

**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

**MAY 2 1 2015**

Ms. Peggy Hobson Calhoun
Board President
Hinds County Board of Supervisors
Hinds County Chancery Court Building
316 South President Street
Jackson, MS 39201

Mr. Tyrone Lewis
Sheriff
Hinds County
407 East Pascagoula Street
Jackson, MS 39201

        Re:    <u>Investigation of the Hinds County Adult Detention Center</u>

Dear Ms. Calhoun and Mr. Lewis:

      The Special Litigation Section of the Civil Rights Division has completed its investigation of conditions at the Hinds County Adult Detention Center ("Jail"),[1] pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.[2]  Consistent with the statutory requirements of CRIPA, we now write to inform you of our findings, the facts supporting those findings, and the minimum remedial steps necessary to address the identified deficiencies.  We conclude that Hinds County ("County") violates the Eighth and Fourteenth Amendments of the United States Constitution by (1) failing to provide conditions of confinement that offer prisoners reasonable safety and protection from violence, and (2) holding prisoners in the Jail beyond their court-ordered release dates.[3]

---

[1]     Our investigation included both the Hinds County Adult Detention Center in Raymond, Mississippi, and the Jackson City Detention Center in Jackson, Mississippi.

[2]     CRIPA authorizes the U.S. Department of Justice to seek equitable relief where conditions violate the constitutional rights of prisoners in state or local correctional facilities.

[3]     For purposes of this letter, the term "prisoner" refers to all individuals housed at the Jail. We understand that various categories of individuals are held in the Jail, including pretrial detainees, people who have been convicted of crimes, people awaiting transfer to another jurisdiction, and people who are being held for nonpayment of child support.



GOVERNMENT EXHIBIT

As you are aware, over the last three years, a series of incidents have caused serious physical harm and posed an ongoing risk of serious harm to individuals in the Jail. These incidents include at least three major riots, two alleged homicides, and numerous assaults on prisoners and staff members. They required closing entire housing units and transferring prisoners to other jurisdictions, where they were difficult to locate by defense attorneys and court officials. Attorney access to clients was interrupted. Tactical teams have been repeatedly called in to restore order to the facility. The situation has been of such concern that in September 2013, the County Circuit Court entered a series of orders directing the grand jury to review Jail conditions with the assistance of an appointed monitoring team. Grand jury consultants and the monitoring team identified a host of serious systemic issues such as inadequate staffing, physical plant deficiencies, and unsound security procedures. As discussed further in this letter, we confirmed many of the same findings during our inspection.

In response to the emergency situation, County officials have tried to take remedial action to address reported Jail deficiencies. The Sheriff and County Board have expended funds to make physical plant repairs, contracted with experienced managers to oversee Jail reforms, and started planning other improvements. However, these actions have not remedied the Jail's fundamental problems. As we detail below, the Jail needs additional qualified staff, an effective classification system, and systemic improvements to the maintenance of physical security features. Harsh practices, such as long-term lockdowns and the confinement of prisoners in unsanitary cells, must cease. Policies and procedures for processing prisoners must be more reliable and efficient, to prevent unnecessary detention. Until the County implements systemic remedies, piecemeal reforms are insufficient.

Thus, despite the County's recent efforts to address systemic deficiencies, we find that longstanding problems with Jail safety and security persist. Many of these problems were described by local grand jury investigations, news reports, and the facility's own incident reports. They continue to pose an unacceptable risk to prisoners in violation of the Constitution.

## I.   SUMMARY OF FINDINGS

Constitutional deficiencies at the Jail violate prisoners' Eighth and Fourteenth Amendment rights. Specifically:

- The Jail does not provide prisoners with reasonable safety and minimum levels of protection from violence by other prisoners and staff members. The Jail lacks sufficient numbers of trained staff to supervise prisoners and to deal with emergencies. The Jail's physical plant poses serious maintenance challenges. Prisoners have exploited physical plant weaknesses to breach secured areas in order to assault other prisoners. The Jail also has a serious contraband problem. Ready prisoner access to weapons, cell phones, drugs, and other illicit materials contribute to the ongoing risk of harm to both prisoners and staff.

- The dangerous conditions in the Jail have resulted in, or contributed to, numerous prisoner-on-prisoner assaults. Gang violence is common, and Jail staff has few tools available to separate rival gang members and others who pose a threat of violence. While

many staff members strive to respond professionally to dangerous working conditions, inexperienced or inadequately trained staff members use force even in situations when such force may be excessive or could escalate tensions in an already dangerous environment.

- Jail understaffing and inadequate recordkeeping and communication systems with the courts have resulted in overdetention of prisoners beyond their court-ordered release dates.

## II.    INVESTIGATION

On June 2, 2014, we notified County officials of our intent to conduct an investigation of the Jail pursuant to CRIPA.  Specifically, we notified officials that the investigation would focus on whether the County protects prisoners from prisoner-on-prisoner violence and use of force by staff members.  On January 20, 2015, we notified County officials that we were expanding our investigation to consider whether the Jail detains individuals without legal authority by failing to release them once there is no longer a legal basis for their detention.

During our investigation, we interviewed administrators, County officials, representatives of the County criminal justice system, prisoners, and staff members.  We reviewed policies and procedures, incident reports, education records, internal investigation reports, grievances, legal complaints, grand jury inspection reports, news articles and numerous other Jail records.  We conducted on-site inspections September 9-11, 2014, and January 27-29, 2015.  We also received correspondence and communicated with concerned members of the community.

County officials cooperated with our investigation.  We would like to specifically thank the Sheriff, Members of the County Board, former Administrator Gatson-Riley, Warden Taylor, Sergeant Hooker, and counsel for the Sheriff and County Board, for their efforts to facilitate our review.  Such cooperation helped clarify issues and expedite the completion of our investigation.

At the beginning of our on-site inspections, County representatives acknowledged many of the concerns that were ultimately confirmed by our investigation.  In recognition of the County's cooperation and in keeping with our pledge to be transparent, we conveyed preliminary findings to County officials at the conclusion of our September on-site visit as technical assistance.  This letter now embodies the formal findings of the Department of Justice.  We appreciate the positive working relationship adopted during our investigation, and we are confident that it will continue as the parties address the egregious conditions described in this letter.

## III.    BACKGROUND

The Jail includes two major facilities operated by the Hinds County Sheriff's Department.  The 594-bed facility in Raymond, Mississippi, was built in 1994 ("Raymond Facility").  The 192-bed facility in Jackson, Mississippi, was built in 1974 ("Jackson Facility").  Juveniles charged as adults and female prisoners are held at the Jackson Facility.  The Sheriff's Department also operates a Work Release Center next to the Raymond Facility.  We did not specifically review conditions at the Work Release Center, because it is a distinct and separate

minimum-security, state-county operation. However, as we will detail later in this letter, the manner in which the Work Release Center fits into the County detention system has an indirect impact on conditions in the other two facilities. To that extent, we address the relationship and its implications for remedying unconstitutional Jail conditions.

## IV.   FINDINGS

We find that the County violates the constitutional rights of prisoners by failing to protect prisoners from serious physical harm caused by other prisoners and by exposing prisoners to an unreasonable risk of harm from the inappropriate use of force by untrained and poorly supervised staff members. We further find that the County fails to meet its constitutional obligation to release individuals from the Jail once the County no longer has a legal basis for the individuals' detention.

### A.   The Jail Fails to Reasonably Protect Prisoners from Serious Harm.

We find that the Jail does not meet its obligations under the Eighth and Fourteenth Amendments to protect prisoners from serious harm, *see Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and a substantial risk of serious harm, *see Helling v. McKinney*, 509 U.S. 25, 33-35 (1993); *see also Stokes v. DelCambre*, 710 F.2d 1120, 1124-25 (5th Cir. 1983) (holding that jailers must provide prisoners "reasonable protection" from injury by other prisoners); *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 482 (5th Cir. 2014) (officials liable for failure to take reasonable measures to abate serious risk of harm). Because they have not been convicted of any crime, pretrial detainees are protected by the Fourteenth Amendment from "punishment per se," while individuals convicted of a crime are protected by the Eighth Amendment's prohibition against "cruel and unusual punishment." *Jones v. Diamond*, 636 F.2d 1364, 1368-370, 1373-74 (5th Cir. 1981) ("*Jones II*") (subsequent history omitted). In making this finding, we draw three conclusions. First, Jail conditions are unsafe by any objective measure. Second, the conditions have resulted in harm or serious risk of harm to prisoners. Third, the County has not corrected known systemic deficiencies that contribute to violence at the Jail. *See generally Farmer*, 511 U.S. at 833-38; *cf. Ramos v. Lamm*, 639 F.2d 559, 573 (10th Cir. 1980) (upholding district court finding that state failed to protect inmates from violence from other inmates).

   1.   Jail Conditions Are Objectively Unsafe.

Under the Constitution, officials must take precautions to protect prisoners from violence, and are "not free to let nature take its course." *Farmer*, 511 U.S. at 833-34. This means officials must have systems in place to ensure objectively reasonable levels of safety and supervision. Required security systems can include having sufficient numbers of trained personnel to deter violence and policies for the safe housing and monitoring of prisoners. Required security policies can further include a classification system to separate prisoners based on identified security concerns, such as whether an individual has been convicted of serious crimes or has other individual characteristics that may affect housing decisions. *See Jones*, 636 F.2d at 1373-76; *Jones v. Diamond*, 594 F.2d 997 (5th Cir. 1979) (addressing classification as an appropriate remedy for violence stemming from failure to appropriately separate prisoners); *Gates v. Collier*, 501 F.2d 1291, 1309-310 (5th Cir. 1974) (lack of classification, supervision, and other factors may together result in a constitutional violation); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014

(11th Cir. 2001) (en banc) (lack of classification and risk assessment system constitutes deliberate indifference where inmates were harmed by other inmates because housing assignments did not account for the risk violent prisoners posed), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Jensen v. Clarke*, 94 F.3d 1191 (8th Cir. 1996) (failure to account for size, age, or length of sentence of inmates entering facility in determining appropriate housing assignment may amount to deliberate indifference); *Jones v. Gusman*, 296 F.R.D. 416, 431-443 (E.D. La. 2013) (Constitution could require improved staffing, contraband controls, classification, and facility maintenance).

The Jail lacks many of these basic systems for ensuring a safe facility. More specifically, the Jail lacks (a) sufficient staff to supervise prisoners, (b) effective security and classification policies, (c) working security equipment and well-maintained physical plant, and (d) adequate control over the introduction of contraband into the Jail. Notwithstanding recent improvements in these areas, the County has failed to fully correct these deficiencies, and the Jail remains an unsafe place for prisoners.

### a.   Inadequate Staffing and Staff Training

"Confinement in a prison where terror reigns is cruel and unusual punishment. A prisoner has a right to be protected from the constant threat of violence . . . ." *Jones*, 636 F.2d at 1373 (internal citations omitted). To provide such protection, Jail officials must supervise prisoners by providing adequate numbers of qualified security staff and may not leave prisoner safety to the prisoners themselves. *See Gates*, 501 F.2d at 1309-310; *Jones*, 296 F.R.D. at 431-33 (holding that relief was warranted to address "mutually reinforcing effect" of inadequate classification, staffing, and other security components). In Hinds County, grossly deficient staffing is the most immediate problem facing the Jail. This deficiency affects every operation and is both a direct and indirect cause of many of the Jail's constitutional deficiencies. Without adequate staffing, the Jail cannot supervise prisoners, deter violence, or properly respond to emergencies. The staffing problem involves both the number of staff members and their qualifications.

Budgeted staffing is very low, with only a few staff members assigned to control rooms and housing units. Moreover, the staff turnover rate is very high, which exacerbates an already unsafe situation. The vacancy rate is approximately *80%* at the Raymond Facility, and *50%* at the Jackson Facility. As a result of poor staffing, we found a pattern and practice of poor prisoner supervision. This pattern included: (a) poorly-staffed control rooms, where the officer on duty handles multiple tasks (*e.g.*, monitoring cells, responding to alerts, and controlling doors) without sufficient assistance; (b) poorly-staffed housing pods, where as few as one or two officers supervise hundreds of prisoners in different units without adequate backup; and (c) low levels of staffing even in high risk areas, as exemplified by a lack of documented welfare checks on suicidal and high security prisoners.

Low staffing levels contribute directly to the rampant Jail violence. For example, on January 16, 2014, an officer reported witnessing a cell door being opened by the pod control room operator. The officer reported that he had never instructed pod control to open the door. When the prisoner in the cell came out into the dayroom, ten other prisoners attacked him. They

beat him with a broom, and broke it in two. They punched him in the face. The officer reported that he had no radio to call back up. Accordingly, the officer had to beat on a door for thirty minutes, asking pod control to open the door. During that time, the prisoners continued to beat the victim. One month later, on February 19, 2014, a prisoner reported being attacked by thirteen other prisoners, and reported that the shift deputy never intervened.

Many Jail employees also lack training and experience. In Mississippi, staff members can start working in the Jail without having completed the state's 96-hour jailer training course. They only have to complete the training program within two years of employment. The Jail has its own pre-service training program, but until January 2014, staff members could begin work without completing the program. At the time of our September tour, some staff members were on the job who still had not completed the Jail's program. Allowing untrained staff members into a facility is problematic in itself. But conditions are especially bad in the Jail. With very few staff members and high turnover rates, Jail administrators assign junior staff members to even the most challenging positions. At the Raymond Facility, we learned that staff members with only a few months on the job may be assigned to gang units. Other inexperienced staff members have to manage prisoners with mental illness and prisoners who have engaged in violent behavior. Staff members with just a few years of experience become supervisors with even more difficult responsibilities. For instance, junior personnel have been assigned to monitor suicidal prisoners and to process prisoners for release. Both of these areas involve significant responsibility and risk beyond the norm for Jail operations.

We recognize that the Jail has made progress in developing policies, procedures, and post orders, which can serve as a focus for training and can help professionalize staff. Policies, procedures, and post orders are not consistent between facilities, however, and staff members lack proper understanding of them. For instance, during our September 2014 site visit, staff members had placed a prisoner in a grossly inappropriate housing area, in apparent violation of facility procedures. We were touring an isolation unit, and our consultant asked to inspect some of the cells. Staff members told him that two of the cells were out-of-service and should not be occupied. When we tried to enter the cells, the staff members could not open one cell at all. When they opened the other one, we were surprised to find that it contained a prisoner. It turned out that the prisoner had spent the past three weeks in this cell, without properly functioning plumbing and in horrible living conditions. The cell stank, and the floor toilet was clogged with urine-soaked blankets and cloth. Knowing where prisoners may, or may not, be housed is a basic job responsibility. Staff should know their unit's system for designating an occupied cell and how they are supposed to determine which prisoners are in their charge. Post orders and training help staff members develop the necessary familiarity with such systems, and errors of the sort that apparently occurred in this case should not happen.

Staff members assigned to critical posts, such as the booking area and control rooms, conveyed to us different understandings of what constitutes a post order. Some could not locate them without prompting by other officers. A number of officers have been signing forms that indicate that they have received their post orders every time they report to the post. This practice is itself a troubling indication that staff members do not really understand the function of post orders and training. The reason jails maintain such signature sheets are that they help establish that staff has been trained on their post orders (*i.e.*, the specific responsibilities for a post). There

is no reason for staff members to review and sign these documents repeatedly.  Indeed, the practice strains already limited resources.

> b.     Ineffective Implementation of Adequate Security and Classification Policies

Protecting prisoners involves more than just assigning officers to monitor housing units. Policies and procedures should also separate potential victims from predators, convicted prisoners from detainees, and include other mechanisms for ensuring safe living conditions. When officials fail to protect prisoners from violence, the Constitution may impose a specific obligation upon them to adopt security and classification procedures designed to abate the risk of violence. *Jones II*, 636 F.2d at 1373; *Jones*, 296 F.R.D. at 431-35.  A safely operated detention facility should have an effective classification system to assess prisoners' likelihood of harming or being harmed by other prisoners, and to house prisoners based on their risk level.  *See Gates*, 501 F.2d at 1309-310 (lack of classification, supervision, and other factors may together result in a constitutional violation); *Marsh*, 268 F.3d at 1014 (lack of classification and risk assessment system constitutes deliberate indifference where inmates were harmed by other inmates because housing assignments did not account for the risk violent prisoners posed); *Jensen*, 94 F.3d at 1191 (failure to account for size, age, or length of sentence of inmates entering facility in determining appropriate housing assignment may amount to deliberate indifference).

Adequate classification systems assess individual risk factors, such as their age, size, institutional history, charges, and "special needs" (*e.g.*, whether the prisoner is suicidal or has a mental illness that requires additional supervision).  Prisoners must then be housed in accordance with their classification such that lower risk prisoners may be housed together in minimum security units, while the most predatory prisoners will be placed in more secure units.  This also helps administrators allocate personnel based on security concerns.  Prisoners with lower level security classifications can be placed in areas with lower staffing levels, while other classifications may require higher levels of supervision.

The Jail has very recently drafted forms and policies for a classification system.  But the Jail cannot implement the classification system, because it lacks both the staffing and housing options required.  An effective classification system integrates classification assessments with housing assignment and supervision procedures.  So prisoners deemed to be higher security risks are placed in more secure units with higher levels of supervision.  Thus, the County needs to ensure that there are both secure housing facilities and sufficient staff to implement a classification system.  Merely writing a policy or even training a few officers to serve as classification staff is not sufficient.  The Jail's violent history and widespread deficiencies have made it difficult to implement any type of classification system.  At times, because of the riots, so many cells have been unavailable that the Jail has been forced to house prisoners together without adequate regard for security and classification concerns.  Without a proper classification system, the Jail has not been able to consistently identify and separate potentially violent prisoners from potential victims, known enemies, and gang members.  The Jail also does not have enough custody staff or high security cells to appropriately separate and monitor prisoners with behavioral problems or prisoners with special needs (*e.g.*, prisoners requiring suicide observation).

8

With regard to gangs in particular, instead of making individualized housing decisions for each gang member, the Jail currently has a default process of housing all the members of a gang together in some of the same units. This is a counter-productive policy as it actually strengthens gangs, and, in the absence of adequate staff, creates more opportunities for violence. It also reinforces staffing problems, because inexperienced staff members find themselves in dangerous working conditions and soon leave.

A number of incidents at the Jail have involved gang violence, both between gangs and by gang members against their own followers. For example, on May 5, 2014, a prisoner with a family gang history that made him a potential target for a rival gang was reportedly placed in a housing unit with enemies. The other prisoners reportedly managed to pop open their cell doors to threaten the prisoner. Less than two months later, on July 1, 2014, gang members assaulted a rival. A nurse requested hospital transport for the victim. The gang members then threatened two more rivals who were being housed in their unit.

Similarly, the lack of a classification system has also led to poor management of juveniles. The Jail does not properly separate juveniles from adults. The juvenile housing units are located within sight and sound of adult prisoners, a practice that grossly departs from federal standards and exposes juveniles to potential predation by adults.[4] In sum, the Jail's housing and classification policies, or rather, the lack thereof, are unacceptable by any reasonable standard.

     c.     Physical Plant-Related Security Issues

The Constitution also requires that officials provide prisoners with adequate shelter, which includes maintaining facility conditions in a manner that promotes prisoner safety and health. *See generally Helling*, 509 U.S. at 32; *Jones*, 296 F.R.D. at 433-34, 452-53; *Ramos*, 639 F.2d at 573 (noting, among other security deficiencies, that the physical structure of the prison resulted in "numerous 'blind areas' where violence, threats, and other illegal activities can occur without detection by prison officials"). The Jail buildings have a number of physical plant-related security issues that contribute to the unreasonable risk of serious harm from prisoner violence. At the Raymond Facility, the most glaring structural problems are well-known, and include defective locks, cameras, and alarms, as well as structural design issues and weaknesses with the building and its perimeter. These problems allow prisoners to leave supposedly secure areas, to obtain contraband, and to improperly associate with or assault other prisoners. The County's failure to correct these issues poses a serious risk to prisoner safety and health. *See*

---

[4]     Such deficiencies violate the Prison Rape Elimination Act, 42 U.S.C. § 15601, and its implementing regulations, which mandate a number of safeguards to prevent sexual assault against prisoners and juveniles. *See* 28 C.F.R. § 115.14(a) ("A youthful inmate shall not be placed in a housing unit in which the youthful inmate will have sight, sound, or physical contact with any adult inmate through use of a shared dayroom or other common space, shower area, or sleeping quarters."). Housing juveniles with adults has long been a disfavored practice under federal law. *See, e.g.,* Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. §§ 5601, 5633 (requiring sight and sound separation of juveniles held in adult detention facilities); *Jones*, 296 F.R.D. at 434 (relief appropriate to address poor classification practices, including the failure to separate juveniles from adults).

*Stokes*, 720 F.2d at 1124-26 (holding Sheriff liable for failure to repair obstructed viewing panel and address other conditions that led to assault on prisoner); *Gates*, 501 F.2d at 1300-02 (observing that courts must act if physical conditions pose "grave and immediate threat to health or physical well-being" (internal citations omitted)).

Further, there are indications that too many staff members exhibit a culture of tolerance towards significant physical plant problems. We observed several examples of damage to critical Jail facilities that had apparently been in place for weeks or longer, such as a broken sally port door, a hole burned in a security observation window, a disabled door control system, and a damaged roof. The sally port door, a critical part of the Jail's outer security perimeter, had been inoperative for weeks prior to our tour. The hole in the window could not have been made quickly. Instead, prisoners apparently had the opportunity to remove wires from cell lighting, use the wires to create a make-shift electric torch, and then gradually burn a hole in a glass-polycarbonate window. Similarly, maintenance reportedly opened a hole in a wall at the Jackson Facility to repair plumbing several months before our inspection. As part of the repair, they shut off electricity to a cell block across the hall. This affected electric door controls, which remained inoperative for the entire period. Prisoners have repeatedly breached the roof in order to get closer to the Jail's security perimeter and obtain contraband.

These physical plant deficiencies contribute to the ongoing risk of harm from the rampant prisoner violence at the Jail. For example, on January 10, 2014, gang members allegedly assaulted a prisoner for not participating in gang activities. An officer discovered that doors on the unit had been "rekeyed with bars of soap," and "covers over the manual overrides were all pushed open." The next day, another prisoner reported being "jumped" by members of the same gang. Just one month later, on February 18, 2014, prisoners attacked another prisoner for violating "the rules of the" gang. An officer reported that there was "no radio in unit."

The County has recently renovated some areas of the Raymond Facility, which now have relatively secure locks, ceilings, and doors. The County has also made some changes to how maintenance is handled. County maintenance personnel also provided us with printouts of their work orders, which suggest there is some system in place to handle maintenance. However, the measures are not sufficient given the extent of physical plant problems and other security issues. We find that despite the improvements, the Jail's physical plant remains a serious concern. Again, staffing and administrative policies are likely the key. In the absence of sufficient staff to maintain order, even renovated areas are quickly damaged. It is only a matter of time before unsupervised prisoners find any weaknesses in the *ad hoc* improvements.

     d.     Uncontrolled Contraband, Including Weapons and Drugs

The lack of adequate staffing and security exacerbates a serious contraband problem. Contraband, in turn, poses a security threat, because weapons, currency, drugs, and other items facilitate violence. *See generally Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1519 (2012) ("Weapons, drugs, and alcohol all disrupt the safe operation of a jail."); *United States v. Ward*, 561 F.3d 414, 417 (5th Cir. 2009) (observing that dangerous contraband is a unique challenge for prisons); *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 328 (3d Cir. 2014) (noting that "the Supreme Court approved searches of inmates and their cells to discover contraband in order to . . . prevent violence against correctional staff and

other prisoners [and] to prevent suicides" (citing *Hudson v. Palmer*, 468 U.S. 517, 526 (1984))); *Jones*, 296 F.R.D. at 433-34 (requiring procedures to minimize amount of contraband).

The Jail's contraband problem reflects the broader problem of poor prisoner supervision. Searches at the Jail regularly reveal weapons in the form of home-made knives (shanks), as well as items that are being smuggled in from the outside, such as marijuana, lighters, and cell phones. For instance, in June and July 2014, the staff found approximately a dozen or more cell phones per month at the Raymond Facility alone. In May 2014, they found nearly two dozen. An October 2014 grand jury report noted that while inspecting the Jail, the members themselves saw a prisoner with a cell phone. The grand jury members were apparently quite surprised that someone would so flagrantly violate the contraband rules, as the members noted that a prisoner's mere possession of a cell phone is a felony in Mississippi. Incident reports describe prisoners "fishing" for contraband left outside near their broken cell windows. Some reports read like illicit shopping lists—the volume of contraband is remarkable. For instance, in one incident, staff found 17 cell phones, a pound of marijuana, and 12 phone chargers on a single prisoner. During a perimeter search, staff found two carry-on bags filled with contraband. During his inspection, our corrections consultant smelled tobacco burning in every wing except the women's wing of the Jackson Facility.

2.   The Jail's Unsafe Conditions Result in Serious Harm, and Risk of Harm, to Prisoners.

In recent years, the Jail has been the site of rampant violence. In the past three years, there have been several major disturbances, including at least three riots. A 2012 riot rendered one of three housing units at the Raymond Facility uninhabitable until 2014. Another riot in 2014 resulted in the alleged murder of a prisoner by another prisoner. During the riots, prisoners were able to overpower staff, breach doors, and enter sensitive security areas. Other serious incidents include fights between groups of prisoners and a homicide. For example, in 2013, a prisoner with a reported history of mental illness allegedly murdered his cellmate. All of these disturbances and major incidents implicate systemic deficiencies with Jail security, such as inadequate staffing, inoperative security equipment, the use of contraband weapons, and unsound classification and housing supervision policies. These dangerous conditions have repeatedly resulted in serious harm to prisoners, and continue to pose a risk of serious harm from both prisoner-on-prisoner violence and staff-on-prisoner violence.[5]

a.   Prisoner-on-Prisoner Violence

Our review confirmed that despite improvements, the Jail remains an unacceptably dangerous environment, where the risk of severe violence among prisoners is unabated. Over the past year, facility incident reports illustrate gross security deficiencies and the Jail's persistent, systemic failure to protect prisoners from serious harm or risk of harm. *See Helling*, 509 U.S. at

---

[5]   As discussed below, other factors have contributed to and exacerbated the situation. These include the excessive use of lockdowns, harsh security measures, unsanitary conditions, and strains in the Jail's relationship with other parts of the criminal justice system.

33-35. At the time of our most recent inspection, Jail staff members were still documenting several fights a month between prisoners, or prisoners and staff.

Prisoner assaults are likely underreported. Jail records document several troubling incidents a month where prisoners inexplicably "fall" or suffer other unexplained injuries that are not fully investigated. Some of these incidents provide at least circumstantial evidence that prisoners fear retaliation, or additional violence by other prisoners, if they were to report being assaulted. In one December 2014 example, a staff member reported that a prisoner may have been repeatedly threatened, extorted, and stripped of his food by other prisoners. The victim was apparently so afraid to return to his cell that he disobeyed staff when they told him to do so. The staff then used force on the prisoner. The prisoner reportedly suffered injuries and required hospital care. Staff did not investigate or corroborate some of the allegations of victimization. Still, the alleged facts suggest that at minimum, a prisoner was in such fear of prisoner violence that he was willing to refuse a staff member's instruction to return to his housing area and risk being disciplined.[6]

As noted throughout this letter, many serious recent incidents documented in facility incident reports illustrate longstanding security deficiencies, such as a lack of sufficient staff to detect and remove contraband and ensure prompt response to violent incidents, the failure of locks and other security equipment, and the practice of housing rivals and enemies together without sound classification and housing assignment procedures.

      b.     Staff Use of Force

The harm prisoners suffer arises not only from other prisoners, it also sometimes occurs as a result of staff use of force. In such a dangerous facility, it should not be surprising that some Jail violence involves the staff's use of force. In a troubling number of cases, officers appear to have used excessive, or at least facially problematic, force. We found major systemic deficiencies, as well as a pattern of serious incidents, that indicate that the Jail lacks appropriate policies and procedures to prevent, investigate, and hold officers accountable for excessive use of force.

The Constitution requires the County to operate the Jail in a manner that protects prisoners from *all* conditions that pose "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (discussing objective requirement for claims based on a failure to prevent harm). This obligation includes requiring the County to implement appropriate training and oversight procedures to prevent the misuse of force. *Id.*; *see generally* Steve J. Martin, *Staff Use of Force in United States Confinement Settings*, 22 Wash. U. J.L. & Pol'y 145, 146 (2006) (observing that "staff use of force is inherently dangerous"); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting

---

[6]     This type of incident illustrates why security requires a well-developed system of classification, supervision, and investigation. A good classification system identifies prisoners who may be vulnerable to violence, and allows staff to move prisoners if they are victimized. Good internal administrative procedures allow prisoners to safely and confidentially request staff assistance, and for staff to investigate suspected incidents of violence or predation even if a victim does not complain.

that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination'" (emphasis omitted)); *Jones*, 296 F.R.D. at 439-440, 442 (approving consent judgment that included, among other things, measures to address deficiencies in supervision and investigation of staff uses of force, which adversely impacted inmate "safety and security"). Any failure to remedy such deficiencies is as problematic as a failure to correct other conditions that result in harm or serious risk of harm to prisoners.

        i.      Prisoners have suffered actual harm from the improper use of force.

We found incidents where staff members used force in situations where such use was facially problematic, particularly situations in which force was used as a coercive tool rather than as a proportionate response to a threat posed by a prisoner. *Kitchen*, 759 F.3d at 477. Chemical munitions and tasers appear to be routinely used as coercive (offensive) tools rather than for their designated purpose as defensive measures. *Cf. Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." (internal quotation marks and citations omitted)).

In one instance, an officer used a taser on a prisoner who reportedly refused to comply with an order. In itself, refusing an order does not necessarily warrant the use of force. Rather, the legal standard typically requires a stronger justification for incapacitating a prisoner. In this case, there was no indication that the officer was acting in self-defense and the limited information provided in Jail records suggest that the use of force was disproportionate to the violation. As our consultant noted, "[t]he officer and his supervisor obviously have no idea what a taser is designed to do"—tasers are not meant "to be a pain compliance tool." Normally, using corporal punishment to ensure prisoner obedience to instructions is not acceptable. *See, e.g.*, *Gates*, 501 F.2d at 1305-06. Otherwise, allowing the immediate use of force on anyone who fails to comply with an order opens the door for even more serious abuses. What is particularly problematic in this case is that there was no evidence of any corrective action. Even if the force was justified, the Jail should have conducted a closer review of the incident to ensure that the officer complied with policy and law.

In another case, an officer ordered a canine to bite a prisoner during an otherwise non-violent encounter. The basis for using force was that the prisoner supposedly refused an order. A dog can cause severe injuries, and even death. In our view and that of our consultant, using such a level of force in the reported circumstances was inappropriate. The officer involved in the canine incident was reprimanded, but the disciplinary action was for technical reasons— the officer had failed to notify his immediate supervisor of the incident and had disobeyed an order given by his immediate supervisor to keep a safe distance between himself, his K-9, and a prisoner. The implication was that the incident was an accident. Notably, records indicate that the officer expressly directed the dog to bite the prisoner. Yet, there appears to have been no documented investigation or action taken regarding the officer's potential misuse of force. Nor was there adequate documentation as to why the officer did not utilize a less dangerous approach.

When incidents occur, the County does not respond adequately to correct or prevent future abuses. As a result, the harm that results from use of force may actually be under-reported. The County bears some responsibility because Jail policies and training do not ensure full, accurate reporting and review of the use of force. For instance, the policies do not establish what responsibilities, if any, the Jail Administrator, wardens, or other supervisors have in reviewing use of force. Existing documentation is too sparse to ensure meaningful administrative review. Our consultant examined dozens of incident reports—including the ones described above—and could not find any in which the supervisor even indicated agreement, disagreement, or a need for follow-up action. Instead, supervisors simply signed the reports. As our consultant noted, "their signatures appear to be of little value." Even more troubling, sometimes the supervisor who signed a report participated in the use of force he or she was ostensibly reviewing.

> ii.   Deficient Jail policies and systems pose a substantial risk of
>        serious harm to prisoners from the misuse of force.

In addition to actually causing harm, the County's failure to implement necessary policies and systemic safeguards needed to deter, identify, and address the improper use of force poses an ongoing unconstitutional risk of serious harm to prisoners. We found that the Jail does not have adequate (a) policies and training for officer use-of-force; (b) administrative mechanisms to review uses of force against prisoners; (c) command staff authority to hold staff members accountable for violations and to address operational concerns; and (d) technological safeguards to prevent or uncover improper uses of force. In combination with the other conditions that create a dangerous Jail environment, such deficiencies have resulted in serious risk of harm from the improper use of force.[7] *See generally Kitchen*, 759 F.3d at 480-85.

Jail standards for triggering an administrative use-of-force investigation are vague and inadequate. For more serious incidents, such as when officers use force that appears to be excessive or in breach of policy, the Jail should conduct administrative reviews above the immediate supervisor level. Such reviews would evaluate the use of force to determine whether it was excessive under applicable law and policy. When appropriate, an adverse finding should lead to re-training or even disciplinary action. The Sheriff's internal affairs office is reportedly responsible for conducting such use-of-force investigations. In practice, however, the Sheriff's Department has not conducted a single use-of-force investigation at the Jail in the past year— something our corrections consultant described as *"incomprehensible."*

Jail policies further weaken supervisory oversight of staff by limiting the personnel authority of top administrators. For instance, the Jail Administrator has no authority to transfer staff to or from the Work Release Center, which has much better staffing, in order to increase the number of staff available in those sections of the Jail that are most in need of staff. She also has

---

[7]   Besides the risk that they may utilize excessive force, poorly supervised and trained staff also pose a general security risk to the entire Jail. For example, in June 2014, a fight broke out in a housing unit. While one officer deployed a taser against a prisoner, another officer pulled two other prisoners involved in the fight *into a control room*, a very unsafe situation that could have placed even more prisoners and staff in danger.

no authority over a tactical team used to conduct searches and respond to major disturbances. During our tour, a number of prisoners, including juveniles, reported that the tactical team used force upon them during cell searches. One juvenile we saw had a broken tooth and another had obvious bruises. Even if members of the tactical team had submitted use-of-force reports, which does not appear to be case, the Jail Administrator would likely have had little authority to discipline the officers on her own. Not every use of force warrants criminal review or even an internal affairs referral. However, supervisors need the authority to review use of force incidents by any officers who operate in their facility, because those supervisors are responsible for the treatment of prisoners in their custody. Under the current organizational structure, the Jail Administrator lacks the necessary authority to oversee all of the staff members operating in the County's detention facilities.

As a result, even when use-of-force reports facially indicate that improper or even dangerous force may have been used against a prisoner, there is little or no effective administrative review. For example:

- January 9, 2014: A prisoner told escorting officers that he was going to assault them once released from his handcuffs and leg irons. Once removed from his restraints, the prisoner raised his hands and said: "Now what [expletive]'s." An officer then punched the prisoner in the nose and wrestled him to the ground.

- February 1, 2014: One officer reported that another had "boastfully" informed her that "he had dry tased a [juvenile] inmate by placing the Taser slightly on the inmate's butt."

- May 6, 2014: An officer reported observing a struggle between a colleague and a prisoner. Other officers separated the individuals and took them to another area, where the two continued to argue and fight. The reporting officer noted that "it seems like the situation was getting worser an worser [sic]," and he had "never seen [his colleague] this upset." He and other officers had to pull their colleague away from the prisoner. The officer indicated that his angry colleague "overpowered us all several times as well" and may have thrown a "couple head butts" at the prisoner.

- July 15, 2014: A supervisor found an officer fighting with a prisoner. The officer had the prisoner in a headlock, and both prisoner and officer were "scuffing and talking trash to each other." After other officers arrived, they "succeeded in pulling them apart."

In these and other incidents, the Jail's records describe a problematic use of force—such as force used when an officer is acting out of control or using force under questionable circumstances. Even the limited information provided should have raised questions as to whether at least some force was inappropriately exercised. *See generally Mann v. Failey*, 578 F. App'x 267, 275 (4th Cir. 2014) (per curiam) (reversing grant of summary judgment to prison officials on excessive force claims where "there is ample support for an inference that 'summary, informal, unofficial and unsanctioned corporal punishment' was employed in retaliation for [the prisoner]'s attack" (quoting *Ort v. White*, 813 F.2d 318, 324 (11th Cir. 1987))). However, it appears that no further investigation, review, or corrective action occurred.

As with other parts of the physical plant, technological safeguards against abuses are non-existent or inoperative at the Jail. Such technology is often very useful to correctional administrators in monitoring staff as well as prisoners. When staff members know that their actions may be monitored by others, they may be deterred from engaging in misconduct. Many of the Jail cameras are broken, and there is no portable means of video-recording serious incidents. So when violence breaks out, including staff use of force, many sections of the Jail lack cameras to record what actually occurred. The Jail layout does not allow staff to directly observe what may be occurring in many parts of the Jail. Combined with inadequate staffing, training, and reporting, these types of deficiencies make it much harder for supervisors to oversee staff, review uses of force, and deter abuses.

3.    County Officials Have Long Known of the Unsafe Jail Conditions.

Under the Constitution, County officials may not be responsible for unforeseeable harm, but when they have notice of constitutional deficiencies, they must act responsibly. *See Farmer*, 511 U.S. 835-38 (subjective "deliberate indifference" towards objective conditions that pose a serious risk to prisoners violates the Constitution); *Marsh*, 268 F.3d at 1028 ("Plaintiffs' allegations that the County received many reports of the conditions but took no remedial measures is sufficient to allege deliberate indifference to the substantial risk of serious harm faced by inmates in the Jail."). Case law promotes or requires many of the policies, procedures, and safeguards that we describe in this letter, placing the County on notice of obvious ongoing harm at the Jail. For instance, the Fifth Circuit has long required corrections officials to protect prisoners from violence, train staff, review serious incidents, deter physical abuse, and investigate violations of prisoner's rights. *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Here, County officials have long known that the facility lacks the systems required to protect prisoners from violence yet have failed to remedy serious safety and security deficiencies. Local grand jury reports, news articles, and court-appointed monitors have identified many of the same problems that we cite in this letter. For instance, a 2013 consultant report prepared for the County Grand Jury identified many of the same issues that we identified during our review, including staff vacancies that prevent adequate supervision of the Jail; inadequate training; inadequate maintenance of physical security systems; inadequate classification; inadequate administrative command structures; and problematic policies that result in the detention of more prisoners for longer periods than may be appropriate or necessary. *See* James Austin, Robert Harris, Kenneth McBride, Hinds County Detention Center Jail Assessment Report (Sept. 10, 2013) ("Austin Report").

Staff members have also repeatedly reported problems with Jail security. Staff annotations on incident reports confirm a dangerous working environment, with exhausted officers expressing frustration over systemic deficiencies, such as the poor physical state of their equipment and staffing challenges. For example, in a July report, a detention officer complained that prisoners were running rampant through a housing unit and repeatedly popping open security doors. The officer wrote: ***"The doors ... are not secure and inmates easily pop them, this is unsafe and needs immediate attention**—especially since almost every shift is working with one officer and one person in"* critical security posts (emphasis added). In another July

incident report, an officer described making a mistake by opening multiple cell doors to facilitate pill call. In apologizing for his actions, he wrote: "It's my fault. It will never happen again and I am sorry. *We are just run so ragged. So few of us. So worn out*" (emphasis added).

Jail records reveal numerous reports of equipment malfunctions, violence, and facility maintenance problems. To illustrate, broken radios were so common that we found a cluster of incident reports on that problem alone:

- January 15, 2014: A fight broke out between two prisoners. One of the prisoners had to be taken to medical. An officer reported that "[*b*]*ack up took for every* [sic] *to come because their* [sic] *was no radio's* [sic]" (emphasis added).

- January 15, 2014: Several prisoners affiliated with a gang attacked a prisoner affiliated with a rival gang with the handle of a broken broom. The assaulted prisoner suffered a deep laceration on his forehead and bruising on the side of his head. Afterwards, another prisoner "tried to excite a riot" by encouraging retaliation by other gang members. An officer noted that staff ordered a lockdown, but some prisoners broke out of their cells. The officer reported "I had no radio to call for back up. *We need radios that work… I did my best to protect* [*the assaulted prisoner*] *and get him to safety. I wish there was more I could have done*" (emphasis added).

- February 18, 2014: A prisoner tried to set himself on fire. The responding officer "exited the unit to get assistance *because of no radios* [sic]" (emphasis added).

These security problems have persisted beyond our initial September 2014 on-site inspection, as we continued to review incident reports and other documents showing serious systemic deficiencies similar to those that have plagued the Jail for years. For instance, staff found cell phones, chargers, and weapons during routine searches on December 11, 2014; January 2, 2015; and January 14, 2015. They also continued to find tampering with the physical plant, which could seriously jeopardize institutional security. One notable breach was a December 12, 2014 incident where staff found a door hinge that was no longer secured by screws.[8]

In sum, our corrections consultant's overall impression is that the Raymond Facility "is out of control," and conditions at the Jackson Facility are not much better. Without substantial improvements to staffing, training, security, classification, physical plant, and contraband controls, the County will not be able to restore conditions required to ensure security and humane prisoner treatment. While we commend County officials for trying to make improvements, we

---

[8]     Recent escapes also indicate continued problems with Jail security. *See* R.L. Nave, *4 Men Escape Downtown Jail, Search Ongoing*, Jackson Free Press (Apr. 2, 2015), http://www.jacksonfreepress.com/news/2015/apr/02/4-men-escape-dowtown-jail-search-ongoing/#_; *3 Inmates Escape In Jackson Jail; 2 Caught*, Clarion Ledger (May 4, 2015), http://www.clarionledger.com/story/news/2015/05/03/inmates-escape-jackson-jail-caught/26843937/.

must conclude that they have much more to do before they meet their constitutional obligations. Conditions continue to violate prisoners' constitutional right to reasonable safety and protection.

## B.     The Jail Imprisons People Beyond Court-Ordered Release Dates.

We also find that the Jail has imprisoned people without legal basis for days and months. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). "Even if an inmate's initial confinement was justified by a constitutionally adequate basis, that confinement cannot constitutionally continue once that basis no longer exists." *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 275 (D.D.C. 2011) ("*Barnes II*"); *cf. Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993) (recognizing "[t]he constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release"), *modified*, 15 F.3d 1022 (11th Cir. 1994); *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1969) ("There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence."). Accordingly, "courts recognize that inmates' due process rights may be violated if they are not released within a reasonable time after the reasons for their detentions have ended." *Barnes*, 793 F. Supp. 2d at 275 (collecting cases).

"[T]he great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues, and that after some period of hours—not days—a presumption of unreasonableness, and thus unconstitutionality, will set in." *Barnes v. District of Columbia*, 242 F.R.D. 113, 117 (D.D.C. 2007); *see, e.g.*, *Berry v. Baca*, 379 F.3d 764, 773 (9th Cir. 2004) (reversing grant of summary judgment in favor of county sheriff where plaintiffs contended they were detained twenty-six to twenty-nine hours after a court ordered their release); *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2003) (noting that "even a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment"); *Barnes II*, 793 F. Supp. 2d at 272 (granting summary judgment in part to people who had not been released by midnight of the day a court ordered them released); *Green v. Baca*, 306 F. Supp. 2d 903, 919 (C.D. Cal. 2004) (rejecting defendants' argument that a twelve and a half hour delay in release is reasonable as a matter of law).

During our investigation, and as explained in more detail below, we reviewed over 100 prisoner records—either the hard copy file or information contained in the Jail Management System ("JMS"). We reviewed hard copy records for sixty individuals listed on the Jail's booking list as having been detained thirty or more days.[9] We also reviewed JMS entries for over forty people detained thirty or more days, and, when a JMS entry indicated possible unlawful detention, we reviewed the corresponding hard copy record. Finally, we reviewed nine hard copy records for people brought to our attention through prisoner correspondence, news articles, our September site visit, and Court Administrator emails to the Jail inquiring about the status of a person's release. Based on our review of these records, we found that the Jail has held

---

[9]     Narrowing our review to people housed thirty or more days allowed us to eliminate people housed for only a short time or no time, such as people who picked up an indictment at the Jail and therefore were "booked" into the facility, but nonetheless were released the same day because they already had posted bond.

at least twelve people past midnight on the day they were ordered released, and up to *seventy days* after a court ordered their release.

    1.    Release Procedures and Recordkeeping at the Jail

According to the records supervisor, the Jail handles about 15 releases per day. Court orders that a person be released arrive at the Jail in two ways. The Hinds County Justice Court, Hinds County Chancery Court, and Jackson Municipal Court each send their orders to the Jail by fax throughout the day. Although the Jail prefers to receive orders by email, we were informed that an undefined IT problem prevents correspondence by email with these courts. The remaining courts—the Hinds County Circuit Court and Hinds County Court—send their orders by email. Some orders state that the person should be released that day. Others state that, if the person is not indicted by a certain date in the future, the Jail should release them. We were informed that there is no way for the Jail to print out a list of every person who is supposed to be released on a given day.

The Jail tracks inmate bookings and releases in JMS. JMS was rolled out the week of May 19, 2014, and does not contain accurate release information for inmates released before or during that week. Only the Jail has write-access to JMS. Court personnel and attorneys reportedly have limited read-access to view certain entries; they cannot enter or change information.

The Jail was unable to provide a list of people who had been detained past his or her court-ordered release date. The Jail attempted to provide us with lists of all bookings and releases between June 1, 2014, and January 27, 2015. We are not confident in the completeness or reliability of the lists. Some people listed as booked and released during the relevant time frame on one list do not appear on the other. Other people are listed both as having been released and as being currently housed at the Jail. The Jail was unable to explain these and other discrepancies.

Many of the people listed as "released" on the booking list provided to us were not released back into the community, but instead were transferred to the Work Center or Mississippi Department of Corrections to serve their sentences, to another jurisdiction for prosecution on separate charges, or to the custody of U.S. Immigration and Customs Enforcement for removal proceedings. Many records also were incomplete—missing, among other things, the court order directing release and/or a release form indicating when a person was in fact released. We were informed that there is a substantial backlog at the Jail in filing court orders and other information in hard copy records. Thus, we were unable to evaluate the timeliness of every person's release.

    2.    The Jail Detains People for Days and Months Past Court-Ordered Release Dates.

Notwithstanding the Jail's inadequate recordkeeping, we were able to determine that, of a sample of over 100 prisoners booked in the last year, at least twelve people were held at the Jail after the day they were ordered released—some past midnight, others much longer. We searched the records for any indication that the person could have been lawfully detained beyond the court-ordered release date and found none. We also interviewed the records supervisor to determine whether there could have been any other lawful reason for holding these people

beyond their court-ordered release date. The records supervisor reviewed the records and was unable to provide a reason for any of the delays.

At least four people were held beyond the release date ordered by a County Court Judge. A County Court Judge ordered that Prisoner AA,[10] then a thirteen-year-old middle school student, be released if he was not indicted by August 1. Prisoner AA was not indicted by that date, but was not released until October 10, 2014, after serving 173 days in the Jail—*seventy of which were after his court-ordered release date.* Prisoner BB, another juvenile, was booked in December 2014. Over a month later, a County Court Judge found that there was no probable cause to charge him and ordered him released "today, January 20, 2015." The Court Administrator emailed the order to the Jail at 2:36 PM that day. Prisoner BB was not released, however, until after the Court Administrator sent an email to the Jail the *next day*, stating:

> I have the mother of [Prisoner BB] in my office. . . . His mother
> has been trying to get him out since 4:00 p.m. [yesterday]. She
> called up until 2:00 a.m. this morning and was told that booking
> did not have the paperwork. Can you all get him released please?

In addition, Prisoners CC and DD were both booked at the Jail in June 2014. In July 2014, a County Court Judge issued separate orders that, if Prisoners CC and DD were not indicted by October 1, 2014, they should be released from custody for lack of prosecution. The Jail did not comply with either order. Neither was indicted by October 1; nonetheless, both were held in the Jail until October 3—*two days later.*

At least five people who had been ordered released by a Circuit Court Judge were held between one and ten days more. Prisoner EE entered a guilty plea on August 26, 2014, and a Circuit Court Judge ordered that he be "RELEASED PENDING ADMISSION TO RID PROGRAM." The Jail did not release Prisoner EE until September 5—*ten days later*, apparently after a Court Administrator contacted the Jail to inquire about the delay. On December 12, 2014, a Circuit Court Judge issued a probation order for Prisoner FF. The Judge ordered that the Jail "RELEASE TODAY." The Jail released Prisoner FF only after the Court Administrator emailed the Jail to inquire on Prisoner FF's release status—*three days later*. On April 2, 2014, a Circuit Court Judge ordered Prisoner GG released. Prisoner GG was not released until two days later. Prisoners HH and II entered into plea agreements on November 24, 2014, and a Circuit Court Judge ordered that the Jail "RELEASE TODAY." Nonetheless, the Jail did not release either prisoner until the next day.

The Jail also has failed to comply with orders of the Municipal Court. Prisoner JJ, a disabled veteran, was arrested on a misdemeanor charge in October 2014. On November 21, 2014, a Municipal Court Judge ordered him released and scheduled a new court date. The Jail did not comply with the order; Prisoner JJ was not released from the Jail until November 24—*three days later*. Prisoner KK was booked in June 2014 for contempt of court. On December 12, 2014, a Municipal Court Judge ordered him released, checking "Contempt Paid" on Prisoner KK's misdemeanor charges. The court transmittal form stated that it was completed at 9 AM.

---

[10]     Throughout this letter, when referring to a specific prisoner, we use pseudonymous initials to protect the identity of the prisoner.

The Jail did not release Prisoner KK until after midnight. Prisoner LL was booked on September 9, 2014, for disorderly conduct. A Municipal Court Judge ordered her released on time served on October 17. The release notification form was faxed to the Jail at 4:02 PM. Nonetheless, Prisoner LL was not released until 2:13 AM.

We therefore find a pattern and practice at the Jail of detaining people past court-ordered release dates. The pattern and practice has at least several causes. The Jail has reduced the number of staff members handling releases, reassigning some to security posts. Most of the staff members are relatively new. The fax machine that transmits court orders sometimes is broken or out of paper. Once received, release orders are not timely filed. No post order explains the procedures staff should follow when a court orders a prisoner's release. Staff members sometimes do not understand the language in court orders. The current Jail administration removed books that explained the meaning of language in judicial dispositions. Dynacom, the database that contains information on local warrants and indictments, sometimes is not up-to-date. Staff members therefore may call the District Attorney's office to confirm that an indictment has not issued before releasing a person, but it can take two or three days to receive a response.

Finally, although none of the files we reviewed involved people who were acquitted or found not guilty of the charges against them, we were informed that such individuals are returned to the Jail for out processing. Prisoner BB appears to have been returned to the Jail after the Court found no probable cause to charge him. We note that such a process raises constitutional concerns. *See Hill v. Hoisington*, 28 F. Supp. 3d 725, 728 (E.D. Mich. 2014) (observing that "the proper post-acquittal procedure requires the immediate release of a detainee following an acquittal, allowing for any possible outprocessing to occur without continued or required detention" (internal citations omitted)); *Jones v. Cochran*, 1994 U.S. Dist. LEXIS 20625, *18 (S.D. Fla. Aug. 8, 1994) (holding that practice of returning acquitted individuals to jail "on average for a period of hours" before release in Broward County violated the Fourth Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment). We also note that the County's search policy and procedure appears to allow a person to be strip searched upon "return . . . from outside the institution" without "reasonable belief that the inmate is carrying contraband or other prohibitive material." The policy and procedure do not exempt persons returning from a court hearing in which they were acquitted, found not guilty, or had the charges against them dismissed. We note that the policy and procedure therefore raise significant constitutional concerns.

3.   The Jail's Deliberate Indifference to Unlawful Detention Violates the Fourteenth Amendment.

The Jail is well aware of unlawful detention at the Jail, but has failed to adequately address the problem. Court Administrators routinely contact the Jail to inquire why a person previously ordered released remains in the Jail. During our September on-site inspection, the Jail Administrator and records supervisor acknowledged that prisoners sometimes are held past their release dates without cause. When staff members learn that an individual has been held without lawful authority, they verbally inform their supervisors. Staff members, however, are not

required to (and do not) complete an incident report.[11] During our January 2015 site visit, we were informed that the County intends to hire a contractor to serve as a "court facilitator" who will attempt to remedy the problem of people "lost . . . in the system." We were also informed that a quality control officer had been hired to monitor overdetentions; her computer had been unusable for two months, however, and relevant data was not available to us. In February 2015, we were informed that there is no longer a quality control officer.

The Jail's deliberate indifference to its imprisonment of people without legal basis "shocks the conscience" and also "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotations marks and citations omitted) (defining substantive due process); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851-52 (1998) (observing that deliberate indifference can "rise to a constitutionally shocking level" in "the custodial situation of a prison, [where] forethought about an inmate's welfare is not only feasible but obligatory"). This is particularly so because "[t]he full brunt of the harm for the [the County]'s refusal to get its act together falls, not on [County] employees or influential citizens, but exclusively upon persons with little voice, who are shut away from public view." *Barnes II*, 793 F. Supp. 2d at 280.

## V.     OTHER CONCERNS

During the course of our investigation, we also identified additional troubling practices and conditions that contribute to the constitutional violations described above and an unsafe Jail environment in general.

### A.     Misuse of Lockdown, Including of Vulnerable Prisoners

The Jail has attempted to address the staffing and security situation in part by locking down prisoners after each riot. The lockdowns continue to be widespread and subject prisoners to highly restrictive and unsanitary conditions. At the Raymond Facility, prisoners have to remain in their cells for most of the day. At the Jackson Facility, prisoners must remain in their housing units without recreation. In sum, the lockdowns have severely limited or eliminated prisoners' access to exercise, visitation, and treatment. Over time, such deprivations risk violating the Constitution, increasing prisoner tensions, and exacerbating violence. *See Brown v. Plata*, 131 S. Ct. 1910, 1933-34 (2011) (holding that relief was warranted when lockdown and unsanitary conditions resulted in harm to prisoners with mental illness); *Farmer*, 511 U.S. at 832 (prison officials must provide "humane conditions of confinement," including adequate shelter);

---

[11]     The Jail Administrator did order staff to complete incident reports in December 2014 for Prisoner MM, who was improperly released in October 2014. Prisoner MM had been indicted for, among other things, armed robbery, sexual battery, kidnapping, and aggravated, and should have remained in Jail. In December 2014, after being released, he allegedly committed another felony. Unfortunately, this may not be the first time the Jail has prematurely released people. For example, in 2012, the Jail reportedly erroneously released six people. Those people were facing charges that ranged from burglary to rape and murder. Many of the causes of unlawful detention—including inadequate staffing and training, a backlog in record filing, and a lack of centralized information—may also result in the Jail releasing people prematurely.

*Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914-15 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) (isolation and sensory deprivation that results in severe psychological deprivations violate the Constitution).

We are especially concerned about the Jail's harsh and highly restrictive treatment of prisoners with disabilities and juveniles. The Jail has been routinely placing prisoners with behavioral issues and apparent symptoms of mental illness in segregation cells located in the cramped booking area. The cells thus serve as both mental health observation cells and disciplinary cells.[12] Even in good circumstances, booking cells are not well-designed for long-term prisoner housing. They provide little space or light, and it is harder to provide any prisoners locked in these cells with proper supervision and programs than if they were housed in larger housing units. They are especially inappropriate for the routine housing of persons with serious mental illness, who may deteriorate or act out in response to being isolated and mistreated, which can lead to a further cycle of abusive discipline. *See generally Brown*, 131 S.Ct. at 1933-34 (describing negative effects of crowding and segregation on the mental health of prisoners and their adverse effect on the delivery of care).

At the time of our tour, the conditions inside the Jail's booking area cells were especially deplorable. As discussed above, we found one prisoner inside a cell that did not have working, conventional plumbing facilities. The smell was so strong, someone had covered the toilet with urine-soaked blankets and towels. In another booking cell, we found a prisoner who could neither speak nor hear. He could only communicate with staff by (somewhat incoherent) writing. His windowless cell was similarly equipped with a reeking toilet. He had been living in such conditions *for nearly three years*. The other booking cells were similarly dim, filthy, and lacking in even basic plumbing facilities. These are the types of conditions that courts have found to be completely inappropriate for housing prisoners who have serious mental health conditions. *Brown*, 131 S.Ct. at 1933-34.

Juveniles have also been particularly impacted by the lockdown, as it has resulted in the denial of access to education and treatment programs. Because of their physical and mental development, juveniles should receive programs, protection from adults, and educational services while awaiting trial. *See generally Roper v. Simmons*, 543 U.S. 551 (2005) (discussing differences between adults and juveniles as basis for prohibiting imposition of the death penalty on the latter); *Youngberg v. Romeo*, 457 U.S. 307 (1982) (right to rehabilitation for institutionalized persons protected by the Fourteenth Amendment); *Morgan v. Sproat*, 432 F. Supp. 1130, 1134-37 (S.D. Miss. 1977) (juveniles have right to individualized treatment); *Swansey v. Elrod*, 386 F.Supp. 1138, 1143-44 (D. Ill. 1975) (merely providing criminal constitutional rights is not sufficient as juveniles are recognized as different from adults and

---

[12]     Such treatment of prisoners with disabilities can also violate the Americans with Disabilities Act ("ADA"), which prohibits the segregation of persons with disabilities and discrimination in the administration of programs and services. *See* 42 U.S.C. §§ 12102, 12132. ADA regulations require public entities to administer services and programs in the "most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 28 C.F.R. § 35.152(b)(2); *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999) ("Unjustified isolation . . . is properly regarded as discrimination based on disability.").

should receive more services); *Baker v. Hamilton*, 345 F. Supp. 345 (D. Ky. 1972) (juveniles have a right to due process and rehabilitation if housed in jail); Individuals with Disabilities in Education Act, 20 U.S.C. § 1401 (requiring individualized programs and services for children with disabilities including those housed in public institutions); *but see Morales v. Turman*, 562 F.2d 993 (5th Cir. 1977) (questioning existence of right of rehabilitation for juveniles); *Santana v. Collazo,* 714 F.2d 1172 (1st Cir. 1983) (no right to rehabilitation for juveniles).

Instead of being housed and provided with programming consistent with federal requirements, the juveniles in the Jail have been placed unsafely in an adult unit, within sight and sound of other prisoners. Their cells are unsanitary and dark. Not only are they denied access to recreation and programs normally available to adult prisoners, they have also been denied access to education and services that are specific to the rights of juveniles. To meet constitutional standards, the County will need to either significantly re-configure or expand juvenile housing and services at the Jail, or remove all juveniles from the adult detention system and place them in more appropriate secure juvenile facilities.

## B.    Unsanitary and Unsafe Physical Conditions of Confinement

County officials must provide humane living conditions for prisoners, and "take reasonable measures to guarantee safety." *Farmer*, 511 U.S. at 832-33; *Gates*, 376 F.3d at 333-34, 338-39; *Alberti*, 406 F. Supp. at 669; *Ruiz*, 37 F. Supp. 2d at 914-15. Since the most recent riot, the County has made a number of improvements to the Jail's physical plant. The Raymond Facility in particular has benefited from upgrades and repairs. Nevertheless, the physical plant conditions in Jail facilities are still grossly inadequate. Both facilities exhibit signs of longstanding neglect, and critical safety and security features, such as smoke detectors and cameras, are broken. Some of these issues involve specific challenges at each location, but others reflect common problems with the maintenance system. These conditions are not just dangerous in themselves. Together, they contribute to the inhumane atmosphere that makes the Jail so difficult to manage.

At the Raymond Facility, in addition to the physical plant deficiencies discussed above, *see* Part IV(A) (1)(c), many of the housing areas are unhygienic. As noted above, *see* Part V(A), the booking area used for isolation is in especially poor physical condition. Open pit toilets and drains are foul-smelling or inoperative. The lighting is poor. The roof has been leaking directly into the main hall for a year and a half. More generally, we found poor housekeeping throughout the facility, with many vents, lights, and observation windows damaged or blocked. Trash build-up and missing fire safety equipment (*e.g.*, fire hoses) was also a serious concern throughout the facility. The fire detection and suppression system should be considered non-functioning. *See Helling*, 509 U.S. at 33-34 (courts need not await a tragic event to correct deficiencies, such as deficient firefighting measures and conditions that pose risk of future health problems).

At the Jackson Facility, the physical plant problems reflect the facility's age. Because of differences in population mix and operations, some units in the Jackson Facility are in better condition than the much newer Raymond Facility. For example, the women's unit in the Jackson Facility was notably cleaner and more orderly than Raymond Facility units, even the most

recently renovated. Overall, however, the facility remains unhygienic and unsafe. Security staff reported that the utility projects have been going on for months, and it was unclear when they would be completed. At the time of our September 2014 tour, some parts of the Jail were without electricity or lights, and there were large holes in some of the walls.[13] As context, the Jackson Facility is difficult to supervise even in ideal daylight conditions. What little natural light that exists in the units comes through either cell windows, which are now mostly covered with opaque screens, or indirectly from the hallway. There are no working cameras in most of the facility; nor is there enough staff supervision to deter prisoner damage to facilities. The lack of any outdoor exercise space makes the situation worse.[14]

Both the Raymond and Jackson Facilities were modern facilities at the time of their construction in 1994 and 1978, respectively. They have some unusual physical plant features that cause problems, but we do not believe that the facilities are themselves unsalvageable.[15] Maintaining a jail in good condition requires constant attention. This is only in part related to any original design defects, facility age, or the rate of wear-and-tear. Staffing deficiencies contribute to problems with maintaining the physical plant. The Raymond Facility was designed as a "direct supervision" facility, so to operate it properly, Jail officials should have assigned enough staff to monitor each housing unit. If staff members were in each unit, regularly interacting with prisoners, they could direct cleaning crews, discipline prisoners who damage equipment, or prevent vandalism from occurring in the first place. But because of staffing deficiencies and related operational problems, prisoners are locked in cells, mostly out of sight of any officers. The Jail needs to hire staff to provide programs, services, and supervision, and to prevent idleness and ensure safe conditions. That is unlikely to occur any time soon.

The organization of the maintenance department also makes it harder to maintain acceptable physical plant conditions. The County has taken some commendable steps to address the maintenance issue by assigning staff directly to the Jail and hiring contractors to make various improvements. This change to the reporting structure is an improvement over past practice. However, maintenance staff continues to report primarily to County administration, and maintenance personnel rotate handling of Jail duties. The Jail administration needs full management control over a team of maintenance personnel, with Jail-related experience, who are

---

[13]     During our January 2015 tour, Jail officials reported a number of initiatives including the addition of new cameras and repairs to the roof. However, as discussed elsewhere in this letter, physical plant problems remained a concern, as poorly supervised prisoners continued to find ways to damage critical plant and equipment. We therefore believe systemic changes are still required.

[14]     Theoretically, prisoners could get a bit more natural light and space in an enclosed recreation area on an upper floor, but the Jail has made that room off-limits since the riot. At the time of our inspection, no one had been allowed to use the recreation room for months, regardless of whether they had actually participated in the riots.

[15]     Whether doing so is the most cost-efficient approach is a more difficult question and exceeds the scope of this review. As our corrections consultant indicated during his exit interview, the Jail is likely salvageable. However, the County will need the assistance of skilled construction and architectural experts to come up with workable alternative designs and plans.

dedicated to handling Jail repairs. Once the Jail has a dedicated maintenance team, the County can further develop and improve the preventative maintenance program. Having key maintenance staff integrated into the Jail operation will also help administrators and County officials to develop a more comprehensive renovation plan.

Without such changes, Jail conditions will not improve. At present, piecemeal improvements and repairs have been insufficient. Staff cannot keep up with the challenging maintenance environment. In combination, the failure to staff housing units, widespread damage from recent incidents, aging facilities, and weaknesses with the maintenance system pose serious challenges to Jail maintenance. The County needs to address all of these issues as part of a planned and system-wide review of Jail maintenance needs. As technical assistance, we recommend that the County ensure that the Jail has a functioning maintenance system, which should include policies and procedures for routine health and safety inspections, as well as a process for scheduled, routine, and emergency repairs. The system should include a tracking process and complete documentation of when work orders are received and completed. The system should also include quality assurance mechanisms to identify outstanding orders that have not been resolved in a timely manner. The County should consider whether staffing increases and changes in supervision may be required to ensure an effective, working relationship between detention and maintenance staff. We recommend placing maintenance staff directly under the supervision of the Jail Administrator. To the extent budget issues may affect timeliness of facility repairs and replacement, a Jail renovation and construction committee, or another appropriate forum, should address funding of maintenance as one of its duties.

## C.   Operation of, and Integration with, the Criminal Justice System

Jail deficiencies may be a symptom of, or contributor to, stresses in the local criminal justice system. The administrative mechanisms at the Jail and the criminal justice system are supposed to operate as a well-integrated whole in order to provide prisoners with due process and meaningful access to the courts. Over the course of their incarceration, individuals must repeatedly interact with prosecutors, defense attorneys, the courts, and Jail staff, as they are initially detained, given notice of charges, tried, serving any sentence, and released. While improving Jail administrative practices, staffing, and other conditions will help ensure safe and humane conditions of confinement, such improvements may prove to be only part of the solution. A failure to address broader criminal justice issues may affect the Jail's ability to comply with constitutional standards.

Local officials, concerned citizens, and grand jury proceedings have all recently raised questions about whether the Hinds County criminal justice system adequately protects citizens' constitutional rights against unlawful or prolonged detention. *See, e.g.*, Austin Report; Hinds County Corrections' Monitoring Team's First Quarterly Report (September 13, 2013) ("Monitor Report"). For reasons that are in dispute, the Hinds County criminal justice system has a number of bottlenecks that delay timely case resolution. In combination with conditions at the Jail, these types of bottlenecks raise a real possibility that people are being jailed for excessive periods of time. The County and its judges have started collecting information and assessing the situation. The information collected to date is at least facially troubling. According to the County's most recent data production, over 100 indicted prisoners have been incarcerated more than 270 days

(after arrest) in the Jail without a conviction. *See Amos v. Thornton*, 646 F.3d 199, 206 (5th Cir. 2011) (noting that a one-year delay between arrest or indictment and trial is "presumptively prejudicial" for speedy trial purposes). There have also been documented delays in other parts of the criminal process, such as incarceration for hundreds of days without indictment and delays in the forensic mental health process.[16] Such deficiencies may be especially serious for persons with disabilities, as weaknesses in related parts of the criminal justice and forensic process may lead to unnecessary, long-term institutionalization. While the specific reasons why a prisoner may be incarcerated for long periods of time without trial or release may vary, unnecessary detention can exacerbate other deficiencies and place individuals at risk of harm from unconstitutional conditions for prolonged periods of time.

Holding prisoners for unnecessary lengths of time drains already limited resources from a facility that is in crisis. Tensions between county leaders with responsibilities over different parts of the criminal justice system may interfere with remedial efforts. *See generally* Kate Royals, *Hinds DA Drops Contempt Citation Against Sheriff*, Clarion-Ledger (Oct. 27, 2014), http://www.clarionledger.com/story/news/local/2014/10/27/hinds-da-drops-citation/18003431/ ("After a grand jury report issued earlier this month called Sheriff Tyrone Lewis 'incompetent' to run the jail, Lewis responded by pointing out the dangerous overcrowding in the jail as a result of cases moving too slowly through the court system."); Jimmie E. Gates, *Judge Seeks to Bar Public Defender*, Clarion Ledger, March 2, 2015, http://www.clarionledger.com/ story/news/2015/03/02/judge-seeks-bar-public-defender/24297205/. Finally, the County's general authority to hold persons for trial does not include a right to place prisoners in inhumane conditions for excessively long periods of time. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979) (conditions that amount to punishment of pretrial detainee violate due process).

As technical assistance, we recommend that the County continue with efforts to establish a criminal justice committee to coordinate the workings of relevant agencies in order to improve the criminal justice system's effectiveness and efficiency. The committee can also help ensure adequate system-wide resources, engage in community outreach, and provide a forum for discussions between local officials. More specifically, the committee should address any structural problems with the local criminal justice process which may contribute to crowding, result in excessive trial delays, or cause the unlawful or prolonged detention of citizens. The committee should include representatives from County government, law enforcement (including both the Sheriff and District Attorney), members of the defense bar, and the community. The committee should also consider what steps may be required to prevent actual or potential violations of prisoners' constitutional right of access to the courts, which includes the right to adequate indigent defense and the right to speedy trial. Such steps can include, but are not limited to, budget planning and programs that ensure (a) adequate community housing and treatment services for the diversion of individuals arrested for minor offenses related to serious

---

[16]     *See, e.g.*, Letter from Thomas E. Perez, Assistant Attorney General, to Haley R. Barbour, Governor of Mississippi, *United States' Investigation of the State of Mississippi's Service System for Persons with Mental Illness and Developmental Disabilities* (Dec. 22, 2011), http://www.justice.gov/crt/about/spl/documents/miss_findletter_12-22-11.pdf (noting that lack of mental health services results in cycling of patients through segregated institutions, including jails).

mental illness; (b) adequate funding of the criminal justice system; and (c) prompt transport of prisoners to the state.

## VI.    MINIMUM REMEDIAL MEASURES

In order to rectify the constitutional deficiencies identified in this findings letter, we recommend that the County implement, at minimum, the following remedial measures:

1.    The County should promptly implement a staffing plan that provides prisoners with adequate supervision; reasonable protection from violence; and adequate access to exercise, treatment, and other programs. At minimum, the plan must:

- ensure full staffing of all permanent posts in each housing pod/unit, booking, and control rooms;

- provide for rovers, emergency response, and a relief factor; and

- include sufficient staff to ensure that welfare checks (rounds) are conducted and documented at appropriate frequencies[17]—

  - at least hourly in general population units; and

  - for prisoners with higher security and special supervision needs (*e.g.*, prisoners in suicide observation, medical observation, administrative segregation, and disciplinary segregation), Jail policies and procedures must define varying levels of enhanced supervision, which can range from every thirty minutes up to constant, one-to-one observation in the highest risk circumstances (*e.g.*, for prisoners who are acutely psychotic or have demonstrated a high risk of suicide).

The staffing recommendations made by County consultants may serve as the basis for the staffing plan. In implementing these recommendations, the County should give high priority to filling the existing staff vacancies at the Raymond and Jackson Facilities. This may require re-assigning some staff members from the Work Release Center. For staff assigned to work at the Jail, the County must make every reasonable effort to avoid utilizing those personnel for other Sheriff's Department duties that do not relate directly to the supervision and custody of prisoners.

2.    The County should consider offering a significant financial incentive to recruit and retain detention staff. Officers need to be assigned equitably between facilities, and detention officers on loan to other areas of the Sheriff's Department need to be returned to their posts within the Jail system. The temporary assignment of up to twenty law enforcement officers

---

[17]    Such checks are only a partial remedy. Eventually, the County needs to ensure that the Jail is staffed as a direct supervision facility requires.

to the Jail system (as was recommended in the Austin Report) should be immediately implemented and continued until the County can replace these temporary officers with new hires.

      3.     The County should implement a classification system that houses prisoners based on appropriate risk factors, and not just gang affiliation. The County should develop a plan for managing gangs and preventing gang violence at the Jail. Models of sound classification systems are available from the United States' National Institute of Corrections and private correctional associations. The plan currently under development at the Jail is a good start, but must be tailored to the Jail's specific housing and staffing situation. It also needs to be implemented and changed over time as the County adopts other remedial measures.

      4.     The County should modify Jail policies and procedures to reduce the risk of holding prisoners beyond the Jail's legal authority to do so. Those policies and procedures must address the Sheriff's legal authority to detain citizens and when that authority ends. To that end, the County must at minimum ensure that the Jail complies with all court orders that direct the release of a prisoner that the Sheriff otherwise has no authority to detain. The Jail also needs to have qualified staff with access to prisoner records, handling release 24 hours/day, 7 days/week. The County should also evaluate current record-keeping procedures to determine whether changes in those procedures, or improved communications between agencies, may reduce confusion regarding the reasons why prisoners are being held at the Jail.

      5.     The County should establish a Jail Renovation and Construction Committee to develop a long-term, comprehensive plan for Jail improvements, repairs, and construction. The committee should retain qualified construction and corrections consultants to develop a master renovation and construction plan. The plan should consider renovation or replacement of existing facilities. However, we do not recommend complete Jail replacement at this time. Instead, we recommend that the committee consider adding a new confinement unit (pod) to the Raymond Facility so that the Jail has a modern, fully secure housing area for the prisoners requiring the highest level of security and supervision. This unit should have at least 60 beds. We also recommend that the committee consider whether it would be possible to completely renovate one full pod at a time, instead of piecemeal renovations.

## VII.   CONCLUSION

      In summary, to address our findings of a pattern and practice of Constitutional violations, the County needs to promptly improve staffing and staff training and accountability measures; address the Jail's physical plant deficiencies; and implement adequate systems to prevent detention without a lawful basis.

      We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this letter if County officials have not satisfactorily addressed our concerns. 42 U.S.C. § 1997b(a)(1). Please also note that this Findings Letter is a public document. It will be posted on the Civil Rights Division's website.

We hope, however, to resolve this matter through a more cooperative approach.  The lawyers assigned to this investigation will therefore be contacting the County to discuss options for resolving this matter amicably.  If you have any questions regarding this letter, please call Judy C. Preston, Acting Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-6258.

Sincerely,

Vanita Gupta
Principal Deputy Assistant Attorney General

cc:     Sherri M. Flowers
        County Attorney

        Dana Sims
        Counsel to the Sheriff

        Pieter Teeuwissen
        Board Attorney