IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil No. 3:16cv489 WHB-JCG |
| | ) | |
| HINDS COUNTY;  THE HINDS COUNTY | ) | |
| BOARD OF SUPERVISORS; VICTOR MASON, | ) | |
| HIND COUNTY SHERIFF, IN HIS OFFICIAL | ) | |
| CAPACITY, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**SETTLEMENT AGREEMENT BETWEEN
THE UNITED STATES OF AMERICA AND HINDS COUNTY, MISSISSIPPI
REGARDING THE HINDS COUNTY JAIL**

I.     PARTIES .................................................................................4

II.    INTRODUCTION ..................................................................4

III.   DEFINITIONS .....................................................................5

IV.   SUBSTANTIVE PROVISIONS .........................................10

     A.    PROTECTION FROM HARM.................................10

     B.    USE OF FORCE STANDARDS ..............................20

     C.    USE OF FORCE TRAINING ...................................23

     D.    USE OF FORCE REPORTING................................23

     E.    USE OF FORCE SUPERVISOR REVIEWS ..........25

     F.    INCIDENT REPORTING AND REVIEW ..............27

     G.    SEXUAL MISCONDUCT.........................................29

     H.    INVESTIGATIONS ..................................................30

     I.     GRIEVANCE AND PRISONER INFORMATION SYSTEMS...................32

     J.     RESTRICTIONS ON THE USE OF SEGREGATION.................................33

     K.    YOUTHFUL PRISONERS.......................................36

     L.     LAWFUL BASIS FOR DETENTION.......................39

     M.   CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE ..........46

     N.    CRIMINAL JUSTICE COORDINATING COMMITTEE ...........................50

V.    IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS ....................52

VI.   POLICY AND PROCEDURE REVIEW.............................53

VII.  MONITORING .....................................................................54

     A.    SELECTION AND AUTONOMY OF THE MONITOR............................54

     B.    MONITOR'S AND UNITED STATES' ACCESS .......................55

     C.    MONITOR REPORTING.........................................56

     D.    LIMITATIONS ..........................................................58

VIII. COUNTY SELF-ASSESSMENT REPORT AND COMPLIANCE
COORDINATOR..........................................................................59

IX.   EMERGENT CONDITIONS ..............................................60

X.    JURISDICTION AND ENFORCEMENT ...........................60

XI.    CONSTRUCTION AND TERMINATION ........................................................... 61

XII.    STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM

ACT, 18 U.S.C. § 3626 ....................................................................................................... 61

## I.  PARTIES

1.   This Consent Judgment ("Agreement") is between the United States of America ("United States" or "Plaintiff"), acting through the United States Department of Justice ("DOJ"), and Hinds County, Mississippi ("County" or "Defendants"), acting through the Hinds County Sheriff ("Sheriff") and Hinds County Board of Supervisors ("Board") (collectively, the "Parties").  The Sheriff has entered into this Agreement in his official capacity only.

## II.  INTRODUCTION

2.   The Parties enter this Agreement to provide County prisoners with reasonable safety, protection from harm, and conditions of confinement that conform to the requirements of the United States Constitution and federal law.  The County recognizes that it must provide prisoners with adequate supervision and housing in order to prevent violence between prisoners and the use of excessive force by detention staff.  The County also acknowledges that government detention is a serious infringement on the rights of citizens and other individuals, and is thus subject to constitutional limits.  Detention is permitted only when justified by law, may last no longer than permitted by law, and should be administered in a manner that balances the community's interest in safety with individuals' right to liberty.  The Parties agree that achieving the goals of this Agreement will require increased detention staffing and supervision; enhanced policies, procedures, training and staff accountability measures; modification of detention facilities; and the development and implementation of a release system that protects detainees' constitutional rights.

3.   The County has agreed to enter into this Agreement in order to address constitutional violations alleged by the United States, including specifically violations described in the findings letter issued by the United States on May 21, 2015.

4.   The Hinds County Adult Detention Center ("HCDC") and Work Center ("Farm") in Raymond, Mississippi, and the Jackson Detention Center ("JDC") in Jackson, Mississippi, are collectively referred to as the "Jail."  The Jail is an integral part of the public safety and criminal justice system in Hinds County.  Through the provisions of this Agreement, the

Parties seek to ensure that the conditions in the Jail comply with the United States Constitution.

5. The County is responsible for funding, operating, and maintaining the Jail. The County acknowledges that it must fund, operate, and maintain the Jail in a manner that complies with the United States Constitution. This obligation specifically includes a duty to provide sufficient staffing, training, and supervision to protect incarcerated persons from violence, to prevent the excessive use of force, and to ensure that individuals are detained only to the extent permitted under the Constitution. Nothing in this paragraph is intended to alter the legal duties, authorities, or responsibilities of the Defendants as defined by state or federal law.

6. The County also recognizes that compliance could be furthered through voluntary efforts that seek to reduce the population of the County detention centers and work farm, particularly special needs populations such as individuals with serious mental illness and juveniles. The Parties will work toward the goal of population reduction in a manner that preserves public safety, prioritizes diversion for unnecessary criminal justice involvement, and reduces recidivism.

7. Conditions in County detention facilities have been a subject of private litigation. Other cases alleging overcrowding or other systemic issues involving County prisoners include Wilson v. City of Jackson, et al, No. 3:80-cv-00008-DCB-AGN (S.D. Miss.); Bell v. City of Jackson, et al, No. 3:15-cv-732-TSL-RHW (S.D. Miss.); and J.H. v. Hinds County, Miss. et al, No. 3:11-cv-327-DPJ-FKB (S.D. Miss.).

III.     DEFINITIONS

8. "Days" are measured in calendar days; Saturdays, Sundays, and holidays are included.

9. "Direct supervision" is a term of art used by corrections professionals and refers to a model for safely operating and supervising a correctional facility. The direct supervision method for supervising a correctional facility requires placing detention officers inside housing units, where such officers have continuous direct contact with prisoners and are not routinely separated from prisoners by physical barriers. Officers are required to provide

5

active supervision of housing areas, which includes routinely interacting with, and checking on, prisoners in their charge. Video surveillance, separate control rooms, and other techniques or design features used to maintain security and safety, are permitted as complements to, but not replacements for, direct supervision by housing unit officers. A direct supervision facility requires integration of design, staffing, training, and procedures so that all operations are consistent with the model.

10. "Effective Date" means the date the Court approves this Agreement as an order of the Court.

11. "Early Intervention System" (or "EIS") is a system to collect and analyze data regarding uses of force and is used to identify the need for corrective action, including changes to training protocols and policy, as well as retraining or disciplining individual officers or groups of officers.

12. A "health assessment" refers to a medical evaluation by a Qualified Medical Professional or Qualified Mental Health Professional. A health assessment specifically identifies a patient's individual health needs, utilizing generally accepted forms, screening tools, assessment instruments, physical exams, and other scientifically reliable and valid techniques. A health assessment must be sufficient to collect and document information necessary to provide a basis for the patient's treatment. A suicide assessment is a health assessment that must also specifically evaluate and estimate the individual's risk for suicide and self-harming behavior.

13. "Implement" or "implementation" means putting a policy, procedure, or remedial measure into effect, including informing, instructing, or training impacted staff and ensuring that staff in fact follow the policy, procedure, or remedial measure.

14. "Include," "includes," or "including" means "include, but not be limited to," "includes, but is not limited to," or "including, but not limited to."

15. "Interdisciplinary team" refers to a team consisting of treatment staff from various disciplines, including, at minimum, a physician, nurse, Qualified Mental Health Professional, and one or more members from security.

6

16. "Jail" refers to HCDC, JDC, and the Work Center ("Farm"). For purposes of interpreting and enforcing this Agreement, the term also refers to any facilities used to expand, supplement, or replace HCDC and JCDC. The term also includes any new construction, contracted facilities, leased facilities, renovated facilities, or other replacement facilities used to house County prisoners.

17. "Monitor" means an individual and his or her team of professionals, if any, who are approved by the Court pursuant to the provisions of this Agreement to oversee and facilitate implementation of the Agreement.

18. "Planned force" or "planned use of force" means a use of force in response to a prisoner's actions, where the prisoner's behavior does not pose an imminent threat to the prisoner's own safety or another individual's safety. Examples include cell extractions to remove a recalcitrant prisoner, force used to restrain a prisoner in order to prevent continuing property damage, and medically-ordered restraints on a prisoner exhibiting escalating signs of mental illness.

19. "Prisoners" or "prisoner" is construed broadly to refer to one or more individuals detained at, housed in, held in, in the custody of, or confined at the Jail for any reason, including as a result of arrest, criminal charges, detainers, civil contempt charges, involuntary civil commitment, or convictions.

20. "Qualified Medical Professional" means an individual who possesses the education, experience, training, credentialing, and licensing required to provide the medical services for which he or she has responsibility for providing.

21. "Qualified Mental Health Professional" means an individual who possesses the education, experience, training, credentialing, and licensing required to provide the mental health services for which he or she has responsibility for providing. A Qualified Mental Health Professional must be either a doctorate-level psychologist, psychiatrist, psychiatric nurse, or a master's level licensed clinical (or psychiatric) social worker.

22. "Qualified Training Officer" means a state certified deputy with the education, experience, training, credentialing, and licensing required to serve as a Jail instructor. A

Qualified Training Officer must have at least three years of field experience and demonstrated familiarity with professional standards and Jail policies.

23. "Reportable incident" refers to any incident that involves a prisoner death or serious injury, suicide attempt, self-harming behavior, rape, sexual threat or abuse, use of force or restraint, use of segregation, medical emergency, escape or escape attempt, criminal activity, or fire. Reportable use of force or restraint incident reporting is governed by the Use of Force section of this Agreement.

24. "Segregation" means involuntary confinement in a locked room or cell with two or fewer prisoners, for at least the majority of waking hours per day. "Long-term segregation" means a period of segregation intended to last, or that does last, more than fourteen (14) consecutive days.

25. "Self-harm" includes head-banging, cutting, intentional medication overdoses, and other self-directed, injurious or potentially injurious behavior.

26. "Serious injury" means any injury that is extensive, serious, visible, or likely to become visible. "Serious injury" includes black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to organs, and injuries causing unconsciousness or death.

27. A prisoner with a "serious mental illness" (or "SMI") is a person with a mental, behavioral, or emotional disorder of mood, thought, or anxiety that is diagnosable currently or within the last year; that significantly impairs judgment, behavior, capacity to recognize reality, and the ability to cope with the demands of life in the general population facilities of the Jail.

28. "Special management" means prisoners who are in administrative or disciplinary segregation, in protective custody, on suicide precautions, require treatment or monitoring for a medical or mental health condition (including physical, developmental, and cognitive disabilities), or who are age 17 or younger. Special management can also refer to units housing this category of prisoners.

29. "Staff members" includes all county employees, contractors, volunteers, or agents, including detention officers and medical personnel, who work in the Jail.

30. "Suicide attempt" means any non-fatal, self-directed, potentially injurious behavior, where there was an intent to die as a result of the behavior, or any non-fatal, self-directed, self-harming behavior that results or could have resulted in a serious injury. Even if stopped before actual injury, a suicide attempt is reportable under this Agreement if the attempted act could have resulted in serious injury.

31. "Suicide precautions" mean any measures to prevent suicide or self-harm, including observation of a prisoner.

32. "Train" means to instruct in skills to a level that the trainee has demonstrated proficiency by testing to implement those skills as and when called for. "Trained" means proficient in the skills.

33. "Use of force" means the application of physical, chemical, or mechanical measures on a prisoner. "Use of force" includes all force to compel compliance except un-resisted handcuffing and un-resisted shackling of prisoners for movement purposes.

    a.    "Level 1 uses of force" include:

        i.    all serious uses of force, meaning the use of force leads to injuries that are extensive, serious, visible, or become visible, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to organs, and injuries causing unconsciousness or death;

        ii.    force applied in violation of Jail policies and procedures (e.g., unauthorized, retaliatory use of force);

        iii.    use of tasers;

        iv.    use of chemical munitions, including pepper spray; and

        v.    occasions when staff member accounts offer inconsistent, conflicting, or otherwise suspicious reports about a use of force.

    b.    "Level 2 uses of force" will include all uses of force not covered by the

definition of Level 1 force (e.g., a control hold).

34. "Youth" and "youthful prisoner" means any person in County custody who is under the age of 18.

35. Throughout this Agreement, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance. "Substantial Compliance" indicates that the County has achieved compliance with the material components and has met the goals of the relevant provision of the Agreement. "Partial Compliance" indicates that the County achieved compliance with some of the components of the relevant provision of the Agreement, but significant work remains. "Non-compliance" indicates that the County has not met most or all of the components of the relevant provision of the Agreement.

## IV.     SUBSTANTIVE PROVISIONS

### A.     PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff. To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff. Such policies and procedures must include the following:

   a.     Booking;
   b.     Objective classification;
   c.     Housing assignments;
   d.     Prisoner supervision;
   e.     Prisoner welfare and security checks ("rounds");
   f.     Posts and post orders;
   g.     Searches;
   h.     Use of force;
   i.     Incident reporting;
   j.     Internal investigations;

k. Prisoner rights;

l. Medical and mental health care;

m. Exercise and treatment activities;

n. Laundry;

o. Food services;

p. Hygiene;

q. Emergency procedures;

r. Grievance procedures; and

s. Sexual abuse and misconduct.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members. At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail. They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail. The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis. The Sheriff

recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds. To that end, the County must at minimum:

a.  Hire and retain sufficient numbers of detention officers to ensure that:

    i.  There are at least two detention officers in each control room at all times;

    ii.  There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

    iii.  There are rovers to provide backup and assistance to other posts;

    iv.  Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

    v.  There are sufficient detention officers to implement this Agreement.

b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement. As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below. The study or study update must be completed within six months of the Effective Date and must include the following elements:

    i.  The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

    ii.  The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

    iii.  As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations. Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement. The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

f. Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge. Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit). Additionally, the classification and housing assignment process must include the following elements:

   i. The classification process must be handled by qualified staff who have additional training and experience on classification.

   ii. The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

   iii. Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

13

iv. The classification system must track the location of all prisoners in the Jail, and help ensure that prisoners can be readily located by staff. The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

v. The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi. The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement. Placing prisoners together because of gang affiliation alone is prohibited. The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

g. Develop and implement positive approaches for promoting safety within the Jail including:

i. Providing all prisoners with at least 5 hours of outdoor recreation per week;

ii. Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

iii. Creating work opportunities, including the possibility of paid employment;

iv. Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

v. Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

vi. Screening prisoners for serious mental illness as part of the Jail's

booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

vii. Providing reasonable opportunities for visitation.

h. Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances. Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i. Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process. The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

a. Staff vacancy rate of more than 10% of budgeted positions;;

b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

c. A major disturbance resulting in the takeover of any housing area by prisoners;

d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e.      Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

f.      One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g.      One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate. To that end:

a.      Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b.      All security rounds must be conducted at irregular intervals to reduce their predictability, and must be documented on forms or logs.

c.      Officers must only be permitted to enter data on these forms or logs at the time a round is completed. Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.      The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility. This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff

16

are providing adequate supervision.

e.   Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail. To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

a.   Mandatory pre-service training. Detention officers must receive State jailer training and certification prior to start of work. Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement. During that twelve month period, the County must develop an in-house detention training academy.

b.   Post Order training. Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter. To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c.   "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure

17

that staff are providing effective "direct supervision."

    d.    Jail administrator training. High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

    e.    Post-service training. Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year. Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings. Post-service training should also include field and scenario-based training.

    f.    Training for Critical Posts. Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position. Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

    g.    Special management unit training. Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

    h.    Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a.    Review and modify policies, procedures, and practices to ensure that the Jail

Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight. This personnel authority must include the power to hire, transfer, and discipline staff. Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority. While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command. This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

  i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

  ii. An inspection process.

  iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

  iv. A requirement that any corrective action ordered be taken.

  v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

  vi. To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant

delays with repairs or a pattern of problems with equipment. Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband. Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail. Installation must be completed within two years after the Effective Date.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

## B.   USE OF FORCE STANDARDS

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it. To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force. The policies and procedures must:

    a.    Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

    b.    Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c.    Prohibit the use of force against a prisoner after the prisoner has ceased to

resist and is under control;

d.    Prohibit the use of force as punishment or retaliation;

e.    Limit the level of force used so that it is commensurate with the justification for use of force; and

f.    Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force. These policies and procedures must specifically include the following requirements:

a.    Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b.    If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

    i.    The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

    ii.    Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

    iii.    Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c.    Staff members must conduct health and welfare checks every 15 minutes

while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d.    The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e.    A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f.    Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g.    The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

    i.    a sign-out process for staff members to carry any type of weapon inside the Jail,

    ii.    a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

    iii.    random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h.    A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i.    All staff members using force must immediately notify their supervisor.

j.      All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

## C.      USE OF FORCE TRAINING

52. The County must develop and implement a use of force training program. Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

53. Topics covered by use of force training must include:

  a.      Instruction on what constitutes excessive force;
  b.      De-escalation tactics;
  c.      Methods of managing prisoners with mental illness to avoid the use of force;
  d.      Defensive tactics;
  e.      All Jail use of force policies and procedures, including those related to documentation and review of use of force.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action. The results and recommendations of such evaluations must be provided to the United States and Monitor.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

## D.      USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force. To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift. Staff members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

    a.    A unique tracking number for each use of force;

    b.    The names of all staff members, prisoner(s), and other participants or witnesses;

    c.    Housing classification and location;

    d.    Date and time;

    e.    A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f.    A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use). For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.    A description of the staff member's attempts to de-escalate the situation without use of force;

h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

i.  A description of any observed injuries to staff or prisoners;

j.  Whether medical care was required or provided to staff or prisoners;

k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

### E.  USE OF FORCE SUPERVISOR REVIEWS

59. The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force. At minimum:

a.  A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

b.  A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

c.  Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

d.  If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.  Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.  All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.    A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy. Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

60. After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.    Ensure the safety of everyone involved in or proximate to the incident.

b.    Determine if anyone is injured and ensure that necessary medical care is or has been provided.

c.    Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force. Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent. If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

d.    Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

e.    Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

f.    Document whether the use of force was recorded. If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded. If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must

also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

62. Reviewing supervisors must document the following:

    a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

    b.    Witness statements;

    c.    Review date and time;

    d.    The findings, recommendations, and results of the supervisor's review;

    e.    Corrective actions taken;

    f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

    g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

        i.    The nature and extent of injuries, or lack thereof;

        ii.    The date and time when medical care was requested and actually provided;

        iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

    h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

## F.    INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63. Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

64. Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:

   a.   Tracking number for each incident;

   b.   The names of all staff members, prisoner, and other participants or witnesses;

   c.   Housing classification and location;

   d.   Date and time;

   e.   Type of incident;

   f.   Injuries to staff or prisoner;

   g.   Medical care;

   h.   All staff involved or present during the incident and their respective roles;

   i.   Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

   j.   External reviews and results;

   k.   Corrective action taken; and

   l.   Warden and Administrator review and final administrative actions.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift. At minimum:

   a.   Staff members must complete all fields on an Incident Report for which they have responsibility for completion. Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report. If no injuries are present, staff members must write that; they may not leave that section blank.

   b.   Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

   c.   Supervisors must also comply with their documentation obligations and will

also be subject to re-training and discipline for failing to comply with those obligations.

66. Ensure that Jail supervisors review and respond appropriately to incidents. At minimum:

   a.  Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

   b.  Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

   c.  Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted. Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

   d.  Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

## G.    SEXUAL MISCONDUCT

67. To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

   a.  Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

   b.  Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.      Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

## H.     INVESTIGATIONS

68. The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution. At a minimum, the County shall:

a.      Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

     i.      Any prisoner exhibited a serious injury;

     ii.      Any staff member requested transport of the prisoner to the hospital;

     iii.      Staff member reports indicate inconsistent, conflicting, or suspicious

accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

    i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

    ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation. The criteria will require an investigation if:

    i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail

policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

    i.    a brief summary of all completed investigations, by type and date;

    ii.    a listing of investigations referred for administrative investigation;

    iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

    iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

    v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor and United States.

## I.    GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system. To that end:

69. The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

70. Grievance policies and procedures must be applicable and standardized across the entire Jail.

71. All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation. Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

72. The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

73. The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures. The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights. The County must provide such information in appropriate languages for prisoners with LEP.

## J. RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation. To that end, this Agreement imposes the following restrictions and requirements:

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

75. The County must document the placement and removal of all prisoners to and from segregation.

76. Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness. These safeguards must include the following:

a. All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

b. Segregation must be presumed contraindicated for prisoners with serious mental illness.

c. Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d. If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e. Documentation of such extraordinary and exceptional circumstances must be in writing. Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.   Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

    i.   If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

    ii.   The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

    iii.   If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.   Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation. This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner. Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.   If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional. Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner. Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.   The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and

guided by formal, written treatment plans. The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights. The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.    Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

## K.    YOUTHFUL PRISONERS

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners. During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center consent decree, and any other individuals or entities whose input is relevant. The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. Within 18 months after the Effective Date of this Agreement, the County will have completed transitioning to any new or replacement youthful prisoner housing facility. For any youthful prisoners in its custody, the County must:

78. Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

79. Ensure that youth receive adequate free appropriate education, including special education.

80. Ensure that youth are properly separated by sight and sound from adult prisoners.

81. Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

82. Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

83. Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general. In addition:

   a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

   b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

   c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat. As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

   d.  If a youth is placed in segregation, the County must immediately provide one-

on-one crisis intervention and observation.

e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes. Such observation must be documented immediately after each check.

g. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours. If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional. The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.


84. Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

a. The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

b. An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file.

Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

## L.  LAWFUL BASIS FOR DETENTION

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests. To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order. Examples of inadequate paperwork include, but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in Bearden v. Georgia, 461 U.S. 660 (1983) and Cassibry v. State, 453 So.2d 1298 (Miss. 1984). The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful. At a minimum, the County must confirm receipt from the

sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner. After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence. If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees. To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration. Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor. Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences. Any physical labor by pre-trial detainees or by

prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

   a.   Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

   b.   Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

   c.   Examples of prisoners presumptively entitled to release include:

      i.    Individuals who have completed their sentences;

      ii.   Individuals who have been acquitted of all charges after trial;

      iii.  Individuals whose charges have been dismissed;

      iv.   Individuals who are ordered released by a court order; and

      v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and

efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise. Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release. If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process. At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners. These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's

anticipated release date, and their status in the criminal justice system.

b. Specifically detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c. Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d. Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community. These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. Any post orders must:

a. Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

b. Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders. Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner. The results of release verification checks must be fully documented in prisoner records.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors. To that end, the County must:

a. Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

b. Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures. At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures. The training must include instruction on:

   i. How to process release orders for each court, and whom to contact if a question arises;

   ii. What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

   iii. Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

   iv. How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

c. Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

100. The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

101. The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process. The County must, at minimum, require:

a.    A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release. The incident report must document the reason(s) for the error. The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

102. The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process. This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks. If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release. The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

103. The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator. The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures. Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

104. The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner. The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above. The County must document the audits and recommendations, and must submit all documentation to the Monitor and the United States for review.

105. The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system. The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting, and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay. An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

## M.    CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights. To that end, the County must:

106. Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances. This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

107. Compile an Incident Summary Report on at least a monthly basis. The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members. The Incident Summary reports must, at minimum, include the following information:

a.   Brief summary of all reportable incidents, by type, shift, housing unit, and date;

b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

d.   List and total number of incident reports received during the reporting period;

e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

108. Compile a Use of Force Summary Report on at least a monthly basis. The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members. The Use of Force Summary reports must, at minimum, include the following information:

a.   Summary of all uses of force, by type, shift, housing unit, and date;

b.   List and total number of use of force reports received during the reporting period;

c.   List and total number of uses of force reports/incidents referred to IAD or other   law enforcement agencies for investigation.

109. Compile a Grievance Summary Report on at least a monthly basis. The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct. To identify trends and

potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period. These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

110. Compile a monthly summary report of IAD investigations conducted at the Facility. The IAD Summary Report must include:

    a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;

    b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;

    c.    A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

    d.    A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

111. Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations. The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews. These reviews and corrective actions must be documented and provided to the United States and Monitor.

112. Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity. As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns. If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail

supervisors, administrators, IAD, or other law enforcement agencies for investigation. Additionally:

a. The Early Intervention System may be integrated with other database and computerized tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

b. The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement. This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

c. The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly. The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendations, or corrective actions taken.

d. The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline. A copy of this list must be provided to the United States and the Monitor.

e. The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f. The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline. The County must document any findings, recommendations, or corrective actions taken as a result of these reviews. Copies of these reviews must be provided to the United States and the Monitor.

113. Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security. The policies and procedures must address all of the following issues: data

storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

114. Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process. At minimum, medical and mental health staff must be included through all of the following mechanisms:

   a.   Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

   b.   Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents. At minimum, a physician must prepare a mortality review within 30 days of every prisoner death. An outside physician must review any mortalities associated with treatment by Jail physicians.

## N.   CRIMINAL JUSTICE COORDINATING COMMITTEE

115. Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes, and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration. The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles. Using the Sequential Intercept Model,[1] or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system, and will

---

[1]      See Mark Munetz & Patricia Griffin, Use of the Sequential Intercept Model as an approach to decriminalization of people with serious mental illness, Psychiatry Services, 57(4):544–549, April 2006, http://ps.psychiatryonline.org/doi/pdf/10.1176/ps.2006.57.4.544.

assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

116. The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors. The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

117. The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

118. Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles. This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies. The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation. Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment

and recommendations. The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

## V. IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS

119. Consistent with the Prison Litigation Reform Act, the Constitution, and termination procedures of this Agreement, the County must substantially implement all provisions of this Agreement.

120. The County must begin implementing the requirements of this Agreement immediately upon the Effective Date. Unless otherwise provided in this Agreement, all provisions of the Agreement must be implemented within one year of the Effective Date.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement. At minimum:

    a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

    b.    Individual copies of the Agreement must be provided to prisoners upon request.

122. This Agreement is applicable to and binding upon all parties, their officers, agents, employees, assigns, and their successors in office.

123. This Agreement is enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

124. All parties must bear their own costs, including attorney fees.

125. The parties agree to defend the provisions of this Agreement. The parties must notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, the parties will seek to remove the action to a federal court.

126. The failure by either party to enforce this entire Agreement or any provision thereof, with respect to any deadline or any other provision herein, must not be construed as a waiver of its right to enforce any deadlines or provisions of this Agreement.

127. If any unforeseen circumstance occurs that causes a failure to timely carry out any requirements of this Agreement, the County must notify the Monitor and the United States in writing as soon as possible, and in any case no later than 14 days after the County becomes aware of the unforeseen circumstance and its impact on the County's ability to perform under the Agreement. The notice must describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The County must implement all reasonable measures to avoid or minimize any such failure.

128. In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding does not affect the remaining provisions of this Agreement.

129. All subheadings in this Agreement are written for convenience of locating individual provisions. If questions arise as to the meanings of individual provisions, they should be resolved by the text of each provision.

## VI.    POLICY AND PROCEDURE REVIEW

130. The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement. Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

132. Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment. The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

133. No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

134. Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

135. The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

## VII.    MONITORING

### A.    SELECTION AND AUTONOMY OF THE MONITOR

136. This Agreement must be monitored by an individual approved by the Court. Within thirty (30) days after the Effective Date, the United States and the County must jointly submit a proposed Monitor to the Court for approval. If the parties cannot agree on a joint Monitor, each party must submit the names and curricula vitae of three proposed candidates to the Court for approval, and the Court will select one of the candidates from the parties' lists.

137. If the Monitor position becomes vacant during the life of the Agreement, within 90 days of the vacancy, the United States and the County will jointly submit a new proposed Monitor to the Court for approval. If the parties cannot agree on a joint Monitor, each party must submit the names and curricula vitae of up to three proposed candidates to the Court for approval, and the Court will select one of the candidates from the parties' lists.

138. The cost of the Monitor's fees and expenses will be borne by the County. The County will contract with the Monitor to provide these monitoring services. As part of that contract, a reasonable budget will be agreed upon by and between the County and the Monitor to include a maximum dollar amount that can be spent in a given twelve (12) month period. The County will provide the Monitor with a budget sufficient to carry out the responsibilities described in this Agreement.

139. The Monitor only has the duties, responsibilities, and authority conferred by this Agreement. The Monitor must be subject to the supervision and orders of the Court and applicable law.

140. Neither the County nor the United States, nor any of their employees or agents, may have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. The Monitor may be terminated only by (i) joint stipulation of the parties; or (ii) for good cause unrelated to the Monitor's findings, as approved by the Court.

141. The Monitor may contract or consult with other individuals or entities to assist in the evaluation of compliance. The Monitor will pay for the services out of his/her budget. These individuals and entities must be governed and bound by the terms of this Agreement as the Monitor is governed and bound by those terms. The Monitor may engage in ex parte communications with the County and the United States regarding this Agreement.

### B.    MONITOR'S AND UNITED STATES' ACCESS

142. The Monitor and United States will have full and complete access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members, and prisoners.

143. The Parties shall have the opportunity to participate in all monitoring site visits.

144. The County must maintain sufficient records to document that the requirements of this Agreement are being properly implemented and must make such records available to the United States or Monitor at all reasonable times for inspection and copying. The County must maintain, and submit upon request, records or other documents to verify that the County has

taken such actions as described in any self-assessment compliance reports (e.g., census summaries, policies, procedures, protocols, training materials and incident reports).

145. The County will direct all employees, contractors, and agents to cooperate fully with the Monitor and United States.

146. Consistent with federal law, the Local Rules of the Court, and the Federal Rules of Civil Procedure, all information obtained by the Monitor will be maintained in a confidential manner.

147. Within seven days of receipt, the Monitor will distribute to the United States all documents, forms, assessments, and reports submitted by the County to the Monitor unless the County has already distributed a copy of such items to the United States.

## C.  MONITOR REPORTING

148. Within three months of the Effective Date, the Monitor will conduct a baseline site visit of the Jail to assess the Jail's status regarding the obligations under this Agreement. This baseline visit will include a preliminary evaluation of how County policies and practices address each paragraph of this Agreement. As a result of the baseline site visit, the Monitor will design a monitoring plan. The baseline site visit will allow the Monitor to become familiar with the Jail and this Agreement. It will also allow the Monitor to inform the County and United States regarding what information the Monitor will require the County to routinely report and with what frequency, consistent with this Agreement.

149. The Monitor must conduct an on-site inspection and issue a Compliance Report four months after the baseline visit. The Monitor must then conduct an on-site inspection at least every four months thereafter, and issue a draft Compliance Report 30 days after each inspection. A draft Report must be provided to the County and the United States for comment at least thirty (30) days prior to its issuance as a final Report. If any party wishes to comment, comments must be submitted to the Monitor no later than 10 business days after the draft is provided to the parties. The Monitor must consider the comments of the County and the United States, if any, before issuing each final Compliance Report.

150. The Compliance Reports must describe the steps taken by the County to implement this Agreement and evaluate the extent to which the County has complied with each substantive provision of the Agreement. Findings in the Monitor's Reports will be considered persuasive, but rebuttable, in Court. Each Report:

a.  Must evaluate the status of compliance for each provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance.

b.  Must be based on the Monitor's review of a sufficient number of pertinent documents and interview a sufficient number of staff and prisoners to accurately assess current conditions.

c.  May include information received by the Monitor through communication with former prisoners and staff, family members, local officials, criminal justice officials (including representatives of both the District Attorney's Office and Public Defender's Office), private defense attorneys, and relevant community members, so long as such communication is consistent with applicable law.

d.  Must describe the steps taken by the Monitor to analyze conditions and assess compliance. This description must include identifying any documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings. The report, however, must be prepare with due regard for the privacy interests of individuals.

e.  Must contain the Monitor's independent verification of representations from the County regarding progress toward compliance.

f.  Must provide recommendations to assist the County in attaining compliance with the Agreement, including a proposed outline of corrective actions that the County should implement within the next six months after issuance of the Monitor's report.

g.  Must be filed with the Court.

151. Nothing in this Section prohibits the Monitor from issuing interim letters or reports to the United States, the County, or the Court in this case, should the Monitor deem such correspondence necessary.

## D.   LIMITATIONS

152. The Monitor may not make any public statements (at a press conference or otherwise) with regard to any act or omission of the County, or disclose information provided to the Monitor pursuant to this Agreement, except as authorized by this Agreement, the Court, or by joint stipulation of the parties.

153. The Monitor may not testify in any other litigation or proceeding with regard to any act or omission of the County, or the County's agents, representatives, or employees, as those acts or omissions relate to this Agreement. The preceding restriction does not apply to any legal action brought by the Monitor against the County to obtain compensation for past services or to enforce the Monitor's rights under this Agreement. Unless called to testify by the Court or one of the parties to this Agreement, the Monitor may not testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement. Unless such conflict is waived in writing by the County and the United States, the Monitor must not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future private litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the County or the United States, including their departments, officers, agents or employees, regarding the subject matter of this case. If the parties cannot agree on whether to waive a conflict, they may seek appropriate relief from the Court. The mere fact that the Monitor provides expert opinion or consulting services regarding civil rights or institutional reform does not itself constitute a conflict, where such opinion or services are provided in another jurisdiction.

154. The Monitor is not a State, County or local agency; nor is the Monitor an agent thereof. Accordingly, records maintained or in the custody of the Monitor must not be deemed public records subject to public inspection.

155. The Monitor will provide the County with technical assistance as reasonably requested. Technical assistance requests must not interfere with the Monitor's independence and ability to assess compliance.

156. The Monitor will convene regular monthly conference calls with the County and the United States to discuss implementation of the terms of the Agreement, updates, and any other items that the Monitor or the parties wish to discuss.

157. The County, including its agents, representatives, and employees, is prohibited from retaliating against any person for providing information or assistance to the Monitor or the United States relating to this Agreement. If the Court finds that such retaliation has occurred, it may issue appropriate relief, including issuance of an appropriate protective order, sanctions, and referral for criminal prosecution.

158. The Monitor must treat all personally identifiable information obtained pursuant to this Agreement as confidential. While the Monitor may comply with this provision by using pseudonyms, codes, or initials when describing individual prisoners in any Compliance Report, the Monitor must also maintain a key. The Monitor must provide the key to the County and the United States, when submitting any Compliance Report, unless there is reasonable concern that such provision would subject the individual to retaliation. A copy of the key must be filed under seal with the Court if the Court requires filing of the key with the Compliance Report.

## VIII.     COUNTY SELF-ASSESSMENT REPORT AND COMPLIANCE COORDINATOR

159. The County must file a self-assessment compliance report. The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit. Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance

information, trends, statistical data, and remedial activities. Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

160. The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement. This person will serve as a primary point of contact for the Monitor. Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

## IX. EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e., failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

## X. JURISDICTION AND ENFORCEMENT

162. The United States District Court for the Southern District of Mississippi will retain jurisdiction over this matter for the purposes of enforcing this Agreement. The Court's jurisdiction extends to any facilities built, contracted, modified, or used by the County to house prisoners during the life of this Agreement.

163. During the period that this Agreement is in force, prior to initiating any enforcement proceedings in Court for an alleged failure to fulfill an obligation under this Agreement, the aggrieved party will notify the other party in writing of the facts supporting the aggrieved party's belief that the other party is not in compliance. The responding party will investigate the allegations and respond in writing within 30 days. If the parties are unable to resolve the issue(s) satisfactorily within 30 days of the written response, the aggrieved party may move the Court for any relief permitted by law or equity. In the event of an emergency (i.e., imminent threat to the life, health, or safety of prisoners), the United States may seek

immediate relief without providing the notice and conciliation otherwise required by this provision.

## XI. CONSTRUCTION AND TERMINATION

164. This Agreement will terminate if the parties jointly stipulate that the County has achieved and maintained substantial compliance with the Agreement for at least two years, and the Court then enters an appropriate order terminating the Agreement and dismissing jurisdiction.

165. If the parties do not jointly stipulate to dismissal, the County may file a unilateral motion to dismiss. The County may not file a unilateral motion to dismiss until this Agreement has been in effect for at least two years. Unless otherwise directed by the Court, the burden will be on the County to demonstrate that the County substantially implemented each provision of the Agreement, and that such compliance was maintained continuously for the two years prior to filing of the motion. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise substantial compliance, will not constitute failure by the County to maintain compliance. At the same time, temporary compliance during a period of sustained non-compliance will not constitute substantial compliance.

## XII. STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

166. The United States and the County stipulate and agree that this Agreement complies in all respects with the requirements for prospective relief under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

167. The United States and the County stipulate and agree that all of the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violations of federal rights as set forth by the United States in its Complaint and Findings Letter, is the least intrusive means necessary to correct these violations, and will not have any adverse impact on public safety or the operation of a criminal justice system.

FOR THE UNITED STATES OF AMERICA:

GREGORY K. DAVIS
 U.S. Attorney
Southern District of Mississippi

VANITA GUPTA
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Civil Rights Division

MITZI DEASE PAIGE
Civil Chief
U. S. Attorney's Office
Southern District of Mississippi
501 East Court Street
Suite 4.430
Jackson, MS 39201
 (601) 973-2840
Mitzi.Paige@usdoj.gov
MS Bar #6014

STEVEN H. ROSENBAUM
Chief
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave. N.W
Washington, DC 20530
(202) 514-5393
Steven.Rosenbaum@usdoj.gov
NY Bar #1901958

LAURA L. COON
Special Counsel
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., NW
Washington, DC 20530
Laura.Coon@usdoj.gov
DC Bar # 481379

CHRISTOPHER N. CHENG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-8892

(202) 514-4883 (fax)
Christopher.Cheng@usdoj.gov
PA Bar #69066


*Elizabeth C Kelley*
ELIZABETH C. KELLEY
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-0460
Beth.Kelley@usdoj.gov
VA Bar #80255

FOR THE COUNTY, SHERIFF, BOARD OF SUPERVISORS, AND COUNTY
ADMINISTRATOR:

PIETER TEEUWISSEN
Board Attorney
P.O. Box 686
Jackson, MS  39205-0686
(601) 968-6797
(601) 968-6794 (fax)
MS Bar #8777
pteeuwissen@co.hinds.ms.us

CLAIRE BARKER
Counsel to the Sheriff
407 East Pascagoula Street
Jackson, MS  39205
(601) 974-2967
(601) 968-6105 (Fax)
MS Bar # 101312
cbarker@co.hinds.ms.us