Court-Appointed Monitor's First Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 WHB-JCG

Elizabeth E. Simpson, J.D.
Court-Appointed Monitor

David M. Parrish                   Jacqueline M. Moore, RN, Ph.D.          Jim Moeser
Corrections Operations             Corrections Medicine                    Juvenile Justice

## EXECUTIVE SUMMARY

Following the first site inspection in October 2016, the Monitor prepared the Baseline Visit Report which summarized the status of the County with regard to the many provisions of the Settlement Agreement.

Subsequent to the first visit, the County hired a Compliance Coordinator which has improved communication with the Monitor and appears to be facilitating steps towards compliance.  In addition, the Sheriff's Office took a positive step in December when it began to utilize some of the available space in the Work Center (WC) to accommodate prisoners that were (and are) crowding the understaffed Raymond Detention Center (RDC).

There followed the second visit and the first actual monitoring visit in February, 2017. Progress had been made in a number of areas. However, there were a number of critical areas of deficiency having substantial impact on the health and safety of the prisoners.  The body of this report contains a listing of each substantive requirement of the consent decree and a description of the status of compliance as of the time of the site visit. This executive summary highlights some areas of progress and those areas of greatest concern.  Communications since the time of the site visit indicate that additional progress has been made subsequent to the site visit. This report, however, reflects conditions at the time of the site visit. The progress since that time will be reflected in the report on the next site visit.

**Corrections Operations**

The overarching problem facing the Hinds County Jail System is the inability to hire and retain enough qualified personnel (deputies) to staff required positions.  No matter what other steps are taken to address operational problems within the facilities, compliance with conditions of the Settlement Agreement cannot be achieved until this matter is successfully addressed.

For at least five years, there have not been enough officers on board to staff direct supervision housing units, particularly at the RDC, as they were originally designed.  This has left prisoners in charge, which resulted in riots, prisoner deaths and major structural damage to the facility. Repairs to the jails have not been long-term solutions because, unsupervised, the prisoners are free to quickly destroy what has been repaired.   Until each direct supervision housing unit is continuously staffed, and sufficient escort officers are on board to relieve and back them up, the cycle of facility and equipment destruction cannot be broken.

In order to identify and address a problem it is necessary to record accurate data.  Until one has a baseline against which to measure progress, it is impossible to move forward.  The lack of accurate, verifiable data with regard to incidents that occur within the Hinds County Jail System,

2

makes corrective action problematic at best.  Based on the amount of damage that is readily observable throughout the facilities, the obvious lack of staff in critical positions, and the dearth of incident reports that one would expect to be generated regarding such conditions, it is apparent that report writing is not a primary concern of Hinds County Jail staff.  It will take a great deal of effort to reverse this historical failure to document significant incidents.

A positive result of the various committees created by the Compliance Coordinator is reflected in the fact the WC has already made modifications to the ten confinement cells located on each side of the main corridor. The double deck bunks have been replaced with single beds and the (unused) corridor surveillance gangway has been removed.  Once the other recommendations submitted by the Monitor have been put into place, the WC will become a much more staff-efficient, and secure, facility.

**Youthful Offenders**

There has been little, if any, substantive progress in addressing requirements related to youthful prisoners since the baseline visit in 2016.  The assignment of an officer to the youthful prisoner unit on a more consistent basis is a step forward as is the recognition that more needs to be done related to providing appropriate programming for youth, including educational assessment and supports as well as other services.  However, overall staff and physical plant limitations continue to be a significant barrier to progress.  A decision on where to house youthful offenders in the future needs to be made as soon as possible, as making a successful transition will require substantial planning and will have fiscal implications that should be considered in the development of the county's 2018 budget.

The responsiveness of key leadership in Hinds County is a positive sign of their recognition of the importance of addressing the requirements for youthful prisoners, but it is evident that the scope and complexity of issues facing the County makes it difficult to make progress in this area separate from addressing other fundamental concerns.  Nonetheless, the County must take steps to incorporate additional support services (e.g.  education assessment and instruction programming beyond GED supports, mental health assessment and treatment services, life skill programming, etc.) that could be provided on a limited basis within the current structure of the facility.

**Medical and Mental Health**

Quality Correctional Health Care ("QCHC"), the contract medical and mental health provider for the Hinds County detention facilities, has developed health care policies and procedures, however they are not specific to the requirements of the consent decree nor are they in accordance with NCCHC standards.    This will be a priority for the next quarter.  Two new

forms have been developed for mental health. One is an AIMS test (Abnormal Involuntary Movement Scale) for tardive dyskinesia and the second is a mental health consent form.  Yet to be implemented is a use of force report. Despite the prevalence of mental illness among the prisoner population, there is little or no discharge planning.  A discharge planner should be a priority for the County and QCHC.

**Criminal Justice and Correctional System Issues**

In this area as well, key leadership in the county expressed strong support for developing systemic improvements. At the time of the site visit, the County brought together potential facilitators and contributors to the development of a Criminal Justice Coordinating Committee ("CJCC") as a start to laying the groundwork for the implementation of such a committee. County leadership demonstrates an effort to be strategic in building an effective CJCC. However, a broader meeting of the stakeholders has not yet taken place nor has the County retained a consultant to assist with this process, a consent decree requirement that is now long overdue.  Of great concern is the lack of any progress at the time of the site visit in the area of detaining individuals unlawfully when fines and fees are ordered although as of the date of this report, some progress is reported. This has included some individuals who are detained solely for old fines or fees after present pending issues are resolved including situations where there has never been a court order of detention. Equally concerning is the lack of tracking at Raymond of expected release dates. Records staff relies upon the prisoner to notify them when the prisoner believes they should be released.  It also became apparent that the record system is significantly inaccurate even with respect to who is in the facility.

County and correctional staff also demonstrated motivation to develop the systems that will allow them to track and achieve compliance. The hiring of a compliance coordinator is a good step in this direction. However, the infrastructure to track, demonstrate and ultimately achieve compliance still needs to be developed. This includes completing a self-assessment, initiating and improving record keeping, and developing the ability to generate routine reports and respond to special inquiries. The ability to access data is not just for purposes of demonstrating compliance; it is an important internal tool for tracking and achieving safety and security within the facility.

**Priority Recommendations**

Following the February 2017 site visit, the Monitoring Team identified steps that could be taken to make interim improvements so that real, measurable progress could be made in some priority areas while the Board worked on the financial solution.  To that end, in late February, the Monitor submitted a list of Priority Recommendations.  (Attachment 1) They included seven items associated with jail operations; three regarding juvenile offenders; six concerning criminal

justice system issues; and four associated with medical/mental health issues.  All of the Priority Items represent action that the County can take without waiting to go through the annual budget cycle for funding.

Shortly after the second site visit the Compliance Coordinator organized a number of working groups, which have designated members, specific assignments and a set meeting schedule.  They are:  (1) Steering/Reporting Group; (2) Workforce Development; (3) Facilities Maintenance/Housing/Equipment; (4) Mental Health and Substance Abuse; and (5) Criminal Justice Coordinating Committee.  The Priority Recommendations submitted by the Monitor were passed along to each of these working groups for their respective action.  As was reported in the Clarion Ledger on March 10, 2017, these steps have already resulted in a change that is both cost effective and operationally efficient.  By no longer participating in the program that allows it to house and work state prisoners, Hinds County saves the cost of food and medical care, frees up approximately twenty deputies who can now supervise Division of Detention prisoners and makes 200 beds at the WC available to help ease the crowded conditions at the RDC.

## MONITORING ACTIVITIES

The Monitoring Team conducted a Site Visit February 7th through the $10^{th,}$ 2017.  The Site Visit schedule was as follows:

| February 7th | | | |
|---|---|---|---|
| | Track One | Track Two | Track Three |
| A.M. | Introductory Meeting With Stakeholders including Board of Supervisors, County and Sheriff Attorneys, Sheriff, Sheriff and Detention Staff, Medical Staff, Hinds County Behavioral Health Staff, Potential CJCC participants | | |
| A.M. | Moeser visits Henley Young Discussions with Director Johnny  McDaniels, Operations Manager Eric Burnside, and Kenneth Devine, School Principal | Moore and Parrish go to Jackson facility | Simpson meets with Attorneys, Compliance Coordinator, and potential CJCC participants |
| P.M. | Moeser visits Henley Young | Moore and Parrish go to Work Center | Simpson goes to Work Center to review fines and fees records; meets with Capt. Chandler, Deputy Neal |
| February 8th | | | |
| A.M. | Meeting with Major Rushing and Raymond Leadership; County Attorneys join at | | |

| | 10:00 | | |
|---|---|---|---|
| A.M. | Moeser and Parrish tour Raymond and review records | Moore tours medical areas and reviews medical records | Simpson tours booking; reviews booking and release records |
| P.M. | Parrish and Moeser continue tour of Raymond and review | Moore continues record review; Moeser joins for review of juvenile records | Simpson meets with Compliance Coordinator to go over self-assessment |
| February 9th | | | |
| A.M. | | | Simpson and team meet with compliance coordinator and IT team to discuss reports that must be generated and documents to be produced |
| 11:00 | | | Simpson and Moore meet with QCHC |
| P.M. | Parrish continues to tour Raymond | | Simpson, Moeser and Moore meet with combined jail based and community based mental health stakeholders |
| | | | Simpson reviews grievance and court tracking records; Tours visitation areas |
| February 10th | | | |
| A.M. | Exit Meeting | | |

Prior to the site visit, the County provided some documents in response to previous document requests. The attached spreadsheet indicates the documents requested and those received. (Attachment 2) All documents received were reviewed either prior to or, because of the short time available prior to the site visit, after the site visit.

In the course of the site visit, the team interviewed numerous staff members, contractors, prisoners and stakeholders as mentioned below when relevant. In addition, facility and prisoner records on site were reviewed during the course of the site visit again as referenced below when relevant.  A number of documents related to staffing and budget were reviewed but there

remained a lack of clarity in this area and additional documents were requested post visit. Draft policies and procedures were reviewed but final policies and procedures have not yet been completed. With respect to youthful prisoners, on-site activities included discussions with Major Rushing related to education programming, the review of 21 youthful prisoner records and the GED files for all enrolled, the interview of 4 youthful prisoners, brief interview of Sgt. Tower, and an interview of Deputy Newell, the Programming Officer. With respect to medical and mental health, prisoner medical records and QCHC records were reviewed.

An additional document request was made after the site visit.  This request is attached in spreadsheet form showing what documents have been provided. (Attachment 3) Those that have been provided have been reviewed. Some requests are still pending. Specific to youthful offenders, post visit document review included daily count records for Henley Young for approximately November 2016 through early March 2017, Raymond 2017 draft Policies and Procedures Manual and Raymond daily count records related to youthful prisoners.

## COMPLIANCE OVERVIEW

The monitoring team will track progress towards compliance with the following chart. This chart will be added to with each monitoring report showing the date of the site visit and the number of consent decree requirements in full, partial or non-compliance. Requirements that have not yet been triggered such as an annual review are listed as NA (not applicable) at this time. Sustained compliance is achieved when compliance with a particular settlement agreement requirement has been sustained for 18 months or more. The count of 91 requirements is determined by the number of settlement agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart.

| Site Visit Date | Sustained Compliance | Full Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

7

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:

    a.  Booking;

    b.  Objective classification;

    c.  Housing assignments;

    d.  Prisoner supervision;

    e.  Prisoner welfare and security checks ("rounds");

    f.  Posts and post orders;

    g.  Searches;

    h.  Use of force;

    i.  Incident reporting;

    j.  Internal investigations;

    k.  Prisoner rights;

    l.  Medical and mental health care;

    m.  Exercise and treatment activities;

    n.  Laundry;

    o.  Food services;

    p.  Hygiene;

    q.  Emergency procedures;

    r.  Grievance procedures; and

    s.  Sexual abuse and misconduct.

**Non-Compliant**

A Policies and Procedures Manual for the Detention Division has yet to be compiled.  During the February site visit draft versions of independent manuals for each jail were provided to the Monitor.  The failure to develop a single manual that applies to all three facilities reflects the long history of each jail acting as a stand-alone facility instead of an integral part of a jail system.  Work is now underway to consolidate the three drafts and develop one manual.  According to status reports developed by the Compliance Coordinator, the manual was to be completed and presented at the March 20, 2017, meeting of the Board of Supervisors, then on to the Monitor by April 1, 2017.

With respect to the medical policy and procedure there are several deficiencies that should be specifically addressed. All intakes are still performed by Correctional Officers at the Raymond Facility. Nurses have been assigned to the intake area but rather than performing the receiving screening they are providing a health assessment.  The nurses have been provided with a room in the intake area but there is no examination table there.  There is no ophthalmoscope or otoscope to look into the patient's eyes or ears.  Instead the nurses bring a flashlight which is totally unacceptable.

Nurses at the Jackson Facility are required to review the charts created at the Raymond Facility and follow up on any medications or appointments.  There is a space on the intake form for nurses to sign when they have reviewed the chart; however 80% of the time it was not signed indicating review by the Jackson nursing staff was not completed. The electronic medical record is not used by all providers.

 Dr. Kumar, the contract psychiatrist, visits the Jackson Facility at 7 AM in the morning once every two weeks.  Many of the patients that are on his list do not get up to attend their appointment and thus do not receive mental health counseling or medication therapy.  The appointments are marked refused and are not re-scheduled.  Consideration should be provided for appropriate appointment times and all appointments should be re-scheduled at least for a second visit.

A review of medication administration records and interviews with prisoners indicated that bedtime medications are distributed around 5 PM.  It is recognized that the prisoners are locked in their cells by 9PM, however many of the medications given at bedtime have short half-lives, thus if the medication is given too early the effects will peak out at 6 hours and the patient will be awake all night which is not the purpose of the medication order.

There has not been an administrative meeting with the medical staff since five months ago.  This was brought up at the exit conference.  The meetings should be held quarterly and involve the doctor, social worker, health administrator and correctional supervisors.  The Health staff has not implemented a continuous quality improvement system.  Chart audits and peer reviews should be performed on a monthly basis. The policies and procedures have been reviewed.  The policies have been pulled together from several different projects that QCHC manages and are not specific to the consent decree.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy

administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

The current Jail Administrator does not have the requisite bachelor's degree.  Although she majored in Criminal Justice at Mississippi Valley State University (1978-80) and Chicago State University (1980-81) she did not graduate.  Consideration should be given, however, to her extensive experience in law enforcement and corrections at both the local and state level. Beginning as a police officer with the Flora, Mississippi Police Department from 1981 to 1986, she moved on to become the Jail Administrator for the Madison County (Mississippi) Sheriff's Department from 1986 to 2000.  Thereafter she was employed by the Hinds County Sheriff's Office where she rose through the ranks from Corporal to Assistant Director between 2002 and 2006 and to Director from 2006 to 2012.  That was followed by almost two years (2012-2013) with the Mississippi Department of Corrections as a Facility Commander and two more years as Warden of the Yazoo County Regional Correctional Facility (2014-2015).  In January 2016 she assumed her present position as the Major in charge of the Hinds County Division of Detention. Based on her extensive experience, completion of numerous career development courses and obvious commitment to the position, the monitoring team does not recommend a personnel change in this position.  Although there is an authorized deputy administrator position in the table of organization, it is presently unfilled.


39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Non-Compliant**

A number of senior level supervisory positions (three lieutenants) have not yet been filled.  The personnel files of the three captains and existing sergeants have not yet been examined to determine whether or not they meet the minimum three-year experience standard. This provision is noted as non-compliant as compliance has not been demonstrated. It should be noted, however, that their familiarity with Jail policies and procedures must be questioned considering the fact that there is no published manual available at this time.


40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Non-Compliant**

Individual employee records have not yet been examined due to time constraints during the site visit. This provision is noted as non-compliant as compliance has not been demonstrated.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

Since the Policies and Procedures Manual has not yet been issued, this item cannot be measured; however, it should be noted that currently only the Work Center operates under the principles of Direct Supervision.  While the Raymond Detention Center was designed for and operated that way initially, it will not be able to re-implement Direct Supervision until enough deputies are hired to staff the housing units.  The Jackson Detention Center was built before the practice of Direct Supervision was conceived and will never be able to become a Direct Supervision facility because of its design.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:

        i.  There are at least two detention officers in each control room at all times;

        ii.  There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii.  There are rovers to provide backup and assistance to other posts;

        iv.  Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v.  There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i.  The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii.  The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

       iii.  As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

  c.  Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

  d.  The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

  e.  The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

The Jail system has insufficient staff, both authorized and on board, to effectively operate the facilities or fulfill the terms of the Agreement.  The National Institute of Corrections (NIC) Staffing Analysis (2014) has not been reviewed or updated.  In fact, the most basic of computations, an in-house post, shift and position classification requirement, with associated relief factor, is not available to validate the need for a specified number of positions.  During the February site visit the steps necessary to carry out this initial effort were covered in detail with the Division Major and three facility Captains.  Once that has been accomplished, the resultant figures need to be carefully compared to the NIC study and the Consent Agreement to clarify inconsistencies.  In the interim, the 5.1 relief factor identified by then Sheriff Tyrone Lewis in his memorandum dated September 23, 2013, should be utilized as the basis for preliminary staffing computations.  This equates to 1.2 staff required for a single shift, five days per week (not 1.4 as was stated in the previously mentioned memorandum); 1.7 staff for a single shift seven days per week; and 5.1 for a post that is operated seven days per week on all three shifts.  These figures should be utilized by Hinds County when computing workforce projections.  Current turnover projections for 2016, based on the first nine months of the year, indicate that the WC will be 30.3%, the JDC 22.7% and the RDC 56.2%.  While those numbers reflect an improvement over previous years, they are still excessive to the point that the RDC, in particular, cannot function effectively.  Further, the accuracy of any figures associated with the authorized and actual work force is suspect because neither the County nor the Sheriff's Office has been able to provide a valid list to date.  It is imperative that a comprehensive list of all authorized positions, identified by a permanent position number, and organized by Operations and Detention Division of the Sheriff's Office, be provided to the Monitor as soon as possible.  In order to address the County's inability to hire and retain enough qualified deputies, it is essential that immediate action be taken to create a competitive salary schedule that recognizes and

rewards longevity.  The current system, which pays the same amount to a ten-year deputy as it does to a new hire, is entirely untenable.

f.  Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

    i.  The classification process must be handled by qualified staff who have additional training and experience on classification.
    ii.  The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.
    iii.  Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.
    iv.  The classification system must track the location of all prisoners in the Jail, and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.
    v.  The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.
    vi.  The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

While significant progress has been made toward the development and implementation of an objective and validated classification and housing system, major enhancements are required before compliance can be achieved.  The Classification staff is only available Monday through

Friday on the day shift.  Further, they do not have total authority on facility, unit and cell assignments.  They are not even routinely kept up to date when changes are made during their absence.  Currently, prisoners arrested over the weekend are not interviewed for classification until mid-day Monday.  In order to make significant progress in this area, Classification staff needs to be on duty seven days per week.  All prisoner movements must be cleared through Classification in advance.  During the evening and night shifts, supervisors must document any movements and forward that information to Classification so that corrective action can be taken in the morning, if necessary.  Strong consideration should be given to combining Classification and Records in order to expand hours of operation while standardizing record keeping.  There needs to be a single point of information for every prisoner in the Jail System instead of compartmentalized records in the various facilities.  While gang based unit assignment has been curtailed, behavior based classification, as opposed to charge based, has yet to be implemented.

    g.  Develop and implement positive approaches for promoting safety within the Jail including:

        i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

        ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

        iii.  Creating work opportunities, including the possibility of paid employment;

        iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

        v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

        vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

        vii.  Providing reasonable opportunities for visitation.

    h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.  Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Non-Compliant**

Outdoor recreation has been non-existent throughout the Jail System, except in the WC, since the riot at the RDC in 2012.  Other programs and educational opportunities are rarely available due to lack of staff.  Enhanced security for problematic/high security prisoners is not available for the same reason.  Hourly well-being checks at the RDC and JDC are sporadically documented, but are essentially meaningless in that deputies do not enter the units and check individual cells.  More frequent well-being checks, as specified in the Settlement Agreement are not performed except when a prisoner is on a suicide watch in the Infirmary of the RDC.  Progress has been made with regard to the juveniles housed at the RDC in that their unit is staffed at least part time.  An enhanced video surveillance and recording system at the RDC represents a significant step forward; however, there is no one available to monitor it except for the single deputy assigned to Master Control, and that officer is already severely overtaxed with time-consuming duties.  At the time of the February site visit, the JDC had no video or recording capability, but in March cameras and recording equipment were installed.  They cover some support areas of the jail as well as the third and fourth floor corridors.

With respect to programing for youthful prisoners, based on discussions with Deputy Newell and Major Rushing, it is apparent that the adult GED program is still in place, although it is not clear how many prisoners, including young adults, take advantage of the program compared to how many may be eligible given more staffing and space.  Deputy Newell seems to be in the process of building up other programming that could be available to prisoners, utilizing his connections in the faith community to recruit potential volunteers and other programs to provide services.  Deputy Newell indicates that he circulates information about programming options to prisoners, and prisoners can then express their interest in the various options (e.g. Reading, Anger Management, Fatherhood, Computer Skills, Employment, Parenting, Credit Recovery, Alcohol/Substance Abuse).  Even if Deputy Newell is successful in getting these program offerings off the ground, significant staffing and physical plant challenges will remain in being able to provide appropriate services.

Individuals who would benefit from group treatment would include individuals with substance abuse, prisoners charged with or who have been involved in domestic violence and prisoners on the mental health unit which could include courses of daily living.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome

measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

a. Staff vacancy rate of more than 10% of budgeted positions;

b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

c. A major disturbance resulting in the takeover of any housing area by prisoners;

d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e. Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

f. One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g. One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

These outcome measures are not routinely collected as part of the Jail's internal reporting processes. Currently, several of the outcome measures listed create a rebuttable presumption of unsafe conditions. The turnover rate for all three facilities exceeds 20%, while at the RDC, the largest jail, the turnover rate is more than 50%. This results in no staff being available to stand required posts. With the exception of the Juvenile Unit, all units at the RDC are routinely left unattended. During the most recent site visit, Pod B did not have a single officer assigned, except for the Control Room, on the second shift (February 8th). This shortage was only rectified when Captain Shields ordered an officer to be pulled from Booking so that there would at least be a rover in the corridors for the Pod. Use of force reports are still suspect in that the number of recorded reports is unrealistically low considering the number of incidents that resulted in media coverage and the level of destruction in the facilities, particularly the RDC. An outcome measures system is not in place with regard to data collection. Incident reports requested by the Monitor have not been provided beyond September 2016.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate. To that end:

a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b. All security rounds must be conducted at irregular intervals to reduce their predictability, and must be documented on forms or logs.

c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed. Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility. This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, prisoner worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Non-Compliant**

At present, only the WC adequately documents well-being checks. They are recorded in the unit master log on an hourly basis when the unit deputy confirms the current count. Even here, however, the practice does not comply with what the Settlement Agreement requires (30 minute well-being checks). At the JDC well-being checks are recorded in the control rooms on the third and fourth floors. That practice needs to be modified by placing a log at the end of each corridor for the respective floor officers to sign as they make their rounds. While that still does not insure that the officer has checked each cell, at least it will guarantee that he/she has traversed the wing at least once per half hour as required. At the RDC there is no system in place to satisfy the requirements of this section. It cannot be met until a deputy is assigned inside each unit on every shift.

45. Ensure that all correctional officers receive adequate pre and post-service training to provide for reasonably safe conditions in the Jail. To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

a.  Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

b.  Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c.  "Direct supervision" training.  Detention officers must receive specific pre- and post-service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.  Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d.  Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.  Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies.  The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding

supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

While pre-service training for new officers is now being conducted, there is still a backlog of required pre, post and in-service training.  Further, Direct Supervision training for deputies and supervisors is lacking.  The Major has attended specialized management training at NIC's Large Jail Network, but similar training has yet to be provided to the facility commanders (Captains). Post Order training is dependent upon the issuance of current Post Orders, which has not been done because the Policies and Procedures Manual has not yet been issued.  Required specialized training is similarly lacking.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

a.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

b.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c.  Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d.  Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

i.  Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

ii.  An inspection process.

    iii.  A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

    iv.  A requirement that any corrective action ordered be taken.

    v.  Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

    vi.  To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

The Policies and Procedures Manual has not yet been published and issued.  While the Sheriff's General Orders Manual does specify that the Detention Services Division Major is responsible for the operation of the Division, and thus all three facilities, it is not sufficiently specific to be responsive to the management issues specified in this section.  There is currently no way to confirm that supervisors conduct daily rounds on each shift in the housing units.  A review of unit logs at the RDC does not support such activity there.  Nor is there a system in place to identify and correct maintenance issues.  This was apparent at each facility where long standing damage and maintenance items go uncorrected.  At the RDC the prisoner wristband system in Booking was found to be out of operation.  The best estimate of the duration of the problem was "two months or more" as stated by the officer assigned to the Identification Post (mug shots, finger prints and wristbands).  During the walk through of the housing units, several showers were found to be running constantly.  They were incapable of being shut off at the showerhead.  This appears to be an ongoing problem that is simply accepted by staff.  At the WC a toilet in Unit 4 has been out of order for over seven months.  After it was noted during both the October 2016 and February 2017 site visits, Captain Chandler researched the matter and determined that a work order was submitted on June 29, 2016.  At the JDC, lights in the two holding cells in Intake have been inoperative for an undetermined amount of time, but worse yet; the ventilation in those cells is either non-functional or inadequate to the point that officers have to periodically open the cell doors so that the prisoners can breather fresh(er) air.  While written work orders are submitted to County maintenance staff, there is no system in place to insure their timely completion.


47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

While shakedowns may occur on an irregular basis, there is no schedule and record to reflect that such is happening.  Indicative of this shortfall was the recent escape at the RDC that occurred

just prior to the Super Bowl football game.  A prisoner literally pounded and chiseled a hole in the exterior wall of his cell, exited the facility and was captured by the outside security officer as he attempted to retrieve contraband items that an outside accomplice had thrown over the perimeter fence.  The ease of access to contraband items by prisoners is exacerbated by the fact that deputies are not assigned to duty inside each housing unit as they should be.   Over a period of just three days in early April, large holes were found in the perimeter fence and the exterior walls of two cells in A Pod at the RDC.  During a follow up cell search, a mobile phone, a "shank" and thirty unauthorized blankets were recovered.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.
**Non-Compliant**
There is no record that action has been taken to address this issue.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.
**Non-Compliant**
There is no record that action has been taken to address this issue.  In the Monitor's Baseline Report it was noted that the practice of classifying and housing prisoners according to gang affiliation had been ended shortly after the new Sheriff's administration assumed command.  It should be noted, however, that some incident reports indicate that the impact of gang membership is still significant.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:
  a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
  b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c.   Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

    d.   Prohibit the use of force as punishment or retaliation;

    e.   Limit the level of force used so that it is commensurate with the justification for use of force; and

    f.   Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Until the Policies and Procedures Manual is issued to all personnel the adequacy of procedures associated with use of force cannot be determined.  In the interim, under the technical assistance provision of the Consent Agreement, model Incident Report and Use of Force Report forms from the Volusia and Hillsborough County Jail Systems in Florida were provided to the Compliance Coordinator for use by Hinds County Detention staff.  It should be noted that the number of incident reports and use of force reports that were filed through September, 2016, appear to be very low considering the amount of damage that is obvious throughout the Jail System.  It is doubtful that incident reports and use of force reports accurately reflect the number of incidents that should be documented.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a.   Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b.   If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

        i.   The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

        ii.   Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

        iii.   Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force.  Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility.  Such controls must include:

   i. a sign-out process for staff members to carry any type of weapon inside the Jail,

   ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

   iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

j. All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

Until the Policies and Procedures Manual is issued to all personnel, the adequacy of policies dealing with use of force and coordination between line and medical/mental health staff cannot be determined.  Current incident reports and use of force reports do not reflect compliance with this section's referenced standards.  Until the Policies and Procedures Manual is issued to all personnel, the adequacy of policies dealing with periodic well-being checks and follow up by medical and mental health personnel cannot be determined.   There are no records maintained

regarding 15 minute well-being checks except in the Infirmary where prisoners are under suicide watch.  No records have been provided to date regarding prisoners who are in restraints. Until the Policies and Procedures Manual is issued to all personnel, the adequacy of policies associated with planned use of force situations, video recording, non-lethal weapons inventory and supervisory notification, cannot be determined.  No records have been provided to date regarding planned use of force situations.  There is no record of an inventory of less than lethal weapons, nor is there a record of discharge of such weapons.

The County does not utilize restraint chairs but does utilize pepper spray and tasers.  The QCHC staff has been instructed to develop a use of force report and to document whenever force is utilized. QCHC has also been tasked with the development of medical policies when pepper spray is utilized and when tasers are used. These policies have not yet been developed.

The policy for QCHC is for the health care staff to respond to all use of force incidents and cell extractions.   The policy indicates that security will consult with medical for allergies such as asthma, other respiratory conditions or mental health illness.  Health monitoring, is put in place and if a medical or mental health condition develops, then the physician is notified.

The QCHC policy indicates that security will consult with medical staff before and after all use of force on juveniles or prisoners so that medical and mental health can offer alternatives such as de-escalation techniques and voluntary cooperation with medications.  The practice will be reviewed at the next site visit to determine if this practice is followed.

## USE OF FORCE TRAINING

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.
**Non-Compliant**
The Policies and Procedures Manual has not yet been issued to all personnel; however the Training Director is developing an on-going program for new and existing employees.  Records are not yet available to validate compliance.

53. Topics covered by use of force training must include:
   a. Instruction on what constitutes excessive force;
   b. De-escalation tactics;
   c. Methods of managing prisoners with mental illness to avoid the use of force;
   d. Defensive tactics;
   e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Non-Compliant**
The Policies and Procedures Manual must be issued to all personnel before this section can be properly analyzed.  The Training Director needs to provide a training curriculum covering use of force, de-escalation tactics, and defensive tactics.  The training curriculum has been requested.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.
**Non-Compliant**
This cannot be completed until after the training is completed.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.
**Non-Compliant**
This cannot be updated until the requisite training has been completed.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.
**Non-Compliant**
This matter cannot be addressed until the Policies and Procedures Manual is issued to all personnel.  Current forms and procedures do not provide for adequate supervisory review.  The forms simply provide a space for "Supervisor Signature".  That is inadequate in that a supervisor's signature does not indicate approval, disapproval or recommendation for corrective/follow up action.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.
**Non-Compliant**

This requirement will be analyzed once the Policies and Procedures Manual is issued to all personnel.  At present, it is not possible to tell whether or not incident reports are submitted in a timely fashion or whether supervisors follow through within the time parameters specified in the Settlement Agreement.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

      a.  A unique tracking number for each use of force;

      b.  The names of all staff members, prisoner(s), and other participants or witnesses;

      c.  Housing classification and location;

      d.  Date and time;

      e.  A description of the events leading to the use of force, including what precipitate or appeared to precipitate those events;

      f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

      g.  A description of the staff member's attempts to de-escalate the situation without use of force;

      h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

      i.  A description of any observed injuries to staff or prisoners;

      j.  Whether medical care was required or provided to staff or prisoners;

      k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

      l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Non-Compliant**

After the Policies and Procedures Manual is issued to all personnel, and a revised Use of Force Report is put in place, it will be possible to determine whether or not policies comply with this standard.  In the interim, forms and existing procedures do not comply with the Settlement Agreement.

**USE OF FORCE SUPERVISOR REVIEWS**

59.     The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

      a.     A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

      b.     A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

      c.     Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

      d.     If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

      e.     Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

      f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

      g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

Appropriate supervisory review cannot be determined until the Policies and Procedures Manual is issued to all personnel and they have had an opportunity to implement it.  Currently, supervisors merely sign off on forms.  Their signature does not reflect agreement, disagreement or recommended action.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

      a.     Ensure the safety of everyone involved in or proximate to the incident.  Determine if anyone is injured and ensure that necessary medical care is or has been provided.

      b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident.  Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver

indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.    Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.    Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.    Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

Until the Policies and Procedures Manual is issued to all personnel it is impossible to determine whether or not proper supervisory review practices were followed.  Currently, both forms and practice do not reflect compliance with the terms of this section.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

See the previous response, above.   With only three use of force reports submitted from January through September, 2016, it is not reasonable to assume that such incidents are being routinely documented or that supervisory review is being conducted appropriately.  The three use of force reports in question did not comply with the Settlement Agreement's standards.

62. Reviewing supervisors must document the following:

a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

b.    Witness statements;

c.    Review date and time;

d.    The findings, recommendations, and results of the supervisor's review;

e.    Corrective actions taken;

f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.  Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

i.  The nature and extent of injuries, or lack thereof;

ii.  The date and time when medical care was requested and actually provided;

iii.  The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.  Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

See the previous response, above.  Existing incident reports and use of force reports do not reflect compliance with the above referenced criteria.   Photographs, digital recording and related records are not currently maintained.

**INCIDENT REPORTING AND REVIEW**

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.  Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

Incident Report policies and procedures have not yet been issued.  When they have been put forth in the required Policies and Procedures Manual, this matter will be addressed.  As was previously noted, the Monitoring team has provided sample forms to Hinds County from agencies that have model documents and procedures in place.

QCHC policy requires that all injuries to staff and prisoners are to be reported on a log.  Also included are the medical care received and the housing area of the occurrence.   Medical staff that has been involved or has observed a reportable incident are to complete an incident report.

64.  Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:

a.  Tracking number for each incident;

b.  The names of all staff members, prisoner, and other participants or witnesses;

c.  Housing classification and location;

d.  Date and time;

e.    Type of incident;

f.    Injuries to staff or prisoner;

g.    Medical care;

h.    All staff involved or present during the incident and their respective roles;

i.    Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

j.    External reviews and results;

k.    Corrective action taken; and

l.    Warden and Administrator review and final administrative actions.

**Non-Compliant**

The comments associated with the previous section apply. As an indicator of non-compliance, on March 4, 2017, three prisoners escaped from the RDC. Their escape was not even noted until an arresting officer from another agency called the facility and reported that there was a prisoner outside of the facility by A Pod. A review of records revealed that the officer responsible for conducting the head count prior to the incident had obviously counted a "body" as opposed to a prisoner. No corrective action or recommendation by a supervisor was noted on any incident report. In fact, some forms were not even signed by a supervisor. Certainly, nothing went to the level of the Captain or Major.


65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift. At minimum:

a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion. Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report. If no injuries are present, staff members must write that; they may not leave that section blank.

b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

c.    Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

Policies and Procedures must first be issued before compliance with these criteria can be measured. It is not possible to determine whether or not disciplinary action is required when nothing has been documented at the supervisory level.


66. Ensure that Jail supervisors review and respond appropriately to incidents. At minimum:

a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

b.     Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

c.     Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.     Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

The Policies and Procedures Manual must be issued to all personnel before this matter can be addressed.  Based on existing incident reports, supervisors are in non-compliance with the criteria.


## SEXUAL MISCONDUCT

67.     To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

a.     Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.     Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.     Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.     Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.     Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.     A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.     A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.     Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.     Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Non-Compliant**

This matter cannot be addressed until the Policies and Procedures Manual is issued to all personnel and a Prison Rape Elimination Act (PREA) Coordinator is designated.  At present there is no record on file to reflect compliance with any aspect of this section.

QCHC has not yet developed a formal policy that meets PREA guidelines.  The medical policy when developed should identify needed staff training, the process for screening prisoners for rape at the local hospital, the availability of prophylactic treatment for sexually transmitted diseases, and the completion of an examination by a qualified mental health.  In practice, prisoners are sent to a community hospital. In the new policy, QCHC should have the authority to promptly refer cases of suspected abuse to the jail administrator, IAD or other law enforcement agencies.

## INVESTIGATIONS

68.    The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

     i.     Any prisoner exhibited a serious injury;

     ii.     Any staff member requested transport of the prisoner to the hospital;

     iii.     Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

     iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.     Per policy, investigations shall:

     i.     Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

       ii.      Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

       iii.     Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.      Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.      Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.      Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

       i.       Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

       ii.      Any staff member requested transport of the prisoner to the hospital;

       iii.     Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

       iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.      Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

       i.       a brief summary of all completed investigations, by type and date;

       ii.      a listing of investigations referred for administrative investigation;

       iii.     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

       iv.     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

       v.      a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.      Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Non-Compliant**

Compliance with this section cannot be achieved until the Policies and Procedures Manual is issued to all personnel.   Currently, criminal investigators conduct an analysis of significant incidents in the Jail System.  For example, when there was an escape from the WC on February 15, 2017, by a prisoner who had completed his sentence, but was due to be held for ICE, detectives conducted a thorough investigation.  The same can be said when three prisoners escaped from the RDC on March 4, 2017.   It should be noted, however, that in both cases no action was apparently taken with regard to the officers involved, although it may be that action will follow once the full investigations are complete.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

On this monitoring visit the Monitoring team reviewed the grievance system only at RDC.  The grievance process that is described in the Prisoner Handbook is significantly different from the process described by the grievance officer. The process described in the Handbook requires the prisoner to talk first to the Housing Deputy and then the shift lieutenant. Then, the prisoner may file a request with the facility commander. According to the Handbook, the prisoner must then request an Prisoner Grievance Form by writing a letter requesting the form to the Warden and then submitting it through a detention officer. This process requires the intervention of a detention officer at multiple times in the process and would not be compliant with this requirement. The process as described by the Grievance Officer at RDC is very different from that in the Handbook. Grievance forms are in the control room. A prisoner has to ask the housing deputy to get a grievance form. Deputy Newell who was described as overseeing program security, goes around to the housing units daily with a cart/box. The prisoner drops the grievance in the box. Deputy Newell then pulls them out, initials and dates the request, and then gives them to the grievance officer. This does not require as much involvement of detention officers. However, the prisoner must still make the initial request to the housing deputy to get the form. In the short term, it would be better if Deputy Newell could provide the form when he is collecting previously filled out grievance forms. A number of jurisdictions use an electronic kiosk system for many prisoner communication functions including submitting grievances. The County should consider this in the future.

QCHC has developed a grievance policy which requires all grievances to be addressed in a timely manner according to the facility policy.  During prisoner orientation, prisoners are advised

of the manner in which complaints regarding health services can be resolved both informally and formally.  Tracking of grievances is maintained in a prisoner grievance log.   The grievances and the response are faxed to the Corporate Director of Nursing.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**

The monitoring team did not have time to investigate the grievance procedures at each of the three facilities. The Work Center Handbook is consistent with the RDC handbook. However, the procedure described in the RDC handbook is not the one used at RDC. At this time it is not known if the WC process is consistent with the WC Handbook, or the current RDC procedure or is different from both. The County needs to identify a consistent process across all facilities and revise the handbook to reflect that process and adequately inform the prisoners.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

The grievance system at RDC is a functional system. Grievances are tracked and are responded to. The Warden responds to all grievances. The Grievance officer maintains an up to date spreadsheet.  The spreadsheet needed to include additional data points including the officer involved, the resolution and whether the resolution was implemented in order to accurately track the relevant information related to grievances.  The Grievance Officer sends medical grievances directly to the Medical Contractor. These are not logged in and the Grievance Officer does not track the response. The Grievance Officer should be logging them in and ensuring a timely response. The Monitoring Team will determine in the next site visit whether the expanded spreadsheet is being maintained.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

There is currently no identified practice to accommodate prisoners with disabilities or who might otherwise require assistance to access the grievance system. Other prisoners are permitted to assist a prisoner but there is no other identified mechanism for assistance. This does not meet the requirements of the settlement agreement.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information

through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

As noted above, the grievance procedure described in the Handbook is not the one that is utilized and would not be consistent with paragraph 69 above. There is nothing in the Handbook describing how to report misconduct, sexual abuse, or battery and assault.  The Handbook does not describe prisoner rights. It was previously reported that a translation into Spanish was being worked on but that has not been provided.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

The Policies and Procedures Manual has not yet been issued to all personnel.  In the interim, Booking cells continue to be inappropriately used for long term housing of problematic prisoners.  During the February site visit it was noted that two prisoners were held there in single cells that do not meet basic standards for housing—one for two and one half years and the other for eight and one half months.  All prisoners held in multiple occupancy cells at the time of the inspection had been there for less than eight hours.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Non-Compliant**

At the RDC, general population housing units are designed to hold approximately 60 prisoners each and are supposed to be staffed with one officer continuously.  In this Direct Supervision configuration the prisoners should be in the dayroom throughout the day and be in their locked cells only at night and during special evolutions such as headcount and in preparation for feeding.  Confinement housing, sometimes referred to as lockdown or segregation, is designed to house prisoners who cannot get along in general population.  These prisoners are usually held in isolation for disciplinary, administrative or protective custody reasons.  They are locked in their

cells for 22 or 23 hours per day with only an hour or two out of cell time for showering, visitation, recreation and to have access to a telephone.  Confinement housing should be sub-divided into small components of from four to sixteen cells (modules) within a 48 to 64 cell unit.  This type of housing is more expensive to construct than general population and is much more labor intensive to operate.  Realistically, three officers are required to operate a 64 bed confinement unit.  None of the housing units at the RDC are properly designed to serve as confinement units because they are not sub-divided into modules.  This makes the job of keeping problem prisoners separate from each other much more difficult.  All of these issues are exacerbated at the RDC because the shortage of deputies makes it impossible to assign officers to any of the adult housing units.   A separate segregation log is not maintained, rather, notations are made in the Pod Control Logs and some notations are made in Classification records.  Once a designated (and properly staffed) Segregation/ Confinement Unit is operational it should be possible to achieve compliance.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Non-Compliant**

This section requires that all prisoners held in segregation be seen by a Qualified Mental Health Professional at least weekly, to determine his/her status, in addition to regularly scheduled treatment.   At the RDC, Housing Unit C-1 holds mental health prisoners, A-3 holds high risk prisoners and some single cells in Booking hold long term, segregated mental health prisoners.  While it was not possible to review logs associated with the weekly status review requirement during the February site visit, the absence of security staff, who must be available to assist with this activity, makes it most unlikely that it is being carried out. This will be reviewed at the next site visit.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

a.   All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

b.   Segregation must be presumed contraindicated for prisoners with serious mental illness.

c.   Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to

determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or

verbal function; delusions; self-harm; or behavior indicating a heightened risk
of suicide (e.g., indications of depression after a sentencing hearing).

   i.  The treatment and housing of prisoners with serious mental illness must be
coordinated and overseen by the Interdisciplinary Team (or Teams), and
guided by formal, written treatment plans.  The Interdisciplinary Team must
include both medical and security staff, but access to patient healthcare
information must remain subject to legal restrictions based on patient privacy
rights.  The intent of this provision is to have an Interdisciplinary Team serve
as a mechanism for balancing security and medical concerns, ensuring
cooperation between security and medical staff, while also protecting the
exercise of independent medical judgment and each prisoner's individual
rights.

   j.  Nothing in this Agreement should be interpreted to authorize security staff,
including the Jail Administrator, to make medical or mental health treatment
decisions, or to overrule physician medical orders.

**Non-Compliant**

By design, a Direct Supervision housing unit should be staffed continuously with one officer to
manage approximately 64 prisoners.  Segregation (also known as "confinement") housing units
generally require three officers to handle the same number of prisoners.  They are much more
labor intensive because the prisoners must be dealt with individually, they are usually the most
problematic prisoners and documented well-being checks are required at least every 30 minutes.
Due to the lack of staff in the Hinds County Jail System, it is impossible to operate segregation
housing as it should be.  At the RDC none of the housing units are staffed appropriately.  In fact,
only A-1 which houses juveniles, has a deputy assigned even part time.  At the WC prisoners
placed in the two, five cell segregation modules are left virtually unattended for the duration of
their stay.  Without officers available to provide security, medical and mental health
professionals cannot perform their mandated function.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and
procedures for their supervision, management, education, and treatment consistent with federal
law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  Within
six months of the Effective Date of this Agreement, the County will determine where it will
house youthful prisoners.  During those six months, the County will consult with the United
States, the monitor of the Henley Young Juvenile Detention Center consent decree, and any
other individuals or entities whose input is relevant.**  The United States will support the
County's efforts to secure appropriate housing for youthful prisoners, including supervised

release.  Within 18 months after the Effective Date of this Agreement, the County will have completed transitioning to any new or replacement youthful prisoner housing facility.

**Non-Compliant**

As of the February site visit there was not a clear decision on where Hinds County will house youthful prisoners.  It is apparent that further discussions have occurred, and as referenced in the baseline report, consideration of utilizing the Henley Young facility is a logical option and in many ways the most feasible choice.  The programming and staffing at Henley Young makes it much more likely that the county can meet the conditions of this agreement.  However, based on this visit and discussions with Henley Young staff, actually making this transition functional will rely on considerable planning that includes resolution related to a number of issues identified in the baseline report, including:

- Review of physical plant alterations and/or expansion that could be required to provide sufficient flexibility for (a) appropriate classification of youthful offenders and placement in appropriate housing unit(s); (b) expanded and/or reconfigured education and other programming space, as current space is fairly limited/restricted and may not be appropriate for inclusion of all youthful offenders; and (c) review of existing outdoor space (and related access) to ensure security is sufficient for longer-term youthful offenders.  The current education space is marginal, at best, for the current population, and with only one other multi-purpose space the county should consider some expansion of the current Henley Young facility that would provide appropriate separation and supervision of youth based on their educational needs.  This would best be done in conjunction with other architectural recommendations included in the February 2017 Monitoring Report completed by Leonard Dixon.  There are a number of physical plant options/changes that could be made to improve utilization of Henley Young while at the same time creating a more appropriate and sustainable configuration to house youthful prisoners.

- Staffing requirements that need to be in place to meet best practice standards for current juveniles as well as a determination of the number of added staff that may be needed to safely supervise youthful offenders, especially during the early stages of transition to Henley-Young.  Currently it is reported that two staff are present supervising youth in the living units/pods.  If the majority of youthful prisoners are placed in a single unit, a third staff member should be added.

- Meeting the requirements of the Hinds County Settlement Agreement without jeopardizing the progress that has been made towards compliance with the Henley-Young Consent Decree especially related to the implementation of an appropriate behavior management program/system, provision of mental health services/supports (note that the County is in the process of adding Case Managers which is a good step forward), and reducing the use of isolation/segregation for disciplinary purposes.  If the County decides to move the youth being tried as adults to Henley-Young, the County should ensure that these components of the Henley-Young decree are sufficiently implemented so that transferring in additional youth will not set back the conditions of individuals housed there.

- Ensuring that appropriate educational assessment and support services, particularly related to youth with special needs, are available and prepared to deal with a slightly older population. Based on the most recent monitoring report and meeting with the relatively new school Principal, again progress appears to have been made, but limitations of both the physical plant and educational staffing would make transition of youthful offenders a challenge.

-  Implementing reforms to reduce the population of juveniles at Henley-Young to ensure that only those youth who present a danger to the community and/or those for which there is reason to believe they would be unavailable for court proceedings are confined and that court processes are established to promote appropriately expeditious processing of juvenile cases. Based on a review of the reason for confinement for youth in Henley-Young at the time of the site visit and on discussions with leadership at Henley-Young, a significant portion of the youth held were being held for offenses that do not pose a danger to the community or represent youth who have a chronic history of missing court.  For example, a number of youth were being referred for confinement and held as the result of "domestic battery" type incidents in which the youth poses no danger to the general public but given the lack of a non-secure or other alternatives end up being at Henley-Young.  A number of youth are held in what is now a "21 day" program use primarily for technical violations of court orders, when in reality there is little research to support that any length of stay in secure confinement is a net positive in changing behavior and in many cases exacerbates problems for the youth reentering the community. These kinds of issues have been addressed successfully and much more cost-effectively in dozens of jurisdictions around the nation. With the transition to Judge Priester in mid-February as the presiding juvenile judge there is an opportunity to revisit both the process and the criteria used for screening placements of youth in the facility. This monitor reviewed (and provided some feedback on) a Detention Risk Assessment Instrument that is consistent with good screening practices.  Additionally, as part of the transition with a new judge it is recommended that the county revisit specifically who is making the detention placement decisions. Ideally, these decisions would be made based on policies and criteria that provide greater control over admissions by the Henley Young Director.

In order for the county to achieve compliance with the 18 month provision to have the any planned move of youthful offenders completed, the County must ensure that the 2018 budget process happening now addresses the fiscal implications of the decision.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.
**Non-Compliant**

There has not been a suitable screening tool implemented on a routine basis beyond the basic screening completed at the time of booking, which is a cursory review of the youth's presenting status.  There is no evidence of post-booking assessment in the required areas beyond that which has been done related to those youth that have participated in the prior GED programming.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Non-Compliant**

As of the February visit, the only educational program, GED programming, which had been in place, was suspended pending securing another provider for that program.  A review of records for youth that had been receiving GED support reflected appropriate documentation of skill levels and progress, including some evidence of youth making progress in related GED testing.  Major Rushing indicated that she is in the process of finding another provider for that service and has plans to visit with Director McDaniels and others at Henley Young to learn more about the nature of the programming that is provided there.  That said, there are no other educational services in place, including lack of initial assessment services, linkage with prior enrollment/school programming, provision of required curriculum, and/or any special education services to which a youth may be entitled.  Initial outreach has been made to the Jackson school system, but the indication is that any additional services would not be available until next year.  However, Hinds Countyremains responsible for obtaining the required assessment, instruction, and special educational services from a local district or other properly accredited provider as soon as possible.

Implementation of an adequate educational program is limited not only by lack of education personnel and resources but also by both physical plant and staffing limitations that will make providing proper space and supervision for educational programming a challenge.  The program space that is available is adequate, at best, but use of that space requires scheduling it for use of adult programs so there is not adult-juvenile contact, and proper staff supervision for a "classroom" environment will require more staff than appear to be currently available. Meeting the appropriate educational requirements for youth would likely require scheduling that space for a substantial portion of each day and significantly limit program delivery to adult offenders.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Non-Compliant**

Youth are housed in a separate unit so that contact with adults is minimized.  Since the baseline visit, a staff member has been regularly assigned to provide direct supervision in the juvenile unit, which is an improvement.  Youth seem to respect the officer assigned, and she indicates a willingness and some affinity to supervising youth, which is not always true for officers used to supervising adult offenders.  However, that assignment covers only the day shifts five days per

week.  Other staff are assigned, on a rotating basis, to the juvenile unit during evening, overnight, and weekend shifts, and there was an indication that due to staff limitations in the facility overall those staff would need to leave the youth unit for periods of time to check on other units.

Absent review of specific policies and procedures related to separation, including policies related to documentation of any violations/incidents of impermissible contact, it is difficult to determine that all staff is aware of the specifics of this requirement or the proper procedures required to maintain it.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.
**Non-Compliant**
All youthful prisoners are housed in the same unit, making meeting this provision moot at this point.  If/when steps are taken to develop alternate housing for youthful prisoners, part of the planning for that change should include development of appropriate screening and classification criteria.  Criteria can include age, nature of admitting offense, and most importantly any information about prior behaviors that provide insight into the potential behavior of the youth on a housing unit.  As noted in the baseline report, if a decision is made to transfer youthful prisoners to Henley-Young, further discussion of classification in that facility, as well as any physical plant modifications would need to take place prior to transfer.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.
**Non-Compliant**
During the baseline visit, the curriculum for training supervising staff related to supervision of youthful prisoners was reviewed.  That curriculum was adequate as a starting point for staff training, and the plan to train supervising staff prior to direct supervision officers made sense. However, that training did not take place as planned, undoubtedly related to reasons related to the general staffing shortage and what would have been an inevitable gap between the time of training lead/supervising staff and then training line officers.  Additionally, one would expect that this training would impact policies and procedures related to supervising youthful prisoners and any behavior management program, and integrating any appropriate changes probably

should be done prior to further staff training.  Additionally, the relevance of this requirement is ultimately dependent on what decision is made related to actual placement of youth, i.e. if youth are placed at Henley Young, it would not be necessary to train Raymond/Jackson staff accordingly (albeit there are many aspects of this training that would be relevant for young adult (age 18-21) offenders as well as youth. On-going review of training documentation and consultation as to other potential areas for training can be completed on subsequent site visits.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

   a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

   b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

   c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

   d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

   f. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

   g. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

   h. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail.  If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

      i.   If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

      j.   Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Non-Compliant**

In reviewing the individual records of all youthful prisoners confined at the time of this visit, there was no documentation of room confinement/segregation, although several youth interviewed indicated there are periods of time during what would be normal waking hours that they are confined to their cells. This appears to be a practice related to managing the population "out" at any one time in the unit rather than disciplinary isolation/segregation, but it is also likely that there are times when youth are confined to their rooms for other reasons as well. Given the general nature of the staffing shortage, the lack of training related to working with youthful prisoners, the lack of adequate policies/procedures, limited documentation, and the lack of other behavior management programming it is safe to assume that these requirements are not being met

84.     Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

      a.   The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.   An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.   The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Non-Compliant**

As with other aspects related to youthful prisoners, there is no indication that any aspects of this requirement have been implemented. Major Rushing did provide some anecdotal information about some "group rewards" that had been provided to youth, intermittently and/or related to a special occasion. That is an indication of interest and intent in moving in the right direction, but no substantive behavioral treatment program has begun. There does not appear to be any information in the 2017 Raymond Detention Facility Policies and Procedures related to youthful prisoners related to this requirement, or any other for that matter. This stands in stark contrast to the progress that has been made at Henley Young in this regard, albeit there have been, and

likely will continue to be, significant staffing, training, and physical plant challenges at Raymond that take precedence. While implementing a comprehensive behavioral treatment program is complicated and will take time, there are some steps that could be taken in the short term with the assistance of a consultant.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests. To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order. Examples of inadequate paperwork include, but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Non-compliant**

In a review of the paperwork of approximately 25 prisoners at the Work Center, there was no or insufficient paperwork supporting the incarceration of 10 individuals. Deputy Neal stated that the paperwork could be in the file at RDC and explained that the RDC file would be the official file. There was insufficient time to check all of the files in RDC but a check of 3 individual files showed that there was a similar lack of paperwork in the RDC file. Missing paperwork included court ordered sentences, holds, bonds, an order for a competency evaluation, fines and fees, and warrants, and the missing paperwork reflected multiple jurisdictions.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984). The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Non-Compliant**

See response to number 87 below.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful. At a minimum, the County must confirm receipt from the

sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Non-Compliant**

At this time, neither RDC nor the WC is determining whether there has been a meaningful analysis of a person's ability to pay.  In other jurisdictions, when a person is ordered to pay fines and fees, they are released from custody and if they fail to pay the fines or fees, a warrant is issued and they are arrested and brought back to court. This is when an analysis of the person's ability to pay would take place. The Jackson Municipal Court, after being sued for its practices on fines and fees, now conducts this analysis in the initial order and creates a payment plan. Orders coming from Justice Court do not include this analysis either before or after the initial order, and at the time of the site visit to the Work Center, these orders continued to be handled as they had been in the past. Under this process, when an individual comes back from Justice Court with an order to pay fines and fees, they continue to be incarcerated until they work off the fines and fees. If the prisoner or a family member can pay the total amount of the fines and fees, they will be released, but otherwise they are not released until they have worked off the fines and fees. This is also true at RDC. (The monitor did not review Jackson files on this site visit).

There is an additional problem in the handling of old fines and fees. At the Work Center, the Justice Court data system is checked to see if there are old fines or fees. This may include traffic tickets on which the individual never appeared in court. If there are old fines and fees, a setting with Justice Court is requested. However, it is reportedly difficult to get a setting and sometimes impossible. (RDC staff reports similar problems).  In the meantime, the old fines and fees are added to the total and the individual works off those as well. In some instances, the old fines and fees for which there has never been a court order of incarceration are the only thing keeping an individual in custody. One individual at the WC had been waiting over a month for a setting on new charges, for which there was no paperwork, and so was working off old fines and fees.

At RDC, it was reported that when there is an individual set to be released, they will check to see if there are old fines or fees in Justice Court. If there are, Justice Court is called and a clerk reportedly typically instructs that the prisoner can't be released until the fines and fees are paid. The prisoners will then continue to be held until the fines and fees are worked off.  The prisoners are not taken to court prior to holding on the old fines and fees. A court liaison reviews the daily booking list. If there is a Justice Court charge a setting is requested. However, if Justice Court does not respond and old fines and fees are located in the data base, the prisoner will continue to be held without a warrant or other court order. If there is no documentation of old fines and fees, release is requested in 48 hours.

This issue was included on the Monitoring Team's List of Priority Recommendations to be addressed promptly.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Non-Compliant**

See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Non-Compliant**

See response to paragraph 87 above. The 48 hour requirement is being applied. However, it appears that locating old fines and fees in the Justice Court database is considered sufficient documentation for continued incarceration.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Non-Compliant**

As stated in response to paragraph 85 above, a number of files did not have any or sufficient paperwork supporting the order of incarceration including the fines and fees. In the case of old fines and fees, the County appears to consider the Justice Court data system sufficient for holding individuals on old fines and fees. This should not be considered sufficient. The WC does keep a spreadsheet with the calculation of the term of incarceration based upon the staff's understanding of the law. RDC does not keep a spreadsheet or other system for calculating the term of imprisonment. (The Monitor did not review the Jackson system during this site visit).

48

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliant**

The standard practice at the work center is to give half the amount of credit towards fines and fees for individuals who do not preform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. Captain Chandler stated that individuals with medical conditions did get the full amount of credit without working. However, Deputy Neal stated that only in special situations would they get full credit. He would make the recommendation to the Captain based upon criteria such as how long the prisoner has been incarcerated, the nature of the charge and generally a subjective judgement.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

     a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

     b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

     c.    Examples of prisoners presumptively entitled to release include:

          i.    Individuals who have completed their sentences;

          ii.    Individuals who have been acquitted of all charges after trial;

          iii.    Individuals whose charges have been dismissed;

          iv.    Individuals who are ordered released by a court order; and

          v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Non-Compliant**

As described above, individuals continue to be detained based upon old fines and fees without a court order of incarceration. The practice of not releasing individuals when they are given an order to pay fines and fees also results in an unlawful basis of detention. The failure to track the sentences of individuals at RDC, but rather relying on prisoner requests for release no doubt results in some individuals staying longer than lawful although the Monitor learned of this practice late in the site visit and did not review individual files for this purpose. There did appear

to be at least one individual who was still incarcerated beyond the length of her sentence. The Monitor has requested further explanation of this situation.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Non-Compliant**

As described in response to paragraph 85 above, the documentation of individuals at the Work Center was incomplete and the files at RDC on those individuals did not fill in the gaps in the paperwork. Reference to the Justice Court data system for old fines and fees is not a sufficient basis for continued detention.  The Jail Information Management System appears to be highly inaccurate. Using the "Unindicted List" of prisoners in custody, the Monitor and Records staff looked up 17 individuals who appeared to be in custody for an unusually long period of time. Of the 17 individuals reviewed through the Jail Management System, hard files, and the "blue screen," 10 of them were not actually in custody. Other errors appeared as well including an individual listed as waiting for an indictment for a felony who was actually sentenced on a misdemeanor, an individual who had been indicted, and an individual whose picture did not match her name and it was unclear whether the current prisoner was the one in the picture or the one on the booking sheet. With this percentage of error, the JMS system cannot give an accurate picture of who is in the jail or even how many people are in the jail.

There should be one complete prisoner file in one location and one central office responsible for ensuring that the court information is complete and accurate. This would normally be the records office. Currently, it appears that the separate facilities contact the courts separately and may have documentation that records does not or records may have documentation that the facilities do not. The court liaison maintains separate records. Booking appears to obtain documentation that may or may not get to records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's

mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-compliant**

The jail record system does not identify persons with serious mental illness. Although jail and QCHC staff attempt to move individuals to the state hospital as needed, this continues to be a systemic problem. Transition planning is minimal at best.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed

medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The County/Sheriff has not yet promulgated policies and procedures on release of prisoners. Neither the County nor QCHC have developed sufficient mechanisms for the transition of persons with mental illness into community based services.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:

      a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

      b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Non-Compliant**

The booking staff runs an NCIC check at the time of booking but not at the time of release.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

      a.      Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

      b.      Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

      i.      How to process release orders for each court, and whom to contact if a question arises;

      ii.      What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

      iii.      Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

      iv.      How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

Records staff stated that there is a shortage of clerks in booking. In fact, on the day of the site visit to booking, there was only 1 booking clerk. The Sergeant stated that there were supposed to be 4. The NIC staffing study stated that there should be 2 at all times and 3 at peak times. Records staff stated that this shortage results in court information including release information not getting into the system. Records will sometimes get a separate hard copy and will check the system. However, their copy is usually mailed instead of faxed so this results in a delay in releasing. The Monitor did not determine the training process for the booking and releasing staff during this site visit.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

There has not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

b.      Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. WC keeps a spreadsheet which contains some but not all of the information in sub-paragraph (a) above. The Jackson facility reportedly keeps a spreadsheet that was not reviewed at the time of this site visit. RDC does not keep a spreadsheet or a log. There are large books in the booking/release area that contain some of the information but not in a log format. Incident reports are not completed for delayed releases.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The County has not appointed a Quality Control Officer. Ms. Kenisha Jones performs some of these functions at RDC; Deputy Neal at the WC; and Ms. Whitley at Jackson. However, none of these individuals preform a full audit and quality control function.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

No documentation was provided of incident reports being created for untimely or erroneous prisoner release or any investigations of such incidents.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations, and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There not being policies or procedures at this time, there has not been an audit of those. There has not been an initial audit of releasing practices.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting, and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

There appears to be sufficient space for confidential attorney visitation. The Monitoring Team did not have time to confirm whether there are delays in transporting individuals for attorney visitation. That will be investigated in the next site visit.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**

There is currently no database tracking these activities. The grievance officer maintains a spreadsheet regarding grievances.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

a.   Brief summary of all reportable incidents, by type, shift, housing unit, and date;

b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

d.   List and total number of incident reports received during the reporting period;

e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

There is currently no Incident Summary Report being compiled.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

a.       Summary of all uses of force, by type, shift, housing unit, and date;

b.       List and total number of use of force reports received during the reporting period;

c.       List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

There is no Use of Force Summary Report currently being compiled.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There is no Grievance Summary Report currently being compiled. There is a spreadsheet being maintained. It did not have all the data points required by this paragraph.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

a.       A brief summary of all completed investigations, by type, shift, housing unit, and date;

  b.  A listing of investigations referred for disciplinary action or other final disposition by type and date;

  c.  A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

  d.  A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Non-Compliant**

There is currently no summary report of IAD investigations currently being compiled.


111.  Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD  systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**N/A-Annual Review would not yet be due.**


112.  Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

  a.  The Early Intervention System may be integrated with other database and computerized tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

  b.  The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

  **c.**  The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

d.   The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline. A copy of this list must be provided to the United States and the Monitor.

e.   The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f.   The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline. The County must document any findings, recommendations, or corrective actions taken as a result of these reviews. Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.   Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security. The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

There are currently no policies and procedures covering this matter.

114.   Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process. At minimum, medical and mental health staff must be included through all of the following mechanisms:

a.   Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.   Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents. At minimum, a physician must prepare a mortality review within 30 days of every prisoner death. An outside physician must review any mortalities associated with treatment by Jail physicians.

**Non-Compliant**

Currently there is no policy on mortality review by QCHC. In order to conduct adequate mortality reviews, the review must be completed by an outside physician not contracted or employed by the jail and should include an administrative component regarding an assessment of correctional officer and health care staff emergency response actions, an assessment of the clinical care the prisoner received and the circumstances leading up to his death, and a

psychological autopsy which has an emphasis on factors in the individual's life with an emphasis on factors that led up to or contributed to the death.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes, and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system, and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.
**Non-Compliant**
The County is laying the groundwork for a CJCC but has not yet established one.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.
**Non-Compliant**
See 115 above.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.
**Non-Compliant**
See 115 above.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and

juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Non-Compliant**
The County has not engaged a consultant to provide technical assistance on jail population reduction and diversion.


**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
   a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
   b.      Individual copies of the Agreement must be provided to prisoners upon request.

**Non-Compliant**
During the February site visit, copies of the Consent Agreement were found to be posted in many, but not all of the housing units of the Jail System.  Some, but not all, support areas had copies posted.

Paragraphs 122-129 regarding third party beneficiaries, costs, severability, etc. omitted.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Non-Compliant**

At the time of the site visit, the County/Sheriff did not have policies and procedures in place and so had no policies and procedures to review. The County/Sheriff has not completed drafting policies and procedures.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.
**Non-Compliant**
Six months expired on January 19, 2017. The policy and procedure review and drafting has not been completed.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.
**Non-Compliant**
The policies and procedures have not been completed and so have not been submitted to the United States or the Monitor for review and comment.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.
**Non-Compliant**
Again, the policies and procedures are not completed so can't be implemented at this time.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.
**Non-Compliant**
Policies and procedures have not been adopted so are not ready for approval or implementation.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.
**NA at this time**

Paragraphs 136-158 regarding appointment and duties of the monitor omitted.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the site visit, the County had not yet completed its first self-assessment which is overdue.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Compliant**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Non-Compliant**

At the time of the site visit, the monitoring team was not receiving any immediate notifications. Since that time, numerous immediate notifications have been received. The team will continue to monitor to determine whether notices are being provided in all instances where required.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.