IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                         PLAINTIFF


VS.                            CIVIL NO. 3:16CV00489-WHB-JCG


THE HINDS COUNTY BOARD                           DEFENDANTS
OF SUPERVISORS, HINDS COUNTY
SHERIFF VICTOR MASON, IN HIS
OFFICIAL CAPACITY



**TRANSCRIPT OF IN-PERSON STATUS CONFERENCE**



BEFORE THE HONORABLE JOHN C. GARGIULO
UNITED STATES MAGISTRATE JUDGE



JULY 10, 2017
GULFPORT, MISSISSIPPI







REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

2012 15TH STREET, SUITE 403
GULFPORT, MISSISSIPPI  39501
(228) 563-1748

APPEARANCES:

FOR THE PLAINTIFF:

    CHRISTOPHER N. CHENG, ESQUIRE
    LAURA L. COON COWALL, ESQUIRE
    U.S. DEPARTMENT OF JUSTICE – CIVIL RIGHTS DIVISION
    SPECIAL LITIGATION SECTION
    950 PENNSYLVANIA AVENUE, NW
    WASHINGTON, D.C.  20530

    CANDACE GREGORY MAYBERRY, ESQUIRE
    OFFICE OF THE UNITED STATES ATTORNEY
    501 EAST COURT STREET
    SUITE 4.430
    JACKSON, MISSISSIPPI  39201


FOR THE DEFENDANT, HINDS COUNTY BOARD OF SUPERVISORS:

    PIETER TEEUWISSEN, ESQUIRE
    ANTHONY SIMON, ESQUIRE
    SIMON & TEEUWISSEN, PLLC
    621 EAST NORTHSIDE DRIVE
    JACKSON, MISSISSIPPI  39206

FOR THE DEFENDANT, HINDS COUNTY SHERIFF VICTOR MASON:

    CLAIRE BARKER, ESQUIRE
    HINDS COUNTY SHERIFF'S DEPARTMENT
    POST OFFICE BOX 1452
    JACKSON, MISSISSIPPI  39215-1452


COURT MONITORS:  ELIZABETH SIMPSON, DAVID PARRISH

1          **THE COURT:**  Ms. Busby, please announce the case

2    that's on the docket.

3          **THE CLERK:**  United States of America versus Hinds

4    County, et al, Civil Matter Number 3:16cv489.  We are here on

5    an in-person status conference.

6          **THE COURT:**  And in that matter, is the government,

7    the plaintiff, ready to go forward?

8          **MR. CHENG:**  Yes, Your Honor.

9          **THE COURT:**  Sir, if you could please, for the record,

10   introduce yourself and any co-counsel you have with you.

11         **MR. CHENG:**  Yes.  My name is Christopher Cheng.  I'm

12   an attorney with the U.S. Department of Justice, Civil Rights

13   Division, Special Litigation Section.  This is Laura Cowall.

14   She is one of our special counsels.  We also have Candace

15   Mayberry from the U.S. Attorney's Office here in the Southern

16   District of Mississippi.

17         **THE COURT:**  Good afternoon to you all.  Ma'am, what

18   is your last name again?

19         **MS. COWALL:**  On the record, it is currently Coon.  I

20   recently changed to my married name, which is Cowall,

21   C-O-W-A-L-L.

22         **THE COURT:**  Cowall.  All right.  Thank you, ma'am.

23   And is the Hinds County Sheriff's Department ready to go

24   forward?

25         **MS. BARKER:**  Yes, Your Honor.  Claire Barker,

1    in-house counsel for the Hinds County Sheriff's Department.

2            **THE COURT:**  Ms. Barker, has anyone accompanied you to

3    the hearing today?

4            **MS. BARKER:**  Yes, Your Honor.  If you would stand,

5    please.  We have Sheriff Mason.

6            **THE COURT:**  How are you, sir?

7            **SHERIFF MASON:**  Fine, sir.

8            **MS. BARKER:**  Major Pete Luke.

9            **THE COURT:**  Major, how are you?

10           **MAJOR LUKE:**  Good, sir.

11           **MS. BARKER:**  And Major Mary Rushing.

12           **THE COURT:**  Okay.  Thank you for being here.  It's a

13   pleasure to meet you.  And what says the Hinds County Board of

14   Supervisors?

15           **MR. TEEUWISSEN:**  Good afternoon, Your Honor.  Pieter

16   Teeuwissen, board attorney for Hinds County.  Also here at

17   counsel table is Anthony Simon, special legal counsel for Hinds

18   County.  And present in the courtroom today -- I'm going to

19   step so you can see -- Darrel McQuirter, who is president for

20   the Hinds County Board of Supervisors.

21           **THE COURT:**  How are you, sir?

22           **MR. TEEUWISSEN:**  Also, Supervisor Mike Morgan with

23   the Hinds County Board of Supervisors.

24           **THE COURT:**  Supervisor, how are you?

25           **MR. TEEUWISSEN:**  County Administrator Carmen Davis.

1          **THE COURT:**  How are you, ma'am?

2          **MR. TEEUWISSEN:**  And then sitting on the other side

3    of the courtroom, we also have the compliance monitor

4    internally for Hinds County, Mr. Synarus Green.

5          **THE COURT:**  What was your last name again, sir?

6          **MR. GREEN:**  Green.

7          **THE COURT:**  Green.  I believe we spoke on the phone

8    awhile back, didn't we?

9          **MR. GREEN:**  Yes, sir.

10          **THE COURT:**  All right.  I appreciate you being here,

11    sir.  Pursuant to the term of the consent decree, as well as

12    the order of District Judge Barbour, a court monitor was

13    appointed.  Ms. Simpson, are you present, ma'am?

14          **MS. SIMPSON:**  Yes, Your Honor.  And with me I have

15    David Parrish.  He is a member of the monitoring team with

16    expertise in correctional operations.

17          **THE COURT:**  Okay.  How are you, Mr. Parrish?  A

18    pleasure to meet you.  And Ms. Simpson, are you ready to go

19    forward, ma'am?

20          **MS. SIMPSON:**  Yes, Your Honor.

21          **THE COURT:**  Okay.  Go ahead and have a seat for a

22    brief moment.  I would ask is Mr. Jimmy Hendrix present in the

23    courtroom?

24          **MR. HENDRIX:**  Yes, Your Honor.

25          **THE COURT:**  How are you, Mr. Hendrix?

1          **MR. HENDRIX:**  Fine.  Thank you, Your Honor.

2          **THE COURT:**  Sir, I will be very brief.  I have in

3     front of me an affidavit that you swore to and signed.

4          **MR. HENDRIX:**  Yes, Your Honor.

5          **THE COURT:**  Sir, you promise to abide by all of the

6     terms and condition?

7          **MR. HENDRIX:**  Yes, Your Honor.

8          **THE COURT:**  Okay.  It's a pleasure to meet you, sir.

9          **MR. HENDRIX:**  Thank you, Your Honor.

10          **THE COURT:**  Mr. Hendrix, if I were to spell your name

11     H—E—N—D—R—I—X, would the Court be correct?

12          **MR. HENDRIX:**  Yes, Your Honor.

13          **THE COURT:**  Okay.  Thank you, sir.

14          All right.  I would like to initiate with a procedural

15     posture.  I'm going to ask the government if it would be

16     willing, very generally —— and the parties can remain seated as

17     long as we promise not to speak over each other.  The parties

18     may remain seated during this proceeding.  If you can give just

19     a brief procedural posture, we can start with the entry of the

20     consent decree to present.

21          **MR. CHENG:**  Your Honor, after the consent decree was

22     entered, the monitoring team conducted a baseline inspection of

23     the Hinds County Jail.  They have since completed a follow—up

24     inspection, which was the first formal compliance visit.  I

25     will leave it up to the monitor to provide more details about

1     what they are finding.  At this time, the United States has

2     some concerns about the jurisdiction's compliance with the

3     consent decree.  Almost immediately, most of the deadlines

4     inside the consent decree, the time deadlines came and passed,

5     and a number of them have been violated.  So we have asked for

6     a status conference face to face, and the county and sheriff's

7     office have been cooperative in that and have been happy to

8     join us in seeking the status conference.

9             **THE COURT:**  All right, sir.  And let me just inform

10    the parties, it is the intent of this Court to conduct what I

11    will call is monitoring of not only the court monitor but of

12    the overall resolution of the instant litigation.

13         My goal is cooperation, ladies and gentlemen.  It is the

14    belief of this Court that one of my directives is to encourage

15    cooperation.  I would like to address any potential

16    deficiencies.  And, of course, with any deficiency that is

17    addressed by the court monitor, I'm also going to want to

18    discuss what we need to do to resolve it.  All right?

19         Ms. Simpson, ma'am, are you ready to address the Court as

20    well as the parties?

21            **MS. SIMPSON:**  Yes, Your Honor.

22            **THE COURT:**  You may proceed, ma'am.  And I will tell

23    you that that podium has a button, if you want to raise it or

24    lower it.  It's to your right.

25            **MS. SIMPSON:**  This will be fine.  Hopefully -- I

1    assume this is a microphone, because I tend to be soft-spoken,

2    so let me know if you can't hear me.

3            THE COURT:  Well, the court reporter is the important

4    one here.  If she raises her hand, then she will let us know.

5    But I can hear you fine.  And if anyone can't, please just

6    raise your hand.

7            MS. SIMPSON:  Thank you, Your Honor.  Good afternoon.

8    As has been mentioned, the consent decree was entered

9    approximately a year ago -- actually, almost.  We are about one

10   week shy of a year.  And the conditions at the time of the

11   findings letter and continuing on to when the consent decree

12   was entered were seriously deficient.  This is detailed in the

13   findings, and I won't go into detail here.  However, probably

14   the biggest challenge at that time and, as you will hear,

15   continues to be the biggest challenge is an extreme lack of

16   staffing in the facilities.

17           As a result, at that time the prisoners were, to a large

18   extent, unsupervised, and this resulted in numerous prisoner

19   assaults, riots actually, ready access to contraband, major

20   structural damage and overdetention of defendants.  There are

21   numerous other problems that were detailed in the findings

22   letter, but as I said, the biggest challenge was the extreme

23   lack of staffing.

24           So suffice it to say, there was a long ways to go this

25   past year.  We did a baseline visit in October in which me and

1   my team, and my team is comprised of Mr. Parrish, who I

2   introduced earlier -- he is a corrections expert; Jim Moser,

3   who is a juvenile expert, because there are juveniles being

4   tried as adults held at the facility; and Jacqueline Moore, who

5   is a medical mental health expert.  We did the baseline visit

6   in October to determine where the jail was at at that time

7   vis-a-vis the consent decree requirements, if any had been --

8   come into compliance or had potentially backslid.

9       We then did our first monitoring visit in February.  That

10  was another three-and-a-half-day tour, at which we review

11  records, we look at the facility, we meet with staff, we talk

12  with prisoners, as well as lower level staff, and again try to

13  gauge compliance vis-a-vis the consent decree requirements.

14  And we have just completed our second monitoring visit, which

15  was the second week of June.

16      After the February visit, the monitoring report was

17  completed and filed.  The monitoring report for the June visit

18  is not yet due but should circulate to counsel next week,

19  actually.  In addition, though, to creating monitoring reports,

20  we have been producing priority recommendations.  The consent

21  degree has a very, very fine number of requirements based on

22  the requirements -- what was needed in the facility.  And in

23  order to assist the defendants in zeroing in on some of the

24  most critical issues, we concluded that it would be helpful to

25  produce priority recommendations after each visit.  And so

1    those were produced after the February visit and have already

2    been provided after the June visit.

3        I do want to say that the Hinds County defendants have

4    been very cooperative in our site visits.  They've made

5    themselves available, made the facility available, have

6    produced documents, not necessarily all the documents that we

7    have requested, but in part, there hasn't been a history of

8    generating all of those documents, so that's been a process.

9    But they definitely have been cooperative, and they have sought

10   the technical assistance of the team and appeared to have

11   utilized that assistance in decision-making.

12       There does appear to be motivation to improve the

13   conditions at the detention facilities.  There has been

14   progress in a number of areas, which I'll mention as we go

15   through.  However, in a number of very critical areas, there

16   has actually been no real progress, and those are the ones that

17   we want to focus on a little bit more.

18       I did want to mention a couple of things about how the

19   facilities are set up just because I think it will help

20   understand where some of the issues are.  There's actually

21   three separate facilities that are the Hinds County Detention

22   Facility.  One is the Jackson Detention Center, which is an

23   older center downtown.  It was built in 1972.  It's a

24   traditional styled jail in that it is very linear.  It doesn't

25   allow for the new concept of direct supervision.  It has a

1    capacity of 196 individuals.  It holds all the females on one

2    floor, and then the males who are considered somewhat lower

3    risk are on another floor.  And that's, like I said, in the

4    downtown facility.  It is also where people come and go if they

5    are going to court, because the court is downtown.  So there's

6    a lot of movement in and out there.

7         One of the other facilities is the Work Center.  This is a

8    very new facility.  It was built in 2009.  It was built as a

9    400-bed facility, was holding quite a few state inmates who

10   were there at the end of their sentences doing work release --

11   not work release but working out of there.  It also holds

12   pretrial and sentence misdemeanants.  It is a dormitory-styled

13   facility, and it has generally been well maintained and

14   adequately staffed.  It is out at Raymond, which is about

15   20 miles away from Jackson.

16        And then lastly is the Raymond Detention Center, and this

17   really has been the focus of much of the work on the consent

18   decree and of the monitoring team.  It was built in 1994, and

19   it has a capacity of 594 people.  It is also located out at

20   Raymond.  It holds primarily pretrial felony defendants.  It

21   also holds juveniles being tried as adults.

22        It was built as a direct supervision facility, which is

23   considered the best practice in correctional facilities, but

24   with the lack of staffing, it has not operated as such.

25   This -- the lack of staffing eventually led to a lack of

1    control of the facility.  There was a riot in 2012 in which a
2    third of the facility was actually damaged and closed.  That
3    has been rehabilitated and reopened, but the condition of the
4    facility itself continues to be a major problem.  With the lack
5    of staffing, the prisoners cause significant damage, and it is
6    very difficult to keep up with that.

7        By the time of the Department of Justice findings letter
8    in 2015, there had been at least three major riots, two alleged
9    homicides, numerous assaults on prisoners and staff, and
10   repeated use of tactical teams to restore order to the
11   facility.

12       So I'm not going to go through all of the consent decree
13   requirements or even the priority recommendations for that
14   matter.  I want to focus on some of the real critical areas,
15   and I believe it is probably already apparent that the most
16   critical area is that of staffing.  Without adequate staffing,
17   it would be almost impossible for the county to comply with
18   most of the provisions of the consent decree.

19       The county sheriff's office currently has 251 authorized
20   positions for the detention facility.  Fifty of those positions
21   are currently vacant.  A staffing analysis was done initially
22   by a National Institute of Corrections expert, and then again
23   internally in April, and then most recently with the assistance
24   of the corrections expert, it was completed again just last
25   month, in June.

1    All of these studies were pretty consistent in finding

2    that there needs to be 433 authorized positions.  This is 182

3    more than currently authorized and 230 more than current staff.

4    So the facilities are operating with less than half of the

5    needed staff.

6    And the staffing shortage is most pronounced in the

7    Raymond Detention Center.  As I said, that is one of the three

8    facilities.  At this time they are operating at about

9    37 percent of the staffing that they need, so they have about a

10   third of what they need to staff the facility.  And so, as an

11   example, the way the facility is designed, there is a control

12   room and then a pod that has several units.  And as a direct

13   supervision facility, there should be one correctional officer

14   in each one of those units.  And for the most part, there is

15   never a correctional officer in any of those units, except for

16   the juvenile unit at this time.

17   They have one officer in the control room and one officer

18   acting as a rover that goes amongst all of the units, and even

19   that is sometimes missing.  So as you might imagine, the

20   prisoners are often completely unsupervised.

21   For an example, because of the lack of staffing, no one --

22   no prisoners in the facility other than the juveniles has had

23   recreation, outdoor recreation, in five years because they

24   don't have the staff to do it.

25   Another very clear example of the impact of lack of

1   staffing was not long ago, there was a young individual,

2   17-year-old, so one of the juveniles, that engaged in a fairly

3   serious suicide attempt.  When that happens, there is supposed

4   to be one-on-one staff observation of the individual.  Because

5   there was not an officer to do that one-on-one observation, the

6   solution was to take the clothes and the blanket of the

7   individual, the 17-year-old, and leave him in that condition

8   for over a week.  So he stayed in his cell without clothes,

9   without a blanket, and it was a very cold unit, and said that

10  he could not sleep or eat due to the coldness.  So that was as

11  a result of the lack of staffing in order to do the suicide

12  watches that are needed.

13      In addition, without the appropriate staffing, there is

14  prevalence of contraband that finds its way into the facility.

15  There was a shakedown in June, on June 7, 2017, in two of the

16  facilities, RDC and the Work Center.  And among other things,

17  they recovered 43 cell phones, 39 cell phone chargers, 25

18  shanks, a digital scale, miscellaneous tobacco products, and

19  marijuana, two steak knives, and 38 DVDs and CDs, a huge amount

20  of contraband that is able to come into the facility.

21      Also, with the lack of staffing, there are frequent

22  breaches of security.  The inmates are able to pull the welding

23  off of some of the doors and pull the metal plates off of some

24  of the prior holes that have been patched up.  In the entire

25  period between March and the end of May, there were 16 security

1    breaches that were reported.  Those included actual escapes as

2    well as pulling off the metal plates and creating holes in the

3    roof and in the walls.  So the lack of staffing is a huge

4    impact on the facility and really keeps them, as I said, from

5    being able to come into compliance with most of the

6    requirements of the consent decree.

7         I wanted to emphasize that this is addressed very clearly

8    in the consent decree.  Paragraph 42 provides that the

9    defendants shall ensure that the jail has sufficient staffing

10   to adequately supervise prisoners, fulfill the terms of this

11   agreement and allow for the safe operation of the jail.  The

12   parties recognize that the board allocates to the sheriff lump

13   sum funding on a quarterly basis.  The sheriff recognizes that

14   sufficient staffing of the jail should be a priority for

15   utilizing those funds.

16        So at the time the consent decree was written, the

17   staffing analysis hadn't been completed, so what constituted

18   sufficient staffing was not fully known at that time, but now

19   with the completion of the staffing analysis, we do know that

20   sufficient staffing is 433 authorized positions.

21        There have been some steps taken in this area.  The

22   sheriff has approved the increase of the salaries of detention

23   officers.  This should improve recruitment and detention.  It's

24   not entirely clear whether that has been implemented, but it

25   has had initial approval.

1    One of the problems that has existed has been the use of

2  some of the detention positions for nondetention purposes.  And

3  one of the aspects of the staffing analysis was to attempt to

4  identify those detention positions that were being essentially

5  funneled out of the jail and detention activities and used

6  elsewhere.  Some of these have in fact been identified and have

7  been moved.  That has not increased the availability of staff

8  in the detention division.  It has just clarified, at least to

9  some extent, what had been coming under the detention budget

10  which actually wasn't being used as detention services.

11    So again, to clarify, the sheriff has two divisions:  The

12  operations division and the detention division.  And what was

13  happening is that some of the positions in the budget within

14  the detention division were being used in the operations

15  division.

16        **THE COURT:**  Under whose authority does that happen?

17        **MS. SIMPSON:**  That would have been -- had to be

18  permitted by the sheriff.

19        **THE COURT:**  All right.  So if the Court understands,

20  there are funds in the budget that are -- you said there is an

21  operations budget or a division?

22        **MS. SIMPSON:**  Division.

23        **THE COURT:**  And a detention division?

24        **MS. SIMPSON:**  Yes, sir.

25        **THE COURT:**  If the Court understands, the budget is

1   set by the board of supervisors?

2          **MS. SIMPSON:**  I believe the sheriff proposes the

3   budget, and it is approved by the board of supervisors, but I

4   would defer to the attorneys to answer that.

5          **MR. TEEUWISSEN:**  That is correct.

6          **THE COURT:**  They are nodding in the affirmative.  All

7   right.  So that sounds like one issue.  I understand staffing.

8   You've emphasized staffing.  And then another issue that we

9   need to address is -- I'm sure there was a reason that the

10  funds are being pulled from the detention budget, but that is

11  adversely affecting the consent decree?

12         **MS. SIMPSON:**  That is correct.

13         **THE COURT:**  Okay.  That is something we need to

14  address as well.  I'm sorry to interrupt.  You may proceed,

15  ma'am.

16         **MS. SIMPSON:**  That's fine.  Also, relating to what's

17  impacting staffing, obviously the budget needs to include the

18  additional positions that the staffing analysis has identified

19  as needed, and as was mentioned, discontinuing the use of

20  detention positions in budget for nondetention purposes.

21         There also needs to be, probably as an interim measure,

22  the moving of some of the operations personnel over to

23  detention so that they can begin staffing up more quickly.

24  There needs to be an aggressive hiring strategy.  There have

25  been steps approved for the officers within the detention

1    facility.  There needs to be steps that, again, encourage

2    retention for the deputies and some clarity as to when those

3    steps kick in.

4         As near as I can tell, there appears to be somewhat of a

5    two-step process.  There are the authorized positions, and

6    right now there needs to be more authorized positions, but it

7    also appears to be sort of a separate process to make sure that

8    those authorized positions all have funding attached to them.

9    So there needs to be not only the authorized positions but also

10   funding that goes with them.

11        So those are the issues related to staffing.  A couple of

12   other -- a number of other issues I wanted to raise.  One is

13   the policies and procedures.  At the time of the consent

14   degree, there actually were no policies and procedures in place

15   for the jail.  That's sort of a remarkable situation to be in.

16   They didn't exist.  It is very difficult to have staff trained

17   appropriately on policies and procedures when there are none.

18        The practices were all over the map.  As I said, there are

19   three facilities.  The practices did not match within the

20   different facilities, and they were not consistent with the

21   inmate handbook on things that related to inmates, such as

22   grievance procedures and such.  And this is an area where some

23   progress has been made.

24        Initially, there was -- the three facilities operated

25   almost independently.  One thing that has happened through this

1    process is that they are more of a system, and there is at

2    least an understanding that things need to be consistent across

3    the system.  There have been draft policies and procedures.

4    They were promulgated after the deadline, but they were

5    promulgated this past April.  Comments were provided, according

6    to the consent decree, provided from the monitoring team and

7    the DOJ team.  At that point, the policies and procedures

8    should have been finalized within 30 days.  That 30 days has

9    just recently passed, but there is a long ways to go in

10   developing adequate policies and procedures.

11       Many of the policies and procedures were very general,

12   somewhat vague, and didn't match either the practice that was

13   going on or the practice that needed to be detailed in terms of

14   being sufficient guidance for the detention officers, so there

15   is really quite a bit of work that needs to be done on the

16   policies and procedures, and that is a fairly important matter

17   for the operation of the jail.

18       Another extremely important area of deficiency is the

19   decisions with respect to the juveniles being tried as adults.

20   Again, there was a deadline for determining what should be done

21   with those individuals, those juveniles.  That deadline was in

22   January.  The decision has not yet been made.  The juveniles

23   are -- the conditions in which they are confined are really not

24   appropriate for juveniles.

25       Originally, there really wasn't much separation between

1    adults and juveniles.  That actually has been another area of

2    some improvement.  There was absolutely no programming at the

3    time of the site visits, the earlier site visits.  Now there is

4    one person who does adult basic education, and the juveniles

5    may attend that between one and three times a week.  There is

6    also a chaplain that does a fatherhood group, but the

7    juveniles, being juveniles and still potentially in the

8    educational system, are entitled to much more educational

9    programs, as well as therapeutic programming, and it's very

10   important that they receive that programming.

11       In addition, and this is sort of a general problem as

12   well, but there is very little behavioral health services for

13   juveniles.  Like I said, it is a general issue as well.  There

14   is no regular involvement of behavioral health with the youth

15   in terms of supporting their mental health, and there is,

16   again, no regular involvement with the staff, which also needs

17   guidance in working with this population.  There is no routine

18   mental health screening.  There is no routine educational

19   screening.

20       And again, this was brought home in a recent event.  There

21   was a youth who was experiencing sort of a mental health

22   episode.  He ran into what is called the cage, which is a

23   cage-like area at the front of the unit, and beat his head

24   against the cage repeatedly and then proceeded to run around

25   the pod.  He tried to jump a table, fell head first and

1    experienced some head trauma.  Again, that is the type of

2    individual who should be identified and provided services with

3    behavioral health services.

4        That -- again, the decision to -- where to house them

5    permanently was supposed to be made in January.  The consent

6    decree requires that the move actually take place, wherever it

7    is, by June of 2018.  Given that the decision has not yet been

8    made where to move them to, and some construction will be

9    required, it is likely that that deadline will be missed as

10   well.

11       I should say they have hired an architectural team, and

12   they are starting to look at some of the alternatives, but they

13   are definitely behind schedule on that one.

14       As mentioned earlier, one of the problems with the lack of

15   staffing is that it results in a real lack of maintenance and

16   structural damage to the facility.  One thing that has been

17   done, because of the lack of the ability to oversee the

18   prisoners, is that they -- the staff has welded shut the

19   maintenance doors, the doors to the recreation yards and the

20   storage doors, so they have just been welded shut.  However,

21   the prisoners have learned to break those welds and then cover

22   them with a dark paste.  This allows them to get into the pipe

23   chase, which allows them to get up on the roof and elsewhere.

24   This is how some of the escapes have happened, but it is also

25   how many of them get out of the facility over to the fence,

1    pick up contraband and then go back into the facility.  So this

2    inability to control that structural part of the building is

3    obviously contributing to the escapes and to the contraband.

4        There has been numerous examples of lack of maintenance or

5    things that get broken and aren't repaired quickly enough.

6    During our February site visit, when more time was spent in the

7    actual units, there were two -- the showers could not be shut

8    off.  One of the toilets had been out of order for seven

9    months.  Lights in the holding cells were inoperable.  There is

10   no ventilation in the holding cells.  The sallyport doors at

11   RDC have not been fully functioning during any of the site

12   visits.  In one of the booking cells, Mr. Parrish, the

13   correctional expert, asked that the booking cell door be opened

14   so that he could look into the cell.  The officers were unable

15   to get the door open, and the inmate on the inside had to be

16   asked to push open the door from the inside in order for the

17   officers to get the door open.  So the condition remains very

18   difficult.

19       And again, some progress has been made.  The Jackson

20   Detention Center has had a real face lift, and RDC has been

21   attempting to clean and repair some of the units on a case by

22   case basis.  But it's still almost impossible, without

23   staffing, for them to keep up with all of the malfunctioning

24   that happens, all the damage that happens.

25       So I wanted to talk a minute about records and releasing.

1    This is another major problem in the facility.  The consent
2    decree requires that the detention facility be able to keep
3    sufficient records to be able to track who is in the facility,
4    but most importantly, to release people when it is time for
5    them to be released.

6         In February we did a review of people that were on the
7    list as being in jail for fines and fees and working off those
8    fines and fees.  Out of the 25 files reviewed, ten of them had
9    insufficient paperwork to support detention.  This included the
10   sentencing that was missing, holds that were missing, bonds
11   that were missing, warrants that were missing, so significant
12   deficiencies.  The paperwork itself could not justify the
13   detention of ten out of 25.

14        Also, in that site visit I looked at 17 files of people
15   who were on the unindicted list.  That is a list that the
16   senior judge requests the jail to make of anybody who has been
17   there without indictment 90 days or more.  I looked at 17 of
18   those files.  Ten of the 17 people that were listed as in
19   custody without indictment were not actually in custody.  They
20   had previously been released.

21        In this trip, I looked at 11 files of individuals who came
22   in on a probation violation warrant, and those individuals are
23   supposed to have a probation violation hearing within 21 days
24   or be released.  Of the 11 files I looked at, ten of them were
25   lacking documentation showing the lawful basis of detention.

1   The missing documentation included the holds themselves, holds
2   that appeared to be lifted but the system hadn't been updated,
3   holds that didn't currently exist.  In one case the case had
4   been mistakenly entered as a new charge, and of course it
5   wasn't being processed as a new charge because it wasn't
6   actually a new charge, but the individual continued to be
7   incarcerated as a result.
8       There were warrants that had been withdrawn but the hold
9   hadn't been lifted, and in some there was no explanation for
10  detention at all.  And in one case there was actually no file
11  at all.
12      It appeared that one individual had been held three months
13  too long but had been released.  There was another individual
14  who was in for six months with no documentation of anything
15  holding them.
16      We also looked at some files of people waiting for
17  hospital beds, state hospital beds.  Again, there was another
18  inmate whose file could not be located, and yet another inmate
19  who had three volumes of his file, but the first two couldn't
20  be located.
21      So it continues to be a problem, a severe problem in
22  actually being able to track who is in the facility and why and
23  when their entitlement to release is.  RDC does not track the
24  sentences of individuals at RDC, nor does it track individuals
25  who are entitled to release after 21 days.  They typically rely

1    on the inmates to submit a request, either a grievance or a

2    separate inmate request.  No doubt in some of these instances,

3    the individuals do not have the wherewithal to know to do that

4    and stay in longer than they should.

5        It appeared that there were at least five individuals who

6    were held beyond their release time, although it should be said

7    that because of the conditions of the records, it could be they

8    are held in on something else that doesn't appear in the

9    records.

10       So there is basically a practice of not recognizing that

11   21 days as a firm deadline.  Understandably, the jail prefers a

12   Court order to actually confirm that a release is proper, but

13   their attitude is more that the D.O.C. will eventually get

14   something to them, and they are not proactive about making that

15   happen.  So there really needs to be --

16           **THE COURT:**  The records and filing issues that you

17   are addressing, does that fall under operations?

18           **MS. SIMPSON:**  No, that would be under the detention

19   facility as well.

20           **THE COURT:**  Okay.  I'm sorry to interrupt.

21           **MS. SIMPSON:**  No, that is okay.  Another issue is

22   reporting and use of reporting.  At the time we began our work,

23   there had been only three use of force reports in the prior ten

24   months, although that is really not realistic for a facility of

25   that size.  It indicates a lack of reporting.  The reporting

1    has increased since then.  It is very difficult to tell if it

2    is complete.  We do know in some instances it is not -- they

3    are supposed to prepare an incident report if somebody is

4    detained beyond their release date.  There were no such

5    incident reports, and we know that there have been

6    overdetention incidents.

7         It is also unlikely that they have not experienced any

8    lost property during this time frame, and there should be

9    incident reports regarding lost property, and there are no such

10   reports there as well.

11        They are developing a computer-based incident and use of

12   force report which should assist them in creating the summary

13   reports that are required by the consent decree.  Right now

14   they don't have summary reports that are consistent, and those

15   are really necessary to guide really oversight of the facility

16   and the operations in the facility.

17        One area that is, as all of these really, particularly

18   problematic is the use of confinement and segregation.  Again,

19   when we started, there was a practice of using a couple of the

20   cells in the booking area for individuals with severe mental

21   illness.  This was really not tolerable, and that has

22   discontinued, so that was a very good step forward.  They are

23   using some isolation cells in one of the units for segregation

24   or confinement, and some of those are individuals with severe

25   mental illness that have not succeeded well in general

1   population.  Particularly for those with severe mental illness,

2   it is still not an appropriate setting.  The consent decree

3   requires that they have individual and group treatment, as well

4   as treatment and therapeutic housing when it is needed.

5        The conditions in those isolation cells is that they are

6   pretty much continuously locked down in the cells.  There are

7   no services.  They are able to watch T.V. by sitting on the

8   floor and looking through the feed slots, and that has kept

9   them somewhat entertained.  There are now rounds being

10  conducted on that unit.  However, many individuals are locked

11  down throughout the general population of the jail, and there

12  is really not a very good way of identifying where and who is

13  locked down, and those individuals do not get rounds as is

14  required by the consent decree and best practices.

15       Sort of combined with this is the lack of mental health

16  program generally, as well as any dedicated area for

17  individuals with mental health issues.  There is a part-time --

18  well, a contract psychiatrist who comes in for a couple of

19  hours a week and a contract psychologist who comes in for a

20  couple of hours a week, but they don't have the level of mental

21  health staff that is needed.  They don't have adequate -- they

22  don't have a designated space with specially trained officers,

23  which would be needed in a well-run mental health unit.  And

24  unfortunately, as is the case all over the country, that jails

25  have ended up being the mental health providers for many

1    communities.  This is true in Hinds County as well.  It is

2    unfortunate, but it is the reality, and it really is necessary

3    to ensure that those people are properly housed and receive

4    treatment.

5         This is particularly true, I would say, in Hinds County

6    and the state in general where there are only 15 forensic beds

7    in the state hospital, and there have been individuals waiting

8    for those state hospital beds five or six years in the county

9    jail, and those are often the most challenging individuals.

10        Their medical staffing is low, even with what is supposed

11   to be in the contract.  They are now short four nurses, which

12   is a fairly high percentage of the contract, and so they are

13   not able to provide the level of medical services that are

14   needed.  And this really requires some more significant

15   oversight of the medical contract.

16        **THE COURT:**  Is that in addition to the 433 --

17        **MS. SIMPSON:**  Yes, yes, because the medical services

18   are provided pursuant to a contract with a private company.

19        One issue that has been briefly mentioned earlier is the

20   problem with fines and fees, people being in the jail ordered

21   to pay fines and fees.  Again, when the case started, there was

22   a very high number of people there working off fines and fees.

23   The uniform practice was whenever fines and fees were ordered,

24   they were immediately converted into days of work.

25        And in addition, the staff looked up old fines and fees

1   and added that to the number of days.  There has been

2   improvement here in that the jail staff is not now

3   automatically converting orders to days and looking up old

4   fines and fees, but unfortunately, they are still receiving

5   some orders from the court that in fact are what's been called

6   "pay or stay orders."  And I brought the stack of orders that

7   were holding people in the jail at the time of our site visit.

8   They include language that says that the jail shall keep in

9   jail until payment thereof of the fines and shall keep in jail

10  until such sentence is satisfied.  They also will say pay or

11  stay directly, or the fines are to be worked off.  And in some

12  instances, there is a check-off box that "must pay or work off

13  before release."  So there are probably about 30 or 40 people

14  that are in the jail on these orders.

15          **THE COURT:**  These are judicial orders?  These are

16  judgments?

17          **MS. SIMPSON:**  Yes, they are sentences, minimus

18  sentences they are called.

19          **THE COURT:**  From --

20          **MS. SIMPSON:**  Mostly --

21          **THE COURT:**  -- municipal court, a justice court,

22  potentially a circuit court?

23          **MS. SIMPSON:**  I have not seen any from circuit court,

24  but justice and municipal.

25          **THE COURT:**  So this is a lower court ordering a

1    defendant to remain in custody until a fine or fee is paid in

2    full?

3             **MS. SIMPSON:**  That is correct.

4             **THE COURT:**  And then, obviously, you can't earn an

5    income when you are incarcerated, so the detention center

6    allows them the opportunity to work?

7             **MS. SIMPSON:**  That is correct.

8             **THE COURT:**  All right.

9             **MS. SIMPSON:**  And I would say this is one area where

10   the constitutional law is actually quite clear.  That's not

11   always the case, but there is a U.S. Supreme Court case, *Tate*

12   *v. Short*, 401 U.S. 395, which holds "The Constitution prohibits

13   the state from imposing a fine as a sentence and then

14   automatically converting it into a jail term solely because the

15   defendant is indigent and cannot forthwith pay the fine in

16   full."

17            **THE COURT:**  All right.  So the orders that you have a

18   stack of in front of you appear to violate the Constitution?

19            **MS. SIMPSON:**  Yes, Your Honor.

20            **THE COURT:**  Okay.  All right.

21            **MS. SIMPSON:**  And the consent decree anticipated that

22   and set forth a process that should be followed.  It obviously

23   is a little delicate for the jail to be pushing back on court

24   orders, but it does require that the jail return defendants to

25   the court that have this kind of order and requests that the

1    court do what is legally required to enter a valid order.

2          **THE COURT:**  You may know, you may not know, maybe

3    someone in the courtroom may be aware of the recent rules of

4    criminal procedure this Court understands, I believe, were

5    recently enacted in the state.

6          **MS. SIMPSON:**  Yes, Your Honor.

7          **THE COURT:**  Do we know, do any of those rules

8    potentially address in any way, shape or fashion what is being

9    addressed to the Court right now with regard to the pay or stay

10   provisions?

11         **MR. TEEUWISSEN:**  Your Honor, I believe they, if not

12   directly, at least indirectly address that, and I believe the

13   new -- I don't profess to be a criminal lawyer, Your Honor, but

14   it is my understanding from talking to members of the committee

15   that drafted those rules, chaired by Justice Kitchens of the

16   Mississippi Supreme Court, that those rules were drafted or

17   revised in part to address these very issues.

18         **THE COURT:**  So I guess as it pertains to Hinds

19   County, the defense may, I guess, need to pursue maybe

20   education, training to our municipal court and justice court

21   judges.

22         **MR. TEEUWISSEN:**  Yes, Your Honor.  We would agree.

23   We have spoken with Justice Kitchens as chair of that drafting

24   committee and have asked him to, and he has said he will give a

25   day of his time to Hinds County to set up some sort of

1    continuing education, which would allow us certainly to get the

2    circuit judges, county judges and hopefully the justice court

3    and City of Jackson municipal judges, which is where most of

4    these orders come from, in the same room.

5           **THE COURT:**  Okay.  Thank you, sir.

6           **MS. SIMPSON:**  If I may, Your Honor, I think it may

7    also be helpful to affirm that it is appropriate for the jail

8    to return to the courts if they receive an order that is not

9    consistent with the law.

10          **THE COURT:**  So it is incumbent on the jail to

11   identify what we will refer to as an illegal sentence, right?

12          **MS. SIMPSON:**  Yes.

13          **THE COURT:**  But then we are going to go back to the

14   staffing issue is going to cause the jail issue, and then the

15   staffing issue we'll address shortly is going to need to be

16   addressed by the board of supervisors with regard to budget.  I

17   didn't mean to interrupt you.  Thank you, ma'am.

18          **MS. SIMPSON:**  There are just a couple more issues.

19   One of the requirements of the consent decree is that the

20   county retain a consultant to assist them in facilitating the

21   development of a Criminal Justice Coordinating Council, a CJCC,

22   and that through the CJCC, there would be an opportunity, then,

23   to address some system issues.  Many jurisdictions are moving

24   towards having the CJCC.  There are quite a few issues that

25   have been addressed through that process, the number of people

1    and how long they stay unindicted, the issues around fines and

2    fees, issues around delays in hospital beds being available and

3    competency process.  Pretrial decision-making, that is a huge

4    area that many jurisdictions address.  And typically, that is

5    done by developing a risk assessment instrument.  Through that

6    it often becomes clear that very low and moderate risk people

7    are being held in the jail, and this often assists in reducing

8    a jail population to a number that is more manageable.

9         So given that some of those issues are very much present

10   here, moving forward on a CJCC is an important requirement of

11   the consent decree.  The consultant was supposed to be retained

12   30 days after the consent decree was entered, so that would

13   have been in August of 2016.  I know they are now getting close

14   on that contract.  I don't believe it has been finalized yet,

15   or if so, it has just been finalized.  There has been no

16   initial meeting of a CJCC.  So that is something that is

17   overdue and could potentially provide them some relief on the

18   population, which would provide some relief on the staffing.

19        Classification has been an issue.  They do have a

20   classification tool.  They have not been using it with

21   misdemeanors, and as a result, misdemeanors have not been

22   housed based on their risk classification.  They basically have

23   been housed because they are misdemeanants.  They have been

24   presumed to be lower risk, which is not necessarily the case.

25        At the time of the last site visit, this was brought to

1    the attention of the staff, and I believe they are now starting

2    to classify misdemeanants as well.  In addition, though, to

3    classifying them, they now need criteria for where people go

4    based on that classification and when they get moved between

5    the three facilities.  Their classification previously was five

6    days a week during business hours.  They have now expanded it

7    to seven days a week, but classification needs to be 24-hour

8    coverage.  This can potentially be handled by combining

9    classification and records so that they can sort of multi-task

10   and cover the full 24/7.  This is required because really there

11   shouldn't be moves in housing without it being cleared through

12   classification, and that has been an issue after hours.  So

13   classification still needs to be worked on.

14        The booking areas are both very poor facilities.  They

15   have got outdated cells, outdated doors.  There is no visual

16   ability to see within the cells.  There is a lot of traffic,

17   particularly at Jackson Detention Center, going through

18   booking, no detention, overcrowding.  The corrections expert

19   has recommended that they move to an open booking style, which

20   would address this unsafe and inhumane setup in the booking

21   area, and that is something that needs to be moved on.

22        Those are the particular subject areas I wanted to

23   address.  I did, sort of as a general matter, want to mention

24   that deadlines have not generally been adhered to, and that

25   continues to be an ongoing problem.

1          The staffing study, just to run through a few -- the

2     staffing study was due January 17th.  It was done in April and

3     then actually not finished until June.  The training

4     requirements have not been met.  They are behind on those.  The

5     policies and procedures should have been completed in January

6     and were not done until April, and now they are overdue on

7     finalizing it.  Self-assessment was due November, 2016.  That

8     has not been completed.  Technical assistance on the CJCC was

9     due August '16.  That hasn't been completed.  The housing

10    decision for youth was due January 17th, and that hasn't been

11    completed.  There are several more, but as was mentioned

12    previously, most of the deadlines that were in the consent

13    decree have been missed.  Some have been completed late, and

14    some are still undone.

15          **THE COURT:**  Okay, ma'am.  Thank you.  I don't have

16    any questions at this time.  I appreciate the work that you've

17    done in furtherance of ultimate resolution, hopefully.  I may

18    have some questions as we proceed.  I'm going to give the

19    parties an opportunity to speak, but I will allow you to have a

20    seat.  You have been standing for some time.

21          **MS. SIMPSON:**  Thank you, Your Honor.

22          **THE COURT:**  I appreciate the work you have done on

23    this.

24          All right.  What says the plaintiff, the government at

25    this time, if anything?

1          **MR. CHENG:**  Your Honor, I would like to provide a

2     little context for some of the violations that Ms. Simpson has

3     identified.  The first is the staffing study.  Ms. Simpson

4     indicated that they failed to meet the deadline for the

5     staffing study.  Under the consent decree, the county had the

6     first crack at providing reasonable staffing figures.  We

7     generally assumed that the NIC figures that had been done for

8     them some years back would be pretty close on what they

9     required.  The county did not, however, complete their own

10     independent staffing study.  So under the consent decree, the

11     monitor and her corrections consultant could provide technical

12     assistance.  Mr. Parrish basically sat with his counterparts in

13     security at the jail, and they crunched the numbers.  So the

14     numbers that are provided are pretty reasonable from the United

15     States' point of view.  I should note, however, that to this

16     date, the county still has not formally adopted this as the

17     staffing study.

18          The other thing I'd also want to provide a little bit of

19     context about is the policies and procedures issue.  Policies

20     and procedures are about more than just documentation or formal

21     policy just so people know what is going on.  The policy

22     process that's been built into the agreement is designed to

23     allow the jurisdiction to incorporate the consent decree

24     requirements into a unified system of operations.  So, for

25     example, from the moment someone is booked until the time they

1    are classified based on their security risk until the time they

2    are housed, there are certain things envisioned in the decree

3    that have to be built into the policy process.  So by not

4    submitting a policy that incorporates the consent decree, it

5    throws off implementation of other provisions as well.

6         The third thing I would like to address is the issue of

7    the youth.  We do realize that the initial decision on where to

8    place a youth, which looked fairly simple at the beginning --

9    at first we thought the youth could just be placed at

10   Henley-Young, which is a juvenile detention facility in the

11   county.  That has turned out to be more complicated than

12   expected.  However, even under the decree, we did have some

13   provisions to allow them to make a reassessment and make a

14   decision.  They just needed to do what they needed to do to

15   find out what their options are and make its choice, and they

16   still haven't really done that yet.  Hiring the architect is

17   helpful, but they are well behind on that process.

18        The final thing I want to talk about from the monitor's

19   report is the issue of overdetention, the fines and fees.

20   There are a number of these odd criminal justice procedures

21   that have -- there are deficiencies with the criminal justice

22   process in Hinds County that affect the jail.  We recognize

23   that we are focused on the constitutional rights of inmates

24   inside the jail, and so the decree has some remedies to try to

25   make that process work better.  But at some point, the county

1    has to take some responsibility for fixing its own system.  So

2    we required that they create a Criminal Justice Coordinating

3    Committee and at least get a dialogue among key players within

4    the county on how to address these broader community and system

5    issues that were causing so many constitutional violations in

6    the jail.

7         It is frankly incredible to us that there are people who

8    are held in a jail who, for all practical purposes, there is no

9    documentation explaining why they are still in the jail.  It is

10   unconscionable.  And there are a number of reasons why that

11   process is happening this way that have to be addressed at the

12   Criminal Justice Committee level.  To not even convene the

13   committee and at least start cracking on it is a real problem

14   there.  Hiring a consultant will help, but again, it is just a

15   consultant that helps them set up the process.  The county has

16   to take some ownership of it.  Until then, they are just

17   ignoring really clear requirements in the consent decree.

18        I think that is it for now, Your Honor.

19             **THE COURT:**  All right.  If I could ask, I will ask

20   the defense, but I suspect Sheriff Mason will be able to

21   answer.  How much does it cost to house an inmate on a daily

22   basis?

23             **MR. TEEUWISSEN:**  Nobody knows.

24             **THE COURT:**  Nobody knows.

25             **SHERIFF MASON:**  Per inmate?

1      **THE COURT:**  Per inmate, just a ballpark.

2      **MR. TEEUWISSEN:**  Your Honor, before anybody gives an

3  off-the-cuff answer, there has been no analysis done.

4      **THE COURT:**  Okay.  All right.  I thank the counsel

5  for the plaintiff for those comments.  What says the board of

6  supervisors, if anything?

7      **MR. TEEUWISSEN:**  Your Honor, may I briefly -- may I

8  sit?

9      **THE COURT:**  Yes, sir.

10      **MR. TEEUWISSEN:**  I'll briefly address three things:

11  The 433 number, the juveniles, and the Criminal Justice

12  Coordinating Committee.

13      The 433 number was provided for the first time on

14  June 30th of this year, so this is not a number that the county

15  has had for some extended period of time.  It has had it about

16  ten days with the intervening 4th of July holiday.  It has not

17  had an opportunity to discuss this with Mr. Parrish in some

18  detail as to the underlying assumptions in that number.  So I

19  don't want Your Honor to think that the board has failed to

20  budget for something that it has just been provided.

21      In contrast, the sheriff's office complete personnel is

22  currently 430.  That would be detention and everything else,

23  every secretary, everybody.  So, clearly, this 433 number,

24  which is significantly different than the National Institute of

25  Corrections number that everyone had operated on, is something

1    that the board of supervisors will look into going forward, but

2    we are going to need some time on behalf of the board to really

3    look into that number and understand the assumptions and what

4    number is appropriate.

5         With respect to the juveniles, as Mr. Cheng said, everyone

6    assumed that was going to be an easy piece.  The county has a

7    facility, the Henley-Young facility, in which it currently

8    houses juveniles who are not charged with felonies.  The

9    assumption was going to be that perhaps we could move those

10   individuals there.  That facility is also under a consent

11   decree.  And, quite frankly, the monitor, Jim Moser, in this

12   case, the monitor in the Henley-Young case, Leonard Dixon, as

13   well as other individuals, have not been able to reach a

14   consensus.  It's not that the county has not been trying to

15   figure out what to do with the juveniles.  The experts can't

16   agree.  I'm not sure how a board is supposed to solve something

17   if the experts can't agree.

18        Having said that, the board recently engaged an architect

19   who has designed specifically juvenile facilities, and that

20   architect will present this week some preliminary drawings and

21   ideas on how to renovate existing county facilities or do a new

22   stand-alone to house those juveniles.

23        That population runs about 20 on any given day.  The sad

24   thing, Your Honor, the Henley-Young facility has an 84-bed

25   capacity, and we run about 15 juveniles charged with

1    nonfelonies on any given day.  So we have got beds at that

2    facility, but again, that is a facility, although it was built

3    in the 1990s, that isn't necessarily designed for juveniles

4    charged with felons.  The programming is there, Your Honor, so

5    we are looking at that.

6         On the Criminal Justice Coordinating Committee, we have

7    got the media here, and I want to be careful what I say, but

8    let me make this abundantly clear.  The Hinds County Board of

9    Supervisors has no control over the district attorney.  The

10   district attorney has been invited, before the Department of

11   Justice ever showed up, to quarterly meetings that occurred

12   between the circuit judges, the public defender, the sheriff's

13   office to help solve these problems.  The district attorney

14   remains engaged in other priorities, and I will leave it at

15   that.

16        We will -- we have retained the criminal justice

17   consultant.  We will start those meetings.  But as a practical

18   matter, we do not see any short solutions coming forward until

19   we can figure out how to get the district attorney's office

20   better engaged.  And that is a problem, Your Honor, that the

21   Mississippi Supreme Court has spoken to.  In fact, there is an

22   opinion by Justice Carlson, now retired, about five years ago,

23   in which he expressed for the Supreme Court frustration with

24   the Hinds County District Attorney's Office.

25        I will answer any questions you have, Your Honor, but

1    those are the three areas that I wanted to respond to on behalf

2    of the board.

3              **THE COURT:**  Yes, sir.  And I appreciate your

4    comments.  What says, if anything, the sheriff's department,

5    Ms. Barker?

6              **MS. BARKER:**  I would like to echo Mr. Teeuwissen

7    comments.  However, I would like to address one issue with the

8    policies and procedures.  It is true that the jail did not have

9    any policies and procedures whenever this consent decree was

10   entered.  We submitted and approved policies and procedures for

11   all three facilities in April.  That was then submitted to the

12   Department of Justice and also the monitors, who had very

13   lengthy comments on those policies and procedures.

14       A visit was had by all monitors, the Department of

15   Justice, June 6th.  We then received a good manual to go by

16   that Mr. Parrish submitted to us on June 6th, so we are looking

17   into perhaps hiring someone on the -- a third party to come in

18   and help revise those policies and procedures.

19       So I just would like to let the Court know that we have

20   received this in short time, and we are currently addressing

21   that.

22             **THE COURT:**  All right, ma'am.  Thank you for your

23   comments.

24             **MS. BARKER:**  Thank you.

25             **THE COURT:**  Anything further on behalf of any of the

1    parties at this time?  Ultimately, before we recess, I'm going

2    to want to address future scheduling of telephone conferences

3    and status conferences, but prior to that, any further

4    comments, additional comments at this time?

5            **MR. CHENG:**  Your Honor, I appreciate this one more

6    thing.

7            **THE COURT:**  Yes, sir.

8            **MR. CHENG:**  Ms. Simpson mentioned a self-assessment

9    process, and one of the things we do in these consent decrees

10   is we create a road map to deal with what's at the facility but

11   also to deal with these types of contingencies.  So, for

12   example, if there is a delay in making the decision about

13   juveniles, or if there is a problem with the staffing analysis,

14   but it is important that the county have a self-assessment

15   process.  And Ms. Simpson has actually gone to the county to

16   sort of explain to them how that process can be set up so they

17   collect information on their own, they identify deadlines, and

18   they can adapt as there are problems.

19       The idea of a self-assessment is to identify the

20   provisions of the decree, if they are in compliance, and if

21   they are not in compliance, what they are going to do in the

22   near future to try to bring themselves into compliance.

23       So as a problem-solving tool, it is very useful to have

24   something like that in place.  It is required by the decree,

25   but so far, for example, the county does not actually have a

1    system like that in operation.  So as you are considering what

2    to advise Judge Barbour of what to do, that is something to

3    think about as well.

4            **THE COURT:**  Any comments with regard to that on

5    behalf of the defense?

6            **MR. TEEUWISSEN:**  No, Your Honor.  I did have one

7    other comment on a different area.

8            **THE COURT:**  Yes, sir.

9            **MR. TEEUWISSEN:**  Your Honor, Hinds County currently

10   has approximately a $3.2 million structural budget deficit.

11   The county has been relatively well managed, has until last

12   month -- has had the same bond rating as the state of

13   Mississippi.  However, they have pulled reserves to make

14   repairs to the jails, and they are going to have to deal with

15   their structural budget deficit.

16        I say all of that as foundation that if the board fixed

17   the budget and said, we will go from 250 detention officers to

18   300, if we got with Mr. Parrish and said, would that be a step

19   in the right direction, the county has no assurance that if it

20   budgets and provides funding, that that funding will actually

21   be spent by the sheriff on detention, and that is going to

22   continue to be an issue or cause of concern between the board

23   and the sheriff's office.

24           **THE COURT:**  This -- and I was going to address that.

25   We touched on that briefly, initially, during the status update

1    provided by Ms. Simpson.  You know, ladies and gentlemen, to

2    the actual parties in the courtroom, it should be the intention

3    of all parties to comply with the terms and conditions of the

4    consent decree.  I would hope that the sheriff's department and

5    the board of supervisors would be working conjunctively towards

6    complying with the terms and conditions.

7         I can speak to and I will allow the attorneys to add to

8    it.  If we follow logically looking into the future, what will

9    happen if the terms and conditions are not being met and not

10   being complied with?  I understand there has been some progress

11   made, but there have also been some areas of some deficiencies.

12   I'm confident that your legal counsel has addressed this with

13   you, but, you know, the goal should be compliance and to

14   preclude the necessity of a motion.  All right?

15        If the terms and the conditions are not being met, there

16   may be a motion filed by the plaintiff to enforce the terms and

17   conditions of the consent decree.  Now, what may be included

18   with that or what may potentially happen is a judicial

19   determination that someone in the courtroom, one of the

20   parties, is not in compliance, and there is the potential that

21   you could be found in contempt.  All right?

22        I'm hoping that the actual parties -- I'm glad you are

23   present today for the hearing.  I don't see how that would be

24   in anyone's best interest to be found in contempt, a judicial

25   determination that you are found in contempt of the consent

1    decree.

2         In addition to a finding of contempt, there may be

3    sanctions imposed.  So what this Court is encouraging is

4    coordination between the board of supervisors and the sheriff's

5    department, is all I can say at this point.  It just makes

6    sense.  Each of you, it's incumbent on each of you to comply

7    with the terms and conditions.

8         Now, I understand there may be some difficulties, and your

9    attorneys have mentioned that there are some road blocks, maybe

10   some hindrances to complete compliance, but ultimately, that is

11   what is going to be required is compliance with the consent

12   decree that was signed by a United States Court District Judge.

13        All right.  To the Court's knowledge, there has not been a

14   motion to enforce that's been filed, but I will ask plaintiff's

15   counsel at this time, is that something you would foresee?

16        **MS. COWALL:**  Your Honor, I can answer if you would

17   like.  Speaking on behalf of the civil rights division, yes, as

18   of January of this year, the department could have brought a

19   contempt motion for the missed deadlines and the consent

20   judgment.  However, we are here today, and we are looking to

21   the sheriff, we are looking to the board of commissioners, to

22   demonstrate to us that they have a plan that they will be able

23   to implement to timely get into compliance with the consent

24   judgment.

25        The monitoring team has laid out a number of priority

1    recommendations, and so now we are looking to the county to see

2    how they plan to implement those recommendations and get into

3    compliance, and we are looking for who is going to be

4    responsible for implementing the recommendations.  What are the

5    timelines?

6         And this all goes back to the self-assessments that my

7    colleague mentioned, but we really need to see that immediately

8    in order for us to have some level of comfort that we don't

9    need to bring a contempt motion now.

10         **THE COURT:**  And forgive me if I've forgotten.  Is the

11    president of the board of supervisors present?

12         **MR. TEEUWISSEN:**  Yes, Your Honor.

13         **THE COURT:**  Sir, you may remain seated.  I apologize.

14    But do you understand what was just addressed by the Court with

15    regard to the potential of the filing of a motion asking the

16    District Court to find the parties in violation of the consent

17    degree?

18         **MR. MCQUIRTER:**  Yes, sir, Your Honor.

19         **COURT REPORTER:**  What is your name, sir?

20         **MR. MCQUIRTER:**  Darrel McQuirter.  We are aware, we

21    are appreciative of the Department of Justice in working with

22    the county and working with the sheriff's department on

23    numerous issues that we are facing.

24         **THE COURT:**  Yes, sir, I understand.

25         **MR. MCQUIRTER:**  And we are working together, our

1    counsels are working together, our counterparts having to meet

2    as well to address as many of these as we can.  Some of them,

3    again, we have been working on them.  We just have not been

4    able to get all of them resolved in these time frames that have

5    been placed before us.

6         **THE COURT:**  I understand, and I appreciate that, sir.

7    Let me ask, just to be certain so the Court understands,

8    Sheriff Mason, sir, do you understand what transpired when we

9    are discussing the potential of the plaintiff filing a motion?

10        **SHERIFF MASON:**  Yes, sir, Your Honor.

11        **THE COURT:**  And again, as I initiated, the goal is

12   for cooperation, and this Court's goal, in my opinion, is

13   initially to try to get us to work together towards resolution

14   and hopefully not being put in a position of having to have a

15   formal motion to enforce.  It's in no one's interest to be

16   placed in that position.

17        All right.  Let me ask Ms. Simpson, ma'am, what is the

18   next event to take place?

19        **MS. SIMPSON:**  The next event will be our monitoring

20   report from the June monitoring visit.  It will be circulated

21   to counsel and then should be finalized within 30 days of that

22   circulation.

23        **THE COURT:**  Okay.  So that should be around August;

24   is that correct, ma'am?

25        **MS. SIMPSON:**  That is correct.

1          **THE COURT:**  All right.  What says the parties to a

2     status conference, a telephonic status conference in the month

3     of September?  What says the plaintiff?

4          **MR. CHENG:**  We agree that would be very sensible,

5     Your Honor.

6          **THE COURT:**  And the board of supervisors?

7          **MR. TEEUWISSEN:**  We agree, Your Honor.  Under state

8     law, the board must adopt a budget for fiscal year '18.  That

9     begins October 1 of 2017.  And so we think a status conference

10    in September will be helpful because we will be able to present

11    to the Department of Justice and the Court a proposed -- or

12    adopted, it should be adopted by that point -- budget that will

13    incorporate many of these recommendations.

14         **THE COURT:**  Okay.  And what says the sheriff's

15    department?

16         **MS. BARKER:**  We do agree with that, Your Honor.

17         **THE COURT:**  All right.  So we will set a telephonic

18    status conference that will be noticed by the Court.  And what

19    says -- well, let me initiate by asking the court monitor, Ms.

20    Simpson, do you see a need for a follow-up in-person status

21    conference?

22         **MS. SIMPSON:**  Yes, Your Honor, I think that would be

23    very helpful.  We have our October site visit the third week of

24    October, and it might be helpful to have an in-person status

25    conference following that site visit.

1          **THE COURT:**  End of October to the beginning of

2    November?

3          **MS. SIMPSON:**  Yes, sir.

4          **THE COURT:**  Does the plaintiff disagree with anything

5    that was just asserted?

6          **MR. CHENG:**  No, Your Honor.

7          **THE COURT:**  Either of the defendants?  If anyone is

8    in disagreement, please raise your hand at this time.

9          **MR. TEEUWISSEN:**  No disagreement from the board, Your

10   Honor.

11          **MS. BARKER:**  No disagreement from the sheriff's

12   office.

13          **THE COURT:**  The parties had agreed to this in-person

14   status conference taking place in the Gulfport courthouse.  Are

15   the parties still in agreement with regard to that?  The court

16   monitor is nodding her head in the affirmative.

17          **MS. SIMPSON:**  Yes, Your Honor.

18          **THE COURT:**  What says the plaintiff?

19          **MR. CHENG:**  That is fine, Your Honor.

20          **THE COURT:**  Defense?

21          **MR. TEEUWISSEN:**  We agree, Your Honor.  Both the

22   Department of Justice and the monitors have to come to Jackson

23   on enough other occasions.  It only seems fair to allow them,

24   since they're out of state, the opportunity to come to the

25   coast and make easier travel arrangements.

1          **THE COURT:**  Okay.

2          **MS. BARKER:**  That is correct, Your Honor.

3          **THE COURT:**  All right.  So that will be the venue and

4  the locale of the in-person status conference.

5      Staffing policies and procedures, we addressed the

6  juvenile.  The CJCC, you addressed that as well.  Pay or stay,

7  which gives this Court some concerns, you have got Justice

8  Kitchens is going to conduct training.  Anything further

9  required on the record on behalf of the court monitor at this

10  time?

11         **MS. SIMPSON:**  No, Your Honor.

12         **THE COURT:**  On behalf of the plaintiff?

13         **MR. CHENG:**  No, Your Honor.

14         **THE COURT:**  On behalf of the board of supervisors?

15         **MR. TEEUWISSEN:**  No, Your Honor.

16         **THE COURT:**  On behalf of Sheriff Victor Mason?

17         **MS. BARKER:**  No, Your Honor.

18         **THE COURT:**  All right.  Well, with that being said, I

19  appreciate everyone's patience.  I appreciate everyone's

20  cooperation.  I wish you all a safe trip back to your point of

21  origin, and we are adjourned.

22                      (HEARING CONCLUDED)

23

24

25

CERTIFICATE OF COURT REPORTER

I, Teri B. Norton, RMR, FCRR, RDR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

s/ *Teri B. Norton*
TERI B. NORTON, RMR, FCRR, RDR
OFFICIAL COURT REPORTER