Court-Appointed Monitor's Second Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 WHB-JCG

Elizabeth E. Simpson, J.D.
Court-Appointed Monitor

David M. Parrish                 Jacqueline M. Moore, RN, Ph.D.         Jim Moeser
Corrections Operations           Corrections Medicine                   Juvenile Justice

# EXECUTIVE SUMMARY

Following the first site inspection in October 2016, the Monitor prepared the Baseline Visit Report which summarized the status of the County with regard to the many provisions of the Settlement Agreement. Subsequent to the first visit, the County hired a Compliance Coordinator which has improved communication with the Monitor and appears to be facilitating steps towards compliance. There followed the second visit and the first actual monitoring visit in February, 2017. Progress had been made in a number of areas. However, there were a number of critical areas of deficiency having substantial impact on the health and safety of the prisoners. As required by the Settlement Agreement, the areas of deficiency were identified in the First Monitoring Report. Prior to the First Monitoring Report, priority recommendations were identified to allow for immediate attention to areas that could either be addressed quickly or presented the most pressing health and safety concerns.

The second site visit took place from June 13, 2017 through June 16, 2017. This Monitoring Report describes the findings from that visit. In keeping with the previously adopted process, priority recommendations have been provided subsequent to the June site visit. And, as required by the Settlement Agreement, the body of this report contains a listing of each substantive requirement of the Settlement Agreement and a description of the status of compliance as of the time of the site visit. This executive summary highlights some areas of progress and those areas of greatest concern.  This report reflects conditions at the time of the site visit. Any progress since that time will be reflected in the report on the next site visit.

**Corrections Operations**

Lack of staff continues to be the most critical issue facing the Hinds County Jail System.  The Sheriff's Office took a positive step in December when it began to utilize some of the available space in the Work Center (WC) to accommodate prisoners that were (and are) crowding the understaffed Raymond Detention Center (RDC). However, the population of the facilities still requires significantly more staff than is currently allocated or employed. In May, the Sheriff approved a new pay plan which sets more reasonable salary levels for the various ranks and includes five step increases within each supervisory pay grade for the first time.  This action should have a positive effect in the long run, but the lack of qualified applicants is of crisis proportions at this time.

As was previously noted, baseline data regarding authorized positions within the Jail System is woefully lacking.  During the June site visit an updated list of authorized positions for the Detention Services Division was provided, but of the 275 positions identified, 24 actually work in other divisions of the Sheriff's Office.  That leaves 251 positions of which more than 50 are

vacant. The actual availability of another 50 positions is not entirely certain because the positions appear to be mischaracterized by title or job duties.  The creation of an accurate workforce database must be accomplished before meaningful progress can be made toward rectifying the staff shortage problem.

In April, Hinds County completed an update to the Staffing Analysis that was done by the National Institute of Corrections in 2014.  While the revised figures are based on an appropriate relief factor, a schematic rendering had not been developed for each facility.  That visual record is necessary so that the County can validate and historically monitor the number of necessary personnel as conditions in, and the use of, each jail change over time.  The staffing analysis conducted by the County concluded that a total of 428.4 positions were needed. The Correctional Expert of the Monitoring Team continued to work with the Detention Command Staff to finalize an accurate accounting of required positions and personnel in order to inform the budgeting process currently underway in Hinds County. The staffing analysis completed through the combined efforts of the Detention Command Staff and the Correctional Expert has determined that there is a need for 433.1 positions in the three detention facilities in order to safely operate them, very similar to the County's independent analysis. This requires an increase of 182.1 positions. It is essential that the County and the Sheriff include funding for this number of positions in the budget in order to make any substantial progress towards compliance with the Settlement Agreement. The County should also consider achieving sufficient staffing by reducing the jail population. However, the jail population would have to be reduced to the point where a unit can be closed or facilities can be combined in order to achieve a reduction in needed staff.

Notable progress continues to be made with regard to operational procedures that do not require additional personnel.  The booking area of the RDC no longer houses any inmates for more than eight hours.  The WC is now a reduced custody level housing facility for pre-trial and sentenced misdemeanants and felons.  While Units 3 and 4 have not been physically separated by a secure wall yet, once that is accomplished the WC will have a rated capacity of 256, with four, 64 bed units.  Documented well-being checks are recorded much more routinely throughout the Jail System, though still not as specified by the Settlement Agreement.  Lastly, the Policies and Procedures Manual is under revision so that a compliant version can be issued and personnel can be trained on the new policies and procedures.

**Youthful Offenders**

There have been some limited positive steps taken since the first monitoring visit in February of this year.  This includes: (1) reinstituting some educational programming, although what has been reinstituted falls far short of the Settlement Agreement requirements (refer to report for more information); (2) identifying an architectural firm to develop concepts/designs for a

potential new/remodeled juvenile offender unit in which to house juvenile offenders; (3) completing some staff training on supervision of juvenile offenders; and (4) taking a more proactive approach to ensuring that youth have some access to outside recreation (the only group of Raymond inmates that are getting access to the recreation area), albeit that seems to be limited to weekdays only.  However, the County remains behind schedule in making a decision about alternative housing for juvenile offenders and has not made substantive progress on other requirements in the Agreement.  The development of a number of work groups focusing on the varied requirements of the full Agreement is a positive, but key staff is spread thin across those groups.  The result appears to be sporadic attention to the tasks that need to be completed to make substantive progress on the specific youthful offender requirements.  The actual progress on youthful offender items in the Agreement is limited in that there has been no real progress on education or behavior management and they are certainly behind schedule on identifying an alternate location, planning/design for such a location and the development of policies/procedures related to juveniles.

**Medical and Mental Health**

There is a shortage of health care providers both RN and LPN. Many of the new staff are not fully oriented.  Due to correctional staff shortages, there are some health care responsibilities that are not consistently being performed such as medication administration.  If the nurses don't have a correctional officer, medication is not passed to those unit.  These occurrences occur mostly on the evening shift.  Medical staff maintain a binder of when medications are missed.  Nursing sick call is not always performed in a timely manner.  It generally is performed 3-5 days after the initial request.

There has been a revision of the Hinds County Detention Center's policies.  Once these policies are approved, the medical and mental health expert on the Monitoring Team will work with Quality Correctional Health Care (QCHC) to revise their policies so that they are congruent with the jail policies and the Settlement Agreement. A discharge planner has been hired and she is coordinating with Hinds County Behavioral Health for discharge and follow-up care on soon to be released inmates.  AIMS (Abnormal Involuntary Movement Scale) testing for tardive dyskinesia is now performed during all psychiatric evaluations; however, consent forms for mental health medications have not been implemented.

There has been inconsistency in performing segregation rounds at RDC and performing mental health evaluations as required by the Settlement Agreement.  Part of the issue is that medical staff is not notified when inmates are moved to segregation. There have been a number of inmates that were placed on suicide watch during the last quarter.  Additional training on this topic would be useful to the correctional officers.  There are no special management cells for the juveniles at RDC which would allow for an intermediate level of observation and protection on

the juvenile unit. As a result, a juvenile was placed on suicide watch in an adult unit. The problem was compounded by the lack of security staff to provide one on one observation, so the juvenile's clothing was removed and he was left naked without a blanket on an adult unit for over a week.

**Criminal Justice and Correctional System Issues**

The County continues to express support for addressing internal and external processes for ensuring that individuals are processed through the system promptly and fairly. However, despite this motivation, significant problems and abuses continue to exist both internally and systemically. Internally, the records and releasing system is so fraught with problems and errors that there is no assurance that individuals are released as required by their case status. Almost universally, case files and computer records could not be reconciled with each other or the documentation supporting incarceration. For the most part, release dates are not tracked and depend on prisoners trying to identify release dates through grievances or inmate requests. Although it appears that prisoners are routinely held beyond their release dates, there are no incident reports identifying when prisoners are held beyond their release dates. The JMS system, like the paper system does not have accurate inputting that would identify release dates or failure to release according to release dates. This is an extremely significant deficit.

People continue to be held on invalid orders requiring full payment of fines and fees before release and showing no evidence of a determination of willfulness. The County has discontinued interpreting all fines and fees orders as requiring incarceration until payment in full but continues to hold people when the court order explicitly states to detain until payment in full despite no indication of a finding of willfulness. The Settlement Agreement sets out a process for returning these individuals to court in order to ensure the detention orders are valid.

It is essential that the County contract with a technical assistance provider on the development of a Criminal Justice Coordinating Council and begin facilitating CJCC meetings. The contracting with a consultant in this area is almost a year overdue.

**Priority Recommendations**

Following the February 2017 site visit, the Monitoring Team identified steps that could be taken to make interim improvements identified as Priority Recommendations.  Shortly after the second site visit the Compliance Coordinator organized a number of working groups to address the priority recommendations and a number of actions were taken to address these recommendations. These include:

- Work on the update of the NIC staffing analysis which then formed the basis for the completion of the staffing analysis with the Monitoring Team's correctional expert;

- Approval of salary increases for detention officers;
- Return of the state prisoners housed at the Work Center, which provides needed additional housing for inmates from RDC;
- Completion and adoption of policies and procedures for the detention facilities which will provide a basis for further development;
- Hiring of a discharge planner by the medical provider, QCHC;
- Audit of the JMS system for current custody status of prisoners;
- Discontinuing the practice of automatically converting fines and fees to jail time even in the absence of a court order requiring the jail to do so.

Additional progress has been made in some of the other priority recommendations. This reflects a significant amount of effort on the part of the County and Sheriff staff. Not all of the priority recommendations, however, were completed and some, such as the policies and procedures need additional work to be satisfactory. These areas are reflected in the updated and revised priority recommendations attached as Attachment 1. Other areas of improvement or lack thereof are covered in the executive summary above and the detail below.

## MONITORING ACTIVITIES

The Monitoring Team conducted a site visit June 13th through June 16th, 2017.  The site visit schedule was as follows:

| June 13th | | | |
|---|---|---|---|
| | Track One | Track Two | Track Three |
| 8:30 AM | Opening Meeting: Report on Progress from Last Site Visit; Identify Priority Areas for Current Site Visit | | |
| 10:00 AM | Moeser meet with Synarus, Rushing and and Sgt Tower and Deputy Newell re Juvenile Programming | Moore and Parrish visit JDC | Simpson meet with Public Defender Office |
| PM | Moeser visit youth unit at RDC (observe & interview youth); meet with ABE educator | Moore and Parrish visit RDC-including booking | Simpson review fines and fees records with WC personnel |
| June 14th | | | |
| 8:30 AM | Moeser and Parrish meet with design team Richard | Moore and Parrish at RDC including review of seg and seg records | Review JDC records re fines and fees and grievances with JDC personnel |

|  |  |  |  |
|---|---|---|---|
|  | McNeel and Johnnie McDaniel and Tower/Newell at HY |  |  |
| AM | Moeser, Parrish and the design team go through the WC to determine applicability/options for juvenile housing. The same group then tours Booking | Moore at RDC | Simpson meet with counsel on fines and fees<br><br>Simpson meet with Judge Green |
| PM | Parrish meeting with Rushing, Captains and Synarus on policies and procedures and post orders | Moeser/Moore meet with County staff and Peterkin Group re mental health services; Moeser observe juvenile unit and interview youth and staff; Moore at RDC | Simpson meet with Justice Court |
| PM | Moeser joins policy and procedure group | Moore continue RDC work | Simpson meets with Records/Releasing of RDC and reviews charts |
| June 15th |  |  |  |
| AM | Moeser review education plan for young adults | Parrish meeting on staffing, relief factors and training with Maj. Rushing, all Captains, Synarus Green and Claire Barker | Moore and Simpson review files and meet re state hospital beds with QCHC staff 10:30 Meet with Philip Gaines, Dr. Recore re state hospital beds and JBCR |
| PM | Jim interview youth off unit | Parrish review personnel files of supervisors | 1:00 Simpson and Moore meet with BH partners and QCHC |
| PM |  |  | Meet with compliance monitor/IT re reporting |
| June 16th |  |  |  |
| Early AM | Meeting with Sheriff, both Majors and Attorneys |  |  |
| 10:00 | Exit Conference |  |  |

Prior to the site visit, the County provided some documents in response to ongoing document requests. All documents received were reviewed either prior to or, because of the short time available prior to the site visit, after the site visit. The County has improved its ability to provide the requested documentation, however, it is not yet complete or in the format requested or required by the Settlement Agreement. The Monitoring Team will continue to work with the County to improve its ability to produce the required documentation and reports.

In the course of the site visit, the team interviewed numerous staff members, contractors, prisoners and stakeholders as mentioned below when relevant. In addition, facility and prisoner records on site were reviewed during the course of the site visit again as referenced below when relevant.  A number of documents related to staffing and budget were reviewed but there remained a lack of clarity in this area. A significant amount of time during the site visit was devoted to clarifying the current staffing allocation and the needed staffing allocation. The Policies and Procedure Manual was reviewed prior to the site visit with extensive comments being provided. This was also the subject of intense review during the site visit. With respect to youthful prisoners, on-site activities included interviews with and observation of youth on the juvenile unit, interviews with educational and program staff, touring the WC and Henley-Young facilities with the architectural team, and review of roster information with records staff. With respect to medical and mental health, prisoner medical records and QCHC records were reviewed. Because there were four RN nursing vacancies for the three facilities, payroll records were obtained and a review of contractual obligations regarding staffing was performed.

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Requirements that have not yet been triggered such as an annual review are listed as NA (not applicable) at this time. Sustained compliance is achieved when compliance with a particular settlement agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of settlement agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart.

| Site Visit Date | Sustained Compliance | Full Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;
    n.  Laundry;
    o.  Food services;
    p.  Hygiene;
    q.  Emergency procedures;
    r.  Grievance procedures; and
    s.  Sexual abuse and misconduct.

**Partial-Compliance**

A Policies and Procedures Manual (P&P Manual) for the Detention Services Division was issued in April, but it fails to address all of the areas of concern that are covered by the Settlement Agreement.  In addition, it does not include Post Orders as individual Policies.  Rather than issuing two separate manuals, the Post Orders should be re-written as Policies and included in the P&P Manual.  Based on guidance provided in writing by the Monitor and the Department of Justice (DOJ) in May, as well as verbal suggestions made by various members of the Monitoring Team and the Department of Justice during the June site visit, the P&P Manual should be revised and re-issued as soon as possible.  Special attention should be paid to making it consistent with

the Inmate Handbook so that when inmates are provided individual copies during the booking process, the information that they receive applies uniformly to each facility. As part of the revision of the policies and procedures manual, revised and, in some cases, new forms will have to be developed such as a revised incident/use of force form and an Inmate Release Tracking Form to be consistent with the new policies and procedures.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**
There has been no change in the status of this section since the last Report.  The Jail Administrator, while well qualified through experience, does not meet the technical education level in that she has the equivalent of an AA degree, but did not graduate with a BA/BS.  The Assistant/Deputy Jail Administrator's position is still vacant. The three Captains have AA degrees but only two of the three meet the requisite experience requirement.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
Of the 27 Lieutenants and Sergeants, all have at least a high school diploma or GED and eight have AA degrees; however, seven had less than three years of relevant work experience at the time of their promotion.  Familiarity with the P&P Manual will be determined once it is published in final form.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Non-Compliant**
This paragraph is still carried as non-compliant because there has not been sufficient time during the site visits to review all individual employee records and the County has not submitted documentation through self-reporting demonstrating compliance.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

Once the P&P Manual is re-issued it will be reviewed to determine compliance.  It should be noted, however, that implementation of the direct supervision related policies will require the employment and assignment of a sufficient number of Detention Officers to staff the housing units at the RDC.  Only the WC currently operates as a direct supervision jail and has enough staff assigned to do so.  The JDC cannot function as a direct supervision facility because of its linear design.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:

        i.  There are at least two detention officers in each control room at all times;

        ii.  There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii.  There are rovers to provide backup and assistance to other posts;

        iv.  Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v.  There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i.  The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii.  The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

11

      iii.   As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

   c.   Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations. Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

   d.   The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement. The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

   e.   The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Partial Compliance**

No progress has been made with regard to the critical issue of hiring and retaining enough officers to ensure that the facilities are properly staffed. From that perspective a finding of Non-Compliant would be in order; however, the County has taken significant steps to deal with the other aspects of this section. Those efforts give rise to the Partial Compliance notation. In April the County's Workforce Development Group studied the NIC Staffing Analysis (2014) and issued an updated report that called for a total of 428.4 Detention positions in order to adequately staff the facilities and comply with the conditions specified in the Settlement Agreement. In May the Sheriff approved a revised salary schedule for Detention Officers, Sergeants, Lieutenants and Captains. It includes a five-step salary increase within each supervisory rank and a $2,500 increase for Detention Officers after eighteen months of service. Under this plan the entry level salary will increase from the current $21,816 per year to $27,500. That significant change should make the position of Hinds County Detention Officer much more competitive in the employment marketplace. During the June site visit the Monitor finally received a copy of authorized Detention positions which lists each permanent position number, title of the position, respective facility and salary amount. Of the 275 positions, fully 24 were actually assigned to other divisions of the Sheriff's Office, many of the Detention Officer positions were carried as Correctional Officers, each of the three Captains were listed differently (S.O. Captain—Administration, Captain—Security and even Correctional Officer). Some positions were titled with job descriptions that do not exist in the Division of Detention Services. On June 27th the Monitor conducted a conference call with the Compliance Coordinator and five Sheriff's Office staff during which each position was reviewed so that an accurate baseline list of authorized Detention positions can be established. Of the 251 positions that are now recognized as being in the division, just over 50 are currently vacant. Following this effort, the same group

reviewed the updated staffing analysis using the recognized relief factors of 5.1 (three shifts, seven days a week), 1.7 (one shift, seven days a week) and 1.2 (one shift, five days a week).  The resultant list of Required Positions, organized by facility, was provided to the Compliance Coordinator and other command staff by the Monitor.  It calls for a total of 433.1 positions, which is 182.1 more than are currently authorized.

    f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

      i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

     ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

   iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

   iv.   The classification system must track the location of all prisoners in the Jail, and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

    v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

   vi.   The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

13

**Partial Compliance**

Progress continues to be made in this area. A Classification Officer is now on duty seven days per week on the day shift. This means that individuals who are arrested during the weekend do not have to wait until Monday to be classified. Ultimately, continuous coverage needs to be in place so that all classification decisions and associated records are handled by Classification personnel. The recommendation to consolidate Classification and Records that was made in the last Monitoring Report, has even greater urgency now. There needs to be a single point of information for every inmate in the Jail System and all coordination with the courts should be handled by Records, not the individual facilities. Consolidation of Classification and Records into one unit has the potential to solve many of the record keeping and accountability problems that plague the Jail System.

Pursuant to prior recommendations, the Classification office has moved towards greater reliance in its classification system on behavior and less on current charge. Previously, classification staff used a classification instrument, but housing assignments were made primarily based on charge. The Classification Office is now relying on the results of the classification instrument and not just the current charge to identify the proper housing assignment. However, in this visit, it became apparent that this new approach was not being applied to persons charged with misdemeanors. Persons charged with misdemeanors were not being classified and they were all being sent to the WC without classification. This is inconsistent with this requirement of the Settlement Agreement and with best practice. Persons charged with misdemeanors may present significant risk in the institution. The Classification office must begin classifying misdemeanors and the Sheriff's office must develop criteria for placement of persons charged with misdemeanors in the various facilities. In addition, specific criteria should be developed for the assignment of individuals or reassignment to the various facilities.

       g.  Develop and implement positive approaches for promoting safety within the Jail including:

            i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

           ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

         iii.  Creating work opportunities, including the possibility of paid employment;

         iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

          v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

      vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

     vii.  Providing reasonable opportunities for visitation.

h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.  Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Non-Compliant**

Outdoor recreation is still not provided to most inmates at the RDC, a condition that has existed for approximately five years; however, the juveniles in A-1 now have access to the outdoor recreation yard for one shift, five days per week.  The WC inmates continue to have access to outdoor recreation on a daily basis.  The JDC has no outdoor recreation yard.  The best solution for that facility is to build a rooftop enclosed recreation yard at the fifth floor level accessed through the multi-purpose room on that floor.  Rewards and incentives for good behavior have not yet been developed, nor are work opportunities available.  Other than limited Adult Basic Education programming for youthful offenders, there is no routine screening of inmates that would identify youth/young adults who should be receiving special education services. The newly installed video recording system in the housing units at the RDC is a valuable resource, but it cannot be properly utilized until at least two officers are assigned to Master Control.  Such equipment is not in place at the JDC and WC.  Hourly well-being checks are now being documented in selected areas of the Jail System, but the practice is by no means universal.  The more frequent checks required by the Settlement Agreement are not maintained in any facility.

With respect to the requirement to provide individual and group treatment, there is one to one counseling provided on Fridays with a PhD psychologist.  He saw approximately 50 patients in April 2017. His hours are insufficient to cover the needs of all three jail facilities.  There is no group therapy provided for either the youth or other inmates with behavioral health problems. Currently the only groups provided are those provided by the Chaplain to the youth housing unit. The groups consist of NA and AA, however the youth complained that there was too much of a

religious overtone in the groups.  There are insufficient psychologist, psychiatrist and social worker hours to provide groups.

Inmates are screened at booking by correctional officers.  Following this screening, an additional health assessment is conducted by RN nursing staff.  The assessment includes a suicide screen. Inmates with mental health problems are referred to the psychologist or social worker.  If the inmate is on psychotropic medication, they are referred to the psychiatrist for an order to continue the medication.  Medications are verified at booking by the nurses.  Intake nurses are provided 7-3 PM, 4-11PM Monday through Friday and 7pm to 7 AM three times per week. There is no intake coverage on the weekends and several graveyard shifts during the week. QCHC is requested to maintain a spreadsheet of the number of individuals booked in each shift and on the weekends.  It was the Monitoring Team's understanding that this area would be staffed 24 hours per day. The number of inmates booked per shift and per day will help to discern the staffing level needed.

Despite the fact that both officers and nurses conduct an intake screening, one offender, R.I was booked into the jail with a serious problem.  His extremities were swollen; he had just been released from the hospital with pneumonia; and his vital signs were low.  He was released on his own recognizance that night and retuned back to the hospital. Further review will be necessary to determine whether the screening is being done adequately and whether proper guidelines exist and are being followed.

    While there is a full time social worker, many suicide threats occur after she has left for the day.  The result is that a large number of inmates have been assigned to suicide watch.  In the month of April there were 15 inmates placed on suicide precautions for verbalizing a suicide threat. A review of a sample of inmates that were placed on suicide precautions by officers indicated that three of the six patients reviewed were not actively suicidal, however without a mental health professional to screen the inmates, the officers place the inmates on a suicide watch.  A preliminary screening form can be utilized by the nurses to call the social worker or psychiatrist for orders. In addition, it is essential that the facility be able to staff one on one observation when it is needed. One juvenile was placed on suicide watch in an adult segregation unit and because of the inability to provide one on one observation all of his clothing and blankets were removed.  The juvenile (17 years old) was naked on a suicide watch for over a week.  The air temperature of the unit is very cold.  The youth complained that he could not sleep or eat due to the coldness.  This was problematic on several levels-the placement of a juvenile on an adult unit and leaving him naked and without a blanket for a week.

Contributing to the problem in responding to suicide comments is the lack of sufficient correctional staffing at RDC to provide one to one staffing. In the future, the facility should explore crisis intervention with Hinds County Behavioral Health and admit the patient to St.

Luke's Hospital.  Another recommendation is to add a part time social worker that would work 20 hours per week at RDC.  This position could perform a suicide assessment and screenings on inmates that verbalize self-harm or on new intakes that are booked in the facility.  The individual might also be responsible for group therapy which could include life skill groups such as anger management, domestic violence, parenting etc.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a.  Staff vacancy rate of more than 10% of budgeted positions;

    b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c.  A major disturbance resulting in the takeover of any housing area by prisoners;

    d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The required outcome measures are still not routinely collected although the Jail System is starting to collect some baseline data.  Although there has been an increase in the reporting of incidents and use of force, the documentation does not include all of the required information including a supervisor's recommendation and findings. Similarly, the most recent prisoner death did not have a mortality review and, in fact, the medical file could not be located at the time of the site visit.  The turnover rate for Detention was 43% in 2016—the WC was 23.5%, the JDC was 31.5% and the RDC was 58.8%.  Consequently, almost every unit at the RDC is not staffed leaving the inmates in charge of 90% of the facility.  The one exception is A-1, the juvenile unit, which is staffed with one officer on at least a part time basis. Pursuant to this provision of the

Settlement Agreement, this lack of documentation and the turnover rate that is documented creates the rebuttable presumption that the jail fails to provide reasonably safe conditions for prisoners.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

    a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b.  All security rounds must be conducted at irregular intervals to reduce their predictability, and must be documented on forms or logs.

    c.  Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

    d.  The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

    e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, prisoner worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

The WC continues to document hourly well-being checks in the unit logs for general population inmates.  Thirty-minute well-being checks are being put in place for inmates who are isolated in the two, five cell sub-units.  Since the February site visit the JDC has begun to document hourly well-being checks in the general population wings, but the log for inmates held in confinement/segregation is maintained in the floor control room instead of where the inmates are actually housed.  At the RDC no record is maintained for inmates in booking holding cells and the general population entries in the pod control logs are not supported by actual inspections of the units.   Based upon observation during the site visit, the officers do not go into the Housing

18

Units and physically check on the welfare of the inmates, yet the log entries reflect that well-being checks are being conducted routinely. Those inmates held in B-4's four-cell isolation unit are being properly checked every thirty minutes. Overall, improvement has been made in the area of well-being checks, but much still needs to be done. Ultimately, compliance with this section can only be achieved at the RDC once an officer has been permanently assigned to each housing unit so that the facility can operate under the principles of direct supervision.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail. To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

    a.  Mandatory pre-service training. Detention officers must receive State jailer training and certification prior to start of work. Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement. During that twelve month period, the County must develop an in-house detention training academy.

    b.  Post Order training. Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter. To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c.  "Direct supervision" training. Detention officers must receive specific pre- and post-service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

    d.  Jail administrator training. High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

    e.  Post-service training. Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year. Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment

meetings.  Post-service training should also include field and scenario-based training.

    f.   Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

    g.   Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

    h.   Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

The team was provided a list of training opportunities (completed and planned) that reflected progress toward meeting some of the pre-service, post-employment, and/or other skill training required.  However, there are still officers who are working posts/assignments who have not yet received required pre-service training and many more who have not received either mandated in service or the post-employment 120-hour class during their first year of employment.  Direct supervision training has not been put into place, nor has critical post training.  The County will not be in compliance with the requirement to train on Policies and Procedures and Post Orders until those documents are revised such that they are a satisfactory source for training.   The Training Captain prepares extensive lists dealing with the training status of all HCSO personnel, but in order to address the requirements of the Settlement Agreement, he needs to break out Detention Services Division personnel from the rest of the Sheriff's Office and then organize the periodic reports so that they clearly show each individual's status with regard to paragraph 45.  As of the time of this final report, the Training Captain has retired and Captain Ric Fielder has taken over the position.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a.   Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and

procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command. This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

  i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

  ii. An inspection process.

  iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

  iv. A requirement that any corrective action ordered be taken.

  v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

  vi. To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment. Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

The P&P Manual was issued in April 2017; however, as was previously noted, it needs to be revised and re-issued so that Post Orders are included in the document as specific Policies. The guidance that was provided in writing by the Monitor and the DOJ, as well as the suggestions made by members of the Monitoring Team and the Justice Department during the June site visit need to be taken into account as this effort is undertaken. Currently, supervisors do not document the results of their rounds. In most cases, an entry by the control room officer or unit officer simply states that a supervisor entered the unit or area. Maintenance issues are not resolved in a timely fashion, nor does there appear to be a solution to the problem. A problem noted in the last Monitor Report was that the wristband system in Booking had been out of operation for at least two months. While it is now functioning, the utility of the system has to be

called into question.  No inmates were observed wearing their wristbands in any of the three facilities, although some inmates who had removed their wristbands stored them in cells or living areas.  The roll up sally port doors in Booking at the RDC are another example of the routine nature of maintenance malfunctions.  At least one door has been found to be out of operation during each of the Monitoring Team's three site visits.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**
Random shakedowns are not conducted by Detention Officers as they should be.  Instead, law enforcement personnel are periodically called upon to perform that duty. As indicated in this Settlement Agreement requirement, shakedowns should be conducted by Detention Officers not outside law enforcement personnel. Shakedowns are not conducted as frequently as they should be. More frequent shakedowns would limit the massive accumulation of contraband and the high number of security breaches. This problem was evidenced on June 7, 2017, when approximately 116 Deputies and Mississippi Department of Corrections officers conducted a major sweep of the RDC and the WC at 0110 hours.  Among other things they recovered 43 cellphones, 39 cellphone chargers, 25 "shanks", a digital scale, miscellaneous tobacco products including marijuana, two steak knives and 38 DVD/CD's.  That impressive collection of contraband is reflective of the breakdown in control of the Jail System, particularly the RDC, which is directly attributable to the fact that officers are not assigned to the housing units due to a critical lack of personnel.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**
Because of legal barriers, cell phone jammers will not provide the solution to the problem of unauthorized communications. However, other alternatives have been suggested to the County by both DOJ and the Monitoring Team and reference material regarding potential vendors of the relevant equipment has been provided to the Jail Administrator by the Correctional Expert.  No action has been taken to address this issue.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Partial Compliance**

A law enforcement investigative officer who specializes in gang identification and suppression is now assigned to conduct criminal investigations within the Jail System.  While he has not yet developed and implemented a gang program that links the community and the Jail and provisions for education, family and community involvement have not been identified, his involvement represents a positive step toward compliance.

## USE OF FORCE STANDARDS

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:
   a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
   b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;
   c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;
   d. Prohibit the use of force as punishment or retaliation;
   e. Limit the level of force used so that it is commensurate with the justification for use of force; and
   f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

The Policies and Procedures adopted in April are not sufficient to meet the requirements of this paragraph and need to be revised before compliance can be achieved. It should be noted, however, that in one reported incident where excessive or inappropriate force was used by a Detention Officer at the RDC, his actions resulted in dismissal.  This incident was well documented and even supported by video recording which was used as evidence by the law enforcement officer who investigated the case. However, most use of force reports did not result in an investigative report and the use of force reports themselves are incomplete and do not reflect adequate supervisory review and corrective action. Although the number of use of force reports has increased, there continue to be fewer than would be expected given the conditions as

the facilities. The reports that do exist indicate that staff are not adequately trained in or are not using de-escalation techniques. In addition, there appears to be unnecessary and unauthorized use of tasers and pepper spray.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a.  Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b.  If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

        i.  The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

        ii.  Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

        iii.  Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

    c.  Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

    d.  The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

    e.  A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

    f.  Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the

use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

    g.  The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

        i.  a sign-out process for staff members to carry any type of weapon inside the Jail,

        ii.  a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

        iii.  random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

    h.  A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

    i.  All staff members using force must immediately notify their supervisor.

    j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

The P&P Manual is under review and will be re-issued once it has been revised. The Policies and Procedures adopted in April do not meet the requirements of this paragraph. Incident reports continue to be written in sporadic fashion on differing forms at each facility. Records reflecting 15 minute well-being checks are maintained only when inmates are under a suicide watch, generally at the RDC, though infrequently such watches occur at the JDC. Although some reports involve planned use of force, no records have been provided to date that meet the requirements of this paragraph regarding a planned use of force situation. Nor is there a record of an inventory of less lethal weapons or a record of their discharge even though the use of pepper spray and tasers appears repeatedly in the use of force reports. The restraint chair is not used by the Jail. There is no communication with the medical staff before pepper spray is used. Inmates with serious or potentially serious medical problems are not identified prior to pepper spray use. Correctional staff do not contact medical staff before force is used on juveniles with serious mental health conditions.

Inmates that have been tased are only brought to the medical clinic if the taser prong is left in the skin. The incident reports and medical records indicate that inmates that have been subject to use of force where pepper spray is used are brought to the medical unit for an evaluation. A review of the medical records disclosed that some of the nursing staff are very diligent about taking vital signs and checking the eyes after an inmate has been sprayed, other nurses did not perform all of the required checks or vital signs.

It is recommended that a protocol be developed and posted in the medical exam area for inmates that are tased or pepper sprayed and that it include the documentation of vital signs and the rinsing of eyes in the cases of pepper spray use.  An eye wash station should be set up with disposable saline solution bottles or an attachment that fits on the sink. During the health assessment, inmates that have illnesses where their condition could be compromised if pepper sprayed, e.g. asthma, COPD, could be given an arm band. These bands are available in medical supply catalogs. A course on pepper spray was recently conducted. However, training on the use of force on seriously mentally ill inmates and inmates that may adversely be affected by pepper spray should be added to the training curriculum and roll call.

Use of force training was conducted the last time in 2015.  This training should be provided annually.

The QCHC staff has been instructed to develop a use of force report and to document whenever force is utilized. QCHC has also been tasked with the development of medical policies when pepper spray is utilized and when tasers are used. These policies have not yet been developed. The use of a protocol for nurses would help ensure that all assessments on the use of force are complete and that documentation is thorough.

The QCHC policy indicates that security will consult with medical staff before and after all planned use of force on juveniles or prisoners so that medical and mental health can offer alternatives such as de-escalation techniques and voluntary cooperation with medications.  The practice will be reviewed at the next site visit to determine if this practice is followed.
If properly notified, the policy for QCHC is for the health care staff to respond to all use of force incidents and cell extractions. The policy indicates that security will consult with medical for allergies such as asthma, other respiratory conditions or mental health illness.  Health monitoring would then be put in place and if a medical or mental health condition develops, then the physician is notified.

There were four RN nursing vacancies for the three facilities.  Payroll records were obtained and a review of contractual obligations regarding staffing will be performed.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Non-Compliant**

Although the Training Director is developing an on-going program for new and existing employees, compliance with this requirement has not been achieved.

53. Topics covered by use of force training must include:
> a. Instruction on what constitutes excessive force;
> b. De-escalation tactics;
> c. Methods of managing prisoners with mental illness to avoid the use of force;
> d. Defensive tactics;
> e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Non-Compliant**

The requested training curriculum covering use of force, de-escalation tactics, and defensive tactics has not yet been received.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This cannot be completed until the revised P&P Manual is issued, officers are trained and sufficient time has passed to conduct the random testing of at least five percent of Jail staff.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

This cannot be updated until the requisite training has been completed.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**

This paragraph cannot be addressed until the P&P Manual is revised and issued to all personnel. The inadequacy and inconsistency of the existing use of force forms, previously noted, is still an issue. Different forms are used at each facility and the space provided for supervisory review simply calls for a signature, not approval, disapproval or recommendation for corrective or follow up action. A computer based use of force report is now being developed. The jail leadership should review the form being developed to ensure that it includes the information needed to analyze and respond. Jail leadership should ensure that supervisors provide a meaningful review of the use of force with recommendations for follow up actions.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift. Staff members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

This requirement will be analyzed once the P&P Manual is revised and issued to all personnel. While report writing is improving throughout the Jail System, it is still not possible to determine whether incident reports are submitted in a timely fashion or whether supervisors follow up as required.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:
    a. A unique tracking number for each use of force;
    b. The names of all staff members, prisoner(s), and other participants or witnesses;
    c. Housing classification and location;
    d. Date and time;
    e. A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events;
    f. A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use). For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

g.  A description of the staff member's attempts to de-escalate the situation without use of force;

h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

i.  A description of any observed injuries to staff or prisoners;

j.  Whether medical care was required or provided to staff or prisoners;

k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Non-Compliant**

The Use of Force report forms vary from facility to facility.  Sometimes they are not numbered and in some instances location information is incomplete.  De-escalation efforts are seldom specified and inmate witnesses are infrequently identified. The revision of the Policies and Procedures Manual and the standardized incident report form will move the County towards compliance but it will be essential to train staff to provide complete and accurate information and to review and provide corrective action.

**USE OF FORCE SUPERVISOR REVIEWS**

59.  The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

a.  A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

b.  A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

c.  Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

d.  If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.  Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.  All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

      g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

Appropriate supervisory review cannot be determined until the P&P Manual is revised and issued.  In addition, standardized incident and use of force forms must be in place.  At present supervisors merely sign their names on forms.  Their signature does not reflect agreement, disagreement or recommended action.

60.    After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

      a.     Ensure the safety of everyone involved in or proximate to the incident.  Determine if anyone is injured and ensure that necessary medical care is or has been provided.

      b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident.  Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

      c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

      d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

      e.     Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

Currently, supervisors do not routinely collect witness statements or take photographs. The revision of the Policies and Procedures Manual and the standardized incident report form will move the County towards compliance but it will be essential to train supervisors to complete these procedures and provide complete and accurate information. Consistent review and corrective action will be essential.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

The number of use of force reports has increased significantly since the last Monitor Report.  All three facilities had submissions, but supervisors do not follow the requirements of this paragraph.  Although medical care issues are documented, photographs are not taken or reference to them included in the reports.  Witnesses are seldom questioned and supervisors do not make comments about recording of the incidents.

62. Reviewing supervisors must document the following:

    a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

    b.    Witness statements;

    c.    Review date and time;

    d.    The findings, recommendations, and results of the supervisor's review;

    e.    Corrective actions taken;

    f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

    g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

        i.    The nature and extent of injuries, or lack thereof;

        ii.    The date and time when medical care was requested and actually provided;

        iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

    h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Supervisors do not follow through with the requirements of this paragraph. They simply sign the incident and use of force reports (without making a recommendation of any type) and forward them through the chain of command.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.     Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The P&P Manual must be revised and issued to all personnel before the level of compliance can be determined. In addition, standardized forms for use by all facilities must be developed and put in place.

64.     Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:
   a.      Tracking number for each incident;
   b.      The names of all staff members, prisoner, and other participants or witnesses;
   c.      Housing classification and location;
   d.      Date and time;
   e.      Type of incident;
   f.      Injuries to staff or prisoner;
   g.      Medical care;
   h.      All staff involved or present during the incident and their respective roles;
   i.      Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
   j.      External reviews and results;
   k.      Corrective action taken; and
   l.      Warden and Administrator review and final administrative actions.

**Non-Compliant**

The comments associated with the previous paragraph apply to this one as well. Each facility still uses unique forms rather than standardized documents. By means of example, on June 9, 2017, three inmates assaulted another inmate at the WC. His injuries were so severe that he had to be sent to "CMMC" by transportation after being seen by Medical. The incident report was

not identified with a number.  No Medical notes or records were attached and the facility Lieutenant wrote the report, not the Detention Officer who was in charge of the unit where the incident occurred.  A computer based form is being developed which may address some of the deficiencies. However, training and corrective action will be essential in ensuring that complete reports are prepared.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

   a.  Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

   b.  Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

   c.  Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

At present, it is not possible to determine whether or not incident reports are being routinely submitted on all reportable incidents.  While the number of untoward events that are documented appears to be increasing over time, the fact that there are no reports on file regarding late releases or lost money and property is indicative of a failure to document significant incidents.  Based on a review of records during the June site visit, it is known that inmates have been held beyond their scheduled release dates, yet no incident reports are on file.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

   a.  Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

   b.  Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

   c.  Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos,

and digital recordings), review dates, findings, recommendations, and case
dispositions.

d.     Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Partial Compliance**

While a more definitive determination cannot be made until the P&P Manual is revised and
issued, it does appear that supervisors are reviewing incident reports in a timely fashion. Most
reflect same day review based on signature dates. They do not, however, indicate any follow up
or recommendation. Supervisors routinely simply sign the reports and forward them.

**SEXUAL MISCONDUCT**

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must
develop and implement policies and procedures to address sexual abuse and misconduct. Such
policies and procedures must include all of the following:

a.     Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.     Staff training on the zero-tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.     Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.     Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.     Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.     A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.     A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.     Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.     Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Non-Compliant**

The Policies and Procedures adopted in April do not meet the requirements of this paragraph. It should be noted that there are no notices regarding the PREA posted anywhere throughout the Jail System.  At present, there is no record on file to reflect compliance with any aspect of this paragraph.

There have not been any sexual assaults reported to the medical department during the last monitoring period.  A new policy on PREA has been sent to jail administration for review which contains all of the elements in the Settlement Agreement.  There are no rape kits on-site.  The reported practice is that inmates that complain of being sexually assaulted would be sent to the emergency room under the new draft policy where a rape kit would be performed.  The inmate would be housed in the medical observation unit upon his/her return from the Emergency Room.

  An in-service on PREA provisions for the health staff is essential.

## INVESTIGATIONS

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

   a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

   i.      Any prisoner exhibited a serious injury;

   ii.     Any staff member requested transport of the prisoner to the hospital;

   iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

   iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

   b.     Per policy, investigations shall:

   i.      Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

   ii.     Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

       iii.     Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.     Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.     Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.     Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

       i.     Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

       ii.     Any staff member requested transport of the prisoner to the hospital;

       iii.     Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

       iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.     Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

       i.     a brief summary of all completed investigations, by type and date;

       ii.     a listing of investigations referred for administrative investigation;

       iii.     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

       iv.     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

       v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.     Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Compliance with this section cannot be achieved until the P&P Manual is revised and issued to all personnel and documentation is available to verify that actions taken are consistent with the policies/procedures developed.  During the past four months criminal investigators have conducted reviews of a number of incidents.  In at least one case that process resulted in the dismissal of a Detention Officer at the RDC who used excessive force in dealing with an inmate. Similarly, at the JDC a Detention Officer was disciplined and ultimately terminated for a pattern of insubordination.  A monthly summary has been provided through May. The summary includes a brief summary of each investigation but the summary chart does not include all of the data points required by this paragraph.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

The practice with respect to grievances is still inconsistent with the process in the Inmate Handbook and still does not permit the obtaining of a grievance form or submission of it without the intervention of a Detention Officer. Efforts have been made to minimize the involvement of detention officers but it has not been eliminated. The Sheriff's office is investigating and considering the use of an electronic system/screen that would be used for visitation from the units and could also be used for the submission of grievances. This could eliminate the need for detention officer involvement. However, it would be essential that the screens placed in a way that provides for confidentiality and that adequate staffing be available so that the equipment is not destroyed.

Medical grievances are sent directly to the medical department. However, a detention officer still has to be requested to provide the grievance form. The health administrator responds to the grievance within 1-2 business days.  There were 7 grievances filed in April 2017 and 4 filed in May 2017.  In addition to a written response the health administrator interviews each inmate that filed a grievance.  The nature of the grievances involved sick call requests not conducted timely, missed medicines, etc.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**
The Monitoring Team did not have time to investigate the grievance procedures at each of the three facilities. The Work Center Inmate Handbook is consistent with the RDC Handbook. However, the procedure described in the RDC Handbook is not the one used at RDC. At this time, it is not known if the WC process is consistent with the WC Handbook, or the current RDC procedure or is different from both. The County needs to identify a consistent process across all facilities and revise the Handbook to reflect that process and adequately inform the prisoners.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**
The grievance system at RDC is a functional system. Grievances are tracked and are responded to. The Warden responds to all grievances. The Grievance Officer maintains an up to date spreadsheet.  At last review, the spreadsheet needed to include additional data points including the officer involved, the resolution and whether the resolution was implemented in order to accurately track the relevant information related to grievances.  The Grievance Officer sends medical grievances directly to the Medical Contractor. These are not logged in and the Grievance Officer does not track the response. The Grievance Officer should be logging them in and ensuring a timely response. The grievances from JDC provided to the Monitoring Team did not uniformly have a response to the grievance provided in the documentation.

Medical staff maintains a monthly log which delineates all grievances filed that month, the reason for the grievance and the resolution.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
There is currently no identified practice to accommodate prisoners with disabilities or who might otherwise require assistance to access the grievance system. Other prisoners are permitted to assist a prisoner but there is no other identified mechanism for assistance. This does not meet the requirements of the settlement agreement.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information

through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

As noted above, the grievance procedure described in the Inmate Handbook is not the one that is utilized and would not be consistent with paragraph 69 above. There is nothing in the Handbook describing how to report misconduct, sexual abuse, or battery and assault.  The Handbook does not describe prisoner rights. It was previously reported that a translation into Spanish was being worked on but that has not been provided.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

Although inmates are not yet classified within eight hours of intake, they are now classified within 24 hours as a result of the implementation of daily Classification coverage on the day shift.  During the June site visit no inmates were found to be detained in the Booking holding cells in excess of eight hours.  Most significantly, the single cells in Booking are no longer used for long term housing of problematic inmates.  They have been moved to the four cell B-4 isolation section.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Non-Compliant**

The WC has two, five cell confinement/segregation sections that are used to isolate inmates who violate housing unit standards.  A plan to utilize them properly, supported by adequate documentation, is being implemented, but there is no record to support compliance at this point. The JDC utilizes a typical housing unit on a selected wing for confinement/segregation housing.

The documentation of who is held in that area, showing when they enter and leave, is not uniformly maintained, nor is there a record of why their status changed. At the RDC there is no designated area which qualifies as a confinement/segregation unit. Inmates are simply locked down without adequate documentation or supervision.

These prisoners are usually held in isolation for disciplinary, administrative or protective custody reasons. They are locked in their cells for 22 or 23 hours per day with only an hour or two out of cell time for showering, visitation, recreation and to have access to a telephone. Confinement housing should be sub-divided into small components of from four to sixteen cells (modules) within a 48 to 64 cell unit. None of the housing units at the RDC are properly designed to serve as confinement units because they are not sub-divided into modules. This makes the job of keeping problem prisoners separate from each other much more difficult. Because the configuration in Hinds County has 50 or more cells opening to a common day room, it is impossible to allow each inmate out of the cell individually in a 24 hour period. This type of housing is much more labor intensive to operate. Realistically, three officers are required to operate a 64-bed confinement unit. All of these issues are exacerbated at the RDC because the shortage of deputies makes it impossible to assign officers to any of the adult housing units. A separate segregation log is not maintained, rather, notations are made in the Pod Control Logs and some notations are made in Classification records. Once a designated (and properly staffed) Segregation/ Confinement Unit is operational with adequate policies, staff training, and consistent practices it should be possible to achieve compliance.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Nurses at JDC make and document mental health rounds twice a day. Inmates that were interviewed confirmed that rounds do occur. Notification is provided by the Captain when an inmate is placed in segregation. Mental health rounds are made weekly by the social worker. A checklist is used to document mental health conditions.

At RDC there is no notification provided to the health staff when inmates are placed in segregation. Thus, inmates in segregation are discovered by the nurses during medication pass. Segregation rounds are not made on a daily basis by the nursing staff. Chart review and interviews indicated that rounds were made 2-3 times per week. Mental health staff visits the inmates on a monthly basis.

The Settlement Agreement requires that mental health staff visit inmates in segregation the day after their placement.  Coordination between security and medical staff is required to notify the medical staff that an inmate has been placed in segregation.  An in-service and CQI study are recommended to enhance compliance with this element of the Settlement Agreement.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

      d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

      e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

      f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

         i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

         ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

         iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health

41

Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.  Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Although the WC and JDC have made efforts to properly staff and document the use of their confinement/segregation areas, the RDC has been unable to do so due to lack of staff.  The medical staff is not even notified when an individual is placed in confinement/segregation.  Hence, they are not being consulted prior to placement of an inmate with SMI in confinement/segregation.  Until Classification oversight is available twenty-four hours per day to

authorize and/or override the decisions of shift commanders regarding inmate cell assignments, it is unlikely that compliance can be achieved.

The facility should develop a multidisciplinary team that is comprised of medical, mental health and security staff that discusses inmates in segregation and their mental health needs.  Treatment plans should be developed for long term mentally ill patients.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. **Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  Within 18 months after the Effective Date of this Agreement, the County will have completed transitioning to any new or replacement youthful prisoner housing facility.

**Non-Compliant**
Although the County has identified several options for consideration, as of the June visit the County has not made a determination as to where it will house youthful prisoners.  There has been discussion with leadership at Henley Young, the Henley Young Monitor, and others related to potential options, and the County recently identified an architectural team to assist them in developing initial concepts and plans.  Options being considered include a unit attached to Henley Young, a unit attached to the WC in Raymond, remodeling a "wing" of the WC, and a stand-alone facility.  During the June site visit, key leadership from Hinds County, the architectural team, and two Monitoring Team members (Jim Moeser and Dave Parrish) toured both the Henley Young and WC facilities to discuss some of the initial ideas related to design/programming that had been previously presented to the architectural team.  A follow-up phone conference was held on June 23 to discuss some additional requirements of the Settlement Agreement that need to be considered in potential design concepts.  The next steps in the process include: (1)  completion of the initial design concepts (new construction linked with Henley Young and/or the WC, remodeling a unit of the work center, and a stand-alone facility); (2) discussions of those concepts (including adjacencies, operational and programmatic requirements, and staffing consistent with best practice and the settlement agreement) with key Hinds County leadership, ideally resulting in improving and narrowing down to the optimal concept for more detailed design and analysis; (3) completing estimates of construction,

furnishing, and operational costs (including staffing and other program requirements); and (4) finalizing a proposal that can be approved by the County Supervisors for the 2017-18 budget. The February Monitoring Report includes a number of considerations for the design and programming of a new/remodeled youthful prisoner facility regardless of whether it is attached to Henley Young, within/attached to the Work Center, or developed as a stand-alone facility. Those considerations continue to be relevant as more focused planning continues.

The timeline for completion of these steps is exceptionally tight, and the County, including the County Supervisors, need to place a high priority on establishing a timetable for each step (including identification of a lead staff design team that will be the source of operational information to the architects, the Sheriff, and the Board as decisions are made) and ultimately completing them in time for inclusion in budget decisions in August/September. Short of developing a plan and including funding in the 2017-18 budget, it is unlikely that a new/remodeled facility would be available at all in 2018, let alone within the timeframe required by this Agreement.

The Settlement Agreement requires that the youth be transitioned to the new location by June, 2018. It seems unlikely that a new/remodeled facility will be completed in this timeframe. Therefore, the county should be thinking about potential interim steps to safely house and program for youthful offenders pending project completion as well as developing a transition plan to move youth to the new permanent location.

Finally, the number of female juveniles held at the JDC is very low, often a single female isolated in a housing unit to ensure separation from adults. Given this limited number and the limited number of girls held at Henley Young, the County should set a date certain in the near future, e.g. September 1, after which any female juvenile held on adult charges would be held in the girl's unit at Henley Young. This will allow sufficient time for Detention and Henley Young staff to modify any operational and programmatic procedures if/as needed.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Non-Compliant**

In the time between the February and June visits, the number of reported incidents of self-harm, suicide attempts, suicidal verbalization, and assaultive behavior have increased. This increase may be in part the result of increased routine reporting (which has generally been a positive for the Monitoring Team's ability to get a better understanding of what is going on). But, the incidents illustrate concerns about how the unmet mental health needs of juveniles when combined with conditions of confinement, inconsistent and insufficient staffing, inadequate

programming, infrequent family contact, and the unique trauma and social background these youths have experienced inevitably lead to these behaviors.  An incident/situation of particular note is that at the time of the site visit a juvenile (E.W.) was being held (at the time of the visit for over a week) in a room in an adult segregation unit as a result of an incident that started on the juvenile unit in which he was assaulted by another youth. E.W. subsequently made a suicide attempt that resulted in him being placed in the suicide wedge of an adult segregation unit where he made another attempt.  The youth remained fearful about returning to the juvenile unit. As a result of the most recent suicide attempt staff was told by mental health staff to remove all items from his room, including clothing.

While the County has initiated discussions with Peterkin Associates of Mississippi and has continued interaction with Hinds County Behavioral Health Services, the County is nowhere near providing the kind of behavioral and mental health interventions and consultation that are likely to reduce these incidents from occurring or meet the goals of the Settlement Agreement. Services needed continue to include: (1) routine mental health screening of all inmates admitted to the facility, but particularly youthful prisoners; (2) use of a mental health tool (e.g. MAYSI II or other valid tool) to further assess youth's mental health needs; (3) routine counseling/interaction with juveniles by a qualified mental health professional (e.g. social worker, psychiatric nurse, etc.); (4) more consistent access to psychologist/psychiatrist consultation related to medications and treatment planning; and (5) consultation with key Detention leadership and staff in developing individualized observation and/or behavioral plans as may be needed to prevent and/or respond to juveniles experiencing mental health issues that are too often revealed through harmful behavior(s).

Implementing a more comprehensive mental health program also means integrating what is known about the mental health needs of youthful prisoners with multiple requirements of the operation including reducing the use of seclusion/restraints, increased training for staff supervising youth, and development of a behavioral management program.  A good source for information about developing a comprehensive mental health program can be found in Chapter 11 of The Desktop Guide to Quality Practice for Working with Youth in Confinement (https://info.nicic.gov/dtg/).

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Non-Compliant**
Although the County has secured the support of a volunteer for Adult Basic Education (ABE) services and has placed a priority on using the existing program space (one classroom) and having an officer in the classroom to support the teacher, the delivery of services remains limited both in the number of youth receiving regular instruction and the frequency they receive it.  In

addition, as a result of outreach to Jackson schools, the County has learned that of the juveniles in custody on the date of the request a number of them (about 1/3) had been and should be receiving exceptional education services under IDEA.  And, as expected, none of them are receiving those services, nor was inquiry made relative to other youthful offenders in custody, ages 18-21, that may also be eligible for such services.  Although a positive step, the ABE program is dependent on the availability and interest of the volunteer, and that person is not certified to fully assess educational needs or administer GED testing (if appropriate), and staffing and facility limitations will continue to pose a problem in providing even a modest range of services.

There remains no routine screening process (other than some assessment related to ABE skills) to determine whether and what educational services a juvenile or youthful offender was engaged in prior to admission that would help determine what the appropriate, and often legally required, services should be for the youth while confined.  Although recognizing the need to do so, Hinds County has not fully pursued the needed review of state statutes and/or negotiations with Jackson Public Schools, or any other potentially responsible district/entity, to establish the requirements for funding and provision of educational services to all juveniles, let alone those that fall under IDEA requirements.

The key recommendations related to education continue to be:

1) Review state statutes and any other legal requirements related to education of confined juveniles/youthful offenders, including identifying the entity/entities responsible for providing and/or funding services; and

2) Develop and implement a routine screening process for determining the educational history and/or requirements related to all juveniles and other youthful offenders admitted to the facility. This may require contracting with appropriately certified and/or licensed education professional(s) to provide technical assistance to develop the screening process as well as appropriate professionals to properly assess inmates and identify what services are required and/or needed;

Based on the above, as soon as possible contract with and/or complete negotiations with the appropriate entity/entities so as to begin providing additional and more appropriate services possible, ideally no later than October 2017.  It is understood that even though statutes may require a local district/entity to provide the required services, actually implementing that can be a challenge for both the district and the facility.  However, in the end Hinds County is responsible for ensuring that the services are provided, even if that means Hinds County has to fully provide the funding necessary to make it happen.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Partial Compliance**

Youth are housed in a separate unit so that contact with adults is minimized.  Since the baseline visit, a staff member has been regularly assigned to provide direct supervision in the juvenile unit, which is an improvement.  Youth seem to respect the officer assigned, and she indicates a willingness and affinity to supervising youth, which is not always true for officers used to supervising adult offenders.  However, that assignment covers only the day shifts five days per week.  Other staff are assigned, on a rotating basis, to the juvenile unit during evening, overnight, and weekend shifts.  Contrary to statements by youth at the time of the baseline visit and in February, youth interviewed during the June visit indicated that there were not instances of adults entering the juvenile unit by "popping the cage door".  The Monitoring Team will continue to inquire about the previously reported practice to determine if this is a permanent improvement.

The Policies and Procedures provided, however, fall short of emphasizing the need for this separation/proper supervision to be carried through all aspects of the operation, lacking reference to how youth might be moved throughout the facility, e.g. to medical, the classroom, or holding/transportation to court. Further revision of Policies/Procedures should also include a requirement to document (via an Incident Report) any instance in which improper contact occurs. If this can be implemented, it will assist leadership in further modifying procedures and/or staff training to ensure this condition is met in the future.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Non-Compliant**

With only one unit in RDC, this provision cannot be met.  This does, however, have implications for the design of an alternate plan for housing youth. Specifically, although a single juvenile unit may be developed as an alternative, it needs to have at least two separate housing areas that will permit implementation of a more refined and appropriate classification system.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**

The planned training for supervising youthful prisoners that was delayed prior to the February visit was initiated in June prior to the site visit.  Ten staff participated in the training, although seven of the ten are staff currently assigned to the Jackson facility, leaving only three Raymond staff receiving the training.  As indicated in the baseline report, the curriculum for the training is appropriate and feedback from Sgt. Tower and Captain Van Egmond suggested that the training was well-received by staff.  This represents a small step toward compliance but leaves a long way to go in terms of: (1) training any/all staff working with youthful prisoners (keeping in mind that much of the training is appropriate for supervision of young adult offenders as well as youth under age 18); (2) assigning only properly trained staff to the juvenile unit; (3) training key supervisory staff so they can properly reinforce the training that was received and properly evaluate officer performance; (4) and integrating knowledge gained in the training in development of a behavioral management program and related policies/procedures.  The sooner more staff are trained, the sooner these additional steps can be taken that will help meet other conditions of the Agreement.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition**:**

  a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

  b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

  c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

  d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

  f.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

  g.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

    h.   Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail.  If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

    i.   If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

    j.   Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Non-Compliant**

There remains no evidence of sufficient policies/procedures or documentation related to the use of room confinement or other forms of isolation/segregation for youth.  In response to specific questions directed to youth during interviews about room confinement for disciplinary purposes/punishment, they indicated that there were generally not instances where they or other youth were placed in their cells for discipline.  Rather, they were more consistent in expressing concerns about not being allowed out of their cells following the day to evening shift change, indicating that while they expected to be in their rooms from approximately three to five p.m. that it was not uncommon for the incoming shift to leave some, if not all, youth in their cells into the evening shift.  This is consistent with information in the previous Monitoring Report in which this appears to be a practice related to managing the population "out" at any one time in the unit rather than disciplinary isolation/segregation.

In a discussion with Sgt. Tower who is assigned to Unit A-1 on weekday shifts, she did indicate that there were occasional times when she addressed behavioral concerns by placing youth in their cell for short periods of time, e.g. 30 minutes, to calm a situation of concern that she was observing.  She indicated that her routine process was then to talk with the youth shortly after being in the cell and when the youth was calm and ready to return to the group she would let them out.  Several of the youth interviewed essentially corroborated this, and it would be reasonable to expect that some use of short-term (15-60 minute) room confinement could be part of a complete behavioral management program that is not inconsistent with conditions of the Agreement.

Steps toward compliance can be made by (1) developing clear policies/procedures, consistent with the Agreement requirements, related to the use of segregation or other forms of isolation/confinement for disciplinary purposes; (2) establishing and adhering (with the

exception of emergency situations) to a daily schedule so that youth are not left in their cells during times when they should be out/on the unit; and (3) keeping a room confinement log that documents any period of time in which a youth is placed in segregation/room confinement for disciplinary purposes that includes the name of the youth, the time confined, the officer implementing the confinement, and a brief reason for the confinement; and (4) require the writing of an Incident Report for any such confinement that exceeds one hour.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

   a.   The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.
   b.   An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.
   c.   The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Non-Compliant**

There has been no change related to these provisions since the baseline and February site visits. While development of a behavioral management program will take time and is complicated by facility, training, and staffing limitations, the County has not yet identified a consultant to help them take steps to develop even a rudimentary behavioral management program. Implementation of any program will need to be done in coordination with additional staff training related to supervising youthful offenders, development of policies/procedures specific to behavior management, and development of additional programs (education, life skill, and counseling).  Implementing a program on a piecemeal/sporadic basis could do more harm than good, but with the help of a qualified consultant it would be possible to begin to make progress toward meeting the Settlement Agreement requirements.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include, but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Non-Compliant**
Determining the lawful basis for detention including on-going detention after some court activity continues to be difficult. The Monitor reviewed records related to individuals who came in on warrants or had a hold of some kind. In a review of 11 files with RDC records staff, 10 of them were lacking documentation showing the lawful basis of detention or on-going detention. This included lack of documentation of holds, holds that appeared to be lifted but the system hadn't been updated, holds that didn't currently exist because the case went in as a new charge, warrants that had been withdrawn but the hold hadn't been lifted, no explanation for detention, and in one case, no file at all. In looking at files related to people waiting for hospital beds, there was another inmate whose file could not be located and one inmate whose earlier volumes also related to the current booking were missing.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in Bearden v. Georgia, 461 U.S. 660 (1983) and Cassibry v. State, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Non-Compliant**
See paragraph 87 below.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Non-Compliant**

In the past, many but not all of the court orders received by the detention facilities included language that the defendant was ordered to pay fines and fees and should remain in the county jail until payment thereof or more bluntly "pay or stay". These orders present the problem addressed in this paragraph. However, the Jail was compounding this problem in two respects. Even where the court order did not include the "pay or stay" or equivalent language, the Jail was interpreting court orders as if the court orders did requiring all prisoners with an order to pay fines and fees to stay until the fines and fees were paid or worked off at a daily rate. In addition, the Jail was looking up court records to locate earlier fines and fees and adding them to the length of stay. The Jail has now discontinued both of those practices. As a result, a number of individuals have been released. There remain individuals whose orders do include "pay or stay" or similar language with no evidence of any finding that a failure to pay the fines or fess was willful or that any attempt to determine ability to pay was made. The Jail has not confirmed the receipt of an order with the requisite finding or followed the procedures set forth in the following paragraphs. These orders appear from all the local courts-Jackson Municipal Court, Hinds County Justice Court, and the other municipal courts within the county. As a result of class action litigation, there is a court order directing Municipal Court not to order defendants to pay or stay without a finding of wilfulness. Local attorneys reported that the problem may be that the Municipal court is utilizing old forms as opposed to violating the court order in the class action case One of the Monitoring Team's priority recommendations was to work with the class action attorney to resolve the "pay or stay" orders coming out of Jackson Municipal court. If this is not resolved in this manner, the procedure set forth below will need to be followed.  Hinds County Justice Court is not subject to the same class action order. In a meeting with two of the Justice Court judges, they acknowledged that the new Rules of Criminal Procedure do not allow for "pay or stay" orders without a finding of willfulness and these orders should not be seen going forward. However, there may be people in the jail now with these orders which will require bringing the existing orders to the attention of the Court as set forth below and the County is not in compliance with these requirements. It should also be noted that currently defendants are not represented in Justice Court and holding a meaningful willfulness hearing may be difficult.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Non-Compliant**

See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Non-Compliant**
See response to paragraph 87 above.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Non-Compliant**
A spreadsheet had been kept by the Work Center and JDC. It was reported that no one in RDC was working off old fines and fees. The Work Center spreadsheet is in the process of being incorporated into the jail JMS system. Prisoners are not provided with documentation of their term of imprisonment although they typically have received the orders from the court. Currently, there continue to be prisoners in the facility who have orders to stay incarcerated until fines and fees are paid or worked off without a finding of willfulness.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliant**

The standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. Captain Chandler stated that individuals with medical conditions did get the full amount of credit without working. However, Deputy Neal stated that only in special situations would they get full credit. He would make the recommendation to the Captain based upon criteria such as how long the prisoner has been incarcerated, the nature of the charge and generally a subjective judgement. There needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

        v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Non-Compliant**

RDC continues to rely on inmate requests to identify prisoners entitled to release. RDC does not track the sentences of individuals at RDC nor does it track individuals who are entitled to release because they came in on a probation warrant and did not receive a hearing in 21 days. Relying on prisoner requests for release no doubt results in some individuals staying longer than lawful. In looking at persons brought in on a probation warrant, there appear to be 5 individuals who were held or continue to be held beyond their release time. Because of the condition of the records, it may be that something else is holding them that could not be discerned. One individual was released but 4 months late. The others remained in custody at the time without any documentation of other reasons for detention-one for over 6 months. There also appears to be a practice of not recognizing the 21 day deadline as firm. Understandably the Jail prefers a court

order of release to ensure that the release is proper. However, the Jail needs to be proactive in ensuring that the deadline is met or the hold is lifted within the required time frame.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Non-Compliant**

As described above, the current records system and process for tracking releasing is very deficient. There was not a single file reviewed that did not have some missing paperwork related to basis for detention, time for release, or current legal status. In some instances, the JMS system had information that was not in the paper file although in some instances the information was inconsistent with the paperwork in the file. In some instances the entire file was missing.

There should be one complete prisoner file in one location and one central office responsible for ensuring that the court information is complete and accurate. This should be the records office. However, it is essential that there be a process by which booking initiates the booking and it is passed to records and records initiates the release and it is passed to releasing. At the present time, no such process exists and there is a lack of communication between the two offices ending up with only sporadic paperwork in the files. In addition, because of the inability to rely on records or releasing, the administrative staff in each of the detention facilities contact the courts separately and may have documentation that records does not or records may have documentation that the facilities do not. As suggested above, classification should be part of the records office so the records office can operate 24/7 and records should assume primary responsibility for all paperwork related to the lawful basis of detention and entitlement to release. This will require substantial modification of current operations.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The jail record system does not identify persons with serious mental illness. While there are incident reports submitted, the forms do not have a place to indicate if the individual had a mental health illness.  And there is no electronic method of identifying individuals with mental illness at the time an incident is occurring. Unless a computerized program is developed between the contractor and the medical vendor, officers will not know in advance of inmates with special mental health needs.  Health staff can identify the information after the fact, which may be useful.

Although jail and QCHC staff attempt to move individuals to the state hospital as needed, this continues to be a systemic problem. There are only 15 forensic beds at the State Hospital to serve the entire state for competency evaluations or restoration.  There are an additional 20 beds that are for individuals for civil commitments.   Of the 15 forensic beds, two are reserved for females.

The social worker at RDC maintains a list of all inmates who are waiting to go to the state hospital or require competency evaluations. This list is updated with their current status in the process. Court orders for competency are sent to Sgt. Lewis who is in charge of transportation. He provides a copy to the social worker. The list tracks when a competency hearing was held, if the patient was sent to Mississippi State Hospital and if they were returned to the Hinds County Detention Center.  As of June 14, 2017 there were 41 names on the list.   Eleven individuals had been or were currently at Mississippi State Hospital for competency restoration, three individuals were transferred to MDOC and five inmates were released from the jail.  Other inmates were waiting for a competency evaluation or a state hospital bed for restoration or the next step in the legal process. At the time of the site visit, twelve individuals were waiting for a state hospital bed for either competency restoration or a competency evaluation. The time waiting for a state hospital bed ranged from one year to three years.

An additional list of inmates was provided on January 19, 2017. There were 34 inmates on this list. Many of them had been sent to drug and alcohol facilities.  Others were on the list for mental health evaluations.  The list that is generated in Word is not user friendly.  Basically, in Word format, one cannot extrapolate from the data the amount of people waiting for beds, the dates of when the competency evaluation occurred or the status of the court proceedings.  An excel spreadsheet would be more helpful with these categories.

Four correctional files along with the medical records were reviewed with QCHC staff available for questions. Of the charts randomly selected, the diagnoses included bi-polar disorder, schizophrenia, and included some with paranoia. One in particular had especially severe illness where despite IM Haldol Deaconate, he was still hearing voices, having hallucinations, and very agitated.  Several had one or more suicide attempts.

56

One had been returned from a 12 month stay at State as not restorable.  He demonstrated episodes of aggression toward staff and other patients while he was hospitalized. His criminal case was remanded and he was ordered to chancery court for civil commitment but is still incarcerated at RDC. The course of these inmates/patients demonstrates the problem of long periods of incarceration at the Jail while waiting years for forensic beds. The Jail environment, particularly at Hinds County which lacks a mental health unit, results in decompensation resulting in suicide attempts and serious management problems for the staff.

An individual found to be incompetent to stand trial is then provided treatment in an effort to achieve competency. This is historically done at the state hospital and may include medication, counseling and education and because of the limited forensic beds at the state hospital has resulted in long periods of confinement at the jail waiting for the state hospital beds. The state has offered a program to provide treatment to competency services in the jail. This was initiated the week of the site visit. Counselors visit RDC twice a week to provide restoration services. It is understood that these services are minimal and are being provided in an extremely non-therapeutic environment.  This program will not take the place of competency restoration at the State Hospital but may shorten the length of time inmates reside at the state hospital. Individuals are not being taken off the state hospital list. If it appears that this program is being used as a substitute for state hospital restoration, the Monitor will most likely require that the County provide the therapeutic environment that is appropriate for treatment to competency.

As discussed elsewhere, transition planning has not been provided. A transition planner has been hired by QCHC and the provision of this service will be evaluated in the future.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.      Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.      Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.      Requiring the individual to submit to bodily strip searches;

        ii.      Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

       iii.     Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

Policies and procedures have been adopted. There are two policies that may relate to this requirement-the policy on records and the policy on booking which includes some requirements related to release. These policies do not have the specificity or the breadth required by this paragraph. In addition, the policy places much of the responsibility on a court liaison officer. It is unclear whether anyone currently fulfills this role. The Monitoring Team and DOJ provide comments on these policies and a second draft should be forthcoming. Neither the DA's office nor the defense bar has been involved in the drafting. The level of specificity required by this paragraph will require significant revision of the policy. Neither the County nor QCHC have developed sufficient mechanisms for the transition of persons with mental illness into community based services. QCHC has hired a discharge planner.  She is an RN with correctional experience.  Her start date was June 12, 2017, thus at the time of the audit she was still in orientation.  There have been meetings with the Hinds County Mental Health and QCHC.  The staff at Hinds County went to the jail and identified two inmates that were soon to be released. They would like to perform transition planning with the inmates and require about two weeks advance notice.

Hinds County Behavioral Health has identified how long it will take for discharging prisoners to obtain medications in their system-typically 14 days. QCHC has not yet determined the cost of providing that supply. In addition, even with the current supply (whatever is left in the blister pack), there is no process to ensure that the discharging prisoner obtains the medications at the time of release.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:
      a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
      b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**
The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Non-Compliant**
The booking staff runs an NCIC check at the time of booking but not at the time of release.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:
      a.      Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.
      b.      Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-

service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

    i.      How to process release orders for each court, and whom to contact if a question arises;

    ii.     What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

    iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

    iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

In the prior site visit, the booking area did not have the full complement of booking officers at the time and a chronic shortage of booking staff in booking was reported. At the time of the June site visit, the monitoring team observed that there was a shortage of detention officers in booking with one officer being pulled from booking to fill a shortage in another location. At the present time, there are inadequate processes for identifying prisoners who should be released and properly processing the release. As a result, there is a lack of training on what should be the appropriate processes.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

There has not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when

information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. Incident reports are not prepared for errors in releasing.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The County has not appointed a Quality Control Officer.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

No documentation was provided of incident reports being created for untimely or erroneous prisoner release or any investigations of such incidents.

104.     The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations, and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

Initial policies or procedures have been adopted but require significant revision. There has not been an initial audit of releasing practices.

105.     The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting, and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

Currently the jail provides attorney visitation in the pods instead of the visitation area. The visitation area was not providing adequate visitation because there was insufficient staff to bring prisoners to the visitation area. Providing visitation in the pods solves that problem. However, given the shortage of staff in the pods, there are significant security concerns expressed by the defense bar and acknowledged by the Monitoring Team.

**CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE**

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.     Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**

There is currently no database tracking these activities. The IT team is developing a computer based incident and use of force report in the JMS system. This should allow for computerized

tracking of incidents and grievances. The grievance officer maintains a spreadsheet regarding grievances.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

    a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;

    b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

    c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

    d.  List and total number of incident reports received during the reporting period;

    e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**
The County provided a monthly report of incidents in the three facilities. Although the information was helpful and appreciated, it did not meet the requirements of this paragraph. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. In meeting with the IT department, it was learned that not all the requirements of this paragraph were addressed. That should be remedied. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

    a.  Summary of all uses of force, by type, shift, housing unit, and date;

    b.  List and total number of use of force reports received during the reporting period;

    c.  List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**
The County provided a monthly report of use of force in the three facilities. Although the information was helpful and appreciated, it did not meet the requirements of this paragraph. As

mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. In meeting with the IT department, it was learned that not all the requirements of this paragraph were addressed. That should be remedied. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

109.     Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**
There is no Grievance Summary Report currently being compiled. There is a spreadsheet being maintained. It did not have all the data points required by this paragraph.

110.     Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:
      a.     A brief summary of all completed investigations, by type, shift, housing unit, and date;
      b.     A listing of investigations referred for disciplinary action or other final disposition by type and date;
      c.     A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and
      d.     A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Non-Compliant**
There is currently no summary report of IAD investigations being compiled.

111.     Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**N/A-Annual Review would not yet be due.**

112.     Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

     a.     The Early Intervention System may be integrated with other database and computerized tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

     b.     The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

     **c.**     The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

     d.     The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

     e.     The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

     f.     The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**
There is currently no Early Intervention program.

113.     Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and  corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The recently adopted policies and procedures do not include policies and procedures covering this matter.

114.     Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

      a.      Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

      b.      Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Non-Compliant**

Currently there is no policy on mortality review by QCHC.  In order to conduct adequate mortality reviews, the review must be completed by an outside physician not contracted or employed by the jail and should include an administrative component regarding an assessment of correctional officer and health care staff emergency response actions, an assessment of the clinical care the prisoner received and the circumstances leading up to his death, and a psychological autopsy which has an emphasis on factors in the individual's life with an emphasis on factors that led up to or contributed to the death. The recent death of a prisoner did not have a mortality review and, in fact, his medical file could not be located by QCHC staff at the time of the site visit.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.     Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes, and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus

particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system, and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Non-Compliant**
The County is laying the groundwork for a CJCC but has not yet established one.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Non-Compliant**
See 115 above.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Non-Compliant**
See 115 above.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a

thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Non-Compliant**

At the time of the site visit, the County had identified a consultant in this area but had not completed a contract with the organization.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

     a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

     b.      Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

During the June site visit copies of the Settlement Agreement were found to be posted in most housing and support areas of the Jail System.  This had been accomplished by driving a rivet through the upper left corner of the multi-page document into the concrete walls of the facilities. While this meets the technical requirement of paragraph 121of the Agreement copies will be shredded and defaced in short order leaving behind unsightly rivets or holes.   It is not reasonable to expect someone to stand for an extended period of time to review a document which is literally bolted to the wall. In the juvenile unit, the copy was posted high up on the wall and was inaccessible. A more practical, long term, solution needs to be found.  Copies should be made that approximate the size and shape of the Inmate Handbook so that they can be given out to inmates upon request.  Direct supervision unit officers can keep a supply available at their posts. Copies can be periodically placed in housing units that do not currently operate in a direct supervision mode.

Paragraphs 122-129 regarding third party beneficiaries, costs, severability, etc. omitted.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**
At the time of the site visit, the County/Sheriff had adopted an initial set of policies and procedures. These have been reviewed and been found to not be fully compliant with the terms of the agreement. The Monitoring Team and DOJ provided comments and a second round of drafting should be underway.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Partial Compliance**
Six months expired on January 19, 2017. The policy and procedure review and drafting was completed after that time. Those policies are not sufficiently in compliance so this requirement is listed as partially compliant.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Non-Compliant**
The policies and procedures were completed and submitted to the United States and the Monitor in April for review and comment. The comments were provided on June 1, 2017. Changes have not been made in the 30-day time frame.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**
The policies and procedures are in need of revision. They should be revised before training and other ensuing operations.

134.     Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Non-Compliant**

There have not yet been policies and procedures approved by the United States.

135.     The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**NA at this time**

Paragraphs 136-158 regarding appointment and duties of the Monitor omitted.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the site visit, the County had not yet completed its first self-assessment as required by this paragraph and therefore a self-assessment is long overdue.

160.     The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Compliant**
The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications have been provided. However, the county has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date. After the site visit, the Monitor provided a list of prisoners who appeared to have been detained beyond their legal release date and requested confirmation of the over-detention or an explanation as to why the records did not reflect the ongoing detention. No explanation was received. This was also the subject of a priority recommendation. The records office needs to be reorganized to implement business practices that accurately identify release dates and process releases. In the interim, the County needs to develop internal audit procedures to identify individuals entitled to release and prepare incident reports for persons who were detained beyond their legal release date.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.