IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF


VS.                    CIVIL NO. 3:16CV00489-WHB-JCG


THE HINDS COUNTY BOARD                    DEFENDANTS
OF SUPERVISORS, HINDS COUNTY
SHERIFF VICTOR MASON, IN HIS
OFFICIAL CAPACITY


**TRANSCRIPT OF IN-PERSON STATUS CONFERENCE**




BEFORE THE HONORABLE JOHN C. GARGIULO
UNITED STATES MAGISTRATE JUDGE



OCTOBER 25, 2017
GULFPORT, MISSISSIPPI




**DIGITALLY RECORDED**


TRANSCRIBED BY:  TERI B. NORTON, RMR, FCRR, RDR
                 Mississippi CSR #1906
_____

2012 15TH STREET, SUITE 403
GULFPORT, MISSISSIPPI  39501
(228) 563-1748

1       APPEARANCES:

2       FOR THE PLAINTIFF:

3            CHRISTOPHER N. CHENG, ESQUIRE
             LAURA L. COON COWALL, ESQUIRE
4            U.S. DEPARTMENT OF JUSTICE — CIVIL RIGHTS DIVISION
             SPECIAL LITIGATION SECTION
5            950 PENNSYLVANIA AVENUE, NW
             WASHINGTON, D.C.  20530
6
             CANDACE GREGORY MAYBERRY, ESQUIRE
7            OFFICE OF THE UNITED STATES ATTORNEY
             501 EAST COURT STREET
8            SUITE 4.430
             JACKSON, MISSISSIPPI  39201
9

10      FOR THE DEFENDANT, HINDS COUNTY BOARD OF SUPERVISORS:

11           PIETER TEEUWISSEN, ESQUIRE
             ANTHONY SIMON, ESQUIRE
12           SIMON & TEEUWISSEN, PLLC
             621 EAST NORTHSIDE DRIVE
13           JACKSON, MISSISSIPPI  39206

14

15      COURT MONITOR:  ELIZABETH SIMPSON

16

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  All right.  Before we proceed, I

2     understand, I believe -- I hope I pronounce the name correctly.

3     Is it Mr. Jimmy Hendrix with --

4          **MR. HENDRIX:**  Yes, Your Honor.

5          **THE COURT:**  Yes, sir.  All right.  Good afternoon to

6     you, Mr. Hendrix.  I understand that you had some

7     correspondence with the Clerk of Court, Mr. Arthur Johnston,

8     prior to you attending the hearing today; is that correct?

9          **MR. HENDRIX:**  Yes, sir.

10         **THE COURT:**  And I have your word as a gentleman that

11    you will comply with the agreement that was made and with the

12    Court's instruction?

13         **MR. HENDRIX:**  Yes, Your Honor.

14         **THE COURT:**  Okay.  Thank you, sir.  I appreciate you

15    being here.

16       All right.  In this matter, is the plaintiff ready to go

17    forward?

18         **MR. CHENG:**  Yes, Your Honor.  We just have a few

19    opening remarks before we think we should turn it over to Ms.

20    Simpson, the Court monitor.

21         **THE COURT:**  That's fine.  Give me one second, and I

22    will allow that.  Let me just ask the defense if they are ready

23    to proceed.

24         **MR. TEEUWISSEN:**  Yes, Your Honor.  Pieter Teeuwissen,

25    board attorney; Anthony Simon, special board counsel.  On

1    behalf of Hinds County, we are ready to proceed, Your Honor.

2              **THE COURT:**  It's a pleasure to see you both again.

3              **MR. TEEUWISSEN:**  Thank you, Your Honor.

4              **THE COURT:**  All right.  You had some comments that

5    you wanted to initiate with.  You may proceed, counselor.

6              **MR. CHENG:**  Yes, Your Honor.  You may recall, the

7    last time we had a status conference, just how far we had to go

8    with Hinds County Jail.  This was a facility that, as Ms.

9    Simpson described, wasn't even always sure exactly who was

10   actually within the jail, whether people had finished their

11   sentences.  They couldn't even determine what their actual

12   staffing was.  And I think what was clear from the last phone

13   conference with the Court is that significant steps have been

14   taken to address these very, very basic problems.

15        I think what you will hear today from Ms. Simpson,

16   however, is that they are still far, far from compliance with

17   the agreement.  So while we are very happy that steps have been

18   taken, much still needs to be done, and the continued attention

19   of this Court is something that we do believe is going to be

20   required.  With that said, however, I will turn it over to Ms.

21   Simpson.

22             **THE COURT:**  Okay.  Good afternoon, Ms. Simpson.

23             **MS. SIMPSON:**  Good afternoon.  May I approach?

24             **THE COURT:**  Yes, ma'am.  Ms. Simpson, that podium has

25   a button to the right if you would like to raise it or lower

1    it.

2           **MS. SIMPSON:**  I think I might just not mess with it.

3    Thank you.  Thank you, Your Honor, and good afternoon.

4           **THE COURT:**  Yes, ma'am.

5           **MS. SIMPSON:**  It's a pleasure to be back here.  We

6    did our site visit on October 16th through the 20th.  And when

7    I say we, that's myself and the three subject matter experts

8    that accompanied me, and that's David Parrish, an expert on

9    correctional operations, Jacqueline Moore, an expert on medical

10   services, and James Moser, an expert on juveniles.

11          We had great cooperation from everyone at the jail and

12   within the county and within the sheriff's office.  One thing

13   that was particularly helpful this time around was that there

14   actually seemed to be a little more crossover between the

15   operations and the detention division.  As we mentioned the

16   last time, under the sheriffs, there's an operation division

17   and a detention division.  Detention oversees much of the jail

18   operations, but there are some areas which cross over, and we

19   had people from the operations division participating in some

20   of the meetings that really made it much more productive.  So

21   we appreciated that and hope we will continue to see that.

22          With respect to a timetable on a report, I wanted to sort

23   of lay that out a little bit.  Obviously, the site visit having

24   wrapped up just last Friday, we don't have a written report at

25   this time.  We probably will do priority recommendations as we

1  have done in the past, and that's from all of the team, a list

2  of recommendations that we really want the defendants to focus

3  on prior to the next site visit.

4       An actual report is due 30 days after the site visit, so

5  that will be around November 20th.  Then there is a time for

6  comments from both plaintiff and defendant.  And after those

7  comments, we issue a final report.  So sometime probably

8  mid-December, there should be a final report that we will be

9  filing.

10       As Mr. Cheng mentioned, the last phone conference focused

11  quite a bit on progress that had been made since the prior site

12  visit.  I'm not going to repeat all of that.  I will raise some

13  of that augmented by some of our observations during this site

14  visit.  However, this conference is more focused on those areas

15  that we see there needing to be more progress, and in some

16  instances, significantly more progress.  That's sort of the

17  nature of this work, is when you see something being

18  accomplished, it's time to push to the next level.  And there

19  is quite a bit of progress that remains to be made.

20       I wanted to start with some of the areas that we've talked

21  about as being most critical, staffing being the obvious one.

22  At the time of the last status conference, in-person status

23  conference and the site visit itself, we really have been

24  unable to determine exactly how many positions were allocated

25  to the detention division and how many of those positions were

1   actually being used for detention services.

2        Significant progress has been made in that area.  Our

3   corrections expert feels fairly confident that he now has a

4   good listing, with the help of the sheriff and county staff, of

5   the number of positions and who's doing what.

6        So just to sort of elaborate on that, he determined that

7   there are approximately -- I shouldn't say approximately --

8   there are 410 positions that are in the sheriff's office.  270

9   of those are allocated to detention.  140 are allocated to

10  operations.  He drilled down to the point of determining

11  whether those 270 positions were actually being used for

12  detention.  At the time of the site visit, there were still two

13  that were in question.  One was moved immediately before the

14  site visit, and one was moved at the time of the site visit.

15  So he's fairly confident that that breakdown is accurate and

16  those people are doing duties where they are said to be doing

17  them.

18       The monitoring team has recommended that they shoot for

19  275 positions for this fiscal year, and the budget was passed

20  on October 1.  As you might remember, the staffing analysis

21  actually says that 433 positions are needed to cover the

22  operations in the three facilities.  275 is far short of that,

23  but in terms of a manageable goal, that appeared to be a

24  manageable goal for this fiscal year.  However, there are --

25  that does leave five positions that are not funded, and so they

1    will need to find -- to meet that goal, they will need to find

2    those five positions either through additional funding or

3    moving it from operations.

4        In addition to finding those five positions, they, of

5    course, need to fill all of those positions.  At the time of

6    the last site visit, they were at probably around 200.  Again,

7    it was somewhat unclear at that time.  They are now at -- or at

8    the time of the site visit were at 250.  So that was actually

9    significant progress and more than we actually expected, but

10   still a far cry from the 275, and certainly a far cry from the

11   433.

12       We did notice the impact of the additional staffing.  This

13   trip there were officers in each of the housing units at RDC.

14   In the past, that had not been the case.  There was often one

15   officer assigned for the four pods of the housing unit, and

16   really, everybody had to be locked down, and that one officer

17   had to keep moving and obviously could not see a lot of what

18   was going on in the pods or in the units.

19       There may be an opportunity to reduce the required number

20   of staff.  The county operates three facilities.  There has

21   been a reduction in the population of the total detention

22   facility, partly as a result of returning state prisoners,

23   partly as a result of limiting the people that are there on

24   misdemeanors, which I will talk about a little bit later.  But

25   with that reduction, there are some opportunities to close some

1    of the units and potentially a facility which would greatly

2    benefit their staffing situation.

3         So right now there does appear to be significant

4    improvement in the area of staffing, but particularly if they

5    keep all three units open, it's a long ways to go to get to

6    that 433.

7         Also, with respect to staffing, it's of course not only

8    necessary to hire people; it's necessary to retain people.  One

9    of the initiatives that we had hoped to see and had been

10   discussed was introducing a step increase, salary increase, for

11   detention officers and sergeants.  This was discussed.  It did

12   not happen in this budget.  So they will need to work more on

13   retention, then, without that step increase.

14        I should mention that they did adopt in the budget a base

15   salary increase for detention officers, and that brings them

16   much closer -- similar to other correctional officers in the

17   area, so that makes them much more competitive, and that was

18   included in this fiscal year's budget.

19        There is one position in particular that we believe to be

20   critical that has not been filled, and that's a deputy director

21   for the jail director.  So we have definitely urged them to

22   fill that position as promptly as possible.  Really the upper

23   level staff is stretched far too thin to be able to maintain

24   the operations in the three different facilities.

25        Another area of improvement that I want to focus on is

1    training.  Of course, that goes hand in hand with increased

2    staffing.  One has to have the training of that new staff, and

3    there has been a new interim training director that has been in

4    that position I believe about six weeks or so, and his efforts

5    appear to be paying off.  The preservice training is happening.

6    The graduates appear to be invested in their work, motivated.

7    The training material has been reviewed.  It is professional

8    and extensive.  It is subject to further review and has some

9    tweaking to do.  Perhaps the most problematic aspect of the

10   training as it stands now is that it is really not tailored to

11   this specific facility, and in part, that's because they really

12   have not gotten to where their policies and procedures and

13   their post orders are what they need to be just yet, which I

14   will talk about a little bit later.

15       In addition, the training does not currently provide for

16   direct supervision.  We talked about that a little bit at the

17   last time.  The RDC, the Raymond Detention Center, is designed

18   as a direct supervision facility.  Direct supervision is

19   definitely the best practice in correctional work these days.

20   The Raymond facility has not been operated as a direct

21   supervision facility because of the lack of staffing.  So as

22   their staffing increases, they need to move towards that, and

23   their training needs to incorporate direct supervision

24   practices.

25       They also have many inexperienced correctional officers on

1    the floors these days.  Because they have improved their

2    staffing levels so much, it's a good thing, but the down side

3    is that they have a lot of inexperienced people, and they are

4    talking about incorporating a field training component to their

5    training that is really going to be essential to get so many

6    young inexperienced officers up to a level where they can truly

7    function in that jail, particularly given that it does still

8    have a lot of challenges that even an experienced officer would

9    have trouble with.

10       And I should say in this area, as with staffing, that all

11   of these areas need to be attended to to make sure that there

12   is not backsliding.  The staffing needs are now in the budget,

13   but they need to continue to be prioritized.  The training is

14   really in its infancy and really needs to be maintained at that

15   level and improved in the areas that we've talked about.  So

16   that's really critical in this area not to see any regression.

17       The policies and procedures, again, as probably reported

18   in the last visit, sort of skeletal policies and procedures

19   were adopted.  It was an effort to get policies and procedures

20   in place, but they really need quite a bit of additional work.

21   And I think it became apparent that outside consultation was

22   needed to get the policies and procedures where they needed to

23   be.

24       The county has -- I believe has made arrangements or is in

25   the process of making arrangements with Jackson State

1    University to build the policies and procedures.  That requires

2    an additional expert to come on board with Jackson State to

3    provide the substance of what's needed in jail policies and

4    procedures.  That does seem to be proceeding, but this, of

5    course, is another area where there's concern about how long

6    it's been.  It's been a year now, operating in part with no

7    policies and procedures, in part very deficient policies and

8    procedures, so it's well overdue.  And in addition, it's hard

9    to train new officers adequately if you don't have new policies

10   and procedures that you're training them on.  So that's an area

11   of great need.

12        Fines and fees:  As you know, at the time of the last site

13   visit and particularly the site visit before that, there were

14   quite a few individuals who were being held in the jail on

15   fines and fees that -- orders that didn't comply with

16   constitutional requirements.  As of last January, there were a

17   hundred people that were in on fines and fees with these

18   pay-or-stay orders.  As of this site visit, there were zero, so

19   that was very encouraging.

20        The county is also sponsoring a training -- or

21   participating in a training of the judges that will happening

22   in November on the new rules of criminal procedure that really

23   walk them through what they need to be doing in this area.

24        Another area of progress is that on the Criminal Justice

25   Coordinating Council, a consultant has been hired.  Their first

1    visit took place at the same time as our site visit, so that

2    was last week.  And I believe the consultants are hoping to

3    have the first CJCC meeting the first week in December.

4        So I want to talk about records.  Here we got into areas

5    where there is some progress, but there continues to be

6    significant concern.  As of the last site visit, there was

7    pretty widespread inaccuracy in the record system.  There were

8    people that were said to be in custody who were not.  There

9    were people who had no files whatsoever.  There were people who

10   were mistakenly other actual people in the files.  People were

11   in beyond their time.

12       And so it was very, very problematic.  We were focused on

13   some other items as a greater priority this trip, so we did not

14   do a deep dive into the records.  There did appear to be

15   progress.  There were three individuals who now had different

16   areas of focus within this area trying to track people and make

17   sure their records were up to date.  We still did observe some

18   individual problems.  The indicted -- they produce two lists

19   every month of people who are indicted and people who are

20   unindicted after 90 days.  We ran into people who were in both

21   of those categories but were not on either of those lists.  So

22   it would certainly indicate that the lists are still not

23   entirely accurate, but they did have the appearance of being

24   more accurate.  In the past, there were people on the list that

25   appeared to be in jail three to four years that when reviewed

1    were not even in jail.  There were not so many of those

2    instances during this trip.

3              **THE COURT:**  Unindicted longer than 90 days?

4              **MS. SIMPSON:**  Right.

5              **THE COURT:**  So you are arrested on a felony,

6    no-bonded, and then are waiting for presentation to a grand

7    jury?

8              **MS. SIMPSON:**  That's my understanding.  I'm not as

9    familiar with criminal procedure under Mississippi law, but it

10   appears that there is not a deadline in the rules, and people

11   have in the past sat for many, many months without being

12   indicted.

13        I believe the senior judge at the circuit court which

14   oversees felonies has, as a result, requested that the jail

15   generate this list identifying people that have been there 90

16   days.  That list goes to her, and then she reviews it.  And as

17   I understand it, she releases some people on their own

18   recognizance, but not everybody is released on their own

19   recognizance, so some people continue to sit unindicted.

20             **THE COURT:**  I wonder if that list could be presented

21   to the public defender.  Is there a public defender's office in

22   the county?

23             **MR. TEEUWISSEN:**  Yes, Your Honor.  There is a public

24   defender's office that is paid for by the county.

25             **THE COURT:**  How would that work?  You've got you're

1    charged, you're arrested, and there hasn't been presentation to

2    a grand jury over 90 days, the list is given to the public

3    defender, and then the public defender -- I would think it

4    would be incumbent on the public defender to notify or maybe to

5    file a motion with the circuit court.  No?

6         **MR. TEEUWISSEN:**  We can certainly ask that.  The

7    public defender's office has been cooperative in what we've

8    asked them to do, and I will have some remarks about some of

9    the things they have done since our last status conference.  We

10   certainly have no objection to that.

11        **THE COURT:**  Wait.  I'm not directing or mandating.

12   I'm simply thinking out loud as I hear it, but please don't

13   take that as a directive.

14        **MR. TEEUWISSEN:**  Yes, Your Honor.  I will also say at

15   this point, it may be appropriate to add that I had a

16   conversation with the senior circuit judge yesterday, and she

17   and I will meet after next week's training that justice

18   kitchens is putting on with the judges, and she has agreed that

19   it would be appropriate if the county -- if the board passed

20   some resolutions, and then on behalf of the board, I come

21   before her and ask her to administratively do certain things

22   that would help with the process.

23        **THE COURT:**  Okay.  Well, there you go.  Okay.  Thank

24   you, sir.  Did you want to add something, sir?

25        **MR. CHENG:**  Yes, Your Honor.  This is true of the

1   people who have been waiting a long time for indictments is a

2   fairly complicated one, and it has had an impact on conditions

3   in the jail.  One of the reasons we've asked that the CJCC be

4   created and include local members of the judiciary is that

5   remedying this issue does require some cooperation among all

6   the branches in county government.

7      **THE COURT:**  Okay.

8      **MR. CHENG:**  My understanding is, for example, some of

9   the individuals may have private counsel.  Some of them have

10  public defenders representing them.  And so who you notify and

11  when that notification should occur really should be a function

12  of the criminal justice process.  That said, I do think the

13  list, if it's something that can be shared and made public, at

14  a minimum should be made available to the members of the CJCC.

15  And we do think it actually makes sense to make it available to

16  members of the defense bar, especially people who have

17  representation.  But as I think we've noted before, we try to

18  take baby steps in this case.

19     The level of coordination required to make sure that these

20  types of lists go to the right people, it may be something to

21  look at in the near future, but right now they are just having

22  a hard time figuring out who is in the jail, let alone who is

23  representing who and which members of the judiciary need to be

24  looped in on the process.

25     **THE COURT:**  Okay.  I didn't mean to interrupt you,

1   Ms. Simpson.

2          **MS. SIMPSON:**  No, that's fine.  I think also we

3   talked about providing the list to the public defender.  I

4   think it would also be valuable to provide it to the district

5   attorney.  Obviously, it's the district attorney that needs to

6   take the case before the grand jury, I believe, in Mississippi.

7   And there are certainly issues there, but that's where it also

8   should land.

9          **THE COURT:**  Yes, ma'am.  I agree.

10          **MS. SIMPSON:**  So there are -- one of the issues we

11   ran into last time was people that were in beyond the time

12   limit for people arrested for probation violations.  They do

13   have someone tracking that specifically, and that appears to be

14   much improved as well.

15          There does appear to be sort of an ongoing issue with sort

16   of understanding the court orders and having access to court

17   information.  As I understand it, the circuit court there moved

18   to a different information management system about two or three

19   years ago, and the jail no longer has access to that.  And so

20   they're not able to sort of research and look up where somebody

21   is in the process if there is an issue.  So that has certainly

22   been one of our recommendations is that they take the necessary

23   steps to be able to access the court information so they can

24   fully understand where in the process an individual is and what

25   the next step is.

1          **THE COURT:**  So circuit court has gone to electronic

2     case management, and the sheriff doesn't have access to it?

3          (Inaudible response).

4          **MS. SIMPSON:**  And we did run into at least one

5     situation where there was an order that was admittedly very

6     unclear, and it appeared to be being read probably not

7     unreasonably but not accurately by the individual that was

8     trying to figure out why that person was in.  And she was

9     unable to access the Court database to get any further light on

10    it.  It raised a couple of issues.  One was access to the

11    database.  Two was communication with the court directly.

12    Three was the level of understanding of the court orders and

13    the oversight of those individuals trying to make sense of it.

14          **THE COURT:**  That's a circuit court order?

15          **MS. SIMPSON:**  It was a circuit court order as I

16    recall.

17          **MS. MAYBERRY:**  County order.

18          **THE COURT:**  County court.

19          **MS. SIMPSON:**  County order.  Thank you, Ms. Mayberry.

20    A county order.  It was admittedly unclear, but the individual

21    was sort of taking a tack that really wasn't accurate, didn't

22    realize it wasn't, didn't have access to the database that

23    would have enabled her to further understand it.  So it

24    elucidated a number of problems with the system there.

25          A couple of other areas within sort of the records and

 1   understanding court orders.  The individuals in records that

 2   oversee and initiate releasing do not get copies of the no-bill

 3   list, the list of people who are not -- who the grand jury has

 4   declined to indict, so those are delayed on a somewhat regular

 5   basis until they find out.

 6          **THE COURT:**  Who doesn't get a copy of the

 7   no-true-bill list?

 8          **MS. SIMPSON:**  The records office in the detention

 9   center.

10          **THE COURT:**  That seems like an easy fix.

11          **MS. SIMPSON:**  Some of these are easy fixes.  And I

12   should say in this area, one of the things we recommended last

13   time is that they seek technical assistance from the National

14   Institute of Corrections to really review their entire booking

15   and releasing and records process and most likely revamp it.

16   They did apply for that technical assistance.  I believe it's

17   just recently been approved, and hopefully that will help

18   identify and resolve some of these problems.

19          There still is a very systematic problem in terms of who

20   there gets the orders, who is primarily responsible for

21   implementing the orders, who it's supposed to be shared with,

22   what the supervisory chain of command is in that area and sort

23   of a lack of communication between all involved.

24          **THE COURT:**  That, I would think, would be the circuit

25   court administrator.  Right?  Can you bring that up, do you

1   mind, when you meet with Justice Kitchens and the Chief Circuit

2   Court Judge?

3          **MR. TEEUWISSEN:**  Absolutely, Your Honor.  There are

4   four circuit judges and three county judges.  Each of those

5   judges has his or her own court administrator.  Unquestionably,

6   Your Honor, we need to get all of them on the same page.

7          **THE COURT:**  Maybe the clerk.  How about the county

8   court clerk?

9          **MR. TEEUWISSEN:**  Circuit --

10         **THE COURT:**  Just a suggestion.  And the circuit

11  clerk.  I would think the sheriff would love to know who was no

12  true billed for an almost immediate outprocessing.

13         **MR. TEEUWISSEN:**  I would hope he could pick up the

14  phone and call the circuit clerk.  I understand they are on

15  fairly good terms.

16         **THE COURT:**  But he's not going to know when the --

17  he's not going to know when the grand jury report is issued.

18         **MR. TEEUWISSEN:**  No, Your Honor.  I was thinking if

19  he asked the circuit clerk to provide it, I'm pretty sure his

20  circuit clerk could, but I will personally make sure the

21  circuit clerk provides that to the sheriff.

22         **THE COURT:**  That's got to become a regular --

23         **MR. TEEUWISSEN:**  Right.

24         **THE COURT:**  This has got to be a regular, and then

25  the sheriff needs to let them know who needs to receive it to

1    make it happen.  But those are -- okay.  Good.  Thank you.  I'm

2    sorry.  I didn't mean to interrupt you again.

3              **MS. SIMPSON:**  That's fine.  Feel free to interrupt

4    with questions at any time and clarification from anybody here.

5    It's hard to absorb all of this in a one-week site visit.

6              One other area I wanted to mention with respect to records

7    and court orders.  The competency process -- in part, I think

8    because of the lack of forensic beds at the state hospital, the

9    competency process ends up being very protracted.  There's one

10   individual who could not remember exactly how long he'd been in

11   jail, but it was somewhere between six and eight years.  He was

12   eventually found to be incompetent, was sent to the state

13   hospital, again, after many, many years delay, was there for

14   five months, was said to have had his competency restored and

15   then has come back to the jail.

16             The records -- again, they don't get very good records of

17   what is happening in this competency process, and neither the

18   medical staff nor the records staff understand the competency

19   process enough to know where in the system somebody actually

20   is.  The medical staff thought this individual was waiting to

21   go back to the state hospital.  In fact, he supposedly had

22   found his competency restored and was waiting for a trial date.

23   So they were sort of unable to push the system in the direction

24   it needed to go because of a lack of understanding.

25             And it does also appear to be sort of a chronic issue that

1    the state hospital has a list of 12 people from Hinds County

2    Jail that they understand to be waiting for a hospital bed.

3    The medical staff at the Hinds County has a list of 23 people

4    they think are waiting for a hospital bed.  So there clearly is

5    a disconnect or a lack of understanding of where people are in

6    the process.

7              **THE COURT:**  Okay.

8              **MS. SIMPSON:**  And the impact of that is partly that

9    it seems that very little happens in the system without

10   somebody pushing the system, so you have to understand where a

11   case is in order to push it in the right direction.

12        I wanted to --

13             **THE COURT:**  Wait, wait.  Go back to that one.

14   Somebody has got to -- I don't understand how that happened.

15             **MS. SIMPSON:**  How somebody can be there six to eight

16   years?

17             **THE COURT:**  Well, the -- if it's -- as I would

18   appreciate it, I'm suspecting if someone is held six to eight

19   years, it's probably a felony case?

20             **MS. SIMPSON:**  Yes, Your Honor, it is.

21             **THE COURT:**  So someone is arrested on a felony.  And

22   then has he been indicted yet or not?  Probably indicted?

23   Maybe?  Yes?

24             **MS. SIMPSON:**  That case is indicted.  I can't tell

25   you how long he sat there before indictment, but it is

1   indicted.

2        **THE COURT:**  Okay.  So it's indicted, and then

3   somebody asserts that the defendant is not competent?

4        **MS. SIMPSON:**  That's correct.

5        **THE COURT:**  That would be a defense attorney.

6        **MS. SIMPSON:**  That's correct.

7        **THE COURT:**  All right.  So a defense attorney asserts

8   incompetence, and then potentially it's held before a circuit

9   judge, and the circuit judge orders a competency hearing and

10  then refers to -- it's Whitfield, I believe, is the medical

11  facility?

12       **MS. SIMPSON:**  The first step is actually the

13  competency evaluation.  And so that can be done outside of the

14  state hospital, but in some instances, the evaluator recommends

15  that the evaluation itself be done in the state hospital.  And

16  so that then results in a delay just getting to the state

17  hospital for an evaluation.

18       **THE COURT:**  Okay.

19       **MS. SIMPSON:**  Then it comes back and gets the

20  competency hearing.

21       **THE COURT:**  Okay.

22       **MS. SIMPSON:**  The individual, if found incompetent,

23  then has to wait for a state hospital bed to be restored to

24  competency.

25       **THE COURT:**  All right.  So -- okay.

1          **MS. SIMPSON:**  There are only 15 forensic beds at the

2     state hospital for the entire state, and so that is in part

3     where the enormous delay comes from, particularly if the

4     individual had to go to the state hospital first for the

5     evaluation and then for the restoration.

6          **THE COURT:**  Okay.  And I guess I meant -- I don't see

7     that at this point as attributable to the Hinds County Sheriff.

8          **MS. SIMPSON:**  That's correct.  That delay --

9          **THE COURT:**  Or maybe even the county.  But I would

10    think that -- well, the defense attorney, that should be --

11         **MS. COON:**  Your Honor, the Department of Justice also

12    has a statewide case involving the state of Mississippi mental

13    health services, so this may be an issue that is addressed in

14    our other pending investigation.

15         **THE COURT:**  All right.

16         **MS. SIMPSON:**  I raised it here because of the lack of

17    understanding of where people are in this process and because

18    it would appear that very often one doesn't get the court

19    hearing or a hospital bed unless somebody is actively

20    advocating for it.  If you're pushing the wrong way, you're not

21    going to get what is needed in the next --

22         **THE COURT:**  Yes, ma'am.

23         **MS. SIMPSON:**  I wanted to mention about the situation

24    with juveniles.  The decision as to where the ultimate location

25    for juveniles being charged as adults would be -- was

1   initially -- had an initial deadline of January 1st of 2017.

2   That deadline was missed.  However, the county was

3   investigating and getting information on the various possible

4   alternatives.

5        It has been decided by the county that the juveniles being

6   charged as an adult will be moved over to Henley-Young, the

7   juvenile facility, over time.  And this move has actually

8   already started.  So that was actually ahead of schedule to

9   some extent on the actual implementation, although it will take

10  time to complete the move in that they are primarily just

11  having new juveniles being charged as adults moving into

12  Henley-Young and not transferring current youth from RDC to

13  Henley-Young.

14       Some of those youth are aging out and moving into the

15  adult population.  Some of them may go to trial.  And the

16  reasoning is that having spent so much time at the adult

17  facility as they had, that some of them would be difficult to

18  transition into the setting with youth not being charged as an

19  adult.  So that's the reasoning for the gradual implementation.

20  Our team member expert on juveniles agrees with that approach

21  to do this gradually and thoughtfully.

22       This process is not without challenges.  The length of

23  stay at Henley-Young for youth not being tried as adults is

24  typically very short, around 21 days.  Obviously, the youth

25  being tried as adults, particularly in the current system, may

1    stay for years.  And so that's an adjustment for Henley-Young.

2         Henley-Young currently has a low number of juveniles,

3    which allows for this change.  That might not always be the

4    case.  That would present future challenges.

5         As I'm sure you know, there's also a class action

6    involving Henley-Young that has its own consent decree

7    provisions.  Significant progress has been made in that case.

8    I think there is some concern on the part of the parties to

9    that case that this move may jeopardize compliance in that

10   case, just because of the additional people involved and

11   perhaps some additional challenges that that population

12   presents.

13        And the Henley-Young people feel that there are probably

14   some additional security modifications that need to be made for

15   this additional population, perhaps some expanded service

16   facilities as well.  So there are things to be worked out in

17   that move, but it does seem to be happening in a thoughtful

18   manner.

19        In addition, there are probably some legal issues that

20   will need to be worked out in terms of how the two consent

21   decrees sort of overlap and how to bring them together.

22        The plaintiff in the Henley-Young case is the Southern

23   Poverty Law Center, and I think they are now involved in the

24   conversation and are working that out as well.

25        So still remaining are the youth that are still at RDC and

1    exactly what and when they will be able to be moved out of RDC

2    or complete their cases.  In the meantime, though, they still

3    are entitled to programming at RDC.  That programming has

4    improved somewhat in the sense that there are fewer individuals

5    there now.  So the person that has been providing some

6    educational services is able to add some one-on-one time.

7    There is also a daily schedule that is provided for those

8    youth.  However, it's still minimal and way below standards for

9    programming for youth in the system.

10        The supervision in the unit is not where it should be.

11    There should be security officers specifically trained for

12    working with youth.  There is some of that.  As with the

13    facility as a whole, they have some very inexperienced

14    officers.  There was an instance not too long ago where there

15    was an altercation on the unit.  The juvenile expert reviewed

16    the videotapes of it, and the inexperienced officer really had

17    the opportunity to intervene at least four times in the course

18    of the altercation and did not.  The youth was badly beaten,

19    has a broken jaw and is in the medical area of the jail at this

20    point now for several weeks.  So that appeared to be not

21    purposeful on the part of the guard but inexperience and the

22    need for additional training.  He's been in medical since

23    August 27th, so about a month now.

24        And I should say this actually goes towards renovations,

25    but he was -- he was in medical, and because he's a juvenile,

1    he had to be separated from the adult population that was in

2    medical.  At the same time, they had a person who might have

3    tuberculosis come in.  They have to use a special cell for

4    people in that status.  The youth was in that cell in medical,

5    so that individual was put back into one of the cells in the

6    booking area that the monitoring team had previously said

7    should never be used for housing individuals.  So that

8    presented the additional problem of going back to using those

9    booking cells.

10        When that was brought to the attention, they found another

11   location for the youth so that person in booking could be moved

12   to the medical, but the booking area should never be used for

13   housing individuals.  It's very, very inadequate.

14        Another area of concern, and this is one that we haven't

15   addressed very directly, and we probably need to drill down

16   more in the next visit, but there really does not seem to be a

17   very strong or consistent effort to comply with the Prison Rape

18   Elimination Act, PREA.  There are provisions in the settlement

19   agreement that require compliance with PREA.  Obviously, the

20   law itself requires compliance.  There's supposed to be a PREA

21   officer, there's supposed to be signs posted, there's supposed

22   to processes that inmates are informed of to report.  None of

23   that actually appears to be happening.  In many instances

24   nobody could identify who the PREA officers were or what the

25   requirements were, and it was acknowledged that in at least one

1   of the facilities, there is a current problem with sexual

2   assaults taking place.  But again, there's no clear officer or

3   process assigned in this area.  So that is a major concern.

4       In the area of grievances, the jail just moved to a new

5   system.  Hopefully, that system will work eventually, but right

6   now it is creating quite a bit of havoc.  In sort of not

7   attacking it too directly because it is a new system and those

8   things often have glitches, but it is something that needs to

9   be attended to promptly.  It's a kiosk system where they have

10  kiosks in the different pods, but many of the inmates

11  complained that they were unable to get into the system.  They

12  enter their name, and then they have a password, which I

13  believe is their inmate number.  They enter that, and they are

14  told no known inmate in the system.

15      Some of the inmates interpreted that to mean that they

16  were being retaliated against for something they had done

17  previously, obviously upsetting them quite a bit.  And while it

18  was so widespread, that didn't appear to be the case, but it

19  definitely is causing agitation that is not helpful.

20      So many of the passwords don't work.  The work center

21  system has been completely shut down.  They have moved back to

22  a paper system because they can't get it to work.  And there

23  may be some training that needs to happen on the system of

24  staff, but right now there does not appear to be any way to

25  aggregate it, so the staff cannot say, oh, we've had five

1    grievances involving medical, ten involving kitchen.  So it
2    just has sort of a completely random list.

3        There's no category in the system for emergency grievances
4    which do need to be identified.  There's no provision for
5    individuals that are illiterate.  There does seem to be a
6    provision for Spanish language, although none of the staff were
7    aware of it, and likely the inmates not as well.

8        The way it is set up, it's a little bit difficult to
9    navigate through for the inmates, and so they end up marking
10   things that are not necessarily quite accurate in terms of
11   categories, and there's no way for the staff to override that.
12   So all of that hopefully can be worked out if they get down
13   with the vendor and sort of figure out how it works and deal
14   with some of those glitches.

15       On sort of a systemic level, however, there needs to be, I
16   think, a greater understanding on the part of the staff as to
17   when they resolve a grievance and when they don't.  So, for
18   example, one of the grievance officers that oversees this was
19   responding to a grievance that asked about some property.  She
20   referred the individual to the supervisor on the unit and
21   marked the grievance as resolved.  Well, that's not really
22   resolved.  There's actually nothing of substance that resolves
23   it, and there's actually no oversight above her other than
24   potentially the inmate saying what happened.

25       So there needs to be better understanding of how

1    grievances are responded to and sort of hierarchy of who

2    oversees that process, and also a better ability to track

3    medical grievances.  Those tend to appear to go to medical, and

4    the grievance supervisors never see what happens, so they don't

5    actually even know if it's responded to.

6         Another very problematic area is reporting.  And this also

7    has been both a training and an IT issue.  On the IT side there

8    was hopefully a productive meeting, and we will see some of

9    those glitches getting out of the system.  The way the reports

10   were being completed, they were very cursory and often no

11   indication of what happened.  So a fight happened on the unit,

12   so and so went off to medical, and that's it.  We know nothing

13   about, you know, was there a disciplinary action, did the

14   person die, did they come back?  So part of that problem is

15   that the IT system does not tie those sort of sequential

16   reports together, as well as the fact that for the most part,

17   they're not happening, so nobody is doing supplemental reports

18   that identify what happened next.  And even if they did, there

19   would be no way of tying it into the original report so that a

20   supervisor or a monitoring team could track it.

21        They also have -- are not tying in use of force reports.

22   It's not entirely clear how many are even being done, but they

23   are not tied in.  And they don't really have a disciplinary

24   system, so it's not tied in.  Typically, the officer that's

25   involved is deciding on the disciplinary action.  There's not

1    really any guidance or consistency to what that action is.  And

2    typically, with these reports, we see no supervisor signature

3    and no supervisor approval.  And the reports themselves are

4    very cursory, for the most part.  Obviously, some people are

5    better than others, but many of them are very cursory and do

6    not really provide the information that's needed.

7         So it's in part a training issue to make sure that the

8    officers know how to write an adequate report and know when

9    they need to do supplemental reports, know when they need to do

10   use of force reports, and then it's an IT issue to actually tie

11   those together so that the supervisory staff and the monitoring

12   team can actually follow an incident all the way through, as

13   well as training of supervisors to make sure that those are

14   signed off on and that the action taken is reviewed

15   substantively.

16        On the disciplinary side, one of our recommendations is

17   they actually have a disciplinary committee and that they start

18   setting some policies and procedures to identify what

19   infractions get what discipline and ensure that there's some

20   consistency to that.  And they often -- it's not unusual to see

21   an entry that an inmate got 60 days segregation or confinement,

22   and that is never appropriate.  Usually 30 days is the max.

23        So on all of those levels, there needs to be work related

24   to reporting and discipline and use of force, and that's a

25   pretty profound need.  Right now it's difficult to track not

1    only for the team but for the supervisors to know what is

2    really happening with respect to incidents of use of force.

3          Classification:  There was improvement in the area of

4    classification.  At the time of our last site visit, they were

5    not classifying misdemeanants.  All misdemeanants were treated

6    as low risk, which they are not necessarily.  They have now

7    started classifying misdemeanants -- even though they are

8    classifying them, they pretty much always send them to the work

9    center, and so that's probably the next step is to understand

10   that doing the classification scoring itself is just the first

11   step.  Then misdemeanants need to be evaluated for what housing

12   location is appropriate, and it's not always going to be a low

13   risk housing unit.  So that -- that's the next step in sort of

14   moving that along.

15         One very good improvement was that the classification

16   office is now being consulted whenever there's a change in an

17   inmate housing assignment.  It used to be that the corrections

18   officers would, as a result of an incident or a request or

19   whatever, would just move somebody, not even telling

20   classification.  Now there's a process by which if they have to

21   move somebody immediately, they go to a staging area, and

22   classification comes in and determines the appropriate housing

23   area.  So that is an improvement.

24         There is still a lack of clarity on how the three

25   different facilities should be used.  There's no real policy

1   and procedure on what classification levels.  As I said,

2   misdemeanors almost always are sent to the work center, whether

3   or not they pose a higher risk.  So there needs to be a more

4   thoughtful process of what works -- which facility works best

5   for which inmates and for the system as a whole.  But there was

6   generally improvement in the area of classification.

7        A major issue that is just ongoing is maintenance of the

8   facility.  And I know that there's some frustration that with

9   the lack of supervision, any repairs that are made are often

10  undone by unsupervised individuals in the unit, and that may be

11  the problem.  Other than that, it is unclear what exactly the

12  barrier is, but we have encountered toilets that don't work and

13  have not worked since we started going a year ago.  Same with

14  showers that don't work.  The sallyport in RDC has not worked

15  pretty much the entire time we have been going there.

16       A number of the cells have no functioning lights.  We

17  visited with some of the inmates in the segregation unit.  The

18  cell does not have any exterior light.  Many of those lights

19  were out.  The only light they could get for reading was if

20  they laid on the floor and looked at the light that came

21  through the crack at the bottom of the door.  And it has been

22  reported, the holes in the walls and the doors that don't work.

23  So there's ongoing problems with maintenance that just are

24  there every time we go.

25       In addition, there are six what are called isolation

1    units.  So each pod has four units, and each has two isolation

2    units, which is a group of four cells in kind of a separate

3    area.  And four of those isolation units have been

4    nonfunctional because of needed repairs.

5        This has a big impact on the management of inmates because

6    they are not available to use as protective custody or suicide

7    rooms or additional areas for working with inmates that have

8    special management needs.  So having those isolation units out

9    of commission has really limited their ability to provide for

10   special management inmates.

11       The booking area we've talked about for some time, and I

12   understand that they are looking at having some capital money

13   to redo the booking area.  It's very, very needed.  The cells

14   in that area are not only very bad in themselves, just in terms

15   of accommodating people, but the doors are almost solid metal.

16   They have this little lattice that has been covered up and

17   uncovered and modified so many times that you basically can't

18   see into the booking cells at all.  And it's really important,

19   particularly in booking, that you be able to see into those

20   cells because you have people coming in who may still be on

21   drugs, coming down from drugs, coming down from alcohol, off

22   their medicine.  In booking more than anywhere, you have

23   inmates that are potentially unstable, and you need to have

24   that observation.

25       Also, the medical area, and I'm going to talk about that a

1    little bit later, is in great need of renovation.  It has the

2    same problem with doors being impossible to see through in an

3    area where that's the whole point of having them there is for

4    observation.  And the Jackson Detention Facility downtown, the

5    transport area there needs to be remodeled as well.

6         Another maintenance issue is two out of the three pod

7    security doors which lead from the pods -- there's four pods --

8    well, there's one that's used differently, but two out of the

9    three pods used for housing, their security doors that lead

10   from the pod into the central corridor can't be closed, so

11   that's another maintenance issue that involves security, a

12   particular concern for security.

13        On security itself, we found that there was really sort of

14   a problem, particularly at RDC, in maintaining the rules

15   regarding security.  So, for example, in most jails and

16   prisons, you have two -- a set of two doors where you go in one

17   door, it closes behind you, and then the other door opens.  In

18   RDC, they routinely just open both doors together, which is

19   convenient and makes it nice for us in terms of getting around,

20   but it really is not the way security is supposed to work.

21        There was one instance where the master control center

22   door was propped open, even though there was a trustee inmate

23   in the area and actually no security officer right there.  That

24   is potentially a disastrous security concern.  We observed

25   other doors propped open.

1    There were officers in the administrative area, not in the

2    secure area but in the administrative area who were carrying

3    guns.  That's generally not acceptable, even though it's in the

4    administrative area.  And as has been reported, there continue

5    to be significant issues with contraband getting into the

6    facility, indicating that there needs to be more efforts in the

7    area of security.

8    In addition to contraband, you know, the lack of security

9    certainly contributes to inmates having fights and having

10   dangerous fights.  In two of the medical charts the medical

11   expert reviewed, there were inmates who had been stabbed

12   multiple times, so obviously contraband a factor there.

13   The kitchen, we haven't really focused on that, but we

14   couldn't help but observe that the food service could not show

15   that it had any special diets approved by a dietician.  So for

16   hypertension or diabetes, there were no apparent special diets

17   that had been approved.  And in fact, some of the kitchen

18   practices were not consistent with the needs of diabetic

19   patients in particular.

20   The menu that was posted as current was actually dated

21   2014.  And then there was one issue that was particularly

22   problematic in the area of kitchen, and there had been a

23   grievance on this.  We came across the inmate who had filed

24   that grievance.  He had requested a kosher diet.  He was not

25   being given a kosher diet.  It appeared to be a bit of a

1    catch-22, although clearly there's a way of dealing with this.

2    The jail has relied on medical to request special diets.

3    Medical said that a religious diet is not something within

4    their jurisdiction, so they wouldn't request it.  As a result,

5    the individual has gone some weeks now, at least, without a

6    kosher diet and was obviously very unhappy about it and was

7    trying to eat as little as possible, which was not helpful

8    either.

9        I'm getting close to the end.  Medical, there was a

10   shortage in medical staff.  They were down one RN, two LPNs, a

11   part-time RN at Henley-Young, a file clerk, and a discharge

12   planner who left after three months.  So that's actually a

13   significant percentage of the staff and makes it difficult to

14   provide the services that are needed there.

15       Our medical expert indicates that the medical records were

16   in disarray at all three facilities.  There was no organization

17   to them, making it very difficult for her and presumably for

18   the medical staff to find what they needed to track care.  The

19   emergent -- or the electronic medical record that they are

20   planning on moving to has not been available to them because

21   they don't get adequate internet reception in the medical area,

22   so another IT issue that needs to be attended to.  So far,

23   that's been preventing implementation.

24       And the medical provider is also required and expected to

25   provide for chronic care for certain diseases, being diabetes,

1    hypertension, AIDS, COPD.  The medical expert reports that this

2    is in place in the work center and in JDC but is not in place

3    at RDC, and that's a significant problem.

4         Although it's now last, it is one of the most important

5    areas I wanted to talk about was mental health.  This visit we

6    had all of the team members focus on mental health within their

7    area of expertise.  In the settlement agreement, there's not a

8    separate section on mental health, but there are quite a few

9    provisions that require sufficient mental health services.

10   Paragraph 42 provides generally that the county must screen and

11   assess for severe mental illness and then provide appropriate

12   treatment and therapeutic housing.  And there are additional

13   provisions that have specific requirements with respect to

14   training, use of force, segregation, increased observation, use

15   of an interdisciplinary team, youth programming, so quite a few

16   provisions that relate to mental health services.

17        So the first question is how many people there need mental

18   health services.  And one of the first problematic issues is

19   are they identifying people that need mental health services.

20   And we ran into a problem right off there in that the medical

21   provider was really not able to say how many people they have

22   on their mental health case load.  So that made it very

23   difficult to determine what their staffing should be and what

24   the services need to be.

25        They did provide a list of 60 individuals that may be the

1   people there with severe mental illness.  If that is the case,

2   they are well below the national average for what a jail their

3   size should have in terms of people with severe mental illness.

4   A jail their size would normally be expected to have about 140

5   individuals with severe mental illness.  And as I mentioned,

6   they appear to be identifying 60.

7       A jail would also have another 120 or so on a mental

8   health case load but without severe mental illness.  And again,

9   they don't really even know what that number is if there are

10   additional people that they consider on the case load.

11       And I should say that this not only deprives the

12   individuals who need mental health services of those services,

13   but also it really contributes to being able to manage the

14   inmate population.  If you have people with mental illness who

15   are not identified and not being treated, you have people that

16   are probably posing a management problem at times.

17       So one of the things that was suggested as a reason for

18   why they might be under-identifying is that because behavioral

19   health services are not provided extensively in the community,

20   that that may be why they are not being identified in the jail.

21   Typically, a screening involves, you know, have you been

22   receiving services, are you on meds, have you ever been

23   inpatient in a hospital.  And with a lack of community-based

24   services, that would explain, in part, why they are not

25   identified there.

1    So then there really needs to be an evaluation of their

2    screening and assessment process to determine why they are not

3    identifying more individuals.  And then once that is

4    identified, they can look at the staffing level, we can look at

5    the staffing level.

6    Assuming they are at the national average, and there's no

7    reason to assume that they wouldn't be, the -- one would

8    normally expect to see about 1.4 full-time equivalence of

9    psychiatry time.  That's based on the American Psychiatric

10   Association recommendations for jails.  Their current contract

11   provides for eight hours a week, significantly different from

12   1.4 FTE.  They have a psychologist who comes in for some period

13   of time, also a matter of hours, and that is clearly

14   insufficient for the jail.

15   Social workers, they have one full-time social worker for

16   all three facilities.  Just as a comparison, Henley-Young has

17   three case managers for, right now, ten youth.  That probably

18   is a little rich.  They were anticipating more youth in the

19   facility, but still, as compared to one social worker for 700

20   individuals, it's significantly different.

21   So there's clearly a need for more staffing.  We intend to

22   drill down a little on that and be able to provide more of a

23   specific recommendation as to what that staffing should look

24   like.

25   They also are in need of therapeutic housing for those

1    individuals that really can't maintain stability in general

2    population.  They do put mental health inmates on C-1, one of

3    their housing units, but it is clearly not a therapeutic

4    housing situation.  There's no criteria for being placed there.

5    There's no therapeutic programming, no specially trained staff,

6    no specific policies and procedures.  Many appear to simply be

7    on lockdown in a particular unit.

8         In addition, many of the people on the segregation unit,

9    B-3, appear to have mental health issues, but they also don't

10   really have another location to go because of the lack of

11   therapeutic housing.  They would really need to be assessed and

12   evaluated as to whether they could maintain in therapeutic

13   housing if it existed, and then I think you would see some of

14   those people in segregation actually moving to mental health

15   housing.

16        Nurses are doing daily rounds of segregation.  That is

17   actually an improvement.  They weren't doing that before.  They

18   were actually getting informed of people that are in

19   segregation.  The social worker, however, is only going twice a

20   week.  Given that there's only one of her, and that's

21   understandable, but the consent decree actually requires that a

22   mental health trained individual does the rounds of

23   segregation.

24        There also should be interdisciplinary teams between

25   security and mental health staff to staff those who are the

1    highest need, highest risk individual.

2        The suicide observation situation is very, very

3    problematic.  Essentially, the correctional officers decide who

4    goes into suicide observation.  It appears that if anybody says

5    they are feeling suicidal, they are put into observation, and

6    it's good that the officers err on the side of that, since they

7    are not trained.  However, that results in a lot of people in

8    the suicide observation and staying in observation because

9    their policies do say that you can't get out of that until you

10   are seen by a doctor, the psychiatrist or the psychologist.

11   And as I mentioned, they only have limited hours at the

12   facility, so people end up in that for long periods of time.

13       So at the time of our visit, there were nine people in

14   suicide observation.  And again, as a comparison, our

15   correctional expert previously ran a jail of about 4,000

16   individuals, typically had four people in suicide observation

17   at any given time.  This is nine people in a jail of about 700,

18   many more than should be in there.  And part of the problem

19   with that is the facility itself is not really suitable.

20       They had several small cells.  When we were there, there

21   were four men in two of those cells and one alone, so four men

22   in a very small cell for a period of days, maybe up to a week,

23   who were reportedly unstable at the time.  They were obviously

24   very agitated, bouncing off the walls.  There were three

25   altercations in there during the course of our visit, a very

 1   inappropriate setting for them.

 2       The records that were maintained did not reflect

 3   consistent observation.  The doors, once again, are almost

 4   solid, do not really allow for adequate observation.  The

 5   medical expert and the correctional expert recommended that the

 6   use of these cells be discontinued as soon as possible for

 7   suicide watch.  And this, again, would be a potential use of

 8   one of those isolation units if the repairs were made to

 9   actually make it usable.

10       It does appear that some of the inmates in suicide watch

11   were not actually suicidal, that they appeared for their

12   safety.  That's what they said, and the staff seemed to confirm

13   that.  And obviously, in that situation, they should really be

14   addressing the underlying issue both of the safety and

15   potentially protective custody units, again, needing those

16   isolation units for protective custody.

17       And lastly, as I mentioned, the discharge planner left

18   after three months, and so the role that she was to play is not

19   happening.  There has been some effort towards looking at

20   diversion.  The Hinds County Behavioral Health Office held a

21   sequential intercept mapping meeting, which is to identify

22   places in the criminal justice process where people might be

23   diverted out of the process and into mental health services.

24   So having that happen was a good step.

25       The medical provider is providing discharge medications up

1   to a two-week supply, which is what the behavioral health

2   entity said was needed in order to actually have the time to

3   get them into community-based services.  Unfortunately, many of

4   the individuals in jail are discharged without medical knowing,

5   so they don't get their meds before they leave.  And one of the

6   recommendations in that area is that a check by medical become

7   part of the releasing process, so that typically in the

8   releasing process you have a matrix which identifies each place

9   you need to get an okay before a person can be released.  So

10  it's usually property, commissary, and making medical part of

11  that, so people that are needing discharge meds get them.

12      The other thing, even when the discharge planner was

13  there, there were a number of opportunities to coordinate with

14  Hinds County Behavioral Health and actually bring them into the

15  facility.  There wasn't any follow-through on those.

16      When there is additional staffing, whether it's a

17  discharge planner or additional social workers, that really

18  needs to be utilized.  It's a great potential resource for the

19  jail to help people transition safely into the community and

20  ideally not to come back.  But this always comes back to the

21  issue of sufficient mental health staffing.

22      So I mentioned some progress in various areas, obviously

23  some areas in great need of improvement.  Even those areas of

24  progress, however, I want to emphasize the need to sustain

25  that.  There's so much work that needs to be done there, it's

1    easy to put one's attention in another area and let something

2    that's already being achieved backslide, and it's real

3    important that we stay on top of all these improvements to make

4    sure there is no regression.  And that completes my report.

5            **THE COURT:**  All right.  Thank you very much.  Very

6    thorough.  And before I open the monitor up to questions, I

7    understand that the seats in the back of the courtroom might be

8    uncomfortable.  I will offer at this time, if anyone would like

9    to stand up and stretch their legs, that goes for counselors as

10   well, you may do so at this time.

11           All right.  Any questions on behalf of the government of

12   the monitor at this time?

13           **MR. CHENG:**  Yes, Your Honor.  I would like a little

14   bit of clarification regarding the example of the individual

15   who may have spent several years muddling through the

16   competency process.  My understanding is, on their return, it

17   wasn't quite clear whether they really should have been sent

18   through the civil commitment process or whether they really

19   were still awaiting trial.

20           The reason it does matter is, while we don't have a lot of

21   say in this case about how state handles the forensic mental

22   health system, the jail is required, under paragraph 94, to do

23   a better tracking of its mental health caseload so it knows

24   where people are in the competency evaluation process and to

25   make the proper notifications to keep that system moving.

1    So if the monitor could perhaps elaborate a little bit on

2    that situation, that would be helpful.

3         **MS. SIMPSON:**   That would be fine.  I'm looking for my

4    notes specifically on that individual.

5         So, again, I would say there's a couple of barriers to

6    actually understanding what is going on.  One is that the

7    people over records don't fully understand the system, and so

8    it's not always clear that what's in the JMS is accurate, and

9    they don't necessarily have -- they don't have access to the

10   circuit court docket to get further clarification.

11        I think that individual -- it does appear to be awaiting

12   trial -- that was treated to competency and is now awaiting

13   trial.  There was another individual that is also sort of

14   caught up in the competency system, and this appeared to

15   present another systemic issue.  And this was an individual who

16   competency was raised, went to the hospital, was found to be

17   nonrestorable and continues to be held in the jail.

18        And it appears that he is -- again, I'm not an expert on

19   Mississippi law by any means, but it would seem that once

20   you're found to be nonrestorable that you are not at that point

21   being held in the jail pretrial.  It's unclear to me what the

22   legal authority for holding him in the jail is.

23        It would seem that unless Mississippi law provides for

24   either that person going to the state hospital or going through

25   a civil commitment process, that it is unknown to the jail

1    where he is in the system.  But I believe that he would be

2    waiting for a civil commitment at that point.  And while he is

3    waiting for it in jail, I don't know.  That would not seem to

4    be the right place.

5         I do have the names of those individuals for tracking --

6         **MR. CHENG:**  Yes.  I think one of the concerns here is

7    that there are some pretty serious constitutional and federal

8    laws issues if someone is being held basically for civil

9    reasons in a jail, especially if it is unclear how long they

10   are going to be there.  One of the safeguards built into the

11   agreement is to try to alert the proper authorities, the public

12   defender or others so that those people's rights can be

13   protected in an individual level, but the jail still has a role

14   to play in this case.  And so keeping good records and knowing

15   where people are and having medical staff understand that

16   process, that is still something required of the county.  I

17   have no other questions from Ms. Simpson.

18        **MS. SIMPSON:**  And I should say I did check the state

19   hospital list on that individual.  He is listed as waiting for

20   a bed, and they have the abbreviation for commitment as the

21   type of bed he is waiting for.  But that doesn't answer the

22   question of what the authority is for him continuing to be in

23   jail.

24        **THE COURT:**  All right.  Any questions of the monitor

25   on behalf of defense?

1              **MR. TEEUWISSEN:**  Yes, Your Honor.  Ms. Simpson, do

2     you have an understanding that Hinds County has a budget

3     deficit?

4              **MS. SIMPSON:**  I've been informed of that, yes.

5              **MR. TEEUWISSEN:**  What efforts have you or the monitor

6     team undertaken to make sure that paragraph 42 of the consent

7     decree is being complied with?

8              **MS. SIMPSON:**  And by that, I think you mean that the

9     sheriff is directed to prioritize resources for the compliance

10    with the provision of the settlement agreement.

11             **MR. TEEUWISSEN:**  Yes.

12             **MS. SIMPSON:**  Our team routinely meets with the

13    sheriff on the operations side as well as the detention side

14    with every visit.  And we have worked with the sheriff's office

15    to identify the positions that are allocated to operations

16    versus detention, and certainly advocated for increased

17    positions with detention.  And we continue to advocate with the

18    various agencies within the defendant to prioritize compliance

19    with the settlement agreement and will continue to do that.

20             **MR. TEEUWISSEN:**  In doing so, are you aware of

21    whether the sheriff submitted a timely budget by statute?

22             **MS. SIMPSON:**  I believe I heard that he did not.  I

23    know a budget ultimately was passed, and -- but in terms of

24    whether all the -- time requirements leading up to that, I

25    don't know.

1          **MR. TEEUWISSEN:**  Okay.  Your Honor, those questions

2     were asked because the county -- the board of supervisors

3     continues to have some concerns about whether paragraph 42 is

4     being complied with by the sheriff in terms of priority of

5     budget.

6          I don't think those need further exploration today, but I

7     am putting the Court on notice -- and I've had this discussion

8     with Monitor Simpson before, so this was not an ambush

9     question, Your Honor -- that as we go through the new budget

10    year, that's going to continue to be a concern.

11         I will represent to the Court that the sheriff's budget

12    takes 42 percent of the county general fund, and the county is

13    running approximately an eight-percent budget deficit.

14         Your Honor is aware we have to balance that budget every

15    year.  We have had reserves which have carried us through the

16    previous budget deficits.  It is unlikely we will have those

17    after this year, so I'm trying to get ahead of that issue.

18         Thank you.  That's all I have, Your Honor.

19         **THE COURT:**  Ms. Simpson, you may have a seat.  Thank

20    you, ma'am.  I appreciate the work that you are doing on this

21    case.

22         **MS. SIMPSON:**  Thank you.

23         **THE COURT:**  All right.  What says the government?

24    You've heard the report by the monitor.  You've heard what I

25    would consider an important aspect or issue that was just

1    brought up by the defense.  Do you have any comments at this

2    time?

3           **MR. CHENG:**  The only thing we ask for the Court to

4    continue to do, Your Honor, is to continue monitoring this

5    case.  We do think there may be a proposed schedule for

6    additional monitoring conferences like this one, and we hope to

7    be able to submit something to the Court formally.

8        At minimum, we would like to do a telephonic conference

9    sometime before the next tour is scheduled, and then possibly

10   another face-to-face conference a few months down the road

11   after that tour.  The thinking is that we will then be able to

12   use these face-to-face conferences -- after the experts have

13   completed a tour, they will have a little bit more time to

14   prepare their views and recommendations before they give you a

15   formal briefing.  I'm sorry.  It's a few weeks after the next

16   tour.  But we would still also want the phone conferences as

17   well.

18          **THE COURT:**  And is the monitor in agreement, Ms.

19   Simpson?

20          **MS. SIMPSON:**  Yes, Your Honor.  Now that we have been

21   through one cycle of this, I think what seems to make the most

22   sense, as Mr. Cheng suggested, is that between now and the next

23   site visit, so sometime in probably early December, we have a

24   telephone status conference.

25       The next site visit should be the very end of January, I

1     believe, and in order to give my experts time to sort of digest

2     what they have seen and provide me some feedback, I think

3     probably about a month after the site visit, a face-to-face

4     status conference would be good.  That would be late February,

5     early March.

6          **THE COURT:**  All right.  Ms. Simpson, I'm going to

7     defer to you, as to aside from the obvious counselors that

8     would be present and participate in the telephone conference,

9     any additional parties you deem necessary, simply notify the

10    respective counselors.

11         **MS. SIMPSON:**  I will do that, Your Honor.

12         **THE COURT:**  All right.  Any objection to that on

13    behalf of the defense?

14         **MR. TEEUWISSEN:**  No, Your Honor.  And in fact,

15    Mr. Cheng and I had discussed this before today, and Hinds

16    County is in agreement that we need to keep the schedule --

17    perhaps tweak the order but keep the schedule of routinely

18    advising the Court where we are in getting feedback.

19         **THE COURT:**  I guess as an officer of the court, do

20    you find it productive?

21         **MR. TEEUWISSEN:**  Absolutely, Your Honor.

22         **THE COURT:**  Okay.  All right.  Well, I remain

23    committed.  Any further comments on behalf of the defense at

24    this time?

25         **MR. TEEUWISSEN:**  Yes, I do have a few, Your Honor.

 1   May I step to the podium?

 2                **THE COURT:**  You may, sir.

 3                **MR. TEEUWISSEN:**  Your Honor, on behalf of Hinds

 4   County, I feel like I'm about a mile south of here drowning in

 5   deep water.  Ms. Simpson went through a long list of concerns,

 6   valid concerns, constitutional concerns.  This is not going to

 7   be achievable overnight.  It is going to take time.  We are

 8   changing a culture.  With that in mind, I think there are a few

 9   things that I would like to put emphasis on on behalf of Hinds

10   County.

11         First and foremost, the issues with the criminal justice

12   system are well beyond anything that the board of supervisors

13   or the sheriff can control.  As Your Honor is aware, it's a

14   state criminal justice system.  Save the public defender's

15   office, which the board funds, they have very little control

16   over that situation.

17         We are working with the appropriate individuals.  We have

18   had a commitment by our Supreme Court.  Chief Justice Waller

19   has, for lack of a better term, blessed our efforts and

20   encouraged us to use the Supreme Court as a resource.  We are

21   likewise exploring other administrative ways to work with our

22   criminal justice partners.

23         I would also want the Court to note that we have some

24   challenges with our district attorney.  I will not say anymore.

25   I don't think anymore needs to be said, but we have yet to have

1    the district attorney participate in anything in a meaningful

2    way.  And until we get that, Your Honor, we are going to remain

3    challenged with moving individuals through the jail.

4         I also want to point out to Your Honor, with respect to

5    programming for juveniles, we have a challenge there as well.

6    We utilize the Jackson Public School District to provide

7    educational programming.  That remains a challenge.  The

8    Governor is certainly -- is considering whether to issue an

9    emergency takeover of the district.  And so, quite frankly, our

10   needs for juveniles have not been a priority with the school

11   district, but we continue to emphasize those.

12        I think the juveniles is an area of success that we don't

13   get enough credit for, and I want to stress this again.  We

14   currently have six individuals who are charged as adults,

15   including one who is charged with capital murder in the

16   Henley-Young facility.  That was done with the blessing of

17   Leonard Dixon, who is the monitor in the Southern Poverty class

18   action, and the blessing of Jim Moser, who is the monitor with

19   respect to juvenile matters before Your Honor in this matter.

20        That has gone well.  I almost want to knock on wood, like

21   saying somebody doesn't miss a free throw.  I'm afraid I'm

22   going to jinx us.  We are making progress there.  Mr. Dixon

23   believes that notwithstanding any concerns from Southern

24   Poverty, he believes he will recommend to Judge Jordan, who is

25   the Article III judge on that matter, that Henley-Young come

1    out from under that consent decree in 2018.

2         He is likewise concerned about transferring any juveniles

3    who have already spent time in Raymond to that facility,

4    difficulty of integrating those, but is comfortable that as new

5    juveniles are arrested and charged with crimes, they can come

6    directly to Henley-Young.  That would give them better

7    education, better programming.

8         Your Honor, I'm not saying Henley-Young is perfect, but it

9    is light years beyond any of the other facilities because we've

10   had a head start in getting it there.  And so we feel

11   comfortable that the juvenile situation is headed in the right

12   direction.

13        I also want to direct the issue of policies and

14   procedures.  Your Honor, we would hope to have a short timeline

15   and a significant report by our January visit from the monitor

16   team on their project.  Quite frankly, the county solicited

17   quotes to do those.  The sheriff did not feel he had anyone

18   in-house who could do those, and the quotes came back well

19   above a hundred thousand dollars to write those.

20        In a time of budget concerns, the board asked us to look

21   for alternatives.  We are engaging graduate students from

22   Jackson State University, but in conjunction with Dr. Jim

23   Austin and Mr. Morris Thigpen, who are also consulting to help

24   make sure we get the proper policies and procedures.  Mr.

25   Thigpen and Dr. Austin have the expertise for using the

1    students as free or discounted labor.  But I want to emphasize

2    to the Court that we expect a significant progress report on

3    that by January.

4         With respect to the issue of maintenance, Your Honor, I've

5    represented the county now for four years.  I've watched the

6    county spend $8 million in maintenance.  I've watched the

7    county do everything that's been recommended by the monitor

8    before she ever got hired and everything else that could be

9    thought of.  Maintenance is a reflection of staffing.  When you

10   don't have appropriate staff, things get torn up.

11        The county is taking another approach.  For fiscal year

12   2018, which started October 1st, the county has taken empty

13   maintenance slots and has engaged a contractor who will be on

14   call 24 hours a day, seven days a week.  You may have seen me

15   pass a note to the county administrator during Ms. Simpson's

16   presentation.  I wanted to confirm that that is in the

17   implementation process.  We don't know whether this will solve

18   our solution, but again, we are looking at a different approach

19   to speed maintenance and have improved maintenance.

20        Your Honor, the facility, Raymond facility, the main

21   facility, was built in 1994.  The day after it opened, there

22   were lawsuits about the design and the construction.  It's an

23   albatross that this sheriff and this board inherited, and they

24   are collectively trying to do their best job at tackling the

25   maintenance issues.  We suspect that's going to always be an

1    issue.  We just need it to be a smaller issue.

2        With respect to the food contractor and medical

3    contractor, those are not county employees but are under

4    contract.  Ms. Davis, the county administrator, is here, along

5    with the board president.  Each of them share similar concerns,

6    and we've asked Ms. Simpson.  We rapidly await the

7    documentation that those contractors are short in performance

8    delivery, whether it's the meals or the mental health

9    assessments, and we will take those, renegotiate our contracts

10   accordingly and hopefully address those situations.

11       With respect to the mental health and not knowing who is

12   in the jail, Ms. Simpson is absolutely correct.  Got a little

13   bit of good news, though.  This assistance from the Department

14   of Justice, Hinds County, Jackson State University and

15   Mississippi Urban Research Center have been approved for a

16   joint grant, phase I funding, to study who's coming in the

17   front door of the jails and what mental health conditions they

18   have.

19       Week before last, there was a project kick-off meeting in

20   which we are designing the screening instrument that will be

21   used for every individual that comes in the facility.  We

22   expect that phase I to take approximately a year, may take 18

23   months, to get solid data as to who is coming in the front

24   door.  And we are using our mental health professionals, social

25   workers and others to help design that instrument.

1       From there, I believe once the county knows exactly what

2   is mental health issues and how many are coming through, we

3   will apply for phase II funding and be able to better tailor

4   services in Hinds County for mental health.

5       As Your Honor may have heard, Justice Kitchens is putting

6   on a seminar next Wednesday for county court judges, circuit

7   court judges and justice court judges on the new criminal

8   rules.  He has met with Mr. Simon on several occasions, he has

9   also met with Mr. Green, to make sure his charge is clear and

10  that he can help us get the attention of everyone in the

11  criminal justice system that when it is inefficient, the

12  problems fall in the sheriff's lap and the board pays for them.

13      Chief Justice Waller has committed to us that any IT

14  services we need from the State Supreme Court.  So I heard

15  about some disconnect today and lack of access of certain

16  electronic filing.  I believe that's one that we can have

17  solved fairly rapidly as well, based on the chief justice's

18  commitment that his IT people and/or those systems, he will do

19  whatever is necessary to work with us on that.

20      Your Honor, I do share one concern on behalf of the board

21  and the county administrator that was mentioned by Ms. Simpson

22  and I think needs to be our refrain.  While we have made

23  progress, there is a danger of backsliding.  We need Your

24  Honor's continued attention as he has pledged on this to make

25  sure that we do not backslide.

1    Parties have worked to make sure that detention funding is

2    spent on detention.  Your Honor asked a question in the July

3    hearing of the sheriff, one the sheriff paused and I stopped

4    him from answering because he didn't have a ready answer:  How

5    much does it cost per day to house someone?  The board would

6    like to know the same question.

7    With the fiscal year having started October 1st, we are

8    committed to figuring out that cost.  In other words, the

9    moving of funding between categories of detention and operation

10   is not going to occur anymore.  The county administrator is not

11   going to approve that, and the board is not going to approve

12   that.

13   We have to figure out that cost for several reasons, not

14   just because Your Honor inquired, but also because we have an

15   agreement to house individuals from the city of Jackson, an

16   agreement that goes back a number of years, and we need to

17   address that with the city as well.

18   With respect to staffing, I think it would be appropriate

19   if we could ask the Court to have a commitment from the sheriff

20   that no detention funding is spent on nondetention matters so

21   we can track this straightforward significantly for the next

22   six months so we can all get a baseline of what it costs and

23   what we are working with.  I will answer any questions that

24   Your Honor may have.

25        **THE COURT:**  I don't have any questions of you at this

1    time.

2         **MR. TEEUWISSEN:**  Thank you, Your Honor.  May I stand

3    down?

4         **THE COURT:**  You may.  I hesitate to call it rebuttal.

5    Do you have any additional comments on behalf of the plaintiff?

6         **MR. CHENG:**  No, Your Honor.

7         The only thing I would mention about Henley-Young, I think

8    the Henley-Young situation does demonstrate how all the parties

9    are as careful about security and public safety issues as they

10   are about making sure the rights of the individuals are

11   protected.  We are all very sensitive that these reforms have

12   an impact on the community, and so we are being very thoughtful

13   when we work with the county on these issues.

14        **THE COURT:**  Okay.  I am going to -- I do want to

15   initially note that up to this point, the Court hasn't heard

16   anything to indicate that any of the relevant parties are

17   acting intentionally or I guess rather conducting themselves in

18   bad faith as it pertains to complying with or rather coming

19   into compliance with the consent decree.  So I am going to note

20   that I have seen a degree of cooperation, and the Court is

21   appreciative, albeit understanding that we still have work

22   ahead of us.

23        I will set a telephonic status conference on December 5th

24   at 10:00, and the Court would be available for an in-person

25   status conference on March the 8th at 2:00.  I learned a long

1    time ago not to ask if there are any conflicts when there are

2    multiple parties, but I will defer to the monitor.  Ms.

3    Simpson, are you available on those dates?

4         **MS. SIMPSON:**  Yes, Your Honor, as far as I know.  I

5    will make myself available.

6         **THE COURT:**  All right.  So with that being said,

7    nothing further required on the record at this time on behalf

8    of the plaintiff?

9         **MR. CHENG:**  Correct, Your Honor.

10         **THE COURT:**  On behalf of the defense?

11         **MR. TEEUWISSEN:**  Correct, Your Honor.

12         **THE COURT:**  All right.  I appreciate the update, and

13    I also appreciate the work that everyone is putting into this.

14    I know it is a difficult task, but the Court is appreciative.

15    We are adjourned.  And I hope everyone has a safe trip.

16         **MR. TEEUWISSEN:**  Thank you, Your Honor.

17         **MS. SIMPSON:**  Thank you, Your Honor.

18                        (HEARING CONCLUDED)

19

20

21

22

23

24

25

1

2                        CERTIFICATE OF COURT REPORTER

3

4            I, Teri B. Norton, RMR, FCRR, RDR, Official Court

5     Reporter for the United States District Court for the Southern

6     District of Mississippi, appointed pursuant to the provisions

7     of Title 28, United States Code, Section 753, do hereby certify

8     that the foregoing is a correct transcript of the proceedings

9     audio recorded and transcribed by me using the audio recording

10    made in this matter, and that same is a true and correct

11    transcript to the best of my ability and understanding.

12    Any inaudibles that occur in the transcript are a result of the

13    poor recording quality of the audio.

14           I further certify that the transcript fees and format

15    comply with those prescribed by the Court and the Judicial

16    Conference of the United States.

17

18

19

20           s/ *Teri B. Norton*
             TERI B. NORTON, RMR, FCRR, RDR
21           OFFICIAL COURT REPORTER

22

23

24

25