Court-Appointed Monitor's Third Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 WHB-JCG

Elizabeth E. Simpson, J.D.
Court-Appointed Monitor

David M. Parrish                   Jacqueline M. Moore, RN, Ph.D.        Jim Moeser
Corrections Operations             Corrections Medicine                  Juvenile Justice

## EXECUTIVE SUMMARY

The Monitoring Team has now completed a year at the Hinds County Detention Center. The first site inspection was completed in October 2016 as a baseline visit. Subsequent to the first visit, there have now been three additional site visits completed as monitoring visits. Although compliance activities started slowly and a number of early deadlines in the Settlement Agreement were missed, there has nonetheless been progress made in a number of areas. However, there continue to be some critical areas of deficiency having substantial impact on the health and safety of the prisoners.  As required by the Settlement Agreement, the areas of deficiency are identified in the Monitoring Reports. In addition to the Monitoring Reports, priority recommendations have been identified after each visit to allow for immediate attention to areas that could either be addressed quickly or presented the most pressing health and safety concerns.

The third site visit took place from October 16, 2017 through October 20, 2017. This Monitoring Report describes the findings from that visit. In keeping with the previously adopted process, priority recommendations were provided subsequent to the October site visit. And, as required by the Settlement Agreement, the body of this report contains a listing of each substantive requirement of the Settlement Agreement and a description of the status of compliance as of the time of the site visit. This executive summary highlights some areas of progress and those areas of greatest concern.  This report reflects conditions at the time of the site visit. Any progress since that time will be reflected in the report on the next site visit.

**Corrections Operations**

After an extensive review and reconciliation of Sheriff's Office and County records, the number of authorized positions in the Hinds County Sheriff's Office has been determined to be 410.  Of those, 140 are assigned to Operations and 270 are assigned to Detention Services.  Within the Detention Division 5 positions are allocated to Detention Administration, 154 to the Raymond Detention Center ("RDC"), 49 to the Jackson Detention Center ("JDC") and 62 to the Work Center ("WC").  Currently, 250 of those positions are filled.  The goal for the fiscal year (October 2017 through September 2018) is to have and fill 275 positions in Detention.  The five unfunded positions will have to be funded either by transferring them from the Operations side of the Sheriff's Office or by identifying the necessary funding somewhere in the Operations budget and using that money to create and fund five new positions in Detention.

The salary increase, previously reported as applying to all ranks within the Detention Services Division, with a five-step merit increase system, was not implemented as planned; however, a significant increase for Detention Officers and Sergeants did go into effect on October 1st.  A

merit step plan will be put in place once a procedure for step achievement has been developed by the Sheriff's Office and adopted by the County.

Construction of the wall separating Units 3 and 4 at the Work Center is almost complete.  The units currently each have 100 beds. Thirty-six beds need to be removed from each unit as soon as possible because the units are not capable of accommodating 100 inmates each based on their size and configuration.  In short order, all four, 64-bed units should then be available for housing of pre-trial and sentenced felons and misdemeanants in any combination, based on appropriate behavior.  Priority needs to be given to adding secondary security fencing for each recreation yard, as they are not adequately protected at this time.

Building maintenance is still a major issue, particularly at the RDC.  The roll up, drive through, sally-port doors have been reported as "out of order" during each site visit for the past year.  Currently, two out of three pod security doors leading to the central corridor cannot be closed.  Numerous showerheads and even entire plumbing boxes are missing in shower stalls throughout the facility.  This situation has obviously existed for a period of time prior to the Monitoring Team's initial Baseline Visit.

Basic security measures throughout the Jail System continue to be ignored.  During the most recent site visit the door to master control at the RDC was found standing open.  It was also noted that the interlocking vestibule doors were routinely overridden throughout the facility.  In addition, the entry door to the main corridor at the WC was observed standing ajar, held open with a wooden wedge.  Law enforcement officers were seen walking throughout the administrative areas of the RDC while armed, in contravention of the standard practice that requires firearms to be secured in the gun locker by the entrance to the facility.  Convenience of operations must not take precedence over security.

Renovation of the transfer waiting area at the JDC and the booking component of the RDC needs to proceed apace.  The holding cells at the JDC cannot be upgraded to meet basic standards.  The only solution is to demolish them and add their space to the processing area to create a usable place for transfer waiting.  The facility commander has already taken steps to clean and paint the area and to install a television to keep inmates occupied while they await their court appearances.  At the RDC, the County is actively examining the practicality of opening up all of Booking to make it operate as a true "open booking" area.

Suicide watches, and the cells in which they are maintained at the RDC, do not comply with the requirements of the Settlement Agreement.  The assigned Detention Officer sits at a desk outside a door to a vestibule area which leads to another set of doors for the two cells that house suicidal inmates.  There is virtually no visibility into the cells even through the door windows because they have been so heavily modified and damaged over the years.  During the most recent site

visit, one assigned officer was found to have a total of three days of experience on duty subsequent to his 40 hours of pre-service training.  This critical post requires a seasoned officer who is familiar with jail operations.  It is essential that the suicide watch procedure be revised and that suicide watches be maintained in a different setting.  Utilization of a four-cell isolation unit may be the most practical answer, with three cells closed and one left open for the inmates to access toilet and water facilities.  This will require an officer to be assigned inside the unit as if he/she were working in a mini-direct supervision unit.

Food service at the three facilities is provided by a private contractor.  While general sanitation and operational practices appear to be in place, inmates at the RDC and JDC receive a hot meal for breakfast and lunch and a cold meal for dinner.  At the WC the cold meal is at noontime, while hot meals are served for breakfast and supper. As a matter of uniformity, the  vendor should be required to serve according to the same schedule at each facility—a hot breakfast, cold lunch and hot supper.  The food service contractor should also be required to provide a new rotating menu every three months, approved by a certified dietician.  The current menu was last revised in March 2014.  This discrepancy was pointed out during the June site visit, but no corrective action was taken other than to update the signature line on the 2014 menu.

A more integrated response on the part of the Sheriff's Office to the Settlement Agreement was noted during this site visit.  Personnel from all areas of the agency as well as from various levels, not just command staff, participated in a series of productive meetings regarding Information Technology issues, Training and Report Writing.

**Youthful Offenders**

Significant progress has been made as a result of the county's decision to transition juvenile offenders to the Henley Young (HY) Juvenile Detention facility.  Beginning on/about September 1, 2017 Hinds County began placing any "new" juvenile offenders (referred to as JCAs – Juveniles Charged as Adults) at HY, and as of the end of this site visit there were five JCA youth in placement at Henley Young and nine JCAs remaining at the RDC.
Many of the requirements of the Settlement Agreement for this case are consistent with and/or complementary to the provisions of the Hinds County/Southern Poverty Law Center (SPLC) Consent Decree, and significant progress has been reported in meeting the requirements of that Decree.  Movement towards substantial compliance with the components of this agreement related to JCAs should be much easier, assuming this transition continues.

The decision poses a potential conflict with the Hinds County/SPLC Decree as it relates to the 21-day placement limit for youth under that decree and potentially the limit on the total number of youth (maximum 32) in placement at Henley Young. Steps to reconcile the discrepancy between the two cases need to be taken as soon as possible, and a number of additional steps to

ensure a safe and successful transition for all JCAs need to occur prior to complete transition.  It is possible that the transition of all JCAs to Henley Young may be completed by the time of the next site visit at which time more detailed work can be done to confirm whether the requirements in this case are being met at Henley Young.

The status of the JCAs at RDC remains relatively unchanged, albeit benefiting somewhat from the reduced number of juveniles in placement. There is little evidence of further movement toward the compliance requirements for those youth.  Concerns about the limited educational programming, mental health services, training of supervising staff, and case processing in adult court remain.

**Medical and Mental Health**

There continues to be a shortage of nurses and health care staff in the Hinds County Jail System. There are three full time vacancies and one part time vacancy. (1 RN, 2 LPNs and a PT RN at Henley Young).  The current contract is budgeted for 7 RN's and 10 LPN's for all three facilities and Henley Young. The discharge planner left after three months and the file clerk position is vacant.  The dental assistant performs some part time filing.

Medical records are in disarray at all facilities.  There is no organization of the medical record which makes auditing a difficult process.  Quality Correctional Health Care ("QCHC") has developed an Electronic Medical Record ("EMR") system but does not have internet reception. Follow up with IT is necessary to resolve this problem.

There was some progress and some regression in the efforts to divert individuals with mental illness out of the jail and into community services. Hinds County Behavioral Health held a Sequential Intercept meeting on August 16-17, 2017.  There were 45 participants from the mental health community and law enforcement officials.  Dr. Crockett, the Executive Director of Hinds County Behavioral Health, reported that the meeting was very successful.  The Gaines center is putting together a report.  Mental health first aid training is planned for November 2017 for both the correctional staff and the health care staff.

The discharge planner that had been hired since the last site visit resigned shortly before this site visit. There were reported problems regarding the effectiveness of the work that was done. It was reported that the discharge planner made 60 referrals but only one appointment was kept.  The discharge planner did not follow through with efforts to provide more in-reach into the facility that might improve this outcome. A two-week supply of discharge medicine is available when an inmate is released from the jail but release procedures do not ensure that the releasing inmate obtains the medications from medical before being discharged.

Chronic care consisting of diabetics, hypertension, AIDS, COPD is in place at JDC and WC, but not at RDC. Food services were unable to indicate that there was a special diet menu reviewed by a certified dietician. During the site visit, there was one inmate requesting a Kosher diet. Security insisted that special diet requests must come from medical and medical stated that it only prescribes diets for medical not religious reasons. There needs to be a means identified in the Policies and Procedures and the Inmate Handbook to provide religious diets.

As noted above, suicide watches are not being performed adequately. During the visit there were nine inmates on suicide watch. The inmates were housed in two cells which were not able to accommodate four grown men. As a result, there were three altercations which occurred in the suicide units during our visit. Logs of suicidal inmates are not maintained well. National standards and paragraph 44a of the Settlement Agreement require that watches are maintained every 15 minutes at irregular times unless constant observation is necessary (paragraph 42h of the Settlement Agreement). Logs sheets had times and watches recorded that had not occurred.

There were a number of altercations that occurred between the inmates. Two of the charts reviewed recorded that inmates had been stabbed multiple times. Interviews with inmates indicated that they did not feel safe in the jail.

**Criminal Justice and Correctional System Issues**

The County has made significant progress in eliminating the incidence of people being held on unlawful orders regarding fines and fees. This was largely due to the new Supreme Court Rules on Criminal Procedure and a class action against the City of Jackson. However, the County had previously made progress by eliminating the practice of researching old fines and fees and converting those into jail days. And the County assisted in educating the stakeholders regarding the constitutional and new local law requirements in this area.

Jail staff is working to track inmates being booked into the facility in order to identify their release dates. However, this continues to be a fractured process with numerous systemic pitfalls. It continues to be difficult to track individuals in the records system. As recommended after the last site visit, there needs to be a centralized, cohesive system for receiving, updating, and maintaining records related to detention and release. Currently, there are three individuals-two in records and another not in records-who are tracking individuals and maintaining separate spreadsheets outside the case management system. In addition, there continues to be an unclear line of authority between records and booking for overseeing the documentation. Several systemic problems were reported. Records does not routinely get the "no bill" list which identifies people who the grand jury did not indict. The three individuals do not have access to the new circuit court system providing court event information on cases after 2014. Cases initiated in Byram and Clinton often get lost in the system. There also appears to be a lack of

knowledge on the part of both detention and medical staff regarding competency proceedings and the status of defendants who are involved in those proceedings. Consultation with the National Institute of Corrections when their budget is eventually approved should continue to be sought to provide the overhaul that this system needs. Staff should continue to audit the records and track individuals.

The paper grievance system was replaced by a computerized system. This may be an improvement in the long run but the system is currently fairly dysfunctional for the submission of grievances. The system is also either dysfunctional or not understood in its ability to generate reports. Many prisoners are not recognized by the system and therefore unable to submit grievances. The Work Center has found the system completely unusable in this respect. The staff does not know how to generate reports, if it is possible, to meet the requirements of the Settlement Agreement and be useful to them.

The County and the Jail specifically, participated in the Sequential Intercept Mapping exercise hosted by the Hinds County Behavioral Health agency. This is a good first step towards developing more diversion opportunities. The County has contracted with a consultant to assist in the development of a Criminal Justice Coordinating Council ("CJCC"). It is now necessary for the County to move forward with that work with the assistance of the consultant. A number of systemic problems impacting the jail including the incarceration of many individuals with mental illness can only be solved with the collaboration of other stakeholders.

**Priority Recommendations**

Following the June 2017 site visit, the Monitoring Team identified steps that could be taken to make interim improvements identified as Priority Recommendations.  An action plan was created to identify the action steps required to achieve the Priority Recommendations and also identifying the responsible individuals and a target date for each action item. This has proven useful in organizing the compliance efforts and a number of priority items have been achieved. These include:

- An acceptable staffing analysis has been completed;
- Salary increases for detention officers have been implemented;
- A unit at the Work Center has been divided by a wall which allows for housing of different classifications in the unit;
- Operational changes have been made at JDC to relieve congestion in the booking area;
- A contract with a consultant for the development of a CJCC has been completed;
- A decision has been made on the housing of juveniles charged as adults; and
- The routine detention of any prisoners on any unlawful fines and fees orders has been eliminated.

Additional progress has been made in some of the other priority recommendations. This reflects a significant amount of effort on the part of the County and Sheriff staff. Not all of the priority recommendations, however, were completed and some, such as the policies and procedures need additional work to be satisfactory. These areas are reflected in the updated and revised priority recommendations attached as Attachment 1. Other areas of improvement or lack thereof are covered in the executive summary above and the detail below.

## MONITORING ACTIVITIES

The Monitoring Team conducted a site visit October 16th through October 19th, 2017. The site visit schedule was as follows:

## HINDS COUNTY SITE VISIT SCHEDULE
## OCTOBER 16-19, 2017

|  | Simpson | Parrish | Moore | Moeser |
|---|---|---|---|---|
| Monday 8:30 | Simpson and Parrish meet with Major Rushing and Synarus | Simpson and Parrish meet with Major Rushing and Synarus |  |  |
| Monday 9:00 | Simpson and Parrish at RDC Booking and Release | Simpson and Parrish at RDC Booking and Release |  |  |
| Monday 11:00 | Simpson and Parrish meet with Board of Supervisors | Simpson and Parrish meet with Board of Supervisors |  |  |
| Monday P.M. | Simpson meet with Kanesha Jones re court orders and grievances | Parrish reviews staffing efforts; Meet with Major Rushing, Doris Coleman and Synarus |  |  |
| Monday 5:15 | Simpson and team meet with JMI | Simpson and team meet with JMI | Simpson and team meet with JMI | Simpson and team meet with JMI |
| Tuesday 8:30 | Intro Meeting | Intro Meeting | Intro Meeting | Intro Meeting |
| Tuesday A.M. | Simpson, Parrish, and Moore at RDC Mental health/seg housing | Simpson, Parrish, and Moore at RDC Mental | Simpson, Parrish, and Moore at RDC Mental health/seg housing | Moeser met with staff at Southern Poverty Law Center re: |

| | | health/seg housing | Interviews with selected inmates. Chart reviews | coordination with HY Consent Decree |
|---|---|---|---|---|
| Tuesday P.M. | Simpson and Moore meet with QCHC re mental health Simpson meet with Tanika Moore re court orders | Parrish tour RDC | Simpson and Moore meet with QCHC re mental health Moore review medical records | Moeser at HY; Met with leadership team at Henley Young, including Judge Priester; Continued discussions with SPLC staff re: status of transition and future plans; meeting(s) with HY Executive Director ; met with staff responsible for behavior management programming at HY |
| Tuesday P.M.-4:30 | Team Meeting on Mental Health | Team Meeting on Mental Health | Team Meeting on Mental Health | Team Meeting on Mental Health |
| Wednesday A.M. | 8:00 Simpson meet with Sheriff Simpson and Parrish meet with RDC architect Parrish and Simpson meet with classification Simpson meet with Records | Simpson and Parrish meet with RDC architect Parrish and Simpson meet with classification Parrish at RDC | Moore at RDC, medical record review and staff interviews Observation of psychiatric sick call.  Review of mental health records and inmates on suicide watch | Moeser at RDC; review juvenile records (incidents, grievances, etc.); review youth medical records; |

| | | | | |
|---|---|---|---|---|
| Wednesday P.M. | 2:00 Simpson meet with Dr. Crockett at Hinds County Behavioral Health Simpson meet with District Attorney Simpson meet with JDC re grievances | Parrish at RDC | Moore at JDC Review of medical records, review of juvenile medical records, observation of medication pass evening shift | Continue juvenile record review; met with program officer re programming; Briefly observed ABE class and met with ABE instructor; |
| Thursday A.M. | Simpson and Parrish meet with training and top staff re reporting Simpson meet with Deputy Neal and Ms. Shuler at Work Center | Simpson and Parrish meet with training and top staff re reporting Parrish at RDC | Moore at RDC chart reviews and interviews with staff | Moeser at HY; Met with Henley Young school Principal, three Case Managers; interviewed three of the five Juveniles Charged as Adults (JCAs) re: their transition, experience @ HY, behavior management system, incentives, etc. |
| Thursday P.M. | Simpson at federal court hearing | Parrish meet with IT and captains re reporting | Moore at Work Center and RDC Chart reviews, interviews with nurses that were on-staff | Moeser continue @ HY with above; Interview youth at RDC; meet w. programming officer; review |

| | | | | juvenile unit daily log; interview Sgt. Tower; Join meeting re: IT at RDC |
|---|---|---|---|---|
| Friday | Exit Meeting | Exit Meeting Parrish at JDC | Exit Meeting | Exit Meeting |

Prior to the site visit, the County provided documents on an ongoing basis in response to standing document requests. The Monitoring Team members reviewed the documents relevant to their areas of expertise. The County has improved its ability to provide the requested documentation, however, it is not yet complete or in the format requested or required by the Settlement Agreement. The Monitoring Team will continue to work with the County to improve its ability to produce the required documentation and reports.

In the course of the site visit, the team interviewed numerous staff members, contractors, prisoners and stakeholders as mentioned below when relevant. In addition, facility and prisoner records on site were reviewed during the course of the site visit again as referenced below when relevant.  Of particular note was the review of the training modules provided prior to the site visit and the review of architectural drawings during the site visit. With respect to youthful prisoners, on-site activities included activities at both Henley Young and RDC as there are youth charged as adults at both facilities at this time. With respect to medical and mental health, prisoner medical records and QCHC records were reviewed.

**COMPLIANCE OVERVIEW**

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Requirements that have not yet been triggered such as an annual review are listed as NA (not applicable) at this time. Sustained compliance is achieved when compliance with a particular settlement agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Raymond Detention Center are included in the totals in this chart.

| Site Visit Date | Sustained Compliance | Full Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|---|

| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |

# INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

# SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:

    a.  Booking;

    b.  Objective classification;

    c.  Housing assignments;

    d.  Prisoner supervision;

    e.  Prisoner welfare and security checks ("rounds");

    f.  Posts and post orders;

    g.  Searches;

    h.  Use of force;

    i.  Incident reporting;

    j.  Internal investigations;

    k.  Prisoner rights;

    l.  Medical and mental health care;

    m.  Exercise and treatment activities;

    n.  Laundry;

    o.  Food services;

    p.  Hygiene;

    q.  Emergency procedures;

    r.  Grievance procedures; and

    s.  Sexual abuse and misconduct.

**Partial Compliance**

Prior to and during the June site visit, the Hinds County Sheriff's Office's (HCSO) first effort to issue a Policies and Procedures Manual (P&P Manual) was critiqued by the Monitoring Team and Justice Department representatives. Because it did not adequately address the requirements of the Settlement Agreement, the decision was made to solicit technical assistance from the National Institute of Corrections (NIC) or a private corrections consultant. That effort resulted in an unacceptably lengthy schedule. The private vendor indicated that the estimated completion date would be at least a year off. Consequently, the HCSO has arranged with Jackson State University to provide the re-writing service. Although no specific date is on record, it is anticipated that the job can be completed in a more timely fashion because the University is a local institution. It is essential that the concerns and recommendations outlined in the Second Monitoring Report be addressed. Until this project is accomplished, the Detention Services Division will continue to operate without adequate written directives and compliance with many aspects of the Settlement Agreement cannot be achieved.

As reported in the executive summary, many inmates at RDC reported they were concerned for their safety. Two charts were reviewed and two inmates were interviewed that had alleged to have been attacked. Patient 1 indicated that he had been attacked by 12 inmates in C 3. He had been sent to the ER with contusions on his head. A CAT scan was performed. RDC took pictures of his injuries. The second inmate complained that he was jumped and stalked by multiple inmates on 10/11/17. He was now housed in the observation unit. His chart revealed that he had lacerations of his left brow and shoulder and that the hospital initially thought that he might have kidney failure from the injuries. This has not been the case but he does not want to return to general population. The lack of a safe environment is reflected throughout this report including the insufficient staffing, the lack of adherence to security requirements, the presence of contraband, the high number of people on suicide watch-some reportedly because they do not feel safe in the units, and the fights occurring in the suicide cells. Those issues are addressed under the related specific Agreement requirement.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

At the time of the site visit there had been no change in the status of this paragraph since the last Report; in fact, there had been no change since the Baseline Visit a year ago. Subsequent to the site visit, the Acting Training Director was appointed to be the Deputy Jail Administrator. The

monitoring team will assess whether the appointment provides the appropriate level of expertise at the time of the next site visit. However, of immediate concern is that the Deputy Administrator was the Acting Training Director and had made progress in the area or orientation and training. The newly appointed Training Director is not experienced in corrections and does not have the necessary background to provide training in this area.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

With three additional supervisors added since the last site visit, there are now 30 Lieutenants and Sergeants.  All have at least a high school diploma or GED and eight have AA degrees; however, seven had less than three years of relevant work experience at the time of their promotion. Familiarity with the P&P Manual will be determined once it is published in final form.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Non-Compliant**

This paragraph is still carried as non-compliant because there has not been sufficient time during the site visits to review all individual employee records and the HCSO has not submitted documentation that supports compliance.  As a preliminary step, such documentation, attesting to compliance, should be submitted to the Monitor.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

There has been no change with regard to this issue since the last site visit.  Once the P&P Manual is re-issued it will be reviewed to determine compliance.  It should be noted, however, that implementation of the direct supervision related policies will require that an officer be assigned inside each housing unit at the RDC.  Only the WC currently operates as a direct supervision jail and has enough staff assigned to do so.  The JDC cannot function as a direct supervision facility because of its linear design.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the

Board allocates to the Sheriff lump sum funding on a quarterly basis. The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds. To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:

        i. There are at least two detention officers in each control room at all times;

        ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii. There are rovers to provide backup and assistance to other posts;

        iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v. There are sufficient detention officers to implement this Agreement.

    b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement. As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below. The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

        iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations. Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

    d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement. The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

    e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

15

**Partial Compliance**

Since the Second Monitoring Report was submitted, the County and the HCSO have moved forward to identify and set actual and necessary staffing levels within the Detention Services Division.   As a result of the combined efforts of the County's Workforce Development Group and members of the Monitoring Team, the NIC Staffing Analysis (2014) has been updated.  A total of 433.1 positions are required in order to fill all posts throughout the Jail System.  This figure takes into account appropriate relief factors.  They are allocated as follows:

```
Administration------------------5.0
Jackson Detention Center-----83.6
Work Center--------------------64.1
Raymond Detention Center--280.4
Total----------------------------433.1
```

Recognizing that the County cannot afford to increase staffing to that level immediately, a goal of 275 positions was set for FY 2017-18.  Currently, there are 250 authorized Detention positions with 20 more authorized and funded for the fiscal year.  That leaves a total of five positions that must either be funded and added to the total or be permanently reassigned from within other areas of the Sheriff's Office.  Significant progress has been made to fill vacancies.  While there were only 199 Detention positions occupied by employees in June, by October that number had risen to 238.  The number of currently authorized positions in Detention Administration and at each facility follows:

```
Administration--------------------5 (4 are filled)
Jackson Detention Center------49 (all are filled)
Work Center----------------------62 (52 are filled)
Raymond Detention Center---154 (132 are filled)
Total------------------------------270 (238 are filled)
The goal for FY 2017-18 is---275
```

The issue of future bed space and facility needs has not been addressed to date.  The proposed salary schedule, previously reported, was originally supposed to include a significant increase for all ranks within Detention from Officer to Captain, with a five-step merit salary increase for each supervisory rank.  Although the merit increase system was not approved and funded, a salary increase was approved for Detention Officers and Detention Sergeants.  Effective October 1, 2017, they received 26.05% and 6.9% raises respectively.  Detention Officers now start work at $27,500 per year while Sergeants earn approximately $32,500.  This realignment for the most critically undercompensated officers has made the position of Detention Officer much more competitive in the local marketplace and is reflected in the remarkable employment statistics that

have been posted recently.  If the HCSO and County are successful in creating a validated, merit based career ladder within the various Detention ranks, it will go a long way toward reducing the excessive turnover rate that has plagued the Jail System.

      f.  Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

        i.  The classification process must be handled by qualified staff who have additional training and experience on classification.

        ii.  The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

        iii.  Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

        iv.  The classification system must track the location of all prisoners in the Jail, and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

        v.  The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

        vi.  The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

Improvement in the area of Classification continues to be noted with each site visit.  As was reported previously, a Classification Officer is now on duty seven days per week on day shift which was made possible by the assignment of a Sergeant and six Detention Officers to the Section.  They are responsible for the placement of all inmates during an extended day shift and follow up on all movements that occur during their absence on the evening and night shifts.  This is accomplished by requiring the shift commanders to submit a written move report to Classification whenever a change of cell/location is made.  An override by Classification can then be ordered if required.  The need to have a single point of information for every inmate in the Jail System was highlighted in the Second Monitoring Report.  The consolidation of Classification and Records into a single Unit/Section was recommended.  To date no concrete action has been taken with regard to this matter other than to coordinate with NIC in order to obtain technical assistance.  Follow up on that effort should be given priority.  In addition, the Classification Sergeant should submit recommended policies regarding Classification for inclusion in the P&P Manual.  There are currently no written directives or Post Orders in place governing Classification operations other than memoranda generated by the Sergeant.  It appears that Classification procedures are adapting with the changing conditions within the Jail System.  Both pre-trial and sentenced felons and misdemeanants are now held at the WC since it has evolved from a facility dedicated to sentenced low risk inmates into a full service, general population jail.

    g.  Develop and implement positive approaches for promoting safety within the Jail including:

        i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

        ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

        iii.  Creating work opportunities, including the possibility of paid employment;

        iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

        v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

        vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

        vii.  Providing reasonable opportunities for visitation.

    h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant

observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.   Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Non-Compliant**

There has been no change in conditions within the facilities regarding outside recreation.  It is still not available at JDC or the RDC other than for juveniles being tried as adults.  As was previously noted, this has been the case for at least five years at the RDC and apparently since the 1970's at the JDC since there is no outside recreation area at that facility.  Only the WC meets the standard as outlined in the Settlement Agreement.   Documentation of hourly, thirty minute and fifteen minute well-being checks has not improved since the last site visit, but an orientation and training session with all supervisory personnel (lieutenant and above) held during the October site visit should help to standardize the completion of these required documents.  Video recording capabilities have not changed since the last site visit; however, hand held recording devices are reportedly on order.

With respect to the requirement to provide individual and group treatment, there is one-to-one counseling provided on Mondays and Fridays with a Ph.D. psychologist.  He saw approximately 101 patients in August 2017. His hours are insufficient to cover the needs of all three jail facilities.  There is no group therapy provided for either the youth or other inmates with behavioral health problems. Currently the only groups provided are those provided by a Chaplain to the youth housing unit.  The groups consist of NA and AA, however the youth complained that there is too much of a religious overtone in the groups.

The treatment that is provided does not substantially comply with the requirement for individual therapy. Most medication renewals should take approximately 15 minutes. New intake evaluations should generally take 45 minutes or longer depending upon the inmate's past history and current problems. Care at RDC is very rushed allowing only 5 minutes per patient.

Psychiatric sick call and mental health charts were reviewed.  Five charts were reviewed and eight interactions with the psychiatrist were observed.  The psychiatrist spent about five minutes with each patient. The patients were scheduled for a re-ordering of medications and one was a new patient A chart review indicated insufficient follow up on reported mental health symptoms

and a lack of therapeutic intervention. The ongoing behavior issues of the patient in one of the isolation units and his isolation as a result of that behavior without any change in medication or other therapeutic interventions is a prime example of the lack of appropriate therapeutic services.

The facility is now tracking the number of inmates that are receiving Haldol Deaconate.  As of 9/27/2017, there were 8 inmates at RDC receiving the medication and 1 inmate at Jackson.  This number has decreased significantly from the first monitoring report.    Unfortunately, none of the inmates had mental health consents on their chart other than the initial consent signed at intake.

Inmates are screened at booking by Detention Officers. The nurses hired to do intake screening resigned. Following this screening, an additional health assessment is conducted by RN nursing staff during the booking process.   Due to a lack of space in the booking area for this medical assessment, inmates are now brought to the medical unit for their secondary assessment. The second assessment includes a suicide screen.  Inmates with mental health problems are referred to the psychologist or social worker.  If the inmate is on psychotropic medication, they are referred to the psychiatrist for an order to continue the medication.  Medications are verified at booking by the nurses.  Intake nurses are supposed to be provided 7-3 PM, 4-11PM Monday through Friday and 7 pm to 7 am three times per week.  County staff stated that the booking area will be revamped and a secure space will exist for medical intake screenings and that the area will be staffed 24 hours per day.

Although inmates are screened for mental health issues, there is not appropriate therapeutic housing as required by paragraph 42(g)(vi). One unit is identified as the mental health unit but it is simply a segregation unit where they place individuals with mental health issues. It is not appropriately designed or staffed as a mental health unit and there is no therapeutic programming.

The physical portion of the health assessment form is inadequate.  The only areas for inclusion are a checkmark for normal and abnormal findings without adequate space to identify what the findings are.  Revision of the form is necessary in order to require and allow for the recording of more detail such as abnormal findings.

A review of five medical records was performed with the objective to see how soon a mental health professional saw an inmate after he was booked into the jail.  The charts were randomly selected from inmates that had been booked into RDC in the last three weeks.

| Date arrested | Date referred | Referral completed by mental health |
|---|---|---|
| 7/15/17 | 7/26/17 | 8/21/17 |
| 7/14/17 | 7/15/17 | 7/26/17 |
| 5/22/17 | 5/23/17 | 6/7/17 |

| 5/27/17 | Request of SGT | 8/28/17 |
| 7/14/17 | 7/26/17 | 8/21/17 |

The mental health referral was identified as the first mental health evaluation.  It could have been by a bachelor's level social worker, psychologist or psychiatrist.  The sample size is too small to derive definite conclusions but it does appear that nursing referrals are not made in a timely manner to mental health staff and that it takes the inmates 2-3 weeks to enter the mental health caseload.  This study will be repeated during the next audit with a larger sample size. Additional criteria will be added which looks at the time of the arrest and the time the inmate is seen by nursing staff.

As a result of the chart review, it appears that many inmates that need mental health treatment go untreated for weeks before they enter the system.  Even when identified, mentally ill prisoners receive inadequate care. Individual sessions with the psychiatrist were cancelled on a weekly basis due to time constraints.  Dr. Kumar generally provides psychiatric care on Wednesdays and starts at JDC and then provides care at the other facilities.  The care is very rushed which cannot be considered as therapeutic care. Statistical reports show that Dr. Kumar sees a range of 100 to 150 inmates per month during his visits.

Suicide watch conditions are not adequate to deal with the inmates who require close supervision.  The two cells located in the Medical Unit are unsuitable for such use.  It is impossible to observe what is going on in them because the tiny windows are literally obscured with retrofitted metal and screening that makes them almost opaque.  In addition, the assigned officer sits outside a second door leading to the general cell area, which makes direct supervision impractical.  The Detention Services Division should consider utilizing a four cell isolation unit associated with one of the housing units at the RDC as an alternative area for supervising suicidal inmates.  One cell could be left open so that inmates have access to toilet and water facilities.  The other three cells should remain locked.  Four or more inmates could be supervised in such a setting with an officer physically located inside the isolation unit, equipped with a work station/desk, phone, radio and emergency alarm.  In this way the officer would serve as assigned officer in a "mini-direct supervision unit".

While there is a full time social worker who could evaluate whether an inmate needs to be on suicide watch, she does not perform this function and many suicide threats occur after she has left for the day.  The result is that a large number of inmates have been assigned to suicide watch without being first screened by a mental health professional. In August and September there were 22 inmates each month placed on suicide precautions for verbalizing a suicide threat.

Inmates on suicide watch are placed in a suicide cell designed for two persons. There is  limited visibility into the cell.  On the days of the audit, one cell contained four adult inmates and the other cell five adult inmates.  As a result, there were three altercations of inmates in these cells

due to overcrowding of the cells.  An additional issue is that inmates placed in lockdown complain of suicidal ideation in order to be transferred to the suicide cells.  The suicide cells have also been used by inmates to escape gang activities or to carry out gang-related activities. The last altercation in the suicide cell during the site visit was gang related.  An inmate from lockdown unit entered the suicide unit and immediately started a fight with another inmate that was in the suicide cell.  Suicide units are for inmates suffering from acute mental health problems such as acute psychosis or other conditions causing an acute risk of self-harm and who have not been stabilized through other interventions.  Suicide units are intended to stabilize the patient as quickly as possible so that the patient can return to a less restricted housing unit. Unfortunately, inmates placed in the current suicide cells receive no additional mental health therapy.  When they are released they are returned to general population or lockdown cells.

Contributing to the problem in responding to suicide comments is the lack of sufficient correctional staffing at RDC to provide one to one staffing. In the future, the facility should explore crisis intervention with Hinds County Behavioral Health and admit the patient to St. Luke's Hospital.  Another recommendation is to add a part time social worker that would work 20 hours per week at RDC and/or mental health technicians that would be on-call for one to one suicide watches.  This position could perform a suicide assessment and screenings on inmates that verbalize self-harm or on new intakes that are booked in the facility.  The individual might also be responsible for group therapy which could include life skill groups such as anger management, domestic violence, parenting etc.

Based on a review of visitation records covering a two week period (October 2-16, 2017), it appears that only at the JDC are some of the inmates able to visit with family and friends.  Of 82 scheduled video visitation connections, 50 were actually completed at that facility.  This means that about 20% of the inmates were able to have a visit each week.  At the RDC and WC, which share video visitation equipment, only 12 inmates were able to have a visit although 53 visits were scheduled.  Thus only 1.2% of the inmates at those facilities were able to have a visit each week.  While the Inmate Handbook requires inmates to schedule visitation seven days in advance between the hours of 8:00 AM and 5:00 PM, in reality visitation is apparently not a viable privilege for most of the inmates in the Jail System.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:
    a. Staff vacancy rate of more than 10% of budgeted positions;
    b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c.  A major disturbance resulting in the takeover of any housing area by prisoners;

    d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The last reported turnover rate for Detention was 43% in 2016.  Although recruiting efforts have paid off with 58 Detention Officers hired since January 2017, the number of vacancies still stands at 32, which equates to an 11.85 vacancy rate.  Required posts at the WC and JDC appear to be more frequently filled than at the RDC.  This is partly due to the fact that approximately 25% of rated capacity at those two facilities is either closed for renovation (HU-4 at the WC) or not occupied because of the low daily census (one wing at the JDC).  Consequently, even though there are 10 vacancies at the WC and the number of authorized positions at the JDC is inadequate, both facilities are able to cope well with current conditions.  The staffing situation at the RDC is better than was observed during previous site visits, but it is still inadequate to meet inmate supervision requirements.  Based on inspection and a review of daily duty rosters, it appears that approximately half of the housing units are now being staffed with an officer. Unfortunately, he/she is placed in the safety vestibule leading to the housing unit instead of physically inside it.  While it is not possible to supervise inmates from that position, until all staff have been trained on the principles and dynamics of direct supervision, the command decision that led to this situation is understandable.  While training records are more comprehensive than any time to date, it is still not possible to determine exactly how many officers have not completed the basic 40 hour orientation class before being assigned to a post.  It should be noted, however, that every new officer questioned during the most recent inspection of the facilities had completed the orientation class prior to assignment.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b. All security rounds must be conducted at irregular intervals to reduce their predictability, and must be documented on forms or logs.

c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed. Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility. This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, prisoner worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

There have been a few positive changes regarding the completion of rounds and documentation of well-being checks, but the system-wide response to this requirement is inconsistent at best. At the WC officers document hourly well-being checks in the unit logs for general population inmates; however, command staff and supervisors should set and enforce standard entries since it is not clear what some officers mean or what they did based on the jail slang and abbreviations that are used. This recommended action should be institutionalized throughout the entire Jail System. Thirty minute well-being checks were found to be properly documented on an inmate who was housed in a segregation cell. At the JDC hourly logs for general population and 30 minute logs for those in confinement/segregation were maintained as required. The previously reported recommendation, to place the segregation log adjacent to the inmates rather than in the control room, has been implemented. At the RDC there has been little change since the last site visit. One notable difference is that the unit logs are now frequently maintained at the entrance to the respective units rather than in the control room. While this is a step in the right direction, no amount of documentation can take the place of assigning an officer inside each unit so that

they can operate under the principles of direct supervision.  In Booking a log calling for 30 minute well-being checks was located inside the staff office area, not by the individual cells as had previously been recommended.  In addition, because of the nature of the inmates being temporarily held in this area, and the lack of knowledge about their backgrounds during the booking process, well-being checks need to be conducted every 15 minutes.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

    a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

    b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c. "Direct supervision" training.  Detention officers must receive specific pre- and post-service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.  Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

    d. Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

    e. Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies.  The training may be provided during roll call, staff meetings, and post-assignment

    meetings.  Post-service training should also include field and scenario-based training.

    f.   Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

    g.   Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

    h.   Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

With the change of Training Directors previously noted, efforts to enhance training have escalated.  A 40-hour orientation block of instruction is now provided to all new hires.  While that insures that Detention Officers receive at least a modicum of training and relevant job information before being assigned to a post, it does not prepare them to work independently.  A copy of the Settlement Agreement is now given to each employee for orientation and reference purposes.  It has been reproduced in a compact booklet form similar in size to the Inmate Handbook.  The 120-hour block of instruction (basic academy) that is required during the first year of employment is also now being provided; however, according to Training records there are more than 30 officers who have still not completed this training.  Records are not available to determine whether or not officers receive 40 hours of in service training annually after their first year of employment.  Information regarding Post Order training, Critical Post training, Special Management Unit training and Direct Supervision training has as yet not been provided.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a.   Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel

decision, what administrative procedures apply, and the basis for personnel decisions.

b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command. This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

   i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

   ii. An inspection process.

   iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

   iv. A requirement that any corrective action ordered be taken.

   v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

   vi. To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment. Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

Until the P&P Manual is revised and re-issued, compliance with this paragraph cannot be achieved. The revision work is underway in concert with Jackson State University, but as yet there is no estimated date of completion. As was previously reported, supervisors still do not document the results of their rounds. Maintenance issues are not resolved in a timely fashion, particularly at the RDC. Conditions at the JDC and WC are better, primarily because staffing levels are better at those facilities than at the RDC. Once the housing units there are properly staffed and function under the principles of direct supervision, it should be possible to achieve higher maintenance standards.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband. Such shakedowns must be

conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

Random shakedowns are still not conducted by Detention Officers as they should be; however, in a significant policy change, law enforcement officers no longer go into the facilities to conduct shakedowns independently as last occurred on June 7, 2017.  That practice was counter-productive in that it undercut the authority of the Detention Officers and, worse yet, was done outside the scope of the Detention chain of command.  A recent shakedown of Pod C, Unit 3 at the RDC was conducted appropriately utilizing law enforcement officers in support of, not in place of, Detention staff.  Further it was conducted under the command of the Detention Services Division Administrator.  Unfortunately, the results of the shakedown revealed that the prevalence of contraband in the Jail System continues to be completely unacceptable.  Items found included 12 cellphones, 15 phone chargers, one cellphone battery, five bags of marijuana, 33 bags of tobacco, one razor, two sets of ear buds, eight cigarette lighters, one knife, one Allen wrench, a flat piece of metal, four large screws, an unspecified number of containers filled with bleach and various prescription medications.  All of this contraband was found in one general population unit that routinely houses fewer than 66 inmates.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no change in the status of this paragraph.  Because of legal barriers, cell phone jammers cannot resolve the problem of unauthorized communications.  Other alternatives have been suggested to the County by both the DOJ and Monitoring Team and the Correctional Expert has suggested potential vendors who can supply appropriate equipment.  No action has been taken to address this issue to date.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Partial Compliance**

There is no change in the status of this paragraph.  Updated information was not provided on the actions of the law enforcement investigative officer who is now assigned to conduct investigations within the Jail System.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

      a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

      b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

      c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

      d. Prohibit the use of force as punishment or retaliation;

      e. Limit the level of force used so that it is commensurate with the justification for use of force; and

      f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Until the P&P Manual is revised, re-issued and approved, compliance with this paragraph cannot be achieved.  While use of force documentation is improving, according to the monthly summary, there were still only eight such reports for the entire Jail System for the month of October.  Of those, seven were described as "muscling", a term that needs to be clarified.  In a separate report for the RDC, nine use of force cases were generated in October.  The inconsistency in documentation brings into doubt the accuracy of reporting.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

      a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

      b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

      i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

      ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

      iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

      i. a sign-out process for staff members to carry any type of weapon inside the Jail,

      ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

      iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

     j.    All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

There are no recorded instances of staff members obtaining supervisory approval prior to using weapons and mechanical restraints; nor is there any record of chemical sprays, physical restraints and electronic control devices being used when a prisoner may be at risk of positional asphyxia. At this point it is not possible to determine whether or not Detention staff are following prescribed procedure. There are no records noted to date that reflect whether or not an inmate was placed on a 15 minute watch while in restraints. Restraints are not utilized at any of the facilities except for transport.

The P&P Manual is still under review and will be re-issued once it has been revised.  Until then, compliance with this paragraph is not possible.  Currently, 15 minute well-being checks are maintained only for inmates under suicide watch although it is expected that detainees in Booking holding cells will be similarly monitored henceforth.  To date no documentation has been submitted reflecting a planned use of force which would necessitate video recording, supervisory authorization or communication/coordination with medical staff.  Inmates with serious or potentially serious medical problems are not identified prior to pepper spray use, nor do correctional staff contact medical staff before force is used on juveniles with serious mental health conditions.  A recent innovation at the RDC allows OC spray canisters to be weighed so that it can be determined whether or not they have been used.

A review of the uses of force reports for September 2017 reported that there were 28 uses of force reports written.  Four inmates were escorted to medical for evaluation.  Tasers were used but pepper spray was not utilized.  If the inmate required hospitalization, he was immediately sent to the ER. As previously stated, inmates sustaining serious injuries from the use of force are sent to the hospital.  On the reports sent in the drop box there was no resolution written by medical staff.  It could be in the chart; however, time did not permit a review of charts.

As previously recommended, a protocol should be developed and posted in the medical exam area for inmates that are tased or pepper sprayed and that it include the documentation of vital signs and the rinsing of eyes in the cases of pepper spray use.  An eye wash station should be set up with disposable saline solution bottles or an attachment that fits on the sink. Training on the use of force on seriously mentally ill inmates and inmates that may adversely be affected by pepper spray should be added to the training curriculum and roll call.

QCHC has been tasked with the development of medical policies following the use of pepper spray or tasers. These policies have not yet been developed.

## USE OF FORCE TRAINING

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Non-Compliant**

The Training Director has accessed on line training modules offered by the Mississippi Department of Standards and Training which address at least some components of the Settlement Agreement.  While it is not totally compliant, it represents a step in the right direction.  The requirement for every member who supervises prisoners to receive at least eight hours of pre-service training and annual use of force refresher training has not been met.

53. Topics covered by use of force training must include:
   a. Instruction on what constitutes excessive force;
   b. De-escalation tactics;
   c. Methods of managing prisoners with mental illness to avoid the use of force;
   d. Defensive tactics;
   e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Non-Compliant**

These topics cannot be addressed until the P & P Manual is revised and published.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This cannot be completed until the revised P&P Manual is issued, officers are trained and sufficient time has passed to conduct the random testing of at least five percent of Jail staff.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

This cannot be updated until the requisite training has been completed.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**
There has been no change with regard to this paragraph.  It cannot be addressed until the P&P Manual is revised and issued to all personnel.  The inadequacy and inconsistency of the existing use of force forms is still an issue.  While a standard, computer based form is being developed, supervisory review is still inadequate.  It must include a recommendation for approval, disapproval and/or corrective action.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**
There has been no change with regard to this paragraph.  The requirement cannot be analyzed until the P&P Manual is revised and issued to all personnel.  While report writing is improving throughout the Jail System, it is still not possible to determine whether incident reports are submitted in a timely fashion or whether supervisors follow up as required. Use of Force and Incident Report documentation, while better, is still inadequate.   Some reports include no supervisory review.  In those cases where supervisory review is documented it does not indicate approval, disapproval or recommended follow up action.  While reports sometimes indicate that the involved inmate was referred to Medical for treatment/evaluation, the results of the treatment/evaluation are seldom included as a supplement to the original incident report.
A training session with Detention, Operations and Information Technology personnel representing various supervisory ranks, that was held during the October site visit, should help to standardize and improve the quality of documentation.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:
        a.   A unique tracking number for each use of force;

b.  The names of all staff members, prisoner(s), and other participants or witnesses;

c.  Housing classification and location;

d.  Date and time;

e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events;

f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

g.  A description of the staff member's attempts to de-escalate the situation without use of force;

h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

i.  A description of any observed injuries to staff or prisoners;

j.  Whether medical care was required or provided to staff or prisoners;

k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Non-Compliant**

Although this paragraph must still be carried as "Non-Compliant", it is anticipated that it will move toward "Partial Compliance" by the time of the January 2018, site visit.  The Use of Force report forms are now being generated through the Jail Management System (JMS).  Although staff have not been adequately trained to date, once they are familiar with the computer created forms and how they link electronically with the original Incident Report associated with each event, there should be a major improvement in the quality of documentation.  A training and orientation session was held during the October site visit involving Information Technology, Training, Operations, Detention, Justice Department and Monitoring Team staff. Many areas of inconsistency and concern were addressed.

**USE OF FORCE SUPERVISOR REVIEWS**

59.   The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

a. A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

b. A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

c. Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

d. If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e. Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f. All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g. A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy. Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

The status of this paragraph is unchanged. Appropriate supervisory review cannot be determined until the P&P Manual is revised and issued. In addition, the standardized, computer generated incident and use of force forms must actually be used by all personnel. At present supervisors merely sign their names on forms or review them electronically. Their signature does not reflect agreement, disagreement or recommended action.

60. After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a. Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b. Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force. Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent. If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.   Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.   Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.   Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change with regard to compliance with the requirements of this paragraph.  Currently, supervisors do not routinely collect witness statements or take photographs.  The revision of the P&P Manual and the standardized incident report and use of force report forms will move the County towards compliance, but it will be essential for supervisors to be trained to follow through and to provide complete and accurate information.  Consistent review and follow up corrective action will be essential.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

Although the number of use of force reports continues to increase, it is not necessarily an indication of more violence, rather it may represent improved reporting on the part of staff.  All three facilities had submissions.  Supervisors still do not follow through with the requirements of this paragraph.  Although medical care issues are documented, photographs are not taken, nor is reference to them made in the reports.  Witnesses are seldom questioned and supervisors do not make comments about recording of the incidents.  While using the paper report forms supervisors have historically not made any recommendations or indicated whether or not they concurred with the action taken.  While using the new computer-generated forms supervisors seldom followed through with any recommendation or action because it was not automatically required of them.

62. Reviewing supervisors must document the following:

a.  Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

b.  Witness statements;

c.  Review date and time;

d.  The findings, recommendations, and results of the supervisor's review;

e.  Corrective actions taken;

f.  The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.  Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

  i.  The nature and extent of injuries, or lack thereof;

  ii.  The date and time when medical care was requested and actually provided;

  iii.  The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.  Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Supervisors do not follow through with the requirements of this paragraph. They simply sign the incident and use of force reports (without making a recommendation of any type) on the older paper forms; on the new computer-generated forms they often take no action because, to date, the system did not require them to do so.

**INCIDENT REPORTING AND REVIEW**

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.  Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The P&P Manual must be revised and issued to all personnel before the level of compliance can be determined. Computer generated, standardized forms are being developed for use by all personnel.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:

      a.     Tracking number for each incident;

      b.     The names of all staff members, prisoner, and other participants or witnesses;

      c.     Housing classification and location;

      d.     Date and time;

      e.     Type of incident;

      f.     Injuries to staff or prisoner;

      g.     Medical care;

      h.     All staff involved or present during the incident and their respective roles;

      i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

      j.     External reviews and results;

      k.     Corrective action taken; and

      l.     Warden and Administrator review and final administrative actions.

**Non-Compliant**

The comments associated with the previous paragraph apply to this one as well.  Hopefully, the computer-generated forms being developed for use by all personnel will address the previously noted deficiencies.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

      a.     Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

      b.     Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

      c.     Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change in the status of this paragraph.  At present, it is not possible to determine whether or not incident reports are being routinely submitted on all reportable incidents.  While the number of untoward events that are documented appears to be increasing over time, the fact that there are no reports on file regarding late releases or lost money and property is indicative of a failure to document significant incidents.  Based on a review of

records and through conversation with staff, it is known that inmates have been held beyond their scheduled release dates, yet no incident reports are on file.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:
    a.       Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.
    b.       Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.
    c.       Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.
    d.       Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Partial Compliance**

While a more definitive determination cannot be made until the P&P Manual is revised and issued, it does appear, from a review of paper generated reports, that supervisors are reviewing incident reports in a timely fashion.  Most reflect same day review based on signature dates.  That determination cannot be made at this time with regard to the new computer-generated forms.

**SEXUAL MISCONDUCT**

67.     To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:
    a.       Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;
    b.       Staff training on the zero-tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;
    c.       Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

    d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

    e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

    f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

    g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

    h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

    i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Non-Compliant**

There does not appear to be any change in the status of this paragraph.  The P&P Manual, as originally submitted in April, does not meet the requirements of the Settlement Agreement.  It should be noted that there are no notices regarding the PREA posted throughout the Jail System although the Inmate Handbook does contain a brief reference to it.  At present, there is no record on file to reflect compliance. The health administrator reported that there were no cases of sexual misconduct this visit.  If an inmate complains of a sexual assault, they are sent to the hospital and a rape kit is performed.

An in-service on PREA provisions for the health staff is essential.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

    a.      Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

        i.     Any prisoner exhibited a serious injury;

        ii.    Any staff member requested transport of the prisoner to the hospital;

        iii.   Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

      iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.     Per policy, investigations shall:

      i.     Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

      ii.     Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

      iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.     Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.     Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.     Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

      i.     Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

      ii.     Any staff member requested transport of the prisoner to the hospital;

      iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

      iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.     Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

      i.     a brief summary of all completed investigations, by type and date;

      ii.     a listing of investigations referred for administrative investigation;

      iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

      iv.     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

          v.      a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

    g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

There has been no substantive change with regard to this paragraph since the Second Monitoring Report.  Compliance with this paragraph cannot be achieved until the P&P Manual is revised and issued to all personnel and documentation is available to verify that actions taken are consistent with those policies and procedures.  The number of IAD investigative reports submitted through Dropbox actually reflects a decrease during the current reporting period.  In one case, a Detention Officer was found to be guilty of making a false statement, refusal or non-compliance with a direct lawful order and making improper use of his official position to include introduction of contraband to the facility.  Although appropriate action may have been taken by the HCSO, there is no documentation of the disposition of the investigation that has been provided to the Monitor to date even though the IAD investigation is dated August 14, 2017.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.    The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

The use of the new kiosk system will eventually allow the prisoners to report grievances without the intervention of detention officers. However, the system is newly implemented and is not working as it should. A number of prisoners reported that when they try to submit a grievance the system will not accept their pin and they are kicked out of the system. Corrections officers confirmed that this is true. Staff have not identified an alternative method for submitting grievances for those prisoners. The system at the Work Center was completely non-functioning at the time of the site visit and the facility had reverted to paper grievances. Improvements to the system should be addressed promptly. In the interim, prisoners that cannot access the kiosk system should be able to submit paper grievances. The Inmate Handbook will need to be updated and will need to provide more detail to assist prisoners in using the system.  The grievance

protocol in the current Handbook does not even reflect the process that was in place prior to the kiosks being implemented. Medical grievances are unusually low for the size of the population. This should be evaluated to ensure that prisoners understand that the grievance process can be used for medical grievances.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**

It was reported that there is now one Inmate Handbook that applies to all facilities. However, that Inmate Handbook, as noted above, describes a grievance procedure that has not existed in any of the facilities since the time monitoring began. Also, as noted above, because of problems with the kiosk system, the Work Center is not using the kiosk system. There should be training of staff on the kiosk system so that they can assist prisoners as needed.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

The new system creates a spreadsheet to track grievances and responses. The Grievance Officer can track who has been assigned to respond to a grievance on the spreadsheet. There are currently several problems with the process that prevent compliance. The person assigned to respond to a grievance is assigned based on housing and subject matter. However, this results in some situations in the responding individual not being impartial. The assignments need to be evaluated both generally and in the specific case to ensure that an impartial person is reviewing the grievance. At least one grievance was marked as resolved because it was referred to an individual to resolve. Referral alone does not constitute a resolution. At RDC, there is no one routinely checking to ensure that all grievances have been responded to and no one ensuring whether resolutions have been implemented. The new system has no means known to staff for marking a grievance as an emergency or otherwise identifying emergent grievances.

The number of grievances reported to medical for RDC seems very low.  There was one grievance in June, 2 in July, 9 in August, and 15 grievances in September.  The grievances were for a variety of issues with delayed care being the most frequent followed by missed medication. One inmate that was a diabetic requested his diabetic shoes from his property.  The response was that it was not a medical issue.  The need for diabetic shoes is a medical issue in that a diabetic inmate may develop ulcers due to poor fitting shoes.  The physician should examine this patient. QCHC must coordinate with security when there are grievances that might involve security

rather than deny those grievances as non-medical. A similar impasse was reached with an inmate requesting a Kosher diet. QCHC would not order the diet because it was not a medical issue. The Jail would not allow the diet without an order from medical. The failure to provide the diet, however, resulted in the inmate refusing to eat and having increased mental health symptoms. All grievances were answered within 5 days. Medical grievances go directly to the medical department.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

The staff is currently not well-trained on the capabilities of the system. They will need to be trained so that they can assist prisoners with accessing the system once it is functional. Staff did not know whether a different language could be selected and utilized with the system. Neither did staff know whether it had a voice recognition feature. These questions should be addressed to the vendor. Currently, the staff assumes that other prisoners will assist with prisoners who cannot access the current system. This does not meet the requirements of this paragraph.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

As noted above, the grievance procedure described in the Inmate Handbook is not the one that is utilized and would not be consistent with paragraph 69 above. There is nothing in the Handbook describing how to report misconduct, sexual abuse, or battery and assault.  The procedure for a medical or other inmate request is now outdated. The Handbook does not describe prisoner rights. Punishment is being assigned in excess of that listed for rules infractions. It was previously reported that a translation into Spanish was being worked on but that has not been provided.

**RESTRICTIONS ON THE USE OF SEGREGATION**

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation. To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

During the October site visit, discussions with Classification staff set in place procedures which should make it possible for all detainees to be classified and assigned to appropriate housing within 24 hours of entry to the RDC. While this still does not comply with the requirement that classification take place within eight hours of intake, it represents another step toward compliance with that standard. Although it was previously reported that the single cells in Booking were no longer used for long term housing, during the October site visit it was discovered that an inmate with medical issues was, once again, housed there in a negative pressure cell. The situation was immediately rectified and the inmate was placed in a negative pressure cell in the Medical Unit.

At the RDC none of the housing units are properly designed to serve as a confinement/segregation unit. The recommendations that were made in the Second Monitoring Report need to be implemented. Confinement housing should be sub-divided into small components of from four to sixteen cells (modules) within a 48 to 64 cell unit. Without this design feature the job of keeping problem prisoners separate from each other is extremely difficult. Because the configuration at the RDC has 50 or more cells opening to a common day room, it is impossible to allow each inmate out of the cell individually in a 24 hour period. Segregation housing is very labor intensive to operate. Realistically, three officers are required to operate a 64 bed confinement unit. All of these issues are exacerbated at the RDC because the shortage of officers makes it impossible to assign one to many of the adult housing units.

The monitoring team as a group interviewed several patients that were in lockdown. The conditions in the segregation unit reflected significant problems. Inmates reported being in fear of their lives, unable to file grievances, denied a religious diet, and having insufficient light with the lights in the cells being non-functional. Time did not permit the monitoring team to verify all of the information provided by the inmates. It was verified that one inmate had been in altercations with other inmates and the lighting in the cells was poor with most of the cell ceiling lights being non-functional. It was also verified that a Kosher diet was not being provided. The inmates were shouting and throwing food and other items out of their cells.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Non-Compliant**

There has been little change in the status of this paragraph.  Documentation of inmates housed in the two, five bed confinement/segregation modules at the WC were found to be current although well-being checks were conducted at 30 minute, rather than 15 minute intervals.  The same conditions were found at the JDC.  During an inspection of HU B-3, which is currently designated as a segregation housing area, the well-being logs taped to the front of each cell were all signed by the officer at precisely the same time in exact 30 minute increments—a physical impossibility.  On the following day, the well-being logs were no longer taped to the cell fronts; instead, they were located in the officer's Unit Log.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Non-Compliant**

Segregation rounds are conducted by nursing staff on a daily basis at all three facilities.  Nurses see each patient that is housed in segregation.  Units that are utilized include B-3 and B-3 Isolation. The social worker conducts segregation rounds on all inmates placed in segregation twice a week. There is no notification by correctional staff prior to placement of an inmate on disciplinary sanctions or suicide precautions.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

  a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.
  b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.
  c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to

determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d. If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e. Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f. Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i. If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii. The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii. If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g. Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h. If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or

47

verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.  Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Some RDC segregation practices can be thought to inflict further harm on inmates suffering from inadequate medical care.  Inmates in these cells receive less contact with and less monitoring by providers than the acuity of their condition demands.  When they are released to the general population inmates receive little follow-up care.  Due to the effects of isolation, placement in segregation endangers mentally ill inmates and the risk of harm increases with the length of isolation and severity of their mental illness.  Despite these dangers RDC does not have a meaningful mechanism that allows mental health staff to review an inmate's chart prior to placement.  Moreover, many mental health patients end up in segregation as a result of symptoms of mental illness and as described under suicide prevention, many inmates try to commit suicide in segregation cells.

There are no interdisciplinary team meetings.  Mental health staff should meet with the Major, Classification officer, Captain on a weekly basis to discuss housing, treatment goals and medications for seriously mental ill offenders.  The meetings should last no longer than 30-45 minutes and two or three of the most mentally ill inmates should be discussed. When the unit designated as a mental health unit is actually operated as a therapeutic mental health unit as required by paragraph 42(g)(vi), the interdisciplinary team meeting should take place with the staff of that unit.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal

law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. **Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners. During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.** The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Partial Compliance**

The County has taken a significant step toward compliance with this requirement. Specifically, beginning September 1, the transition of Youthful Prisoners (Juveniles Charged as Adults – JCAs) began by placing "new" JCAs at the Henley Young Juvenile Justice Center (hereinafter referred to as Henley Young). In this case, "new" refers to JCAs that had not already been in placement at the RDC other than for a short time, i.e. a few days following booking up to one youth indicating he had been at RDC about three weeks. As of this site visit, five JCAs were housed at Henley Young. Consequently, the number of JCAs remaining at the RDC is diminishing, with eleven JCAs in placement as of the start of the site visit. During the week of the site visit, two of those youth turned age 18 and were transferred to an adult unit at RDC, leaving nine JCAs at RDC at the end of the site visit. The current plan is to continue this transition. In order to meet the requirement of the Agreement, all JCAs would have to be transitioned out of RDC by January 19, 2018 (note previous report erroneously referenced this date as June 2018). None of the youth remaining at RDC will turn 18 prior to that date so absent changes in their court case that results in placement elsewhere these youths will need to be moved. These remaining JCAs present greater challenges in transitioning to Henley Young, at least in part resulting from their long-term confinement at the RDC and the resulting "adultification" they have experienced by being housed in a setting that has offered little programming, minimal mental health services, often inadequate supervision, and generally poor living conditions. The concerns related to transitioning remaining JCAs is echoed in the September 25, 2017 Henley Young Monitoring report filed by Mr. Leonard Dixon, the court-appointed monitor for the Hinds County/Southern Poverty Law Center (SPLC) Consent Decree related to the Henley Young facility.

Pertinent sections of that report include:

> *"During my visit to the County Jail, the young adult unit was in extreme poor condition, no programs were available, the young adults were constantly on lockdown and there were inadequate supervision for them. Transitioning from a jail environment which is run by sworn officers to Henley-Young which is staffed with unsworn staff may lead to an increase in violence toward both staff and residents. This will have to be addressed and managed properly.*

*If this transition is to occur I would recommend a slow transfer of these young adults into Henley-Young to mitigate the negative impacts from integrating these young adults into a relatively structured facility. An initial carefully planned selective transitional program should be developed to slowly move these young adults a few at a time into Henley-Young on a weekly or biweekly basis. This transition process is critical if the facility is to maintain its compliance with the consent decree. There also needs to be additional security for these adult inmates. The physical plant needs greater security hardware (i.e. fencing for outdoors, outdoors ground security, outdoor windows security etc.) and new stringent staffing security protocols in place before this transition takes place….* and

*I am concerned that the integration of young adults into Henley-Young may possibly jeopardize and potentially undermine all the hard work and effort put in place by the County if the above- mentioned recommendations are not carefully considered or adhered to".[1]*

The decision to utilize Henley Young for JCAs does create an immediate conflict with the Hinds County/SPLC Consent Decree related to the maximum length of stay (21 days) that will need to be resolved.  It is our understanding that the parties for both cases are aware of this conflict, and some resolution of that conflict will need to occur.  The court should be advised of any progress on this issue.

Finally, as noted in the initial Baseline Report and as referenced in other reports, making this transition successful (safe for all youth and staff as well as meeting both Agreement requirements), additional steps will need to be taken, including but not limited to:

1. Continue to house "new" JCAs (male and female) at Henley Young after booking at RDC;
2. Additional physical plant modifications related to perimeter and living unit security;
3. Constructing of additional classroom, multi-purpose, and recreational programming space(s) that will permit proper programming, classification, and supervision for all youth at Henley Young;
4. Reviewing staffing alignment and positions to ensure additional staffing and supports as additional JCAs are transferred from RDC. While the Henley Young agreement calls for a direct supervision staff/youth ratio of 1/8, a 1/6 ratio for the JCA youth that remain at RDC is recommended;
5. Addressing case processing concerns in the adult system that has resulted in very lengthy periods of confinement for JCAs at RDC and, absent changes will result in similar lengths of stay at Henley Young.  This not only delays resolution of the youth's case but also increases the likelihood that the population of JCAs at Henley Young will grow and create additional challenges for operation of the facility as a whole.  Note that the Dixon Monitoring Report

---

[1] Dixon, Leonard.  *Henley Young Compliance Monitoring Report*. J.H., ET AL, Vs. Hinds County Mississippi.  Filed September 25, 2017.  pp. 11-12.

provides some specific recommendations in this regard that would provide more timely and appropriate outcomes for JCAs;

6.  Making structural improvements to the living units that will support more effective supervision and programming for youth including:

      a.  Installing soundproofing materials (e.g. acoustic ceiling tiles, acoustic wall panels, carpeting in portions of the floor) to reduce the noise level created by normal adolescent behavior(s); noise that makes it not only difficult to properly interact with/supervise youth but also adds to the overall noise level that unnecessarily elevates the emotional level of youth;

      b.  Removing the steel tables and replace them with movable, security grade tables and chairs that are more comfortable, flexible, and permit rearrangement for purposes of programming in small groups, separation of youth within a unit, and/or even individual program purposes; and

7.  Continuing to implement practices and policies that limit the number of non-JCA youth confined at Henley Young.  In recent months, the average daily population of non-JCA youth has declined considerably, making it possible to "free up" at least one, and possibly two, housing units for JCA youth.  This has been accomplished in large part by implementing a detention screening tool that helps limit youth being admitted, authorizing the release of youth that can be supervised in the community, reducing the use of Henley Young for probation violations, and ensuring timely processing of cases in the youth court.  Use of Henley Young for non-JCA youth should be limited to those youth that pose a danger to the community or circumstances in which it is necessary to secure a youth's appearance in court; and for those youth only as long as those conditions remain a concern.  Continued administrative and judicial leadership to support alternatives to confinement will be critical to making it possible to utilize Henley Young safely and effectively for all youth.

All of these steps will become increasingly important as the number of JCAs at Henley Young grows, so proper planning (including needed funding) for/implementation of these changes should be done as soon as possible.

REPORTING COMPLIANCE ON THE REMAINING CONDITIONS WILL REFERENCE ONE/BOTH LOCATIONS AS APPROPRIATE.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance at Henley Young**

Moving to Partial Compliance on this component is solely the result of transitioning some youth to the Henley Young facility.  Any JCAs booked at RDC and then housed at Henley Young are screened for mental health concerns using the MAYSI-II, a common screening tool that is appropriate for use with adolescents.  Additionally, the County has hired three additional case managers to help support individualized planning and services and has been in the process of hiring an on-site psychologist.  However, the case manager positions are relatively new and the nature of their role and responsibilities is still being developed; and, the psychologist position remains unfilled, as a previous offer was made to a potential employee but that offer was ultimately rejected.  Based on interviews with staff at Henley Young, comments included in Mr. Dixon's recent report are appropriate. Work on roles and policies are in the early stages but the progress is promising.

As noted in the prior Compliance Report, implementing a more comprehensive mental health program also means integrating what is known about the mental health needs of youthful prisoners with multiple requirements of the operation including reducing the use of seclusion/restraints, increased training for staff supervising youth, and development of a behavioral management program.  Significant progress toward this goal has been made at Henley Young, including developing a contractual relationship for various services with the Hinds County Behavioral Health unit, and will be evaluated further in subsequent visits.

Finally, further information related to this requirement may be available upon receipt of a report by Dr. Boesky, the consultant hired to assess mental health services for the Henley Young Consent Decree.

**Non-Compliant at RDC**

There is no evidence of any change in how JCAs confined at RDC are screened and/or served in relation to the various components required in this provision.  Mental health services remain limited to dealing with crisis situations (i.e. suicide concerns) and issues related to psychotropic medications (i.e. adjustments in medications).   Thus, there is no evidence of any substantive programming/services to deal with issues related to developmental disabilities or integration of any such services into a behavioral health approach to addressing the needs of youth at RDC.

In the last Compliance Report, it was noted that there were increasing concerns about the number and nature of incidents for JCAs of suicide ideation/expression, but in reviewing the RDC youth's files and other information provided by the County, that concern has subsided in recent months; perhaps consistent with the reduction in the number of youth at RDC.

On a positive note, Deputy Newell has been given the task of developing some additional supportive life skill programming for adults, including young adults, at RDC. He has recruited fifteen volunteers to offer a variety of group programs that inmates can participate in, for example decision-making, AODA support, money management, anger management, parenthood, etc. Those programs are being planned to be implemented in later October/early November, and review of progress in this regard can be done during the next site visit.

Recommendations:
1. Assuming the transition of JCAs to Henley Young continues, the case manager recently employed to work with the JCA youth at Henley Young should begin outreach to the remaining JCAs at RDC to begin a more complete assessment process and assist in the transition of those youth to Henley Young; and
2. The County should continue efforts to secure a psychologist for Henley Young consistent with the terms of that Consent Decree or, at a minimum, on a contractual basis.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance at Henley Young**
Education services at Henley Young are provided by the Jackson Public School (JPS) system. As youth transition to Henley Young they are assessed by JPS staff related to their education status including whether they have been receiving special education services. This is a first step in meeting the condition of this requirement, but at this point the determination has been made that only youth 15 and under will be integrated into the regular JPS program at Henley Young. The current plan calls for the 16 & 17 year old JCAs placed at Henley Young to be placed in a developing GED instruction/testing program. For some youth that will be an appropriate placement, while for others it will not likely be consistent with what is appropriate and/or legally required (particularly for youth that are eligible for special education services). Unfortunately, the majority of youth already at Henley Young as well as those remaining to be transferred from RDC fall in the 16-17 year old category.

Further concerns related to the education program at Henley Young include (1) whether or not the amount of instructional time provided for youth is consistent with state requirements, and (2) whether youth at Henley Young are provided services in a way that will permit them to keep up with where they were at academically prior to admission and/or whether they are able to receive credit (time and/or actual course credit) that will support successful reentry back into the community and a school program at the time of release.

These concerns are even more relevant for JCA youth for longer periods of time, periods that will likely span multiple academic semesters. In some ways, having youth for longer periods of

time should enable JPS to provide a more complete education program, e.g. assess needs and gather appropriate educational records, provide individualized programming, provide remedial support as needed to allow youth to "catch up", and ultimately provide credits that can be applied to subsequent programming.

In addition to meeting the needs of youth while placed at Henley Young, it will be increasingly important that there is adequate programming at RDC for those youth who "age out" of Henley Young and return to RDC and/or that there is sufficient transition planning done to ensure that youth receive required/appropriate services no matter where they ultimately are released to/placed at.

Finally, the state of compliance with this requirement will be further informed by a pending report being submitted to Mr. Dixon by Carol Kramer-Brooks, a well-respected expert on educating youth in confinement.  Conclusions and recommendations in that report will be reviewed and assist in planning the next site visit.

**Non-Compliant at the Raymond Detention Center**
The JCAs at RDC have continued to benefit, albeit on a very limited basis, from the continued support of a volunteer for Adult Basic Education (ABE) services.  With a reduced number of youth to serve, the volunteer has been focusing more on providing individualized instruction, but that remains limited to two-three times/week for relatively brief periods of time (e.g. 1-2 hours). As noted in the prior report, the ABE program is dependent on the availability and interest of the volunteer, and that person is not certified to fully assess educational needs or administer GED testing (if appropriate).  Leadership reported that they are in the process of recruiting a certified GED instructor that will enable increased services for young adults, but it is not clear to what extent that individual will serve JCAs if/when that position is secured.

There remains no routine screening process (other than assessment related to ABE skills) to determine whether and what educational services a juvenile or youthful offender was engaged in prior to admission that would help determine what the appropriate, and often legally required, services should be for the youth while confined. As well as providing some increased GED programming for adults, as JCAs are transitioned out of RDC there will still be a need to assess young adults placed at RDC that may be eligible for special education services.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance at Henley Young**
Since there are no adult prisoners placed at Henley Young, this provision is met, and as JCA youth in placement turn 18, they will be transferred to RDC.

**Partial Compliance at the Raymond Detention Center**
Youth are housed in a separate unit so that the potential for contact with adults is minimized.
The initial Policies and Procedures provided, however, fall short of emphasizing the need for this
separation/proper supervision to be carried through all aspects of the operation, lacking reference
to how youth might be moved throughout the facility, e.g. to medical, the classroom, or
holding/transportation to court. Further revision of Policies/Procedures has apparently been
contracted out to Jackson State University and the timeline for completion is uncertain but not
imminent..  Any revision (as well as related training) should clearly include a requirement to
document (via an Incident Report) any instance in which improper contact occurs.

As noted in prior reports, there is no evidence of signage or consistent policies that indicate
appropriate attention to the requirements of the Prison Rape Elimination Act (PREA) related to
youthful offenders, including separation and supervision.

81.	Ensure that the Jail's classification and housing assignment system does not merely place
all youth in the same housing unit, without adequate separation based on classification standards.
Instead, the system must take into account classification factors that differ even within the youth
sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of
victimization, and sex/gender.

**Partial Compliance at the Raymond Detention Center and Henley Young**
With only one unit in RDC, this provision cannot be fully met.  Separation of some JCAs has
been achieved simply through the process of placing new JCAs at Henley Young.  The number
of youth remaining at RDC has declined as noted, and the youth remaining tend to be older and
have alleged to have committed very serious offenses.

At this point in time, the JCA youth at Henley Young are assigned to one housing unit.  As the
transition continues it may be possible to utilize two of the Henley Young housing units in a way
that permits appropriate classification, but that will be dependent on a number of factors,
including: (1) maintaining the number of non-JCA youth as low as possible; (2) reconciling any
conflicts between this Settlement Agreement and the SPLC/Hinds County Consent Decree; and
(3) the creation of additional program space(s).

The criteria and process for classification will need to be finalized and evaluated as additional
youth are transferred from RDC.

82.	Train staff members assigned to supervise youth on the Jail's youth-specific policies and
procedures, as well as on age-appropriate supervision and treatment strategies.  The County must
ensure that such specialized training includes training on the supervision and treatment of youth,
child and adolescent development, behavioral management, crisis intervention, conflict

management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance at Henley Young**

Supervising staff at Henley Young receive basic detention officer certification through the state. In reviewing that standard curriculum and notes from Mr. Dixon's most recent report, I agree that the focus of that training provides some baseline knowledge that is useful, but it lacks the kind of focus on working with youthful offenders that is needed be effective with juveniles and young adults.  In addition to this state training and the facility orientation training, all staff apparently receives Non-Violent Crisis Intervention training (and refresher training) certified by the Crisis Prevention Institute. This is a curriculum that is commonly used in juvenile detention settings and places an emphasis on verbal de-escalation skills and, if necessary, restraint and protection skills that are safe and more appropriate when used with juveniles.

Time did not permit a full review of training records, but Mr. Dixon's report indicates that there is good documentation related to staff training.  Henley Young is making notable progress toward substantial compliance, and continuing to develop specific training programs related to adolescent development, professional communications, mental health, gang recognition skills, behavior management, and dealing with suicide/self-harm behaviors will further advance the safety and effectiveness of the facility for all youth, not just the JCAs.  Further review of all training records and curriculum at Henley Young should be a priority for the next site visit.

**Non-Compliant at the Raymond Detention Center**

The last specialized training for supervising youthful prisoners was held in June prior to the site visit.  Ten staff participated in the training, although seven of the ten are staff currently assigned to the JDC, leaving only three RDC staff receiving the training.  And, it appears that no effort has been made to then clearly assign those trained staff to the juvenile unit (A-1) with the exception of Sgt. Tower. While the general course of training for new detention officers does include some basic elements that are appropriate for juveniles, the lack of additional training and lack of focus on assigning specific staff to the juvenile unit is of significant concern. Overall this is a step backward from the prior plan to train more officers and assign them to the juvenile unit.

That concern was perhaps best illustrated by an incident on August 27 when a juvenile, D.C., ended up with a broken jaw resulting from a fight with another juvenile on the unit.  In reviewing the Incident Report, speaking with Warden Rushing and Mr. Bennis (Internal Affairs), and viewing the video recording of the lead-up to the incident, it was clear that there were three to four points in the minutes before the fight occurred in which a more experienced and well-trained officer could have and likely would have intervened to prevent the fight from occurring. So, while there was an officer providing direct supervision on the unit (recall prior concerns that there were periods of time when a staff was not on the unit), the officer did not respond at all to

the precursors of the fight and in fact did not respond after either.  It was not until some other youth helped D.C. down the stairs and brought him to attention of the next staff member on the unit that medical support was called.  Per the report(s) D.C had significant injuries that required the use of oxygen, transport to the hospital, and eventually having his jaw wired shut.  D.C. was then placed in isolation in a medical monitoring unit and was still on that unit at the time of this site visit.  Of additional concern is that the Internal Affairs follow up report of the incident had not been completed at the time of the site visit, and the conclusion that the officer essentially did nothing overtly wrong is confusing at best.  Clearly, negligence on the part of the officer in failing to intervene was a contributing factor in the resulting incident.

Recommendations included in the prior report remain largely appropriate as long as juveniles remain at RDC, including: (1) training any/all staff working with youthful prisoners (keeping in mind that much of the training is appropriate for supervising young adult offenders as well as youth under age 18); (2) assigning only properly trained staff to the juvenile unit; (3) training key supervisory staff so they can properly reinforce the training that was received and properly evaluate officer performance; (4) and integrating knowledge gained in the training in development of a behavioral management program and related policies/procedures.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition**:**

   a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.
   b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.
   c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.
   d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.
   e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.
   f. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least

every fifteen (15) minutes.  Such observation must be documented immediately after each check.

g.   Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h.   If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i.   Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance at Henley Young**

Based on conversations with staff and youth, segregation as defined in this agreement is uncommon in that there are short periods of time when youth may be confined to a cell for disciplinary reasons but not for a majority of waking hours.  This is consistent with the general operation of a reasonable behavior management system in which most of the behavior is managed by adhering to a full daily routine of constructive pro-social activities, promoting sound direct supervision practices, and shaping behaviors through use of a well-designed incentive system.

However, it is apparent that policies do permit the use of cell confinement/segregation for up to three days for non-JCA youth and up to five days for JCA youth.  Further review of the policies, practices, and documentation related to the use of cell confinement will need to be completed during the next site visit.

While there are some differences in the language of the Henley Young Consent Decree and this Agreement, Mr. Dixon's most recent report does reference those requirements and includes the following:

> *During this visit and my review of documentation, I found that the facility was not abusing isolation practices. However, I would recommend the administration closely review incidents reports to ensure that staff is accurate when placing residents in confinement (i.e. Resident M.C. on 2/9/2017 was escorted back to B Pod however there is no mention of the resident going to his room; Resident J.P. on 2/15/2017 was escorted back to his pod again there was no mention of the resident placed in his room after flooding his room; Resident J.P. on 2/9/2017 he was escorted to his room B101 but there is no indication that he was placed on BMI for 15 minutes to cool down and Resident L.M. on 6/13/2017 was escorted to his room for acting out however there is no indication that he was placed in his room even though the*

*incident report shows that he was placed in his room). These are areas that must be persistently monitored.*[2]

Note that his specific concerns relate to documentation (rather than evidence of the overuse of cell confinement), which is critical for ensuring staff accountability and overall compliance with proper policies. Overall, implementing a comprehensive behavior management system that includes the strategic use of various forms of "time outs" or short term room confinement (e.g. up to one hour) for disciplinary purposes only when necessary is a fairly complex task. Mr. Dixon's recommendations that this continue to be a focus of policy development and staff training is appropriate.

## Non-Compliant at the Raymond Detention Center

There remains no evidence of sufficient policies/procedures or documentation related to the use of room confinement or other forms of isolation/segregation for youth, although youth report that use of extended room confinement is not occurring. In a discussion with Sgt. Tower she continues to report that there were occasional times when she addressed behavioral concerns by placing youth in their cell for short periods of time, e.g. 30 minutes, to calm a situation of concern that she was observing. However, as noted earlier, the youth that had his jaw broken in the incident of August 27 was placed in a medical isolation cell since the incident and complained of being able to be out of his cell on rare occasion and not having hot water for a shower.  While concerns about his health and the potential of risk of further harm if returned to the juvenile unit were legitimate, something other than extended isolation in this manner should be developed for such cases.  Per Warden Rushing, the plan was for the youth to return to the juvenile unit the week following the October site visit.

Recommendation: Steps toward compliance can be made by (1) developing clear policies/procedures, consistent with the Agreement requirements, related to the use of segregation or other forms of isolation/confinement for disciplinary purposes; and (2) keeping a room confinement log that documents any period of time in which a youth is placed in segregation/room confinement for disciplinary purposes that includes the name of the youth, the time confined, the officer implementing the confinement, brief reason for the confinement, and any involvement of medical/mental health staff to review confinement if it is extended; and (3) require the writing of an Incident Report for any such confinement that exceeds one hour.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

---

[2] Dixon, Leonard.  *Henley Young Compliance Monitoring Report*. J.H., ET AL, Vs. Hinds County Mississippi.  Filed September 25, 2017.  p.14.

a. The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

b. An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

c. The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance at Henley Young**

In moving toward compliance with the County/SPLC Consent Decree, many steps have been taken to develop staffing and programming to meet the requirements of this paragraph. For example:

1. Three case managers have been hired to work with youth in placement to provide some individualized counseling, provide some group programming, serve as a link to other needed resources to address behavioral and mental health needs, and keep youth informed of their court status. As this role is further developed, the case manager can be a facilitator for the kind of treatment team approach envisioned in this requirement;

2. The County continues searching for a psychologist on an employee or contractual basis to provide support for on-going treatment of all youth, including the JCA youth;

3. A rudimentary point/level system is in place that links expectations for youth to various privileges/rewards they can earn, and the JCAs interviewed all referenced some activities and privileges they had received. This system remains a work in progress, as there are a number of improvements that can be made as it is used for all youth; but, particularly it should be enhanced with additional requirements/incentives for JCA youth (e.g. provide for individualized goal-setting, compliance with additional programming expectations, use of peer support, etc.);

4. Based on brief conversations with staff and youth and consistent with the information included in Mr. Dixon's most recent report, there is a daily schedule of programming that keeps youth relatively active and engaged in a variety of constructive activities. Keeping youth active in "normalized" activities is an important component of managing the behavior of youth in the facility as well as promoting more effective reentry when they are released; and

5. Use of isolation, extensive cell confinement, use of restraints, and corporal punishment are not permitted according to facility policies/procedures. Disciplinary procedures do provide for periods of cell confinement for up to three days (non-JCA youth) or five days (JCAs), but actual use for any/all youth appears to be for short periods of time, e.g. hours to several

hours.  However, further review of policies/procedures and the documentation of the use of cell confinement for disciplinary or safety purposes will need to be done on future visits.

While there remains room for improvement on these requirements, certainly Henley Young is much further along in meeting them than anything that has developed at RDC.  Additional information related to this requirement is available in Mr. Dixon's most recent report, but further review of policies/procedures should take place on the next site visit.

Recommendation:  While the fact that a point//level system exists is a big step toward compliance, the system should be improved in various ways, including:  (1) further integration of that system along with increasing the variety of programming (e.g. cognitive-behavioral programs, life skills programming, etc.); (2) further refining the level system to better define expectations for youth for the "recreation" aspect of the system (recreation is a general term apparently used for all types of activities including school, physical recreation, various groups, etc.); (3) especially for JCA youth beginning to incorporate other longer-term requirements and incentives, focusing particularly on education and other pro-social skill development; and (4) increasing communication between staff and youth related to behavioral expectations and how youth are "scored" on the system.  Further technical assistance would be helpful in making these and other improvements to the current system.

**Non-Compliant at the Raymond Detention Center**

There has been no substantive change related to these provisions.  The County has not identified a consultant to help them take steps to develop even a rudimentary behavioral management program.   A small step forward in a potential foundation for such a program is the development of a "daily schedule" for programming, but absent any other incentives (group or individual) there remains no behavioral program to speak of.  Some "rewards" for group behavior(s) have been provided but those have been on an ad hoc, incidental basis rather than built into any kind of systemic approach.  Finally, as previously noted, there is no real assessment (other than for the Adult Basic Education programming), no treatment team, no individualized goal setting, or other components of a complete behavioral management program.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include, but are not limited to undated or

unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Non-Compliant**

Determining the lawful basis for detention including on-going detention after some court activity continues to be difficult. In addition to booking staff, there are three individuals-two in records and the court liaison-tracking the lawful basis of detention. They are all three using separate spreadsheets and lists. There continues to be a lack of business process to check all law enforcement and court documents. The Monitor did not conduct an extensive review of files during this site visit. There was at least one individual who continued in custody without valid paperwork from the court although paperwork was subsequently provided by the public defender. Another individual remained in custody as a result of an order that was confusing and efforts to clarify it had proved unsuccessful. The indicted and non-indicted lists were substantially improved but still included people on one list that should have been on the other and some individuals were charged with a felony but were not on either list. There is significant confusion regarding the status of individuals who are in the competency process. At least one individual appeared to have been found incompetent and non-restorable.  The records did not reflect the legal basis for his continued detention in the detention facility.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Non-Compliant**

At the time of the site visit there was no one in the facility on an unlawful order for failure to pay fines and fees compared to a 100 inmates detained on unlawful fines and fees orders at the time of the February visit. With the municipal class action and the adoption of Supreme Court rules for criminal procedure, the jail has not been receiving unlawful orders. This requirement is listed as non-compliant because the jail has not developed or implemented policies as specified in paragraphs 87 through 89 below.  As the Supreme Court rules are very new, it would be advisable to have polices to address orders that are not compliant with the new rules.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the

subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The County sponsored a training session on the new rules as related to orders on fines and fees. This is to be commended. This requirement is carried as partial compliance in that a process was not adopted to address non-compliant orders. If this becomes moot because of the rule change, the parties could explore dropping this requirement.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**

See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**

See response to number 87 above.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each

prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are some individuals who have a sentence of confinement. Some of these individuals show fines and fees but with the notation of a payment plan in effect. This signifies that they will be released after the sentence of confinement. The Monitor will continue to track these entries to ensure that individuals are released after the confinement period. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor. Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences. Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliant**

This has become a limited issue now that virtually no individuals are working off fines and fees. The recent standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. Captain Chandler stated that individuals with medical conditions did get the full amount of credit without working. However, Deputy Neal stated that only in special situations would they get full credit. He would make the recommendation to the Captain based upon criteria such as how long the prisoner has been incarcerated, the nature of the charge and generally a subjective judgement. There needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

    a.      Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.      Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.      Examples of prisoners presumptively entitled to release include:

    i.      Individuals who have completed their sentences;
    ii.     Individuals who have been acquitted of all charges after trial;
    iii.    Individuals whose charges have been dismissed;
    iv.    Individuals who are ordered released by a court order; and
    v.     Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Non-Compliant**

The Monitor did not do a thorough review of files for release at this site visit. At last review RDC continued to rely on inmate requests to identify prisoners entitled to release. RDC did not track the sentences of individuals at RDC. During this site visit, by report and random check, it appeared that individuals who are entitled to release because they came in on a probation warrant and did not receive a hearing in 21 days was more routine and accurate. There was still not an accurate method for accessing court records to verify information regarding court events and, in some instances, there was a lack of understanding of court events. There were seven cases in which the current status of the defendant was incorrect or uncertain. At the time of the site visit, it could not be determined with certainty whether any of the seven were entitled to release.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Non-Compliant**

It continues to be difficult to track individuals in the records system. As recommended after the last site visit, there needs to be a centralized, cohesive system for receiving, updating, and maintaining records related to detention and release. Currently, there are three individuals-two in records and another not in records-who are tracking individuals and maintaining separate spreadsheets outside the case management system. In addition, there continues to be an unclear line of authority between records and booking for overseeing the documentation. Several systemic problems were reported. Records does not routinely get the "no bill" list which identifies people who the grand jury did not indict. These individuals would be entitled to release if no other case is holding them. The three individuals do not have access to the new circuit court system providing court event information on cases after 2014. They were unaware that they could access the circuit court docket on earlier cases. Ongoing difficulties tracking cases initiated in Byram and Clinton were reported. It was said that these cases often get lost in the system. This was identified as arising from the lack of communication that resulted from that community

conducting its own preliminary hearings with its own public defender office. There also appears to be a lack of knowledge on the part of both detention and medical staff regarding competency proceedings and the status of defendants who are involved in those proceedings. One individual was believed to be waiting for a hospital bed when, in fact, he was waiting for a trial date. Another individual had been found incompetent and non-restorable. He appeared to be on the list waiting for a civil commitment bed but no one could explain the jail's continuing authority to detain the individual. The two individuals did not appear on the indicted or unindicted list. Another 5 individuals, as reported above, had case status that was unclear. In one instance, the lack of clarity resulted in efforts to get a hearing set in the wrong court which left the case stagnant.

Priority recommendations have been made in this area. Consultation with the National Institute of Corrections or an alternative should continue to be sought to provide the overhaul that this system needs. Staff should continue to audit the records and track individuals. A knowledgeable attorney should provide a training on the competency process and how the jail and the medical staff should be tracking these individuals.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The Jail record system does not identify persons with serious mental illness. While there are incident reports submitted, the forms do not have a place to indicate if the individual had a mental health illness.  And there is no electronic method of identifying individuals with mental illness at the time an incident is occurring. Unless a computerized program is developed between the contractor and the medical vendor, officers will not know in advance of inmates with special mental health needs.  Health staff can identify the information after the fact, which may be useful but does not allow security staff to adjust its response to a developing incident based on possible mental health issues.

The QCHC staff could not identify the number of individuals on the mental health caseload. They provided a list of 60 individuals all of whom were listed with an SMI diagnosis. The staff

could not say whether this list was what was understood to be the mental health case load. QCHC also provided the number of encounters with the psychiatrist and the psychologist. This was not broken down by how many individual patients were seen or whether they were assessments or for ongoing care. Based on this information, it would appear that the Jail is significantly under identifying persons with mental illness.

Although Jail and QCHC staff attempt to move individuals to the state hospital as needed, this continues to be a systemic problem. There are only 15 forensic beds at the State Hospital to serve the entire state for competency evaluations or restoration.  There are an additional 20 beds that are for individuals for civil commitments.   Of the 15 forensic beds, two are reserved for females.

The social worker at RDC maintains a list of all inmates who are waiting to go to the state hospital or require competency evaluations. This list is updated with their current status in the process. Court orders for competency are sent to Sgt. Lewis who is in charge of transportation. He provides a copy to the social worker. The list tracks when a competency hearing was held, if the patient was sent to Mississippi State Hospital and if they were returned to the Hinds County Jail System.  At the time of the site visit there were 23 names on the list.  However, the state hospital has only 8 people on their list for people waiting for a state hospital bed. A similar discrepancy was noted last time. As mentioned above, there appears to be a lack of knowledge on the part of both detention and medical staff as to competency proceedings and the status of individuals in those proceedings. QCHC and legal staff should review the list with the state hospital to ensure the correct status of those individuals.

The jail based restoration to competency program reported its progress since its inception in June, 2017. The program reports that three individuals were restored to competency in the program and are no longer waiting for a state hospital bed. It is understood that the services are minimal and are being provided in an extremely non-therapeutic environment.  This program is a pilot program and should be evaluated. As a substitute for state hospital restoration, an appropriate therapeutic environment that does not currently exist in the jail will need to be created. However, the twice-weekly sessions with mental health workers does provide some therapeutic interaction that does not otherwise exist in the facility.

Medical Records are still in paper copy.  The EMR was unsuccessful due to problems with connectivity.  Until this issue is resolved, it is recommended that a four folder chart is utilized with tabs that describe the various services.  Old records can be separated from new admissions by utilizing colored paper.

A medical quality assurance program is in its beginning stages.  A case study was performed on an inmate that missed his 4 AM medications on 21 days between January 2017 and March 2017. The psychiatrist was contacted and medication times were adjusted.  Nurses were required to

obtain refusals of medication and to bring inmates in for counseling after three refusals.  The study was a good start at a CQI program but it did not list the participants or the date and time of the study.

The second study focused on daily booking statistics.  Daily booking statistics were examined during the month of May 2017.  Daily booking statistics were compared to the QCHC intake log.  The study was a bit confusing but the result was that daily booking statistics were not being cross checked with the intake log.  Policy changes were made to correct this problem. This study also lacked attendees present, date and time of study

As discussed below, transition planning has not been provided. A transition planner was hired by QCHC but then resigned.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.     Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d.     Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

Policies and procedures have been adopted. There are two policies that may relate to this requirement-the policy on records and the policy on booking which includes some requirements related to release. These policies do not have the specificity or the breadth required by this paragraph. The Monitoring Team and DOJ provided comments on these policies and a second draft should be forthcoming. Neither the DA's office nor the defense bar has been involved in the drafting. The level of specificity required by this paragraph will require significant revision of the policy.

Neither the County nor QCHC have developed sufficient mechanisms for the transition of persons with mental illness into community based services. As stated earlier the discharge planner was an RN from another County who was unfamiliar with the resources at Hinds County. The discharge planner met with Hinds County Behavioral Health (HCBC) on three occasions.  Each time they requested that she send them information which she never followed through on. One of the problems with referrals to HCBC was that the address of the inmate at booking was not updated by the officers. Thus, HCBC staff was unable to track the inmates for their upcoming appointments. Other items that were not provided to HCBC was a release of information and the current medicine that the inmate was taking.  The mental health specialist from HCBC indicated that during the month of July there were only 7 referrals made. HCBC attempted to schedule a weekly time when they would regularly go to the jail and connect with clients. The discharge planner did not follow through with this plan. When this position is filled again, it is recommended that the health administrator and the Behavioral Specialist from HCBC are involved in the interview and orientation process.

Nursing states that inmates are provided with two weeks of discharge medications if they know that the patient is released from the jail.  However, the nurses do not know when an inmate is released and ensuring that medications are provided has not been made part of the releasing process.  This is an issue that should be addressed by both custody and medical.

Hinds County Behavioral Health received a grant from the GAINS Center to conduct a two day meeting on Sequential Intercept Mapping as an approach to decriminalize individuals with serious mental illness. A two day meeting was held on August 16-17, 2017.  There were 45 participants involved.  Participants were from all disciplines such as judges, warden, police chief, QCHC staff, crisis team members, day outreach center members, psychiatrist from the State Hospital, and staff from Merritt Hospital and St. Dominic's Hospital.

The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  Using the model, a community can develop targeted strategies that evolve over time to increase the diversion of individuals from entering the criminal justice system.  The GAINS center will develop a report for Hinds County Behavioral Health.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:
- a.  Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
- b.  Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**
The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**
The booking staff reportedly now runs an NCIC check at the time of booking and again at release. This will be verified at the next site visit. The business processes of booking and release need to be evaluated and revised in conjunction with the NIC consultation.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.    How to process release orders for each court, and whom to contact if a question arises;

        ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

        iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

        iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

Staffing levels in Booking are still inadequate. There is routinely only one officer and one booking clerk assigned (in addition to an ID officer, although sometimes even that post is not covered).  They should routinely have at least two officers assigned in order to be able to receive arrestees and monitor those who are held in the cells, and there should be at least two booking clerks on duty.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

There has not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

      a.     A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

      b.     Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. Incident reports are not prepared for errors in releasing.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Jail has two individuals who are tracking inmates booked into the facility. One is tracking the circuit court cases and the other is tracking lower court cases. These individuals attempt to identify individuals entitled to release. These individuals operate independently of the booking and release process and maintain their own spreadsheets. This is a valuable task; however, this should eventually loop back to the booking and release process so that a systemic approach to ensuring proper detention and release is developed. The NIC consultation should address this issue.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

No documentation was provided of incident reports being created for untimely or erroneous prisoner release or any investigations of such incidents.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations, and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

Initial policies or procedures have been adopted but require significant revision. There has not been an initial audit of releasing practices.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting, and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

The current attorney/client visitation spaces in the pods at the RDC do not allow officers to readily monitor them for safety and security.  The situation is exacerbated by the shortage of staff; however, a reasonable solution to the problem is readily at hand as a result of the recent change of video visitation vendors.  The new equipment is located inside each housing unit, which makes the old video visitation space, adjacent to the three pod control rooms, available for

repurposing.  Once the old equipment and floor mounted stainless-steel stools are removed, the addition of typical office type tables and chairs will create three private, yet easily observed attorney/client visitation rooms.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**
The data base is getting better, but is not yet a reliable source of information.   They are transitioning over from paper incident and use of force forms to an automated system that ties all records on an incident to the original report number. This will hopefully address a current problem by requiring approval/disapproval/action required blocks for supervisors. There continues to be a concern that some incidents and grievances are underreported including late releases, lost money and property, medical grievances and some use of force incidents.

The new computerized grievance system should allow for the compilation of a summary grievance report. Currently, this is not possible for several reasons. As noted above, the system is not functioning properly at this time and many prisoners are unable to submit grievances. The reporting functions of the system are either problematic or not adequately conveyed to staff. Staff reported that they could not generate reports with identified parameters. Another problem is that the prisoner identifies the type of grievance. Most are clicking on "general" rather than the specific type. Staff are unable to correct this so a report by type of grievance would not prove useful. Similarly, there is a separate category for inmate request. This is seldom used and again results in an inability to accurately aggregate the data. If the prisoner replies via the kiosk in any fashion to the grievance response, that is then automatically converted to an appeal. The system needs to be able to generate accurate reports.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
      a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;

    b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

    c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

    d.   List and total number of incident reports received during the reporting period;

    e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of incidents in the three facilities. Although the information was helpful and appreciated, it did not meet the requirements of this paragraph. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. At the present time, the summary reports, particularly from RDC and the WC are difficult to follow and incomplete. Because they are manually compiled, it is difficult to identify trends over time. The computerized summary report should remedy this. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

    a.   Summary of all uses of force, by type, shift, housing unit, and date;

    b.   List and total number of use of force reports received during the reporting period;

    c.   List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of use of force in the three facilities. Although the information was helpful and appreciated, it did not meet the requirements of this paragraph in that the reports are manually prepared each month and do not allow for identifying trends over time. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. In meeting with the IT department, it was learned that not all the requirements of this paragraph were addressed. That should be remedied. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**
See response to 106 above.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

      a.     A brief summary of all completed investigations, by type, shift, housing unit, and date;

      b.     A listing of investigations referred for disciplinary action or other final disposition by type and date;

      c.     A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

      d.     A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Non-Compliant**
There is currently no summary report of IAD investigations being compiled.

111.     Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**
An annual review has not been conducted.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or

allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**
The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:
      a.     Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;
      b.     Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Non-Compliant**
As reported above, a medical quality assurance program is in its beginning stages.  A case study was performed on an inmate that missed his 4 AM medications on 21 days between January 2017 and March 2017.  The psychiatrist was contacted and medication times were adjusted. Nurses were required to obtain refusals of medication and to bring inmates in for counseling after three refusals.  The study was a good start at a CQI program but it did not list the participants or the date and time of the study.

The second study focused on daily booking statistics.  Daily booking statistics were examined during the month of May 2017.  Daily booking statistics were compared to the QCHC intake log. The study was a bit confusing but the result was that daily booking statistics were not being cross checked with the intake log.  Policy changes were made to correct this problem. This study also lacked attendees present, date and time of study.

A mortality review was completed after the last monitoring report noted this deficiency. The mortality review was incomplete.  It does not contain the time the inmate was booked, the time medical was called, and the time the ambulance arrived.  Dr. Bates in his mortality review indicated that the patient died of positional asphyxia; however, an autopsy report to support this diagnosis was not attached to the mortality review.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining

criminal justice processes, and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system, and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Non-Compliant**
The County is laying the groundwork for a CJCC but has not yet established one.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Non-Compliant**
See 115 above.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Non-Compliant**
See 115 above.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to

achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**
At the time of the site visit, a consultant had been identified, a contract completed, and the initial visit was underway. The County now must use the technical assistance to develop the CJCC and identify the strategies in this paragraph.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
>       a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
>       b.       Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**
Copies of the Settlement Agreement that were found riveted to the wall in common areas and housing units during the February site visit are no longer there.  As expected they have all been pulled apart and destroyed.  The Monitor's recommended solution, creation of an Inmate Handbook sized copy that could be given to each employee and inmate, has proven to be a successful solution.  While they have not been distributed to the inmate population at this time, and not all staff have copies, it is expected that by the next site visit most staff and inmates should have copies readily available.

Paragraphs 122-129 regarding third party beneficiaries, costs, severability, etc. omitted.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure

in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

At the time of the site visit, the County/Sheriff had adopted an initial set of policies and procedures. These have been reviewed and been found to not be fully compliant with the terms of the agreement. The Monitoring Team and DOJ provided comments and a second round of drafting should be underway. As recommended, the County/Sheriff is identifying key policies to develop first and circulate for review This will help guide the process in the remaining areas.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Partial Compliance**

Six months expired on January 19, 2017. The policy and procedure review and drafting was completed after that time. Those policies are not sufficiently in compliance so this requirement is listed as partially compliant.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Non-Compliant**

The policies and procedures were completed and submitted to the United States and the Monitor in April for review and comment. The comments were provided on June 1, 2017. Changes have not been made in the 30-day time frame.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

The policies and procedures are in need of revision. They should be revised before training and other ensuing operations.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Non-Compliant**

There have not yet been policies and procedures approved by the United States.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**NA at this time**

Paragraphs 136-158 regarding appointment and duties of the Monitor omitted.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Partial Compliance**

At the time of the site visit, the County provided its first self-assessment. The assessment is a good first step towards compliance with this paragraph but needs to have the level of detail required by this paragraph.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Compliant**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

Immediate notifications have been provided. However, the County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date. The records office needs to be reorganized to implement business practices that accurately identify release dates and process releases. In the interim, the County needs to continue and improve its internal audit procedures to identify individuals entitled to release and prepare incident reports for persons who were detained beyond their legal release date.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.