Court-Appointed Monitor's Fourth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 WHB-JCG

Elizabeth E. Simpson
Court-Appointed Monitor

| David M. Parrish | Jacqueline M. Moore | Jim Moeser | Dr. Richard Dudley |
|---|---|---|---|
| Corrections Operations | Corrections Medicine | Juvenile Justice | Mental Health |

# EXECUTIVE SUMMARY

**Corrections Operations**

While the lack of staff continues to be the most significant problem facing the Detention Services Division (DSD), it is now possible to determine the number of positions that are actually assigned to, and work in, the Division.  Currently, 271 positions are authorized and funded.  Four additional positions need to be funded or moved from the Operations side of the Sheriff's Office in order to meet the goal of 275 Detention positions in the current fiscal year. Only 239 of the 271 positions are filled, which represents a decrease of 11 since the October site visit. Although the monitoring team set 275 positions as a goal for the current fiscal year, the result of the staffing analysis is that 433 positions are needed to adequately staff the detention facilities. The target of 275 positions is still significantly below the needed staffing level.

The creation of a Policies and Procedures Manual is still a work in progress.  After attempting to handle the project in house, the Sheriff's Office and County have decided to contract with Dr. James Austin, an expert in the field of corrections and criminal justice systems, to move forward with the work as expeditiously as possible.  The expected completion date is July 2018. Individual policies will be submitted to the Monitor and DOJ staff for review as they are completed. The policies were originally to be provided in January, 2017. A draft set was provided in April,2017; comments by DOJ and the monitoring team were provided; and a final set of policies and procedures were to be provided 30 days thereafter. The project stalled at that point and now the policies and procedures are significantly overdue. This represents a major hurdle in coming into compliance as staff can not be properly trained until there are adequate policies and procedures to form the basis of the training.

Maintenance issues in the three jail facilities continue to be a problem but most significantly at the Raymond Detention Center (RDC).  While both roll up sally port doors in Booking were finally found to be functional during the January/February site visit, major security issues need to be corrected as soon as possible.  Two of the three doors that separate the main corridor (Great Hall) from the three pods do not function.  This same problem was noted during the October site visit.  Further, several of the doors that allow access to the pod control rooms are in such a state of disrepair that maintenance staff have been forced to develop a hand operated latching mechanism which requires an officer in the corridor to lift up a lever in the tracking system so that the door can be opened.  The County's plan to replace all of these doors should be carried out as quickly as possible.

At the Work Center (WC) a wall has been built so that the facility now has four housing units. In addition, 36 beds have been removed from each unit so that they are all now rated at 64 inmates. However, Housing Unit 4 is still not on line because of HVAC problems that surfaced when the wall, separating HU3 from HU4 was added. A second chain link fence has been installed outside each recreation yard, but it does not provide the level of security that a solid wall would by limiting visual contact. County maintenance staff are currently working on a solution.

While extensive training is required by the terms of the Settlement Agreement, direct supervision training is critical for DSD staff so that the WC can function according to the principles and dynamics of direct supervision and so that the RDC can be returned to direct supervision operation once officers are permanently re-assigned to the housing units. To that end, the Sheriff's Office needs to obtain the services of the National Institute of Corrections (NIC) to provide "Train the Trainers" instruction. A cadre of qualified trainers can then provide instruction to all DSD staff.

On January 28th the DSD designated C4 Isolation at the RDC as the location for future suicide watches. This four-cell unit can hold four or more inmates in the dayroom space, properly supervised by an officer who is permanently assigned inside the same area. Three of the cells are locked shut (unoccupied) while the fourth is left open so that the inmates have access to water and toilet facilities. This mini-direct supervision unit allows for constant supervision (not just every 15 minutes) of inmates in a much more humane setting than the two cells in Medical that were previously used for suicide watches.

The County has retained the services of JBHM Architects to plan for renovations of Booking at the RDC in order to make it operate as an "open booking", i.e. direct supervision facility. In order to make the structural changes without negatively impacting booking activities, JBHM has created a plan to temporarily relocate Booking to the WC. That also provides the opportunity to create a secure drive through sally port at the WC so that inmates do not have to be processed through the public lobby as they are now.

Over the past year the DSD has undergone a change in reporting systems from paper to electronic. While it will ultimately prove to be an asset to both the staff and administration, the changeover has left the monitoring team without access to critical reporting information and documentation of supervisory review. A second planning and coordination meeting with all affected personnel was held during the January/February site visit in order to identify expectations and to determine how best to achieve the desired results. Hopefully, the gaps in the reporting process will be resolved shortly.

Fire safety is a critical matter in a jail.  At the WC there is an alarm and sprinkler system with fire extinguishers readily available to each unit officer; but at the Jackson Detention Center (JDC) and RDC the lack of access to fire hoses and extinguishers as well as the lack of operable alarm and sprinkler systems creates an unsafe environment.  Recognizing that, the Department of Justice sent a letter to the County and Sheriff's Office on February 8, 2018, that outlined the seriousness of the situation as well as expected actions.  DOJ requested documentation of remedial actions within 30 days which was not provided. This area of concern will receive more detailed attention during the May site visit.

**Medical and Mental Health**

There continues to be a shortage of nurses and health care staff in the jail facilities.  Since the last site visit, the health administrator and regional manager for QCHC have been replaced.  The physician resigned two weeks prior to the visit and a new physician has not yet been hired.  A new health administrator has been hired.  A new corporate director of nursing has been hired for all of the QCHC facilities. The corporate director of nursing has had years of experience in the Florida juvenile and adult system and has made positive changes in the medical unit.  A new discharge planner has been hired and she has developed policies and procedures related to releasing inmates.  She is working with Hinds Behavioral Health to develop effective discharge planning and reentry practices. There are five nursing positions that are currently unfilled. Medical records are being maintained in paper files and while not completely organized, the organization is much better than previously.  QCHC has developed an electronic medical records (EMR) system but it is still not operational due to issues with internet reception.

Chronic care services related to diabetes, hypertension, AIDS, and COPD are in place at all of the facilities.  RDC has initiated a chronic care program within the last two months.  The other two facilities have maintained chronic care quarterly visits conducted by the nurse practitioner.

The policy on alcohol withdrawal should be addressed and reviewed with the nursing staff.  It was noted in the chart review that there were inmates who admitted during the intake process to drinking heavily and daily.  However, there were no indications that these inmates were referred to a nursing staff member or placed on a withdrawal protocol. During interviews with nurses, the nurses were not familiar with the withdrawal policy. Similarly, observations of the medication administration indicate problems that should be addressed in both the QCHC policies and procedures and the Security policies and procedures. These include the responsibility of detention officers to assist in supervising inmates and checking for ingestion and signing for refusals.

Continuous Quality Improvement (CQI) studies indicate a high number of missed medications. A corrective action plan has not been initiated.  A MAC meeting has not been held since the last monitoring report.

This was the first site visit for the mental health consultant to the monitoring team, and due to prior commitments, the consultant was only able to participate in the site visit for the first two days.  Therefore, there was not enough time during this first visit to assess progress towards addressing all of the mental health provisions of the Settlement Agreement.  However, during the visit, it became clear that there is inadequate documentation in multiple critical areas required for the facilities' own internal monitoring and review by the monitoring team.  For example, due to the absence of full mental health evaluations, psychiatric evaluations (when indicated), and treatment plans it is impossible to assess the quality and effectiveness of mental health treatment. Even when there are mental health emergencies, such as a suicidal inmate, there is no documentation of an evaluation that confirms the emergency status and the precise interventions required; there is no documentation that indicates that the interventions have been followed as prescribed; and there is no documentation of an evaluation that indicates that the emergency has been resolved.

There are also mental health provisions that have not been addressed at all, such as mental health participation in the disciplinary process, mental health monitoring of inmates placed in segregation, mental health assessment in cases of use of force, mental health assessment in cases of sexual abuse and misconduct, and the development of mental health programs that would support inmates with special needs and facilitate the discharge planning for inmates with serious mental illness.  It is clear that the current mental health staffing pattern is woefully inadequate to address all of the provisions of this agreement, in that there is simply not enough staff to do the work and in that the scheduling of the existing mental health staff is such that there is no opportunity for mental health staff to meet together and thereby function as a team.

**Youthful Offenders**

This visit afforded the opportunity to assess the progress made in transitioning Juveniles Charged as Adults (JCAs) to the Henley Young Juvenile facility following the decision to begin placing "new" JCA youth there in September 2017.  In general, the transition has been successful and holds out promise that the Henley Young facility, with some substantive facility and programming improvements, can be a long-term solution to meet the requirements of this Agreement.  This is in large part the result of the significant progress that the County has made in meeting the requirements of the Hinds County/Southern Poverty Law Center (SPLC) Consent Decree, many of which are essentially the same as this Agreement.  It is the understanding of the monitoring team that both the Consent Decree and this Agreement will continue in effect simultaneously.

At the time of this visit there were eleven JCAs in placement at Henley Young and seven JCAs remaining at RDC.  Whereas a number of the requirements of the Agreement can be considered

to be in substantial compliance at Henley Young, the status of the JCAs at RDC remains relatively unchanged, albeit benefiting somewhat from the reduced number of juveniles in placement. There is little evidence of further movement toward the compliance requirements for those youth.  Concerns about the limited educational programming, mental health services, training of supervising staff, and case processing in adult court remain.

Improvements that need to be made at Henley Young are related to the differing needs and opportunities that result from youth being placed/confined for much longer periods of time.  This is reflected in recommendations including enhancing the mental health services, expanding the educational program, modifying the behavioral management program, and developing additional cognitive-behavioral and positive youth development programs.  Concerns about the limitations of the Henley Young facility have been referenced in prior reports and should be given heightened attention as the time to make decisions and facility improvements is before problems occur, not after.  Therefore, the most important recommendation conveyed in this report is that a plan including action steps, timetables, and resources needed to complete the transition of youth out of RDC be developed as soon as possible.

**Criminal Justice and System Issues**

There were several areas of progress since the last site visit. The CJCC was convened and the first meeting was held. The Sequential Intercept Mapping, although anticipated under the Settlement Agreement to be facilitated by the CJCC, was actually completed by the Hinds County Behavioral Health agency with a grant from the GAINS Center. The final report was issued and provides a useful road map for developing diversion and re-entry strategies.

The County continues to have no one incarcerated on unlawful orders regarding fines and fees but has not yet adopted policies to ensure a process for addressing this should such orders be used in the future. A full time Quality Control Officer was designated to identify persons who can or should be released. However, this continues to be a reactive process responding to inmate grievances and requests. As previously reported it continues to be difficult to track individuals in the records system. As recommended after the last site visit, there needs to be a centralized, cohesive system for receiving, updating, and maintaining records related to detention and release. Currently, there are three individuals maintaining separate spreadsheets outside the case management system. In addition, there continues to be an unclear line of authority between Records and Booking for overseeing the documentation. Previously reported systemic challenges continue to exist. As a result, a number of people were identified who had been detained beyond their release date and there is inadequate documentation for the detention of others. Consultation with the records expert should be utilized to assist in this area.

The paper grievance system was replaced by a computerized system. Some of the initial problems have been remedied but new problems have been identified. Most troubling is that numerous grievances appear to get lost in the system and, as a result, many grievances never receive a response. The system is also either dysfunctional or not understood in its ability to generate reports. The staff does not know how to generate reports, if it is possible, to meet the requirements of the Settlement Agreement or be useful to them.

More focused attention was provided on PREA compliance and, although there is some new attention to this area, the jail is woefully out of compliance with PREA. This area will require some attention at the higher administrative levels to begin to move towards compliance.

Reporting including the summary reports on incidents, use of force, grievances, and IAD investigations as required by the Settlement Agreement continues to be a work in progress. It appears that progress is being made towards having adequate incident reports and summary reports. However, the reporting currently received by the monitoring team does not meet the requirements of the Settlement Agreement.

**Monitoring Activities**

The Monitoring Team conducted a Site Visit January 29th through February 2nd. The site visit schedule was as follows:

January 29-February 2, 2018 Site Visit Schedule

| Date and Time | Lisa Simpson | Dave Parrish | Jim Moeser | Jackie Moore | Richard Dudley |
|---|---|---|---|---|---|
| Monday 9:00 A.M. | Meet with Major Rushing, Fielder, and Synarus | | | | Meet with Major Rushing, Fielder, and Synarus |
| Monday 10:30 | Tour Medical Unit, Meet Medical Staff | | | | Tour Medical Unit, Meet Medical Staff |
| Monday P.M. | 12:30 Meet with Dr. Kumar 2:00 Meet with Dr. Melvin Davis | | | | 12:30 Meet with Dr. Kumar 2:00 Meet with Dr. Melvin Davis |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 4:00 Meet with Philip Gaines |  |  |  | 4:00 Meet with Philip Gaines |
| Tuesday A.M. | Review records with Kanisha Jones<br><br>11:00 Meet with Ken Lewis | 9:00 Meet with Major Rushing, Doris Coleman, Synarus and Fielder re staffing levels and position control<br>Tour RDC | At Henley Young meet w. Johnnie McDaniels, Eddie Burnside, Eric Dorsey, Tom Devine, Tamika Barber, Mashara Cook, Brenda Froelich, Fernice Galloway | Meet with Richard Dudley and jointly tour, interview, or look at charts | Meet with Jackie Moore and jointly tour, interview, or look at charts |
| Tuesday P.M. | 1:00 Meet with County Attorney Mumford 3:00 Meet with RDC grievance officer Observe grievance kiosks | Continue work at RDC<br><br>4:00 Meet with new FSSO, Rohlan Tucker | Tour at Henley Young; meet w. staff from SPLC | Observe competency session 4:00 Meet with social worker Brown Follow up as needed | Observe competency session 4:00 Meet with social worker Brown Follow up as needed |
| Wednesday A.M. | Meet with Policy and Procedure team 10:30 Meet on recruiting and training plan (Sheriff, Miller, Fielder) 11:00 Capt. Dalton & Lt. Petty about Chancery Court | Meet with Policy and Procedure team 10:30 Meet on recruiting and training plan 11:00 Capt. Dalton & Lt. Petty about Chancery Court | Tour at RDC; Interview youth; review JCA files; Sgt. Tower; Assistant Admin. Fielder; Lead QCHC Nurse; thru afternoon | Continue at RDC |  |

| | | | | | |
|---|---|---|---|---|---|
| Wednesday P.M. | 1:30 Meet with Chancery Court Captain Dalton, Major Rushing, Synarus, and Chancery Judge<br><br>3:00 Meet with architect | 1:30 Meet with Chancery Court-Captain Dalton, Major Rushing, Synarus, and Chancery Judge<br>3:00 Meet with architect | Continue at RDC as needed Review training records Review programming documentation | Tour JDC | |
| Thursday A.M. | 9:00 Meet with Sheriff, DOJ<br><br>10:30 Meeting on reports and summary reports<br><br>11:30 Meet with Medical | 9:00 Meet with Sheriff, DOJ<br><br>10:30 Meeting on reports and summary reports-Supervisory staff and IT | Meeting on reports and summary reports | Follow up at RDC<br><br><br><br><br><br>11:30 Meet with medical | |
| Thursday P.M. | 1:30 Meet with Dalton and JDC grievance staff<br>3:00 Meet on PREA requirements-PREA officers | Tour JDC with Capt. Dalton & Lt. Petty<br><br>2:45 Tour Work Center | Tour Henley Young; Meeting. W. Johnnie McDaniels; Malcolm Sanders Recreation Coord.), Nurse La Flore, Alan Hines (Trng. Officer) | Tour Work Center | |
| Friday A.M. | Exit Meeting | Exit Meeting | Exit Meeting | Exit Meeting | |
| | | Complete tour of RDC with Captain Fielder | | | |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Requirements that have not yet been triggered such as an annual review are listed as NA (not applicable) at this time. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Raymond Detention Center are included in the totals in this chart.

| Site Visit Date | Sustained Compliance | Full Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:

- a.  Booking;
- b.  Objective classification;
- c.  Housing assignments;
- d.  Prisoner supervision;
- e.  Prisoner welfare and security checks ("rounds");
- f.  Posts and post orders;
- g.  Searches;
- h.  Use of force;
- i.  Incident reporting;
- j.  Internal investigations;
- k.  Prisoner rights;
- l.  Medical and mental health care;
- m.  Exercise and treatment activities;
- n.  Laundry;
- o.  Food services;
- p.  Hygiene;
- q.  Emergency procedures;
- r.  Grievance procedures; (Lisa) and
- s.  Sexual abuse and misconduct.

**Partial Compliance**

Work on writing and issuing a Policies and Procedures Manual that complies with the conditions and standards of the Settlement Agreement has been ongoing for the best part of a year.  The first effort, completed in house, resulted in an unsatisfactory compilation of Policies and Procedures and redundant, but somewhat different, Post Orders.  They were adopted by the County but upon review by the Monitor and DOJ staff they were found to be inadequate.  After some exploration of options, the County has contracted with Dr. Austin to complete the policies and procedures. He has retained the services of Mr. Emmett Sparkman to assist with policy development.  Mr. Sparkman has over forty years of corrections experience including time as the Deputy Secretary of the Mississippi Department of Corrections.  Individual policies will be submitted to the Monitor and DOJ as they are completed for review and approval.  It is anticipated that the entire Manual will be drafted by July 2018.

The policy on alcohol withdrawal should be addressed and reviewed with the nursing staff. There was no indication that inmates who, at the time of intake, admitted to drinking heavily and daily were referred to a nursing staff member or placed on a withdrawal protocol. During interviews with nurses, the nurses were not familiar with the withdrawal policy.  Medication administration should also be addressed in the policies and procedures.  The officer making

rounds with the nurse did not attempt to control the inmates receiving medication nor did he check the inmate's mouth to ensure that the inmate was not hoarding the medication.  Inmates that were no-shows to the medication line were not called to sign a refusal of medication. Refusals should be signed in real time and if the inmate refused to get up then signed by the officer and the nurse. There was an incident in which the door and cabinet in the dental suite was unlocked and dental instruments were stolen. Counts had not been maintained so it was not known how many sharps were missing. Adequate security and accounting of medical equipment should be addressed in the policies and procedures.

Needed policies and procedures related to mental health are addressed below if required by a specific Settlement Agreement provision. However, in order to develop and implement the necessary policies and procedures additional mental health staffing will be required. Based on a review of mental health related provisions of the Agreement, and even just a preliminary assessment of what it will take to address those provisions, it is quite clear that there are not enough mental health staff hours currently available to implement the policies and procedures that would be required to address the mental health related provisions of the Agreement. Furthermore, there is no time that all of the mental health staff are at the facility at the same time in order to discuss and coordinate in a way required to do such things as treatment planning and discharge planning.  Therefore, a mental health staffing analysis, with a commitment to increasing the mental health staff is required.

During the next site visit, the consultant will arrange meetings with QCHC, County and Jail staff to clarify with staff the meaning and significance of a provision, to provide background with regard to why such a provision is important, and to describe best practices with regard to addressing a provision.  It then offers an opportunity for health and mental health staff, and also often security staff, to discuss relevant issues, questions and concerns, as they jointly move towards the development and/or refinement of policies and an implementation plan. Addressing these provisions will require that other medical staff, security staff, and administrative staff also participate in this effort.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**
As was previously reported, the Jail Administrator, Major Rushing is well qualified for the job, but has only an AA degree, not the BA degree that the position requires.  Captain Richard

Fielder, who previously was the Training Captain, has taken on the post of Assistant Jail Administrator.  His education (BA) and experience meet the standard set forth in the Settlement Agreement.  This section will continue to be carried as being in Partial Compliance because of the Jail Administrator's AA degree.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
Other than the Assistant Jail Administrator's position, reported above, there have been no changes in supervisory positions. This section continues to be carried as being in Partial Compliance since the P&P Manual has not been issued and it has not been possible to determine whether or not all supervisors are familiar with it and the terms of the Settlement Agreement.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Non-Compliant**
The Jail was requested to provide at the time of the site visit a listing of all current jail employees, the date of their employment and the date of their background check. This was not provided. Until the HCSO provides documentation reflecting that all employees have successfully passed a background check, including a criminal history check, this paragraph will continue to be carried as Non-Compliant.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**
The Policies and Procedures Manual has yet to be published.  Further, no staff members have received training with regard to the principles and dynamics of direct supervision.  One of the Priority Recommendations made by the monitoring team subsequent to the January/February site visit was that the County coordinate with the National Institute of Corrections to obtain "Train the Trainers" support so that staff assigned to the WC can be properly trained.  Once that is done, it will be possible to rotate officers through that facility to gain hands on experience in direct supervision before they are reassigned to the RDC as it slowly transitions back to being a direct supervision jail.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:

        i. There are at least two detention officers in each control room at all times;

        ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii. There are rovers to provide backup and assistance to other posts;

        iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v. There are sufficient detention officers to implement this Agreement.

    b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

        iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

    d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

     e.   The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Partial Compliance**

As was previously reported, the total required staffing for the Jail System is 433 positions. The goal for the current year is 275 positions, of which 271 have been funded. Four still require funding or else reassignment of that number of positions from other areas of the Sheriff's Office. While 250 positions were reported as filled during the October site visit, that number has dropped to 239 in spite of the fact that the new salary schedule for entry-level officers represented a significant increase in compensation. It should be noted that the career ladder and bonus system outlined in the Settlement Agreement are still not in place. During the January/February site visit, the Sheriff agreed to make Investigator Marquette Funchess the full-time recruiter for the HCSO. Previously only 25% of his time was dedicated to this function. He has worked up a six-month plan of action for recruiting activities which will, hopefully, result in a larger pool of potential employees.

The number of officers assigned to each shift, particularly at the RDC, is insufficient to meet the criteria of the Settlement Agreement. Routinely, less than half the required number is available. Only the juvenile unit (HU A1) at the RDC has an officer assigned to a post inside the unit on each shift; however, the officers assigned have not been trained with regard to direct supervision operation. At best, half of the units have an officer who sits in the vestibule, not inside the unit. Even in the Confinement/Segregation unit, (HU B3), where the inmates are locked down in individual cells, the officer sits in the vestibule, from which position he is supposed to conduct thirty-minute well-being checks on each inmate—an impractical expectation. In Booking little has changed since the last Monitor Report. Routinely, only one Detention Officer is on duty instead of two (exclusive of the ID officer) while one, sometimes two Booking Clerks are on post. It should be noted that a female Booking Clerk is often called upon to handle intake duties when a female detainee is received. This is acceptable in that booking clerks are also detention officers, but the practice reflects the shortage of personnel. As was previously reported, the staffing situation at the JDC and WC is not as critical as at the RDC because portions of those two facilities are currently vacant and they are operating at well below rated capacity.

     f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge. Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum

security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

    i. The classification process must be handled by qualified staff who have additional training and experience on classification.

    ii. The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

    iii. Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

    iv. The classification system must track the location of all prisoners in the Jail, and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

    v. The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

    vi. The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

There has been no change with regard to compliance in this section since the last reporting period.  The Classification Sergeant has prepared some preliminary draft proposals, but has not submitted any Policies and Procedures for inclusion in the P&P Manual as was suggested in the last report.  Misdemeanant detainees continue to be assigned directly to the WC from Booking prior to being classified.  Movement of inmates by supervisors when Classification officers are not on duty now must be documented by a report that goes to the Classification supervisor so that follow up can occur the following morning.  The use of gang pods ended almost a year ago; however, many classification decisions still default to charges rather than behavior.

    g. Develop and implement positive approaches for promoting safety within the Jail including:

        i. Providing all prisoners with at least 5 hours of outdoor recreation per week;

    ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

    iii.  Creating work opportunities, including the possibility of paid employment;

    iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities; (Jackie)

    v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law; (Jim and Jackie)

    vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

    vii.  Providing reasonable opportunities for visitation.

h. Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances. Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i. Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Non-Compliant**

42 (g)(i) Outdoor recreation is still unavailable to almost all inmates in the Hinds County Jail System. It has never been available at the JDC because there is no outdoor recreation yard. At the RDC it has not been available for over five years. After the riot that caused major damage to Pod C all recreation ceased and most doors to the recreation yards were welded shut, as well as many other doors, including pipe chases, throughout the jail. Only at the WC is outdoor recreation feasible, but even there it is not documented in a format that allows for readily tracking when recreation was made available. Subsequent to the January/February site visit, the WC forwarded a copy of the log entries from HU3 covering 2-1-18 to 2-14-18. A review of those entries revealed that recreation was made available on seven of fourteen days, for a total of five hours and forty minutes. On three days there were log entries made when the recreation

yard was opened but none made to show when it closed.  The total documented outdoor recreation was just over half of what is required by the Settlement Agreement.

 42(g)(iv) Due to the fact that prisoners' medical records do not include adequate mental health evaluations or treatment plans, at present, it is extremely difficult, if not impossible to assess (internally and/or by the monitor) whether or not any given prisoner with a serious mental illness, developmental disability, or other behavioral or medical condition is receiving appropriate therapeutic interventions. At minimum, a mental health evaluation should include the prisoner's history, a description of the prisoner's signs and symptoms of mental illness and related distress and/or impairments in functioning, and a diagnostic opinion and/or psychodynamic formulation. For prisoners for whom medication might be indicated and/or prisoners who are experiencing some type of mental health emergency, a psychiatric evaluation should also be performed and documented in the medical record.  In the absence of such evaluations that are documented in prisoners' medical records, there is no way to know why a prisoner is receiving mental health treatment or what the prisoner is being treated for.

At minimum, a treatment plan should include a list of problems to be addressed noting the therapeutic intervention(s) which will be employed to address each problem and the expected outcome or goal of such treatment within a designated timeframe.  If an indicated treatment is simply not available within the facility and significant compromises must be made, this should also be noted in the treatment plan.  There should also be evidence that treatment plans are reviewed on a regular basis (consistent with community standards of practice for the treatment of the particular psychiatric difficulty), and that any indicated adjustments in the treatment plan have been made.  In addition, since both treatment planning and treatment plan review is a multi-disciplinary effort, mental health, nursing and security staffs must work together to discuss and ensure that everyone understands their role in the development and implementation of the treatment plans.  As noted above, this multi-disciplinary treatment planning and review process is one of the efforts that is complicated by the fact that there is no time when all mental health staff are at the facility at the same time, and so options for addressing this complication will also have to be explored.  In the absence of treatment plans, there is no way to know whether or not prescribed treatment is appropriate or effective.

Furthermore, the absence of a detailed log for the mental health caseload makes it extremely difficult, if not impossible, to assess (internally and by the monitor) whether or not the overall caseload of prisoners with serious mental illness, developmental disability, or other behavior or medical conditions is receiving appropriate therapeutic interventions.  There is a list of prisoners seen by the psychiatrist or the psychologist each week, which also notes if and when another appointment should be scheduled.  However, at minimum, a detailed log would list each prisoner on the mental health caseload, with their diagnosis, prescribed treatment, staff providing treatment, most recent and next scheduled visits, and any special circumstances, such as prisoner non-

compliance, suicide watch, segregation, etc. As noted, the lack of this documentation not only affects the monitoring team's ability to determine compliance with the mental health provisions of the Settlement Agreement, it also impacts the ability of the County and medical provider to ensure that appropriate treatment is being provided.

With respect to this provision, current recommended actions are:

1. Mental health evaluations must be performed on all prisoners on the mental health case load.  For prisoners for whom medication might be indicated and/or prisoners who are experiencing some type of mental health emergency, a psychiatric evaluation should also be performed.
2. Treatment plans must be developed for each prisoner on the mental health caseload, and must then be periodically reviewed.
3. Documentation of a mental health evaluation and/or psychiatric evaluation, and documentation of a treatment plan and treatment plan review must be included in the prisoner's medical record.
4. A detailed log for the mental health caseload must be developed and maintained.

42(g)(v) An assessment of efforts to comply with this provision was initiated during the site visit, but was not completed.  However as of this point, it at least appears that education and other programs, supports, and services for youth remain very limited.  This will be explored further during the next site visit.

42(g)(vi) Although there is mental health screening at the time of booking and during the initial health assessment process, the adequacy of this screening is yet to be determined.  One tool that would be helpful in this regard is the development and maintenance of a log for self-referral for mental health services and referrals for mental health services made by security staff or other medical staff, which indicates whether or not mental illness was identified during the initial screening processes.  Such a log would also indicate how quickly the prisoner was seen, who saw the prisoner, and the outcome, and so it would also help with internal (and external) monitoring/assessment of the responsiveness of mental health to such referrals.  In addition, the screening tools used will be further assessed by the monitor.

Recommended actions at this time are to develop the above described log that would track self-referrals for mental health services as well as referrals for mental health services made by security staff or health staff.

See paragraph 74 and paragraph 77 (i and j) regarding housing decisions and the availability of appropriate housing for prisoners with serious mental illness.  See section 42 (g)(iv) with regard to the availability of appropriate treatment.

42(g)(vii) Visitation records are similarly problematic.  A review of visitation records covering two weeks, from 12-31-17 to 1-13-18 revealed the following--

    (1) At the JDC, 68 inmates were scheduled to have a visit with family and friends; however, only 31 actually were able to complete a visit.  The others were cancelled by administration, missed by the inmate or caller, or were interrupted.

    (2) At the RDC and WC visitation records are combined, so it is not possible to differentiate between facilities.  A total of 82 inmates were scheduled to visit, but only 36 actually completed their visits.  The others were cancelled by administration, missed by the inmate or caller, or listed as "unpaid refusal". Staff described the "unpaid refusal" as a system problem in that the inmate's family has money in the account but the recording says number restricted. The provider, Securus has said that the problem is on the jail end.

Based on the number of inmates held at the three facilities, on average only 48% of the inmates at the JDC actually have a visit during a month's time, while at the RDC and WC that figure is only 14%.  Since the majority of the population is held at these two jails, it is apparent that very few inmates in the custody of the Detention Services Division are able to visit with family and friends on a routine basis.

42(h) During a review of the medical records for a small number of prisoners who had been on suicide watch, there was no documentation of a mental health assessment that resulted in the placement of the prisoner on suicide watch or the continuation of an emergency suicide watch originally initiated by security staff who were concerned about a prisoner's suicide potential. Without such an evaluation, compliance with this provision is not possible as it is the mental health assessment that would form the basis for an opinion on the level of supervision required.  There was also no documentation of a mental health assessment that resulted in the termination of a period of suicide watch.  In addition, it remains unclear which staff has the authority to terminate/responsibility for terminating a suicide watch.  Furthermore, if this authority and responsibility is limited to the psychiatrist and/or the psychologist, there are at least 5 days each week when neither one of them are at the facility to assume this responsibility.

Logs that would document some higher level of supervision by security staff have been requested. Therefore, further assessment is required to determine whether or not there is documentation of security supervision and then whether or not any documented supervision is adequate.  As noted above, this is somewhat complicated by the lack of clear mental health orders regarding the level of supervision required, based on mental health assessments.

This is an area where medical policies and security policies when they are completed must be consistent. Assuring a higher level of supervision by must be addressed at the level of policy and practice to clearly delineate the levels of supervision required and the respective roles of security

and mental health staff. This issue also intersects with issues of staffing levels to ensure that such higher levels of supervision can actually be provided.

42(i) Video surveillance capabilities vary greatly between facilities.  While the JDC and WC have no such capability, the RDC has been upgraded significantly.  Supervisory staff at that facility should take advantage of the ability to monitor and review incidents and daily activity.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

     a. Staff vacancy rate of more than 10% of budgeted positions;
     b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;
     c. A major disturbance resulting in the takeover of any  housing area by prisoners;
     d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;
     e. Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;
     f. One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);
     g. One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

Currently, 11.8 % of the authorized positions are vacant (271 authorized, 32 vacant).  Turnover statistics for 2017 reflect a continuing problem in the Detention Services Division.  At the JDC it was 18.4%, at the WC it was 26.0% and at the RDC it was 48.9%.  Ideally, a 10% turnover rate should be the goal, but the JDC and WC fall within a manageable range.  The RDC's turnover rate, however, is not sustainable.  When almost 50% of a facility's staff leave during a one-year period, maintaining continuity and consistency of daily activities is not possible.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b.  All security rounds must be conducted at irregular intervals to reduce their predictability, and must be documented on forms or logs.

c.  Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.  The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

Well-being checks continue to be conducted more effectively than previously, although still not in compliance with the Settlement Agreement.  In Booking they are conducted at 15-minute intervals.  In general population areas of the RDC they are sometimes maintained at hourly intervals, although consistency of entries in the Unit logs is sporadic at best with gaps of four or more hours, and even whole shifts, noted.  In Isolation Unit B4, the 15-minute well-being checks are routinely recorded on the individual inmate logs; however, the Unit Log, which was in place during the October site visit, was no longer in use during the January/February site visit.  In Confinement/Segregation Unit B3, 30-minute well-being checks are maintained by the officer who sits in the vestibule (see paragraph 42 above).  The Settlement Agreement calls for 15-minute well-being checks.  At the JDC, general population 30-minute well-being checks were recorded appropriately on forms located at the end of each corridor.  The 30-minute confinement/segregation logs for those inmates who were in a lock down status were not maintained on individual forms, as they should have been, (and as they were during the October site visit).  Instead, 30-minute Activity Logs were kept on each inmate, which reflected feeding,

out of cell time and other evolutions rather than 30-minute well-being checks. At the WC, officers made inconsistent entries in the Unit Logs which were sometimes hourly and sometimes only sporadic, if at all, throughout the shift. While direct supervision housing does not require the maintenance of a routine well-being check notation when other activity entries reflect continuing supervision, standard procedures regarding log entries need to be developed, so that all officers follow the same practices.

See section 76 with regard to mental health rounds for prisoners in segregation. See section 42 (h) with regard to prisoners who require special management due to acute mental health difficulties.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail. To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

    a. Mandatory pre-service training. Detention officers must receive State jailer training and certification prior to start of work. Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement. During that twelve month period, the County must develop an in-house detention training academy.

    b. Post Order training. Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter. To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c. "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

    d. Jail administrator training. High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.  Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

As was previously noted, then Training Director, Captain Fielder, recently took on the position of Assistant Jail Administrator.  In his place Captain Miller assumed responsibility for training. One of the first things that he put into place was elimination of the 40-hour orientation block of instruction for new Detention Officers.  Now new employees are immediately assigned to the 120-hour basic recruit academy which they must complete before being assigned to a facility. Training records do not yet reflect how many officers still need to complete this training within the first year of employment or how many officers received 40 hours of in-service training during the past year.  Post Order training, Critical Post training, Special Management Unit training and Direct Supervision training are as yet not identified.  The HCSO attempted to hire a Director of Detention Training but was unable to attract candidates at the pay level that was offered. The HCSO needs to recruit and hire a Director of Detention Training, at the level of a lieutenant, as soon as possible.  This position requires a candidate who has extensive detention experience to ensure that the training curriculum and schedule provides the needed training for detention officers.

During the past year the Division Major attended the Large Jail Network's training program put on by the National Institute of Corrections (NIC), and the Jail and Prisoner Legal Issues seminar hosted by the Americans for Effective Law Enforcement Legal Center.  The newly appointed Assistant Jail Administrator is slated to attend New Warden's Training through NIC later this year.

Reportedly, there is a modest amount of mental health training that occurs when security staff persons are in training at the academy. This training curriculum will be reviewed. More recently, an in-service training program, entitled "Mental Health First Aid" has become available, and security staff persons are beginning to receive this training. This training curriculum will also be reviewed.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

   a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight. This personnel authority must include the power to hire, transfer, and discipline staff. Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority. While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

   b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command. This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

   c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

   d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

      i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

      ii. An inspection process.

      iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

      iv. A requirement that any corrective action ordered be taken.

      v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

      vi.   To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

Until the P&P Manual is revised and re-issued, compliance with this paragraph cannot be achieved.  The revision work was recently assigned to Dr. James Austin with an expected completion date of July 2018.  Individual policies will be submitted to the Monitor and DOJ for review and approval as they are completed.  No progress has been made with regard to the requirement for supervisors to document the results of their rounds.  This long-standing problem needs to be addressed immediately.  At a minimum, a supervisor should make an entry in the Unit Log or Control Room Log.

Maintenance issues are still not resolved in a timely fashion, particularly at the RDC.  As was previously reported, two of the three primary corridor doors leading from the "Great Hall" to the three pods (A, B and C) still do not function.  They are propped open because they cannot be properly secured/locked.  In A and B Pods the control room doors also cannot be secured, so maintenance staff have jury rigged a manual locking system that depends upon an officer in the corridor to lift a mechanism located above the door before it can be opened.  This totally unacceptable situation can be rectified when the County replaces the security doors into the pods.  At that time, they should eliminate the two sets of security doors located in the corridors between the Great Hall and the control rooms since they serve no purpose other than to impede the ability of staff to move between the Great Hall and the housing units.  When that work is done, the County should also create a safety vestibule, with two swinging security doors, as the single point of entry to each control room.  The single sliding doors located on each side of the three control rooms should be removed and the walls secured. It was also observed that many cells lacked functioning lights causing inmates in segregation cells to lay on the floor and use light coming through from the hall when light was needed.

While the JDC and WC do not have the overall appearance of neglect that afflicts the RDC, they need more timely correction of maintenance problems regarding plumbing and electrical work.  An example is the electrical cord that runs across the floor in the lobby of the WC. This obvious violation of fire and safety regulations has been noted during each of the past three site visits.  There is still no standard format in place at each of the three facilities for the documentation and repair of maintenance issues.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be

conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

Random shakedowns of cells and common areas are still not accomplished and documented as this paragraph requires although a review of incident reports reflects an increase in the number that are conducted.  While the monitoring team was informed that shakedowns are now conducted solely by Detention Officers, not by law enforcement officers, at least one incident report, #171283, dated 12-14-17, indicated that such is not the case.  On that date, HCSO patrol deputies, SRT Team members and a Mississippi Department of Corrections RRT team conducted a shakedown of RDC, Unit A2.  If law enforcement officers are involved, they should provide back up and work under the direction of Detention Center staff. The practice of undercutting the authority and responsibility of Detention Officers by allowing law enforcement and outside agency officers to assume their duties is inappropriate and counterproductive.  On January 31, 2018, Assistant Jail Administrator Fielder issued a memo to all personnel that calls for each facility to conduct two shakedowns per month.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

While no concrete action has been taken to date to deal with this issue, in December the Jail Administrator received a briefing from Securus Technologies on a Wireless Containment Services (WCS) system, which may be a viable option to control contraband cell phones in the jail facilities.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Partial Compliance**

There has been no change in the status of this paragraph.  No additional information was provided during the most recent site visit beyond the fact that a law enforcement officer is assigned to conduct investigations within the Jail System.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

    a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

    b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c.  Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

    d.  Prohibit the use of force as punishment or retaliation;

    e.  Limit the level of force used so that it is commensurate with the justification for use of force; and

    f.  Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Since the P&P Manual has still not been revised, reissued and approved, compliance with this paragraph cannot be achieved.  The significance of non-compliance was reinforced by two use of force reports in early February that reflected a lack of understanding regarding some of the practices outlined in this paragraph by command level staff, the very people who are responsible for ensuring that subordinate staff follow proper procedures.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a.  Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b.  If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

**Non-Compliant**

To date there are no recorded instances of staff members obtaining supervisory approval prior to using weapons and mechanical restraints. The same can be said for the use of chemical sprays, physical restraints and electronic control devices being used when a prisoner may be at risk of positional asphyxia. The fact that a non-approved use of force technique was used during a recent incident by a member of the Detention Services Division command staff (Incident Report #1800268) is reflective of the need for intensive and extensive training for all Detention personnel.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

**Non-Compliant**

The P&P Manual is still under review. Revised policies and post orders should be submitted for review by the Monitor and DOJ staff by July. Fifteen-minute well-being checks are now maintained both in Booking and in the RDC, B4 Isolation Unit. Suicide watch procedures changed on January 28, 2018, with the closure of the two cells in Medical that were previously used for that purpose. Suicide watches are now maintained in C4 Isolation and the assigned officer stays inside the unit making it possible to achieve constant supervision instead of only a 15-minute well-being check. Four or more inmates can be supervised by one officer in this configuration. There is no evidence that mental health staff assess prisoners who have been subjected to Level 1 use of force.

e.  A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f.  Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g.  The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

    i.  a sign-out process for staff members to carry any type of weapon inside the Jail,

    ii.  a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

    iii.  random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h.  A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i.  All staff members using force must immediately notify their supervisor.

j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

To date there has not been a recorded incident of a planned use of force, which would have, in turn, necessitated notification of supervisory staff and video recording of the event. A review of use of force reports for December indicated that there were three such reports written at the RDC, none at the JDC and no monthly report submitted for the WC. In January there were three reports submitted at the JDC and none at the WC, but no monthly report submitted by the RDC. The monthly reports by the three facilities need to be done uniformly utilizing the same format. The only report of a taser being used was at the RDC in November. That report reflected the proper use of the taser in defense of the officer, but also that he threatened to use it on the inmate if he did not comply with an order to submit to a strip search. This coercive use of the taser is in violation of the standards set forth in the Settlement Agreement. Inmates were routinely sent to medical for a follow up review and, when necessary, they were transported to a local hospital for treatment.

There is no evidence that mental health staff is being consulted prior to a planned use of force on juveniles or prisoners with serious mental illness.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program. Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Non-Compliant**
With the change in Training Directors since the October site visit, there has been a reset in the area of staff training. Use of force is covered during the basic 120-hour academy, but there is no record of comprehensive use of force training for all personnel, either in the academy or through annual in-service training.

53. Topics covered by use of force training must include:
   a. Instruction on what constitutes excessive force;
   b. De-escalation tactics;
   c. Methods of managing prisoners with mental illness to avoid the use of force;
   d. Defensive tactics;
   e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Non-Compliant**
As was previously reported, these topics cannot be addressed until the P&P Manual is revised and published.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action. The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**
This action cannot be undertaken until the revised P&P Manual is issued, officers are trained and sufficient time has passed to conduct the random testing of at least five percent of Jail staff.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

This cannot be updated until the policies and procedures on use of force have been completed.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**

There has been no change with regard to this paragraph.  It cannot be addressed until the P&P Manual is revised and issued to all personnel.  According to Information Technology and Jail staff, the new computerized incident report and use of force report forms contain information that has not been made available to the monitoring team. In addition, it is reported that a separate investigation report that is not linked to the incident and use of force report forms contains additional information. Also, it is reported that on the computer-based forms there is a space for supervisory approval, disapproval and recommended action.  Unfortunately, that documentation has not been made available to the monitoring team for review.  At present, it is still not possible for a determination to be made as to the adequacy and accuracy of supervisory review.  The team has requested that jail and IT staff be able to generate and provide reports to the monitoring team that provide the information needed to determine compliance.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change with regard to this paragraph.  The requirement cannot be analyzed until the P&P Manual is revised and issued to all personnel.  While report writing is improving throughout the Jail System, because the incident reports provided to the monitoring team lack information, it is still not possible to determine whether all incident reports are submitted in a timely fashion or whether supervisors follow up as required.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

      a.  A unique tracking number for each use of force;

      b.  The names of all staff members, prisoner(s), and other participants or witnesses;

      c.  Housing classification and location;

      d.  Date and time;

      e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

      f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

      g.  A description of the staff member's attempts to de-escalate the situation without use of force;

      h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

      i.  A description of any observed injuries to staff or prisoners;

      j.  Whether medical care was required or provided to staff or prisoners;

      k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

      l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

During the January/February site visit another training session was held with IT, Investigations, Operations and Detention staff to facilitate compliance with the reporting requirements of the Settlement Agreement.  Special emphasis was placed on the need for all incidents to be given a specific number with any supplemental reports and investigation reports tied back to that original number no matter whether that report was a use of force, rule violation, mechanical problem or any other matter worthy of being recorded.  While the monitoring team is still unable to see everything that appears in the Jail Management System (JMS), hopefully, the critical measurable details will soon be available through Drop Box.

**USE OF FORCE SUPERVISOR REVIEWS**

59.     The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

     a.     A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

     b.     A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

     c.     Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

     d.     If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

     e.     Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

     f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

     g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

No final determination can be made until the P&P Manual is revised and re-issued.  It was reported that formatting changes have been made in the electronic reporting system that allow the supervisory review required by this paragraph.  However, because of the limitation on what the system can provide in paper form, the monitoring staff cannot, as yet, see whether or not supervisors are taking appropriate follow up action on each report.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

     a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

     b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may

refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.  Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.  Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.  Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

The specified actions of this paragraph are not routinely followed by supervisors.  A review of recent use of force reports revealed that photographs are seldom taken and waivers related to the refusal to be photographed are not included.  Witness statements are virtually non-existent and use of force incidents are not recorded.  It would seem that supervisors at the RDC should be able to review video of incidents by examining recordings in Master Control.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

At this point it is still not possible to determine whether or not supervisors are performing their required duties because the monitoring team does not have access to the supplemental information that may be included in the JMS reports.  The limited documentation available through Drop Box does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

62. Reviewing supervisors must document the following:

a.  Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

b.  Witness statements;

c.  Review date and time;

d.    The findings, recommendations, and results of the supervisor's review;

e.    Corrective actions taken;

f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

    i.    The nature and extent of injuries, or lack thereof;

    ii.    The date and time when medical care was requested and actually provided;

    iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Until it is possible to review the supervisory review portion of use of force reports it is not possible to determine whether or not supervisors are taking the required actions and appropriately documenting them.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The P&P Manual must be revised and issued to all personnel before the level of compliance can be determined.

64.    Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:

a.    Tracking number for each incident;

b.    The names of all staff members, prisoner, and other participants or witnesses;

c.    Housing classification and location;

d.    Date and time;

e.      Type of incident;
f.      Injuries to staff or prisoner;
g.      Medical care;
h.      All staff involved or present during the incident and their respective roles;
i.      Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
j.      External reviews and results;
k.      Corrective action taken; and
l.      Warden and Administrator review and final administrative actions.

**Partial Compliance**

While compliance is dependent upon the publication and issuance of the P&P Manual, Incident Report documentation currently provides for some of the information specified in this paragraph. Reports routinely have a tracking number, list all persons involved, including staff and inmates, although inmate witnesses are infrequently noted.  Many reports still do not specify in which facility the incident occurred.  Supervisory review information cannot be reviewed and validated until the monitoring team is able to access more sections of the automated report writing system. The same applies to external reviews and results, corrective action taken, Warden/Administrator review and final administrative actions.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

a.      Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.
b.      Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.
c.      Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change in the status of this paragraph.  While documentation of incidents is certainly more routine than was the case just a year ago, the fact that there have still been no reports of lost money and property or late releases and overstays is indicative of a failure to document.  During each site visit, a review of inmate records has revealed multiple cases where inmates have been held beyond their scheduled or ordered release, yet no incident reports documenting these situations have been written.  Consequently, there has been no follow up and

corrective action taken to include disciplinary action and re-training. Based on the expected experience with money and property at even the best run jails, there will typically be some incidents of lost money or property. For there to be no incident reports in this area suggests that officers have not been trained to provide incident reports on these incidents.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

    a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

    b.    Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

    c.    Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

    d.    Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Partial Compliance**

There has been no change in the status of this paragraph; however, validation of supervisory actions has actually been hampered by the transition to an electronic report writing system in that the monitoring team cannot track the actions of supervisors after the initial report has been submitted.  Hopefully, the previously mentioned coordination meeting that took place during the January/February site visit will help to rectify this problem.

**SEXUAL MISCONDUCT**

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

    a.    Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

    b.    Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.      Screening prisoners to identify those who may be sexually abusive or at risk of
        sexual victimization;

d.      Multiple internal ways to allow both confidential and anonymous reporting of
        sexual abuse and sexual harassment and any related retaliation, including a
        mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual
        assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity
        searches except in exigent circumstances or when performed by a medical
        examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent
        circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and
        sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual
        abuse and sexual harassment allegations.

**Non-Compliant**

Until the P&P Manual is published and issued, even partial compliance is not possible.  Separate
from the issuance of adequate policies and procedures, the practices at the jail are woefully
inadequate under PREA. There is a PREA Coordinator who is newly focused on achieving
compliance and is informed regarding PREA requirements. However, there is a long way to go.
Areas of concern include lack of training on PREA, lack of notice to inmates at booking or
comprehensive education following, lack of required information in the Inmate Handbook, no
postings on how to report, insufficient options for reporting, no volunteer or contractor training,
reporting and investigations are inadequate, and the evaluation of remedial measures is non-
existent. There needs to be involvement at the highest administrative level to begin to implement
measures that would bring the Jail into compliance with PREA. A first step would be to ensure
that incident reports are prepared following incidents of sexual assault, that those incidents are
adequately investigated, and remedial measures adopted.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct
misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County
shall:

a.      Develop and implement comprehensive policies, procedures, and practices for the
        thorough and timely (within 60 days of referral) investigation of alleged staff
        misconduct, sexual assaults, and physical assaults of prisoners resulting in serious

injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

    i.    Any prisoner exhibited a serious injury;

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

    i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

    ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

    i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

    i.    a brief summary of all completed investigations, by type and date;

      ii.     a listing of investigations referred for administrative investigation;

     iii.     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

     iv.     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

     v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

    g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

There has been no improvement noted with regard to Investigations since the Second Monitoring Report was submitted.  Although there is a designated investigator, the monitoring team has not received notification of investigative dispositions on individual cases.  While this may be due to technical problems associated with the electronic reporting system, the lack of information is so significant that it is not possible to provide an update on the problems that were noted in the last Monitoring Report.  As an example, it is still not known what happened to the officer who was found guilty of making a false statement, refusal or non-compliance with a direct lawful order and making improper use of his official position to include introduction of contraband to the facility.  The IAD investigation into this case was dated August 14, 2017.

**GRIEVANCE AND PRISONER INFORMATION SYSTEMS**

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

The use of the new kiosk system will eventually allow the prisoners to report grievances without the intervention of detention officers. However, the system is still not working as it should. Several problems reported at the time of the last site visit appear to have been remedied. There were no reports at the time of this site visit of inmates not being able to submit grievances because of their pin number being rejected.  The system at the WC which was completely non-

functioning at the time of the last site visit appears to be working now. However, it appears that grievances "get lost" in the system. The grievance officer at RDC showed the page in the program which lists all pending grievances and a second page showing pending grievances assigned to her. There were none on either page pending more than 7 days. However, when a report was run looking for all grievances in the category of waiting assignment, 21% of the grievances showed as waiting assignment over 21 days. These were unknown to the grievance officer because they did not appear on the working pages. One inmate was asked to put in his pin so the monitor could view the system as the inmates operate it. He had 14 unanswered grievances going back to November. One that was answered could not be opened to see the response. A similar situation was observed at JDC. The grievance officer's page and the general page showed nothing over 7 days. However, when a report was run for grievances in the working category, 67% were "working" over 21 days. A report of grievances assigned but not completed showed 87% pending over 21 days. Some of these grievances were assigned to the grievance officer but did not appear on her "pending" page. An inmate who opened his grievance list could not actually open any of the grievances; a report run on his grievances showed 3 grievances dating back to November and December that had not been responded to. Improvements to the system should be addressed promptly. In the interim, the grievance officers will need to run the reports and not rely on the page that supposedly lists all open grievances. There is some confusion with medical grievances. Inmates are using the grievance system to request sick call. Sick call will soon be available through the kiosk system but at this time, they are coming through as grievances.

Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer observing the grievance being filed. It was reported that inmates can observe another's PIN number and then used it to purchase commissary on the other inmate's account. There has also been a problem with inmates communicating with each other through the kiosk system. These issues will need to be addressed.

70.    Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**
The policy on grievances does not describe the current process of using the kiosk. The practice that is described in the current policy does not comply with the requirements of the consent decree.

71.    All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still

need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

The new system creates a spreadsheet to track grievances and responses. The Grievance Officer can track who has been assigned to respond to a grievance on the spreadsheet. There are currently several problems with the process that prevent compliance. As described above, unbeknownst to anyone many grievances were not showing up on the pending pages and as a result, many grievances are not being responded to. A review of the paper grievances used at the WC until recently also showed many grievances with no response reflected on the grievance. The person assigned to respond to a grievance is assigned based on housing and subject matter. However, this can result in some situations where the responding individual is not impartial. This would be the case where the grievance is about an issue that is the responsibility of the responding individual. The assignments need to be evaluated both generally and in the specific case to ensure that an impartial person is reviewing the grievance. At the RDC, there is no one routinely checking to ensure that all grievances have been responded to and no one ensuring whether resolutions have been implemented. No one is tracking whether medical grievances are being responded to in a timely manner. The new system has no means known to staff for marking a grievance as an emergency or otherwise identifying emergent grievances.

72.    The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

The staff is currently not well-trained on the capabilities of the system. They will need to be trained so that they can assist prisoners with accessing the system once it is functional. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number. Staff did not know whether a different language could be selected and utilized with the system. The screen allows one to select Spanish. However, the monitor could not get it to pull up the handbook in Spanish (which had outdated instructions on grievances anyway). Neither did staff know whether it had a voice recognition feature. These questions should be addressed to the vendor. Currently, the staff assumes that other prisoners will assist with prisoners who cannot access the current system. This does not meet the requirements of this paragraph.

73.    The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations;

43

reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The Inmate Handbook has outdated information about most of these issues and will need to be updated and will need to provide more detail to assist prisoners in using the system. It is not available in Spanish or any other language.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

There has been no significant change in compliance with the terms of this paragraph since the October site visit.  Classification now takes place within 24 hours of entry to the RDC, but not within eight hours of intake as this paragraph requires.  Single cells in the Booking area are being used only for the processing of new detainees.  Fifteen-minute well-being checks appear to be current.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The monthly summary reports submitted by each facility now include a listing of inmates who have been placed on or removed from confinement/segregation.  The format for each report is inconsistent, but the basic data is available.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Non-Compliant**

Although the social worker does see at least some of the prisoners being held in segregation, these visits are not the type of mental health rounds described in this provision. A nurse conducts daily rounds of segregation.

77.   The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

    a.   All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

    b.   Segregation must be presumed contraindicated for prisoners with serious mental illness.

    c.   Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

    d.   If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

    e.   Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

    f.   Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

        i.   If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

        ii.   The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

        iii.   If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health

Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g. Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h. If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i. The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j. Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

There is no evidence that the required activities under this paragraph are being done. There is no evidence that segregation is presumed contraindicated for prisoners with serious mental illness (SMI). Prisoners with serious mental illness who are on medication and in segregation do have a daily visit from a nurse during medication pass.  However, during the limited amount of time that was available during this site visit, it was not possible to assess the extent to which the nurse performing medication pass assessed the prisoner's status. There is no evidence that signs of

46

decompensation are being observed or addressed. Given the absence of mental health monitoring of prisoners in segregation, it is also quite possible that mental health staff don't know if prisoners are decompensating or developing new signs or symptoms of mental illness.

Although there appears to be a unit where many of the prisoners who suffer from serious mental illness are housed, there is no evidence of an Interdisciplinary Team as described in this provision, and there is no evidence of treatment plans, even treatment plans that only involve mental health staff.

Addressing the requirements of this paragraph will first require addressing some of the larger issues noted under earlier provisions, regarding the performance of mental health evaluations, the development of treatment plans, and the documentation of such evaluations and treatment plans. Once those issue are addressed, there should be a meeting of health and mental health staff, security staff, and the monitors to discuss this provision and plans to move towards compliance with this provision.  Such a discussion would have to include what role(s) security staff might play; the identification and selection of security staff who might assume such a role(s); and the training that selected security staff require in order to assume such a role(s).

## YOUTHFUL PRISONERS

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Partial Compliance**

Although some Juveniles Charged as Adults (JCAs) had been at Henley Young prior to the last visit, this visit was a better opportunity to evaluate the progress made in transitioning "new" JCAs to the Henley Young Juvenile Detention facility that began with admitting those youth in September 2017 as well as evaluate any substantive changes for JCAs at the Raymond Detention Center (RDC).  As of this visit:

- There were eleven JCAs at Henley Young and seven JCAs remaining at the Raymond facility;

- All youth at Raymond, except one, are age 17 and will "age" into adulthood during this calendar year (March, June, July, August, October, and November);
- The remaining JCA will turn 16 in March;
- Of the eleven JCAs at Henley Young, the ages are 17 (5), 16 (4), and 14 (2); as with RDC, some of these youth will "age out" and be transferred to an adult unit at RDC during the calendar year unless otherwise released;
- Charges for the JCAs at Henley Young include Armed Robbery (7 youth), Armed Auto Theft (2), Capital Murder, and Murder;
- Five of the JCAs at Henley Young have been in placement for five months, three more youth for 2-3 months, and 3 youth two weeks or less;
- Only two of the youth in confinement have been indicted in Hinds County.  Two additional youth had been indicted in another county prior to their arrest and confinement in Hinds County;
- There were eleven non-JCA youth (all males) being held at Henley Young.

As noted in the previous report and in Mr. Dixon's Henley Young Monitoring Report, the remaining JCAs at RDC present greater challenges in transitioning to Henley Young as a result of their long-term confinement at the RDC and the resulting "adultification" they have experienced by being housed in a setting that has offered little programming, minimal mental health services, often inadequate supervision, and generally poor living conditions. However, as the number of JCAs at RDC continues to decline, options other than Henley Young may become more practical (e.g. another unit within RDC, housing in a neighboring/other county) pending achieving full compliance with this requirement.  It will become increasingly inefficient to utilize a full housing unit for the dwindling number of JCAs held at RDC and getting those youth out of RDC may allow the county to get into an "empty" unit to complete repairs/needed maintenance or even utilize the space for other purposes.

In general, the transition of new JCAs to Henley Young has been successful, albeit not without concerns. The process for booking youth at RDC prior to bringing them to Henley Young has worked well, although ironically the youth admitted to Henley Young during the term of this visit did not come with accompanying documentation (a youth should not be admitted to the facility without required documentation).  Both staff and youth express general satisfaction with the transition of JCA youth to Henley Young, and as one might expect most of the youth admitted had been at Henley Young as juveniles.

In sum, the first steps toward transition have been made, but it is not clear that firm decisions have been made to complete the transition, particularly changes needed to address previous recommendations, including:

1. Making additional physical plant modifications at HY related to perimeter and living unit security.  There are legitimate concerns that as more serious offenders are held for longer

periods of time, additional security for the perimeter (to prevent escape, incursion from the outside, tossing contraband into the "yard", etc.) is increasingly critical.

2. Constructing additional classroom, multi-purpose, and recreational programming space(s) that will permit proper programming, classification, and supervision for all youth at Henley Young;

3. Reviewing staffing alignment and positions to ensure additional staffing and supports as additional JCAs are transferred from RDC. This may include adding security staff to ensure perimeter and access safety;

4. Addressing case processing concerns in the adult system that has resulted in lengthy periods of confinement for JCAs at RDC and, absent changes, will result in similar lengths of stay at Henley Young. This not only delays resolution of the youth's case but also increases the likelihood that the population of JCAs at Henley Young will grow and create additional challenges for operation of the facility as a whole;

5. Making structural improvements to the living units that will support more effective supervision and programming for youth including:

   a. Installing soundproofing materials (e.g. acoustic ceiling tiles, acoustic wall panels, carpeting in portions of the floor) to reduce the noise level created by normal adolescent behavior(s); noise that makes it not only difficult to properly interact with/supervise youth but also adds to the overall noise level that unnecessarily elevates the emotional level of youth. This is consistent with recommendations included in the report by Dr. Boesky as it relates to creating a trauma-reducing environment;

   b. Removing the steel tables and replace them with movable, security grade tables and chairs that are more comfortable, flexible, and permit rearrangement for purposes of programming in small groups, separation of youth within a unit, and/or even individual program purposes; and

6. Continuing to implement practices and policies that limit the number of non-JCA youth confined at Henley Young. At the time of this visit there were eleven non-JCA youth in the facility, all male, making the total for the facility 22, within the 32 limit of the Henley Young agreement. If/as girls are added and/or as the number of both JCA and non-JCA youth held grows the flexibility to manage youth will diminish. It seems inevitable that the need for secure placement of a small number of non-JCA girls and/or JCA girls will occur, so planning needs to consider how that need will be accommodated, whether that be at Henley Young or through some alternate arrangements. In any case, use of Henley Young for non-JCA youth should be limited to those youth that pose a danger to the community or circumstances in which it is necessary to secure a youth's appearance in court; and for those youth only as long as those conditions remain a concern.

All of these steps will become increasingly important as the number of JCAs at Henley Young grows and/or their length of stay increases, so proper planning (including needed funding)

for/implementation of these changes should be done as soon as possible.  County staff indicate that some bonding authority has been approved in the budget and that some portion of those funds can be directed to make these changes.  A concern is that given the relative success of the transition to date, the sense of urgency needed to commit the necessary funding in a timely manner is diminished.  The County needs to establish, articulate, and implement a plan (including action steps, fiscal resources, and timelines) to complete the transition of Juveniles Charged as Adults (JCAs) to the Henley Young facility.

**Reporting compliance on the remaining conditions will reference one or both locations as appropriate.**

For any youthful prisoners in custody, the County must:

78.    Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance at Henley Young**
Continuing Partial Compliance on this component is solely the result of transitioning some youth to the Henley Young facility.  Any JCAs booked at RDC and then housed at Henley Young are screened for mental health concerns using the MAYSI-II, a common screening tool that is appropriate for use with adolescents.  The Case Managers, now about one year into that role, seem to be adapting well to providing an appropriate and very helpful support role to youth and other staff.  The Case Managers are in daily contact with their assigned youth, provide information and support to maintain appropriate family contact(s), interact with court staff, help link youth with external resources, and can intervene to prevent behavioral problems.  The counseling staff provide more on-going therapy and support and can help coordinate services with Hinds County Behavioral Health or other resources.  These staff provide a good foundation for the day-to-day behavioral health services needed for youth.

However, there are three remaining concerns:
1.  As of the site visit the County had not yet been able to secure the services of a qualified psychologist.  As noted in prior reports by Dr. Boesky and Leonard Dixon, adding a psychologist will fill in a needed gap in the ability of the program to provide more comprehensive psychological assessments, treatment and other programming for all youth.  This is particularly important for JCA youth who will be held for long periods of time.  Mr. McDaniels at Henley Young indicated that they were in negotiations with a psychologist at the time of the site visit, however, at last communication, that agreement has not been reached;

2. The only psychiatric time provided to Henley Young is apparently a once-a-week short visit by Dr. Kumar.  As noted for the agreement as a whole the amount of psychiatric support allotted is insufficient, let alone for the JCA youth.  It seems likely that at most some sort of cursory psychiatric review of records is possible in the limited time available; and

3. The introduction of other coordinated programming (e.g. cognitive-behavioral programs, life skills, AODA, etc.) that could be led by Case Managers and Counselors has been slowed by waiting for the direction/leadership from the psychologist.  If there are further delays in filling that role, existing staff should be charged with developing additional programming utilizing any number of well-researched, evidence-supported curriculums.

A more comprehensive assessment of mental health services at Henley Young is available in the December 2017 report from Dr. Lisa Boesky.  In that report she highlights both the progress made over the past two years and includes a number of additional recommendations for on-going quality improvement of services.  Those recommendations include suggesting improvements in the intake/screening process, strengthening the assessment process (e.g. AODA assessments, trauma assessment), and making physical plant/environmental changes that will support behavior management and educational programming.

**Non-Compliant at RDC**
There is no substantive change in how JCAs confined at RDC are screened and/or served in relation to the various components required in this provision.  Mental health services remain limited to dealing with crisis situations (i.e. suicide concerns) and issues related to psychotropic medications (i.e. adjustments in medications).   There has been some increase in the "life skill" programming that youth can participate in, but it is not focusing specifically on mental health or substance abuse issues.

Special Note re: Youthful Prisoner D.C. (DOB: 3/21/2000):  A particular concern was raised with RDC staff related to a diagnosed, yet untreated medical condition for this juvenile.  Specifically, there was an indication that the youth complained of an abdominal problem that was subsequently diagnosed as a lingual hernia. As of that date the plan was to follow up within 4 weeks for laparoscopic surgery, but as of the time of this site visit there had been no further action taken, apparently because a determination had been made that the surgery was not urgent.  Although perhaps not urgent, the youth continued to complain of discomfort, and Hinds County should take the necessary steps to resolve the problem.  The Compliance Coordinator conveyed via e-mail (2/13/18) that as of February 5 the plan is to schedule a follow-up evaluation with the surgeon.

Recommendations (continued from prior report):

1.  Assuming the transition of JCAs to Henley Young continues, the case manager recently employed to work with the JCA youth at Henley Young should begin outreach to the remaining JCAs at RDC to begin a more complete assessment process and assist in the transition of those youth to Henley Young; and
2.  The County should secure a psychologist for Henley Young consistent with the terms of that Consent Decree and should increase psychiatry consultation time.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance at Henley Young**

Education services at Henley Young are provided by the Jackson Public School (JPS) system.  A more detailed review of educational programming is available in the November 2017 report submitted by Carol Cramer-Brooks.  As with the report filed by Dr. Boesky, the report recognizes the significant progress (leadership, assessment, instruction, etc.) that has been made in the past two years in meeting the educational needs of youth confined as well as noting some areas for continued improvement.  At the time of her review, serving JCA youth was still in its early stages, but key elements of her recommendations remain relevant for all youth, including:

1.  More fully integrating education staff as an important part of the overall behavior management system;
2.  Improving teachers' ability to provide differentiated instruction (based on the diverse needs of confined youth);
3.  Increasing time and resources allotted to providing specialized educational services;
4.  Improve classroom and other support spaces;
5.  In particular developing a different educational program for JCA, long-term youth who due to their age and length of stay require a different approach than has been developed for the short-term non-JCA youth.

At the time of the last site visit, the plan for JCA youth included integrating younger offenders into the regular school program and developing an appropriate GED program for those youth who may be appropriately assessed to be on that track.  However, due to concerns that arose in "mixing" some youth, it is understood that all JCA youth now receive educational instruction on their living unit on a limited basis, i.e. 2-3 hours/day.  That is not a sufficient substitute for a full educational assessment and programming consistent with the requirements of this Agreement, particularly for youth who may be eligible for special educational services.  Further work needs to be done to implement a more complete educational program for JCA youth, although significant progress will be hampered by the physical plant limitations.

All youth interviewed indicated that there was too much "down time" when there was not structured programming for them to be involved in.  The daily schedule for JCA youth does

include "recreation time", but that term is used generically for any number of unstructured activities other than specific education time.  As noted earlier, Henley Young will benefit by the development of additional cognitive behavioral programming, AODA groups and individual work, decision-making skill classes, tutoring, and engaging outside community groups and resources to provide pro-social learning opportunities for youth.

**Non-Compliant at the Raymond Detention Center**

The program at RDC remains essentially the same as prior reports, with youth benefiting, albeit on a very limited basis, from the continued support of a volunteer for Adult Basic Education (ABE) services.  Youth have daily access to individualized instruction for relatively brief periods of time (e.g. 1-2 hours).

There remains no routine screening process (other than assessment related to ABE skills) to determine whether and what educational services a juvenile or youthful offender was engaged in prior to admission that would help determine what the appropriate, and often legally required, services should be for the youth while confined. However, per County staff steps are being taken to have the educational staff at Henley Young that do those assessments begin to do that with the remaining JCA youth at RDC, starting perhaps with the youngest remaining JCA.

Recommendation: Continue development of a more complete educational program, including GED support, at both Henley Young and at the Raymond facility.  Using the Jackson Public School staff at Henley Young to assess the needs of the remaining JCAs at Raymond would be a positive step to at least understanding what is needed for those youth and taking additional steps forward.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Full Compliance at Henley Young**

Since there are no adult prisoners placed at Henley Young, this provision is met, and as JCA youth in placement turn 18, they will be transferred to RDC.

**Partial Compliance at the Raymond Detention Center**

Youth are housed in a separate unit so that the potential for contact with adults is minimized. As noted in prior reports, the lack of Policies and Procedures make it difficult to determine if the facility has all procedures in place to fully assess compliance, but in talking with youth and staff there is at least an indication that youth are kept on the youthful offender unit and there are not problems with adult contact.  As noted in prior reports, there is no evidence of signage or consistent policies that indicate appropriate attention to the requirements of the Prison Rape Elimination Act (PREA) related to youthful offenders, including separation and supervision.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance at the Raymond Detention Center and Henley Young**
With only one unit in RDC, this provision cannot be fully met, but as the number of youth declines and given that all but one youth is 17 years old, this is less of a concern.

The limited number of non-JCA youth at Henley Young has allowed them wisely to utilize two units for housing JCA youth and even some placement of non-JCA youth (on a limited basis) in one of those units.  The use of two units allows for lower youth to staff ratios and allows youth to be separated if there is conflict, so to date the staff has made reasonable placement decisions.  As with other aspects of this transition, as more youth are housed, this will become an increasingly important decision and will require managing the number of non-JCA youth housed at Henley Young.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance at Henley Young**
In discussion with Alan Hines, Training Coordinator for Henley Young and reviewing the 2017 Training Report, substantial progress has been made in developing a training program, and staff are afforded significant training opportunities. Highlights of the training plan include:
1. Five New Employee Orientation Classes (40 hours total/36 staff) that includes training in Suicide Prevention/Mental Health, Behavioral Management, PREA, Policies and Procedures, and Crisis Intervention.  Each certified detention officer must complete 40 hours of on-going training annually in these areas as "refresher" training;
2. New employees and veteran staff are trained and certified in Crisis Prevention Intervention (CPI), a well-respected curriculum that is appropriate for dealing with crisis situations with youth and focuses on the use of verbal de-escalation as well as providing basic control/restraint techniques that can safely be used with youth.  In 2017, 40 staff received CPI certification (a two-year certification), but some of those staff have since left Henley Young;

3. Twenty-nine detention officers completed a state-required 120-hour Basic Adult and Juvenile Detention certification program; and
4. Over 30 staff completed a required CPR certification (two-year certification).

As changes have been made at Henley Young there has been a significant number of new staff hired. In 2017 a total of 31 officers were hired, but given a variety of reasons by year's end only 16 of them remained on staff as certified officers. This was in part due to appropriate termination decisions made by administration, challenges in hiring related to the low salary paid to staff, and some others simply choosing to take a different path. The County has approved a pay raise for detention officers (reallocating funds from several vacant positions) that hopefully will help with recruitment and retention, but the progress made in developing a professional training program is a significant step forward. A more detailed examination of all training records can be completed during the next site visit, but Henley Young is well on its way to Full Compliance in this area.

**Non-Compliant at the Raymond Detention Center**
The last specialized training for supervising youthful prisoners was held in June 2017 prior to the site visit. Ten staff participated in the training, although seven of the ten are staff currently assigned to the JDC, leaving only three RDC staff receiving the training. And, it appears that no effort has been made to then clearly assign those trained staff to the juvenile unit (A-1) with the exception of Sgt. Tower. While the general course of training for new detention officers does include some basic elements that are appropriate for juveniles, the lack of additional training and lack of focus on assigning specific staff to the juvenile unit is of significant concern. Overall this remains a concern.

While the number of JCAs at RDC has dwindled and the number and severity of problems with youth has also declined, the unit has not been without incidents of concern. There continue to be security problems with the operation of the room doors, youth access to recreation has been more limited, and incidents that should not be occurring with proper supervision and training. For example:

1. On November 9 in the evening there was a physical confrontation/assault of an officer on the unit; this incident occurred after Major Rushing had noted (via camera) that there was no officer on the juvenile unit (at approximately 4:30 p.m.), in violation of policy that requires an officer to be on the unit at all times;
2. On November 28 there was a physical altercation between a staff member and a juvenile following a disruption that included several other youths. What is disconcerting about this incident, based on reports, is that it occurred at **11:10 p.m.,** long after youth should have been securely confined in their cells. Additionally, the reporting officer indicated he was confronted by youth as he entered the unit despite the fact that current policy requires a staff member to be in the unit at all times;

55

3. On December 11 at **2:00 a.m.** there was an altercation between several youth who had gotten out of their cells, and upon entering the facility staff noted one youth up on the second tier of cells holding a metal bar that could be used as a weapon.

The lack of consistent, trained staff assigned to this unit contributes to an environment in which youth can "run the unit", taking advantage of new, inexperienced staff as well as continuing to damage the facility. In addition to constant tampering with the security of cell doors, damages occurred to the steel tabletops in the juvenile unit so that **all** tabletops have been removed (either through damage or simply to prevent further damage). The result if the complete absence of anything resembling a table that can be used for dining, writing, playing cards, etc.. A good security step has been taken to reduce the number of cells that can be used for juveniles, but apparently even those cells cannot be properly monitored to ensure they are secure. One can only assume that absent a change in staff assignments, training, and improved supervision these problems will continue.

Recommendations:

1. Related to Henley Young, the recommendation is to sustain the positive progress made in developing core and introductory training programs and then to (a) augment that training through strategic use of "refresher" trainings that can be included as part of staff meetings or other brief training opportunities; and (b) identify additional competencies for which training can be developed (internally or outreach to other community resources), e.g. training in understanding trauma, gang awareness/intervention, family engagement, professional communications, etc.. Increasing the "professionalism" of staff will prove beneficial for management of the facility and help with staff retention;

2. Related to RDC, the recommendation is for leadership to identify, select, train, and schedule a core group of staff to supervise the juvenile unit. In order to cover the unit on a 24/7 basis and provide some flexibility in scheduling, this may require identifying 8-10 staff that can ultimately work as a "team" to ensure greater consistency, safety, and security.

83. Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general. In addition:

a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h.  If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i.  Any notifications or assessments required by this paragraph must be documented in the youth's individual record.


**Partial Compliance at Henley Young**

Based on conversations with staff and youth and in reviewing incident reports and other records, segregation as defined in this agreement is uncommon in that there are short periods of time when youth may be confined to a cell for disciplinary reasons but not for a majority of waking hours. A number of instances of cell confinement were noted for less than two hours, and appropriate well-being check documentation was provided.  Youth did not report being confined to their cells for disciplinary purposes, other than one youth that is referenced in the incident below.

The HY Policy and Procedure Manual (Chapters 3.C.7 and 3.C.8,) articulate policies and expectations for how discipline and rules are to be enforced in a manner that is consistent with the expectations of the Agreement.  These procedures cover "Behavior Management Isolation" that may be used for short periods of time only as needed (and only for as long as needed) in

instances where a youth needs to be separated to ensure safety as well as "Due Process Isolation" for up to a limit of 72 hours.

There were two incidents that required longer periods of cell confinement (Due Process Isolation), one an assault on another juvenile and one involving an assault on staff.  In both cases, discipline involved a period of cell confinement of approximately 48 hours and in the case of the fight involving youth their separation into different living units.  There was documentation of the incident, well-being checks, appropriate referral for involvement of mental health staff, notification of leadership, and a prompt determination of how to successfully get the youth back into the population.  However, time did not permit complete review of all details of all aspects required, but again Henley Young is well on its way to Full Compliance.  Given the limited number of incidents and relatively short tenure of JCA youth this will remain a focus of review for future site visits.

**Non-Compliant at the Raymond Detention Center**

There remains no evidence of sufficient policies/procedures or documentation related to the use of room confinement or other forms of isolation/segregation for youth. One source of documentation that may help track this is that staff on the juvenile unit are required to document at least every 30 minutes what each juvenile is doing on the unit.  Wading through that documentation is at best a challenge but does reveal a wide range of "activities" that youth are engaged in, with notes that include everything from "on the unit" to " sleeping in room" to "out for program" and various other descriptors.  It is not uncommon for a youth to be listed as "sleeping in room" or "in room" for substantial periods of time during what would be considered "waking hours", and the staff explanation is that the youth is voluntarily in their room.  That is consistent with youth continuing to report that room confinement for disciplinary reasons is not occurring.  Youth did complain less about not being "let out of their room" at required times, but also indicated they are not getting as much outdoor recreation time as they had been previously. This is apparently the result of a policy change related to how Sgt. Tower supervises the youth weekdays.

Recommendations:  Related to Henley Young, the recommendation is to continue to ensure that all staff are consistently documenting any period of cell confinement/isolation, whether part of the behavior management system or for safety reasons; for RDC compliance can be improved by (1) developing clear policies/procedures, consistent with the Agreement requirements, related to the use of segregation or other forms of isolation/confinement for disciplinary purposes; and (2) keeping a room confinement log that documents any period of time in which a youth is placed in segregation/room confinement for disciplinary purposes that includes the name of the youth, the time confined, the officer implementing the confinement, brief reason for the confinement, and any involvement of medical/mental health staff to review confinement if it is extended; and (3) require the writing of an Incident Report for any such confinement that exceeds one hour.

84.    Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

a.    The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

b.    An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

c.    The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance at Henley Young**

This site visit afforded the opportunity to review in more detail the behavior management (point/level) system in place at Henley Young.  As described in the prior report, the facility has developed a reasonable system that is particularly suitable for short-term residents and to date has been applying that same program for the longer-term JCA youth, with reasonable success. The system identifies basic daily expectations and incentives that contribute to the safe operation of the facility and makes clear what additional privileges youth can earn the next day by meeting those expectations as well as an additional incentive for a good "week".  Given the longer time that some JCA youth had been in placement, it was not surprising to hear them be able to reasonably articulate both the expectations and the incentives included in the system.  This is in contrast often to short-term youth who do not always grasp the details of such a system. Therefore, the fact that youth seem to understand the system and take some pride in doing well on the system is a definite positive.  Additionally, the Policy and Procedure Manual (3.C.5.) for Henley Young clearly articulates the purposes and details that are incorporated into the point system.

That said, the program does not fully meet the requirements of the Agreement as it relates to incorporating individualized, longer-term case planning for JCA youth.  The program will benefit by the addition of a psychologist to the staff and the development of a team case planning approach that can identify goals for individual youth to learn and exhibit new and improved pro-social behaviors, sound decision-making skills, and completing other skill and treatment programs.  Also, the Agreement requires substantial documentation of how the program is

implemented for individual youth, which will require additional planning to enable staff to do so in a relatively efficient manner.

**Non-Compliant at the Raymond Detention Center**

There has been no movement toward the development of a behavior management program at RDC.  As noted in the prior report, there has been a small step forward in developing a daily schedule, but that schedule remains relatively limited despite some improvements in offering some structured groups led by volunteers. There is no evidence of a consistent set of expectations, incentives to meet those expectations, and/or consistency in how staff view expected behaviors. This is one of the areas in which identifying a core group of staff that can work as a team in providing more defined expectations and incentives could be at least a small step toward meeting this requirement for youth remaining at RDC.

Recommendation: As the transition of youth to Henley Young continues, a cross-disciplinary team of staff should look at the current behavior point system and develop strategies to enhance it for working with JCA youth, including how to identify targeted behaviors (remedial or new), additional individualized incentives that may be useful in shaping behavior(s), and how these changes can be integrated within an overall behavioral health and youth development perspective.  Related to RDC, it may be too much to expect the development of a behavior management program that meets the conditions of the Agreement, but at least if a core group of staff are identified it may be possible to implement some basic behavior incentives and rewards that help with both the daily structure of the program and prevent some of the more troublesome behaviors that continue to occur.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include, but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Non-Compliant**

There continue to be problems with lack of paperwork and timely release. There were significant problems with paperwork not supporting continued detention when release was warranted by existing paperwork. This is described under paragraph 92 below. In addition, there were files missing copies of the warrant or capias supporting initial detention. One individual booked in August was described as "just being lost in the system." There was no assigned attorney so no preliminary hearing had been set. There was an instruction to "put a hold" on the release but this was a verbal order, not a written order.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**

At the time of the site visit there was no one in the facility on an unlawful order for failure to pay fines and fees compared to 100 inmates detained on unlawful fines and fees orders at the time of the February 2017 visit. As a result of separate litigation and the adoption of Mississippi Supreme Court rules for criminal procedure, the jail has not been receiving unlawful orders. This requirement is listed as non-compliant because the jail has not developed or implemented policies as specified in paragraphs 87 through 89 below.  As the Supreme Court rules are very new, it would be advisable to have polices to address orders that are not compliant with the new rules.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The County sponsored a training session on the new rules as related to orders on fines and fees. This is to be commended. This requirement is carried as partial compliance in that a process was not adopted to address non-compliant orders. If this becomes moot because of the rule change, the parties could explore dropping this requirement.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**
See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**
See response to number 87 above.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**
The WC continues to maintain a spreadsheet. There are some individuals who have a sentence of confinement. Some of these individuals show fines and fees but with the notation of a payment plan in effect. This signifies that they will be released after the sentence of confinement. The Monitor will continue to track these entries to ensure that individuals are released after the confinement period. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliant**
This has become a limited issue now that virtually no individuals are working off fines and fees. As reported recently, the recent standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. In the October site visit, Captain Chandler stated that individuals with medical conditions did get the full amount of credit without working. However, Deputy Neal stated that only in special situations would they get full credit. He would make the recommendation to the Captain based upon criteria such as how long the prisoner has been incarcerated, the nature of the charge and generally a subjective judgement. The monitor did not revisit this information during the current site visit. There needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:
  a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.
  b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.
  c.    Examples of prisoners presumptively entitled to release include:
      i.    Individuals who have completed their sentences;
      ii.   Individuals who have been acquitted of all charges after trial;
      iii.  Individuals whose charges have been dismissed;
      iv.   Individuals who are ordered released by a court order; and
      v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Non-Compliant**

A new scenario was observed during this site visit. A number of prisoners had orders from the preliminary hearing stating that they should be released if not indicted within 90 days. This is consistent with the recent Fifth Circuit case <u>Jauch v. Choctow County</u>, No. 16-60690 (5th Cir. 2017). Some of these prisoners had reached the 90 days but had not been released. It was explained that the judge had issued a verbal order that all of the prior orders should require a release order from the Circuit Court. This has resulted in a number of prisoners having a written order in their case mandating release but not being released. More recent orders on the preliminary hearings specify that the prisoner should be released after 90 days with an order from Circuit Court. However, there is no process to effectuate this. The <u>Jauch</u> case found that the Choctaw County Sheriff violated the Constitution when it held the plaintiff 96 days after arrest without an indictment. The County should seek guidance from the courts on how it should implement this case law. In addition, there were several other instances of persons being held beyond when they should have been released. One individual had been ordered to be released on an unsecured bond. This has not typically been used in the past and releasing staff did not know what to do with it so the individual was not released timely. Another individual had a court order for release if not indicted but was held 6 ½ months beyond the court ordered release date. Several individuals were held beyond the 21 days for Probation Violations without a hearing. One individual was released after 97 days; one after 53 days.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Non-Compliant**

There is still no known process to methodically check for adequate documentation for detention and identify those that should be released. The Jail still relies on inmate requests and grievances to identify people who are being over detained. The booking, release, and records process continues to suffer from a lack of coordination.  In addition to Booking staff, there are three individuals tracking the lawful basis of detention. They are all three using separate spreadsheets and lists. There continues to be a lack of business process to check all law enforcement and court documents. The records consultant for the monitoring team has completed an initial site visit and is planning on working with the jail to develop policies and procedures that will address these issues.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must

develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**
The Jail record system does not identify persons with serious mental illness. While there are incident reports submitted, the forms do not have a place to indicate if the individual had a mental health illness.  And, there is no electronic method of identifying individuals with mental illness at the time an incident is occurring. Unless a computerized program is developed between the contractor and the medical vendor, officers will not know in advance of inmates with special mental health needs.  Health staff can identify the information after the fact, which may be useful but does not allow security staff to adjust its response to a developing incident based on possible mental health issues.

The QCHC staff continue to keep records as described before with a list of individuals on psychiatric medications and a tally of encounters with the psychiatrist or the psychologist. As described in response to paragraph 42 above there is no systematic process or log that would allow for the identification of the mental health case load. The tally of encounters is not broken down by how many individual patients were seen or whether they were assessments or for ongoing care. Based on this information, it would appear that the Jail is significantly under identifying persons with mental illness.

Although Jail and QCHC staff attempt to move individuals to the state hospital as needed, this continues to be a systemic problem. There are only 15 forensic beds at the State Hospital to serve the entire state for competency evaluations or restoration.  There are an additional 20 beds that are for individuals for civil commitments.   Of the 15 forensic beds, two are reserved for females.

At the time of the last site visit there was significant discrepancy between the number of individuals QCHC thought were waiting for a hospital bed and the number the state hospital had on the list. Updated lists were not provided at this site visit.  As mentioned above, there appears to be a lack of knowledge on the part of both detention and medical staff as to competency proceedings and the status of individuals in those proceedings. QCHC and legal staff should review the list with the state hospital to ensure the correct status of those individuals.

The jail-based restoration to competency program reported its progress since its inception in June, 2017. The program reports that nine individuals have been participating in the program and that three individuals were re-evaluated and found to be restored to competency in the program and are no longer waiting for a state hospital bed. It is understood that the services are minimal and are being provided in an extremely non-therapeutic environment.  This program is a pilot program and should be evaluated. As a substitute for state hospital restoration, an appropriate therapeutic environment that does not currently exist in the Jail will need to be created. However, the twice-weekly sessions with mental health workers does provide some therapeutic interaction that does not otherwise exist in the facility. There does not appear to be coordination between the Jail's contracted psychiatrist and the on-site state hospital staff or state hospital psychiatrist. Although such coordination would not occur if the competency restoration were taking place in the hospital, given that the jail psychiatrist and state hospital staff are simultaneously addressing the individual's mental health needs,  it would be advisable to consider whether and what kind of communication would be appropriate.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:
   a.   Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.
   b.   Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:
      i.    Requiring the individual to submit to bodily strip searches;
      ii.   Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and
      iii.  Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**
Individuals are not being released from the Court at this time.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:
   a.   Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b.    Specifically detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

In the initial Policies and Procedures that were adopted there are two policies that may relate to this requirement-the policy on records and the policy on booking which includes some requirements related to release. These policies do not have the specificity or the breadth required by this paragraph. The monitoring team and DOJ provided comments on these policies and a second draft should be forthcoming. Neither the DA's office nor the defense bar has been involved in the drafting. The level of specificity required by this paragraph will require significant revision of the policy.

Neither the County nor QCHC have developed sufficient mechanisms for the transition of persons with mental illness into community-based services. At the time of the last site visit, the recently hired discharge planner had resigned. A meeting with Hinds County Behavioral Health indicated that effective coordination had not been accomplished. At the time of this site visit, a new discharge planner had recently started and there was a renewed focus on discharge planning for prisoners who were identified as needing behavioral health services.  Therefore, there was some preliminary discussion of issues, with a promise to follow up and explore these issues in more detail during the next site visit. Of particular concern is the identification of steps that could be taken that might increase the possibility that a prisoner will comply with a discharge plan and related referrals.  One approach that has proved successful is inviting community providers into the facility to connect with prisoners who will eventually be referred to them upon discharge; with such an effort, the prisoner has actually met and begun to develop a relationship with the provider long before discharge, which significantly increases the compliance rate; and the facility is currently in discussion with community providers about starting such an effort. Another approach that has proved successful is the provision of psychoeducation groups for mentally ill prisoners; such groups help prisoners to learn about their illness and their need for treatment, and also help them identify and address barriers to continued treatment; but providing this type of therapeutic intervention will require additional mental health staff hours.

It was reported that clearance by Medical has been made part of the releasing process so that the discharge medications are being provided. It was unclear whether a 14-day supply or just whatever was left in the blister pack was being provided. Providing a 14-day supply is difficult when QCHC does not receive advance notice of a release. This will be addressed at the next site visit.

Recommendations:
1. Continue working on improvements in the discharge planning process.
2. Continue to explore enhanced working relationships with community providers, including a mechanism whereby such providers might meet and connect with prisoners prior to discharge.
3. Explore the feasibility of adding psychoeducation to the therapeutic interventions provided within the facility.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:
    a.    Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
    b.    Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**
The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**
The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. This will be verified at the next site visit. The business processes of booking and release need to be evaluated and revised in conjunction with the records consultation.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

a.      Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

b.      Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

i.       How to process release orders for each court, and whom to contact if a question arises;

ii.      What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

iii.     Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

iv.      How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

c.      Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

Staffing levels in Booking are still inadequate. They should routinely have at least two officers assigned in order to be able to receive arrestees and monitor those who are held in the cells, and there should be at least two booking clerks on duty. Consistent with the last report, at one time when booking was visited during the site visit there was only one officer on duty (plus the ID officer).  Similarly, during one visit to booking there was only one booking clerk posted while on another visit to booking there were two.  It should be noted that the booking clerks are actually detention officers, so when they have a female detainee delivered to Booking they pull the female booking clerk out to handle the pat down procedure.  While this is not an ideal situation, it allows them to get by without having to pull an officer from some other part of the jail.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**
There has not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

    b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**
The record keeping process does not at this time allow for an audit other than a review of individual files. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not prepared for errors in releasing.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**
The Jail now has an individual whose title is Qualify Control Officer. This individual has only recently been hired and is developing his work process. At the present time, his work is primarily reactive. When an individual is brought to his attention, he researches the situation and takes

corrective action. He does not track releases or prevent errors in the releasing process. He maintains a spreadsheet that includes release errors that he has addressed, but he does not at the present time collect and report on releasing errors. His work is not incorporated into a continuous improvement and quality assurance process. Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. Like the Quality Control Officer she operates independently of the booking and release process and maintains her own spreadsheets. There still is no systemic approach to ensuring proper detention and release processes are being developed. The records consultant will address this in the development of policies and procedures.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator. The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures. Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**
No documentation was provided of incident reports being created for untimely or erroneous prisoner release or any investigations of such incidents.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner. The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above. The County must document the audits and recommendations, and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**
Initial policies or procedures have been adopted but require significant revision. There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system. The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting, and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue

delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

There has been no change in the status of this paragraph since the last report.  The current attorney/client visitation spaces in the pods at the RDC do not allow officers to monitor them for safety and security.  The situation is exacerbated by the shortage of staff, however, a reasonable solution to the problem is readily at hand as a result of the recent change of video visitation vendors.  The new equipment is located inside each housing unit, which makes the old video visitation space, adjacent to the three pod control rooms, available for repurposing.  Once the old equipment and floor mounted stainless-steel stools are removed, the addition of typical office type tables and chairs will create three private, yet easily observed attorney/client visitation rooms.  Although this recommendation was included in the last report, no action to implement it has been taken to date.  At the JDC and WC, adequate space and facilities are available to allow attorney client visitation.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**

The County is making progress towards computerized incident and other reports as well as the development of summary reports that would allow the aggregation and sorting of reports. It was learned in this site visit that the reports provided to the monitor do not incorporate all the information that is accessible in the system. The monitoring team cannot routinely access the data base system to evaluate the information that is in the system and, at this time, there is not an ability to provide that information in an electronic or paper report form (other than the time-consuming process of creating screen shots).   The request was made to provide a report form that provides the monitoring team and internal staff with a report containing the most important information for review. There is better capacity to tie all records on an incident to the original report number. However, it was discovered that the information that was being requested by the monitoring team but not provided was actually included in an investigation report that was not being provided and is not linked by a uniform number. There continues to be a problem with providing a process in the reporting for approval/disapproval/action required blocks for

supervisors. There continues to be a concern because of the lack of reports or the small number of reports that some incidents and grievances are underreported including late releases, lost money and property, medical grievances and some use of force incidents. The ability to aggregate the reports into a summary report is being developed.

The new computerized grievance system should allow for the compilation of a summary grievance report. Currently, this is not possible for several reasons. As noted above, the system is not functioning properly at this time and grievances seem to be lost in the system. The reporting functions of the system are either problematic or not adequately conveyed to staff. Staff reported that they could not generate reports with identified parameters. If the prisoner replies via the kiosk in any fashion to the grievance response, that is then automatically converted to an appeal which inaccurately reflects the number of appeals. The system needs to be able to generate accurate reports.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
      a.   Brief summary of all reportable incidents, by type, shift, housing unit, and date;
      b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
      c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
      d.   List and total number of incident reports received during the reporting period;
      e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**
The County provided a monthly report of incidents in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. The summary reports are manually created and vary by facility. Because they are manually compiled, it is difficult to identify trends over time. The computerized summary report should remedy this. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify

trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

    a.    Summary of all uses of force, by type, shift, housing unit, and date;

    b.    List and total number of use of force reports received during the reporting period;

    c.    List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of use of force in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph in that the reports are manually prepared each month and do not allow for identifying trends over time. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. In meeting with the IT department, it was learned that not all the requirements of this paragraph were addressed. That should be remedied. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

See response to 106 above.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

    a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;

    b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;

    c.    A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

      d.      A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Non-Compliant**

There is currently no summary report of IAD investigations being provided to the monitors.

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD  systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

      a.      The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

      b.      The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

      **c.**      The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

      d.      The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

      e.      The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

      f.      The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and  corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

      a.      Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

      b.      Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Non-Compliant**

Medical Administrative meetings are supposed to be held quarterly. There has not been a MAC meeting since the last audit.  CQI meetings have addressed one issue, missed medications. In January 2018 there were 78 % of inmates with missed medications. However, evidence of corrective actions on this issue have not been provided.

## CRIMINAL JUSTICE COORDINATING COMMITTEE

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes, and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system, and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County has contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. The first two meetings of the CJCC have taken place. In order to have a CJCC with sufficient expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. The recently hired Quality Control Officer may have been designated to provide some staff support but as yet is not familiar with the CJCC. It is unlikely that he will be able to do his job as Quality Control Officer and provide the needed CJCC staff support. At this time, the CJCC is not yet at a place to identify and develop solutions for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for compliance with the diversion and discharge planning requirements of the consent decree.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC had its first two meetings. Not all of the identified agencies were represented at the meeting. The reported intention is to expand representation after further development.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Non-Compliant**

The CJCC has met only twice and has not yet formally adopted priorities.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Non-Compliant**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding

an assessment of and recommendations for strategies to reduce recidivism and increase diversion.

## IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
      a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
      b.     Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**
The creation of an Inmate Handbook sized copy of the Settlement Agreement for distribution to staff has proven to be a viable means of making it available; however, it was not possible to conduct a significant survey during the January/February site visit to determine whether or not most employees had a copy.  Based on a random sampling of inmates at each facility, when questioned, they were not familiar with the Settlement Agreement and did not know how or where to obtain a copy of the document.

## POLICY AND PROCEDURE REVIEW

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**
At the time of the site visit, the County/Sheriff had adopted an initial set of policies and procedures. These have been reviewed and been found to not be fully compliant with the terms of the agreement. The Monitoring Team and DOJ provided comments and a second round of drafting should be underway. As recommended, the County/Sheriff is identifying key policies to develop first and circulate for review. This will help guide the process in the remaining areas.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Partial Compliance**

Six months expired on January 19, 2017. The policy and procedure review and drafting was completed after that time. Those policies are not sufficiently in compliance so this requirement is listed as partially compliant.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Non-Compliant**

The policies and procedures were completed and submitted to the United States and the Monitor in April for review and comment. The comments were provided on June 1, 2017. Changes have not been made in the 30-day time frame.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

The policies and procedures are in need of revision. They should be revised before training and other ensuing operations.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Non-Compliant**

There have not yet been policies and procedures approved by the United States.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**
At the time of the October site visit, the County provided its first self-assessment. The assessment was a good first step towards compliance with this paragraph but needed to have the level of detail required by this paragraph.  This paragraph was listed as Partial Compliant in the last monitoring report. It is now listed as non-compliant because it requires that the self-assessment be updated one month before each site visit, and that was not completed.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Compliant**
The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

Immediate notifications have been provided. However, the County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date. The records office needs to be reorganized to implement business practices that accurately identify release dates and process releases. In the interim, the County needs to continue and improve its internal audit procedures to identify individuals entitled to release and prepare incident reports for persons who were detained beyond their legal release date.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2018, I electronically filed the Court-Appointed Monitor's Fourth Monitoring Report with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

COUNSEL FOR PLAINTIFF, UNITED STATES OF AMERICA:

JOHN M. GORE                                  D. MICHAEL HURST, JR..
Acting Assistant Attorney General             U.S. Attorney
U.S. Department of Justice                     Southern District of Mississippi
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
steven.rosenbaum@usdoj.gov

LAURA COWALL
Special Counsel
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
laura.coon@usdoj.gov

CHRISTOPHER N. CHENG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-8892
(202) 514-6273 (fax)
christopher.cheng@usdoj.gov

COUNSEL FOR DEFENDANTS – HINDS COUNTY; MEMBERS OF THE HINDS COUNTY
BOARD OF SUPERVISORS IN THEIR OFFICIAL CAPACITIES; THE SHERIFF OF HINDS
COUNTY IN HIS OFFICIAL CAPACITY:


PIETER TEEUWISSEN
Board Attorney
P.O. Box 686
Jackson, MS 39205-0686
(601) 968-6797
(601) 968-6794 (fax)
pteeuwissen@co.hinds.ms.us


CLAIRE BARKER
Counsel to the Sheriff
407 East Pascagoula Street
Jackson, MS  39205
(601) 974-2967
(Fax)
cbarker@co.hinds.ms.us

COUNSEL FOR INTERESTED PARTY, DISABILITY RIGHTS MISSISSIPPI:

ELISSA JOHNSON
JODY E. OWENS
PALOMA WU
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
(601) 948-8885 (Fax)
elissa.johnson@splcenter.org

/s  Christopher N. Cheng
CHRISTOPHER N. CHENG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-8892
(202) 514-4883 (fax)
christopher.cheng@usdoj.gov