Court-Appointed Monitor's Fifth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 WHB-JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish       Jacqueline M. Moore    Jim Moeser        Dr. Richard Dudley
Corrections Operations  Corrections Medicine   Juvenile Justice  Mental Health

# EXECUTIVE SUMMARY

**Corrections Operations**

As has been reported previously, the critical lack of staff makes compliance with the provisions of the Settlement Agreement problematic.  Since the last site visit, the Detention Services Division (DSD) has lost a net of ten positions.  Of the targeted 275 positions for the current fiscal year, only 231 are filled.  This represents a decrease in filled positions of 20 since October 2017.  Further, there has been no apparent action taken to reallocate financial resources to reach the goal of 275 funded positions during the current fiscal year.

The DSD continues to operate without an acceptable Policies and Procedures Manual, nor does it have relevant Post Orders located at each designated post throughout the three facilities.  The contractual arrangement with Dr. James Austin to prepare the Manual was never finalized, leaving the HCSO, once again, without a plan in place to complete this basic component of compliance with the Settlement Agreement.  At this point, it appears that Karen Albert, who has been providing technical assistance as part of the monitoring team, will assist with the development of policies dealing with Classification, Records and Booking.  The Sheriff's Legal Counsel and the Compliance Coordinator will address other critical policies.

Major maintenance issues in all three jails continue to remain uncorrected.  At the Raymond Detention Center (RDC), two main corridor doors (Pods B and C), internal corridor doors in the pods and the control room doors in Pods A and B have been non-functional for many months (see the Third and Fourth Monitoring Reports).  Now a primary entrance door to Booking as well as the Master Control Center entry door must be added to that list.  At the Work Center (WC) the door to HU 4 does not lock, either with a key or electronic control, and the door to H U 1 can only be operated with a key since the electronic control does not function.  The HVAC issues associated with the opening of HU 3 have still not been corrected, so that 64 bed unit remains vacant.  At the Jackson Detention Center (JDC) a corridor door on the third floor cannot be locked.  As is the case with staffing, maintenance issues appear to be regressing instead of improving.

Paragraph 46 of the Settlement Agreement includes several sub-paragraphs that address the need for the Jail Administrator to have control over the operations of the Jail. Concerns have been raised about the authority of the Jail Administrator to control operations both in terms of making decisions that require approval of others and others making decisions that undermine her control of operations. Two events after the site visit highlight this problem and are in non-compliance with the requirements of the Settlement Agreement. The recent removal of the Deputy Jail Administrator and replacement by a new individual is contrary to subparagraph (a). That

provision states that policies, procedures, and practices must ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  The Deputy Jail Administrator's removal and replacement appears to have been done without the knowledge of the Jail Administrator who was on medical leave and certainly without the knowledge and approval of the Acting Jail Administrator who was the one removed. There was no documentation of the reason for removal. On a substantive level, there was no adequate process for transition in this key position. The resume of the new Deputy Jail Administrator has been requested but not yet received. At a minimum, it appears he has not had Jail Administrator training prior to placement as required by the Agreement. This is not to weigh in at this time on his suitability for the position, but the process was in non-compliance with the Agreement and is destabilizing for the staff.  In addition, the process surrounding this event also highlights communication issues with the monitoring team. The Monitor attempted to speak with the Sheriff about this action twice by leaving voice mail messages, once by emailing a request for a telephone conference, and in a series of communications with the Sheriff's attorney. No response by the Sheriff was provided.

Also relating to the authority of Jail Administrator over the operations of the jail, the recent shakedown on 6-7-18 was contrary to the requirements of 46 (b) which provides that the Jail Administrator must have the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail and explicitly includes emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances. The shakedown was conducted by road deputies and Mississippi Dept. of Corrections officers without the approval or oversight by the Acting Jail Administrator. The need for jail staff oversight is apparent in the fact that the shakedown officers shot off a 12-guage shot gun (blanks) to create a "noise diversion." Firearms should not be present in the jail except in extremely limited circumstances not present here.

A plan to implement Direct Supervision training was set forth in the Fourth Monitoring Report; however, because of fiscal issues at the federal level, technical assistance from the National Institute of Corrections (NIC), is not currently available.  An alternative option is available by having the Sheriff submit a letter to NIC requesting that a Cooperative Agreement be put in place to provide on-site training for command and line staff.

The County previously retained the services of JBHM Architects to plan for renovations of Booking at the RDC in order to make it operate as an "open booking", i.e. direct supervision facility.  In order to make the structural changes without negatively impacting booking activities, JBHM created a plan to temporarily relocate Booking to the WC.  That also provided the opportunity to create a secure drive through the sally port at the WC so that inmates do not have to be processed through the public lobby as they are currently.  It now appears that the County's

plans have run into a financial roadblock.  Recognizing that there are insufficient funds available to implement major facility renovations, and that there are not enough officers to fill existing positions, it is incumbent upon the County to re-examine the option of closing the JDC as a jail and repurposing it as a court transfer facility.  This would have the added benefit of freeing up to 30 officers to staff the vacancies at the RDC and WC.

The automated report writing system that was developed for the Detention Services Division (DSD) is not consistent with the system used by the law enforcement side of the HCSO.  Two previous meetings with operational and IT staff attempted to address the discrepancies and to make it useful to the reader and compliant with the Settlement Agreement.  To date, those efforts have failed, but a third such meeting during the May site visit may prove to have positive results. If IT is able to make a number of practical changes, the DSD should be able to gather data and incident report information in a form that makes it possible to comply with the provisions of the Settlement Agreement.

Fire safety is a critical area of concern in the operation of any jail.  In Hinds County the physical plant changes that resulted from the removal of the unit officers from the inmate housing areas, and a subsequent major riot, have never been corrected.  Fire extinguishers and fire hoses are no longer available in the housing units at the RDC.  Staff do not have keys readily available to those fire extinguishers and fire hose boxes that are located in the common areas.  A concerted effort to re-establish fire safety as a priority needs to be implemented.

**Medical and Mental Health**

Since the January/February 2018 site visit, there have been significant and quite meaningful advances made with regard to the provision of core mental health services.  More specifically, the mental health evaluation process, the psychiatric evaluation process, and the treatment plan development process have all been better defined; there are new forms for documenting these processes as well as new forms for recording follow-up mental health and psychiatric sessions; and while the evaluations and treatment that is now being done is being done consistent with these better defined and implemented processes, there is also an effort underway to evaluate, plan for, and treat prisoners who were already on the mental health caseload in a manner that is consistent with these revised policies and procedures.

At the May 2018 site visit, there was a joint meeting of mental health and security staff focused on areas of overlapping concern and responsibility, such as the review of prisoners in segregation, disciplinary review, and security use of force, especially with prisoners who are suffering from mental illness and/or intellectual disabilities.  Another major area of focus during the May site visit was discharge planning, and what is required to refer prisoners for community-based mental health services in a way that is most likely to be successful.

There continues to be concern about the adequacy of mental health staffing levels, and so a mental health staffing analysis is recommended.  This analysis must be performed with full awareness of the already expanded responsibilities of mental health staff that have resulted from the above noted revisions of mental health policies and procedures; a full awareness of expansions in the mental health program that will be required to meet the provisions of this agreement; and an awareness of other mental health responsibilities that have only begun to be considered such as mental health's responsibilities with regard to PREA, quality assurance review, and the data collection and organization of data required for the various levels of quality assurance review.

**Youthful Offenders**

This visit provided the opportunity for the expert on juvenile justice to spend the majority of his time at the Henley Young facility and dig deeper into the successes and challenges of the transition of Juveniles Charged as Adults (JCAs) to that facility.  At the time of the visit, there were fourteen JCA youth at Henley Young and only five JCA youth remaining at the Raymond Detention Center (RDC).  As youth continue to "age out" of the youth unit at RDC, it appears that no later than November of this year there will be no JCA youth at RDC.

While placement at Henley Young remains a vast improvement over RDC, there has been a notable increase in the frequency and nature of behavioral issues among JCA youth.  This has been most evidenced by a growing use of segregation/isolation as a disciplinary response to youth misbehavior and noncompliance.  Many of the recommendations contained in prior reports and/or requirements of the Settlement Agreement have not been implemented, so it is not surprising that the hopes of a successful transition are running into the reality of dealing with older, long-term youth.  The core elements of the facility, staff, and program remain a reasonable foundation to build on, but language contained in the previous report perhaps foretells the state of the situation as observed in May.

Concerns about the limitations of the Henley Young facility have been referenced in prior reports and should be given heightened attention as the time to make decisions and facility improvements is before problems occur, not after.  Therefore, the most important recommendation conveyed in this report is that a plan be developed as soon as possible including action steps, timetables, and resources needed to address the concerns at Henley Young so that youth from RDC can be successfully housed there.

The current situation is complicated further by the temporary absence of Mr. McDaniels, Executive Director of Henley Young, which places an added burden on the key leaders remaining at Henley Young who are doing their best to keep up with the changes and challenges faced by holding JCA youth. Nonetheless, while meeting the requirements related

to youthful offenders, let alone the Settlement Agreement as a whole, seems overwhelming the importance of fully committing to this type of planning and step-by-step implementation of changes remains the most important blueprint to moving forward.

**Criminal Justice and System Issues**

Little has changed since the last site visit. The Criminal Justice Coordinating Committee (CJCC) has continued to meet. Some agencies are still not participating but will hopefully engage as it becomes clear that the collaborative effort can address issues of interest to all the stakeholders.

The County continues to have no one incarcerated on unlawful orders regarding fines and fees but has not yet adopted policies to ensure a process for addressing this should such orders be used in the future. These policies have been initiated and are undergoing review by the policy and procedure team and then the administration for final approval. The full time Quality Control Officer who was newly hired at the last visit has gained experience and is identifying people who should be or can be released. However, this continues to be a reactive process responding to inmate grievances and requests. As previously reported it continues to be difficult to track individuals in the records system. There continue to be three individuals maintaining separate manual spreadsheets outside the case management system. In addition, there continues to be an unclear line of authority between Records and Booking for overseeing the documentation. Previously reported systemic challenges continue to exist. As a result, a number of people were identified who had been detained beyond their release date and there is inadequate documentation for the detention of others. Consultation with the monitoring team's expert, Karen Albert, took place after the site visit and following that visit, policies and procedures have been drafted and are being vetted.

The paper grievance system was replaced by a computerized system. Some of the initial problems have been remedied but the system still does not function well. The staff has learned to run reports to find grievances that drop off the current listing without a response. However, at the time of the site visit, the Work Center grievance officer could not run such a report and Medical had not been trained on running the report. There is no procedure to oversee the actual implementation of grievance responses. The system is also either dysfunctional or not understood in its ability to generate reports. The staff does not know how to generate reports, if it is possible, to meet the requirements of the Settlement Agreement or be useful to them.

Compliance with PREA continues to improve. Some orientation of inmates and training of staff has occurred. Some posters are now up identifying reporting mechanisms. The reporting mechanisms were not fully in place at the time of the site visit. At that time, most inmates and staff have not received orientation or training. There is also concern that some of the PREA policies said to be in place were not actually functioning as they should. In particular, potential

victims although identified did not appear to be classified to the most appropriate housing. This area will require some attention at the higher administrative levels to begin to move towards compliance.

**Monitoring Activities**

The Monitoring Team conducted a Site Visit May 22nd through May 25th. The site visit schedule was as follows:

May 22nd through May 25th Site Visit Schedule

| Date | Lisa | Dave | Jim | Jackie | Dudley |
|---|---|---|---|---|---|
| Tuesday a.m. | Meeting with Fielder<br>Tour Booking and meet with Booking staff | Meeting with Fielder<br>Tour RDC | Meet with Burnside, Dorsey, principal, case managers, Dr. Payne<br><br>Review files | Meet briefly with HSA and DON<br>Tour RDC | Meet briefly with HSA and DON<br>Tour RDC |
| Tuesday p.m. | Observe RDC booking<br>Meet with Jones on grievances and review grievances | Meet with Fire Safety officer<br>Meet with property officer<br>Continue tour of RDC | Tour HY<br><br>Review education file/records | Observe competency restoration<br><br>Review records | Tour RDC<br>Tour WC |
| Wednesday a.m. | Meet with Ken Lewis<br>Meet with Sgt. Tillman<br>Review records | Meet with Training captain<br>Meet with Recruitment Officer | Continue at HY, review medical records and video | Tour JDC<br><br>Review Records | Tour JDC<br>Meet with Hinds County Behavioral Health |
| Wednesday p.m. | Meet with Moore re PREA<br><br>Meet with IT re update on reports-review what can be seen in JMS | Continue at RDC<br><br>Meet with IT re update on reports-review what can be seen in JMS | Review files, incident reports, observation logs<br>Meet with staff; program presentation<br><br>Meet with SPLC | Tour WC<br><br>Review Records<br><br>Meet with Discharge Planner | Meet with Mental Health team<br><br><br>Meet with Discharge Planner |

| Thursday a.m. | Meet with Deputy County Manager: Convey PTS info, discuss repairs JDC-grievances | Tour JDC Meet with Deputy County Manager re repairs Tour WC | RDC-Review individual files, interview youth | RDC-booking | Review Records |
|---|---|---|---|---|---|
| Thursday p.m. | WC grievances, fines and fees, daily credit | Tour RDC | Henley Young Review records, interview youth, observe disciplinary hearing | Records | Meet with Interdisciplinary team; review policies and procedures |
| Friday a.m. | 8:30 to10:00 Exit meeting 10:00 to 12:00 Meeting with counsel and command staff re priority items | Exit meeting Meeting with counsel and command staff re priority items | Exit meeting | Exit meeting | Exit meeting |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Requirements that have not yet been triggered such as an annual review are listed as NA (not applicable) at this time. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Raymond Detention Center are included in the totals in this chart.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;
    n.  Laundry;
    o.  Food services;

     p.  Hygiene;
     q.  Emergency procedures;
     r.  Grievance procedures; and
     s.  Sexual abuse and misconduct.

**Non-Compliant**

This provision has been changed from partial compliance to non-compliant. An initial attempt was made to draft policies and procedures in early 2017. The Monitoring Team and DOJ provided comments but the policies essentially needed to be rewritten.  The County identified a consulting team to assist with the policies but that has apparently fallen through. The County informed the monitoring team that the plan is back to preparing the policies and procedures in-house. Because there has been no apparent forward progress, this provision has been changed to non-compliant. At present, the Monitor's expert dealing with Classification and Records consolidation is expected to work on policies associated with Classification, Records and Booking.  The County's Compliance Coordinator and the Sheriff's in house legal counsel will address other priority areas of concern unless a satisfactory alternative can be found.

Since the January/February 2018 site visit, there has been a considerable effort by Quality Correctional Health Care (QCHC) to update or create new QCHC mental health policies and procedures.  There has also been considerable effort to update or create forms for recording mental health activities such as an initial mental health assessment, an initial psychiatric examination, a psychiatric progress note, a follow-up mental health treatment session/progress note, and a mental health treatment plan.  These policies and procedures were carefully reviewed and discussed with staff during the site visit, and by and large, they were quite good.  The forms were also reviewed, and for the most part, they were found to include the important clinical information that should be assessed and recorded.

Further improvement of the various mental health policies and procedures should include: (1) Where appropriate, a clear distinction should be made between 'emergency', 'urgent' and 'routine' responses, with specific time periods given for each type of response; (2) The frequency of visits for various different types of visits should also be established in accordance with recognized standards of practice.  For example, it should be clear how soon an individual newly placed on medication should be seen again for psychiatric follow-up with regard to an assessment of efficacy, adverse effects and the individual's compliance with treatment, and then how frequently the individual should be seen once stabilized on medication.  Similarly, it should be clear how frequently an individual on the mental health case load should be seen for a mental health follow-up appointment; (3) Where appropriate, it should be clear what level of training and expertise is required to perform certain tasks, such as to order or discontinue suicide watch.

As was requested by the mental health expert, there was also a joint meeting of all mental health staff during the May 2018 site visit, which was apparently a fairly unusual event that should be

happening on a regular basis.  This provided an opportunity to review policies, procedures, and the above noted forms with the entire staff, and also provided an opportunity to discuss other steps that must be taken to address the provisions of the Settlement Agreement.

There continue to be concerns about the medication administration that needs to be addressed by adoption and implementation of policies and procedures. Two nurses have been permanently assigned to perform pill pass at the Raymond Facility.  Observation made during pill pass indicated that neither nurses nor officers routinely checked the inmate's mouth for hoarding their medication.  Charting is not performed in real time but done after the medication pass is finished using the pill envelops as a guide as to whether the inmate took his medicines.  After the nurses come back to the clinic they then go back to the housing units to obtain refusals from inmates. Medication Administration was also observed at the work center. The nurse also pre-poured her medication but did chart it in actual time.  Again, officers and the nurse were not diligent in checking to see that the inmate actually swallowed his medication. Medication administration should be charted in actual time.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

As was previously reported, this paragraph is carried as being in Partial Compliance because of the Jail Administrator's lack of a BA degree.  Since the last site inspection, Captain Chandler resigned from his position in charge of the WC and was replaced by Lt. Anthony Simon who was promoted to Captain.  Although he has no college education, he has extensive experience with the HCSO, from 2000 to 2006 (left at the rank of Sergeant) and from 2015 to the present.  He was promoted to Sergeant in 2015 and Lieutenant in 2017. Shortly after the site visit, the Deputy Jail Administrator was replaced by a new individual. The monitoring team has not received a copy of his resume to determine his qualifications for the position consistent with this requirement.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

Until there are policies and procedures, the supervisors will not be able to be familiar with them. Since the last site visit a number of individuals have been promoted.  They include the following:

B. W.—was previously employed by the HCSO from 1997 to 2012.  He was re-employed in August 2017 and was promoted to Sergeant in February 2018.  He has a high school diploma and is qualified as an EMT and Nursing Assistant.

K. C.—was previously employed by the HCSO from 2008 to 2010, when he was terminated for excessive use of force.  He was rehired in January 2011 but was then suspended for five days in 2013.  Promoted to Sergeant in May 2018, he has a two-year college degree.

G. N.—was employed in 2008 and was promoted to Sergeant in March 2018.  Although he has a high school diploma and ten years as a Sheriff's Office employee, his personnel file does not account for 18 years of his life between 1981 and 1999.

K. J.—was employed in 2013 and was promoted directly to Lieutenant in 2018.  Prior to being employed by the HCSO she served for a year with the Mississippi Department of Corrections. She has a high school education.

K. M.—was employed by the HCSO from 2001 to 2013 and held the rank of Sergeant when he resigned.  From 2013 to 2017 he worked for the Oakley Youth Development Facility.  He has a high school education.  He was re-employed by the HCSO in December 2017 and was promoted to the rank of Sergeant in January 2018.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Non-Compliant**

The Jail has still not complied with previous requests to provide a listing of all current employees, their date of employment and the date of their background check.  Until the HCSO provides documentation reflecting that all employees have successfully passed a background check, including a criminal history check, this paragraph will continue to be carried as Non-Compliant.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

There has been no change in the status of this paragraph.  The Policies and Procedures Manual has yet to be published.  Further, no staff members have received training with regard to the principles and dynamics of direct supervision.  One of the Priority Recommendations made by the monitoring team has been for the County to coordinate with the National Institute of Corrections (NIC) to provide "Train the Trainers" support.  To date that has not been

accomplished.  Since NIC's budget was cut by approximately 50% this year, there is no funding available for a Technical Assistance grant; however, money is available, through a Cooperative Agreement arrangement, to provide the specified direct supervision training.  The Sheriff's Office has submitted the request to the NIC with a copy provided to the monitoring team.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:
- i. There are at least two detention officers in each control room at all times;
- ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;
- iii. There are rovers to provide backup and assistance to other posts;
- iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;
- v. There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:
- i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.
- ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.
- iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c.  Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and

facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

While this paragraph was previously carried as being in Partial Compliance, the lack of progress, as exemplified by a net loss of 20 personnel during the past eight months, warrants a change to Non-Compliant.  At the JDC and the WC, required posts are generally filled, but at the RDC, the largest facility in the Jail System, there has been no progress toward filling essential posts.  The only housing unit that has an assigned officer (inside the unit) is A-1 which houses only five juveniles.  All of the adult male housing units are still left unattended.  In Booking, only one officer is assigned to the processing area to conduct well-being checks on those detainees who are housed in holding cells for up to eight hours.

The current staffing is inadequate to safely operate the jail. Serious inmate assaults included inmates with the following injuries:

1.     4/18/18 A scalp laceration and contusion of his head.

2.     4/19/18 A head injury and laceration of his face with sutures above his left eyebrow.

3.     4/19/18 A concussion and facial contusion.

4.     4/22/18 An assault by seven inmates with some kind of weapon.  The inmate has two broken hands and facial lacerations and almost lost his right eye.  He had a subconjunctival hemorrhage.  Both of his hands are in casts and he is being seen by an ophthalmologist on a regular basis.

5.     4/16/18 A sexual assault.

A review of the incident reports indicates that most of the inmate on inmate assaults occur when there are no officers present on the unit. Officers are alerted by the noise, by the video stream, and sometimes only when they discover the injured inmate.

f. Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g.,

placing juveniles with adults, victims with former assailants, and minimum
security prisoners in a maximum security unit).  Additionally, the classification
and housing assignment process must include the following elements:

    i.  The classification process must be handled by qualified staff who have
additional training and experience on classification.

    ii.  The classification system must take into account objective risk factors
including a prisoner's prior institutional history, history of violence,
charges, special needs, physical size or vulnerabilities, gang affiliation,
and reported enemies.

    iii.  Prisoner housing assignments must not be changed by unit staff without
proper supervisor and classification staff approval.

    iv.  The classification system must track the location of all prisoners in the Jail
and help ensure that prisoners can be readily located by staff.  The County
may continue to use wrist bands to help identify prisoners, but personal
identification on individual prisoners may not substitute for a staff-
controlled and centralized prisoner tracking and housing assignment
system.

    v.  The classification system must be integrated with the Jail prisoner record
system, so that staff have appropriate access to information necessary to
provide proper supervision, including the current housing assignment of
every prisoner in the Jail.

    vi.  The designation and use of housing units as "gang pods" must be phased
out under the terms of this Agreement.  Placing prisoners together because
of gang affiliation alone is prohibited.  The County must replace current
gang-based housing assignments with a more appropriate objective
classification and housing process within one year after the Effective Date.

**Partial Compliance**

There has been no significant change in the status of this paragraph since the last reporting
period; however, the Monitor's expert in this area is in the process of working with
Classification, Records and Booking staff to consolidate their activities into a cohesive unit.
Once this is accomplished, it should be possible to expand the hours of coverage by
Classification and Records personnel so that initial classification of arrestees can be
accomplished as part of the booking process.  Further, communication with the courts will be
funneled through only one point in the Jail, thus improving the accuracy and completeness of
inmate records.

    g.  Develop and implement positive approaches for promoting safety within the Jail
including:

      i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

      ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

     iii.  Creating work opportunities, including the possibility of paid employment;

     iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

      v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

     vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

    vii.  Providing reasonable opportunities for visitation.

h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.  Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Non-Compliant**

Regarding 42 (g)(i) Outdoor recreation is still unavailable to almost all inmates in the Hinds County Jail System.  Although there has never been an outdoor recreation yard at the JDC, recently inmates have been permitted to play basketball in the indoor car wash bay.  At the RDC the outdoor recreation yards have been closed for over five years, subsequent to a major riot.  In the past year, outdoor recreation has been available only to juveniles housed in A-1.  During the most recent site visit, it was reported that outdoor recreation was available to adult prisoners periodically, but not routinely; however, a review of pod logs did not reveal documented verification.  As was reported previously, the WC unit logs confirmed that outdoor recreation was available approximately half of the time that the Settlement Agreement calls for.  Since that time, no updated records have been made available to verify the amount of recreation provided.

Regarding 42 (g)(iv) There is not an adequate level of mental health services being provided. The first issue is the issue of mental health staffing levels.  Since the January/February 2018 site visit, a mental health coordinator has been added to the roster of mental health staff (the prior social worker has left, but at the time of the May site visit, a new social worker was about to come on board).  While this is a very positive development, the mental health expert continues to believe that there is clearly inadequate psychiatric time to meet the provisions of the agreement and continues to believe that there needs to be a mental health staffing analysis to determine whether or not there is an adequate number of other mental health staff to meet the provisions of the agreement.

As it now stands, the psychiatrist may see as many as 10 individuals during the several hours each week that he is at the facility, which leaves him a very limited amount a time to complete the above noted new forms.  This also leaves him virtually no time to perform a more in-depth examination of more complicated individuals, perform face-to-face evaluations of individuals on suicide watch or other more intense mental health monitoring, actively participate in the treatment planning process, provide consultative help to other members of the mental health treatment team, and actively participate in any regular meetings of the mental health treatment team.  In addition, adequate mental health programming at the facility should eventually include a psychoeducational group therapy program, focused on helping individuals understand their illnesses, the importance of treatment, and how best to participate in their own treatment; such a group therapy program would also include a focus on medication, benefits and risks of adverse effects, and the importance of compliance; and so eventually, the psychiatrist would either participate in or at least help to develop and supervise such an effort.

The second issue, previously noted in the report of the January/February 2018 site visit, is that there are multiple mental health related provisions that cannot be addressed by mental health staff alone.  During the May 2018 site visit, there was a joint meeting of mental health staff and security staff to discuss these provisions.  More specifically, there was a discussion of the roles and responsibilities of mental health staff with regard to disciplinary review, segregation review, and security use of force; the roles and responsibilities of mental health staff with regard to PREA; the roles and responsibilities of security staff with regard to suicide watch or individuals who are on other forms of mental health observations; and the roles and responsibilities of security staff with regard to accompanying nursing staff while they pass/administer medication. The progress made during this joint meeting of mental health staff and security staff and the yet unresolved issues will be noted in applicable sections of this report.

The third issue, also previously noted in the report of the January/February 2018 site visit, is the matter of how to define/describe individuals who should be on the mental health case load. Although there is general agreement that those with 'serious mental illness' (SMI) should be on

the mental health case load, SMI is not clearly defined.  Then in addition, most definitions of SMI do not include individuals with serious trauma histories and resultant trauma-related psychiatric difficulties; therefore, their psychiatric difficulties are rarely identified and addressed; and this is despite the fact that these individuals tend to function quite poorly while incarcerated and they make up a significant percentage of individuals placed in segregation.  Therefore, the mental health team should explore this issue of who should be on the mental health caseload.  In so doing, when evaluating prisoners with disciplinary charges, prisoners being held in disciplinary segregation, and prisoners against which there was a use of force, staff should explore for a history of trauma and assess the mental health impact of any trauma that is identified.  Then, if it becomes clear that a history of trauma with associated trauma-related psychiatric difficulties makes adjustment to incarceration difficult for a significant number of prisoners (as is the case in most jails and prisons), staff can explore how they might best design and implement mental health interventions focused on meeting the needs of such prisoners, thereby improving their capacity to function while incarcerated and upon their release.

At the time of the January/February 2018 site visit, the absence of mental health evaluations and treatment plans made it impossible to assess whether or not prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions were receiving and benefiting from appropriate therapeutic interventions.  By the time of the May 2018 site visit, for newly admitted prisoners, mental health evaluations were being performed and recorded on the new form for such evaluations; where indicated, psychiatric evaluations were being performed and recorded on the new form for such evaluations; and treatment plans were being developed and recorded on the new treatment plan form.  In addition, there was a plan to perform and record mental health evaluations, perform and record psychiatric evaluations, and develop treatment plans for prisoners who were already on the mental health case load.  These efforts, coupled with the better recording of information obtained during psychiatric and mental health follow-up visits, will now provide an extremely important part of the base of information required to assess whether or not prisoners on the mental health case load are receiving appropriate therapeutic interventions.

The internal assessment of whether or not prisoners with serious mental illness, developmental disabilities, or other behavior or medical conditions are receiving and benefiting from appropriate therapeutic interventions should be done in several ways.  More specifically, a regularly scheduled, treatment plan review process should be developed where the mental health team reviews the progress towards treatment goals and thereby determines whether or not modifications of the treatment plan are required.  A 'mental health chronic care log', should be developed that would include such information as diagnosis or problem to be addressed, related therapeutic intervention(s), last and next visit, and instances when a prisoner was seen on an emergency or urgent basis prior to the next scheduled visit.  Such a log would make it easy to assess whether or not prisoners were being seen with appropriate frequency and in a timely manner, consistent with mental health policies and procedures, and such a log would also

indicate whether or not prisoners are being seen frequently enough (i.e., whether or not prisoners end up needing emergency or urgent visits prior to the time of their next scheduled visit). In addition, when the most appropriate/indicated treatment for a prisoner's mental health problem is not available at the facility and an alternative, less appropriate therapeutic intervention is employed, this should be noted on the treatment plan, because this will support the need to develop additional, needed therapeutic interventions. Furthermore, efforts should be made to identify important gaps in the range of mental health services available to prisoners; for example, it is already clear that there are no services designed to prepare prisoners to continue with treatment once released and there are no trauma-informed therapeutic interventions for prisoners with significant trauma histories. Plans should then be developed to provide such important mental health services/interventions.

With respect to medical interventions, lack of staffing continues to be a concern. There are four LPN nursing vacancies at all of the facilities. There are no relief factors in the current staffing plan, thus the health administrator must utilize agency, PRN and overtime to fill vacancies caused by vacation, holidays or sick time of the regular staff. Staffing at the work release does not permit night time coverage. A new nurse practitioner was hired shortly before the site visit. While she is a FT employee, not all of her hours are at the Hinds County Detention Center. She also provides care at the Madison County Jail.

There are no hours recorded for the physician Dr. Martin. The timesheet indicated that he is paid a contract rate and his hours are not logged. This is not a good accounting practice nor does it show if the County is receiving adequate services for physician services. The Monitoring team will request at the next site visit a copy of the contract for Dr. Martin and his schedule at the various jail facilities.

Chronic care is still in the beginning stage of development. A new nurse practitioner has recently started at the Hinds County Detention Center; thus, the care and scheduling are not timely. A delay of 90 days to obtain Hemoglobin test on diabetics is not acceptable. Most facilities perform laboratory testing within a month or sooner of the inmate's incarceration.

Sick call is written by the inmates on a kiosk system. The nurses print off the sick call requests daily. The nurses date-stamp the request when they receive it. The sick call policy at QCHC is that if the nurse sees the inmate three times for the same request, it is then referred to a provider. Depending on the severity of the request, this can be a dangerous situation. A protocol needs to be created providing nurses guidance on when to refer to a provider based on the severity of the complaint and the results of initial treatment attempts.

One of the inmates submitted a sick call request for a rash due to the harshness of the soap. He was placed on hydrocortisone cream by way of a nursing protocol. After three unsuccessful nursing visits, he filed a grievance. Three visits to confirm that the initial intervention was not

working was not a useful approach. The reply that he received on the grievance was that the medical department did not provide soap.  There was no attempt to solve the complaint by either having the family bring in a special soap or by arranging to sell the soap in the commissary.

Another inmate indicated that she put in several requests for sick call and requested to see the doctor.  She indicated that she was severely depressed.  Chart review indicated that her comments were true and that she had only been referred to a social worker.  She was not referred to the psychiatrist or psychologist.

Another inmate complained of left lower leg pain.  The request was placed on 5/6/18; however, the inmate was not seen until 5/15/18.  A nurse practitioner saw him and ordered an x-ray.  The NP did not perform a physical exam nor order a blood test on the inmate, nor did she order an ultrasound which is the preferred method of diagnosis.  She diagnosed the inmate with a musculoskeletal disease.  This case did not result in a serious complication but could have led to further complications such as a pulmonary embolism.

The sick call procedure is unnecessarily cumbersome by the kiosk system. The complaints listed by the kiosk are vague and provide no space for the inmate to elaborate on their problem.  The categories are asthma, general pain, sprain, constipation, sore throat, dental tooth pain, mental health.  The mental health does not indicate if the inmate is depressed, suicidal or can't sleep. Thus, when the inmates see the nurses, the nurses are unaware of what the complaint is truly about. There is no free text available so that the inmate can elaborate on their complaint.

The dental assistant has resigned, thus inmates that have dental problems must wait for over a month to be seen.  Dental care is not timely. Treatment consists of verbal orders for Naproxen and Augmentin.   Telephone order sheets were not consistently found on the charts on any of the five records reviewed. A new dental assistant has been hired and she will begin her employment on June 4, 2018.  When the health administrator was questioned regarding the dental care, she indicated that there were only nine inmates on the dental list.  This number appears to be underreported in light of the many complaints made by inmates regarding the lack of this service.

Regarding 42(g)(vi) Although there is mental health screening at the time of booking and during the initial health assessment process, the adequacy of this screening has yet to be fully evaluated. Based on the observation of one such screening, it appeared that questions were asked in such a way as to overly determine the response (for example, 'you haven't had XYZ, have you?'; and the structure of the questions appeared to be based on the nurse's premature perception of the incoming prisoner instead of being structured to fully explore the prisoner's history.  Of course, this one screening may have been atypical, but whether it was or not, the adequacy of these screenings needs to be assessed.

As a step towards assessing the intake screening process, a 'mental health sick call log' should be developed. Such a log would record all prisoners who, post intake, were self-referred to mental health, or referred to mental health by medical or security staff or identified as in need of mental health services via some other mechanism (for example, a suicide attempt, evidencing unusual behavior that resulted in disciplinary charges, decompensation while placed in segregation, etc.). Then in each case, the question of why the prisoner wasn't identified as in need of a mental health assessment at the time of intake can be explored, followed by an exploration of the question of whether or not the intake mental health screening process needs to be revised and/or whether or not those performing such intake screens require further mental health training.

See paragraphs 74 and 77 (i and j) regarding housing decisions and the availability of appropriate housing for prisoners with serious mental illness.

Regarding 42 (g)(vii) Visitation records reflect that there has been an improvement in access to visitation at the JDC but a decrease at the RDC and WC. A review of visitation records at the JDC and RDC/WC covering three and three quarter months, revealed that inmates at the JDC are able to complete an average of one visit per month, while at the RDC and WC, whose records are combined, only one inmate in ten is able to complete a visit monthly. Since the majority of the inmates are housed in these two jails, it is apparent that very few inmates in the DSD are able to visit with family and friends on a routine basis. It should be noted that only about half of the inmates who initiate a video visitation communication actually are able to complete it. The most common reason for non-completion is listed as "cancelled by admin" while the next two frequent reasons are "missed by inmate" and "missed by caller".

Regarding 42 (h) The revised 'suicide prevention' QCHC policy is quite good with a few recommendations for improvement. The policy should provide that when medical or security staff suspect that a prisoner is potentially suicidal, the prisoner should be placed under *constant observation* (versus close observation), pending a mental health assessment, and that the need for such a mental health assessment should be considered to be an *emergency* (see paragraph 42, with regard to the need to delineate emergency, urgent and routine responses). The policies should also provide that in the event of an actual suicide attempt, successful or unsuccessful, a rigorous, multi-disciplinary 'morbidity or mortality review' and report is indicated, whereby every aspect of the prisoner's stay at the facility is reviewed, with an eye towards identifying and correcting any avoidable missteps in how the prisoner (or other prisoners) was assessed and managed by each discipline within the facility. This review process and report would include recommendations to address any identified missteps, such as changes in policies and/or procedures, clarifications or directives that might lead to better adherence to existing policies and/or procedures, or staff training focused on helping staff obtain the knowledge and skills required to better adhere to existing or revised policies and/or procedures.

Although the 'suicide prevention' policy is in place, there remain questions about the implementation of the policy.  More specifically, there is no structured tool or form used for the evaluation of potentially suicidal prisoners to determine the need for placement on suicide watch, adjustments of the suicide watch level, or removal from suicide watch. It is unclear to what extent the psychiatrist must be involved in the assessment process and whether an actual face-to-face assessment by the psychiatrist is required (all complicated by the availability of the psychiatrist). Although it is noted that a 'clinical assessment' will be performed at least every 4 hours, it is unclear what type of staff must perform that clinical assessment, and if it is to be performed by mental health staff (a QMHP), it does not appear that there are an adequate number of mental health staff to implement that policy. Although the policy also describes the level of monitoring by security staff and nursing staff for each level of suicide watch, a mechanism for the documentation of adherence to this part of the policy in a form that can be readily reviewed by mental health staff needs to be developed.

Special mental health observation, for acutely mentally ill prisoners, is also described in the 'suicide prevention' policy, with a level of monitoring that is to be prescribed by mental health. With regard to implementation, it is important to make it clear to all staff that a prisoner might be on special observation either because they are suicidal and/or because they are acutely ill while efforts are being made to stabilize them.  If an inmate is on special mental health observation for both reasons, it should be clear that each type of watch has to be terminated individually.   In other words, although suicide watch might be then terminated, that does not mean that the inmate is sufficiently stabilized to end the watch required while still trying to stabilize the inmate.

Regarding 42 (i) Video surveillance capabilities at the various facilities have not changed since the last site visit.  Supervisory staff at the RDC have been able to utilize that facility's video records to review escapes and other significant incidents, in order to determine what actually occurred.  Video related to those events is reviewed on occasion but not routinely.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:
   a. Staff vacancy rate of more than 10% of budgeted positions;
   b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;
   c. A major disturbance resulting in the takeover of any housing area by prisoners;
   d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

Jail administration does not currently create a report covering each of these areas although they respond when asked for this information. At the time of the site visit, 14.8% of the authorized/funded positions are vacant (271 authorized, 40 vacant). And the 271 funded positions are far less than the 433 positions needed to adequately staff the facilities. That would be a 47% vacancy rate. For the past two site visits the number of vacancies has increased. There were 32 in February 2018 and 21 in October 2017.  Previously, the turnover rate was reported as excessive and not in compliance with this paragraph's standard.  The same holds true at this time. There have been multiple incidents of prisoner on prisoner violence resulting in serious injury without adequate documentation. As noted elsewhere, the incident reports do not provide for documentation of supervisory review and recommendations. Injuries are typically not photographed or documented. Witness statements are seldom taken and video is seldom reviewed. These findings trigger the rebuttable presumption that the Jail fails to provide reasonably safe conditions for the prisoners.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b.  All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

c.  Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.  The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

There has been no progress made with regard to the provisions of this paragraph since the last Monitoring Report.  None of the facilities are meeting the requirement to do well-being checks every 30 minutes in general population and every 15 minutes in segregation. While well-being checks at JDC were found to be routinely recorded properly, on the appropriate forms, for inmates in general population (hourly) and in segregation/confinement (30 minutes), even this less frequent timetable was not met at the WC and the RDC.  At those facilities, unit log records reflected that hourly inspections were conducted approximately 50% of the time for general population inmates.  At the WC, 30-minute checks for inmates in segregation/confinement were documented on individual forms posted next to each cell.  At the RDC there was no standard system in place.  The inmates in B-4 and B-4 ISO were both supervised by the same officer. When B-4 ISO was created, it was staffed by one officer continuously.  Apparently, that is no longer the case.  In Booking, the 15-minute observation forms were maintained in the office area, not posted by each holding cell.  Although the proper procedure has been explained in detail during previous site visits, communication through the chain of command and between shifts has been less than effective.

See paragraph 76 with regard to mental health rounds for prisoners in segregation.  See paragraph 42 (h) with regard to prisoners who require special management due to acute mental health difficulties.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail

employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

    a. Mandatory pre-service training. Detention officers must receive State jailer training and certification prior to start of work. Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement. During that twelve month period, the County must develop an in-house detention training academy.

    b. Post Order training. Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter. To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c. "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

    d. Jail administrator training. High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

    e. Post-service training. Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year. Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings. Post-service training should also include field and scenario-based training.

    f. Training for Critical Posts. Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position. Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

During the January/February site visit it appeared that the HCSO had committed to hiring a qualified individual, with extensive detention experience, at the rank of lieutenant. Unfortunately, that did not occur.  The Training Director still does not have anyone on staff with the requisite credentials to head training for the Detention Services Division, which comprises approximately 60% of the authorized positions in the HCSO.

In spite of numerous requests for information regarding the status of training for all DSD personnel, it is still not possible for the Monitor to determine how many officers have not completed basic academy training, which officers have received in service training during the past year and what topics that training covered or the status of specialized training required for critical posts and special management units.  Finally, all important training on policies and procedures has not occurred because the Policies and Procedures Manual has still not been submitted, approved and issued.

As was noted in the report of the January/February 2018 site visit, security staff persons receive at least some training at the academy with regard to 'special needs' prisoners, which includes prisoners who suffer from mental illness.  There is also a recently developed, in-service training program, entitled 'Mental Health First Aid', and security staff persons are beginning to receive this training.  The curriculum for these trainings had been reviewed, both of which include some very important information but issues with the adequacy of the training include whether the curriculum covers the full range of mental health difficulties that might impact on a prisoner's capacity to function in the correctional setting; whether the curriculum adequately describes for security staff what they should look for to indicate that a prisoner is suffering from mental illness; and whether the curriculum offers security staff enough tools to manage prisoners with various types of mental health difficulties.  Therefore, existing training programs should be reviewed by appropriate persons within and/or outside of the facility, with these questions in mind.

There does not appear to be any extra or special training offered to security staff who may be posted on units where there is an increased likelihood of having to work with mentally ill prisoners.

Subsequent to the site visit, the prior Deputy Jail Administrator was removed and a new Deputy Jail Administrator was appointed who because of the Jail Administrator's medical absence is Acting Jail Administrator. The monitoring team has requested but has not received his resume. It does not appear that he has received jail administration training as required by subsection (d).

There are various ways to assess the adequacy of the mental health training that is currently being provided.  QCHC staff should develop a form that security staff can easily use to refer prisoners to mental health; the form would allow staff to check mark symptoms observed and otherwise note the reason for such a referral; and ideally, after a mental health assessment has been performed, the mental health staff person performing the assessment could offer feedback to the security staff person who made the referral.  This same form could be used by security staff when a disciplinary charge is filed against a prisoner and security staff suspects that the prisoner might be suffering from a mental illness that might have contributed to the problematic behavior; by submitting the form under this circumstance, security staff are also requesting a mental health assessment in connection with the prisoner's disciplinary proceeding; and this type of involvement by mental health in disciplinary proceedings is not only an important requirement of this agreement (see paragraph 37 – over riding issues), but it also provides mental health staff with another opportunity to communicate with security staff about mental health issues.  Then in addition, discussion between security staff and mental health staff in areas of over lapping responsibility (such as the segregation review process, etc.) provides other opportunities to assess the impact of the mental health training for security staff.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

        a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

        b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c.   Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d.   Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i.   Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

       ii.   An inspection process.

     iii.   A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

     iv.   A requirement that any corrective action ordered be taken.

      v.   Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

     vi.   To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

Until the Policies and Procedures Manual is revised and re-issued, compliance with this paragraph cannot be achieved.  Because of undetermined issues, the work of writing the P&P Manual was not awarded to Dr. James Austin.  Consequently, valuable time has lapsed with no progress made toward meeting this critical requirement of the Settlement Agreement.  At this point it is imperative that the HCSO take whatever action is necessary to hire a qualified consultant or individual(s) to expedite the process.

The recent removal of the Deputy Jail Administrator and replacement by a new individual appears to be contrary to subparagraph (a). The Deputy Jail Administrator's removal and replacement appears to have been done without the knowledge of the Jail Administrator who was on medical leave and certainly without the knowledge and approval of the Deputy Jail Administrator who was the one removed. There was no documentation of the reason for removal. On a substantive level, there was no adequate process for transition in this key position. The Monitor attempted to speak with the Sheriff twice by leaving voice mail messages, once by emailing a request for a telephone conference, and in a series of communications with the Sheriff's attorney. No response by the Sheriff was provided.

The recent shakedown described in Incident Report #181015, dated 6-7-18 was contrary to the requirements of subsection (b) of this paragraph. The shakedown was conducted by road deputies and Mississippi Dept. of Corrections officers without the apparent approval or oversight

by the Acting Jail Administrator.  The monitoring team had been told that this practice was stopped some time ago, but it appears that is not the case. The need for jail staff oversight is apparent in the fact that the shakedown officers shot off a 12-guage shot gun (blanks) to create a "noise diversion." Firearms should not be present in the jail except in circumstances not present here.

Supervisors still do not follow a systemic procedure to document their inspection rounds.  The failure to develop a simplistic solution is tied directly to the inability of the HCSO to issue a Policies and Procedures Manual.

Maintenance issues, always problematic, have gotten worse since the January/February site visit. All of the detailed security problems associated with electronically controlled doors that do not open or close, and with key operated doors that cannot be locked, are still in need of repair. However, additional security doors in the main corridor at the RDC, the main corridor at the WC and the third-floor corridor at the JDC now need to be added to the list of major security breaches in need of immediate repair.  An electrical cord that ran across the floor in the lobby of the WC, noted during the last four site visits, was found to still be in place.  This obvious violation of fire and safety regulations remained uncorrected even though it did not require action on the part of the County's maintenance personnel.  This relatively minor discrepancy is mentioned because it is indicative of the mentality that has set in over the years throughout the DSD.  Personnel are so used to having problems go uncorrected, that they just accept unsafe and unsanitary conditions as the norm throughout the Jail System, even when they can correct them themselves.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

In spite of assurances that shakedowns of cells and common areas are now conducted only by DSD personnel, Incident Report 181015, dated June 7, 2018, details how a law enforcement sergeant (not assigned to the DSD), along with members of the Mississippi Department of Corrections, and other HCSO law enforcement personnel, conducted a shakedown of all housing units in B Pod at the RDC.  Although they did not report any use of force, they did fire 12-gauge shotguns (utilizing blank rounds) in B-1, B-2 and B-3 in order to get the attention of "…inmates who refused to comply with orders to lay on the floor with their hands on their heads."  Firearms should never be taken inside a jail unless there has been a major riot or hostage situation and there is a need to regain control of the facility.  The practice of bringing in law enforcement or outside agency officers to conduct shakedowns is counterproductive.  Once the outside officers

29

leave, the DSD officers, whose authority has been undercut, are tasked with trying to regain control of their facility.  The Sheriff needs to issue an order permanently curtailing the use of law enforcement and outside agency officers to conduct such shakedowns.

Inmates still have ready access to contraband items, particularly at the RDC.  The problem is so pervasive that breaches of security (escapes from the facility) are routinely accomplished so that inmates can retrieve drugs and cell phones provided to them by friends on the outside.  They then return to their housing units through holes in the roof instead of leaving the grounds.  Examples of this are reflected in Incident Reports 1800654, 1800659 and 1800900.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**
There has been no action to deal with this issue since the last site visit.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Partial Compliance**
There has been no change in the status of this paragraph since the last site visit. An officer was assigned to work on this issue approximately a year ago.  Inmates are no longer assigned to specific units based on their gang affiliation.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:
    a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
    b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c.   Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

    d.   Prohibit the use of force as punishment or retaliation;

    e.   Limit the level of force used so that it is commensurate with the justification for use of force; and

    f.   Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Since the Policies and Procedures Manual has not been revised, reissued and approved, compliance with this paragraph cannot be achieved.   There continue to be examples of excessive use of force that appear in the incident reports.  One, was the shakedown of the RDC, B Pod, on June 7, 2018.  The involved officers from Law Enforcement and the Mississippi Department of Corrections fired a shotgun in Units 1, 2 and 3 (blank shells) in order to coerce the inmates to lie on the floor with their hands on their heads.  Another occurred at the RDC, C Pod, Unit 1 on May 22, 2018. Officers used chemical spray to subdue an inmate who refused to surrender his contraband cell phone.  As a result, all of the inmates in the unit were moved to the recreation yard.  When the sergeant arrived on the scene, he observed an officer walk up to the previously mentioned inmate and strike him in the face several times.  The sergeant had to physically restrain the officer.  To the sergeant's credit, his supplemental report included a recommendation that the officer should be suspended for several days without pay.   It should be noted that the officer who initiated the incident report made no mention of the excessive use of force in his report.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a.   Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b.   If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

        i.   The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

       ii.   Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary

muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

    iii.    Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

**Non-Compliant**

To date there are no recorded instances of staff members obtaining supervisory approval prior to using weapons and mechanical restraints.  The same can be said for the use of chemical sprays, physical restraints and electronic control devices being used when a prisoner may be at risk of appositional asphyxia.

    c.    Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

    d.    The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force.  Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

**Non-Compliant**

The Policies and Procedures Manual is still a work in progress.  Nothing has been submitted to the Monitor and the DOJ for review for the past year.  Fifteen-minute well-being checks are maintained in Booking and in the RDC, B-4 ISO Unit.  Since the last monitoring report, the process of recording those well-being checks has actually regressed in that an officer is no longer assigned exclusively to B-4 ISO and observation forms are no longer posted next to each cell.  Now one officer is responsible for both B-4 and B4 ISO and the records for well-being checks are incorporated into the B-4 Unit Log.

There is no evidence that mental health staff assess prisoners who have been subjected to level 1 use of force.  Although this issue was raised at the joint mental health staff and security staff meeting that occurred during the May 2018 site visit, it remains unclear to what extent efforts will be made to address this provision.

There is no evidence that mental health staff is being consulted prior to a planned use of force on prisoners with serious mental health issues.  This issue was also raised at the joint mental health

staff and security staff meeting that occurred during the May 2018 site visit, it remains unclear to what extent efforts will be made to address this provision.

    e.   A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

    f.   Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

    g.   The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

        i.   a sign-out process for staff members to carry any type of weapon inside the Jail,

        ii.   a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

        iii.   random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

    h.   A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

    i.   All staff members using force must immediately notify their supervisor.

    j.   All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

A planned use of force requires that the use of force be videotaped. This is not done. As an example, Incident Report 1800801, dated May 2, 2018, documents a case where planned use of force procedures should have been followed.  When an inmate refused multiple orders to exit his cell for a scheduled medical appointment, the two officers on scene did not attempt to physically move him; instead, they left the unit and reported the situation to their sergeant.  At this point they should have obtained video equipment before they returned to the unit to again attempt to move the inmate.  The officers followed correct procedure in reporting the situation to their sergeant but video equipment should have been obtained at that point.  In this incident, the inmate was noted to be mentally impaired. This paragraph also requires that if an inmate has serious mental illness, mental health staff should be consulted. That was not done. A review of incident reports involving the use of force revealed that involved inmates are routinely sent to medical for examination subsequent to such incidents.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Non-Compliant**

As was previously noted, Training records do not reflect use of force training for all personnel, either in the academy or through annual in-service training.  The inability to determine whether or not the HCSO is providing such training results in the finding of Non-Compliant.

53. Topics covered by use of force training must include:
     a.  Instruction on what constitutes excessive force;
     b.  De-escalation tactics;
     c.  Methods of managing prisoners with mental illness to avoid the use of force;
     d.  Defensive tactics;
     e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Non-Compliant**

As was previously reported, these topics cannot be addressed until the P&P Manual is revised and published.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This action cannot be undertaken until the revised P&P Manual is issued, officers are trained and sufficient time has passed to conduct the random testing of at least five percent of Jail staff.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

This cannot be updated until the policies and procedures on the use of force have been completed.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**
There has been no change with regard to this paragraph.  It cannot be addressed until the P&P Manual is revised and issued to all personnel.  During a third meeting with IT and Operations personnel, the shortcomings of the Detention Jail Management System (JMS) and the incident reports were outlined by the monitoring team.  The ability of the monitoring team has been severely hampered with regard to determining compliance because adequate incident reports are not provided to the team.  It is impossible to determine who wrote a report (unless that information is contained in the body of the report), when or if a supervisor reviewed it and whether or not he/she made a recommendation about its acceptability. The reports themselves are often very cryptic such as IR # 1800889 where the officer's explanation was that he used "...the necessary force to secure the situation." In a few incidents a supplemental report is made by the supervisor but this is rare. Even in those cases, conclusions or recommendations are not included. There is seldom any information or charts on the nature of any injuries. There are typically supplemental reports by witnessing officers but not other witnesses. There is typically no indication that video tapes are reviewed. During the past two site visits, joint meetings addressed these shortcomings, but the issues still remain unresolved.  If the HCSO cannot correct the shortcomings of the JMS it should be replaced by a jail version of what is provided to the law enforcement side of the Sheriff's Office.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**
There has been no change with regard to this paragraph.  The quality of incident reports in the DSD is generally poor.  Officers and supervisors tend to repeat unnecessary information multiple times throughout their reports, such as "I, Officer XXX, did something".  There should be no

need for an officer or supervisor to state, "I, Officer XXX" in the body of the report because it should be reflected by who wrote the report.  Similarly, the foundation of the report should indicate where the incident occurred.  It is not possible to tell from the incident report form when it was prepared. There is only one date field which appears to be for the date of the incident. There is no place to indicate supervisory review and recommendations. Sometimes a supervisor does a supplemental report but this appears rarely. Unfortunately, because the reports generated out of the JMS system do not capture some of those fields, that basic information is not readily available to the reader of the incident reports.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

     a.  A unique tracking number for each use of force;

     b.  The names of all staff members, prisoner(s), and other participants or witnesses;

     c.  Housing classification and location;

     d.  Date and time;

     e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

     f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

     g.  A description of the staff member's attempts to de-escalate the situation without use of force;

     h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

     i.  A description of any observed injuries to staff or prisoners;

     j.  Whether medical care was required or provided to staff or prisoners;

     k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

     l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The third session with IT, Investigations, Operations and Detention staff, held during the May site visit, addressed the same issues that had been previously reviewed.  If the DSD is to be able

to comply with the conditions of the Settlement Agreement, it is essential that the JMS be given the same level of detail and compatibility as the law enforcement system. Until that occurs, the monitoring team cannot access critical information and the DSD cannot submit what the Settlement Agreement calls for in an intelligible format.

## USE OF FORCE SUPERVISOR REVIEWS

59.     The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force. At minimum:

    a.     A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

    b.     A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

    c.     Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

    d.     If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

    e.     Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

    f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

    g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy. Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

No final determination can be made until the P&P Manual is revised and re-issued. The monitoring team is still not able to view the entries of supervisors on incident reports. Consequently, it is not possible to see whether or not they are approving/disapproving and/or making recommendations rather than simply signing and sending reports up through the chain of command.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.    Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.    Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force. Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent. If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.    Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.    Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.    Document whether the use of force was recorded. If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded. If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit. The specified actions are not routinely followed by supervisors. A review of use of force reports revealed that photographs are seldom taken and that waivers related to the refusal to be photographed are never included. Witness statements are virtually non-existent and use of force incidents are not recorded. On some occasions a supplemental report indicates a review of video recordings but this is rare.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

At this point it is still not possible to determine whether or not supervisors are performing their required duties because the monitoring team does not have access to the supplemental information that may be included in the JMS reports. The limited documentation available

38

through Drop Box does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

62. Reviewing supervisors must document the following:

    a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

    b.    Witness statements;

    c.    Review date and time;

    d.    The findings, recommendations, and results of the supervisor's review;

    e.    Corrective actions taken;

    f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

    g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

        i.    The nature and extent of injuries, or lack thereof;

        ii.    The date and time when medical care was requested and actually provided;

        iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

    h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Until it is possible to access the supervisory review portion of use of force reports, it is not possible to determine whether or not supervisors are taking required actions and appropriately documenting them.

**INCIDENT REPORTING AND REVIEW**

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.     Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The P&P Manual must be revised and issued to all personnel before the level of compliance can be determined. As described above, see, e.g. paragraphs 56-62. The current incident reports do not have sufficient information to allow for an appropriate review by supervisors.

64.    Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:

      a.    Tracking number for each incident;

      b.    The names of all staff members, prisoner, and other participants or witnesses;

      c.    Housing classification and location;

      d.    Date and time;

      e.    Type of incident;

      f.    Injuries to staff or prisoner;

      g.    Medical care;

      h.    All staff involved or present during the incident and their respective roles;

      i.    Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

      j.    External reviews and results;

      k.    Corrective action taken; and

      l.    Warden and Administrator review and final administrative actions.

**Partial Compliance**

There has been no change with regard to the status of this paragraph since the last site visit. Compliance is dependent upon the publication and issuance of the P&P Manual.  Incident report documentation currently provides for some of the information specified in this paragraph. Reports routinely have a tracking number, and list all persons involved, including staff and inmates, although inmate witness statements are infrequently noted.  Many reports still do not specify in which facility the incident occurred. Supervisory review information cannot be reviewed and validated until the monitoring team is able to access more sections of the automated report writing system.  The same applies to external reviews and results, corrective action taken, Warden/Administrator review and final administrative actions.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

      a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

      b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

    c.      Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit.  While documentation of incidents is more routine than was the case a year ago, the fact that there still have been no reports of lost money and property, or late releases and overstays, is indicative of a failure to document.  During each site visit, a review of inmate records has revealed multiple cases where inmates have been held beyond their scheduled or ordered release, yet no incident reports documenting these situations have been written.  Consequently, there has been no follow up and corrective action taken, to include disciplinary action and re-training.  Based on the expected experience regarding money and property at even the best run jails, there will typically be some incidents of lost money or property.  For there to be no incident reports in this area suggests that officers have not been trained to document such occurrences with incident reports.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:
    a.      Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.
    b.      Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.
    c.      Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.
    d.      Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Partial Compliance**

There has been no change in the status of this paragraph.  It should be noted that compliance has actually been hampered by the transition to an electronic report writing system in that the monitoring team cannot track the actions of supervisors after the initial report has been submitted.

**SEXUAL MISCONDUCT**

67.     To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

   a.     Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

   b.     Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

   c.     Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

   d.     Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

   e.     Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

   f.     A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

   g.     A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

   h.     Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

   i.     Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

The PREA officer and jail staff are working on policies and procedures which have not yet been adopted. There has been progress in the implementation of PREA requirements.  There are now posters in some of the units with a plan to put them in all of the units. The posters have reporting instructions, however, the PREA officer did not have a cell phone to forward the calls to and there was some debate about having the calls go through dispatch so the reporting mechanisms had not been fully worked out. The PREA officer had completed some orientation to inmates at JDC with Lt. Petty following up with more detailed information. The PREA officer has also completed a training class of about 3-4 hours at the training academy. There are discussions underway with Catholic Charities to determine whether that agency can provide counseling to any victims of sexual assault or harassment. Although this is very good progress in this area, there are still a number of areas of non-compliance and some of the stated practices do not

appear to be fully operationalized. Areas of concern include lack of training for all officers on PREA, lack of ongoing notice to inmates at booking or comprehensive education following, lack of required information in the Inmate Handbook, postings on how to report in all the units, unresolved mechanisms for reporting, no volunteer or contractor training, reporting is not being completed in the JMS system, and investigation officers do not have PREA training. It was reported that supervisory staff do not get the investigation reports once completed. This prevents any opportunity to use that information to determine whether discipline is appropriate or remedial measures should be implemented. Although the classification process includes a screening for PREA issues, the housing decisions do not appear to reflect attention to those issues. One individual at risk for sexual victimization was being housed in the segregation unit of the WC. At least one staff member indicated that he/she was at the Work Center because no one else wanted him/her. Less restrictive housing for this individual should be evaluated.

The mental health expert reviewed PREA issues from a mental health perspective. He identified two prisoners at risk of sexual victimization, one of which is quite clearly at high risk of such victimization; neither one of these two prisoners have been interviewed/assessed by mental health in connection with PREA-related issues; although one of them was receiving mental health services, none of those mental health services were focused on PREA-related issues; and neither one of these two prisoners appeared to have a real understanding of PREA and its significance to their experience at the facility.  The interview of both of these men revealed the need for mental health services focused on PREA-related issues; it was also clear that each of them could benefit from other PREA-related interventions (such as changes in housing assignment); and so a mental health evaluation would not only result in the provision of appropriate mental health treatment, but the mental health evaluator could also consult with appropriate staff and advocate for other, PREA-related interventions.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

      a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

          i.     Any prisoner exhibited a serious injury;

          ii.     Any staff member requested transport of the prisoner to the hospital;

          iii.     Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

       iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

       i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

       ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

       iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation. The criteria will require an investigation if:

       i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

       ii.    Any staff member requested transport of the prisoner to the hospital;

       iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

       iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

       i.    a brief summary of all completed investigations, by type and date;

       ii.    a listing of investigations referred for administrative investigation;

       iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

       iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.     Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Subsequent to the last site visit, the IAD investigator provided a status report regarding the number of cases under review and resolved.  That report indicates that a total of 48 cases have been referred to IAD between May 2017 and January 2018.  Of those, five resulted in termination, five in suspension, two in transfer, one in a written reprimand and one in reassignment. The quality of the investigations and reports are inconsistent.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.    The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

The use of the new kiosk system will eventually allow the prisoners to report grievances without the intervention of detention officers. However, the system is still not working as it should. Several problems reported at the time of the last site visit appear to have been remedied. At the time of the last site visit, grievances not answered within a certain time period appeared to be dropped from the system. In order to find those grievances, a report had to be run setting the necessary fields to locate them. At the time of the January/February visit, staff did not know to do that. It appears that the staff overseeing grievances now know to do that. However, at the time of the site visit the grievance officer at the WC was not able to run such a report so she still had no way of determining if there were outstanding grievances. And the medical staff had not been trained to run the reports to locate the grievances that appeared to drop off.

Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer observing the grievance being filed. It was reported that inmates can observe another's PIN number and then use it to purchase commissary on the other inmate's account.  There has also been a problem

with inmates communicating with each other through the kiosk system. These issues will need to be addressed.

As noted in the introduction to this section, one function of a grievance system is to identify potential constitutional problems and to prevent more serious problems from developing. The defects in the system prevent its use for meaningful tracking of potential problems. Probably the most problematic is that of the grievances reviewed, most were actually inmate requests, not grievances. Staff cannot recategorize these as inmate requests so any compilation will not accurately identify actual grievances. Within inmate requests, there is no way to identify subject matter so as to compile a report by the area of inmate requests. Even if there were, however, most notably, the system cannot generate a report by subject. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**
Policies and procedures have yet to be finalized. A draft policy on grievances does not describe the current process of using the kiosk.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**
With the knowledge to run reports to find grievances that appear to have dropped out of the system, it was possible to see that most grievances were responded to. However, there continued to be some that showed up as not answered in some cases for over several months. In addition, as mentioned above, the Work Center Grievance Officer was not able to run a report to see if there were unanswered grievances. The new system creates a spreadsheet to track grievances and responses. The Grievance Officer can track who has been assigned to respond to a grievance on the spreadsheet. It appears that there is not one person who oversees the grievance process for all three facilities. Lieutenant Jones appears to be the grievance officer for only RDC. She does not assign the grievances at the other facilities and cannot determine whether grievances at the other facilities have been answered. There is no one who is overseeing whether a promised action in response to a grievance is actually implemented. It appears that medical has not been trained on how to locate grievances that appear to have dropped out of the system. The person assigned to respond to a grievance is assigned based on housing and subject matter. However, this can result in some situations where the responding individual is not impartial. This would be the case

where the grievance is about an issue that is the responsibility of the responding individual. The assignments need to be evaluated both generally and in the specific case to ensure that an impartial person is reviewing the grievance. No one is tracking whether medical grievances are being responded to in a timely manner. No one is overseeing whether medical responses are adequate. One example, is given in response to paragraph 42(g)(iv). The new system has no means known to staff for marking a grievance as an emergency or otherwise identifying emergent grievances.

The system is also being used for sick call requests. A serious deficiency is that there is no text box for sick call requests. There is a drop-down field that has limited choices and even within those choices there could be some much more serious than others with no way for the inmate to communicate that. See, response to 42(g)(4).

72.    The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number. This may inhibit the use of the grievance system and also allows access to the prisoner's funds. There does not appear to be any language choices in the system or voice recognition features. There does not appear to be any policy for providing access for individuals with cognitive disabilities. Currently, the staff assumes that other prisoners will assist with prisoners who cannot access the current system. This does not meet the requirements of this paragraph.

73.    The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures. The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**
The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

**RESTRICTIONS ON THE USE OF SEGREGATION**

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

There has been no significant change in compliance with the terms of this paragraph since the January/February site visit.  Classification takes place within 24 hours of entry to the RDC, but not within eight hours of intake as this paragraph requires.  Detainees are processed through the Booking area within eight hours.

However, after classification, there are limited options to appropriately house individuals based on their risks and needs. There is a concern about the limited availability of housing options (other than segregation) for prisoners who need to be protected from themselves or others as a result of a mental illness, intellectual disability or other special needs or who need a therapeutic setting.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The monthly summary reports submitted by each facility now include a listing of inmates who have been placed on, or removed from, confinement segregation.  The format for each report is inconsistent. The monthly segregation log provided by JDC includes information useful to both the monitors and the command staff such as the reasons for placement and the expected length of segregation. This would be a good model for all the facilities.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Weekly mental health rounds on prisoners in segregation are now being conducted by the new mental health coordinator, and a record of those rounds is being maintained.  Further assessment

is needed to determine the quality of the rounds and the impact of the findings obtained during such segregation rounds on decisions to continue or discontinue placement in segregation.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

    a. All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

    b. Segregation must be presumed contraindicated for prisoners with serious mental illness.

    c. Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

    d. If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

    e. Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

    f. Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

        i. If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

        ii. The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

        iii. If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.   Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.   If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.   The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.   Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

There is no evidence that a mental health professional is being consulted prior to placing an individual in segregation.  The need to address this provision of the Settlement Agreement was raised during the joint meeting of mental health staff and security staff held during the May site visit.

It does not appear that segregation is presumed to be contraindicated for prisoners with serious mental illness. This provision of the Settlement Agreement was also raised during the joint meeting of mental health staff and security staff held during the May site visit.

There is no evidence that prisoners on the mental health caseload and placed in segregation are being screened by a QMHP.  It is unclear if security staff even knows which prisoners are on the mental health caseload.  It also appears that mental health discovers that a prisoner on the mental health caseload has been placed in segregation at the time of his/her next visit or during the weekly, mental health segregation rounds.

There is no evidence that a mental health screen is being conducted prior to use of segregation or that mental health considerations resulted in someone not being placed in segregation.  This is in part due to the fact that the mental health evaluations described in paragraph 76 and 77 (a, b and c) were not being performed (as noted above, the evaluations described in paragraph 76/the weekly mental health rounds on prisoners in segregation have just recently begun to occur); in part due to the prior absence of the presumption that segregation is contraindicated for prisoners with serious mental illness as noted in paragraph 77 (b); and in part due to the absence of a policy that addresses this provision of the agreement, including a clear description of 'extraordinary and exceptional circumstances'.

There is no evidence that the review of mental health inmates in segregation is happening so there is no documentation of the circumstances.  See paragraph 77 (d).

Prisoners with serious mental illness who are on medication and in segregation do have at least one daily visit with a nurse during medication pass.  However, it is unclear whether or not there is or should be any difference in the level of care given during the medication pass for prisoners with serious mental illness who are in segregation, compared to those in the general population.  It should be noted that since such prisoners in segregation do not see a Qualified Mental Health Professional on a daily basis, it should be made clear (in policy and procedure) to what extent the level of care provided by the nurses during medication pass includes some type of assessment of the prisoner's mental status.

It does not appear that prisoners with mental illness in segregation are provided a weekly therapeutic session.  This was in part due to the shortage of Qualified Mental Health Professionals; but as noted in paragraph 37, an additional QMHP is about to be added to the mental health team; and so therefore, this staffing issue is about to be addressed.  Now, when developing and implementing a plan to address this provision, it will be important to remember, as noted in paragraph 76, that the weekly mental health rounds for prisoners in segregation must not be a substitute for this therapeutic session(s).

It does not appear that prisoners with mental illness in segregation more than 24 hours are being reviewed by a QMHP.  However, as noted in paragraph 76, the new mental health coordinator is now performing weekly rounds for all prisoners in segregation.  Therefore, the next step towards

addressing this provision of the agreement will be the development of a plan whereby the mental health coordinator, in conjunction with a jail physician and psychiatrist, can perform a weekly review of the status of the prisoners in segregation who are also on, or should be added to the mental health caseload.

Since the mental health expert's first involvement in this matter was the January/February 2018 site visit, he could not at the time determine whether or not prisoners in segregation were assessed within 30 days of the settlement agreement.  However, based on a review of the medical records of a small sample of prisoners with serious mental illness currently housed in segregation, it does not appear that such prisoners (regardless of how long they have been held in segregation) have received a mental health assessment by a QMHP that includes a documented evaluation, a determination of whether or not there is a need for additional clinical assessment or care, and recommendations regarding more appropriate housing.

At the May 18 site visit, there was a joint meeting of the mental health team and security staff.  Among the issues discussed at that meeting was the need for a monthly review of all prisoners who have been held in segregation for more than 30 days.  It was noted that the review team should be interdisciplinary and include a representative from mental health; the representative from mental health should report on each prisoner's mental status; and when the prisoner is experiencing clinically significant mental health difficulties (that existed prior to the prisoner's placement in segregation or that have developed since the prisoner was placed in segregation), the representative from mental health should offer recommendations for an alternative placement (other than segregation) and any follow-up mental health evaluations or treatment that might be indicated.  The information gathered on each prisoner during each monthly segregation review meeting should be documented; the decisions made about placement and the prisoner's need for further evaluation and treatment should also be documented; and each member of the review team should sign each prisoner's monthly segregation review form (a form that will have to be developed).  It was also noted that at any time that the mental health team finds that a prisoner being held in segregation is suffering as a result of mental illness, the team should immediately discuss the findings with security staff (without waiting for the monthly segregation review team meeting); the mental health team and security staff should jointly develop an appropriate intervention; and this discussion, along with the agreed upon intervention, should be documented.

The additional questions raised in paragraph 77(h) are (1) the extent to which non-mental health staff persons (i.e., security staff and medical staff) are assessing whether or not prisoners held in segregation are decompensating or otherwise developing signs or symptoms of serious mental illness, where such signs and symptoms had not previously been identified, and (2) if non-mental health staff are identifying such prisoners, are they immediately referring them to mental health. This will be evaluated at the time of the next site visit.

There is no interdisciplinary team that attempts to balance security concerns and medical/mental health concerns when decisions are being made about the housing of prisoners with serious mental illness.  As noted in paragraph 42, a mental health treatment planning process and a form for documenting treatment plans has been developed; but at present, the treatment plans do not include recommendations regarding housing; and it is yet to be determined the extent to which available housing options meet the housing needs of prisoners with serious mental illness. Therefore, such an interdisciplinary team needs to be established; there needs to be a fuller assessment of the extent to which available housing options meet the housing needs of prisoners with serious mental illness; and then, mental health should include recommendations for housing in the treatment plans being developed for each prisoner with serious mental illness.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482.  **Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Partial Compliance**

Since more Juveniles Charged as Adults (JCAs) are now placed at Henley Young, a greater focus of this site visit was on assessing the status of the agreement requirements at Henley Young. Other than a gradually reducing number of JCA youth at the Raymond Detention Center (RDC) there has been no notable change in practice or the conditions for the youth at RDC. As of this visit:

- There were fourteen JCAs at Henley Young (includes two admitted during the site visit – one male and one female) and five JCAs remaining at the Raymond facility;
- Three of the five JCA youth at RDC will turn 18 by August 1 (one in June, one in July, one on August 1) and the two remaining youth have birthdays in the fall (October and November). This means that by no later than November of this year, the transition of youth out of RDC will be complete;

- One JCA youth at RDC who was 15 at the time of the January/February visit was subsequently transferred to Henley Young and turned 16 in March (unless transferred, this youth would not have "aged out" of RDC until March 2020);
- The length of JCA youth's placement at Henley Young as of May 22 ranged from a high of 259 days to a low of 26 days (not including the new admissions);
- Four of the JCA youth at Henley Young have birthdays in 2000 and will turn 18 yet this year, albeit several of them late in the year;
- Only **three** of the JCA youth at Henley Young have been indicted, leaving four youth that have been in placement 90 days or more without being indicted;
- As of May 22, there were only four non-JCA youth held at Henley Young (all boys);

As noted in the previous report, it had become increasingly inefficient to take up a whole unit at RDC for the declining number of JCA youth held. The draft report included a recommendation to move the JCA's to a smaller unit. Between the time of the draft report and the final report, the remaining JCA's were moved to an ISO unit to allow the larger unit to be used for adults.

In the last Monitoring Report, a number of recommendations were made related to changes at Henley Young that would support a successful transition (i.e. physical plant changes, security improvements, increased programming, speeding up case processing, improving the overall behavior management system, etc.).  The report indicated that as the length of time JCA youth are in placement increases, the more important these changes would become.  Specifically, the previous report included this language:

> *All of these steps will become increasingly important as the number of JCAs at Henley Young grows and/or their length of stay increases, so proper planning (including needed funding) for/implementation of these changes should be done as soon as possible. County staff indicates that some bonding authority has been approved in the budget and that some portion of those funds can be directed to make these changes.  A concern is that given the relative success of the transition to date, the sense of urgency needed to commit the necessary funding in a timely manner is diminished.  The County needs to establish, articulate, and implement a plan (including action steps, fiscal resources, and timelines) to complete the transition of Juveniles Charged as Adults (JCAs) to the Henley Young facility.*

Unfortunately, most of those recommendations were not implemented, and some projected problems that have arisen since the last visit will be referenced later in this section.  The one item that seems to be "holding" is the reduced number of non-JCA youth being placed at Henley Young, reducing the pressure on overall space and staffing needs.  If the current pattern holds true, Henley Young will essentially be transitioning from a short-term detention facility that holds some long-term youthful offenders to a long-term facility that holds some short-term

youth.  Overall, this represents a significant shift in organizational culture that can build on the previous progress at Henley Young but significantly "raises the bar" to become an effective long-term solution to housing youthful offenders/JCAs.

Reporting compliance on the remaining conditions will reference one or both locations (Henley Young and RDC) as appropriate.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance at Henley Young**

Any JCAs booked at RDC and then housed at Henley Young are screened for mental health concerns using the MAYSI-II, an appropriate screening for use with adolescents.  The Case Managers continue to play a helpful support role to youth and other staff.  The Case Managers are in daily contact with their assigned youth, provide information and support to maintain appropriate family contact(s), interact with court staff, help link youth with external resources, and can intervene to prevent behavioral problems. The counseling staff provides more on-going therapy and support and can help coordinate services with Hinds County Behavioral Health or other resources.

A significant, albeit limited, step forward occurred as Henley Young was successful in developing a contractual relationship with Dr. Payne, a licensed psychologist, to help provide overall direction and support for the mental health program as well as direct services to youth as needed.  Dr. Payne was just beginning her work at Henley Young at the time of this visit and is focusing initial efforts on developing and improving some of the basic procedures and policies related to the mental health program, including how to best implement a successful team approach in partnership with the Case Managers and Therapists. Dr. Payne appears to be very committed to working with youth and a positive addition to the program, although her time is limited to essentially a .5 FTE.  That limitation will make it difficult to meet the full demands for comprehensive assessment and treatment of JCA youth and assessing progress in this area will be an important component of the next site visit.

Concerns remaining include: (1) the only psychiatric time provided to Henley Young is apparently a once-a-week short visit by Dr. Kumar.  As noted for the Settlement Agreement as a whole the amount of psychiatric support allotted is insufficient, let alone for the JCA youth; and (2) the introduction of other coordinated programming (e.g. cognitive-behavioral programs, life skills, AODA, etc.) that could be led by Case Managers and Counselors has been delayed

pending direction/leadership from the psychologist.  Additional psychoeducational, skill development, and other programming remains limited, and again this will be a focus of the next site visit.

Addressing these issues as well as recommendations submitted in the Henley Young litigation included in Dr. Lisa Boesky's December 2017 report (improvements in the intake/screening process, strengthening the assessment process related to substance abuse and trauma, and making physical plant/environmental changes that will support behavior management and educational programming) should be part of the agenda for improvements led by Dr. Payne.

**Non-Compliant at RDC**
There is no substantive change in how JCAs confined at RDC are screened and/or served in relation to the various components required in this provision.  Mental health services remain limited to dealing with crisis situations (i.e. suicide concerns) and issues related to psychotropic medications (i.e. adjustments in medications).

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance at Henley Young**
Education services at Henley Young are provided by the Jackson Public School (JPS) system.  A more detailed review of educational programming is available in the November 2017 report submitted by Carol Cramer-Brooks in the Henley Young litigation.  That report noted progress made in 2016-17 but there has been no substantive change since the January/February site visit. JCA youth are provided some education, scheduled currently in essentially a morning group for some youth and an afternoon group for others.  This does not meet the expected standard for time in class, and in looking at educational records for JCA youth there was no indication that youth who may be eligible for special education services or an Individualized Educational Plan (IEP) were receiving those services.  There is an assessment of basic skills for youth and some identification of individual goals, but the plan falls short of what should be done.

At the time of the May visit, staff indicated that they were on the verge of implementing a GED program for those youth for whom that would be the appropriate and best choice. That is a step forward in some ways, but that education time will then be limited to a two-hour block during the late afternoon.  Given the lack of other structured programming, for youth involved in the GED program this will likely be a step backward in terms of overall program opportunities and will lead to even more "down time" which has been a problem in the past and will likely contribute to behavioral issues.

It does appear that the County has concluded, probably appropriately, that the services and resources provided by Jackson Public Schools (JPS) will not be sufficient to meet the needs of youth or the requirements of the Settlement Agreement.  This may first become evident if, as has been stated, JPS does not provide summer school programming. If JPS does not provide that programming that further reduces the amount of programmed time for youth unless Hinds County/Henley Young invest in additional services.  That said, outreach efforts have been undertaken to work with the Center for Educational Excellence in Alternative Settings (CEEAS) by inviting David Dominici who has been successful in implementing model alternative programs in a number of juvenile facilities. This hopefully will lead to the development of an independent/charter school program on-site at Henley Young that will both meet the educational needs of youth as well as be a positive contribution to the overall behavior management program. At best, it appears that this program could not be in place before January, 2019.

As noted in prior reports and referenced earlier, Henley Young will benefit by the development of additional cognitive behavioral programming, AODA groups and individual work, decision-making skill classes, tutoring, and engaging outside community groups and resources to provide pro-social learning opportunities for youth.  Hopefully with the leadership of Dr. Payne now on board, more of those programs can be developed and implemented.

**Non-Compliant at the Raymond Detention Center**
The program at RDC remains essentially the same as prior reports, with youth benefiting, albeit on a very limited basis, from the continued and generous support of a volunteer for Adult Basic Education (ABE) services.  Youth have daily access to individualized instruction for relatively brief periods of time (e.g. 1-2 hours), but there remains no routine screening process (other than assessment related to ABE skills) to determine whether and what educational services a juvenile or youthful offender was engaged in prior to admission that would help determine what the appropriate, and often legally required, services should be for the youth while confined.  While this is less of an issue given that "new" youth are not placed at RDC, there undoubtedly remain young adults (age 18-21) who need similar assessment and are perhaps legally eligible for specialized educational services.

80.    Ensure that youth are properly separated by sight and sound from adult prisoners.

**Full Compliance at Henley Young**
Since there are no adult prisoners placed at Henley Young, this provision is met. As JCA youth in placement at Henley Young turn 18, they will be transferred to RDC (although more recent interpretations of the Juvenile Justice and Delinquency Prevention Act may permit those youth to remain at a juvenile facility pending conviction/sentencing).

**Partial Compliance at the Raymond Detention Center**

Youth are housed in a separate unit so that the potential for contact with adults is minimized. As noted in other sections of this report, the lack of complete Policies and Procedures makes it difficult to determine if the facility has all procedures in place to fully assess compliance. But, in talking briefly with youth at RDC, they indicate there have been no instances of adults' incursion onto the juvenile living unit (something that some youth indicated was occurring when interviewed during the baseline visit).

81.    Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance at the Raymond Detention Center and Henley Young**
Although given the small number of youth remaining at RDC who will soon become adults this requirement is will soon be at least temporarily moot. However, in the development of policies and procedures, classification and housing of JCA's should be addressed so that when JCA's are booked into RDC it is clear how their classification and housing is addressed.  The continued small number of non-JCA youth at Henley Young has allowed them to utilize two units for housing JCA youth and make case-by-case decisions as to which housing unit is most appropriate. The use of two units also allows for lower youth to staff ratios and allows youth to be separated if there is conflict.  While staff leadership does seem to take the required criteria into account, actual documentation of classification decisions and use of a consistent classification tool will require further review.  On a positive note, that decision is informed by prior experience with most of the youth placed, so they are able to consider actual prior behavior rather than rely on simply the most recent "charge".

82.    Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance at Henley Young**

As noted in the previous (February) report, training for staff at Henley Young has included training beyond new employee orientation such as Suicide Prevention/Mental Health, Behavioral Management, PREA, Policies and Procedures review, and Crisis Intervention.  In reviewing the training records for individual staff to date in 2018, however, training appears to have been

limited to three content areas:  policy/procedure review, fire safety, and effective communications.  Given the changing nature of the facility (i.e. dealing with JCA youth over longer periods of time) it becomes increasingly important for additional training related to adolescent development, behavior management, trauma, and mental health.  A more complete review of training, with hopefully more diverse components, can be completed as part of the next site visit.

**Non-Compliant at the Raymond Detention Center**

There has been no change at RDC related to staff training, again likely the result of viewing this as unnecessary as the number of JCA youth held declines. As noted in the prior report, the last specialized training for supervising youthful prisoners was held in June 2017 prior to the site visit.  It appears that no discernible effort has been made to then clearly assign those trained staff, with the exception of Officer Tower, to the juvenile unit (A-1). While the general course of training for new detention officers does include some basic elements that are appropriate for youthful offenders (e.g. special populations), the lack of additional training and lack of focus on assigning specific staff to the juvenile unit remains a concern.  Even if the remaining JCA youth are moved to a smaller unit, it still makes sense to identify a core of officers that would be best suited to monitor that unit.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition**:**

    a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

    d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

    e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

    f. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least

every fifteen (15) minutes.  Such observation must be documented immediately after each check.

g. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Non-Compliance at Henley Young**

This site visit provided the opportunity to spend more time assessing compliance with the expectations related to the use of segregation as a disciplinary measure, and it became clear that this proved to be the most disconcerting change in monitoring since the last site visit.   This was because the leadership at HY did not seem to know what the terms of the agreement are related to the use of segregation and because the increased use of segregation reflects a deteriorating relationship between staff and youth in large part because of the lack of programming, limited to no incentives/system to help shape positive behaviors (individually and/or as a group), limited options to respond to minor non-compliance, and  limitations created by the physical plant/environment. In part this change is the result of spending significantly more time at Henley Young reviewing individual youth files, Incident Reports, and requesting additional documents in contrast to the prior visit in which both staff and youth represented that use of segregation was pretty limited.  In larger part, however, it seems to be the result of an actual change in youth behaviors and how the staff is responding to those behaviors.

Specifically, based on a more detailed review of youth files and the Due Process Isolation Log, there has been an increase in the use of segregation for disciplinary purposes in recent months. For example, in April there were 12 instances in which youth were confined for disciplinary reasons for 24 hours or more (four in March, eight in February, and eight in January).  There were additional Due Process Isolations in May, including multiple youth isolated following a significant incident on May 12 in which an altercation occurred between staff and youth and assistance was required from the Hinds County Sheriff's office. The incident stemmed from a youth refusing to comply with staff directive to go to his room and a struggle ensuing between a staff member who attempted to then restrain the youth and place them in his room.  The youth resisted, and other youth came to his aid as the staff member.  As additional staff came to assist, more youth also got involved in physically preventing the youth's removal from the day area.  There were other concerns noted from that incident, including whether the staff-written Incident Reports completely and accurately described the incident as it related to one of the staff members needing to be removed from the unit (written reports indicate that concern that a staff

60

member may be subject to further assault by youth, whereas viewing the video suggests that the staff member was not in danger and was in fact further aggravating the situation.  In any case, it resulted in four youth placed in Due Process Isolation status for more than 24 hours with no evidence that they continued to pose a danger to others. While the subsequent segregation of the identified youth is the most direct violation of the agreement, the incident also reflects a concern about the ability of the staff member in question to deescalate the situation (reflecting a need for additional training and supervision) and the lack of an overall behavior management system that could provide alternative response when staff are faced with some form of non-compliance.

Policy and practice at Henley Young provide for three different types of isolation: (1) Behavior Management Isolation (BMI) for short periods of time as a "cooling off" or short-term consequence[1]; (2) Administrative Isolation in which there is a supervisory decision to keep a youth in their cell pending a due process hearing; and (3) Due Process Isolation[2] that permits the use of segregation as discipline for up to 72 hours following a Disciplinary/Due Process hearing[3].  The use of Due Process or Administrative Isolation for an extended period of time is in contradiction to the DOJ Settlement Agreement that defines segregation as: *"24. …….involuntary confinement in a locked room or cell with two or fewer prisoners, for at **least the majority of waking hours per day**…..'"[4]* and are not consistent with the Henley Young/Southern Poverty Law Center Settlement Agreement (note that Provision 6.2 limits the use of isolation for discipline to not more than 24 hours).

It should be noted that in discussing the contradiction between the policy/practice and the requirements of the two agreements, Mr. Burnside, Operational Manager and Mr. Dorsey, Quality Assurance Manager, surprisingly indicated that they were not aware of the specifics of the DOJ Settlement Agreement related to segregation, that they did not have a copy of that agreement.  Regardless of how that happened (e.g. somehow the result of the temporary absence of Mr. McDaniels), it is clear that key staff leaders are now aware of these requirements and that immediate attention needs to be given to changing policies and practice accordingly.

Related to documentation for youth placed in segregation, there are logs submitted by staff that allegedly document the required observations.  It was in reviewing these logs that the extensive use of segregation became evident and further information was requested.  The use of the term "allegedly" in the preceding sentence reflects that far too many of the observation logs include documentation of "15 minute" wellness checks that are exactly 15 minutes apart.  While this is more common on the overnight shift, it is not limited to that shift.  Although signed off on by a shift supervisor, it is simply not believable that those checks are being made at exactly 15 minute intervals and therefore it raises the question of whether they are being made at all. Although a

---

[1] Henley Young Policies and Procedures, 3.C.8.
[2] Henley Young Policies and Procedures, 3.C.7.
[3] Henley Young Policies and Procedures, 3.C.2.
[4] Settlement Agreement, Page 8.

challenge given current leadership resources, a more proactive quality assurance process should be implemented.

It also remains difficult to link Incident Reports to the resulting room confinement.  On a positive note, the format of the Incident Report works pretty well and there is a Supervisor Report/cover sheet that helps ensure some consistency and review of incidents, more work remains in training staff to completely cover the needed information in their reports, and supervisors need to take a more proactive role in ensuring all information is completed correctly (too frequent errors on the IR forms submitted and few, if any, supervisor comments as to follow up action/steps.  The only cumulative log related to isolation/segregation tracks Due Process Isolations, so there is no readily available way to determine the extent of the use of BMIs or other administrative isolation.  Similarly, some of the individual observation logs do include indications that the youth was seen by a supervisor, case manager, or one of the qualified mental health staff, but again this is inconsistent and difficult to monitor.

Alternative forms of discipline and/or incentives need to be implemented in lieu of the use of Due Process Isolation that exceeds the requirements of the agreement. Related to documentation and quality assurance: (a) Supervisory staff and key facility leaders need to take a more proactive role in ensuring that these checks are being made as required; (b) Additional information should be clear in the comments section of the Incident Report cover page related to the subsequent actions taken, particularly if any form of isolation is utilized; and (c) Confirming the recommendation made in the last report, all use of isolation that exceeds one hour (the last report recommended one hour) should be documented on a centralized isolation log that includes the type of isolation, the duration, the staff member(s) directing the segregation, and provides information to link it to a related incident report.  Keeping a more extensive record of segregation will permit key facility staff as well as the monitors to evaluate progress in reducing the use of segregation overall.  This would be one relatively easy benchmark to track as part of a performance-based standards effort.

**Non-Compliant at the Raymond Detention Center**
There has been no change at RDC related to this requirement.  As noted in the prior report:
"…*There remains no evidence of sufficient policies/procedures or documentation related to the use of room confinement or other forms of isolation/segregation for youth. One source of documentation that may help track this is that staff on the juvenile unit are required to document at least every 30 minutes what each juvenile is doing on the unit.  Wading through that documentation is at best a challenge but does reveal a wide range of "activities" that youth are engaged in, with notes that include everything to "on the unit" to " sleeping in room" to "out for program" and various other descriptors.  It is not uncommon for a youth to be listed as "sleeping in room" or "in room" for substantial periods of time during what would be*

*considered "waking hours", and the staff explanation is that the youth is voluntarily in their room…"*

Unfortunately, as a result of a change in how grievances are reported/documented (transitioned to electronic form) staff were unable to provide a list or copies of youth grievances which may have revealed concerns related to cell confinement, although the few youths interviewed did not provide any sense that cell confinement was being used to deal with behavior issues.  That said, there is no way to realistically confirm compliance with the segregation requirements at RDC.

84.      Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

   a.   The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.
   b.   An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.
   c.   The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance at Henley Young**

Despite the positives noted during the last site visit, it has become apparent that continued delays in developing programs (educational, skill development, psychoeducation, Alcohol and Other Drug Abuse (AODA) programming, etc.), the lack of adequate programming space, the lack of modifications to the living units, continued delays in youth's cases moving through the court system, and the delays in getting a psychologist on board have contributed to a deteriorating situation in terms of youth's behavior and staff response.  Along with that, the relatively rudimentary point/level system that works reasonably well for short term youth has not been augmented or modified to either incentivize improved behavior(s) or provide individual goals for youth to work on while in confinement.

Successful behavior management, in the end, comes from a combination of good staff training and supervision, keeping youth actively engaged throughout most of the waking hours in constructive and pro-social activities, utilizing the expertise of mental health staff to address youth's mental health needs and develop preventive and proactive responses to youth's

misbehavior, implementing well-researched cognitive behavioral programs that help teach and allow youth to practice new and improved behaviors, establishing and incentivizing clear behavior expectations, and consistent implementation of discipline to redirect misbehavior.  It is common for juvenile facilities to use some form of a point/level system as part of the overall behavior management system, but overreliance on that system (particularly when not well suited for youth in long term placement) as the sole means to deal with behavior is increasingly recognized as poor practice.

There are a number of steps that should be taken that can help in developing a more comprehensive and effective behavior management system, including: Given the apparent decision not to make substantive facility changes to provide well-integrated additional programming space (there is an apparent plan to in the near future to add some temporary classroom space – a short-term solution at best if it comes to pass), the county can and should invest in improving the living unit environment (e.g. installing acoustical panels to reduce noise, removing the steel tables/benches and replace with other durable furniture to create flexible areas for youth within the unit and create a more normative environment).

As required in the DOJ Settlement Agreement, the County should obtain the services of a qualified consultant to help them to develop a more effective and comprehensive behavior management system.  Even prior to that current staff could take steps to augment the existing point/level system by developing additional incentives that can be applied on an individual basis to encourage new and improved behaviors. Additional programming needs to be developed to more actively engage youth during waking hours in constructive and organized activities. Support for this may be done by creating an additional staff position (or repurposing an existing position) with responsibility for overall program development, including potential outreach to the community for volunteers or other organizations that can provide support;

Leadership should review staffing assignments to ensure that those staff best trained and suited to working with JCA youth are assigned to those units. If need be, some form of differential pay on an hourly basis may be helpful in supporting staff that take on this more complex responsibility.

Based on discussion with key leadership at Henley Young, Mr. Burnside and Mr. Dorsey, it is clear that they had made significant progress in changing the culture and operations of Henley Young to meet many of the requirements of the SPLC agreement but are now struggling to "push the envelope" much further as it relates to serving long-term youth.  To their credit, Mr. Dorsey and Mr. Burnside recognize the challenges they are facing and seem committed to making continued progress but given the temporary absence of Mr. McDaniels in the Executive Director role, they find themselves again juggling additional duties with limited time to deal with some of these issues.  Providing added support through a consultant and exposing them to programs that

have been successful in developing successful behavior management programs will be beneficial.

**Non-Compliant at the Raymond Detention Center**

As with other components of the agreement, there has been no movement toward the development of a behavior management program at RDC.  It was noted in the prior report that a daily schedule had been developed/posted, but that posting was destroyed by youth – evidence of the continued lack of supervision and inability of RDC to develop substantive programming for JCA youth. There remains no evidence of a consistent set of expectations, incentives to meet those expectations, and/or consistency in how staff view expected behaviors. As the number of youth declines at RDC, it actually could become easier to implement a rudimentary behavior/incentive system, but there is no indication leadership is considering doing so.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Non-Compliant**

There continue to be problems with lack of paperwork and timely release. Jail staff recently worked with Karen Albert, a consultant with the monitoring team, to standardize and improve practices in this area and develop policies and procedures reflecting the new practices. The site visit predated this session and so any improvement resulting from this consultation will be measured at the next site visit. At the time of the site visit some of the problems noticed previously continued to exist. There are several individuals who are assigned the task of identifying prisoners who do not have appropriate paperwork to be detained or for continued detention. They are identifying those individuals but the current procedures do not adequately prevent these situations from occurring. There are several situations that occur fairly commonly. One seen repeatedly on this site visit involved holds in the system. Individuals whose local case was resolved continued to remain in custody because the system reflected a hold from another jurisdiction. In a number of instances, the other jurisdiction was not contacted in a timely

fashion. In several of those situations, the other jurisdiction did not have paperwork warranting the hold or no longer wanted the individual. A number of individuals remained in custody beyond what should have been their release date as a result. Another recurring situation is that there is not a way to identify people in the jail who are waiting for a preliminary hearing. Individuals who do not have an attorney have no one to request a preliminary hearing. These individuals currently get lost in the system and some stay long periods of time in the jail. There continued to be some individuals who stayed beyond the 21 days for those waiting for a probation violation hearing. A number of individuals were listed in the JMS system as in custody on charges that didn't match the court records. The court liaison was investigating these individuals. The staff working on records and releasing continue to keep manual records. Because of the lack of standardized entry of data, the JMS system cannot run accurate reports. The manual records of unindicted individuals does not match the system generated list. Similarly, the manual records of people waiting for probation violation hearings does not match the system generated list.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984). The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**

At the time of the site visit there was no one in the facility on an unlawful order for failure to pay fines and fees compared to 100 inmates detained on unlawful fines and fees orders at the time of the January 2017 visit. As a result of separate litigation and the adoption of Mississippi Supreme Court rules for criminal procedure, the Jail has not been receiving unlawful orders. This requirement is listed as partial compliance because the Jail has not developed or implemented policies as specified in paragraphs 87 through 89 below. As the Supreme Court rules are very new, it would be advisable to have polices to address orders that are not compliant with the new rules.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful. At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The County sponsored a training session on the new rules as related to orders on fines and fees. This is to be commended. This requirement is carried as partial compliance in that a process was not adopted to address non-compliant orders.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**
See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**
See response to number 87 above.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**
The WC continues to maintain a spreadsheet. There are some individuals who have a sentence of confinement. Some of these individuals show fines and fees but with the notation of a payment

plan in effect. This signifies that they will be released after the sentence of confinement. The Monitor will continue to track these entries to ensure that individuals are released after the confinement period. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliant**

This has become a limited issue now that virtually no individuals are working off fines and fees. As reported recently, the recent standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. The most recent stated practice was to determine the amount of credit on a case by case basis. There needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:
  a. Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.
  b. Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.
  c. Examples of prisoners presumptively entitled to release include:
     i. Individuals who have completed their sentences;
     ii. Individuals who have been acquitted of all charges after trial;
     iii. Individuals whose charges have been dismissed;
     iv. Individuals who are ordered released by a court order; and
     v. Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Non-Compliant**

See response to number 85.

There continue to be many individuals being held past 90 days without indictment. The new court orders from the preliminary hearings state they should go before a judge for a release decision. The jail is providing the lists of unindicted individuals to the judge, but perhaps due to the volume many of the individuals do not get before the judge in a timely fashion. This is, of course, a system issue which hopefully the CJCC will address. The Jail could consider making the list of unindicted individuals more useful to the judge by identifying those individuals who are lawfully in custody in another matter so that the judge can prioritize those individuals who are only in custody on the unindicted case. The Jail should also ensure that youth being charged as adults and being held at Henley Young are being identified on the unindicted list that is provided to the judge.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Non-Compliant**

There is still no known process to methodically check for adequate documentation for detention and identify those that should be released. The Jail still relies on inmate requests and grievances to identify people who are being over detained. The booking, release, and records process continues to suffer from a lack of coordination.  In addition to Booking staff, there are three individuals tracking the lawful basis of detention. They are all three using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. There continues to be a lack of business process to check all law enforcement and court documents. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's

mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

As was noted in paragraph 42, considerable progress has been made with regard to collecting and organizing the data and developing the records and other forms of documentation that would form the informational base for responding to this provision of the agreement.  More specifically, full mental health evaluations are now being performed and documented; mental health treatment plans are also being developed, which would include whether or not a prisoner must be transferred to another facility in order to receive a required treatment; and a list (or census) of prisoners on the mental health caseload is now being maintained.  As noted in section 42 (g, vi), a mental health care log should be developed that would chart the care being given to each prisoner on the mental health caseload; the suggested log would include housing assignment, which would include an indication for prisoners being held in segregation; but although the log would indicate whether a prisoner had been placed on suicide watch or a special mental health watch, the log would not track other security incidents.  Given the nature and the amount of the information that will be tracked on this recommended mental health care log, another log should be developed and maintained by security and mental health to track security incidents for prisoners on the mental health caseload.  It should also be noted here that a log that tracks mental health and security incidents would also help the mental health team further explore what type of adjustment difficulties prisoners with various different types of mental health difficulties are likely to experience (see also paragraph 37).

Although the above described data and records will form part of the base of information that will be used to perform mental health quality assurance assessments, such a mental health quality assurance program has yet to be developed and must be developed.  As a step in that direction, there should be a regular schedule of treatment plan reviews, performed by the entire mental health treatment team; such reviews will enhance the supervision of mental health treatment; and such reviews will also be an initial step towards assessing the quality of the treatment being provided.  Treatment plans will also note the treatment of choice, regardless of whether or not it is available at the facility and note that an alternative treatment is being used when the treatment of choice is not available at the facility. This will provide documentation of gaps in services that can serve as the base for exploring the need to expand mental health services at the facility and/or the need to increase mental health staffing levels.

At present, there is no specific plan for incorporating records about prisoners with serious mental illness into the Jails' incident reporting and investigations, and this part of this provision requires further exploration.  However, the involvement of mental health with regard to the use of force as described in paragraph 51 (d & f), and the involvement of mental health with regard to

disciplinary review and the use of segregation as described in paragraph 76 and 77 would be a step in the direction of addressing this provision of the agreement.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

In the initial Policies and Procedures that were adopted there are two policies that may relate to this requirement-the policy on records and the policy on booking which includes some requirements related to release. These policies do not have the specificity or the breadth required by this paragraph. These policies as with the others have been stalled. The current practices, as described above, do not meet the requirements of this paragraph. Neither the DA's office nor the defense bar has been involved in the drafting. The level of specificity required by this paragraph will require significant revision of the policy. The policies and procedures now being drafted with Karen Albert should enable compliance with a and b of this paragraph.

The primary focus of subsection d of this provision is the referral of prisoners with mental health difficulties to community mental health services.  As noted in the provision, there are, in fact, community-based mental health services, and so the core issue here is how prisoners can be referred in a meaningful way that is most likely to be effective.  At the present time, effective discharge planning and mechanisms to connect discharging prisoners with community-based services are not being implemented.

There were multiple important findings from a meeting with the Director and senior staff of Hinds Behavioral Health Center and the mental health expert during the site visit that included:

- Hinds Behavioral Health is a comprehensive, community-based mental health services provider that has multiple treatment programs that are designed in such a way that they are ideal for prisoners with mental health difficulties who are being released back into the community, including, for example:
    o There is the PACT program (mentioned in this provision) that provides intensive mental health treatment and other services to persons with severe mental illness; most participants in the program have been court ordered to obtain mental health treatment, but some of them already have a history of incarceration; and so ways in which this program could be made available to prisoners with serious mental illness who are being released from jail or prison should be explored.
    o There is an Adult Treatment program; this is the program that already has at least some communication with the Discharge Planner at the facility; but this program is open to explore better ways of referring prisoners to them upon their release.
    o There is a Psycho-social Rehabilitation program for persons who need rehabilitation services; this is a day program; and although two of the program's sites are housed in nursing homes and are focused on the elderly, there is a third site for younger adults.
    o There is a Crisis Intervention program that focuses on individuals who have deteriorated/become acutely ill, and staff will work to stabilize the individual on an outpatient basis or through emergency hospitalization, before the individual commits a crime.

- o There is an Alcohol and Drug treatment program; this is particularly relevant since substance abuse is yet another risk factor for incarceration and many prisoners have substance abuse difficulties; and for prisoners who are 'dually-diagnosed' (i.e., they have substance abuse difficulties and other mental health difficulties), this program can coordinate treatment with other mental health treatment programs at the facility (which is good since it has been well established that such 'dual-diagnosed' patients need coordinated and integrated treatment of both difficulties if they are to get better).
  - o Then in addition, Hinds Behavioral Health has open access to intake screens every morning at 8:00 AM.  Therefore, when there is a sudden, unexpected release from the facility, the individuals could go to Hinds the next morning, without waiting for an appointment, if they have been told about this option prior to their release date.
- Hinds Behavioral Health also has programs that focus on and address some of the other problems faced by persons with mental illness that are considered 'risk factors' for arrest and incarceration, including, for example:
  - o There is a Community Support service which offers intensive case management to keep people in treatment and provide needed 'wrap-around' services, all of which is particularly valuable for ex-prisoners with mental health difficulties who need support and other services in order to stay in treatment, but do not have any family or other support systems.
  - o There is a Supervised Housing program that provides 24/7 support for persons with serious mental illness and rehabilitation services, such as the learning of basic living skills.
  - o Then in addition, there is a Drop-In Center for persons who become homeless; this program provides a range of services focused on helping the homeless obtain stable housing, including employment services for those who are able to work; and there are also half-way houses connected to this program.  Since the lack of housing is also a risk factor for arrest and incarceration, this program could be extremely helpful to some of the prisoners with mental health difficulties who are being released.
- Staff from Hinds Behavioral Health used to go into the Jail (prior to the time that there were mental health staff at the Jail), so as to evaluate and begin to connect with prisoners who would eventually be referred to the Center for outpatient treatment, and they are still willing and able to do this.
- Hinds Behavioral Health is also specifically interested in knowing which of their patients have been arrested and are being detained in jail.

In summary, Hinds Behavioral Health Center offers a range of programs and services that could specifically meet the needs of prisoners with mental health difficulties who are being released

back into the community.  These programs and services range from the possibility of performing intakes and beginning to develop a connection with prisoners while they are still in the facility; to the capacity to perform intakes on a walk-in basis virtually immediately upon a prisoner's release from the facility (in cases where no intake was done while the prisoner was being held in the facility); to a full range of therapeutic programs and services, including substance abuse treatment services; to many other services that are focused on addressing the problems that ex-prisoners with mental health difficulties face that place them at high risk of getting into trouble and returning to the facility.  In order to fully utilize these services, QCHC and HCDC staff will need to coordinate with Hinds Behavioral Health Center to ensure a warm handoff to community-based services. Therefore, staff of the facility should meet with staff of Hinds Behavioral Health to further explore ways that they can work together to address this provision of the agreement.

It is important to note that the facility will also have to take some other steps to fully address this provision of the agreement.  These include:

- The recognition of the fact that meaningful discharge planning begins when a prisoner who is likely to be eventually released is first admitted to the facility.  When a discharge plan is developed, it should become a part of the prisoner's treatment plan.
- Effective discharge planning and a meaningful/successful referral for outpatient mental health services is most likely to occur where the prisoner is not only stabilized, but also receives psychoeducational services focused on helping the prisoner learn about his/her mental illness, the need for treatment, and his/her roles and responsibilities for obtaining and managing treatment.
- Upon the release of a prisoner with mental health difficulties, in addition to providing the prisoner with an appointment for outpatient mental health services and enough medication to hold them until that appointment, for some prisoners there are other extremely important considerations that might need to be addressed in the discharge plan, such as whether they have a place to live or any psycho-social support outside of the facility.

Discharge planning on the medical side has gathered some momentum since the last audit. Inmates that receive a PPD test for tuberculosis, and are released prior to it being read, are now sent to the health department to have the test read.  Inmates are provided a handout which describes positive findings for the inmates to be aware of.

Beginning in April 2018, inmates that are released are sent to the medical unit to retrieve their medications.  A three-day supply of medication is provided. As previously noted, a three-day supply will generally not be sufficient to ensure that the released inmate can obtain a prescription and medications in time to allow for uninterrupted medication. A 14 day supply was recommended by Hinds County Behavioral Health as needed.

The discharge process is hampered in that the Courts don't send the release papers to the jail until after 5 PM.  Applications for the re-entry centers cannot be processed that late and if the inmate is not immediately placed, the inmate will be lost to follow-up care.  It would be helpful if the judge's clerk could fax the release papers at noon and then again at 4:30 PM so that the discharge planner can start the application process to re-entry facilities.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:

    a.    Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

    b.    Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. A recent release of inmate K.L. on or about February 21, 2018 with a hold from another county demonstrated a deficiency in this area. Jail staff reportedly checked with the other jurisdiction and was told he was no longer wanted by the jurisdiction. This was inadequately documented. In another situation, the Work Center checked with the other jurisdiction and was told the individual was no longer wanted. This documentation was not sent to records or entered in the JMS system. During the process of releasing, Booking checked with the other jurisdiction and was told that he was still wanted. There was apparently some confusion in the other jurisdiction but having multiple individuals independently operating in this area without updating the JMS system allows for errors to occur.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors. To that end, the County must:

a. Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

b. Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures. At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures. The training must include instruction on:

i. How to process release orders for each court, and whom to contact if a question arises;

ii. What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

iii. Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

iv. How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

c. Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

Staffing in the Booking area continues to be unbalanced. While there is routinely only one officer in the holding cell area (where two should be on duty at all times), there are two, three or more Booking Clerks on duty in the office area. Considering the fact that only 14 people are booked on a typical day, this misallocation of manpower should be addressed. When an average of just over one person is booked every two hours, it seems apparent that the number of personnel assigned to the office environment is excessive.

100. The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

   a.    A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

   b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not prepared for errors in releasing.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Jail now has an individual whose title is Qualify Control Officer. At the present time, his work is primarily reactive. When an individual is brought to his attention, he researches the situation and takes corrective action. He does not track releases or prevent errors in the releasing process. He maintains a spreadsheet that includes release errors that he has addressed, but he does not at the present time collect and report on releasing errors. His work is not incorporated

into a continuous improvement and quality assurance process. Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. This individual has been promoted to oversee the Records and Classification Office. It is not known whether someone will be assigned to her prior duties. Like the Quality Control Officer, she operated independently of the booking and release process and maintains her own spreadsheets. There still is no systemic approach to ensuring proper detention and release processes are being developed. This is being addressed by the monitoring team consultant in this area.

103.     The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator. The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures. Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**
No documentation was provided of incident reports being created for untimely or erroneous prisoner release or any investigations of such incidents.

104.     The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner. The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above. The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**
Initial policies or procedures have been adopted but require significant revision. There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.     The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system. The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay. An incident report must be completed if Jail staff are unable to transport a prisoner to

meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

This makes the third time that the monitoring team has recommended that the DSD should take advantage of unused video visitation space in front of the control room officer's station in the A, B and C Pods at the RDC to be repurposed as attorney/client visitation rooms.  With very little effort, and almost no expense, they can be easily transformed into secure rooms that meet the needs of the facility.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**

The County is making progress towards computerized incident and other reports as well as the development of summary reports that would allow the aggregation and sorting of reports. The monitoring team spent a significant amount of time with the IT team in this site visit to identify areas in which the incident reports were deficient. This included adding some fields and moving some fields into the computer-generated report. There continues to be a problem with providing a process in the reporting for approval/disapproval/action required blocks for supervisors. The incident reports are not linked to the investigation reports which often contain important additional information. It was reported that supervisory staff do not receive the investigation reports so they do not have access to this information which may be relevant to discipline, training, or remedial measures. There continues to be a concern because of the lack of reports or the small number of reports that some incidents and grievances are underreported including late releases, lost money and property, medical grievances and some use of force incidents.

The new computerized grievance system does not allow for the compilation of a useful summary grievance report. Currently, this is not possible for several reasons. The reporting functions of the system are either problematic or not adequately conveyed to staff. Staff reported that they could not generate reports with identified parameters. If the prisoner replies via the kiosk in any fashion to the grievance response, that is then automatically converted to an appeal which inaccurately reflects the number of appeals. The system needs to be able to generate accurate reports.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

      a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;

      b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

      c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

      d.  List and total number of incident reports received during the reporting period;

      e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of incidents in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated. The summary reports are manually created and vary by facility. Because they are manually compiled, it is difficult to identify trends over time. The computerized summary report should remedy this. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

      a.  Summary of all uses of force, by type, shift, housing unit, and date;

      b.  List and total number of use of force reports received during the reporting period;

      c.  List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of use of force in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph in that the reports are manually prepared each month and do not allow for identifying trends over time. As mentioned above the IT department is working on a computerized report that should allow for a summary

report to be generated. In meeting with the IT department, it was learned that not all the requirements of this paragraph were addressed. That should be remedied. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

See response to 106 above.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:
   a. A brief summary of all completed investigations, by type, shift, housing unit, and date;
   b. A listing of investigations referred for disciplinary action or other final disposition by type and date;
   c. A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and
   d. A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

See response to paragraph 68.  Subsequent to the last site visit, the IAD investigator provided a summary sheet reflecting the status of IAD investigations since 2017; however, the level of detail included does not comply with all of the requirements of this paragraph.

111.     Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

  a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

  b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

  **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

  d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

  e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

  f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**
The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:
> a.    Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;
> b.    Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**
Medical Administration (MAC) meetings were held in February and May 2018.  The Deputy Jail Administrator is conducting the meetings while the Jail Administrator has been out on sick leave.

Quarterly Continuous Quality Improvement meetings are conducted. Topics have included discharge planning, TB skin tests, medication administration.  At the JDC, CQI studies included discharge planning, medication administration and compliance in conducting the suicide screen during the intake process

There were no critical incidents of deaths since the last audit. During the May site visit a chart of RW who expired on 5/4/17 was located.  A request for medical records was made to the hospital on 5/18/17 but has not been received by the jail.  A mortality review was not conducted.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County has contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. The first three meetings of the CJCC have taken place. In order to have a CJCC with sufficient expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. The recently hired Quality Control Officer may have been designated to provide some staff support but as yet is not familiar with the CJCC. It is unlikely that he will be able to do his job as Quality Control Officer and provide the needed CJCC staff support. At this time, the CJCC is not yet at a place to identify and develop solutions for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for compliance with the diversion and discharge planning requirements of the consent decree.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice)

Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC had its first three meetings. Not all of the identified agencies were represented at the meeting. The reported intention is to expand representation after further development.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Non-Compliant**

The CJCC has not yet formally adopted priorities.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Non-Compliant**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
    a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
    b.       Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**
The HCSO has still not implemented this relatively simple solution.  Staff and inmates are not familiar with the details of the Settlement Agreement, which would not be the case if handbook sized copies of it were made available to all personnel (staff and inmates).

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Non-Compliant**
This provision has been changed from partial compliance to non-compliant. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The County identified a consulting team to assist with the policies but that has apparently fallen through. It is stated that the plan is back to preparing the policies and procedures in-house. Because there is no apparent forward progress, this provision has been changed to non-compliant.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**
See response to 130.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the

United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Non-Compliant**

See response to 130.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

See response to 130.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Non-Compliant**

There have not yet been policies and procedures approved by the United States.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data,

87

and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October site visit, the County provided its first self-assessment. The assessment was a good first step towards compliance with this paragraph but needed to have the level of detail required by this paragraph.  This paragraph was listed as Partial Compliance in the last monitoring report. It is now listed as non-compliant because it requires that the self-assessment be updated one month before each site visit, and that was not completed.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Compliant**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

Immediate notifications have been provided. However, the County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date. The records office needs to be reorganized to implement business practices that accurately identify release dates and process releases. In the interim, the County needs to continue and improve its internal audit procedures to identify individuals entitled to release and prepare incident reports for persons who were detained beyond their legal release date.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.

## CERTIFICATE OF SERVICE

I hereby certify that on August 1 2018, I electronically filed the Court-Appointed Monitor's Fifth Monitoring Report with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

COUNSEL FOR PLAINTIFF, UNITED STATES OF AMERICA:

JOHN M. GORE
Acting Assistant Attorney General
U.S. Department of Justice
Civil Rights Division

D. MICHAEL HURST, JR..
U.S. Attorney
Southern District of Mississippi

STEVEN H. ROSENBAUM
Chief
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
steven.rosenbaum@usdoj.gov

LAURA COWALL
Special Counsel
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
laura.coon@usdoj.gov

CHRISTOPHER N. CHENG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-8892
(202) 514-6273 (fax)
christopher.cheng@usdoj.gov

COUNSEL FOR DEFENDANTS – HINDS COUNTY; MEMBERS OF THE HINDS COUNTY
BOARD OF SUPERVISORS IN THEIR OFFICIAL CAPACITIES; THE SHERIFF OF HINDS
COUNTY IN HIS OFFICIAL CAPACITY:


PIETER TEEUWISSEN
Board Attorney
P.O. Box 686
Jackson, MS 39205-0686
(601) 968-6797
(601) 968-6794 (fax)
pteeuwissen@co.hinds.ms.us


CLAIRE BARKER
Counsel to the Sheriff
407 East Pascagoula Street
Jackson, MS  39205
(601) 974-2967
(Fax)
cbarker@co.hinds.ms.us

COUNSEL FOR INTERESTED PARTY, DISABILITY RIGHTS MISSISSIPPI:

ELISSA JOHNSON
JODY E. OWENS
PALOMA WU
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
(601) 948-8885 (Fax)
elissa.johnson@splcenter.org

/s  Aaron S. Fleisher
AARON S. FLEISHER
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 307-6457
(202) 514-4883 (fax)
aaron.fleisher@usdoj.gov