Court-Appointed Monitor's Sixth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 WHB-JCG

Elizabeth E. Simpson
Court-Appointed Monitor

| | | | |
|---|---|---|---|
| David M. Parrish | Jacqueline M. Moore | Jim Moeser | Dr. Richard Dudley |
| Corrections Operations | Corrections Medicine | Juvenile Justice | Corrections Mental Health |

# EXECUTIVE SUMMARY

**Corrections Operations**

During the past year staffing levels in the Detention Services Division (DSD) dropped from 251 out of 275 authorized positions (271 funded) in October 2017, to only 231 by June 2018. Although that trend has recently been reversed, the total number of filled positions is only back to 251, precisely where it was a year ago. To date no action has been taken to fund the four unfunded positions. As a follow up to the salary increase that was previously approved, the Hinds County Sheriff's Office (HCSO) has submitted a step increase plan to the Board of Supervisors; however, the status of that proposal has not been reported to the monitoring team.

An approved Policies and Procedures Manual must be in place if the HCSO/DSD is ever to comply with the most basic conditions of the Settlement Agreement. Two years have passed since the monitoring process began, and there has been no appreciable progress made toward achieving this basic goal, so it is understandable why most of the paragraphs of the Agreement are carried as "Non-Compliant". Although no final policies have yet been submitted for approval, subsequent to the September site visit, several draft policies that are under development were submitted to the DOJ and Monitor for review.

Inoperative and malfunctioning security doors throughout the Jail System continue to make compliance with the most basic of security measures problematic. The specifics of these long-standing problems are spelled out in paragraph 46 of the Monitoring Report. As is reported there, until direct supervision is reinstituted at the Raymond Detention Center (RDC), and an officer is permanently assigned inside each housing unit, it is unlikely that the systemic vandalism of that facility that has occurred for many years, will be brought under control. One positive step toward addressing this issue is the adoption of a maintenance tracking system by the Facilities Maintenance Director. If it is used by the commanders of each facility, the timely correction of maintenance problems may be possible.

Subsequent to the May 2018 site visit several demotions occurred including the demotion of the Assistant Jail Administrator. The demotions were completed contrary to the procedural requirements of the Sheriff's personnel policies which require notice and an opportunity to respond prior to demotion. In addition, the individual who was selected to fill the position does not meet the minimum qualifications for the position required by the Settlement Agreement. As has been noted, personnel hired prior to the effective date of the Settlement Agreement have

2

understandably been retained even when not meeting the requirements of the Settlement Agreement. However, hiring and promotions after the effective date of the Settlement Agreement should be in compliance with the Agreement.

Changes in personnel have also resulted in some confusion related to classification. An objective classification tool had been adopted but at the time of the site visit the system had moved back to a charge-based system. After the tool is scored and if the charge category is higher than the resulting score, the score is routinely overridden to match the charge level effectively returning to a charge-based system. In addition, persons charged with misdemeanors are routinely sent to the Work Center (WC) without being classified. This is also a charge-based system instead of a behavior/objective system. However, other changes in staffing assignment have allowed the facility to get closer to the 8 hour time requirement for classification in the Settlement Agreement.

Monitoring Reports have previously noted instances where law enforcement officers and Mississippi Department of Corrections staff were brought in to conduct unauthorized shakedowns of DSD facilities.  After this violation of sound correctional practice was brought to the attention of the HCSO command staff, it appeared that the problem had been resolved. However, when it occurred again in June, 2018, the recommendation was made for the Sheriff to issue an order prohibiting such action in the future.  Since it does not appear that the order has been issued, that same recommendation is made again.

In an effort to reinstitute a direct supervision operational philosophy in the DSD facilities, "Train the Trainers" orientation was previously requested through the National Institute of Corrections (NIC).  It is anticipated that it will finally be provided to DSD staff in November 2018, through a Cooperative Agreement Program.

Being informed that the County is not going to proceed with a major overhaul of the Booking area at RDC in order to make it compatible with the Open Booking concept, it now makes sense to move forward with the minimal change in that area that was previously recommended, specifically the replacement of the doors and frames of all the multiple occupancy holding cells and at least two single cells.  This repair is necessary so that the Booking detention officers can see what is going on inside each holding cell without having to open the door(s). It is also recommended that the minor renovations recommended by the policy committee be completed to improve the booking process and move to open booking.

Report writing and review is a critical part of jail operations.  Through training and the report review process, officers should be instructed to write reports that contain the elements required by the Settlement Agreement. Some of those elements may be in the Jail Management System (JMS) but not the generated paper report. It is important that the JMS be modified so that the

same capabilities available to law enforcement officers are available to detention officers.  Until then, officers should be instructed to include the information in the narrative and supervisors should sign off on the paper report. At present it is not possible for the monitoring staff to determine whether or not detention officers and supervisors are making the comments and recommendations required by the Settlement Agreement.  Without that capability, compliance cannot be determined.

Fire safety is encompassed by the safety inspections and corrective action requirements of paragraph 46. It is a critical component of any jail's operation.  Greater emphasis must be placed upon reactivating the fire safety measures that were previously available at the RDC.

**Medical and Mental Health**

Since the May 2018 site visit, there has continued to be significant and quite meaningful advances with regard to the provision of core mental health services and the documentation of the fact that such core services are being provided.  More specifically, virtually all prisoners on the mental health case load now have documented mental health evaluations and treatment plans; there are progress notes for mental health treatment sessions; and at least a significant percentage of those prisoners on medication have psychiatric evaluations and there are psychiatric notes that document medication review.  In addition, the suicide prevention program has been significantly improved, and there are weekly mental health rounds for prisoners who are being held in segregation.  Furthermore, there is now a 'mental health tracking log' that summarizes important information on the 130 prisoners who are currently on the mental health caseload, which greatly facilitates the monitoring of compliance with mental health policies and procedures, and mechanisms for the monitoring and assessment of the quality of core mental health services is currently being explored.

There are, however, critical issues that still need to be addressed:  (1) The hours of service provided by the psychiatrist are woefully inadequate to respond to all of the mental health provisions of this agreement, and so therefore this mental health staffing issue needs to be addressed.  (2) Virtually all of the security policies and procedures that include tasks that must be performed by mental health staff – policies and procedures for classification, disciplinary review, segregation review, and the use of force – have yet to be developed, and therefore the involvement of mental health in these functions has yet to be clearly defined in a manner consistent with the provisions of the agreement, and so at present, there is no mental health involvement in these functions. (3) The roles and responsibilities of security staff and medical staff in the management of mentally ill prisoners under certain special circumstances (such as prisoners on suicide watch or mentally ill prisoners placed in segregation) continue to be unclear and therefore need to be more clearly defined. (4) The rate of successful referrals for follow-up, outpatient mental health treatment upon the release of prisoners from the facility is extremely

4

low, and so therefore strategies for increasing the rate of successful referrals need to be developed and implemented.

**Youthful Offenders**

This vast majority of time for the juvenile expert during this visit was again spent at the Henley Young facility, providing an opportunity to interview more youth, engage in constructive conversations with facility leadership and other key staff, and review selected records related to incidents and the use of confinement for disciplinary purposes.  At the time of the visit there were sixteen Juveniles Charged as Adults (JCAs) at Henley Young, including three girls.  Three JCA youth were being housed at the Raymond Detention Center (RDC).  Two of those youth will "age out" of the youth unit at RDC by the end of 2018, but the third youth is a juvenile previously convicted as an adult who will not "age out" until February 2019.  Earlier in September, a youth at Henley Young was convicted as an adult and placed at the RDC pending commitment to the state correctional system.  The Settlement Agreement does not differentiate between juveniles **charged** as adults and juveniles **convicted** as adults, so compliance with the provision to remove youthful prisoners completely from the adult facility will not be met at any time in which the county holds youth convicted as adults at RDC.

There have been no substantive changes at RDC related to youthful prisoners. An incident in late August in which a youth was allegedly assaulted by an officer for failure to comply with handing over contraband represents a serious lack of adequate supervision and training, at least as it relates to the particular officer, and it raises concerns about the commitment to safely, consistently, and properly supervise the few remaining youth at RDC.

There has been notable progress in moving toward compliance at Henley Young including bringing on board a part-time psychologist making positive changes to the behavior management level system, implementing more psychoeducational programming, developing a process for a more problem-solving approach to youth incidents/misbehaviors, and reducing (albeit not eliminating) the use of isolation as a disciplinary measure.  Much of this work is still in a formative stage, but it does provide evidence that leadership is interested and willing to move forward to implement more appropriate programming for the long-term youthful offenders in custody.  Further assessment of the effectiveness of these changes can be made at the time of the next site visit.

Significant concerns remain relative to the physical plant (e.g. limited classroom and program spaces, poor acoustics, and unnecessary institutional fixtures), limited educational programming, and lengthy case processing delays.  These shortcomings continue to pose unnecessary challenges to accomplishing compliance with the Settlement Agreement.  Previous

recommendations related to developing a plan and timetable for addressing these issues are reaffirmed for this report.

**Criminal Justice and System Issues**

The County and its CJCC consultant are making the effort to develop a functioning Criminal Justice Coordinating Committee (CJCC). Unfortunately, participation by many of the stakeholders has been minimal.  A strategic plan has been adopted and hopefully that will encourage greater participation.

Unlike in the last several site visits, there were a number of people incarcerated on unlawful orders regarding fines and fees. This should have triggered the procedure outlined in the Settlement Agreement for returning the individuals to court in order to obtain a lawful order. Those procedures were not followed. This underlines the importance of adopting policies and procedures to ensure that the required process is followed. These policies have been initiated and a draft which addresses this issue was provided by the Sheriff's office to the monitoring team and DOJ after the site visit.

The full time Quality Control Officer continues to gain experience and is identifying people who should be or can be released. This continues to be primarily a reactive process responding to inmate grievances and requests. However, at the time of the site visit, the Quality Control Officer had just completed a random proactive review of several inmate files in the jail data base to determine if there was a lawful basis for detention. This proactive review is a good first step towards a routine self-auditing process.

The records system is much improved. Unlike prior visits, no examples were found of people being listed as currently in the facility who were not. It is still not possible to run accurate reports out of the data system because of inconsistent in-putting practices and a lack of consistent updating after court activity. Several individuals were identified who should have been released earlier as detailed below. However, there were not as many as found in previous visits. In addition to the three people already working on identifying people that should be released, an additional person is reviewing unindicted individuals. This attention to the lawful basis for detention is yielding results.

The kiosk grievance system continues to present problems. The Sheriff's Office had a scheduled meeting with the vendor after the site visit which will hopefully resolve some of the problems. At the time of the site visit, the WC grievance officer could not run a report to locate grievances that did not have a response and with a change in personnel at the Jackson Detention Center (JDC), the staff did not know how to run such a report. There is no procedure to oversee the actual implementation of grievance responses. The system is also either dysfunctional or not

understood in its ability to generate reports. The staff does not know how to generate reports, if it is possible, to meet the requirements of the Settlement Agreement or be useful to them.

**Monitoring Activities**

The Monitoring Team conducted a Site Visit September 18th through September 21st. Dr. Dudley completed his site visit earlier in the month because of a scheduling conflict with the team visit. The site visit schedule was as follows:

September 18th through September 21st Site Visit Schedule

| Date | Lisa Simpson | Dave Parrish | Jim Moeser | Dr. Jackie Moore |
|------|-------------|-------------|-----------|-----------------|
| Tuesday a.m. | Meeting with Major Rushing, Williams<br>Tour RDC | Meeting with Major Rushing, Williams<br>Tour RDC | Meet with Burnside and Dorsey<br><br>Review individual files for all JCA youth<br>Met with mental health team-Dr, Payne, Case Managers, Clinician | Meet with HSA and DON |
| Tuesday p.m. | Meet with Jones on grievances and review grievances | Meet with Fire Safety officer<br>Meet with Mr. Bell | Review individual mental health records for all JCA youth<br>Review psychoeducation program schedule<br>Reviewed room confinement log/tracking<br>Review Incident Reports in which confinement was used | Tour RDC-observe medication pass |
| Wednesday a.m. | Meet with Ken Lewis<br>Meet with Sgt. Tillman<br>Review records | Meet with Funchess<br>Meet with Miller and Williams | Meet with Training coordinator<br>Meet with one of the Case Managers re: mental health records and programming | Observe sick call at RDC<br>Meet with discharge planner |

| | | | Review updated Strength Based Assessment Review current mental health intake assessment | |
|---|---|---|---|---|
| Wednesday p.m. | Meet with Moore re PREA<br><br>2:00-3:00 Meet with 1st and 2nd shift supervisors re reports<br><br>Review repairs and locks | RDC<br><br>Meet with 1st and 2nd shift supervisors<br><br>Review repairs and locks | Meet w. medical (Nurse LeFlore), review medical records, including use of psychotropic medications<br>Meet with GED teacher re: status of GED progress and testing<br>Observe class instruction re: nutrition<br><br>Meet with SPLC | Tour WC<br>Review Records |
| Thursday a.m. | Meet with Carmen Davis, Synarus pretrial<br><br>Meet with Policy committee | Meet with Marlo Brinnon<br><br>Meet with Policy committee | RDC: Review files of youth, including cross-referencing RDC booking times with HY booking times<br>Interview three JCA youth<br>Review youth observation logs for JCA unit<br>Brief update discussion with Officer Tower on JCA unit<br>Review Incident report re: youth S.P. & discussed incident with the three JCA youth | RDC-chronic care |
| Thursday p.m. | Meet with Lt. George<br><br>WC-grievances | Meet with Carmen Davis, Captain Dalton re JDC repurposing | Interviewed six JCA youth<br>Exit discussion with Mr. Burnside and Mr. Dorsey | Tour JDC<br>Meet with Dr. Martin |
| Friday a.m. | Exit meeting | Exit meeting | Exit meeting | Exit meeting |

| | JDC re grievances | Meet with Ms. Coleman<br><br>Tour JDC<br>Tour RDC | | |
|---|---|---|---|---|

Dr. Richard Dudley Site Visit Schedule
September 5-7, 2018

| | Wednesday | Thursday | Friday |
|---|---|---|---|
| A.M. | Meet with MH Coordinator<br>Meet with PREA coordinator | Meet with combined security and MH staff re policies | Medication Pass<br><br>Segregation Rounds |
| P.M. | Meet with Dr. Payne at Henley Young | Meet with Discharge Planner<br>Chart Review | Segregation Review<br><br>Exit Meeting |

**COMPLIANCE OVERVIEW**

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Raymond Detention Center are included in the totals in this chart.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |

| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
|---|---|---|---|---|---|---|

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

**PROTECTION FROM HARM**

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;
    n.  Laundry;
    o.  Food services;
    p.  Hygiene;
    q.  Emergency procedures;
    r.  Grievance procedures; and
    s.  Sexual abuse and misconduct.

**Non-Compliant**

In the Fifth Monitoring Report this provision was changed from Partial Compliance to Non-Compliant because there had been little appreciable progress made toward the creation of a viable Policies and Procedures Manual.  Without that in place the County and Sheriff's Office

10

are unable to move forward in almost every significant area of concern addressed by the Settlement Agreement.  After the first attempt to prepare policies and procedures resulted in an unsatisfactory document, the HCSO has investigated several options for contracting for assistance in developing the policies and procedures. An expert on the Monitoring Team has been assisting with the development of some policies. Drafts of these policies were provided to DOJ and the Monitoring team after the site visit. Reportedly, the HCSO is looking at contracting with her to continue development of the policies and procedures. This is positive news but to date there is no contract, only a few draft policies, and no final policies and procedures.

Policies related to specific Settlement Agreement provisions are addressed below. Policies not addressed below but essential for a reasonably safe and secure environment are addressed here. Policies and procedures with respect to medical as required by Paragraph 37 (l) should be developed or modified to address or clarify several issues. Sick call is provided within 24-48 hours of the inmate's request at all three facilities.  There was a question regarding the co-payment fee of the County and many inmates during interviews indicated that they were not requesting sick call due to the co-payment charge.  Policies should address the co-payment requirement and accommodation for indigent inmates. Additionally, many nurses interviewed indicated that the inmate had to have presented with the same condition for three times before a referral to a provider was made.  Combined with the co-payment requirement, this places a significant financial burden on the ability to see a provider. Upon review of the QCHC policy this was not the policy and should be clarified with the nursing staff at the next in-service/staff meeting. If multiple nurse visits are required, there should be an ability for a nurse to triage directly to a provider when appropriate.

The kiosk system adds a level of inefficiency to the sick call system. The kiosk options for sick call requests provide limited categories and no way to add additional information.  Many of the inmates check all of the boxes in the kiosk in hope that they will be seen. Thus, the nursing staff are not prepared for a specific complaint or the seriousness of the request.  The medical expert spoke to them in detail regarding going back to a paper system which staff resisted.  With the kiosk system they know a request was submitted.  It is advised that the current kiosk system be revised to include more categories of sick call complaints.

There continue to be concerns about the medication administration particularly at RDC that need to be addressed by adoption and implementation of policies and procedures as described in the last monitoring report. Neither nurses nor officers routinely checked the inmate's mouth for hoarding their medication.  Charting is not performed in real time.

QCHC mental health policies and procedures have continued to be refined, and at this point they are in pretty good shape.  With respect to those policies the final question that needs to be addressed is a commitment with regard to the timeliness and the frequency of examinations and

follow-up visits under various different clinical circumstances, consistent with prevailing standards of practice, especially with regard to the psychiatrist.

Now that mental health policies and procedures have been well developed and put into place, both the internal assessment focus (i.e., by QCHC and other appropriate participants within the facility) and the external assessment focus (i.e., by the monitoring team) shift to measuring compliance with these policies and procedures.  An example of this type of compliance monitoring and assessment was brought to the attention of the monitoring team in the form of a letter from an inmate to the Civil Rights Section of the US Attorney's Office for the Southern District of Mississippi, alleging that he had been inappropriately physically forced to take psychotropic medication against his will.

The mental health policy that is applicable to the above noted inmate complaint is the policy regarding 'emergency psychotropic medication', which details the situations where medication can be given against a patient's will, and the procedures that must be followed and documented. The records indicate that he was given an intramuscular injection of Haldol in response to an emergency order for the medication.  However, there is nothing in the medical record that indicated that that specific injection was given against his will or that there was even an indication for doing so (i.e., either as a psychiatric note or as part of the nurse's medication administration note), and there was no use of force report in the records kept by security.  QCHC was asked to investigate this matter further, in the context of their responsibility for internal assessment of compliance with mental health policies and procedures.

Two additional cases involving orders for involuntary medication were reviewed.  Available records indicate that in both cases the inmate was evidencing psychotic symptoms; the inmate had a history of refusing psychoactive medication; and an emergency intramuscular injection of Haldol was ordered.  As reported by staff, both inmates refused the ordered medication; in both cases, the psychiatrist ordered the nurses to give the injection against the inmate's will; and in both cases, the nurses refused to give the medication against the inmate's will, based on their belief that doing so would be inconsistent with the applicable policy.  Available records indicate that in both cases, there was no psychiatric documentation in the record regarding the reason for/need to force medication.  Therefore, QCHC was asked to investigate these two matters as well. Such investigations should become part of a process to assess staff compliance with the policies and procedures.

Impacting the ability to implement the policies through the development of procedures is the issue of mental health staffing levels.  The acute concern with regard to mental health staffing levels and the ability to provide appropriate treatment is the fact that there is inadequate psychiatric time to fully comply with the policies and procedures as written and meet the provisions of the Agreement.

12

The second issue related to the development of mental health related policies and procedures, noted in prior reports, is that there are multiple mental health related provisions that cannot be addressed by mental health staff alone.  These include, for example, the participation of mental health in the disciplinary review process, the participation of mental health in the segregation review process, incidences where there is an anticipated/planned use of force and incidences where there has already been a use of force, and the roles and responsibilities of mental health with regard to the Prison Rape Elimination Act (PREA).  During this site visit the mental health consultant met with senior security staff for a more detailed discussion of disciplinary review, segregation review and use of force, including the roles/responsibilities of mental health with regard to these security functions, and also had a joint meeting with mental health and the PREA coordinator.  Please see the relevant sections of this report for a more detailed discussion of findings as they relate to each of these areas. There should be continued discussions with security staff and facility administration about the issues that require an understanding and working relationship between mental health staff and security staff, and develop required policies and procedures

Findings with regard to other specific mental health provisions are noted in applicable sections.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Non-Compliant**

This paragraph was previously carried as being in Partial Compliance because the Jail Administrator, although otherwise well qualified, does not have a BA degree.  The Assistant Jail Administrator appointed in June, 2018 does not meet the educational or experience requirements of the Assistant Jail Administrator's position.  While he has been employed by the HCSO for a total of 17 years, almost all of that time has been spent on the law enforcement side of the Office. He has served only two years in the Detention Services Division.  In addition, he does not have a bachelor's degree.  As has been noted, personnel hired prior to the effective date of the Settlement Agreement have understandably been retained even when not meeting the requirements of the Settlement Agreement. However, hiring and promotions after the effective date of the Settlement Agreement and inconsistent with its requirements have to result in a fining of non-compliance.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum,

Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

Until there are approved policies and procedures in place, the supervisors will not be able to be familiar with them.  A number of individuals have been promoted since the May site visit.  They include the following (Because confidential personnel information is referenced, the individuals are referenced by an assigned letter. A key is available):

A.—was employed by the HCSO on 4-19-16 and was terminated on 6-7-17 as a result of a use of force incident involving several officers and a sergeant.  He was reinstated on 8-7-17 subsequent to a Disciplinary Review Board finding that the sergeant had failed to supervise the involved officers.  A has a record of three arrests for domestic violence, but no convictions.  He has a high school education (GED) and was promoted to sergeant on 7-5-18.

B.—was employed on 7-8-16.  He served for two years with Youth Services prior to joining the HCSO.  He has a high school diploma and completed some college hours.  He was promoted to sergeant on 7-1-18.

C.—was employed on 12-11-95 as a law enforcement officer.  He became a school resource officer in 2001.  On 10-4-02 he was suspended for the improper use of a firearm and was transferred to the RDC as a detention officer.  On 3-3-03 he was transferred to Supreme Court Security, then to the RDC on 9-26-05.  On 5-23-08 he was relieved of duty with pay pending the results of an Internal Affairs investigation, but was returned to duty later the same day.  On 3-14-12 he resigned and went to work for the Mississippi Department of Corrections.  On 8-21-17 he was re-employed by the HCSO.  He has a high school diploma.  On 2-1-18 he was promoted to sergeant.  On 7-1-18 he was promoted to lieutenant.

D.—was employed on 6-15-11.  On 5-6-15 D received a letter of reprimand for failure to follow the chain of command.  D has a high school diploma.  D was promoted to sergeant on 11-1-17.  On 7-1-18 D was promoted to lieutenant.

E.—was employed on 9-17-01.  He has a high school diploma.  On 2-1-04 he was promoted to corporal.  He was promoted to sergeant on10-1-06.  He was promoted to lieutenant on 5-1-12.  On 9-29-09 he received a five-day suspension for insubordination.  On 6-14-13 he received a counseling for failing to review and submit an incident report.  On 7-3-13 he was terminated for an undocumented incident.  On 10-9-17 he was re-employed.  He was promoted to sergeant on 2-1-18.  On 7-1-18 he was promoted to lieutenant.

F.—was employed on 7-10-14.  He has a high school diploma and a Culinary Arts Certificate. On 5-26-15 he received a written reprimand for tardiness.  He was promoted to sergeant on 4-11-16.  On 7-1-18 he was promoted to lieutenant.

As the above records indicate, most of the newly promoted individuals have the requisite education and experience; however, two were promoted to sergeant within approximately two years of being employed, one was promoted twice in the same year and several have significant disciplinary histories.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Partial Compliance**

According to the HCSO Director of Human Resources, a background check, including a criminal history check, is conducted on all applicants prior to their employment.  To further support this, she conducted a review of 150 Detention Services Division (DSD) personnel files.  In a written statement on October 2, 2018, she reported that each file contained documentation reflecting that a background and criminal history check had been conducted prior to the respective individual's employment.  A smaller sample of DSD personnel files, conducted by a member of the monitoring team, supported the Human Resource Director's findings.  Although this review indicates that a background check was completed, the personnel history listed in response to paragraph 39 above indicates that individuals that have what should be disqualifying backgrounds are nevertheless hired and/or promoted.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

There has been no change in the status of this paragraph.  The Policies and Procedures Manual has yet to be published.  It was reported that some training on direct supervision for some employees was provided at the WC. The monitoring team has requested documentation on this training but none has been provided. This would not be sufficient to meet the requirements of this paragraph. Although staff members have not yet been trained with regard to the principles and dynamics of direct supervision, progress is being made, in cooperation with the National Institute of Corrections (NIC) to provide "Train the Trainers" support through that agency.  As was previously reported, the HCSO is entering into a Cooperative Agreement arrangement with NIC to host direct supervision training on site at the WC and RDC.  It is anticipated that the training will be accomplished before the next site visit.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:

        i. There are at least two detention officers in each control room at all times;

        ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii. There are rovers to provide backup and assistance to other posts;

        iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v. There are sufficient detention officers to implement this Agreement.

    b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

        iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

    d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

      e.   The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

This paragraph was changed from Partial Compliance to Non-Compliant in the Fifth Monitoring Report because of the lack of progress in filling existing positions.  In fact, there was a net loss of 20 personnel over a period of eight months.  While that downward trend was reversed during the past four months, the Detention Services Division is now only where it was exactly a year ago with 251 positions filled out of 275 authorized (four of which are unfunded).

At the JDC required posts are filled but staff are able to get by primarily because the count averages just over half of the facility's rated capacity.  At the WC Housing Unit 4 is still unoccupied.  Although the heating and air conditioning problems associated with creating Units 3 and 4 have been resolved, the reason now given for not opening Unit 4 is a lack of staff.  Currently, the facility holds approximately 150 inmates, which is well below its rated capacity of 256.  At the RDC lack of staff is still a critical issue.  None of the general housing units have an officer assigned inside so as to permit direct supervision operation.  In fact, specialized ISO units, that had been previously staffed twenty-four hours per day, were found to be unattended either during the September site visit or by reviewing incident reports and video associated with incidents that occurred prior to the visit.  These included the Juvenile Unit (A-1 ISO), the Suicide Watch Unit (C-4 ISO) and the Special Management Unit (B-4 ISO).  A review of incident reports reflects an unacceptable level of assaults, many of which result in serious injury; and, as was previously reported, most of these occur when there are no officers present.  In fact, most incidents are discovered after the fact or when inmates call for assistance.

The HCSO has submitted a recommended salary step system whereby employees would receive periodic increases based on longevity; however, the County has yet to take any action on the proposal.

The current staffing is inadequate to safely operate the Jail. From June 1, 2018 to August 31, 2018 there were 39 reported incidents of inmate assaults. From 6/1/18-9/15/18 there were 24 inmates sent to the emergency room due to stab wounds, fractures, dislocations, eye injuries and casting of broken bones.  Two inmates were hospitalized with chest wounds relating to a pneumothorax due to stabbing from other inmates.  One night during the site visit there were eight inmates sent to the emergency room as a result of a disturbance.

      f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's

bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

    i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

    ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

    iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

    iv.   The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

    v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

    vi.   The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Non-Compliant**

As part of the work with Karen Albert of the monitoring team, an objective classification tool had been adopted and was being used. However, with the change in personnel, the system has moved back to a charge-based system. After the tool is scored and if the charge category is higher than the resulting score, the score is routinely overridden to match the charge level effectively returning to a charge-based system. This was observed in 4 charts. It was not possible to determine whether there were charts in which the score was not overridden for a higher charge category because the charges are not included on the form. The monitor has suggested that this be added to the form so that this practice can be monitored. In addition, persons charged with misdemeanors are routinely sent to the WC without being classified. They are then classified at

the WC and only returned if the individual misbehaves. This is also a charge-based system instead of a behavior/objective system. The monitoring team expert will work with new personnel to continue moving towards an objective classification system.

With the staffing changes, the classification team is close to being able to classify at the time of booking at RDC. However, there is no coverage at RDC from 7:00 a.m. Saturday morning to 7:00 a.m. Monday morning. Also, because persons charged with misdemeanors are sent to the WC before classification and the classification officer at the WC works 7:00 a.m. to 4:00 p.m. Tuesday through Saturday, there are individuals who are not getting classified in a timely manner. The monitors have suggested that these individuals should be classified at RDC before being transferred to the WC. Similarly, because of staffing limitations at JDC, females who are transferred to JDC before classification are not always classified at the time of booking.

Some incident reports indicate that an inmate being moved is taken to Unit B-1 for reclassification. However, other incident reports indicate that an inmate is moved to another unit without notification to Classification or placement in the classification unit. This issue will be monitored more closely during the next site visit.

    g.  Develop and implement positive approaches for promoting safety within the Jail including:

        i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

        ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

        iii.  Creating work opportunities, including the possibility of paid employment;

        iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

        v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

        vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

        vii.  Providing reasonable opportunities for visitation.

    h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal

       behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

    i.   Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g)(i), five hours of outdoor recreation per week is still not provided to all inmates in the Hinds County Jail System.  At the JDC there has never been an outdoor recreation yard, however, inmates there have historically been allowed time in the fifth-floor multi-purpose room.  As was previously reported, the indoor car wash area is now used for inmates to play basketball, but no records were provided to reflect how many hours per week inmates have access to these facilities.  At the WC each recreation yard is shared by two housing units.  Since there is no log maintained that reflects inmate access to recreation, that information can only be obtained by reviewing the Unit Logs.  A synopsis was requested for inclusion in this report, but it was not available at the time of submission.  At the RDC, recreation has not been available for most inmates for over five years, going back to the riot of 2012; the only exception was for juveniles.  During the May site visit there were reports of sporadic recreational opportunities for inmates, but they could not be supported by documentation in the Unit Logs.  A review of Unit Logs during the September site visit revealed that at least some units have access to recreation in the outdoor facilities.  While the Juvenile Unit previously had a record of recreation on almost a daily basis, that data was not available for this report.  In Housing Unit A-1 there were two recorded hours of recreation between 8-19-18 and 10-1-18.  On four dates there was a record of the recreation yard being opened, but no record of it being closed.  This unit is currently closed for repairs.  In Housing Unit A-3 there were a total of 12.5 recorded hours of recreation between 6-23-18 and 8-24-18.  On two dates there was a record of the recreation yard being opened, but no record of it being closed.  In Housing Unit B-1 there was a record of seven hours of recreation between 9-1-18 and 9-30-18.  On nine dates there was a record of the recreation yard being opened, but none of it being closed.  In Housing Unit C-1 there was no record of the recreation yard being opened and closed on the same date, but there were three days where it was noted as being opened without any record of it being closed.  There was no record of recreation being provided to Housing Units A-2, A-4, B-2, B-3, B-4, C-2 and C-4.  Housing Unit C-3 is closed for repairs.

As the above statistics indicate, recreation in all of the facilities is not adequately documented and at the RDC it is not made available at nearly the rate required by the Settlement Agreement.

It should be noted, however, that the RDC is finally offering at least some outdoor recreation for the first time since the inception of the Settlement Agreement.

Regarding 42 (g)(iv) At the time of the January 2018 site visit, the absence of mental health evaluations, treatment plans, and treatment notes made it impossible to assess whether or not prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions were receiving and benefiting from appropriate therapeutic interventions.  Since then, in essentially eight months, these deficiencies have been almost totally addressed.  More specifically, there are currently about 130 inmates on the mental health case load; almost all of the inmates on the mental health case load now have documented mental health evaluations and treatment plans (a handful of inmates have refused to participate in the treatment planning process); there are notes documenting every mental health visit, including visits with the psychiatrist; and the psychiatrist has at least begun to document psychiatric assessments and the psychopharmacologic component of treatment plans.

By the time of the May 2018 site visit, a full-time mental health coordinator had been added to the mental health staff; the part-time psychologist was still in place; and the arrival of a new social worker (to replace the social worker that had left the facility) was anticipated.  By the time of this September 2018 site visit, the new social worker was in place; however, she was about to leave the facility for another job; but the process was underway to find another social worker to fill that position.  As described in more detail in other sections of this report, the mental health coordinator and the other social worker have been extremely busy putting new procedures into place; they have done an incredible job; and although they have almost completed that task, it is reasonable to anticipate that there will be some delay in fully completing that task given that the other social worker position will be vacant for at least some period of time.  Once the other social worker position is filled again and all new procedures are fully in place, the mental health coordinator, social worker, and part-time psychologist can focus on any expansion of mental health programming that might be indicated, participation in the security functions described below (as those policies and procedures are developed and implemented), and the identification of any staffing implications related to any such expansion of programming or assumption of additional responsibilities related to security functions.

The acute concern with regard to mental health staffing levels and the ability to provide appropriate treatment is the fact that there is inadequate psychiatric time to meet the provisions of the agreement.  The contract with QCHC provides for 8 hours of psychiatrist time for the three adult facilities including two hours for Henley Young. (This would be .2 FTE. The QCHC staff vacancy spreadsheet indicates that the psychiatrist time is .15 FTE.) In order to adequately meet the provisions of the agreement, there is a list of responsibilities that must be assumed by psychiatrists or other mental health professions who are licensed to assume some of the responsibilities.  These responsibilities include performing and documenting the performance of

psychiatric evaluations for inmates who might require psychotropic medication; prescribing medication when indicated; and monitoring and documenting the monitoring of the efficacy and safety of the medication prescribed on a regular basis, and making adjustments in the medication regimen when indicated; performing and documenting the performance of psychiatric evaluations for inmates who might require a psychiatric evaluation for accurate diagnosis; participating in the treatment planning process (which should include a discharge plan when eventual discharge is anticipated) for all inmates on the mental health case load and signing off on treatment plans; performing and documenting the performance of psychiatric evaluations for inmates for whom concern about suicide has been raised, and determining the need for suicide watch (if it should be initiated and when it should be terminated); performing and documenting the performance of psychiatric evaluations for inmates who might require special mental health observation (due to the severity of their acute mental illness); and supervising and consulting with mental health staff providing non-pharmacologic therapeutic interventions, especially psychoeducational groups, medication compliance groups, and discharge planning groups; and participating in regularly scheduled mental health team meetings, and being available to consult on any mental health issues that arise that require psychiatric consultation.  Given that at present there are about 100 inmates on the mental health case load who are receiving medication, there are not even enough psychiatric hours available to adequately monitor those inmates in a timely manner (consistent with the current standards of practice), even if it is assumed that none of them will ever need further assessment and adjustments in their medication regimen (which is an unreasonable assumption if only for the fact that some of them have been newly placed on medication).  Therefore, there are clearly not enough psychiatric hours to assume all of the above described responsibilities, and at least at present, there are no other mental health staff persons who are licensed to assume any of those responsibilities. It is a top priority to develop a plan for increasing the hours of service provided by a psychiatrist(s) and/or shifting some of the responsibilities of the psychiatrist to other mental health professionals who are licensed to assume such responsibilities and skilled enough to do so.

Although at present, the psychiatric component of the treatment plan is not integrated with the rest of the treatment plan, when the issue of the extremely limited availability of the psychiatrist has been addressed, an effort should be made to better integrate and coordinate the overall treatment planning process, which will require mental health team meetings for the purpose of treatment planning.  As has been previously noted, such mental health team meetings would also need to occur in order to regularly review existing treatment plans.  Furthermore, it is reasonable to expect that such team meetings focused on treatment planning will also be a setting where gaps in the mental health services provided can be identified, and options for how to fill those gaps can be explored.

Steps have already been made to begin to identify and develop any needed mental health services that had not previously existed.  For example, a weekend on call schedule for mental health has

been developed and implemented.  The mental health coordinator, the other social worker, and the part-time psychologist are all on the on-call schedule; when on call, they call into the facility to see what is going on; and then if they are needed, they will actually come into the facility. The development of mental health therapy groups to address specific issues is also underway. Again, interdisciplinary mental health team meetings would be an ideal place to identify gaps in the mental health services currently being provided and the best ways to fill those gaps.

The mental health coordinator has also developed a 'mental health tracking log'.  The log lists all inmates on the mental health case load; each inmate's intake date, the date of the initial nursing assessment, the date of the initial mental health assessment and where applicable, the date of the initial psychiatric assessment; the source of referral to mental health; diagnosis; the date the treatment plan was completed; whether or not the inmate is on medication, and if so, the dates of the most recent and next scheduled visit with the psychiatrist; and where the inmate will be referred for services upon release.  The availability of this 'mental health tracking log' allows for a clear look at the mental health case load in a way that was never available before; it tracks and logs the information required to determine if certain policies are being followed and if certain procedures are being performed in a timely manner consistent with policy; and it provides a base of information that will be enormously helpful with regard to internal quality assessment.

There still exists the issue of how to define/describe individuals who should be on the mental health case load/receiving mental health services.  More specifically, the question is should the case load only include inmates with 'serious mental illness', or should it also include inmates with a significant trauma history and trauma-related psychiatric difficulties, inmates with intellectual or other cognitive difficulties, and/or even inmates with extremely limited skills required for daily living/functioning in the outside world.  Although it is clear that the impaired functioning of inmates who suffer from this broader range of mental health difficulties has a negative impact on facility safety and security issues, how best to identify such inmates and what mental health services can be reasonably provided for them requires further exploration.

With regard to internal quality assessment, consideration should be given to also attempting to capture (on the mental health tracking log) the frequency of mental health visits with staff other than the psychiatrist.  In addition, there should be effort to capture whether or not inmates either self-refer or are referred by security for mental health services in between scheduled visits, which would allow for an assessment of whether or not inmates on the mental health case load are being seen frequently enough and also help inform the regular treatment plan review process with regard to the efficacy of the prescribed treatment.  While the treatment plan review process and the other above noted mechanisms are first steps towards internal review of the quality of the mental health services provided, it is time to start thinking about what additional quality assurance programming should be developed.

23

The mental health screening is completed as part of the initial screen by the booking officer and the health assessment by nursing staff. The form used by the booking officers contains questions regarding past medical history, infectious disease and suicidal ideation.  At the time of the site visit, the booking officers had an additional form, the MHSF III, which they believed they were supposed to start using to screen for behavioral health issues.  This was part of the project with Jackson State University for the BJA grant. The compliance coordinator stated, however, that it will be implemented by the mental health staff.  This would be preferable as the form is designed to be completed by a mental health specialist and the booking officers have not had appropriate training for administering the screen. The current screening questionnaire completed by the booking staff is more extensive than necessary and is redundant with the health assessment completed shortly after booking by the nursing staff. This is being addressed as part of the development of booking policies and procedures.

On the medical side, within four hours of booking, an RN on the nursing staff completes a health history and physical assessment.  Vital signs, a review of symptoms, mental health screening and a TB test is performed. A CQI study of the compliance on the reading and documentation of the PPD test indicated 100 % compliance for the month of September 2018.

Inmates sign a consent for treatment during this exam.  The Health Assessment form has been revised to include adequate space for abnormalities discovered during the exam. At the current time, all inmates are brought to the medical department for the medical intake.  Because this serves as the medical screen by medical personnel, this should take place in the booking area. This has not been done because adequate space in the booking area has not been identified and there is no internet access to complete the record entry. Plans are in process for the IT department to work with the medical department to provide internet access.  The policy committee is recommending minor renovations which would provide appropriate space.

The forms used by both the intake nurses and booking officers contain many duplicate questions. If the medical staff conduct the assessment promptly, the questions asked by the booking officers can be reduced significantly.

QCHC responded appropriately to an occurrence of scabies, a communicable condition. The Center for Disease Control was contacted and material was on-site to guide the staff in the treatment of this disease. The individuals were separated from the general population.  Laundry was washed separately.  Other inmates and CO staff were examined using a black light. Permethrin was used to treat the infected inmates.

Regarding 42(g)(vi) after the mental health consultant's site visit a new mental health screening form was provided to the monitoring team. It is as yet unclear who is conducting this screen and for what purpose. The mental health consultant will need to reassess the mental health sections of the intake/booking process and the initial health assessment process, with an eye towards

balancing the importance of identifying new admissions with mental health difficulties with a realistic view of what booking officers and intake nurses who do not specialize in mental health can be expected to do.

As has been noted in prior reports, tracking inmates who were not identified as having mental health difficulties at booking or during their initial health assessment, but who were then later self-referred or were otherwise referred to mental health is another mechanism to assess the efficacy of the booking and health assessment processes as they relate to mental health.  Of course, as each such case is reviewed, it will be important to attempt to differentiate between cases where mental health difficulties were missed at booking and during the initial health assessment, and cases where something happened during the course of confinement that prompted the development of new mental health difficulties. To this end, QCHC staff should consider the development of a 'mental health sick call log' that would track referrals and the source of referrals for mental health services and indicate whether or not each inmate was or was not previously known to mental health. For inmates referred to mental health who were not previously known to mental health, staff should determine whether such inmates were inadequately assessed at intake and/or during their initial health assessment, or whether the inmate withheld information at the time the inmate was admitted, or whether something happened since the inmate was detained that prompted the development of new mental health difficulties.

See section 74 and section 77 i regarding housing decisions and the availability of appropriate housing for prisoners with serious mental illness.  See section 42 g iv with regard to the availability of appropriate treatment.

Regarding 42 (g)(vii), visitation records reflect that there is continued improvement in access to visitation at the JDC but that an inmate at the RDC and WC is far less likely to have a visit than his counterpart at the JDC.  A review of records covering September 1-30 at the JDC revealed that 159 visits were scheduled and that 142 were completed during that time frame.  The most common reasons for non-completion were "no show" and "non-payment".  At the WC and RDC, whose records are combined, a total of 81 visits were scheduled between August 16 and September 17, but only 66 were completed.  The single reason for non-completion was listed as "no show".  Based on an average daily census at the JDC of approximately 100 and a combined average daily census at the WC and RDC of approximately 500, the typical inmate at the JDC is able to visit 1.42 times per month while the typical inmate at the WC and RDC is able to visit only 0.13 times per month; thus an inmate at the JDC is able to visit with family and friends almost eleven times (10.92) more frequently than an inmate at the WC and RDC.  This huge disparity needs to be rectified so that all inmates are treated equally and have greater access to visitation.

Regarding 42 (h) The mental health assessment of inmates suspected of being suicidal is now being performed on an emergency basis, and with the new weekend on call schedule, this is even happening on weekends.  Although the QMHPs who perform such assessments consult with the psychiatrist over the telephone, it does not appear that the psychiatrist actually has a face-to-face assessment of these inmates in a timely manner, if at all, even if they are placed on a suicide watch.  It also remains unclear to what extent the QMHPs follow a structured format for the assessment of suicide potential.  QCHC staff should consider the use of a standardized tool as part of the assessment process. In addition, due to the lack of documentation, it also remains unclear as to whether or not inmates who are suspected of being suicidal are kept under constant observation by security staff until the mental health assessment is performed.

Once the mental health assessment of suicide potential is performed, if the inmate is placed on a suicide watch it appears that the inmate does receive a higher level of supervision by mental health and by security; but the level of supervision by security staff should be better documented; and what is expected of the nursing staff with regard to a higher level of supervision needs to be clarified.  The decision to terminate a suicide watch may be made upon telephone consultation with the psychiatrist as opposed to a face-to-face assessment of the inmate by the psychiatrist.

For inmates who have undergone a mental health assessment of suicide potential and found not to be acutely suicidal, there is now a 'safety plan' being developed by a QMHP and the inmate that is signed by both.  Although it is unclear exactly how the involved QMHP follows up with the inmate with regard to adherence to the 'safety plan', the incorporation of such a plan into the facilities' suicide prevention program is a very positive development.

It should be noted that the number of inmates being placed on suicide watch has dropped dramatically over the last several months.  It appears that this is due, at least in part, to the increased efforts of the mental health team to better manage various behavioral issues so that inmates don't have to go so far as to report feeling suicidal to gain attention to their difficulties. However, what appears to be a trend towards fewer incidences of suspected suicidality should be followed, and if such a trend continues, the reason for this should be further explored.

Special mental health observation, for acutely mentally ill prisoners, is also described in the 'suicide prevention' policy, with a level of monitoring that is to be prescribed by mental health. Therefore, in the implementation of this policy it remains important for mental health staff to make it clear that an inmate could be on 'suicide watch' and/or 'special mental health observation', and if an inmate is on both types of watch, each watch may have different requirements for monitoring and different end points.

Regarding 42 (i), video surveillance capabilities at the various facilities have not changed since the last site visit.  Supervisory staff at the RDC have the ability to utilize that facility's video

records to review escapes and other significant incidents in order to determine what actually occurred.  Video related to those events is examined on occasion, but not routinely as it should be.  There is no video capability at the JDC.  At the WC, while there are cameras that monitor the housing units, they have no recording capability.  According to command staff and the Facilities Maintenance Director for the County, there is an effort being made to upgrade the video system at the WC to include a recording capability, but there is no time set for such action to be completed.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

   a. Staff vacancy rate of more than 10% of budgeted positions;
   b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;
   c. A major disturbance resulting in the takeover of any housing area by prisoners;
   d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;
   e. Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;
   f. One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);
   g. One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

Jail administration still does not create a report covering each of these areas although data is received in response to requests for specific information.  At the time of the September site visit a total of 251 positions out of 275 authorized positions (four unfunded) were filled.  That is precisely the number that were filled a year ago, but it does represent an increase of 20 filled positions over the figure that was reported during the May site visit.  However, the staffing analysis determined that 433 positions were needed. That results in a vacancy rate of 43%.  Considering these numbers, it is anticipated that the turnover rate for the entire DSD will

continue to remain excessive and not in compliance with this paragraph's standard by the end of the calendar year.  There continue to be multiple incidents of prisoner on prisoner violence, particularly at the RDC, resulting in serious injury and hospitalization.  As stated in paragraph 42, in about a three-month period there were 24 visits to the emergency room as a result of inmate assaults, most of which had incident reports that do not meet the requirements of paragraph 64 of the Settlement Agreement and some of which had no incident report. As was noted previously, there continues to be a lack of adequate documentation in incident reports. Supervisors do not make specific recommendations and witness statements are seldom taken.  In addition, available video recordings of incidents are seldom reviewed.  Reference to video recordings is most frequently found in IAD investigative reports.  Incident Report (IR) 18-1324 at the RDC involved an inmate who was stabbed several times and taken to the hospital.  IR 18-1818 at the RDC involved an inmate who was assaulted by others with plastic trays.  He was treated by Medical in house.  IR 18-1679 at the RDC involved an inmate who was injured (unidentified injury) by other inmates.  He was transported to the hospital for treatment.  These three incident reports are typical of the incomplete and inaccurate information that is found in DSD reports.  In one case an inmate was "injured" but there was no explanation as to what constituted an "injury", even though the inmate was transported to the hospital.  In none of the reports was there any explanation as to how inmates had access to weapons, whether or not they were recovered or whether inmate witnesses were interviewed.  Finally, there was no reference to a review of video coverage of the incidents. The reports were all generated in August 2018, yet the report numbers varied from 1324 to 1818, far outside the range of expected reports for one month.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

    a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b. All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

    c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

    d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail

must have a system in place to document and ensure that staff are providing adequate supervision.

e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

There has been no progress made with regard to the provisions of this paragraph since the last Monitoring Report. None of the facilities meet the requirement that well-being checks must be conducted every 30 minutes in general population and every 15 minutes in segregation (confinement). Well-being checks at the JDC were found to be almost routinely recorded hourly for general population inmates and every 30 minutes for those in segregation, although there were significant gaps noted in some logs. At the WC and RDC well-being check records reflect greater discrepancies. At those facilities, unit log entries show that hourly inspections are conducted roughly 50% of the time for general population inmates. At the WC, 30-minute checks for inmates in segregation/confinement cells were documented appropriately on individual forms posted next to each cell. The same cannot be said for the RDC where individual logs are not posted next to each cell when inmates are confined to lock down status (B-4, B-4 ISO and C-4 ISO). There, the well-being checks are entered in the Unit Logs which sometimes record data for more than one unit. Such is the case for B-4 and B-4 ISO where log entries are combined. In Booking, where well-being checks are supposed to be every 15 minutes, the officer on duty during the September site visit was making entries hourly on a form that was designed for another area of the Jail System. This level of regression from previously settled practice is indicative of a lack of supervision.

See paragraph 76 with regard to mental health rounds for prisoners in segregation. See paragraph 42 (h) with regard to prisoners who require special management due to acute mental health difficulties.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail. To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

a.  Mandatory pre-service training. Detention officers must receive State jailer training and certification prior to start of work. Staff who have not received such

training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement. During that twelve month period, the County must develop an in-house detention training academy.

b. Post Order training. Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter. To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c. "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d. Jail administrator training. High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e. Post-service training. Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year. Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings. Post-service training should also include field and scenario-based training.

f. Training for Critical Posts. Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position. Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g. Special management unit training. Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.   Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

The HCSO has still not made any progress with regard to the employment of a qualified individual with extensive detention training experience (including direct supervision training) at the rank of lieutenant.  The need for such a person has been addressed with Training and DSD staff during the past two site visits.  It now appears that the Training Director is going to advertise nationally through the American Jail Association (AJA) and the American Correctional Association (ACA).  If that effort fails to attract a qualified candidate it may be necessary to select an interested in-house candidate and send him/her to the requisite training through the National Institute of Corrections, AJA and ACA.

In an effort to update training records on all personnel, the Training Director has created a database that contains the training status for each employee.  Once that has been cross referenced by required category of training, as specified in this paragraph, it will be possible to provide a statistical analysis of compliance.  At the present time, however, that information is still unavailable to the monitoring team in spite of requests that date back to the commencement of the monitoring process two years ago.

As has been previously reported, security staff persons receive at least some training at the academy with regard to 'special needs' prisoners, which includes prisoners who suffer from mental illness.  There is also an in-service training program for security staff, entitled 'Mental Health First Aid', which provides some additional training in mental health.  The mental health expert is unaware of any effort to assess the mental health knowledge base or skills that security staff persons have developed as a result of these trainings.

Although at present, there is no actual special management/mental health unit (i.e., a unit where there is a program consisting of therapeutic interventions for prisoners who are suffering from mental illness or intellectual disabilities), one of the RDC's units has been designated as a unit where prisoners suffering from serious mental illness are placed, and several other prisoners with serious mental illness are placed in 'protective custody'/segregation.  Of course, the other post where security staff persons come into regular contact with prisoners who are suffering from mental illness or intellectual disabilities is the mental health section of the medical department. There is no evidence of any extra or special training offered to security staff who may be placed on any of these posts where there is an increased likelihood of having to work with mentally ill and/or intellectually disabled prisoners.

QCHC staff should work together with security staff to develop a plan for assessing the mental health knowledge base and skills of security staff persons who have completed the training on 'special needs prisoners' offered in the academy and the in-service training program entitled

'Mental Health First Aid.' Following the assessment, mental health and security staff should jointly determine what additional training might be indicated for all security staff persons, and what additional special training might be indicated for security staff persons assigned to the above noted critical posts.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

        ii. An inspection process.

        iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

        iv. A requirement that any corrective action ordered be taken.

        v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

        vi. To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff

response to physical plant, safety, and sanitation problems must be
reasonable and prompt.

**Non-Compliant**

Without an approved Policies and Procedures Manual the HCSO is unable to comply with this
provision of the Settlement Agreement.  In practice, the Jail Administrator has not been provided
the authority over personnel decisions within the Jail. During her medical leave in the summer,
her Assistant Jail Administrator was demoted and removed from the Detention Services Division
(DSD) and another individual was put in the position without consulting her. The new Assistant
Jail Administrator than demoted two individuals she had promoted and replaced them with other
individuals. The Jail Administrator has been informed since her return that she cannot reverse
these decisions. This lack of authority of the Jail Administrator over personnel decisions within
the Jail is contrary to the requirements of this Settlement Agreement provision.

Over the past two years, law enforcement officers and staff from the Mississippi Department of
Corrections have periodically entered the RDC and conducted unauthorized (by the Jail
Administrator) shakedowns of the facility; sometimes they have even used shotguns to fire
blanks in order to get the attention of inmates.  As was noted in the Fifth Monitoring Report, the
"…Sheriff needs to issue an order permanently curtailing the use of law enforcement and outside
agency officers to conduct such shakedowns."  To date that has not been done.  While there was
no instance of outside agencies and law enforcement officers interjecting themselves into the
operation of the Jail System since the last site visit, the recommended order should be issued so
that there is not a reoccurrence of this problem.

The duties and responsibilities of supervisors should be clearly laid out in the Policies and
Procedures Manual.  Lacking such direction, supervisors do not follow any standard practice to
document their inspections rounds.  Unit logs show that supervisors were on scene, but beyond
that there is no information.  Well-being logs for inmates in segregation never reflect any
comments by supervisors beyond their signatures.

A spreadsheet is now being used that shows when problems were reported, what was proposed to
correct them and the current status of that action.  If it is maintained appropriately, this
management tool should help to resolve maintenance issues more expeditiously than in the past.
The Jail Administrator plans to provide each Captain with a copy of the spreadsheet so that they
can track the status of requested maintenance projects.

Major breaches of security are still evident in all three facilities because primary doors are
inoperable.  These mechanical and electrical problems should have the highest priority.  They
should not carry over from one site visit to the next and beyond.  Some of the most egregious
problems are specified in the Appendix to this report. Maintenance problems are so pervasive
that DSD staff do not follow rudimentary security procedures for doors that do function.

At the RDC the ongoing maintenance problems are primarily due to the fact that the housing units are not staffed.  Without an officer present to supervise them, the inmates are free to vandalize the facility and they have done so continuously for years.  The consequences are dangerous for inmates and officers alike.  Fire safety equipment (hoses and extinguishers) is no longer readily at hand, having been removed from the units and, in some cases, even from the corridor around the control room.  Because electrical outlets have been destroyed inside the units, staff have resorted to running unapproved extension cords from inside the control rooms, across the corridor and into the housing units to operate fans.  Staff have become so used to these conditions that they no longer even notice when basic fire safety standards are not followed.  During the most recent site visit the fire extinguisher box mounted on the wall inside the B Pod Control Room was found to be full of cleaning supplies.  Further, the control room officers throughout the facility were unfamiliar with what should be done with the spare fire hoses kept in their respective control rooms, in the event of a fire.  In the Booking office, the fire hose case was blocked by a metal filing cabinet and a heavy trash can even though this same discrepancy was pointed out during the previous site visit.

Sub-paragraph d(vi) also requires attention to sanitation. Due to poor practices in sanitation of the facility, spider bites have increased since August of 2018.  The medical chart review indicated that six inmates were treated with Bactrim, Rocephin and Doxicycline for spider bites in August and September. One inmate had a culture that indicated MRSA.  The housing units for the inmates were B3, A2, and B4.  During an interview with Dr. Martin, the responsible physician, he indicated that during the weeks that he is on-call that he receives at least one call per night because of spider bites.  There is no tracking of the spider bites or the housing units associated with this malady.  Spider bites and the housing units should be tracked.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

There is no documentation of shakedowns having occurred on at least a monthly basis during the last four months.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no action to deal with this issue since the last site visit.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit.  An officer was assigned to work on this issue over a year ago but there is no documentation of a program that meets the requirements of this paragraph.  Incident reports of assaults reflect the fact that gang violence is still a problem.  IR 18-1731, dated 8-11-18 at the RDC dealt with an inmate who was stabbed four times as a result of a conflict between "gangster disciples" and "vice lords".

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

      a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

      b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

      c.  Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

      d.  Prohibit the use of force as punishment or retaliation;

      e.  Limit the level of force used so that it is commensurate with the justification for use of force; and

      f.  Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Since the Policies and Procedures Manual has not been revised, reissued and approved, compliance with this paragraph cannot be achieved.  Use of force reports (UOF) continue to reflect examples of excessive UOF on the part of staff.   Incident Report 181411 summarized an event that occurred in the Juvenile Housing Unit (A-1 ISO) where an officer was alleged to have

hit an inmate repeatedly in order to get him to provide the password to a contraband telephone that was found in the unit. This incident resulted in an IAD investigation which revealed that unnecessary and excessive force was used, the unit was not staffed even though an officer is supposed to be present inside the unit 24 hours per day, and that the officer involved had a prior history of excessive use of force. The officer was terminated as a result of the incident.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force. These policies and procedures must specifically include the following requirements:

    a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

        i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

        ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

        iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

    c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

    d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

    e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

36

f.  Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g.  The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

i.   a sign-out process for staff members to carry any type of weapon inside the Jail,

ii.  a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h.  A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i.  All staff members using force must immediately notify their supervisor.

j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

The Policies and Procedures Manual is still a work in progress.  A draft Use of Force policy was provided after the site visit and is under review. There were no reported cases of inmates being placed in restraints during the last four months except for when inmates are transported between facilities.

To date there are no recorded instances of staff members obtaining supervisory approval prior to using weapons and mechanical restraints.  The same can be said for the use of chemical sprays, physical restraints and electronic control devices being used when a prisoner may be at risk of appositional asphyxia.

Although prisoners injured in a use of force incident are routinely sent to medical, there is no evidence that mental health staff assess prisoners who have been subjected to level 1 use of force.  This issue was raised when the mental health consultant met with senior security staff during his most recent site visit to discuss security policies and procedures that are now being developed. A mechanism for meeting this provision should be incorporated in the security policies and procedures that are now being developed.

A review of use of force reports for the previous four months did not reflect any that were planned.  Prior incidents indicate that staff might not understand that forced medication administration is a planned use of force. This should be addressed in the policies and procedures. There is no evidence that mental health staff is being consulted prior to a planned use of force on prisoners with serious mental health issues.  This issue was raised again when this consultant met with senior security staff during this most recent site visit to discuss security policies and procedures that are now being developed. This should be addressed in the security policies and procedures that are now being developed.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Non-Compliant**
Until the requested record of training by category is created and provided for all personnel, it is not possible to determine whether or not the HCSO is complying with the provisions of this paragraph.

53. Topics covered by use of force training must include:
   a. Instruction on what constitutes excessive force;
   b. De-escalation tactics;
   c. Methods of managing prisoners with mental illness to avoid the use of force;
   d. Defensive tactics;
   e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Non-Compliant**
Training records have not been provided to reflect use of force training for all personnel, either in the academy or through annual in-service training.  The inability to determine whether or not the HCSO is providing such training results in the finding of Non-Compliant.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

As was previously reported, these topics cannot be addressed until the Policies and Procedures Manual is revised and published.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

This cannot be updated until the policies and procedures on the use of force have been updated, approved and published.

## USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**

There has been no change with regard to this paragraph.  It cannot be addressed until the P&P Manual is revised and issued to all personnel.  The reports provided to the Monitor do not contain sufficient information for supervisors to analyze use of force. There may be more in the JMS system but the monitor team cannot assess that. To date the shortcomings of the reports electronically generated by the Jail Management System (JMS) have not been corrected.  As was previously reported, if the HCSO cannot correct the shortcomings of the JMS, it should be replaced by a jail version of what is provided to the law enforcement side of the Sheriff's Office. Even with improvements to the electronically generated reports, as described below, the narratives typically lack the details needed for adequate supervisory review.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

It is not possible for the monitoring team to know when a report was written. The officer can enter any date in the date field. This would result in the report number being out of sequence. However, the report numbers do not always track sequentially. (As noted in paragraph 43, the report numbers in August varied from 1324 to 1818). And, in the format that the reports are received, this would be difficult to discern. When the monitor made an interim site visit at the time of the August status conference, the JCA's at that time complained of being hit by an officer who was trying to get them to provide the password to a cell phone the officer had confiscated. This had happened the day before the site visit. The monitor requested a copy of the incident reports. At that time, an incident report could not be located. When located the following day, it was dated the day of the incident. It is not possible to know from the system whether it was prepared after it was brought to staff's attention or if it could just not be located in the system, either of which is a problem. It may be that it was difficult to locate because the type of incident was listed as contraband as opposed to use of force. It may also have been listed under a different inmate than the one injured. This should be investigated as well as the underlying incident.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

    a.  A unique tracking number for each use of force;

    b.  The names of all staff members, prisoner(s), and other participants or witnesses;

    c.  Housing classification and location;

    d.  Date and time;

    e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.  A description of the staff member's attempts to de-escalate the situation without use of force;

    h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.  A description of any observed injuries to staff or prisoners;

    j.  Whether medical care was required or provided to staff or prisoners;

    k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

     l.    A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The incident reports involving use of force are inconsistent in their level of detail but generally are missing most of the detail required by this provision. The foundation of the report should indicate where the incident occurred which is not a field that appears in the report. It may or may not be mentioned in the narrative.  It is not possible to tell from the incident report form when it was prepared. There is only one date field which appears to be for the date of the incident. Inmate witnesses are rarely identified. The nature of the injuries is often omitted. There is seldom any reference to related disciplinary reports or proceedings.

As an example, Incident Report  # 1800882, dated 5-17-18, dealt with an inmate who refused to comply with an officer's order, lunged at him and was taken to the ground by the officer.  This IR apparently occurred at the RDC although there is no indication in the report to reflect that other than to state that it occurred in Medical.  There was no follow up to the initial report except that the inmate was taken to the hospital and returned.  He was seen by a nurse and sent back to his pod and cell.  When an inmate is brought to medical after a use of force, health staff are utilizing a body chart to show where injuries occurred.  This is not included in the incident report but often is included in an investigation report. There is no record of supervisory review, nor is there any indication that other inmates were interviewed or that video was reviewed.

As has been mentioned, there may be more information in the JMS that does not appear in the reports provided to the monitor. It has been recommended that the electronically generated report be modified to include this additional information.

**USE OF FORCE SUPERVISOR REVIEWS**

59.    The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

    a.    A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

    b.    A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

    c.    Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

    d.    If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.   Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.   All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.   A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

No final determination can be made until the Policies and Procedures Manual is revised and re-issued.  The monitoring team is still not able to view the entries of supervisors on incident or use of force reports.  Consequently, it is not possible to see whether or not they are approving/disapproving and/or making recommendations rather than simply signing and sending reports up through the chain of command. Even within the JMS system, as explained to the monitoring team, the supervisor only checks that the report has been reviewed not whether they are approving/disapproving and/or making recommendations. Incident Report  # 1800882 mentioned above is typical of all use of force reports in that there is no indication of supervisory review.

60.   After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.   Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.   Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.   Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.   Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.      Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph since the last two site visits.  The specified actions are not routinely followed by supervisors.  A review of use of force reports revealed that photographs are seldom taken and that waivers related to the refusal to be photographed are never included.  Witness statements are virtually non-existent and although use of force incidents may be recorded at the RDC, they cannot be recorded at the JDC or WC.  On some occasions a supplemental report indicates that there was a review of video recording at the RDC, but that is rare.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of this paragraph since the last monitoring report.  It is not possible to determine whether or not supervisors are performing their required duties because the monitoring team does not have access to the supplemental information that may be included in the JMS reports and it appears that the ability to reflect such actions is not possible in the JMS.  The limited documentation available through Drop Box does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

62. Reviewing supervisors must document the following:

a.      Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

b.      Witness statements;

c.      Review date and time;

d.      The findings, recommendations, and results of the supervisor's review;

e.      Corrective actions taken;

f.      The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.     Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

     i.     The nature and extent of injuries, or lack thereof;

     ii.     The date and time when medical care was requested and actually provided;

     iii.     The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.     Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Until it is possible to access the supervisory review portion of use of force reports, it is not possible to determine whether or not supervisors are taking required actions and appropriately documenting them.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.     Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The Policies and Procedures Manual must be revised and issued to all personnel before the level of compliance can be determined. See paragraphs 56 to 62 above. The current incident reports should provide sufficient information for supervisors to make an appropriate review, but the reports are routinely deficient. The monitoring team's inability to see everything that is entered into the automated reporting system further hampers its ability to analyze the shortcomings.

64.     Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:

a.     Tracking number for each incident;

b.     The names of all staff members, prisoner, and other participants or witnesses;

c.     Housing classification and location;

d.     Date and time;

e.     Type of incident;

f.     Injuries to staff or prisoner;

g.    Medical care;
h.    All staff involved or present during the incident and their respective roles;
i.    Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
j.    External reviews and results;
k.    Corrective action taken; and
l.    Warden and Administrator review and final administrative actions.

**Partial Compliance**

There has been no change with regard to the status of this paragraph since the last two site visits. Compliance is dependent upon the publication and issuance of the Policies and Procedures Manual.  Incident report documentation currently provides for some of the information specified in this paragraph.  Reports routinely have a tracking number and list all staff involved. Inmate witnesses and even perpetrators are often omitted.  Inmate witness statements are infrequently noted.  The nature of the injuries is often omitted. However, in recent months there have been photographs taken of the injuries in some of the incidents and provided with the incident reports in the monthly reporting. Many reports still do not specify in which facility the incident occurred.

Examples mentioned earlier include Incident Report (IR) 18-1324 at the RDC involving an inmate who was stabbed several times and taken to the hospital; IR 18-1818 at the RDC involving an inmate who was assaulted by others with plastic trays; and IR 18-1679 at the RDC involving an inmate who was injured (unidentified injury) by other inmates.  These three incident reports are typical of the incomplete and inaccurate information that is found in DSD reports.  The reports were all generated in August 2018, yet the numbers varied from 1324 to 1818, far outside the range of expected reports for one month.  In one case an inmate was "injured" but there was no explanation as to what constituted an "injury", even though the inmate was transported to the hospital.  In none of the reports was there any explanation as to how inmates had access to weapons, whether or not they were recovered or whether inmate witnesses were interviewed.  Finally, there was no reference to a review of video coverage of the incidents.

IR 18-1731, dated 8-11-18 at the RDC dealt with an inmate who was stabbed four times as a result of a conflict between "gangster disciples" and "vice lords".  The report does not explain whether or not the inmate was transported to the hospital, only that he was "unresponsive". Witness statements were not taken, nor was there any reference to a review of available video recordings.

IR# 181116, dated 6-24-18, summarized the statement of an officer who said that on camera he saw an unknown inmate being dragged into a cell (#5547).  When officers responded, they found

an inmate unresponsive in the cell.  He was transported to the hospital.  Beyond that the report does not provide any meaningful information.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:
- a.  Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.
- b.  Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.
- c.  Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit or the one before that.  While documentation of incidents continues to improve, the fact that there are still no reports on record of lost money and property or late releases and overstays, is indicative of a failure to document.  During the September site visit the monitoring team met with supervisors to review report writing.  Emphasis was placed on clarity, completeness, and basic information that should be included in each incident report.  In addition, the need to document any unusual activity in the Jail System was stressed, not just use of force, inmate assault and medical cases.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:
- a.  Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.
- b.  Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.
- c.  Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

    d.      Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Partial Compliance**

There has been no change in the status of this paragraph.  As was previously reported, compliance has actually been hampered by the transition to an electronic report writing system in that the monitoring team cannot track the actions of supervisors after the initial report has been submitted.  Although they may be reviewing the report in a timely fashion, there is currently no way to determine whether or not that is happening. Even within the JMS it is reported that the supervisor only checks off that the report has been reviewed. There is no place for approval, disapproval or corrective action.

**SEXUAL MISCONDUCT**

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

    a.      Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

    b.      Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

    c.      Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

    d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

    e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

    f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

    g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

    h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

    i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

The PREA officer continues to work on the PREA policies and procedures. A draft had been completed but was not based on the operations of the local facilities. She is now working on a draft that is specific to the procedures of the HCDC. There has been progress in the implementation of PREA requirements.  All of the units visited had PREA posters posted. The posters have reporting instructions, however, the PREA officer did not have a cell phone to forward the calls to and there was some debate about having the calls go through dispatch so the reporting mechanisms had not been fully worked out. The PREA officer has done some orientation to incoming prisoners, however, this is not universal and the Inmate Handbook does not have current information on PREA. Discussions continue to be underway with Catholic Charities to determine whether that agency can provide counseling to any victims of sexual assault or harassment. Although this is very good progress in this area, there are still a number of areas of non-compliance and some of the stated practices do not appear to be fully operationalized. Areas of concern include lack of training for all officers on PREA, lack of ongoing notice to inmates at booking or comprehensive education following, lack of required information in the Inmate Handbook, unresolved mechanisms for reporting, no volunteer or contractor training, and investigation officers do not have PREA training. It was reported that supervisory staff do not get the investigation reports once completed. This prevents any opportunity to use that information to determine whether discipline is appropriate or remedial measures should be implemented. Although the classification process includes a screening for PREA issues, the housing decisions do not appear to reflect attention to those issues. There were two incident reports since the last site visit that raised PREA concerns. Neither incident was brought to the attention of QCHC. The PREA officer indicated that these had been investigated and determined to be unfounded. However, there was no paperwork documenting that any interviews or investigation of these incidents had occurred.

During the course of the joint meeting with the mental health expert, the mental health coordinator and the PREA coordinator it was discovered that a prisoner who had not been identified during the screening process came directly to mental health because he feared that he would be sexually victimized; mental health contacted classification and was thereby able to obtain a different housing placement for him; mental health also followed him until he was released; but neither mental health nor classification notified the PREA coordinator of any of this.

Also, during the joint meeting with the mental health coordinator and the PREA coordinator it was discovered that a prisoner who had not been identified during the PREA intake screening process had been self-referred (filed a sick call slip) to health and mental health after he had been sexually assaulted, and mental health met with him regularly until he was released.  Although it appeared that the PREA coordinator was aware of this case, the extent of the coordination between mental health and the PREA coordinator, geared towards addressing his needs, was unclear.  More specifically, it does not appear that this prisoner had access to rape counselors

48

from outside of the facility or any of the other PREA-related services that should have been made available to him.

QCHC mental health should notify the PREA coordinator of all PREA-related cases that come to the attention of mental health that were not identified during the PREA intake screening process. Those PREA-related cases that come to the attention of mental health that were not identified during the PREA intake screen should be discussed with the PREA coordinator in an attempt to better coordinate mental health functions and other PREA-related functions, and in an attempt to help determine whether or not any adjustments in the PREA screening process might be indicated. QCHC mental health should continue to provide counseling services to victims of sexual assault and sexual harassment. Such mental health services should be provided in coordination with other services that should have been put into place by the PREA coordinator.

**INVESTIGATIONS**

68.    The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

i.    Any prisoner exhibited a serious injury;

ii.    Any staff member requested transport of the prisoner to the hospital;

iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

    i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

    i.    a brief summary of all completed investigations, by type and date;

    ii.    a listing of investigations referred for administrative investigation;

    iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

    iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

    v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

During the September site visit, the corrections operations member of the monitoring team met with the IAD investigator to review the investigative process and the tracking system that he has put in place.  His efforts are hampered by the fact that there is still no policy/procedure in place to provide direction and authority.  Currently, he investigates cases involving officers to

determine whether or not their actions were justified.  His work is dependent upon the generation of an initial incident report.  In cases that result in the potential for criminal charges (generally on inmates), his work is transferred to a Criminal Investigative Division (CID) investigator.  A meeting with that individual will be scheduled during the January 2019, site visit so that practices, procedures and tracking systems can be standardized between the two investigative specialists (IAD and CID).  In the interim the IAD investigator will examine all use of force cases to determine whether or not he needs to conduct a full IAD investigation.

Criminal investigations are initiated when a deputy/investigator is dispatched to a facility to investigate an incident that was generated by a detention officer.  While these investigations should ultimately lead to criminal charges or at least some action beyond what is done within the facility, a review of CID investigative reports does not currently provide that information. Offense report 18 00001679, dated 8-6-18, is typical of this situation.  On that date a deputy went to the RDC in response to an inmate assault.  Once there he determined that an inmate had been assaulted by several other inmates in Housing Unit B-3.  When the inmate was unable to identify his assailants the report was closed and no further action was taken.  Video recordings were not accessed and no other inmates were interviewed.  Offense report 18 00000396, dated 2-21-18 involved an inmate who was stabbed multiple times in B-3 at the RDC.  He identified several inmates as the perpetrators and said that that he wanted to file charges on them; however, the investigative report does not reflect whether or not action was taken.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.    The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of detention officers. However, the system is still not working as it should. A meeting/training with the vendor was planned for the week after the site visit where issues of staff training and system problems could be addressed.

Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer observing the grievance being filed. It was reported that inmates can observe another's PIN number and then use it to purchase commissary on the other inmate's account.  There has also been a problem

with inmates communicating with each other through the kiosk system. These issues will need to be addressed.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**

Policies and procedures have yet to be finalized. A draft policy on grievances does not describe the current process of using the kiosk. The kiosk system works the same across facilities but there is no unified process in how the staff responds to grievances and monitors the system. Lt. Jones has been identified as the system wide grievance officer, however, her duties for system wide oversight have not been identified. She does not assign grievances for the other facilities and does not provide any oversight of the grievance process or response in the other facilities.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

The system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. The grievance officer at the WC did not appear to have access that would allow her to run such reports. The grievance officer at JDC is on extended medical leave. The persons filling in for her did not know how to run such a report. When a report was run with assistance a number of grievances were found that had not been responded to in 21 days or more. At RDC when a report was run going back to October, 2017 there were 160 grievances waiting assignment. This included the time period when the system was just installed and not well understood. However, going back to January, 2018, there were 21 waiting assignment over 21 days. When looking at these individual grievances, some of them had been responded to but the status had not been changed; some had not been responded to. There was also a period in July when appeals went unassigned. There is no structured system to ensure that all grievances are actually answered; no oversight to review whether responses are adequate; and no oversight to determine that promised actions are actually completed (As an exception to this, the officers overseeing inmate supplies have the inmate sign when a promised item has been delivered). Lt. Jones has been identified as the overall grievance officer, however, facility wide duties that would include this oversight have not been identified. Without this oversight, there is also no assurance that there is a review by an impartial reviewer. Grievances are assigned to the department involved in the grievance which is the department most knowledgeable but not necessarily impartial. There is no known way in the system to mark a grievance as urgent.

Medical grievances are submitted through the kiosk system.   At RDC eight grievances were reviewed by the medical expert.  They were not all answered within the 24 hours required by this paragraph but were all answered within 48 hours.  Three of the grievances were for medication requested by the inmate such as Flexaril which was not a formulary medication. One was for dental pain.  The inmate complained that he had requested dental service for several months and was told that he had to request this service three times, be seen by the nurse practitioner and then would be put on the dental list.  A review of the QCHC policy J-E06 Oral Screening and J-E-07 Non-Emergency Health Care Requests did not authorize this practice.  There was no indication during the medical review that an oral screening was provided by the nurses triaging the sick call request.

The other three grievances involved missed medication, a wrong treatment ordered for a rash, (nurse ordered calamine lotion for a skin rash), and a missed asthma medication.  The last patient gave an alias during booking; thus, the nurses were unable to locate his prescription from the pharmacy.

At the Jackson Detention Center, there were eleven medical grievances reviewed that were filed during the month of September 2018.  Eight of the grievances were filed by the same inmate and were for a variety of issues such as dental pain, numbness of right foot, requests for a low sodium diet, and requests for an additional mat.  Each time the inmate had a sick call request, she was seen by the nurse practitioner.  Other grievances reviewed were for missed medications and one was for dental pain.  Most responses were within one to four days; however, one response was not until six days. This paragraph requires responses to medical grievances within 24 hours. The QCHC policy allows for responses to grievances to be provided in up to seven days. QCHC administration should be made aware of this discrepancy and QCHC policy should be revised to be consistent with Settlement Agreement requirements. The kiosk system has no means known to staff for marking a grievance as an emergency or otherwise identifying emergent grievances.

At the WC two medical grievances were reviewed. One inmate claimed he was not seen after an altercation, however, chart review indicated that he initially denied injuries when he saw the nurse practitioner.  Medical record review indicated that later, he was sent to the emergency room. The second grievance was because the corporate medical director denied an expensive medication for prostate cancer.  The nurse manager and the University Hospital were able to obtain this medication and continue his medical regimen. Policies with respect to non-formulary medications should be evaluated to ensure that inmates are not denied critically needed medications.

It remains to be determined whether all grievances that should be directed towards mental health, in whole or in part, actually get to the mental health team.  In order to determine this, a review of

all grievances would be required, with an eye towards assessing whether or not there were any mental health-related issues, and then, whether or not the recipient of the grievance was able to determine that there were mental health-related issues and thereby refer the grievance, in whole or in part, to the mental health team.  Once it is determined that the mental health team is actually receiving grievances, the timeliness and the appropriateness of the team's response can be assessed.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds. There does not appear to be any language choices in the system or voice recognition features.

Although prisoners who are unable to use that unit due to their mental illness or intellectual disability have not been identified, all identified mentally ill and/or intellectually disabled prisoners have not been surveyed.  Of particular concern are those seriously mentally ill prisoners who are in 'protective custody'/segregation. In developing policies and procedures on grievances, a procedure should be developed for identifying whether persons with mental illness or intellectual disabilities have a grievance including those in protective custody/segregation. In addition, the policies should identify a mechanism for filing a grievance on their behalf.

It was not reported that medical staff was ever called to assist an inmate to submit a grievance. Currently, the staff assumes that other prisoners will assist with prisoners who cannot access the current system. This does not meet the requirements of this paragraph.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

**RESTRICTIONS ON THE USE OF SEGREGATION**

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**
There has been no change in the status of this paragraph since the last site visit.  Classification continues to be accomplished within 24 hours of entry to the RDC, but not within the eight hours of intake that this paragraph requires.  See response to paragraph 42 above. Detainees are processed through the Booking area within eight hours.  None were found to be in holding cells in excess of eight hours.

However, after classification, there are limited options to appropriately house individuals based on their risks and needs. There is a concern about the limited availability of housing options (other than segregation) for prisoners who need to be protected from themselves or others as a result of a mental illness, intellectual disability or other special needs or who need a therapeutic setting. The facility should explore options for developing an actual mental health unit with a program of therapeutic interventions for person who are suffering from mental illness and/or intellectual disabilities. Additionally, the facility should explore options for housing prisoners who need to be protected from themselves or others as a result of a mental illness or intellectual disability other than segregation.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**
The monthly summary reports submitted by each facility include a listing of inmates who have been in segregation.  The format utilized by the JDC does more than simply list inmates; rather, it reflects when they went into segregation and when they were removed as required by this paragraph.  It includes additional information that would be valuable to command staff in evaluating the use of segregation. The reports provided from RDC and the WC list everyone who has been in segregation during the month but not when they went in or were removed. The JDC

system of reporting should be adopted by the WC and RDC so that the information required by this paragraph is available for all three facilities.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**
As noted in the report of the May 2018 site visit, weekly mental health rounds on prisoners in segregation are now being conducted by the mental health coordinator, and a record of those rounds is being maintained.

During this site visit, the mental health expert accompanied the mental health coordinator on the mental health segregation rounds and found the quality of those rounds to be excellent.  There were a total of 23 prisoners in segregation of one type or another; one actually requested mental health treatment; but several others exhibited behaviors that indicated their need for treatment that they had not yet agreed to receive.  It should be noted that observation was complicated in a couple segregation cells where prisoners reported that their light didn't work.

QCHC should develop policies and procedures for continuing to urge prisoners who refuse needed mental health treatment to accept and participate in treatment. As security continues to develop its policies and procedures with regard to segregation, mechanisms should be identified whereby findings obtained during the course of these mental health rounds in segregation impact on decisions to continue or discontinue placement in segregation.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.   All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.   Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c.   Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i. The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans. The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights. The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j. Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

During this most recent site visit, the mental health expert met with senior security staff members to discuss security policies and procedures that are now being developed. Although security staff members indicated that they attempt to consider a prisoner's mental health status when deciding whether or not to place the prisoner in segregation, it was unclear exactly how that was done, and it was quite clear that there was no procedure like that described in this provision for considering mental health issues when making such a decision. Furthermore, as noted in prior reports, mental health staff persons discover that a prisoner on the mental health caseload has been placed in segregation at the time of his/her next visit or during the weekly, mental health segregation rounds, which lends further support to the finding that mental health staff persons have no input into decisions to place mentally ill prisoners in segregation.

It does not appear that segregation is presumed contraindicated for persons with serious mental illness as required by subsection b. More specifically, during this site visit, when the mental health expert accompanied the mental health coordinator on mental health segregation rounds, there were a total of 23 prisoners in segregation. Of these 23 prisoners, 6 of them were in 'protective custody'/segregation (to protect them from themselves or others), and all 6 are on the mental health case load; 8 more of the 23 are also on the mental health caseload; and so, a total of 14 of the 23 prisoners in segregation (about 60%) were known to have serious mental illness and were on the mental health caseload. Although the mental health expert was unable to review the records of all 9 of the prisoners in segregation who were not on the mental health case load, the records of 2 of those prisoners who appeared to be particularly distressed revealed major trauma histories that had never been addressed and that likely caused their distress and the behavioral difficulties that landed them in segregation.

Even if there was a presumption that segregation is contraindicated for prisoners with serious mental illness, there are multiple other issues that contribute to the facility's failure to meet this

provision.  More specifically, there is a lack of appropriate housing for prisoners with serious mental illness, especially those who must be protected from themselves and from others (see sections 74 & 77).  There is not yet a policy and procedure for urging mentally ill prisoners who refuse treatment to accept and participate in treatment, and it does not appear as if other interventions are employed when all efforts to encourage treatment fail (see section 76). Increased efforts to identify prisoners with significant trauma histories with associated trauma-related mental health difficulties, and the development of mental health interventions to help such prisoners are only just beginning (see section 42).  In addition, a formal disciplinary review process and a formal segregation review process, both with mental health input, have yet to be developed and initiated (see sections 76 & 77).

There is no evidence that individuals with mental illness placed in segregation are seen by a QMHP within 24 hours.  It does not appear that security staff even knows which prisoners are on the mental health caseload.

There is no evidence that use of segregation for persons with serious mental illness is limited to cases where there is documented extraordinary and exceptional circumstances.  There are two issues here – one is the performance of the mental health evaluations that would generate the required information, and two is a mechanism whereby the information obtained during the course of such evaluations is shared with security staff members who are making decisions about the use of segregation.

Although there are multiple provisions that speak to the performance of mental health evaluations at various points during the disciplinary review process and the segregation review process, at present, the only related mental health evaluation that is being performed is the weekly, mental health segregation rounds.  Therefore, as security staff develops security policies and procedures, such policies and procedures must include all of the other points where mental health evaluations must be performed.

At present, there is no mechanism whereby mental health staff can have input into decisions made about placing a prisoner with mental illness in segregation and/or keeping such a prisoner in segregation.  Therefore, such mechanisms must also be included in the security policies and procedures that are currently being developed.

Of course, once all of this is put into place, the mental health team must be willing and able to assume the responsibilities outlined for mental health.

In addition, policies and procedures that specifically address this provision must include a clear description of the 'extraordinary and exceptional circumstances' that trump the mental health concerns.  In so doing, a distinction should be made between current circumstances (for example,

the lack of alternative, appropriate housing for seriously mentally ill prisoners), and the circumstances that will continue to exist after other provisions of this agreement have been met.

Prisoners with serious mental illness who are on medication and in segregation typically have two daily visits with a nurse Monday through Friday during medication pass.  During the site visit the mental health expert accompanied the nurses on a medication pass, and did not observe any difference between the nurses' interactions with prisoners in segregation and prisoners who were not in segregation.  Since prisoners in segregation do not see a QMHP on a daily basis, it should be made clear (in policy and procedure) to what extent the level of care provided by the nurses during medication pass includes some type of assessment of the prisoner's mental status.

Prisoners in segregation who are on the mental health caseload are receiving mental health services.  However, it is not yet clear whether or not they are receiving mental health services on a weekly basis, and it does not appear that the services received are always out-of-cell sessions. As has been previously noted, it will be important to remember, as noted in Section 76, that the weekly mental health rounds for prisoners in segregation must not be a substitute for these therapeutic sessions.

Although the mental health coordinator is performing weekly mental health segregation rounds, the requirement of sub paragraph (f)(iii) is not being met.  In order to address this provision, the mental health coordinator, in conjunction with a physician and the psychiatrist, must also perform a weekly review of the status of the prisoners in segregation who are also on, or should be added to the mental health caseload.

Essentially all prisoners with serious mental illness housed in long-term segregation have had an updated mental health evaluation (i.e., with the exception of those who refused to be evaluated). Although those prisoners also have an updated treatment plan, the treatment plans do not yet include recommendations regarding more appropriate housing.  However, as otherwise noted in this report (see sections 42, 74 & 77), at present, there really isn't more appropriate housing, which, of course, complicates the making of such a recommendation.

At present, there is no formal, monthly segregation review process whereby the status of all prisoners who have been held in segregation for more than 30 days is reviewed, with mental health input, in order to determine whether or not they should remain in or be removed from segregation.  As has been previously noted, the development of such a monthly, interdisciplinary, segregation review process is integral to addressing this provision and should be included in the security policies and procedures that are being developed.

The segregation review team should be interdisciplinary and include a representative from mental health (along with security, classification, and the staff persons responsible for disciplinary proceedings). The representative on the team from mental health should report on

each prisoner's mental status; and when the prisoner is experiencing clinically significant mental health difficulties (that existed prior to the prisoner's placement in segregation or that have developed since the prisoner was placed in segregation). The mental health representative should also offer recommendations for an alternative placement (other than segregation) and any follow-up mental health evaluations or treatment that might be indicated.  The information gathered on each prisoner during each monthly segregation review meeting should be documented; the decisions made about placement and prisoner's need for further evaluation and treatment should also be documented; and each member of the review team should sign each prisoner's monthly segregation review form (a form that will have to be developed).  Of course, at any time that the mental health team finds that a prisoner being held in segregation is suffering as a result of mental illness, the mental health team should immediately discuss the findings with security staff (without waiting for the monthly segregation review team meeting); the mental health team and security staff should jointly develop an appropriate intervention; and this discussion, along with the agreed upon intervention, should be documented.

In addition, there is the matter of (1) the extent to which non-mental health staff persons (i.e., security staff and medical staff) are assessing whether or not prisoners held in segregation are decompensating or otherwise developing signs or symptoms of serious mental illness, where such signs and symptoms had not previously been identified, and also (2) if non-mental health staff are identifying such prisoners, are they immediately referring them to mental health.  These are important considerations, especially given that security staff and medical staff (at least the nurses) see the prisoners in segregation more frequently than the mental health staff, and so these considerations need to be further explored.

There is no interdisciplinary team as required by sub-paragraph (i) that attempts to balance security concerns and medical/mental health concerns when decisions are being made about the housing of prisoners with serious mental illness.  Although mental health treatment plans have been developed, those treatment plans do not include recommendations for housing, in large part due to the fact that there is no special housing that is specifically designed to meet the needs of prisoners who are suffering from mental illness and/or intellectual disabilities.  Therefore, in order to address this provision of the agreement, such an interdisciplinary team has to be established, and more appropriate housing options for prisoners with mental illness and/or intellectual disabilities have to be developed.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482.  **Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United**

**States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Partial Compliance**

Juveniles Charged as Adults (JCAs) continue to be placed at Henley Young after being booked at the Raymond facility.  When they turn 18 they are transferred to the Raymond Detention Center (RDC) pending further court action. This was the first opportunity to observe the youth placed at Raymond in the smaller A-I Isolation unit, which has four cells. As of this visit:

- There were sixteen JCAs at Henley Young (including three girls; during the week of the visit one youth was released and one new youth admitted) and three youth housed at RDC, for a total of 19 youthful prisoners.  This number is consistent with the overall average number of youthful prisoners in Hinds County custody over the past two years but does represent a gradual increase in the average daily population of these youth at Henley Young since last fall (see chart below). Given the ages (see bullet below) of current youth in custody, it is likely this number will continue to increase unless case processing timelines are shortened;



- There were three youth at RDC, including two juveniles charged as adults and one youthful prisoner, a youth who had already been convicted as an adult on a prior charge and was arrested on new charges (see subsequent note relating to juveniles **convicted** as adults).
- Both of the juveniles charged as adults turn 18 as this report is being filed/reviewed (S.P. on 10/4/18; C.W. on 11/12/18) and the juvenile convicted as an adult will turn 18 in February although should be in MDOC by then if not at the time of this report;
- Shortly before the site visit, there had been another juvenile charged as an adult (who had previously been placed at RDC for an extended period of time, then transferred to

Henley Young in the spring of 2018) that went to court and was convicted. He was then transferred back to RDC pending placement with the state Department of Corrections which occurred within approximately one week (state statutes permit an up to 30 day stay at a local jail until placement);

- Not including the youth admitted during the site visit, the length of youth's placement at Henley Young ranged from a high of 378 days to a low of 31 days;
- Two of the current 17-year-olds at Henley Young will turn 18 before the end of 2018;
- As of the time of the site visit, there were four youth age 14 held at Henley Young, three were 15, four were 16, and five were 17;
- Only three of the youth at Henley Young had been indicted, and the youth held longest without being indicted had been there for 321 days.

Up until this most recent visit, the use of the term Juveniles Charged as Adults (JCAs) was an apt description of the Youthful Prisoners held in Hinds County. However, two situations make it clear that those terms are not interchangeable, specifically there was:

- One youth at Henley Young who was convicted as an adult and then transferred to RDC pending placement with the state; and
- One youth (M.C., DOB 2/13/01) who had previously been convicted as an adult, was "out" on probation, and was arrested for new, serious charges.

While the pace of the court process (absent significant changes in the current system) makes it likely that more youth will "age out" of Henley Young than be **convicted** while at Henley Young, there will inevitably be some situations in which youth will be convicted while at Henley Young (e.g. note that seven youth currently at Henley Young are age 15 and under). Similarly, one could expect more cases in which a youth convicted as adult is rearrested for a new offense and secure placement will be needed. The rationale for deciding to place youth **convicted** as an adult at RDC ranged from "that's what our Henley Young monitor said to do" to thinking there is some state law that prohibits youth convicted as adults from being held in a juvenile facility.

This agreement uses the term Youthful Prisoners to encompass all youth under 18, not differentiating between youth charged as adults and those convicted as adults. Therefore, to be in full compliance with this agreement in the future, the county will need to change the current practice related to youth convicted as adults and either continue/place them at Henley Young and/or expedite placement to another facility (e.g. state facility) rather than house them at RDC.

Concerns about the limited programming and lack of proper supervision for youth at RDC were reinforced by a notable incident on August 26 in which one of the youthful prisoners was assaulted by a staff member for failure to provide the cell phone password to a cellphone that had been confiscated. Based on incident reports, an internal investigation report, and interviews with youth it appears that the officer in question entered the youthful offender unit after control staff observed youth tampering with the unit camera. The officer entered the unit and confronted one

of the youths (S.P.) about possession of a cell phone; the interaction resulted in the staff member physically assaulting the youth.  Statements by other youth in the unit and other officers (noted in the Internal Investigation report) are consistent with allegations that Officer C.L. used excessive force and acted contrary to proper policies and procedures. The Internal Affairs Investigation report also confirms that the Incident Report filed by Officer C.L. was not consistent with information obtained from other staff or the youth on the unit.

Additionally, this incident revealed that the commitment to ensure the youthful prisoner unit is under constant direct supervision was not adhered to.  There was no staff member present in the unit as youth tampered with the security camera, and it can only be assumed that with direct supervision at all other times the youth would not have been able to possess contraband (in this case a cellphone, pocket knife, and cigarettes).  In reviewing observation logs in youth's files, there were numerous shifts and/or days (e.g. could not find observation logs for 19 shifts and/or days in June and July alone) during which there is no verification that staff were on the unit as required.

While the actions of Officer C.L. in this case clearly resulted in harm to juvenile S.P., the frequent lack of direct supervision on the juvenile unit at RDC also creates an unsafe and unstable environment for youthful prisoners.

In addition to taking severe disciplinary action related to Officer C.L. and pending complete removal of all youth from RDC, the county needs to reaffirm its commitment to maintaining constant supervision of youthful prisoners by staff that have been appropriately trained to do so.

On a positive note, during this visit it was possible to compare booking times at RDC with those at Henley Young to evaluate the efficiency of the transfer process for new youth, ensuring that youthful offenders are not lingering inappropriately in the booking area at RDC prior to transfer to Henley Young.  Comparing times revealed that the transfers of youth from RDC to Henley Young occurred within a reasonable amount of time (i.e. less than three hours in all cases, shorter in many), indicating a consistent commitment by RDC staff/leadership to making this process work efficiently.

Finally, a number of recommendations were made in prior reports related to changes at Henley Young that would support a successful transition (i.e. physical plant changes, security improvements, increased programming, speeding up case processing, improving the overall behavior management system, etc.).  While some progress has been made related to programming and the behavior management system, concerns remain that the lack of progress on others (particularly physical plant changes and case processing) will make it more difficult to achieve compliance with the agreement, particularly in terms of educational programming,

implementing individual case management plans, and limiting the use of isolation as a disciplinary tool.

At a minimum, the County should proceed to add at least some temporary classroom/program spaces that can be used for multiple activities (education, group counseling, skill development programs, etc.) and make changes on the housing units to create a calmer, more flexible, and more normative living environment.  Youthful offenders respond to their surroundings, and the current facilities features add to, rather than reduce, the emotional arousal of youth.

Reporting compliance on the remaining conditions will reference one or both locations (Henley Young and RDC) as appropriate.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance at Henley Young**

As noted in the prior report, youthful offenders are booked at RDC and then taken to Henley Young.  A routine part of the admission process at Henley Young is administration of the MAYSI-II, an appropriate mental health screening tool for use with adolescents. A Case Manager is assigned to each youth and is in daily contact with their assigned youth, providing information and support to maintain appropriate family contact(s), interact with court staff, help link youth with external resources, and intervene to prevent behavioral problems. The counseling staff provides more on-going therapy and support and can help coordinate services with Hinds County Behavioral Health or other resources.

The two mental health clinicians follow up the initial assessment by conducting a more complete mental health assessment that covers a wide range of potential issues and utilizing a strength-based assessment to help youth identify skills they already have that they can build on to be more successful in the future.  Along with interviews, these assessments help the clinicians identify some individual areas/skills that youth can work on while in placement and form a foundation for a basic case plan.  Mental health records include regular documentation of contact between the clinicians and youth and how they are doing relative to the goals they have developed as part of this case plan.

During the September 2018 site visit, the mental health expert also visited and toured Henley-Young Juvenile Justice Center; met with Dr. Payne; reviewed the mental health policies and procedures Dr. Payne has developed and her new mental health program initiatives; and met with

several of the juveniles who were being detained there.  This was done as a first step towards gaining an increased understanding of the nature and quality of the mental health services being provided to the juvenile population that fall under this agreement, all of whom are now being housed at Henley-Young.

During the visit it quickly became apparent that although Dr. Payne had been hired as a part-time psychologist to "run some therapy groups and perform some testing", once she started at Henley-Young and reviewed the consent decree, she realized that a lot of work had to be done to bring the mental health services program into compliance with the consent decree.  She also realized that virtually all of the juvenile population that fall under this agreement, a population that has doubled in size since she has been at Henley-Young (while the remaining population at Henley-Young who are there for only a couple weeks has decreased in size), suffer from some type of mental health difficulties (most often trauma-related mental health difficulties, with or without self-medication with street drugs) and are severely stressed by their situation (i.e., their current incarceration and the uncertainty about the outcome of their cases).  Therefore, she undertook the task of updating mental health policies and procedures; refining the mental health section of the intake assessment process; adding more structure to the follow-up mental health assessment; working with the two existing QMHPs to clarify their roles and responsibilities, and provide a clearer theoretical underpinning for their work; fine tuning the suicide prevention program; developing additional therapeutic interventions that are specifically designed to meet the mental health needs of the population being served; and training and consulting with direct care staff and education staff so as to increase their understanding of mental health issues and develop a more comprehensive and cohesive response to the juveniles being served.  She has also focused her attention on developing a more thoughtful and therapeutically appropriate way to deal with juveniles who are aging out of the facility; she has gotten the QMHPs involved in the juvenile due process hearings, which has resulted in a change of outcomes for those hearings and a resultant significant decrease in the placement of juveniles in segregation; and she has been exploring the possibility of making Henley-Young a placement option for doctoral level interns, which could allow for a further expansion of the mental health services provided at the facility. During this visit to Henley-Young, all of Dr. Payne's above noted initiatives were reviewed by the mental health expert in some detail.  In summary, the work that Dr. Payne has done in the short period of time she has been at Henley-Young (since about April 2018) has significantly improved the mental health program at the facility, making it the type of trauma-informed mental health services that attempts to build on the strengths of the juveniles placed there instead of only focusing on their weaknesses.

When asked about the feasibility of continuing to take on such a leadership role with regard to mental health services at Henley-Young given that she is only a part-time employee, Dr. Payne acknowledged that she can't continue to do this.  As noted above, she has however raised this with the county, and reportedly the county is considering whether or not she can be promoted to

something like a director of behavioral health at the facility on a full-time basis.  When asked about psychiatric services at the facility, Dr. Payne noted that unlike her and the QMHPs, the psychiatrist is hired by and presumably reports to QCHC and not the county; he is at the facility for a very limited period of time, and so she hasn't had much contact with him; and so integrating him into what she has been trying to do has not been possible.

The juveniles at the facility who were interviewed were all quite positive about Dr. Payne and how she has been working with them, and they were all quite positive about the two QMHPs. The juveniles were very much like Dr. Payne described them, in that they were struggling to cope with past traumas that they had endured, having difficulty regulating their mood, and stressed by their current situation.  In summary, the information gleaned from those interviews indicates that Dr. Payne is moving the mental health services program at Henley-Young in the right direction.

Through coordination by Dr. Payne, the Case Managers and mental health clinicians have begun developing and leading more psychoeducational programming, focusing on topics such as cognitive distortion, anger management, teamwork, emotional competence, setting goals, motivation, communication styles, and family dynamics.  Credit should be given to the Case Managers and clinicians for their efforts to develop this programming, as all of these are appropriate topics to include in the overall treatment/programming for youth and represent positive movement toward meeting this provision of the agreement.  If Dr. Payne had more time, she could provide more direction to ensure that these programs are delivered consistently, utilizing well-researched curriculum, and are integrated into other aspects of the mental health and behavior management system(s).

Concerns remain about the limited psychiatric time allotted to youth at Henley Young.  The once-a-week short visit by Dr. Kumar is sufficient for at most a cursory review of medication issues but little else in the way of treatment and/or coordination with Dr. Payne.

In order to meet this provision of the agreement, it is recommended that (1) the psychologist time be increased to at least 1.0 FTE, and (2) greater attention be given by the mental health team as a whole to utilizing evidence-based curriculum where feasible to deliver the psychoeducational programming that has begun, and (3) additional psychiatric consultation time be allotted to Henley Young.

**Non-Compliant at RDC**

The facility wide improvement in mental health screening, assessment, and treatment planning would apply to the youth in the facility as well. However, their charts were not reviewed by the mental health expert on this site visit.  Medical review of the charts indicated that they were screened with 2-4 hours of their booking and seen in a timely manner for sick call.   Other than improvements in identifying the mental health needs, there continues to be a lack of sufficient appropriate programs, supports, education, and services.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance at Henley Young**

Youthful offenders age 15 and under are assessed and integrated into the on-site education program provided by the Jackson Public Schools.  While improvements have been made in that program in terms of meeting class time requirements, there is limited evidence of individualized programming. Youth are assessed using a Standardized Testing and Reporting (STAR) tool that identifies where youth are related to basic skills in core categories including reading, math, social studies, and other language skills.  There is no evidence of identifying youth that already have been assessed for special education needs or have an existing Individualized Educational Plan (IEP) in the Jackson or other school system.  Since it is likely that a portion of youth housed at Henley Young are in need of special education services, it will not be possible to meet this provision unless additional testing and coordination is done regarding special education needs.

At the time of the May visit the County had concluded that services and resources provided solely by the Jackson Public School system were not going to be sufficient to meet this requirement and they would be pursuing the option of developing an independent/charter program with assistance from the Center for Excellence in Education.  As of the September visit there had been little discernible progress on this, and there was an initial concern expressed that the cost of developing the model recommended would be prohibitive.

As noted in the prior report, the new General Equivalency Degree (GED) program was just beginning.  Youth 16 and 17 participate in that programming for two hours each afternoon.  The attitude and interest shown on the part of the newly hired GED teacher is commendable, and she indicated that two or three of the youth had made sufficient progress in terms of skill development to be able to take the actual GED test in the near future.  This is something that several youths stated as a goal, but it will require additional outreach to secure the services of a certified GED test administrator.  Leadership at Henley Young is aware of this and indicates they are in the process of trying to find that appropriate service so that the youth who are ready to take their GED tests can do so before "aging out" of the facility.  Unfortunately for these youth, while implementing the GED program is a good step forward, there is little other educational programming during the day.

The County should (1) continue to pursue the development of an alternative, independent/charter school program sited at Henley Young to better serve the educational needs of all youth, including youthful prisoners: (2) contract with a resource to provide certified GED testing services so youth who are ready/able to take the test(s) can do so; and (3) begin outreach to Hinds Community College or other resources to determine whether there are post-GED programs

that can be provided for the older youth at Henley Young (and coincidentally could be provided at RDC as well).

**Non-Compliant at the Raymond Detention Center**
The program at RDC remains essentially the same as prior reports, with youth benefiting, albeit on a very limited basis, from the continued and generous support of a volunteer for Adult Basic Education (ABE) services. Youth have daily access to individualized instruction for relatively brief periods of time (e.g. 1-2 hours), but there remains no routine screening process (other than assessment related to ABE skills) to determine whether and what educational services a juvenile or youthful offender was engaged in prior to admission that would help determine what the appropriate, and often legally required, services should be for the youth while confined. While this is less of an issue given that "new" youth are not placed at RDC, there undoubtedly remain young adults (age 18-21) who need similar assessment and are perhaps legally eligible for specialized educational services.

80.    Ensure that youth are properly separated by sight and sound from adult prisoners.

**Full Compliance at Henley Young**
Since there are no adult prisoners placed at Henley Young, this provision is met. As JCA youth in placement at Henley Young turn 18, they will be transferred to RDC (although more recent interpretations of the Juvenile Justice and Delinquency Prevention Act may permit those youth to remain at a juvenile facility pending conviction/sentencing).

**Partial Compliance at the Raymond Detention Center**
As noted earlier, youthful prisoners have been moved to a smaller isolation unit in the A pod. This unit includes four cells, a dayroom, television, and tables. A staff member can sit on a chair in the doorway to the unit and provide direct supervision. Youth indicate they still do get outside for recreation on a regular basis and did not indicate they had any inadvertent/unsupervised contact with adult inmates (e.g. when taken to medical they were escorted and under constant supervision). Full compliance may be achieved once final policies/procedures are in place that clearly spells out procedures related to housing and movement of youthful prisoners.

81.    Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance at the Raymond Detention Center and Henley Young**

In discussing housing decisions with staff it is apparent that they do take into consideration the factors indicated above, although formal documentation of that process is somewhat limited. They do have the benefit of having had prior experience with many of the youth, and it is a positive that they consider a youth's vulnerability to others as an important factor to ensure a youth is safely placed. The bottom line is that while age and offense are factors, the key factor in which housing unit youth are placed is their behavior and vulnerability.

Note that as of the September visit, there were three girls in custody who were being tried as adults. These girls are placed on the general girls' unit, which makes sense especially given the relatively small number of girls in custody in the juvenile system at a given time (most often none).

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance at Henley Young**
Progress continues related to training staff at Henley Young. Between the last site visit (May) and this visit, training sessions included: (1) updating certification for Crisis Prevention Institute (CPI) training that focuses on deescalating conflict and preventing injury to others; (2) refresher training related to suicide prevention and intervention; (3) refresher training on use of/administering the MAYSI screen; (4) initial detention officer certification training for new staff; and (5) training related to implementation of a modified behavioral management approach. A refresher course related to implementing PREA requirements is scheduled for October. The training officer appears to be committed and well-organized in terms of ensuring that staff is getting on-going training in these areas on a regular basis. However, note that many of these are considered "refreshers", and it will be helpful going forward to expand the scope of training to include more training related to the impact of trauma on youth behavior, mental health issues facing youth, and effective observation of youth to prevent problems from occurring.

**Non-Compliant at the Raymond Detention Center**
There has been no change at RDC related to staff training, again likely the result of viewing this as unnecessary as the number of JCA youth held declines. Other than again seeing Officer Tower working on the youthful prisoner unit, there appears to be no discernible effort to have particular staff appropriately trained and assigned to that unit. The incident of August 26 in which a youthful prisoner was assaulted by a staff member for failure to promptly turn over contraband

items is a stark example of how important it is to both continuously supervise that unit as well as have staff doing it that are properly trained for working with youth.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

   a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

   b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

   c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

   d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

   e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

   f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

   g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

   h.  If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

   i.  Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance at Henley Young**

The growing use of segregation as a disciplinary measure was noted as a strong concern in the last report filed for this agreement.  Discussions at the time with Henley Young leadership included an emphasis on this particular component, and since that time steps have been taken to reduce, albeit not eliminate, the use of segregation.

Recall that policy and practice at Henley Young provides for three different types of isolation: (1) Behavior Management Isolation (BMI) for short periods of time as a "cooling off" or short-term consequence[1]; (2) Administrative Isolation in which there is a supervisory decision to keep a youth in their cell pending a due process hearing; and (3) Due Process Isolation[2] that permits the use of segregation as discipline for up to 72 hours following a Disciplinary/Due Process hearing[3].  The use of Due Process or Administrative Isolation for an extended period of time is in contradiction to the DOJ Settlement Agreement that defines segregation as: *"24. ........involuntary confinement in a locked room or cell with two or fewer prisoners, for at **least the majority of waking hours per day**....."* [4] and is not consistent with the Henley Young/Southern Poverty Law Center Settlement Agreement (note that Provision 6.2 limits the use of isolation for discipline to not more than 24 hours).

Along with changes in the behavior management system, greater involvement in problem-solving behavior problems by members of the mental health team, and an increase in programming Henley Young has taken additional steps to reduce the use of extended room confinement as discipline, including:  (1) implementing a "step" process to engage case managers and other team members to help problem-solve behavioral issues rather than revert to extended room confinement; (2) shorten the maximum length of room confinement time following a due process hearing (to 24 hour maximum); (3) and allow youth on disciplinary isolation to participate, if they choose to do so, in school/GED and other psychoeducational programming.

The results of the latter two of these changes may be evidenced by a decline in the use (duration and frequency) of room confinement following a due process hearing.  According to records provided, in June there were 15 instances of due process isolation of at least 24 hours, with many of them being 48 or 72 hours.  In July that number was reduced to 8 occurrences, although again many up to 72 hours.  In August, the number was further reduced to 7 instances with one being 20 hours and six being 24 hours.  This progress has not been made without some concerns being expressed by leadership as to whether and how this will work in the long run in terms of being able to safely manage the facility, as it is difficult to "take away" what has been perceived as a behavioral tool without replacing it with something more effective.  In this case, as the new

---

[1] Henley Young Policies and Procedures, 3.C.8.
[2] Henley Young Policies and Procedures, 3.C.7.
[3] Henley Young Policies and Procedures, 3.C.2.
[4] Settlement Agreement, Page 8.

behavior management system and intervention process take hold, credit goes to Mr. Burnside, Mr. Dorsey, Dr. Payne, and others for trying to make this challenging transition.  The next site visit will provide an opportunity to evaluate progress toward full compliance with this provision of the agreement.

That said, limitations of the physical space, the limited psychologist time, the lack of appropriate educational programming, and other things that have been raised as concerns in this and prior reports will continue to pose a barrier to success.

Related to documentation, improvements can be made in tracking observation of youth during confinement and providing ready documentation of contact by clinicians and case managers with youth while confined.  Unfortunately, the only place that clinician contact with youth while in confinement is documented is in the clinicians' records, and both clinicians were out of the facility during the site visit. The clinicians should make a note of the time they observe/check on the youth on the same observation form that the staff use to document the time they check on the youth. That form then is filed in the youths' record.

A simple recommendation to help ensure compliance is to have clinicians and case managers document contact with youth in isolation on the same observation form that is used by line staff. Supervisors should ensure that staff observation logs are completed appropriately and accurately by having supervisors more closely review the logs when they are filed.  There are still too many instances in which the period checks are listed in exact 15 minute increments, and that simply challenges the credibility of their accuracy. Supervisors should also ensure that all use of isolation that exceeds one hour (a previous report recommended one hour) should be documented on a centralized isolation log that includes the type of isolation, the duration, the staff member(s) directing the segregation, and provides information to link it to a related incident report.  If need be, support from county IT staff may be needed to set up a system to track this that is efficient yet provides a level of quality assurance oversight to help move toward compliance.

**Non-Compliant at the Raymond Detention Center**
There has been no change at RDC related to this requirement.  As noted in an earlier report: "*…There remains no evidence of sufficient policies/procedures or documentation related to the use of room confinement or other forms of isolation/segregation for youth...*".  On observation logs (again, note concerns that the youth unit has not been under constant supervision) it is not uncommon for a youth to be listed as "sleeping in room" or "in room" for substantial periods of time during what would be considered "waking hours", and the staff explanation is that the youth

is voluntarily in their room.  Youth do not report being confined for long periods of time but there is no way to realistically confirm compliance with the segregation requirements at RDC.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:
> a. The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.
> b. An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.
> c. The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance at Henley Young**
At the time of this site visit, Henley Young was in the first week of implementing an updated/revised behavior management point system and had developed a more proactive graduated response to behavior problems. Both of these represent steps forward in improving the overall behavior management system and appear to have benefitted from some technical assistance by Leonard Dixon, the Henley Young monitor associated with the SPLC/County consent decree.

In particular, the prior point system was modified to work on a weekly basis (vs. daily) and clarified expectations related to school and/or recreation participation.  Additionally, a broader "menu" of privileges/incentives was developed so the nature of incentives is more clear and provide for youth making a choice related to what would be reinforcing to them.  Certain things like opportunities for visitation or family contact should be viewed more as "rights" than privileges to be earned and should only be restricted if/when there are problems with that specific issue.  Nonetheless, the change is a step forward and will provide an opportunity to assess the value of changes at the time of the next visit in January 2019.

As the new point system evolves, there are several improvements that can be phased in: (1) add an individual weekly goal identified by the youth and case manager – something that is unique to the case plan for that youth and focuses on a particular pro-social skill or behavior and includes a specific incentive/reward that can be implemented for that youth; (2) work with youth to identify

additional incentives that they would like to see included as rewards for achievement; and (3) implement an additional "coupon" or token reward program in which staff can reward "kids doing good", focusing particularly on new and/improved behaviors that contribute to the overall welfare and safety of the group.  Each of these are no-cost/low-cost steps that can engage members of the mental health and staff teams in collaborating with youth to identify and reinforce skill development, allow for some individualization of the system, and create more opportunities for positive staff-youth interaction(s).

Related to dealing with behavioral problems, a positive step forward is the development of a response protocol that reduces the likelihood of extended room confinement as a disciplinary measure by engaging case managers and other mental health staff on a routine basis to "problem solve" issues as they occur.  This process also was in its formative stages at the time of the site visit, but essentially it "slows down" and breaks up what had been an unproductive cycle of responses to misbehavior and emphasizes short-time (e.g. 2 hours, 4 hours) confinement as a response when possible.

While using an appropriate incentive tool (as referenced above) is an important component of the behavior management program, it is the combination of good staff training and supervision, keeping youth actively engaged throughout most of the waking hours in constructive and pro-social activities, utilizing the expertise of mental health staff to address youth's mental health needs, and developing preventive and proactive responses to youth's misbehavior that help teach and allow youth to practice new and improved behaviors. Equally important, creating an integrated approach to behavior management built upon positive staff-youth relationships helps ensure a safe environment for youth and staff.

The Agreement requires the County to obtain the services of a qualified consultant to help them to develop a more effective and comprehensive behavior management system.  It appears that to some degree they have utilized Mr. Dixon on an interim basis for some positive suggestions, but long-term success will still likely require more substantive technical assistance and support. To their credit, Mr. Dorsey and Mr. Burnside recognize the challenges they are facing and seem committed to making continued progress. However, given the temporary absence of Mr. McDaniels in the Executive Director role, they find themselves again juggling additional duties with limited time to deal with some of these issues.  Providing added support through a consultant and exposing them to programs that have been successful in developing successful behavior management programs will be beneficial.  For purposes of this report, however, it is arguably appropriate to defer taking that step until progress with the new changes can be evaluated.

Note that this provision requires extensive documentation related to behavior, incentives, and segregation.  There is a system in place to track the use of room confinement/isolation as a

disciplinary tool, but there will be a need to further assess whether other components in this requirement are routinely captured.  It can be fairly cumbersome to try to track all the details required, so additional assessment and support can be provided at the time of the next site visit.

**Non-Compliant at the Raymond Detention Center**

As with other components of the agreement, there has been no movement toward the development of a behavior management program at RDC.  There remains no evidence of a consistent set of expectations, incentives to meet those expectations, and/or consistency in how staff view expected behaviors. As the number of youth declines at RDC, it actually could become easier to implement a rudimentary behavior/incentive system, but there is no indication leadership is considering doing so.  As with other aspects of this agreement, the best way to meet this requirement will be to close the youthful prisoner unit at RDC and house all youthful offenders at Henley Young.

## LAWFUL BASIS FOR DETENTION

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

There are still no adopted policies and procedures in this area although it is reported that a draft is close to completion. From reviewing the paper files, JMS entries and the court data base that can be accessed, there appears to be improvement in this area. There are four staff members who review various types of cases to track and investigate the basis for detention. This has resulted in significant improvement in the accuracy of the records. There continue to be some files that don't support continued detention and, as a result, individuals who are detained longer than they should be. In some cases, this is because of poor record keeping. However, these are now more likely to be a result of confusing court orders, unclear legal issues, and systemic failures. It is incumbent on staff to seek guidance when there are unclear court orders and legal issues and develop systems to identify individuals lost in the system. Jail staff is working with Karen Albert, a consultant with the monitoring team, to standardize and improve practices in this area

and develop policies and procedures reflecting the new practices. There are several situations that occur fairly commonly. Some individuals continue to be held beyond 21 days waiting for a probation violation determination. There is no way to run this report out of the JMS system because the term probation is used for several different situations so it has to be manually tracked. There were two individuals identified who had stayed beyond the 21 days. One legal issue to be resolved is whether the individual is to be released if the hearing is not held within the 21 days even if a hearing is scheduled not long after the 21 days has run. There also appears to be a communication issue with the court for getting probation related orders in a timely fashion. There continues to be an issue with holds. The records office does not always get notice of holds if they come in after booking. They also have individuals detained on holds after the probation time has passed without determining whether the other agency wants the individual. Another recurring situation is that there is not a way to identify people in the Jail who are waiting for a preliminary hearing. Individuals who do not have an attorney have no one to request a preliminary hearing. These individuals currently get lost in the system and some stay long periods of time in the jail. There continue to be individuals detained beyond 90 days without indictment. As noted above only three of the 16 youth at HY have been indicted and one of the youths being tried as an adult has been confined 321 days without indictment. Staff is working with the courts and the District Attorney to try to resolve this issue. It appears that staff is maintaining an accurate list of unindicted individuals. This also cannot be run accurately out of the JMS system. Several new orders appeared during this site visit remanding charges but ordering the defendant to continue to be detained until a chancery court hearing and transfer to the state hospital. The legality of these orders needs to be determined.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**

At the time of the site visit there were four individuals who were or had recently been held for failure to pay fines and fees without a legal court order. The absence of policies and procedures on this issue contributes to the risk of this continuing to arise after it appeared to be resolved. Although the orders in these cases do not appear ambiguous, a procedure that includes contacting the Sheriff's attorney would ensure that the staff has an avenue for getting a legal interpretation of the court orders when they are unsure whether they meet the legal requirements or not.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written

findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**
The County has been pro-active in ensuring that valid court orders are utilized. The County sponsored a training session on the new rules as related to orders on fines and fees. This is to be commended. This requirement is carried as partial compliance in that policies and procedures do not exist that implement a process to address non-compliant orders.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**
See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**
See response to number 87 above.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each

prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are some individuals who have a sentence of confinement. Some of these individuals show fines and fees but with the notation of a payment plan in effect. This signifies that they will be released after the sentence of confinement. The Monitor will continue to track these entries to ensure that individuals are released after the confinement period. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court. The new non-compliant orders do not use the same daily amount for working off fines and fees. If the Jail at some point receives a valid court order on fines and fees in that the ability to pay has been adjudicated, the jail should work with the courts to utilize a uniform daily rate.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliant**

This has become a limited issue now that virtually no individuals are working off fines and fees. As reported recently, the recent standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. The most recent stated practice was to determine the amount of credit on a case by case basis. There needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

      i.     Individuals who have completed their sentences;

     ii.    Individuals who have been acquitted of all charges after trial;

   iii.    Individuals whose charges have been dismissed;

   iv.    Individuals who are ordered released by a court order; and

    v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

See response to number 85.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

There is still no known process to electronically check for adequate documentation for detention and identify those that should be released. The Jail still relies on inmate requests and grievances to identify people who are being over detained. In addition to Booking staff, there are four individuals tracking the lawful basis of detention. They are all four using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. There continues to be a lack of specified procedures to check all law enforcement and court documents. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

There has been enormous progress with regard to QCHC's tracking of individuals with mental illness.  As noted in Section 42, prisoners on the mental health case load now have complete medical records that document their mental health evaluation, their treatment plan, and their therapeutic sessions and any indicated follow-up evaluations.  There is also a 'mental health tracking log' that tracks all prisoners on the mental health caseload.  Therefore, the collection of data and the development of an information base for quality assessment has begun to fall into place, at least with regard to mental health evaluation and treatment services.

The mental health team is now in a position to begin to develop a quality assessment program. Initially, the data now being collected can be used to assess compliance with mental health policies and procedures.  Once treatment plan reviews are initiated, that will be a first step towards the assessment of the actual quality of the services provided.  However, additional approaches to the assessment of the actual quality of the services provided will need to be developed.

There are other mental health functions that overlap with those of other staff, such as disciplinary review, segregation review, classification and PREA; policies and procedures for these overlapping mental health functions are currently being developed; and so for the most part, mental health staff members have not even begun to perform these functions.  However, once these policies and procedures are developed and mental health staff members begin to assume these responsibilities, it will be important to rigorously collect data on these functions as well. Here too, data collection and analysis will initially focus on compliance with policy and procedures.  However ultimately, there should be an assessment of the quality of the work. Therefore, data collection should not only include the findings of mental health evaluations, the timeliness of the evaluations, and the recommendations made to security or other staff, but also include data such as the extent to which recommendations were accepted or rejected, and reasonable measures of outcome (both short and long-term consequences of accepting or rejecting recommendations).

Although QCHC's progress in this area is significant, at present, there is no specific plan for incorporating records about prisoners with serious mental illness into the jail's record system or incident reporting and investigations, and this part of this provision requires further exploration. The involvement of mental health with regard to the use of force is described in section 51.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

      a.      Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

    i.    Requiring the individual to submit to bodily strip searches;

    ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

    iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b.    Specifically detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

In the initial Policies and Procedures that were adopted there are two policies that may relate to this requirement-the policy on records and the policy on booking which includes some requirements related to release. These policies do not have the specificity or the breadth required by this paragraph. These policies as with the others have been stalled. The current practices, as described above, do not meet the requirements of this paragraph. Although improved, there still are inmate files which do not include documentation establishing the basis for detention. Neither the DA's office nor the defense bar has been involved in the drafting. The level of specificity required by this paragraph will require significant revision of the policy. The policies and

procedures now being drafted with Karen Albert should enable compliance with a and b of this paragraph.

A primary focus of subsection (d) is the successful referral of prisoners with mental health difficulties to community mental health services upon their release from the facility.  As was noted in the report of the May 2018 site visit, there are a range of community-based services provided by Hinds County Behavioral Health that could be made available to prisoners upon their release from the facility (see section 96 of the May 2018 site visit report).

A discharge planner has been in place for the last two visits.  Soon after the intake process is completed, Nurse Meyer sees the new inmates.  She obtains a current address and telephone number which she shares with Hinds County Behavioral Health.  She provides the inmates with information and services that are available to them upon their release.  After their release, she sends a post card and calls them on three separate occasions to pick up their medication.  This process started in July 2018.  The post card informs the inmate that the medication will be held at RDC for seven days post release.  Since the new process was initiated in July 2018, out of 25 inmates contacted, only three inmates have returned to obtain their medication. Some inmates were previously receiving services in Region 8. However, even after appointments were made for them, none of the inmates were compliant with their appointments.

The discharge planner has also coordinated with Mercy House, which is a substance abuse center. However, only 3-4 inmates have been accepted due to their convictions.  She has also referred inmates to Jackson Hinds Comprehensive Clinic which is a clinic for low income individuals, the Health Department, and Dental services.

Because of the poor record of follow-up with community-based services, the mental health expert scheduled a joint meeting with the mental health coordinator, senior staff of QCHC, the facility's discharge planner, and senior staff of Hinds Behavioral Health.  There were three objectives for the meeting, which were (1) generally facilitate a closer working relationship between the facility and Hinds Behavioral Health, (2) assure that staff at the facility were well aware of wide range of services that Hinds Behavioral Health offered, and (3) explore ways for significantly increasing the rate of successful referrals to Hinds Behavioral Health (i.e., referrals that actually result in the released prisoner obtaining community-based, outpatient treatment). All three of these objectives were met.

Of particular interest was the joint discussion of what might be done to increase the rate of successful referrals.  A broad range of approaches were discussed including, for example, focusing interventions during the period of incarceration on stabilizing the prisoner and preparing the prisoner for follow-up outpatient treatment through the increased use of psychoeducation and discharge planning groups; better informing prisoners about the availability

of walk-in assessment services at Hinds Behavioral Health, which would be particularly helpful for prisoners who were unexpectedly released right from court; and bringing staff from Hinds Behavioral Health into the facility in order for prisoners who might be released to meet those staff persons, with the hope that that would increase the likelihood that prisoners would feel comfortable about going to Hinds Behavioral Health upon release from the facility. The feasibility of various options was also discussed. Then in addition, and most importantly, plans were made to continue discussions, further explore options, and develop actual plans for implementation.

There are issues that have complicated discharge planning and the successful referral of prisoners for community-based outpatient services. These issues include, for example, the uncertainty of a release date, and the fact that prisoners might be released directly from court without returning to the facility. Complications such as these were also discussed during this most recent joint meeting, and options for addressing such complications were also explored. This discussion made it all the more clear that in order to increase the rate of successful referrals for follow-up, outpatient treatment, and eliminate gaps in services (including the elimination of any period of time when a prisoner was without medication) discharge planning efforts have to be initiated virtually from the time that a prisoner enters the facility and discharge plans may have to include what happens under various different release scenarios.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. Any post orders must:
   a.   Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
   b.   Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**
The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders. Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner. The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. Documentation of NCIC reports at the time of release will be reviewed at the next site visit.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.    How to process release orders for each court, and whom to contact if a question arises;

        ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

        iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

        iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

Staffing in the Booking area continues to be unbalanced.  While there is routinely only one officer in the holding cell area (where two should be on duty at all times), there are two, three or more Booking Clerks on duty in the office area.  Considering the fact that only 14 people are booked on a typical day, this misallocation of manpower should be addressed.  When an average of just over one person is booked every two hours, it seems apparent that the number of personnel assigned to the office environment is excessive.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

    b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not prepared for errors in releasing.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Jail now has an individual whose title is Qualify Control Officer. At the present time, his work is primarily reactive. When an individual is brought to his attention, he researches the situation and takes corrective action. He does not track releases or prevent errors in the releasing process. He maintains a spreadsheet that includes release errors that he has addressed, but he does not at the present time collect and report on releasing errors. His work is not incorporated into a continuous improvement and quality assurance process. At the time of the site visit, the Quality Control Officer had completed a limited proactive review of several records and identified individuals whose JMS record did not adequately identify the basis for detention. Incorporating this practice into a standard procedure would help to meet the requirements of the Settlement Agreement.

Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. Like the Quality Control Officer, she operates independently of the booking and release process and maintains her own spreadsheets.  There still is no systemic approach to ensuring proper detention and release processes are being developed. This is being addressed by the monitoring team consultant in this area.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

Incident reports are not routinely created for untimely or erroneous prisoner release or any investigations of such incidents. The Quality Control Officer did investigate and report on an allegedly erroneous release at the time of the last site visit. There have been untimely releases and at least one additional alleged erroneous release that have not been investigated and reported.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.     The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

At the JDC and the WC it appears that there is adequate space, and enough staff available, to support timely attorney/client visits.  At the RDC the designated space for these visits is near the front of the jail, which means that inmates must be escorted by staff nearly the full length of the facility.  Considering the critical shortage of officers, it is difficult to deliver inmates in a timely fashion.  The original design of the jail called for attorneys to go to visitation rooms in the A, B and C Pods, but that practice halted years ago because those rooms are isolated and difficult to supervise.  As has been suggested in the Third, Fourth and Fifth Monitoring Reports, the DSD should take advantage of unused video visitation space in front of the control room officer's station in the A, B and C Pods and repurpose it as attorney/client visitation rooms.  With very little effort, and almost no expense, they can be easily transformed into secure rooms that meet the needs of the facility.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.     Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**

The County is making progress towards computerized incident and other reports as well as the development of manually created summary reports. However, at the present time there is no computerized tracking system. As a result, reports can't be aggregated by location, type, persons

involved, etc. It is reported that the Sheriff's office is working with the JMS vendor to see if this can be accomplished. There continues to be a concern because of the lack of reports or the small number of reports that some incidents, uses of force and grievances are underreported including late releases, lost money and property, and medical grievances. At least one incident involving use of force was reported by inmates but as of the next day the report could not be located in the system. The medical transport list also indicates visits to the ER for assault injuries where incident reports were not provided to the monitoring team. When provided, at least one of those incidents involving an inmate assault had a report for the medical transport but not the underlying incident. The manually created summary report for inmate assaults at RDC has not been consistent with a review of the actual incident reports, investigation reports and medical transport logs. For example, in July, the summary report said there were 5 inmate assaults when it appears from the underlying records that there were 14.

The new computerized grievance system does not allow for the compilation of a useful summary grievance report. Currently, this is not possible for several reasons. The reporting functions of the system are either problematic or not adequately conveyed to staff. Staff reported that they could not generate reports with identified parameters. If the prisoner replies via the kiosk in any fashion to the grievance response, that is then automatically converted to an appeal which inaccurately reflects the number of appeals. The system needs to be able to generate accurate reports.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
   a. Brief summary of all reportable incidents, by type, shift, housing unit, and date;
   b. Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
   c. The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
   d. List and total number of incident reports received during the reporting period;
   e. List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**
The County provided a monthly report of incidents in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph. Also, in reviewing the incident reports provided as compared to the summary reports, the summary reports for RDC

did not account for all of the inmate assault incidents that appear in the incident and investigation reports. At the present time, the manual report for RDC does not appear to be accurate. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated electronically. This should improve the accuracy of the summary report and better facilitate identifying problem areas.  Because they are manually compiled, it is difficult to identify trends over time. Even then, it will be essential to determine that reports are being submitted when they should be such that an accurate summary report can be generated.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

      a.      Summary of all uses of force, by type, shift, housing unit, and date;

      b.      List and total number of use of force reports received during the reporting period;

      c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of use of force in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph in that the reports are manually prepared each month and do not allow for identifying trends over time. As mentioned above, the IT department is working on a computerized report that should allow for a summary report to be generated. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated. As mentioned above, at least one use of force incident may have been unreported until it was brought to the supervisor's attention.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

As noted in the introduction to the Grievance section of the Settlement Agreement at paragraph 69, one function of a grievance system is to identify potential constitutional problems and to

prevent more serious problems from developing. The defects in the system prevent its use for meaningful tracking of potential problems. Probably the most problematic is that of the grievances reviewed, most were actually inmate requests, not grievances. Staff cannot recategorize these as inmate requests so any compilation will not accurately identify actual grievances. Within inmate requests, there is no way to identify subject matter so as to compile a report by the area of inmate requests. Even if there were, however, most notably, the system cannot generate a report by subject. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. At the present time, there is no review process in the grievance system.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

      a.      A brief summary of all completed investigations, by type, shift, housing unit, and date;

      b.      A listing of investigations referred for disciplinary action or other final disposition by type and date;

      c.      A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

      d.      A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

See response to paragraph 68.  Subsequent to the last site visit, the IAD investigator provided a summary sheet reflecting the status of IAD investigations since 2017; however, the level of detail included does not comply with all of the requirements of this paragraph.

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members.

The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action,

documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter.

114.   Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

    a.   Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

    b.   Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**

Medical Administration (MAC) meetings were held in February and May 2018.  The Deputy Jail Administrator is conducting the meetings while the Jail Administrator has been out on sick leave.

Quarterly Continuous Quality Improvement meetings are conducted. Topics have included discharge planning, TB skin tests, medication administration.  At the JDC, CQI studies included discharge planning, medication administration and compliance in conducting the suicide screen during the intake process

There were no critical incidents of deaths since the last site visit. During the May site visit a chart of RW who expired on 5/4/17 was located.  A request for medical records was made to the hospital on 5/18/17 but has not been received by the jail.  A mortality review was not conducted.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.   Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the

Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County has contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. The CJCC has been meeting regularly. In order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for compliance with the diversion and discharge planning requirements of the consent decree.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC is meeting regularly. Not all of the identified agencies have been represented at the meeting. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis,

including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC has just adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Further observation of the CJCC and the County's participation in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  If the listed tasks are achieved without being in the consulting contract, this requirement could be changed to compliant.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

a. A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

b. Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The HCSO has still not implemented this relatively simple solution.  Staff and inmates are not familiar with the details of the Settlement Agreement, which would not be the case if handbook sized copies of it were made available to all personnel (staff and inmates).

## POLICY AND PROCEDURE REVIEW

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  At the time of the last site visit, the plan to hire outside consultants for this had fallen through and there was no apparent progress. Since that time, jail staff has been working with Karen Albert of the Monitoring Team to develop policies and procedures and after the September site visit, several draft policies have been provided.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

See response to 130.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

See response to 130.

133.     No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**
See response to 130.

134.     Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Non-Compliant**
There have not yet been policies and procedures approved by the United States. This cannot happen until policies and procedures are provided to DOJ for approval.

135.     The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**
This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Partial Compliance**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May site visit. A self-assessment was provided the week prior to the September site visit. The assessment is a significant step forward but does not include the level of detail required by this paragraph.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Compliant**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

Immediate notifications have been provided. Comparing the notifications to the medical transport list, it appears that immediate notification of hospitalization is not always provided. The County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date and preparing incident reports

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2018, I electronically filed the Court-Appointed Monitor's Sixth Monitoring Report with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

COUNSEL FOR PLAINTIFF, UNITED STATES OF AMERICA:

ERIC S. DREIBAND
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
steven.rosenbaum@usdoj.gov

LAURA COWALL
Special Counsel
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
laura.cowall@usdoj.gov

D. MICHAEL HURST, JR..
U.S. Attorney
Southern District of Mississippi

CHRISTOPHER N. CHENG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-8892
(202) 514-6273 (fax)
christopher.cheng@usdoj.gov

CANDACE G. MAYBERRY
Assistant United States Attorney
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Suite 4.430
Jackson, MS 39201
(601) 973-2838
(601) 965-4409 (fax)
Candace.Mayberry@usdoj.gov

COUNSEL FOR DEFENDANTS – HINDS COUNTY; MEMBERS OF THE HINDS COUNTY
BOARD OF SUPERVISORS IN THEIR OFFICIAL CAPACITIES; THE SHERIFF OF HINDS
COUNTY IN HIS OFFICIAL CAPACITY:

PIETER TEEUWISSEN
Board Attorney
P.O. Box 686
Jackson, MS 39205-0686
(601) 968-6797
(601) 968-6794 (fax)
pteeuwissen@co.hinds.ms.us

CLAIRE BARKER
Counsel to the Sheriff
407 East Pascagoula Street
Jackson, MS  39205
(601) 974-2967
(Fax)
cbarker@co.hinds.ms.us

COUNSEL FOR INTERESTED PARTY, DISABILITY RIGHTS MISSISSIPPI:

ELISSA JOHNSON
JODY E. OWENS
PALOMA WU
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
(601) 948-8885 (Fax)
elissa.johnson@splcenter.org

/s  Christopher N. Cheng
CHRISTOPHER N. CHENG (PA Bar# 69066)
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-8892
(202) 514-4883 (fax)
christopher.cheng@usdoj.gov