Court-Appointed Monitor's Seventh Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish              Jim Moeser              Dr. Richard Dudley
Corrections Operations       Juvenile Justice        Corrections Mental Health

# EXECUTIVE SUMMARY

**Corrections Operations**

During the four months, between the September 2018 and January 2019 site visits, the Detention Services Division (DSD) has made no appreciable progress in three critical areas: staffing, security and the development of policies and procedures. Numerous physical plant problems such as the lack of fire safety equipment have not been addressed despite being raised repeatedly in prior monitoring reports. At the time of this site visit, ground had actually been lost in dealing with the issues of staffing and malfunctioning security doors.

Of the 433 needed positions, the DSD has 275 authorized positions of which 271 are funded. Of those, only 238 are currently filled including six personnel who were completing the recruit academy at the time of the site visit. Over the past year and a half, the number of filled positions has fluctuated between 231 and 251. The current number of officers available represents a decrease of 13 since the previous site visit. Although a salary increase for Detention Officers was implemented last year, the starting salary is still significantly lower than what their law enforcement counterparts receive. Further, no action has been taken with regard to the plan that was previously submitted by the Hinds County Sheriff's Office (HCSO) for a periodic step increase plan.

Because of the staff shortage, none of the general housing units at the Raymond Detention Center (RDC) have an officer assigned inside so as to permit direct supervision of the inmates. In fact, on separate day shift inspections during the January site visit, no officers were on duty (other than the control room officer) in two out of three pods. While there were officers on duty according to the roster, they were not in place to conduct well-being checks on the inmates in the housing units. In Housing Unit A1 (Juvenile) no officer was present. In Pod C, 1 ISO (Mental Health) and 4 ISO (Suicide Watch) were both covered by one officer. Technically, that is impossible, because inmates on suicide watch require constant supervision. On a subsequent inspection, the officer assigned to cover both of these posts was located sitting in a chair in the control room. As noted in previous reports, because of the shortage of staff, and the fact that no officers are assigned to work inside the housing units, assaults and escapes (to retrieve contraband from outside the facility) are often not discovered as they occur, rather after the fact. Since the time of the last site visit there were 30 inmate assaults reported at RDC including multiple stab wounds and lacerations. Then, in December, an inmate was murdered by other unidentified inmates in B3 by beating and stabbing reportedly over an extended period of time when no officer was present on the unit. An investigation of this incident is still in progress.

Policies and Procedures (and associated Post Orders) have still not been adopted. Since the time of the site visit, two policies, one on Pre-booking and one on Booking, have been formally adopted. Without the complete Policies and Procedures in place to guide staff on how to handle

day to day operational activities, the Detention Services Division (DSD) can never succeed in achieving compliance with most of the paragraphs of the Settlement Agreement.  A Policy Committee has been working on the development of the policies and procedures and currently, there are approximately a half dozen policies in process with two policies being adopted since the time of the site visit. Although this effort is commendable, the adoption of policies and procedures is significantly overdue.

The lack of policies and procedures results in changing and deficient practices. At the Work Center (WC) and RDC well-being checks are recorded sporadically.  They are most frequently noted during the midnight shift when there is little activity.  During the day and evening shifts there are lengthy gaps, often from six to eight hours.  In B4 at the RDC Confinement/Segregation logs should be maintained every half hour, but they are listed hourly, however, individual well-being sheets on each inmate are signed every half hour.  When an inspection was conducted of B4 with the assigned officer, he said that he used a flashlight so that he could see inside the individual cells, but he did not have it with him.  When the flashlight was subsequently located in the control room it did not function.  He also indicated that unidentified supervisors had changed the practice of checking on all inmates in B4 on a 30-minute basis and that the requirement to do so no longer applied to protective custody inmates.  In B4 ISO the officer was found to be using an hourly well-being check form.  The previously approved form calls for 30-minute well-being checks.  In Booking, the officer assigned to observe inmates in the holding cells was using a 30-minute observation log form, not the 15-minute form that is supposed to be used.

Inoperative and malfunctioning security doors throughout the Jail System have always been a significant problem, as has been documented in detail in each of the previous Monitoring Reports.  Unfortunately, instead of making progress toward rectifying this situation, Hinds County has allowed it to degenerate to a critical and dangerous level.  Because [1] so many of the housing unit entry slider doors at the RDC no longer work, [2] there is only one set of keys available in each pod and [3] the retrofitted safety vestibule (cage) doors are left open when officers enter the units, there is the potential for a large-scale security breach.  Prompt corrective action must be taken to prevent such an eventuality from occurring.  The list of other maintenance problems in the Jail System has been covered in each previous Monitoring Report.

Apparently recognizing the physical plant deficiencies, particularly at the RDC, the approach at that facility has been to develop a Crisis Emergency Response Team (CERT) to deal with emergencies and uncooperative inmates.  While the concept has merit, it was implemented without guidance on how such a team should function in a detention setting.  Consequently, officers use less than lethal tools such as OC and Tasers and less than lethal shot guns in an offensive or coercive manner to make inmates comply with verbal commands instead of

defensively and only proportional to the risk of injury. This improper use of force practice must be corrected through proper training and by developing an acceptable use of force policy.

The ongoing effort to reinstitute a direct supervision operational philosophy in the DSD facilities was delayed by the recent federal government shutdown. It caused the "Train the Trainers" orientation scheduled for mid-February 2019, to be postponed. Once the National Institute of Corrections (NIC) can reschedule the training it will be possible for DSD staff to be properly oriented so that they can manage a direct supervision housing unit.

Classification had been moving towards use of an objective classification tool but as reported in the last monitoring report, with a change in personnel, there had been a shift back to a charge-based system. As was observed in the last visit, after the tool is scored and if the charge category is higher than the resulting score, the score is routinely overridden to match the charge level effectively returning to a charge-based system. Because it has been assumed that misdemeanor defendants will always go to the WC, Booking will sometimes send them to WC before they are classified. All persons charged with misdemeanors are sent to the WC regardless of the risk score. In fact, there were inmates at the WC, a low custody facility, in red jump suits, indicating a high-risk level; the placement being based on the misdemeanor charge instead of the risk score.

Fire safety should be one of the most critical areas of concern in operating a jail, yet at the RDC fire extinguishers and fire hoses were removed from the housing units years ago after the unit officers were pulled from their posts. Without direct supervision the inmates vandalized the facility, so the equipment has never been reinstalled, leaving both inmates and staff in jeopardy.

**Medical and Mental Health**

Since the September 2018 site visit, there have continued to be significant and quite meaningful advances with regard to the provision of core mental health services, and the provision of these services is clearly documented in well maintained medical records and by the 'mental health tracking log'. During this monitoring period, there has also been a significant increase in the mental health case load (from 130 to 177), most of whom (168) are seriously mentally ill, and this increase appears to be at least in part due to the improved capacity of the mental health team to identify mentally ill prisoners and maintain them in treatment.

The most critical issue at this point is addressing the fact that the hours of service provided by the psychiatrist is woefully inadequate to respond to all of the mental health provisions of the Settlement Agreement in a way that meets even the most minimum standard of practice. QCHC (the medical and mental health services provider) has proposed a reasonable remedy that is awaiting approval by the County, which will hopefully be quickly approved and implemented.

Other mental health priorities include (1) implementation of plans to expand the therapeutic interventions available for seriously mentally ill prisoners, (2) implementation of a more comprehensive approach to discharge planning and referral for community-based mental health services, (3) the provision of mental health input into important security functions once security policies and procedures which will detail those areas of overlap with mental health have been developed, (4) the eventual development of a mental health unit, and (5) developing a more rigorous mental health quality assessment program.

**Youthful Offenders**

Because at the time of the site visit there was only one youthful prisoner remaining at the RDC, time on-site was exclusively devoted to the Henley Young facility.  Again, that provided an opportunity to interview more youth, engage in constructive conversations with facility leadership and other key staff, and review selected records related to incidents and the use of confinement for disciplinary purposes.  At the time of the visit there were fourteen Juveniles Charged as Adults (JCAs) at Henley Young, including two girls, as well as 8 "non" JCA" youth (6 boys and 2 girls).

The final youth at RDC "aged out" on February 13. At the time of the October site visit, a decision had been made to move youth back to RDC once they had been convicted even though they were still juveniles. This resulted in significantly worse conditions of confinement for the youth and would mean that RDC would have to provide all the services and comply with all the provisions of the Settlement Agreement related to holding juveniles at RDC. This prior decision was discussed and it was recommended that it would no longer be the practice.  Assuming this policy of retaining youth at Henley Young is followed, this is a significant step forward in improving the conditions of confinement for youthful prisoners.

There has continued to be incremental progress toward compliance at Henley Young in some areas and little to no change in others from the last site visit.  For example, there has been: (1) a reduction in the frequency and duration of the use of room confinement as a disciplinary tool; (2) a stabilization of the population of both the youth charged as adults as well as the traditional youth held at Henley Young; (3) the start of implementation, albeit on a limited basis, of a behavioral point/incentive system that moves practice closer to the outcome intended in the agreement and (4) some progress in the functioning of the GED program and inclusion of more youth in the more normative classroom programming.  While much work remains in these areas, the progress does reflect key facility leadership's intent to improve practices at Henley Young.

Significant concerns remain in a number of areas, including: (1) the limited time provided to achieve anywhere near optimal functioning of the mental health team, particularly as it relates to limits on the time allotted to the psychologist and psychiatrist position(s); (2) there have been no

changes in the physical plant/facility that is necessary to provide the level of programming required by the Settlement Agreement or address some of the security and safety concerns that have been expressed in prior reports and/or by staff leadership; and (3) there is no evidence of change in the general case processing for juvenile prisoners, including extensive delays in obtaining indictments for incarcerated youth and moving the case through the court system.

While there is some hope for progress on improving the case processing system, there is little evidence of a County commitment to changes in other areas despite repeated claims that some funds have been "set aside" to support additional improvements at Henley Young. Of most immediate concern is that the psychologist position (Dr. Payne) has remained at a .5 FTE allocation, limiting progress in a number of areas (assessment, individualized case planning, treatment team coordination, and others).  Steps should be taken as soon as possible to increase allocation for that position to full-time and hopefully retain Dr. Payne.

An additional note needs to be taken that with the recent election of Mr. Johnnie McDaniels, former Executive Director of Henley Young, to judicial office the County again is in the process of recruiting and selecting an Executive Director.  This position has seen considerable turnover over the last decade, so it will be important to not only find the right person to fill that role but hopefully someone that will stay in that position in the coming years.

**Criminal Justice and System Issues**

The records system continues to improve. However, it is still not possible to run accurate reports out of the data system and staff rely on their own manual spreadsheets instead of the JMS system. Some practices exacerbate the limitations of the JMS system. The Warrants Division within the Sheriff's Office does not use the JMS system, and does not enter warrants into the JMS system so warrants known by one arm of the Sheriff's Office are not known to another. Warrants arising after a person is booked are not known to the Records Office. There were a few examples of persons for whom there was no lawful basis for detention at the time of booking. There were a number of examples of persons who were lawfully booked but detained beyond when they should have been released. Staff are not adhering to the deadlines in the law with respect to first appearances and probation violation hearings citing communications problems with other agencies.  Two individuals manually track first appearances and probation violations. However, there is still no proactive audit of records to ensure that the records are accurate especially with respect to the basis for detention.

The CJCC has not had consistent participation by a number of stakeholders. This has limited its effectiveness. Reducing the jail population is one method for addressing the severe staffing shortage. However, the CJCC or some collaborative body will be needed to implement most jail population reduction strategies. The monitoring team has recommended that the County hire a

CJCC coordinator to improve the effectiveness of the CJCC. This has not been done and the County has not renewed the contract of the CJCC consultant.

A chronic problem contributing to the jail population and the lack of sufficient staffing is the continued incarceration of unindicted individuals and the extraordinary length of time to disposition of cases. A recent review of length of stay at the Jail showed 16 individuals staying more than 1000 days at the Jail. And, there were another 131 individuals held in the Jail for more than a year. The average length of stay was approximately 50 days; about twice the national average. https://www.bjs.gov/content/pub/pdf/cjpc9913.pdf Although the Fifth Circuit has held that detention beyond 90 days of unindicted individuals is unconstitutional, this holding has not been operationalized. Jauch v. Choctaw County, 874 F. 3rd 425 (5th Cir. 2017). The Jail is understandably reluctant to release individuals without a court order and the courts are reluctant to order the release of individuals charged with serious crimes without action by the District Attorney. This logjam overpopulating the Jail, imposing a burden on taxpayers, and creating serious hardship to individuals in the system needs to be addressed.

At the time of the last site visit, four individuals were incarcerated at the WC on court orders related to fines and fees that did not meet the requirements of the law or the Settlement Agreement. This has been for the most part rectified although there was at least one individual at the WC whose court order did not appear on its face to meet these requirements and at least one other court order that was ambiguous in this regard. As new judges are elected, these requirements will have to continue to be addressed by following the requirements of the Settlement Agreement.

The kiosk grievance system continues to present problems. During this site visit, in order to check whether there were outstanding grievances that had fallen off the dashboard, a report was run for grievances assigned but not answered starting from July 1, 2018. The report showed 972 grievances unanswered after 21 days. There is no structured system to ensure that all grievances are actually answered; no oversight to review whether responses are adequate; and no oversight to determine that promised actions are actually completed. This is in part a problem with the kiosk system and in part, a lack of clearly defined roles through policies and procedures.

**Monitoring Activities**

The Monitoring Team conducted a Site Visit January 15th through January 18th. The site visit schedule was as follows:

January 15th through January 18th Site Visit Schedule

| Date and Time | Lisa Simpson | Dave Parrish | Jim Moeser | Dr. Richard Dudley |
|---|---|---|---|---|
| Monday 4:00 | Meet with Daryl Graves | | | |
| Monday evening | Team Meeting | Team Meeting | Team Meeting | Team Meeting |
| Tuesday A.M. | Meet with Rushing and command staff<br><br>Meet with County Attorney and Sheriff Attorney re strategies | Meet with Rushing and command staff<br><br>Tour RDC booking | Met @ Henley Young with: Operations Manager (Eddie Burnside); Quality Assurance Manager (Eric Dorsey); School Principal (Mr. Devine) | Meet with mental health team<br><br>Observe Booking and Intake |
| Tuesday P.M. | Meet with County Attorney re jail population reduction | Tour RDC | Met @ HY with: Psychologist (Dr. Payne); Judge McDaniels; Two Youth Support Specialists; Two Qualified Mental Health Professionals; | Meet with QCHC |
| 4:30 | Meet with Judge Reeves | Meet with Judge Reeves | Meet with Judge Reeves | Meet with Judge Reeves |
| Wednesday A.M. | Meet with Captains (including Miller) and Major re critical incidents<br><br>RDC tour units | Meet with command staff re critical incidents<br><br>RDC | Met w.Training Officer (Mr. Hines) and Review training materials; | Tour RDC<br><br>Observe med pass<br><br>Meet with discharge planner |
| Wednesday P.M. | Meet with Tanecka Moore review hard copy reports- PREA reports Review medical records related to incidents | Meet with Captain Miller<br><br>Meet with Lt. Funchess<br><br>RDC | @ HY observe classroom & interview 4 JCA youth; Review Incident Reports & Due Process Log | Review records<br><br>Meet with Education Department |

| | JDC | | | |
|---|---|---|---|---|
| Thursday A.M. | HY | Meet with Marlo Brinnon and Freddie Singleton | @ HY: Interview one JCA youth (female); Exit discussion(s) with Mr. Burnside and Mr. Dorsey; | Meet with security and MH leadership |
| | | RDC | | |
| Thursday P.M. | Meet with Kenny Lewis Kenisha Jones Sgt. Tillman Classification-Lt. George | WC | Met with staff from Southern Poverty Law Center; Prepare exit interview summary | Observe weekly segregation rounds Interview inmates in segregation |
| Friday A.M. 10:30 | Exit meeting Meet with County and Sheriff leadership to discuss recruitment, retention and training | Exit meeting Meet with County and Sheriff leadership to discuss recruitment, retention and training | | Exit meeting |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Henley Young are included in the totals in this chart. This is a change from the last report which showed compliance at RDC in the totals. The reason for this is that by the time of this report there should be no more juveniles at RDC with the last one aging out as of February.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |

| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
|---|---|---|---|---|---|---|
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15/18/19 | 1 | 1 | 44 | 0 | 46 | 92 |

# INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a. Booking;
    b. Objective classification;
    c. Housing assignments;
    d. Prisoner supervision;
    e. Prisoner welfare and security checks ("rounds");
    f. Posts and post orders;
    g. Searches;
    h. Use of force;
    i. Incident reporting;
    j. Internal investigations;
    k. Prisoner rights;
    l. Medical and mental health care;
    m. Exercise and treatment activities;
    n. Laundry;
    o. Food services;
    p. Hygiene;
    q. Emergency procedures;
    r. Grievance procedures; and
    s. Sexual abuse and misconduct.

**Non-Compliant**

There has been no significant change with regard to this provision since the Sixth Monitoring Report.  At the time of the site visit, only six draft policies had been submitted to the DOJ and Monitor for review and none had been adopted or implemented.  Since the time of the site visit, two policies have been adopted and two new policies have been provided for review. Without a Policies and Procedures Manual (and accompanying Post Orders) Hinds County cannot comply with most of the Settlement Agreement and staff are left without direction other than verbal orders and sporadic memos.  For example, several months ago DSD command staff and the monitoring team set in place a practice for documenting 30-minute well-being checks of inmates in confinement (segregation) housing.  During the January site visit the procedure was found to have been changed to discontinue 30-minute logged well-being checks for inmates in protective custody.  When questioned as to who directed the change in procedure, the response from officers was that unspecified supervisors verbally directed it.  This needs to be addressed in policies and post orders so that proper practices are not modified randomly by individual officers or supervisors.

Over the past two years the HCSO has gone through negotiations with various vendors and agencies to help them draft policies and procedures, but has never finalized an agreement.  Currently, the Monitor's expert who was brought on board to assist in the consolidation of Classification and Records into a single, cohesive unit, has taken the lead on policy development.

As noted in the last monitoring report, the full range of required mental health policies and procedures that cover areas for which the mental health team is fully and virtually solely responsible have been developed and implemented.  (See other sections of this report for a discussion of security policies and procedures that require mental health involvement and/or otherwise impact on the work of the mental health team.)  As the policies and procedures are operationalized, there is an internal and external focus on assessing the adequacy of the policies and procedures, the adequacy of training on the policies and procedures, and the quality of the services provided, particularly with regard to whether or not full compliance with the policies and procedures ultimately addresses the provisions of the agreement.

A recent incident provides an example of the type of assessment described above and the importance of such an assessment.  The incident involved a female detainee who had alleged that she had been sexually abused.  Following an investigation, it was the opinion of the PREA Officer that the allegation was unfounded, and although the detainee was not on the mental health caseload, the PREA Officer had reason to believe that she was seriously mentally ill.  Further review revealed that at intake, the detainee reported a history of mental illness, including possible Bipolar Disorder, and substance abuse; at intake, it was also suspected that she was delusional; and so, she was immediately referred for a mental health evaluation.  However, she

11

then refused to fully participate in the mental health evaluation, saying that there was nothing wrong with her; and so, the psychiatrist dropped her from the mental health caseload due to her noncompliance; and therefore, she had not received any mental health treatment at the facility.  It is also important to note here that this detainee was not the only detainee that the psychiatrist had dropped from the mental health caseload due to noncompliance.

Dropping mentally ill detainees from the mental health caseload because of noncompliance is inconsistent with the provisions of the Settlement Agreement and simply unacceptable.  Instead, when a mentally ill detainee refuses to comply with mental health treatment that is clearly indicated and required, a protocol should be initiated that includes repeated efforts to obtain compliance, coupled with an ongoing assessment of whether or not the detainee is so ill (i.e., so as to be a danger to self or others as result of mental illness) that other interventions are required (such as treatment against the detainee's will, placement in a secure setting, etc.). QCHC administration and the mental health team took on the task of developing a corrective action plan.

As mentioned in prior reports, there are multiple mental health related provisions that cannot be addressed by mental health staff alone.  These include, for example, the participation of mental health in the disciplinary review process, the participation of mental health in the segregation review process, incidences where there is an anticipated/planned use of force and incidences where there has already been a use of force, and the roles and responsibilities of mental health with regard to PREA.  Security policies and procedures that would address these issues have still not been developed.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Non-Compliant**

As was stated in the Sixth Monitoring Report, this paragraph was previously carried as being in Partial Compliance, but was reduced to Non-Compliant when a new Assistant Jail Administrator was appointed in spite of that fact that he does not meet the qualifications for the position.  As has been noted, personnel hired prior to the effective date of the Settlement Agreement have understandably been retained even when not meeting the requirements of the Settlement Agreement. However, hiring and promotions after the effective date of the Settlement Agreement and inconsistent with its requirements have to result in a finding of non-compliance.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

Until there are approved policies and procedures in place, the supervisors will not be able to become familiar with them.  There have been no promotions within the DSD since the September 2018 site visit.  The personnel histories of a number of supervisors promoted at the time of the last site visit indicate that individuals who have what should be disqualifying backgrounds, are nevertheless hired and/or promoted. These were listed in the 6th Monitoring Report. When questioned regarding specific requirements of the Settlement Agreement, most supervisors are unable to articulate knowledgeable responses.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Partial Compliance**

While the HCSO Director of Human Resources conducted a review of most DSD personnel files that supported compliance with this paragraph, the personnel histories of a number of supervisors indicate that individuals who have what should be disqualifying backgrounds, are nevertheless hired and/or promoted. These were listed in the 6th Monitoring Report.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

There has been no change in the status of this paragraph.  The Policies and Procedures Manual has yet to be published.  Even when that is done, the physical design of the Jackson Detention Center (JDC), which is a linear facility, make implementation of direct supervision there an impossibility.  "Train the Trainers" support, through NIC was supposed to occur at the WC and RDC in mid-February, but the federal government shutdown forced that effort to be postponed. This is now scheduled for March.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

a. Hire and retain sufficient numbers of detention officers to ensure that:
   i. There are at least two detention officers in each control room at all times;
   ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;
   iii. There are rovers to provide backup and assistance to other posts;
   iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;
   v. There are sufficient detention officers to implement this Agreement.

b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement. As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below. The study or study update must be completed within six months of the Effective Date and must include the following elements:
   i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.
   ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.
   iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations. Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement. The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

As was previously reported, this paragraph was downgraded from Partial Compliance to Non-Compliant in the Fifth Monitoring Report because of the lack of progress in filling existing positions.  Since then there was a slight improvement, followed by another drop.  At present, only 238 of the 275 authorized positions (271 funded) are filled.  Six of those officers were still in the academy at the time of the site visit.  During the past year and a half, the number of filled positions has fluctuated from a high of 251 to a low of 231.  It should be noted that based on the staffing analysis, 433 positions are required to staff all three facilities. The goal of 275 positions was intended to be an interim benchmark.

At the JDC, 49 Detention Officers of the 83.6 positions are filled, but staff are able to get by primarily because the count at the time of the site visit was 121, which is 71 below the facility's rated capacity of 192.  The required number of positions, however, is not reduced by the lower population. At the WC 56 Detention Officers of the 64.1 positions are filled.  All four housing units are finally open.  Housing Unit 4 was opened during the January site visit.  While the WC currently houses only 174 inmates, which is 82 below its rated capacity of 256, similar to JDC, the required number of positions is not reduced by the lower population. The WC is capable of handling additional population if security modifications are made to the housing unit fire exit doors.  The WC currently posts individuals there because they are not operating the units entirely consistent with principles of direct supervision. Once the fire doors are modified and the NIC direct supervision training has been accomplished the individuals at the fire doors can be located elsewhere.

At the RDC where only 127 Detention Officers of the required 280.4 positions are filled (45%), lack of staff is still a critical issue. At the time of the site visit, there were 361 inmates, which is 462 below the facility's rated capacity of 792. This has allowed the closure of two units resulting in some savings of needed staff positions. If two additional units could be closed such that a pod could be closed, there would be a savings of 35 needed staff positions. Because of the staff shortage, none of the general housing units have an officer assigned inside so as to permit direct supervision of the inmates.  In fact, on separate day shift inspections during the January site visit, no officers were on duty (other than the control room officer) in two out of three pods.  While there were officers on duty according to the roster, they were not in place to conduct well-being checks on the inmates in the housing units.  In Housing Unit A1 (Juvenile) no officer was present.  In Pod C, 1 ISO (Mental Health) and 4 ISO (Suicide Watch) were both covered by one officer.  Technically, that is impossible, because inmates on suicide watch require constant supervision.  On a subsequent inspection, the officer assigned to cover both of these posts was located sitting in a chair in the control room.  As noted in previous reports, because of the shortage of staff, and the fact that no officers are assigned to work inside the housing units, assaults and escapes (to retrieve contraband from outside the facility) are often not discovered as they occur, rather after the fact. Since the time of the last site visit there were 30 inmate assaults

reported at RDC including multiple stab wounds and lacerations. Then, in December, an inmate was murdered by other unidentified inmates in B3 by beating and stabbing reportedly over an extended period of time when no officer was present on the unit. An investigation of this incident is still in progress.

While the County has prepared a staffing study that identifies all of the posts and positions that are required to operate the Jail System, hiring sufficient officers to fill those positions has not been accomplished, nor has an annual update of the plan been undertaken.  Although the HCSO has submitted a recommended salary step system whereby employees would receive periodic increases, the County has yet to take any action on the proposal.

    f.  Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

        i.  The classification process must be handled by qualified staff who have additional training and experience on classification.

        ii.  The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

        iii.  Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

        iv.  The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

        v.  The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi.  The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Non-Compliant**

The shift back to a charge-based system continues as described in the last report. As part of the work with Karen Albert of the monitoring team, an objective classification tool had been adopted and was being used. However, with the change in leadership in Classification, the system moved back to a charge-based system. As was observed in the last visit, after the tool is scored and if the charge category is higher than the resulting score, the score is routinely overridden to match the charge level effectively returning to a charge-based system. Four charts were reviewed and this was observed in 3 of the 4 charts. In the fourth chart, the charge level was consistent with the score. It was also noted that two of the factors were not being calculated accurately. Inmates are sometimes being classified at RDC before being sent to the WC but because it has been assumed that misdemeanor defendants will always go to the WC, Booking will sometimes send them to WC before they are classified. All persons charged with misdemeanors are sent to the WC regardless of the risk score. In fact, there were inmates at the WC, a low custody facility, in red jump suits, indicating a high-risk level.

The coverage for Classification has not changed and leaves a few gaps in the ability to timely classify incoming inmates. With the staffing changes, the Classification team is close to being able to classify at the time of booking at RDC. However, there is no coverage at RDC from 7:00 a.m. Saturday morning to 7:00 a.m. Monday morning. Also, because persons charged with misdemeanors are sent to the WC before classification and the Classification officer at the WC works 7:00 a.m. to 4:00 p.m. Tuesday through Saturday, there are individuals who are not getting classified in a timely manner. It has been suggested that these individuals should be classified at RDC before being transferred to the WC. Similarly, because of staffing limitations at JDC, females who are transferred to JDC before classification are not always classified at the time of booking.

Although all cell assignments and inmate transfers are supposed to be cleared through Classification, there is no policy in place that requires that action, consequently, supervisors sometimes make such transfers on their own.  While the Jail Administrator made a policy decision to end the practice of assignment of inmates to housing according to gang affiliation two years ago, the lack of supervision within the housing units at the RDC makes it impossible to stop physical conflict from developing between competing groups of gang members housed in

the same unit. In addition, elimination of gang pods without having moved to an objective risk-based classification system has the potential of increasing the risk of violence and, in fact, several incidents of gang violence have occurred in the last six months.

g. Develop and implement positive approaches for promoting safety within the Jail including:
  i. Providing all prisoners with at least 5 hours of outdoor recreation per week;
  ii. Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;
  iii. Creating work opportunities, including the possibility of paid employment;
  iv. Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;
  v. Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;
  vi. Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;
  vii. Providing reasonable opportunities for visitation.
h. Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.
i. Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g)(i), five hours of outdoor recreation per week is not provided to all inmates in the Jail System although progress has been made towards that at each facility.  At the JDC there has never been an outdoor recreation yard.  Inmates are allowed to spend time in the fifth-floor multi-purpose room (indoor recreation time) and the indoor car wash area.  A recreation log is

maintained, but it does not reflect the length of time for each recreation period.  A review of this log for the first two weeks of January 2019 revealed that inmates were taken to the 5th floor multi-purpose room on five days and to the indoor car wash area once.  Half of those days were dedicated to female inmates and half to male inmates which means that each group had an opportunity for out of cell time that qualifies as recreation (though not outdoor recreation) a total of only one- and one-half times per week.  (Staff reported less frequent opportunities based on smaller groups being taken at any one time. This will be evaluated further.) Compliance with this paragraph cannot be achieved until an outdoor recreation yard is constructed on the roof of the jail.  At the WC each recreation yard is shared by two housing units.  A separate recreation log is now maintained; it includes the housing unit number and the length of time that the recreation yard was open, making it possible to determine how much outdoor time is provided.  A review of this log from December 28, 2018 to January 10, 2019 revealed that each housing unit was afforded outdoor recreation an average of seven hours per week.  At the RDC inmates went without outdoor recreation for over five years, but during the January site visit, some inmates were observed utilizing the recreation yards again.  Since the RDC does not maintain a recreation log it is not possible to determine how much outdoor recreation time inmates are afforded. Accordingly, the WC is the only facility that is within compliance with regard to the outside recreation standard.

Regarding 42 (g) (iv) During the last twelve months, the mental health program has made enormous progress.

At the time of this site visit, there were 177 detainees on the mental health case load.  Referrals for a mental health evaluation and treatment came from a variety of sources; the most common source of referral was the intake nurse; and the intake nurse made such a referral because the detainee reported a history of mental illness and/or at least appeared to be suffering from mental illness at the point of intake.  Other sources of referral included the 'Form #3' (a mental health screening form completed by each new admission at the time of intake, which is then sent to the Medical Department for review and any indicated action), medical staff, self-referral, and occasionally security staff.  In addition, mental health staff identified detainees in need of a mental health evaluation and treatment during the weekly rounds in segregation, etc.  Whether or not this collection of referral sources captures all detainees who would benefit from mental health treatment in a timely manner has yet to be determined, and approaches to trying to answer that question still need to be developed.

There continues to be an issue of defining the target population for the mental health case load as described in previous monitoring reports.  In other words, is the target population just those who would be described as 'seriously mentally ill' or should it also include detainees who suffer from other mental health difficulties that cause them considerable distress and that significantly impact on their ability to function?  There continue to be efforts to clarify this issue, made all the more

difficult by the fact that the mental health case load is already full of detainees who are defined as seriously mentally ill.

In the medical records of virtually all of the detainees on the mental health case load there were mental health evaluations, treatment plans, progress/treatment notes, and psychiatric follow-up notes for those on medication ("virtually all" because four detainees on the mental health case load have so far refused to be formally evaluated or treated). Due to staffing issues, especially the very limited availability of the psychiatrist, there is still no treatment planning and treatment plan review at mental health team meetings that would allow for a more integrated, interdisciplinary approach to treatment planning and the periodic review of treatment plans. However, it is anticipated that once staffing issues are addressed, this issue will be addressed.

As was noted in the last monitoring report, a 'mental health tracking log' has been developed and it continues to be well maintained. The log lists all detainees on the mental health case load; each detainee's location, booking date, and length of stay in the facility; how and when each detainee was referred to mental health; and information regarding the initial mental health assessment, the initial psychiatric assessment, diagnosis, the treatment plan, any medication, and next scheduled visit. This log facilitates both the internal and external monitoring of the provision of mental health services, particularly with regard to compliance with policy and the performance of procedures in a timely manner.

The next step is the development of mechanisms for the internal and external assessment of the quality of the mental health services provided. Initiation of the above noted treatment plan review process will certainly be an important part of that effort, in that there will be a regularly scheduled review of whether or not each detainee's treatment is addressing the goals of the detainee's treatment plan. It should be noted that there were findings during this most recent site visit that would at least suggest that the quality of the mental health services has continued to improve. These findings include, for example, a significant decrease in manipulative/acting-out behavior by detainees on the mental health case load; a significant decrease in the number of detainees placed on suicide watch, and a shorter length of stay on suicide watch; and fewer referrals for emergency mental health sessions in between scheduled mental health follow-up sessions. However, consideration should be given to what other mechanisms might be employed to more formally assess the quality of the mental health services provided.

Finally, it has already been established that there is a need to develop additional mental health interventions that are not currently available at the facility in order to comply with this provision requiring appropriate treatment and therapeutic housing; and it is anticipated that such an enhancement of mental health services would, in addition, significantly improve the quality of the treatment for such detainees, improve their ability to function within the facility, and increase the likelihood that detainees would continue treatment upon their release from the facility and

thereby decrease the likelihood of recidivism. Planned, additional mental health services include a group therapy program with groups focused on the development of social skills, conflict resolution, substance abuse, dual-diagnosis (i.e. those with substance abuse issues and some other major mental illness), and parenting. There is also a need for psychoeducational groups (focused on learning about one's mental illness, the need for treatment, and the responsibilities for fully participating on one's own treatment), medication management groups, and discharge planning groups. In addition, the mental health team has identified the need to better integrate other services provided at the facility into mental health treatment plans; such other services include, for example, competency training, ministerial work, and the ASU Collaborative's diversion program for individuals with serious mental illness; and so therefore efforts are underway to work more cooperatively with the providers of these other services. Then ultimately, there is the need for a mental health unit, where seriously mentally ill inmates can receive this enhanced range of services in a coordinated and integrated way, within a more therapeutic setting.

As mentioned, staffing levels continue to impact the ability to provide the mental health services required by the Settlement Agreement. At present, the mental health team consists of two full-time QMHPs (the mental health coordinator and another full-time social worker), a very part-time psychologist, and a very part-time psychiatrist. At the time of this site visit, the mental health case load included 177 detainees housed at three different sites, 168 if whom were on medication and considered to be seriously mentally ill. In addition to providing direct, follow-up clinical services to those on the mental health case load, the mental health team has other responsibilities such as mental health assessments of new admissions, the more intensive management and monitoring of suicidal detainees and other more acutely ill detainees, responding to other mental health emergencies, weekly rounds in segregation, and a range of administrative tasks (maintaining records, logs, etc. and attendance at staff meetings and conferences focused on treatment planning, discharge planning, etc.). Furthermore, the two full-time QMHPs and the part-time psychologist rotate weekend call for mental health (which includes checking-in multiple times during the weekend with each facility, seeing detainees on suicide watch or other special watch, and also coming in to assess and manage any acute mental health emergencies), and they do this in addition to their full weekday schedule, and the psychiatrist is also on telephone call virtually all of the time. It should also be noted here that there is a planned expansion of the range of mental health services provided; such an expansion is required to adequately address the treatment needs of the seriously mentally ill and respond to many of the provisions of this agreement; but at present, there are not enough staff to initiate this planned expansion. Then, once security policies and procedures are developed and implemented, the mental health team will have additional tasks, such as participation in the segregation review process and the disciplinary review process.

As was noted in the last monitoring report, the most critical staffing issue is the fact that there is inadequate psychiatric time to meet the provisions of the agreement and any reasonable standard of care.  More specifically, there is a list of responsibilities that must be assumed by psychiatrists or other mental health professionals who are licensed to assume some of the responsibilities. This list of responsibilities were detailed in the last monitoring report, as was the fact that the very limited amount of time the psychiatrist was at each of the facilities wasn't even enough time to prescribe for and supervise the psychopharmacologic treatment of what was then only 100 detainees on medication.  In response to this critical shortage of psychiatric time, QCHC has proposed adding one full-time equivalent psychiatric nurse clinician (two half-time positions) to the mental health team; consistent with the standards promulgated by the Mississippi Board of Nursing, the nurse clinicians would have on-site psychiatric supervision; and QCHC has asked the County to amend the contract with QCHC to include this additional full-time equivalent staff line.  Based upon the QCHC proposal and applicable Mississippi standards, it at least appears that this QCHC proposal would address this critical shortage of psychiatric time.

Although the shortage of psychiatric time is the most critical mental health staffing issue, there is a shortage of other staff as well.  More specifically, at present, each of the two existing QMHPs makes approximately 80 detainee/patient contacts each week.  Given all of the other things that they are trying to do (described above), at multiple facilities, these 80 contacts are obviously far too short and, of necessity, limited in their scope.  Furthermore, this leaves virtually no time at all for expanding the range of therapeutic interventions required to address all of the provisions of the agreement.  (For a discussion of plans to expand/enhance mental health programming, see section 42 of this report.)  During this site visit there was a discussion about the need for an additional QMHP and/or a mental health tech who would assume some of the administrative responsibilities; multiple issues came up during the course of that discussion; and therefore, further assessment and discussion of mental health staffing needs should continue once the psychiatric nurse clinicians are brought on board.

Regarding 42 (g) (vi) In order to evaluate the screening process during this site visit, the mental health monitor followed a new admission (who was apparently transferred from another facility) through each stage of the Jail's booking and health assessment/intake process. Although this was only one admission, the process raised a number of concerns about the adequacy of the screening process.

During the booking process, the mental health and other heath questions were reasonable and included such basic questions as a history of mental health or other health difficulties, hospitalizations, and medications.  There is not much in the way of privacy during the booking process; and so it is quite possible that a new admission might not openly respond to even these most basic questions, particularly with regard to mental health or certain physical health difficulties such as HIV status or other sexually transmitted diseases; and the booking officer

22

even seemed to acknowledge this to some extent, in that the officer informed the new admission that the next step in the process would be medical, and he could talk to the nurse about any health or mental health difficulties that he didn't want to talk to the booking officer about. However, in this case, the new admission did report a history of being hospitalized for mental illness and reported that he had previously attempted suicide; but then he was not asked if he currently felt like hurting himself; and he was not constantly observed until he was seen by the intake nurse or immediately referred for an urgent mental health assessment.

The policy group facilitated by Karen Albert has recommended some minor renovations to the booking area that would address the lack of privacy as well as other issues and improve the efficiency of the booking process. Completion of these recommended renovations would resolve this issue.

When this new admission was seen by the intake nurse, he was asked a long list of questions in a way that overly influenced his responses and limited any real discussion.  For example, 'you don't have x, y or z do you?'.  In addition, although his affect was blunted, his legs were constantly shaking, and he repeatedly asked for water, none of this was recognized and explored by the nurse.

It did not appear that the nurse knew that at booking, the new admission had reported a history of being hospitalized for mental illness and had reported that he had previously attempted suicide. The reported history of suicide attempts did not come up during the interview with the intake nurse, and since the intake nurse at least didn't appear to know what he had told the booking officer, she didn't bring it up and explore it as part of the nursing assessment.  However, he did tell the intake nurse that he had been stabbed in the arm during a fight the previous day (this had not come up during the booking process); the nurse examined the hole in his forearm; but the nurse did not ask any questions about the fight in an effort to determine whether there were any psychological sequelae.

It was reported that new admissions complete the 'Form #3', which is a mental health screen; that this form is sent to medical; and that if there are any positives on the form, the new admission is referred to mental health.  However, in observing the new admission through the intake, booking and initial/intake health assessment process, it wasn't at all clear when this form is completed.

The next day, the new admission was observed on a regular, open unit without the history of suicide being assessed or being observed closely until it could be further assessed.

Of course, this is the story of only one new admission to the facility, and his story may or may not be representative of all or even most new admissions.  However, this story does raise some concerns about the booking/intake process that were discussed with the relevant supervisors.

Based on the observations of the assessment process, it is recommended that QCHC and Booking staff reassess the mental health components of the intake/booking process and the initial health assessment process, including what training and/or enhanced supervision staff responsible for each process might require in order to fully comply with approved policies and procedures, and in turn, the provisions of this agreement. In order to further evaluate the initial assessment process, staff should assess the cases of detainees who are first identified as in need of mental health services at some point after the booking/intake process, with an eye towards determining whether their mental health difficulties were missed during the booking/intake process or they developed mental health difficulties while detained at the facility. Given the deficiencies noted, staff should evaluate whether the policies and procedures that govern the booking process, the initial medical intake/screening process, and classification and assignment to housing units are clear with regard to the identification and management of new admissions who might be suffering from mental health difficulties.

Regarding 42 (g)(vii), visitation records reflect that inmates housed at the JDC continue to have a much greater incidence of visitation than do their counterparts at the RDC and WC.  To date it has not been possible to determine why this disparity exists.  Based on a review of visitation records at the JDC for a period of 12 days, 48 inmates were able to have a visit, which equates to 4.0 per day or 124 per month.  With only 121 inmates in the facility, that means that every inmate is able to have one visit each month.  At the RDC and WC (whose records are combined) there were 43 visits in 17 days, which equates to 2.5 per day or 77.5 per month.  Based on the combined population of the RDC (361) and the WC (177), each inmate in those facilities is able to have a visit only once every seven months.

Regarding 42 (h), as was noted in the last monitoring report, the mental health assessment of inmates suspected of being suicidal is being performed on an emergency basis, and with the weekend on call schedule, this is even happening on weekends.  However, due to the lack of documentation, it remains unclear as to whether or not inmates who are suspected of being suicidal are kept under constant observation by security staff until the mental health assessment is performed.  In addition, although the QMHPs who perform the assessments consult with the psychiatrist over the telephone, in many instances, the psychiatrist does not have an actual face-to-face assessment of the inmate in a timely manner if at all, even if the inmate is placed on suicide watch.

Inmates placed on suicide watch do receive a higher level of supervision by mental health and security, but the level of supervision by security staff should be better documented. As was noted above, at one point during the site visit, the juvenile unit and the suicide unit which are both

supposed to have an officer in the unit at all times were being staffed by one officer. At a second time during the site visit, that officer wasn't in either unit; but rather was sitting in the control room. Also, there still needs to be clarification of what is expected of the nursing staff with regard to a higher level of supervision. The fact that the decision to terminate a suicide watch may also be made upon telephone consultation with the psychiatrist as opposed to a face-to-face assessment by the psychiatrist also needs to be reviewed.

For inmates who have undergone a mental health assessment of suicide potential and found not to be acutely suicidal, there is a 'safety plan' that is developed by the evaluating QMHP and the inmate that is signed by both, and then the QMHP follows the inmate to assure adherence to the 'safety plan'. When an inmate is released from a suicide watch, there is also an established protocol for follow-up that is well structured and closely followed.

Special mental health observation, for acutely mentally ill prisoners, is also described in the 'suicide prevention' policy, with a level of monitoring that is to be prescribed by mental health. In the implementation of this policy it remains important for mental health staff to make it clear that an inmate could be on 'suicide watch' and/or 'special mental health observation', and if an inmate is on both types of watch, each watch may have different requirements for monitoring and different end points.

Regarding 42 (i), video surveillance capabilities at the various facilities have not changed since the last site visit. Supervisory staff at the RDC have the ability to utilize that facility's video records to review escapes and other significant incidents in order to determine what actually occurred. It should be noted that access to recorded video requires approval by the Jail Administrator or Assistant Jail Administrator, so video is only examined on occasion, not routinely as it should be. There is no video capability at the JDC except in the vehicle sally port. At the WC, while there are cameras that monitor the housing units, they have no recording capability. The County should take prompt action to rectify this deficiency.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process. The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a. Staff vacancy rate of more than 10% of budgeted positions;

    b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c. A major disturbance resulting in the takeover of any housing area by prisoners;

    d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The DSD still does not create a report covering each of these areas. Data must be obtained by making specific requests for current information. At the time of the January site visit a total of 238 positions were filled out of 275 authorized (and 271 funded) positions. The average number of filled positions over the past year and a half was 242. That equates to an 11% vacancy rate for the funded positions and a 45% vacancy rate for the 433 positions that are required to staff all three facilities based on the staffing analysis. Excessive turnover of staff, particularly at the RDC, continues to be a problem and results in the failure to staff critical positions such as the housing units.

The number of incidents involving an inappropriate use of force by staff jumped to alarming levels since the September 2018 site visit. In every documented use of OC and the Taser, staff used those defensive tools to coerce inmates into following their verbal commands, not to defend themselves when inmates became violent.

In an incident that occurred at the RDC on December 6, 2019, an inmate was murdered by other, unidentified inmates in Housing Unit B3. The victim was arrested for a gang related murder, then was housed in a unit with other gang members instead of being placed in protective custody. While investigation into this incident is ongoing, it appears to be a direct violation of paragraph "g" above.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate. To that end:

a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b.   All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

c.   Officers must only be permitted to enter data on these forms or logs at the time a round is completed. Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.   The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility. This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e.   Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

There has been no progress made with regard to the provisions of this paragraph since the last Monitoring Report. None of the facilities meet the requirement that well-being checks must be conducted every 30 minutes in general population and every 15 minutes in segregation (confinement). This provision is carried as partial compliance because well-being checks are being made and documented where previously they hadn't been. However, as described below, they are not consistent with the requirements of this paragraph and, as a result, present substantial risk of injury.

Because of time limitations, it was not possible for the corrections operations member of the monitoring team to inspect the JDC with regard to this paragraph during the January site visit. At the WC and RDC well-being checks are recorded sporadically. They are most frequently noted during the midnight shift when there is little activity. During the day and evening shifts there are lengthy gaps, often from six to eight hours. In B4 at the RDC Confinement/Segregation logs should be maintained every half hour, but they are listed hourly, however, individual well-being sheets on each inmate are signed every half hour. It should be noted that the individual log sheets are maintained in a central location outside of the housing unit, not by the individual cells as they should be. When an inspection was conducted of B4 with the assigned officer, he said

that he used a flashlight so that he could see inside the individual cells, but he did not have it with him.  When the flashlight was subsequently located in the control room it did not function.  He also indicated that unidentified supervisors had changed the practice of checking on all inmates in B4 on a 30-minute basis and that the requirement to do so no longer applied to protective custody inmates.  There is no command level documentation to support this inappropriate change in practice.  In B4 ISO the officer was found to be using an hourly well-being check form.  The previously approved form calls for 30-minute well-being checks.  In Booking, the officer assigned to observe inmates in the holding cells was using a 30-minute observation log form, not the 15-minute form that is supposed to be used.  In the Sixth Monitoring Report it was noted that the officer assigned to this same post in Booking was using an hourly well-being check form, not the authorized 15-minute form.  The problem was rectified at that time.  The Sixth Report stated that "This level of regression from previously settled practice is indicative of a lack of supervision."  To find the same problem, albeit with a different improper form, is inexcusable. When questioned as to what the standard for well-being checks is, the Booking Sergeant was unable to provide the answer.  Supervision in the Booking area is not just lacking, it is non-existent.

See paragraph 76 with regard to mental health rounds for prisoners in segregation.  See paragraph 42 (h) with regard to prisoners who require special management due to acute mental health difficulties.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

    a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

    b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.

28

Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d. Jail administrator training. High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e. Post-service training. Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year. Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings. Post-service training should also include field and scenario-based training.

f. Training for Critical Posts. Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position. Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g. Special management unit training. Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h. Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

During the January site visit the HCSO provided information on an in-house candidate for the position of Detention Training Lieutenant who has a background in detention operations and training. It is essential that a qualified candidate is hired to fill this critical position as soon as possible.

While the Training Director has not provided the statistical information referenced in the last Monitoring Report, he did submit an unofficial synopsis of that data. It will be used for reference purposes in this document, but must be supported by a formal report from his office. Pre-service Training has been completed for 236 of 238 officers. Post Order Training has not been conducted because Post Orders have not yet been written or submitted for approval. Direct

Supervision Training is dependent upon NIC's ability to reschedule it to sometime after February.  The Assistant Jail Administrator has not yet been scheduled for specialized training.  In Service Training was completed for 200 of 238 officers in 2018.  Training for Critical Posts was provided to the CERT members as well as Booking and Classification personnel.  Special Management Unit Training has not yet been provided, but 106 of 238 officers have received eight hours of training in Mental Health and First Aid for Public Safety.  There has been no training with regard to policies and procedures because they have not yet been written, approved and published.

Regarding 45 (f)**,** although all security staff undergo some mental health training, the mental health expert member of the monitoring team is unaware of any effort to assess the resultant mental health knowledge base or skills that security staff persons have developed as a result of these trainings.  Furthermore, in the absence of security policies and procedures that would include mental health elements, it is reasonable to assume that security staff persons were not specifically trained on such related mental health issues.

Although at present, there is no actual mental health unit (i.e., a unit where there is a program consisting of therapeutic interventions for detainees who are suffering from mental illness or intellectual disabilities, provided in a therapeutic environment), one of the facility's units has been designated as a unit where prisoners suffering from serious mental illness are placed, and several other detainees with serious mental illness are placed in 'protective custody'/segregation.  Of course, the other post where security staff persons come into regular contact with prisoners who are suffering from mental illness or intellectual disabilities is the mental health section of the Medical Department.  There is no extra or special training offered to security staff who may be placed on any of these posts where there is an increased likelihood of having to work with mentally ill and/or intellectually disabled inmates.

There are far fewer referrals to mental health by security staff than is seen in comparable facilities.  Although it has never been clear why this is the case, the possibility that security staff do not have the knowledge base and skills required to suspect that an inmate might be suffering from mental illness has been one of the possible alternative explanations, and an event that occurred during this last monitoring period raised this possibility again.  More specifically, during this most recent monitoring period there was a murder on one of the units.  Immediately following that murder, there were numerous inmates who were housed on that unit who self-referred for mental health treatment, complaining of the full range of trauma-related psychiatric difficulties as a direct result of the incident.  However, there was no evidence that security staff even considered the possibility that the incident might cause some of the inmates on that unit to experience mental health difficulties; there was no evidence that security staff identified any individual inmate as suffering from new mental health difficulties as a result of that incident and referred the inmate to mental health; and there wasn't any type of intervention initiated by security, focused on minimizing the development of mental health difficulties in response to the

incident, and there is no evidence that mental health was contacted for advice about anything that should be done by security in response to the incident.  It should also be noted here that there appears to have been no effort made by security to address the mental health needs of the security staff persons who were on site at the time of the incident.

Jail staff should develop a plan for assessing the mental health knowledge base and skills of security staff persons who have completed the currently available training and as security policies and procedures that include mental health elements are developed, assure that security staff persons are trained on the mental health elements of these policies and procedures.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

        ii. An inspection process.

        iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

        iv. A requirement that any corrective action ordered be taken.

31

    v.   Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

    vi.   To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

Without an approved Policies and Procedures Manual the HCSO is unable to comply with this provision of the Settlement Agreement.  Priority must be given to compliance with this requirement.

According to the Settlement Agreement (Paragraph 46 a), the Jail Administrator must have the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  "This authority must include the power to hire, transfer, and discipline staff."   It is apparent that the Sheriff has not granted that authority to the Jail Administrator, as evidenced by numerous promotions and demotions that occurred without her knowledge or approval.  The fact that she is not even consulted is indicative of the Sheriff's non-compliance with this paragraph.

In two previous Monitoring Reports it has been suggested that the Sheriff issue an order prohibiting outside agencies (Mississippi Department of Corrections) and HCSO law enforcement officers from conducting shakedowns of housing units in the DSD.  To date that has not been done.  It is now brought to his attention for the third time. At the time of the site visit, there had not been a shakedown with outside agencies since the prior site visit. However, since then personnel from outside agencies were used for a shakedown. This time, the Jail Administrator and Assistant Administrator were present during the shakedown.

The duties and responsibilities of supervisors should be clearly laid out in the Policies and Procedures Manual.  Lacking such direction, supervisors do not follow any standard practice to document their inspection rounds.  Unit logs show that supervisors were on scene, but beyond that there is no information except for their signatures.

Fire safety is a significant issue at the RDC.  When officers were pulled out of the housing units, direct supervision of the inmates ceased to exist and they were free to vandalize the facility.  Consequently, the fire hoses and extinguishers were removed from the housing units and, after the riot that destroyed Pod C, even from the staff corridor that surrounds each control room.  To date those fire safety items have not been replaced.  Worse yet, the officers assigned to work in the control rooms and as rovers in each pod, are unable to answer the most basic questions

regarding what is to be done in the event of a fire. Some have no idea whether or not fire hoses are in place in the staff corridor or if backup hoses are located inside the control rooms. Finally, during the January site visit, it was not possible to meet with the Fire Safety Officer. The Assistant Jail Administrator said that he had recently been transferred out of the DSD, but when questioned about this, the Jail Administrator was not even aware of the move. A qualified replacement for the Fire Safety Officer must be found immediately and such personnel changes into, out of and within the DSD, done without the Jail Administrator's approval or even knowledge, must cease.

In the Sixth Monitoring Report reference was made to the Maintenance Report, published by Mr. Bell, the Maintenance Director for the County. It was anticipated that copies of this spreadsheet would be provided to each captain so that they could track the status of requested maintenance projects. Unfortunately, that did not occur, so there has been no progress in this area. During the January site visit it was brought to the attention of all involved so that, hopefully, the County and the HCSO/DSD can work cooperatively to address the myriad maintenance problems that plague the Jail System.

Major breaches of security that have been brought up repeatedly in previous Monitoring Reports are not only still evident, they are worse than ever before. In the past the fact that primary security doors at the RDC, leading from the main corridor (Great Hall) to the three pods, did not function or lock was a major concern. Now, not only are those primary security doors inoperative, but more than half of the housing unit (sliding) security doors do not work. This leaves only the retrofitted, key operated, (cage) doors between the inmates in their units (note: many cell doors do not lock or can be opened by the inmates) and access all the way to the main corridor. The problem is exacerbated by the fact that the retrofitted (cage) doors are equipped with a keyway only on the exterior side of the door. This means that when an officer enters a unit, he/she leaves the door ajar, because pulling it closed makes opening it from inside the unit nearly impossible since there is no keyway on the inside. This retrofitted design flaw is catastrophic with regard to security. This incredible situation has already resulted in an inmate breaking out of his unit, out of the pod and into the main corridor, with officers in pursuit. It should be noted that this poses a special problem during med rounds in the segregation unit. As the nurses take the medications to the individual cells, the cart with the remaining medications is left by the unsecured door. The issue of inoperative doors is so pervasive that officers often do not even bother to secure doors that still do work.

The maintenance and security issues are made worse by an inexplicable shortage of key sets for the officers who work in A, B and C pods at the RDC. For some reason only one set is available in each pod, which means that when an officer is handling an issue in one of the four units or two ISO units, other officers have no means of entering the other units. Typically, each officer assigned to housing should have a complete set of keys that operate the security doors in his/her

area of responsibility.  This basic security measure must be addressed immediately.  The Jail Administrator should have an analysis done of every area in the Jail System and issue necessary key sets to all on duty personnel so that they have the means to perform their duties and respond to incidents expeditiously.

At the RDC the ongoing maintenance problems are primarily due to the fact that the housing units are not staffed.  Without an officer present to supervise them, the inmates are free to vandalize the facility as they have done continuously for years.  The consequences are dangerous for inmates and officers alike.  The County and the HCSO must work cooperatively to resolve this problem promptly.  It is unacceptable to find the same problems on site visit after visit.  It is not enough to say that a bid has been put out, or research is being done to look into a problem.  These issues must be corrected.  The Jail System is in danger of facing another major riot at the RDC if something is not done immediately.

At the WC it has not been possible to properly secure the entry doors to Housing Units 1 and 3 for over four months.  Since the housing units at that facility are not equipped with safety vestibules, this means that half of the inmates there could easily push open the entry doors to their units and gain access to the main corridor.  Immediate corrective action is essential.  That should be followed by a plan to retrofit a safety vestibule in each housing unit to correct this design flaw.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

There has been no meaningful action to deal with this issue since the last site visit.  The creation of the CERT team has not prevented the introduction of contraband to the Jail System, particularly the RDC.  Subsequent to the murder of an inmate in B3, a shakedown of that unit was conducted by Captain Williams and his team.  In a unit designed to house 64 inmates they found six shanks/knives, 10 cell phones and multiple chargers, SIM cards and related cell phone equipment, as well as lighters, tobacco products and unidentified pills.  The level of contraband found inside the DSD (particularly the RDC) is completely out of proportion when compared to other jails throughout the country.

There continues to be a lack of documentation of random shakedowns to determine compliance with this requirement.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no action to deal with this issue since the last site visit, indeed, since the beginning of the monitoring process.  During the January site visit the corrections operations member of the monitoring team inspected the Armory at the RDC.  Inside that room were literally **hundreds** of confiscated cell phones that have been found within that facility over the past few months.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit.  An officer was assigned to work on this issue over a year ago but there is no documentation of a program that meets the requirements of this paragraph.  Incident reports of assaults reflect a continuing problem of gang related issues.  The most significant one deals with the murder of an inmate at the RDC, Housing Unit B3, who was arrested as a result of a gang related murder.  He was killed by inmates in his housing unit just a few days after his arrest.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

    a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

    b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c.  Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

    d.  Prohibit the use of force as punishment or retaliation;

    e.   Limit the level of force used so that it is commensurate with the justification for use of force; and

    f.   Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Since a Policies and Procedures Manual has not been approved and issued, compliance with this paragraph cannot be achieved.  Use of Force reports continue to reflect examples of excessive UOF on the part of staff.  Since the September 2018 site visit, virtually every report dealing with the use of OC or the Taser revealed that staff used those defensive tools inappropriately in order to coerce inmates into complying with verbal commands.  This represents a major training issue, but it is directly attributable to the fact that there is no Use of Force policy in place to provide direction.

The pervasiveness of improper and excessive force practices, particularly at the RDC, is reflected in Incident Report # 181593 which documents an event that occurred at the RDC on November 28, 2018.  Sergeant "A" became frustrated with an inmate who would not be quiet while waiting to be let into HU C-2.  A verbal exchange escalated to profanity and threats back and forth until the sergeant left the scene and returned shortly thereafter with a less than lethal shotgun in hand.  He entered the inmate's cell and moved the inmate outside where he used the butt of the shotgun to strike the inmate on the arm and head multiple times.  All of this was recorded on video and was observed by two other sergeants, "B" and "C", who were present.  The matter was turned over to the Internal Affairs Division (IAD).  The subsequent investigation revealed that all three sergeants lied to the IAD investigator regarding a number of issues.  To date Sergeant "A", who was responsible for striking the inmate with the shotgun butt, has been fired.  Sergeant "B" has been demoted, though for an unrelated, but unidentified matter.  She was not disciplined for lying to the IAD investigator.  Similarly, no action was taken against Sergeant "C" for the same offense.  It should be noted that the less than lethal shotguns are a new addition to the DSD arsenal as a result of the CERT program recently initiated by the Assistant Jail Administrator.  While the creation of a specialized team to deal with major incidents has merit, in this case implementation of the program was flawed by inadequate and inappropriate training.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a.   Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

    i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

    ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

    iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

    i. a sign-out process for staff members to carry any type of weapon inside the Jail,

    ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

       iii.   random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

   h.  A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

   i.  All staff members using force must immediately notify their supervisor.

   j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

To date there are no approved policies and procedures regarding use of force in place, although a draft Use of Force policy is under review.  There have been no recorded instances of staff obtaining supervisory approval prior to using weapons or chemical restraints.  The only exception to this is when the CERT team conducted a shakedown.  The use of OC, physical restraints and electronic control devices (Taser) have not been used when a prisoner was at risk of appositional asphyxia.

This section is carried as Non-Compliant because there are no policies and procedures in place. There are no records of inmates being held in restraints while in the Jail System.  The DSD does not use the restraint chair as a means of controlling violent inmates and there are no incident reports covering instances of an inmate being restrained to his/her bunk.  As a matter of practice, inmates who have been involved in use of force incidents are taken to Medical for examination and treatment. However, there is no documentation of any mental health assessment of prisoners who have been subjected to a Level 1 Use of Force.

There were no reported planned use of force incidents during the previous four months other than when the CERT team conducted a shakedown.  Consequently, no incidents were electronically recorded and there was no need for coordination with medical staff beforehand. However, mental health staff have not been consulted prior to past planned uses of force in the past and there is no documentation directing a change of this practice. Based on a review of incident reports, it does appear that supervisors are notified when a staff member is involved in a use of force incident.

With regard to the sergeant who was fired, it should be noted that his initial report was purposefully inaccurate.  He made no reference to his improper use of force and he did not notify his supervisor.  In addition, the fact that he left the scene and retrieved a less than lethal shotgun which was not even mentioned in his report indicates that this was actually a planned use of force that should have been coordinated with medical staff and been recorded with a hand-held camera.  Not only was this not done, but DSD does not have hand held video cameras available

in any of its facilities so that planned use of force incidents can be recorded as required by the Settlement Agreement.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**
While there are still no approved policies regarding the use of force, pre-service training of 236 of 238 officers has been completed.  A total of 200 out of 238 officers completed in service training during 2018.  Both training programs includes a section on use of force, which represents a significant step in the right direction; however, a review of the use of force curriculum and power point program used to instruct Detention staff revealed that the training is grounded on a law enforcement perspective rather than what should be presented to officers who work in a jail.  Because individuals in a jail setting are confined within a secure facility, use of force is generally limited to situations involving an immediate threat to safety. However, the training does not prohibit the use of OC and Tasers to coerce inmates to comply with verbal commands.  Those two items are defensive tools which should not be used in a coercive manner.

53. Topics covered by use of force training must include:
   a.  Instruction on what constitutes excessive force;
   b.  De-escalation tactics;
   c.  Methods of managing prisoners with mental illness to avoid the use of force;
   d.  Defensive tactics;
   e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**
The use of force training does include a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not specifically deal with managing prisoners with mental illness, nor are there any approved use of force policies and procedures in place yet. As noted above, the curriculum does not appropriately address the use of OC and Tasers.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and

procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This paragraph cannot be addressed until policies and procedures on the use of force have been approved and published and staff have been appropriately trained.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

Use of force training cannot be updated until the policies and procedures on the use of force have been approved, published and implemented.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**

There has been no change with regard to the status of this paragraph.  It cannot be addressed until appropriate use of force reporting policies and procedures have been approved, published and implemented.  As has been reported previously, the incident reports generated through the JMS system do not provide the monitoring team with sufficient information to determine whether or not supervisors do more than sign and send the reports through the chain of command.  The shortcomings of the JMS system, previous identified, have still not been corrected.  As was recommended in the Sixth Monitoring Report, if the HCSO cannot correct the shortcomings of the JMS, it should be replaced by a jail version of what is provided to the law enforcement side of the Sheriff's Office.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

It is not possible for the monitoring team to know when a report was written because the reports include only the date/time of the incident, not when the report was generated.  The same shortcoming applies to the date/time of supervisory review.  The inadequacies of the JMS need to be addressed as was recommended in paragraph 56 (above).

In the use of excessive force incident referenced above (see paragraph 51), only Sergeant "A" wrote a report.  None of the other RDC staff who were present and witnessed the incident (two sergeants and two detention officers) wrote a supplement report.  A lieutenant who reviewed Sergeant "A"'s report found that "In my opinion this is a good report."  If it had not been for the fact that the IAD investigator was able to view a video recording of the event, it would not have been possible to determine what really happened.  Notification of the incident did not come to the attention of the Jail Administrator until a grievance was filed by the inmate.  His allegations were finally documented by an officer on December 4, 2018, fully six days after the fact.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:
   a.  A unique tracking number for each use of force;
   b.  The names of all staff members, prisoner(s), and other participants or witnesses;
   c.  Housing classification and location;
   d.  Date and time;
   e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.
   f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;
   g.  A description of the staff member's attempts to de-escalate the situation without use of force;
   h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;
   i.  A description of any observed injuries to staff or prisoners;
   j.  Whether medical care was required or provided to staff or prisoners;

    k.   Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

    l.   A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The JMS incident report/use of force format does not directly follow the sub-sections of this paragraph; therefore, incident reports do not reflect all of the information that is specified. While there is a unique tracking number, and the names of staff members and sometimes those of involved inmates are included, witnesses are seldom listed. A cell location is almost always noted (although the facility is not), but not its classification. Generally, the narrative includes the steps taken by an officer to manage the situation prior to the use of force, what methods were used to apply force and whether or not medical attention was required and provided. However, there are several investigations that indicate that these are not always accurate. Reports do not make reference to any associated incident reports or disciplinary reports. A change in procedure has resulted in an officer's signature being placed on a copy of the report, but it does not attest to anything.

Incident Report # 181843, dated 11-22-18, is an all too typical example of the inadequacies of use of force reporting in the DSD. Officer XYZ reported that on November 22, 2018 at 0340 hours, he was conducting a security and wellness check in "C-2" (this is Housing Unit 2 in Pod C, unspecified classification). The facility is not identified, but the housing unit is. He dealt with an inmate who was uncooperative and refused to follow direct orders. The inmate pushed by him through the inner safety vestibule door (simply referred to as the "unit cage") which was unsecured, then exited the unit. There is no mention of the secondary sliding security door to the unit, which should have been closed and prevented this breach of security. The officer said that he "…then used one burst of Oleoresin Capsicum spray to control the situation. Offender --- was in an unauthorized area without official permission by exiting C Unit into the Great Hall". The officer failed to explain how the inmate managed to leave the hallway outside of HU C2 (which goes around the Pod C control room) and go through three security doors between that location and the main corridor of the jail (Great Hall). After the inmate "…started to run up the Great Hall…" Officer XYZ apprehended him with the help of a fellow officer. This total breach of security was not addressed or explained. Instead, Officer XYZ cluttered the report with extraneous and unnecessary information that make it difficult to follow. To his credit, he did take the inmate to Medical for treatment and his supervisor was notified.

Not only does this incident report reflect the sub-standard quality of most reports in the DSD, it highlights a critical security problem at the RDC. The majority of security doors controlling access to the inmate living areas are no longer functional. As was reported during the exit

briefing, at the conclusion of the January site visit, concern that the inmates cannot be kept in their individual cells has now been replaced with concern that they cannot even be kept in their 64 bed housing units.  As this inmate proved, a mass escape into the main corridor is a real possibility.

## USE OF FORCE SUPERVISOR REVIEWS

59.    The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

    a.    A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

    b.    A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

    c.    Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

    d.    If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

    e.    Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

    f.    All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

    g.    A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

Compliance is not possible until the Policies and Procedures Manual is approved and published. Based on the current JMS system there is no way to determine whether or not supervisors review use of force reports by the end of their watch.  Nor is it possible to determine whether or not they comply with the other sub-sections of this paragraph.  Supervisors do not indicate whether or not they approve or disapprove of the actions taken by officers, nor do they make recommendations for corrective action.  Use of force reports are forwarded to the CID investigator for follow up. Duplicate copies are provided to the IAD investigator.  Incident Report # 181843, referenced in paragraph 58 (above), is indicative of the lack of supervisory follow up in that there is no indication of supervisory review.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

      a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

      b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

      c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

      d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

      e.     Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph since the last three site visits.  The specified actions are not routinely followed by supervisors.  A review of use of force reports revealed that photographs are seldom taken (though they are taken more frequently than in the past) and that waivers related to the refusal to be photographed are never included.  Witness statements are infrequent at best, and although use of force incidents may be recorded at the RDC because it has a digital recording system, that is not possible at the JDC and WC.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of this paragraph since the last monitoring report. It is not possible to determine whether or not supervisors are performing their required duties because the monitoring team does not have access to the supplemental information that may be included in the JMS reports and it appears that the ability to reflect such actions is not possible in the JMS. The limited documentation available through Google Docs (this recently replaced Drop Box) does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

62. Reviewing supervisors must document the following:
   a. Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;
   b. Witness statements;
   c. Review date and time;
   d. The findings, recommendations, and results of the supervisor's review;
   e. Corrective actions taken;
   f. The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);
   g. Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –
      i. The nature and extent of injuries, or lack thereof;
      ii. The date and time when medical care was requested and actually provided;
      iii. The names of medical or mental health staff conducting any medical or mental health assessments or care.
   h. Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Until it is possible to access the supervisory review portion of use of force reports, there is no way to determine whether or not supervisors are taking required actions and appropriately documenting them. Reportedly, the supervisory portion in JMS is limited to a check box with no ability to indicate recommended action.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.     Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**
The Policies and Procedures Manual must be approved and issued to all personnel before the level of compliance can be determined.  (See paragraph 56 to 62 above.)  The current incident reports should provide sufficient information for supervisors to make an appropriate review, but the reports are routinely deficient.  The monitoring team's inability to see everything that is entered into the automated reporting system further hampers its ability to analyze the shortcomings.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:
       a.     Tracking number for each incident;
       b.     The names of all staff members, prisoner, and other participants or witnesses;
       c.     Housing classification and location;
       d.     Date and time;
       e.     Type of incident;
       f.     Injuries to staff or prisoner;
       g.     Medical care;
       h.     All staff involved or present during the incident and their respective roles;
       i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
       j.     External reviews and results;
       k.     Corrective action taken; and
       l.     Warden and Administrator review and final administrative actions.

**Partial Compliance**
There has been no change with regard to the status of this paragraph since the last three site visits.  Compliance is dependent upon the approval and publication of the Policies and Procedures Manual.  Incident report documentation currently provides for some of the information specified in this paragraph.  Reports routinely have a tracking number and list all staff involved.  Inmate witness are often omitted.  Inmate witness statements are infrequently noted.  The nature of inmate injuries is often omitted.  More photographs accompany incident

reports than in the past; however, reports still do not specify in which facility the incident occurred.

IR # 182042 is a report that reflects some of the shortcomings mentioned above.  It covers an assault with injury that was observed in Housing Unit C3 by the Pod C control room officer.  At 0800 hours on 12-29-18, he heard noise in that unit; he checked activity on camera and saw one inmate being assaulted by several others.  When he called for assistance, two officers responded and removed the injured inmate from the unit and took him to Medical.  After being examined by a nurse he was transported to Merit Health Hospital for treatment of a laceration between his eyes and another on his chin.  The control room officer notified Captain Shields, the facility commander who wrote two supplemental reports and signed the original report.  The facility in which the incident occurred is not included in the report or the supplements.  There were no pictures taken.  There does not appear to have been an investigation conducted although the matter may have been turned over to the CID investigator.  Consequently, there are no witness statements or even any idea as to who the perpetrators were.  Supervisory review, if any, between the rank of sergeant and captain is not documented.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:
  a.     Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.
  b.     Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.
  c.     Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**
There has been no significant change in the status of this paragraph for the past three site visits; however, IR # 181217, dated 12-17-18, submitted by a sergeant, summarized the loss of $506 belonging to an inmate who was transported from court to the RDC by way of the JDC.  This represents the first record (that the monitoring team is aware of) regarding such a loss since the Settlement Agreement was finalized over two years ago.  It should be noted that the IAD investigator has documentation regarding another such incident, but it never came to the attention of the Monitor.  The lack of incident reports regarding lost money and property has been highlighted in previous Monitoring Reports.  A similar lack of documentation exists regarding incidents involving releasing errors.  While a review of inmate files shows that they

are sometimes held beyond their expected release dates, incident reports documenting such occurrences are not written.

In the case of the missing $506, the sergeant's report did not identify how the money disappeared or that the money was on the front seat of the transportation van where a juvenile inmate had access to it.  That information was provided by the JDC captain who wrote a supplemental report accompanied by photographs taken in the transfer area of that facility.  This report definitely warrants an administrative review so that corrective measures can be taken.

Based on the current status of the JMS system, it is not possible to determine whether or not incident reports are written in a timely fashion (by end of shift or within 12 hours of the incident) and whether or not supervisors do likewise as required (within 24 hours of receipt of an incident report).  The only thing that can be determined is the reported time of the incident as it appears in the written document.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:
   a.   Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.
   b.   Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.
   c.   Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.
   d.   Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

There has been no change in the status of this paragraph.  There are no approved policies in place that specify what supervisors and shift commanders are to do.  The monitoring team cannot determine whether or not supervisors even review incident reports (other than to sign on a printed copy) because of the previously mentioned shortcomings of the JMS system.  There is no documentation that reflects approval, disapproval or recommended action.

**SEXUAL MISCONDUCT**

67.     To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

a.      Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.      Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.      Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

As was reported in the last monitoring report, the PREA officer continues to work on the PREA policies and procedures. A draft had been completed but it restated the requirements of the federal regulations rather than specify the procedures specific to operations at Hinds County. She is now working on a draft that is specific to the procedures of the DSD and it is reported that this draft is near completion.

PREA incidents reported to the PREA officer are investigated and remedial action, usually involving relocation of the involved inmates, is taken. There has not been a practice of disciplinary action taken against perpetrators which is not consistent with zero tolerance. A proposal is currently circulating to remedy this.

The PREA officer provides a 4-hour training as part of the new officer training. She reports that the officers at JDC and WC who pre-dated this initial training have received in-service training. Not all of the officers at RDC have received the training. The incident reports indicate that not all officers recognize a PREA related complaint and some officers do not understand their obligation to report incidents to the PREA officer but rather refer inmates to the kiosk system. The PREA officer concurred that this is the case and is planning an in-service training in May.

Although the classification process includes a screening for PREA issues, the housing decisions do not appear to reflect attention to those issues. Because classification still classifies based on charge, persons charged with misdemeanors are automatically sent to the WC. This includes persons that are transgender or identify as homosexual. Because of the dormitory style housing units this may not be appropriate for all such individuals. Some individuals sent to the WC are then housed in the segregation cells to prevent victimization. Under PREA, jail staff must identify the least restrictive setting in which an individual can be safely housed. This assessment has not been taking place. In addition, at least one individual informed Jail staff that he could not go to a particular unit. He was placed on that unit and subjected to sexual harassment.

There are multiple internal ways to report sexual abuse and harassment including filing a grievance and reporting through the kiosk system. However, the PREA officer still does not have a cell phone to forward the calls to and the calls go through dispatch to the Captain and then to her. Reportedly, the plan is for the calls to go directly to the PREA officer but there has been a delay in implementing this. There is not a system for reporting to an outside entity other than through paid phone calls and there is no guidance on appropriate entities to call. In order to be effective, inmates must be fully informed of what constitutes sexual abuse and harassment and how to report it. As previously reported, all of the units visited had PREA posters posted. The posters have reporting instructions. The Inmate Handbook does not have current information on the PREA process but a separate form is now provided at booking that explains the process. The PREA officer has done some orientation to incoming prisoners in the Classification Unit, however, some inmates are moved before she provides the orientation so not all inmates receive orientation on PREA.  Regulations require a more complete education session after booking. This was being done at JDC but is not currently. This was not started at RDC or the WC. Lack of audio-visual equipment is at issue at RDC.

Discussions continue to be underway with Catholic Charities to determine whether that agency can provide counseling to any victims of sexual assault or harassment. QCHC now has a social worker on staff who provides counseling and can provide services to victims of sexual assault or harassment.

It is reported that the practice is that there be no cross-gender searches by males of females. With respect to female searches of males, strip searches are not permitted but pat down searches are.

There has not yet been training on conducting these searches but a training during roll call is reportedly being planned. A PREA violation can occur even in same sex searches. One such allegation was made by C.F. The PREA officer found no violation based on the investigator's report. However, the investigators have not been trained in PREA and the reported circumstances do not support the conducting of a strip search.

There has been improvement in the reporting and investigation of PREA incidents by the PREA officer. She now keeps a file on each referral, has a report form, and keeps numbered reports. She has completed an on-line training on investigating PREA incidents. A training opportunity has been identified for the PREA officer and should be utilized. Incidents involving alleged staff misconduct or criminal activity are referred to other investigators who have not received PREA training. There is no regular supervisory oversight of the PREA officer's work or reports. It was reported that supervisory staff do not get the investigation reports once completed. This prevents any opportunity to use that information to determine whether discipline is appropriate or remedial measures should be implemented.

Although this is very good progress in this area, there are still a number of areas of non-compliance and some of the stated practices do not appear to be fully operationalized. Areas of concern include lack of training for all officers on PREA, lack of ongoing notice to inmates at booking or comprehensive education following, lack of required information in the Inmate Handbook, unresolved mechanisms for reporting, no volunteer or contractor training, and investigation officers do not have PREA training.

As was noted in the last monitoring report, during the previous site visit it became clear that there was a need for better information exchange and coordination between the PREA coordinator and mental health.  For the most part, this has been addressed.  However, with regard to the PREA-incident referred to in paragraph 42, where the PREA officer suspected that the complainant was suffering from mental health difficulties, a formal referral (or in this case a re-referral) for a mental health assessment was indicated and would have been appropriate.

## INVESTIGATIONS

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

        a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

            i.     Any prisoner exhibited a serious injury;

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

    i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

    ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

    i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

    i.    a brief summary of all completed investigations, by type and date;

    ii.    a listing of investigations referred for administrative investigation;

    iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

During the September 2018 site visit the corrections operations member of the monitoring team was able to conduct an at length interview with the IAD investigator.  That meeting proved to be productive and resulted in access to a spread sheet that he maintains regarding all active and completed IAD investigations.  During the January site visit a similar meeting was held with both the IAD investigator and the CID investigator.  By comparing procedures a process was set in place that will allow the monitoring team to follow all criminal investigations and internal (on staff) investigations.  Subsequently a copy of the Sixth Monitoring Report was sent to each investigator so that they could familiarize themselves with the status of the various paragraphs of the Settlement Agreement. However, since the site visit, the CID investigator was demoted by the Sheriff and has reportedly been replaced. It is not known whether the procedures agreed upon at the time of the site visit have been communicated.

Based on information provided by the Jail Administrator, it was determined that the CID investigator would be moved from downtown Jackson to the RDC shortly.  The IAD investigator is already housed there.  This move would put her closer to the vast majority of her work which is generated primarily from the RDC.  While concurrence with this move was expressed during the exit briefing at the end of the January site visit, it was disconcerting to learn shortly thereafter that the CID investigator was being demoted and moved to another area of the HCSO.

Movement, without explanation, of personnel who are critical to compliance with the terms of the Settlement Agreement continues to be a significant management problem within the HCSO.  Now, whoever replaces the CID investigator will not be familiar with either the Agreement itself or what had been set in place to provide the monitoring team with necessary information.

It goes without saying that the lack of approved policies and procedures regarding this area of concern make compliance with this section impossible.  As has been stated throughout this report, it is imperative that the HCSO/DSD put forth the effort necessary to prepare, have

approved, publish and train all personnel on the Policies and Procedures Manual covering all aspects of DSD operations.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There is no change in the condition of the grievance system. The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of detention officers. However, the system is still not working as it should. Currently, it was reported that there are two units at RDC, B2 and C2, in which the kiosk system is not working and paper grievances are being used. It was also reported that the kiosk system was down for two and a half weeks.

Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer or other inmates observing the grievance being filed. It was reported that inmates have observed another's PIN number and then use it to purchase commissary on the other inmate's account.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Non-Compliant**
Policies and procedures have yet to be finalized. A draft policy on grievances does not describe the current process of using the kiosk. The kiosk system works the same across facilities but there is no unified process in how the staff responds to grievances and monitors the system. There is an identified system wide grievance officer, however, her duties for system wide oversight have not been identified. She does not assign grievances for the other facilities and does not provide any oversight of the grievance process or response in the other facilities. She reported a one-time effort to follow up on grievances that had not received a response by the assigned individual by circulating a list of outstanding grievances to the assigned individuals. She described that this effort was unsuccessful and met with resistance.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still

need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. During this site visit, in order to check whether there were outstanding grievances that had fallen off the dashboard, a report was run for grievances assigned but not answered starting from July 1, 2018. The report showed 972 grievances unanswered after 21 days. There is no structured system to ensure that all grievances are actually answered; no oversight to review whether responses are adequate; and no oversight to determine that promised actions are actually completed. The system wide grievance officer is identified but the facility wide duties that would include this oversight have not been identified. Similarly, there is no guidance as to the oversight that the grievance officers at the WC and JDC are expected to provide or what coordination or reporting is expected with the facility wide grievance officer. There is also no guidance on what constitutes a review by an impartial reviewer. There are no intermediate levels of appeal allowing supervisors to respond before an appeal reaches the Jail Administrator. There is no known way in the system to mark a grievance as urgent. It should be noted that most of the grievances submitted are actually inmate requests such as an initial request to look up a court date or for envelopes and stamps as oppose to an allegation of improper treatment or a refusal to fulfill a request. The kiosk system does not have a way to recategorize these from a grievance to a request so that it can produce a count of actual grievances.

Essentially, the mental health team does not receive grievances, but it remains unclear as to whether there are grievances related to mental health being submitted that are not being directed to the mental health team or whether no such grievances are being submitted.  As has been noted in prior monitoring reports, the only way to answer this question is to review all grievances, with an eye towards whether or not any of them should have been referred to mental health, in whole or in part.

72.    The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds. There does not appear to be any language choices in the system or voice recognition features.

It has yet to be determined whether or not there are inmates who are unable to report grievances via the kiosk system due to their mental illness, and/or intellectual disability, especially those who are also housed in segregation. The mental health expert on the team has found that inmates report their grievances to him when accompanying mental health on weekly segregation rounds. This suggests that they are not using the grievance system or are not finding it effective.

73.    The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures. The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights. The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**
The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation. To that end, this Agreement imposes the following restrictions and requirements:

74.    Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**
There has been no improvement in this area since the last site visit. Although no inmates were found to be kept in Booking holding cells beyond the eight-hour limitation, once again, the officer responsible for supervising inmates in the Booking area was using the wrong form for conducting well-being checks. During the September 2018 site visit he was using a 60 minute/hourly well-being check form. It is supposed to be a 15-minute check form. The monitoring team member was assured that the problem would be rectified. During the January site visit the officer working in Booking was using a 30-minute well-being check form instead of the appropriate 15-minute check form. In each case the officer could not explain why he was using the wrong form. When the sergeant in charge of Booking was questioned regarding this problem, she was not even able to articulate what the standard for well-being checks is for

inmates incarcerated in the Booking holding cells.  Supervisory responsibility is critical to the operation of a jail.  It is completely lacking in this area of the DSD.

There isn't any "appropriate long-term housing" for prisoners who are suffering from mental illness and/or intellectual disabilities.  In the absence of a special mental health unit, it is extremely difficult, if not impossible, for prisoners who suffer from serious mental illness to receive the enhanced program of mental health services they require. Then in addition, due to the absence of "appropriate long-term housing", those prisoners who need to be protected from themselves or others as a result of a mental illness or intellectual disability end up being housed in segregation as a very unacceptable alternative. In the absence of a mental health unit, the facility should explore options for housing prisoners who need to be protected from themselves or others as a result of mental illness and/or intellectual disabilities other than segregation.

75.    The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**
The monthly summary reports submitted by each facility include a listing of inmates who have been placed in segregation.  The format utilized by the JDC does more than simply list inmates; rather, it reflects when they went into segregation and when they were removed as required by the paragraph.  It includes additional information that would be valuable to command staff in evaluating the use of segregation.  The reports provided by the RDC and WC list everyone who has been in segregation during the month but not when they went in or were removed.  As was recommended in the Sixth Monitoring Report, the JDC system of reporting should be adopted by the WC and RDC, but, to date, nothing has been done. The new disciplinary officer at RDC has started using a spreadsheet with more detail. This has not yet appeared in the monthly reports and does not have the same level of detail as the JDC reports. It was recommended that she review the JDC report and incorporate that level of detail in her reports. It should be noted that the new disciplinary officer has created a process and forms that greatly improves the disciplinary system at RDC. However, there are still no policies and procedures in this area.

76.    Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**
The mental health coordinator continues to conduct weekly rounds in segregation, and maintains records indicating that the rounds were performed and the findings.  In addition to reviewing these records, as usual, the mental health member of the monitoring team accompanied the

mental health coordinator on the segregation rounds, and thereby observed the excellent quality of the rounds.  All of the inmates in segregation were clearly used to these rounds; all inmates in segregation appeared to be clear about the fact that the rounds were an opportunity to raise any mental health concerns with the mental health coordinator; and all inmates in segregation appeared to know that they could ask to meet with someone from mental health at any time.

At present, there still is no mechanism for the incorporation of the mental health information obtained during the mental health rounds in segregation into the decisions made by security about inmates who are placed in segregation.  More specifically, there is still no security policy and procedure governing monthly, interdisciplinary segregation rounds, where security and mental health review and discuss each inmate being held in segregation for more than 30 days, with a focus on whether or not segregation is causing a deterioration in the inmate's mental health, whether placement in segregation should be continued or an alternative placement is indicated, and whether there is a need for further enhanced mental health services and/or other supportive services.  Therefore, there is still are no such monthly, interdisciplinary segregation rounds.  In addition, there is still no security policy and procedure governing the mental health input that security could obtain on a weekly basis, following the weekly mental health rounds in segregation.  When an inmate's mental health is deteriorating while being held in segregation, the development of a mechanism for obtaining this weekly available information would allow for an even more timely response by security, without having to wait for the monthly segregation review meeting. As the security policies related to segregation are developed, these areas of intersection with the mental health area should be discussed with the mental health team and incorporated in the policies.

At the time of this most recent site visit, there were 26 inmates being held in segregation for various reasons, including protective custody, other administrative segregation, and as punishment.  As noted in section 72, during the course of these rounds many inmates shared their grievances with the mental health member of the monitoring team and the mental health coordinator.  Although the stated grievances covered a range of issues, some of which had to do with their respective cases and not problems at the facility, most of the grievances had to do with feeling unjustly placed in segregation and/or the conditions of their confinement in segregation. This raises several issues.  (1)  There can be no input from mental health with regard to the disciplinary process which sends inmates to segregation until the security policies and procedures governing the disciplinary review process are completed and implemented.  (2)  The conditions of confinement in most of the segregation cells are unacceptable, in that many of the cells do not have lights and there are rodents.  (3)  The conditions of confinement in most of the segregation cells makes maintaining one's mental health while in segregation all the more difficult, it further impairs the mental health of already mentally ill individuals, and it makes the mental health rounds in segregation much more complicated, given that it is so difficult to see the inmate and examine the cell.  (4)  As noted above, the fact that so many inmates in

segregation used this opportunity to express grievances raises concern about their access to the facility's mechanisms for filing grievances.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

    a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

    b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

    c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

    d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

    e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

    f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

        i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

        ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

        iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.  Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

The mental health expert on the monitoring team has met with senior security staff on multiple occasions to discuss this issue.  Although security staff has stated that they consider an inmate's mental health status during the disciplinary review process, this consideration does not involve the type of mental health input described in this provision, and in fact, this consideration does not involve any input from mental health team.  Similarly, there is no indication that decisions made during the classification process and the assignment to a housing unit, including segregated housing, involves input from mental health team, even when the inmate has been identified as

seriously mentally ill.  Addressing this issue awaits the development of new security policies and procedures governing disciplinary review, classification and housing assignments.

There still does not appear to be a presumption that segregation is contraindicated for persons with serious mental illness.  At the time of this most recent site visit, 16 out of the 26 inmates being held in segregation were also on the mental health case load, and all 16 of those inmates on the mental health case load are known to be suffering from serious mental illness.  During this site visit, these 16 cases were reviewed in detail.

Based on a review of these 16 cases, it is clear that there are several different issues here, most of which are discussed in more detail in other sections of this report.  (1)  Two of the 16 inmates on the mental health case load have continued to refuse treatment and therefore remain acutely psychotic.  With regard to this issue, see section 37 of this report for a discussion of the need for a protocol for inmates who are clearly in need of mental health treatment but fail to comply with the treatment they require.  (2)  An additional 8 of the 16 inmates on the mental health case load are being held in segregation for administrative reasons or for protective custody.  If there was a mental health unit, either as a stand-alone unit or as part of a larger safe unit, at least 7 of those 8 inmates could be safely housed there, and they would also have access to the more enhanced type of treatment program that they require.  With regard to the need for a mental health unit, see paragraphs 42 (g) (iv), 45, and 74. (3) The other 6 inmates on the mental health case load are being held in segregation as discipline.  There was no mental health involvement in the disciplinary review process that placed those 6 inmates in segregation, and there is no segregation review process that includes mental health input that might be used to determine whether or not disciplinary segregation continues to be appropriate for those inmates.  For a discussion of these issues see paragraphs 37, 76 and 77 (a).  (4)  Then, in addition, it at least appears that the absence of the presumption that placement in segregation is contraindicated for prisoners with serious mental illness has resulted in a lack of focus on addressing the above noted issues that have resulted in the placement of prisoners with serious mental illness in segregation.

There is no evidence that individuals with severe mental illness are screened by a QMHP within 24 hours of placement in segregation.  It does not appear that security staff even knows all of the prisoners on the mental health case load.

At present, there are no mental health evaluations during the disciplinary review process that would form the basis for an opinion by a QMHP that placement in segregation is or is not contraindicated.  Although there are weekly mental health rounds for inmates being held in segregation, at present, there is no mechanism whereby mental health might have input into a decision about whether or not a mentally ill inmate should remain in segregation.  Therefore, the security policies and procedures that are being developed which will govern the disciplinary review process, the segregation review process, and also the classification and housing

assignment process must address this issue.  See sections 37, 42, 76 and 77 (a) for a more detailed discussion of these issues.

In addition, in order to fully address this provision, the above noted policies and procedures that are being developed must include a clear description of the 'extraordinary and exceptional circumstances' that trump the mental health concerns.  In so doing, a distinction should be made between current circumstances (for example, the lack of alternative, appropriate housing for seriously mentally ill prisoners), and the circumstances that will continue to exist after other provisions of this agreement have been met.  See section 77 (b).

Since there is no finding of extraordinary and exceptional circumstances and no interdisciplinary team, there is no documentation of such.

Prisoners with serious mental illness who are on medication and being held in segregation do have at least one daily visit with a nurse, who is a QMP, during medication pass.  During this site visit, there was no difference observed between the nurses' interactions with prisoners in segregation and prisoners who were not in segregation.  Since prisoners in segregation do not see a QMHP on a daily basis, it should be made clear in policy and procedures to what extent the level of care provided by the nurses during medication pass should include some type of assessment of the prisoner's mental status and/or other heightened level of care. The heightened level of care expected of the nurses while administering medication to mentally ill prisoners being held in segregation must be defined in a manner consistent with this provision. Once this level of care is defined, any revisions to policies and procedures and/or any additional training or supervision that might be required to deliver this level of care should be identified and undertaken.

There were two other observations made during this site visit.  (1)  During medication pass on the segregation unit, of necessity, the nurses had to leave the medication cart in order to take medication to each of the actual segregation cells.  This left the medication cart and the drugs and needles on the cart unattended.  Due to the configuration of locks on the doors to the unit, the unattended cart and its contents were freely accessible to anyone from outside the unit.  (2) With one exception, the security staff person who supervised the medication pass on each unit only assumed the responsibility for making sure that the nurses were safe, which really didn't require much more than standing there, given that the medication was administered through the gate to each unit (with the exception of the segregation unit).  Only one officer assumed the more full set of responsibilities of a security officer supervising a medication pass, which includes making sure that each prisoner actually swallows the medication.

Prisoners in segregation who are on the mental health case load are receiving mental health services, including face-to-face therapeutic sessions with a QMHP and visits with the psychiatrist.  Given the number of prisoners on the mental health caseload, the current shortage

of mental health staff, and the full range of duties assumed by existing mental health staff, these sessions are not consistently occurring on a weekly basis. Due to these same issues and the shortage of security staff, these sessions are often not out-of-cell sessions. Once mental health staffing issues have been addressed, there must be an increased effort to comply with this provision, keeping in the mind the fact that as noted in Section 76, weekly mental health rounds for prisoners in segregation must not be a substitute for these therapeutic sessions.

Although the mental health coordinator is performing weekly mental health rounds, the requirements for a weekly review by a QMHP is not being met. In order to address this provision, the mental health coordinator, in conjunction with a physician and the psychiatrist, must also perform a weekly review of the status of the prisoners in segregation who are also on, or should be added to the mental health case load. At present, there is clearly not enough psychiatric time or other physician time to address this provision.

Essentially all prisoners with serious mental illness housed in long-term segregation have had an updated mental health evaluation and have an updated treatment plan (i.e., all prisoners with the exception of the 2 prisoners noted in Section 77-b who have refused to participate in a mental health evaluation). Given that at present, there is no 'appropriate housing' for prisoners with serious mental illness who remain acutely ill, or are vulnerable to being harmed by others, or are at risk of harming others, their treatment plans do not include recommendations for 'appropriate housing'. See section 74 with regard to the need for the development of a special mental health unit. See section 77-b with regard to the finding that the mentally ill prisoners housed in long-term segregation could be more safely and better maintained in 'appropriate housing' (i.e., a mental health unit) if such housing existed. However, such prisoners are receiving follow-up care as prescribed in their treatment plans, and they are likely to be appropriate for some of the planned additional mental health services once those services are available. See section 42-g-iv with regard to the planned expansion of the mental health services provided.

In addition to the fact that the development of a mental health unit (i.e., appropriate, more integrated and therapeutic housing for mentally ill prisoners) will be required to meet this provision of the agreement, there must also be mechanisms whereby mental health findings can impact on decisions to transfer a prisoner from segregation to such a mental health unit. As noted elsewhere in this report, such mechanisms should be described in the security policies and procedures that are being developed which govern the disciplinary review process, the segregation review process, and classification and the assignment of housing.

Then with regard to sub paragraph h requiring referral to the mental health team if someone decompensates, there are additional questions/issues. (1) There is the question of to what extent non-mental health staff persons (i.e., security staff and medical staff) are assessing whether or not prisoners held in segregation are decompensating or otherwise developing signs or symptoms

of serious mental illness, where such signs and symptoms had not previously been identified.  (2) Then there is also the question of whether or not non-mental health staff persons are immediately referring any such identified mentally ill prisoners to mental health.  These are both important questions/issues that need to be further explored, especially given that security staff and medical staff (at least the nurses who administer medication) see the prisoners in segregation on a daily basis.

There is no interdisciplinary team that attempts to balance security concerns and medical/mental health concerns when decisions are being made about the housing of prisoners with serious mental illness.  Although mental health treatment plans have been developed, those treatment plans do not include recommendations for housing, due to the fact that there is no special housing that is specifically designed to meet the needs of prisoners who are suffering from mental illness and/or intellectual disabilities.  Therefore, in order to address this provision of the agreement, more appropriate housing options for prisoners with mental illness and/or intellectual disabilities has to be developed, and such an interdisciplinary team has to be established.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Partial Compliance**
Consistent with past practice, Juveniles Charged as Adults (JCAs) continue to be placed at Henley Young after being booked at the Raymond facility.  When they turn 18 they are transferred to the RDC pending further court action.  As of this site visit there were fourteen youthful prisoners at Henley Young and one remaining juvenile at the RDC.  By the time of this report being filed, the remaining juvenile at RDC will have turned 18 (DOB: 2/13/01) and will be transferred to an adult unit, and the prior practice of placing juveniles convicted as adults should have ended.  Thus, for purposes of this report and monitoring compliance the acronym JCA will be used to refer to juveniles <u>charged</u> and/or <u>convicted</u> as an adult.  <u>Assuming the County places no more juveniles in the adult jail, whether charged or convicted as an adult, the County will be in full compliance with this requirement, albeit well behind the intended date.</u>

As of this visit:

- Of the fourteen juveniles at Henley Young, twelve were boys and two girls;
- The age range for youth was 14 through 17, specifically 14 (4), 15 (2), 16 (6), and 17 (2);
- The length of stay ranged from a low of 7 days to a high of 497 days for two of the youth that were in the original group placed at Henley Young in September 2017.  Eight youth had been in placement for 200 days or more;
- Of the fourteen juveniles, only five had been indicted for the incident that resulted in placement;
- Since initiation of the policy to place juveniles at Henley Young a total of 48 youth have been so placed, many of whom were subsequently released to home;
- The overall population of youth at Henley Young has remained relatively stable recent months both staying below the cap of 32 required in the Henley Young/SPLC agreement and more importantly reflecting a generally lower number of JCA youth than prior periods of time. This helps alleviate the prior concern that delays in case processing for JCA youth will result in a gradual increase in that population.  However, it does not alleviate concerns that for those individual youth, the court system delays are inappropriate and need to be addressed.  Refer to the chart below for the average daily population for the period September through December 2019;



- Both of the two 17-year-olds will turn 18 and "age out" of Henley Young prior to the next scheduled site visit.  Of significant note is that one of these youth (C.M.) was in the original group placed, so by the time he turns 18 (on 2/15/19) he will have spent over 550 days in confinement. But, absent some other significant changes in case processing time

and given the relatively low age of a number of youth in placement, if there are not system reforms those younger youth have a long way to go to age out of the system and could be in placement for years, let alone months.

It is worth noting that there are discussions underway by some key decision-makers to change how the JCA youth are processed in the court system, with the hope that much more timely actions will occur relative to indictment (and/or a reduction in charges that could result in the youth returning to the juvenile court system), bail adjustments and/or other interim releases, and ultimately the plea/trial/sentencing decisions.  This remains an issue for the court system overall but for the JCA youth these delays are particularly disruptive during the critical adolescent development years.

Related to the remaining juvenile at the RDC, another member of the monitoring team reported that concerns remain about the consistency of constant, direct supervision of the remaining juvenile unit.  This is not a concern unique to the juvenile unit but does seem to reflect the inability or unwillingness of the County to follow through on the commitment that juveniles are under constant supervision.  Now that the final juvenile has "aged out" this specific concern is moot, but it is likely that many youthful offenders (e.g. age 18, 19, 20) will be housed in units without consistent, direct supervision.  Although an adult by age, there is no "magic birthday" such that concerns about their vulnerability and/or the impact of harmful conditions of confinement simply "go away".

Although specific booking times at RDC and admission times at Henley Young were not compared side-by-side, in talking with staff at Henley Young they confirmed that after booking at RDC youth were being promptly transferred to Henley Young.  Whether it is necessary for the JCA youth to be booked at RDC prior to transfer to Henley Young rather than just being brought directly to Henley Young by law enforcement is something that may be open to further discussion among various county authorities.  It may be more efficient for law enforcement to bring the youth directly to Henley Young and work out other procedures (between Henley Young and the jail) for documenting that admission and checking prior records, but that is an internal discussion.

Repeating the language from the last report, *"…a number of recommendations were made in prior reports related to changes at Henley Young that would support a successful transition (i.e. physical plant changes, security improvements, increased programming, speeding up case processing, improving the overall behavior management system, etc.).  While some progress has been made related to programming and the behavior management system, concerns remain that the lack of progress on others (particularly physical plant changes and case processing) will make it more difficult to achieve compliance with the agreement, particularly in terms of educational programming, implementing individual case management plans, and limiting the use*

*of isolation as a disciplinary tool.  At a minimum, the county should proceed to add at least some temporary classroom/program spaces that can be used for multiple activities (education, group counseling, skill development programs, etc.) and make changes on the housing units to create a calmer, more flexible, and more normative living environment.  Youthful offenders respond to their surroundings and the current facilities features add to, rather than reduce, the emotional arousal of youth*".

It is disconcerting, at best, that none of the physical plant changes have been made.  These changes would complement the current facility leadership's efforts to improve programming and safety, and there have been statements that some fiscal resources have been included in the overall County capital budget that could be used to make some improvements.  Yet as of this visit there remains no evidence of a firm commitment or plan in place to make any of even the most basic changes.  Improvements by adding portable classrooms that can be used for education and other programming, and improving the quality of the housing units will have a beneficial impact on both youth and staff and allow them to fully implement the Settlement Agreement. Limited appropriate space for the variety of group discussions, therapeutic treatment, and special education services makes it difficult to meet those portions of the agreement that focus on being able to provide those services. For example, the GED program has been limited to 2 hours a day because there is no space for it until after the regular classes are done for the day. It also leaves the program more vulnerable to behavior incidents, particularly aggressive and disruptive behaviors that often lead to the need for using physical restraints that place both youth and staff at greater risk of injury. Youth's behavior is highly reactive and more affected by the physical environment.  Things such as the high noise level on the living units, insufficient personal space in classroom(s)/hallways, and otherwise uncomfortable living spaces elevate the emotional part of their brain that overrides the still-developing "executive/ decision-making" part of their brain, leading to more behavior that is driven by those emotions/reactions while the goal is to teach them how to take a "step back" and make more rational decisions.

An example of a simple improvement that could be made is to add telephone access to the housing unit.  Currently youth are limited to two 5-minute phone calls per week to family members, which is clearly insufficient.  One of the stated reasons for this limit is that youth must be taken to another area of the facility to make a phone call, taking staff time and limiting access for youth.  There is no reason phone lines could not somehow be added to the unit such that they can still be controlled/appropriately monitored by staff but save staff time and allow for greater youth and family contact.

In talking with facility leadership and several staff members, there are some additional concerns related to low pay/lack of longevity incentives and the need for enhanced training and staffing related to responding to more violent incidents that although not specifically required to be

addressed in the agreement likely do bear, to a degree, on the long-term efficacy of Henley Young being an appropriate and safe facility.

Specific recommendations related to the above are:
1. Reaffirm recommendations related to physical plant improvements (i.e. program space, living unit modifications, acoustic improvements, etc.) that will be important in the long run for success in placing JCA youth at Henley Young;
2. The County should notify/confirm to the Monitor  when  (a) there are no longer any JCA youth in the adult jail, and (b) the prior practice of placing juveniles <u>convicted</u> as adults in the adult jail (whether RDC or the Jackson facility) has been officially changed;  and
3. Continue to discuss options for expediting the processing of JCA youth through the court system as may be allowable under current statutes and/or can be appropriately implemented through policy or practice changes.

Unlike prior reports that included observations for both Henley Young and RDC, the information provided in response to the additional requirements below will not refer to operations at RDC unless specifically noted.

For any youthful prisoners in custody, the County must:

78.    Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance at Henley Young**
As noted in the prior report, youthful offenders are booked at RDC and then taken to Henley Young.  A routine part of the admission process at Henley Young is administration of the MAYSI-II, an appropriate mental health screening tool for use with adolescents. A Case Manager is assigned to each youth and is in daily contact with their assigned youth, providing information and support to maintain appropriate family contact(s), interact with court staff, help link youth with external resources, and intervene to prevent behavioral problems. The counseling staff provides more on-going therapy and support and can help coordinate services with Hinds County Behavioral Health or other resources.

The two mental health clinicians follow up the initial assessment by conducting a more complete mental health assessment that covers a wide range of potential issues and utilizing a strength-based assessment to help youth identify skills they already have that they can build on to be more successful in the future.  Along with interviews, these assessments help the clinicians identify some individual areas/skills that youth can work on while in placement and form a foundation for a basic case plan.  Mental health records include regular documentation of contact between

the clinicians and youth and how they are doing relative to the goals they have developed as part of this case plan. The opportunity to compete more comprehensive psychological assessments that would include additional psychological testing and gathering prior treatment information is limited by the limited time available to the psychologist, so this remains an unfulfilled goal in reaching full compliance.

Protocols related to suicide concerns are in place and are reflected in documentation in Incident Reports, intake assessment(s), monitoring of youth exhibiting suicide/self-harm concerns, and documentation of review by mental health staff and "release" from suicide watch status. Henley Young has implemented a strong direct supervision protocol, including one-on-one observation for youth on suicide watch status, and there is documentation of required observation checks.

Just prior to the May visit, the County did secure the services of a licensed psychologist, Dr. Payne, to provide therapeutic services and overall mental health program supervision. So, this visit provided an additional opportunity beyond the fall visit to further assess how that addition has impacted compliance with the requirements of the agreement. Based on discussion with Dr. Payne and other staff (mental health staff, leadership, youth specialists) by all accounts she has been an exceptionally positive addition to the mental health team and the facility overall. As noted in the prior report, Dr. Payne has worked to update mental health policies and procedures, refined the mental health section of the intake assessment process, added more structure to the follow-up mental health assessment, worked with the two existing QMHPs to clarify their roles and responsibilities, fine-tuned the suicide prevention program, developed additional therapeutic interventions, and coordinated with facility leadership and staff in developing more appropriate responses to behavioral issues.

However, as noted in the prior report, concerns about her being hired on only a .5 FTE basis have been borne out in that it is not possible to do the kind of work needed to reach compliance on that basis. There is little doubt that Dr. Payne has gone above and beyond her contract to accomplish what she has and even with that there is simply not time to do what is needed. This is particularly true as it relates to having time to complete full assessments, coordinate behavioral health treatment teams and youth goals, directing development of more integrated counseling and skill development programming, and collaborating with other support resources for youth.

Also, as noted in the September visit report, Dr. Payne clearly has a strong personal commitment to the work at Henley Young, but discussions related to expanding her FTE status to full-time have resulted in no change, despite a recommendation from the HY staff and the monitoring team to do so. Given the challenge in initially finding Dr. Payne (a search and negotiation that took many months), it would be a significant setback to the youth and program at Henley Young if Dr. Payne could not remain in that position on a full-time FTE basis.

Concerns also remain about the limited psychiatric time allotted to youth at Henley Young.  The weekly short visit by Dr. Kumar is sufficient for at most a cursory review of medication issues but little else in the way of treatment and/or coordination with Dr. Payne.   It is not uncommon that it is difficult to find and secure the kind of expertise generally associated with child psychiatry, so whether Dr. Kumar is the best resource, especially given the limited amount of time allotted to youth, is an open question.

One of the three Youth Support Specialist (formerly Case Manager) positions is currently vacant.  With the relatively low number of youth in custody, this is not critical although it does limit the amount of time they are available in the facility to lead group programs and respond to behavioral issues.

Related to appropriate programs, the mental health Clinicians and the Youth Support Specialists have continued to expand the content of programs provided for youth.  There is a long list of topics that are covered, including:

- Understanding Emotions
- Action or Reaction
- Good Times and Not Good Times to Act
- Reasons Not to Use Drugs
- How is Your Emotional Wellness?
- Risk Reduction Strategies & Techniques
- Motivation
- Coping Thoughts & Self-Expectations
- Anger Stop Signs
- Teamwork
- Conflict Triggers
- …and more

Youth are involved in these groups approximately 5 days/week in 45-minute blocks led by the clinicians or Youth Support Specialist, and notes are recorded relative to each youth's participation.  This program plan provides some of the building blocks for continued development of a more integrated and intentional behavioral health and skill development program.  The staff that have been on board and waiting for leadership from the psychologist should be commended for moving forward in developing and delivering the content referenced above, this aspect of programming is still in its early developmental stages.  Most of the activities appear to utilize a combination of discussion, presenting material, and worksheets, all of which are reasonable.

However, an example of a recommendation made to the staff by the juvenile expert is that the research about what is effective with youth suggests that as various skills are discussed/taught they need the chance to "practice" (often through forms of role playing or experiential activities) the skills that are being discussed.  In fact, research suggests that for every 15 minutes spent discussing a skill (e.g. "stop and think", peer refusal skills, identifying behavior options, etc.) 45 minutes should be spent in behavioral practice.  Toward that end, staff are encouraged to identify some of the most critical skills youth need to learn and practice and allocate more time to those programs, including time for youth to practice new behaviors.

Additionally, there seems to be little, if any, linkage between what youth are learning in these group programs with what staff supervising youth are observing, teaching, and reinforcing.  In many ways, the most important learning and reinforcement that leads to the development of pro-social skills will come from **all** staff being fully aware of and engaged in reinforcing youth's behavior **as it occurs** rather than solely relying on group discussions/modules to teach new behavior.  The mental health staff indicate that this is a challenge given that there are substantial variability in what staff are working on the units on a consistent basis, so it will take additional time and coordination through team meetings or other forms of communication to increase the chances that all staff can be fully engaged.

Specific recommendations related to the above are:
1.  Increasing time allotted to the psychologist position at Henley Young to full-time;
2.  Increasing the time the mental health team (psychologist, QMHP, Youth Support Specialists) spend reviewing what programs (content and structure) are provided and identifying more targeted behavior skills youth need to learn (generally in the realm of cognitive behavioral programs), searching out related and evidence-based curriculum, and increasing the amount of time youth spend in practicing new skills; and
3.  Getting all supervising staff involved in the teaching and reinforcing of the desired pro-social skills and more fully integrate what is to be learned into the youth's behavior/treatment plan and the behavior management system.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance at Henley Young**
There have been some changes/improvement in the educational program for youth in recent months.  For example:
• Related to the GED program: (1) the teacher assigned to lead that program has been able to work with several youth to move them forward toward developing basic skills, albeit those youth still have significant blocks of time during the day when they are not engaged in educational programming which is limited to 2 hours a day Monday through Friday primarily

because of the limited classroom space; (2) the teacher made arrangements for one youth to take the GED test, and he successfully passed three of the four tests and hopefully will pass the remaining test before he turns 18; (3) the teacher has begun planning to establish a GED testing site at Henley Young and obtain the necessary certifications so that youth can be tested on site more efficiently; and (4) additional software has been purchased and plans to increase youth's access to learning adult basic education skills through those programs is being implemented.

- More of the JCA youth are involved in the classroom-based education program.  Whereas before many of the JCA youth were not included and had significant "down time" during school hours, it is understood that the plan going forward will be to include any youth who has not turned 17 as of September 1 each year in the classroom program.

- There is a special education teacher working with some of the youth identified as in need of those services, but that time is limited and the "classroom" provided is clearly inadequate (essentially a converted closet).

- Some additional work has been done to develop and implement a "credit recover" component to the educational program that may allow some youth a greater opportunity to "catch up" on high school level credits.

However, key components of programming still fall short of meeting requirements, including:

- Although incremental progress in meeting youth's educational needs has occurred, there seems to be little sense of urgency or advocacy to working with JPS to completely meet the requirements of the agreement, particularly as it relates to youth with special education needs. Any discussion of developing an alternative/charter program (initially discussed in May 2018 with possible implementation in January 2019) ended when HY understood JPS to take the position that further resources from Jackson Public Schools would not be forthcoming.

- Time allotted to teachers certified to deliver special education services is too limited.  The educational consultant assessing the Henley Young/SPLC agreement recommended that two full-time special education teachers be assigned.  At this point there is one with some assistance from the teacher that also covers the GED program.

It is recommended that:

1. Increased time be allotted to gather needed information to determine whether or not a youth is entitled to special education services and if so, review and update IEPs as required, allot more teaching resources to special education youth, and provide appropriate space to provide special education services.

2. Recently acquired software should be more fully implemented to provide more basic education programming to youth involved in all aspects of the educational program but particularly those youth who are "tracked" into the GED program and are receiving relatively little instruction.

3.  Staff continue to explore post-GED options for youth, including outreach to Hinds
    Community College or other post-secondary resources.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance at Henley Young**

Since there are no adult prisoners placed at Henley Young, this provision is met. As JCA youth
in placement at Henley Young turn 18, they will be transferred to RDC or the Jackson facility.

**Partial Compliance at the Raymond Detention Center**

As noted earlier, by mid-February the lone remaining youthful prisoner will "age out" and be
transferred to an adult unit.  In the interim he has been held in a smaller isolation unit in the A
pod and has been separated from adults.  Full compliance will be achieved once the final youth
ages out and final policies/procedures are in place that prohibit the placement of youthful
prisoners in any of the adult facilities and are kept separate during any booking and/or transport
process.

It is recommended that the County notify the monitor when:
1.  The remaining youth "ages out" and is moved to an adult unit; and
2.  Policy is in place to ensure that no more youthful prisoners will be held in any of the adult
    facilities, regardless of their charging/conviction status.

81.     Ensure that the Jail's classification and housing assignment system does not merely place
all youth in the same housing unit, without adequate separation based on classification standards.
Instead, the system must take into account classification factors that differ even within the youth
sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of
victimization, and sex/gender.

**Partial Compliance at Henley Young**

In discussing housing decisions with staff, it is apparent that they do take into consideration the
factors indicated above, although formal documentation of that process needs to be confirmed
and the Classification Policy updated to reflect that there are two JCA units. Substantial
compliance can be achieved by updating the Classification Policy to reflect how it is determined
which of the two JCA units youth are assigned to and further verification of the completeness of
the Classification Checklist can be done at the time of the next site visit. They do have the
benefit of having had prior experience with almost all of the youth referred for placement, and it
is a positive that they consider a youth's vulnerability to others as an important factor to ensure a
youth is safely placed.  The bottom line is that while age and offense are factors, the key factor in
which housing unit youth are placed is their behavior and vulnerability.  Given that two living
units at Henley Young are available for youth, staff has also appropriately responded to

73

incidents/problems that have occurred between youth and made use of separating them into different units as needed.

Note that as of the January visit, there were two girls in custody who were being tried as adults. These girls are placed on the general girls' unit, which makes sense especially given the relatively small number of girls in custody in the juvenile system at a given time (often none).

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance at Henley Young**
The training officer at Henley Young continues to do a good job of coordinating and tracking the basic training for staff.  This includes making sure new staff receive 40 hours of new employee orientation training and are enrolled in state-required detention officer training.  The training plan for 2019 includes an appropriate range of training including: Policy and Procedure Review, Behavior Management/Adolescent Development, Non-Violent Crisis Intervention (initial and recertification), PREA, CPR, Intake Procedures including a focus on use of the mental health screening tool (MAYSI-II), dealing with Hostage situations, and Effective Communication.  In addition to providing some of the training directly, the training officer has also engaged Dr. Payne and other resources to provide some aspects of training, e.g. Behavior Management, Adolescent Development, and Effective Communications.  Also on a positive note, in reviewing some of the materials utilized for these trainings, resources include those developed by the National Center for Youth in Custody and the National Partnership for Juvenile Services, both recognized as supporting best practice standards.

The training officer also makes the effort to set training times that do not detract from shift duties or require substantial overtime/work beyond a staff's normal shift.  While this is a challenge in any 24/7 facility, this is complicated in Hinds County as many of the staff need to work other jobs in order to "make ends meet", so coming in before/after shift or on "off days" is difficult for them.  Along with scheduling adequate training time, some challenges remain in developing additional, more advanced trainings due to the fact that staff turnover (hiring and training new staff) takes up a considerable amount of training time and energy. This makes it difficult for staff to "advance" their skills over time vs. essentially simply "refreshing" what they have already learned.

To reach full compliance, it is recommended that:

1. Efforts be made to identify more advanced training programs that build on the basic skills learned in the current training curriculum.  This could include outreach to local/regional resources through the universities, Hinds Behavioral Health, or other programs that focus on working with youth; and

2. The County could consider linking more advanced training to additional performance and/or longevity incentives that would enhance staff retention, increase the staff skill level, and provide reinforcement for staff to advance those skills.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

   a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

   b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

   c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

   d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

   e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

   f. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

   g. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

    h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

    i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance at Henley Young**

For the most part, there has been continued progress in this area in that both the frequency and duration of the use of involuntary room confinement has declined. In particular, in September there were 8 instances, in October there were four, in November there were 6, and in December there were only 2. It will be important to continue to monitor the trend of use of the Behavior Management Isolation as well as the Due Process Isolation steps that have been in place in the past. While this represents progress, it is still outside the requirements of this agreement. Staff indicate that even in situations in which a youth is to be confined to their room for 24 hours, they are allowed to get out for school and one hour of recreation, but they also indicate the youth often chooses to stay in their room rather than go to school.

Actions taken to develop a more appropriate, problem-solving approach to dealing with disciplinary incidents was initiated around the time of the September site visit, and that process seems to be paying off in terms of diverting the situation away from the more "correctional" response of simply using involuntary room confinement. This new process includes involvement of the Youth Support Specialist, the Psychologist, and/or the QMHP staff to work collaboratively with supervising staff and leadership staff to meet directly with the youth and walk through situations that occur and identify new behaviors and solutions in lieu of formal discipline.

Full compliance with the "time limit" on the use of segregation to no more than one hour unless the youth presents an imminent harm to others will require significant continued work related to developing alternatives, training staff on alternative supervision measures, increased programming to constructively occupy youth's time, and increasing incentives for youth to comply with behavioral expectations. A related concern is that one of the "trade-offs" in reducing the use of segregation for disciplinary purposes has included reducing youth's access to phone contact with family members and/or visitation privileges. Both of these are already limited and further reduction can often be counterproductive to maintaining important familial relationships that will benefit the youth in the long run. The ability to earn some additional privileges has been included in the new behavioral point system but more could be done to incentivize positive behaviors without reducing these already very limited privileges.

Related to documentation, improvements can still be made in tracking observation of youth during confinement and providing ready documentation of contact by clinicians and case managers with youth while confined. For example, it is not uncommon to see the "room checks" to be noted in exactly 15-minute increments (e.g. 1500, 1515, 1530, and so on) which always

suggests to an outside observer that the actual time is documented at the end of a shift rather than as it occurs. If not already done, the room observation form could easily be taped to the outside of a youth's room and the actual time recorded as the check is made rather than sitting in a folder to be completed later. Also, the only place that clinician contact with youth while in confinement is documented is in their records, and both clinicians were out of the facility during the site visit. The prior recommendation to add the clinician "check" to the observation form was not adopted, making it very difficult to actually monitor whether and when mental health staff are involved in checking the status of youth in segregation.

It is also difficult to collect good data about the use of shorter term segregation, i.e. when a staff member on duty feels it is necessary for safety purposes to place a youth in their room, as that information is not collected in the same way the longer Due Process Isolation decisions are kept. And, although staff say that a youth that is placed on isolation status may be out of their room for school and recreation, the current Observation log does not adequately reflect whether the youth is actually out of their room leaving no way to verify whether or not that is true.

Related to documentation, there are two simple recommendations (both of which were included in the prior report but not adopted):
1. Improve the system for ensuring that required wellness checks are made and recorded at no longer than 15-minute intervals and include the time of the "check" made by mental health staff directly on the Observation form; and
2. Establish a "master" list of all involuntary room confinements/segregation that exceed 15 minutes, whether initiated by youth care staff or through a disciplinary process; and then include tracking this information through a quality assurance/performance-based process in which trends over time can be tracked (including what staff are imposing restriction). This information can be reviewed monthly by key leadership to assess progress toward eliminating involuntary room confinement.

84.     Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For

instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

   c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance at Henley Young**

At the time of the last site visit, Henley Young was in the first week of implementing an updated/revised behavior management point system and a more proactive graduated response to behavior problems.  As noted in the previous reports, the system was a transition to a weekly vs. daily system, and additional positive incentives were added.  These were positive steps forward, and during this site visit there was an opportunity to evaluate to some extent whether/how the changes have improved youth behavior and/or staff response to behaviors.

In talking with youth and reviewing some of their point sheets (which have continued to evolve in format), youth do seem to be well aware of the basics of the system and the types of "rewards" they can earn.  There was variation in how youth were doing on the system, as one would expect, but in general most youth were consistently being scored to meet the mid-range or above of potential "points" and incentives.

That said, this tool could still be characterized to be in its rudimentary stages of development, and changes made do not include recommendations made in the last report, including: (1) adding an individual weekly goal identified by the youth and case manager – something that is unique to the case plan for that youth and focuses on a particular pro-social skill or behavior and includes a specific incentive/reward that can be implemented for that youth; (2) working with youth to identify additional incentives that they would like to see included as rewards for achievement; and (3) implementing an additional "coupon" or token reward program in which staff can reward "kids doing good", focusing particularly on new and improved behaviors that contribute to the overall welfare and safety of the group.  Each of these are no-cost/low-cost steps that can engage members of the mental health and staff teams in collaborating with youth to identify and reinforce skill development, allow for some individualization of the system, and create more opportunities for positive staff-youth interaction(s).

Implementation is also fundamentally flawed in two ways: (1) youth are not apprised/do not have access to the "points" they are earning through the week or on each shift; and (2) the system does not include behavioral expectations for weekends.

Without going into great detail, discussion with staff reiterated the recommendations made in the last report (that were not implemented) as well as making the strong recommendation that youth have easy access to how staff are scoring the expectations on a routine (at least daily, preferably each shift) basis.  In addition to providing a good way to track some basic behavioral

expectations, the "point" of a system such as this is based on the importance of reinforcing youth's behavior in a timely basis.  In addition to simply "scoring" the points, the staffs need to be proactive in communicating with youth how well they are doing and/or ways they can do better.  It is of little value, for example, for a youth to find out Friday how they were "scored" that prior Monday.

As noted in the prior report, there are many components beyond a "point system" that will ultimately impact behavior (e.g. interaction of programming, staff interactions, mental health support, etc.).  In fact, as referenced earlier in the report, the staff with the greatest opportunity to shape behavior are the direct supervision staff that, if properly trained, can reinforce/shape youth's behaviors as they occur rather than relying on some "corrective" action later.  This speaks to the need for even more staff training related to shaping behavior, encouraging staff to view their role as behavior change "agents" rather than a more passive "correctional" role, and more complete integration of the mental health team and direct supervision staff in development and evaluating progress related to a youth's individualized case plan. For example, although Youth Support Specialists/QMHP identify goals for each youth, the direct supervision staff have no idea what that goal is.  Breaking down those goals into achievable and observable behaviors that can be reinforced in a timely way by staff is necessary to achieve the outcomes desired.

With these things in mind, at the time of the last report the recommendation to engage a consultant was deferred.  Having now had some chance to evaluate the changes made, the concern is that the changes are positive but too incremental and do not reflect the kind of overall integration of treatment and behavior management best practice that is intended by the requirement in the agreement.

Recommendations specific to this requirement include:
1. Reaffirming recommendations noted above to improve the behavioral "point" system by including weekend expectations, more proactively using the tool to shape behavior at the time it occurs, include individualized behavioral goals for each youth on the point system for each youth (so all staff know what to watch for), expand the number and nature of incentives youth can earn (ask youth for ideas and also these can be individualized as needed), and adding additional "coupon" or behavior "rewards" when youth exhibit identified new and improved behaviors;
2. Engage the services of a consultant to serve as a resource to leadership in continuing to evolve the behavior management aspect of the operation.  Staff seem very open to learning more and someone who has implemented the kinds of changes recommended (and help them walk through the programmatic and staff changes required to be successful) could be very useful in moving this component forward on a much more complete and timely basis;
3. Include youth supervision staff in "team" meetings in which goals for youth are set, issues discussed, and approaches to success are developed.  These meetings could also include the

youth as well so that on a regular (even weekly if time permits) basis everyone "gets on the same page" as to what the youth should be working on.

Significant progress in developing an effective behavior management system that fully engages and integrates all staff in working together to increase desired behaviors, teach youth new pro-social skills, and increase overall safety is a process that can take a year or more.   At this point staff leadership is open to continued improvement, and given additional support progress toward that goal can be significantly enhanced.

## LAWFUL BASIS FOR DETENTION

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

At the time of the site visit there were still no adopted policies and procedures in this area However, since the time of the site visit the policies on pre-booking and booking policy have been adopted. A Booking Manual is reportedly being developed. As previously reported, there appears to be significant improvement in documenting the basis for detention. There are four staff members who review various types of cases to track and investigate the basis for detention. This has resulted in significant improvement in the accuracy of the records. However, there continue to be some files that don't support continued detention and, as a result, individuals who are detained longer than they should be. During this site visit, it appeared that the most common reason people were held longer than they should have been was because other agencies were not meeting required deadlines and jail staff were allowing them extra time. This was the case with some individuals held beyond 21 days waiting for a probation violation determination.  With personnel changes at Probation and Parole, communication has been difficult and Jail staff have detained individuals beyond the 21 days to allow for delayed communication. Individuals are supposed to have their first appearance within 48 hours or be released. Four individuals were held beyond the 48 hours because the police agencies did not provide the paperwork. There were two individuals for whom there was no basis for detention at the time of booking. One individual

who was held on a probation violation reached the 21 days. His probation officer came to visit but didn't want to take him so he had the individual released and rebooked although there were no new charges or violations. As a result, there was no supporting documentation for his booking or detention. This was caught 4 days later and he was released. One individual was booked in without any supporting documentation because the Jail was "assisting another agency." There continues to be an issue with warrants and holds. The Warrants Division of HCSO uses an old data base and so does not enter warrants into the JMS system. The Records Office does not always get notice of warrants or holds if they come in after booking or if they are not entered in the charge field.  Another recurring situation is that there is not a way to identify people in the Jail who are waiting for a preliminary hearing. Individuals who do not have an attorney have no one to request a preliminary hearing. These individuals currently get lost in the system and some stay long periods of time in the Jail. There continue to be individuals detained beyond 90 days without indictment. It appears that staff is maintaining an accurate list of unindicted individuals. This also cannot be run accurately out of the JMS system. Jail staff reported that they continue to see orders releasing an individual ROR but ordering the defendant to continue to be detained until transfer to the state hospital. The legality of these orders needs to be determined.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in Bearden v. Georgia, 461 U.S. 660 (1983) and Cassibry v. State, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**

At the time of the last site visit there were four individuals who were or had recently been held for failure to pay fines and fees without a legal court order. There do not appear to be any individuals held on unlawful orders at the present time although there were two court orders that were somewhat ambiguous and were brought to the attention of staff. The absence of policies and procedures on this issue contributes to the risk of this continuing to arise after it appeared to be resolved. The draft policy on Pre-booking does address this issue but has not yet been adopted.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. This is carried as partial compliance because policies and procedures have not yet been adopted. The draft policy on Records does address this requirement but has not yet been adopted.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**

See response to number 87 above.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**

See response to number 87 above.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are some individuals who have a sentence of confinement. Some of these individuals show fines and fees but with the notation of a payment

plan in effect. This signifies that they will be released after the sentence of confinement. The Monitor will continue to track these entries to ensure that individuals are released after the confinement period. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court. The non-compliant orders at the time of the last site visit did not use the same daily amount for working off fines and fees. If the Jail at some point receives a valid court order on fines and fees in that the ability to pay has been adjudicated and the failure to pay is willful, the Jail should work with the courts to utilize a uniform daily rate for discharging the amount owed.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Non-Compliance**
This has become a limited issue now that virtually no individuals are working off fines and fees. As reported recently, the recent standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. The most recent stated practice was to determine the amount of credit on a case by case basis. There needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:
      a.     Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.
      b.     Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.
      c.     Examples of prisoners presumptively entitled to release include:
            i.     Individuals who have completed their sentences;
            ii.     Individuals who have been acquitted of all charges after trial;
            iii.     Individuals whose charges have been dismissed;
            iv.     Individuals who are ordered released by a court order; and

v.  Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

See response to number 85.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

There is still no known process to electronically check for adequate documentation for detention and identify those that should be released. There are no routine audits of paper or electronic files to ensure accuracy. The Jail still relies on inmate requests and grievances to identify people who are being over detained. In addition to Booking staff, there are four individuals tracking the lawful basis of detention. They are all four using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. There continues to be a lack of specified procedures to check all law enforcement and court documents. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

This provision speaks to one set of responsibilities that fall clearly on the mental health team, and another set of responsibilities that must be shared by the mental health team, security staff and the facility's administrative staff.

With regard to those responsibilities that fall clearly on the mental health team, there has been enormous progress towards addressing this provision. More specifically, as discussed in section 42, the mental health team has developed and maintained a 'mental health tracking log' that lists all prisoners with serious mental illness; each prisoner's location, booking date, and length of stay in the facility; how and when each prisoner was referred to mental health; and information regarding the initial mental health assessment, the initial psychiatric assessment, diagnosis, the treatment plan, any medication, and next scheduled visit. The mental health team also maintains a complete medical record for each prisoner with serious mental illness that includes all assessments, treatment plans, and treatment progress notes; these records reflect the activities of each team member involved in the prisoner's treatment, including the psychiatrist; and these records also document assessments and treatment related to any special mental health circumstance that might have occurred including, for example, suicide watch or other special mental health observation.

Given the above noted improvements, the mental health team can provide an accurate census of the jail's mental health population. This census count, coupled with a clear awareness of the standards of clinical practice for addressing the needs of seriously mentally ill persons, has informed discussions in this report regarding staffing, program and resource needs. See sections 37, 42 and 77 with regard to staffing needs, program development and resource needs, including the need for a special mental health unit.

The information contained in the 'mental health tracking log' and the medical records is also used to assess compliance with many of the mental health policies and procedures. For example, these records indicate whether or not specific, required tasks were performed; whether or not tasks were performed in a timely manner; whether or not each task is sufficiently documented; and whether or not a decision made is supported by the information obtained that formed the basis for the decision. While this is the first step in the development of a quality assurance program for mental health, it is anticipated that once additional staff are hired, a more formal treatment plan review process will be undertaken. This process will provide yet another level of quality review, in that team members will be collectively examining to what extent each prescribed treatment plan is actually meeting its treatment goals and objectives, and what adjustments in the treatment plan may or may not be required.

To date, there have been no prisoners who have required a transfer to a mental hospital or other treatment facility for mental health treatment other than those needing long term placement at the state hospital. However, there is a considerable backlog with regard to the transfer of prisoners for forensic evaluations and/or restoration of competency, which is totally due to the limited capacity of the forensic mental health facility where such tasks are performed. In an attempt to respond to this problem, there is now a 'competency restoration program' that has been brought

into the facility, which is a free-standing program that is not part of the facility's mental health treatment program and does not provide treatment.

See paragraph 96 for a discussion of the mental health team's community transition planning for prisoners with serious mental illness.

In contrast to the above noted developments, there has been much less progress towards meeting this provision as it relates to the responsibilities that must be shared by the mental health team, security staff and the facility's administrative staff.  To what extent and through what mechanisms mental health will be involved in such things as security incidences and investigations await the development of security policies and procedures that address such issues.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b.   Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.   Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d.   Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

In the initial Policies and Procedures that were adopted there are two policies that may relate to this requirement-the policy on records and the policy on booking which includes some requirements related to release. These policies do not have the specificity or the breadth required by this paragraph. Although the draft policies on Pre-booking and Booking address some of these issues, there is currently no draft policy on Releasing. The Booking Manual, also in the process of being drafted should provide even more needed specificity. The current practices, as described above, do not meet the requirements of this paragraph. Although improved, there still are inmate files which do not include documentation establishing the basis for detention or continued detention. Neither the DA's office nor the defense bar has been involved in the drafting.

A primary focus of subparagraph d is the successful referral of prisoners with mental health difficulties to community-based mental health services upon their release from the facility.  As has been noted in prior reports, the mental health team and the facility's discharge planner have taken steps towards improving communication and cooperation with community-based providers, especially Hinds Behavioral Health (which is a major community-based provider of a full range of mental health treatment services and wrap-around services).  To date, it at least appears that it will be possible to develop a sound working relationship between the facility and this community-based provider of mental health services that will lead to more meaningful and successful referrals of prisoners to a full range of community-based mental health services upon their release from the facility.  It is anticipated that once additional mental health staff have been hired, more time can be devoted to this extremely important effort.

Another critical factor that impacts on the successful referral of prisoners with mental health difficulties to community-based mental health services is the preparation of prisoners to receive such a referral.  More specifically, upon their release from the facility, prisoners are more likely to actually accept and follow-up on a referral for community-based mental health services if they

have come to understand that they have a mental illness, the impact that the illness has had on their lives, that there is treatment that can help them improve their ability to function, and that it is their responsibility to obtain, actively participate in, and comply with that treatment. Therefore, another part of responding to this provision is the expansion of the mental health services provided at the facility to include psychoeducational groups and discharge planning groups, both geared towards preparing prisoners to accept and follow-up on referrals for community-based mental health services.

Finally, the other critical issue in this provision is providing prisoners, upon their release from the facility, with appointment information and a supply of their prescribed medications to bridge the time period between release and their first outpatient appointment.  In order to address this part of this provision, the mental health team should be informed when a prisoner is going to be released and be given an opportunity to meet with the prisoner prior to release.  This appears to be a major problem.  Although security/booking has asserted that all prisoners are cleared by medical as part of the release process, the records in the Medical Department covering December 2018 indicate that only 13 of the 30 prisoners released from the facility during that month who were known to medical staff were cleared by medical during the release process.  Therefore, the other 17 released prisoners were not brought to medical as part of the releasing process and therefore did not have the opportunity to receive any appointment information or bridge medication that they may have required.  Obviously, security must make more of an effort to assure that prisoners are cleared by the Medical Department as part of the release process.  However, the mental health team is also taking other steps to address this issue.  More specifically, the information transmitted in the above noted psychoeducational groups and discharge planning groups will also include important information on the community-based mental health services provider, such as its location and the fact that they accept unscheduled, walk-in intake appointments every morning.  In this way, if a prisoner is released without being cleared by medical, the prisoner will know that to go to the community-based provider the next morning for assistance, support and medication.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:
    a.    Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
    b.    Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. Documentation of NCIC reports at the time of release will be reviewed at the next site visit.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:
    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.
    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:
        i.    How to process release orders for each court, and whom to contact if a question arises;
        ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;
        iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and
        iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.
    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Non-Compliant**

While this section deals with the qualifications of those people processing records, coordinating with the courts and processing inmates for release (as well as booking), the imbalance of staffing in the Booking area needs to be emphasized again (see the Sixth Monitoring Report).  While there is routinely only one officer in the holding cell area (where there should be two at all times, one male and one female) three, four or more Booking Clerks (who are Detention Officers) are often on duty in the office area.  Considering the fact that only 14 people are booked on a typical day (slightly more than one every **two** hours), this misallocation of manpower should be addressed immediately by the facility captain.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

    b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not prepared for errors in releasing.

102.     The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process. This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks. If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release. The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Jail now has an individual whose title is Quality Control Officer. At the present time, his work is primarily reactive. When an individual is brought to his attention, he researches the situation and takes corrective action. He does not track releases or prevent errors in the releasing process. He maintains a spreadsheet that includes release errors that he has addressed, but he does not at the present time collect and report on releasing errors. His work is not incorporated into a continuous improvement and quality assurance process.

Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. Like the Quality Control Officer, she operates independently of the booking and release process and maintains her own spreadsheets. There still is no systemic approach to ensuring proper detention and release processes are being developed. This is being addressed by the monitoring team consultant in this area.

103.     The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator. The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures. Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

Incident reports are not routinely created for untimely or erroneous prisoner release or any investigations of such incidents. There have been untimely releases as described above that have not been reported.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

At the JDC and the WC there is adequate space, and sufficient staff available, to support timely attorney/client visits.  Although the facilities were not properly designed to accommodate this function, they are able to function.  At the RDC the designated space for these visits was originally in each pod (A, B and C) but because of security considerations since the riot in Pod C, they have not been used for that purpose.  Currently, the space used for attorney/client visits is in the front of the jail, which means that inmates must be escorted by staff nearly the full length of the facility.  Considering the critical shortage of officers, it is difficult to deliver inmates in a timely fashion.  As has been suggested in the Third, Fourth, Fifth and Sixth Monitoring Reports, the DSD should take advantage of unused video visitation space in front of the control room officer's stations in the A, B and C pods and repurpose it for attorney/client visitation.  With very little effort, and almost no expense, it can be easily transformed into secure rooms that meet the needs of the facility.  Why has almost a year and a half passed since this simple recommendation was made without any action on the part of the County, HCSO and DSD?

**CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE**

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Non-Compliant**

The County is making progress towards computerized incident and other reports as well as the development of manually created summary reports. However, at the present time there is no computerized tracking system. As a result, reports can't be aggregated by location, type, persons involved, etc. The primary IT officer is reportedly receiving training on research software that will assist in creating electronic reports which may help to address this deficiency. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, lost money and property, and medical grievances. An IA investigation disclosed a serious use of excessive force that had not been reported. Although an incident report had been prepared, it did not accurately describe the occurrence. The Jail Administrator referred the matter to IA. The IA investigator reviewed the video tape and reported the discrepancy.  There also appear to be inmate assaults that are not reported. The medical transport list also indicates visits to the ER for assault injuries where incident reports were not provided to the monitoring team. The manually created summary report for inmate assaults at RDC has not been consistent with a review of the actual incident reports, investigation reports and medical transport logs.

The new computerized grievance system does not allow for the compilation of a useful summary grievance report. Currently, this is not possible for several reasons. The reporting functions of the system are either problematic or not adequately conveyed to staff. Staff reported that they could not generate reports with identified parameters. If the prisoner replies via the kiosk in any fashion to the grievance response, that is then automatically converted to an appeal which inaccurately reflects the number of appeals. The system needs to be able to generate accurate reports.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

a. Brief summary of all reportable incidents, by type, shift, housing unit, and date;

b. Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

c. The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

d. List and total number of incident reports received during the reporting period;

e. List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provided a monthly report of incidents in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph. Also, in reviewing the incident reports provided as compared to the summary reports, the summary reports for RDC did not account for all of the inmate assault incidents that appear in the incident and investigation reports. At the present time, the manual report for RDC does not appear to be accurate. As mentioned above the IT department is working on a computerized report that should allow for a summary report to be generated electronically. This should improve the accuracy of the summary report and better facilitate identifying problem areas. However, currently some incidents appear to be missed in the summary because the type of incident listed in the report does not necessarily identify it as a report that needs to be included. This may require a modification to the incident report that allows for multiple types to be identified.  Because the summary reports are manually compiled, it is difficult to identify trends over time. Even then, it will be essential to determine that reports are being submitted when they should be such that an accurate summary report can be generated.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

a. Summary of all uses of force, by type, shift, housing unit, and date;

b. List and total number of use of force reports received during the reporting period;

c. List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The County provides a monthly report of use of force in the three facilities. Although the information is helpful, it does not meet the requirements of this paragraph in that the reports are manually prepared each month and do not allow for identifying trends over time. As mentioned

94

above, the IT department is working on a computerized report that should allow for a summary report to be generated. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated. As mentioned above, at least one use of force incident was not apparent from the incident report.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

As noted in the introduction to the Grievance section of the Settlement Agreement at paragraph 69, one function of a grievance system is to identify potential constitutional problems and to prevent more serious problems from developing. The defects in the system prevent its use for meaningful tracking of potential problems. Probably the most problematic is that of the grievances reviewed, most were actually inmate requests, not grievances. Staff cannot recategorize these as inmate requests so any compilation will not accurately identify actual grievances. Within inmate requests, there is no way to identify subject matter so as to compile a report by the area of inmate requests. Even if there were, however, most notably, the system cannot generate a report by subject. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. At the present time, there is no review process in the grievance system.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

     a.     A brief summary of all completed investigations, by type, shift, housing unit, and date;

     b.     A listing of investigations referred for disciplinary action or other final disposition by type and date;

     c.     A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

     d.     A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

See response to paragraph 68.  Subsequent to the last site visit, the IAD investigator provided a summary sheet reflecting the status of IAD investigations since 2017; however, the level of detail included does not comply with all of the requirements of this paragraph.

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

e.   The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f.   The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**
There is currently no Early Intervention program.

113.   Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**
The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter.

114.   Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

a.   Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.   Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**
As reported in the last monitoring report, Quarterly Continuous Quality Improvement and Medical Administration (MAC) meetings have been conducted. Topics have included discharge planning, TB skin tests, medication administration.  At the JDC, CQI studies included discharge

planning, medication administration and compliance in conducting the suicide screen during the intake process.

## CRIMINAL JUSTICE COORDINATING COMMITTEE

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**
Hinds County had contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC but this contract has not been renewed. The CJCC has been meeting regularly. In order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish this has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi

Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC is meeting regularly. Not all of the identified agencies have been represented at the meeting. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC has just adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Further observation of the CJCC and the County's participation in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  The County has not renewed the contract with the consultant without accomplishing the tasks specified in this paragraph.

## IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

    a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

    b.    Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The DSD has printed a booklet-sized version of the Settlement Agreement, which has been distributed to most staff, but copies are not posted in each housing unit.  Further, staff members are not familiar with their obligations under the Agreement.  At the JDC copies of the Agreement and the Monitor's most recent report are located in each control room, but this practice is not followed at the other facilities.  Based on questioning of selected supervisors in various areas of the Jail System, it is apparent that they are not only unfamiliar with the contents of Monitoring Reports, but many of them have not read the original Settlement Agreement.

## POLICY AND PROCEDURE REVIEW

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, jail staff has been working with Karen Albert of

the Monitoring Team to develop policies and procedures and after the September site visit, several draft policies have been provided and at this time, two policies have been adopted.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Two policies and procedures have now been adopted and several others have been drafted and circulated. There are many outstanding policies to be written and no estimated completion date. They are seriously overdue at this time. However, there is a policy committee working with the monitoring team expert on this project.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Several draft policies have been circulated but most have yet to be drafted.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

See response to 131.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Non-Compliant**

There have not yet been policies and procedures approved by the United States. The United States has provided comments on the draft policies that have been provided.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Partial Compliance**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May site visit. A self-assessment was provided the week prior to the September site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph.  A self-assessment was not provided prior to the January site-visit.

160.   The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications have been provided. Comparing the notifications to the medical transport list, it appears that immediate notification of hospitalization is not always provided. The County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date and preparing incident reports

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2019, I electronically filed the Court-Appointed Monitor's Seventh Monitoring Report with the Clerk of the Court using the ECF system, which sent notification of such filing to the following:

COUNSEL FOR PLAINTIFF, UNITED STATES OF AMERICA:

ERIC S. DREIBAND
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
steven.rosenbaum@usdoj.gov

LAURA COWALL
Special Counsel
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
laura.coon@usdoj.gov

CHRISTOPHER N. CHENG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-8892
(202) 514-6273 (fax)
christopher.cheng@usdoj.gov

D. MICHAEL HURST, JR..
U.S. Attorney
Southern District of Mississippi

COUNSEL FOR DEFENDANTS – HINDS COUNTY; MEMBERS OF THE HINDS COUNTY
BOARD OF SUPERVISORS IN THEIR OFFICIAL CAPACITIES; THE SHERIFF OF HINDS
COUNTY IN HIS OFFICIAL CAPACITY:

PIETER TEEUWISSEN
Board Attorney
P.O. Box 686
Jackson, MS 39205-0686
(601) 968-6797
(601) 968-6794 (fax)
pteeuwissen@co.hinds.ms.us


CLAIRE BARKER
Counsel to the Sheriff
407 East Pascagoula Street
Jackson, MS  39205
(601) 974-2967
(Fax)
cbarker@co.hinds.ms.us

COUNSEL FOR INTERESTED PARTY, DISABILITY RIGHTS MISSISSIPPI:

ELISSA JOHNSON
JODY E. OWENS
PALOMA WU
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
(601) 948-8885 (Fax)
elissa.johnson@splcenter.org

/s  Aaron S. Fleisher
AARON S. FLEISHER
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 307-6457
(202) 514-4883 (fax)
aaron.fleisher@usdoj.gov