1               IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                        NORTHERN DIVISION

3


4    UNITED STATES OF AMERICA                          PLAINTIFF

5    VERSUS                        CAUSE NO. 3:16-cv-00489-CWR-JCG

6    THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS CO. SHERIFF VICTOR MASON, ET AL.           DEFENDANTS
7

8

9                  STATUS CONFERENCE PROCEEDINGS
             BEFORE THE HONORABLE CARLTON W. REEVES,
10              UNITED STATES DISTRICT COURT JUDGE,
                        MAY 9, 2019,
11                   JACKSON, MISSISSIPPI

12

13

14
     APPEARANCES:
15
     FOR THE GOVERNMENT:      CHRISTOPHER N. CHENG, ESQ.
16                            AARON FLEISHER, ESQ.
                              CANDACE MAYBERRY, ESQ.
17
     FOR THE DEFENDANTS:      PIETER TEEUWISSEN, ESQ.
18                            CLAIRE BARKER, ESQ.

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov

**TABLE OF CONTENTS**

By the Court............................................   3

By Ms. Simpson.........................................   6

By Mr. Moser...........................................  20

By Mr. Parrish.........................................  26

By Ms. Simpson.........................................  40

By Mr. Dudley..........................................  44

By Ms. Simpson.........................................  54

By Mr. Cheng...........................................  63

By Mr. Teeuwissen......................................  69

By Ms. Barker..........................................  89

By Mr. Cheng...........................................  94

Certificate of Court Reporter......................... 112

1               **IN OPEN COURT, MAY 9, 2019**

2

3        MS. SUMMERS:  Hear ye, hear ye, hear ye, the United States

4  District Court for the Southern District of Mississippi, Northern

5  Division, is now in session.  The Honorable Carlton Reeves

6  presiding.  May God save the United States and this Honorable

7  Court.

8        THE COURT:  You may be seated.  Good afternoon.

9        First of all, I thank the parties for making yourselves

10  available, working with each other to change the time of this

11  status conference today.  Counsel for the County had requested it,

12  and I appreciate you all making your schedules flexible enough to

13  move the time and date or move the -- at least the time.

14        But we're here today for a status conference.  I received

15  the last monitor's report that has been filed, and I assume

16  everyone has reviewed it.  So this is our regularly -- what will

17  soon be called our regularly scheduled status conference.  I'll

18  let you all know that I did meet with the monitor last week in

19  advance of this hearing.  I know the monitor was here last week,

20  and I think the monitor's, if you will, her team has been here

21  this week, I believe.  So I'm ready to find out what I need to

22  know about -- the report is dated 3/5/19 based on the visit that

23  followed, I believe, the January meeting that we had.  And the --

24  that report, the report from 3/5/19 in the Court's view did not

25  look appreciably different from -- in many respects, not all

1   respects -- in many respects from the preceding status report from

2   November 2018.  So I guess the first thing we need to do is talk

3   about what's in the 3/05 report, and then I'll find out what we've

4   learned since then.

5           So who wants to tell me their side of the report?

6           How do the parties wish to proceed?

7           MR. CHENG:  Your Honor, I think typically we allow the

8   monitor to present the bulk of the reporting, and then the parties

9   can comment on it.  Sometimes the parties can make remarks,

10  especially in this form, at it might be better if we let the

11  County go first.

12          THE COURT:  Okay.  With this new format, you mean where

13  the judge comes out in a robe?  Because I was prepared to sit down

14  and --

15          MR. CHENG:  I think more in terms of the focus the judge

16  has brought on what the differences are between the reports, and

17  it was a little bit more open-ended on previous comments.

18          THE COURT:  Okay.

19          MR. CHENG:  But since the Court has a specific idea as to

20  how we are to approach the problem, it may be better to have

21  the --

22          THE COURT:  Okay.  All right.  What does the County say

23  about it?  The County -- and then I'm going to ask, because I know

24  the County is not the sheriff.

25          So what does the County say?

1            MR. TEEUWISSEN:  We're the sheriff when it comes to paying

2    the bills, Your Honor.

3            THE COURT:  Okay.  When it comes to paying the bills.

4            MR. TEEUWISSEN:  I agree with Mr. Cheng.  I think it would

5    behoove the Court to hear from Ms. Simpson first.  I met with her

6    Tuesday evening, and I think she has observations that --

7            THE COURT REPORTER:  Will you please turn your mike on?

8            MR. TEEUWISSEN:  Oh, I'm sorry.  She has observations, I

9    believe, based on our conversations since the 3/5 report that will

10   frame where we are today and where we need to go, so I agree with

11   Mr. Cheng that it's probably best to hear from Ms. Simpson first.

12           THE COURT:  Okay.  And you're going to correct her if she

13   makes any overstatements or misstatements or errors?

14           MR. TEEUWISSEN:  Of course I will, Your Honor.

15           THE COURT:  All right.

16           MR. TEEUWISSEN:  I will say one piece of good news.  We've

17   had no deaths since we last saw you.  And I know that's a low bar,

18   but the last time we saw you, we had just had a death, so that's

19   some good news.

20           THE COURT:  I hope you're not speaking one into existence.

21   All right.  Knock on wood.

22           Ms. Barker, is there anything -- does the sheriff --

23   what's the sheriff position?

24           MS. BARKER:  We agree with the County, Your Honor.

25           THE COURT:  All right.

1          MS. BARKER:  Thank you.

2          THE COURT:  All right.  Ms. Simpson, then.

3          MS. SIMPSON:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.  Make sure the microphone is

5     on.  Just push the button, and the green light should come on.

6          MS. SIMPSON:  Okay.

7          THE COURT:  There you go.  Thank you.

8          MS. SIMPSON:  Great.  I think Mr. Teeuwissen is correct.

9     I think there is some cause for encouragement after this week.

10    Since we're still sort of in the middle of the site visit, I

11    haven't sort of brought all of the information from my respective

12    experts together, so what I'd like to do is give a bit of an

13    overview and then have each of them present a brief synopsis of

14    what they've seen in their area.  And then I'll finish up with

15    some of the administrative areas that I typically look at.

16         We saw a lot of activity and we saw a lot of -- that a lot

17    of activity had occurred since the last visit.  There's been a

18    movement in really quite a few areas that's encouraging.  There's

19    a long way to go, but with the exception of one area, I think we

20    can say that some progress has been made since the last monitoring

21    report.

22         THE COURT:  Let me cut across you and ask this.  Is there

23    anyone from the State here?

24         I know the State is not a party.  Okay.  The reason why I

25    ask -- and I know the district attorney has not been named as a

1   defendant in this matter, and he would be the State for all

2   intents and purposes.

3        But while you give your remarks, I will let you know that

4   in reading these reports, one of the things that the Court is

5   concerned about, as I probably mentioned to you last week, is

6   concerned about is, you know, making sure that -- well, it's my

7   belief there's a fundamental difference between a jail and a

8   prison.  And people who are housed in jail, first of all, are

9   presumed to be innocent, and they are there for temporary

10  purposes.  They either have been arrested and waiting to be

11  indicted, or they've been indicted and waiting to be tried.

12  Because after they're tried and convicted, they -- the custody of

13  their body belongs to the Mississippi Department of Corrections

14  for the most part.

15       And how do we facilitate a conversation, or how does the

16  monitors, the County, the sheriff's office?  And I know there's a

17  team thing that's in place, and we'll talk about that.

18       But how do we have a conversation about how the jail is

19  either adequately staffed or about how people are processed in and

20  out without having the district attorney here?

21       So I say that, Ms. Simpson.

22       MS. SIMPSON:  Yes, Your Honor.  And actually one of the

23  items I wanted to address was some system issues, and I'll maybe

24  jump right into that because your comments certainly go in that

25  direction.  It is an enormous problem for Hinds County and for the

1    jail.  They have people there for extremely long periods of time.

2    One of the lists I was looking through -- I wasn't trying to find

3    the person there the longest, but I noticed that one person has

4    been there 1,776 days, which if I could do the math quickly, I

5    would tell you.  But it's got to be over four years.  And jails

6    are just not built and staffed and serviced for people to stay

7    that long.

8        And in some instances, it's people that are awaiting

9    trial.  There are also some -- and a very difficult problem is

10   also people that are waiting for state hospital beds.  They are

11   found incompetent, nonrestorable, they're committed.  They're

12   sitting there waiting for a state hospital bed, and that could be

13   years as well.

14       So they do have people there for very long periods of

15   time.  Their average length of stay is about twice the national

16   average, which is way outside the mark one would aim for.  The

17   national average is usually around 20, 22, and they're closer to

18   50 average length of stay which really in some ways --

19       THE COURT:  You're saying 20, 22 months?

20       MS. SIMPSON:  No, no, days.

21       THE COURT:  Days.  Days.

22       MS. SIMPSON:  And even at Hinds County a lot of people do

23   cycle through quickly, but they have so many people that stay so

24   long that it pushes the average length of stay up to close to

25   50 days.  And that sort of understates the problem when you --

1    when you see how many people are actually there for over a year or

2    over two years.  It -- jails aren't built for that, and they're

3    not designed for that, and that is a huge problem in Hinds County.

4         It's not something that the County controls or the sheriff

5    controls.  But one of the provisions of the settlement agreement

6    is that they have a CJCC, and the County has taken the lead in

7    creating that.  It's Criminal Justice Coordinating Council.  It

8    underscores the importance of continuing to support that and to

9    move that forward, because that's typically where these kind of

10   systems issues are addressed.  It brings the stakeholders

11   together, if they come to the table, and those kind of systems

12   issues can be addressed.

13        One thing we did this site visit is we brought some of

14   those stakeholders together:  the County manager, the chief judge

15   of the circuit court, the juvenile court judge, the head of

16   Henley-Young -- I'm trying to think who else was in the room --

17   one of the attorneys for the County.  And we had a conversation

18   about developing a pretrial services program that does not move

19   people through the system faster, but it allows them to -- it

20   gives an alternative to be out of custody for that length of time,

21   and the County is very open to doing that.  Judge Green is very

22   open to doing that, and it's still a process to develop it.

23   That's a major undertaking, but, hopefully, we'll see that moving

24   forward.  The development -- similar to what the federal court

25   has, the development of a risk assessment tool and then a

1    supervision model that would allow some people to be supervised.

2    Those that are more moderate risk could be supervised and stay out

3    of custody during the pretrial period.

4         Also speaking of the systems issues, one of the things

5    that the jail has attempted to do to address some of that is to

6    create a list of everybody who has been in the jail over 90 days

7    who has been unindicted -- or not who has been unindicted -- but

8    who has not yet been indicted.  And there have been problems with

9    the accuracy of that list, and I think there was some frustration

10   when it was taken to the judges that they found many of the people

11   on that list would be in jail otherwise or had inaccurate

12   information.

13        One of the improvements we saw this trip was some pretty

14   solid improvement in the area of records and the ability to

15   produce a list of unindicted individuals that is really much more

16   accurate.  And there was some feeling that they've gotten a very

17   good response now that they have that improved unindicted list

18   with the judges either finding ways to move to ROR individuals or

19   reducing their bail to what they can afford, so they feel they've

20   moved some people out as a result.

21        And the population -- the jail population is slightly

22   lower than it has been in the past.  It had been running closer to

23   630, 650, and right now it's at 590, so that's an improvement as

24   well and partly due to working on that unindicted list and having

25   the assistance of the judges to -- to find ways of releasing those

1    individuals.

2         The areas that I've referred to as the big three are

3    policies and procedures, the facility itself, and staffing, and

4    there's been some progress on the policies and procedures.  It's

5    been slow.  It's obviously very long after the due date in the

6    settlement agreement, which would have been January 2018, I think,

7    or '17.  Sorry, it was six months after the agreement was adopted.

8    And the process has been slow, but they now have three adopted

9    policies, and they have five in circulation.

10        The settlement agreement requires that after they develop

11   a draft policy, that the monitor and the Department of Justice

12   have the opportunity to review and comment, and so when I say five

13   in circulation, that's where they're at in the process.

14        THE COURT:  Tell me whether -- do you know offhand the

15   three policies that have finally been adopted?

16        MS. SIMPSON:  The three that have been adopted are a

17   pre-booking policy, records, and the booking policy.

18        The ones that are in circulation are protective custody,

19   use of force, initial classification, review and investigations,

20   and release.  And I believe we just actually were e-mailed one on

21   Monday, which because I was here I haven't added to my tracking

22   list.  But I believe they've circulated grievances, and I have a

23   draft that I received today on PREA, the Prison Rape Elimination

24   Act.

25        THE COURT:  Are there any to be expected outside of the --

1    would those constitute all the policies and procedures to be

2    adopted?

3         MS. SIMPSON:  No, there's quite a few to go.  I wouldn't

4    be able to name them all, but segregation, housing --

5         THE COURT:  Are we halfway through?

6         MS. SIMPSON:  No.  I mean, I will say --

7         THE COURT:  And who's responsible for adopting policies

8    and procedures?

9         MS. SIMPSON:  The sheriff ultimately signs off on them.

10   They have a policy committee that includes most of the command

11   staff in the jail and some additional people.  And it actually is

12   facilitated by a member of my team, Karen Albert, who really

13   doesn't come with us to monitor, but her role is to provide that

14   type of onsite assistance.

15        And I will say that one of the reasons it is slow now is

16   because it is really kind of a training at the same time, that

17   it's a facilitation, a development of the policies.  So she really

18   works through with the staff, you know, what the national best

19   practice would be, how to -- how to make that happen in this

20   facility, and the staff is very involved in developing the

21   policies.

22        So they're certainly overdue, but it also I would say is a

23   good process in sort of building policies that are tailored to

24   this facility and that the command staff have a good understanding

25   of by the time they're adopted.  So it probably could go faster,

1    but it is a good process I would say.

2        THE COURT:  Okay.  One concern that the Court has is that

3    we're in the midst of a campaign season.  There's -- we know

4    there's a primary election in August, which may lead to a runoff

5    in late August.  And I'm not sure if for the sheriff's position

6    there will actually be a general election; I'm not sure.  I don't

7    know how all the candidates have lined themselves up with party

8    affiliation.

9        But assume that there's a new sheriff, and that sheriff

10   decides to change command staff.  I don't think everybody within

11   the sheriff's department will be subject to being -- I imagine

12   they may be subject to being shifted around, some of them, but I

13   assume a sheriff will -- if a sheriff comes in, he'll have the

14   opportunity to change command staff.

15       How would the change of command staff or the change in

16   sheriff affect some of the policies that either are currently

17   being drafted or that have been drafted?

18       A sheriff may take more of a hands-on approach to dealing

19   with the -- who knows, the jail itself may be the issue that is

20   going to be fundamental in that election, and the sheriff may

21   decide that if I'm elected, and if it's me, I'm going to do this

22   or I'm going to do that.  And instead of having resources out

23   there on the ground as deputies, I'm going to place it right here.

24       Would that upend the policies that you all have been

25   working on so vigorously over the last several months?  I mean,

1    might his command staff -- his or her command staff decide that

2    maybe that policy needs to be tinkered with?

3         MS. SIMPSON:  Your Honor, I would think that that is a

4    possibility and something to be concerned about.  Transitions in

5    the sheriff's position or in the County commissioner position

6    could have an impact on how this litigation proceeds in the -- you

7    know, the -- sort of the institutional knowledge that has

8    developed over the last two and a half years would not carry over

9    potentially.  So I think it could impact in a lot of ways.  I'm

10   not sure what we can do about it, other than try to develop the

11   most solid policies that we can --

12        THE COURT:  Okay.

13        MS. SIMPSON:  -- and have a good explanation for why they

14   have been developed that way.

15        THE COURT:  Okay.  Thank you.

16        MS. SIMPSON:  And one last thing I would say on the

17   policies and procedures, one of those that's in circulation is the

18   use of force policy, which is really an important policy.  It's

19   been a difficult issue in the jail, and so I think the progress

20   that's been made -- it's important that that's one that has been

21   looked at early on and is close to being in final form.

22        THE COURT:  Why has the use of force issue been so, I

23   think your words, so difficult?

24        MS. SIMPSON:  We in the -- starting last summer, we saw a

25   lot of increase in the use of force, particularly in the use of

1    chemical spray and paint ball guns and tasers, and they have been

2    used in ways that are not appropriate.  And so it was important

3    that that policy get addressed quickly because of what we were

4    seeing in the facility.

5         The second of the big three that I've talked about is the

6    facility itself and the poor shape of the facility.  And I wanted

7    to read several lines from an incident report that I think kind of

8    pretty graphically discloses the type of problems the facility

9    condition has caused, and this incident report is from April 19th

10   which is when a riot occurred in Raymond Detention Center.

11        THE COURT:  April 19, 2019?

12        MS. SIMPSON:  Yes.

13        THE COURT:  Less than a month ago?

14        MS. SIMPSON:  Yes.

15        THE COURT:  Okay.

16        MS. SIMPSON:  And it's -- there's always the question of

17   what constitutes a riot.  It is the term that was used in the

18   incident report, so I used that term.  Three of the housing units

19   managed to leave their unit and get into the common area of the

20   pod and were attempting to get into the control room, and so it

21   was out of control for some period of time.

22        And four or five lines from this incident report:  The

23   inmates can somehow unlock the cage door.  The inmates from A-3,

24   one of the housing units, were the first to jimmy the cage door

25   open.  They then forced the exterior door open, which has been

1   broken with the exterior cover off for months.  Once they got out,

2   they ran and opened A-2 and A-1.  These doors are also broken and

3   have to be opened by hand from the horseshoe.  It's part of the

4   common area.  All of the doors in A Pod are broken and maintenance

5   is waiting on parts.  They then tried to get into A-4, but the

6   inmates in A-4 kept them from getting into their housing unit.

7       The inmates tore down the cameras and exit signs in the

8   horseshoe area.  Detention officers had locked themselves in the

9   control room.  The inmates were physically pulling on the pod

10   control doors, but the officers were holding them shut.  These

11   doors are also broken and can be opened manually from the

12   horseshoe.

13       The inmates then went into the old visitation room.  The

14   door is also broken, and pried open the wire-mesh ceiling cage

15   door.  They then attempted to -- they got into the ceiling.  They

16   attempted to go through the ceiling to get into the control room.

17   They were unable to do that.  They went back, and the incident

18   proceeded.  It was eventually under control.

19       My point in reading that is that one of the things we've

20   had in our reports over and over and over again has been the doors

21   that are broken and not functioning, and that was definitely an

22   issue in this incident.

23       The good news is that the incident was a catalyst to

24   actually getting the doors fixed.  They have now fixed the doors

25   into the Pod A housing area and I believe into the control room of

1    Pod A, and they have a plan and a prototype on how they're going

2    to fix the individual cell doors.  So it's good that this is being

3    done.  It's unfortunate that it took an incident like that to

4    actually make that happen.

5         And, in fact, we did see -- and this is a cause for

6    encouragement -- really some indication that some of the

7    maintenance problems are, in fact, now being addressed.  In this

8    trip we found doors that had been fixed like I described.  Doors

9    that were now locked that haven't been locked in the past.  Fresh

10   paint on some of the walls.

11        They have a new person assigned to maintenance and

12   security, a captain of maintenance and security.  He is keeping a

13   spreadsheet with all of their work orders, so that they can be

14   tracked and followed up on.  So I would say that is one area at

15   least now we're seeing some energy and some improvement.  It's

16   early, but if that's sustained, I think we can expect to see a

17   real difference at the time of the next site visit.

18        In that regard, they have -- the C Pod has four units, as

19   all the pods do, and they've now emptied two of those units so

20   they can come in and really overhaul those units.  They're hoping

21   to empty the other two housing units on C, so that they can do it

22   all at once.  And at least what is planned is really a major

23   overhaul in addressing some of the real chronic problems that have

24   existed for the last years.

25        So that appears to be in the works.  There's not a

1   specific timetable.  They'll have to wait on some parts, but we're

2   hoping certainly by the next visit that that will be an area of

3   improvement.

4        The one area that really has not improved, and, in fact,

5   has probably worsened in the past, is that the staffing is

6   probably about as low as we've seen it.  It's been up over 250 at

7   some of the visits.  It's down to 229, and it's really at this

8   point impacting all three facilities.  Certainly the worst of that

9   is at Raymond, but it really is very low.  And not only is the

10  actual field positions low, but there seem to be quite a few

11  people that are out on medical leave, which complicates it quite a

12  bit more.

13       And I think Mr. Parrish on our team will have some more

14  specific impact on the staffing that he saw while there.  I would

15  say sort of in this overview that we still see a lot of

16  inmate-on-inmate assaults, in large part because of the lack of

17  staffing.  The jail was built to have an officer in each housing

18  unit.  With their level of staffing that's not possible, and as a

19  result, the inmates are in those units without oversight, without

20  the needed oversight for quite a bit of time.

21       Most recently, again on the same day as the riot, the

22  incident I had mentioned earlier, there was an inmate-on-inmate

23  assault where the inmate had eight stab wounds and had to go out

24  to the hospital with pretty serious injuries.  So -- so that is

25  continuing at a similar pace as before.

1          THE COURT:  That was going to be my question.  Since the

2     last monitors -- well, since the last visit, do we know the number

3     of inmates who have had to have been hospitalized because of an

4     assault either by another inmate or an assault by an officer?

5          MS. SIMPSON:  I don't have it broken down by how many have

6     been hospitalized and how many not.  I do keep a log of how many

7     inmate assaults there are, and I make a note as to whether they've

8     gone to the hospital.  I'd have to count it up to see how many.

9          One problem -- and I'll talk about this at the end when I

10     talk about some of the administrative matters -- the reporting

11     that we've had during this period has been incomplete, and that's

12     another thing that appears to be about to change in a good way.

13     They have now gotten the capacity to generate an electronic report

14     that should enable it to be done more easily on their side and

15     more complete from our perspective.

16          But we actually did not get the monthly reports for

17     January and February from Raymond Detention Center and the other

18     months in that period have been incomplete, so I do keep a log.  I

19     have the ones that I've seen logged in.  But I don't -- I don't

20     think for this period that it's complete.  But it's still running

21     between 10 and 15, and I think January, I think, was a high of 20

22     inmate-on-inmate assaults.  And I mentioned that with the

23     staffing, because that does appear to be directly related to the

24     staffing.

25          I would like to turn it over to my experts and my

1    experts -- my expert on juvenile matters has an earlier plane to

2    catch, so I'd like to have him speak first.  He's Jim Moser.

3            MR. MOSER:  Thank you, Lisa, and thank you, Judge.

4            THE COURT:  You're welcome.

5            MR. MOSER:  So, yes, my name is Jim Moser.  I've been

6    working in the juvenile justice related field for about 45 years.

7    About 40 of those years in responsibility -- either direct

8    responsibility or administrative responsibility for everything

9    from short-term nonsecure facilities just to long-term

10   institutions for youth, also have done a fair amount of training

11   and publications around best practice in the juvenile justice

12   world.  So I'm pleased to be able to come to Hinds County and

13   participate in this.

14           As you know from -- or as you may have seen from the last

15   report, and I think we'll see in this report as well, continued

16   progress at Henley-Young, a lot of the heavy lifting and changes

17   that have been made I think are a result of the work they have

18   done through the agreement with Southern Poverty Law Center, which

19   has been a positive step.

20           The change to taking on the long-term youth was a big

21   change, so I've described it as going from a short-term facility

22   housing some long-term youth to really a long-term

23   facility housing short -- also some short-term youth in other

24   units.

25           THE COURT:  So Henley-Young is basically operating sort of

1    like it should --

2         MR. MOSER:  Yes.

3         THE COURT:  -- because they are complying with the other

4    terms of the settlement agreement, right?

5         MR. MOSER:  Yes.  I mean, there are some -- there are some

6    parallels and overlaps between that agreement and this agreement,

7    but I'll highlight some of the ones that are either unique to this

8    agreement or areas to still be worked on from our point of view

9    for this agreement.

10        The biggest one, as you probably saw in the last report,

11   is there was still I one, I think, youth at Raymond who aged out.

12   There should no longer be any youth under the age of 18 at any of

13   the adult jails, Jackson, Raymond; that shouldn't happen.  They're

14   now dealt with completely by being housed at Henley-Young if need

15   be, so that should be the case from now on.  There should be no

16   longer youth at one of those facilities, and that's a huge, big

17   step forward.

18        As that change was made, I sort of described it as taking

19   those long-term kids in as sort of jumping into the deep end of

20   the pool in terms of the changes and the different mindset that

21   has to go on in working with longer-term youth versus short-term

22   youth.  And over the past 18 months, I think they've made

23   continued progress, and I would say very impressive progress in a

24   number of areas.  So it's generally positive.

25        The most significant change this time around is a

1  significant reduction in the use of room confinement, of isolation

2  for any disciplinary purposes.  I think we counted only four

3  instances over the last quarter where a youth was held in a room

4  for discipline for up to 24 hours.  That's a very significant

5  reduction from -- in both terms of frequency and duration in terms

6  of any kind of room confinement isolation, significant change, and

7  a very positive change resulting from a lot of different efforts

8  that they've been making.

9      Continued progress in the area of education, both in their

10  delivery of GED program for youth that are appropriate for that as

11  well as sort of increasing the engagement of youth in the regular

12  school program.  I think there's a continued evolution forward in

13  their behavior management system, which includes incentive-based

14  approach to encouraging behavior and working with youth behavior.

15  That still has a ways to go, but has really continued to see

16  progress in that.

17      And I think another significant thing that we're hopeful

18  and I look forward to seeing where we are at next time is some

19  changes that are hopefully underway at the court process to speed

20  up some of those early decisions around youth, so that they're not

21  lingering for months and months and months not being indicted or

22  high bonds that are no longer needed.  I know I referred to one

23  case, I think the youth was there about 300-something days, and

24  eventually the charges were dismissed.  You know, that just

25  shouldn't happen, and under the new procedure that should be

1   resolved much faster.

2        So I wouldn't be surprised to see the total number of

3   youths charged as adults going down.  There are 14 today.  That

4   number has varied from about that to almost 20 over the course of

5   the last 18 months.  But that's a good sign that there's some good

6   management of -- you know, hopefully, some increased management of

7   the timeframe for kids, and, as you know, to have a youth sit

8   there for a year.

9        There is one youth who came early on in September of '17,

10  has now been there about 600 days, significant concern related to

11  their court process.

12       THE COURT:  How old is that person now?

13       MR. MOSER:  He's now 15.

14       THE COURT:  So he's been in --

15       MR. MOSER:  He started at 13.

16       THE COURT:  And he's -- and he's where?

17       MR. MOSER:  He's at Henley-Young.  And I'm not sure -- I

18  don't know with the court where he's at court-wise.  It's a

19  serious case, but they are all stuck in the same morass of the

20  adult system here that needs a lot of work and, hopefully, can --

21       THE COURT:  But I presume at least that child is getting

22  some educational --

23       MR. MOSER:  Yes, he's in school.

24       The youth in general seem to have adapted to the routines

25  and the daily programming, and his programming has increased.  The

1   number of incidents has gone down.  Again, the longer room

2   confinement has gone down.  There continue to be some incidents of

3   youth fighting with each other that you might expect, but even

4   that seems to have moderated some more or less quarter.  So that's

5   positive.

6           There's a new executive director on board that's joining I

7   think a very strong leadership team with Mr. Burnside and

8   Mr. Dorsey, along with some other folks there.  So with the new

9   executive director, I'm looking forward to seeing how that shapes

10  up in the coming months.

11          THE COURT:  And the new executive director became

12  necessary because?

13          MR. MOSER:  Mr. McDaniel's left to run for office and got

14  elected.

15          THE COURT:  Okay.

16          MR. MOSER:  So I think he stepped down in -- certainly

17  early summer, if not before, of last year as the campaign began.

18          So areas of concern remain, of course.  Probably the

19  biggest at this time is there's been a half-time psychologist,

20  which is a significant addition to the program, provides a range

21  of services that accommodate a number of the conditions of our

22  agreement around programming, around psychological evaluation,

23  around treatment, around leadership for the other mental health

24  team members.  Not possible to do on a half-time basis.

25          That person who has been onboard is planning to leave, so

1    continuing to make a strong push for certainly a full-time

2    psychologist treatment director who can have a significant -- play

3    a significant role in a whole range of services there at the

4    facility.  And hopefully -- and, hopefully, that can be done

5    fairly expeditiously as well as putting in place some interim plan

6    to provide at least some of that direction.  There are good folks,

7    a number of good staff members, folks on the mental health team,

8    youth specialists, a couple of qualified mental health folks.

9         But to really get that organized and moving all in the

10   same direction, needs that leadership, so it's been great to have

11   Dr. Payne.  There needs to be -- we just need to get that position

12   filled and full time.

13        Continue to make recommendations or concerns about the

14   physical plant, particularly around the area of programming areas.

15   There are limited spaces for some of the counseling groups,

16   treatment sessions, and even individual sessions.  The classroom

17   space is tight.  One of the special education classes runs,

18   essentially, out of what was a closet.  It's a very confined space

19   for youth to move around in.  Some of the incidents of conflict

20   have happened in that space, very tightly confined.

21        I also continue to recommend changes to the living units

22   to improve the acoustics, lower the energy level, make it more

23   comfortable, so that the kids' emotional level is lowered since

24   that's when they tend to act out.  So I'll continue to make those

25   recommendations through some remodeling and restructuring,

1    hopefully.

2         I think there's still room to move on training direct

3    supervision staff on preventing incidents from occurring.  I think

4    that's happened to a degree, but it's a continuing work in

5    progress to get all staff to be as observant and preventive in

6    their interactions with youth as possible to head off conflicts

7    and misbehavior.

8         But, overall, it's a -- overall, I guess my sense would be

9    if you looked at my reports from the last few times, I think

10   reflect continued progress and, hopefully, just kind of stay the

11   course as it relates to the youth.

12        THE COURT:  Thank you, Mr. Moser.

13        MR. MOSER:  Sure.  Thank you.

14        THE COURT:  And you may be excused anytime you wish,

15   Mr. Moser.  If there's anything that I have a question about, I'm

16   pretty sure part of the team or somebody will be able to respond.

17        MR. MOSER:  Thank you.

18        MS. SIMPSON:  I would like to ask my corrections expert,

19   Mr. Dave Parrish, to give his synopsis.

20        MR. PARRISH:  Good afternoon, Your Honor.

21        THE COURT:  Good afternoon.

22        MR. PARRISH:  I'm David Parrish, and I handle the

23   corrections operations aspects of the jail system, just day-to-day

24   jail operations.  My background is I did 34 and a half years with

25   the Hillsboro County Sheriff's Office in Tampa, Florida, and the

1    last 27 years of my career there, I was the colonel in charge of

2    the County jail system.

3          During that time up until I retired in 2008, I oversaw the

4    design and construction of 5,000 beds of jail space, all direct

5    supervision.  And when I was there, it was all accredited by the

6    American Correctional Association, so we met constitutional

7    standard.  And I've been retired since 2008, and now I tend to use

8    my experience there to help out on projects like this.

9          Unfortunately, much of what I have to report on is the --

10   I guess you could say the unsavory part of the reports.  I have to

11   look at things from a practical point of view.  Can the jail staff

12   actually manage the inmate population with the circumstances that

13   they have there, so the monitor covered the basic things that I'm

14   going to cover.  I'd just like to go into a little bit of detail.

15         Basically, the Hinds County jail system is comprised of

16   three jails, one that goes back to 1976 or so when it was built,

17   the Jackson Detention Center; it's an old linear jail.  It can't

18   really handle direct supervision.  Direct supervision being if

19   this were the unit, there's an officer in charge, and then all the

20   inmates are out and about just like a teacher in a classroom.  And

21   that's the way that all the jails are supposed to operate under

22   the terms of the settlement agreement.  That's the way the Raymond

23   Detention Center was actually designed, but they gave up on that

24   many, many years ago.  So that's what we're trying to get back to.

25         Then you have more traditional confinement space for

1   people that can't cooperate in that kind of environment, and they

2   get locked down.  So it's like instant repercussions for your

3   action.  Behave, become a part of the operation, or we have an

4   alternative.

5         The work center was actually designed that way, although

6   it was not designed as a direct supervision jail.  It really looks

7   more like an old prison dormitory, and at one point half of the

8   people in there were state prisoners.  The County doesn't handle

9   them anymore.  They've gone back to the State, and it's been

10  subdivided.  Instead of two great big dorms, now it's four more

11  manageable dorms of about 64 inmates each.

12        The staff there have not been properly trained in how to

13  operate direct supervision, so at the present time they're

14  overstaffed from my perspective.  You should have one person in

15  charge of a direct supervision dorm, and right now because of

16  historical issues, they still have extra staff in there.  And

17  that's one place where I think we can help in saving staff for

18  them.

19        The third jail, of course, is the Raymond Detention

20  Center, which is the facility that gets the most attention,

21  because that's where the biggest problems are.  And that facility

22  was designed and built in 1995.  It was designed for direct

23  supervision, and, apparently, operated that way initially.  But

24  for whatever reason, either shortage of staff or administration

25  policy, I don't know what, this is a number of administrations

1    back, the officers were pulled out of the housing units.

2         Well, the bottom line was, then the inmates took over, and

3    they totally destroyed the place.  And there was a riot about

4    seven years ago where pod Charlie was totally trashed.  They lost

5    the thing completely.  The inmates were able to get inside the

6    control room.  Destroyed the sprinkler system, everything was

7    gone.  That whole pod has since been rebuilt, and as you just

8    heard, pod Charlie is now being rebuilt again just a few years

9    later.

10         I can understand the frustration on the part of the County

11   maintenance staff; we fix it and they tear it up, you know.  The

12   problem is the inmates tear it up, because there's nobody there to

13   manage them, no supervisor, no officer in the units, and that's

14   what we have to get back to.

15         Four major issues:  staffing, lack of policies and

16   procedures, maintenance issues, and doors that don't work on just

17   an incredible level, and, finally, fire safety, one other issue

18   associated with the maintenance and such.

19         Staffing, as has been indicated, a staffing study was done

20   on what should be available to operate all three jails properly,

21   and it was done by the County and the sheriff's staff and I did it

22   independently.  And we came up with about two positions, and it

23   comes down to they need about 433 people to operate everything

24   properly.  That's more people than there are in the entire

25   sheriff's office, so that's not something that's viable right now.

1   And so what we've done is look at what can be done on a

2   step-by-step basis.

3        The goal for last year was to have 275 people on board.

4   We haven't come close to that, and, as was reported, we're down to

5   229 right now.  And of that 275, only 271 are funded.  We've still

6   been asking for the last four to be funded, and that's another

7   issue of how do you get people on board?  What can be done?

8        And we've been through a lot of different things, and I

9   think the monitor will cover some more of that later on.  And if

10  necessary, I can always come back.  But I won't belabor that right

11  now.

12       That's a critical issue.  The staffing is too low at each

13  jail.  They're able to get by at the Jackson Detention Center and

14  the work center, because their population there is lower than

15  their rated capacity.  There are about 1100 beds in the entire

16  jail system, and years ago there used to be over a thousand people

17  in the jail system.  Today it's down around 595, thank goodness.

18  They used to book 9- or 10,000 people a year.  Right now, they're

19  booking between 6- and 7,000 a year.  Those numbers are very

20  encouraging.

21       But they've got about 120, 115 people at the Jackson

22  Detention Center, about 200 at the work center, and about 275 at

23  the Raymond center.  Now, the Raymond center technically has about

24  700-plus beds.  But so many of them are not usable that -- so it's

25  not even a comparison of what technically they have on board.

1      Okay.  So policies and procedures; we have been going

2  around this for two and a half years, and no jail can operate

3  without policies and procedures.  The officers don't know what

4  they're supposed to do, so word of mouth orders change from day to

5  day.  And that's what we see every time we come back here.  We set

6  something in place.  We come back the next time, it's not the

7  same.  Why?  Well, the sergeant said to do -- I would always want

8  to go back to the policy.  Well, it doesn't exist, and that's our

9  problem.

10      And you asked about what percentage of them are done, it's

11  a minuscule amount right now.  I mean, we are just getting

12  started.  And the problem has been that the County or the

13  sheriff's office prepared policies and procedures and post orders

14  initially, but they were totally unsatisfactory and didn't meet

15  the standards at all.  So they were set aside.

16      Then there was an effort to go through a local university

17  and then through a private contractor and then finally to where we

18  are today, so that's why we've been going through these various

19  steps to get the job done that should have been addressed

20  immediately.

21      So I like the process that we're going through now.  It is

22  productive.  It gets people on board with it.  It's not just

23  something that's passed down to them and said do this, but it's

24  not fast enough.  We're way, way behind the curve there.

25      Maintenance; I came here five years ago at the behest of

1   the Department of Justice to do an analysis of the whole system.

2   And I did that and that preceded what we are involved in now by

3   several years, so I go back to some of the things I saw then and

4   today.  There's been incredible progress in certain areas.

5        The Jackson Detention Center reminded me of the Raymond

6   Detention Center when I went through it five years ago under the

7   previous administration.  That has totally changed.  That's an

8   old, old jail.  It's a bad design, but it's neat, clean, well

9   organized.  It's smooth; I am really impressed with what's

10  happened there to the point that I stop and take pictures of

11  things like the laundry.  I get excited; this is wonderful news.

12       The work center wasn't designed for what we're going to

13  turn it to completely, but it works.  And it's a well-run

14  facility, and there's a good commander there now.  And they're

15  adopting the principals and dynamics of direct supervision, and

16  that's going to be the model for what we need to do to make the

17  Raymond Detention Center work that way again.  So those things are

18  really encouraging.

19       The real downside is there's been so much damage to the

20  structure, particularly at Raymond, that it -- everybody is just

21  totally discouraged.  If the doors don't work, the staff finally

22  doesn't even bother closing doors, because that's what the point?

23  Nothing works.

24       And I'm able to just walk into places through multiple

25  security doors that should never happen.  And when we say can it

 1  be fixed?  Well, there's an attempted effort make locally.

 2  Unfortunately, and the County maintenance staff are not qualified

 3  as corrections security maintenance personnel.

 4        And the good news is that since we were last here, they

 5  found a firm in Texas that is proficient.  They brought them in,

 6  and they repaired those broken control room doors and unit doors.

 7  And I'm really impressed with what they've done.  Now, it's the

 8  first time I've seen quality work on something like that, so I

 9  have great hopes if the County can adopt that and expand it

10  throughout the rest of the building, they can take charge of it

11  again.

12        Then when you go to reopen those units, an officer has to

13  be put inside so it's not just trashed again, and we need to then

14  go back to direct supervision.  That falls back on staffing.  We

15  have to have enough staff on board to put an officer inside each

16  housing unit 24 hours a day, seven days a week, as originally

17  designed in order to make it work.

18        THE COURT:  With respect to staffing and I'm -- well, the

19  understaffing has contributed to some maintenance issues.

20        MR. PARRISH:  Oh, absolutely.

21        THE COURT:  We agree with that, right?

22        MR. PARRISH:  Absolutely, yes, sir.

23        THE COURT:  As I read the report, describe a pod for me.

24  It contains how many units?

25        MR. PARRISH:  Four units.  There are three pods at the

1    Raymond Detention Center:  Alpha, Bravo, and Charlie.  Each of

2    them has about 250 beds total.  And you go down what they call

3    "the great hall."  It's a main corridor.  There's a security door

4    that goes out to each of those three pods.  In each pod, there's a

5    control room in the center, then there are four units of about 60

6    inmates each, and then two what we call "iso units."  They are

7    four-person cells or four cell units for specialty types of

8    inmates, and each one is laid out like that.

9         THE COURT:  Right.  And each unit is supposed to have how

10   many officers?

11        MR. PARRISH:  One officer in it 24 hours a day all the

12   time.

13        THE COURT:  Okay.

14        MR. PARRISH:  And right now none of them have anybody

15   inside.  Haven't had them for years, so none of the units are

16   staffed.

17        THE COURT:  None of the units are staffed, so the only

18   staffing then becomes the one or two officers --

19        MR. PARRISH:  You'll have an officer inside the control

20   room and then what staff refers to as "the horseshoe."  It's the

21   corridor that goes around the control room that then goes into the

22   four units.  And I refer to them as escort officers, but anyway.

23        Many times I'll go in, and there's one person for all four

24   units.  Sometimes there's two.  I've gone in on occasion and

25   there's nobody, there's only a control room officer.  The staffing

1   is critical in that facility.  It's beyond below critical.

2        THE COURT:  Right.  And if there is no officer within any

3   of the units, I assume that one person in the control room, all

4   the persons have to do is take control of the control room, right?

5        MR. PARRISH:  Well, the control room has been better

6   secured than it was originally.  You used to be able to go in up

7   through the ceiling and come down inside it.  You know, it was

8   just a bad design.

9        But the problem is that the inmates can pop open their

10  cell doors, so then you have two doors, a cage door that was

11  retrofitted, and then the sliding door that gets you into the

12  unit, so this unit of 60.  The last time I was here in our exit

13  briefing I passed along this concern.  I said in the past I used

14  to worry that we couldn't keep the inmates in their cells.  I said

15  now I'm more concerned you can't keep them inside the housing

16  units, and the incident on April the 19th proved it absolutely,

17  had over 100 inmates out trying to tear the place apart, able to

18  pull open doors by hand, push their way out, that's just

19  incomprehensible in a jail.  It shouldn't be.

20       And the maintenance that's been done since then is one of

21  the most positive things I've seen.  I just hope that that gets

22  expanded to the entire place.

23       Fire safety; last thing I have to say really is when the

24  Raymond Detention Center was torn apart during the riot about

25  seven years ago, the inmates tore out sprinklers.  I didn't think

1    there ever were any, but the fire safety officer explained to me

2    that the sprinkler pipes up in the ceiling were -- the inmates

3    tore them up, flooded the whole place, so at that time, they

4    pulled everything out of the jail.  So there was no sprinkler

5    system in the jail anymore.

6         The fire hoses that used to be inside the housing units

7    were all pulled out, because the inmates could tear them up.  Just

8    any of the normal fire safety issues, suppression issues that you

9    would expect in a public building, certainly in a place that holds

10   hundreds of people, do not exist, and that's dangerous for the

11   staff and for the inmates alike.  And that's something that really

12   needs to be addressed.

13        I'm going to be trying to get together with the fire

14   marshal, because I have a little difficulty understanding some of

15   the things that I see in those reports right now.  So that's a big

16   life safety issue.  There's nothing worse than a fire in a jail.

17   It can be devastating.

18        And the last -- excuse me.  I misspoke, one last thing.

19   The County and the sheriff's office have worked hard to try and

20   address problems.  Part of the frustrations from I guess our

21   perspective is that they seem to move forward a little bit here,

22   and then change gears and go over here.  And it would be great if

23   we could settle on this is what we're going to do to address

24   problems with regards to the facilities.

25        Will we shutdown the Jackson Detention Center and turn it

1    into a court holding place?  That's one thing that's been

2    considered, but nothing's happened.  Will we expand the work

3    center?

4          THE COURT:  When you say shut -- when you say make the

5    Jackson facility a court holding place, presumably, those persons

6    who are coming up for a court proceeding in a matter of days or

7    weeks, will be housed at Jackson?

8          MR. PARRISH:  There are no holding cells for the

9    courtrooms, and, therefore, they use the Jackson Detention Center

10   as a place to hold people as they go to court each day, and then

11   they go back to their facilities.

12         And we just said, the Jackson facility is labor-intensive,

13   and it's old.  And it's never going to meet the standards of

14   direct supervision.  Maybe one thing to consider -- I'm not going

15   to stand here and advocate one over the other.  I'm just pointing

16   out examples of things that have been considered.

17         But the idea was just expand the holding area down below,

18   and that way people would move in and out.  It would only be

19   operated during the day Monday through Friday taking people to and

20   from court.

21         If you shut down a whole facility like that, you save

22   staff, you can expand the work center maybe and hold female

23   inmates there or other things.  In other words, consolidate the

24   jail system.  That was one thing that has been considered, but

25   there's been no decision one way or the other.  I'm not saying

1    what's the right thing.  I'm just saying that it's one of many

2    things that's been considered.  We've looked at the work center,

3    could that be expanded to make it a larger jail, because it's

4    efficient.  It's all on one level, and it seems to be well-suited

5    for direct supervision.

6            We looked at the Raymond center.  Should it be just

7    closed?  Is it beyond repair, or should something else be added on

8    to it?  There have been plans that were being developed to

9    completely redo the booking area, expand the work center, then

10   that stopped.

11           All I'm saying is that I got to give them credit for

12   looking at lots of alternatives.  We need all the decision-makers

13   together to move forward in one direction and settle on something

14   and make some permanent fixes happen.  That's just from my

15   perspective, sir.

16           THE COURT:  You mentioned a minuscule amount of policies

17   and procedures that are in place.  You heard the question I asked

18   Ms. Simpson.

19           How reticent or useful might it be to try to get policies

20   and procedures approved through -- right now in this volatile time

21   of either campaign season, whether it may be people thinking that

22   there may be some transition, people are slow to move on anything

23   right now?

24           MR. PARRISH:  I think that what they have done is probably

25   the best thing.  There are some things that you just do what you

1   can.  And, by and large, they've taken the policies that they

2   drafted up, which were not acceptable, and put them in place.  And

3   said, look, here at least you've got something.  It's not perfect.

4   It doesn't meet DOJ standards, the monitor hasn't signed off, but

5   at least you've got something here as opposed to just you know --

6          THE COURT:  Nothing.

7          MR. PARRISH:  -- you know, go by ear.  You know, just wing

8   it.  So we're getting the important ones done first, getting them

9   through the front door.  How do you handle use of force and things

10  like that?  But as far as, like, in my system, mine was a lot

11  bigger.  I had two books that tallied up this thick, and they're

12  not going to have anything that big by the time we're done here.

13  But, I mean, we're only talking about a handful of policies that

14  have been actually processed so far.  The vast majority of them

15  still have to be done.

16         THE COURT:  And what, other than outside approval by DOJ

17  and the monitors, what inside approval is needed on any of these?

18         MR. PARRISH:  The sheriff's office is processing things.

19  The problem is getting the people together to think through how do

20  you want your jail to operate?  What should it cover?  And then

21  getting that developed for review, but I don't find the hold up

22  within the sheriff's office by any means.

23         And DOJ and the monitor are -- we'll have conference

24  calls.  We'll do whatever, send e-mails.  Everybody's moving

25  forward.

1          The problem is that in order to get something that's

2     worthwhile, you need input from the people that are going to have

3     to do the job.  Instead of just handing them, here this is what

4     you do, and they don't understand or that doesn't work here.  So I

5     like the process we're finally getting to.  It's just been

6     tedious.  Thank you, sir.

7          THE COURT:  All right.  Thank you, Mr. Parrish.

8          MS. SIMPSON:  I want to make sure that we do mention all

9     the positive things, so I want to add one thing to what

10    Mr. Parrish said.

11         One thing that did happen in this last time period is the

12    National Institute of Corrections came in and did a training

13    session for the upper-level staff on direct supervision in

14    preparation for really moving towards the best practice of using

15    direct supervision.  National Institute of Corrections will be

16    back on site in July I understand to do a similar training with

17    the officers the next level down, so they are utilizing the

18    opportunity that the National Institute of Corrections offered to

19    do that direct supervision training.  And it appears to be

20    received very positively on site.  There's a lot of enthusiasm

21    around it.

22         So as has been mentioned, it does require a significant

23    number of staff to be able to operate as a direct supervision

24    facility, so that has yet to be achieved.  But they are getting

25    the training.

1        And following up on Dave's last comment about sort of

2    making decisions about the long-term plan.  One thing that a

3    number of facilities or jurisdictions do is they go through a

4    master planning process, and there are consultants out there that

5    are there to do exactly that.  It is a broad-ranging project,

6    because it's not just, you know, what condition is this facility

7    in, what are the practices.  You also have to look at the

8    economics of it, you know, the costs of building new or

9    renovating, the cost of transportation if you build far out, so

10   it's a big undertaking.  But it is very useful in making what I

11   think here is a particularly tough decision, because there are

12   three facilities.  Some benefits to each one, definitely some

13   downside to each one, and so all of that has to be weighed very

14   heavily.  And building a new jail, as probably everybody knows, is

15   extremely costly and takes quite a bit of time.

16       So those are tough decisions, and typically a community

17   would have a master planner specific to corrections that would

18   help them through that process.  But I want --

19       THE COURT:  Has -- and I'm going to ask the County this.

20   But has your team come up with what it's costing Hinds County each

21   day to house the number of prisoners that they are?

22       For example, you said somebody's been there over a

23   thousand days.  It costs money to have somebody in there a

24   thousand days, and on the average people being there more than

25   50 days as opposed to 22 days.  Is there a per dollar -- is there

1    a per prisoner amount that we're spending each day on each -- I

2    assume the County has that figure.  It seems that somebody has

3    that figure because of budgeting principles, so what do we know

4    the County is spending each day on each inmate?

5         MS. SIMPSON:  I don't believe that that figure is actually

6    known.  We have not had the financial information to calculate

7    that.  My impression is that it will be difficult here because a

8    lot of the -- it will take quite a bit of time, and I think

9    Ms. Davis has actually been working on it.  She's shaking her

10   head.

11        But here a lot of the costs are in different pots, so the

12   County directly contracts with, for example, the medical provider,

13   and the County directly contracts with some of the other services

14   that are actually at the jail.  And then the -- some of the

15   services, such as IT, the technology and investigations are

16   actually within the sheriff's general budget and not in the jail

17   budget.

18        So all of that will have to be identified and pulled out

19   to figure out exactly what the true jail budget is before a per

20   bed day can be calculated.  I understand from Mr. Teeuwissen that

21   the State recently did a calculation for state inmate beds.  It

22   seems a bit low.

23        THE COURT:  Well, the only reason why I ask is, for

24   example, if somebody is in there a thousand days, needs

25   psychiatric mental health treatment, the County is responsible for

1    that.  But if that person has been through a trial process,

2    through guilty plea or otherwise, once that person is -- has

3    crossed that bridge, that then becomes the responsibility of the

4    Mississippi Department of Corrections, and the County is relieved

5    of that obligation I think.

6         MS. SIMPSON:  Yes.

7         THE COURT:  It's the same way we have over here.  As long

8    as somebody's in pretrial detention, it's the burden of the United

9    States Marshal to make sure they are adequately housed, you know,

10   make sure they got everything in place, including all medical

11   treatment.  Which the inmate who is stabbed eight times, for

12   example, when he goes to the hospital, he or she -- these are all

13   male prisoners?

14        MS. SIMPSON:  In Raymond Detention Center, that's correct.

15        THE COURT:  Okay.  And he goes to the hospital, whatever

16   expenses that inmate incurs, including security as I take it --

17        MS. SIMPSON:  Yeah.

18        THE COURT:  -- is borne by the County.  Now, if we don't

19   know how much the County is spending on each of these prisoners on

20   a daily or monthly basis, then --

21        MS. SIMPSON:  It's hard to make those tough decisions --

22        THE COURT:  It is.

23        MS. SIMPSON:  -- without having all the information.

24        And adding to that, whatever that figure turns out to be,

25   now it's based on a facility that's understaffed, so one would

1    have to look also at what the cost would be if it were run

2    adequately with adequate staff.  So that would bump it up even

3    more.

4          THE COURT:  Okay.  I think you wanted to say something

5    before I cut across you.  I'm sorry.

6          MS. SIMPSON:  That might have been it.

7          THE COURT:  Okay.

8          MS. SIMPSON:  I lost my train of thought.

9          THE COURT:  Okay.  Do you want to --

10         MS. SIMPSON:  I would like to introduce my mental health

11   expert, Dr. Richard Dudley.

12         MR. DUDLEY:  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon.

14         MR. DUDLEY:  My background is shorter than the rest.  I

15   had been the deputy commissioner for mental health, mental

16   retardation, and alcoholism services in the city of New York.

17   Among my program responsibilities were the health and mental

18   health services at Rikers Island and other New York City jail

19   facilities.

20         When I left that position, I went into practice where I

21   had a private practice and a forensic practice going in and out of

22   jails and prisons a lot as a forensic expert, and then continued

23   to consult with the juvenile detention programs and the adult

24   corrections programs in the city, both from the standpoint of

25   mental health program design and development, and even more so

1    from the standpoint of training of mental health professionals who

2    worked in those facilities and security staff who were receiving

3    extra training in mental health services.

4             I went on to be a commissioner, a national commissioner on

5    safety and abuse in America's prisons, where we looked a lot at

6    health and mental health services and helped to write the mental

7    health sections of the PREA guidelines and other activities like

8    that.

9             From the standpoint of what's happened since our last

10   visit, with regard to staffing --

11            THE COURT:  Did you turn off the microphone?

12            MR. DUDLEY:  No.

13            THE COURT:  Did you bump it?  Is the green light on?

14            MR. DUDLEY:  No.  Now it is.

15            THE COURT:  Okay.

16            MR. DUDLEY:  The -- on the health side, the physical

17   health side, the staffing looks pretty good.  On the mental health

18   side, you may have remembered from the last report we had a

19   serious concern about the psychiatric coverage, and that there was

20   a proposal to change that and that has been accomplished since our

21   last visit.  We now have much more time available through a

22   Dr. Bell, a psychiatric nurse clinician, and her collaborator, so

23   that the availability of those services at all three facilities is

24   significantly increased.  And I believe the quality of it has

25   significantly improved as well.

1          On the other hand, QCHC has had a proposal in to the

2    County for some time to be able to expand a mental health staff by

3    two staff positions, and at least as of this week, they haven't

4    heard back anything about whether that's going to be approved or

5    negotiated or whatever.  So that's still an important concern, at

6    least from my point of view.

7          Over a third of the population at the three facilities are

8    on the mental health caseload, and so that's a significant number

9    of people in three different facilities.  So the staff have to

10   travel around to these three different facilities to provide

11   mental health services to this population, and we just don't have

12   enough qualified mental health professionals.

13         THE COURT:  Do we know what percentage of that percentage

14   is people pretrial versus posttrial?

15         Because I think I heard Ms. Simpson say that some people

16   are awaiting to be transferred to what we call Whitfield, I

17   assume, or either East Mississippi Central Facility that generally

18   house most of the State's mental health prisoners.  So I assume

19   they have no more beds there, and that they're being held here for

20   placement into what I assume would be Whitfield.  It may be some

21   other place; I don't know.

22         MR. DUDLEY:  Yeah.

23         MR. TEEUWISSEN:  They're all pretrial.  We are getting

24   individuals who belong to the State, we're getting them out within

25   30 days.  The problem is pretrial mental health services and beds.

1        THE COURT:  Okay.  Thank you.

2        MR. DUDLEY:  So virtually all of them.

3        THE COURT:  All right.

4        MR. DUDLEY:  The -- and, you know, of that number the vast

5    majority of them, like about 90 percent, are seriously mentally

6    ill and on medication and the whole routine.  So the ability to

7    provide services to that number of people in three different

8    facilities, we just don't have enough mental health staff to do

9    that.

10        THE COURT:  And Mr. Teeuwissen could probably answer this

11    question.  Do we know if these are people who have been charged or

12    arrested and indicted for certain crimes vis-à-vis those who have

13    gone through the Chancery Court process?

14        When they go through the Chancery Court process and are

15    deemed to not being able to take -- being committed, are they then

16    turned over to the County, or are y'all housing anybody through

17    the Chancery Court process, Mr. Teeuwissen, is what I'm asking?

18        MR. TEEUWISSEN:  I don't believe we have anybody else like

19    that, Your Honor.  These are all individuals charged with felonies

20    who also have severe mental illness.

21        THE COURT:  Okay.  Thank you.

22        MR. DUDLEY:  That's my impression.

23        THE COURT:  Okay.  All right.

24        MR. DUDLEY:  With regard to program development with the

25    mental health services, that's begun to move with regard to

1    expanding the range of services.  Take into consideration what you

2    were discussing earlier in this conference about, you know, what's

3    the kind of appropriate types of services to provide to a jail

4    population where you anticipate their moving on to another place?

5         So kind of we've been -- certainly one of my focuses has

6    been on helping them look at what kinds of services would be

7    appropriate for that, whether it's towards discharge and release

8    planning and referral to services in the community and/or programs

9    designed to look at -- help inmates look at their behavior, so

10   they don't come back.  And what kinds of things that they can

11   do -- what kind of interventions can be done to help them in that

12   regard?

13        So the design of those programs in the beginning to

14   implement those programs is well underway.  Obviously, we'll be

15   able to really kind of realize that if we can address the staffing

16   problem and have the adequate number of staff to do that.

17        The -- you've heard about the renovation of the C Pod, and

18   that one of the units in that pod C-1 is being considered as a

19   space to actually have a mental health unit for some of the more

20   seriously ill inmates.  And we spent some time during this visit

21   looking at exactly what the renovation of that unit should look

22   like to be appropriate for use in that purpose, so clearly there's

23   a focus on at least the physical space for a mental health unit.

24        Obviously, the implementation of such a unit and staffing

25   it and programming, it is tied up in the first two issues that I'm

1   raising.

2        THE COURT:  Mental illness can -- it's a range of things:

3   paranoid schizophrenic to, you know, just anything else, I guess.

4   Some people can be severely mentally ill, and it might call for

5   either -- either more monitoring, more supervision, or more -- I

6   don't know if it might call for physical restraints.

7        But aren't those all concerns, too, the types of mental

8   health illnesses these people might be suffering from?

9        I mean --

10       MR. DUDLEY:  Well, traditionally in -- you know, in

11  this -- in this area of kind of prison mental health services,

12  there is a distinction made between what they call the seriously

13  mentally ill, the SMI, and then there's the other individuals who

14  may be on the mental health caseload who don't fit that

15  definition.

16       So the seriously mentally ill I think is what you're

17  referring to.  Those with schizophrenia, major mood disorders,

18  bipolar, who most of them are on medication.  Most of them have

19  much more difficulty managing their behavior, and many of them

20  without the kind of treatment they're receiving have a difficult

21  time having some real sense of reality that they're remaining in

22  touch with.  Their behavior is driven often by delusions or other

23  things like that if they're not getting treatment.

24       So clearly this mental health unit would be designed for

25  the more seriously mentally ill, particularly when they come in

1    acutely ill, which is often the case.  So it would be a place

2    where they could be stabilized.  It would also be a unit for

3    people who have chronic conditions that render them particularly

4    vulnerable to victimization on another unit, the inability to take

5    care of themselves on another unit, and so they may be on a

6    special mental health unit as well.

7        Certainly part of what we focused on during this visit was

8    now that they're thinking of the design of a physical space

9    specifically for this population, not only have we talked about

10   what would the programming be, everything from what's the mental

11   health staff programming going to be, what would be the special

12   training for corrections officers who would work on that unit,

13   additional training so that they would know how to better manage

14   people who are seriously mentally ill.

15       But we also talked about what would be the criteria, the

16   admission criteria, for inmates.  You know, how ill do you have to

17   be to get on this special unit?  So we've been looking at all of

18   those since the last visit.

19       THE COURT:  And how do you typically -- how does the

20   County typically identify those who are in need of mental health

21   treatment?

22       I guess there might be some record taken by the arresting

23   authorities or the -- or either the Court?  I mean, when do we

24   first learn that somebody might need some sort of mental health

25   treatment?  Is it based on what they might tell someone in intake

1   or what?

2       MR. DUDLEY:  Well, there's a variety of things that

3   happen.  I think, first and foremost, they're just -- I think

4   because of the -- a combination of we haven't had an effective

5   discharge release program, and, you know, people fall through the

6   gaps.  They don't follow-up through ambulatory services when

7   they're released.  We have a considerable recidivism rate amongst

8   people who are mentally ill.

9       So issue number one is they walk in the door and they go,

10  oh, hi, we've seen you again.  We already know you, and we know

11  you have this mental health history simply because you've been

12  here before.

13      Second, then there's a screening that's done, you know,

14  right after the booking process and where people have an

15  opportunity to report a history of mental health treatment or

16  hospitalizations or being on psychiatric medications.  They're

17  also screened for some of the more severe symptoms, and then

18  following that, there's a full mental health evaluation.

19      So even if they don't have a prior history of mental

20  health treatment, that could be picked up during the process of

21  this initial intake evaluation.  So when you're talking about what

22  would be the criteria to get on a special mental health unit, it

23  would be a combination of what their history is and what's known

24  about them with regard to suffering from a serious mental health

25  difficulty combined with their mental state when they come in.

1    Because, clearly, we would want to make sure that the unit is

2    capable of accepting people who still need to be stabilized who

3    come in symptomatic.

4              Is that responsive?  Oh, okay.

5              THE COURT:  No.  You can -- no, thank you.  I mean, go

6    ahead.

7              MR. DUDLEY:  The -- I guess the third issue I want to

8    raise is that we still have work to do with regard to the

9    interface between security and health and mental health services.

10   You know, despite the fact that the health and mental health

11   services are contracted out to a body outside of corrections,

12   obviously, they all have to work together in -- in order to

13   provide, you know, kind of safety in any sort of real way within

14   the prison system.  Not only safety for the individuals and the

15   healthiest status for the inmates that are there, but for safety

16   for the staff as well.  And so a fuller working relationship and

17   integrative relationship between security and the health and

18   mental health services is still a goal that we're working towards.

19              The policies and procedures issue that you've heard about

20   already, in part, reflects that.  Some of the policies and

21   procedures that are still outstanding address some of this

22   interface between security and the health and mental health

23   services.  So things like the disciplinary policies, when do --

24   who do you have to take into consideration an individual's mental

25   health when looking at disciplinary issues and kneading out

1   punishment for disciplinary problems.

2        The segregation policies as it relates to the use of

3   segregation for individuals who are mentally ill, the monitoring

4   of people in segregation with regard to their mental status and

5   their physical health status, so some of the policies and

6   procedures that are outstanding come right into this area of the

7   integration between health, mental health, and security, and so

8   those are issues yet to be addressed.

9        Certainly the development of clear policies and procedures

10  in this area will help address that interface, but the kind of

11  working relationship that's required to adequately do so is really

12  the larger issue that I'm trying to raise here.  This comes up

13  even as it relates to kind of discharge planning, which is so

14  critical, particularly for the mentally ill.  You know, adequate

15  preparation for discharge and discharge planning and referral to

16  ambulatory services, and without a good program, you're just going

17  to continue to have this revolving door of mentally ill people who

18  come in, get stabilized, leave, fall apart, get in trouble, and

19  come back again.

20       Just as a comment on the question that you've asked now

21  each of us about policies and procedures, I think from my point of

22  view that a lot of what goes into the policies themselves are

23  really a combination of some laws and legal standards and

24  standards of practice that are pretty much fixed no matter who's

25  administering the system.

1          What changes somewhat are the procedures, I mean, how you

2     actually play that out in your particular facility in light of

3     whatever the unique needs or situations may be at your particular

4     facility.  And sometimes even under the same administration, those

5     conditions change requiring tweaks and changes in the policies,

6     you know, whether you have a new administration or not.

7          So I would expect some stability as it relates to what is

8     the standard of practice, what are the laws that govern some of

9     these things, and what are the other standards?

10          So, for example, you're talking about health and health

11     policies and mental health policies, you know, there are laws that

12     govern, you know, medication or the forced use of medication and

13     things like this that are going to stay the same.  It's just that

14     how you're going to play them out procedurally may change, and

15     that's subject to change at any time.

16          THE COURT:  Okay.  Well, thank you, Mr. Dudley.

17     Appreciate you.

18          MS. SIMPSON:  Thank you, Judge.  I wanted to follow-up on

19     one item from the last discussion and then just wrap up with some

20     of the more administrative sides that we look at.

21          You had asked about whether the people waiting for the

22     state hospital beds are pretrial, and they all are to some extent.

23     There's a small number -- and I've had trouble wrapping my head

24     around how the competency process works here in this state, but

25     there's a small number who have pending charges.  They're found

1   incompetent and nonrestorable.  At that point, the -- it's my

2   understanding that their charges are remanded, and the jail staff

3   actually approach what's called "lunacy court" to have them

4   committed.

5         And then if they are committed, they continue to stay in

6   the jail until a bed is available.  I don't fully understand that

7   process.  I understand that the charges are remanded, so they're

8   not currently active charges against them.  It's my understanding

9   that the commitment is a civil commitment, but they're waiting for

10  forensic beds which are very -- there's a very small number of

11  those, so they can wait for a very long time.

12        It's also my understanding that it's a civil commitment,

13  so I don't know what the legal basis is to continue holding them

14  in jail.  So there are a small number that are in that status that

15  are present in the jail.

16        The couple -- the administrative things I wanted to

17  follow-up on, I spoke briefly about the reporting.  There are a

18  number of provisions in the settlement agreement that require

19  monthly reporting, and they also have some standards for the

20  internal investigation reports and incident reports.  This has

21  been a difficult area.  We've worked with IT in the County and not

22  been able to get to where that reporting could be accomplished.

23        We seem to have had a breakthrough in the last couple of

24  months, and they have made revisions to the incident report form,

25  including some of the fields that needed to be included.  And also

1    as I had mentioned before, they're now able to generate electronic

2    reports, which should result in getting complete monthly summaries

3    that meet the requirements of the settlement agreement.  So I'm

4    looking forward to when we actually start getting those.  But

5    we've seen one that's been generated, and it looks like it's going

6    to be a very good thing.

7        Another administrative area is records.  One of the

8    problems that was addressed in the settlement agreement was the

9    difficult situation of the records.  There were many inmates that

10   did not have documentation supporting their incarceration in their

11   records files.  Many of those weren't actually legally

12   incarcerated, because the documentation didn't exist.  In other

13   cases, it existed but it wasn't in the files.

14       There were quite a bit of problems with that in the past,

15   and typically I found a number of individuals that were

16   incarcerated beyond their appropriate length of stay.  That seems

17   to be much improved.  The records policy has been promulgated.  It

18   involves sort of going through and standardizing the files and

19   sort of setting up a tracking system and doing audits.  All of

20   that is being done.

21       There was one individual that was held quite a bit beyond

22   his length of stay.  It really arose from what has been a more

23   chronic problem in the past where they would accept somebody for

24   booking that actually -- where the police officer would say, "I'll

25   get you the documentation tomorrow," but it didn't come and it

1    didn't come and the person stayed in jail.

2           This over-incarceration did seem to arise from that

3    situation.  It was rectified.  It's not a common scenario anymore

4    whereas it used to be in the past.

5           There also were some shorter overstays involving probation

6    violations and the 48-hour hearing, and that seems to have been

7    resolved with some very good tracking and record-keeping.  There

8    are still problems.  There are files that don't have the

9    underlying paperwork, but if you get on the court database you can

10   find it.  But that should be in the files themselves and should be

11   in their database system.

12          There are some things that are entered in different ways,

13   so you can't run reports that automatically track people.  But

14   they do seem to be working on it, and it does seem to be improved.

15          Classification had been a problem recently.  The

16   settlement agreement requires objective behavior-based

17   classification, which is sort of standard.  And the alternative is

18   an older version of sort of charge-based classification.  You get

19   classified based on whatever you're charged with and not how

20   dangerous you may actually be.

21          And they were moving towards objective behavior based.

22   They kind of moved back.  They now seem to be moving back towards

23   behavior based.  There was a period of time when it wasn't.  An

24   audit done by another member of the monitoring team found that I

25   believe it was 30 out of 35 classification files were actually

1    incorrect, so it was a high number.  But there seems to be an

2    activity now to go back through and correct -- go back through all

3    the classification files, correct them, and to make sure they're

4    correct moving forward.  So in the recent months, it did not look

5    good, but the current activity seems to be moving in the right

6    direction.

7          Lastly, in the area of PREA, the Prison Rape Elimination

8    Act, there continues to be some improvement.  There -- there needs

9    to be some training of the PREA officer and the investigation

10   officers on PREA investigations; that needs some improvement.

11         The other thing, and this is probably most troubling, is

12   that the PREA officer was doing some orientation and education of

13   the inmates in the three facilities.  She wasn't able to do that

14   for a while because of a lack of equipment.  The equipment is

15   there.  She is not doing it now in RDC, because she does not feel

16   safe going back into the units.  So somehow there needs to be --

17   obviously, the best result is that the safety and security get to

18   the point where she would feel safe going to the units.  But until

19   then, there needs to be a process for providing that orientation

20   and education to the inmates on what PREA is and how to report and

21   things of that sort.

22         But there generally has been quite a bit of improvement in

23   the area of PREA, certainly since we started, and that's one

24   policy that I believe is about to be circulated.  So we should see

25   some standardization there as well.

1          And I didn't mention grievances.  There's improvement

2     there as well.  The system is still problematic, but I think the

3     staff appears to have figured out how to go back in and make sure

4     they're answering grievances.  A lot of grievances were falling

5     off the dashboard and not being responded to, so inmates weren't

6     getting any response in a pretty high percentage of cases.  It

7     appears the staff has figured that out.

8          When we ran the report this time, there were very few that

9     came up in that non-responded-to category.  There is a need to

10    drill down now at this point to look at how the grievances are

11    being responded to and to provide some guidance and training on

12    what constitutes an adequate response to the grievances.  So that

13    is the area of grievances, and that -- that covers the

14    administrative items that I wanted to close out with.  And I'm

15    happy to answer any questions you have on those or anything else

16    that's been discussed.

17         THE COURT:  Let me just ask this simple question.  You've

18    identified three problem areas:  policies and procedures,

19    staffing, and the facility itself.  And, obviously, it appears to

20    me when you look at all three of them in the subparts of each, it

21    looks as if you just cannot make any headway on anything.  And I

22    think there's a -- I think it's an African proverb.  You know, if

23    you've got to eat an elephant, you eat it one bite at a time -- or

24    how do you eat an elephant?  One bite at a time, I think it is.

25         And it seems like all of these are interrelated actually,

1    so if you commit to doing one, such as staffing, get all your

2    staffing in place.  Those staff members could work to get all the

3    policies and procedures in place.  Staff members reduce the

4    possibility that the facility will be dis-maintained, if you will,

5    or will -- that maintenance will be less of an issue, because the

6    inmates will probably be -- or not inmates, because they're not

7    prisoners.  Those being held in custody could be deterred or less

8    likely to damage the property or destroy the property.

9         Have there been any talks among you with the County or

10   with the sheriff as far as what they might take up as a priority?

11        MS. SIMPSON:  Well, the first three, or the big three as I

12   call them, are interrelated.  And, really, they -- I mean, they're

13   sort of chicken and the egg.  I think the difficulty -- or the

14   facility condition certainly makes it difficult to retain staff,

15   and the lack of sufficient staff have resulted in the facility's

16   deterioration.  So they really go hand in hand, and I think

17   probably have to be addressed at the same time or if you fail to

18   do one, you're just going to cause yourself problems in the other.

19        We have made some recommendations with respect to both of

20   those areas.  Staffing seems to be the most challenging area.  The

21   County did raise the base salary for the incoming corrections

22   officers, and we saw a bump in the staffing level after that.

23        Retention appears to be perhaps a bigger problem than

24   recruitment, although they're both difficult areas.  One of the

25   things we have recommended is establishing a step increase, so

1     that there's some financial incentive to stay on.  I think there

2     has been difficulty in training the staff, incoming staff, so that

3     they feel comfortable in their positions.

4          And, obviously, the fact that it's understaffed makes it

5     difficult for new staff coming on board.  It makes it more

6     dangerous and such.  So another possibility Mr. Parrish mentioned,

7     to the extent possible consolidating the population so that the

8     staff that does -- that is there can be sort of consolidated as

9     well, so there's better staffing levels in a smaller space.

10         And that goes back somewhat to having a master plan and

11    sort of knowing what your end game is, so that you know whether to

12    fix up C Pod so that it can be used in the short term, or are you

13    going to build a new jail or add a new unit?  And so having that

14    sort of master plan so that you can target your renovations and

15    your staffing based on what your long-term plan is.

16         Another -- another possibility, but this involves expense

17    as well, is to purchase out-of-county beds for part of your

18    population, so that you bring your population down to what can be

19    managed by the current staffing level.  That, obviously, has an

20    expense associated with it.  But it's another way of --

21         THE COURT:  When you say "purchase out," you mean contract

22    them to other counties?

23         MS. SIMPSON:  Yes.  Yes.  So that's another way, and I'll

24    defer to my corrections expert if he has other ideas.  We've

25    certainly made recommendations in that area.  I don't have them

1    all in front of me but --

2         THE COURT:  Let me ask you this, going back to the problem

3    that I foresee on the front end that I raised at the beginning

4    with respect to the processing people through the criminal justice

5    process, I think -- I know the note that the report indicates that

6    there is a -- and I might have the acronym or even the name

7    incorrect -- but there's some sort of committee, criminal justice

8    something committee in place?

9         MS. SIMPSON:  Yes.

10        THE COURT:  How active has that committee been?

11        Because I presume that these issues have been taken to

12   that committee that is composed of, I think, judges, mental health

13   people, the prosecutor's office, the public defender's office, and

14   other interested parties.

15        What, if anything, it -- what has that committee done?

16        MS. SIMPSON:  Your Honor, that's the Criminal Justice

17   Coordinating Council or committee, the CJCC, and all of those

18   individuals you mentioned are officially members of the committee.

19   However, we certainly have had it reported that not all of them

20   participate actively, and both Ms. Davis and Synarus Green, who

21   are in the courtroom, are participants in that process and could

22   give more detail.

23        But I believe the district attorney has not been a regular

24   attendee or participant.  I think some of the courts -- not -- the

25   circuit court has had regular attendance and participation.  In

1   fact, Judge Green is the chair of that committee, but not all of

2   the other courts within the County have been regular attendees or

3   participants.  So that -- but I will say it's new.  It's a

4   process.  I've seen CJCCs developed in other jurisdictions, and it

5   sometimes takes time and takes a few achievements before everybody

6   sees the benefit of having them.  But, yes, I think the

7   participation has been a bit of a disappointment.

8              THE COURT:  Okay.  All right.  Thank you, Ms. Simpson.

9   Thank you so very much.  I'm going to take a 15-minute break for

10  my court reporter.  In between the United States and the

11  defendants, you all can work among yourselves as to whose going to

12  be next.  I'll let you all decide whose next, and we'll be back

13  after then.  15 minutes.

14             MS. SUMMERS:  All rise.

15                   (A brief recess was taken.)

16             THE COURT:  You all may be seated.  I gave the parties an

17  opportunity to tell me how they wish to proceed.  Have you all

18  discussed that?

19             MR. CHENG:  Yes, Your Honor, I'll have a few brief

20  remarks.

21             THE COURT:  All right.  You can come to the mike.

22             MR. CHENG:  Thank you.

23             THE COURT:  Since you're starting, let me ask you this

24  question.

25             MR. CHENG:  All right.

1          THE COURT:  This case was filed in 2016.  How long before

2     that -- because I know DOJ typically goes through some arduous

3     process before it elects to sue any entity, in particular, a

4     public entity.  When did the investigation begin?

5          And because I know prior to any lawsuit being filed,

6     there's an investigation, and then there's negotiations and

7     there's discussions and typically the last thing the DOJ does will

8     actually file the suit.

9          MR. CHENG:  So the Department of Justice issued its

10    findings letter on May 21st, 2015.  By the time that letter was

11    actually issued, it had actually been a couple of years since we

12    had noticed the jurisdiction of the investigation, and then after

13    the findings letter was issued, the statute usually gives us

14    49 days to resolve the case.  If not, we're authorized to sue.

15         We obviously did not do so until we entered into the

16    settlement talks, and the settlement agreement itself was then

17    filed on July 19th, 2016.  I believe the settlement itself may

18    also have the exact dates of the notice letters.

19         THE COURT:  That's fine.  That's fine.  I just wanted --

20    okay.  That's fine.

21         MR. CHENG:  Right.

22         THE COURT:  You may proceed.

23         MR. CHENG:  So as Your Honor alludes to, this is a long

24    process, and while a lot of positive things have been said today,

25    I do want to caution just how new a lot of these improvements

1    were.  And by way of analogy, let me talk a little bit about that

2    riot.

3            When we came in on Tuesday, we had not been notified that

4    there had been a riot just a few weeks before, and when we got on

5    site, we learned about it from the staff and the administrators at

6    the jail.  The riot --

7            THE COURT:  Does the settlement agreement require

8    notification?

9            MR. CHENG:  Yes, it requires immediate notification after

10   something as severe as a riot.

11           When we found out more about the riot, among other things,

12   the riot occurred during a severe storm.  The storm took out power

13   to the entire Raymond Detention Center.  The emergency generators

14   failed, which contributed to the security failures.  The door

15   breakdown was just part of a very longstanding pattern of them

16   simply being unable to keep inmates in the jail.

17           As you may have seen from the compliance reports, there's

18   a long history of the inmates breaking out of the jail just to get

19   contraband and bringing it back into the jail, inmates

20   overpowering officers, inmates getting into control rooms.  This

21   one was almost as bad as it could have been, and it was only by a

22   small miracle that nobody was hurt.

23           So just as that incident occurred very recently, a lot of

24   what you heard today from the monitor and her team are very recent

25   improvements that were represented to us by staff.  And that isn't

1   to say they're not real.  These are all real improvements.  There

2   are definitely a lot of steps being taken by the current deputy

3   jailer at the Raymond Detention Center as well as more

4   long-standing reforms adopted by the captains at the work center

5   and at Jackson Detention Center.

6        But these are all staff-level improvements and staff-level

7   representations.  At a very core level, the major policy decisions

8   that need to be made by the defendants themselves have not

9   actually been made, so there is some concern that the really big

10  reforms that are needed can't be done without some demonstration

11  of greater commitment by the defendants.

12       And I think the monitor alluded to a couple of the issues

13  that really need to be addressed.  The first is that while there

14  have been a lot of promises and going back and forth with the

15  defendants, there really hasn't been any type of master plan or

16  any indication that the defendants themselves have a strategic

17  vision for where they want to go with the jails.

18       I mentioned I believe at the last hearing that there has

19  been a lot of technical assistance, and Ms. Simpson alluded to it

20  as well.  When she talked about the various proposals, we're not

21  talking about just like off-the-cuff comments.  We're talking

22  about talking with architects.  The County themselves that the

23  administrative level brought in architects to draw up plans for a

24  new intake reception center.  There were pretty detailed

25  discussions with managers about how to improve staffing.  There

1    were discussions about how to develop a staffing recruitment plan.

2    All these were in the works at some point during the compliance

3    process, and then they fell apart.

4          Now, why they fell apart, it's not always clear.  But at

5    least from the United States' point of view, some of it is because

6    there really isn't sort of the buy in at the highest level, a

7    commitment for what they want to do in the long term.

8          The second issue that comes up is that for a long-term

9    plan to work, there have to be certain key steps taken before you

10   can start building on them.  And while there are a lot of

11   improvements across the board, some of those key steps have not

12   been taken.  One of them is staffing.  What do they want to do?

13   Do they want to try to hire more staff every year?  In which case,

14   they need to improve funding every year for more staff.  Instead

15   we've been stuck at a 275 figure.

16         If they want to do something else, like consolidate

17   facilities, that, too, requires commitment.  Having a working

18   committee get together, talk to the monitor, write something up.

19   Let us know what you want to do, so we can at least comment on it

20   and then let's do it.

21         So I guess the sum of all of that is that there's a lot of

22   potential for breakthrough based on what we saw during this last

23   compliance inspection, but there's a lot of room for it to fall

24   apart again as well.  And I think it's, therefore, very important

25   for the Court to continue to be as active and for the United

1    States to continue to monitor this case and work with the monitors

2    as closely as possible to push the defendants to do what needs to

3    be done.

4         THE COURT:  In two months this settlement agreement will

5    be three years old.  What part of the settlement agreement does

6    the United States believe the County has been in compliance with

7    since the agreement has been reached?

8         MR. CHENG:  I think --

9         THE COURT:  The answer is none.  Because I asked that

10   question, I said what part has the County been in complete

11   compliance with since the settlement agreement has been reached?

12   Is there any -- is there any portion of the agreement that the

13   County has been -- the County and/or the sheriff's department has

14   been in complete compliance with since July of 2016?

15        MR. CHENG:  I think the monitor has identified one

16   provision that the jurisdiction is in complete compliance with,

17   which is the appointment of a compliance coordinator.  The monitor

18   has not found them to be in compliance with any other provision,

19   or at least not sustained compliance, and the Department has never

20   disagreed with her.

21        I do have to caveat it, because as always for the

22   Department to take an official position on whether there's

23   compliance would require further briefing.  But so far we have not

24   contested any of that by the monitor.

25        THE COURT:  And how long does this -- and I have to go

1    back and look at the agreement itself.  How long is the agreement

2    supposed to be in place?

3         MR. CHENG:  The agreement has no automatic termination

4    date, so most of the guidelines, most of the deadlines are tied to

5    about a two-year date for compliance.  A number of provisions,

6    such as the policies and procedures provisions, have much shorter

7    deadlines of about six months to a year.  So technically, you

8    know, when the monitor says they're not in compliance with any of

9    the deadlines, the United States has never contested that

10    statement either.

11         THE COURT:  Okay.  Thank you, sir.

12         MR. CHENG:  Thank you.

13         MR. TEEUWISSEN:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MR. TEEUWISSEN:  May it please the Court?

16         THE COURT:  You may proceed.

17         MR. TEEUWISSEN:  You quoted an African proverb.  I'm going

18    to quote JayZ.  The County's got 99 problems, but the current

19    elected officials aren't one.

20         Let me caution everybody in this room.  It won't be a

21    surprise to anybody on this side.  You end up with three different

22    supervisors and a different sheriff, you think you got problems

23    now, you're going to start from scratch because you won't have

24    your lawyers and you won't have anybody who understands any of

25    this.

1      We have a narrow window, Your Honor, between now and this

2 fall to figure out how to get some traction, and I'm glad the

3 government got up and said we aren't in compliance, because I'm

4 pretty sure I told you that in January.

5      Now, I would quip with the government on the issue of the

6 juveniles, and I would say that if Your Honor was to hold a

7 hearing next week, we could show we're in compliance on the

8 juvenile provisions of the adult decree.  But that's not the real

9 issues of why we're here.

10      We've got three big issues, and I view them a little bit

11 differently than Ms. Simpson.  We've got management of the

12 facilities, structure of the facilities, and the criminal justice

13 system.  Management, structure, and the system.

14      I think Your Honor was astute in the proverb about how to

15 eat an elephant.  Hinds County has said for two years to the

16 Department of Justice and to the monitors that we are overwhelmed

17 with the problems we are facing, and, quite frankly, we don't have

18 the internal capacity to figure out how to prioritize and get out

19 of what amounts to decades of poor management, and, obviously, a

20 decrepit structure that was flawed from the beginning.

21      I would request that the Court direct the parties to

22 somehow figure out a way to streamline and prioritize what we are

23 trying to accomplish.  And I say that because your neighbor, Judge

24 Jordan, just directed the County and SPLC, who is here, to do the

25 same thing with respect to the juvenile consent decree at

1    Henley-Young.

2         Of course, we have made much more progress, but Judge

3    Jordan, who quoted you several times by the way, said that we need

4    to get off that consent decree and figure out how to wrap it up.

5         The County then sat down with SPLC and actually came up

6    with a timeline and a structure that should wrap up the juvenile

7    consent decree, and we did it by agreeing that certain problems,

8    while present, would be addressed six months from now or 12 months

9    from now because we needed to address other problems first.

10         If I misspeak on any of this, Ms. Woo is here and her team

11    and they can correct me.  I think we've got to come up with

12    something similar with the adult system.  We've got to realize

13    what can we tackle now and put in place that then allows us to

14    build upon it?

15         And, quite frankly, I don't understand how -- I respect

16    these folks.  I don't understand how they can get up and tell you

17    close downtown jail and put more people into the worst facility in

18    the County at Raymond just so we can consolidate staff.  We're

19    consolidating staff at the expense of how many more people that

20    we're going to put in there.  The County has jumped all over the

21    board.  We've got to have some sort of plan that makes sense.

22    Don't know that we're going to solve it today --

23         THE COURT:  How do you the -- I'm sorry to cut across you,

24    Mr. Teeuwissen.  But you indicated management, structure, and the

25    criminal justice system?

1          MR. TEEUWISSEN:  Yes.

2          THE COURT:  How do we address the criminal justice system

3     aspect of it when the district attorney or the judges are not a

4     part of -- I guess they're part of the process through the CJCC or

5     whatever, but they're not here -- the DA isn't here today and has

6     never been here.  And by the time this wraps up after November,

7     the first Tuesday in November after the first Monday in November,

8     we will have a new district attorney no matter who that person is,

9     because the district attorney says he's not -- well, he has not

10    qualified to run for his -- he's qualified to run for a higher

11    office, so he's not running again.  So we will have a new district

12    attorney.

13          But how do we address the criminal justice side of the

14    thing if there is nobody here as a stakeholder from the person

15    who's in charge of indicting and bringing people to trial?

16          MR. TEEUWISSEN:  I think there are provisions within the

17    consent decree, and I'm sorry I don't have it in front of me.  But

18    I hope this will answer your question.  The County believes there

19    are provisions within the consent decree that would allow us to

20    basically backdoor force the district attorney and the judges to

21    do their jobs in a timely fashion.  We've had that discussion with

22    the Department of Justice.  They take a very different position on

23    those provisions.  They view those as a prisoner release issue

24    that would require a three-judge panel.  We don't see it that way.

25          We think Your Honor, who has ample authority to fashion

 1   remedies, could say, for example, that you will not, Hinds County,

 2   hold unindicted people beyond a certain number of days, unless

 3   there is some hearing, some record that says why you're holding

 4   them.  That would be one way to do it, and we think you have those

 5   powers.  We could brief the issue.  We could put the case law

 6   before the Court to do things like that, not to effectuate a

 7   release as the government is concerned, but to effectuate judges,

 8   district attorney's office, you can't ignore everything.

 9        And there are provisions in the consent decree that

10   discuss what paperwork and under what circumstances the County

11   will hold someone.  You could interpret those provisions and

12   provide some relief.  That will be our position, because we've got

13   to get them to the table.

14        Now, let me say this.  I believe the four circuit judges

15   who are now on the bench are serious about addressing these

16   problems.  I say that because in April, we had a meeting with the

17   four circuit judges, myself, Ms. Davis, Mr. Simon, just the seven

18   of us.  That was the first time in my 29 years of practice, Your

19   Honor, that I have seen four Hinds County circuit judges in the

20   same room trying to tackle something with the criminal justice

21   system.  It was clear that was not a one-time meeting, so I do

22   think we have support of the judges, though because they're

23   elected, they're looking for some cover as well, if that makes

24   sense.  They don't want to be seen as being painted as being soft

25   on crime or some other term that gets bandied about in the media

1   that mischaracterizes what they're trying to do by enforcing

2   constitutional rights.  We have to recognize that.

3       I think that we have got to have something in place so

4   that whomever the next district attorney is that district attorney

5   understands coming in the door that there are certain priorities

6   necessary to A, protect constitutional rights of the accused; and,

7   B, relieve the pressure that currently occurs in the criminal

8   justice system, and specifically, in the holding facilities.  And

9   I think we can do that through some order of this court.

10       Now, how we approach that, whether that means the County

11   needs to file a motion and memorandum brief and ask for that

12   specific relief, whether that means that the County and the

13   Department of Justice needs to sit down and roll up their sleeves

14   like the County did with SPLC.  We had five separate negotiating

15   sessions with SPLC to come up with a plan that made sense, and if

16   you had listened to the hearing in February in the next courtroom,

17   the SPLC and the County were miles apart.

18       It was amazing when Judge Jordan ordered us to go solve

19   some problems what we came back with in six weeks, and we're on

20   track.  We think we're going to get there.

21       While I'm there, let me digress momentarily, Your Honor.

22   We do have a new director of Henley-Young Juvenile Detention

23   Center.  He's here in the courtroom, Mr. Fernandez Frazier.  He is

24   a -- has a long, distinguished career and retired from the Bureau

25   of Prisons, so we think Hinds County has hit a home run.  And

1    that's not to diminish Mr. Dorsey and Mr. Burnside, who have been

2    the backbone of the Henley-Young efforts over the last four years.

3    We've got to think outside the box.  We've got to do something

4    different.

5         THE COURT:  Who is the director of -- is there an

6    administrator for Raymond?

7         MR. TEEUWISSEN:  Yes, the administrator of the adult

8    system is Mary Rushing.  She's been here previously.  She's not

9    here today.  Candidly, we probably need somebody with Bureau of

10   Prison experience to run the adult system, too, but we're not

11   there yet.  The job isn't attractive.  I will say that the four

12   finalists for Henley-Young were markedly different this year than

13   they were in 2014.  We hired Mr. McDaniels in 2015, but that was

14   after 65 people applied and the federal monitor in that case said

15   don't interview any of the 65.  We had a much different -- as you

16   make some progress, it's easier to find individuals such as

17   Mr. Frazier who are willing to take their experience into another

18   setting that is making progress.

19        I think the monitors are well intentioned.  You know, I

20   think when we testify or speak to the Court, either from the

21   witness stand or as counsel, we're supposed to be accurate.  We're

22   supposed to be truthful.  We're supposed to be complete.  I think

23   the monitors are truthful.  I think they're reasonably accurate,

24   but far from complete.

25        Every issue they've identified today, I could spend the

1    next two hours explaining the rest of the story.  I'll give you

2    one.  Mr. Moser stood up before you and said he sure hopes we get

3    a full-time psychologist at Henley-Young.  SPLC will tell you they

4    hope the same thing.  What Mr. Moser doesn't know, hasn't asked,

5    or just didn't tell the Court is that the person we have that

6    everybody likes, we tried to hire her full time.  She told us she

7    wanted $36,000 per month; that's not going to happen.

8            Ms. Davis did her best to negotiate with this woman.  The

9    woman insisted on making at least $160,000 a year.  That's not

10   going to happen in Hinds County.  There's no employee in Hinds

11   County who's making $160,000 a year.

12           Her initial request for $36,000 a month is more than

13   Ms. Barker makes, myself, Mr. Simon, and two other attorneys under

14   contract make.  So while we hear a lot of great ideas, we've got

15   to get realistic as to what this market can and can't do, and

16   where do we find these individuals.

17           If we don't keep Dr. Payne, we're looking elsewhere.  We

18   haven't found somebody, so I'm not sure how we're going to solve

19   some of the problems that are just inherent to the State of

20   Mississippi and what we're facing.  Hinds County pays its

21   detention officers more than the State of Mississippi, yet both

22   Hinds County and the State of Mississippi have a severe shortage

23   of detention officers.

24           You've heard the issue on the mental health.  The State of

25   Mississippi has 15 criminal beds for 82 counties.  We need more

1    than 15 for folks we got in Raymond.  I don't know how we solve

2    those, but working on some of those problems while trying to work

3    on all the rest of the problems, is not something that builds to

4    success.  We've got to realize that some issues, however bad they

5    are, however unconstitutional they are, have to take a backseat to

6    certain others.

7        And I will tell you I am not a detentions expert.  I don't

8    know how you prioritize, but I also don't know anyone in the

9    County who knows how to prioritize those types of complicated

10   issues.  And that's what we were hoping, "we" being the County and

11   the sheriff, we would get from the monitor team.  Clearly they

12   view their roles very different, which is understandable, and

13   their role is to monitor, not necessarily provide technical

14   advice.  But the capacity of what we have to work with is truly a

15   challenge.

16       Going back to Henley-Young, Your Honor knows we've had

17   problems with youth being abused in this county going back to the

18   1980s.  Think about that, 1980s, and it's only within the last

19   three years that we've solved those problems so the youth aren't

20   being abused.

21       Now, do we have more things we need to do to make sure

22   we're constitutional?  Yes.  But we don't have abuse issues and

23   safety and security issues.

24       At some point, again, the government, federal government,

25   the County, the sheriff, the monitors have got to figure out

1   what's the first priority and how do we get after it?  It seems

2   like those should be safety and security issues, and we've somehow

3   got to structure those.  But that's where we are.  I don't know

4   how we get there.  I don't know, should the County file for formal

5   relief asking that you point us in that direction?  We're willing

6   to do so, but that's where we stand.

7        I stand ready to answer any of your other questions.  I

8   don't want to get into rebutting everything that was said, because

9   I think that is kind of a waste of time.  Yes, the doors are an

10  issue.  But, Judge --

11       THE COURT:  I assume this falls under the PLRA, does it?

12       MR. CHENG:  The doors themselves do not fall under the

13  Prison Litigation Reform Act.  I think what Mr. Teeuwissen is

14  referring to is if there were any additional relief entered to try

15  to get inmates out of the facility or to cap the population.

16       THE COURT:  Okay.

17       MR. TEEUWISSEN:  But I just wanted to speak to the doors.

18  Your Honor, these Wiley Coyote geniuses built a facility with

19  sliding doors.

20       THE COURT:  But the County accepted the facility with the

21  sliding doors.

22       MR. TEEUWISSEN:  I agree.

23       THE COURT:  And I understand it was under a separate

24  administration, separate board of supervisors, and we have -- you

25  know, we have no control over who the people of Hinds County elect

1    to do its job, to do the job that they're elected to do.

2         But the County has an obligation -- as long as it's going

3    to participate in the criminal justice system, it has an

4    obligation to make sure that the constitutional rights of those

5    who they accuse of crimes are protected.

6         MR. TEEUWISSEN:  Absolutely, Your Honor.  But the

7    assumption is or the representation is that the County hasn't

8    addressed doors until the last two months, that's simply not true.

9    The County has addressed the problems with doors on an ongoing

10   basis for the five years I have represented them.

11        THE COURT:  The County has been trying to get that jail in

12   a state where it can be a jail since 1995, and it didn't

13   accomplish that goal when it was built.  There have been -- the

14   County has sued different people who were responsible and -- and

15   all of -- and all of that.  So I imagine there are provisions in

16   the settlement agreement itself that requires the parties to try

17   to work or monitor or try to get things right, and obviously it

18   shouldn't take an additional from the court, I don't think, to

19   make the parties do whatever the settlement agreement -- whatever

20   the terms of -- because this was negotiated, I presume.

21        MR. TEEUWISSEN:  Yes, the order of the Court I was

22   referencing would be to effect those actors who are not

23   stakeholders but who impact the system.

24        THE COURT:  Okay.

25        MR. TEEUWISSEN:  The reason I referenced the doors is it's

1  an ongoing issue.  It's going to be an ongoing issue until a new

2  jail is built, but I think there's some confusion as to lack of

3  effort versus effort that ultimately ends up futile.

4       And I think the sheriff's office and the County could put

5  on proof that they have done effort after effort.  Now they

6  haven't made a change, that's the problem, we're still in the same

7  position.  But it's not like money hasn't been spent.  There's

8  been about $7 million spent on the jail since I've been the board

9  attorney of the Raymond jail, and yet we still have the same

10 problems.

11      So we've got to, again, somehow what can we reasonably

12 tackle short of just throwing money at problems?  Because we've

13 shown that the throwing of money at problems really hasn't worked.

14      Now, it's going to cost money to get off the consent

15 decree; no question about that.  Ultimately -- and I've said this

16 to the board of supervisors in the last six months -- after this

17 election year settles, assuming that a majority of that board

18 comes back, they're going to have to really consider building a

19 new facility.

20      I think Dr. Dudley makes a good point about mental health,

21 but even if we modify some part of C into a mental health unit,

22 it's not going to be a true mental health unit, because each of

23 those pods is designed the exact same way.  We have no ability to

24 reward good behavior or punish bad behavior.  There's no maximum

25 security.  There's no minimum security.  It's just there.

 1          And so I've changed my tune in terms of advising the board

 2     that they're going to have to cross a very uncomfortable political

 3     situation and really bear down on -- you've got to figure out how

 4     to get the right jail in the right place and the right size jail.

 5          I heard some reference by Ms. Simpson to planning new

 6     programming in the jails.  The County went in 2014, a member of

 7     the board of supervisors, Ms. Davis, myself, then Sheriff Lewis,

 8     his jail administrator went to the National Institutes of

 9     Correction for a week, went through the planning of new facilities

10     program, and the only thing we could conclude after that in 2014

11     was the County was not ready to build a new facility.  Simply we

12     didn't think we had the capacity to make the right decisions and

13     not do what was done just a generation ago.

14          We've got to change the culture in detention.  Detention

15     has always been a stepchild to every sheriff, that's not the

16     exciting part of the job.  That's no disrespect to Sheriff Mason

17     or Sheriff Lewis or Sheriff McMillan, that's just not a part of

18     the job that people have emphasized.  That's a cultural shift

19     that's going to take several years at best.  We've changed that

20     culture at Henley-Young, but we didn't have that culture five

21     years ago.  We're starting to get that culture now.

22          Again, the County is not asking to be excused from what it

23     negotiated.  Your Honor, I negotiated it.  I think everything in

24     the consent decree needs to occur to protect the constitutional

25     rights of those who are housed in the County facilities.

1          Having said that, we've got to change the approach,

2    because we can't eat the elephant all at once.  And our people get

3    frustrated.  They check out on us in terms of they're committed,

4    they're not committed two months later because they're frustrated

5    for whatever reason.  And that's a difficult challenge, and I'm

6    not sure how we get there.  But we've got to figure out how to get

7    there, and it can't be we're worrying about every provision in the

8    consent decree with equal force at all times.

9          THE COURT:  Has the County attempted to find out what it's

10   costing the County every day to hold a particular -- it seems to

11   me that that would be an incentive to the board of supervisors and

12   the sheriffs.  For example, if it's costing a prisoner $50 a day,

13   then we're holding that one prisoner a thousand days, that's --

14   you know, I don't know, that's $50,000, or is that more than that?

15   That's 50 and 40, that's five and three zeros, right?

16         Yeah, no, that's on the record.

17         MR. TEEUWISSEN:  I'm a lawyer.  Your Honor, I get the

18   point.  The answer is no, but after the no, Ms. Simpson and I met

19   earlier this week, and she wanted to prioritize the budget.  It is

20   timely to do so, because the County's budget review occurs during

21   the summer with budget adoption by September 15th.

22         And let me back up.  Previous sheriffs had a tendency to

23   mix detention funding with operations or other things, so for us

24   to have tried to figure that out probably before the current

25   fiscal year was not going to occur because the board

1     appropriates -- yes, there are various budget line items.  But by

2     state statute, they appropriate a quarterly amount to the sheriff.

3     The sheriff then spends that.  As long as it's legal, the sheriff

4     can move it between budget lines.

5          This year, this fiscal year, the sheriff has refrained

6     from doing that.  Ms. Davis has tried to ensure through her

7     finance people that that is not occurring, and I think we're at a

8     position where we can start looking at what the true cost is

9     remembering -- and the budgeting, I heard you reference that

10    earlier.  What you say makes sense, but local government budgeting

11    doesn't operate the way you think it should, or the way I think it

12    should for that matter.

13         They'll look up, and the sheriff will come in, and he'll

14    say, look, I need $21 million this year.  And, yeah, I got all

15    these line items.  This is how I come to $21 million.  The board

16    will come back and say I'm going to give you 19, and you can

17    figure out where to cut it.  And they arrive at some global number

18    in the middle, without really looking at how does that impact

19    those individual lines.

20         And part of that is because once the board appropriates

21    it, the money belongs to the sheriff, and they can't tell him how

22    to spend it.  So nobody gets into the weeds that they should

23    really trying to figure out the budget.  Again, I think through

24    this -- this process, specifically Paragraph 42 of the consent

25    decree -- I knew that one -- there has to be prioritization of

 1    what's occurring to prioritize detention.  And we've got to figure

 2    out those numbers.  Realizing as well that when we determine those

 3    numbers, the 20 million -- this is an estimate.  I'm not giving

 4    you the exact number, but the sheriff gets 20 million this year.

 5    It doesn't include health care costs, insurance costs, and other

 6    costs that are borne by the County outside of that 20 million.

 7         Medical is obviously a major expense.  A medical

 8    contractor is about 2.5 to $2.8 million a year, that's not

 9    medications, that's not hospital bills, that's just the medical

10    contractor.

11         So, yes, I think that we do need to figure out how much it

12    is per day.  I think if the County is going to look at a new

13    facility, they've got to have those numbers, so they can talk to

14    the public.  That's what they told us at NIC, that just kind of

15    makes common sense.  We need to know whether it costs $50 a day or

16    75 or whatever number it is in between.

17         I will tell you that part of the reason the jail

18    population is down is because the County has engaged in electronic

19    monitoring, well intended to reduce pressure on the jail, and I

20    think we're spending $800,000 a year on electronic monitoring.

21    That has caused Ms. Simpson and everybody else to say, wait, wait,

22    wait a minute, that's some money that ought to be going back into

23    the jails, which is true.  And that's a cost outside of what is

24    appropriated to the sheriff, but it's a cost that we bear with

25    respect to the criminal justice system.

1          Complicated issues, Your Honor.  I could be up here all

2     afternoon.  I would prefer to answer your questions as opposed to

3     trying to make some particular case, except I want to say we've

4     got a window of opportunity between now and the election, and

5     somehow collectively, Your Honor, the government, the monitors,

6     the County, the sheriff we've got to take advantage of this,

7     because we don't need new elected officials, regardless of whether

8     I'm here or Ms. Barker or Sheriff Mason or Ms. Davis.  We don't

9     need a new set of officials coming in thinking that they've got to

10    reinvent the wheel and somehow need to relitigate the issues.

11         THE COURT:  Well, I mean, you've gotten a guarantee --

12    there is a guarantee that there will be a new set of elected

13    officials, because at least one member of the board of supervisors

14    has announced she's not running.

15         MR. TEEUWISSEN:  Correct.

16         THE COURT:  So she's gone December 31st, and for all

17    practical purposes, she may be gone now, and she may decide that

18    she does not want to bind the County with something that she does

19    because she's not going to be here after January 1.  I don't know

20    what her thoughts might be on that.  I don't know.  I mean, you

21    know -- and then again, I don't know what the other county

22    officials might be thinking in that regard whether they're the

23    board of supervisors, the sheriff, or the district attorney.

24         Well, we know one member of the board of supervisors is

25    going to be gone, and we know the district attorney is going to be

1    gone.  We know that.  And I think those are the only two who have

2    decided not to run again.  And are all the members of the board of

3    supervisors in contested races between now and November?

4          MR. TEEUWISSEN:  Yes, Your Honor.

5          THE COURT:  And you think you have the capacity and the

6    will to try to get something to address what the monitor and what

7    DOJ says is the -- are the problems?

8          We haven't been able to get it since July 2016, but we're

9    going to get it done between May 10th, 2019, and December 31st,

10   2019?

11         MR. TEEUWISSEN:  No, Your Honor.  But I do think there are

12   pieces of the puzzle that can be solved.  You don't put together a

13   thousand piece puzzle by dumping a thousand pieces out and

14   slapping them all together.  You work on a counter here.  You

15   build an edge or a framework.  I think the consent decree is our

16   framework for that edge for that puzzle.  I think we have got some

17   corners where we've made progress, such as the juveniles, some

18   degree medical and mental health seems to have made some

19   improvement.  But we need to take care of some other corners, and

20   probably the most important one we can deal with this election

21   year is one that involves the district attorney since we know

22   that's going to change and the circuit judges who were elected

23   last year and are not feeling the political heat at the moment.

24   And we need to take advantage of that to somehow at least get

25   something from this court which tells them you've got to hold some

1    hearings and justify why these folks are in the Hinds County

2    facilities.

3         We've had a youth over there for an armed carjacking since

4    September 5th of 2017, that was the first day we put the juveniles

5    charged as adults in Henley-Young.  He's still there.  It seems

6    like there ought to be some hearing, some order that says Hinds

7    County you can't hold that youth without somebody going on the

8    record and explaining why he ought to be held.

9         Now, if he ought to be held, if he's such a danger, if

10   they can't process the case, I don't know what the reason could

11   be.  There could be a reason to hold them, but I do think we could

12   get that relief right now that would at least address that portion

13   of the criminal justice system and help take some pressure off

14   whomever the individuals are, board-wise or sheriff-wise, that

15   have to run these operations.

16        THE COURT:  What does the County say about the DOJ's and

17   the monitor's issue with again putting pieces together -- and

18   maybe this is not a question for you, Mr. Teeuwissen, because it

19   appears the County has nothing to do with it.

20        But what has hamstrung the sheriff's department from

21   drafting or either adopting policies and procedures?  That seems

22   to me that that is a matter of somebody going into a room or going

23   to rooms looking over old policies and procedures of other

24   entities.  I don't know, I'm told today there is just a minute

25   number that has been done.

1        What extraordinary efforts does it take to get that part,

2    that piece done?

3        MR. TEEUWISSEN:  I don't think the sheriff's office has

4    individuals with capacity to do that, not that they're not good

5    individuals.  But without having something directly and somebody

6    being held directly accountable by the sheriff or by the jail

7    administrator and saying that's your job; here are some model

8    policies, do that.  It just doesn't get done.

9        Contrast that with Henley-Young, Mr. Burnside and

10   Mr. Dorsey drafted the policies, but our monitor in that case gave

11   them policies to start with.  They then edited those policies to

12   apply to Henley-Young, and, in fact, now SPLC has its own monitor

13   that the County has agreed to who's reviewing those policies.  And

14   we were pleased she said that there were very few that needed

15   tweaking or adjusting.

16       But, Your Honor, we don't have professional detention

17   people in Mississippi.  I don't know how else to say that.  We

18   don't pay the salaries or make the decisions to hire those people,

19   and that's what we need.  We're very fortunate to have Mr. Frazier

20   who's able to have both a federal retirement and come to the

21   County.  We're underpaying him.  I mean, you can guess that.  He's

22   local, so he wanted to come back here because he was most recently

23   in Texas.

24       But short of kind of stumbling on those type of

25   individuals, they just aren't on the staff, and it's not just in

1   detention.  Ms. Davis and I will tell you it's the same for permit

2   and zoning.  It's the same for grant writing.  It's the same

3   throughout local government.  It's not an excuse not to get it

4   done, Your Honor.  It should have been done, but that is why we

5   tend to get stuck where we are.

6          THE COURT:  Thank you, Mr. Teeuwissen.

7          MR. TEEUWISSEN:  Thank you.

8          THE COURT:  Ms. Barker, you have anything you wish to add?

9          MS. BARKER:  Good afternoon, Your Honor.

10         THE COURT:  Good afternoon.

11         MS. BARKER:  Mr. Teeuwissen hit on most of the points that

12  I would have made, and so I'm not going to use up my time with the

13  Court reiterating that.  I do note -- I would like to speak about

14  the policies and procedures, and Mr. Teeuwissen was correct and

15  being very candid with the Court.

16         Whenever we entered into this consent decree, we had a

17  broken system, a broken detention center.  We had a new sheriff

18  coming in, a new command staff, new everything.  We are basically

19  rebuilding a detention center from the ground up in detention

20  services, which does require a change in mindset.

21         This has gone a lot -- patience is not one of my virtues,

22  so the process of getting policies and procedures that are

23  compliant with this consent decree has taken a long time.  Now, we

24  do have policies and procedures in place that are in line with the

25  ACA; however, the consent decree is -- goes above and beyond what

1    the ACA requires.

2         And so initially we had a lot of trial and error as far as

3    who we were going to contract with.  Some people came in, JSU came

4    in, and it just -- it fell apart, and I honestly think that the

5    process that was originally tried with this consent decree was

6    basically here's a consent decree that's 120 pages or whatever;

7    fix it.  And like Mr. Teeuwissen said, this thing is like an

8    octopus and it has overwhelmed our staff.  It has overwhelmed

9    everyone who has come in contact with it.

10         So I think that the policies and procedures, which we did

11    a lot of trial and error, thank goodness.  And we're very happy

12    with Karen Albert who Ms. Lisa Simpson sent to us.  It is working

13    now, because she's engaging the staff.  And I do think -- I'm like

14    you, Your Honor, why can't you just have a use of force policy and

15    say, here, do it.  The staff is being retrained in direct

16    supervision.  Whenever NIC came down with the command staff to

17    have a direct supervision training, only three people really knew

18    and had worked in direct supervision, and that's catching on.

19         I think that in the same vein as the policies and

20    procedures with Karen Albert coming here, I've sat in those

21    meetings, and sometimes I'm like wait a minute.  This is going

22    off -- you know, veering off a little bit to the left.  However,

23    it is helping our staff to be more responsible to have critical

24    thinking skills, and I have seen this.

25         In the past, we have not had staff with critical thinking

1    skills.  Basically, they were just reactionary, and that's not a

2    way to sustain your -- your system.  You know, we're supposed to

3    have quality assurance -- and however we don't even have people

4    that have the skills -- or I don't want to say "the skills,"

5    because they do.  I have seen them; they do have the skills.  But

6    they don't know what they don't know.  And so right now, although

7    it's a painstaking process, it is the right process.

8         Let's see.  And that's basically what I wanted to touch

9    on, because that is a huge issue.  I do -- we do recognize that.

10   But the sheriff's office and the County in the last -- well,

11   really, in the last -- since the last visit have really come

12   together and shown an extraordinary effort to grasp this problem,

13   and without any direction as to how to do it.  We're figuring

14   out -- hopefully, we can figure it out for ourselves.

15        But I do agree for the last year and a half we have been

16   asking for some priorities that we can enter into, some doable

17   priorities.  One step built on the back of another, another step

18   built on the back of that, and that's the only way we're going to

19   get out of this.  Your Honor, I have -- I'm here to answer any

20   questions.

21        THE COURT:  Is my assumption correct that if there's a new

22   sheriff, the new sheriff has an opportunity to select or change

23   his or her command staff?

24        MS. BARKER:  That's correct.

25        THE COURT:  All right.  It's just the -- I know the person

1    can't come in and just fire every deputy and all that.  But

2    certainly the --

3           MS. BARKER:  Yeah.

4           THE COURT:  Oh, he can?

5           MR. TEEUWISSEN:  It's Sheriff Lewis that started us on the

6    path -- I'm sorry to interrupt, Your Honor.

7           Yes, under Mississippi law every employee of the sheriff's

8    office is a will and pleasure employee.  And in fact when Sheriff

9    Lewis was elected, he wiped out a large portion of the sheriff's

10   office, including the veteran detention staff which then led to

11   the riot in 2012 and took us from probably what was not a good

12   situation but now one that has us in the consent decree where we

13   are now.

14          MS. BARKER:  That's correct with the entire sheriff's

15   office.  You know, McMillan was the sheriff for 20-something years

16   and whenever Sheriff Lewis came in, the entire office, including

17   detention services, was gutted, which a sheriff has every right to

18   do.  However, it was -- I'll go on the record to say it was poorly

19   managed, especially detention services, during his tenure, and so

20   not only did Sheriff Mason walk into this already bad position,

21   but everything was effectively stripped.  All the institutional

22   knowledge was effectively stripped from the sheriff's office, and

23   so we've had to rebuild a sheriff's office and then rebuild

24   detention services where, you know, that institutional knowledge

25   has just -- I mean, has --

1          THE COURT:  I mean, but the sheriffs -- all the sheriffs,

2    I think as Mr. Teeuwissen has indicated, you know, you prioritize

3    what's important to you.  And for many -- I assume for many of the

4    sheriffs, it's important to be seen out there in the street.

5          MS. BARKER:  Important to our citizens, yes.

6          THE COURT:  So maybe money is being spent on whatever the

7    sheriff's department does as far as policing, if you will, or

8    criminal investigations, because they figure that once they're in

9    jail, people are in jail.  So -- and that's how the public might

10   see it.

11         MS. BARKER:  You're correct about that.

12         THE COURT:  It's important to see the sheriff's people at

13   the grocery stores and --

14         MS. BARKER:  That's right.  That's right.  And it's

15   difficult to explain to the public that, okay, we're going to take

16   people off the streets, and your house may be robbed.  But we have

17   to, you know, keep our people safe in the jail that some of the

18   public deems are already criminals.

19         THE COURT:  Okay.  Thank you, Ms. Barker.

20         MS. BARKER:  Thank you, Your Honor.

21         THE COURT:  Appreciate it.

22         Any rebuttal or any response from the United States?

23         I guess my central question is where do we go from here?

24         Do we continue to monitor?

25         Well, the monitor's already scheduled to -- they're on

1  track to come back and to submit a report to the Court based on

2  what they've encountered since the last report.  Some of the

3  preliminary things I believe I've been advised of today, because I

4  assume some of the stuff that I've heard from the monitors

5  postdate 3/05/2019.  So I suspect what I'm going to get is a

6  report that sounds like it's not going to be too substantially

7  different from the one that I have before me now.

8         So what is the next step for the Court?

9         MR. CHENG:  The federal government is a bureaucracy, and

10  like many other things for us to formally ask the Court to do

11  something would normally be subjected to a lot of review, and if

12  we wanted something, we would have filed something.

13         I think it is fair to say, and I'm authorized to say that

14  any guidance the Court can give us to developing a plan to move

15  forward would be helpful.  But I think the Department's concept of

16  a plan to move forward is a little different from

17  Mr. Teeuwissen's.

18         After having had months to implement things and not being

19  able to do so, we would not be rewarding the County by saying

20  we're going to give you more months where we're not going to look

21  at these issues, so you can focus on a few items.  I think the

22  idea is the settlement agreement is a fair agreement, and

23  everything in the agreement is something that needs to be done.

24         That said, it does make sense for the parties to talk to

25  each other about what can be done on certain priority issues.  The

1    staffing is one issue, some of the security fixtures are another

2    issue.  There are other things like that that could probably be

3    addressed by the parties.  We are open to those types of

4    negotiations.  We have actually been passing a number of documents

5    back and forth to the County, but we haven't had much success in

6    getting the County to deal with some of those foundational

7    decisions and coming back with a solid response.

8            And I talked about this earlier, so let me give you sort

9    of a tiny example.  In June 2018, the monitor actually issued a

10   list of priority recommendations to address the County and the

11   sheriff's concern that this was an octopus.  There are too many

12   issues to deal with.  Priority recommendation number one was

13   complete and implement the policies and procedures manual.  There

14   are four bullet points on what to do.  One was develop a realistic

15   plan for completing policies and procedures.  Reconsider the

16   option to contract for development of policies and procedures.

17   Finalize policies and procedures developed with Karen Albert

18   regarding classification, records, and booking and submit for

19   review, and complete draft policies by the next site visit;

20   straightforward, very direct.  The County couldn't really do most

21   of those.  They sort of did some of them and they fell behind.

22           Priority recommendation two was achieve 275 filled

23   positions, and again there were some bullet points.  One of which

24   was adopt a step increase as incentives for retention.  There

25   were, like, a list of these things, and the County just didn't do

1    it.

2          Now, if we were to have conversations with the County

3    about a plan, I think the County has to come back in good faith

4    and look at these recommendations, look at those plans, and have a

5    concrete response.  Otherwise, we're just going to keep talking

6    around and around about what needs to be done.

7          Let me give just one more example, the lock issue.  Early

8    on one of the priority recommendations was get the locks fixed.

9    And, you know, County counsel is correct, that they have tried to

10   fix it, but what they don't mention is they tried to fix it

11   in-house.  The monitor and his team has repeatedly talked to them

12   about having professional security contractors who know what

13   they're doing fix the doors.  And what often turns out to be the

14   impediment is that when you hire people like that, they do cost

15   money.

16         Now, if they don't want to hire these people or they have

17   an alternative plan or they've come up with a way to do it, then

18   let us know what it is.  If it looks reasonable, we can sign off

19   and proceed, but so far we don't have anything like that.

20         The Department of Justice fairly recently asked the County

21   to provide proof that they have actually gone out there to look

22   for bids.  If you've supposedly gone out to search for contractors

23   to fix the doors, where are the requests for proposals?  Where are

24   the various bids from different contractors?

25         We're told they're very expensive, just like we're told

1    that the psychologist is going to be real expensive, or that, you

2    know, hiring a new administrator is really expensive, but there's

3    no, like, proof.  There's nothing to document what's really going

4    on.

5          So we end up with staff telling us we got great results

6    when we went with this person, and then nothing happens at the

7    defendant's level.  I worry about this trend, because, again,

8    going back to the door issue, very recently after the riot, the

9    staff were able to go out to this Texas operation that fixes

10   security doors.  They've come up with a model to fix the locks.

11   They fixed the hallway doors.  They fixed at least some of the

12   cell doors.

13         But for all practical purposes, it was just a short-term

14   priority project.  It is apparently very expensive to keep this

15   contractor on staff.  I forget what the exact number was.  I think

16   they got eight doors fixed for about $50,000.

17         So if you talk with staff, they're on their way to fixing

18   the doors and the locks.  But if I talk with the defendants, I

19   have no idea if this is really going to be the plan to fix the

20   remaining doors.  And if it's not the plan, what's the

21   alternative?

22         So basically, Your Honor, we agree with them in concept

23   that we need to talk and we need to come up with priorities, but

24   what we don't agree with is whether or not the County is able to

25   come back and reciprocate.  It feels to us as though they're

1    trying to avoid making some tough decisions.  No matter how it's

2    couched, it basically boils down to they don't want to spend money

3    on certain things, and at some point they're going to have to

4    spend the money.

5         Now, I know that doesn't seem completely fair because on

6    their budget they have probably spent a great deal of money, but

7    it hasn't always been very thoughtfully, carefully managed.  And

8    it doesn't go down to things the way we've tried to suggest they

9    go down the list.

10        THE COURT:  Thank you.  Can somebody tell me when the next

11   monitor's report is expected to be "due"?

12        MS. SIMPSON:  The report on the site visit is due to the

13   parties 30 days after the site visit, and they have ten days to

14   review and get comments.  I enter those, and then I submit it to

15   the Court.  So it's typically 45 days after the visit.

16        THE COURT:  And the visit ends tomorrow?

17        MS. SIMPSON:  Yes.

18        THE COURT:  So by July 10th, which will be 60 days, the

19   report will have been filed in all likelihood?

20        MS. SIMPSON:  Yes.  Yes, Your Honor.

21        THE COURT:  For purposes of the record, Mr. Teeuwissen,

22   you mentioned Mr. Frazier, and I see Ms. Davis.  Who else is here

23   for the County?

24        MR. TEEUWISSEN:  Your Honor, Fernandez Frazier executive

25   director of the Henley-Young who began May 2nd, next to him Carmen

1    Davis the County administrator, next to her Mr. James Ingram who

2    is operations director, behind him is Mr. Eric Dorsey who is

3    quality assurance at Henley-Young, next to him Mr. Eddie Burnside

4    who is the operations director at Henley-Young, next row back

5    Mr. Synarus Green the internal compliance monitor for the County,

6    behind him the sheriff, next to the sheriff is Captain Dalton from

7    the Jackson Detention Center.

8         I'm sorry, on the other side in the uniform is Captain

9    Fielder who is assistant to the jail administrator and works at

10   the Raymond Detention Center.  I believe I've gotten everybody.

11        THE COURT:  Okay.  Thank you.  When are the monitors --

12   excuse me, Ms. Simpson, when are the monitors expected to return?

13        MS. SIMPSON:  We would normally return in September.  I

14   think because of some conflicts in the schedule, it might be early

15   October.

16        THE COURT:  Okay.  Thank you.  Mr. Teeuwissen, let me ask

17   you a question, you or Ms. Barker whomever.  The government

18   indicated that they were not informed of or didn't realize there

19   had been a riot in April until they arrived here.  Is there any --

20   I mean, is it -- I assume that's truthful and accurate.  But is

21   there any reason why the County did not inform the Department

22   about -- did the County not -- does the County not concede that

23   there was a riot, or that it was worth reporting?

24        MR. TEEUWISSEN:  I think the incident should have been

25   reported, Your Honor.  I will say this, me personally as an

 1    officer of the court, I did not know there was a riot today.  And,

 2    in fact, one of the things I leaned over to Ms. Barker and said,

 3    "That was a riot?"  I knew there was some sort of incident.

 4         Now, Mr. Cheng did misstate when he said the generators

 5    failed.  They ran out of fuel.  That's another issue.  We talk

 6    about capacity, Your Honor.  Somebody should have been checking

 7    the fuel level and making sure they were ready.  If we don't have

 8    capacity to check the fuel level, you can see we don't have

 9    capacity to write policies.

10         Having said that, I was unaware personally that it was a

11    riot, as that term is used, until in the courtroom.  I am unclear,

12    have not had time during our brief recess to ask the compliance

13    monitor and others why that was not reported.  I agree that if it

14    was a riot, it was a reportable incident.

15         THE COURT:  Is that the incident where the inmate was

16    stabbed eight times or was that a different --

17         MR. TEEUWISSEN:  I'm going to have to defer to Ms. Barker,

18    because as I just represented to the Court, my knowledge is

19    similarly limited.  In fact, the government may know more than I

20    know quite frankly.

21         THE COURT:  Okay.  I mean, I see your deputy jail

22    administrator, the man on this side of the room that's nodding his

23    head like --

24         MR. FIELDER:  Your Honor, those are two separate

25    incidents.  It occurred on the same day, but it was two separate

1    incidents.  But it was reported.  It was reported.

2         THE COURT:  To whom?

3         MR. FIELDER:  To our compliance monitor, the sheriff, and

4    everybody that's on our notification committee to the sheriff,

5    both the majors, Major Rushing, Major Luke, Sheriff Mason,

6    Ms. Barker, and our compliance.  It was reported.

7         THE COURT:  But it was not reported to DOJ is what the DOJ

8    lawyer has said.

9         MR. FIELDER:  Our compliance monitor knew of it.

10        MS. BARKER:  Yeah.  Your Honor, today is the first day

11   I've learned it was not reported to the Department of Justice.  We

12   have -- we actually have an after-incident report that Captain

13   Fielder has generated whenever we got together and addressed this

14   issue, and so I do not know why it wasn't sent to DOJ.

15        MS. SIMPSON:  Your Honor, I might be able to cut through

16   some of the confusion here.  The way the compliance coordinator

17   now provides immediate notification as he uploads it into Google

18   docs, and they used to come as e-mails.  They don't any longer.

19   They go into Google docs, and we don't necessarily know when

20   something has been uploaded.  And I believe -- I'm not sure if DOJ

21   is allowed to access Google docs, so I don't know if they get

22   notifications that way.

23        THE COURT:  Okay.  Thank you, Ms. Simpson.

24        Mr. Teeuwissen, the monitors are not expected to be back

25   here until October.  You have represented that the County is ready

1   to make some headway on some aspect of this if you -- if only

2   you're given more opportunity to discuss these things with DOJ.

3   The monitors are leaving tomorrow or so.  They've been here -- I

4   don't know if there's a preliminary sort of assessment or

5   something where they talk to you about what all has occurred

6   during this visit.  You'll get some indication, I suspect, as to

7   how the report might look.

8         And I will frankly tell the parties that when I read the

9   report from 3/05/19, in many substantial reports it suggests that

10  there was nothing done between November 15th, 2018, and 3 --

11  excuse me -- and March 5th, in many respects, not all respects.

12  But there were significant issues that I saw.

13        MR. TEEUWISSEN:  And I'm pretty sure I raised those in

14  January when we were here.

15        THE COURT:  Right, you did.

16        MR. TEEUWISSEN:  I think I have tried to be as candid with

17  the Court as any counsel can be but still represent my client,

18  because this issue is serious.  I've said this at board meetings

19  publicly.  I'm saying it to Your Honor.  I've said this everywhere

20  I can.  We cannot continue on the path we are where we have

21  individuals who are charged, but presumed innocent, and have their

22  constitutional rights violated.

23        And you are not the first person I've said that to, nor is

24  this the first public forum in which I have said that.  Your

25  Honor, it may behoove the parties to attempt to -- October is a

 1    long time, that concerns me.

 2          THE COURT:  October is a long time.  But I suspect I'll

 3    get a report by July.  I think the parties ought to be prepared

 4    for -- I see -- I'm looking back on the docket back in 2017, 2018,

 5    and I'm looking at various minute entries that was done by Judge

 6    Gargiulo, and from time to time, he would have in person and

 7    telephonic status conferences to find out what might be going on.

 8    And I don't want the parties to incur unnecessary costs with

 9    traveling here and all but --

10          MR. TEEUWISSEN:  Your Honor, may I make a suggestion?

11          THE COURT:  Yes.

12          MR. TEEUWISSEN:  Judge Jordan ordered the County and SPLC

13    to -- I don't think he did a formal order, but he directed us from

14    the bench.  We all took it as an order to figure out a corrective

15    action plan, and the County's initial position was it was not

16    interested in a CAP.  I think, and, Ms. Woo, if I'm wrong, please

17    correct me.  We actually ended up entering a CAP that prioritized

18    some things.

19          I think it would behoove the parties to try and figure out

20    some priority to the many tasks that are before us, say, between

21    now and when the report is actually filed.  And if the parties

22    can't, I think that also tells the Court something.

23          And I don't disagree with Mr. Cheng, we need good faith on

24    both sides, and with all due respect to the government, all you

25    got to do is go down the road to Orleans Parish; they've got to

1   give some, too, because the standard DOJ playbook doesn't work

2   necessarily any better than the standard local county government

3   playbook.  We're both going to have to get creative if we really

4   want to make some headway.  And that's where I compliment SPLC

5   from moving off their position, which in turn got the County to

6   move off its position and come up with something, much to Judge

7   Jordan's surprise.  I don't think he discharged us in February

8   with much hope that we would come back before the end of March

9   with some plan that made sense.

10       I will also say that that plan has us on the phone every

11  three weeks discussing our progress and has some hard and fast

12  benchmarks, in addition to Ms. Woo four calls with the -- or four

13  meetings with the magistrate, I believe, that have been scheduled

14  as well to make sure that we can stay on track.

15       THE COURT:  But the -- but the Henley-Young thing is a

16  much smaller piece.

17       MR. TEEUWISSEN:  It is.  I agree with that.

18       THE COURT:  I mean, you're talking about -- you're just

19  talking about children, and I hope Hinds County is not locking up

20  a thousand children.  I mean, you're talking about a youth

21  detention facility.  Here you're talking about something much more

22  egregious, if you will.  I mean because, you know, I'm looking

23  back at the earlier status conferences that have been held in this

24  case.  I'm looking at the minute entries and things, and, again,

25  frankly, I'm disappointed that there -- when I saw the report that

1   was issued in May -- and I'm bracing myself to be equally

2   disappointed in 60 days when I get this report, because this

3   report is going to tell me something about how that prisoner got

4   it -- how that detainee got assaulted and was stabbed eight times

5   and it's going to be because there was no locks.  There were no --

6   the place was inadequately staffed.  You leave doors open, because

7   the correctional officer needs a way to go in and out because

8   there's no second person there because it's inadequately staffed.

9   And I'm -- and I've -- I'm bracing myself to hear the inadequate

10   staff again, because they're paid a little bit better than the

11   state correctional officers and you can't even hold them.  I mean,

12   you know, main -- you can't keep those people in the high turnover

13   rate.  I'm bracing myself to be equally disappointed.

14        And the closer we get to August, that first Tuesday in

15   August after the first Monday, and then three weeks later, and

16   then as we look toward November, I suspect all things are going to

17   happen.  I mean, suppose the current sheriff does not make it

18   beyond the primary.  That's a possibility, I think.  I mean, not

19   that I'm predicting what might happen in the election.  I'm not

20   doing that, but it's all possible.

21        It's all possible --

22        MR. TEEUWISSEN:  Your Honor --

23        THE COURT:  -- that the current DA might be the democratic

24   nominee for governor, in which case all bets are off.

25        MR. TEEUWISSEN:  Your Honor, I want to disagree with you

1  slightly.

2       THE COURT:  Okay.

3       MR. TEEUWISSEN:  The Henley-Young is not that different,

4  because you've got to recall we had a youth court judge that was

5  locking up dozens of delinquents who had never been adjudicated,

6  and so we had the same systemic issues.  We didn't have the

7  physical facility issues to the extent we have in Raymond.  We did

8  have physical facility issues, but we had those same system

9  issues.

10      And I would remind Your Honor there was actually, I want

11  to say, five separate pieces of litigation between the board of

12  supervisors and the youth court to try and get that system to run

13  in such a way that we move the children out of there.

14      THE COURT:  I will agree with you, it was egregious

15  because y'all had to -- yeah, because the youth court judge was

16  being sued by y'all or he was suing somebody or he was almost

17  being held in contempt.  I understand that, you're right.

18      MR. TEEUWISSEN:  I agree that the problems are of a

19  greater magnitude because of the number of individuals involved

20  and all that, Your Honor, but I don't think -- it's easy now to

21  look at Henley-Young and the success that has occurred and

22  minimize it without -- it's easy to forget the struggles we went

23  through to get there.  We are going through those same struggles

24  right now with the adult system.

25      And let me say this.  I think the government means well.

1   I think every monitor means well, but we are all struggling to

2   figure this out.  And I'm sorry you're bracing yourself for

3   disappointment, but I heard today they said we're at 229 detention

4   officers.  You're going to be disappointed.  I don't think that

5   the County is magically going to get to the budgeted 271 by the

6   time you get the report.  It would be wonderful if we could.  I'm

7   sure the sheriff wants to do it, because he could tout that on the

8   election trail.  I think everybody would like that.

9        But I think you are correct that we have some --

10  unfortunately, we have some additional disappointment ahead of us

11  while we try and figure out how to get traction.  And I'm telling

12  you all as the County's attorney, I'm not sure how to get that

13  traction.  It was extremely difficult to get the traction in the

14  youth system, which as you've pointed out is much smaller.

15       I'm not sure how to get it, but I do think we need to

16  think outside the box.  We need some order from this Court with

17  respect to the criminal justice system that helps us, and then

18  we've got to -- all of us have got to figure out how to prioritize

19  what we're doing in a way that's doable.

20       As Your Honor knows if you can start building some

21  success, it will build upon itself just like the negativity.  And

22  you may have forgotten this, Your Honor, in 2014, Mr. Burnside and

23  Mr. Dorsey were back there.  They had escapes from that facility.

24  We had some youth set his mattress on fire in the secure part of

25  the facility.  We had another young man jump out of a vehicle

1  because he didn't want to go to the facility and got shot by a

2  neighboring property owner.  Our problems were pretty bad not that

3  long ago.  We figured out how to get traction in that system and

4  have been able to sustain success.

5          I'm telling you I don't know, I don't think Ms. Barker

6  knows how we do that with the adult system, but we fully

7  acknowledge, the County acknowledges as my client, we've got to

8  figure out how to get that traction going.

9          THE COURT:  Okay.  Well, this is what I'll do.  We will

10  have a telephonic status conference.  I'll give you all until

11  June 28th.  By that time, the parties will have likely received

12  from the monitor her report.  You will still be fighting about

13  what's true or not in it I would imagine, because that's slightly

14  after -- that's about 48 days or so from now I believe.

15          MR. TEEUWISSEN:  Actually we probably won't, because the

16  County has generally not responded to the monitor's report because

17  we, as counsel for County, did not think it was worth quibbling

18  about what was in the report.

19          I'll just take juveniles, for example.  There are

20  recommendations made by Mr. Moser which are simply beyond what the

21  adult consent decree says.  Yeah, making things more acoustically

22  and more pleasant with the furniture are great, but those aren't

23  constitutional requirements.  But we have -- the County has been

24  very intentional in one thing, and that is not creating fights

25  with the Department of Justice, the government, or the monitors

1    that don't lead to some result.

2          THE COURT:  We will set it for 2:30 that afternoon, and

3    that's a Friday, 2:30 central time, that's a Friday.  It won't --

4    I don't suspect it will be long because by then I will -- the

5    parties will tell me what -- what is it that they've agreed to in

6    this thousand piece puzzle, what corners, what have they agreed

7    to.  They will have had the benefit of seeing, in all likelihood,

8    the monitor's report.  I will not have received it, which is fine.

9          But I'm giving the parties this opportunity to put this

10   thing on a map to getting it -- to get the County on a track to

11   compliance, and looking at the other status conference minutes, it

12   appears that the County has not been in compliance, certainly has

13   not been on every term ever.  And that's what the County agreed to

14   do.

15         And I'm saying this on the record in the open so that

16   everybody can go tell all the stakeholders -- all the

17   stakeholders, particularly the named defendants have not done what

18   they need to do, and it makes it easy for the Court when you have

19   not complied to a term -- to terms that you agreed to comply to

20   that you participated in drafting the agreement saying I promise I

21   will do this, I promise I will do that, and I signed off on it to

22   get rid of the -- to get the litigation resolved.

23         It is easy for a court to find that someone has violated

24   their own agreement.  I've done it before.  I'll do it again.  I

25   will find a party in contempt for violating terms that they agreed

1   to.   Search Carlton Reeves contempt, violation of agreement, and

2   you might see something, and that's for the stakeholders.   This is

3   serious.   Every case is serious.

4       And, Mr. Teeuwissen, Ms. Barker, and everybody else, the

5   United States has done an admirable job of trying to make sure,

6   but the pieces need to come together.   And I don't know what the

7   cost is going to take to make these pieces come together.   I don't

8   know who will have to make whatever decisions about priorities and

9   all of that.

10       But I'll only be trying to enforce the terms of the

11   agreement that the parties themselves presented to Judge Barbour

12   for approval.   The parties gave the Court its word that this is

13   what was going to bind them, and he adopted it.   He accepted it.

14   So my only thing is to keep the parties -- to commit to the -- you

15   know, to commit to the word that they gave the Court, and if they

16   can't commit to that word, they're going to have to find -- show

17   significant substantial reasons why it cannot, and at that point,

18   this Court has not solicited what that might be right now.   So I

19   can't say that the County can't show that it can't do it, but at

20   this time, I'm not trying to even make a record on that respect.

21       What I'm trying to do is make sure that the parties

22   understand that this Court, because of the kinds of cases we

23   receive, the types of complaints that we receive, because of

24   things that are tied to the people who are being held over in the

25   detention facility, the County understands it should not happen.

1    The United States understands it should not happen.  And I'm just

2    trying to keep the parties, to keep the State committed to the

3    word and the promise that they gave the Court and the promise they

4    gave the public.  Because this -- Judge Barbour signed off on this

5    agreed consent decree, because y'all gave it to him.

6         And so having said that, thank you all again for

7    accommodating each other and my schedule to be here today.  I do

8    look forward to hearing about significant progress that's been

9    made with respect prior to June 28th.

10        I commend the monitors again for their very thorough

11   report from back in March.  I expect to receive an equally

12   thorough report 60 days from now, but until then, I don't think

13   there's anything further.

14        Is there from the United States?

15        MR. CHENG:  No, Your Honor.

16        THE COURT:  Is there from -- and I don't know if I said it

17   on the beginning of this record, but this is *United States versus*

18   *Hinds County, Civil Action 3:16-CV-489-CWR-JCG*.

19        Is there anything further from the County or the sheriff?

20        MR. TEEUWISSEN:  Not from the County, Your Honor.

21        MS. BARKER:  No, Your Honor.

22        THE COURT:  All right.  Thank you so much.  The Court is

23   adjourned.

24   *********************************************************************

25

1

2

3 **COURT REPORTER'S CERTIFICATE**

4

5      I, Candice S. Crane, Certified Court Reporter, in and for

6 the State of Mississippi, Official Court Reporter for the United

7 States District Court, Southern District of Mississippi, do hereby

8 certify that the above and foregoing pages contain a full, true,

9 and correct transcript of the proceedings had in the aforenamed

10 case at the time and place indicated, which proceedings were

11 recorded by me to the best of my skill and ability.

12      I further certify that the transcript fees and format

13 comply with those prescribed by the Court and Judicial Conference

14 of the United States.

15      THIS the 21st day of May, 2019.

16

17                /s/ Candice S. Crane, CCR

18                Candice S. Crane, CCR #1781
               Official Court Reporter
19                United States District Court
               Candice_Crane@mssd.uscourts.gov
20

21

22

23

24

25