1   chemical spray and paint ball guns and tasers, and they have been
2   used in ways that are not appropriate.  And so it was important
3   that that policy get addressed quickly because of what we were
4   seeing in the facility.
5           The second of the big three that I've talked about is the
6   facility itself and the poor shape of the facility.  And I wanted
7   to read several lines from an incident report that I think kind of
8   pretty graphically discloses the type of problems the facility
9   condition has caused, and this incident report is from April 19th
10  which is when a riot occurred in Raymond Detention Center.
11          THE COURT:  April 19, 2019?
12          MS. SIMPSON:  Yes.
13          THE COURT:  Less than a month ago?
14          MS. SIMPSON:  Yes.
15          THE COURT:  Okay.
16          MS. SIMPSON:  And it's -- there's always the question of
17  what constitutes a riot.  It is the term that was used in the
18  incident report, so I used that term.  Three of the housing units
19  managed to leave their unit and get into the common area of the
20  pod and were attempting to get into the control room, and so it
21  was out of control for some period of time.
22          And four or five lines from this incident report:  The
23  inmates can somehow unlock the cage door.  The inmates from A-3,
24  one of the housing units, were the first to jimmy the cage door
25  open.  They then forced the exterior door open, which has been

1   broken with the exterior cover off for months.  Once they got out,
2   they ran and opened A-2 and A-1.  These doors are also broken and
3   have to be opened by hand from the horseshoe.  It's part of the
4   common area.  All of the doors in A Pod are broken and maintenance
5   is waiting on parts.  They then tried to get into A-4, but the
6   inmates in A-4 kept them from getting into their housing unit.
7           The inmates tore down the cameras and exit signs in the
8   horseshoe area.  Detention officers had locked themselves in the
9   control room.  The inmates were physically pulling on the pod
10  control doors, but the officers were holding them shut.  These
11  doors are also broken and can be opened manually from the
12  horseshoe.
13          The inmates then went into the old visitation room.  The
14  door is also broken, and pried open the wire-mesh ceiling cage
15  door.  They then attempted to -- they got into the ceiling.  They
16  attempted to go through the ceiling to get into the control room.
17  They were unable to do that.  They went back, and the incident
18  proceeded.  It was eventually under control.
19          My point in reading that is that one of the things we've
20  had in our reports over and over and over again has been the doors
21  that are broken and not functioning, and that was definitely an
22  issue in this incident.
23          The good news is that the incident was a catalyst to
24  actually getting the doors fixed.  They have now fixed the doors
25  into the Pod A housing area and I believe into the control room of

1  Pod A, and they have a plan and a prototype on how they're going
2  to fix the individual cell doors.  So it's good that this is being
3  done.  It's unfortunate that it took an incident like that to
4  actually make that happen.
5         And, in fact, we did see -- and this is a cause for
6  encouragement -- really some indication that some of the
7  maintenance problems are, in fact, now being addressed.  In this
8  trip we found doors that had been fixed like I described.  Doors
9  that were now locked that haven't been locked in the past.  Fresh
10 paint on some of the walls.
11        They have a new person assigned to maintenance and
12 security, a captain of maintenance and security.  He is keeping a
13 spreadsheet with all of their work orders, so that they can be
14 tracked and followed up on.  So I would say that is one area at
15 least now we're seeing some energy and some improvement.  It's
16 early, but if that's sustained, I think we can expect to see a
17 real difference at the time of the next site visit.
18        In that regard, they have -- the C Pod has four units, as
19 all the pods do, and they've now emptied two of those units so
20 they can come in and really overhaul those units.  They're hoping
21 to empty the other two housing units on C, so that they can do it
22 all at once.  And at least what is planned is really a major
23 overhaul in addressing some of the real chronic problems that have
24 existed for the last years.
25        So that appears to be in the works.  There's not a

1  specific timetable.  They'll have to wait on some parts, but we're
2  hoping certainly by the next visit that that will be an area of
3  improvement.
4        The one area that really has not improved, and, in fact,
5  has probably worsened in the past, is that the staffing is
6  probably about as low as we've seen it.  It's been up over 250 at
7  some of the visits.  It's down to 229, and it's really at this
8  point impacting all three facilities.  Certainly the worst of that
9  is at Raymond, but it really is very low.  And not only is the
10 actual field positions low, but there seem to be quite a few
11 people that are out on medical leave, which complicates it quite a
12 bit more.
13       And I think Mr. Parrish on our team will have some more
14 specific impact on the staffing that he saw while there.  I would
15 say sort of in this overview that we still see a lot of
16 inmate-on-inmate assaults, in large part because of the lack of
17 staffing.  The jail was built to have an officer in each housing
18 unit.  With their level of staffing that's not possible, and as a
19 result, the inmates are in those units without oversight, without
20 the needed oversight for quite a bit of time.
21       Most recently, again on the same day as the riot, the
22 incident I had mentioned earlier, there was an inmate-on-inmate
23 assault where the inmate had eight stab wounds and had to go out
24 to the hospital with pretty serious injuries.  So -- so that is
25 continuing at a similar pace as before.

1        THE COURT:  That was going to be my question.  Since the
2   last monitors -- well, since the last visit, do we know the number
3   of inmates who have had to have been hospitalized because of an
4   assault either by another inmate or an assault by an officer?
5        MS. SIMPSON:  I don't have it broken down by how many have
6   been hospitalized and how many not.  I do keep a log of how many
7   inmate assaults there are, and I make a note as to whether they've
8   gone to the hospital.  I'd have to count it up to see how many.
9        One problem -- and I'll talk about this at the end when I
10  talk about some of the administrative matters -- the reporting
11  that we've had during this period has been incomplete, and that's
12  another thing that appears to be about to change in a good way.
13  They have now gotten the capacity to generate an electronic report
14  that should enable it to be done more easily on their side and
15  more complete from our perspective.
16       But we actually did not get the monthly reports for
17  January and February from Raymond Detention Center and the other
18  months in that period have been incomplete, so I do keep a log.  I
19  have the ones that I've seen logged in.  But I don't -- I don't
20  think for this period that it's complete.  But it's still running
21  between 10 and 15, and I think January, I think, was a high of 20
22  inmate-on-inmate assaults.  And I mentioned that with the
23  staffing, because that does appear to be directly related to the
24  staffing.
25       I would like to turn it over to my experts and my

1  experts -- my expert on juvenile matters has an earlier plane to
2  catch, so I'd like to have him speak first.  He's Jim Moser.
3          MR. MOSER:  Thank you, Lisa, and thank you, Judge.
4          THE COURT:  You're welcome.
5          MR. MOSER:  So, yes, my name is Jim Moser.  I've been
6  working in the juvenile justice related field for about 45 years.
7  About 40 of those years in responsibility -- either direct
8  responsibility or administrative responsibility for everything
9  from short-term nonsecure facilities just to long-term
10 institutions for youth, also have done a fair amount of training
11 and publications around best practice in the juvenile justice
12 world.  So I'm pleased to be able to come to Hinds County and
13 participate in this.
14         As you know from -- or as you may have seen from the last
15 report, and I think we'll see in this report as well, continued
16 progress at Henley-Young, a lot of the heavy lifting and changes
17 that have been made I think are a result of the work they have
18 done through the agreement with Southern Poverty Law Center, which
19 has been a positive step.
20         The change to taking on the long-term youth was a big
21 change, so I've described it as going from a short-term facility
22 housing some long-term youth to really a long-term
23 facility housing short -- also some short-term youth in other
24 units.
25         THE COURT:  So Henley-Young is basically operating sort of