IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀PLAINTIFF,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No.: 3:16-cv-00489-CWR-JCG
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
HINDS COUNTY, ET AL.,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀DEFENDANTS.⠀⠀⠀⠀⠀⠀)
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯)


## UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN ORDER TO SHOW CAUSE

⠀⠀⠀⠀Plaintiff United States files this Memorandum in Support of Its Motion for an Order to

Show Cause Why Defendants Should Not Be Held in Contempt. Nearly two years after Court-

ordered deadlines, Defendants have failed to implement the majority of the provisions of the

Settlement Agreement entered as an order of the Court to remedy alleged unconstitutional

conditions in the Hinds County Detention Center ("Jail"). Order, July 19, 2016, Doc. No. 8

(hereinafter "Order, Doc. No. 8"); Settlement Agreement Between U.S. and Hinds County,

Miss., Regarding Hinds County Jail, July 19, 2016, Doc. No. 8-1 (hereinafter "Settlement").[1]

Defendants should have implemented critical Settlement provisions requiring new policies,

improved security, and better youth services, within one year of the Settlement's Effective Date

---

[1] Defendants include Hinds County, Members of the Hinds County Board of Supervisors in their official capacities, and the Sheriff of Hinds County, in his official capacity. Settlement ¶¶ 1-4. The United States filed this action pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 (2018). The parties simultaneously filed a Settlement Agreement, which the Court entered as an Order with an "Effective Date" of July 19, 2016. Order, Doc. No. 8; Settlement ¶ 10. The Jail includes the Sheriff's Department's Raymond Detention Facility ("Raymond"), Work Center, and Jackson Detention Facility. Settlement ¶¶ 1-4. The Settlement also covers facilities used to house youth, including the Henley-Young Juvenile Justice Center. *Id.* § IV.K.

(July 19, 2017). Settlement ¶¶ 120, 131. *But see* Settlement § IV.K (providing 18 months instead of 12 for final youth transition). Instead, Defendants have missed the deadlines, failed to implement the Court-appointed Monitor's technical assistance recommendations, and provided no plan to comply with the Settlement. The Jail remains a violent, dangerous facility, with numerous assaults and a recent prisoner-on-prisoner homicide.

Pursuant to Settlement Paragraph 163, the United States notified Defendants of its intent to initiate enforcement proceedings due to Defendants' failure to fulfill key obligations under the Settlement. Letter from U.S. to Defendants (Jan. 10, 2019), Ex. 1 ("Enforcement Letter"). The United States supplemented that notice after the Monitor's January 14-18, 2019 compliance inspection. Letter from U.S. to Defendants (Jan. 24, 2019), Ex. 2 ("Supplemental Enforcement Letter"). Taken together, these letters formally notified Defendants of their noncompliance with 32 key provisions of the Settlement. Meanwhile, the Jail conditions remain unconstitutional, and Defendants are making little progress at implementing the Settlement. The parties were unable to resolve their differences about the assertions in the United States' Enforcement Letters. The United States therefore respectfully requests that the Court order Defendants to show cause why they should not be held in civil contempt of Settlement Paragraphs 9, 22, 37-39, 41-42, 44-46, 50-62, 68, 78-84, and 130-31, and order relief to expedite compliance.

## I.    BACKGROUND

The Settlement addresses a long history of alleged unconstitutional Jail conditions. As referenced in Settlement Paragraph 3, the United States' investigation of the Jail identified a host of systemic deficiencies that posed a serious risk to the life, health, and safety of prisoners. Letter from U.S. Dep't of Justice to Peggy Hobson Calhoun, Bd. President, Hinds Cty. Bd. of Supervisors, et al., regarding Investigation of the Hinds Cty. Adult Det. Ctr., May 21, 2015, Doc.

No. 3-3 (hereinafter "Notice Letter"). Prisoner-on-prisoner assaults, staff misconduct, dangerous contraband, poor mental health care, unsafe living conditions, inadequate housing for youth detainees, inadequate youth programs, and unlawful detentions were all commonplace in the facility.

At the parties' request, the Court approved the Settlement and appointed Elizabeth Simpson as the Court's Monitor ("Monitor"). Order, Doc. No. 8; Order, Aug. 18, 2016, Doc. No. 11. The Monitor then hired a team of subject matter experts, most of whom have toured the Jail at least seven times to assess compliance with the Settlement. The Monitor and her experts have also provided Defendants with extensive technical assistance on how to implement the Settlement.[2]

Defendants have not, however, implemented necessary remedies. Although Defendants are completely non-compliant with 46 out of 92 provisions of the Settlement, and only partially compliant with 44 more, the United States focuses this motion on Defendants' failure to comply with provisions regarding: 1) policies and procedures, 2) use of force, 3) staffing and prisoner supervision, 4) supervisor qualifications and training, 5) physical plant, and 6) youth prisoners. Settlement ¶¶ 37-39, 41-42, 44-46, 50-62, 68, 78-84, 130-31; s*ee* Court-Appointed Monitor's Seventh Monitoring Report at 9-10, Doc. No. 27 (hereinafter "Monitor's Seventh Report") (identifying 46 areas of non-compliance and 44 areas of partial compliance out of 92 provisions).[3] These provisions relate to the most immediately dangerous conditions and the Monitor's highest priority recommendations.[4]

---

[2] For instance, after Defendants' months-long failure to provide a single Settlement-compliant policy, the Monitor agreed to dedicate money from her budget to pay for a consultant to help Defendants with policy writing. Monitor's Seventh Report at 11. This consultant, Ms. Karen Albert, is not part of the monitoring team. *See* Settlement ¶ 141.
[3] All cites to the Court-Appointed Monitor's Monitoring Reports will be cited in a shorthand format based on each report's number. For example, "Court-Appointed Monitor's First Monitoring Report" will be cited as the "Monitor's First Report."
[4] During the week of May 6, 2019, the Monitor conducted a compliance inspection but has not yet submitted her

## II. LEGAL STANDARD FOR CONTEMPT

It is widely established that district court judges retain the power to enforce consent decrees entered in their cases. *See, e.g.*, *Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."); *Spallone v. United States*, 493 U.S. 265, 276 (1990). "Courts possess the inherent authority to enforce their own injunctive decrees" and "do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender." *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (quoting *Berry v. Midtown Serv. Corp.*, 104 F.2d 107, 110-11 (2d Cir. 1939)).

In exercising its inherent authority to enforce a consent decree, a court may find that a defendant simply cannot meet the remedial targets set by the initial order, and therefore additional orders are needed to ensure that constitutional rights are not being violated. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 683-88 (1978) (district court was justified in issuing specific, comprehensive orders to defendants, where broad orders, giving corrections officers wide latitude to correct unconstitutional conditions, did not suffice to remedy unconstitutional conditions).

To establish civil contempt, the movant "bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *Petroleos Mexicanos v. Crawford Enters.,*

Eighth Report. However, she provided an oral preliminary report during a May 9, 2019 status conference. Based on information and belief, the conditions in the Jail remain largely unchanged. While the Monitor reported some very recent remedial efforts, staffing and security remain poor.

*Inc.*, 826 F.2d 392, 401 (5th Cir. 1987); *see also Cooper v. Noble*, 33 F.3d 540, 545 (5th Cir. 1994) (affirming contempt when defendants failed to make reasonable effort to comply with decree), *supplemented*, 41 F.3d 212 (5th Cir. 1994). However, the United States does not need to show willfulness. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Petroleos*, 826 F.2d at 401; *see N.L.R.B. v. Trailways, Inc*., 729 F.2d 1013, 1017 (5th Cir. 1984).

### III.    THE COURT SHOULD ISSUE AN ORDER TO SHOW CAUSE

Although substantial compliance with most of the Settlement was due nearly two years ago, Defendants still have not met the Settlement requirements. The Monitor's seven compliance reports show their continued failure to comply with nearly all provisions of the Settlement, including provisions regarding security, medical screening, suicide prevention, mental health care, youth services, fire safety, sanitary conditions, and release procedures. *See generally* Court-Appointed Monitor's First, Second, Third, Fourth, Fifth, Sixth, and Seventh Monitoring Report(s), Doc. Nos. 12-1, 16, 19, 22, 23, 24, 27; *see also* Settlement ¶ 35. In the most recent Monitor's Report, the Monitor assesses just two paragraphs as substantially compliant, 44 paragraphs as partially compliant, and 46 paragraphs as non-compliant.[5] Monitor's Seventh Report at 9-10. In general, substantial compliance requires that Defendants enact Settlement-compliant policies, train staff on those policies, and verify that staff are following the policies in practice. *See* Settlement ¶¶ 13, 35, 120, 164-65. Defendants have not even reached the policy drafting stage for the majority of the Settlement provisions addressing protection of prisoners from harm. Monitor's Seventh Report at 10-12.

---

[5] Settlement Paragraph 35 states "Throughout this Agreement, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance. 'Substantial Compliance' indicates that the County has achieved compliance with the material components and has met the goals of the relevant provision of the Agreement. 'Partial Compliance' indicates that the County achieved compliance with some of the components of the relevant provision of the Agreement, but significant work remains. 'Non-compliance' indicates that the County has not met most or all of the components of the relevant provision of the Agreement."

Failure to comply with the provisions of a court order alone would justify finding Defendants in contempt. As discussed in more detail below, however, Defendants here compounded their violation with a pattern of delays and failure to address compliance recommendations. Defendants have repeatedly missed Settlement deadlines, extensions, and their own internal deadlines. They also have failed to implement technical assistance recommendations made by the Monitor and the United States. If implemented by Defendants, those recommendations could have expedited the exceedingly slow pace of compliance. While failing to implement the recommendations, Defendants have offered no reasonable alternate plans or timetables to increase the likelihood of eventual compliance.

The United States' Motion for contempt focuses the request for relief on what the Monitor has termed "priority recommendations." These priority recommendations address certain foundational requirements for systemic reform, such as hiring qualified staff, or target the most dangerous conditions in the Jail. Specifically, the United States alleges that Defendants are in contempt for failing to: 1) draft and revise policies and procedures setting safety measures, Settlement ¶¶ 37, 68, 130-31; 2) prevent improper use of force, Settlement ¶¶ 50-62; 3) improve staffing and supervision practices, Settlement ¶¶ 9, 41-42, 44, 68, 130-31; 4) improve supervisor and trainer qualifications, Settlement ¶¶ 22, 38-39, 45, 130-31; 5) repair broken physical plant, security equipment, and safety fixtures, Settlement ¶ 46; and 6) provide youth with age-appropriate housing and programs, Settlement ¶¶ 78-84.

**A. Defendants' Non-Compliance with the Court's Order Places Prisoners, Staff, and the Public at Serious Risk of Harm.**

Evidence of serious harm reinforces the Court's discretion to grant relief necessary to correct constitutional violations. *See, e.g.*, *Hutto*, 437 U.S. at 683-88 (court may consider severity of violations and has "ample authority . . . to address each element contributing to the

[constitutional] violation").  The Court "has the discretion — indeed, the duty — to take immediate action in a manner coextensive with the degree of ongoing and persistent harm." *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932243, at *8 (N.D. Cal. May 10, 2005).

The Monitor reports numerous prisoner assaults and other serious incidents in the Jail. Monitor's Seventh Report at 15-16; Tr. of In-Person Status Conference 15-20, May 9, 2019, Ex. 3 ("May 2019 Transcript").  Evidence of serious harm includes:

- In April 2019, a riot broke out during a power outage.  As the Monitor reported during the May 2019 status conference, prisoners escaped from their cells and three of four units.  They nearly breached another unit on the pod and a control room.  Earlier that day, a prisoner had been stabbed by unknown assailants in the same pod.

- In December 2018, a prisoner was allegedly killed by other prisoners, who beat and stabbed the victim over an extended period of time when no officer was present on the unit.[6]

- From June 1 through August 31, 2018, there were 39 reported prisoner-on-prisoner assaults.

- From June 1 through September 15, 2018, Jail staff transported 24 prisoners to the emergency room for a variety of serious injuries from assaults, including stab wounds, fractures, dislocations, and eye injuries.

- Two of the stabbings resulted in especially serious pneumothorax injuries (collapsed lungs).

- A major disturbance occurred *during* the Monitor's September 2018 site visit.

---

[6] The County's investigation of this incident is ongoing.

That incident alone resulted in eight emergency room transports.
Monitor's Seventh Report at 16; Monitor's Sixth Report at 17, 28; May 2019 Transcript, Ex 3.

These disturbing facts do not tell the complete story.  The situation is likely worse.  Basic Jail recordkeeping systems are so poor that staff have long had difficulty providing basic incident data and mandatory reports to the Monitor.  Monitor's Seventh Report at 25-26, 46-48.  In many incidents, staff either do not complete an incident report at all, or fail to include information required by the Settlement.  The errors occur even at the supervisor level.  The Monitor has repeatedly noted that supervisors are not documenting video reviews or taking witness statements.  Monitor's Seventh Report at 25-26, 46-48.[7]  These omissions are widespread and compound the risk of ongoing serious harm.  For instance:

- In late December 2018, a Jail control room officer observed activity on a camera. The officer saw prisoners attacking another prisoner.  Officers removed the victim and sent him to the hospital.  The incident report for this event was very poor. There were no pictures, witness statements, or evidence of supervisory review between the ranks of sergeant and captain.  The documentation does not even provide an idea as to the identity of the possible perpetrators.  Monitor's Seventh Report at 47.

- On December 6, 2018, a prisoner was killed inside the problem-plagued Raymond facility.  Adam McWilliams, *Murder Suspect Dies After Jail Assault, Authorities Say* (Dec. 7, 2018, 5:10 pm CT https://www.wapt.com/article/1-dead-1-injured-in-fatal-shooting-in-jackson/25373800; Monitor's Seventh Report at 26.  The Monitor is still reviewing the incident, and the County's investigation is ongoing.

---

[7] Cameras are also missing and inoperative throughout Jail facilities.  Lack of working security doors and equipment has been a longstanding issue.  Monitor's Sixth Report 2, 26-28, 33-34.  Inadequate supervision contributes to these problems.

However, based upon materials made available so far, Defendants' initial reports raise questions about their compliance efforts. At minimum, staff are not adequately reporting what happens during serious incidents. One officer's report states that staff observed the prisoner "being dragged across the unit upstairs into the shower." Incident Information (December 6, 2018), Ex.4. There is no indication in this report of what happened after the staff observed the event, except that the prisoner was later "escorted out of [the] unit" by staff. Although the beating may have been observed on camera, nothing in the report indicates that staff intervened to protect the prisoner. The report does not indicate who else was involved in the incident. It suggests the prisoner left the unit on his own volition. Nor does the report indicate any observed injuries. A lieutenant's section of the report gives a very different story. That statement indicates that a lieutenant looked into the shower and saw a prisoner inside. She then *left* the shower area and met medical staff. Security staff then apparently waited for medical staff to enter "the shower area to make sure it was safe to move the inmate because the shower was running and the inmate was getting wet." Four officers then had to "pick him up and carry him down the stairs" to a stretcher. This report explained that the prisoner had suffered head trauma and lacerations. The reported sequence of events and disparate fact summaries raise many questions about staff emergency response, prisoner supervision, and incident reporting. *See* Monitor's Seventh Report at 2, 26.

- In August 2018, a fight broke out between gang members. Jail incident reports, however, were vague about what happened. The Monitor eventually determined

that medical staff sent one "unresponsive" prisoner to the hospital. The prisoner had been stabbed four times. Other internal Jail reports gave little indication of the seriousness of the incident. Also, no one took witness statements or reviewed videos associated with the incident. Even though someone was seriously hurt, the Jail did not do a thorough incident review. *See* Monitor's Sixth Report at 45.[8]

- In June 2018, an officer observed a prisoner being dragged into a cell. The officer saw the event on camera, and officers found the prisoner unresponsive in the cell. Beyond this minimal information, the incident report provided no useful narrative. Monitor's Sixth Report at 45-46.

The Monitor has also expressed concerns about the veracity of reports that staff provided to her. For instance, the Monitor requested the report for a use of force on a juvenile. Monitor's Sixth Report at 35-36, 40, 63-64. Staff could not initially locate one. They eventually produced a report a day later, but it was dated as if it had been completed on the request date. The Monitor found other incident reports with tracking numbers outside of the expected range, given the dates of those incidents. Monitor's Sixth Report at 39-40. Defendants' data summaries are similarly unreliable. For example, Defendants provide monthly summary reports to the Monitor. In July, Defendants claimed there had been only five prisoner assaults in the Jail. The Monitor checked the underlying records and found 14 such incidents. Monitor's Sixth Report at 88-89.[9]

In sum, Jail violence is widespread, and the Jail's records likely understate the severity of

_____

[8] Incomplete internal reports can hamper both the Jail's administrative review process and outside investigations. The Settlement emphasizes the importance of accurate reporting and effective investigations in a number of sections. *See* Settlement §§ IV.D-I.

[9] During the May 2019 status conference, the United States and the Board counsel noted that we had not received immediate notification of the riot as required by the Settlement. The Sheriff's Department's response was vague, but their representatives indicated that they had uploaded the incident report into a cloud-based database used for uploading document productions. The database contains all types of documents, such as draft policies. Records are uploaded in bulk form. So the most serious incidents are buried in the productions, and the United States would not receive notice of an emergent situation unless we were checking all new uploads every day. This process would not provide the immediate notification of certain specific emergency conditions (e.g. riots) required by Settlement ¶ 160.

the situation.  Even what is known indicates unreasonable risk of harm from prisoner-on-prisoner assaults, mass disturbances, use of force, and other unconstitutional conditions.  Meanwhile, Defendants have not taken basic steps to start implementing the Settlement.  Their inaction, combined with ongoing dangerous Jail conditions, warrant the Court's attention and contempt.

**B. Defendants Have Unreasonably Delayed the Development of Policies and Procedures Needed to Ensure a Safer Facility.**

Written policies serve as the foundation for compliance because they guide training, implementation, and administrative oversight.  Policies governing officer training, classification, and prisoner supervision are especially important for reducing Jail violence, improving conditions, and addressing the Monitor's priority recommendations.

Defendants should have reviewed their policies and conformed them to the Settlement within six months of the Settlement's "Effective Date", or January 19, 2017.  Settlement ¶¶ 37, 68, 130-31; Enforcement Letter 2, Ex. 1.  They should then have implemented Settlement-compliant policies by July 19, 2017.  Settlement ¶ 120.

Defendants missed all of these policy deadlines.  In Spring 2017, Defendants belatedly submitted policies that were not modified to meet Settlement requirements.  *See* Monitor's Seventh Report at 2-3 (lack of policies results in changing and deficient practices); Monitor's Sixth Report 2 (indicating "no appreciable progress" on policy development over previous two years); Monitor's First Report at 8 (Defendants promise a revised policy manual by April 2017). After that, Defendants made little effort to comply with the policy development provisions of the Settlement.  The United States and the Monitor tried to resolve the matter by allowing Defendants additional time to revise policies, offering technical assistance, and prioritizing policy development.  Although Defendants claimed to be working on policies, they did not

submit any drafts.[10]

By mid-2018, the Defendant Board attorneys acknowledged that Defendants were not making enough progress on this issue. Monitor's Sixth Report at 10; Tr. of In-Person Status Conference 55-56, Oct. 25, 2017, Ex. 5 ("October 2017 Transcript"). They advised the Court that their clients were going to hire an outside consultant to help them draft policies. After the hearing, Defendants failed to hire an outside consultant. Given the continued lack of progress, the Monitor took it upon herself to dedicate part of the monitoring budget to pay an outside consultant to help Defendants with policy revisions. *See* Monitor's Sixth Report at 10-11. Since then, Defendants have been able to provide about a half-dozen draft policies. Monitor's Seventh Report at 2-3.

In February 2019, Defendants reported some progress with developing classification and housing policies (as yet unverified by the Monitor and the United States) and submitted new Prison Rape Elimination Act and grievance policies in April and May 2019, respectively. As the Monitor's team reported during the May status conference, however, the submitted policies are just a small fraction of the total number of policies that still need to be drafted. And Defendants have not set out any clear plan or timetable for drafting the remaining policies. *See generally* Monitor's Seventh Report at 2-3, 10-12; Monitor's Fifth Report at 2; Letter from Sheriff's Counsel to U. S. 1-2 (Mar. 4, 2019) ("Sheriff's Letter"), Ex.6; Letter from Bd. Counsel to U. S. 1 (Mar. 4, 2019), Ex. 7 ("Board's Letter"). Moreover, Defendants have made little or no progress in several other key policy development areas, including safety checks, incident reporting, and managing special needs prisoners.

---

[10] Because Defendants failed to timely develop policies, they did not meet the Settlement deadline for implementing them. *See* Settlement ¶ 132 (outlining a comment and revision period after submitting revised policies to the Monitor and the United States); *Id.* ¶ 120 (requiring that all provisions of the Settlement be implemented by July 19, 2017).

C.  **Defendants Allow Security Staff to Use Force Without Adequate Supervisory Oversight, Training and Controls.**

While Defendants' general failure to draft written policies has impeded compliance efforts, their failure to implement use of force policies is especially problematic. Defendants should have drafted Settlement-compliant policies governing the use of force within six months of the Settlement's "Effective Date," or by January 19, 2017. Settlement ¶¶ 50-62, 130-31. With regard to use of force, the Settlement also requires: 1) clear use of force standards, 2) mandatory use of force training and staff competency testing, 3) prohibitions on unjustified use of force, 4) a ban on summary punishment, 5) a ban on staff using unauthorized weapons, 6) inventory controls, 7) video recording of "planned" uses of force (e.g. cell extractions), and 8) thorough investigations after uses of force. Settlement ¶¶ 50-62. To date, Defendants have done little to implement any of these requirements. Monitor's Seventh Report at 3-4, 35-45. In December 2018, they belatedly submitted a draft use of force policy that was supposedly designed to comply with the Settlement, but was instead vague and incomplete. Meanwhile, they continue to allow staff to use an array of weapons in Raymond with little oversight and review. Monitor's Seventh Report at 3-4, 35-45.[11]

The situation has become even more precarious since the Sheriff replaced several supervisors in 2018. Instead of improving classification and supervision practices, Jail administrators have given staff wide leeway in using force to try to control the Jail. Jail administrators have been deploying a Corrections Emergency Response Team ("CERT"), and staff have been using force without adequate justification, increasing tensions with prisoners.[12]

---

[11] The situation is better at the Work Center and the Jackson Detention Center. Although neither facility has adequate written policies and formal systems in place to limit use of force, the facility commanders have informally restricted use of force by staff. Also, the Work Center population tends to be lower security prisoners, who have fewer conflicts.

[12] The Sheriff replaced some of these supervisors shortly before the Monitor's May 2019 tour. The Monitor is still

Monitor's Seventh Report at 3-4, 36, 38.

For instance, a November 18, 2018 investigation of an excessive force case illustrates the scope of the problem. Originally, when the incident occurred approximately one month earlier, no one reported a serious use of force involving staff use of a shotgun butt to assault an inmate. Someone eventually alerted the Sheriff's Department. The subsequent investigation included video footage review, which did not match the staff reports about what happened. An internal affairs investigation found that staff had lied about the alleged excessive use of force. The incident implicated at least three supervisors. Monitor's Seventh Report at 36. The main perpetrator was a sergeant who allegedly got into an argument with a prisoner who had ignored instructions to return to his unit. The prisoner eventually went back to his cell. The sergeant left to retrieve a shotgun and returned to the unit. The sergeant removed the inmate from his cell, and repeatedly struck the inmate with the butt of the shotgun. Two other sergeants were in the immediate area, but none of the three supervisors reported the use of force.

In another incident addressed by an internal affairs report, an officer found a contraband cellphone in a juvenile unit. The officer then reportedly assaulted a juvenile for not giving the officer the passcode for the cellphone. Monitor's Sixth Report at 63-64.

Other facts indicate a troubling trend in the use of force. During the January 2019 site visit, the Monitor observed that staff have introduced tasers and "less lethal" shotguns into the Raymond facility. Yet the Jail does not have required policies governing the use of weapons, such as restrictions on who may use the more dangerous devices, supervisor responsibilities, sign-out procedures, and mandatory evidence collection after use of force. Monitor's Seventh Report at 3-4, 35-45.

Use of force deficiencies extend to report writing as well. When staff do not properly

assessing whether the changes have resulted in meaningful, sustained improvements in staff practices.

complete use of force reports, the consequences are minimal or non-existent, even for the most egregious cases. *Id.* at 36, 40-41, 43-45. More generally, the Monitor found that the reports are so vague, no one can use them to effectively monitor staff for abuses. *Id*. at 41-43. Use of force reviews do not routinely include collection of videos, witness statements, and medical records. As such, the reports lack necessary details to determine the extent of any problematic uses of force and to take appropriate corrective action.

### D. Defendants Have Taken No Action to Develop and Implement Staffing and Supervision Requirements.

Defendants should have begun staffing and supervision improvements within six months of the Settlement's "Effective Date," or by January 19, 2017. Settlement ¶¶ 41-42, 44, 68, 130-31. Specifically, the Settlement required: 1) implementation of a staffing improvement plan, and 2) development and implementation of improved housing and prisoner supervision policies. Settlement ¶¶ 9, 41-42, 44, 68, 130-31.

From the start, Defendants fell behind on staffing improvements. After some time, they agreed to recommendations made by the Monitor and Jail staff, which were based on an update of a 2014 National Institute of Corrections study.[13] This staffing analysis indicates that the Jail needs approximately 433 officers to meet Settlement standards. *See* Monitor's Seventh Report at 2, 13-16. The number is based on fundamental requirements, such as having enough officers to staff housing posts, conduct welfare checks, transport prisoners to medical care, and provide required services.

However, Defendants have not even begun the budgeting and planning required to hire and retain the required number of staff. *Cf.* Settlement ¶ 42. Instead, Defendants designated a staffing goal of 275 officers for Fiscal Year 2017-2018, but then made no further plans for

---

[13] The parties contemplated using the NIC study when they entered into the Settlement. Settlement ¶ 42.

additional staff.  Monitor's Seventh Report at 2, 15; *see also* Monitor's First Report at 12-13.

During the Monitor's January 2019 site visit, the Jail had only 238 officers.  Monitor's Seventh

Report at 2, 15-16.  For about a year and a half, actual staffing levels have fluctuated between

231 and 251 positions.  Monitor's Seventh Report at 2, 15-16.  Based on information and belief,

the staffing level was even lower during the May 2019 site visit.

      After the United States sent its Enforcement Letters, Defendants promised to increase

hiring, but such promises have proved inadequate in the past.[14]  Sheriff's Letter 2, Ex. 6.  In any

event, the parties all seem to agree that *current* staffing levels are grossly inadequate to fulfill

Defendants' obligation to "adequately supervise prisoners, fulfill the terms of [the] Agreement,

and allow for the safe operation of the Jail."  Settlement ¶ 42.  As technical assistance, the

Monitor recommended various improvements to administrative, personnel, recruitment, and

retention practices, which could have at least mitigated staffing shortages.  *See, e.g.*, Monitor's

Priority Recommendations to Defendants (June 2018), Ex.8 (hereinafter "Priority

Recommendations June 2018").  For instance, the Monitor suggested that Defendants develop a

formal recruitment and retention plan, adopt salary step increases, and improve the training

program.  *Id.* at 1. She also offered a plan to re-open some damaged units, relocate prisoners, and

convert the Jackson Detention Center into a short-term court holding facility so Defendants

could shift staff to units with more pressing security needs.  *Id.*  Defendants failed to implement

any of these technical assistance recommendations, and then failed to develop effective

alternatives.

      Defendants also failed to update supervision policies and practices.  Because Defendants

---

[14] In his response to our Enforcement Letter, the Sheriff claims he will hire 10 officers each month with regular training classes.  He has made similar promises in the past, but then failed to implement them.  Also, without more systemic changes to their policies and procedures, retention will likely remain a serious problem for some time to come.

have not prioritized policy development, they have no new procedures for reducing violence in the Jail. For instance, Defendants have made little progress on implementing an "objective classification" system, which would assign prisoners to housing based on known, objective security risks (*e.g.* a history of violence in institutions, gang membership, reported enemies, mental health risks, or vulnerability to predation). Monitor's Seventh Report at 4, 16-18. Although the Sheriff claims to have now reclassified every RDC prisoner based on objective classification, Sheriff's Letter at 3, the Monitor has not yet evaluated the reclassification or housing assignments and there is no classification policy addressing periodic reclassification or adequate prisoner disciplinary system to drive episodic reclassification. In the past, Defendants have also promised to take steps in this area, only for them to fall short or revert to unsafe practices. *See, e.g.*, Monitor's Seventh Report at 4; Monitor's Sixth Report at 3 (discussing confusion over classification reforms due in part to Sheriff's Department personnel changes).

Defendants also have made little progress on implementing Settlement-required "direct supervision," or active, continuous prisoner supervision.[15] Monitor's Sixth Report at 2, 15, 17, 28-29. The Settlement allowed for a transition to a "direct supervision" jail, provided Defendants would at least make sure staff conducted documented "rounds" (i.e. welfare and safety checks) during the transition. Settlement ¶ 44. Defendants have not done that either. Based upon the Monitor's repeated observations, units are left with little or no staff supervision for long periods of time. Monitor's Sixth Report at 17, 26, 28-29, 33, 64. As discussed above, violence and other serious incidents can and do occur without any staff intervention on unsupervised and poorly supervised units. *See, e.g.*, Monitor's Seventh Report at 17-18 (risk from gangs and violence because Defendants stopped implementing recommended classification

---

[15] The Settlement defines "direct supervision" more completely at Paragraph 9. It is a term of art that involves placing officers in housing units so they have continuous interaction with prisoners.

forms and procedures).[16]

### E. Defendants Have Failed to Follow the Settlement Requirements when Making Supervisor and Training Staff Hiring Decisions.

Defendants should have deployed a leadership team with significant jail experience within six months of the Settlement's "Effective Date," or January 19, 2017. Settlement ¶¶ 22, 38-39, 45, 130-131. The Settlement required specific education and work experience for all supervisors and trainers. Instead, Defendants have repeatedly hired individuals with little or no jail experience to run the facility and train other staff. (Monitor's Seventh Report at 12-13), (Monitor's Sixth Report at 13-15). When making important policy, personnel, and operational decisions, the Sheriff and his chief deputy have also repeatedly bypassed the warden, who, though lacking the Settlement's technical requirements, has correctional management experience and ought to be involved in the Jail management and operational decisions.[17] Although a March 19, 2019 order purports to delegate hiring, transfer, and disciplinary authority to the warden, it remains to be seen whether this will change past practice.

Past practice includes repeated alteration of the Jail's management structure to accommodate the Sheriff's hiring decisions, even when those decisions did not comply with the Settlement. Monitor's Seventh Report 12-13; Monitor's Sixth Report at 2-3, 13-15, 33. For instance, Defendants replaced the Assistant Jail Administrator with an individual who did not meet the Settlement's minimum requirements for the position. Monitor's Seventh Report at 2-3. In the process, Defendants disrupted efforts to draft an objective classification policy. *Id.* The original Assistant Jail Administrator had drafted a basic, objective classification assessment tool

---

[16] Other problems with prisoner supervision include the failure to properly investigate incidents and the failure to implement more proactive approaches to managing violence. Settlement ¶¶ 42, 68. Defendants have also had problems staffing the investigative unit, developing youth programs, and using the Criminal Justice Coordinating Committee to help improve mental health care. *See generally* Monitor's Seventh Report 18-25, 51-54, 67-74, 100.
[17] The Sheriff also has repeatedly made important personnel changes without complying with his department's personnel policies or Settlement provisions. (Monitor's Sixth Report at 2-3, 13, 32-33).

at the time of his demotion. *Id*. Although not yet approved by the Monitor or the United States, it was an important forward step. The Sheriff appointed a new Assistant Jail Administrator who allowed re-implementation of the Jail's old practice of assigning prisoners' housing based on their charges, rather than on objective risk factors.[18] On March 20, 2019, after the United States sent its Enforcement Letter and Supplemental Enforcement Letter, the Sheriff reportedly reinstated the original Assistant Jail Administrator.[19]

The Sheriff made several other hiring, demotion, and promotion decisions that have, at minimum, caused confusion and interrupted compliance progress. Monitor's Seventh Report at 12-13, 53-54; Monitor's Sixth Report at 2-3, 13-15, 33. At worst, he sent a message that individuals with problematic experience and credentials could be in leadership positions. *See* Monitor's Sixth Report at 13-15. Most recently, the Monitor's use of force review indicates that some of the most problematic developments, such as the introduction of shotguns into the facility, involved new managers. *See* Monitor's Seventh Report at 36. The Sheriff recently advised that he will be reversing many of the personnel decisions. Sheriff's Letter at 3. Even if the Sheriff removes or transfers supervisors, it is not yet clear whether the replacements meet the Settlement's requirements.

## F. Defendants Have Failed to Correct Serious Physical Plant and Safety Equipment Deficiencies.

The Settlement required Defendants to fix locks, fire equipment, security doors, and other critical safety infrastructure in a "reasonable and prompt" manner. Settlement ¶ 46. Since entry

---

[18] One of the reasons why the United States and the Monitor have pressed for objective security classification (and corresponding housing assignments), rather than charge-based classification, is that charges alone tell Jail administrators very little about whether a new prisoner may be a security risk. A prisoner with a long history of violence, institutionalization, and gang membership, may only be in the facility because of a minor charge. It is dangerous to place such a prisoner with non-violent misdemeanants or even lower risk general population prisoners. The Settlement and modern corrections practice require a more thoughtful and comprehensive assessment process.

[19] The Monitor's team met with the new/former Assistant Jail Administrator during the May 2019 compliance inspection. He had been back on the job for just a few weeks. While he has reportedly taken some remedial action, he has not been back long enough to assess his effectiveness.

of the Settlement, the Monitor has been urging Defendants to implement a system for identifying damaged equipment and prioritizing repairs. Among other things, Defendants needed to develop inspection and maintenance policies, track maintenance requests, improve security equipment (e.g. locks, videos, doors), and make more timely arrangements for bringing in contractors. Monitor's Seventh Report at 3-4, 25, 31-34. They did not do so. Without these changes, the Jail continues to lack even the most basic security and safety features, such as lockable cell doors, fire hoses, and secure control rooms. *See generally* Monitor's Seventh Report at 3-4, 25, 31-34.

Even before entry of the Settlement, the United States warned Defendants that the physical plant issues contributed to violence and contraband. Notice Letter 8-9. Prisoners were regularly escaping from their supposedly locked cells to attack other prisoners, or getting out of the facility to obtain contraband. *See* Notice Letter 9. While Defendants periodically repair some plant problems, they have never developed policies and systems to keep ahead of maintenance issues. Instead, they continue to rely on ad hoc, improvised approaches that are simply insufficient given the poor security conditions.

The Monitor and her team proposed temporary remedies to help Defendants with this problem, such as recommending transfer of prisoners out of a unit to complete a retrofit, and prioritizing lock replacements. *See, e.g.*, Monitor's Fourth Report at 2-3, 26 (reviewing architectural plans, manual locks, and creation of space at Work Center); Priority Recommendations June 2018, Ex.8. Defendants, however, have been delinquent in making decisions about whether to implement the Monitor's recommendations or other improvements, even as the security situation has deteriorated so badly that the Monitor believes there is an ongoing risk of riots. [20] Monitor's Seventh Report at 31-34 (reporting that the entire Raymond Detention Center is at risk from widespread security problems).

---

[20] The warning was prescient, as a major riot occurred not long after filing of her report.

Shortly after the United States sent its Enforcement Letter and Supplemental Enforcement Letter, the Sheriff reported that he was starting to implement some of the Monitor's urgent recommendations.  *See* Sheriff's Letter at 2-3.  The Board claimed it has approved funds for improvements but acknowledges there is "no plan to prioritize ongoing needed maintenance." Board's Letter at 2.  Also, the Monitor has not yet independently confirmed whether Defendants have actually done all that they say they have done.

### G. Defendants Have Not Completed the Transition of Youth Prisoners from the Jail to a Facility with the Required Age-Appropriate Programs.

The Settlement required improvements to housing, supervision, and programs for youth held in the Jail.  Settlement ¶¶ 78-84.  Essentially, Defendants needed to either provide such programs in the Jail, or transition the youth to a more age-appropriate facility that had such programs.  The Settlement specifically allowed Defendants to use the nearby Henley-Young Juvenile Detention facility as a placement option, but any replacement facility still had to have the necessary housing, supervision, education, mental health, and behavioral treatment programs. The deadline to decide where to house youth was six months after the "Effective Date," or by January 19, 2017, with implementation to be completed within 18 months of the "Effective Date," or by January 19, 2018.  After significant delay, Defendants notified the United States of their decision to use Henley-Young.  However, they actually continued housing youth in the Jail until early 2019.[21]  *See* Monitor's Seventh Report at 5-6, 64-80.

When Defendants moved all youth prisoners into Henley-Young, they came into partial compliance with the relevant provisions of the Settlement.  Monitor's Seventh Report at 5-6, 64-80.  However, Defendants merely relocated these youth, without adequate planning for their transition or for the changes needed to ensure that Henley-Young, a short-term facility, can

---

[21] Defendants' responses to the United States' Enforcement Letters do not provide a clear commitment to keeping the youth out of the Jail.

appropriately house longer-term detainees. As a result, Defendants' implementation of the Settlement's youth provisions remains inadequate. For instance, youth do not receive adequate education and behavioral programs at Henley-Young, as required by the Settlement at paragraph 78-79, because there is insufficient space and limited staff to provide such services. Monitor's Seventh Report at 5-6, 67-73, 77-80.

The Monitor offered numerous short-term technical assistance recommendations to facilitate the transition of youth to Henley-Young. *See, e.g.*, Priority Recommendations June 2018 at 5. These recommendations included adding temporary programming space, converting a part-time psychologist to full-time, adding some mental health coverage, and putting in security features. Monitor's Sixth Report at 63-76. Defendants initially moved forward with improvements, but recently stopped planning or making other progress. Monitor's Seventh Report at 5-6, 64-80.[22] Moreover, some Defendants have indicated that they do not believe they have any obligations under the Settlement to make further improvements. In response to our Enforcement Letters, the Board asserted that conditions at Henley-Young are appropriate, asserted without providing any details that efforts to improve programming are ongoing, and dismissed "almost all" of the Monitor's recommendations as merely "lagniappe." Board's Letter at 2. If Defendants will not implement the Monitor's priority recommendations, they cannot begin to implement more complex remedies, such as developing a behavior management program and providing age-appropriate educational services for longer-term youth detainees.

The United States seeks the Court's aid to compel implementation of certain priority

---

[22] The Southern Poverty Law Center, counsel for plaintiffs in ongoing litigation regarding conditions at Henley-Young, has filed a motion for an extension, or in the alternative, contempt, of their consent decree governing conditions in Henley-Young. *See* Motion for Extension of Consent Decree and Corrective Action Plan or, in the Alternative, Contempt, *J.H. v. Hinds County*, No. 3:11-cv-327-DPJ-FKB (S.D. Miss. Oct. 31, 2019), Doc. No. 128. The District Court recently approved a Third Amended Consent Decree in that case. *J.H. v Hinds County*, Doc No. 145.

youth recommendations identified by the Monitor. For instance, Defendants need to increase the psychologist's hours so she can develop youth treatment programs and develop a plan to add education, program, and secure outdoor recreation space. These remedies are needed as soon as possible so the youth treatment staff can improve safety and treatment until Defendants have implemented longer-term systemic improvements.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court issue an Order to Show Cause Why Defendants Should Not Be Held in Contempt. If the Court finds Defendants in contempt, the United States requests additional briefing regarding appropriate remedies.

Respectfully submitted,

**FOR THE UNITED STATES:**

D. MICHAEL HURST, JR.
United States Attorney
Southern District of Mississippi

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Civil Rights Division
Special Litigation Section

/s/ Candace G. Mayberry
CANDACE G. MAYBERRY (MS #104014)
MITZI DEASE PAIGE (MS #6014)
Assistant U.S. Attorneys
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Ste. 4.430
Jackson, MS 39201
candace.mayberry@usdoj.gov
(601) 973-2838
(601) 965-4409 (fax)

/s/ Laura L. Cowall
LAURA L. COWALL (DC # 481379)
Special Counsel
laura.cowall@usdoj.gov
(202) 514-1089
(202) 514-0212 (fax)

/s/ Christopher N. Cheng
CHRISTOPHER N. CHENG (PA #69066)
Trial Attorney
christopher.cheng@usdoj.gov

(202) 514-8892
(202) 514-4883 (fax)

AARON FLEISHER
Trial Attorney
aaron.fleisher@usdoj.gov
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

/s/ Candace G. Mayberry
CANDACE G. MAYBERRY (MS #104014)
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Ste. 4.430
Jackson, MS 39201
candace.mayberry@usdoj.gov
 (601) 973-2838
(601) 965-4409 (fax)