Court-Appointed Monitor's Eighth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish              Jim Moeser              Dr. Richard Dudley
Corrections Operations        Juvenile Justice        Corrections Mental Health

# EXECUTIVE SUMMARY

**Corrections Operations**

During the four months between the January and May 2019 site visits, the Detention Services Department (DSD) has undergone a number of significant changes, some positive and some negative.  The most noteworthy involved the issuance of a Personnel Action, dated March 19, 2019, by Sheriff Mason, that authorized the Jail Administrator (Major Rushing) to exercise full power and authority to manage the DSD in accordance with paragraph 46 of the Settlement Agreement.

The order specifies that she has "…the authority to make all personnel decisions necessary to ensure adequate staffing, staff discipline and staff oversight.  The personnel authority includes the power to hire, transfer and discipline staff.  These duties further include, the ability to monitor, ensure compliance with Jail Policies, and take corrections, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This includes road deputies assigned to supervise housing units and emergency response, tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.  These duties further include the authority to authorize any training or travel."

In addition, the Sheriff issued an order that effective March 20, 2019, Richard Fielder was reinstated as the Assistant Jail Administrator.  If these two orders are fully operationalized, this will put the DSD on track to begin to comply with the Settlement Agreement.  Previous efforts were hampered by personnel changes made during the Jail Administrator's medical leave that were counterproductive to compliance.

The lack of staff is still one of the most critical problems faced by the DSD.  Of the 433 positions that the staffing analysis calls for, only 275 have been authorized and only 271 of them are actually funded.  Over the past two years, the number of filled positions has fluctuated between 251 and 229 (the staffing level at the time of the May site visit).  Even assuming the Raymond Detention Center (RDC) can completely close one pod, it would still be short 115 officers. In spite of a salary increase that was authorized for Detention Officers, recruitment efforts have been limited, but more importantly, retention has been dismal.  A step increase based on longevity, proposed by the HCSO, has never been acted on by the County.

Because of the staff shortage, none of the housing units at the (RDC) are manned so as to permit the Direct Supervision of inmates.  Consequently, the inmates, rather than the officers, are in charge of the facility.  This results in assaults, injuries, escapes, destruction of the facility and even riots.  Such an incident (riot) occurred on April 19, 2019, at the RDC, Pod A.  The killing

of an inmate in December 2018, in the RDC HU B3, is reportedly still under investigation, although at least four inmates have been charged with the crime.  These two high profile incidents are indicative of the lack of control of the facility.

Policies and procedures should have been implemented within the first few months of the monitoring process.  Instead, two and a half years later, there are only three policies adopted with seven pending (going through the review and approval process).  With a hundred or more policies required in order to meet the requirements of the Settlement Agreement, it is obvious that very little progress has been made.  The lack of policies and procedures also results in inconsistent application of verbally approved practices.  Each site visit reveals unexplained changes in procedure, primarily because there is no approved frame of reference for supervisors and staff to follow.

Maintenance problems in the DSD continue at an unprecedented level.  No jail system can function with cell doors that do not lock, housing unit doors that do not function and even control room doors that cannot be secured.  The Hinds County maintenance staff are not equipped or qualified to deal with the major maintenance issues presented by the DSD.  Recognizing that, the County brought in a professional corrections maintenance firm (CML) from San Antonio, TX to deal with the most critical issues.  They refabricated eight sliding doors into a swinging door configuration that represents a significant improvement in the level of facility maintenance.  The County should continue to utilize professional contractors to deal with maintenance issues.

In March the National Institute of Corrections (NIC) provided Direct Supervision Training for Executive Staff on site.  It is scheduled to be followed by a Train the Trainers program in July for those Detention Officers who will serve as trainers for the rest of the DSD staff.  Once that training is complete, it will be possible for the Work Center (WC) to function in a Direct Supervision mode and for the RDC to reopen each housing unit incrementally, with an officer assigned full time, as repairs are made to the facility.

Because of personnel changes, the classification process had become "objective" in name only.  Although the forms were completed, assignment to housing units was based on charge rather than classification.  Since the last site visit, the previous Sergeant in charge of Classification was returned to her position. She is reviewing the classification of all active inmates in order to return to objective/behavioral measures. Currently, however, a review of the files found errors, including charge-based classification, in 10 out of 12 files.

Fire safety is one of the most critical areas in jail operations, yet in the DSD fire safety is not a priority (primarily at the RDC).  While at the Jackson Detention Center (JDC) and WC fire safety equipment is available (fire hoses, fire extinguishers and even a sprinkler system at the WC), at the RDC almost all of those fire prevention/suppression systems are missing.  The

sprinkler system was removed after the riot that destroyed Pod C approximately seven years ago, and was never re-installed.  The State Fire Marshall inspections make no mention of this significant fire safety discrepancy.  It would be useful for the State Fire Marshall to be requested to participate in the next site inspection process to provide guidance in addressing fire safety measures.

**Medical and Mental Health**

There has continued to be significant and quite meaningful advances with regard to the provision of core mental health services, and the provision of these services is clearly documented in well maintained medical records and by the 'mental health tracking log'.  Given that mental health services are being provided to between 180 and 200 individuals, in the 3 different facilities, the small mental health team is already more than overextended.  The previously reported crisis regarding the woefully inadequate amount of psychiatric time has been addressed by replacing the .2 FTE psychiatrist with a .5 FTE psychiatric nurse clinician supervised by a psychiatrist, within QCHC's existing contract with the County.  However, there is still not enough mental health staff to expand the therapeutic interventions available for seriously mentally ill prisoners, implement a more comprehensive approach to discharge planning and referral for community-based mental health services, and develop a more rigorous mental health quality assessment program, all of which are required to address the mental health provisions of the Agreement.  In addition, once security policies and procedures that require the involvement of the mental health team have been developed and implemented (such as policies and procedures regarding disciplinary review, segregation review and use of force), the mental health team will have even more responsibilities.  Therefore, in January 2019, QCHC submitted a proposal to the County Board of Supervisors to expand the mental health staff, but the County has not yet responded to this request for two additional, critically needed, staff positions.  It is important to note here that although these two additional mental health staff persons will make it possible to address the above noted provisions of the agreement, a new staffing analysis will have to be done in connection with the development of plans to open a mental health unit at the facility, which ultimately will also be required to adequately meet the treatment needs of the seriously mentally ill.

**Youthful Offenders**

Between the prior site visit in January and this May site visit, the remaining youthful prisoner placed at the Raymond Detention Center (RDC) "aged out" and was transferred to the Jackson Detention Center (JDC).  Given assurances that no more youthful prisoners will be housed at any of the Hinds County adult facilities, this represents the completion of the transition that began in September 2017.  Although behind the intended time frame of the Agreement, this represents a significant milestone in the overall agreement related to youthful prisoners.

Therefore, the focus of this visit was solely on assessing compliance with the conditions of the agreement for youth placed at the Henley Young juvenile facility.  As of this May visit, there were fourteen youthful prisoners (twelve boys, two girls) at Henley Young, the same number that were there at the time of the January visit.  Additional time during this visit centered around tracking the status of the educational program, reviewing training records and plans for 2019, reviewing youth files, reviewing a sample of Incident Reports, and reviewing the use of room confinement (segregation) as a disciplinary measure.  Additional time was spent in meetings with the new Executive Director, Mr. Fernandeis Frazier, as well as reviewing progress with other core leadership team members, Mr. Burnside and Mr. Dorsey.

There continues to be progress toward compliance in a number of areas, including: (1) a significant decline in the use of segregation/room confinement for disciplinary purposes; (2) continued stability in the population of both the youthful prisoners as well as the traditional short-term youth placed in the detention facility; (3) improvements in the educational programming for youth; (4) selection of a new Executive Director; and (5) some modifications in how the point/level system is utilized with youth. Additionally, planning has taken place to implement a new court process to review youth's cases, focusing on promoting more timely decisions related to indictment, returning the case to the youth court, and/or altering bail conditions.  The intention is to implement this new process beginning in June, and that should have a positive impact on moving the youth's cases through the appropriate court system more promptly.

Concerns remain related to: (1) the limited time provided to achieve optimal functioning of the mental health team, particularly as it relates to limits on the time allotted to the psychologist and psychiatrist position(s); and (2) there have been no changes in the physical plant/facility that provide either more appropriate space for living units and a variety of programming or address some of the security safety concerns that have been expressed in prior reports and/or by facility leadership.

**Criminal Justice and System Issues**

A number of steps were taken that while not achieving compliance in many areas are certainly a step towards compliance. The policy on Inmate Records Management was adopted and includes a number of procedures that should improve the accuracy of the records and ensure the lawful basis of detention and timely release. The Records staff has begun a review of every file at the pace of 30 a week to reorganize them according to the new policy and create a summary sheet that tracks the detention status. As this is just the beginning of this process, there continued to be a number of files with inaccurate or incomplete information at the time of this site visit. There was one case in which a juvenile who should have been released was detained over a month after his release date. But there were fewer cases of over detention than in the past.  Records

continued to have a number of inaccuracies that give rise to the potential for over detention or mistaken release. There are also systemic issues that contribute to over detention. During this site visit, it was learned that many defendants are not getting their first appearance in 48 hours because the judge that normally handles them is out. The Jail is entering a bail amount from a bail schedule but individuals who cannot make that bail are held weeks before getting before a judge and getting released. Other systemic issues are described below.

The County IT Department is now creating reports that can pull data from the JMS system. This will assist in identifying release dates and ensuring timely release. However, this is still not reliable because the information has not been entered consistently so manual tracking is still required. Some practices exacerbate the limitations of the JMS system. As described previously, the Warrants Division within the Sheriff's Office does not use the JMS system, and does not enter warrants into the JMS system so warrants known by one arm of the Sheriff's Office are not known to another. Warrants arising after a person is booked are not known to the Records Office.

The Criminal Justice Coordinating Council (CJCC) has not had consistent participation by a number of stakeholders. This has limited its effectiveness. Reducing the jail population is one method for addressing the severe staffing shortage. However, the CJCC or some collaborative body will be needed to implement most jail population reduction strategies. The monitoring team has recommended that the County hire a CJCC coordinator to improve the effectiveness of the CJCC. This has not been done and the County has not renewed the contract of the CJCC consultant.

A chronic problem contributing to the jail population and the lack of sufficient staffing is the continued incarceration of unindicted individuals and the extraordinary length of time to disposition of cases. This was described in the last monitoring report and that status has not changed.

At the time of the October and January site visits, there were several persons incarcerated on court orders for fines and fees that did not appear to meet the requirements of the law or the Settlement Agreement. Since then, the Pre-Booking and Inmate Records Management Policies have been adopted which mandate compliance with the provisions of this Agreement. And at the time of the May site visit there were no individuals detained for failure to pay fines and fees. These provisions are now shown as compliant. However, this area will continue to be monitored to ensure that the policy is followed.

The kiosk grievance system continues to present problems. During this site visit, a report was once again run from the system to locate outstanding grievances that had fallen off the dashboard. Once again, hundreds of outstanding grievances were found but significantly less than at the last site visit. Many of these were medical grievances which were not previously

visible to the Grievance Officer. This has been changed and the Grievance Officer should be able to ensure that medical grievances are answered and that medical staff are trained to track grievances. A new system is only now getting started to ensure that all grievances are actually answered. There is still no system to review whether responses are adequate; and no oversight to determine that promised actions are actually completed.

**Monitoring Activities**

The Monitoring Team conducted a Site Visit May 7th through May10th. The site visit schedule was as follows:

Site Visit Schedule
May 7-10, 2019

| Date and Time | Lisa Simpson | Dave Parrish | Jim Moeser | Dr. Richard Dudley |
|---|---|---|---|---|
| Monday evening: 6:00 Lobby of Hotel | Team Meeting | Team Meeting | Team Meeting | Team Meeting |
| Tuesday A.M. | Meet with command staff<br><br>Tour Pod C Meet with Mr. Bell and staff re repairs | Meet with command staff<br><br>Tour Pod C Meet with Mr. Bell and staff re repairs | HY-meet with HY command staff<br><br>Review youth records | Meet with mental health team |
| Tuesday P.M. | Meet with Marlo Brinnon<br><br>Tour C pod for MH unit<br><br>Meet with Discharge Planner | Meet with Marlo Brinnon<br><br>RDC | HY<br>Review room confinement observation logs<br>Meet with GED/Special Ed staff<br>Meet w. School Principal<br>Meet with Training Staff | RDC<br><br>Tour C pod for MH unit<br><br>Meet with Discharge Planner |
| Wednesday A.M. | Meet with Sgt. Tillman Review records | RDC<br><br>Meet with CID investigator Jeremy Nelson<br><br>Meet with Captain Miller and (new training Lt.) | HY-review records and Incident Reports Further discussions with Mr. Burnside Met w.Youth Support Specialists Meet w. Dr. Payne | Tour RDC |
| Wednesday P.M. | Pretrial Services Meeting | RDC | Participate in Pretrial services | RDC |

7

| | JDC | Meet with FSO Rholon Tucker<br><br>JDC | meeting, w. focus on changes related to processing JCA cases | |
| Thursday A.M. | Meet with Taneka Moore<br><br>Meet with Kenny Lewis | | Meet w. Nursing Director<br>Follow up w. Training staff<br>Exit discussion with HY leadership<br>Met with SPLC staff | JDC |
| Thursday P.M. | Status Conference | Status Conference | Status Conference | Status Conference |
| Friday 9:00 A.M. | Meet with Sgt. Hubbard<br><br>Meet with Kenisha Jones<br><br>WC | RDC<br><br>Follow up as needed | | |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Henley Young are included in the totals in this chart. This is a change from the last report which showed compliance at RDC in the totals. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |

8

| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| --- | --- | --- | --- | --- | --- | --- |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
   a.  Booking;
   b.  Objective classification;
   c.  Housing assignments;
   d.  Prisoner supervision;
   e.  Prisoner welfare and security checks ("rounds");
   f.  Posts and post orders;
   g.  Searches;
   h.  Use of force;
   i.  Incident reporting;
   j.  Internal investigations;
   k.  Prisoner rights;
   l.  Medical and mental health care;
   m.  Exercise and treatment activities;
   n.  Laundry;
   o.  Food services;
   p.  Hygiene;

q. Emergency procedures;
r. Grievance procedures; and
s. Sexual abuse and misconduct.

**Non-Compliant**

There has been no significant change with regard to this provision since the Sixth Monitoring Report.  Prior to the May 2019, site visit, only nine draft policies had been submitted to the DOJ and Monitor for review, but three have now been adopted (5-500 Pre-Booking, 6-100 Booking and 4-200 Inmate Record Management).  At the time of the May site visit, one additional policy had been submitted for review (12-400 Inmate Grievances). Since the site visit, two additional policies have been submitted for review (Searches and Conditions of Confinement) for a total of twelve policies drafted, three of which have been approved and adopted. The County has reported that an additional ten policies are in development. While it is encouraging that progress is finally being made, the fact that the monitoring process has been in place for approximately two and a half years, and that there are only three policies approved to date, is disturbing.  Until Hinds County develops a comprehensive Policies and Procedures Manual, along with Post Orders, the staff of the Hinds County Jail System cannot be expected to comply with the provisions of the Settlement Agreement.  For an agency the size of the HCSO, a Policies and Procedures Manual encompassing far more than a hundred individual policies would be expected.  It is apparent that a great deal of effort needs to be put forth before significant progress can be achieved.

As noted in the last monitoring report, the full range of required policies and procedures that cover areas for which the health and mental health teams are fully and virtually solely responsible have been developed and implemented.  Therefore, the internal focus (i.e., by QCHC and other appropriate participants within the facility) and the external focus (i.e., by the monitoring team) has shifted to assessing compliance with these health and mental health policies and procedures.  Of course in addition, as the policies and procedures are operationalized, there is also an internal and external focus on assessing the adequacy of the policies and procedures, the adequacy of training on the policies and procedures, and the quality of the services provided, particularly with regard to whether or not full compliance with the policies and procedures ultimately addresses the provisions of the Agreement.

As noted in prior reports there are multiple health and mental health related provisions that cannot be addressed by health and mental health staff alone.  These have included, for example, the participation of mental health in the disciplinary review process, the use of suicide watch, the participation of health and mental health in the segregation review process, incidences where there is an anticipated/planned use of force and incidences where there has already been a use of force, and the roles and responsibilities of health and mental health with regard to PREA. Security policies and procedures that would address these issues have still not been developed,

approved, and implemented. The medical and mental health staff should be involved in the development of these policies and procedures when that occurs.

During this most recent site visit, a new concern was raised, and that is the safety of the nursing staff at the RDC.  More specifically, although the nursing staff feels that the security staff in the medical/mental health offices manage/control the detainees quite well, this is not the case when the nurses are doing medication pass on the units; the nurses reported multiple incidences where they were harassed and even grabbed, and at least one incident where urine was thrown on a nurse, while security staff did nothing to protect them; and medical/mental health administration reported that memos to security administration about these incidences have not been responded to. Policies and procedures are needed to address the duties of the security staff on the housing units when medical staff are present.

Given this newly voiced concern/issue, during this most recent site visit the mental health expert met with security administration and was told that such incidences should be reported through the regular mechanism for reporting incidences (instead of sending a memo to security administration); and security administration assumed the responsibility for informing medical/mental health administration that they could and should use this mechanism for reporting such incidences and assumed the responsibility for making sure that medical/mental health administration was taught how to access and use this mechanism for reporting such incidences.  Regardless of the reporting mechanism, security staff is now clearly informed of the problem and should address this through training of the housing unit staff promptly. This issue will require follow-up at the next site visit in order to determine whether security administration has, in fact, assumed the above noted responsibilities; whether or not nursing administration has begun to access and use this incident reporting system; and most importantly, whether or not security administration has begun to address the roles and responsibilities of security staff during medication pass, which is, in fact, the underlying problem here.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

Significant changes have been made since the Seventh Monitoring Report was published.  The new Assistant Jail Administrator, who was appointed in spite of the fact that he did not meet the qualifications for the position, has since been replaced by his predecessor, who was well qualified.  The County had kept him on the payroll and consequently, he was available to return to his previous position when the Sheriff issued a reassignment memorandum on March 20,

2019.  At the same time (March 19, 2019) he issued a Personnel Action that designated "…Major Rushing as his designee to execute all duties and responsibilities relating to Detention Services, including the authority to make all personnel decisions necessary to ensure adequate staffing, staff discipline and staff oversight.  The personnel authority includes the power to hire, transfer and discipline staff.  These duties further include, the ability to monitor, ensure compliance with Jail Policies, and take corrective action for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This includes road deputies assigned to supervise housing units and emergency response, tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.  These duties further include the authority to authorize any training or travel."  This major shift in operational responsibility makes it possible for the Jail System to progress toward compliance with the conditions of the Settlement Agreement. The monitoring team will continue to track whether the Jail Administrator is permitted to exercise the authority seemingly granted by this Personnel Action.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
Until there are approved policies and procedures in place, the supervisors will not be able to become familiar with them.  Since the last site visit there have been five promotions, two returns to previous status and one transfer to a lateral position. The qualifications of the five promoted individuals and the one transfer are:

A.—When the previous Assistant Jail Administrator (Captain) was returned to his original position, the Captain, who had filled this post for several months, was transferred into a new position, titled Maintenance and Security Chief.  Although it did not previously exist, considering the long-standing maintenance and security problems the DSD faces, placing responsibility for addressing maintenance/security on a dedicated manager makes operational sense.
B.—This individual has a high school diploma, has been employed by the HCSO for 19 years, and served as a Sergeant for 15 months before being promoted to Lieutenant.
C.—This Sergeant has a high school diploma, has been employed by the HCSO for 14 years and worked at both the RDC and WC before being promoted.
D.—This Sergeant has a high school diploma plus three years of college with a major in Engineering.  Although he has been employed by the HCSO for only 20 months, he has approximately 30 years of experience in personnel management.

E.—This Sergeant has a high school diploma, but only two years of experience with the HCSO.
F.—This Sergeant has a high school diploma, five years of experience with the Mississippi
Department of Corrections and has been employed by the HCSO for two years.

Not all of these appointments meet the specific criteria of this provision, however, the
appointments appear to be merit based. Until there are approved policies and procedures in place,
the supervisors will not be able to become familiar with them.  When questioned regarding
specific requirements of the Settlement Agreement, many supervisors below the command staff
level are still unable to articulate knowledgeable responses.  It should be noted that copies of the
Settlement Agreement and most recent Monitoring Report are available in the control rooms at
the JDC.  The same is not true for the RDC and WC.  It would be beneficial for those facilities to
emulate the practice of the JDC.

40. Ensure that no one works in the Jail unless they have passed a background check, including a
criminal history check.

**Partial Compliance**
As was previously reported, the HCSO Director of Human Resources conducted a review of
most DSD personnel files that supported compliance with this paragraph.  However, the
personnel histories of some supervisors listed in the 6th Monitoring Report indicate that
individuals who have what should have been disqualifying backgrounds, were nevertheless hired
and/or promoted. The more recent promotions do not appear to have the same problems with
their background. If the HCSO continues to hire and promote only those persons who have
successfully passed a background check, including a criminal history check, as specified by this
paragraph, it should be possible to move from Partial Compliance to Substantial Compliance.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail
housing units.

**Non-Compliant**
There has been only nominal change in the status of this paragraph since the Seventh Monitoring
Report.  The Policies and Procedures Manual has yet to be published.  While three policies have
been approved and seven have been submitted for review, they represent only a very small
fraction of the many policies that are required.  Even when that is done, the physical design of
the JDC, which is a linear facility, make implementation of Direct Supervision there an
impossibility.

On a more positive note, the National Institute of Corrections (NIC) provided a week of on-site
Direct Supervision Training for Command and Administrative Staff in April.  That training was
well attended by command staff and those in attendance appeared to have learned from the

experience. That training will be followed up by a Train the Trainers program in July for Training staff and the Detention Officers who will serve as trainers for the rest of the DSD staff. Once that is done, the WC can begin to operate under the principles of Direct Supervision, followed by the RDC, but only as staff are assigned to work inside the housing units as they are refurbished.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:

        i. There are at least two detention officers in each control room at all times;

        ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii. There are rovers to provide backup and assistance to other posts;

        iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v. There are sufficient detention officers to implement this Agreement.

    b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

        iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and

        facility improvements recommended by the study, as modified and approved by the United States.

    d.   The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

    e.   The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

As was previously reported, this paragraph was downgraded from Partial Compliance to Non-Compliant in the Fifth Monitoring Report because of the lack of progress in filling existing positions.  Unfortunately, that trend has continued.  There were only 229 filled positions at the time of the May site visit.  According to the staffing analysis that was conducted by the HCSO and the Monitor, 433 positions are required to staff all three facilities.  Since that represents more positions than there are in the entire HCSO, the decision was made to set an initial goal of 275 positions (of which 271 are funded).  Over the past two years, that goal has never been met.  In fact, the number of filled position has fluctuated from a high of 251 to the current low of 229.

The WC and JDC continue to function fairly effectively even though both are understaffed. With an average daily census of 592 during the May site visit, the Jail System is operating at well below authorized capacity.  The WC, at 199, has 256 beds, while the JDC, at 116, has 192 beds (although some are off line).  While the RDC would seem to be in similar shape, with only 276 inmates, but 594 beds, in reality, this facility is in critical condition. Although the low population allows for some staff savings, the facility is still severely understaffed. If the entirety of Pod C is closed, the staffing requirement for the RDC facility would be 240 which is 40 less officers than the 280 required if the facility were full. However, the current staff at RDC is 125 which is 115 short of the staffing required. There are not enough officers to staff any of the housing units.  Detention Officers work only in the control rooms and the circular corridor that separates the control rooms from the housing units.  Because cell doors in the housing units can be easily overridden by the inmates, and most of the doors controlling access to the housing units cannot be secured, the inmate population is in a position to gain control of the three pods should they so desire.  In fact, a major riot occurred in Pod A on April 19, 2019, during which the inmates from three of the four housing units broke out and attempted to take over the pod control room.

Because so much of the RDC has been seriously damaged due to the total lack of inmate supervision, the County and HCSO are now planning to shut down a full third of the facility (one pod comprised of four housing units) at a time so that it can be rehabilitated and made secure again.  Once that is done, it is proposed that each housing unit will be reopened only when

sufficient staff are on board to operate in a Direct Supervision mode.  That means that one officer will have to be assigned to a housing unit 24 hours per day.  It can never be left unattended.  The current shortage of staff makes such a plan unrealistic unless a major recruiting effort is successful in filling approximately 45 vacancies and the HCSO is able to retain officers better than in the past.

During previous site visits, various four cell Isolation Units (ISO), small units located aside the larger housing units in the Pods, were set up to accommodate unique population groups such as Suicide Watch and Special Management Inmates.  Each was supposed to be staffed with an officer at all times, but the lack of written policies and post orders, the lack of staff and changes in supervisory responsibility resulted in a breakdown of those practices.  During the May site visit, only the Suicide Watch ISO Unit was ever found to be staffed, and that but about half the time.

Because of the chronic staffing shortages at the RDC, as well as the operational and supervisory shortcomings noted above, the incidence of inmate assaults and breaches in security continue at an extraordinary level.  By means of example, between May 8 and May 21, 2019, there were six breaches of security at the RDC.  In each case, holes were pounded through cell walls, hinges were cut or welds broken and in one instance a lock was found to be missing from the housing unit fire exit door. The lack of adequate staffing has resulted in the prisoners having significant control of the facility as demonstrated in Incident #1901005. In this incident two inmates were found outside the facility attempting to recover three bags of contraband.  Officers began to conduct a security check throughout the jail, but the inmates in HU A2 refused to let them enter the unit.  This lack of control is exacerbated by the maintenance issues described in paragraph 46 below where inmates can open cell doors, housing unit doors and even control room doors.  Inmates break out of the facility, almost at will, but not to escape; rather, to retrieve contraband and return to their housing units.  Officers are prevented from performing their duties by inmates who refuse them entry to a housing unit, forcibly restrain them in a housing unit or gain unauthorized access to a pod control room.

As has been reported in prior monitoring reports, the County has taken some steps to recruit detention officers. The County increased the starting pay for detention officers reportedly matching the highest paying correctional agency in the state. The Sheriff has a recruitment officer who does recruiting for both the patrol and detention side of the Sheriff's Office. He has reported attending job fairs and working with Hinds Community College to add detention specific courses to their criminal justice curriculum. The County reports having a staffing development group responsible to reviewing and enhancing recruitment. In fact, the County has hired a significant number of detention officers since the time of the Settlement Agreement. Two hundred (200) officers have been hired in this time frame. However, two hundred and twenty (220) have terminated in this time frame. Retention appears to be a major issue.

The Staffing Analysis that was completed by the County/HCSO and Monitor has not been updated annually as required, nor have the issues of a career ladder or a retention bonus system for Jail staff been addressed beyond a preliminary recommendation by the HCSO.

f. Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge. Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit). Additionally, the classification and housing assignment process must include the following elements:

   i. The classification process must be handled by qualified staff who have additional training and experience on classification.
   ii. The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.
   iii. Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.
   iv. The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff. The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.
   v. The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.
   vi. The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement. Placing prisoners together because of gang affiliation alone is prohibited. The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Non-Compliant**

The Classification Unit has had a change in leadership and is returning to a behavior based classification system. The office is in the process of reviewing all of the active files to ensure accurate classification. That process had just begun at the time of the site visit. However, a review of the files already indicated less occasions when the behavior based score was overridden based on the charge, something that was observed routinely in the last two site visits. At the time of this site visit, of the 12 files reviewed, only two had an override based on charge. However, the accuracy of the scoring is still a problem. Of the 12 files reviewed only two were accurately scored. The inaccuracies included incorrect criminal histories, improperly weighting the current charge, incorrect addition, scoring factors such as mental health that are not intended to be scored in the instrument, using the incorrect form, and missing paperwork. The classification does appear in the JMS system and the system can run a report of everyone needing reclassification on a particular day. One systemic problem appears to be that the current charge in the JMS system at the time of classification does not always appear to be accurate. Two files used the charge listed on the booking sheet at the time of classification. The charge was then corrected or updated to a different charge in the JMS system which would have impacted the score. For example, one individual showed the charge of Failure to Appear which scores low. However, the JMS system had been changed to show that he was charged with armed robbery and shooting which scores very high. There is no system for alerting Classification of the change.

The hours of coverage by the Classification Unit have not changed.  Gaps in time result in some inmates being assigned to facilities or housing units without going through the classification process.

While cell assignments and inmate transfers are supposed to be cleared through Classification, there is no policy in place that requires that action, consequently, supervisors sometimes make such transfers on their own.  Finally, while the decision to end housing according to gang affiliation was made early on by the Jail Administrator, the lack of supervision within the housing units at the RDC makes it impossible to stop physical conflict from developing between competing groups of gang members housed in the same unit. The move back to behavior based classification should reduce the risk of gang related violence. However, there were several assaults that appear to be gang related in the last six months.

       g.  Develop and implement positive approaches for promoting safety within the Jail including:
- i. Providing all prisoners with at least 5 hours of outdoor recreation per week;
- ii. Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

      iii.  Creating work opportunities, including the possibility of paid employment;

      iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

      v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

      vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

      vii.  Providing reasonable opportunities for visitation.

h. Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i. Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation per week is still not provided to all inmates in the Jail System although significant progress has been made.  The WC is the only facility that is in compliance to date.  There, outdoor recreation was provided virtually every day, to each of the four housing units, during the month of April.  Log records are complete and well maintained.  At the RDC a recreation log is now maintained, but it reflects only sporadic and incomplete entries.  It shows that outdoor recreation was provided on six days during April.  One entry noted that recreation began at 1903 hours and ended at 1542 (three hours earlier).  Records for the JDC indicate that indoor recreation was provided on only seven days during April.  The Captain of that facility plans to install a roll up sally port security gate in the enclosed drive thru parking area separating the jail from the courthouse.  That will allow inmates to have greater access to recreation facilities, although it still does not meet the standard of outdoor recreation. The only way that the JDC can comply with the Settlement Agreement is through the construction of an outdoor recreation yard on the roof of the facility.

Regarding 42 (g)(ii) and (iii), there is no incentive program. There are work opportunities at the WC but not paid employment and the only opportunities at JDC and RDC are working as trusties.

Regarding 42 (g) (iv) As has been previously reported, prisoners who are in need of mental health services are identified in a variety of ways, including during the initial nurse's intake, via the 'Form #3' (a form filled out by the prisoner at the time of booking), during mental health weekly rounds in segregation, prisoner self-referral, and the referral of prisoners by security staff.  Although whether or not these identification mechanisms/sources of referral capture all prisoners who would benefit from mental health services in a timely manner has yet to be determined and awaits the development of an assessment tool to look at this issue, the number of prisoners on the mental health caseload continues to hover around 175, with an average length of stay of 400+ days.

The nurse's intake remains by far the most common point of identification of prisoners in need of mental health services.  A comparison of information obtained by the intake nurse with information obtainable from the 'Form #3' indicates that the 'Form #3' rarely identifies prisoners in need of mental health services who were not already identified during the nurse's intake; although this is rare, it has occurred; and so if/when this does occur, it might be reasonable to at least attempt to assess whether this is due to the fact that the newly admitted prisoner felt more comfortable reporting mental health difficulties and/or a history of mental health difficulties in writing versus during the intake interview, or whether this was due to a failure of the intake interview to elicit such information, which would then need to be addressed.  Mental health staff report identifying prisoners who deteriorate while in segregation (see section 76), and there are prisoners who self-refer for mental health services (see also section 45).  It has been difficult to obtain a clear sense of the extent to which prisoners are referred for a mental health evaluation and treatment by security staff, especially in the absence of a referral form that would document such a referral; therefore a more formalized mental health referral process for security staff is recommended; and once this is in place, it will be easier to assess the number, quality, appropriateness and timeliness of such referrals, as well as whether or not there is a need for additional training for security staff in mental health related issues.

Prior monitoring reports raised the question of how QCHC was defining the target population for the mental health case load.  In other words, is the target population just those who would be traditionally described as 'seriously mentally ill' or should it also include detainees who suffer from other mental health difficulties that cause them considerable distress and that significantly impact on their ability to function?  This issue has now been addressed, in that the target population for the mental health caseload now includes the full range of detainees who suffer from mental health difficulties that cause them considerable distress and/or that significantly impacts on their ability to function.  During this most recent site visit, it was also noted that even

detainees who are receiving short-term supportive therapy, and who are not otherwise suffering from an underlying, major mental illness, were not being included on the mental health caseload list and it was recommended that they should be included on the mental health caseload during the time that they are receiving such short-term supportive therapy.

In the 65 medical records reviewed, there were mental health evaluations, treatment plans, progress/treatment notes, and psychiatric nurse clinician follow-up notes for those on medication.  There are still no treatment planning and treatment plan review mental health team meetings that would allow for a more integrated, interdisciplinary approach to treatment planning and the periodic review of treatment plans; this issue is particularly important given that the new psychiatric nurse clinician isn't seeing all of the prisoners on the mental health case load (i.e., as noted above, she is not seeing prisoners who are already stable on their medication); during this most recent site visit, this was discussed with the mental health staff, including the new psychiatric nurse clinician; and now that the new psychiatric nurse clinician is on board, it is anticipated that this issue will be addressed.

As was noted in the last monitoring report, a 'mental health tracking log' has been developed; the log continues to be well maintained; and the log serves to facilitate both the internal and external monitoring of the provision of mental health services, particularly with regard to compliance with policy and the performance of procedures in a timely manner.  Therefore, the next step is the development of mechanisms for the internal and external assessment of the quality of the mental health services provided.  Initiation of the above noted treatment plan review process will certainly be an important part of that effort, in that there will be a regularly scheduled review of whether or not each detainee's treatment is addressing the goals of the detainee's treatment plan.  Although there are indications that at least suggest that the quality of the mental health services has continued to improve, consideration should be given to what additional mechanisms might be employed to more formally assess the quality of the mental health services provided.

Finally, it has already been established that there is a need to develop additional mental health interventions that are not currently available at the facility. This is particularly the case for detainees with serious mental illnesses; and it is anticipated that such an enhancement of mental health services in the facility would significantly improve the quality of the treatment for such detainees, improve their ability to function within the facility, and increase the likelihood that detainees would continue treatment upon their release from the facility. This would thereby decrease the likelihood of recidivism.  Planned, additional mental health services include a group therapy program with groups focused on the development of social skills, conflict resolution, substance abuse, dual-diagnosis (i.e. those with substance abuse issues and some other major mental illness), and parenting.  There is also a need for psychoeducational groups (focused on learning about one's mental illness, the need for treatment, and the responsibilities for fully

participating in one's own treatment), medication management groups, and discharge planning groups.  In addition, the mental health team has identified the need to better integrate other services provided at the facility into mental health treatment plans; such other services include, for example, competency training, ministerial work, and the ASU Collaborative's diversion program for individuals with serious mental illness; and so therefore efforts are underway to work more cooperatively with the providers of these other services.  Then ultimately, there is the need for a mental health unit, where seriously mentally ill inmates can receive this enhanced range of services in a coordinated and integrated way, within a more therapeutic setting.

The ability to provide these needed services is dependent on the issue of mental health staffing levels.  At the time of the previous site visit (January 2019), the mental health team consisted of two full-time QMHPs (the mental health coordinator and another full-time social worker), a .2 FTE psychologist, and a .2 FTE psychiatrist, for a mental health case load that included 177 detainees housed at three different sites (168 of whom were on medication and considered to be seriously mentally ill).  In addition to providing direct, follow-up clinical services to those on the mental health case load, the mental health team has other responsibilities such as mental health assessments of new admissions, the more intensive management and monitoring of suicidal detainees and other more acutely ill detainees, responding to other mental health emergencies, weekly rounds in segregation, and a range of administrative tasks (maintaining records, logs, etc. and attendance at staff meetings and conferences focused on treatment planning, discharge planning, etc.).  Furthermore, the two full-time QMHPs and the part-time psychologist rotate weekend call for mental health (which includes checking-in multiple times during the weekend with each facility, seeing detainees on suicide watch or other special watch, and also coming in to assess and manage any acute mental health emergencies), and they do this in addition to their full weekday schedule, and the psychiatrist is also on telephone call virtually all of the time.  The planned expansion of the range of mental health services provided is required to adequately address the treatment needs of the seriously mentally ill and respond to many of the provisions of this agreement; but there are not enough staff to initiate this planned expansion.   Then, once security policies and procedures are developed and implemented, the mental health team will have additional tasks, such as participation in the segregation review process and the disciplinary review process, as well as performing mental health evaluations and offering consultation with regard to the planned use of force and following any incident where there was a use of force.

As was noted in the monitoring report of the January 2019 site visit, the most critical staffing issue was the fact that there was inadequate psychiatric time to meet the provisions of the agreement and provide any reasonable standard of care.  In response to this critical shortage of psychiatric time, at the beginning of April 2019, QCHC replaced the very part-time psychiatrist with a half-time psychiatric nurse clinician, and consistent with the standards promulgated by the Mississippi Board of Nursing, the nurse clinician has on-site psychiatric supervision with and unlimited telephone access to her psychiatrist 'collaborator'.  In order to allow time for the new

psychiatric nurse clinician to get on board, the medical nurse clinician, aided by consultation with her collaborator and the facility's mental health coordinator, has assumed the responsibility for mental health medication management for stabilized detainees, while the new psychiatric nurse clinician has assumed the responsibility for all new admissions to the mental health case load and any detainees who appear to require a reassessment of their medication.

During this site visit, the mental health expert met with both nurse clinicians; discussed this staffing change with health/mental health administrators and line staff; and reviewed case records.  Based on these sources of information, it appears that this staffing change has been an extremely positive change that is responsive to the previously identified critical staffing issue. However, given that at the time of this most recent site visit this staffing change had only been in effect for one month, this will be closely reviewed again at the next site visit.

Although the shortage of psychiatric time was the most critical mental health staffing issue, there is a shortage of other mental health staff as well.  More specifically, each of the two existing QMHPs makes approximately 80 detainee/patient contacts each week.  Given all of the other things that they are trying to do, at multiple facilities, these 80 contacts are obviously far too short and, of necessity, limited in their scope.  Furthermore, this leaves virtually no time at all for expanding the range of therapeutic interventions required to address all of the provisions of the agreement.  In response to this critical mental health staffing issue, in about January 2019, QCHC submitted a proposal to the County Board of Supervisors to expand the QCHC contract to add an additional QMHP and a mental health tech who would assume some of the administrative responsibilities.  However, it is the understanding of this monitor that as of this most recent site visit, the Board of Supervisors has not responded to this proposal from QCHC; as noted above, addressing this staffing issue will be required in order to address the provisions of this agreement; and so it is hoped that the Board of Supervisors will soon affirmatively respond to this proposal.

Despite the shortage of mental health staff, mental health staff has started one group, which has provided an opportunity for staff to identify and explore the range of clinical and logistical issues related to designing and implementing a more expanded group therapy program.  More specifically, they have identified and worked out a range of issues related to identifying and selecting group therapy members, which not only included clinical issues but also issues such as obtaining clearance from classification to allow for identified members to meet together in a group setting.  They have also identified ways to work cooperatively with other services/service providers at the facility, and these other providers are helping to assure that the group meets and runs smoothly.  The syllabus for the group and a meeting of the group was observed. The group plan was well organized, the group was well run, the content appeared to be clinically appropriate for the group members involved, and the prisoners involved in the group were quite responsive to the group process and at least appeared to find it quite beneficial.

During this most recent site visit, there was also some discussion of the development of a special mental health unit, and space was identified that might be used for such a unit and the needed modifications to the space for that purpose were discussed.  It at least appeared that this discussion was quite preliminary; the discussion did not include issues such as staffing of the unit by security staff or mental health staff, and did not include a discussion of plans for programming on the unit; but the fact that there was at least some initial thinking about the development of such a unit was a positive finding.

Regarding 42 (g)(vi) during the previous/January 2019 site visit, a new admission (who was apparently transferred from another facility) was followed through each stage of the Jail's booking and initial health assessment/intake process (see January 2019 site visit report). Although several concerns were identified about the screening of that new prisoner who had a significant history of mental health difficulties, both during the intake/booking process and the nurse's initial health assessment/intake process, it was not apparent whether it was just that one case that wasn't handled well, or whether that one poorly handled case was representative of more frequently occurring difficulties.  Therefore, a review of both the intake/booking process and the nurse's initial health assessment/intake process with regard to screening for serious mental illness was recommended; at the time of this most recent site visit/May 2019, such a review had not occurred; and so, the same recommendation is repeated.

Based on the observations of the assessment process as described in the January, 2019 report, it is recommended that QCHC and Booking staff reassess the mental health components of the intake/booking process and the initial health assessment process, including what training and/or enhanced supervision staff responsible for each process might require in order to fully comply with approved policies and procedures, and in turn, the provisions of this agreement. In order to further evaluate the initial assessment process, staff should assess the cases of detainees who are first identified as in need of mental health services at some point after the booking/intake process, with an eye towards determining whether their mental health difficulties were missed during the booking/intake process or they developed mental health difficulties while detained at the facility. Given the deficiencies noted, staff should evaluate whether the policies and procedures that govern the booking process, the initial medical intake/screening process, and classification and assignment to housing units are clear with regard to the identification and management of new admissions who might be suffering from mental health difficulties.

A lack of privacy in the screening process was also identified in the January 2019 report. As reported at that time, the policy group facilitated by Karen Albert has recommended some minor renovations to the booking area that would address the lack of privacy as well as other issues and improve the efficiency of the booking process. Completion of these recommended renovations would resolve this issue.

Regarding 42 (g) (vii), visitation records reflect that inmates housed at the JDC continue to have a much greater incidence of visitation than do their counterparts at the RDC and WC.  There is still no readily apparent explanation for this disparity.  Based on a review of inmate visitation records for the month of April 2019, 90 inmates at the RDC and WC (their records are combined) were scheduled to have a video visit with family and friends.  Of that number, only 37 visits were completed, just over one per day.  The majority of the reasons listed for why visits were not completed includes the following:  "missed by caller", "missed by inmate", "cancelled", "cancelled by admin" and "refused".  With an average daily census of 475 for those two facilities, that means that it would take 12.8 months for every inmate to have one visit.  By means of comparison, every inmate at the JDC has a visit on average within 1.8 months.  While there is no set standard for allowable visits, the opportunity for inmates housed in the RDC and WC is exceptionally low.  An initial effort should be made to arrange for every inmate in the DSD to be able to visit with family and friends at least once per month; a long-term goal of once per week is both reasonable and attainable.

Regarding 42 (h) as has been previously reported, the mental health assessment of inmates suspected of being suicidal is being performed on an emergency basis, and with the weekend on call schedule, this is even happening on weekends.  The QMHPs who perform these assessments consult with the psychiatric nurse clinician over the telephone, just as they had previously done with the psychiatrist.  Although in the past, the psychiatrist did not have an actual face-to-face assessment of the inmate in a timely manner, if at all, even if the inmate was placed on suicide watch, it appears that the psychiatric nurse clinician is actually seeing prisoners who have been placed on suicide watch.  However, the decision to terminate a suicide watch may also be made by a QMHP upon telephone consultation with the psychiatric nurse clinician, as opposed to a face-to-face assessment by the nurse clinician.

A review of the suicide watch data/log for the month of April 2019 (since the psychiatric nurse clinician has been on board) would suggest that the criteria for the placement and the removal of a prisoner from suicide watch and the mechanism by which these decisions are made should be reviewed.  More specifically, during the month of April 2019, there were 21 times that a prisoner was placed on suicide watch.  However, of these 21 incidences, 2 of them involved the same prisoner, and 4 of them involved another prisoner who on two occasions was removed from suicide watch and then placed on suicide watch again within a day or two.  Although such a review might indicate that these two cases are very unusual, such a review is still indicated in order to assure that the criteria and the approach employed for the assessment of suicidality continue to meet clinical standards of practice.

Due to the lack of documentation, it remains unclear as to whether or not inmates who are suspected of being suicidal are kept under constant observation by security staff until the mental health assessment is performed.  Documentation reflects that inmates who are actually placed on

suicide watch do receive a higher level of supervision by mental health and security on at least an intermittent basis; but lapses in observation have been observed. What is expected of the nursing staff with regard to a higher level of supervision still needs to be clarified.

As was previously noted, for inmates who have undergone a mental health assessment of suicide potential and found not to be acutely suicidal, there is a 'safety plan' that is developed by the evaluating QMHP and the inmate that is signed by both, and then the QMHP follows the inmate to assure adherence to the 'safety plan'. When an inmate is released from a suicide watch, there is also an established protocol for follow-up that is well structured and closely followed.

Special mental health observation, for acutely mentally ill prisoners, is also described in the 'suicide prevention' policy, with a level of monitoring that is to be prescribed by mental health. In the implementation of this policy it remains important for mental health staff to make it clear that an inmate could be on 'suicide watch' and/or 'special mental health observation', and if an inmate is on both types of watch, each watch may have different requirements for monitoring and different end points.

Regarding 42 (i) video surveillance capabilities have not changed since the last site visit. At the RDC cameras in the corridors and housing units are recorded, so incidents can be reviewed after the fact. At the WC live action cameras allow visual coverage of the hallways and housing units, but they are not recorded, so there is no way that incidents can be reviewed after the fact. At the JDC, there are cameras that cover and record the hallways and the drive through sally port/transfer waiting area, but nothing inside the housing units. In almost every previous Monitoring Report it has been suggested that action be taken to provide full recording capability for all housing and operational areas of each facility. To date nothing has been done, nor has a plan even been submitted. Corrective action is long overdue. The County should immediately obtain the services of a qualified audio/visual provider.

In the 7th Monitoring Report it was recommended that both the IAD Investigator and the CID Investigator be granted access to the video recording system so that they can quickly obtain copies of incidents that they have to investigate. Currently, they must go through a bureaucratic and time-consuming process to obtain access. To date, nothing has been done to rectify the situation. This roadblock to conducting investigations can be easily rectified. Action should be taken promptly.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process. The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

      a. Staff vacancy rate of more than 10% of budgeted positions;

b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

c.  A major disturbance resulting in the takeover of any housing area by prisoners;

d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

As has been previously reported, the DSD still does not create a report covering each of these areas.  Data must be obtained by making specific requests for current information.  At the time of the May site visit, a total of 229 positions were filled out of 275 authorized.  The average number of filled positions over the past year and a half was still at approximately 17% for funded positions and 47% for required (433) positions.  Excessive turnover of staff continues to be a problem, particularly at the RDC where none of the housing units are staffed, leaving inmates unattended and unsupervised.

On April 19, 2019, a major riot occurred at the RDC. (Incident Report # 1900748) During a storm, all power to the facility was lost.  At that time the emergency generator kicked on and, for a while, operations continued as usual until the generator shut down several hours later.  Apparently, no one had tracked of the fuel level in the emergency generator tank and it ran out of gas.  At that time, with absolutely no lighting in the facility except for hand held flashlights, the inmates in Pod A broke out of Housing Units 1, 2 and 3.  The inmates in HU 4 refused to come out, possibly because an inmate in their unit had been stabbed eight times earlier in the day.  Over 100 inmates did their best to break into the control room by pulling open the door and by going up into the ceiling.  Fortunately, neither effort succeeded, but the officers in the control room had to physically hold the sliding door shut because the locking mechanism could be overridden manually.  When command staff and backup arrived to assist, they were unable to open the main entrance to the facility with keys because the locks require electricity to function.

27

This critical design flaw must be rectified immediately.  During the May site visit the Corrections Operations member of the monitoring team asked for a copy of the After Action Report regarding this serious incident.  None had been prepared, however, command staff immediately set to work and a comprehensive After Action Report, involving appropriate personnel, was provided to the Monitor.

As was previously reported, an inmate at the RDC was murdered in HU B3 on December 6, 2018.  The victim was arrested for a murder, then was placed in HU B3, where he was killed in retaliation for that murder.  To date there has been no Administrative Review or Mortality Review conducted.  In fact, it has been difficult to determine the status of the CID investigation of the incident since the investigator was subsequently reassigned to Patrol duties and her replacement was not given responsibility for handling the investigation.  During the May site visit a telephone conversation with the previous investigator revealed that several inmates have been charged and bound over for trial, but the investigation is ongoing.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

   a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

   b. All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

   c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

   d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

   e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must

be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

There has been no progress made with regard to the provisions of this paragraph since the last Monitoring Report.  None of the facilities meet the requirement that well-being checks must be conducted every 30 minutes in general population and every 15 minutes in segregation (confinement).  This provision is carried as Partial Compliance because well-being checks are being made and documented, where previously they had not been.  However, as described below, they are not consistent with the requirements of this paragraph and, as a result, present substantial risk of injury.

At all three facilities well-being checks are conducted sporadically, although records at the JDC are the most consistent.  Unfortunately, even there, significant discrepancies were noted during the May site visit.  The suicide watch log on midnight shift showed gaps of one and one half to two hours instead of 15 minute notations.  General population checks were routinely current at hourly intervals.

At the WC, hourly well-being checks were recorded appropriately in HU-1 and HU-2, but in HH-3 and HU-4 nothing was recorded on the day shift.  In the Segregation/Special Housing units, individual 30 minute logs were current and were located on the wall next to each cell.  This practice should be followed throughout the Jail System.

At the RDC, hourly well-being checks were generally entered in the unit logbooks, as required, on the evening and midnight shifts, but less frequently during the day shift when there is more activity.  The maintenance of such logs in the specialty ISO units was totally unsatisfactory.  In B4 ISO (Suicide Watch) an officer is supposed to be in attendance constantly.  On one day of the May site inspection, the unit was unattended.  On another the officer in the unit was unaware of his responsibilities and duties.  The door to the unit was not secured.  The officer did not know which cell the inmate was to use for toilet facilities.  The officer's 15 minute entry log had times entered for an hour and a half in advance!  The officer also had the log books for B1, B3 and B4 on his lap and was filling them out even though he was not assigned to those units.  When questioned, he said that he sometimes left the ISO unit.  This unconscionable violation of procedure is due to a number of factors including the lack of a Policies and Procedures Manual/Post Orders, incompetent supervision and a critical shortage of staff.  In HU B4 (Segregation/Confinement), where well-being checks are supposed to be conducted every 30 minutes, some entries were made on time, some were made hourly and some were not made at all over a period of several hours.  The officers assigned to this unit took it upon themselves to split up responsibility for log entries (upper and lower levels) rather than have one person accountable.  Consequently, nothing was done properly.  Lack of supervision is, once again, a

contributing factor.  While supervisors are present within the facility, it does not appear that they hold their staff accountable to reasonable standards.

In Booking, for the first time in the past three site visits, the correct 15 minute well-being log was being used to monitor inmates in the holding cells.  Unfortunately, this improvement was offset by the fact that the Corrections Operations member of the monitoring team was able to walk directly into the Master Control Center (MCC) because the entry door was propped open. This is the second time that this has occurred during site visits.  It points out several problems.

- Staff, including supervisors, do not have a grasp of, and proper concern for, basic security measures required to operate a jail.
- The facility was poorly designed.  A control room should have a safety vestibule (two interlocking doors) rather than a single door to gain entry.
- The addition of electronic equipment in the MCC generates heat, which overloads the AC system in that room.

It is imperative that staff be properly trained, supervisors perform their duties and physical plant upgrades be implemented as soon as possible.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

- a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.
- b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.
- c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."
- d. Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and

his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.  Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Non-Compliant**

Subsequent to the January site visit the HCSO promoted a well qualified candidate into the Training Division's vacant Lieutenant position.  His strong background in corrections at the local, state and national level make him ideally suited to take on the training responsibilities for DSD personnel.  The Training Director (Captain) provided a synopsis of training completed as follows.

- Mandatory Pre-Service Training—228 out of 229
- Post Order Training—None.  Post Orders have not yet been submitted and approved.
- Direct Supervision Training—Executive Training was conducted in March 2019, by the National Institute of Corrections.  A follow up Train the Trainers session is scheduled for July.
- Jail Administrator Training—Incomplete.
- In-Service Training—200 of 229 officers attended In-Service Training in 2018.

- Training for Critical Posts—Less than Lethal and Use of Force training was provided for the Corrections Emergency Response Team members.  In-service training was provided for Booking and Classification personnel.
- Special Management Unit Training—None to date with the exception of an eight hour segment on Mental Health and First Aid for Public Safety.
- Policies and Procedures (to include prisoner rights and the prevention of staff abuse and misconduct)—Training will be conducted once policies and procedures are approved and issued.

Regarding 45 (f) although all security staff undergo some mental health training on the identification and management of prisoners with mental health issues, there is no apparent effort to assess the resultant mental health knowledge base and/or skills that security staff persons have developed as a result of these trainings.  Furthermore, in the absence of security policies and procedures that would include mental health elements, it is reasonable to assume that security staff persons have not received training related to when and how security issues and mental health issues intersect with each other.

Although at present, there is no actual mental health unit (i.e., a unit where there is a program consisting of therapeutic interventions for detainees who are suffering from mental illness or intellectual disabilities, provided in a therapeutic environment), one of the facility's units has been designated as a unit where prisoners suffering from serious mental illness are placed, and several other detainees with serious mental illness are placed in 'protective custody'/segregation. Of course, the other post where security staff persons come into regular contact with prisoners who are suffering from mental illness or intellectual disabilities is the mental health section of the medical department.  There is no extra or special training offered to security staff who may be placed on any of these posts where there is an increased likelihood of having to work with mentally ill and/or intellectually disabled inmates.  Offering special or extra training to these security officers would be enormously helpful to them now and be a step towards the development of a specially trained sub-set of security officers who would be prepared to staff an actual mental health unit should such a unit be developed.

There appear to be far fewer referrals to mental health by security staff than is seen in comparable facilities.  Although it is not clear why this is the case, the possibility that security staff do not have the knowledge base and skills required to suspect that an inmate might be suffering from mental illness has been one of the possible alternative explanations.  If this is the case, it means that prisoners who are in need of mental health services who were not identified during intake and/or who have deteriorated while detained are not being identified by security staff and referred for services.  In addition, it means that security staff may not be adequately considering mental health issues when filing disciplinary charges, placing prisoners in segregation, making decisions about using force, etc.

During the previous monitoring period leading up to the January 2019 site visit, there was an event that occurred that, among other things, further raised the possibility that security staff were not sufficiently trained in mental health issues to suspect that a prisoner might be suffering from mental health difficulties and then refer the prisoner for a mental health assessment.  Now, during this most recent monitoring period leading up the May 2019 site visit there was yet another incident that, among other things, raised the same possibility again.  With regard to this most recent incident, there was a blackout in the facility, during which time there was a "riot"; numerous prisoners were distressed by this event; and although none of those distressed prisoners were referred to mental health by security staff, many of those prisoners self-referred to mental health.  Furthermore, as with the prior incident, no one from security contacted mental health for a consultation on whether or not there should be any mental health-related intervention for the population of prisoners who were exposed to the incident and/or the security staff who were exposed to the incident.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

        ii. An inspection process.

    iii.  A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

    iv.  A requirement that any corrective action ordered be taken.

    v.  Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

    vi.  To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment. Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

Without an approved Policies and Procedures Manual the HCSO is unable to comply with this provision of the Settlement Agreement. Priority must be given to the development of comprehensive policies and procedures as well as post orders.

As was noted in paragraph 38, above, the Sheriff issued Special Order 2019-054, effective March 29, 2019, that designated "…Major Mary Rushing as his designee to execute all duties and responsibilities relating to Detention Services…". Consistent with the Settlement Agreement, this authority includes the power to hire, transfer and discipline staff. Consequently, it should not be necessary for the Sheriff to issue an order prohibiting outside agencies and HCSO law enforcement officers from conducting shakedowns of housing units in the DSCD as had been recommended in the previous three Monitoring Reports. The Jail Administrator now has authority to control and manage such situations. The monitoring team will continue to track whether the Jail Administrator does indeed have the authority indicated by the Sheriff's Special Order and that there is a mutual understanding that outside agencies cannot conduct shakedowns without direction from the Jail Administrator.

The lack of policies and procedures as well as post orders severely hampers the ability of supervisors to perform their duties effectively. That end result is inconsistency in the application of rules, regulations and procedures. Supervisors are not held accountable for the actions of their subordinates. In essence, supervisors do not "supervise", they merely "sign off" on documents, activities and actions. It is imperative that they be required to make decisions and recommendations with regard to incidents and activities that occur within their respective areas of responsibility.

While daily rounds and inspections may be conducted by supervisors, they are not documented. The only entry made in the unit logs is that a supervisor entered the pod or unit. Supervisors do not document maintenance issues, possibly because they are so prevalent, particularly at the RDC. Nevertheless, maintenance issues should be documented in the unit logs.

During the September 2018, site visit reference was made to the Maintenance Report prepared by Mr. Bell, the Maintenance Director for the County.  It was anticipated that copies of this spreadsheet would be made available to each captain so that they could track the status of requested maintenance projects.  During the January site visit it was determined that no action had been taken.  The facility captains and Jail Administrator did not receive copies of the Maintenance Report.  Incredibly, during the May site visit, DSD command staff were still not in receipt of this report.  The lack of communication and cooperation between County Maintenance staff and DSD command staff is unacceptable.  It should not take eight months for two entities to exchange information on a routine basis (to their mutual benefit), even after having such a system proposed and explained by the monitoring team.  It is imperative that the HCSO and County begin to communicate appropriately to ensure that maintenance projects are accomplished on a timely basis.

The January site visit revealed that a basic operational security measure at the RDC was not being followed.  Each pod had only one set of keys, which had to be shared by the assigned officers.  It was recommended that a complete set of keys be issued to each officer, a basic standard in any jail.  Four months later (the May site visit) that simple action had not been taken.  This is another indication of the lack of coordination between the HCSO and County.  There is no reason why such a simple measure (duplication of sets of keys) could not be accomplished in that time. This is a serious safety hazard as the officer outside the control room may observe an assault occurring in the housing unit but has to run get the keys before being able to enter the unit. By then, serious injury could occur.

Incident Reports #'s 1900713 and 1900758 reflect the serious maintenance problems at the RDC that make it possible for inmates to break out of their cells, break out of their housing units and even to open a pod control room.  In the first incident an inmate was able to manually open the sliding security doors to HU's A2, A3 and A4 before backup arrived and he was restrained.  In the second incident "multiple inmates" broke out of HU A3, held the door to HU A4 shut to keep officers in that unit from assisting, then entered the pod control room and removed a contraband backpack (that had been recovered from HU A4 earlier) and returned to HU A3.

One significant sign of improvement with regard to maintenance occurred subsequent to the riot of April 19, 2019.  The County brought in CML Security from San Antonio, TX to repair security doors in Pod A.  The work that they did to convert eight control room and unit entry doors from a sliding to swinging door configuration represents the first professional security work that has been performed on the RDC in recent years.  The County would be well served to develop a long-term working relationship with a firm that is expert in the field of corrections.

At the WC the County needs to retrofit a safety vestibule for each of the four housing units.  In the interim, stopgap repairs were made on the entry doors to HU 1 and 3, but they are still not secure.  The County should have CML upgrade the doors consistent with the work that they did at the RDC.  Finally, the alarm and camera enhancements for the fire exit doors in each WC housing unit have yet to be addressed.  This work must be accomplished before the WC converts to a true Direct Supervision operation. This would also result in staff savings allowing staff to be reassigned to critically understaffed areas.

As has been pointed out in virtually every previous Monitoring Report, fire safety issues at the RDC are critical.  When the officers were pulled out of the housing units years ago, the inmates were left free to vandalize the facility.  Consequently, fire hoses and fire extinguishers were removed.  During the riot 7 years ago that destroyed Pod C, inmates broke sprinkler system pipes and flooded the jail.  As a result, the entire sprinkler system was removed.  To date, none of these fire suppression systems have been replaced.  Further, officers assigned to work in the control rooms in each pod are unable to answer the most basic questions regarding what is to be done in the event of a fire.  Some have no idea whether or not fire hoses are in place in the staff corridor or if backup hoses are located inside the control rooms.

Of particular concern is the fact that the DSD's Fire Safety Officer was transferred to another area of the HCSO without replacement.  Although he has indicated that he still conducts fire inspections and fire drills and there was documentation of fire drills at RDC for December, January and February, the Jail System has been left in a precarious position.  The Jail Administrator should designate a replacement immediately.  Further, a review of the State Fire Marshall's most recent report of the DSD facilities calls into question the value and validity of his inspections.  No correctional facility should be permitted to operate under the conditions currently found at the RDC.

On a positive note, the Sheriff's Office has created and staffed a position titled Chief Safety and Security Officer who is responsible for operating as a liaison between the County and the Sheriff's Office on maintenance matters, prioritizing DSD's maintenance needs, structuring a preventative maintenance plan, and working with command staff at each facility to develop oversight protocols for emergency procedures and custodial services. This officer is maintaining a spreadsheet of pending workorders that should assist in tracking and addressing outstanding maintenance issues.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

There has been no appreciable change with regard to this paragraph since the last site visit. The change of Assistant Jail Administrators has resulted in less reliance on the CERT team to react to incidents; however, documentation regarding shakedowns has not improved. Inmates still break out of the RDC simply so that they can pick up contraband and return it to their housing units. Incident Report #1900908, dated May 12, 2019, is a typical example. Two inmates broke a hole in the wall of their cell, exited the RDC through the roof, then returned shortly thereafter. Incident Report #1900882 documented how the door hinges to a pipe chase in the RDC HU A2 were found cut. After a search was conducted, unspecified contraband was found and removed. The names of the officers involved in the search were carefully documented and attested to by the supervisor, but there was no indication as to what contraband items were found, simply that they were "…removed and taken to Property."

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail. Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no action taken to deal with this issue since the beginning of the monitoring process. More than two years have passed since the effective date of the Settlement Agreement.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for more than a year. An officer was assigned to work on this issue, but there is no documentation of a program that meets the requirement of this paragraph. Gang activities cannot be monitored or managed at the RDC because the housing units are not staffed.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it. To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force. The policies and procedures must:

a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

d. Prohibit the use of force as punishment or retaliation;

e. Limit the level of force used so that it is commensurate with the justification for use of force; and

f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Although the Use of Force Policy has not yet been approved and adopted, it was been submitted to the DOJ and Monitor for review and comments were provided to the HCSO policy committee. Once it is adopted the HCSO should provide staff training even before the rest of the Policies and Procedures Manual is issued.

The pervasiveness of improper and excessive force practices, documented in the Seventh Monitoring Report, has been somewhat rectified since January 2019.  Most Use of Force incidents since that time have been appropriate including the use of OC foam.  Whereas, in the past it was used in a coercive manner to force inmates to follow directives, now documentation reflects the use of OC as a defensive measure to prevent an officer from being injured by an attacking inmate or to break up a fight among uncontrollable inmates.  Incident Report #1900928 is an example of the latter.  Staff at the RDC, HU B4 attempted to break up a fight between multiple inmates.  When they refused to comply with orders to cease, OC was deployed.  Subsequently, an eight-inch shank was confiscated from one of the inmates.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force

that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

    i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

    ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

    iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

    i. a sign-out process for staff members to carry any type of weapon inside the Jail,

    ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

    iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

    h.   A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

    i.    All staff members using force must immediately notify their supervisor.

    j.   All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

This section is carried as Non-Compliant because there are no policies and procedures in place. To date there are no approved policies and procedures regarding use of force in place, although a draft Use of Force Policy is under review. There have been no recorded instances of staff obtaining supervisory approval prior to using weapons or chemical restraints with the exception of the riot on April 19, 2019. In that circumstance the Assistant Jail Administrator was on site as the leader of the response team. His use of the pepper ball gun would be questionable under other circumstances, but can be understood considering the seriousness of the situation. Incident Report #1900748 provides a detailed synopsis. OC, physical restraints and electronic control devices (Taser) have not been used when a prisoner was at risk of appositional asphyxia.

There are no records of inmates being held in restraints while in the Jail System. The DSD does not use the restraint chair as a means of controlling violent inmates and there are no incident reports covering instances of an inmate being restrained to his/her bunk. As a matter of practice, inmates who have been involved in use of force incidents are taken to Medical for examination and treatment.

There were no reported planned uses of force incidents during the previous four months. However, as noted below the reporting to the monitors has been very deficient during this time period. If in fact there were no planned uses of force, then it follows that no incidents were electronically recorded and there was no need for coordination with medical staff beforehand. Although mental health staff were not consulted prior to past planned uses of force prior to this reporting period, there is no documentation directing a change of this practice. Based on a review of incident reports, it does appear that supervisors are notified when a staff member is involved in a use of force incident.

As was previously reported, the DSD does not have hand held video cameras available in any of its facilities so that planned use of force incidents can be recorded as required by the Settlement Agreement. They should be purchased and made available to DSD supervisors.

There is no evidence that medical or mental health staff are routinely asked to assess prisoners who have been subjected to level 1 use of force. It appears that a request for a medical assessment only occurs in instances where the prisoner is obviously injured.

There is no evidence that either medical or mental health staff is being consulted prior to a planned use of force on prisoners with serious medical and/or mental health issues.

## USE OF FORCE TRAINING

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**

While there are still no approved policies regarding the use of force, pre-service training for 228 of 229 officers has been completed.  Further, a total of 200 or 229 officers completed in service training.  Both training programs include a section on use of force.  As was noted in the Seventh Monitoring Report, the training provided was law enforcement based and did not specifically prohibit the use of OC and Tasers to coerce inmates to comply with verbal commands.  Those two items are defensive tools, which should not be used in a coercive manner.  The Training Director has since modified the UOF training curriculum to correct the previous deficiencies. The positive results of that change are already apparent, as validated by the most recent UOF incident reports.

The Sheriff's Office has added a person from the DSD to the Training Division. This individual appears to have detention experience and should assist in ensuring that the training is focused on practices appropriate for detention services.

53. Topics covered by use of force training must include:
   a.  Instruction on what constitutes excessive force;
   b.  De-escalation tactics;
   c.  Methods of managing prisoners with mental illness to avoid the use of force;
   d.  Defensive tactics;
   e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

The use of force training does include a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not specifically deal with managing prisoners with mental illness, nor are there any approved use of force policies and procedures in place yet.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures.

The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This paragraph cannot be addressed until policies and procedures on the use of force have been approved and published and staff have been appropriately trained.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

Use of force training cannot be updated until the policies and procedures on the use of force have been approved, published and implemented.

## USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**

There has been no change with regard to the status of this paragraph.  It cannot be addressed until appropriate use of force reporting policies and procedures have been approved, published and implemented.  Although reports generated through the current JMS system do not provide the level of detail that the Settlement Agreement calls for, the HCSO Information Technology (IT) Unit is in the process of making significant changes that will allow supervisors, commanders and the monitoring team to track compliance.  Hopefully, this will occur in short order.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

It is not possible for the monitoring team to know when a report was written because the reports include only the date/time of the incident, not when the report was generated.  The same shortcoming applies to the date/time of supervisory review.  The inadequacies of the JMS system are being addressed as noted in paragraph 56 (above).  Incident Report #1900673, dated April 8, 2019, is an example of a report that reflects the inadequacies of the current system.  An officer observed several inmates in Pod A, HU 4 at the RDC get into a fight.  He called for assistance.  Fully a half hour later, after sufficient backup officers arrived, they entered the unit and restrained the inmates.  There was no explanation regarding the use of force.  The reporting officer noted that he left his post in the control room (leaving it unattended) in order to initially respond to the incident.  The supervisor who signed off on the report made no comments or recommendations.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events.
At minimum, use of force reports must document the following information:

    a.  A unique tracking number for each use of force;

    b.  The names of all staff members, prisoner(s), and other participants or witnesses;

    c.  Housing classification and location;

    d.  Date and time;

    e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.  A description of the staff member's attempts to de-escalate the situation without use of force;

    h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.  A description of any observed injuries to staff or prisoners;

    j.  Whether medical care was required or provided to staff or prisoners;

    k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.   A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

There has been no change with regard to use of force reports since the last site visit although changes to the reporting system are being programed by IT.  The JMS incident report/use of force format does not directly follow the sub-sections of this paragraph; therefore, incident reports do not reflect all of the information that is specified.  While there is a unique tracking number, and the names of staff members, and sometimes those of involved inmates, are included, witnesses are seldom listed.  A cell location is almost always noted (although the facility is not), but not its classification.  Generally, the narrative includes the steps taken by an officer to manage the situation prior to the use of force, what methods were used to apply force and whether or not medical attention was required and provided.  However, many reports do not provide all of the specified information.  A change in procedure has resulted in an officer's signature being placed on a copy of the report, but there is no indication of approval, disapproval or recommended action.

Incident report 1900673, dated April 8, 2019, reflects many of the problems that are found in DSD use of force reports.  Officer XYZ was working in the control room in Pod A.  The facility was not identified.  The officer indicated that he heard several inmates arguing in HU A4, so he left the control room and went to the "cage" (safety vestibule leading into the unit) and observed a fight break out between two inmates.  By doing so he left the control room unattended.  He called for backup, and when other officers arrived, they entered the unit.  By that time the fight had escalated and involved multiple inmates, so the officers withdrew and waited for more backup.  When additional officers arrived, they entered the unit again and "restrained" one inmate who was "escorted to Medical."  Supervisory staff up to the rank of Major were notified.  The report was signed by the originating officer, as well as by a Sergeant.  Although force was used when an inmate was "restrained" there was no mention of UOF, there was no indication as to what medical treatment was necessary or provided, none of the other officers involved wrote supplements and there were no interviews of inmate witnesses.  The Sergeant who signed the report made no recommendation or finding, he merely signed the document.

**USE OF FORCE SUPERVISOR REVIEWS**

59.   The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

a.   A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

b.   A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

c.   Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

d.   If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.   Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.   All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.   A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

There has been no change in the status of this paragraph since the Seventh Monitoring Report. Compliance is not possible until the Policies and Procedures Manual is approved and published. Based on the current JMS system there is no way to determine whether or not supervisors review use of force reports by the end of their watch; nor is it possible to determine whether or not they comply with the other sub-sections of this paragraph.  Supervisors do not indicate whether or not they approve or disapprove of the actions taken by officers; they also do not make recommendations for corrective action.  Use of force reports are forwarded to the CID Investigator for follow up.  Duplicate copies are provided to the IAD Investigator.  Incident Report #1900673, referenced in paragraph 58 (above), is indicative of the lack of supervisory follow up in that there is no indication of supervisory corrective action or recommendation.

60.   After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.   Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.   Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

    c.    Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

    d.    Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

    e.    Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph for the past four site visits.  The specified actions are not routinely followed by supervisors.  A review of use of force reports revealed that photographs are seldom taken.  Waivers related to the refusal to be photographed are not included.  Witness statements are infrequent at best, and although use of force incidents may be recorded at the RDC because it has a digital recording system, that is not possible at the JDC and the WC since they are not similarly equipped.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of this paragraph since the last Monitoring Report.  It is not possible to determine whether or not supervisors are performing their required duties because the monitoring team does not have access to the supplemental information that may be in the JMS reports.  Currently, the limited documentation available through Google Docs, the repository for documents being provided to the monitoring team does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.  Fortunately, the HCSO IT Director is in the process of modifying the system so that appropriate information will (hopefully) be available in the near future.

62. Reviewing supervisors must document the following:

    a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

    b.    Witness statements;

c.    Review date and time;

d.    The findings, recommendations, and results of the supervisor's review;

e.    Corrective actions taken;

f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

    i.    The nature and extent of injuries, or lack thereof;

    ii.    The date and time when medical care was requested and actually provided;

    iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Until it is possible to access the supervisory review portion of use of force reports, there is no way to determine whether or not supervisors are taking required actions and appropriately documenting them. Currently, the supervisory portion of JMS generated reports is limited to a check box with no ability to indicate recommended action or discrepancies noted regarding the items for which this paragraph requires review.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The Policies and Procedures Manual must be approved and issued to all personnel before the level of compliance can be determined (see paragraphs 56 to 62 above). The current incident reports should provide sufficient information for supervisors to make an appropriate review, but the reports are routinely deficient. The pdf reports provided to the monitoring team do not include everything that is in the JMS system. The monitoring team's inability to see everything that is entered into the automated reporting system further hampers its ability to analyze the

shortcomings. IT is working on a new generated report that should address some or all of the deficiencies in the form.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:
   a.      Tracking number for each incident;
   b.      The names of all staff members, prisoner, and other participants or witnesses;
   c.      Housing classification and location;
   d.      Date and time;
   e.      Type of incident;
   f.      Injuries to staff or prisoner;
   g.      Medical care;
   h.      All staff involved or present during the incident and their respective roles;
   i.      Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
   j.      External reviews and results;
   k.      Corrective action taken; and
   l.      Warden and Administrator review and final administrative actions.

**Partial Compliance**
There has been no change with regard to the status of this paragraph for the last four site visits. Compliance is dependent up the approval and publication of the Policies and Procedures Manual. Incident report documentation currently provides for some of the information specified in this paragraph.  Reports routinely have a tracking number and list all staff involved.  Inmate witnesses are almost never noted nor are witness statements.  The nature of inmate injuries is noted sporadically.  More photographs accompany the reports than in the past, but almost all reports do not specify the facility in which the incident occurred.  That can only be determined by having knowledge of the housing unit configurations of each jail and thereby recognizing the facility by how the unit, pod or cell is identified.

IR #1900972 is a report that reflects some of the shortcomings mentioned above.  It covers a breach of security that occurred at the RDC (facility not identified) in HU A4, cell 5525.  While conducting a head count an officer entered a cell on the mezzanine level and found red jumpsuit uniforms stuffed into a hole in the wall.  Supervisors demanded that inmates turn in the tool that was used to pound a hole in the cell wall.  It turned out to be a metal bar (no picture).  A work order, which accompanied the incident report, described how the breach was secured with metal plates.  Not mentioned in the incident report, but noted in the work order was the fact that the lock was missing from the back exit door to the housing unit.  The originating officer and a Sergeant signed the incident report.  The latter made no notations regarding discrepancies or recommendations.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

    a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

    b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

    c.    Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit.  Since the start of the monitoring process over two and a half years ago, a total of two incident reports have been written regarding lost money or property.  None have been written with regard to inmate overstays or improper releases although the Court Liaison has written at least two reports, but not on the standard incident report form, regarding releasing errors that he investigated.  While there is no specific policy in place which requires that a report be written in such instances, both this Settlement Agreement and accepted correctional practice mandate documentation.  Based on a review of inmate records, many instances of improper release have been noted by the Monitor.  It would be appropriate for the Jail Administrator to issue a special order to address this matter until such time as an approved policy is published.

Based on the current status of the JMS system, it is not possible to determine whether or not incident reports are written in a timely fashion (by end of shift or within 12 hours of the incident) and whether or not supervisors do likewise as required (within 24 hours of receipt of an incident report).  The only thing that can be determined is the reported time of the incident as it appears in the written document.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

    a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

    b.    Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

    c.    Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to

allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.  Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

There has been no change in the status of this paragraph.  There are no approved policies in place that specify what supervisors and shift commanders are to do.  The monitoring team cannot determine whether or not supervisors even review incident reports (other than to sign on a printed copy) because of the previously mentioned shortcomings of the JMS system.  There is no documentation that reflects approval, disapproval or recommended actions.

**SEXUAL MISCONDUCT**

67.  To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

a.  Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.  Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.  Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.  Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.  Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.  A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.  A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and
        sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual
        abuse and sexual harassment allegations.


**Partial Compliance**

There is a draft PREA policy that has been circulated for review and returned to the policy
group. This policy has not yet been finalized or adopted.

PREA incidents reported to the PREA officer usually result in relocation of the involved
inmates. There has not been a practice of disciplinary action taken against perpetrators. One case
was reportedly referred to the Criminal Investigator. However, that was not documented in the
file and there was no documentation of any criminal investigation or referral for prosecution.

The PREA officer provides a 4-hour training as part of the new officer training. There continue
to be incident reports that appear to raise PREA issues that are not referred by the unit officer to
the PREA officer. There was one such incident in February and another in March. The in-service
that at the time of the last visit was planned for May has not taken place. The PREA Officer
reported that she is working with the Training Officer to schedule the training.

Although the classification process includes a screening for PREA issues, the housing decisions
have not in the past appeared to reflect attention to those issues. This has been reported in past
monitoring reports. The monitoring team did not observe any incidents of this in this monitoring
period but will continue to monitor this issue.

There are multiple internal ways to report sexual abuse and harassment including filing a
grievance and reporting through the kiosk system. The PREA officer now has a cell phone to
which kiosk calls are forwarded. However, the PREA number on the kiosk system had to be
changed from 999 to 888. When this happened, inmates were charged a fee for reporting a PREA
violation. The PREA Officer reported that this was being remedied. There is not a system for
reporting to an outside entity other than through paid phone calls and there is no guidance on
appropriate entities to call. In order to be effective, inmates must be fully informed of what
constitutes sexual abuse and harassment and how to report it. As previously reported, all of the
units visited had PREA posters posted. The posters have reporting instructions. The Inmate
Handbook does not have current information on the PREA process but a separate form is now
provided at booking that explains the process. The PREA officer no longer does orientation or
education of inmates. She does not feel safe going into the housing units at RDC. They are
considering putting the PREA video on the kiosk system but have not completed an evaluation of

that. The PREA Officer did not know if any orientation or education was taking place at JDC or the WC.

QCHC now has a social worker on staff who provides counseling and can provide services to victims of sexual assault or harassment. It was noted in prior monitoring reports that there needed to be better information exchange and coordination between the PREA coordinator and medical/mental health.  For the most part, this has been addressed.  During prior monitoring periods there were inmates who were victims of sexual assault and/or sexual harassment who received ongoing mental health care, and the mental health care they received was appropriate and was apparently quite helpful.  There were no new such cases during this most recent monitoring period.

It is reported that all cross-gender searches have been banned. There is no policy and procedure on this and no documentation of this was provided. The draft policy on searches allowed for female pat searches of males in certain circumstances.

The PREA Officer keeps a file on each referral, has a report form, and keeps numbered reports. She has completed an on-line training on investigating PREA incidents. Incidents involving alleged staff misconduct or criminal activity are referred to other investigators who have not received PREA training. The reports of these other investigators are not in the PREA Officer's file and her file does not reflect the results of the investigation. The PREA Officer does not get the medical records when there has been a referral to Medical. The PREA Officer reported that on one case Medical reported that something could have happened but she was not sure which case that was. There is no regular supervisory oversight of the PREA officer's work or reports.

There are still a number of areas of non-compliance and some of the stated practices do not appear to be fully operationalized. Areas of concern include lack of training for all officers on PREA, lack of ongoing orientation to inmates at booking or comprehensive education following, lack of required information in the Inmate Handbook, unresolved mechanisms for reporting, no volunteer or contractor training, and investigation officers do not have PREA training. The PREA Officer and the IAD and CID investigators should all receive training on handling sexual abuse and sexual harassment allegations.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

      a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious

injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

i. Any prisoner exhibited a serious injury;

ii. Any staff member requested transport of the prisoner to the hospital;

iii. Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

iv. Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b. Per policy, investigations shall:

i. Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

ii. Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

iii. Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c. Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d. Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e. Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation. The criteria will require an investigation if:

i. Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

ii. Any staff member requested transport of the prisoner to the hospital;

iii. Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

iv. Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f. Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

i. a brief summary of all completed investigations, by type and date;

53

      ii.     a listing of investigations referred for administrative investigation;

      iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

      iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

      v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

    g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

During the January 2019, site visit, the Corrections Operations member of the monitoring team arranged a joint meeting with the Internal Affairs Detective (IAD) and the Criminal Investigations Detective (CID) Investigators so that they could both adopt investigative and record keeping practices consistent with this paragraph.  Unfortunately, subsequent to that meeting, the CID Investigator was transferred to Patrol duties, but was not relieved of her duties to complete pending Jail investigations, including the inmate death case in the RDC where a gang related murder occurred.  Eventually, a new CID Investigator was appointed.  He has a solid background in both law enforcement and corrections that make him well qualified to hold the position.  He began his career in 2010, while working for the Mississippi Department of Corrections.  Subsequently he worked for the Jackson, MS Police Department, the HCSO (where he was promoted to Sergeant) and the Federal Bureau of Prisons in Yazoo City, MS.  He returned to the HCSO in 2019.  It is anticipated that he will adopt the same spreadsheet format used by the IAD Investigator so that there can be consistency in reporting.

During the January 2019, site visit the monitoring team was informed that the CID Investigator would be relocated from downtown Jackson to the RDC, where the IAD Investigator is currently located; however, that did not occur.  Now that a new CID Investigator has been designated, he should be co-located with the IAD Investigator since the vast majority of their work is generated by incidents that occur in the RDC.

It goes without saying that the lack of approved policies and procedures regarding investigations makes compliance with this section impossible.  As has been stated throughout this report, it is imperative that the HCSO/DSD put forth the effort necessary to prepare, have approved, and publish the Policies and Procedures Manual covering all aspects of DSD operations.

**GRIEVANCE AND PRISONER INFORMATION SYSTEMS**

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There is no change in the condition of the grievance system. The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of detention officers. However, the system is still not working as it should. There are still problems with the system being down in some units at some times. At those times, the use of the paper system requires intervention by a detention officer.

Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer or other inmates observing the grievance being filed. It was reported that inmates have observed another's PIN number and then use it to purchase commissary on the other inmate's account.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**
Policies and procedures have yet to be finalized. A draft policy has now been written and is being circulated for comment. The policy would standardize the grievance system. At present, the kiosk system works the same across facilities but a unified process is just now being developed with the development of the policy. Even with the policy in place, there will need to be training on how to properly respond to grievances in order to achieve consistency. There has been significant progress in developing an actual grievance process including identifying the duties of the system wide grievance officer, clarifying the roles of the system wide grievance officer and the facility grievance officers, developing a tracking system, creating a tiered appeal process, and addressing the process for requests vs. grievances.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. The Grievance Officer reported at the time of this site visit that she had a report showing the grievances that had not had a response and she cleared all 1200 of them. However, during this site visit, in order to check whether there were outstanding grievances that had fallen off the dashboard, a report was run for grievances assigned but not answered from May 10, 2018 to May 1, 2019. The report showed 197 that had not been responded to after 7 days. It is not clear why these would not have been identified in the report the Grievance Officer was working from. Reports run specifically to the WC showed 150 assigned but not answered after 7 days and at JDC, 17 unanswered after 7 days. It appeared that the majority of unanswered grievances were medical grievances. It will be important to provide additional training to medical staff on the kiosk system. However, the tracking system recently developed should ensure that grievances receive a timely response going forward. And the number of unanswered grievances was significantly less than previously.  Even with the new tracking system, running a report from the system should be incorporated in the process to ensure that all grievances get a response.

Although the new system should ensure responses, there needs to be some training on what constitutes an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. Many of the responses simply say "denied" with no explanation. Some responses promise some future action but there is no process to ensure that promised actions are actually taken. It is still not possible to run a useful report from the grievance system. A system needs to be developed to track the information to provide the report required by paragraph 109 below.

Although QCHC does receive medical grievances, the mental health team does not receive grievances. It remains unclear as to whether or not this is the case because all grievances that should be directed towards them, in whole or in part, actually get to them.  As has been noted in prior monitoring reports, the only way to answer this question is to review all grievances, with an eye towards whether or not any of them should have been referred to mental health, in whole or in part.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds. There does not appear to be any language choices in the system or voice recognition features.

The mental health expert on the monitoring team continues to be concerned about whether or not there are inmates who are unable to report grievances via the computer tablet-like system due to their mental illness, and/or intellectual disability, especially those who are also housed in segregation. This concern is indicated when the expert is accompanying mental health on weekly segregation rounds, and inmates report their grievances in that setting. It has been previously recommended that a review of this issue be undertaken by a team of security staff and mental health staff; but such a review has not been done; and so this monitor makes the same recommendations again.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures. The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights. The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation. To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

During the September 2108, site visit, the officer supervising inmates in the Booking holding cells was found to be using an hourly well-being log form (the standard in Booking is 15 minutes). In January 2019, the officer assigned to the same post was observed using a form that called for 30 minute well-being checks. During the May 2019, site visit the correct form was finally in place. No inmates were found to be held in Booking holding cells beyond the eight hour limit. In fact, most are transferred through Booking in far less time than that. Considering

the fact that the DSD processes only one and a half (1.5) inmates through Booking each hour on average, compliance with the eight hour standard should be easily maintained.

At present, there isn't any "appropriate long term housing" for prisoners who are suffering from serious physical health difficulties, mental illness and/or intellectual disabilities.  In the absence of a special mental health unit, it is extremely difficult, if not impossible, for prisoners who suffer from serious mental illness to receive the enhanced program of mental health services they require. Then in addition, due to the absence of "appropriate long term housing", those prisoners who need to be protected from themselves or others as a result of a mental illness or intellectual disability end up being housed in segregation as a very unacceptable alternative.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The monthly summary reports submitted by each facility include a listing of inmates who have been placed in segregation.  The format utilized by the JDC does more than simply list inmates; rather, it reflects when they went into segregation and when they were removed, as required by this paragraph.  In the Sixth Monitoring Report it was suggested that the RDC and WC should adopt the same (in and out) format.  While nothing has yet been done, the Monitor met with the facility commanders during the May 2019, site visit in an effort to streamline the monthly reporting process.  The newly created electronic summary report achieves much of the monthly reporting that was being gathered manually. This should cut down on needless entries regarding each facility while making it easier for the monitoring team to access required information.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

QMHPs continue to conduct weekly rounds in segregation, and maintain records indicating that the rounds were performed and the findings.  Based upon a review of these records, followed by a meeting with the QMHPs who perform these weekly rounds, it is clear that the QMHPs have identified a sub-set of prisoners who have deteriorated during their placement in segregation.  It is also clear that although they have attempted to report such to security staff, security staff have been unresponsive at best, and in some instances, the response from security staff has been things like 'they are in prison' or 'they have to pay for what they did.

Obviously, although mental health staff persons are conducting weekly rounds in segregation, at present, there is still no mechanism for the incorporation of the mental health information obtained during the mental health rounds in segregation into the decisions made by security about inmates who are placed in segregation.  More specifically, as required by Paragraph 77(i) there is still no security policy and procedure governing monthly, interdisciplinary segregation rounds, where security and mental health review and discuss each inmate being held in segregation for more than 30 days, with a focus on whether or not segregation is causing a deterioration in the inmate's mental health, whether placement in segregation should be continued or an alternative placement is indicated, and whether there is a need for further enhanced mental health services and/or other supportive services.  Therefore, there still are no such monthly, interdisciplinary segregation rounds.  In addition, there is still no security policy and procedure governing the mental health input that security could obtain on a weekly basis, following the weekly mental health rounds in segregation.  When an inmate's mental health is deteriorating while being held in segregation, the development of a mechanism for obtaining this weekly available information would allow for an even more timely response by security, without having to wait for the monthly segregation review meeting.  Of course, in addition, the development of these security policies and procedures would make it clear that a prisoner's mental health status while being held in segregation is something that security must consider when making decisions to continue placement in segregation.

As has been previously reported, the finding that so many of the prisoners placed in segregation experience a deterioration in their mental health status while in segregation appears to be due to multiple factors.  These include: (1) In the absence of the yet to be completed security policies and procedures governing the disciplinary review process, there is no input from mental health with regard to the disciplinary process which sends inmates to segregation, and therefore prisoners who are already mentally ill inmates are placed in segregation.  (2) The conditions of confinement in most of the segregation cells are unacceptable, especially at Raymond, in that many of the cells do not even have lights and there are rodents.  (3)  The conditions of confinement in most of the segregation cells makes maintaining one's mental health while in segregation all the more difficult, it further impairs the mental health of already mentally ill individuals, and it makes the mental health rounds in segregation much more complicated, given that it is so difficult to see the inmate and examine the cell.  (4)  As noted above, the fact that so many inmates in segregation use the weekly mental health rounds as their opportunity to express grievances raises concern about their access to the facility's mechanisms for filing grievances and the extent to which they view themselves as suffering without recourse.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

        a.   All decisions to place a prisoner with serious mental illness in segregation
    must include the input of a Qualified Mental Health Professional who has

conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.   If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.   The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.   Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

There is no indication that there is any formal input from mental health into decisions made to place a prisoner in segregation, whether that decision is being made by security staff as a result of a disciplinary action, or being made during the classification process, or being made during the assignment of prisoners to a housing unit.  Addressing this issue awaits the development of new security policies and procedures governing disciplinary review, classification and housing assignments.

It still does not appear that there is a presumption that segregation is contraindicated for prisoners with serious mental illness.  The percentage of prisoners in segregation who are also on the mental health caseload continues to be above 50%.  As has previously been the case, the overwhelming majority of these mentally ill prisoners being housed in segregation fall into one of two categories.  (1) Prisoners on the mental health case load who are being held in segregation for administrative reasons or for protective custody; most of them could almost certainly be more appropriately and safely housed on a mental health unit if there was a mental health unit; and if there was such a mental health unit, these prisoners would also have access to the more enhanced type of treatment program that they require, which would in turn, improve their ability to

function in the facility.  (2) Prisoners on the mental health case load who are being held in segregation as discipline; there was no mental health involvement in the disciplinary review process that placed those prisoners in segregation; and there is no segregation review process that includes mental health input that might be used to determine whether or not disciplinary segregation continues to be appropriate for those inmates.

Regarding 77(c) there is no evidence that prisoners on the mental health caseload are being screened by a QMHP within 24 hours of being placed on segregation.  Furthermore, it does not appear that security staff even knows all of the prisoners on the mental health case load and therefore which prisoners would be subject to this provision.

Regarding 77(d) at present, there are no mental health evaluations during the disciplinary review process that would form the basis for an opinion by a QMHP that placement in segregation is or is not contraindicated.  Although there are weekly mental health rounds for inmates being held in segregation, at present, there is no mechanism whereby mental health might have input into a decision about whether or not a mentally ill inmate should remain in segregation.  Therefore, the security policies and procedures that are being developed which will govern the disciplinary review process, the segregation review process, and also the classification and housing assignment process must address this issue.  See sections 37, 76 and 77 for a more detailed discussion of these issues.

In addition, in order to fully address this provision, the above noted policies and procedures that are being developed must include a clear description of the 'extraordinary and exceptional circumstances' that trump the mental health concerns.  In so doing, a distinction should be made between current circumstances (for example, the lack of alternative, appropriate housing for seriously mentally ill prisoners), and the circumstances that will continue to exist after other provisions of this agreement have been met.

There is no evidence that there is any finding of extraordinary and exceptional circumstances justifying continued segregation let alone any documentation in writing of such a finding as required by paragraph 77(e).

Regarding 77(f) prisoners with serious mental illness who are on medication and being held in segregation do have at least one daily visit with a nurse, who is a QMP, during medication pass. As has been previously noted, since prisoners in segregation do not see a QMHP on a daily basis, it should be made clear in policy and procedures to what extent the level of care provided by the nurses during medication pass should include some type of assessment of the prisoner's mental status and/or other "heightened level of care".  However, to date, there has been no revised medical policy and procedure that would clarify this.

With regard to the nurses' medication pass, there continues to be a lack of appropriate/adequate involvement of security staff as they accompany the nurses on medication pass.  As noted in section 37 of this report, nursing staff is now also reporting that security staff persons are not consistently assuring their safety during medication pass.  Therefore, a review of the roles and responsibilities of security staff persons as they accompany nurses on medication pass is recommended again; a review of the security policies and procedures that govern those roles and responsibilities; and an assessment of whether or not any additional training on those roles and responsibilities might be indicated.

Prisoners in segregation who are on the mental health case load are receiving mental health services, including face-to-face therapeutic sessions with a QMHP and visits with the psychiatric nurse clinician.  However, given the number of prisoners on the mental health caseload, the current shortage of mental health staff, and the full range of duties assumed by existing mental health staff, these sessions are not consistently occurring on a weekly basis.  Due to these same issues and the shortage of security staff, these sessions are often not out-of-cell sessions.  Once mental health staffing issues have been addressed, there must be an increased effort to comply with this provision, keeping in the mind the fact that as noted in Section 76, weekly mental health rounds for prisoners in segregation must not be a substitute for these therapeutic sessions. It has yet to be determined whether or not there is sufficient security staff to implement this provision of the agreement once the shortage in mental health staff has been addressed.

Although the mental health coordinator is performing weekly mental health rounds, this provision is not being met.  In order to address this provision, the mental health coordinator, in conjunction with a physician and the psychiatrist, must also perform a weekly review of the status of the prisoners in segregation who are also on, or should be added to the mental health case load.  At present, there is clearly not enough psychiatric time or other physician time to address this provision; although there is the psychiatric nurse clinician and the medical nurse clinician who could perform this task, their respective physician collaborators are not on site enough to perform this task; and so this provision should be reviewed to determine whether or not the involvement of the respective nurse clinicians in this effort would meet this provision.

Essentially all prisoners with serious mental illness housed in long-term segregation have had an updated mental health evaluation and have an updated treatment plan (i.e., all prisoners with the exception of those who have repeatedly refused to participate in a mental health evaluation). Given that at present, there is no 'appropriate housing' for prisoners with serious mental illness who remain acutely ill, or are vulnerable to being harmed by others, or are at risk of harming others, their treatment plans do not include recommendations for such 'appropriate housing'. See section 74 with regard to the need for the development of a special mental health unit.  See section 77-b with regard to the finding that the mentally ill prisoners housed in long-term segregation could be more safely and better maintained in 'appropriate housing' (i.e., a mental health unit) if such housing existed.  However, such prisoners are receiving follow-up care as

prescribed in their treatment plans, and they are likely to be appropriate for some of the planned additional mental health services once those services are available.  See section 42-g-iv with regard to the planned expansion of the mental health services provided.

In addition to the fact that the development of a mental health unit (i.e., appropriate, more integrated and therapeutic housing for mentally ill prisoners) will be required to meet this provision of the agreement, there must also be mechanisms whereby mental health findings can impact on decisions to transfer a prisoner from segregation to such a mental health unit.  As noted in multiple other sections of this report, such mechanisms should be described in the security policies and procedures that are being developed which govern the disciplinary review process, the segregation review process, and classification and the assignment of housing.

Regarding subsection h, there are additional questions/issues.  (1)  There is the question of to what extent non-mental health staff persons (i.e., security staff and medical staff) are assessing whether or not prisoners held in segregation are decompensating or otherwise developing signs or symptoms of serious mental illness, where such signs and symptoms had not previously been identified.  (2) Then there is also the question of whether or not non-mental health staff persons are immediately referring any such identified mentally ill prisoners to mental health.  These are both important questions/issues that need to be further explored, especially given that security staff and medical staff (at least the nurses who administer medication) see the prisoners in segregation on a daily basis.

Regarding subsection i:  As stated in Paragraph 76 above, there is no interdisciplinary team that attempts to balance security concerns and medical/mental health concerns when decisions are being made about the housing of prisoners with serious mental illness.  Although mental health treatment plans have been developed by mental health, those treatment plans do not include recommendations for housing, due to the fact that there is no special housing that is specifically designed to meet the needs of prisoners who are suffering from mental illness and/or intellectual disabilities.  Therefore, in order to address this provision of the agreement, more appropriate housing options for prisoners with mental illness and/or intellectual disabilities has to be developed, and such an interdisciplinary team has to be established.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  <u>Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.</u>**  The United States will support

the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Substantial Compliance**

Consistent with the practice begun in September 2017, Juveniles Charged as Adults (JCAs) continue to be placed at Henley Young after being booked at the Raymond facility. When they turn 18, they are now transferred to the Jackson Detention Center (JDC) pending further court action (vs. returning to the Raymond facility). As of this site visit there were fourteen youthful prisoners (JCAs) at Henley Young and no juvenile remained at the Raymond Detention Center (RDC), the last youthful prisoner turning 18 in mid-February. It is understood by the monitoring team that no more youth under age 18 would be housed at any of the adult facilities, including Juveniles Convicted as Adults (either waiting to be placed at the Mississippi Department of Corrections [MDOC] or previously convicted and arrested for a new offense or probation violation). However, this has not been confirmed in a written policy. Use of the acronym JCA is used to refer to both pre-conviction and post-conviction youth, although at the time of this visit only pre-conviction youth were in placement.

The only circumstances in which a juvenile may be at an adult facility should be: (1) following arrest by law enforcement, youth may go through the booking process at RDC/JDC and be promptly transferred to Henley Young; and (2) circumstances in which a juvenile may need to return briefly to RDC or JDC for purposes of release or pending transfer to the Mississippi Department of Corrections. Ideally, arrangements should be made so that youth can be released/transferred directly from Henley Young without having to go back through RDC, but absent that happening any time spent at RDC should be brief (e.g. one hour or less) and the juvenile should be kept separate from adults and under constant supervision/observation.

Compliance with this requirement will be monitored in the future to ensure sustained compliance.

As of this visit (date used is May 8):
- Of the fourteen JCAs at Henley Young, twelve were boys and two girls;
- The age range for youth was 14 through 17, specifically 14 (3), 15 (5), 16 (5), and 17 (1);
- The length of stay (LOS) ranged from a low of 7 days to a high of 610 days for one of the youth that was in the original group placed at Henley Young in September 2017. That particular youth recently turned 15. Six youth have been in placement for 219 days or more; Four youth have been in placement less than 60 days;
- Of the fourteen juveniles, only five had been indicted for the incident that resulted in placement;

- During the interim between the last site visit and this May visit, eight new JCA youth were admitted, three of whom were also released during this time frame; that brings the total number of JCA placed at Henley Young since initiation of the policy in September 2017 to 56 (over 21 months, an average of just less than 3/month);

- The overall population of youth at Henley Young has remained relatively stable during recent months, both staying below the cap of 32 required in the Henley Young/SPLC agreement and more importantly reflecting a generally lower number of JCA youth than prior periods of time. This helps alleviate the prior concern that delays in case processing for JCA youth will result in a gradual increase in that population.  However, it does not alleviate concerns that for those individual youth, the court system delays are inappropriate and need to be addressed.  Refer to the chart below for the average daily population for the period January through April 2019;



There are two particular comments **related to length of stay** (LOS) relevant at this point in the discussion:

1. The length of stay for JCAs at Henley Young has been an expressed concern in all prior monitoring reports.  While true for adult inmates in the other Hinds County facilities as well, it is particularly disconcerting that these delays are occurring for the JCA youth during their critical adolescent development years.  Not only has one youth been in placement for over 600 days, but four youth have been in placement for essentially a year or more.  Even under the best of circumstances, to have a youth that age confined in what is a "holding" facility serves neither the best interests of the youth or the community.  Anecdotally, staff related a case of a JCA youth that had been in placement for over 300 days only to then have the charges dismissed;

2.  Given this concern, the <u>county and court are to be commended</u> for taking steps to develop a new process, to be implemented beginning on June 1, in which newly-elected Judge McDaniels will hold a status hearing within 90 days of placement.  At that time action can be taken to expedite the case via ensuring an indictment is filed, the case is referred back to the Youth Court, and/or alterations can be made in bail amounts/conditions.  This change will hopefully have an impact on expediting these cases, at least during the early stages of proceedings. The impact of this change can be assessed at the time of the next site visit (September 2019) but more likely will be evident with more cases being reviewed by the end of 2019.

Assuming the length of stay for JCAs can be reduced and the number of youth being admitted remains at a relatively constant level, the number of JCAs in placement at Henley Young could decline. While this is important for the continued stability and functioning of Henley Young it is even more important for the youth to be held no longer than necessary.

There have been no changes to the physical plant.  There remains no evidence of a commitment to add appropriate program/classroom space or improve the housing units as has been repeatedly recommended.  Adding portable classrooms that can be used for education and other programming and improving the quality of the housing units will have a beneficial impact on both youth and staff.  At this point it is perhaps best to simply say that "no decision" in reality reflects a decision to **not** make the recommended improvements.  However, it is still recommended that: (1) additional classroom/program space is provided/developed to help meet requirements for education and mental health programming, and (2) improvements be made to the housing units to "normalize" the environment to help reduce the emotional arousal experienced by youth as a result of the environment.

The information provided in response to the additional requirements below will not refer to operations at RDC unless specifically noted.

For any youthful prisoners in custody, the County must:

78.      Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

As noted in the prior reports, youthful offenders are booked at RDC and then taken to Henley Young.  A routine part of the admission process at Henley Young is administration of the MAYSI-II, an appropriate mental health screening tool for use with adolescents. A Youth Support Specialist (referred to as Case Manager in prior reports) is assigned to each youth and is

in daily contact with their assigned youth, providing information and support to maintain appropriate family contact(s), interact with court staff, help link youth with external resources, and intervene to prevent behavioral problems.  One of the Youth Support Specialist positions that had been vacant at the time of the January visit has been filled, a positive step forward in ensuring adequate coverage for the programming on a seven-day/week basis.

The two mental health clinicians follow up the initial assessment by conducting a more complete mental health assessment that covers a wide range of potential issues and utilizing a strength-based assessment to help youth identify skills they already have that they can build on to be more successful in the future.  Along with interviews, these assessments help the clinicians identify some individual areas/skills that youth can work on while in placement and form a foundation for a basic case plan.  Mental health records include regular documentation of contact between the clinicians and youth and how they are doing relative to the goals they have developed as part of this case plan.

The opportunity to complete more comprehensive psychological assessments for youth that would include additional psychological testing and gathering prior treatment information remains limited by the limited time available to the psychologist, rendering it unlikely substantial compliance with this requirement can be achieved.

Protocols related to suicide concerns are in place and are reflected in documentation in Incident Reports, intake assessment(s), monitoring of youth exhibiting suicide/self-harm concerns, and documentation of review by mental health staff and "release" from suicide watch status.  Henley Young has implemented a strong direct supervision protocol, including one-on-one observation for youth on suicide watch status, and there is documentation of required observation checks, albeit some of the documentation raises questions about its accuracy (see section related to observations conducted during disciplinary isolation periods).

This visit affirmed that the psychologist, Dr. Payne, has had a profoundly positive impact on mental health and program services since her addition to the team in May 2018. However, despite by all accounts working more than her .5 FTE allotment, it is simply not possible to accomplish the variety of tasks envisioned for the psychologist role at Henley Young.  Ideally, the psychologist role would include performing psychological assessments of each youth, supervising/coaching other members of the mental health team, coordinating treatment teams and plans, providing direction and support for much of the treatment programming, interacting with and supporting family engagement, and teaming with other staff in responding to crisis situations.  This leadership role, both as a psychologist and serving essentially as the facility treatment director, cannot be accomplished on a .5 FTE basis. Therefore, while there has been some improvement in the overall delivery of program and treatment services, the continuity and coordination of these supports falls short of the goals of the agreement.

It is of concern that the county and Dr. Payne have been unable to come to an agreement to increase her time to 1.0 FTE, and it appears that Dr. Payne will be leaving her position in the near future, as early as June. Absent reaching that agreement and assuming Dr. Payne does leave, immediate efforts to recruit a qualified psychologist on a 1.0 FTE basis need to begin. Given the length of time needed to bring Dr. Payne on board a year ago, it is of significant concern that there again could be an extended delay in filling that position. That concern is compounded by the fact that even once hired it will take time for that new person to become fully integrated into the program and get the mental health/clinical team functioning in a coordinated and comprehensive way.  Under the best of circumstances, given Dr. Payne's combination of expertise and dedication to youth, it will be difficult to find someone to "fill her shoes".

An example of something that has "fallen by the wayside" as a result of limited psychologist time is the scheduling of regular team meetings of all the members of the mental health team (the psychologist, the two qualified mental health clinicians, and the three Youth Support Specialists) to better coordinate case plans, coordinate programming to the degree desired, and develop behavior crisis plans.  So, while the "pieces" of a solid mental health support team are ostensibly in place and while they have developed some informal communication networks, their efforts are still somewhat disjointed and inefficient.

Despite the psychologist time limitations, the Youth Support Specialists, in coordination with Dr. Payne, have implemented a process to hold multi-disciplinary team meetings for youth on a more routine basis. Those meetings include other staff from the facility as well as parent(s) and represent a positive step forward in getting everyone "on the same page", improving communication across staff lines, and meaningfully engaging families in supporting youth in custody.  Also on a positive note, there has been a change in psychiatric services, as Dr. Kumar has been replaced by Dr. Bell.  Although a relatively recent change, anecdotally staff relates that Dr. Bell is more accessible and available to work with youth at Henley Young, albeit still on a relatively limited basis, and seems to relate well with youth.  Further assessment of this change can take place during the September visit, but at this point it seems to be a step in a positive direction.

Related to appropriate programs, the mental health Clinicians and the Youth Support Specialists continue to provide various group sessions for youth.  Examples of programs led in recent months include:

- Avoiding Trouble
- Managing Anger
- Character Traits
- Juggling Different Thoughts

- What Calms You Down
- Anger Arousers
- Good Times and Not Good Times to Act
- Social Support

Ostensibly these groups are scheduled 5 times/week in 45-minute blocks led by the clinicians or Youth Support Specialist, and notes are recorded relative to each youth's participation. Ideally, these programs provide some of the building blocks for continued development of a more integrated and intentional behavioral health and skill development program.  Individual Youth Support Specialists and clinicians have taken the initiative to develop these programs, but there are a number of concerns that remain to be addressed, including: (1) there is still a lack of cohesion in how the various groups and programs "fit together" to work toward an underlying and consistent approach; (2) it is not clear that the various groups are structured and delivered in a manner consistent with the research evidence about what is most effective with youth; (3) youth not infrequently appear to choose to "sleep" in their room rather than participate in the groups – more work needs to be done to assess the reason for that (e.g. incentive to participate are not working/available, youth that have been there a long time view the groups as redundant, the actual delivery does not provide sufficient opportunity for "active" involvement, etc.) – one of the roles for the treatment director/psychologist would normally be to assess this issue and work with the whole team to find solutions that would more effectively engage youth ; (4) the Youth Support Specialists cite that it is not uncommon that lack of a suitable space for their program and/or a shortage of staff available to get youth to and then supervise the program limits their ability to provide the programming that is scheduled.

Therefore, movement toward substantial compliance related to programming remains in what might best be described as a "holding pattern".

Recommendations to help move toward substantial compliance in this area remain essentially the same as the prior report, including:
1. Increasing time allotted to the psychologist position at Henley Young to full-time.  If that is not Dr. Payne and she leaves the program, a qualified replacement needs to be found as soon as possible;
2. Providing portable "classrooms" or creating additional space that can also be used for various group programs as well as educational programming; and
3. Supporting the mental health team (psychologist, QMHP, Youth Support Specialists) to review what programs (content and structure) are provided and identifying more targeted behavior skills youth need to learn (generally in the realm of cognitive behavioral programs), searching out related and evidence-based curriculum, and increasing the amount of time youth spend in practicing new skills.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance**

There continue to be improvements in delivery of educational services for JCA youth, including:

- Youth involved in the GED program also are now participating in the classroom instruction as well.  Whereas in the past, those youth were receiving only two hours of GED/basic education per day and the rest of their day was spent on the living unit, they now receive approximately 5 hours of programming plus additional GED preparation support;

- This visit allowed for time to review the process of assessing the youth's needs, particularly as it might relate to special education services that the youth was being provided prior to admission and be eligible for while at Henley Young.  Designated educational staff is able to access Jackson Public School (JPS) records (which accounts for almost all youth admitted) and obtain educational records including an Individualized Educational Plan (IEP) if it has already been done.  Within 10 days, that information is reviewed in collaboration with the Youth Support Specialist, the parent(s), and the designated special education teacher.  Progress for these youth is monitored/evaluated every 4-6 weeks, and the IEP is reviewed and modified/updated if needed.  Youth with IEPs participate in the regular classroom programming where possible but may be "pulled out" for additional support as needed to meet their needs, but the only space available for this purpose is inadequate – essentially a converted closet;

- Efforts to move some of the youth toward GED attainment continue, although getting one or more youth to the point where they can pass all the requisite tests remains to be accomplished.  Suitable arrangements seem to be in place in coordination with JPS to administer tests at a JPS site when needed, and sheriff's staff has been supportive in securely transporting youth to the site and supervising as needed.  The goal remains to set aside space in the facility for testing, and the GED support teacher's goal is to become certified to administer the tests;

- Additional education software that will provide additional options to support youth's continuing education, particularly for youth who obtain a GED, has been purchased, but additional staff training is needed to fully implement the planned upgrade(s).  When completed, the changes should enhance the ability of the educational program to individualize program delivery, including some credit recovery applications that will enable youth to "catch up" on credits much more efficiently.

To move toward substantial compliance it will be necessary to:

(1) Provide additional adequate space for special education services.  Adding some portable classroom space would accomplish that as well as providing space for additional educational, treatment, and behavioral programming;

(2) Conduct a more thorough review of youth's educational records to ensure that: (a) the expressed process for obtaining and reviewing a youth's prior records, particularly as it relates to special education records, is what actually happens; (b) reviews of IEPs are being conducted on a regular basis and required services are actually being provided; and (c) re-verify the number of instruction hours all youth are receiving on a daily basis, including verifying regular attendance (vs. youth being allowed to "opt out" of school programming); and

(3) Confirm steps taken to fully implement additional services, including credit recovery programming and GED certification. Both of these programs have been outlined in at least one site visit prior to this May visit but have yet to be implemented, so it is necessary to move from the "goal" to actual implementation.

It is reasonable that substantial compliance related to this requirement can be accomplished by the end of the calendar year, if not sooner, and subsequent visits can focus on ensuring that compliance is sustained.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance**

Since all youth under 18 have "aged out" of RDC and there are no adult prisoners at Henley Young, this provision is met. As JCA youth in placement at Henley Young turn 18, they will be transferred to RDC or the Jackson facility. For purposes of monitoring sustained compliance it will be necessary to track whether any youth under 18 are held at either RDC or JDC.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Substantial Compliance**

The most relevant classification issue for JCA youth at Henley Young is related to which unit to house the youth in. Two of the four housing units are designated for JCA males, one unit is for non-JCA males, and one unit houses both JCA and non-JCA girls. In discussing housing decisions with staff, it is apparent that they do take into consideration the factors indicated above, but documentation for the decision had been lacking. The primary focus for classification at Henley Young is to ensure youth's safety. While the presenting offense provides some information that informs the placement decision, they also have the benefit of often having prior experience with the youth based on a prior juvenile placement at Henley Young. Thus, they are

able to gather information about prior behavioral concerns, age, gang affiliation if any, and other factors relevant to placement.

During discussions, staff committed to developing a form for documenting the classification decision, and subsequent to the visit that form was developed and provided for review.  The classification policy will be modified to reflect use of a new documentation format, and reviewing the use of the form will be a focus of the next site visit to ensure that compliance is sustained.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**
This visit afforded the opportunity to meet with Off. Hines who has been serving as the interim training coordinator for much of the past 18 months and with Off. Cole who is the designated training coordinator (but has been deployed to the Middle East for the bulk of the last two years or so).  As with prior months, the training conducted since the visit in January included New Employee Orientation, CPR, Suicide Prevention, and Crisis Prevention Institute (CPI) training.  As noted previously Off. Hines does a good job tracking minimum training requirements and providing training on a flexible schedule that best meets the needs of staff.  Delivery of training is complicated by the fact that due to the low wages staff receive, the vast majority of them have second jobs which makes scheduling training at a time they can attend more difficult. The programs provided during this recent period continue to be the core programs that staff are involved in along with periodic trainings related to updated policies and procedures.  And, as with prior reports, these trainings may bring staff up to a basic skill level but do not provide any level of advanced training that would be helpful for staff and fully meet the requirements of this provision. Hinds County engaged a trainer to provide a series of five training modules to HY supervisors and administrative staff.

That said, the recommendations for this report remain the same as the January report:
(1) Efforts need to be made to identify/develop more advanced training programs that build on the basic skills learned in the current training curriculum.  This could include outreach to local/regional resources through the universities, Hinds Behavioral Health, or other programs that focus on working with youth; and

(2) The County should consider linking more advanced training to additional performance and/or longevity incentives that would enhance staff retention, increase the staff skill level, and provide reinforcement for staff to advance those skills.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

    a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

    d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

    e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

    f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

    g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

    h.  If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

    i.  Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

In reviewing youth records, a random sample of Incident Reports, and all Incident Reports that resulted in segregation as a discipline it became apparent that there has been a significant and impressive reduction in the use of extended room confinement in response to behavior problems. For purposes of review, there are two kinds of room confinement used at Henley Young: (1) Behavioral Management Isolation/Confinements (BMI) which can be initiated by supervision staff at the time of an incident/behavior that poses a substantive problem that can't be readily resolved through verbal interaction with the youth and/or require some short-term separation of youth for safety reasons, and (2) Due Process Isolation (DPI) which is implemented following a major incident and an administrative review process conducted usually by Mr. Dorsey, the Quality Assurance Manager.

While previously a log was kept of DPIs only, in response to discussions with Mr. Dorsey and Mr. Burnside, the Operations Manager, on previous site visits, a similar tracking log was implemented for the BMIs as well.  This afforded the opportunity to track essentially any period of involuntary room confinement to determine its length and match it with Observation logs to ensure that any youth so confined was being properly monitored by staff.

In January through April, the log revealed that there were twenty-four instances of BMIs, with the majority of those confinements being for 30 minutes or less. Five BMIs lasted approximately one hour, and there were only two BMIs that extended beyond one hour (lasted 90 minutes). These two were related to a fight between two residents and separation for longer than one hour was needed to support a safe return to the unit.  In short, the pattern of use of BMIs suggests that there has been a significant change in how staff respond to incidents, namely a significant reduction on the reliance of room confinement as the "tool" to deal with misbehavior(s).

Records revealed only four instances of Due Process Isolation for up to 24 hours since the January site visit.  All were instances of fighting/assaultive behavior which is considered a major violation requiring some form of more serious disciplinary and safety response.  This reduced number of DPIs, four in essentially a four-month period, can be compared with prior numbers of anywhere from four to eight DPIs per month through the fall of 2018.  Additionally, the 24-hour DPI is reduced from what had been the practice less than a year ago of allowing DPIs for up to 72 hours (Note: the 24 hour limit currently in effect is consistent with the requirements of the Henley Young/SPLC agreement).

Leadership staff attributes this improvement to a combination of factors, including youth adapting to the routines and programs at Henley Young, staff responding more proactively to behaviors that may portend more serious incidents, implementation of additional incentives to promote positive behavior, and most importantly enhanced communication and collaboration across supervising staff and the mental health team members.  Youth Support Specialists are

much more involved in responding to situations that arise and taking a problem-solving approach to issues that arise, Due Process Hearings are focused more on finding alternative ways to hold youth accountable than simply imposing room confinement, and all staff are encouraged to utilize focus more on building positive relationships with youth than simply "monitoring" behavior "after the fact".

While the progress is impressive, these DPIs remain inconsistent with the terms of the agreement that limit the use of involuntary room confinement to a maximum of one hour unless there is an evident safety risk.  Overall the use of room confinement can be further reduced by continuing to improve the environment in the living units, retaining and expanding training of direct supervision staff, continuing to expand social skill training, adding additional program opportunities, and ensuring a full complement of mental health support staff (i.e. a full-time psychologist).

Observation logs to document observation of youth that are confined in their room are kept in the youth's individual files, and review of those logs revealed two continuing concerns:  (1) although there has been some improvement, too many of the logs reflect "time checks" that exactly meet the maximum 15 minute observation requirement (e.g. 1500, 1515, 1530 and so on). Based on experience, this pattern tends to occur when checks are either not made at all for periods of time and/or the times are noted at the beginning or end of a shift/time period, neither of which provides assurance that the checks occurred as required; and (2) in situations in which a mental health clinician is required to interview the youth there is no documentation that has occurred. While clinicians may document that check in their files, it is not required to be done, and there is no way to verify the mental health consultation has occurred as required.  It is well accepted in the field that "If it is not documented, it didn't occur…", so this needs to be rectified.

In addition to making continued efforts to reduce the use of involuntary room confinement for disciplinary purposes, it is recommended that:

(1) Leadership implement improvements to the supervision and quality assurance process related to Room Observation logs to ensure that they are being completed accurately and represent actual times that the required monitoring occurs.  Supervisors on duty can play a key role in making sure this happens, but to date that has not seemed to fully address the concern, so additional steps need to be implemented; and

(2) Documentation of mental health wellness checks conducted by the qualified mental health professional is done directly on the Room Observation Log. Additional notes may be made by clinicians in their mental health records, but at a minimum these need to be readily available for review by supervisors, managers, and the monitoring team. This has been recommended in prior reports, but following this visit the Quality Assurance Manager has indicated this will be implemented.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

> a. The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.
>
> b. An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.
>
> c. The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

Overall, Henley Young has made continued progress toward achieving substantial compliance on most areas related to this requirement.  It is my understanding that the arrangement with Mr. Leonard Dixon has moved from him serving as a monitor for the Henley Young/SPLC agreement to providing technical assistance for the program, including the implementation of an appropriate behavior treatment program envisioned by this agreement.  That may satisfy the requirement to utilize the assistance of a qualified consultant, and that assistance is reflected in some of the changes that have occurred over the past 4-8 months, including: (a) continued evolution of the "point" system by promoting greater communication between youth and staff about both what they are earning and what they could do better; (b) increased communication between members of the mental health team (Youth Support Specialists, psychologist, clinicians) and staff providing direct supervision for youth; (c)  implementation of a more collaborative process to address behavioral concerns; and (d) reduced use of segregation for disciplinary purposes.

One of the positive changes that has been made is the addition of a weekly conference with the youth to review their "points" for the week, and youth can ask to see their point sheet daily if they desire.  While that is an improvement, it is important to remember that the point system is only a tool that can be used to promote timely interaction with youth to help identify and verbally reinforce desired behavior(s).

As noted in the prior report, the staff with the greatest opportunity to shape behavior is the direct supervision staff.  If properly trained, they can reinforce/shape youth's behaviors as they occur

rather than relying on some "corrective" action later.  This speaks to the need for even more staff training related to behavior management, encouraging staff to view their role as behavior change "agents" rather than a more passive "correctional" role, and more complete integration of the mental health team and direct supervision staff in development of and evaluating progress related to a youth's individualized case plan.

As noted previously, the point system does include some incentives, but work still needs to be done to expand the positive reinforcers and find ones that fit what youth may be most interested in.  Documentation of what incentives youth choose is still lacking, and the system does not yet include individualized behavioral goals that are developed in collaboration with the Youth Support Specialist or mental health team. Nor does the current system include tracking of youth behaviors on weekends, which is an opportunity lost in terms of promoting increased pro-social skills.

Specific recommendations to move toward substantial compliance continue to be:
- Add an individualized weekly goal for each youth, developed in collaboration with the youth, the Youth Support Specialist and/or other members of the treatment team;
- Consider developing a "coupon" or other incentive-based tool that staff can use to reinforce new/improved behaviors;
- Continue/expand training with staff to increase their use of verbal reinforcers that are consistent with but not necessarily dependent on the point/level system;
- Add a weekend component to the point/level system so that youth are evaluated seven days/week; and
- The current point sheet form should be used to document what incentives the youth selects based on the level of points they receive.  The form currently lists most of the options youth can choose from, so it would be a relatively simple matter to highlight/circle/note what youth choose as their weekly incentive.  That could serve as the documentation required above.

Deference can be given to Henley Young leadership in consultation with Mr. Dixon as to how some continued improvements can be made, but it is conceivable that substantial compliance could be accomplished relatively soon, and monitoring could transition to sustaining compliance related to the behavioral treatment program.

## LAWFUL BASIS FOR DETENTION

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

Since the time of the last site visit the policies on pre-booking, booking and records have been adopted. A Booking Manual is reportedly being developed. There continue to be improved systems in place to track individuals and release them timely. However, there continue to be some systemic problems that make this a challenge. The new Records Policy requires uniform organization of the files and requires a summary sheet that tracks the individual's detention status. Updates are immediately reviewed by a peer and the Supervisor is to conduct an audit of 10 files a week and do a semi-annual review of all files. The policy was adopted on March 11, 2019 and was not fully operationalized at the time of the site visit. The Records Supervisor and another staff member are attempting to review 15 files a week, reorganize them and create the summary sheet. As they review the files, they document any missing paperwork. As this process progresses, there should be fewer examples of files without documentation of the basis for detention.

At the present time, there continue to be some files that don't support continued detention and, as a result, individuals who are detained longer than they should be. Most notably one individual was held over a month too long. He was a JCA sent to RDC for releasing. The Jackson Police Department stated that had a burglary charge being filed and promised the paperwork the next day. The JCA was sent back to Henley Young but the paperwork was never provided. This wasn't discovered until over a month later.

Although there is improved communication between the court administrator and the Records Supervisor there are occasional miscommunications. There were two recent cases in which the release orders were not sent to the jail. The inmates informed jail staff that they were to be released which was confirmed in the court data base. One inmate was released timely; the other was released two days late.

There is improved communication with the Probation and Parole Department resulting in more timely release.  The Records Supervisor now runs a report out of the JMS showing everyone in jail on a probation or parole violation. However, this is not always complete. If Booking has entered the Probation Violation (PV) as a hold, it will not appear in the report. The Records Supervisor also tracks people booked on a PV but if the PV is entered after the booking she

won't catch it. The Records Supervisor has to use multiple methods to track everyone in on a PV and she reports that people can still get lost in the system.

The current audit process is disclosing a number of files where supporting documents are missing or the information in the JMS is inaccurate. One person was almost improperly released because the JMS had not been updated with a second charge. Improper releases are also a potential problem as a result of the Warrants Division using a different data base than the rest of the Sheriff's Office. The Warrants Division of HCSO uses an old data base and so does not enter warrants into the JMS system. If a warrant is entered after 5:00 or on the weekend, the Records Office won't know about it until the next business day.

There are several system issues that result in over-detention. One recurring situation is that there is not a way to identify people in the Jail who are waiting for a preliminary hearing. Individuals who do not have an attorney have no one to request a preliminary hearing. These individuals currently get lost in the system and some stay long periods of time in the jail. One individual had been in since January without a preliminary hearing. Although it is the court's responsibility to provide timely settings, the jail currently has no way of tracking these individuals to alert the court. Another recurring problem is that individuals ordered to be released on electronic monitoring are sometimes rejected by the electronic monitoring companies. There is no system to inform the jail or the court when they reject someone. One individual stayed 5 months before it was discovered, the court informed, and a Release on Own Recognizance (ROR) was entered. There continue to be individuals detained beyond 90 days without indictment. It appears that staff is maintaining an accurate list of unindicted individuals. This also cannot be run accurately out of the JMS system. A current, and hopefully, temporary problem is that the judge who normally does first appearances has been out. A circuit judge is filling in but cannot cover the entirety of the other judge's work load. As a result, defendants are not appearing before a judge in the required 48 hours. For those individuals, the jail is entering a bail bond amount from a bail schedule. If they can't post the bail amount, they stay in jail without having seen a judge. Two individuals had been in jail 20 and 21 days before seeing a judge and getting an ROR.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in Bearden v. Georgia, 461 U.S. 660 (1983) and Cassibry v. State, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Substantial Compliance**
Since the time of the last site visit, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the jail absent documentation that a meaningful analysis of the person's ability to pay was conducted

and written findings that any failure to pay was willful. At the last site visit, there were several fines and fees orders that were ambiguous. At the time of this site visit there were no individuals in the facility on a fines and fees order so at the present time this has been changed to substantial compliance. However, this will continue to be monitored closely as the policies are new and sentencing orders are sometimes ambiguous.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Substantial Compliance**
The County has been pro-active in ensuring that valid court orders are utilized. The policy on pre-booking is consistent with this paragraph and at the time of the site visit there was no one in the facility for failure to pay fines and fees.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Substantial Compliance**
The policy on Records Management meets the requirement of this paragraph and at the time of the site visit there was no one in the facility for failure to pay fines and fees.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required

documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Substantial Compliance**

The policy on Records Management meets the requirement of this paragraph and at the time of the site visit there was no one in the facility for failure to pay fines and fees.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court. At the time of the site visit, one prisoner was meeting with the case manager to clarify his release date.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals working off fines and fees. As reported recently, the recent standard practice at the WC is to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This includes individuals who cannot perform physical labor because of a medical or mental health condition. In prior site visits the stated practice was reported as determining the amount of credit on a case by case basis. At the time of the current site visit, the stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

        v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

See response to number 85.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As described in paragraph 85, the new Records policy establishes a system that should greatly improve the reliability of the prisoner record system. However, it is not operationalized yet and a complete updating and review of the records has not been completed. Similarly, when the Booking Manual is completed, there should be improvement in the initial entries into the JMS system. County IT staff have recently been very active in developing reports out of the JMS system including the ability to run a PV report for example that allows tracking of dates of release for prisoners booked on a PV. Additional problems described in paragraph 85 continue to exist. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained. In addition to Booking staff, there are four individuals tracking the lawful basis of detention. They are all four using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. There continues to be a

lack of specified procedures to check all law enforcement and court documents. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Partial Compliance**

This provision speaks to one set of responsibilities that fall clearly on the mental health team, and another set of responsibilities that must be shared by the mental health team, security staff and the facility's administrative staff.

With regard to those responsibilities that fall clearly on the mental health team, there has been enormous progress towards addressing this provision. More specifically, the mental health team has developed and maintained a 'mental health tracking log' that lists all prisoners with serious mental illness; each prisoner's location, booking date, and length of stay in the facility; how and when each prisoner was referred to mental health; and information regarding the initial mental health assessment, the initial assessment by the psychiatric nurse clinician, diagnosis, the treatment plan, any medication, and next scheduled visit. The mental health team also maintains a complete medical record for each prisoner with serious mental illness that includes all assessments, treatment plans, and treatment progress notes; these records reflect the activities of each team member involved in the prisoner's treatment, including the psychiatric nurse clinician; and these records also document assessments and treatment related to any special mental health circumstance that might have occurred including, for example, suicide watch or other special mental health observation.

Given the above noted, the mental health team can provide an accurate census of the jail's identified mental health population. This census count, coupled with a clear awareness of the standards of clinical practice for addressing the needs of seriously mentally ill persons, has

informed discussions in this report regarding staffing, program and resource needs.  See sections 37, 42 and 77 with regard to staffing needs, program development and resource needs, including the need for a special mental health unit.

The information contained in the 'mental health tracking log' and the medical records is also used to assess compliance with many of the mental health policies and procedures.  For example, these records indicate whether or not specific, required tasks were performed; whether or not tasks were performed in a timely manner; whether or not each task is sufficiently documented; and whether or not a decision made is supported by the information obtained that formed the basis for the decision.  While this is the first step in the development of a quality assurance program for mental health, now that the psychiatric nurse clinician has been brought on board, it is anticipated that a more formal and expansive initial treatment plan development process and a periodic treatment plan review process will be undertaken.  This treatment planning and review process will provide yet another level of quality review, in that team members will be collectively examining to what extent each prescribed treatment plan is actually meeting its treatment goals and objectives, and what adjustments in the treatment plan may or may not be indicated.  It is further anticipated that once other mental health staff shortages have been addressed, time can be allotted for the development of additional mechanisms for the assessment of the quality of the mental health services delivered, including those services that have yet to be developed.

To date, there have been no prisoners who have required a transfer to a mental hospital or other treatment facility for mental health treatment.  However, there is a considerable backlog with regard to the transfer of prisoners for forensic evaluations and/or restoration of competency, which is totally due to the limited capacity of the forensic mental health facility where such tasks are performed.  In an attempt to respond to this problem, there is now a 'competency restoration program' that has been brought into the facility, which is a free-standing program that is not part of the facility's mental health treatment program.

See section 96 for a discussion of the mental health team's community transition planning for prisoners with serious mental illness.

In contrast to the above noted, there has been much less progress towards meeting this provision as it relates to the responsibilities that must be shared by the mental health team, security staff and the facility's administrative staff.  To what extent and through what mechanisms mental health will be involved in such things as security incidences and investigations await the development of security policies and procedures that address such issues.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

a. Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

b. Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

    i. Requiring the individual to submit to bodily strip searches;

    ii. Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

    iii. Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

a. Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b. Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c. Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d. Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

A primary focus of this provision is the successful referral of prisoners with mental health difficulties to community-based mental health services upon their release from the facility.  As has been noted in prior reports, the mental health team and the facility's discharge planner have

taken steps towards improving communication and cooperation with community-based providers, especially Hinds Behavioral Health (HBH, which is a major community-based provider of a full range of mental health treatment services and wrap-around services). To date, it at least appears that it will be possible to develop a sound working relationship between the facility and this community-based provider of mental health services that will lead to more meaningful and successful referrals of prisoners to a range of community-based mental health services upon their release from the facility. A number of options for improved collaboration are being considered; at least one option might require a proposal to the County to fund part of a HBH outreach/intake worker's time that would actually be spent at the jails, linking prisoners likely to be released to HBH; but all possible options need further consideration before the best option(s) can be selected. It is anticipated that once additional mental health staff have been hired, more time can be devoted to this extremely important effort.

Another critical factor that impacts on the successful referral of prisoners with mental health difficulties to community-based mental health services is the preparation of prisoners to receive such a referral. More specifically, upon their release from the facility, prisoners are more likely to actually accept and follow-up on a referral for community-based mental health services if they have come to understand that they have a mental illness, the impact that the illness has had on their lives, that there is treatment that can help them improve their ability to function, and that it is their responsibility to obtain, actively participate in, and comply with that treatment. Therefore, another part of responding to this provision is the implementation of the planned expansion of the mental health services provided at the facility to include psychoeducational groups and discharge planning groups, both geared towards preparing prisoners to accept and follow-up on referrals for community-based mental health services.

Finally, the other critical issue in this provision is providing prisoners, upon their release from the facility, with appointment information and a supply of their prescribed medications to bridge the time period between release and their first outpatient appointment. In order to address this part of this provision, the mental health team should be informed when a prisoner is going to be released and be given an opportunity to meet with the prisoner prior to release. During prior site visits, this has appeared to be a major problem, in that a comparison of the total number of persons released from all 3 facilities with the number of persons who were seen by medical and mental health prior to their final release indicated that only about 30% of released persons were cleared by medical and mental health. However, booking staff have repeatedly insisted that they attempt to assure that all persons are cleared by medical prior to their final release, and that therefore, the percentage cleared by medical just couldn't be that low.

During this site visit, the question of why the percentage of medically cleared released persons appears to be so low, when booking insists that all discharging inmates, in fact, cleared by medical. One proffered explanation is that a large number of people are booked and released

before there is even a chance for them to undergo the nurses' intake screen. There was no specific data regarding the volume of such cases, booking estimated that there were about 10 such cases each week.  In addition, a considerable number of persons are brought to the facility by the Jackson Police Department, directly from Court; their release papers are already at the facility, and so these persons are also almost immediately released (and counted as a release) after booking and before there is even a chance for the nurses' intake screen; and although there was no specific data regarding the volume of such cases, booking estimated that there were also about 10 of these cases each week.  Furthermore, booking indicated that there are an additional set of persons who are brought to the facility in the evening and are released early in the morning (and counted as a release); therefore these individuals are only held at the facility overnight/for less than 12 hours, and therefore they are never fully evaluated by medical and are virtually never evaluated by mental health; but again, there was no specific data regarding the volume of such cases, and booking didn't want to even attempt to estimate the number of such cases.

These estimates will need to be further evaluated. However, taking this additional information into consideration, and therefore for the purpose of this assessment, including only released persons who were detained at the facility long enough to have had an opportunity to be seen by medical and/or mental health, the percentage of such persons released who were cleared by medical and mental health at least appears to be somewhat better.  However, given that for the month of April, of the 372 persons who were released, only 122 were cleared by medical/mental health, subtraction of the above noted estimated number of persons who were likely never seen by medical or mental health still leaves a large number of persons who were detained long enough to have been seen by medical or mental health but were still not cleared by medical or mental health upon their release from the facility.  Further evidence of the fact that this new information still doesn't resolve this issue is the data maintained by medical and mental health. The data maintained by medical and mental health, concerning persons clearly known to medical and mental health who were released, indicates that less than 50% of released person who had been treated by medical or mental health are cleared by medical or mental health and receive a supply of their medication prior to their release.  Therefore, efforts to obtain more specific data and a further review and analysis of this issue continue to be indicated.

As the issue of obtaining medical/mental health clearance prior to release continues to be studied, already existing data indicates that security must make more of an effort to assure that prisoners are cleared by the medical and mental health departments as part of the release process. However, the mental health team is also taking other steps to address this issue.  More specifically, once the above noted psychoeducational groups and discharge planning groups have been initiated, the plan is that the information that will be transmitted in these groups will include important information on the community-based mental health services provider, such as its location and the fact that they accept unscheduled, walk-in intake appointments every morning.  In this way, if a person is released without being cleared by medical and mental health,

the person will know that he/she should go to the community-based provider the next morning for assistance, support and medication. The transmittal of such information has already been incorporated into the one group therapy effort that has already been initiated, which is allowing the mental health team an opportunity to examine the best way to transmit this information and assess the efficacy of this effort.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. Any post orders must:

      a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

      b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders. Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner. The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. The files reviewed did include a copy of the NCIC report at the time of release. Once the policy on Release is revised and adopted, and the files continue to contain the required documentation, the county can be considered compliant.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors. To that end, the County must:

      a.      Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.     Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.     How to process release orders for each court, and whom to contact if a question arises;

        ii.     What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

        iii.     Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

        iv.     How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.     Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. As stated in paragraph 85 above, there is a problem in checking for detainers because the warrants division does not enter warrants in the JMS system and the Records Supervisor does not have access to their system after hours.

While this section deals with the qualifications of those people processing records, coordinating with the courts and processing inmates for release (as well as booking), the imbalance of staffing in the Booking area needs to be emphasized again (see the Sixth Monitoring Report).  While there is routinely only one officer in the holding cell area (where there should be two at all times, one male and one female) three, four or more Booking Clerks (who are Detention Officers) are often on duty in the office area.  Considering the fact that only 14 people are booked on a typical day (slightly more than one every **two** hours), this misallocation of manpower should be addressed immediately by the facility captain.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

    b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not routinely prepared for errors in releasing. When involved in the incident, the Court Liaison has prepared a report on significant incidents of over-detention such as the JCA held over a month too long. This is not done on an incident report form in the JMS system.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Jail now has an individual whose title is Quality Control Officer or sometimes is referred to as the Court Liaison. At the present time, his work is primarily reactive. When an individual is brought to his attention, he researches the situation and takes corrective action. He does not track releases or prevent errors in the releasing process. He maintains a spreadsheet that includes release errors that he has addressed, but he does not at the present time collect and report on releasing errors. His work is not incorporated into a continuous improvement and quality assurance process.

Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. Like the Quality Control Officer, she operates independently of the booking and release process and maintains her own spreadsheets but she does not perform all the duties listed in this paragraph.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

Incident reports are not routinely created for untimely or erroneous prisoner release or any investigations of such incidents. The Court Liaison does investigate and prepare a report on incidents that he has investigated. There have been untimely releases as described above that have not been reported.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**
This paragraph has been carried as Non-Compliant because the DSD has taken no action since the Third Monitoring Report, when a simple solution to the problem at the RDC was recommended.  If unused video visitation space in front of the control room officer's station in the A, B and C Pods were repurposed as attorney/client visitation space, attorneys would have the opportunity to meet with their clients without having to wait for inmates to be brought to the front of the facility.  This solution to the problem has been recommended in the Third, Fourth, Fifth, Sixth and Seventh Monitoring Reports.  There is no expense involved other than to remove some floor and wall mounted equipment and to place tables and chairs in the space.  It should not take two years to implement this recommendation.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**
Since the time of the last site visit, County IT has created a report that pulls data by field from the incident reports which includes reportable incidents and uses of force. County IT has also revised the incident report in the system to create new fields. This is the beginning of being able to comply with this provision. The incident reports provided to the monitoring team do not appear to be on the new form at this time. Since the time of the site visit, the monitoring team has received the electronic monthly report for May. The monitoring team will continue to look for this as a monthly report and explore during the next site visit whether the new system serves to inform continuing improvement or quality assurance report. There continues to be a concern

because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. With the drafting of a policy on Grievances, a system of manually recording data on grievances is being developed. The Grievance Officer is using Excel to record information related to grievances. The new policy also rejects grievances that are actually inmate requests and directs inmates to use the inmate request category. This allows an accurate depiction of grievances. With the new policy, it should be possible to have a useful data base on grievance data.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
  a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;
  b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
  c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
  d.  List and total number of incident reports received during the reporting period;
  e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**
The County provided a monthly report of incidents in the three facilities. Although the information was helpful, it did not meet the requirements of this paragraph. Also, in reviewing the incident reports provided as compared to the summary reports, the summary reports for RDC did not account for all of the inmate assault incidents that appear in the incident and investigation reports. For this monitoring period the summary reports were particularly deficient. When the command staff moved to creating weekly reports instead of monthly reports, the reporting provided to the monitoring team became very unpredictable. Days at the beginning or end of the month that did not align with the week were often missing, some weeks were posted twice but more importantly some weeks were missing completely and for some months there are no summary reports for some of the facilities. Specifically, the reporting was:

| January: | RDC | No summary report |
|----------|-----|-------------------|
|          | JDC | Complete          |

|  | WC | Only 1/1 to 1/3 provided |
|---|---|---|
| February: | RDC | No summary report |
|  | JDC | Missing 2/10 through 2/16 |
|  | WC | Complete |
| March: | RDC | Missing 3/1 and 3/2 and 3/17 through 3/23 |
|  | JDC | Missing 3/1 and 3/2 and 3/24 through 3/31 and the incident reports for 3/3 through 3/9 |
|  | WC | Missing 3/1, and 3/16 through 3/31 |
| April | RDC | Missing 4/7 through 4/30 |
|  | JDC | Missing 4/14 through 4/30 and the incident reports for 4/7 through 4/13 |
|  | WC | Missing 4/27 through 4/30 |
|  | No CID investigation reports provided |  |
| May |  | Electronic report was provided |
|  |  | No CID investigation reports provided |

As mentioned above, since the time of the site visit, the monitoring team has received the electronic monthly report for May. This should improve the accuracy of the summary report and better facilitate identifying problem areas. Even then, it will be essential to determine that reports are being submitted when they should be such that an accurate summary report can be generated. The incident reports can also be provided through this reporting mechanism. Again, the monitoring team received the first version of this for the month of May.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

  a. Summary of all uses of force, by type, shift, housing unit, and date;

  b. List and total number of use of force reports received during the reporting period;

  c. List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Non-Compliant**

The Use of Force information has been provided in the Monthly Summary Report with the incidents and grievance information. As such the same problem described in paragraph 108 has

been occurring with missing days and weeks and for RDC two whole months. As mentioned above, the first electronic version of the monthly report was received for the month of May. Even then, it will be essential to determine that reports are being submitted such that an accurate summary report can be generated. For the missing reporting, see paragraph 107.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

The defects in the electronic system prevent its use for meaningful tracking of grievances. The system is not able to generate a report that meets the requirements of this paragraph. Staff is now redirecting inmates filing a grievance who are actually making a request. That at least allows for a compilation of actual grievances. However, the system cannot generate a report by subject, location, shift, or persons involved. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. At the present time, there is no review process in the grievance system. As mentioned above, the Grievance Officer is now keeping an Excel spreadsheet and manually entering information related to grievances. If it includes the information required by this paragraph, this should enable staff to generate a report consistent with this provision.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

   a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;

   b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;

   c.    A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

   d.    A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

See response to paragraph 68.  The IAD investigator continues to provide a summary sheet reflecting the status of IAD investigations since 2017; however, the level of detail included does not comply with all of the requirements of this paragraph.

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**
There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

c.    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

e.  The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f.  The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.  Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.  Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

a.  Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.  Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**

This provision will be updated at the next site visit.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC but this contract has not been renewed. The CJCC has been meeting regularly. In order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish this has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC is meeting regularly. Not all of the identified agencies have been invited or represented at the meeting. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC has just adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  The County has not renewed the contract with the consultant. The initial contract was narrower than required by this paragraph.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

  a.  A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

  b.  Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The DSD has printed a booklet-sized version of the Settlement Agreement, which has been distributed to most staff, but copies are not posted in each housing unit.  Other than command staff, most DSD personnel are not familiar with their obligations under the Agreement.  At the JDC copies of the Agreement and the Monitor's most recent report are located in each control room.  This practice is not followed at the RDC and WC.  Based on questioning of some supervisors and Detention Officers during each site visit, it is apparent that they are not only unfamiliar with the contents of the Monitoring Reports, but many of them have never read the original Settlement Agreement.  Since this finding is consistent with that reported several times previously, the DSD should implement a system to standardize availability of the Settlement Agreement booklets (and the most current Monitoring Report) for staff.  In addition, a systematic procedure should be developed to allow inmates access to the Settlement Agreement booklets in the housing units at each facility.

**POLICY AND PROCEDURE REVIEW**

130.  The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten. The plan to hire outside consultants fell through and there was no apparent progress. Since that time, jail staff has been working with Karen Albert of the Monitoring Team to develop policies and procedures and after the September site visit, several draft policies have been provided and at this time, three policies have been adopted.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Three policies and procedures have now been adopted and several others have been drafted and circulated. There are many outstanding policies to be written and no estimated completion date. They are seriously overdue at this time. However, there is a policy committee working with the monitoring team expert on this project.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

See response to 131.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**

There have three policies approved by DOJ and adopted by the Sheriff. The three policies are only partially implemented but six months has not run from the approval of the three policies. The policies have not been incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph.  A self-assessment was not provided prior to the January or May 2019 site visit. This paragraph is now carried as non-compliant based on this history.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

 **Sustained Compliance**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications have been provided although there has not been a routine method. Most recently, the notifications have returned to being provided by email which is helpful. They were not being provided to the United States; however, it appears that this has been remedied. Comparing the notifications to the medical transport list, it appears that immediate notification of hospitalization is not always provided. The County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date and preparing incident reports.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.