1               IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                        NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA                        PLAINTIFF

5    VERSUS                        CAUSE NO. 3:16-cv-00489-CWR-JCG

6    THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS CO. SHERIFF VICTOR MASON, ET AL.          DEFENDANTS
7

8

9                 STATUS CONFERENCE PROCEEDINGS
             BEFORE THE HONORABLE CARLTON W. REEVES,
10              UNITED STATES DISTRICT COURT JUDGE,
                      SEPTEMBER 26, 2019,
11                    JACKSON, MISSISSIPPI

12

13

14
     APPEARANCES:
15
     FOR THE PLAINTIFF:       CHRISTOPHER N. CHENG, ESQ.
16                            SARAH TERESA RUSSO, ESQ.
                              CANDACE MAYBERRY, ESQ.
17
     FOR THE DEFENDANTS:      PIETER TEEUWISSEN, ESQ.
18                            ANTHONY R. SIMON, ESQ.
                              CLAIRE BARKER, ESQ.
19

20

21

22   REPORTED BY:

23      CANDICE S. CRANE, CCR #1781
        OFFICIAL COURT REPORTER
24      501 E. Court Street, Suite 2.500
        Jackson, Mississippi  39201
25      Telephone:  (601)608-4187
        E-mail:  Candice_Crane@mssd.uscourts.gov

1                        **TABLE OF CONTENTS**

2    By the Court............................................     3

3    By Mr. Cheng............................................     3

4    By Mr. Teeuwissen.......................................     4

5    By Ms. Simpson..........................................     8

6    By Mr. Parrish..........................................    21

7    By Dr. Dudley...........................................    25

8    By Mr. Moser............................................    37

9    By Ms. Simpson..........................................    43

10   By Mr. Cheng............................................    47

11   By Mr. Teeuwissen.......................................    54

12   By Ms. Barker...........................................    72

13   By Mr. Cheng............................................    78

14   By Ms. Simpson..........................................    86

15   Certificate of Court Reporter...........................    89

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **IN OPEN COURT, SEPTEMBER 26, 2019** |
| 2 | |
| 3 | THE COURT:  Good morning.  This is *United States versus* |
| 4 | *Hinds County, 3:16-CV-489*.  I know we're here today for the |
| 5 | purpose of our quarterly status conference; is that correct? |
| 6 | MR. CHENG:  Yes, Your Honor. |
| 7 | THE COURT:  All right.  The Court understands and knows |
| 8 | that there's an outstanding motion for contempt that has been |
| 9 | filed.  And I think I may have advised the parties over the phone |
| 10 | that the Court may talk about it some today, may, but I don't |
| 11 | intend to take argument or receive argument on the motion. |
| 12 | So let's -- I know since we were last here -- I think we |
| 13 | were here back in June or maybe the first part of July.  I think |
| 14 | it was in June that we were last here, and between that time and |
| 15 | this, this Court made an unannounced visit to the Hinds County |
| 16 | facility, along with two of the monitors.  And I know the monitors |
| 17 | have been here this week -- I presume, this week, and they'll be |
| 18 | prepared to give me their preliminary update with respect to this |
| 19 | most recent inspection, as well as anything following up from my |
| 20 | visit back in August. |
| 21 | So I'll hear from the Government. |
| 22 | MR. CHENG:  Your Honor, at this time the parties are |
| 23 | proceeding with their own process.  We are conducting some |
| 24 | discovery aside from what the monitor has been doing.  We've made |
| 25 | some document requests. |

1          THE COURT:  Make sure you're always speaking into the

2     microphone, just for the benefit of the court reporter.

3          MR. CHENG:  So we are continuing with our own discovery.

4     We may have indicated before -- and I think the defendants

5     agree -- that if the Court can decide the papers as soon as

6     possible regarding the motion for show cause, I think both parties

7     agree that that is something that would be very helpful.

8          So in order to expedite that process, we have actually

9     been conducting some discovery on the side.  We've been exchanging

10    documents.  Depositions were conducted last week.  We expect to do

11    some more depositions in about a week.

12         I don't want to get in the way of this status conference,

13    however.  And I think it's probably best to let Ms. Simpson

14    present what she is finding, again, based on her preliminary

15    assessment.  She has been out here all week, and we have been with

16    them.  After she presents her assessment, if the Court would

17    entertain just a few additional comments from the United States

18    before we proceed.

19         THE COURT:  Any problem with us proceeding in that

20    fashion, Mr. Teeuwissen?

21         MR. TEEUWISSEN:  No, Your Honor.

22         THE COURT:  All right.

23         MR. TEEUWISSEN:  Your Honor, before we proceed, could we

24    identify a few people for the record?  I think it's important.

25         THE COURT:  Yes.

1          MR. TEEUWISSEN:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. TEEUWISSEN:  Pieter Teeuwissen, Board Attorney for

4   Hinds County.  Also, to my immediately left is Claire Barker,

5   counsel for the sheriff's office, and Anthony Simon, special legal

6   counsel for Hinds County.

7          I think it's important to note, Your Honor, that today we

8   have District Attorney Elect Jody Owens present.  And I say that's

9   important because we've had a number of status conferences where

10  no district attorney has attended.  So I want to give him credit,

11  even though he's not sworn in, for being here.

12         We also have present democratic candidate Lee Vance, who

13  is not yet elected.  He's got to go through the November election,

14  but is the presumptive sheriff elect.  And I think it's also

15  important to note that he is here.

16         I don't want to introduce everybody else, but there are a

17  few people on the front row that is important to put on the

18  record.  Synarus Green, Hinds County compliance monitor

19  internally; Ms. Carmen Davis, as the Court knows, the Hinds County

20  Administrator; Major Mary Rushing, from RDC, are also present.

21  And I omit the others not out of disrespect, but just out of time.

22         Thank you.

23         THE COURT:  But I do note for the record that the current

24  sheriff is not here.

25         Oh, you're standing in his place, Ms. Barker?

1          MS. BARKER:  Well, Your Honor, the sheriff had a surgical

2     procedure on Monday, and he is healing currently.  So I think he

3     has --

4          THE COURT:  Did he send anyone from the sheriff's

5     department, other than his lawyer?

6          Well, I know Ms. Rushing is here, and I know she's the

7     administrator over --

8          MS. BARKER:  Right.  Right.  Yes, Your Honor.  Major

9     Rushing is here on behalf of the detention services portion of the

10    sheriff's department.

11         THE COURT:  Just the detention services portion?

12         MS. BARKER:  We do not have anybody here for the

13    enforcement side.

14         THE COURT:  Okay.  All right.  Thank you.

15         MR. TEEUWISSEN:  Your Honor, you did not ask, but all five

16    supervisors, currently sitting supervisors, were advised on more

17    than one occasion about today's status conference.  They felt

18    comfortable sending County Administrator Davis and Mr. Green as

19    their representatives to the hearing.

20         Thank you.

21         THE COURT:  Let me ask you this:  Did you invite -- I see

22    Mr. Vance and Mr. Owens are here.  There are -- I think there are

23    presumptive winners who will be on the board of supervisors.  In

24    fact, one or two of them don't have any general election opponent,

25    right?  Does Credell Calhoun have a general election opponent?

1          MR. TEEUWISSEN:  I believe he does, Your Honor.

2          THE COURT:  Okay.  All right.  Well, that's fine.

3          Is there anybody who does not have an opponent who will be

4  a new supervisor in January?  Does Mr. Archie have an opponent, or

5  has Mr. Archie won?  I don't know.

6          MR. TEEUWISSEN:  It's my understanding -- and, again, I'm

7  here as board attorney, not any personal counsel.  But it's my

8  understanding, Your Honor, that the current District 2 Supervisor,

9  Darrel McQuirter, is contesting the election of Mr. Archie.

10          THE COURT:  Oh, okay.

11          MR. TEEUWISSEN:  And I further understand, though not

12  through direct knowledge, that the Hinds County Democratic Party

13  is holding a hearing at some point next week on that challenge.

14          THE COURT:  Okay.

15          MR. TEEUWISSEN:  What I can say is that we know that

16  District 1 Supervisor Robert Graham is -- has been elected, does

17  not have an opponent.  He is currently out of the country.

18          We also know that the District 5 Supervisor, Bobby

19  "Bobcat" McGowan, is re-elected and does not have an opponent.

20          That leaves District 4 Supervisor Mike Morgan.  He's

21  running as an independent, and he does have an opponent.

22          But, again, all incumbent supervisors were advised on more

23  than one occasion of today's status conference, and they all have

24  expressed confidence that Ms. Davis and Mr. Green can represent

25  the county's positions, if need be, today.

```
1            THE COURT:  Okay.  Thank you.

2            MR. TEEUWISSEN:  Thank you.

3            THE COURT:  All right.  Ms. Simpson.

4            MS. SIMPSON:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MS. SIMPSON:  So I always like to start off the discussion

7       with the positive.  And I will say, we're sort of midway through

8       the site visit.  So the --

9            THE COURT:  And thank you, again, for the parties

10      accommodating me on that request.  This hearing was supposed to

11      take place tomorrow, but because of my obligations, we had to move

12      it to today.  And I appreciate you all for doing that.

13           MS. SIMPSON:  You're welcome, Your Honor.  And that works

14      out fine for our schedule.  We will continue to do some

15      observations this afternoon and tomorrow morning.  So the site

16      visit isn't complete at this time.  And we always end up with a

17      number of records that we review after the site visit and sort of

18      share information among the team members.  So it is definitely

19      preliminary.

20           And on the positive notes, there are areas that continue

21      to see improvement, some of them marked improvement.  One of those

22      areas is the grievance system.  That's been a problem, sort of

23      adjusting to the electronic system and figuring out what it can do

24      and what it can't do and making adjustments for what it can't do,

25      and that has proceeded apace.
```

1        There is a grievance officer that's now appointed for all

2    three facilities.  The -- and an overall grievance officer.  She's

3    keeping a spreadsheet determining that grievances are responded to

4    in a timely fashion.

5        From looking at the system, there still seem to be some

6    glitches with that.  And sometimes when a report is run, it shows

7    all grievances responded to; and, then, another time it will show

8    a number of grievances that haven't been responded to.

9        And so there did appear to be a number of grievances that

10    hadn't been responded to, but they -- some of them probably fell

11    into sort of a limbo area.  But the -- but that's an area of

12    improvement.  The grievance officers know how to run those reports

13    to figure out what hasn't been responded to.  A spreadsheet is

14    being maintained.

15        And looking at the substance of the responses, those --

16    the substance has improved.  In the past, there were some that

17    were sort of "we'll look into this" as a response.  And I think

18    there's been some training that there needs to be a more

19    substantive response.

20        So that has continued to see improvement, and I think

21    there's more planned in that regard.

22        Another area of significant improvement, it would be the

23    records department.  That's been an area of focus for Karen

24    Albert.  And they developed a plan for how the records should be

25    maintained.

1          One of the problems had been, certainly in the very

2    beginning, that the records were very inaccurate.  And we found as

3    we went through a lot of people that were listed as active inmates

4    were not in the facility at all, as well as inmates who should

5    have been released or potentially never should have been booked

6    in.  That happens much more rarely now.  It still happens on

7    occasion, but I can say that I did not on this trip find any

8    problems in the records that I reviewed in terms of people that

9    should have been released that hadn't been.

10          Some of the records are still deficient, but there's now a

11    system that has a summary and a log, where all of the activity is

12    logged in.  So only some of the records have been updated in that

13    way and audited.  They are supposed to audit about -- I believe

14    it's 10 to 15 records a month, and they are proceeding on that

15    audit process.  But at this point only about 70 files have been

16    audited.

17          So there's, again, a way to go on getting all the files up

18    to where they should be, but that process is underway.  And the

19    ones that have been audited are, in fact, in very good shape.

20          Classification is also an area of improvement.  There had

21    been a period where -- there had been an initial period when they

22    had moved to behavior-based classification.  Then there had been

23    sort of some backtracking on that.  And earlier this year, they

24    began moving forward again on behavior-based classification.  That

25    appears to be the case now.

1        What was happening is they were doing a behavior-based

2   risk assessment and then overriding it based on a charge.  And

3   many files had that override, in fact, I would say the majority of

4   files that I reviewed in past site visits.  Now, the override rate

5   appears to be somewhat less than 10 percent.  And that is actually

6   a good override rate.  You do expect some overrides based on sort

7   of knowing individuals, so that appears to be moving.

8        Again, there were some just mechanical errors in the

9   scoring system and -- and in understanding the criminal history.

10   And so that is -- there's still room for improvement there, but it

11   is moving towards a behavior-based classification system.

12        The -- there's also some improvement -- some more -- the

13   detention services appears to be getting some more attention from

14   the IT branch of the sheriff's office.  The -- they are now able

15   to run a summary report of incidents.  And I believe the command

16   staff is finding that useful, is actually using those summary

17   reports.

18        There still is a problem with the actual incident report

19   form not including information that needs to be there under the

20   terms of the settlement agreement.  We've heard that IT has worked

21   on that, but we have not seen a change in that.

22        Another, I think, improvement on the horizon is I think

23   with the new DA coming into office, we're going to see more

24   activity at the CJCC, the Criminal Justice Coordinating Council,

25   and that will really help with some system improvements that will

1    benefit the jail.  That's something that hasn't happened yet, but

2    based on conversations during this site visit, that appears to be

3    on the horizon.

4         Another positive step in the same area of system work is

5    that the courts and the county did come to a process by which they

6    could reduce the use of electronic monitoring and utilize those

7    savings to actually create a pretrial services program.  It's my

8    understanding in the 2020 budget that has now been approved that

9    there have been two positions authorized for the development of a

10   pretrial services program.  So that will also be a huge benefit to

11   the jail in terms of managing the population and to the system

12   work generally.

13        So the jail population is done -- down.  I believe it is

14   around 535, 540, somewhere in there.  That's a big improvement.

15   As I understand it, it comes from the work of some of the new

16   judges, and, of course, Judge Green overseeing the unindicted list

17   and entering some orders based on that.  So that population

18   reduction is a very good improvement for the jail.

19        All that being said, there -- well, one other thing I want

20   to mention is that the renovations of Pod C are moving forward.

21   We were able to see some of the work being done in Pod C.

22        THE COURT:  Any anticipation that it's going to be done by

23   the -- I mean, based on what you observed, I guess, the other day,

24   any -- I know when I was there in August, I think the

25   representation that was made was that it would be done by the end

1    of this month, I think.  Or did they say October?  I knew it was

2    before the end of the year.

3        MS. SIMPSON:  I think it was said that it would be the end

4    of September, but I think there was some skepticism about that

5    from some of the other people that were present.  So it's not

6    going to be done by the end of September.  And that sort of blends

7    over into some of the ongoing problems.

8        You know, despite these very good advances, RDC in

9    particular, remains a very dangerous place for both inmates and

10   officers, and that comes from two sources.  One is the condition

11   of the facility, and the other is the low staff levels.

12       The condition of the facility I think, Your Honor, you saw

13   when we were there, but most importantly, the security doors have

14   been nonfunctional.  And after the riots in June, the doors in A

15   going into the control room in the housing units were repaired, so

16   they now are functional.  They're manually operated.  That has not

17   been done in B, and there are some issues with the security doors

18   in C.

19       So there remains a problem, particularly on B, with there

20   being a lack of security such that the inmates are able to

21   actually pop out, as they call it, the doors into the horseshoe,

22   which gives them access to, potentially, the control room, where

23   those control room doors also don't work, and they can potentially

24   go into the control room.

25       So that is a huge security risk for the officers and for

1    other inmates, not having those -- those sort of doors that lead

2    into the officer areas repaired such that they can be secure.

3         There also is a problem with the cell doors not being

4    secure.  And we've discussed among the team and with the parties

5    whether all cell doors need to be secure.  And I believe the

6    answer is that they don't.  They have different classifications of

7    inmates.  As they move to direct supervision, it's not necessary

8    that all cell doors be able to be secured.  But certainly there's

9    a need for some units to have secure doors, so that inmates that

10   present a high risk can be locked into the cells when needed.

11        So that continues to be a major problem.  And there

12   continued to be assaults at a fairly high level through August.

13   They do look to be down some in September for no -- there's no

14   apparent reason for that, but we're not seeing as high a number in

15   September.  But certainly through July and August, they continued

16   at a pretty high rate.

17        And there's quite a few incident reports, I would say,

18   where those assaults happened by the inmates actually popping out

19   the doors.

20        THE COURT:  Since August?

21        MS. SIMPSON:  In August.  I have not seen the September

22   incident reports yet.

23        THE COURT:  But since June?

24        MS. SIMPSON:  Yes.  Yes.  And some incident reports are

25   really fairly -- very troubling, where they say that inmates

1    popped out the doors and were able to freely come and go, and

2    refused to go back into their cells and be locked down and came

3    and went throughout the day.

4         And clearly in that report, the officer was unable to

5    maintain control of the unit in large part because the inmates are

6    able to control their coming and going in the cells, and to some

7    extent, out into the horseshoe.  So the -- and there's a number of

8    incident reports.  When we prepare the actual monitoring report,

9    we can quantify how many of those instances that we see.

10        So the doors are -- continue to be a huge problem.  And

11   potentially because of that, they continue to have difficulty

12   retaining staff.  The report I received was that the staffing

13   level for the three facilities is now at about 218.  That's

14   significantly lower than the staffing levels needed.

15        The staffing level at RDC is disproportionately low.  They

16   have about 100 staff -- that's not an exact number, that's the

17   estimate we were given -- about 100 staff at RDC.  Even with

18   the -- one of the pods closed -- the closing of one pod actually

19   only saves about 40 staff positions.  So instead of the 433 number

20   that you've heard, with one pod closed the staffing requirement is

21   still around 290.  And obviously at 218, it's still significantly

22   low.  And at RDC, like I said, they're disproportionally low.  So

23   they're running at probably about 40 percent of the staffing that

24   they need.

25        And of course that means they can't be doing direct

1   supervision.  It's difficult for them to even have a sort of

2   consistent presence in the housing units.

3        A couple -- and one of the things I think we have achieved

4   in this site visit in regard to both of those items is we had an

5   early meeting with command staff and with Ms. Davis getting -- all

6   getting on the same page about what is happening with the locks

7   and the lock repair.  As of last week, that still had not been

8   authorized, so it has not begun.

9        THE COURT:  The locks were going to be -- as I recall from

10   being out there, they have a contract with some outfit in Texas to

11   do the locks?

12        MS. SIMPSON:  That's correct.

13        THE COURT:  Okay.  And they were talking about getting the

14   locks done when I was out there in August.  Has any lock been

15   done?

16        MS. SIMPSON:  Only the sample locks, Your Honor, that had

17   been done in August.  So Housing Pod A and then one demonstration

18   cell and --

19        THE COURT:  Anybody in the demonstration cell -- I mean,

20   sample?  Sample and demonstration?  They don't house real people,

21   I presume, right?

22        MS. SIMPSON:  I don't believe they do have anybody in the

23   demonstration cell, but I would have to defer to either my

24   correctional expert or Major Rushing on that.

25        They are using Pod A, which does have the control room

1    doors secured and the housing unit door secured, not the inner

2    cage door and not the rec door, which also involve inmates getting

3    out of the actual housing unit.  So those need to be done as well.

4    We had anticipated that that work would have been authorized by

5    now.  It is not.

6         We did, I would say, in terms of getting some progress

7    have come to an agreement as to which doors would be prioritized

8    and which doors would be repaired -- which cell doors would be

9    repaired.  So all of the control room doors and housing unit

10   doors, anything leading into what's called the horseshoe or on

11   into the control room, would be prioritized.

12        And that in terms of the cell doors, that instead of

13   repairing the cell doors in C, that they would repair the cell

14   doors in Units B3 and B4, because those would be used to house the

15   higher-risk inmates.  So the -- that work has not been started.

16   It had been anticipated it would have been started by now, but the

17   step we made during the site visit was to, in fact, all get on the

18   same page on that.

19        THE COURT:  Do you know, once the work begins, how long it

20   might take?  Do we know that?

21        MS. SIMPSON:  I do not know that, and I'm looking at my

22   corrections expert.  He says we do not know that.  I don't know if

23   an estimate has been given to the defendants or the defense

24   counsel.

25        THE COURT:  They'll let me know.

1      MS. SIMPSON:  Another thing that we observed during the

2  site visit was that -- and we had seen it on prior site visits --

3  is that the corrections officers, the housing unit officers spend

4  a lot of their time in the control rooms as opposed to being in

5  the housing units.  That was the subject of another discussion

6  during this site visit, and that has been a problem.

7      I think that another positive step that we've made is to

8  look at procedures that would actually enable the housing unit

9  officers to actually be in the housing unit much more and much

10  more safely.  And I can go into detail on that, but I believe the

11  command staff has committed to making some of those changes in the

12  next -- in the near future.

13      It essentially involved sort of revising the recordkeeping

14  and logging system, so that the housing unit officers did not have

15  to go back into the control room to log every activity so that

16  they could stay in the housing units more.  So hopefully that will

17  get implemented soon, and we'll see some overall safety

18  improvement as a result of that.

19      One of the meetings we have this afternoon that I hope

20  will lead to additional improvements is the -- two actually --

21  one, a meeting of the combined mental health staff and security

22  staff, so that we can make some progress in those areas where that

23  overlaps.  And another to look at one of the housing units in C

24  since it's being renovated, and to see what additional renovations

25  could be made to use one of those housing units as an actual

1  mental health unit, which they haven't had up until now.  And as a

2  result, a lot of mental health -- mentally ill inmates end up

3  being held in segregation, because there's really not an

4  appropriate placement for them.

5       So there continue to be significant problems.  We do see,

6  as I described, some improvement in some areas.  The -- oh, and I

7  guess one issue I should mention is the policies and procedures.

8  We have received more drafts to review.  I don't have that

9  spreadsheet in front of me, but I believe we're probably working

10  with about 15 policies now.  I believe four have probably been

11  adopted, and there's at least -- I believe, about another ten that

12  are in circulation for review.

13       I think everybody is a little frustrated with how slow

14  that process has been.  The policies and procedures were intended

15  to be in place years ago, and we still do not have those.  And,

16  obviously, that impacts the training of staff and insuring that

17  they're properly trained.  So that's been a slow process and --

18       THE COURT:  Any explanation, speculation, any reason why?

19  I mean, policies and procedures, I would think, are not that

20  difficult because they've been implemented in other places before.

21  They've been done before.

22       When I came on the bench I had never been on the bench

23  before, but I learned how to sort of set up my chambers by getting

24  information from the judges who we were here before me as far as

25  how to do this, how -- I had never -- I mean, you know, I had

1    never hired law clerks and put together any -- I mean, so what's

2    so difficult about at least some -- well, tell me this:  How many

3    policies and procedures on whatever area you have -- I know you

4    said it's about ten of them outstanding.  Is there any area where

5    the procedures are complete?  Just one?  Or is there?

6            MS. SIMPSON:  I believe there's four that have been

7    completed in the sense that they have been approved by both the

8    monitoring team and the Department of Justice, which is required

9    under the settlement agreement.

10           The other ten have been drafted and are in that review

11   process.  I would say the parties disagree on where the problem

12   lies.  And it's probably some of both of what they would say.  The

13   policies are being drafted fairly slowly, and I think we probably

14   need to figure out how to expedite that process.

15           The review process has been a slow process as well, and we

16   need to figure out how to expedite that process.  So it is a

17   problem, and I think it's both of those things.

18           And I would say -- so Ms. Albert from my team is

19   facilitating that process.  I have talked to her about whether she

20   can increase the speed of putting out policies.  There is -- the

21   way she's doing it is making them sort of fine tuned for that

22   facility and doing sort of a training process as she goes.  There

23   are ways that she could produce them faster.

24           To maintain that process, I think the facility and the

25   people at the facility that are involved probably do -- do not

1    commit the amount of time to continue with that sort of drafting

2    process.  And on the flip side, the review process has been slow,

3    and we are trying to find ways of improving that.  But that is

4    certainly a problem area.  And I know I was about to say something

5    else before I went back to policies and procedures, and I don't

6    recall what that was.

7         I do not spend a lot of my time at Henley-Young.  And so I

8    would like to have our juvenile expert address any sort of

9    improvements and continuing problems at Henley-Young, and then

10   also have you hear from our mental health expert and our

11   corrections expert, if they want to add to anything that I've

12   said.

13        So if I could, let me start with the corrections expert,

14   because that really does appear to be the biggest concern, and

15   particularly at RDC, so...

16        THE COURT:  Thank you, Ms. Simpson.

17        MR. PARRISH:  Good morning, Your Honor.  David Parrish.

18        THE COURT:  Good morning.

19        MR. PARRISH:  Lisa hit the -- or the monitor hit the key

20   points.  There are several things that are really moving in the

21   right direction.  There are several problem areas that we now have

22   some plans for to correct, but they haven't -- there hasn't been

23   change since you went through the facility with us in early

24   August.

25        The good news, first of all, as she mentioned was the

1    count is down around 535.  Last time we were here that was in

2    excess of 600, and when I started coming here, it was around 800

3    or more.  So they've really made some significant progress to move

4    people through the system to make the thing operate more

5    efficiently.  And the winners there are the people that have to

6    work in the jail, because it's more manageable.

7         The downside that we mentioned was staffing at 218.  To my

8    recollection, that's about an all-time low for total staffing.

9    There are a number of -- a number of issues that impact that.

10   They keep working, even with only like six people coming on board

11   for the next class.  I mean, they keep putting on classes and

12   moving in the right direction, but -- some good things have been

13   done with regard to salaries and pushing for better compensation,

14   but until some issues are resolved, particularly at the Raymond

15   Detention Center, recruitment is going to be problematic.

16        Really good news deals with direct supervision training.

17   The National Institute of Corrections, we had them come in and

18   provide technical assistance.  Their first training session was

19   for command staff, pointing out the importance of commitment to

20   direct supervision from the top to the bottom, that this is the

21   best way to run a jail, where you run the whole place, not just

22   the hallways and the control rooms.

23        The next training, which took place most recently, was

24   train the trainers, bringing in people to train and finding good

25   people on staff who can then do the training for the rest of the

1   staff, because NIC can't do that for everybody.

2        They have identified five key trainers.  And I had an

3   excellent session with the training commander and his assistant

4   and then with the captain and his lieutenant for the work center,

5   which is the logical place for the training to take place and to

6   implement direct supervision the way it should be done.  They are

7   close to it at that facility.  Some minor modifications, and they

8   can put it in place.  And then that will serve as the training

9   ground for the rest of the staff, who then implement it at the

10  Raymond Detention Center as the renovated housing units are

11  reopened.  So that is truly moving in the right direction.

12       Security doors is the major issue, the one that gives me

13  greatest cause for concern, and we had a productive meeting and a

14  walk-through on Tuesday.  And I think that the monitor is going to

15  be submitting and I'm going to be putting my thoughts down for

16  what priorities should be set for the work that needs to be done.

17  The county can't afford to do everything that we would like to see

18  done, so it's critical that the most important things be done

19  first for the safety of the officers that have to work there.  And

20  that starts with having the control room doors and the housing

21  unit entry doors, both of them, all converted to swinging style.

22       Only in Charlie pod do they have a modern control panel

23  that allows those doors to be electrically controlled.  In Alpha

24  and Bravo, those panels have to be replaced.  So, initially, that

25  work is going to result in key-operated doors.  That's better than

1    inoperable doors, so that's our number one priority.

2          And then they're going to need to go back and replace the

3    control panels in Bravo and Charlie, so that they can electrically

4    pop all of those doors.

5          Subsequently, they need to go in and look at the

6    individual cell doors.  First, they have to be contained in the

7    housing units.  Then we need to be able to contain them in their

8    individual cells.

9          In Charlie, I agree with what the county is now

10   recommending.  Those doors were replaced after the major riot

11   about seven years ago, and with some minor modifications, they

12   have been made much more secure.  And in a direct supervision

13   environment, that will be satisfactory.  So I don't think the

14   county is going to have to spend money to convert those individual

15   cell doors to swinging doors.

16          Bravo and Alpha, it's kind of a different story.  In

17   particular as the monitor mentioned, like Bravo 4 right now is a

18   lockdown unit.  It's in name only, because the inmates can kick

19   the doors open.  So those doors absolutely have to be the first

20   priority to be repaired.  And that's what she made reference to,

21   that Bravo 3 and 4 would serve as the lockdown units.  And those

22   doors need to be converted to swinging and electrically controlled

23   first, and then move on to the rest.  But I don't think it will be

24   necessary to do that in Charlie.  We're going to lay that out in a

25   list of priorities, and as the county can afford, they'll take

1    them in order and do that.

2         So I think we have a plan in place finally.  And we have a

3    firm that they have used previously, CML out of Texas, that's

4    quite capable of doing the work and doing quality work.  So I

5    think that covers it, sir.

6         THE COURT:  Okay.

7         MR. PARRISH:  Thank you very much.

8         DR. DUDLEY:  Good morning.

9         THE COURT:  Good morning, sir.  State your name for the

10   record.

11        DR. DUDLEY:  Dr. Richard Dudley.

12        THE COURT:  Thank you, Dr. Dudley.

13        DR. DUDLEY:  I guess, as you've been hearing, there's been

14   substantial progress in the areas of health and mental health.  We

15   have a really firm understanding of the scope of the health and

16   mental health of inmates in the facilities.  We're monitoring

17   that.  There are spreadsheets of those who are receiving chronic

18   medical and mental health care.  And so that we basically know

19   what we're facing, we can look and see whether care is being given

20   in a timely manner, whether people are being followed up in a

21   timely manner, et cetera, et cetera.

22        So kind of where we are developmentally is that the mental

23   health side of the program needs to be expanded to assure safety

24   with regard to some of the most seriously mentally ill,

25   particularly those who it's difficult to obtain compliance, some

1   of those who are being held in segregation because, you know,

2   it's -- their behavior has not been under control, et cetera.

3         But when you review those cases, it's clear that they can

4   be managed with an expanded mental health program that provides

5   other sorts of services that are not currently available with the

6   existing staff.  So there's been a proposal sitting with the

7   county for some months now, almost a year, to add two additional

8   staff, mental health staff, to the contract.  And that would --

9         THE COURT:  When you say "mental health staff," are you --

10  what positions?  Psychiatrists?

11        DR. DUDLEY:  No, qualified mental health professionals.

12  We are covered at that level, but we need some kind of frontline

13  qualified mental health professionals.

14        THE COURT:  I think you said qualified mental health

15  professionals at that level.  What would that be, a psychologist

16  or a nurse or what?

17        DR. DUDLEY:  That would be LCSWs --

18        THE COURT:  Social worker?

19        DR. DUDLEY:  Yeah.

20        THE COURT:  An LCSW?

21        DR. DUDLEY:  Yes.

22        THE COURT:  Or an MSW, maybe?

23        DR. DUDLEY:  MSWs.

24        THE COURT:  MSW?

25        DR. DUDLEY:  Right.

1          THE COURT:  Or what others could be --

2          DR. DUDLEY:  A more junior psychologist could do it as

3   well.  So it wouldn't require a PhD, but a licensed clinical

4   psychologist could do it.

5          THE COURT:  Could a nurse do it?  I mean, I'm just asking.

6          DR. DUDLEY:  Yeah, a mental health nurse could do it.

7   They can sometimes be a little bit more expensive than --

8          THE COURT:  Okay.  They can be more expensive?

9          DR. DUDLEY:  Right.

10          THE COURT:  I'm just trying to find out -- you said it's

11   been -- that's been on the table to the county, that proposal, for

12   nearly a year?

13          DR. DUDLEY:  That's correct.  Correct, since like January.

14          THE COURT:  Okay.  Nine months.  So -- and has the county

15   taken steps to even advertise for those type of positions or --

16          DR. DUDLEY:  Well, there needs to be an approval to amend

17   the contract for the provider, you know, the health and mental

18   health services are provided via a contract.

19          THE COURT:  Is that Quality Care Health --

20          DR. DUDLEY:  Right.  Yes.

21          THE COURT:  -- or whichever one it is?

22          DR. DUDLEY:  Yes.  So the contract just needs to be

23   modified, then they could search for a person.

24          THE COURT:  Okay.

25          DR. DUDLEY:  Well, you're really looking at two issues.

1    The more safe and improved management of some of the more

2    seriously ill on the unit.  You're looking at that in anticipation

3    of the development of a mental health unit, which would have to --

4    you know, have to be adequately staffed in order to achieve what

5    we would hope to achieve through such a unit.

6         And also as it relates to just recidivism, you know, do we

7    have an adequate mental health program that prepares people to go

8    out and continue to receive services on the outside, linking them,

9    training them about -- helping them to understand the need to

10   continue on their medication, to continue on treatment, so that

11   they don't just kind of go out -- you know, having been stabilized

12   during their time in the jail, deteriorate, and then return to us.

13   So it's all of that programming that we're trying to put into

14   place.

15        THE COURT:  Go ahead.

16        DR. DUDLEY:  The other issue is the one that Simpson

17   related to, which is kind of the interface between health, mental

18   health, and security, which includes a chunk of the policies that

19   have yet to be developed.  But other operational concerns like,

20   you know, how do you have more interdisciplinary incident reports

21   and reviews, you know, that include input from not only security,

22   but from health and mental health where appropriate.  So

23   addressing kind of a series of issues around the interface between

24   health, mental health, and security is really the big current

25   task.

1          You know, in response to your earlier question about, you

2   know, what makes this so difficult, part of it is because some of

3   that work requires people to struggle with sharing

4   responsibilities for things that they had total responsibility on

5   before.

6          So say, for example, disciplinary proceedings, there needs

7   to be a policy that if a person is on the mental health caseload

8   or is known to have mental health difficulties that, you know, a

9   mental health evaluation and input into the disciplinary process

10  becomes important, so that in the disciplinary process you can

11  consider the possibility whether that behavior is the result of

12  mental illness versus -- and then, therefore, how are you going to

13  respond to it?  You know, should that person be thrown in

14  segregation versus should you adjust their mental health

15  treatment?

16         So it's that sort of working through of that interface is

17  not simply one of writing a policy, but helping people to kind of

18  deal with how are you going to deal with things somewhat

19  differently to take into consideration these health and mental

20  health issues that overlap with security concerns.

21         And that's the same when you're talking about reviewing of

22  people in segregation and stuff like that.  So that's some of the

23  stuff that we're working on right now.

24         THE COURT:  Do we know the number or percentage -- the

25  number or percentage of the inmates who are -- need the mental

1    health treatment?

2         Obviously, there -- I mean -- I guess my question is, I

3    assume there are some people who are there waiting for a bed at

4    Whitfield?

5         DR. DUDLEY:  Correct.

6         THE COURT:  Do we know what that number is, and do we know

7    how long they have -- I'm concerned about that, because it's all

8    tied into another issue that I have before me.  But how many

9    people are in Hinds County who are waiting on a diagnosis or to

10   be -- a forensic diagnosis to find out if they might be competent

11   to stand trial?

12        DR. DUDLEY:  We know that.

13        THE COURT:  You do know the number?

14        DR. DUDLEY:  In the three facilities, there are

15   approximately -- because it's now -- you know, now that the total

16   census is down, the mental health numbers are down as well.  So in

17   the three facilities, there are approximately 150 people who are

18   seriously mentally ill, who are suffering from major psychiatric

19   disorders.  About ten of those are waiting for competency

20   restoration at the state facility, so, you know, obviously, the

21   overwhelming majority of them are not.

22        And then there's about an additional 30 people who would

23   not be considered seriously mentally ill.  I mean, they're not --

24   it's not schizophrenia.  It's not bipolar disorder.  But they have

25   major trauma histories that have resulted in, you know, kind of

1  acting out behavior and management issues on the unit who are

2  being seen by mental health as well.  So that entire mental health

3  caseload is about 180 people.

4          THE COURT:  180 out of 535 I think is the number that I --

5          DR. DUDLEY:  Exactly.

6          THE COURT:  -- was given earlier.  That's --

7          DR. DUDLEY:  So that would be the population of people who

8  are being seen by the mental health staff.

9          THE COURT:  You good, Candice?

10          THE REPORTER:  Yes, sir.  My computer was about to go

11  dead.  Sorry.

12          THE COURT:  That's slightly less than 50 percent.  I

13  haven't gotten the total yet.  But 180 out of 535, that's --

14          DR. DUDLEY:  That's correct.

15          THE COURT:  Now, do we know -- I guess -- you said there

16  are ten waiting for competency hearing?

17          DR. DUDLEY:  About ten.

18          THE COURT:  About ten.  Do you know what number of persons

19  who might have been found to have been incompetent through the

20  Chancery Court process or declared -- where someone has gone

21  through that process who might be being held in jail, again,

22  waiting for a bed?  Which is a different process than it is for

23  restoring your competency for a criminal matter.

24          Do we know if there are any in Hinds County?

25          DR. DUDLEY:  There is one that I'm aware of who has

1    returned, continued to be incompetent.  They were unable to

2    restore him to competence.

3         THE COURT:  No, no, that's not my question.  There's a

4    Chancery Court process that we use here --

5         DR. DUDLEY:  Right.

6         THE COURT:  -- when somebody cannot take care of

7    themselves, then you go to Chancery Court.  You ask the court

8    to -- a conservatorship or whatever it is.

9         I know Mr. Teeuwissen and Mr. Simon would know because

10   they have a special court for that --

11        DR. DUDLEY:  Right.

12        THE COURT:  -- over there in Hinds County.

13        DR. DUDLEY:  Right.

14        THE COURT:  Once they go through that process, there's two

15   doctors that declare this person cannot take care of himself and

16   might be a harm to himself or others, and therefore he should be

17   committed to the -- committed to the -- to Whitfield or some --

18   it's a commitment proceeding.

19        MS. SIMPSON:  Your Honor, I asked to jump in because --

20        THE COURT:  Go ahead.

21        MS. SIMPSON:  -- I have asked that that total number be

22   provided to us.  And one thing we have found is that the jail's

23   JMS system, the information management system, does not have a

24   field for identifying those individuals.  The medical and mental

25   health staff generally don't know or perhaps understand the legal

1    process to know which of those boxes the person falls into, and

2    the security staff doesn't have that information.

3          And so we haven't been able to get very solid information

4    on that.  It has been requested through the compliance

5    coordinator, and my understanding is that he is working with the

6    head of inmate services department within the jail to actually go

7    through the active inmate list and to be able to nail down the

8    total number waiting for hospital beds and what category they fall

9    into.

10         And that process isn't complete, but it appears that it

11   actually is a much higher number than the ten people that have

12   been assumed to be waiting for a bed.  It may be double that.  But

13   we haven't gotten a final number or a number of who fits in each

14   of those legal categories, but hopefully we will have that before

15   too long.

16         THE COURT:  Okay.  Now, with respect to just a routine --

17   I don't want to call them routine -- just a person who is

18   processed into the system, a person who is arrested, I assume,

19   once that arrest is made and they're transferred down to await

20   bond or whatever else, I assume there's an intake form that is

21   completed on the particular individual, and that intake form takes

22   care of that biographical information, including their medical

23   history; is that correct?

24         DR. DUDLEY:  That's correct.  But then after -- after they

25   come into booking, they're seen by a nurse, who does a whole

1    medical and mental health kind of screen.

2         THE COURT:  Right.  So if, for example, the -- because I

3    can only imagine, and I'm pretty sure the facts bear it out, a lot

4    of people who -- many people who are arrested here in Hinds County

5    have psychological or psychiatric issues.  Some of them may be

6    already under somebody's care.  And based on the medication that

7    they tell you that they're on, that they don't have with them, on

8    them, but I'm on Seroquel, or I'm on this, or I'm on that, we

9    know -- we're able to know, based on what that person has told us

10   or what the officers who were -- I don't know if they're

11   interviewed for -- I don't know what information they provide, how

12   the person might have been acting upon arrest and all that kind of

13   stuff.  But is that the initial information that is taken from the

14   nurse?

15        The nurse takes that information.  And if the inmate -- if

16   the arrestee says, I'm on this particular medication, I'm on

17   Prozac.  I'm on whatever that type of medication is, is -- are

18   there any buzz words, buzz medication that sort of flags the

19   person for special -- for an additional assessment, if you will,

20   as far as mental health, the mental health side goes?

21        DR. DUDLEY:  There are two things that happen.  In

22   booking, before they even see the nurse, there are questions that

23   are kind of red flags and triggers for mental health services.

24        And then the routine next step is nursing, and, again,

25   there's a health and mental health assessment that goes on there.

1    And so there's flags in that process as well.

2         So there's really two sets of information gathered under

3    those two separate steps that either one or both end up in a

4    referral to -- for a mental health assessment.  And then a mental

5    health assessment is done right after that.

6         Does that -- and that -- it could be -- it could be all of

7    the things that you listed.  It could be something that they've

8    reported as part of their history.  It could be observations made

9    at either one of those steps about just kind of the way the person

10   presented.  And it could be things that the person said that

11   raised concerns about suicide or irrational thinking or whatever.

12        So it's a variety of red flags in both of those steps that

13   would trigger mental health assessments.

14   THE COURT:  Is there a policy in place or is there

15   something in place -- again, you said at least ten.  Ms. Simpson

16   said maybe even double that -- of those who are waiting for

17   competency restoration, waiting on a bed, a forensic bed at

18   Whitfield?  What, if any -- is there a policy or is there

19   procedures for a periodic review or request of Whitfield to -- is

20   there a bed available?

21        I know Whitfield has to service the entire state, but do

22   we just sit back and just wait until Whitfield calls and says, we

23   got a bed now?  I realize your guy has been waiting 60 months.

24   Because we do need to know, what is the time that the person -- I

25   want to know.  And you may not be the person to tell me, but --

1   and you may be requesting this.  But it's important for us all to

2   know who's been down there and for what period of time they've

3   been down there and why they might have been down there for as

4   long or as little time that they've been down there.  I want to

5   know, you know, because I suspect, based on some census data that

6   I've seen, that there have been some people down there for quite

7   some time.

8          DR. DUDLEY:  There have been some people there for quite

9   some time.  I was not -- what we were commenting on at the end is

10  that there's kind of another program in place where they've been

11  trying to do some competency restoration at the facility, where

12  people have come in to try to work with people who might be

13  otherwise waiting for a bed.  So I wasn't actually counting that

14  population.  I was counting the people who haven't qualified for

15  that program, who are, in fact, waiting -- who I know to be

16  waiting for a bed.

17         There is obviously people that I don't know are waiting

18  for a bed.  And I don't know -- I don't have the information, nor

19  do the health and mental health people have the information, about

20  the availability of beds and why they're not -- you know, that's

21  not something that they're really --

22         THE COURT:  Right.  But is there something that --

23         DR. DUDLEY:  So I don't know the answer to that.

24         THE COURT:  Okay.  Yeah, is it -- and I'm saying this for

25  the record -- is there something there that -- you know, is

1    there -- is there even a need to, or is there a policy in place

2    where there is followup on a periodic basis, either monthly,

3    quarterly, hopefully something less than annually, but annually,

4    every three years?  There's some people over there who have been

5    in there longer than three years, I'm pretty sure.

6          DR. DUDLEY:  That I do know.  Right, that I do know.

7          THE COURT:  All right.  And I'll ask the county this, and

8    whether or not the law requires that jurisdictions only use the

9    state facilities to do competency restoration or something, or

10   could that be contracted out or something?  You know, what monies

11   or resources might be available to -- you know, there is no need

12   for a person who is in -- who is an SMI identified person -- jails

13   cannot treat people with serious mental illness.  Jails cannot do

14   it, period.  And they have no business being in jail.  In some of

15   the conditions that I saw, they definitely have no business out

16   there at the Raymond Detention Facility.

17         DR. DUDLEY:  Right.

18         THE COURT:  All right.  Thank you, Dr. Dudley.

19         DR. DUDLEY:  Thank you.

20         MR. MOSER:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. MOSER:  My name is Jim Moser, and as Lisa alluded to,

23   I have been focusing on those youth charged as adults that are

24   placed at Henley-Young.  And also as she referenced, there's more

25   work to be done today, more information to review after the visit.

1          But just the basics to give you an idea of where things

2     are at, there are currently 14 males in that category.  There are

3     no girls currently.  There have been in the past some girls

4     charged as adults at Henley-Young, not currently.  The average age

5     is around 16.  Some -- a couple 14 up through 17.

6          The length of stay I mention in particular because of the

7     kids that are currently there, the low end is 11 days, a youth who

8     came in less than a couple weeks ago.  The long is 750 days, a

9     youth who came in September of 2017 who is still there.  And I

10    reference that in part because even though length of stay is

11    technically not an element or condition in this agreement I don't

12    think, it does play into the question of adequacy of programming.

13    It plays into some of the issues around behavioral concerns that

14    develop over time.  And I think, clearly, the kind of programming

15    and treatment and management of youth for 60 days, 90 days, six

16    months, nine months is much different if a youth has been -- the

17    needs become much greater and different over that long a period of

18    time.  So that's an issue that I think has continued to be of

19    concern for us, again, not a specific item in the agreement, but

20    plays into the -- there's an overlay of that over other issues.

21         That said, some significant process or continued progress

22    on a number of areas that are, I think, important.  There's a

23    process underway to update all of the policies and procedures, in

24    light now of the youthful offenders being there.  I've had a

25    chance to review a few of the ones that have been updated.  And

1    although they had, I think, generally pretty good policies

2    beforehand, I think the effort to update those in light of those

3    youth being on board has been very positive.  And I've seen a few

4    of those, and we'll be getting most of the rest of them in early

5    October I hope.

6         There have been modifications to their behavior point

7    system, level system that's often used with youth.  I think that

8    change has been positive.  It continues to evolve and is still in

9    many ways in its early stages of really being integrated fully

10   into the program components, but continue to see efforts by staff

11   there and leadership there to continue to improve that component

12   of the behavior management system overall.

13        Education, the county and the school district have worked

14   together to engage additional consulting support around education

15   for youth in confinement, a well respected -- nationally

16   well-respected person to provide some feedback, do some

17   assessment, provide some feedback more in the spring.  He was just

18   there the other day.  So he's getting his feet under him in terms

19   of sort of what he might be saying, but hopefully have some more

20   information in the early spring that might speak to this sort of

21   education program.

22        Again, thinking in terms of it's one thing to educate a

23   youth -- a short-term detention youth for 20 days, 21 days.

24   Significantly different to do it for a long period of time.  That

25   said, the district has good procedures in -- there seem to be

1    pretty good procedures in place to monitor attendance.  Kids are

2    attending.  It's a full day of school.  There are five youth

3    involved in their GED preparation program, with someone who is

4    very positive and energetic and very passionate about helping

5    those youth make progress on getting a GED that might be eligible.

6         THE COURT:  Are there times when you have less than

7    100 percent attendance?

8         DR. DUDLEY:  I'm sorry.  Say that again.

9         THE COURT:  I mean, you mentioned attendance.  Are there

10   circumstances, people who are in the facility who are not

11   attending?

12        DR. DUDLEY:  There seems to be very limited, but every

13   time -- you know, there are youth who don't want to get to school,

14   or maybe want to be sick for a day or something like that.  There

15   are occasionally incidents that -- you know, where there's a

16   disruption where they can't attend.  But by and large, kids --

17   really, kids are attending.

18        So anytime a kid is sick for a day, you can say, okay,

19   maybe -- that's one day.  We'll see what happens.  But they're not

20   kids who -- as far as I can tell, not kids who are just missing

21   school for any significant period.

22        THE COURT:  Okay.

23        DR. DUDLEY:  There is, I think -- and why I mentioned

24   length of stay -- there is a process that's getting underway with

25   some recent court involvement here and court orders where

there's -- creating a special docket to try and move some of those

youthful cases faster.  So Judge McDaniels will be assuming some

responsibility in working with the district attorney's office, law

enforcement, and through the court process, trying to avoid these

lengthy delays between indictments and stays.  We'll have to see

what the results of that are.  But I think the process -- have to

give a lot of credit to the folks that were involved in developing

that process, because I think it has the potential to

significantly shorten length of stay.  And even though some youth

will stay in the adult system, but the process will move much

faster.  And we'll see if that plays out in the months ahead.

Mr. Frazier, I want to thank Mr. Frazier, who's the new

executive director, relatively new still, started in May just

about the time of our last visit, and his staff for all their help

in providing information.  They have a lot to manage there,

including a water main break that shuts down the water for days at

a time.  But they went right into action and resolved some of

those problems and managed to take care of the youth

appropriately, so that's a positive.

The concerns -- you know, there are still some of the

concerns -- and depending on how this plays out in actual report

and getting some more information -- their psychologist position

is vacant since June.  They have been advertising and trying to

seek a replacement, but that continues to be a sore point in terms

of having a treatment director of sorts who can coordinate the

1    work of some of the other mental health professionals and social

2    workers there.  Hopefully, that can be -- someone can be on board,

3    but I know initially it was a long time to get the -- Dr. Payne,

4    and now she's gone.  They'll hopefully find a new person soon.

5         I think education in general, more of the concern of

6    quality and, again, length of time that kids are there and are

7    kids really learning.  I will compliment, again, the special

8    education efforts to get information, get IEPs, those kinds of

9    things, from the kids' school.  So that's being addressed.

10        Space concerns remain around recreation, therapeutic

11   programming space, you know, and even just continue to think --

12   we'll continue to make recommendations around how to improve the

13   environment that will help with some of the behavioral issues as

14   well.

15        And there are challenges around that, around, for example,

16   the play out of things like use of room confinement, which is a

17   tight goal to meet in terms of, you know, youth not being confined

18   in their room for any extended periods of time.  They've made

19   significant progress in that over the last six, seven months.

20   That seems to have continued reasonably well, but challenged

21   somewhat by a facility where a youth -- you know, they sort of can

22   be in and on the unit with the other kids, or they can be in their

23   cell.  There's no sort of other option to work with the youth

24   separately in any way, so that's a challenge in a physical plant

25   environment as well.  So I'll continue to make some

1   recommendations around that regard.

2          But, overall, I think I would -- I continue to

3   characterize it as continued progress, steps forward.  I think

4   they're aware and well aware of areas where they can continue to

5   make efforts to improve and will continue to do so.

6          THE COURT:  Okay.  Thank you, Mr. Moser.

7          DR. DUDLEY:  Thank you.

8          MS. SIMPSON:  Your Honor, I wanted to say just a couple

9   words.  We always try to highlight the areas of improvement and

10  progress.  Listening to myself and my team, I do want to make sure

11  we don't leave an unrealistically rosy picture.

12         If you were to go back to RDC today in the unit that -- or

13  the pod that we toured when you were there in August, it would

14  look very similar to what you saw in August.

15         THE COURT:  One of the questions that I had is -- that I

16  already wrote down and was going to call you back up, was whether

17  or not -- are there some sort of plastic tables or anything in

18  that pod that I was in?  Because the inmates have to eat sitting

19  on the floor or be the first ones who get to the stairs, and there

20  were no tables.  There was nothing there.

21         They did not like the idea of sitting in their cell rooms

22  to eat their food because there's no lights in many of them.  And

23  they're sitting there in very close proximity to their toilets,

24  and that does not allow for a good situation to be eating.  So

25  they move out into the community area, if you will, and they have

 1    to sit there on the floor.  And Hinds County gives them three

 2    meals a day, I presume, but they have to eat their three meals

 3    sitting on a floor.

 4         MS. SIMPSON:  I don't believe that's changed, but I'm

 5    going to look to my corrections expert.  That has not changed.

 6         THE COURT:  That's not the case at the work center.

 7         MS. SIMPSON:  No.

 8         THE COURT:  No.  I saw tables in the work center.  I saw a

 9    long table.

10         MS. SIMPSON:  Yeah, that's correct.

11         THE COURT:  That's not the same at the work center, and

12    it's not the same at Jackson.

13         MS. SIMPSON:  That's correct.

14         THE COURT:  Okay.

15         MS. SIMPSON:  And as I said, I mean, that's obviously one

16    of the difficulties.  The facility that -- C is being refurbished,

17    but B and A look the same as when you saw them.  So you're aware

18    of the condition of the facility there, the locks, as we've

19    described before.

20         As I mentioned, in August the assaults continued somewhat

21    apace.  Through the incident reports, there appear to be -- to

22    have been about 13 assaults at RDC, some of them quite serious.

23    One individual was found unconscious in the shower, quite a bit of

24    blood around him, went to the hospital, and remained in the

25    hospital for some time, may still be in the hospital.  I'm not

1    sure about that.  Stab wounds, so some serious assaults.  People

2    are being injured, and the officers express concern for their

3    safety as well.

4           So as I said, I didn't want to leave it as too rosy a

5    picture.  The conditions you saw continue to exist.  The condition

6    of the facility, the low staffing, it's a very serious problem at

7    RDC.

8           THE COURT:  Thank you, Ms. Simpson.

9           MS. SIMPSON:  Thank you.

10          THE COURT:  I know now it's the phase where I'll hear from

11   the parties.  But we're going to take about a ten-minute break

12   before doing so, and I'll be prepared to hear from you then.

13          Court's in recess.  You can keep your -- I mean, you can

14   go about -- I'm going to do something here.  Court's in recess.

15              (A brief recess was taken.)

16          THE COURT:  You may be seated.

17          Ms. Barker, I just learned that Sheriff Mason was in this

18   courthouse yesterday for an omnibus hearing or some type of

19   hearing?

20          MS. BARKER:  Yes, sir, he was.

21          THE COURT:  I guess because he was under subpoena?

22          MS. BARKER:  I don't know that he was under a subpoena,

23   but he was here yesterday.

24          THE COURT:  After his surgery, the surgery that we talked

25   about just Monday?

1          MS. BARKER:  Yes, Your Honor.  And he contacted me this

2    morning and said that he is very ill.  That he's, you know, having

3    problems recovering, so that's the communication that I've had

4    with him this morning.

5          THE COURT:  Did you know he was here yesterday?

6          MS. BARKER:  Yes, sir.  I was here with him yesterday.

7          And I've advised my client, Your Honor, that, you know,

8    this was a very important status conference, and he has stated

9    that he has some medical issues.  And I don't want to misrepresent

10   anything to the Court, but that's the status of that right now.

11         THE COURT:  Okay.  United States has filed a motion for

12   contempt because of him not -- they contend that he's been

13   derelict in a portion of his duties.  In fact, I think the

14   county's counsel -- counsel for the county, in its response, has

15   suggested that the county has done all that it could do.

16         MS. BARKER:  As far --

17         THE COURT:  The board of supervisors has given them the

18   money, you know, but, Judge, we're not responsible for hiring

19   people.  We're not responsible -- as I recall -- it's been a while

20   since I've read these things.  But he was here yesterday, and he's

21   too sick to come here today.  He's still the sheriff of Hinds

22   County until December 31st.

23         MS. BARKER:  Yes, Your Honor.

24         THE COURT:  All right.  Okay.  I guess, the Government --

25   in suggesting how we should proceed, the Government has said that

1      they wanted to respond or follow up first, and you may.

2          MR. CHENG:  Your Honor, we have sort of a suggestion

3      regarding the use of this hearing and this process.  Normally the

4      court monitor provides a report and then we get the information,

5      and we mull it over.  But it's not always clear what should be

6      done with the information.  I do think these monitoring procedures

7      work better when they're being used in some way to guide how the

8      process should move forward.

9          So in this case, Ms. Simpson has made a number of factual

10     allegations.  They are technically just allegations at this point,

11     although they are entitled to some presumption of accuracy under

12     the consent decree.

13         But let's suppose everything she said is true.  Let's

14     suppose she's correct.  The population has declined, but staffing

15     has actually dropped since the last time there was a status

16     conference.  Officers still are not going into the housing units.

17     They still don't have direct supervision.  Most of the policies

18     and procedures still have not been done.  Most of the locks are

19     still broken.  Inmates are still able to get out of their cells

20     and attack other inmates.

21         If those allegations are true, and the county and the

22     sheriff don't truly dispute any of those allegations, then there's

23     really no dispute over the material facts that are before this

24     Court.  And so I think let's perhaps put this in the county and

25     the sheriff's court.

1        Ms. Simpson has done a very good job.  She and her team

2   have gone very completely through the jail and provided some very

3   basic facts that are now pending before the Court.  What we don't

4   know is whether the county and the sheriff actually dispute any of

5   those facts.  And usually during these hearings after the report

6   is made, we walk out of here never really knowing if there's any

7   real dispute or concern.

8        This is really important to understand from the hearing,

9   because not only does it affect the papers pending before the

10  Court, it also affects the compliance process in trying to get

11  things fixed.  The monitor and her team have suggested that there

12  are now some plans and some understandings about what is going to

13  be done in the next couple months to get the county into

14  compliance.  And while I totally respect their efforts, we've been

15  through this process before where the monitors have come in, and

16  certain representations were made, certain understandings were

17  supposedly attained, but then, months later, we find out, well,

18  there were changes.  There were surprises.  There were things that

19  happed that interrupted the process.

20       Just to highlight just a few of the items, for example,

21  even though Dr. Dudley mentioned it in passing -- or Mr. Moser

22  mentioned it in passing -- Dr. Payne left.  She left with plenty

23  of notice to everyone that she was going to be leaving

24  Henley-Young.  There were supposed to be plans in the works to

25  replace her, but as you heard from Mr. Moser, she still hasn't

1    been replaced.  It's been months.  You know, she's providing

2    mental health services for the youth.

3         Likewise, there were plans to improve the doors.  And

4    early on, Mr. Parrish talked about replacing unit doors and

5    control room doors as a priority, because if you can't control

6    those doors, they could lose the entire facility.

7         Now we're talking about maybe we can modify C Pod, B Pod,

8    A Pod.  We understand these are long-term plans.  These are things

9    that have to be done long term.  But what about the priority

10   recommendations?  What about the emergency things that need to be

11   done right away?

12        Your Honor has already been through the facility on your

13   own.  You've seen those conditions.  And when Ms. Simpson says she

14   doesn't want to be leaving an unrealistically rosy picture, we

15   agree.  Like, we do not want to leave an unrealistically rosy

16   picture.

17        One issue that wasn't even mentioned during the briefing,

18   inmates are sleeping on the floors in a number of housing units.

19   Now, presumably, this is going to be a short-term issue as some of

20   the air conditioning and ventilation systems weren't working, but

21   we have inmates not just, you know, without furniture to eat on.

22   We have inmates sleeping on the floors in the dayrooms.  We

23   continue to have vermin issues.  We have a host of other problems.

24        And I wish I could say there won't be more surprises, but

25   even after all these years, the United States is still surprised

1    when weird things happen at this jail, things we never

2    anticipated.

3         So just to give an example, last week people swore -- I'll

4    proffer this -- they swore that the jail is literally built of

5    regular, unreinforced cinder block and a tin roof, the Raymond

6    Detention Center.  It was designed by a school architect.

7         Now, I have heard of this as an anecdotal claim, but we

8    hadn't had anyone swear to it before.  To literally have a jail

9    built with a tin roof is so, like, shocking, even for those of us

10   who have been doing this for a number of years, that I cannot be

11   as optimistic as the monitor about what's going to happen next.

12   There are just too many things still needing to be done.  There's

13   still too many policies and procedures that haven't even been

14   drafted.  There are still too many staffing problems.

15        And I, therefore, leave it up to the Court how to run with

16   this, but I do suggest that maybe we can ask the county and

17   sheriff what is really in dispute here, other than people just not

18   wanting to do what they have to do.

19        THE COURT:  Well, the sheriff isn't here.

20        MR. CHENG:  Well, one difference between our office and

21   regular plaintiffs is that when the United States brings an

22   action, it's basically a government versus a government.  In many

23   ways, it doesn't really matter if the individual isn't here; it's

24   the entity.  And it's the sheriff's department and the county, as

25   entities, that have failed to do their duty.  And while we can go

1   back and forth about who's most responsible, legally, it's still

2   the entity.

3        THE COURT:  Yeah.  And I hear you, and I know you hear my

4   frustration.  I hear you.  Part of going out when I did in late

5   August, as opposed to late July, I realized that there was a

6   pending primary election.  Didn't want to give the implication

7   that the Court was somehow stepping into a process that might

8   affect how persons might view the impending election prior to

9   the -- prior to the primary.

10       Then when we went out there, it was even after -- I

11  think -- was it after the runoff?  It might not have been.  I'm

12  not sure.

13       MR. TEEUWISSEN:  It was after the first vote, but before

14  the runoff.

15       THE COURT:  Okay.  Went out there before the runoff.  But,

16  again, it wasn't in any attempt to try to influence or do anything

17  in that regard, so I hear your frustration.

18       Now, we are faced with -- and this is one of the issues

19  that we'll have to deal with when the Court hears the contempt

20  motion.  Although the county government is the county government,

21  the players within the county government have changed.  And how

22  does the Court deal with that particular change?

23       Should the Court give the new people an opportunity to get

24  it right, to put a plan together?  Do I -- I mean, I don't know.

25       But it seems to me, if they have any interest in doing it,

1    they would have been here today, either those who are elected,

2    those who are appointed, or those who will be leaving office.

3    Because based on the papers that you filed back in June, or

4    whenever it was, you're talking about stuff that happened before

5    June.  And you were saying, Judge, you can find them in contempt

6    based on the findings that the monitors found prior to June.  And,

7    Judge, they submitted their report to you on June 27th, and that

8    report sort of confirms all that we said when we were here back in

9    June.  And it's gotten a little worse since then, Judge.  I think

10   that's what your papers say.

11        MR. CHENG:  Yes, Your Honor.

12        THE COURT:  So now we're three months down the road, and

13   we have -- we know we're going to have a new sheriff, but what

14   responsibility does the existing sheriff have for the running of

15   the jail right now?  That's his obligation, according to the

16   papers filed in response by the attorneys for the county, I

17   believe.  Well, Judge, we appropriate money.  We do this.  The

18   board of supervisors are not implementing policies and procedures,

19   the sheriff is.  I think that's what the papers say, I think.

20        I'm not trying to drive a wedge between the two -- I'm not

21   trying to drive a wedge between the two, but all I'm saying is --

22   I bet you what I hear from some of the defendants, Judge, we have

23   new people coming aboard.  Mr. Teeuwissen already mentioned, we

24   might have us a district attorney who attends the CJC meetings,

25   who might be interested in the CJC meetings, if that's the right

1   thing for -- criminal justice committee, whatever that meeting is.

2   You know, we may have somebody who is more attentive, more

3   responsive, but who has no authority to do anything until

4   January 1.

5        And if I wait until January 1, as you say, if there's a

6   jail that's made of cinder blocks and a tin roof, it may collapse

7   before then.  More people may get stabbed before then.  They still

8   might be eating off the floor until then.

9        So I hear your concern, and I hear -- and I -- and I know

10  you all hear mine.  So we need to get to a remedy real quick.  I

11  agree with the United States.

12       MR. CHENG:  If I may add, Your Honor, there is one

13  difference between contempt and, say, a criminal proceeding.  You

14  know, normally in a criminal proceeding, there is an individual

15  actor who, because of their mental state, has done something

16  wrong, and they're liable.

17       Contempt in some ways is simpler, because you are simply

18  enforcing the orders of the Court.  So while one particular

19  defendant may or may not be as culpable as another, the real

20  question is whether the entity has actually violated the order or

21  failed to comply with the order.

22       And so I appreciate that, as actors change, realistically,

23  practically, we need to take that into account, because new people

24  have new ideas.  But as you're thinking that through, just bear in

25  mind that for the process at least, you know, it is actually in

1   some ways less of a personal process and more of a procedural

2   mechanism.

3         THE COURT:  Oh, I understand.  I've done criminal

4   contempt.  I've done civil contempt.  I've done show cause.  I've

5   done sanctions.

6         MR. CHENG:  I have not.

7         THE COURT:  Oh, I have, and so I think I know how to

8   demand respect for the court process.  Okay.  Thank you.

9         Where does the county wish to -- well, how or where does

10  the county wish to start?  Because I did say we weren't having a

11  hearing on the contempt today.  I mean, you know, we will not have

12  a hearing on that, but I'll listen to what one has to say.

13        MR. TEEUWISSEN:  May I approach the podium, Your Honor?

14        THE COURT:  Yes, you may.

15        MR. TEEUWISSEN:  May it please the Court?

16        THE COURT:  You may proceed.

17        MR. TEEUWISSEN:  We have a number of items that are of

18  grave concern to the Court as well as the monitors and the

19  parties.  If Your Honor will allow me to briefly -- during the

20  break, I think I can speak to a couple of the most immediate

21  issues, and then we can delve into perhaps a suggested procedure

22  to deal with the other, more complicated issues.

23        First and foremost, there is furniture that has been

24  ordered for the Pod C direct supervision.  Major Rushing assured

25  me during the break.  County Administrator Davis has concurred.

1   That furniture will be placed into the existing pods where there
2   is no furniture, so no one else has to eat off of the floor or in
3   any other inconvenient position.  And because it does not appear
4   that Pod C direct supervision will be online before the end of
5   October -- and, Your Honor, if we're all saying the end of
6   October, realistically, that's going to be November the way
7   construction goes.  Furniture will be reordered for Pod C, so that
8   takes care of at least one immediate issue that was raised today.
9   There is furniture available in the wrapper that can be placed in
10  those pods, so people can have somewhere to eat.
11          With respect to the proposal for work to be done, Pod C
12  is, as you heard from various monitors, under renovation for
13  direct supervision.  There's been training for that.  That has
14  included appropriate door work, and it will include classification
15  with better inmates entering Pod C.  That should be done by the
16  end of October.  Again, I would put the caveat in there, let's say
17  November.
18          As soon as that occurs, the plan is to take either Pod A
19  or B completely offline.  In the pod, take two of the units and do
20  them as lockdown units, with complete renovation of swinging doors
21  as opposed to sliding doors and make the other two pods in -- I'm
22  sorry -- the other two units in that pod as direct supervision.
23          There is no intent at this time to renovate the third pod,
24  but to keep the population lower to help with the staffing ratios
25  from that standpoint.

1          Those are the immediate things that will occur between now

2     and let's say the end of the year, six months at the most.  Those

3     address some of the safety and security issues and some of the

4     conditions about which the Court has concern.

5          I do disagree with Mr. Cheng on a number of points, but I

6     don't think that's for today.  I would say to the Court, Your

7     Honor, issue a show cause order and set a hearing.

8          There are things in which the sheriff's office and/or the

9     county may have a defense of inability, such as the Dr. Payne

10    situation at Henley-Young.  We're posting.  We're advertising.

11    Director Frazier is interviewing.  We haven't found anybody who

12    wants to fill that position.

13         So there are certain things in which the county may have a

14    defense -- when I say "county," I mean sheriff or board.  There

15    are other issues, quite frankly, that only upon hearing testimony

16    is the Court going to be able to solve, because like it or not,

17    that District 2 Supervisor race you were asking me earlier, it

18    didn't turn on the jail.  It turned on whether there was enough

19    street paving in the City of Jackson.  And so I realize that while

20    we may have new actors, and certainly new actors should be given a

21    chance to do things, I also think it's a bit unrealistic, having

22    now represented the county for five and a half years, to think

23    that simply having new actors is going to solve some of the

24    tougher challenges that are facing this Court.

25         And I think the sooner we get to some sort of hearing and

1    get some sort of evidentiary record made so that the Court can

2    decide how to proceed, whether that's with a direct order of this

3    Court on contempt, or whether it's something similar to what the

4    Court did in the state mental health, whereby the Court had

5    directed the parties to find a special master and take some other

6    approach, I would ultimately defer to the Court.

7          I think we have a short window.  We have a plan to take

8    care of some of the most pressing things.  But other things such

9    as what Mr. Moser referenced, 750-day individuals, the county

10   can't control that, and it's unrealistic to expect the county to

11   design programming to house youth for 750 days.

12         THE COURT:  I mean, look, if a child is in the custody of

13   Hinds County, is incarcerated, the law requires that Hinds County

14   provide educational services for that child, correct?

15         MR. TEEUWISSEN:  And Hinds County does, as well as

16   behavioral management and qualified mental health individuals who

17   are at Henley-Young, but hear me out, Your Honor.  There should

18   not be a responsibility of Hinds County to keep building

19   additional programming for individuals who are that young.  And if

20   they are guilty, they should be moved to the state system.  If

21   they are not guilty, we are ruining kids' lives.  No matter how

22   much programming Hinds County provides, we're ruining a kid's

23   life.

24         THE COURT:  Why is it that our system allows them to be

25   over there for 750 days, either with a trial or even after a trial

1    of some adjudication?  I mean, if they're in the youth court

2    system, and they have been adjudicated --

3         MR. TEEUWISSEN:  No.  These are juveniles charged as

4    adults who have never had a trial.  And Your Honor has answered

5    that question in another opinion with respect to the speedy trial

6    rights, that for whatever reason, our state and our state supreme

7    court does not think are important.

8         We simply should not have folks sitting in these detention

9    facilities.  That does not alleviate the county from providing

10   programming.  I'm not saying that at all, Your Honor.  But to

11   continue to design programming for individuals who have been

12   charged, but not convicted, because somehow the state system won't

13   move them, that's not a remedy.  That's just throwing money at a

14   problem.

15        THE COURT:  Well, but if they -- if they are sitting there

16   and the state is not allowing them to leave on bond, bail, or

17   some -- and they say, no, you're denied bond or bail based on the

18   alleged crime, then the county is responsible for all of their

19   needs just like every other pretrial detainee.  If they're not

20   being moved, the county is responsible for their three meals a

21   day, for their medical services, and all of that.  And once

22   convicted, that responsibility is passed over to the Mississippi

23   Department of Corrections.

24        So -- I mean, so why they are in custody, I think -- I

25   mean, we will talk about this in depth at any particular hearing,

1    which we won't set today, but we will set, as you've requested,

2    before the end of the year --

3         MR. TEEUWISSEN:  Your Honor, I want to make sure I'm

4    clear.  I'm not disagreeing with you on that.  And I'm certainly

5    prepared to call witnesses to show that we are providing that

6    programming.

7         I think when you hear from Mr. Moser from the stand or

8    other individuals, we're talking about a fine level of additional

9    detailed program.  This is not an all-or-nothing situation.  But

10   at the same time, I think if the county is going to be held

11   responsible for the failings of the state criminal justice system,

12   you know what, Your Honor, I owe it to my clients to put some

13   testimony on the stand, so that somebody at the legislature,

14   somebody running for governor, somebody somewhere else can

15   understand that they're pushing down their failures to my client.

16   And I think the public is entitled to know that as well.

17        So I'm not disagreeing with you --

18        THE COURT:  I mean, the only state actors who are

19   responsible for bringing a person to court is the district

20   attorney and the state circuit judges, --

21        MR. TEEUWISSEN:  Correct.

22        THE COURT:  -- period.

23        MR. TEEUWISSEN:  But to the extent that there is some

24   other lack of funding somewhere, whether it's the state court

25   system, the district attorney system, or elsewhere -- specifically

1  with mental health issues, as Your Honor is well familiar with --

2  read your opinion -- those issues need to be discussed and brought

3  out as well.

4       There are things, yes, Your Honor, that the county is

5  absolutely responsible for and has to do.  There are things that

6  any sheriff is responsible for and must accomplish.  But there are

7  other things, other requirements that are not so easy as, board,

8  appropriate money; or, sheriff, hire more people.  And that's

9  where I disagree with the Government, because, yes, my client

10 should be held accountable for what my client has done or failed

11 to do.  Yes, Ms. Barker's client should be held accountable for

12 what he has done or failed to do.  But there are yet other

13 circumstances, mental health, where all of our hands are tied, and

14 we're frustrated.

15      And at least those issues need to be put out there.

16 Perhaps -- as Your Honor has other parties before him considering

17 remedies for mental health issues, perhaps the county and the

18 sheriff can get to the table as well, because those issues affect

19 us.  That's where I disagree with the Government.  I'm not trying

20 to avoid responsibility.

21      And I'll say this.  I'm glad Mr. Cheng is passionate.  I

22 was passionate in January when I told you these problems right

23 here, the first time I appeared before you.  And I was passionate

24 the first time I was on the phone with the Department of Justice

25 in May of 2014, when I asked them what took them so long to get

1    down here and get started.  These problems have to be solved, but

2    we've got to focus on some resolutions as opposed to what boxes

3    are checked or not checked.

4         I think that the monitors have offered good advice.  I

5    think the plan with Pod C certainly seems to be going well.  The

6    changing of doors and securing of locks seem to be going well --

7    I'm sorry, let me digress.

8         There has been something done with respect to security

9    issues at Raymond since August.  Maybe all the doors have not yet

10   been fixed, but Major Rushing arranged for about two dozen bad

11   actors to be removed to nine other counties.  Those are the types

12   of things that need to be heard as well.  Perhaps we haven't done

13   everything to the highest level, but we haven't been deliberately

14   indifferent of the issues that are facing and plaguing the

15   detention system in Hinds County.

16        THE COURT:  I heard you say that the Court -- you might

17   want to think about doing something -- suggesting to the Judge

18   that you might want to think about doing something like you've

19   done in the mental health case and think about a special master

20   and all that kind of stuff.

21        But in this situation, I assume the monitors have been

22   serving sort of that particular function.  The -- and, again,

23   we'll talk about this at the full hearing, but I guess one of the

24   concerns that the Court has in this case is that the parties agree

25   to these terms, whatever terms that there are, and that's what

1    this is about, whether or not the terms of the parties' agreement

2    have been complied with.  The United States says it has not.

3         And since January when this case was reassigned to me, I

4    don't know if there's been any appreciable difference in how -- in

5    how the county has performed.  Again, I am reserving judgment on

6    all of that, because we're not hearing it.

7         But what I've heard from the monitors and what I've read

8    in the reports, there are recurring themes and recurring things

9    that -- themes that -- themes and things, t-h-i-n-g-s, which are

10   recurring.  And it's like a treadmill, not getting anywhere.  And

11   I want to be true to my word -- well, obviously I've lied already,

12   because I said I didn't want to see anybody get hurt under my

13   watch while this thing is before me.  And I'm hearing today from

14   the monitor, Judge, there are real issues with respect to the

15   incident reports that we've reviewed this time around and all of

16   that.  Not to say that any -- if everything is complied with in

17   the agreement that the parties have reached, that some of the

18   violent acts which have occurred there, the assaults, the

19   stabbings, would not have occurred.  But while it's under my

20   watch, I don't want to see that happen.  I don't want to see

21   anybody hurt.  I don't want to see anybody die.

22        I have a lawsuit, *Wade versus Hinds County, 3:19-cv-193.*

23   Hinds County has been sued by an inmate who has been -- his

24   attorney says has been hurt subject to stabbings, and I'm not even

25   sure if this is the one who Ms. Simpson has told me about today.

1   But Hinds County, again, is facing litigation based on that.

2          MR. TEEUWISSEN:  Your Honor, I'll take it further.

3   Mr. Simon and I have met within the last month with the insurance

4   carrier for Hinds County.  We understand the pressure every

5   much -- bit as much as Your Honor does.  The question is how do we

6   get either the right people's attention to make resolution

7   priority and/or what are priority resolutions that are achievable

8   to get this done?

9          We're not disagreeing, Your Honor.  I understand your

10  frustration, and I understand I get paid to stand up here and take

11  your frustration.  I get that.  I'm as frustrated as you are.  I'm

12  as frustrated with the Government and its three-ring binder, slow

13  approach to everything.  I'm as frustrated as anybody.  I can say

14  that for Mr. Simon.  I can say that for Ms. Barker.  That's why

15  I've encouraged a hearing, so we can parse this and figure out

16  what is going to be something that's really going to get us there?

17         We would contend we're not avoiding the terms of the

18  settlement agreement that were negotiated, but that the priority

19  recommendations are additional requirements beyond the settlement

20  agreement which don't help us achieve the safety and security

21  issues that we need, and which another judge said, you don't have

22  to pay attention to the priority recommendations; file the

23  settlement agreement.

24         Your Honor, I have asked for a hearing.  I understand my

25  client may be facing a contempt sanction.  My client may be firing

1    me for asking for a hearing.  But I think that's the best method

2    forward.  I think Your Honor needs to hear evidence as to what

3    works or does not work.

4         And I think Ms. Simpson has done a good job this morning

5    stating -- and I don't disagree with her representations this

6    morning or Mr. Parrish or Mr. Moser -- as to what is working or is

7    not working, but we still got to have more improvement than we

8    have.

9         It's nice for Mr. Cheng to say he finally learned that the

10   Raymond Detention Center was built of cinder block and tin.  Where

11   has he been for the last five years?  I told him that five years

12   ago when he first came.  So now he heard it under oath.  It wasn't

13   good enough coming from the lawyer, but now he heard it under

14   oath.  That's not going to change between now and the end of the

15   year, Your Honor.  That's not going to change between now and next

16   year.  We've got to get some real solutions here.  Build upon the

17   progress that we've made.

18        Five years ago, there were 1,100 people in county

19   detention facilities every day.  It's down to 535.  It may drop a

20   little bit more with the new district attorney.  We've figured out

21   about what a stable level is.  How now do we get the recruiting

22   effort -- Ms. Simpson and I have talked about this -- how do we

23   build that stability for folks who want to come and work for an

24   elected official, because that's a challenge we have, Your Honor.

25   It's not just pay.  It's if I go to work for the sheriff, I'm an

 1   at-will employee.  I don't have civil service protection.  What if

 2   he doesn't like me today?  How do we tackle those issues?

 3        And we think they're already negotiated.  We think you

 4   look at paragraph 42 that addresses funding and budget.  We think

 5   you look at paragraph 47 that addresses personnel matters.  But

 6   you need to hear the evidence, and we need to figure out some

 7   way -- some way to get additional teeth in where we are.

 8        THE COURT:  How long do you anticipate a hearing will

 9   last?

10        MR. TEEUWISSEN:  The Government is taking a series of

11   depositions.  We would not anticipate recalling individuals that

12   the Government is deposing, so that will shorten the hearing.  I

13   think we could get a hearing done in a week.  The Government had

14   previously said two weeks.

15        I think the discovery efforts -- my suggestion, Your

16   Honor, would be that both parties submit portions of depositions

17   they feel are supportive of their position and not then have to

18   recall that testimony live.

19        There is some other live testimony that I think would help

20   Your Honor.  I'll give you an example.  Talking about the

21   education programming at Henley-Young, we agree with Mr. Moser.

22   We need better education programming.  We've got to figure out how

23   to do that under state statute, or Your Honor is going to have to

24   give us an order.  Because while we have Mr. Dominiche,

25   (phonetically) who's visited and has offered to do a program,

1    while we have Administrator Davis' and the current board's support

2    for doing some other educational programming, state statute says

3    we've got to cooperate with the local school district.

4            And, you know, the local school district, they're fighting

5    about charter schools.  So they have no interest in seeing

6    Mr. Dominiche come in and do something different at Henley-Young,

7    because to them that's just another version of a charter school or

8    a loss of control.

9            There are real issues here that need to be brought before

10   the Court.  I think you got that point.  But I also want to make

11   it clear to Your Honor I'm not standing here on behalf of Hinds

12   County trying to shirk from those issues.  They've been going on

13   too long.  We're hearing the same thing from Monitor Simpson that

14   we heard from Dr. Austin when Senior Judge Green brought him in in

15   2012 when I was still city attorney.  We've got to figure out what

16   do we do to really get traction.

17           Building a new facility, that needs to be discussed.

18   Quite frankly, there needs to be some evaluation by the county,

19   but I don't think it comes short of a court order where you say,

20   county, you got to tell the Court what you're going to do with

21   these facilities.  Are you either going to commit to another round

22   of several million dollars to shore them up, or are you going to

23   commit to building a new facility?  And you've got to make that

24   decision sometime sooner rather than later, because we can't

25   continue to put band-aids on it.

1          You know, only in Hinds County, Your Honor, can we have a

2     tornado in Learned and it miss the jail.  I wish the tornado had

3     hit the jail, not to injure anybody who's there, but to help

4     destroy it so we can start over.  But I think if we leave it to

5     the elected officials -- and you've seen this, not just with the

6     state mental health, but with the *Olivia Y.* case and other things,

7     you know they're going to be kicked down the road.

8          THE COURT:  Let me ask you this.  I mentioned the CJC or

9     whatever it's called, that committee.

10         MR. TEEUWISSEN:  Yes, sir.

11         THE COURT:  Has that committee met since we were last here

12    in June?

13         MR. TEEUWISSEN:  No, sir.  Judge Green and Ms. Davis are

14    the co-chairs of that.  At Judge Green's recommendation, the CJCC

15    suspended meeting -- they will meet again in October, but

16    suspended it for the same reason that you are cognizant of with

17    your visit, the primaries.  Did not want anybody to use the CJCC

18    progress to try and abrade, for lack of a better term, indict,

19    point the finger at anybody else.  But there is a scheduled CJCC

20    meeting in October, and they will resume at that time.

21         THE COURT:  Well, it's unfortunate.  I see Mr. Owens has

22    left, but --

23         MR. TEEUWISSEN:  In his defense, he has some out-of-state

24    individuals.  We hope to meet with them when the hearing is over.

25    He's asked them to come in and help him assess how to make a

1  better functioning district attorney's office.  And so he left --

2  I want to defend him, not out of -- even though he's not my

3  client -- not out of any unappreciation for these issues, but

4  because he had previously committed to have some people from Texas

5  in, from Austin.

6       THE COURT:  No.  No.  No, and I wasn't being critical of

7  him.  I was just going to -- I had failed to make the inquiry

8  about the CJC and --

9       MR. TEEUWISSEN:  He is aware of those.  And he said he

10  will attend those meetings before he takes office, which would be

11  great, because then he's part of the dialogue and the discussions.

12  He doesn't have a legal obligation to do so, but he has

13  represented he will do so.  I certainly think he will.

14       THE COURT:  Okay.  And with regard to that, the Court

15  still receives habeas petitions from persons in Hinds County and

16  other counties throughout the state.  But not just Hinds County, I

17  want to be clear -- claiming that they have not been -- had their

18  trial and -- no speedy trial, maybe not even meeting with lawyers.

19  So the Court has been looking at these petitions.  And saying that

20  I'm under arrest, I've not been indicted, so what the Court has

21  done from time to time is enter a show cause order to find out why

22  the person has not been indicted.

23       I did it most recently in *McElroy versus* -- McElroy,

24  excuse me, I think that's the young man's name.  He told me how to

25  pronounce it.  *McElroy versus Mason, 3:19-cv-296*, just last week.

1    And the DA's office came forward and seemed to have been perplexed

2    about what their process was for indicting people.  And this man

3    had been in jail.

4         But the show cause order prompted the DA to present that

5    person's case to the grand jury.  And now we were told that the

6    person is under indictment at least, but he's been sitting there

7    for months.  And so is this what the Court is going to have to do

8    to make sure that people are shepherded through the system like

9    they should be?

10        I don't know what the CJC does.  I don't know.  I mean, I

11   don't know if they track stuff or what, but it seems to me -- I

12   don't know what it does.  But we need some system that makes

13   everyone accountable for making sure that the people in the jail

14   are not there as a prison, because there is a fundamental

15   difference between the two.  And that goes for the mental health

16   side to everything else.  People need -- that's a temporary

17   holding facility.  And if you're not going to give them bail or

18   bond, or if you're going to keep their bail or bond too high where

19   they can't afford to get out, or they can't do electronic

20   monitoring, you're going to have to make sure that those people --

21   because they are all human -- that those individuals are not there

22   excessively long, subjected to inhumane conditions.

23        MR. TEEUWISSEN:  We agree, Your Honor.  And, in fact, I

24   think in the *Jaurich* -- if I'm pronouncing that correctly,

25   J-a-u-r-i-c-h -- *versus Choctaw County* case, the Fifth Circuit

1   said the sheriff has a responsibility to do that.  Now, I

2   understand that was a divided opinion, and basically you're

3   telling a sheriff that he has to be responsible for the state

4   criminal justice system not moving.

5        But I've taken the position with the Government that we

6   need an order similar to that in this case, that Hinds County --

7   and there's language that's been negotiated that the order could

8   spring from that says if you're not indicted in 90 days, you need

9   to have a hearing on the record as to why you're still in the

10  Hinds County Jail.  If you are a juvenile --

11       THE COURT:  But why does it take an order from this Court

12  to do it?  Everybody's familiar with that decision.  Why does it

13  take an order from this Court to put in a stopgap or to do

14  something in that regard?  I mean, everybody -- Westlaw, Lexis,

15  and read the newspaper, where they saw that decision and others.

16       MR. TEEUWISSEN:  Your Honor, if I could answer that I

17  don't think I'd be standing before you, because that means I would

18  have figured out how to make state government run.  And I think I

19  would be somewhere else other than here.

20       I think that's a valid question as to why should it take

21  an order of this Court.  That's certainly the Government's

22  position, why should it take an order of this Court.  All I'm

23  saying is, I don't know how else to get it done, and the problems

24  end up in my client's facility.

25       It doesn't excuse my client's building a poor facility

1    25 years ago.  It doesn't address any of the maintenance or

2    staffing issues.  But those are very real complications that are

3    occurring.  And I'm not sure why it takes an order of this Court

4    either, but I also don't sit in one of those other positions and

5    can't answer that.

6         THE COURT:  Okay.  Thank you.

7         MR. TEEUWISSEN:  And I'm trying to be candid with Your

8    Honor.  I think Your Honor has had me appear before him on enough

9    occasions to know that I'm about as candid as they come, even if

10   my client doesn't like it.

11        And I think Your Honor is also appreciative that we want

12   to solve the problems.  Ms. Davis has been at every status

13   conference you had.  Ms. Davis and supervisors trekked to the

14   Coast.  Now, I don't know what you've done to scare the

15   supervisors from trekking a block over this way, when they would

16   trek to the Coast for previous status conferences.

17        We've got to have solutions.  There's going to be no

18   insurance coverage for Hinds County.  There is going to be

19   continued assaults.  There is going to -- if we don't find true

20   solutions.  And we've gotten bogged down too often in a shotgun

21   approach and avoided the real issues that are there.

22        With all due respect to Sheriff Mason, his disinterest

23   didn't start today.  I can say that because he's not my client,

24   but his disinterest didn't start today.

25        Your Honor, I'll answer anything else specifically.  I

1    think I've represented the position of the county and the board of

2    supervisors appropriately.  I do think that to the extent -- I

3    know Your Honor has a very busy calendar -- that something can be

4    heard or testimony established between now and the end of the

5    year, I certainly agree with the Government that the sooner rather

6    than later as to trying to find solutions and get testimony

7    recorded is important.

8              THE COURT:  Thank you, Mr. Teeuwissen.

9              MR. TEEUWISSEN:  Thank you, Your Honor.

10             THE COURT:  Ms. Barker?

11             MS. BARKER:  Good morning.  May it please the Court?

12             THE COURT:  You may proceed.

13             MS. BARKER:  Your Honor, I would like to make it very

14    clear for the Court, I understand your frustrations.  However, my

15    client is the office -- is the sheriff's office.  And I don't want

16    the sheriff's lack of being here because he is ill to overshadow

17    what these good people, Major Rushing and all of our employees,

18    have done to try to meet compliance with this -- with this consent

19    decree.  And I want to make that very clear for the Court.

20             Also, I do share the Court's frustrations.  I want to hit

21    specifically -- Mr. Teeuwissen just did an excellent job on

22    hitting on all the problems that we are facing.  And we want

23    solutions.  This is -- I've been sitting here for three years

24    asking for solutions.  For whatever reason, a priority

25    recommendation is given, and it's really not -- you know, it's 27

1   priorities, and you really don't know if this is on the way to

2   achieve compliance, because some of these priorities are not even

3   in the consent decree.  It has been a haphazard approach to comply

4   with this.  And the sheriff's office has been working with what we

5   have to really try to achieve compliance.

6        Now, paragraph 42 does state that the sheriff's office is

7   given an amount of money from which to work.  Yes, that is true;

8   however, the sheriff's office is not responsible for the

9   maintenance facilities or for fixing -- I'm sorry, for facilities

10  maintenance or fixing the locks or anything like that.  And I

11  think that it's apparent that if we want to address the staffing

12  issue that we have to -- and recruit -- we cannot recruit members

13  of the community who are civilians to come work in a detention

14  center for low pay in a place that the doors do not lock.

15       And the assaults that occur, Ms. Simpson stated, was

16  because -- or majority of them were because the inmates got out

17  because the doors do not lock.  This is not a new problem.  This

18  problem has been going on since 1994.  And we -- and I agree with

19  Mr. Teeuwissen and the county that we have got to have a show

20  cause hearing on this and present evidence to the Court.

21       Another thing that is within the sheriff's office control

22  that we have been proceeding on is the policies and procedures.

23  Now, I know that Mr. Cheng is going to -- or has stated that we

24  have not -- but we don't even have any policies.  We have four

25  that have been adopted.  That is just not true.  And I want to

1   make it very, very clear for the record that the Hinds County

2   Sheriff's Office Detention Services has policies and procedures in

3   place.  We are not functioning without any policies and

4   procedures.

5          THE COURT:  Are they adequate, though?  Has that been a

6   dispute?

7          MS. BARKER:  I can answer that, Your Honor.

8          THE COURT:  I don't just need to know whether or not

9   you've got something in place that does not do what it needs --

10          MS. BARKER:  Okay.  Your Honor, these policies and

11   procedures were put in place in 2017.  They were taken from an ACA

12   accredited facility and modified to meet our facilities.

13          Now, do they comply with the heightened requirements of

14   the consent decree?  No.  In fact, whenever we submitted these

15   policies and procedures, basically, we were told that they were so

16   insufficient to meet the consent decree requirements that we had

17   to start from scratch.

18          We've had a very difficult time finding our footing and

19   trying to develop all of these policies from scratch.  And, Your

20   Honor, we have -- we are very thankful that Ms. Simpson has

21   brought on Karen Albert.  Karen Albert has 25 years of experience

22   working in detention services creating policies and procedures,

23   worked with the National Institute of Corrections.  She has

24   been -- she, along with our team, have been working so diligently

25   at creating these policies and procedures.

1          And guess what?  There is a very big hang up.  We submit

2     these.  We've submitted almost 15 policies and procedures, and

3     some were in the draft stage.  We could not get them approved by

4     the Department of Justice.

5          Your Honor, the excessive use of force policy has been

6     going back and forth between the Department of Justice and

7     Ms. Albert and our team trying to develop these policies for one

8     year.  That is unacceptable on any level.  One month is

9     unacceptable.

10          Now, it's not from the county -- I mean, from the

11     sheriff's office not trying at all.  We have technical support.

12     In fact, Your Honor, I was on a conference call with Ms. Albert,

13     Ms. Simpson, and Mr. Cheng; 45 minutes approximately was spent

14     dissecting one sentence.

15          Now, I would -- I would submit to the Court that a better

16     use of our time -- instead of taking depositions for 40 hours last

17     week -- would be to sit down and hammer out these policies and

18     procedures, and actually come up with a plan that works for Hinds

19     County.  That was not done.  We didn't learn anything new in those

20     depositions.

21          And, Your Honor, I believe -- and my client, when we have

22     the new, presumed-elected sheriff here ready to take the wheel and

23     go forward, who is going to be interested and very aggressive in

24     trying to meet compliance with this.  But I don't disagree with

25     the Court's frustrations.  I have it.

1      My first question was what the Court asked, why don't we

2   just have policies and procedures and take them and tailor them a

3   little bit to meet Hinds County?  That's what I asked.  How can it

4   be this difficult?  Well, I've learned painstakingly how it can be

5   this difficult over the last six -- I'm sorry, eight months,

6   whenever we had brought Ms. Albert on.

7      So, Your Honor, we don't know what else to do.  We think

8   that the process is working with the fact that we are taking our

9   key employees, and they are being trained with these policies and

10   procedures as they are writing them.  I believe that that's

11   helping our workforce.

12      But, yes, I would love, honestly, just to ask the

13   Department of Justice, just give us something and we will do it.

14   That's how desperate we are.  We have good workers who are trying

15   to do their jobs, being underpaid and under difficult

16   circumstances, and they have been working diligently.  And I just

17   wanted to make that clear for the Court and for everyone here,

18   that despite the fact of the -- you know, the sheriff may not be

19   here due to illness.  My client has been working, and we do take

20   this very seriously.

21      And I commend Chief Vance on being here and Mr. White that

22   he's going to be part of his leadership team that -- you know,

23   this will have an aggressive approach going forward.

24      And, Your Honor, that's all that I have.  I know that Your

25   Honor may have some questions.

1         THE COURT:  No.  You know, my only concern is I don't

2   think we can have a hearing before -- before the end of the year.

3         The other thing is, as Mr. Teeuwissen mentioned, there

4   are -- the sheriff's employees are at-will employees.  And every

5   sheriff has a right and a responsibility to make sure that they

6   let people go who don't need to be there, or that they bring in

7   people who can do whatever needs to be done.  And that -- but in

8   addressing past failures while we have this transition, you know,

9   that's my concern.

10        I don't know what to do because the past failures need to

11  be -- need to be spoken about or tended to, as my parents would

12  say, or excised or whatever.  You want the next group of people to

13  come in on a clean slate possibly, so that eight -- six, eight

14  months down the road, they won't be able to say, but that was here

15  before I got here, and I'm being burdened by this or that.

16        The new group of people might have different ideas and

17  different approaches about how to do things, who's responsible for

18  the technical assistance of communicating, or even drafting these

19  policies and procedures or anything of that matter.

20        But do you agree with the -- with Mr. Teeuwissen that any

21  hearing that would take place would -- could -- would take at

22  least a week, but could possibly be done within a week?

23        MS. BARKER:  I agree, Your Honor.

24        THE COURT:  All right.  Okay.  Thank you.

25        MS. BARKER:  Thank you.

1          THE COURT:  Mr. Cheng, I know you want to sort of

2    reinforce your reputation, because you've been attacked.  No, no,

3    just teasing -- kind of teasing.  You want to lighten up some.

4    Now, I don't want y'all to go back and say, boy, the Judge was

5    just off his rockers the whole time.

6          MR. CHENG:  You know, it's amazing.  We agree so often,

7    but somehow still disagree so much.

8          You know, let me just mention first that we don't even

9    think you need a week.  We think you could do this in a day, maybe

10   even two days, especially if the defendants are serious about

11   using some of the depositions and not bringing in additional

12   witnesses and just submitting those on the papers.  Indeed we

13   actually think that, in many ways, a lot of these issues could be

14   addressed on the papers already in front of you.

15         One of the reasons we mentioned asking the county whether

16   they really dispute the facts is, at least on the past errors, the

17   ones you've talked about, I don't think anyone disagrees.  There

18   aren't enough staff, the doors are still broken, et cetera, et

19   cetera.

20         What we worry about is an open-ended hearing.  That if at

21   some point the Judge decides to proceed, what if it really does is

22   become an open-ended hearing about every system issue that

23   faces -- the state faces, or every problem the county has to deal

24   with.

25         The county and the sheriff are entitled to a hearing.

1    They're not entitled to a hearing on every imaginable issue, and

2    they're not entitled necessarily to full-blown discussions on

3    everything they want to bring forward if there's no dispute on the

4    material facts about what's pending before the Court.

5        Now, I didn't want to go into too much of this because

6    this does come too close to arguing the motions, but in terms of

7    helping us move forward, there are a couple of things that, if the

8    Court is thinking about, the Court might want to address.

9        If, for example, the Court does decide to have some type

10   of hearing, we're perfectly fine with talking about remedies and

11   addressing what's needed to move forward.  We do have some

12   concerns when we hear the county talk about these experts that

13   they've brought in or people who can talk about remedies.  We have

14   actually had a discussion with the county about whether there will

15   be any expert testimony.  As far as we know, there is not to be

16   any additional expert testimony other than from the monitors.

17       If they're going to bring in people to talk about remedies

18   or other things like that who are not current county employees,

19   then they need to provide additional disclosures, and we need to

20   talk about why that information is even relevant or necessary.  A

21   lot of these issues can be addressed, not necessarily at this

22   hearing, but if the Court decides to set some type of schedule for

23   a show cause hearing.

24       Other things that should also probably be addressed is

25   whether there should be some type of preliminary hearing about

1    scheduling, timetables, disclosures, just some of the basic stuff

2    that needs to be addressed before the substantive hearing.

3         And, finally, all this gets well ahead of myself because

4    technically the Court has never granted our motion, which is a

5    request for the show cause hearing.  But, certainly, we agree with

6    counsel that the Court should grant it and do so as quickly as

7    possible.

8         The hearing date is a different issue, but we do ask the

9    Court to grant the motion.

10        THE COURT:  Obviously, the county does not have any

11   objection to the Court granting that motion for show cause?

12        MR. TEEUWISSEN:  No objection, Your Honor.

13        MS. BARKER:  No objection from the sheriff's office.

14        THE COURT:  It is granted.  We'll have to figure out a

15   date, and we can do that at a later time.  I will tell you the

16   parties need to talk to each other and tell me exactly how much

17   time that they need -- or that they would need, because my

18   schedule for the -- actually for the months of October, and if the

19   trials that I have currently scheduled are going forward in

20   November, there is no time to do it.

21        I don't mind making you come in the Wednesday before

22   Thanksgiving.  But I don't want to do that to my staff, because

23   I'm sure we'll be able to get to some understanding about how

24   things will do.  And I'm trying to leave open that week of

25   Thanksgiving, again, being respectful to my staff and others,

 1    generally respectful to lawyers too in that way.  But that will

 2    take us into December, and I have a two-week trial that begins the

 3    first week of December I think.

 4         But the parties need to figure out how much time they

 5    need.  And we could figure out how we could hear this matter as

 6    expeditiously as possible, even if -- and I don't want to burden

 7    the parties with expenses and stuff -- even if they are not taken

 8    in consecutive days, but obviously the first option would be for

 9    consecutive days to get it in and out and over with.

10         I think Mr. Teeuwissen, I think, you know, said I don't

11    know what one could do or should do.  And that made me think of

12    what Judge Ellison's, in Houston, Texas, response to the parties

13    in that litigation, the state -- there was a state prison system

14    there.  They had agreed that they would provide air conditioning

15    for some of the prisoners there, and they apparently failed in

16    their responsibility.  And they kept failing and kept failing, and

17    this has been a very hot summer, as you know.

18         Judge Ellison made the remark -- I think he's quoted in

19    articles of having said, well, I guess I just need to bring y'all

20    here, and let y'all stay in the jail in the uncooled cells and

21    maybe that would get their attention.

22         I'm not suggesting that.  I'm saying that that ought to be

23    the remedy in this case, because I don't want to hear anybody go

24    out and say, Judge Reeves said he's going to put everybody in

25    Hinds County in jail.

1          MR. TEEUWISSEN:  You tell Mr. Davis and Mr. Simon that.

2          THE COURT:  But I just want to underscore the gravity that

3    I've been expressing since January.  And should -- but the parties

4    should talk about the number of days that it might take.  The

5    parties are still -- should still be trying to narrow whatever

6    disputes that might exist.  If there could be some resolution on

7    this or that or something else, get that resolved.

8          MR. TEEUWISSEN:  Your Honor, --

9          THE COURT:  Yes.

10          MR. TEEUWISSEN:  -- thank you for that instruction.  I

11    think if we could narrow the issues that may help determine the

12    exact amount of time and the number of witnesses.

13          At the present, the issues are defined by the Government,

14    who fired a fairly broad shot at the county and the sheriff.  And

15    so out of an abundance of caution, the county and the sheriff have

16    fired a broad shot back with the number of witnesses.  As a

17    practical matter -- Your Honor, do I need to stand?  I'm sorry.

18          THE COURT:  No problem.  No problem.

19          MR. TEEUWISSEN:  For example, I don't know that the

20    Henley-Young issues need to be front and center before Your Honor,

21    because they are addressed through other plans and means.  I'm not

22    discounting them, but I certainly don't think, as I understand it

23    in talking with Monitor Simpson, that the Henley-Young issues are

24    as important as, say, safety and security of doors and employees

25    and detainees.

1          THE COURT:  You all will see some sort of minute entry

2     setting up a telephonic conference call for you all.  And it

3     probably won't -- I know it won't be before -- it won't -- it may

4     be a week from today, or it may be sometime later.  I'll just say

5     that for the purpose of us selecting dates for this hearing to

6     take place.

7          I'm trying to -- maybe I'll give you seven or ten days or

8     so to sort of talk among yourselves about how long it might take,

9     and then we'll get -- I have a very, very, very busy October and

10    November.  I mean, I just -- three trials, I believe, in November.

11         MR. TEEUWISSEN:  Your Honor, could we respectfully request

12    ten days for the parties to meet and confer?  Obviously, we don't

13    have to do it in person, but meet and confer with respect to

14    narrowing any issues and/or trying to narrow witnesses?

15         And the reason I ask for ten days, Your Honor, the next

16    meeting of the board of supervisors, because the month starts on a

17    Tuesday, is not until Monday the 7th.  And I would like -- even

18    though we briefed them in writing, I would also like to be able to

19    have a discussion amongst the board with Ms. Davis, Mr. Simon, and

20    I.

21         THE COURT:  Okay.  All right.  So it'll be sometime after

22    the week of the 7th then.

23         MR. TEEUWISSEN:  After the 7th.  We meet on that Monday,

24    so anytime -- yes, sir.  Thank you.

25         THE COURT:  It will be sometime after that.  It may not be

1    until the week of the 14th.  Knowing that the 14th is a holiday,

2    it may be on the 15th.  I'm just -- a lot of moving parts here.

3         I did ask -- I did not ask you directly, Mr. Teeuwissen,

4    but I mentioned a question to Mr. Dudley or either somebody else,

5    and I said I would ask you.  Do you know if there -- if state law

6    requires -- now, I'm jumping to the mental health people who might

7    be waiting for forensic evaluation for criminal purposes, or

8    either those who have been committed and waiting for a bed

9    specifically at Whitfield.  I would imagine that's -- might be --

10   there may be something in state law that requires that when they

11   are found adjudicated to be committed, they must be committed to

12   Whitfield.  That may be the law.  But for those who are awaiting

13   forensic evaluation to figure out whether one has the -- or can be

14   tried, you know, whether they're insane or whether they are

15   competent to stand trial and whether their competency can be

16   restored, are they required, do you know, for that process to go

17   through the state facilities?

18        MR. TEEUWISSEN:  It's my understanding that they are not

19   required for the competency hearing pretrial to go through the

20   state facility, that they -- if a circuit judge allows, that a

21   private psychiatrist can make that competency determination.

22        I also know that Ms. Davis budgets for private reviews or

23   competency assessments, and the board of supervisors includes

24   funding for that.  I hear that that -- you didn't say it, but I

25   hear that's going to be a question at next month's CJCC meeting,

1    to see if we can't have the four judges determine for us what

2    non-state psychiatrists they would feel comfortable with the

3    assessments.

4        I think -- quite candidly, I think both private lawyers,

5    and to some degree, the public defenders prefer to wait it out and

6    hope that evidence is lost or witnesses disappear.  I have a great

7    deal of respect for the county public defender.  As you know, she

8    worked for me when I was city attorney.  But there are times when

9    I feel like perhaps the legal strategy to defend a client isn't

10   necessarily what those of us with the county and the sheriff feel

11   would be best to meet compliance.  But you have my commitment that

12   I will bring that up at the next CJCC meeting.

13       THE COURT:  And that may be slightly different from having

14   competency restored.  Finding that someone is incompetent is just

15   one evaluation or a couple of days of watching them.

16       MR. TEEUWISSEN:  Right.  Right.

17       THE COURT:  But to have one to see if their competency can

18   be restored requires long-term stuff.  And I'm not sure if the law

19   even allows them to be placed in --

20       MR. TEEUWISSEN:  I think the restoration has to occur at

21   the state facility, unfortunately.  And that puts us back into --

22   and Mr. Simon has spent much more time than I have with this, but

23   I think there's something like 20 beds for 82 counties.

24       THE COURT:  Right, it's just a small number.

25       MR. TEEUWISSEN:  And the state -- I can't believe I'm

1   saying this, because I used to fight with him all the time --

2   Philip Gaines, when he was with the state system, had really

3   worked with Hinds County to prioritize Hinds County.  You can't

4   prioritize, but to tell us what would get us to the top of the

5   list.  Mr. Gaines is no longer there.

6        I know that Major Rushing still talks with state hospital

7   all the time.  But I think they're just stretched so thin that

8   when there has to be a restoration, we just sit on a waiting list.

9        THE COURT:  Okay.  All right.  Thank you, Mr. Teeuwissen.

10       Ms. Simpson?

11       MS. SIMPSON:  May I approach, Your Honor?

12       THE COURT:  Yes, you may.

13       MS. SIMPSON:  Your Honor, I just wanted to add a factual

14   detail.  I don't -- I haven't researched the law myself, but the

15   state hospital has started a pilot program at the Hinds County

16   facility doing competency restoration at the jail.  And it's a

17   small program, and some of those people ultimately end up at the

18   facility.  But it appears, at least from the state's perspective,

19   that they can do competency restoration outside of the state

20   hospital.  They're doing it at the jail.  I don't know if the law

21   would permit them to do it in a community-based setting.

22       THE COURT:  Okay.  Thank you.

23       Oh, Ms. Simpson, I'm sorry.  For purposes of today, it's a

24   preliminary report that is normally followed up with a written

25   status report.

1        MS. SIMPSON:  Yes, Your Honor.

2        THE COURT:  Any projected date when that written report

3  would be presented to the Court?

4        MS. SIMPSON:  The settlement agreement gives us 30 days to

5  provide the report to the parties and then allows the parties to

6  provide comments.  And then we make revisions, where appropriate,

7  based on those comments, so it most likely would be six weeks out.

8        THE COURT:  I just wanted the record to reflect that.

9  That's all.  Okay.  Thank you.

10       Counsel, thank you for your attendance today and your

11 attention to the matters raised by the Court and with each other.

12 Again, you will receive some sort of minute entry setting a

13 telephonic status conference.  In my conferences generally, and

14 will apply in this case, that, you know, every counsel does not

15 have to appear.  Only one counsel for each side must appear.

16 So -- but all -- all are welcome to attend, but you don't -- you

17 should not feel compelled to.  And the monitors will be

18 represented by one of their persons on the call, if they wish, or

19 all of them.

20       We will have a hearing before the end of the year.

21       MR. TEEUWISSEN:  Okay.

22       THE COURT:  We will.  It may not be until December, but we

23 will have a hearing before the end of the year.

24       As I said, the motion to show cause is granted.  You'll

25 see a text order to that effect.

```
 1            Is there anything else we need to take care of?

 2            MR. CHENG:  No, Your Honor.  Thank you.

 3            MR. TEEUWISSEN:  Not on behalf of the board of

 4     supervisors, Your Honor.

 5            MS. BARKER:  Not on behalf of the sheriff's office, Your

 6     Honor.

 7            THE COURT:  All right.  Thank you, ladies and gentlemen.

 8     The Court is now adjourned.

 9            MS. SUMMERS:  All rise.

10              (Proceedings adjourned at 12:21 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Certified Court Reporter, in and for

4    the State of Mississippi, Official Court Reporter for the United

5    States District Court, Southern District of Mississippi, do hereby

6    certify that the above and foregoing pages contain a full, true,

7    and correct transcript of the proceedings had in the aforenamed

8    case at the time and place indicated, which proceedings were

9    recorded by me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial Conference

12   of the United States.

13         THIS the 16th day of October, 2019.

14

15                         /s/ Candice S. Crane, CCR

16                         Candice S. Crane, CCR #1781
                           Official Court Reporter
17                         United States District Court
                           Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25