Court-Appointed Monitor's Ninth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                Jim Moeser                Dr. Richard Dudley
Corrections Operations          Juvenile Justice          Corrections Mental Health

## EXECUTIVE SUMMARY

**Corrections Operations**

While the Settlement Agreement is a comprehensive document, its most basic components deal with the safety and security of inmates held in the three jail facilities—the Raymond Detention Center (RDC), Jackson Detention Center (JDC) and Work Center (WC).  At the latter two facilities progress is being made toward compliance, but at the RDC the living conditions for inmates and working conditions for staff continue to decline.  The inability of staff to secure inmates in their cells, and even housing units, because of locks and doors that cannot be secured, reflects an unacceptable situation.

The Sheriff's Orders of March 20, 2019, returned Captain Richard Fielder to the Assistant Jail Administrator's position and clearly spelled out the authority of Major Mary Rushing to administer all aspects of the Detention Services Division (DSD).  In fact, however, it does not appear that the orders have materially changed day-to-day operations.

The lack of staff is still the most critical problem facing the DSD.  As has been reported in previous Monitoring Reports, of the 433 positions that the staffing analysis calls for, only 275 have been authorized by the County and only 271 of them are actually funded.  Over the past two and a half years the greatest number of positions that were actually filled was 251.  During the September site visit that number was down to 218, a new low.  Even with C Pod at the RDC closed for renovation, based on the posts needed for the remaining pods and the other facilities, 399 positions are needed system-wide and 246 positions at RDC. However, RDC is operating with only 113 filled positions, 133 less than needed. The uncertainty caused by the election has reportedly made it even more difficult to recruit new detention officers or to promote/hire personnel to take key positions.

With the lack of staff, direct supervision is an impossibility, and even remote surveillance from outside the housing units is an unrealistic goal when officers spend most of their time in the pod control rooms filling out unit logs with entries that cannot be validated.  Recognizing the futility of this situation, the Monitor and Corrections Operations member of the monitoring team worked with the DSD command staff to develop a more practical and meaningful method of recording well-being checks during the most recent site visit explained below; however, it will not be possible to determine how well the revised procedures work until records and the facility are examined during the January 2020, site visit.

Policies and procedures (P & P) are finally being developed through the efforts of Karen Albert, who was originally brought on the Monitoring Team to facilitate the consolidation of the Records and Classification Units into one Section.  Since that work was undertaken, she has

continued on the monitoring team and has assumed responsibility for the oversight and coordination of the P & P effort in conjunction with DSD staff.  To date, approximately 18 policies have been entered into the review process.  This is something that, pursuant to the Settlement Agreement, the Hinds County Sheriff's Office (HCSO) should have set in motion and completed within the first year of the monitoring process.

Maintenance issues are significant in each DSD facility, but are especially severe at the RDC. The problems there are compounded by the fact that the Jail Administrator does not have budgetary authority over, or operational control of, the County's maintenance efforts.  In the Eighth Monitoring Report it was noted that the County finally brought on board a professional correctional maintenance contractor, CML Security, to repair control room and housing unit entry doors in A Pod and to fix one sample cell door in C Pod.  Each was converted to a swinging configuration, which is more secure than the slider system that was in place. Unfortunately, once that sample work was done, the County did not proceed with similar corrective work in each pod and housing unit.  Consequently, the Monitor has submitted a list of suggested corrective actions for the RDC to include C Pod, B Pod and A Pod in that order. Hopefully, the County will adopt a schedule of action to be taken according to a firm, documented timetable.

The combination of the lack of adequate staffing and cell and housing unit doors that don't lock creates a volatile situation. This contributed to the riots on June 28th and 29th 2019 in which one officer was injured and at one point the officers were barricaded in the control room and planning to retreat to the restroom. In September alone there were 10 incident reports which involved cell or housing unit doors that were rigged to stay unlocked or were popped open. There continue to be numerous assaults between inmates with 10 in September, at least two of which required hospitalization. This situation, no doubt, contributes to the difficulty in retaining officers.

Tracking use of force incidents presents a challenge. It is difficult to know whether all uses of force are reported. The titles of incident reports may reflect an incident type that does not reflect a use of force. There is a check box in the JMS system for a use of force but it is not clear whether it is always checked. For October, 2019, 7 incidents were listed in the spreadsheet as involving a use of force. However, in reviewing the actual incident reports an additional 4 incidents involved the use of force. In addition, the description of the use of force in the incident report may significantly understate the use of force employed. And the deficits in the JMS system do not allow for documentation of corrective action when use of force is used. This troubling situation was highlighted in a use of force incident in August when an egregious use of force described below occurred and neither the use of force nor the corrective action was adequately documented.

The direct supervision Train the Trainers program that was put on by the National Institute of Corrections (NIC) in July proved to be a great success.  Since then, five officers have been identified who will serve as the core group of trainers for all Detention staff.  That work will be undertaken during annual in-service training so that officers can obtain firsthand experience working in a direct supervision environment at the WC.  Eventually, that will make it possible to open individual housing units at the RDC in a direct supervision mode, beginning with C Pod, as the renovations there are completed.

Fire safety continues to be a critical area of concern at the RDC.  The State Fire Marshal's annual inspections are of little value since they are not specific and do not address major issues such as the lack of a sprinkler system and fire hoses.  The Monitor's effort to obtain input from the Fire Marshal's Office, through a face-to-face meeting during a site visit, has proven to be ineffectual since no representative is willing to appear and participate.  It is therefore, incumbent upon the HCSO/DSD to take on the responsibility of voluntarily meeting basic fire safety code standards that are recognized by the National Fire Protection Association (NFPA).

**Medical and Mental Health**

At the time of the prior site visit, the nurses reported being harassed and not being consistently protected by security staff during medication pass.  In response, security changed the location of the medication pass from the entrance to each pod to a passthrough window away from the pods.  Since this change of location for medication pass, the medication refusal rate has skyrocketed to an unacceptable level.  Furthermore, the nurses are no longer able to observe and speak to prisoners who refuse medication in an effort to determine if their medical and/or mental health status is deteriorating as a result of their refusal to take medication.  Therefore, security and medical must develop an alternative plan for medication pass that assures the safety of the nurses while allowing them to do their job, does not unnecessarily burden security staff, and does not act as an impediment to prisoners' compliance with prescribed medication.

The small mental health staff is stretched to the limit with providing mental health services to a case load of 183 prisoners housed at three different facilities, performing assessments of new prisoners referred to them, responding to/managing mental health emergencies including suicidal prisoners, performing PREA assessments and providing treatment when indicated, performing weekly rounds in segregation, and maintaining records and logs.  Therefore, they have not been able to implement the planned expansion of mental health services that is required to meet the provisions of this agreement (for example, adding mental health therapy groups and a more rigorous discharge planning program), and they have not been able to implement other required corrective actions (for example, regularly scheduled treatment plan reviews and increased liaison with community-based providers).  As has been previously reported, in January 2019, QCHC requested permission to hire two additional mental health staff, but the County has still not responded to that request.  Meanwhile, as security policies regarding disciplinary review,

segregation review, use of force and incident reporting and review are completed and implemented, the mental health staff will have additional responsibilities in connection with these activities.  Then in addition, if/when a special needs/mental health unit is opened the development and implementation of programming for that unit will also be the responsibility of the mental health staff.  Therefore, the County must respond to QCHC's request to hire additional mental health staff.

**Youthful Offenders**

As of the September visit, there were fifteen youthful prisoners (all male) at Henley Young.  Overall, Henley Young is operating as a safe and secure environment for youthful offenders.  The program at Henley Young continues to evolve in a positive direction in a number of areas, including:  (1) the decreased use of segregation/room confinement for disciplinary purposes; (2) continued stability in the population of both the youthful prisoners as well as the traditional short-term youth placed in the detention facility; (3) improvements in the educational programming for youth; (4) selection of a new Executive Director; and (5) some modifications in how the point/level system is utilized with youth. Additionally, planning has taken place to implement a new court process to review youth's cases, focusing on promoting more timely decisions related to indictment, returning the case to the youth court, and/or altering bail conditions.  As Henley Young has moved from being a short-term facility that houses some long-term youth to a longer-term facility that also houses some short-term youth, it becomes increasingly difficult to develop and implement adequate educational and treatment programming in a way that supports the successful transition of youth to the next step/stage in the process.  The new court process was scheduled to be implemented beginning in October and should have a positive impact on moving the youth's cases through the appropriate court system more promptly.

Concerns remain related to: (1) the limited time provided to achieve optimal functioning of the mental health team, particularly as it relates to limits on the time allotted to the psychologist and psychiatrist position(s); and (2) there have been no changes in the physical plant/facility that provide either more appropriate space for living units and a variety of programming or address some of the security safety concerns that have been expressed in prior reports and/or by facility leadership.

**Criminal Justice and System Issues**

A number of steps were taken that, while not achieving compliance in many areas, are certainly a step towards compliance. The policy on Inmate Records Management was adopted prior to the last site visit and includes a number of procedures that should improve the accuracy of the records and ensure the lawful basis of detention and timely release. The Records staff has begun

a review of every file. The initial targeted pace has not been achieved as only one staff member is completing the review. She has completed about 70 files but a number of those individuals had discharged by the time she completed the review. As a result, there are probably about 450 active files that have not been reviewed. There is also no system in place to ensure that the deficiencies that are identified are remedied. As this is just the beginning of this process, there continue to be a number of files with inaccurate or incomplete information at the time of this site visit that give rise to the potential for over detention or mistaken release.

There are also systemic issues that contribute to over detention. Although not the fault of the County, it is particularly troubling that many defendants are not getting their first appearance on felony arrests in 48 hours because of the unavailability of the judge. The Jail is entering a bail amount from a bail schedule but individuals who cannot make that bail are held potentially weeks before getting before a judge and being released. And, of course, the number of individuals being held without indictment continues to be a travesty. There are 15 individuals booked in 2018 that have still not been indicted.

The County IT Department is now creating reports that can pull data from the JMS system. This will assist in identifying release dates and ensuring timely release. However, this is not entirely reliable because information is not being entered consistently, so manual tracking is still required. Some practices exacerbate the limitations of the JMS system. As described previously, the Warrants Division within the Sheriff's Office does not use the JMS system, and does not enter warrants into the JMS system so warrants known by one arm of the Sheriff's Office are not known to another. Warrants arising after a person is booked are not known to the Records Office. Although the ability to generate reports is improving, incident reports and summary reports are still lacking some information required by the Settlement Agreement for the purpose of guiding corrective action and quality assurance.

The Criminal Justice Coordinating Council (CJCC) has not had consistent participation by a number of stakeholders. This has limited its effectiveness. Reducing the Jail population is one method for addressing the severe staffing shortage. However, an effective CJCC or some collaborative body will be needed to implement most jail population reduction strategies. The monitoring team has recommended that the County hire a CJCC coordinator to improve the effectiveness of the CJCC. This has not been done and the County has not renewed the contract of the CJCC consultant.

A significant change in policy by the stakeholders that was fostered by Hinds County was the elimination of individuals held in the Jail for failure to pay fines and fees. At the time of the last and current site visits, there has been no one incarcerated on court orders for fines and fees. In addition, the Pre-Booking and Inmate Records Management Policies have been adopted which

mandate compliance with the provisions of this Agreement. These provisions are now shown as compliant. However, this area will continue to be monitored to ensure that the policy is followed.

The kiosk grievance system continues to present problems. During this site visit, a report was once again run from the system to locate outstanding grievances that had fallen off the dashboard. Once again, hundreds of outstanding grievances were found but significantly less than during some prior site visits. A new manual system is only now getting started to ensure that all grievances are actually answered. There is still no system to review whether responses are adequate; and no oversight to determine that promised actions are actually completed.

**Monitoring Activities**

The Monitoring Team conducted a Site Visit September 24th through September 28th. The site visit schedule was as follows:

Site Visit Schedule
September 24-28, 2019

| Date and Time | Lisa Simpson | Dave Parrish | Jim Moeser | Dr. Richard Dudley |
|---|---|---|---|---|
| Monday evening: 6:00 Lobby of Hotel | Team Meeting | Team Meeting | Team Meeting | Team Meeting |
| Tuesday A.M. | Meet with command staff<br><br>Tour Pod C Meet with Ms. Davis, Mr. Bell, Rushing, Fielder and Williams re repairs | Meet with command staff<br><br>Tour Pod C Meet with Ms. Davis, Mr. Bell, Rushing, Fielder and Williams re repairs | HY-meet with HY Fernandez Frazier<br><br>Meet with Off. Young-Training Officer<br><br>Education: Ed. Consultant and Principal | Meet with mental health and medical team |
| Tuesday P.M. | Meet with Sgt Hubbard<br><br>Meet with Sgt Newell and program staff | Meet with Marlo Brinnon<br><br>Meet with Rholonn Tucker | Meet with Operations Manager<br><br>Recreation Coordinator<br><br>QMHP/clinician | RDC |
| Wednesday A.M. | Meet with Felicia Johnson Review records | RDC | Policy update meeting with | Tour RDC |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Meet with Kenny Lewis | Meet with Captain Miller and Lt. Knox<br><br>Meet with Jeremy Nelson | Quality Assurance Mgr.<br><br>Review training documents<br><br>Review current roster with leadership<br><br>Review special ed. Process and GED with Special Ed and GED teacher |  |
| Wednesday P.M. | Meet with Rushing, Fielder, and Lt. McBride re housing unit officer procedures<br><br>Meet with Kenisha Jones | Meet with Rushing, Fielder, and RDC Captain re housing unit officer procedures<br><br>RDC | Review Incident reports and hearing notes<br><br>Meet with Youth Support Specialist<br><br>Meet with Judge McDaniels<br><br>Interview youth | RDC<br><br>WC |
| Thursday A.M. | Status Conference | Status Conference | Status Conference | Status Conference |
| Thursday P.M. | Meet with mental health staff and RDC command staff<br><br>Tour Pod C-4 for use as mental health unit<br><br>Meet with Tanika Moore | JDC | Review youth master files<br><br>Meet with Supervisors<br><br>Exit Discussion | Meet with mental health staff and RDC command staff<br><br>Tour Pod C-4 for use as mental health unit<br><br>JDC |
| Friday 9:00 A.M. | Meet with Kenny Lewis re pretrial<br><br>Meet with Lt. George<br><br>Meet with Ms. Jackson | WC |  |  |

**COMPLIANCE OVERVIEW**

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 18 months or more. The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders were evaluated in the text below for compliance at Henley Young and Raymond Detention Center but only the results for Henley Young are included in the totals in this chart. This is a change from the last report which showed compliance at RDC in the totals. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |

**INTRODUCTORY PARAGRAPHS**

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

**SUBSTANTIVE PROVISIONS**

**PROTECTION FROM HARM**

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
      a.   Booking;
      b.   Objective classification;
      c.   Housing assignments;
      d.   Prisoner supervision;
      e.   Prisoner welfare and security checks ("rounds");
      f.   Posts and post orders;
      g.   Searches;
      h.   Use of force;
      i.   Incident reporting;
      j.   Internal investigations;
      k.   Prisoner rights;
      l.   Medical and mental health care;
      m.  Exercise and treatment activities;
      n.   Laundry;
      o.   Food services;
      p.   Hygiene;
      q.   Emergency procedures;
      r.   Grievance procedures; and
      s.   Sexual abuse and misconduct.

**Non-Compliant**

To date approximately 18 policies have been entered into the review process and only 3 have been approved.  While that represents a significant increase since the Eighth Monitoring Report, it falls far short of what is required.  For an agency the size of the HCSO, a Policies and Procedures Manual encompassing far more than a hundred individual policies would be expected. While it is encouraging that progress is finally being made, the fact that the monitoring process has been in place for approximately two and a half years, and that there are only three policies approved to date, is disturbing.  The Sheriff's Office has complained that the process has been hampered by a cumbersome review process. A revised process is being initiated that will hopefully expedite the adoption of policies. Implementation of those policies as required by the paragraph will require a significant training effort. Until Hinds County develops a comprehensive Policies and Procedures Manual, along with Post Orders, the staff of the Hinds County Jail System cannot be expected to comply with the provisions of the Settlement

Agreement.  It is apparent that a great deal of effort needs to be put forth before significant progress can be achieved.

As noted in prior reports there are multiple health and mental health related provisions that cannot be addressed by health and mental health staff alone.  These have included, for example, the participation of mental health in the disciplinary review process, the use of suicide watch, the participation of health and mental health in the segregation review process, incidences where there is an anticipated/planned use of force and incidences where there has already been a use of force, and the roles and responsibilities of health and mental health with regard to PREA.  Security policies and procedures that would address these issues have still not been developed, approved, and implemented. The medical and mental health staff should be involved in the development of these policies and procedures when that occurs.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree.  When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**
The administrative realignment noted in the Eighth Monitoring Report resulted in a qualified Assistant Jail Administrator being returned to his former position.  In addition, the Sheriff's Order of March 20, 2019, specified that the Jail Administrator (Major) has full authority to manage the day-to-day operations of the Jail System.  Unfortunately, it does not appear that the Sheriff's Order has had much practical impact.  In at least one recent event, the Sheriff intervened in the personnel hearing process. The Major had recommended termination as a result of excessive use of force but the Sheriff advocated to the Personnel Committee for suspension instead of termination. The individual was ultimately terminated but this, once again, appeared to undermine the Major's authority at the Jail. As has been noted previously, the Jail Administrator does not have the credentials required by this paragraph.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
Until there are approved policies and procedures in place, the supervisors will not be able to become familiar with them.  Since the last site visit the most significant supervisory change has

been the retirement of Captain Shields, who commanded the RDC.  There is currently no one in line to fill that position, so the Assistant Jail Administrator is the acting RDC facility commander. There were no other promotions to supervisory positions. The most recent individuals promoted to supervisory positions were described in the Eighth Monitoring Report and it was noted that not all of the appointments met the specific education and/or experience requirements of this provision, but that the appointments appeared to be merit based in terms of job performance.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Substantial Compliance**
The most recent hires for the position of detention officer appear to be in compliance with this paragraph in that they successfully passed a criminal history check.  Since that standard has been met on consecutive site visits, this paragraph is moved from Partial Compliance to Substantial Compliance.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**
There has been only nominal change in the status of this paragraph since the Eighth Monitoring Report.  The Policies and Procedures Manual has yet to be published.  While some policies (approximately 15) are under review and 3 adopted, the vast majority have yet to be addressed. Even when that is done, the physical design of the JDC, which is a linear facility, makes implementation of direct supervision there an impossibility.  At the WC progress is being made to implement direct supervision.  Once security enhancements are put in place at the fire exit doors of each housing unit (a camera and alarm system), it will be possible to eliminate the second officer from each unit.  This represents a savings of 20.4 officers (4 posts times 5.1 officers per post).

Although there is insufficient staff at RDC to provide direct supervision, current practices exacerbate the lack of supervision of the housing units. During the current and prior site visits including the site visit with the Judge, it was frequently observed that there were multiple detention officers in the control rooms in addition to the officer assigned to Control. This is reflected in incident reports, e.g. IR #191139 in which 4 officers were in the control room in addition to the control room officer and IR #191429 which describes 5 officers sitting in the control room when an inmate left the housing unit and was standing by the control room door. At the time of the September site visit, this was attributed to officers completing their logs in the

control room. A solution was discussed that would involve the housing unit officers radioing their log entries for entry by the control room officer. In addition, officers would make entries on log forms outside any locked down cell. This may not be the complete solution but policies, procedures, training and supervision need to emphasize increased presence of the officers in the housing units.

The direct supervision Train the Trainers program that was put on by the National Institute of Corrections (NIC) in July was well attended. From interviews of staff, it appears that the concepts of direct supervision were understood and well received.  Since then, five officers have been identified who will serve as the core group of trainers for all Detention staff.  That work will be undertaken during annual in-service training so that officers can obtain firsthand experience working in a direct supervision environment at the WC.  Eventually, that will make it possible to open individual housing units at the RDC in a direct supervision mode, beginning with C Pod, as the renovations there are completed.  A staffing plan involving rotation of officers between facilities so that this can be achieved is being developed and the current stated plan is not to reopen C Pod until they can operate it as a direct supervision pod.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:
- i. There are at least two detention officers in each control room at all times;
- ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;
- iii. There are rovers to provide backup and assistance to other posts;
- iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;
- v. There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:
- i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

      ii.   The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

      iii.  As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c.  Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d.  The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e.  The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

Since the Eighth Monitoring Report was submitted, the number of filled positions has dropped to a new low of 218.  This means that only 50% of the required ((433) per the staffing analysis of the facilities at capacity) positions are filled. Even with one Pod at RDC closed the level of staffing is significantly deficient. The total number of staff needed for the three facilities is 399 making the current staffing rate 55%. The closure of one pod at the RDC means that only 246 positions are required. However, RDC is operating with only 113 filled positions, 133 less than needed. That is a staffing rate of 46%. Over the past two and a half years the County's goal has never been met; in fact, the number of filled positions has not gone up; rather, it has gone down.

The WC and JDC are both understaffed, but they function fairly effectively because, at the JDC, the count (115) is well below the number of authorized beds (192), while at the WC, officers who used to supervise outside work crews are now available to fill required housing posts.  This was made possible by the HCSO's decision to return State prisoners to the Mississippi Department of Corrections (MDOC) shortly after the monitoring process began.

At the RDC there are not enough officers available to operate the facility effectively, even  with remote supervision for outside the housing units, in spite of the fact that one third of the jail is shut down for repairs (C Pod has been closed for several months; only A and B Pods are open). There are certainly not enough officers to implement direct supervision (where an officer is

assigned permanently inside each housing unit) as C Pod is repaired and put back on line.  The lack of staff, coupled with locks and doors that do not function properly or cannot be secured, led to a riot in A Pod on April 19, 2019, that was followed by three more riots in A Pod in late June and contributes to ongoing assaults of inmates, safety threats to staff and proliferation of contraband.

The Staffing Analysis that was completed by the County/HCSO and Monitor has not been updated annually as is required, nor has the County addressed the issues of a career ladder or a retention bonus system for Jail staff that were submitted by the HCSO.  The County did, however, approve a $100 per month pay increase for all detention officers (excluding supervisors) effective January 1, 2020. As noted in the last report, the County has hired additional detention officers; however, it has lost an even greater number of officers. The Monitor has recommended and is facilitating consultation with a corrections recruitment and retention consultant.  With the assistance of this consultant, the County and the Sheriff's Office will work on some of the previous recommendations such as the development of a recruitment plan.

> f.  Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:
>
> > i.  The classification process must be handled by qualified staff who have additional training and experience on classification.
> > ii.  The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.
> > iii.  Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.
> > iv.  The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-

controlled and centralized prisoner tracking and housing assignment system.

v. The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi. The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

The changes in the Classification Unit's management, reported in the Eighth Monitoring Report, have resulted in a return to "behavior based" as the foundation for classification decisions. Accordingly, this paragraph has been moved from Non-Compliant to Partial Compliance. The Sergeant now overseeing classification has reviewed most of the files of active inmates and all files are reviewed at 90-day intervals which will result in a review of all files. A review of eleven files found that none of them had the previously routine override based on current charge which had resulted in the system not being "behavior based." However, there continue to be some errors and systemic concerns. One such systemic concern is that the Classification Officer does not have access to the NCIC report on prior arrests (the "rap sheet") in preparing the risk assessment. Booking runs the NCIC report that is limited to outstanding warrants and puts that in the file. The only source for prior arrests that Classification has is the JMS system which includes only bookings in Hinds County. One individual stated that he was previously convicted of aggravated robbery. This was not in the JMS system so wasn't scored.  Also, involving the JMS system, one case had a different charge in the JMS system from the booking packet which would have significantly changed the classification level. There were a number of files where documents were missing or errors occurred, but, in general, the files were improved and indicated behavior-based classification.

Accurately scoring the risk assessment is an important step, however, it is also essential that the scores then be used to house inmates appropriately. Despite requests, there has never been a clear articulation of how inmates are assigned to the three facilities. The WC being a dormitory style facility would be expected to serve mostly minimum level inmates. The custody level as reflected on a report run shortly before the site visit shows that there were 129 minimum custody inmates, 25 medium, 6 medium high and 17 maximum security inmates. There was no indication of an override on the higher custody inmates. This is an issue that should be addressed in the developing policies and procedures.

According to the Sergeant in charge of the unit, there is a classification officer on duty almost 24/7.  There is a short gap from 3:00 a.m. to 7:00 a.m. on weekends. The Intake/Classification housing unit, currently B-1, no longer houses just newly arrested detainees.  Because C Pod is closed for renovation, space is at a premium; therefore, new detainees and other inmates are mixed in B-1.

While cell assignments and inmate transfers are supposed to be cleared through Classification, there is no policy in place that requires that action, consequently, supervisors sometimes make such transfers on their own.  This practice, however, appears to occur infrequently. Finally, while the decision to end housing according to gang affiliation was made early on by the Jail Administrator, the lack of supervision within the housing units at the RDC makes it impossible to stop physical conflict from developing between competing groups of gang members even when gang affiliation is considered in the classification process.

g.   Develop and implement positive approaches for promoting safety within the Jail including:

   i.   Providing all prisoners with at least 5 hours of outdoor recreation per week;

   ii.   Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

   iii.   Creating work opportunities, including the possibility of paid employment;

   iv.   Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

   v.   Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

   vi.   Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

   vii.   Providing reasonable opportunities for visitation.

h.   Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

      i.   Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation per week is still not provided to all inmates in the Jail System.  The WC is the only facility that is in compliance.  A separate log tracks the availability of outdoor recreation there on a daily basis.  At the RDC a recreation log is now maintained, but it still reflects only sporadic and incomplete entries.  Compliance will require far more staff and a better record keeping system.  At the JDC compliance is not possible because the facility does not have an outdoor recreation yard.  While the facility commander has implemented a number of innovative means for increasing out of cell recreation time, none can comply with this requirement of the Settlement Agreement.

Regarding 42 (g)(ii) and (iii), there is no incentive program. There are work opportunities at the WC but not paid employment and the only opportunities at JDC and RDC are working as trusties.

Regarding 42 (g)(iv), At the time of this site visit, there were a total of 183 prisoners on the mental health caseload; 146 prisoners were receiving psychotropic medication; and 131 prisoners were defined as 'seriously mentally ill', employing the most narrow definition of 'seriously mentally ill' (i.e., prisoners with psychotic disorders and/or major mood disorders).

Except for two prisoners who have to date refused treatment, prisoners on the mental health caseload are receiving individual treatment sessions, albeit not always as frequently as might be indicated.  Presently, there is only one mental health therapy group that is up and running; given the limited number of mental health staff persons, that is all that can be offered at this time; and so, access to group therapy remains extremely limited.

The mental health staff consists of one full-time QMHP/Mental Health Coordinator, another full-time QMHP, a part-time psychologist, and a part-time Psychiatric Nurse Clinician (supported by a psychiatrist).  In addition to providing individual treatment sessions for the 183 prisoners on the mental health case load, housed at three different facilities, and the one group therapy program, the two QMHPs perform mental health assessments of new prisoners referred to mental health, develop treatment plans for all prisoners on the mental health caseload and discharge plans when appropriate, perform assessments, manage mental health emergencies (assessing suicidal prisoners/suicide watch, crisis management, etc.), provide any assessments and treatment required for PREA-involved prisoners, perform weekly rounds for all prisoners held in segregation, and maintain all records and logs.  As all of the security policies and procedures

required to comply with all provisions of the agreement are developed and implemented, the two QMHPs will have numerous additional responsibilities related to the disciplinary process, segregation review, and security uses of force.  In addition, a review of incident reports indicates that mental health should be more engaged in the incident-reporting and review process (see section on Incident Reporting).  Obviously, two QMHPs cannot adequately assume all of these responsibilities.

QCHC (the contract provider for health and mental health services) has asked to expand their contract in order to hire another QMHP and a counselor who would also assume certain clerical and record keeping duties now assumed by the Mental Health Coordinator; this additional staff would allow for the much needed further development of the group therapy program; but to date, the County has not responded to QCHC's request.  The much needed expansion of the group therapy program would include, for example, the development of groups focused on psychoeducation (regarding one's mental illness, need for treatment and one's responsibility to actively participate in one's treatment), medication/medication compliance, discharge planning, daily living skills, relationship management, and trauma/trauma-related issues.

Furthermore, the additional mental health staff requested by QCHC will be required in order for the mental health unit to have the capacity to assume the other above noted anticipated additional responsibilities, and also required if the facility is to open a special needs/mental health unit.

Providing medication is a necessary part of treatment. The adequacy of providing medications has recently diminished because of newly adopted procedural barriers which were well intended but problematic.  At the time of the previous site visit, the Mental Health member of the monitoring team expressed concern about the fact that the nursing staff had reported multiple incidences of harassment by prisoners during medication pass and stated that therefore, they did not feel that all security staff assigned to supervise medication pass were consistently protecting them.  It was anticipated that the response to this expressed concern would be that security administration would make it clear to security staff that when assigned to supervise medication pass they had three responsibilities – gather all inmates who were on medication, assure that each inmate actually consumed the medication, and protect the nurses who were doing the medication pass.  However instead, the location of the medication pass was changed; the nurses now pass medication through a window removed from the unit; and now therefore, during medication pass, the nurses are unable to see what is happening on each unit.  This change is particularly of concern when it comes to prisoners who reportedly refuse medication; such prisoners are not being called out to the window so as to sign a medication refusal form, and so even if a signed refusal form is brought to the nurse, the nurse cannot confirm that it was actually signed by the prisoner; and most importantly, since the nurse can't see the prisoner, the nurse cannot observe whether or not the prisoner is deteriorating due to the fact that he/she is not taking prescribed medication.  The impact of this change in the medication pass procedure is all the more alarming when one reviews the data kept by the medical department on medication refusals.  In the

months prior to this change in how/where medications were passed, refusal numbers ranged from 3/month to a high of 10/month, but during the month of September/after the change was made, the refusal number was 146.

Although the change was well intended, it has had a significant negative impact. Security staff should reconsider the location and the procedure for medication pass understanding that it is important for nurses to actually see and interact with a prisoner even if the prisoner refuses to accept prescribed medication

A recent incident also raises the concern for adequate overnight medical coverage at the WC.  If there is a medical emergency there at night, it must await the transport of the nurse from RDC to the WC; she must bring an emergency kit with her because the medical office at the WC is all locked up for the night; and then she will likely have to transport the prisoner back to RDC.  All of this can be a waste of time in a medical emergency where time is of the essence, which was evidenced in a recent situation where a prisoner at the WC had a stroke in the early morning hours. This individual survived, but time is of the essence when responding to a stroke and the delay inherent in this staffing of the WC has the potential for negative outcomes.

Regarding 42 (g)(v), there has been significant expansion of educational and life skills programming. The programming includes GED instruction, anger management, computer skills, reading, recovery groups, mental health groups, finance class, job skills, and fatherhood groups. There is some 1on 1 support for individuals needing a remedial level of critical thinking training. They have close to 20 volunteers. The GED program has served 258 students in the last 15 months. There are several barriers to the program including the lack of a classroom at JDC where they can only use the visitation room one day a week and evenings. Currently, the program cannot do the GED testing so individuals cannot actually get their GED even though they may be ready.

Regarding 42 (g)(vi), During the Jail's booking process, new admissions complete a mental health history form; this is forwarded to the medical department; and this form helps to flag new admissions who might be in need of mental health services.  During the initial nurses' health assessment process, the nurses also screen for mental health difficulties, and the majority of prisoners on the mental health caseload were first identified and referred to mental health during that initial screening process.  It should be noted however that over a third of the prisoners on the mental health caseload were not identified during the booking process or the initial health assessment process, but were later identified by the mental health team, and several prisoners who were not previously identified self-referred for mental health services.  Referral of prisoners to mental health by security staff continues to be unexpectedly rare (see section 45-f, and the sections on Incident Reporting, Disciplinary Review, Segregation Review and Use of Force). Therefore, there continues to be concern about the ability of medical and security staff to identify prisoners who are in need of mental health services.

20

With regard to initial mental health assessments (performed by the mental health team when a prisoner is referred to mental health), over the last year there has been considerable improvement with regard to the timeliness of these assessments.  More specifically, during the period covered by this site visit, there were 10 prisoners referred to mental health for whom it took more than 3 days for them to be seen/assessed by mental health, while during this same period in 2018, there were 20 prisoners referred to mental health for whom it took more than 3 days for them to be seen/assessed by mental health.  However, despite staff shortages, mental health staff must continue to strive to see/assess all prisoners referred to them within 3 days.

Therapeutic housing is not available at this time. Prior to the closure of C Pod, individuals with mental illness were typically placed in one particular housing unit in that pod. However, there were no enhanced services on that unit or specially trained officers. As such it was not a therapeutic housing unit. Currently, with the closure of C Pod, individuals with mental illness are housed in various locations which clearly does not allow for a therapeutic housing unit. As a result of the lack of therapeutic housing, inmates with mental illness at times exhibit behavioral problems and are placed in segregation housing where they can further decompensate. The magnitude of this problem is described in Paragraph 76 and 77. There is some discussion of the creation of a mental health unit in the renovated C Pod. The physical requirements would be minimal. However, as stated previously, in order to provide the therapeutic activities of a mental health unit and as required by this Settlement Agreement, two additional mental health professionals are needed.

Regarding 42 (g) (vii), Representative visitation records provided to the monitoring team for this reporting period were incomplete.  The partial data that was available reflected a significant drop in visitation activity at the WC and RDC.  Detailed records covering the months of October through December 2019, will be analyzed in the Tenth Monitoring Report.

Regarding 42 (h), As has been previously noted, various staff are responsible for the higher levels of supervision required for prisoners who are on suicide watch and other special medical or mental health observation. Security staff are responsible for the more constant observation and supervision of prisoners on suicide watch, and the level of suicide watch ordered by mental health defines the extent of that supervision.  However, the extent to which security staff fulfill this responsibility remains unclear, given that there are times that the monitors have observed prisoners on suicide watch without any security staff observing them and given the inadequacy of security logs that would document such supervision. Although there is no policy that covers this situation, male inmates under suicide watch at the RDC are supposed to be monitored continuously (constant supervision) by security staff, with 15-minute notations.  While that standard is sometimes maintained, on several occasions the suicide watch isolation unit has been found to be either not staffed, or staffed by a part time officer who is responsible for other duties

beyond his/her primary function.  At the JDC, female inmates on suicide watch are observed every fifteen minutes, not constantly.

Prisoners on suicide watch are seen daily by both mental health staff and medical staff, including on weekends (as has been previously noted, mental health staff have assumed the additional responsibility of taking weekend call on a rotating basis, which has included coming into the facility to see prisoners on suicide watch and assess any new mental health emergencies).

Prisoners on special medical observation are seen daily by medical staff.  At present, there is no special mental health observation for acutely ill prisoners; most acutely ill prisoners are being held in segregation; but it is anticipated that if/when a mental health unit is established, a part of the function of that unit would be to provide a higher level of supervision by mental health, medical and security staff, as well as more appropriate therapeutic intervention for such acutely mentally ill prisoners.

Regarding 42 (i), video surveillance capabilities have not changed since the first site visit.  At the RDC cameras in the corridors and housing units are recorded, so incidents can be reviewed after the fact.  At the WC live action cameras allow visual coverage of the hallways and housing units, but they are not recorded, so there is no way that incidents can be reviewed after the fact.  At the JDC, there are cameras that cover and record the hallways and the drive through sally port/transfer waiting area, but there is no coverage inside the housing units.  In every previous Monitoring Report it has been suggested that action be taken to provide full recording capability for all housing and operational areas of each facility.  To date nothing has been done, nor has a plan of action been submitted.

While the IAD and CID investigator now have access to the video recording system so that they can quickly view incidents, they still cannot obtain copies of them without having to go through a request process with Information Technology.  It is imperative that these investigators be granted immediate access to both view and record copies of previously recorded incidents.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a.  Staff vacancy rate of more than 10% of budgeted positions;

    b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c.  A major disturbance resulting in the takeover of any housing area by prisoners;

    d.   Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e.   Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f.   One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g.   One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

While the HCSO still does not create a report covering each of these areas, a review of specific data reveals that the agency is not in compliance with almost every aspect of this paragraph. With only 218 of the 271 funded positions filled as of the September site visit, the DSD has a vacancy rate of 20% of funded positions, well above the 10% threshold. (As previously noted, the vacancy rate of needed positions is 55%). Consequently, the DSD is unable to staff required posts, particularly at the RDC.

In June 2019, that facility experienced three riots in A Pod where staff lost control of the majority of the housing units and almost ceded the pod control room as well. The situation was so critical that staff even planned on retreating to the control room's bathroom in the event that the inmates were able to breach the control room entry door. Incident Reports 191145, 191148 and 191162 provide a synopsis of the situation as it evolved over time. Inmates "masked up" so that they could not be identified on video recordings. They threatened to stab officers with shanks and they took their keys. While the incident reports do not reflect it, subsequent investigation revealed that at least one officer provided his keys to the inmates.

During the past year there have been numerous incidents reported where inmates were assaulted and injured some very seriously. However, the severity of the injuries, the involvement of staff, or other significant details have not always been reported and have come to the attention of the Monitor only as a result of media coverage or a lawsuit filed on behalf of the victim. The case of inmate Landon Veal is indicative of this point. On September 18, 2018, he was assaulted in the RDC and so brutally beaten by a number of inmates that he is no longer able to function independently. When officers responded to the scene, they questioned other inmates, but left the victim lying on the floor and failed to provide any first aid or assistance before leaving the

housing unit.  A video recording of the incident was released to the media by the inmate's attorney in October 2019. The video recording and allegations of the lawsuit disclose a much more serious and troubling event than could be gleaned from the jail reporting.

In December 2018, an inmate was beaten to death in the RDC, Housing Unit B-3.  Although three inmates were charged with murder in January 2019, there has been no Administrative Review or Morality Review conducted to date.  The investigative report identifies five other inmates who were involved in the incident, but it does not appear that they have been charged. While it makes no findings with regard to the actions of staff, the matter has not been referred to the IAD Investigator for review.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

  a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

  b. All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

  c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

  d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

  e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been reported previously, none of the facilities meet the requirement that well-being checks be conducted every 30 minutes on general population inmates, however, progress has been made towards compliance. At the JDC and WC, well-being checks are routinely conducted and documented on an hourly basis.  Further, at those facilities, 30-minute well-being checks are maintained on inmates held in confinement housing cells (although the Settlement Agreement calls for 15-minute well-being checks for those inmates).  At the RDC, even the hourly standard for general population and 30-minute standard for confinement inmates is not met consistently.

Officers at the RDC spend a great deal of time inside their respective control rooms filling out unit logs and individual inmate logs instead of actually doing the required checks.  In essence, the pod control rooms are used as break rooms for the officers.  In order to correct this problem, the Monitor, Corrections Operations member of the monitoring team and command staff from the DSD and RDC met during the most recent site visit in order to work out a better system of well-being check documentation that actually reflects what occurs.  It was decided that detention officers will be restricted from entering the pod control rooms, except to use bathroom facilities, and that they would spend all of their time inside housing units conducting well-being checks, dealing directly with inmates, assisting with laundry, medical, food service and other staff in conducting routine operational business.  Officers will call in their well-being checks by radio to the pod control room officer(s) who will make the entries in the pod control log. In addition, the housing unit officer will make entries on logs posted by the door of any locked down inmate. Once direct supervision is reinstituted, the unit logs will be used again and be located within the housing units.

In Booking, the correct 15-minute well-being check form was found to be in place for the second consecutive site visit.  Each log was current and no inmates were detained in the multiple occupancy holding cells for more than eight hours.  The only discrepancy noted was that a single cell had been reactivated to house a problematic inmate.  This misuse of a holding cell (for housing—over eight hours) represents a violation of previously adopted standards.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

> a.  Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

b.   Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c.   "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.  Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d.   Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.   Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies.  The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.   Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.   Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.   Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

Based on the actions taken to implement training requirements, this paragraph is moved from Non-Compliant to Partial Compliance.  As was noted in the Eighth Monitoring Report, a qualified detention officer was promoted to the Detention Training Lieutenant's position.  Since then the HCSO has completed the second phase of the National Institute of Corrections (NIC) Train the Trainers program (in direct supervision) in July.  The annual in-service training program will now concentrate on direct supervision training for all officers with priority given to WC staff so that direct supervision can be completely implemented there, followed by C Pod at the RDC as it is reopened after renovation.

The Training Director (Captain Miller) provided an updated written synopsis of training completed as follows—

- Mandatory Pre-Service Training—219 of 220 (since this was reported, the number of detention officers has dropped to 218).
- Post Order Training—All officers have received training on the existing (not approved) post orders.  Training will be conducted on the new post orders once they have been written and approved.
- Direct Supervision Training—Training was conducted on March 26-28, 2019, for leadership personnel.  Train the Trainers for Direct Supervision was conducted on July 15-19, 2019, for staff who will assist in implementing direct supervision.
- Jail Administrator Training—This has not yet been provided for the Assistant Jail Administrator.
- In Service Training—190 of 210 officers have attended in service training since January 2019.  A new round of in-service training will commence on October 23, 2019.
- Training for Critical Posts—Less than Lethal and Use of Force training was provided for Corrections Emergency Response Team (CERT) members.  In service training was provided for Booking and Classification personnel.
- Special Management Unit Training—Officers have not yet received training for Special Management Units; however, officers have received an eight-hour block of instruction on Mental Health and First Aid for Public Safety.
- Policy and Procedures, to include prisoner rights and the prevention of staff abuse and misconduct—No compliant training has been conducted to date.  Training will be conducted once the Policies and Procedures Manual has been approved and issued.

Presently, although there are security staff assigned to the medical/mental health exam and office areas of the facility, there are no medical or mental health units, and so prisoners with special medical needs and/or mental health difficulties are housed throughout the facility.  Furthermore, even if/when a mental health unit is established, it will not be big enough to house all of the prisoners on the mental health caseload, and so there will still be prisoners who are suffering from mental illness and/or intellectual disabilities housed in general population.  Therefore, with regard to this provision of the agreement, it is important to consider the mental health training

provided to all security staff, as well as the need for additional training that might be provided to security staff assigned to any special needs/mental health unit that might be eventually established.

Although the corrections training on 'special needs inmates' is generally quite good, there are several concerns that merit review.  The first concern is with regard to the identification of prisoners with special needs, especially those who are suffering from mental illness and/or intellectual disabilities.  There is considerable discussion in the training program about the various levels of assessment performed at the facility as if the findings of those assessments will help security staff identify mentally ill prisoners; but security staff doesn't have access to medical records which would provide the findings of those assessments; and so security staff must rely more heavily on their capacity to recognize the signs and symptoms of illness. Therefore, although signs and symptoms of mental illness are listed in the training materials, this area of the training should be expanded in order to help staff actually visualize those signs and symptoms by employing videos, etc.

A second area of concern is with regard to some of the recommendations made (or not made) for security staff intervention.  For example, in the section on suicide prevention there is a section on making a 'non-suicide agreement' with a prisoner who might be having suicidal thoughts.  There is some concern about the capacity of all security officers to do this, and the appropriateness of security officers doing this, especially in the absence of assistance from mental health.  For example, the section on suicide prevention also includes a list of risk factors for prisoners who are at especially high risk of becoming suicidal, but there is no clear instruction about what a security officer should do when faced with such a prisoner.  Therefore, specific recommendations made in the training program should be reviewed.

The third area of concern is with regard to whether or not the information contained in the training will be consistent with the security policies and procedures that are currently being developed.  In this regard, there are obvious areas of concern such as the part of the training that deals with administrative segregation, but there are also less obvious areas of concern such as the part of the training that deals with alcohol and other drug detoxification.  Therefore, as new policies and procedures are finalized, the training program will have to be adjusted to conform to the new policies and procedures.

If/when a special needs/mental health unit is established, security staff assigned to that unit will require additional training.  This is because they will be dealing with the most seriously ill prisoners; their interaction with such prisoners will be more ongoing and more intense; and it is anticipated that they will be working in a more coordinated/collaborative way with mental health staff.  In essence, this additional training should include much more about the signs and symptoms of mental health and intellectual disability; the impact of the various mental illnesses

and intellectual disability on an individual's ability to function; and approaches to the management of prisoners with mental illness and/or intellectual disability that can dovetail with the therapeutic services being provided, thereby creating an overall and consistently run therapeutic environment.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

        ii. An inspection process.

        iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

        iv. A requirement that any corrective action ordered be taken.

        v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

        vi. To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff

response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

Compliance with the provisions of this paragraph cannot be realistically achieved until the Policies and Procedures Manual is approved and issued. Priority needs to be given to the development of comprehensive policies and procedures as well as post orders.

As was noted in the Eighth Monitoring Report, on March 19, 2019, the Sheriff issued Special Order 2019-054, which specifically designated "…Major Mary Rushing as his designee to execute all duties and responsibilities relating to Detention Services…". While that is consistent with the expectations outlined in the Settlement Agreement, in practical terms the order has made little difference in the day-to-day operation of the Jail System. Both the Jail Administrator and Assistant Jail Administrator are still unable to make routine personnel decisions without the approval of the Sheriff. These include such basic matters as the enforcement of individual uniform grooming standards as well as more serious matters such as the termination of an officer for use of excessive force discussed above. It must be acknowledged, however, that there have been no unauthorized shakedowns of DSD facilities by law enforcement deputies or Mississippi Department of Corrections personnel since the Special Order was issued.

Lack of supervisory responsibility and accountability continues to be a significant problem at the RDC. While each jail operates with inadequate and unapproved (by DOJ and the Monitor) policies and procedures as well as post orders, the inconsistency of operation is greater at the RDC than at the JDC and WC. When procedures at the RDC are set in place, actual practice tends to deviate over time because supervisors do not ensure consistent compliance or because they allow modification for undetermined reasons.

Supervisors are also supposed to make documented daily rounds of the housing units to ensure that inmates are properly managed and to identify maintenance issues that must be resolved. While supervisors fairly routinely document the fact that they have made rounds in the pod or unit logs (either personally or by the pod/unit officer's entry) maintenance issues are not documented. This may be because they are so prevalent that the repeated documentation of them on each shift would be a redundant exercise in futility.

One year ago, during the September 2018, site visit, reference was made to the Maintenance Report, prepared by Mr. Bell, the Maintenance Director for the County. At that time, it was anticipated that copies of this spreadsheet would be made available to each facility captain so that they could track the status of requested maintenance projects as well as the monitor team. During the site visit in January 2019, and again in May 2019, it was determined that the facility captains and the Jail Administrator still did not receive copies of the Maintenance Report.

Neither had the monitoring team received the spread sheet. In the Eighth Monitoring Report the failure of the County and DSD to address this issue was highlighted.  Now, a full year after this matter came to light, the facility captains, Jail Administrator and even the (newly created) Chief of Maintenance, Security and Sanitation for the DSD still do not routinely receive the Maintenance Report.  During the September site visit the Chief of Maintenance had to request a copy from the County so that it could be provided to the facility captains and the Corrections Operations member of the monitoring team. The monitoring team finally received a copy of the spreadsheet from the County Manager after the site visit. As is clear from many sections of this report, the physical condition of the RDC facility is a key problem and the ability of both the jail staff and the monitoring team to track repairs and renovations is critical.  There continues to be a lack of communication and cooperation between the County and the HCSO/DSD over this matter.

During the January site visit, the shortage of keys to the housing units and cells at the RDC was pointed out and a solution (the assignment of a set of keys to each on duty officer) was offered, but the May site visit revealed that the problem had not been corrected.  During the September site visit, key sets were found in the pod control rooms, but they are not assigned to officers. What began as a simple solution has been complicated by the fact that the control room officers in A and B Pods cannot electronically open and close doors, so it is impractical to give an officer a complete set of keys.  If he/she were to be overpowered by inmates they would be able to access all security doors. Although this presents an unacceptable security risk, that security risk actually occurs on a daily basis as a result of other adjustments made to address the lack of electronically operated doors. When an officer takes a key set from the control room and enters a housing unit, he/she leaves both doors open.  That is because it takes another officer, with a separate set of keys, to enter the unit to provide assistance if each door is secured after it is opened.  Until the electronic control panels in A and B Pods are replaced, it will impossible for security to be maintained, even if each officer has a set of keys.

Another key related security problem recently came to light when inmates took a recreation yard key from an officer (see Incident Report 191145).  Because each recreation yard door is not fitted with a unique lock, the inmates were able to gain access to the adjacent housing unit through the connecting recreation yard.  This security issue should be addressed by the firm that is retained by the County to upgrade doors and locks at the RDC.

During the September site visit, the Monitor and Corrections Operations member of the monitoring team met with the Jail Administrator, Assistant Jail Administrator and a lieutenant (shift commander) at the RDC to review well-being check and log entry documentation procedures.  At the WC and JDC officers perform their duties and enter the appropriate information in unit/control room logs as required, but the same is not the case at the RDC.  There the control rooms serve as place for officers to spend time and fill out entries in the housing unit

log books which, because the log books are not actually in the housing units are not verifiable in the sense that the entry does not itself prove the officer's presence in the unit.  Rather than spending their time inspecting conditions inside the housing units, officers literally waste their time making log entries that serve no purpose.

In order to eliminate time spent making unverifiable log entries and to have officers use their time conducting productive housing inspections, it was decided that the only log to be maintained would be the Pod Log.  Once direct supervision is reinstated at the RDC it will be possible to have individual housing unit logs again.  Until that time, officers will enter the housing unit in pairs, conduct required hourly well-being checks, and call them in to the pod control officer by radio.  In confinement pods (currently B-4) individual 30-minute well-being check logs will be maintained on the wall/door by each cell.

The need for the repair of security doors and locks at the RDC has been documented in previous monitoring reports, but the County has not developed a plan for correcting problems there in a timely and systematic manner.  Consequently, during the September site visit the Monitor and Corrections Operations member of the monitoring team met with the County Administrator, County Maintenance Director, Jail Administrator, Assistant Jail Administrator and Chief of Maintenance (along with DOJ representatives) to set a plan in place.  The meeting resulted in a comprehensive list of priority items for each facility.  It was presented by the Monitor to the County/HCSO/DSD for consideration and implementation.  While the full record of those proposals is contained in separate documents provided to the parties, the following highlights reflect the priority items for consideration.

- RDC.  The renovation of C Pod will be completed by October or November.  That pod has a new electronic control panel that allows all doors to be opened and locked from the control room.  The cell doors will remain as sliders.  One control room door, all housing unit entry doors and the two recreation yard doors will be changed to swinging.  One control room door is already a swinging door.
- RDC.  B Pod will have a new electronic control panel installed and both control room doors, all housing unit entry doors and the two recreation yard doors will be changed to swinging.  The cell doors in housing units B-3 and B-4 will be changed to swinging.  The cell doors in B-1 and B-2 will be left as sliders but with enhanced security strips.  Note: The interior, retrofitted (cage) doors must be equipped with a keyway on the inside (housing unit side).
- RDC.  The primary security door that controls access to the main corridor from B Pod, must be repaired because it cannot be operated electronically.  Currently, an officer must stand by with a key to open and close it.
- RDC.  A Pod will be left unchanged unless it must still be used for housing.  In that case, a new electronic control panel must be installed and all control room, housing unit entry doors and the two recreation yard doors must be converted to swinging.  Note:  The

interior, retrofitted (cage) doors must be equipped with a keyway on the inside (housing unit side).

- WC.  Each of the four housing units needs to be equipped with an alarm system and a video camera system covering the fire exit door.

Longer term renovations identified were:

- WC.  The double entry doors for housing units 1 and 3 need to be upgraded so that they are secure.  The repair work done in house is unsatisfactory. The County maintenance staff attempted to resolve the problem by tack welding the left side of the double door. They did not reinforce or permanently replace that door, as they should have, which means that it can still be forced open if inmates make a concerted effort to breach it.

- WC.  Each of the four housing units should have a safety vestibule installed so that inmates cannot rush out when the existing single door is opened.  As a part of this security upgrade, a time out cell should be created next to the entry.

- JDC.  The two holding cells in the Transfer Waiting area should be eliminated so that the whole space becomes open.  Replacement holding cells can be created in the adjacent inmate search space.

- JDC.  Create an outdoor recreation yard on the fifth floor of the facility.

Because cell doors, housing unit entry doors, pod control room doors, and at least one main corridor (Great Hall) entry door (to B Pod) cannot be electronically controlled, must be key operated or cannot be secured at all, it is impossible to maintain the most basic security measures at the RDC.  During the June riots, staff actually considered barricading themselves inside the staff bathroom, inside the A Pod control room, when it appeared that inmates would be able to breach the entry door. The lack of secure cell and housing unit doors not only contributed to the riots in April and June, but they create an ongoing inability to manage the inmate population. In September there were no less than 10 incident reports involving inmates that were letting themselves out of cells or out of the housing units. This leaves the inmates in control on the units, if not the pods. An August 10th incident report, IR#191331, stated that the inmates in B4 refused to comply with lockdown orders. The officer states "The inmates kicked open doors, keyed doors so that they could freely come in and out of cells. I gave multiple verbal command for them to go back in cells throughout the day and also to un-key the cell doors in which they all refused orders." An August 11th incident report, IR#191337, reported that one inmate opened his cell door and refused to go back. It states "he has his door rigged so he can come and go as he pleases. At around 1305 hours he kicked open [another inmate's] door and let him out as well."

Although the County took steps to bring on board a qualified security contractor, CML, and actually had sample A Pod control room and housing unit entry doors modified, as well as one cell door in C Pod, once that was done, no further action was taken.  During the September site visit, at a joint meeting of HCSO, County and monitoring team representatives, they reviewed reasonable options and priorities for corrective action.  Since then the Monitor has submitted a

recommended plan of action for fixing security door/lock problems at the RDC.  It is hoped that the County will accept this plan and implement it in a timely fashion.

Fire safety issues continue to be problematic at the RDC.  While the Fire Safety Officer, Rholonn Tucker, has been left in place, he still has duties outside of the DSD.  The State Fire Marshall's representative did not participate in the September site visit, as requested.  It is apparent that he/she does not hold local jurisdictions to reasonable fire safety regulations that are the norm in most states.  It is, therefore, incumbent upon the DSD/HCSO to voluntarily comply with recognized national fire safety standards.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

There is no central record maintained at each facility to reflect the accomplishment of random shakedowns.  Incident reports reflect that inmates still have access to contraband items and that staff respond to incidents after the fact.  In a direct supervision setting they would identify problems in advance of incidents, thus preventing them from occurring.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no action taken to deal with this issue since the beginning of the monitoring process.  Approximately three years have passed since the effective date of the Settlement Agreement.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for more than a year.  An officer was assigned to work on this issue, but there is no documentation of a program that meets the requirement of this paragraph.  Gang activities cannot be monitored or managed at the RDC because the housing units are not staffed.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

      a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

      b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

      c.  Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

      d.  Prohibit the use of force as punishment or retaliation;

      e.  Limit the level of force used so that it is commensurate with the justification for use of force; and

      f.  Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Non-Compliant**

Although the Use of Force Policy has not yet been approved and adopted, it has been reviewed by the DOJ and Monitor.  Once it is adopted, the HCSO should provide staff training, even before the rest of the Policies and Procedures Manual is issued.

Incident reports and CID/IAD investigative reports continue to reflect serious violations of Settlement Agreement requirements, particularly at the RDC.  At the JDC and WC, the number of use of force (UOF) cases is less than at the RDC on a per capita basis but it is difficult to track the actual number of use of force incidents.  In addition, the inappropriate UOF is greater at the RDC than at the JDC and WC combined.  Incident Report 191294 describes how an inmate was forced back into his cell in B-4 at the RDC and in the process fell face first onto the floor.  His arm was broken and he had to be sent to the hospital.  In Incident Report 191111 the officer explained his actions by stating that "necessary force" was used to gain control of the situation. There was no explanation of what that entailed.

Tracking use of force incidents presents a challenge. It is difficult to know whether all uses of force are reported. The titles of incident reports may reflect an incident type that does not reflect a use of force. There is a check box in the JMS system for a use of force but it is not

clear whether it is always checked. For October, 2019, 7 incidents were listed in the spread sheet as involving a use of force. However, in reviewing the actual incident reports an additional 4 incidents involved the use of force. In addition, the description of the use of force in the incident report may significantly understate the use of force employed. And the deficits in the JMS system do not allow for documentation of corrective action when use of force is used.

This troubling situation was highlighted in a use of force incident in August when an egregious use of force occurred and neither the use of force nor the corrective action was adequately documented. Incident Report 191336 was titled "Assault."' The event described involved the UOF by multiple officers, which resulted in serious injury of an inmate.  The incident report indicated only an open hand blow to the face and abdomen (in itself questionable but far less than the injuries ultimately described by medical staff including boot marks left on the body and a broken shoulder). Medical transport to a local hospital was required. Although extremely troubling that this egregious use of force was by a lieutenant, the subsequent IAD investigation resulted in the appropriate dismissal of the lieutenant and a detention officer for excessive UOF and "untruthfulness."

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a.  Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b.  If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

        i.  The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

        ii.  Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

        iii.  Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

    c.  Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-

person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

   i. a sign-out process for staff members to carry any type of weapon inside the Jail,

   ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

   iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

j. All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

This section is still carried as Non-Compliant because there are no policies and procedures in place. There have been no recorded instances of staff obtaining supervisory approval prior to using weapons or chemical restraints since the Eighth Monitoring Report. There are no records of inmates being held in restraints while in the Jail System except as part of the routine acceptance of arrestees, transfers between facilities or as part of the restraining process (handcuffs) when force is used. The DSD does not use the restraint chair as a means of controlling violent inmates and there are no incident reports of an inmate being restrained to

his/her bunk.  As a matter of practice, inmates who have been involved in use of force incidents are taken to Medical for examination and treatment.

There were no reported planned use of force incidents during the previous four months, consequently, there were no incidents that were electronically recorded and there was no need for coordination with medical or mental staff beforehand.  Based on a review of incident reports, it does appear that supervisors are notified when staff members are involved in use of force incidents.

As has been reported in all previous Monitoring Reports, the DSD does not have hand held video cameras available in any of its facilities so that planned use of force incidents can be recorded as required by the Settlement Agreement.  To date there has been no evidence submitted to the Monitor that indicates that the DSD/HCSO has taken any action to obtain/purchase such equipment.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**
While there are still no approved policies regarding the use of force, according to the Training Director, pre-service training for all current detention officers has been provided this year utilizing an in-house training curriculum that includes information provided by the monitoring team to address training deficiencies.  Based on a review of the incident reports since the last site visit, staff no longer appear to be using either OC spray or tasers as a coercive tool, rather they use them as a defensive measure, which is their designed purpose.

53. Topics covered by use of force training must include:
      a.  Instruction on what constitutes excessive force;
      b.  De-escalation tactics;
      c.  Methods of managing prisoners with mental illness to avoid the use of force;
      d.  Defensive tactics;
      e.  All Jail use of force policies and procedures, including those related to
          documentation and review of use of force.

**Partial Compliance**
The use of force training does include a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not specifically deal with

managing prisoners with mental illness, nor are there any approved use of force policies and procedures in place yet.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**
This paragraph cannot be addressed until policies and procedures on the use of force have been approved and published and staff have been appropriately trained.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**
Use of force training cannot be updated until the policies and procedures on the use of force have been approved, published and implemented.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Non-Compliant**
There has been no change with regard to the status of this paragraph.  It cannot be addressed until appropriate use of force reporting policies and procedures have been approved, published and implemented.  Although reports generated through the current JMS system do not provide the level of detail that the Settlement Agreement calls for, the HCSO Information Technology (IT) Unit is in the process of making significant changes that will allow supervisors, commanders and the monitoring team to track compliance.  While IT now publishes a list of all incident reports, separate from the details of each, it does not appear that this information has resulted in any change in supervisory review.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff

members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

It is still not possible for the monitoring team to know when a report was written because the reports include only the date/time of the incident, not when the report was generated. The same shortcoming applies to the date/time of supervisory review. The inadequacies of the JMS system are being addressed, but they have not resulted in a resolution of this problem. Virtually any incident report reflects these shortcomings. The time of the incident is recorded but there is no way to tell when the report was generated, nor is there any way to tell when a supervisor reviewed or noted anything about the incident. A hand written signature shows on the incident report copies that are forwarded to the monitoring team. A date/time of review is not included and there is no record of the supervisor's determination (approval/disapproval or recommendation).

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

    a.  A unique tracking number for each use of force;

    b.  The names of all staff members, prisoner(s), and other participants or witnesses;

    c.  Housing classification and location;

    d.  Date and time;

    e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use). For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.  A description of the staff member's attempts to de-escalate the situation without use of force;

    h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.  A description of any observed injuries to staff or prisoners;

    j.  Whether medical care was required or provided to staff or prisoners;

k.   Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.   A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

There has been no change with regard to use of force reports since the last site visit although changes to the reporting system are being programed by IT.  The JMS incident report/use of force format does not directly follow the sub-sections of this paragraph; therefore, incident reports do not reflect all of the information that is specified.  While there is a unique tracking number, and the names of staff members, and sometimes those of involved inmates, are included, witnesses are seldom listed. A cell location is almost always noted (although the facility is not), but not its classification.  Generally, the narrative includes the steps taken by an officer to manage the situation prior to the use of force, what methods were used to apply force and whether or not medical attention was required and provided; however, many reports do not provide all of the specified information.  A copy of the reporting officer's signature is now noted on the report, but there is no indication of approval, disapproval or recommended action on the part of the supervisor.

Incident Report 190092 is indicative of the problem.  An inmate was transported to the hospital, but there is no explanation as to what caused the injury or how it occurred.

**USE OF FORCE SUPERVISOR REVIEWS**

59.   The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

a.   A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

b.   A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

c.   Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

d.   If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.   Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

There has been no change in the status of this paragraph since the Eighth Monitoring Report. Compliance is not possible until the Policies and Procedures Manual is approved and published. Based on the current JMS system, there is no way to determine whether or not supervisors review use of force reports by the end of their watch; nor is it possible to determine whether or not they comply with the other sub-sections of this paragraph.  Supervisors do not indicate whether or not they approve or disapprove of the actions taken by officers; they also do not make recommendations for corrective action.  Use of force reports are forwarded to the CID Investigator for follow up.  Duplicate copies are provided to the IAD Investigator.

Incident Report 191015 reflects the inadequacy of documentation.  An inmate in B-4 (facility not identified) refused to lock down so deputies forced him into his cell.  During that process he struck his head on the "door corner of his cell" and began to bleed.  Staff took him to Medical, but never stated that they used force in the incident report.

60.    After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

    e.     Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph for the past five site visits.  The specified actions are not routinely followed by supervisors.  A review of use of force reports revealed that photographs are seldom taken.  Waivers related to the refusal to be photographed are not included.  Witness statements are infrequent at best, and although use of force incidents may be recorded at the RDC, because it has a digital recording system, that is not possible at the JDC (recording is limited to hallways in the housing areas) and the WC (which has no recording capability).

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status since the last Monitoring Report.  It is not possible to determine whether or not supervisors are performing their required duties because the monitoring team does not have access to the supplemental information that may be in the JMS reports.  Currently, the limited documentation available through Google Docs, the repository for documents being provided to the monitoring team, does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

62. Reviewing supervisors must document the following:
    a.     Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;
    b.     Witness statements;
    c.     Review date and time;
    d.     The findings, recommendations, and results of the supervisor's review;
    e.     Corrective actions taken;
    f.     The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.     Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

     i.     The nature and extent of injuries, or lack thereof;

     ii.     The date and time when medical care was requested and actually provided;

     iii.     The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.     Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Currently, the supervisory portion of JMS is limited to a check box with no ability to indicate recommended action or discrepancies noted regarding the items for which this paragraph requires review. Even the check box does not appear in the generated report. As a result, the supervisors have been signing the reports to indicate a review but this alone this does not meet the requirements of this paragraph. The documentation that exists, therefore, does not disclose whether the supervisors are making an appropriate review and they are definitely not documenting it if they are.

**INCIDENT REPORTING AND REVIEW**

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.     Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

The Policies and Procedures Manual must be approved and issued to all personnel before the level of compliance can be determined (see paragraphs 56 to 62 above).  The current incident reports should provide sufficient information for supervisors to make an appropriate review, but the reports are routinely deficient.  The PDF reports provided to the monitoring team do not include everything that is in the JMS system.  The monitoring team's inability to see everything that is entered into the automated reporting system further hampers its ability to analyze the shortcomings.  IT is working on a new report that should address some, or all, of the deficiencies of the current form.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:

     a.     Tracking number for each incident;

     b.     The names of all staff members, prisoner, and other participants or witnesses;

     c.     Housing classification and location;

     d.     Date and time;

     e.     Type of incident;

     f.     Injuries to staff or prisoner;

     g.     Medical care;

     h.     All staff involved or present during the incident and their respective roles;

     i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

     j.     External reviews and results;

     k.     Corrective action taken; and

     l.     Warden and Administrator review and final administrative actions.

**Partial Compliance**

There has been no change with regard to the status of this paragraph for the last five site visits. Compliance is dependent upon the approval and publication of the Policies and Procedures Manual.  Incident report documentation currently provides only some of the information specified in this paragraph.  Reports routinely have a tracking number and list all staff involved. Inmate witnesses are almost never noted, nor are witness statements.  The nature of inmate injuries is noted sporadically. More photographs accompany the reports than in the past, but almost all reports do not specify the facility in which the incident occurred.  That can only be determined by having knowledge of the housing unit configurations of each jail, and thereby recognizing the facility by how the unit, pod or cell is identified.

The lack of sufficient information in incident reports can be seen in IR # 191151 and 191156, both of which involve individuals being returned from the hospital with no indication of why they went to the hospital or their condition. Another incident report, IR #191057, states that a call from a family member had caused jail administration to question an inmate. He was described as very scared. He was taken to medical. Medical reported "that something had happen to him and he may need to move downtown." There is no indication of what had happened to him. If this was a PREA (Prison Rape Elimination Act) issue there may be cause for discretion. However, there was no corresponding PREA investigation. More troubling is the lack of detailed reporting that has come to light as a result of the recent article and video published by the Clarion Ledger. This involved the brutal and prolonged assault on an inmate in September, 2018. The incident report at the time, IR#181498 indicated that medical came to the unit to get the inmate and that he and three other inmates were escorted to Medical. The only description of his

injuries was in the investigation report which stated that he had been hit by an object causing the left side of his face to swell. There is nothing in the original report or a supplemental report that describes the severity of the injuries which, according to the Clarion Ledger, became known to jail administration not long after the incident if not at the time of the incident.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

    a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

    b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

    c.    Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There has been no change in the status of this paragraph since the last site visit.  Since the start of the monitoring process, approximately three years ago, there have been only two incident reports written regarding lost money or property.  While there is no specific policy in place which requires that a report be written in such instances, both this Settlement Agreement and accepted correctional practice mandate documentation.  As was previously recommended, it would be appropriate for the Jail Administrator to issue a special order to address this matter until such time as an approved policy is published.

Based on the current status of the JMS system, it is not possible to determine whether or not incident reports are written in a timely fashion (by end of shift or within 12 hours of the incident) and whether or not supervisors do likewise as required (within 24 hours of receipt of an incident report).  The only thing that can be determined is the reported time of the incident as it appears in the written document.

As noted in paragraph 64, incident reports frequently lack important information.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

    a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

    b.     Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

    c.     Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted. Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

    d.     Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

There has been no change in the status of this paragraph. There are no approved policies in place that specify what supervisors and shift commanders are to do. The monitoring team cannot determine whether or not supervisors even review incident reports (other than to sign on a printed copy) because of the previously mentioned shortcomings of the JMS system. There is no documentation that reflects, approval, disapproval or recommended actions.

**SEXUAL MISCONDUCT**

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

    a.     Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

    b.     Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

    c.     Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

    d.     Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

    e.     Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.  A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.  A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.  Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.  Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

There is a draft PREA policy that has been circulated for review, but it has not yet been finalized or approved. Incidents reported to the PREA officer usually result in relocation of the involved inmates, however, there has not been a practice of disciplinary action taken against perpetrators.

The PREA officer provides a four-hour program as part of the new officer training orientation. Additional in-service training is planned to inform officers of the need to make appropriate referrals to the PREA officer.

Although the classification process includes a screening for PREA issues, the housing decisions have not in the past appeared to reflect attention to those issues. During this reporting period there was an issue involving a transgender inmate at the WC. There have been problems in the past at the WC. The incident report and the PREA report states that the officers at the WC talked with the inmates involved and they agreed to get along. The PREA officer did not interview the involved inmates. Further investigation by the PREA officer should be completed to determine whether the WC is an appropriate housing location for transgender inmates given the ongoing issues there when there is a transgender inmate housed there.

Nursing staff continue to be involved in the screening of prisoners to identify those who may be sexually abusive or at risk of sexual victimization as part of the initial intake screening process. New admissions so identified are referred to the PREA officer.  Mental health staff perform a mental health assessment of all such new admissions forwarded to them by the PREA officer.  In addition, if medical or mental health staff identify a PREA eligible prisoner who was not identified as such at the point of admission to the facility, that prisoner is also referred to the PREA officer. There remains the issue of what housing is appropriate once identified.

There are multiple internal ways to report sexual abuse and harassment including filing a grievance and reporting through the kiosk system. The PREA officer now has a cell phone to which kiosk calls are forwarded. However, the PREA number on the kiosk system had to be changed from 999 to 888. When this happened, inmates were charged a fee for reporting a PREA

violation. This was reportedly being remedied and follow up is needed to determine if that has occurred. There is not a system for reporting to an outside entity other than through paid phone calls and there is no guidance on appropriate entities to call. However, the Sheriff's Office is negotiating an agreement with the Mississippi Coalition Against Sexual Assault to provide inmates access to MSCASA for reporting and counseling services. At the time of the site visit, this had not been completed.

In order to be effective, inmates must be fully informed of what constitutes sexual abuse and harassment and how to report it. As previously reported, all of the units visited had PREA posters posted. The posters have reporting instructions. The Inmate Handbook does not have current information on the PREA process but a separate form is now provided at booking that explains the process. The PREA officer no longer does orientation or education of inmates. The PREA Officer did not know if any orientation or education was taking place at JDC or the WC.

As noted above, mental health staff perform a mental health assessment on all new admissions who are referred to mental health by the PREA officer.  When mental health treatment is indicated, the PREA officer is notified of that and the new admission is offered mental health treatment. If a prisoner is a victim of sexual assault and/or sexual harassment, both the medical and mental health staff are prepared to provide any emergency and ongoing care that might be indicated. The social worker employed by QCHC who was providing this support has resigned and a new social worker had not yet been identified at the time of the site visit. Prompt replacement will be necessary to fill this critical role. Also, as noted above, the Sheriff's Office is negotiating with MSCASA to fill this role as well.

It is reported that all cross-gender searches have been banned. No documentation of this was provided. The draft policy on PREA/Sexual Safety provides HCDS does not conduct cross-gender pat searches by males of females or cross-gender visual body searches unless under exigent circumstances, and then only with the approval of the Shift Supervisor. However, the draft policy on Searches does not require approval of the Shift Supervisor and for pat searches by a male officer of a female inmate, it appears to define exigent circumstances to include possible disposal or concealment of contraband. This would allow cross gender searches of females by males in less than emergent situations.

The PREA Officer keeps a file on each referral, has a report form, and keeps numbered reports. She has completed an on-line training on investigating PREA incidents. Incidents involving alleged staff misconduct or criminal activity are referred to other investigators who have not received PREA training. The reports of these other investigators are not in the PREA Officer's file and her file does not reflect the results of the investigation. The incident referred to above reflects the lack of investigation by the PREA officer. The incident took place at the WC. The PREA officer called security staff to interview the inmates. The security staff then reported that

the situation was resolved. The PREA Officer also reported that upon receiving a PREA complaint at RDC, either she or the Lt. interviews the inmate. The PREA Officer does not get the medical records when there has been a referral to Medical. There is no regular supervisory oversight of the PREA officer's work or reports.

## INVESTIGATIONS

68.    The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

    a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

        i.    Any prisoner exhibited a serious injury;

        ii.    Any staff member requested transport of the prisoner to the hospital;

        iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

        iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

    b.    Per policy, investigations shall:

        i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

        ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

        iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

    c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

    d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

    e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

    i.      Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii.     Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

    i.      a brief summary of all completed investigations, by type and date;

    ii.     a listing of investigations referred for administrative investigation;

    iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

    iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

    v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

During the September site visit the Corrections Operations member of the monitoring team met with both the Internal Affairs Division (IAD) Investigator and the Criminal Investigation Division (CID) Investigator in order to develop consistent reporting practices and spreadsheet formats.  Both investigators provided copies of their most recent investigative reports for review.

During the January site visit, it was noted that the CID Investigator was going to be re-located from downtown Jackson to the RDC, but that never occurred.  Subsequently, the Monitor endorsed this move because most of the Investigator's work is generated at the RDC, and the IAD Investigator is already located there.  For unknown reasons, the HCSO has not followed through with this practical change.

The previous CID Investigator, who was responsible for the investigation into the death (murder) of an inmate at the RDC in December, 2018, has apparently completed her investigation. Affidavits seeking arrest warrants on three inmates were filed with the court on January 31, 2019.  Five other inmates were identified as being involved in the murder, but the report does not reflect their status.  While the report makes no findings with regard to the actions of staff, that matter has not yet been referred to the IAD Investigator for review.

The lack of approved policies and procedures regarding investigations makes compliance with this paragraph impossible.  While the investigators are making progress, they cannot be expected to meet the provisions of the Settlement Agreement until policies and procedures are in place.

IAD and CID investigations tend to examine issues and list HCSO rule violations, but do not reflect the disposition of many cases.  Because the investigators do not routinely receive such information, it is not possible to tie investigative efforts to results.  A detailed report of disciplinary and/or criminal prosecution of each IAD/CID investigative report should be provided to the respective investigator so that those results can be incorporated into their investigative spread sheets.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There is no change in the condition of the grievance system. The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of detention officers. Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer or other inmates observing the grievance being filed. Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.      Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**
Policies and procedures have yet to be finalized. A draft policy has now been written and is being circulated for comment. The policy would standardize the grievance system. At present,

the kiosk system works the same across facilities but a unified process is still in the process of being developed with the development of the policy. Even with the policy in place, there will need to be training on how to properly respond to grievances in order to achieve consistency. There continues to be significant progress in developing an actual grievance process including identifying the duties of the system wide grievance officer, clarifying the roles of the system wide grievance officer and the facility grievance officers, developing a tracking system, creating a tiered appeal process, and addressing the process for requests vs. grievances.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. The Grievance Officer reports that she runs back reports and clears old grievances. However, during this site visit, in order to check whether there were outstanding grievances that had fallen off the dashboard, a report was run for grievances assigned but not answered from January 1, 2019 through one week before the site visit. The report showed 272 that had not been responded to after 21 days. It is not clear why these would not have been identified in the report the Grievance Officer was working from. A report run specifically to the WC showed 243 assigned but not answered after 21 days. It is possible that the assigned individual responded to the grievance but didn't change the status in the system. The system will also show a grievance as awaiting assignment if it has been answered and appealed. The tracking system recently developed should be able to identify these situations and allow for correction. That spreadsheet does not currently have a column identifying when a grievance received a response. Adding this to the spreadsheet should help ensure that grievances receive a timely response going forward. Even with the new tracking system, running a report from the system should be incorporated in the process to ensure that all grievances get a response.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. The Grievance Officer has prepared some routine responses, for example, informing the inmate that the grievance is a request and how to submit a request. This has improved the responses in a large number of cases. There are still some where the adequacy of the response need improvement. Some responses promise some future action but there is no process to ensure that promised actions are actually taken.

A review of medical grievances and responses indicated that although there were only a very small number of such grievances, the medical grievances that were submitted were responded to virtually immediately upon receipt by medical.  In the overwhelming majority of instances, the response to medical grievances was an attempt to clarify the procedure the prisoner must follow to get what the prisoner was asking for.  In the two instances where it appeared that medical might have failed to adequately address a prisoner's medical needs, in response to the grievance Medical immediately met with and evaluated the prisoner.  However, in the above noted overwhelming majority of cases, there was no attempt by medical to determine if the prisoner required an emergency medical assessment and therefore didn't have the time to try to go back and seek medical attention in a more appropriate manner, and there was no attempt by medical to determine whether or not the prisoner was able to comprehend medical's response/explanation of the procedure that the prisoner must follow to get what the prisoner was asking for.  Therefore, in that sense, 'staff tracking' of whether resolution had been implemented or still needed to be implemented was lacking. One possible glitch in the system, is that if a grievance is filed as an emergency, it is not identified as a medical grievance and the Grievance Officer cannot assign it to Medical. She has to identify it as a medical grievance, print it out and hand carry it to Medical. It does not appear that this has led to delays or omissions but it has that potential.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds. There does not appear to be any language choices in the system or voice recognition features.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

During the September 2018, and January 2019, site visits hourly and 30-minute well-being check logs were observed in the booking area; but the appropriate (15 minute) logs were found to be in place during the May and September 2019, site visits.  No inmates were held in holding cells for more than eight hours, with one exception.  In order to deal with a problematic inmate who was returned to the DSD, after being held there previously, he was permanently housed in a single cell.  This inappropriate use of a holding cell (for housing) had previously been corrected.  The inmate was transferred to another county prior to the end of the four-day site visit.

Presently, there is no mechanism by which either medical or mental health have any input into classification or the assignment of housing.  Although there are barriers to this, in particular the level of mental health staffing, it will be especially important to seek this input when there is a special needs/mental health unit. There will have to be input from mental health regarding which of the prisoners on their caseload can best benefit from placement on such a unit (especially given that the mental health caseload is too big to put everyone on the caseload on that unit).

Accomplishing this will have to address several issues.  The first is whether or not a mental health assessment can be done within 8 hours of intake in order to determine whether or not a new admission is a potential candidate for the mental health unit.  The second issue is that if a new admission is a potential candidate for the mental health unit, is there room on the unit or will getting them a space on the unit take more than 8 hours.  Then, of course, there is the issue of a policy and procedure that establishes some type of cooperation between classification and mental health so that any of this can happen.

In addition, there is the issue of housing the more acutely mentally ill inmates – especially those who are currently viewed by classification and security staff as a danger to themselves or others and/or likely to be victimized by others – who are currently housed in segregation.  A mental health unit with access to a number of lock down cells would address this need.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The monthly summary reports submitted by each facility used to include a listing of inmates who have been placed in segregation (confinement).  This is no longer the case and should be remedied so this can be tracked. However, the monitoring team was able to review the reports on site. The format utilized by the JDC has now been adopted by the RDC and WC.  It does more than simply list inmates; rather, it reflects when they went into segregation and when they were removed, as required by this paragraph.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for prisoners who are being held in segregation; when indicated, they offer mental health services to a prisoner that is not already on the mental health caseload; or when indicated, they might make adjustments in the treatment that is being provided to a prisoner who is already on the mental health caseload.  However, to date, no mechanism has been established whereby any findings from those rounds can be shared with security staff and possibly have any impact on any decisions made by security staff regarding the continuation or termination of a prisoner's placement in segregation.

Obviously, although mental health staff persons are conducting weekly rounds in segregation, at present, there is still no mechanism for the incorporation of the mental health information obtained during the mental health rounds in segregation into the decisions made by security about inmates who are placed in segregation.  More specifically, as required by Paragraph 77(i) there is still no security policy and procedure governing monthly, interdisciplinary segregation rounds, where security and mental health review and discuss each inmate being held in segregation for more than 30 days, with a focus on whether or not segregation is causing a deterioration in the inmate's mental health, whether placement in segregation should be continued or an alternative placement is indicated, and whether there is a need for further enhanced mental health services and/or other supportive services.  Therefore, there still are no such monthly, interdisciplinary segregation rounds.  In addition, there is still no security policy and procedure governing the mental health input that security could obtain on a weekly basis, following the weekly mental health rounds in segregation.  When an inmate's mental health is deteriorating while being held in segregation, the development of a mechanism for obtaining this weekly available information would allow for an even more timely response by security, without having to wait for the monthly segregation review meeting.  Of course, in addition, the development of these security policies and procedures would make it clear that a prisoner's

mental health status while being held in segregation is something that security must consider when making decisions to continue placement in segregation.

As has been previously reported, the finding that so many of the prisoners placed in segregation experience a deterioration in their mental health status while in segregation appears to be due to multiple factors. These include: (1) In the absence of the yet to be completed security policies and procedures governing the disciplinary review process, there is no input from mental health with regard to the disciplinary process which sends inmates to segregation, and therefore prisoners who are already mentally ill inmates are placed in segregation. (2) The conditions of confinement in most of the segregation cells are unacceptable, especially at Raymond, in that many of the cells do not even have lights and there are rodents. (3) The conditions of confinement in most of the segregation cells makes maintaining one's mental health while in segregation all the more difficult, it further impairs the mental health of already mentally ill individuals, and it makes the mental health rounds in segregation much more complicated, given that it is so difficult to see the inmate and examine the cell. (4) As noted above, the fact that so many inmates in segregation use the weekly mental health rounds as their opportunity to express grievances raises concern about their access to the facility's mechanisms for filing grievances and the extent to which they view themselves as suffering without recourse.

The monitoring team facilitated a meeting between the QCHC staff and security command staff at the time of the site visit to highlight the areas where coordination between the two was needed. Among other results, it was decided that interdisciplinary meetings would be reconvened and members of QCHC staff would be included in the development of policies and procedures that require coordination between security and medical/mental health staff.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness. These safeguards must include the following:

      a. All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b. Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c. Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

      d. If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent

documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must

include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.  Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77(a): There is still no mechanism for input from a QMHP in the decision to place someone in segregation.  The security policy and procedures that would speak to this provision have not yet been developed.  Such a policy would require security to seek and then consider mental health input in the disciplinary review process that leads to the placement of a prisoner in segregation or the decision to place an individual in administrative segregation or any other decision that results in segregation, and would outline the roles and responsibilities of mental health in that process.  This policy would apply to all prisoners on the mental health caseload, and should also apply to any prisoner who, at the time of an infraction or behavior, appears to be evidencing signs and symptoms of mental illness, regardless of whether or not the prisoner is already on the mental health caseload.  There have been numerous meetings with security staff about the need for such a policy, and during this most recent site visit, there was a joint meeting with security staff and mental health staff about the development of such a policy.

Regarding 77(b): Presently, there does not appear to be a presumption that segregation is contraindicated for persons with SMI.  At the time of the site visit, there were 24 prisoners being held in segregation on B-4; 14 of them were on the mental health caseload; and at least 10 of those 14 are considered to be seriously mentally ill.  In addition, there were 4 seriously mentally ill prisoners in segregation on A-4 Isolation, and there were also 4 seriously mentally ill prisoners in segregation on A-1 Isolation.

During this site visit, the medical records of these 22 prisoners on the mental health caseload who are being held in segregation were reviewed. Each case was discussed with the mental health staff, and some of the prisoners were interviewed.  Some (about 10) of these prisoners are so actively seriously mentally ill that they are unable to adequately care for themselves and/or present a risk to others; some (about 5) are not currently psychotic but in segregation as a form of protective custody; others (about 4) were quite ill when placed in segregation, but have since been stabilized on medication, but yet are still being held in segregation; and it at least appears that some prisoners (about 3) have deteriorated while in segregation.  Although it was not always

clear how each prisoner ended up being placed in segregation, it at least appears that most were placed there because they were difficult to manage and/or protect (via the classification process), but there were clearly a couple who were placed there for disciplinary reasons and a couple who were placed there because they were transferred from another facility while in segregation and therefore were continued in segregation.

During this site visit, this monitor also reviewed these 22 prisoners with an eye towards which of them could be managed on a special needs/ mental health unit.  There were several assumptions used in this analysis, which included (1) that there would be a section of the mental health unit for acutely ill prisoners, focused on a more intense effort to obtain their compliance with treatment, coupled with a more rigorous program of therapeutic interventions focused on stabilizing them and helping them with daily living skills as required, (2) the unit would be supervised in such a way that it would be a safe place for more vulnerable prisoners,  (3) the programming on the unit would include behavioral programs designed to address and correct inappropriate behavior, and (4) the unit would be run by an interdisciplinary team, that offers a full range of interventions in a therapeutic environment.  With these assumptions in mind, virtually all of the 22 prisoners could be better managed and receive a more appropriate set of mental health services on a mental health unit.

Regarding 77(c): Prisoners on the mental health caseload are not screened by a QMHP for SMI. In fact, mental health staff are not even notified when a prisoner is placed in segregation.

Regarding 77(d) and (e): As noted in section 77-a, the mental health staff are not being offered the opportunity to assess any prisoners prior to their placement in segregation.  The security policy and procedures that would address this provision have not been developed and implemented.

It should be noted that security staff are aware of the fact that there are some seriously mentally ill prisoners being held in segregation.  However, there does not appear to be any specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation.  Furthermore, the placement of these prisoners in segregation has not been short term, and this monitor is unaware of the development of any individualized plans (developed by security staff and/or mental health staff) to get these prisoners out of segregation as quickly as possible.

Regarding 77(f): For prisoners who are compliant with the medication that has been prescribed for them, they are receiving a face to face visit by the nurses during medication pass.  However, as noted in the discussion on medication pass, with the revised procedure for medication pass, the nurses have been unable to observe/visit with a prisoner who refuses medication on any given day.  This is in contrast to the old procedure for medication pass where the nurses would at

least have the opportunity to observe/visit with a prisoner who refuses medication on any given day.

Prisoners on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP. However, due to the shortage of mental health staff, this does not consistently occur on a weekly basis. Furthermore, due to the shortage of security staff, these individual sessions are not consistently out-of-cell sessions.

As noted above, a QMHP makes weekly rounds for all prisoners placed in segregation, during which each prisoner's mental health status and need for mental health services is assessed. However, this assessment/review is not performed in conjunction with a jail physician and a psychiatrist, or in conjunction with anyone else. Furthermore, given that the services that would be provided by a jail physician and a psychiatrist are provided by a medical nurse clinician and a psychiatric nurse clinician, compliance with this provision as currently written is unlikely to occur. Therefore, there should be a review of this provision to determine whether weekly review by a QMHP in conjunction with the two nurse clinicians is acceptable, and if so, the two nurse clinicians should begin to participate in such a weekly review. If this is not acceptable, the staffing pattern outlined in the QCHC contract will have to be reviewed.

Regarding 77(h): There is no evidence of any occasion where security staff referred a prisoner to mental health due to the prisoner's decompensation while being held in segregation. However, mental health staff, during the course of making weekly rounds in segregation and/or while providing mental health services to prisoners held in segregation, have identified at least three prisoners who have decompensated while being held in segregation, one of which was not previously on the mental health caseload and was identified as evidencing decompensation during mental health rounds in segregation.

As has been noted in prior reports, although mental health staff carefully considers what additional mental health services can be provided to such prisoners, currently there is no formal mechanism whereby mental health staff can share these findings with security staff and thereby possibly impact on security staff's decision to continue or discontinue placement in segregation. In other words, there is still no policy and procedure for interdisciplinary segregation review. Such a policy would require regularly scheduled interdisciplinary review of all prisoners being held in segregation; both medical and mental health would have an opportunity to provide input into the decision to continue or discontinue placement in segregation; and it is recommended that each prisoner also participate in his/her regularly scheduled review.

It should also be noted that there is no mutually accepted informal mechanism to deal with this issue. Mental health staff report that when they have attempted to raise concerns about a prisoner with security staff, security staff has been unresponsive.

Finally, as was noted in section 77-b, the provision of more integrated and therapeutic housing for most of the prisoners on the mental health caseload who are being held in segregation awaits the development of a special needs/mental health unit.

Regarding 77(l): See section 77-b with regard to the need for a special needs/mental health unit, and see section 45-f with regard to the provision of additional special training for security staff who would be assigned to that unit.  If/when a mental health unit is opened, it is expected that medical, mental health and security staff would work together as an interdisciplinary team to provide a safe environment for mentally ill inmates and staff, while providing mentally ill inmates with the level of mental health services that they require.  While this will be important for the management and treatment of all prisoners who will be housed on that unit, it will be particularly important for the management and treatment of the most acutely ill prisoners, most of whom are currently being held in segregation.

It should be noted that security staff who are assigned to the mental health unit will largely focus on each prisoner's behavior and, in consultation with the mental health staff, the best way of managing/responding to each prisoner's behavior in a way that is also consistent with the goals, objectives and interventions outlined in the prisoner's treatment plan.  In fact, there will be many cases where the treatment plan might include specific interventions that will be made by security staff.  Therefore, while communication and cooperation between security staff and mental health staff will be critical to the success of a mental health unit, this will not require that the security staff have any type of access to information or records that would violate a prisoner's privacy rights.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  __Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.__**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Substantial Compliance**
Consistent with the practice begun in September 2017, Juveniles Charged as Adults (JCAs) continue to be placed at Henley Young after being booked at the Raymond facility.  When they

turn 18, they are now transferred to the Jackson Detention Center (JDC) pending further court action (vs. returning to the Raymond facility).  As of this site visit there were 15 youthful prisoners (JCAs) at Henley Young and no juvenile remained at the Raymond Detention Center (RDC), the last youthful prisoner turning 18 in mid-February. It is understood by the monitoring team that no more youth under age 18 will be housed at any of the adult facilities, including Juveniles Convicted as Adults (either waiting to be placed at the Mississippi Department of Corrections [MDOC] or previously convicted and arrested for a new offense or probation violation).

Compliance with this requirement will be monitored in the future to ensure sustained compliance.

As of this visit (date used is September 25):
- Of the fifteen JCAs at Henley Young, all fifteen were males; at one point over the summer there were two JCA girls;
- The age range for youth was 14 through 17, specifically 14 (3), 15 (1), 16 (5), and 17 (6);
- The length of stay (LOS) ranged from a low of 1 day to a high of 751 days for one of the youth that was in the original group placed at Henley Young in September 2017.  That particular youth recently turned 16. Four youth have been in placement for 360 days or more; eight youth have been in placement less than 90 days;
- Of the fifteen juveniles, only five had been indicted for the incident that resulted in placement;
- During the interim between the last site visit and this September visit, nine JCA youth were admitted, three of whom were also released during this time frame; that brings the total number of JCAs placed at Henley Young since initiation of the policy in September 2017 to 65 (over approximately 24 months, an average of 2.7/month);
- The overall population of youth at Henley Young (including non-JCA youth) has remained below the cap of 32 (although there is an increase in the number of non-JCA youth which raises the overall average), as required in the Henley Young/SPLC agreement and reflecting a relatively stable number of JCA youth detained. While the number of JCA youth has been steady, that does not alleviate concerns that for those individual youth that the court system delays are inappropriate and need to be addressed. Refer to the chart below for the average daily population for the period June 1 through September 24, 2019;



There are two particular comments **related to length of stay** (LOS) relevant at this point in the discussion:

1. The length of stay for JCAs at Henley Young has been an expressed concern in all prior monitoring reports.  While true for adult inmates in the other Hinds County facilities as well, it is particularly disconcerting that these delays are occurring for the JCA youth during their critical adolescent development years.  Not only has one youth been in placement for over 750 days, but four youth have been in placement for essentially a year or more.  Even under the best of circumstances, to have a youth that age confined in what is a "holding" facility serves neither the best interests of the youth or the community, let alone that this is a pre-conviction placement.  While the County cannot control the length of stay, these extended lengths of stay are inextricably linked to the ability of the facility to provide adequate and appropriate educational programming, skill development training, and mental health treatment.  This is a larger system issue that cannot be solved by Henley Young alone.

While there is not a "guaranteed" link between length of stay and declining behavior, it is not uncommon to see a youth's behavior and response to interventions degrade over time. Significant delays in getting through the court process and moving on to the next step no matter what that may be (e.g. return home, correctional or other placement) reduces the likelihood of successful transition to subsequent treatment and development.  In fact, in many

ways, extending youth in this sort of limbo status increases the likelihood of failure and future criminal activity.

2. Given this concern, the <u>county and court are to be commended</u> for taking steps to develop a new process, a Minors Diversion Docket, was scheduled to be implemented beginning on October, in which Youth Court Judge McDaniels will be able to act as a Circuit Court Judge to hold expedited hearings to ensure timely review of status of the charge(s) and any bond requirement.  A component of this plan includes securing a psychological assessment of youth that can be done in a timely manner and assist the court in making a well-informed decision relative to potential changes in court assignment (i.e. keep case in adult court or remand to youth court) or other conditions.  Progress on implementing this change can be assessed at the time of the next site visit.

Assuming the length of stay for JCAs can be reduced and the number of youth being admitted remains at a relatively constant level, the number of JCAs in placement at Henley Young could decline. While reducing the number of JCA's at the facility is important for the continued stability and functioning of Henley Young, it is even more important to the youth to be held no longer than necessary.

The program is in the process of updating/revising all its policies and procedures, in consultation with Ann Nelson, the monitor assigned for the Southern Poverty Law Center (SPLC) agreement and Mr. Leonard Dixon who is now providing additional technical assistance.  While the existing policies and procedures were already pretty well done, this review has provided an opportunity to make some improvements in specific expectations for staff and update them in light of the increased length of stay for the JCA youth.  As new policies are approved, the training coordinator schedules briefings with staff to update them on changes.

There have been no changes to the physical plant.  It is still recommended that: (1) additional classroom/treatment program space is provided/developed to help meet requirements for education and mental health programming, and (2) improvements be made to the housing units to "normalize" the environment to help reduce the emotional arousal experienced by youth as a result of the environment.

A somewhat simplified way of thinking about successfully managing youth's behavior and ensuring a safe environment is to think of three key components that impact youth's behavior: (1) the physical environment, recognizing that youth are particularly impacted by things like excessive noise, lack of natural light, limited/tight spaces, etc.; (2) the program, including education, mental health, behavior management, recreation, etc.; and (3) staffing, including the level of staff, their skills and training, and how they relate to and interact with youth.  Henley Young has continued to progress in the latter two of these three components but has been "stuck"

in making any physical plant/environmental changes that could contribute to better and safer supervision of youth in placement.

For any youthful prisoners in custody, the County must:

78.    Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II, a strength based assessment, and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two mental health clinicians, and the group work and counseling provided by the three Youth Support Specialists (YSS).

In addition, members of that mental health group continue to form a treatment team for each youth that establishes treatment goals and meets regularly to review the youth's behavior and progress on those goals.  The Youth Support Specialists (YSS) continue to serve as contact points for parent(s) of youth in placement, and the clinicians and Youth Support Specialists participate in addressing behavioral issues/incidents that arise during placement.

Protocols related to suicide concerns are in place and are reflected in documentation in Incident Reports, intake assessment(s), monitoring of youth exhibiting suicide/self-harm concerns, and documentation of review by mental health staff and "release" from suicide watch status.  Henley Young has implemented an appropriate supervision protocol for youth on suicide watch status, and there is documentation of required observation checks, albeit some of the documentation raises questions about its accuracy (see section related to observations conducted during disciplinary isolation periods).

As indicated in the previous report, it was clear to see how the influence of Dr. Payne, on staff as a .5 FTE Psychologist was contributing to a more comprehensive and effective mental health treatment team.  Her role in providing both direct therapeutic interventions with youth as well as coordinating the work of other team members was important.  Ideally, she will be replaced with someone who will fill the role of performing psychological assessments of each youth, supervising/coaching other members of the mental health team, coordinating treatment teams and plans, providing direction and support for much of the treatment programming, interacting with and supporting family engagement, and teaming with other staff in responding to crisis situations.

With the departure of Dr. Payne in June of this year, the mental health/treatment program has taken a step backward, and that position has yet to be filled.   County staff indicate that despite posting the position for a 1.0 FTE position prior to Dr. Payne's departure, they have been unable to find a replacement.  Other staff have attempted to "fill in the gaps", but that is not a long-term substitute for having a full-time individual to lead the mental health program.  The County will not be able to reach full compliance with this aspect of the agreement unless/until they can obtain the services of a qualified individual to provide leadership for the program.  Even once someone is hired, it will take some time for that person to further shape the quality of programming and delivery of mental health supports.

On a positive note, multiple staff continue to be positive about the change in the provision of psychiatric services/consultation from Dr. Kumar to Dr. Bell, a change that occurred in the spring.  Staff indicate that Dr. Bell comes regularly to the facility, responds as needed, and most importantly does a good job working directly with the youth.

Related to appropriate programs, the mental health Clinicians and the Youth Support Specialists continue to provide various group sessions for youth.  In addition to various groups conducted and referenced in the prior report (e.g. Avoiding Trouble, Managing Anger, Social Supports, Character Traits, etc.) one of the YSS staff has begun using the Power Source curriculum, a well-researched curriculum that includes activities and support materials related to things such as techniques and strategies for impulse control, anger management, stress reduction, and conflict resolution; high-risk behaviors, such as substance abuse, criminal activity, and gang involvement; and childhood abuse and neglect and the resulting feelings of shame, grief, anger, and loss.  This is exactly the kind of evidence-based curriculum that could form the basis of a more integrated treatment program, i.e. used by other YSS staff and direct supervision staff to better reinforce youth's behavior on the living units.

Individual YSS and clinicians have taken the initiative to develop these programs, but there are a number of improvements that could be made, including: (1) strengthening the cohesion in how the various groups and programs "fit together" to work toward an underlying and consistent approach (e.g. as referenced above related to Power Source, which is just one example of a curriculum that could be used);  and (2) the Youth Support Specialists cite that it is not uncommon that lack of a suitable space for their program and/or a shortage of staff available to get youth to and then supervise the program limits their ability to provide the programming that is scheduled.

There is simply not appropriately therapeutic space in which to conduct either individual therapy or do the group work.  Most areas of the facility are noisy, the furniture is uncomfortable at best, and using space that is designed for other purposes (including using the classroom space) is not

at all conducive to the kind of privacy or environment in which youth can calm down and get the maximum benefit from the services provided.  Thus, it remains a recommendation to either add portable classrooms and/or group programming space that can meet these needs, as there is not "extra" space that could be appropriately reconfigured/remodeled to accomplish this goal.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance**

There continue to be improvements in delivery of educational services for JCA youth, including:

- There are currently five youth involved in the GED, and those youth also participate in the daily classroom instruction as well.  There has been a change in the GED testing site that will be used for these youth, and credit goes to Ms. Finley for her continued attention to trying to move youth forward towards their GED.  Efforts to reconfigure/remodel space at Henley Young and obtain the needed certification to perform on-site testing have been discontinued given the offer of a local church based education program to provide a GED test site for the youth;

- There is currently one vacancy in the Special Ed. Teacher position, so all of the special education work is currently being performed by Ms. Finley, and her passion and commitment to ensuring youth are receiving adequate services is evident.  There appears to be a well-planned and consistent process in place to promptly get a youth's previous education records when a youth comes to Henley Young, including obtaining any Individual Education Plans for youth receiving exceptional education services.  Those IEPs are reviewed initially, updated as needed, and then reviewed periodically as required.  That review includes engaging with parent(s) and obtaining needed authorizations and approval(s).

- School is scheduled from 8:00 a.m. to 2:30 p.m. including a one hour lunch period.  Attendance of youth is appropriately tracked and reported to the Jackson Public School information management system;

- The space previously used for providing some Special Ed. programming (essentially a converted closet) is now used for testing purposes only – an improvement, albeit that space is still not particularly conducive for any educational purpose.

- Additional software for credit recovery and providing greater individualized programming remains to be fully implemented.

On a positive note, in an effort to further assess and improve education services, the Jackson Public School District has contracted with Mr. David Domenici, Director of the Center for Educational Excellence in Alternative Settings (CEEAS) as a consultant for the school system.  His tasks includes taking a look at the education program at Henley Young.  Mr. Domenici was coincidentally on site at Henley Young on the 24th, so a direct conversation with him was possible.  This appears to have been the first on-site opportunity for Mr. Domenici, and he will

be following up with some observations as well as visiting again after the new year.  His impressions of the current program and recommendations for improvement will be helpful in assessing the educational program.

That said, the operative word in this particular compliance condition is "adequate", and there are some concerns about whether and when to consider Henley Young to be in full compliance, including: (1) The overall educational program space is confined; the classrooms are adequate at best, although certainly not ideal, and there is not sufficient space or staffing to fully individualize programming at an adequate level; (2) Youth in facilities like Henley Young vary considerably in age, ability, and learning styles, and although each youth is given an initial assessment, it is not clear that programming is individualized in a way to meet those varied needs; (3) Both of these problems are exacerbated by the very lengthy stays that some youth are experiencing. What has to be seen as at best a temporary education program and facility is ill-equipped to properly educate youth for one or more years; and (4) the bottom line for any educational program is to what extent youth are actually learning versus just attending, and further assessment by Mr. Domenici and a review of any measures of academic progress will be helpful in assessing that quality.

To move toward substantial compliance, it is recommended to: (1) Provide additional adequate space for special education services.  Adding some portable classroom space would accomplish that as well as providing space for additional educational, treatment, and behavioral programming; (2) Conduct a review of any measures of academic progress to assess what youth are actually learning, what skills they are improving in, and to what extent individual learning plans are implemented.  A focus for the next site visit will be to see what kind of measures are in place; and (3) Utilize information provided by Mr. Domenici (and previous recommendations from Carol Cramer-Brooks, the prior education consultant evaluating the program at Henley Young) to develop an overall improvement plan for the school program.

It should also be noted that (unless additional information is provided by the County and verified by the monitoring team) young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance**

Since all youth under 18 have "aged out" of RDC and there are no adult prisoners at Henley Young, this provision is met. As JCA youth in placement at Henley Young turn 18, they will be transferred to RDC or the Jackson Detention Center (JDC). One youth (J.L) currently in placement will turn 18 prior to the next site visit, and unless that youth's case is otherwise resolved by the court he will be transferred to the JDC.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance** *(from Substantial Compliance in May report)*
The most relevant classification issue for JCA youth at Henley Young is related to which unit to house the youth in.  Two of the four housing units are designated for JCA males, one unit is for non-JCA males, and one unit houses both JCA and non-JCA girls. In discussing housing decisions with staff, it is apparent that they do take into consideration the factors indicated above, and the current policy includes them, but documentation for the decision had been lacking. The primary focus for classification at Henley Young is to ensure youth's safety.  While the presenting offense provides some information that informs the placement decision, they also have the benefit of often having prior experience with the youth based on a prior juvenile placement at Henley Young.  Thus, they are able to gather information about prior behavioral concerns, age, gang affiliation if any, and other factors relevant to placement.

Following the prior site visit staff developed a form for documenting the classification decision, and based on representation that the form would be implemented the prior report listed this provision as being in Substantial Compliance (subject to verification during the September visit). However, as part of a complete review and rewrite of all their policies in consultation with the monitor for the Southern Poverty Law Center agreement, they have in fact not implemented a change in documentation for classification. While the previous policy was deemed to be sufficient, in order to reach substantial compliance Henley Young will need to document implementation of that or any newly adopted policy.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**
Henley Young continues to provide training on an on-going basis for some requirements of this provision, including new employee orientation for new staff, updates on policies and procedures

as they are adopted, use of force refresher training, CPR training, fingerprint training (for intake purposes), and use of radio/communication equipment. As in past reports, this reflects that the bulk of training conducted for Youth Support Specialists (YSS -the line staff position) is on basic operational skills and falls short of the intent of providing more advanced training on issues such as the impact of trauma on youth behaviors, trauma-informed practice, adolescent development, and mental health.

This visit provided the opportunity to interview the staff member, Ms. Young, who has recently been designated to lead future training for YSS.  Officer Cole the formerly designated Training Officer was again on deployment out of the country (which has been the case for much of the last three years), and Officer Hines who was essentially the Acting Training Officer is phasing out toward retirement.  On a positive note, Ms. Young has a background as a certified trainer in trauma-based cognitive behavioral treatment approaches which are particularly applicable to working with youthful offenders and is consistent with much of the group training provided by the Youth Support Specialists.  It is her stated intent to broaden the training curriculum for line staff, so it will be of interest for the next site visit to see what has been accomplished in terms of developing a training plan that includes more advanced opportunities.

Several staff members (Director Frazier, Ms. Frelix, Ms. Barber, and Off. Nelson) traveled to Chicago to tour the Cook County youth facility and get program ideas from Mr. Leonard Dixon.  Mr. Dixon is the former monitor for the SPLC agreement and now provides technical assistance to Henley Young.  Several other staff members attended a recent Leadership Development Symposium conducted by the National Partnership for Juvenile Services.  Both of these represent an interest in learning more about best practices related to supervising youth in confinement, and time will tell to what extent that information translates to changes in policy and practice at Henley Young.  In addition, coincidental to this visit, the two mental health clinicians were scheduled to attend an annual mental health conference (25th-27th) focused on dealing with the impact of trauma.

Developing a more complete training program is hampered somewhat by rather consistent turnover of youth supervision staff.  Although there were only three vacancies at the time of this site visit, since the May visit at one point the number of vacant positions had risen to 13 (approximately 30% of the positions).  This not only makes basic supervision challenging but also means that the bulk of the training effort be directed at new employee orientation and basic training related to policies and procedures.  If/as staff retention continues to be a problem, at any point in time no matter how good the training program is there will be a notable portion of staff on duty that have not had more advanced youth supervision training.

Overall there is progress related to the overall training effort at Henley Young, but the recommendations for this report remain essentially the same as prior reports (particularly as it

relates to training for youth supervision staff), namely (1) developing more advanced training programs that build on the basic skills learned in the current training curriculum. Given Ms. Young's recent assignment to the training position, it seems unlikely that actual training sessions will be in place by the time of the next visit, but hopefully there will be evidence of a more advanced training plan for 2020. Some of this training could perhaps be provided through local/regional resources, e.g. through the universities, Hinds Behavioral Health, or other programs that focus on working with youth; and (2) the County should consider linking more advanced training to additional performance and/or longevity incentives that would enhance staff retention, increase the staff skill level, and provide reinforcement for staff to advance those skills.  This is clearly a challenge given limited resources, but if/when additional incentives are put in place to help retain staff this could be one component of such a plan.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

   a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

   b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

   c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

   d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

   e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

   f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

   g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth

and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

This continues to be one of the more challenging provisions of the Agreement, both in terms of implementing all of the requirements and in monitoring proper implementation. An important step was taken over this last period to document all Behavior Management Confinements, those that are implemented by staff for relatively short periods of time to defuse or respond to behavior incidents. It appears that this documentation process is not yet fully functional, but approximately 30 instances of use of this isolation are noted, with the majority of them being for only 15 minutes. That is consistent with the plan to use these isolations essentially as a short time out to remove the youth temporarily from the situation pending some resolution of the situation. In a few cases in which this confinement lasted for more than an hour, there are notes indicating that the youth was continuing to be disruptive.

Of greater concern are those situations resulting from more serious behavior or what Henley Young characterizes as major violations. Between June 1 and the time of this site visit there were 10 incidents that resulted in the use of isolation for an extended period of time and required the use of a Due Process Hearing for the imposition of a consequence. In terms of number, this reflects an increase in such incidents from the prior period but still a notable decrease from the trend in 2018.

There were two incidents involving multiple youth worthy of note:

(1) An incident on July 10 in which several youth obtained a cellphone and created/posted a video message to a relative of one of the youth's alleged victims. The person receiving the message contacted the facility, and leadership promptly investigated to determine what had happened. Per Director Frazier, in violation of policy a staff member provided a cell phone and allowed the youth to use a cell for the period of time in which the message was created/sent. Mr. Frazier indicted that the staff member involved was promptly terminated for this serious breach of policy. The youth involved were confined for 24 hours.

(2) An incident on September 3 in which five youth were involved in assaulting a staff member, initially on the recreation yard and continuing into the living unit. In observing the video and per the follow-up conducted by facility leadership it appears that the incident was initiated by one of the more volatile youth following a conversation with the staff member, and other

youth jumped in.  While the situation was responded to promptly by other staff, youth continued to act out until support from the Sheriff's Department responded with assistance and ultimately were secured in their cells.  The staff member did sustain a wrist injury.  The youth involved were confined in their cells for five days, one day as a consequence and four more days as what the facility calls "Administrative Confinement." Use of confinement for an extended, determinate length of time as discipline is not consistent with the time-limited, imminent harm standard of the agreement.  It will be important to monitor that "Administrative Confinement" is not used on a recurring basis.

In addition to reviewing reports about the incidents and the due process records, the relevant observation logs were also reviewed.  These are the logs kept when a youth is confined in their room/cell on which staff are supposed to document their wellness checks.

Reviewing all incident reports (including these more serious reports as well as a sample of other less serious reports), the due process records, and the observation logs documenting required wellness checks for youth in confinement raises several issues that will need additional work in order to reach compliance.  This includes:

(1) All of the more serious incidents resulting in isolation/confinement beyond one hour are beyond the intent of this provision to limit disciplinary confinement to no more than one hour (with some exceptions).  Especially for more serious incidents, this will be difficult to meet given the limited options the facility provides to supervise youth or provide other disciplinary alternatives.

(2) While leadership indicates that youth on more extended confinement are allowed out of their rooms to attend school, attend groups, and access recreation, it is very difficult to confirm if that is actually happening.  The observation logs used to track wellness checks for isolated youth only occasionally actually reflected that was the case.  Additional notes or codes need to be developed so it is clear whether or not a youth is "in" or "out" of their cell during those periods of time.

(3) Additional notes have been made on the observation logs indicating that one of the mental health team members or the assigned Youth Support Specialist are checking on the youth during confinement, but that documentation does not occur regularly enough to verify that the required clinician involvement always occurs as required. More careful documentation of those checks needs to be made.

(4) While the nature of the September 3 incident (assault on staff) is very serious and may require extended confinement, simply categorizing it differently without taking added steps to evaluate and document subsequent intervention is not sufficient.  The use of any Administrative Confinement based on concerns that a youth represents a danger to staff or other youth requires more documentation of actions taken, involvement of mental health staff, and regular assessment/review of the youth's situation by administrative staff.  It may

be worth creating a different tracking mechanism for these situations that would permit verification of all that was done to ensure youth's safety.

(5) The Observation Logs used to document checks for youth in confinement still too frequently reflect exactly 15-minute interval checks. This suggests that staff are filling the logs out after the fact rather than at actual times checks are conducted.  More attention by supervisors to proper completion of those logs will help ensure compliance.

Overall the use of room confinement can be further reduced by continuing to improve the environment in the living units, retaining and expanding training of direct supervision staff, continuing to expand social skill training, adding additional program opportunities, and ensuring a full complement of mental health support staff (i.e. a full-time psychologist).

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

   a. The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.
   b. An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.
   c. The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

As part of the behavior management program, Henley Young has again revised the point/level system tool used to document youth's performance and provide the basis for certain rewards or incentives (in consultation with Ann Nelson).  Once again, it seems to be an improvement in that it breaks up the daily schedule into more discrete observation periods, which can be a positive in terms of more routinely documenting youth behaviors.  Also, this revised tool adds the weekend; that has been a repeated recommendation in prior reports, so youth behaviors will now be documented on weekends as well as weekdays.  The change is too recent to evaluate how it has been implemented and how it has impacted youth behavior(s).  The Recreation Officer, Mr. Nelson, does track what incentives youth select each week based on the number of points they have earned, although that information is kept in a separate record than the point sheets themselves.

Just having a new "tool" does not in and of itself ensure that it will work properly to shape youth behavior(s).  As with prior reports, there are several recommendations that would contribute to this being an adequate component of the behavior management system, including: (1) staff need to document reasons for scoring the form, one way or the other; the more immediate and complete the positive or negative feedback about the behavior, the more likely it is to be effective in shaping the behavior. The current practice of having the Recreation Officer go over the point sheet at the end of the week is acceptable, but he has no way of explaining to youth why it was scored the way it was;  (2) add a weekly behavior goal to the point system, coordinating that goal with the youth's treatment team.  This will help youth focus on new and improved individualized behaviors that can be reinforced throughout the week rather than relying solely on interactions with the Youth Support Specialists; (3) continue to expand the nature of potential incentives youth can "earn"; and (4) simply make a note on the individual point sheet what incentive(s) the youth selected for each week, so that information is recorded not only in a central log kept by the Recreation Officer but also is reflected on the youth's individual form as well. This would simply make it easier to track individualized incentives.  Fully implementing use of this tool will also require continued training of line staff as to how best to use it as one way to interact with youth.

Overall, Henley Young has made continued progress toward achieving compliance on most areas related to this requirement. Leonard Dixon continues to be available to them as a consultant, and they seem to be utilizing Ann Nelson, monitor for the SPLC agreement.  Both are well-respected professionals in the youth confinement field.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

At the time of the last site visit the policies on pre-booking, booking and records had recently been adopted. A Booking Manual is reportedly being developed although this has been for some time with no provided draft. There continue to be improved systems in place to track individuals and release them timely. However, there continue to be some systemic problems that make this a challenge. The new Records Policy requires uniform organization of the files and requires a summary sheet that tracks the individual's detention status. Updates are immediately reviewed by a peer and the Supervisor is to conduct an audit of 10 files a week and do a semi-annual review of all files. The policy was adopted on March 11, 2019 and was not fully operationalized at the time of the last site visit. A staff member is reviewing files, reorganizing them and creating the summary sheet. As she reviews the files, she documents any missing paperwork. As this process progresses, there should be fewer examples of files without documentation of the basis for detention. This staff member is the only one reviewing the files in this manner and as a result this process is taking longer than anticipated. To date, she estimates that she has reviewed approximately 70 files. Generally, her reviews are thorough and the report she creates on each file appears to be clear and complete. However, when the file paperwork is described as disorganized, there does not appear to be a conclusion regarding the adequacy of the court documents.

At the present time, there continue to be some instances of people being booked without proper paperwork or being detained longer than they should be. There were 3 individuals that were detained 5 days without appropriate paperwork for booking. Another individual was detained 5 days longer than he should have been because of a problem getting the paperwork from the court. Another individual was no billed but the charge listed in the no bill did not match the charge in the JMS system. In fact, it was intended to be the same charge. The no bill was 6/22/19 and he was released 9/13/19. Although Jail staff ultimately pieced this together, the inquiry should have been made when the no bill came in instead of after 2 and ½ months of over incarceration.

The Records Supervisor was not on site during the site visit. The Supervisor tracks the probation violation charges and timely release. This information could not be updated. At the time of the last site visit, the Supervisor reported that there was improved communication with the Probation and Parole Department resulting in more timely release.  The Records Supervisor now runs a report out of the JMS showing everyone in jail on a probation or parole violation. One weekly report was provided and reviewed at the time of the current site visit and no untimely releases were noted. However, the Supervisor previously reported that this report is not always complete. If Booking has entered the Probation Violation (PV) as a hold, it will not appear in the report. The Records Supervisor also tracks people booked on a PV but if the PV is entered after booking she won't catch it. The Records Supervisor has to use multiple methods to track everyone in on a PV and she reported that people can still get lost in the system.

Improper releases continue to be a potential problem as a result of the Warrants Division using a different data base than the rest of the Sheriff's Office. The Warrants Division of HCSO uses an old data base and so does not enter warrants into the JMS system. If a warrant is entered after 5:00 or on the weekend, the Records Office won't know about it until the next business day.

There are several system issues that result in over-detention. One recurring situation previously identified is that there is not a way to identify people in the Jail who are waiting for a preliminary hearing. Although it is the court's responsibility to provide timely settings, the Jail currently has no way of tracking these individuals to alert the court. There continue to be individuals detained beyond 90 days without indictment. There are still 15 people currently in custody without indictment who were booked in 2018. Again, this appears to be primarily a problem with the District Attorney and the courts. Initially, the Jail was not maintaining a useful list of these individuals.  It now appears that staff is maintaining and providing to the court an accurate list of unindicted individuals.

There continues to be a problem with individuals waiting for their first appearance in County Court. This is supposed to occur within 48 hours. Because of frequent absences of the judge and the lack of weekend coverage, defendants are routinely not appearing before a judge in the required 48 hours. For those individuals, the Jail is entering a bail bond amount from a bail schedule. If they can't post the bail amount, they stay in jail without having seen a judge.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Substantial Compliance**
As reported at the time of the last site visit, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. At the time of the last site visit and this site visit there have been no individuals in the facility on a fines and fees order. This will continue to be monitored closely as the policies are new and sentencing orders are sometimes ambiguous, but this provision is now listed as in substantial compliance.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the

subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Substantial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The policy on pre-booking is consistent with this paragraph and at the time of this and the prior site visit there was no one in the facility for failure to pay fines and fees.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Substantial Compliance**

The policy on Records Management meets the requirement of this paragraph and at the time of this and the prior site visit there was no one in the facility for failure to pay fines and fees.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Substantial Compliance**

The policy on Records Management meets the requirement of this paragraph and at the time of this and the last site visit there was no one in the facility for failure to pay fines and fees.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary

information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals working off fines and fees. As reported recently, the recent standard practice at the WC was to give half the amount of credit towards fines and fees for individuals who do not perform physical labor. This included individuals who could not perform physical labor because of a medical or mental health condition. In prior site visits the stated practice was reported as determining the amount of credit on a case by case basis. At the time of the last site visit, the stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

     i.     Individuals who have completed their sentences;

     ii.    Individuals who have been acquitted of all charges after trial;

     iii.   Individuals whose charges have been dismissed;

     iv.   Individuals who are ordered released by a court order; and

     v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

See response to number 85.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As described in paragraph 85, the new Records policy establishes a system that should greatly improve the reliability of the prisoner record system. However, a complete updating and review of the records has not been completed and the system of auditing files has not been implemented. Similarly, when the Booking Manual is completed, there should be improvement in the initial entries into the JMS system. Additional problems described in paragraph 85 continue to exist. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained. In addition to Booking staff, there are four individuals tracking the lawful basis of detention. They are all four using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. There continues to be a lack of specified procedures to check all law enforcement and court documents. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's

mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.


**Non-Compliant**

Medical and mental health use an electronic medical records system, which keeps a full record of all medical and mental health assessments and treatments.  Of course, as is legally required, only medical and mental health staff have access to these records.  Mental health staff also maintain a log for prisoners on the mental health caseload.  Although this log has not consistently included prisoners on the mental health caseload who were not receiving medication, these prisoners will now be added to the log.  The log tracks the location of each prisoner, booking date, the date of the initial nursing intake assessment, the date the prisoner was referred to mental health and the source of the referral, the date of the initial mental health assessment, the date of the initial psychiatric assessment, the prisoner's diagnosis, the date the treatment plan was developed, whether or not the prisoner is on psychotropic medication, whether or not there is a discharge plan, and the prisoner's length of stay.  There is a separate log/tracking system for prisoners placed on suicide watch.

The above noted medical records and logs document the work that is being done and are constantly referred to when continuing to plan for and provide treatment.  In this regard, treatment plans should be periodically reviewed and updated when indicated; but this process of formal treatment plan review has not yet been initiated; however, it is anticipated that such a formal process of treatment plan review will be initiated once requested additional mental health staff have been brought on board.

The above noted records and logs are kept confidential due to prisoner/patient privacy rights.  However, see paragraph 77(l) for a discussion of how medical and mental health staff can work with security staff in the interest of providing a safe environment for mentally ill prisoners while providing such prisoners with an appropriate level of mental health services.

Based on the logs maintained by the mental health staff, the mental health staff is able to provide an accurate census of the population on the mental health caseload.  This census count, along with consideration for the other current and anticipated responsibilities of the mental health staff (see section 42), was used to assess the mental health staffing needs; this resulted in the request from QCHC for two additional mental health staff persons; but as noted above, the County has not yet responded to that request.  In addition, the need for a special needs/mental health unit was also made clear based on a review of all of the records and documents maintained by the medical and mental health staff.

Mental health staff are not involved with the transfer of prisoners to the state hospital for competency evaluations and/or the restoration of competency.  In fact, mental health staff are unaware of which prisoners are awaiting such transfer, and staff have no idea who is responsible for making sure that such prisoners are transferred in a timely manner.

Presently, mental health staff are also not involved in the incident reporting and review process. However, a review of incident reports for this monitoring period indicates that there were incidences reported for which there was important, relevant information that could have been obtained from mental health that was not obtained from mental health; there are no security policy and procedures that require this and provide a mechanism for doing this; and so such policies and procedures need to be developed.  Furthermore, a review of these incidences, coupled with the mental health information that was available, demonstrates how important and useful such a fuller, more interdisciplinary incident reporting system can be.  More specifically, for example, this broader review of these incidences highlights the need for certain policies and procedures, specifies certain mental health training needs, and informs the development of approaches to the management of prisoners with serious mental illness.

The incident reports for which there was important, relevant mental health information fall into several categories.  The first group consists of 4 suicide-related incident reports.  In 2 of these incidences, the prisoners reported being suicidal; therefore, they were placed on suicide watch; but then they acknowledged to the mental health staff that they had claimed to be suicidal to escape problems on their units.  If security staff knew of this outcome, it might have helped security staff identify and address problems on their units.  A third incident was an actual attempt and the prisoner had left a suicide note; mental health staff recognized this as the severe mood dysregulation of a prisoner with an extensive early childhood trauma history; and triggering events for the attempt were identified.  This fuller understanding of this incident might suggest that mental health training for security staff should include more about trauma and its effects, but it also suggests that information about and an understanding of triggers and their role in precipitating such an attempt could help security staff better manage the prisoner.  The fourth incident was yet another, even more severe suicide attempt; a review of available records indicates that actually, the situation had escalated over the course of about 24 hours, during which time the prisoner's behavior on the unit was deteriorating; and the prisoner had been seen in medical twice on the day of the attempt, the second time being 10 minutes before the attempt. This incident requires an even more in depth review; whether or not medical and/or security failed to recognize warning signs/the seriousness of the situation should be examined; and of course, the ultimate question is should this prisoner have been placed on some type of special observation or at least housed with another prisoner, instead of being left alone in his cell where he made the suicide attempt.

The second group consist of 5 medication pass/medication refusal incidences that ended up in some level of confrontation between security staff and the prisoner.  In all 5 of these incidences the prisoner was suffering from acute mental health difficulties.  If the impact of these difficulties on a prisoner's ability to function was understood by security staff, and if security staff were given additional tools for the management of prisoners with such mental health difficulties, security staff might have managed these prisoners some other way, thereby avoiding the confrontations.  This group of incident reports also focuses attention on the importance of mental health input into the disciplinary review process, in that the problematic behavior of these 5 prisoners (which resulted in incident reports) was clearly a symptom of their mental illnesses.

The third group, which consist of 4 misconduct-related incidences, raises similar questions about the impact of mental illness on a prisoner's ability to function and the importance of mental health input in the disciplinary review process.  It should also be noted that in one of these cases, the prisoner, who had been relatively stable on medication, clearly deteriorated over time as a result of multiple transfers to various units (after C pod was closed); this deterioration was not clearly recognized and/or not adequately considered as it relates to the management and repeated movement of this prisoner; and ultimately, there was an incident where the prisoner was seriously injured.

Another incident involved a prisoner who appeared to have an acute medical emergency and was therefore sent to medical.  What is missing from the incident report is that medical and mental health discovered that the reported acute physical symptoms were actually a reaction to some illicit drugs that the prisoner had taken – i.e., it was a classic allergic response to those specific drugs and the drugs were found in his urine.  Obviously, security should be informed that such drugs were available on the unit.

The last incident demonstrates the possibilities/potential benefits of a good working relationship between sensitive and knowledgeable security staff and mental health staff.  In this incident, the security officer recognized that the prisoner was deteriorating (i.e., not his usual self) and had become 'a danger to himself and others'; so the officer took the prisoner to medical, where he discovered that the prisoner had been refusing his antipsychotic medication;  and the security officer assisted medical/mental health in getting the prisoner medicated (he was given an injection), which then helped the prisoner to calm down.

This requirement envisions coordination and communication between security and mental health staff in working with individuals with SMI. While this happens on a sporadic basis in individual incidents, this communication is not built in to jail operations through interdisciplinary teams, consistent participation in disciplinary and classification decisions, and procedures requiring regular communication. Although there are confidentiality concerns to be accommodated, at the

present time there is no systemic process for communication and coordination between the mental health staff and security staff.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed

medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been circulated for review. The draft currently addresses some but not all of these requirements. The draft policy primarily addresses procedures that would ensure the accurate release of inmates completing a sentence. This is a small percentage of the releases. Inmates are released in a variety of circumstances including pretrial release on bond, ROR or electronic monitoring, releases of holds, pick ups on holds, expiration of time limits on detention, and others. The policy should address these other forms of release.

As noted in previous monitoring reports, compliance with this provision actually involves several different activities.  The first is the development of a written discharge plan for each prisoner who is likely to be eventually released; the plan would include the type of treatment needed, where the prisoner will obtain that treatment, and any other wrap-around services that might be indicated (housing assistance, vocational assistance, case management, etc.); and ultimately, the plan should be developed and shared with the prisoner, with the goal of obtaining the prisoner's commitment to the plan.  Once the prisoner is relatively stable within the facility, the second activity is to prepare the prisoner for release; this is done via psychoeducation and medication management groups, discharge planning groups, etc.; and where indicated, it may also involve other individual and group therapeutic interventions that maximize the prisoner's ability to function outside of the facility.  The third activity is the development of working relationships with community-based providers of mental health services and other important wrap-around services; this effort is to assure that such community-based providers will accept referrals; and this effort should also be focused on the mechanics of referral and how to maximize the possibility of having a successful/completed referral.  The fourth activity is finding ways to bridge the gap between release time and the prisoner's first meeting with a community-based provider; this includes giving the prisoner medication upon their release from the facility to hold them over until they see the community-based provider, but it might also include making sure that the prisoner knows how to access any emergency services that the prisoner might require prior to the time the prisoner meets with the community-based provider; and ways to do this must be developed even for prisoners who are released directly from court or otherwise fail to go through the medical clearance process upon their release from the facility.

Although there was an initial burst of activity around these various activities, during this last monitoring period not much has happened to continue to move forward with these activities, largely due to staff shortages.  More specifically, although there have been discussions about the need to develop written discharge plans, that activity has not been initiated.  Similarly, although there are plans to eventually start psychoeducation and medication management groups,

discharge planning groups, etc., those groups have not been initiated.  There has also not been any follow-up after initial meetings with Hinds Behavioral Health, regarding better ways to assure successful referral to the various programs they provide; although this monitor met with another potential referral source during this most recent site visit (Dr. Chandler, Director of Adolescent and Family Services, LLC) that possibility will also require follow-up; and in both cases, there are funding issues that need to be further explored.  Finally, there continues to be a considerable number of prisoners who are released without medical clearance and therefore fail to get a supply of medication that is waiting for them in medical; so there still needs to be improvement there; and it is still anticipated that once medication groups, discharge planning groups, etc. are in place, prisoners can learn about available ways to get emergency medication if they do leave the facility without a supply of medication.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:

      a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

      b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area. The Records Supervisor and her assistant and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. The files reviewed did include a copy of the NCIC report at the time of release. Once the policy on Release is revised

and adopted, and the files continue to contain the required documentation, the county can be considered compliant.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

i.    How to process release orders for each court, and whom to contact if a question arises;

ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. As stated in paragraph 85 above, there is a problem in checking for detainers because the Warrants Division does not enter warrants in the JMS system and the Records Supervisor does not have access to their system after hours.

The imbalance of staffing in Booking needs to emphasized again (see the Sixth, Seventh and Eighth Monitoring Reports).  While there is routinely only one officer in the holding cell area (where there should be two at all times, one male and one female) three or four Booking Clerks (who are Detention Officers) are routinely on duty in the office area.  Considering the fact that

only 14 people are booked on a typical day (slightly more than one every two hours), this misallocation of manpower should have been addressed previously.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

      a.     A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

      b.     Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The log and summary that is now supposed to be in each individual file would provide this information. A technological solution should be considered to pull this information into a system wide log that would meet the requirements of subparagraph a. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not routinely prepared for over detention.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control

Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Jail now has an individual whose title is Quality Control Officer or sometimes is referred to as the Court Liaison. At the present time, his work is primarily reactive. When an individual is brought to his attention, he researches the situation and takes corrective action. He does not track releases or prevent errors in the releasing process. He maintains a spreadsheet that includes release errors that he has addressed, but he does not at the present time collect and report on releasing errors that he has not himself addressed. His work is not incorporated into a continuous improvement and quality assurance process.

Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. Like the Quality Control Officer, she operates independently of the booking and release process and maintains her own spreadsheets but she does not perform all the duties listed in this paragraph.

103.     The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

As noted above, incident reports are not routinely created for untimely releases, nor are any investigations initiated for such incidents.  The Court Liaison does investigate and prepare a report on incidents that he has investigated, but there have been many untimely releases that have not been reported.  Recently, there have been a few incident reports involving erroneous releases. There were two in June and one in September. This is a positive step. It is not clear that any of these erroneous releases prompted any corrective action other than retrieving the inmate. These events should prompt an "after action" review with corrective action identified. The Jail

Administrator needs to issue a DSD Order requiring documentation of all untimely or erroneous releases.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**
There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**
The DSD has taken no corrective action to resolve the problem that exists at the RDC.  The need to move inmates out of the Pods to meet with attorneys, coupled with the lack of staffing to promptly move inmates, causes significant delays and cancellation of attorney visits. In the Third Monitoring Report it was recommended that unused video visitation space, in front of the control room officer's station in the A, B and C Pods, should be repurposed as attorney/client visitation space.  Attorneys would then have the opportunity to meet with their clients without having to wait for inmates to be brought to the front of the facility.  There is no expense involved other than to remove some floor and wall mounted equipment and to place tables and chairs in the space.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

At the time of the May site visit, County IT had created a report that pulls data by field from the incident reports which includes reportable incidents and uses of force. This is the beginning of being able to comply with this provision. Since the time of the site visit, the monitoring team has received the electronic monthly reports. The Jail Administrator reports that the spreadsheet is reviewed at command meetings and does assist in targeted improvement efforts. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include much of the information listed in paragraph 107 and 108 below and that would be needed to provide the information needed to inform continuing improvement or quality assurance reports. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. In addition, a system of manually recording data on grievances is being developed also in Excel. The new policy also rejects grievances that are actually inmate requests and directs inmates to use the inmate request category. This allows an accurate depiction of grievances. With the new policy, it should be possible to have a useful data base on grievance data. These reports are not yet being used to inform improvement or quality assurance efforts.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
    a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;
    b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
    c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
    d.  List and total number of incident reports received during the reporting period;
    e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

There are two spreadsheets being generated. One has the text of the narrative of the initial incident report and some information. The other spreadsheet does not have the narrative but has some additional information. The spreadsheets now being created are a first step towards being able to generate the reports required by this paragraph. At this time, it does not include all of the information required by this paragraph including information that would be necessary to be fully informed regarding the nature of the incident. Combined, the spreadsheets would have quite a bit of the required information but the information should be accessible in one summary report. Most importantly, neither spreadsheet has an actual summary of the incident. The spreadsheet pulls in the first incident report and not the supplements. The first incident report does not necessarily have important facts. For example, in the case of the death of the inmate in December, 2018, neither the first, nor the supplemental incident reports included the fact of his death. That would be important to know and is in fact required in subsection b. Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate on inmate assault or an inmate on officer assault. Only by reading the narrative of the first report, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

      a.      Summary of all uses of force, by type, shift, housing unit, and date;

      b.      List and total number of use of force reports received during the reporting period;

      c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

One of the new spreadsheets has some of this information with respect to Use of Force. The Use of Force incidents are now submitted on an incident report form. This is preferable to separate forms. Again, there is no summary of the use of force in the spreadsheet and there is no listing or totaling of referrals to investigation.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance

Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**

Some progress has been made in this area but the limitations of the system and the overwhelming number of requests and grievances filed have made it difficult to track the grievances in a meaningful way. The spreadsheet generated by pulling data from the system provides some of this information. The manual spreadsheet provides other information. There is currently not a process to merge the two. Grievances can now generally be identified separate from requests but the same individuals are responsible for both so the volume remains daunting. (It should be noted that once officers are more available in the housing units, most requests can be directed and handled by them and should reduce the burden on the grievance system). Neither system can generate a report by location, shift, or persons involved. A report can be generated by the types permitted in the electronic system. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. At the present time, there is no review process in the grievance system. As mentioned above, the Grievance Officer is now keeping an Excel spreadsheet and manually entering information related to grievances. One option would be to expand the manual spreadsheet to include the information required by this paragraph, this should enable staff to generate a report consistent with this provision.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:
   a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;
   b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;
   c.    A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and
   d.    A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

See response to paragraph 68. The IAD Investigator continues to provide a summary sheet reflecting the status of IAD investigations since 2017; however, the level of detail included does not comply with all of the requirements of this paragraph.  Part of the problem is that the IAD Investigator does not routinely receive notice of disciplinary review dispositions.

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need

additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**
There is currently no Early Intervention program.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**
The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:
    a.    Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;
    b.    Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**
Medical staff are not included in the review of serious incidents. This was discussed in a joint meeting between QCHC staff and command staff. It was decided that the Interdisciplinary Team meetings would be reinstituted and one task of the Team would be to review serious incidents.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead

to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.


**Partial Compliance**

Hinds County had contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. Hinds County is to be commended for getting the CJCC implemented and continuing its facilitation of those meetings despite a lack of participation by some key players. This paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. The JMI contract has not been renewed. As both JMI and the monitoring team has recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish this has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from

Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC is meeting. Not all of the identified agencies have been invited or represented at the meeting. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC has just adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  The County has not renewed the contract with the consultant. The initial contract was narrower than required by this paragraph.

## IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

    a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

    b.    Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The DSD has printed a booklet-sized version of the Settlement Agreement, which has been distributed to staff, but when questioned regarding the booklets, most staff cannot produce them and many do not have access to them.  While copies were previously posted in the housing units for the benefit of the inmates, a more practical approach toward compliance has been to make the Settlement Agreement available through the inmate kiosk system.  Based on inquiries from inmates, it appears that some inmates are accessing the Settlement Agreement in this manner. Each jail now has a copy of the Settlement Agreement and most recent Monitoring Report in a binder in each control room (RDC and JDC) and housing unit (WC).  Assuming that this system is found to be still in place during the January 2020, site visit, it will be possible to move this paragraph from Partial Compliance to Substantial Compliance.

## POLICY AND PROCEDURE REVIEW

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert of the Monitoring Team to develop policies and procedures. A number of draft policies have been provided and at this time, three policies have been adopted. It does not appear that there is a system in the policy development to incorporate requirements of the Settlement Agreement. In many respects, the draft policies reflect Settlement Agreement requirements because they both reflect best practices. However, there are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Three policies and procedures have now been adopted and several others have been drafted and circulated. There are many outstanding policies to be written and no estimated completion date. They are seriously overdue at this time. However, a new process is being identified that would accelerate the drafting and approval process.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

The policies and procedures are, at this point, seriously overdue. As stated above, a new process is being discussed that would accelerate the drafting and approval process. This paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken.

This has yet to be fully evaluated. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff.

134.     Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**
There have been three policies approved by DOJ and adopted by the Sheriff. The three policies are only partially implemented. The policies have not been incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.     The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**
This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph. A self-assessment was not provided prior to the January, May, or September, 2019 site visit. This paragraph is now carried as non-compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement. This person will serve as a primary point of contact for the Monitor. Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**
The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
The practice of providing immediate notifications has improved. The notifications have returned to being provided by email which is helpful. In the past, by comparing the notifications to the medical transport list, it appeared that immediate notification of hospitalization was not always provided. The medical transport list is no longer provided despite being requested so it is unclear whether this continues to be the case. The County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date and preparing incident reports.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.