IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 3:16-cv-00489-CWR-JCG |
| | ) | |
| | ) | |
| HINDS COUNTY, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**FINDINGS OF FACT**

## I.     INTRODUCTION

Hinds County, et al. ("Defendants"[1]), should be held in contempt for violating agreed-upon remedial measures ordered by this Court to remedy unconstitutional conditions in the Hinds County Detention Center ("Jail"[2]).  Defendants' non-compliance exposes prisoners to serious harm and violates their constitutional right to reasonable safety while incarcerated in Hinds County.  More than two years after Court-ordered deadlines, Defendants have failed to implement the majority of the provisions of the Settlement Agreement entered as an order of the Court.  Order, July 19, 2016, ECF No. 8 ("Order, ECF No. 8"); Settlement Agreement Between the United States of America and Hinds County, Miss., Regarding the Hinds County Jail, July 19, 2016, ECF No. 8-1, PX 114 ("Settlement").  Defendants have missed the deadlines and provided no plan to comply with the Settlement.  Defendants admit non-compliance with the Settlement and concede that their efforts "have fallen short of constitutional requirements." Mem. of Authorities in Support of Hinds County's Resp. to Mot. for an Order to Show Cause Why Defendants Should Not Be Held in Contempt, July 22, 2019, ECF No. 36 at 1 ("Defendants' Memo").  As a result, the Jail remains a violent, dangerous facility, with numerous assaults and a recent prisoner-on-prisoner homicide.

---

[1] Defendants include Hinds County, Mississippi, the Hinds County Board of Supervisors, and the Sheriff of Hinds County, in his official capacity.  Settlement Agreement Between the United States of America and Hinds County, Miss., Regarding the Hinds County Jail, July 19, 2016, ECF No. 8-1, PX 114 ("Settlement").

[2] The Jail includes the Hinds County Adult Detention Center in Raymond, Mississippi ("Raymond"), the Work Center in Raymond, Mississippi, and Jackson Detention Center in Jackson, Mississippi. Settlement, PX 114 ¶ 4. The Settlement also covers facilities used to house youth, including the Henley-Young Juvenile Justice Center. *Id.* § IV.K.

## II.     BACKGROUND

1.     On June 2, 2014, Plaintiff, United States of America ("United States"), notified Defendants of its intent to investigate conditions of confinement at the Jail pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA").  Letter from U.S. Dep't of Justice Initiating Investigation of the Hinds Cty. Det. Ctr., June 2, 2014, ECF No 3-1.

2.     On May 21, 2015, the United States issued a letter providing notice to Defendants that Jail conditions violated prisoners' constitutional rights through systemic deficiencies with Jail staffing, supervision, policies and practices, staff training, security equipment, physical plant, records, and prisoner tracking and release procedures.  Letter from U.S. Dep't of Justice to Peggy Hobson Calhoun, Bd. President, Hinds Cty. Bd. of Supervisors, et al., regarding Investigation of the Hinds Cty. Adult Det. Ctr., May 21, 2015, ECF No. 3-3 ("Notice Letter").

3.     The parties negotiated the Settlement to resolve the United States' investigation and ensure constitutional conditions at the Jail.  Settlement, PX 114 ¶¶ 2-3.

4.     The Court approved and entered the Settlement as an Order with an "Effective Date" of July 19, 2016.  Order, ECF No. 8; Settlement, PX 114 ¶ 10.

5.     At the parties' request, the Court appointed Elizabeth Simpson as the Court's Monitor ("Monitor").  Joint Mot. to Appoint Elizabeth Lisa Simpson as Monitor, August 18, 2016, ECF No. 9; Order, Aug. 18, 2016, ECF No. 11.  The Monitor then hired a team of subject matter experts, most of whom have toured the Jail at least nine times to assess compliance with the Settlement.  Anticipated testimony of Elizabeth Simpson ("Tst. Simpson"); Anticipated testimony of David Parrish ("Tst. Parrish").

6.     The Monitor and her experts have provided Defendants with extensive recommendations and technical assistance on how to implement the Settlement.  *See* Monitor's

Seventh Report, PX 102 at 11;[3] Tst. Simpson; Tst. Parrish; *see, e.g.*, Monitor's First Report, PX 96 at 4 ("Following the February 2017 site visit, the Monitoring Team identified steps that could be taken to make interim improvements so that real, measurable progress could be made in some priority areas while the Board worked on the financial solution."); Monitor's Second Report, PX 97 at 2 ("Prior to the First Monitoring Report, priority recommendations were identified to allow for immediate attention to areas that could either be addressed quickly or presented the most pressing health and safety concerns."); Monitor's Third Report, PX 98 at 13 ("It is essential that the concerns and recommendations outlined in the Second Monitoring Report be addressed."); Monitor's Fourth Report, PX 99 at 72 ("Although this recommendation was included in the last report, no action to implement it has been taken to date."); Monitor's Fifth Report, PX 100 at 5 ("Many of the recommendations contained in prior reports and/or requirements of the Settlement Agreement have not been implemented, so it is not surprising that the hopes of a successful transition are running into the reality of dealing with older, long-term youth."); Monitor's Sixth Report, PX 101 at 3, 5-6 (noting unheeded recommendations re: shakedowns, booking, physical plant, educational programming, and lengthy case processing delays); Monitor's Eighth Report, PX 103 at 26, 33, 35 (noting repeated unheeded recommendations regarding investigations, shakedowns, and key control); Monitor's Ninth Report, PX 104 at 2-4 (noting technical assistance related to well-being checks, policy development, maintenance corrective actions, and fire safety).  In addition to the Monitor and her experts providing technical assistance, the

---

[3] All cites to the Court-Appointed Monitor's Monitoring Reports will be cited in a shorthand format based on each report's number.  For example, "Court-Appointed Monitor's First Monitoring Report" will be cited as the "Monitor's First Report."  The filing dates, Court Docket numbers, and PX designations for the Monitor's Reports are as follows:  Monitor's First Report, June 3, 2017, ECF No. 12-1, PX 96; Monitor's Second Report, Aug, 23, 2017, ECF No. 16, PX 97; Monitor's Third Report, Dec. 11, 2017, ECF No. 19, PX 98; Monitor's Fourth Report, Apr. 18, 2018, ECF No. 22, PX 99; Monitor's Fifth Report, Aug. 1, 2018, ECF No. 23, PX 100; Monitor's Sixth Report, Nov. 15, 2018, ECF No. 24, PX 101; Monitor's Seventh Report, Mar. 5, 2019, ECF No. 27, PX 102; Monitor's Eighth Report, June 27, 2019, ECF No. 33, PX 103; and Monitor's Ninth Report, Nov. 13, 2019, ECF No. 46, PX 104.

Monitor dedicated funds from her budget to enable Defendants to use the services of a consultant to help develop the policies required by the Settlement. *See* Monitor's Fifth Report, PX 100 at 2; Monitor's Sixth Report, PX 101 at 96; Monitor's Ninth Report, PX 104 at 2-3 (discussing the work of the consultant); Tst. Simpson.

7.      Defendants dismissed technical assistance recommendations made by the Monitor and the United States. *See supra* Paragraph 6.  If implemented by Defendants, those recommendations could have expedited the exceedingly slow pace of compliance.  Tst. Simpson; Tst. Parrish.

8.      Defendants are violating the Court-ordered Settlement.  Although substantial compliance with most of the Settlement was due nearly two years ago, Defendants still have not met the Settlement requirements.  Defendants are non-compliant with 38 out of 92 provisions of the Settlement, and only partially compliant with 47 more.  Monitor's Ninth Report, PX 104 at 9; Tst. Simpson; Tst. Parrish.  More than three years after the Settlement's Effective Date, Defendants have achieved substantial compliance with only 7 out of 92 substantive provisions. Monitor's Ninth Report, PX 104 at 9; Tst. Simpson.

9.      Pursuant to Settlement Paragraph 163, the United States notified Defendants of its intent to initiate enforcement proceedings due to Defendants' failure to fulfill key obligations under the Settlement.  Jan. 10, 2019 Letter from United States to Defendants, June 24, 2019, ECF No. 30-1, PX 105 ("Enforcement Letter").  The United States supplemented that notice after the Monitor's January 14-18, 2019 compliance inspection.  Jan. 24, 2019 Letter from United States to Defendants, June 24, 2019, ECF No. 30-2, PX 106 ("Supp. Enforcement Letter").  Taken together, these letters formally notified Defendants of their non-compliance with 32 key provisions of the Settlement.  Enforcement Letter, PX 105; Supp. Enforcement Letter, PX

106.  Despite this non-compliance, Defendants offered no reasonable alternate plans or timetables to increase the likelihood of eventual compliance.  Tst. Simpson.  The parties were unable to resolve their differences about the assertions in the United States' Enforcement Letters.

10.     After seven Monitor's Reports confirming widespread non-compliance and no assurance of timely resolution from Defendants, the United States filed its Motion for an Order to Show Cause Why Defendants Should Not be Held in Contempt, June 24, 2019, ECF No. 30 ("Mot. for Contempt").

11.     Despite Defendants' lack of substantial compliance with nearly all provisions of the Settlement, the United States focused its Motion for Contempt on Defendants' failure to comply with provisions regarding:  1) policies and procedures, 2) use of force, 3) staffing and prisoner supervision, 4) supervisor qualifications and training, 5) physical plant and safety equipment deficiencies, and 6) youthful prisoners.[4]  Mot. for Contempt, ECF No. 30; Settlement, PX 114 ¶¶ 9, 22, 37-39, 41-42, 44-46, 50-62, 68, 78-84, 130-31.  These provisions relate to the most immediately dangerous conditions and the Monitor's highest priority recommendations. Tst. Parrish; Tst. Simpson.

12.     The United States' Motion for Contempt requests narrow relief drawing from certain "priority recommendations" that the Monitor has included with the compliance reports.

---

[4] At the time the United States filed its Motion for Contempt, Defendants had made inadequate progress in complying with key Settlement provisions regarding youthful prisoners.  Defendants also continued to fail to achieve compliance with the settlement in *J.H. v. Hinds County*, No. 3:11-cv-327-DPJ-FKB (S.D. Miss. filed June 11, 2011), a separate lawsuit regarding conditions at the Henley-Young Juvenile Justice Center.  A recent order in *J.H.* directs Defendants to select an approach to address the need for additional programming space at Henley-Young, which relates to a main concern the United States had with regard to youth prisoners in this matter.  *Id.* at Order, Nov. 4, 2019, ECF No. 147.  Based on this development, as well as improved compliance findings in the most recent Monitor's Report in this case, *see* Monitor's Ninth Report, PX 104 at 62-76, the United States no longer seeks a ruling holding Defendants in contempt regarding the youthful prisoners provisions. The United States notes, however, that Defendants have not yet achieved substantial compliance with all of these provisions.  In fact, most provisions are currently in only partial compliance, including one provision that regressed from substantial to partial compliance in the Monitor's Ninth Report, and much work remains.  The United States will continue to monitor Defendants' compliance, and reserves its right to move for contempt on these provisions in the future, should conditions warrant it.

*See, e.g.*, Priority Recommendations (June 2018), Attachment 8 to Mot. for Contempt, ECF No.

30-8, PX 111 ("Priority Recommendations June 2018").  These priority recommendations

address certain foundational requirements for Settlement compliance, such as hiring qualified

staff, or target the most dangerous conditions in the Jail.  *Id.* at 1-2.

13.     In the time that has passed since the United States filed for contempt, Jail

conditions remain unconstitutional, and Defendants are making little progress at implementing

the Settlement.  The two most recent Monitor's Reports confirm continuing non-compliance and

dire conditions.  Monitor's Eighth Report, PX 103 at 8-9; Monitor's Ninth Report, PX 104 at 9.

While the Monitor reported some very recent remedial efforts, staffing and security remain poor;

the physical plant remains insecure and unsafe; the vast majority of policies have not been

drafted, much less implemented; and use of force is inadequately reviewed and regulated.

Monitor's Ninth Report, PX 104 at 2-3; Tst. Simpson; Tst. Parrish.

### III.  DEFENDANTS' NON-COMPLIANCE WITH THE COURT'S ORDER PLACES PRISONERS, STAFF, AND THE PUBLIC AT SERIOUS RISK OF HARM.

14.     The Jail is plagued with numerous prisoner assaults and other serious incidents,

which demonstrate Defendants' non-compliance with the Settlement and the substantial risk of

serious harm that Hinds County prisoners face on a daily basis.  Monitor's Ninth Report, PX 104

at 23-24; Monitor's Seventh Report, PX 102 at 15-16; Tr. of In-Person Status Conference 15-19,

May 9, 2019, ECF No. 30-3, PX 107 ("May 2019 Transcript").[5]  As noted below, within the last

18 months, a prisoner died at the hands of fellow prisoners, at least four riots occurred, staff were

---

[5] *See also* Copy of HCDS Monthly Incidents Summary – October 2019, PX 78; HCDS Monthly Incidents Summary – October 2019, PX 79; Hinds County Incident Report Chart, PX 80; Incident Narratives by Date, PX 81; July Incident Excel, PX 82; July Incident Log, PX 83; July Nar. PDF, PX 84; July Narrative Log, PX 85; June Incidents Chart, PX 86; September 2019 Incident by Date Spreadsheet, PX 87; September 2019 Incident by Date, PX 88; September 2019 Incident Narratives by Date (pdf), PX 89; September 2019 Incident Narratives by Date Spreadsheet, PX 90; Narratives by Date for August 2019 Spreadsheet, PX 113.

threatened with harm, and at least three dozen prisoners were transported out of the Jail for medical treatment due to injuries incurred during assaults and other disturbances.  Incidents of serious harm are pervasive and widespread.  Much of the harm is similar to that reported in the United States' Notice Letter, over four years ago.  Notice Letter, ECF No. 3-3 at 10-11.

15.     Defendants do not deny that the Jail is dangerous to staff and prisoners. According to the County Maintenance Director, even he does not feel safe in the Raymond facility because of the lack of security staff.  Anticipated testimony of Robert Bell ("Tst. Bell"). According to the Major for Operations, Administrative Services, for the Hinds County Sheriff's Office, the Jail is dangerous.  Anticipated testimony of Major Pete Luke ("Tst. Luke"). According to the Captain who is Director of Training for the Hinds County Sheriff's Office, the Jail is not safe.  Anticipated testimony of Captain Terry Miller ("Tst. Miller").  According to the Captain in charge of Jackson, Raymond is not safe.  Anticipated testimony of Captain Sandra Dalton ("Tst. Dalton").  According to the President of the Hinds County Board of Supervisors, the Jail is a dangerous place to work.  Anticipated testimony of Peggy Calhoun ("Tst. Calhoun").

16.     In December 2018, a prisoner was beaten to death in a Raymond housing unit. Monitor's Ninth Report, PX 104 at 23-24; *see also* Incident Report 181913, PX 14 (describing the incident but failing to report the death of the inmate).  A group of prisoners beat and stabbed the victim over an extended period of time when no officer was present on the unit.  Monitor's Seventh Report, PX 102 at 2, 15-16; Anticipated testimony of Mary Rushing ("Tst. Rushing"). Although three prisoners were charged with murder in January 2019, the Jail had not conducted a documented Administrative Review or Mortality Review[6] as of the Monitor's compliance visit in

---

[6] This type of review involves an interdisciplinary group of staff, including correctional and medical management, analyzing an incident to identify the causative factors, any flaws in practice or policy that contributed to the incident, and any necessary remedial measures that should be put in place to avoid similar incidents in the future.

late September 2019, which are required by the Settlement and essential to Defendants'
understanding of how the incident occurred and what Defendants can do to prevent such
tragedies in the future.  Monitor's Ninth Report, PX 104 at 24; Settlement, PX 114 ¶¶ 43, 66.c-d,
114.b.  The Jail's report of the attack on the prisoner is vague and appears incomplete.  *See*
Monitor's Ninth Report, PX 104 at 52.  The report identifies five additional prisoners as being
involved in the murder, but does not report on their status, and the report makes no findings with
regard to the actions of staff.  *Id.*

17.     In June 2019, there were three riots in one housing unit of Raymond, where staff
lost control of the majority of the housing units and almost ceded the pod control room as well.
Monitor's Ninth Report, PX 104 at 22 (citing Incident Reports 191145, PX 128; 191148, PX
129; and 191162, PX 130).  One officer was injured and at one point the officers were barricaded
in the control room and planning to retreat to the restroom.  Monitor's Ninth Report, PX 104 at
3, 22.  Masked prisoners threatened to stab officers with shanks and took the officers' keys.  *Id.*
at 22.  The subsequent investigation revealed that at least one officer provided his keys to the
prisoners, although the incident reports do not reflect that fact.  *Id.*; Anticipated testimony of
Captain Ric Fielder ("Tst. Fielder").

18.     In April 2019, a riot broke out during a power outage.  Incident Report 1900748,
PX 19; Tst. Fielder.  The lights went out throughout the Jail, the locks failed, and prisoners
escaped from their cells.  Incident Report 1900748, PX 19; Tst. Fielder.  Prisoners were able to
escape from their housing unit and attempted to break into a control room.  Tst. Fielder.  Earlier
that same day, a prisoner had been stabbed by unknown assailants in the same pod.  May 2019
Transcript, PX 107 at 18.

19.     Prisoner-on-prisoner assaults resulting in serious injuries are common.  From June

1 through September 15, 2018, Jail staff transported 24 prisoners to the emergency room for a variety of serious injuries from assaults, including stab wounds, fractures, dislocations, and eye injuries.  Monitor's Sixth Report, PX 101 at 17.  Two of the stabbings resulted in especially serious pneumothorax injuries (collapsed lungs).  *Id.*  From June through September 2019, there were approximately a dozen prisoner-on-prisoner assaults each month:  15 in June 2019, 12 in July 2019, 15 in August 2019, and 11 in September 2019.  *See* July Narrative Log, PX 85; June Incidents Chart, PX 86; September 2019 Incident by Date, PX 88; September 2019 Incident Narratives by Date Spreadsheet, PX 90; Narratives by Date for August 2019 Spreadsheet, PX 113.

20.     Prisoners themselves report multiple assaults, an absence of officers, and deplorable living conditions.  Declaration of Demarcus Banyard at 2 (September 25, 2019); Declaration of Mario Barnes (September 25, 2019); Declaration of Deangelo Dent at 2 (September 25, 2019); Declaration of Christian Dyre at 2 (September 25, 2019); Declaration of Serbastian Short at 2 (September 25, 2019).  One prisoner "was stabbed ten times," and "[his] lung was punctured."  Dyre Decl. at 2.  No officers were in the unit during the fight, and he had to bang on the control room windows, which were covered with paper bags, for officers to come help him.  *Id.*  The prisoner "was in the hospital for about 3 days."  *Id.*  This prisoner also has to hide his hygiene kits, sheets, and blankets so they will not be stolen, sees "rats and roaches" at RDC, and lives in "fear for [his] life."  *Id.*  Another prisoner reported being "attacked at least twice at RDC [Raymond Detention Center]," "rarely see[ing] officers in pods" during day shifts, and cells with "mold, rats, mildew," inoperative lights and "blood on the toilet."  Banyard Decl. at 2.  A third prisoner reported being "attacked by numerous inmates with free world knives," seeing "other inmates get stabbed during this attack," rarely see[ing] officers come through the

pods," and a "filthy" housing unit infested with "rats, snakes and spiders."  Barnes Decl. at 2.  A fourth prisoner was "attacked by numerous inmates with free world knives," suffered a fractured shoulder and eye injury, and had to be taken to a hospital.  Short Decl. at. 2.  A fifth prisoner was "attacked by a group of inmates" and taken to the hospital.  He has seen contraband knives, mold inside housing, and "observed that only 2 cells have lights in the pod."  Dent Decl. at 2.

21.     A major disturbance occurred *during* the Monitor's September 2018 site visit.  Monitor's Sixth Report, PX 101 at 17.  That incident alone resulted in eight emergency room transports.  *Id.*; May 2019 Transcript, PX 107; Incident Report 181493, PX 9; Incident Report 181500, PX 10.

22.     Another egregious example of violence in the Jail involves the September 18, 2018 assault on a prisoner at Raymond.  Monitor's Ninth Report, PX 104 at 23; *see also* Video Clip, PX 136 at 00:43-01:38 (local news broadcast showing video footage of the Sept. 18, 2018 assault).  The prisoner was brutally beaten and, as a result of this attack, he is no longer able to function independently.  Monitor's Ninth Report, PX 104 at 23.  When officers responded to the scene, they questioned other prisoners, but left the victim lying on the floor and failed to provide any first aid or assistance before leaving the housing unit.  *Id.*; Video Clip, PX 136 at 1:50-2:06.  The incident report submitted at the time of the assault indicated only that medical staff came to the unit to get the victim, and that he and three other prisoners were "escorted" to the medical unit.  Monitor's Ninth Report, PX 104 at 44 (citing Incident Report 181498, PX 9).  The only description of the victim's injuries was in a later report of an investigation into this incident, which stated that the victim had been hit by an object causing the left side of his face to swell.  *Id.*  There is nothing in the incident reports prepared at the time of attack, or in a supplemental incident report, that describes the severity of the victim's injuries.  *Id.*

23.     These disturbing facts do not tell the complete story.  The situation is likely worse.  Basic Jail recordkeeping systems are so poor that staff have long had difficulty providing basic incident data and mandatory reports to the Monitor.  Monitor's Seventh Report, PX 102 at 25-26, 46-48.  In many incidents, staff either do not complete an incident report at all, or fail to include information required by the Settlement.  The errors occur even at the supervisor level. The Monitor has repeatedly noted that supervisors are not documenting video reviews or taking witness statements.  Monitor's Seventh Report, PX 102 at 25-26, 46-48; Tst. Simpson; Tst. Parrish.  Although the Monitor brought this to the attention of the Jail Administrator, the Jail Administrator has not disciplined any staff for filing incomplete incident reports.  Incident Report 181913, PX 14; Tst. Rushing.

## IV.     DEFENDANTS ARE VIOLATING THE COURT-ORDERED SETTLEMENT.

24.     Defendants are completely non-compliant with 38 out of 92 provisions of the Settlement, and only partially compliant with 47 more.  Monitor's Ninth Report, PX 104 at 9; Tst. Simpson; Tst. Parrish.

25.     The Monitor's nine compliance reports show Defendants' continued failure to comply with Settlement provisions covering nearly every aspect of the Jail's operations, including security, suicide prevention, mental health care, youth services, fire safety, sanitary conditions, and release procedures.  *See generally* Court-Appointed Monitor's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Monitoring Report(s), PX Nos. 96-104; *see also* Settlement, PX 114 ¶ 35.

26.     In order to prioritize and ensure resolution of the areas of most grievous concern, the United States focused its Motion for Contempt on Defendants' failure to comply with provisions regarding:  (1) full staffing and supervision of all occupied Jail units, including

recruiting and retention of staff, achievement of direct supervision, and appropriate welfare checks on units pending adequate staff for direct supervision; (2) addressing physical plant deficiencies, including all malfunctioning locks, doors, video cameras, sprinklers, hoses, and fire safety equipment; (3) completion of Settlement-required Jail policies essential for safe operation of the facility; (4) finalization of use of force policies and implementation of training, review, and accountability measures for use of force; (5) experience and competency requirements for Jail leadership and supervisors; and (6) youthful prisoners.[7]  Mot. for Contempt, ECF No. 30 at 8 (citing Settlement, PX 114 ¶¶ 37-39, 41-42, 44-46, 50-62, 68, 78-84, 130-31).  These provisions relate to the most immediately dangerous conditions and the Monitor's highest priority recommendations.  Priority Recommendations June 2018, PX 111; Tst. Parrish; Tst. Simpson.

## A.  Defendants Have Taken No Action to Develop and Implement Staffing and Supervision Requirements.

27.  Defendants should have begun staffing and supervision improvements within six months of the Settlement's "Effective Date," or no later than January 19, 2017.  Settlement, PX 114 ¶¶ 41-42, 44, 68, 130-31.  Specifically, the Settlement required: (1) implementation of a staffing improvement plan, and (2) development and implementation of improved housing and prisoner supervision policies.  Settlement, PX 114 ¶¶ 10, 41-42, 44, 68, 130-31.  Despite these requirements, lack of staff remains the Jail's "most critical problem."  Monitor's Ninth Report, PX 104 at 2.

28.  From the start, Defendants fell behind on staffing improvements.  After some time, they agreed to recommendations made by the Monitor and Jail staff, which were based on

---

[7] As explained more fully above in note 4, the United States no longer asks this Court to hold Defendants in contempt based on their failure to implement provisions related to youth prisoners given recent progress in this area, as reflected in the Monitor's Ninth Report.

an update of a 2014 National Institute of Corrections ("NIC") study.[8]  This staffing analysis indicates that the Jail needs approximately 433 officers to meet Settlement standards.  *See* Monitor's Seventh Report, PX 102 at 2, 13-16.  Without adequate staffing numbers, the Jail staff cannot cover housing posts, conduct welfare checks, transport prisoners to medical care, and provide required services.  *See* Tst. Parrish.

29.     However, Defendants have not even begun the budgeting and planning required to hire and retain the required number of staff.  *Cf.* Settlement, PX 114 ¶ 42.  Instead, Defendants designated a staffing goal of only 275 officers for Fiscal Year 2017-2018, but then made no further plans for additional staff.  Monitor's Eighth Report, PX 103 at 2; *see also* Monitor's First Report, PX 96 at 12-13; Anticipated Testimony of Carmen Davis ("Tst. Davis").  Only 271 of those positions are actually funded.  Monitor's Ninth Report, PX 104 at 2; Tst. Davis.

30.     While Defendants have hired additional detention officers during the term of the Settlement, they have lost an even greater number of officers.  Monitor's Ninth Report, PX 104 at 15.

31.     For about a year and a half, actual staffing levels have fluctuated between 231 and 251 positions.  Monitor's Seventh Report, PX 102 at 2, 15-16; Monitor's Ninth Report, PX 104 at 2.  During the September 2019 site visit, staffing was down to 218—a new low.  Monitor's Ninth Report, PX 104 at 2.

32.     Based on current population counts, the Jail needs at least 399 positions system-wide, with 246 positions just at Raymond.  Monitor's Ninth Report, PX 104 at 2, 14.  However, at the time of the September 2019 site visit, Raymond was operating with only 113 filled positions, less than half what is needed.  *Id.*

---

[8] The parties contemplated using the NIC study when they entered into the Settlement.  Settlement ¶ 42.

33.     The parties all seem to agree that *current* staffing levels are grossly inadequate to fulfill Defendants' obligation to "adequately supervise prisoners, fulfill the terms of [the] Agreement, and allow for the safe operation of the Jail."  Settlement, PX 114 ¶ 42; Defendants' Memo, ECF No. 36 at 9.

34.     As technical assistance, the Monitor recommended various improvements to administrative, personnel, recruitment, and retention practices, which could have at least mitigated staffing shortages.  *See, e.g.*, Priority Recommendations June 2018, PX 111.  For instance, the Monitor suggested that Defendants develop a formal recruitment and retention plan, adopt salary step increases, and improve the training program.  *Id.* at 1-2.  Other suggestions in the Monitor's Priority Recommendations, including reopening some damaged units, relocating prisoners, and converting JDC into a short-term court holding facility, could aid the Jail in mitigating some of the problems related to the lack of staff.  *Id.* at 1; Tst. Simpson; Tst. Parrish. While Defendants did implement a $100 per month pay increase for officers, Defendants failed to implement other technical assistance recommendations, such as creating retention bonuses, a step ladder, or hiring a recruitment consultant.  Monitor's Ninth Report, PX 104 at 15.

35.     Defendants have not implemented retention bonuses or other incentives, and have not drafted standardized personnel or promotion policies.  Tst. Rushing.  The Sheriff has not requested an increase to his staffing budget to provide bonuses.  Tst. Davis.  The Sheriff also disregarded the County Compliance Coordinator's recommendations for improving staff recruitment.  Anticipated Testimony of Synarus Green ("Tst. Green").  Defendants made no effort to prioritize vacant positions to be filled or develop a plan of action for filling Jail vacancies.  *Id.*

15

36.     Defendants also failed to update supervision policies and practices.  Monitor's Ninth Report, PX 104 at 10, 16-18; Tst. Simpson; Tst. Parrish.  Because Defendants have not prioritized policy development, they have not implemented new procedures for reducing violence in the Jail.  Monitor's Ninth Report, PX 104 at 16-17 (noting lack of procedures to incorporate criminal record data for classification and to decide where to house prisoners); Tst. Simpson; Tst. Parrish.

37.     None of the Jail facilities meet the Settlement requirement that well-being checks be conducted every 30 minutes in general population units.  Monitor's Ninth Report, PX 104 at 24-25.  At Raymond, Defendants do not even consistently perform hourly rounds for general population or 30-minute rounds for confinement prisoners, who should be checked every 15 minutes.  *Id.* at 24.  Defendants acknowledge that staff do not document rounds consistently and that some rounds are documented before being conducted.  Tst. Rushing.

38.     In the Jackson facility, staffing is limited to the point that one officer is responsible for supervising 12 separate housing units simultaneously.  Tst. Dalton.  At times, there are no officers assigned to the JDC unit for suicidal inmates, even when an inmate is housed on that unit.  Tst. Dalton.

39.     Defendants also have made little progress in implementing Settlement-required "direct supervision," or active, continuous prisoner supervision.[9]  Monitor's Ninth Report, PX 104 at 12; *see also* Monitor's Sixth Report, PX 101 at 2, 15, 17, 28-29.  Defendants acknowledge the benefits of direct supervision and the fact that the Jail has not implemented direct supervision.  Tst. Rushing.  While the Settlement allows time for Defendants to transition to "direct supervision," Defendants are required to ensure that staff conduct documented "rounds"

---

[9] The Settlement defines "direct supervision" more completely at Paragraph 9.  It is a term of art that involves placing officers in housing units so they have continuous interaction with prisoners.  Settlement, PX 114 ¶ 9.

(i.e. welfare and safety checks) during the transition.  Settlement, PX 114 ¶ 44.  Defendants are

not performing timely well-being checks at RDC.  Monitor's Ninth Report, PX 104 at 24.

"Consequently, the inmates, rather than the officers, are in charge of the facility.  This results in

assaults, injuries, escapes, destruction of the facility and even riots."  Monitor's Eighth Report,

PX 103 at 2.

40.     While there is insufficient staff at Raymond to provide direct supervision

currently, other practices exacerbate the lack of supervision of the housing units.  Monitor's

Ninth Report, PX 104 at 12.  Defendants admit that while there should be a staff member in each

housing unit at Raymond, this is not consistently the case.  Tst. Rushing.  Some housing units are

unmanned during second and third shifts, and staff routinely leave housing units unsupervised to

assist with pill call, meals, recreation, and other duties.  *Id.*  Even during the site visits by the

Monitor and the Court, there were frequent instances in which multiple officers gathered in the

control rooms, in addition to the officer assigned to Control, despite the fact that supervision on

the housing units is severely lacking.  Monitor's Ninth Report, PX 104 at 12 (citing Incident

Report 191139, PX 127 (four officers in the control room in addition to the control room

officer); Incident Report 191429, PX 134 (five officers sitting in the control room when a

prisoner left the housing unit)).  "In essence, the pod control rooms are used as break rooms for

the officers."  *Id.* at 25.

41.     Insufficient staffing also contributes to the risk of serious harm from dangerous

and illegal contraband in the Jail.  Monitor's Ninth Report, PX 104 at 14-15, 34; *see generally* all

nine Monitor's Reports, *supra* note 3; Barnes Decl. at 2; Dent Decl. at 2; Dyre Decl. at 2; Short

Decl. at 2.[10]  Due to staff shortages, Defendants often cannot conduct appropriate contraband

---

[10] *See also* Supp. Incident Report 181583, PX 13; Incident Report 1900344, PX 17; Incident Report 191164, PX 20;

searches and shakedowns, even when contraband is known to be present.  Tst. Dalton; *see also* Incident Report 1900734, PX 115 (stating that "due to staff shortage a shakedown was not conducted").

42.    Even when staff are present, supervision may be lacking.  The Maintenance Director for the Jail felt compelled to photograph a control room window that had been covered by Jail staff, which obscured the ability of staff inside the control room to observe the housing unit.  Tst. Bell.

43.    As the Monitors have repeatedly observed, units are left with little or no staff supervision for long periods of time.  Monitor's Sixth Report, PX 101 at 17, 28-29, 64; Monitor's Ninth Report, PX 104 at 12; *see also* Banyard Decl. at 2; Barnes Decl. at 2; Dyre Decl. at 2.  The lack of supervision is so severe that the Jail Administrator could describe in a routine manner a September 2018 incident in which a prisoner climbed a pole in his housing unit to a ceiling high above, crawled through a hole the prisoners had made in the ceiling to access the roof, jumped off the building, retrieved a bag of contraband through another hole that had been cut through the wire perimeter fence, and brought the bag back into the Jail.  Incident Report 181486, PX 7; Tst. Rushing.

44.    As discussed above, riots, violence, and other serious incidents can and do occur without any staff intervention on unsupervised and poorly supervised units.  *See, e.g.*, Monitor's Seventh Report, PX 102 at 17-18 (risk from gangs and violence because Defendants stopped implementing recommended classification forms and procedures); Monitor's Ninth Report, PX 104 at 15 (noting that lack of staffing contributed to four riots in April and June 2019); *see generally* all nine Monitor's Reports, *supra* note 3.

---

Incident Report 191379, PX 23; Incident Report 1900627, PX 42; Incident Report 1900757, PX 44; Incident Report 191058, PX 45.

**B.      Defendants Have Failed to Correct Serious Physical Plant and Safety Equipment Deficiencies.**

45.      The Settlement required Defendants to fix locks, fire equipment, security doors, and other critical safety infrastructure in a "reasonable and prompt" manner.  Settlement, PX 114 ¶ 46.  Since entry of the Settlement, the Monitor has been urging Defendants to implement a system for identifying damaged equipment and prioritizing repairs.  Among other things, Defendants needed to develop inspection and maintenance policies, track maintenance requests, improve security equipment (e.g. locks, videos, doors), and make more timely arrangements for bringing in contractors.  Monitor's Seventh Report, PX 102 at 3-4, 25, 31-34; *see generally* Banyard Decl. at 2; Barnes Decl. at 2; Dent Decl. at 2; Dyre Decl. at 2.  They did not do so.

46.      The Jail continues to lack even the most basic security and safety features, such as lockable cell doors, accessible fire hoses, and secure control rooms.  *See generally* Monitor's Seventh Report, PX 102 at 3-4, 25, 31-34.  Jail doors require repairs continuously.  Tst. Bell; *see also* Tst. Fielder.  "The inability of staff to secure inmates in their cells, and even housing units, because of locks and doors that cannot be secured, reflects an unacceptable situation."  Monitor's Ninth Report, PX 104 at 2.

47.      Even before entry of the Settlement, the United States warned Defendants that the physical plant issues contributed to violence and contraband.  Notice Letter, ECF No. 3-3 at 8-9.  Prisoners were regularly escaping from their supposedly locked cells to attack other prisoners and regularly getting out of the facility to obtain contraband.  *See id.* at 9.  Such conditions persist; in September 2019 alone, there were 10 incidents involving cell or housing unit doors that were rigged to stay unlocked or were popped open.  Monitor's Ninth Report, PX 104 at 3, 32.  As of summer 2019, prisoners were not only opening their cells, but also breaking out of the Jail on a weekly basis.  Tst. Rushing.  The County Maintenance Director has estimated that there

are six or seven escapes per month.  Tst. Bell.  "No jail system can function with cell doors that do not lock, housing unit doors that do not function and even control room doors that cannot be secured."  Monitor's Eighth Report, PX 103 at 3.

48.     The lack of secure cell and housing unit doors contributed to the riots in April and June 2019 and create ongoing obstacles to Defendants' ability to manage the Jail population. Monitor's Ninth Report, PX 104 at 33; Tst. Fielder.  This is evident as, in a two-day period in August 2019, multiple prisoners refused to comply with lockdown orders and demonstrated that the Jail's infrastructure was not capable of ensuring confinement.  Monitor's Ninth Report, PX 104 at 33 (citing Incident Report 191331, PX 118 ("The inmates kicked open doors, keyed doors so that they could freely come in and out of cells.  I gave multiple verbal commands for them to go back in cells throughout the day and also to un-key the cell doors in which they all refused orders.")); *see also* Incident Narratives by Date for August 2019 Spreadsheet, PX 113 cell N945-47 (reporting that a prisoner opened his cell door and refused to go back:  "[H]e has his door rigged so he can come and go as he pleases.  At around 1305 hours he kicked open [another prisoner's] door and let him out as well.").  Prisoners can still open many cell doors on their own.  Tst. Rushing.

49.     While Defendants periodically repair some plant problems, they have never developed policies and systems to keep ahead of maintenance issues.  Instead, they continue to rely on ad hoc, improvised approaches that are simply insufficient given the poor security conditions.  Defendants do not have a preventative maintenance policy, a general housekeeping policy, or an emergency maintenance policy.  Tst. Rushing; Tst. Bell.  Jail maintenance work orders have no deadlines for completion.  Tst. Bell.

50.     Some repairs cannot be made because the Jail has insufficient staff to move prisoners out of the unit or supervise them while repairs are being done.  Tst. Bell.  Some maintenance problems are created because there are insufficient security staff to supervise the prisoners and prevent property destruction.  *Id.*  In addition, Jail staff perceive the facility as unsafe, which affects retention and worsens the problems.  Tst. Luke.

51.     Fire safety issues present a risk of harm at the Jail.  Monitor's Ninth Report, PX 104 at 4, 34.  The Jail does not have a fire safety procedure in place.  Tst. Rushing.  Maintenance staff do not check the fire safety equipment.  Tst. Bell.  The Jail does not have a procedure for testing sprinklers or smoke detectors.  Tst. Rushing.  Raymond has no fire suppressant sprinklers.  Tst. Fielder.  Jackson has sprinklers only on the first floor, and no smoke detectors.  Tst. Dalton.  Because the State Fire Marshal's annual inspections are not specific and do not address major issues such as the lack of a sprinkler system and fire hoses, it is incumbent upon Defendants to take on the responsibility of ensuring basic fire safety in the Jail.  Monitor's Ninth Report, PX 104 at 4, 34.

52.     The Monitor and her team proposed temporary remedies to help Defendants with physical plant problems, such as prioritizing lock replacements.  *See, e.g.*, Monitor's Ninth Report, PX 104 at 2-3, 30-34 (reviewing list of unaddressed, high priority equipment issues); Monitor's Fourth Report, PX 99 at 2-3, 26 (reviewing architectural plans, manual locks, and creation of space); Priority Recommendations June 2018, PX 111.  Defendants, however, have been delinquent in making decisions about whether to implement the Monitor's recommendations or other improvements, even as the security situation has deteriorated so badly that the Monitor warned of the risk of riots.[11]  Monitor's Seventh Report, PX 102 at 31-34

---

[11] The warning was prescient, as a major riot occurred not long after filing of the Monitor's Seventh Report.

(reporting that the entire Raymond Detention Center is at risk from widespread security problems); Tst. Parrish.

53.     For example, during the Monitor's September 2018 site visit, it was anticipated that the Maintenance Report, prepared by the Maintenance Director for the County, would be made available to each facility captain so that they could track the status of requested maintenance projects.  Monitor's Ninth Report, PX 104 at 30.  During the site visit in January 2019, and again in May 2019, facility captains and the Jail Administrator still had not received copies of the Maintenance Report.  *Id.*  The Monitor also highlighted Defendants' failure to address this issue in the Monitor's Eighth Report.  Monitor's Eighth Report, PX 103 at 35. Regardless, during the Monitor's September 2019 site visit, the facility captains, Jail Administrator, and a new Chief of Maintenance for Security and Sanitation still did not routinely receive the reports.  Monitor's Ninth Report, PX 104 at 30-31.

54.     Similarly, Defendants have been unable or unwilling to address routine problems related to key access and control at the Jail—a primary concern in any correctional environment. The Jail does not have a key control policy.  Tst. Rushing.  During the Monitor's January 2019 site visit, a shortage of keys to the housing units and cells in Raymond was noted.  Monitor's Ninth Report, PX 104 at 31.  The Monitor proposed a solution:  the assignment of a set of keys to each on-duty officer.  *Id.*  The May 2019 site visit revealed that the problems with key shortages and policies still had not been corrected.  *Id.* at 30-31.  Defendants' efforts to address the issue ad hoc, and without a comprehensive plan including well thought-out policies and necessary repairs to the electronic control panels that control doors, have resulted in continued security problems. Because the electronic control panels in certain pods are broken and have not been replaced, officers are required to leave doors to both the control room and the housing unit open when

entering the unit, which results in security breaches on a routine basis.  Until the electronic control panels are replaced, it will be impossible to maintain security even if each officer has a set of keys.  *Id.*

55.     Shortly after the United States sent its Enforcement Letter, PX 105, and Supp. Enforcement Letter, PX 106, the Sheriff reported that he was starting to implement some of the Monitor's urgent recommendations.  *See* Letter from Sheriff's Counsel to United States (Mar. 4, 2019), ECF No. 30-6, PX 109 at 2-4 ("Sheriff's Letter").  The Board claimed it had approved funds for improvements but acknowledged that there "has been no plan to prioritize ongoing needed maintenance."  Letter from Bd. Counsel to United States (Mar. 4, 2019), ECF No. 30-7, PX 110 at 2 ("Board's Letter").

56.     Defendants' efforts thus far are insufficient.  For example, Defendants finally brought on board a professional correctional maintenance contractor to repair control room and housing unit entry doors in one housing unit and to fix one sample cell door in another housing unit.  Monitor's Ninth Report, PX 104 at 3.  Unfortunately, once that sample work was done, Defendants did not proceed with similar corrective work in each pod and housing unit where repairs are needed.  *Id.*  The County has delayed completion of the lock maintenance.  Tst. Davis.  The Jail Administrator acknowledged that most of the cell doors on one of the housing units cannot be locked.  Tst. Rushing.  The County Maintenance Director testified that in two of the three housing pods in Raymond (A and B Pods), none of the cell doors lock.  Tst. Bell.  In addition, while the Jail has temporarily closed C Pod for repairs, Defendants are repairing the same sliding doors that were damaged previously, with only minor improvements that Defendants hope will make them more difficult for prisoners to open.  Tst. Bell.

57.     As of the Monitor's September 2019 site visit, Defendants had not developed a plan for correcting physical plant problems in a timely and systematic manner.  Monitor's Ninth Report, PX 104 at 32.  During the site visit, the Monitor and Corrections Operations member of the monitoring team met with the County Administrator, County Maintenance Director, Jail Administrator, Assistant Jail Administrator, Chief of Maintenance, and the United States to set a plan in place.  *Id.*  The meeting resulted in a comprehensive list of priority maintenance items for each facility, but beyond the hiring of the professional correctional maintenance contractor and the repair of sample A Pod control room and housing entry doors and the one sample cell door in C Pod, it is unclear if Defendants have made any progress.  *Id.* at 32-33; Tst. Bell.

58.     On November 27, 2019, Defendants confirmed that the C Pod repairs, which were expected to be complete in September, remained incomplete.  Update on C Pod Renovations Memorandum from Cap. Williams to Maj. Rushing (Nov. 27, 2019), PX 156 at 1.  This report lists more than 40 pages of problems that require repair.  *Id.* at 2-44.  "The ceiling remained plagued with leaks, light fixtures were inoperable, etc."  *Id.* at 1.

## C.     Defendants Have Unreasonably Delayed the Development of Policies and Procedures Needed to Ensure a Safer Facility.

59.     Written policies serve as the foundation for compliance because they guide training, implementation, and administrative oversight.  Policies governing officer training, classification, use of force, and prisoner supervision are especially important for reducing Jail violence, improving conditions, and ensuring constitutional compliance.  Tst. Simpson; Tst. Parrish.

60.     Defendants should have reviewed their policies and conformed them to the Settlement by no later than six months after the Settlement's "Effective Date," or by January 19, 2017.  Settlement, PX 114 ¶¶ 37, 68, 130-31; Enforcement Letter, PX 105 at 2.  They should

then have implemented Settlement-compliant policies by July 19, 2017. Settlement, PX 114

¶ 120. Defendants have not even reached the policy drafting stage for the majority of the

Settlement provisions addressing protection of prisoners from harm. Monitor's Seventh Report,

PX 102 at 10-11; Monitor's Ninth Report, PX 104 at 99-101.

61.     In Spring 2017, Defendants belatedly submitted policies that were not modified to

meet Settlement requirements. *See* Monitor's Sixth Report, PX 101 at 2 (indicating "no

appreciable progress" on policy development over previous two years); Monitor's First Report,

PX 96 at 8 (Defendants promised a revised policy manual by April 2017); *see also* Hinds Cty.

Det. Div. Serv., Policy 03.006, Use of Force (Apr. 1, 2017), PX 55; Hinds Cty. Det. Div. Serv.,

Policy 03.004, Classification (Apr. 1, 2017), PX 73; E-mails from Synarus Green to Lisa

Simpson et al. (Apr. 18, 2017, 3:33:42 AM, 3:34:19 and 3:34:33 AM), PX 72.

62.     The United States and the Monitor tried to resolve the matter by allowing

Defendants additional time to revise policies, offering technical assistance, and prioritizing

policy development. Tst. Simpson; Tst. Parrish. Although Defendants claimed to be working on

policies, they did not submit any new or revised policies. Tst. Simpson.

63.     By mid-2018, Defendants still had not made adequate progress on this issue.

Monitor's Sixth Report, PX 101 at 10; Tr. of In-Person Status Conf. 55:13-56:3, Oct. 25, 2017,

ECF No. 30-5, PX 108 ("October 2017 Transcript"). The Defendant Board's attorneys advised

the Court that their clients were going to hire an outside consultant to help them draft policies.

*Id.* Despite this promise, Defendants failed to hire an outside consultant. Given the continued

lack of progress, the Monitor took it upon herself to dedicate part of the monitoring budget to

pay an outside consultant to help Defendants with policy revisions. *See* Monitor's Sixth Report,

PX 101 at 10-11; Tst. Simpson; Tst. Parrish. The Monitor found the consultant with the

assistance of one of her team members, Mr. Parrish.  The consultant was originally hired only to help with drafting record and booking policies, but her responsibilities expanded when the Defendants repeatedly failed to find a consultant to help them with developing new policies.  Tst. Simpson; Tst. Parrish.

64.     Since the consultant has assumed responsibility for the oversight and coordination of Defendants' policy development, 3 policies have been approved and approximately 18 draft policies are under review.  Monitor's Ninth Report, PX 104 at 2-3, 10, 100.  However, the submitted policies are just a small fraction of the total number of policies that still need to be drafted.  *Id.* at 10, 100.  "For an agency the size of the HCSO, a Policies and Procedures Manual encompassing far more than a hundred individual policies would be expected."  *Id.* at 10.

65.     While Defendants should have completed policy development in the first year of the Settlement, Defendants have not set out any clear plan or timetable for drafting the remaining policies.  *See generally id.* at 2-3; Monitor's Seventh Report, PX 102 at 2-3, 10-12; Monitor's Fifth Report, PX 100 at 2; Sheriff's Letter, PX 109 at 1-2; Board's Letter, PX 110.

66.     Moreover, Defendants have made little or no progress in several key policy development areas, including safety checks, incident reporting, and managing special needs prisoners.  Tst. Simpson; Tst. Parrish.  In addition, policies are meaningless without implementation, which will require a significant training effort.  Monitor's Ninth Report, PX 104 at 10.  "Until Hinds County develops a comprehensive Policies and Procedures Manual, along with Post Orders, the staff of the Hinds County Jail System cannot be expected to comply with the provisions of the Settlement Agreement.  It is apparent that a great deal of effort needs to be put forth before significant progress can be achieved."  *Id.* at 10-11.

**D.**     **Defendants Allow Security Staff to Use Force Without Adequate Supervisory
Oversight, Training, and Controls.**

67.     While Defendants' general failure to develop written policies has impeded overall

compliance efforts, their failure to implement use of force policies is especially problematic.

Defendants should have drafted Settlement-compliant policies governing the use of force within

six months of the Settlement's "Effective Date," or by January 19, 2017.  Settlement, PX 114

¶¶ 50-62, 130-31.  In December 2018, they belatedly submitted a draft use of force policy that

was supposedly designed to comply with the Settlement, but was instead vague and incomplete.

Tst. Simpson; Tst. Parrish.  Meanwhile, they continue to allow staff to use an array of weapons

at Raymond with little oversight and review.  Monitor's Seventh Report, PX 102 at 3-4, 35-45;

Monitor's Ninth Report, PX 104 at 37.

68.     In addition, the Settlement requires: 1) clear use of force standards, 2) mandatory

use of force training and staff competency testing, 3) prohibitions on unjustified use of force, 4) a

ban on summary punishment, 5) a ban on staff using unauthorized weapons, 6) inventory

controls, 7) video recording of "planned" uses of force (e.g. cell extractions), and 8) thorough

investigations after uses of force.  Settlement, PX 114 ¶¶ 50-62.  To date, Defendants have done

little to implement any of these requirements.  Monitor's Seventh Report, PX 102 at 3-4, 35-45.

Incident reports and Jail investigations continue to reflect serious violations of the Settlement's

use of force requirements.  Monitor's Ninth Report, PX 104 at 35-45.

69.     The situation became even more precarious when the Sheriff replaced several

supervisors in 2018.  Tst. Rushing.  Instead of improving classification and supervision practices,

Jail administrators have given staff wide leeway in using force to try to control the Jail.  Jail

administrators have deployed a Corrections Emergency Response Team, and staff have used

force without adequate justification, increasing tensions with prisoners.[12]  Monitor's Seventh Report, PX 102 at 3-4, 36, 38.

70.     The Jail was unable to provide the specialized training appropriate for the Corrections Emergency Response Team.  Tst. Miller.  The Jail's use of force training is not sufficiently focused on use of force in the corrections setting, and is conducted by an individual with little corrections experience.  Tst. Rushing; Tst. Miller.  Although the Sheriff has designated a Captain from the Operations Division to provide use of force training to Jail staff, the Captain is never consulted by Jail supervisors about whether actual use of force at the Jail complies with the training or whether additional training may be indicated.  Tst. Miller.

71.     A November 18, 2018 investigation of an excessive force case illustrates the scope of the problem.  Incident Report 181593, PX 11; Internal Affairs Case 18-0005, PX 12; Incident Report 191259, PX 46.  When a staff member used a shotgun butt to assault a prisoner in October 2018, there was no initial report of this serious use of force.  Incident Report 181593, PX 11; Incident Report 191259, PX 46; Tst. Rushing.  Someone eventually alerted the Sheriff's Department.  *Id.*  The subsequent investigation included video footage review that did not match the staff reports about what happened.  Tst. Rushing; Internal Affairs Case 18-0005, PX 12 at 2-4.  The incident implicated at least three supervisors.  Monitor's Seventh Report, PX 102 at 36; Internal Affairs Case 18-0005, PX 12.  The main perpetrator was a sergeant who allegedly got into an argument with a prisoner who had ignored instructions to return to his unit.  The prisoner eventually went back to his cell.  The sergeant left to retrieve a shotgun and returned to the unit. Internal Affairs Case 18-0005, PX 12 at 1-4; Tst. Rushing.  The sergeant removed the inmate

---

[12] The Sheriff replaced some of these supervisors shortly before the Monitor's May 2019 tour.  The Monitor is still assessing whether the changes have resulted in meaningful, sustained improvements in staff practices.  Tst. Fielder; Tst. Parrish; Tst. Rushing; Tst. Simpson.

from his cell and repeatedly struck the inmate with the butt of the shotgun.  Internal Affairs Case 18-0005, PX 12 at 1-4; Tst. Rushing.  Two other sergeants were in the immediate area, but none of the three supervisors reported the use of force.  Tst. Rushing.

72.     In another incident, the Assistant Jail Administrator found that an officer used excessive force when, following an earlier altercation with a prisoner, the officer returned to the prisoner while he was being examined by medical staff and punched the prisoner in the face. Tst. Fielder.  Although the Assistant Jail Administrator recommended that the officer receive a 15-day suspension, the Sheriff lowered the discipline to only four or five days and castigated the Assistant Jail Administrator for being "too hard" on the officer.  *Id.*

73.     Officers' use of force at the Jail is resulting in serious injuries to prisoners.  For example, in July 2019, officers forced a prisoner back into his cell and, in the process, the prisoner fell face first onto the floor.  Monitor's Ninth Report, PX 104 at 35 (citing Incident Report 191294, PX 47).  His arm was broken and he had to be sent to the hospital.  *Id.*

74.     Other facts indicate a troubling trend in the use of force.  During the January 2019 site visit, the Monitor observed that staff introduced tasers and "less lethal" shotguns into the Raymond facility.  Monitor's Seventh Report, PX 102 at 36; Tst. Parrish.  Yet the Jail does not have required policies governing the use of weapons, such as restrictions on who may use the more dangerous devices, supervisor responsibilities, sign-out procedures, and mandatory evidence collection after uses of force.  Monitor's Seventh Report, PX 102 at 3-4, 35-45; Monitor's Ninth Report, PX 104 at 36-47.  Staff continue to use weapons and chemical restraints without obtaining supervisory approval.  Monitor's Ninth Report, PX 104 at 37.  Defendants do not have hand-held video cameras available in any of their facilities, so planned use of force incidents are not and cannot be recorded as required by the Settlement.  *Id.* at 38; Tst. Fielder.

There is no evidence indicating that Defendants have taken any action to obtain or purchase such equipment.   Monitor's Ninth Report, PX 104 at 38.  The Jail has no policy requiring staff to record planned uses of force.  Tst. Fielder.

75.     Deficiencies related to the use of force extend to report writing as well.  Monitor's Ninth Report, PX 104 at 39-41.  Use of force reviews do not routinely include collection of or access to videos, witness statements, and medical records.  Monitor's Ninth Report, PX 104 at 41-46.  As such, the reports lack necessary details to determine the extent of any problematic uses of force and to take appropriate corrective action.  *See* Monitor's Seventh Report, PX 102 at 41-43; Monitor's Ninth Report, PX 104 at 39-41 (citing Incident Report 190092, PX 124, as not meeting the requirements of the Settlement); *see also* Incident Report 181593, PX 11 (lacking detail required by Settlement Agreement); Internal Affairs Case 18-0005, PX 12 (same); Incident Report 191294, PX 47 (same).  In another example, an officer's report on use of force stated only that he used "necessary force" to gain control of the situation, without any further explanation.  Monitor's Ninth Report, PX 104 at 35 (citing Incident Report 191111, PX 126).

E.     **Defendants Have Failed to Follow the Settlement Requirements when Making Supervisor and Training Staff Hiring Decisions.**

76.     Defendants should have deployed a leadership team with significant jail experience within six months of the Settlement's "Effective Date," or January 19, 2017.  Settlement, PX 114 ¶¶ 22, 38-39, 45, 130-131.  The Settlement required specific education and work experience for all supervisors and trainers.  Instead, Defendants have repeatedly hired individuals with little or no jail experience to run the facility and train other staff.  Monitor's Seventh Report, PX 102 at 12-13; Monitor's Sixth Report, PX 101 at 13-15.  The County's Compliance Coordinator confirmed that current Jail supervisors do not meet the minimum qualifications required by the Settlement.  Tst. Green.  Lack of supervisory responsibility and

accountability continues to be a significant problem at the Jail.  Monitor's Ninth Report, PX 104 at 29-30.

77.     The Sheriff has repeatedly bypassed the Warden on important policy, personnel, and operational decisions.  *See, e.g.*, E-mail from Warden Mary Rushing to Sheriff Victor Mason (Aug. 8, 2017), PX 74 at 1; Tst. Rushing.  Although the Warden lacks technical requirements, she has years of correctional management experience, *see* Tst. Rushing, and should be involved in the Jail management and operational decisions.[13]  A March 19, 2019 order purports to delegate hiring, transfer, and disciplinary authority to the Warden, but it remains to be seen whether this will result in a change from past practices.  Monitor's Ninth Report, PX 104 at 30.

78.     The Sheriff has hired, fired, and replaced key supervisors without complying with Settlement requirements.  Monitor's Seventh Report, PX 102 at 12-13; Monitor's Sixth Report, PX 101 at 2-3, 13-15, 33.  For instance, the Sheriff replaced the Assistant Jail Administrator with an individual who did not meet the Settlement's minimum requirements for the position.  Monitor's Seventh Report, PX 102 at 12; *see also* Tst. Fielder; Tst. Parrish; Tst. Simpson; Tst. Rushing.  These questionable personnel decisions have caused Defendants to regress in compliance.  Tst. Fielder; Tst. Rushing.

79.     On March 20, 2019, after the United States sent its Enforcement Letter and Supplemental Enforcement Letter, the Sheriff reinstated the original Assistant Jail Administrator.  Monitor's Ninth Report, PX 104 at 11, 29-30.  However, in the Monitor's assessment,  the leadership changes have had little "practical impact."  Monitor's Ninth Report, PX 104 at 11.  Both the Jail Administrator and Assistant Jail Administrator are still unable to make routine personnel decisions without the approval of the Sheriff.  *Id.* at 30; Tst. Fielder.  Just last month,

---

[13] The Sheriff also has repeatedly made important personnel changes without complying with his department's personnel policies or Settlement provisions.  Monitor's Sixth Report, PX 101 at 2-3, 13, 32-33.

the Court found it necessary to issue an order prohibiting any attempts to supersede, override, or contradict the objective housing classifications or personnel decisions made by the Jail Administrator to ensure compliance with the Settlement.  Parties' Stipulated Order, ECF No. 45 (Nov. 13, 2019).

80.     In addition, the commander of Raymond retired earlier this year.  Monitor's Ninth Report, PX 104 at 11-12.  As there is currently no one in line to fill that position, the Assistant Jail Administrator is also the acting facility commander of Raymond, further stretching the Jail's staffing and supervisory resources.  *Id.*

81.     The Sheriff made several other hiring, demotion, and promotion decisions that have, at minimum, caused confusion and interrupted compliance progress.  Monitor's Seventh Report, PX 102 at 12-13, 53-54; Monitor's Sixth Report, PX 101 at 2-3, 13-15, 33; Tst. Fielder. At worst, the Sheriff sent a message that individuals with problematic experience and credentials could be in leadership positions.  *See* Monitor's Sixth Report, PX 101 at 13-15.  The Monitor's use of force review indicates that some of the most problematic developments, such as the introduction of "less than lethal" shotguns into the facility, occurred while the Sheriff had personally appointed a different Assistant Jail Administrator.  *See id.* at 13-14; Monitor's Seventh Report, PX 102 at 36; Tst. Rushing.  The Sheriff has reversed some of these personnel decisions.  Sheriff's Letter, PX 109 at 3.  However, it is not yet clear whether the current supervisors meet the Settlement's requirements.

## CONCLUSIONS OF LAW

I.    **THE COURT HAS THE AUTHORITY TO HOLD DEFENDANTS IN CONTEMPT AND ORDER ADDITIONAL RELIEF.**

A.    **The Court Has the Power to Enforce the Settlement.**

1.    District court judges retain the power to enforce consent decrees entered in their cases. *See, e.g.*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance.  Once entered, a consent decree may be enforced."); *Spallone v. United States*, 493 U.S. 265, 276 (1990).  "First, consent decrees are contractual in nature, so parties may fairly expect such orders to be enforced as both a contract and a judicial decree."  *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 407 (5th Cir. 2017) (*citing Frew*, 540 U.S. at 437).

2.    "Courts possess the inherent authority to enforce their own injunctive decrees," *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (citing *United States v. Hall*, 472 F.2d 261, 267 (5th Cir. 1972)), and "do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender."  *Id.* at 716 (quoting *Berry v. Midtown Serv. Corp.*, 104 F.2d 107, 110-11 (2d Cir. 1939)).

B.    **The United States Has Satisfied the Legal Standard for Contempt.**

3.    To establish civil contempt, the movant "bears the burden of establishing by clear and convincing evidence:  (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *see also Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) (same).  The United States has met the burden of

showing that Defendants failed to comply with the remedial measures required by the Court's Order entering the parties' Settlement.  Defendants are still non-compliant with 38 out of 92 provisions of the Settlement, and only partially compliant with an additional 47 provisions. Monitor's Ninth Report, PX 104 at 9; Tst. Simpson; Tst. Parrish.  Indeed, Defendants do not dispute their failure to comply with the provisions of the Court's Order.  *See* Defendants' Memo, ECF No. 36 at 1, 4.

### (1)    The Settlement Ordered by the Court Is in Effect.

4.    On July 19, 2016, the Court entered the Settlement as an Order of the Court to remedy alleged unconstitutional conditions at the Jail.  Order, ECF No. 8.  The Settlement remains in effect.

### (2)    The Settlement Requires Defendants to Implement Reforms.

5.    The Settlement ordered by the Court requires Defendants to implement and sustain specified remedial measures to ensure constitutional conditions at the Jail.  Settlement, PX 114 ¶¶ 2-3.

6.    The Settlement required Defendants to review and revise their policies by no later than January 19, 2017.  *Id.* ¶¶ 37, 68, 130-31; Enforcement Letter, PX 105 at 2.  Defendants should have implemented all Settlement-compliant policies by July 19, 2017.  Settlement, PX 114 ¶ 120.

7.    Defendants should have achieved substantial compliance with the remaining Settlement provisions by July 19, 2017, *Id.*¶ 120, except for the requirement for transitioning youth to an appropriate facility, which was due by January 19, 2018.  *Id.*§ IV.K.

### (3)     Defendants Failed to Comply with the Court-Ordered Settlement.

8.      Defendants concede that their attempts to comply with the Settlement "have fallen short of constitutional requirements," and agree that their effort at "achieving agreement milestones is lagging."  Defendants' Memo, ECF No. 36 at 1, 15.  Defendants assert that they cannot properly prioritize "constitutional compliance at the jail" because it is not a political priority among elected officials.  *Id.* at 15.  Defendants admit that "something different needs to occur" and ask the Court to "help."  *Id.* at 2.

9.      The Monitors' Reports confirm Defendants' non-compliance with 38 out of 92 provisions of the Settlement, and only partial compliance with 47 more provisions.  Monitor's Ninth Report, PX 104 at 9; Tst. Simpson; Tst. Parrish.  The United States is seeking contempt with regard to 26 of the provisions in which Defendants have failed to achieve substantial compliance.  Mot. for Contempt, ECF No. 30 at 8 (citing Settlement, PX 114 ¶¶ 9, 22, 37-39, 41-42, 44-46, 50-62, 68, 130-31).[14]

## II.    DEFENDANTS FAILED TO REBUT THE UNITED STATES' SHOWING OF CONTEMPT.

10.     Because the United States has established that Defendants are in violation of the court-ordered Settlement, the burden shifts to Defendants to demonstrate either substantial compliance with the Settlement or "mitigating circumstances that might cause the district court to withhold the exercise of its contempt power. . . ."  *Whitfield v. Pennington,* 832 F.2d 909, 914 (5th Cir. 1987) (citing *Louisiana Educ. Ass'n v. Richland Parish School Bd.,* 421 F. Supp. 973, 977 (W.D. La. 1976), *aff'd* 585 F.2d 518 (5th Cir. 1977)) (holding that the district court abused its discretion in excusing defendants' clear violation of court orders).

---

[14] The United States is no longer pursuing contempt with regard to the Settlement provisions related to youthful prisoners, Settlement, PX 114 ¶¶ 78-84.  *See supra* note 4.

11.     The United States does not need to show willfulness.  *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984).

12.     Defendants argue, without any legal support, that their non-compliance is mitigated by alleged "good faith efforts toward compliance."  Defendants' Memo, ECF No. 36 at 3.  This argument is legally and factually flawed.  Good faith is not a defense to contempt. *Whitcraft v. Brown*, 570 F.3d 268, 272 (5th Cir. 2009); *Waffenschmidt*, 763 F.2d at 726 (noting that "good faith is irrelevant as a defense to a civil contempt order").

13.     Contempt is appropriate where Defendants fail to make reasonable efforts to comply with the Court's Order.  *See Cooper v. Noble*, 33 F.3d 540, 544 (5th Cir. 1994) (*supplemented*, 41 F.3d 212 (5th Cir. 1994)).  As demonstrated by nine Monitor's Reports detailing Defendants' non-compliance, Defendants have not made reasonable efforts to comply with the Settlement.  Monitor's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Reports, PX 96-104.

14.     Indeed, Defendants have:  (1) repeatedly missed Settlement deadlines, extensions, and their own internal deadlines; (2) disregarded technical assistance recommendations made by the Monitor and the United States to help facilitate compliance; and (3) offered no reasonable alternate plans or timetables to increase the likelihood of eventual compliance.  *See supra*, Findings of Fact ("FOF") Part IV (setting forth violations of the Court-ordered Settlement). Defendants have made a series of broken promises that have delayed necessary improvements in the Jail.  For example, Defendants have failed the most basic correctional practice of ensuring that doors within the Jail lock, *see id.* Part IV.B; have not developed or implemented a hiring or retention plan to address security staffing at the Jail, *see id.* Part IV.A; and have made inadequate

efforts to conduct a search to find a correctional administrator with appropriate experience or credentials.  *See id.* Part IV.E.  While various factors complicate Defendants' road to compliance, Defendants' lackluster efforts at achieving compliance cannot be described as reasonable or in good faith.

15.     In addition, while Defendants vaguely reference "limited resources" in their response to the United States' Motion for Contempt, Defendants' Memo, ECF No. 36 at 4, it is well established in the Fifth Circuit that "inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement."  *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir. 1980).

16.     Defendants cannot dispute their non-compliance with the Settlement, and the facts of the case do not provide sufficient mitigation to excuse Defendants from contempt.

## III.    DEFENDANTS' NON-COMPLIANCE RESULTS IN CONSTITUTIONAL VIOLATIONS.

17.     The Eighth Amendment's prohibition of cruel and unusual punishments imposes duties on corrections officials to "provide humane conditions of confinement" and to "'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *see also Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Farmer*, 511 U.S. at 832; *Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir. 1986)).   Embodying "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," the Constitution prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of violence, illness, or injury.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *see also Farmer*, 511 U.S. at 832-33.

18.     That the Jail houses a large number of pre-trial detainees, in addition to convicted prisoners serving short misdemeanor sentences, does not alter the analysis.  *See Hare v. City of Corinth*, 74 F.3d 633, 647 (5th Cir. 1996) (en banc) (finding that "no constitutionally relevant difference exists between the rights of pretrial detainees and convicted prisoners to be secure in their basic human needs").   Although the Eighth Amendment extends only to sentenced prisoners and not pre-trial detainees, it is well-established that the protection of pretrial detainees' rights under the due process clause of the Fourteenth Amendment is "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *Id.* at 639 (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see also Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("*A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.").

19.     To demonstrate unconstitutional conditions of confinement, a plaintiff must show that:  (1) the challenged conditions of confinement pose a substantial risk of serious harm; and (2) prison officials were deliberately indifferent to that substantial risk of serious harm.  *Farmer*, 511 U.S. at 834.

20.     In the Fifth Circuit, to determine whether conditions of confinement violate the Constitution, a court "need not separately weigh each of the challenged institutional practices and conditions," but must instead look at "the totality of conditions" within the institution. *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (citing *Ruiz v. Estelle*, 679 F.2d 1115, 1139 (5th Cir. 1982), *modified on other grounds*, 688 F.2d 266 (5th Cir. 1982)) (holding that the court need not determine whether any specific incident "individually constituted an Eighth Amendment violation, for the evidence established that the totality of the circumstances in the jails were condemnable").

21.     Jail conditions may result in a constitutional violation "in combination when each would not do so alone" where they have a "mutually enforcing effect" that results in the deprivation of a basic human need.  *Gates*, 376 F.3d at 333 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)); *see also Hutto*, 437 U.S. at 687 ("We find no error in the court's conclusion that, taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.").  The obligation to consider the totality of the circumstances includes contemplating "a number of factors," including overcrowding, inability of staff to control prisoners, and physical plant deficiencies.  *Alberti v. Sheriff of Harris County, Tex.*, 937 F.2d 984, 1000-01 (5th Cir. 1991) (confirming district court's proper review of "the totality of the conditions" resulting in a constitutional violation).

A.     **Substantial Risk of Serious Harm**

22.     Whether the inadequacies in a jail's conditions and practices create a substantial risk of serious harm is evaluated with regard to whether there is an "'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Thorson v. Epps*, 701 F.3d 444, 446 (5th Cir. 2012) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)).  The conditions in the Jail, which result from Defendants' non-compliance with the Settlement, create a substantial risk of serious harm.  *See generally supra*, FOF Part III (explaining how Defendants' failure to comply with Settlement provisions creates a substantial risk of serious harm).

23.     The high level of violence at the Jail demonstrates an egregious violation of Hinds County prisoners' right to reasonable safety.  *See id.*  It is well established that "all jailers owe a constitutionally rooted duty to their prisoners to provide them reasonable protection from injury at the hands of their fellow prisoners."  *Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir.

1983) (reiterating the court's previous holding that "failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment"); *accord Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006); *Cantu v. Jones*, 293 F.3d 839, 843-44 (5th Cir. 2002) (affirming verdict against prison-guard defendants found to have manifested the requisite deliberate indifference when they left the door to prisoner's cell unlocked, allowing him to escape and assault another prisoner); *see also Hudson*, 468 U.S. at 526-27 (acknowledging prison officials are "under an obligation to take reasonable measures to guarantee the safety of the inmates themselves").

24.     Defendants not only fail to reasonably protect prisoners from each other, *see supra*, FOF Parts III, IV.A-B, but they also fail to adequately prohibit, prevent, and address the unnecessary use of force by staff against prisoners.  *See* FOF Part IV.C-D.  The Constitution forbids jail officials from using excessive physical force against prisoners.  *See Farmer*, 511 U.S. at 832; *Hudson v. McMillian*, 503 U.S. 1, 4 (1992).  The Due Process Clause of the Fourteenth Amendment protects individuals from any excessive force that "amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citation omitted).  The Due Process Clause also protects pretrial detainees from intentional force that is "objectively unreasonable," *id.*, even when the use of force does not result in significant injury.  *McMillian*, 503 U.S. at 4; *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999) (concluding that there is no categorical requirement for an Eighth Amendment excessive force claim to be supported by a prisoner's significant, serious, or more than minor physical injury).

25.     Protecting prisoners from violence requires adequate supervision and staffing. *Klevenhagen*, 790 F.2d at 1225-27 (upholding district court's order requiring specific staffing and hourly visual inspections by guards to address high violence and sexual assault at jails);

*Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977) (upholding requirement for hourly guard visits, and disapproving not having a guard on each floor).  The Jail is woefully understaffed, which results in unchecked violence and a serious risk of harm to prisoners.  *See* FOF Part IV.A.

26.     Physical plant conditions that endanger prisoners' health or safety constitute an Eighth Amendment violation.  *Gates*, 376 F.3d at 333.  The dysfunctional locks and dangerous maintenance deficiencies in the Jail pose a risk of serious harm to prisoners.  *See* FOF Part IV.B.

27.     The totality of the circumstances that influence prisoner safety at the Jail demonstrates that that the facility's numerous and significant deficiencies create a substantial risk of serious harm.  *See Klevenhagen*, 790 F.2d at 1226 (holding that violence at a jail, "coupled with such inadequate supervision, creates a constant threat to the inmates' safety"). Defendants' prisoners face precisely that risk on account of systematic failures to take reasonable measures to ensure prisoner safety.

**B.     Deliberate Indifference**

28.     The obviousness and severity of the substantial risks to prisoner safety that are created by the deplorable conditions and substandard correctional practices at the Jail manifest Defendants' deliberate indifference to the basic security needs of prisoners.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").  A plaintiff can satisfy the deliberate indifference requirement by showing that the risk to prisoner safety is so apparent so as to impute actual knowledge of that risk to prison officials.  *Farmer*, 511 U.S. at 842 (deliberate indifference can be inferred "from the very fact that the risk was obvious"); *Gates*, 376 F.3d at 343 (noting that the "obvious and

pervasive nature" of several deficient prison conditions supported the conclusion that prison officials displayed deliberate indifference to such conditions).

29.     Where unconstitutional conditions have persisted for a "long duration," it is easier to establish a correctional official's knowledge of the deficiencies. *Alberti*, 937 F.2d at 998 (quoting *Wilson v. Seiter*, 501 U.S. 294 (1991)).  More specifically, if a plaintiff shows a substantial risk of unreasonable harm was "longstanding, pervasive, [and] well-documented," and that "the circumstances suggest that the [prison officials] had been exposed to information concerning the risk," then "such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842-43.

30.     Such are the precise circumstances here.  The deficiencies at the Jail related to policies for safety measures, use of force, staffing and supervision, staff training and qualification, physical plant safety and security, and appropriate youth housing and programming are "long-standing, pervasive, [and] well-documented" such that Defendants must have recognized those deficiencies and their associated dangers. *Id.* at 842.  In cases involving similarly severe risks to prisoner safety, courts have found officials to be deliberately indifferent even where plaintiffs did not present any additional evidence showing officials had actual knowledge of the risks to prisoner safety beyond the deplorable conditions themselves. *See, e.g., Gates*, 376 F.3d at 333-44 (affirming the trial court's findings that the long-standing and obvious nature of several deficient prison conditions demonstrated prison officials' deliberate indifference to such conditions); *Alberti*, 937 F.2d at 998 (holding that "there is little doubt" that officials were aware of unconstitutional conditions given decades of court involvement on the issue).

31.     Although the Court could rely on the egregious nature of the deficiencies at the Jail to infer deliberate indifference, the deliberate indifference requirement is further satisfied here because Defendants have been on notice of the facility's deficiencies for years, but failed to take adequate remedial measures to correct those deficiencies.  On May 21, 2015, Defendants received the United States' CRIPA Notice Letter, which concluded that there was reasonable cause to believe that conditions at the Jail violated the constitutional rights of prisoners, and provided minimum remedial measures.   Notice Letter, ECF No. 3-3 at 1.

32.     On July 19, 2016, the Court entered the Settlement between Defendants and the United States, which required Defendants to "provide County prisoners with reasonable safety, protection from harm, and conditions of confinement that conform to the United States Constitution and federal law."  Settlement, PX 114 ¶ 2.  The parties stipulated that the Settlement contained relief measures "necessary to correct the violations of federal rights" as set forth in the United States' Complaint and CRIPA Notice Letter pursuant to 42 USC §1997b(a)(1). Settlement, PX 114 ¶ 167.

33.     Nine Monitor's reports have confirmed Defendants' non-compliance with the Settlement and noted the harm and substantial risk of serious harm to prisoners as a result of Defendants' non-compliance.  *See generally* Monitor's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Reports, PX 94-104.

34.     Defendants do not deny their widespread non-compliance with the Settlement, and admit that their efforts "have fallen short of constitutional requirements."  Defendants' Memo, ECF No. 36 at 1.

35.     Yet despite ample notice that conditions at the Jail created a substantial risk of harm to prisoners, and Settlement provisions laying out what must be done to resolve those

conditions, Defendants have failed to implement the reasonable measures required to bring the facility into compliance with the Constitution.  *See, e.g.*, *Gates*, 376 F.3d at 333 ("A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate.").  The record in this case is clear that Defendants "know[ ] of and disregard[ ][the] excessive risk to inmate health [and] safety" at the Jail, and are thus deliberately indifferent for Eighth Amendment purposes.  *Farmer*, 511 U.S. at 837.

## IV.     THE COURT SHOULD ORDER THE UNITED STATES' REQUESTED RELIEF TO RESOLVE THE ONGOING VIOLATIONS.

### A.     The Court Can Order Additional Remedies to Resolve Defendants' Contempt.

36.     In exercising its inherent authority to enforce a consent decree, a court may find that a defendant simply cannot meet the remedial targets set by the initial order, and therefore additional orders are needed to ensure that constitutional rights are not being violated.  *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 683-88 (1978) (district court was justified in issuing specific, comprehensive orders to defendants, where broad orders, giving corrections officers wide latitude to correct unconstitutional conditions, did not suffice to remedy unconstitutional conditions).

37.     Evidence of serious harm reinforces the Court's discretion to grant relief necessary to correct constitutional violations.  *See, e.g.*, *Hutto*, 437 U.S. at 687 (court may consider severity of violations and has "ample authority . . . to address each element contributing to the [constitutional] violation").  The Court "has the discretion — indeed, the duty — to take immediate action in a manner coextensive with the degree of ongoing and persistent harm." *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932243, at *8 (N.D. Cal. May 10, 2005).

38.     The United States has established Defendants' non-compliance, *see supra*, FOF Part IV, and the harm and substantial risk of serious harm resulting from such non-compliance is so severe, *see id.* Part III, the Court should exercise its authority to remedy the violations and order the relief the Court believes is needed to expedite Settlement compliance.

39.     In addition, the United States is requesting limited relief to address the most serious and time-sensitive areas of non-compliance and to prioritize necessary steps toward achieving compliance.  To that end, with the United States and the Monitors' input, review and approval, Defendants should develop and implement court-enforceable corrective action plans to achieve compliance in the following areas of the Settlement:  (a) full staffing and supervision of all occupied Jail units, including recruiting/retention of staff and achievement of direct staffing and increased welfare checks on units pending adequate staff for direct staffing, (b) addressing physical plant deficiencies including all malfunctioning locks, doors, video cameras, sprinklers, hoses, and fire safety equipment, (c) completion of Settlement-required Jail policies, (d) finalization of use of force policies and implementation of training, review, and accountability measures for use of force, and (e) experience and competency requirements for Jail leadership and supervisors.

40.     These corrective action plans must include interim and final deadlines, identify County officials and staff responsible for drafting and approving the plans, and address any necessary funding.  Final deadlines for achieving substantial compliance with the covered areas of the Settlement shall be no later than two years of the date of this Order, with reasonably interspersed interim deadlines.  Defendants shall provide initial drafts of these corrective action plans within 60 days of this order.

**B.**     **The United States' Requested Relief Complies with the PLRA.**

41.     In entering the parties' Settlement, the Court previously confirmed that the remedial measures required by the Settlement comply with the Prison Litigation Reform Act, 18 U.S.C. § 3626(a) ("PLRA").  Settlement, PX 114 ¶¶ 166-67.  The additional relief the United States requests to address Defendants' non-compliance is limited to specific relief that is narrowly tailored to achieve compliance with the original Settlement, and is thus compliant with the PLRA.

42.     The PLRA provides that courts shall not issue prospective relief with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation. *See* 18 U.S.C. § 3626(a).

43.     "Narrow tailoring requires a 'fit between the [remedy's] ends and the means chosen to accomplish those ends'" such that the "scope of the remedy [is] proportional to the scope of the violation." *Brown v. Plata*, 563 U.S. 493, 531 (2011) (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989)).

44.     Critically, however, the Supreme Court has cautioned that the "PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations."  *Plata*, 563 U.S. at 526.

45.     Given that the constitutional violations involving conditions of confinement stem from the "totality of the conditions" affecting prisoners, remedying such constitutional violations requires relief that comprehensively addresses the deficiencies that combine to create a substantial risk of serious harm.  *Klevenhagen*, 790 F.2d at 1231 (Brown, J., concurring) ("The

law in our Circuit, for some years now, has been that we look instead to the totality of the conditions of confinement to determine whether they are cruel and unusual in light of contemporary standards of decency." (internal citations omitted)).

46.     The additional remedies the United States now requests are directly proportional to the scope of Defendants' non-compliance, which results in the current constitutional violations at the Jail.  The relief has been narrowly tailored to remedy the longstanding, specific institutional deficiencies outlined in the United States' CRIPA Notice Letter and the nine Monitor's Reports that followed.  And the proposed relief is targeted at expediting compliance with the existing provisions of the Settlement.

47.     At the same time, the requested relief extends no further than necessary to protect prisoners' constitutional rights and is the least intrusive means necessary to correct the violation of those rights.  Despite Defendants' overall lack of compliance with the Settlement, the United States has focused its motion and relief request on only those provisions that give rise to the greatest risk of harm and must be resolved first, in order to ensure adequate safety and Defendants' ability to address the remaining Settlement provisions.

Dated this 11th day of December, 2019.


Respectfully submitted,


COUNSEL FOR UNITED STATES OF AMERICA:

| | |
|---|---|
| D. MICHAEL HURST, JR. | ERIC S. DREIBAND |
| United States Attorney | Assistant Attorney General |
| Southern District of Mississippi | Civil Rights Division |

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

*/s/ Candace G. Mayberry*
CANDACE G. MAYBERRY (MS #104014)
MITZI DEASE PAIGE (MS #6014)
Assistant U.S. Attorneys
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Ste. 4.430
Jackson, MS  39201
Candace.Mayberry@usdoj.gov
(601) 973-2838

*/s/ Laura L. Cowall*
LAURA L. COWALL (DC #481379)
Deputy Chief
Special Litigation Section

*/s/ Shelley R. Jackson*
SHELLEY R. JACKSON (MA #548997)
Deputy Chief
Special Litigation Section

*/s/ Christopher N. Cheng*
CHRISTOPHER N. CHENG (PA #69066)
AARON FLEISHER
SARAH RUSSO
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., N.W.
Washington, DC  20530
Christopher.Cheng@usdoj.gov
(202) 514-8892

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2019, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record:

/s/ Aaron S. Fleisher
AARON S. FLEISHER (NY #4431052)
Trial Attorney
aaron.fleisher@usdoj.gov
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
(202) 514-8892
(202) 514-4883 (fax)