## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DISTRICT

UNITED STATES OF AMERICA                                      PLAINTIFF

VS.                                    CIVIL ACTION NO. <u>3:16-CV-00489-CWR-JCG</u>

HINDS COUNTY, ET AL.                                         DEFENDANTS

### HINDS COUNTY'S PROPOSED FINDINGS OF FACTS
### AND CONCLUSIONS OF LAW

**COMES NOW** Hinds County, Mississippi, by and through counsel of record, and submits its Proposed Findings of Facts and Conclusions of Law Denying the United States' Motion for an Order to Show Cause Why Defendants Should Not be Held in Contempt, and would state unto this Honorable Court the following:

### INTRODUCTION

On December 16, 2019, a hearing was held before this Court on the United States' Motion to Show Cause Why Defendants Should Not Be Held in Contempt. Based on the testimony elicited at trial and the evidence produced to this Court, there has been no showing of contumacious behavior on behalf of Hinds County[1] (Board and Sheriff). While not in absolute compliance with the terms of the Settlement Agreement, testimony and evidence demonstrates that the County has made good faith efforts to meet constitutional compliance. Hinds County concedes its efforts have fallen short of the requirements set

---

[1] The terms "Hinds County" or "County" are inclusive of the elected Board of Supervisors and elected Sheriff along with staff and administration. The terms "Board" or "Sheriff" are used where a specific reference is appropriate.

forth in the Consent Decree.  However, mitigating circumstances and a proven effort to work towards compliance precludes the finding for contempt.

**FINDINGS OF FACTS**

The United States focuses its Motion for an Order to Show Cause on six areas of alleged non-compliance:

1.  Policies and procedures;
2.  Use of force;
3.  Staffing and prisoner supervision;
4.  Supervisor qualifications and training;
5.  Physical plant; and,
6.  Youthful prisoners.

During the trial on this matter, the Court heard testimony regarding these six areas of non-compliance; however, the facts presented did not rise to the level of contumacious behavior on behalf of the County.  Rather, the County has demonstrated a good faith effort to diligently move towards compliance, which is set forth more specifically below.

## I.    POLICIES AND PROCEDURES

The United States alleges that the County has failed to adopt policies and procedures that are reflective of the Consent Decree.  However, the evidence before this Court demonstrates that the County has been diligently striving to craft acceptable policies and procedures, and the review process by both the United States and the Monitors have proven to slow down and frustrate those efforts.

To be clear, the County is not functioning without any policies and procedures whatsoever.  Detention Services adopted a set of policy and procedures in 2017; however, because these policies did not meet the heightened requirements of the Consent Decree, they were rejected in their entirety by the United States.  The 2017 policies and procedures

are a combination of language that existed in Detention Services, then current policies and specific mandates set forth in the Consent Decree. In response to the United States' rejection of these policies and procedures, the County solicited support of both in-state and out-of-state consultants to assist in redoing the policies. The search identified vendors ranging in service cost from $50k to $120k. The Board of Supervisors allocated $50k for this purpose, and a team of venders was identified for the work in the Spring of 2017. This group comprised of professors from Jackson State University and former staffers from the Mississippi Department of Corrections specialized in policy writing for a nationally accredited corrections agency.  The United States expressed concerns for the capacity of the County's selected team which, in part, led the County to explore other vendors that might be more aligned with the United States' interests.

In January of 2018, the federal monitors recommended a consultant, Karen Albert, to the County to offer technical support for the enhancing the Records Division of Detention Services. After meeting and working with Mrs. Albert on matters related to Records, the County was impressed with her skillset and professionalism and solicited her support for policy and procedure development. Mrs. Albert agreed and began working with the County on all policy and procedure development.

Conducting policy development has proven to be a sizable undertaking for the County.  Due to the lack of clarity or practice of many standards within Detention Services, some polices require a significant amount of development to meet the standard of industry best practices. Additionally, the County's Detention Services are divided into three separate facilities all having different operational structures. In order to meet this mandate, the County has created a policy development team consisting of command and subject area staff from all three facilities. The team is currently functioning under the

"operationalized" style of policy development, meaning that staff works as a team to develop the policy and logistics needed to support that policy. Using this development format, staff create policies that are culturally relevant while also developing a sustainable skillset amongst staff for future policy development and review.

The policy development process, though naturally slower by design, has been severely hampered by the lack of clarity provided by United States and federal monitors as it relates to substantive edits as opposed to stylistic edits. The policy team has the same respect and confidence in Mrs. Albert to perform her duties as a subject matter expert in detentions polices as the National Institute of Corrections, which outsources her nationally for technical assistance. Mrs. Albert is onsite for team work monthly and conducts digital conferencing between visits. However, the policy team spends an inordinate amount of time reviewing edits and questions on policies returned from United States with comments. The County has communicated to the United States how labor intensive the editing process is to the overall product development. The fact that the County is steadily and diligently working on drafting policy and procedures precludes any finding of contempt on this issue. Indeed, the County's efforts are frustrated by the mundane and confusing acceptance process of the United States.

Moreover, during policy development process, the policy team has identified new system enhancements in areas of concern in the Consent Decree. This further demonstrates a diligent, good faith effort to comply with the Consent Decree. The following areas of improvement are notable:

A) **BOOKING**

The policy team created a new "Pre-Booking" policy to ensure that Detentions Services had clear authority to properly accept arrestee into their system. The

Pre-Booking and Booking policies led to the County deciding to make structural modifications to the booking area; these modification would help streamline the booking process and centralize medical and Classifications staff for more efficient assessment and housing procedures. The County also:

- Hired two (2) master's level social workers and one (1) doctor's level nurse practitioner to provide the mandated evaluations and counseling services for individuals with severe mental illnesses (SMI).

- Began conducting mental health assessment on 100% of the individuals being booked into the jail.

- Hired a discharge planner and partnered with Hinds Behavioral Health Services to connect individuals being released from the jail to available mental health services within the community.  This was a recommendation from the newly created Criminal Justice Coordinating Committee (CJCC).

- Conducted a training with County/Detentions staff, local public defenders, local judges and local prosecutors to educate participants on Mississippi's New Criminal Rules of Procedure. This effort, in part, was designed to support issues with timely release and pay-or-stay court orders.

- Returned all State of Mississippi inmates and made a policy decision to opt out of the Mississippi State Inmate Work Program.

- In alignment with State Law and the guidance of the New Criminal Rules of Procedure, Detention Services began eliminating the acceptance of any misdemeanor arrestee unless it was for a domestic, D.U.I. or some simple assaults; additionally, the County, in coordination with local judges, worked to eliminate the holding of any inmates held solely for fines and fees.

**B)  CLASSIFICATIONS/HOUSING**

The County has partnered with the National Institute of Corrections to provide a year-long training and technical assistance program designed to provide staff with the skills they need to operate a direct supervision facility.  Since direct supervision is a mandate of the settlement agreement, the County has done the following:

- Installed a divider wall at the Work Center (WC) to create four total housing units and reduce the total prisoner population per unit from (100) to (65). The Work Center is structured as a direct supervision unit.

- Trained command and classifications staff through the National Institute of Corrections (NIC) Inmate Behavior Management Training which included key aspects of proper classifications.

- Eliminated the use and identification of "gang pods".

- Modified the Jail Management System (JMS) to allow for the ability to track the entire jail population by classification and housing location.

- Began planning for the remodeling and staffing of a unit within C-Pod at Raymond Detention Center (RDC) as a piloted direct supervision unit.

- Created and staffed a position titled "*Chief Safety and Security Officer*" responsible for:

   i. Operating as a liaison between the County and Sheriff's office on maintenance matters

   ii. Prioritizing Detention Services' maintenance needs and structuring a preventative maintenance plan

   iii. Working with command staff at each facility to develop oversight protocols for emergency procedures and custodial services.

- Created and staffed the *Program Officer* position who oversee Detentions current programs which includes Narcotics Anonymous (NA), General Education Development (GED), Life Skills, Basic Computer Skills, Job Interviewing, Anger Management, and Celebrating Recovery.

- Established a standing monthly meeting between the Board of Supervisors (*county administrator) to discuss the administrative strategies for short and long term facilities management.

It is quite evident that the County has, in good faith, been working towards compliance in the area of policies and procedures.  Given the marked improvements in this area, there can be no finding of contempt.

## II.     USE OF FORCE

The second area in which the United States alleges that the County should be in contempt is on the subject of Use of Force.  The United States alleges that the County "has not remedied long-standing problems with use of force in the Jail." [DOC.] 30 at ¶. 4. The United States' complaints with respect to use of force basically pertain to: a) policies; b) training; and, c) reporting.  While not fully compliant with the Consent Decree, the County has demonstrated a diligent effort to come into compliance and there has been noticeable improvement from the date of entry of the Consent Decree to the present.

The use of force policy currently in place was drafted in 2017 and it mirrors those policies of detention facilities that have an ACA (American Correctional Association) use of force policy in place.  Karen Albert has drafted a more specific use of force policy that is mirrored by the National Institute of Corrections (NIC), for which Ms. Albert works closely.  This policy was first submitted to the United States for approval on December 18, 2018. To date, the United States has still not approved this policy, and it has undergone approximately six drafts due to edits from the United States' attorneys. This fact alone demonstrates good faith on behalf of the County and frustrated efforts on behalf of the United States.

Notwithstanding the fact that the United States is frustrating the County's efforts of compliance on this issue, all new detention officers receive State of Mississippi required use of force training in the detention officer orientation program.  In addition to the state minimum requirement of eight hours of use of force training, the County has instituted an annual eight hour use of force refresher training.  Importantly, the County has begun

direct supervision training under the NIC which is designed, in part, to reduce the need for the use of force.

With respect to use-of-force reporting, in 2016 reporting was virtually non-existent and what reporting did occur was paper based. The County has since implemented a policy that all incident reports, including use of force, are completed using the jail management system (JMS) software. This system allows for documenting, tracking and supervisory review of use of force. The County's internal compliance monitor promptly sends these reports to the Department. Moreover, the County's internal affairs department compiles an investigative summary of every reported use of force. These summaries are provided to the Sheriff, Jail Administrator, Deputy Jail Administrator, and Department of Justice/federal monitors.

Specific acts taken by the County that demonstrate good faith efforts and preclude the finding of contempt are as follows:

- The County set a department wide policy requiring all incident reports to be completed using the digital Jail Management System (JMS);

- The County added "Use of Force" as a report type to JMS which allows for the tracking of these types of incidents;

- Screen entry options were added to JMS which allow for supervisors to note their review of uses of force;

- The County began requiring the engagement of medical assistance for every use of force;

- A shared, confidential excel tool was developed for tracking SMIs system-wide to ensure awareness and proper response in the event force is used involving a prisoner with SMI;

- The County hired a full time investigator for the agencies Investigations Division - Internal Affairs Section and assigned this investigator to Detention Services;

- To support the additional training needs for use of force, and the development of new policies and procedures division wide, the Sheriff's Office hired and assigned a division captain and detention officer to the Training Division.

### III.   STAFFING AND PRISONER SUPERVISION

While staffing is still an enormous issue for the County, there has not been a demonstration that the County has willfully and blatantly ignored its obligation to properly staff its jail.  As mandated by paragraphs 38-42 of the consent decree, the County has hired a Detentions Administrator (*Major Mary Rushing) as well as a Deputy Detentions Administrator (*Captain Richard Fielder) to oversee Detentions Operations. Additionally, the Sheriff has signed an executive order giving full authority to the Detentions Administrator for the management of personnel.  Detentions has not fully staffed all supervisor positions. However, Detentions has promoted and placed a supervisor of every rank at each facility's housing area and in the centralized booking area.

Paragraph 42 of the consent decree requires the placement of sufficient staff to adequately supervise prisoners.  To that end, the United States asserts that the County needs 433 employees for Detention Services.  This number is unrealistic and is higher than the number of employees in the entire Sheriff's Office. This staff level was determined by a 2014 staffing study when the population of the jail was roughly 1,110 inmates.  Now, the jail population has been decreased to approximately 420 inmates due to the County's efforts.  Because the inmate population has significantly decreased, and the staffing suggestion of 433 is unrealistic, the County and United States agreed to a benchmark of 275 staffing positions, which the County has funded. The County currently has (234) detention officers which creates a 24.1:1 inmate-to-staff ratio compared to the national average of 4.2:1.

Despite these difficulties, the County has diligently attempted to increase staffing. Upon discovering that its Detention Services employees were amongst the lowest paid in the State, the County agreed to match the highest paying agency in the state at $28,000.00 in order to make the positions financially more marketable. The County also used the data developed during this salary study to begin the development of a merit based salary adjustment plan. To support staff efforts, the County also:

- Appointed a Staffing Recruitment Officer responsible for overseeing recruitment and hiring efforts;

- Began conducting and participating in local public and private sector job fairs;

- Opened talks with Hinds Community College (Raymond) about adding detentions specific courses to their criminal justice curriculum;

- Began tracking staffing data monthly to monitor retention and turnover rates; and

- Created a staffing development group responsible for reviewing and enhancing the recruitment, assessment, evaluation and hiring practices for Detention Services.

- Hired/appointed two officers to work in the training department dedicated to Detention Service training

Poor retention appears to be the greatest factor impacting the County's ability to meet staffing requirements for detentions. Though the County has worked diligently to change the system and the culture both inside and outside of the jail, new employees are either incapable or unwilling to commit to the demands that come with a difficult jail system. The County had not hit its benchmark of 275 detention officers, despite the fact that it has hired nearly 200 officers since entering the settlement agreement. Retention is difficult because employees do not feel safe at the Raymond Detention Center due to the fact that the doors and locks do not work, resulting in the facility not being secure.

The County needs to hire qualified contactors who have experience in the area of corrections to make repairs to the facility.  If the facility remains unsafe and unmaintained properly, then retention will continue to be an ongoing problem.

Notwithstanding the poor retention of employees, the County has displayed a commitment to increasing the staffing to a sufficient level for the jail. In an effort to provide for a safer jail system, the County has deployed resources intended to help reduce the jail population and create a more manageable staff to prisoner ration. One area of concerns was the length of stay for individuals awaiting a bed at the Mississippi State Hospital under court order for competency restoration; many of which had been waiting 300 to 400 days. The County partnered with the Mississippi Department of Mental Health to pilot the Community Competency Restoration Program that would allow mental health professionals (on behalf of the State) to conduct therapy and treatment session for restoration within the Hinds County Detention System. This did not resolve all of the long stays as not all prisoners waiting were eligible for the program. However, it did prove to be a successful alternative for others. Another such effort was the hiring of a Court Liaison whose responsibilities include reviewing the jail population to identify prisoners who appear to be "stuck in the system" due to circumstances that are fairly easy to remedy (e.g., monitoring individuals booking for probation violation to ensure they have their hearings within the statutorily required twenty-one days).

At the onset of the consent decree, the County had roughly 1100 inmates system-wide. As a result of the County's reduction/diversion efforts, the jail's daily population over the last month has been around 420. This has allowed the County to reduce its jail occupancy rate to 54% which is nearly 30% below the national average. This also places

the County below the national average of 229 detainees per 100,000 citizens. Though problems still exist, this reduction has made for a more manageable population. Based on these efforts, there can be no finding of contempt on behalf of the County.

### IV.  SUPERVISOR QUALIFICATIONS AND TRAINING

The fourth issue raised by the United States in its motion is the issue of supervisor qualifications and training.  However, the evidence presented to this Court shows that the County has taken steps towards hiring qualified supervisors and training employees.  The Sheriff has returned the former assistant jail administrator, Ric Fielder, to his position as well as utilizing Fielder for training on use-of-force. The Sheriff further issued a Special Order in March of 2019 assigning Major Rushing, the Jail Administrator, 'to execute all duties and responsibilities relating to Detention Services ...'  Major Rushing has been given autonomy to manage the jail, and she has demonstrated a good faith effort to hire qualified individuals to work in Detention Services.  However, the County has put on evidence that mitigating circumstances exist in this area:  the labor pool in Mississippi and Hinds County poses difficulties in finding qualified individuals to work in Detention Services.

County and State detention is not a career that attracts those whose skills are needed for management.  The labor pool does not consist of the college educated, experienced professionals required by the Consent Decree.  Individuals who possess such skillset do not apply at Hinds County; rather, they are applying for employment that is safer and higher paying than Detention Services.  Ultimately, the County is left with people who are in need of a stable job, but are wholly untrained to work with inmates or in a corrections environment.  These are factors beyond the County's control, therefore,

the County should not be held in contempt for failing to hire qualified individuals.  The County is using its best efforts to attract qualified candidates, and the only remedy that will aid in this process is continued monitoring and support, not the sanction of contempt.

### V.   PHYSICAL PLANT

Hinds County concedes the obvious: the 1994 poorly designed, poorly constructed RDC that holds a population far longer than normally intended is in poor condition despite millions of dollars of repairs over the last five years. The United States paints with a broad brush, however, in an attempt to impute the RDC physical plant problems to three other county facilities *and* ignores the on-going, emergency efforts of the County. Hinds County, since 2013, has spent approximately $7 Million on County detention facilities. Just in the last six months, the Hinds County Board of Supervisors has approved $500,000.  County maintenance staff are on site at RDC seven days a week and the Sheriff's Office has designated a captain to work with maintenance in prioritizing repairs.

Hinds County is currently nearing completion of all four units in Pod C. Renovations include verification of safety and security for doors and locks, plumbing, ceiling/roof, and cosmetic items such as fresh paint.  The renovated units will no longer have stationary chairs and tables, but will, instead, have appropriate modular furniture (such furniture is already in use in B Pod).   Renovated Pod C is intended for direct supervision of well-behaved, medium-security detainees.  Hinds County is in transition to renovating Pod B with two units specifically modified for maximum detention conditions.  Hinds County also intends in 2020 to modify doors to the booking area and undertake various minor maintenance and improvement issues at the dormitory-style

Work Center.   Notably, Hinds County has issued an emergency proclamation allowing an in-house maintenance director to utilize local vendors in making repairs.

### VI.   Youth Charged as Adults

The Department's assertions regarding Hinds County's detention of juveniles charged as adults "JCA's") are, simply, misrepresentations.   The Department takes Hinds County to task, for example, over the length of time involved in deciding where to locate the JCA's ("significant delay").   Here is what occurred: no one knew what to do.   The Henley Young Juvenile Justice Center Monitor, Mr. Dixon, didn't want JCA's at the Henley Young Juvenile Justice Center, as it would represent a 21-day, nesting compliance facility developing enhanced education and mental health programing.   Such an expansion of mission to dual tracks of short-term delinquency and long-term JCA's would inevitably stymie Henley Young Juvenile Justice Center's progress.   Monitor Parrish proposed remodeling the Work Center at a cost of several million dollars; Hinds County engaged an architect, plans were drawn.   Other monitors, consultants and elected officials expressed opinions.   Hinds County considered RDC, but it had no outdoor exercise area.

After due consideration, Mr. Dixon proposed that all ***new*** JCA's would go directly to the Henley Young Juvenile Justice Center, but those already at RDC would remain in a specific-age appropriate area at RDC.   Major Rushing supported the proposal, and Sheriff Mason gladly obliged.   With no better solutions, on September 5, 2017, Hinds County implemented Mr. Dixon's recommendations.   The results are overwhelmingly positive--if not perfect.   Further, the Department and monitors know that Hinds County has increased counseling services, though it involved a state court litigation challenge to

the Board's appropriation power by an angry youth court judge.  Hinds County provides a licensed professional counselor (Brenda Frelix), case workers and an on-going search for a full-time psychologist.

Perhaps nothing better demonstrates the Department's misrepresentations than its accusation Hinds County is deliberately obstinate with respect to "priority recommendations" and continued improvements.  [DOC.] 31 at ¶22.  The priority recommendations are:

- adding temporary programming space
  (Not in Settlement Agreement);

- converting a part-time psychologist to a full-time psychologist
  (Search on-going after part-time psychologist gave a $160,000 per year ultimatum);

- adding some mental health coverage
  (Nebulous, but ongoing);

- putting in security features
  (No document Henley Young Juvenile Justice Center incident caused by deficient "security features");

With respect to education services for longer-term JCA's, MISS. CODE ANN. § 43-21-621 places education under the purview of the youth court judge and local school district.  Nevertheless, Hinds County has engaged David Domenici to advise the County regarding educational programming.  Hinds County and Jackson Public Schools are exploring a co-share agreement with Mr. Domenici for the upcoming school year.  With

all due respect to the Department and Monitor Simpson, Henley Young Juvenile Justice Center's path to sustained constitutional compliance has received Chief Judge Jordan's approval.

## VII.   CRIMINAL JUSTICE COORDINATING COUNCIL

Although not raised in the United States' motion, it is worth noting the County's efforts in tackling the troubled criminal justice system in Hinds County.  In 2015, prior to entering into the settlement agreement, the County operated a Criminal Justice Summit tasked with addressing the urgent safety needs presented by the overcrowding of the detention facilities. The Summit included representation from the Board of Supervisors, the Sheriff's Office, the District Attorney's Office, the Public Defender's Office, the City of Jackson and the Circuit, Chancery, County and Youth Courts. In compliance with paragraph 115, the County changed the name of the Summit to the Criminal Justice Coordinating Council and requested voluntary representation from the Mississippi Department of Mental Health and Human Services, Hinds Behavioral Health Services and the City of Jackson. The County developed bi-laws and establishment documents for the council and had its establishment spread across the minutes at a Board of Supervisors meeting.

The County hired the consulting firm JMI (Justice Management Institute) as a subject matter expert to help in the establishment of the CJCC and to help to build in some of the national best practices for a council of this type. With the assistance of Hinds Behavioral Health Services, and a partnership-grant with the US Department of Health and Human Services - Substance Abuse and Mental Health Services Administration (USDHSS-SAMHSA), the County used the sequential intercept model to identify

strategies for diversion at each intercept point where individuals may encounter the criminal justice system and assessed the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of individuals with SMI.

The Council is currently developing a separate youth court docket, in cooperation with the circuit court that will help to better manage matters involving juveniles charged as adults. Additionally, the Council is evaluating the use of ankle monitors and bond practices; all efforts to reduce jail population through diversion.  In order to attempt diversions at earlier intercepts, the County partnered with Jackson State University's - Mississippi Urban Research Center to acquire a DOJ - Bureau of. Justice Assistance - Justice Mental Health Collaboration Grant. This planning and implementation grant, that the County was awarded, will help in furthering the County's compliance by increasing public safety through innovative cross-system collaboration for individuals with mental illness who come into contact with the criminal justice system.

Additional efforts resulting from the CJCC included a countywide training on Mississippi's recently adopted uniform criminal rules of procedure and the establishment of a piloted jail-based competency restoration program which has served (31) detainees.

## CONCLUSIONS OF LAW

In order for the Court to hold a party in contempt, the movant in such proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 401 (5thCir.1987); *see also Travelhost, Inc. v. Blandford,*

68 F.3d 958, 961 (5th Cir.1995) ("In a civil contempt proceeding, the movant bears the burden of establishing the elements of contempt by clear and convincing evidence."). Once a violation of the order is demonstrated, the burden shifts to the violating party to "show either mitigating circumstances that might cause a district court to withhold the exercise of its contempt power, or a substantial compliance with the consent order." *Whitfield v. Pennington,* 832 F.2d 809, 914 (5th Cir. 1987) (citing *Louisiana Educ. Ass'n v. Richland Parish School Bd.,* 421 F.Supp. 873, 977 (W.D.La.1976), aff'd 585 F.2d 518 (5th Cir.1977)).  Here, the Department fails in both aspects of the aforementioned standard:  they cannot establish a violation by "clear and convincing evidence," and, more importantly, the County can demonstrate mitigating circumstances that it has taken in good faith efforts towards compliance.

Further, "district courts have wide discretion to enforce decrees and to implement remedies for decree violations." *United States v. Alcoa,* 533 F.3d 278, 288 (5th Cir. 2008). That is, "while a district court generally lacks authority to rewrite the terms of a consent decree, it has broad discretion to fashion equitable remedies to enforce a consent decree in response to a party's noncompliance." *Chisolm ex rel. CC v. Greenstein*, 876 F. Supp. 2d 709, 720 (E.D. La. 2012) (citing *EEOC v. Local 580, Int'l Assoc. of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588, 593 (2d Cir. 1991)). "These remedies 'need not match those requested by a party or originally provided by the court's earlier judgment.' " *Id.* (quoting *Alcoa* at 288).

The numerous requirements placed on a moving party to prove contempt are necessary because "[t]he judicial contempt power is a potent weapon," *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76 (1967), and

"[t]he consequences that attend the violation of a court order are potentially dire," *Project B.A.S.I.C. v. Kemp,* 847 F.3d 11, 17 (1st Cir.1991); thus, "courts must 'read court decrees to mean rather precisely what they say,' " *id.* (quoting *NBA Properties, Inc. v. Gold,* 895 F.2d 30, 32 (1st Cir.1990)); *see also United States v. Armour & Co.,* 402 U.S. 673, 681– 82 (1971) ("... [T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). And, to temper the "potent" contempt power even further, courts "must read any ambiguities or omissions in ... a court order as redound[ing] to the benefit of the person charged with contempt." *NBA Properties,* 895 F.2d at 32.

A sanction may issue only if the relevant court decree is clear and unambiguous, *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *North Shore Laboratories Corp. v. Cohen,* 721 F.2d 514, 521 (5th Cir.1983), the proof is "clear and convincing" (a standard higher than "preponderance" though not commensurate with "beyond a reasonable doubt"), *Neely v. City of Grenada,* 799 F.2d 203, 207 (5th Cir.1986); *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir.1976), and it is established that the violation was occasioned by reason of failures amounting to a want of diligence, ineffective control, and lack of steadfast purpose to effectuate the prescribed goals. *Aspira of New York, Inc. v. Board of Education of City of New York,* 423 F.Supp. 647 (S.D.N.Y.1976).   Contempt represents more than a delay in performance or lack of perfection; it is, instead, the failure to accomplish what was ordered in meaningful respects. Moreover, good faith alone is no defense to this charge, since there is no intent requirement in respect of a determination of civil contempt. *McComb v. Jacksonville*

*Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Newman v. Graddick,* 740 F.2d 1513, 1528 (11th Cir.1984).

At the show cause hearing, the contemnor is "allowed to show either that he did not violate the court order or that he was excused from complying." *Mercer v. Mitchell,* 908 F.2d 763, 768 (11th Cir. 1990). A contemnor may be excused because of an "inability" to comply with the terms of the order. *See Citronelle-Mobile Gathering Inc. v. Watkins,* 943 F.2d, 1297, 1301 (11th Cir. 1991). To satisfy this burden, a contemnor must "offer proof beyond the mere assertion of an inability." *Id.* at 1301. Instead, a contemnor "demonstrate [s] an inability to comply only by showing that [he has] made 'in good faith all reasonable efforts to comply.' " *Id.* (quoting *United States v. Ryan,* 402 U.S. 530, 534, 91 S.Ct. 1580, 1583, 29 L.Ed.2d 85 (1971)); *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir.1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt.")

In the case before this Court, the County has offered sufficient evidence that they have made all good faith attempts and reasonable efforts to comply with the Consent Decree thus far.  Further, mitigating circumstances are present that should be factored into the County's ability to comply with the demands of the Consent Decree.  Although there is no exhaustive list of mitigating circumstances which would excuse a violation of a court order, courts have generally considered whether the cause of the violation was beyond the control of the defendant. *See In Re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358, 366 (Bankr. W.D. La. 1999) (where order required production of documents, "[t]he destruction of records could possibly be a mitigating circumstance, had they been destroyed by a fire or flood").

The task of enhancing Detention Services is complicated by factors both inside and outside of the jail, including factors over which the County has no control. Some of those factors hampering progress include a lack of institutional knowledge of the staff in Detention Services.  Under the previous Sheriff's administration, a significant number of veteran detention officers were either transferred out of detention or terminated subsequently. Unrest and riots lead to additional staff separating employment with the County. The County continues to hire new staff but the lack of institutional structure significantly reduces retention efforts.  Further, the delays in prosecuting the pre-trial detainees housed at the Detention Center is another mitigating factor that is hampering compliance.  The national average for length of stay in jails is 25 days. Hinds County's average length of stay is roughly 54 days or more. This well above average length of stay of a pre-trial detainee and is often the result of excessive bonds and an untimely indictment process.

Moreover, the evidence demonstrates that the County has attempted to substantially comply with the demands of the Consent Decree. To show substantial compliance, a defendant must show that it took "all the reasonable steps within [its] power to insure compliance with the order[ ]." *Alberti v. Klevenhagen*, 610 F.Supp. 138, 141 (S.D. Tex. 1985) (quoting *Mobile Cty. v. Purvis*, 703 F.2d 580 (11th Cir. 1983)).

Courts around the County have examined the issue of "substantial compliance," and have found that if there is a showing of diligent, good faith efforts, as demonstrated in the instant case, that a finding of contempt cannot stand.  First, a complainant must prove civil contempt by clear and convincing evidence. *See, e.g., AMF, Inc. v. Jewett,* 711 F.2d 1096, 1100 (1st Cir.1983). Second, substantial compliance can avert a finding of contempt. That is to say that the Consent Decree in the present case is susceptible to

satisfaction by diligent, good faith efforts, culminating in substantial compliance. *See, e.g., Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990) ( "Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance."); *Drywall Tapers, Local 1974 v. Local 530,* 889 F.2d 389, 394 (2d Cir.1989) ("A court may hold a party in civil contempt only if … 'the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered.' ") (citation omitted), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990); *Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461, 466 (9th Cir.1989) ("Substantial compliance with a court order is a defense to an action for civil contempt."); *see also Board of Educ. v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991) (question of whether school board complied with desegregation order depends on whether board acted in good faith and whether vestiges of past discrimination had been eradicated to the extent practicable).

The First Circuit has noted that context is extremely important when addressing whether a party should be held in contempt.   In the context of public law litigation, the First Circuit opined that a district court's construction of a consent decree should be accorded considerable deference, because broad leeway is often necessary to secure complicated, sometimes conflicting, policy objectives. *See United States v. Commonwealth of Massachusetts,* 890 F.2d 507, 509–10 (1st Cir.1989).

In public law litigation, courts typically play a proactive role—a role which can have nearly endless permutations. *See, e.g., Massachusetts Ass'n of Older Americans,* 803 F.2d at 38. Frequently, the trial court's adjudicative function blends with its service as an instrument for change. When dealing with local government, as is the case before the Court, Consent Decrees "provide for a complex, on-going regime of performance rather

than a simple, one-shot, one-way transfer…. It prolongs and deepens, rather than terminates, the court's involvement with the dispute." Chayes, *The Role of the Judge in Public Law Litigation,* 89 Harv.L.Rev. 1281, 1298 (1976). This is precisely why this Court declines to hold the County in contempt.  The progress and efforts made by the County must be taking into consideration, and "appropriate consideration must be given to principles of federalism in determining the availability and scope of [federal] equitable relief." *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).

If this Court were to focus solely on the County's non-compliance, in isolation, the finding of contempt may be necessary. But, because this issue is one of public law, it cannot be viewed in a vacuum and a wider view of the litigation is required. Since the time of *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), district courts have exercised broad powers and enjoyed great latitude in regulating the operations of state institutions, ranging from school districts, to hospitals, to prisons, as may be necessary to enforce federally assured rights. *See The Supreme Court—Leading Cases,* 104 Harv.L.Rev. 129, 296–97 (1990) (citing cases).   The First Circuit has opined in dicta that although federal district courts have been allowed—indeed, at times constitutionally required—to intrude in the affairs of state and local governments, such intervention has been conducted with the clear understanding that the autonomy of these governmental entities should be safeguarded to the maximum extent possible.  *Langton v. Johnson,* 928 F.2d 1206, 1221 (1st Cir. 1991).  As the Supreme Court has stated, "one of the most important considerations governing the exercise of [federal] equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins,* 495 U.S. 33, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1990).

The concern of balancing the power of a local government and a district court has been further examined in *Spallone v. United States,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), where the Supreme Court held that a district court had over-extended its equitable powers. There, the lower court imposed contempt sanctions on individual city council members who had failed to comply with a consent decree between the city and the United States. *Id.* 110 S.Ct. at 634. In setting aside the sanctions, the *Spallone* Court emphasized that district judges should exercise the "least possible power" to achieve the remedial end proposed. *Id.* at 635 (quoting *Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966)).

In the case at bar, this Court is a central figure in monitoring the extent and adequacy of the steps towards compliance demonstrated by the County. The County has shown reasonable, diligent efforts and marked progress, and compliance or non-compliance with this Consent Decree cannot be viewed as a series of unyielding absolutes. This Court's duty is to achieve the legally required goals by methods which, while effective, are among the least onerous and intrusive methods available. As such, in light of the County's notable progress, there is substantial compliance with the overall mandate of the consent decree, and therefore, no contempt. The County has demonstrated that they have extended their best efforts to comply with the decree.

It is quite plain from the testimony and evidence produced at the hearing on this matter that there was neither letter-perfect compliance with, nor total disregard for, the demands of the consent decree. The fact that the County has not completely implemented the programs specified in the decrees does not support a finding for contempt. Considerable evidence has been demonstrated that mitigating circumstances such as the

troubled criminal justice system and staffing shortages beyond the County's control, has prevented the County from attaining full compliance notwithstanding good faith efforts.

## CONCLUSION

Cognizant of the heavy burden which a complainant must carry in a contempt proceeding, this Court finds that there has not been a sufficient showing of contempt by the United States.  The County has made substantial progress in establishing those requirements memorialized in the Consent Decree.  Furthermore, the County is acting in good faith in using the limited resources it has to attain compliance while making efforts to achieve better practices within its Detention Services.

Respectfully submitted this the 11th of December, 2019.

/s/  Anthony R. Simon_____
ANTHONY R. SIMON, MSB # 10009

/s/Claire Barker_____
CLAIRE BARKER, MSB # 101312

OFFICE OF THE BOARD ATTORNEY
316 SOUTH PRESIDENT STREET
POST OFFICE BOX 686
JACKSON, MISSISSIPPI 39205-0686
OFFICE:        601-968-6797
FACSIMILE:    601-948-1003

CLAIRE BARKER, LEGAL COUNSEL,
HINDS COUNTY SHERIFF DEPARTMENT
407 E PASCAGOULA STREET
JACKSON, MS 39205-0686
OFFICE:        601-974-2900
FACSIMILE:    601-968-6705

**CERTIFICATE OF SERVICE**

The undersigned certifies that he has this day electronically filed the foregoing document with the Clerk of the Court using the Court's electronic filing system (ECF), which sent notification of such filing to all attorneys of record.

Respectfully submitted this the 11th day of December, 2019.

/s/ Anthony R. Simon
ANTHONY R. SIMON, MSB # 10009


/s/Claire Barker
CLAIRE BARKER, MSB # 101312