```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3


 4    UNITED STATES OF AMERICA                      PLAINTIFF

 5    VERSUS                     CAUSE NO. 3:16-cv-00489-CWR-JCG

 6    THE HINDS COUNTY BOARD OF SUPERVISORS,
      HINDS CO. SHERIFF VICTOR MASON, ET AL.        DEFENDANTS
 7

 8

 9              SETTLEMENT CONFERENCE PROCEEDINGS
            BEFORE THE HONORABLE CARLTON W. REEVES,
10             UNITED STATES DISTRICT COURT JUDGE,
                     DECEMBER 16, 2019,
11                  JACKSON, MISSISSIPPI

12

13

14
      APPEARANCES:
15
      FOR THE PLAINTIFF:      SHELLEY R. JACKSON, ESQ.
16                            CHRISTOPHER N. CHENG, ESQ.
                              SARAH TERESA RUSSO, ESQ.
17                            AARON FLEISHER, ESQ.
                              MITZI D. PAIGE, ESQ.
18
      FOR THE DEFENDANTS:     PIETER TEEUWISSEN, ESQ.
19                            ANTHONY R. SIMON, ESQ.
                              CLAIRE BARKER, ESQ.
20

21
      REPORTED BY:
22
          CANDICE S. CRANE, CCR #1781
23        OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi  39201
          Telephone:  (601)608-4187
25        E-mail:  Candice_Crane@mssd.uscourts.gov
```

1           **IN OPEN COURT, DECEMBER 16, 2019**

2

3        THE COURT:  You may be seated.

4        MR. CHENG:  Good morning.

5        THE COURT:  Good morning.

6        MS. BARKER:  Good morning, Your Honor.

7        THE COURT:  Good morning.

8        MS. BARKER:  First of all, my apologies extended to the

9  Court and also to the Department of Justice for being a little

10  late in this matter.  I know that the Court extended us the grace

11  period to 9:45 to get authority from the board.  However, I

12  believe I sent an e-mail a minute ago stating that it was a little

13  bit more contentious matter than normal, and the board had a lot

14  of questions.  However, a vote was taken --

15        THE COURT:  Hold on.  Let me call the case.  I have not

16  even called the case yet.

17        MS. BARKER:  You're right.  I just wanted to extend my

18  apologies to the Court.

19        THE COURT:  This is *United States versus Hinds County*

20  3:16 CV-00489.

21        Who is here for the Department of Justice?

22        MS. JACKSON:  Good morning, Your Honor.  I'm

23  Shelley Jackson, here for the United States.

24        THE COURT:  Make sure you're speaking into the microphone

25  for the benefit of the court reporter.

1          MS. JACKSON:  Thank you.  Shelley Jackson representing the

2     United States, Your Honor.

3          THE COURT:  All right.  Okay.  Thank you.

4          MR. CHENG:  Christopher Cheng with the justice department.

5          MS. PAIGE:  Good morning, Your Honor, Mitzi Dease Paige,

6     US Attorney's Office, Jackson, Mississippi.

7          MR. FLEISHER:  Aaron Fleisher on behalf of the United

8     States.

9          MS. RUSSO:  Good morning, Your Honor, Sarah Russo on

10    behalf of the United States.

11         THE COURT:  And who is here for the county?

12         MR. SIMON:  Good morning, Your Honor.  Anthony Simon on

13    behalf of the county.  And the board attorney, Pieter Teeuwissen,

14    is still participating in the board meeting with the board of

15    supervisors right now, and he will be coming over just as soon as

16    they finish.

17         THE COURT:  Okay.

18         MS. BARKER:  Good morning, Your Honor, Claire Barker on

19    behalf of the Hinds County Sheriff's Office.

20         THE COURT:  The purpose of this matter was to begin the

21    hearing on the Government's motion for contempt.  And the Court

22    learned that the parties were working on trying to reach an

23    agreement that might dispose of a full hearing on these issues.

24    That's my understanding, that that agreement was presented to the

25    Hinds County Board of Supervisors at this morning's meeting and

1  that the board at least has, I assume, agreed to the order that --

2  or to the agreement.

3       MR. SIMON:  That's correct, Your Honor.  The board voted 4

4  to 1 to approve the stipulated order with the settlement with the

5  Department of Justice.

6       THE COURT:  All right.  Now, obviously, because this is a

7  consent decree that affects this litigation, obviously the Court

8  is the one that has the final authority on approving.  When we

9  talked about this possibility of the government's resolving this

10  dispute, I indicated to the parties that I have not seen anything,

11  and the parties were reticent about the Court even seeing anything

12  before it got submitted to the board because I would be a finder

13  of fact -- as I recall since I would be a finder of fact and have

14  to hear the issues with respect to the contempt matters, then I

15  assume that's why it was not -- any proposal was not shared with

16  the Court on the front end.

17       It's still my obligation, I believe, to see if the

18  agreement meets what this Court desires for it to meet and so we

19  may be having at some point a fair -- some type of hearing because

20  I need to figure out if what the United States proposes and what

21  the parties have agreed to satisfy me.  In reading the proposed

22  findings of fact that the parties submitted, I do have questions

23  because the United States expressed its concerns through its

24  proposed findings of fact, and the Hinds County has expressed why

25  it should not be found in contempt.  And it -- and I take it

1    that -- again, I have not seen the proposal, but I suspect that

2    the proposal might be centered around the limited relief that the

3    United States has sort of set forth in Paragraph 39 of its

4    conclusions of law; and if that is the case, I do have questions.

5            Ms. Jackson?

6            MS. JACKSON:  Thank you, Your Honor.  Your Honor is

7    correct.  The parties negotiated and will be presenting to the

8    Court, as soon as we can sign it and properly file it, a

9    stipulated order that is focused on the areas of the United

10   States' motion for contempt.  However, the stipulated order is

11   designed by the parties to be additional specific relief.  It does

12   not replace the Court's original consent decree back from 2016.

13           Our goal was to provide some shorter term and longer term

14   steps that the defendants could take to further their compliance

15   with the original order.  The proposed stipulation provides for

16   continued involvement by the monitors and by the United States in

17   a number of areas, and it provides for the parties to reconvene

18   with the Court in a year to tell you where we are.

19           It also provides that we would continue the self-reporting

20   and the periodic conferences that we have been having with the

21   Court about compliance issues since the matter was issued or since

22   Your Honor became the presiding judge.

23           THE COURT:  You mentioned self-reporting.  I'm highly

24   concerned about the self-reporting because the county has failed

25   miserably over the last year since I've been involved with -- with

1    reporting things that should be reported.  The -- the motion, the

2    proposed findings submitted by the United States suggest that

3    there's so much information that is not being provided even on

4    reports that are required, incident reports.  We know, for

5    example, that there have been incidents that have occurred with

6    detention officers and prisoners that went unreported.

7         MS. JACKSON:  Your Honor, that's correct.

8         THE COURT:  And stayed unreported.  In fact, there's a

9    criminal investigation that was simply jump started because the

10   Court mentioned something, and that was less than 60 days ago on

11   something that occurred some time ago.

12        I think the United States proposed findings suggest that

13   there is other evidence of -- of things that are not being

14   reported.  I mean, the documents can't be trusted on the

15   self-reporting thing, so I would want to know what does this

16   stipulated order do about this self-reporting thing?

17        MS. JACKSON:  Thank you, Your Honor.  The stipulated order

18   also provides for the continued involvement of Ms. Simpson and her

19   team in monitoring the agreement and in continued involvement of

20   the United States.

21        THE COURT:  I understand that.  Ms. Simpson has been

22   involved since -- I've been involved since January.

23        MS. JACKSON:  Yes, Your Honor.

24        THE COURT:  On some of the incidents, for example, one in

25   particular had a corresponding video with the incident.  That

```
 1   incident does not sort of -- the report does not reflect what we
 2   see on the video.  That's one thing.  Ms. Simpson was not even
 3   informed that the video existed, I don't think.  That's another
 4   thing.  Again, that's self-reporting.  That's a real problem.  If
 5   we're going to have to rely on what the county tells us about how
 6   they're doing things in there, can we trust any of it as far as
 7   self-reporting goes?
 8            And having Ms. Simpson and Mr. Parrish and all the other
 9   monitors coming through every other month or every two or three
10   months or quarterly and us having the status hearing for the last
11   year that I've been -- the last 11 months that I've been involved.
12   Again, can the data be trusted?
13            Is there any way we can make sure whatever the county
14   tells us on any or all these things is the truth?  And if it's not
15   the truth, how does the proposed stipulated order deal with that?
16            MS. JACKSON:  Your Honor, I think all that I can tell you
17   is our view is that, as Your Honor knows, there's new leadership
18   coming in on the board and the sheriff.  We would hope that the
19   county's vote this morning is a reaffirmation of the understanding
20   of the seriousness of this issue, and that we are going to be very
21   vigilant, as we have been, in trying to enforce every aspect of --
22   of the order, the substantive aspects of it and the procedural
23   aspects in terms of communication between the parties, reporting
24   between the parties.
25            THE COURT:  When this case was reassigned to me in January
```

1    of 2019, I think I convened -- I ordered the parties to come

2    forward and had a status conference to let you all know that I

3    would be taking a central focus in making sure that this case

4    moves along as it should, and I expressed concern.

5         We had another status conference here after the monitor

6    submitted their next report.  I expressed a concern, board members

7    were here I think, or at least board employees were here, and the

8    sheriff may or may not have been there.

9         I took it upon myself to go to the facility itself back in

10   August.  Again, since then, even since then, even after I have

11   notified the county and the United States the importance of this

12   case to me and the interest that I took in it and how I was so

13   concerned about some of the matters, there's still stuff that was

14   left out of the self-reporting.  And that's a -- there are other

15   things.  There are other things, too.

16        It's my understanding that facility-wise when I was there

17   in August, I was given some assurance that one of the pods would

18   be repaired within -- I think I asked them, please, I'll give you

19   more than what you're requesting.  I think they told me four

20   weeks.  I said, I'll give you six.  I'll give you eight.  I'll

21   give you whatever time you need.  Has it been done yet is the

22   question that I have today.  Has it been done yet?

23        MS. JACKSON:  My understanding is it has not, Your Honor.

24        Is that correct, counsel?

25        MS. BARKER:  It's my understanding that it has not been

1    renovated to the satisfaction of our jail administrator or the

2    sheriff's office.

3         THE COURT:  Well, that means it has not been done if it

4    hasn't even been done to the satisfaction of the jail

5    administrator.

6         MS. BARKER:  You're exactly right, Your Honor.  There are

7    no inmates housed in it, and I do think this settlement agreement

8    addresses both of those issues.  I think that for the first

9    time -- I don't know, I'm speaking on behalf of the sheriff's

10   office -- that we are finally at a place where we are -- we can

11   actually get some headway with this order.  And I realize that we

12   entered into the consent decree in 2016, and we should have had

13   all this done within two years.  However, this settlement

14   agreement specifically addresses the maintenance issue.

15        The maintenance issue is that there have been some

16   less-than-qualified individuals doing the work on behalf of the

17   county in C-POD.  This settlement agreement specifies that a

18   qualified contractor in corrections has to do the work.  I think

19   that that ensures that -- it ensures that there's no more taxpayer

20   waste.  Because if you go over there right now, you're going to

21   ask where and how much money -- taxpayers' funds -- were put in on

22   this because the level of the work is subpar, and it's going to

23   fall apart again.

24        I think the United States has been very -- we've worked

25   together very well in coming up with some actions to ensure

1    against that.  Additionally on the self-reporting, the sheriff's

2    office concedes, yes, there has been a problem with that.  This

3    settlement agreement specifically addresses within five months

4    that we're going to have training on dealing with use of force,

5    the reporting, the reporting for medical, and also the

6    investigations.

7         Now, yes, the Court may say that's already in the consent

8    decree.  What this is, is more specific relief to get us going in

9    the right direction, because as Your Honor knows, we've said this

10   for the past two years, I think.  We've been doing the best we can

11   with the resources that we have.  This is a huge, huge

12   undertaking.  And whenever we have limited resources and we're

13   trying to pour all those resources into all 92 sections of the

14   consent decree, we're getting nowhere.

15        So this is what this stipulated order does is help get us

16   in the right direction, help us get some traction, and I have to

17   say I have to thank Sheriff-Elect Vance for being here.  You're

18   going to see a very, very different sheriff's office coming into

19   this, and I have confidence in that.

20        THE COURT:  How much training does one need to tell

21   employees this is the form that you must fill out when this type

22   of situation happens?  When use of force is used against an

23   inmate, I need the person -- and I don't know what the policy is.

24   I need the person who committed the force and another officer to

25   fill out a form.

1        MS. BARKER:  And I think that has been a problem, Your

2    Honor.  We've been going back and forth on the use-of-force

3    policy, so there hasn't been a straight -- you know, here is this

4    policy; do A, B, C, and D.  So in the same vein of that, we also

5    have a portion on the policies and procedures and how to

6    streamline that to get it done expeditiously.

7        And so I think that on both sides -- and I don't want to

8    speak for the Department of Justice.  They'll probably refute

9    this.  But as far as use of force, there have been some problems

10    because none of the parties can agree to an actual policy.

11        THE COURT:  What policy do you have in place when the

12    Court first learned of the inmate who might have been criminally

13    violated and nobody had even reported that to the DA's office, to

14    the attorney general's office, to law enforcement, to the

15    Department of Justice, and only when the Court mentioned it --

16    only when the Court mentioned it was it referred to DOJ for an

17    investigation.  And you had somebody being beaten, allegedly, by

18    an officer or officers and witnessed by officers, and there was no

19    report done.  It only came up because we were talking.  So -- so

20    how much training does one need?

21        It seems to me that persons are afraid to tell on each

22    other, or that that's the common way of doing things to discipline

23    people there and do nothing about it and that, obviously, people

24    in leadership -- not obviously, but one can lead to the conclusion

25    that people in leadership were accepting it.

1          MS. BARKER:  The only thing I can respond to that, Your

2     Honor, is that leadership is changing.  I'm not excusing that

3     behavior.  I am not representing to the Court that it was proper

4     in any manner.  However, we will have a new administration, and

5     you will see a new sheriff's office going forward.

6          MS. JACKSON:  If I may, Your Honor, on the use-of-force

7     issues, the settlement -- the proposed stipulated order does

8     include some provisions about increasing staff accountability for

9     complying with use-of-force requirements.  So, for example, within

10    30 days the stipulated order requires that the jail will ensure

11    that hand-held video recorders are available, that planned uses of

12    force are recorded.  Within five months, the settlement agreement

13    provides for additional training in settlement compliant

14    use-of-force policies and that supervisors be trained on

15    use-of-force reviews, so that the collection of information, the

16    preservation of videos of witness statements, of medical reports,

17    that that kind of thing does occur.  So we did try to respond to

18    those concerns that Your Honor so appropriately raised.

19         THE COURT:  Have the parties -- do the parties know --

20    well, is there any system in place that keeps track of those

21    offenders -- that's what your housing there, and alleged offenders

22    I guess -- the number of escapes that you have?  Do the parties

23    know?  Is there -- is there an account of how many reports of

24    escapes are recorded on a weekly, monthly, yearly basis?

25         And the second question is -- again, it's all about

1    self-reporting.  The second question would be are those numbers

2    accurate?  I'm not talking about people who escape and permanently

3    are gone or gone for more than 24 hours.  I'm talking about every

4    escape that is done, whether the person, once they breach the

5    premises and might be returned by any law enforcement officer in

6    Raymond, Clinton, Madison, or from wherever, Highway Patrol,

7    Department of Public Safety, or by whomever it is.  Do we know the

8    number of escapes?  Clearly there are people who leave and go

9    back, pick up contraband, and do other things.  They leave and go

10   back.  Do we know the number of people who breach the premises --

11   that's what I'm calling it -- who get out of the secured area, do

12   we know what that number is on a daily, weekly, monthly basis?

13            MS. JACKSON:  Can I have a moment?

14            THE COURT:  Yes.

15            MS. JACKSON:  Thank you, Your Honor.  My colleagues inform

16   me that we don't have any specific tracking of that type of

17   occurrence in the way that Your Honor is describing.  We would

18   know about it when we get notifications through instant reports

19   of, you know, specific things that occur, and this incident

20   report, you know, could be an escape and a return.  It could be

21   some other problem.  But there's no specific data collection to

22   us, is my understanding, about people who escape and return as

23   Your Honor has described.

24            THE COURT:  So Ms. Simpson raised her hand, and I know

25   she's the monitor who -- Ms. Simpson, could you come forward,

1    please?

2         MS. SIMPSON:  Thank you, Your Honor.  And I know

3    Synarus Green is also in the courtroom and is very familiar with

4    the reporting.

5         Starting last spring, the IT department of the sheriff's

6    office developed a system where incident reports are pulled into

7    an Excel spreadsheet, and certain fields from those reports are

8    populated in the Excel spreadsheet.  One of the fields is "type of

9    incident," and "escape" is one of the types of incident in the

10   drop-down menu.  So that can be pulled into the Excel spreadsheet

11   and sorted as to show you all of the escapes in whatever timeframe

12   you set for the reporting period.  So there is a way of looking

13   and sorting the Excel spreadsheet to determine how many escapes in

14   a certain timeframe.

15        What doesn't exist, and what we've requested as a

16   modification to the incident report, are some additional

17   drop-downs so that the escape is broken up into two categories.

18   One, those who escape completely, and those who are just going out

19   to pick up contraband and come back.  All of those go under the

20   heading of "escape."  So right now, the system can't separate out

21   those two types of escape.

22        We have requested that that modification be made.  And

23   Mr. Parrish does -- and I both review all the incident reports and

24   do look at the escapes to determine which of those categories they

25   are.

1        The actual escapes, what we would think of as escapes,

2   people leaving the premises, are actually very few.  We don't have

3   that figure here today, but it's probably around two in the time

4   period that we've been involved, so...

5        THE COURT:  Who left the premises permanently?

6        MS. SIMPSON:  Yes.  It's --

7        THE COURT:  It used to be a systemic problem.  You mean to

8   tell me that doesn't exist anymore?

9        MS. SIMPSON:  We don't see that very often.  Most often

10  they leave the building, go to the perimeter fence, pick up

11  contraband, and go back into the building.

12       THE COURT:  And when those -- when something like that

13  would occur, you would expect -- or would you expect some sort of

14  investigation to be done?

15       MS. SIMPSON:  Yes.  Escape is, of course, a crime, and so

16  there should be both an internal investigation as well as a

17  referral for investigation by police or district attorney.

18       THE COURT:  And do your records -- did you receive records

19  of what follow up is done on situations like those?  And even in

20  the other situations that -- where you said crimes have occurred?

21       MS. SIMPSON:  Right.  We do receive the investigation

22  reports from the jail.  We do not get investigation reports from

23  the police department or the district attorney.

24       THE COURT:  Or the sheriff's department.  I assume the

25  sheriff's department would be the one who would do them?  I mean,

1    I assume the detention center is within the purview of the

2    sheriff's department and maybe not the City of Raymond.

3          MS. SIMPSON:  That's right.

4          THE COURT:  Okay.

5          MS. SIMPSON:  That's right.  And we don't routinely get

6    investigation reports from the patrol side of the sheriff's

7    department, but we do from the detention side.

8          THE COURT:  Okay.  Thank you, Ms. Simpson.

9          MS. JACKSON:  Your Honor, if I may?

10         THE COURT:  Yes, you may.

11         MS. JACKSON:  I wanted to stress to the Court that in this

12   process what the parties attempted to do in the stipulated order

13   was to focus on the things that collectively we thought were of

14   the greatest concern:  The locks not working, so repairs to the

15   physical plant.

16         Staffing enhancements, the creation of a staffing plan,

17   better use of staff, recruitment, and retention.

18         A master plan on the physical plant side for the use of

19   all facilities in the court system.

20         As counsel alluded to, a process for the accelerated

21   development and adoption of policies and procedures.

22         Population management and improvements in the programming

23   and services provided to youthful prisoners who are now at the

24   Henley-Young facility.

25         The stipulated order contains enumerated specific dates

1    for compliance.  It contains a provision that implementation of

2    plans and policies and procedures be approved by the United States

3    and the monitors.  It contains specific requirements for plans

4    that the order requires, for example, the master plan for the use

5    of facilities that the -- those plans include deadlines, who's

6    responsible, and how it's going to be paid for.

7           So we did try to focus on those things that the parties

8    agreed were of highest priority.  Perhaps what Your Honor might

9    want to do, respectfully, if we could request, is if the parties

10   can sign and file the matter, and Your Honor can review it and

11   perhaps we can discuss it later today if you have time.

12          THE COURT:  Oh, we got the whole week.  I set aside the

13   whole week for this matter here.  Like I suspected, Paragraph 39

14   suggested to me that those were -- would be the priorities that

15   the United States would be focused on, because that's what you put

16   in Paragraph 39 of your conclusions of law, addressing the most

17   serious and time-sensitive areas, which you just expressed I

18   think.

19          But when I was reviewing all this, one of the things that

20   came to my mind was the lack of reporting, the false reporting.  I

21   mean, it's in your proposed findings in Paragraph 22 and 23 of not

22   documenting video reviews or not taking witness statements.

23          Paragraph 37, none of the jail facilities meet the

24   settlement required that well-being checks be conducted every

25   30 minutes in general population units.  Defendants acknowledge

1   that staff do not document rounds consistently, and some rounds

2   are documented before even being conducted.  In other words,

3   that's a false report there.

4           MS. JACKSON:  Yes, Your Honor.

5           THE COURT:  And my concern is that it's these simple

6   things that cause the pretrial detainees to be hurt.  It is

7   what -- I mean, if you're not doing the 30-minute check and you're

8   lying about it that leads to what we saw on the video.

9           MS. JACKSON:  Your Honor's correct.  Our hope is that, or

10  intent, is that with, for example, some of the staffing

11  enhancements contemplated in the stipulated order that, for

12  example, people will be there to do the checks that have not been

13  done to date.  So that's one example of something that we're

14  hoping to get at through staffing.

15          We are hoping through the policies and procedures to get

16  at some of the other things Your Honor is talking about.  We --

17  it's just occurring to us as a team here on the fly somewhat, but

18  Your Honor could ask the parties to report directly to you or the

19  United States if we became aware of a failure to do the type of

20  reporting that's contemplated by the original settlement

21  agreement.  We could amend the order perhaps, if counsel would

22  agree to, or Your Honor could order that sua sponte, because we'd

23  have to get approval on our end to have, you know, more frequent

24  reporting to you if we become aware that the self-reporting that

25  we think is going to occur is not, in fact, occurring.

1      THE COURT:  Has anybody been killed in the jail since

2  January 2019?

3      MS. JACKSON:  Oh, since 2019?  I think the answer is no.

4      THE COURT:  But many have gone to the hospital because of

5  injuries since January 2019.  That's a true statement; right?

6      MS. JACKSON:  Yes, sir.

7      THE COURT:  And I think somewhere in the proposed findings

8  as many 12 to 14 people on average a month are going to the

9  hospital?

10      MS. JACKSON:  I believe that's right, at least for a time

11  period that we covered, I think, in the summer and fall.

12      THE COURT:  And was that 2019?

13      MS. JACKSON:  Yes, sir.

14      THE COURT:  And when I was here -- and I know you were

15  not, Ms. Jackson, because this is my first time seeing you I

16  think.  I don't think you were here whenever I had that first

17  hearing and the second hearing, told the parties if this

18  settlement agreement is going to be up under the Court's

19  supervision, the last thing I wanted to hear is that somebody got

20  hurt while under the Court's supervision.  That somebody got

21  killed.  That somebody got hurt to the point -- because that's

22  under my watch.  And I expressed that strong concern back then,

23  but I guess they tell me, "So what if it's under your watch?"

24      MS. JACKSON:  I don't think that's the United States'

25  position, Your Honor.  I think that what we're trying to do here

1    is to establish an improved process, shorter timeframes, more

2    specific relief, so that it doesn't happen under anyone's watch.

3            I was not a member of the team when Your Honor made those

4    statements in court, but in the little bit of time that I've been

5    on the team, I've heard Your Honor say that in telephonic status

6    conferences with the parties.  And we do take that very seriously.

7    We would not have filed --

8            THE COURT:  No, no, I --

9            MS. JACKSON:  -- the motion for contempt if we didn't, and

10   we wouldn't have --

11           THE COURT:  I'm not -- I'm sorry, Ms. Jackson.  I'm

12   cutting across you and we're talking at the same time.  And I warn

13   witnesses about that all the time.  I apologize.  You may complete

14   your thought.

15           MS. JACKSON:  Thank you, Your Honor.  I think I would just

16   say that we wouldn't be here as the United States proposing this

17   relief if we didn't think it was a way to address the things of

18   the biggest concern and if we didn't think it would work.

19           THE COURT:  Okay.  And my thing is I was not accusing the

20   United States of not being concerned.

21           MS. JACKSON:  Thank you.

22           THE COURT:  I know I was looking at you, but obviously

23   what happens in the detention center is the county's problem.

24   What happens with staffing, what happens with conditions there,

25   that's on the county.

1          You might not even need policies and procedures for

2   certain things.  You shouldn't.  Just don't violate these people's

3   constitutional rights.  Don't subject them to criminal activities.

4   If they are subjected to criminal activities, report it.

5          I mean, it seems simple to me.  Now, I'm not a

6   criminologist.  I'm not a penologist.  I'm not a jail expert in

7   that.  That's why we have the monitors and stuff to provide to the

8   Court those things that the Court ought to be concerned.

9          And those monitor reports that I have seen since January

10  have been illuminating, and they've been more or less consistently

11  the same and nothing seems to be done differently from report to

12  the next report.

13         And I know I have spent a lot of time looking in this

14  direction, and I should probably be looking over to the county in

15  that regard.  So I'm willing to -- you know, obviously the parties

16  have a settlement agreement that I have not seen.  The -- I think

17  when we were on the telephone conference, I think I at least made

18  some suggestion that -- you know, I don't know what the board

19  agenda was.  I don't know if the meeting could have been

20  expedited, I realize, or could there have been a called meeting

21  just for the purpose of the agreement.  That call meeting did not

22  occur.  Maybe it could not have occurred statutorily or feasibly.

23         But there was a request to delay for a period of time the

24  hearing in this matter so that you could get board approval, and

25  now that board approval -- because the only way the county acts is

1    through its minutes, and so it's on the minutes now.  It has been

2    approved.  The parties should formalize it in a way where it gets

3    to the Court, so that the Court can review it.

4         And I will review it, and I will obviously be looking at

5    those areas that the parties believe that the Court ought to be

6    focused on, those areas that are time sensitive and most serious,

7    as the United States has put in its proposed conclusions of law.

8         Obviously the malfunctioning of the locks, that's

9    something we talked about when I was there in August.  I know

10   there was this outfit out of Texas that had been, I thought,

11   retained to do something about the swinging doors or about

12   something.  And I think since then, I guess at the last telephonic

13   conference, we learned that even one of the pods that had an

14   operating door, that that door no longer is operating because it's

15   been welded shut.  I don't understand that.

16        If -- if my memory -- if my memory is wrong about the

17   conversation, please let me know, because I may be operating under

18   a false assumption.  And if I'm operating under a false

19   assumption, please correct me.

20        MS. JACKSON:  Your Honor is not operating under a false

21   recollection.  That was a statement that was made in our

22   telephonic hearing.  We're trying to address the physical plant

23   things first through, as Ms. Barker said, trying -- requiring that

24   the county use a qualified security contractor, that an architect

25   be involved in that process, that the architect conduct periodic

1    inspections of the contractor's work.  So the parties attempted in

2    the stipulated order to tighten up some of what's going on there

3    so that we could better address the concern that Your Honor

4    expressed and that the parties should.  The order is quite

5    specific about C-POD at Raymond, Your Honor, for example.

6         THE COURT:  Does -- one of the things that has been

7    consistent throughout the monitor's report -- and I assume this

8    is -- again, relates to something that's most serious and time

9    sensitive and deals with plant deficiencies.  By now, do we know

10   if there's an operational sprinkler system or some -- some fire

11   safety inspection that has been done and approved or certified by

12   the appropriate officials in that regard?

13        We've had -- I'm going to go back and find the case, but I

14   think in the early 1980s down on the Gulf Coast, Mississippi Gulf

15   Coast, there was a fire in the jail in Pascagoula, Jackson County

16   or Harrison County, and I think people were killed.  Again, stuff

17   that should not be tolerated in a civil society.  Do we know if we

18   have a fire protection system in place at this -- I mean, we're

19   housing 400 inmates or -- I don't know, 475 inmates or more?

20        MR. SIMON:  That's correct, Your Honor.  That's for all

21   facilities, Your Honor.

22        THE COURT:  For all facilities?  Okay.  Thank you,

23   Mr. Simon.  We're housing more than 50 in one place with no fire

24   safety code things, and I assume what the parties are submitting

25   to me will help address that area, too.

1        MS. BARKER:  Yes, I think it does, Your Honor.

2        THE COURT:  And the reason why --

3        MS. JACKSON:  Your Honor, the order requires that the

4   county will reinstall fire hoses as part of the renovation of the

5   pods.

6        MS. BARKER:  And it stipulates within four months, Your

7   Honor.

8        THE COURT:  And until then if a fire breaks out --

9        MS. BARKER:  From what I understand as being represented

10  to me by my client is that it is scheduled, hoses are scheduled to

11  be installed in the premises.  An exact date, I do not want to

12  misrepresent anything to the Court, but I do not know.  But I

13  share Your Honor's concern.

14       MR. SIMON:  Your Honor, --

15       THE COURT:  Yes.

16       MR. SIMON:  -- may I address one matter along the lines of

17  Ms. Jackson on behalf of the county?

18       THE COURT:  Yes.

19       MR. SIMON:  We mentioned in court today, but we haven't

20  focused on it enough, but we believe we need some type of project

21  manager.  The architect that Ms. Jackson referred to, there have

22  been repairs -- and my clients are frustrated because there has

23  been a lot of money spent attempting to make repairs at the

24  facility.  But we feel that there's a need for a project manager,

25  someone with knowledge, and someone that can coordinate all of the

1    renovations and things there, and that's what's so important.

2         Ms. Jackson mentioned someone at an architectural firm.

3    We had some experts that had had experience with this in the past,

4    and they recommended someone in an architectural firm who had

5    experience in building jails and detention facilities would be a

6    good person as a project manager to come in and oversee the

7    renovations.  And I can tell you the county agrees with that, and

8    we believe that there is a need for a person in that position to

9    coordinate all the renovations at the detention facility.

10         THE COURT:  Do the parties, in what they've determined is

11   most serious -- and I want to use the Government's words at

12   Paragraph 39.  I think it's time sensitive and most serious -- I

13   want to use your language, "most serious and time sensitive, most

14   serious."  Do the parties, the county, in its proposed findings,

15   acknowledge that persons are staying within the facility much

16   longer here than in most places on average, and I think the

17   county's, I think, suggested -- I forget the exact number.  The

18   national length of a jail stay, according to Page 21 of the

19   county's proposal, is 25 days.  Hinds County's average length of

20   stay is roughly 54 days or more.

21         Does the proposal address how the county should move these

22   people through the system?  Because I see who is absent from here,

23   and I'm not sure -- I think the district attorney has been here

24   once, I think, in the last year.  And I know there's a criminal

25   justice coordinating committee or something to that effect, but

1    does the agreement that the parties reached attempt to address

2    that?  Because there certainly is no need -- again, this is a

3    jail.  A jail is for temporary housing.  It's bad enough the state

4    supreme court says that your statutory speedy trial right is

5    270 days, so you can sit nine months without an utterance of being

6    found in violation of a statutory right to a speedy trial.  But

7    does the -- does the agreement that the parties reached attempt to

8    address that?

9        MS. JACKSON:  Yes, it does, Your Honor.  There's a section

10   in the proposed stipulated order about population management, and

11   it includes the development of a pretrial services program that

12   will provide for long-term population management.

13       There are steps that the county needs to take as soon as

14   four months including retaining a consultant who is experienced in

15   this area, hiring a full-time person who is qualified to oversee

16   the development and implementation of a pretrial services program,

17   providing technical support for the implementation of a risk

18   assessment instrument for pretrial release decision-making, and

19   authorizing training at the National Institutes of Corrections for

20   pretrial executives for individuals who are involved in the

21   development of this program.

22       In addition, as Your Honor may recall, Ms. Simpson has

23   been particularly involved in this aspect of implementation

24   including the CJCC, which Your Honor mentioned.  Those efforts

25   will be ongoing.

1       THE COURT:  Now, I presume that something has been in

2   place, because the population has dropped tremendously since this

3   order was first entered into through Judge Barbour back in 2016.

4   I think the population has dropped dramatically for whatever

5   reason.

6       Does that have anything to do with people being actually

7   moved through the system?  I mean, you talk about hiring a person

8   to do a risk assessment analysis, but I would imagine the judges

9   do that every day at the detention hearing or at the defendant's

10  preliminary hearing or when there is a request for bond for a

11  particular defendant.

12      They look and see if the defendant -- you know, if this is

13  a person whose -- they look at the crime charged.  They look at

14  what is the characteristics of that particular defendant.  They

15  set a bond that the defendant can make, if he's -- if he or she is

16  entitled to bond.  I mean, is that person a safe, suitable person

17  to go back into the community and who will show up for his or her

18  next court appearance?

19      That's assessments that the county court judge or the

20  circuit judge does every day, and then it's left up to the state

21  authorities to make sure that these people go through the

22  particular process.  I mean, if they're on a bond -- or whether

23  they're on a bond or not, they get a trial date, and then you sort

24  of proceed with making sure that that matter goes to trial as

25  opposed to a continuance.  And if it's a continuance, why it might

1    be necessary.  And, again, if there are reconsiderations even

2    after that point on bail conditions, to get that done, is that

3    what this new risk assessment person might do?

4          MS. JACKSON:  No, Your Honor, and I think if I could get

5    some assistance from Ms. Simpson, maybe she can answer the Court's

6    questions more specifically than I could about this.

7          THE COURT:  That would be fine.

8          MS. SIMPSON:  Thank you, Your Honor.  Actually the system

9    that is contemplated by the settlement order is somewhat similar

10   to the system that exists in the federal system.  The risk

11   assessment analysis is actually the use of a risk assessment tool.

12   The most notable one these days is considered to be the public

13   safety assessment, which was developed by the Arnold Ventures

14   Foundation, and most jurisdictions that adopt a risk assessment

15   tool find that many of the people in their jails are actually very

16   low-risk people.  And not only do they not need to be in the jail,

17   but by virtue of being in the jail, they increase their risk of

18   recidivism dramatically.

19         So the risk assessment tool is an analytic tool.  It's not

20   binding on judges, but it provides a very important piece of

21   information regarding taking all of those things that Your Honor

22   mentioned and putting them in a statistical tool to predict what

23   the risk of failure to appear is and what the risk of future

24   criminal activity is, and they have generally been tested and

25   found to be very reliable and typically much more reliable than

1    subjective judgment.  But, again, they're not binding, but they

2    provide that piece of information.

3         And as I said, most jurisdictions that have moved to that

4    risk assessment tool have found that they have a lot of low-risk

5    people in their jail that don't need to be there.  And then in

6    addition to adopting this risk assessment tool, the idea is to

7    actually create a pretrial program, again, much similar to what

8    the federal system has in that you have pretrial supervision

9    officers who are there to provide supervision when in the

10   community.

11        And so for the low-risk people, one anticipates that the

12   effort is made even if they can't make a financial bond to get

13   them out of jail.  For moderate-risk people, the effort is made to

14   get them out of jail but under supervision, so that the only

15   people you're using your most extensive resources for are your

16   high-risk people.  So it's a process to move towards that system,

17   and most jurisdictions find as they do that they typically reduce

18   their jail populations significantly.

19        THE COURT:  Would that require that the county hire more

20   people?  I mean, because they have probation officers already;

21   right?

22        MS. SIMPSON:  So, typically, the state has the probation

23   officers.  The -- currently the county spends a significant amount

24   of money on electronic monitoring, so their -- really, their only

25   form of pretrial supervision is electronic monitoring, which is an

1    extremely expensive form of pretrial supervision and not actually

2    shown to be very effective.

3         THE COURT:  Isn't the county making most of these people

4    pay for the electronic monitoring?

5         MS. SIMPSON:  I believe they do, but many of the

6    individuals are indigent and the county pays -- I understand that

7    this fiscal year budget, or last fiscal year budget was $750,000

8    for the electronic monitoring the county paid.  So the idea would

9    be to hire, as the settlement order requires, a person that would

10   begin the process of creating a pretrial services program and to

11   contract with someone like J.M.I. to provide the consultation in

12   order to be able to do that, eventually moving savings from the

13   electronic monitoring program over to a pretrial services program

14   that would be less costly but also allow for the supervision of

15   additional people in the community.

16        THE COURT:  You mentioned that the electronic monitoring

17   has cost the county about $750,000.

18        MS. SIMPSON:  That's what's reported.

19        THE COURT:  And that is probably for persons like you

20   mentioned who are indigent.  Do we know how much the county has

21   made off of electronic monitoring?

22        MS. SIMPSON:  That, I don't know.  My understanding is

23   that it costs them, and they use private contracting companies.

24   So if a payment would be made, I would assume, although I don't

25   know, that it would go to the companies.

1          THE COURT:  And my question is -- yeah, I mean, if the

2    county is losing $750,000, who is making more than $750,000?

3          MS. SIMPSON:  The private companies is my understanding.

4          MR. SIMON:  I can address that, Your Honor, if you'd like.

5          THE COURT:  Yeah.

6          MR. SIMON:  The county has not made one cent off

7    electronic monitoring, and Ms. Simpson is right.  Last year the

8    county spent $750,000 with three vendors for ankle monitoring.

9    The county is in the process -- and that's the primary reason

10   there's been a reduction in population at the jail.  It hasn't

11   been because people are flowing through the system as we wish they

12   would.  It's because of the home arrest and home confinement that

13   the numbers have gone down in our facility.

14         But I can tell you that the county is moving quickly.

15   They have reduced the amount of inmates using ankle monitoring,

16   and the county is in the process of taking the home arrest and

17   home confinement inhouse.  So that the amount the county will be

18   spending on that in private vendors will drop dramatically, and

19   the county is in the process of taking the ankle monitoring

20   process using -- well, they put out our fee for these same vendors

21   to apply and they've all agreed to the same terms and rates.  But

22   the county is going to take control of that and take that inhouse,

23   and I believe that is expected to occur within the next three

24   months or so for that process to be complete.

25         THE COURT:  There are persons who are not indigent who are

1  paying, though, for the electronic monitoring; is that a true

2  statement?

3       MR. SIMON:  Paying Hinds County?

4       THE COURT:  No, no, paying as a condition of their bond.

5  You must have electronic monitoring, and if you can afford it, you

6  are going to pay for whatever it costs --

7       MR. SIMON:  That's correct.

8       THE COURT:  -- per month.

9       MR. SIMON:  That's correct.  They pay the vendor

10  themselves.  That's correct.

11       THE COURT:  Do we know what that amount is?

12       MR. SIMON:  I know it's an amount not to exceed $10.50 per

13  day is the contract they've entered.  So it should not exceed

14  $10.50 per day.

15       THE COURT:  So $350 a month basically?

16       MR. SIMON:  Yes, sir.

17       THE COURT:  And so if you're out ten months, that's

18  $3,000.  If you're out two years, that's $6,000, more than $6,000.

19       MR. SIMON:  That's correct.

20       THE COURT:  Okay.

21       MS. SIMPSON:  And, Your Honor, the goal of a standard

22  pretrial supervision program would be to minimize the use of

23  electronic monitoring and use standard supervision which is more

24  of a reporting process.

25       THE COURT:  Okay.  Again, thank you, Ms. Simpson.

1          MR. SIMON:  Can I mention one more thing, Your Honor?

2          THE COURT:  Yes, Mr. Simon.

3          MR. SIMON:  In an extension of what Ms. Simpson was

4    expressing, Your Honor asked about the criminal justice system.  I

5    am encouraged.  We have had two meetings with the district

6    attorney elect, and as everyone knows -- it's not a secret -- we

7    haven't had much cooperation with our current district attorney's

8    office in our criminal justice system, at least since I've been

9    representing Hinds County.

10         But I am encouraged based on the two meetings that we've

11   had with the district attorney elect.  He understands the problems

12   and issues that we have here, and I have no reason to doubt that

13   he will keep his word, that he is focused on moving folks through

14   the system.

15         And I know he's been meeting with our circuit judges in

16   Hinds County.  I have been encouraged with that, and we have two

17   new circuit judges as Your Honor knows.  And I am encouraged, and

18   I do truly believe that we will see more people going through the

19   system as they should once the new district attorney takes office.

20         MS. BARKER:  And, Your Honor, I would like to echo that on

21   behalf of the sheriff's office.  Sheriff-Elect Vance has -- we've

22   reached out to the incoming district attorney, and we are trying

23   to set up some sort of meeting, which is a huge step forward,

24   because we've not had that relationship with the district

25   attorney's office in the past.  So I am very encouraged by that

1    fact as well.

2              THE COURT:  Ms. Jackson?

3              MS. JACKSON:  Your Honor?

4              THE COURT:  Does the -- again, I'll see the report.  I

5    realize that.  But does the report address -- not the report, the

6    settlement agreement -- I think I heard you indicated retention of

7    employee staffing and retention.

8              MS. JACKSON:  Yes, Your Honor.

9              THE COURT:  Does it address who is ultimately -- I guess

10   I'm looking at Paragraph 77, 76, 77 of your proposed findings.  It

11   talks about the warden having been placed over the jail, but the

12   warden's decisions being overridden by the sheriff and replaced.

13   The sheriff replacing supervisors without regard -- I won't say

14   with specific defiance -- without regard to the existing

15   settlement agreement.  Does the proposed agreement sort of shore

16   up or solidify how and what can be done by whom in that regard?

17             MS. JACKSON:  I think that the way that we tried to get at

18   that, Your Honor, is to require -- as Your Honor may be aware, we

19   don't currently have an administrator who meets the requirements

20   of Paragraph 38 of the agreement, and so what we did is we are

21   requiring that the county hire somebody who does have those

22   qualifications.  There's a process for advertising.  There's a

23   process for what to do if after advertising for someone, there's

24   not an acceptable candidate, the parties coming back to the Court

25   to discuss that.

1          Our view was that a more procedural way of approaching the

2    issue as well as the other aspects of the agreement and at

3    retaining and bringing in more qualified staff and giving staff

4    more direction and support.  Our view was that that would be the

5    way to address some of those concerns at this time when we know

6    that the leadership of the sheriff's office is changing.

7          THE COURT:  And in that -- I'm sorry.  You need to

8    consult?

9          MS. JACKSON:  No.  I'm sorry, Your Honor.

10         THE COURT:  No.  No.  And in that regard the staffing has

11   been defined a real issue, and maintaining persons who are

12   qualified to do the particular job, I believe, in the county's

13   proposed findings.  I think they take the position that it's just

14   difficult to find anybody here who can do the job, number one, and

15   who will do the job, number two.  And they -- part of the reason

16   they contend, I believe, that they can't find anybody is because

17   people are so afraid to work out there.

18         Is the pay that they're getting there comparable to the

19   pay that people are receiving in the metro area in corrections,

20   whether it's for MDOC or Madison County or Rankin County?  I

21   realize Hinds County is different.  It is much bigger.  I realize

22   that.  But the Hinds County Detention Center is no bigger than the

23   facility out there in Pearl under the state system.

24         I mean, can we not attract people because they're not

25   making the same amount of money, or...

1          MS. JACKSON:  I believe the record is not so much the

2     dollar amount, Your Honor, but we are trying through the

3     stipulated order to get at some of those other issues.  So, for

4     example, the county has to designate a full-time recruitment

5     officer, so it's somebody's full job to be trying to get people,

6     to try to get the right people, to retain the right people.  The

7     county and this person will have to develop a recruitment and

8     retention plan.

9          But also within six months the county is going to have to

10    develop and implement a process that looks at merit-based

11    promotion, looks at the establishment of a career ladder.  And we

12    are hoping with -- it's the parties intent that these provisions,

13    in addition the provision about the jail administrator, the

14    qualifications of that person, that if we can look at the problem

15    from the recruitment, retention, qualification, and support for

16    supervision aspect of it, but elsewhere in the stipulated order we

17    are, through the physical plant repairs, trying to deal with the

18    safety issues, so that when folks come to work there, they'll feel

19    like they're in a safe environment.

20         So the idea -- again, this is a very high priority for the

21    parties -- is in both of these ways to approach why is it that

22    people don't come there; why is it people don't stay there through

23    both a staff support, staff-retention perspective, and a let's

24    make it a physically safer place to work.

25         THE COURT:  Mr. Simon?

1    MR. SIMON:  Let me add to Ms. Jackson's answer to your

2  question, Your Honor.  Hinds County now pays more than the state

3  of Mississippi for detention officers.  We pay more than everyone

4  else in the state.

5    And also you won't hear the same cry and refrain because

6  we understand that there's a problem with the resources, the

7  population of the people who fill these jobs.  But to give the

8  Court the latest update -- and not to put Ms. Simpson on the spot

9  again, but she could probably give the Court the most accurate

10  description -- the county just hired a national retention expert

11  through Ms. Simpson.  And, again, she could probably tell the

12  Court more about this gentleman.  But he has been to Hinds County

13  recently, and we have started utilizing his services as well to

14  see if we can retain and attract more detention officers for the

15  detention facilities.

16    THE COURT:  Okay.  I mean, advertising and where you

17  advertise, who -- you go out and try to attract people who are

18  interested in law enforcement and corrections, people who may be

19  retired from other agencies.  And it just seems -- I mean, Jackson

20  State has a criminal justice.  I don't know if the county is going

21  over there to the criminal justice fairs or job fairs or having

22  any sort of relationship with -- there's too many colleges and

23  universities in this general area -- Hinds, the community college

24  system.  I mean, that's to get people who are -- technically can

25  be educated.  But I don't think you all require anything beyond

1    high school now; right?

2          MR. SIMON:  Right.

3          THE COURT:  So why is that not -- you know, you've got the

4    public schools, the private schools, you've got the largest county

5    in the state that's underemployed.

6          MR. SIMON:  I can tell you this, Your Honor.  I've had a

7    hand in working with Henley-Young and the juveniles in the six

8    years I've been representing Hinds County.  And I can tell you

9    we're hiring detention officers in that environment often, and

10   we've gone to those sources, schools, and other places.  But often

11   folks will take these jobs, and they're already low-paying jobs,

12   and they don't know what they're getting into.  And after a day or

13   two on the jobs, they often walk away, and they don't come back.

14         And I don't know if that's the same experience with our

15   adult facility, but we experienced that with the juvenile

16   facilities in hiring detention officers.  They started work and

17   realized it just wasn't for them.  And the pay is so low, they can

18   find other low-paying jobs and go do something else.

19         MS. BARKER:  Right, Your Honor.  Just to echo Mr. Simon's

20   statement on that, on the adult side it is -- I don't know anyone

21   who could go out there in good faith and say, "Come work in our

22   facility," whenever it is not safe.

23         And so the stipulated order contemplates, as Ms. Jackson

24   stated, that the facilities will be repaired.  We are going in for

25   the recruitment side.  And Ms. Simpson has been so generous in her

1    technical assistance in this, and hire -- and given the name of

2    Matt Rivera, (phonetically) and he has already visited our

3    facilities, and he's going to look at the systematic culture.

4    Because it's not just we can't hire detention officers.  There's

5    also problems within the culture of the detention services in

6    Hinds County, and so it's a huge undertaking.

7         And it seems like it would be very simple; however, when

8    you get into the weeds of it, we are -- we realize the

9    shortcomings that we have, and we are taking steps to work with a

10   qualified individual to help us in recruiting and retention for

11   detention services.

12        THE COURT:  Since you mentioned the word "culture," I

13   noticed that in the county's proposed findings, using this -- this

14   is at Page 4 of the proposed findings, and I circled it because

15   I -- it's talking about policy developments and all.  But the last

16   sentence says, "Using this development format, staff create

17   policies that are culturally relevant while also develop a

18   sustainable skill set among staff for future policy development

19   and review."

20        And you've mentioned this word "culture."  Is it the

21   culture of the penal -- I mean, what distinguish -- why is this so

22   aberrationally culture -- I mean, I'm just trying to figure out

23   the culture.

24        MS. BARKER:  What do I mean whenever I say "culture"?

25        THE COURT:  Yeah.

1          MS. BARKER:  Something that I have observed in my time

2     representing the sheriff's office is that the detention services

3     has basically been looked at as the stepchild of the sheriff's

4     office.  It's not nearly as glamorous.  You don't get to go out on

5     the road and everything.  And so in developing these, you know,

6     culturally appropriate policies and procedures where you have

7     built in, you know, professional expectations -- and I know that

8     it sounds really silly, maybe, to this common person, but

9     expecting that you wear your uniform in a certain way every day,

10    you adhere to those standards, that's been left -- that's been

11    gone to the wayside with detention services.

12         And it's -- we're hoping that having someone who has dealt

13    with -- like from Mr. Rivera, he has dealt with detention services

14    in this issue.  And I don't think this is unique to Hinds County,

15    Your Honor.  Hopefully he can help us get to the root of some of

16    cultural issues.  It's not going to be changed overnight because

17    it's just set in people's minds.  But that is what we meant by

18    trying to establish a sense of professionalism that everybody is

19    on the same page, operations and detention services.

20         And I can represent to the Court I have had some very

21    encouraging conversations with the leadership who is here today

22    for the incoming administration, and that is their -- that was

23    their first and foremost intent without me even having to say

24    anything to them.

25         THE COURT:  Okay.  And, finally, Ms. Jackson, and I'll

1    give the parties the opportunity again to sign off and get it to

2    me and we will reconvene.  That's what I intend to do unless the

3    parties suggest something else ought to be done -- does the

4    agreement set forth what is to be done if there are future

5    violations or shortcomings or failures or whatever you want to

6    call them if these goals are not met after four months, for

7    example?

8         I've heard a four-month timeframe on several things, maybe

9    three months from time to time and maybe as much as six months.

10   It seems like I heard four months quite a bit.  What happens if

11   the targets are not reached, the goals are not met, or if there

12   have been clear violations?  I mean, does the agreement address

13   that issue?

14        MS. JACKSON:  Not specifically in the way that Your Honor

15   is describing it.  But, Your Honor, of course your authority to

16   enforce the agreement, to supervise it, all of the powers that the

17   Court has under the original 2016 agreement are still there.  This

18   is a supplement.

19        What the -- the agreement contemplates that the parties

20   will continue to meet with the Court as we have, that the monitors

21   will continue to do their job.  There are one or two 30-day

22   deadlines; Your Honor is correct, a few three months, six months,

23   five months.  I think we have a ten month.  And the end point of

24   the agreement in terms of the reporting is in a year we come back

25   to you.  We talk about what has happened and if something further

 1   is needed.

 2        But we would continue, we anticipate, the periodic reports

 3   that we have been doing with Your Honor during the time that

 4   you've been presiding over this matter.

 5        THE COURT:  Let me ask you this:  Do we know when the --

 6   the order was originally adopted in 2016 I think.

 7        MS. JACKSON:  That's right.

 8        THE COURT:  Do you know off the top of your head when that

 9   was due to expire?

10        MS. JACKSON:  I don't think it has a set date of

11   expiration.  It's probably once there's been a period of sustained

12   compliance.  There were interim deadlines, for example, develop

13   policies by -- I think there was a date in 2017 that's been

14   missed.  But the original agreement doesn't have what we sometimes

15   refer to in our office as a bright line, meaning we get to this

16   date and we're done.  It doesn't have that.

17        THE COURT:  And so the new agreement does not set a bright

18   deadline either then?

19        MS. JACKSON:  No.  No, Your Honor.  It sets deadlines for

20   action steps to be accomplished by certain days, at certain

21   periods, and then says -- I'll just read Your Honor the language.

22        "One year from the entry of this order, the parties shall

23   reconvene with the Court to determine whether additional

24   compliance plans are necessary."

25        But it's not the intent of the parties that we sign this,

1  if Your Honor approved it, we go away, and you don't hear from us

2  for a month.  The idea is that all of the ongoing monitoring and

3  court supervision that has been in place for the 2016 order would

4  still continue.

5       THE COURT:  All right.  And Mr. Simon and Ms. Barker, has

6  the county sort of figured out what it's costing the county each

7  month to be up under the supervision of this Court?  I know these

8  monitors have to be paid, and now these monitors have suggested --

9  have always recommended, at least since I've been in it, different

10  staffing changes, different type of hiring, programming changes

11  that all cost money.  I think Karen Albert was -- was ultimately

12  hired to help draft policies and procedures, and there may have

13  been others who have been contracted with and/or hired.

14       You're talking about the facilities update and what -- I

15  mean, has the county sort of -- not necessarily budgeted, because

16  these amounts -- some of which have already been paid -- but has

17  the county figured out what it's costing each month that they're

18  under this consent decree?

19       MR. SIMON:  The answer is no, Your Honor, and I'll

20  explain.  Since we've been involved in this case, even for

21  instance with the sheriff's department, we have been asking for

22  years and battling around how much it costs to house an inmate in

23  the Raymond jail.  And as Ms. Simpson and everyone can tell you,

24  we've never ever been able to get a number for that.  So there is

25  no monthly number that the county has, but I can tell you, Your

1   Honor, the county does track global numbers.  And had you gone to

2   trial, you'd have heard testimony about $7 million spent on

3   Raymond for renovations.  The county knows the global numbers that

4   have been spent trying to address these issues, but I have never

5   seen calculations for a monthly figure.

6         THE COURT:  Do we know what the monthly figure cost to

7   have monitors?  I mean, that's part of the remedy the Court

8   adopted in 2016, and I assume the county is the one that's on the

9   hook for the cost of the monitors.  And so long as this thing is

10  in place, the monitors are in place, and that amount is going to

11  have to be -- that's a bare bones amount.  But the monitors have

12  recommended the hiring of certain other people and contracting

13  with other people, and it sounds like there is more that the

14  county is going to have to do, the retention person that

15  Ms. Jackson mentioned, that you all have already said exists, and

16  others.  Even that cost, do we know what it -- what it's costing

17  the county on a monthly basis?

18        MR. SIMON:  Again, I can tell you we don't know what it's

19  costing the county on a monthly basis, but I can tell you, for

20  instance, like Karen Albert -- Ms. Simpson was gracious.

21  Karen Albert was hired -- the county still pays her but was hired

22  through Ms. Simpson's budget, which the county still pays.  And I

23  can tell you, having been involved in the county's budgeting

24  process, there are certain costs that have already been

25  incorporated in the county's budget going forward, such as the

1   monitoring teams.

2        The costs that have been incurred in the past have already

3   been accounted for in the county's budget moving forward.  And I

4   believe -- and I can't speak completely for Carmen Davis, our

5   county administrator.  But because there -- the county knows that

6   there are going to have to be certain hires made to meet other

7   objectives of the consent decree.  Some of these prospective

8   hires -- I don't know if they all have.  But some of those

9   prospective jobs have been incorporated in the budget moving

10  forward next year, so the county can fund those positions that are

11  needed.

12       THE COURT:  All right.  Is there finally -- and I don't

13  suspect that this is a problem because this is an agreement that

14  is -- that is going -- that has been agreed to by the existing

15  board of supervisors.  There's going to be a change January 1st at

16  the latest with respect to new members of the board.  The county,

17  I presume, is not going to ever take the position that it cannot

18  be bound from one board to the other based on this agreement?

19       MR. SIMON:  No, the county will not take that position.

20  As Your Honor knows, successor boards do not have to be bound for

21  many things, but statutory things or things -- this matter in

22  federal court is not a matter that the new board can disregard or

23  change.  And I can say that when the board took their vote today,

24  the -- two of the three supervisors elect were in the audience and

25  were aware.

1          As a matter of fact, President Calhoun involved them in

2    the conversation when this vote was taken and talked to them about

3    upcoming things.  So they're aware of what's coming in, and

4    they're aware that they're bound by the decision made today by the

5    current board.

6          THE COURT:  Was this not taken up in executive session?

7          MR. SIMON:  Open court, Your Honor.  It was done in open

8    session.

9          THE COURT:  Open session.

10         MR. SIMON:  Yes, sir.

11         THE COURT:  Okay.  All right.  Well, I'm going to give the

12   parties an opportunity to sign off on it and to talk, whatever you

13   think you need to talk about, and we will reconvene at 1:30.  And,

14   you know, hopefully by that time you will have presented to me and

15   I will have had some time to look at it, and I might have some

16   more questions rather than have you go and come back another day

17   or so since we're all here.  We'll be here together for right now.

18         Is that enough time?  Is that enough time?

19         MS. JACKSON:  Yes, Your Honor.  Thank you.

20         THE COURT:  All right.  Is that enough time for the

21   county?

22         MR. SIMON:  Well, the reason -- I was going to bring up a

23   housekeeping matter.  Again, I haven't had a chance to meet with

24   Ms. Jackson in person, and because of the fluid nature of this

25   morning and voting with the board, we have a couple of little --

 1   and they're not substantive changes; they're cosmetic changes that

 2   we'll talk to them about.  But they're minor, so I think that

 3   should be enough time.  But nothing changes anything of substance

 4   of anything we've agreed to.  But there's a couple of cosmetic

 5   changes we would like to discuss with you.

 6          THE COURT:  Okay.  Does that -- that might -- well, send

 7   word back to me whether that might affect the 1:30 time because,

 8   again, you all are on my calendar through December the 20th.

 9          MS. JACKSON:  Thank you, Your Honor.

10                      (A recess was taken.)

11          THE COURT:  You may be seated.  We're back on the record.

12   The Court has had an opportunity to review the parties' memorandum

13   in support of joint motion for entry of stipulated order.  Of

14   course, I have more questions since now I've had the opportunity

15   to review what the parties have agreed to.

16          In preparing the proposed settlement agreement, how much

17   input, if any, did the monitors have in hammering out the terms?

18          MR. TEEUWISSEN:  I think -- Your Honor, I'm probably best

19   prepared to answer that.  Would you like me to speak from counsel

20   table or the podium?

21          THE COURT:  It doesn't matter.  It doesn't matter.

22          MR. TEEUWISSEN:  Your Honor, the monitor Lisa Simpson had

23   a good deal of input.  The process to get us where we are today

24   unfolded like the following:  First, Ms. Barker and I --

25   Claire Barker and I got together and discussed with the monitor

1   whether she thought there was any middle ground for the parties to

2   explore resolution of the impasse with respect to compliance

3   issues.  The monitor indicated, based on her discussions with the

4   Department of Justice, there was.

5        From there, Ms. Barker and I undertook outlining a

6   framework directly with the monitor through a series of phone

7   calls that was the monitor Lisa Simpson, myself, and Ms. Barker.

8   Ms. Simpson would, in turn, consult with Mr. Parrish or other

9   members of her monitoring team.  I believe she also had some

10  discussions with individuals at the Department of Justice.

11  Likewise, Claire, Ms. Barker would go back and talk with the

12  people she needed to.  I, in turn, would talk with

13  Mr. Synarus Green and Ms. Carmen Davis, the county administrator,

14  to come up with a framework.

15       The thought process being once it was submitted to the

16  Department of Justice, hopefully it would be something that the

17  monitor felt she could endorse and would be something along the

18  lines of whatever her conversations with the Department of Justice

19  were that would readily address the issues where the county has

20  not made progress.

21       THE COURT:  Okay.  Thank you.

22       Any disagreement with what Mr. Teeuwissen has said?

23       MS. JACKSON:  No, Your Honor.  We have --

24       THE COURT:  Just make sure you're speaking into the

25  microphone.

1            MS. JACKSON:  No, Your Honor.  Counsel is correct.

2            THE COURT REPORTER:  I don't think it's on.

3            MS. JACKSON:  I apologize.  Your Honor, counsel is

4    correct.  The monitor was heavily involved in this process.

5    After -- I think about two, two and a half weeks ago, we received

6    a proposal from opposing counsel.  We spoke with the monitor about

7    some of those provisions.  She was very helpful, for example, in

8    filling in some of the timeframes that Your Honor will see in the

9    order.

10           The parties then had exchanged drafts, had a series of

11   phone calls.  There was some give and take about the timeframes,

12   but the substance of the order, the issues that should be

13   addressed in the order, we were on one page with that from the

14   beginning of the conversations as we've had them a couple of weeks

15   ago.  So we've just been refining the issues bit by bit until we

16   got to the point, I think, on -- from the department's side.  Last

17   Friday we were authorized to enter in to the proposed stipulation,

18   and as Your Honor knows, this morning the county board voted.

19           THE COURT:  Okay.

20           MR. TEEUWISSEN:  Your Honor?

21           THE COURT:  Yes.

22           MR. TEEUWISSEN:  I'm sorry.  I should have done this

23   before I answered your first question.  Before this afternoon's

24   session, as Your Honor was probably made aware, I was in the board

25   meeting this morning, but also present today this afternoon is

1    current board president, Peggy Hobson Calhoun, who had her last

2    meeting this morning, but she is in attendance, and with her is

3    incoming supervisor elect, Credell Calhoun.  Both of them are

4    present and here in the courtroom.

5          The other thing, Attorney Jackson is correct.  As we work

6    through Monitor Simpson, as you can imagine, the county proposed

7    somewhat longer timeframes than either the monitor or the

8    Department of Justice were comfortable agreeing to.  And so the

9    timeframes that you see, Your Honor, in the proposed stipulation

10   have actually been negotiated down to where Ms. Barker and I

11   originally set deadlines.  Thank you.

12         THE COURT:  All right.  I note the proposal identifies

13   certain people by title.  I think somewhere I saw one of the

14   committees was served, the board president, the jail

15   administrator, county administrator.  Come January the 1st, when

16   will we know who is the new board president?

17         MR. TEEUWISSEN:  January 6th, Your Honor.  That is the

18   first scheduled meeting of the new board term, and at that time,

19   the board will take two actions.  One is to elect a president or

20   vice president.  And, two, will be to establish a term for the

21   president and vice president.

22         THE COURT:  And with respect -- because I know this county

23   administrator, that title is here.  Is there any indication that

24   that person will change?

25         MR. TEEUWISSEN:  I'm not aware of that, Your Honor, and I

1    don't think I'd be the one to speak to that.

2         THE COURT:  Okay.  The new board will have the right to --

3    to, I guess, appoint a new county administrator and --

4         MR. TEEUWISSEN:  There are four positions, Your Honor,

5    which by state statute the new board will have a right to review.

6    Those are four positions that answer directly to the board itself.

7    Those being the public works director -- which is actually a

8    misnomer.  Under state statute, it should be the road manager,

9    same department.  The second is the emergency operations center

10   director or E.O.C., that's E911 and assorted matters; the county

11   administrator; and the board attorney.

12        THE COURT:  Okay.  We've tried to prepare a chart just so

13   we can see what it looks like and the timeframes involved, and

14   please tell me if these timeframes do not coincide with what the

15   parties contemplate through the agreed order.

16        The hiring of a qualified security contractor, there's no

17   definitive timeframe with respect to that condition, is there?

18        MR. TEEUWISSEN:  No, Your Honor.  The intent there is that

19   there may be more than one individual or business that is needed.

20   And, in fact, quite frankly, that's probably the case that there

21   will be more than one type of business.  For example, the company

22   that has done the door locks and established some tamper-proof

23   door locks on a test basis in other pods is out of Texas, but that

24   is not necessarily the same company, by way of example, that would

25   address electrical issues, because we would anticipate that would

1    be more of a local vendor.

2         So that is an ongoing requirement, Your Honor, that any

3    vendor, contractor, or professional who is hired has to be

4    competent and have some experience in security or detention

5    settings.

6         THE COURT:  And with respect to -- and with respect to

7    hiring of an architect with corrections experience, that, too,

8    there is no definitive -- according to the agreement, there's no

9    definite date by which that entity is selected; is that correct?

10        MR. TEEUWISSEN:  That's correct, Your Honor, but if you

11   read the agreement in toto, it doesn't seem like Hinds County

12   could get very far down the road without that individual.  So we

13   would certainly -- Mr. Simon and I as counsel would make

14   recommendations at the January 6th meeting that the board

15   undertake to hire their professional.  We're not going to

16   recommend a particular architect.  But to the extent we can

17   determine those locally who have experience, of which there are

18   some, we will present that list to the board, so they can move

19   expeditiously.  Clearly we can't wait until March or April to get

20   that architect in place to oversee the repairs if we're going to

21   meet the schedule.

22        Now, by way of a little good news, and it's ancillary but

23   it's important, Your Honor, this morning the board of supervisors

24   approved retaining Richard McNeel from Johnson Henderson Bailey

25   and McNeel, architects here in Jackson, to do the schematics for

1  Henley-Young where there will be some additional programming space

2  built pursuant to a separate order.

3       But the board did engage Mr. McNeel.  He has previously

4  done some work in the adult consent decree, so that's one option

5  that could be moved quickly.  And there will be other options, we

6  believe, that will allow the board to move quickly with respect to

7  an architect.

8       THE COURT:  In letting or -- I mean, will the county --

9  these are -- the county consider these professional services, or

10  will the county have to go through a process of advertising and

11  bidding?  Because that's going to add time to it.  I don't know.

12  How would the county deal with the retention of these individuals

13  to do this type of thing?

14       MR. TEEUWISSEN:  Your Honor, under the state statute, an

15  architect and an engineer, either of which could probably fill the

16  role that's in the proposed stipulation, are considered

17  professional services, and architect and engineer are two of the

18  eight categories which are exempt from bidding and may be engaged

19  directly under state statute.

20       With respect to the other vendors, we would propose that

21  the board of supervisors enter on January 6th an emergency

22  declaration with respect to specifically RDC to allow them to

23  speed the process and not go through all the delayed bidding

24  requirements.  And we feel confident writing an emergency

25  declaration for the board to consider that, because these are

1  constitutional rights.  And under the guise of where the Court is,

2  they can enter that emergency declaration.

3        The board has done so in the past when we have had issues

4  either at RDC, JDC, or Henley-Young.  So this is a new ground I'm

5  mentioning to the Court.  It's new that I've said it to you, but

6  it's something that we've incorporated in the past.

7        THE COURT:  Before a different board, though.  Because

8  you've got a new board coming on January 1, and nobody speaks for

9  them at this point.  Who knows what they -- you know, who knows

10  what they may do?  Who knows?  The road manager might tell them,

11  "I need more money.  That's more important than what the judge

12  might say or more important than the jail."

13        They may have new counsel who might advise them, "I need

14  time to think about the consent decree that the old board just

15  did, and I'm going to need some time."  And there's nobody here --

16  I mean, because that board doesn't exist now, so nobody can really

17  speak for that board.

18        You know, I've been blowing in the wind the whole year

19  with respect to the existing board; that hasn't changed much.  The

20  existing sheriff; that hasn't changed much.

21        But I hear you say you will offer a proposal for an

22  emergency spending or emergency declaration, but there's no

23  guarantee that anybody will take that up; right?

24        MR. TEEUWISSEN:  Your Honor, there's no guarantee that any

25  party will ever follow the Court's directive.  Just being honest.

 1          THE COURT:  Or order.

 2          MR. TEEUWISSEN:  Or order.

 3          THE COURT:  I can find ways for them to feel the pain if

 4    they don't, though.

 5          MR. TEEUWISSEN:  Mr. Simon and I have been on the end of

 6    the inheriting consent decree with Judge Jordan.  That was a

 7    consent decree that was negotiated by counsel other than Mr. Simon

 8    and I and by a board other than the one who we were first hired by

 9    the county.

10          All I can say is that your colleague on the bench didn't

11    entertain any of those arguments from Mr. Simon or I and pointed

12    out that it was irrelevant who the board was.  It's the county

13    that is the party, and the county has constitutional obligations

14    that it must obey.

15          In turn, you hope that the individuals who are the public

16    stewards of the county's business will obey those orders and

17    prioritize them.  If not, as Judge Jordan determined, they can be

18    held in contempt.

19          But I think we're getting a little bit lost on what the

20    next board may do.  It can certainly replace us as counsel.  It

21    can certainly replace the county administrator.  But this is a

22    binding obligation if entered by the Court that binds the county,

23    not just the individuals, but the county.

24          And those individuals take the county, not with a fresh

25    slate, any more than President Obama had a fresh slate.  He didn't

1     have one.  When he came in behind Bush, he inherited a financial

2     crisis.  You don't get a fresh slate when you come into office.

3     You get all the good that comes with it and all the existing

4     headaches, and that's where the new board will find itself.  They

5     can thank this current board for having made a lot of progress.

6     But they also have to recognize we're far from done, and they're

7     going to have to move quickly.

8                THE COURT:  Okay.

9                MR. TEEUWISSEN:  And let me say this, Your Honor.  I said

10    this on a previous phone conference, but we're on the record

11    today.  Everything I say to Your Honor, to this Court as board

12    attorney for Hinds County is pursuant to the Mississippi Rules of

13    Professional Conduct, specifically Rule 1.13, the comments to that

14    rule, and the references to scope of representation as a

15    government attorney.

16               In other words, Your Honor, it's my obligation,

17    Mr. Simon's, and Ms. Barker's to do what's in the best interest of

18    the government as a whole and not on behalf of any particular

19    individuals, and that's what we are here today trying to do.

20    Having said that, I have confidence that the incoming board is

21    going to understand, if not through us as counsel, from Your Honor

22    directly on January 24th when the next status conference is set,

23    just how serious it is to have humane and constitutional

24    conditions at the Hinds County detention facilities.

25               THE COURT:  Okay.  I guess I've broken these things up in

 1    a couple of different ways looking at the safety and

 2    security/physical plan issues which the hiring of the qualified

 3    security person or contractor and hiring of the architect fall

 4    under that category.  It looks like the other thing that does not

 5    have a specific timeframe under -- which would fall under that

 6    category according to the chart that I've devised, is the A-POD

 7    renovations which may be postponed at a time until the A-POD is

 8    used again.

 9         MR. TEEUWISSEN:  That's correct, Your Honor.  I think you

10    probably heard this morning, but C-POD is still incomplete.  C-POD

11    has to be completed, and the plan then is to occupy C-POD under

12    direct supervision and in turn focus on B-POD.  A-POD will have to

13    remain in use while B-POD is done.

14         It is the plan that, by using a qualified engineer,

15    architect, or someone to oversee the renovations of B-POD, that it

16    will not take as long as it took with C-POD.  Then the population

17    from A will be moved to B.  A will be, I would say, permanently

18    shut down.  Ultimately that would be a decision for the next board

19    and the sheriff when they make a long-range plan.  But the county

20    detention population is such that only two pods are necessary at

21    this time.

22         So the plan is get both B- and C-PODs into some level of

23    facilities constitutional compliance, get that done within the

24    next 12 months, and then let the new board decide ultimately do

25    you build a new jail?  Do you renovate A-POD?  What other things

1   do you do long term?

2        THE COURT:  Okay.  We'll talk about that in a little bit.

3   That's on my notes down the line.  So the -- because they're

4   different deadlines for different things.  The first 30 days it

5   appears that the county is obligated to retain a corrections

6   recruitment and retention consultant.  That's what my notes sort

7   of reflect, and that's one of the provisions that's 30 days;

8   correct?

9        MS. BARKER:  Yes, Your Honor.

10       THE COURT:  All right.  Within 60 days, then -- again,

11  this is safety, security, physical plan -- within 60 days a job

12  description will be created for the jail administrator.

13       MS. BARKER:  Yes, Your Honor.  That's correct.

14       THE COURT:  I just have a -- I know the parties have

15  agreed to it.  I just got a question.  Why does it take 60 days to

16  create a job description for somebody who either exists or --

17  or -- not the individual who exists, but the jail has been

18  operating with a jail administrator for how long?

19       MS. BARKER:  Well, Your Honor, the current jail

20  administrator -- I think that the thinking behind that, I know

21  that the Department of Justice proposed the 60 days.  We had --

22  the county initially had a different proposal to that.  But the

23  thinking behind that is to review her job description and her

24  duties and come up with a job -- a job description to post and

25  open it up to qualified individuals.  And she can reapply for her

1    job as well.

2        And the 60 days is because the incoming sheriff is coming

3    in in January.  If we do enter this agreement right now, that

4    will -- there's nothing really that can be done between, you know,

5    now and January 1, so that just gives the sheriff's office a

6    little bit more leeway to get that done once the new

7    administration gets in and comfortable.

8        THE COURT:  Does the current jail administrator operate

9    under a job description?  And how much tink- -- I know you all

10   have agreed to it, and that's fine.  I'm just raising these

11   questions for my own benefit because you're asking me to sign off

12   on it, and I think the public needs -- this all needs to be aired

13   in public in some way, and this is its opportunity.  So why would

14   it take 60 days to create a job description?

15       MS. JACKSON:  Maybe I can try to shed some light on this,

16   Your Honor.  Thank you.  The person who currently fills that job

17   does not meet all of the requirements in Paragraph 38 of the

18   agreement.  Your Honor has heard concerns from the county about

19   whether it's possible, for some of the reasons that we discussed

20   this morning, to attract the right person to the -- to the jail

21   and so we -- I think this was one of the deadlines that we

22   actually did negotiate.

23       We also, Your Honor, might -- I think we've placed in the

24   record issues about the jail administrator's ability and authority

25   in actuality to carry out the responsibilities that the agreement

1    contemplates.

2         So what we tried to do here was to have a somewhat longer

3    period at the beginning to create the appropriate description, to

4    put it out for discussion, see who applies, and see if there are

5    the type of people that the parties would agree to -- that there

6    are the type of people that the parties would agree can actually

7    do this job.

8         And so we are hoping that, with the change of -- coming

9    change of administration in the sheriff's office, that the person

10   who is currently fulfilling the role, the person who is the jail

11   administrator, that she will have more autonomy and authority and

12   ability, frankly, to do the job that is contemplated in the

13   settlement agreement without being held back or undercut in any

14   way.

15        THE COURT:  The job description, though, will be defined

16   or written in 60 days.  Then the posting, I presume, would be

17   announced?

18        MS. JACKSON:  Yes, Your Honor, four months.  The person

19   will have -- the county will have four months to fill after the

20   posting is announced.

21        THE COURT:  After the posting of the announcement?

22        MS. JACKSON:  Yes.

23        THE COURT:  So in 60 days, it will go up the middle of

24   February?

25        MS. JACKSON:  Yes, Your Honor.

1        THE COURT:  At the latest, March 1st.  Because the Court

2    is going to take some time before it enters this order.  So

3    March 1st the position description itself goes out, and then the

4    county has four months from that time, so we're talking about

5    July 1, until that position is filled.  And we're in the middle of

6    2020 now before that position even gets filled.

7        MS. JACKSON:  Formally under this agreement, Your Honor is

8    correct.

9        THE COURT:  Yes?

10       MR. TEEUWISSEN:  One thing to note, Your Honor, one of the

11   challenges with the current jail administrator has been

12   interference or undermining by the current sheriff.

13       THE COURT:  We're going to get to that.

14       MR. TEEUWISSEN:  Well --

15       THE COURT:  No, no, we're going to get to that.  I got

16   some --

17       MR. TEEUWISSEN:  Let me connect some --

18       THE COURT:  I got some questions about that.

19       MR. TEEUWISSEN:  All right.  But there was a dot I was

20   going to connect which may help explain something Your Honor was

21   asking.

22       Your Honor entered an order at the end of October,

23   beginning of November.  Since that time, the jail administrator

24   has finally had the autotomy contemplated in the settlement

25   agreement and matters -- the facilities are running considerably

1   smoother since Your Honor took up the urgent and necessitous

2   matter and entered the order.  Thank you.

3        THE COURT:  Okay.  With respect to safety and security

4   physical plan issues, the 60-day timeframe appears -- seems like

5   the job description for the jail administrator is what is to be

6   done within 60 days.

7        The next deadline that the parties have come to is a

8   three-month sort of timeframe, and the three-month timeframe, I

9   believe, the county creates a staffing plan to increase RDC

10   prison -- prison supervision.  So they have three months to do

11   that.

12        Installation of an alarm system on housing unit and fire

13   exit doors, I believe that's a three-month period.  And then

14   within the three-month period, installation of a camera that

15   covers four fire exit doors.  It looks like that falls within that

16   three-month period.

17        MS. JACKSON:  Yes, Your Honor.

18        THE COURT:  Then the next timeframe by which the parties

19   have said things will be done is four months.  And the four-month

20   deadline applies, again going through what I've sort of cabined

21   into safety and security/physical plan issues, in the occupied

22   pods, convert the control room doors, housing unit, entry doors,

23   recreation doors, isolation doors, and cage doors to

24   electronically controlled swing doors.

25        It looks like the county has four months to get those done

1    on the pods in the area that that applies to.

2          MS. JACKSON:  Yes, Your Honor.

3          MR. TEEUWISSEN:  Yes, Your Honor, and that's the Texas

4    company I referenced earlier that has already come and done some

5    of those swing doors that were installed earlier in 2019, and so

6    we've seen the work of that company.  We know that actually does

7    work as intended.

8          THE COURT:  Have they done any additional doors since the

9    last --

10         MR. TEEUWISSEN:  No, Your Honor.

11         THE COURT:  -- status conference -- or the status

12   conference in October?  We've had a status conference -- we've

13   had -- well, I take that back.  We had a status conference in --

14         MR. TEEUWISSEN:  January.

15         THE COURT:  -- September?  November?

16         MR. TEEUWISSEN:  We had a status conference in person in

17   January, May, and September.  We have had, in addition to that,

18   probably a half dozen telephonic status conferences.  Your Honor,

19   the company from Texas did those doors prior to the September

20   in-person status conference, has not done anymore since then.  As

21   you'll recall, there were representations made at that time that

22   the priority was going to be on Pod C.

23         What we're saying now is that we've now had those doors

24   installed by the Texas company in use for a number of months.

25   They are, indeed, electronically operable swing doors as

1    recommended by Monitor Simpson and Monitor Parrish.  It seems

2    easy, then, for the county to reach back to that same vendor and

3    say come in and do these other doors that we have identified.

4         THE COURT:  Okay.  For the four months -- Mr. Cheng, did

5    you have something?

6         MR. CHENG:  I believe the monitor was shaking her head.  I

7    believe there's a problem with that report about the doors.  I'm

8    not sure if the monitor has the same understanding about the door

9    repairs.

10        THE COURT:  Okay.

11        MS. SIMPSON:  So it gets confusing when there are

12   different pods and different doors and different issues in the

13   different pods.  But I believe what C.M.L. has completed are the

14   swing doors in A-POD for the control room and the housing units.

15   And those actually aren't tied to the electronic system, because

16   the electronic panel in A has to be replaced before that can

17   happen.  They have done a prototype of the cell door in C, but I

18   don't believe -- unless it's happened since the last site visit, I

19   don't believe that they've completed the conversion of the swing

20   doors in the control room or the housing unit of Pod C yet, unless

21   I'm --

22        MR. TEEUWISSEN:  Your Honor, I think Monitor Simpson is

23   correct.  I forgot there is no electronic control pad in A-POD, so

24   I may have overstepped when I represented those doors were working

25   off of the electronic board.  Thank you for correcting me.

1          Your Honor, I apologize.  That was unintentional.  The

2     doors have been installed.  They are working as swing doors

3     appropriately.  But, yes, they will have to be tied to a control,

4     an electronic control board.

5          There is an electronic control board for Pod C. However,

6     it was determined there was some additional piece or something

7     that was necessary to control those doors.  The electronic board

8     for Pod C was installed after the 2012 riots, those repairs being

9     done in 2014 and 2015.

10          An electronic control board will have to be installed in

11     Pod B. And of course, that's now known on the front end, so that

12     would be a part of everything that's done in Pod B.

13          THE COURT:  Where's the prototype of the swing doors?

14     It's in Pod A?

15          MR. TEEUWISSEN:  Pod C.

16          MS. SIMPSON:  Well, the prototype of the cell swing doors,

17     Pod C.  The prototype of the swing doors for the control room and

18     the housing unit is in A.

19          THE COURT:  Okay.  Because A is off the table because A,

20     the renovations won't be -- postponed until the county decides to

21     put inmates over in A in the future.

22          MS. SIMPSON:  That's correct, and the reason why the

23     decision was not to use A is because B-POD has a housing unit that

24     is designed for confinement or segregation and neither A nor C

25     have that.  So A-POD was -- those doors were fixed first because

1   that's where the riot occurred in April of this past year, so

2   following that riot, those doors were fixed.  But despite that,

3   the decision was made to -- in the long term stick with B because

4   of the availability of the housing unit there that has confinement

5   or segregation cells, and there will have to be a -- the

6   electronic control panel will have to be renovated in Pod B in

7   order for everything to be tied to the electronic system.

8            THE COURT:  Okay.  And --

9            MR. TEEUWISSEN:  Your Honor, as you can tell, there's been

10   somewhat of a -- I'm trying to figure out the right word --

11   hopscotch or mismatched approach to renovating the pods.  One of

12   the most significant goals of the proposed stipulation is to

13   eliminate that hopscotch or haphazard manner by which some of A is

14   done or some of B is done or some of C is done, but nothing ever

15   completely gets done.  So that's one of the main goals that we

16   worked with the monitor to identify and prioritize, so that when

17   we come before the Court or our successors come before the Court

18   and say that a pod is indeed done, you won't have to wonder is it

19   partially done or is it completely done.

20            THE COURT:  Okay.  "Within four months, reinforce all

21   C-POD cell doors with strips of steel."  I think that's a

22   timeframe to do something that is evident by this agreement.  It

23   says within four months.

24            MS. JACKSON:  Yes, sir.

25            THE COURT:  Okay.  "Within four months, modify B-POD doors

1    to swinging doors, install new electronic control panel, update

2    cage doors to have key way on each side, reinstall fire hoses in

3    each pod."  That's under the four-month sort of deadline.

4          This is what the parties agreed to, but I simply ask the

5    question:  Why does it take four months to install water hoses?

6          MS. JACKSON:  Counsel?

7          THE COURT:  I mean, I'm not a fireman.  I'm not an

8    engineer.  I'm not an architect.  But I'm concerned -- this is

9    what the parties agreed to.  I'm concerned that -- what might

10   happen if a fire breaks out?  How do we put it out quickly?

11         I see the monitor is coming forward.

12         MR. PARRISH:  Good afternoon, Your Honor, David Parrish.

13   I think the effort is to get something off a dead center and get

14   them started to do something.  And with regard to fire safety,

15   there are no hoses inside the housing units at the present time

16   throughout the entire facility at Raymond.  There are not even

17   fire hoses in what's referred to as the horseshoe, the corridor

18   around the control room, in several of the pods.  So they're

19   working on those first.  That's a staff-controlled area where they

20   stand a better chance of staying there.

21         They've hesitated to put them back into the housing units,

22   because they'll just be torn up again with no supervision.  So if

23   they -- you know, from my perspective the current situation is

24   absolutely untenable, and I can't believe that the fire marshal's

25   inspection has not made an issue of this.  But we haven't had any

1   success in working with them.

2       So if they will -- at least as they open up new areas of

3   the facility and go to direct supervision, they've got to have

4   fire hoses inside and inside the housing units themselves.  This

5   still does not address the issues of sprinklers, which were

6   removed after the riot of 2012 and then never replaced, and the

7   fire marshal has never had an issue with that, which is also

8   incomprehensible.  But getting something started is a move in the

9   right direction.

10      At least they'll have fire hoses in the horseshoe areas

11  around the control room in all of the pods.  They'll have fire

12  hoses inside the housing units of those that are occupied and

13  staffed in a direct supervision mode.  And while that's not

14  totally acceptable, it's certainly better than what they have

15  right now.  And if we can make that happen, that's a step in the

16  right direction.

17      THE COURT:  Thank you, Mr. Parrish.

18      MR. PARRISH:  Yes, sir.

19      THE COURT:  The next thing that the Court has identified

20  as -- that falls under the four-month timeframe:  "Retain

21  consultant to assist in the master plan or the planning process."

22  They have four months to retain that person and to form a

23  committee to develop and implement that particular plan.  And that

24  committee will consist, I think, the county administrator, the

25  sheriff, the jail administrator, the facility captains, and the

1   board of supervisors president or other members may be included at

2   the discretion of the county and the sheriff.

3          Within a four-month period, the next thing appears to be

4   hire and designate a full-time recruitment officer with -- within

5   the detention division and to develop a recruitment and retention

6   plan.  That seems to be everything within the first four months.

7   There is no five-month deadline under this particular area.

8          And now I'm turning to what is to be done in six months:

9   Convert the B-POD Units 3 and 4 from cell doors to swinging doors.

10  So they've got -- we've led it.  We've ordered it.  I assume this

11  is the people from Texas.  We've given them a deadline by which to

12  convert B-POD Units 3 and 4 cell doors to swinging doors,

13  reinforce B-POD Units 1 and 2 doors with strip of steel, replace

14  all holding cell doors in the booking area with full transparent

15  panel security doors -- and I assume this is the same outfit doing

16  all of this.

17         Would it be the same group, the consultants from Texas, or

18  is this going to require different contractors to do it?  You

19  know, I know it's going to be done, and it doesn't matter by whom

20  in my mind.

21         MR. TEEUWISSEN:  I think that is -- I think it can

22  certainly be done by the company out of Texas, because they meet

23  all the criteria.  I would like to think there are some local

24  vendors, though, who could be involved and perhaps -- I don't want

25  to say partner but work with the Texas company to speed the

1  process, especially when you're talking about the booking area

2  doors.  That's a fairly simple and straightforward project.

3      As Your Honor recalls the main issue there is that those

4  booking cell doors only have a small window.  The booking cells

5  themselves are fairly dimly lit, and there simply needs to be a

6  replacement to -- they do have swinging doors, but a transparent

7  door that promotes visual monitoring of what's occurring in the

8  booking cells.

9      THE COURT:  Okay.  And within the six months, it looks

10 like the jail will discontinue use of the holding cells that are

11 not directly visible from the booking station.

12     Mr. Cheng?

13     MR. CHENG:  I think a couple of times we've talked about

14 the Texas company being on board, but I think Mr. Parrish may be

15 able to elaborate on the status of that contract.

16     THE COURT:  Oh, okay.  Thank you.

17     MR. PARRISH:  Your Honor, the monitoring team and the

18 monitor did not select this company from Texas.  That was an

19 organization that was found by the county.  When we looked at the

20 work that they did and then looked at the record of their

21 experience in the business, we were totally supportive of bringing

22 them on board to do that work, first professional level work to

23 repair things within the jail system.  They handle major jail

24 systems of many, many thousands of inmates, so they're a very

25 capable firm.  And if they can be brought on to follow along with

1    the work that they've already shown as a model, that would save

2    time, and we know that we -- the county would probably get a

3    quality product out of it.

4         I know that they have not been contacted about certain

5    things such as replacing holding cell doors in booking.  I would

6    totally support them to do that kind of work, even if they bring

7    in local vendors to work with them, but they need somebody there

8    experienced to oversee the work.  So right now the only thing that

9    I'm aware of from dealing directly with them to communicate with

10   them was that they have been contacted with regard to the

11   preliminary work that's outlined in this, the first step of the

12   work -- looking at the control panels, replacing the control room

13   doors, housing unit entry doors, and so forth.  They have not gone

14   beyond that, but they're going to be submitting a proposal to the

15   county regarding that.

16        THE COURT:  And I presume the parties -- again, based on

17   the information before the parties in seeking to avoid the trial

18   in this matter -- assume the parties have not agreed to

19   unrealistic timeframes to make sure that these things fall within

20   those timeframes.  I mean, I don't know the group out of Texas.  I

21   don't know how many employees they have.  I don't know what they

22   do.

23        MR. PARRISH:  Right.

24        THE COURT:  Like you say, we talked to them months ago

25   about doing the prototype.  They haven't been brought on

1   necessarily to do anything else at this point.  But these are

2   deadlines that the parties have suggested.

3        MR. PARRISH:  And we really have to hear back from the

4   firm as to their capability of getting that done, but at least if

5   this moves forward, then we have some action being taken which has

6   not occurred up until now.

7        THE COURT:  Thank you.  Ms. Jackson?

8        MS. JACKSON:  Your Honor, you're correct.  We did try to

9   balance two things in the negotiations about the timelines

10  recognizing that these are matters of grave importance to the

11  people who are incarcerated in this facility, but also wanting to

12  set times where things could actually be done.  So, you know, not

13  setting a 30-day deadline for something that realistically might

14  not be able to get done in that time, and then we'd be back

15  exactly where we are here now.

16       So that was, as I said, a great deal of the negotiation

17  that we had.  And we on the DOJ side were also cognizant in

18  listening to our colleagues on the other side here talking about

19  some of the issues that accompany their transition and the delays

20  that go along with that.  So we were trying to balance all of that

21  when we came up with these deadlines.

22       THE COURT:  I mean, I hear you.  And so six months -- it

23  looks like a lot is supposed to be done between now and June,

24  basically.

25       MS. JACKSON:  Yes, sir.

1          THE COURT:  All right.  Understaffing, sort of the

2    staffing side of safety and security, within six months the county

3    is to develop criteria for merit-based promotions.  And I guess as

4    part of retention, the county will be establishing a career

5    ladder.  With respect to doing that, is that criteria for

6    merit-based promotion or career ladder?  How might that affect

7    what the county does in other departments?  It won't affect it at

8    all, I presume?

9          MR. TEEUWISSEN:  No, Your Honor.  The six-month deadline

10   was chosen on purpose.  Under state statute, a sheriff has to

11   present to the board of supervisors by the first meeting in July

12   the sheriff's proposed budget that would go into effect

13   October 1st of the following year.  In other words, you've got to

14   give the board July, August, and till September 15th to consider

15   the sheriff budget.

16         The thought process was that the sheriff and his personnel

17   would develop that career ladder and present that as part of his

18   budget to the board, which he's required to do anyway by statute.

19   Because the sheriff is a separate elected official, anything the

20   sheriff adopts does not mean it necessarily encumbers, for

21   example, the road department, justice court, coroner's office, or

22   whomever else.

23         THE COURT:  So any of this merit-based promotion and

24   career ladder stuff won't go into effect until July 1, 2021?

25         MR. TEEUWISSEN:  No, sir.  It would go into effect

1    October 1st of 2020.

2        THE COURT:  Oh.

3        MR. TEEUWISSEN:  The local budget year is October 1.  So

4    currently we're in physical year '20.  That started October 1,

5    2019, and runs till September 30th of next year.  However, the

6    sheriff has to present his proposed budget to the board by the

7    first meeting in July.

8        So, again, the hope is that that is presented, then the

9    board and the sheriff can work through the budget process, which

10   they have to do regardless, and that these merit-based or

11   retention-based career ladder, whatever it is, comes into effect

12   October 1 of 2020.

13       THE COURT:  Okay.  And within that six-month period, the

14   final thing that I can see within that six-month period, the

15   latest offer to hire the jail administrator or plan if no

16   qualified candidate has been found at six months.

17       MS. JACKSON:  That's correct, Your Honor.  That's correct.

18       THE COURT:  Within ten months, sort of tied to the

19   staffing side, county -- the next deadline, I don't see anything

20   under that area between six and ten months.

21       The next thing that I see on the staffing side of things,

22   county develops a plan for retention pay within ten months.

23       MS. JACKSON:  Yes, sir.

24       THE COURT:  Now, under the ten-month period also, we've

25   talked about that master plan and the persons who are suppose to

1    work on that master plan.  There's a ten-month deadline for that

2    master plan itself to be completed to determine the long-term use

3    of the three facilities.  I think it says, "Complete master plan

4    to determine the long-term use of the three facilities."

5          So assuming we get everything in by January 1, by

6    October 1, or November 1, actually, there will be something

7    definitive as to the long-term use of the three facilities.

8          MS. JACKSON:  That's correct, Your Honor.  And the

9    consultant who's going to be hired in four months, I would imagine

10   the master plan would be high up on that person's to-do list.

11   This is also an area where the monitors and the United States will

12   be involved in the review of the plan.

13         THE COURT:  Right.  And -- yeah.  And that master plan,

14   the county will always be involved in it because it has the county

15   administrator, the sheriff, the board president, and others

16   involved in that committee who the consultant would be working

17   with, I presume.

18         MS. JACKSON:  Yes, sir.

19         THE COURT:  But during that -- the other deadline -- the

20   only other deadline in that category is to evaluate the options of

21   either, one, building a new facility, or, two, further renovating

22   the existing facilities.

23         MS. JACKSON:  Yes, sir.

24         THE COURT:  And by that time I presume -- again, I don't

25   know what it's going to cost to do these swing doors and all of

1    that stuff.  But I would imagine -- I would imagine the members of

2    the board and the public and the sheriff will be at the point

3    where they say, "We put all this money, this new money into these

4    buildings.  There's no need now to tear them down."  That's what

5    we're going to hear.  That's what we're going to hear, I bet you.

6          Because now we've -- over the last several months, we've

7    put -- I have no idea how much this is going to cost.  I heard

8    Mr. Simon earlier today talk about what has been spent on the

9    jail.  I don't remember the timeline.  I don't know if it's been

10   just this one year or two years or whatever.  But I did read

11   somewhere in the last couple of months a half a million dollars

12   was put into it.

13         And at some point in time, folk are going to hear about

14   all the money that has gone into it, all the money that has been

15   paid with respect to making sure that the county's in compliance

16   with the consent decree.  And then you're going to have the

17   question, "Do we tear all of that down in Raymond and start anew?"

18         I know that's something that the county board of

19   supervisors past, current, and future will be thinking about.  But

20   my primary obligation so that the past members, so that the future

21   members will understand, is that those people have constitutional

22   rights, too.  They're pretrial detainees.  They're presumed to be

23   innocent.  They don't suppose (sic) to be held there forever.

24         The law is that we value freedom.  *US versus Salerno*, the

25   presumption is that people be free.  And obviously if you're going

1    to confine them, you need to confine them as little time as

2    possible to make sure that their final detention, if any, you get

3    on with that at a facility that's appropriate to house them

4    permanently.  So --

5              MR. TEEUWISSEN:  Your Honor?

6              THE COURT:  Yes.

7              MR. TEEUWISSEN:  Other than the citation to *US versus*

8    *Salerno*, that was what I said publicly this morning at the board

9    meeting.  Pretty much verbatim what you just said.  It's also not

10   the first time I've said that at the board meeting.

11             THE COURT:  The next category that I have sort of divided

12   up on my own personal chart, "Development and Implementation of

13   Policies and Procedures."

14             Within the first 30 days, the jail shall ensure that

15   hand-held video recorders are available and planned uses of force

16   are video-recorded.

17             The only question that I have:  What's a planned use of

18   force?  I mean, is that something in response to a riot?

19   Certainly nobody has come in to work in the morning and said, I'm

20   going to come in and --

21             MS. BARKER:  Your Honor, that is an interesting term.

22   That is whenever there are cell extractions.

23             THE COURT:  Make sure you're speaking into the microphone

24   for the court reporter.

25             MS. BARKER:  I apologize.  That is -- a planned use of

1    force is whenever there are cell extractions.  And I think -- and

2    it's actually outlined in the consent decree.

3         Mr. Parrish, if I'm wrong about that, or you need to add

4    anything, please come and let me know.

5         But part of the consent decree, it calls for video

6    recordings whenever there is a planned cell extraction.

7         THE COURT:  Oh, cell extraction.  Okay.  All right.  Okay.

8         Anything to add to that, Mr. Parrish?  No?  All right.

9         Under "Policies and Procedures," within 60 days the county

10   shall provide a table of contents of policies and procedures with

11   anticipated completion deadlines and anticipated submission

12   deadlines.

13        Again, I realize this is what the parties agreed to, but

14   we -- when I say "we," the monitor and everybody else has been

15   complaining about policies and procedures for the year that I have

16   been involved in the case.  Why do we not know what policies and

17   procedures those are and why do we need 60 days?  You've agreed to

18   it, I understand that.  Why would one need 60 days to come up with

19   a table of contents?

20        MS. JACKSON:  Your Honor, I think I'll start with that and

21   maybe our monitors can fill in where I don't adequately respond.

22   The table of contents is intended to prioritize what happens when.

23   During the course of the enforcement of the settlement, we had

24   several different approaches to trying to get the policies up and

25   on board and approved and out.  And part of the problem may have

1    been too much going on at one time.

2          So the table of contents, it's my understanding that

3    Ms. Albert, who already works with Ms. Simpson, has started.  It's

4    something to, again, move this matter off of close to square one

5    and to do it in a way where everyone is on the same page about

6    what needs to be done first and to memorialize that as part of the

7    Court's order.

8          Ms. Simpson, do you have anything to add?

9          MS. SIMPSON:  Your Honor, we do have a draft table of

10   contents that Ms. Albert has provided.  Ms. Albert's process has

11   been to facilitate the development of policies and procedures as

12   opposed to just drafting them.  And so it -- the policies ended

13   up -- end up being tailored to Hinds County, and it's in part a

14   training process as its developed.  And as a result it requires

15   the participation of staff from the facility and from the

16   sheriff's office.

17         So there has been a table of contents, but the

18   facilitation process to bring in the input from the sheriff's

19   office and the jail staff is a longer process than just having her

20   fill in dates using her own thoughts of how long it would take.

21         So that's been sort of the slow-down, at least on that

22   piece of it, so having a deadline will be really helpful.  The

23   60 days is really to allow for that facilitation process as

24   opposed to having her just fill in the blanks.

25         THE COURT:  I'm looking at your most recent monitor's

1    report from November the 13th.  For example, at Paragraph 37 it

2    mentions -- it's under the part "Protection of Harm," and it says,

3    "Develop and implement policies and procedures to provide a

4    reasonably safe and secure environment for prisoners and staff.

5    Such policies and procedures must include the following...."  And

6    it goes A through S.

7         Is that the table of contents we're talking about?

8         MS. SIMPSON:  No.  It's a much more complete table of

9    contents.  In fact, I have the draft here if the Court would like

10   to look at it.  But the number of policies that would be expected

11   for a jail of this size is easily over 100, probably between 100

12   and 150, so there's quite a few in addition to the ones listed

13   there.

14        THE COURT:  Okay.  All right.  So that's why it would take

15   more than six months or 60 days, rather.  Okay.  Thank you.

16        Under what I've sort of labeled as the category

17   "Development of Implementation of Policies and Procedures," the

18   next deadline that would be looming is five months, is that the

19   deputies will have to be trained on the settlement, compliant use

20   of force policy.  That looks like that would be -- and the

21   supervisors will be trained within that time period on the

22   use-of-force reviews.

23        And I have nothing else necessarily tied to policies,

24   development and implementation of policies and procedures.  I'm

25   going from my chart.  If there's -- if I've overlooked something,

 1   please chime in.

 2         MS. JACKSON:  Well, Your Honor, on Page 6 of the proposed

 3   order, there is the plan for implementation, so there in B1 and 2,

 4   in addition to the 60 days of providing the table of contents.

 5   Then there's a provision for training and curriculum on the policy

 6   and a training plan.

 7         So that sort of goes along with the development of the

 8   policies, making sure that staff understand them and can implement

 9   them.  I think that would be the only deadline.

10         THE COURT:  Okay.  B1 and 2?

11         MS. JACKSON:  Yes, sir.

12         THE COURT:  And that is within three months then?

13         MS. JACKSON:  Within three months --

14         THE COURT:  Okay.

15         MS. JACKSON:  -- of approval of the policies.

16         So, Your Honor --

17         THE COURT:  Okay.  So basically 60 days to come up with

18   the table of contents.  The parties go back and forth with what --

19   how those policies and pro- -- what those policies and procedures

20   look like.  They agree to it, and then they have 14 days, I

21   believe, for them to be implemented after there's full agreement.

22         MS. JACKSON:  I think that's correct.  And so the

23   three-month discussion there, just to be clear, in B1 and 2 is as

24   each policy comes online, then the three months starts.  So it

25   isn't that necessarily everything would be done at the exact same

1    time, but -- so it could be a rolling basis.  The policies come

2    out, staff are trained, the curriculum is developed, and on and on

3    for each policy.

4          THE COURT:  Okay.  Well, let me ask you this:  Is it DOJ's

5    understanding that all those policies will be adopted and

6    implemented within these 12 months or 10 months or --

7          MS. JACKSON:  Yes, Your Honor.  We're also going to -- so

8    that we don't have a situation where policies are still being

9    developed and yet staff need guidance, at the top of Page 6,

10   there's a discussion about after we, DOJ, get the table of

11   contents, we'll look at what policies could be disseminated on an

12   interim basis.

13         So we get the table of contents.  We look at the -- we

14   come up with an interim list.  The policies get sent to us.  We

15   look and make best efforts to respond expeditiously.  The policies

16   are released.  Then the curriculum and the training roll all out

17   from there.  But the idea is that the agreement itself, yes, I

18   think it would be done in 12 months.

19         Is that correct, Ms. Simpson, or am I mistaken?

20         MS. SIMPSON:  I believe what would happen is that when the

21   timetable is proposed that there would -- it would need to be

22   acceptable to both the parties and that the idea would be that it

23   would be -- that timetable would be limited to that 12-month

24   period or negotiated by the parties once the timetable is

25   proposed.

1        THE COURT:  You indicated there might be 100 policies?

2        MS. SIMPSON:  That's correct.

3        THE COURT:  And we've had difficulty doing one policy, the

4   use of force as I recall it.

5        MS. SIMPSON:  That's correct.  We do have 18 policies that

6   have been produced, and then Friday evening, I received another

7   batch of policies.  I have not looked closely to see how many it

8   is.  So there is progress in that area, but I think the

9   designation of the timetable is the first step in ensuring that

10  they're all done in a timely manner.

11       THE COURT:  I'm sure glad the new chief is here -- well,

12  not the new chief.  The new sheriff is here, because I imagine he

13  hears what's going to be on his plate, and I'm glad the members of

14  the county board of supervisors are here.  This is a lot, and it's

15  going to be a lot.  Okay.

16       MS. SIMPSON:  Your Honor, that's one reason why some of

17  the individual timelines might be a little longer than we might

18  otherwise like.  But when we looked at the totality of what was

19  being required, we wanted to make sure that there was not too much

20  being imposed in a short timeframe to allow for the develop -- the

21  implementation of all of the provisions.

22       THE COURT:  Okay.  Again, I have nothing on four-month

23  with respect to development and implementation.  Five months, we

24  have the specific training on settlement compliant use of force,

25  supervisors being trained on use-of-force reviews.

1          The next category that the parties have mentioned is

2    population management.  The first thing you do under population

3    management, I believe, occurs four months down the road.  The

4    county must retain a consultant experienced in the implementation

5    of the pretrial services program.  That's not the first consultant

6    that the county will be retaining.  I just want the record to be

7    clear, there have been other instances where we said the county is

8    going to have to hire people, consult with people, retain people,

9    retain consultants to assist in the master plan, retain

10   corrections recruitment and retention consultant, and now you're

11   going to have to retain a consultant experienced in the

12   implementation of pretrial services.

13         MR. TEEUWISSEN:  Yes, Your Honor.

14         THE COURT:  Make sure you --

15         MR. TEEUWISSEN:  I'm sorry, Your Honor.  It's not quite as

16   bad as it sounds.  One, with respect to the retention plan

17   staffing and recruiting, the county, at the recommendation of

18   Monitor Simpson, has already met with an individual, had that

19   individual here last week in Hinds County, and believes we've

20   identified somebody who will both be cost effective and

21   understands the particular challenges of a lower-educated

22   population for these positions.

23         With respect to the master plan, the county has previously

24   used the individuals that the Department of Justice has also used

25   and had them do a baseline in August of 2018.  And also they came

1    down week before last to do a follow up, and so hopefully we've

2    already engaged those individuals.  And they have been very cost

3    effective as well at rendering the advice.

4          The advice they gave us initially in August 2018 was key

5    to us reducing the population and developing a classification plan

6    that has decreased violence.  So, hopefully, those are on board

7    for the master plan and for the recruiting and retention piece.

8          With respect to the pretrial, yes, there will have to be

9    an individual who will guide us.  But the county board of

10   supervisors and the county administrator, in this current fiscal

11   year, have already budgeted for inhouse pretrial supervision.  In

12   other words, the county has already begun the move of bringing

13   pretrial electronic monitoring supervision from contractors to

14   inhouse at the county.  So while there will be some cost for that

15   consultant and the other parts of population management, the

16   county has already embraced that and got a little bit ahead of

17   that.

18         THE COURT:  Okay.  And that also includes hiring the

19   full-time individual to oversee the development and implementation

20   of the pretrial services program?

21         MR. TEEUWISSEN:  Yes.  It's my understanding that that

22   position is already in the county budget, yes.

23         THE COURT:  Okay.  And under population, the other

24   deadline, it appears that the county must authorize attendance at

25   the -- I guess at the National Institute of Corrections, NIC --

1          MS. JACKSON:  Yes, sir.

2          THE COURT:  -- training for pretrial executives for

3    individuals involved in the development of the pretrial program.

4    So those are the big issues with RDC, the work center, and JDC.

5          The next area where it appeared from the proposed findings

6    and the competing proposed findings -- and, again, I know that the

7    backdrop of Henley-Young involves the J.H. case somewhat, and I've

8    always heard that the county, more or less -- and I did not go

9    visit Henley-Young when I did my, I guess, "surprise visit."

10   Henley-Young appears to be different and in a special place.

11   They've done a lot.

12         MR. TEEUWISSEN:  Your Honor, one, it was called a surprise

13   visit, but I think I invited you out in January.  So let's call it

14   an unannounced visit.

15         THE COURT:  Okay.

16         MR. TEEUWISSEN:  Anybody in the county that was surprised

17   wasn't paying attention.  With respect to Henley-Young,

18   Monitor Simpson looked at the agreement that the county has for

19   compliance in the J.H. case and took a separate timeline that the

20   county has previously agreed to in the J.H. case and has been

21   approved by Judge Jordan, and the monitor pulled out those items,

22   which, for the most part, are already approved.  And the county is

23   working on -- and suggested incorporating those to make sure we

24   deal with the JCAs.

25         Just so Your Honor knows, when the J.H. case was started,

1    you only had delinquents at Henley-Young.  It was only after this

2    case arose that juveniles charged as adults were also incorporated

3    into Henley-Young, and because they were, that required the need

4    of additional programming and additional programming space.

5         Also so Your Honor is aware, Judge Ball entered an order

6    at the beginning of November -- I believe November 4th -- which

7    gave Hinds County 90 days to develop a programming plan with

8    respect to facilities and positions.  Thereafter, Judge Ball

9    called the current board of supervisors to his chambers to

10   emphasize the importance of that 90 days, mentioned some of the

11   same concerns that Your Honor has about changing boards, and said,

12   quite frankly, he probably should have shortened it to 60.

13        President Calhoun, who is here today, promptly left that

14   meeting with Judge Ball.  And by the time we got downstairs on the

15   sidewalk, Your Honor, the county administrator and myself and

16   others to make sure we meet their plan (sic).

17        This morning at the board meeting, County Administrator

18   Davis indeed presented a plan, and the board also agreed, I think

19   I mentioned earlier, to retain an architect for the programming

20   space.  So thus what you see in your document to a large degree

21   mirrors what the county is already obligated to do in the J.H.

22   document, so that we don't layer on a confusion but make sure that

23   the appropriate programming space and facilities are available

24   both to those who are classified as delinquents and those who are

25   classified as juveniles charged as adults.

1          THE COURT:  Ms. Jackson?

2          MS. JACKSON:  Thank you, Your Honor.  Counsel is correct.

3     Some other things that I wanted to note is when we filed our

4     motion for contempt, issues about youthful prisoners was included

5     in that document.  In the interim, one of the things that happened

6     was the monitors filed their ninth report, and our view upon

7     reading the ninth report, some of the developments that counsel

8     has alluded to also, is that we felt that the defendants had come

9     in -- had made enough progress that the juvenile prisoners issues

10    didn't need to be in our contempt motion.

11         However, the defendants still aren't in substantial

12    compliance with those provisions, so we're definitely still

13    watching, still keeping an eye on those provisions.  We're in

14    touch with, regularly, counsel in the J.H. case.  But we thought,

15    particularly given some of the other issues and matters involved

16    in our motion for contempt, that we didn't need to seek contempt

17    on that.

18         That being said, the provisions here in the stipulated

19    order are to respond to some of the concerns that we did have,

20    particularly about the programming, about mental health staff for

21    these young people.  The monitor's report talks about, you know,

22    how long youth are staying at Henley-Young, which was designed for

23    a different shorter-term population.  So this is something that we

24    are really happy to have in the stipulated order, because it

25    provides a better framework for us to continue monitoring this

1   important area.

2          THE COURT:  Right.  And in that regard, in 30 days are

3   going to post a salary for a licensed clinical social worker or

4   psychologist.  In three months with respect to Henley-Young, there

5   should be a program or something in place for educational,

6   rehabilitative, and/or recreational programs for the youth who are

7   housed there.  And then in four months, by then, there will be an

8   offer that will be submitted out there to this new clinical social

9   worker or psychologist to be on staff or to do whatever or -- or

10  at least a plan to be adopted by that time if you have not found

11  one -- if an individual has not been found.

12         MS. JACKSON:  Correct.  And then if you couple that with

13  the physical plant issues, the space for the programming dealt

14  with in the J.H. case, we think we have a real basis for

15  continuing progress here.

16         THE COURT:  Okay.  Now, according to my notes, that sort

17  of sets forth what the parties have agreed to in the various

18  deadlines.  One thing that that does not do, that this does not

19  do, and this is something that we need to talk about, it does not

20  address the past contempt.  It does not.  It does not address the

21  past contemptuous behavior of either certain individuals or

22  entities with respect to what was agreed to and why -- why

23  things -- what made the Government have to file this particular

24  motion, why this Court had to set aside this time for the hearing.

25         And it's somewhat problematic to the Court in that

 1    individuals who are responsible for carrying out their duties,

 2    number one, chose not to even show up; understood presumably what

 3    the obligations were up under the agreement; and has understood

 4    for a time this Court's concern with respect to how the agreement

 5    was going to be implemented and carried out.  And I guess I need

 6    to figure out for myself, how does the Court deal with that issue?

 7    Because this order is a binding order.

 8         The settlement agreement has been in place since 2016, and

 9    so much has occurred that is disruptive to the order, to

10    everything else about this process, and just because an individual

11    is no longer in office and no longer has to care about it and is

12    no longer his or her problem does not mean that they didn't run

13    the red light.  And it's very simple terms, and that they did

14    not -- or that they affirmatively violated the Court order.

15         So separate and apart from what I might do with respect to

16    whether I choose to sign off on the agreed order, one thing that

17    may remain open is that there may be a show cause hearing on why

18    specific individuals should not be held in contempt specifically,

19    because I look back at the monitor's report -- and, again, I

20    understand what the proposed findings say.  But what other persons

21    might have is that, Judge, there's no record, because we've agreed

22    to everything.

23         And I know the parties have said that part of the record

24    will include the exhibits that are a part of the motion and the

25    response as well as the monitor's reports because those -- I can

1    take judicial notice of the monitor's report.

2          And I've looked back at the monitor's report, and I see

3    things that the monitors have seen that cause real questions to

4    the Court.  For example, monitor's report from November the 13th,

5    2019, at page 11, which references the realignment of the eighth

6    monitoring report.  The report of 11/13/19 is the ninth report,

7    but it references the eighth report, which resulted in a qualified

8    assistant jail administrator being returned to his former

9    position.  And this is talking about the actions of the sheriff.

10         The order of March 20, 2019, specified that the jail

11   administrator, a major, has full authority to manage the

12   day-to-day operations of the jail system.  Unfortunately, it does

13   not appear that the sheriff's order has had much practical impact.

14   In at least one recent event, the sheriff intervened in the

15   personnel hearing process despite the fact that we had this

16   settlement agreement in place, despite the fact that we've had

17   those previous -- the previous monitor's report, despite the fact

18   the monitors had been on site and had dealt with these issues.

19         Someone might have to explain to me why is it appropriate

20   for this Court to just wash its hands and move on just because the

21   sheriff is no longer or will no longer be in office.  His counsel

22   is here, because he's still the sheriff.  So I assume those things

23   will be relayed to him.  That's not all.

24         Paragraph 43 of the ninth monitor's report talks about --

25   as I recall, the monitor's report sort of tracks the settlement

1    agreement.  And so it talks -- in Paragraph 43 it is talking

2    about -- Paragraph 43 of the settlement agreement itself, and it

3    talks about and it breaks up those things which are partial

4    compliance, noncompliance, full compliance, I think.

5         Of course, I've always -- skipping back to protection of

6    harm, I've always been concerned about that, Paragraph 37 of it,

7    and in fact, the partial compliance that I just described with

8    respect to intervening in the hearing comes under the protection

9    of harm portion of the agreement.  And, of course, the protection

10   of harm says, you know, you should have all these different

11   policies and procedures that we know do not exist and that we're

12   now still trying to figure out, and the parties have agreed to

13   give each other more time to do it.  And I've been begging for the

14   full year that I've been involved about why is it not done?

15        So skipping on to Paragraph 43, I raised the question this

16   morning about how can we rely on the information that is input by

17   individuals who work there at the jail?  How can we honestly sit

18   back and feel comfortable that the truth is being -- that the

19   truth is being input in the various documents, reporting

20   documents, and things of that nature?

21        We used to say at the advent of computers and stuff

22   "garbage in, garbage out."  But Paragraph 43 talks about including

23   outcome measures as part of the jail's internal data collection

24   management and administrative reporting process.  And it says

25   that, "The occurrence of any of the following specific outcome

1    measures creates a rebuttable presumption, in this case that the

2    jail fails to provide reasonably safe conditions for prisoners."

3          A rebuttable presumption, what it says is if they falter

4    on any one of these, then there's a rebuttable presumption that

5    they're not in compliance, basically.

6          And we know that there's a staff vacancy.  I mean, it's A

7    through G, and it's several of them that are not met.  So the

8    rebuttable presumption somewhat exists.

9          Staff vacancy rate of more than 10 percent of budgeted

10   positions.  A major disturbance resulting in the takeover of any

11   housing area by prisoners; I don't know how many times that has

12   occurred.

13         Three or more use-of-force or prisoner-on-prisoner

14   incidents in a fiscal year.  One of the reports that I've seen --

15   well, I guess it's in the proposed findings.  I mean, you have the

16   list of incidents that the parties intended to make sure that

17   there was a record of it to be put on.  But we're talking about as

18   many as, on average, 10 to 12 a month.

19         So we know within a fiscal year more than three have

20   occurred, which a prisoner suffers a serious injury, but for which

21   staff members failed to complete all documentation required by

22   this agreement, including supervision recommendations and

23   findings.

24         One death of a prisoner within a fiscal year.  Maybe we're

25   outside of the time of the fiscal year or not, but we do know that

1    there have been serious injuries while I've been involved since

2    January of 2019.

3          And the monitor's report says that, in looking at that,

4    that, "The sheriff's office, HCSO, still does not create a report

5    covering each of these areas.  A review of specific data reveals

6    that the agency is not in compliance with almost every aspect of

7    this paragraph.  Consequently, the detention services division is

8    unable to staff required posts, particularly at the Raymond

9    Detention Center."

10         But it says that in every -- they're noncompliant on that

11   very, very -- what the Court believes a very, very important

12   piece.  And at paragraph -- Page 30 of the monitor's report, that

13   ninth report, says that the sheriff's office and others talks

14   about authority having been given to the jail administrator, I

15   believe, to execute all duties and responsibilities relating to

16   detention services.

17         Says, "While this is consistent with the expectations

18   allowed in the settlement agreement, in practical terms the order

19   has made little difference in the day-to-day operation of the jail

20   system.  Both the jail administrator and assistant jail

21   administrator are still unable to make routine personnel decisions

22   without the approval of the sheriff.  These include such basic

23   matters as the enforcement of individual uniform grooming

24   standards as well as more serious matters such as the termination

25   of an officer for use of excessive force," which was discussed

1    previously.

2         All of those things -- just some of those things were done

3    despite the parties knowing that they're under this agreement.

4    And now just because persons will no longer be in office -- and

5    that was the thing that I was facing going into this thing.

6    Because you do want to give the new people a clean slate and to

7    start anew, but how do you address flagrant violations in the

8    past?  Do we just allow elected officials and others to walk away,

9    wash their hands, and not be held accountable in any way?

10        So part of the order that I might be implementing and

11   signing off, there may be a component -- I'm just -- I'm just

12   telling you -- another show-cause hearing as to why certain

13   specific individuals ought not be held in contempt.

14        They don't care enough to be here.  Their conduct is in

15   question.  There are tools that the Court can use and will use.

16   And one of the issues that might come up is whether persons ought

17   to be permitted to be involved in any jail in the state of

18   Mississippi on an ongoing basis because of how they fail to do

19   their -- not just because of how they failed but how they

20   interfered with the progress of the consent decree, the order of

21   this Court from 2016, the blatant interference.

22        And I understand that there's something with being able to

23   appropriate enough money and being able to hire enough people and

24   being able to do things, but some things -- I can't say that

25   there's no excuse, because I have to give persons an opportunity

1    to be heard and to provide that excuse.  But there can be little

2    excuse for someone reading the terms of the settlement agreement

3    and specifically doing things that breach that settlement

4    agreement.

5         I warned the parties back in January of 2019 take this

6    serious, because everybody at the detention center -- no one over

7    there is guilty of anything.  That's the first thing.  They are

8    all presumed to be innocent.  Some of them are indeed truly, truly

9    innocent.  And for them to be subjected to some of the things that

10   I saw -- which reminds me of the question that I did -- I thought

11   about when I was back there during the break.

12        When I went out to the detention center back in August,

13   and when we came and had our status conference in September, I

14   raised the question, and I need to know the answer:  Are there

15   tables that those -- for the -- do we have --

16        MR. TEEUWISSEN:  I shot up on that one, Judge.

17        THE COURT:  You shot up there.  But they do have tables to

18   eat off of now?

19        MR. TEEUWISSEN:  I can verify as an officer of the Court,

20   my personal inspection Thursday before last, that what you

21   witnessed in August is no longer occurring.  There's appropriate

22   modular furniture, both chairs and tables that was bought for

23   Pod C. The other Pod C isn't done.  We've said that.  And that

24   furniture was Major Rushing put all that in Pod B, and yesterday

25   they were using it.  Some of those tables have a game top.  Others

1    don't, but it is there.

2         THE COURT:  Please tell me it got there in October.

3         MR. TEEUWISSEN:  I'm not sure when it got there.  I wasn't

4    in charge of that, Your Honor.

5         THE COURT:  Okay.

6         MR. TEEUWISSEN:  But you asked me two questions in

7    September which were very serious.  One, what was the status of

8    Pod C?  And, two, why on earth anyone would have to eat sitting on

9    the floor?

10        I was not going to come back before Your Honor without

11   having at least those two answers.  And so I'm proud -- that's why

12   I shot up.  I'm proud to say that, based on our inspection, that

13   furniture is in place and is working appropriately.

14        THE COURT:  All right.  Now, I appreciate the parties'

15   efforts in trying to get this matter -- get the matter of the

16   contempt issue resolved.  I'm going to take your joint motion

17   under consideration.  I have an obligation to review it, to think

18   about it, and sign off on it if I -- if I agree with it.  And

19   assuming that I do agree with it, I would expect that these -- the

20   deadlines that you all have agreed to.

21        It's easy for me to say this is what the -- this is what

22   the parties agreed to.  That's what I told you back when I got

23   involved, when parties come to me with consent decrees and

24   stipulated agreements and they've worked it out with each other

25   and they've assured each other that this is what they can do.

1       So now I only have to enforce your own orders, and I will

2  attempt it.  I will seek to do that.  And I will hold -- I will

3  hold you to it.

4       I do not want to hear, read, or see or be -- or have to

5  suffer through the fact that somebody got hurt over there again,

6  because just like I suggested over that status conference that DOJ

7  be informed and to open a criminal investigation, I will -- I will

8  expect nothing less for anything else or for anyone else over

9  there who commit criminal acts against these persons who are held

10  in your custody.  And however high up the chain DOJ must go, they

11  should go.

12       Leave it to the grand jury.  Leave it to the jury of your

13  peers.  But we cannot tolerate what's been going on at the Raymond

14  Detention Center.  We cannot tolerate that, not in this society,

15  not in 2019, not in 2020.

16       Is there anything else, Ms. Jackson?

17       MS. JACKSON:  No, sir, Your Honor.  Thank you very much.

18       THE COURT:  All right.  Anything from the monitors?

19       MS. SIMPSON:  No, Your Honor.

20       THE COURT:  All right.  Anything from the county?

21       MR. TEEUWISSEN:  Yes, Your Honor.  I think there's some

22  language that was in a different matter, but it's really

23  appropriate as well for this matter.

24       This Court stated, "It should come as no surprise that

25  when the government underfunds its large systems, whether schools,

1    social service agencies, prisons, or mental health providers, the

2    systems become ripe for constitutional violations.  If it remains

3    uninterested in fixing this problem, the government will be doomed

4    to repeat it and repeatedly have to defend it in federal court."

5         I say those words, and I will make sure that the incoming

6    supervisors, regardless of who they choose as counsel, know those

7    words as well.

8         Your Honor, on behalf of the county, pursuant to our

9    rules, our ethical obligations, we wholeheartedly hear you and

10   will continue doing everything we can for whatever time we

11   represent the county to make sure that no one is treated

12   inhumanely at and county detention facilities.  Thank you.

13        THE COURT:  Thank you, Mr. Teeuwissen.

14        Anything further from the representative for the sheriff?

15        MS. BARKER:  No, Your Honor.

16        THE COURT:  All right.  The Court is going to take this

17   under advisement.  Of course, for the parties who are not here,

18   you can share with them what you remembered about what I said, and

19   to the extent the Court has anything, it will put it in the order.

20        And, again, there may be a portion of that order which

21   talks about what tools the Court might have available to it and

22   whether or not we need to have a specific show-cause hearing on

23   some of the issues that might still be out there that cause real

24   concern to the Court.

25        I appreciate the parties for having attempted to and done

```
 1    all that you've done to sort of bring a close to this, so that you
 2    can move forward with implementing what you agreed to.
 3            What the Court cannot tolerate, though, is flagrant
 4    violations of its orders.  And I've adopted Judge Barbour's
 5    order -- that's not my order.  That's the Court's order from 2016,
 6    and I have been trying to facilitate trying to make sure that that
 7    order is complied with throughout this year.
 8            And the Department of Justice came forward and said,
 9    "There has been no compliance with many portions of it; and,
10    therefore, Judge, you need to find -- we have a contempt motion.
11    And -- but we've resolved it.  We've resolved our differences."
12    That's what the parties have told me.
13            But I'm involved now.  I'm fully engaged, and we're moving
14    forward.  That concludes all that I have today.  Thank you, ladies
15    and gentlemen.  Court is adjourned.
16                    (Proceedings adjourned at 4:41 p.m.)
17
18
19
20
21
22
23
24
25
```

1          **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Certified Court Reporter, in and for

4    the State of Mississippi, Official Court Reporter for the United

5    States District Court, Southern District of Mississippi, do hereby

6    certify that the above and foregoing pages contain a full, true,

7    and correct transcript of the proceedings had in the aforenamed

8    case at the time and place indicated, which proceedings were

9    recorded by me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial Conference

12   of the United States.

13         THIS the 17th day of December, 2019.

14

15                      */s/ Candice S. Crane, CCR*

16                      Candice S. Crane, CCR #1781
                        Official Court Reporter
17                      United States District Court
                        Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25