```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3


 4    UNITED STATES OF AMERICA                          PLAINTIFF

 5    VERSUS                       CAUSE NO. 3:16-cv-00489-CWR-JCG

 6    THE HINDS COUNTY BOARD OF SUPERVISORS,
      HINDS COUNTY SHERIFF, ET AL.                     DEFENDANTS
 7

 8

 9                 STATUS CONFERENCE PROCEEDINGS
              BEFORE THE HONORABLE CARLTON W. REEVES,
10               UNITED STATES DISTRICT COURT JUDGE,
                         JANUARY 24, 2020,
11                     JACKSON, MISSISSIPPI

12

13

14
      APPEARANCES:
15
      FOR THE PLAINTIFF:      CHRISTOPHER N. CHENG, ESQ.
16                            AARON FLEISHER, ESQ.
                              CANDACE MAYBERRY, ESQ.
17
      FOR THE DEFENDANTS:     SCHERRIE L. PRINCE, ESQ.
18                            TONY R. GAYLOR, ESQ.
                              CLAIRE BARKER, ESQ.
19

20

21
      REPORTED BY:
22
          CANDICE S. CRANE, CCR #1781
23        OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi  39201
          Telephone:  (601)608-4187
25        E-mail:  Candice_Crane@mssd.uscourts.gov
```

1          **IN OPEN COURT, JANUARY 24, 2020**

2

3          THE COURT:  You may be seated.

4          Good morning.  This is *United States of America versus*

5  *Hinds County*, cause number 3:16-CV-489-CWR-JCG.  We're here for a

6  status conference today.  Who is here for the United States?

7          MR. CHENG:  Christopher Cheng, Candace Mayberry, and

8  Aaron Fleisher, Your Honor.

9          THE COURT:  All right.  Thank you.  And my monitors are

10  here today as well.  Ms. Simpson?

11          MS. SIMPSON:  Mr. James Moser, David Parrish, and Dr. Rick

12  Dudley.

13          THE COURT:  Okay.  Thank you.  Did you hear that, Candice?

14          THE COURT REPORTER:  Yes, sir.

15          THE COURT:  All right.  Thank you.  And who is here for

16  Hinds County?

17          MS. PRINCE:  Scherrie Prince and Tony Gaylor.

18          THE COURT:  Okay.  All right.  And who is here for the

19  sheriff?

20          MS. BARKER:  Good morning, Your Honor.  Claire Barker on

21  behalf of the sheriff's office, and at the table, we have

22  Supervisor Credell Calhoun, Sheriff Vance, and Supervisor Graham.

23          THE COURT:  All right.  I presume the parties have

24  received the Court's order adopting the motion for settlement; is

25  that correct?

1          Any particular questions or issues with respect to the

2     order that the Court entered?

3          MR. CHENG:  No, Your Honor.  We did receive the order.

4          MS. PRINCE:  No, Your Honor.

5          THE COURT:  Okay.  How do we wish to proceed with respect

6     to the status conference?

7          MR. CHENG:  Your Honor, I just have a few opening remarks,

8     and then I think it would be best to return to the normal format,

9     which is to have the monitors report on what they have observed

10    during last week's -- during this week's tour.  We did want to

11    thank the Court for issuing the stipulated order and his opinion

12    in advance of the tour, so we could provide them to the defendants

13    as well as to the monitors.

14         I think it's very clear to all the parties, including the

15    monitors, the United States, that the Court considers this to be a

16    matter of urgency.  And during the tour, we have tried to make it

17    very clear that these are real deadlines; people have to comply

18    with them.  And despite the fact that there are a lot of things to

19    be done, they really do need to be done.

20         I think it's also fair to say that we got a general sense

21    from everyone we dealt with that they understood that.  The only

22    question is, what are the actions going to be like once this week

23    has moved on?

24         That said, I would like to turn it over at this time to

25    the monitor, so she can brief the Court on the initial assessment

1    based upon this week's on-site visit.

2         THE COURT:  All right.  Just out of curiosity, it was not

3    clear for the last year that this Court was serious about this

4    order?  It just took these 12 pages to let you know that everybody

5    now understands?

6         MR. CHENG:  Sometimes when something is in writing, it

7    becomes much more concrete, Your Honor.

8         THE COURT:  Okay.  All right.  Ms. Simpson, good morning.

9         MS. SIMPSON:  Good morning, Your Honor.  I struggled with

10   how to present the report today, because we do have the new

11   stipulated order.  And so now we have two working documents:  the

12   settlement agreement and the stipulated order.

13        And we also, as I'm sure everyone in the courtroom knows,

14   have a lot of new players in -- in this cause, so we have a new

15   sheriff, many new board of supervisors members, new county

16   attorney, new county manager, and there's also been changes at

17   Henley-Young.  So it seemed to me that it might be helpful to

18   highlight a couple of the requirements in the stipulated order and

19   look at the current status and what's expected under the order,

20   and then we can go back more generally to some of the settlement

21   agreement requirements.

22        THE COURT:  Okay.  So that we can make sure that the

23   record is clear and the vernacular is correct, we have a new

24   attorney for the board of supervisors.

25        MS. SIMPSON:  That's correct.

```
 1          THE COURT:  We don't have a new county attorney, I don't
 2   believe.
 3          MS. SIMPSON:  Oh, I'm sorry.
 4          THE COURT:  I don't -- because there is a distinction
 5   here.
 6          MS. SIMPSON:  Yes, I understand, and it's something that I
 7   have not -- it's not the same terminology where I'm from, so
 8   that's --
 9          THE COURT:  Trust me, it's not the same terminology.  I
10   mean, it's Mississippi, so...
11          MS. SIMPSON:  Okay.  Okay.  So one of the -- and I think
12   very important settle- -- or provisions in the stipulated order is
13   in the very first paragraph of -- or numbered paragraph "IA" and
14   that is that the County shall use a qualified security contractor
15   with the assistance and oversight of an architect with corrections
16   experience to accomplish the following safety and security
17   measures, and I think that is an important provision.
18          Throughout the litigation, we continued to hear that a lot
19   of money has already been spent on repairs and renovations at RDC
20   in particular, and it was always a little difficult to see where
21   that money was going because RDC continued to be in a very
22   dilapidated state.  And so that was the reason for that particular
23   provision.
24          You know, there were some specific examples of work that
25   was done that would really not even have been done at all if a
```

1    qualified corrections person was involved.  So, for example, at

2    one point in the renovation of C-POD, the maintenance personnel

3    had -- had put -- basically had covered over the windows in the

4    cells.  In their view, making it more fortified.  Well, in a jail

5    you can't cover over the windows into a cell, because then you

6    can't see what's going on in the cell.

7         So that's sort of an example of really a need for a

8    contractor with experience in corrections work, so that the work

9    is done -- the necessary work is done, and it is done correctly.

10   There also had reportedly been a lot of money going into repairing

11   the doors on an ongoing basis, but they were repaired in such a

12   way that they continued to be broken by the inmates.  And now that

13   there is a qualified contractor coming in on the doors, they have

14   found a way that they can be renovated that they won't be broken

15   again or less likely to be broken by the inmates.

16        So that language is really important in something that we

17   want to see going forward, that there be somebody on site with

18   experience in correctional renovation and -- and repairs and

19   overseen by an architect as well that has that correctional

20   experience.  That doesn't mean that somebody local can't be

21   involved in doing the work.  I think that's great to develop local

22   capacity, but it really is important that there be somebody with

23   that kind of correctional experience involved.

24        And this will also be important when we get to the master

25   planning part of the stipulated order, because it really is -- in

1    looking at the options for the long-term plan, it's really

2    important to have a good handle on what it would take to bring RDC

3    up to needed standards and the cost and the effort, so that that

4    knowledge can go into figuring out what the long-term plan could

5    be.

6           The -- the stipulated order goes on to talk about the

7    various repairs to the doors, so that they actually can lock.

8    Obviously, that's a very important function in a jail.  The C-POD

9    is being worked on.  I think it's important to know that it looks

10   nice now.  It's got a fresh coat of paint, but there is a long

11   ways to go for it actually to be ready to be occupied.  One of the

12   provisions is that there be a fortified strip go down the side of

13   the cells to minimize the ability of the inmates to push the doors

14   open.  That's been done in two of the housing units.  That hasn't

15   been done in the two other housing units, so that's still a pretty

16   big job that has -- on those two units hasn't been started.  When

17   we toured C-POD --

18          THE COURT:  Let me ask you -- I'm sorry.  Let me ask you

19   this.  Which pod was it when we were back here -- I guess I made

20   my visit in August, and I was assured that one pod or one area --

21   and I can't remember which one it was -- was going to be done in

22   30 days, and I said, no, let's say 60 or 90 days.  Is that pod

23   complete yet?

24          MS. SIMPSON:  No.  That was C-POD, and that's the one I'm

25   talking about now.  The two units still need that metal strip.

1    The -- when we were there, there was water on the floor, and it

2    was from the recent rain.  And we learned that there -- the roof

3    has quite a few problems.  May at one point -- may already need a

4    new roof, but at a minimum, a lot of patching work has to be done

5    so that it does not leak.  In fact, in one place you could stand

6    in the -- on the upper floor of the housing unit, and you could

7    actually see daylight out through the roof.  So the roofing is a

8    real problem.

9         The water was turned off at the time we toured.  At some

10   point, obviously, it needs to be turned on, and there may or may

11   not be issues with the toilets and the sinks leaking.  Certainly

12   that had been reported by the inmates, but because the water was

13   turned off, we had no way of checking it while we were there.

14        THE COURT:  The water was turned off where, Ms. Simpson?

15        MS. SIMPSON:  I think during the renovations.  When we

16   toured this week, the water was turned off, so I assume --

17        THE COURT:  Just in that particular pod that's being

18   repaired?

19        MS. SIMPSON:  Right.  Right.  And the pod is four units,

20   so its C -- each of the pods -- there's A, B, and C-POD.  Each one

21   has four housing units in it, so C-POD has four units and the

22   water was turned off for all four units.

23        THE COURT:  Anyone living in there?

24        MS. SIMPSON:  No.

25        THE COURT:  Okay.  That's --

1          MS. SIMPSON:  C-POD is empty for these renovations.

2          THE COURT:  All right.

3          MS. SIMPSON:  And the -- the work on the housing -- and

4     I'm not right now having the different pods clear in my mind,

5     because some have been repaired and some have not.

6          In C-POD I believe there are still housing unit rec yard

7     doors and control room doors to be repaired.  Mr. Parrish could

8     provide the detail on which of those doors are -- need repairing

9     and renovating in C-POD, so that I believe has not been done as

10    well.

11         And there is what I would call "a punch list."  I believe

12    Captain Fielder has created a punch list of a number of other

13    things that need to be done in C-POD.  Some places where a bunk is

14    missing, where there's some sheetrock damage, things of that sort,

15    so there is a full punch list.

16         But Your Honor is correct; when we toured, it was

17    represented that it would be completed in one month, and assuming

18    that that was overly ambitious, there was talk of two or three

19    months.  But it's now much further than that and still with quite

20    a bit of work to be done.

21         And I -- the doors need to be done under the stipulated

22    order within four months, so there is some time under the order

23    for that.  But in order for the pod to be occupied, there's quite

24    a few other things that need to be completed.

25         Another requirement of the stipulated order that has not

1    really been initiated yet is -- involves the booking cells.  And

2    the order requires that in the occupied cell, in the booking cell

3    have the door changed out.  Right now you can't see into any of

4    the booking cells if the doors are closed.  They do have a little

5    window.  They've been covered over with mesh.  As a practical

6    matter, you can't see into them.

7         And that's typically a very dangerous time, because

8    individuals come in potentially intoxicated or on drugs or with

9    unclear medical issues.  And so it's really important to have that

10   visibility in that timeframe.  That's something that needs to be

11   completed.  It really -- I don't believe -- has been looking at

12   yet in terms of who the contractor would be and when the work

13   would be completed.

14        More troubling to me is -- and in retrospect the

15   stipulated order on this issue could have been a little more

16   clear.  It was my understanding that those single cells in the

17   booking area would not be used to house inmates at all.  They're

18   not built for housing inmates.  The settlement agreement requires

19   that those holding cells not be used to house anybody longer than

20   eight hours.  Currently, they are being used to house inmates.

21   One inmate has been there since mid December.

22        And they -- they are limited in space because of the

23   renovations, and they do have issues with difficult inmates

24   because the doors don't lock.  But those cells really aren't

25   intended to be used for housing.  It is addressed in the

1    stipulated order.  The way the order reads, it sounds like they

2    have four months to discontinue using those cells.  It certainly

3    is not ideal to be using them.

4          THE COURT:  Which paragraph of the order are you

5    specifically referring to?

6          MS. SIMPSON:  It would be paragraph "I(A)(7)," the County

7    shall replace all holding cell doors in the booking area.

8          THE COURT:  Is this the area where -- and forgive me if

9    I'm -- you know, I'm going off on memory.  Is this the area where

10   they keep people who might be injured or need medical attention?

11   Because I remember seeing a couple of people who had received some

12   sort of medical treatment and were -- was in an area where that

13   person was recuperating.  Is that the area where you're talking

14   about they should not --

15         MS. SIMPSON:  No.  I believe that would have been the

16   medical housing area.

17         THE COURT:  Okay.

18         MS. SIMPSON:  This is the booking area.  When people first

19   come in and they're booked during the booking process and until

20   they're classified and sent to housing, they are typically held in

21   a holding cell in the booking area.

22         THE COURT:  Okay.

23         MS. SIMPSON:  And there are a couple of multiuse cells

24   there, which are typically used for the inmates being booked in.

25   Although, occasionally there's a difficult inmate that needs to be

1    housed separately, in which case they use a single cell.

2         But then there's a whole row of single cells that are

3    actually not visible from the booking station, and they typically

4    are not used and should not be used.  If they're used at all, it

5    should be for a short period of time before somebody is moved to

6    housing -- one of the regular housing units.  Right now four of

7    those cells are being used to actually house inmates, and one

8    person there has been there a little over a month.  And as I

9    said --

10        THE COURT:  Did you receive any explanation as to why the

11   person -- I mean, because booking takes 24 hours, 48 hours,

12   72 hours I would imagine.  You know, if somebody is intoxicated

13   when they come in --

14        MS. SIMPSON:  Right.

15        THE COURT:  -- generally.

16        MS. SIMPSON:  And these are not being used at this time

17   for incoming inmates.  These are inmates that have presented a

18   problem at the facility and the -- as I said, the explanation was

19   because they -- the cells in the housing unit are limited because

20   of the renovation and because the doors don't lock, they have used

21   these booking cells for more difficult inmates.

22        We have suggested that alternatives include using the

23   special housing units at the work center, using JDC, using the

24   multicell -- multiperson cell in booking, because at a minimum, it

25   provides more room.  You know, there certainly may be times when

1   those alternatives aren't available either.  But -- but using

2   those cells -- single cells in booking for housing is -- is --

3   ultimately is prohibited by the stipulated order.  The sooner they

4   can do that, the better, because they're really not intended for

5   long-term housing and they're not appropriate for that use.

6        THE COURT:  But did you get an explanation as to why those

7   particular --

8        MS. SIMPSON:  Yeah.  As I mentioned, because they're

9   difficult inmates and they don't -- the explanation was they don't

10  have cells in the housing units that can adequately handle these

11  inmates because of the limitation of cells, and because they don't

12  have cells that lock at this time is the explanation.

13       THE COURT:  Okay.  Thank you.

14       MS. SIMPSON:  And moving to I(B) the master planning

15  process, again, those deadlines aren't upon us yet, but this is

16  something that really the preparation for that needs to start now.

17  It is a fairly long-term process.  A lot of information has to be

18  gathered, a committee needs to be formed, a facilitator needs to

19  be contracted, and its -- it really is an important part of the

20  roadmap.

21       One of the difficulties for the County and for the sheriff

22  is knowing where to invest their money.  Is RDC going to be used

23  in the long term?  Is it not?  Same with JDC.  And it's

24  understandably difficult to invest a whole of money in a facility

25  that may not be used.  But that end game needs to be identified,

1   so that what we do in the short run is -- becomes clear and makes

2   sense, and so that's really important.

3        And its -- we don't know at this time what that master

4   planning process will disclose.  But we have said from the

5   beginning that for an inmate population of the size here and the

6   size of the county, running three facilities is not very

7   efficient.  And I understand that there's a perceived benefit in

8   each facility, but one of the reasons why the staffing needs are

9   so high is because they are operating three facilities.  And --

10  and that makes the master planning process very important to

11  figure out what the best use is, so that they can reduce the

12  number of facilities and invest the money in the ones that they

13  are going to keep.

14       One of the critical provisions of the stipulated order,

15  and perhaps one of the most difficult, is to increase the

16  staffing, and the staffing this trip was actually at an all-time

17  low.  They are now down to 204, and it helps that their population

18  is also down.  It's like 430, in that range.  But still, again,

19  with the inefficiency of running three facilities, that is far

20  less than what they need to provide adequate supervision.

21       And some work is underway.  We did bring a staffing or a

22  recruit -- retention and recruitment specialist on to the team to

23  help provide that.  Defendants have embraced that, which is -- has

24  been good to see.  That person has been out once, and he is coming

25  I believe next week and will be meeting with the various

 1   stakeholders and working through some of the issues.

 2        As has been mentioned, they actually have hired quite a

 3   few people, but they've lost more than they've hired.  And

 4   retention seems to be an enormous issue here, so that's being

 5   worked on.

 6        And I do want to eventually talk about some of the more

 7   general things we've seen, but in connection with staffing, we had

 8   a very good visit with the training personnel and are very

 9   encouraged with some of the work that's going on there.  And when

10   I'm done, I'll have Mr. Parrish talk about some of that.

11        There's a couple of very early job description -- or

12   excuse me, jumping ahead -- early deadlines that I think really

13   need to be highlighted, and one of them is the job description for

14   a jail administrator.  Major Rushing has -- has done a great job

15   holding down the fort.  It's been difficult for us, because she

16   doesn't actually meet the requirements of the settlement

17   agreement.  And so I -- one of the provisions in the stipulated

18   order is that they actually post for somebody who meets those

19   requirements, and there's provision for if no one appears with

20   those qualifications.  But that deadline is 60 days, so that's

21   going to come up pretty quickly.

22        THE COURT:  What -- I'm sorry.  Which paragraph is that,

23   Ms. Simpson?

24        MS. SIMPSON:  That is P.I. --

25        THE COURT:  Is that C(1)?

1          MS. SIMPSON:  Yes, C(1), II. C(1).

2          THE COURT:  Okay.

3          MS. SIMPSON:  And this is jumping around a little bit,

4     because I wanted to highlight some of the things that are very

5     short deadlines.  Another one that has a very short deadline is --

6          THE COURT:  I mean, do you know if -- if the job

7     description has been prepared at this time?

8          MS. SIMPSON:  Not to my knowledge, but I have to admit we

9     didn't specifically ask that question.  So perhaps Ms. Barker

10    knows.

11         THE COURT:  Okay.  I mean, that's one of the -- when the

12    others respond, please respond to the questions that I've posed

13    simply because the Court took -- it took the Court about 30 days

14    after the parties submitted the order to the Court for the Court

15    to enter it.  And the parties knew at the time back in December

16    when we met -- I guess it was December when we met -- that it was

17    the Court's intention to enter the order in its submitted form, I

18    believe.  I think I indicated that to the parties.  I just think I

19    announced that I would have something else to say, but that I

20    would enter the order.

21         So I'm hoping the County and/or the sheriff's department

22    and the parties in general did not sit to wait for the Court's

23    actual execution and entry of the order before it started taking

24    steps to implement the order.  In other words, you've -- the

25    parties had about a 30-day grace period that would not count

1   against you for getting some of these things done.  You may

2   proceed.

3        MS. SIMPSON:  That's correct.  So another fairly short

4   deadline is under the policies and procedures, which is

5   III.(A)(1), within 60 days there has to be a table of contents

6   listing the policies and procedures to be developed and the

7   anticipated deadlines.  This is another short deadline.

8        As the Court knows, I have brought on to my team an

9   individual to help with the development of the policies and

10  procedures.  It does require the participation of the local staff.

11  And the -- I think the point person on this particular project has

12  been difficult to engage, and so I think that needs to be

13  addressed in order to meet this -- this deadline.  So that

14  deadline is going to also come up pretty quickly.  And it is --

15  even though a member of my team is working on it, it does require

16  the participation of sheriff's office staff.

17       Another very short deadline -- and I want eventually to

18  talk about Henley-Young in a little more detail.  But they have

19  30 days to post a position for a treatment director and/or

20  coordinator, and that, Your Honor, is in IV.(A).  And I'm -- they

21  certainly have been looking for somebody to fill that role.  What

22  the stipulated order did that's a little bit different is it

23  identified the position as a treatment coordinator or program

24  coordinator, and that appeared to be, based on the experience with

25  the prior individual, of what was really needed on site.  And also

1   the stipulated order allowed that posting to be either a

2   psychologist or LCSW, a licensed clinical social worker.  And so

3   it's important that those nuances be understood and addressed in

4   the posting, because it does change the nature of the position

5   somewhat and also changes the licensure requirement that hopefully

6   will still bring a very qualified applicant but may broaden the

7   potential applicant field.  So that's -- that's a very quick

8   deadline, 30 days, and an important one to read carefully to see

9   how it is different from what's been posted previously.

10          Another area -- and this doesn't have particularly quick

11   deadlines but it's -- it's sort of a new -- a new area for Hinds

12   County, and that's the development of a pretrial services program.

13   The purpose of that provision is to maintain population

14   management.  Hinds County inmate population has dropped

15   significantly, and that's a result of a number of things.  But

16   this develops what most communities are using, including the

17   federal court system is using, to actually have a pretrial program

18   that is high functioning and makes that population drop

19   sustainable.

20          And the requirement in the stipulated order is that there

21   be a consultant retained, and there is a consultant that has

22   previously worked with Hinds County who does -- he was working

23   with them on the development of the CJCC, the Criminal Justice

24   Coordinating Counsel, that his organization also has a lot of

25   experience in developing pretrial programs.  They can, of course,

1  contract with somebody else, but there is somebody who's already

2  experienced in Hinds County that has that expertise.

3       It also requires that the County hire a full-time

4  individual to oversee the development and implementation of a

5  pretrial program, and I did want to emphasize that because

6  understandably in a jurisdiction where funds are limited, which is

7  true in every jurisdiction but perhaps has been more of a problem

8  here, there's a tendency to add these kind of duties to somebody

9  who already has a job.  And that was being done with an individual

10  who was already serving under the settlement agreement as the

11  quality control officer in the area of releasing and records, and

12  when there was apparently a position budgeted for pretrial

13  services, he was given that job on top of what he was already

14  doing.

15       And so this stipulated order makes clear that's not what

16  is expected to happen.  That there needs to be a full-time person

17  dedicated to the development of pretrial services program and not

18  have those duties added on to somebody who already has a full-time

19  job.  And I can go more into what that looks like, but there is a

20  fairly long period of time for the actual development of the

21  program, but it does require getting those people on board so that

22  can get started.  And --

23       THE COURT:  But the County has, according to section

24  IV.(2), I guess it is, IV.(A)(2), the County has four months to

25  hire that particular person, right?

 1          MS. SIMPSON:  That's correct.

 2          THE COURT:  Okay.

 3          MS. SIMPSON:  That's correct.  One thing that is mentioned

 4     in the introductory paragraphs that I want to mention, and that's

 5     on Page 2, it says, "The Settlement's self-reporting and

 6     monitoring processes also shall apply to this Order."  And that's

 7     one thing I wanted to emphasize, because it's something that we

 8     believe is an important part of the settlement agreement, and by

 9     incorporation, a part of this.  And it's not something that has

10     been done in accordance with the settlement agreement, and that is

11     there is a requirement that there be a self-assessment, and that

12     self-assessment is supposed to be completed before each site

13     visit.

14          The purpose of that requirement is actually to essentially

15     create their own action plan on how they're going to achieve

16     compliance and whose responsible for each area of compliance, what

17     actions are needed.  And that is intended to really guide their

18     own process towards compliance, and that hasn't been routinely

19     done.  That is something that we would like to see done.  It's

20     required by the settlement agreement and now by the stipulated

21     order as well.

22          And in that area, I also want to highlight that the -- the

23     compliance coordinator position is, in fact, a full-time position

24     under the -- the settlement agreement.  And, again, I think

25     there's a tendency to sometimes add on other duties that are

1    separately required and -- and attention has to be given to the

2    fact that the actual requirement that that be a full-time

3    position.  There was recently talk about adding some of the -- the

4    quality control duties to that position or potentially some of the

5    pretrial duties to that position, and it really needs to be

6    highlighted that under the settlement agreement, those are

7    different -- different duties.  And at a minimum, the compliance

8    coordinator at this time needs to be a full-time position.

9          And then lastly I wanted to highlight the provisions on

10   Henley-Young.  I mentioned the posting for a treatment director,

11   because that requirement is very short.  But there is also the

12   requirement for developing programming that is covered in the

13   Henley-Young section, Roman Numeral V.  The Henley-Young section

14   of the litigation is sometimes a bit of a stepchild.  As it turned

15   out, the individuals at Henley-Young had not seen the stipulated

16   order when we visited -- when my juvenile expert visited with them

17   this week.  And its -- so they're already somewhat behind in not

18   even knowing that those requirements had been entered into a court

19   order, so I think --

20         THE COURT:  Any -- any explanation as to why?

21         MS. SIMPSON:  I will let my juvenile expert address that.

22   But my sense is in part because of the turnover in the -- in the

23   attorneys' positions and the County positions as well as

24   Henley-Young having a separate settlement agreement, which I think

25   has often been their focus.  And so the proceedings related to

1   Henley-Young in this case sometimes seem to get lost in the

2   translation I guess I would say.  But they have now been informed

3   of the requirements.

4        The programming deadline is three months, which is still a

5   fairly short deadline, but the posting of the position for the

6   program coordinator is coming up rapidly.  So those are the

7   positions in the stipulated order that I wanted to emphasize and

8   mention briefly where we see the current status.

9        We, of course, did our general site visit as well looking

10  at the requirements of the settlement agreement, and I typically

11  look more at the administrative side of things.  And there has

12  been, I would say, very good progress in the area of grievances.

13  It's, again, perhaps not the highest priority, given the condition

14  of RDC, but it can certainly help with the demeanor of the inmates

15  and the facility generally.

16       In the past there have been -- many times when there are

17  hundreds of grievances that have fallen off the dashboard, and,

18  therefore, not been responded to.  That was not the case now.

19  There were virtually no grievances that had gone unresponded to,

20  and looking at the substance of the grievance responses, they have

21  certainly improved.  There are still occasions where they really

22  don't provide an adequate response to the inmate, which can

23  contribute to frustration and -- and poor -- and cause attitude

24  issues on the -- on the housing units, but that area was much

25  improved.

1        Records is very much improved.  Again, there were some

2   issues, which will be detailed in the monitoring report, but the

3   files are in much better order.  They're tracking the basis for

4   detention.  I will highlight one glitch that is really quite

5   troubling is I did not have the opportunity to review too many

6   files, but in two of those files, there was a notation on the

7   arrest form after noting the arrest that said, "hold for

8   investigation."

9        In fact, one of those individuals should not really have

10  been booked in, but was booked in because it said, "hold for

11  investigation," which was a handwritten note by the officer.  And,

12  obviously, that does not constitute a legal hold.  So that's the

13  first time I've seen it.  I saw two out of seven files had it, so

14  it's a trend that should definitely be addressed promptly.  But in

15  general, the files were in much better order than I've seen in the

16  past.

17       THE COURT:  Well, what did -- could you tell me what do

18  you mean by notation that says "hold for investigation"?  Who is

19  that notation to, and what is someone to do when they see that

20  notation?

21       MS. SIMPSON:  It -- the intent was that the releasing

22  officer should hold that individual for purposes of the officer

23  doing an investigation, even though the individual might otherwise

24  be entitled to release.

25       THE COURT:  So the person is being detained for a period

1  of time, so that an investigation can be completed?  Is that what

2  you perceived to be from that particular note?

3       MS. SIMPSON:  That's correct, that a handwritten note like

4  that does not constitute a valid hold.  So if a person is

5  otherwise entitled to release, they should not be detained based

6  on that.  And like I said, one individual actually was being

7  booked only on misdemeanors, which the jail no longer takes those

8  misdemeanors, and so the only reason he was booked in was based on

9  that handwritten note "hold for investigation."

10       THE COURT:  Is that -- I mean, did you ask anyone any

11  question about that, and did they respond in any way?  I mean,

12  like, the person -- you've got the file.  I mean --

13       MS. SIMPSON:  Yes, Your Honor.  I was looking at it with

14  the records supervisor, and she understood that that was not

15  valid.  And the one individual that had been booked on

16  misdemeanors, the next morning a supervisor came in and said, no,

17  that person should not have been booked, and he was released.

18       THE COURT:  Okay.  All right.

19       MS. SIMPSON:  So that -- we did spend quite a bit of time,

20  like I said, with our regular review, but I wanted to focus, as I

21  said, on the stipulated order.  And we did see many encouraging

22  things.  Like I said, the training in particular I want to have

23  Mr. Parrish address.  And, obviously, we are seeing some

24  improvement to the facility itself, so I would like to turn it

25  over first to Mr. Parrish to get an update on those more general

1   areas of the settlement agreement.

2          THE COURT:  Thank you, Ms. Simpson.

3          MR. PARRISH:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. PARRISH:  Dealing with the corrections operations

6   aspects of the settlement agreement, as Ms. Simpson mentioned,

7   staffing, one of the key components, was at an all-time low of

8   only 204.  When we reported at our last status hearing, it was

9   218.  And in the past two years, the highest it's ever been is

10  256.  There are 275 authorized positions.  271 are actually

11  funded, but the downward trend is counterproductive.

12         The one saving grace is that the count is down.  The

13  inmate count is down to an all time new low as well.  It was only

14  441 this week.  Now, when we started the monitoring process about

15  three years ago, the count was in excess of 700, so that's made it

16  possible for a whole pod to be shutdown for renovations.  It's

17  made it possible for, you know, them to survive with so many

18  malfunctioning locks and such.  But that -- that figure is

19  incredibly low as well.

20         Direct supervision training finally began in December, and

21  the last time we were here, we met with the training staff.  The

22  National Institute of Corrections had put on a train the trainers

23  program.  They came in to town twice over the past year and got

24  the command staff on board with direct supervision, committed to

25  it, and then did specialized training for people who would then be

1    the trainers for direct supervision for all the rest of the staff

2    who are going to be working in the jail.  We're finally to the

3    point where we're starting to train the people who are actually

4    going to be doing the work, and the first class within December

5    had 32 people in it.  Twelve of them were new recruits that just

6    came on board.  Twenty of them were existing officers that came

7    from the Work Center, Raymond Detention Center, Jackson Detention

8    Center, and that process is going to continue.  They've got a good

9    system in place.  It's going to continue with each new recruit

10   class to add a direct supervision component for the new officers

11   and then some of the existing staff.  That's critical to make it

12   possible to retake control of the Raymond Detention Center.

13        THE COURT:  How often will this training take place?

14        MR. PARRISH:  How often?

15        THE COURT:  Uh-huh.

16        MR. PARRISH:  It's every time they have a new class, so

17   the next class -- they're doing interviews for 15 potential

18   recruits next week.  They'll bring them on board, so it would be

19   just in a matter of weeks that they would start the next class, so

20   that's a good way to do it.  It's a routine process.  It's not

21   something that requires specialized scheduling and gets shunted

22   off to the side as so often happens when other priorities set in,

23   so I like the way training is approaching it.

24        THE COURT:  And how long is that training?

25        MR. PARRISH:  It's not as long as I would like to see.

1   It's only 16 hours; that's not sufficient to truly train somebody

2   to take over a housing unit.  But the next part of it is they're

3   working on a field training officer program.  That's excellent as

4   well, something they've never had.  And when they do that, then

5   they can put somebody with an officer whose working in a direct

6   supervision housing unit at the work center, spend a week or so

7   doing that kind of thing until you're comfortable that that person

8   can be cut loose and hands free to take over a housing unit.  So

9   they're going in the right direction.

10          THE COURT:  This 16-hour training, is it like two days of

11   eight-hour training or four days of four hours?

12          MR. PARRISH:  Yes, sir, it's two days' worth.  And they

13   have some classroom time; they have some hands-on time.  They'll

14   go into a housing unit at the work center, and then they'll go

15   over to, like, take a look at like Charlie, which is under

16   renovation, to see this is what you're going to be going into

17   eventually.  So it's really moving in the right direction.

18          Charlie pod, it is -- when you walk in, the impact is

19   significant.  It looks like a jail again, but it's not going to be

20   ready for several months, at least two months.  Quite frankly,

21   its -- there's two aspects of this.  One, physically, they've got

22   to get the area ready, but they also have to have the people

23   trained to be able to get to that.  Because once they reopen a

24   housing unit at -- in Charlie, it needs to be under direct

25   supervision.  After all that time, effort, and money that's been

1    put into fixing that place, it can't just be turned back to the

2    inmates to trash again.  You have to have an officer inside to

3    truly run each housing unit, and that's why these two things are

4    interlocked.  It's really, really important.  There's been a

5    commitment to doing that, but from my perspective, it's essential.

6    Otherwise, we're just spinning our wheels.

7            At the Work Center, this is not included in the stipulated

8    order, but something that has been submitted for quite a while and

9    hopefully the County will have it installed in short order, is a

10   camera and an alarm system at each fire exit door in the Work

11   Center, so each housing unit has that.  Because of the

12   configuration, the way it is right now, ever since the building

13   opened, they've staffed it with two people for each housing unit,

14   which is an incredible waste of manpower.  If they have the camera

15   and the alarm system installed on each door, they can then safely

16   drop back to only one officer, save staff, and then they'll be

17   able to operate those housing units truly in direct supervision

18   the way they should be.  So I hope that that will happen very

19   shortly, although I said it's not specified in the order, but

20   that's a critical thing for them to do.

21           MR. CHENG:  Your Honor, just as a quick correction, that

22   is actually specified in the order.

23           MR. PARRISH:  Is it?

24           MR. CHENG:  It is.  It's at II.(A)(4).

25           MR. PARRISH:  I'm sorry.

```
 1            THE COURT:  I'm sorry.  Which paragraph, Mr. Cheng?

 2            MR. CHENG:  II.(A)(4).

 3            MR. PARRISH:  My mistake.

 4            THE COURT:  No problem.

 5            MR. PARRISH:  I even looked it over again this morning;

 6    I'm sorry.

 7            Booking holding cells, the first time that we came in here

 8    and started monitoring three years ago, inmates were routinely

 9    housed in booking holding cells.  We found one that had been there

10    for three and a half years.  That was one of the first things that

11    we said needed to stop, and that's an inappropriate use of booking

12    holding cells.  And for quite a while, it did stop.  And then

13    sporadically it would pop up again when there was a real problem

14    person that maybe got transferred in from another facility and

15    such.  But this time we came back, and it's become a systemic

16    practice again which needs to stop.

17            Those holding cells have no windows.  There's no

18    recreation space.  There's no -- visitation becomes real

19    problematic.  It's just inappropriate housing.  It's okay for up

20    to a few hours, that's why they're called holding cells.  And we

21    would encourage that process to stop.

22            But as Ms. Simpson said, the reason is the locks don't

23    work, and iso units are jammed full right now.  The isolation

24    units that have four cells that are associated with each pod,

25    there's one iso on each side, and that's the reason that's
```

1    happened.  But that's one of those practices that needs to stop.

2         THE COURT:  How many iso units do we have?  I mean, you

3    say four --

4         MR. PARRISH:  At each pod.  There are three pods:  Alpha,

5    Bravo, Charlie.  Each pod has two iso units.  It will have Alpha 1

6    iso, Alpha 4 iso, Bravo 1 iso, and so there's four of them.

7    Excuse me, there are two of them in each of the pods, so there are

8    a total of --

9         THE COURT:  Six right now.

10        MR. PARRISH:  -- six.  Yes.  Yes, sir.  And, you know, two

11   of them are out of service, because they're in Charlie.

12        THE COURT:  Right.  So it's a total of six that can be --

13        MR. PARRISH:  There are a total of six.  There are four

14   that are operational, yeah.

15        THE COURT:  No.  There's a total of -- it would be a total

16   of eight -- oh, okay, A, B, C, there's only three pods.

17        MR. PARRISH:  There are three pods.

18        THE COURT:  Okay.

19        MR. PARRISH:  One is completely shutdown.  Charlie is

20   shutdown.  So you have two iso units in Alpha and two iso units in

21   Bravo.

22        THE COURT:  And the iso units are designed to only hold

23   one person?

24        MR. PARRISH:  They have four single cells, except for one

25   that has been modified down to three.  But they -- like for

1    suicide watch, one of them is dedicated to that.  Real problematic

2    people that used to be housed in booking, that's where they went

3    to, to an iso unit.  And then other people who have either real

4    management problems or real protective custody issues that we

5    can't put them somewhere else, that's what they're used for.

6            THE COURT:  Where are the -- you mentioned the individual

7    who had been three and a half years when you first started --

8            MR. PARRISH:  Yeah.

9            THE COURT:  -- in one of the areas, in the holding area.

10   Did you all find out anything about that particular individual?

11   Was that an individual who might have been waiting to be

12   transferred to Whitfield or something like that?  Do you know?

13           MR. PARRISH:  A real problem inmate who is deaf and had

14   all kinds of problems --

15           THE COURT:  Okay.

16           MR. PARRISH:  -- that just were really unusual, yeah.

17   Yeah.

18           THE COURT:  Okay.  Well, with respect to those who are

19   utilizing the iso units today, why are they there?

20           MR. PARRISH:  They're making good utilization of them.

21   Like, some are real management problems.  Some are others that

22   have to have protective custody that they can't put them somewhere

23   else.  You can't put them somewhere else.  You can't put them in a

24   whole unit somewhere; they wouldn't be safe.  So they're making

25   good utilization of the space they do have.

1      But they -- and as I think the monitor said, they're even

2  making full utilization of the ten isolation cells that are over

3  at the Work Center now.  When I went through there twice this

4  week, they were full, so they are utilizing their space as

5  effectively as possible.

6      But there are all kinds of issues they've had.  Like at

7  the Jackson center, there are plumbing and mold issues.  They had

8  to move all of the men from the third floor out to the Work

9  Center.  They were moved out there last week.  They will probably

10  be there until next week sometime.  They've managed to get the job

11  done in spite of all kinds of problems, but it's really put a

12  strain on the system.

13      THE COURT:  Okay.  Thank you.

14      MR. PARRISH:  Well-being checks are a very important part

15  of getting the job done, and there was a huge improvement.  As a

16  result of our last visit, the monitor and I met with Major Rushing

17  and Captain Fielder and a shift commander and developed a system

18  to allow for more effective well-being checks to be done at the

19  Raymond center, which eliminated the need to keep individual logs

20  for each of the housing units, even though they're not staffed

21  now.  And that made it possible to keep staff out of the control

22  room and put them on the floor where they're able to better do

23  their job doing well-being checks inside the housing units.

24      So there's been a tremendous improvement with that.  That

25  process was implemented back in October, and I can really see the

1   process already.  So that's a step back towards taking control of

2   the jail again.

3        There is always a problem with staff being consistent in

4   what they do, so I am going to submit an interim stopgap policy

5   that hopefully won't be necessary in the future; it will be

6   incorporated into something else.  But it's going to spell out the

7   requirement for 15-minute well-being checks for people that are in

8   holding cells and booking, 30-minute well-being check for people

9   that are in confinement cells who are locked down 23 hours a day,

10  and one hour well-being checks for general population.

11       Everybody supposedly knows that, but every time I come

12  back, things have drifted.  So I think the staff will benefit from

13  having a written policy on that, and that's not -- not normal

14  order of things, but I'm going to work on that and run it through

15  the monitor during the next week or so.

16       Finally, we talk about door locks and repairs, and we were

17  very pleased to see that on Tuesday the board of supervisors

18  awarded a contract to CML, the company that had come in from Texas

19  and done the sample repairs in Alpha pod.  They did swinging doors

20  in the control room there.  They did swinging doors in the entry

21  to the four housing units in Alpha, and they are now contracted to

22  do the same thing in the other two housing units -- excuse me, the

23  other two pods Charlie and Bravo -- and also to put swinging doors

24  in Units 3 and 4 in Bravo.  So that work is going to progress with

25  a qualified contractor; that's a real step in the right direction.

 1          THE COURT:  Any particular timeline, other than the

 2     timeline that's set forth --

 3          MR. PARRISH:  No, sir.

 4          THE COURT:  -- in the agreement?

 5          MR. PARRISH:  No, just the agreement.

 6          THE COURT:  Okay.

 7          MR. PARRISH:  But -- but the contract was awarded this

 8     week while we were here.  They were here on site this week.

 9          THE COURT:  Right.

10          MR. PARRISH:  And that's why I think that it's important

11     that that provision in the agreement be that a professional

12     corrections contractor be utilized to supervise things.  There are

13     long-standing issues that may go back as far as three years that

14     have been corrected, falling apart, corrected again, falling

15     apart.  If they had been done right with somebody who was really

16     qualified the first time, we wouldn't be going through the same

17     process again.  So that concludes my report, sir.

18          THE COURT:  Thank you, Mr. Parrish.

19          MR. PARRISH:  Thank you.

20          MS. SIMPSON:  Your Honor, I wanted to ask Dr. Dudley to

21     come up and give his report.  And as an introduction, Dr. Dudley

22     is a psychiatrist and is addressing the mental health provisions

23     of the settlement agreement.  There are not mental health

24     provisions in the stipulated order.  It's not because we don't

25     think of those provisions as important.  They really weren't

 1    raised in the contempt motion, and so they were not incorporated

 2    in the stipulated order.

 3         The mental health area is one I think is critical to the

 4    operation of the jail.  The jail here, like many jails across the

 5    country, has a very high percentage of people who are on the

 6    mental health caseload.  And Dr. Dudley can provide the numbers.

 7         Those individuals typically present some of the most

 8    difficult management problems in the jail and are often the ones

 9    involved in fights or other incidents, sometimes as the

10    perpetrator, sometimes as the victim, because it's very hard for

11    the other inmates to understand the -- the individuals with mental

12    illness.

13         So even though it's not incorporated in the stipulated

14    order, we hope that the progress in the mental health area will

15    continue.  And I will say -- and Dr. Dudley can provide more

16    detail -- having seen a variety of medical providers, contract

17    medical providers in the jail, one thing that has been beneficial

18    in making progress in this area is that the contractor here, QCHC,

19    has actually been very responsive to concerns both in the medical

20    and mental health area.  And so hopefully that progress will

21    continue, but I'll let Dr. Dudley provide the detail in that area.

22         MR. DUDLEY:  Good morning, Your Honor.

23         THE COURT:  Good morning.

24         MR. DUDLEY:  Certainly this site visit has been attempting

25    to assure that the gains that have been made in medical and mental

1    health have been sustained and that any problems that were

2    identified were addressed.  And so just like with any other of the

3    site visits so that -- I think you may have remembered there were

4    some concerns about the med pass, the medication pass, those have

5    been addressed during this site visit.

6         There were some concerns about needing to make adjustments

7    in the -- in the logging process by which we track compliance with

8    the settlement that things are being done in a timely way and in

9    an appropriate way.  We finally identified some glitches in that

10   log process that have been addressed, and now we have more

11   accurate reflection of what's actually being done.  So the efforts

12   that have been made in medical and mental health have not only

13   been sustained during this site visit, but some small problems

14   have been addressed so that we can have even a better handle on

15   what's going on in the area of medical and mental health.

16        So the big focus of this visit was on the proposed mental

17   health unit and what work would need to be done as things move

18   forward with regard to the opening of the proposed mental health

19   unit.  The -- and its, of course, much more than just the

20   renovation of the physical space in C that would be used for a

21   mental health or behavioral health unit.  And so the -- there's

22   several areas that we focused on that I think will need to be

23   attended to over these next months.

24        One is the broader issue of making sure that everyone's on

25   the same page with regard to what is a mental health unit?  What

1    is a behavioral health unit?  That it's not simply a unit where

2    you put everybody who has mental health problems, that there's

3    supposed to be something going on there that is an intervention

4    that will either prepare people to move into general population

5    and/or prepare them when they're released to continue to

6    participate in mental health treatment in an attempt to undercut

7    the revolving door of people who have these mental health problems

8    and to appreciate the advantages that such a unit has as it

9    relates to safety within the facility as well as in the community.

10        The second area is that of developing a pro -- a clinical

11    program for that unit.  That's something we've been working on.

12    There needs to be a menu of services that we're attempting to

13    develop.  The staff have been working on the development of

14    various sorts of interventions, groups specifically, and discharge

15    planning and education groups.  They're beginning to try some of

16    those groups on existing clients at the facility, and they're

17    working to improve the quality of those groups that by the time

18    the unit would be open, there would be a menu of services that

19    would be appropriate for a mental health unit.

20        The third area is, of course, the identification and

21    training of security staff who have -- who might have a particular

22    interest and/or affinity in working in such a unit and providing

23    them with the increased training that they need to do so.  On

24    these sorts of units, the security staff are an integral part of

25    what happens on the unit, and are, in fact, considered part of the

1    treatment team.  And so you're really looking at a special core of

2    security staff to work in such a unit.

3         The other issue is making adjustments in policies and

4    procedures that will effect what happens on the unit, particularly

5    since individuals who, for example, have not been compliant or

6    refuse treatment who are now being held in segregation someplace

7    because they've been difficult to manage will be managed on this

8    unit in a different sort of way.  And so how are policies and

9    procedures adjusted to address the needs of that population?

10        And, finally, there will be the issue of some increase in

11   the mental health staff to be able to staff this unit while still

12   assuming the other responsibilities of the mental health staff,

13   not only for people who are housed in general population who are

14   on the mental health caseload, but those on suicide watch, you

15   know, all the other mental health activities that are going on.

16        And so that was really the big focus on this visit is

17   talking to the different players and trying to have everybody on

18   the same page about what it is we're trying to do, and what, in

19   reality, that will entail and how much energy's required to get to

20   that point where you're even ready to open and program for mental

21   health.

22        THE COURT:  Let me ask you, do we know the number of

23   individuals who would qualify for mental health services and/or

24   treatment that are being housed down there?

25        MR. DUDLEY:  Well, at present the mental health caseload

1  hovers between 30 and 35 percent of the overall population of the

2  facility, and so those are people on the mental health caseload.

3  Many of those are stable enough that they can be housed in general

4  population.  So the people that would be on the mental health unit

5  would be those who haven't gotten to that point yet.  It would be

6  presumed that some of these would be new people who, once

7  stabilized, could then move to general population.

8         But, of course, it's going to include some people who even

9  complying with medication will not be stable enough to function in

10  general population because of the chronicity and the severity of

11  their underlying mental illness.  And it would also include many

12  of those who are intellectually disabled, and therefore likely to

13  be victimized in a general population unit may remain on that

14  unit.

15         THE COURT:  So out of 400 inmates, approximately 100 or so

16  might be -- 120 or so?

17         MR. DUDLEY:  It's about -- it hovers between 130 and 140.

18         THE COURT:  Okay.  And do we know what of that number -- I

19  assume there are some people who are severely mentally ill who

20  might be awaiting a bed at Whitfield to have their competency

21  restored, I presume?

22         MR. DUDLEY:  That's true.

23         THE COURT:  Do we know what that number is?

24         MR. DUDLEY:  We don't, or I don't.

25         THE COURT:  Okay.  Do we -- because one of the questions

 1   that I'll ask the County is how long some of these people have

 2   been there.

 3         MR. DUDLEY:  Right.

 4         THE COURT:  And, you know, obviously, that is not an

 5   appropriate place for people to be for an extended period of time

 6   if they are indeed suffering from severe mental illness.  And it

 7   is a subject that came up in a trial that I had the middle of last

 8   year.

 9         MR. DUDLEY:  Well, I will say even in the absence of

10   knowing which specific people are being held for competency

11   assessments at the state facility, that the length of stay for

12   those who would fall under the seriously mentally ill category is

13   eight, nine, ten times that for everybody else who goes in and out

14   of Hinds County.

15         THE COURT:  No.  No.  No.  I guess my question is, is

16   there anyone in Hinds County who is awaiting?  Because as I

17   understand the process, people who contend that they -- that

18   they're incompetent to stand trial can have their competency

19   restored.  But I think state law only requires that -- or only

20   allows the restoration process to be at Whitfield, which has a

21   number of -- a limited number of beds, and I think Whitfield is

22   the only place where they allow for that to occur.

23         But Hinds County being the largest county in the state, I

24   would imagine -- I mean, you know, and I think Whitfield only has

25   a limited -- a really limited -- when I say a limited number of

```
 1    beds, I'm talking about probably less than 20 beds for the entire
 2    state of Mississippi, which has 82 counties, and Hinds County
 3    being more than twice the population of the next county in
 4    population.  So do we -- what I'm trying to get at is, do we know
 5    what number of individuals are languishing there in Hinds County?
 6          MR. DUDLEY:  I guess what I'm saying is that the -- that
 7    the mental health staff know -- you know, I know who that
 8    particular person is, who that particular person is.  But they are
 9    not given the information that would allow them to say of our
10    total population, the number is X.
11          So they know from working with some of the individuals
12    that's the position that they're in.  But they don't get the
13    orders for competency assessments, so that they can give you a
14    specific, exact tally of how many people are on the caseload --
15    the mental health staff --
16          THE COURT:  I mean, but that information is easily
17    obtainable.  I mean, the sheriff would have that information I
18    presume.
19          MR. DUDLEY:  And there's also the program that's going on
20    there for -- to attempt to restore some at the facility, a
21    competency restoration program at the facility as well.
22          THE COURT:  Oh, there is a competency restoration?
23          MS. SIMPSON:  I'm sorry, Your Honor.  I wanted to add it
24    seems like it should be a simple task, but I've actually tried to
25    do that and it has not proven to be very simple.  In my last site
```

1  visit, Lieutenant George had gathered the court orders related to

2  everybody who was in the jail that was somewhere in the process

3  and was going through those orders.  They don't get all the

4  information they need to know exactly where they are in the

5  process and they don't always -- and the orders aren't always real

6  clear.

7       So some are ordered to competency evaluations, but they

8  don't necessarily have to be at the hospital.  Some, the outside

9  eval happens and the evaluator determines that there needs to be a

10 transfer to the hospital to have a complete evaluation.  Sometimes

11 they go to the hospital for the evaluation, they come back, but

12 the jail staff doesn't really know what it's waiting for at that

13 point.  Typically, it's waiting for the attorney to then request a

14 court hearing.

15      Sometimes they go to the hospital; they're found to be

16 restored.  They come back, and the jail staff don't know why

17 they're still there.  In some instances, the attorney has made

18 another motion, because they've decompensated.  So it is pretty

19 difficult for the jail to know exactly why people who are in this

20 process are stuck in the jail.

21      But I believe when Lieutenant George accumulated the

22 orders, I believe there were about 60 that were somewhere in that

23 process, and they were in the jail.  But exactly where in that

24 process they were, it would be hard for the jail to know, and

25 because we're looking at the jail records, it's hard for us to

1    know where in that process they are.

2         And it's true they have the restoration program at the

3    jail, but I believe, as you mentioned, that's been found to be not

4    lawful to do restoration outside the hospital.  So I'm not quite

5    sure where that program is at this point, if it's still existing

6    or if that is being challenged.

7         So I don't know if that's helpful, but as I said, I think

8    there's about 60.  But exactly who's waiting for a bed and who's

9    waiting for further court proceedings is a little unclear and hard

10   for the jail to know.

11        That's right.  And as Dr. Dudley was just reminding me,

12   neither QCHC or the jail gets any reporting back from the

13   hospital, so they don't actually know what the hospital

14   determined, whether they've been found to be competent or

15   incompetent or restorable or not restorable.  And from a treatment

16   perspective, it's also challenging, because in some instances, the

17   hospital will change the medication regimen.  Maybe that's why

18   they've been found restorable.  But they come back to the jail

19   without that information, and so the medical provider at the jail

20   does not know how the medication has been changed and only knows

21   to perhaps go back to the old regimen that apparently was found to

22   be not working.  So there's a treatment component problem to this

23   whole process as well.

24        THE COURT:  Yeah.  But it seems like the initial problem,

25   though, is notice and who knows what.  So we know that for every

1    defendant where there's an issue with respect to his or her

2    competency, and in these situations its all males I guess because

3    we're dealing with only RDC and only house male inmates.  If

4    there's a question with respect to the person's competency or

5    whether it needs to be restored, there will be a court order or

6    should be a court order finding that the person is mentally either

7    incompetent to stand trial or a court order that says that he's

8    mentally incompetent.  And there will be an order that would

9    direct a person to go to a facility to have his competency

10   restored.

11        Now, the one person who has access to all that information

12   is the district attorney, because he's representing the state of

13   Mississippi on each of those cases.  And I don't see the district

14   attorney here.  And I was going to ask that question, with respect

15   to whether or not any representative from that office is here.

16        But it seems to me that at least at a minimum, they have

17   all the information, because the state is seeking to prosecute the

18   person.  The state receives the order just like the counsel for

19   that defendant receives the order.  Counsel for the defendant --

20   no one person is representing all these people.  There is one

21   person, however, who's representing the state of Mississippi in

22   Hinds County, and that is the district attorney.

23        MS. SIMPSON:  That's correct, Your Honor.  And this would

24   actually be an ideal issue for the Criminal Justice Coordinating

25   Committee.  Any time you have an issue like that where it sort of

1    involves more than one stakeholder, so the jail, the public

2    defender, and the DA, it's good for them to come to the table.

3    The Criminal Justice Coordinating Counsel provides that venue.   I

4    think probably some kind of tracking process across those entities

5    would help understand where people are getting snagged up in the

6    system.

7        THE COURT:  Right.  I mean, I imagine that they're -- and

8    because we're going to -- I imagine we're going to mention it at

9    some point in time, because there is a point in the reports and

10   even this -- the order that I entered that alludes to at least how

11   long people are staying there in Hinds County.

12       So, obviously, there has to be a conversation between the

13   district attorney's office and the sheriff's office, because the

14   sheriff, again, has the obligation to hold these people and make

15   sure that they are available for their next court appearance.  And

16   they need to be available when the district attorney's office says

17   he or she is next up.  So it seems to me that there needs to be --

18   it could work through the Criminal Justice Coordinating Committee

19   or whatever.  Devise some way for that to be tracked or whatever.

20   But that should already exist between the district attorney's

21   office and the sheriff department.  And I'm hearing it does not

22   exist, and that's sad.

23       MS. SIMPSON:  That's correct, Your Honor.

24       THE COURT:  Okay.  Anything further, Dr. Dudley?

25       MR. DUDLEY:  Just that there are women as well.

```
 1              THE COURT:  Oh, there are?

 2              MR. DUDLEY:  Correct.

 3              THE COURT:  Where are they being -- oh, they're at the

 4    Jackson -- they're at JDC.

 5              MR. DUDLEY:  Yeah.

 6              THE COURT:  They're at JDC.  Thank you.

 7              MR. DUDLEY:  But, I mean, there's --

 8              THE COURT:  That's the only place they are, right?

 9    They're not at Raymond --

10              MR. DUDLEY:  No, that's correct.

11              THE COURT:  -- or even the workers center, right?

12              MR. DUDLEY:  No.  But, I mean, with the mental health.

13              THE COURT:  With the mental health, right.  Right, they're

14    at JDC, though.  Is that where they're being housed, too, even --

15              MR. DUDLEY:  But also for long periods of time.

16              THE COURT:  Right.  Right, for long periods of time.

17    Thank you.  Thank you for that reminder.  Yeah.  All right.  Yes,

18    sir.  Thank you.

19              We're going to take a break after this one, Candice.

20              MR. MOSER:  Good morning, Your Honor.

21              THE COURT:  Good morning.

22              MR. MOSER:  I'm Jim Moser, and I'm working with the

23    youthful offenders who are at Henley-Young, the youth under 18

24    charged as adults.  And I'll just start by saying in February, I

25    believe, marks the two-year anniversary of the last youth leaving
```

1    Raymond.  There have been no youthful offenders at Raymond or

2    Jackson now for two years, so that's a significant issue and, of

3    course, was one of the significant concerns as this agreement got

4    underway.

5         I'll start with focusing on leadership issues and three

6    positions in particular that are of concern for being in a state

7    of flux.  As you heard Ms. Simpson talk about the need for a

8    treatment director to work with the mental health -- other mental

9    health staff, help guide that program, help put together a program

10   that really meets the needs of youth, not just a number of

11   disconnected activities.  There are good staff -- other good staff

12   on board.  The pieces of the puzzle in some ways are there, but

13   there's nobody there to kind of put the puzzle together and

14   provide that kind of guidance both from a clinical point of view

15   and also from a leadership in terms of how you put together a good

16   overall mental health program for youth.  That position, as

17   Ms. Simpson alluded to, needs to be finally posted and hopefully

18   someone on board fairly soon.

19        As you also know, there is no current executive director.

20   It's my understanding that Judge McDaniels has stepped into his

21   prior role to some degree as an interim director, but that is

22   certainly not sustainable over time.  And I, in talking with him,

23   understand there will be a process hopefully in place to hire an

24   executive director that can provide the kind of professional,

25   youth-oriented leadership that the facility needs for the long run

1   as well.

2        THE COURT:  Everything that I had been hearing, though,

3   over the last 12 months was that Henley-Young was going rather

4   smoothly, and that they were in compliance with the other consent

5   decree and everything was going along pretty good.  So -- and they

6   had an executive director in place.  What -- I mean, I had been

7   hearing that everything was going fine.  Is that not the case?

8        MR. MOSER:  I think that would be a somewhat rosier

9   picture than I would paint.  In terms of really getting to full

10  compliance or getting to compliance with many of the conditions of

11  our agreement, and also really fully complying with some of the

12  issues in the Southern Poverty Law Center agreement, there's still

13  work -- there's still significant work to be done.

14       In terms of safety concerns, general -- general

15  supervision of youth, things like that, I would say things are

16  going pretty well from an operational point of view.  But to

17  really get to where they need to be in terms of providing the most

18  successful treatment for kids, the best education for kids,

19  there's a lot of work to be done, and that kind of leadership is

20  going to be significantly important.

21       I also talked with Judge McDaniels yesterday in his sort

22  of interim role a little bit about bringing on board a program

23  director.  They have formerly previously have had what they've

24  called a recreation director who has focused a lot on getting the

25  kids outside, general physical activities, really need to get

1    someone on board who can put together a successful and more

2    comprehensive set of activities for kids, not just going out and

3    playing basketball.  Not just getting outside for some fresh air,

4    but filling up -- filling up the time of the day with pretty

5    constructive activities.

6              And as you note in the stipulated order, it's pretty

7    significant expectations around filling up the days for youth, so

8    that they're in productive activities.  Recognizing there is a

9    chance for some free time as well.

10             THE COURT:  Let me ask you this, Mr. Moser.  So how -- you

11   know, this Court's primary focus, I think, is on RDC, --

12             MR. MOSER:  Sure.

13             THE COURT:  -- the worker center, and JDC, with some hint

14   at Henley-Young with respect to what the sort of educational

15   component is.

16             But Henley-Young, is it still under the existing case

17   before Judge Jordan?  Is it -- is he receiving monitor reports and

18   stuff like I am receiving for these.

19             MR. MOSER:  They are still being monitored.  I don't -- I

20   frankly don't know the judge.

21             THE COURT:  I mean, the other judge, is he receiving --

22             MR. MOSER:  The SPLC agreement, that is still operating.

23   As far as my understanding, he's still receiving updates and

24   reports.

25             THE COURT:  And I assume --

1              MR. MOSER:  They have a monitor who has been coming.

2              THE COURT:  Right.  And I assume there has been no motion

3    for contempt or anything or that judge has not -- I don't know --

4    I don't know what he does with respect to overseeing --

5              MR. MOSER:  Sure.

6              THE COURT:  -- that facility.  But getting to the nuts and

7    bolts of the activities there, the personnel issues, if any, and

8    all of that, those issues are addressed to Judge Jordan with

9    respect to the -- the judge who is overseeing that specific

10   agreement between the SPLC, if you will, and Hinds County; is

11   that --

12             MR. MOSER:  I -- I honestly can't speak to that as much,

13   Your Honor.  I know that -- I know that they have recently --

14   there has been another amended agreement that they have that also

15   places some deadlines for them around programming that is similar

16   to what we've got in our agreement.  We've also made some

17   additional requirements around space.

18             MS. SIMPSON:  Sorry, Your Honor.  I'm always sort of

19   jumping in but --

20             THE COURT:  No.  No.  That's fine.

21             MS. SIMPSON:  The -- I think one significant difference

22   between the two is that the SPLC litigation focused on juveniles

23   who were there as juveniles, and so it was anticipated to be a

24   very short period of time.  So if you look in their agreement

25   about the required activities, it's things like games, cards,

1   hobbies, arts and crafts.

2          The JCAs, the juveniles charged as adults, tend to be

3   there for a long period of time.  In fact, I think the longest now

4   is 800 and some days.  And so when you have a juvenile that's

5   going to be incarcerated for that long a period of time, the

6   education and the programming requirements really are fairly

7   different and need to be more extensive.

8          So there's the education component; they basically need to

9   be going to school there.  And the treatment component; their

10  mental health needs and psychosocial needs need to be addressed.

11  So -- so that is picked up in the settlement agreement in this

12  case as opposed to the SPLC litigation.

13         Some of the facility stuff overlaps, that sort of thing,

14  but I would say it's really the education and treatment component

15  that's needed for these longer-term inmates that are part of our

16  litigation.

17         THE COURT:  So is there -- based on -- and I'll ask

18  Mr. Moser.  But based on your review, then, you said there are

19  some things that are not -- I mean, for those kids who have been

20  there for more than 300 days, for example, who are high school age

21  or middle school age even -- because I think Mississippi allows

22  people to be prosecuted as adults as early as 13 or 14 -- are they

23  receiving their required education?

24         MR. MOSER:  What I have -- what I have indicated in the

25  past and we'll just kind of affirm in prior reports talking about

1   they've made what I would consider incremental progress in the

2   education program in terms of going from originally those youth --

3   not even all those youth were attending school regularly, they've

4   expanded so that all youth are going to school, which is great.

5   They've increased some capacity in terms of software and tools and

6   teaching the youth.

7           I have concerns and spent more time this time focusing on

8   the education program, although I'm not an education expert.  But

9   our kids in school -- and we found as a result of an incident over

10  the weekend, through the week only half the kids were -- the kids

11  were only in school half days instead of a full day for safety

12  reasons.  Part of that is the result of the structure of the

13  school is so compact that it's very difficult to bring kids in the

14  same area that are essentially ready to fight again.

15          I think in terms of the overall quality of education, I

16  have concerns that I believe the kids that are coming in,

17  especially, again, for long term, really need to get an

18  accelerated program.  And I would argue -- I would probably

19  suggest that what they have is a pretty basic program that really

20  does not meet their educational needs.

21          Are they -- is there a program there?  Are there classes

22  there?  Are there teachers there?  Yes.  Is it what I consider

23  adequate or appropriate given their needs?  No.

24          And they have some recommendations from an education

25  expert through the other agreement that are very sound and can

1    help provide guidance for them as they, I think, look towards

2    improving or finding other ways to elevate the nature of

3    education.

4         Kids are earning credit.  Kids are attending.  They're

5    getting grades.  They have a process in place for getting

6    information from their prior school.  If there are exceptional

7    education needs, getting those individualized education plans,

8    trying to support that.  Those are all things that have developed

9    over time, but there's a long way to go.

10        THE COURT:  Now, like the people who are being housed in

11   the other facilities, these are individuals who are waiting on a

12   trial?  These are individuals who are waiting to be tried?

13        MR. MOSER:  Yes.

14        THE COURT:  They've been arrested, in all likelihood, and

15   I guess -- I guess indicted or either they've had a youth court

16   proceeding that transfers them over there and still have to wait

17   for their trial.  These are pretrial people, right?

18        MR. MOSER:  Its pretrial, and in many cases, pre

19   indictment.  There have been youth there as well who have been

20   there long periods of time and not been indicted.  Several hundred

21   days, for example.

22        THE COURT:  Right.  Right, several hundred days.

23        MR. MOSER:  Right.  Without being indicted, correct.

24        Now -- now, I would just add to that to address some of

25   that concern, Judge McDaniels has worked out some process to -- I

1   forget the exact title now.  It's sort of a youth docket where

2   he's able to hear some of those cases and sort of push the system

3   along, look at bail or bond issues, possibly return some kids to

4   youth court.

5        That process is getting -- has hooked up with a

6   psychologist, which I think is very positive to get an evaluation

7   on youth.  So he gets full information about -- about that youth

8   and can make a decision on is there an opportunity for the youth

9   to go back to youth court and process through that way or not.

10  That process is -- it's not just beginning, but its in its early

11  stages, so there are some youth who have been able to be released

12  around Christmas.

13       THE COURT:  I think they start -- I think if they don't --

14  well, maybe somebody will speak to it.  The youth starts out in

15  the youth court process, and then he's -- once certified, right?

16       MR. MOSER:  Well, Judge McDaniels or someone else would be

17  better than I to explain how it works.

18       THE COURT:  Somebody needs to explain that to me.

19       MR. MOSER:  You have -- some of the managed youth are not

20  yet indicted, and so where do they belong technically really?  You

21  know, I don't -- I mean, that's -- I'll let someone else answer

22  the legal aspects of that.

23       THE COURT:  Thank you.

24       MR. MOSER:  All I would say is there has been Judge

25  McDaniels and I think through the other supportive courts have

1    taken some steps to try and address this issue of kids lingering

2    without indictments, kids lingering without trial, and decreasing

3    the population.

4         THE COURT:  My thought was even -- you know, one only gets

5    into the adult system if the youth court certifies that person

6    deserves to be over there, or if the DA certifies that the person

7    should be certified as an adult, I mean.

8         MR. MOSER:  Well, there are many -- and I, again, someone

9    else would be better on the Mississippi law, but there are many

10   offenses for which youth can be directly charged as adults.  I

11   think at age 15 I think is the earliest.  I think at 15 with

12   certain offenses, they can be charged as adults, and they are

13   arrested and brought in as adults and start through that process.

14        THE COURT:  Okay.

15        MR. MOSER:  And without having been waived forward from

16   the youth court based as a result of the charges.

17        THE COURT:  But even charged as an adult, once they're

18   charged as an adult, they have the right to be tried as an adult.

19        MR. MOSER:  Yep.

20        THE COURT:  In a speedy manner.

21        MR. MOSER:  That's correct.

22        THE COURT:  And you're telling me 800 days?

23        MR. MOSER:  Correct.  That youth was about this tall when

24   I first started.  He's now a six-foot youth, so that kind of

25   leading to what Ms. Simpson was alluding to.  Many of the concerns

1  that we have are around that length of stay and the need for the

2  significantly more robust treatment and education planning that

3  had typically been the case.

4      Now, to their credit, Henley-Young staff has worked hard

5  to try to accommodate those things, but without the leadership of

6  a treatment director, a good program director, and now not an

7  executive director, sort of treading water, again, to try and

8  hopefully come back and catch up on some of that stuff.  And as

9  you know from the stipulated order, there are some specific

10  timelines to move some of this -- these things forward.

11      And, again, I would just allude to a -- there is a

12  difference between a series of activities that are done with youth

13  and different groups.  And -- but they're not -- they're not

14  coordinated.  They're not all moving towards the similar treatment

15  goals, the kind of thing you really would organize in a

16  longer-term program.

17      So there's a lot of work to be done.  That said, you know,

18  it's again -- it's certainly an improvement over where they had

19  been, and there are some good relationships going on.  I had the

20  opportunity to sit in on treatment teams with five youth the other

21  day, and clearly pretty positive relationships between the

22  clinicians and their case managers, good interaction, the youth

23  could articulate to some degree the kinds of -- what they're

24  working on in terms of -- in terms of overall -- things like anger

25  management.  So there are some positive things going on, but it

1   really needs to -- it really needs to improve, Your Honor.

2           The staff turnover is an issue.  In talking with the

3   training officer or training director right now, interim, was my

4   understanding.  She said she's trained 20 new line staff in the

5   last -- since October.  That's a significant percentage of their

6   overall staff.  I think Mr. Burnside told me they had currently

7   nine vacancies, and whenever I go, they have somewhere between

8   five and a dozen vacancies.  So they are constantly turning staff

9   over, constantly training new staff.  That complicates everything

10  from sort of the day-to-day operations and the quality of

11  interaction with kids as well as the ability to move them along in

12  their training, so they become increasingly adept and professional

13  in how they interact with youth.

14          Many of the things that you want to work on with youth

15  have to be reinforced from everything from the line staff all the

16  way up to the treatment staff, so that what they're learning in

17  treatment groups and discussing with their clinician is reinforced

18  on a day-to-day basis by the staff on duty.  That requires them to

19  be -- to sort of elevate their ability to reinforce that behavior

20  and say the right things at the right time.  So it makes that kind

21  of ongoing or advanced training particularly difficult.

22          I believe the board of supervisors at their last meeting

23  waived the residency requirement for recruitment for staffing at

24  the jail and Henley-Young as well, so that there's hopefully a

25  broader pool that can be drawn from.  That's a positive.  It

 1   wasn't -- I had never heard there was one.  Obviously, that's a
 2   limiting factor on who they can recruit if it requires people to
 3   move into the county within six months or already be a resident.
 4   There may be people outside of the county who are willing to apply
 5   but not with that requirement.
 6        You will also see in my report, and I think paralleled
 7   somewhat in the SPLC agreement, issues around program space,
 8   recreation space.  Because of the rain the prior week, the cold
 9   weather this week, the youth have not been outside for recreation
10   now for essentially two weeks.  The only space they have for
11   recreation is a multipurpose room that -- and when you ask them
12   what they're doing in there, by and large, they are playing video
13   games, some other activities.  There are some exercise equipment
14   there.  But for youth to be confined, again, for long periods of
15   time and not have access to being outside and large muscle
16   activity is a significant problem, and hopefully that can be
17   addressed.
18        And I'll also continue to recommend improvements in the
19   housing units themselves to improve the cleanliness, to improve
20   the -- to reduce the sound levels, to improve the environment in
21   which they live, because youth are particularly reactive to their
22   surroundings.  And so as sound goes up, their emotion goes up.
23   Their behavior gets worse.  And there is a lot that can be done
24   with physical environment changes that can help with overall
25   behavior management.  I think that's all I have.

1          THE COURT:  Thank you, Mr. Moser.

2          We're going to take a ten-minute recess for our court

3     reporter and for you all, too.  We're going to be in recess and

4     return in ten minutes.

5          MS. SUMMERS:  All rise.

6                    (A brief recess was taken.)

7          MS. SUMMERS:  All rise.

8          THE COURT:  You may be seated.

9          All right.  I've heard from the monitors.  I guess I'll

10    turn back to the United States.  Is there any response to

11    anything?

12         MR. CHENG:  Just one --

13         THE COURT:  Make sure you're speaking into the microphone.

14         MR. CHENG:  Yes, Your Honor, just one matter.

15         THE COURT:  Make sure it's on.

16         MR. CHENG:  Thank you.  It's the technology that always

17    throws me, Your Honor.  I would mention one thing.  I think the

18    monitor did talk about having a qualified contractor handle

19    renovations, and the contractor should be under the supervision of

20    an architect.  I wasn't quite clear if that point had been

21    properly explained in court.  There is no actual architect

22    overseeing the renovations right now, and I did want to mention

23    that as part of a broader theme.

24         One of our concerns is that as we go through the

25    stipulated order and the settlement agreement, people look at

1     these things as less.  They identify a bunch of things they have

2     to do.  But as a foundational issue, there has to be adequate

3     leadership.  Right now there is no leader at Henley-Young.  There

4     is no program director.  There is a little bit of concern about

5     who's going to be the next warden and running the jail, and there

6     is no architect overseeing the renovations.

7          Now, I realize that under the stipulated order and under

8     the settlement, the defendants have some time to get these people

9     in place.  But I did want to make clear that the United States

10    considers it to be very important to have these positions filled

11    as soon as possible.

12         We know there are new defendants in place.  There are new

13    board members.  There is a new sheriff.  When they come in, they

14    have the right to appoint their own teams.  But sometimes in the

15    leadership transition, a lot of decks are cleared.  People are

16    moved around, and that can actually impede the implementation of

17    the settlement agreement.  So we do want to flag that as a

18    potential issue.  We're not saying it's a problem yet, but these

19    issues do need to be addressed with the leadership.

20         THE COURT:  Okay.  Thank you, Mr. Cheng.  The only new

21    defendant is the sheriff.  The Hinds County Board of Supervisors

22    has always been a defendant.  Now, the context of the board itself

23    might have sort of shifted and all, but it's the board.  So

24    there's only one board of supervisors.

25         Now, as I appreciate it based on what the receiver has

1    said, the County is obligated to hire a pretrial services person;

2    a compliance coordinator; to contract with -- or however they seek

3    to do it -- a quality security contractor; a consultant to do the

4    master plan; for Henley-Young, an LCSW or a psychologist who can

5    put together a treatment program or something.  And those are what

6    I would describe as new positions or new obligations.  New as in

7    those people are not on board yet and have never been on board.  I

8    may be wrong.  I mean, I'm going to hear from the County in a

9    minute.

10        And right now, we have the director of Henley-Young

11   vacant.  For all intents and purposes, the warden at RDC is not

12   technically vacant, but there's going to be a posting for a person

13   who can fulfill the duties or meet specified qualifications that

14   the parties have agreed to.

15        At Henley-Young -- well, I may have mentioned the LCSW

16   that would be -- is that the treatment director?  That's the

17   treatment director?

18        MR. CHENG:  Yes, Your Honor.

19        THE COURT:  But then at Henley-Young, there's also a need

20   for a program director, which is different from the executive

21   director and different from the treatment director?

22        MR. CHENG:  The program/treatment director can be the same

23   person.  It's a --

24        THE COURT:  I'm hearing -- I'm seeing that the monitor is

25   telling me those are three different positions at Henley-Young:

1    The director of the facility itself, the -- what he calls the

2    executive director, a treatment director that would be served by a

3    person who's a licensed certified social worker and/or

4    psychologist, and a program director.  And Mr. Moser is shaking

5    his head again.

6         MR. MOSER:  That's correct.  There has historically been a

7    recreation -- what they called a recreation director focusing

8    primarily on playing basketball.

9         THE COURT:  Okay.  All right.

10        MR. MOSER:  Program-wise there's a whole range of other

11   kinds of youth-oriented productive activities that could be done

12   and worked in the schedule, work with other staff.  So for the

13   treatment director focusing on the mental health aspects, that

14   person focusing on everything from how do we get kids learning

15   about nutrition and exercise and all of a range of other kinds of

16   activities that can be provided to kids to fill -- to work with

17   their time.

18        MR. CHENG:  Your Honor, I understand, I think, what

19   Mr. Moser is saying.  There is the recreation director, but for

20   the purposes of the stipulated order, we're only talking about one

21   position, which is the clinical social worker or psychologist to

22   serve as a treatment director or coordinator, so I should probably

23   be more specific about the terminology.  The treatment coordinator

24   is covered by the stipulated order.  There are some other

25   positions that handle programs at Henley-Young.

1          THE COURT:  Okay.  I turn now to the County.

2          MS. PRINCE:  Your Honor, Scherrie Prince on behalf of

3    Hinds County.  At this time, I would like for Judge Johnny

4    McDaniels to address the Court as it relates to Henley-Young.

5    He's actually expected to be in another courtroom after -- after

6    this hearing.  So if it pleases the Court, could he come and

7    answer some of your questions about Henley-Young?

8          THE COURT:  Okay.  All right.  Ms. Prince, you need to

9    slow down when you speak, but go ahead.

10          MR. MCDANIELS:  Good morning, Your Honor.

11          THE COURT:  Good morning, Judge.  How are you doing?

12          MR. MCDANIELS:  Doing fine.  Actually, Judge, I have to

13    start court proceedings in my court and I adjusted that --

14          THE COURT:  Whenever you get there, it's on time, though,

15    right?

16          MR. MCDANIELS:  Absolutely.  That's the benefit of being a

17    "Your Honor."  I learned that from you, Judge.

18          THE COURT:  No.  No.  No. That's why I'm always on time.

19          All right.  Mr. McDaniels.

20          MR. MCDANIELS:  Thank you.  Johnny McDaniels, Your Honor,

21    Hinds County Youth Court Judge, County Court Judge, here in my

22    capacity also as the interim director of the Henley-Young Juvenile

23    Justice Center.  That's a decision that the Hinds County Board of

24    Supervisors decided to make at the beginning of this year when the

25    new board assumed their positions.  And I'll start briefly by

1   saying, Your Honor, that the idea of the detention center being

2   under the jurisdiction of the youth court judge is not a new

3   concept in the sate of Mississippi.  I think, in fact, Hinds

4   County is the only county that operates it that way, but for the

5   benefits of the parties in this room, the board is very much aware

6   of the need to have a director at the facility, an official

7   director.  And I think the advertisement has already began for the

8   purposes of identifying a director for the facility.  So the

9   County is certainly moving forward with that being a major issue

10  that we have to address.

11          But, specifically, Your Honor, as it relates to the issue

12  that you raised earlier in terms of the -- I guess for lack of a

13  better way of putting, it the two consent decrees.  The one that

14  we've been under at the Henley-Young Juvenile Justice Center since

15  2012 under Judge Jordan and currently working with the Magistrate

16  Judge Ball on those matters.

17          Of course, Judge Ball recently entered an order directing

18  the County to address certain issues by February the 4th, and the

19  County is putting forth their response to that order as it relates

20  to some of those issues that are in this particular order that

21  Your Honor has executed.

22          Specifically, Your Honor, the approach by the monitor, Ann

23  Nelson, in that group in the juveniles consent decree is more of a

24  need-analysis approach.  The position that Southern Poverty kind

25  of carved out, which was a new way of them addressing these

1    issues, was for their monitor to identify certain needs of the

2    facility.  And once those needs are identified, the County then

3    has to develop an approach to how are you going to satisfy those

4    needs?

5          The issue of the mental health team has been an issue that

6    we have been working on with the help of the previous board

7    attorneys, the previous board of supervisors, and others for

8    several years now in terms of getting the mental health team up to

9    staff at Henley-Young.  And we kind of built that team from the

10   bottom up, I guess, in a sense, and that we made a decision

11   several years ago to move case managers from the youth

12   detention -- from the youth court to the detention side and also

13   to retain two qualified mental health professionals with the hope

14   of having a psychologist at the top of that particular team.

15         In 2018, the County was able to identify and retain a

16   part-time clinical psychologist who was on board with the facility

17   for that purpose and was developing that program in such a way

18   that it could address the concerns that Mr. Moser has stated in

19   terms of the facility being able to have all of the parts working

20   together, the case managers, the qualified mental health

21   professional, and the psychologist at the top of that particular

22   approach.

23         As a result of some issues that I'm not totally aware of

24   during my absence from the facility, that clinical psychologist

25   was no longer there.  But the position for the clinical

1    psychologist is still being currently advertised by the County.

2    It's still listed on our position analysis as a person we're

3    trying to identify and bring back on board.

4         In this particular environment in terms of identifying a

5    number of psychologists that may be available, that will be a

6    challenge.  But as it relates to the two consent decrees and

7    what's required maintaining a clinical psychologist is something

8    that is recognized as a need by the consent decree under which the

9    facility operates.

10        Identifying a program director is a need that they've

11   identified.  And when we talk about programming, Your Honor,

12   there's some dispute as to whether or not what's called

13   "programming" is the same thing within the context of what we do

14   with juveniles.  There's programs at Henley-Young.  Identifying

15   and bringing on a program coordinator would help us to capitalize

16   or to indoctrinate exactly what those programs are and how they

17   are fitted into that seven-to-nine structure for young people

18   within a detention center.

19        Your Honor, the most important piece of day programming

20   for any young person is, of course, school.  Henley-Young has a

21   fully functioning school within the facility.  As the youth court

22   judge, Jackson Public Schools has been identified as the

23   sponsoring school district for the facility for as long as the

24   facility has been there.  We have social studies, science,

25   history, all of the core subjects are being taught.  With the

1    exception of young people and some infractions that they may have

2    or some other security measures, they attend school on a regular

3    schedule from about 8:00 to 2:30.  After the 2:30 period, then the

4    issue of what other types of programming do you have for them

5    throughout the week in the context of court appearances, in the

6    context of shift changes that have to occur, in the context of

7    spacing that's an issue at that facility.

8         The board of supervisors, again, has addressed that

9    through their response to Judge Ball's concern about programming

10   space, and the County will be able to further advise the Court on

11   what those specific objectives are in terms of expanding the use

12   of the facility that's there with covering of the outside area,

13   bringing in modulars for the campus itself, so that we can have

14   other -- other multipurpose space.

15        But, again, Your Honor, the issue as it relates to this

16   specific decree or this specific order that Your Honor has signed,

17   the requirement that the County advertise competitively for the

18   clinical psychologist position is something that we have been

19   addressing for the last two years and trying to make sure we can

20   identify and bring that person on board.  The difference in this

21   is that we also, within this particular order, can look at the

22   option of a licensed clinical social worker.

23        I have not discussed it in detail with the -- Ms. Nelson,

24   the monitor in our consent decree with the youth court in terms of

25   making sure that we can maybe do that with a clinical psychologist

1  being as a part of that process.  That's something I'll discuss

2  with her.  But the need that they've identified for us

3  specifically in that decree is a clinical psychologist, and they

4  want to know what's our approach to get that done.

5       In reference to the programming director, again, it has

6  been identified as a need for the facility, and they've requested

7  that we identify an approach to get that done.  We have, in fact,

8  as recently as this week changed the legal description for the

9  recreation person more from the idea of being involved with the

10  activities of large muscle exercise or involved in basketball or

11  those types of things to more of a programming director, again, so

12  that we can capture all the programs that Henley-Young is involved

13  in, identify other programs that can be offered, especially on the

14  weekend hours when kids are out of school and they're -- there's

15  more time.

16       So those two things are definitely being addressed, Your

17  Honor, in the context of what we've been doing with the juvenile

18  consent decree for the last six years.  That provision -- that

19  consent decree, of course, had 86 provisions.  We have reached

20  substantial or partial compliance in, I think, 83 of them, with

21  the three deficit ones being in the area of mental health.  And

22  that's why I think it's important that I emphasize to this Court

23  that it's an issue that we've been aware of for several years.

24  It's an issue that the board has emphasized.  They're committed to

25  making sure we get the resources that we need to further address.

1          And whether or not I can convince the previous clinical

2     psychologist to come back on board, we haven't had that discussion

3     yet.  Whether or not we can identify any other clinical social

4     workers or psychologists who may be out there and available, it

5     will be advertised for that purpose, but we are clearly in a

6     position to move forward on those two issues.

7          The third thing that Mr. Moser represented, and I think

8     the Court asked specific questions about, how do young people

9     charged -- juveniles charged as adults end up in Henley-Young?

10         At the beginning of this project getting those juveniles

11    into Henley-Young, the decision was made that -- and I think all

12    of us agreed that it would be in the best interest of those

13    juveniles, the County, and everyone else, for those juveniles to

14    no longer be in Raymond.  So in 2017, we made the decision to

15    begin housing them at Henley-Young.

16         As soon as they hit the door at Henley-Young, they became

17    subject to the consent decree that we were operating under with

18    the regular juveniles for lack of a better description.  So the

19    issue about making sure they were properly educated, properly fed,

20    properly clothed, recreation became a part of that consent decree

21    just as if they were original parties.  So we made sure that the

22    school addressed those issues in terms of identifying their

23    educational assessment when they came through the door, making

24    sure that we could make sure -- making sure that we knew what was

25    happening with them educationally, so that we could incorporate it

1 into the daily programming there.

2  And, again, Jackson Public Schools has its challenges

3 outside of the detention facility, so you can imagine they

4 translated into the detention facility.  But there is an absolute

5 commitment to make sure those children are educated on a daily

6 basis, and they attend school.

7  I invite Your Honor to come down and walk through the

8 school we have there.  It's a small school that could certainly

9 benefit from more spacing, but the teachers are committed to

10 trying to improve upon what we do there on a daily basis.  We

11 could certainly use more space, and we could certainly use more

12 educational services.  And those are discussions that we're going

13 to continue to have with JPS.

14  But juveniles charged as adults in terms of the criminal

15 side of this, of course, Your Honor, the way our statute is

16 written is that a juvenile as young as 13 who happens to use a

17 weapon as a part of any criminal offense can be charged by law

18 enforcement as an adult without the youth court being involved,

19 and that's how so many of them got into the criminal justice

20 system as adults.

21  Judge Green and I and the previous board attorneys and

22 others talked about that process almost two years ago and began to

23 try to formulate some type of response to that that we could do

24 from a court's perspective.  And so we came up with the juveniles

25 charged as adults diversion docket, almost a reverse waiver.  As

1   you mentioned earlier, it's real easy for me as a youth court

2   judge to waive a young person into adult court.

3          But the question became how do you get a person whose in

4   adult court back to youth court?  So we came up with the juveniles

5   charged as adults diversion docket, brought Dr. Marion on board as

6   a clinical psychologist to do the assessment that we needed as a

7   part of that process.  And I conduct hearings as frequently as

8   possible on those 18 youth for the purposes of making a

9   determination about which ones we may be able to put back into the

10  youth court.

11         And the ones that are going to remain in adult court, how

12  do we get them more quickly through the system, so that you won't

13  have a situation like the young person who has been there for

14  800-plus days awaiting trial.  And that's a question, again, that

15  we've had to have with our district attorney who was a part of

16  this discussion about juveniles charged as adults.  He's attended

17  hearings that we've held in the youth court about that diversion

18  docket and has shown a commitment to making sure that we correct

19  that system.

20         Your Honor, it's certainly not a swipe at anyone

21  previously, but we just did not have that type of commitment from

22  our district attorney's office in the past.  And this is something

23  that we're excited about as a county that we can move forward on

24  addressing, at least from my perspective, 18 juveniles charged as

25  adults who are sitting in Henley-Young, some of them indicted,

1    some of them unindicted.  And when we get into the discussions

2    about, Judge McDaniels, how are you going to bring a young person

3    who's 15, happened to use a weapon in the commission of a crime,

4    and state statute says you can't be moved back to youth court.

5    How are you going to do that?

6          THE COURT REPORTER:  Slow down just a little bit.

7          MR. MCDANIELS:  Thank you.  Sorry.

8          How are you going to do that?  And I emphasize to them,

9    well, if a young person has not been indicted, then I don't think

10   he's sufficiently charged with a crime to the extent that I can't

11   conduct, in my capacity as a youth court judge, the appropriate

12   status hearings to determine what should happen with that person

13   in the terms of pretrial release, in terms of being moved back to

14   the youth court, and all the other things that the youth court

15   statute provides that I can do for a young person charged as an

16   adult or not charge as an adult, but still remaining as a pretrial

17   detainee.

18         And, Your Honor, so that system, again, is something that

19   we looked at actually kicking into higher gear with the election

20   of the new district attorney, who has made a commitment to making

21   sure that his DAs are available for those court proceedings.  I

22   have three of such hearings scheduled for this afternoon on three

23   of those young persons, and we're moving through that docket as

24   systematically as possible to make sure that we can address at

25   least the Court's concerns about juveniles charged as adults being

1    in detention for hundreds of days without indictment.

2         So I'll be happy to address any other questions the Court

3    may specifically have as it relates to those issues.  But, Your

4    Honor, I don't want to leave the impression that the Henley-Young

5    Juvenile Justice Center was waiting on Your Honor's order to

6    address your concerns about the mental health team or about the

7    programming director.  We're way ahead of the Court on making sure

8    that those issues are properly addressed.

9         THE COURT:  Okay.  So as interim director of Henley-Young,

10   when do you anticipate the process starting to find a full-time

11   director?

12        MR. MCDANIELS:  Well, again, if I'm not mistaken, the

13   board is advertising for that position.  They've been advertising

14   for that position.  So, Your Honor, you know, the process is that,

15   you know, those resumes will come in, and the conversation that

16   I'll have with the board, with the board president and vice

17   president and others, is how that selection process is going to

18   move forward.

19        What I emphasized to Mr. Moser and to Mr. Cheng is that my

20   idea of that is that the director has to have the ability to

21   function independently of the Court and also of the County.  As a

22   director having sat in that seat before, in order to be as

23   effective as possible, any plan that we put together as a Court

24   and as a board has to give that director that flexibility.

25        Again, that advertising process is going on now, and I

1    would anticipate within the next 30 to 60 days that the board and

2    I should be in a position to say this is how we're going to move

3    forward with the director, the official director of Henley-Young,

4    identifying a supervisor structure for that.  Again, so that the

5    director can operate in a position of knowing that you're not

6    responsive to Judge McDaniels and I'm not going to try to run you

7    off if you don't agree with me, because my job is to make sure

8    that the children of the facility are served first and foremost.

9    And the daily operations of that facility certainly will require a

10   full-time director.

11        THE COURT:  All right.  Thank you, Judge McDaniels.  I

12   have no other questions of you.  You may be excused and go to your

13   normal duties.

14        MR. MCDANIELS:  Thank you, Your Honor.

15        THE COURT:  All right.

16        MS. PRINCE:  Good morning, again.  I'd also like to

17   recognize at this time, we did have another supervisor come in

18   since we've initially made introductions.  Supervisor Vern Gavin,

19   he is District 4 Supervisor for Hinds County.

20        THE COURT:  Okay.  All right.  Thank you.

21        MS. PRINCE:  And, Your Honor, this is my first time before

22   you in this matter, but I would like for you to know I've been

23   with the County for eight years now.  And while we have a new

24   board with new supervisors and positions that are rapidly being

25   filled, I would like for this Court to also know that the board of

1    supervisors has hit the ground running in terms of trying to meet

2    the needs of the consent decree and be in compliance.  What I

3    would like to do this morning is go through, based on each of the

4    objectives in the stipulated order, some of the progress the board

5    has made since that time.

6         THE COURT:  Well, let me just make sure that we're on the

7    same page.  The parties have entered a stipulated order, like they

8    did with the consent decree.  It was an agreement, and there's a

9    lot of mandatory language in this stipulated order.  I was just

10   glossing over will convert, shall modify, shall install, shall

11   upgrade, shall repair, will be completed within four months, will

12   reinstall, shall complete, will retain, shall provide, will post,

13   shall develop.

14        Now, that was an agreement that the parties have reached

15   between themselves just like they did with the consent decree.  It

16   was the language that the parties agreed to, the timeframe that

17   the parties agreed to.  So with all that mandatory language, I

18   mean, it looks like the County is going to have to hire some

19   people, contract with others, and get some things done in the next

20   30 days.

21        MS. PRINCE:  Your Honor, the board -- the complete board

22   is aware of that, also the administration, and what I would like

23   to do is outline some of the authority that's been given by the

24   board and resources set aside to accomplish some of these tasks.

25        THE COURT:  I only say that, because I assume the last

1    board -- the configuration of the last board, there's -- I don't

2    see this as a new board.

3            MS. PRINCE:  Yes, Your Honor.

4            THE COURT:  This is one board of supervisors.  It is one

5    sheriff's office, because the sheriff is sued in his official

6    capacity so it's the office.  Everybody knew that coming into

7    the -- about this case about a year ago when I inherited it, and I

8    think my first status conference might have been in January of

9    2019.  So everybody was aware of what I expected that their

10   obligations were, because it was the agreement that the parties

11   had -- that I inherited.

12           Now, I have a new agreement that has been devised or

13   drafted by the parties up under my watch.  I will hear what you

14   have to say about what all the board has done, but there was a

15   motion for contempt that was filed because the parties -- the

16   United States has accused the defendants of having not complied by

17   that order.

18           And I mean just for the record, I think that motion for

19   contempt was filed back in June of 2019.  The Court didn't hear it

20   and set it for hearing until six months later in December.  So I'm

21   saying all that because I do expect that every -- everything that

22   the parties have agreed to -- because this is the language that

23   you all agreed to, and you presented it to me to put off the

24   hearing on contempt.  So I'm looking at every word.  I'm looking

25   at every promise.  And, again, there's a lot of mandatory language

1    in here, and I'm expecting to hear that the parties are fulfilling

2    their respective obligations.  So I'll hear from you, Ms. Prince.

3         MS. PRINCE:  Thank you, Your Honor.  I'd like to take it

4    point by point with some of the earlier deadlines addressing those

5    first.  One of the first being that the County shall improve

6    recruitment and retention initiatives.  I would like to point out

7    to the Court that this board held an emergency meeting on

8    January 15th, and as part of their effort to improve recruitment

9    and retention, they also --

10        THE COURT:  Slow down just a little bit.

11        MS. PRINCE:  Okay.  This board met on January the 15th,

12   2020, and as part of their effort to improve retention and

13   recruitment initiatives, they authorized the use of security firms

14   to comply with the consent decree requirement.  And in doing that,

15   what they basically did was give the sheriff some additional

16   options for staffing.  It doesn't mean necessarily that those

17   people would actually be in direct supervision, but maybe have the

18   option for -- until they can actually be trained to go through the

19   process the other county staff goes through to assist in getting

20   our staffing numbers up.

21        So this is one of the initiatives that the board has

22   taken, and with the approval of the monitors and some review by

23   the Southern Poverty Law Center as it relates to Henley-Young,

24   that is one measure that was taken to increase the staffing issues

25   there.

1          The board also held a meeting on January the 21st where

2     they approved advertising for more detention officers, and in

3     doing that, they actually expanded the way that we do our

4     recruitment.  I'm not sure if the Court is aware, but the sheriff

5     has a personnel department and the county has a personnel

6     department, and they work in conjunction.  And what we have

7     recently done is combined our efforts and our resources, and we've

8     also expanded the way that we actually look for staff to -- to

9     look at sites like CareerBuilder, GlassDoor, WeLookForJobs,

10    Indeed, LinkedIn.  We also use social media.  We're using the

11    newspapers, the Jackson Advocate, the Clarion Ledger, and we also

12    do periodic press releases.  So we're combining our efforts, and

13    we're being more intentional in the way that we actually look for

14    people to work at both facilities, Henley-Young and the other

15    three facilities.  We also --

16          THE COURT:  I presume you contacted the Mississippi

17    Department of Employment Security, for example.  I mean, that's

18    what they are tasked with doing, helping the unemployed find

19    employment.  I think it's still in place.  I realize I've been out

20    of the market for 30 years now, but that seems like that used to

21    be a go-to place to at least get some information out at the cost

22    of the state and not necessarily at the cost of the County.

23          MS. PRINCE:  And I don't want to speak for the personnel

24    department, but I do know that she's been thinking out of the box

25    in terms of trying to get us before traditional and nontraditional

1    means to get additional staff.  We have also disbanded the

2    residency requirement with hopes that there's talent in the

3    Metro-Jackson area who would like to come to work in our

4    facilities.

5        THE COURT:  When you say "expanded," what was the

6    limitation at first?

7        MS. PRINCE:  The limitation at first was that you had to

8    be a Hinds County resident or have plans to move in Hinds County

9    within one year.  And so at this point, there is no limitation.

10   If somebody who lives in Rankin County who does not intend to move

11   to Hinds County wants to come and work for us, they're able to do

12   that.

13       THE COURT:  Can you live anywhere as long as -- I mean,

14   anywhere -- is it a three-county area, or is it anywhere?

15       MS. PRINCE:  It's anywhere.  It's unlimited.

16       THE COURT:  You just need to be at work on time -- you

17   just need to be able to be at work on time no matter where you

18   live?

19       MS. PRINCE:  Yes, Your Honor.

20       THE COURT:  Okay.

21       MS. PRINCE:  And also we'd like for this Court to also

22   note there has been some conversation about the rate of pay, and

23   Hinds County does realize that the rate of pay is currently not

24   comparable to other agencies in this area.  So what this board has

25   committed to doing beginning with the next budget cycle and is

1   probably going to take about two or three budget cycles, but we're

2   putting in place a tiered program to increase that salary.  So the

3   next two to three years, we will be comparable with Hinds County,

4   Copiah, Simpson County, and other salaries in the state, so that

5   we'll be more competitive.  And hopefully that will help us, you

6   know, attract new talent and retain some of the talent that we do

7   have.

8          THE COURT:  Hinds County is paying less than Copiah?

9          MS. PRINCE:  Copiah was an example.

10          THE COURT:  Okay.  Okay.  Hinds County may be paying less

11   than Rankin County, though?

12          MS. PRINCE:  We are definitely paying less than Rankin and

13   Madison, but we will be comparable in a few years.  So we're going

14   to start addressing that with this upcoming budget cycle.  I think

15   the budget has to be set by September the 15th of each year, so

16   we'll incrementally start looking at raising that -- those wages

17   for potential employees.

18          THE COURT:  And the budget that has to be set by 2000 -- I

19   mean, by September of this year would be the budget that begins in

20   October 2021?

21          MS. PRINCE:  October 2020.

22          THE COURT:  October 2020.  Okay.  All right.

23          MS. PRINCE:  And some of the other activities that we're

24   working on to actually help increase retention, we sent out press

25   releases.  We have also been a little bit more diverse in where we

1    place physical applications.  We do recognize that everyone may

2    not have access to the internet, so there are strategic locations

3    all over the County where we have actually placed hard copy

4    applications.  And we have made that announcement to local

5    television, radio, and print media announcing what some of those

6    locations are.

7        We are also working in conjunction with the sheriff's

8    department on a job fair.  And hopefully that will be a big to do

9    where we actually really put it out there and promote it and have

10    people to come in and to apply on site, and we're still working

11    out those details.

12        Lastly, as it relates to retention, the County has digital

13    monitors that are located throughout the county.  They're at the

14    jails.  They're in county buildings.  We're going to start posting

15    positions on those.  So if you're waiting for the elevator or

16    you're waiting for court, and you see some of those monitors,

17    you'll be informed about those positions that are available.

18        And I think Judge McDaniels has touched on this briefly,

19    but we have a meeting coming up on February the 3rd.  This board

20    meets twice a month, the first Monday and the third Monday of each

21    month.  And our next meeting on February the 3rd, we have several

22    positions that we're going to advertise for and authorize funds

23    for.  One of those is for the clinical social worker or

24    psychologist.  In working with the sheriff's department, the board

25    of supervisors recognizes that it has to provide certain resources

1  for the sheriff to be successful, and so this board has committed

2  to doing that.  So as I go through a lot of this, you'll see where

3  there have been several appropriations to make sure that we can

4  meet some of these directives.

5      Also, we have authorized the approval to fund and to

6  advertising for a consent decree compliant jail administrator and

7  working with the sheriff's department on that as well.

8  Advertising for all of these new positions will actually be done

9  through some of the resources that we spoke about initially.

10      Now, as it relates to a staffing plan, on the 15th of

11  January at the emergency meeting, that's when the County

12  officially moved to give jurisdiction of the youth court to Judge

13  McDaniels.  But I would also like for this Court to know that he

14  does have -- even though there's not currently an executive

15  director, he does have a staff who has been there long term that

16  is the core team that he uses day to day.

17      And in the absence of an executive director, they have

18  actually split those duties, and there is nothing that has gone

19  undone.  But we're going to go ahead and advertise for the

20  executive director's position, and they are accepting

21  applications.

22      I would like to note as well that Mr. McDaniels had

23  brought his operations manager, Mr. Eddie Burnside, who was here,

24  and I think he is -- he's left the courtroom.  But Mr. Burnside

25  has been with the County for a number of years.  He's been very

1   instrumental in helping Henley-Young get their policies and

2   procedures together, and he's been a true resource.  And they are

3   committed to being a part of this process and actually being here

4   for these proceedings.

5       Next for the Court's consideration, there is a provision

6   in the stipulated order that talks about the installation of an

7   alarm system on the housing and unit fire doors.  This matter is

8   anticipated to be on the board's agenda for March -- I'm sorry --

9   for February the 17th, 2020.  Staff is currently exploring

10  specifications and trying to identify vendors for this.  But this

11  is a matter that is on our radar, and it is a matter that the

12  board will be addressing.  And at this time, we hope to identify a

13  contractor that has experience with corrections and jails, and

14  also an architect to oversee the installation of these fire doors

15  and other improvements at all the facilities.

16      THE COURT:  Speaking of architects, I think the monitor

17  said that part of the -- I think part of the agreement says that

18  the County would contract with an architect to oversee all of

19  these architectural changes, some person with correctional

20  architectural experience.  I think that's what I heard.  I may be

21  wrong.  But what has the County done to contract or hire the

22  architect and doing what it needs to do to have the architect on

23  board to supervise or to review all of these physical changes that

24  will be occurring?

25      MS. PRINCE:  Well, the County has a regular relationship

1    with several architecture firms and engineering firms, but not

2    specifically in corrections.  So the very first thing we've been

3    trying to do is rely on some of those existing relationships for

4    referrals and look for someone with this experience.

5        We may have to put out a request for qualifications to

6    actually find someone with the exact experience, because we do

7    have architects that we work with with other things.  But they are

8    not qualified for the work that the consent decree requires.  But

9    the authority is going to be there at the next meeting to do

10   whatever we need to do funding-wise to make this happen.

11       THE COURT:  I mean, because you've got some stuff,

12   physically, that's going to have to be done probably no later than

13   four months.  Probably sooner than that, you know, so by May 1st,

14   I guess it is, or May something, May 15th?

15       MS. PRINCE:  Well, I know there has been an aggressive

16   effort by our maintenance staff, and also we have relied to some

17   degree on our public works staff with some of those relationships

18   from existing vendors.  So we're hoping by the next meeting, we'll

19   have a plan in place, and hopefully someone pinpointed to take

20   this up, because we do realize we have projects that are going on

21   right now at the jail that do require that supervision.

22       THE COURT:  Okay.

23       MS. PRINCE:  The stipulated order requires several

24   modifications to doors in the facility.  We have contracted with

25   CML, LLC.  They are a contractor out of Texas, and I believe the

1    contractor has been blessed by the monitors.  They are in the

2    process now of evaluating and getting that work done.  And we're

3    going to make sure that the work is done in the order that

4    actually works with the staffing plan and the training for the

5    officers.  We do realize there has to be a direct supervision

6    model, and we just want to make sure that based on how the jail is

7    going to be staffed once the renovations are completed that we

8    work in that order and work closely with the sheriff's department.

9         Slated also for our February the 3rd meeting, we're going

10   to retain the authority to fund and retain a consultant with

11   experience in master planning to facilitate the process of

12   long-term planning.  Now, we're hoping to do this fairly soon, but

13   we also want to make sure that we work very closely with the

14   monitors.  So hopefully after we get this authority at our

15   meeting -- at our next meeting, we will have something for the

16   Court at our next status conference once we're able to actually

17   work with the monitors and identify what that person needs to be

18   doing and get a job description that's sufficient for compliance

19   with the consent decree.

20        Another matter that the stipulated order addresses is the

21   need for safety and security repairs.  There were several things

22   that were identified in the process of reviewing what was required

23   for the consent decree that we felt we needed to do additionally

24   to make sure that not only the detainees were safe, but also

25   staff.  So the board, at its January 21st meeting, made several

1    authorizations for the Raymond Detention Center to start with.

2    One is the approval to purchase a 12-foot high and 1,987-foot

3    fence.  Now, this fence would have razor wire enforcement.  It is

4    a stand alone exterior and also it has a stand alone exterior

5    tilt-zoom IP camera, and so this is going to be placed around the

6    perimeter of the Raymond Detention Center.  And this is already in

7    process in terms of the construction.

8         The board has also secured an x-ray machine.  Now, the

9    x-ray machine has the capability to identify all levels of

10   contraband, weapons, explosive devices, and it also uses color

11   codes to assist.  The company that the board used to purchase the

12   x-ray machine will also be providing training, so we're not just

13   going to purchase it and put it down there.  They're going to

14   actually train the staff on how to use it, so it can be the most

15   effective.

16        The board has also purchased a guard house.  We're hoping

17   that with having the guard house there, that is going to deter

18   issues that we have in terms of contraband entering the facility.

19   So that has been purchased.  It's currently being installed.  I'm

20   sorry, not installed; it should be delivered by January the 30th.

21        THE COURT:  What is a guard house, if I may ask?

22        MS. PRINCE:  Just when you enter the premises, there's no

23   guard sitting there when you actually go to the facility.  So

24   there is going to be a guard house, so before you enter the

25   facility, you will pass by the guard house to get to the facility.

1          THE COURT:  So that's going to have to be maintained by a

2     guard?

3          MS. PRINCE:  Yes, Your Honor.

4          THE COURT:  So -- okay.  So as you get -- you're talking

5     about RDC, right?

6          MS. PRINCE:  Yes, at RDC.

7          THE COURT:  Okay.  So you'll go past -- the person will

8     let you -- you will leave your car in the parking lot, walk over

9     into the area, is that it, and then go into the building?

10          MS. PRINCE:  Well, before you get to the building the --

11          THE COURT:  Oh, before you get in?

12          MS. PRINCE:  Before you get to the building.

13          THE COURT:  Are you talking about before you get to the

14     parking lot or --

15          MS. PRINCE:  Yes, before you get to the parking lot is my

16     understanding.

17          THE COURT:  Okay.  So on the road?

18          MS. PRINCE:  On the road.  And we're also putting cameras

19     up, so you can actually look at the perimeter of the building.

20     But the guard house is to deter the entry of contraband and to

21     prevent any escapes or things of that nature, so there's an added

22     security feature of having the guard house.

23          THE COURT:  So a person's car -- like at the state

24     facilities, a person's car will be searched when they come up.  I

25     mean, you'll be asked to show your ID and open up your trunk or do

1    whatever?

2            MS. PRINCE:  Yes, Your Honor.

3            THE COURT:  Whatever -- whatever --

4            MS. PRINCE:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MS. PRINCE:  And lastly in terms of security features,

7    they've also installed a flashing light and a video monitor.  This

8    will cover the County Farm Road and entry into the road to the

9    Raymond Detention Center that lead to the rear gate.  So there's

10   an extra flashing light that lets people know, hey, you're being

11   watched.  You're on surveillance.  And it gives us more security

12   in terms of who is entering and exiting the facility.

13           Another hire that they're looking to authorize in

14   February, we're asking for the authority to hire a designated

15   full-time recruitment officer within the detention center.  So

16   this action is going to be taken in conjunction with input from

17   the sheriff's department and the monitors as well.  But the

18   authority will be there, so we'll be able to be in compliance at

19   the time outlined by the stipulated order.

20           As it relates to population management, there is authority

21   on February the 3rd to make -- to create three new positions.

22   Each time there is a new position created, there's a new pin

23   that's created and a new budget appropriation.  So on

24   February 3rd, we're asking for the authority to create a pretrial

25   services program for long-term population management.  We're also

1   getting authority to retain a consultant experienced in the

2   area -- in the area of implementation of pretrial services and the

3   authority to hire a full-time individual who is qualified to

4   oversee this program.

5        The County does understand that even though we're

6   initially getting someone to oversee the program that the program

7   may grow into a multiperson department.  So as we look at the

8   budget, we're also looking at additional funds to staff the

9   department to include more than one person, because in order to be

10  successful in pretrial prevention, then it probably will take more

11  than one person.  So the board is aware, and they're making

12  provisions to help do that as well and will also do this in

13  conjunction with input from Southern Poverty since it will

14  possibly effect things at Henley-Young as well.

15       Lastly in terms of ongoing efforts, the County is really

16  trying to make sure that this Court understands -- that they know

17  and they understand the seriousness of this matter, and we

18  appreciate the Court's willingness to work with us as we work

19  through the issues that are outlined in the stipulated order and

20  the consent decree itself.  And we're committed to making sure

21  that we comply with this Court's continued orders, and this

22  concludes my update.  I'm available for any additional questions

23  you have.

24       THE COURT:  You talked about a lot of new positions for a

25  county that says that they didn't have x-amount of dollars to do

1    some of the other earlier stuff.  But you've committed to it.

2    You've told me that that's what I should expect, so that's what I

3    will expect.

4          But let me ask this question, and I did not go back to it

5    with the monitors.  I failed to re-ask it at the time.  What --

6    there's -- the issue of either 800 days by a juvenile who is

7    sitting over there or 800 days by an adult who is sitting in

8    Raymond, what -- and I know we've got a plan for a CJCC.  But

9    what, if anything, is the County -- I realize the district

10   attorney is a state officer; I realize that.  But there has to be

11   some coordination between that state officer and the sheriff's

12   department, because the sheriff's department has the obligation to

13   provide for these people while they are awaiting trial.  The

14   sheriff has custody over them.  The County pays all of the bills

15   that are attended to them.

16         In the County's response to the Government's motion for

17   contempt, the County noted that it is multiple -- the times at

18   which one is detained in their facilities is substantially longer

19   than other places across the country and/or across the state.

20   What is being done to make sure -- I imagine it's pretrial

21   services department as you said.  You know, one person won't be

22   able to do this.  It's probably going to take a department.  And

23   that will probably alleviate some of the problem, because you'll

24   find that certain people might be best being monitored outside of

25   the facility some way.  But what -- what plan is in place?  What

1    is being talked about to get people processed through the system

2    in a timely fashion?

3        There's a 270-day rule under state law.  Obviously, that

4    is compounded, because there's always continuances and stuff.  But

5    what is being done to make sure that nobody is -- this is a --

6    this is an excessive burden on the County.  The County assumes a

7    cost per day, I would imagine, in sort of figuring out how much

8    money to allot toward their criminal justice system.  Say, it's

9    $10 a day, which I know it's not.  It's much greater than that.

10   But what is the County doing to make sure that these people are

11   getting processed through the system?

12       MS. PRINCE:  Well, the County has been fortunate very

13   recently that the current district attorney has been very

14   responsive.  One way that we're able to monitor this is working

15   closely with the courts.  The board of supervisors has enjoyed a

16   good relationship with the circuit court.  And as we identify

17   individuals who have been detained for periods longer than

18   270 days, the new DA has been very responsive in terms of trying

19   to identify those issues and possibly get those people put on

20   house arrest or released.

21       THE COURT:  Can the sheriff's department, for example,

22   tell me today of the 400 people over there, who has been there

23   more than 270 days?

24       MS. PRINCE:  I don't want to speak out of turn for the

25   sheriff's department.  I will yield that to Ms. Barker.  But I

1   would like to address another comment that the Court made in terms

2   of being able to afford the different positions that we're talking

3   about, because we want to be clear to the Court that we're not

4   here to make empty promises or to make excuses.

5        But one thing that the board has recently done is take a

6   hard look at some of their expenses and the way that they've

7   handled the budget, and they've made the consent decree a

8   priority.  One of those things is by looking at tax revenues and

9   the way that we budget those.  Looking at the amount of tax

10  abatements that are provided and possibly looking to reduce those

11  and put that money into salaries, put that money into training,

12  and put that money into funding some of these positions.

13       So there is a budget crunch with Hinds County, but they

14  have been very deliberate in looking at the budget to make sure

15  that we can meet some of the requirements to be competitive,

16  because we just don't want any jail administrator or any program

17  manager.  We want the best for Hinds County.  So we're hoping by

18  doing some of these things that we're getting the best, and we're

19  offering competitive salaries.

20       And then once people actually come to Hinds County to

21  work, they'll say that they like it here, and they can help

22  improve the system.  And that is the ultimate goal to get the

23  system improved, you know, for the benefit of all the detainees

24  both at all the adult centers and at Henley-Young.

25       THE COURT:  I mean, the significant cost that the County

1    is making, I think the monitor mentioned this at some point with

2    respect to the physical plant issues and the costs therein, the

3    County might get to the point where it makes -- has to make a

4    fork-in-the-road decision; do they spend, you know, millions of

5    dollars in the RDC over the short term with thinking about a

6    long-term plan for something else, which is going to cost even

7    more millions of dollars?  I don't know.  That's left to the

8    policymakers in Hinds County.

9         But it seems like that's an issue that might have to be

10   discussed and grappled with, but, of course, in grappling with

11   that issue you'll be bound by this agreement.  Do you agree?

12        MS. PRINCE:  I agree, Your Honor.

13        THE COURT:  Okay.  Thank you, Ms. Prince.

14        MS. PRINCE:  Thank you, Your Honor.

15        THE COURT:  Ms. Barker?

16        MS. BARKER:  May it please the Court?

17        THE COURT:  You may proceed.

18        MS. BARKER:  Your Honor, I believe that Ms. Prince

19   detailed a lot of the efforts that have been ongoing between the

20   board and the sheriff's office.  I would like to just add a little

21   bit more detail to those issues that fall under the direct purview

22   of the sheriff's office, mainly I believe it's Sections II and III

23   of the stipulated order.

24        The first section regarding staffing, we do appreciate the

25   County's efforts and knowing or identifying that this is a

1    critical issue.  Safety and security has always been a critical

2    issue in this matter, first and foremost, before any of the other

3    95 provisions of the consent decree.  And we do appreciate the

4    County trying to be proactive in hiring perhaps a security firm to

5    man those guard shacks and the parameter, so we can devote more

6    resources to the employees inside the pod.

7        Next week we have Mr. Matt Rivera, who is our staffing

8    expert, who has -- who has been identified by the monitors to help

9    the sheriff's office in recruiting and retention specific to

10   corrections.  Now, there has been a long-standing problem with

11   retention of our detention officers, and we are hoping that -- we

12   are very encouraged that Mr. Rivera, who was on site in December,

13   he's going to come back and have more specific meetings to help us

14   identify and correct any problems that could be system-wide with

15   retention.

16       With that effort as well, he's going to help us craft a

17   job description for jail administrator, which we will post next

18   week, because the board has given authority for us to post and pay

19   those bills for posting.  So we are encouraged in that effort.

20       The week after that, Ms. Karen Albert, who is the policy

21   and procedure expert who is being paid through the monitor's

22   budget, she will be on site to help us plug along and further our

23   attempts in the policies and procedures.  Which one thing I am

24   very happy to report to the Court is that we have adopted our use

25   of force policy.  It has been approved through the Department of

1    Justice, and it is adopted.  So that is -- that is huge, and in

2    conjunction with that, the stipulated order specifically mandates

3    an amount of time and basically a process as to -- as to implement

4    these new policies and procedures.  So I know Your Honor is aware

5    of that, that once a policy is accepted, we have to come up with a

6    training plan and a curriculum to train all the officers within

7    the detention services.  I have met, along with the monitors, this

8    week with our new training department to come up with that

9    curriculum, and they've already actually have one in the works.

10        So we do have a lot of work to do.  However, a lot of that

11   work has already been committed to and is already being done.  I'm

12   encouraged by that.  There is a -- we're seeing a lot of new

13   players in this, which I think is needed.

14        Now, I'm not naive to say that everything is going to

15   magically fix itself overnight, but we have a new DA who seems to

16   be very engaged and very enlightened to the plight of the

17   detainees who are -- the pretrial detainees, innocent people by

18   all facts and circumstances, who are sitting in our jail for an

19   exorbitant and unacceptable amount of time.

20        THE COURT:  Has there been any discussion or talk about --

21   and I apologize for cutting across you.

22        MS. BARKER:  No.  No.  No.

23        THE COURT:  Has there been any discussion to talk about

24   some mechanism between the two offices about tracking and keeping

25   track?

1          MS. BARKER:  Well, Your Honor, I appreciate that you've

2     mentioned that.  I am in talks with DA Owen to get down -- sit

3     down for a meeting.  And also as -- I don't know if Your Honor is

4     aware, we have a new public defender as well, Ms. Gail Lowery, and

5     I have a great working relationship with Ms. Lowery.  I'm very

6     encouraged about that.

7          And I believe that we three need to get to the table as

8     soon as possible.  We've had, quite frankly, Your Honor, we've

9     been a little busy the last two weeks, so I anticipate with

10    sheriff as well to sit down with DA Owens in the next week or the

11    next.

12         THE COURT:  I mean, I realize the public defender

13    represent a great swath of the people, but the DA represents

14    everybody.

15         MS. BARKER:  Right.

16         THE COURT:  I mean, the DA is on one side of the "v" in

17    every case -- every case.

18         MS. BARKER:  Yeah.

19         THE COURT:  So I'm just trying to figure out why there's

20    not been any -- I'm just trying to figure out why we can't track

21    certain things.

22         MS. BARKER:  I understand what you're saying.  It sounds

23    like a seemingly --

24         THE COURT:  Because what I heard earlier from Ms. Simpson,

25    for example, there are 60 different people in the system who might

1  have an order that questions or deals with their competency.  Now,

2  whether or not they're being sent to a place, whether they're

3  being evaluated, or whether they're being sent to a state

4  facility, or being -- or frankly staying there, nobody knows what

5  that number -- nobody knows the status --

6          MS. BARKER:  Right.

7          THE COURT:  -- of those orders.  Although, the DA has a

8  copy of all of those orders.

9          MS. BARKER:  That's right.

10         THE COURT:  And the sheriff's office should have a copy, I

11  guess.  I'm trying to figure out if there is -- I mean, the

12  sheriff's department -- I mean, because the sheriff has custody of

13  these people.

14         MS. BARKER:  Right.

15         THE COURT:  Our U.S. Marshals have custody of our people.

16  They get a copy of every judgment and the commitment order, and

17  they know where their people are who they have custody of and who

18  they are at the time that they have them.  I take it y'all, the

19  sheriff's department, does not know that.

20         MS. BARKER:  It does not seem like that they do.  I mean,

21  Ms. Simpson represented to the Court as well it's a confusing

22  process, because from what I understand is that there is trouble

23  with communication between the state hospital and our medical

24  provider and even the state hospital and our booking as to where

25  these people are in the process; and that is unfortunate.

1          And, quite frankly, we couldn't even -- the past DA would
2    not even come to a meeting or respond to e-mails, so there was no
3    way to physically move those people forward or to clear up any
4    confusion.  So from the sheriff's office standpoint, you know,
5    we're in this consent decree.  The County is in this consent
6    decree.  There are two other parties who could be that are -- that
7    are held responsible for the criminal justice system, which is the
8    DA's Office and the judiciary.

9          So I'm encouraged going forward.  I'm not naive that it's
10   going to magically happen overnight.  But, yes, that is something
11   that is going to be on the agenda to speak with DA Owens about,
12   and I'm hoping that we will have a good mechanism to go forward.

13         Additionally, I would request -- I know that the monitors
14   mentioned this, but the position of court coordinator or court --
15   I believe it was the court coordinator.  It was a position held by
16   Kenny Lewis within the -- it's a county position, but he worked
17   within the detention department.  And he did a great job pushing
18   people through the system and making sure that people who were
19   held there for a long time got out.  That position is now vacant.
20   I would -- that is a very important position.  We've done a lot, I
21   believe, with the resources that we have given the fact that there
22   is a lot that still needs to be done that's out of our control.
23   That is one thing that's in our control, and I do think that we
24   need that position filled.

25         THE COURT:  Is it vacant because Mr. Lewis is now a

1    justice court judge, or is it vacant because there have been some

2    other decisions made by the county --

3          MS. BARKER:  I'm not --

4          THE COURT:  -- or the sheriff?

5          MS. BARKER:  I can't speak to that.

6          THE COURT:  Who did Mr. Lewis --

7          MS. BARKER:  He was a county employee, and the position is

8    vacant now.

9          THE COURT:  Okay.  Ms. Prince?

10         MS. PRINCE:  Your Honor, if it pleases the Court?

11         The position is vacant, because Mr. Lewis took the

12    position as justice court judge.  At the January 15th, 2020,

13    meeting, the board did authorize a risk manager position, which

14    also included the duties of making sure that the County was in

15    compliance with Section L of the consent decree.

16         After taking that action, I did have a conversation with

17    Ms. Simpson, who said that we probably will need to get a

18    full-time person just for Section L.  So the County is currently

19    looking for that person, so that is a position that will be filled

20    that will be separate from the risk manager and will assume the

21    duties that Mr. Lewis was doing.

22         THE COURT:  Okay.  All right.  Ms. Barker, you may.

23         MS. BARKER:  And, Your Honor, I believe that that

24    concludes my presentation to the Court.  I am here to answer any

25    of the Court's questions that you may have.

1          THE COURT:  All right.  Thank you, Ms. Barker.  I would --

2     I just inquire of the parties, including the monitor, for future

3     purposes with respect to these status conferences and hearings, I

4     realize the district attorney has been to at least two of these

5     over the last 12 months, I think.  I think I remember seeing

6     Mr. Smith at one and Mr. Owens at another, I think.

7          It's such a fundamental person in the Hinds County

8     criminal justice system that an invitation needs to be extended to

9     him if -- or somebody in his office.  And because you believe that

10    the public defender has a critical role because they represent a

11    significant number of these people -- I realize you have your

12    CJCC, and they're on that.  But it might be helpful to at least

13    have them represented.

14         MS. BARKER:  I agree, Your Honor, and I will reach out to

15    both DA Owens and Ms. Lowery and advise them or invite them to the

16    next status conference.

17         THE COURT:  Okay.  The monitor mentioned -- and this is

18    probably something I should ask the county.  But the monitor

19    mentioned about the leak in the roof, and one being able to I

20    guess request or repair submitted by requisitions or whatever or

21    request for repairs are submitted by the sheriff's office to the

22    county or the county administrator or to the county about -- I

23    mean, do we know when or if that particular need has even been

24    given to the County yet?

25         MS. BARKER:  From my understanding, it has been.  However,

1    I don't want to speak on behalf of the County.  So I'll let

2    Ms. Prince address any issues.

3           THE COURT:  I mean, but it's been reported by the sheriff

4    to the County is the question.

5           MS. BARKER:  Yes.  Yes, Your Honor.

6           THE COURT:  Okay.  All right.  I think that the -- I think

7    that the stipulated order speaks for itself.  I'm certainly going

8    to -- any fair reading of it to me suggests it does and that the

9    parties have negotiated all that language and all the details in

10   it, so I expect -- I expect compliance, full compliance.

11          I know the original consent decree broke things down to

12   substantial compliance and some other type of compliance, and I

13   think in going through it, I think my order noted that there

14   was -- I heard Mr. McDaniels say over there at Henley-Young 83 out

15   of 87 or 83 out of something was substantial compliance or either

16   full compliance, I think he said.

17          And I think my order represents that there's only been --

18   of the 92 issues for the County at their three facilities: RDC,

19   JDC and WC, that there's only one.  I don't expect to see that

20   again.

21          MS. BARKER:  I don't either.

22          THE COURT:  So is there anything else that the Court needs

23   to take up?  Excuse me.  Hold on.

24          Reminded me of a note that I have here.  One of the

25   monitors -- or the monitor, Ms. Simpson, did mention, and I know

1  the Court mentioned it, too, I think self-reporting and

2  self-assessment.  Self-reporting in particular, because we need to

3  know what's going on over there when things happen, and we need to

4  know in a timely manner.  I think I noted that the Court became

5  aware of one thing, because it was circulated in the media.

6       But there's some provisions of self-assessment and

7  self-reporting.  What measures does the sheriff have adopted or

8  seeking to adopt or doing whatever to make sure that everybody

9  understands what -- what the monitors mean by self-reporting and

10  self-assessment?

11       And that's to the County, too, because the County has some

12  assessment issues, I think, but particularly the sheriff.

13       MS. BARKER:  Your Honor, what we envision is the

14  quality -- we do need to have someone in charge from the sheriff's

15  office to do that self-assessment.  And just being candid with the

16  Court, that has not been a priority for the sheriff's office it

17  seems for the last couple of years.  However, I have had some very

18  serious conversations with our new sheriff and new administration,

19  our new command staff, and they understand that.

20       And that is a recommendation that we will have or identify

21  someone in charge of the self-assessment in the future.  That has

22  not been done on the County side nor the sheriff's side for the

23  last couple of years.  And that will be -- I think that that could

24  contribute to one of the reasons that maybe it seemed like we were

25  chasing our tails for the last three years with no firm direction.

1    You know, that is a very valid point that that will help us

2    internally regulate what we are doing and where we are going and

3    getting a big plan.  One thing that I'm very encouraged about and

4    very happy to be representing a client that understands the need

5    for specific duties and deadlines and ways to accomplish a goal

6    and accomplish a plan.

7           THE COURT:  Thank you, Ms. Barker.

8           MS. BARKER:  Thank you.

9           THE COURT:  I'll return to the United States.  Is there

10   anything else?

11          MR. CHENG:  No, Your Honor.

12          THE COURT:  Anything else from my monitors, Ms. Simpson?

13          MS. SIMPSON:  No, Your Honor.

14          THE COURT:  All right.  Oh, I didn't ask you, Ms. Barker,

15   as I said I would.  But is there a report -- can the sheriff run

16   a -- is it physically -- is there a system in place that allows

17   the sheriff to run a report, for example, which would show him

18   persons who have been in the facility for more than 270 days?

19          MS. BARKER:  Yes, there is, Your Honor.  And I don't want

20   to speak out of turn, because that is not my -- that is not my

21   expertise.  So I would -- yeah, Major Rushing should know.  But

22   could I --

23          MR. TEEUWISSEN:  The answer is yes.

24          MS. BARKER:  The answer is yes, but to the detail that I

25   want to give Your Honor --

1          THE COURT:  I realize there are extenuating circumstances

2     on everybody's case.

3          MS. BARKER:  Right.

4          THE COURT:  Sometimes the state will have filed a motion

5     for continuance, sometimes the defendant.  A lot of times the

6     defendants will have, and I know sometimes that is used as a trial

7     strategy.

8          We get petitions, habeas petitions, because some of the

9     people say I'm sitting over here, and I don't even know that my

10    lawyer has filed that.  I mean, so we do know that there are many

11    extenuating circumstances with respect to why one may be there,

12    but do we have something that tracks the days which somebody is

13    there?

14         MS. BARKER:  Yes, Your Honor.  And actually it's a report

15    that is given monthly, and now we're doing it weekly to the

16    circuit clerk, the circuit judges, to the DA's Office, to the

17    sheriff's office, the board of supervisors.  It's an entire report

18    of indicted, nonindicted inmates or detainees, their specific

19    charge, how long they have been there, and I believe there's a

20    little bit more information.

21         But that is a generated report that is done now internally

22    weekly, so we will know.  Because that's at the top of the

23    sheriff's agenda is how long have these people been in here, and

24    why are they still here?  And that actually goes out monthly.  I'm

25    not sure if it's a statutorily mandated report, but I do know that

1    it goes to, for example, the McArthur Justice Center gets that

2    monthly.

3            THE COURT:  Okay.  All right.  Thank you.

4            Did you have something, Mr. Cheng?

5            MR. CHENG:  Your Honor, I think that actually addresses

6    it, but Ms. Simpson did have a process that she worked with

7    Mr. Lewis on identifying people who had been held for long periods

8    of time.  It's a manual process.  She might be able to better

9    explain it.

10           THE COURT:  Okay.

11           MS. SIMPSON:  I think there are a couple of things going

12   on.  One, is the indicted/unindicted list that Ms. Barker is

13   talking about, and it is run through the JMS, the information

14   management system.  There is a lot of manual look-ups that have to

15   be done to actually clean up that list, but that is done and

16   provided, as I understand it, to a number of people in the system.

17           There is another more simple list that Kenny Lewis and I

18   and the IT department were working on, and that did not involve

19   separating it by unindicted and indicted.  It was just a straight

20   list, and from that is how we calculated the average length of

21   stay and found that it was, as has been noted previously, about

22   twice the national average.

23           So that is something that was being calculated on a

24   monthly basis to see if that length of stay was improving.  That's

25   not being done now with the change in employees, so there's a

1   number of different ways that that can be done.

2          And there are also quite a few system improvements that

3   can be looked at.  Often that's done through the CJCC.  I think

4   now with the active involvement of a DA that there's probably more

5   potential there.  We did meet with the DA earlier this week and

6   learned of some of the impediments.  He described the difficulties

7   dealing with the state lab and getting autopsy reports and

8   toxicology reports and the extent to which that slowed down the

9   indictment process and prosecution, as well as getting some

10  information from the public or from the police departments to the

11  prosecutor.

12          So there are -- there are a number of system issues that

13  can be addressed that would help improve the process.  Some of

14  those cost money, such as one of the things that's being looked at

15  is whether private labs can be used to provide some of the

16  information that seems to be coming out so slowly from the state

17  lab.  It's always a difficult position for a county who is bearing

18  the cost of the incarceration, to what extent do they pay for

19  something somebody else should be paying for, but would alleviate

20  their burden of the number of people incarcerated.  So that's a

21  difficult question, but there are some areas that certainly can be

22  looked into to assist in moving that process along.

23          THE COURT:  Thank you, Ms. Simpson.

24          Anything else, Mr. Cheng?

25          MR. CHENG:  Nothing else, Your Honor.

1          THE COURT:  All right.  Counsel, I appreciate your

2     responses and making yourselves available for this status

3     conference.  As you know, the monitor will be submitting a report

4     to the Court in the coming months.  I think it's 90 days, 60 days?

5          MS. SIMPSON:  Thirty days I provide a draft to the

6     parties, and they have, I believe, ten days to provide me their

7     comments, and then I get it in usually within about a week or two

8     after that.

9          THE COURT:  So about 60 days, I guess, we should get an

10     update on what it was -- what the monitors have observed during

11     this week of visiting the facilities and talking to people and

12     looking over documents and things.

13          Again, I thank you all for your attention in this matter.

14     Obviously, the Court is -- I can't say fully aware.  The Court --

15     you know, the Court's been accused of living in a tunnel, but

16     sometimes things come through the tunnel.  And of course, we see a

17     crisis in our whole correctional facilities across the state.

18     Again, we're going to do all that we possibly can do to make sure

19     that this facility -- these facilities owned and operated by Hinds

20     County do not fall into disarray in any way.

21          I will have no problem enforcing the terms of this order

22     and doing whatever is necessary to protect the interests of those

23     who the County has a responsibility of protecting.  The pretrial

24     detainees, the employees, and the public have no problem, and I'll

25     use all the tools that allow for me to do what I must do, every

1    tool possible.

2          So -- but thank you for this new commitment to making sure

3    that this process works.  Obviously, no entity likes to be in the

4    state of receivership or having to be monitored by anybody.

5    Nobody likes that.  But we're at this point now, and so we need to

6    be on a path to make sure that Hinds County can operate the

7    detention centers without the need of being monitored by any

8    court.

9          Again, thank you all so very much.  Court is in recess.

10         MS. SUMMERS:  All rise.

11   ********************************************************************

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **COURT REPORTER'S CERTIFICATE**

2

3           I, Candice S. Crane, Certified Court Reporter, in and for

4   the State of Mississippi, Official Court Reporter for the United

5   States District Court, Southern District of Mississippi, do hereby

6   certify that the above and foregoing pages contain a full, true,

7   and correct transcript of the proceedings had in the aforenamed

8   case at the time and place indicated, which proceedings were

9   recorded by me to the best of my skill and ability.

10          I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial Conference

12  of the United States.

13          THIS the 7th day of February, 2020.

14

15                          /s/ Candice S. Crane, CCR

16                          Candice S. Crane, CCR #1781
                            Official Court Reporter
17                          United States District Court
                            Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25