Court-Appointed Monitor's Tenth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                   Jim Moeser                      Dr. Richard Dudley
Corrections Operations            Juvenile Justice                Corrections Mental Health

# EXECUTIVE SUMMARY

**Update on Corona Virus Preparations**

Since the circulation of the draft of this report, the seriousness of the Corona Virus has become apparent including its risk to the incarcerated population which frequently includes individuals in poor health. The County reported that it has been in frequent communication with the Mississippi Department of Health. Counsel for the Department of Justice provided recommendations and links to the recommendations of the American Corrections Association and the National Commission on Correctional Health Care and the Center for Disease Control. The Monitoring Team provided sample directives on measures to address the virus. The Sheriff's Office has issued some of these directives. The directives provide guidance on measures to be taken in this crisis. However, the directive related to new arrests and bookings does not appear to be fully tailored to Hinds County. For example, it does not address how females will be handled who are housed in the Jackson Detention Center where there is no negative pressure cell and refers to equipment that Hinds County does not have. This policy should be reviewed to determine how it can be operationalized in Hinds County. The provided Emergency Response Plan Checklist does not appear to be a complete and final Emergency Response Plan at this time. The Plan does not appear to anticipate the possible magnitude of the spread of the virus within the jail. The Monitoring Team has recommended that the jail identify units that would be used for quarantine in the event a large number of inmates become infected. The Monitoring Team has also suggested that a point person be assigned to the COVID-19 response. This would assist in finalizing and implementing these measures.

Also of concern is the ability to implement these directives effectively particularly given the lack of staffing which has impacted the ability to operate the jail generally. In addition, the national problem of scarce test kits and protective equipment will similarly be a problem within the jail. The District Attorney has taken steps to identify cases where bail might be reduced so that individuals can be released from the jail. This appears to have resulted in some reduction of the population which is now 419 in the adult facilities. The Monitoring Team recommends that additional efforts be made to release the elderly, the vulnerable and non-violent individuals. Judge McDaniels has been working to reduce the population at Henley Young. At the time of the site visit there were 32 youth at the facility. There are now 17 youth at the facility with the reduction being primarily in the youth being processed in the juvenile system.

**Corrections Operations**

With the change of elected officials in January, there have been a number of changes in personnel. The new Sheriff, Lee Vance, has a new command team; the prior Jail Administrator has resigned and an Interim Jail Administrator is in place. There is also a new County

Administrator. With these changes there has been encouraging activity at the jail. The new administration has authorized work to begin on correcting the basic security issues facing the Hinds County Jail System, particularly at the Raymond Detention Center (RDC).  The lack of staff is still the most critical problem facing Hinds County Detention Services (HCDS).  The number of filled positions dropped to a new low.  Only 204 of the authorized 275 positions are filled.  This is the lowest number recorded during the past two years.  When one considers the fact that the staffing study that was conducted in 2017, called for over 400 personnel, these figures are particularly disturbing. Even with C Pod at the RDC closed for renovation, based on the posts needed for the remaining pods and the other facilities, 399 positions are needed system-wide and 246 positions at RDC. However, RDC is operating with only 103 filled positions, 143 less than needed.

Although the lack of adequate staff makes direct supervision an impossibility, since the last site visit a new procedure has been implemented at the RDC which allows staff to spend more time actually inspecting the housing units instead of sitting in the pod control rooms filling out logs. This practice provides for more accurate, verifiable record keeping and increases the presence of the officers in the housing units.  Once direct supervision is implemented in the renovated housing units (starting with C Pod) the use of individual housing unit logs will be reinstituted.

Policy and Procedure development is underway as specified in the Stipulated Order of January 16, 2020.  Ten have been approved and fourteen are in the review process.

Maintenance issues are still one of the most significant problems facing the HCDS.  Doors that cannot be closed and secured at the RDC make the operation of that facility problematic. Not only are individual cell doors inoperable, but housing unit safety vestibule doors can be manually opened by kicking on them or by accessing the control mechanism above the door panels.  This means that the entire inmate population can gain access to the pod control rooms and (in some cases) to the Great Hall, if they so desire. There continue to be incidents in which inmates let themselves out of "locked" cells, let others out of their cells, and exit the housing units. Once again, in January there were 12 incidents related to inmates being able to freely open locked cell doors. This dangerous situation affects the safety of both inmates and staff.  It certainly contributes to the inability of the HCSO to hire and retain officers to work in that facility.

During the December Contempt Hearing, the HCSO and County agreed to expedite the repair of control room doors, housing unit safety vestibule doors and individual cell doors by employing a qualified corrections maintenance company.  In January, the Board of Supervisors approved a contract with CML Security Services; the authorization to proceed was issued on February 17, 2020. It is troubling that this comes six months after this authorization was represented to have occurred but it does appear to be movement in the right direction now.

3

Fire safety issues have not been adequately addressed since the beginning of the monitoring process.  Nothing has been done to correct discrepancies since the last monitoring report; however, on January 10, 2020, the HCSO submitted a Work Order to the Board of Supervisors to have fire hoses reinstalled in the renovated housing units.  In addition, back up fire extinguishers have been ordered.  The State Fire Marshal's Office has still not made a representative available during a site visit to explain why that agency has allowed sub-standard conditions to exist within the RDC without remedial action or a plan to rectify the situation.

Direct supervision training has commenced for new and existing staff on a continuing basis. Although the block of instruction is of very short duration, only sixteen hours, it does represent a step in the right direction.  Each incoming recruit class will contain a direct supervision component which groups of currently employed personnel will attend.

**Medical and Mental Health**

The Mental Health Coordinator's position has remained vacant since shortly after the September 2019 site visit.  The remaining mental staff include a full-time QMHP, a part-time psychologist, and a part-time psychiatric nurse clinician.  Therefore, this small, existing mental health staff is stretched to the limit with developing treatment plans for and providing mental health services to a case load of 139 prisoners housed at three different facilities (because of the staff shortage, the caseload has been reduced by only providing mental health services to the seriously mentally ill prisoners), performing assessments of new prisoners referred to them, responding to/managing mental health emergencies including suicidal prisoners, performing PREA assessments and providing treatment when indicated, performing weekly rounds in segregation, and maintaining medical records and logs.  Once security policies and procedures for disciplinary review, segregation review, and use of force are completed, the mental health staff will have additional responsibilities related to these activities.  In addition, in anticipation of the opening of the mental health unit, the mental health staff should be engaged in planning to expand existing mental health programming into the type of mental health program that would be appropriate for that unit, and engaged in actually beginning to implement some of the new programs even before the unit is opened.  Therefore, while doing all of this, QCHC (the contract provider of mental health services) needs to perform a mental health staffing analysis, outlining the number and types of mental health staff that will be required to fulfill all of these responsibilities. The need for some additional staff has already been identified. As has been previously reported, in January 2019, QCHC requested permission to hire two additional mental health staff, but the County has still not responded to that request.

The last Monitoring Report noted the change in the method of completing medication pass at RDC such that inmates were escorted from the housing unit into the "horseshoe" to obtain their medications. The corrections expert identified the security risks of this method and the mental health expert observed that medication refusals had skyrocketed with this change. The medical

provider additionally expressed concern that this method did not give the medical staff the opportunity to observe the condition of inmates refusing their medication. RDC was still utilizing this method of med pass at the time of the January 2020 site visit. However, command staff agreed to return to completing med pass in the housing units which would address the noted concerns. Command staff will need to ensure that housing unit officers are properly trained and supervised regarding their duties during med pass; the failure to properly execute their duties in this regard is what led to the initial change in med pass implementation.

**Youthful Offenders**

As of the January site visit, there were seventeen JCA's (Juveniles Charged/Convicted as Adults) (16 males, one female) at Henley Young.  It is worth noting that there were 15 non-JCA's at Henley Young, resulting in a total of 32 youth in care on January 22.  That number is the maximum number permitted under the Consent Decree in J.H. v. Hinds County, 3:11-cv-327-DPJ-FKB, the litigation brought by the Southern Poverty Law Center regarding conditions at Henley Young. As a result, continued management of the non-JCA youth will be important. Overall, Henley Young continues to operate as a generally safe and secure environment for youthful offenders, but other than significant personnel changes there was no notable change in the program since the fall 2019 visit. As has been stated, the addition of JCA's to Henley Young, while an appropriate solution to the housing of these children in an appropriate environment, meant that Henley Young and the Settlement Agreement with the SPLC had to adjust to individuals who would be residing there for much longer periods of time than individuals in the juvenile system. For that reason, it is essential that the litigation in the present case ensure that the juveniles being prosecuted in the adult system receive appropriate services given that much longer period of time of incarceration.

The program and progress toward substantial compliance in most of the areas of the Agreement is best described as being "on hold".  Three key positions were vacant at the time of this visit: (1) Mr. Frazier who had begun in May 2019 as Executive Director was dismissed from that position in early January; (2) the Psychologist position has remained vacant since June 2019 with the departure of Dr. Payne; and (3) the Recreation Coordinator position was vacated more recently. Mr. Burnside, the Operations Manager, and Mr. Dorsey, the Quality Assurance Manager, continue to provide stable leadership for the program, and Judge Johnnie McDaniels was designated as the Interim Executive Director following the dismissal of Mr. Frazier.  The Board of Supervisors has apparently restored oversight of Henley Young to the Youth Court Judge, Judge McDaniels, with an expressed intent to recruit and hire an Executive Director as soon as possible to assume that role.  Fortunately Judge McDaniels has had prior experience leading Henley Young, so working with Mr. Burnside and Mr. Dorsey on an interim basis is workable. Of greater concern is the continued vacancy for the Psychologist position, a key position to both provide direct assessment and therapeutic services to youth as well as provide leadership for

other mental health team members. Although the position was posted in early January, it was not posted as a Treatment Coordinator, a role that Dr. Payne was in actuality performing and was enormously beneficial.

Other programmatic components/activities remain relatively unchanged, and there have been no physical plant improvements related to creating additional program space or improving the condition of the housing units.  The lack of program space has continually been cited as the reason for the lack of adequate programming as required by both this Settlement Agreement and the SPLC agreement. The lack of adequate outdoor recreation space was of concern given heavy rains the week before the site visit and cool temperatures during the visit, both of which resulted in youth not getting access to large muscle activity for nearly two weeks. The Youth Support Specialists and Clinicians continue to provide a variety of discussion group activities, but they remain relatively uncoordinated and minimal in terms of time allotted.

The length of time youth are in custody remains excessive, although implementing the Minors Diversion Docket has resulted in two youth being released prior to the January visit, with several more youth in the "pipeline" for hearings, one or more of which may be released prior to submission of this report. This process also should reduce the length of time youth are confined without being indicted, and the overall impact will continue to be monitored going forward.

Related to the January Stipulated Order, the County should keep the Monitor apprised of progress in meeting the specifics of that order, including: (1) Posting of a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator (due February 16); (2) Making an offer to a qualified person within 3 months of posting the treatment director position, or if no qualified person is hired consulting with the Monitor and US DOJ to discuss options (due May 16); and (3) Developing and implementing a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. (Refer to V. B. and C. of the Order; due April 16).  Although not specified in the Stipulated Order, prior to the next site visit Henley Young should provide a copy of current Policies/Procedures to the Monitor so they can be reviewed as to whether they are fully consistent with specifics of the overall Agreement

**Criminal Justice and System Issues**

There continues to be significant improvement in the accuracy of the records. The new Records Policy requires the audit of the files and the creation of a summary. This process should improve the accuracy of the records and allow for an efficient auditing process. However, there are many files that remain to be reviewed and have the summary created. The files that do have a summary have more of a chronological listing of events as opposed to a summary which details the basis

for detention. A review of several files disclosed one error in the summary that could have resulted in over detention and one error in the underlying paperwork that could have resulted in an erroneous release. As this auditing process continues, the files should continue to improve.

There appeared for the first time a new practice that is questionable. In two separate files, the arrest form submitted by a Sheriff's Deputy stated "Hold for Investigation." In one instance, the individual was charged only with misdemeanors and appears would not have been booked except for the indicated hold. That individual was released the next morning. Another troubling development is the resurgence of orders on fines and fees that do not meet the legal requirements. The Jail was not holding anyone on fines and fees alone. However, there were two individuals who had orders on fines and fees in their files that did not have a finding of willfulness as required by law. The Jail has not sent the orders back to the court for correction as required by the Settlement Agreement but has not held the individuals if there is no other basis for detention. The creation of the Booking Manual which is in development will assist in addressing these issues.

At the time of the last report, many individuals were not getting their first appearance on felony arrests because of the unavailability of the judge. This appears to have been rectified. In addition, the bail schedule that was heavily utilized during this period has been eliminated. Instead, the Jail has been successful in contacting the court and being authorized to enter a Release on Own Recognizance (ROR) for individuals delayed in getting before the judge.

There appears to be increased assistance for Detention Services from the IT personnel. They have developed some ability to pull reports from the JMS system. This is an improvement but the reports do not yet meet the requirements of the Settlement Agreement in terms of containing the required information. The information required by the Settlement Agreement is for the purpose of providing command staff in summary form the data that would inform system improvement. In addition to improving the summary reports, there needs to be continued focus on improving the JMS system so that it can be relied upon to identify individuals appropriate for release. At least three individuals spend a significant amount of time creating manual spreadsheets to identify people for release. This is not only an IT problem but also an issue with the consistency of how information is entered into the system. One individual who provided some protection from over detention was the Court Liaison. He performed some, although not all, of the duties required under the Settlement Agreement to be performed by a Quality Control Officer. He was recently terminated. It would be an opportune time to define the position consistent with the terms of the Settlement Agreement.

The grievance system continues to improve, however, again, only with the labor-intensive creation of manual tracking systems as opposed to a functional electronic system. There was once again a decrease in the number of grievances that had not received a timely response.

Although more grievances are now receiving a timely response, there is still no system to review whether responses are adequate; and no oversight to determine that promised actions are actually completed.

The Criminal Justice Coordinating Council (CJCC) has not had consistent participation by a number of stakeholders. This has limited its effectiveness. Reducing the Jail population is one method for addressing the severe staffing shortage. However, an effective CJCC or some collaborative body will be needed to implement most jail population reduction strategies. Recent events give cause for hope of a more effective CJCC. The County has stated that it has authorized contracting with Justice Management Institute to assist with the creation of a pretrial program. This will greatly assist the CJCC in collaborating on the development of such a program. In addition, the County has also stated that it has approved the hiring of a person to serve as a CJCC coordinator or support staff. This is essential in the development of an effective CJCC and is to be commended. This will be monitored, of course, to track whether these steps are actually taken.

## STIPULATED ORDER UPDATE

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

## STIPULATED ORDER UPDATE

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes | 10/19 | Consultant is retained through the monitoring team |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | Partial | 3/20 | Purchase Order submitted on 1/22/20; cameras were on back order; they have now arrived |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | Partial | | Posted 1/8/20 but not posted as a treatment coordinator |
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and security measures at RDC. The architect shall conduct periodic inspections. | In Progress | | The County is negotiating with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, Farr & Lemons Architects & Engineers (CDFL, PA) but a contract has not yet been finalized. |
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |
| | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, | | | |

| | | | | |
|---|---|---|---|---|
| | anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 | |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement-required policy review and approval process is completed. | | | |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the supervision of inmates at RDC. The plan shall include the following: II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | | | |
| | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | | | |
| | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare check sheets at the cell doors of those inmates held in segregation. | Yes | | Directive issued on 9/27/19 by Major Rushing and radios assigned |

| | | | |
|---|---|---|---|
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other areas or facilities. This work will be completed within 3 months. | | | Work Order submitted to County on 8/14/19; Purchase Order submitted; No installation yet |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the curriculum and materials for training on the new policy or procedure. | | | |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | | | |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include: <br> 1. Activities which are varied and appropriate to the ages of the youth; <br> 2. Structured and supervised activities which are intended to alleviate idleness and | | | |

| | | | | |
|---|---|---|---|---|
| | develop concepts of cooperation and sportsmanship;<br>3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and<br>4. Hinds County, by and through its County Administrator and/or Executive Director at Henley-Young, shall maintain exclusive control and maintenance of any facilities or technology that promotes compliance with this provision. | | | |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as:<br>1. cognitive behavioral programming;<br>2. independent living skill training;<br>3. relationship and positive communication skills;<br>4. anger management;<br>5. peer refusal skills;<br>6. trauma informed programming; and<br>7. pre-vocational skill building. | | | |
| 05-16-20 | I. A. 1. In any occupied pod, the County will convert all control room doors, housing unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically controlled swing doors to the control panel | | | |

| | | | |
|---|---|---|---|
| | so they can be electronically operated with a CML type locking mechanism. | | |
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | | |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | | Work Order for equipment needed in the three pods submitted to County |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | | |
| | I. B. 4. Form a committee to develop and implement the Master Plan, which will include the County Administrator, the Sheriff, the Jail Administrator, the facility | | County has reported that the committee was formed; Monitor has requested but not received documentation |

| | | | |
|---|---|---|---|
| | captains, and the Board of Supervisors President. Other members may be included at the discretion of the County and the Sheriff. | | | |
| | II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division specifically for recruitment of detention officers. | In progress | | A job description was prepared and has been posted. |
| | II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | | | |
| | IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of implementation of pretrial services programs. | | | |
| | IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or within 12 months shall obtain certification by the National Association of Pretrial Services Agencies (NAPSA). | | | |

| | | | | |
|---|---|---|---|---|
| | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | | | |
| | IV. A. 4. The County shall provide the technical support for implementation of a risk assessment instrument for purposes of pretrial release decision-making. | | | |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | | | |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train deputies on a Settlement-compliant use of force policy, including Settlement requirements for reporting of use of force. | | | |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of | | | |

| | | | |
|---|---|---|---|
| | videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | | | |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | | | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be converted to secure swinging doors and tied to a new control panel. | | | |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | | | |

| | | | | |
|---|---|---|---|---|
| | II. B. 4. Within 6 months, the County shall develop and implement a process that provides criteria for merit-based promotion and establishes a career ladder. | | | |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | | | |
| 8-16-20 (2 months to post, 4 months to offer, and 1 month evaluate structure | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | | | |
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the development of the pretrial program within 9 months. | | | |
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | | | |

| | | | | |
|---|---|---|---|---|
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | | | |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | | | |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. Work with the monitoring team to gather the information that is needed for the long-term planning process. | | | |
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the information that is needed for the long-term planning process. | | | |
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will notify the Monitor and DOJ of any | | | The policy development and review process has been proceeding at an accelerated pace with 10 policies now approved. |

| | | | |
|---|---|---|---|
| | anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | | | |

## Monitoring Activities

The Monitoring Team conducted a Site Visit January 21, through 24, 2020. The site visit schedule was as follows:

Site Visit Schedule
January 21-24, 2020

| Date and Time | Lisa Simpson | Dave Parrish | Jim Moeser | Dr. Richard Dudley |
|---|---|---|---|---|
| Monday | | Tour RDC and WC | | |
| Monday evening: 6:00 Lobby of Hotel | Team Meeting | Team Meeting | Team Meeting | Team Meeting |
| Tuesday A.M. | Meet with Captain Dalton<br><br>Meet with Lt. Petty<br><br>Meet with Ms. Winters<br><br>Meet with County Attorney and Board of Supervisors | Meet with Captain Dalton<br><br>Meet with Lt. Petty<br><br>Tour JDC<br><br>Meet with County Attorney and Board of Supervisors | HY-Meet with command staff Burnside and Dorsey<br><br>Meet with County Attorney and Board of Supervisors | JDC review records meet with medical staff<br><br>Meet with County Attorney and Board of Supervisors |
| Tuesday P.M. | Meet with Sheriff Vance, Allen White, Eric Walls and Claire Barker<br><br>Meet with Marlo Brinnon, Jeremy Nelson and Captain Jones | Meet with Sheriff Vance, Allen White, Eric Walls and Claire Barker<br><br>Meet with Marlo Brinnon, Jeremy Nelson and Captain Jones<br><br>Meet with Rholon Tucker (or current Fire Officer) and request State Fire Marshall to attend | Visit Unit B-discussions with youth<br><br>Meet w School Principal-Mr.Devine<br><br>Attend teacher mtg re Individual Academic Plans<br><br>Meet with SPLC | RDC<br><br>Meet with Nurse Minor re discharge planning and group therapy<br><br>Meet with Nurse Sims re staffing and mental health unit |
| | Meet with DA Jodie Owens | | | |
| Wednesday A.M. | Meet with RDC command staff<br><br>Tour Pod C | Meet with RDC command staff<br><br>Tour Pod C | Discussion with Mr. Butler, YSS | Hinds County Behavioral Health and QCHC staff re |

|  | Meet with Mr. Ingram, Bell, Rushing, Fielder and County Attorneys re repairs | Meet with Mr. Ingram, Bell, Rushing, Fielder and County Attorneys re repairs | Visit Units A and B, discussions with youth<br><br>Meet with Y. Coleman, YSS | discharge planning<br><br>Meet with Synarus re competency |
|---|---|---|---|---|
| Wednesday P.M. | Meet with Lt. George, Sgt Hubbard, and Sgt. Tilman re org structure<br><br>Review Classification records<br><br>Meet with Kenisha Jones | Meet with Lt. George, Sgt Hubbard, and Sgt. Tilman re org structure<br><br>Meet with Coleman Meet with Funchess | Attend Treatment mtg re five youth<br><br>Meet with Judge McDaniels | RDC Review incidents and medical records<br><br>Meet with Dr. Brown |
| Thursday A.M. | Meet with Captain Butler/Hightower, Miller and Knox<br><br>Meet with Sgt. Tillman<br><br>Review records | Meet with Captain Butler/Hightower, Miller and Lt. Knox<br><br>RDC | Meet with F. Galloway re programming<br><br>Review training with Ms. Young<br><br>Meeting with Ms. Frelix, QMHP re programming, youth behaviors | RDC<br><br>Meet with QMHP and Nurse Minor<br><br>Meet with psychiatric nurse clinician<br><br>Meet with Sims |
| Thursday P.M. | Meet with mental health staff and RDC command staff re med pass<br><br>WC | Meet with mental health staff and RDC command staff re med pass<br><br>WC | Observe due process disciplinary<br><br>Review ½ individual youth master files<br><br>Review incident reports<br><br>Exit discussion with leadership (McDaniels, Burnside, Dorsey) | Meet with mental health staff and RDC command staff re med pass<br><br>RDC |
| Friday 9:00 A.M. | Status Conference | Status Conference | Status Conference | Status Conference |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

**SUBSTANTIVE PROVISIONS**

**PROTECTION FROM HARM**

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;
    n.  Laundry;
    o.  Food services;
    p.  Hygiene;
    q.  Emergency procedures;
    r.  Grievance procedures; and
    s.  Sexual abuse and misconduct.

**Non-Compliant**
The County/HCSO has developed a Table of Contents for existing and proposed policies.  This was provided to DOJ and the monitor on March 16, 2020.  To date twenty-four policies have been entered into the review process, of which ten have been approved.  The Table of Contents lists a total of 91 policies. While it is encouraging that progress is being made and is accelerating, the adoption of policies and procedures is long overdue. Creation of the policies and procedures is essential for compliance with most aspects of the Settlement Agreement. Until Hinds County develops a comprehensive Policies and Procedures Manual, along with Post Orders, the staff of the Hinds County Jail System cannot be expected to comply with the provisions of the Settlement Agreement.

Of the policies listed above, policies on a. Booking (with related policies on Pre-Booking and Records), h. Use of Force and k. Prisoners' Rights (titled Conditions of Confinement) have been approved. Under review are policies on b. Classification, g. Searches, i. Incident Reporting, j. Investigations, l. Mental Health Care, p. Hygiene, r. Grievances, and s. Sexual Safety.  With respect to e. Prisoner Welfare and Security Checks, the Interim Jail Administrator has issue a directive so that well-being checks will be made consistently and uniformly.  This will eventually be incorporated into an approved policy.

As noted in prior reports there are multiple health and mental health related provisions that cannot be addressed by health and mental health staff alone.  These have included, for example, the participation of mental health in the disciplinary review process, the use of suicide watch, the participation of health and mental health in the segregation review process, incidences where there is an anticipated/planned use of force and incidences where there has already been a use of force, and the roles and responsibilities of health and mental health with regard to PREA. Security policies and procedures that would address these issues have still not been developed, approved, and implemented. The medical and mental health staff should be involved in the development of these policies and procedures when that occurs.

Significantly, two recent policies developed and in the review process address mental health services and mental health housing. These were developed with the participation of the mental health staff and the mental health expert of the monitoring team. As with many detention facilities, Hinds County has a large percentage of people with mental illness in the Jail and these inmates often present the greatest challenges in management. The development of these policies and the formation of a mental health unit as addressed in one of these policies reflects a significant step towards meeting the needs of this population and progressing towards compliance with the Settlement Agreement. However, as is noted elsewhere in this report, the current number of mental health staff will not actually be able to implement all of the requirements of these policies or the terms of the Settlement Agreement.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**
Shortly after the January site visit, the Jail Administrator resigned and retired.  On February 6, 2020, the Sheriff appointed the Assistant Jail Administrator as the Interim Jail Administrator.  He has the requisite education.

On the same date, the Captain in charge of the RDC was designated as the Interim Assistant Jail Administrator.  While the actual order states "Interim Facility Commander at the Raymond Detention Center", according to the HCSO In-House Counsel, in her letter of February 14, 2020, the temporary transfer is to the position of Interim Assistant Jail Administrator.  He has twenty years of corrections and law enforcement experience at the Mississippi Department of Corrections, Mississippi State Hospital, Pelahatchie Police Department, and private enterprise.  From 2014 to 2016 he was employed by the HCSO as a Detention Officer.  He was promoted to Captain of the RDC in April 2016 and resigned in December after being returned to his former rank.  He has a high school diploma.  He does not have five years of supervisory experience (other than as a K-9 supervisor at the MDOC and eight months as the RDC Captain) and he does not have the four-year college degree specified for the position of Assistant Jail Administrator in the Settlement Agreement.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
Full compliance with the provisions of this paragraph cannot be achieved until policies and procedures are in place and training has been completed.

A number of personnel changes have occurred since the beginning of January 2020.  The Captain who served as the Director of Maintenance, Security and Sanitation, was transferred to the law enforcement side of the HCSO.  His replacement came on board shortly thereafter at the level of a Sergeant. This position was intended to track and coordinate all maintenance efforts with the County, a much-needed task. However, shortly before finalizing this report, it was learned that he has resigned.

On the same date that the RDC Captain was transferred to the Interim Assistant Jail Administrator's position, a Lieutenant was temporarily appointed to take his place as the Interim Facility Captain at the RDC.  The Interim Facility Captain has been employed by the HCSO since July 2014, initially as a Detention Officer.  He was promoted to Sergeant in 2014 and to Lieutenant in 2018.  He has a high school diploma.

During the past four months, three supervisors have been promoted from within the ranks from Detention Officer to Sergeant.

- Detention Officer "A" was employed on 8-8-16 and was promoted to Detention Sergeant on 11-1-19.  She was previously employed in Booking, left the HCSO, then returned. She has a high school diploma and an AA degree.
- Detention Officer "B" was employed on 4-23-18 and was promoted to Detention Sergeant on 11-1-19.  She previously worked at the HCSO.  She has a high school diploma and an AAS degree in Arts and Science.
- Detention Officer "C" was employed on 11-4-13.  He was promoted to Detention Sergeant on 11-1-19.  He has a high school diploma.

All three officers have at least 3 years experience as required by the Settlement Agreement. The monitoring team has been informed that supervisory positions have recently been posted and interviews are underway. This is a more deliberate process than has been used in the past and should ensure that supervisors have the requisite education and experience required by this paragraph.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Substantial Compliance**
The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check.  This was confirmed by the Recruitment and Screening Investigator and the Director of Human Resources as well as by a review of selected personnel files.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**
As has been previously noted, compliance with the terms of this paragraph cannot be achieved because there is no policy in place which addresses the issue of "direct supervision".  Further, it does not appear that pending policies, whether under review or under development, specifically deal with the direct supervision of housing units.  In addition, while the RDC and Work Center (WC) were both designed to be direct supervision facilities, the Jackson Detention Center (JDC) is a first generation, linear intermittent surveillance jail that cannot be modified without a very expensive renovation.

At the RDC and WC steps are being taken to make direct supervision operation a reality. Cameras and an alarm system for the fire exit doors at the WC have been ordered.  Once in place it will be possible to eliminate the second post that is assigned to each of the four housing units. The principles of direct supervision call for one officer to be responsible for a housing unit.  At

the RDC, an order was issued on October 8, 2019, which limits access to the pod control rooms and calls for well-being checks to be reported by radio to the control room officer. Individual unit logs are no longer maintained. All information is recorded in the control room log. When housing units are staffed continuously and returned to direct supervision operation, unit logs will be reactivated. This change in procedure has resulted in a noticeable improvement. Officers now have more time inside the housing units supervising inmates instead of inside the control rooms filling out logs.

The first direct supervision orientation class was held in December 2019. Thirty-two officers (20 current staff and 12 recruits) completed the sixteen-hour block of instruction. Each subsequent academy will include a direct supervision component which is comprised of classroom training as well as time inside housing units at the WC and RDC. While more time working with a direct supervision housing unit officer would be beneficial, this first step toward training all staff is a good beginning.

C Pod at the RDC has been closed for approximately six months while undergoing renovation. The project has proven to be much more complex and time consuming than was originally estimated. In addition, there was an unexplained failure to authorize the renovation of the security doors for over six months. Consequently, there is still no firm reopening date. When it is placed on-line, the plan is to staff each housing unit continuously so that direct supervision can be reinstated. However, at current staffing levels, it is unclear how this will be achieved. The Stipulated Order entered on January 16, 2020 to resolve a contempt motion requires the County to develop a plan for providing direct supervision in Pod C when it reopens. This is essential to avoid the destruction of the pod as was done the last time it was renovated and left minimally staffed.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail. The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis. The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds. To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:
        i. There are at least two detention officers in each control room at all times;
        ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;
        iii. There are rovers to provide backup and assistance to other posts;
        iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;
        v. There are sufficient detention officers to implement this Agreement.

b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement. As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below. The study or study update must be completed within six months of the Effective Date and must include the following elements:

   i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

   ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

   iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations. Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement. The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

The staffing problem has become more critical over time. As of the January site visit the total number of personnel was reported at only 204 which is the lowest level since the monitoring process began over three years ago. The highest number recorded during that time was 256. With 275 authorized positions in the Jail System, only 74% are filled. That figure is misleading in that the (2017) staffing study called for over 400 positions. The study needs to be updated for two reasons: (1) sub-paragraph d., above calls for that to be done at least annually; and (2) the inmate population has dropped significantly over time which is what has made it possible to close C Pod for the past six months. In spite of that, the existing facilities, particularly the RDC are severely understaffed. The WC has approximately 60% of the required staff, the JDC only

28

53% and the RDC just 41% even taking into account that one third of its capacity (C Pod) is closed.

At the RDC there are not enough officers available to operate the facility effectively, even with remote supervision for outside the housing units, in spite of the fact that one third of the jail is shut down for repairs (C Pod has been closed for several months; only A and B Pods are open). There are certainly not enough officers to implement direct supervision (where an officer is assigned permanently inside each housing unit) as C Pod is repaired and put back on line.  The lack of staff, coupled with locks and doors that do not function properly or cannot be secured, continue to create a volatile situation.

Because the housing units at the RDC have not been staffed since 2012, the inmates have control of the living spaces, while staff manage only the control rooms and corridors.  Consequently, inmate assaults are routinely discovered after the fact rather than being prevented by the presence of officers.  Incident Report #20000090 is a case in point.  Two inmates in Pod A, HU-3 asked to be moved from that unit.  The officer immediately noticed that they were injured and subsequently determined that they had been assaulted.  After they were escorted to Medical, one was treated on site, but the other had to be transported to a local hospital. However, there appears to be a decrease in the severity of inmate assaults from prior months and there is reportedly a decrease in contraband found in the facility. This may be due to the change in procedure described above that allows housing unit officers to spend more time in the housing units and measures that appear to have reduced access to contraband serving as weapons.

The only reason that the HCDS is able to function is that the number of detainees arrested has dropped to a new low of just 4,617 in 2019.  That equates to a little over one booking every two hours.  In addition, the count on January 22, 2020, was just 441, the lowest figure since the monitoring process began.

The County has not addressed the plan for a career ladder or a retention bonus system for Jail staff that were submitted by the HCSO.  The County did approve a $100 per month pay increase for all detention officers (excluding supervisors) effective January 1, 2020. However, the new Board rescinded that decision. As noted in the last report, the County has hired additional detention officers; however, it has lost an even greater number of officers.

Several recent developments will hopefully lead to some improvement in this area. The corrections recruitment and retention consultant has now been added to the monitoring team and made available to the County for consultation. The County has been working with him and will hopefully begin to see improved recruitment and retention.  The County is reportedly beginning the process to hire a Recruitment Officer specifically for Detention Services as is required by the Stipulated Order. The utilization of the hiring process for promotion to supervisors contributes to

the creation of a career ladder encouraging retention. In addition, two measures create better availability of staff where needed. The monitoring team has been informed that the Sheriff is utilizing the Reserve Unit to guard inmates in the hospital and a purchase order has been submitted for the equipment needed at the WC to free up an additional 20 officers.

    f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

      i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

     ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

    iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

    iv.   The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

     v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

    vi.   The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

As previously reported the classification scoring reflects a return to "behavior based" as the foundation for classification decisions. The Sergeant now overseeing classification has reviewed most of the files of active inmates and all files are reviewed at 90-day intervals which will result in a review of all files. A review of five files found that none of them had the previously routine override based on current charge which had resulted in the system not being "behavior based." However, there continue to be some errors and systemic concerns described below some of which keep the classification system from being behavior based in reality.

Accurately scoring the risk assessment is an important step, however, it is also essential that the scores then be used to house inmates appropriately. Despite requests, there has never been a clear articulation of how inmates are assigned to the three facilities. During this visit, it was reported that the Captains of the facilities can reject placement of an inmate in their facility by Classification staff. Although this can be for legitimate reasons such as a "keep away" inmate, it was reported that it was sometimes based on unwritten criteria not consistent with the classification scoring. In addition, the lack of criteria for placement in the facilities raises the concern that the scoring is not driving the housing decision. The WC being a dormitory style facility would be expected to serve mostly minimum level inmates. The custody level as reflected on a report during the site visit shows that there were 15 maximum security inmates. At the time of the site visit there were a number of inmates from JDC temporarily moved to WC because of problems with mold and this could account for some of the maximum-security inmates. This is an issue that should be addressed in the developing policies and procedures. The closure of C Pod for renovation has also impacted the ability to house inmates by classification level.

Even when the initial decision is by Classification, subsequent movement can, once again, undermine the use of an objective classification tool. While cell assignments and inmate transfers are supposed to be cleared through Classification, there is no policy in place that requires that action, consequently, supervisors sometimes make such transfers on their own. This practice was previously reported as infrequent but during this site visit the practice was reported as a more frequent occurrence. Also, impacting the use of the classification tool, was the practice of classifying new arrivals at RDC but not sending the paperwork with the inmate to JDC. This was occurring when a supervisor was not on site at RDC to sign off on the paperwork. When the inmate arrived, JDC staff did not have the classification paperwork to make an appropriate cell assignment. It appears that this will be addressed following the site visit.

It is also essential that the scoring be done accurately in order to have an objective, behavior based system. One such systemic concern contributing to problems in this area is that the Classification Officer does not have access to the NCIC report on prior arrests (the "rap sheet") in preparing the risk assessment. Booking runs the NCIC report that is limited to outstanding warrants and puts that in the file. The only source for prior arrests that Classification has is the

JMS system which includes only bookings in Hinds County. It was reported that IT is working on getting access to the NCIC for Classification. Also, involving the JMS system, updates to charges made by Records or Booking does not automatically get conveyed to Classification. This can have a significant impact on scoring. Although the files have improved markedly from the beginning of the monitoring, there continue to be a number of errors. Of the five files reviewed, four of them had at least one error.

Finally, while the decision to end housing solely according to gang affiliation was made early on by the Jail Administrator, the lack of supervision within the housing units at the RDC makes it impossible to stop physical conflict from developing between competing groups of gang members even when gang affiliation is considered in the classification process.

The Classification Unit has gone through a series of changes since the monitoring process began. Gang affiliation was ended as the primary criteria for housing unit assignment.  Then the development of a behavior based, objective classification system followed.  Most recently, it became apparent that some previously undocumented issues tended to undercut the authority and effectiveness of the classification system as described above.  Classification decisions should be made by the Classification Unit, not by individual housing supervisors.  In addition, facility commanders should not set arbitrary criteria for assignment to a specific jail.  Classification decisions need to be managed through a central point.

    g.  Develop and implement positive approaches for promoting safety within the Jail including:
- i. Providing all prisoners with at least 5 hours of outdoor recreation per week;
- ii. Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;
- iii. Creating work opportunities, including the possibility of paid employment;
- iv. Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;
- v. Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;
- vi. Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;
- vii. Providing reasonable opportunities for visitation.

    h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual

circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.   Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation per week is still not provided to all inmates in the Jail System.  The WC is the only facility that is in compliance.  There a weekly Recreation Log is maintained for each housing unit.  It reflects that more than five hours of outdoor recreation are provided to all inmates each week.  At the RDC a similar log was to be maintained, but it has not been made available to the monitoring team to date.  At the JDC compliance is not possible because that facility does not have an outdoor recreation yard.  To the credit of the facility commander, she has implemented a number of innovative measures that give inmates out of cell recreation opportunities; however, they do not meet the criteria spelled out in this paragraph.

Regarding 42 (g) (ii) and (iii), there is no incentive program.  There are work opportunities at the WC but not paid employment, and the only opportunities at the JDC and RDC are working as trusties.

Regarding 42 (g)(iv), providing individual and group treatment as needed covers a broad range of needs and activities. Providing medication is one necessary part of treatment that has been challenged as a result of a change in security procedures. At the time of the May 2019 site visit, the nursing staff reported multiple incidences of harassment by prisoners during medication pass and stated that, therefore, they did not feel that all security staff assigned to supervise medication pass were consistently protecting them.  It was expected that  supervisors would make it clear to security staff that when assigned to supervise medication pass they had three responsibilities – gather all inmates who were on medication, assure that each inmate actually consumed the medication or signed the form indicating a refusal to take the medication, and protect the nurses who were doing the medication pass.  However instead, the location of the medication pass was changed; the nurses had to pass medication through a window removed from the housing unit; and therefore, during medication pass, the nurses were unable to see what was happening on each unit.  This change was particularly of concern when it comes to prisoners who reportedly

refuse medication. Such prisoners were not appearing at the window to sign a medication refusal form. As a result, even if a signed refusal form was brought to the nurse, the nurse could not confirm that it was actually signed by the prisoner. Most importantly, since the nurse couldn't see the prisoner, the nurse could not observe whether or not the prisoner was deteriorating due to the fact that he/she was not taking prescribed medication.  The impact of this change in the medication pass procedure was all the more alarming when one reviewed the data kept by the medical department on medication refusals.  In the months prior to this change in how/where medications were passed, refusal numbers ranged from 3/month to a high of 10/month, but during the month of September, after the change was made, the refusal number was 146. Therefore, during the September 2019 site visit, reconsideration of the change in location and procedure for medication pass was recommended.

At the time of this site visit, the location and procedure for medication pass had remained the same; the nurses were still unable to fulfill all of their responsibilities associated with medication pass; and the medication refusal rate was still unacceptably high.  Therefore, the monitors scheduled a joint meeting between security and medical to discuss this issue.  In that meeting, it was decided to return to the old location and procedure for medication pass, and security administration agreed to assure that security staff assigned to medication pass would assume all responsibilities (noted above) associated with such an assignment.

Following the September site visit, it was noted that there was no overnight medical coverage at the WC (as there is at RDC and JDC).  Therefore, if there is a medical emergency there at night, it must await the transport of the nurse from RDC to the WC; she must bring an emergency kit with her because the medical office at the WC is all locked up for the night; and then she will likely have to transport the prisoner back to RDC.  All of this can be a waste of time in a medical emergency where time is of the essence, which was evidenced in a recent situation where a prisoner at the WC had a stroke in the early morning hours. This continues to present the potential for untimely medical care in an emergent situation.

At the time of this site visit, the full-time QMHP/Mental Health Coordinator position had been vacant since about two weeks after the last site visit.  Therefore, during the period covered by this site visit, the mental health staff consisted of one full-time QMHP, a part-time psychologist, and a part-time Psychiatric Nurse Clinician (supported by a psychiatrist). As noted previously, QCHC had already determined that an additional two QMHP's were needed to provide needed treatment and perform the duties required by the Settlement Agreement.

Because of what is now an extraordinary shortage of mental health staff, at the time of this site visit, the total number of prisoners on the mental health caseload had been decreased from 183 at the time of the last site visit to 139, all of whom are seriously mentally ill. The prisoners dropped from the caseload are those who are not seriously mentally ill but were previously being seen for more supportive mental health treatment are no longer being seen.  All but 12 of the 139

prisoners remaining on the caseload are on psychotropic medication. Medication is indicated for 6 of the 12, but those 6 have refused to take medication. Medication is managed by the part-time Psychiatric Nurse Clinician, with some additional assistance provided by the General Practice Nurse Clinician.  Except for two prisoners who have to date refused any type of treatment, prisoners on the mental health caseload are receiving individual treatment sessions, albeit not always as frequently as might be clinically indicated. The full-time QMHP provides individual sessions for the 83 prisoners at RDC; and the part-time psychologist provides individual sessions for the remaining prisoners housed at JDC and the WC.

In addition to providing individual treatment sessions for the 139 prisoners on the mental health case load, housed at three different facilities, the full-time QMHP and part-time psychologist perform mental health assessments of new prisoners referred to mental health; develop treatment plans for all prisoners on the mental health caseload and discharge plans when appropriate; perform assessments, manage mental health emergencies (assessing suicidal prisoners/suicide watch, crisis management, etc.); provide any assessments and treatment required for PREA-involved prisoners; perform weekly rounds for all prisoners held in segregation; and maintain all records and logs.

As all of the security policies and procedures required to comply with all provisions of the agreement are developed and implemented, mental health staff will have additional responsibilities related to the disciplinary process, segregation review, and security uses of force. In addition, a review of incident reports indicates that mental health should be more engaged in the incident-reporting and review process.  Furthermore, once the mental health unit is opened, a more enhanced treatment program will need to be put in place, which will include a range of treatment groups and other structured therapeutic activities, and a range of therapeutic interventions for acutely ill but non-compliant prisoners (now being held in segregation) will also have to be put in place (See 42(g)(6)).

Obviously, even when the currently vacant mental health position is filled, there will still not be enough mental health staff to adequately assume all of the above noted responsibilities, and so clearly, an analysis of mental health staff needs is indicated.  In conjunction with the plan to open the mental health unit, the program for that unit should be designed as soon as possible so that staffing requirements for the unit can be assessed. In addition, as security policies and procedures are finalized, mental health staffing requirements to fulfill the responsibilities outlined in those policies and procedures can be assessed. All of these staffing needs can then be added to staffing requirements.

Once this analysis of mental health staff needs is completed, QCHC (the contract provider for health and mental health services) will have to submit a proposal to the County for an expansion of their contract in order to hire needed mental health staff.  Given discussions with Hinds

County Behavior Health regarding the much needed enhancement of the discharge planning process and the process for the referral of released prisoners to community based, outpatient mental health services, there will likely be an additional proposal to the County to fund these efforts.  The mental health expert strongly encourages the county to seriously consider these requests for additional funding for mental health services because it is anticipated that such improved mental health services will not only decrease the suffering of mentally ill prisoners, but also improve safety and security within the Jail and significantly decrease the high rate of recidivism for mentally ill prisoners.

There is an immediate need, however, to fill the vacant Mental Health Coordinator position. While discussing this position with the QCHC Health & Mental Health Director for the facility, Ms. Simms, RN MSN MHA, it was discovered that her efforts had been to fill the position with another QMHP who would *not* be designated as the Mental Health Coordinator and the duties of the prior Mental Health Coordinator would be shared among the mental health staff.  However, there should be a Mental Health Coordinator who represents the mental health program in meetings with security staff, the PREA Coordinator and outside agencies such as Hinds Behavioral Health. A Mental Health Coordinator should also share the responsibility with the Director to assign mental health staff to their various responsibilities and schedule them for coverage of the mental health program. A Mental Health Coordinator should also assume duties that had not yet been assumed by the prior Coordinator, such as scheduling and running regular mental health team meetings, treatment planning meetings and treatment plan review meetings. Once security policies and procedures have been completed, the Mental Health Coordinator would also represent the mental health program at disciplinary hearings and the monthly segregation review meetings. And, once the mental health unit is opened, the Mental Health Coordinator would be responsible for running that unit, which will include integrating security staff into the unit's treatment plan for each person housed there.

Regarding 42 (g)(v), time did not permit a visit with programming staff during the current site visit. As previously reported, however, there has been significant expansion of educational and life skills programming. The programming includes GED instruction, anger management, computer skills, reading, recovery groups, mental health groups, finance class, job skills, and fatherhood groups. There is some 1 on 1 support for individuals needing a remedial level of critical thinking training. They have close to 20 volunteers. The January program report indicates that 37 inmates participated in 4 different programs including GED. There were barriers specific to the month of January including the closure of downtown programming because of the transfer of inmates to other facilities while the mold problem was addressed. There are several systemic barriers to the program which continue including the lack of a classroom at JDC where they can only use the visitation room one day a week and evenings. Currently, the program cannot do the GED testing so individuals cannot actually get their GED even though they may be ready.

Regarding 42 (g)(vi), during the Jail's booking process, new admissions complete a mental health history form; this is forwarded to the medical department; and this form helps to flag new admissions who might be in need of mental health services.  During the initial nurses' health assessment process, the nurses also screen for mental health difficulties, and the majority of prisoners on the mental health caseload were first identified and referred to mental health during that initial screening process.  It should be noted however that over a third of the prisoners on the mental health caseload were not identified during the booking process or the initial health assessment process, but were later identified by the mental health team, and several prisoners who were not previously identified self-referred for mental health services.  Referral of prisoners to mental health by security staff continues to be unexpectedly rare (see section 45(f), and the sections on Incident Reporting, Disciplinary Review, Segregation Review and Use of Force). Therefore, there continues to be a concern about the ability of medical and security staff to identify prisoners who are in need of mental health services.

With regard to initial mental health assessments (performed by the mental health team when a prisoner is referred to mental health), over the last year there has been considerable improvement with regard to the timeliness of these assessments.  Despite staff shortages, mental health staff continue to strive to see/assess all prisoners referred to them within 3 days.  It was discovered during this site visit that although the attempt to assess new referrals within 3 days was confirmed by a review of medical records, this was not clearly evident by reviewing the mental health log, because there was no place to log attempts to assess that were refused, thereby delaying the assessment process.  So now the log has been revised to include such refusals so as to better reflect the efforts that staff persons are actually making to perform assessments in a timely manner. Other than inmates who were offered and refused assessment within the 3 days there was only one inmate who was not assessed within 3 days and he was assessed on the 4th day.

Once the mental health unit is open, rapid assessment of newly admitted, mentally ill prisoners will be even more important, because it will determine whether they are placed on the mental health unit or in general population.  Since some of the more acutely mentally ill new admissions, who would be most in need of placement on the mental health unit, will include that population who tends to initially refuse a mental health assessment, planning for the mental health unit should include a plan for where to hold/house apparently ill, new admissions who refuse an initial mental health assessment until an assessment can be done.

Steps have been taken towards opening a special needs/mental health unit.  More specifically, County and Detention staff have identified the physical space in C Pod for a mental health unit and have identified the needed renovation of the space. It will be important to monitor whether the identified renovations for a mental health unit are made. The renovated pod will include a housing unit for seriously mentally ill prisoners, with an adjacent ISO-unit for even more

seriously mentally ill prisoners (those at risk of harming themselves or others, either because they have to date refused treatment or they are receiving treatment but have not yet stabilized); an ISO unit for suicide watch and special mental health observation; space for group therapy and other expanded mental health programming; and office space for mental health staff.  The unit will also be designed so that security staff can employ a direct supervision approach to security management.  In addition, a draft policy and procedure for the unit has been drafted and is in the review process.

Command staff, however, indicated an unwillingness to commit to the use of one unit in C Pod as a Mental Health Unit immediately upon its reopening, indicating that with one pod closed, there was insufficient room to commit one unit for Mental Health. However, as was discussed, the inmates with mental illness are all currently taking up bed space in the facility and could be congregated on a Mental Health Unit without reducing space for other inmates. As the provision of therapeutic housing is required by the Settlement Agreement and the current renovation work provides the opportunity to create such a unit, this is an opportune time to move towards compliance with this Settlement Agreement requirement.

With regard to the mental health program for the unit, a menu of therapeutic interventions needs to be developed and implemented in order to address the needs of the various types of seriously mentally ill prisoners that will be housed on the unit.  Then, following a mental health assessment of each prisoner, a treatment plan would be developed that describes the prisoner's mental health difficulties; the goals of treatment; the specific selections from the menu that will be employed to reach each goal of treatment; which staff person will be responsible for each therapeutic intervention that will be employed; and an estimate of how long it will take to reach each treatment goal.  Treatment plans will be developed and signed off on by the treatment team, and will be reviewed by the treatment team on a regular basis and revised when indicated.

With regard to the population who will be appropriate for placement on the mental health unit, there will be seriously mentally ill prisoners who are expected to be able to stabilize (get their symptoms under control) and then undergo psychoeducation (i.e., learn about their illness, their need for treatment, and how best to participate in their treatment), so that they can continue with treatment upon their release from jail and thereby hopefully avoid rearrests; there will be a similar set of prisoners who are likely to be convicted and imprisoned for some period of time, but stabilization and psychoeducation will be focused on helping them function better in prison; and while detained in the facility, some sub-set of both groups of prisoners will likely stabilize to the point where they can be housed on a general population unit.  These prisoners will require aggressive medication management, individual therapy, and group therapy that includes various psychoeducation groups, life skills groups and discharge planning groups.

There will be other seriously mentally ill prisoners who remain so impaired despite compliance with treatment that they will have to remain on the mental health unit while detained in the facility. These prisoners will require aggressive medication management, supportive individual therapy, and group therapy including various support groups and groups focused on how they might transition to a setting that has adequate supports once they are released.

Then there will be the even more seriously mentally ill prisoners (so acutely ill that they are a danger to themselves or others), who are being treated but have not yet stabilized or who have refused treatment. Those in treatment who have not yet stabilized may be in the ISO-section of the unit, or on suicide watch, or on special mental health observation. Those who have refused treatment will be in the ISO-section of the unit. Those prisoners who have accepted treatment need an even more aggressive approach to medication management, coupled with individual therapy focused on helping them stabilize. Those prisoners who have refused treatment will require repeated individual visits, focused on helping them come to understand their need for treatment, coupled with monitoring of their mental status to determine whether or not some emergency mental health intervention is indicated.

In addition, some individuals within the above noted groups of seriously mentally ill prisoners will also be suffering from substance abuse difficulties; so they should also have access to individual and group therapy focused on addressing those difficulties; and with regard to the treatment of these dually-diagnosed individuals, it will be important to remember that it has been well established that the integration of the treatment of their substance abuse difficulties and other mental health difficulties is required in order to successfully treat them. Furthermore, some individuals are also suffering from intellectual or other cognitive difficulties, and so special programming for those individuals will also be required.

As noted above, it is expected that medical, mental health and security staff will work together as an interdisciplinary team in order to provide a safe environment for mentally ill inmates and staff, while providing mentally ill inmates with the level of mental health services that they require. It should be noted that security staff who are assigned to the mental health unit will largely focus on each prisoner's behavior and, in consultation with the mental health staff, the best way of managing/responding to each prisoner's behavior in a way that is also consistent with the goals, objectives and therapeutic interventions outlined in the prisoner's treatment plan. In fact, there will be many cases where the treatment plan might include specific interventions that will be made by security staff. Therefore, since communication and cooperation between security staff and mental health staff will be critical to the success of a mental health unit, what information will be shared and how information will be shared needs to be determined and clearly articulated so that both mental health staff and security staff can fulfill their responsibilities while protecting prisoner's privacy rights.

Finally, there are several other issues, discussed in other sections of this report, that will need to be resolved before the mental health unit opens.  These include issues regarding specialized training for security staff (see 45(f)), classification and housing (see section 74); issues regarding mental health involvement in disciplinary review (see section 77); an interdisciplinary approach to treatment (see section 77(l)) and the range of issues related to avoiding the placement of those prisoners with serious mental illness in segregation and removing such prisoners from segregation.

Regarding 42 (g) (vii), visitation records for each facility covering one month reflected that at the JDC an average of 80 visits were scheduled with family and friends.  Of those, 68 were completed.  At the RDC and WC (whose records are combined) only 44 visits were scheduled.  Of those, 32 were completed.  Most of the visits that were not completed were due to "Cancelled by Admin" followed by "Missed by Caller/Inmate".  Based on the number of inmates assigned to each facility, that means that at the JDC an inmate had a 6.8 in ten chance of having a completed visit each month whereas at the RDC and WC an inmate had only a 0.8 in ten chance of having a completed visit each month.  This extreme disparity is still unexplained.  Jail administration needs to look into why the numbers are so disparate.

Regarding 42 (h), suicide watch procedures are not consistent at each facility.  At the RDC, inmates placed on suicide watch are assigned to a specific ISO Unit which has an officer assigned full time to the ISO Unit for the duration of the watch.  Log entries are made every fifteen minutes but observation is constant.  At the WC suicide risk inmates are sent to the RDC.  At the JDC, male inmates who require a suicide watch are sent to the RDC.  Female inmates placed on a suicide watch are put in a designated unit, but the observation is every 15 minutes, not constant.

As has been previously noted, various staff are responsible for the higher levels of supervision required for prisoners who are on suicide watch and other special medical or mental health observation. In past Monitoring Reports periodic discrepancies were noted with regard to staff failure to properly follow suicide watch procedures at the RDC; specifically, leaving the post unattended or taking on extraneous duties in other areas of the pod which made it impossible to maintain a continuous suicide watch.  During the January site visit there were no active suicide watches underway during the times of inspection, but a review of the most recent suicide watch record revealed no discrepancies.

Prisoners on suicide watch are seen daily by both mental health staff and medical staff, including on weekends. Mental health staff have assumed the additional responsibility of taking weekend call on a rotating basis, which has included coming into the facility to see prisoners on suicide watch and assessing any new mental health emergencies.  Security staff are responsible for the more constant observation and supervision of prisoners on suicide watch, and the level of suicide watch ordered by mental health defines the extent of that supervision.

It should be noted, with regard to describing the need for mental health staff, that although the management of suicidal prisoners is just one of their activities, it consumes a significant amount of staff time.  More specifically, there are 2-3 prisoners placed on suicide watch each week; a handful of those prisoners declare the next day that they were not suicidal and only said they were to get away from some type of problem on the unit; but the overwhelming majority of those placed on suicide watch are on watch for 2-3 days.  For each prisoner placed on suicide watch a QMHP must perform an initial assessment, which includes an assessment for suicide potential, and then reassess the prisoner each day he/she is on suicide watch.  In addition, the psychiatric nurse practitioner must see the prisoner while he/she is on suicide watch.  Then once a prisoner is released from suicide watch, he/she begins a program of gradually reducing, frequent follow-up individual sessions with a QMHP, in order to monitor the prisoner and address any issues that might have contributed to the suicidal ideation that prompted placement on suicide watch.  In other words, on any given week, between assessing and treating prisoners on suicide watch and monitoring and providing treatment for those who had been on suicide watch in the prior weeks could consume 1/3 to1/2 of a QMHP's time. It is important that individuals who claim to be suicidal are treated as such and placed on suicide watch. However, there appears to be a population of people who assert that they are suicidal and then quickly admit (after being placed on suicide watch) that they are trying to escape 'something' on their unit. Given the amount of limited mental health staff time this consumes, security staff and mental health staff should work together to better understand what is happening with this population and what can be done to manage them differently.

Prisoners on special medical observation are seen daily by medical staff.  At present, there is no special mental health observation for acutely ill prisoners; most acutely mentally ill prisoners are being held in segregation. When the mental health unit is opened, a part of the function of that unit will be to provide a higher level of supervision by mental health, medical and security staff, as well as more appropriate therapeutic intervention for such acutely mentally ill prisoners (see 42(g)(vi)).

One of the issues that arose while drafting the policies and procedures for the mental health unit was the medical, mental health and security supervision of prisoners who are withdrawing from alcohol and/or other drugs.  At present, such prisoners are placed on a unit with enhanced medical, mental health and security supervision, unless it is suspected that they are withdrawing from a substance that requires more constant medical supervision, in which case they are placed in the infirmary.  Whether or not there will be adequate staff on the mental health unit to manage those prisoners who currently undergo withdrawal in the infirmary must be carefully considered.

Regarding 42 (i), video surveillance capabilities have not changed since the first site visit.  At the RDC cameras in the corridors and housing units are recorded, so incidents can be reviewed after

the fact.  At the WC live action cameras allow visual coverage of the hallways and housing units, but they are not recorded, so there is no way that incidents can be reviewed after the fact.  At the JDC, there are cameras that cover and record the hallways and the drive through sally port/transfer waiting area, but there is no coverage inside the housing units.  In every previous Monitoring Report, it has been suggested that action be taken to provide full recording capability for all housing and operational areas of each facility.  Once again, that suggestion is made.  This is definitely an item that should be addressed by the Master Plan Committee.

While the IAD and CID investigators now have access to the video recording system so that they can quickly view incidents, they still cannot obtain copies of them without having to go through a request process with IT.  It is recommended, again, that these investigators be granted immediate access to both view and record copies of previously recorded incidents.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a.  Staff vacancy rate of more than 10% of budgeted positions;

    b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c.  A major disturbance resulting in the takeover of any housing area by prisoners;

    d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The HCSO still does not create a report covering these areas.  A review of specific data reveals that non-compliance is the status quo with regard to almost every aspect of this paragraph.  With

only 204 of the 271 funded positions filled, the vacancy rate is 24.9%, more than double the 10% threshold for non-compliance.  This means that required posts are routinely left vacant.  And, again, this is the vacancy rate of the funded positions, the vacancy rate of the needed positions is over 50%.

As described in past monitoring reports, there have been at least 3 incidents in the past year in which the inmates took over a housing unit.

There have been uses of force resulting in serious injury to inmates. See, e.g. 191883, 191336, and 191294.  There was inadequate reporting of these incidents as well as all uses of force as is described below.  Specifically required by this paragraph and consistently noted as missing are the supervisors' recommendations and findings. Similarly, there continue to be inmate on inmate assaults resulting in serious injury. There were at least two in January with transport to the hospital. As with the Use of Force Reports the Incident Reports routinely lack a supervisor's findings and recommendations. Incident Report #20000090 described above in paragraph 42, page 22, is a case in point.

Follow up on assaults and serious incidents is inadequate.  As was noted in previous Monitoring Reports, the beating death of an inmate in December 2018, has yet to be properly addressed. Although some inmates have been criminally charged, there has been no Administrative Review or Mortality Review conducted to date, nor has the matter been referred to IAD for investigation.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

    a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b. All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

    c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

    d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been reported previously, none of the facilities meet the requirement that well-being checks be conducted every 30 minutes on general population inmates, 15 minutes on restrictive housing inmates and 15 minutes on detainees held in Booking holding cells.  While the corrections operations member of the monitoring team has spent a great deal of time attempting to set up procedures in each facility that at least meet the American Correctional Association standard of 60 minutes for general population inmates, 30 minutes for restrictive housing inmates and 15 minutes for holding cell (Booking) inmates, it has not been possible to implement even those practices consistently at each facility.  In order to address this problem, the Monitor is creating a stopgap order that the Interim Jail Administrator can issue to all personnel regarding expected procedures at each facility.  Later, this direction can be incorporated into a permanent policy.  Once direct supervision is reinstituted at each facility (except the JDC) the hourly well-being check for general population can be entered in the unit log when inmates are in their cells/on their bunks at night.  During the day, that entry will not be necessary.

Indicative of the above referenced discrepancies, during the January site visit most 15-minute well-being checks in Booking were found to be current and properly entered on individual log sheets attached to the wall next to each single cell, but there were no such log sheets maintained for inmates located in the multiple occupancy cells.  Neither the assigned officer, nor the Booking Sergeant could explain why well-being checks for those inmates were ignored.  After three plus years of monitoring inspections, such a situation is inexcusable; hence the need for a stopgap order from the Interim Jail Administrator.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:
a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During

that twelve month period, the County must develop an in-house detention training academy.

b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d. Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e. Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f. Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g. Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h. Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

Because of personnel changes resulting from the change of administration, current training records are not available for review.  During the January site visit, the Monitor and corrections operations member of the Monitoring Team had an excellent meeting with the new Training Director (Captain) who is replacing his (retiring) predecessor.  It was expected that he would forward the training status report shortly thereafter, but it has not yet been received.  Hopefully, the status report on training will be available in May.

Presently, although there are security staff assigned to the medical/mental health section of the facility, there are no medical or mental health units, and so prisoners with special medical needs and/or mental health difficulties are housed throughout the facility.  Furthermore, even when the mental health unit is opened, it will not be big enough to house all of the prisoners on the mental health caseload, and so there will still be prisoners who are suffering from mental illness and/or intellectual disabilities housed in general population.  Therefore, with regard to this provision of the agreement, it is important to consider the mental health training provided to all security staff, as well as the need for additional training that might be provided to security staff assigned to the special needs/mental health unit once it is opened.

Although the corrections training for all detention officers on 'special needs inmates' is generally quite good, as has been previously noted, there are several concerns that merit review.  The first concern is with regard to the identification of prisoners with special needs, especially those who are suffering from mental illness and/or intellectual disabilities.  There is considerable discussion in the training program about the various levels of assessment performed at the facility as if the findings of those assessments will help security staff identify mentally ill prisoners; but security staff doesn't have access to medical records which would provide the findings of those assessments; and so security staff must rely more heavily on their capacity to recognize the signs and symptoms of illness.  Therefore, although signs and symptoms of mental illness are listed in the training materials, this area of the training should be expanded in order to help staff actually visualize those signs and symptoms by employing videos, simulated cases, etc.

A second area of concern is with regard to some of the recommendations made (or not made) for security staff intervention.  For example, in the section on suicide prevention there is a section on making a 'non-suicide agreement' with a prisoner who might be having suicidal thoughts.  There is some concern about the capacity of all security officers to do this, and the appropriateness of security officers doing this, especially in the absence of assistance from mental health.  For example, the section on suicide prevention also includes a list of risk factors for prisoners who are at especially high risk of becoming suicidal, but there is no clear instruction about what a security officer should do when faced with such a prisoner.  Therefore, specific recommendations made in the training program should be reviewed.

The third area of concern is with regard to whether or not the information contained in the training will be consistent with the security policies and procedures that are currently being developed.  In this regard, there are obvious areas of concern such as the part of the training that deals with administrative segregation, but there are also less obvious areas of concern such as the part of the training that deals with alcohol and other drug withdrawal.  Therefore, as new policies and procedures are finalized, the training program will have to be adjusted to conform to the new policies and procedures.

Before the special needs/mental health unit is established, security staff who will be assigned to that unit will require additional training.  This is because they will be dealing with the most seriously ill prisoners; their interaction with such prisoners will be more ongoing and more intense, especially given that security staff will be employing the direct supervision model; and it is anticipated that they will be working in a more coordinated/collaborative way with mental health staff (see section on Housing).  In essence, this additional training should include much more about the signs and symptoms of mental illness and intellectual disability; the impact of the various mental illnesses and intellectual disability on an individual's ability to function; and approaches to the management of prisoners with mental illness and/or intellectual disability that can dovetail with the therapeutic services being provided, thereby creating an overall and consistently run therapeutic environment.

It should be noted here that security staff persons who will be assigned to the mental health unit should be carefully selected based on their interest in working on such a unit, their experience and innate capacity to work with such prisoners, and their willingness to undergo additional specialized training.  It might also be helpful to obtain recommendations from supervisors, as well as mental health and medical staff, since it is clear that they have gotten to know specific security staff persons who appear to work well with mentally ill prisoners.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

      a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d. Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

    i. Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

    ii. An inspection process.

    iii. A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

    iv. A requirement that any corrective action ordered be taken.

    v. Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

    vi. To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Non-Compliant**

With the change of administration, hopefully, the Interim Jail Administrator will be given the authority to manage the Jail System as is specified by this paragraph of the Settlement Agreement. The new Sheriff had only recently assumed office at the time of the site visit. This will be an area that the monitoring team will watch closely prior to and at the time of the next site visit. It is important that someone with experience in jail operations and management be given the opportunity to move the HCDS in the right direction.

Lack of supervisory responsibility and accountability continues to be a significant problem at the RDC.  While each jail operates with inadequate and unapproved (by DOJ and the Monitor) policies and procedures as well as post orders, the inconsistency of operation is greater at the RDC than at the JDC and WC.  When procedures at the RDC are set in place, actual practice tends to deviate over time because supervisors do not ensure consistent compliance or because they allow modification for undetermined reasons.

Responsibility for maintenance issues falls on the shoulders of detention supervisors, but there is little incentive for them to report and document issues if the problems are not addressed in a timely manner.  The lack of communication between the HCSO and the County with regard to maintenance issues is un-paralleled.  Long standing issues have gone unaddressed for years with each agency (County and HCSO) blaming the other for the problem.  The new Maintenance Chief for the HCSO needs to develop a sound working relationship with his counterparts in County government. One of the long-standing problems was the unavailability to both detention staff and the monitoring team of the spread sheet maintained by the County used to track repairs and renovations. The inability to obtain that spreadsheet even when requested let alone on a routine basis was discussed in the last monitoring report. This does not necessarily have to be the form of communication and tracking but under the new administrations, hopefully, this or some other form of routine tracking and communication will be established.

The problem with the security doors has been well documented in prior monitoring reports. As previously noted, this includes cell doors, "cage" doors, housing unit doors, control room doors, doors to the rec year, and doors to the grand hallway. This has allowed group disturbances and individual assaults. The January incident reports indicate that the inmates' ability to open supposedly locked doors was at issue in at least 12 incidents at RDC This is now addressed in the stipulated order with deadlines for compliance. This is another area that will be watched closely as progress in this area has been overstated in the past. Based upon a tour of C Pod during the site visit, the renovation is not nearly completed and the renovation of the Pod and the doors in particular was promised months ago. The change in administration has, no doubt, caused some delay. Even so, the company doing the critical door repairs was not authorized to proceed until February 17 2020.

The Master Plan Committee, required by the Stipulated Order, is a critical component of the County's effort to make repairs and renovations in a deliberate manner.  For three years there has been no consistent action, rather the County has moved in one direction, then retreated and moved in a different direction.  It is time for the County to settle on a plan of action and to move forward to make a concerted effort to comply with the conditions of the Settlement Agreement. Developing a Master Plan is critical to this process and must be facilitated by someone experienced in this area.

Fire safety continues to be a serious issue, particularly at the RDC where the sprinkler system was removed after the 2012 riot.  Fire extinguishers and fire hoses were also removed from the housing units at that time.  The State Fire Marshal has been unresponsive to continued requests to meet with members of the monitoring team regarding fire safety issues.  A case in point is the extension cord that runs from the control room, across the corridor (horseshoe) into B-2 so that the television in that unit has power.  This fire code violation has been noted since the First

49

Monitoring Report over three years ago, but the problem has not been rectified. A January incident report, IR# 200000064 reports that a fire in one of the housing units was put out by using the water cooler. What is not mentioned in the incident report is that the responding officer initially took the fire extinguisher from B Pod control room but it did not work. A week later, the fire extinguisher had still not been replaced. There are reportedly no back up fire extinguishers and when a fire extinguisher is used, it is recharged only after making a request to the County. This results in significant gaps in availability.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Non-Compliant**

While a record of shakedowns at each facility is now apparently consolidated and maintained by month, it has not previously been available to the monitoring team.  A copy of the November 2019, synopsis was obtained subsequent to the January site visit.  It shows that shakedowns were conducted on ten days during the month.  Eight were conducted at the RDC, three at the JDC and one at the WC.  The shakedown list is cross referenced to incident report numbers and whether or not force was used, but not as to whether or not contraband was found.  Current incident reports make it appear that inmates have less access to such items than in the past.  There has certainly been a reduction in the number of reports of inmates escaping from the RDC solely for the purpose of retrieving drugs, telephones and other contraband.  Similar incidents are not noted at the JDC or WC.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no action taken to deal with this issue since the beginning of the monitoring process.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for more than a year and a half.  An officer was assigned to work on this issue, but there is no documentation of a program that meets

the requirement of this paragraph.  Gang activities cannot be monitored or managed at the RDC because the housing units are not staffed.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:
   a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
   b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;
   c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;
   d. Prohibit the use of force as punishment or retaliation;
   e. Limit the level of force used so that it is commensurate with the justification for use of force; and
   f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

The Use of Force Policy was recently approved for implementation.  Once training of staff is complete this paragraph may be moved to Partial Compliance. This paragraph includes implementation. As such, after training, it will be necessary to ensure that officers follow the new policy.

Inappropriate use of force continues to be a problem. As was described in the last monitoring report, there was an egregious use of force in August when an inmate was seriously injured after being beaten and kicked. Eventually, several of the officers involved were terminated and several received re-training. However, two of the officers who were retrained were subsequently involved in a later use of force, IR # 191883, in which they beat the inmate with a flashlight and kicked him. These officers were then terminated.

Incident Report #200000008, titled Assault or Attempted Assault, involved a confrontation between an officer and an inmate in HU B-4 at the RDC.  When the inmate pushed the officer,

he responded with "…an open hand strike…" to the inmate's face and neck area.  According to a sergeant and another officer who responded to the scene, they pulled the officer away from the inmate.  Both the type of physical response to being pushed, and the fact that the officer was pulled away from the inmate by responding staff, indicate that this incident should be referred to IAD for further investigation.  While the inmate was examined by medical staff, there is no record of supervisory review by a supervisor not involved in the incident.  Further, the initiating officer's report states that the (then) Major and a lieutenant also responded to the scene and assisted in pulling him and the inmate apart.  It should be noted that there were no supplemental reports attached to the original from the Major and lieutenant despite the requirement of the Settlement Agreement that all officers involved complete a use of force report. Nor did the sergeant and other responding officer make mention of them in their supplemental reports.

Incident Report #20000034, titled Assault or Attempted Assault, involved an officer who attempted to remove an inmate from his cell (HU B-4 ISO at the RDC) in order to take him to med pass.  When the inmate spit on him and refused to exit his cell, the officer obtained the assistance of two additional officers.  In essence the situation escalated to a cell extraction, which should have been authorized by a supervisor before any action was taken.  Ultimately, the officers used OC foam spray to subdue and handcuff the inmate.  He was taken to Medical and decontaminated.  There is no record of supervisory review.  This incident also warrants further review by IAD.


It will continue to take consistent training, supervisory review, and disciplinary action to implement the new policy on use of force.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

    a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

    b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

        i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

        ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary

muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

    iii.  Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c.  Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d.  The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e.  A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f.  Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g.  The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

    i.  a sign-out process for staff members to carry any type of weapon inside the Jail,

    ii.  a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

    iii.  random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h.  A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i.  All staff members using force must immediately notify their supervisor.

j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

Although a Use of Force Policy has been approved, it has yet to be implemented through required training; therefore, previous comments regarding this paragraph still stand. Once training has been accomplished it will be possible to move the finding to Partial Compliance. The lack of documented supervisory review is still a significant problem; however, it is routine for supervisors to be notified whenever there is a UOF noted.

Regarding 51(d), The security policies and procedures that would address this provision have still not been adopted and implemented. Since at present, medical and mental health staff have no way of knowing that a prisoner has been the subject of a Level 1 use of force, medical and mental health staff would only get to assess such a prisoner if there were physical injuries that caused security staff to bring them to medical, or the prisoner self-referred to medical or mental health, or the prisoner reported this to medical or mental health staff during a subsequent visit. A review of incident reports, however, indicate that security staff do take inmates to medical after a use of force.

Although there were no planned uses of force documented during the last four months, this situation may change once the UOF Policy is implemented through training. In the interim, cases occur which should be classified as a planned use of force. If there is time to go to the armory to retrieve less than lethal shotguns and to call for back up personnel, that qualifies as a planned use of force. Incident Report #2000079, which occurred at the RDC, Pod B, HU-4 on 1-18-20, meets all of those criteria. During this incident a lieutenant took command of the situation. He used a shotgun to hit an inmate in the lower left side of his torso with a bean bag. Another inmate was sprayed with OC. The inmates were treated in Medical and then housed in Booking holding cells "…until further notice." IR # 200000135 represents another planned use of force that would require the supervision by a supervisor and recording by video equipment.

Of special note is the fact that hand-held video cameras have been ordered. A Purchase Requisition from the HCSO was submitted to the Board of Supervisors on January 8, 2020, and the Board submitted a Purchase Order on January 22, 2020. The cameras were on back order but were delivered in March.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program. Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**
According to the new Director of Training, UOF training was scheduled for all personnel during a two week block in February (17-20 and 24-27). This did not happen and is rescheduled for April. This should help to reduce and prevent the excessive use of force by staff as was noted in

Incident Report 191883 at the RDC.  In that case an officer used his flashlight to strike an inmate; in addition, he was kicked.

53. Topics covered by use of force training must include:
    a.  Instruction on what constitutes excessive force;
    b.  De-escalation tactics;
    c.  Methods of managing prisoners with mental illness to avoid the use of force;
    d.  Defensive tactics;
    e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

The UOF training includes a continuum of appropriate force responses to escalation situations, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This paragraph cannot be addressed until staff have been trained on the new Use of Force Policy.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

Since the new policy on Use of Force has just been approved, there have been no revisions to it which would justify updated training.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

The Use of Force Policy has been approved; however, training on associated report writing and review requirements has not yet been conducted.  In the interim the HCSO has implemented a Rapid Notification System that was designed to expedite the reporting process on high priority incidents.  It has boxes that require filling in the facility, the location within the facility, the time, and staff members involved; information that was sometimes missed in the standard incident report. It is still essential that the incident report itself contain all of this information and that the narrative be complete which has not always been the case. In addition, it does not, however, reflect a very important component of UOF reporting; specifically, supervisory review. That information will only become available when the UOF Policy has been fully implemented through training and documented via IT upgrades.  The UOF Policy outlines the duties and responsibilities of supervisors as outlined in this and the following paragraphs.  While supervisors do not currently meet those standards, as has been noted in each previous Monitoring Report, the hope is that they will be able to do so after receiving training.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

The comments in Paragraph 56 above, apply here as well.  It is still not possible for the monitoring team to know when a report was written because the reports include only the date/time of the incident, not when the report was generated.  The same shortcoming applies to the date/time of supervisory review.  The inadequacies of the JMS system are being addressed, but they have not resulted in a resolution of this problem.  Virtually any incident report reflects these shortcomings.  The time of the incident is recorded but there is no way to tell when the report was generated, nor is there any way to tell when a supervisor reviewed or noted anything about the incident.  A hand written signature shows on the incident report copies that are forwarded to the monitoring team.  A date/time of review is not included and there is no record of the supervisor's determination (approval/disapproval or recommendation). Although the new UOF Policy calls for the required information, it is not yet available.

As has been noted in various paragraphs above, not all staff members using or observing a use of force are writing incident reports. IR #20000015 is a case in point (this report appears as #20000016 in the spreadsheet of monthly incident reports).  The type of incident is identified as Disorderly Conduct, but it is really another example of UOF where OC was deployed, this time in Booking. Two sergeants and three officers were involved in subduing an uncooperative inmate

who had previously flooded his single cell. When his cell door was opened in order to pass food to him, the inmate tried to push his way out. During the ensuing struggle, he was sprayed with OC twice in order to break his hold on an officer. He was subsequently taken to Medical, decontaminated and returned to Booking where he was placed in a different (multiple occupancy) cell. The (then) Major dispatched a Patrol Deputy to respond to Booking. There is no indication as to why or what he did when he arrived approximately an hour after the incident. Although there were five officers involved in this incident, only one sergeant generated a report. There were no supplements attached.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

- a. A unique tracking number for each use of force;
- b. The names of all staff members, prisoner(s), and other participants or witnesses;
- c. Housing classification and location;
- d. Date and time;
- e. A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.
- f. A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use). For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;
- g. A description of the staff member's attempts to de-escalate the situation without use of force;
- h. A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;
- i. A description of any observed injuries to staff or prisoners;
- j. Whether medical care was required or provided to staff or prisoners;
- k. Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;
- l. A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

There has been no change with regard to use of force reports since the last site visit although changes to the reporting system are being programed by IT. The JMS incident report/use of

force format does not directly follow the sub-sections of this paragraph; therefore, incident reports do not reflect all of the information that is specified.  While there is a unique tracking number, and the names of staff members, and sometimes those of involved inmates, are included, witnesses are seldom listed. A cell location is almost always noted (although the facility is not), but not its classification.  Generally, the narrative includes the steps taken by an officer to manage the situation prior to the use of force, what methods were used to apply force and whether or not medical attention was required and provided; however, many reports do not provide all of the specified information.  A copy of the reporting officer's signature is now noted on the report, but there is no indication of approval, disapproval or recommended action on the part of the supervisor.

The comments in paragraph 56 apply here as well.  Once training is done it is expected that the information required by the Settlement Agreement will be incorporated into incident reports/UOF reports.  It is then incumbent upon staff and supervisors to ensure that comprehensive information is reflected in reports consistent with that training.

## USE OF FORCE SUPERVISOR REVIEWS

59.     The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

      a.     A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

      b.     A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

      c.     Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

      d.     If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

      e.     Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

      f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

      g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

There has been no change in the status of this paragraph since the Eighth Monitoring Report. Once all supervisors have had required training on the approved UOF Policy, they should be capable of meeting the reporting and review requirements of this paragraph. However, based on the current JMS system, there is no way to determine whether or not supervisors review use of force reports by the end of their watch; nor is it possible to determine whether or not they comply with the other sub-sections of this paragraph.  Supervisors do not indicate whether or not they approve or disapprove of the actions taken by officers; they also do not make recommendations for corrective action.  Problems with JMS system compatibility will have to be resolved. Use of force reports are forwarded to the CID Investigator for follow up.  Duplicate copies are provided to the IAD Investigator.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

   a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

   b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

   c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

   d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

   e.     Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph for the past five site visits.  The specified actions are not routinely followed by supervisors.  A review of use of force reports revealed that photographs are seldom taken.  Waivers related to the refusal to be photographed are not included.  Witness statements are infrequent at best, and although use of force incidents

may be recorded at the RDC, because it has a digital recording system, that is not possible at the JDC (recording is limited to hallways in the housing areas) and the WC (which has no recording capability).

While supervisors do not currently comply with the provisions of this paragraph, the fact that the UOF Policy has been approved is a step in the right direction. Once training has been completed it will be necessary for supervisors to confirm compliance by documentation of expected practice in reports before this paragraph can be moved to Partial Compliance.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status since the last Monitoring Report. As has been consistently noted, there is apparently a check box in the JMS system for a supervisor to check after review. Even if the monitoring team was able to routinely see this check box, this is not sufficient to meet the requirements of the Settlement Agreement. There is no documentation in the JMS system of approval or disapproval or any recommendations following review. Currently, the documentation provided to the monitoring team does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

While supervisors do not currently comply with the provisions of this paragraph, the fact that the UOF Policy has been approved is a step in the right direction. Once training has been completed it will be necessary for supervisors to confirm compliance by documentation of expected practice in reports before this paragraph can be moved to Partial Compliance.

62. Reviewing supervisors must document the following:
    a.      Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;
    b.      Witness statements;
    c.      Review date and time;
    d.      The findings, recommendations, and results of the supervisor's review;
    e.      Corrective actions taken;
    f.      The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.      Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

i.      The nature and extent of injuries, or lack thereof;

ii.     The date and time when medical care was requested and actually provided;

iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.      Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

Currently, the supervisory portion of JMS is limited to a check box with no ability to indicate recommended action or discrepancies noted regarding the items for which this paragraph requires review. Even the check box does not appear in the generated report. As a result, the supervisors have been signing the reports to indicate a review but this alone this does not meet the requirements of this paragraph. The documentation that exists, therefore, does not disclose whether the supervisors are making an appropriate review and they are definitely not documenting it if they are.

The comments regarding the preceding paragraph (#60), apply here as well.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

While the approved UOF Policy is in place, there is, as yet, no approved counterpart for incidents in general.  Once one has been adopted and requisite training is accomplished, it will be up to supervisors to ensure that documented incidents comply with policy.

Supervisors are supposed to ensure that detention officers follow policy by properly documenting incidents, yet sometimes the supervisors themselves are guilty of failure to document, either by not initiating an incident report or by not adding a supplement.  Incident Report #2000086 documented a use of force at the RDC.  The report concludes with the

statement that a lieutenant and sergeant were present during the incident, but neither supervisor included a supplement to the original report. The purpose of the incident report is to provide sufficient information so that supervisors and command staff have an understanding of what occurred and can ensure that a proper response was made and systemic improvements are made. The requirements of this paragraph are to ensure that information is provided but the bottom line is that when reading an incident report, it should be fairly clear what transpired and why and have sufficient information to track trends in incidents that might call for proactive response. All reports could be found to be deficient in not including a supervisory review and recommendation. Numerous reports could be found to be deficient in not providing specific information as to location or extent of injuries. See, e.g. IR # 200000005. However, more importantly, some reports are completely uninformative as to what was happening. See, e.g. IR ## 200000006, 20000007, 200000018, 200000088, and 200000089.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:
      a.     Tracking number for each incident;
      b.     The names of all staff members, prisoner, and other participants or witnesses;
      c.     Housing classification and location;
      d.     Date and time;
      e.     Type of incident;
      f.     Injuries to staff or prisoner;
      g.     Medical care;
      h.     All staff involved or present during the incident and their respective roles;
      i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
      j.     External reviews and results;
      k.     Corrective action taken; and
      l.     Warden and Administrator review and final administrative actions.

**Partial Compliance**
While the UOF Policy has been approved, a basic policy regarding incident reports has not. Reports provide some but not all the information that is required by the Settlement Agreement.

There has been no change with regard to the status of this paragraph for the last five site visits. Compliance is dependent upon the approval and publication of the Policies and Procedures Manual.  Incident report documentation currently provides only some of the information specified in this paragraph.  Reports routinely have a tracking number and list all staff involved. Inmate witnesses are almost never noted, nor are witness statements.  The nature of inmate injuries is noted sporadically. More photographs accompany the reports than in the past, but almost all reports do not specify the facility in which the incident occurred.  That can only be

determined by having knowledge of the housing unit configurations of each jail, and thereby recognizing the facility by how the unit, pod or cell is identified.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

    a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

    b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

    c.    Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

Since there is no approved policy regarding Incident Report documentation, this paragraph is still carried as Non-Compliant.  Incident Reports continue to reflect a lack of basic information including facility and location.  There is still no standard in place that requires a written report (Incident Report) whenever lost money or property, or a bad/late release is noted.  Consequently, there is no way to know how many such incidents have occurred.

Based on the current status of the JMS system, it is not possible to determine whether or not incident reports are written in a timely fashion (by end of shift or within 12 hours of the incident) and whether or not supervisors do likewise as required (within 24 hours of receipt of an incident report).  The only thing that can be determined is the reported time of the incident as it appears in the written document.

As noted in paragraph 64, incident reports frequently lack important information.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

    a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

    b.    Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

    c.    Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such

documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

    d.    Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

There has been no change in the status of this paragraph. There are no approved policies in place that specify what supervisors and shift commanders are to do. The monitoring team cannot determine whether or not supervisors even review incident reports (other than to sign on a printed copy) because of the previously mentioned shortcomings of the JMS system. There is no documentation that reflects, approval, disapproval or recommended actions.

The new, approved UOF Policy is a step in the right direction in that it describes the duties of a supervisor with regard to a UOF incident. However, it does not deal with all incident reports. The duties of supervisors in non-UOF cases are not clearly outlined in existing Policies. Once they have been approved this paragraph can be carried as being in Partial Compliance.

**SEXUAL MISCONDUCT**

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

    a.    Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

    b.    Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

    c.    Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

    d.    Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

    e.    Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.    A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.    A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.    Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.    Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

Time did not permit a meeting with the PREA officer during this site visit. However, the monitors continue to review PREA reports that are provided as part of the document production. There is a draft Sexual Safety (PREA) policy that has been circulated for review, but it has not yet been finalized or approved.

At the time of the last report, the PREA officer was providing a four-hour program as part of the new officer training orientation.  Additional in-service training is planned to inform officers of the need to make appropriate referrals to the PREA officer.

Nursing staff continue to be involved in the screening of newly admitted prisoners to identify those who may be sexually abusive or at risk of sexual victimization as part of the initial intake screening process.  New admissions so identified are referred to the PREA officer.  Mental health staff perform a mental health assessment of all such new admissions forwarded to them by the PREA officer, and if mental health treatment is indicated, such is provided.  In addition, if medical or mental health staff identify a PREA eligible prisoner who was not identified as such at the point of admission to the facility, that prisoner is also referred to the PREA officer.

If a prisoner is a victim of sexual assault and/or sexual harassment, both the medical and mental health staff are prepared to provide any emergency and ongoing care that might be indicated. The social worker employed by QCHC who was providing this support has resigned and a new social worker had not yet been identified at the time of the site visit. Prompt replacement will be necessary to fill this critical role. At the time of the last report, the Sheriff's Office was negotiating an agreement with the Mississippi Coalition Against Sexual Assault to provide inmates access to MSCASA for reporting and counseling services. Counsel for the Sheriff has stated that this has been approved by the Board. However, no executed contract has been provided at this time. It provides for counseling services once it is executed.

There are multiple internal ways to report sexual abuse and harassment including filing a grievance and reporting through the kiosk system. The PREA officer now has a cell phone to which kiosk calls are forwarded. However, the PREA number on the kiosk system had to be changed from 999 to 888. When this happened, inmates were charged a fee for reporting a PREA violation. This was reportedly being remedied and follow up is needed to determine if that has occurred. There is not a system for reporting to an outside entity other than through paid phone calls and there is no guidance on appropriate entities to call.  The MOU with MS Coalition Against Sexual Assault will provide this service when executed.

In order to be effective, inmates must be fully informed of what constitutes sexual abuse and harassment and how to report it. As previously reported, all of the units visited had PREA posters posted. The posters have reporting instructions. The Inmate Handbook does not have current information on the PREA process but a separate form is now provided at booking that explains the process. However, the PREA officer no longer does orientation or education of inmates. It was reported that the PREA officer had requested IT staff to determine whether the PREA orientation could be done via the kiosk system. This would not be sufficient because it does not allow for inmates to ask questions or seek further clarification.

It is reported that all cross-gender searches have been banned. No documentation of this was provided as of yet as the draft procedure is currently being revised to reflect the new policy. The draft policy on PREA/Sexual Safety provides HCDS does not conduct cross-gender pat searches by males of females or cross-gender visual body searches unless under exigent circumstances, and then only with the approval of the Shift Supervisor. The draft Search policy is now consistent with the PREA policy.

The PREA Officer keeps a file on each referral, has a report form, and keeps numbered reports. She has completed an on-line training on investigating PREA incidents. Incidents involving alleged staff misconduct or criminal activity are referred to other investigators who have not received PREA training. The reports of these other investigators are typically not in the PREA Officer's file and her file does not reflect the results of the investigation. However, a group of reports recently provided included two reports from the Internal Affairs Investigator. There were no reports from the Criminal Investigator. Recently, the PREA officer has relied upon security staff who have not received PREA training to interview the complainant. The PREA Officer does not get the medical records when there has been a referral to Medical. There is no regular supervisory oversight of the PREA officer's work or reports.

After an initial focus on developing materials and process for compliance with the PREA provisions there appears to be waning commitment to PREA compliance. The education component at booking and later orientation was dropped, the PREA officer referred almost all aspects of the investigation to the Investigation Unit with no follow-up, no PREA investigations

have been provided by the Investigation Unit except for two,  the investigation officers have had no training on PREA investigations, the PREA officer has only had an on-line module on PREA investigations, and there is no indication of any higher level oversight of PREA compliance. Given the lack of staff and cell doors that don't lock, the potential for sexual assault is high. The paucity of reports made would suggest that the system is not designed to support full reporting.

## INVESTIGATIONS

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

    a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

        i.     Any prisoner exhibited a serious injury;

        ii.     Any staff member requested transport of the prisoner to the hospital;

        iii.     Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

        iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

    b.     Per policy, investigations shall:

        i.     Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

        ii.     Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

        iii.     Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

    c.     Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

    d.     Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

    e.     Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

i.      Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

ii.     Any staff member requested transport of the prisoner to the hospital;

iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.     Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

i.      a brief summary of all completed investigations, by type and date;

ii.     a listing of investigations referred for administrative investigation;

iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.     Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Although a policy dealing with investigations has not yet been approved, Policy # 1-600, titled Review and Investigations, is under review.  In the interim the monitoring team has worked with the designated IAD and CID investigators to help them implement consistent practices.  During the January site visit another group meeting was held to follow up on previous recommendations. This meeting included the Captain in charge of investigative services, his assistant, the CID and IAD investigators, HCSO In-House Counsel, Compliance Coordinator and DOJ attorney.

The following areas of concern were addressed--

- The CID investigator needs to be physically located at the RDC because that is where most of his work originates.
- The CID and IAD investigators now have immediate access to view recorded video where that capability is available (the RDC, the hallways and receiving area of the JDC,

whereas the WC video system is live view only) but they need to be able to obtain a copy of recordings without having to go through a request process through IT.

- The CID and IAD investigators need to review all incident reports, not just those that are referred to them.  By doing so they can ensure that all relevant issues/incidents are properly investigated.

- The investigative spreadsheets that the IAD and CID investigators develop will be standardized to incorporate the information required by paragraph 68 of the Settlement Agreement.

- The IAD and CID investigators need to be provided timely disposition information regarding their investigations so that it can be included in the spreadsheets.

- Prison Rape Elimination Act (PREA) investigation training needs to be made available to the IAD and CID investigators.  The monitoring team will coordinate with the HCSO In-House Counsel to identify potential training sites and dates.

- The death investigation following the incident at the RDC in December 2018, has resulted in the prosecution of approximately five inmates, but to date the matter has not been referred to IAD to determine whether or not staff action or inaction requires review; nor has an administrative and/or mortality review been conducted.

It should be noted that the ability of the monitors to track Investigation activity is hampered by the lack of reporting in this area. The last criminal investigations provided by the Jail was in August, 2019. Despite repeated requests, there has been no additional reports provided or any explanation for the lack of reporting.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There is no change in the condition of the grievance system. The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of detention officers. Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer or other inmates observing the grievance being filed. Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

Policies and procedures have yet to be finalized. A draft policy has now been written and is being circulated for comment. The policy would standardize the grievance system. At present, the kiosk system works the same across facilities but a unified process is still in the process of being developed with the development of the policy. Even with the policy in place, there will need to be training on how to properly respond to grievances in order to achieve consistency. There continues to be significant progress in developing an actual grievance process including identifying the duties of the system wide grievance officer, clarifying the roles of the system wide grievance officer and the facility grievance officers, developing a tracking system, creating a tiered appeal process, and addressing the process for requests vs. grievances.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. The Grievance Officer reports that she runs back reports and clears old grievances. There continues to be improvement in ensuring that grievances receive a timely response. A report run for calendar year 2019 during this site visit showed 57 that had been assigned but not responded to after 21 days at JDC, 12 at RDC, and 0 at WC. This is a significant improvement over prior site visits. Even with these, it is possible that the assigned individual responded to the grievance but didn't change the status in the system. The Grievance Officer appears to have a tracking system that identifies overdue grievances. She sends reminder emails to those individuals who have not responded to the grievances in a timely manner. This, no doubt, has contributed to the improvement in reducing the number of grievances that have not received a timely response. Progress in this area is notable.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. The Grievance Officer has prepared some routine responses, for example, informing the inmate that the grievance is a request and how to submit a request. This has improved the responses in a large number of cases. There are still some where the adequacy of the response need improvement. Some responses promise some future action but there is no

70

process to ensure that promised actions are actually taken. The Grievance Officer at JDC described her process of responding to the grievance. She prints out the grievance, takes it to the inmate, tells them what is being done and then has the inmate sign it. This personal response is to be commended. However, the written response to the grievance is often "It will be taken care of." In order to be able to adequately oversee the system, the written response should contain the actual steps taken. In addition, there continue to be grievances that are responded to with the notation denied. There should be an explanation of why a grievance is denied.

A review of medical grievances and responses indicated that although there were only a very small number of such grievances, the medical grievances that were submitted were responded to virtually immediately upon receipt by medical. However, the it is not apparent that the response is always adequate. As in the past, in the overwhelming majority of instances, the response to medical grievances was an attempt to clarify the procedure the prisoner must follow to get what the prisoner was asking for. But there was no attempt by medical to determine if the prisoner required an emergency medical assessment and therefore didn't have the time to try to go back and seek medical attention in a more appropriate manner, and there was no attempt by medical to determine whether or not the prisoner was able to comprehend medical's response/explanation of the procedure that the prisoner must follow to get what the prisoner was asking for. Therefore, in that sense, 'staff tracking' of whether resolution had been implemented or still needed to be implemented was lacking. In the one instance where it appeared that medical might have failed to adequately address a prisoner's medical needs, in response to the grievance medical immediately met with and evaluated the prisoner.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds. There does not appear to be any language choices in the system or voice recognition features.

There continues to be a concern about whether there were prisoners who were unable to use the grievance reporting system due to mental illness and/or intellectual disability. There needs to be an assessment of the ability to use the system by those significantly impaired, and a process developed for those who are unable to work the kiosk system. This appears to be an issue when during monitoring, several of the more impaired prisoners will complain about their conditions of confinement in ways that might constitute a grievance, but do not appear to have submitted grievances.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**
The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**
The misuse of holding cells in Booking is a problem that was initially resolved shortly after the first site visit.  The holding cells are inappropriate for long term (beyond eight hours) housing. They have no access to natural light, space for visitation or recreation, or even associated day room space.  The metal screens on the small door windows provide virtually no visibility in or out of the cells. Unfortunately, once corrected, the problem has resurfaced periodically (see the Ninth Monitoring Report).  The excuse that is offered to justify these violations of procedure is that the locks and closing mechanisms on the Booking holding cells still work, which is not the case with the housing unit cell and entry (safety vestibule) doors at the RDC.  While understandable, that explanation is unacceptable.  The problem of malfunctioning locks should have been addressed by hiring CML, or some other qualified corrections security firm, shortly after CML repaired sample control room and housing unit vestibule doors in A Pod and a cell door in C Pod.  Instead, more than a year has passed.  Only now, as a result of the Stipulated Order, does it appear that this critical repair work will begin. Furthermore, a review of incident reports indicates that the booking cells are not just being used for those extraordinary inmates that have a record such that they cannot be housed elsewhere but are being used on a more routine basis for inmates as a disciplinary measure. See, e.g. IR #200000131, IR# 2000000076,

2000000105. At least one inmate appears to have become suicidal in the booking cell which can happen elsewhere but certainly the inhumane conditions of being housed in a booking cell can contribute to this problem. See, e.g. IR # 200000036.

At the beginning of the January site visit, four single holding cells and one multiple occupancy cell, in Booking were found to contain inmates who were "housed" there.  The multiple occupancy cell was vacated almost immediately, but the four single cells were still occupied by the last day of the site visit.  Three of the inmates had been held there for from eight to sixteen days, but the fourth had been housed there for over a month.

Well-being checks were generally conducted within the required time (15 minutes) for inmates in the single cells, although one inmate was not monitored for more than an hour.  The inmates in the multiple occupancy cells were not monitored at all.  The officer on duty did not even post a log sheet by each cell.  When he was questioned as to why the multiple occupancy cells were not monitored the same as the single cells, he had no explanation.  When the Booking Sergeant was questioned as to the same issue, she had no explanation.  The inadequacy of supervision in Booking has been noted in previous Monitoring Reports.  That condition continues.

With the anticipated opening of a special housing/mental health unit, the implementation of this provision with regard to appropriately classifying and placing prisoners on that unit will need to be addressed.  In that regard there are multiple issues.

First of all, as the program plan for the unit is developed, the plan must include a clear definition/description of the sub-set of prisoners on the mental health case load who would be appropriate for placement on the unit.  Then, mental health assessments would need to be performed within 8 hours of intake, which is possible given that there are mental health staff on call on weekends.  Cooperation between classification and mental health will also be required, based on yet to be established policy and procedures regarding how prisoners will be classified and housed on the unit, which would include a clear description of how such a decision will be made/who will have the authority to make the decision.

It is anticipated that the special needs/mental health unit will be designed to house two different populations – those prisoners who are so acutely mentally ill that they are at risk of harming themselves or others (currently on suicide watch, or on special mental health observation, or held in the infirmary, or held in segregation), and those prisoners who can't be safely held on a general population unit due to their mental health status and/or intellectual disabilities (currently held together on a unit that does not provide any expanded mental health programming).  Therefore, another issue that will need to be resolved is what to do when there is a new prisoner who is appropriate for placement on the unit when there is no room on the unit.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The form that is utilized by the JDC to track inmates placed in segregation (restrictive housing) is designed for use by all three facilities, however, if the RDC and WC are using it, the information has not filtered through to the monitoring team.  Each facility commander will be contacted directly to obtain their documentation and to ensure that future records are consistent.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for prisoners who are being held in segregation; when indicated, they offer mental health services to a prisoner that is not already on the mental health caseload; or when indicated, they might make adjustments in the treatment that is being provided to a prisoner who is already on the mental health caseload.  However, to date, no mechanism has been established whereby any findings from those rounds can be shared with security staff and possibly have any impact on any decisions made by security staff regarding the continuation or termination of a prisoner's placement in segregation.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

      d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an

immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

    i.   If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

    ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

    iii. If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare

information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j. Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77(a): There is still no mechanism for input from a QMHP in the decision to place someone in segregation.  The security policy and procedures that would speak to this provision have not yet been adopted and implemented.  Such a policy would require security to seek and then consider mental health input in the disciplinary review process that leads to the placement of a prisoner in segregation, and would outline the roles and responsibilities of mental health in that process.  It should be noted that if a prisoner is on the mental health caseload or otherwise suspected to be suffering from a mental illness or intellectual disability, and security places that prisoner in segregation for a short period of time without formal disciplinary charges, such a placement in segregation should also prompt a mental health assessment.  This policy would apply to all prisoners on the mental health caseload, and should also apply to any prisoner who, at the time of an infraction, appears to be evidencing signs and symptoms of mental illness, regardless of whether or not the prisoner is already on the mental health caseload. Medical receives a list of inmates in segregation and assesses them after placement. However, a QMHP is not involved in decisions to place the inmate in segregation.

Regarding 77(b): Presently, there does not appear to be a presumption that segregation is contraindicated for persons with SMI. As has been noted in each prior report, there are prisoners with serious mental illness housed on the segregation unit and held in segregation in the isolation section of other units.  Over the last several site visits, the number of such prisoners has averaged about 24.

During the September 2019 visit, the mental health expert reviewed the cases of the then 22 prisoners with serious mental illness who were being held in segregation, and found that all 22 prisoners would be appropriate for transfer to the mental health unit (once it is opened) if the unit is appropriately designed both physically and programmatically (see section on Housing). Therefore, once the special needs/mental health unit is opened, there will be an appropriate alternative option for housing prisoners with serious mental illness, and at least in that sense, placing such prisoners in segregation could then be presumed to be contraindicated.

It is important to note here that some of these prisoners who will be transferred to the mental health unit will be isolated in the isolation section of the mental health unit because they are so seriously mentally ill that there is a risk of harm to themselves and/or others.  However, it is anticipated that the mental health programming for the isolation section of the mental health unit and the associated amount of engagement with the prisoners placed there will be such that it is clearly differentiated from simply housing such prisoners in segregation.

Regarding 77(c): Prisoners on the mental health caseload are not screened by a QMHP for SMI.  In fact, mental health staff are not even notified when a prisoner is placed in segregation.

Regarding 77(d) and (e), As noted in section 77(a), the mental health staff are not being offered the opportunity to assess any prisoners prior to their placement in segregation.  The security policy and procedures that would address this provision have not been developed and implemented.

It should be noted that security staff are aware of the fact that there are some seriously mentally ill prisoners being held in segregation.  There does not appear to be any specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation.  Furthermore, the placement of these prisoners in segregation has not been short term, and there do not appear to be any individualized plans (developed by security staff and/or mental health staff) to get these prisoners out of segregation as quickly as possible.  Although the opening of the mental health unit will provide a housing option for seriously mentally ill prisoners currently held in segregation, individualized plans will still be required.

Regarding 77(f): For prisoners who are compliant with the medication that has been prescribed for them, this is being done by the nurses during medication pass.  Now that it has been decided to return to the old procedure for medication pass (see discussion on medication pass), the nurses should be able to have their daily visit even if the prisoner refuses medication on that day.  More specifically, prisoners who refuse medication on any given day are required to sign a medication refusal slip; this is supposed to be done in front of the nurse who is passing the medication; and with the return to the old procedure for medication pass, the nurse who is passing the medication will again have full view of the unit and the prisoners housed there, and the nurse is therefore much more able to have access to and observe such non-compliant prisoners.

Prisoners on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP.  However, due to the shortage of mental health staff, this does not consistently occur on a weekly basis.  Furthermore, due to the shortage of security staff, the individual sessions that do occur are not consistently out-of-cell sessions.

As noted above, a QMHP makes weekly rounds for all prisoners placed in segregation, during which each prisoner's mental health status and need for mental health services is assessed. However, this assessment/review is not performed in conjunction with a jail physician and a psychiatrist, or in conjunction with anyone else.  Furthermore, given that the services that would be provided by a jail physician and a psychiatrist are provided by a medical nurse clinician and a psychiatric nurse clinician, compliance with this provision as currently written is unlikely to occur.  Therefore, there should be a review of this provision to determine whether weekly review by a QMHP in conjunction with the two nurse clinicians is acceptable, and if so, the two nurse clinicians should begin to participate in such a weekly review.  If this is not acceptable, the staffing pattern outlined in the QCHC contract will have to be reviewed.

All prisoners with serious mental illness housed in long-term segregation have been assessed by a QMHP, but to date, there has been no appropriate housing for such prisoners that could be recommended based on those assessments (see section 77-b and the section on Housing). However, as discussed in the report of the September 2019 monitoring visit and in section 77-b of this report, based on this monitor's review of the prisoners with serious mental illness housed in long-term segregation, once the special needs/ mental health unit is opened there will be an appropriate alternative housing placement for all of these seriously mentally ill prisoners.

At present, all prisoners with serious mental illness housed in long-term segregation who have agreed to accept mental health treatment are receiving treatment, albeit less than they require.  At present, although prisoners with serious mental illness housed in long-term segregation who have refused treatment are seen during weekly mental health segregation rounds, this is not treatment, and there is no mental health program/intervention specifically designed to encourage their eventual participation in treatment, while monitoring their mental health status with a view towards whether or not emergency interventions are required.  However, it is anticipated that the expanded mental health programming that will be available on the anticipated special needs/mental health unit will address these shortcomings.

Regarding 77(h): There is no evidence of any incidences, or at least any recent incidences, where security staff referred a prisoner to mental health due to the prisoner's decompensation while being held in segregation.  However, mental health staff, during the course of making weekly rounds in segregation and/or while providing mental health services to prisoners held in segregation, have identified at least four prisoners who have decompensated while being held in segregation, one of which was not previously on the mental health caseload and was identified as evidencing decompensation during mental health rounds in segregation.

As has been noted in prior reports, although mental health staff carefully considers what additional mental health services can be provided to such prisoners, currently there is no formal mechanism whereby mental health staff can share these findings with security staff and thereby possibly impact on security staff's decision to continue or discontinue placement in segregation.

In other words, there is still no policy and procedure for interdisciplinary segregation review. Such a policy would require regularly scheduled interdisciplinary review of all prisoners being held in segregation; both medical and mental health would have an opportunity to provide input into the decision to continue or discontinue placement in segregation; and it is recommended that each prisoner also participate in his/her regularly scheduled review.

It should also be noted that there is no mutually accepted informal mechanism to deal with this issue. Mental health staff report that when they have attempted to raise concerns about a prisoner with security staff, security staff has been unresponsive.

Finally, as was noted in section 77(b), the provision of more integrated and therapeutic housing for the prisoners on the mental health caseload who are being held in segregation awaits the opening of the special needs/mental health unit.

Regarding 77(i): When the mental health unit is opened, it is expected that medical, mental health and security staff would work together as an interdisciplinary team to provide a safe environment for mentally ill inmates and staff, while providing mentally ill inmates with the level of mental health services that they require. While this will be important for the management and treatment of all prisoners who will be housed on that unit, it will be particularly important for the management and treatment of the most acutely ill prisoners, most of whom are currently being held in segregation. Therefore, a mental health program plan for the unit needs to be developed, and steps must be taken to assure that there is an adequate complement of mental health staff to implement that program. In addition, security staff who will be assigned to the unit need to be selected and trained (see section 45(f)).

It should be noted that security staff who are assigned to the mental health unit will largely focus on each prisoner's behavior and, in consultation with the mental health staff, the best way of managing/responding to each prisoner's behavior in a way that is also consistent with the goals, objectives and therapeutic interventions outlined in the prisoner's treatment plan. In fact, there will be many cases where the treatment plan might include specific interventions that will be made by security staff. Therefore, since communication and cooperation between security staff and mental health staff will be critical to the success of a mental health unit, what information will be shared and how information will be shared needs to be determined and clearly articulated so that both mental health staff and security staff can fulfill their responsibilities while protecting prisoner's privacy rights.

## YOUTHFUL PRISONERS

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. **Within**

**six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Substantial Compliance**

As of the drafting of this report, early February 2020 is the one-year mark since the last youth under 18 was released from the Raymond Detention Center (RDC).  This was the completion of the transition that began in September 2017 when the decision was made to place new juveniles charged/convicted as adults (JCAs) at the Henley Young (HY) facility and gradually transition the remaining youth out of RDC. It is understood by the monitoring team that no more youth under age 18 will be housed at any of the adult facilities, including Juveniles Convicted as Adults (either waiting to be placed at the Mississippi Department of Corrections [MDOC] or previously convicted and arrested for a new offense or probation violation).  Presuming this continues thru February 2021, sustained compliance will be achieved.

As of this visit there were 17 JCA youth at Henley Young.  Of the JCAs:

- 16 of the JCAs were male, and one female was admitted to the facility on January 21; interestingly, there were no female JCAs in custody between October 1 and January 20
- Only 7 of the JCAs had been indicted, including 4 youth that had been in placement over 129 days
- Five of the JCAs had been in placement for less than 10 days
- The ages of JCA youth in custody were:  14 (2), 15 (3), 16 (6), and 17 (6)
- As of January 22, four youth had been in placement longer than 270 days (869, 610, 311, and 288)
- During the period from October through the time of this site visit, there were 12 JCAs admitted to Henley Young and overall 9 youth were released, including 3 youth that had been in placement prior to October (specifically one youth who was admitted in April 2018, one who had been admitted in September 2019, and one admitted in July 2019;

The practice that began in September 2017 of booking JCAs at the Raymond Detention Center (RDC) prior to placement at Henley Young has continued. If they remain in placement when they turn 18, they are transferred to JDC pending further court action (vs. returning to RDC). Compliance with this requirement will be monitored to ensure sustained compliance.

In addition to the JCA youth, there were 15 (11 males, 4 female) other youth in placement at Henley Young facility.  These are short-term placements of youth alleged to be delinquent held

pending further court proceedings.  Thus, the total number of youth in custody as of January 22 was 32. Refer to the chart below for the average daily population for the period October 1 through December 31, 2019. During this period there were nine days in which the population was 30 or more youth. Under the SPLC Consent Decree, the <u>maximum number of youth to be held at HY is 32,</u> so continued vigilance in limiting the number of non-JCA youth held is important to meet the conditions of that agreement as well as maintaining effective functioning of the facility and programs.



| | OCT | NOV | DEC |
|---|---|---|---|
| Non-JCA female | 4.3 | 1.5 | 1.7 |
| Non-JCA male | 6.9 | 8.1 | 7.8 |
| JCA Female | 0.0 | 0.0 | 0.0 |
| JCA male | 15.0 | 15.7 | 14.2 |

The length of stay for JCAs and the length of time it takes for youth to go through the court system remains a concern in terms of how effectively Henley Young can program for youth over very extended periods of time.  There is simply a difference between programming for youth over a 6-12-month period compared to trying to do so over much longer periods of time, let alone also providing appropriate services for the smaller number of short-term youth in placement.  As has been referenced in a prior report, Henley Young continues to evolve from a short-term program that houses some longer-term youth to a long-term placement that houses some short-term youth.  The challenges related to that transition cross all aspects of the program, from staffing to programming to treatment.  To their credit, key leadership and staff at Henley Young have done a good job working through this transition, albeit additional work remains.

As noted in the prior report, beginning in October the county and court implemented a new process, a Minors Diversion Docket, in which Youth Court Judge McDaniels has held several expedited hearings to ensure timely review of status of the charge(s) and any bond requirement. A component of this plan also includes securing a psychological assessment of youth that can be done in a timely manner and assist the court in making a well-informed decision relative to potential changes in court assignment (i.e. keep case in adult court or remand to youth court) or other conditions. Since implementation in a couple of cases youth were returned to the Youth Court or released from Henley Young with a lower bond requirement. As of the time of this site visit, there were two youth scheduled for hearings on January 24 and an additional youth scheduled for January 31. Per Judge McDaniels, other positive changes have occurred in working with the newly elected District Attorney, including assignment of a specific prosecutor for the JCA youth cases and a similar action taken by the State Public Defender, and along with these parties the plan is to continue to refine/improve the process to reduce the length of time youth are in placement without being indicted and/or implement alternative plans to shorten the overall length of stay at Henley Young.  Continued assessment of the impact of this Minors Diversion Docket Progress can be done at the time of the next site visit.

If the length of stay for JCAs can be reduced and the number of youth being admitted remains at a relatively constant level, the number of JCAs in placement at Henley Young could decline. As noted, as of this January visit, that has not yet occurred, and while keeping the number of JCA's low is important for the continued stability and functioning of Henley Young, it is even more important for the youth to be held no longer than necessary.

Significant Leadership Changes

Pursuant to changes in the make-up of the Board of Supervisors, several significant personnel changes have occurred in Hinds County.  Those changes have an impact on operations of all the confinement facilities covered under this agreement, and as it relates to Henley Young and JCAs the specific change was the discharge of the prior Executive Director, Mr. Fernandez Frazier, who had begun his work at Henley Young in May 2019.  That means that in less than nine months there had been another leadership change at Henley Young, a change that is one of multiple changes over the past decade.  Much of the actual leadership of Henley Young over this time has been provided by Mr. Eddie Burnside, Operations Manager and Mr. Eric Dorsey, Quality Assurance Manager.   The stability of their leadership over this period has played an important role in the relative success of the transition through the SPLC agreement and more recently progress in addressing the issues of this agreement.

In discussions during this site visit it was represented that the Board of Supervisors also has or will soon endorse returning oversight responsibility of the Henley Young facility to the Youth

Court Judge, Judge McDaniels. Judge McDaniels indicated it was his intent to serve effectively as an Interim Executive Director and then work with the Board of Supervisors to develop a process to recruit and select a new Executive Director.  A recruitment process for selection of the Executive Director is underway, and a copy of the job announcement is available on the Hinds County employment website.  Prior to his election to the court, Judge McDaniels had served for over two years as the Executive Director for Henley Young, and by all appearances the partnership with Mr. Burnside and Mr. Dorsey was an effective one.

While having the operation of the youth detention facility under the oversight of the court is relatively unusual, it is not unheard of and is purportedly consistent with Mississippi statutes. Since most elected judges have little to no experience operating confinement facilities, with Judge McDaniels being an exception, this does place the ultimate operation of the facility subject to the willingness of the Youth Court Judge to select and support an Executive Director with substantive professional experience working with youthful offenders.  Henley Young is in a relatively unique position, housing JCA youth under the jurisdiction of the adult court, youth held based on a booking in the adult jail overseen by the Sheriff, and still working with/responsible to the general county administration/Board as it relates to budgeting, maintenance, personnel recruitment, and other functions.

Mr. Burnside and Mr. Dorsey have demonstrated the willingness to take on additional tasks and responsibilities throughout the many leadership transitions at Henley Young, but to expect that Henley Young can successfully operate and continue to move forward without adding a qualified Executive Director to the leadership team is unrealistic.  In the long run, Judge McDaniels can provide an appropriate oversight role, but it should not fall on Judge McDaniels or the other team members to continue "making it work".  There is clearly additional work that could be done by Mr. Burnside and Mr. Dorsey if they can be relieved of some of the administrative work that has fallen on their shoulders as a result of the absence of a qualified Executive Director.

The Recreation Coordinator position is also currently vacant and posted for applications on the Hinds County website.  Historically that position has focused on providing support for physical and other "recreational" activities (e.g. video games, movies, etc.) and played a role in implementing the behavior management tool/point system.  Expanding the role of that position to more of a "Program Coordinator" to support other components of the overall program will be helpful in achieving the program requirements of the Settlement Agreement and providing valuable services to the youth, e.g. coordinating visitation, outreach to recruit community volunteers to provide a range of supports for youth, outreach to the faith community for services for youth, and expanding the number and nature of behavioral rewards that youth can earn for positive behaviors.

Henley Young should consider a leadership structure that includes an Executive Director (to be hired), the current Operations Manager and Quality Assurance Manager, a Treatment Director/Coordinator (refer to the recent Stipulated Order, Item V. A.), and a Program Coordinator (with responsibilities for the "non-mental health" aspects of the program).

Physical Plant Changes

There have been no discernible physical plant changes that have been recommended in prior reports, including: (1) no additional classroom/programming space has been developed to support both educational, mental health, and/or other youth development programming; and (2) no changes in the housing units that have been recommended, changes that would "normalize" the environment and contribute the more effective management of youth behavior.

As noted in prior reports, the classroom area remains cramped and difficult to create some challenges in managing behaviors for youth, and the lack of appropriate space for group discussions, counseling, and other youth development programming makes development of a more complete program difficult at best.  That said, the Youth Support Specialists did not cite any instances in which they could not find a space for their programming, just that it was often loud and challenging (particularly if they had to hold the group discussions on the housing unit).

Additionally, during this site visit it was noted that other improvements in the physical plant would make the units more appropriate for long-term confinement, including the limited water pressure (apparently a chronic infrastructure problem), and a number of the youth's sleeping mattresses have been worn down to the point they provide very little support for sleeping.  In addition to prior recommendations to replace the steel tables with detention-grade moveable furniture and add some sound-dampening acoustic panels (or comparable acoustical improvements), it would make sense to repaint the housing units and replace some of the sleeping mattresses for youth.

The lack of adequate recreation space for large muscle activity was of concern during this visit, as due to rainy weather the week before and cold weather through almost all the days of this visit, youth did not go outside for recreation.  Youth noted it was not unusual overall during the winter to not go outside, limiting physical activity to the multi-purpose room that simply does not provide youth any large muscle activity.  "Recreation" is the term loosely used to describe a range of activities that youth may do in the multi-purpose space, e.g. watching TV, a movie, video games, etc., hardly a sufficient replacement for large muscle activity.  There are plans in discussion to "cover" a portion of the outdoor courtyard and perhaps add portable classrooms. Whether those plans are implemented can be confirmed during the May visit and/or communicated to the Monitor in the interim.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II, a strength based assessment, and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two mental health clinicians, and the group work and counseling provided by the three Youth Support Specialists (YSS).

There are concerns noted in the SPLC agreement that the MAYSI-II may not always be administered in a timely manner and/or individual treatment plans are not fully developed. However, during prior visits it did appear that youth were being screened for mental health concerns.  The absence, again, of a psychologist or alternatively a Treatment Coordinator in conjunction with added psychological services is a concern, and further auditing of assessments and treatment plans can be done during the May visit.

In addition, members of that mental health group continue to form a treatment team for each youth that establishes treatment goals and meets regularly to review the youth's behavior and progress on those goals.  The Youth Support Specialists (YSS) continue to serve as contact points for parent(s) of youth in placement, and the clinicians and Youth Support Specialists participate in addressing behavioral issues/incidents that arise during placement. We (Jim Moeser and Aaron Fleisher, DOJ) were able to sit in on a team meeting during which five youth's plans were reviewed, and in general it seemed to be a positive process, engaging the Youth Support Specialist, clinicians, school personnel, and in one case a parent participated.

Protocols related to suicide concerns are in place and are reflected in documentation in Incident Reports, intake assessment(s), monitoring of youth exhibiting suicide/self-harm concerns, and documentation of review by mental health staff and "release" from suicide watch status.  Henley Young has implemented an appropriate supervision protocol for youth on suicide watch status, and there is documentation of required observation checks, albeit some of the documentation raises questions about its accuracy (see section related to observations conducted during disciplinary isolation periods).

With the departure of Dr. Payne in June of 2019, the mental health/treatment program has taken a step backward, and that position has yet to be filled.   County staff previously indicated that

despite posting the position for a 1.0 FTE position prior to Dr. Payne's departure, they have been unable to find a replacement. Some hope was expressed that under new leadership it may be possible to reengage with Dr. Payne and reach an agreement that could make that position full-time and properly reflect the important coordinator/leadership role she could play for the overall delivery of mental health and treatment services.

However, as of the drafting of this report, that position remains unfilled and is posted as a Licensed Clinical Psychologist (the same posting from May 2019) rather than the Treatment Coordinator concept proposed in the recent Stipulated Order.   Other staff have been working to "fill in the gaps", but that is not a long-term substitute for designating a full-time Treatment Coordinator to lead the mental health program.  The bottom line is that the County will not be able to reach full compliance with this aspect of the agreement unless/until they can obtain the services of a qualified person to provide leadership for the program.  Even once someone is hired, it will take some time for that person to further shape the quality of programming and delivery of mental health supports.  The Stipulated Order requires the posting of a position within 30 days of the order (the order was entered January 16, 2020) and offering the position to a qualified person within 3 months of the posting.  That Stipulated Order was intended to provide some flexibility for the County to focus on hiring someone with an appropriate skill set to meet the needs of the program without limiting it to a specific licensing requirement.  The County should be updating the Monitor as to progress in posting the position and/or finding the appropriate person to fill this need.

Staff continue to be positive about the provision of psychiatric services/consultation from Dr. Bell.  Staff indicate that Dr. Bell comes regularly to the facility, responds as needed, and most importantly does a good job working directly with the youth. Verification of that contact can be done during the May visit.

Related to appropriate programs, the mental health Clinicians and the Youth Support Specialists continue to provide various group sessions for youth.  In addition to groups conducted and referenced in the prior report (e.g. Avoiding Trouble, Managing Anger, Social Supports, Character Traits, etc.) one of the YSS staff has begun using the Power Source curriculum, a well-researched curriculum that includes activities and support materials related to things such as techniques and strategies for impulse control, anger management, stress reduction, and conflict resolution; high-risk behaviors, such as substance abuse, criminal activity, and gang involvement; and childhood abuse and neglect and the resulting feelings of shame, grief, anger, and loss.  This is the kind of evidence-based curriculum that could form the basis of a more integrated treatment program, i.e. used by other YSS staff and direct supervision (Youth Care Professionals) staff to better reinforce youth's behavior on the living units. Documentation of group attendance has improved, making it easier to see what youth attended specific programs. Additionally, the clinicians and YSS staff have ordered additional curriculum/materials from the

Change Company that appear to be evidence based and appropriate for youthful offenders, utilizing cognitive-behavioral and journaling approaches. Most of those materials had not yet arrived but can be reviewed during the May visit. Note that the Stipulated Order lists examples of the types of curriculum and topics that have proven to be most effective with youthful offenders.

Both youth and staff noted that it was common that individual youth participated in three to four of these programs each week, but each session is scheduled for only 30 minutes, shortened from the initial plan of 45-60 minutes. Assuming there is some "down time" in getting the group started, that means that each youth is receiving at most two hours of this programming per week, far below what could be considered adequate to meet the requirements of the agreement.

Discussions with staff reaffirmed the prior assessment that much more needs to be done to create a coordinated and effective program, including: (1) strengthening the cohesion in how the various groups and programs "fit together" to work toward an underlying and consistent approach (e.g. as referenced above related to Power Source, which is just one example of a curriculum that could be used); (2) increasing the amount of structured program time; and (3) the Youth Support Specialists cite that it is not uncommon that lack of a suitable space for their program and/or a shortage of staff available to get youth to and then supervise the program limits their ability to provide the programming that is scheduled; more appropriate space should be developed.

Additionally, one YSS indicated that she was developing activities on an "as needed" basis each day/week by looking for ideas on the internet. Another YSS noted that in the past she had prepared a monthly lesson plan that laid out the activities, a positive model, but that model was not adopted by other YSS staff, so she discontinued doing so. Whereas most evidence-based curriculum addressing the requirements of the Stipulated Order utilize sequenced activities (e.g. 12 sessions focusing on increasing skills in a particular area/skill), most of the programs provided by YSS staff were not set up in that model. With proper materials, supervision, and support the YSS staff could work together to develop monthly or even quarterly plans for the specific programs provided and could reinforce each other's work to be more effective with youth. To meet the requirements of the Stipulated Order, the team should develop a coordinated monthly plan (e.g. for May 2020) listing the planned group discussions and materials to be used. As the team meets, they can "roll" that plan forward on a monthly basis.

As it relates to meeting the conditions of the January Stipulated Order, the County needs to:

- Hire a Psychologist/Treatment Director to provide direction for the mental health and behavioral health components of the program. Whether Dr. Payne is reengaged or not, the job description for that position should be updated to clearly reflect the skills and tasks for a Treatment Director/Coordinator. That current posting should be updated

and/or reposted by the time this report is filed, and the Monitor should be kept informed of progress (or lack thereof) in offering someone the position no later than May 15. (Refer to V.A. of the Stipulated Order).

- The mental health team, ideally under the leadership of a Treatment Director/Coordinator and in consultation with other leadership, should put together a coordinated treatment program plan outlining the specific group discussions/activities (including the schedule, reference to the materials/curriculum to be used, and who is responsible for conducting/developing the activity) to be conducted in the coming month(s).  That may take the form of a monthly schedule and should include a substantial increase in the amount of structured time youth are engaged in recreation and other youth treatment/development programming.  This should be in place by May 1. (Refer to V. B., and C. of the Stipulated Order).

79.    Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance**

The education program appears to be relatively unchanged from prior visits, with only minor improvements related to the use of credit recovery and other educational software.  Some basic observations include:

- There remains one vacancy in the Special Ed. Teacher position, so all the special education work is currently being performed by Ms. Finley, and her passion and commitment to ensuring youth are receiving adequate services is evident.  There appears to be a well-planned and consistent process in place to promptly get a youth's previous education records when a youth comes to Henley Young, including obtaining any Individual Education Plans for youth receiving exceptional education services.  Those IEPs are reviewed initially, updated as needed, and then reviewed periodically as required.  That review includes engaging with parent(s) and obtaining needed authorizations and approval(s).
- School is scheduled from 8:00 a.m. to 2:30 p.m. including a one hour lunch period. Attendance of youth is tracked and reported to the Jackson Public School information management system.
- The space previously used for providing some Special Ed. programming (essentially a converted closet) is now used for testing purposes only – an improvement, albeit that space is still not particularly conducive for any educational purpose.
- Additional software for credit recovery and providing greater individualized programming has been implemented, albeit on a limited basis.

That said, the operative word in this particular compliance condition is "adequate", and there are some concerns about whether and when to consider Henley Young to be in full compliance,

including: (1) The overall educational program space is confined; the classrooms are adequate at best, although certainly not ideal, and there is not sufficient space or staffing to fully individualize programming at an optimum level; (2) Youth in facilities like Henley Young vary considerable in age, ability, and learning styles, and although each youth is given an initial assessment, it is not clear that programming is individualized in a way to meet those varied needs. . These problems are exacerbated by the very lengthy stays that some youth are experiencing; and (3) the bottom line for any educational program is to what extent youth are learning versus just attending.

The program may meet minimum Mississippi Department of Education requirements, but what has to be seen as at best a "temporary" education program and facility is not well-equipped to properly educate the variety of JCA youth for the extended period of time they are in placement. The JCA youth come into the Henley Young well-behind where they should be related to education (often the result of poor attendance and failure in their prior academic program) and accelerating their learning with a more robust program would be more appropriate. It would be helpful for an education expert to again review the program, as was done by Carol Cramer-Brooks in 2018 through the SPLC agreement. At that time, she concluded that "The space is definitely inadequate, made workable only because of the small numbers of residents attending school. If the numbers ever consistently approach the 32- resident capacity this will be an issue that needs to be revisited." As mentioned above, there 32 residents at the time of the site visit.

As it relates to reviewing and documenting academic progress, an audit of the program (as part of the audit of Jackson Public Schools) by the Mississippi Department of Education found that documentation of Individual Academic Plans (IAP) was not sufficient, so the program has implemented a Corrective Action Plan to better ensure that academic progress is reviewed routinely and documentation related to that review is completed approximately every 10 school days.  Further review of those IAPs can be done during the May visit, but staff indicate they did alter the procedure beginning with this academic year to meet the MDE requirement.

Limited Classroom Attendance During the Site Visit

Of concern during this site visit was that for safety concerns in response to a recent incident between two youth in different housing units only one-half of the youth were in class at a time. This was the case for at least the Tuesday thru Thursday of the visit.  One housing unit attended in the morning, and the other unit attended during the afternoon.  When not in class, the youth remained on their housing unit and were supposedly provided "homework" to do while on the unit.  When visiting with youth on the unit it did appear that youth had been provided some worksheets to read and answer some questions, but on one occasion no youth seemed to be working on anything and on another visit only one youth seemed to be even looking at the worksheets. Other than for one or two Exceptional Education Need (EEN) students, there

appeared to be little or no staff support to do the work. This clearly cannot be portrayed as appropriate, yet youth on the unit were recorded as attending regardless of whether they were doing the work.

Given some of the limitations of the classroom space and ability to manage that area safely with "conflicting youth", leadership staff took the position that this extended separation for "groups" of youth was necessary for safety purposes.  While it is correct that the rather confined classroom area adds to behavior management concerns, there appeared to be little sense of urgency about resolving the underlying conflict and/or getting youth back into the full program quickly. Imposing the separation for a brief time for the school program as well as imposing some sort of disciplinary response for the specific youth involved in an altercation may be necessary, but it should be brief and followed up with some sort of reconciliation effort.

To move toward substantial compliance it is recommended to: (1) Provide additional classroom space that could also be used for additional educational, treatment, and behavioral programming; (2) Conduct a review of any measures of academic progress to assess what youth are actually learning, what skills they are improving in, and to what extent individual learning plans are implemented; and (3) Review and address recommendations for improving the school program previously provided by Carol Cramer-Brooks and any upcoming recommendations made by Dr. Domenici.  It is positive to note that Judge McDaniels has expressed an interest in reviewing those recommendations and looking at additional ways to improve the school program going into the next academic year, if not sooner.

It should also be noted that (unless additional information is provided by the county and verified by the monitoring team) young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance**
Since all youth under 18 have "aged out" of RDC and there are no adult prisoners at Henley Young, this provision is met. As JCA youth in placement at Henley Young turn 18, they will be transferred to RDC or the Jackson Detention Center (JDC). Two youth (J.N., C.W.) currently in placement will turn 18 by the end of May, and unless their case is otherwise resolved by the court they will be transferred to JDC.   As referenced earlier, February 2020 will mark one year since any youth under 18 was housed at RDC, so there is every reason to suggest that sustained compliance can be achieved by February 2021.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards.

Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**

There has been no change related to compliance with this requirement although staff purport that Policies/Procedures have been updated and documentation of classification is occurring. However, staff have not yet provided the final version of the policy or a copy of the form for review nor were admission files inspected during this visit to confirm compliance with the policy. To reach Substantial Compliance Henley Young will need to provide the updated policy and related documentation it is being followed. Additionally, admission files can be reviewed during the May visit.

82. Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**

Henley Young continues to provide training on an on-going basis for some requirements of this provision, including new employee orientation for new staff, updates on policies and procedures as they are adopted, use of force refresher training, CPR training, fingerprint training (for intake purposes), and use of radio/communication equipment. As in past reports, this reflects that the bulk of training conducted for Youth Support Specialists (YSS -the "line" staff position) is on basic operational skills and falls short of the intent of providing more advanced training on issues such as the impact of trauma on youth behaviors, trauma-informed practice, adolescent development, and mental health.

Copies of training records were provided by Ms. Young who has continued to serve as the training coordinator for Henley Young, and, as has been the case in prior reports, developing a more complete training program is hampered by consistent turnover of Youth Care Professional staff. Ms. Young indicated that she had trained 22 staff, many new, over the past four months, a substantial percentage of the overall staffing for Henley Young. If/as staff retention continues to be a problem, at any point in time no matter how good the training program is there will be a notable portion of staff on duty that have not had more advanced youth supervision training.

Although not specifically itemized in this Agreement it seems clear that absent substantive changes in the salary structure for new and more experienced Youth Care Professional staff, this

turnover will continue and it will be an "uphill struggle" to develop a fully effective program at Henley Young.  We understand that the Board of Supervisors has authorized some form of compensation study for adult jail and Henley Young staff, and hopefully additional resources will be provided to make those salaries more competitive in the Hinds County area. Additionally, the Board has apparently waived the residency requirement for those positions, and that is a positive step in increasing the potential pool of applicants.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h.  If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

  i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

This continues to be one of the more challenging provisions of the agreement, both in terms of implementing all the requirements and in monitoring proper implementation. HY tracks both Behavior Management Isolation (BMI) (short-term, implemented by YSS staff) and Due Process Confinements (DPC) (longer-term confinement following a disciplinary review by leadership). Per those records:

- In October 2019 there were 5 instances of BMIs and 3 instances of Due Process Confinements. The BMIs ranged from 15 to 25 minutes and the three DPCs were all for a period of 24 hours.
- In November there were 10 BMIs and 5 DPCs. Five of the BMIs were for approximately 2.5 hours (four of them relating to one incident of fighting). Four of the five DPCs were for 24 hours and one was for six hours.
- In December there were 9 BMIs and 8 DPCs. Only one of the 9 BMIs exceeded one hour; six of the nine DPCs were for 24 hours and three were for 6 hours.



This does represent a modest decrease (compared to the last site visit period covered) in the use of Behavior Management Confinements, and most of them were for short periods of time. But there has been an increase in the number of Due Process Confinements compared to the prior period. Fortunately, leadership staff report that there had not been an incident similar to the staff assault that occurred just prior to the last site visit in September, so that is a positive compared to the concern about the increasing number of Due Process Confinements.

Since the Agreement limits room confinement to a maximum of one hour unless the youth poses an imminent safety risk to staff or other youth, all of the sixteen Due Process Confinements arguably do not meet that expectation. Staff purport that during this 24-hour period youth can come out of their rooms for structured activities (school, recreation, group programming), but in reviewing five of the observation records for DPI confined youth, only one included

documentation that the youth was "out of their room" for school during that 24-hour period (a "code" was added to use to document "other" activity, including if the youth came out for school or other programming), but several indicated youth came out for recreation.  If other youth were allowed out of their room, it was not documented. Mr. Dorsey and Mr. Burnside indicated that youth are given the option to come out of their room for structured programs but there is no way to tell from the documentation whether or not youth were offered that opportunity and/or refused to take it. There was, however, more frequent documentation of a visit/check by one of the mental health team members, either the QMHC or the Youth Support Specialist during the confinement period.

For purposes of tracking whether/how often youth come out of their room during any confinement period and/or refuse that opportunity it would be useful for YSS staff to more clearly document what happens, e.g. if the youth is offered and declines the opportunity to come out of their room that should be noted.

The juvenile justice expert and DOJ were able to observe one of the Due Process hearings for a youth involved in an incident (fighting with another youth), and although it technically provided a chance for the youth to explain what had happened it was a pretty perfunctory process that did little to address any of the underlying issues involved.  Not knowing the youth involved, it is difficult to critique the hearing process, but when asked if there would be any follow up with the youth involved to bring them together to resolve any conflict and/or discuss what could be done differently, Mr. Dorsey indicated that would not be done.  The actual disciplinary decision often refers to "24-hour room confinement with counseling", and the YSS assigned to the youth may discuss it further with the youth (though it was unclear what would happen in this regard).  It is important to keep in mind that discipline comes from the Latin word "disciplina" that means "instruction and training", so simply holding a hearing to impose a consequence and assuming that will be "corrective" is short-sighted and does not provide an opportunity for youth to learn new behaviors going forward.

Ultimately the use of room confinement can be further reduced by continuing to improve the environment in the living units, retaining and expanding training of Youth Care Professional staff, continuing to expand social skill training, adding additional program opportunities, and ensuring a full complement of mental health support staff (i.e. a full-time psychologist).

Finally, the last Henley Young Policy/Procedure related to Due Process Confinement provided to the Juvenile Justice expert is from September 2017 and does not match verbal representations by staff about current procedures.  Henley Young staff need to provide the team with current/recently adopted Policies/Procedures so they can be reviewed to determine if they are consistent with requirements of the Agreement.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

      a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

The point/level system tool used to track and document youth behaviors has remained essentially the same as it was adopted just prior to the visit in September.  It does provide more discrete time frames in which to document/track behaviors, and the person performing the role of Recreation Coordinator is responsible for documenting what incentive youth choose based on what they earn.  While the tool can be functional, several recommendations related to its use remain, including: (1) staff need to document in more detail why they "rate" a youth the way they do, both positively and negatively;  simply providing a "number score" does little to reinforce and/or shape youth's behavior going forward;  (2) individual goals need to be added to the tool based on consultation with the YSS assigned to the youth so that discrete areas for improvement can be identified and reinforced; (3) more work needs to be done to expand options for incentives; and (4) Youth Care Professional staff need to be more overt in using the system as a "tool" for discussing with youth what they are doing well and how they can do better. Making this last recommendation effective is complicated by the frequent staff turnover and need to focus on basic training rather than more advanced behavior change/management skills.

The YSS and QMHC staff do identify some individual goals for youth in care and part of the Treatment Team review process includes some discussion of those goals, although at least for the five youth observed during the treatment team meeting during the visit, the goals seemed pretty much the same.  That may be appropriate, but requires further assessment of the details and documentation of progress.  Henley Young continues to receive technical assistance/support through Anne Nelson, monitor for the SPLC agreement and Leonard Dixon providing periodic support/technical assistance.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

The policies on pre-booking, booking and records have now been in place for almost a year. A Booking Manual is being developed and an initial review of the uncompleted manual indicates that it will be a useful document. There continue to be improved systems in place to track individuals and release them timely. The new Records Policy requires uniform organization of the files and requires a summary sheet that tracks the individual's detention status. Updates are immediately reviewed by a peer and the Supervisor is to conduct an audit of 10 files a week and do a semi-annual review of all files. The files provided for review all had the log of activity required by the Records Policy. However, this was not necessarily a random selection so the percentage of files that have been updated with this log is not currently known. The files did not have the summary sheet required by the Records Policy to clearly summarize the current basis of confinement as there appeared to be some misunderstanding of how that differed from the chronological entries. The summary of detention status should identify every matter that is causing the individual to be detained and identify the supporting documentation. This would allow for a quick and accurate assessment of when court action warrants release. It would also allow for efficient auditing of the files. Currently, determining the status of the inmate requires a review of most of the paperwork in the file which can be voluminous.

A review of the files and the summary indicated some discrepancies. One individual had an out of state hold withdrawn but this did not appear in the log. Another individual had a warrant for parole with no documentation that the warrant had been withdrawn. The individual had been released. The NCIC report in the file was only a driver's history as opposed to the criminal history which reportedly resulted in the warrant not showing up at the time of release.

At the present time, there continue to be some instances of people being booked without proper paperwork or being detained longer than they should be. A new issue was observed in this site

visit. Two individuals had arrest forms that had handwritten notations to "Hold for Investigation." This is not a valid hold. The second individual should not have been booked under current policy as he was only charged with non-qualifying misdemeanors. He was, however, booked on the hold. A supervisor ensured his release the next day. These were both bookings from the HCSO and should be addressed. It was also reported that one of the judges does not have an administrative assistant and as a result there is a delay in receiving release orders. This often results in a 2 or 3 day delay although the Jail is releasing the inmates once they receive the paperwork.

The tracking of individuals held on probation violations appears to be accurate. However, there have been individuals who have overstayed the 21 days allowed for a hearing when a hearing has been set but has not occurred. One individual was held an additional week beyond the 21 days. Another individual was held over a month after the 21 days had run. This issue was previously addressed by the Sheriff's attorney but needs to be revisited.

Improper releases continue to be a potential problem as a result of the Warrants Division using a different data base than the rest of the Sheriff's Office. The Warrants Division of HCSO uses an old data base and so does not enter warrants into the JMS system. If a warrant is entered after 5:00 or on the weekend, the Records Office won't know about it until the next business day.

There are several system issues that result in over-detention. One recurring situation previously identified is that there is not a way to identify people in the Jail who are waiting for a preliminary hearing. Although it is the court's responsibility to provide timely settings, the Jail currently has no way of tracking these individuals to alert the court. There continue to be individuals detained beyond 90 days without indictment. However, it appears that the new District Attorney is committed to remedying this. It should be noted, however, that this does not mean these individuals will be released. As cases are reviewed, some will no doubt be dismissed but some will result in indictments.

The problem with individuals waiting for their first appearance in County Court appears to be resolved. In addition to seeing the judge more promptly, the bail bond schedule has been eliminated. For those individuals who will not see a judge in 48 hours, the staff are usually able to get phone approval for an ROR.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in Bearden v. Georgia, 461 U.S. 660 (1983) and Cassibry v. State, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Substantial Compliance**

As reported at the time of the last site visit, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. At the time of the last two site visits and this site visit there have been no individuals in the facility on a fines and fees order. This will continue to be monitored closely as the policies are new and sentencing orders are sometimes ambiguous, but this provision is now listed as in substantial compliance.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Substantial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The policy on pre-booking is consistent with this paragraph and at the time of this and the prior site visit there was no one in the facility for failure to pay fines and fees. However, at the time of this site visit, a review of inmate files disclosed two individuals who had illegal orders to stay in jail until payment of fines and fees. It was reported that these individuals are not held on these orders. If in custody on another matter, the individual is considered to have time served on the fines and fees order. It was reported that the illegal fines and fees orders are typically not entered into the JMS system. While it is the case that this process results in no one being held on fines and fees, a better process would be to ensure that the orders are corrected as set out in this Settlement Agreement. These requirements will continue to be carried as in compliance as no one is being held on fines and fees.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Substantial Compliance**

See paragraph 87.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Substantial Compliance**
See paragraph 87.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**
The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**
This has become a limited issue now that there are no individuals working off fines and fees. At the time of the September and the last site visit, the stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. The spread

sheet appears to be consistent with this stated policy. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.     Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.     Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.     Examples of prisoners presumptively entitled to release include:

        i.     Individuals who have completed their sentences;

        ii.     Individuals who have been acquitted of all charges after trial;

        iii.     Individuals whose charges have been dismissed;

        iv.     Individuals who are ordered released by a court order; and

        v.     Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

See response to number 85.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As described in paragraph 85, the new Records policy establishes a system that should greatly improve the reliability of the prisoner record system. However, a complete updating and review of the records has not been completed and the system of auditing files has not been implemented. The summary required by the Records policy has not been fully understood and so has not been created as opposed to a chronological log of events. Similarly, when the Booking Manual is completed, there should be improvement in the initial entries into the JMS system. Additional problems described in paragraph 85 continue to exist. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained. In addition to

Booking staff, there are three individuals tracking the lawful basis of detention. They are all three using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

Medical and mental health use an electronic medical records system, which keeps a full record of all medical and mental health assessments, treatment plans, and treatments. Only medical and mental health staff have access to these records. Mental health staff also maintain a log for all prisoners on the mental health caseload. The log tracks the location of each prisoner, booking date, the date of the initial nursing intake assessment, the date the prisoner was referred to mental health and the source of the referral, the date of the initial mental health assessment (see section 42(g)(vi), the date of the initial psychiatric assessment, the prisoner's diagnosis, the date the treatment plan was developed, whether or not the prisoner is on psychotropic medication, whether or not there is a discharge plan, and the prisoner's length of stay. There is a separate log/tracking system for prisoners placed on suicide watch, which tracks the number of prisoners placed on suicide watch each week and their average length of stay on suicide watch.

The above noted medical records and logs document the work that is being done and are constantly referred to when continuing to plan for and provide treatment. In this regard, treatment plans should be periodically reviewed and updated when indicated; but this process of formal treatment plan review has not yet been initiated; however, it is anticipated that such a formal process of treatment plan review will be initiated once additional mental health staff have been brought on board.

At present, the above noted records and logs are kept confidential due to concerns about prisoner/patient privacy rights. However, HIPAA includes a specific exception to its privacy provisions in recognition of the fact that in a corrections setting communication and cooperation between security staff and mental health staff will be critical to the success of the mental health

unit. Training of both medical and security staff on what information can be shared and how information can be shared should be completed so that both mental health staff and security staff can fulfill their responsibilities while protecting prisoner's privacy rights.  In addition, as is noted in various sections of this report, security staff assigned to general population units are also managing prisoners who are seriously mentally ill and will continue to do so even when the mental health unit is opened; therefore, they need to know which prisoners are suffering from serious mental illness and how illness impacts on their ability to function; and so developing a mechanism whereby they will know who is on the mental health caseload, coupled with adequate training (see section 45), is important.

Based on the logs maintained by the mental health staff, the mental health staff is able to provide an accurate census of the population on the mental health caseload.  This census count, along with consideration for the other current and anticipated responsibilities of the mental health staff (see paragraph 42), can be used to assess mental health staffing needs.  As noted elsewhere in this report, it is anticipated that once all security policies and procedures have been completed, especially with regard to disciplinary review, segregation review, and use of force, it will be possible to calculate the mental health staff hours required for mental health to fulfill its responsibilities with regard to these activities.  In addition, once the mental health program plan for the mental health unit has been developed, it will be possible to calculate the mental health staffing needs for that unit.  So, although clearly there is a need for additional mental health staff, the development of a more detailed staffing plan awaits the completion of these developments.

Mental health staff are not involved with the transfer of prisoners to the state hospital for competency evaluations and/or the restoration of competency.  In fact, mental health staff is unaware of which prisoners are awaiting such transfer, and staff have no idea who is responsible for making sure that such prisoners are transferred in a timely manner.

Presently, mental health staff are also not involved in the incident reporting and review process. At the time of the September 2019 visit, the mental health expert on the monitoring team reviewed 15 incident reports were there was important, relevant information that could have been obtained from mental health that was not obtained from mental health.  Four of those reports were related to potentially suicidal prisoners, and indicated that security staff could benefit from additional training on suicide prevention.  Nine of the reports were related to some type of misconduct; after reviewing the available mental health information, it became clear that the incidences were the product of serious mental illness; and indicated that security staff could benefit from additional training on mental illness and the management of seriously mentally ill prisoners.  However, there was one incident where security staff clearly recognized that the prisoner's mental health status had declined and took the prisoner to mental health.  In the one other incident, a prisoner was exhibiting adverse effects to an illicit drug that he had taken, but

security staff mistakenly thought he was having some type of medical difficulty and took him to medical.

During this site visit, 9 incident reports were identified where there was important, relevant information that could have been obtained from mental health that was not obtained from mental health.  Two of these reports were related to potentially suicidal prisoners, and once again raised the question of whether or not security staff could benefit from additional training on suicide prevention.  Seven of the reports were related to some type of misconduct; after reviewing the available mental health information, it became clear that the incidences were the product of serious mental illness; and again raised the question of whether or not security staff could benefit from additional training on mental illness and the management of seriously mentally ill prisoners.

In addition to raising the above noted training issues, these reviews of incident reports raise several other issues or questions as well.  More specifically, for incidences such as these, can there ever be an adequate review of the incident without obtaining available, related health and mental health information.  Therefore, should medical and mental health be asked to add to incident reports and/or review incident reports when there is any reason to suspect that there is a medical and/or mental health issue (assuming that security staff, or at least security reviewers of incident reports, have enough training in mental health to suspect that there might be a mental health issue).  Since incidents can become the basis for disciplinary charges, these reviews confirm the need for a disciplinary review process that includes mental health (described in the section on Segregation).  In addition, since security review of incident reports might result in a review of and possible changes in policies and procedures, mental health input on incidences such as these might be extremely helpful.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been circulated for review. The draft currently addresses some but not all of these requirements. The draft policy primarily addresses procedures that would ensure the accurate release of inmates completing a sentence. This is a small percentage of the releases. Inmates are released in a variety of circumstances including pretrial release on bond, ROR or electronic monitoring, releases of holds, pick ups on holds, expiration of time limits on detention, and others. The policy should address these other forms of release.

As has been previously noted, the requirements for discharge planning actually involve several different activities.  The first is the development of a written discharge plan for each prisoner who is likely to be eventually released; the plan would include the type of treatment needed, where the prisoner will obtain that treatment, and any other wrap-around services that might be indicated (housing assistance, vocational assistance, case management, etc.); and ultimately, the plan should be developed and shared with the prisoner, with the goal of obtaining the prisoner's

commitment to the plan.  Currently, staff provide referrals to discharging inmates but there is no written discharge plan. Once the prisoner is relatively stable within the facility, the second activity is to prepare the prisoner for release; this is done via psychoeducation and medication management groups, discharge planning groups, etc.; and where indicated, it may also involve other individual and group therapeutic interventions that maximize the prisoner's ability to function outside of the facility.  Although mental health staff have initiated two groups both of these have since been dropped. This was an initial effort to provide the type of programming that is needed. The third activity is the development of working relationships with community-based providers of mental health services and other important wrap-around services; this effort is to assure that such community-based providers will accept referrals; and this effort should also be focused on the mechanics of referral and how to maximize the possibility of having a successful/completed referral.  The mental health staff has developed a very good working relationship with the intake staff at Hinds County Behavioral Health. There is a need to locate and build such a relationship with an agency that provides residential services. The fourth activity is finding ways to bridge the gap between release time and the prisoner's first meeting with a community-based provider; this includes giving the prisoner medication upon their release from the facility to hold them over until they see the community-based provider, but it might also include making sure that the prisoner knows how to access any emergency services that the prisoner might require prior to the time the prisoner meets with the community-based provider; and ways to do this must be developed even for prisoners who are released directly from court or otherwise fail to go through the medical clearance process upon their release from the facility. This was partly addressed in the medication management group that was initiated but since that is not longer functioning, this is an area that needs to be addressed.

All of the above described activities related to mental health discharge planning must be included in the mental health program plan that needs to be developed for the anticipated mental health unit.  Although some of these activities will be totally under the control of the mental health staff, other activities will require a close working relationship with other units within the facility (such as classification and booking) or a close working relationship with community-based providers of mental health services and other important wraparound services.

One of the nurses had designed and began a psychoeducation group focused on medication; the group started out well; but most of the prisoners stopped attending once the problems with their medication had been addressed.  As part of an effort to push the program planning for the mental health unit, a meeting was held by the mental health expert with the medical staff to discuss the difficulties experienced with starting that medication group, how such difficulties could be addressed, and how that experience informs the program planning effort for the mental health unit.

During this last site visit, the mental health expert on the monitoring team and mental health staff also met again with the director and staff of Hinds Behavioral Health.   The nurse/discharge planner is in regular contact with the intake person at Hinds Behavioral Health; they reported that about 25% of the jail's mental health caseload have been clients of Hinds Behavioral Health in the past; and they reported that only about 30% of the prisoners who are referred to Hinds Behavioral Health upon their release from jail actually show up for their scheduled appointment. This and other information shared at the meeting confirmed the need for the type of more rigorous discharge planning effort that is envisioned once the mental health unit is opened and adequately staffed.  This and other information shared at the meeting also again pointed to the potential benefit of having staff from Hinds Behavioral Health actually do intakes at the jail prior to a prisoner's release (thereby beginning to develop a relationship with the prisoner prior to release); this also pointed to the potential benefit of staff from Hinds Behavioral Health participating in the discharge planning groups, etc. that will be held at the Jail; but since Hinds Behavioral Health isn't funded to do these things, they were asked to figure out how much funding would be required to do these things.  It should be noted here that this type of involvement at a jail by community-based providers of mental health services has been demonstrated to increase the rate of successful referrals for community based mental health services post-release.  It should also be noted that a representative from medical was also at this meeting with Hinds Behavioral Health, because Hinds Behavioral Health now has an integrated care program which provides a range of medical services on site to clients of the agency. Therefore, prisoners who are successfully referred there could receive both their mental health and medical services at the same facility, in an integrated way.

Another issue that came up at the meeting with Hinds Behavioral Health is the high number of individuals with serious mental illness who are only held at the Jail for a day or two, estimated to be about 20-25 individuals/month.  These individuals are not at the Jail long enough to receive any mental health services, including discharge planning services; upon their release, they don't receive community-based mental health services; and most of them are back for another short stay at the jail very quickly.  It was noted that although the Jail has contact information for these prisoners, it is not always accurate; there was a discussion about the feasibility of sharing this information with Hinds Behavioral Health so that case managers there could actively search for and follow-up with these rapidly released prisoners.  During the meeting with Hinds Behavioral Health, all present agreed to work collaboratively to continue to explore the feasibility of such an effort, with an eye towards the extent it might help decrease recidivism among this specific population.

Finally, there continues to be a considerable number of prisoners who are released without medical clearance and therefore fail to get a supply of medication that is waiting for them in medical; so there still needs to be improvement there; and it is still anticipated that once medication groups, discharge planning groups, etc. are in place, prisoners can learn about

available ways to get emergency medication if they do leave the facility without a supply of medication.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:

    a.    Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

    b.    Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area. The Records Supervisor and her assistant and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

The Booking staff reportedly now runs an NCIC check at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. The files reviewed did include a copy of the NCIC report at the time of release although, as noted above, one file had only an NCIC driver's report instead of the criminal history report which was possibly the cause of a parole warrant being missed. Once the policy on Release is revised and adopted, and the files continue to contain the required documentation, the county can be considered compliant.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to

implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

      i.      How to process release orders for each court, and whom to contact if a question arises;

      ii.     What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

      iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

      iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

      c.     Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. As stated in paragraph 85 above, there is a problem in checking for detainers because the Warrants Division does not enter warrants in the JMS system and the Records Supervisor does not have access to their system after hours.

The imbalance of staffing in Booking (reported in the Sixth through the Ninth Monitoring Reports) was not as noticeable during the January site visit.  While there was still only one (male) officer assigned to handle the reception of arrestees and to conduct well-being checks on inmates in the holding cells, there were only two Detention Officers acting as Booking Clerks which represents a reduction from previous site visits.  There is some confusion as to their duties. When the corrections operations member of the monitoring team questioned how a female arrestee is processed, he was told that one of the Booking Clerks (females) left the Booking Office and assisted.  When the Monitor's expert on Policies and Procedures asked the same question, she was told that the Booking Clerks never left the office environment.  This is a matter that needs to be addressed and clarified in writing by the Interim Jail Administrator.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

     a.     A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

     b.     Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The log and summary that is now supposed to be in each individual file would provide this information. A technological solution should be considered to pull this information into a system wide log that would meet the requirements of subparagraph a. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not routinely prepared for over detention.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The Jail had an individual whose title was Quality Control Officer or sometimes was referred to as the Court Liaison. He did not fulfill all of the duties required by this paragraph but did fulfill some so this paragraph was listed as in Partial Compliance. He was terminated at the beginning of the year. When the position is filled, the County should consider structuring the positions so that all of the duties required by this paragraph are completed.  This would include a proactive approach in tracking releases and preventing errors in the releasing process. The person in this position should also collect and report on releasing errors and incorporate the data into a continuous improvement and quality assurance process.

Another individual serves as a court liaison with the lower courts. She also attempts to identify individuals entitled to release. Like the previous Quality Control Officer, she operates independently of the booking and release process and maintains her own spreadsheets but she does not perform all the duties listed in this paragraph.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

As was noted in the Ninth Monitoring Report, the documentation of untimely/erroneous releases is not required by an approved policy. As was previously noted, there have now been a few incident reports on erroneous releases. There have still not been any reports on untimely releases. There should be clarification as to who has the responsibility for completing the report.  It was recommended that the Jail Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.  Since she has since resigned, it is now up to the Interim Jail Administrator to do so.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.     The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Non-Compliant**

The corrective measure that was previously recommended to resolve the problem of attorney/client access at the RDC, has never been addressed by the HCDS administration.  It now appears that in C Pod, the old video visitation space (previously recommended as an attorney/client visitation area) may be utilized for mental health office space.  Recognizing that, it is recommended that a vacant area near the control room in each pod be designated for attorney/client visits.  The removal of old floor mounted, stainless steel chair/table combinations, and the installation of free-standing tables and chairs, is the only expense involved.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.     Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

At the time of the May site visit, County IT had created a report that pulls data by field from the incident reports which includes reportable incidents and uses of force. This is the beginning of being able to comply with this provision. Since the time of the site visit, the monitoring team has received the electronic monthly reports. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include much of the information listed in paragraph 107 and 108 below and that would be needed to provide the information needed to inform continuing improvement or quality assurance reports. There continues to be a concern because of the lack of reports or the small number of reports that some

types of incidents are underreported including late releases, use of force, and lost money and property.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securis does not include some critical fields that are in the system but can't be pulled into the spreadsheet. The Grievance Officer manually creates a separate spreadsheet and enters for each grievance the information in the Securis spreadsheet and adds the type of grievance, the date of response and the date of the response to an appeal. The new policy also is to reject grievances that are actually inmate requests and directs inmates to use the inmate request category. A review of some of these indicate that the rejection is not always appropriate and indicates some training on this would be valuable. However, this policy allows a more accurate depiction of grievances. With the new policy, it should be possible to have a useful data base on grievance data. These reports are not yet being used to inform improvement or quality assurance efforts.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

   a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;
   b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
   c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
   d.  List and total number of incident reports received during the reporting period;
   e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

There are two spreadsheets being generated. One has the text of the narrative of the initial incident report and some information. The other spreadsheet does not have the narrative but has some additional information. The spreadsheets now being created are a first step towards being able to generate the reports required by this paragraph. At this time, it does not include all of the information required by this paragraph including information that would be necessary to be fully informed regarding the nature of the incident. Combined, the spreadsheets would have quite a bit of the required information but the information should be accessible in one summary report. Most importantly, neither spreadsheet has an actual summary of the incident. The spreadsheet

112

pulls in the first incident report and not the supplements. The first incident report does not necessarily have important facts. For example, in the case of the death of the inmate in December, 2018, neither the first, nor the supplemental incident reports included the fact of his death. That would be important to know and is in fact required in subsection b. Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate on inmate assault or an inmate on officer assault. Only by reading the narrative of the first report, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:
      a.      Summary of all uses of force, by type, shift, housing unit, and date;
      b.      List and total number of use of force reports received during the reporting period;
      c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**
One of the new spreadsheets has some of this information with respect to Use of Force. The Use of Force incidents are now submitted on an incident report form. This is preferable to separate forms. Again, there is no summary of the use of force in the spreadsheet and there is no listing or totaling of referrals to investigation.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**
As mentioned above, the limitations of the reporting from the Securis system has led the Grievance Officer to manually create a spreadsheet. Neither system can generate a report by location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. At the

present time, there is no management review process in the grievance system. As mentioned above, the Grievance Officer is now keeping an Excel spreadsheet and manually entering information related to grievances. One option would be to expand the manual spreadsheet to include the information required by this paragraph, this should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced maintaining an expanded manual spreadsheet would be a very time intensive process.

110.     Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

   a.     A brief summary of all completed investigations, by type, shift, housing unit, and date;
   b.     A listing of investigations referred for disciplinary action or other final disposition by type and date;
   c.     A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and
   d.     A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

See paragraph 68, above.  The IAD investigator provides a summary sheet reflecting the status of each IAD investigation since 2017.  Hopefully, implementation of the recommendations noted in paragraph 68 will provide the required information.

111.     Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.     Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such

patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

a.   The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

b.   The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

**c.**   The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

d.   The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

e.   The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f.   The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.   Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.     Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

   a.     Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

   b.     Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**

Medical staff are not included in the review of serious incidents. This was discussed in a joint meeting between QCHC staff and command staff during the September site visit. It was decided that the Interdisciplinary Team meetings would be reinstituted and one task of the Team would be to review serious incidents. There is no indication that this has occurred. Medical staff do have independent authority to refer cases of assault or abuse.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.     Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. Hinds County is to be commended for getting the CJCC implemented and continuing its facilitation of those meetings despite a lack of

participation by some key players. This paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI and the monitoring team has recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Since the time of the site visit, the County has informed the Monitor that it intends to hire a staff position for the CJCC. This is separate from the pretrial services director required by the Stipulated Order. This will be a significant step forward in meeting the requirements of this paragraph. The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish this has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping will soon be two years old. This would be a useful activity for the CJCC.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**
As noted above the CJCC is meeting. Not all of the identified agencies have been invited or represented at the meeting. The reported intention is to expand representation after further

development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant to provide technical assistance in developing the CJCC. However, that contract does not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  The County has not renewed the contract with the consultant. The initial contract was narrower than required by this paragraph.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
>  a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
>  b.     Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**
The HCDS has printed a booklet-sized version of the Settlement Agreement, which has been distributed to staff.  In order to improve familiarity with it, the Director of Training should include a segment of the annual in-service program on the requirements of the Settlement Agreement.  Inmates now have access to the Settlement Agreement via the kiosk system. However, the medical staff did not have copies of the Settlement Agreement and did not appear to know of the provisions that applied to them. Similarly, although there is a segment in the orientation training related to the terms of the Settlement Agreement, it does not appear that the officers when questioned are familiar with the requirements. Future monitoring will evaluate the training more closely to determine if it is sufficient to meet the terms of this paragraph.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**
This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert of the monitoring team to develop policies and procedures. A number of draft policies have been provided and at this time, ten policies have been adopted. It does not appear that there is a system in the policy development to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Five policies and procedures have now been adopted and several others have been drafted and circulated. There are many outstanding policies to be written and no estimated completion date. They are seriously overdue at this time.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

The policies and procedures are, at this point, seriously overdue. This paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. This has yet to be fully evaluated. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**

There have been five policies approved by DOJ and adopted by the Sheriff. The five policies are only partially implemented. The policies have not been incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

## COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph.  A self-assessment was not provided prior to the January, May, or September, 2019 or the January, 2020 site visit. This paragraph is now carried as non-compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for

the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities. With the change in administration there was some cause for concern about continued compliance in this area. The position was advertised and there was some discussion of adding the duties of a terminated individual to the Compliance Coordinator positions. At this time, however, the position appears to be continuing as a full-time position and continues to be filled. The Monitor will continue to track this assignment to ensure sustained compliance in this area.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

The practice of providing immediate notifications has improved. A new form for Rapid Notifications is being used in house and externally. While this form requires certain information to be filled in, the narrative is sometime much less informative than the incident reports which were previously provided. (See, e.g. Rapid Notification on 1/21/20 associated with IR # 2000097) The notifications have returned to being provided by email which is helpful. The County has not been providing notification of over-detention and, in fact, is not currently identifying prisoners who have been detained beyond their release date and preparing incident reports.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.