1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                          PLAINTIFF

VERSUS                    CIVIL ACTION NO. 3:16-CV-00489-CWR-JCG

HINDS COUNTY BOARD OF SUPERVISORS, ET AL.        DEFENDANTS



TELEPHONIC STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE CARLTON W. REEVES,
UNITED STATES DISTRICT COURT JUDGE,
APRIL 22, 2020,
JACKSON, MISSISSIPPI


(Appearances noted herein.)

REPORTED BY:

CANDICE S. CRANE, CCR #1781
OFFICIAL COURT REPORTER
501 E. Court Street, Suite 2.500
Jackson, Mississippi  39201
Telephone:  (601)608-4187
E-mail:  Candice_Crane@mssd.uscourts.gov

1    **APPEARANCES VIA TELEPHONE:**

2        FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

3            CHRISTOPHER N. CHENG, ESQ.
             AARON FLEISHER, ESQ.
4            SARAH T. RUSSO, ESQ.
             MITZI DEASE PAIGE, ESQ.
5            SHELLEY R. JACKSON, ESQ.

6

7        FOR THE DEFENDANTS, HINDS COUNTY, ET AL:

            CLAIRE BARKER, ESQ.
8            TONY R. GAYLOR, ESQ.
             JENNIFER RILEY-COLLINS, ESQ.

9

10       ALSO PRESENT:

11           JODY E. OWENS, ESQ.
             VIDHI BAMZAI, ESQ.
12           LESLIE JONES, ESQ.
             WILL BARDWELL, ESQ.
13           SHERIFF LEE VANCE
             SUPERVISOR ROBERT GRAHAM
14           MAJOR RICK FIELDER
             CAPTAIN BRADY BUTLER
15           DAVID PARRISH
             JIM MOSER
16           RICHARD DUDLEY

17

18

19

20

21

22

23

24

25

1        **PROCEEDINGS VIA TELEPHONE, APRIL 22, 2020**

2

3        THE COURT:  Okay.  All right.  Thank you-all for making

4    yourselves available for this call.  Can everyone hear me

5    fine?

6            (Unidentified affirmative responses.)

7        THE COURT:  Okay.  When persons are asked to speak, I

8    would ask that you state your name, so that the court reporter

9    can make an accurate record.  It's important for us to speak

10    at a tone and at a pace at which the court reporter can keep

11    up with us, and always make sure that we all can hear each

12    other.

13        I would imagine we are all in our respective places of

14    comfort, because nobody -- I don't think -- is in the

15    courtroom.  I don't anticipate anyone being in the courtroom,

16    except the court reporter; she's there.  But we're going to

17    have to make sure that we do everything we can do to make sure

18    that she has an accurate record of these proceedings.

19        I know that the public has been authorized or allowed to

20    participate.  I think our system is designed in a way that

21    they can only hear what's going on.  We will not be able to

22    hear from the public, like any other court proceeding.  So I

23    will ask the parties just to make sure that, again, that

24    you're speaking loudly and clearly enough, so that the record

25    can be taken in this case.

```
1          As we discuss the matters for which we're here, if the
2     parties believe that it might touch on a matter that requires
3     a confidential response, please let the Court know.  A
4     confidential response being one that is either -- that might
5     broach on any matter that the parties might contend that it --
6     that it might be confidential, such as, you know, exposing the
7     county's security procedures, or something like that, then let
8     the Court know.  Obviously, we don't want -- if we were in
9     open court, it might be a matter that we could handle at a
10    side bar, and if we need to do a side -- a "side bar" here, we
11    will do so.  We will do so at the appropriate time.
12         So the Court requested that the parties be prepared to
13    discuss -- and I've gotten some written responses, and I
14    appreciate the parties for getting that to us.  But be
15    prepared to discuss what the Court became aware of the other
16    week, that there had been a positive finding among a staff
17    member at the detention center, a positive finding of
18    COVID-19.  And so we want to talk about now that there -- now
19    that the county, or at least the penal system within the
20    county, the prison system, has been invaded, I think it's
21    appropriate, and the Court is appropriate, and the Court is
22    concerned to make sure that the parties, in light of this
23    Court's overall order of monitoring the facility, that we're
24    doing everything that we can do to mitigate any expected
25    damage that might come from that particular infection.  And I
```

1    just want to talk to the parties, and primarily most of my

2    questions, I believe -- I prepared an outline, and most of my

3    questions will likely be directed at the county and the county

4    officials, so that they can inform us of what is being done,

5    what is being considered, and how -- what is the plan to

6    either implement anything that the county will do so -- so a

7    lot of these questions will be directed to the county.  Some

8    of which I have already received some sort of written

9    responses to, and I think DOJ has similarly received those

10   responses.

11        If there is a need at any time for the monitor to step

12   in and speak, you may do so.  If there is any time that the

13   United States believes that it should speak, please do so.

14        So turning to the specific issue of the positive finding

15   there within the county, it's my understanding that there was

16   a correctional officer who tested positive.

17        To the county, do we know that individual's current

18   status?

19        MS. BARKER:  Your Honor, this is Claire Barker for the

20   sheriff's office.  Right now that individual is at home being

21   treated for COVID-19 and that's about all that -- and she also

22   has pneumonia as well, and that's the status as of right now.

23        THE COURT:  Okay.  And so she's still -- I presume,

24   then, she's quarantined?

25        MS. BARKER:  Yes, Your Honor, at home.

1          THE COURT:  Okay.  And I take it since she's still out,

2     there is no suspect -- no expected return date at this time;

3     is that a fair statement?

4          MS. BARKER:  That's a fair statement.

5          THE COURT:  Okay.  And this employee worked at the front

6     desk at which facility?  Was it Raymond, or was it the Jackson

7     work center?

8          MS. BARKER:  It was the Raymond Detention Facility.

9          THE COURT:  Okay.  Do we know the number of her -- well,

10    let me ask you this:  Prior to that person testing positive,

11    was visitation being allowed at the court -- I mean, excuse

12    me -- at the facility, outside visitation from family members

13    or others?

14         MS. BARKER:  No, Your Honor, that was stopped on

15    March 12th.

16         THE COURT:  Okay.  So she would not have had any contact

17    with the public at the detention center after March 12th; is

18    that a fair statement?

19         MS. BARKER:  That's correct.  That's correct.

20         THE COURT:  Okay.  So have we identified -- obviously,

21    you know what employees she would normally come in contact

22    with in performing her duties.  Have we identified those

23    employees with whom she's came in contact with just on her

24    day-to-day job?

25         MS. BARKER:  Yes, Your Honor, we did.  Whenever we found

1    out that the officer was positive -- I'm hearing a feedback.

2    Is somebody else hearing that?

3          THE COURT:  You appear to be breaking up from time to

4    time, but I don't hear any feedback.  Is -- is there -- are

5    you in a room where there are multiple phones on?

6          MS. BARKER:  I am.  But that seems to be a little bit

7    better.  Can the Court hear me now?

8          THE COURT:  Yes, I can hear you fine.

9          Can everyone else hear?  That's the more pertinent

10   question.  Can the United States hear and the monitors?

11         MS. JACKSON:  This is Shelley Jackson, Your Honor.  I

12   can hear Ms. Barker.

13         MS. BARKER:  Okay.  Fantastic.  Whenever we were alerted

14   that this employee tested positive to COVID-19, we made

15   contact with the state epidemiologist, Dr. Byers, and he

16   advised that we should get a list of all employees in which

17   the employee made contact with and any persons within the

18   department for approximately two days before she started

19   exhibiting symptoms.

20         We got a list of those employees, and it was about -- it

21   was 18 employees department-wide just by virtue of her being

22   at the front desk.  And those employees were sent home for a

23   14-day quarantine from the date of exposure.  All of those

24   employees are -- have now returned to work, and none of the

25   employees exhibited any symptoms of COVID-19 who were

1    quarantined.

2         THE COURT:  Okay.  Thank you.  Thank you, Ms. Barker.

3    At the time that these -- I assume these -- I assume, then,

4    these employees were tested under the protocol that has been

5    established by the state currently.  That is, that they

6    were -- they must have been tested possibly at UMC; is that a

7    fair statement or --

8         MS. BARKER:  No, Your Honor.  Per the CDC

9    recommendations and the state epidemiologist, the employees

10   would only be tested if they showed symptoms of COVID-19 while

11   in quarantine.  None of our employees exhibited symptoms of

12   COVID-19 while in quarantine, and so they were not tested.

13        THE COURT:  Oh, okay.  Thank you.  I'm pulling up my

14   notes on something else.  I'm sorry.

15        In light of what I'm calling -- and this might be an

16   inappropriate word, but what I'm calling a breach or a -- you

17   know, where the positive finding has come into the premises.

18   In light of that, what specific measures is the jail taking to

19   prevent COVID-19 from entering the jail?

20        I know you-all are doing -- I take it you-all are doing

21   temperature checks of the employees daily; is that correct?

22        MS. BARKER:  Yes, Your Honor, we are doing temperature

23   checks of the employees daily.  We are also doing a verbal

24   screening of them, and I believe I submitted that employee

25   screening form to the Court in which we ask if they have been

1    around -- had contact with anyone that's tested positive and

2    the other questions that the CDC recommends.

3        You will note that the day that the employee came to

4    work on, I believe it was April 3rd, the day -- and the day

5    that she later went to the hospital that night for a COVID

6    test, her employee screening form did not indicate that she

7    was symptomatic of COVID-19.  She didn't have a fever or

8    shortness of breath or cough or anything like that.  That is

9    something that we are doing is screening all employees.

10       Additionally, we've had other measures put into place, I

11   believe, in mid March.  We've had directives on how we do the

12   new intakes.  We screen new detainees in the sally port.  We

13   also have directives on social distancing.  We have educated

14   the inmates and our employees by putting up posters and flyers

15   from the CDC's website in all three facilities.

16       We also have -- and I submitted this to the Court

17   yesterday -- a COVID-19 response plan that we've put in place.

18   Additionally, there's a worksheet attached to that that has

19   specific responses, what we are doing right now to mitigate

20   the spread.  Additionally, just for record-keeping purposes,

21   we have a point person who is reporting daily to the

22   Department of Health and to the governor's office as to --

23       THE COURT:  Okay.

24       MS. BARKER:  I'm sorry.

25       THE COURT:  Ms. Barker?

1        MS. BARKER:  Yes.

2        THE COURT:  No, no, no, no, I appreciate that.  You're

3    getting ahead of my little outline, --

4        MS. BARKER:  Oh.

5        THE COURT:  -- but that's fine.  No, no, no, those are

6    great responses, responses that the Court would like to hear,

7    but I will get to all those points.

8        MS. BARKER:  Okay.

9        THE COURT:  I did have a question about the

10   questionnaire that -- is this particular questionnaire done on

11   each employee daily when they report to work?

12       MS. BARKER:  Yes, every time they come through the gate.

13   Yes, Your Honor.

14       THE COURT:  Okay.  Let me ask you this.  I know the

15   CDC's original recommendation back in early March -- because

16   the various courts even adopted their recommendation -- asked

17   the particular question, I think at one time, many courts were

18   asking about international travel to specific countries and

19   limited to specific countries.  And here the county's

20   questionnaire says, "Has patient traveled outside of the

21   United States within the past 21 days?"

22       Now that the virus has completely overwhelmed all 50

23   states within the United States and there are several hot

24   spots within the United States, this is a question that might

25   be opened up to the county for DOJ's response, as well as the

1    monitors.  But wouldn't it be as appropriate or more

2    appropriate to ask if you've had any interstate travel within

3    the last 21 days and where that might have been?  Or, you

4    know, now that the virus is fully -- now that all 82 counties

5    in Mississippi are fully engulfed with the virus, and

6    particularly the counties where most of these employees live,

7    I presume Hinds County, should we narrow -- should there be a

8    question that should be asked, at a minimum, about interstate

9    travel?  Which would include travel to a couple of the truly

10   hot spots in the south, that is New Orleans and maybe Atlanta.

11   But should we ask something about whether there has been

12   something more than just international travel?

13        I ask the county's response to that, and if DOJ or the

14   monitors wish to respond, you may do so.

15        MS. BARKER:  Your Honor, yeah, this is Claire Barker

16   again.  I don't know -- I believe we've revised our form a

17   tad.  The form now no longer has a question as to travel,

18   because that was not on the CDC's recommendation.  But it does

19   say, "In the past 14 days, have you had contact with a person

20   known to be identified with COVID-19?"

21        But I think that it would be pertinent about the travel

22   as well, so we can definitely add that to the form.

23        THE COURT:  I know DOJ has had an opportunity to review

24   this form as well as the monitors.  Are there any other

25   suggestions about -- well, I mean, I guess first of all, would

1    it be appropriate to sort of narrow it in that way?

2        And if there are any other additions or revisions to

3    this form that either the DOJ or the monitors would recommend?

4    DOJ first, if there's anything.

5        MS. JACKSON:  Good afternoon, Your Honor.  This is

6    Shelley Jackson.  We -- I don't believe -- have opined about

7    this or any other form.  We'd like the opportunity to review

8    it and speak separately with the monitors and the county, and

9    then we could get back to the Court.  We don't have a

10    suggestive language on that at this time.

11        THE COURT:  Okay.  All right.  And I guess the monitors

12    are agreeable with trying to speak with the parties first and

13    reporting back to the Court?

14        MR. PARRISH:  This is David Parrish.  Yes, Your Honor,

15    that will be fine.

16        THE COURT:  Okay.  Thank you, Mr. Parrish.

17        Now, with respect -- now that it's clear to the Court --

18    now, well, let me ask this specific question.  The one

19    employee who has tested positive so far is the only employee

20    at -- within the correctional system, the detention centers,

21    whether it's the work center, Raymond, or Jackson, or

22    Henley-Young, that is the only staff member who has tested

23    positive?

24        MS. BARKER:  That's correct, Your Honor.

25        THE COURT:  All right.  And that is the only staff

1  person who has actually been tested; is that a fair statement?

2      MS. BARKER:  No, sir.  We have -- we have several

3  different employees who have been tested and that's a part --

4  they've all received negative results, and they have received

5  doctors' excuses to come back.  That statistic is in --

6  contained in our reporting that is given to the Department of

7  Health daily.

8      THE COURT:  Okay.  And what -- you said all of them have

9  tested negative.  Do we know what number of employees, then,

10 have been tested?

11     MS. BARKER:  Approximately, five.

12     THE COURT:  Okay.  Now, I specifically asked about

13 employees.  Has any detainee tested positive or has any --

14 well, has any detainee been tested?  That's the first

15 question.

16     MS. BARKER:  Yes, Your Honor, a detainee has been tested

17 and -- and just one detainee, and it came back negative.  I

18 got it.  I got it.  And then he was -- while -- he was tested

19 while he was in the hospital for a prior injury.  And so there

20 wasn't -- I think he had been in the hospital for

21 approximately two weeks prior to him being symptomatic for

22 COVID-19.  So there wasn't any need to quarantine other

23 inmates, because he was in the hospital whenever he started

24 getting symptoms.  And he was tested at the hospital, and that

25 test came back negative.

1      THE COURT:  Okay.  But he was in the hospital for

2  something separate --

3      MS. BARKER:  Yes, sir.

4      THE COURT:  -- and apart from anything that might have

5  triggered the county to have any suspicion?  You know, a

6  broken -- well, I don't want to suggest that he had anything

7  broken.  But he was in the hospital for something non-related

8  to a respiratory illness?

9      MS. BARKER:  Yes, Your Honor.  And I would like to add

10  for the record, he was in the hospital for something

11  non-related to an injury that occurred at the jail.

12      THE COURT:  Right.  Okay.

13      MS. BARKER:  Okay.

14      THE COURT:  Right.  And only then -- and he was tested,

15  and has he been returned back to the jail?

16      MS. BARKER:  No, Your Honor, he's still receiving

17  treatment for the previous injury at the hospital.

18      THE COURT:  Okay.  Is there a plan -- what is -- is

19  there a plan to have more detainees tested?

20      MS. BARKER:  Not at this time, Your Honor.  If a

21  detainee is exhibiting symptoms, then they will get tested.

22  But right now, we don't have any plans to do a blanket testing

23  of detainees.  In fact, that's not what the CDC or the

24  Department of Health recommends.

25      THE COURT:  Okay.  And that's -- and this is all part of

1    the county's -- is that part of your response plan?

2         MS. BARKER:  Yes, Your Honor.

3         THE COURT:  Okay.  And now we're going to move into that

4    plan.  Okay, Ms. Barker?

5         MS. BARKER:  I apologize for jumping forward.

6         THE COURT:  No, no, no, no, that's absolutely no

7    problem.

8         MS. BARKER:  Okay.

9         THE COURT:  As I tell y'all all the time, my brain, I

10   have to compartmentalize everything and sort of shift things

11   from one thing to the next.  So let's talk about -- a little

12   bit about the response plan that the county has created.  It's

13   my appreciation that there were several members involved in

14   formulating that plan; correct?

15        MS. BARKER:  That's correct.

16        THE COURT:  Okay.  And looking at the various names, it

17   looks like it was all employees of the sheriff's department;

18   is that correct?

19        MS. BARKER:  Yes, Your Honor, it was the sheriff, the

20   undersheriff, chief deputy, the Major Fielder over the jail,

21   all of the corrections captains, as well as our training

22   captain.

23        THE COURT:  Okay.  Now, was there any thought about -- I

24   don't know if the plan itself -- I know as part of the overall

25   order, consent decree that the Court has, I know there's a

1    Criminal Justice Coordinating Council.  Has this plan been

2    provided to that particular council either for informational

3    purposes or for educational purposes or for even their input?

4         MS. BARKER:  Well, I did -- Your Honor, it has been

5    provided to the county attorney.  I mean, I'm sorry, the

6    county administrator, Mrs. Jennifer Riley-Collins, and she is

7    the co-chair of the Criminal Justice Coordinating Committee.

8    Additionally, it has been forwarded to Synarus Green, who is

9    the compliance coordinator as well as our monitors.

10        THE COURT:  Okay.  And I guess that plan has been sort

11   of implemented or adopted?  And if so, when?

12        MS. BARKER:  It has, Your Honor.  This particular plan

13   was adopted recently this -- earlier this week.  However, it

14   does mirror the -- all of the directives that were issued in

15   mid March regarding the intake of employees -- I mean, the

16   intake of detainees and employee social practices and all.

17   However, this plan adds a little bit more meat to the bones of

18   the initial directive.

19        THE COURT:  Okay.  That plan also provides, I think,

20   that the Hinds County Detention Services would bear the

21   primary responsibility of addressing COVID-19 in the jail; is

22   that right?

23        MS. BARKER:  I'm not sure that -- if that's what the

24   plan states.  I mean, yes, we will bear the responsibility of

25   addressing it.  However, we do have a medical provider, and

1    that's outlined in the plan as well; that they will have their

2    own sets of protocol as far as addressing the medical care of

3    COVID-19 patients.

4         THE COURT:  Okay.  Who makes up the detention services

5    team, if there is -- I mean, is there a detention services

6    team?

7         MS. BARKER:  I'm -- are you referring to the command

8    staff of detention services?

9         THE COURT:  Well, I think the plan mentions that, you

10   know, that the detention services division, division services

11   would bear the responsibility of addressing COVID-19 in the

12   jail.  Let me pull it up.

13        MS. BARKER:  Okay.

14        THE COURT:  I think it's on the first page of your plan.

15   If you have your plan before you?

16        MS. BARKER:  I do.  I do, Your Honor.  Your Honor, I'm

17   not sure where it says that.  I'm a little confused by your

18   question.  Can you repeat that again?

19        THE COURT:  I was just asking who makes up the detention

20   services -- who makes up the detention services division?

21        MS. BARKER:  Within Hinds County that is the jail

22   administrator, the assistant jail administrator, all of the

23   facility captains, their lieutenants, their sergeants, and all

24   of the detention officers.

25        THE COURT:  Oh, okay.  Now, one of the -- I guess,

1    again, that plan has been implemented earlier this week, then;

2    is that correct?

3         MS. BARKER:  Yes, Your Honor.

4         THE COURT:  Okay.  All right.  And that's -- and that is

5    what's guiding how the prison's operating under these

6    conditions right now?

7         MS. BARKER:  Yes, Your Honor.

8         THE COURT:  Okay.  Now, I think it's appropriate for us

9    to talk about one of the -- one of the ways that the Court has

10   been informed of -- in reading of what's happening across the

11   country with respect to the introduction of COVID-19 into the

12   facilities, one of the things that law enforcement and

13   correctional folk, I think, for example, even the Mississippi

14   Department of Corrections has now sort of held at bay some of

15   the persons who ought to be in their custody and left them at,

16   I guess, county facilities in an attempt to decrease the

17   inflow of people, I guess, into the system.

18        What is the county -- and this might be directed to the

19   sheriff's department because -- and actually probably the

20   district attorney as well and the rest of the law enforcement

21   entities throughout the county, what are they doing about

22   making sure that the inflow into the detention center is

23   either slowed down, decreased, stopped, or that the inflow is

24   somehow restricted?

25        I guess, obviously, crime is still occurring.

1    Obviously, arrests are still being made.  But is there an

2    attempt on the sheriff or the law enforcement side to -- what

3    is -- what, if anything, is law enforcement doing, or what

4    type of guidance are they following with respect to decreasing

5    the inflow of people who come into the facility?

6         MS. BARKER:  Your Honor, this is Claire Barker again.

7    We are not taking any misdemeanors, except for domestic

8    violence.  We are also -- and DUIs, I'm sorry.  And we are

9    also testing, screening all of the detainees prior to coming

10   in the facility, and if they have a fever or exhibit any

11   COVID-19 symptoms, we are not accepting them.

12        THE COURT:  Has there been any --

13        MS. BARKER:  And --

14        THE COURT:  Go ahead.  Go ahead, Ms. Barker.  I'm sorry.

15        MS. BARKER:  And actually we're very thankful to DA

16   Owens.  He has been working tirelessly on trying to get some

17   of these numbers down, and we are at an all-time low in the

18   facility.  As of today, we have 371 inmates total between all

19   three facilities.  At RDC, there is 220.  At JDC, there is 82,

20   and at the work center, there is 69.  And I believe that we

21   are holding about 17 inmates from MDOC who would be

22   transferred out under normal circumstances.

23        THE COURT:  Do we know how many kids are at

24   Henley-Young?

25        MS. BARKER:  There are 12 at Henley-Young.

```
 1          THE COURT:  Now, let's talk about MDOC inmates that are
 2     housed at your facility briefly.  These are inmates, I
 3     presume, who have had their trial and have been sentenced?
 4          MS. BARKER:  Yes, Your Honor.
 5          THE COURT:  And MDOC -- now, well, do we know how long
 6     each of those persons have remained in your custody since they
 7     were sentenced?
 8          MS. BARKER:  Your Honor, I don't have that.  Yeah, we
 9     don't have that timeline in front of us right now, but we can
10     get that for the Court.
11          THE COURT:  And do you know what authority this MDOC
12     states that it has to force the county to continue to house
13     criminals -- or excuse me -- convicted persons in your
14     detention center?
15          MS. BARKER:  Your Honor, this a very fluid situation.
16     I'm not sure if the governor's executive order covers that,
17     but they have just informed us that they are not going to move
18     any inmates or receive any inmates.
19          THE COURT:  Are they paying -- are they reimbursing the
20     county for housing those individuals --
21          MS. BARKER:  No, Your Honor.
22          THE COURT:  -- because those persons are -- I'm sorry?
23          MS. BARKER:  No, Your Honor.
24          THE COURT:  The circuit courts there have turned over
25     the custody of those individuals to the state, I presume, at
```

1    sentencing.  So I think it would behoove the county to find

2    out on what basis the county ought to be obligated or is

3    obligated to continue to have the custody over people who

4    belong to the state.  Because when a person is sentenced in

5    circuit court, that person is sentenced to the custody of the

6    Mississippi Department of Corrections; at least that's my

7    understanding.

8         MS. BARKER:  That's correct, Your Honor.  And we will

9    definitely look into that.  We don't have authority to keep

10   them anymore, and we will be in touch with MDOC.

11        THE COURT:  Now, you indicated that you're only --

12   you're not accepting any misdemeanors.  You're only -- except

13   for domestic violence and only DUI cases.  I presume based on

14   that answer, then, there is no efforts being taken to arrest

15   persons for revocations, revocation of either parole or

16   probationary matters.  Are there being any arrests on things

17   like that?

18        MS. BARKER:  Okay.  Your Honor, yes, we do have some of

19   those.  It has not been a lot.  I don't have the exact number

20   right now that have been brought in for revocation, but there

21   have been a few that have been brought in for that.

22        THE COURT:  Okay.  In that regard, I realize we've been

23   talking about arrests made by the sheriff.  Obviously, the

24   detention center houses people from, I presume -- and please

25   correct me if I'm wrong -- houses people from all the local

 1    jurisdictions within the county, which will include Jackson,

 2    Clinton, Byram, Utica, Edwards, Bolton, and Terry.  I'm not

 3    sure if there's anybody else, but are those jurisdictions

 4    operating under your same sort of plan, your idea?

 5        I mean, because if somebody commits a crime in Clinton

 6    or Byram, they may get a bond that they cannot meet.  Do

 7    you-all -- does the sheriff's -- are they -- at any time -- if

 8    there is no Byram facility, for example, are those persons

 9    housed by the county?

10        MS. BARKER:  Your Honor, the sheriff would like to

11    address the Court on this matter.  He's had multiple meetings

12    with all the chiefs in those jurisdictions.

13        THE COURT:  Thank you.

14        SHERIFF LEE VANCE:  Good afternoon, sir.

15        THE COURT:  Good afternoon, Mr. Vance.

16        SHERIFF LEE VANCE:  Obviously, we will continue to house

17    all the people we are, you know, bound by law to house.  We

18    are having weekly meetings with all of the sheriffs of those

19    jurisdictions that you just named, and we are in a cooperative

20    mode.  They are working with us on items such as you named,

21    but if we are bound to hold them by law, we certainly will.

22        THE COURT:  Okay.  And I guess -- I mean, do you know if

23    those jurisdictions, I guess, are doing what you sort of

24    recommend, I guess, in, again, trying to limit the inflow?

25    You know, are the municipal judges and/or the justice court

1    judges, are they -- you know, are they setting bond at rates

2    that people can make or trying to do some other thing which

3    would prevent people from having -- from you having to pick

4    them up and put them in the detention center?

5    SHERIFF LEE VANCE:  For the most part, I would say about

6    99.9 percent that's true.  We did have one exception a couple

7    of weeks ago where a Clinton judge had given what we thought

8    was an excessive sentence.  We had our victims' advocate to

9    contact that judge, and that judge released that individual

10   immediately.  So I think that all the parties are working

11   together as far as local agencies, and I'm satisfied with how

12   it's working so far.

13   THE COURT:  Okay.  Thank you.  With respect to those

14   persons who are newly entranced into the detention center,

15   those new arrestees, how are they generally processed now?  I

16   assume sanitation processes are used.  Are those persons given

17   gloves and/or masks or anything?

18   MS. BARKER:  Yes, Your Honor.  Upon arrival, they are --

19   they have their temperature checked, and they are screened in

20   the sally port.  And they are also given masks and gloves --

21   oh, I'm sorry, we're not giving gloves.  We're giving them

22   education on hygiene and ensuring that they have soap and are

23   washing their hands properly.

24   THE COURT:  Okay.  Now, I guess I did ask that the

25   district attorney attend this hearing, because he's part of

1    the Criminal Justice Coordinating Council and obviously he's

2    responsible for at least prosecuting felonies.  And I do

3    understand that there has been a significant decrease in the

4    number of current inmates.  And explain, if you can to me,

5    Mr. DA, is that a -- has that reduction come because, you

6    know, the office has now reevaluated bails or bonds for

7    individuals, or how did that significant decrease occur, and

8    if you had a role in it?  I don't know.

9         MR. OWENS:  Yes, Your Honor.  This is Jody Owens in the

10   district attorney's office.  The reduction in the jail

11   population came from several factors from the very start of

12   our term in office.  The board of supervisors and President

13   Graham have been very vocal about ensuring that we had a

14   constitutionally compliant jail, and most of this that you've

15   seen occur was more in line with the consent decree and

16   litigation before COVID.

17        For example, one of the significant ways that we reduced

18   the population in the jail is by controlling the incoming

19   population as well as the existing population.  So when we

20   look at the population, we divide it in those two categories.

21        With respect to the existing population, we get a daily

22   roster of all individuals who are in the jail, and with the

23   chair of the task force -- you referenced Judge Green's

24   mandate -- we continue to evaluate all those individuals, who

25   is housed, how long they've been in the jail.  One of the

1    significant issues that we faced, Your Honor, was that

2    individuals were in the jail for long periods of time without

3    being indicted, and so we looked at all those factors.

4         And this is exactly what we did with that population.

5    We started looking at the individuals who had been in the jail

6    the longest without indictment and focused on all those

7    individuals.  Secondly, we looked at the bonds to determine

8    could they be reduced?  Had individuals served enough time,

9    and what was their threat risk to the public safety and the

10   county?  And we started working from that list backwards to

11   make sure the individuals who had been there the longest cases

12   were presented to the grand jury that we did have before

13   COVID.

14        With respect to COVID, we didn't -- because we're not

15   having any grand juries and we're not able to have jury

16   trials, we then specifically looked at the bonds to reduce

17   them more for all the nonviolent offenders.  Right now, I

18   believe the jail has less than ten percent of violent

19   offenders.  One of the things we also did, Your Honor, in

20   January --

21        THE COURT:  You said -- I'm sorry, Mr. Owens.  I want to

22   make sure the record is clear.  Less than ten percent of

23   nonviolent offenders?

24        MR. OWENS:  The population is about less than ten

25   percent of non -- I'm sorry -- yes, nonviolent offenders,

1    that's correct.

2          THE COURT:  Okay.  All right.

3          MR. OWENS:  And, Your Honor, those individuals we can

4    move.  The two populations that present the greatest challenge

5    to our office are the 80 -- approximately 80 individuals who

6    are waiting for autopsies to either be completed or available

7    to have trials.  As the Court may know, the state only has one

8    forensic pathologist.  We're working with the new

9    administration, the gubernatorial administration, and

10   non-profits on trying to determine what we can do to move

11   that; that's a significant group.

12         And then you have a second group that the Court may be

13   aware of that are waiting for mental evaluations, and there

14   are bed restrictions, availability at the state hospital.

15   Those groups our hands are largely tied with.  One of the

16   things we did before COVID really hit the county was that the

17   board authorized us to hire an additional pretrial officer for

18   our diversion programs.

19         Your Honor, before this term started for us in 2020,

20   there was only one individual committed to doing so, and

21   frankly when we evaluated the system, if every -- if each one

22   of the circuit court judges tried two cases a week in their

23   criminal terms, they could only get to about 80 individuals in

24   a calendar year, and we're averaging about 150 to 250 per

25   grand jury setting.  So our staff has been instructed that we

1    have to divert as many people as we're prosecuting from the

2    Hinds County justice system in order to right side the system

3    and have a system that's manageable for all the parties at

4    play.  And we've gotten a significant level of support from

5    the newly appointed public defender, Gail Lowery, there as

6    well as each of the circuit court judges.  And that's kind of

7    how we got here.

8         We are concerned, Your Honor.  I would be remiss if I

9    didn't acknowledge that.  We will not have an April grand

10   jury.  We hope to have one in May because of COVID

11   restrictions.  And at that point in time, you might see a

12   slight uptick.  But I am -- but I am -- I would say that the

13   COVID epidemic has given us an opportunity to get completely

14   caught up in our indictments, so when individuals are now

15   arrested and presented to our office, we should be able to

16   indict them in 30 to 60 days, which is significantly a

17   decrease from what the time was.

18        An example that our pretrial program is currently

19   working is that last year our office diverted 72 cases of

20   individuals in our pretrial diversion program.  This year in

21   the first four months, we've already exceeded that number, so

22   we're looking at having a 400 percent increase.

23        So I know the question has been raised, do we think we

24   can continue to have a low jail population when the pandemic

25   is over?  And the answer, Your Honor, I think is yes.  We'll

1    continue to do more diversion programs, more drug court, and

2    we're looking at developing a pre-indictment diversion

3    program, which would be so significant to the population that

4    we're trying to work with here in Hinds County.

5         And the Court also asked the question to the sheriff's

6    office about revocations.  I will say to the extent we do have

7    the media on the phone, I want to be careful what I say.  We

8    have been very selective on the cases that we revoke for

9    parole.  From our perspective, there are -- there are

10   nonviolent cases, particular cases where we don't think the

11   individual is a threat to the public right now, realizing that

12   we're trying to limit the introduction of exposure to the

13   current pretrial detainee population.

14        THE COURT:  Thank you, Mr. Owens.  The diversion program

15   that you're sort of putting meat on, most of those -- is it

16   fair to say most of those are -- you know, would benefit from

17   a diversion program, the drug diversion program, or the drug

18   court that the court has already established?  Or does this

19   also include, like, obviously economic -- I guess some crimes

20   that don't necessarily -- are not violent crimes; right?

21   They're eligible for some pretrial diversion under the

22   statute; is that correct?

23        MR. OWENS:  That's correct, Your Honor.  The current

24   statutes allow for two diversion programs that are currently

25   funded in Hinds County, that being the drug court, which has a

1    cost fee associated with that, and the pretrial program, which

2    is the nonviolent offenses.  What we're trying to develop in

3    our diversion program -- and, Your Honor, it's very

4    preliminary at this stage -- is one that deals with things

5    like life-care skills, conflict-resolution skills, and we can

6    get those cases pre-indictment, because the indictment itself

7    creates a need for an expungement phase.  So we're looking at

8    more things in that component where we can do that immediately

9    upon an arrest.

10          The county has been tremendously supportive in doing

11   that, but it does take staff.  And we're trying to make sure

12   we have programs that offer sliding fee scales in an analysis

13   of individuals who have already been deemed to be indigent in

14   some form or fashion, because we don't want a system that

15   individuals can't afford to get into based on socioeconomic

16   status.

17          But a lot of that is in the workings, and we hope to

18   continue to have this conversation with the Court and all the

19   parties throughout the year as we work toward a better model

20   here in Hinds County.

21          THE COURT:  Okay.  I mean, it's laudable that the

22   population is now below 400, because that gives much more --

23   or at least more wiggle room on some of the other issues that

24   the consent decree is concerned with, I think.  Thank you,

25   Mr. Owens.  I might come back to you with some more questions,

1    but I want to go back -- putting Ms. Barker back in the cold

2    seat.  It's not a hot seat today, Ms. Barker.

3         MS. BARKER:  And I do appreciate that, Your Honor.  I

4    think I've had my fair share of being in the hot seat lately.

5         THE COURT:  Now, I think your report -- and what I

6    learned from the media -- but I also think your report has

7    told me that there is a memorandum of understanding between

8    the City of Jackson and the county with respect to getting

9    some test kits.  I guess the first question is, has the county

10   received those test kits?  And if so, how many?

11        MS. BARKER:  I am going to defer this question to the

12   board attorney, Mr. Gaylor.  I think that he can --

13        THE COURT:  Okay.

14        MS. BARKER:  -- best address the Court.

15        THE COURT:  That's fine.

16        MR. GAYLOR:  Good afternoon, Your Honor.

17        THE COURT:  Good afternoon.

18        MR. GAYLOR:  Yes, we have not received the kits.  We're

19   still in the process of coordinating receipt of those kits.

20   And the -- we've got to forward the actual executed memorandum

21   to the Court.  There was a draft of the memorandum that was

22   forwarded to the Court as of yesterday, I believe.  We'll send

23   the actual -- the one that was actually executed a day or so

24   ago.  But we have not received those kits at this time.  We're

25   still coordinating our receipt of them.

1    THE COURT:  Okay.  And is it like approximately 500, 510

2    or so?

3    MR. GAYLOR:  Yes, Your Honor.

4    THE COURT:  Okay.  And between the county and the

5    sheriff's department or whatever, have you decided, will those

6    500 be used exclusively for the detainees there at the

7    facilities, or will they be some for the detainees, some for

8    the staff, or how will those test kits be used?  Do we know?

9    MR. GAYLOR:  Your Honor, the intention is that the kits

10   would be available for the use of the sheriff's department.

11   THE COURT:  Okay.

12   MR. GAYLOR:  Exclusively for the sheriff's department

13   with regard to their employees, detainees, what have you.

14   That is the intention, is that they would be used for that

15   purpose when necessary.

16   THE COURT:  And "department" would include persons who

17   were not employed or are not employed at either of the

18   facilities, like patrol -- first-responding patrol officers,

19   would it include them?

20   MR. GAYLOR:  They would be made available for that

21   purpose, Your Honor, to the extent the department feels

22   necessary to use them.

23   THE COURT:  Okay.  Thank you, Mr. Gaylor.

24   MR. GAYLOR:  Yes, Your Honor.

25   THE COURT:  Turning back to the jail, I think your

1    report indicated, Ms. Barker, that the sheriff's department

2    has roughly 500 masks at its disposal and about 30,000 gloves?

3         MS. BARKER:  That's correct.

4         THE COURT:  Has there been any attempt to secure

5    additional masks or any ways -- if you've got 300 -- I mean,

6    are these -- I guess the first question, are these masks given

7    to the inmates?

8         MS. BARKER:  Yes, Your Honor, they've all been

9    distributed to the inmates in all three facilities --

10        THE COURT:  Okay.  So --

11        MS. BARKER:  -- and staff.

12        THE COURT:  So now you only have approximately -- you're

13   saying "and staff?"

14        MS. BARKER:  That's how many we have now after the

15   distribution to the inmates and staff.

16        THE COURT:  Oh, okay.  So okay.  So you have 500 left?

17        MS. BARKER:  Yes, Your Honor.

18        THE COURT:  Okay.  Has there been any attempt -- or I

19   guess with respect to these, how -- well, has there been any

20   attempt to secure additional masks and/or gloves?

21        MS. BARKER:  Yes, Your Honor, that is on backorder.

22   We've also worked with the EEOC -- I mean, the EOC to place

23   an order --

24        THE COURT:  That's the Emergency Operations Center?  I'm

25   sorry.

1          MS. BARKER:  Yeah, I apologize, to acquire other

2     additional PPE items, and they are all on backorder right now.

3          THE COURT:  Okay.  And, I guess, are the prisoners and

4     the staff -- I mean, I guess they're issued one mask, and how

5     long are they suppose to use that mask before it is changed

6     out?

7          MS. BARKER:  Your Honor, right now it's until we get

8     more masks that are available, and we can change those out on

9     a regular basis.

10          THE COURT:  Okay.  Now, you indicated earlier,

11     Ms. Barker, now that there's 371 inmates.  But you also

12     indicated earlier, I think, when we were talking about what

13     steps the county is doing to make sure that, you know, they

14     detect early whether or not employees or the detainees

15     themselves are infected by the virus.  You know, you mentioned

16     the sanitation thing and checking of the temperature.

17          I think I also heard you talk about the CDC's social

18     distancing policy.  How do you expect -- how does the

19     sheriff's department expect to enforce or implement a social

20     distancing policy for persons who are detainees?

21          MS. BARKER:  Your Honor, that is something that we have

22     given guidance to our detainees, of course, in the open area

23     situations and the way that some of the jails are set up, some

24     of our facilities are set up, we can't enforce that strictly.

25     But -- but we've stopped all movement between any of the

1    facilities or between any of the pods.

2         THE COURT:  Okay.  And some of the inmates still share

3    cells, right, or do they?

4         MS. BARKER:  Yeah, that's correct.

5         THE COURT:  Okay.  Now, does the county have -- does the

6    sheriff's department have anything in place for quarantine

7    purposes for when a detainee has tested positive and that

8    detainee needs to be isolated?

9         MS. BARKER:  Yes, Your Honor, we do have plans for each

10   facility -- or I'm sorry -- rooms for each facility that will

11   serve as quarantine.  I believe that is in the worksheet.

12   Let's see, I can give you exact numbers.

13        Okay.  Yeah, in the event that we need to isolate

14   someone, we have a total of 104 single-occupancy cells.  At

15   the work center, we have ten restrictive housing units.  At

16   JDC, we have 55 single cells on the third floor, and at RDC,

17   we could use C-4, Pod C-4, which has 27 single cells.

18   Medical, our medical unit at RDC has six, and additionally, we

19   have six booking tanks that we could use for isolation, if

20   needed.

21        THE COURT:  And I presume -- you say all these.  Are --

22   I guess since it sounded like so many of them, I assume some

23   of those spaces are currently occupied by a single-cell person

24   or something; is that a fair statement?

25        MS. BARKER:  That's correct.

1      THE COURT:  Okay.  Now, do you know whether or not CDC

2   or otherwise suggests -- is there any suggestion about how

3   isolation cells should be constructed?  I mean, should it

4   be -- I know many of the jail cells that I saw were just

5   regular cells with bars and all that, that were, you know, I

6   guess there was -- they were -- the doors were constructed

7   with bars and gaps between the bars.

8      Is there any guidance on what a quarantine room should

9   actually look like?  Should it be a closed door, for example?

10  I'm not sure; I'm just asking.

11     MS. BARKER:  Well, Your Honor, there is no specific that

12  I -- I have not seen any specific guidance.  The only thing

13  that I have seen is that it requires to have a toilet and a

14  sink available for proper hygiene and sanitation.  And as far

15  as like any negative-pressure rooms or anything like that, I

16  haven't seen any CDC guidance on that.

17     THE COURT:  All right.  And for hygiene purposes, I

18  presume we have adequate warm or hot water and soap dispensers

19  available for sanitizing -- sanitizing dispensers available to

20  the population?  And when I say "the population," I'm talking

21  about the detention officers as well as the detainees; is that

22  a fair statement?

23     MS. BARKER:  Yes, Your Honor.  We have -- we ensure that

24  soap dispensers and water are available to all detainees and

25  employees throughout all three facilities.

1        THE COURT:  Okay.  Do you allow hand sanitizer?  I know

2   that's been an issue, I think, with respect to MDOC, because I

3   think the regs -- the CDC requires 60 percent of the hand

4   sanitizer -- 60 percent of it being alcohol-based.  And

5   apparently within MDOC -- I think I read that with MDOC that

6   alcohol content is too high and they may have been -- or they

7   may be precluding the sanitizer from MDOC inmates.  Do

8   you-all have -- is there sanitizer available at the detention

9   center?

10       MS. BARKER:  The sanitizer is available to our

11  employees.  However, because efficient sanitizer has to have a

12  high alcohol content, that's not allowed in our facilities as

13  contraband.  We are just using soap and water at this point.

14  We do sanitize the cells, Your Honor.  We have an employee

15  going in and its -- I'm sorry, what?  And spraying it down

16  with bleach and water.

17       THE COURT:  Each cell?

18       MS. BARKER:  Each cell, Your Honor, yes.

19       THE COURT:  Each cell in each unit?

20       MS. BARKER:  That's correct.

21       THE COURT:  And how often is that done, Ms. Barker?

22       MS. BARKER:  That is done three times a day throughout

23  the facility.

24       THE COURT:  Okay.  And with respect to the question

25  concerning a quarantine set up, I think the CDC has provided

1    some guidance on that issue.  And it says -- they say

2    ideally -- ideally, and I know ideally may be reaching for

3    the -- you know, way beyond the moon here.  But ideally each

4    quarantined individual would be quarantined in a single cell

5    with solid walls and a solid door that closes.  That's what I

6    see on their particular guidance, and it may be some other

7    things.  It may be DOJ and the monitors will be able to help

8    us work our way through that.

9         Let's turn now -- and we just have a little longer, I

10   believe.  Let's turn now to how does this COVID-19 affect, if

11   any, how medical care is provided to the detainees?

12        Has the introduction of the virus into the facility, has

13   it impacted in any way the medical care that's made available

14   to each inmate on an -- I guess on a day -- how has it

15   affected how medical care would be provided to the detainees?

16        MS. BARKER:  No, Your Honor, it has not.  What our

17   medical is doing at this moment is if, in the event that an

18   inmate has -- is symptomatic of COVID-19, he will be sent to

19   medical health -- I'm sorry -- Merit Health to be tested.  We

20   were informed that they -- that our medical provider does not

21   test for COVID-19 at the jail.  So that is the current

22   protocol at this moment.

23        THE COURT:  Okay.  And I guess under ordinary

24   circumstances, any care that -- any medical services or stuff

25   that a detainee needs, isn't there a co-pay with that?  Is

1    there a co-pay?  I know at some other facilities there is.  Do

2    the inmates have to pay a fee?

3          MS. BARKER:  I think that the county could answer that

4    question.

5          MR. GAYLOR:  We'll get the -- we'll make a final

6    determination of that and get right back with you.

7          THE COURT:  No.  Well, let me ask you under current

8    procedures, is there a co-pay for the inmates?

9          MR. GAYLOR:  No, not that we're aware of.

10         MR. GRAHAM:  The answer is no.  The answer is no.

11         THE COURT:  Oh, okay.  Okay.  All right.

12         THE COURT REPORTER:  This is Candice Crane.  Who was

13   just speaking?

14         THE COURT:  That was Mr. Gaylor, and I believe

15   Mr. Graham; is that correct?

16         MR. GRAHAM:  Yes, sir, Your Honor.

17         MR. GAYLOR:  Yes, Your Honor.

18         THE COURT REPORTER:  Thank you.

19         THE COURT:  Okay.  Mr. Graham said "no," and Mr. Gaylor

20   was the one said, "I don't think" -- well, we'll have to find

21   that out.  I'm sorry.  Thank you, Ms. Crane.

22         I know we have scheduled a status conference late next

23   month, just our regular status conference on the consent

24   decree.  But has there -- has there been a -- in light of

25   COVID-19, has there been a work stoppage at all on some of the

1   things that the jail was trying to get done?  In particular,

2   the repair of the doors?

3       MS. RILEY-COLLINS:  Your Honor, this is Jennifer

4   Riley-Collins, county administrator.  No, sir, there has not

5   been a work stoppage at all.  We are moving forward with our

6   consultants and contractors, all of our vendors, and getting

7   all of the repairs at the jail made.

8       THE COURT:  Okay.  Returning to the data, I guess the

9   county -- I guess the jail is collecting data, and I think I

10  heard you, Ms. Barker, say that data is turned over to the --

11  I think you said the governor's office and the state

12  Department of Health or at least one or the other; is that

13  correct?

14      MS. BARKER:  That's correct, Your Honor.  It's directly

15  to the Department of Health, and that is shared with the

16  governor's office.

17      THE COURT:  Okay.  Is that data made public?  I mean, is

18  it made available to the public, or do you rely on the

19  Department of Health and the governor's office to make it

20  public?

21      MS. BARKER:  The data that we provide the Department of

22  Health is not made available to the public, because it has the

23  names of the employees who have tested positive.  And so

24  that -- we couldn't make it public, but I believe that if

25  you -- I'm not sure what protocols the Department of Health is

1    following as far as making those statistics public.

2         THE COURT:  Okay.  And its just -- more than just the

3    employees.  Once a person who is a detainee tests positive,

4    that information, too, would be turned over to the governor

5    and/or the Department of Health; correct?

6         MS. BARKER:  Yes, Your Honor.  The numbers that we are

7    collecting right now, it is the number of employees that have

8    tested positive, the number of employees who have a pending

9    COVID-19 test, and any number of deaths.  And it's the same --

10   the same statistics we're collecting on the detainee side as

11   well, anyone who has tested positive, any detainee who has a

12   pending COVID-19 test, and any deaths.  But that

13   information --

14        THE COURT:  I'm sorry, Ms. -- go ahead, Ms. Barker.

15        MS. BARKER:  That information is also shared with our

16   compliance coordinator, so in the event that he wants to

17   update any of the other monitors as to our collection efforts,

18   he can do as he sees fit.

19        THE COURT:  All right.  And I think the monitors are in

20   the process -- as you know, they come do their quarterly or

21   however often inspection and stuff.  I think they may be

22   attempting to do it remotely.  We will still have our

23   scheduled status conference.

24        Obviously, if there is another positive finding or

25   the -- or the jail has to do something with its protocol or

1    implementing or moving through its protocol, I would ask the

2    county to please notify the monitors just as soon as you

3    receive notice of it.  Obviously, the monitors would need to

4    know, and, of course, I suspect DOJ would want to know, as

5    will the Court.  But I'm concerned about the monitors knowing

6    even before the Court may find out.

7         Let me ask the monitors if there are any questions or

8    concerns or any things that -- points which you think that the

9    Court should query about over this particular call?

10        MR. PARRISH:  Your Honor, this is David Parrish.  I

11   don't have any specific things.  You've been very

12   comprehensive in covering a lot of important issues.

13        I'll just throw two things out.  One, as a retired jail

14   administrator, it really bothers me to see state prison

15   systems all over the country putting a freeze on accepting

16   people from county jails.  Jails don't have the option to say

17   we're not going to take anybody more at booking.  And why in

18   the world can they just shut the door?

19        To make matters worse, there are some jurisdictions, and

20   apparently Mississippi is one of them, where they don't even

21   take back people that are their own prisoners who have been

22   brought back to a county for a court hearing.  And my

23   understanding is that two of the nine people that are sitting

24   in the Hinds County jail system fall into that category; they

25   were state prisoners in the prison system, they were brought

1    back to Hinds County to have a hearing, and now they're stuck

2    there.  It just doesn't seem fair.

3        The other issue I throw out, when we look at the -- at

4    the news and what's happening around the country, it's kind of

5    scary to see that nationwide, we really don't know what the

6    problem is, because we haven't tested our way into it to see

7    what's really going on.  You can't expect what you don't

8    inspect.  And in Ohio day before yesterday, they reported on

9    something which was kind of mind-boggling.  At the Marion

10   Correctional Institution in Ohio, which holds about 2,400

11   inmates, the Ohio Department of Corrections decided to test

12   every inmate and every employee.  And they found, to their

13   horror, that 73 percent of the inmates, over 1,800 of them,

14   tested positive.  Many were not showing signs of it.  But when

15   they actually did the test, the numbers were amazing, and over

16   a hundred of their staff also tested positive.

17       Those are really scary figures, and part of the problem

18   that we have everywhere.  Not just here, but everywhere, is

19   that we have tested so very few people in the community and

20   certainly within our facilities.  This is the first time that

21   I've seen a just blanket testing of everybody in a facility,

22   and those numbers were just absolutely scary.

23       So I'm afraid that's the kind of thing that's going to

24   start surfacing more and more around the country as there's

25   more testing done.  I think we're going to discover an awful

1       lot more, so that's my bad news for the day, sir.  I'm sorry.

2            THE COURT:  Okay.  Thank you, Mr. Parrish.  And that's

3       very helpful.  I had heard or read about Ohio.  I had also

4       read what happened in Arkansas just the other day as well.

5            MR. PARRISH:  Yeah.

6            THE COURT:  There was -- I think they -- it was one

7       inmate who tested positive on one day, and by the time -- I

8       think within 24 or 48 hours, there were dozens who tested --

9       when I talk about dozens, I'm talking about dozens, who

10      ultimately tested positive within a matter of 24 or 48 hours

11      and it could very well -- obviously, all those folks probably

12      had it at the time the initial positive was found as to that

13      one inmate, anyway.

14           I am concerned about MDOC refusing to receive its

15      inmates.  If, for example, there is an inmate who's in the

16      custody of MDOC, and this Court has a criminal matter

17      involving that inmate, this Court would send a writ.  That

18      writ would require that that person be brought to Madison

19      County Detention Facility where the US Marshals in our

20      district house our inmates.  Could be called here for a

21      particular reason, to testify, to be charged, or sentenced on

22      a case that involves that particular inmate.

23           But once we are through with that inmate, he's returned

24      to that facility from which he came.  That writ is no longer

25      there.  I don't think there's a mechanism in place which would

1   require us to continue to hold an inmate who is released from

2   our detainer and who is currently in the custody of the

3   Mississippi Department of Corrections.  So I think the county

4   would be well within their right to consult with the state

5   attorney general's office, the Mississippi Department of

6   Corrections, and the governor's office to find out why it has

7   to hold persons in their facility who don't belong to them.

8        And for that reason, this Court will likely enter an

9   order for the Mississippi Department of Corrections to answer

10  that specific question at our status conference hearing or

11  before our status conference that is set for late May.  I just

12  don't see a basis -- and I could be -- you know, maybe there

13  is something in state law that might require it.  There may be

14  an executive order by the governor.  There may be something in

15  place to say that local jurisdictions are required to house

16  inmates in the custody of the Mississippi Department of

17  Corrections.

18       But because this consent decree is in place, I want

19  advise of that formally by the Mississippi Department of

20  Corrections, or whoever it is that can tell me that particular

21  answer.  So I will likely have that question and hopefully

22  will have the answer before our next status conference.

23       I know I've done a lot of talking today.  But I'm going

24  to ask DOJ, is there anything about the current consent

25  decree, about the steps that have been taken by the county in

1    implementing its COVID-19 response?  Is there anything that

2    the Department of Justice has some concern with or some

3    questions about?

4         MS. JACKSON:  Thank you, Your Honor.  This is Shelley

5    Jackson from the Department of Justice.  There's just a couple

6    of things.  We have been in communication with the county and

7    the sheriff's department probably since mid March about these

8    ongoing issues.  I just wanted to let the Court know that as

9    we are aware, as the Court is, that the next monitoring tour

10   would have taken place during the week of May 18th.

11        Periodically, the parties have an all-parties call, and

12   in that last call, we flagged for the defendant that there may

13   be a need, as the Court alluded to, to gather information

14   through alternative means in the event that through

15   stay-at-home orders or other circumstances it's not advisable

16   to travel to be there for an in-person tour.

17        So we've had some initial conversations with members of

18   the monitoring team about how to gather the information,

19   including through document review or phone or video

20   interviews, and so we're hoping to finalize those

21   conversations and work with the monitors to discuss these

22   options with the defendants.  So that is in process.

23        We appreciate the information that we have received from

24   the defendants, including the submissions that the Court was

25   copied on last night.  One question that I had or I wanted to

1      confirm is, I thought Ms. Barker indicated that the compliance

2      coordinator, Mr. Green, would be able to share with the United

3      States and the monitoring team the daily reports or statistics

4      that are sent to the state.  And I just want to confirm that

5      that's true, that I heard correctly?

6           MS. BARKER:  Yes, he's able to share that.  Of course,

7      if there's any names that are contained in the report, we

8      would just ask that they be redacted.

9           MS. JACKSON:  Okay.  We can make -- you know, talk about

10     that afterwards, but it would be helpful for us to stay on top

11     of that information.  So I really appreciate that, Claire.

12          MS. BARKER:  Okay.  No problem.

13          MS. JACKSON:  I think that's all from the department,

14     Your Honor.

15          THE COURT:  Okay.

16          MS. JACKSON:  Thank you for giving us this opportunity

17     to get additional information.

18          THE COURT:  Okay.  One thing that I failed to mention in

19     our -- in my long outline of things that I was looking at, and

20     I know it's going to come up in the next monitors' report, but

21     I am aware of the steps that the county has already taken.

22     But it concerns staffing, and one thing I alluded to was the

23     reduction in the number of inmates might affect the consent

24     decree in some way.

25          But how is the county coming along in getting to the

1    appropriate level of staffing for the detention centers?

2    Where are we in that process?  I know you-all have made -- I

3    know you've taken out ads in the paper, and I know you talked

4    about it on the radio.  I know there have been radio ads, and

5    I know persons that even talked about it on the radio.  How

6    are you coming in trying to fill those vacancies?

7        MS. BARKER:  Okay.  Your Honor, hi, this is

8    Claire Barker.  In March, we graduated 18 detention officers.

9    We currently have about 42 individuals waiting to start

10   another class.  Right now because of social distancing

11   measures and all, it's not possible.  We've, I guess, put on

12   hold our classes, so that's where we are right now with that

13   process.

14       THE COURT:  And to the extent -- and I think I read in

15   your report to me, to the extent that you need staffing

16   assistance, there's a plan in place to use other law

17   enforcement personnel within the sheriff's department to fill

18   in the gaps where needed?

19       MS. BARKER:  That's correct, Your Honor.  We've

20   identified 40 law enforcement officers on the operations side

21   who have detention certification and detention experience.

22   The plan is to assign those officers where needed, and we do

23   appreciate the monitors helping us come up with that plan.  In

24   the event that we run through all of those 40 and we need to

25   have other officers, we will conduct a training, however

 1     appropriate.  We'll see how we have to do that.  It might be

 2     via Zoom or some other conferencing method if we all can't get

 3     in one room to train them, and so that's the plan right now.

 4          THE COURT:  Okay.  Let me go off the record for a

 5     second.

 6                    (A brief recess was taken.)

 7          THE COURT:  Okay.  I'm back.  I do have one other

 8     question for the county and its plan with respect to medical

 9     issues.  And obviously in light of what Mr. Parrish mentioned

10     about the Marion Correctional Facility and what I've read

11     about the facility up in Arkansas, if there is a significant

12     breach where we find that there are many positives, and not

13     only that, those positives begin to show symptoms, has the

14     county -- will the county -- has the county implemented a plan

15     or has the county thought about a plan that would make sure

16     that those folk are treated expeditiously?

17          What happens -- it may be a lot of quarantining that may

18     be going on, but it also means that would likely require some

19     immediate attention to several people at one time.  Is there a

20     plan?

21          I mean, it may be that there is a plan in place already

22     for multiple injuries that might occur at the facility that

23     requires attention and all that.  I don't know.  But is there

24     anything in place which would account for that type of

25     concern?

1          MS. BARKER:  Your Honor, we have -- like I said earlier,

2     we have about 104 quarantine cells, if needed.  In the event

3     that there are a lot of -- there's like a mass outbreak of the

4     coronavirus, I mean of COVID-19, those inmates will -- I don't

5     want to speak to our medical provider's protocol, but our

6     protocol is that they will be sent out to a medical facility

7     for testing.  And we do have the capacity to quarantine and

8     isolate other inmates who may have been exposed, if -- if they

9     are indeed positive.

10          THE COURT:  Okay.  All right.  Well, counsel, I

11     appreciate you-all making yourselves available at this time

12     for this particular call.  I thank all those who have appeared

13     on behalf of the county and the employees and those persons

14     who are responsible for carrying forward the obligations and

15     the duties of the county.

16          I thank my monitors for being on this call, and I thank

17     the district attorney, who is not a county officer.  I realize

18     that.  He's a state officer, and I appreciate him for coming.

19     I appreciate the work of the Criminal Justice Coordinating

20     Committee, and I do, again, say it is laudable and commendable

21     that these numbers of detainees are hovering below 400.  And I

22     realize, you know, in a matter of a day or two that could jump

23     up significantly based on other things that might be

24     occurring.

25          And I do thank the lawyers for the Department of Justice

 1    for being a part of this call.  I know that the parties are

 2    continuing to talk to one another, exchange information

 3    between one another to make sure that the terms, conditions,

 4    and the spirit of the consent decree are complied with.  And I

 5    would just encourage you-all to continue to work cooperatively

 6    with one another and utilize the monitors to get to the point

 7    where you can do things through agreement.

 8         I know that you have upcoming spot checks of the

 9    facilities, or whatever you-all do on an ongoing basis.  And I

10    do realize it's going to require many of the stuff to be done

11    remotely.  I just ask that people or persons cooperate as much

12    as possible, to the extent possible, and continue to carry

13    forward the terms and conditions, as I said, in the spirit of

14    the consent decree.

15         That is all that I have.  Again, I thank you-all for

16    making yourselves available, and I do hope each of you remain

17    safe, you and your families.  Each of you remain safe, and

18    each of you remain vigilant as we proceed forward in what --

19    this new world that we're facing.  Thank you so much.  This

20    concludes all that the Court has.

21    ****************************************************************

22

23

24

25

**COURT REPORTER'S CERTIFICATE**

I, Candice S. Crane, Certified Court Reporter, in and for the State of Mississippi, Official Court Reporter for the United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS the 4th day of May, 2020.

/s/ Candice S. Crane, CCR

Candice S. Crane, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov