<pre>
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                         NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                         PLAINTIFF

 5   VERSUS                        CAUSE NO. 3:16-cv-00489-CWR-JCG

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                     DEFENDANTS
 7

 8

 9              STATUS VIDEOCONFERENCE PROCEEDINGS
             BEFORE THE HONORABLE CARLTON W. REEVES,
10               UNITED STATES DISTRICT COURT JUDGE,
                         JUNE 26, 2020,
11                    JACKSON, MISSISSIPPI

12

13                 (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
</pre>

1   **APPEARANCES VIA VIDEOCONFERENCE:**

2       FOR THE PLAINTIFF:

3           CHRISTOPHER N. CHENG, ESQ.
            AARON FLEISHER, ESQ.
4           SARAH T. RUSSO, ESQ.
            MITZI DEASE PAIGE, ESQ.
5           SHELLEY R. JACKSON, ESQ.

6       FOR THE DEFENDANTS:

7           CLAIRE BARKER, ESQ.
            TONY GAYLOR, ESQ.
8
        ALSO PRESENT:
9
            ELIZABETH SIMPSON
10          DAVID PARRISH
            JIM MOSER
11          RICHARD DUDLEY
            SHERIFF LEE VANCE
12          UNDERSHERIFF ALAN WHITE
            CHIEF DEPUTY ERIC WALL
13          WARDEN RICK FIELDER
            SHENIKA FIELDS
14          SYNARUS GREEN
            KEITHFER ROBINSON
15          WILL BARDWELL
            DORIS COLEMAN
16

17

18

19

20

21

22

23

24

25

1                    **TABLE OF CONTENTS**

2      Style and appearances................................... 1-2

3          By Ms. Simpson.......................................  6

4          By Dr. Dudley........................................  8

5          By Mr. Parrish....................................... 13

6          By Ms. Simpson....................................... 20

7          By Dr. Dudley........................................ 26

8          By Mr. Moser......................................... 36

9          By Mr. Cheng......................................... 54

10         By Sheriff Vance..................................... 61

11     Court Reporter's Certificate.............................71

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **PROCEEDINGS VIA VIDEOCONFERENCE, JUNE 26, 2020**

2

3          THE COURT:  So Mr. Cheng is here for the government,

4     along with Aaron -- you said Aaron Fleisher?

5          MR. CHENG:  Yes.

6          MR. FLEISHER:  Yes, Your Honor.  Thank you.

7          THE COURT:  Okay.  And I'm sorry.

8          MR. CHENG:  And Sarah Russo.

9          THE COURT:  Sarah Russo, okay.

10          MR. CHENG:  Shelley Jackson.

11          THE COURT:  Okay.

12          MR. CHENG:  And with the U.S. Attorney's Office, we have

13     Mitzi Paige.

14          THE COURT:  Okay.  And who's on for Hinds County?

15          MR. GAYLOR:  Right now we have Tony Gaylor here, Hinds

16     County Board of Supervisors' attorney.  We're waiting for

17     Claire Barker who is the attorney for the sheriff's department

18     who will be providing vital information to this call.

19          THE COURT:  Okay.  I see Ms. Barker.

20          MR. GAYLOR:  Okay.

21          MS. BARKER:  Hi.  And Claire Barker on behalf of the

22     Hinds County Sheriff's Office.  Hi.  And in here with me, I

23     have Lieutenant Childs, Undersheriff White, Sheriff Vance,

24     Major or Warden Fielder, Chief Deputy Wall, and our new PREA

25     coordinator, Ms. Sheena Fields, (phonetically) who is also

1   doubling as our COVID response person.

2        THE COURT:  Okay.

3        MS. BARKER:  I'm sorry.  And our Human Resources

4   Director, Doris Coleman.

5        THE COURT:  Okay.  Let me make sure the court reporter

6   got those names.  Madam Court Reporter, did you get everyone?

7        THE COURT REPORTER:  Yes, sir, Judge.

8        THE COURT:  Okay.  All right.  And --

9        MR. GREEN:  Synarus Green is also on, Your Honor.

10        THE COURT:  Oh, thank you, Mr. Green.

11        Anyone else from the county, Mr. Gaylor?  I heard all

12   those people from the sheriff's department, and I heard

13   Mr. Green.  Anyone else from the county with you?

14        MR. GAYLOR:  No, Your Honor.

15        THE COURT:  Okay.  Thank you.  And my monitors are here.

16   Could you identify yourselves, please, for the record?

17        MS. SIMPSON:  Yes, Your Honor, this is Lisa Simpson, the

18   monitor, and also on is Dave Parrish, Dr. Dudley, and Jim

19   Moser.

20        THE COURT:  Okay.  Again, thank you-all for making

21   yourselves available.  I know we're in this virtual sort of

22   setting here, and I'll remind the parties that the public does

23   have access to this call I think.  I don't know how many

24   members of the public chose to participate through telephone,

25   but that line is open for the public.  So let me begin --

1    well, let me -- I think we were supposed to have this call

2    back in May.  Obviously because of the situation and the

3    condition we're in here in Mississippi and throughout the

4    country, that was rightfully delayed, and I'm not sure how

5    much you've been able to -- I'm not sure how much you've been

6    able to do in light of our COVID situation.

7         I do know the monitors have not been able to travel,

8    have not been able to come onsite, but I understand that there

9    have been talks, communications, review of documents, and all

10   of that.  So we're going to do this like we're -- like we've

11   done in court.  I would like for the monitor to bring us up to

12   speed, and I realize the monitors, I don't think, have

13   submitted a report from back when -- a status report that we

14   would typically get, and that is completely absolutely

15   understandable with, again, all that we're facing.

16        One thing I would request is that everyone mute their

17   phones or their laptops unless you're speaking, so that we

18   won't get any feedback when the person who's designated to

19   speak will be speaking.  So I guess I'll turn it over at this

20   point to Ms. Simpson.

21        MS. SIMPSON:  Thank you, Your Honor.  We had a remote

22   site visit, and that took place the week of June 8th.  It was

23   delayed from the May date, because we wanted to get quite a

24   few documents to review that we would typically review onsite.

25   But all those documents had to be scanned in and then made

1    available to us electronically.  So that -- and, of course,

2    all of that was going on in the midst of the COVID virus.

3       But we did get quite a few documents.  We've reviewed

4    those prior to setting up phone conferences and Zoom meetings.

5    We spent about three days interviewing people in Hinds County

6    and at the detention centers.  Some of them, Zoom.  We were

7    able -- obviously we couldn't tour the facility, and the

8    physical plant is a big part of the focus.  But the Benchmark

9    people, the contractors that are doing a lot of the renovation

10   and repair work, had a video that they were able to show us,

11   particularly of C-Pod, which is where the most of the

12   renovations are.

13      So it actually went remarkably smoothly.  There were

14   some things that really we just couldn't do remotely the same

15   as we would do onsite, but it actually went more smoothly than

16   I anticipated.  And I think we got more information than I had

17   anticipated.  So -- and we had great cooperation from the

18   county and the sheriff's office in making that happen.  People

19   were available when they were scheduled to be, and   the --

20   the technology worked.  We were even able to interview some

21   inmates, which seems like it would be challenging.

22      So what I would like to do for the report -- and I

23   thought Your Honor would probably be interested in the

24   situation with the virus.  And Dr. Dudley has been in frequent

25   contact with the medical staff and can provide an update on

1    that.  It is a situation that seems to be changing and

2    unfortunately growing daily.  So we -- our information may not

3    be entirely up to date, and I'm sure Ms. Fields as update us

4    as well.  So I'd like to turn it over to Dr. Dudley to provide

5    an update on the COVID situation.

6        THE COURT:  Okay.  Thank you.  Dr. Dudley, you may

7    proceed as you wish.

8        DR. DUDLEY:  I'd like to start mentioning that the

9    monitoring team has over time raised concern of improving the

10   communication between the admin -- the security

11   administration, the medical contractor in some sort of ongoing

12   way.  Obviously, this COVID situation has -- we increased the

13   need for that improved communication between security and

14   medical and better communication in general would be helpful

15   in this regard.

16       Next, I am updated on the results of the Department of

17   Health testing and that the -- there were 230 inmates that

18   were tested, but that left actually a population of about 146

19   that were not tested during that -- that round of testing.

20       Out of that round of testing, there were 12 inmates who

21   had tested positive, keeping in mind that there were five

22   inmates who had been previously tested before the Department

23   of Health testing.  Two of whom tested negative.  Two of whom

24   tested -- three of whom tested positive.  One eventually ended

25   up being hospitalized in relationship to COVID, and I just

1    would point out for the later part of this discussion that he

2    had other high-risk factors that made him even all the more

3    vulnerable to complications of the COVID-19 infection.

4         So the -- the next point that we're concerned about, of

5    course, is contact tracing, tracing inmates who had been in

6    contact with those tested positive or had been in contact with

7    any corrections officers who had tested positive.  The -- this

8    is, I guess, a particular concern for the number of inmates

9    who refused testing at the time of the Department of Health

10   testing.

11        We're particularly concerned about unit B3.  The -- on

12   three (AUDIO GAP).  Twelve tested positive at the time of the

13   Department of Health testing were on B3.  And of the 41

14   inmates on three at the time, 18 of them were amongst those

15   who refused testing, so we don't really know what's going on

16   with them.  The fact that they work on the unit with, like I

17   said, eight of the 12 who had tested positive.

18        So we -- we are anxious to hear whether there is (AUDIO

19   GAP) for contact tracing and what the plan is and what the

20   thoughts are depending on the outcome of what that plan would

21   be, so whether there's going to be an attempt to try to

22   encourage those who refused testing the first time around

23   (AUDIO GAP) or not, the results of those testing, what plans

24   are in place.  If people continue to refuse to be tested, how

25   are they handled?  What is the plan to increase the compliance

1    with wearing masks and taking (AUDIO GAP) from those units, et

2    cetera, et cetera.  So I have not heard of what the plan is,

3    and maybe we'll hear that today for contact tracing.

4         The individuals who (AUDIO GAP) during the DOH testing

5    were -- when the results were back, they were removed from

6    their units.  They -- six of them were placed in a room in the

7    booking area.  The other six were placed in the room together

8    in medical.  We are concerned -- we were concerned about those

9    conditions and having them all together like that in those

10   rooms, which were not for long-term housing purposes.

11        However, it's my understanding that they were moved to

12   JDC, and they're now being there as of last night.  So I hope

13   we will be hearing an update with regard to that today as

14   well.

15        With regard to protocol for -- medical protocol for

16   monitoring those who have tested positive, we've reviewed

17   that.  The -- the every four-hour monitoring for temperature,

18   other systems of progressing disease seems to be well thought

19   out.  I reviewed records for those who had previously tested

20   positive to confirm that four-hour monitoring was going on and

21   the results of that monitoring adequately recorded.

22        With the one individual who I think had to be

23   transferred to the hospital, it was -- he was transferred at

24   the first sign of any (AUDIO GAP) in the information that was

25   being gathered, so he was sent to the hospital in a (AUDIO

1    GAP) fashion.  So we're, at least at present, satisfied with

2    protocol for monitoring and its implementation to date.

3        I have asked that the move of the positive individuals

4    to JDC -- whether there was adequate nursing coverage at the

5    same level that had been happening at Raymond, and it appears

6    that there is adequate nursing coverage to address that.

7        So I guess ultimately the concern is what we're going to

8    do to follow up on those who refuse testing who are still in

9    the general population who have been potentially exposed to

10   those who had been tested positive at the time of the

11   Department of Health testing.

12       The other question is the protocol -- return to work of

13   officers who had tested positive and some clarity on the

14   protocol for that.

15       THE COURT:  All right.  I do have one question with

16   respect to -- obviously, I think Hinds County is taking the

17   lead on testing inmates.  I'm not sure if -- well, I know at

18   MDOC, they certainly have not tested the percentages of people

19   that they've tested here in Hinds County, and that may be

20   representative throughout the state.  So I do know that there

21   were -- have been a high percentage of the inmates who were

22   tested, and I think that was because of the board of

23   supervisors made monies available for the particular test.

24       But I do understand there were some inmates who refused

25   to be tested.  And if that's -- and if I'm mistaken in that

1   understanding, please let me know, but I understand that there

2   were some inmates -- I guess, were the tests -- is the testing

3   protocol optional, or could they have a legitimate right not

4   to be tested in the minds of the Hinds County officials who

5   are administering the tests?

6        MS. BARKER:  Your Honor, this is Claire Barker for the

7   sheriff's office.  At this time, the Department of Health,

8   Mississippi Department of Health actually came in and

9   administered the testing, and they had nurses from the

10  National Guard that were helping administer the tests.

11       It was all voluntary.  We didn't feel like we could

12  force any inmate to take the test, and the test is kind of

13  invasive and that lends to security issues and medical issues

14  that -- that we didn't feel that, you know, were -- that we

15  should broach at this time.  So, yes, there are some inmates

16  who did refuse.  Those inmates are asymptomatic, or they're

17  not exhibiting any symptoms of COVID.  And they have been --

18  excuse me one moment, Your Honor.

19       Okay.  And -- and they are still in the unit, and they

20  have been asked to wear masks and continue to social distance.

21  And we are still checking their temperatures.

22       THE COURT:  Okay.  For those persons who become

23  symptomatic, the ones who start showing signs, are they

24  immediately tested even though one may object to it?

25       MS. BARKER:  Yes, Your Honor.  We haven't had any inmate

 1    object to the testing who was exhibiting symptoms.

 2         THE COURT:  Okay.  All right.  Dr. Dudley, that's all I

 3    had.  I mean, that was the only question that came to my mind

 4    with respect to your report, and I appreciate what you've done

 5    here.

 6         Ms. Simpson, I return to you for the order or priority

 7    you think we ought to move in.

 8         MS. SIMPSON:  I'm sorry.  What was --

 9         THE COURT:  Oh, I'm sorry.  I return to you, whoever you

10    designate to go next.

11         MS. SIMPSON:  Okay.  Thank you.  Yes, I was going to ask

12    Mr. Parrish to go next and give us the report on, essentially,

13    corrections operations in the facility itself.

14         MR. PARRISH:  Thank you.  Good afternoon, Your Honor.

15         THE COURT:  Good afternoon, Mr. Parrish.

16         MR. PARRISH:  I'm going to start out by talking about

17    staffing.  It's some good news for a change.  During our

18    remote site visit as of June, we had 215 staff in detention.

19    That's up from 204 in January.  We have 25 more that started

20    recruit training on June the 22nd just this past Monday.

21         The background screening officer that I had talked to

22    has an additional 40 candidates to review.  That doesn't mean

23    there's going to be 40 qualified, but that's the largest

24    number I've seen for him to review.  And he attributes this

25    significant increase in applicants to the change of

1    administration.  He said after Sheriff Vance took office,

2    applications suddenly increased dramatically, particularly for

3    detention officers, and this was in spite of the fact that

4    they've had only one recruiting event during the past six

5    months.  So these are encouraging numbers from what we have

6    seen in the past.

7        There were a number of key promotions and specialty

8    assignments that I'm just going to briefly cover.  Some of

9    these are included in the stipulated order.  And in February,

10   the previous jail administrator retired.  She was replaced by

11   Major Rick Fielder on an interim basis.  Captain Travis Crane

12   was designated as the interim assistant jail administrator,

13   and Captain Marcus Taylor became the interim captain of the

14   Raymond Detention Center.  All three were elevated to

15   permanent status on June the 1st.

16       In April, Miioka Laster was promoted and designated as

17   the new, full-time fire safety.  He has an impressive

18   background and has been a Jackson Fire Department officer for

19   15 years, so well qualified for the position.

20       THE COURT:  Could you -- what was the person's first

21   name again?

22       MR. PARRISH:  M-i-i-o-k-a.  That's -- I asked him about

23   where it comes from, and he said that was just the family name

24   they gave him.

25       THE COURT:  Okay.

1     MR. PARRISH:  In June, Sheena Fields filled the PREA

2     coordinator's position.  Priscilla Dawson filled the quality

3     assurance officer's position, and Roderick Aikens became the

4     full-time detention recruiter.  So now we have a full-time

5     detention recruiter and a full-time background investigator.

6     Finally, Steve Winter was hired as the chief safety and

7     security officer to coordinate all maintenance efforts with

8     the county.

9         Staffing analysis:  In April, I spent quite a bit of

10    time working with Major Fielder to revise the detention

11    staffing plan.  It was originally developed in 2017, and it

12    had been not updated since then (AUDIO GAP) even though that's

13    something that's supposed to be done annually.  So the new

14    plan makes provisions for direct supervision staffing levels

15    at the work center and the Raymond Detention Center and has

16    fine tuned the changes that have taken place over the past

17    several years; that's been published.

18        The average daily population and the number of bookings

19    both are down significantly.  The ADP now fluctuates between

20    375 and 390 inmates.  For the first five months of the year,

21    bookings dropped to only 9.6 per day, which equates to 3,500

22    per year.  Most of the ADP and the booking figures are

23    approximately 50 percent lower than what we saw when the

24    monitoring process began four years ago.

25        Maintenance:  Bringing CML, the Texas firm, and

1    Benchmark Construction on board has made one huge difference

2    all for the good.  Security upgrades and repair projects are

3    being completed professionally and in a much more timely

4    fashion.  Let me start with the Raymond Detention Center

5    booking.  All four multiple-occupancy holding cells have been

6    upgraded with doors that make it possible for staff to

7    actually see inside the cells for the first time in many

8    years.

9         In C-Pod all the control room, vestibule, recreation

10   yard, and cell doors have been made secure and lockable.

11   Firehoses have been re-installed in the housing units.  They

12   hadn't been there since 2012.  This pod should be ready to

13   open very shortly, and at that time, CML will commence similar

14   repair work on Bravo pod.

15        A-Pod's control room and primary doors, excluding the

16   cells, were previously repaired as an example showing how they

17   would be upgraded, but no further work is planned because of

18   the intent to keep this pod closed for the time being.

19        At the Jackson Detention Center, we've had a number of

20   problems; that's the oldest facility in the system built in

21   the '70s.  The entire facility was closed in January because

22   of water leaks and air conditioning problems.  And at that

23   time, the inmates were moved to the work center.  After

24   temporary repairs were made, the inmates were moved back to

25   the Jackson Detention Center, but in May it had to be closed

1    for the second time because of the same problems.  So once

2    again, the inmates were relocated to the work center.

3         This past Friday, June the 19th, the females were moved

4    back to JDC after air conditioning issues were resolved, but

5    the males, as of what I was told yesterday, are still held at

6    the work center until the plumbing problems can be corrected.

7    Benchmark is apparently waiting on approval to proceed with

8    that work.

9         At the work center, each housing unit fire escape door

10   is now monitored by camera and alarm systems, and especially

11   noteworthy is the fact that when this work was done, Benchmark

12   had a recording capability installed for the camera system.

13   This makes it possible for the CID and the IAD investigators

14   to examine visual evidence of events within the facility when

15   they review incidents; something that they've never had the

16   ability to do before.

17        With regard to direct supervision, when C-Pod opens,

18   each general population housing unit will operate under the

19   principles of direct supervision with an officer assigned

20   inside permanently.  On July the 1st, the work center is also

21   scheduled to begin operating under the principles of direct

22   supervision.  Now that the fire exit doors have been secured,

23   it should be possible for each housing unit to be staffed with

24   only one officer instead of two.  This should result in a

25   savings of 20 personnel.

1          Direct supervision training continues to be included as

2     a block of instruction in the recruit academy for the new

3     detention officers.  But the pandemic has created problems,

4     and it hasn't been possible to include existing officers in

5     the most recent class nor in the one that's scheduled unless

6     something can be worked out.

7          With regard to policies and procedures, tremendous

8     progress has been made.  There are now 20 policies and

9     procedures approved (AUDIO GAP).  A proposed table of contents

10    has been adopted, as required, and this is a significant

11    improvement.  But the requisite training on the new policies

12    is not keeping pace, and that is because of problems

13    associated with the pandemic.  And so my recommendation is

14    that priority needs to be given to the use-of-force training

15    first and then to move on to the others, as possible.

16         Dr. Dudley just brought me up to speed on something that

17    I wasn't aware of yesterday when I talked to people, and

18    that's the COVID-19 cases.  They had 12; six in medical, six

19    in booking.  Those are two of the most really inappropriate

20    places for housing people.  Holding cells should not hold

21    somebody more than eight hours, and they're being used for

22    full-time housing.  And the medical area needs to be

23    completely rebuilt and refurbished.  It's in really pretty

24    deplorable condition.  So using the Jackson Detention Center

25    is a great alternative.  I'm glad that they can do that now.

1      And then once Charlie Pod is reopened, that gives you

2  the added flexibility to be able to take one of the housing

3  units and designate it for some kind of quarantine housing,

4  because you'll be able to actually lock inmates down in

5  individual cells and they'll stay there, because the doors

6  close and block.  So some good news, really big improvement in

7  maintenance issues since CML and Benchmark were given the go

8  ahead to get things done, encouraging.  That's all I have.

9      MS. SIMPSON:  Thank you, Dave.

10     THE COURT:  Thank you.

11     MS. SIMPSON:  Judge, do you have any questions for

12 Mr. Parrish before I move on?

13     THE COURT:  The one question that I do have, and I'm

14 sorry; you may have been going in and out.  But that C-Pod,

15 the -- have the people in Texas -- from Texas completed or

16 where are they in the process of doing the doors?

17     MR. PARRISH:  CML has completed all of their work.  The

18 only thing holding up opening the whole pod is other local

19 issues, like some roof work and checking on water and things

20 like that.  But it has nothing to do with CML.  They're

21 standing by ready to start.  As soon as inmates can be moved

22 out of Bravo, they'll start working on that pod.

23     THE COURT:  Okay.  Thank you.

24     MS. SIMPSON:  Your Honor, I typically look at sort of

25 the administrative and system issues, so I'm going to report

1    on that next.

2         THE COURT:  Okay.

3         MS. SIMPSON:  And as Mr. Parrish mentioned, there have

4    been some good activity in this area.  We went without a PREA

5    coordinator for about four or five months and the --

6    Ms. Fields was appointed or selected as the PREA coordinator

7    the week of the remote site visit.

8         So we -- I interviewed her the second day on the job, so

9    at that time, she obviously was still getting up to speed.

10   And we don't really know what all was happening with PREA

11   during those four or five months.  There did not appear to be

12   any education.  There were no PREA investigations.  I don't

13   know if anybody was manning the PREA phone line.  And its --

14   at the time of speaking with the new PREA coordinator, that

15   phone line had not been setup for her yet, so it was very

16   beginning stages.

17        I think Ms. Fields showed a great deal of enthusiasm and

18   has already reached out to get quite a bit of education and

19   training in the area, so I'm certainly optimistic that area is

20   going to see some improvement.  But we're at the very

21   beginning stages of that.

22        It's also very encouraging that they've hired a

23   full-time quality assurance officer.  Again, that's at the

24   very beginning stages.  The settlement agreement has quite a

25   few requirements for reporting and being able to pull summary

1    reports.  I think the new quality assurance officer is working

2    on making that happen.  Again, it appears to be a manual Excel

3    spreadsheet, which is fine.  Its just -- would be -- it's

4    labor intensive and would be nice if more could be pulled

5    directly out of the JMS system.  And that has been -- I think

6    it will take a little bit of time to coordinate everybody

7    that's doing manual spreadsheets at Hinds County.  There's

8    quite a few people and taking quite a few hours, and hopefully

9    there will be some coordination and maybe automation out of

10   the JMS system at some point.

11        The records review was, I would say, the most difficult

12   area for me to do remotely.  Usually onsite I review a number

13   of inmate files and am able to compare that to the JMS system,

14   at times finding instances of over detention, at times just

15   finding things that don't match up.  But it really wasn't

16   possible to have entire inmate files scanned in.  Most of them

17   are pretty voluminous, because people are there a long time.

18   So that was difficult to do remotely.

19        I did request what's called the inmate status sheet,

20   and -- and the chronology.  So the way the inmate files are

21   setup, there's a status sheet on one side and the chronology

22   on the other.  And the status sheet is really very important,

23   because it shows why an inmate is in the facility and what the

24   underlying documentation for it is.

25        Unfortunately, I learned that the records office had

1   stopped doing the inmate status sheet, and it might have been

2   from some miscommunication.  But that is of some concern

3   because that is what -- it allows them to audit their files

4   and allows us to audit the files more efficiently, so I'm

5   encouraging them to do it.  It's required by the policies and

6   procedures.  Its -- that kind of auditing process is required

7   by the settlement agreement, so I'm hoping that they will get

8   back to doing that.

9        And an example of why it is so useful is that there were

10   a number of instances where people were eligible for release

11   from Hinds County, but they had a hold from another

12   jurisdiction.  But that hold wasn't identified promptly, and

13   so the other jurisdiction wasn't contacted.  That can result

14   in somebody staying when they should be released.  If the

15   other jurisdiction doesn't want them, they would be released.

16   If the other jurisdiction does want them, then they can be

17   told to come pick them up promptly.  But without that status

18   sheet, those kind of things can get lost in cracks and that

19   appears to be happening.

20        The records supervisor has started doing audits, and

21   that's how some of these holds were found.  There's -- under

22   the policies and procedures, they're supposed to be done at

23   the rate of ten a week, and they're supposed to get to all the

24   inmate files within a six-month period.  The audits are being

25   done not quite at the required pace under the policy, but it's

1   a fairly new process and hopefully that will pick up in

2   frequency.

3        There is a problem that's not of the jail's making.  But

4   the county court has not had -- has frequently not had a judge

5   sitting for first appearances.  And the jail staff have been

6   able to work well with the circuit court to deal with those

7   first appearances on felonies, but there is not really anyone

8   to work with on the misdemeanor side.  And so at the 48-hour

9   mark, the jail is entering release on own recognizance for

10  these people charged with misdemeanors.  That's good that

11  they're getting them out of the jail in the required

12  timeframe.  It -- it's a system issue that needs to be

13  addressed in some fashion, because it really shouldn't be on

14  the jail to decide who gets released.

15       The grievance system is working much better over the

16  last couple years.  The -- and one thing I couldn't do

17  remotely that I usually try to do is run a report out of the

18  secure system, which is the electronic grievance system, to

19  see how many grievances haven't been responded to timely.

20  Because there's sort of the ongoing problem of them dropping

21  off the dashboard after seven days and being hard to find at

22  that point.  But that has been steadily improving through the

23  last site visit, and I think they've got a pretty good handle

24  on that now.

25       What -- what appears to be somewhat of a problem is that

1    the grievances aren't always properly responded to, and

2    sometimes they'll just say denied and not have any

3    explanation.  Sometimes they'll say something like, oh, I'll

4    come talk to you about that.  And so the grievance coordinator

5    is aware that that is an issue, and she stated that she is

6    planning on doing that training for all of the people that

7    respond to grievances to help them understand what a more

8    proper response is.  But that generally is going well.

9         The -- as I mentioned, the quality assurance officer is

10   working to develop the summary report.  As of now, they're not

11   quite inclusive enough, and they're not compliant with the

12   settlement agreement.  And we have gone through that in prior

13   reports.  It really hasn't been too much change there, but

14   hopefully with the new quality assurance officer that will

15   change.

16        The CJCC I don't believe has been meeting during this

17   time, but we were informed that they are planning on meeting

18   either later this month or in July.  The -- an area of concern

19   is that this stipulated order requires them to hire a

20   full-time qualified person to do the pretrial services

21   program, to develop it and subsequently run it.  We also had

22   been told that the county was planning on hiring a CJCC

23   coordinator, which is not required by the stipulated order,

24   but to have a fully effective CJCC, you do need somebody in

25   that role.

1          But what we learned recently is that an employee who

2     already had a full-time position as the criminal justice and

3     quality control officer, sometimes called the court liaison,

4     was actually assigned to do both the CJCC coordinator work and

5     the pretrial services work.  I did speak with her, and it may

6     be hard to find somebody locally with knowledge in that area.

7     But she is really unfamiliar with either of those -- those

8     areas.  And the position wasn't posted, so there may be

9     somebody there who does know how these -- does know this area.

10    It would be worthwhile to post it and see if that can be

11    achieved.

12         Right now, I would not say that they were compliant with

13    the stipulated order in terms of hiring a full-time qualified

14    pretrial services director.  The other thing is that the

15    stipulated order requires that they contract with some -- an

16    agency like JMI, Justice Management Institute, to assist them

17    in developing a pretrial program.  Obviously, that would be

18    critical if they have somebody in the pretrial position that

19    doesn't really know what pretrial services are, and so it's

20    important.

21         Almost all jurisdictions do seek that kind of technical

22    assistance in developing pretrial programs, but certainly if

23    you have somebody that doesn't know this area, you would

24    definitely need that kind of technical assistance.

25         And I think that is all that I have in the

1    administrative and systems area, and I would turn it over to

2    Dr. Dudley, unless you have some questions for me.

3         THE COURT:  Thank you, Ms. Simpson.  I don't have any

4    questions.  Thank you.

5         MS. SIMPSON:  Okay.  Thank you.  Dr. Dudley.

6         DR. DUDLEY:  Just to be -- so that I was clear,

7    returning to COVID for a moment, the B3, again, which is

8    admittedly where such a larger range of positive showed up

9    that -- about a third of the total inmates who were tested

10   tested positive, and so it's reasonable to be concerned that

11   of the 18 who were not tested might be positive as well.

12        And, yes, it's important that we are monitoring them for

13   symptoms.  But keeping in mind the fact that somebody who is

14   positive doesn't always have symptoms, if there are other

15   positive people on that unit, either discovered through the

16   fact (AUDIO GAP) then, you know, we're starting from scratch.

17   Unless we are more effective than we have been in making sure

18   that inmates on that unit are wearing masks and doing other

19   sorts of -- taking other sorts of steps to protect themselves

20   from infection.  So that's -- I think that's the point we're

21   trying to make here.

22        Moving on to the kind of medical side, everything is

23   pretty much the same, unchanged from prior reports.  On the

24   mental health side, a vacant position has been filled, and the

25   person has been in place since the first of June, which is

1   good news in that they can at least continue to do the work

2   that they were doing before, as well as initiate the planning

3   for the (AUDIO GAP).

4        The other mental health services that are coming into

5   place as (AUDIO GAP).  There's the planning for the mental

6   health unit, and what the programming and staffing needs will

7   be (AUDIO GAP).  There are two things that we were looking at

8   over the last several visits.  One is how to improve the

9   discharge planning process, because the rate of successful

10  (AUDIO GAP) is still less than 25 percent, which is (AUDIO

11  GAP).

12       I believe that incorporating some types of interventions

13  that have been used in other correctional facilities increases

14  the successful referral rate to outpatient mental health

15  services much above that so that (AUDIO GAP).

16       The third area of planning has been the recognition --

17  based on the recognition of the fact that there is a

18  revolving-door population of individuals who are arrested,

19  stay at the facility for less than 24 hours, who are known to

20  have a history of mental health problems, and that's, in part,

21  why they're repeatedly arrested.  And is there an alternative

22  to picking them up and (AUDIO GAP) outpatient mental health,

23  so that they don't continue to be part of this revolving door?

24       And the fourth thing would be what will be the final

25  outcome of security policies that have mental health impact,

1    like mental health involvement in the discipline and review

2    process, the segregation review process, and use of force.

3    And so that (AUDIO GAP) the unit is working on all these four

4    areas and (AUDIO GAP) and participation has been coming into

5    place.  And then an analysis (AUDIO GAP) the additional staff

6    are required in order to assume these responsibilities.  At

7    which point, then I guess a proposal will be submitted in an

8    attempt to obtain those staff.

9        The only other issue I have is that I know the Court had

10   received a complaint about an overmedicated inmate.  I didn't

11   know if you wanted to hear about that, or whether you just

12   wanted to wait until we submitted our report.

13       THE COURT:  Have you been able to verify -- have you

14   been able to interview the subject of that?  Or I think we

15   received a complaint from the person's mother or sister, I

16   think; I can't recall which.  Have you -- at least have you

17   been able to follow up?

18       DR. DUDLEY:  I've been able to follow up.  I went

19   through exactly what happened.  He was no longer at the

20   facility by the time of our visit.  He had been released by

21   then.  But I did review the medical record.  I interviewed the

22   people who had contact with him, so I'm pretty clear about

23   (AUDIO GAP).  But I was not able to (AUDIO GAP).

24       THE COURT:  Okay.  I'll wait on your written report with

25   respect to that, but I do have this one question.  Do we know

1     the -- as of today, do we know the total number of inmates --

2     and then I'm going to ask you about the total number of

3     employees next -- but do we know the total number of inmates

4     who have tested positive for COVID-19 as of today's date or

5     yesterday's date?  Or whatever is your most recent

6     information.

7          DR. DUDLEY:  My --

8          MS. BARKER:  Yes, Your Honor.  There are 17 inmates that

9     have tested positive as of today and 19 staff.

10         DR. DUDLEY:  That's my understanding as well.

11         THE COURT:  Okay.  And has there been -- I guess with

12    the number of staff who have tested positive that has not

13    affected the county's ability to continue to maintain the

14    staffing of the facility?  Because if you -- you know, once

15    one person tests positive, obviously that person is on a

16    14-day quarantine.  But so are -- so is everyone else that the

17    person has come in to contact with I would think.

18         Is that impacting at all the county's ability to

19    properly staff the facilities?

20         MS. BARKER:  Not necessarily, Your Honor, because we've

21    had a number of employees who have tested positive for COVID

22    and made a full recovery and come back.  So the only thing --

23    the only part that is kind of affecting us right now is the

24    fact that our -- whenever we tested all of the employees, two

25    of our training -- two of the three people in our training

 1    department tested positive, and they were asymptomatic.  So

 2    that's the only thing that's kind of thrown a kink in things,

 3    but other than that, the staffing remains manageable.

 4         THE COURT:  Okay.  All right.  Thank you so much, again,

 5    Dr. Dudley.

 6         MS. SIMPSON:  Judge, may I ask a question of the

 7    sheriff's attorney and the COVID point person?

 8         I'm wondering if you can tell us what you're doing with

 9    respect to contact tracing, and if everybody that's had

10    contact with the employees testing positive is also home on

11    quarantine?

12         MS. BARKER:  One second.  I'm confirming with Ms. Fields

13    right here to get an exact answer.

14         MS. SIMPSON:  Okay.  Thank you.

15         MS. BARKER:  Okay.  Thank you.  So the employees who

16    were tested by the Department of Health, they come out of

17    quarantine -- they'll be back at work on Monday, because

18    that's two weeks from the day of the test.

19         As far as contact tracing goes, Ms. Fields has been --

20    is in constant contact with the Department of Health, who we

21    are taking guidance from as far as that.  And those

22    individuals who have had contact with those who have tested

23    positive, they are being allowed to stay at work given that

24    they are not symptomatic, and that's what the Department of

25    Health recommended.

 1          MS. SIMPSON:  Your Honor, I may ask Dr. Dudley to speak

 2     to that practice.  I do understand it's what the Department of

 3     Health has said.  It's certainly not what the CDC has said.

 4     And since people can transmit the virus who are asymptomatic,

 5     there's a pretty good risk that the virus will be transmitted

 6     in that fashion.

 7          Dr. Dudley, do you want to speak to that?

 8          DR. DUDLEY:  Only to say that that is accurate from the

 9     standpoint of what's the CDC's advisement on this.  And I

10     guess that's the point I'm trying to raise that (AUDIO GAP)

11     from the onset of symptoms.  While of course it's important,

12     that's not sufficient to really assure against the spread.

13          THE COURT:  So let me ask you this, Dr. Dudley.  The CDC

14     guidelines recommend that once you -- you trace -- once

15     someone becomes positive, is confirmed to be positive, those

16     individuals with whom that person has had contact should

17     self-quarantine or should be quarantined in some effect?

18          DR. DUDLEY:  When it's (AUDIO GAP) is the extent of the

19     risk that they infect -- I guess what we're trying to say is

20     that in this -- in this setting that means that other inmates,

21     particularly those who we don't know what their status is

22     because they've refused testing, that even though they're not

23     symptomatic, there's a -- there's a risk, a meaningful risk,

24     that they are infected and therefore can continue to transmit

25     the virus on the unit.

1          And so the issue is, you know, given the reality of

2    those settings, what are our options?  So the (AUDIO GAP)

3    certainly one option is to be more rigorous than we have been

4    on -- on assuring that inmates (AUDIO GAP) to decrease the

5    risk of transmission by wearing masks, by washing their hands,

6    making sure we're rigorous about that based on the reasonable

7    assumption that there's somebody else on that unit who's able

8    to transmit the disease, whether they're showing symptoms or

9    not.  And that would seem to me to be the minimum intervention

10   we can make.

11        MS. BARKER:  And, Your Honor, may I state a response to

12   Ms. Simpson and Mr. Dudley's position on COVID?

13        THE COURT:  Yes.

14        MS. BARKER:  Okay.  I think Mr. Dudley skipped to

15   inmates.  We were originally speaking of our employees.  One

16   of the reasons that our employees are allowed to be at work

17   per the Department of Health, the guidelines, and I think this

18   is CDC as well for healthcare workers or any essential

19   workers, such as the detention officers; that they may be

20   allowed to continue work based on the capacity of needs of

21   your facility.  If you have no symptoms, undergo symptom and

22   temperature monitoring by your facility and wear a surgical

23   mask while you are at work until 14 days after exposure, and

24   that's exactly the protocol we're taking right now with our

25   detention officers.

1          Now, with the inmate situation that may be another issue

2     that we'll have to address.  But as far as contact tracing and

3     allowing those officers who have been in contact with those --

4     with COVID working, those are specific stipulations from the

5     Department of Health, and I do believe the CDC follows that as

6     well.

7          DR. DUDLEY:  You know, the concern is that we're raising

8     because, you know (AUDIO GAP) for example, you know, we asked

9     explicitly were people coming down to medical wearing masks?

10    And they weren't consistently wearing masks, whether they were

11    officers or inmates.  And so we're raising concern making sure

12    that we're aggressive from the standpoint of those protective

13    measures, which I think is the important part of what was just

14    read.

15         THE COURT:  Is everybody in the facility, Ms. Barker,

16    wearing masks 24 hours a day?  I mean, are all shifts wearing

17    masks during the entire shifts, particularly employees, but

18    also I think Hinds County distributed enough masks for the

19    inmates as well.  Are they required -- is everybody wearing

20    masks 24 hours a day?

21         MS. BARKER:  Yes, Your Honor.  In fact, the sheriff is

22    sitting back here, and he -- you know, we have supplied

23    everyone with masks.  We have given multiple mandates that

24    they do wear masks.  All -- you know, all shifts, every day,

25    employees and inmates, so, you know, those are our demands.

1    Yeah.  I'm sorry, the sheriff would like to say something,

2    Your Honor.

3         SHERIFF VANCE:  Your Honor, --

4         THE COURT:  Yes.

5         SHERIFF VANCE:  -- our intent is that everybody wears a

6    mask 24 hours a day seven days a week.  They have a sufficient

7    amount of masks.  But to be 100 percent truthful, you know,

8    you can't necessarily make a grown person wear a mask every

9    second of every day, but we have warned our staff that failure

10   to use a mask can result in severe disciplinary action.  So I

11   am comfortable that we've done everything as an administration

12   to both supply masks and require that masks be used as much as

13   humanly possible at this stage.

14        THE COURT:  Okay.  All right.  Thank you, Sheriff Vance.

15        Have there been any write-ups or have there been any

16   disciplinary actions taken?  I assume -- I guess if there have

17   been no write-ups, no disciplinary actions taken, then that

18   suggests that people are abiding by the rules.  Otherwise,

19   there should be some evidence of some checking, some evidence

20   of disciplinary action taken if one has not been doing what

21   they need to do with respect to the mask wearing and other

22   essential protocols that the jail is taking or the detention

23   center is taking to make sure that people are doing all that

24   they can do to reduce the risk of transmission.  You know, so

25   have there been any write-ups or anything?

1          SHERIFF VANCE:  Not yet.  But, you know, this is a

2     day-to-day, night-to-night proposition.  Again, the

3     instructions have been very clear, especially to staff, what

4     the expectation is, and so we're under the impression that

5     we've got the vast majority of individuals in that facility

6     that are complying with our policy directives.

7          But I just want to be clear.  I don't want to mislead

8     anybody.  It's a 24/7 operation, and every second of every day

9     we expect them to have the mask on.  And they will be

10    accountable if they do not.  But as of this moment, we have

11    not issued any discipline for somebody that has not worn a

12    mask.

13          THE COURT:  Okay.  Thank you, again, Sheriff Vance.

14          SHERIFF VANCE:  Yes, sir.

15          THE COURT:  Ms. Simpson?

16          MS. SIMPSON:  Yes, Your Honor.

17          THE COURT:  Is there anyone next who should speak?

18          MS. SIMPSON:  There is.

19          THE COURT:  Okay.

20          MS. SIMPSON:  And before I turn it over to him, just one

21    last item on the COVID and the mask issue.  We did a number of

22    interviews of the -- of inmates, and we did that by Zoom.

23    There were -- I am not sure I know the exact number.  I would

24    say there were two or three inmates that did not have masks.

25    They appeared to be inmates that have mental health issues,

1    and I suspect as a result of that may have their own

2    difficulty complying with that one way or another.  So I'm not

3    saying that the directive hasn't gone to the inmates, but I

4    think it's probably reasonable to expect that a number of

5    inmates aren't wearing masks at all times.  And that's what we

6    observed.

7         THE COURT:  Thank you, Ms. Simpson.

8         MS. SIMPSON:  And so I'll turn it over to Jim Moser now,

9    our juvenile expert.

10        MR. MOSER:  Thank you.  And good afternoon, Judge.

11        THE COURT:  Good afternoon.

12        MR. MOSER:  So I was able to do -- have a number of

13   conversations with folks at Henley-Young.  There are -- as

14   Lisa alluded to, there were limitations in being able to

15   really check youth records, which is a great source of

16   information to both, you know, find incidents or other bits of

17   information that may or may not have come through in the

18   materials that were sent ahead of time and/or confirmed things

19   or raised questions.

20        So that was a limitation on being able to really verify

21   some of the information.  That said, they did provide quite a

22   bit of information and a fair amount of work ahead of time to

23   get that to us, which was quite useful.

24        In terms of progress, I think it's very positive.

25   Mr. Greg Harrington is on board as the new executive director

1    as of April 1st.  I had a chance to talk with him a couple

2    different times.  His background seems to be appropriate for

3    the position, and he has in particular some background in

4    education, which I think is a very timely, positive addition

5    to the leadership team there.  So looking forward to him

6    really having a positive impact on the education program,

7    which I think as you know has always been a -- kind of been an

8    area of concern, you know, over time and a challenge, but also

9    something that I hope he can dig in, along with Judge

10   McDaniels, and improve.

11        They've also hired a recreation program coordinator.

12   And in discussing that position with Mr. Harrington, he seems

13   to have a very solid understanding of that role, going beyond

14   someone who takes kids out to shoot baskets.  You know, they

15   have an opportunity to develop a range of other kinds of skill

16   development and culturally appropriate programs that will

17   be -- that will help fill in some of the time that the kids

18   have, that the youth have there, and that also is a positive

19   addition to the team.

20        So they have two positions still posted at this time.

21   One is for a training and learning and development

22   coordinator.  They have historically had a training officer.

23   The lead officer for much of the time that we've been involved

24   has been on -- out of country serving the country, and so

25   they've had a number of other folks -- a couple other folks

1    kind of stand in to provide some basic training.

2        But, again, from the job description and in talking with

3    Mr. Harrington, he seems to have a very good idea of how to

4    utilize that person to really get that training system up and

5    running beyond the sort of basic training that staff get when

6    they first come on board.  So I'd be -- I'm looking forward

7    and optimistic about if he can find the right person to really

8    begin to improve the skills of staff working with youth.

9        The other position, the mental health treatment

10   coordinator, is finally posted but not until roughly mid May.

11   That, again, is a critical element of coordinating the mental

12   health programming, supervising the youth sports specialist,

13   working with the other clinicians, really building a way to

14   integrate that programming in with the other behavior

15   management aspects of the facility and also provide some

16   direct therapeutic support for the -- for the youth there.

17       So that is a critical position, as you may recall, that

18   had initially been a psychologist position.  Through the

19   stipulated order, we -- there was some leeway provided to --

20   for some other credentialing that didn't limit it to a

21   licensed psychologist.  So hopefully someone will fill in that

22   position who can provide leadership for the overall mental

23   health and psychosocial, psychoeducational programming to be

24   developed.  So that's that.

25       Hopefully, that would complete, I think, a pretty strong

1   administrative structure along with Judge McDaniels who is the

2   youth court judge and is maintaining some, you know, awareness

3   of what's going on.  But I think has appropriately developed a

4   positive relationship and a structure that he'll fill in as it

5   relates to his overall oversight to a degree, but really

6   relying on the executive director.  So I think structurally,

7   they are moving forward in the right direction.

8       I am concerned about the number of youth care

9   professional vacancies at this time.  When we called, there

10  were 15 vacancies.  That's a huge number.  Not uncommon in the

11  past might have been six or seven or some number.  I think the

12  highest he had ever said before was 13.  But 15 vacancies

13  among the youth direct -- sort of youth care professionals is

14  a sizable percentage of their overall staffing and attributed

15  largely to -- or they attribute it largely, and I have no

16  reason to doubt, to the extremely -- you know, the very low

17  starting pay, the lack of any sort of pay progression system,

18  and that's something we've talked about before.

19      Mr. Harrington, again, when I asked about things that he

20  was -- you know, had seen immediately, talked about focusing

21  some energy on staff support and retention.  I think with a

22  training director and some support, that's progress, but I

23  think it's going to be impossible for them to maintain a

24  consistent staff over time at the low pay that's there.

25  That's an issue the county, you know, struggles with across

1    the board.

2         But just so you're aware at this time, it creates a

3    significant number of vacancies that creates challenges both

4    for appropriately staffing the facility at all times, plus

5    also having staff stay on board over a period of time and gain

6    both experience and education that could help them serve the

7    youth better and supervise the youth better.

8         The mental health, some of the programming that's been

9    developed, the youth support specialists have moved forward

10   starting to utilize some additional materials that are

11   consistent with the stipulated order.  I'm still concerned

12   about this relatively limited amount of time you'd spend in

13   some of those group programs, but that's, I think, a

14   continuing effort.  And hopefully with a mental health person

15   on board and with Mr. Harrington, that will continue to

16   evolve.  But I think it's positive that the youth support

17   specialists have located and begun using some of the kinds of

18   materials that are really appropriate and consistent with the

19   stipulated order.  So that's a positive as well, but continue

20   to watch going forward.

21        The mod- -- there is a -- on the weekly call, there were

22   modular units being installed.  I haven't heard if that was

23   completed.  They were to be completed that week.  That at

24   least was the first step in providing some additional space

25   for some of the kinds of group programming, some alternative

1    activities, so youth are not restricted to the multipurpose

2    room solely or the classrooms, which are not really well

3    designed for some of that group work.

4         So I think as those are put in place and functioning,

5    along with a recreation program coordinator, a treatment

6    coordinator, I would be hopeful and optimistic that they could

7    make use of those spaces in a positive way to meet both prior

8    concerns, but also the elements of the original order as well

9    as the stipulated order.

10        They, at this point, at the point of talking about it,

11   they did not have a budget for furnishings.  But hopefully

12   that will be resolved, and they can work and begin to plan for

13   how to best utilize that space appropriately.

14        On a positive note partly as it relates to the COVID is

15   concerned, they have done a pretty good job managing the

16   population.  There were -- I think the day we talked, I think

17   there were 14 roughly or have been around 14 youth juveniles

18   charged as adults in the facility, along with a varying --

19   there are more short-term youth both male and female.

20        Judge McDaniels had done some outreach and work to

21   reduce the number of all youth coming in, but certainly the

22   short-term youth and not -- making sure that any youth was

23   being held for -- whether they were charged as an adult or

24   still in youth court, really needed to be in secure detention

25   and has expressed quite an interest, a positive interest, in

1    finding alternatives.

2        I think one of the things that comes out in a situation

3    like this is that there are youth out there who have been --

4    in the past been held in secure confinement who probably

5    didn't need to be, and other alternatives can be found or

6    hopefully can be found.  There are some youth who don't take

7    yes for an answer and get out and sort of keep getting in

8    trouble and eventually maybe have to be confined for a period

9    of time.  But I think Judge McDaniels has taken a strong

10   interest in trying to manage that population in a positive

11   way.

12       Also, through his diversion docket, some of the

13   longest-term youth that we had seen before had finally been

14   released.  And hopefully as that continues, he'll be able to

15   keep the system moving forward with the cooperation of the

16   district attorney and other parties, so that cases keep moving

17   forward in a more timely way than they have in the past.  And,

18   again, we'll be able to see progress over time.

19       It's hard to assess the education program given the

20   COVID concerns, inability to be onsite, the -- you know, they

21   were doing some combination of sort of distance learning by

22   Zoom and other means and various packets of information.  As

23   the concerns that we've had in the past about education

24   being -- maybe technically meeting minimum qualifications, but

25   questioning whether it's really adequate or appropriate, I

can't see any reason to think that hasn't been kind of a patchwork, at best, for the spring.  And now they'll move into a summer schedule that hopefully will keep kids moving forward, and it's positive that there will be some summer programming.

There were a sizable number of uses of isolation in February that were of concern.  That had been sort of dropping nicely.  It seemed to be leveled out, but they've noted 14 instances of what they call "due process isolation" up to 24 hours.  That's well beyond the limit in our agreement.  And just the number, the frequency of them was really an increase beyond prior months.  Excuse me.  That dropped a little bit in March and April.  It was reported that they had none in May. I -- that was a surprise to me, and I think I'd want to check that somewhere down the road.  But reported that they had not had to use the due process isolation in May.  That would be remarkable, but, again, a sign of progress if that actually happened.  So hopefully -- hopefully that is an issue that can continue to be worked on, and, again, with Mr. Harrington's leadership and his experience and working with the team that's already there that can be hopefully going forward.

So I think that said, overall, Your Honor, there are signs of progress.  I think a good team is in place.  The fact that they have added the units finally for additional space after -- oh, I don't know how many months or how many times

1     we've recommended it is positive.  I think continued --

2     continued work on the educational program will be really

3     important.  And we'll just have to see if Judge McDaniels can

4     work with community partners in the district, and hopefully

5     move that forward in some ways.  I think I'll leave it there.

6            THE COURT:  Okay.  Thank you, Mr. Moser.

7            MR. MOSER:  You're welcome.

8            THE COURT:  Ms. Simpson?

9            MS. SIMPSON:  I believe that would be it for our team

10    report.

11           THE COURT:  Okay.  Thank you so much.

12           MR. MOSER:  Your Honor -- I'm sorry.  Lisa and Your

13    Honor, could I just -- I should have mentioned something about

14    COVID as well.  There are procedures in place.  I think it's

15    really hard from the outside.  You know, they have policies

16    and procedures on checking staff when they come in, but they

17    are also focused on any staff who show symptoms.  They have

18    not, as far as I could tell, at least that we talked about

19    during our conversations, had reached out to public health to

20    get some testing done for staff there as well.  Indicated they

21    had not had any tests -- I believe no tests -- no staff that

22    have been tested, either with symptoms, had been tested

23    positive.  But I think as kind of alluded to in the other

24    discussion, I think I'd want -- I would try and be more

25    aggressive and maybe work with public health to do some

1    additional testing.

2         As far as staff wearing masks, that's their policy.

3    Whether its -- not being able to be there onsite, I can't

4    tell.  And certainly expecting youth to wear a mask is

5    probably not realistic or social distancing.

6         But, of course, the concern is staff coming in and out

7    more so than it is -- because the number of youth coming in

8    and out is relatively low.

9         THE COURT:  Okay.  Thank you, again, Mr. Moser.

10        Ms. Simpson said that was all that she had, so I'm going

11   to direct just a couple of pointed questions to the county and

12   hear those responses.  And then I'll hear from -- I guess I'll

13   hear from DOJ.  And -- but I just have a couple of questions

14   based on what I've heard from Ms. Simpson and her team, and

15   Ms. Barker or Mr. Gaylor might be able to answer these.

16        As a practical matter, I know when we last spoke, the

17   county -- the sheriff had indicated to all the municipalities

18   and government authorities that, you know, be cautious.  We're

19   not going to hold your misdemeanors and, you know, only felony

20   arrests.  I assume that policy is still in place and the

21   jurisdictions are adhering to it?

22        MS. BARKER:  Yes, Your Honor, that's still in place, and

23   as far as -- as far as we know, the jurisdictions are still

24   adhering to them.  I know that Sheriff Vance had almost

25   monthly or tried to do monthly meetings with all of the police

1    chiefs in the jurisdiction, so that seems to help.

2        THE COURT:  Okay.  Now, the other question that was --

3    well, the Criminal Justice Coordinating Committee, I realize

4    that with respect to how we've all been operating since March,

5    I know Mr. Green is there and Mr. Gaylor.  But is that

6    committee functioning at all or what?

7        And I do note that the -- there is no representative

8    from the district attorney's office here today; is that

9    correct?

10       MR. GAYLOR:  Correct.  That's correct, Your Honor.

11       THE COURT:  Okay.  So has the Criminal Justice

12   Coordinating Committee been able to meet or adjust its

13   policies or whatever they're going to do to try to continue to

14   make sure that people are being moved in and out, I guess, of

15   the facilities as expeditiously as possible?  Is that

16   committee meeting?

17       MR. GAYLOR:  There aren't any official meetings that are

18   taking place per se.  Judge Green is communicating with

19   members of the committee, and the district attorney is still

20   working in collaboration with the court and the county to move

21   people through the system as quickly as possible.

22       We're having some challenges with regard to facilities

23   because the courts -- the courtroom -- well, there's some

24   concern from the judges as to whether or not the courtrooms

25   can be used properly because of social distancing.  There's

1    some problems with regard to whether or not grand juries can

2    be convened because of the -- you know, concerns with the

3    courts.

4         So presently we're in communication with the court and

5    the county -- between the court and the county and the DA's

6    Office to come up with a solution -- as well as the circuit

7    clerk's office to come up with a solution for that, so we're

8    looking at a number of different facilities.  But we haven't

9    settled on anything in particular yet.

10        But in terms of continuing to make sure that people who

11   don't have to be in detention facilities aren't there, we're

12   still collaborating and communicating to make that happen.

13        THE COURT:  Okay.  Thank you, Mr. Gaylor.

14        Now, I think Ms. Simpson raised an issue.  It sounds

15   like it's been brought to the attention of the county, but I

16   just want to ask specifically about how the county intends to

17   address it.  I believe Ms. Simpson mentioned the position of

18   the pretrial services director and the person who was

19   currently in that position, at least on an interim basis, or

20   whatever does not -- and correct me if I'm wrong, Ms. Simpson,

21   if I'm misinterpreting or if I'm misconstruing what you said.

22        But the particular person who serves in that capacity,

23   in your view, does not meet the qualifications that one would

24   need to do the functions of that position?

25        MS. SIMPSON:  That's correct, Your Honor.

1          THE COURT:  Okay.  So --

2          MS. SIMPSON:  (AUDIO GAP) but, yeah.

3          THE COURT:  Oh, okay.  So there have been some

4     conversations about that -- about that particular position.

5     So what -- how does the county anticipate or the sheriff

6     anticipate or whoever that person reports to, how do you-all

7     anticipate addressing the monitor's concerns with respect to

8     that position?

9          MR. GAYLOR:  We don't agree that that person doesn't

10    meet the qualifications.  And, in fact, between that person

11    and the person that the district attorney's office has hired

12    to also from their end of things review and administer some

13    pretrial services, we believe that the position can be covered

14    fine.

15         I believe the person that's serving in that capacity

16    right now has been with the county for a number of years and

17    has a law degree, and I don't believe that she is not capable

18    of serving in that capacity.

19         THE COURT:  Okay.  Has that person been doing the

20    pretrial services?

21         Well, Ms. Simpson, what is it that the pretrial -- what

22    is it that you believe that the pretrial services director

23    ought to be doing or should be doing?

24         MS. SIMPSON:  Well, as I understand it, she was

25    appointed to those duties in April.  I -- in my interview with

1    her, she did not know what a pretrial services program was.

2    She did not know what risk assessment was.  She said she was

3    going to start looking into that soon, and she has no

4    knowledge in that area.

5         And as I said, it -- if somebody with knowledge can't be

6    found, then it's all the more important that there be a

7    consultant that knows what to do and can walk them through

8    that process.

9         MR. GAYLOR:  Your Honor, if I may?

10        THE COURT:  Yes.

11        MR. GAYLOR:  Yes.  The mere fact that she may not have

12   left a great impression with Ms. Simpson, I don't believe

13   means that she's unqualified to serve in that capacity nor

14   that she can learn the position quite well.  We're talking

15   about someone who does have several years of legal experience,

16   and I do believe that she can coordinate fine with the

17   district attorney's office and the person that serves in that

18   capacity over there and learn the position just fine.  She may

19   be new to the position, but it doesn't mean that she doesn't

20   have the capacity to serve in that capacity.

21        THE COURT:  Well, I mean, was -- you indicated that the

22   person was already employed by the county.  Was this a

23   position that was advertised, and there was some selection

24   process used to get to this particular person?

25        MR. GAYLOR:  Well, she was interviewed by the county

1    administrator.  And the -- it was explained to her what the

2    position would entail and what we needed in that capacity, and

3    she thought she had the talent to do it, quite frankly.  And

4    she's been with the county probably -- I would say probably

5    seven or eight years or more and in several different

6    capacities, and so I simply ask that she be given an

7    opportunity to get up to speed with regard to what we need

8    from her.

9         Understanding that she did come on board in the middle

10    of a pandemic, and so it's not as if she's had the opportunity

11    to really collaborate with the CJCC and Judge Green and the

12    other members of the court to serve in that capacity.  So I

13    just simply ask that she be given an opportunity.

14         THE COURT:  And I guess -- I guess the question becomes

15    so what happens in six months if she hasn't learned the

16    position?  I mean, if she hasn't fulfilled those duties or

17    become familiar with them?  I mean, just because one has a law

18    degree -- and, you know, one can do civil practice 30 years

19    and not know anything about the criminal practice.  But you've

20    been a lawyer for 30 years and not know.  So that -- that law

21    degree in and of itself does not make one specially qualified

22    to do certain things.

23         MR. GAYLOR:  That's understood, Your Honor.  I would say

24    that certainly if she's not meeting the needs for the

25    position, then we would certainly advertise for someone else

1    to serve in that capacity.  It doesn't mean that whoever we

2    pick will work out perfectly, so when that person doesn't work

3    out, we go and pick someone else who does.

4        THE COURT:  I guess in picking this person this time, I

5    guess what I'm hearing is it was not an advertised position

6    which applications came in; it was someone who was already

7    employed with the county.  They figured that that person could

8    do it, and they sort of even shifted that person around and

9    said other duties are assigned.  This would be your new

10   duties, assuming you can learn them.

11       I mean, I'm just trying to figure out was this a process

12   that was open, and was this the best person who gravitated to

13   the top through that process?

14       MR. GAYLOR:  It wasn't -- it wasn't an advertised

15   position, Your Honor.  But in knowing the person that's

16   serving in that capacity and the many roles that she's served

17   the county in the past, they thought that she could serve in

18   this capacity just fine.  And I really don't have any -- in

19   knowing her myself, I really don't have any doubts that she

20   could.

21       THE COURT:  What is it, Ms. Simpson, that this person

22   suppose -- what -- in the general setting, what are the job

23   duties?  And I know you don't have the job description before

24   you, but in a general sense, what is this pretrial services

25   director?  What is it that that person should be doing?  You

1    mentioned risk assessment, so what is that?

2         MS. SIMPSON:  So actually from where Hinds County is

3    now, the first step is to develop a pretrial services program,

4    and then to operate it.  And the development of it requires

5    researching and selecting an appropriate risk-assessment tool,

6    figuring out where that tool is going to be operated, figuring

7    out what the pretrial supervision is going to be.  When you

8    have the tool, you have to develop a matrix to tell -- to make

9    recommendations to the judges as to what the outcome of the

10   tool should -- should recommend in terms of release

11   conditions, and you have to develop your supervision models.

12        You would have to ultimately work closely with all the

13   stakeholders, and particularly the judges.  A lot of education

14   is involved in that.  Right now, Hinds County's sort of only

15   pretrial supervision is electronic monitoring, and the goal

16   would certainly be to move away from that extent of electronic

17   monitoring.

18        So it's a pretty involved process to develop such a

19   program.  It typically takes eight to ten months or a year to

20   actually do the development, and then, of course, then there

21   would be ongoing operations to run.

22        And like I said before, if they don't have somebody

23   local that's knowledgeable, they really need to hire a -- or

24   contract with a consultant to assist them in developing the

25   pretrial process.  And that, of course, is in the stipulated

1    order as well.

2        MR. GAYLOR:  If I may, Your Honor?  I believe that

3    contracted consultant is JMI; is that correct?

4        MS. SIMPSON:  I believe the stipulated order says JMI or

5    some other agency with that expertise.

6        MR. GAYLOR:  JMI is working with us, and we are

7    certainly paying JMI as we speak to do that consulting in

8    development of that program.  So I know that the county

9    administrator has been a part of that process and

10   communicating with them as well.  So it's not as if we're

11   doing those things absent of the involved consultant --

12   recommended consultants for that program.

13       THE COURT:  How far along are we with getting a plan

14   prepared at least?  Not necessarily implemented, but how far

15   along are we even getting the plan done?

16       MR. GAYLOR:  I don't have that full update with regard

17   to how far along they are.  I know we're several months into

18   it.

19       THE COURT:  Okay.  All right.  Well, thank you.  That's

20   all I have with respect to what has come from -- out of the

21   reports from the various -- from the monitors and her

22   associates.

23       I'll turn to the United States, I mean, because this is

24   your agreement that you have with the county that you-all

25   hammered out prior to the end of last year, I think right at

1    the time that we were about to have our hearing.  So what, if

2    anything, does the Department of Justice say with respect to

3    any of what Ms. Simpson and her team has reported, or anything

4    else with respect to how DOJ believes the parties are moving

5    to accomplish what it intended to accomplish through the

6    consent decree?

7         MR. CHENG:  Thank you, Your Honor.  I think we are very

8    realistic in that we cannot expect perfect compliance with the

9    orders; that there will be slippages and errors.  Overall, it

10   does sound like the county has been making positive progress,

11   and that is a very good thing.

12        However, there are a few areas of significant weakness

13   that we foresee could become a problem in the near future.  I

14   think Ms. Simpson has highlighted those, and I think once we

15   have her full report, we'll have a better idea of whether

16   those issues are simply the regular hiccups in trying to get

17   things done or something more serious.

18        I think the overall problem with the pandemic is one

19   that's going to be a concern for everyone for sometime, so we

20   are looking at this more long-term concern, and therefore,

21   strong compliance with recommendations and guidelines is

22   highly recommended.  While there can be adjustments to

23   accommodate the specific needs of the county, we do hope the

24   county will continue to work in good faith.

25        I have a couple of issues I do want to flag for

1    Ms. Simpson that were a little unclear to me, which at least

2    on our end, seems like it might be a potential problem.

3    Regarding COVID, there are a couple of issues.  The first is

4    whether inmates and staff are actually getting replacement

5    masks and other equipment or whether there is really just a

6    one-time-only supply.

7        Related to that issue, there's the issue of the staff

8    testing; again, is that just a one-time-only thing, or is

9    there actually a process in place to continually retest as

10   this pandemic continues and continues?

11       And then the last issue regarding COVID is the issue of

12   why there are staff testing gaps.  At least in the reports we

13   were receiving, it looked like not all the staff were being

14   tested either, and we were unclear about the discrepancy.

15       And besides the COVID issues, the only other issues I

16   would flag are, again, the pretrial program.  On its face, the

17   coordinator is supposed to be a full-time employee, not an

18   employee with two different jobs.  We do worry about the

19   county trying to technically comply with the orders without

20   really having always the people or procedures in place that

21   will guarantee substantial compliance over the long term.

22       But I do agree with Mr. Gaylor to a degree that some of

23   these issues, we can at least wait a little bit to see how

24   they pan out, but we did want to at least flag that they're

25   concerns.  The COVID issue at this point is the most serious

1      area.

2            THE COURT:  Okay.  Thank you, Mr. Cheng.

3            As I heard DOJ, and I know the sheriff has said that

4      everyone in the facility has masks and use masks.  Is it a --

5      Ms. Barker, is it a one-time issuing of the masks or to -- how

6      often -- I guess are the masks replaced at any -- on an

7      interval or at all?

8            MS. BARKER:  Yes, Your Honor, those masks are replaced

9      as needed.  We have a lot of masks.  Look at the sheriff

10     pumping up, wanting to talk on this issue.  So they are

11     replaced as needed.

12           THE COURT:  Okay.  And with respect -- I guess as

13     needed, I mean, I don't know what type of masks you-all have.

14     Is it the N95 masks?  Is that what everyone has?

15           SHERIFF VANCE:  Yes, Your Honor.

16           MS. BARKER:  Yes.

17           THE COURT:  Okay.  And --

18           SHERIFF VANCE:  If I could clear it up, too?

19           THE COURT:  Yes.

20           SHERIFF VANCE:  I use the term "as needed" from the

21     standpoint that some -- somebody may break their mask.  You

22     know, they got rubber bands around them, so we'll replace them

23     whether its on the first day or the fourth day is basically

24     what I was saying when I said "as needed."

25           THE COURT:  Okay.  With respect to the testing issue

1    that Mr. Cheng mentioned, is it -- is the staff tested on

2    intervals, or have they just been testing once?  And once was

3    good forever until somebody presents symptoms, I guess?

4        MS. BARKER:  That's how we're functioning right now,

5    Your Honor.  The Department of Health did not suggest to have

6    retesting.  However, that is not to say that we won't call

7    them up in a month, you know, and ask them to come back and

8    retest everybody again.  But right now, they haven't suggested

9    retesting, so there are no plans in the future to do that for

10   the staff or for the inmates.

11       THE COURT:  And Mr. Cheng, he had asked the question

12   about -- I guess you've seen some documents, Mr. Cheng, where

13   it appears that there's been some testing gaps among the

14   staff; is that correct?

15       MS. BARKER:  Yes, Your Honor.  The testing was optional

16   for the staff, too.  It wasn't mandatory, and I believe 80

17   staff members tested -- took the test and I believe 12 came

18   back from that positive -- I'm sorry; seven came back from

19   that positive.

20       THE COURT:  Eighty staff members, and seven came back

21   positive?

22       MS. BARKER:  Yes, Your Honor.

23       THE COURT:  Okay.  And so that means how many opted out?

24       MS. BARKER:  I don't have those exact numbers of how

25   many opted out.  Your Honor, I don't have those exact numbers.

1    I can get those to you, though.

2        THE COURT:  I guess I just have the question of why did

3    the county make it optional?  I mean, we're -- I don't know;

4    this question hasn't come before me in any way with this

5    ability to opt out of testing in this particular environment.

6    It may be that I'm overlooking some -- some sort of

7    inalienable right of persons to avoid or to refuse testing in

8    these situations.

9        I take it it's the county's position that they can't

10   make anybody take a test, unless they're -- I guess is it the

11   county's position you can't make anybody take a test,

12   regardless of whether you're asymptomatic, symptomatic, or

13   whatever?

14       MS. BARKER:  Well, Your Honor, our position is that we

15   can't -- you know, especially if they're asymptomatic, we

16   can't force them to take a test.  Now, if they are symptomatic

17   and they refuse to take a test, of course we have the option

18   of sending them home given the pandemic.

19       And also on the number of employees that were tested, I

20   was just told that a number of our employees have already been

21   tested voluntarily by other means.  Those were just the number

22   of employees -- the 80 number, that was only the employees

23   that opted in for the Department of Health that came and

24   tested onsite.  So we really don't have a true, accurate

25   number as to how many people have ever been tested or how many

1   people went and got tested on their own.  We've had quite a

2   few tested on their own and come up negative.

3       THE COURT:  I'm trying to make sure you don't hear the

4   background noise going on in my place.  Okay.  Is there

5   anything else that the -- and I think we've talked enough,

6   Mr. Cheng, about the full-time pretrial coordinator position.

7   And I do think given the existent environment we're in where

8   there probably is no movement of anybody coming in, going

9   out -- we know that there are no trials.  We don't know when

10  there may be trials again in Hinds County, or anywhere for

11  that matter.  And, obviously, still we ain't got but -- you

12  don't have but four circuit judges, anyway, so I suspect you

13  wouldn't have any more than four trials on a given -- (AUDIO

14  GAP).  I'm sorry about that.

15      So is there anything else from the Department of

16  Justice?  I'm sorry, Mr. Cheng.

17      MR. CHENG:  Yes.  Thank you, Your Honor.  You know, I do

18  realize that the issue of consent is a difficult one.  There

19  is actually some history of litigation on these issues.  I

20  don't have a quick answer for the Court.

21      The only thing I would strongly encourage the county to

22  do is that when staff members in particular decline testing,

23  the jurisdiction does have a little more authority over its

24  own employees as making it a condition of employment.  And

25  typically because of the ethical issue of consent, if a

1    patient refuses to get tested on something really important,

2    there should be some type of protocol for trying to educate

3    and convince the patient to -- to at least think very

4    carefully about that decision.  I think it's very risky,

5    especially in this situation, to say somebody declined, we

6    don't care, and we're just going to move on.

7         And I'm not saying that's what they're doing, but I

8    think that's an issue that's going to have to be revisited a

9    bit both by the monitors and the United States.

10        THE COURT:  Okay.  I think so, too, because in the --

11   there are a number of us -- you know, and we've seen it

12   throughout BOP and otherwise.  Once the virus takes hold, it

13   just goes.  And unfortunately it -- I have not seen any good

14   results of once the virus is fully unleashed, so, you know,

15   right now, again, I commend Hinds County for the number of

16   tests that it has done, because it's certainly not on par at

17   all with what I'm reading about MDOC and even some of the

18   other facilities.  So you're to be commended on that.

19        By the same token, though, you're still going to have to

20   continue to be aggressive to make sure that the -- the virus

21   does not become unleashed.  So thank you, Mr. Cheng.  Is there

22   anything else from the Department of Justice?

23        MR. CHENG:  That's it, Your Honor.  Thank you.

24        THE COURT:  All right.

25        MS. BARKER:  Your Honor, the sheriff asked to speak on

1   an issue if you don't mind.

2       THE COURT:  Okay.

3       SHERIFF VANCE:  Your Honor, I just wanted to mention for

4   you and for the group, since the beginning of my

5   administration, our number one goal is to seek compliance, not

6   only with the consent decree, but everything that we can do to

7   keep both our staff and the detainees safe that are located in

8   our facilities, we have done.

9       I will freely admit to you that I am not a COVID expert.

10  What we've tried to do is follow the directions and the

11  recommendations of the Mississippi Department of Health and

12  the CDC.  So we haven't tried to be creative as far as how we

13  approach keeping our people safe from COVID.  From the

14  beginning, we started our own temperature checks.  If staff or

15  inmates came into the facility or attempted to come into the

16  facility, if their temperature was above 100.4, they were

17  turned away.

18      So I'm comfortable that under the circumstances -- and

19  this is not trying to point a finger or lay blame on anybody.

20  I think this is a journey that all of us are on for the first

21  time, and we don't have perfect solutions.  But what we're

22  trying to do, again, is follow the guidelines of the medical

23  experts and their recommendations.  And unless somebody can

24  think of a better way, that's the path we're going to continue

25  to follow.

1        THE COURT:  Okay.  Thank you, Sheriff Vance.

2        All right.  Does the county -- well, I neglected -- at

3   the beginning of this call, I had DOJ to announce who was with

4   it, and I had the monitors and also the county -- the sheriff

5   and the county and its people to announce themselves on the

6   record.

7        I do know in this case there are interested parties, and

8   I did not ask if any of the interested parties are present on

9   the Zoom call and not necessarily listening in.  Are there any

10  of the members of the interested parties present?

11       All right.  Thank you.  So I guess I'll turn to the

12  county; Mr. Gaylor and Ms. Barker, is there anything you wish

13  the Court should hear?

14       MR. GAYLOR:  Well, Your Honor, this is Tony Gaylor.

15  With regard to the requirements and our progress under the

16  consent decree, we do have one challenge with regard to the

17  juvenile facility.  And that requirement being in terms of the

18  treatment director, there's a requirement that that person be

19  a licensed clinical psychologist and/or a clinical social

20  worker.

21       It's been noted that we have posted for the position,

22  but we have had a really tough time in getting people who meet

23  that qualification, that baseline qualification, to serve in

24  that capacity.

25       Under the other consent decree that we're under, we're

1    allowed to contract with an entity to serve in that capacity,

2    and that's a lot easier for us to do in light of our

3    relationship with Hinds Behavioral Services and even other

4    entities.  But there is a challenge for us to actually hire

5    somebody with that baseline qualification of being a licensed

6    clinical psychologist or even a clinical social worker.  So

7    certainly, Your Honor, I'm not exactly sure how that baseline

8    was established as the consent decree was negotiated, but that

9    is a challenge for us.

10        THE COURT:  So that position has been advertised, I

11   guess more than one time, and you've not been able to attract

12   any applicants for it?

13        MR. GAYLOR:  We haven't been able to attract an

14   applicant that meets that baseline qualification.  We have

15   other -- there are master's level therapists that are out

16   there who have expressed some interest, but they happen not to

17   be a clinical social worker or a licensed clinical

18   psychologist.  And in light of the fact that we are obviously

19   going to be contracting with a mental health institution like

20   a Hinds Behavioral Services or like entities to provide mental

21   health services and therapy services, as we even have right

22   now down there, hiring someone full time in that capacity with

23   that baseline qualification is a challenge for us.  So if

24   there was any way -- any suggestions that the Court had or any

25   way that we could have even a master's level therapist serve

1    in that capacity without them being a licensed clinical

2    psychologist or a clinical social worker, it would help us

3    tremendously in terms of meeting that requirement.

4          THE COURT:  All right.  Well, I'll give the parties the

5    opportunity to talk through that.  It seems to me if you can't

6    find anybody who meets those baseline -- and you need to

7    figure out why that is the baseline, number one.  And if, for

8    example, a master's level social worker could probably fulfill

9    the goals, or if you can contract with the Hinds County

10    Behavioral Service or Jackson-Hinds Comprehensive Health or

11    one of the other public health entities, maybe -- maybe the

12    Department of Justice will allow you to sort of solicit bids

13    on which one of those public health agencies might take it up.

14    Because they have clinical people on their staffs and could

15    provide the services on a contract basis where someone does

16    not have to be there 12 hours a day, but be available to be

17    there whenever -- you know, to do the clinical-type work, like

18    the -- I guess like the health services themselves are

19    contracted out to some entity doing the medical stuff.

20          But I think that would be a matter that's left to the

21    parties to try to iron out and think about whether it can

22    be -- whether that issue can be reformed in the agreement and

23    presented to the Court in that way.  I think that's suitable.

24    I mean, I'll hear from you if you don't think that's suitable.

25    I'm talking to DOJ now.

1          MR. CHENG:  Yes, Your Honor.  I think this is definitely

2     one we'll bring up with the monitor and Mr. Moser.  I did want

3     to point out, though, that a very similar issue came up last

4     year, and one of the misunderstandings on the county's part

5     was the assumption that this person was supposed to be there

6     as sort of a specialist to provide clinical assistance.

7          The need was for somebody to actually develop behavioral

8     programs.  And once you actually have somebody overseeing

9     treatment for some of the kids with very difficult behavior

10    and trauma histories, it isn't something that can easily be

11    delegated to someone without pretty good qualifications.

12         There are ways to put together that kind of a program,

13    so we're certainly willing to hear them out about contracting.

14    But the idea that, you know, we've had difficulty hiring

15    someone and this has been a challenge, that was actually

16    envisioned at the time the stipulated order was developed.

17         The other thing I should mention is that we will also be

18    interested in seeing what the results are of the actual

19    posting, because the posting just went up.  So it's really

20    unclear, you know, is this difficulty because there are no

21    people, or is there some difficulty in terms of the salary

22    structure or what's been offered or something else.  And so

23    until we know a little bit more and can talk with the

24    monitors, I don't want to commit to anything.  But I do want

25    to flag to the Court that this is actually a known issue and

1    was actually considered at the time it was negotiated.

2         THE COURT:  Okay.

3         MS. SIMPSON:  Your Honor, may I say something?

4         THE COURT:  Yes, you may.

5         MS. SIMPSON:  The -- initially, the thought was that it

6    had to be a psychologist position, and one of the reasons why

7    it says psychologist or clinical social worker was in order to

8    broaden the pool that could be attracted.  A clinical social

9    worker is typically a master's level, and so that does bring

10   down the expected pay and broaden the pool that could be --

11   that could attract somebody to the position.

12        The -- the history of this is also that they did have a

13   half-time psychologist that really was serving as a treatment

14   coordinator, and it was from evaluating that position and that

15   work that it became apparent that it needed to be a full-time

16   position.  So it might be difficult to contract with somebody

17   on a full-time basis.  I mean, you have kind of a full-time

18   position.  It is more likely to be an employee, but it doesn't

19   necessarily preclude contracting.  But it is expected to be

20   full time, and that's based on the experience that we had when

21   they had a half-time position.

22        And if I may, Your Honor, I think there's some confusion

23   about -- going back to the pretrial position.  I think there

24   must be some confusion, because I did just hear from JMI that

25   they do not have a current contract with Hinds County.  And

1    they haven't heard from Hinds County since they completed

2    their initial work about a year ago.

3            MR. GAYLOR:  Well, that's certainly surprising to me

4    since I was looking at their invoice about three weeks ago.

5            THE COURT:  Hmm, well, that sounds like that's a real

6    doozy there.

7            MR. GAYLOR:  Indeed.  We'll certainly follow up with

8    them to find out why they're billing us for services that they

9    say they're not giving us.

10           THE COURT:  All right.

11           MR. GAYLOR:  But in conjunction with what Ms. Simpson

12   was saying, it has been a challenge for us.  We have posted

13   the position.  We just have not received any clinical social

14   workers and certainly not any licensed clinical psychologists

15   have expressed an interest.

16           We've talked with -- and, in fact, we talked with the

17   previous person that served in that I guess part-time

18   capacity, and she moved to another part of the country.  And

19   she didn't know of any of her colleagues that might be

20   interested either.

21           We reached out to a couple of other entities that we

22   knew had professionals in that capacity, and they were

23   circulating the information among their colleagues.  And we

24   haven't received any feedback.  We sent it to UMMC actually

25   and some other entities and still haven't been able to receive

1    any feedback from anyone interested thus far.

2        In terms of our ability to contract with, yes, obviously

3    we can contract with a service that would provide those

4    services.  That's what we're hoping -- we're certainly

5    hoping -- actually the consent decree says that we need to do

6    that, anyway, so we're certainly doing that.

7        But -- and maybe it's just a problem with the language.

8    It states that we have to hire one full time; that implies

9    that that's a full-time employee of the county.  So if that's

10    interpreted as just contracting with a service or someone who

11    can serve in that capacity, that would certainly alleviate

12    some of that burden if it can be interpreted that way.

13        THE COURT:  Okay.

14        MR. GAYLOR:  If they don't have to be a full-time

15    employee of Hinds County, then that certainly makes it a lot

16    easier.

17        THE COURT:  Okay.  Well, I mean, I'll give the parties

18    an opportunity to try to make sure that they can present the

19    best thing to me on a going forward basis.

20        Is there anything else we need to take care of today?

21        MR. BARDWELL:  Your Honor, this is Will Bardwell.  We

22    represent the plaintiffs in the Henley-Young matter.  The

23    Court asked earlier whether there were interested parties on

24    the phone, and I couldn't get the phone un-muted quick enough,

25    but we have been on.

1              THE COURT:  Okay.  Bardwell, okay.

2              MR. BARDWELL:  Yes, sir.

3              THE COURT:  All right.  Is there anything else we need

4         to take care of?

5              I do commend the parties for making yourselves available

6         for this call in this way.  I will tell you this for future

7         references.  If we are on a call such as this, you don't

8         necessarily have to dress up for the Court occasion, but be

9         dressed -- but be dressed.  But you don't have to -- and I

10        apologize I did not say that on the front end.

11             Because of the recent uptick over the last couple of

12        days, I decided that we would not be in the office for the

13        next few days, and, you know, we're going forward on a

14        day-to-day sort of basis.  And I feel so underdressed with

15        you-all, and you-all won't tell me that I'm underdressed

16        because I'm the judge.  So the judge is inviting you to dress

17        down the next time if we have these matters.  But dressing

18        down does not mean no dressing.  I've been reading.  I've been

19        seeing where people have taken real advantage of that.  You

20        know, you don't need to be in your bed.  You don't need -- you

21        know, none of that.  But certainly you do not have to be in

22        suit and tie and slacks and blazers and all of that if we're

23        operating in this way.  You certainly have my permission not

24        to.

25             But I appreciate you-all for working diligently since we

1    last spoke.  I know it's been difficult trying to get the

2    information that you need.  This pandemic, you know, is

3    causing all of us to rethink how we do things and how we

4    operate on a day-to-day basis.

5         I just appreciate your patience, and I do want each of

6    you to continue to be careful, to be safe, and to be vigilant.

7    And the Court will wait to hear from the parties, and we'll

8    set a call sometime down the road, a next status conference,

9    if you will.  Hopefully, it will not be a call.  Hopefully, we

10   will be moving back to what we thought was normal back some

11   months ago or so, and I'm just hoping we're able to get back

12   to that process.  Otherwise, we'll have to get prepared for a

13   new normal, and I think we're doing that.  But, hopefully,

14   we'll be back in each others' physical presence soon.

15        Again, thank you so very, very much, and I appreciate

16   you.  That's all that I have.  Court is adjourned.

17   ****************************************************************

18

19

20

21

22

23

24

25

1                    **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Certified Court Reporter, in and

4     for the State of Mississippi, Official Court Reporter for the

5     United States District Court, Southern District of Mississippi,

6     do hereby certify that the above and foregoing pages contain a

7     full, true, and correct transcript of the proceedings had in

8     the aforenamed case at the time and place indicated, which

9     proceedings were recorded by me to the best of my skill and

10    ability.

11         I further certify that the transcript fees and format

12    comply with those prescribed by the Court and Judicial

13    Conference of the United States.

14         THIS the 21st day of July, 2020.

15

16                    */s/ Candice S. Crane, CCR*

17                    Candice S. Crane, CCR #1781
                      Official Court Reporter
18                    United States District Court
                      Candice_Crane@mssd.uscourts.gov
19

20

21

22

23

24

25