Court-Appointed Monitor's Eleventh Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                  Jim Moeser                  Dr. Richard Dudley
Corrections Operations           Juvenile Justice           Corrections Mental Health

## EXECUTIVE SUMMARY

Because of the COVID-19 pandemic, this site visit was handled remotely June 8-10, 2020, through conference calls and Zoom meetings with key personnel, members of the Monitoring Team and County and DOJ representatives.  The Compliance Coordinator provided extensive documentation electronically which made it possible to review many records that are normally examined on site.  In some cases, the absence of specific records and the remote nature of the visit obviated the Monitor's ability to report on the status of compliance with regard to a few paragraphs.

**Update on COVID-19**

Pursuant to paragraph 37 of the Settlement Agreement, Hinds County is required to develop policies and procedures, including medical policies and procedures that provide a reasonably safe and secure environment for prisoners and staff. The COVID-19 pandemic certainly presents a major challenge in this regard. Most commonly, the investigation and/or monitoring of a correctional facility's medical and mental healthcare involves an assessment of the facility's overall performance against the 'standard of medical practice' and the identification of any harm that might occur as a result of any failure to meet that standard.  The management of the COVID-19 pandemic presents special challenges with regard to evaluating performance against the 'standard of practice' for multiple reasons.  More specifically, for example, it is a new COVID virus about which more is being learned on an almost daily basis, it is highly contagious and potentially quite lethal, currently there is no highly effective treatment and no vaccine, recommended infection control protocols are much more rigorous and expansive then those usually employed, and the havoc that the COVID-19 pandemic has caused around the world  has been met with a range of psychological/emotional responses, ranging from overwhelming anxiety and fear to almost complete denial and dismissal.

COVID-19 presents even more special challenges as each correctional facility attempts to apply outside recommendations regarding the 'standard of practice' to the unique circumstances of the facility.  For example, the conditions of confinement in any given facility could have an enormous impact on the implementation of recommendations regarding infection control, when and how the identification and isolation of infected individuals is undertaken could have an enormous impact on the approach to tracing contacts with those individuals, and the capacity for providing acute medical services within the facility could have an enormous impact on the approach/protocol for the medical monitoring of infected individuals.

Given the above noted, the harm caused by the failure of Hinds County Jail to establish a meaningful line of communication and cooperative planning between jail administration, senior security staff and the jail's contract provider of medical and mental health services is even more evident.  There is no ongoing, regularly scheduled problem identification and problem solving

2

meeting that involves these three groups; if there had been such, that would have been the natural and perfect place to design and coordinate the facility's response to COVID-19; and no such meetings were initiated when the facility was faced with COVID-19.  As a result, decisions made were not consistently informed by the knowledge base that each of these groups had to offer, and even at times, each group had misinformation about what the other was or wasn't doing and/or was or wasn't willing to do.

Essentially, decisions about the overall management of the COVID-19 pandemic were made by the facility's administration, without the involvement of medical staff.  The initial approach was to monitor staff and inmates for signs and symptoms of COVID-19-related illness, especially the development of a temperature.  While this was important to do, the problem with this limited approach was that when an individual is infected with the virus, it can take anywhere from several days to two weeks before the individual develops symptoms; and some infected individuals never develop symptoms; but all infected individuals, regardless of whether or not they are symptomatic, can transmit the virus to other individuals.  Furthermore, in contrast to situations where this approach might be adequate, the jail is a very different situation.  More specifically, for example, the jail is not a series of individual households, but instead a large communal living situation; there are also new people of unknown status introduced into the population on a regular basis; and in reality, with regard to the control of the spread of this virus. With the first case of an infected staff member in April, the jail sent those with close contact home to quarantine. They did not test the individuals. As more staff members and inmates have tested positive, the jail has not quarantined or tested individuals who have had close contact with the infected individuals. The monitoring team has repeatedly urged the facility to do contact tracing, testing and quarantining of persons who have had close contact with an infected individual regardless of the presence or absence of symptoms. This has not been done.

Unfortunately, it wasn't until the first week of June (months into the pandemic) that an arrangement was made with the Department of Health to come in and test all staff and inmates who had not already been tested.  When the monitoring team was notified about this, the monitoring team noted that it was highly likely that there would be many inmates who would refuse to be tested; the team suggested that every effort should be made to attempt to get all staff and inmates tested; the facility responded by saying that the test would be voluntary and neither staff nor inmates could be forced to be tested. The mental health member of the monitoring team noted that if an education/information sharing effort was made prior to testing day (an effort that would be part of any similar public health intervention), that might at least increase the percentage of staff and inmates who agreed to be tested, but no such effort was undertaken.

Ultimately, only 230 inmates were tested (about 60%); but of those tested, 12 were found to be positive for COVID-19; and there were already 5 inmates who had previously tested positive for COVID-19.  Therefore, given how this virus is transmitted, it is reasonable to assume that there

are at least some individuals within the population that refused to be tested that are also positive for COVID-19.  In addition, only 80 of the 215 employees elected to be tested, 7 of whom tested positive. An additional unknown number may have been tested in the community.

After the results of the Department of Health testing were received, the 12 new inmates who tested positive were isolated from other inmates; 6 of them were placed in a cell in Booking and the other 6 were placed in a room in the medical area; neither of these two placements were adequate/appropriate or consistent with the guidelines of the Center for Disease Control for detention facilities. The 12 infected inmates were eventually moved to JDC and after the 14 days returned to general population.

Although the monitoring team was told that all inmates would continue to be checked for signs and symptoms of illness, there was no specific plan to assess, monitor more closely, or do anything special with regard to those inmates who were likely in contact with the inmates who tested positive for COVID-19.  More specifically, for example, 8 of the 12 inmates who tested positive during the Department of Health testing were from the same pod, B3; but only 18 of the 41 inmates housed on B3 were tested; therefore, the fact that 8 of the 18 tested were positive for COVID-19 raises considerable concern about the status of the 23 inmates on that unit who were not tested.

Hinds County is reportedly doing contact tracing of those inmates and staff who have tested positive. However, they are not testing or requiring the quarantine of those who have had close contact with infected individuals. With respect to staff, they report that they are following the guidelines of the Mississippi Department of Health for essential workers which provide that essential workers can continue working if they are asymptomatic. However, the Center for Disease Control has specific guidelines for detention facilities because, as the guidelines state, detention facilities "present unique challenges for control of COVID-19 transmission." The CDC recommends that in the correctional setting any staff with close contact with an infected person self-quarantine for 14 days and any inmate who has close contact with an infected person be quarantined for 14 days. The CDC does state, "the guidelines may have to be adapted based on the individual facilities' physical space, staffing, population, operations, and other resources and conditions." Hinds County faces challenges in a number of these areas: one pod is closed, JDC has had to close several times because of maintenance issues, understaffing has always been a problem and the staff is additionally depleted because of COVID. This no doubt makes quarantining more difficult and testing all the more important.

A review of Medical's protocol for the monitoring of infected inmates indicates that the protocol exceeds the standard of practice.  A review of the medical records for inmates who are known to be infected indicates that the protocol is closely followed (i.e., a full range of signs and symptoms are monitored every 4 hours); therefore, the onset of symptoms and/or any

4

complications are identified very early on; and individuals can be immediately transferred to the hospital for the inpatient assessment and management of such emerging symptoms or complications as indicated.

It is the opinion of the monitoring team that there is still inadequate information about the extent of COVID-19 infection at the facility, and that efforts to control the spread of the virus are inadequate.  The Sheriff has indicated that he mandated that all staff and inmates wear masks as a protection against the spread of COVID-19; reportedly, there is an adequate supply of masks at the facility so that even a damaged mask can be replaced; and reportedly, every effort is being made to assure that the masks are worn, including threats of disciplinary actions for not wearing a mask.  However, the medical and mental health staff report that there are still inmates who show up for medication pass without a mask and there are still inmates who are escorted to medical or mental health visits without a mask, and it is not at all clear (in the absence of any type of COVID-19 educational effort) that all inmates appreciate the need to wear a mask when social distancing is not possible, which for many inmates is virtually all of the time. Furthermore, it is now the understanding of the monitoring team that inmates not known to be infected are not being monitored for the onset of any COVD-19 related symptoms (such as routine temperature checks), despite the above described likelihood that there are infected inmates in the general population that have not been identified.  All of this raises an even more ongoing concern about COVID-19 infection at the facility.

**Corrections Operations**

A number of key personnel changes have been made during the past five months.  On June 1st the Interim Jail Administrator/Major Ric Fielder was promoted to Warden of Detention Services (otherwise known as the Detention Administrator).  The Interim Assistant Jail Administrator Travis Crain was promoted to Assistant Jail Administrator and the Interim Captain of the Raymond Detention Center Marcus Taylor was promoted to Captain of that facility.  Since then a well-qualified Detention Officer Miioka Laster was promoted to the position of full time Fire Safety Officer (FSO).  In addition, a candidate, Steven Winter, was hired to fill the newly created position of Chief Safety and Security Officer (CSSO).  That person will be responsible for coordinating all HCSO/Detention Services maintenance issues (work orders) with the County through Benchmark Construction, the firm that the County hired to handle the oversight of maintenance projects in the Jail System.

The critical lack of staff continues to make the operation of all three jails (Raymond Detention Center—RDC, Jackson Detention Center—JDC and the Work Center—WC) problematic.  The number of filled positions has risen slightly, to 215, since the January site visit when that figure stood at only 204.  There are 275 authorized positions, of which 271 are funded.  Over the past two years, the number of filled positions has never exceeded 256.

In April the Detention Administrator issued an updated Staffing Analysis.  Although required annually, this had not been done since the original Staffing Analysis was published in 2017.  It now calls for 405.7 personnel to operate the Jail System (two were added to the original figure of 403.7 during the remote site visit); however, with RDC's C-Pod still closed for repairs, that figure can be reduced to 359.5.

Maintenance issues in all three jails are finally being addressed systematically now that Benchmark Construction has been brought on board.  At the WC, door and camera alarms required by the Stipulated Order are in place.  This means that in July that facility will be able to implement direct supervision in the housing units.  At the RDC, CML Security has repaired all of the locks and doors in C-Pod, which has been closed for approximately one year.  Once roof and plumbing issues are resolved, the plan is to operate the general population housing units there utilizing the principles of direct supervision.  At that time, CML will begin security repair work on B-Pod.  There is no plan to renovate A-Pod; rather, it will be left vacant once work on B-Pod is complete.

All of this is made possible by the fact that the average daily population (ADP) has dropped significantly over the past four years.  Currently the ADP for the three facilities ranges between 375 and 390.  Both bookings and the ADP stand at about one half of their level in 2016.

The number of approved policies now stands at 21.  While significant progress continues to be made in developing the full range of necessary policies, training must be provided to all staff in order to implement them in compliance with the Settlement Agreement.  Unfortunately, the COVID-19 pandemic has had a negative impact on the availability of staff to conduct, and participate in, that training.

**Medical and Mental Health**

The need for a regular problem identification/problem solving meeting between jail administration, senior security staff and medical and mental health is now more evident than ever.  Many of the problems noted in this report could have been more easily addressed had there been a better line of communication between these groups, and moving forward with the work that is yet to be done could be enormously facilitated by a better line of communication between these groups. The jail administration must address this by taking deliberate steps to improve coordination and communication between security and medical/mental health staff. Establishing a regular joint meeting would be a good step in this direction.

It is imperative that the jail administration participate in the development of the mental health unit. QCHC must focus now on the development of the treatment program plan for the anticipated mental health unit, given that even after this plan is developed, there will still be a lot

of work that will have to be done before the unit can be opened.  More specifically, the development of such a plan will be required before a mental health staffing analysis can be performed and negotiations for any additional staff that might be required can be initiated; the plan would also describe how security staff will be integrated into the therapeutic work of the unit and thereby inform what additional, special mental health training should be provided to security staff who will be assigned to the unit; and the plan will also more clearly describe which prisoners would be most appropriate for placement on the unit, an understanding of which is required before finalizing policy and procedural issues related to the unit, regarding the working relationships between mental health, classification and security staff.

**Youthful Offenders**

As of the time of the June virtual site visit, there were fourteen Juveniles Charged as Adults (JCAs), in the Henley Young facility.  All of them were male.  Population management efforts led by Judge McDaniels were successful in reducing the overall Henley Young population in recent months, in part due to COVID-19 concerns but also due to on-going concerns about the extended length of stay for JCA youth.  Overall Henley Young continues to operate as a generally safe and secure environment for youthful offenders and filling the Executive Director position in April and Recreation/Program Coordinator position in May were good steps forward. When vacancies in the Treatment Coordinator and Training Coordinator are filled, there will be a strong leadership team that includes some new staff as well as continued support by Mr. Burnside, Operations Manager and Mr. Dorsey, Quality Assurance Manager.

Modular units to provide additional and more appropriate education, program, and treatment space were finally in the process of being constructed at the time of the remote site visit in June, and the intent is to have those spaces fully operational by the start of the next school year in early August. Additional physical plant changes (i.e. recreation space, living unit improvements) continue to be recommended to improve overall program operations.

A significant concern evidenced during the June calls was the large number of Youth Care Professional (YCP) staff vacancies (15 vacancies out of 45 authorized positions).  These are the staff that provide direct and critical day-to-day supervision for youth, and significant turnover will continue to make it difficult to achieve program goals.  The County is encouraged to review the compensation schedule for YCP staff and support the development of additional retention incentives. The Youth Support Specialists and Clinicians continue to provide a variety of discussion group activities, but they remain relatively uncoordinated and minimal in terms of time allotted.

Related to the January Stipulated Order, the County did not meet the targets set for recruitment and selection of a Treatment Coordinator, although the position was finally posted on May 22. A

more detailed daily schedule for all programming has been developed, and additional documentation will be required that should enable better monitoring as to whether/what extent all programming requirements are being met. Progress has been made by mental health team members in procuring and implementing additional evidence-based programming for youth, although concerns remain about the frequency of those programs as well as coordination of overall treatment programming.  A key role for the Treatment Coordinator (that was, per the Stipulated Order due to be hired by mid-April) will be to further coordinate those programs and integrate those programs with other behavioral management components of the Henley Young program.

**Criminal Justice and System Issues**

It was difficult to do a review of the records remotely as the inmate files are too voluminous to scan. A copy of the inmate status sheet and the chronological sheet was requested for 23 randomly selected inmates. However, it was not possible to compare these face sheets with the actual inmate files. The monitoring team learned that Records staff had discontinued creating the inmate status sheet. This is inconsistent with the Records Policy and does not provide the assurance of a lawful basis of detention as required by the Settlement Agreement. It is strongly recommended that the practice of creating an inmate status sheet be reinstituted. It did appear that some of the chronology sheets were not up to date by comparing them to entries in the JMS system. The new Records Policy requires the audit of the files at a rate of 10 a week and a review of all files every six months. The weekly requirement has not been met although it was close for the month of May with 35 files audited. However, only 100 files had been audited from January through May which makes it unlikely that all files will be audited in this six-month period. The auditing process is relatively new and no doubt will improve.

One systemic problem disclosed by the auditing process is that a number of inmates remained in detention because of a hold from another jurisdiction. Once an inmate is otherwise entitled to release, the jurisdiction with a hold should be contacted to determine if they want to pick the inmate up. The inmate should either be released or picked up promptly. However, the Records Supervisor cannot easily determine which inmates are in solely on a hold from another jurisdiction in order to make this contact. There continues to be difficulties with getting information properly entered into the JMS system so that accurate reports can be run. This continues to be the case with identifying inmates who are booked on a probation violation so that the Records Supervisor can ensure that they don't stay beyond 21 days without a hearing.

There had previously been a problem with individuals getting their first appearance in County Court because of the unavailability of the judge. This appeared to have been rectified at the time of the January site visit. However, it has once again become a chronic problem since then. For individuals charged with felonies, jail staff have been able to work with the Circuit Court to

obtain release conditions. For individuals charged with misdemeanors, jail staff have been releasing them on their own recognizance (ROR).

As previously reported, there is increased ability to pull reports from the JMS system. This is an improvement but the reports do not yet meet the requirements of the Settlement Agreement in terms of containing the required information. The information required by the Settlement Agreement is for the purpose of providing command staff in summary form the data that would inform system improvement. In addition to improving the summary reports, there needs to be continued focus on improving the JMS system so that it can be relied upon to identify individuals appropriate for release. At least three individuals spend a significant amount of time creating manual spreadsheets to identify people for release. This is not only an IT problem but also an issue with the consistency of how information is entered into the system. A very notable improvement is the hiring of a Quality Assurance Officer who is working to create a spread sheet containing the summaries required by the Settlement Agreement. Her first day was during the week of the site visit so her work is in the early stage, but having a full time individual devoted to Quality Assurance is a big step towards compliance in this area.

The grievance system continues to improve, however, again, only with the labor-intensive creation of manual tracking systems as opposed to a functional electronic system. Because of the remote nature of the visit, it was not possible for the monitoring team to run a report to determine whether there were grievances that had not received a timely response. There has been significant improvement in this area in the prior two site visits. A number of grievances had inadequate responses; mostly in promising some future action with no way of knowing if the action had been taken. The Grievance Coordinator is planning to provide training on what constitutes an adequate response. Although more grievances are now receiving a timely response, there is still no system to review whether responses are adequate; and no oversight to determine that promised actions are actually completed.

In the last 12 months, the CJCC has met twice; in October and February. The coronavirus no doubt impacted the ability of the Criminal Justice Coordinating Council (CJCC) to meet. However, the CJCC will need to meet more frequently to be an effective body. Even before the virus, the CJCC had not had consistent participation by a number of stakeholders. This has limited its effectiveness. An effective CJCC or some collaborative body is needed to implement most jail population reduction strategies and other system efficiencies. As reported in the last monitoring report, the County had stated that it had authorized contracting with Justice Management Institute (JMI) to assist with the creation of a pretrial program. Contrary to the requirements of the Stipulated Order, the County has not contracted with JMI or another consultant. In addition, the County had also stated that it had approved the hiring of a person to serve as a CJCC coordinator or support staff. And the Stipulated Order requires the County to hire a full-time qualified individual to implement the pretrial program. In fact, the County did not

post these positions but rather has assigned both the role of the CJCC coordinator and the pretrial director to a person who already had a full-time position, the Criminal Justice and Quality Control Officer (sometimes called the Court Liaison). This does not meet the requirements of the Stipulated Order. The person assigned these positions already had a full time job and has no knowledge or experience in these areas. Although it may be difficult to find someone locally who has knowledge in these areas, the positions should be posted

### STIPULATED ORDER UPDATE

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

## STIPULATED ORDER UPDATE

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes | 10/19 | Consultant is retained through the monitoring team |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | No | 3/20 | Purchase Order submitted on 1/22/20; cameras were on back order; they have now arrived |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | No | 5/22/20 | Posted 1/8/20 but not posted as a treatment coordinator; Position posted correctly on 5/22/20 |
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and security measures at RDC. The architect shall conduct periodic inspections. | No | 4/15/20 | The County has entered into a contract with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, Farr & Lemons Architects & Engineers (CDFL, PA). This was reportedly on 4/15/20. The monitoring team has not seen the contract or documentation of any inspections by CDFL. |
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 |  |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement-required policy review and approval process is completed. | Yes | 3/27/20 |  |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the supervision of inmates at RDC. The plan shall include the following:<br>II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | Yes | 4/13/20 |  |
|  | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | No |  | The staffing plan does not address this paragraph. The Detention Administrator developed a plan for rotation of staff but this was put on hold because of COVID-19. |
|  | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare | No |  | Directive issued on 9/27/19 by Major Rushing and radios assigned. Review of incident reports discloses that the directive is not always being followed. |

| | | | |
|---|---|---|---|
| | check sheets at the cell doors of those inmates held in segregation. | No | | |
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other areas or facilities. This work will be completed within 3 months. | Yes | 4/2/20 | The alarms and cameras have been installed but the operations have not yet been modified to realize the staff savings. |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the curriculum and materials for training on the new policy or procedure. | No | | Training has been delayed due to COVID-19. |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | No | | Training on the Use of Force Policy, adopted 2/1/20, was scheduled for February, then postponed until April, and now postponed due to COVID. Training on the other policies adopted more than 3 months ago has not occurred. |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include:<br>1. Activities which are varied and appropriate to the ages of the youth; | | | Progress is being made. A more complete daily schedule has been developed. It does not yet meet the requirements of this paragraph. |

| | | | |
|---|---|---|---|
| | 2. Structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship;<br>3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and<br>4. Hinds County, by and through its County Administrator and/or Executive Director at Henley-Young, shall maintain exclusive control and maintenance of any facilities or technology that promotes compliance with this provision. | No | | |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as:<br>1. cognitive behavioral programming;<br>2. independent living skill training;<br>3. relationship and positive communication skills;<br>4. anger management;<br>5. peer refusal skills;<br>6. trauma informed programming; and<br>7. pre-vocational skill building. | No | | Progress is being made. Staff have incorporated more evidence based curricula in the programming but it does not provide the breadth of programming required by this paragraph. |
| 05-16-20 | I. A. 1. In any occupied pod, the County will convert all control room doors, housing unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically | | | This has been completed in C-Pod and A Pod but not in B-Pod. Although the security doors in A-Pod have been changed from a sliding to a swinging configuration, |

| | | | |
|---|---|---|---|
| | controlled swing doors to the control panel so they can be electronically operated with a CML type locking mechanism. | No | | and they now lock, their operation is still by key, not electronic control. |
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | Yes | 4/30/20 | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | No | | |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | No | | Fire hoses have been installed in C Pod during the renovation. They have not been reinstalled in the other 2 pods the renovation of which is now overdue. |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | Yes | 4/15/20 | CDFL and HDR, Architects, have been retained. |

| | | | |
|---|---|---|---|
| I. B. 4. Form a committee to develop and implement the Master Plan, which will include the County Administrator, the Sheriff, the Jail Administrator, the facility captains, and the Board of Supervisors President. Other members may be included at the discretion of the County and the Sheriff. | Yes | 4/28/20 | County has contracted with facilitators. First meeting of committee and facilitators was 4/28/20 |
| II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division specifically for recruitment of detention officers. | No | 6/1/20 | |
| II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | No | | |
| IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of implementation of pretrial services programs. | No | | JMI reports that they have no current contract with the County and there has been no communication since their last contract ended over a year ago. The invoice referenced by the County at the last status conference was for JMI's earlier work. |
| IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or | | | The County assigned this role to an employee who already had a full time job and gave her the additional role of CJCC Coordinator. At the time of the June site visit, she did |

| | | | |
|---|---|---|---|
| | within 12 months shall obtain certification by the National Association of Pretrial Services Agencies (NAPSA). | No | | not know what a pretrial program involved. Her job description does not include developing or directing a pretrial program. |
| | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | No | | |
| | IV. A. 4. The County shall provide the technical support for implementation of a risk assessment instrument for purposes of pretrial release decision-making. | No | | |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | No | | The position was not posted until 5/22/20. |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train deputies on a Settlement-compliant use of | | | Training was scheduled but has been delayed due to COVID. |

| | | | | |
|---|---|---|---|---|
| | force policy, including Settlement requirements for reporting of use of force. | No | | |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | No | | Training has been delayed due to COVID. |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | No | | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be converted to secure swinging doors and tied to a new control panel. | | | Since the renovation of B Pod has not even begun, A Pod will continue to be used for some time. However, the plan continues to be to eliminate its use once the renovation of B Pod is complete and C Pod is occupied. |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute | | | Multiple person cell doors have been replaced but single cells were still being used for housing without the required doors. This is reportedly because C-Pod can't be opened yet |

| | well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | No | | as a result of the lack of sufficient staff and the doors in B-Pod have not yet been repaired to stay locked. |
| --- | --- | --- | --- | --- |
| | II. B. 4. Within 6 months, the County shall develop and implement a process that provides criteria for merit-based promotion and establishes a career ladder. | No | | |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | Yes | 6/1/20 | |
| 8-16-20 (2 months to post, 4 months to offer, and 1 month evaluate structure | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | | | |
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the development of the pretrial program within 9 months. | | | |

| | | | | |
|---|---|---|---|---|
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | | | |
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | | | |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | | | |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. | | | |
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the information that is needed for the long-term planning process. | | | |
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will | | | The policy development and review process has been proceeding at an accelerated pace with 21 policies now approved. Not all projected |

| | | | |
|---|---|---|---|
| | notify the Monitor and DOJ of any anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | No | | deadlines have been met but significant progress is being made. |

**Monitoring Activities**

The Monitoring Team conducted a Remote Site Visit June 8 through June 12, 2020. The site visit schedule was as follows:

Site Visit Schedule
June 8-12, 2020

| Date and Time | Lisa Simpson | Dave Parrish | Jim Moeser | Dr. Richard Dudley |
|---|---|---|---|---|
| June 8<br><br>9:00 | Ric Fielder and Captain Crain<br><br>Zoom | Ric Fielder and Captain Crain<br><br>Zoom | Mr. Greg Harrington, Executive Director | Nurse Sims |
| 10:30 | Bob Brown, David Marsh and Gary Chamblee and Work Order Coordinator Zoom | Bob Brown, David Marsh and Gary Chamblee and Work Order Coordinator Zoom | Mr. Burnside, Operations Manager and Mr. Dorsey, Quality Assurance Manager | |
| 1:00 | Sgt Tillman | Captains Simon, Dalton and Taylor Zoom | | Qualified Mental Health Professionals Martin and Ross |
| 2:30 | | Miioka Laster, Fire Safety Officer | Ms. Barber and Ms. Galloway, Youth Support Specialists Zoom | |
| 3:00 | Kenisha Jones | Doris Coleman | | Nurse Sims |
| June 9<br>9:00 | Felicia Johnson | Marquette Funchess (Recruitment and Screening) | Judge McDaniels, Youth Court Judge | Dr. Bell |
| 10:30 | Taneka Moore | Kimblar McLaurin, Food Service Director | | Representative from Nursing staff |
| 1:00 | Sheena Fields | | | Nurse Minor |
| 2:00 | Captain Tyree, Lt. Holmes, Sam Dukes and Marlo Brinnon, Investigations Zoom | Captain Tyree, Lt. Holmes, Sam Dukes and Marlo Brinnon Zoom | | Dr. Brown |
| June 10<br>9:00 | Sgt Hubbard, Classification | Sgt Hubbard | Mr. Harrington, Executive Director | Nurse Sims |
| 10:30 | Jennifer Collins, County | Jennifer Collins, County | | |

| | | | | |
|---|---|---|---|---|
| | Administrator; Robert Farr, CDFL Architects; Bill Prindle, HDR Architects; Tony Gaylor, County Attorney (and maybe others) to discuss Master Planning<br><br>Zoom | Administrator; Robert Farr, CDFL Architects; Bill Prindle, HDR Architects; Tony Gaylor, County Attorney (and maybe others) to discuss Master Planning<br><br>Zoom | | |
| 1:00 | Inmate interviews Zoom | Lt. Knox, Training | | |
| 3:00 | Claire Barker, Synarus Green, Tony Gaylor, Jenifer Collins, Sheriff Vance, Walls and White Zoom | Claire Barker, Synarus Green, Tony Gaylor, Jenifer Collins, Sheriff Vance, Walls and White Zoom | Claire Barker, Synarus Green, Tony Gaylor, Jenifer Collins, Sheriff Vance, Walls and White Zoom | Claire Barker, Synarus Green, Tony Gaylor, Jenifer Collins, Sheriff Vance, Walls and White Zoom |
| Thursday, June 11, 2020 | | | 1:30 Phone interview with Mr. Devine, School Principal | |
| Friday, June 12, 2020 | | | | Review Medical Records |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

**PROTECTION FROM HARM**

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;

g.  Searches;
h.  Use of force;
i.  Incident reporting;
j.  Internal investigations;
k.  Prisoner rights;
l.  Medical and mental health care;
m.  Exercise and treatment activities;
n.  Laundry;
o.  Food services;
p.  Hygiene;
q.  Emergency procedures;
r.  Grievance procedures; and
s.  Sexual abuse and misconduct.

**Partial Compliance**

The County/HCSO has made significant progress toward developing required policies and procedures.  To date 21 policies have been approved by the DOJ and many more are in the process of development and review; however, post orders have not yet been identified or developed.  The review and approval process has been streamlined and appears to be far more effective than in the past.  As policies are approved and distributed, the next challenge will be to ensure that training is provided to staff in a timely fashion. Priority should be given to Use of Force training. The two mental health policies are still in the review process. However, as previously reported, the current number of mental health staff will not actually be able to implement all of the requirements of these policies or the terms of the Settlement Agreement.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

As was noted in the last Monitoring Report, the Assistant Jail Administrator was appointed as the Interim Jail Administrator on February 6, 2020, subsequent to the retirement of his predecessor. On June 1, 2020, he was promoted from "Interim Jail Administrator/Major to Warden of Detention Services".  In order to be consistent with the terminology of the Settlement Agreement, he will continue to be titled as the Jail Administrator in the Monitoring Reports.  As an alternative, the title "Detention Administrator", which has been adopted in the approved policies, will be utilized.  The title "Warden" is inappropriate for the Jail System in that it is a rank/position that is associated with prison systems.  As was previously reported, the incumbent

Jail Administrator/Detention Administrator has a Bachelor of Arts degree and the requisite years of supervisory experience. He meets the requirements of the Settlement Agreement.

On February 6, 2020, the Captain in charge of the RDC was designated as the Interim Assistant Jail Administrator.  On June 1, 2020, he was promoted from Interim Assistant Jail Administrator to "Assistant Jail Administrator of Detention Services".   As was noted in the Tenth Monitoring Report, this individual has over twenty years of experience in corrections and law enforcement, but he does not have five years of supervisory experience required by the Settlement Agreement. In addition, he has only a high school diploma, not the four-year college degree specified for the position of Assistant Jail Administrator in the Settlement Agreement.

The Lieutenant who was promoted to Interim Facility Captain at the RDC in February, was promoted to Jail Captain by order of the Sheriff on June 1st.  He has a high school diploma and has been employed by the HCSO since July 2014.  He received a written reprimand in 2015.  He was promoted to Sergeant in 2016, and to Lieutenant in 2018. He meets the requirements of the Settlement Agreement.

The Captain of the JDC retired at the end of June.  Her replacement is a Detention Officer who was hired in 2012, as an Administrative Assistant and was promoted to Detention Officer in 2015.  She is worked at the JDC (2015) and the RDC in Booking since 2016.  She has a Bachelor of Science degree.  She refused to sign a disciplinary notice (written reprimand) in 2018.  Since this candidate has no supervisory experience, she is not qualified to fill the position of Captain at the JDC according to the requirements of this paragraph.  While it is understood that the Sheriff has final authority on such decisions, the decision to put a Detention Officer with no supervisory experience in charge of the JDC is inconsistent with the Sheriff's efforts to comply with the Settlement Agreement.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

Substantial Compliance cannot be achieved until policies and procedures are in place and supervisory staff have received the requisite training.  In the interim, a significant number of promotions and personnel changes have been made, most of which appear to be in compliance with the standards required by the Settlement Agreement with regard to experience and education with the exception noted above. All of the individuals hired or promoted are qualified for their positions.

In March 2020, one Sergeant was promoted to Lieutenant and four Detention Officers were promoted to Sergeant.

- Sergeant "A" was employed from 2007 to 2015, then went to work for the Madison County Sheriff's Office and returned to the HCSO in 2016. She was promoted to Sergeant that year and to Lieutenant on March 1st. She has a high school diploma.
- Detention Officer "B" has worked in the Jail System for more than five years. He has both a college degree and a Master of Science degree.
- Detention Officer "C" has worked in the Jail System for three years. She has a high school diploma.
- Detention Officer "D" has worked in the Jail System for five years. She has a high school diploma and completed two years of college.
- Detention Officer "E" had worked in the Jail System for only a month at the time of her promotion, but was previously employed by the HCSO from 2004 to 2012. She has a high school diploma.

In April 2020, Detention Officer "F" was promoted to the position of Fire Safety Officer. He has been employed by the HCSO since 2016, and has a high school diploma. In addition, he has been a certified fire fighter since 2006, and has worked in that capacity for the Jackson Fire Department for fifteen years.

In May 2020, three Detention Officers were promoted to Sergeant.

- Detention Officer "G" was employed by the HCSO in 2017; she previously worked for the Vicksburg Police Department from 2012 to 2015. She has a high school diploma and five years of college attendance, but no indication of a degree.
- Detention Officer "H" was employed by the HCSO in 2009. He has a high school diploma. He refused to sign a disciplinary notice (written reprimand) in 2014.
- Detention Officer "I" has worked in the Jail System for two and a half years, but he previously worked for the MDOC from 2002 to 2017. He has a high school diploma.

In June 2020, four personnel were promoted to specialty positions.

- Administrative Assistant "J" was promoted to PREA Coordinator. She has worked in the Jail System for five years. She has a high school diploma.
- Administrative Assistant "K" was promoted to Quality Assurance Officer. She has ten years of work experience, four with the HCSO. She has a college degree and a Master of Arts degree.
- Detention Officer "L" was promoted to Detention Recruiter. He just graduated from the most recent recruit academy, but he has over thirteen years of prior recruiting experience in private enterprise. In addition, he has an Associate of Arts degree.

- The Chief Safety and Security Officer (CSSO) is the new title for the employee who keeps track of all maintenance issues in the Jail System and coordinates with the County to insure corrective action. The point of contact with the County is now through Benchmark Construction, the firm that has been hired to manage maintenance projects. The duties of the CSSO were previously handled by the Assistant Jail Administrator, then by an officer who was employed specifically for that purpose; however, he recently resigned. The new CSSO has a high school diploma. He is also a certified EMT. He previously worked as the manager of a tool and equipment company for over four years.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Substantial Compliance**

The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check. This was confirmed by the Background Screening Investigator and the Director of Human Resources, as well as by a review of the personnel files of recently employed Detention Officers.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

Historically, jails have been categorized into three generations: first, second and third.

- First generation jails are characterized by long rows of cells; hence they are referred to as "linear intermittent surveillance" facilities. The officers have to walk up and down a corridor in order to periodically look into the cells.
- Second generation jails are referred to as "podular remote surveillance" facilities because the cells and day rooms are arranged in pods (or housing units) surrounding a control room. Once again, the officers cannot do anything more than periodically look into the living areas, either from the control room or from the corridor between the control room and the living areas.
- Third generation jails are described as "podular direct supervision" facilities because an officer is assigned permanently inside each housing unit. That results in his/her ability to supervise inmates constantly rather than merely surveil them intermittently.

While the RDC and WC were originally designed to operate as "direct supervision" facilities, the JDC was built in the 1970's as a first generation, "linear intermittent surveillance" jail. As such, it cannot operate as a direct supervision facility because it would be too labor intensive to place an officer inside each housing unit/cell block. That, in itself, makes compliance with this paragraph impractical.

28

From 1995 until 2012, the RDC was operated as a direct supervision facility.  Although poorly designed, it functioned effectively until the officers were withdrawn from the housing units as an ill- conceived cost saving measure.  That left the inmates free to literally destroy the facility. The extent of the damage that they did, and continue to do, can be attested to by the fact that C-Pod was closed (for a period of two years) and completely refurbished after the riot of 2012, and it was closed again, approximately a year ago, in order to be renovated a second time.  When it reopens in mid-year 2020, the plan is to re-institute direct supervision in that pod by assigning an officer permanently to Housing Units C-1, C-2 and C-3; C-4 will be utilized as a segregation/confinement unit.  Once B-Pod undergoes a similar extensive refurbishing effort, it is anticipated that direct supervision will be reinstituted in that pod as well.

The WC was originally built as a 400 bed facility comprised of two, 200 bed dormitories, each with several officers assigned in a modified direct supervision mode.  Since then it has been reconfigured into four, 64 bed dormitories.  In April, Benchmark Construction oversaw the installation of a camera and alarm on the fire exit door in each housing unit.  This security upgrade makes it possible for one officer, instead of two, to supervise each unit.  The savings in manpower is significant, but accountability and control should actually improve with only one officer present.  Direct supervision training was initially provided by the National Institute of Corrections (NIC) for command staff and a cadre of trainers.  Direct supervision training is now a component of each recruit academy; however, it is imperative that policies and procedures, as well as post orders, be developed and implemented governing the principles and dynamics of direct supervision.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:

        i.  There are at least two detention officers in each control room at all times;

        ii.  There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii.  There are rovers to provide backup and assistance to other posts;

        iv.  Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v.  There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the

September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

    i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

    ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

    iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

The lack of staff has consistently been the greatest problem facing the Hinds County Jail System. The original staffing plan prepared in 2017, reflected a need for 433 personnel (subsequently changed to 423 due to a computing error).  In spite of the recommendations from the monitoring Team, today there are still only 275 positions authorized for the Jail System, of which just 271 are actually funded.  For the past four years the number of filled positions has continued to drop, from a high of 256, to only 204 as was noted in the Tenth Monitoring Report.  During the remote site visit, conducted from June 8-10, 2020, the staffing level was reported to be 215, up marginally since January.

According to the Background Screening Officer, 25 new personnel have been hired and will commence training in the recruit academy shortly.  He noted that approximately half of that group were not recommended for employment by the Oral Review Board (comprised of the

Detention Administrator, the three facility Captains, a Human Resources representative and the Background Screening Officer) reportedly because of their unsatisfactory performance before the Board; however, all of the candidates were approved for employment by the Sheriff.  While it is important to employ as many Detention Officers as possible, it is questionable not to give the Oral Review Board recommendations due consideration.

The Background Screening Officer also reported that 40 new applicants are under review.  The increase in the number of candidates is attributed to the change of administration.  Once Sheriff Vance took office, applications for employment, particularly for Detention Officer, increased dramatically.

On a positive note, the Detention Administrator, in conjunction with the corrections operations member of the monitoring team, issued a revised Staffing Analysis in April 2020.  This represents the first update since the original Staffing Analysis was prepared in 2017.  The current document calls for a total of 403.7 positions, assuming that all housing units are operational and open.  During the remote site visit, from June 8-10, 2020, it was determined that two additional food service positions need to be added to the total. It should be noted that C-Pod at the RDC has been closed for approximately one year.  That closure has reduced the number of required staff by just over 44.

Based on recommended staffing levels, the WC has 57.8% of positions filled, the JDC has 51.4% filled and the RDC has just 48.1% of required positions filled.  Recognizing that C-Pod is closed, that means that 57.1% of the current required positions are filled.  The staffing figures continue to be inadequate to provide the level of staffing required by this paragraph.

The County has failed to develop a career ladder for Detention employees, nor has it provided any additional financial incentives.  The $100 per month salary increase that was approved by the previous Board of Supervisors was rescinded when the new Board took office in January.

> f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

    i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

    ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

    iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

    iv.   The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

    v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

    vi.   The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

Currently Classification staff are able to cover virtually all of the week 24/7, with the exception of short periods on weekends.  The classification process has gone through a number of changes over the past four years.  As previously reported, the classification scoring reflects a return to "behavior based" as the foundation for classification decisions.  The Sergeant now overseeing Classification has reviewed most of the files of active inmates and all files are reviewed at 90-day intervals which will result in a review of all files. A review of 73 files found that none of them had the previously routine override based on current charge which had resulted in the system not being "behavior based." However, there continue to be some errors and systemic concerns described below some of which keep the classification system from being behavior based in reality.

Accurately scoring the risk assessment is an important step, however, it is also essential that the scores then be used to house inmates appropriately. Despite requests, there has never been a clear articulation of how inmates are assigned to the three facilities. During the January site visit, it was reported that the Captains of the facilities can reject placement of an inmate in their facility

by Classification staff. Although this can be for legitimate reasons such as a "keep away" inmate, it was reported that it was sometimes based on unwritten criteria not consistent with the classification scoring.  During the January site visit a joint meeting with the (then) Jail Administrator, Assistant Jail Administrator and other key personnel resulted in an agreement to designate Classification as the final authority on assignment decisions.  The Jail Administrator indicated that she would issue a written directive to that end.  During the remote site visit in June it was discovered that the directive was never issued before the prior Jail Administrator retired. The current Jail/Detention Administrator needs to issue a definitive order that facility commanders and other personnel cannot override Classification's decisions.

The last report noted that there were a number of maximum-security inmates being housed at the WC. The WC being a dormitory style facility would be expected to serve mostly minimum level inmates. At the time of this site visit there were a number of inmates from JDC temporarily moved to WC because of plumbing problems and as a result there were still a number of maximum-security inmates at the WC. In reviewing the classification decisions for March and April, before the JDC inmates were moved, it appears that most of the inmates classified to the WC were minimum and medium. There were still however, 8 maximum security inmates classified to the WC in this time frame. This will be reviewed with the Classification Supervisor during the next site visit.

One problem noted in the last report was the practice of classifying new arrivals at RDC but not sending the paperwork with the inmate to JDC. This was occurring when a supervisor was not on site at RDC to sign off on the paperwork. When the inmate arrived, JDC staff did not have the classification paperwork to make an appropriate cell assignment. It was reported that this was corrected immediately following the January site visit.

It is also essential that the scoring be done accurately in order to have an objective, behavior based system. The systemic concern reported last time-that Classification did not have access to the NCIC report on prior arrests (the "rap sheet")-was quickly remedied. It was reported that shortly after the January site visit Booking started providing the NCIC report to Classification. This was described as fairly consistent. Because of the remote nature of the site visit, the monitoring team could not see the actual files to confirm this. There were a few files where the scoring was not consistent with the prior history reported by the inmate. One was scored as no priors; the inmate said he had prior convictions for manslaughter and armed robbery. Another said no priors; the inmate said he had a prior conviction for sexual battery. Another said no priors; the inmate said he had a prior conviction for aggravated assault. The files weren't readily accessible to check the NCIC report. One systemic problem appears to have arisen from a miscommunication. The Classification Officers were told that they should not score the severity of a prior offense unless it is "high" or "highest." They have not been scoring the severity of the prior offense if it is "moderate." This resulted in an inaccurate score in 16 of the 73 files. This

should be easily remedied. Other than this systemic error, there were very few errors observed in the files.

    g. Develop and implement positive approaches for promoting safety within the Jail including:

        i. Providing all prisoners with at least 5 hours of outdoor recreation per week;

        ii. Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

        iii. Creating work opportunities, including the possibility of paid employment;

        iv. Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

        v. Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

        vi. Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

        vii. Providing reasonable opportunities for visitation.

    h. Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances. Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

    i. Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation is still not provided to all inmates in the Jail System. The WC continues to be the only facility that is in compliance. There, a weekly Recreation Log is maintained for each housing unit. It reflects that more than five hours of recreation are provided to inmates each week. At the RDC a similar log has been adopted, but compliance with this standard was not achieved. A number of entries reflected the following

comment: "Rec door messed up" which resulted in inmates not being able to recreate as required. At the JDC, compliance cannot be achieved until an outside recreation yard is made available. When this facility was built in the 1970's it was not designed with an outside recreation yard and it has never been retrofitted/renovated to include one.  While this problem has been noted for the past four years, the County and HCSO have never attempted to address it.  This is certainly an issue/item that should be taken into consideration by the Master Planning Committee.

Regarding 42 (g) (ii) and (iii), there is no incentive program.  There are work opportunities at the WC but not paid employment, and the only opportunities at the RDC and JDC are working as trusties.

Regarding 42 (g) (iv), as was previously reported, the medication pass procedure needed to be returned to the original procedure, whereby officers and medical staff entered each housing unit to conduct business.  It now appears that the recommended procedure has been put into place, but to date there is no record of a written order documenting the change.

In general, security staff had been maintaining better control of inmates during medication pass, and so the nurses were feeling much more comfortable when passing medication.  Therefore, it appeared that this issue had been addressed.  However, then there were 2 incidents that occurred more recently that made the medical staff somewhat more anxious again.  The first incident involved an inmate who had been escorted to medical for a visit who was found to be carrying a shank, which he ended up producing in medical, while threatening another inmate.  The second incident involved a fight between two inmates during medication pass; the fight spilled out into the area where the nurse and her cart were located, and so she had to grab her cart and run; and although the officer who was escorting the nurse was attempting to address the situation, two other officers who were able to see what was going on didn't respond at all.

Although both of these 2 recent incidences were reported to the Jail Administrator, there was no specific feedback given to medical with regard to what was done and how such incidences could be avoided in the future.  Of course, these are also among the difficulties that could be addressed in a regularly scheduled meeting between administration, security staff and medical staff, if such a meeting occurred.  Therefore again, the establishment of a regularly scheduled meeting between administration, security staff and medical/mental health focused on problem identification and problem solving is strongly recommended.

At the time of this site visit, the full-time QMHP position (which had previously been a Mental Health Coordinator's position), which had been vacant since February, had been filled, and the new hire started on June 1, 2020.  Therefore now, all of the currently approved positions within the mental health team are full, and include 2 QMHPs (clinical social workers), a part-time psychologist, and a part-time psychiatric nurse clinician (supported by a psychiatrist).  The new QMHP is not expected to assume the role of a Mental Health Coordinator despite the

recommendation of the mental health expert of the monitoring team that the position should continue to be structured as such. A Mental Health Coordinator will be essential when the mental health unit is opened. This team is responsible for all of the mental health services at all three facilities.

At the time of the site visit, there were 129 inmates on the mental health caseload, all of whom are considered to be seriously mentally ill.  All but 19 of those inmates are currently being treated with psychotropic medication.  However, a review of the 19 inmates who are not currently being treated with psychotropic medication revealed that all of them have been diagnosed as suffering from a mental illness for which psychotropic medication is indicated, but to date, they have repeatedly refused to take medication. Mental health staff continue to encourage medication compliance. This will be easier once the mental health unit is open. Prior to the departure of the Mental Health Coordinator there were some individuals on the caseload who benefitted from mental health services. These individuals were dropped from the caseload because of the staff vacancy. Now that a new QMHP has been hired, it is recommended that non-SMI individuals who would benefit from the mental health services be added back to the caseload.

The part-time psychiatric nurse clinician is responsible for the evaluation of all new additions to the mental health case load and the prescribing of medication for them when indicated; monitoring the safety and efficacy of medication that has been newly prescribed; repeatedly and frequently (every several days) following up with those for whom medication is indicated but refuse to take medication, with the goal of encouraging them to take medication; responding to mental health emergencies; and the routine monitoring (every 3 months) of those who have been stabilized on medication.  Given all of these responsibilities and the number of inmates involved, the part-time psychiatric nurse clinician is unable to fulfill all of these responsibilities; and so the medical/primary care nurse clinician has been assigned the responsibility for the routine monitoring of a small sub-set of those who have been stabilized on psychotropic medication; but the medical nurse clinician will refer an inmate back to the psychiatric nurse clinician if there is any reason that the inmate's psychotropic medication needs to be fully reassessed.

At present, the 2 QMHPs and the part-time psychologist are responsible for all initial mental health assessments; the development of treatment plans for those added to the mental health caseload, as well as the development of discharge plans when indicated; providing individual treatment sessions for those on the mental health caseload; the assessment and management of mental health emergencies (including suicide watch and inmates placed on mental health observation); the weekly evaluation/review of inmates being held in segregation; providing any assessments and treatment required for PREA-involved inmates; and maintaining all medical records and logs.  In addition, they take weekend call for mental health emergencies on a rotating basis, and they come to the facility in the event of an emergency and/or to see inmates who are

on suicide watch or other special mental health observation.  Given all of these responsibilities and the number of inmates on the mental health caseload in the 3 facilities, it is obviously impossible for these 2.5 staff persons to provide individual sessions to all inmates on the mental health caseload on a weekly basis.  Therefore, although those inmates who are the most unstable may be seen at least once a week if not more, others may only be seen every 2 or 3 weeks. Furthermore, given the size of the staff and their above described responsibilities, the staff has been unable to initiate much needed group therapy programs.  However, to at least help begin to address this problem, one of the senior nurses has initiated a short-term 'discharge planning group' (focused on understanding one's mental illness, medication compliance and the responsibility for following up with treatment once released from jail), which appears to be going very well.

Given the above noted, it is reasonable to say that although the mental health team is providing a considerable amount of mental health services to inmates on the mental health caseload, there are simply not enough staff to provide individual and/or group treatment to all inmates with serious mental illness, developmental disabilities, or other behavioral difficulties, who would benefit from therapeutic activities.   There are no services for those SMIs who refuse treatment; they are simply periodically asked if they would accept treatment; and so, they require a more rigorous program that might include behavioral interventions, designed to reward them for participation in treatment.  There is a medication group (focused on learning about medication and how best to manage it), run by one of the nurses, but there are no other groups (for those on the mental health caseload regardless of whether or not they are on the mental health unit) -- needed groups include, psychoeducational groups (focused on learning about one's illness, associated dysfunction, and the benefits of treatment), discharge planning groups (focused on individuals discharge plans and how to implement them), habilitation/life skills groups (for those most chronically ill who lack some basic life skills), alcoholism and substance abuse groups, and groups for those with serious trauma histories.

It should also be noted that as all of the security policies and procedures required to comply with all provisions of the agreement are developed and implemented, mental health staff will have additional responsibilities related to the disciplinary review process, segregation review, and security uses of force; this will stretch staff even further; and therefore, staff will be even less able to provide required therapeutic activities.  Furthermore, there is a sub-set of inmates on the mental health caseload who require more than the range of mental health services/interventions currently available at the facility. Those SMIs who are acutely ill, accepting treatment, but not yet stable need the mental health unit -- a therapeutic environment that will help keep them oriented and supported (by mental health staff and security staff) in order to facilitate stabilization.  Those SMIs and those with intellectual disabilities or other cognitive deficits that cannot function in general population, despite engaging in treatment, also need a mental health unit that is a safe and therapeutic place for them --  they require groups geared towards their

special needs (for example, a group for the intellectually disabled and a group for SMIs who have residual symptoms) and a program of activities to enhance socialization and to keep them from just sitting around all day doing nothing but getting lost in their symptoms.   The plan to address this is to open a mental health unit at RDC which will offer additional services; and that unit will also have to be staffed.  Therefore, a reanalysis of mental health staff needs is indicated. This analysis should take into account the scope and frequency of therapeutic interventions that are necessary to meet the needs of the population and all the other responsibilities outlined in the Settlement Agreement. It is imperative that this reanalysis occur and the approval for additional staff is obtained prior to the opening of the mental health unit.

Mental health and health staff should work with security staff to develop procedures for the implementation of anticipated policies related to disciplinary review, segregation review, security's use of force and incident reporting and review. Mental health should design and begin to develop the plan/program for the mental health unit. QCHC should perform an analysis of mental health staff needs based on all of the issues noted above. Once QCHC assesses mental health staff needs and forwards a proposal to the County, the County should seriously consider the need to increase the number of mental health staff at the facility.

Regarding 42(g)(vi), the process/procedures for screening prisoners for serious mental illness as part of the jail's booking and initial health assessment process has been described in prior reports.  As was found during prior site visits, about 2/3 of the inmates on the mental health caseload (86 of the 129 inmates on the mental health caseload) were identified as possibly in need of mental health services and referred to the mental health team during the booking and initial health assessment processes.   A review of the 43 inmates on the mental health caseload who were added to the caseload at some later point revealed that 19 of them were self-referred; 11 were referred by the medical department; 9 were added because they had become suicidal; and 4 were identified by the mental health staff.  The majority of these 43 inmates were found to be suffering from depression, especially amongst the group that was self-referred; this might suggest that this sub-set of inmates became depressed while detained at the facility (and did not show signs of or report a history of depression at intake); but the fact that a considerable percentage of them were ultimately found to be suffering from a chronic depressive disorder raises the question of whether or not their need for mental health services was missed during the booking and initial health screening processes.  Furthermore, the fact that a significant percentage of these 43 inmates were found to be suffering from some type of psychotic disorder further raises the question of the adequacy of the booking and initial health screening processes with regard to identifying new admissions who might be seriously mentally ill.

With regard to initial mental health assessments (performed by the mental health team when a prisoner is referred to mental health), the timeliness of these assessments has continued to improve.  It should be noted however that 38 of the 86 inmates on the mental health caseload who were referred to mental health from Booking and/or after the initial health screen initially

refused to undergo a mental health assessment; multiple, repeated attempts (every 2 to 3 days) were required to get them to undergo a mental health assessment; and about 2/3 of these 38 resistant inmates were eventually found to be suffering from a psychotic disorder.  Of course, this is important because it means that the initiation of appropriate treatment for this seriously mentally ill population was delayed due to their refusal to be evaluated, but it also means that for a significant number of new admissions, the staff time required to perform an initial mental health assessment (involving multiple repeat attempts) is much more than would be expected and this needs to be considered when performing an analysis of the need for mental health staff.

Once the mental health unit is open, rapid assessment of newly admitted, mentally ill inmates will be even more important, because it will determine whether they are placed on the mental health unit or in general population.  Since some of the more acutely mentally ill new admissions, who would be most in need of placement on the mental health unit will include that population who tends to initially refuse a mental health assessment, planning for the mental health unit should include a plan for where to hold/house apparently ill, new admissions who refuse an initial mental health assessment until an assessment can be done.

Steps have been taken towards opening a special needs/mental health unit on C-pod.  The renovated unit will include a pod for seriously mentally ill prisoners, with an adjacent ISO-unit for even more seriously mentally ill prisoners (those who are at risk of harming themselves or others, either because they are not yet stabilized on medication or have refused medication); an area for special mental health observation; space for group therapy and other expanded mental health programming; and office space for mental health staff and individual therapy sessions. The unit will also be designed so that security staff can employ a direct supervision approach to security management.  In addition, work has been done on the development of the policies and procedures for the unit.

When the mental health unit is opened, it is expected that medical, mental health and security staff would work together as an interdisciplinary team to provide a safe environment for mentally ill inmates and staff, while providing mentally ill inmates with the level of mental health services that they require.  While this will be important for the management and treatment of all prisoners who will be housed on the unit, it will be particularly important for the management and treatment of the most acutely ill prisoners, most of whom are currently being held in segregation. Therefore, a mental health program plan for the unit needs to be developed, and steps must be taken to assure that there is an adequate compliment of mental health staff to implement that program.  In addition, security staff who will be assigned to the unit need to be selected and trained (see section 45-f).

With regard to the mental health program for the unit, a menu of therapeutic interventions needs to be developed and implemented in order to address the needs of the various types of seriously

mentally ill prisoners who will be housed on the unit.  Then, following a mental health assessment of each prisoner, a treatment plan would be developed that describes the prisoner's mental health difficulties; the goals of treatment; the specific selections from the menu that will be employed to reach each goal of treatment; which staff person will be responsible for each therapeutic intervention that will be employed; and an estimate of how long it will take to reach each treatment goal.  It is anticipated that treatment plans will be developed and signed off on by the unit's treatment team, and that treatment plans will be reviewed by the treatment team on a regular basis and revised when indicated.

With regard to the populations who will be appropriate for placement on the mental health unit, there will be seriously mentally ill prisoners who are expected to be able to stabilize (get their symptoms under control) and then undergo psychoeducation (i.e., learn about their illness, their need for treatment, and how best to participate in their treatment), so that they can continue with treatment upon their release from jail and thereby hopefully avoid rearrests; there will be a similar set of prisoners who are likely to be convicted and imprisoned for some period time, but stabilization and psychoeducation will be focused on helping them function better in prison; and while still detained in the facility, some sub-set of both groups of prisoners will likely stabilize to the point where they can be housed on a general population unit.  These prisoners will require aggressive medication management, individual therapy, and group therapy that includes various psychoeducation groups, life skill groups, discharge planning groups, and other activity groups.

There will be other seriously mentally ill prisoners who remain so impaired despite compliance with treatment that they will have to remain on the mental health unit while detained in the facility.  These prisoners will require aggressive medication management, supportive individual therapy, and group therapy, including various support groups and groups focused on how they might transition to a community-based setting that has adequate supports once they are released.

Then there will be the even more seriously mentally ill prisoners (so acutely ill that they are a danger to themselves or others), who are being treated but are still quite ill or who have refused treatment; those in treatment may be in the ISO-section of the unit or under special mental health observation of some type until they have begun to stabilize enough that they are no longer a danger to themselves or others; and those who have refused treatment will be in the ISO section of the unit.  Those prisoners who have accepted treatment need an even more aggressive approach to medication management, coupled with individual therapy focused on helping them stabilize – once stabilized, they will receive the type of treatment that other seriously mentally ill prisoners receive (described above).  Those prisoners who have refused treatment will require repeated individual visits, focused on helping them come to understand their need for treatment, coupled with monitoring of their mental status to determine whether or not some emergency mental health intervention is indicated.

In addition, some individuals within the above noted groups of seriously mentally ill prisoners will also be suffering from substance abuse difficulties; upon admission, some might be experiencing a withdrawal syndrome that needs to be managed; but all such prisoners should also have access to individual and group therapy focused on addressing their substance abuse difficulties; and with regard to the treatment of these dually-diagnosed individuals, it will be important to remember that it has been well established that the integration of the treatment of their substance abuse difficulties and other mental health difficulties is required in order to successfully treat them.  Furthermore, some individuals will also be suffering from intellectual and/or other cognitive difficulties, and so special programming for those individuals will also be required.

A program plan for the mental health unit needs to be developed that reflects all of the above noted.  This will be done by the mental health staff, with the support of the facility's director of medical and mental health services, and with consultation with security administration where/as indicated.  Since the newly hired QMHP has helped develop and then worked on such a mental health unit, her knowledge base and experience should be extremely helpful with this effort.  It is also recommended that the local QCHC staff seek assistance from the QCHC central office through knowledgeable individuals or the retention of an outside consultant. As previously stated, it is essential that this planning occur now in advance of the mental health unit opening.

Finally, there are several other issues, discussed in other sections of this report, that in various ways relate to and/or impact on the proposed mental health unit.  These include issues regarding classification and housing (see section 74); issues regarding mental health involvement in disciplinary review (see section 77); and the range of issues related to avoiding the placement of those prisoners with serious mental illness in segregation and removing such prisoners from segregation.

Regarding 42 (g) (vii), visitation has always been very limited, particularly at the RDC and WC. However, since the COVID-19 pandemic has struck, visitation has been totally restricted.  This restriction seems to be extreme in that all visitation in the Jail System has been limited to video for several years.  Now, the only video visits allowed are by family members who do so from their own homes, at a significant cost to those individuals.  Considering the impact of the pandemic on inmate visitation, some jurisdictions have waived the fee for visitation entirely, and/or have waived the fee for inmate telephone calls.  This is certainly something that the HCSO should consider.

Regarding 42 (h) as has been previously reported, various staff are responsible for the higher levels of supervision required for prisoners who are on suicide watch and other special medical or mental health observation.  These staff include medical and mental health staff as well as security staff. Suicide watch procedures are not consistent at each facility.  At the RDC male inmates placed on suicide watch are assigned to a specific ISO Unit which is supposed to have

an officer assigned full time to the ISO Unit for the duration of the watch.  While supervision is constant, log entries are made every 15 minutes.  At the WC suicide risk inmates are sent to the RDC.  At the JDC, male inmates who require a suicide watch are sent to the RDC.  Female inmates placed on a suicide watch are put in a designated unit, but the required observation is every 15 minutes, not constant.  The procedure should be standardized between facilities.  In spite of this inconsistency, documentation of well-being checks of female inmates on suicide watch at the JDC indicates that they are conducted far more frequently than the fifteen minute expected standard.

At the RDC suicide watches are supposed to be constant, with an officer always assigned inside the ISO unit, but incident reports reflect that the procedure is not followed consistently.  The lack of compliance with the approved policy is apparent in Incident Report 2000874 which documents that an officer responsible for B-1 ISO (suicide watch) was not on his post when one inmate assaulted another.  While the shift supervisor did write a supplemental report, it did not even mention the fact that the assigned officer was not on post.  A review of 12 suicide watch logs from the month of May revealed a broad range of discrepancies.  While the majority of well-being checks were recorded at 15 to 20 minute intervals, many entries were a half hour to 45 minutes late.  One log had only 12 entries during an eight hour shift where there should have been 32.  Another officer listed "shake down" in the comments section of the log for almost every 15 minute entry.  In all cases, the log forms were signed by a supervisor indicating review, but none of the obvious discrepancies were noted, nor were there any notes of corrective action.  It is apparent that supervisory review is pro-forma.  Supervisors merely sign their names; they do not actually "supervise".

As has also been previously noted, given that 2 or 3 inmates are placed on suicide watch each week, the initial assessment of inmates who are suspected of being suicidal, the daily monitoring of those placed on suicide watch, and providing follow-up care and monitoring of inmates for a reasonable period of time upon their release from suicide watch requires a considerable amount of QCHC staff time.  This will be important to consider when performing an analysis of mental health staff needs.

Prisoners on special medical observation are seen daily by medical staff.  At present, there is no special mental health observation for acutely mentally ill prisoners; most acutely mentally ill prisoners are being held in segregation; but it is anticipated that when the mental health unit is opened, a part of the function of that unit will be to provide a higher level of supervision of these prisoners by mental health, medical and security staff, as well as more appropriate therapeutic interventions for such acutely mentally ill prisoners. As noted in prior reports, a review of the mental health records of the mentally ill inmates in segregation indicates that many of them would be successful in a more therapeutic, less restrictive setting.

Prisoners who are withdrawing from alcohol and/or other drugs also require enhanced supervision by medical, mental health and security staff.  At present, such prisoners are placed on a regular unit with enhanced medical, mental health and security supervision, unless it is suspected that they are withdrawing from a substance that requires more constant medical supervision, in which case they are placed in the infirmary.  Whether or not there will be adequate staff on the mental health unit to manage those prisoners who currently undergo withdrawal in the infirmary must be carefully considered.

Regarding 42 (i), video surveillance capabilities, at the RDC, cameras in the corridors and housing units are recorded, so incidents can be reviewed after the fact.  This capability has been in place since the beginning of the monitoring process.  At the WC, live action cameras have always allowed visual coverage of the hallways and housing units, but they were not recorded until Benchmark Construction added that capability in June when they installed cameras covering each housing unit fire escape door in June.  This enhancement will finally allow the CID and IAD investigators to review video recordings of incidents.  At the JDC, there are cameras that cover and record the hallways and the drive through sally port/transfer waiting area, but there is no coverage inside the housing units.

While the IAD and CID investigators now have access to the video recording system so that they can quickly view incidents, they still cannot obtain copies of them without having to go through a request process with IT.  It is recommended, again, that these investigators be granted immediate access to both view and record copies of previously recorded incidents.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

   a. Staff vacancy rate of more than 10% of budgeted positions;
   b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;
   c. A major disturbance resulting in the takeover of any housing area by prisoners;
   d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;
   e. Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;
   f. One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality

review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g. One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The HCSO still does not generate a unique report to cover this paragraph.  The turnover rate of staff was approximately 22% for the first five months of 2020.  That is more than twice the threshold figure of 10% specified in 43 (a).  Consequently, required posts cannot be filled as necessary.  This is supported by the fact that staff routinely discover problems after the fact when inmates report that they have been assaulted or when they respond to fights and assaults already in progress.  Incident Report #2000997 is a case in point.  Officers picking up trays in HU B-3 at the RDC saw an inmate with an eye injury.  He reported that he had been assaulted the previous night.  The Detention Officer who made the initial report did not indicate where the incident occurred, but the Sergeant who was called to the scene included that information in his supplement.

With regard to 43 (c), the RDC continues to experience incidents in which the inmates break out of their cells and housing units, sometimes even taking over staff areas.  A major riot occurred in 2012, shortly after the housing unit officers were removed from their assigned posts.  Since then, the lack of inmate supervision, coupled with locks and doors that cannot be secured, has led to periodic reoccurrences.  Incident Report #2000819 states that on May 18, 2020, the inmates in A-2 "breached" the Recreation door and were rushing into A-3. The officers who had been in A-3 retreated to the Control Room where they found an inmate sitting in the back of Pod Control. Eventually, the incident was brought under control. Four inmates were treated on site with bruising, abrasions, lacerations and puncture wounds. Incident Report #2000877 reflects the most recent case on point.   On May 26, 2020, when officers went into HU B-4 to conduct a security check, inmates overpowered them, took their keys away, exited the HU and "kicked the cage door to B-3 open" and entered that housing unit.  Fortunately, backup officers were able to regain control of the situation in short order.

With regard to 43 (d), there has still been no mortality or administrative review conducted regarding the death of an inmate who was beaten to death by other inmates in his housing unit at the RDC in December 2018.  Although the CID investigation of the case has been completed, it was never referred to IAD for investigation.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b.  All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

c.  Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.  The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been indicated in previous Monitoring Reports, none of the facilities meet the requirement that well-being checks be conducted every 30 minutes on general population inmates, 15 minutes on restrictive housing inmates and 15 minutes on detainees held in Booking holding cells.  The corrections operations member of the monitoring team has spent a great deal of time attempting to set up procedures in each facility that at least meet the American Correctional Association standard of 60 minutes for general population inmates, 30 minutes for restrictive housing inmates and 15 minutes for holding cell (Booking) inmates.  That standard is now incorporated into Policy 9-200, Supervision and Post Operations.

While well-being checks have been consistently accomplished at the hourly level for general population inmates at the JDC and WC in the past, the RDC has not achieved that level. Consequently, the Monitoring Team developed a procedure whereby officers at that facility were restricted from using the control rooms as break areas and which required officers to call in their reports to the respective control room officers.  That procedure was put in place through a

directive by the previous Jail Administrator prior to her retirement. It should be followed until such time as direct supervision is reinstituted at the RDC. Initially this interim procedure appeared to result in more timely and complete well-being checks when it was followed, but several recent incident reports indicate that officers sometimes reverted to their old ways. In Incident Report # 2000226, it was noted that two floor officers were in B-Pod control "doing observation" when the incident occurred. Similarly, Incident Report #1000819 includes supplemental reports that state that after completing their well-being checks the A-Pod floor officers "all came back to Pod Control to do our paperwork." This is exactly what is intended to be prohibited by the new directive.

While direct supervision operation is scheduled to be implemented at the WC in July, at the JDC remote, periodic surveillance is dictated by the design of the facility. Hopefully, direct supervision will be implemented in C-Pod sometime in July; however, A-Pod will continue to function as a remote surveillance housing area.

Because it was not possible to review the control room logbooks during the remote site visit, no determination can be made as to compliance with the hourly well-being check standard at the RDC. The same is true for the WC's housing unit logs. Well-being check logs for the JDC were available for review because those records are maintained on a form, not in a logbook. They show that inmates in general population at the JDC are monitored at least hourly and that inmates in confinement are monitored at least every 30 minutes.

A series of well-being check forms for inmates held in confinement (segregation) during June were received covering the following locations.
A-1 ISO
A-4 ISO
B-1 ISO (Suicide watch)
B-4 (Confinement housing)
B-4 ISO
Booking (Holding cells)
The frequency requirement for well-being documentation is every 15 minutes in B-ISO and Booking. All of the other above listed areas require 30 minute checks.

While most of the forms were completed properly, the frequency of discrepancies is unacceptable. Many forms were improperly labeled. General population housing units were listed as the "Location" instead of the actual ISO unit. Entries were made (uniformly) exactly on 15 minute or 30-minute intervals precisely on the quarter hour, half hour, three quarter hour and hour. This has the appearance of a form that has been filled out in advance or after the fact, certainly not when the check actually occurred. One officer recorded checks at precisely the same minute in A-1 ISO and A-4 ISO, a physical impossibility. Booking holding cells were

variously identified as "Booking, TI and H-1". Suicide watch records in B-1 ISO were recorded on a standard 15-minute watch form, not the required 15-minute Suicide Watch Form.

It is apparent that remedial training is required.  In addition, supervisory responsibility and accountability must be reinforced.  While almost every well-being check form was signed by a supervisor, not a single one noted any of the readily apparent discrepancies noted above.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

   a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

   b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

   c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

   d. Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

   e. Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment

meetings.  Post-service training should also include field and scenario-based training.

    f.   Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

    g.   Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

    h.   Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

During the remote site visit in June the Training Captain did not participate in the scheduled conference call.  In his place, the Training Lieutenant reviewed records covering the first five months of 2020.  With regard to 45 (a), all Detention Officer recruits complete the basic academy before they are assigned to duty within the respective facilities.  45 (b), post order training cannot commence until post orders are developed and published.  45 (c), a direct supervision block of instruction is now incorporated into each basic recruit academy curriculum. Initially a cadre of existing staff were included in this training, but due to problems associated with the pandemic, it has not been possible to include them in the most recent class.  45 (d), Jail Administrator training has not yet been provided to the new Jail (Detention) Administrator. 45 (e), (f), (g), (h), in service training is continuing, but is hampered by pandemic restrictions on staff.  Training for critical posts and special management unit training is not currently ongoing. Training on policies and procedures is not keeping pace with the approval of new policies. Recognizing this, priority should be given to Use of Force training as one of the most critical areas facing the HCSO.

Presently, although there are security staff assigned to the medical/mental health section of the facility, there are no medical or mental health units, and so prisoners with special medical needs and/or mental health difficulties are housed throughout the facility (with the exception of the several prisoners who might be in the infirmary at some point – see also the section of this report on COVID-19).  Furthermore, even when the mental health unit is opened, it will not be big enough to house all of the prisoners on the mental health caseload, and so there will still be prisoners who are suffering from mental illness and/or intellectual disabilities housed in general population.  Therefore, with regard to this provision of the agreement, it is important to consider the mental health training provided to all security staff, as well as the need for additional training

that might be provided to security staff who will be assigned to the special needs/mental health unit once it is opened.

The mental health expert on the monitoring team has raised some concerns (as recently as the last monitor's report) about the mental health training provided to all security staff.  No review of that training has been reported in response to the concerns that have been raised.

Before the special needs/mental health unit is opened, security staff who will be assigned to that unit will require additional training.  This is because they will be dealing with the most seriously ill prisoners; their interaction with such prisoners will be more ongoing and more intense, especially given that security staff will be employing the direct supervision model; and it is anticipated that they will be working in a more coordinated/collaborative role with mental health staff.  In essence, this additional training should include much more about the signs and symptoms of mental illness and intellectual disability; the impact of the various mental illnesses and intellectual disability on an individuals' ability to function; and approaches to the management of prisoners with mental illness and/or intellectual disability that can dovetail with the therapeutic services being provided, thereby creating an overall and consistently run therapeutic environment.

It should be noted here that security staff persons who will be assigned to the mental health unit should be carefully selected based on their interest in working on such a unit, their experience and innate capacity to work with such prisoners, and their willingness to undergo additional specialized training.  It might also be helpful to obtain recommendations from supervisors, as well as mental health and medical staff, since it is clear that they have gotten to know specific security staff persons who appear to work well with mentally ill prisoners.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

     a.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

     b.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any

who are not already reporting to the Jail Administrator and the Jail's chain of
command.  This provision covers road deputies assigned to supervise housing
units and emergency response/tactical teams entering the Jail to conduct random
shakedowns or to suppress prisoner disturbances.

c.  Ensure that supervisors conduct daily rounds on each shift in the prisoner housing
units, and document the results of their rounds.

d.  Ensure that staff conduct daily inspections of all housing and common areas to
identify damage to the physical plant, safety violations, and sanitation issues.
This maintenance program must include the following elements:

  i.  Facility safety inspections that include identification of damaged doors,
  locks, cameras, and safety equipment.

  ii.  An inspection process.

  iii.  A schedule for the routine inspection, repair, and replacement of the
  physical plant, including security and safety equipment.

  iv.  A requirement that any corrective action ordered be taken.

  v.  Identification of high priority repairs to assist Jail and County officials
  with allocating staff and resources.

  vi.  To ensure prompt corrective action, a mechanism for identifying and
  notifying responsible staff and supervisors when there are significant
  delays with repairs or a pattern of problems with equipment.  Staff
  response to physical plant, safety, and sanitation problems must be
  reasonable and prompt.

**Non-Compliant**

While there is still no specific policy that delegates authority to the Jail (Detention)
Administrator to manage the Jail System as specified by this paragraph of the Settlement
Agreement, the change of administration with the election of a new Sheriff offers the opportunity
to implement revised practice.  To that end, it would be appropriate for the Jail (Detention)
Administrator to be able to designate who is promoted into key positions such as the Assistant
Jail Administrator and Captain at the JDC.  At this point it appears that such is not the case.

The lack of supervisory responsibility and accountability, particularly at the RDC, noted in the
Tenth Monitoring Report, continues to be a particularly troublesome problem.  As has been
noted in previous paragraphs (above) supervisory review generally amounts to nothing more than
a signature.  Comments regarding discrepancies and recommendations for corrective action are
not included in supplemental reports or following supervisors' signatures.

Supervisors are responsible for daily inspections of the facilities to document and correct
maintenance and security issues; however, since the riot of 2012, there has been little incentive
to follow through with this duty since there was no system in place to ensure that work orders

submitted by Detention staff resulted in timely corrective action.  Recognizing the long-standing nature of this problem, a number of specific measures were included in the Stipulated Order that is now in place.  One of the most positive outcomes was that the County contracted with Benchmark Construction to coordinate and supervise all major maintenance issues in the Jail System.  Since Benchmark came on board there has been a marked improvement.  A qualified supervisor is on site full time.  He serves as the point of contact between the HCSO/Detention Services and the County Administrator who has taken a hands-on approach by personally reviewing and authorizing individual projects.  For its part, the HCSO has hired a full time Chief Safety and Security Officer who will coordinate all HCSO work orders with the County (through Benchmark Construction) to ensure accountability and consistency with regard to maintenance issues.  Hopefully, this will finally resolve the long-standing lack of communication issue between the HCSO and County that has characterized their relationship when attempting to deal with maintenance problems in the Jail.

After it was given approval to proceed, CML Security, a qualified corrections contractor, completed C-Pod door and lock repairs and upgrades in a timely fashion. At this time, there are insufficient staff available to open C-Pod as a direct supervision housing area, but a training class for new officers should graduate soon which should make it possible to open C-Pod on August 1st.  Once C-Pod opens, B-Pod will be closed to undergo a similar renovation.

The new Master Planning Committee, which is required by the Stipulated Order, is proceeding with the necessary research to develop a comprehensive plan to address Hinds County's correctional needs.  A local firm, CDFL Architects, and a nationally recognized architectural and planning firm, HDR, have been retained by the County to direct this effort.

Fire safety issues, which are most critical at the RDC, are being addressed by the newly appointed Fire Safety Officer (FSO).  He will report to the above-mentioned Chief Safety and Security Officer (CSSO), who in turn reports to the Assistant Jail (Detention) Administrator and Detention Administrator.  The FSO has already ensured that fire hoses were reinstalled in the C-Pod housing units.  In addition, he had the fire hydrants at the RDC and WC tested in April, and he submitted records of fire drills at each facility for the month of May. It is anticipated that he will work with the CSSO and Benchmark's on-site supervisor to address other fire safety problems.  The FSO has also communicated directly with the State Fire Marshal's Office to obtain copies of the most recent fire inspection reports and to schedule the next inspection of all three facilities.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Partial Compliance**

Because shakedowns occur more frequently than in the past and documentation is much improved, this paragraph is upgraded to Partial Compliance.  According to the monthly shakedown log that was provided for each facility for the months January through May, there were a total of 37 shakedowns conducted in the Jail System; four at the WC, seven at the JDC and 26 at the RDC.  It is possible that the log is incomplete because there were no shakedowns recorded at the WC for March, April and May; there were none recorded for the JDC for April and May; yet the RDC recorded shakedowns in each month.

The shakedown log provides a consolidated record of activity in all three jails in a standardized format.  As was previously noted, although it cross references incident report numbers, it does not reflect whether or not contraband was found.  In some instances, significant quantities of contraband items are confiscated, although fewer telephones have been found than was the case just a year ago.  Instead, a wide array of homemade shanks appear to be the contraband item of choice.  In Incident Report #2000887, it was noted that 20 shanks were recovered in a shakedown at the RDC.  This incident was also video recorded, which is something that has never occurred until this reporting period.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

There has been no action taken to deal with this issue since the beginning of the monitoring process.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for two years.  An officer was assigned to work on this issue, but there is no documentation of a program that meets the requirements of this paragraph.  Gang activities cannot be monitored or managed currently at the RDC because the housing units are not staffed.  When C-Pod opens as a direct supervision housing area, that situation should change.  Hopefully, B-Pod will undergo the same change after it is renovated.  At the WC, gangs do not have a free hand to operate because staff are always present within the housing units.  At the JDC gang issues are not as prevalent as at the RDC because of the small size of the individual cell blocks/housing units.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:
   a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
   b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;
   c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;
   d. Prohibit the use of force as punishment or retaliation;
   e. Limit the level of force used so that it is commensurate with the justification for use of force; and
   f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

Policy 5.500, Use of Force, was approved by the Sheriff on February 1, 2020.  It lays out UOF standards that are consistent with the requirements of this paragraph.  Sub-paragraphs (a) through (f) are all covered by and comply with the provisions of the policy.

Training on this policy needs to be completed for all personnel as expeditiously as possible.  While one segment of training was scheduled for February, it had to be delayed until April.  In the interim, the COVID-19 pandemic struck, which caused UOF training to be delayed again, and resulted in a negative impact on the training process.

Incident reports covering the most recent reporting period reflect the need for the referenced training.  Incident Report #2000288 deals with an inmate who refused orders from an officer.  Consequently, he was sprayed with OC foam in order make him comply.  OC, and other similar weapons are designed for defensive, not coercive, purposes.  There was no supervisory review regarding this situation.  It will continue to take consistent training, supervisory review, and disciplinary action to implement the new policy on UOF.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

   i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

   ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

   iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

   i. a sign-out process for staff members to carry any type of weapon inside the Jail,

   ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

   iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

j. All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Non-Compliant**

Although a Use of Force Policy has been approved, it has yet to be implemented through required training; therefore, previous comments regarding this paragraph still stand. Once training has been accomplished it will be possible to move the finding to Partial Compliance. The lack of documented supervisory review is still a significant problem; however, supervisors are routinely notified whenever there is a UOF noted.

Regarding 51 (d), a review of incident reports shows that inmates are routinely sent to Medical for clearance whenever UOF cases are recorded. What happens there is often not documented, recorded or included in supplements to the original reports

Although there were no planned UOF cases documented during the past reporting period, there were, once again, a number of cases that could have been so classified. Incident Report # 2000079 represents a confrontation between inmates and staff that actually developed into a planned UOF case. Unfortunately, it was not handled as such. When less than lethal equipment was obtained in order to handle the situation, that constituted a planned UOF, and should have been documented as such.

In compliance with the Stipulated Order, the County ordered, and has now taken custody of, hand held video recording equipment. This means that it is now possible for staff at each facility to record shakedowns, planned UOF cases and other significant incidents.

## USE OF FORCE TRAINING

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**

This paragraph is carried as Partial Compliance because the HCSO has had on-going UOF training, just not based on the recently approved UOF policy.  The UOF training that was scheduled for February was rescheduled to April, but then was postponed again due to the COVID -19 pandemic.

53. Topics covered by use of force training must include:
   a. Instruction on what constitutes excessive force;
   b. De-escalation tactics;
   c. Methods of managing prisoners with mental illness to avoid the use of force;
   d. Defensive tactics;
   e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

The UOF training includes a continuum of appropriate force responses to escalation situations, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This paragraph cannot be addressed until staff have been trained on the new Use of Force Policy.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

Since the new policy on Use of Force was just approved in February, there have been no revisions to it which would justify updated training. This paragraph is listed as non-compliant because there has been no training on the new Use of Force Policy.

## USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**
Although a Use of Force policy has been approved, training on associated report writing and review requirements has not yet been conducted.  The Rapid Notification System has improved the reporting process on high priority incidents, which includes UOF cases, but supervisory review is still lacking. The form of the Rapid Notification ensures that some basic information is routinely provided; however, the narratives contained in the Rapid Notifications are inconsistent in quality.

Incident Report #2000819 is indicative of the problem.  The incident is titled "Riot" by the initiating officer, but "Minor Disturbance" on the Rapid Notification form.  The chain of events is almost impossible to follow in the report, but supplemental reports by other officers and supervisors brought to light the following issues:  (1) Inmates were able to break out of A-2, A-3 and A-4 at the RDC.  Fights between inmates ensued.  (2) At one point, the pod officers retreated to the control room.  An inmate was found inside the control room, but there was no explanation as to how he got there or what happened afterwards.  (3) Officers deployed OC multiple times. At least one officer was threatened by an inmate with a shank.  (4) One officer reported that she and two other officers were inside the pod control room doing paperwork after conducting a wellness check when the incident began.  (5) The facility Captain and road deputies were called in for backup.  Supervisory review of this situation is totally lacking.  There was no after action report or administrative review of the incident.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There is no way for the monitoring team to determine whether or not UOF reports are submitted by the end of a staff member's shift.  Reports reflect the time of the incident, but not when the report was submitted.  A time check needs to be incorporated into the JMS system.  The same discrepancy applies to supervisory review.  Supervisors who are involved in incidents often write supplementary reports, but supervisors do not approve/disapprove and make comments/recommendations regarding the reports and logs that they review.  In the past, a hand written signature constituted the extent of their review. Since January signatures have not appeared on copies of incident reports provided to the monitoring team.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

    a.  A unique tracking number for each use of force;

    b.  The names of all staff members, prisoner(s), and other participants or witnesses;

    c.  Housing classification and location;

    d.  Date and time;

    e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.  A description of the staff member's attempts to de-escalate the situation without use of force;

    h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.  A description of any observed injuries to staff or prisoners;

    j.  Whether medical care was required or provided to staff or prisoners;

    k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

    l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

Although there is now an approved Use of Force policy, there has been no change in the form and substance of UOF reports. They do not reflect all of the information that is specified in this paragraph. While there is a unique tracking number, and the names of staff members, and sometimes those of involved inmates, witnesses are seldom, if ever, listed. Even in cases where witnesses are identified, witness statements are almost never taken. The cell location is usually noted, but quite often the facility is not. The classification of the cell/location is not noted. When force is used, an explanation is generally included; and in most instances, medical follow up is documented although seldom is the nature of the injuries recorded. Unfortunately, that information is only available through the originating officer's comments. Medical staff should have the ability to provide supplemental reports just as Detention Officers do.

The comments noted in paragraph 56, above, apply here as well. The incident report referenced there is all too representative of the poor quality of incident report writing in the Jail System.

**USE OF FORCE SUPERVISOR REVIEWS**

59.     The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force. At minimum:

    a.    A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

    b.    A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

    c.    Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

    d.    If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

    e.    Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

    f.    All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

    g.    A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy. Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

There has been no significant change in the status of this paragraph. While supervisors do respond on scene to incidents in a timely fashion, they still do not review and approve/disapprove or make recommendations as they should; nor is it possible to see whether or not they review UOF reports by the end of their shift. In some instances, supervisors indicate that the CID investigator was notified, but there are no instances of supervisors making a recommendation that the report be referred to IAD for review.

Although there has been no appreciable change since the last Monitoring Report, the fact that there is now a Use of Force Policy in place should result in positive change once training has been completed.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force. Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent. If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.     Document whether the use of force was recorded. If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded. If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph. The required actions are not routinely followed by supervisors. A review of UOF reports revealed that photographs are infrequently taken. There is no record of a waiver related to the refusal to be photographed in the past five months. The good news is that there is now a recording capability on the cameras at all three facilities. At the JDC that is limited to the hallways and common areas associated with intake/transfer waiting.

Although supervisors do not currently comply with the provisions of this paragraph, once training has been provided to all personnel on the new Use of Force policy, it should be possible to better measure compliance.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status since the last Monitoring Report.  As has been consistently noted, there is apparently a check box in the JMS system for a supervisor to check after review. Even if the monitoring team was able to routinely see this check box, this is not sufficient to meet the requirements of the Settlement Agreement. There is no documentation in the JMS system of approval or disapproval or any recommendations following review. Currently, the documentation provided to the monitoring team does not reflect supervisory action regarding approval, disapproval and recommended action on individual reports.

There is no record of supervisory review at the rank of Captain or above on all level 1 UOF cases.  If there is a record of such action, it has never been provided to the monitoring team.

62. Reviewing supervisors must document the following:
   a. Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;
   b. Witness statements;
   c. Review date and time;
   d. The findings, recommendations, and results of the supervisor's review;
   e. Corrective actions taken;
   f. The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);
   g. Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –
      i. The nature and extent of injuries, or lack thereof;
      ii. The date and time when medical care was requested and actually provided;

       iii.     The names of medical or mental health staff conducting any medical or mental health assessments or care.

   h.     Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

The supervisory portion of the JMS reporting system is limited to a check box.  Supervisors do not have the ability to indicate recommended action or discrepancies noted regarding the items for which this paragraph requires review.  Consequently, supervisors previously had been signing the reports to indicate a review. However, since January even this is not occurring and this alone would not begin to meet the requirements of this paragraph.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

While the approved Use of Force policy is in effect, there is, as yet, no approved counterpart for incidents in general.  Once one has been adopted, and requisite training is completed, it will be up to supervisors to ensure that incident reports comply with policy.  Incident Report 2000819, referenced earlier, is an example of a report that is so confusing that it is difficult to determine what occurred even though it dealt with a very serious situation.  Inmates broke out of their housing units, fights ensued, force (including OC) was used by staff on multiple inmates, officers were threatened with weapons, officers (by their own admission) were in violation of the standing order regarding well-being checks, no photographs were taken, contraband was collected, but there was no specific record of what or where in the report and there was no supervisory review.

64.    Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:

   a.     Tracking number for each incident;
   b.     The names of all staff members, prisoner, and other participants or witnesses;
   c.     Housing classification and location;
   d.     Date and time;
   e.     Type of incident;

f.      Injuries to staff or prisoner;

g.     Medical care;

h.     All staff involved or present during the incident and their respective roles;

i.      Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

j.      External reviews and results;

k.     Corrective action taken; and

l.      Warden and Administrator review and final administrative actions.

**Partial Compliance**

There has been no change with regard to the status of this paragraph.  While the Use of Force policy has been approved, a basic policy regarding incident reports has not yet been developed and approved.  Reports provide some, but not all, of the information that is required by the Settlement Agreement.

Incident reports routinely have a tracking number and list those staff involved.  Inmate witnesses are almost never noted, nor are witness statements.  The nature of inmate injuries is noted in some, but not all, cases.  Only a few incident reports reflect photographic evidence.  Most reports do not specify the facility in which the incident occurred.  That information can only be determined by having knowledge of the pod or housing unit configurations of each jail.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

a.     Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

b.     Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

c.     Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

Since there is no approved policy regarding incident report documentation, this paragraph is still carried as Non-Compliant.  Incident reports continue to reflect a lack of basic information including the facility where the event occurred.  There is still no standard in place that requires a written report whenever lost money or property, or a bad/late release is noted.  Consequently, there is no way to know how many such incidents have occurred.

Not all staff members are preparing report supplements when they are involved in an incident. Incident Report 2000784, dated 5-13-20, occurred at the RDC.  It was originally listed as an Assault, but the Rapid Notification called it Assault or Attempted Assault/Use of Force.  Two officers were getting an inmate out of B-1 to go to court when the inmate swung on one officer and spit on the other.  The second officer pulled out his OC and delivered two bursts.  Three other officers then responded to the scene and assisted in placing the inmate in handcuffs.  The officer who used OC wrote a report.  The officer who was swung on wrote a supplement.  The three responding officers who helped put the inmate in handcuffs did not write supplements.  A sergeant wrote a UOF supplement that said only "REFUSED MEDICAL TREATMENT".  He never indicated whether or not the force used was appropriate, he took no pictures, did not identify witnesses or take witness statements and did not ensure that all officers involved in the incident wrote supplements.

Based on the current status of the JMS system, it is not possible to determine whether or not incident reports are written in a timely fashion or whether or not supervisors do likewise.  The only thing that can be determined is the reported time of the incident as it appears in the report.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:
   a.   Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.
   b.   Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.
   c.   Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.
   d.   Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**
There has been no change in the status of this paragraph.  The monitoring team cannot determine whether or not supervisors review incident reports (other than to sign on a printed copy which had been done but is no longer) because of the previously mentioned shortcoming of the JMS system.  There is no documentation that reflects approval, disapproval or recommended actions.

While the newly approved Use of Force policy spells out the duties of supervisors with regard to a UOF incident, it does not deal with all incident reports.  Policies dealing with all incident reports need to be developed and approved.

## SEXUAL MISCONDUCT

67.     To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

    a.    Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

    b.    Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

    c.    Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

    d.    Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

    e.    Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

    f.    A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

    g.    A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

    h.    Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

    i.    Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

At the time of the site visit, the new PREA Coordinator had been newly appointed the day the site visit began. The position had been vacant for 5 or 6 months during which time there appears to have been no education of inmates, no training of staff on PREA, no PREA investigations. However, because the new PREA Coordinator had only been in the position for one day, she could not provide updates on the activity prior to her appointment. The new PREA Coordinator appears to be diligently working to educate herself in this area and create an effective program

including coordinating with the PREA officers at JDC and the WC. This paragraph continues to be listed as partial compliance as some requirements such as posters and inmate orientation continue to be in place.

Nursing staff continue to be involved in the screening of newly admitted prisoners to identify those who may be sexually abusive or at risk of sexual victimization as part of the intake screening process.  New admissions so identified are referred to the PREA officer.  Mental health staff perform a mental health assessment of all such new admissions forwarded to them by the PREA officer, and if mental health treatment is indicated, such is provided.  In addition, if medical or mental health staff identify a PREA eligible prisoner who was not identified as such at the point of admission to the facility, that prisoner is also referred to the PREA officer.

If a prisoner is a victim of sexual assault and/or sexual harassment, and the incident is brought to the attention of medical and/or mental health, both the medical and mental health staff are prepared to provide any emergency and ongoing care that might be indicated.

It was reported that the MOU with the Mississippi Coalition Against Sexual Assault has been finalized although the monitoring team has not received a copy signed by the Sheriff. The MOU provides that counseling will be available through MSCASA although it is unclear how that will be implemented.

PREA complaints can be reported as a grievance or a PREA complaint through the kiosk system. However, the PREA complaints were routed to a cell phone maintained by the PREA Coordinator. The new PREA Coordinator did not have the cell phone linked to the kiosk system and had not been informed about getting one. It is not clear whether anyone was receiving PREA complaints during the months when there was no PREA Coordinator. It is recommended that the new PREA Coordinator determine the status of any pending investigations and determine whether there were any PREA complaints submitted via the kiosk during the time when there was no PREA Coordinator. The MOU with MSCASA also provides for reporting to that agency although it is not clear whether inmates have been informed of this or whether provision has been made to allow cost free calls to MSCASA.

In order to be effective, inmates must be fully informed of what constitutes sexual abuse and harassment and how to report it. As previously reported, all of the units visited had PREA posters posted at the time of the last site visit. The posters have reporting instructions. Not being on site the monitoring team could not confirm that this is still the case. The Inmate Handbook does not have current information on the PREA process but a separate form is now provided at booking that explains the process. However, the prior PREA Coordinator had no longer provided orientation or education of inmates and the lack of inmate education continued during the months when there was no PREA Coordinator. The new PREA Coordinator stated that she is going to start the education component again.

It is reported that all cross-gender searches have been banned. No documentation of this was provided as of yet as the draft procedure is currently being revised to reflect the new policy. The draft policy on PREA/Sexual Safety provides HCDS does not conduct cross-gender pat searches by males of females or cross-gender visual body searches unless under exigent circumstances, and then only with the approval of the Shift Supervisor. The Search policy now approved and adopted is now consistent with the PREA policy.

The PREA Officer was keeping a file on each referral, had a report form, and kept numbered reports. She had completed an on-line training on investigating PREA incidents. The new PREA Coordinator should receive more extensive training. Incidents involving alleged staff misconduct or criminal activity are referred to other investigators. The new investigator reviewing complaints involving inmate perpetrators had received PREA training at MDOC. The investigator reviewing complaints involving staff misconduct has not received PREA training. Previously, the reports of these other investigators had typically not been in the PREA Coordinator's file and her file did not reflect the results of the investigation. The prior PREA Coordinator had at times relied upon security staff who had not received PREA training to interview the complainant. This practice should not be continued under the new PREA Coordinator. The prior PREA Coordinator did not get the medical records when there had been a referral to Medical. There is no regular supervisory oversight of the PREA officer's work or reports.

It was previously reported that after an initial focus on developing materials and process for compliance with the PREA provisions there appeared to be waning commitment to PREA compliance. The education component at booking and later orientation was dropped, the PREA Coordinator referred almost all aspects of the investigation to the Investigation Unit with no follow-up, no PREA investigations had been provided by the Investigation Unit except for two (and since the time of the last site visit, there have been none),  the investigation officers had no training on PREA investigations (although the new CID investigator does have PREA training), the PREA Coordinator had only had an on-line module on PREA investigations, and there was no indication of any higher level oversight of PREA compliance. Given the lack of staff and cell doors that don't lock, the potential for sexual assault is high. The paucity of reports made would suggest that the system is not designed to support full reporting.

The new PREA Coordinator has indicated an intention to remedy these past deficiencies.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

a.  Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

  i.  Any prisoner exhibited a serious injury;

  ii.  Any staff member requested transport of the prisoner to the hospital;

  iii.  Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

  iv.  Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.  Per policy, investigations shall:

  i.  Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

  ii.  Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

  iii.  Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.  Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.  Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.  Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

  i.  Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

  ii.  Any staff member requested transport of the prisoner to the hospital;

  iii.  Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

  iv.  Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

     f.     Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

        i.     a brief summary of all completed investigations, by type and date;

        ii.     a listing of investigations referred for administrative investigation;

        iii.     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

        iv.     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

        v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

     g.     Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

The HCSO has made progress in that there is now an approved and adopted policy regarding investigations.  It also appears that the new CID investigator is following up on incidents appropriately.  His reports often reflect that he interviewed inmates/witnesses involved in incidents, but basically in a pro-forma manner; e.g., "they indicated that they did not wish to press charges" rather than actual statements from the respective parties.  Partial Compliance is warranted because a good faith effort is being made to look into all reported incidents, but Substantial Compliance has not yet been achieved.  One indicator of this is the fact that virtually no investigations result in the prosecution of perpetrators.  Documentation is important, but follow up is equally necessary.  To date command staff have not submitted documentation of their review of the investigators' periodic reports in order to determine whether or not the investigative system is meeting the requirements of the Settlement Agreement.

In addition, significant changes have occurred since the last Monitoring Report.

- The CID and IAD functions have been separated.  While the CID investigator remains under the supervision of the Investigations Captain, the IAD investigator now reports to a Lieutenant who supervises two investigators, one assigned to Detention cases and the other assigned to Law Enforcement cases.  The Lieutenant reports directly to the Sheriff.

- The previous CID investigator has been replaced by a new investigator who is also certified as a PREA investigator.  Similar training and certification needs to be provided for the IAD investigator.  The CID investigator's office has been moved from downtown Jackson to the RDC.  This change of venue is important because most of his work is

initiated from within the RDC.  This change of location has been advocated by the monitoring team for more than two years.

- The IAD and CID investigators have access to all incident reports.  It is imperative that they review them on a daily basis in order to monitor issues within the Jail System in a timely fashion.  It is not sufficient for them to wait for specific incidents to be referred to them for review.
- The CID and IAD investigators now compile individual spreadsheets which reflect the status of their work.  The IAD version is the most compatible with the provisions of the Settlement Agreement.  It would be beneficial for the two investigators to compare notes so as to standardize the information that is available in each.
- It should be noted that the monitoring team's prior inability to access the CID and IAD investigators' spreadsheets was due to the fact that the downloaded information was apparently blank when opened.  The Compliance Coordinator has since provided a means to access the data.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

There is no change in the condition of the grievance system. The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of detention officers. Although the kiosk system does not require the intervention of a detention officer, the physical set up does not allow for privacy. This could potentially result in an officer or other inmates observing the grievance being filed. The newly approved grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a detention officer. The newly approved grievance policy also requires that if there are cognitive or communication barriers, the detention officer refers the issue to the Area Supervisor for communication assistance or problem resolution. This new policy is not operational yet. Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.      Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

A Grievance Policy has now been approved although not formally adopted. Once fully implemented, it would be applicable and standardized across the entire Jail. At present, the kiosk system works the same across facilities but a consistent process will need to be developed in accordance with the new policy. The new policy envisions that all grievances will go through the Grievance Coordinator so that she can ensure consistency across all three facilities. Currently, when she is not on duty, the Grievance Officers at JDC and the WC function independently and this has resulted in some inconsistency. For example, there has been some effort to ensure that inmates use the appropriate form depending on whether they are submitting a request or a grievance. This is for the purpose of enabling the system to actually track genuine grievances. The Grievance Coordinator has been diligent in this. However, the Grievance Officers have not been consistent. Even with the policy in place, there will need to be training on how to properly respond to grievances in order to achieve consistency. There continues to be significant progress in developing an actual grievance process including identifying the duties of the system wide grievance coordinator, clarifying the roles of the system wide grievance coordinator and the facility grievance officers, developing a tracking system, creating a tiered appeal process, and addressing the process for requests vs. grievances.

71.      All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. The Grievance Coordinator reports that she runs back reports and clears old grievances.  At the time of the last site visit there continued to be improvement in ensuring that grievances receive a timely response. It was not possible for the monitoring team to run such a report because of the remote nature of the visit. The Grievance Coordinator appears to have a tracking system that identifies overdue grievances. She sends reminder emails to those individuals who have not responded to the grievances in a timely manner. This, no doubt, has contributed to the improvement in reducing the number of grievances that have not received a timely response. Progress in this area is notable.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to

determine that promised actions are taken and then some quality assurance to check the adequacy of responses. The Grievance Coordinator has prepared some routine responses, for example, informing the inmate that the grievance is a request and how to submit a request. This has improved the responses in a large number of cases. There are still some where the adequacy of the response needs improvement. For example, the Emergency Grievance filed by inmate C.O. on 5/2/20 stated that the inmate needed to get downtown because he was in danger. The response was that the inmate was already in protective custody and there were no beds downtown. Security needs to be informed of the potential danger. The Grievance Coordinator stated that she did alert security but there is no way of knowing that from the grievance or her spreadsheet. A grievance filed by inmate E. R. on 5/3/20 stated that the inmate needed a different size uniform because hers was falling off her and the person dispersing uniforms wouldn't give her the correct size. The response was that a supervisor would talk with her. It is not uncommon for responses such as this one to promise some future action but there is no process to ensure that promised actions are actually taken. Similarly, inmate A.J. filed a grievance on 5/3/20 stating that his canteen money was missing and he was unable to get a response from the responsible person. The response was "this information will be passed on." The Grievance Coordinator was aware that a number of responses were inadequate and was planning a training of the individuals who are assigned to respond to grievances.

A review of medical grievances and responses indicated that although there continue to be only a very small number of such grievances, those submitted were responded to virtually immediately. When there is an associated emergency or urgent medical or mental health matter, the response is immediate assessment and the initiation of any indicated treatment.

Since the January 2020 site visit, there were complaints made by family members of 2 different inmates regarding the mental health treatment the inmates received while being detained at the jail. The mental health expert on the monitoring team has reviewed the medical records and discussed the complaints with QCHC staff and found the care to be appropriate and the complaints unfounded. A full report on the results of the review can be made available.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
The newly approved grievance policy requires that if there are cognitive or communication barriers, the detention officer refers the issue to the Area Supervisor for communication assistance or problem resolution. Under this system non-English speaking persons and persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. The Securus system should at some point be programmed to include the most common foreign languages. The new policy is not operational

yet. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

In past reports it was noted that inmates were held in Booking holding cells less than eight hours. Over the past four years there has been an ongoing problem with Booking holding cells being used for the long-term housing of inmates.  Once the problem was rectified, it reoccurred, again and again.  In each instance the explanation for this violation of policy was that the holding cells were the only cells in the RDC where the locks functioned and the cells could actually be secured.  Most recently, the need to isolate COVID-19 positive inmates has resulted in inmates being housed (not merely held) in Booking cells again.  With no beds, no day room space, no cell windows, no tables or chairs, no television and no access to phone or recreation facilities, these cells are ill equipped for long term housing purposes.   It is imperative that the use of holding cells for the housing of inmates beyond eight hours must be permanently prohibited.

Consistent with the requirements of the Stipulated Order, the doors to the four multiple occupancy holding cells were replaced by CML Security.  For the first time since the facility was built, officers working in the Booking area can visually observe inmates in those cells through glass panels without having to open the doors to do so.  The single cells in Booking were not similarly retrofitted.

Staffing in the Booking area continues to be allocated inappropriately.  Only one officer is assigned to monitor inmates in the holding cells, while two and often three officers work inside the office area.  As has been recommended in the past, the number of officers working in the office area should be reduced and the surplus officer(s) assigned to the monitoring of inmates in the intake/holding cell area.

As described in paragraph 42 above, there currently is not appropriate housing for inmates with serious mental illness. With the anticipated opening of a special housing/mental health unit, the implementation of this provision with regard to appropriately classifying and placing prisoners on that unit will need to be addressed.  As has been previously noted (as recently as in the report of the last site visit), in this regard, there are actually multiple issues that will need to be addressed.  More specifically…

- Although it is anticipated that the mental health unit will be designed to house two different populations – prisoners who are so acutely and severely mentally ill that they are at risk of harming themselves or others, and prisoners who cannot be safely housed on a general population unit due to a mental illness or intellectual disability – the population to be housed on the unit must be clearly defined in policy and procedures

- In order to comply with this provision, mental health assessments would have to be performed within 8 hours of intake

- The nature of the cooperation between classification and mental health will have to be described in policy and procedures regarding how prisoners will be classified and housed on the unit, including who will be responsible for which decisions

- It will need to be determined where newly admitted prisoners should be housed if there is a delay in obtaining the initial mental health assessment and/or if a newly admitted prisoner is found to be appropriate for placement on the unit but the unit is full

75.    The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

 In the Tenth Monitoring Report it was noted that the JDC was using a segregation tracking form, but that it was not used by the other two facilities.  During the current remote site visit

74

segregation logs were submitted by each jail, but every one was in an independent format.  The JDC format is most complete and would serve as a good model. Regardless, the HCSO/Detention Services should develop one standard form that is utilized by all three facilities.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for prisoners who are being held in segregation; when indicated, they offer mental health services to a prisoner that is not already on the mental health caseload; and when indicated, they make adjustments in the treatment that is being provided to a prisoner who is already on the mental health caseload.  However to date, no mechanism has been established whereby any findings from those rounds (such as a deterioration in a prisoner's mental health status) can be shared with security staff and possibly have an impact on any decisions made by security staff regarding the continuation or termination of a prisoner's placement in segregation.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

      d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the

76

exercise of independent medical judgment and each prisoner's individual rights.

j. Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77(a): At present a QMHP does not have input as to whether to put someone in segregation.

As noted in prior monitoring reports, this provision applies to all prisoners who are already on the mental health caseload, and prisoners who are not already on the mental health caseload but the behavior they exhibited around the time of the infraction that might cause them to be placed in segregation could reasonably lead security staff to suspect that they might be suffering from a mental illness.

Regarding 77(b): Presently, there does not appear to be a presumption that segregation is contraindicated for persons with SMI.  As has been noted in each prior report, there are prisoners with serious mental illness housed on the segregation unit and held in segregation in the isolation sections of other units.  It is anticipated that the program design for the mental health unit will be such that these prisoners can be moved to the mental health unit once it is open providing a less restrictive and more therapeutic environment.

Regarding 77(c): Prisoners on the mental health caseload are not screened by a QMHP for SMI prior to placement in segregation.  In fact, mental health staff are not even notified when a prisoner is placed in segregation.

Regarding 77(d) and (e), As noted in section 77-a, the mental health staff are not being offered the opportunity to assess any prisoners prior to their placement in segregation.  The security policy and procedures that would address this provision have not been developed and implemented.

It should be noted that security staff are aware of the fact that there are some seriously mentally ill prisoners being held in segregation.  However, the existence of any specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation does not appear to exist.  Furthermore, the placement of these prisoners in segregation has not been short term (several have been there since the mental health member of the team started almost two years ago),  and there do not appear to be any individualized plans (developed by security staff and/or mental health staff) to get these prisoners out of segregation as quickly as possible.  Although the opening of the mental health unit will provide a housing

option for seriously mentally ill prisoners currently held in segregation, individualized plans will still be required.

Regarding 77(f): The nurses during medication pass provide daily visits to prisoners on medication.  If a prisoner refuses to take the medication but comes out and signs the medication refusal form, the nurse still has an opportunity to visit with/observe the prisoner.  However, if a prisoner refuses to take the medication and even refuses to come out and sign the medication refusal form, the nurse is unable to visit with/observe the prisoner.

Prisoners on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP.  However, due to the shortage of mental health staff (see section 42-g-iv), this does not consistently occur on a weekly basis (please note: although prisoners held in segregation are seen by a QMHP during the weekly segregation rounds, this is not considered to be a therapeutic session).  Furthermore, due to the shortage of security staff, the individual sessions that do occur are not consistently out-of-cell sessions.

As noted above and in prior reports, a QMHP makes weekly rounds for all prisoners placed in segregation, during which each prisoner's mental health status and need for mental health services is assessed.  If the QMHP finds that there has been a deterioration in a prisoner's mental health status, the QMHP will refer the prisoner to the psychiatric nurse clinician for an assessment and consultation.

As noted in prior reports, there is no on-site jail medical physician or psychiatrist.  The responsibilities that would be assumed by such a physician and such a psychiatrist are assumed by a medical/primary care nurse clinician/practitioner and a psychiatric nurse clinician/practitioner.  Therefore, it is impossible to fully meet this provision as currently written, and so the parties need to come to some sort of agreement about how this will be addressed. Each of these practitioners has a physician available for consultation. There is also a physician in the QCHC central office that is available for consultation.

All prisoners with serious mental illness housed in long-term segregation have been assessed by a QMHP, but to date, there has been no appropriate housing for such prisoners that could be recommended based on those assessments (see section 77-b).  However, as noted in prior reports and in section 77-b of this report, it is anticipated that the new mental health unit will provide appropriate alternative housing for this population, at which point this provision can be addressed. It should be noted that the jail administration has not committed to a specific timetable for the opening of a mental health unit nor has there been a commitment from the County to fund the increase in mental health staff that would be necessary to operate such a unit.

Regarding 77(h): There is no evidence of any incidences where security staff referred a prisoner to mental health due to the prisoner's decompensation while being held in segregation.  When it

has been discovered that a prisoner's mental health status has deteriorated while being held in segregation, this has been discovered by mental health staff during weekly segregation rounds or during an individual session with a prisoner, or discovered by nursing staff during their weekly segregation rounds or during medication pass.

As has been noted in prior reports and previously in this report, although mental health staff carefully consider what additional mental health services can be provided to prisoners being held in segregation, especially if there has been a deterioration in a prisoner's mental status, currently there is no formal mechanism whereby mental health staff can share these findings with security staff and thereby possibly impact on security staff's decision to continue or discontinue placement in segregation. Furthermore, the efforts of mental health staff to informally communicate their concerns about a prisoner's mental health status to security staff have not been successful.

Regarding 77(i): As noted above, it is expected that medical, mental health and security staff will work together as an interdisciplinary team in order to provide a safe environment for mentally ill inmates and staff, while providing mentally ill inmates with the level of mental health services that they require. It should be noted that security staff who are assigned to the mental health unit will largely focus on each prisoner's behavior and, in consultation with the mental health staff, the best way of managing/responding to each prisoner's behavior in a way that is also consistent with the treatment goals, objectives and therapeutic interventions outlined in the prisoner's treatment plan. In fact, there will be many cases where the treatment plan might include specific interventions that will be made by security staff. Therefore, since communication and cooperation between security staff and mental health staff will be critical to the success of a mental health unit, what information will be shared and how information will be shared need to be determined and clearly articulated so that both mental health staff and security staff can fulfill their responsibilities while protecting prisoners' privacy rights. Currently, there is no functioning interdisciplinary team and, as has been noted above, the communication between security staff and medical/mental health staff is minimal. It is strongly recommended, as noted above, that the jail administration take deliberate steps to increase communication with medical and mental health staff including the develop of an interdisciplinary team with regular meetings and the inclusion of medical/mental health staff in decisions that relate to medical/mental health operations or the medical/mental health of individual inmates.

With respect to 77(j): It appears that this provision is understood by all staff.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. **Within**

**six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Substantial Compliance**

As of the drafting of this report in June 2020, it has been approximately sixteen months since the last youth under 18 was released from the Raymond Detention Center (RDC).  That was the completion of the transition that began in September 2017 when the decision was made to place new juveniles charged/convicted as adults (JCAs) at the Henley Young (HY) facility and gradually transition the remaining youth out of RDC. It is understood by the monitoring team that no more youth under age 18 will be housed at any of the adult facilities, including Juveniles Convicted as Adults (either waiting to be placed at the Mississippi Department of Corrections [MDOC] or previously convicted and arrested for a new offense or probation violation). Presuming this continues thru February 2021, sustained compliance will be achieved.

As of June 1, 2020, there were 14 JCA youth at Henley Young.  Of the JCAs:
- All the JCA youth were male.
- For the period from February 1 through the end of May, there had been only one JCA female, and that female was released at the end of February. So, there were no female JCA youth held in March, April, or May.
- As of June 1, six of the JCA youth had been indicted, leaving eight who had not yet been indicted.  Of the yet to be indicted youth, three had been admitted in May, four in January, and one in November of 2019. All JCA have allegedly committed serious felonies, most of them (10) involving some form of armed robbery/carjacking.
- Three of the JCA youth have been in confinement for over one year, the longest being 442 days.  Note that several of the longer-term youth that were in placement at the time of the January visit were released in the last four months, including one youth (C.S.) who was one of the original Henley Young placements in September 2017, meaning he had been at Henley Young for over two years.
- The ages of JCA youth in custody were:  14 (2), 15 (2), 16 (4), and 17 (6).
- During the period from February through the end of May there were 7 JCAs admitted to Henley Young, four of whom were released after a brief stay.

The practice that began in September 2017 of booking JCAs at the Raymond Detention Center (RDC) prior to placement at Henley Young has continued. If they remain in placement when they turn 18, they are transferred to the Jackson Detention Center (JDC) pending further court

action (vs. returning to the Raymond facility). Compliance with this requirement will be monitored to ensure sustained compliance.



One of the issues referenced in the January report was that the total number of youth at Henley Young, counting both JCA and non-JCA youth, had approached the 32-youth limit imposed under the SPLC/Henley Young Consent Decree.  Also noted was a recommendation that continued vigilance in managing both the JCA and non-JCA populations would reduce the likelihood of reaching that limit as well as providing greater flexibility and opportunity for sufficient staffing and programming for all youth.  The chart above includes the Average Daily Population each month, but the chart below helps illustrate the impact of some practice changes made to address concerns resulting from the COVID-19 pandemic.  In particular, note the significant decline in the overall population beginning in mid-March, resulting primarily from outreach efforts and directives instituted by Judge McDaniels to limit admissions to Henley Young to youth allegedly committing the most serious offenses.  While this had a greater impact on reducing the non-JCA population, of the JCA youth held on June 1 none of them were admitted in February, March, or April.



In addition to best practice reasons to confine youth only when necessary to support public safety, there are two additional reasons for continued vigilance in managing the daily population of youth, including (1) as long as COVID-19 concerns remain, confinement facilities are one of the most challenging environments in which to manage any infection spread, and (2) challenges in retaining a sufficient number of staff, particularly Youth Care Professionals providing direct safety and supervision of youth, makes it difficult to maintain an effective youth/staff ratio.

There is evidence that some progress has been made on reducing the length of stay, likely resulting from efforts by Judge McDaniels to implement a Minors Diversion docket designed to ensure more timely review of progress in indictment and charges and identify alternatives to secure confinement and/or processing the case in the adult system. Per discussions with Judge McDaniels, he is continuing to work with court leadership and the District Attorney's office to expedite cases in an appropriate manner that accounts for public safety as well as the interests of youth involved.  As noted in the prior report, there is substantial difference between programming for youth over a 6-12-month period compared to trying to do so over much longer periods of time, let alone also providing appropriate services for the smaller number of short-term youths in placement.  Therefore, this attention to ensuring that only those youth needing placement are confined as well as attending to the length of stay will benefit overall program operations.

<u>Significant Personnel Changes</u>

In recent months, progress occurred related to two key positions, the Executive Director and the Recreation/Program Coordinator.  Mr. Greg Harrington assumed the role of Executive Director in April.  His background included substantive experience in education and youth correctional settings, so bringing that experience to the team is a cause for optimism about continued program development, particularly related to the educational program.  The hiring of a new Recreation/Program Coordinator in May added another piece to the leadership team, a position that can focus on building a more varied and coordinated set of recreational, cultural, and skill-building activities for youth.

There are two additional vacancies posted, including: (1) a Training Coordinator to develop a more complete Learning and Development program for staff; and (2) a Treatment Coordinator to provide leadership and supervision for all aspects of the mental health program plus integrating those components with other behavior management efforts.  With the continuing support of Mr. Burnside (Operations Manager) and Mr. Dorsey (Quality Assurance Manager), filling these positions should provide a strong leadership team and help move the County toward full compliance with the conditions of this agreement.  Additionally, the leadership and support Judge McDaniels has provided to the program, both in his prior role as Executive Director and more recently as the Youth Court Judge, has been a positive for the transition of the Henley Young program for both this and the SPLC agreements.

During the June 26 Status Conference, the County raised an issue related to filling the Treatment Coordinator position, indicating that they felt the certification requirements for the position (Licensed Psychologist or Licensed Clinical Social Worker) are too restrictive and that finding an appropriate person to fill that position has continued to be difficult. The original requirement for a Licensed Psychologist was modified in the January Stipulated Order to help broaden the potential field of applicants.  The language of the Stipulated Order is:

> *V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. If there is a qualified candidate(s), the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services of the clinical social worker….*

Related to this (1) the posting for the position was not done until May 22, approximately 90 days past the due date, and (2) until the time of the Status Conference there had been no consultation

with the Monitor and United States to revise the requirement to allow for contracting for the position.  Based on the request made at the Status Conference, the monitoring team is available to work with the County and US DOJ to move forward on considering other options that may lead to appropriately filling this important position.

Physical Plant Changes

During the week of the virtual visit, staff reported that construction of additional modular units was underway and should be completed by the time this report is filed.  These modular units each contain two program spaces that can be used for education, counseling, guest speakers, and a variety of other programming.  When furnished with appropriate furniture and other materials/supplies, this will represent completion of one of the longest-standing recommendations related to providing sufficient and appropriate space for the programming required under this agreement.  Next steps will need to be taken to operationalize use of that space, including scheduling and staffing, and to what extent that space adds to overall operations can be assessed in subsequent visits. Subsequent communications with Mr. Harrington indicate that the plan is to have those spaces fully furnished and operational by early August for the start of the new school year.

Additional physical plant changes that have been recommended in the past have not been addressed, including (1) dealing with limited use of outdoor recreation space related to weather (e.g. cold, rain, darkness); discussions are underway to determine if one of the four new modular "rooms" created can be help address that;  and (2) making changes in the living units to improve acoustics and furnishings to make those units more "livable" and appropriate for adolescents, particularly youth placed for long periods of time.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II, a strength based assessment, and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two mental health clinicians, and the group work and counseling provided by the three Youth Support Specialists (YSS).

During the period since the January visit, most of the programming provided by the mental health team members continued, including purportedly reinstating regular treatment team meetings (after a hiatus related to COVID concerns) and the provision of group programming by YSS and the Qualified Mental Health Clinicians (QMHC).  Full compliance can't be achieved until a Treatment Coordinator is on board and further development of group programs and additional integration of mental health services with other behavioral components of the program is completed, but it is positive to note that much of the programming has continued to be delivered in the interim period.

Presumably protocols (observation, classification, intervention) related to suicide concerns remain in place, but limited access to youth records and reports made it impossible to fully confirm that to be the case.  However, in past visits all indications were that those protocols were routinely followed.

Related to appropriate programs, it is positive to note that the QMHCs and the Youth Support Specialists continued to provide various group sessions for youth.  In particular, materials provided to the monitoring team indicate that they had taken steps to obtain and utilize additional program materials that begin to meet the specific program-type requirements of the Stipulated Order, e.g. increased use of Journaling approaches, focusing on improving relationships, Responsible Behavior, understanding behaviors, and Substance Using Behaviors.  Many of these curriculum materials do provide the kind of evidence-based programming envisioned in the Stipulated Order, and staff will become increasingly proficient in delivering those programs.

Three issues remain related to programming: (1) the amount of time that each youth is engaged in this type of programming remains very low, e.g. maybe four times a week for 30 minutes at a time, meaning that youth are engaged only about two hours a week; and (2) while record-keeping related to programming has improved it is still difficult to determine how many of the youth regularly participate, and (3) to what extent the individual YSS and QMHP staff coordinate their groups with each other to work toward common themes needs more attention.

To address these remaining concerns it is recommended that: (1) the leadership team work together to increase the frequency and/or duration of these programs delivered, (2) some sort of "master program" calendar should be created to more easily track actual program delivery and attendance (note: this calendar could serve as a calendar for all programs delivered, including recreation, visitation, and other personal growth activities), and (3) under the leadership of a Treatment Coordinator, the mental health team members should meet regularly as a team to share progress/challenges related to program delivery and plan for the coming week/month. Some of this planning may go on individually already but it is difficult to confirm absent an on-site visit.  The addition of program space that is more appropriate for programming, the

acquisition of more appropriate curriculum/materials, and the evident interest of the existing mental health staff to keep moving forward during these difficult months are all positive signs moving toward full compliance.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance**

It not possible to assess the education program that has been delivered in recent months under the conditions created by the COVID-19 concerns.  It was reported that delivery of educational programming was done through a combination of "online"/Zoom calls and "work packets" developed by the teachers and provided to youth to complete under the supervision of Youth Care Professionals. During the January visit when youth were allegedly working on packets on the unit, we observed two units on which it appeared only one youth was actually working on the materials.  Other youth were engaging in other activities, i.e. card games, dominos.  Several youth indicated they had completed their work, but others seemed not to care about it at all.  The work did not appear to be individualized in any way, and expectations for youth seemed low.  If a similar approach was followed during the recent COVID-related months, it is reasonable to be concerned about the quality of education youth received recently. On a positive note, it is understood that Ms. Finley was regularly on site and did continue to provide some of the special educational services required for youth.  In prior visits, she has demonstrated a consistent dedication to her work with youth, and youth seem to respond well to her efforts.  Overall, the challenges faced at Henley Young due to COVID-1 were likely consistent with the difficulty of delivering an adequate educational program for all Jackson Public Schools (JPS), so some flexibility in assessing compliance during this period may be appropriate.

Looking forward, this may be an opportune time to restructure and/or enhance the relationship with JPS and develop a program that is more individualized and appropriate for the long-term JCA youth confined at Henley Young.  Both Judge McDaniels and Executive Director Harrington indicated an interest in strengthening the education program. Whether that results in substantive education personnel changes and/or varying program delivery options (e.g. making more use of technology, altering the daily schedule, etc.) there is considerable room for improvement to achieve full compliance with the agreement.  Subsequent site visits will be needed to continue assessing how this program is developing, but it is certainly recommended that Mr. Harrington and Judge McDaniels utilize the coming weeks/months to work with JPS to improve the program.

It should also be noted that young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance**

As noted earlier, the last youth "aged out" of RDC in February 2019, so as of this report, this complete separation has been in effect for over one year.  Transitioning Henley Young to serve these long-term youth has not been without challenges, but progress made at Henley Young under the SPLC agreement and their continued efforts under this agreement are to be complimented.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**

There has been no change related to compliance with this requirement although staff purport that Policies/Procedures have been updated and documentation of classification is occurring. However, staff have not yet provided the final version of the policy or a copy of the form for review nor were admission files inspected during this visit to confirm compliance with the policy.  To reach Substantial Compliance Henley Young will need to provide the updated policy and related documentation to demonstrate that it is being followed.  Additionally, admission files will need to be audited in a future visit, if not confirmed in some other way.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**

Henley Young continues to provide training on an on-going basis for some requirements of this provision, including new employee orientation for new staff, updates on policies and procedures as they are adopted, use of force refresher training, CPR training, fingerprint training (for intake purposes), and use of radio/communication equipment. As in past reports, this reflects that the bulk of training conducted for Youth Care professionals (YCP -the "line" staff position) is on basic operational skills and falls short of the intent of providing more advanced training on issues

such as the impact of trauma on youth behaviors, trauma-informed practice, adolescent development, and mental health.

Ms. Young has continued to serve as the interim training coordinator for Henley Young, but as noted earlier recruitment for a full-time Training Coordinator has begun.  Based on that job description and conversations with Mr. Harrington, he very appropriately envisions someone who can develop a more comprehensive staff learning and development program, something that will be needed to fully comply with this agreement. Staff turnover continues to pose difficulties in implementing a solid professional development program and has made it necessary to focus almost exclusively on the basic training needed for Youth Care Professional staff.

Although not specifically itemized in this Agreement it seems clear that absent substantive changes in the salary structure for new and more experienced Youth Care Professional (YCP) staff, significant staff turnover will continue and it will be an "uphill struggle" to develop a fully effective program at Henley Young.  One of Mr. Harrington's first expressed priorities is to develop some sort of staff recruitment and retention program that can reduce turnover among YCP staff, and he should be commended for placing a priority on this issue.  Fifteen YCP vacancies, the most ever encountered during monitoring visits, represents a substantial portion of YCP budgeted positions.  At the most basic level, this number of vacancies creates problems in scheduling the minimal number of staff required to supervise youth let alone provide for accomplishing a range of other tasks needed on a day-to-day basis.  This shortage (especially as it relates to having sufficient male staff) was also noted as an issue related to an incident in which an allegation against a female YCP was made that she had inappropriate physical/sexual contact with a male youth.  While Mr. Harrington took immediate steps to investigate the April 28 allegation (the results of which indicated he could not confirm or fully rule out the allegation) and implemented some changes to help ensure the safety of youth, in response to the question of why a female YCP was assigned alone on the male unit on the overnight shift to conduct room wellness checks, the response was that he did not have a sufficient number of male staff available.

Mr. Harrington did appropriately refer the alleged incident to the Sheriff's Department and the Department of Health/Human Services, but as of this writing Mr. Harrington had not received the results of their investigations.  The staff member in question has been assigned to the control room on the evening (2nd) shift, thereby avoiding further direct contact with youth.

There are several specific follow-up  actions that should be taken by Mr. Harrington, including: (1) obtaining results of the Sheriff's and/or DHHS investigations as soon as possible, (2) providing the monitors with a review/summary of both his investigation and that of those other parties; and (3) implement a policy that youth in the housing unit are not left solely to the supervision of a YCP of the opposite sex.

In addition to an extremely low starting salary (essentially at the federal poverty level for a family of three), there is no pay progression system or other apparent incentive for continuing employment as a YCP.  It was proffered by leadership that as much as 85% of YCP staff had at least one other job that competes for the energy and attention of YCPs.  That is consistent with prior conversations monitors have had with line staff, almost all of whom indicate they have second jobs.  It is recommended that the County take steps to increase the starting pay for YCP staff and develop some form of pay progression (based on service and/or training) system that supports retaining qualified staff.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

    a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

    d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

    e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

    f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

    g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the

Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

This continues to be one of the more challenging provisions of the agreement, both in terms of implementing all the requirements and in monitoring proper implementation. As previously reported, there is tracking of both Behavior Management Isolations (BMI) (short-term, implemented by YSS staff) and Due Process Isolations (DPI) (longer-term confinement following a disciplinary review by leadership). However, materials provided for this review included only DPIs, for February through April noting that:

- In February 2020 there were 14 DPIs, a notable increase from prior months and considerably outside the trend that had been evidenced in earlier months.
- In March and April there were 9 such uses of isolation each month, closer to what had been true in prior months but still more than ideal.
- Almost all of the isolations logged were for 24 hours, suggesting that there has been a tendency to default to that period of time vs. trending toward shorter periods that had been seen in prior months. However, it also should be noted that not all Due Process Disciplinary Hearings resulted in room confinement, and use of alternate forms of accountability are encouraged.
- When asked about the use of DPIs in May, the response was that there had been none. The inability to review youth records made it impossible to audit/confirm that, but if true it would be a significant achievement.

Since the Agreement limits room confinement to a maximum of one hour unless the youth poses an imminent safety risk to staff or other youth, none of the Due Process Isolations meet that expectation. Staff again purport that during this 24-hour period youth can come out of their rooms for structured activities (school, recreation, group programming), but that could not be confirmed since observation logs could not be reviewed off site. It also was impossible to confirm remotely whether required mental health checks were made during any period of isolation.

It is recommended that additional attention be given to ensuring that all documentation related to the use of isolation, both for initial behavioral reasons or disciplinary reasons, is carefully kept and made available for review on subsequent visits. This includes documentation of whether

youth do, in fact, take the opportunity to be out of their room during any disciplinary period and whether required mental health checks are being made.

Ultimately the use of room confinement can be further reduced by continuing to improve the environment in the living units, retaining and expanding training of Youth Care Professional staff, continuing to expand social skill training, adding additional program opportunities, and ensuring a full complement of mental health support staff (i.e. a full-time psychologist).

Finally, the last Henley Young Policy/Procedure related to Due Process Confinement provided to the Juvenile Justice monitor is from September 2017 and does not match verbal representations by staff about current procedures.  Despite prior requests, Henley Young has not yet provided the team with current/recently adopted Policies/Procedures so they can be reviewed to determine if they are consistent with requirements of the Agreement.

84.    Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

      a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

The point/level system tool used to track and document youth behaviors has purportedly remained essentially the same as it was adopted just prior to the visit in September 2019, and Henley Young reports continuing technical assistance from Anne Nelson, a juvenile justice consultant serving as monitor in the SPLC case involving Henley Young. As it relates to this provision or others in this and the SPLC agreement, Mr. Harrington was informed that he should feel free to let monitoring team member Jim Moeser know if there ever are conflicts between recommendations made by Mr. Moeser and Ms. Nelson so they could be resolved. The existing point system does provide discrete time frames in which to document/track behaviors, and the person performing the role of Recreation Coordinator is responsible for documenting what

incentive youth choose based on what they earn.  A review of point sheets was not possible as part of the remote visit, but the recommendations made in the past remain: (1) staff need to document in more detail why they "rate" a youth the way they do, both positively and negatively;  simply providing a "number score" does little to reinforce and/or shape youth's behavior going forward;  (2) individual goals need to be added to the tool based on consultation with the YSS assigned to the youth so that discrete areas for improvement can be identified and reinforced; (3) more work needs to be done to expand options for incentives; and (4) Youth Care Professional staff need to be more overt in using the system as a "tool" for discussing with youth what they are doing well and how they can do better. Making this last recommendation effective is another complication resulting from the frequent staff turnover and need to focus on basic training rather than developing more advanced behavior change/management staff skills.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

The quality of the inmate records was difficult to evaluate during the remote site visit. Typically, the monitoring team is able to review the paper files and determine whether the appropriate paperwork is in the file. These are too voluminous to have scanned in for review. The documents requested were the status sheet showing the detention status and the chronology sheet showing the activity related to the inmate's status. This was for approximately 30 randomly selected inmate files. Because of the remote nature of the site visit, it was not possible to compare the chronology sheet to the documentation in the inmate files. From having the Records Supervisor look up the inmates on the JMS system, it became apparent that a number of the chronology sheets were not up to date. In addition, the Records Supervisor stated that they had discontinued keeping the inmate status sheet based upon a communication from the prior Detention Administrator. This is inconsistent with the policies and procedure on Records and should be reinitiated. The summary of detention status should identify every matter that is causing the individual to be detained and identify the supporting documentation. This would allow for a

quick and accurate assessment of when court action warrants release. It would also allow for efficient auditing of the files. Currently, determining the status of the inmate requires a review of most of the paperwork in the file which can be voluminous.

The policies on pre-booking, booking and records have now been in place for a year. However, as evidenced by the failure to keep the inmate status sheet, they are apparently not being fully implemented. A Booking Manual is being developed and an initial review of the uncompleted manual indicates that it will be a useful document. There continue to be improved systems in place to track individuals and release them timely.

The tracking of individuals held on probation violations appears to be accurate. However, the tracking sheet indicated that there were 2 individuals who were held more than 21 days with no explanation.

There are several system issues that make it difficult to ensure timely release. The booking clerks have not consistently entered probation holds as such and still enter them as a warrant. This makes it impossible to run a report showing everyone that is in on a probation violation so that the Records Supervisor can track the 21-day time limit. She described having to run every inmate every day to get the information. To some extent they rely on the inmates to alert them.  The lack of clarity and consistency on how to enter information into JMS was also illustrated by a case where the Jail was waiting for documentation from another jurisdiction of time served. The booking clerk had entered the information in the field for holds, so the Records Supervisor did not know to call the other jurisdiction. This individual was being transferred to MDOC so was not waiting for release into the community. There were several inmates who had extended stays waiting for other jurisdictions to pick them up. Without a better way to track people who remain in only on a hold from another jurisdiction, the Records Supervisor does not know to call the other jurisdiction to get them transported. Again, these are individuals who weren't waiting for release into the community but this contributes to the population numbers at the Jail and potentially extends their overall time in detention. One recurring situation previously identified is that there is not a way to identify people in the Jail who are waiting for a preliminary hearing. Although it is the court's responsibility to provide timely settings, the Jail currently has no way of tracking these individuals to alert the appropriate court when a preliminary hearing is overdue. There continue to be individuals detained beyond 90 days without indictment. However, it appears that the new District Attorney is committed to remedying this. It should be noted, however, that this does not mean these individuals will be released. As cases are reviewed, some will no doubt be dismissed but some will result in indictments.

The problem with individuals waiting for their first appearance in County Court appeared to have been resolved at the time of the last site visit. However, in the intervening months there was again the difficulty of having a judge available. For persons charged with felonies, the Jail has

worked with the court, to get a decision on release conditions. For persons charged with misdemeanors, the Jail is releasing them ROR.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Substantial Compliance**
As previously reported, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. At the time of the last three site visits and this remote site visit there have been no individuals in the facility on a fines and fees order. This will continue to be monitored closely as the policies are new and sentencing orders are sometimes ambiguous, but this provision is now listed as in substantial compliance.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Substantial Compliance**
The County has been pro-active in ensuring that valid court orders are utilized. The policy on pre-booking is consistent with this paragraph and at the time of this and three prior site visits there was no one in the facility for failure to pay fines and fees. However, at the time of the January site visit, a review of inmate files disclosed two individuals who had illegal orders to stay in jail until payment of fines and fees. It was reported that these individuals were not held on these orders. If in custody on another matter, the individual is considered to have time served on the fines and fees order. It was reported that the illegal fines and fees orders are typically not entered into the JMS system. The last monitoring report recommended that a better process would be to ensure that the orders are corrected as set out in this Settlement Agreement. There were no such improper orders reported at the time of the current site visit. These requirements will continue to be carried as in compliance as no one is being held on fines and fees.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Substantial Compliance**

See paragraph 87.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Substantial Compliance**

See paragraph 87.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or

prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals working off fines and fees. At the time of the September and the January site visit, the stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. The spread sheet appears to be consistent with this stated policy. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

        v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

See response to number 85.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As described in paragraph 85, the new Records policy establishes a system that should greatly improve the reliability of the prisoner record system. However, a complete updating and review of the records has not been completed and the system of auditing files has not been fully implemented. As noted above, the inmate status sheet required by the Records Policy has not been maintained. Similarly, when the Booking Manual is completed, there should be improvement in the initial entries into the JMS system. Additional problems described in paragraph 85 continue to exist. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained. The Records Policy requires that the Supervisor conduct an audit of 10 files a week and do a semi-annual review of all files. The Records Supervisor maintains a spread sheet of the files that she has audited. The entries prior to April most often don't show the audit date so it is difficult to tell the frequency. It also was reported that another individual was doing audits in this time frame but they weren't included in the spreadsheet and no number was reported. In April, there are more frequent notations of the date of the audit. In April, there were approximately 10 files audited although possibly 3 more without dates. In May, there were 35 files audited. The spread sheet spans January through May and shows 100 files audited. The May activity is close to that required by the Records Policy. However, earlier months do not appear to be close to compliance and the number through May would suggest that there will not be close to a review of all files in a six-month period. In addition to Booking staff, there are three individuals tracking the lawful basis of detention. They are all three using separate spreadsheets and lists which as noted above do not match reports run from the JMS system. Jail staff do not have access to the county court data base or the updated circuit court data base which would allow them to improve the accuracy of their records.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The electronic medical record system and the various tracking logs that are maintained by medical and mental health have been described in prior reports, including the report of the last site visit. The various ways these records and logs are used has also been previously described.

With regard to full compliance with this provision, there are several issues that still need to be resolved.  The first issue is what information should be shared with entities outside of the medical and mental health department and how should that information be shared.  Although the sharing of certain information that would normally be HIPPA protected might be shared in a correctional setting, it still needs to be determined who needs what information in order to comply with this provision, and how that information should be shared.

The person who is reportedly tracking the individuals waiting for state hospital beds has not developed an effective system or contacts to be able to track who is waiting for an evaluation or a commitment to the state hospital. The monitor encouraged her to contact the doctor overseeing the state hospital forensic program to assist in tracking these individuals. Mental health staff are not involved with the transfer of prisoners to the state hospital for competency evaluations and/or the restoration of competency, and they are not even involved in the restoration of competency program that is provided by an outside provider at the facility.  In fact, mental health staff are unaware of which prisoners are awaiting such transfer; staff have no idea who is responsible for making sure that such prisoners are transferred in a timely manner; and when prisoners are returned from the state hospital, staff do not receive a full report.

Neither medical nor mental health staff are involved in the incident reporting and review process. Although an incident report might indicate that a medical or mental health staff person was called/involved, neither medical nor mental health is asked what they thought and/or what they did, and so for the most part, that information is not included in an incident report.  As noted in section 77, there is also not yet an operating policy and procedure that would require security to obtain medical and/or mental health input when there is an incident that might result in a disciplinary charge.  Therefore, any reporting and review of incidences that have a medical or mental health element/component do not include information from medical and/or mental health (gathered at the time or after the fact), which compromises both the full reporting of and adequate review of such incidences.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures

govern the process.  At minimum, policies and procedures must prohibit staff from:

i.      Requiring the individual to submit to bodily strip searches;

ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

iii.   Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC. Further collaboration with the courts will be necessary to allow for release from the court.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

a.     Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b.     Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.     Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d.     Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been reviewed and is in the process of being finalized.

In prior monitoring reports, including the report of the January site visit, it has been noted that compliance with the provision for discharge planning involves multiple different activities.

The first set of activities include the development of a discharge plan for each prisoner on the mental health caseload who is likely to be released back into the community at some point;

providing those prisoners with the insight and understanding required for them to appreciate their need to continue with treatment once released and know what they have to do in order to continue with treatment; upon their release, make an initial appointment for them with a community-based provider of mental health services and provide them with enough medication to carry them until the time of that appointment; and assure that they know what to do in the event there is an emergency prior to the time of their scheduled appointment.

The mental health team has made significant gains with regard to this first set of activities. Discharge plans are prepared for individuals on the mental health caseload and, as noted above, one of the senior nurses has started a discharge planning group, focused on helping prisoners gain insight into their need for treatment, gain knowledge about what they have to do in order to continue with treatment, and learn what to do in the event there is an emergency before their first appointment; and prisoners are provided with enough medication to hold them until their first appointment, unless for some reason security does not bring them to medical as part of the discharge process in order to pick up that medication (which they are supposed to do as part of the discharge process).

As has been previously noted, despite these efforts, the successful referral rate (i.e., those, who upon their release, actually show up for their scheduled appointment with a community-based provider of mental health services) remains about 30%. Therefore, consideration has been given to adding an additional intervention that has been demonstrated to increase the rate of successful referrals in comparable facilities. This intervention would involve having staff from the community-based mental health provider actually visit the jail on a weekly basis; perform intake evaluations of prisoners who will be referred to them upon their release; and begin to establish a relationship with those prisoners prior to their release. It has been the experience of other comparable facilities that have employed such an initiative that released prisoners are more likely to follow-through with an appointment with someone who they have already met and begun to develop a relationship with, and if they still fail to show up for that initial appointment, staff from the community-based provider can better seek them out/follow-up with them.

Hinds County Behavioral Health has agreed to partner with the facility's mental health staff to try to employ and then assess the outcome of such an initiative. HCBH has just recently agreed to initiate contact with inmates while they are still in the facility. This intervention will begin when the facility is open to outside individuals.

In addition, as has also been noted in prior reports, it has become clear that there is a group of individuals with serious mental health difficulties who are arrested and brought to the facility multiple times each year; each time one of them is arrested, he/she is only kept at the facility for 1 or 2 days, and therefore there is not enough time to engage any of them in any mental health services; and it at least appears that they are engaged in this pattern of frequent recidivism in

large part because they are not engaged in any type of community-based treatment.  Therefore, consideration has been given to adding an intervention for this population as well, which would involve giving an individual's contact information to a community-based provider of mental health services (whenever a known, seriously mentally ill individual is brought to and then immediately released from the facility), who would then use case managers to go out and visit the individual and attempt to engage him/her in treatment.  If some of these individuals can be engaged in treatment in their community and then stabilized, this would be a benefit to them, their families and their communities, and also be a benefit for those involved in repeatedly arresting them and booking them in and out of the jail.

Hinds Behavioral Health has agreed to partner with the facility's mental health staff to try to employ and then assess this initiative as well.  Here too, since Hinds Behavioral Health does not have the funding to deploy staff for this purpose, in order to do this, QCHC will prepare a funding request to the county to support Hinds Behavioral Health's involvement in this effort.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:
   a.   Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
   b.   Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**
The County has not yet developed post orders in this area. The Records Supervisor and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

At the time of the last site visit, the Booking staff reported that they run an NCIC check at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. The files reviewed at that time did include a copy of the NCIC report at the time of release. There has been an issue of resolving holds promptly. The monitoring team was not able to review the physical files during the remote site visit. The releasing officers are aware of the holds in the system. However, the Records Supervisor cannot run an accurate report showing all holds because they are not always entered into the system in a consistent manner. This means that she cannot call the jurisdiction with the hold to determine whether they want to pick up the inmate. As a result, some inmates remain in the Jail instead of being released or transported.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.    How to process release orders for each court, and whom to contact if a question arises;

        ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

        iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

        iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

It was reported that because of turnover in the Booking Clerk positions, some procedures that were adopted to address communication issues between Booking and Records get forgotten. There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming

into compliance in this area. In addition, a staff member is working on a Booking and Release Manual which will provide the detailed guidance required by this paragraph.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

   a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

   b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Non-Compliant**

The record keeping process does not at this time allow for an audit other than a review of individual files. The log and summary that is now supposed to be in each individual file would provide this information. A technological solution should be considered to pull this information into a system wide log that would meet the requirements of subparagraph a. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not routinely prepared for over detention.

As noted in paragraph 94, in April, there were approximately 10 files audited although possibly 3 more without dates. In May, there were 35 files audited. The spread sheet spans January through May and shows 100 files audited. The May activity is close to that required by the Records Policy. However, earlier months do not appear to be close to compliance and the number through

May would suggest that there will not be close to a review of all files in a six month period as required by the Records Policy.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The week of the site visit, the Sheriff's Office hired an individual with the title of Quality Control Officer. She has prepared an initial spread sheet to meet the various requirements of the Settlement Agreement. This is currently in the review process but is certainly a step in the right direction. Previously, several individuals had some responsibility for tracking timely release as has been described in prior monitoring reports. This was not a coordinated, proactive auditing process as required by this paragraph. The hiring of an actual Quality Control Officer will assist in coming into compliance with this paragraph.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

As was noted in the Ninth Monitoring Report, the documentation of untimely/erroneous releases is not required by an approved policy. As was previously noted, there have now been a few incident reports on erroneous releases. There have still not been any reports on untimely releases. There should be clarification as to who has the responsibility for completing the report.  It was recommended by the corrections expert of the monitoring team that the Jail Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

Attorney/client visits do not appear to be a problem at the JDC or the WC, but the RDC, where the majority of the inmates are held, does not provide satisfactory space for attorneys to visit their clients in a convenient, secure area.  Inmates either have to be escorted from their respective housing units to the front of the jail, or else attorneys have to be escorted to unspecified multi-purpose spaces in each pod in order to conduct a visit.  The monitoring team has made recommendations to correct this problem over a period of years, but to date nothing has been done to rectify the situation.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

The monitoring team has received the electronic monthly reports. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include much of the information listed in paragraph 107 and 108 below and that would be needed to provide the information needed to inform continuing improvement or quality assurance reports. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property. The new Quality Assurance Officer is preparing a new spreadsheet that should assist with compliance in this area.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securus does not include some critical fields that are in the system but can't be pulled into the spreadsheet. The Grievance Officer manually creates a separate spreadsheet and enters for each grievance the information in the Securus spreadsheet and adds the type of grievance, the date of response and the date of the response to an appeal. The new policy also is to reject grievances that are actually inmate requests and directs inmates to use the inmate request category. This policy allows a more accurate depiction of grievances. With the new policy, it should be possible to have a useful data base on grievance data. These reports are not yet being used to inform improvement or quality assurance efforts.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
   a.   Brief summary of all reportable incidents, by type, shift, housing unit, and date;
   b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
   c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
   d.   List and total number of incident reports received during the reporting period;
   e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**
There are two spreadsheets being generated. One has the text of the narrative of the initial incident report and some information. The other spreadsheet does not have the narrative but has some additional information. The spreadsheets now being created are a first step towards being

able to generate the reports required by this paragraph. At this time, it does not include all of the information required by this paragraph (e.g. use of restraints, segregation, referral to IAD) including information that would be necessary to be fully informed regarding the nature of the incident. Combined, the spreadsheets would have quite a bit of the required information but the information should be accessible in one summary report. Most importantly, neither spreadsheet has an actual summary of the incident. The spreadsheet pulls in the first incident report and not the supplements. The first incident report does not necessarily have important facts. Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate on inmate assault or an inmate on officer assault. Only by reading the narrative of the first report, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:
   a.    Summary of all uses of force, by type, shift, housing unit, and date;
   b.    List and total number of use of force reports received during the reporting period;
   c.    List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**
One of the new spreadsheets has some of this information with respect to Use of Force. The Use of Force incidents are now submitted on an incident report form. This is preferable to separate forms. Again, there is no summary of the use of force in the spreadsheet and there is no listing or totaling of referrals to investigation.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**
As mentioned above, the limitations of the reporting from the Securus system has led the Grievance Officer to manually create a spreadsheet. Neither system can generate a report by

location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. At the present time, there is no management review process in the grievance system. As mentioned above, the Grievance Officer is now keeping an Excel spreadsheet and manually entering information related to grievances. One option would be to expand the manual spreadsheet to include the information required by this paragraph, this should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced maintaining an expanded manual spreadsheet would be a very time intensive process.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

      a.     A brief summary of all completed investigations, by type, shift, housing unit, and date;

      b.     A listing of investigations referred for disciplinary action or other final disposition by type and date;

      c.     A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

      d.     A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

Even though the IAD and CID functions have been separated, it is important that the two investigators continue to cooperate closely.  As was mentioned previously, they need to compare notes so that their spreadsheets are as closely matched in structure as possible.  The IAD spreadsheet sets the standard and should be used as the model for format.

Since January 1, 2020, the IAD investigator has handled 37 cases.   Of that number only three were referred to IAD by the IAD supervisor while the investigator initiated 34 cases.  While one would have expected more to have been referred from the Detention command staff, it may be an indication that the investigator is a motivated self-starter.  Certainly, the timeliness of many of his investigations supports that position.

Of the 37 cases investigated, the vast majority involved allegations of excessive use of force, two were allegations of negligence, two involved officer conduct and one was for the introduction of contraband.  One officer was terminated (for the introduction of contraband), but there are 11 cases still pending.

The IAD spreadsheet statistics confirm that the problems in the Jail System occur overwhelmingly at the RDC.  One occurred at the WC, two at the JDC and 34 at the RDC. No IAD cases were referred to outside agencies.

The CID spreadsheet reflects similar statistics regarding the number and location of inmate on inmate and inmate on staff incidents that have to be investigated for criminal purposes.  Of 41 cases investigated by the CID detective since January 1, 2020, three occurred at the JDC, two at the WC and 36 at the RDC.  Two were referred to IAD and none were referred to an outside agency.  The most surprising statistic was that no inmates were indicted as a result of the CID investigations.  Considering the frequency and severity of the assaults and incidents that occur in the Jail System, the lack of prosecution of the perpetrators, in itself, requires further investigation.

The statistics generated by the IAD and CID investigators support the need for the HCSO to re-implement direct supervision at the RDC again as soon as possible.  The huge disparity, with regard to the number of IAD and CID investigations at the RDC as compared to the WC and JDC, can only be explained by the fact that inmates at the RDC are not supervised by staff because officers are not assigned to the housing units.

111.     Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.     Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

a.  The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

b.  The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

**c.**  The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

d.  The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

e.  The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f.  The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Non-Compliant**

There is currently no Early Intervention program.

113.  Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

    a.    Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

    b.    Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**

Medical staff are not included in the review of serious incidents. This was discussed in a joint meeting between QCHC staff and command staff during the September site visit. It was decided that the Interdisciplinary Team meetings would be reinstituted and one task of the Team would be to review serious incidents. There is no indication that this has occurred. Medical staff do have independent authority to refer cases of assault or abuse.

## CRIMINAL JUSTICE COORDINATING COMMITTEE

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had previously contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. Hinds County is to be commended for getting the CJCC implemented and continuing its facilitation of those meetings despite a lack of participation by some key players. This paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate

have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI and the monitoring team have recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Among other duties, staff duties will include collection and analysis of data, facilitation, research and analysis, presentation, project management, consultation, and distribution of information to the policy makers on the committee so that they have the information they need to make policy decisions. The County had stated that it was going to hire a CJCC Coordinator. However, during this site visit, the monitoring team was informed that the Criminal Justice and Quality Control staff person (sometimes called the Court Liaison) was assigned to be the CJCC Coordinator and the Pre-Trial Services Director required by the Stipulated Order. This will not meet the requirements of this paragraph or the Stipulated Order as having both of these roles as well as the duties of her other full time position does not allow her to devote sufficient time to any of these roles to be effective.  The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish this has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping will soon be two years old. This would be a useful activity for the CJCC.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC has met only twice in the last 12 months, the last meeting being in February. Not all of the identified agencies have been invited or represented at the meeting. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant, JMI, to provide technical assistance in developing the CJCC. However, that contract did not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  That contract ended over a year ago and the County has not renewed the contract with JMI.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
       a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
       b.       Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**
Initially, the HCSO/Detention Services printed a booklet-sized version of the Settlement Agreement which was distributed to staff.  Whether or not it is still provided to new employees is undetermined.  It was previously recommended that the Director of Training should include a segment of the annual in-service training program to include the requirements of the Settlement Agreement.  The inability to be on site during the June remote site visit made it impractical for members of the monitoring team to determine whether or not conditions have regressed, remained the same or improved.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**
This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The monitoring team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert of the monitoring team to develop policies and procedures. A number of draft policies have been provided and at this time, twenty-one policies have been approved. It does not appear that there is a system in the policy development to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Twenty-one policies and procedures have now been approved and several others have been drafted and circulated. There are many outstanding policies to be written but progress is being made.

132.     Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.     No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

In addition to completing the development of policies, this paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. This has yet to be fully evaluated. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff.

134.     Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**

There have been twenty-one policies approved by DOJ. It does not appear that the policies have been fully incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

## COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph.  A self-assessment was not provided prior to the January, May, or September, 2019 or the January, or June 2020 site visit. This paragraph is now carried as non-compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for

the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**
The County has designated a full-time Compliance Coordinator who is coordinating compliance activities.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications are being provided. One concern is that there was an incident on May 18, 2020 which was labeled in the incident report as a riot. The Rapid Notification provided called the incident a minor disturbance. The incident involved the inmates from one housing unit "popping" the recreation door to another housing unit and rushing in. Four inmates received medical attention on site for lacerations, bruises, abrasions and puncture wounds. The officers retreated to the control room.  It would not be accurate to describe this incident as a minor disturbance. It is important that the reporting not only be timely but also be accurate.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.