Court-Appointed Monitor's Twelfth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -CWR-JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                Jim Moeser                Dr. Richard Dudley
Corrections Operations          Juvenile Justice          Corrections Mental Health

1

## EXECUTIVE SUMMARY

Because of the COVID-19 pandemic, this site visit was once again conducted remotely October 5-8, 2020, with additional interviews as explained below. The remote site visit was completed through conference calls and Zoom meetings with key personnel, members of the Monitoring Team and County and DOJ representatives.  The Compliance Coordinator provided extensive documentation electronically which made it possible to review many records that are normally examined on site. This does limit the ability to verify some of the information as might be done with an on-site visit in which more substantial interviews/observations can be completed and additional documents reviewed.  Comments and other information in this report should be considered in light of that limitation.

The executive summary and the body of the Monitoring Report below provide detail on compliance. However, there have been a number of notable steps taken since the last Monitoring Report and these should be highlighted. The Monitoring Report is required to report on ongoing areas of non- or partial compliance which might overshadow some of the improvements that have been made. Among the recent developments are:

1. C-Pod has been renovated, detainees have been moved in, and direct supervision of the pod has reportedly been implemented;
2. Renovations on B-Pod have commenced;
3. All supervisors were trained on the Use of Force policy;
4. The Quality Assurance Officer, hired at the time of the June site visit has begun to standardize forms across facilities and develop a work plan for review of operations;
5. Staff participated in PREA Investigations training with the National PREA Resource Center;
6. The Chief Safety and Security Officer overseeing maintenance for HCDS is doing an excellent job tracking needed repairs and their completion;
7. A treatment coordinator was hired for Henley Young (however, prior to the completion of this report, she resigned);
8. The portable buildings have been installed at Henley Young, although they are not yet functional;
9. The spreadsheet on incident reports has been expanded to include additional needed information;
10. The Records Unit has been completing the required number of records audits;
11. The Records Unit has reinstituted the inmate status sheet in the files although with some needed reformatting;
12. An Early Intervention Program (a program to address individual staff problems promptly) has been implemented.

Although these efforts are commendable, they have not yet had a significant impact on operations. A review of the immediate notifications for October revealed that there were 18 inmate on inmate assaults, 3 fires, 10 use of force incidents some of which were excessive, a

number of violations of policy and procedure, and continuing problems with incident reporting. As some of the efforts mentioned above develop further, hopefully there will be a positive impact on operations.

**Update on COVID-19**

The CDC and the most respected infections disease experts have recognized that there are circumstances, settings and/or populations where there is a significant increased risk of infection with COVID-19, and in turn, an increased risk of COVID-19 morbidity and mortality.  As a result, the CDC and infectious disease experts have repeatedly urged governments, administrators and other parties to employ specific public health principles and interventions that would decrease risks, taking into consideration the circumstances, setting and/or population for which they are responsible.  Jails and prisons have been among the clearly identified settings in which there is increased concern about COVID-19 infection, and the CDC and the infectious disease experts have promulgated specific recommendations for jails and prisons.  Given the provisions of Hinds County Settlement Agreement to have medical policies that provide for the health and safety of the inmates, the Monitoring Team views the extent to which the County follows the specific recommendations for jails as an appropriate and important issue that must continue to be included in the team's monitoring.

Essentially, the CDC's recommendations for jails can be summarized as follows (see https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html for a detailed list of the CDC's recommendations for the treatment and management of COVID-19 in jails and prisons):
- Given that it is impossible to consistently employ 'social distancing' as a means of primary prevention of infection with COVID-19, employing the other recommended approaches to the prevention of infection with COVID-19 become all the more important
- Therefore, for example, assuring that all inmates and all staff have access to and consistently wear a clean and functioning mask, and assuring that all inmates and all staff have access to and consistently use supplies appropriate for hand washing and keeping surfaces sanitized
- This also means that it is extremely important to identify and isolate inmates and staff who have been infected with COVID-19 for as long as they are infectious to others, and to assure that those infected individuals receive any medical treatment/intervention that they may require
- With regard to a program/approach to the identification of infected individuals, the design or selection of a program/approach must be done with the understanding that temperature and symptom checks might not be enough to identify all infected and thereby infectious individuals, given the lag time between infection and the development of symptoms and the fact that some infected individuals will never evidence symptoms

- Therefore, in addition, a program/approach to the identification of infected individuals must include 'contact tracing' or the assessment of individuals who have had contact with those who have been infected that is close enough contact to place them at risk of infection
- Testing of individuals beyond those that are symptomatic including testing newly incarcerated or detained persons at intake; testing close contacts of cases; repeated testing of persons in cohorts of quarantined close contacts; and testing before release
- And finally, the effective implementation of these recommendations requires that all inmates and staff receive COVID-19 specific public health education that is sufficient enough to maximize compliance with these recommendations

At the time of the June 2020 site visit, the CDC had already promulgated these recommendations for jails and prisons, and the Monitoring Team used those recommendations as the 'standard of practice' for monitoring the jail's management of COVID-19. The Monitor's report of the June 2020 site visit summarized the findings at that time and provided specific recommendations.

The most significant concerns are related to aspects of the facility's approach to the identification of COVID-19 infected individuals.

More specifically, it appears that there continues to be an over reliance on temperature and other symptom checks, without adequate attention paid to the limitations of such an approach. For example, it is the understanding of the Monitoring Team that in response to the Circuit Court's request that inmates be checked for COVID-19 infection prior to appearing in Court, the facility established a policy of quarantining inmates for 10 days before a scheduled court appearance while checking them for signs and symptoms of COVID-19 infection instead of simply testing them for infection. Although facility administration indicated that this policy was the recommendation of the medical director of QCHC (the facility's contract provider of medical and mental health services), the medical director told the Monitoring Team that although this approach was discussed, he did not intend to make that specific recommendation. During discussion with the Monitoring Team, QCHC's medical director also appropriately noted that there is the flip side of the Court issue, which is the risk of infection for the inmate when an inmate leaves the facility to attend Court, and the Monitoring Team noted that there was nothing in the new policy to address that concern. It was reported that inmates with scheduled court appearances were identified but no one was able to identify who was responsible for ensuring that those inmates were quarantined prior to their court dates or report how many inmates were currently quarantined under this policy. One incident of concern was reported in IR#201939. It is stated that a nurse said an inmate coming to the Work Center (WC) was possibly COVID positive. The report states that the inmate was accepted and housed in Unit 2, a dormitory style housing unit. There is no indication that the inmate was tested prior to housing the inmate with other inmates or that any precautions were taken.

4

In addition, the Monitoring Team was told that contact tracing of staff was being done but received conflicting reports about what was done with that information. It was initially reported that staff who had close contact were not informed of their exposure but it was subsequently reported that those individuals were so informed. There was no effort by the County to ensure that staff who had close contact were tested. Contact tracing and testing of inmates who had close contact was not being done. The Monitoring Team has repeatedly recommended that contact tracing and testing of those with close contact even if asymptomatic be done. One issue raised by the County was the expense of testing and the lack of assistance from the Mississippi Department of Health in making testing available. Therefore, it is unclear as to whether or not this important public health intervention is, in fact, a part of the facility's plan for the management of COVID-19. The number of COVID cases (63 staff and 34 inmates) has remained relatively flat since August but without the contact tracing and testing, it is impossible to know the actual prevalence of the virus in the facilities.  When what was essentially random testing of inmates scheduled for court was completed in September, almost 30% of the tested inmates who were asymptomatic tested positive indicating that the virus is more prevalent than is known. The Monitoring Team was recently informed that because the numbers have remained relatively flat, the Mississippi Department of Health has said that Hinds County no longer needs to report on the number of cases at the detention facility.

Inmates interviewed during the site visit reported that masks were made available to them. However, most, but not all, inmates reported that masks were not routinely worn on the housing units. Several inmates reported that it was their understanding that they only had to wear masks when they left the units, not while on the housing unit.

The County should review and adhere to the CDC guidelines and include testing for COVID-19 in situations where a symptom check is an inadequate assessment for COVID-19 infection and assure that contact tracing and testing of staff and inmates is consistently an integral part of the facility's COVID-19 management plan. The County should consider the use of a test for COVID-19 as an alternative for screening inmates prior to a court appearance instead of moving them/placing them in isolation for 10 days prior to a court appearance, and consider the efficacy of the screening of inmates upon their return from court. The County should provide additional education to and oversight of inmates regarding the need to wear masks while on the housing units.

**Corrections Operations**

In spite of a concerted effort to hire additional personnel, the number of filled positions has not increased since the last reporting period.  In January there were 204 filled positions, in June that figure stood at 215 and now, in October, it is at 204 again (plus eight candidates in the academy).

Since the time of the October site visit, 12 more individuals have resigned and 4 have been hired. Over the past two years, the number of filled positions has never exceeded 256.  As a reminder, there are 275 authorized positions in the Detention Services Division, 272 funded and three unfunded.  By means of comparison, the required staffing is 405, as specified in the Revised Staffing Plan, issued in April. Despite the ongoing problem with retention, detention staff have not fully utilized the services of the recruitment and retention consultant made available to them through the Monitoring Team. And the Recruitment and Retention Plan required by the Stipulated Order has not been completed although a draft is now circulating.

Fortunately, the average daily census for the Jail System has been between 372 and 408 over the past four months.  That, coupled with the fact that the Jackson Detention Center (JDC) has not housed inmates for the past six months due to plumbing and HVAC problems, and that C-Pod at the Raymond Detention Center (RDC) has been closed for well over a year while undergoing its second major renovation since the riot of 2012, has made it possible for the Jail System to function in spite of the critical staffing shortage.

All of that changed on October 22nd when C-Pod was reopened, operating under the principles of, and staffing levels required by, direct supervision.  At the same time the entire jail system began operating under a 12-hour shift plan which provides greater efficiencies with regard to staff utilization.  This quantum change in operating conditions for the RDC is a step in the right direction.  Now the renovation of B-Pod can begin so that the doors and cells in that pod can be secured.  When it re-opens it will be necessary for the HCSO to increase Detention staffing significantly so that B-Pod can also be operated under the principles of direct supervision, as required.  There is still no plan to renovate A-Pod; rather, it is to be left vacant.

Once C-Pod became operational, with cell doors in C-4 (the confinement housing unit) that can be secured, the inmates who had been inappropriately housed in Booking were relocated. Since the October site visit, however, the Monitoring Team learned that a female was being housed in one of the multiple occupancy cells in RDC Booking. This has been corrected. Hopefully, holding cells in Booking will never again be used for long term housing purposes.  As the Settlement Agreement requires, they should not hold an inmate there for more than eight hours.

Maintenance issues are finally being systematically addressed by the Chief Safety and Security Officer who coordinates all work orders and submits them to the County Administrator through Benchmark Construction.  This arrangement marks a major change (for the better) in the way the HCSO and the County have addressed maintenance problems.

The COVID-19 pandemic has turned the world upside down for the country's population, but not more so than for the inmate population.  It has made social distancing a major requirement in facilities where such a standard is impossible to meet.  It has made testing an improbability

because no funding is made available to make that happen.  It has made training of staff virtually impossible when no more than ten officers can be allowed in a classroom setting at a time.  That has forced the HCSO to prioritize training for new recruits, to the detriment of in-service and necessary training on recently approved policies.  The HCSO faces enough difficulties in complying with the provisions of the Settlement Agreement, but the pandemic has significantly multiplied those problems.

An analysis of Rapid Notification and Priority Incident Reports, that were made available to the Monitoring Team for the month of October, revealed that the RDC continues to be a violent and dangerous facility, even though the average daily census is far lower than it was when the monitoring process began.  Almost all of the reported inmate on inmate assaults (18), fires (3), and use of force incidents (10) occurred there.  Hopefully, a similar analysis in future months will reflect the positive impact of direct supervision when it is possible to compare the prevalence of incidents in A-Pod (remote surveillance) which is being used during the renovation of B-Pod to C-Pod (direct supervision).

**Medical and Mental Health**

In all correctional facilities, safety, at times characterized as minimizing the risk of harm, is one of the major overriding issues. During each of the most recent site visits, concerns have been raised about the safety of the medical staff.  Although administration has responded to each raised concern, the Monitoring Team is concerned about whether or not administration's response identifies and addresses broader, underlying safety issues/concerns, especially given that there continues to be incidents where medical staff feel unsafe.

As described in the June report, there continues to be a need for a regular problem identification/problem solving meeting between jail administration, senior security staff and medical and mental health.  The safety of medical staff and many of the problems noted in this November report could have been more easily addressed had there been a better line of communication between these groups, and moving forward with the work that is yet to be done could be enormously facilitated by a better line of communication between these groups. The jail administration must address this by taking deliberate steps to improve coordination and communication between security and medical/mental health staff. Establishing a regular joint meeting would be a good step in this direction.

**Youthful Offenders**

As of the time of the October virtual site visit, there were nineteen Juveniles Charged as Adults (JCAs), in the Henley Young facility.  All of them were male.  Population management efforts related to the short-term (non-JCA) youth seem to remain in place, keeping the overall facility population below the maximum capacity of 32.  Concerns remain related to the extended length of stay for JCA youth, particularly given the absence of a judge overseeing the Minors Diversion

Docket initiated by Judge McDaniels. Overall Henley Young continues to operate as a generally safe and secure environment for youthful offenders, but the large number (17 out of 47) of vacancies in the Youth Care Professional (YCP) ranks severely limits the ability of the program to move forward in meeting a number of requirements of the agreement.  Steps to support the recruitment, training, and retention of YCP staff should be taken as soon as possible.

The filling of the Program Coordinator and Treatment Coordinator positions was a step forward. The programs initiated by the Program Coordinator are appropriate, but actual implementation remains a work in progress as it represents a change in the daily expectations for both youth and staff.  The Treatment Coordinator is very new to the facility and will need support in shaping the overall mental health services and programs into a more comprehensive and integrated component of facility operations.  The leadership team of Mr. Harrington, Mr. Burnside, and Mr. Dorsey had continued to provide good leadership, albeit staff shortages mean that an inordinate amount of time and energy is likely focused on "filling slots" during the day rather than being able to move forward in overall program quality. Shortly before the completion of this report, the Monitoring Team learned that Mr. Harrington's last day as Executive Director was November 30, and the recently hired Treatment Coordinator, resigned effective November 25.

Modular units to provide additional and more appropriate education, program, and treatment space are on site but not yet operational, with a stated goal of being ready for use by the end of November if not before. Additional recommendations related to facility plant changes have not been implemented nor have any funds been budgeted in this fiscal year to make those changes. These recommended changes include:  (1) repair/replace the electronic door system controls so they don't all require manual operation; (2) finish and put in operation the additional program spaces constructed (e.g. finish wiring, furnishings, etc.); (3) living unit improvements, i.e. replace fixed/steel table with movable security furniture and improve acoustics.

Related to the January Stipulated Order, the County had finally hired a Treatment Coordinator, a cornerstone position in terms of providing vision and leadership for the mental health services and integrating those with other aspects of the overall program. However, the Treatment Coordinator has since resigned once again leaving a vacuum in this area. A more detailed daily schedule for all programming has been developed, and additional documentation will be required that should enable better monitoring as to whether/what extent all programming requirements are being met. YSS staff and the new Program Coordinator continue to research and utilize more appropriate research-supported curriculum that moves them closer to meeting the type of program requirements included in the Stipulated Order.  It is difficult to monitor actual delivery and documentation of all these programs without being on-site, but it does appear that staff continue to make progress in this area.

**Criminal Justice and System Issues**

As with the June site visit, it was difficult to complete a review of the records remotely as the inmate files are too voluminous to scan. A copy of the inmate status/summary sheet and the chronological sheet was requested for 30 randomly selected inmates. However, it was not possible to compare these face sheets to the actual inmate files. The Monitoring Team learned during the June site visit that Records staff had discontinued creating the inmate status sheet. It was recommended that this be re-implemented as it is required by policy and assists in ensuring the lawful basis of detention. The records provided for the October site visit had status/summary sheets for the 30 inmates although they are in need of revision and standardization. In the June Monitoring Report, it was noted that the records were not being audited at the pace required by the Records Policy. The number of audits completed since the June visit does meet the requirement of the policy.

There continues to be over-detention in some areas. It was reported that several inmates who had unsecured bonds had not been released timely. There were a number of people who were held beyond the 21 days allowed for a probation violation hearing to take place. It was reported that the Mississippi Department of Corrections requested that they continue to be held. This does not constitute a lawful basis for detention. As reported in the June report, there continues to be a problem with identifying holds and contacting the other jurisdictions in a timely manner. All of these issues should improve with the use of an up to date status sheet.

As previously reported, there is increased ability to pull reports from the JMS system. Additional fields were added to the Incident Summary Report. This is an improvement but the reports do not yet meet the requirements of the Settlement Agreement in terms of containing all the required information and analysis. The information required by the Settlement Agreement is for the purpose of providing command staff in summary form the data that would inform system improvement. The Quality Assurance Officer hired in June is working on developing a Quality Assurance program and has created a spreadsheet with additional reporting. The next step will be to use the data being collected to generate reports identifying trends and system issues. Having a full time individual devoted to Quality Assurance is a big step towards compliance in this area. It has been reported that the County is getting a new JMS system. The current JMS system has been an impediment to compliance both in its inability to add fields or generate tailored reports but also in the inconsistent manner in which information is entered. The Booking and Release Manual has been updated and expanded. This should assist in entering information accurately and consistently in the JMS system.

The grievance system continues to improve, however, again, only with the labor-intensive creation of manual tracking systems as opposed to a functional electronic system. Because of the remote nature of the visit, it was not possible for the Monitoring Team to run a report to determine whether there were grievances that had not received a timely response. It was reported

that a number of staff do not enter their responses in the system so they may appear not to have a response and the Grievance Coordinator has no way of knowing whether there has been a response. Several grievances were denied as non-grievable when they were, in fact, grievable. The Grievance Coordinator is going to do some additional training on this issue. There has been significant improvement in this area in the prior three site visits. A number of grievances had inadequate responses; mostly in promising some future action with no way of knowing if the action had been taken. Although more grievances are now receiving a timely response, there is still no system to review whether responses are adequate; and no oversight to determine that promised actions are actually completed.

In the last 12 months, the CJCC has met once in February. The coronavirus has, no doubt, impacted the ability of the Criminal Justice Coordinating Council (CJCC) to meet. However, the CJCC will need to meet more frequently to be an effective body. Even before the virus, the CJCC had not had consistent participation by a number of stakeholders. This has limited its effectiveness. An effective CJCC or some collaborative body is needed to implement most jail population reduction strategies and other system efficiencies. Contrary to the requirements of the Stipulated Order, the County has not contracted with JMI or another consultant. And the Stipulated Order requires the County to hire a full-time qualified individual to implement the pretrial program. In fact, the County did not post these positions but rather has assigned both the role of the CJCC coordinator and the pretrial director to a person who already had a full-time position, the Criminal Justice and Quality Control Officer (sometimes called the Court Liaison). This does not meet the requirements of the Stipulated Order. At the time of the October site visit this person reported that she had not been able to work on developing a pretrial program because she was too busy with her other duties. Although it may be difficult to find someone locally who has knowledge in these areas, the positions should be posted.

## STIPULATED ORDER UPDATE

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

## STIPULATED ORDER UPDATE

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes | 10/2019 | Consultant is retained through the Monitoring Team. However, although regular meetings have been scheduled, they are most often cancelled by the HCDS staff. |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | No | 3/2020 | Purchase Order submitted on 1/22/20; cameras were on back order; they have now arrived. As yet, there have been no video recordings of planned UOF although there have been some incidents that should have been considered planned UOF. |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | No | 5/22/20 | Posted 1/8/20 but not posted as a treatment coordinator; Position posted correctly on 5/22/20. Treatment Coordinator has been hired but has now resigned. |
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and security measures at RDC. The architect shall conduct periodic inspections. | No | 4/15/20 | The County has entered into a contract with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, Farr & Lemons Architects & Engineers (CDFL, PA). This was reportedly on 4/15/20. The Monitoring Team has not seen the contract or documentation of any inspections by CDFL. |

| | | | | |
|---|---|---|---|---|
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |
| | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 | |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement-required policy review and approval process is completed. | Yes | 3/27/20 | |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the supervision of inmates at RDC. The plan shall include the following: II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | Yes | 4/13/20 | |
| | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | No | | The staffing plan does not address this paragraph. The Detention Administrator developed a plan for rotation of staff but this was put on hold because of COVID-19. The new 12 hour shifts for the entire jail system does better utilize staff. |

| | | | |
|---|---|---|---|
| | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare check sheets at the cell doors of those inmates held in segregation. | No | | Directive issued on 9/27/19 by Major Rushing had radios assigned. Review of incident reports discloses that the directive is not always being followed. |
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other areas or facilities. This work will be completed within 3 months. | Yes | 4/2/20 | The alarms and cameras have been installed in April. The operations did not shift to direct supervision with one officer in the unit until September. The staff savings can now be achieved. |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the curriculum and materials for training on the new policy or procedure. | No | | Training has been delayed due to COVID-19. |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | No | | Training on the Use of Force Policy, adopted 2/1/20, has been postponed several times due to COVID. In the interim, UOF training has been provided to all supervisors. Training on the other 20 policies adopted more than 3 months ago has not occurred. |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, | | | A more complete daily schedule has been developed that outlines times for more structured activities, although it was not possible to |

| | | | |
|---|---|---|---|
| | and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include:<br>1. Activities which are varied and appropriate to the ages of the youth;<br>2. Structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship;<br>3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and<br>4. Hinds County, by and through its County Administrator and/or Executive Director at Henley-Young, shall maintain exclusive control and maintenance of any facilities or technology that promotes compliance with this provision. | No | | confirm to what extent those times are actually filled with activities outlined in the Stipulated Order. |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as:<br>1. cognitive behavioral programming;<br>2. independent living skill training;<br>3. relationship and positive communication skills;<br>4. anger management;<br>5. peer refusal skills;<br>6. trauma informed programming; and | | | Progress is being made. Staff have incorporated more evidence-based curricula in the programming but it does not provide the breadth of programming required by this paragraph. |

| | | | | |
|---|---|---|---|---|
| | 7. pre-vocational skill building. | No | | |
| 05-16-20 | I.  A. 1. In any occupied pod, the County will convert all control room doors, housing unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically controlled swing doors to the control panel so they can be electronically operated with a CML type locking mechanism. | No | | This has been completed in C-Pod and A Pod but not in B-Pod. Although the security doors in A-Pod have been changed from a sliding to a swinging configuration, and they now lock, their operation is still by key, not electronic control. |
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | Yes | 4/30/20 | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | No | | |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | | | Fire hoses have been installed in C Pod during the renovation. They have not been reinstalled in the other |

| | | | | |
|---|---|---|---|---|
| | | No | | 2 pods the renovation of which is now overdue. |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | Yes | 4/15/20 | CDFL and HDR, Architects, have been retained. |
| | I. B. 4. Form a committee to develop and implement the Master Plan, which will include the County Administrator, the Sheriff, the Jail Administrator, the facility captains, and the Board of Supervisors President. Other members may be included at the discretion of the County and the Sheriff. | Yes | 4/28/20 | County has contracted with facilitators. First meeting of committee and facilitators was 4/28/20. A second meeting was held on 9/14/20 when CDFL and HDR provided a presentation of their work to date. |
| | II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division specifically for recruitment of detention officers. | No | 6/1/20 | A full-time recruitment officer was hired in June, 2020. |
| | II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | No | | |
| | IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of | | | JMI reports that they have no current contract with the County and there has been no communication since their last contract ended over a year ago. |

16

| | | | |
|---|---|---|---|
| | implementation of pretrial services programs. | No | | |
| | IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or within 12 months shall obtain certification by the National Association of Pretrial Services Agencies (NAPSA). | No | | The County assigned this role to an employee who already had a full time job and gave her the additional role of CJCC Coordinator. At the time of the October site visit, she explained that she had not had time to do any work on developing a pretrial program because of her other duties. |
| | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | No | | |
| | IV. A. 4. The County shall provide the technical support for implementation of a risk assessment instrument for purposes of pretrial release decision-making. | No | | |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services | | | The position was not posted until 5/22/20. The position was filled in late September, 2020 with the hiring of a clinical social worker but she has now resigned. The County had not contracted with a psychologist to provide any services needed in addition to the services provided by the social worker. |

| | | | | |
|---|---|---|---|---|
| | of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | No | 9/2020 | |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train deputies on a Settlement-compliant use of force policy, including Settlement requirements for reporting of use of force. | No | | Training was scheduled but has been delayed due to COVID. |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | No | 9/2020 | Training on supervisory review of UOF incidents was included in the UOF training of the supervisors. |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | No | | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be | | | Since the renovation of B Pod has just begun, A Pod will continue to be used for some time. However, the plan continues to be to eliminate its use once the renovation of B Pod is complete. |

| | | | | |
|---|---|---|---|---|
| | converted to secure swinging doors and tied to a new control panel. | | | |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | No | 10/24/20 | Multiple person cell doors have been replaced but single cells were continued to be used for housing without the required doors. This has reportedly stopped now that C-Pod has been occupied under direct supervision and with cell doors that lock. |
| | II. B. 4. Within 6 months, the County shall develop and implement a process that provides criteria for merit-based promotion and establishes a career ladder. | No | | |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | Yes | 6/1/20 | |
| 8-16-20 (2 months to post, 4 months to offer, and 1 month evaluate structure | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | No | | |

| | | | |
|---|---|---|---|
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the development of the pretrial program within 9 months. | No | | |
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | | | |
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | | | |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | | | |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. | | | |
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the | | | |

| | | | |
|---|---|---|---|
| | information that is needed for the long-term planning process. | | |
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will notify the Monitor and DOJ of any anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | No | | The policy development and review process has been proceeding at an accelerated pace with 21 policies now approved. Not all projected deadlines have been met but progress was being made. More recently the policy group working on the policies has not been fully engaged and progress has stalled. |

**Monitoring Activities**

The Monitoring Team conducted a Remote Site Visit October 5, through October 8, 2020 and October 19, through October 21, 2020. The juvenile expert's visit was delayed until October 19th because of a death in the family. The site visit schedule was as follows:

Site Visit Schedule
October 5-8, 2020

| Date and Time | Lisa Simpson | Dave Parrish | Dr. Richard Dudley |
|---|---|---|---|
| October 5<br><br>9:00 | Ric Fielder and Captain Crain<br><br>Zoom | Ric Fielder and Captain Crain<br><br>Zoom | Nurse Sims (and whoever she would like to include) through 12:00 |
| 10:30 | Bob Brown, David Marsh and Gary Chamblee and Sgt. Steven Winter<br>Zoom | Bob Brown, David Marsh and Gary Chamblee and Sgt. Steven Winter<br>Zoom | |
| 1:00 | Captains Simon, Johnson and Taylor<br>Zoom | Captains Simon, Johnson and Taylor<br>Zoom | Mental health team/staff-QMHP's |
| 2:30 | Tony Gaylor and Jennifer Collins | Miioka Laster | |
| 3:30 | Sheena Fields | Doris Coleman | |
| 4:00 | | | Nurse Sims |
| October 6<br>9:00 | Kenisha Jones | Marquette Funchess and Officer Andrew White | Nurse Sims and Mental Health Staff |
| 10:30 | Taneka Moore | Kimblar McLaurin | |
| 1:00 | Samuel Dukes and Capt. Tyree Jones | Samuel Dukes and Capt. Tyree Jones | Nurse Minor |
| 2:00 | Lt. Cheryl Childs, and Marlo Brinnon | Lt. Cheryl Childs, and Marlo Brinnon | Representative from Nursing Staff |
| 3:00 | Claire Barker, Sheriff Vance, Allen White and Eric Wall<br>Zoom | Claire Barker, Sheriff Vance, Allen White and Eric Wall<br>Zoom | Medical Nurse Practitioner/Clinician |
| 4:00 | | | Nurse Sims |
| October 7<br>9:00 | Lt. George re Classification | Lt. George re Classification | Nurse Sims or person with full access to EMR |
| 10:30 | Jennifer Collins, County Administrator; Robert Farr, CDFL | Jennifer Collins, County Administrator; Robert Farr, CDFL | |

22

|  | Architects; Bill Prindle, HDR Architects; Tony Gaylor, County Attorney (and maybe others) to discuss Master Planning Google Meeting | Architects; Bill Prindle, HDR Architects; Tony Gaylor, County Attorney (and maybe others) to discuss Master Planning Google Meeting |  |
|---|---|---|---|
| 1:00 | Lt. George re Records Zoom | Brady Butler | Mental Health Nurse Practitioner/Clinician |
| 3:00 | Dr. Bates and Nurse Ash |  | Dr. Bates and Nurse Ash |
| October 8 9:00 | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited) Zoom | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited) Zoom | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited) Zoom |
| 11:00 | Inmate Interviews Zoom |  |  |

Site Visit Schedule
October 19-21, 2020

| Date/Time (CT) | Jim Moeser |
|---|---|
| October 19 9:00 | Mr. Greg Harrington Executive Director |
| 10:30 | Mr. Burnside and Mr. Dorsey |
| 1:00 | Mr. Caldwell, Principal |
| 2:30 | Ms. Fernice Galloway, Youth Support Specialists |
| 4:00 | Judge Carlyn Hicks, Youth Court |
| October 20 |  |
| 10:30 | Ms. Ruth Walker, Treatment Coordinator |
| 1:00 | Ms. Andrea Baldwin, Program Coordinator |
| 1:45 | Ms. Tamika Barber, |

| | Youth Support Specialist |
|---|---|
| October 21 | |
| 1:00 | Exit/Check-out w. Mr. Harrington, Attorney Gaylor |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |

| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 | 1 | 6 | 57 | 0 | 28 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
  a.  Booking;
  b.  Objective classification;
  c.  Housing assignments;
  d.  Prisoner supervision;
  e.  Prisoner welfare and security checks ("rounds");
  f.  Posts and post orders;
  g.  Searches;
  h.  Use of force;
  i.  Incident reporting;
  j.  Internal investigations;
  k.  Prisoner rights;
  l.  Medical and mental health care;
  m.  Exercise and treatment activities;
  n.  Laundry;
  o.  Food services;
  p.  Hygiene;
  q.  Emergency procedures;
  r.  Grievance procedures; and
  s.  Sexual abuse and misconduct.

## Partial Compliance

25

The County continues to make some progress with regard to the development and implementation of policies and procedures. However, more recently the policy group working on the development of the policies has not been engaged and progress has stalled. To date 21 policies have been approved by the DOJ and adopted by the Sheriff and many more are under review.  An additional three policies have been approved by DOJ but are awaiting review with the medical provider regarding aspects that involve medical. While there is significant improvement in this area, nothing has been done to comply with the creation of related post orders.  Further, the impact of the COVID-19 pandemic on training has hampered the ability of staff to become familiar with and to implement policies as they are approved with the exception of the Use of Force policy as described below.  Instead, almost all training efforts have been concentrated on new recruits and basic academy orientation so that new personnel can be assigned to fill staff vacancies. The two mental health policies are still in the review process. However, as previously reported, the current number of mental health staff will not actually be able to implement all of the requirements of these policies or the terms of the Settlement Agreement.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

 **Partial Compliance**
As was reported in the last Monitoring Report, the Jail Administrator is qualified to hold the position that he fills, but the Assistant Jail Administrator does not have the requisite education to fill his post and the Captain who now commands the JDC (although assigned to RDC at the present time because of the closure of JDC) does not have the necessary supervisory experience to hold that position. Since the time of the October site visit, this Captain has been assigned as the sole Captain at RDC.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
As has been previously noted, Substantial Compliance cannot be achieved until policies and procedures are in place and supervisory staff have received the requisite training.  In the interim, another group of promotions have been made which appear to be in compliance with the

standards required by the Settlement Agreement with regard to experience and education.  In July one Sergeant was promoted to Lieutenant and three Detention Officers were promoted to Sergeant.

- Sergeant "A" has worked for the HCSO for one year and for the Henley Young Juvenile Justice Center for four years.  He has been a Sergeant for only three months.  He has a high school education.
- Detention Officer "B" has worked for the HCSO for three years in various positions throughout the Jail System.  He has a Master's degree in Education.
- Detention Officer "C" has worked for the HCSO for three and a half years.  She has a high school education.
- Detention Officer "D" has worked for the HCSO for three years.  She has a high school education.

In August one Sergeant was promoted to Lieutenant and two Detention Officers were promoted to Sergeant.

- Sergeant "E" has worked for the HCSO for four and one-half years.  She was promoted to Sergeant in 2019.  She has a high school education.
- Detention Officer "F" has worked for the HCSO for only one month, but she has 13 years of correctional experience including five years as a supervisor (Lieutenant) with the Mississippi Department of Corrections (MDOC).

In September one Sergeant was promoted to Lieutenant and one Detention Officer was promoted to Sergeant.

- Sergeant "G" was hired as a Lieutenant for the HCSO on September 1, 2020.  She was previously employed by the MDOC where she held the rank of Sergeant.  She has an Associate Degree in Fine Arts.
- Detention Officer "H" has over 13 years of experience in corrections, law enforcement and private security.  He has been employed by the HCSO for seven years.  He previously served as a Sergeant at the RDC from 2016-17, but then resigned, was re-hired in March of 2018, and resigned again in December 2018; he was re-hired in 2019.  He has a high school education and attended college for three years.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Substantial Compliance**

The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check.  This was confirmed by the Background Screening Investigator and the Director of Human Resources, as well as by a review of the personnel files of recently employed Detention Officers.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

The Eleventh Monitoring Report contained a detailed explanation of the three generations of jails: first (linear intermittent surveillance), second (podular remote surveillance) and third (podular direct supervision).  That was followed by an analysis of the three Hinds County jails.  The Jackson Detention Center (JDC) is a first generation (linear intermittent surveillance) jail that cannot be practically converted to direct supervision operation because of cost.  The Work Center (WC) is a third generation (podular direct supervision) jail that has not operated under the principles of direct supervision until recently; however, it now is functioning according to those principles.  The Raymond Detention Center (RDC) was designed as a third generation (podular direct supervision) jail, but since 2012 it has operated as a second generation (podular remote surveillance) jail.  This change in operational philosophy and procedure resulted when the officers were pulled out of the housing units at the direction of a previous sheriff.  Recognizing that this was a catastrophic mistake, the current administration has permanently assigned an officer to each housing unit on each shift beginning with C-Pod on October 22nd when it was reopened after being renovated.  The plan is to follow the same procedure when B-Pod is re-opened after undergoing a similar renovation.  At that point A-Pod will be mothballed.  If it is subsequently needed it will be necessary to renovate it to the standards of C and B Pods and to staff it according to the principles of direct supervision.  Once C-Pod is operated successfully in a direct supervision mode for the next reporting period this paragraph can be upgraded to Partial Compliance; however, full compliance cannot be achieved until the JDC is closed as a housing facility and all operational pods at the RDC operate under the principles of direct supervision.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:

        i.  There are at least two detention officers in each control room at all times;

        ii.  There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii.  There are rovers to provide backup and assistance to other posts;

        iv.  Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v.  There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements

28

required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

    i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

    ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

    iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e. The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

Little has changed since the last Monitoring Report.  The critical lack of staff in the Jail System makes daily operations problematic at best even considering the fact that the JDC has been closed for the past six months due to plumbing and HVAC issues.  All of the inmates and staff from the JDC were relocated to the WC.  That it was able to absorb both male and female inmates, speaks well for the fact that the WC is a direct supervision facility.

In the Eleventh Monitoring Report it was noted that the number of filled Detention positions in the past four years has fluctuated from a high of 256 to only 204.  In June 2020, the staffing level was reported at 215.  During the October remote site visit that figure stood at 204 again (excluding eight officers in the academy).  Since the October site visit, 12 additional staff have resigned and 4 have been hired. According to HR records, 42 applicants were brought on board

in June, July and August.  While that number is significant, it has not quite kept up with the number of personnel who have left the Detention Services Division.

It should be noted that the HCSO and County have never created the positions that are required to run the Jail System.  Similarly, they have never even funded all of the positions that are in the current table of organization.  The most recent Revised Staffing Analysis, that was issued in April 2020, calls for 405 Detention positions.  Currently there are only 275 authorized Detention positions; 272 are funded and three are unfunded.

The County has failed to create a true career ladder for Detention employees.  In 2019, the previous Board of Supervisors approved a $100 per month salary increase, but when the new Board took office in January 2020, that increase was rescinded.  Recently the Board approved a 2% increase for every five years of service for Detention Officers effective October 2020.  This does not apply to supervisory personnel.

The lack of detention personnel has contributed to the safety concerns of the medical staff.  During each of the most recent site visits, concerns have been raised about the safety of the medical staff.  Although administration has responded to each raised concern, the Monitoring Team is concerned about whether or not administration's response identifies and addresses broader, underlying safety issues/concerns, especially given that there continues to be incidences where medical staff feel unsafe.

On 19 September 2020, in the medical unit, an inmate smashed a lamp into a window; he then proceeded to attempt to hit a nurse with the lamp, just missing her head; and then he threatened a second nurse with the same lamp post/pole.  When this incident was reported to administration, the response was to require that specific inmate, known to have problems controlling his behavior, to be cuffed when being brought to and when in medical.

However, there are other issues here that make it difficult to assure the safety of the medical staff.  More specifically, when the above noted incident occurred, there was only one female officer in medical; when the inmate became upset, she went to call for back-up, leaving the nurses alone (which is when he attempted to attack the nurses); and even if she had remained with the nurses, it is unlikely that she would have been able to protect the nurses all by herself.  In addition, virtually all of the security cameras in the medical unit have been inoperable for years, and the one that does work is positioned in such a way that it only picks up a small part of the area it is supposed to be focused on.

      f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and

then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

    i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

   ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

  iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

  iv.   The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

   v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

  vi.   The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

Classification staffing coverage was less comprehensive during the past four months than during the previous reporting period.  This was caused by a combination of resignations and the impact of the COVID-19 pandemic resulting in 4 of the 11 positions being either vacant or temporarily absent.  Two vacancies currently exist, the unit supervisor (Sergeant) and one Detention Officer. In addition, up to four additional officers were unavailable for work due to their quarantine status.  This left a gap in coverage on the first and third weekend shifts.  According to the Lieutenant in charge of Booking, it is anticipated that daily coverage will return to normal

shortly. Starting the weekend after the site visit, the weekends were going to be covered by rotating the staff including the Lieutenant over Inmate Services.

Previously it was reported that the Captains at the JDC and WC periodically overrode Classification decisions and sometimes refused to accept inmates that were assigned to their facilities.  The previous Jail Administrator failed to issue an order prohibiting this practice; consequently, it was recommended in the Eleventh Monitoring Report that the current Jail Administrator follow through and issue a definitive order.  The Jail Administrator did so on July 22, 2020.

Since the JDC has not housed inmates for the past six months, female detainees are now moved directly to the WC once they have completed the booking process.  There they are placed in Housing Unit 2 unless they require confinement/lockdown housing, in which case they are held in a single cell in one of the two Specialized Housing Units (five cells each).

While wrist bands are still used, the number of inmates who actually have/wear them cannot be determined until the next on-site visit.

The housing of inmates according to gang affiliation was one of the first classification discrepancies that was corrected after the monitoring process began in 2016.  Unfortunately, during the discussion of an incident during the October remote site visit, it became apparent that housing by gang affiliation is practiced once again and has been on-going for over a year.  The inability to supervise inmates in the unstaffed housing units at the RDC is what caused this lapse in previously approved procedure.  With the opening of C-Pod under the principles and constant staffing of direct supervision, it should be possible for inmates to be housed there without regard to gang affiliation.

The review of the classification system was completed by review of the spreadsheet showing all classifications from June through September and the scoring sheets of all inmates classified the first two weeks of September. The spreadsheet indicated very few overrides of the classification level determined by the score. Those that were identified in the spreadsheet as overrides appeared to be based on an outstanding warrant. This is not actually an override because that adjustment to the score is called for by the scoring sheet. The scoring sheets reviewed showed no overrides. Extensive use of overrides in the past had kept the classification system from being an objective, behavior-based system. This appears to have been remedied.

It is also essential that the scoring be done accurately in order to have an objective, behavior-based system. The systemic concern reported in January-that Classification did not have access to the NCIC report on prior arrests (the "rap sheet")-was reportedly remedied. It was reported that shortly after the January site visit Booking started providing the NCIC report to

Classification. However, it was learned during the October site visit, that the NCIC report provided to Classification was only the outstanding warrants sheet. Classification still did not have the rap sheet and could not identify arrests outside of Hinds County. This may be why there continue to be files where the scoring was not consistent with the prior history reported by the inmate. One was scored as no priors; the inmate said he had a prior violent conviction in 2020. Another said no serious offense history; the inmate said he had a prior conviction for armed robbery. The Undersheriff indicated in a later interview that they were working on making the NCIC rap sheet available to Classification.

As reported in the June Monitoring Report, one systemic problem appears to have arisen from a miscommunication. The Classification Officers were told that they should not score the severity of a prior offense unless it is "high" or "highest." They have not been scoring the severity of the prior offense if it is "moderate." This had been clarified with the Sgt. over Classification but apparently was not communicated to the rest of the Classification staff. This resulted in an inaccurate score in 22 of the files of the approximate 90 files reviewed. This was clarified with the Lt. and should be easily remedied. Other than this systemic error, there were very few errors observed in the files.

The last several reports noted that there were a number of maximum-security inmates being housed at the WC. The WC being a dormitory style facility would be expected to serve mostly minimum level inmates. At the time of the October and the June site visit there were a number of inmates from JDC temporarily moved to WC because of plumbing problems which may be why there continue to be a number of maximum-security inmates at the WC. In reviewing the classification decisions for June through September, it appears that most of the inmates classified to the WC were minimum and medium. There were still, however, 15 male maximum security inmates classified to the WC in this time frame. The Captain in charge of the WC indicated this has not presented a problem because of their direct supervision.

      g.  Develop and implement positive approaches for promoting safety within the Jail including:
          i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;
          ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;
          iii.  Creating work opportunities, including the possibility of paid employment;
          iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

      v. Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

     vi. Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

    vii. Providing reasonable opportunities for visitation.

h. Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances. Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i. Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation is provided to most, but not all inmates. Each facility now uses a Recreation Log which makes it possible to track scheduled time by housing unit. As was previously reported, the WC has been consistent in meeting this standard.

At the RDC the log entries are subject to question. On multiple occasions documentation reflected that the recreation yards were opened but never closed, that they were open for most of the entire day up until 2330 hours at night, and that inmates from adjacent housing units were in the shared recreation yard simultaneously. This constitutes a violation of policy or erroneous log entries. Certainly, it is the sort of thing that should have been noted and corrected by supervisors who signed off on the log forms, but supervisors do not make such observation notes. The lack of supervisory accountability has been highlighted on numerous occasions, without apparent effect. Until such time as the Recreation Log entries reflect an accurate documentation of practice, the RDC cannot comply with the five-hour recreation standard.

As has been pointed out for approximately four years, the JDC cannot comply with this standard because it does not have an outside recreation yard. In spite of that recurring finding, no action has been taken to date to address the design shortfall. The Master Planning Committee should make a recommendation to either correct the problem or else to take the JDC off-line as a housing facility.

Regarding 42 (g) (ii) and (iii), there is no incentive program.  There are work opportunities at the WC but not paid employment, and the only opportunity at the RDC is to work as a trusty.  The housing units at the JDC are currently closed.

Regarding 42 (g) (iv), as was previously reported, the original medication pass procedure at the RDC was reinstated after a review of medical refusals revealed that many inmates were not receiving their medications.  A written order to that effect, issued by the previous Jail Administrator, has since been provided to the Monitoring Team.  It specifies that nurses will pass out medication in the cage area of the units and that a detention supervisor "must" be present during medication pass at all times.

Regarding 42 (g) (vi), as has been noted in prior site visit reports, the currently approved positions within the mental health team include 2 QMHPs (clinical social workers), a part time psychologist, and a part-time psychiatric nurse clinician (supported by a psychiatrist).  The team is supported by the nursing staff in that the nurse responsible for discharge planning is also involved with discharge planning for those on the mental health caseload, and the monitoring function that the nurses perform while passing medications includes the monitoring of the mental status for all detainees, including those on the mental health caseload.

The size and the makeup of the mental health caseload remains fairly stable.  At the time of the site visit, there were 123 detainees on the mental health caseload, virtually all of whom are considered to be seriously mentally ill.  All but 13 of those detainees are currently being treated with psychotropic medication; at this point. of those 13, only 6 have been diagnosed as suffering from a mental illness for which psychotropic medication is indicated, but they have repeatedly refused to take the medication. This is an improvement from prior visits indicating that the mental health team's increased efforts to encourage those who require medication to accept medication have had positive results.

As has been noted in prior reports, even when all of the currently approved positions within the mental health team are full, there are not enough staff to provide individual or group treatment for all detainees with serious mental illness, developmental disabilities, or other behavior or medical conditions, who would benefit from therapeutic activities.  At the time of the site visit, the recently hired QMHP had resigned; so, the mental health team was again functioning with only one QMHP; and so again, the most stable detainees were being seen less frequently than they should be.  As has also been noted in prior reports, the absence of a mental health unit and the resultant housing of the most unstable, seriously mentally ill in segregation makes it impossible to establish an appropriate therapeutic setting with reasonably adequate programing for those most unstable detainees, and it also makes it extremely difficult to establish an appropriate therapeutic setting with adequate programming for detainees who are more stable but yet still unable to function on a general population unit.

When a mental health unit is opened, it will need to be staffed, and so once the program plans for the unit have been developed, a staff request will be submitted. Unstable detainees who are currently in segregation, and somewhat more stable detainees who remain unable to function on a general population unit (now housed together on a unit with detainee trustees) will be housed there.

Mental health staff who are not assigned to the mental health unit will be responsible for providing individual and group treatment for the rest of the detainees on the mental health caseload housed in general population (the majority of the mental health caseload), based on individually developed treatment plans, and they will continue to perform their other responsibilities, including initial mental health assessments, emergency assessments including suicide risk assessments (including on weekends via a rotating weekend call schedule), mental health assessments in connection with the disciplinary review process, weekly evaluation/review of all detainees being held in segregation and participation in the facility's segregation review process, any assessments and treatment required for PREA-involved detainees, maintaining all medical records, logs and any other information that feeds into the quality assurance program, and discharge planning. At present, there are not enough approved staff positions to assume all of these responsibilities and provide individual and group treatment for those who would benefit from therapeutic activities. Therefore, a request has been made for 2 additional staff persons over and above those staff who will be needed to staff the mental health unit once it is opened.

The County cannot meet the requirements of this paragraph to provide appropriate treatment and therapeutic housing until additional mental health staff are added and a mental health unit is created. The County should approve the current request for 2 additional mental health staff. Once the existing vacant QMHP's position is filled and the 2 requested additional staff positions are approved and filled, the mental health team should move forward with plans to develop a group therapy program designed to meet the needs of detainees on the mental health caseload housed in general population units. Once the program plans for the mental health unit have been developed, additional mental health staff may be needed. Once the staff positions for the mental health unit have been approved and filled, those staff persons should move towards the implementation of the program for the mental health unit.

At the time of the last monitoring visit, the stated plan was that a unit in C Pod was to become the mental health unit; input from the Monitoring Team had been obtained with regard to the renovation of the unit for that purpose; and the renovations were underway. However, it has since been decided that the now renovated unit in C Pod would be used for another purpose; that now a unit in B Pod would be renovated in order to become the mental health unit; and completion of that renovation is at least four months away.

Although the mental health expert on the Monitoring Team has met with the mental health team during each site visit to discuss the need to plan and begin to develop treatment programs for the various different types of detainees who will be housed on the mental health unit and even described what those various different treatment programs might look like, such a plan has not yet been developed.  This has been in part due to the shortage of mental health staff (as noted above), but also due to the lack of participation by QCHC corporate staff in these discussions.  More specifically, it has now become clear that the responsibility and authority for any review and approval of new policies and procedures, as well as any type of program planning and development lies with the QCHC central office, and not with the on-site QCHC administrator or her staff.  Therefore, during this site visit the QCHC central office staff person responsible for mental health with regard to the need to plan and begin to develop treatment programs for the proposed unit was requested to participate in the discussion.  In addition, since in so doing it became clear that QCHC has not operated a mental health unit at any facility where QCHC is the contract provider of mental health services, a consultant was identified by the mental health member of the monitoring team who could work with QCHC with regard to the planning, development and operation of such a unit and QCHC is working with that consultant.

To date, no steps have been taken to address the range of other issues related to the planning for and operation of a mental health unit.  These include:

- Develop policies and procedures that would govern the working relationship between classification and mental health, regarding the assessment of detainees and their placement on and removal from the unit
- Determine how to assure the timely mental health assessment of new admissions to the facility in order for such assessments to be considered by classification and in turn, impact on the appropriate placement of new admissions on the unit
- Determine whether or not other special medical and/or mental health services will be moved to the unit such as detoxification/withdrawal from alcohol or other substances, suicide watch, and the management of detainees with profound intellectual deficits
- Perform an analysis of the mental health staffing needs for the unit (once the treatment program plan has been developed)
- Identify security staff who will be assigned to the unit, and develop and provide the additional, specialized training that such security staff will require (such as additional training on mental health, and training on direct supervision)
- Identify and address issues related to how security staff will be incorporated into the treatment program for/the maintenance of a therapeutic environment on the unit, including, for example, the degree of access to clinical information about each detainee and how such access will be obtained
- Determine where detainees who might benefit from placement on the unit will be held when the unit is full

- Determine how the opening of a mental health unit relates to/impacts on other issues raised in this report in connection with other provisions of the agreement (such as disciplinary review, segregation review, and the presumption that detainees with serious mental health difficulties should not be placed in segregation) and assure that none of the related policies, procedures and practices are in conflict with each other

To achieve compliance with this paragraph, the County must complete the renovation of the mental health unit, assure that classification, other security, and medical/mental health policies and procedures clearly address, in a coordinated way, how detainees will be identified for placement on the mental health unit and removed from the unit, develop the mental health program/menu of therapeutic interventions that will be employed on the mental health unit, develop and implement a treatment planning and treatment plan review process, and take the steps required to assure that there is an adequate compliment of mental health staff to implement the program plan for the unit. See paragraph 45(f), with regard to the provision of additional special training for security staff who will be assigned to the mental health unit, and identify and train those staff persons, assure that plans for the operation of the mental health unit include how security staff can become a meaningful part of the interdisciplinary management and treatment team, in a manner that is consistent with this provision and prisoner privacy rights regarding personal healthcare information. Finally, the County must address related issues such as those described in paragraphs 74 and 77, and all of the other paragraphs regarding avoiding the placement of seriously mentally ill detainees in segregation, and assure that none of the related policies, procedures and practices are in conflict with each other. This requires a significant amount of planning and resources but is essential to meeting the requirements of this paragraph and, more importantly, to addressing the needs of inmates with serious mental illness that currently do not receive appropriate care in the facility and consequently, present a significant management problem to the County.

Regarding 42(g)(vi) The process/procedures for screening new detainees for serious mental illness as part of the Jail's booking and initial health assessment process has been described in prior reports.  At the time of this site visit, the percentage of detainees on the mental health caseload who were identified as possibly in need of mental health services and referred to the mental health team during the booking and initial health assessment process was 74% (96 of 130 detainees on the mental health caseload), which is somewhat of an improvement (historically it has been about 66%).  However, a review of the 34 detainees on the mental health caseload who were added to the caseload at some later point after they were admitted to the facility was somewhat more disconcerting than during prior site visits.  More specifically, 41% (14 of the 34) were added after becoming suicidal, and virtually all of them were then found to have a major mood disorder.  This raises the question of whether some new detainees mask, deny or simply lack insight into their history of mood disorder at intake and/or there are problems identifying mood disorders at intake.  In addition, 4 of those 14 detainees who became suicidal and 4

additional detainees from a group of 12 who were self-referred (a total of 8 of the 34, or 24%) exhibited psychotic symptoms.  This raises the question of whether some new detainees mask, deny or simply lack insight into their history of psychosis at intake and/or there are problems identifying psychotic disorders at intake.  In other words, a significant percentage (53%) of those who were not identified at intake and later ended up on the mental health caseload were suffering from serious mental illness (psychotic disorders and mood disorders) that was not identified at intake. To assess the screening process, when detainees were not referred to mental health at intake but then later added to the mental health caseload, staff should review their initial mental health screenings and MH Form 3s in an attempt to determine whether or not indications of mental illness were missed at intake, and if that is the case, develop and implement a corrective action plan.

With regard to the initial mental health assessments (performed by the mental health team when a prisoner is referred to mental health), the timeliness of these assessments or at least the timeliness of attempts to perform these assessments has continued to improve.  Although at the time of this site visit, the percentage of detainees referred to mental health from the booking/intake process who initially refused an initial mental health assessment was still high (30%) it is an improvement (historically it has been about 45%).  However, the staff time required to repeatedly meet with and urge such detainees to undergo a mental health assessment is considerable, and the time required to do this must be considered when looking at the staffing of the mental health team.  Of course, in addition, the delay in initiating treatment that generally results from such a delay in performing an initial mental health assessment is also an important consideration, especially given that those who refuse an initial assessment are often suffering from some type of serious mental illness.  Therefore, as has been noted in prior reports, when planning for the mental health unit consideration must be given to the fact that there is a significant percentage of seriously mentally ill newly admitted detainees who will refuse the initial mental health assessment that will be part of the basis for their placement on the mental health unit, and so a plan must be made for the placement and management of such new admissions (either a presumptive placement on the mental health unit or placement someplace else) until such time that they agree to be more fully assessed.

Regarding 42 (g) (vii), visitation has always been very limited, particularly at the RDC and WC. The only type of visitation for family and friends is by video.  However, once the COVID-19 pandemic struck, visitation was totally restricted.  Subsequently it was allowed as long as the family member/friend did so from his/her home, which is considerably more expensive than an on-site video connection from the lobby of the RDC (the JDC has not housed inmates for the past six months).  While it was previously recommended that Hinds County follow the lead of some other jurisdictions, and waive the fee for visitation entirely during the pandemic, that action has not been taken; however, the Jail Administrator indicated that he is working on a measure to implement that change.  Based on the record of video visitation visits that occurred in

September, only 17% of the inmates were able to have a visit.  This means that a typical inmate would have the opportunity to participate in a video visitation just two times per year.

Regarding 42 (h), as has previously been reported, suicide watch procedures for male and female inmates are not consistent.   Males are placed in an ISO unit at the RDC where they have access to a toilet and shower but are not housed in a cell.  Instead they sleep on a stackable cot in the dayroom area, are clothed in a suicide prevention gown and are supervised by a Detention Officer who must stay inside the ISO unit where he/she makes 15-minute notations on the Suicide Watch Observation Sheet.  When the JDC housed inmates, a female placed on suicide watch would be housed in a confinement area under similar conditions, but she was not constantly observed.  Instead, an officer would check on her every 15 minutes to make the Suicide Watch Observation Sheet entries.  This left almost 15 minutes during which untoward things could happen.

When the female inmates were moved to the WC, no provision was made to correct this disparity in procedure.  Therefore, when a female inmate was placed on suicide watch (see IR 201471) she was put in a bed in the general population housing unit.  It has since been recommended to the Jail Administrator and Captain of the WC that they implement a policy for females that is consistent with what is done for males.  This would require a female inmate, placed on suicide watch, to be housed in the dayroom area of a Special Housing Unit on a stackable cot, clothed in a suicide prevention gown and supervised constantly by a female Detention Officer who must stay within the Special Housing Unit, where she can make notations on the Suicide Watch Observation Sheet every 15 minutes.

Many suicide watch notations are inadequate and not in compliance with established procedure.  While the standard is that a notation should be made every fifteen minutes, there are frequently gaps of an hour or more between entries.  Further, when an officer notes that the inmate is "looking out the window" or the officer has to enter the ISO Unit to break up a fight, that shows that the officer was not at his/her assigned post inside the ISO Unit.  (IR #201216, IR# 201488, IR# 201489, IR# 201500) A review of Suicide Watch Observation Forms revealed that not once did a supervisor make a notation, correction, observation or otherwise comment on the inaccuracies that are readily apparent.  Instead, supervisors merely signed their names without taking appropriate action.

As has been previously reported, in addition to security staff, medical and mental health staff are also responsible for the higher levels of supervision required for detainees who are on suicide watch and other special medical or mental health observation.  At the time of this site visit, there were no changes in the ways in which the supervision of these special populations is addressed.  As has been previously noted, the current, acceptable higher level of medical/mental health supervision of detainees on special medical observation is expected to remain unchanged, with the possible exception of the supervision and management of detainees undergoing withdrawal

from alcohol or other substances.  The latter are currently detoxed in general population or in the infirmary if they are identified as at risk. That level of medical supervision is appropriate. However, it is anticipated that the plan for the mental health unit will address indicated changes in the supervision of detainees who are on suicide watch or require other special mental health observation such as detox.

With regard to detainees undergoing withdrawal from alcohol or other substances, at present, they are placed on a regular unit with enhanced medical, mental health and security supervision, unless it is suspected that they are withdrawing from a substance that requires more constant medical supervision, in which case they are placed in the infirmary.  During the development of plans for the mental health unit, the decision must be made as to whether or not some of these detainees should and could be managed on the mental health unit instead of as they are currently managed, especially those who are currently managed in the infirmary and/or those who are dual-diagnosed (with a substance abuse difficulty and some other major psychiatric difficulty).

With regard to suicide watch, detainees on suicide watch are housed in a small ISO unit, and the medical/mental health procedures for suicide risk assessment, placing a detainee on suicide watch, providing appropriate mental health interventions for those on suicide watch, ongoing evaluation and then removing a detainee from suicide watch, and the immediate mental health follow-up for detainees removed from suicide watch are well established and working well.  Yet to be determined is whether there will be suicide resistant cells on the mental health unit or whether the location of the suicide observation cells will remain unchanged, and in turn, whether staff for the mental health unit will be responsible for the supervision of suicide watch or whether this responsibility will be with the other mental health staff.

With regard to detainees who require special mental health observation, at present, such detainees are being held in segregation, which is an unacceptable alternative to providing such detainees with the higher level of supervision and the rigorous therapeutic interventions that they require.  It is anticipated that once the mental health unit is operational, these detainees will be housed there, and the higher level of supervision and therapeutic interventions that they require will be provided by the medical, mental health and security staff assigned to the mental health unit.

A related issue was newly identified during this site visit.  That issue is the timely mental health assessment of detainees who appear to be exhibiting the signs and symptoms of some type of crisis or deterioration, and who may, in turn, require some type of emergency or urgent mental health intervention, possibly including special mental health observation.  When the mental health member of the Monitoring Team was reviewing incident reports and related medical records, it was discovered that when a seemingly disturbed detainee is urgently referred to mental health by medical staff or security staff, it has been the practice of some of the mental

health staff to 'give the detainee a day or so to calm down' before performing an assessment.  In two of the incidences reviewed during this site visit, this meant that neither an emergency assessment, nor identification of the need for emergency intervention, nor the provision of an emergency intervention occurred in a timely manner.  Although it is understandable how frightening an extremely agitated detainee can be, this should not be a reason to avoid performing an assessment; an assessment should be performed even if the presence of security staff is required to assure the safety of the mental health staff person; and it is important to note that the failure to perform an emergency assessment followed by any emergency intervention that might be required simply leaves other medical and/or security staff at risk of harm.

Regarding 42 (i), video surveillance capabilities, at the RDC, cameras in the corridors and housing units are recorded, so incidents can be reviewed after the fact.  This capability has been in place since the beginning of the monitoring process; however, it recently came to the attention of the Monitoring Team that, with the exception of one, the cameras in the Medical area of the facility are out of service.  This maintenance issue needs to be addressed immediately.  It was reported to the Monitoring Team that this was previously reported to the maintenance staff by QCHC but was raised again after the incident when an inmate attacked the nurses in the Medical Unit. When this problem was brought to the attention of the Chief Safety and Security Officer, he submitted a work order promptly.  At the WC, when new cameras were installed, both they and the existing cameras were upgraded so that they can be recorded.  This enhancement finally allows the CID and IAD investigators to review video recording of incidents.  At the JDC, there are cameras that cover and record the hallways and the drive through sally port/transfer waiting area, but there is no coverage inside the housing units.

While the IAD and CID investigators now have access to the video recording system so that they can quickly view incidents, they still cannot obtain copies of them without having to go through a request process with IT.  It is recommended, again, that these investigators be granted immediate access to both view and record copies of previously recorded incidents.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a.  Staff vacancy rate of more than 10% of budgeted positions;

    b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c.  A major disturbance resulting in the takeover of any housing area by prisoners;

    d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e.   Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f.   One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g.   One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The HCSO still does not generate a unique report to cover this paragraph.  The turnover rate of staff is projected to be 47% based on the number of people who were hired and terminated/resigned/retired during the first eight months of the year.  With 212 positions filled at the time of the site visit (204 plus eight in the academy), the vacancy rate of funded positions is 21.8%, which is more than twice the threshold figure of 10% specified in 43 (a).  The vacancy rate for required positions specified in the Revised Staffing Analysis is 47.6%.  While required posts cannot be filled as necessary, the Jail System has been able to function because the average daily census has fluctuated between 372 and 408 over the past four months.  Further, the closure of the JDC and C-Pod at the RDC reduced the number of required posts significantly.  Finally, the security upgrades at the WC, including cameras and alarms added to each housing unit fire escape door, allowed that facility to finally have just one officer (instead of two) manage each housing unit under the principles of direct supervision.

In spite of the relief provided by the lower average daily census and closed housing areas, the inability of staff to manage the inmate population is graphically documented in incident reports.  In IR 201005, the reporting officer stated that an inmate housed in B-4 at the RDC was out of control in the horseshoe (corridor) area surrounding the control room.  The inmate opened the door to B-3 by pulling down on the unsecured locking mechanism above the unit entry door, then "…proceeded with aggression…" toward the officer who then retreated before deploying his OC spray.  Ultimately the inmate was "…found in (sic) laying front down in the Great Hall."  Not only is the report an incoherent documentation of what occurred, there is no explanation as to how the inmate managed to exit B-Pod and find his way through a major security door into the Great Hall.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b. All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times.  Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been indicated in previous Monitoring Reports, none of the facilities meet the requirement that well-being checks be conducted every 30 minutes on general population inmates, 15 minutes on restrictive housing inmates and 15 minutes on detainees held in Booking holding cells.  The corrections operations member of the Monitoring Team has spent a great deal of time attempting to set up procedures in each facility that at least meet the American Correctional Association standard of 60 minutes for general population inmates, 30 minutes for restrictive housing inmates and 15 minutes for holding cell (Booking) inmates.  That standard is now incorporated into Policy 9-200, Supervision and Post Operations.

Since the JDC has not housed inmates for the past six months, compliance with this standard there will not be addressed.  It should be noted, however, that the JDC did comply previously.  At the WC, hourly well-being checks continue to be made as required.  This finding is based on a review of the WC unit logs.  That review also revealed that the officers at the WC have not yet implemented the documenting standard associated with true direct supervision operation of their

facility.  Since there is only one Detention Officer assigned to each housing unit, and the WC has adopted the principles of direct supervision, it is no longer necessary to make an hourly security check entry in the unit logs during daytime hours.  That is only required during the night-time hours when inmates are assigned to their bunks.

At the RDC, hourly well-being check documentation has always been a problem.  In order to alleviate this, a procedure was set in place which required officers to call in their well-being checks to the control room officer.  A review of the A-Pod and B-Pod control logs in September revealed that documentation of those hourly well-being checks is totally inadequate.  Depending upon which officer was on duty, entries were only somewhat systemic or else missing in their entirety.  Retraining for the officers involved is mandatory, and the lack of supervisory review, once again, must be addressed.

The quality of well-being checks in confinement housing was best at the WC where most entries were made in 15-minute increments and on the appropriate forms.  The same can be said for Booking, which also requires 15-minute entries.  Unfortunately, the 30-minute entries required for those inmates housed in B-4 at the RDC did not live up to that standard.  Some entries were made precisely at the same time for every cell in B-4, which is an impossibility.  Others were not within the 30-minute timeframe.  Some entries were made at precisely the same time for both A-1 ISO and A-4 ISO—another physical impossibility.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

    a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

    b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.

Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d.  Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.  Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

The COVID-19 pandemic has created significant problems for compliance with training standards.  Because of the need to hire and train new recruits (coupled with the fact that class sizes are limited to ten Detention Officers), priority has necessarily been given to this area. Consequently, the other areas of training required by the Settlement Agreement have been relegated to secondary status.  In service (roll call) training continues to be done and special emphasis has been placed on Use of Force Training for supervisors, but otherwise, most training efforts have been postponed.

Direct supervision training continues to be included in the basic academy curriculum, but existing staff have not been included in that component of the academy since the first few

classes.  In order to better qualify the officers who were assigned to C-Pod when it opened, they were assigned to the WC in order to obtain a few days of hands on direct supervision experience. As has been previously noted, at present, there is no medical housing unit, except for the infirmary at the RDC, and there is no mental health unit; detainees with special medical and/or mental health needs are housed throughout the facility; and so therefore, it is important for all security staff to have a reasonable amount of training on persons with serious medical and mental health difficulties and the security management of such persons.  Although specific concerns have been raised about the mental health training provided to all security staff, a review in response to the concerns that have been raised has not been done.

Additional training has not been provided to security staff assigned to the Medical Unit, which, except for the infirmary, is essentially like an outpatient medical and mental health setting. Although the detainee population brought to Medical is the same as the detainee population on the general population units, for detainees, medical or mental health visits can, at times, trigger intense responses, and when off their units/in Medical, but such triggering might result in special concerns about their safety and the safety of the medical staff.  The fact that this happens is confirmed by a review of incident reports and the safety concerns raised by medical and mental health staff during each site visit.  This not only raises questions about how security is managed in Medical, but also raises the question of whether or not security staff assigned to Medical should have the benefit of some type of additional training.

As has been discussed in prior reports, in anticipation of the opening of a special mental health unit, security staff who will be assigned to that unit will have to be selected and given additional training.  Issues related to the identification and selection of security staff for the mental health unit, the reasons why additional training will be required, and the nature of such additional training have all been outlined in prior reports.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:
   a.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.
   b.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and

take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c.  Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d.  Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

    i.  Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

    ii.  An inspection process.

    iii.  A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

    iv.  A requirement that any corrective action ordered be taken.

    v.  Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

    vi.  To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Partial Compliance**

There is still no policy or order in place that specifically authorizes the Jail Administrator to make the administrative and operational decisions outlined in paragraph 46 (a) and (b).  While supervisors do conduct daily rounds, documentation of their findings as required by 46 (c) is questionable.  No forms, logs or written records reflect supervisory review.  They simply show that a supervisor has signed his or her name on the document.  Comments regarding discrepancies and recommendations for corrective action are not included in supplemental reports, nor do they follow the supervisors' signatures. There is a column in the revised Monthly Incident Summary report for Supervisor's Notes. It appears that this is a narrative of the supervisor's involvement in the incident and not findings or recommendations.

In the past, supervisors were supposed to identify and report maintenance and security problems as specified in 46 (d), but there was little incentive to do so since there was no way to follow up on corrective action and identified problems were left uncorrected for so long that there was little point in reporting them again.  Fortunately, the Chief Safety and Security Officer now identifies, documents and follows up on those maintenance and security problems.  He generates a monthly

48

Work Order Report that tracks work orders by date, location and status.  Further, he submits all work orders to the County Administrator via Benchmark Construction.  She determines what action will be taken and authorizes Benchmark to handle major projects and County maintenance staff to deal with routine maintenance issues.  For the first time, the HCSO is able to track the status of maintenance issues in the Jail System.

In addition, the new Fire Safety Officer now reports to the Chief Safety and Security Officer, so there is continuity of effort.  This represents a major step forward toward accountability and quality assurance.

During the exit briefing with HCSO and County staff, it was recommended that the County authorize the pre-purchase of a supply of critical equipment for the Jail System so that it was not necessary to wait for those items to be delivered when shortages occurred.  The two items cited were fire extinguishers and motors for security doors.  Currently, there are nine fire extinguishers waiting to be recharged and four primary security doors at the RDC that do not function while waiting for motors to be delivered.  It is most likely that there are other routine items that should be available for immediate installation.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Partial Compliance**
Shakedowns have apparently become much more routine throughout the Jail System in recent months.  In addition, the recently acquired video recording equipment (Go Pro) is being used in most shakedown incidents.  From August 1, 2020, to September 18, 2020, a total of 27 shakedowns were conducted at the RDC and WC.  The primary shakedown log summarizes information without having to go through each incident report, however, the IR's still provide information that is not readily available in the summary log.  Of special note is the fact that cell phones are seldom found; instead, shanks, wires, batteries and undetermined drugs appear to be the contraband items most frequently found.  This represents a significant change from just a year ago, when cell phones were readily available throughout the Jail System.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

For the first time since the beginning of the monitoring process, a step has been taken toward compliance with this paragraph.  In September the Board of Supervisors received a proposal from the HCSO to advertise for bids on a cell phone jamming system.  This represents a positive step toward compliance with this paragraph.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for over two years.  Since the JDC is closed due to maintenance problems, only the RDC and WC are currently affected at the present time.  Regardless, after an officer was initially assigned to work on this issue, nothing further has been done.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

    a.  Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

    b.  Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c.  Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

    d.  Prohibit the use of force as punishment or retaliation;

    e.  Limit the level of force used so that it is commensurate with the justification for use of force; and

    f.  Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

Policy 5-500, Use of Force was approved by the Sheriff on February 1, 2020.  It lays out UOF standards that are consistent with the requirement of this paragraph.  Sub-paragraphs (a) through (f) are covered by, and comply with, the provisions of the policy.

Training on the UOF policy needs to be conducted for all personnel, but to date only supervisors have had the opportunity to receive it.  While that is a good beginning, it is essential that every Detention Officer receives the same training.  Unfortunately, as was pointed out in paragraph 45 (above) almost all training, with the exception of basic recruit academy orientation, has been postponed due to the impact of the COVID-19 pandemic.

Incident reports indicate that UOF standards are recognized by an increasing proportion of staff, but they also continue to reflect violations of policy.  IR 201153 deals with an inmate in B-4 at the RDC who refused to obey an officer's orders, broke out of his housing unit and entered another.  The officer used OC in an effort to make the inmate comply with his orders (as a coercive tool), not as a defensive measure to protect himself.  IR 201499 described a more serious situation where inmates in B-4 at the RDC were fighting with shanks.  In this case an officer deployed OC in an effort to break up the fight.  This is an appropriate use of OC in order to prevent injury or death.  Other aspects of the IR are more problematic.  One officer reported that an inmate was taken to the CID investigator's office "…after being extracted at gun point…".  There was no further explanation as to who authorized less than lethal weapons to be obtained from the facility armory and more particularly whether or not the "gun" in question was a less than lethal shotgun or a weapon that should not have been inside the facility.  In any case, supplements were written by two sergeants who participated in the incident, but neither one shed any light on these basic questions.

IR 201989, titled "Assault", describes an incident that occurred in A-1 at the RDC.  Inmates were involved in a fight by the entry door.  At least one was armed with a shank and another suffered a number of stab wounds.  Three officers were nearby, but instead of being on their posts, they were inside the control room (which is a restricted area) reportedly doing paperwork or eating.  Ultimately, OC was deployed (appropriately, to break up the fight) and a less than lethal shotgun was used "…to gain compliance", but there was no supplement submitted by whoever used it.  There is no record of who authorized staff to draw less than lethal weapons from the armory.  The (planned UOF) incident was not video recorded.  A shakedown followed and contraband items were found, including two cell phones and three shanks.  In addition, a breach was discovered in a cell wall. No pictures were attached.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

    i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

    ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

    iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

    i. a sign-out process for staff members to carry any type of weapon inside the Jail,

      ii.  a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

      iii.  random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

  h.  A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

  i.  All staff members using force must immediately notify their supervisor.

  j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Partial Compliance**

Although a Use of Force Policy has been approved, it has yet to be implemented through required training for all personnel (only supervisors have received it to date); therefore, previous comments regarding this paragraph still stand. The fact that supervisors have been trained, however, makes it possible to move this paragraph from Non-Compliant to Partial Compliance.

Regarding 51 (a), incident reports do not reflect that supervisory approval is obtained before less than lethal weapons are accessed and used. That information is never contained in IR's.

Regarding 51 (b), the medical condition or other circumstances that may increase the risk of death or serious injury from the use of force are never included in IR's.

Regarding 51 (c), there were no IR's that indicated inmates were held in restraints during the previous reporting period. If they needed to be restrained, they were placed in a confinement cell.

Regarding 51 (d), medical staff routinely examine inmates when a UOF incident results in them being referred to Medical. The problem that persists is that Medical entries are not included in the JMS system. Rather, the Medical documentation takes the form of an e-mail or hand-written document. Sometimes Detention Officers or supervisors summarize the findings of Medical staff and include them in their reports. It is essential that Medical personnel be able to prepare and enter supplemental IR's.

Regarding 51 (e), a first line supervisor may be required to supervise all planned uses of force, but documentation of such does not exist.

Regarding 51 (f), there is no record of a cooperative process being followed. Security staff and medical/mental health staff have never worked together in advance of a planned use of force action.

Regarding 51 (g), the Jail has a system of inventory, accountability and verification of use for less than lethal weapons.

Regarding 51 (h), the Jail now has Go Pro equipment that makes the video recording of planned UOF cases possible.  This is done in some, but not most, cases.  It has been used more regularly during shakedowns.

Regarding 51 (i), supervisors are routinely notified whenever an incident escalates to the point that force must be used.

Regarding 51 (j), shift commanders are routinely notified whenever an incident escalates to the point that force must be used.

## USE OF FORCE TRAINING

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**

Although UOF training has not been conducted for all HCSO Detention Officers, supervisors and those going through the basic recruit training program (in the past few months) have received that training.  See comments in paragraph 50 (above).  All Detention Officers need to undergo this critical training as soon as possible.

53. Topics covered by use of force training must include:
    a.  Instruction on what constitutes excessive force;
    b.  De-escalation tactics;
    c.  Methods of managing prisoners with mental illness to avoid the use of force;
    d.  Defensive tactics;
    e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

The UOF training includes a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures.  The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

This paragraph cannot be addressed until all staff have been trained on the new Use of Force policy.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Non-Compliant**

The UOF policy was approved in February 2020.  There have been no revisions to it since that time. This paragraph is listed as non-compliant because the training on the new UOF policy has not been completed.

## USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

Although a Use of Force policy has been approved, training on associated report writing and review requirements has not yet been conducted.  Consequently, incident reports are routinely deficient with regard to the basic, intelligible information necessary to understand what happened and what actions were taken.  Even the supplements generated by supervisors, who have had UOF training, routinely leave the reader unable to follow the chain of events and with no information regarding video recording, interviews with witnesses, who authorized the use of less than lethal weapons and what happened to recovered contraband.

Incident Report 201896 is indicative of the problems noted above.  Inmates in the A-1 and A-4 recreation yards at the RDC became disruptive, masked up, obtained metal rods from an undisclosed location and began pounding on the ceiling inside one of the housing units.  One officer indicated that she exited the pod control room to complete her observation sheets.  No explanation was given as to what she was doing in the control room—a restricted area.  She said that she heard inmates planning to pop a recreation yard door.  The Captain of the RDC was notified, a Lieutenant responded to the scene and less than lethal weapons were drawn from the armory, but there is no record of who authorized that action.  According to the supplement written by the Lieutenant, a "…blank shot was shot and a spider ball was used to diffuse the minor disturbance."  Metal rods were recovered, but there was no inventory or pictures of the specific items.  No video was taken and there were no witness statements.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There is no way for the Monitoring Team to determine whether or not UOF reports are submitted by the end of a staff member's shift.  Reports reflect the time of the incident, but not when the report was submitted.  A time check needs to be incorporated into the JMS system.  The same discrepancy applies to supervisory review.  Supervisors who are involved in incidents often write supplementary reports, but supervisors do not approve/ disapprove and make comments or recommendations regarding the reports and logs that they review on the reports themselves. The monthly incident summary spreadsheet has a column for approval and supervisor's notes. By looking up the incident on that spreadsheet, it would be possible to determine whether a report was approved. However, that column is frequently blank. The column for supervisor's notes would be a good location to include findings or recommendations. Currently, it appears to have the narrative of the supervisor's actions in the incident. The approve/disapprove and findings and recommendations should also appear on the incident report itself.  In the past, a hand-written signature constituted the extent of their review.  Since January signatures have not appeared on copies of incident reports provided to the Monitoring Team.

IR 202017, titled "Disorderly Conduct", was actually a "Use of Force" case.  It serves as an example of excessive/inappropriate use of force on the part of an officer and lack of supervisory responsibility on the part of a Sergeant.  An unruly inmate was in Medical at the RDC in order to provide a urine sample.  Although he was acting out, he was already restrained by being handcuffed to a bathroom rail when a Detention Officer deployed OC on him.  A Sergeant was present throughout, but took no corrective action and did not even explain what happened in her UOF supplement report.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:
      a.  A unique tracking number for each use of force;
      b.  The names of all staff members, prisoner(s), and other participants or witnesses;
      c.  Housing classification and location;
      d.  Date and time;
      e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

g.  A description of the staff member's attempts to de-escalate the situation without use of force;

h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

i.  A description of any observed injuries to staff or prisoners;

j.  Whether medical care was required or provided to staff or prisoners;

k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The adoption of a Use of Force policy in February and the completion of UOF training for supervisors are positive steps, but they have had little to no effect on the provisions of this paragraph.  Incident reports/UOF reports do not reflect all of the information that is required. Each report does have a unique tracking number and the names of staff members are included. Sometimes the names of inmates involved in the incident are included, witnesses are seldom, if ever, listed and witness statements are virtually never taken.  The cell location is usually noted, but the facility is not.  The classification of the cell/location is not noted.  When force is used an explanation is generally included, and in most instances, transport to Medical is briefly mentioned by the originating officer or in a supervisor's supplement.  The lack of detail of injuries is attributable to the fact that Medical staff do not have the ability to enter supplemental reports in the JMS system.  As has been previously recommended, they should be given access to the system as soon as possible.  The comments in paragraph 56 (above) apply here as well.

IR 201688 is an example of a report that leaves the reader wondering what really happened.  At 0035 hours a Detention Lieutenant, a Patrol Lieutenant and a Patrol Officer attempted to move an inmate from B-4 to B-1 at the RDC (the facility was not identified in the report, but the identified units are at the RDC).   When he became "…resistance (sic) a warning blank shot…" was fired by the Patrol Lieutenant.  The inmate fell on his bed, was handcuffed and escorted by the officers to a cell in B-1.  At 0424 hours the same morning the inmate notified an officer that

he needed medical attention.  He was escorted to Medical where a nurse "…administered treatment to a teacup size reddish bruise to the right side of his underarm torso area."  He was bandaged by the nurse and then was returned to his cell.  This information was entered into the JMS system under the same IR number (201688) which indicates that the two incidents are related, however, there is nothing in the supplement to indicate how or why they were connected.  The facility was never identified.  There was no explanation as to why the inmate had to be moved from B-4 to B-1, nor was there any justification for why a Patrol Lieutenant and a Patrol Officer were involved or why they had a gun with them capable of firing blanks.  Was it a less than lethal shotgun drawn from the facility armory or was it something that they brought with them from the street?  Who authorized the less than lethal weapon(s) to be brought on scene?  Since the officers had a less than lethal weapon present when they went to move the inmate, the incident was actually a planned UOF.  Why was it not recorded?  Go Pro equipment is now readily available.  How did the inmate receive a teacup size reddish bruise to the right side of his underarm torso?  The inmate was not questioned and there is no record of what he had to say as a personally involved witness.  Finally, the Patrol Lieutenant who fired a weapon did not write a supplement report in the JMS system.  It is possible that he wrote a report that was entered in the Law Enforcement version of J MS, but that information is not available to the Monitoring Team.  This incident should be referred to the IAD investigator for review and recommendation.  Although this lack of information is typical of the incident reports, there are some exceptions. In IR#201645, the sergeant wrote a supplement in which he identified who ordered the use of the less than lethal shotgun, who carried the shotgun, and what the orders were with respect to the shotgun.

## USE OF FORCE SUPERVISOR REVIEWS

59.    The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

   a.    A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

   b.    A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

   c.    Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

   d.    If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

   e.    Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

      f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

      g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Non-Compliant**

There has been no significant change in the status of this paragraph in spite of the fact that supervisors have received UOF training.  While supervisors do respond on scene to incidents in a timely fashion, they still do not review and approve/disapprove or make recommendations as they should; nor is it possible to see whether or not they review UOF reports by the end of their shift.  As mentioned in paragraph 57, there is a column on the incident summary spreadsheet for approval which is often blank and the information should be on the UOF report itself. In some instances, supervisors indicate that the CID investigator was notified, but there are still no known instances of supervisors making a recommendation that the report be referred to IAD for review. The appropriate administrative level (e.g. Facility Captain or Jail Administrator) managers are notified of UOF incidents, but there is no record available to show that they took action to rectify obvious problems.  IR 201688 (see paragraph 58, above) is a case in point.

In the review of October incident reports, subsequent to the remote site visit, the first case of a supervisor disagreeing with the content of a report was noted.  In reviewing IR 202053 (regarding an inmate on inmate assault) a Sergeant found that force was used during the incident; something that the Sergeant who wrote the original IR never mentioned even though his actions made it readily apparent. This is the first example of a meaningful review of incident reports that has been seen in the documentation.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

      a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

      b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.      Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.      Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.      Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph in spite of the fact that UOF training has been provided to supervisors.  The required actions are not routinely followed by supervisors.  A review of UOF reports revealed that photographs are infrequently taken.  There is no record of a waiver related to the refusal to be photographed in the past nine months.  Now that all three facilities have a recording capability on permanently mounted cameras, it is possible for supervisors, as well as the CID and IAD investigators, to examine incidents after the fact.  The Jail System is also now equipped with Go Pro cameras which have been used on occasion, but primarily for shakedowns, not UOF cases.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of the paragraph since the last Monitoring Report.  As has been previously noted, there is a check box in in the JMS system for a supervisor to indicate that he/she has reviewed an incident report.  The monthly summary spreadsheet shows approval on some of the incidents if one were to look up the incident report number on the summary sheet.  However, there is no documentation in the JMS system that shows findings or recommendation on the part of the reviewing supervisor.  Further, there is no record of supervisory review at the rank of Captain or above on all level 1 UOF cases.  If there is a record of such action, it has not been provided to the Monitoring Team.

62. Reviewing supervisors must document the following:

a.      Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

b.      Witness statements;

c.      Review date and time;

d.      The findings, recommendations, and results of the supervisor's review;

e.      Corrective actions taken;

f.      The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.      Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

   i.      The nature and extent of injuries, or lack thereof;

   ii.     The date and time when medical care was requested and actually provided;

   iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.      Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

The incident summary spreadsheet has a column for supervisor's notes. This would be an appropriate location for the information required by this paragraph including any recommended action or discrepancies noted regarding the items for which this paragraph requires review.  It would also be possible to indicate the required review and action by generating a supplemental report; however, the only such reports that supervisors generate are those reflecting their personal involvement in the incident.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.      Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

While the approved Use of Force policy has been in effect since February, there is, as yet, no approved counterpart for incidents in general.  Once one has been adopted, and requisite training

completed, it will be up to supervisors to ensure that incident reports comply with policy. Incident Report 201688, referenced earlier, is an example of a report that is confusing, unclear and incomplete.  The inmate's injury is consistent with being hit by a less than lethal round at close range, but there is nothing in the report that even attempts to address that possibility.  The report leaves the reader with more questions than answers.

Deficiencies in the incident reports have been noted throughout this Monitoring report. Similarly, the inability of Medical to enter supplemental reports in the JMS system such that there is a lack of critical information related to an incident has been noted throughout this report. IR# 201793 demonstrates both of these deficiencies. In the incident recounted in paragraph 42, an inmate in Medical had broken a lamp, attempted to hit a nurse in the head with the lamp post and just missed her head, and then he threatened a second nurse.  The one, lone female officer who was stationed in medical had run off to call for backup during which time the assault occurred, leaving the nurses alone with the inmate. The incident reports provide none of this information. The initial narrative states only that the officer was told by the nurse to call for assistance and the supplements state that when responding officers arrived, the inmate was being escorted out of medical. Without having learned from the medical staff what had occurred, the seriousness of the situation could not have been ascertained from the incident reports. Either the detention staff need to collect the information from medical and include it in their reports or medical staff need to be able to access the JMS system to report their involvement or both. The lack of critical information regarding this incident in the reporting is a significant deficiency.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:
   a.     Tracking number for each incident;
   b.     The names of all staff members, prisoner, and other participants or witnesses;
   c.     Housing classification and location;
   d.     Date and time;
   e.     Type of incident;
   f.     Injuries to staff or prisoner;
   g.     Medical care;
   h.     All staff involved or present during the incident and their respective roles;
   i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
   j.     External reviews and results;
   k.     Corrective action taken; and
   l.     Warden and Administrator review and final administrative actions.

**Partial Compliance**

Although there is still no policy governing incident reports, much of the information required by this paragraph is already in place. They routinely have a tracking number and list those staff involved. However, inmate witnesses are almost never noted, and witness statements are virtually non-existent. The nature of inmate injuries is recorded in some, but not all, cases. Only a very few incident reports reflect photographic evidence. Most incident reports do not specify the facility in which the incident occurred. That information can only be determined by having knowledge of the pod or housing unit configurations of each jail. There is no record of supervisory review, at all levels.

In addition to the deficiencies in reporting recounted throughout this Monitoring Report, difficulty in keeping track of incident reports is compounded by the fact that many are improperly titled. In reviewing the most recent cases (October) one Fire was titled Destruction of County Property. Use of Force cases were variously listed as (1) Notification, (2) Being in an Unauthorized Area, (3) Failure to Obey/Comply with a Lawful Order of a Detention Officer, (4) Setting Fire in a Housing Area, and (5) Disorderly Conduct.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift. At minimum:
- a.  Staff members must complete all fields on an Incident Report for which they have responsibility for completion. Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report. If no injuries are present, staff members must write that; they may not leave that section blank.
- b.  Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.
- c.  Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**
Since there is no approved policy regarding incident report documentation, this paragraph is still carried as Non-Compliant. Incident reports continue to reflect a lack of basic information including the facility where the event occurred. There is still no standard in place that requires a written report whenever lost money or property, or a bad/late release is noted. Consequently, there is no way to know how many such incidents have occurred; however, two such reports were filed during the June-September time frame. Based on the current status of the JMS system, it is not possible to determine whether or not incident reports are written in a timely fashion or whether or not supervisors review them before the end of shift. The only thing that can be determined is the reported time of the incident as it appears in the report.

Although sub-paragraphs b and c call for disciplinary action and re-training for failure to report a reportable incident and failure to comply with documentation obligations, for both officers and supervisors, there is no record of such action being taken as reflected by a review of the CID and IAD spread sheets.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

  a. Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

  b. Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

  c. Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

  d. Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

There has been no change in the status of this paragraph.  The Monitoring Team cannot determine whether or not supervisors review incident reports other than referring to the incident summary spreadsheet where that column is often blank.  There is no documentation that reflects recommended actions.  While the approved Use of Force policy spells out the duties of supervisors with regard to a UOF incident, it does not deal with all incident reports.  Policies covering all incident reports need to be developed and approved.

**SEXUAL MISCONDUCT**

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

  a. Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.   Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.   Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.   Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.   Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.   A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.   A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.   Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.   Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

At the time of the June site visit, the new PREA Coordinator had been newly appointed the day the site visit began. The position had been vacant for 5 or 6 months during which time there appears to have been no education of inmates, no training of staff on PREA, no PREA investigations. The new PREA Coordinator appears to be diligently working to educate herself in this area and create an effective program including coordinating with the PREA officers at JDC and the WC. The PREA Coordinator has been participating in PREA Coordinator Orientation with the National PREA Resource Center. This is a weekly remote training session with the PREA Resource Center and other PREA Coordinators around the country. She and approximately 20 other detention supervisors, investigators and staff participated in a three-day training on PREA investigations the week after the October site visit.

Nursing staff continue to be involved in the screening of newly admitted detainees to identify those who may be sexually abusive or at risk of sexual victimization as part of the intake screening process.  New admissions so identified are referred to the PREA officer.  Mental health staff perform a mental health assessment of all such new admissions who are then forwarded to them by the PREA officer, and if mental health treatment is indicated, such is provided.  In addition, if medical or mental health staff identify a PREA eligible detainee who was not identified as such at the point of admission to the facility, that detainee is also referred to the PREA officer.

It should be noted that given the various above noted roles and responsibilities that medical and mental health staff assume with regard to PREA, staff may have knowledge about any given PREA-involved detainee that is not readily available elsewhere.  However, although medical and mental health records may or may not be requested as part of a PREA investigation of an alleged incident, it does not appear that medical and mental health staff are routinely interviewed as part of such an investigation.  In the most recent PREA case reviewed by the mental health expert on the Monitoring Team, there was clearly considerable knowledge about and understanding of the involved detainee that was not gathered from medical and mental health staff; therefore, this knowledge about and understanding of the detainee was not integrated into the investigation report; and therefore, the facility's response to and decisions made about the detainee were not informed by an appreciation of the significance of the knowledge about and understanding of the detainee that could have been provided by medical and mental health staff had staff been interviewed.

If a detainee is a victim of sexual assault and/or sexual harassment, and the incident is brought to the attention of medical and/or mental health, both the medical and mental health staff are prepared to provide any emergency and ongoing care that might be indicated, and staff have been providing such care.  It should be noted that if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment.

It was reported that the MOU with the Mississippi Coalition Against Sexual Assault has been finalized although the Monitoring Team has not received a copy signed by the Sheriff. The MOU provides that counseling will be available through MSCASA although it is unclear how that will be implemented. Currently, the inmates cannot make a toll free call to MSCASA. There is a need for an outside line so that this can be implemented.

PREA complaints can be reported as a grievance or a PREA complaint through the kiosk system. However, the PREA complaints are routed to a cell phone maintained by the PREA Coordinator. At the time of the June site visit, the new PREA Coordinator did not have the cell phone linked to the kiosk system. The PREA Coordinator now has the cell phone. She has not received any calls from the kiosk. The MOU with MSCASA also provides for reporting to that agency although it is not clear whether inmates have been informed of this and, as noted above, at this time inmates cannot make cost free calls to MSCASA.

In order to be effective, inmates must be fully informed of what constitutes sexual abuse and harassment and how to report it. As previously reported, all of the units visited had PREA posters posted at the time of the last on-site visit. The posters have reporting instructions. Not being on site the monitoring team could not confirm that this is still the case. A PREA orientation sheet is provided to inmates when they are booked into the facility. The new PREA

Coordinator has a draft of a new orientation sheet and a more extensive booklet. This is under review at this time. The prior PREA Coordinator had no longer provided orientation or education of inmates and the lack of inmate education continued during the months when there was no PREA Coordinator. The new PREA Coordinator stated that she was planning on starting an education program the week of the October site visit. She plans to have 10 inmates at a time come to the onsite classroom and provide education based on the training she received from the PREA Resource Center.

There is a need for additional staff training on PREA. PREA training is provided to the new officers in their initial training. There was reportedly roll-call training on PREA (approximately 15 minutes of training during roll call) for the second and third shifts. There were several incident reports involving PREA issues that should have been reported to the PREA Coordinator but were not. In IR #201164 in July, an inmate with mental illness reported consensual sexual activity leading to a fear of harm from other inmates on the unit. He also reported that inmates mess with him when he sleeps. In IR#201414 in August, an inmate reported that his cell mate was having consensual sexual activity with another inmate. Also, in August, in IR# 201498, an inmate reported that another inmate had made sexual advances to him. These August incidents were also not reported to the PREA Coordinator. Particularly troubling is a PREA complaint in September in which the victim tried telling an officer that he had been assaulted but was brushed off. He then put a bag over his head in order to get the attention of another officer. The assault was substantiated. The PREA Coordinator reported that she facilitates training of new officers and has provided the national PREA guidelines to the detention officers but she has not yet done an in-service training. The failure to refer the three mentioned incidents indicate that additional training is needed.

It is reported that all cross-gender searches have been banned. No documentation of this was provided as of yet as the draft procedure is currently being revised to reflect the new policy. The draft policy on PREA/Sexual Safety provides HCDS does not conduct cross-gender pat searches by males of females or cross-gender visual body searches unless under exigent circumstances, and then only with the approval of the Shift Supervisor. The Search policy now approved and adopted is now consistent with the draft PREA policy. No incident reports reviewed indicated any searches inconsistent with this policy.

There needs to be additional clarity regarding the role of the PREA Coordinator and the Criminal Investigator (CID). Currently, the PREA Coordinator interviews the alleged victim and then refers the matter to CID. The investigation reports reviewed did not meet the requirements of the Settlement Agreement generally, but also did not address the sexual safety of the inmates. The CID reports indicate that the alleged victim was interviewed but do not indicate that any video was reviewed, any witnesses were identified and interviewed, that medical staff were interviewed, that hospital records were obtained and reviewed, or even that the alleged

perpetrator was interviewed. The CID investigator appeared to view his role as determining whether the incident could be prosecuted and did not proceed beyond that. Whether or not a case can be prosecuted, there is still an issue of the sexual safety of the inmate. This was not evaluated. In the case of R.T. there was physical evidence of sexual activity and harm to the inmate that was apparent in the incident reports and medical records. This was not identified and, as a result, there had not been a plan for his sexual safety. The three-day training on PREA by the National PREA Resource Center is timely in this regard and hopefully will result in improvement in this area. His safety was eventually addressed after discussion with the Monitoring Team. The PREA complaint in September referred to above appears to have been handled more appropriately.

The PREA Coordinator has started keeping a spreadsheet of PREA referrals that will be very helpful in tracking PREA complaints and investigations. She is preparing a narrative of her activity on each PREA complaint. At the time of the October site visit, there had been very little follow up on most of the complaints after the CID investigation was completed. It is recommended that more follow up with the inmate be done to ensure he or she feels safe in the facility and is getting the services needed. The follow up should then be documented in the PREA file.

The new PREA Coordinator has indicated an intention to develop a strong PREA program and has participated in training to move in that direction. She is still fairly new to the position but is starting to work on improvements such as starting an education program for the inmates and creating a booklet. There is still work to be done but the program is moving in the right direction at this time.

**INVESTIGATIONS**

68.	The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

    a.	Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

        i.	Any prisoner exhibited a serious injury;

        ii.	Any staff member requested transport of the prisoner to the hospital;

        iii.	Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

        iv.	Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate

personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b. Per policy, investigations shall:

    i. Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

    ii. Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    iii. Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c. Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d. Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e. Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation. The criteria will require an investigation if:

    i. Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii. Any staff member requested transport of the prisoner to the hospital;

    iii. Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv. Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f. Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

    i. a brief summary of all completed investigations, by type and date;

    ii. a listing of investigations referred for administrative investigation;

    iii. a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

    iv. a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

    v. a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.      Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Now that there is an approved and adopted policy regarding investigations, it appears that follow up on incident reports is becoming more routine.  The new CID investigator added 83 investigations to his caseload between June and September.  Of those, only one was referred to an outside agency (regarding a sexual battery) but no cases were referred to IAD.  According to the spread sheet compiled by the CID investigator 41 investigations dealt with simple assault, three with sexual battery, eight with assault on a law enforcement officer, seven with arson, seven with contraband, one with escape, two with malicious mischief and three were listed as information reports.  An analysis of the point of origin of the investigations revealed that 74 occurred at the RDC, eight at the WC and one at the Courthouse.  The JDC was closed during the current reporting period.

The CID reports reflect consistent deficiencies. The CID investigator does not review every incident report as should be done (the IAD investigator does review every incident report). This would identify incidents that need to be investigated even though a referral has not been made. The reports on incidents that are investigated disclose that the CID investigator typically interviews the alleged victim of an assault or the alleged perpetrator of a crime but very little more. Any review of video surveillance is seldom noted in the reports, interviews of potential witnesses are not noted, medical staff are not interviewed, medical records are seldom obtained, and alleged perpetrators of assaults are not interviewed. It appears that the CID investigator determines whether a case can be prosecuted and, if not, often because the victim does not want to pursue charges which no doubt puts the victim at risk of retaliation, closes the investigation. The CID investigator should be looking more broadly at violations of policy and procedure and concerns regarding the safety of staff and inmates in the facility, e.g. non-functioning cameras, blind spots, use or non-use of restraints, inadequate supervision, etc. Appropriate cases should be referred to IAD.

While most CID investigations result in no follow up action because one or more of the participants refused to file charges, several incidents that occurred during between June and September are worth noting.

- IR 201279 was the report of a fire that was set in housing unit B-1 at the RDC. Investigation revealed that the fire was put out by staff who used a fire extinguisher.  An inmate was asked several times how the blaze started, but he claimed ignorance.  A review of video surveillance subsequently proved that the inmate started the fire.  He was

charged with arson.  The CID investigator's follow up validated the observations and allegations of officers who were on scene at the time of the incident. Both the incident and the investigation appear to have been handled appropriately.

- IR 201443 was the report of a fire in housing unit A-3 at the RDC.  A fire started in a cell that had been previously welded shut, and which was subsequently used as a trash receptacle by inmates.  Officers used a fire hose from the Great Hall although there should have been one available in the control room.  Officers reported that all inmates were moved to the recreation yard, yet in a supplement another officer found inmates still in their cells.  The responding Lieutenant stated that a review of recorded camera coverage showed that a particular (named) inmate started the fire.  In spite of all this information, there is no record of a CID investigation, nor was it referred to IAD for follow up on fire safety conflicts regarding access to fire hoses.  Finally, there is no record that the named inmate was charged with arson.

- IR 201260 was the report of three inmates in B-1 ISO (suicide watch) at the RDC who were involved in an assault.  It was readily apparent that procedure was not being followed from the description of the incident.  The assigned officer was not present in the ISO unit.  Inmates had access to individual cells, contrary to standard procedure.  They are supposed to be assigned to stackable cots with only one cell open for access to the toilet and sink, but not for housing.  An inmate was injured and required medical attention.  While all of this was noted in the CID investigator's synopsis, the information was not passed along to IAD for follow up on the failure to follow procedure.

Two of the three incident reports listed above indicate significant shortcomings in the CID investigative process.  They should have resulted in action on the part of the CID investigator.

IR 201443 was a serious incident that should have been investigated by CID, but there is no record of follow up.  If the investigator was personally reviewing each incident report, he would have seen that investigation was required.  A referral from Detention supervisory and command staff should have resulted in a CID investigation, but even when that did not occur, the CID investigator should have picked up on the need for action.

IR 2001260 involved a case of staff negligence and failure to follow established procedure.  Their actions could have easily resulted in the death of an inmate on suicide watch. It is obvious from the report that standard procedures were not being followed.  There was no officer present in the ISO Unit.  Inmates were apparently housed in individual cells instead of in the dayroom area.  The cells are supposed to be locked shut, with the exception of one that is kept open to allow access to the toilet.  If an officer had been present, as required, the inmates would have been under constant supervision and the incident could have been contained immediately. While the CID investigator did look into the matter, he failed to make an appropriate referral to IAD for further review.

The IAD investigator generally has fewer incident reports to review than does the CID investigator, but his research requires extensive interviews.  From June through September he handled 26 cases.  Of those, 21 involved UOF, one assault, one insubordination and three dealt with fact finding.  Only four cases originated at the WC while 22 were at the RDC.  The JDC was closed during this reporting period due to plumbing and HVAC problems.  During the four-month period, one case resulted in a one-day suspension, one officer resigned and one was terminated.

Detailed IAD investigative reports were not available for review for the June to September reporting period.

To date command staff have not submitted documentation of their review of the investigators' periodic reports in order to determine whether or not the investigative system is meeting the requirements of the Settlement Agreement.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

The use of the new kiosk system in theory allows the prisoners to report grievances without the intervention of Detention Officers. This has been carried as partial compliance in the prior reports because although the kiosk system does not require the intervention of a Detention Officer, the physical set up does not allow for privacy. This could potentially result in an officer or other inmates observing the grievance being filed. However, it has become apparent that as experience with the system has progressed, inmates are using the system and there has been no stated concern about officers observing the use of the kiosk. This may be in part due to the lack of staffing and the long periods of time when there is no officer on the housing unit. As the Jail moves to direct supervision with an officer on the unit at all times, this will have to be tracked. There are periods of time when the kiosk system is down during which a grievance can be entered through the kiosk but will not be received until the system is back up. An emergency grievance during this time would have to go through a Detention Officer. These outages are reportedly occasional, however. Again, this should be tracked to determine the frequency.

The newly approved grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer. The newly approved grievance policy also requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. This new policy is not operational yet. Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

A Grievance Policy has now been approved and adopted. Once fully implemented, it would be applicable and standardized across the entire Jail. At present, the kiosk system works the same across facilities but a consistent process will need to be developed in accordance with the new policy. The new policy envisions that all grievances will go through the Grievance Coordinator so that she can ensure consistency across all three facilities. Previously, when she was not on duty, the Grievance Officers at JDC and the WC functioned independently and this had resulted in some inconsistency. For example, there has been some effort to ensure that inmates use the appropriate form depending on whether they are submitting a request or a grievance. This is for the purpose of enabling the system to actually track genuine grievances. The Grievance Coordinator has been diligent in this. However, the Grievance Officers had not been consistent. Now that the JDC inmates are housed at the WC this has been less of an issue. However, there has been some confusion as to who should be overseeing the grievances of JDC inmates while they are housed at the WC. Even with the policy in place, there will need to be training on how to properly respond and ensure promised response to grievances are implemented in order to achieve consistency.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the system itself presents several challenges in this regard. Notably, if a grievance is not responded to in seven days, it drops off the dashboard. The only way to find the grievance is to run a report for a longer time frame and search for grievances in different status categories. The Grievance Coordinator reports that she runs back reports and clears old grievances.  At the time of the January site visit there continued to be improvement in ensuring

that grievances receive a timely response. It was not possible for the Monitoring Team to run such a report in June or October because of the remote nature of the visit. The Grievance Coordinator appears to have a tracking system that identifies overdue grievances. She sends reminder emails to those individuals who have not responded to the grievances in a timely manner. This, no doubt, has contributed to the improvement in reducing the number of grievances that have not received a timely response. Progress in this area is notable. That being said, it was reported that a number of staff do not use the system to respond to grievances and several grievances and requests were observed to have no response. The Grievance Coordinator reported that about 19 staff members did not routinely respond through the system. When the inmate leaves, she clears the grievance or request from the system. The staff may have responded to the grievance or request in person but there is no record of such a response and this does not comply with the requirements of this paragraph that a written response be provided.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. The Grievance Coordinator has prepared some routine responses, for example, informing the inmate that the grievance is a request and how to submit a request. This has resulted in an appropriate drop in grievances since many of the ones previously filed were in fact requests. Although it is appropriate that both requests and grievances be responded to, it is also important that the system be able to track true grievances as opposed to requests. This has notably improved. The Grievance Coordinator is soon to go on maternity leave and she is training the person who is to fill in during her absence. This individual is still learning the system, but it was observed that she denied some grievances as being requests when they were in fact grievances. Of those that were appropriately denied as requests instead of grievance, the response did not inform the inmate to file a request instead of a grievance. The Grievance Coordinator is going to do additional training on this issue.

There are still some where the adequacy of the response needs improvement. In a number of instances, the response is a promise of future action. There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. Some grievances have a response that says "resolved" without an indication of how it was resolved. The new grievance policy requires that the Quality Assurance Officer do a monthly audit of grievances and responses to determine the timeliness and appropriateness of the responses. This has not been implemented yet but should provide some oversight in this area.

A review of medical grievances and responses indicated that although there continue to be only a very small number of such grievances, those submitted were responded to virtually immediately. It should be noted that the vast majority of medical grievances are actually a request for medical or mental health services that should have been submitted as a sick call request, and so the

detainee is advised to simply submit such a sick call request.  However, when it appears that there is an emergency or urgent medical or mental health matter, the response is an immediate assessment and the initiation of any indicated treatment.

Although a review of the medical grievances with the medical staff indicates that staff know that the situations raised have been resolved, there is no formal, documented tracking system that could be used to confirm that a resolution has occurred.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
The newly approved grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. Under this system non-English speaking persons and persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. The Securus system should at some point be programmed to include the most common foreign languages. The new policy is not operational yet. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**
The Inmate Handbook has outdated information about most of these issues and will need to be updated. It is not available in Spanish or any other language.

**RESTRICTIONS ON THE USE OF SEGREGATION**

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Partial Compliance**

Over the past four years the HCSO has vacillated with regard to compliance with the eight-hour standard.  Because the locks on cell doors, housing unit doors, and even doors to the Great Hall did not function, or did so only sporadically, holding cells in Booking were used for long term housing as they were the only cells in the RDC that could actually be secured.  Consequently, compliance with the eight-hour standard would be noted in one Monitoring Report only to be followed with non-compliance in the next Monitoring Report.  Most recently, mis-use of the holding cells was driven by the need to quarantine groups of inmates because of COVID-19 concerns.  Hopefully, this problem will be permanently resolved now that C-Pod has reopened after undergoing an extensive renovation for the second time since 2012.

As was noted in the Eleventh Monitoring Report, the doors to the four multiple occupancy holding cells were replaced by CML Security with doors that feature glass panels, making it possible for Detention Officers to visually observe inmates inside the cells.

Since the Monitoring Team had to conduct the October site visit remotely, it was not possible to determine whether or not staffing in the Booking area has been reallocated appropriately, with two officers assigned to the holding cell area and only one or two officers inside the office area.  That determination will have to await the next on-site inspection.

With the anticipated opening of the mental health unit, the implementation of this provision with regard to appropriately classifying and placing detainees on that unit will need to be addressed.  As has been previously noted, in this regard, there are actually multiple issues that will need to be addressed.  More specifically…

- Although it is anticipated that the mental health unit will be designed to house two different populations – detainees who are so acutely and severely mentally ill that they are at risk of harming themselves or others, and prisoners who can not be safely housed on a general population unit due to a mental illness or intellectual disability – the population to be housed on the unit must be clearly defined in policy and procedures
- In order to comply with this provision, mental health assessments would have to be performed within 8 hours of intake

- The nature of the cooperation between classification and mental health will have to be described in policy and procedures regarding how detainees will be classified and housed on the unit, including who will be responsible for which decisions, especially when security concerns appear to be in conflict with those of the mental health team
- It will need to be determined where newly admitted detainees will be housed if there is a delay in obtaining the initial mental health assessment and/or if a newly admitted detainee is found to be appropriate for placement on the unit but the unit is full

75.    The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

In the Eleventh Monitoring Report it was noted that the JDC, WC and RDC were using different segregation tracking forms.  It was recommended that they all use the same form.  No forms were submitted by the JDC because it has been closed for approximately six months.  While the RDC and WC did use the same form, they filled them out differently. It would be appropriate for a standardized format to be adopted.

Although the form now seems to be standardized, it is not routinely provided. The WC provided a segregation report for August but not September and the RDC provided a segregation report for September but not August. The RDC report for September showed only one inmate placed in segregation for disciplinary reasons and noted that the Disciplinary Hearing was N/A. It would appear that RDC is using Administrative Segregation instead of holding a hearing for Disciplinary Segregation. The spread sheet for the WC states that disciplinary hearings were held although no date is provided and incident reports routinely state that the officer responding to the incident places the inmate in Special Housing for a specified number of days without a hearing. See, e.g. IR# 201302.

The segregation report should also include the date of the last review of the Classification Committee for inmates in restrictive housing (segregation) for administrative or protective custody. The Reclassification policy, 7-400 requires that the Classification Committee review all cases of inmates in restrictive housing 24 hours after placement and then every seven days after that. Including the last date of review in the segregation spread sheet would ensure that there is compliance with this policy.

Additionally, there is an issue of appropriate segregation housing. RDC has been using the single cells in Booking for administrative segregation. These cells are not intended to be used for housing and that is a subject of the stipulated order. This has now reportedly been discontinued with the opening of the renovated C-Pod. However, the WC has been using the WC intake area for segregation which is also not appropriate and in October, transferred a female to a multiple

occupancy holding cell in RDC Booking to house the female inmate.  Inmate A.W. was housed in Intake at the WC for most of October (from about the 4th to the 27th).  Then, after she was involved in a second assault, she was moved to RDC Booking.  Neither the WC intake area or RDC booking should be used for housing.  Women who have to be locked down should only be held in single cells in Special Housing 1 at the WC.  That is where female suicide watches should take place too, but a female inmate on suicide watch should not be placed in a single cell; rather, she should be on a stackable cot in the dayroom area of Special Housing 1 and that is where the monitoring officer should be too. This change in procedure has been agreed to.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for detainees who are being held in segregation; when indicated, they offer mental health services to a detainee who is not already on the mental health caseload; and when indicated, they make available adjustments in the treatment that is being provided to a detainee who is already on the mental health caseload.  However to date, no mechanism has been implemented whereby any findings from those rounds (such as a deterioration in a detainee's mental health status) can be shared with security staff responsible for the placement in and removal of detainees from segregation and thereby possibly have an impact on any decisions made by security staff regarding the continuation or termination of a detainee's placement in segregation. A formal, interdisciplinary 'segregation review process' should be implemented.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

79

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.  Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77 (a), at present, mental health staff are not involved in the decision to place someone in segregation. As noted in prior monitoring reports, this provision applies to all detainees who are already on the mental health caseload, and those who are not already on the mental health caseload but the behavior they exhibited around the time of the infraction that might cause them to be placed in segregation could reasonably lead security staff to suspect that they might be suffering from a mental illness. The Classification policies adopted before the June site visit require the input of mental health staff. However, this has not been implemented.

It should be noted that the mental health assessment performed in connection with security's review in the disciplinary process of a detainee's infraction(s) should be focused on several questions.  These include whether or not the detainee's mental status is such that he/she cannot credibly participate in the disciplinary review process; whether or not the detainee's infraction/behavior is actually a symptom of his/her mental illness rather than a willful breaking of the rules; whether or not placement of the detainee in segregation is likely to be harmful to the detainee/cause further deterioration of his/her mental status; and whether or not there is an intervention that is more appropriate than placement in segregation, such as altering the detainee's mental health treatment program and/or a punishment that doesn't include placement in segregation.

The policies and procedures regarding disciplinary review should be implemented. They require security to seek and consider mental health input into the disciplinary review process for detainees who are known to be suffering from serious mental illness or appear to be suffering from mental illness. This should include a mechanism whereby security will know which detainees are on the mental health caseload and therefore subject to this policy.

Regarding 77 (b), as has been noted in each prior report, there does not appear to be a presumption that segregation is contraindicated for detainees with serious mental illness. There are detainees with serious mental illness housed on the segregation unit and held in segregation in the isolation sections of other units.  It is anticipated that the program design for the mental health unit will be such that these detainees can be moved to the mental health unit once it is open.

Regarding 77 (c) inmates on the mental health caseload are not being screened within 24 hours of placement in segregation. In fact, mental health staff are not even notified when a detainee is placed in segregation. As noted above, this is required by the Classification policies but has not been implemented.

Regarding 77 (d), as noted in sections 77-a and 77-c, the mental health staff are not being offered the opportunity to assess any detainees prior to their placement in segregation.  Again, the Classification policies that have been adopted require this input but those provisions have not been implemented.

It should be noted that security staff are aware of the fact that there are seriously mentally ill detainees being held in segregation.  However, there is no specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation. Furthermore, the placement of these detainees in segregation has not been short term, and there is no development of any individualized plans (developed by security staff and/or mental health staff) to get these detainees out of segregation as quickly as possible.  Although the opening of the mental health unit will provide a housing option for seriously mentally ill detainees who were placed in segregation, individualized plans for moving them from segregation to the mental health unit will still be required.

Regarding 77(e), there is no documentation of extraordinary and exceptional circumstances for the placement of inmates with mental illness in segregation.  This provision outlines specific requirements with regard to the review and approval of the 'extraordinary and exceptional circumstances' that have been asserted.

The incident described in paragraph 42 when an inmate assaulted medical staff in the medical unit highlights the need for an interdisciplinary team as required by this paragraph. As noted above, the inmate involved in this particular incident is known to have problems controlling his behavior.  He is a major security management problem; he continues to suffer from serious mental illness, despite an aggressive approach to the treatment of his mental illness; and he also suffers from diabetes that continues to be way out of control, despite an aggressive approach to the treatment of his diabetes.  Among the reasons why his diabetes has been so impossible to control are the fact that there are times when his 'diabetic diet' contains too much sugar and the

fact that he negotiates with other inmates for food items that he is not supposed to eat. Given his extremely high blood glucose levels, it is not always clear to what extent his agitation and other difficult to control behaviors are a result of uncontrolled diabetes and/or a lack of effectiveness of his psychotropic medication. Given the above noted, this inmate is a perfect example of the type of inmate that could benefit from an interdisciplinary approach to treatment/management planning. More specifically, if all parties were aware of and developed a fuller understanding of what was going on with him and all parties jointly developed a plan/an approach to managing him, dietary and security staff could invest in better controlling his sugar intake, his diabetes could be brought under better control, and then in turn, there could be a more meaningful assessment of psychopharmacologic treatment of his serious mental illness.

Regarding 77(f)(i), inmates with mental illness in segregation receive a daily visit during medication pass. It should be noted that if a detainee refuses to take the medication but comes out and signs the medication refusal form, the nurse still has an opportunity to visit with/observe the detainee. However, if a detainee refuses (or appears to refuse) to take the medication and even refuses (or appears to refuse) to come out and sign the medication refusal form, the nurse is unable to visit with/observe the detainee. Therefore, when security staff is assisting the nurses during medication pass, security staff should make every effort to assure that the nurses at least have an opportunity to see/observe each detainee who is supposed to be taking medication, even if the detainee refuses to take the medication. Nursing staff should continue the practice of notifying the prescriber when a detainee continues to refuse medication; in so doing, indicate whether or not they have still been able to visit with/observe the detainee; and also report any deterioration in the detainee's physical and/or mental health status that they are aware of.

Regarding 77(f)(ii), detainees on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP. However, due to the shortage of mental health staff (see paragraph 42(g)(iv)), this does not consistently occur on a weekly basis (please note: although detainees held in segregation are seen by a QMHP during the weekly segregation rounds, this is not considered to be a therapeutic session). In addition, due to the shortage of security staff, the individual sessions that do occur are not consistently out-of-cell sessions. Furthermore, due to the problems that have been associated with securing the cell doors on the segregation unit, there are times when individual sessions need to be canceled.

Regarding 77(f)(iii), as noted above and in prior reports, a QMHP makes weekly rounds for all detainees being held in segregation, during which each detainee's mental status and need for mental health services is assessed. If the QMHP finds that there has been a deterioration in a detainee's mental health status, the QMHP will refer the detainee to the psychiatric nurse clinician for consultation and any further assessment that might be indicated.

As also noted in prior reports, there is no on-site jail medical physician or psychiatrist.  The responsibilities that would be assumed by such a physician and/or such a psychiatrist are assumed by a medical/primary care nurse clinician/practitioner and a psychiatric nurse clinician/practitioner, both of whom have access to physician consultation/backup.  Therefore, it is impossible to fully meet this provision as currently written.

Regarding 77(g), all detainees with serious mental illness housed in long-term segregation have been assessed by a QMHP, but to date, there has been no appropriate housing for such detainees that could be recommended based on those assessments (see paragraphs 42 and 77(b)).  However, as noted in prior reports and in paragraph 77(b) of this report, it is anticipated that the new mental health unit will provide appropriate alternative housing for this population, at which point this provision can be addressed.

Regarding 77(h), when it has been discovered that a detainee's mental health status has deteriorated while being held in segregation, this has usually been discovered by mental health staff during weekly segregation rounds or during an individual session with a detainee, or discovered by nursing staff during their weekly segregation rounds or during medication pass.  It does not appear that security staff identify such deteriorating detainees; the reason(s) for this is unclear; but a lack of focus on this issue by security staff and/or the need for additional mental health training for security staff should be considered. To the extent security staff do recognize decompensation, there does not appear that there is a clear mechanism to communicate or otherwise address the situation.

As has been noted in prior reports and previously in this report, although mental health staff carefully consider what additional mental health services can be provided to detainees being held in segregation, especially if there has been a deterioration in the detainee's mental status, currently there is no formal mechanism whereby mental health staff can share these findings with security staff and thereby possibly impact on security staff's decision to continue or discontinue placement in segregation.  Furthermore, the efforts of mental health staff to informally communicate their concerns about a detainee's mental health status to security staff have not been successful (i.e., have had no impact on security staff's decision to continue or discontinue placement of the detainee in segregation). This, again, is an important function of an interdisciplinary review that does not currently occur.

The need for a mental health unit in order to address the needs of the seriously mentally ill detainee population and the provisions of this agreement; the location of and the mental health programming for such a unit; and the range of other issues related to the planning for and operation of such a unit have all been described in prior monitoring reports, as recently as the last report.  A status update on those plans is provided in paragraph 42.

Regarding 77(j), it does appear that security staff understand that they cannot make mental health treatment decisions or overrule physician medical orders.

## YOUTHFUL PRISONERS

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

### Substantial Compliance

As of the drafting of this report in October 2020, it has been approximately nineteen months since the last youth under 18 was released from the Raymond Detention Center (RDC).  That was the completion of the transition that began in September 2017 when the decision was made to place new juveniles charged/convicted as adults (JCAs) at the Henley Young (HY) facility and gradually transition the remaining youth out of RDC. It is understood by the monitoring team that no more youth under age 18 will be housed at any of the county adult facilities, including Juveniles Convicted as Adults (either waiting to be placed at the Mississippi Department of Corrections [MDOC] or previously convicted and arrested for a new offense or probation violation).  Presuming this continues thru February 2021, sustained compliance will be achieved at that time.

As of October 19, there were 19 JCA youth at Henley Young.  Of the JCA youth:

- All the JCA youth were male
- There were no female JCA youth held at Henley Young in June, July, or August of 2020 (September Daily Population Record was not provided)
- As of October 19, the Roster indicated that only five of those youth had been indicted, although in speaking with staff they indicated they had just received a couple more.  In any case, it is worth continuing to monitor the "pace" of the indictment/court process to determine if cases are moving faster or not.
- Two JCA youth had been in custody for 404 days and three more youth for 280 days.
- The ages of JCA youth in custody was 17 (7 youth), 16 (3 youth), 15 (4 youth), and 14 (5 youth). Of the 17-year-olds, the earliest one of them turns 18 will be in April 2021.

- In addition to the 19 JCA youth, on October 19 there were five youth held in the short term units of Henley Young (2 male, 3 female), bringing the total number of youth at Henley Young to 24 which is higher than had been true through the summer months but less than the typical population in early 2020. Recall that the agreement with SPLC "caps" the total number of youths at Henley Young at 32, so continued attention to managing both the JCA and short-term youth populations will be important.



| | JUN | JULY | AUG |
|---|---|---|---|
| ■ Non-JCA female | 1.6 | 0.2 | 1.2 |
| ■ Non-JCA male | 3.9 | 1.5 | 1.4 |
| ■ JCA Female | 0.0 | 0.0 | 0.0 |
| ■ JCA male | 14.8 | 14.6 | 12.7 |

In addition to best practice reasons to confine youth only when necessary to support public safety, there are two additional reasons for continued vigilance in managing the daily population of youth, including (1) as long as COVID-19 concerns remain, confinement facilities are one of the most challenging environments in which to manage any infection spread, and (2) challenges in retaining a sufficient number of staff, particularly Youth Care Professionals providing direct safety and supervision of youth, makes it difficult to maintain an effective youth/staff ratio.

There is a concern related to the issue of keeping cases moving through the system in that Judge McDaniels who had begun implementing a Minors Diversion Docket, designed to ensure more timely review of progress in indictment and charges and identify alternatives to secure confinement and/or processing the case in the adult system, has been assigned to a Criminal Docket.  In July, Judge McDaniels sent a memorandum to Senior Hinds County Circuit Court Judge Green indicating that he could no longer oversee the Minors Diversion Docket.  He strongly recommended that steps be taken to reinstate the Minors Diversion Docket.  Although

two different individuals during discussions with the juvenile member of the Monitoring Team at the time of the site visit represented their belief that Judge McDaniels was still handling the Minors Diversion Docket, Hinds County Compliance Coordinator Synarus Green confirmed that as of now Judge McDaniels is not doing that work, so it remains apparently unassigned.

As noted in the previous report, ensuring timely movement of youth through the court system is both appropriate for the youth involved and makes programming goals for the JCA youth at Henley Young much more achievable.  A clear recommendation is that Hinds County resume operating the Minors Diversion Docket as soon as possible.

Personnel Changes

Since the last report, two key positions have been filled, including: (1) the Program Coordinator position filled by Ms. Andrea Baldwin, and (2) the Treatment Coordinator position filled by Ms. Ruth Walker in September. Comments related to the functioning of those positions will be made in subsequent sections of this report.

However, subsequent to the initial preparation of this report there have been two significant personnel changes: (1) The departure of Mr. Greg Harrington, with his last day of work being November 30; and (2) The resignation of Ruth Walker, Treatment Coordinator, effective November 25.  Both of these positions are critical to the operation of Henley Young and raise serious concerns, particularly in light of the unique history of those positions.  Mr. Harrington was approximately the 7th Executive Director of Henley Young over the past 10+ years; and (2) the Treatment Coordinator position was originally envisioned to be filled by a licensed psychologist, but it has been vacant for the majority of time since this Settlement Agreement was filed in July 2016.  Pursuant to a request by Hinds County to consider modifications to the hiring requirements for that position, a Stipulated Order was filed in January 2020 to create more flexibility related to the hiring qualifications for the Treatment Coordinator position.

A third key position, Training Coordinator, was filled briefly.  Executive Director Harrington appears to have a solid vision for how that position can improve training at Henley Young, but unfortunately the person selected found another position relatively soon after starting at Henley Young.  Essentially over the past three years, the Training Coordinator has technically been filled by an individual who has been on deployment overseas for lengthy periods of time.  The work has been covered by two different "interim" coordinators, but the training of staff will continue to be limited until an active full-time Training Coordinator can be hired and brought on board.

The greatest concern raised during this "visit" was that there are a high number of current vacancies in the Youth Care Professional position(s).  It was indicated that there are currently 17 vacancies, higher than the 15 vacancies noted in May and much higher than was evident during

most of the site visits in 2018-2019.  From an operational point of view, an inordinate amount of focus and time must be spent on simply filling "slots" on shifts to maintain anything close to the target youth to staff ratio of 8:1 let alone providing sufficient staff to support other needs during the day and evening shifts (e.g. supervising recreation programs,  escorting/moving youth within the facility for other programming, medical, or visitation purposes).  Having just the minimum, or probably in some cases less than minimum, number of staff on duty creates additional safety and security risks in the event significant behavior problems occur in one area of the facility and some staff have to leave their "post" temporarily to assist others.

Mr. Harrington was able to provide a survey conducted by Mr. Frasier, the prior Executive Director, of salaries for similar staff in other counties in Mississippi.  Although there are comparables provided, it is important to note that the role that YCP staff play at Henley Young is considerably more complex and demanding than in many counties that simply provide short-term detention for smaller numbers of youth.  That said:

- Of the fifteen counties cited, Henley Young YCP salary is lower than eight counties.
- One of the closest counties in terms of location and size of facility is Rankin County in which the salary is $2,000/year higher than Hinds County.
- The Hinds County salary is approximately $1,000/year lower than the average for the 15 counties surveyed, and that statewide average is approximately $5,000/year below the average of an eight state cohort (Alabama, Mississippi, Georgia, Louisiana, Florida, Kentucky, Tennessee, and Arkansas).

At the time this survey was conducted, approximately 60% of staff had second jobs in order to "make ends meet", and at the time of this virtual visit leadership estimated that had risen to over 75-85% of YCP staff.

There is no pay progression system in place that would reinforce remaining as a YCP at Henley Young and little, if any, opportunity for overtime pay.  After reviewing the current pay scale and comparable positions in nearby counties (or even within Hinds County), the county should consider increasing the starting pay for YCP positions and developing a pay progression system that provides step increases or other incentives based on experience and training that may assist in the retention of staff over time.

In short, being able to fully meet many of the requirements of this agreement depends on being able to recruit, train, and retain an adequate number of well-qualified Youth Care Professional staff.

Physical Plant Changes

During the May virtual visit, staff indicated that additional modular units that can be used for education, recreation, and group programming were being added to the facility with a goal of

having them operational by the start of the school year.  As of the time of the site visit, the units were still not operational, waiting for the arrival and placement of furniture/furnishings and completing additional electrical and security system work.  The stated goal is to have the units ready for use within approximately 30 days, so generously no later than the end of November.

Although some discussions have occurred relative to the units' use once operational, actual policies and procedures related to staffing, scheduling, supervision, and safety monitoring have yet to be determined.  Actual use of these units may be hampered by the limitations created by staffing shortages noted earlier.  Moving youth to the units and providing proper supervision will be difficult at best and more likely pose additional safety and security risks absent a suitable number of staff being available at the time the units are in use.

It is recommended that the County inform the Monitoring Team when the units are completed, ready for operation, and put in daily use.

Additional physical plant changes that have been recommended in the past have not been addressed, including (1) dealing with limited use of outdoor recreation space related to weather (e.g. cold, rain, darkness); Whether one of the four new modular "rooms" created can help address that remains to be seen;  and (2) making changes in the living units to improve acoustics and furnishings to make those units more "livable" and appropriate for adolescents, particularly youth placed for long periods of time.  Considerable reference has been made in prior reports about the importance of making these living unit changes and the benefit they will bring to overall program operations, including behavior management, so they will not be repeated here. Suffice it to say, staff at Henley Young will continue to fight an "uphill' battle to properly program for and manage youth's behavior if these changes are not made.

Subsequent to initial preparation of this report, it has been confirmed that the electronic door control system is no longer working.  This means that staff must manually lock/unlock doors in the facility. This exacerbates the already challenging situation with the number of staff vacancies and adds to the risks associated with providing adequate safety and security for youth and staff. Repair/replacement of the door control system should be the highest immediate priority for facility repairs/upgrades.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II, a strength based assessment, and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two mental health clinicians, and the group work and counseling provided by the three Youth Support Specialists (YSS).

During the period since the January visit, most of the programming provided by the mental health team members continued, including holding regular treatment team meetings and the provision of group programming by YSS and the Qualified Mental Health Clinicians (QMHC). Although some documents were provided by YSS staff showing some of the programming that they deliver, it is difficult to assess the quality and fidelity of those programs without being on site to observe them in action.  The documents do indicate that many (although difficult to tell if all) JCA youth participate in 2-3 group programs each week, but those program periods continue to be limited to 30 minutes.  That is not sufficient to shape the kind of thinking and behavior change that is envisioned by this requirement of the agreement.  That constitutes 90 minutes of programming a week when they should be receiving closer to 10 hours of programming (including education) a day. Some examples of curriculum materials were provided, and they seem appropriate, and one of the YSS staff indicated that she had implemented more "role playing" activities as well as continuing some "journaling" activities, the kinds of activities that provide youth an opportunity to practice new, more positive behaviors in terms of how they interact with peers and/or adults.  YSS staff did provide some "lesson plans" that reflect an effort to do a better job pre-planning group programs and make them more consistent from week to week.

The addition of a Program Coordinator (Ms. Baldwin), referenced earlier, was a positive step forward. She had developed a number of materials and curriculum ideas that cou be implemented during other times of the day that heretofore had simply been labeled as "recreation".  These activities included:  Understanding/Managing Anger, various teambuilding components to improve positive connections among youth and teach pro-social cooperative skills, Nutrition, Life Skills, and Decision-Making.  The intent of these was that they be delivered on the living unit by the Youth Care Professionals (YCP) supervising the youth, providing both appropriate constructive programming as well as shaping a more positive relationship between youth and YCP staff.  Unfortunately, there are reports from other sources, mostly confirmed by facility leadership and Ms. Baldwin, that the delivery of the programs by YCP staff is "hit and miss" at best.  There are a number of reasons this may be happening, including: (1) staffing limitations make it difficult to assign staff consistently to any living unit, making it much more difficult to consistently provide this type of programming; (2) staff turnover means that training and supporting staff to learn the kind of facilitation skills necessary is limited, even when the actual program materials are "packaged" to make it easy to deliver; (3) for some staff, doing this kind

of program delivery is inconsistent with either their past role (simply providing safety and security) or their understanding of why they were hired; (4) the starting salary for YCP staff is not sufficient to recruit and/or retain as many qualified staff as needed to perform this new role; and (5) frankly, youth were used to spending their "recreation" time playing games, watching TV, or sleeping and getting them to change their behavior in this regard will take time and consistent reinforcement from all levels of staff (including supervisors and key leadership).  In this regard, in short, it is easier to let the youth "do what they want to do" than to actually deliver the programming as desired, despite some efforts by Ms. Baldwin to provide added incentives for youth to do so. With the departure of Ms. Walker, it remains to be seen whether the programming initiated by her will be continued.

Further assessment of the quality of assessments and treatment needs to take place after Ms. Walker has an opportunity to organize and structure the overall mental health program into a more comprehensive and coordinated program.  Ms. Walker did reference connections she had made with Hinds County Behavioral Health, and building on those initial steps toward collaboration and linking HBMH resources with needs of youth at Henley Young can help achieve compliance with this requirement. Ms. Walker and Executive Director Harrington were aware of the need to provide additional psychologist support for the program and were in the process of reviewing the existing Memorandum of Understanding (MOU) with Hinds County Behavioral Health Services to determine if additional psychologist support can be developed within that  agreement, including what form that support can take in terms of providing direct therapy services as well as overall program consultation. Again, it remains to be seen whether this process will continue after the departure of both Ms. Walker and Mr. Harrington.

Presumably, protocols (observation, classification, intervention) related to suicide concerns remain in place, but limited access to youth records and reports made it impossible to fully confirm that to be the case.  However, in past visits all indications were that those protocols were routinely followed.

In short, there continues to be slow progress, but three issues remain related to programming: (1) the amount of time that each youth is engaged in this type of programming remains very low, e.g. maybe four times a week for 30 minutes at a time, meaning that youth are engaged only about two hours a week. The additional time scheduled for Ms. Baldwin's activities is only useful if actually delivered; and (2) while record-keeping related to programming has improved it is still difficult for the monitor to determine how many of the youth regularly participate (there is a program log and documentation required for each unit, and there is some Quality Assurance oversight provided by Mr. Harrington and Mr. Dorsey, but it admittedly remains a work in progress), and (3) to what extent the individual YSS and QMHP staff coordinate their groups with each other to work toward common themes needs more attention and should ultimately benefit when Ms. Walker assumes a greater leadership role.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance**

As with the May "visit" it was not possible to adequately assess what is occurring in the education program. However, based on conversations with the new Principal, Mr. Antonius Caldwell, and limited documentation:

1. Based on conversation with Mr. Caldwell there is a sense that he is more proactively engaged in the day-to-day operation of the program than the previous Principal, including adding in some appropriate life and social skill programming to the school day.  He expresses a strong belief in programming and making the best use of the time they have with each youth.

2. Mr. Caldwell is focused on promoting key behaviors to change, behavioral skills that teachers can reinforce and that will be useful for youth no matter where they go after their time at Henley Young.

3. Ms. Findley continues to provide special education services pursuant to Individualized Educational Plans that have been developed for youth.

4. COVID still has an impact in that any new youth housed at Henley Young cannot attend school in the school area for the first 14 days, although Ms. Findley and others try to provide initial assessment services and some work packets.

5. There continue to be instances in which youth are not allowed to attend school in the classroom area, usually the result of behavioral incidents and/or safety concerns.  As has been noted in prior reports, the classroom area has limited space for movement and/or separation of youth, so as/when conflicts occur the determination is that the safest way to manage the situation is to simply separate some number of youth from the classroom area for a period of time. Whether and how the newly added program space may be used for school programming has yet to be determined, as it may require additional teaching staff as well as YCP staff to provide adequate services and supervision.

Concerns in prior reports reflect a sense that the internal goal for the educational program was to meet basic minimum state requirements, something that is not adequate given the needs of the youth that are held at Henley Young.  While information is limited, based on the conversation with Mr. Caldwell he appears to have higher goals for the program, and to what extent those goals can be supported by Jackson Public Schools remains to be seen.

As previously reported, unless additional information is provided by the county and verified by the monitoring team young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Substantial Compliance**

As noted earlier, the last youth "aged out" of RDC in February 2019, so as of this report, this complete separation has been in effect for over eighteen months.  Transitioning Henley Young to serve these long-term youth has not been without challenges, but progress made at Henley Young under the SPLC agreement and their continued efforts under this agreement are to be complimented.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards.  Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**

There has been no change related to compliance with this requirement although staff purport that Policies/Procedures have been updated and documentation of classification is occurring.  However, staff have not yet provided the final version of the policy or a copy of the form for review nor were admission files inspected during this visit to confirm compliance with the policy.  To reach Substantial Compliance Henley Young will need to provide the updated policy and related documentation it is being followed.  Additionally, admission files will need to be audited in a future visit to confirm proper documentation, if not confirmed in some other way.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**

There has been no change in the training program for some time.  The Training Coordinator position as envisioned by Executive Director Harrington was only filled for a brief period.  The intent to move the training program beyond basic/orientation/policy training to a more comprehensive professional development program remains hampered both by this position being vacant and the turnover and vacancies in the Youth Care Professional positions.  A training plan for the coming months was requested but not provided to the Monitoring team, presumably due to the absence of an assigned Training Coordinator.

As noted previously, it seems clear that absent substantive changes in the salary structure for new and more experienced Youth Care Professional (YCP) staff, significant staff turnover will continue and it will be an "uphill struggle" to develop a fully effective training program at Henley Young.

One of Mr. Harrington's first expressed priorities was to develop some sort of staff recruitment and retention program that can reduce turnover among YCP staff, and he should be commended for placing a priority on this issue.  Mr. Harrington indicated that more applications had been coming in recently, but only time will tell whether there is substantive improvement in this area.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

    a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

    d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

    e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

    f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

    g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the

> Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.
>
> h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.
>
> i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

This continues to be one of the more challenging provisions of the Agreement, both in terms of implementing all the requirements and in monitoring proper implementation. Recall from the prior report that there is tracking of both Behavior Management Isolations (BMI) (short-term, implemented by YSS staff) and Due Process Isolations (DPI) (longer-term confinement following a disciplinary review by leadership). Materials provided for this review included DPIs for May through August 2020 and only a second shift record of BMIs for June and July, so that portion of the records is incomplete making it difficult to confirm the frequency and/or duration of BMIs implemented by line staff on the units. What the documents do show includes:

- Eleven instances of BMIs in June, with eight of them related to one incident in which those youth engaged in a fight. That said, their BMIs were all listed as lasting 15 minutes, presumably used to calm the immediate situation pending further disciplinary review.

- Four BMIs in July from two separate incidents, one of which is listed as "fighting". For the two "fighting" incidents, youth were placed in their room for approximately 40 minutes before being released.

- No information for BMIs was provided for August, although there were three instances in which youth were subsequently confined to their room for 24 hours which would be a DPI. Depending on the type of incident, such as possession of contraband, it is possible that there would be a DPI without a preceding BMI. However, this is not common. It is more likely that this discrepancy is the result of documentation not being complete. In either case, it is important that an accurate record of the use of BMIs be maintained and monitored by the Quality Assurance Manager.

- It is possible, though unlikely, that none of these instances resulted in at least a short-term BMI.

- Consistent with representations made on the mid-May calls, there were no Due Process Isolations (DPIs) effected in May 2020. That is very positive, particularly considering some of the limitations imposed resulting from COVID.

- There were 15 instances of DPIs in June, a substantial increase from recent months, but 5 of them appeared to be related to the fight incident on June 3. Of the June DPIs 12 were for 24 hours and 3 were for 6 hours.

- There were 5 DPIs in July and only 3 in August. All these isolations were imposed for 24 hours. Both July and August represent relatively limited use of DPIs.

Since the Agreement limits room confinement to a maximum of one hour unless the youth poses an imminent safety risk to staff or other youth, none of the Due Process Isolations meet that expectation.  Staff continue to purport that during this 24-hour period youth can come out of their rooms for structured activities (school, recreation, group programming), but that could not be confirmed since observation logs could not be reviewed off site.  We also could not confirm whether required mental health checks were made during any period of isolation, although YSS staff do indicate that they are involved in the Due Process reviews and do check on their assigned youth regularly during any confinement period.

It bears repeating that facility leadership need to remain vigilant in ensuring that all documentation related to the use of isolation, both for initial behavioral reasons or disciplinary reasons, is accurately completed and reviewed and made available for review on subsequent visits. There are records for due process confinements that provide the reason and disciplinary action taken.  There is a "master" confinement log/record that helps with tracking the frequency and duration of room confinements.  There is not good documentation of whether youth do, in fact, take the opportunity to be out of their room during any disciplinary period and whether required mental health checks are being made.

Ultimately the use of room confinement can be further reduced by continuing to improve the environment in the living units, retaining and expanding training of Youth Care Professional staff, and continuing to expand social skill training and adding additional program opportunities.

Finally, the last Henley Young Policy/Procedure related to Due Process Confinement provided to the Juvenile Justice monitor is from September 2017 and does not match verbal representations made by staff about current procedures.  Henley Young needs to provide the monitor with current/recently adopted Policies/Procedures so they can be reviewed to determine if they are consistent with requirements of the Agreement.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

        a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

        b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For

instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

   c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

It was not possible to review youth point sheets during this offsite visit, and discussion related to the incentive system was limited to essentially indicating there had been no substantive changes over the last 6+ months.  There are some basic elements of the system that move toward at least partial compliance with requirements of the agreement, including (1) there is on-going documentation of what youth earn and what incentives they select; (2) the system is broken up into appropriate blocks of time, providing an opportunity for youth to earn rewards for their behavior during various program periods/activities (an improvement from a system that simply tracks youth by larger blocks of time, e.g. a whole shift or even half-shift); (3) Ms. Baldwin has introduced additional incentives to reinforce youths' participation in the program activities she has developed for what formerly were simply "recreation" periods, although with somewhat mixed results.

However, based on conversations with Ms. Baldwin and Anne Nelson, monitoring the SPLC agreement, there remains a disconnect between how useful the incentive tool can and should work and how it is applied by YCP staff, with perhaps the best description being that is it applied inconsistently at best.  Documentation of why youth earn/fail to earn points remains limited, and rather than being a tool for line staff to use in shaping youth behaviors it appears to be more of an "afterthought" in terms of how it is applied.  Ms. Nelson indicated that she has made some suggestions for additional changes to the system that have not been implemented by leadership. While frequent changes to such a system is not desirable, and it may be hard for some staff to feel like things are "changing too much", periodic review of ways to improve its effectiveness make sense. Leadership is encouraged to take the advice provided by Ms. Nelson and make changes as needed.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from

court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

As was the case during the June site visit, the quality of the inmate records was difficult to evaluate during the October remote site visit. Typically, the Monitoring Team is able to review the paper files and determine whether the appropriate paperwork is in the file. These are too voluminous to have scanned in for review. The documents requested were the status/summary sheet showing the detention status and the chronology sheet showing the activity related to the inmate's status. This was for approximately 30 randomly selected inmate files. This site visit was complicated further in that the Sgt. in charge of Records went out on maternity leave the day her interview was scheduled. The Lt. of Inmate Services which is over Records and an officer in Records assisted with the site visit.

The status sheet is required by policies and procedures and should greatly assist in both the jail staff and the monitors assessment of whether the paperwork supports the booking and ongoing detention. It is a face sheet that lists each charge and the status of the charge such as whether there is a bond, an indictment, a next court date, a dismissal etc. It would also list any detainers/warrants with the jurisdiction and contact information. The legal documentation related to the charge or detainer would then be behind the status sheet on one side of the inmate file. This would provide staff an efficient means to determine the status of detention and could then be uploaded for review during site visits without uploading the entire file. At the time of the June site visit, staff reported that they had discontinued doing the status/summary sheet. It was clarified that the status/summary sheet is required by policies and procedures and is intended to ensure compliance with this paragraph of the Settlement Agreement. The documents provided for the October site visit do include a summary sheet. However, it is essentially an abbreviated version of the chrono sheet which staff understandably found redundant. After some discussion at the time of the site visit and a subsequent remote meeting, the format of the summary/status sheet was agreed upon. This should assist the assessment of compliance with this paragraph particularly if the next site visit is again remote.  The file audits completed since the June site visit, indicate that at the time of those audits, a number of files did not have the summary sheet. It is, however, a step forward that the status/summary sheets are once again being implemented.

The policies on pre-booking, booking and records have now been in place for a year. However, as evidenced by the failure to keep the inmate status sheet at the time of the June site visit, they are apparently not being fully implemented. A Booking Manual has been updated and expanded and should assist in ensuring that proper paperwork supporting detention is provided and the information is accurately entered into the JMS system. It should be noted that since monitoring began there has been significant improvement in the quality of the records, the accuracy of the

JMS system, and the presence of paperwork supporting booking and detention. There continue to be improved systems in place to track individuals and release them timely.

There was one individual whose basis for detention was unclear. He was incarcerated on a probation violation and the 21 days had expired. The court ordered that he continue to be detained, but the Jail had no paperwork other than the judge's order supporting his detention. Staff opined that there might have been an earlier charge with bond revoked but they had no paperwork showing that. The issue became moot in that he soon was sentenced and was waiting for MDOC. Even though moot, it would be useful to investigate this situation to find out why the file was lacking the paperwork supporting detention in order to ensure that this doesn't result in over detention in the future.

The problem with individuals waiting for their first appearance in County Court appears to be resolved with the newly assigned judge. It was also reported that the officers were much better at getting their paperwork submitted in time for a timely first appearance.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Substantial Compliance**
As previously reported, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. At the time of the last three site visits and this remote site visit there have been no individuals in the facility on a fines and fees order. This will continue to be monitored closely as the policies are new and sentencing orders are sometimes ambiguous, but this provision is now listed as in substantial compliance.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Substantial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The policy on pre-booking is consistent with this paragraph and at the time of this and three prior site visits there was no one in the facility for failure to pay fines and fees. However, at the time of the January site visit, a review of inmate files disclosed two individuals who had illegal orders to stay in jail until payment of fines and fees. It was reported that these individuals were not held on these orders. If in custody on another matter, the individual is considered to have time served on the fines and fees order. It was reported that the illegal fines and fees orders are typically not entered into the JMS system. The last Monitoring Report recommended that a better process would be to ensure that the orders are corrected as set out in this Settlement Agreement. There were no such improper orders reported at the time of the June or October site visit. These requirements will continue to be carried as in compliance as no one is being held on improper fines and fees orders.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Substantial Compliance**
See paragraph 87.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Substantial Compliance**
See paragraph 87.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not

specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration. Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court and the case manager typically provides court information upon request.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor. Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences. Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals working off fines and fees. At the time of the September 2019 and the January site visit, the stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. The spread sheet appears to be consistent with this stated policy. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

v.      Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

There has been ongoing improvement in the area of releasing. The ability to track individuals booked on probation violations and release them if a hearing is not held in 21 days continues to be a challenge in that the entry of information into the JMS system can vary. The Sgt. continues to keep a manual spreadsheet upon reviewing booking information. The Records Sgt. had a good working relationship with an individual at MDOC and was typically able to get a hearing or a decision on release within 21 days. It was reported that this individual was no longer at MDOC and the current communication was problematic. MDOC has been directing the Jail to continue to hold individuals after the 21 days. In September, there were six individuals held beyond the 21 days including the one mentioned in paragraph 85 above. It was also reported that the 21 days did not begin to run until the individual was otherwise entitled to release. This was not the monitor's understanding from the Sgt. over Records or her spreadsheet. As she will be on maternity leave for a while, this should be clarified.

Another area that has presented ongoing difficulties involves unsecured bonds. It was reported that several individuals were over detained when they had unsecured bonds that should have entitled them to release. The cause was not investigated during this site visit, but in the past, this has been due to the bonds not being entered into the JMS system correctly. There has also been a problem in the past with individuals being detained on holds for other jurisdictions without confirming that the other jurisdiction wants them after they would have otherwise been released. This was not observed during this site visit. The status/summary sheet should be helpful in addressing this issue.

It should be noted, however, that there has been significant improvement in this area since monitoring began.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As previously stated, the condition of inmate files has improved since monitoring began. As described in paragraph 85, the new Records policy establishes the use of a status/summary that

should greatly improve the reliability of the prisoner record system. However, a complete updating and review of the records has not been completed and the system of auditing files has only recently been fully implemented. As noted above, the inmate status sheet required by the Records Policy had not been maintained and once reinitiated, it has not provided the relevant information. Similarly, the recently updated Booking Manual should result in improvement in the initial entries into the JMS system. Additional problems described in paragraph 85 continue to exist. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained although the auditing process has greatly improved since the June site visit. The Records Policy requires that the Supervisor conduct an audit of 10 files a week and do a semi-annual review of all files. At the time of the June site visit, this target was not being met. The audit sheets provided for June through September showed 180 files had been audited. This is a significant improvement and consistent with the policy. The audit process and implementation of the status/summary sheets should result in continued improvement in the quality of the files. In addition to Booking staff, there are three individuals tracking the lawful basis of detention. They are all three using separate spreadsheets and lists which as noted above do not match reports run from the JMS system.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The electronic medical record system and the various tracking logs that are maintained by medical and mental health have been described in prior reports.  The various ways these records and logs are used has also been previously described, and all are consistent with this provision.

It is the understanding of the monitor that in a correctional setting, certain medical and mental health information that would normally be HIPAA protected might be shared with certain non-medical/mental health staff without a detainee's consent.  However, it has yet to be determined and outlined in policy and procedure what type of information should be shared with non-medical/mental health staff and for what security and/or medical/mental health purposes; who requires access to that information; and how/in what form that information should be shared.

Medical/mental health staff are not involved with the transfer of detainees to the state hospital for competency evaluations and/or the restoration of competency. Medical/mental health staff do not even know which detainees are awaiting transfer to the state hospital until the transfer is imminent. More specifically, just prior to such a transfer the state hospital will request records from medical/mental health, and then when the detainee returns from the state hospital there will be a transfer note, indicating what treatment the detainee received at the state hospital. Medical/mental health is not told the state hospital's opinion regarding the competency question before the court. The Monitoring Team has suggested that the Court Liaison contact the state hospital to track these transfers as the state hospital appears to have the most accurate information which could then be communicated to mental health staff.

At present, neither medical nor mental health staff are involved in the incident reporting and review process or even consulted or interviewed as part of those processes, even when an incident might indicate that medical and/or mental health staff were called at some point during the incident or it was otherwise apparent that medical and/or mental health was involved with or had information that might be related to the incident. Therefore, any reporting and review of incidences that have a medical or mental health element/component do not include information from medical and/or mental health, gathered at the time of the incident or after the fact. This clearly compromises both the full reporting of and adequate review of such incidences. Review of incident reports by an interdisciplinary team is essential to identify problems in addressing the individual and management needs to identify problems and improvements that can be made. The Monitoring Team has suggested that the medical staff be given access to the JMS system so that they can enter supplemental reports providing the relevant medical information.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise. Additionally:

    a.     Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.     Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release. If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process. At minimum, policies and procedures must prohibit staff from:

        i.     Requiring the individual to submit to bodily strip searches;

        ii.     Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.     Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC. Further collaboration with the courts will be necessary to allow for release from the court.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

  a. Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

  b. Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

  c. Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

  d. Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been reviewed and is in the process of being finalized.

The various different activities/tasks that need to be performed in order to comply with this provision have been described in prior site visit reports.  Therefore, all of that will not be described again here, and instead, this report provides a status update.

A discharge plan is developed for each detainee who is likely to be released back into the community, and upon the detainee's release he/she is offered an appointment for outpatient services and enough medication to hold him/her until the time of that appointment.  Although discharge planning groups had also been initiated (focused on helping a detainee understand his/her illness, the importance of treatment, and his/her responsibility for active participation in his/her treatment), once the COVID pandemic hit, those groups were discontinued (although it now appears that they may be restarted).  Despite these efforts, upon their release, a significant number of detainees do not pick up their medication from medical (a log on this is now being kept to get the exact number/percentage, while also continuing to try to address this issue), and

ultimately, only about 30% of released detainees show up for their scheduled outpatient appointment. This is mostly unchanged from prior reports. It was hoped that the discharge planning group would improve this outcome but it has been on hold because of COVID. The Monitoring Team has suggested that medical consultation be incorporated into the releasing process to ensure that medications are provided and post incarceration appointments are communicated.

As has been previously reported, a plan has been developed to have staff from Hinds County Behavioral Health (HCBH) perform intake assessments at the facility and begin to engage detainees with HCBH prior to their release, in an effort to increase the percentage of successfully completed referrals for outpatient treatment  At the time of this most recent site visit, it at least appeared that the County is open to considering including in a contract with HCBH a small amount to support this effort.

As has also been previously reported, there is yet another group of mentally ill individuals who are repeatedly arrested and admitted to the facility, but stay for only about 24 hours.  These individuals are not detained at the facility long enough for the mental health staff and/or staff from HCBH to even attempt to engage them in treatment at the facility or connect them with community-based treatment before their release. Therefore, mental health staff and HCBH also developed a community outreach/case management plan for this group of individuals, and at the time of this most recent site visit, it at least appeared that the County is open to considering including in a contract with HCBH a small amount to support this effort as well.

The Monitoring Team continues to recommend that in the County's negotiations with Hinds County Behavioral Health the County fund the two programs described above that would lend invaluable support to the facility's discharge planning efforts and reduce recidivism.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:

    a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

    b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area. The Records Supervisor and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

At the time of the January site visit, the Booking staff reported that they run an NCIC check for outstanding warrants at the time of booking and again at release. NCIC reports run at the time of booking are in the inmate files. The files reviewed at that time did include a copy of the NCIC report at the time of release. The June and October site visits, being remote, did not permit a review of the files. It was reported that there has been an issue recently with the NCIC being down and therefore unavailable when needed at the time of release. One individual was released when the NCIC was unavailable. He was still, however, in the building when it was discovered that he had an outstanding warrant and so he was rebooked. The source of the problem with the system should be investigated and remedied if possible.

As reported at the time of the June site visit, there has been an issue of resolving holds promptly. The Monitoring Team was not able to review the physical files during the remote site visit. The releasing officers are aware of the holds in the system. However, the Records Supervisor cannot run an accurate report showing all holds because they are not always entered into the system in a consistent manner. This means that she cannot call the jurisdiction with the hold to determine whether they want to pick up the inmate. As a result, some inmates remain in the Jail instead of being released or transported. The Monitor was not able to confirm with the Records Supervisor during the October site visit whether this situation has improved.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County

must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

    i.       How to process release orders for each court, and whom to contact if a question arises;

    ii.      What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

    iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

    iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.      Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

It was reported at the time of the June site visit that because of turnover in the Booking Clerk positions, some procedures that were adopted to address communication issues between Booking and Records get forgotten. The Monitor was not able to confirm with the Records Supervisor during the October site visit whether this situation had improved. There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. In addition, a staff member has updated and expanded the Booking and Release Manual which will provide the detailed guidance required by this paragraph.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

a.   A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

b.   Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Partial Compliance**

This paragraph has been changed to partial compliance because of the improvement in the internal auditing process and the implementation of the summary sheet although it is in need of improvement. There is not a log required by subparagraph a. The County has provided their list of releases but the list does not include the information required by subparagraph a. Incident reports are not routinely prepared for over detention.

102.   The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The week of the June site visit, the Sheriff's Office hired an individual with the title of Quality Control Officer. Her list of duties includes monitoring records to ensure that inmate files are current. She has prepared an initial spread sheet to begin to meet requirements of the Settlement Agreement. The spreadsheet does reflect significant activity in a number of areas and she reported additional quality assurance activity. This work does appear to be on the right track. However, at this time, the spreadsheet does not reflect the requirements of this paragraph. It is recommended that a system be put in place to review inmate files periodically to incorporate this requirement in the quality assurance process.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**
As was noted in the Ninth Monitoring Report, the documentation of untimely/erroneous releases is not required by an approved policy. As was previously noted, there have now been a few incident reports on erroneous releases. There have still not been any reports on untimely releases. There should be clarification as to who has the responsibility for completing the report.  It was recommended by the corrections expert of the Monitoring Team that the Jail Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**
There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

Attorney/client visits have not been a problem at the JDC or WC; however, the JDC is currently closed.  At the RDC, where the majority of the inmates are held, the originally designed attorney/client visitation space in the pods has not been used for years because of security concerns.  Instead, inmates have either been escorted from the respective housing units to the front of the jail, or else attorneys have been escorted to unspecified multi-purpose spaces in each pod.  The Monitoring Team has made recommendations to correct this problem over a period of years, but nothing has been done to rectify the situation.  With the opening of C-Pod in October, the HCSO has an opportunity to designate an appropriate area of attorney/client visitation that is satisfactory to both the HCSO and local attorneys.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**
The Monitoring Team has received the electronic monthly reports. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include much of the information listed in paragraph 107 and 108 below and that would be needed to provide the information that could inform continuing improvement or quality assurance reports. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property. The new Quality Assurance Officer is working on developing a comprehensive quality assurance program. Appropriately, she is not creating a new manual spreadsheet on incidents, uses of force and grievances. It is recommended that she work with IT to determine whether the JMS system can add the information required by paragraphs 107 and 108 or whether the additional information can be added manually to the current spreadsheets.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securus does not include some critical fields that are in the system but can't be pulled into the spreadsheet. The Grievance Officer manually creates a separate spreadsheet and enters for each grievance the information in the Securus spreadsheet and adds the type of grievance, the date of response and the date of the response to an appeal. There is also a limitation in that some staff do not respond to grievances assigned to them in the system. The Grievance Officer clears these out of the system when the

inmate is released, but it is not possible to determine whether the grievance was responded to and what the response was. The new policy to reject grievances that are actually inmate requests and direct inmates to use the inmate request category appears to be effective. This policy allows a more accurate depiction of grievances although, as mentioned above, some of the grievances rejected for this reason should have been considered grievances. With the new policy, it should be possible to have a useful data base on grievance data. These reports are not yet being used to inform improvement or quality assurance efforts.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

      a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;

      b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

      c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

      d.  List and total number of incident reports received during the reporting period;

      e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

There are two spreadsheets being generated. One has the text of the narrative of the initial incident report and some information and starting in August, the text of the supplemental reports. The other spreadsheet does not have the narrative but has some additional information. Starting in July, the second spreadsheet added the facility and a column for supervisor's notes. The spreadsheets now being created are a first step towards being able to generate the reports required by this paragraph. The monitors receive the spreadsheet as a pdf document but it appears to be an excel spreadsheet. As such, it could be used to aggregate types of incidents or location and generate charts or graphs to identify trends or problem areas. At this time, it does not include all of the information required by this paragraph (e.g. use of restraints, segregation, referral to IAD) including information that would be necessary to be fully informed regarding the nature of the incident. (The segregation log could provide the needed information for segregation). Most importantly, neither spreadsheet has an actual summary of the incident. The spreadsheet now pulls in the first incident report and all supplements. This provides additional information than was previously available. A brief summary of the incident that incorporates information from the various narratives and includes information from medical which is often not included in the narratives would be useful. The column for supervisor's notes would be a

good location to include a brief summary of the incident as required by this paragraph (and findings or recommendations as required by paragraph 64). Currently, the supervisor's notes appear to be a narrative of their actions as opposed to a summary. Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate on inmate assault or an inmate on officer assault. Only by reading the narrative, can that be discerned. There appears to be a growing problem of incidents being mischaracterized by type with UOF incidents listing the type as notification and fires being listed as destruction of county property. It is essential that the type entered be accurate. Having a summary would also allow the reviewer to determine if the incident type is identified accurately. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation. RDC and the WC are now using the same form for segregation although they are filling it out differently. This should be standardized. This is not in Excel but could be drawn from manually to create the same type of trend analysis envisioned by this paragraph. At this time, there is no report tracking the use of restraints.

108.     Compile a Use of Force Summary Report on at least a monthly basis. The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members. The Use of Force Summary reports must, at minimum, include the following information:

      a.      Summary of all uses of force, by type, shift, housing unit, and date;

      b.      List and total number of use of force reports received during the reporting period;

      c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The monthly Incident Summary report has a column for whether or not force was used. The monthly spreadsheet with the narratives can be cross referenced to view the narrative reports. Although this provides some of the information required by this paragraph, it is not the type of useful report envisioned by this paragraph. As noted in paragraph 107, there should be one report that provides the information and analyzes the information to identify problem areas and trends.

109.     Compile a Grievance Summary Report on at least a monthly basis. The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct. To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period. These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**

As mentioned above, the limitations of the reporting from the Securus system has led the Grievance Officer to manually create a spreadsheet. Neither system can generate a report by location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. Also, as mentioned above, some of the staff are not entering responses in the system. As mentioned above, the Grievance Officer is now keeping an Excel spreadsheet and manually entering information related to grievances. One option would be to expand the manual spreadsheet to include the information required by this paragraph, this should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced maintaining an expanded manual spreadsheet would be a very time intensive process. At the present time, there is no management review process in the grievance system. The Quality Assurance Officer is reviewing the Grievance Officer's spreadsheet but is not yet reviewing and reporting on a review of a random sampling of grievances.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

   a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;

   b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;

   c.    A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

   d.    A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

As has been previously reported, both CID and IAD investigators compile a spreadsheet that tracks their investigations and provides most of the information required by this paragraph. From June through September the IAD investigator handled 26 cases.  Of those, 21 involved UOF, one was an assault, one case was insubordination and three were labeled fact finding.  IAD initiated 24 of the 26 cases, while two were referred for investigation.  None of the investigations were referred to an outside agency.

Once again, the vast majority of the cases originated at the RDC (22), while only four were associated with the WC.  The JDC was closed for maintenance during the four month reporting period.  While the facility was always identified, the specific housing unit was frequently omitted.  The disparity between the RDC and WC is primarily attributable to the fact that the

WC operates as a direct supervision facility, with an officer working inside each housing unit at all times.  Although the RDC does hold higher security inmates than the WC, the RDC operates as a remote surveillance facility where the inmates are left unattended except for periodic well-being checks.  Now that C-Pod at the RDC has been re-opened with direct supervision staffing levels, it is anticipated that UOF cases will drop in that pod relative to A-Pod.

During the June-September time period, IAD investigations resulted in the termination of one Detention Officer, while another resigned and a third was suspended for one day.  The reason for disciplinary action was identified. As with the other paragraphs requiring summary reports, the spreadsheet being provided provides much of the needed information but not the aggregation and analysis envisioned by these paragraphs.

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**
There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**      The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.      The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.      The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.      The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Partial Compliance**

The Quality Assurance Spreadsheet indicates that there has been implementation of an Early Intervention program. It will be necessary to review the underlying documentation to determine compliance with this paragraph.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

    a.      Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.    Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**

Medical staff are not included in the review of serious incidents. This was discussed in a joint meeting between QCHC staff and command staff during the September 2019 site visit. It was decided that the Interdisciplinary Team meetings would be reinstituted and one task of the Team would be to review serious incidents. There is no indication that this has occurred. Medical staff do have independent authority to refer cases of assault or abuse.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had previously contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. Hinds County is to be commended for getting the CJCC implemented. However, the CJCC has not met since February. No doubt, COVID makes an in person meeting ill advised. The County should consider setting up a remote meeting or otherwise continuing the work of the CJCC during this time. This paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI and the monitoring team have recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Among

other duties, staff duties will include collection and analysis of data, facilitation, research and analysis, presentation, project management, consultation, and distribution of information to the policy makers on the committee so that they have the information they need to make policy decisions. The County had stated that it was going to hire a CJCC Coordinator. However, during June site visit, the Monitoring Team was informed that the Criminal Justice and Quality Control staff person (sometimes called the Court Liaison) was assigned to be the CJCC Coordinator and the Pre-Trial Services Director required by the Stipulated Order. This will not meet the requirements of this paragraph or the Stipulated Order as having both of these roles as well as the duties of her other full-time position does not allow her to devote sufficient time to any of these roles to be effective.  The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish this has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping is now three years old. This would be a useful activity for the CJCC.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC has not met since February. Not all of the identified agencies have been invited or represented at the meeting. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.     The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.     Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the Jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant, JMI, to provide technical assistance in developing the CJCC. However, that contract did not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  That contract ended over a year ago and the County has not renewed the contract with JMI.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

    a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

    b.       Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

Initially, the HCSO printed a booklet-sized version of the Settlement Agreement which was distributed to staff.  Whether or not it is still provided to new employees is undetermined.  It was previously recommended that the Director of Training should include a segment of the annual in-service training program to include the requirements of the Settlement Agreement.  The inability to be on site during the June and October remote site visits made it impractical for members of the Monitoring Team to determine whether or not conditions have regressed, remained the same or improved.

## POLICY AND PROCEDURE REVIEW

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

This provision has been changed back to partial compliance. An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert retained through the Monitoring Team to develop policies and procedures. A number of draft policies have been provided and at this time, twenty-one policies have been approved and signed. It does not appear that there is a system in the policy development to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Twenty-one policies and procedures have now been approved and several others have been drafted and circulated. There are many outstanding policies to be written but progress is being made.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**
Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**
In addition to completing the development of policies, this paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. Not all policies have been developed and training has not been completed on the ones that have been adopted. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**
There have been twenty-one policies approved by DOJ and adopted. It does not appear that the policies have been fully incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report. The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit. Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities. Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph. A self-assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 site visit. This paragraph is now carried as non-compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160. The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement. This person will serve as a primary point of contact for the Monitor. Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

Immediate notifications are being provided. The County is not preparing incident reports or providing immediate notification of over-detention.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.