1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                    NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA                    PLAINTIFF

5    VERSUS                    CAUSE NO. 3:16-cv-00489-CWR-JCG

6    THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                DEFENDANTS
7

8

9               VIDEOCONFERENCE PROCEEDINGS
         BEFORE THE HONORABLE CARLTON W. REEVES,
10           UNITED STATES DISTRICT COURT JUDGE,
                    FEBRUARY 9, 2021,
11                 JACKSON, MISSISSIPPI

12

13               (Appearances noted herein.)

14

15

16

17

18

19

20

21

     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov

 1   **APPEARANCES VIA VIDEOCONFERENCE:**

 2       FOR THE PLAINTIFF:

 3           CHRISTOPHER N. CHENG, ESQ.
             AARON FLEISHER, ESQ.
 4           SARAH STEEGE, ESQ.
             LORA COWALL, ESQ.
 5           HELEN VERA, ESQ.
             MITZI DEASE PAIGE, ESQ.
 6
         FOR THE DEFENDANTS:
 7
             CLAIRE BARKER, ESQ.
 8           TONY GAYLOR, ESQ.
             RAYFORD G. CHAMBERS, ESQ.
 9
         ALSO PRESENT:
10
             ELIZABETH SIMPSON
11           DAVID PARRISH
             JIM MOESER
12           RICHARD DUDLEY
             SHERIFF LEE VANCE
13           UNDERSHERIFF ALAN WHITE
             CHIEF DEPUTY ERIC WALL
14           WARDEN RICK FIELDER
             SYNARUS GREEN
15           LESLIE FAITH JONES
             MIRANDA BOLEF
16           JODY E. OWENS, II
             CREDELL M. CALHOUN
17

18

19

20

21

22

23

24

25

1

## TABLE OF CONTENTS

2   Style and appearances....................................1-2

3     By Ms. Simpson......................................... 10

4     By Mr. Parrish......................................... 11

5     By Mr. Moeser......................................... 35

6     By Dr. Dudley......................................... 54

7     By Ms. Simpson......................................... 57

8     By Mr. Cheng......................................... 67

9     By Mr. Gaylor......................................... 79

10    By Ms. Barker......................................... 84

11    By Mr. Gaylor......................................... 92

12    By Ms. Barker......................................... 96

13    By Mr. Owens......................................... 98

14    By Mr. Cheng......................................... 109

15   Court Reporter's Certificate............................ 118

16

17

18

19

20

21

22

23

24

25

1          **PROCEEDINGS VIA VIDEOCONFERENCE, FEBRUARY 9, 2021**

2

3          THE COURT:  Good morning.  Who's on?  Can you hear me

4     fine?

5          MR. CHENG:  Yes.  Yes, Your Honor.

6          THE COURT:  Okay.  All right.  Who's on for the

7     government?

8          MR. CHENG:  This is Christopher Cheng.

9          I also have my colleagues Aaron Fleisher,

10    F-l-e-i-s-h-e-r --

11         THE COURT:  Okay.  Hold on, please.  Hold on for one

12    second.  Mr. Cheng, you say you're on and Ms. Fleisher?

13         MR. CHENG:  Mr. Aaron Fleisher.

14         THE COURT:  Mr. Aaron Fleisher.  I'm sorry.

15         MR. FLEISHER:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. CHENG:  Sarah Steege.  That's S-a-r-a-h, last name

18    is S-t-e-e-g-e.

19         Helen Vera, her last name is V-e-r-a.

20         Lora Cowall, C-o-w-a-l-l.

21         And from the U.S. Attorney's Office, Mitzi Dease Paige,

22    P-a-i-g-e.

23         THE COURT:  Okay.  All right.  Who's on for the County?

24         MS. SUMMERS:  I think they went away.

25         THE COURT:  No one's on for the County?

 1              Who's on for the sheriff?

 2         MR. CHAMBERS:  Your Honor, Ray Chambers and Tony Gaylor

 3    is on the line, too, for the County.  I'm sorry.

 4         THE COURT:  Mr. Chambers and Mr. Gaylor.

 5         Who is on for the sheriff?

 6         MS. BARKER:  Claire Barker for the sheriff's office.

 7         THE COURT:  And are there -- are there any parties --

 8    are there any parties here as well?

 9         MS. BARKER:  Yes, Your Honor.  For the sheriff's

10    office, we have Sheriff Vance in the room, Undersheriff White,

11    Chief Deputy Wall, and Warden Fielder.

12         THE COURT:  Warden -- if you could you spell the last

13    name?

14         MS. BARKER:  Fielder, F-i-e-l-d-e-r.

15         THE COURT:  And what is the undersheriff's first name?

16    I see you said the last name is White.

17         MS. BARKER:  Alan White and Chief Deputy Eric Wall.

18         THE COURT:  Any county officials available or on the

19    line or present?  Are there any county officials -- in

20    addition to the sheriff's department, are there any county

21    officials on the line?

22         MR. CHAMBERS:  No, Your Honor.  Your Honor, Mr. Gaylor

23    is having a little trouble with his connection.  He's trying

24    to get back in right now, I think.

25         THE COURT:  Okay.  And I -- I'm sorry.  Mr. Gaylor, you

1    made it back on?

2         Who are my monitors on the line?  I know I see a

3    couple.  I see three of you, at least.

4         MS. SIMPSON:  Yes, Your Honor.  This is Lisa Simpson,

5    the monitor, and my team is present:  Dave Parrish, Jim

6    Moeser, and Dr. Richard Dudley.

7         THE COURT:  Okay.  All right.  We're here for the

8    status conference.  Now, I can't see everyone because I assume

9    some people are calling in and not utilizing Zoom or whatever

10   we made available to you.  I think we made Zoom or either the

11   other thing that we use here at the court, so...

12        MS. PAIGE:  It was Zoom, Your Honor.  It was Zoom.

13        THE COURT:  It was Zoom, okay.  Thank you.

14        So, Mr. Gaylor, are you connected?

15        MR. GAYLOR:  Yes, Your Honor.  Can you hear me?

16        THE COURT:  Okay.  Yes.  All right.

17        MR. GAYLOR:  Yes.  I apologize for our technical

18   difficulties at the County.  We are still experiencing them.

19   That's why my video is not working.

20        THE COURT:  Okay.  Are there any county -- I think I

21   asked this question, but I just want -- well, Mr. Chambers

22   answered it.  No county officials are -- no county officials

23   are present?

24        MR. GAYLOR:  No county officials.

25        THE COURT:  Okay.  The county administrator is not

1    present?

2         MR. GAYLOR:  No, Your Honor, she's not on the call.

3         THE COURT:  Who is the county administrator?  I know it

4    has changed since we last spoke.

5         MR. GAYLOR:  It's Ms. Scherrie Prince.  She's the

6    acting county attorney until another one is appointed.

7         THE COURT:  She's the acting county administrator?

8         MR. GAYLOR:  Administrator, I apologize.  Yes.

9         THE COURT:  Is there any particular reason why the

10   county officials are not present?  I mean, they've been

11   present before, I think.

12        MR. GAYLOR:  There -- I don't believe there is a

13   particular reason.  In fact, I can still try and reach the

14   board president, which (AUDIO GAP) last month, so, you know,

15   people are still getting a little adjusted to their new roles.

16        THE COURT:  Okay.  The new -- the board presidency has

17   changed.

18        MR. GAYLOR:  Yes.

19        THE COURT:  The current president is now Supervisor

20   Calhoun?

21        MR. GAYLOR:  Supervisor Calhoun.  Yes, Your Honor.

22        THE COURT:  Okay.

23        MR. GAYLOR:  And so I'll make sure I get him located.

24        THE COURT:  Okay.  It's been several months, and if at

25   any time anyone does not hear me or understand what I am

1    saying, please ask me to repeat it or whatever.

2         If you are not speaking, I ask that you place your

3    microphones on mute so that you won't hear any feedback of any

4    kind or no disturbances from where you are sitting.

5         It's been many months since we last got together.  I

6    think it was back in June.  So we -- so our last status

7    conference I believe was in June, and I know we've had at

8    least two reports to have been submitted since that last one.

9    The most recent report is of December 4th, 2020.  There was

10   one that was submitted I think prior to that, and we did not

11   hold a status conference after having received it.

12        The status report was submitted on August 4th, 2020,

13   and now we have received this one on December the 4th, 2020,

14   and the purpose of this is to find out where we are, where the

15   County is with respect to the issues that are germane to the

16   oversight of the Hinds County detention centers or facilities

17   which are the subject of the lawsuit that was filed.

18        So it may take just a little bit longer to get through

19   today's proceedings than usual because we did not have the

20   other hearing, but I do believe what is covered in the report

21   of December, to the extent -- I think it might just be

22   appropriate to talk about what's in the December report

23   because it follows up on what was submitted back in August.

24        Unless the monitors or the parties suggest otherwise,

25   that's how -- we will do as we've done in the past.  I will

1    ask Ms. Simpson to give me her report findings.

2          When you're speaking, I will ask that you state your

3    name for the record.  I can see you.  I can hear you.  This is

4    a public hearing.  Persons may be participating on the call --

5    I say "participating."  They may be listening.  And so there

6    won't be any confusion as to who is speaking at any given

7    time, I'll ask you to, you know, state your name for the

8    purposes of making sure that those who might be on the line

9    will know who's speaking.

10         So, Ms. Simpson, thank you-all for the work that you

11   have done.  I do realize since June, I guess -- I guess -- no,

12   no, since even before June, you've not had the ability to come

13   onto the premises to do what might be necessary to do, and I

14   will get you to explain, if you will, any shortcomings because

15   of your lack of ability to actually come to the facility.

16         And I want to stress and make sure that the people --

17   or that the record reflects that has nothing to do with you

18   and your team.  It has everything to do with COVID why you

19   cannot have any personal presence here.  No need to jeopardize

20   you and your team, and no need to jeopardize any of the

21   attorneys or anyone else.

22         So I'll start with you, Ms. Simpson, and let you go

23   forward as you deem necessary.  I might have some questions

24   about certain things and might interject, but at the end of

25   your presentation, I definitely will give the attorneys the

1    opportunity to ask any questions or to do -- make any

2    presentation that they wish to make.

3        MS. SIMPSON:  This is Lisa Simpson.  Thank you, Your

4    Honor.

5        I'm actually going to turn it over to Mr. Parrish

6    fairly quickly because I think the most important issues

7    facing the County and the sheriff have to do with staffing and

8    supervision and the condition of the facility.

9        But to respond to your question about any limitations

10   by doing these site visits remotely, I'll say a few words.

11   The compliance monitor -- or compliance coordinator and the

12   county staff and the sheriff's staff have been very helpful in

13   getting the documents that we request to us.  This site visit

14   was a little more rocky in part because we wanted a lot of the

15   January documents, and January had only just ended by the time

16   we needed the documents, so it was a little trickier, but they

17   have been very helpful in getting documents uploaded that we

18   need to review.

19       There are limitations, of course.  Among others, we

20   can't physically walk around the facility, so we're fairly

21   reliant on people telling us what the condition of the

22   facility is.  The same with staffing; we can't see what posts

23   are staffed and what aren't.  And some of the files, like the

24   inmate record files, are -- some of them are very voluminous

25   and can't necessarily be fully uploaded.  So there's some

 1    limitation in reviewing the inmate records.  And as each of my

 2    team members speak, they may alert you to other limitations.

 3    And we tried to make a note of it in the report where there

 4    was a limitation in our ability to monitor.

 5           But we -- and we're just now starting the February site

 6    visit.  We had a full day of interviews yesterday, and then

 7    we'll continue on this afternoon.  So we may have some updates

 8    from the December report based on the documents that we've

 9    reviewed and the few interviews that we've completed, but

10    mostly the December report reflects our most recent findings.

11           So with that, I think I'll turn it over to Mr. Parrish

12    so he can talk about the areas within corrections operations.

13           THE COURT:  Thank you, Ms. Simpson.

14           Mr. Parrish?

15           MR. PARRISH:  Good morning, Your Honor.

16           THE COURT:  Good morning.

17           MR. PARRISH:  I hope I got it right and unmuted.  Okay.

18           I'm going to cover three interrelated areas:  status of

19    the facilities, staffing, and supervision.  And each one is

20    affected by the other.

21           And, you know, with regard to facilities, the Jackson

22    Detention Center has been closed for over six months due to

23    plumbing and HVAC issues.  The inmates and staff were moved

24    from there to the work center and to the Raymond Detention

25    Center.  And fortunately, with the count being down, they've

 1  been able to accommodate that.

 2      THE COURT:  Let me ask a question about that,

 3  Mr. Parrish.  And I apologize for cutting across you.

 4      When we -- I guess it was in August of 2019 that I

 5  walked around with the monitors team at the facilities.  The

 6  Jackson Detention Center, that's where a lot of -- that's

 7  where the majority of the women were being held; is that

 8  correct?

 9      MR. PARRISH:  That's correct.  And they are now housed

10  at the work center.

11      THE COURT:  They're now housed at the work center?  Are

12  there males housed at the work center too?

13      MR. PARRISH:  Yes, there are.  There are three housing

14  units that house males and one housing unit that handles

15  females.

16      THE COURT:  Okay.

17      MR. PARRISH:  All right?

18      THE COURT:  Okay.  Thank you.

19      MR. PARRISH:  All right.  There's no estimated date for

20  reopening of the Jackson Detention Center, but from my

21  perspective that's really a moot point because they don't have

22  the staff to reopen and run three facilities again.  That's

23  how these things are interrelated.

24      THE COURT:  But let me ask you this, though.  I guess

25  going back to the time that we were there in August, I think I

1  walked away that day with the understanding and the impression

2  that the JDC was the one that was the most efficient, was the

3  one that was, I guess, most efficient.  It ran the best.  I

4  mean, it seems like they had the most capable people there

5  doing everything that needed to be done.

6         The only thing -- as I recall, the only hiccup with the

7  Jackson Detention Center was that there was no real area for

8  people to engage in any type of exercise or to go out or to be

9  out.  I think that was the only sort of -- to the extent

10 there's something negative about the JDC, that was the only

11 thing.  It was run by a young woman I think who was doing an

12 excellent job.

13        At least I left with that impression on that day that

14 the Jackson Detention Center was the one that was in the best

15 shape and it was the best of the three operations or four

16 operations among the facilities.

17        MR. PARRISH:  Partially correct, Your Honor.

18        THE COURT:  Okay.

19        MR. PARRISH:  The oldest jail was built in the 1970s.

20 It's a linear/intermittent surveillance facility that can't be

21 modified to direct supervision, which is required by the

22 settlement agreement.  It's not an efficient facility, but it

23 was a very well-run facility.  When I first went through that

24 jail before the settlement agreement, it was a disaster, but

25 they brought in new staff, they turned it around, and it did

1  run well.  The captain that was in charge has since retired.

2      But there are mechanical and maintenance problems with

3  that facility that are tied to age and design that have caused

4  us to look at recommending that facility be closed from the

5  very beginning.  Some of that's going to be covered in master

6  planning when that work is done.

7      THE COURT:  Okay.

8      MR. PARRISH:  But at any rate, that facility is now

9  closed.  There is no estimated date for reopening, and so

10  they're making do with work center, which is now operating at

11  a greater capacity than it did before.  It's within capacity,

12  but they're making better utilization of the facility than

13  they did in the past.

14      And two of the three pods at the Raymond Detention

15  Center are currently open.  Now, at Raymond, Charlie Pod was

16  under renovation for the second time now for the best part of

17  a year or more, and it reopened on October the 22nd,

18  supposedly now under the direct supervision housing mode.  But

19  unfortunately, that's just not the way it's worked out.  They

20  are trying to staff them with an officer inside each housing

21  unit, but adopting the principles and dynamics of direct

22  supervision has been a real problem there.  That's something

23  I'll address later on.

24      Then work on the Bravo Pod, B-Pod, has begun, and the

25  idea was to renovate that and bring it up to the standard of

1    Charlie Pod.  CML was the firm from Texas that was brought in

2    to work on the doors and the control panel, and the estimate

3    is that they're going to be completed with their work by

4    mid-March.  But there are so many other problems to be fixed

5    for which the County has no plan that there's no estimated

6    date for when it will be reopened.

7            Maintenance is a major problem between the County

8    supposedly providing the service and -- the whole maintenance

9    work order system that was put in place under the previous

10   county administrator has kind of collapsed, and it's become

11   dysfunctional, and that's partially because we've had so many

12   personnel changes at the County from the top to the bottom,

13   and the maintenance director retired, was replaced by another

14   one, who is now gone, and I have hopes that as of yesterday

15   they selected somebody else.  But getting things repaired has

16   become worse than problematic.

17           Alpha Pod is still open, but it is totally unsecure due

18   to locks on doors that do not work, and there is no plan to

19   repair this pod.  Rather, it's supposed to be closed when

20   Bravo (AUDIO GAP).

21           THE COURT:  Okay.  Hold on for one second, Mr. Parrish.

22   You sort of broke off there.  You said that there is no plan

23   to repair Pod A?

24           MR. PARRISH:  That's correct.

25           THE COURT:  But it's currently being used?

1      MR. PARRISH:  It is being used until such time as Bravo

2  Pod can come back online after CML and the County have

3  repaired it and brought it up to the level of Charlie Pod,

4  which was repaired.

5      THE COURT:  Okay.  The -- what -- the state of

6  disrepair includes the doors not being able to be locked on

7  Pod A?

8      MR. PARRISH:  In Alpha Pod, that's correct.  That's the

9  worst of the facility there.

10      THE COURT:  How many inmates are in the Alpha Pod?  Do

11  we know?

12      MR. PARRISH:  Generally, they've got well over 200

13  people at the Raymond Detention Center, and they're split

14  between Charlie and Alpha, so it's in excess of 100.  I can't

15  tell you what it is today.

16      THE COURT:  I have not compared my notes from the past

17  reports quite yet, but with respect to the locks -- well, is

18  there a plan to -- is there a plan to continue to use the

19  Alpha Pod?

20      MR. PARRISH:  No, sir.  This was done when the

21  stipulated order was put together, and the plan was to repair

22  Charlie first and then to repair Bravo next and then

23  ultimately to repair Alpha only if it's ever put back online.

24  But right now there is no plan to operate that pod once Bravo

25  comes back online.

1          THE COURT:  There's no timeframe on when Bravo will be

2     finished, though; right?

3          MR. PARRISH:  No, sir.

4          THE COURT:  Okay.  So we're -- so in effect we are

5     using -- and when I say "we," the County is using the Alpha

6     Pod?

7          MR. PARRISH:  Oh, it is using it, has always used it,

8     but once Bravo comes back online, the plan is to shut it down.

9          THE COURT:  Right.  But there is no target date for

10    Bravo to come back online.  There's no end date.

11         MR. PARRISH:  Not yet, sir, no.

12         THE COURT:  And so while we await the repair of the

13    Bravo Pod, the Alpha Pod is being used by over 100 inmates,

14    and there are no locks -- are there locks on any of the doors?

15         MR. PARRISH:  Oh, yes, sir.  There are locks in there,

16    but the inmates are able to jimmy them and pop out almost at

17    will, even to doors that come out from the housing units, but

18    certainly from the cell doors.

19         THE COURT:  Right.  The problem that we've been talking

20    about ever since I assumed this case.

21         MR. PARRISH:  Yes, sir.

22         THE COURT:  And I guess I assumed this case about two

23    years ago, I think.

24         MR. PARRISH:  Yes, sir.

25         THE COURT:  You may proceed, Mr. Parrish.

1          MR. PARRISH:  Thank you, Your Honor.  The next topic is

2     staffing, which has always been a significant problem.  The

3     numbers that I got yesterday indicate that staffing is up to

4     about 231 of the about now 281 funded positions.  Nine of

5     those 231 are new -- they're not new positions.  They used to

6     be contract food service employees, who are now county

7     employees, so that's bumped the number up just a little bit.

8          Over the past two and a half years, staffing has never

9     exceeded 256.  The last report, we were down in the

10    neighborhood of 204 less some people in the academy.  So the

11    numbers are up marginally, but when you have the impact of

12    COVID and excessive turnover, it just makes usable people --

13    getting enough usable people a problem.

14         There are now 284 authorized positions, of which 281

15    are funded.  If yesterday's figure's correct, we've got 231

16    that are actually on board.  The revised staffing plan calls

17    for 407 people.  That was the staffing plan revision that was

18    issued last April.

19         But Jackson Detention Center is closed; that's about 64

20    or 65 positions.  And the Raymond Detention Center Bravo Pod

21    is closed; that's 45.  So you put those together, that's about

22    110.  That means that they really need about 297 positions to

23    operate the portions of the jail system that are open today,

24    and they're in the neighborhood of 230, 231.

25         The next area deals with supervision, and part of the

1    problem is tied back to staffing.  Unfortunately, supervisors

2    are called upon to do an awful lot of detention officer work

3    rather than supervisory work because of the vacancies.  So, to

4    their credit, they go around and they stand posts and they do

5    work the detention officers should be doing, but it certainly

6    takes away from their ability to actually supervise and make

7    sure that things are done according to the policies and

8    procedures that have been approved.

9         We're in the neighborhood of 25 to 27 now approved and

10   adopted policies, but getting that out to the officers and

11   having supervisors make sure that they're following it is what

12   has -- it's like the next problem.

13        I'm going to start off with the direct supervision at

14   the Raymond Detention Center in Charlie Pod.  We brought in

15   the National Institute of Corrections to provide training on

16   direct supervision.  They did that to orient people.  Then

17   Hinds County was to take it upon themselves to train the rest

18   of their staff and be able to open up each pod as it's

19   renovated under direct supervision.

20        Well, to do that in Charlie Pod means you have to have

21   an officer inside each of the direct supervision housing

22   units.  That pulls officers from other places and creates a

23   staffing issue.  But unfortunately, the officers working in

24   Charlie Pod at the Raymond Detention Center are used to

25   operating under the old method where they locked inmates down

1    and were able to walk away from it, or left the door closed so

2    they couldn't come out of the housing unit.  And they've been

3    doing the same thing in Charlie Pod, which is not direct

4    supervision.  That's not taking control of the place.  And

5    it's actually counterproductive.

6        So I've been working closely with Jail Administrator

7    Fielder to try and develop some interim guidelines for them

8    until a proper policy can be developed.  And hopefully we'll

9    be able to get that out to them so they have some direction on

10   when can I lock an inmate down in his cell?  Where are inmates

11   fed?  It's supposed to be in the day room, not in their cells

12   like they often did before.

13       It's just a whole cultural change for them, and it's

14   been very difficult.  It's been easier to adopt at the work

15   center, which has a dormitory-style operation and was set up

16   that way from the time the building opened up back in early

17   2000s.  And we see that officers are not able to be where they

18   need to be and supervisors, therefore, are filling in for them

19   by -- for instance, in Charlie 4, which is a lock-down area, a

20   significant number of fires set by inmates.  That's not what

21   you expect when you have a properly controlled lock-down area.

22       And all these things are linked to supervision, to lack

23   of staff, and to issues with the facility.  Hopefully we were

24   looking at, when Charlie opened up, that the issues with the

25   facility would help alleviate some of these other problems.

1    They have to a certain degree, but the level of supervision is

2    still inadequate, inconsistent, and the staffing issues make

3    everything worse.  So they're -- the three issues are

4    interrelated.

5        The encouraging thing is that we finally got Charlie

6    online.  I have hopes yet that four months later we'll finally

7    be able to start implementing direct supervision.  It should

8    have started in October when it opened up.  Unfortunately,

9    that just was not the case.

10        And that's basically where we stand right now, sir.

11    THE COURT:  With respect to -- with respect to

12    supervision, I'm looking at the executive summary that has

13    been prepared by you-all.  Got a couple of questions about

14    supervision.

15        The executive summary indicates that all the

16    supervisors have been trained on the use-of-force policy.

17    Now, are those supervisors then in turn responsible for making

18    sure that every other employee is trained in the use-of-force

19    policy?  Because I see the executive summary sort of hones in

20    on the fact that the supervisors themselves have been trained

21    on the use-of-force policy, but I'm not sure if it indicates,

22    well, what about the regular COs there and others there at the

23    facility?

24    MR. PARRISH:  The training bureau is providing that

25    training as people come in through the academy.  I can't say

1    that every officer has received this training yet, but they

2    gave priority to that.  I'll be having a meeting later this

3    week with the commanders in training to review the specifics

4    of that.  They gave me a preliminary report, but I can't say

5    that everybody has had that yet.

6        But getting the training and then implementing it,

7    overcoming years of history of doing things differently, is

8    the problem to be overcome in all of this.  So at least we

9    have it documented now as to what's required, and hopefully

10   through review of specific incidents through having review by

11   CID and IAD, we can make sure that they develop some

12   consistency in applying use-of-force standards.

13       THE COURT:  Okay.  The jail administrator, I guess

14   since I've been involved, that position I guess has been

15   filled by -- it was -- I think when I got first involved, Mary

16   Rushing was jail administrator at RDC, and I think the report

17   now reflects that there is a different jail administrator and

18   that that person I believe, according to you, Mr. Parrish,

19   meets all of the qualifications necessary to be the jail

20   administrator?

21       MR. PARRISH:  Yes, sir.  He has the education and

22   experience and supervisory experience.  That's something we

23   didn't have before.  We had a lot of experience but didn't

24   have the requisite education level.

25       THE COURT:  Okay.  And under the jail administrator,

1  there is an assistant jail administrator.  The report reflects

2  that that person does not meet the education qualifications

3  that you would expect; is that correct?

4      MR. PARRISH:  Yes, sir.  Just going by what the

5  requirements call for for the position, he didn't meet it.

6      THE COURT:  Okay.  Did the County give you any

7  particular reason why or what steps that might be taken to

8  make sure that that person or that someone else might be

9  necessary to -- well, what kind of inquiry was -- did you make

10  with respect to that, I guess?

11      MR. PARRISH:  Well, all we can do is really point it

12  out.  They've got to look at what experience qualifications

13  you have and compare them against what else is available out

14  there, and they opted for experience as opposed to trying to

15  zero in just on education.  You know, sometimes you find the

16  education but you don't have the experience to go with it.  So

17  they didn't have, apparently, both requisites fulfilled in a

18  candidate and opted for experience.

19      THE COURT:  Okay.  And I think the report shows that

20  the third person necessarily in hierarchy, I guess, at the

21  facility would be -- is a captain, and I think there you

22  indicated that the captain did not meet the requisite

23  supervisory experience.  I think -- I think that's in the

24  report.

25      MR. PARRISH:  Yes, sir, he had a great deal of

1  experience, but it just wasn't necessarily in a supervisory
2  position for the requisite amount of time.  It was close but
3  didn't quite make it, but had a great deal of experience.
4      THE COURT:  Now, and then also with respect to staffing
5  supervision, whatnot, it also -- you know, as the parties
6  know, we've had rounds of trying to meet whether the County
7  might be in full compliance, substantial compliance with
8  respect to any of these things, and I do have some questions
9  about, again, staffing and supervision, the policies and
10  procedures, because I think -- I think the executive summary
11  in the report indicates that substantial -- obviously we want
12  full compliance.  That's our goal, I think.  Full compliance.
13  And if we can't get full compliance, we want substantial
14  compliance.
15      And I think I read where there's not even substantial
16  compliance on some of the areas in particular.  And part of
17  that -- the substantial compliance cannot be reached, I think,
18  if I recall reading the summary correctly, because you don't
19  have the policies and procedures in place in all of the
20  necessary areas, and this is something that we've been talking
21  about since day one that I've been involved in it.
22      I think the monitors went out -- well, I think either
23  the monitors went out and got somebody to assist in that
24  regard.  I know DOJ was looking at it.  The policies and
25  procedures' shortcomings, the sputtering that's going on with

1    trying to get them all done, in my mind -- and, please, I'm

2    going to give the parties an opportunity to tell me, Judge,

3    no, no, you're wrong, but in my mind is just taking way too

4    long to get some written words on policies and procedures.

5    It's just way too long.  It should not take two full years to

6    have the policies and procedures in place.  And, again, I'm

7    going to hear from the parties in that regard, but -- and find

8    out what the holdup is and why that just cannot be done.

9         MS. SIMPSON:  Your Honor?

10         THE COURT:  Yes.

11         MS. SIMPSON:  This is Lisa Simpson.  May I speak to

12    that for a minute?  I wanted to give you more precise

13    information as to where we're at on the policies and

14    procedures, and I say "we" because I've been working on them

15    as well.

16         There's a list of needed policies that is 93 needed

17    policies.  Forty-eight of those are identified as priority

18    policies.  Of those 48 priority policies, 23 have been

19    approved and adopted as well as four nonpriority policies.  So

20    that's 27 policies that have been approved and adopted.  Two

21    additional policies are currently under review by the

22    Department of Justice.  So you're right, it's been a slow

23    process, and I can speak to that to some extent.

24         It was slow to get started.  I think the sheriff's

25    office and the County looked at different approaches for

 1   getting the policies and procedures completed, and I don't

 2   recall how long a period of time that was where it really just

 3   didn't get much traction at all.

 4        My team -- actually, Mr. Parrish -- contacted the

 5   National Institute of Corrections to see -- initially to see

 6   if they had an expert in the area of records that could assist

 7   Hinds County in working on their inmate records and the record

 8   system.  She turned out to be a very knowledgeable, very

 9   helpful person.  NIC could not provide her.  I think that had

10   something to do with the change of administration at that time

11   and the loss of funding by the NIC.  So we recommended that

12   the County contact with her directly.  That apparently was

13   cumbersome, and so we brought her on to our team.

14        And I have to apologize.  We're having some work done

15   on the house, so if you hear -- (AUDIO GAP) appear to be on

16   the roof right now.

17        THE COURT:  All right.

18        MS. SIMPSON:  The -- the -- sorry.  They're drilling or

19   something.

20        The -- so she came on to our team, but the approach

21   that she has taken, which I think is a good approach, but it

22   is a more time-consuming approach, is to work with a committee

23   within Hinds County and have them develop the policies along

24   with her guidance.  I think that makes them tailored to Hinds

25   County operations and also is sort of a training mechanism in

1    the process.

2        That happened, moved along fairly well.  In the last, I

3    would say, six months, there has not been as much engagement

4    by the Hinds County people.  And speaking with Ms. Albert in

5    the last several weeks, that appears to have been remedied.

6    So there should be more progress now, but we did have a period

7    of time where it was difficult getting the policy group to

8    really engage in that process.  So I agree it's been slower

9    than it should be, but we're hopeful that we'll now get a

10   little more progress speeding up.

11       So that's where the policies are, and I would say,

12   however, that with the policies that have been adopted, we

13   don't always see that they're really being implemented, that,

14   you know, there's certain requirements with respect to, oh,

15   classification committees and things of that sort that really

16   don't seem to be being implemented according to the policies.

17   So I think there's still a bit of a disconnect even with

18   policies that have been adopted.

19       THE COURT:  So you're telling me you-all are working on

20   establishing -- using up all this time drafting policies and

21   procedures that would make things work more efficiently and

22   work things according to the standards, but you're drafting --

23   but they're drafting up the policies and basically relegating

24   them to the dustbin and not implementing them?

25       MS. SIMPSON:  It does appear that they are not fully

1    implemented.  Some are.  Some reflect what they've done in the

2    past.  I think -- as Mr. Parrish mentioned, I think it's been

3    very difficult for -- to make changes in how the operations

4    are run, and so there's a tendency to just do what they've

5    always done even after a new policy has been adopted that

6    directs some other type of action.

7         And just as an example, administrative segregation is

8    used extensively at Hinds County, and people stay in

9    segregation for fairly long periods of time.  There's actually

10   supposed to be a review under the newly adopted policies, a

11   review of people in administrative segregation by the

12   classification committee every seven days to see if they can

13   be returned to general population.  And as near as we can

14   tell, that review doesn't take place and, in fact,

15   classification doesn't always even know why somebody is in

16   administrative segregation.

17        So that's just one example.  There are others.  There's

18   supposed to be an audit of grievances.  I think the new

19   quality assurance officer is looking at getting that going,

20   but that's something that's in the policies but not done.  So

21   there's a number of examples like that.  I think Mr. Parrish

22   has some concerns that use of force is not consistent with the

23   policy.

24        So, yes, even when they're adopted, they're not

25   necessarily fully implemented, and that's an issue that we

1    continue to look at.

2         THE COURT:  Well, Mr. Parrish, what are the

3    shortcomings on the use-of-force type of things that you think

4    are shortcomings?  I mean, in my mind that's something easy

5    for me to see.  So what sort of shortcomings are we having on

6    the use-of-force policy?

7         MR. PARRISH:  Your Honor, I'll give you an example.  On

8    the street certain things are acceptable because if you're not

9    able to pop somebody, they can escape, run down the road, and

10   get away.  Inside a correctional facility, a jail or a prison,

11   the same standards do not apply, and you have time and the

12   ability to call for backup and you've got a secure wall that

13   keeps the inmate there.

14        So with regard to the use of, for instance, OC spray or

15   foam to try and control somebody in a jail setting it's

16   inappropriate to use it to coerce an inmate to do something,

17   to tell them go into that cell and he doesn't go.  Go into

18   that cell or I'm going to spray you.  He doesn't go.  So you

19   spray him with OC.  That's an inappropriate use of force.  OC

20   and other less lethal weapons are designed for protection.

21   It's entirely appropriate to use it to break up a fight

22   between inmates where they're hurting each other and you can't

23   get into the middle of it.  No problem.

24        It's inappropriate to tell somebody to do something and

25   they refuse to cooperate to then coerce them into doing it by

1  spraying them.  Unfortunately, that still happens a lot in the

2  jail system, and that's something that has to be overcome

3  through training.  They're used to being able to do it that

4  way.  You can't do it that way.  The policy says very

5  specifically that it cannot be used to coerce somebody or to

6  force them to do something that you tell them unless it's to

7  protect yourself.

8       If they're coming at you, throwing blows at you, doing

9  something like that, by all means, then it's a defensive tool

10  and it's appropriate to use.  But that educational process is

11  a difficult one because it's ingrained in them that if he

12  doesn't do what I say, I can spray him or I can shoot the

13  less-than-lethal shotgun, and that's inappropriate.  That's

14  one of those training issues that's going to have to be

15  overcome.

16       THE COURT:  Let me ask you this, Mr. Parrish:  How do

17  you know that is an issue?  Is it because maybe they are

18  documenting it and you see it from the file, or through your

19  monitoring you've talked to inmates or others who have -- I'm

20  just trying to find out -- you say that OC is used quite a bit

21  in various capacities there or utilized quite often, I think

22  might have been the word that you used.  But how do we know

23  that?  Is it because it's in some sort of document that the

24  monitors have seen?

25       MR. PARRISH:  Yes, sir.  It's from reviewing the

1    incident reports --

2         THE COURT:  Okay.

3         MR. PARRISH:  -- the use-of-force reports, the criminal

4    investigative reports subsequently, and the internal affairs

5    investigative reports subsequently, and that's where we draw

6    that information from.  It's by their own documentation as to

7    what happened.

8         THE COURT:  Does that documentation show what, if

9    anything -- what discipline, if any, persons who violate the

10   policy, what discipline, if any, they receive?

11        MR. PARRISH:  No, sir.  Because nobody is found guilty

12   of violating the policy, even by CID or IAD, in spite of what

13   the policy says.  They're all exonerated without exception.

14   And that's one of the training things that we're going to go

15   through with CID and IAD to have them walk us through cases

16   during this hearing or during this week to please explain to

17   us, this is what the report says; why do you find it this way

18   or that way?  And maybe that will help resolve the issue.

19        THE COURT:  You indicated with respect to staffing,

20   Mr. Parrish, that you still believe that they're understaffed,

21   and I note that I'm looking again at the report, and I do

22   appreciate the chart, Ms. Simpson, that you developed to help

23   keep track of when things are done, and it's very helpful, but

24   I note that there's a -- at one time the County was trying to

25   get a recruitment and retention plan adopted.

1          The first thing they had to do was get a recruitment

2     officer in place, and I think that was done at or near the

3     time of our -- the last status conference we had.  I believe

4     they got a retention officer in place.  Is that person still

5     in place?

6          MR. PARRISH:  No, sir.  Unfortunately, he was

7     transferred to detention afterwards and then resigned, so

8     they're looking for a replacement at the present time.

9          THE COURT:  And so they never -- so they don't have a

10    retention officer, and the person over recruitment, that

11    person was going to be designated or responsible for, again,

12    trying to hire these additional COs and others that were

13    needed within the facilities; right?

14         MR. PARRISH:  Yes, sir.  The recruiting officer was

15    part of the group that we talked to during our last remote

16    site visit, and we were scheduled to talk to him again along

17    with the background investigator, but unfortunately, yesterday

18    we learned that he has since resigned.

19         THE COURT:  The County will be able to answer this

20    question, but have they discussed with you, Mr. Parrish, what

21    plan they have?  I know when we met in June and even before

22    then, you know, there were talks about trying to hire

23    additional COs and taking every effort necessary, radio

24    advertising, I think, and I even heard some myself.  Haven't

25    heard it in a while, I don't think.  But they are -- but I

1   assume -- have you and the County discussed what are they

2   doing to try to meet the goals that you say that they're

3   needed for these facilities to be sufficiently staffed?

4       MR. PARRISH:  Your Honor, we (AUDIO GAP) directly with

5   the County on that issue.  The sheriff's office has put

6   together a plan for, like, a career development ladder for

7   detention officers to increase their salary from the

8   neighborhood of 27,000 to about 30,000 and to have step

9   increases per year after that.  That went to the County, but

10  our understanding is that nothing has been actually approved

11  and implemented yet.

12      THE COURT:  Okay.  Thank you, Mr. Parrish.

13      MR. PARRISH:  Thank you.

14      THE COURT:  Thank you so much.

15      Ms. Simpson, I'll return it to you to tell -- let you

16  engineer this train.

17      MS. SIMPSON:  Okay.  And I do have some things to add,

18  but I think I'll have Jim Moeser speak next in the hopes that

19  the people on the roof will have moved elsewhere by the time I

20  need to speak.

21      And with respect to the juveniles being charged as an

22  adult, there's been sort of an issue that's become a concern,

23  and that is that the number of JCAs, as they're referred to,

24  has been growing, and the Henley-Young facility has a cap, and

25  so the County has been concerned about what alternatives there

1  are for the JCAs.

2      So in addition to having Mr. Moeser talk about the

3  conditions and compliance with the settlement agreement, I'd

4  like to have him sort of explain what that issue is.  And

5  obviously you'll need to hear more from the County and the

6  sheriff's office with respect to where that stands.

7      So I'll turn it over to Mr. Moeser now.

8      THE COURT:  Thank you.

9      MR. CHENG:  Your Honor, this is Christopher Cheng.

10     THE COURT:  Yes.

11     MR. CHENG:  If I could interrupt just for a moment.  I

12 did want to point out that the counsel for interested parties,

13 the Southern Poverty Law Center, have been present in this

14 hearing from the beginning.  I see Leslie Faith Jones up on my

15 screen, at least.  I did want to mention they are here today.

16     THE COURT:  Thank you, because I don't see that.

17     Anyone else with you, Ms. Jones?  Maybe you can't --

18 maybe she can't --

19     MS. JONES:  Yes, sir.  Good morning.

20     THE COURT:  I'm sorry?

21     MS. JONES:  Good morning, Judge Reeves.  Good morning.

22 Yes, sir.  I am here with Miranda Bolef, also from our office.

23     THE COURT:  Could you spell the last name?

24     MS. JONES:  Yes, sir.  B-o-l-e-f.

25     THE COURT:  Thank you, Ms. Jones.  And the interested

1    parties are particularly interested in the Henley-Young

2    matter; is that right?  For the most part; right?

3              MS. JONES:  Yes, sir.  Thank you, Judge Reeves.

4              THE COURT:  All right.  Mr. Moeser, thank you.

5              MR. MOESER:  Thank you, Your Honor.

6              Good morning to everyone.

7              So my name is Jim Moeser, M-o-e-s-e-r, and I have been

8    focusing, as Lisa said, on the youth charged as adults located

9    at Henley-Young.  Currently there are, I think, 22 youth that

10   fit that category, and I'll cover kind of a range of things

11   from personnel to physical plant, some programming and some

12   population issues that start to hit on the concerns that

13   Ms. Simpson mentioned about location, where they stay.

14             Just -- personnel, just from the prior report, even as

15   that was being written, changes were occurring.  The executive

16   director that had started in May left at the end of November.

17   The mental health treatment coordinator that started in, well,

18   actually, I think also early November left near the end of

19   November as well.  So those are two key vacancies.  So there's

20   again an acting executive director, Mr. Burnside, who has

21   filled that role and close to that role a number of occasions

22   over the past years.  I think since I've been involved in fall

23   of 2016, I think it's about -- I would say most -- probably

24   the majority of time has been a vacant executive director

25   position.

1          THE COURT:  The -- I'm sorry, Mr. Moeser.  At one time,

2     I guess, since I've been involved, they did have an executive

3     director --

4          MR. MOESER:  Correct.

5          THE COURT:  -- or somebody on staff.

6          MR. MOESER:  Yeah.  Mr. McDaniels, when I started, was

7     involved.  He went on leave at the time he ran for a court

8     position, for a judicial position, so he was gone for a period

9     of time on leave, and then he was elected, and then it took

10    another four or five months to hire his replacement.  That

11    person I think began at the start of May and left at the end

12    of November.  So it's been pretty significant.  Just so you're

13    aware that that executive director position has continued to

14    be in flux really the whole time that we've been involved.

15         THE COURT:  Was that -- I'm sorry.  Was that the

16    position -- did Mr. Fernandez Frazier hold that position at

17    one time?

18         MR. MOESER:  Oh, that's correct.

19         THE COURT:  I'm sorry?

20         MR. MOESER:  Mr. Frazier was -- your memory is better

21    than mine.  Yes.  Mr. Frazier was in there for a period of

22    time as well.  So really there have been three people since

23    I've been involved as well as big gaps of time when there's

24    not been someone in that role.  Right.

25         THE COURT:  Okay.  And currently right now that role is

1   being filled by Mr. Burnside on an interim basis?

2        MR. MOESER:  Correct.  Correct.  The mental health

3   treatment coordinator, which is a position that we've been

4   advocating for, as you know, for quite a while was filled

5   originally by a psychologist for a period of time.  She left.

6   Ms. Walker was hired as a -- in that position in early

7   November, I believe, last year and left in about the third

8   week of November.  So, again, that position has been largely

9   vacant for significant periods of time.  And both of those are

10  pretty key positions.  So those are a concern.

11       I would say, again, Mr. Burnside and Mr. Dorsey have

12  been through this a number of times at Henley-Young and

13  continue to try and carry the load, but it is a challenge.

14       They have hired a new training and development

15  coordinator, which is helpful.  There has been always a

16  position for training officer being filled by someone who's on

17  leave, on military duty, for most of the time I've been

18  involved.  They've had other people temporarily filling that

19  role.

20       Mr. Harrington I think created -- I think wisely sort

21  of realigned that position to be sort of a training and

22  development coordinator, and someone has been brought on board

23  who seems to have or at least purported to have really good

24  experience and will be able to develop sort of a training

25  curriculum that goes beyond the basics.  That's been the

1   constant concern, that due to staff turnover and training

2   limitations, staff were getting sort of basic training and not

3   much beyond that.  But hopefully this person can help put

4   together a curriculum and development structure so that as

5   people progress in their experience they will also be able to

6   get more training.

7        There's also brought on board in the fall a program --

8   sort of a program coordinator who was charged with developing

9   additional life skill, social skill, cognitive behavioral

10  interventions to work with kids to fill in some of the time on

11  the units that otherwise was left for playing cards, and

12  things around decision-making and anger management and things

13  like that that she has been working on and developing that

14  as -- I'll talk a little bit more about that when I get to

15  programming in particular.

16       And, you know, in the December report, you'll notice

17  significant concerns about the vacancies in the youth care

18  professional position.  That has been alleviated somewhat but

19  still remains an issue.  I think, according to Mr. Burnside,

20  as of yesterday, there were still eight or nine vacancies,

21  which is not -- which is more than there had been in prior

22  years but less than the 15 vacancies that we found when we

23  were there last time, or talked (AUDIO GAP).

24       But that raises a significant challenge to filling --

25  you know, covering shifts, having the staff in the facility to

1  be able to move youth around the facility appropriately, to

2  get them to visitation -- or to get them for phone calls, for

3  other safety concerns, if they have youth that needs

4  one-on-one supervision, *et cetera*.

5      They still remain pretty short staffed and still

6  significant amounts of turnover, as well as the vast majority

7  of youth care professionals have second jobs because the pay

8  is so poor that it makes it difficult for training.  They

9  can't fill extra shifts.  Apparently the County doesn't allow

10  or provide overtime compensation, A, so I think you'll see in

11  the last report, I alluded to that, you know, Mr. Burnside and

12  those folks were really just struggling just to get people to

13  fill slots that were needed, and I think that's still somewhat

14  of an issue, although they've brought in some new people to

15  begin training.

16      So personnel -- similar to Mr. Parrish, these things

17  are interrelated.  Personnel is a significant issue, and I

18  don't see Henley-Young being able to progress in some of the

19  other areas until that's stabilized either through an increase

20  in pay or other means to recruit and retain line staff to stay

21  there for periods of time where they can become experienced

22  and get more training.

23      They are also facing, both on the adult and youth side,

24  apparently a new recruitment from the state Department of

25  Corrections in which someone with even less experience and

1    less education than Henley-Young requires can make 8 to

2    $10,000 a year more being hired by the State.  They're

3    expecting -- Mr. Burnside's concerned about staff leaving him

4    as that recruitment goes forward.  So that remains a

5    significant issue.

6         Physical plant.  The additional portable classroom

7    space has been added but not yet utilized.  It is furnished.

8    I think the necessary electronics and cameras I think are

9    installed, but they have not been used yet and integrated into

10   the program, partly due to -- largely due to lack of staffing

11   and teaching staff.  The intent would have been to -- and

12   continues to be to be able to use those as classrooms, which

13   would require additional teachers from Jackson public schools

14   and will require staff -- enough staff in the facility to make

15   sure they can cover additional spaces, although some of that

16   can be accommodated by how you move kids around.

17        But at least the physical part is there; however, the

18   security fencing around those units has not been completed.

19   Also can't use them for that reason.  So they're technically,

20   I guess, outside -- in the recreation yard fence, they are

21   outside that space, so they need additional fencing, which I

22   understand has been bid -- I think bids -- and someone from

23   the County may know.  I think bids may have been received, but

24   there's -- I'm not sure of any timetable for actual

25   completion.

1          The door locking/unlocking system has broken down.

2     It's an old system, not modern, and not uncommon that those

3     things eventually wear out.  All the doors -- interior doors

4     have to be opened and locked manually.  That's not ideal.  It

5     slows things down in terms of movement through the facility.

6     It also means staff are carrying keys.  Kids sometimes then

7     know that staff have keys that can open certain doors.  They

8     have not had any incidents where staff have been attacked to

9     get keys, but there are always ongoing concerns.  But it's not

10    the ideal.

11         That's a fairly expensive proposition.  There have been

12    some potential bidders on the site recently, but, again, I

13    don't have a timetable on when something might be done.  The

14    cameras do work so they can do observation from a central

15    area, but they can't control any movement or doors.

16         The population -- well, let me talk about programming

17    first.  Programming continues to be a concern.  Education

18    continues to be split.  There are -- because of -- and this is

19    interrelated to staffing as well as behavioral issues with

20    youth.  Not all the kids are getting school all the time.

21    There are kids, for example, today -- at least or yesterday

22    when we asked, half the youth are -- half of the youth charged

23    as adults are doing work on their unit in packets that the

24    teachers prepare that are given to them, and staff that are on

25    the unit can help them, but having observed that in a prior

1  visit, it's pretty -- it's marginal -- it's marginal, if

2  helpful at all, and I can't -- it's one of the limitations of

3  not being on-site to be able to really see what's actually

4  happening.

5      But I think there are extended periods of time where

6  youth are not really getting educational services.  The

7  teachers are there but are only seeing half the kids at a

8  time, and even what was a marginal school program, in my

9  opinion, is even more so problematic now.  And that has not

10  changed, and, again, not being able to be there on-site, I

11  have a lot of concerns about how that's being done.

12      Some of the other program- -- go ahead.

13      THE COURT:  Let me ask you this, Mr. Moeser:  What's

14  the age of the youngest child there?

15      MR. MOESER:  Let me see if I can get that.  Fourteen,

16  looks like.  Looks like 14.  There are -- of the 22 youth in

17  that category, ten of them are 17, and then, you know, 15 and

18  16.  So 14 is youngest I see right now.

19      THE COURT:  And all of these -- all of these children,

20  like the people at RDC, are awaiting trial; right?

21      MR. MOESER:  Yes.  I'm told that -- although the

22  document they gave me doesn't reflect this, I'm told verbally,

23  and I want to try and confirm that before the week is out,

24  that the vast majority of the 22 youth charged as adults have

25  been indicted.  You know, someone said 21 of the 22.  I'm not

1    sure that's -- I can't confirm that, but there are four youth

2    that have been there over a year, and so length of stay

3    continues to be an issue for the youth and the --

4         THE COURT:  And as a part of what you're doing, that is

5    information that I would like to know:  how long they are

6    there pre-indictment and post-indictment.

7         MR. MOESER:  Okay.

8         THE COURT:  And it's concerning to me that, again,

9    like, a 14-year old obviously has been accused of -- I assume

10   all of them have been accused of, I guess, murder or rape, I

11   guess.  I mean, not just any felony.  I guess it's murder and

12   rape, and I guess the -- they've been certified as adults and

13   the state court judges have found or determined that there are

14   no conditions that they can place on these kids to be released

15   from jail, you know, any kind of bond, any type of anything

16   they -- I guess the judges have determined that the best place

17   for that individual is the Henley-Young facility.

18        MR. MOESER:  I think that's generally right, Your

19   Honor.  The charges often are -- there's -- strong-arm robbery

20   is a common one, armed robbery, some -- I think a couple

21   homicide cases.  These are directly filed as adults.  The

22   majority of youth do not have a bond available.  The other

23   ones obviously are pretty high.  So they are stuck.

24        And I'm -- it's actually a good lead-in to one of the

25   other issues with the population that as the length of stay

1   has increased -- and this -- you will recall that's been an

2   issue all along.  Judge McDaniels had implemented what's

3   called the Minors Diversion Docket, which was trying to,

4   through an arrangement with the chief judge, do what he called

5   Minors Diversion Docket, which was within 90 days bringing the

6   parties together and seeing what direction the case was going.

7        He did get that started, and back in the late spring

8   and early summer, when he was still on that assignment, there

9   were a number of hearings that were being held.  He did

10  release some youth.  He did return, I think, one or more youth

11  back to the youth court.  So there was some fairly quick

12  review.

13       That ceased at the time he was transferred to criminal

14  court.  He sent a memo suggesting that that diversion docket

15  be continued.  It wasn't.  The County now has been exploring

16  with the judges and working with the judges and the district

17  attorney to develop some process to expedite these youthful

18  cases.  That has not been resolved as far as I can tell or

19  kicked in in any significant way, either in terms of

20  indictment or, you know, getting these cases to trial.

21       I think the district attorney -- it sounds like the

22  district attorney is currently on board with moving them

23  sooner, and the judges hopefully are going to be on board and

24  there's going to be some expediting of these cases that will

25  have an effect, but we don't know yet.  And Mr. Gaylor can --

1          THE COURT:  But we have nobody from the District

2     Attorney's Office present today; right?

3          MR. MOESER:  I believe that's correct.

4          THE COURT:  So that's been a shortcoming all along,

5     under the past administration and now it looks like this

6     administration.  I understand this suit is against Hinds

7     County, and it doesn't say the State of Mississippi, which is

8     the office that the district attorney represents.  I know it's

9     a state office, but the district attorney is a necessary cog

10    in this wheel because they're part of the Criminal Justice

11    Coordinating Committee, if nothing else.

12         But I don't have anybody here from that office to help

13    me see why is it that, you know, we have these kids and the

14    people at RDC -- because we've talked about this before, that

15    people over in RDC for 3, 4, 5, 600 days before getting a

16    trial or having a case disposed of in some way.

17         All right.  Let me ask you.  I'm looking at your

18    report.  Again, this is the executive summary.  You say -- and

19    this is a related point, Mr. Moeser -- concerns remain related

20    to the extended length of stay for JCA youth particularly

21    given the absence of a judge overseeing the Minors Diversion

22    Docket initiated by Judge McDaniels.

23         I realize Judge McDaniels now does something else as

24    the youth court judge.  I think he's over the criminal docket,

25    I think.  But there is another youth court judge now.

1          MR. MOESER:  Correct.

2          THE COURT:  Judge Hicks.  Now, has she continued that

3    process?  Is she -- what is it -- to your knowledge, what is

4    it that she's doing as youth court judge now?

5          MR. MOESER:  Right.  So to the best of my knowledge, in

6    that she started her term relatively shortly before, I think,

7    our last calls and visit, has not picked up that docket in any

8    way.  There's been no -- despite, well, Judge McDaniels laying

9    out that process, has not been picked up by her or initiated

10   or authorized by Judge -- I don't know if Judge Green is still

11   the presiding chief judge or not, but -- so no one has picked

12   up that process.

13         So she is doing solely youth court cases, child welfare

14   cases, juvenile court cases, and that's -- she's not involved

15   at all at this point with these youth charged as adults.

16         THE COURT:  Who's -- is it -- does anyone know who's

17   in -- I would have assumed that that was going to fall up

18   under the judge who was assigned to the youth court.  That's

19   how it's been in the past.

20         MR. MOESER:  And Mr. Gaylor may be able to say more.  I

21   mean, I think that was -- that process was a unique creation

22   of Judge McDaniels given his experience at Henley-Young and

23   his interest in that population and moving those cases

24   forward.  He saw the impact of them lingering at Henley-Young,

25   and so he took it upon himself to work with Judge Green and

1    some others to develop that Minors Diversion Docket, but that

2    was the first time it's been implemented in any way.  And I

3    think it was a very creative and potentially productive

4    solution to some of the length-of-stay issues.

5         But it was not technically a youth -- he was doing it

6    as a -- somehow he was given this extra docket assigned by

7    Judge Green, so it was a little bit off-line in the normal

8    process is my understanding.

9         MR. GAYLOR:  Your Honor, if I can --

10        THE COURT:  Hold on, Mr. Gaylor.  And, Mr. Gaylor, you

11   can correct me.  It's my understanding that we have three

12   youth court judges -- three county court judges, excuse me.

13   One judge does primarily criminal work, the criminal docket.

14   That is now Judge McDaniels.  One judge does the civil docket.

15   That's now Judge Stokes.  And then there's a judge to the

16   youth court.  In the past that position -- even before

17   Mr. McDaniels had it as a youth court position, that was --

18   Judge Skinner was housed over there in Henley-Young, and he

19   did it.

20        So it has always -- over the last several years or

21   maybe even decades, the County has divided it up in this

22   particular way with respect to -- going back to Judge -- going

23   back to Judge Henley days, who the detention center is named

24   in part after, Chet Henley.  I mean, you know, so these have

25   been divided -- these responsibilities have been divided

1   between these county court judges.  Again, though, I'll hear

2   from Mr. Gaylor, because -- because if I am incorrect in how I

3   think it is, I certainly need to be corrected.

4           MR. GAYLOR:  Yes, Your Honor.  If I may interject, I

5   can perhaps bring a little clarity to the situation.

6           Again, I also have board president Credell Calhoun, who

7   has been in my office since almost the beginning of the call,

8   since he joined us, so I just wanted to make you aware that

9   the board president is on the call as well.

10          Now, with regard to the administration of the docket,

11  the youth court judge is Judge Hicks.  She was assigned that

12  by the chief county court judge, Judge Stokes.  The chief

13  circuit court judge, Judge Green, had assigned -- or had

14  attempted to assign as a special circuit judge Judge McDaniels

15  for the administration of the JCAs.  It has been brought to my

16  attention by Judge Green that most of those JCAs, perhaps 21

17  of the 23, have been indicted.  So now all of those cases

18  belong to the judges -- the circuit court judges who have

19  those cases, and 15 of those cases actually are with Judge

20  Green.

21          So the Minor Diversion Docket that you're speaking of

22  probably would have been -- and, again, I'm not completely

23  familiar because I'm somewhat newer to it as well, but the

24  Minor Diversion Docket you're speaking of primarily would have

25  been taking place with people pre-indictment.

1      But nevertheless, that being said, Judge Green informed

2   me that most of those cases now reside with -- the vast

3   majority of those cases reside with the circuit judges that

4   have those cases.  And so what has been taking place now is

5   conversations between the circuit court and the District

6   Attorney's Office to figure out a way to process those cases

7   for the JCAs now.

8      Most of those JCAs do have a bond, some of which are as

9   low as $15,000.  But several of those -- a few of those cases

10   do have no bonds because of the heinous nature of the crime

11   and other factors, I imagine.  So that is what's taking place

12   right now, Your Honor.

13      THE COURT:  Okay.  Thank you, Mr. Gaylor.

14      MS. SIMPSON:  Your Honor?

15      THE COURT:  Ms. Simpson?

16      MS. SIMPSON:  Could I mention that the district

17   attorney, Jody Owens, has joined the call?

18      THE COURT:  Okay.  Thank you.  I see Mr. Owens.  Okay.

19      And, Mr. Owens, you might chime in to explain some

20   things at some point in time.

21      But, Mr. Moeser, I'll go back to you.  You can continue

22   where you left off.

23      MR. MOESER:  Sure.  Thank you, Your Honor.  I think

24   that's probably a good way to segue into the concerns that

25   Ms. Simpson alluded to.  If the population of youth charged as

1   adults continues to grow -- and I'll just mention to you that,

2   again, about ten of those kids currently there will turn 18

3   this calendar year, and most of the youth that have left that

4   facility under that youth charged as adult are aging out

5   versus actually getting to court and getting to sentencing or

6   getting to conviction, so I think the effort to the extent --

7   and Mr. Owens could talk more about that.

8        If they are indicting faster, that's good, and Mr. --

9   Judge McDaniels had been correct -- Attorney Gaylor was

10   correct that he was hearing cases that had not been indicted

11   yet, which was very slow to happen and in some cases months

12   and months before even being indicted, so if in fact most of

13   the youth are indicted, that's good news.  It doesn't match

14   the document I have, but I can straighten that out later.

15        THE COURT:  When you say "aging out," is that 18 or 21?

16        MR. MOESER:  They'll turn 18 and be transferred to

17   Raymond.

18        THE COURT:  Okay.  At 18?

19        MR. MOESER:  Correct.  Correct.

20        THE COURT:  Thank you.

21        MR. MOESER:  Yeah.  But anyway, so the concern is

22   from -- the County's concern that's been raised is if that

23   population continues to rise, either because we can't get a

24   handle on moving these -- expediting these cases and getting

25   them to disposition in some way and given potential -- some

1   concerns about potential rise in crime, if that population

2   continues to increase, they will take over a significant --

3   they already have a significant part of Henley-Young, but with

4   a population cap of 32, Mr. Gaylor has explained that Judge

5   Hicks is concerned about not having Henley available for youth

6   court kids.

7         Ironically, as of today, I think there are no youth

8   court kids at Henley-Young.  That number has remained very low

9   over the past year or more, but there are concerns about the

10  growing number of youth charged as adults at Henley-Young.  So

11  I think it's important to everyone's benefit to be able to

12  maintain Henley-Young as a viable facility that cases keep

13  moving forward as best they can.

14        So these things -- so, yes, it's intertwined with how

15  fast they're moving through the system and is raising some

16  concern on the part of the County as to the long-term

17  viability of Henley-Young as the place for youth charged as

18  adults or other youth, for that matter.

19        So let me move on -- so let me get to -- oh, I'll just

20  say there has been and I think you'll see in the report of

21  December reference to that Henley-Young is a safe and stable

22  environment.  I think that's -- I would say I'm less confident

23  of that this time than I was back then.

24        There has been a, I would say, notable increase in the

25  number of incidents that include fights between youth, two

1   suicide attempts, a handful of youth that are really sort of

2   involved in a bunch of stuff that they are struggling to get a

3   handle on.  I think some of it is related to the lack of staff

4   and limited experience of staff.  I continue to suggest that

5   some of it's related to the physical plant, challenges with

6   programming.

7        The youth are on their living units for significant

8   periods of time with limited or marginal programming, and I

9   don't remember if I've said this in your court, Your Honor,

10  but in the youth world we say "if you don't plan activities

11  for them, they will plan activities for you."  So the more we

12  can keep them programmed and better supervised, the less

13  likely those incidents will be occurring.

14       I think there are also some concerns that some of those

15  youth have significant mental health issues that they are

16  continuing to work to address, but I think we really need to

17  see to what extent they're able to manage some of the youth

18  there.  I think they are.  I think they're capable of doing

19  it, but they need a stable staff, they need a better physical

20  plant, and they need to have that support to do that kind of

21  programming that is needed.

22       And I think I'll just mention the -- it's a little

23  difficult -- I think Ms. Simpson alluded to the value of being

24  on-site is being able to look through youth records,

25  cross-reference things, talk face-to-face with both staff and

1  youth.  That's hard to do from a site -- from a virtual visit,

2  so there are limitations on what we can -- you know, how

3  confident I am of some of the things, but I echo Ms. Simpson's

4  notes that they did provide quite a bit of documentation, and

5  that's the bulk of what we've been able to look through and

6  work from.  And I'll leave it there.

7          THE COURT:  Candice, how are you doing?

8          THE REPORTER:  I'm okay, Judge.

9          THE COURT:  Okay.  All right.

10         Okay.  Thank you, Mr. Moeser.  I'll expect the County

11 to tell me -- they can put a pin in, you know, when they

12 anticipate getting a permanent -- again, something other than

13 an interim executive director on board and a treatment

14 coordinator for the kids over there.

15         But, Ms. Simpson, you can call your next person.

16         MS. SIMPSON:  Okay.  I'll have Dr. Dudley speak to the

17 mental health and medical issues, and then I'll wrap up with

18 some of the additional areas that we look at.

19         Dr. Dudley?

20         THE COURT:  Okay.  I note that Mr. Synarus Green is

21 on -- is now on.  Is that correct?

22         MR. GREEN:  Yes, sir, Your Honor.  I just switched

23 devices.

24         THE COURT:  Okay.  All right.  Thank you.

25         Mr. Dudley, thank you.  Dr. Dudley, excuse me.

1          DR. DUDLEY:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          DR. DUDLEY:  I'll just say that with regard to the

4   virtual visits, the major limitations that I have is that I'm

5   unable to meet with and talk to individuals about whom I might

6   have some concern with regard to their mental health, and I

7   therefore have to rely more on the medical records.

8          The only problem there is that in the absence of --

9   when we're on-site, I can get into the medical records myself

10  and do it, but in this kind of virtual setup, I don't have

11  remote -- direct remote access into the electronic medical

12  records, and so somebody has to sit there with me, share their

13  screen, and -- as I go through the records, so it's just a

14  little bit more cumbersome.  So I can see still see the

15  medical records; it's just a little bit more difficult than

16  when I was able to do it on my own on-site.

17         The issues that Mr. Parrish mentioned with regard to

18  the physical plant issues, the staffing issues, supervisory

19  issues, I just wanted to note that those issues do have an

20  impact on the delivery of health and mental health services.

21  There are times when, for example, med pass gets interrupted

22  and can't be completed because of -- in the context of a unit

23  where there's doors that aren't locking, *et cetera*, and the

24  shortage of staff, there's may be no one to sufficiently

25  accompany the nurses for doing that.

1          Similarly, there are times when the mental health staff

2     can't see someone on the unit or complete seg rounds, things

3     like that.  So it does have its impact on the delivery of

4     medical and mental health services.

5          With regard to updates, the long-standing vacant

6     qualified mental health professional position has been filled.

7     That person started this last week, so the good news is that

8     it's filled and the person has started.  But the shortage

9     of or the vacancy -- as a matter of fact since we've been here

10    the last time, just one qualified mental health professional

11    trying to address all the mental health needs, and so the

12    difficulties that we've described in the last report

13    essentially remained until last week.

14         Another update is that there appears to be improved

15    operation around identifying and addressing the needs of those

16    whose mental status deteriorates while in segregation; that

17    mental health staff have found that the classification staff

18    are working much better with them to address the needs of

19    those so identified and assure that their mental health needs

20    can be addressed and some other placement, where indicated,

21    can be identified for them.  So that's good news, because in

22    the past when individuals were deteriorating with regard to

23    their mental status while in segregation, it was hard to have

24    those issues addressed.

25         Another update is that, as I mentioned in the last

1    report, I obtained a consultant for the mental health staff at

2    the facility and those in the central office of the contractor

3    to help them with regard to the planning for a mental health

4    unit.  That consultant has shared an enormous amount of

5    information with them.  There was also a virtual site visit

6    arranged for them to visit one of the best jail mental health

7    units in the country, and the warden and representatives from

8    security and mental health all went on that virtual site visit

9    together.

10           I sat in on it.  They really talked about the planning

11   process, the physical space needs, how they implemented the

12   program, the lessons that they learned from doing that, and

13   the feedback that that was enormously helpful to the security

14   side as well as to the mental health side in moving forward in

15   the planning for a mental health unit not only in the existing

16   facility but in the future.

17           I mentioned in the last report that the State was

18   beginning to do competency (AUDIO GAP) via telepsychiatry to

19   address the backlog and the difficulty moving people, and that

20   has in fact happened.  They were being done at about the rate

21   of one to two a week, and so that that has moved forward.

22           We don't have access to the findings of those

23   competency evaluations, but at least they have been being

24   done.  As best I can tell, there was only one person who was

25   so acutely ill and disorganized that they were unable to be

 1   evaluated via telepsychiatry and therefore had to be actually

 2   taken to the state facility for that evaluation, but for the

 3   most part these telepsychiatry competency evaluations have

 4   moved forward.

 5          MS. SIMPSON:  Dr. Dudley, are you finished, or do you

 6   have more?

 7          DR. DUDLEY:  I'm finished.

 8          MS. SIMPSON:  Okay.

 9          Your Honor, do you want me to wrap up the final areas?

10          THE COURT:  Yes.  Yes.  Yes, Ms. Simpson.

11          Dr. Dudley, it looks like you've been spared.  I don't

12   have many questions for you, I don't think.

13          MS. SIMPSON:  So I think the really important areas

14   have been covered in terms of the facility and the staffing

15   and the supervision.  I look primarily at sort of system

16   issues and administrative areas, so I'll just run through

17   those, but I think the major concerns are in the areas I

18   mentioned.

19          I wanted to mention some things that have been very

20   good milestones.  One is that the contractor -- the

21   consultants that were retained to prepare a master planning

22   report have in fact completed that report and have made some

23   recommendations, some recommended options for the County to

24   consider.

25          We've reviewed the report.  We have not -- I think our

1    talk with them is tomorrow, but we had the report to review,

2    and it really is a very good report, I believe.  They did an

3    excellent job of sort of assessing what it would take to make

4    the current facilities operational and what the costs would be

5    as well as some options for new facilities.

6         And I'll mention in that regard you had stated, Your

7    Honor, that the JDC facility seemed to be one of the

8    better-run facilities, which I think we would agree.  A big

9    part of the problem and the reason why we recommended a master

10   planning process to begin with is that the staffing and the

11   cost associated with running three facilities is really

12   prohibitive, and so that was the purpose of the master

13   planning process was to figure out which could be retained

14   affordably or should they look at sort of building a new

15   facility that would potentially allow them to close all three

16   facilities.

17        So that master planning process I think is -- was an

18   important one, and it made some recommendations, some

19   recommended options, that I think will be helpful for the

20   County to consider based on the information -- the wealth of

21   information that's in that report.

22        And I wanted to -- one of the areas that I look at is

23   grievances, and so in that connection I review grievance

24   responses to see if they're appropriate.  I wanted to share

25   with you one of the grievances because, as Mr. Parrish

1   mentioned, A-Pod is in pretty bad condition, and I think this

2   information from the inmate is sort of -- provides some detail

3   to that.  And I'll paraphrase a little bit.

4       It says, we're housed on a zone where the lights don't

5   work.  It's dark.  We can't see at all.  The doors do not lock

6   at all.  It's already dark.  The light's out.  We can't see,

7   and the doors don't lock at all.  The zone is real nasty.  The

8   cells are flooded everywhere with little tadpoles and little

9   bugs in the water and the cell welded shut.  There's a cell

10  that's welded shut, so we can't clean it up.  The top shower

11  is broke.  The water is not coming out, but it's running, so

12  the water is foaming up inside the wall.  And we still have

13  not received cleaning supplies to clean up what we can.

14      And we did confirm with staff that the lights in A1

15  have been mostly out for the last month and a half.  They

16  function intermittently.  The detention officers use

17  flashlights.  There are in fact plumbing problems.  The roof

18  leaks, so when it rains, there's puddles on the floor.  So

19  it -- again, one of the limitations of a remote site visit is

20  that we're not actually on-site to see the conditions, but it

21  does appear from both staff and the inmates that A-Pod

22  needs -- even though it's not going to be used going forward,

23  it needs some work now to be livable.

24      A couple of good progress areas.  The quality assurance

25  officer that was hired, I believe last summer, is really doing

1   a fine job, a very good job.  She's pulling together data from

2   the different departments and not only putting it in a

3   spreadsheet-type report, but she's developed a template for a

4   narrative that would go with that.

5        She also has put together another spreadsheet that

6   really looks at the reporting requirements of the settlement

7   agreement and who's responsible and when they're supposed to

8   be done so that she can track that and make sure that all of

9   those reports are completed.  And not just those required by

10  the settlement agreement but also those that would be required

11  by best practices.

12       One difficulty for her, though, is that she relies on

13  the underlying data being accurate, and it is not always

14  accurate, and that's a problem that we've had with

15  particularly the incident reports from the beginning that not

16  only are the incident report narratives not always complete,

17  but there are fields that need to be checked off that are not

18  necessarily checked off.

19       So, for example, I think her November report had five

20  use of force -- that there had been five uses of force during

21  the month when in fact if you go through the narrative of the

22  incident reports there actually had been 11 uses of force, ten

23  of which were OC spray.  So she's moving in the right

24  direction, but it will be difficult for those reports to be

25  fully useful if the underlying data doesn't get improved.

 1          I've not talked to the people from records or

 2     classification yet, so I don't really have an update from the

 3     December report.  There's really been very good improvement in

 4     the records since -- certainly since we started the

 5     monitoring.  We see much better consistency with the JMS

 6     system, the underlying files, and who's actually in the

 7     facility.  So that's moving in the right direction.

 8          There's still -- as of the December report, there were

 9     still some areas of difficulty where individuals were held

10     longer than they should have been, typically not long periods

11     of time, but just a few areas where the system needs some

12     tweaking still.

13          Classification has also improved quite a bit since we

14     started monitoring.  There were a few glitches there, but

15     the -- for the most part, the classification -- the initial

16     classifications are being done accurately and there's not the

17     same overrides.

18          As I mentioned earlier, there are quite a few people in

19     administrative segregation.  They don't seem to be getting the

20     periodic review that they are supposed to be getting.  And so

21     that's an area of concern within classification.

22          The PREA officer -- PREA coordinator is doing very

23     well.  The quality of her reports have really improved, and

24     she's really circling back to ensure that victims are getting

25     the services that they need, so that's been a good area of

1    improvement.  The one concern is sometimes we see in the

2    incident reports what is a PREA incident that doesn't end up

3    getting referred to the PREA coordinator, and so that training

4    of the officers needs to be focused on.  And, of course,

5    training has been an issue under COVID, so hopefully that will

6    gear up a little more once -- once everybody's vaccinated.

7         There is -- one of the requirements of the stipulated

8    order is that there be hiring somebody -- or retaining

9    somebody to assist with development of a pretrial services

10   program.  We spoke with the person that oversees that area,

11   the court liaison, yesterday, and she is applying to a

12   nonprofit to become a learning site for the development of a

13   pretrial program.  That application is due at the end of the

14   month, so it -- it's not in the process yet, but that is a

15   step towards compliance in that area that we really hadn't

16   seen before.

17        So as I mentioned, there are areas of improvement, not

18   just in these few areas that I've talked about, but certainly

19   completing the renovations of C-Pod is a big step, and the

20   quality control officer, PREA, there are areas of improvement.

21        Reviewing the incident reports, we continue to see

22   operations maybe not changing that much despite these steps

23   that have been taken, and a lot of that goes back to the

24   inability to retain staff and sort of make -- retain staff

25   long enough that the midlevel supervisors are qualified and

1   able to provide better guidance to the line officers, and so

2   that probably contributes quite a bit to the difficulties in

3   bringing operations into -- in line.

4        And I believe that's all I have as well.

5        THE COURT:  Let me -- the Criminal Justice Coordinating

6   Committee, it looks like they have not met since maybe last

7   February.  Is that a system that is not working?  Is that -- I

8   assume they can meet remotely like we're doing now.  It would

9   not require people to be in the same room, I wouldn't guess.

10  Is that a fair assumption?

11       MS. SIMPSON:  Mr. Gaylor informed me that they had met

12  in December, and I believe Ms. Moore mentioned that they had

13  met in October.

14       THE COURT:  Okay.

15       MS. SIMPSON:  I'll let Mr. Gaylor speak to that.  It

16  looks like he was unmuting there for a minute.  Anyway, I

17  understand from Mr. -- okay.

18       MR. GAYLOR:  Right.  Correct.  We have met at least two

19  times since the date that you mentioned last February.

20  Probably three times since then, actually.

21       THE COURT:  Okay.

22       MR. GAYLOR:  We had -- but most recently we did have a

23  meeting of stakeholders, which I believe should be classified

24  as that type of a coordinating committee, in December, and

25  primarily we're just trying to figure out a way to process

1   through this bottleneck because, again, I don't believe that

2   we can make the representations in the absence of the pandemic

3   that it is a huge challenge for us to have the processing of

4   trials right now.  So we're still working through that.

5          THE COURT:  Well, y'all -- Hinds County's doing a

6   better job of having trials than we are.  Hinds County is

7   having trials in civil matters and some criminal matters, so,

8   you know, I don't know -- I don't know how it could be

9   justified to have the civil trials to the extent of the

10  criminals.  I mean, you know, that's just my view.  I mean, I

11  know some of the judges are having trials, because I read

12  about the verdicts.

13         MR. GAYLOR:  Right.  Well, Your Honor, honestly, it has

14  been somewhat haphazard, to say the least, because we were

15  having difficulties finding venues to convene grand juries.

16  We've had to contract with hotels.  We've had the assistance

17  from the secretary -- state secretary of Agriculture, I guess,

18  Agriculture secretary, to use the Trademart Center and other

19  agencies' venues.

20         We've had quite a bit of a problem, and so we do have a

21  significant bottleneck right now, particularly in the criminal

22  arena, but there were only probably two of the four judges

23  that were having court at least on a little bit more of a

24  routine basis than the others, but that has not been normal at

25  all.

1          THE COURT:  Okay.  I'm not one who's pushing folk to go

2    to trial.  I'm not doing that, I mean, because I have not had

3    a trial here in over a year -- or in about a year myself, so

4    I'm just saying, but I've had no civil trials or criminal

5    trials, and to the extent I expect to have anything, it's

6    going to be criminal trials because those defendants have that

7    higher constitutional right, at least, or definitive

8    constitutional right, unlike persons who are pursuing civil

9    matters.

10         We're going to be ready to take a break to give my

11   court reporter about a ten-minute break.  You can put your --

12   you know, you can put your -- keep your speaker on mute.

13   Don't take your Zoom thing to the bathroom with you.  Shut

14   that off, and, you know, take it -- go powder your nose.

15   We're going to take about a ten-minute break.

16         And I'll tell the County and the sheriff what I'm

17   concerned about here:  the notion that Pod A is being used,

18   and Pod A should not be used, from what I heard about the

19   lights being out, the leaking roof, the doors not working, the

20   officers having to use flashlights.  I understand it's being

21   used because Pod B is totally incapable of being used, and I

22   don't know how long the County intends to continue doing that.

23         And I'm going to give the County too the opportunity to

24   address those other things that Ms. Simpson and her team has

25   said, like the substantial time that people are placed in

1    administrative segregation without -- or prolonged

2    administrative segregation.  It seems like -- there seems to

3    be no follow-up.  The fact that we have had -- we have been

4    talking about these policies and procedures and

5    implementing -- well, first of all, drafting them and,

6    secondly, implementing them, and now what I've heard today,

7    some have been drafted but very few have been implemented.  So

8    it seems to me that what's the use?  If you're not going to --

9    you know, so I'll be ready to hear from you on those things as

10   well as the other things, including the use-of-force policy,

11   the hospitalizations that have occurred, and the

12   inmate-on-inmate assaults that have occurred.

13       There are other things.  I'm sure Mr. Cheng and others

14   will make sure we cover everything, but those are the things

15   that come to the front of my mind right now that deserve and

16   need a response from the County, and now that Mr. Owens is on

17   from the state authorities as well.

18       We're going to take about a ten-minute break and then

19   we'll start back up.

20            (A brief recess was taken.)

21       THE COURT:  Are we ready to proceed?

22       MR. CHENG:  Yes, Your Honor.

23       THE COURT:  Okay.

24       MR. CHENG:  The United States is ready.

25       THE COURT:  All right.  The County?  I don't see

1   Mr. Gaylor or Mr. Chambers.

2           MR. GAYLOR:  Yes, Your Honor, we're still on.

3           THE COURT:  Okay.  All right.  All right.  Well,

4   we'll -- we're back from a recess.

5           Obviously the County's doing some things, and I know

6   the sheriff is doing other things, and some of which y'all are

7   doing together.  So how do you propose is more efficient to

8   proceed?  Who has the most answers?  Because I have plenty of

9   questions.  Or at least the monitor's laid out plenty of

10  things that are unresolved or questions, so who would like to

11  go first?

12          I'm very accommodating.  I usually give you an

13  opportunity.  If you want me to just designate one of you to

14  go first, I will.

15          MR. CHENG:  Your Honor, we could probably help provide

16  a bit of a road map for us to proceed.  There are a lot of

17  problems here, and we do have some suggestions on how to focus

18  the hearing a little bit to target the main problems.

19          THE COURT:  Okay.

20          MR. CHENG:  So as Your Honor has heard from Ms. Simpson

21  and her team, there are a myriad of violations of the

22  settlement agreement, some of which pose very serious risks to

23  the inmates, the staff, and the community.  The life safety

24  issues, for example, in the A-Pod could themselves be the

25  focus of an entire hearing.

1          For our purposes, however, our focus is a little

2     narrower.  We've recognized for some time that the only way to

3     get the County into compliance with the settlement agreement

4     is to prioritize certain key remedies.  The stipulated order

5     in particular covered some of the highest priority issues, and

6     that's why I think it's helpful to start there.

7          According to the monitor's last report, the defendants

8     missed about 26 of the deadlines in the stipulated order.

9     They met ten, and there are about seven that are not

10    applicable or are pending, or at least that's our count based

11    on her report.  So when we're doing this tour this time

12    around, we're focusing on some of those same issues, and we

13    are thinking that a lot of those remedies are sort of the

14    foundation for further improvement in the other big areas.

15         When the defendants failed to implement some of those

16    express provisions of the stipulated order, in some cases they

17    actually still made some progress with their own *ad hoc*

18    approaches.  We don't want to criticize them for some types of

19    delays that can occur with any complex endeavor or just good

20    faith efforts to implement the stipulated order.  We're also

21    sensitive to the fact that the pandemic has complicated

22    things, and, you know, they've had some staffing turnover,

23    which has also made their lives difficult.

24         So our focus is on the violations that we don't think

25    are justifiable and that need to be addressed right away if

1  they're going to make progress on critical issues such as

2  staffing and for providing services for the youth and certain

3  elements of mental health care.

4        I think our concerns fall into two big categories.  The

5  first is the County's failure to build expertise and develop

6  the institutional structures needed to address the

7  long-standing staffing issues.

8        THE COURT:  If you would, Mr. Cheng, would you slow

9  down just a little bit.

10        MR. CHENG:  Yes.

11        So, again, the first big issue is the failure to build

12  expertise and the institutional structures needed to address

13  long-standing staffing issues.  They've had a problem for some

14  time with severe staffing turnovers, inexperienced

15  supervisors, and bottlenecks in the criminal justice process,

16  so the settlement and stipulated order included several

17  provisions to address these issues.  They include stipulated

18  order 2(b)(4), which required they hire a credentialed

19  corrections recruitment and retention consultant.

20        Defendants have done very little in this area.  Other

21  than a slight pay increase, they have not been working with a

22  consultant to develop strategies for retaining staff, training

23  supervisors to motivate and manage their employees, creating a

24  salary ladder, or any of the other pieces that were built into

25  the stipulated order.

1    Stipulated order 4(a)(1) required that this consultant

2    come in within four months, which would have been May 16th,

3    2020.  Our understanding is they just haven't brought anyone

4    in.  I believe Ms. Simpson has put a consultant under her own

5    contract, but it's not really clear what the status of that

6    process is.  And even though she has a consultant helping her,

7    my understanding is the County has not really been meeting

8    with the consultant or doing any of the things they need to do

9    to get retention under control.

10    Another provision is the provision regarding the

11    pretrial services program.  Within four months they were

12    supposed to hire a full-time employee to oversee development

13    and implementation of the program.  The individual had to be

14    certified by the National Association of Pretrial Services

15    Agencies, and that certification was supposed to be completed

16    within 12 months.

17    I believe Ms. Simpson had flagged that the people they

18    were assigning to handle these tasks were often people who had

19    other duties and didn't really have a lot of training on

20    developing pretrial programs.  The County, again, just didn't

21    do much here.  They just came up with their own solution and

22    hoped it would work, and I think that's one of the reasons

23    they're behind again.

24    There's also stipulated order 5(a) which said within

25    30 days they should have posted for a treatment director at

1    Henley-Young.  They didn't post for the correct position until

2    May 20th, and, as Ms. Simpson and Mr. Moeser pointed out, both

3    the executive director and the treatment directors for

4    Henley-Young left in November 2020.  So we don't know how they

5    can get into compliance with the agreement when they're not

6    doing the really basic things about hiring the people they're

7    supposed to hire, looking for the expertise they're supposed

8    to find, paying for the people they need to pay for in

9    critical positions so they can then take next steps under the

10    agreement.

11        THE COURT:  What do you say, Mr. Cheng, to -- I assume

12    this is what we're going to hear:  We hired a treatment -- we

13    hired somebody under 5(a) and they left.  What is it that --

14    what more -- I'm just asking because I'm assuming that's what

15    I'm going to hear from the County:  We hire people; they

16    leave.  I guess we need to get to the source of why they're

17    leaving.

18        MR. CHENG:  Yes, Your Honor.

19        THE COURT:  I mean, you hire a treatment coordinator,

20    and position posted correctly in May of 2020, and here it is

21    February of 2021 and the person is already gone.  I think the

22    person stayed there a couple of months at most.  The same way

23    we're operating under an interim executive director of the

24    youth facility; right?  That person came aboard and they left,

25    and I guess -- you know, so what -- what do you say to the

 1   County's response that I think we're going to hear:  We can't

 2   make people stay?  But the County certainly should not be

 3   running people off.  I don't know if that's the case.

 4        MR. GAYLOR:  It's not.

 5        THE COURT:  Mr. -- I heard Chief -- okay.

 6        MR. CHENG:  I think as we continue with this week's

 7   inspection, that's one of the things we're going to try to

 8   find out is why people are leaving and what is causing so much

 9   turnover.  But I think the history of this case indicates

10   there's a tendency by the County to sort of nominally comply

11   with the provisions of the agreement.  They hire someone, they

12   fill a slot, and they report to the Court they've done it.

13   Sometimes they do it, like, right before a hearing.

14        MR. GAYLOR:  No.

15        MR. CHENG:  But what they haven't done is -- well, I

16   realize they may disagree with that.  But what they haven't

17   done is sort of do exactly what they're required to do by the

18   stipulated order.  They haven't advertised and advertised for

19   exactly the person they're supposed to hire and then get the

20   people certified who are supposed to be certified.

21        Now, we understand maybe it's difficult to find people

22   who are qualified, maybe they had difficulties finding a

23   psychologist.  We have worked with them to try to modify the

24   qualifications for some of these positions so they could

25   eventually fill those positions, but at a certain point one

1    has to ask, you know, is there a problem with they're just not

2    paying enough?  I mean, there were some concerns early on that

3    the reason they couldn't get a psychologist is they just

4    didn't want to pay for a psychologist.  So we modified the

5    requirement to allow them to use a different type of

6    credentialed professional to do it.

7         When they finally brought in that person, you know, how

8    much empowerment did they give to that person?  You know,

9    how -- how much authority did they really let them have to run

10   the program?

11        I will say that because this type of issue is kind of

12   complicated, thus our segue into sort of the second big

13   category issue.  You know, we understand sometimes even if you

14   get the great person, they just leave, all right?  We think

15   it's strange that they keep losing critical people all across

16   the board, you know, wardens and captains and executive

17   directors and program directors.  We suspect that's partly

18   because there are bigger political issues going on in the

19   County.  Something else is going on with the leadership.

20        But leaving that aside, the second big issue is where

21   is the planning, right?  Even if somebody leaves, if you

22   really had a system in place, when that person leaves, there

23   are policies and procedures or something in the works that can

24   be continued by the next person, and so you don't depend

25   heavily on filling the post; you depend on having a plan for

1   moving ahead.

2       And so the second big area is that there seems to be a

3   lack of planning by the county leadership, and that is

4   therefore causing some stress or problem for the facility and

5   for the staff.

6       To illustrate that a little more clearly, let's talk

7   about, like, for example, the maintenance issue.  A-Pod having

8   to be retrofitted is not a surprise.  That was built into the

9   stipulated order.  Everyone understood when C-Pod was opened,

10  A-Pod would continue in place.  They had a plan for how to do

11  that.  They brought in outside architects and contractors to

12  make repairs.  Our understanding is that all those contractors

13  are now in place, they're submitting work orders, and the

14  whole work order system has broken down at the county level.

15      There used to be a system where everything went to

16  county administrator; she would decide if things would be paid

17  for and handled by the contractors or should instead be

18  handled by county maintenance.  When the county administrator

19  left, that process disappeared.  We don't know what happened

20  to it.  We're going to have to find out.  But if there was any

21  planning up front, they should have known that something like

22  that could happen.  That process should have continued with

23  the next county administrator.  And to be frank, Your Honor,

24  we flagged this issue with the County when we heard the county

25  administrator was leaving.

1        THE COURT:  Well, I think you're being generous when

2   you say "leaving" and "left."  From what I've seen in the

3   newspaper and seen on the news, I said, there was no sort of

4   leaving and left.  She was fired.  She was terminated.  And

5   I'm not taking sides on it at all because we know the Board of

6   Supervisors can do what it wishes to do, but I do think you

7   are being generous when you say that the previous county

8   administrator left.

9        MR. CHENG:  Well, Your Honor, there are times when I

10  really don't want to get too much into the politics of what's

11  going on in Hinds County.  My focus is primarily on are they

12  in compliance with the order.  I only felt like I had to go

13  into it here because it directly impacted implementation of

14  the agreement.  So if they don't have a plan, though, when

15  they know they're going to fire their county administrator,

16  then nobody should be surprised that they're out of compliance

17  with the maintenance when they don't have anything in place to

18  take over.

19        I wish some of the other issues were surprises, but

20  they're not.  The JCA issue has been brewing for some time.

21  We're well aware that the youth court judge, for example, has

22  had some concerns about the number of JCAs, which is why the

23  stipulated order said they had to have programming, they had

24  to bring in a program director.  They had have to some effort

25  to address the mental health services, they had to upgrade the

1    training, they had to do more -- they had to do more to expand

2    those services so that it would go from being a short-term

3    detention facility for basically runaways and other lower-risk

4    youth to being a more long-term facility with JCAs who have

5    more challenging issues.  But, again, where's the plan for

6    that, right?  There -- there were some efforts to meet the

7    terms of the stipulated order.  They brought in a few people,

8    and then nothing.  And, you know, despite efforts I think by

9    the monitor to get more information about what they were up to

10   or how they were going to implement programs, tour after tour

11   occurs and we never see anything.

12          Again, talking about planning, let me just go back to

13   pretrial services as another illustration.  They talk about

14   bringing in a pretrial services nonprofit to help them develop

15   assessment forms and a program.  We've been talking about

16   pretrial services since last year, and this was supposed to

17   have been done early on.  The pretrial service proposal they

18   submitted I think came in last week, and it's not because DOJ

19   and the monitor haven't been asking about it.  It's just

20   something that got done at the last minute.  And as far as we

21   know, nobody's acted on it.

22          So just like the maintenance requests, the treatment

23   programs, the pretrial services, things happen.  They happen

24   right before the hearing, they happen right before a tour, but

25   there's no indication that anyone at the leadership level has

1    a big-picture strategic plan on how they're going to implement

2    even the basic requirements of the stipulated order so that

3    they can then get ahead of all these other problems.

4         When you don't have key leadership in place and you

5    don't really have a plan at the top levels and you're not

6    really engaged at the highest levels, when a disaster occurs

7    or something bad happens, no one's ready for it.  You know,

8    maybe it's the pandemic.  Maybe it's a physical plant issue at

9    Jackson which causes them to have to watch everybody and move

10   them to another facility.  Maybe it's the loss of the program

11   director or the executive director.

12        Things like that are going to happen over the course of

13   any endeavor this complicated.  The key is that a good,

14   well-run system has some resilience and is able to deal with

15   it because they've been building up the leadership expertise,

16   they value stability in their leadership, and they have a plan

17   for where they're going to go for implementing all these

18   provisions.  And I think when those two big pieces of the

19   stipulated order are missing, it's just going to be very, very

20   hard to make progress for the settlement agreement.

21        I think that in a nutshell is our view on this, Your

22   Honor.

23        THE COURT:  And I guess it's the DOJ's overarching

24   principle this stipulated order is exactly what it is:  The

25   parties agreed to these terms, every one of these terms.  The

1    parties worked out this about a year ago to resolve the DOJ's

2    motion for contempt, as I recall; is that right?

3          MR. CHENG:  Yes, Your Honor.

4          THE COURT:  And so every one of these things, the

5    parties agreed that this would -- that they could do it and

6    that there would be -- and this is how they would resolve the

7    motion for contempt that the Court was prepared to hear.  And

8    I guess, Mr. Cheng, DOJ is now considering at what point in

9    time does it try to resurrect its motion for contempt or find

10   a new one.  Is that what I'm hearing?

11         MR. CHENG:  I think that is something we were

12   definitely going to have to think about after this tour.  You

13   know, to be honest, Your Honor, they already had their chance.

14   They technically -- when they entered the stipulated order as

15   to avert contempt, they're already on thin ice with the

16   Department as it is.

17         We have tried to be creative and patient about the

18   County's interim efforts, right.  Like, if they can't comply

19   with the settlement agreement, we understand -- if they can't

20   comply with the stipulated order, we have less understanding,

21   but nonetheless if they can come up with a good proposal or a

22   good plan or really have something in place, you know, we

23   might not need to file for contempt.

24         Our concern is there's nothing really like that, as far

25   as we can tell.  Like, there really isn't an effort to satisfy

1    the Department's concerns or the monitor's concerns on some of

2    these big issues.  It's often sort of a void from the County.

3    We just don't hear very much at all and then something gets

4    done and it's not particularly effective and then we do a site

5    visit and find out things really aren't doing well at all.

6              THE COURT:  Okay.  Thank you, Mr. Cheng.

7         I guess I'll turn it to the County and/or the sheriff.

8              MR. GAYLOR:  Yes, Your Honor.  This is Tony Gaylor.

9         I'm not sure which portion of the argument you want to

10   hear -- or response you want to hear first.

11             THE COURT:  Well, I guess one of the things that

12   concerns me here is this whole situation with Pod C and --

13   well, Pod B not being used; A being used temporarily; and from

14   all indications, A should not be used at all.  No -- no

15   doors -- inability to lock the doors, if that's true; if

16   there's leaking in the roof; if the lights are out or -- it

17   just seems to me that you're endangering the inmates.

18        So if there -- and what I've heard is that there's this

19   whole work order problem -- or at least there is a work order

20   problem, and I don't know if work is not being done because

21   people are not being paid or if work is not being done because

22   we don't know who's supposed to do the work.  So I guess

23   that's a place to start.

24        How long will those inmates be in Pod A?  Because

25   there's never an understanding or an intention that Pod A

1   would even be used, from what I've heard today, and if I'm

2   wrong on -- I don't want to leave here under the wrong

3   impression on anything, so if I'm wrong on that, let me know.

4        MR. GAYLOR:  With regard to the repairs -- and,

5   Attorney Barker, you can chime in when you feel necessary --

6   we retained a construction manager, an expert, to oversee the

7   repairs that were done to Pod C, Pod B as well.  There was not

8   the intention that Pod A would be in this use for this period

9   of time, but we -- it is taking us a little bit longer to get

10  Pod B repaired.  Pod C has obviously come back online.  We've

11  got to figure out a way to make the repairs to Pod B as fast

12  as possible.

13       THE COURT:  When you say "as fast as possible," is

14  there a targeted date at which you expect Pod B to be

15  operable?

16       MR. GAYLOR:  Board President Supervisor Calhoun would

17  like to address that as well.

18       MR. CALHOUN:  Thank you, Your Honor.

19        I'm sure that, according to the contractor, they would

20  be through with the doors on Pod B within a month or a month

21  and a half.  And according to my contractor that's been

22  overseeing the progress on not only the doors but also the

23  repairs to Pod B, we think that's going to be -- come about a

24  month after that.

25       THE COURT:  How long have these repairs for Pod B been

1  going on?

2      MR. CALHOUN:  Since -- since they finished with the

3  Pod C.  And then -- they're utilizing Pod C now.

4      THE COURT:  Okay.  And when was that?  I'm just trying

5  to see how long -- okay.  C-Pod -- was C-Pod completed back in

6  May?

7      MR. CALHOUN:  I don't think it was quite through --

8      MR. GAYLOR:  No.

9      MR. CALHOUN:  -- at that time.

10     MR. GAYLOR:  It was the fall.

11     THE COURT:  Well, was Pod C repaired on a time schedule

12 that the County thought it would be repaired, or was there

13 some delay in repairing Pod C?  Because as I recall, when we

14 were back here, again going back as far as -- when we were

15 back here last January, there was some indication that the

16 people from Texas would be in to finish up the locks on the

17 doors by the spring, I think.  Now, I could be wrong, because

18 I am going off the top of my head.

19     So -- but did Pod C get fully repaired under the

20 timeline that the County thought it would be or contracted for

21 it to be?

22     MR. GAYLOR:  Your Honor, I don't believe any repairs

23 are made absolutely in the timeframe or by the deadlines we

24 proposed them to be in this past year, because we have been

25 dealing with some extenuating circumstances.  You know, we

1  don't actually -- we're not operating in -- as if everything

2  is normal, so it does take -- it has been taking a little bit

3  longer to make the repairs that we thought needed to be made.

4  And then there's times when the construction people go into a

5  system and thinking that something needs to be done and more

6  work needs to be done.  So it's typical construction type of

7  delays on top of a pandemic.

8          THE COURT:  On top of what, sir?

9          MR. CALHOUN:  On top of COVID-19.  COVID-19 has slowed

10  us up quite a bit, and it's not only with work but also with

11  funds to do the work.

12          THE COURT:  So is it -- so, again, is there -- I think,

13  then, I heard from you, Mr. Calhoun, I think you said that you

14  expect Pod B, did I hear you correctly, in about 60 days?

15          MR. CALHOUN:  Yes, sir.  And that should be well within

16  the range that they told me that it would -- I'm talking about

17  the doors now.  The doors should be ready in 60 days, and

18  30 days after that we should have -- be ready to go on line

19  with Pod B.

20          THE COURT:  The 60 days for the doors, the doors are

21  being done by this outfit -- this specialty outfit out of

22  Texas?

23          MR. CALHOUN:  Yes, sir.  And the other work is done by

24  our folk or other contractors.  Mr. Marsh is over that.  And

25  what we're talking about is Benchmark Construction was, I

1   think, okayed by the Court.

2       MR. GAYLOR:  So, Your Honor, let me add also, in the

3   midst of all of this, yes, some of the representations that

4   have been made with regard to the maintenance department has

5   certainly been accurate in the sense that a transition had to

6   have been made, and as that transition has taken place, a lot

7   of things have been discovered that were certainly less than

8   optimum.  So we do have some additional delays associated with

9   the maintenance department not being completely up to speed.

10  But since that time, we've also hired a full time -- a new

11  full-time maintenance director, who has pledged his efforts to

12  make sure that we can get back online with some of these

13  matters as well.

14      THE COURT:  But until we get Pod B back online, those

15  prisoners in Pod A are at risk because they are in an

16  ill-equipped jail or pod.  So every day they're at extra risk

17  for whatever.  You can't see what's going on in there because

18  the lights don't work.

19      MR. GAYLOR:  Well, Your Honor, now that the

20  representation has been made, we've got to get the repairs

21  done, Your Honor.  But oftentimes -- some of these matters

22  were not completely budgeted for because they're coming in at

23  higher estimates than was given to us initially months ago,

24  and so we have to make presentations back to the board

25  repeatedly for change orders and budget amendments to try and

1    pay for these matters.

2         Quite frankly, it's going to be a bit of a haphazard

3    process because we don't have all of the funds budgeted.  We

4    have the funds budgeted, but the estimates have come in a lot

5    higher than the budget.  So we've got to find money to get all

6    of the rest of these repairs paid for, and that's a challenge.

7         THE COURT:  I hear you.  I understand it's a challenge,

8    but --

9         MR. GAYLOR:  It's certainly not a challenge that we

10   aren't willing to or trying to meet, Your Honor.  We are

11   having the meetings.  The assessments are being done.  The

12   estimates are coming in higher than they were supposed to be.

13   But we're making repairs and progress in spite of that.  It's

14   not happening as fast as we would like for it to.

15        THE COURT:  Okay.  Do you wish to address any of the

16   other concerns that have been pointed out by the monitor

17   and/or the Government?

18        MR. GAYLOR:  I'm going to let the -- I'm going to defer

19   to the sheriff's department on policies, procedures, and other

20   matters associated with the detention centers.

21        THE COURT:  Ms. Barker.

22        MS. BARKER:  Good afternoon, Your Honor.

23        I have a couple -- I'll try to respond as succinctly as

24   possible to the DOJ and to the monitor's concerns.

25        First of all with staffing, yes, staffing has been a

1    problem, and it has continued to be a problem, especially

2    within this last year given the challenges that we face with

3    COVID.  It's been a little bit difficult to hire people who

4    want to come and work in a detention center, in a closed

5    setting.  However, we have been hiring quite a few people.

6        The Department of Justice stated that we failed to

7    retain a retention consultant, which is simply not true.  He

8    was retained, and he is getting paid from the monitor's

9    budget.  We retained him in January of 2020.  He came and made

10   one initial site visit prior to COVID.

11       And -- however, what I will admit to is that the

12   recruit -- I mean, the recruit and retention expert officer

13   that we hired, we recently realized that the job is a little

14   too big for his skill set and we need someone with a lot more

15   experience in this issue.  Because we can hire, but it is a

16   problem keeping detention officers.  And the sheriff and our

17   staff have recognized that, and we are trying to address that

18   problem.

19       Now, we have -- I'm sorry.  I'm hearing a little bit of

20   feedback.  I don't know if that's something on my computer or

21   not.  Do y'all hear feedback?

22       THE COURT:  I hear you fine.

23       MS. BARKER:  Okay.  I just wanted to make sure.

24       We have advertised publicly and also as well as inside

25   for a recruit and retention expert, and we are going to

1   require some level of experience, a college graduate is -- or

2   a college degree is also one of the qualifications.  And once

3   that person gets on board, we will be working very closely

4   with Matt Rivera.  That has been kind of an issue in the past,

5   and I do know that the fact that Matt can't be here on-site

6   and talk to some of the employees and kind of gather a feel

7   for the overall, I guess, work space here has kind of been a

8   problem.  But we do recognize that that is an issue,

9   especially with retention, and we are working on that.

10          Let's see.  I'm trying to address this in the way that

11   the Court...

12          As far as policies and procedures go, Your Honor, I

13   share your sentiments as far as why it's taking so long to get

14   words on a page.  I believe that Monitor Simpson alluded to

15   the fact that Karen Albert has been very helpful, although her

16   approach in drafting these policies I think has proved to be

17   something of -- it's a longer process, and in the last couple

18   of months, I've reached out to Ms. Albert and Monitor Simpson

19   and we've discussed -- and I was just very candid with

20   Ms. Albert that, number one, we don't have the staff to take

21   away and to do a seven hour -- you know, she would come in and

22   do an entire week worth of policy drafting.  We don't have the

23   staff to take away a week from their job to do that.

24          Secondly, the staff that we have, unfortunately, just

25   does not have that skill set.  And it was coming -- it was

1   starting to be a burdensome process in that it was really

2   having an effect on the morale of our employees.  So what we

3   have done is identified two people, Captain Johnson and the

4   assistant to the jail administrator, Melody Clayton, who are

5   in charge of keeping up with the policies and procedures,

6   helping draft those.

7           So rather than have a big group and a lot of time taken

8   to dedicate to one policy, we have tried to streamline that.

9   And since that has been done, policies have been coming out a

10  lot quicker.  I do -- I realize that having 25 policies when

11  we're supposed to have perhaps 70 or 60 is a problem, but I --

12  we have identified that, and we're working to streamline that

13  process.

14          Let's see.  As far as training and implementing those

15  policies, that is another area in which we are trying to

16  address as well and get stronger, and we do need to do more

17  training.  It has been difficult, though, with the turnover

18  that we have had, so -- and also with COVID, it's difficult to

19  get everyone together in one training class.  We're trying to

20  implement these policies by training during roll call.  So

21  that is something that we are very -- we realize that we have

22  to work on.

23          Something that -- actually, speaking of staffing, we've

24  actually had a net gain in staffing.  Since January of 2020 to

25  date, we've hired a total of 115 and we've lost 67.  So we

1   actually had a net gain of about 58 as far as staffing goes,

2   and I think that that's something that is -- should be

3   commendable given the fact that we are in a pandemic and we

4   are -- this is a detention -- this is a jail that not

5   necessarily a lot of people want to come work in for the pay

6   especially.

7          As far as incidents go, we've also had a decreased

8   number of incidences from last year.  The total number of

9   detainees has gone down by 19 percent, and the -- we've

10  decreased detainee escape by about 86 percent from last

11  year -- I mean, I'm sorry, from 2019.  There has been a

12  decreased inmate-on-inmate assault by 34 percent, and there's

13  also been a decreased inmate-on-detention-officer assault by

14  16 percent.  And overall the decreased use of force has gone

15  down by 39 percent.  And that was taken from just the number

16  of incident reports that were recorded in 2019 and also with

17  2020 and compared those.

18         So I think that there are some issues that we

19  definitely need to tackle, that we are very aware of.  We are

20  in the process of tackling those.  However, overall, from what

21  the sheriff's office can control, I believe that we have done

22  pretty good under the circumstances.

23         THE COURT:  Let me ask you about what the sheriff's

24  office can control.  Ms. Simpson mentioned that there were

25  several indications of the use of -- I think Mr. Parrish

1    also -- the use of OC spray inappropriately, but nobody -- I

2    think -- I think I heard this right.  There's no indication

3    that anyone has been disciplined in any way for violating that

4    rule.

5        You certainly have total control over discipline, and

6    I'm just trying to figure out how does that happen?  If there

7    is this violation that they say that has occurred that they

8    say is reflected in the incident reports and that everybody's

9    cleared at every instance, how can that be explained?

10       MS. BARKER:  Your Honor, I understand it looks like

11   there's a systemwide failure based on what the monitors have

12   said and the fact that no one has been disciplined.  The only

13   thing that I can chalk that up to -- our defense is that we

14   simply just need more training.  It's very difficult to change

15   the culture of the environment that's been -- that's done

16   something a certain way for so many years.  Even if we do have

17   new people that come in, there's still some --

18       THE COURT:  I think -- hold on.  Hold on, Ms. Barker.

19   I don't think it's that difficult.  I mean, I really don't.

20   But even if it is, with the rate of turnover that you-all say

21   that you had, at least in the past, very few of these people

22   are part of that culture from years ago, because they're no

23   longer there, and I know they've trained the people who are

24   there, but what I've been hearing over the last couple of

25   years, there's a lot of turnover, you can't find people.

1          But when the rules are violated and management has an

2     opportunity to do something about -- and management has

3     changed over the last two years.  New management came on board

4     in January 2000 -- 2020, excuse me.  So management has

5     changed.  But that -- and you tell me that there are still

6     issues with people using OC in an offensive way, and they

7     shouldn't be.

8          MR. BARKER:  Your Honor, the sheriff would like to

9     address the Court, if that's okay.

10          THE COURT:  Okay.

11          SHERIFF VANCE:  Good afternoon, Your Honor.

12          THE COURT:  Goof afternoon.

13          SHERIFF VANCE:  As far as the disciplinary issues that

14     we're discussing right now, I don't know exactly where -- if I

15     would agree that no one has been disciplined.  I can think of

16     one case in particular myself where we had pictures of a

17     detention officer actually using OC spray against a detainee

18     that I knew myself and I decided myself was inappropriate, and

19     I know for a fact that particular detention officer was

20     disciplined.  So I would question that -- respectfully, that

21     nobody has been disciplined.  I don't have the exact numbers

22     at my fingertips.

23          I would also add that dealing with disruptive,

24     combative detainees is a challenge, for -- especially when you

25     have staff shortages where perhaps you have one detention

1     officer have to confront individuals that will not take simple

2     instruction, like going back into their cells.  I think that

3     training is definitely a part of the solution for that

4     problem.

5          That particular thing is also challenged by the fact

6     that, as counsel stated, we've hired over a hundred people in

7     the last year, but we've lost about 60 people.  So there's a

8     constant need for maturation for detention officers, for

9     training for detention officers, because we still -- even

10    though we've turned it over quite a bit trying to reach our

11    required number, people who come into a facility like that,

12    they're going to constantly have to be trained.  They will not

13    necessarily respond the same way a more seasoned detention

14    officer would.  But we're losing a lot of our people that do

15    have that seasoning, and we're going to have to bring up

16    through training the new people that we're hiring.  So I would

17    suggest that it's a process that we're trying to adhere to.

18         THE COURT:  Thank you, Sheriff Vance.

19         SHERIFF VANCE:  Yes, sir.

20         THE COURT:  Ms. Barker, I know I cut across you.  You

21    were saying some other things.

22         MS. BARKER:  I think that the sheriff pretty much

23    touched on all the issues as far as trying to discipline our

24    own.  You know, he's correct, we have fired and disciplined a

25    lot of officers for use of force, so there might have been one

1  or two that maybe IAD for whatever reason found that it was

2  acceptable, but I think that the statement that we haven't

3  done anything is a misstatement.

4       THE COURT:  I assume the records will speak for

5  themselves, then.  So once we see the records, we'll go from

6  there, to the extent it becomes an issue.

7       I guess with respect to a plan going forward, we've --

8  I've heard a lot today.

9       MR. GAYLOR:  Your Honor?

10       THE COURT:  Yes.

11       MR. GAYLOR:  If I may add also, with regard to the

12  matters that are taking place at Henley-Young, if I may remind

13  the Court we're also under another consent decree with regard

14  to that facility, and one of the things that has taken place

15  with that facility, we've been working with the monitor that

16  is in place over that facility, Ms. Anne Nelson, trying to

17  comply with the stipulated order in place on that facility,

18  and it -- as you noted, we have hired a treatment director, a

19  training director, and an executive director.

20       We do have some turnover problems with regard to that,

21  and we talked with the treatment director as to why she was

22  leaving her post, and one of the things that was mentioned to

23  us is that, quite frankly, right now as a result of -- as a

24  result of the pandemic, the economy for licensed clinical

25  social workers and licensed clinical psychologists has changed

1    in the sense that they can make as much, if not more, money

2    treating patients via Zoom rather than being on-site at a

3    facility all day.  And so we've had some challenges trying to

4    hire a licensed clinical social worker to fill that treatment

5    director's spot, although we are encouraged that the training

6    director has been doing some decent work.

7         The interim executive director is someone who has been

8    at the facility for some time, and so there's no unfamiliarity

9    with the issues that are taking place down there, and we're

10   trying to get them addressed through him.

11        We anticipate hiring an executive director, a

12   permanent -- a more permanent executive director, as soon as

13   more qualified applicants make themselves available, but we're

14   not exactly sure when that will be completed.

15        With regard to educational services, I have to push

16   back on the representation being made that no -- or that

17   educational services aren't being offered.  I think we should

18   also be mindful of the fact that no in-person education took

19   place within the district over nine months, and so, you know,

20   with regard to any child in that school district, in or out of

21   the facility, they are receiving their educational through --

22   whether it's through work packets or even through some

23   distance learning.  All of the residents received tablets from

24   the school district so that that could be implemented as well,

25   but --

1          THE COURT:  Was it implemented?  I mean, if people

2     couldn't come in and teach them like they used to do during

3     this pandemic, were they -- were the students receiving the

4     education that they needed and that -- the education that was

5     available to everybody else?  I mean, did they receive that

6     education?

7          MR. GAYLOR:  They received tablets for the students

8     outside of the facility.  Now, with regard to there being many

9     disruptions that have taken place over that period of time, we

10    certainly can't argue that there haven't been disruptions.

11    There have been disruptions with regard to incidents that have

12    taken place between residents.  There have been disruptions

13    with regard to technology, disruptions with regard to the

14    water system, and a lot of different things that have taken

15    place to disrupt learning over the course of the last year.

16    However, we cannot say that we have not been making good faith

17    attempts to educate the students that are down there, because

18    we have.

19          We do have some staffing shortages down there because

20    the turnover, and so there are times in which we have to make

21    some adjustments with regard to whether or not in-person

22    learning can take place.  We cannot say that, you know, that

23    has not -- that has been optimum, but we have been making good

24    faith attempts.

25          THE COURT:  What level of education had the children

1   been receiving?  I mean, that's the ultimate question.  I

2   understand there's been disruptions, and I understand you say

3   the County -- that they're doing everything that they can

4   possibly do.  Were these kids getting any type of education?

5   Was it once a week, was it one hour a day every day during the

6   week?  Was it five days a week?  I mean, did they -- have they

7   been taught anything since the pandemic?

8           MR. GAYLOR:  Absolutely, Your Honor.  And in fact,

9   in-person learning was taking place at Henley-Young before

10  in-person learning took place within the system at all.  So,

11  yes, learning has been taking place and teaching has been

12  taking place, but I'm not going to make the representation

13  that no disruptions have taken place over the course of the

14  last year.  Of course they have.  But they have been going to

15  school.  They have been receiving assignments.  They have been

16  taught.  But, you know, those aren't the best of circumstances

17  down there in many instances.  We won't dispute that.  There's

18  a principal on-site, and there's teachers that come every day.

19          THE COURT:  Let me -- Ms. Barker, let me ask you this

20  question, because I don't think this has been addressed by

21  anybody on your side of the table; that is, the County, and I

22  think this is in the hands of the sheriff, so that's why I'm

23  asking you about this administrative segregation -- the

24  administrative segregation issue that the monitors have

25  pointed out, persons being placed in administrative

1    segregation for extended period of time.

2         MS. BARKER:  Yes.

3         THE COURT:  Do you agree that is happening?

4         MS. BARKER:  Well, Your Honor, they are placed in

5    administrative segregation for violent crimes, and their cases

6    are reviewed weekly to see if they should stay there or not.

7         THE COURT:  For violent crimes that occur within the

8    institution?

9         MS. BARKER:  Yes, Your Honor.  And in very extreme

10   circumstances, if they're a danger to other inmates or a

11   danger to our staff and continued disciplinary issue.

12        THE COURT:  The monitor seems to suggest that there's

13   either several of them or that they stay in there for extended

14   period of times without -- I guess without an attempt to

15   return to the regular population.

16        I don't need to speak for you, Ms. Simpson or

17   Mr. Parrish.  You know, again, please make sure I'm saying the

18   right thing.

19        MS. BARKER:  Your Honor, I'm sorry.  I was getting

20   information from our jail administrator.

21        At any given time, from what I understand, we have

22   between about four to ten inmates in the administrative

23   segregation, and their cases are reviewed, from what I

24   understand, weekly to see if they are safe enough to be placed

25   back in general population.

1          MS. SIMPSON:  Your Honor, I was just trying to find the

2     segregation report in the documents that have been uploaded,

3     and I'm not finding it quickly.  My understanding is there's

4     significantly more people in administrative segregation than

5     four to ten.  That might be disciplinary segregation, but the

6     administrative segregation is typically much higher.  But I

7     will try to find that report.

8          And, Dave Parrish, I don't know if you have that --

9     better handle on that number off the top of your head, the

10    number of people in administrative segregation.

11         MR. PARRISH:  No, I don't have current figures right at

12    hand.  I'm sorry.

13         MS. SIMPSON:  I can try to get that to you, Your Honor.

14         THE COURT:  Okay.  Well, I guess the bottom line --

15    well, no.  Let me ask since I do have -- and I appreciate the

16    DA -- Mr. District Attorney for getting here, and I do know

17    that the DA had a press conference about two weeks ago, I

18    guess, talking about the first year of his tenure.

19         I only saw and read the little bit that I saw and read,

20    Mr. Owens.  I did not attend the press conference, so I didn't

21    hear everything or I did not read all that you said, but I got

22    the impression that the State is -- or at least indicting not

23    necessarily more people but at least the process is now

24    moving, you're getting more and that way -- you're processing

25    cases now, and in that regard the next step would be trying to

1   get those matters resolved through guilty plea or some going

2   to trial.  Is there anything you wish to tell the Court?

3        MR. OWENS:  Good afternoon, Your Honor.

4        I think the Court properly summarized one of the things

5   that we expressed in our year in review.  I'd say that in

6   2020, in January, we had two backlogs both equally affecting

7   the consent decree and the Hinds County Jail, independent of

8   COVID and those challenges.

9        One backlog was just hundreds of indictments that we

10  found in rooms that we were not meeting the Mississippi

11  Supreme Court constitutional rights of defendants in ensuring

12  that we indict individuals who had been arrested within

13  90 days, and because of that, you had this huge backlog where

14  people were coming in and out that created complete

15  dysfunction in the jail and also inhibited our ability to

16  prosecute cases.  And 90 days is generally the best practices

17  nationwide, as I understand it, Your Honor, from arrest to

18  indictment, which includes a thorough investigation.  We have

19  met that hurdle.  We conquered that.  We are indicting all

20  cases in 90 days.

21       But because of the other backlog, which is our

22  inability to prosecute cases, which are the best national

23  standards, which is a year's time from arrest to adjudication

24  of the case, in this county, Your Honor, we're closer to two

25  and a half and sometimes three years for a myriad of factors.

1    That's our challenge right now.  That's certainly impacting

2    the jail population and the larger population of JACs

3    independent of the new challenges that were presented because

4    of COVID.

5         I would highlight something the Court said I guess

6    about an hour ago.  We had a jury trial set yesterday which we

7    needed 48 jurors to select a jury from.  We only had 26 people

8    show up.  That's occurred at least 12 to 14 times over the

9    last year, Your Honor, where we just could not move forward.

10        And one of the reasons that's really impactful, Your

11   Honor, is not just because of those 12 or so triers, but our

12   inability to have trials means defendants, particularly the

13   most violent population that's in the jail that, as I

14   understand it, is wreaking the most problems, we're giving

15   them serious time, Your Honor.  I mean, if you take a life in

16   our county, it's a minimum 30 years, if not life, or 40 years.

17   There's no incentive to plea, and that's something that we

18   can't get around right now.

19        I will tell the Court, I want you to know that both the

20   sheriff and the Board of Supervisors are meeting regularly

21   with this.  I am getting a weekly and monthly list of

22   individuals at the jail.  Where we can not violate public

23   safety and reduce bonds or use the least restrictive means, we

24   do so, and we've been pretty successful in that, particularly

25   at the height of COVID.  But because the City of Jackson and

1    our county had almost 140 murders last year and this year we

2    already are at 17, I believe -- we had four last weekend -- we

3    are in an untenable situation of being able to deal with that

4    level of crime.

5         We are proposing some pretty significant solutions.

6    I'm going to meet with the board next week as well as the City

7    of Jackson, which I think is a significant part of this

8    conversation, too, because the City --

9         THE COURT:  Oh, we lost everybody.  It's something that

10   happened with us, I think.

11              (A brief recess was taken.)

12        MR. OWENS:  And, Your Honor, if I could add one more

13   thing, I'm not sure --

14        THE COURT:  Hold on.  Hold on, Mr. -- did everybody

15   hear Mr. Owens that entire period?  Because the Court -- we've

16   been off.  The Court has been off, so I haven't -- I think,

17   Mr. Owens, the last thing that I heard from you was that,

18   Judge, we have a solution -- or I'm presenting a solution to

19   the Board of Supervisors and -- I guess, and the sheriff, and

20   I guess you might have said JPD.  I don't know.  But I'm

21   presenting -- I have something that I'm presenting to them

22   because we've had all of these murders here in Hinds County

23   last year and even the four who were homicides last week, and

24   then it went out on this end, and I know that's been about

25   three minutes ago and you said a lot.  But if you will, at

1    least try to bring me up to speed.

2         MR. OWENS:  Yes, Your Honor, and add one more thing to

3    that.  I think that was most of it frankly, Your Honor.  You

4    know, we're not staffing all the courts in Hinds County.

5    We're not staffing the city courts.  The District Attorney's

6    Office is not.  It's only the Public Defender's Office.  We

7    have to kind of stop the flow of traffic in the jail.  I think

8    there are a lot of people going to the jail we can keep from

9    going to the jail.  That's one of the initiatives that we're

10   trying to enroll currently.

11        But the JACs, which I understand is a big concern on

12   this call, Your Honor, those individuals who are at

13   Henley-Young who are charged as adults, their case time is the

14   same case time as every individual who's charged in Hinds

15   County.  I know it might seem like that those cases are

16   delayed, but it's the same case time.  We're seeing them come

17   up.  I think both Judge McDaniels and Judge Hicks, and

18   certainly Judge Green with her diversion program, have

19   advocated that we make sure we're not forgetting about those

20   individuals, but it's not that they're being forgotten.  We're

21   recognizing those on the jail list that are provided to the

22   District Attorney's Office, and we're making sure we

23   prioritize those cases as well.

24        THE COURT:  Are there any -- and the sheriff would know

25   this.  Are there any persons who would ordinarily be in state

1   custody being housed currently in Hinds County?  Are there any

2   MDOC defendants there still?  I know at one time there was,

3   and I know there was an effort to make sure that MDOC came and

4   retrieved their folk.

5        MS. BARKER:  Right now I'm being told that we have 31

6   individuals and that 18 individuals are ready to go to MDOC

7   and the remaining are here for court orders.  So we will work

8   with MDOC to come and pick up those inmates.  It hasn't --

9   it's been a process to get them to come pick up the inmates,

10  but I know that our classifications officer reaches out to

11  them -- I don't know if its weekly or monthly, but, yeah, we

12  do need to get those out of the system.  Weekly, I'm being

13  told.

14       THE COURT:  That returns us to Mr. -- I'm sorry,

15  Mr. Owens.  Were you through?

16       MR. OWENS:  Yes, Your Honor, unless the Court has any

17  specific questions to what we're doing or instruction to how

18  we might do what we're doing better.

19       THE COURT:  Okay.  Well, I mean, that basically gets us

20  back to the starting point of Mr. Cheng's probing issue, I

21  guess.  The -- there's still -- there's still not full or

22  substantial or in some cases no compliance with various terms

23  of the stipulated order.  And I can't underscore the word

24  "stipulated" enough because this was the promises that the

25  parties made that they could hold up.  It's just like any

1    other contract, settlement agreement.  It's like any other

2    thing.  You do this, I promise to do that, you get this.

3         So I -- you know, how do the parties anticipate -- I

4    mean, this is -- again, I picked up this matter in January of

5    2019.  I believe that was my first hearing with the parties.

6    And I regret to say that, you know, we're still dealing with

7    some issues that came up that were apparent when I inherited

8    this matter.

9         Is there any point in time that the County wishes to be

10   out from up under a consent decree that's monitored by a

11   court?  I mean, that's what it's going to boil down to.

12        At some point in time -- you know, the County's you

13   know, paying money for monitors; the County is doing -- you

14   know, doing other things.  At some point in time, I assume the

15   County's not -- does not wish to be up under a court order to

16   do the things that it's supposed to do.  So I guess when does

17   the County want that to happen?

18        MR. GAYLOR:  Your Honor, if I may attempt to answer

19   some of that, without question the County does not wish to

20   continue to be under a consent decree order for a prolonged

21   period of time, but I must say that, you know, with regard to

22   certain matters, there are certainly attempts that are being

23   made to come out from under the stipulated order or comply

24   with the stipulated order, and then there are times when

25   things happen that become setbacks.  We hire people.

1  Sometimes they leave.  You know, I would like to know if -- or

2  to what level some type of grace is given to the County for

3  its attempts to comply and when we make hires and then those

4  people leave.

5        There are times when maintenance issues are resolved

6  and then those matters get broken.  When you talk about

7  cameras that are being installed, well, sometimes those

8  cameras get broken as a result of (AUDIO GAP).  Doors get

9  repaired, but sometimes those doors get broken and jimmied

10  open again, and then those repairs have to be made again.  And

11  so I'm hoping that some level of assistance can be given to

12  the County with regard to attempts to comply with the orders,

13  because things do intervene at times, and certainly this year

14  has been a very, very challenging year.

15        What hasn't been brought up over the course of this

16  call -- or status conference is the fact that we have -- we

17  lose personnel from time to time as a result of the diagnosis

18  of COVID.  We've lost employees for weeks at a time on

19  multiple occasions, and so that has also presented a challenge

20  in the continuity of trying to meet the demands of the order.

21  And I don't think those things can risk being overlooked,

22  because they're real.  And oftentimes the people who are in

23  charge of complying, or in charge of trying to get us in

24  compliance, they come up sick, you know.  And so I don't think

25  that this has been an ordinary year in any way, shape, or

 1   form, but we are making attempts to comply with the stipulated

 2   order that we agreed to over a year ago.

 3       MS. BARKER:  Your Honor, and I would just like to

 4   piggyback on what Attorney Gaylor has said.  Yes, if this was

 5   the same day and time of December 20-something, whenever we

 6   entered into this order, do I think we would be compliant in

 7   it?  Yes, I do.  However, it's not.  A new sheriff's

 8   administration came in.  We were -- you know, and I know the

 9   County, we were all on board.

10       COVID hit.  Our lives came to a halt.  Nobody knew how

11   to deal with this in detention services.  People -- our

12   employees were hospitalized, key employees, and the fact --

13   yes, we did not meet every deadline, and there are some we are

14   deficient in, but we've done a lot of it under the

15   circumstances.

16       And I understand the DOJ's frustrations; I understand

17   the Court's frustrations.  However, we have, you know, had

18   improvements, and the fact that we've done anything and there

19   hasn't been a complete breakout in the jail with COVID or

20   that, you know, we've totally failed on every avenue is

21   amazing given the resources that we have, given the staffing

22   that we have, and, you know, given what we have faced, I mean,

23   not only professionally, personally.  People are -- this is

24   just a difficult year.

25       So for the DOJ to say they will renew their motion for

1    contempt, they have every right to do that; however, this is

2    not the same playing field as it was whenever we sat in your

3    courtroom in December of '19.

4         THE COURT:  Well, let me ask this question.  DOJ will

5    have -- I don't think they actually said that they would do

6    that, but they'll have an opportunity to do whatever they

7    wish.

8         But since Pod C has been repaired, have there been any

9    breakdowns of the locks anymore in Pod C?  In Pod C?  Did --

10   in other words, did the people from out in Texas come do the

11   job and did that fix the door issue?  Because that had been a

12   running issue about the doors.

13        MS. BARKER:  Yes, Your Honor.

14        THE COURT:  So no more doors have been broken in Pod C?

15        MS. BARKER:  Correct.

16        THE COURT:  Okay.  So that's one big thing that has

17   been resolved, then; right?

18        MS. BARKER:  That's -- that's huge, yes.

19        THE COURT:  That's huge.  So, again, I would expect

20   them to do that in Pod B really soon.

21        MS. BARKER:  Yes, sir, that's what our expectation is.

22   It would be great, because our staff and our inmates are --

23   the safety and security of them are at issue, and it's a very

24   big concern.

25        MR. GAYLOR:  We've also communicated with our

1    construction manager during the course of this hearing, and

2    it's our understanding that some repairs to the doors in Pod B

3    are supposed to be made by the end of the month as well, by

4    the end of February.  And so we are making the attempt to get

5    things in order so that that place can be habitable.

6         I think it should also be noted that over the course of

7    the last year, our inmate resident population has gone up

8    significantly as well.  So that would have an impact on the

9    housing arrangements; that would have an impact on staffing

10   issues and everything else.

11        THE COURT:  It has gone up because JDC has moved out

12   there?  Because I don't think the County now is holding people

13   for misdemeanors.  Has crime jumped up -- I mean, you know,

14   have that many more arrests been made, or are we talking about

15   the RDC -- more people out at the RDC because JDC has closed?

16        MR. GAYLOR:  I believe the representation can be made

17   that more arrests have been made.  I will let the sheriff's

18   department answer that, though.

19        SHERIFF VANCE:  Your Honor?

20        THE COURT:  Yes, I'm here.  Yes.

21        SHERIFF VANCE:  Yes, sir.  We've been pretty successful

22   in trying to keep the number consistent.  It has gone up some,

23   but we're able to manage despite the fact that the JDC has

24   been closed down.  And -- but, again, it's difficult to

25   predict because of the turnover, the large turnover, that

1    we're having with our detention officers.  But our staff has

2    been able to manage.

3         I failed to mention the other time, we're starting

4    another class of detention officer candidates next week.

5    We're also getting ready to find us a recruiter.  The first

6    two that we hired just, frankly, did not work out or

7    underachieved, so we are -- we have accepted the fact that

8    constant hiring as far as detention officers are concerned is

9    going to be a way of life for us.  We've accepted that.  And

10   so we will be constantly hiring as long as we can find

11   suitable candidates.

12        THE COURT:  Okay.  Thank you.

13        Ms. Simpson, did I hear you correctly that -- I think

14   typically we would do this call at the end of the week after

15   you've done everything for your "site visit."  As I appreciate

16   it, you're still doing your site visit now.  I think you said

17   you're at least doing some stuff today or tomorrow or

18   whatever.  So we're on the front end of your site visit; is

19   that right?

20        MS. SIMPSON:  That's correct.  We started it yesterday

21   and have interviews scheduled through Thursday.  I think we'll

22   probably have to add a few rescheduled interviews on Friday,

23   so we should be completed sometime on Friday other than

24   additional documents that we might need to review.

25        THE COURT:  Okay.  All right.

1          Mr. Cheng for the Government, do you have any, I guess,

2     final words or observations you wish to make?

3          MR. CHENG:  Yes, Your Honor.  I think we could probably

4     get into a big argument about what's going on or not going on

5     and there would be a big fact dispute.  But I think even from

6     what you've heard from the County this afternoon, there are

7     some concessions here that I think are relevant to how we'd

8     look at the stipulated order and noncompliance not only with

9     the stipulated order but with the settlement agreement itself,

10    which, just as a reminder, is also a lawful agreement that

11    they stipulated to when they signed it.

12         You hear both the district attorney and the county

13    folks talking about how they've been having these separate

14    meetings about how to get the criminal justice process working

15    and about how there's a backlog in getting people tried and

16    how that breaks the entire system.  We knew that when we

17    entered a stipulated order, which is why there's an entire

18    provision on creating a pretrial services program and using

19    the CJCC to help to deal with these problems.

20         Now, I appreciate that folks are sort of on their own

21    going out there and dealing with this stuff, but where's the

22    big-picture, long-term planning for trying to deal with these

23    problems?  How do they get all the parties together through

24    the mechanisms that have been developed under decree to get

25    these problems fixed?  So that goes back to the concern about

1    the long-term planning.

2         And then, of course, we've got the short-term planning

3    issues.  These maintenance issues that they're talking about,

4    you know, I know the County -- you know, I'm grateful to them

5    for being candid and admitting that there are lighting issues

6    and that there are these other problems in A and B-Pod, but

7    these didn't just sort of happen today.  These were issues

8    that they've known in some form were prevalent throughout

9    Raymond when the stipulated order was entered.

10        So once they started moving people around and they knew

11   there were these sort of emergency physical plant issues, what

12   were the short-term plans to deal with the lack of lighting or

13   fire safety problems or the many other issues that are showing

14   up now?

15        I guess what I'm saying is that while I understand and

16   appreciate their difficulties, I do think, you know, they're

17   accepting a state of affairs that they shouldn't accept.

18   There needs to be sort of high-level executive leadership and

19   planning to deal with these things.

20        I do want to mention a COVID issue since that got

21   brought up.  I actually felt kind of bad watching them

22   Ms. Barker, the sheriff, and other key administrators in the

23   office not wearing their masks.  This isn't the first time

24   this has happened.  I do want to make it clear that although

25   we're asking for meetings with all these folks, we don't want

1    anyone to do anything that is unsafe and that they should

2    still follow their own policies for COVID prevention, and we

3    don't want to suggest anyone should break it for this site

4    visit.

5         I will mention, however, that while we're still looking

6    at the COVID issue, we do have some concerns about the quality

7    of the COVID testing and the sort of protocols for contact

8    tracing, which we're going to ask the monitor to look into.  I

9    think Dr. Dudley is looking into that issue.  We understand

10   they don't have a lot of positive tests, but, you know, I

11   don't think it's a surprise to Your Honor that there have been

12   some articles indicating that the state of Mississippi hasn't

13   been particularly good about statewide testing.  We are not

14   making this the highest priority issue just because we

15   understand everyone is having difficulties with COVID right

16   now, but we did want to flag that as a concern.

17        In addition to the plan timetable issue, I also want to

18   ask if the Court could consider setting another hearing.  We

19   do find that when there are these hearings, it does make

20   people focus a little more on the immediate reforms.  We heard

21   the County today talk about how they're going to get the doors

22   fixed, B fixed, A fixed.

23        I personally -- I think the Department has some

24   concerns about whether that's really going to happen on the

25   timeframes mentioned here during this hearing.  I think the

 1    concern is sort of based on this sort of long-standing history

 2    where, you know, promises are made, but then things don't

 3    really get done when they're promised.  But we also know even

 4    from this initial site visit that there are already some

 5    issues that are creeping up in the interviews that we should

 6    flag to the Court.

 7          One is that the maintenance staff, there was such

 8    turnover in the maintenance staff and a complete

 9    reorganization of the county maintenance department that may

10    end up delaying some of the reforms.

11          Another issue is budgetary.  Our understanding is that

12    the construction manager has already submitted proposals for

13    getting a lot of these things fixed.  But there was apparently

14    quite a bit of cost overrun in the last round of repairs, and

15    that has been giving the Board of Supervisors concerns.  If

16    that remains a problem, then those big-picture repairs are

17    going to be delayed as well.

18          And, finally, there's issue with the staffing.  At

19    least based on the initial interviews, it sounds like the

20    state Department of Corrections is recruiting for

21    $30,000-per-year starting salaries for state prison staff.

22    The detention staff in Hinds County I believe start at around

23    27,000 at the jail, and they start much lower than that at the

24    Henley-Young facility.

25          So, you know, these things are all sort of out there.

1  I know the monitor hasn't had to deal with it yet because

2  she's still assessing it.  But I think we can proffer to the

3  Court that there's every reason to believe that absent, you

4  know, close scrutiny by this court, the problems are going to

5  remain, and they're not going to be fixed right away.  So I

6  think that is in a nutshell sort of our view on this matter,

7  Your Honor.

8          THE COURT:  Okay.  I did -- I'm glad you mentioned the

9  COVID, because I did have my questions there to the County and

10  the sheriff with respect to that issue.  I heard Ms. Barker

11  say there has not been an outbreak.  How much testing --

12  formal testing and tracing is the County doing?  Is the

13  sheriff doing any testing and tracing?

14          MS. BARKER:  Yes, Your Honor.  We're only testing if an

15  employee -- I mean, if an inmate complains of COVID symptoms

16  or if they are symptomatic.  And we've tested -- the last

17  positive -- the last positive test that we had was

18  January 31st.  Since then we have had probably about 15 more

19  tests done.  They've all been negative.  And so that has --

20  like I said, we're not testing every single inmate, but those

21  that are symptomatic, we are testing.  And no one has had to

22  be treated for severe flu-like symptoms, or no one has gone to

23  the hospital for any COVID symptoms or illness.

24          THE COURT:  And that protocol that you're operating

25  under, is that the protocol that the state Department of

1   Health has suggested or authorized?

2       MS. BARKER:  It is, Your Honor.  Our medical provider,

3   QCHC, is -- we're following their protocol as well as the

4   state Department of Health's protocol.

5       THE COURT:  Has there been any attempt to test all of

6   the inmates out there?  I know that was done at another

7   facility.  Have all the inmates under your custody been

8   tested?

9       MS. BARKER:  Your Honor, last year we did do mass

10  testing of all the inmates in our custody.  Of course, it was

11  voluntary, and I think from that there was a very low

12  number -- I think that maybe (AUDIO GAP) -- I don't want to

13  give you wrong numbers, Your Honor.  We've presented it to the

14  Court before.  But there was a relatively low number of

15  inmates who tested positive in that group.

16      THE COURT:  With respect to the use of masks and

17  sanitizing soap and sanitizers, are the inmates provided with

18  masks?

19      MS. BARKER:  Yes, Your Honor.  They're presented with

20  masks and soap, and from my understanding is that the masks

21  are -- they have the option of changing out the masks about

22  weekly.

23      THE COURT:  Biweekly, or did you say "about weekly"?

24      MS. BARKER:  Biweekly, Your Honor.

25      THE COURT:  Twice in a week or once every other week?

1          MS. BARKER:  Once every other week.

2          THE COURT:  What type of masks are these?  N95 or cloth

3     or paper?  What type?

4          MS. BARKER:  It's a combination, Your Honor.  It's

5     really whatever based on our resources and what we have on

6     hand.

7          THE COURT:  Has there been any talk about trying to

8     provide masks more frequently than -- you said one mask, so

9     one mask every other week.  So an inmate gets about two masks

10    a month.

11         MS. BARKER:  Your Honor, we are dealing -- we are

12    trying to ration the -- I don't want use the word "ration."

13    We are dealing with the resources that we have as far as the

14    masks.  If we had one that we can give them every single day,

15    a new mask, that would be wonderful.  Right now I don't think

16    that's the --

17         THE COURT:  Are you providing the employees with a mask

18    every other week?

19         MS. BARKER:  Employees have their own mask.  Or if they

20    need one, we will supply them one.

21         THE COURT:  That just does not sound as sanitary to me

22    as it should.  I don't know.  I'll talk with the health

23    officers about that and allow them to chime in at some point

24    in time, but that just doesn't sound the best for a place that

25    you cannot social distance and a place where hygiene is not

1    optimum.  It just -- I mean, it just sounds that way to me,

2    but, hey, I'm sitting here.

3         I know we got off track with respect to our meeting

4    times because, again, we have not met since last June.  If we

5    get back on the same schedule that we were operating under

6    prior to December, that the monitors would submit a report to

7    the Court from this review which they expect to end by the end

8    of this week, Ms. Simpson, that -- you would submit that

9    report when?  Is it 60 or 90 days?

10        MS. SIMPSON:  It is -- I submit it to the parties

11   30 days after the end of the site visit, and then I believe

12   there's ten working days for the parties to review it and get

13   any revisions back to me or any suggestions.  And then it

14   usually takes me a few days after that to incorporate those.

15   So it ends up being probably 45 days.

16        THE COURT:  Okay.  In that case, I will suggest that

17   our next meeting be 60 days from today, or I'm saying 60 days.

18   April 9th, which is a Friday, at 10:00 a.m.  And right now

19   we'll plan for it to be in this same format, Zoom.  I just

20   don't expect things to have lightened up anyway by then.  So

21   we'll do it by then.

22        And I will expect to hear real good news on this Pod B

23   and Pod A situation.  I would expect to hear it.  I mean,

24   unfortunately, I won't be able to see it, but I did find that

25   my visit was helpful to me.  But I can tell you this:  I will

1  not be visiting the detention center during the era of COVID,

2  so you don't have to worry about that.

3          MR. CHENG:  Your Honor?

4          THE COURT:  Yes, Mr. Cheng.

5          MR. CHENG:  May I make a suggestion?

6          THE COURT:  Yes.

7          MR. CHENG:  The -- Benchmark actually produced videos

8  of the repairs.  They provided it to the monitoring team.  It

9  might be helpful if they could submit a report and a video for

10  the hearing.  If in theory everything is fixed in 60 days, the

11  architects should be able to submit photographs and videos of

12  that.

13          THE COURT:  Yeah.  The monitors could request it and

14  get to me anything that they think I need to see.  That's a

15  good idea.  I mean, you know, so -- yeah.

16          Is there anything else we need to cover?

17          All right.  Well, Counsel, I appreciate your

18  participation.  Thank you for making yourselves available, and

19  the Court will see you back on April 9th and continue to work

20  with each other.

21          That concludes all that the Court has.  The Court is

22  now adjourned.

23  ****************************************************************

24

25

1            **COURT REPORTER'S CERTIFICATE**

2

3       I, Candice S. Crane, Certified Court Reporter,

4 Registered Professional Reporter in and for the State of

5 Mississippi, Official Court Reporter for the United States

6 District Court, Southern District of Mississippi, do hereby

7 certify that the above and foregoing pages contain a full,

8 true, and correct transcript of the proceedings had in the

9 forenamed case at the time and place indicated, which

10 proceedings were stenographically recorded by me to the best

11 of my skill and ability.

12       I further certify that the transcript fees and format

13 comply with those prescribed by the Court and Judicial

14 Conference of the United States.

15       THIS the 24th day of February, 2021.

16

17                       /s/ Candice S. Crane, RPR, CCR

18                       Candice S. Crane, RPR, CCR
                           Official Court Reporter
19                       United States District Court
                           Candice_Crane@mssd.uscourts.gov

20

21

22

23

24

25