Court-Appointed Monitor's Thirteenth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -CWR-JCG

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                Jim Moeser                Dr. Richard Dudley
Corrections Operations         Juvenile Justice          Corrections Mental Health

1

**EXECUTIVE SUMMARY**

Because of the COVID-19 pandemic, this site visit was once again conducted remotely February 8-11, 2021, with additional interviews as explained below. The remote site visit was completed through conference calls and video conferencing with key personnel, members of the Monitoring Team and County and DOJ representatives.  The Compliance Coordinator provided extensive documentation electronically which made it possible to review many records that are normally examined on site. An off-site document review does limit the ability to verify some of the information as might be done with an on-site visit in which more substantial interviews/observations can be completed and additional documents reviewed.  Comments and other information in this report should be considered in light of that limitation.

**Update on COVID-19**

The Monitoring Team has made extensive recommendations in prior reports and will not repeat them in this report. The County continues its practice of testing only symptomatic detainees with the exception of testing JCA's at Henley Young after exposure to a teacher who tested positive and testing of kitchen workers at RDC after exposure. The Monitoring Team continues to recommend testing of all inmates exposed to individuals who are or might be positive for COVID consistent with the recommendations of the CDC for prisons and detention facilities. The County reports that since the beginning of COVID testing,  80 staff and 36 inmates have tested positive.

**Corrections Operations**

As has been noted in previous reports, the Hinds County Jail System is characterized by (1) a critical shortage of staff, (2) serious maintenance issues that go unaddressed for months and years on end, and (3) dangerous and unsanitary living conditions for inmates at the Raymond Detention Center (RDC).  This last condition continues even after C-Pod was reopened on October 22, 2020, with enhanced staffing and a plan to operate under the principles of direct supervision.  Unfortunately, to date the Jail has not succeeded in operating C-Pod under the principles of direct supervision.  The direct supervision training that was provided by the National Institute of Corrections (NIC) a year ago was not properly implemented at the RDC, even though the same guidelines function effectively at the Work Center (WC).  Apparently, changing almost a decade of operation at the RDC, where the inmates had control of the housing units and staff were unavailable to supervise them, has proven to be an even greater problem than was expected.

The number of authorized and funded Detention positions now stands at 281 with the addition of nine Food Service slots that were added when they were changed from contract to County personnel; currently 231 are filled.  While that number is higher than the 204 noted in the 12th Monitoring Report, it is still well below the high of 256 that was recorded approximately two years ago and significantly below the 412 positions needed under the revised staffing plan although with the JDC closed and B-Pod closed the number of needed positions is 303.3. This is a vacancy rate of about 25% (231 of the 303.3 needed positions). However, the vacancy rate is not equally distributed between the two facilities. RDC has a vacancy rate of about 40% while the WC actually has more than the needed staff by about 20%.  Since the Jackson Detention Center (JDC) has been closed for almost a year, the officers who were normally assigned there were reallocated to the WC; all female inmates were moved to that facility as well.  At the RDC, C-Pod was reopened in October after going through a renovation that lasted almost two years. B-Pod is now closed and going through a similar renovation.  There is no plan to repair A-Pod. When B-Pod is reopened, A-Pod will be permanently closed unless the County decides to renovate and staff it appropriately.  In the interim, A-Pod is an unsafe and unsanitary housing area.  Inmates live in darkness much of the time because most of the lights do not work.  Some damaged cells have been secured by welding their doors shut.  This leaves them to serve as "garbage dumpsters" where the inmates can deposit their trash through the broken windows. HVAC problems are exacerbated by the fact that the new replacement chillers are electronically controlled while the original air handlers in the housing units are mechanically controlled.  In essence, the two components do not talk to each other.

Fire safety continues to be a life-threatening issue.  At the WC the sprinkler system has not functioned for well over a year.  At the RDC the sprinkler system was removed after inmates damaged it during the riot of 2012 that caused C-Pod to be shut down for renovation the first time.  The facility also does not have a fire alarm system.  Although the State Fire Marshal has not required corrective action, this serious shortcoming was addressed by the Master Planning Committee which included fire safety improvements in its Final Report.

Maintenance was seen as a bright spot in the last Monitoring Report because the new Chief Safety and Security Officer for the HCSO was given responsibility for collecting and coordinating all work orders with County Maintenance.  Unfortunately, the whole system collapsed when the previous County Administrator left County employment.  Along with her, the incumbent in the County Maintenance Director's position turned over twice, leaving no one in charge.  Work orders languished in limbo and no corrective action was taken.  Since then, a new County Maintenance Director has been appointed and he is working with the County's primary contract coordinator, Benchmark Construction, to get things back on track.  While the recent step backward is frustrating, the real problem is with the County's on-going system for handling maintenance issues.  In most major jurisdictions the responsible agency, in this case the Sheriff's Office, is given a line item in its annual budget to handle routine maintenance matters while

major projects are still directed to the Administrator and Board of Supervisors for review and the award of specific contracts. Hinds County should adopt such a system. The micro-managing of daily maintenance problems is not the appropriate role of the County Administrator and the Board of Supervisors.

The County reports that since the time of the site visit, it has invested a substantial amount of time and money in repairing the detention facilities to comply with the Consent Decree. It reports that it has repaired the lighting in Pod A where the detainees were living in the dark for protracted periods of time. These repairs have reportedly been made while putting the majority of effort in repairing Pod B so as to house the detainees presently residing in Pod A. The County reports that it has repaired doors, installed fixtures for plumbing and fire protection and painted the Pod.

When C-Pod was reopened in October it was supposed to be staffed for, and operate under, the principles and dynamics of direct supervision. On paper a staffing plan was laid out, but no specific directions were developed for officers working there; nor were there standing orders for the duties and responsibilities of supervisors with regard to direct supervision operations. In reality, the staffing requirement has not been met during the past four months. Incident reports reflect that direct supervision housing units (C-1, 2, & 3), the confinement unit (C-4) and even the suicide watch unit (C-4 ISO) are often left unattended. This represents a gross violation of the direct supervision concept. Housing areas must always be staffed; they can never be left vacant. As a result of this problem, inmates are not allowed out of their cells to be in the dayroom throughout the day; instead, they are frequently locked down in their cells even to the point of having their meals served there. The failure to properly implement direct supervision is reflected in the number of incidents that now occur in C-Pod. Instead of seeing a decrease in that area, as was expected, the number continues to match A-Pod where staff has little or no control over the inmates. The lack of proper staffing of C-Pod has also led to the continued use of booking cells to house inmates. Booking cells are completely inappropriate for housing. It is imperative that staffing in C-Pod must be sufficient to provide continuous direct supervision. In addition, written procedures/expectations for staff need to be put in place and supervisors must ensure compliance.

An area of major concern is that as policies have been adopted there appears to be little commitment to actually implementing those policies. The training on these policies is, no doubt, impacted by COVID but supervisors should at least be familiar with the policies and ensuring their implementation. Numerous examples are mentioned below. As examples, use of chemical spray is being used to enforce compliance as opposed to only as a defensive measure as required by policy, there is no review of administrative segregation as required by policy, medical/mental health staff are not notified so as to conduct a review of placement in segregation as required by policy and there is no interdisciplinary team as required by policy. Additional examples are

mentioned below. The adoption of policies needs to be not a "check the box" activity; the policies need to actually guide detention practices.

**Medical and Mental Health**

Some progress is now being made on the appropriate housing, security management, and treatment of the facility's most seriously mentally ill detainees.  Planning for the proposed mental health unit is moving forward with a recent planning meeting involving security and mental health staff. The newly designated space for the unit is being renovated, and so now there must be a focus on the identification and selection of security officers to staff the unit, and then providing them with the additional mental health training that they will require.  The policy that requires regularly scheduled, interdisciplinary review of detainees who are being held in segregation has been approved, but now it must be implemented in order to assure that there is meaningful input from mental health staff into decisions made about the seriously mentally ill detainees who are being inappropriately held in segregation.  The policy that would assure input from mental health staff during the disciplinary review process has yet to be developed, and so there must be a focus on the development and implementation of this policy so as to assure that seriously mentally ill detainees are not inappropriately placed in segregation in the first place. Continued progress in these three areas will not only do a lot to increase compliance with many of the provisions of the Settlement Agreement, but continued progress will also significantly enhance safety and the quality of mental health care within the facility.

The weekend after the virtual site visit, the QCHC Health Services Administrator (HSA) for the facility, was banned from the facility by the Jail Administrator.  The Monitoring Team had no idea that such a move was even being considered, and is now looking into the circumstances surrounding this action.

**Youthful Offenders**

As of the time of the February virtual site visit (as of 2/9/21), there were twenty-three Juveniles Charged as Adults (JCAs), in the Henley Young facility, including one female JCA.  Population management efforts related to the short-term (non-JCA) youth seem to remain in place, but the Youth Court Judge and other county personnel express increasing concerns should the population of both long and short-term youth increase and approach the allowable capacity of 32. This has led to some initial discussions about the viability of maintaining JCAs at Henley Young and what other alternatives could be developed, but there does not appear to be a need for an imminent change.

There has been a notable increase in the number of more serious incidents involving JCAs, including fights, significant disruptions, suicide attempts, and possession of contraband items.

While difficult to fully quantify, this increases concerns about safety at Henley Young. There are several factors that may have led to this increase, including the large number of vacancies in the Youth Care Professional (YCP) ranks which severely limits the ability of the program to move forward in meeting a number of requirements of the agreement as described below.

Once again, the Executive Director position is vacant as is the Treatment Coordinator position that was filled for a brief period in the fall.  However, the County reports that since the time of the site visit, it has hired an Executive Director. The recent hiring of a Training and Development Coordinator is a positive step forward, and that person may be able to play an important role in the recruitment and retention of staff as well as develop a more comprehensive and progressive training program. Mr. Burnside, and Mr. Dorsey continue to provide good leadership, albeit staff shortages means that an inordinate amount of time and energy remains focused on "filling slots" during the day rather than being able to move forward in overall program quality.

Modular units to provide additional and more appropriate education, program, and treatment space are on site but not yet operational. Additional recommendations related to facility plant improvements have not been implemented such as security fencing and appropriate furnishings, and additional needs related to the security system and water system have developed and need to be addressed. The County reports that since the time of the site visit, it has made improvements to the facilities at Henley Young to accommodate educational and programming needs.

Related to the January 2020 Stipulated Order, the County did hire a Treatment Coordinator, a cornerstone position in terms of providing vision and leadership for the mental health services and integrating those with other aspects of the overall program. Unfortunately, that person was on staff for only about eight weeks, and the position is again vacant.  A more detailed daily schedule for all programming has been developed, but the overall quality and consistency of implementation, including the education program, has regressed and is of increasing concern.

Overall, some of the progress that was seen in prior months has been lost in recent months, and absent a full complement of well-trained staff, from leadership down to critical line staff it seems unlikely that the conditions of the Settlement Agreement can be met.

**Criminal Justice and System Issues**

Some subset of the CJCC met in October and/or December. The coronavirus has, no doubt, impacted the ability of the Criminal Justice Coordinating Council (CJCC) to meet. However, the CJCC will need to meet more frequently and with more full participation to be an effective body. Even before the virus, the CJCC had not had consistent participation by a number of stakeholders. This has limited its effectiveness. An effective CJCC or some collaborative body is needed to implement most jail population reduction strategies and other system efficiencies.

Contrary to the requirements of the Stipulated Order, the County has not contracted with JMI or another consultant. The Criminal Justice Coordinator is preparing an application for being a learning site for implementation of the Arnold Public Safety Assessment due May 28th. This would meet the requirement of the Stipulated Order but, even if selected, is long overdue. The Stipulated Order requires the County to hire a full-time qualified individual to implement the pretrial program. In fact, the County did not post these positions but rather has assigned both the role of the CJCC coordinator and the pretrial director to a person who already had a full-time position, the Criminal Justice and Quality Control Officer (sometimes called the Court Liaison). This does not meet the requirements of the Stipulated Order.

As with the recent remote site visits, it was difficult to complete a review of the records remotely as the inmate files are too voluminous to scan. A copy of the inmate status/summary sheet and the chronological sheet was requested for 30 randomly selected inmates. However, it was not possible to compare these face sheets to the actual inmate files. The records provided for the February, 2021 site visit had status/summary sheets for the 30 inmates although some are in need of revision and standardization. In the June, 2020 Monitoring Report, it was noted that the records were not being audited at the pace required by the Records Policy. However, in the October 2020 and February, 2021 site visit the records are now being audited at the required pace. As noted below, the improvement in inmate records has been substantial since the beginning of monitoring and it is now uncommon to find inmates whose release has been delayed or who are listed as current inmates when they have actually been released.

There continues to be over-detention in some areas. There were a few people who were held beyond the 21 days allowed for a probation violation hearing to take place. It was reported that the Mississippi Department of Corrections requested that they continue to be held. This does not constitute a lawful basis for detention. As reported in the December report, there continues to be a problem with identifying holds when those holds were entered after booking and contacting the other jurisdictions in a timely manner. All of these issues should improve with the use of an up-to-date status sheet.

As previously reported, there is increased ability to pull reports from the JMS system. Additional fields were added to the Incident Summary Report. This is an improvement but the reports do not yet meet the requirements of the Settlement Agreement in terms of containing all the required information and analysis. The information required by the Settlement Agreement is for the purpose of providing command staff in summary form the data that would inform system improvement. The Quality Assurance Officer hired in June is working on developing a Quality Assurance program and has created a spreadsheet with additional reporting. She has prepared a draft narrative summary that highlights the trends and problem areas that meets the purpose of Settlement Agreement requirements although this is not yet operational. Having a full time individual devoted to Quality Assurance is a big step towards compliance in this area and this

individual appears very motivated to meet the requirements of the Settlement Agreement. The County has upgraded its JMS system and this appears to address some of the deficiencies in reporting and creating summary reports although pulling all the information into a spreadsheet that meets the reporting requirements of the Settlement Agreement is still a work in progress. The Booking and Release Manual has been updated and expanded. This should assist in entering information accurately and consistently in the JMS system.

The grievance system continues to improve, however, again, only with the labor-intensive creation of manual tracking systems as opposed to a functional electronic system. Because of the remote nature of the visit, it was not possible for the Monitoring Team to run a report to determine whether there were grievances that had not received a timely response. It was reported that a number of staff do not enter their responses in the system so they may appear not to have a response and the Grievance Coordinator has no way of knowing whether there has been a response and, in fact, a review of the manual spreadsheet indicated a large number of untimely responses. Several grievances were denied as non-grievable when they were, in fact, grievable. The Grievance Coordinator is going to do some additional training on this issue. There has been significant improvement in this area in the prior four site visits. A number of grievances had inadequate responses; mostly in promising some future action with no way of knowing if the action had been taken. Although more grievances are now receiving a timely response, there is still no system to review whether responses are adequate; and no oversight to determine that promised actions are actually completed. As the Quality Assurance Officer expands her focus on this area, an internal audit system should improve these outcomes.

## STIPULATED ORDER UPDATE

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

**STIPULATED ORDER UPDATE**

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes | 10/2019 | Consultant is retained through the Monitoring Team. However, there has not been regular engagement by HCDS staff. |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | No | 3/2020 | Purchase Order submitted on 1/22/20; cameras were on back order; they have now arrived. As yet, there have been no video recordings of planned Uses of Force (UOF) although there have been some incidents that should have been considered planned UOF. |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | No | 5/22/20 | Posted 1/8/20 but not posted as a treatment coordinator; Position posted correctly on 5/22/20. The Treatment Coordinator position was filled in late September but only for about eight weeks.  It is again vacant and posted on the County's website. |
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and security measures at RDC. The architect shall conduct periodic inspections. | | | The County has entered into a contract with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, Farr & Lemons Architects & Engineers (CDFL, PA). This was reportedly on 4/15/20. The Monitoring Team has not seen the contract or documentation of any |

| | | | | |
|---|---|---|---|---|
| | | No | 4/15/20 | inspections by CDFL although Benchmark has generated a punch list. |
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |
| | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 | |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement-required policy review and approval process is completed. | Yes | 3/27/20 | |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the supervision of inmates at RDC. The plan shall include the following:<br>II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | Yes | 4/13/20 | The Revised Staffing Plan was developed in April 2020.  It specified direct supervision staffing for all three pods at the RDC.  On August 1, 2020, the Sheriff issued an order that called for direct supervision staffing in C-Pod upon its reopening (which occurred on October 22, 2020).  However, incident reports disclose that C-Pod |

| | | | | |
|---|---|---|---|---|
| | | | | is often not staffed according to the Plan and Order. |
| | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | No | | The staffing plan does not address this paragraph. The Detention Administrator developed a plan for rotation of staff but this was put on hold because of COVID-19. The new 12 hour shifts for the entire jail system does better utilize staff. The JDC has been closed for almost a year. Since that time most of the JDC staff were reassigned to the WC which helped that facility but did nothing to increase coverage at the RDC. |
| | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare check sheets at the cell doors of those inmates held in segregation. | No | | Directive issued on 9/27/19 by the previous Jail Administrator; radios assigned. Review of incident reports discloses that the directive is not always being followed. |
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other areas or facilities. This work will be completed within 3 months. | Yes | 4/2/20 | The alarms and cameras were installed in April 2020. The operations did not shift to direct supervision with one officer in the unit until September. The staff savings can now be achieved. |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each | | | New policies have been provided to staff. However, training has been |

| | | | |
|---|---|---|---|
| | policy or procedure, the County shall develop the curriculum and materials for training on the new policy or procedure. | No | | delayed due to COVID-19. Supervisors do not appear to be requiring staff to adhere to the adopted policies. |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | No | | Training on the Use of Force Policy, adopted 2/1/20, has been postponed several times due to COVID. In the interim, UOF training has been provided to all supervisors as of March 2020. In-service training has not been provided on the other policies adopted since COVID first appeared. |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include: 1. Activities which are varied and appropriate to the ages of the youth; 2. Structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship; 3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and 4. Hinds County, by and through its County Administrator and/or Executive Director at | | | A more complete daily schedule has been developed that outlines times for more structured activities, but it was not possible to confirm to what extent those times are actually filled with activities outlined in the Stipulated Order.  In fact, discussions suggest that many of the times noted for various programs are simply turned into "free time". |

| | | | | |
|---|---|---|---|---|
| | Henley-Young, shall maintain exclusive control and maintenance of any facilities or technology that promotes compliance with this provision. | No | | |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as: 1. cognitive behavioral programming; 2. independent living skill training; 3. relationship and positive communication skills; 4. anger management; 5. peer refusal skills; 6. trauma informed programming; and 7. pre-vocational skill building. | No | | The mental health team (Youth Support Specialists and QMHPs) have worked to identify and implement evidence-based curriculum/programs in the areas outlined.  Further assessment of progress related to both the content and frequency of these programs will be required to determine if they are in full compliance with this provision. |
| 05-16-20 | I.  A. 1. In any occupied pod, the County will convert all control room doors, housing unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically controlled swing doors to the control panel so they can be electronically operated with a CML type locking mechanism. | No | | This has been completed in C-Pod and A Pod but not in B-Pod. Although the security doors in A-Pod have been changed from a sliding to a swinging configuration, and they now lock, their operation is still by key, not electronic control. CML's work on the doors in B-Pod has been completed and a walk through is scheduled for the week of March 29th.. |
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of | | | |

| | | | | |
|---|---|---|---|---|
| | steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | Yes | 4/30/20 | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | No | | The estimated completion date for this work is mid-March. |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | No | | Fire hoses have been installed in C Pod during the renovation. They have not been reinstalled in the other 2 pods the renovation of which is now overdue. |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | Yes | 4/15/20 | CDFL and HDR, Architects, have been retained. |
| | I. B. 4. Form a committee to develop and implement the Master Plan, which will include the County Administrator, the Sheriff, the Jail Administrator, the facility captains, and the Board of Supervisors | | | County contracted with facilitators and formed a committee to work with the facilitators. The consultants completed the master plan |

| | | | |
|---|---|---|---|
| | President. Other members may be included at the discretion of the County and the Sheriff. | Yes | 4/28/20 | recommendations on January 15, 2021. |
| | II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division specifically for recruitment of detention officers. | No | 6/1/20 (but again vacant) | A full-time recruitment officer was hired in June, 2020. He has since resigned and the position is currently vacant. |
| | II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | No | | A draft Recruitment and Retention Plan was sent to the HR consultant on the Monitoring Team on 2/4/21. He returned comments on 2/9/21. |
| | IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of implementation of pretrial services programs. | No | | The County has not retained a consultant. The County is applying to be a learning site with Advancing Pretrial Policy and Research which if accepted would provide technical assistance. The application is due May 28, 2021 which even if accepted is long after the deadline in the Stipulated Order. |
| | IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or within 12 months shall obtain certification by the National Association of Pretrial Services Agencies (NAPSA). | No | | The County assigned this role to an employee who already had a full time job and gave her the additional role of CJCC Coordinator. |

| | | | | |
|---|---|---|---|---|
| | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | No | | The development of a pretrial program has been discussed at CJCC meetings but has not included all necessary stakeholders or focused on actual implementation. |
| | IV. A. 4. The County shall provide the technical support for implementation of a risk assessment instrument for purposes of pretrial release decision-making. | No | | |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | No | 9/2020 (but again vacant) | The position was not posted until 5/22/20. The position was filled in late September, 2020 with the hiring of a clinical social worker but she has now resigned. The County had not contracted with a psychologist to provide any services needed in addition to the services provided by the social worker. |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train deputies on a Settlement-compliant use of force policy, including Settlement requirements for reporting of use of force. | | | Training was scheduled but has been delayed due to COVID. UOF training is provided to new recruits during the basic academy, but existing staff have not received formal training.  Instead, UOF was |

| | | | | |
|---|---|---|---|---|
| | | No | | covered during Roll Call Training by supervisors which is roughly 15 minutes and can only be accomplished through paid overtime. |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | No | 9/2020 | Training on supervisory review of UOF incidents was included in the UOF training of the supervisors. Incident reports indicate that supervisors are approving reports that disclose improper use of force. Since the time of the supervisors' training, new supervisors have been promoted and need training. |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | No | | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be converted to secure swinging doors and tied to a new control panel. | No | | Since the renovation of B Pod has just begun, A Pod will continue to be used for some time contrary to the time line in the Stipulated Order. However, the plan continues to be to eliminate its use once the renovation of B Pod is complete. |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern | | | Multiple person cell doors have been replaced but single cells continue to |

| | | | | |
|---|---|---|---|---|
| | full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | No | | be used for housing without the required doors. It was anticipated that Booking would no longer be used for housing when C Pod opened. However, it continues to be used for housing. |
| | II. B. 4. Within 6 months, the County shall develop and implement a process that provides criteria for merit-based promotion and establishes a career ladder. | No | | A draft Career Development Plan was provided to the HR Consultant on 12/2/20. He returned comments on 12/3/20. |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | Yes | 6/1/20 | |
| 8-16-20 (2 months to post, 4 months to offer, and 1 month evaluate structure | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | No | | |
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the | | | |

| | | | |
|---|---|---|---|
| | development of the pretrial program within 9 months. | No | | |
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | No | | |
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | No | | |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | No | | The master plan recommendations report was completed on 1/15/21. However, the County has not adopted a master plan based on those recommendations. |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. | Yes | | The master plan recommendations report includes a listing of necessary safety and security repairs. The County has not adopted a master plan with deadlines for making those repairs. |
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | No | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the information that is needed for the long-term planning process. | Yes | | |

| | | | |
|---|---|---|---|
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will notify the Monitor and DOJ of any anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | No | | The policy development and review process has been proceeding with 28 policies now approved. Not all projected deadlines have been met but progress was being made. More recently the policy group working on the policies has not been fully engaged and progress has stalled. |

**Monitoring Activities**

The Monitoring Team conducted a Remote Site Visit February 8, through February 11, 2021 with some follow up interviews. The site visit schedule was as follows:

Site Visit Schedule
February 8-11, 2021

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Richard Dudley | Jim Moeser |
|---|---|---|---|---|
| February 8 9:00 | Major Fielder and Captain Crain | Major Fielder and Captain Crain | Nurse Simms | Mr. Burnside and Mr. Dorsey |
| 10:30 | Kenisha Jones | Bob Brown, David Marsh and Gary Chamblee and Sgt. Steven Winter | | |
| 1:00 | Major Fielder and Captains Crain, Simon, and Conner | Major Fielder, Captains Crain, Simon, and Conner | Mental health team/staff-QMHP's | Synarus Green |
| 2:30 | Tanecka Moore | Miioka Laster | | Youth Support Specialists Galloway and Barber |
| 3:30 | Tony Gaylor | Doris Coleman | Nurse Minor | Tony Gaylor |
| February 9 10:00 | Status Conference | Status Conference | Status Conference | Status Conference |
| 2:00 | Priscilla Dawson | Lt. Cheryl Childs, and Marlo Brinnon | Medical Nurse Practitioner/Clinician | Mr. Caldwell, School Principal |
| 3:00 | Claire Barker, Sheriff Vance, Undersheriff White and Chief Deputy Wall | Claire Barker, Sheriff Vance, Undersheriff White and Chief Deputy Wall | Nurse Simms | |
| February 10 9:00 | Mazie Jones | Mazie Jones | Nurse Simms/ EMR access | |
| 10:30 | Robert Farr, CDFL; Bill Prindle, HDR; | Robert Farr, CDFL; Bill Prindle, HDR; | | |

| | | | |
|---|---|---|---|
| | David Bostwick, HDR, Tony Gaylor, Board Attorney | David Bostwick, HDR; Tony Gaylor, Board Attorney | | |
| 2:00 | Inmate Interviews | Captain Tyree Jones and Investigators Dukes and Elkins | | Ms. Monica Harper, QMHP |
| February 11 9:00 | Krista Chick and Donald Kern, QCHC, Nurse Sims and re Mental Health Unit | Marquette Funchess and Doris Coleman | Krista Chick and Donald Kern, QCHC, Nurse Sims and re Mental Health Unit | Ms. Jacqueline Foster, Training and Development Coordinator |
| | | Tony Hannah and Kimblar McLauran re Food Service | | Ms. Andrea Baldwin, Program Coordinator |
| 1:00 | Sheena Fields | | | Mr. Burnside and Mr. Dorsey |
| 2:00 | Claire Barker, Synarus Green, Tony Gaylor, Undersheriff Wall, Major Fielder | Claire Barker, Synarus Green, Tony Gaylor, Undersheriff Wall, Major Fielder | Claire Barker, Synarus Green, Tony Gaylor, Undersheriff Wall, Major Fielder | Claire Barker, Synarus Green, Tony Gaylor, Undersheriff Wall, Major Fielder |
| February 12 1:00 | | | | Youth Court Judge Carolyn Hicks |
| March 1 1:00 | Sgt. Tillman | | | |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

**PROTECTION FROM HARM**

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;

h.   Use of force;
i.   Incident reporting;
j.   Internal investigations;
k.   Prisoner rights;
l.   Medical and mental health care;
m.   Exercise and treatment activities;
n.   Laundry;
o.   Food services;
p.   Hygiene;
q.   Emergency procedures;
r.   Grievance procedures; and
s.   Sexual abuse and misconduct.

**Partial Compliance**

Pursuant to the Stipulated Order a list of 93 needed policies was developed. Of those, 48 were
identified as priority policies. Twenty-four of the priority policies have been approved by DOJ
and adopted by the Sheriff. Two additional policies as well as the definitions for the policy
manual are currently under review. Four non-priority policies have also been approved and
adopted for a total of 28 approved policies. Of the 19 policy areas listed above, 12 have been
addressed in whole or in part by policies that have been adopted. Two more are addressed in
policies currently under review and "Housing Assignments" has been addressed in a housing
plan. Although progress is being made, the target dates for policy development have not been
met.

The development of a complete set of policies, approved by the DOJ and adopted by the Sheriff,
is moving forward but at a less than satisfactory rate.  The first two years of the monitoring
process resulted in virtually no progress, but the addition of a coordinator employed through the
Monitor resulted in positive movement. With changes in HCDS personnel there has been less
engagement by HCDS staff in the policy development process which has slowed the pace.

Because the HCSO has opted to generate independent post orders rather than using individual
policies for specific posts, post orders cannot be created until policies are in place.
Consequently, there are no post orders available to Detention staff.  This creates operational
problems throughout the Jail System in that staff have no written direction specific to their
individual assignments. The current situation in C-Pod at the RDC is a case in point.  When it
reopened on October 22, 2020, it was supposed to operate under the principles and dynamics of
direct supervision.  Unfortunately, almost four months later that is not the case, significantly
because the housing unit officers do not have adequate written directions or guidelines as to what
is expected of them. The Jail Administrator is working with the corrections expert of the
monitoring team to create written directives in this area. An interim measure for other posts

24

would be to provide a binder with the policies relevant to a particular post along with any written directives available at the post and reviewed by personnel assigned to that post.

More troubling is that the adopted policies do not appear to be implemented. Most notably, the Use of Force policy explicitly requires that chemical spray be used as a defensive measure, not as a tool to coerce compliance with officers' orders.  A number of incident reports described below ( IR # 202348, 202425, and 202444) indicated that chemical spray was being used to coerce compliance. Not only did the officers act contrary to policy, but their supervisors signed off on the reports and the Internal Affairs investigator exonerated the officers. As another example, the Classification policies require that there be a Classification Committee and, among other duties, the Classification Committee is supposed to review all placements into administrative segregation and review the classification every seven days. There is no Classification Committee. Placements in administrative segregation are not reviewed by Classification. In fact, Classification often does not know why someone is in administrative segregation. There are no 7-day reviews of inmates in segregation which combined with no notice to mental health staff regarding inmates with SMI being placed in segregation also required by policy has the potential of prolonged stays of inmates with SMI in segregation as has been noted.  Training on new policies is, no doubt, hampered by COVID. However, it appears that even the supervisors and leadership is unaware of or uninterested in following the adopted policies.

Training on new policies is provided to officers during their time in the recruit academy.  That puts them at an advantage over existing staff who do not receive the same level of orientation due to the cessation of in-service training caused by the COVID-19 pandemic.  Those previously hired officers merely receive a copy of each new policy as it is adopted, along with a brief explanation by shift supervisors during the short roll call time associated with shift overlap. Since that period must be compensated through paid overtime, it is kept to a minimum.  Even supervisors have not been trained on the new policies.  This places the supervisors in an untenable position.  Without the benefit of formal training on the new policies, they are expected to instruct their officers on them.  To date the only policy on which supervisors have actually been trained is Use of Force.

Of equal concern is the adoption of some practices without any policy. In two incident reports, it was reported that an inmate was placed on "meal loaf" as a disciplinary measure. Meal loaf is a loaf made of grinding up everything being served as the meal. It is used on rare occasions when an inmate, usually one with mental illness, is not eating the food being served and needs the nutrition. It should never be used as discipline. This practice was being used without any written guidance through policies.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

 **Partial Compliance**
There have been several personnel changes at the top level in the Jail System.  The Jail Administrator continues in his post.  He meets both the education and experience requirements specified in the Settlement Agreement.  The Assistant Jail Administrator has the requisite experience, but does not have the required four-year college education.  On January 1, 2021, a new captain was hired to oversee the operation of the RDC.  He meets both the education and experience requirements for the position.  The captain that he replaced was moved to being in charge of Transportation, Programs and Food Service.  Since then, she has been reassigned again and has been placed in charge of Policy Development.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**
Substantial Compliance cannot be achieved until policies and procedures are in place and supervisory staff have received the requisite training.  Currently, annual in-service training has been put on hold due to COVID-19 pandemic restrictions.  A review of incident reports and CID/IAD investigations indicates that Detention personnel are not currently complying with UOF criteria specified in the adopted policy.  This issue is covered in greater detail later in this report.

On February 1, 2021, three Detention Officers were promoted to the rank of Sergeant.  While two of them meet the experience requirement for promotion, one does not.  Further, two of the three have significant disciplinary histories that make their selection for supervisory status questionable.
- Sergeant "A" has worked for the HCSO since November 2018, but previously worked in law enforcement and corrections, so her total work experience exceeds three years.
- Sergeant "B" was employed by the HCSO in November 2020.  He previously worked for the HCSO from July 2013 to November 2014, when he was terminated for unexcused

absences.  He does not have the requisite three years of experience in corrections and he was previously terminated for unsatisfactory service.
- Sergeant "C" was employed in September 2013, so he has the requisite experience in corrections; however, he was counseled for allowing confiscated contraband to be returned to inmates in 2014, and he was suspended for 10 days for sleeping on duty in April 2019.

When the Jail Administrator was questioned as to why two candidates were promoted when their qualifications and disciplinary history should have eliminated them from consideration, he indicated that a panel of Detention, Law Enforcement and Civilian personnel makes the decision as to whether or not a candidate is selected.  Whether or not a promotional review board may specify qualified candidates, the Settlement Agreement states that the Jail Administrator is supposed to be able to make employment and promotional decisions.  He should not have to approve candidates submitted by the promotional review board who are less than qualified.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Substantial Compliance**
The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check.  This was confirmed by the Background Screening Investigator and the Director of Human Resources, as well as by a review of the personnel files of recently employed Detention Officers.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**
As has been previously reported, the JDC was designed as a first-generation jail (linear intermittent surveillance).  It cannot operate as a direct supervision jail without major modification.  Considering its age and condition that is not a practical alternative.  Consequently, the JDC should be permanently shuttered, something that has been recommended in the Master Planning Committee's Final Report.  Only the transfer waiting area should remain open.  That space must continue to function in order to support the courts.

The WC was originally designed as a modified state prison style dormitory with two, 200 bed housing units.  Subsequently it was modified to become a 256-bed facility comprised of four, 64 bed housing units.  It currently operates under the principles and dynamics of direct supervision.

The RDC was originally designed to be a direct supervision facility, but that ended in 2012, when the housing unit officers were pulled out and the inmates were left virtually unsupervised. A major riot resulted, and C-Pod had to be closed for a complete renovation. Subsequently, the failure to adequately staff the RDC led to C-Pod being closed again to undergo a second complete renovation. When it was re-opened on October 22, 2020, the expectation was that C-Pod would operate under the principles of direct supervision. Unfortunately, that has not happened. The C-Pod housing units continue to function much as they did prior to the renovation. While officers are assigned to the housing units, they sometimes leave their posts without first obtaining a replacement. Further, they lock inmates in their cells for non-disciplinary reasons and even feed them in their cells. These actions are in conflict with direct supervision principles.

It is apparent that the direct supervision training provided by the National Institute of Corrections has not been transferred and implemented into daily operations at the RDC. The Monitor's corrections operations expert has worked with the Jail Administrator over a period of more than a month and a half to provide technical assistance. A draft directive is currently being developed for the Jail Administrator's signature which will outline the duties and responsibilities of Detention Officers assigned to housing units.

B-Pod is currently closed while it is brought up to the standards of C-Pod. CML, a security firm based in Texas, anticipates that its work on cell doors and the control panel will be completed by mid-March. The County is responsible for all other maintenance issues in B-Pod. A realistic completion date for that work has not yet been set forth. Based on past experience, it will be many months from now. Major plumbing, electrical and HVAC problems, missing cameras and ongoing issues with the integrity of the roof, cannot be quickly corrected. In the meantime, the County has pushed to have inmates paint the pod, something that should be done only after mechanical, electrical, plumbing and roofing problems have been rectified. Without concerted focus on retention of staff by the HCSO and County, the staffing required for B and C-Pod to operate under the principles of direct supervision will not be possible.

There is no plan to utilize A-Pod once B-Pod is reopened. Consequently, it will not be renovated and brought up to direct supervision standards unless the County opts to staff and occupy it. In the interim, the inmates assigned to A-Pod are forced to contend with unsafe and unsanitary conditions. Rather than fix long standing problems, the County has simply welded some cell doors shut; but inmates are able to dump trash into those cells through broken door windows, which means that there are unsanitary "garbage dumpster cells" within the housing units. Finally, most lights within the units do not function, leaving the inmates in the dark both in their cells and in the dayroom and requiring officers to use flashlights to complete well-being checks. According to inmates, most of the showers are non-functioning. A-Pod should be closed as quickly as possible.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

   a. Hire and retain sufficient numbers of detention officers to ensure that:
      i. There are at least two detention officers in each control room at all times;
      ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;
      iii. There are rovers to provide backup and assistance to other posts;
      iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;
      v. There are sufficient detention officers to implement this Agreement.

   b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:
      i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.
      ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.
      iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

   c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

   d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties

       recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

    e.  The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

The lack of staff to fill required posts has consistently been the single greatest shortfall of the HCSO and County since the beginning of the monitoring process in 2016. The root cause of this problem is multi-faceted. The salary offered for a Detention Officer's position is not adequate to entice candidates to work in an environment that is known to be unsafe and poorly managed.

Further, there is no career path in place to help retain personnel. With a starting salary of $27,500 per year (considerably less than the $30,000 offered by the Mississippi Department of Corrections and the pay for less hazardous employment in the community) and no step increase plan in place, there is little incentive for a Detention Officer to join and stay with the HCSO. The County should implement a system whereby officers receive specified annual increases. This was previously recommended by the HCSO, but has never been adopted by the County. Under the current system, a ten-year Detention Officer veteran makes no more than when he/she was first employed.

Lack of retention has been an ongoing problem in HCDS with a turnover rate of close to 25% in 2020. Despite the pressing nature of this issue, lack of retention has received little attention at the higher levels of the Sheriff's Office. Financial incentives can contribute to retention, but other factors such as personnel policies and practices and the work environment can contribute to a lack of retention. Although the Stipulated Order required the County to contract with an HR consultant, in October, 2019, the Monitor added a correctional human resources expert to the team to provide technical assistance in this area to assist with compliance. The Recruitment Officer initially assigned to work with this consultant was reassigned. His replacement was pulled away from those duties to work posts in the Jail and was eventually reassigned to work in the jail permanently. At this time, HCDS is not utilizing the consultant pending hiring of a new Recruitment Officer. Hiring a new Recruitment Officer is an important step. However, given the critical nature of this very problematic area, higher level staff at the Jail and in the Sheriff's Office should be engaged in this process.

The original Staffing Analysis, completed in 2017, called for well over 400 personnel in order to staff the three jails. When the report was updated in April 2020, that figure was revised to 412. With JDC and B-Pod being closed the number of needed positions is 303.3. This is almost a 25% vacancy rate. However, with the transfer of JDC staff to the WC, the RDC still experiences a 40% vacancy rate. To date the County has never attempted to create the number of positions required to meet that standard. In fact, the number of funded positions has stayed the same at

272 until recently, when nine Food Service positions (previously carried as contract personnel) were added as County positions.  That changed the number of funded positions to 281.  Currently 231 of them are filled, which is still far below the high of 256 that was recorded approximately two years ago.

The shortage of personnel has meant that inmates are not properly supervised.  Currently, the only area of the Jail System that appears to be adequately staffed is the WC.  All of the RDC, including C-Pod (which was supposed to re-open as a direct supervision housing area), has never been staffed at a level that complies with this paragraph.  This is in spite of the fact that the JDC has been closed for close to a year and B-Pod at the RDC is closed for renovation.  While those closures save immeasurably on the minimum staffing requirement, they are insufficient to offset the shortage of personnel.

The lack of staffing contributes to the lack of safety, particularly at RDC. From a review of the incident reports it appears that many of the fights, assaults and fires occur when there is no officer on the unit. This continues to be true in C-Pod which is supposed to now have one (C-1, 2 and 3) or two (C-4) officers on the unit at all times. This is also the case in the suicide watch unit, C-4 ISO. This area is supposed to have an officer inside the unit at all times.  It is apparent from the incident reports that this is not the case. See, e.g. IR # 202333, fight in C-4 ISO with no officer present, IR # 202349, destruction of property in C-4 ISO with no officer present, IR # 202363, fight in C-4 ISO with no officer present. A particularly troubling PREA complaint highlights this as an ongoing problem. An inmate reported that he repeatedly claims to be suicidal so that he can be placed on C-4 ISO and engage in sexual activity. He reported that this activity is able to occur because the assigned officer is sitting in the control room instead of on the unit. HCDS staff has confirmed that C-4 ISO is often unsupervised because of understaffing. Whether because of understaffing or the officer leaving the post, this critical post should not be left unfilled.

The inability to retain staff also contributes to the lack of appropriate candidates to promote to supervisory positions. As has been noted in this and prior reports, a number of promotions have been to officers with limited experience and/or questionable employment history. Without solid supervisory personnel, Detention Officers do not receive the adequate guidance in their duties.

There continues to be concern about the safety of the medical and mental health staff.  Most certainly, issues like the shortage of security staff and the absence of working security cameras in Medical continue to be issues that compromise staff safety.  In addition, as noted in other sections of this report, there are times when due to safety concerns, medication pass and scheduled evaluation and treatment visits are disrupted.  Therefore, it is imperative that these safety issues be addressed.

f.  Develop and implement an objective and validated classification and housing
    assignment procedure that is based on risk assessment rather than solely on a
    prisoner's charge.  Prisoners must be classified immediately after booking, and
    then housed based on the classification assessment. At minimum, a prisoner's
    bunk, cell, unit, and facility assignments must be based on his or her objective
    classification assessment, and staff members may not transfer or move prisoners
    into a housing area if doing so would violate classification principles (e.g.,
    placing juveniles with adults, victims with former assailants, and minimum
    security prisoners in a maximum security unit).  Additionally, the classification
    and housing assignment process must include the following elements:

    i.   The classification process must be handled by qualified staff who have
         additional training and experience on classification.

    ii.  The classification system must take into account objective risk factors
         including a prisoner's prior institutional history, history of violence,
         charges, special needs, physical size or vulnerabilities, gang affiliation,
         and reported enemies.

    iii. Prisoner housing assignments must not be changed by unit staff without
         proper supervisor and classification staff approval.

    iv.  The classification system must track the location of all prisoners in the Jail
         and help ensure that prisoners can be readily located by staff.  The County
         may continue to use wrist bands to help identify prisoners, but personal
         identification on individual prisoners may not substitute for a staff-
         controlled and centralized prisoner tracking and housing assignment
         system.

    v.   The classification system must be integrated with the Jail prisoner record
         system, so that staff have appropriate access to information necessary to
         provide proper supervision, including the current housing assignment of
         every prisoner in the Jail.

    vi.  The designation and use of housing units as "gang pods" must be phased
         out under the terms of this Agreement.  Placing prisoners together because
         of gang affiliation alone is prohibited.  The County must replace current
         gang-based housing assignments with a more appropriate objective
         classification and housing process within one year after the Effective Date.

**Partial Compliance**

Classification coverage, as was noted in the last Monitoring Report, was probably less than was
indicated.  The Classification Unit has only seven personnel, not eleven as was listed.  That
higher figure came from the Revised Staffing Analysis, not what actually exists today.
According to the new Classification Supervisor, there are two vacancies, yet the five remaining

personnel are able to provide 24 hour coverage.  This may be possible, but it seems unlikely considering the fact that 28.6% of Classification positions are vacant.

The new Classification Sergeant indicated that assignment by gang affiliation is no longer practiced.  It was reported during the October 2020 remote site visit, however, that housing by gang affiliation has continued. This will continue to be monitored. In addition, the Classification Sergeant stated that the Captain at the WC does not override Classification decisions regarding facility assignment.  She did note, however, that inmates are routinely moved from one area to another by supervisors or officers without prior approval by Classification in violation of policy. She said that she is able to review these moves the following morning to determine whether or not they were appropriate and to take corrective action.

With regard to the utilization of Booking holding cells for housing purposes, the Sergeant reported that orders from the Assistant Jail Administrator and Jail Administrator directed her to house inmates there.  Not only are inmates held in multiple occupancy holding cells that have had new doors installed, but some inmates are held in single cells where no corrective renovations have been, or are scheduled to be, made.  In almost every previous Monitoring Report it has been noted that "…hopefully this will be the end of housing inmates in Booking holding cells…" or words to that effect.  Obviously, that is not the case.  No matter what has been done to rectify the situation, the HCSO continues to fall back on Booking holding cells as the place to house problematic inmates.  This has to stop.  With the opening of C-4 as the confinement unit, it was hoped that housing inmates in Booking holding cells (which should never hold an inmate longer than eight hours, not days, weeks or months) would finally come to an end.  Unfortunately, so many cell door windows in Housing Unit C-4 (the lockdown unit) have been broken out by inmates that Booking holding cells continue to be used for housing.

While wrist bands are still used, the number of inmates who actually have/wear them cannot be determined until the next on-site visit.

A review of the initial classification scoring sheets for the first two weeks of January was completed.  As was reported in the December Monitoring Report, the classification sheets indicate that Classification consistently uses an objective scoring system with no overrides, although some overrides would be acceptable. Previously, although using the scoring sheet, staff routinely did an override based on charge undermining the utility of the objective classification tool. Classification staff is now scoring offense history for those with a moderate history. Previously, they were scoring offense history only if it was in the high or highest category. This has been rectified. However, one officer was scoring the moderate offense history incorrectly assigning 2 points instead of 1 point. This resulted in a scoring error in 11 of the files reviewed. The Sergeant is going to address this with the officer and this should be easily remedied. Another scoring error was seen in 3 files. The scoring tool provides for subtracting up to 3 points, one

point for each indicator of positive history such as residential stability. The classification officer scoring the three files was only scoring 1 point even when there was more than one indicator. The Sergeant is going to address this issue with the officer and should also be easily remedied.

One problem noted in prior monitoring reports was the lack of Classification staff access to the NCIC "rap sheet." Classification staff only had access to the JMS system to determine prior offense history. In some instances this resulted in the inmate scoring low on offense history even though the inmate reported serious violent offenses or reported being on probation or parole which would indicate a criminal history. This appeared to be the case in five files during the current review. However, the Sergeant reported that the Monday prior to the site visit, Classification staff was given access to the NCIC "rap sheets." She was not aware that the NCIC was to be used in scoring the offense history in the scoring tool. However, with access and use of the NCIC, staff should be able to more accurately score the offense history.

The classification spreadsheet continues to show a number of male maximum security inmates being assigned to the Work Center. There appear to be about 17 maximum security females for whom there is not currently an alternative. However, there appear to be about 24 maximum security males. The Work Center being a dormitory style housing facility with unfortified walls would not be expected to house maximum security inmates.

Classification should also be overseeing the appropriate assignment of people to segregation housing. This has not been occurring. It is appropriate for security staff to place someone in segregation if there is an immediate danger. However, the Classification Committee should review that placement within 24 hours and then conduct a review every seven days. There is no Classification Committee. Security does inform Classification if they have put someone in segregation including the cells in Booking. However, Classification is seldom told why a person has been moved to segregation and does not conduct a review in 24 hours contrary to adopted policy. Classification does follow up with the Jail Administrator or Assistant Jail Administrator to see if they want the inmate to stay in segregation but there is no review by Classification and no review every seven days. It appears from the incident reports that administrative segregation is often used instead of following the disciplinary process as inmates are moved to "lock down" with no reference to referral to the disciplinary process. Consistent with this, the segregation report for January showed 16 people were placed in administrative segregation while only 2 were placed in disciplinary segregation.  The disciplinary officer also stated that the disciplinary process is seldom used as most inmates go to lock down for administrative segregation. The report shows that no disciplinary hearing was held for the two in disciplinary segregation at RDC. The process currently in use is that an inmate subject to discipline is offered a plea which they can accept or not. If they do not a sanction is imposed without a hearing. The inmate can appeal in which case, the Disciplinary Committee reviews the case. However, the inmate does not appear before the Committee. This does not comport with due process.

The Classification Sergeant was involved with the placement of 3 individuals in Booking. These individuals had made PREA complaints and the Classification Sergeant together with the PREA Coordinator decided that they would only be safe in the Booking cells. On the segregation unit, inmates have broken their cell door windows and crawled out. This combined with the fact that there is not an officer on the unit at all times does create a risk. However, this needs to be rectified. The cells in Booking are not appropriate for housing.

     g.  Develop and implement positive approaches for promoting safety within the Jail including:

          i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

         ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

       iii.  Creating work opportunities, including the possibility of paid employment;

       iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

        v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

       vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

      vii.  Providing reasonable opportunities for visitation.

     h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances. Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

     i.  Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation is provided to inmates per week at the WC, but that standard cannot be confirmed at the RDC based on the records that were provided.  At the WC documented records reflect approximately three hours of recreation per day are provided to each housing unit.  At the RDC the logs routinely do not indicate whether or not the whole housing unit was allowed to participate. In addition, the number of hours they do show do not reflect a sufficient number of hours.  Further, in C-Pod only specific cells are noted, not the entire housing unit.  This reflects that the principles of direct supervision are not being followed.

Regarding 42 (g) (ii) and (iii), there is no incentive program.  There are work opportunities at the WC but not paid employment, and the only opportunity at the RDC is to work as a trusty.  The housing units at the JDC are currently closed.

Regarding 42 (g) (iv), since the last site visit, the mental health caseload has grown by about 20%, from 123 detainees to 151 detainees.  It also appears that the acuity of the mentally ill population has also increased, meaning that there is a greater percentage of detainees on the mental health case load whose ability to function in the facility is very seriously impaired as a result of their mental illness.  Supportive of this opinion is the finding that there is an increased number of incidences that could be reasonably viewed as directly related to a detainees' serious mental illness (for example, at least 4 incidents of aggressive behavior towards staff, at least 4 PREA incidences, and at least 3 of the frequent users of suicide watch, all added to the population in long-term segregation due to the fact that their serious mental illness makes them a danger to themselves and/or others); indications that about 25% of the caseload was so seriously ill and resistant at the time of admission that they refused to undergo an initial mental health assessment; and the finding that those on the mental health caseload are significantly over-represented on the list of detainees who fail to comply with the medication that has been prescribed for them (measured as a compliance rate of 50% or less), as well as follow-up chronic care visits.

At present, the mental health staff are responsible for performing initial mental health assessments on all detainees identified as possibly in need of mental health services at intake or later (i.e., upon self-referral, upon referral by security or medical staff, upon referral by the PREA office, or when identified by mental health staff).  Staff also then develop an individualized treatment plan for each detainee who is placed on the mental health caseload, provide individual and group therapy, provide medication management, perform emergency assessments, including suicide risk assessments, manage detainees on suicide watch or other special mental health observation, and develop and implement discharge plans.  In addition, staff perform weekly mental health rounds on all detainees who are being held in segregation. While awaiting the implementation of the approved policy on 'segregation review', staff attempt to advocate for detainees whose mental health status has deteriorated while in segregation and provide such detainees with additional mental health services. Also, while awaiting the

development of a policy on 'disciplinary review', staff have planned for how they will perform timely mental health assessments and then make recommendations for mentally ill detainees who have received disciplinary charges.  Once the mental health unit is opened, mental health staff will also have the responsibility of providing the expanded mental health program that will be available on that unit, while continuing to provide all of the other above noted services.

Although the vacant QMHP position has been filled since the last site visit (the new QMHP started a week before the site visit), the mental health treatment team still only includes 2 QMHPs, another part-time QMHP, a part-time Mental Health Nurse Practitioner (the prescriber of medication), and a portion of a senior nurse's time (focused on discharge planning).  The above-described growth in the mental health caseload and associated demand for services focuses even more attention on the need for additional mental health staff, which has been an issue repeatedly raised by the Monitoring Team.  However, the increase in the acuity of the mental health population and the resultant need for expanded programming to address the treatment needs of this more seriously ill population (which would include repeated and more rigorous efforts to even engage such detainees) even further focuses more attention on the need for additional mental health staff.  Therefore, as has been previously noted by the monitoring team, obtaining a positive response from the County to the QCHC request in the current contract negotiation for two additional mental health staff (and additional prescriber hours) remains a critical issue. Furthermore, although it is anticipated that the opening of a designated mental health unit would finally provide a more appropriate treatment setting for the most unstable, acutely mentally ill population, the opening of the unit will require even more mental health staff (that staffing need is to be determined as part of the planning process for the mental health unit, as noted below).

The County should seriously consider the above noted current request for two additional mental health staff. Once the two additional staff positions are approved and filled, the mental health team should move forward with plans to develop a group therapy program designed to meet the need of detainees on the mental health caseload housed in general population. Once the program plans for the mental health unit have been developed and a staffing request for the unit has been submitted to the County, the County should seriously consider this request. Once the staff positions for the mental health unit have been approved and filled, those staff persons should move towards the implementation of the program for the mental health unit.

Regarding 42 (g) (vi), the process/procedures for screening new detainees for serious mental illness as part of the jail's booking and initial health assessment process has been described in prior reports.  During the October 2020 site visit there was a more detailed effort to look at the efficacy of the screening process with regard to the identification of detainees who were suffering from serious mental illness.  That effort revealed that although 74% of the detainees on the mental health caseload were identified during the initial screening process, more than 50% of those who were added to the mental health caseload at some later point were suffering from a

chronic, serious mental illness (such as a psychotic disorder or a major mood disorder) that was not identified during the screening process. This finding suggested that about 12-13% of newly admitted detainees either failed to acknowledge a history of serious mental illness during the screening process (i.e., they were stable at that moment and simply failed to recognize and/or report that they had a history of mental illness) and/or the screening process failed to identify that population (i.e., they evidenced symptoms at that moment that were not recognized or sufficiently considered).

During this site visit, while attempting to further explore the efficacy of the screening process, at least one irregularity surfaced. More specifically, as has been previously noted, when a newly admitted detainee fails to cooperate with the intake screening, and the nurse suspects that such failure is possibly due to mental illness, the nurse can and should immediately request a mental health assessment. However, this doesn't always happen; there were at least three identified cases where repeated efforts to perform an intake screen delayed referral for a mental health assessment (instead of prompting an emergency mental health assessment at the point of intake); and in two of those cases, a mental health emergency situation occurred during that period of delay. Therefore, it is imperative that intake nurses request emergency mental health assessments when faced with a new intake who appears to be unable to cooperate with the intake screening process due to mental illness.

With regard to the initial mental health assessments, performed on detainees referred to mental health for such an assessment, the timeliness of these assessments or at least the timeliness of attempts to perform these assessments has been good (most performed on the day of referral), and the quality of these assessments has been good. Although the percentage of detainees who at least initially refused a mental health assessment was 25%, that is down from the previous site visit (30%) and significantly down from the historic high of about 45%. However, this still means that a significant amount of staff time is consumed by repeated attempts to perform initial mental health assessments, especially since many of those who initially refuse require that staff make multiple attempts before a mental health assessment is finally performed.

When detainees were not referred to mental health at intake but then later added to the mental health caseload, staff should review their initial mental health screenings and MH Form 3s (a self-reporting form regarding mental health issues and history filled out by the inmate at the time of booking) in an attempt to determine whether or not indications of mental illness were missed at intake, and if that is the case, develop and implement a corrective action plan. A plan should be developed to assess the capacity of security staff to identify detainees who might be suffering from mental health difficulties and/or intellectual disabilities, and assure that security staff have a clear mechanism whereby they can refer identified detainees to mental health. While developing the procedure for rapid assessment of new admissions for placement on the mental health unit, staff should consider how acutely mentally ill new admissions who refuse an initial mental health

assessment will be housed and managed until such time that such an assessment can be performed.

The County cannot meet the requirements of this paragraph to provide appropriate treatment and therapeutic housing until additional mental health staff are added and a mental health unit is created.  The need for the development of a mental health unit in order to address the needs of the seriously mentally ill detainee population and comply with many of the provisions of the Settlement Agreement has been outlined in prior reports and noted again in various other sections of this report.  The various issues that need to be addressed in order to get to the point where a mental health unit would become operational have also been outlined in prior reports and many of them have been noted again in other sections of this report.  Therefore, all of the above noted will not be outlined again here, and instead, will simply offer a status update.

With regard to the planning process the mental health expert on the Monitoring Team did identify a consultant to work with QCHC.  Since the last site visit, the consultant has spent time with QCHC and provided QCHC with a range of model planning documents.  The consultant also arranged for a virtual site visit with one of the model jail mental health units which was attended by Hinds County Jail security staff, QCHC Central Office staff, and mental health staff from Hinds County Jail. The mental health expert on the Monitoring Team participated in the visit; and both mental health and security staff from the facility that was visited provided a tour of the unit and described how the unit was planned for/developed, how it was implemented, and how it is currently run.  The consultation, especially the site visit, has been enormously helpful in that it has made all the more clear the work required to plan for and open a mental health unit, and it has highlighted the need for such a unit to be a joint mental health/security effort (a point that was repeatedly made in relationship to so many different issues during the site visit).  It now appears that the planning process is in full swing.

As noted in the last Monitoring Report, the proposed location of the mental health unit has been changed, and B-Pod including the newly designated location for the mental health unit is now under renovation.  At the urging of the Monitoring Team, an onsite joint meeting of mental health and security staff took place in mid-March, in order to help assure that the renovation of the space will be completed in such a way that is as consistent as possible with the plans for the operation of the unit.  The renovations are projected to be completed by mid-March although given reports of progress to date, that seems unlikely.

Although the above noted planning is underway, there are still several issues that need to be addressed that will require a cooperative effort between multiple different players.  Therefore, it is worth noting these issues/tasks here.  They include:

- Develop practices consistent with the adopted policy for the mental health unit that would govern the working relationship between classification and mental health, regarding the assessment of detainees and their placement on or removal from the mental health unit

- Obtain approval from the County to add the mental health staff and additional prescriber hours that will be required to operate the mental health unit so that QCHC can recruit and hire the staff

- Assure that the program model designed for the unit clearly indicates how security staff will be incorporated into the treatment program for/the maintenance of a therapeutic environment on the unit, including, for example, the degree of access to clinical information about each detainee, how such access will be obtained, and the ways in which security staff might act in accordance with a detainee's treatment plan

- Identify security staff who will be assigned to the mental health unit, and develop and provide them with the additional specialized training that they will require

- Determine where detainees who might benefit from placement on the unit will be held when the mental health assessment required to determine appropriateness for placement on the unit is delayed or the detainee is deemed appropriate for placement on the unit but the unit is full

- Determine how the opening of a mental health unit relates to/impacts on other issues raised in this report in connection with other provisions of the agreement (such as disciplinary review, segregation review, and the presumption that detainees with serious mental health difficulties should not be placed in segregation) and assure that none of the related policies, procedures and practices are in conflict with each other

Interim steps towards the development of the mental health unit include:

- Obtain input from mental health on the renovation of the space designated to become the mental health unit, and complete the renovation of the unit consistent with the needs of the mental health staff to provide required services on the unit

- Assure that classification, other security, and medical/mental health policies and procedures clearly address, in a coordinated way, how detainees will be identified for placement on the mental health unit and removed from the unit

- Develop the mental health program/menu of therapeutic interventions that will be employed on the mental health unit, and include in those plans how security staff will support each detainee's treatment plan

- Assure that the treatment planning and treatment plan review process is flexible enough to work for detainees housed on the mental health unit

- Once it becomes clear what additional staff will be required to open the mental health unit, obtain approval from the County to add those lines and then recruit and hire the staff

- Identify security staff who will be assigned to the mental health unit, and see paragraph 45(f) with regard to providing those staff with additional specialized mental health training
- Address related issues such as those described in paragraphs 74 and 77, and all of the paragraphs regarding avoiding the placement of seriously mentally ill detainees in segregation, and assure that none of the related policies, procedures and practices are in conflict with each other

Regarding 42 (g) (vii), video visitation records for the RDC and WC confirm that approximately nine calls are accomplished per day.  That means that a typical inmate in the Jail System is permitted seven video visits per year, just over one every other month.  This figure is substantially better than what was noted in the last Monitoring Report, but it is still well below what should be expected.

Regarding 42 (h), suicide watch procedures for men and women are now consistent, but compliance with those procedures is suspect.  A review of incident reports shows that officers are often not present in the C-4 ISO unit at the RDC when inmates are housed there.  This has resulted in several assaults and at least one PREA investigation.  In IR 202349, the Sergeant who responded to banging in the C-4 ISO unit, found an inmate tearing the light fixture apart.  Obviously, there was no officer inside the ISO unit as there should have been.  In IR 202333, a Sergeant called for an officer to respond to an assault within C-4 ISO.  Once again, there was no officer present inside the ISO unit as there should have been.  The issue of whether or not suicide watch logs are properly maintained becomes moot when no officer is actually assigned in the Suicide Watch Unit.  It is supposed to be handled by paid overtime details, but that is obviously not happening, which is another indicator of deficient supervisory responsibility.

The medical and mental health related circumstances where higher levels of supervision are required; which staff (medical, mental health and security) are responsible for providing such higher levels of supervision; and where a detainee is housed while being so supervised have all been described in prior reports.   Compliance with this provision remains variable, depending on the nature of the special circumstances being responded to.

Some special medical observation is managed in the medical unit, while other less severe situations are managed on the detainee's regular housing unit.  In both situations there is an appropriate higher level of supervision provided by medical staff.  Suicide watch is managed in suicide-resistant cells.  There is an appropriate higher level of supervision provided by mental health and medical staff.  As noted above, security staff do not appear to consistently provide the required higher level of supervision to detainees.

Until the mental health unit is open/operational, there really is no appropriate housing for detainees who require special mental health observation due to the fact that they are seriously

41

impaired as a result of their mental illness.  Instead, such detainees continue to be placed on a segregation unit.  As noted above the segregation unit, C-4 is supposed to have two officers present at all times but it is clear from incident reports that there are often no officers present. Although both mental health and security staff make regularly scheduled rounds on detainees who are being held in segregation, this does not constitute the higher level of mental health supervision that such severely mentally ill detainees require (which will hopefully be made available to them once the mental health unit is operational).

In addition, during the October 2020 site visit the mental health expert on the Monitoring Team discovered that when a seemingly disturbed detainee was urgently referred to mental health, there were times when mental health staff delayed performing emergency assessments in order to 'give the detainee a day or so to calm down'.  As the mental health expert on the Monitoring Team noted in the report of that site visit, such a delay in performing an emergency mental health assessment results in a delay in providing any special mental health observation and treatment that might be indicated, and leaves other medical and/or security staff at risk of harm. Although no such cases were identified during this most recent site visit (i.e. the mental health expert on the Monitoring Team, did not identify any requests for emergency mental health assessments on severely agitated detainees), it is imperative that staff remember that when requested, an emergency mental health assessment should be performed as quickly as possible, even if the strong presence of security staff (to assure the safety of all concerned) is required in order to perform that emergency assessment.

When developing the plan/treatment program for the mental health unit, staff should ensure that there is also the capacity to provide a higher level of supervision and appropriate therapeutic interventions for detainees who are acutely mentally ill/unstable (i.e., special mental health observation status). Mental health staff should ensure that the practice of 'giving the detainee a day to calm down' when a detainee is referred for an emergency or urgent mental health assessment is discontinued, even if the detainee is extremely agitated, and that security staff assure that adequate security staff are available to assure the safety of all concerned (staff and detainee) when performing an assessment of an extremely agitated detainee.

Regarding 42 (i), video surveillance capabilities, at the RDC, cameras in the corridors and housing units are recorded, so incidents can be reviewed after the fact.  This capability has been in place since the beginning of the monitoring process; however, a number of cameras are out of order and need to be replaced. During the October, 2020 site visit it came to the attention of the Monitoring Team that, with the exception of one, the cameras in the Medical area of the facility are out of service.  This maintenance issue needs to be addressed immediately.  It was reported to the Monitoring Team that this was previously reported to the maintenance staff by QCHC but was raised again after the incident that occurred before the October 2020 site visit when an inmate attacked the nurses in the Medical Unit. When this problem was brought to the attention of the Chief Safety and Security Officer, he submitted a work order promptly.  However, the

cameras in Medical have still not been repaired. At the WC, when new cameras were installed, both they and the existing cameras were upgraded so that they can be recorded.  This enhancement finally allows the CID and IAD investigators to review video recording of incidents.

While the IAD and CID investigators now have access to the video recording system so that they can quickly view incidents, they still cannot obtain copies of them without having to go through a request process with IT.  It is recommended, again, that these investigators be granted immediate access to both view and record copies of previously recorded incidents.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a.  Staff vacancy rate of more than 10% of budgeted positions;

    b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c.  A major disturbance resulting in the takeover of any housing area by prisoners;

    d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The new Quality Assurance Officer is now generating a monthly report which will reflect the status of information required by this paragraph, but no system is in place to have the data submitted to her for inclusion in that report.  There are currently 281 funded Detention positions.  Of those, 231 are filled which equates to a vacancy rate of approximately 17.8%., well in excess of the 10% threshold.  Of the 303 needed positions with JDC and B-Pod being closed, the

vacancy rate is 25%.  (The vacancy rate at RDC is 40%) The actual turnover rate for 2020, was 23.8% of funded positions.  During the year a total of 87 staff members either resigned or were terminated.

As has been noted above, critical posts are often left unfilled, either because of staff shortages or because of the failure of supervisors to ensure that they are covered.  While incident reports may reveal that required posts are vacant, the underlying cause for that condition is not clear. Without the ability to physically observe operational areas, and to question supervisors as to why posts are vacant, a definitive finding cannot be made.

According to the Lieutenant in charge of Detention training, all Detention Officers have received, or are in the process of receiving, basic jailer training.

Use of Force review by supervisors continues to be an area of non-compliance with the Settlement Agreement.  Supervisors almost never do more than sign acknowledgment that they have reviewed a UOF report.  They increasingly note approval of reports but this is equally concerning when the reports indicate questionable action and there are no supervisor's recommendations regarding corrective action.  UOF incidents that occurred during the October 2020 to January 2021, reporting period included a number of cases where officers used OC or other less than lethal weapons as coercive means to force inmates to do what they wanted. Although this is a direct violation of Policy 5-500, paragraph 5-502 1, which states that such weapons "…may not be used as a means to force an inmate to comply with verbal orders…", no supervisors pointed out that violation in their review of the respective incident reports.  IR's 202348, 202425, and 202444 are representative examples where OC was used by an officer because an inmate refused to comply with his or her verbal orders.  Not only did supervisors fail to take corrective action, but the actions of the officers were exonerated by IAD when a follow up investigation was conducted.

There have been no reported inmate deaths during the past year.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

    a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b.  All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

    c.  Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times.

Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d. The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility. This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e. Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

In previous Monitoring Reports it has been noted that the HCSO is not in compliance with the requirement that well-being checks must be conducted every 30 minutes on general population inmates, 15 minutes on restrictive housing inmates and 15 minutes on detainees held in Booking holding cells. To date, only the inmates in Booking have been monitored according to the 15 minute standard. In an effort to move toward compliance, the corrections operations member of the Monitoring Team has helped Detention staff to develop procedures that at least meet the American Correctional Association standard of 60 minutes for general population inmates and 30 minutes for those held in restrictive housing (lockdown). That standard in now incorporated into Policy 9-200, Supervision and Post Operations.

Since the JDC has not housed inmates for almost a full year, current compliance there cannot be addressed. As was previously noted, however, the JDC did comply with the well-being check standard. At the WC well-being checks for inmates held in Special Housing cells 1-5 and 6-10 are generally conducted within the 30 minute standard. In some instances all entries are made precisely on the hour, quarter hour, half hour and three quarter hour. This is a physical impossibility which brings into question the accuracy/validity of the checks. It should be noted that the supervisor(s) who signed off on those forms never made any comments regarding this discrepancy. In most instances, however, well-being entries were made at the time that they actually occurred, even when they were outside the 30 minute parameter. No housing unit log entries were made available to review, so it was not possible to determine whether or not officers are complying with the new direct supervision standards.

At the RDC the lack of representative records made it impossible to determine compliance. There were no records provided for housing unit or pod control posts.  The individual well-being check forms for 30 minute and 15 minute logs did not reflect (in most cases) the housing unit, ISO unit or Booking location.  Generally, a four digit number was noted, which may mean something to the officer who is assigned, but does not indicate location (housing unit, pod or Booking) to the outside investigator.  The same discrepancies regarding precise hour/half hour entries noted above regarding the WC, apply to the RDC.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

    a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

    b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.  Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

    d. Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

    e. Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year

after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

While 215 of 220 existing Detention Officers have received mandatory pre-service training, five who were previously certified will undergo refresher training on Use of Force, Direct Supervision, Policies, Sexual Misconduct/Harassment and the Settlement Agreement.  New officers go through pre-service training as they are brought on board.

Post order training is currently based on the unapproved post orders that were in place under the previous administration.  New post orders have yet to be developed.

Direct supervision training, which began in 2020, is part of the pre-service training program for new personnel.  Existing personnel are no longer involved in this component due to COVID imposed restrictions.

Jail administrator training options through AJA and NIC have been made available to the Jail Administrator, Assistant Jail Administrator and Facility Captains, but to date none of them have enrolled in these on-line options.

In-service training was stopped in early 2020 due to COVID issues.  It is not scheduled to begin again until it is approved by the Sheriff.

Training for critical posts is not on-going.  The only such specialized training provided during the past year was to supervisors regarding the new Use of Force policy.  It has yet to be provided to all personnel, however, 34 officers have received this training while they were going through

the pre-service program prior to being assigned to a facility.  All other approved and adopted policies are also covered during the pre-service training period (academy) along with the Settlement Agreement.  Officers are given copies of those documents at that time.  The Training Director reported that all other personnel are provided their copies during roll call training periods at shift change and that the actual training is provided by supervisory staff.  There is no documentation to support this.  Since the Jail System changed over to a 12-hour shift schedule in October 2020, there has been no time for shift overlap (when roll call training could occur) without incurring paid overtime.  In addition, supervisors, who have not received formal training on the new policies, are tasked with providing orientation and explanation of those policies to existing staff.

Since at present, there is no medical unit (except for the small infirmary) or mental health unit, detainees with special medical and/or mental health needs are housed on virtually all units of the facility.  Therefore, it is important for all security staff to have a reasonable amount of training on serious medical and mental health difficulties, and the security management of detainees with such difficulties.  Although the mental health expert on the Monitoring Team has repeatedly raised specific concerns about the mental health training provided to all security staff and urged a review of that training program (see prior reports), he is unaware of any review that has been done in response to the concerns that have been raised.

As noted in prior reports, there is no additional training for security staff assigned to Medical, which includes the infirmary, the medical clinic and the mental health clinic.  As has also been noted in prior reports, given the security problems that can arise when physically and/or mentally ill detainees are off their units/brought to Medical, security staff assigned to Medical could benefit from additional training, focused on the best security management of that critical post.

In addition, in anticipation of the opening of a mental health unit, security staff who will be assigned to that unit will have to be selected and given additional training.  Issues related to the identification and selection of security staff for the mental health unit, the reasons why additional training will be required, and the nature of such additional training have all been outlined in prior reports.

Training staff together with medical and mental health staff should review the corrections training on 'special needs inmates' considering the concerns that have been raised by the Monitoring Team, and make adjustments in the training where indicated. This review should include an assessment of whether the current training provides security officers with the knowledge about mental health that they need, and helps them to develop the sensitivity and skills required to manage detainees with mental illness and/or intellectual disabilities. In addition, security staff should assess the safety and security in Medical (which would include such issues as sufficient security staffing and functioning security cameras), determine whether or not security staff assigned to Medical might benefit from additional training.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c.  Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d.  Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i.  Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

        ii.  An inspection process.

        iii.  A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

        iv.  A requirement that any corrective action ordered be taken.

        v.  Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

        vi.  To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Partial Compliance**

General Orders of the Sheriff's Office provide that the day-to-day operations of the detention facilities shall be the responsibility of the Jail Administrator.  Policy 1-100, Administration, states that "Detention Services is responsible for the management and operation of the HCSO detention operation.  Employees assigned to HCDS report to the Detention Administrator." While neither of these policies explicitly include the authority to hire, fire, discipline and promote, they would appear to provide for that.

Review of prior housing unit logs indicate that supervisors do conduct daily rounds and they indicate their presence by signature in the housing unit log book, on well-being check forms and other documents, but they do not indicate findings or relevant comments. Housing unit logs for RDC were not provided during this site visit so this cannot be confirmed presently.

The requirements of sub-paragraph 46 (d) are not addressed by supervisors, but their failure to do so is understandable in that the duplication of effort to document the multitude of maintenance issues, particularly at the RDC, would be overwhelming.  Fortunately, this problem is being addressed by the relatively new position of Chief Safety and Security Officer.  He now coordinates the collection and reporting of all work orders to the County's representative for action, and he keeps a running status report on a monthly basis.  Unfortunately, the departure of the previous County Administrator resulted in other personnel changes within County government.  That resulted in a total breakdown of maintenance services temporarily and a backlog of work orders.  A new Maintenance Director was put in place during the remote site visit.  Hopefully, that will allow a return to better service.

The maintenance problems associated with the Jail System are due to multi-faceted issues.  Lack of staff leaves inmates free to damage and destroy even high security items in the housing units. However, the County's overly detailed maintenance requirements result in unnecessary delays. During the October 2020, site visit it was pointed out that there were no back up fire extinguishers and that at least three primary security doors at the RDC were inoperable because the County did not have electric motors on hand to fix them.  The County Administrator said that she would rectify these problems immediately.  Unfortunately, she subsequently left County employment, so nothing happened.  The HCSO has managed to obtain some fire extinguishers to be held in reserve, but the electric motors have still (four months later) not been purchased. Incredibly, in order to have a fire extinguisher recharged, the HCSO has to submit a work order which goes to the County for approval on an individual basis.  At the very least, the County should issue a blanket purchase order that allows fire extinguishers to be recharged by a vendor whenever the Jail's Fire Safety Officer delivers them for service.

Following up on this issue, the County should change its policy with regard to maintenance.  A line item for maintenance should be placed in the Sheriff's budget so that he can have routine maintenance problems handled immediately in the Jail.  Major items, such as a new roof or

HVAC system could still be taken to the Board of Supervisors for individual action.  The County's in house maintenance personnel are not qualified to handle maintenance issues in a jail setting.  It is imperative that specialists be brought on board through contractual arrangements to handle that work and that the authority and funding to do so in a timely fashion be placed in the hands of the HCSO.

The old way of doing business in Hinds County is readily apparent when one examines the memo from Benchmark Construction dated December 7, 2020, and the minutes of February 15, 2021, regarding maintenance issues at the RDC.  They address the broad range of problems in the Jail System that have gone without corrective action for too long.  Among those items are the fact that the RDC has no fire alarm system and has not had a sprinkler system since 2012, when it was removed subsequent to the riot in C-Pod.  At the WC the sprinkler system has not been operational for over a year.  In addition, a steam pipe in the kitchen at the RDC has been leaking for many years.  These are only a few of the many significant problems that have been identified, but not corrected because of the County's inability to process requests.  A major overhaul of maintenance procedures and funding allocations is in order.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Compliant**

The Monthly Shakedown Log shows that a total of 38 shakedowns were conducted from October 2020 through January 2021 at the RDC and WC.  In most cases, pictures were taken and an itemized list of contraband found was maintained.  The Log summarizes when the shakedowns were conducted, but it is necessary to review the associated incident reports in order to determine the specifics of each case.  The reduction in the number of cell phones found is noteworthy.  Now shanks and miscellaneous items are more common.  In one instance an electric hair clipper was confiscated.  Assuming that it was a Detention issue item, it should have been accounted for when the hair cutting session was completed.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Partial Compliance**

This paragraph is upgraded from Non-Compliant to Partial Compliance because the County has issued a request for proposal that resulted in multiple bids being received.  Because of personnel

changes within County government, specifics regarding the award of a contract are not yet available.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for a least three years.  Since the JDC is closed due to maintenance problems, only the RDC and WC are currently affected at the present time.  Regardless, after an officer was initially assigned in 2017 to work on this issue, nothing further has been done.

## USE OF FORCE STANDARDS

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

   a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

   b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

   c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

   d. Prohibit the use of force as punishment or retaliation;

   e. Limit the level of force used so that it is commensurate with the justification for use of force; and

   f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

Although Policy 5-500, Use of Force, was adopted/signed by the Sheriff on January 27, 2020, this paragraph is still carried as being in Partial Compliance because the policy has not yet been implemented.  The policy is consistent with the provisions of this paragraph of the Settlement Agreement, but to date only supervisors and recent graduates of the recruit academy have been

given formal training on it.  As was noted in paragraph 43, above, officers continue to use less than lethal weapons, particularly OC, to coerce inmates into doing what they order rather than as a defensive measure.  This direct violation of the UOF policy is not only apparently condoned by supervisors, but also by CID and IAD when they review UOF cases and exonerate the actions of the officers involved.  During the February site visit this matter was reviewed at length with Detention command staff as well as the individual CID and IAD investigators and their supervisors.  When line supervisors and higher ranking staff fail to take corrective action as they review incident reports, it is up to CID and IAD to serve as a safety net to ensure compliance with adopted policy.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

   a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

   b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

      i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

      ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

      iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

   c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

   d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force.

Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e.   A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f.   Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g.   The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

   i.   a sign-out process for staff members to carry any type of weapon inside the Jail,

   ii.   a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

   iii.   random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h.   A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i.   All staff members using force must immediately notify their supervisor.

j.   All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Partial Compliance**

The comments made regarding this paragraph in the 12th Monitoring Report still stand. Nothing has changed since that time except for the fact that the Monitor is now aware of an accountability form regarding the maintenance and use of less than lethal weapons.

Regarding 51 (a), incident reports do not reflect that supervisory approval is obtained before less than lethal weapons are accessed and used. This information is only rarely contained in IR's. Regarding 51 (b), contact with Medical regarding health risks and any information on the medical condition, or other circumstances that may increase the risk of death or serious injury from the use of force are not included in IR's.
Regarding 51 (c), Detention Services does not utilize the restraint chair. Handcuffs are sometimes used when physical restraint is required, but most frequently, when inmates need to be restrained, they are placed in a single cell.

Regarding 51 (d), Medical staff routinely examine inmates when a UOF incident results in them being referred to Medical.  The problem that persists is that Medical staff do not have the capability of making JMS entries.  Not only should they be able to do that, but they should be able to initiate incident reports and prepare supplements.  Under the existing system their critical information is often lost.

Regarding 51 (e), there is no documentation to support supervisory approval of a planned use of force.  To date, incidents which should have been categorized as "planned" have been routinely treated as operational matters.

Regarding 51 (f), there is no record of a cooperative process being followed.  Security staff and Medical/mental health staff have never worked together in advance of a documented planned use of force.

Regarding 51 (g), the Jail has an inventory form that shows when less than lethal weapons are checked out and returned to the armory.

Regarding 51 (h), the Jail now has Go Pro equipment that makes the video recording of planned UOF cases possible.  This capability is utilized most frequently during shakedowns. IR # 202498 reflects planned UOF involving the involuntary administration of medication at the WC. This was not filmed.

Regarding 51 (i), supervisors are routinely notified after an incident escalates to the point where force must be used.

Regarding 51 (j), shift commanders are also routinely notified whenever incidents require the use of force.


**USE OF FORCE TRAINING**


52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.


**Partial Compliance**
Although UOF training has not been conducted for all Detention Officers, supervisors, other than newly appointed supervisors have received that training. In addition, those officers going through the basic recruit training program in the past year have received that training.  The restrictions on training imposed by the COVID pandemic have prevented all Detention staff from receiving this critical training.  Existing officers have been briefed by supervisors during roll call training, but that is limited by the availability of paid overtime.


53. Topics covered by use of force training must include:
       a.  Instruction on what constitutes excessive force;
       b.  De-escalation tactics;
       c.  Methods of managing prisoners with mental illness to avoid the use of force;

d.  Defensive tactics;
e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been no change since the last reporting period.  The UOF training includes a continuum of appropriate force responses to escalating situation, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

Although the UOF policy was adopted by the Sheriff on January 27, 2020, only Detention supervisors and those officers hired since that date, have received formal training on the policy. All officers have received a copy of it, but existing staff have only received an orientation during roll call training.  The County (HCSO) has not randomly tested any Jail staff to determine whether or not they have a meaningful knowledge of the policy. The improper use of OC spray would indicate that they do not.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Not Applicable**

This paragraph is not applicable at this time.  The UOF policy was adopted just over a year ago. It has not been reviewed or revised since that time; therefore, UOF training has not been updated.

## USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

Policy 5-500 (Use of Force), adopted over a year ago, complies with the requirements of the Settlement Agreement; however, implementation of the policy is not in place. Consequently, this paragraph continues to be carried as Partial Compliance. Incident reports do not routinely contain the basic information required by the policy, nor do supplements written by supervisors. In many instances there is no coherent explanation of what transpired, where the incident occurred, whether or not witnesses were identified and questioned, if pictures were taken, and whether or not use of force was justified.

IR 201936 is representative of many of the discrepancies noted. At approximately 2:15 PM a sergeant, who was in the Great Hall, entered Booking after smelling smoke. She found "…a huge cloud of smoke by holding cell T1-1124." When three inmates refused to exit the cell the sergeant used OC to make them comply. The inmates were sent to Medical in order to be decontaminated. The CID investigator, Patrol and higher ranking Detention officers in the chain of command were notified. When questioned about the fire, the inmates stated that they "…signed their papers to be moved from Booking back to the pod yesterday." It appears that they had been held in a Booking cell for long in excess of the eight hour maximum allowed. The report leaves the reader to question where the officer was who is supposed to be conducting 15 minute well-being checks in the Booking area. Why did the Booking Sergeant not observe or smell anything? Finally, the improper use of OC (as a coercive measure) to force inmates to comply with her verbal orders, was completely glossed over when it could have incapacitated the inmates increasing the risk of harm. It was not even addressed in follow up by CID or IAD. Of special note is the fact that setting fires now appears to be a common method for inmates to get the attention of staff regarding their complaints. This is especially common in C-Pod, HU-4, which is supposed to have two officers present at all times because it is the segregation/lockdown unit.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift. Staff members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**
The Monitoring Team is still unable to determine whether or not UOF reports are submitted by the end of the writer's shift because of issues associated with the Jail Management System. The updated JMS system reportedly records the date of submission but this is not in the spreadsheet that is provided to the Monitoring Team for review. The specific shortfalls have been previously outlined. Reports need to reflect the time when they were submitted as well as the time of

incident.  This same standard needs to be in place for supervisory review.  The most basic supervisory requirement, to approve, disapprove or recommend, is often not followed and, as previously noted, there is no recommendation for corrective action when it is apparent that it is needed.  This standard is required by the Settlement Agreement and is included in the UOF policies.  This information should be included in both the actual incident reports and the spreadsheets that the HCSO now generates regarding IR's and supervisory comments.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

   a.  A unique tracking number for each use of force;
   b.  The names of all staff members, prisoner(s), and other participants or witnesses;
   c.  Housing classification and location;
   d.  Date and time;
   e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.
   f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;
   g.  A description of the staff member's attempts to de-escalate the situation without use of force;
   h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;
   i.  A description of any observed injuries to staff or prisoners;
   j.  Whether medical care was required or provided to staff or prisoners;
   k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;
   l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**
In spite of the fact that a UOF policy, which complies with the conditions of the Settlement Agreement, was adopted over a year ago, there has been little progress in this area.  UOF reports routinely include a unique tracking number as well as the names of officers involved, but frequently do not identify witnesses.  The classification of the housing area where the incident

occurred is never specified although the location is routinely noted.  Date, time and description of events leading to the UOF are included as are the type and duration of force used.  The other requirements of this paragraph are generally met with the exception of supervisory review and signature.  Supervisors do not review and "approve/disapprove and recommend" as required.  Nor is there a signature to attest to that fact, although this may be as a result of JMS shortcomings.

IR 202468 reflects the shortcomings outlined above.  The IR was titled "Failure to/Obey/Comply with Lawful Order of a Detention Officer", but it was actually a UOF report.  The initiating officer's report never identified the facility or housing unit where the incident occurred.  Only through a review of supplementary reports was it possible to determine that the incident occurred in C-2.  The facility (RDC) was never identified.  OC was deployed because an inmate refused to comply with verbal orders with no imminent risk of harm to officers or inmates—a direct violation of the UOF policy, but no action was taken by supervisory or command staff.  Medical staff did conduct an assessment of the inmate and authorize his reassignment to housing.  According to the Rapid Notification report, OC implements were weighed and returned to the lieutenant's office, but that information is not included in the IR's and supplements that were provided to the Monitoring Team.  A supervisor's signature does appear on her supplement, but no approval, disapproval or recommendation is noted.

**USE OF FORCE SUPERVISOR REVIEWS**

59.    The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

     a.    A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

     b.    A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

     c.    Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

     d.    If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

     e.    Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

     f.    All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.  A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Partial Compliance**

While there has been little change in the status of this paragraph, the actions of supervisors to address some of its conditions warrants changing its status to Partial Compliance.  Although supervisors have received training on the UOF policy, the impact on their daily activities and practices has been negligible.  Supervisors respond to incidents in a timely fashion.  In fact, they are often involved in them because they are assisting with or performing duties that should be handled by officers.  They routinely notify their chain of command, CID, Patrol, Medical and other appropriate individuals of unusual circumstances, but their follow up on incidents leaves a great deal to be desired.  The most significant shortcoming is that they do not evaluate incidents, they merely sign off on them.  Until this major failing in supervisory responsibility is rectified, this paragraph cannot be upgraded further.  IR 202468, above, is illustrative of this problem.

60.  After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.  Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.  Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.  Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.  Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.  Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

While supervisors have taken steps to improve their compliance with standards, as noted in paragraph 59, they have not met the requirements of this paragraph. Specifically, they do not require that photographs be routinely taken, nor do they ever indicate that an inmate has refused to sign a waiver when photographs are refused. Witnesses are seldom identified, nor are witness statements taken. Finally, they do not explain why an incident was not recorded if there is no video evidence.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of this paragraph since the last reporting period. Individual incident reports sometimes reflect approval but no recommendations on the part of supervisors. Monthly spreadsheets do reflect approval of some incidents, but this is something that should be readily apparent on each and every incident. In addition, higher level comments, approval/disapproval and recommendations are not apparent. The command level Detention staff (lieutenants, captains and above) need to indicate that they have reviewed incident reports and document such with recommendations.

62. Reviewing supervisors must document the following:
    a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;
    b.    Witness statements;
    c.    Review date and time;
    d.    The findings, recommendations, and results of the supervisor's review;
    e.    Corrective actions taken;
    f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);
    g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –
        i.    The nature and extent of injuries, or lack thereof;
        ii.    The date and time when medical care was requested and actually provided;

       iii.     The names of medical or mental health staff conducting any medical or mental health assessments or care.

    h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

There has been no change in the status of this paragraph since the last reporting period.  The incident summary spreadsheet has a column for supervisors' notes.  This would be an appropriate place for information required by this paragraph, but supervisors' notes are generally limited to their personal involvement in the incident(s). The Monitoring Team recently learned that there is an approval screen in the JMS system. Given the poor quality of the incident reports, it would appear that supervisory review to require or document the above requirements is not taken. However, the Monitoring Team will request access to the approval screen in the future to further monitor this requirement.

**INCIDENT REPORTING AND REVIEW**

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Non-Compliant**

Although there has been a UOF policy in place for just over a year, there has been no comparable policy approved yet which specifies general report writing criteria (although the policy is under review at this time).  The problem has been exacerbated by the fact that in-service training has been curtailed for the past year due to COVID restrictions.  It is imperative that officers be trained in the practices and practicalities of report writing so that supervisors and other individuals (including the Monitoring Team) can read and understand what occurred when they review incident reports.

Deficiencies in the incident reports have been noted throughout this monitoring report. Similarly, the inability of Medical to enter supplemental reports in the JMS system such that there is a lack of critical information related to an incident has been noted throughout this report. Either Detention staff need to collect the information from Medical and include it in their reports or Medical staff need to be able to access the JMS system to report their involvement or both. The lack of critical information regarding this incident in the reporting is a significant deficiency.

64.     Ensure that Incident Reports include an accurate and detailed account of the events.  At minimum, Incident Reports must contain the following information:

      a.     Tracking number for each incident;

      b.     The names of all staff members, prisoner, and other participants or witnesses;

      c.     Housing classification and location;

      d.     Date and time;

      e.     Type of incident;

      f.     Injuries to staff or prisoner;

      g.     Medical care;

      h.     All staff involved or present during the incident and their respective roles;

      i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

      j.     External reviews and results;

      k.     Corrective action taken; and

      l.     Warden and Administrator review and final administrative actions.

**Partial Compliance**

There is still no policy that governs the preparation of incident reports in general; however, the issues related to UOF reports also apply to all incident reports.  As noted above, unique tracking numbers are listed, staff involved are also noted, although all inmates and witnesses are only sporadically recorded.  The facility of occurrence is almost never specified, but the housing unit generally is.  The type of incident is often mis-stated.  Assaults are often indicated when use of force would be the more appropriate title.  Injuries to staff and inmates are sometimes noted and referral to Medical is usually noted although the extent of injuries and medical care is not always obvious.  While it is not possible to determine whether or not all staff involved are documented, it appears that most are.  Supervisory findings, recommendations and case dispositions continue to be non-existent.  External reviews are limited to CID and IAD investigations.  Virtually no outside agency reviews are ever recorded.  CID and IAD seldom result in corrective action and administrative review at the level of the Jail Administrator is not noted. The Monitoring Team recently learned that there is an "approval screen" in the JMS system that could contain comments from a supervisory review. The quality of the reports would indicate that there is rarely a meaningful review, but the Monitoring Team will attempt to review the approval screen in some fashion in connection with future monitoring reports.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

      a.     Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time,

incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

b.  Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

c.  Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Non-Compliant**

There is no adopted policy regarding incident report documentation.  Therefore, this paragraph is still carried as Non-Compliant.  As has been noted with regard to UOF cases, incident reports almost never indicate in which facility the event occurred although housing unit or cell assignment make it possible to determine the location.  While there have been reports of lost money or property and a bad release, there is still no policy or memo/order that requires such a report to be generated.  Because of the previously noted shortcomings of the JMS system or the spreadsheet generated from the JMS, it is still impossible to determine whether or not reports are submitted in a timely fashion.  There is no record of supervisors or officers being disciplined for failure to comply with documentation obligations.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

a.  Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

b.  Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

c.  Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.  Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

The discrepancies and shortcomings identified in the 12th Monitoring Report are still apparent.  It is not possible to determine whether or not supervisors document all reportable incidents by the end of shift or within 12 hours at the latest.  Incident reports do reflect that supervisors respond

to incidents and that inmates who need to be checked or treated are appropriately referred. Supervisory review seldom includes witness statements, photographs and findings. Approval/disapproval statements and recommendations are routinely missing.  IR 210283 (Breach of Security) in HU A-2 at the RDC, is reflective of these shortcomings.  Although the case was managed by a Lieutenant, and command staff as well as Patrol were involved, there were no pictures taken of the contraband that was seized, there was no complete inventory listed, there were no witnesses questioned.  The case was referred to the CID investigator for follow up.

## SEXUAL MISCONDUCT

67.    To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

a.    Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.    Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.    Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.    Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.    Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.    A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.    A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.    Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.    Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

## Partial Compliance

The new PREA Coordinator continues to strengthen the program. The PREA Coordinator provides training to on-boarding officers in the training academy. In December, she did a roll call training (15 minutes during roll call) for the 2nd and 3rd shift in RDC. On January 25, 2021

she did an in-service training for 16 officers. Several incident reports indicate the need for additional in-service training which is complicated by COVID and the chronic understaffing.  As noted in the 12th Monitoring Report, there are incidents that should be referred to the PREA Coordinator that do not get referred. In this reporting period, IR # 202313 involved a male inmate exposing himself to females on the recreation yard through the window of the unit at the WC; a Rapid Notification on January 2, 2021 (with no corresponding incident report in the spreadsheet) reported an inmate grabbed a nurse in her private parts; IR#210165 involved an inmate grabbing an officer in her private parts; and a grievance involved a female inmate walking around naked on the unit making sexual comments. None of these incidents were reported to the PREA Coordinator. Most likely, the victims in these incidents did not require special services. However, the perpetrator should receive appropriate discipline and/or counseling to address these behaviors. The PREA Coordinator reported plans to start small group in-service training for Detention officers and staff at Henley Young.

Nursing staff continue to be involved in the screening of newly admitted detainees to identify those who may be sexually abusive or at risk of sexual victimization as part of the intake screening process.  New admissions so identified are referred to the PREA officer.  Mental health staff perform a mental health assessment of all such new admissions who are then forwarded to them by the PREA officer, and if mental health treatment is indicated, such is provided.  In addition, if medical or mental health staff identify a PREA vulnerable detainee who was not previously identified, that detainee is also referred to the PREA officer.

The MOU with the Mississippi Coalition Against Sexual Assault is in effect and is being utilized. An outside line has been implemented such that inmates can call the Coalition directly from the kiosk in the unit without charge. DOJ has highlighted a problem with reporting through the Coalition in that if the Coalition receives certain federal funds, it cannot pass on any PREA reports without a written release from the inmate. Third party reporting is still available through friends and family. PREA complaints can also be reported through the kiosk directly to the PREA Coordinator or through submitting a grievance at the kiosk. An inmate who reported a sexual assault in November but declined to press charges was connected with the Coalition for counseling. He has had counseling with the Coalition every few weeks via Zoom starting in late December.

Although the outside line for reporting to the Coalition is available, the educational material available to the inmates does not yet contain this update. The Coordinator reports that the posters regarding PREA reporting are still on the walls in A-Pod, but they do not contain up to date information including the availability of the direct line to the Coalition. She is working on a new poster. She has prepared a brochure to be given to inmates at booking with this updated information and more extensive information than the sheet they had been receiving. The PREA Coordinator intends to distribute the brochure to current inmates. The brochure is awaiting on

approval for printing. She has also prepared a brochure for the lobby that would inform visiting family members about PREA. This is also waiting on approval. Calls from the kiosk are recorded and the educational material will need to inform inmates of that. Starting the Monday of the site visit, the PREA Coordinator began providing education to inmates who were assembled to participate in a group conducted by nurse providing discharge planning. This included 5 inmates from A-Pod. The PREA Coordinator did not know how the inmates were selected. It would be important to determine if this is an appropriate group of inmates as this nurse conducts a discharge planning group for inmates approaching release. PREA education should take place as early as possible during detention.

In addition to counseling through the Coalition, both medical and mental health staff continue to provide any clinically indicated emergency and ongoing medical and mental health care for victims of sexual assault and/or sexual harassment.  It should be noted that if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment (which would include the use of a rape kit).

The investigations by the CID officer were much improved in this reporting period. The investigation reports indicated that video was reviewed, the perpetrators were interviewed, and medical information was included in the report. The PREA Coordinator also was very proactive in securing safe housing and services for the victims and speaking with them directly about their concerns and safety. As mentioned above, she secured counseling with the Coalition for one of the victims.  Although the PREA Coordinator was appropriately concerned about safe housing, the Coordinator and the Classification Sergeant housed the 4 victims alleging physical sexual assault or activity were in Booking cells, one for two months. The stated reason was that C-4, the segregation unit for protective custody and administrative segregation, was not safe as some inmates had broken the cell door windows and climbed out. As noted above, it appears from the incident reports that an officer is not always on the segregation unit. Similarly, one inmate was housed in booking because when on the units, he claims to be suicidal so that he can go to the suicide unit and engage in sexual activity where there is similarly no officer present. It is essential that these units are staffed as required so that there is a safe location for protective custody and suicidal inmates. As has been repeatedly stated, the Booking cells are not appropriate for housing.

As has been noted in prior reports, given the various above noted roles and responsibilities that medical and mental health staff assume with regard to PREA and PREA-involved detainees, medical and mental health staff may have knowledge about and an understanding of any given PREA-involved detainee that is not readily available elsewhere.  Therefore, during the course of a PREA investigation, it would likely be quite helpful to actually interview involved medical and mental health staff in addition to requesting medical and mental health records.  During this reporting period there were at least 4 new PREA cases that involved detainees who suffered from

mental health difficulties that likely had an impact on their vulnerability, and/or their response to the incidences they endured, and/or their ability to report, as well as on the nature of any mental health and medical treatment that they required.  Therefore, investigators should make sure that they fully gather and integrate information obtained from mental health and medical staff into PREA investigations.

Although, as noted, while the investigations have improved, a particularly troubling PREA incident was reported in late January involving an officer. This incident is still being investigated. However, the officer involved has not been placed on leave during the pending investigation. Nor has the inmate been transferred to the WC where the officer would not have access to the inmate. The inmate remains housed in Booking. The seriousness of this officer involved allegation should also warrant referral to an outside agency for investigation.

In addition to the positive steps mentioned above, the PREA Coordinator reports that she is applying for a PREA grant to address maintenance issues such as doors and cameras so that there is a safer environment for the inmates and staff.

## INVESTIGATIONS

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

    a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

        i.    Any prisoner exhibited a serious injury;

        ii.    Any staff member requested transport of the prisoner to the hospital;

        iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

        iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

    b.    Per policy, investigations shall:

        i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

      ii.     Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

      iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.     Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.     Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.     Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

      i.      Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

      ii.     Any staff member requested transport of the prisoner to the hospital;

      iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

      iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.     Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

      i.      a brief summary of all completed investigations, by type and date;

      ii.     a listing of investigations referred for administrative investigation;

      iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

      iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

      v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.     Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Policy 1-600, Investigations, was adopted on March 25, 2020.  It calls for thorough review of CID and IAD investigations that are consistent with the requirements of the Settlement Agreement.  In the last Monitoring Report it was noted that a new CID investigator had been assigned to handle the caseload.  During the February remote site visit the Monitoring Team was informed that he was being replaced by another investigator.  Hopefully, this investigator will be afforded the opportunity to remain in place for a longer period of time than his predecessors.  The IAD investigator has held his position since the beginning of the monitoring process, while the current CID investigator is the third placeholder during the same time frame.

The CID and IAD investigators have both been encouraged by the Monitoring Team to review every incident report on a daily basis even though that is not required by the Settlement Agreement.  Since they deal directly with all significant issues within the Jail System, they are eminently qualified to pick up on operational and procedural problems when they review incident reports.  In essence, they serve as a safety valve to identify things that do not comport to standards.  Therefore, rather than wait until cases are referred to them, they should try to pick up on and identify problems when they review the incident reports. The IAD investigator reports conducting such a review; the CID investigator does not.

During the past four months, the CID investigator handled 69 cases of which 58 were at the RDC, eight were at the WC and three were at Henley Young.  One case was referred to IAD and no cases were referred to outside agencies.  Of the 69 cases referred to CID, four were for arson, 19 malicious mischief, 27 assault, four sexual battery, eight assault on a law enforcement officer, three property damage and three contraband. The CID reports reflect improvement from the last monitoring visit with increased interviews and review of video footage when available.

During the same time frame the IAD investigator processed 37 cases.  They included 28 involving UOF, one dereliction of duty, two conduct unbecoming, four fact finding and two contraband.  Nine of those cases were referred to IAD and 28 were initiated by the IAD investigator.  They resulted in two officers who were arrested and terminated for introduction of contraband to the Jail, one other who was terminated, one suspended for six days and one for one day.  No cases were referred to outside agencies and all UOF cases were exonerated even though a number of them dealt with officers who used OC to coerce inmates into doing what they verbally ordered, a direct violation of the UOF policy.  This matter was brought to the attention of the CID and IAD investigators, along with their supervisors, during the remote site visit.

**GRIEVANCE AND PRISONER INFORMATION SYSTEMS**

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

There has been no change in the status of this requirement. As stated in the December monitoring report, it will be necessary to track whether there is a concern about the confidentiality of the use of the grievance system once there was an officer consistently on the unit as required in C Pod by the Stipulated Order. As previously stated, the incident reports indicate that this is still not the case. Until then, it will not be possible to know if the physical setting of the kiosks which does not allow for privacy results in issues with the confidentiality of filing a grievance. However, it should be noted that inmates are using the system and there has been no stated concern about officers observing the use of the kiosk. There are some gaps in access to the kiosks. There are no kiosks in Booking where people are inappropriately housed. There are periods of time when the kiosk system is down during which a grievance can be entered through the kiosk but will not be received until the system is back up. An emergency grievance during this time would have to go through a Detention Officer. These outages are reportedly occasional, however. Again, this should be tracked to determine the frequency.

The grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer. The grievance policy also requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It does not appear that this provision of the policy has been implemented or that the inmates have been informed of it. In addition, without an officer regularly on the unit in A Pod, an inmate would not have easy and confidential access to a Detention Officer.  Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

A Grievance Policy has now been approved and adopted. Once fully implemented, it would be applicable and standardized across the entire Jail. At present, the kiosk system works the same across facilities and it appears that all grievances go through the Grievance Coordinator for

assignment and tracking. The Grievance Coordinator determines whether the grievance presents a grievable issue. This was an area of inconsistency between facilities that appears to be remedied although some grievable issues appear to be denied as non-grievaable. Where there is inconsistency is in how grievances are responded to once assigned. In addition to some responders not providing any response through the system, described below, some responders research the grievance and respond substantively whereas others simply say the matter will be looked into. Even with the policy in place, there will need to be training on how to properly respond and ensure promised response to grievances are implemented in order to achieve consistency. The grievance policy requires that a percentage of grievance responses be audited on a periodic basis. Once this is implemented, it will be possible to target appropriate training and corrective action.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

The Grievance Coordinator maintains a spread sheet to track the grievances and grievance responses. Many of the fields are pulled electronically from the Securus system. However, she has to manually add the type of grievance, the date of response, and the date of an appeal. The Grievance Coordinator previously reported that some officers do not respond to grievances through the Securus system and, as a result, there is no documentation of a response to some grievances. This appears to be a significant problem. In November, 124 grievances were filed; 18 of them had no response and 16 had an untimely response. In December, 94 grievances were filed; 3 of them had no response. Although this was an improvement from the prior month, 20 grievances had an untimely response many of them receiving a response when the Grievance Coordinator returned from maternity leave in mid-January. In January, 99 grievances were filed and as of January 24; 33 had no response and 16 had untimely responses.  Of the untimely responses, a number of them were filed as emergency grievances which should receive a response in 24 hours. However, it appears that many of the emergency grievances were not emergencies. It will be important to educate the inmates on what constitutes an emergency so that true emergencies aren't overlooked among the many emergency grievances. The Grievance Coordinator has also suggested that a timely response to emergency grievances could be better ensured if the system had an alert signal for emergency grievances. The Grievance Coordinator works regular business hours and will not see an emergency grievance submitted in the evening or on the weekend until the next business day.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy

of responses. One area of concern is that all grievances related to court proceedings are denied as not being a grievance. While this is usually true, there were several grievances denied as not being a grievance when the complaint was that the inmate was entitled to release and the Jail had not released him. It is certainly possible that the inmate is mistaken but this is a grievable issue. In fact, when over-detention was a more frequent occurrence, the grievance system was an important vehicle for identifying instances of over-detention. It will be important to identify alleged over-detention as a grievable issue and refer those grievances to Records. Another example of a legitimate grievance being denied because it was said to be a request was a grievance regarding not getting medications. This was denied as being a request, not a grievance. Although a request for some items might be simply a request; a complaint that prescribed and needed medications were not being provided would constitute a grievance. A response of concern was a grievance stating that the inmate feared for his life. The response was that he should tell the housing officer. Although that might have been the better path for him in the first place assuming there was a housing officer available, this information should be passed on to security and/or Classification. The Grievance Coordinator believes she did tell security but this should be included in the response or otherwise documented.

There are still some where the adequacy of the response needs improvement. In many of instances, the response is a promise of future action or that the officer "will look into it." There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. The new grievance policy requires that the Quality Assurance Officer do a monthly audit of grievances and responses to determine the timeliness and appropriateness of the responses. This has not been implemented yet but should provide some oversight in this area.

A review of medical grievances and responses indicated that those submitted were responded to promptly but not always within 24 hours as recorded in the Securus system.  When a grievance is submitted instead of more appropriately submitting a sick call request (which is the majority of the small number of grievances submitted to medical), the request is still reviewed; if there appears to be an emergency, the detainee is seen right away; but if it does not appear to be an emergency or an urgent situation, the detainee is advised to submit a sick call request.

A file of medical grievances and written responses is maintained.  However, there is no attached documentation of a resolution of the matter, and so a reviewer would have to pull the detainee's medical record to determine what ultimately happened. Medical should formally track whether resolutions of grievances have been implemented or still need to be implemented, and the documentation of such tracking should be included in the maintained file of grievances and associated responses.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. Under this system non-English speaking persons and persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. The Securus system should at some point be programmed to include the most common foreign languages. There is no indication that this provision of the policy is being implemented or that inmates have been informed of this option. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

While the county does issue an inmate handbook to detainees during the booking process, it is significantly out of date.  It is not available in Spanish or any other language.  In spite of assigning the job of updating the handbook to various command level personnel over the past four years, the project has not been completed.

As has been stated from the First Monitoring Report, the Inmate Handbook has outdated and incomplete information about most of these and other issues and will need to be updated. It is not available in Spanish or any other language.

**RESTRICTIONS ON THE USE OF SEGREGATION**

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

Although this paragraph has been carried as Partial Compliance in the past, it is now downgraded to Non-Compliant because of the HCSO's continuing failure to ensure that holding cells are not used for housing inmates.  Even after C-Pod was re-opened, with C-4 set aside for problematic inmates, the holding cells in Booking have continued to be used for inmates who are unmanageable, COVID-19 cases or others specifically ordered by supervisors or even command staff.  In addition, as was noted above (paragraph 56), the incident report verified the fact that inmates are kept in holding cells long beyond the eight hour maximum (sometimes months) specified by the Settlement Agreement including some for several months.

With the anticipated opening of the mental health unit, the implementation of this provision with regard to appropriately identifying (by way of a mental health assessment), classifying and placing newly admitted detainees on that unit in a timely manner will need to be addressed.  As has been noted in prior reports, issues to be addressed include clarity about which detainees would be clinically appropriate for placement on the unit; how to assure that mental health assessment are performed in a timely manner; what should be done if a newly admitted detainee refuses an initial mental health assessment or if there is some other delay in obtaining a mental health assessment; and the working relationship between classification and mental health as it relates to the placement of detainees on the unit.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The Segregation Log now has a column to list the charge against an inmate, when he was placed in segregation and released and the facility where he/she was held.  The WC appears to routinely include the charge; RDC does not. Beyond that it does not explain the circumstances of his/her confinement or any review by a Classification Committee.

The WC provided a segregation report for October through December and the RDC provided a segregation report for January. The RDC report for January showed only two inmates placed in segregation for disciplinary reasons and did not indicate a disciplinary hearing date. It would appear that RDC is using Administrative Segregation instead of holding a hearing for Disciplinary Segregation. See, e.g., IR # 20202203 and 20 2275, inmates moved to segregation with no reference to disciplinary referral. Alternatively, it may be that, as described in paragraph 42, "hearings" are never held. The inmate is given the option of accepting a plea. If he does not, a sanction is imposed without a hearing and if appealed, the appeal is decided without a hearing.

The spread sheet for the WC states that disciplinary hearings were held although no date is provided and incident reports routinely state that the officer responding to the incident places the inmate in Special Housing for a specified number of days without a hearing. See, e.g., IR# 202510 (loud inmate taken to special housing "where she will remain until further notice.")

The segregation report should also include the date of the last review of the Classification Committee for inmates in restrictive housing (segregation) for administrative or protective custody. The Reclassification policy, 7-400 requires that the Classification Committee review all cases of inmates in restrictive housing 24 hours after placement and then every seven days after that. Including the last date of review in the segregation spread sheet would ensure that there is compliance with this policy. As stated in paragraph 42, there currently is no Classification Committee and there are no reviews of administrative segregation. That practice needs to be implemented and documented.

Additionally, there is an issue of appropriate segregation housing. RDC has been using the single cells in Booking for administrative segregation and/or protective custody. These cells are not intended to be used for housing and that is a subject of the stipulated order. This was to be discontinued with the opening of the renovated C-Pod but Booking cells are in fact still being used for this purpose.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

**Partial Compliance**
Mental health staff continue to perform weekly rounds for detainees who are being held in segregation; when indicated, they offer mental health services to a detainee who is not already on the mental health caseload; and when indicated, they make available adjustments in the treatment that is being provided to a detainee who is already on the mental health caseload. However, a review of records at least appears to indicate that since the women have been moved from JDC to the WC, there have not been weekly mental health rounds for women who are being held in segregation. If, in fact, this is the case, this should be corrected immediately.

Prior reports have expressed concern about the lack of a mechanism whereby any findings from these mental health rounds (such as a deterioration in a detainee's mental health status) can be shared with security staff responsible for the placement in and removal of detainees from segregation and thereby possibly have an impact on any decisions made by security staff regarding the continuation or termination of a detainee's placement in segregation. Although there is now an approved policy that requires an interdisciplinary review of detainees who are

being held in segregation (a review that includes mental health/requires mental health input), the policy has not been implemented and inmates with SMI continue to deteriorate while in segregation.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

    a. All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

    b. Segregation must be presumed contraindicated for prisoners with serious mental illness.

    c. Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

    d. If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

    e. Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

    f. Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

        i. If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

        ii. The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

        iii. If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.   Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.   If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.   The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.   Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77 (a), At present, a QMHP is not assessing individuals prior to placement in segregation.  As previously noted, there are many individuals on the mental health caseload who are in segregation. This can be protective custody, administrative segregation or disciplinary segregation. The classification policies require an assessment of individuals placed in segregation by a QMHP but this is not being implemented. Similarly, the policy on Protective Custody requires notification to Medical staff to determine the inmate's mental health status. This also is not being implemented. A policy on Disciplinary Process has not been adopted yet.

As noted in prior monitoring reports, this provision applies to all detainees who are already on the mental health caseload, and those who are not already on the mental health caseload but the behavior they exhibited that might cause them to be placed in segregation could reasonably lead security staff to suspect that they might be suffering from a mental illness.

The mental health assessment performed in connection with security's review of a detainee's segregation should be focused on the following:

- Whether or not the detainee's mental status is such that he/she cannot credibly participate in the disciplinary review process
- Whether or not the detainee's infraction/behavior is actually a symptom of or the result of his/her mental illness
- Whether or not placement of the detainee in segregation is likely to be harmful to the detainee/cause further deterioration of his/her mental status
- Whether or not there is an intervention that is more appropriate than placement in segregation, such as altering the detainee's mental health treatment plan and/or a punishment that doesn't include placement in segregation

To achieve compliance with this provision, HCDS should develop and then implement policies and procedures regarding 'disciplinary review' that require security to seek and consider mental health input as part of the disciplinary review process for detainees who are known to be suffering from serious mental illness or appear to be suffering from mental illness. HCDS should ensure that the current policies on Classification and Protective Custody are implemented. A mechanism will need to be developed whereby security staff will know which detainees are on the mental health caseload and therefore subject to this policy. And, as noted previously, it is essential to ensure that security staff are adequately trained to suspect that a detainee might be suffering from mental health difficulties, regardless of whether or not the detainee is on the mental health caseload in order to refer them to mental health staff.

Regarding 77 (b), as has been noted in each prior report, there are detainees with serious mental illness housed on the segregation unit and held in segregation in the isolation sections of other units.  It is anticipated that the program design for the mental health unit will be such that these detainees can be moved to the mental health unit once it is operational as is required to achieve compliance with the Settlement Agreement. Given the high number of inmates with mental illness in segregation, it cannot be said that segregation is contraindicated as is required by paragraph 77(b) for detainees with serious mental illness.

Regarding 77 (c) at present, medical and mental health staff are not notified when an individual is placed in segregation.  In fact, mental health staff are not even notified when a detainee is placed in segregation, even when the detainee is on the mental health caseload. As noted above, this is contrary to the Classification and Protective Custody policies.

Regarding 77 (d) and (e), As noted in sections 77-a and 77-c, the mental health staff are not being offered the opportunity to assess any detainees prior to their placement in segregation contrary to the Classification and Protective Custody policies.

Security staff are aware of the fact that there are seriously mentally ill detainees being held in segregation.  However, there is no specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation.  Furthermore, the placement of these detainees in segregation has not been short term, and there are no individualized plans (developed by security staff and/or mental health staff) to get these detainees out of segregation as quickly as possible.  Although the opening of the mental health unit will provide a housing option for seriously mentally ill detainees who are currently placed in segregation, individualized plans for moving them from segregation to the mental health unit will still be required.

Regarding 77(f)(i), as part of medication pass, the nurses offer daily visits to detainees being held in segregation who are on medication.  However, there are times when this does not happen.  More specifically, for example, on the segregation unit, the nurse goes door-to-door to pass medication, but occasional problems with security on that unit (problems with the locks on the cell doors mixed with a shortage of security officers) can make it impossible (unsafe) for the nurse to pass medication and visit with detainees.  For example, detainees held in segregation on other units may or may not be brought to the nurse to accept or refuse medication (due to an adamant refusal by the detainee, problems/noise on the unit such that the detainee is unaware that medication is being passed, and/or the lack of enough security staff to manage any problems on the unit and also assist the nurse with medication pass), and therefore the nurse is also unable to have a visit with the detainee.

Regarding 77(f)(ii), detainees on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP.  However, due to the shortage of mental health staff (see section 42(g)(iv), this does not consistently occur on a weekly basis (note:  although detainees held in segregation are seen by a QMHP during the weekly segregation rounds, this is not considered to be a therapeutic session).  In addition, due to the shortage of security staff, the individual sessions that do occur are not consistently out-of-cell sessions, but rather sessions held at the detainees' cell door.  Furthermore, due to the problems associated with securing the cell doors on the segregation unit, there are times when mental health staff access to the unit is impossible (unsafe) and individual sessions are canceled.

Regarding 77(f)(iii), as noted above and in prior reports, a QMHP makes weekly rounds for all detainees being held in segregation, during which each detainee's mental status and need for mental health services is assessed.  However, as also previously noted, there is no on-site jail medical physician and/or psychiatrist; the responsibilities that might be assumed by such

physicians are assumed by a medical/primary care nurse clinician/practitioner and a psychiatric nurse clinician/practitioner, both of whom have physician collaborators; and so therefore, it is impossible to fully meet this provision.

Regarding 77(g), all detainees with serious mental illness housed in long-term segregation have been assessed by a QMHP, but to date, there has been no appropriate housing for such detainees that could be recommended based on those assessments.  However, as noted above, it is anticipated that the new mental health unit will provide appropriate alternative housing for this population, at which point this provision can be more fully addressed.

Regarding 77(h), when it has been discovered that a detainee's mental health status has deteriorated while being held in segregation, this has usually been discovered by mental health staff during weekly segregation rounds or during an individual session with a detainee.  Nursing staff have also identified such detainees during their weekly segregation rounds or during medication pass.  It does not appear that security staff identify such deteriorating detainees; the reason(s) for this is unclear; but a lack of focus on this issue by security staff and/or the need for additional mental health training for security staff should be considered as possibilities and assessed, and any indicated corrective actions should be undertaken.

When it has been determined that a detainee's mental health status has deteriorated while being held in segregation, mental health staff assess mental health treatment needs; if the detainee is already on the mental health caseload, any indicated changes to his/her treatment plan are made; and if the detainee is not already on the mental health caseload, he/she is added to the caseload and an appropriate treatment plan is developed.

At present, mental health staff have no input into housing decisions being made for detainees who have deteriorated while being held in segregation despite current policies requiring such notification and input.  However, if/when the approved policy that requires regularly scheduled, interdisciplinary segregation review is implemented as required by the Classification policy, that will provide an opportunity for mental health staff to have such input.  Ideally, the implementation of that policy will also help to establish an improved working relationship between classification, security staff responsible for disciplinary review and segregation review, and mental health staff, whereby appropriate housing for any given detainee who has deteriorated while being held in segregation can be discussed and addressed at any time (not just during the regularly scheduled meetings required by the policy), especially when the deterioration is severe enough that the need for action has become urgent.

Regarding 77 (i) there is currently no Interdisciplinary Review Team reviewing inmates in segregation.

Regarding 77(j), it does appear that security staff understand that they cannot make mental health treatment decisions or overrule physician medical orders.

## YOUTHFUL PRISONERS

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. **Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.** The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

### Sustained Compliance

As of the recent virtual site visit in February 2021, it has been approximately twenty-four months since the last youth under 18 was released from the Raymond Detention Center (RDC), essentially reaching the standard of sustained compliance.

This requirement will continue to be monitored particularly in light of recent discussions that have begun in Hinds County related to the County's ability to continue using the Henley Young facility for this purpose.  The basic elements of that discussion revolve around:

(1) The interpretation of Mississippi statutes[1] by the new Youth Court judge that will require more complete separation of JCA youth from non-JCA youth. This imposes added limits on the flexibility of how various portions of the facility are used, for example  (a) JCA and non-JCA youth cannot be housed in the same living unit even if for purposes of safety and proper classification, limiting the ability to place a younger, more vulnerable JCA youth in the same unit as similar aged non-JCA youth (note under no circumstances has/would a non-JCA youth be housed in a JCA living unit); (b) all programming, particularly educational programming requires separation of youth, so the classroom area cannot have a "mixed" population even if properly supervised by staff; (c) a JCA female (rare) and a non-JCA female (almost as rare) cannot be housed in the same living unit which has resulted on occasion a non-JCA girl being housed in the intake area which is not properly equipped for that purpose;

---

[1] Refer to Miss. Code Ann. § 43-21-315 (Proper Facilities): Note the key reference to section (1) that includes *"....unless jurisdiction is transferred, no child shall be placed in any jail or place of detention of adults by any person or court unless the child shall be physically segregated from other persons not subject to the jurisdiction of the youth court..."* This effectively precludes JCA and non-JCA youth from being together in areas of Henley Young.

(2) As the number of JCA youth has risen (refer to subsequent information about population trends), there are concerns on the part of the Youth Court Judge and other officials that they will not be able to maintain the overall population of the facility to 32 or fewer youth as required by the SPLC agreement that remains in place;

(3) The Youth Court Judge and other County officials refer to increased serious crime trends as increasing the potential of JCAs essentially "crowding out" the ability of the Youth Court Judge to utilize Henley Young for non-JCA youth that may need to be held to protect public safety and/or ensure appearance in Youth Court.

It is helpful to note that in part due to changes made in recent years, the population reductions related to COVID concerns, and the expressed intent of the Youth Court Judge to use Henley Young as sparingly as possible, the number of non-JCA youth has declined over time.

Given these concerns, the Youth Court Judge and other county officials have begun discussions about how to best manage the JCA and non-JCA populations, including initial discussions about alternatives to house JCAs. It is beyond the scope of this report to detail the brief discussions the Monitoring Team has had with County officials, but from the point of being able to comply with conditions of this agreement: (1) Despite its shortcomings and needed improvements, Henley Young is clearly the best option for the foreseeable future for housing youth charged as adults (JCAs); (2) Given sufficient support (fiscal, physical plant, personnel, etc.) and leadership, Henley Young can achieve compliance with this agreement; (3) It is inconceivable, short of monumental changes, that JCAs could be returned to/housed in a portion of any of the existing adult or planned adult facilities and reach compliance; and (4) Placing JCAs in facilities in other counties in the state does not alleviate the county's requirement to meet the conditions of the agreement, and there does not appear to be a suitable option in any case.

Although this issue does not present an imminent crisis for Hinds County, prior to making any decisions that could alter where/how JCAs are held, the County should (1) conduct a thorough population trend analysis taking into account youth populations, crime rates (including types of crimes/arrests), and Henley Young population trend over the past seven years; (2) review its current capacity to manage non-JCA youth at home (e.g. variations of home confinement/detention/supervision) or in alternate non-secure settings, including consideration of developing additional alternatives (particularly for the small number of girls that need placement); and (3) through coordination with the courts and other stakeholders and with the support of the Criminal Justice Coordinating Council (CJCC) evaluate and expedite current court processes for JCAs, from the point of arrest through indictment through trial and sentencing.  As noted in the prior report, use of the Minors Diversion Docket was suspended with the reassignment of Judge McDaniels to a different division.  The County has begun discussions with the District Attorney and judges to expedite JCA cases, and it is likely that the number of JCAs held will be reduced as much, if not more, by shortening the length of stay than may occur

<u>through any reduction in admissions.</u>  Successfully managing both the JCA and non-JCA populations will increase the likelihood Henley Young will be a workable option for youth confinement.

It is also noted that the County recently received a Final Jail Master Plan report, commissioned in spring 2020, that outlines options for replacing one or more of the current adult jail facilities. The plan does not include nor is it appropriate to return/house JCAs to/in any of the options currently included in the plan.  It is conceivable that the county could choose to add JCA housing/services to the Master Plan, but to do so would require substantially more planning and design work to meet the needs of youth and the provisions of the Settlement Agreement.

As of February 25[2], in preparing this report, there were 20 JCAs and 3 non-JCA youth held at Henley.  Some basic data includes;

- Nineteen JCAs were male, one was female.
- As of February 25, the Roster indicated that of the 17 youth held for at least 90 days, 12 of them have been indicted.
- In terms of length of stay, the number of days in confinement range from 18 to 533; four youth have been held over one year (two for 533 days, two for 409 days). Chart 1 below illustrates the length of stay pre- and post- indictment for youth in custody (note: information provided lists 3 youth as indicted but with no indictment date, so they are excluded from this table).
- The ages of JCA youth in custody as of 2/25/21 was 17(10), 16 (2), 15 (5), 14 (3). Chart 2 illustrates the relative percentage of ages.  Fully one-half of the youth are 17 and will turn 18 in 2021.  If a youth turns 18 prior to being convicted/sentenced he or she is transferred to an adulty facility.
- In addition to 20 JCAs in custody, there were three male youth held in the short-term detention portion of Henley Young, bringing the total number of youth held to 23, short of the maximum 32 allowed in the SPLC/County agreement.
- Chart 3 shows the Average Daily Population of youth at Henley Young from September '20 through January '21.  The monthly ADP varied from a low of 21 to just over 25. The lowest Daily Population through this period was 19, the highest was 30 which is close to the maximum allowable number of youths under the SPLC agreement.  Also, note the very small number of girls, particularly JCA girls (none for four of the five months).
- In the period from September thru December 20, 2020, 15 JCA youth were admitted to Henley Young.

---

[2] Note: on February 9, there were 23 JCAs and no non-JCA youth in custody, but the 2/25/21 numbers are used for additional analysis in later sections of this report.







(Note: The ADP for January is through January 21)

| | SEP | OCT | NOV | DEC | JAN |
|---|---|---|---|---|---|
| Non-JCA female | 1.17 | 1.16 | 0.6 | 0.2 | 0.3 |
| Non-JCA male | 3.23 | 1.74 | 4.3 | 1.5 | 1.6 |
| JCA Female | 0.57 | 0 | 0.0 | 0.0 | 0.0 |
| JCA male | 16.07 | 18.61 | 20.5 | 21.0 | 20.7 |

Observations about this data related to planning for the future of JCAs and other youth being confined at Henley Young include:

- There does appear to be some progress in getting JCA youth indicted in a timelier manner after initial placement than has been true in the past. While the data is not fully complete, it was not uncommon in the past for three quarters of the JCA youth in custody to be awaiting indictment, often for exceptionally long periods of time. Progress in getting timelier indictments now needs to be followed up on by ensuring there is greater attention to processing these cases through the court system more timely as well. During the visit, County staff indicated that there are some discussions beginning with the judges to see if there is some way to expedite these cases. This is not the same as what was the "Minors Diversion Docket" started under Judge McDaniels, but if indictment decisions are in fact being made within 90 days of confinement that process may not be needed.

- Given that one-half of the JCA youth are 17 years old, it seems likely that many of these youth will "age out" to 18, although half of those youth do not turn 18 until the fourth quarter of 2021. Unfortunately, the vast majority of JCAs that have been released from Henley Young in recent years have been released by "aging out" and being placed in the adult jail rather than having their case get to trial/sentencing.

86

- There have been few placements of non-JCA youth at Henley Young, particularly for females.  Analysis of to what extent this relatively low number has been affected by concerns about COVID and/or the development of placement alternatives may provide some insight into options that can be expanded/developed to keep the number of non-JCA youth as low as it has been, housing only those non-JCA youth that present a substantial risk to others in the community. The current Youth Court Judge seems to be committed to limiting non-JCA placements, and there is time to do further planning that may be helpful in managing the population.
- Finally, keep in mind that ADP, particularly on the non-JCA side of the operation can "hide" fluctuations that need to be planned for.  The JCA population tends to be more stable, but even that could be impacted by an incident in which there are multiple youth involved in a serious incident that results in confinement.  If the ADP begins to regularly exceed 25/26, it becomes more likely there will be "peak" populations that reach or exceed the facility limit, so continued attention to both ADP and daily trends is important.

<u>Personnel Changes</u>

There continues to be a "revolving" door in critical positions, including: (1) The latest Executive Director began in May 2020 and left in November, leaving that position vacant again; (2) The Treatment Coordinator position was finally posted in May 2020, filled in mid-September, but that individual left in November as well; (3) The Training & Development Coordinator position was filled for about two weeks and then remained vacant again until February 8.  The new Training Coordinator does seem to have good experience in working with youth in facilities, so she may be a positive addition to the overall leadership team as she begins to put together a more complete training program. She also has recently been designated as the PREA Compliance Monitor for Henley Young, which given her background, is a positive step.

The greatest concern expressed in the previous report was the large number of vacancies in the Youth Care Professional (YCP) position, those staff that provide the direct, on-unit supervision for youth in care.  At that time there were 17 vacancies, over one-third of needed positions.  As of February, about one-half of those have been filled, but that leaves 8+ positions still vacant.  Simply covering shifts with a required number of staff to maintain the minimum 1 staff/8 youth ratio is a challenge, let alone having staff well trained to implement some of the safety and programmatic components of the program.  A more suitable ratio of one staff for 6 youth during waking hours is far out of reach for Henley Young. In addition, to the YCP vacancies, one out of the three Youth Support Specialists (YSS) positions is vacant.

The last report also contained some information about the exceptionally low pay scale for YCP positions[3] and the lack of any pay progression. The low pay and limited opportunity for advancement will continue to make it difficult to recruit and retain qualified YCP staff, the cornerstone of overall operations.  Meeting the requirements of the Settlement Agreement will depend on the county taking steps to remedy or overcome this challenge, a challenge that includes a recent recruitment effort by the Mississippi Department of Corrections (MDOC) in which they are paying similar positions almost 1/3 more[4] to start with and have lower application requirements than Hinds County.  Time will tell if/how many YCP-type staff leave Henley Young to move to a nearby MDOC facility.  Toward that end, it is recommended that the County: (1) review the job description for YCP positions, including enhancing the description to more accurately represent the duties and desired capabilities needed for the position; (2) increase the starting pay for the YCP position (and adjust any collateral positions as may be needed) and pay progression opportunities based on experience and/or training to match those provided by MDOC; and (3) develop a progressive training curriculum that includes basic/orientation training, CPI (or comparable) training, frequent policy/procedure training, and more comprehensive training in working with adolescents (supervision and communication skills, de-escalation, team communication skills, dealing with trauma, brain and adolescent development, group facilitation skills, etc.).

It is a positive step forward that Mr. Burnside, the Operational Manager, has recently received Trainer Certification for the Crisis Prevention Institute (CPI) that will allow him to be an on-site trainer for all staff.  This will allow him to appropriately "fit" the CPI training to the Henley Young facility and give him hands-on experience in initially training staff and then providing additional coaching and training as staff experience requires.

In short, being able to fully meet many of the requirements of this agreement depends on being able to recruit, train, and retain an adequate number of well-qualified Youth Care Professional staff as well as successfully filling (and keeping) qualified individuals in key leadership and program positions.

Physical Plant Changes

The modular units planned for use for additional programming and education have been placed on the Henley Young campus and as of this latest visit have been furnished, have had cameras and other wiring completed, and are ready for use except for needed perimeter fencing for

---

[3] Henley Young salaries are approximately $1,000 lower than the state average to start and nearly $5,000 below the average for surrounding states for similar positions.

[4] The starting pay for a MDOC Correctional Officer as of 2/1/21 is $30,347, increases to nearly $32,000 after six months, $33,650 after two years, up to over $37,000 after five years.  The starting salary for Henley Young is just over $23,000.  Additionally, the minimum requirements for MDOC are lower than those for Hinds County/Henley Young.

security purposes.  Per staff at Henley Young, a request for bids has been let by the County but no contract has yet been awarded or timetable set for completion.  Once the units are ready for use, they will provide additional flexibility in which youth are using various spaces within the facility for different programs, including education.  Utilizing these spaces appropriately, however, will require additional support staff, including teaching staff supplied by Jackson Public Schools.  It is recommended that the County inform the Monitoring Team when the units are ready for operation and put in daily use.

Additional physical plant changes that have been recommended in the past have not been addressed, including (1) dealing with limited use of outdoor recreation space related to weather (e.g. cold, rain, darkness). Whether one of the four new modular "rooms" created can help address that remains to be seen; and (2) making changes in the living units to improve acoustics and furnishings to make those units more "livable" and appropriate for adolescents, particularly youth placed for long periods of time and (3) installing the recommended security fencing. Considerable reference has been made in prior reports about the importance of making these living unit changes and the benefit they will bring to overall program operations, including behavior management, so they will not be repeated here.  Suffice it to say, staff at Henley Young will continue to fight an "uphill' battle to properly program for and manage youths' behavior if these changes are not made.

The last report included reference to the "breakdown" of the master controls that would allow remote operation of doors within the facility, requiring that all doors be operated manually.  This increases the time required for movement of youth throughout the facility and poses some additional security risk.  Per staff at Henley Young, there have been potential contractors looking at the system, and the County is in the process of soliciting proposals for replacement.

Maintaining sufficient water pressure in the facility continues to be a problem that creates an inconvenience for staff and youth.  This is compounded by poor infrastructure in the community, as evidenced by substantial water main breaks during cold weather.  As this report is being prepared, Henley Young has been without running water for almost two weeks, with an undetermined point of repair in the city overall.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II, a strength based assessment, and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two mental health clinicians, and the group work and counseling provided by the three (one position currently vacant) Youth Support Specialists (YSS).

During the period since the October visit, most of the programming provided by the mental health team members continued, including holding regular treatment team meetings and the provision of group programming by YSS and the Qualified Mental Health Clinicians (QMHC). Although some documents were provided by YSS staff showing some of the programming that they deliver, it is difficult to assess the quality and fidelity of those programs without being on site to observe them in action.  The documents and discussions do indicate that many (although difficult to tell if all) JCA youth participate in 2-3 group programs each week, but those program periods continue to be limited to 30 minutes. That means that most youth receive only about 1.5 hours of this programming per week.  While that may be sufficient for non-JCA youth, it is clearly inadequate for JCA youth who both need and could better benefit by more comprehensive and coordinated programming.  A reasonable goal would be that JCA youth participate in at least one hour/day in this mental health programming led by YSS staff.

That programming can be augmented by the activities developed by the Program Manager.  It is reasonable to expect that JCA youth participate in these other personal/skill development activities at least one hour per day.  As noted in the last report, her addition to the team is a positive step forward, and she seems to have developed a number of materials and curriculum ideas that can be implemented during other times of the day that heretofore had simply been labeled as "recreation".  The Program Manager provided several outlines and summaries of program packets and activities she has developed, but almost all of them require that YCP staff take the lead in implementing them. Based on verbal accounts, and absent any additional documentation, it appears that few youths routinely participate in these activities, resorting instead to playing card, playing dominos, or watching TV.  Staff have been reluctant and/or resistant to taking a lead in supporting these activities and reportedly simply do not follow through with the program design or requirements.  The Program Manager attempted to implement an incentive system, STARS, complementary to the existing point system, but she indicated that this was also not supported by staff or leadership and is therefore minimally effective in promoting engagement by youth.

The prior report referenced this issue as well as some of the reasons this may be a problem. Those will not be repeated in this report, but absent clear direction and support from leadership (managers and supervisors), implementing this component of the program is far from compliance.

Since the Treatment Coordinator remains vacant, the concerns that led to the creation and modification of this position remain, largely meaning that various program components are not integrated into a cohesive overall treatment vision.  Individual (YSS and QMHP) staff are genuinely committed to working with youth and meeting their treatment/program needs, but it remains a somewhat scattered program overall.  Further review of the quality of assessments and treatment needs to take place once a Treatment Coordinator is on board, and that person can organize and structure the overall mental health program into a more comprehensive and coordinated program.

Additionally, it is difficult, absent some substantive change in documentation to monitor to what extent youth are participating in the mental health and other structured programming.  There is a daily schedule that "blocks" out time for various activities but having space on the calendar for activities does not mean that things are happening as scheduled.  Some sort of master calendar and documentation system needs to be developed to be able to monitor actual compliance. (Note: one of the YSS staff did supply a roster of attendees for many of their sessions, but some were canceled, and it is difficult to track how consistently youth are engaged).

Something that has not been highlighted in prior reports is that the January 2020 Stipulated Order related to programming combines some of the prior language of the SPLC agreement but adds the more therapeutic/treatment-oriented requirements of this agreement.  It is reasonable to expect that there can be some differences in the frequency and duration of programming for JCA and non-JCA youth, with an emphasis on  providing JCA youth with more comprehensive programming than the short-term non-JCA youth.

79.    Ensure that youth receive adequate free appropriate education, including special education.

**Non-Compliant**

It is not possible to assess the education program from a distance but based on discussions/interviews it is apparent that the education program has regressed from being "minimal" to less than minimal. Concerns in prior reports reflect a sense that the internal goal for the educational program was to meet basic minimum state requirements, something that is not adequate given the needs of the youth that are held at Henley Young. Although information is limited, cautious optimism about progress noted in the prior report has been reversed.

In earlier months programming was impacted in part by COVID restrictions that limited the ability of teachers to be on site working directly with youth, but more recently other issues have arisen, including:

- The inability to "mix" in any way JCA and non-JCA youth in the school area has reduced the ability of those youth to be in the school area at the same time. The fact that the portable classroom/program spaces added have not yet been utilized makes it impossible for the education program to comply with even basic instructional requirements.
- The above, combined with safety/security concerns has resulted in youth in the JCA units attending class on alternate days, left with receiving work "packets" on those day in which they remain confined in the housing units. As noted in the prior report, this is not sufficient to provide adequate programming, particularly for youth with exceptional educational needs.
- There appears to be a difference of opinion about how best to manage the classroom area, with the current Principal requesting a sizable number of staff in the classroom area when classes are in session, far more than may be available at any given time. This contrasts with the Acting Executive Director/Operations Manager Mr. Burnside's opinion of how the school should be operated.  Even if more staff were available, the school/classroom area is poorly designed to provide the kind of separation and individualized instruction that is needed.  If additional teachers were available and if the portable classrooms could be put in use and if Henley Young is sufficiently staffed, it would be possible for youth to receive more individualized and consistent instruction.

It is becoming increasingly apparent that absent significant changes, the partnership of Henley Young/Hinds County and Jackson Public Schools (JPS) will at best result in a marginal school program.  This is truly unfortunate given that the youth at Henley Young are typically far behind their community-based peers, and the opportunity to provide a safe and individualized educational program to help them catch up is being wasted.

There were prior discussions about the possibility of creating a charter school program for Henley Young, something that presumably faces a number of fiscal and legal hurdles. This is a good time to revisit that possibility and determine the best route to improvement for the school program.

As previously reported, unless additional information is provided by the County and verified by the Monitoring Team young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Sustained Compliance**
As noted earlier, the last youth "aged out" of RDC in February 2019, so as of this report, this complete separation has been in effect for two years.  Transitioning Henley Young to serve these long-term youth has not been without challenges, but this remains a significant achievement.

Any discussion about moving JCAs out of Henley Young must clearly address all the elements of this agreement, particularly the sight and sound separation from adult prisoners.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**
There has been no change related to compliance with this requirement although staff purport that Policies/Procedures have been updated and documentation of classification is occurring. However, staff have not yet provided the final version of the policy or a copy of the form for review nor were admission files inspected during this visit to confirm compliance with the policy.  To reach Substantial Compliance Henley Young will <u>need to provide the updated policy and related documentation it is being followed.</u>  Additionally, admission files will need to be audited in a future visit to confirm proper documentation, if not confirmed in some other way.

Ironically, it was what seemed to be the appropriate placement of a vulnerable, 14-year-old male in the non-JCA male unit and a subsequent incident when he was transferred back to the JCA unit that led to the Youth Court Judge revisiting the interpretation of statutes which led to eliminating the potential of JCAs and non-JCA youth mixing in the facility.  That youth, recently turned 15, has substantial mental health issues to deal with and since placement on one of the older JCA units has struggled considerably in "fitting in", both as the victim of aggression by older teens as well as acting out in various ways.  This suggests that the classification decision to place that youth in the typically younger, non-JCA, unit was some validation of how those decisions are being made.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**
There has been no change in the training program for some time.  The Training Coordinator position was essentially filled only since February 8 (except for about 2-3 weeks in October). The intent to move the training program beyond basic/orientation/policy training to a more

comprehensive professional development program remains hampered both by this position being vacant and the turnover and vacancies in the Youth Care Professional positions.  A training plan for the coming months was requested but not provided to the Monitoring team, presumably due to the absence of an assigned Training Coordinator.

It is recommended that the County (led by the Training Coordinator and leadership at Henley Young) develop a staff recruitment, training, and retention plan that includes basic as well as a progressive series of more advanced training for all staff.

As noted in the prior report, absent substantive changes in the salary structure for new and more experienced Youth Care Professional (YCP) staff, significant staff turnover will continue, and it will be difficult to develop a fully effective training program at Henley Young.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

g. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth

and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

While there is some evidence that parts of this section are compliant, the overall assessment based on the information during the February "visit" suggests that progress in reducing the frequency and duration of Due Process Confinements[5] that was being made has regressed, and the documentation of various aspects of the room confinements remains troublesome. Continued regression may lead to this paragraph being considered non-compliant. Of note:

- Due Process Confinement was used 8 times in September, 14 times in October, 9 times in November, 13 times in December, and 5 times (thru 1/19/21) in January. Of these 49 DPCs, 37 (75%) were issued for 24 hours. Other periods of confinement ranged from 4 hours to 8 hours. The number of DPCs has been volatile over the past year, but any month in which the number is over 5-6 represents a concern that requires greater attention to the causes and potential remedies to reduce serious incidents.

- Incident reports for the DPCs was provided, and most of the discipline taken was based on incidents of fighting/aggression, sometimes one-on-one but more commonly multiple youth being involved.

- There were approximately 8 additional incidents that were considered serious but did not result in any room confinement, for various reasons (lack of documentation, youth was the victim vs. aggressor).

- Staff continue to purport that appropriate mental health checks are being made as required by the Settlement Agreement but did not, despite a request, provide any documentation to that effect.

- Similarly, staff purport that youth confined for discipline for 24 hours are allowed out of their room for various structured programming, e.g. school, recreation, mental health groups, etc. However, absent the requested documentation there is no way to confirm that, so one could assume that youth are confined to their room for 24 hours without time outside their room.

Beyond the specifics of the Settlement Agreement, the increase in incidents that result in room confinements is disconcerting in that it suggests an increase in the volatility of the day-to-day environment. An increase in disruptions, fights, and possession of contraband raises the

---

[5] Note that in prior reports the term "Due Process Isolation" has been used, but that term should be synonymous with Due Process Confinement (which is the term used by the Quality Assurance Manager) used in this report.

emotional level for youth. To the extent they feel less safe, youth feel like they need to be proactive in defending themselves, taking sides in arguments, and are less able to focus their attention on any productive programming.  Fortunately, leadership reported that there had been no staff injuries in recent months as they intervened in these situations, but staff also need to feel safe in order to appropriately engage with youth in a positive manner.  Overall safety comes only in part from the basics of a "secure envelope" that everyone lives/works in, but real safety comes largely from other factors that impact youth behaviors (e.g., physical plant/environment, variety in surroundings, relationships with staff, lack of idle time, experienced staff, etc.).

The Settlement Agreement limits room confinement to a maximum of one hour unless the youth poses an imminent safety risk to staff or other youth. None of the Due Process Isolations meet that expectation in that they were all over one hour without evidence of an imminent safety risk.

It bears repeating that facility leadership need to remain vigilant in ensuring that documentation related to the use of isolation, both for initial behavioral reasons or disciplinary reasons, is accurately completed and reviewed and made available for review on subsequent visits.  This includes documentation of whether youth do, in fact, take the opportunity to be out of their room during any disciplinary period and whether required mental health checks are being made.

Finally, the last Henley Young Policy/Procedure related to Due Process Confinement provided to the Juvenile Justice expert is from September 2017 and does not match verbal representations made by staff about current procedures.  Henley Young needs to provide the Monitor with current/recently adopted Policies/Procedures so they can be reviewed to determine if they are consistent with requirements of the Agreement.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

      a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

Again, it was not possible to review youth point sheets during this offsite visit, and discussion related to the incentive system was limited to essentially indicating there had been no substantive changes over the last 10+ months. In fact, it sounds like there has been less attention paid to the incentive system and that staff are clearly not utilizing the system as intended. Changes that have been recommended by monitors for both legal agreements have not been made, and attempts by the Program Manager to enhance the incentive system to support increased participation by youth in the programming she develops have been met with staff resistance and/or non-compliance. There are basic elements of the system that suggest partial (albeit minimal) compliance with requirements of the agreement, including (1) there is on-going documentation of what youth earn and what incentives they select; and (2) the system is broken up into appropriate blocks of time, providing an opportunity for youth to earn rewards for their behavior during various program periods/activities (an improvement from a system that simply tracks youth by larger blocks of time, e.g. a whole shift or even half-shift). That has not changed.

More importantly, there remains a disconnect between how useful the incentive system can and should work and how it is applied by YCP staff, with perhaps the best description being that is it applied inconsistently at best. Documentation of why youth earn/fail to earn points remains limited, and rather than being a tool for line staff to use in shaping youth behaviors it appears to be more of an "afterthought" in terms of how it is applied. It is time for leadership to revisit the basics of the incentive system, take a greater role in directing compliance, and enhancing the incentives. Absent changes being made, the incentive system exists essentially "on paper" but is doing little to shape youth's behavior over time.

## LAWFUL BASIS FOR DETENTION

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests. To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order. Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

As was the case during the June and October 2020 site visits, the quality of the inmate records was difficult to evaluate during the February 2021 remote site visit. Typically, the Monitoring Team is able to review the paper files and determine whether the appropriate paperwork is in the file. These are too voluminous to have scanned in for review. The documents requested were the status/summary sheet showing the detention status and the chronology sheet showing the activity related to the inmate's status. This was for approximately 30 randomly selected inmate files.

The status sheet is required by policies and procedures and should greatly assist in both the Jail staff and the Monitors assessment of whether the paperwork supports the booking and ongoing detention. It is a face sheet that lists each charge and the status of the charge such as whether there is a bond, an indictment, a next court date, a dismissal etc. It would also list any detainers/warrants with the jurisdiction and contact information. The legal documentation related to the charge or detainer would then be behind the status sheet on one side of the inmate file. This would provide staff an efficient means to determine the status of detention and could then be uploaded for review during site visits without uploading the entire file. At the time of the June 2020 site visit, staff reported that they had discontinued doing the status/summary sheet. The Monitor clarified with the Lieutenant over Inmate Services during the October 2020 site visit that the status/summary sheet is required by policies and procedures and is intended to ensure compliance with this paragraph of the Settlement Agreement. The documents provided for the October 2020 site visit included a summary sheet. However, it was essentially an abbreviated version of the chrono sheet which staff understandably found redundant. After some discussion at the time of the site visit and a subsequent remote meeting between the Monitor, Karen Albert, and the Lieutenant, the format of the summary/status sheet was agreed upon. The status sheets provided for the February 2021 site visit included status sheets using the format. However, many of them were not filled out correctly so it remained difficult to determine the status of the inmates without having the Records Sergeant review the paper file. On one status sheet, the inmate was listed as being detained on a DUI and marijuana charges. Those charges did not appear in the JMS or paper file. The charge he was detained on was a kidnapping charge that did not appear on the status sheet. However, the use of status sheets and their overall content reflected significant improvement in this area. The file audits completed in January indicate that all of the files had the status sheet.

It should be noted that since monitoring began there has been significant improvement in the quality of the records, the accuracy of the JMS system, and the presence of paperwork supporting booking and detention. There continue to be improved systems in place to track individuals and release them timely. The random files reviewed remotely did not disclose any individuals who did not have the proper paperwork supporting detention. One individual identified through a grievance was held 4 days beyond the 21 days allowed for probation violations. The Records Sergeant indicated that MDOC continues to request that individuals be held beyond the 21 days when they have not completed the paperwork in time. The Sergeant

reported that the Jail Administrator typically authorizes the release of these individuals. One individual received a release order from the judge on a misdemeanor. However, the judge wrote on the release order to hold until trial. This paperwork should be clarified. There continues to be some difficulty in locating holds in the system when the hold is placed subsequent to booking. The records clerks have no way of knowing if a hold has come in. These holds are identified when the individual is otherwise entitled to release, but this causes some delay in determining whether the other jurisdiction wants to pick up the individual. Any holds coming in after booking should be provided to the records clerks to ensure timely release. This provision will remain in partial compliance until an on-site visit can be completed and the actual files reviewed.

The problem with individuals waiting for their first appearance in County Court appears to be resolved with the newly assigned judge. It was also reported that the officers were much better at getting their paperwork submitted in time for a timely first appearance. However, there are still problems with some officers getting the paperwork in. Reportedly, Detention staff typically contact the judge after 48 hours and arrange for their release if no paperwork has been submitted.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Substantial Compliance**
As previously reported, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the Jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. At the time of the last four site visits and this remote site visit there have been no individuals in the facility on a fines and fees order. This will continue to be monitored closely as the policies are new and sentencing orders are sometimes ambiguous, but this provision is now listed as in substantial compliance.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Substantial Compliance**

The County has been pro-active in ensuring that valid court orders are utilized. The policy on pre-booking is consistent with this paragraph and at the time of this and four prior site visits there was no one in the facility for failure to pay fines and fees.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Substantial Compliance**
See paragraph 87.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Substantial Compliance**
See paragraph 87.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**
The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees. There was no documentation that prisoners were provided

with documentation of their release date although they do typically have the orders from the court and the case manager typically provides court information upon request.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals working off fines and fees. The stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. The spread sheet appears to be consistent with this stated policy. However, it was reported that Clinton Municipal Court includes in its sentencing orders that individuals must serve day for day time. 21 of the 24 individuals at the WC on misdemeanors are from Clinton and are getting only day for day credit, some with lengthy sentences; one at 540 days so they cannot get credit for performing labor. Two from Justice Court appear to be pretrial with no bond listed and one from Jackson Municipal Court appears to be pretrial with a bond. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.      Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.      Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.      Examples of prisoners presumptively entitled to release include:

            i.      Individuals who have completed their sentences;

            ii.      Individuals who have been acquitted of all charges after trial;

            iii.      Individuals whose charges have been dismissed;

            iv.      Individuals who are ordered released by a court order; and

            v.      Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

There has been ongoing improvement in the area of releasing. The ability to track individuals booked on probation violations and release them if a hearing is not held in 21 days continues to be a challenge in that the entry of information into the JMS system can vary. The Records Sergeant continues to keep a manual spreadsheet upon reviewing booking information. MDOC has been requesting the Jail to continue to hold individuals after the 21 days. As mentioned in paragraph 85 above, at least one individual was held beyond the 21 days in January. This individual did not appear in the manual spreadsheet but was identified through a grievance he had submitted. This is an improvement from September but it is concerning that the spreadsheet did not identify him.

As mentioned in paragraph 85 above, there is an additional problem when a hold comes in subsequent to booking. The records clerk does not always know of such a hold so that she can contact the jurisdiction to determine if the jurisdiction wants to pick up the individual. This can delay the releasing process.

It should be noted, however, that there has been significant improvement in this area since monitoring began.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As previously stated, the condition of inmate files has improved since monitoring began. As described in paragraph 85, the new Records policy establishes the use of a status/summary that should greatly improve the reliability of the prisoner record system. With the ongoing pace of auditing files, a review of all files should soon be completed. As noted above, the inmate status sheet required by the Records Policy are now being completed and with some additional direction regarding how they are to be completed, this should provide added certainty for timely release. Similarly, the recently updated Booking Manual should result in improvement in the initial entries into the JMS system. Additional problems described in paragraph 85 continue to exist. Holds that come in subsequent to booking are not routinely brought to the attention of Records staff. As a result, they are not able to contact the jurisdiction prior to the release date potentially causing a delay in releasing. Similarly, Records staff cannot reliably use the JMS system to identify people with a probation hold and create a manual spread sheet to track this.

This has the potential to miss individuals such as the individual who was over detained in January and did not appear in the manual spreadsheet. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained although the auditing process has greatly improved since the June 2020 site visit.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The electronic medical records system and the various tracking logs that are maintained by medical and mental health have been described in prior reports.  The various ways these records and logs are used has also been previously described.  Essentially, this data collection, record keeping and use of data addresses the sections of this provision of the Settlement Agreement that are totally within the purview of medical and mental health.

With regard to prisoners requiring forensic evaluations which are performed by staff at the state mental hospital, medical/mental health staff have no knowledge of which prisoners are awaiting such evaluations. Immediately prior to the evaluation, state hospital staff request medical/mental health records, which are provided by medical/mental health staff. Medical/mental health staff are not involved in the transport of such prisoners to the state mental hospital. When prisoners come back from the state mental hospital, they are accompanied by a brief note that essentially indicates what medication they received while at the state hospital.  At the time of the October 2020 site visit, the state hospital had begun to perform forensic evaluations by way of telepsychiatry (presumably due to the large backlog and restrictions on movement due to the COVID 19 pandemic); this practice has continued, and so a much larger volume of forensic evaluations has been performed; but essentially, there has been no real changes in the role that medical/mental health play in this process. Although this development and reported expansion of the availability of state forensic beds would seem to minimize the presence of inmates waiting for state hospital beds, there still seem to be a number of individuals in Hinds County waiting for evaluations or beds. This situation should be explored more directly with the state hospital.

Similarly, neither medical nor mental health staff play a significant role in the incident reporting and review process, and staff are rarely even consulted or interviewed as part of those processes (although there have been times when medical/mental health records were requested), even when an incident might indicate that medical and/or mental health staff were called at some point during the incident or it was otherwise apparent that medical and/or mental health was involved with or had information that might be related to the incident. Medical and mental health staff do not have access to the JMS system and can't submit any information into that system with respect to incidents. Therefore, any reporting and review of incidences that have a medical or mental health element/component do not include all potentially available information from medical and/or mental health, gathered at the time of the incident or after the fact.  This clearly compromises both the full reporting of and adequate review of such incidences.  Furthermore, if security staff fail to recognize that an incident has a medical or mental health component, such incidences will not be included in any tracking of medical and mental health related security incidences. Security staff should explore ways to better integrate medical and mental health into the incident reporting process in order to establish a fuller, interdisciplinary reporting process when indicated and review/use these fuller, interdisciplinary incident reports to identify problems that need to be addressed/corrective actions that need to be developed and undertaken.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC. Further collaboration with the courts will be necessary to allow for release from the court. In particular, the courts will need to develop the capability to provide a written release order in the courtroom for an individual to be released from court. In addition,

HCDS staff will need to have a system to identify individuals with holds at the time of the court order releasing the individual to ensure that the individual does not have some other basis for detention.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been reviewed and is in the process of being finalized. This has been delayed in an effort to address the requirement of the prior paragraph that individuals be released from the court.

With regard to medical and mental health, the various different activities/tasks that need to be performed in order to comply with this provision have been described in prior site visit reports and therefore, all of that will not be described again here.

Discharge plans continue to be developed for detainees who are expected to be eventually released back into the community.  Group therapy sessions focused on discharge planning (with the goal of helping detainees understand their need for continued treatment in the community and learn how to obtain the treatment they require) were initiated at the end of 2019; as efforts to refine that group therapy process were underway, the COVID 19 pandemic hit and group therapy sessions were discontinued, but at the time of this most recent site visit, group therapy sessions were beginning again.  Medical/mental health prepares a discharge packet for each detainee who is about to be discharged, which includes a supply of medication for the detainee's use until his/her first outpatient visit; but there continue to be a significant percentage of detainees who do not pick up their discharge packet and medication from medical upon discharge, and so, efforts

to better understand and address this problem continue. It is essential that HCDS make contact with Medical part of the discharge process so that needed medications can be provided. This not only benefits the individual but reduces the risk of recidivism from persons with mental illness decompensating upon release.

Still only about 30% of released detainees who had been on the mental health caseload show up for their scheduled outpatient appointments.  As has been previously reported, having staff from Hinds Behavioral Health come to the facility and begin to engage detainees prior to their release from the facility has been the plan to increase the rate of successful referral for outpatient care. A proposal has been submitted to the County to fund such an effort, with the argument that such an effort would reduce recidivism; but the status of this proposal to the County remains unclear.

With regard to detainees who are released to some type of residential treatment program, virtually 100% of those detainees begin the program; however, some leave prior to completion of the program and medical/mental health staff should attempt to obtain data on what percentage leave such residential programs and gain a better understanding of why they leave.  Subsequent to this site visit, 2 such detainees who left programs have been interviewed, and both reported leaving because they felt that they and/or their possessions were not safe.  Given the very limited number of residential programs available (made even smaller by the fact that some programs refuse to accept individuals who have been involved in the criminal justice system, or have pretty severe restrictions on which such individuals they will accept), attempting to identify and address such problems is an important part of efforts to enhance the discharge planning process.

As has also been previously reported, there is yet another group of mentally ill individuals who are repeatedly arrested and admitted to the facility, but stay for only about 24 hours.  These individuals are not detained at the facility long enough for the mental health staff and/or staff from Hinds Behavioral Health to even attempt to engage them in treatment at the facility or in the community/upon their release from the facility.  How to best identify and address the needs of this population continues to be explored.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:
      a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;
      b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area. The Records Supervisor and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

At the time of the January 2020 site visit, the Booking staff reported that they run an NCIC check for outstanding warrants at the time of booking and again at release. NCIC reports run at the time of booking were in the inmate files. The files reviewed at that time did include a copy of the NCIC report at the time of release. The June, October and February 2021 site visits, being remote, did not permit a review of the files.

As mentioned above holds coming in after booking may not come to the attention of Records. As a result, they are identified when the inmate is otherwise entitled to release. The process of then contacting the jurisdiction with the hold and determining if they want to pick up the inmate can delay the release.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.    How to process release orders for each court, and whom to contact if a question arises;

       ii.     What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

      iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

      iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. In addition, a staff member has updated and expanded the Booking and Release Manual which will provide the detailed guidance required by this paragraph. As noted above, there is still an issue with detainers that come in after booking such that releasing is not delayed.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

b.      Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Partial Compliance**

This paragraph has been changed to partial compliance because of the improvement in the internal auditing process and the implementation of the summary sheet although it is in need of improvement. There is not a log required by subparagraph (a). The County has provided their list of releases but the list does not include the information required by subparagraph (a). Incident reports are not routinely prepared for over detention although this appears to happen much less frequently than previously.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The week of the June site visit, the Sheriff's Office hired an individual with the title of Quality Control Officer. Her list of duties includes monitoring records to ensure that inmate files are current. She has prepared an initial spread sheet to begin to meet requirements of the Settlement Agreement and she is working on a template for a narrative that will describe trends and problem areas. The spreadsheet continues to reflect information gathered in a number of areas and she has developed a timeline for the audits required by the Settlement Agreement and policies including inmate records. This work does appear to be on the right track. However, at this time, the spreadsheet does not reflect the requirements of this paragraph. It is recommended that a system be put in place to review inmate files periodically to incorporate this requirement in the quality assurance process.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective

action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

As was noted in the Ninth Monitoring Report, there is currently no approved policy requiring the documentation of untimely/erroneous releases. As was previously noted, there have now been a few incident reports on erroneous releases. There have still not been any reports on untimely releases. There should be clarification as to who has the responsibility for completing the report. It was recommended by the corrections expert of the Monitoring Team that the Jail Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has not been an initial audit of releasing practices. There are no incident reports regarding untimely releases even though such incidents have occurred.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

Attorney/client visits were not problematic at the JDC when it was open, however, that facility has been closed for almost a year.  At the WC there is no designed space for such visits, but the Captain's office and space in the administrative area of the facility has served adequately.  If or when the WC is renovated and expanded, consideration for dedicated space should have priority.

At the RDC, where the majority of the inmates are held, the original space in the pods, that was set aside for that purpose, has not been used for years. There is no reason why it cannot be reactivated once direct supervision has been implemented in C-Pod and B-Pod (once it is renovated and re-opened). In the interim, inmates at the RDC have to be escorted to multi-purpose space in the front of the jail in order to meet with their attorneys. This places a burden on Detention staff which could be alleviated if the attorney/client visitation spaces in the pods were utilized.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights. To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances. This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

The Monitoring Team has received the electronic monthly reports on incidents which includes the complete narrative of the primary report and supplemental reports. There is a field in JMS which appears on the spread sheet for checking use of force. However, this field is frequently not checked when force is used. A separate use of force report is supposed to be completed when force is used. However, this is also frequently not completed even though force has been used. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include much of the information listed in paragraph 107 and 108 below and that would be needed to provide the information that could inform continuing improvement or quality assurance reports. The Quality Assurance Officer is creating a master spreadsheet with information on incidents, use of force, training activity and other areas. For the incident reports and use of force she was pulling the information from the JMS. However, it quickly became apparent that this was inaccurate. For example, the narratives disclose for November that there were 11 incidents of use of force, 10 of which involved the use of chemical spray. Using the field for use of force, only 5 incidents of use of force were noted. In January, there were 11 incidents of use of force, 8 of which were use of chemical spray and one of which was use of the less than lethal shotgun. The use of force field was not checked in any of the 11 incidents. Similarly, the type of incident listed is inconsistent. When there is a fire, it might be listed as a fire, or destruction of property or malicious mischief. The Quality Assurance Officer has started to review the narratives to determine accurate number and categorization of incidents. However, the issue should be addressed through training. There should also be some consideration of whether the JMS system could allow multiple incident types so that, for example, when an inmate burns county property both fire and destruction of property could be

listed. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property. The new Quality Assurance Officer is working on developing a comprehensive quality assurance program including monthly summary reports.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securus does not include some critical fields that are in the system but can't be pulled into the spreadsheet such as type of grievance and date of response. The Grievance Officer manually creates a separate spreadsheet that pulls the information from Securus and then the type of grievance, the date of response and the date of the response to an appeal. There is also a limitation in that some staff do not respond to grievances assigned to them in the system. The Grievance Officer clears these out of the system when the inmate is released, but it is not possible to determine whether the grievance was responded to and what the response was. The policy to reject grievances that are actually inmate requests and direct inmates to use the inmate request category appears to be effective. This policy allows a more accurate depiction of grievances although, as mentioned above, some of the grievances rejected for this reason should have been considered grievances. The Quality Assurance Officer has not yet incorporated the grievance information in her master spreadsheet but intends to do so.

107.   Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
   a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;
   b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
   c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
   d.  List and total number of incident reports received during the reporting period;
   e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**
The spreadsheet currently being provided has the text of the narrative of the initial incident report and the text of the supplemental reports. Additional information includes the date and time of the incident, the location, the type of incident, the name of the inmate involved, the name of

the initial responding officer, a field for use of force, the supervisor reviewing the report, the date and time of review, and whether the report was approved. The spreadsheet now being created is a step towards being able to generate the report required by this paragraph. The monitors receive the spreadsheet as a pdf document but it appears to be an excel spreadsheet. As such, it could be used to aggregate types of incidents or location and generate charts or graphs to identify trends or problem areas. However, as noted above, until the underlying information in the JMS system is more accurate, an electronically generated spreadsheet will not be accurate. In addition, at this time, it does not include all of the information required by this paragraph (e.g. use of restraints, segregation, referral to IAD) including information that would be necessary to be fully informed regarding the nature of the incident. (The segregation log could provide the needed information for segregation).

Most importantly, the spreadsheet does not have an actual summary of the incident. The spreadsheet now pulls in the first incident report and all supplements. This provides more information than was previously available. A brief summary of the incident that incorporates information from the various narratives and includes information from medical which is often not included in the narratives should be incorporated. The JMS system includes a field for supervisor's notes. This does not appear in the current spreadsheet but would be a good location to include a brief summary of the incident as required by this paragraph (and findings or recommendations as required by paragraph 64).

Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate on inmate assault or an inmate on officer assault. Only by reading the narrative, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation. RDC and the WC are now using the same form for segregation. This is not in Excel but could be drawn from manually to create the same type of trend analysis envisioned by this paragraph. At this time, there is no report tracking the use of restraints.

108.     Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

      a.      Summary of all uses of force, by type, shift, housing unit, and date;

      b.      List and total number of use of force reports received during the reporting period;

      c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The monthly Incident spreadsheet has a column for whether or not force was used. As noted above, this is not routinely checked when force is used so can't be relied upon for this information. Although this would provide some of the information required by this paragraph, it is not the type of useful report envisioned by this paragraph. As noted in paragraph 107, there should be one report that provides the information and analyzes the information to identify problem areas and trends. The Quality Assurance Officer is working on a more useful summary report.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**
As mentioned above, the limitations of the reporting from the Securus system has led the Grievance Coordinator to manually create a spreadsheet. The spreadsheet has the location of the kiosk terminal where the grievance was submitted although this might not reflect the location of the event giving rise to the grievance. Neither system can generate a report by location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. Also, as mentioned above, some of the staff are not entering responses in the system. One option would be to expand the manual spreadsheet kept by the Grievance Coordinator to include the information required by this paragraph. This should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced maintaining an expanded manual spreadsheet would be a very time intensive process. At the present time, there is no management review process in the grievance system. The Quality Assurance Officer is reviewing the Grievance Coordinator's spreadsheet but is not yet reviewing and reporting on a review of a random sampling of grievances.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:
>    a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;
>    b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;

c.   A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

d.   A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

The IAD spreadsheet tracks all investigations according to most of this paragraph's criteria. During the October 2020, to January 2021, time period a total 37 cases were investigated.  Of those 28 involved UOF, one was dereliction of duty, two involved conduct unbecoming, four were fact finding and two involved the introduction of contraband.  All of the UOF cases were exonerated even though some involved the use of OC to force inmates to comply with the direct orders of officers.  Two officers were terminated and arrested for the introduction of contraband. One was terminated on a fact finding case and two officers were suspended (one for a day and the other for six days).  No cases were referred to outside agencies.

Of special note is the fact that only three of the IAD investigations involved the WC, while 34 were attributed to the RDC.  The JDC has been closed for approximately one year.  The RDC currently houses approximately 300 inmates while the WC holds half that number, and the security level of inmates held at the WC is lower than those held in the RDC.  In spite of those differences, the impact of Direct Supervision on the two jails makes for radically different figures.  At the WC an officer is always stationed in each housing unit, so potential problems are identified quickly, and an officer is present to answer questions and/or take immediate action if necessary.  At the RDC inmates in A-Pod and B-Pod (before it was closed for renovation) are not supervised through direct supervision.  That leaves them free to create problems (such as assaults and breaches of security) that are not addressed by staff until well after the fact.  When C-Pod was re-opened in October it was supposed to operate under the principles of direct supervision, but it has not been implemented properly.  Inmates are routinely locked in their cells when they should be out in the dayroom throughout the day.  In addition, incident reports often reveal that no officer is present in the housing units.  Consequently, the improvement that was expected when C-Pod re-opened has not occurred.  In fact, at least 13 of the IAD investigations were associated with incidents that occurred in C-Pod.  That number may be even higher because some incidents were only identified as having happened at the RDC, without the pod and unit number included.  As was previously noted, in C-Pod inmates now set fires in order to get the attention of staff.  This should not be necessary, particularly if officers were actually inside their assigned housing units (C-1 through C-4).

111.   Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the

system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Partial Compliance**

The Quality Assurance Spreadsheet indicates that there has been implementation of an Early Intervention program. It will be necessary to review the underlying documentation to determine compliance with this paragraph.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**
The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:
   a.    Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;
   b.    Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**
Medical staff are not included in the review of serious incidents. This was discussed in a joint meeting between the Monitoring Team, QCHC staff and command staff during the September 2019 site visit. It was decided at that meeting that the Interdisciplinary Team meetings would be reinstituted and one task of the Team would be to review serious incidents. There is no indication that this has occurred. The HSA has scheduled MAC meetings which would provide a forum for such discussions, but security staff did not attend. Medical staff do have independent authority to refer cases of assault or abuse.

## CRIMINAL JUSTICE COORDINATING COMMITTEE

115.    Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining

criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had previously contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. Hinds County is to be commended for getting the CJCC implemented. There was conflicting information as to whether a CJCC meeting was held since February, 2020 and no minutes were kept to confirm the date or attendance. There may have been a small meeting in October and/or a small meeting in December although that meeting might have been postponed. The meeting might have been primarily informational from the chair regarding pretrial services or moving individuals through the criminal justice process particularly during this time of COVID. The lack of minutes, limited participation, and inconsistent reports suggest that the CJCC is not currently entirely functional. No doubt, COVID has interfered with the effectiveness of the CJCC.

This paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI when they were providing consultation and the Monitoring Team have recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Among other duties, staff duties will include collection and analysis of data, facilitation, research and analysis, presentation, project management, consultation, and distribution of information to the policy makers on the committee so that they have the information they need to make policy decisions. The County had stated that it was going to hire a CJCC Coordinator. However, during the June, 2020 site visit, the Monitoring Team was informed that the Criminal Justice and Quality Control staff person (sometimes called the Court Liaison or Facilitator) was assigned to be the CJCC Coordinator and the Pre-Trial Services Director required by the Stipulated Order. This will not meet the requirements of this paragraph or the Stipulated Order as having both of these roles as well as the duties of her other full-time position does not allow her to devote sufficient time to any of these

roles to be effective.  The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the Jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping is now three years old. This would be a useful activity for the CJCC.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC has not met in full since February, 2020. Not all of the identified agencies have been invited or represented at prior meetings and the October and/or December meeting was a limited group. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in

the CJCC. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation. The reported current priority is moving people through the criminal justice system particularly during this time of COVID.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the Jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant, JMI, to provide technical assistance in developing the CJCC. However, that contract did not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  That contract ended over a year ago and the County has not renewed the contract with JMI. Hinds County is applying to be a learning site with Advancing Pretrial Services. The deadline for the application is May 28, 2021. If accepted, this would provide the needed consultation although long overdue.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

      a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

      b.     Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The booklet sized version of the Settlement Agreement is provided to new staff as they go through basic training.  Existing staff previously received this booklet, and they have access to the same document through their supervisors during Roll Call Training.  Inmates have access to the document through the kiosk system, but it is not possible to determine whether or not that is a practical option without being able to question inmates and inspect housing units.  At the very least, each control room and each direct supervision housing unit should have a copy of the Settlement Agreement booklet for inmates to review at their convenience.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert retained through the Monitoring Team to develop policies and procedures. A number of draft policies have been provided and at this time, twenty-eight policies have been approved and signed. It does not appear that there is a system in the policy development to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies w ould be valuable. As noted above, there is the additional concern about the actual implementation of policies that have been adopted. As has been stated above, the process has slowed because of a lack of participation by HCDS staff and there is a major concern that even once adopted the policies are not being implemented.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Twenty-eight policies and procedures have now been approved and several others have been drafted and circulated. There are many outstanding policies to be written but progress is being made. This does not meet the deadline set by this provision.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**
Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**
In addition to completing the development of policies, this paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. Not all policies have been developed and training has not been completed on the ones that have been adopted. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff. Although training is hampered by COVID, it is concerning that some supervisors seem unfamiliar with the requirements of newly adopted policies or disinclined to ensure those policy requirements are implemented  even those adopted long before COVID began.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**
There have been twenty-eight policies approved by DOJ and adopted. It does not appear that the policies have been fully incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**

At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph.  A self-assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 or February, 2121 site visit. This paragraph is now carried as Non-Compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications are being provided. The County is not preparing incident reports or providing immediate notification of over-detention.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.