```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                      PLAINTIFF

 5   VERSUS               CIVIL ACTION NO. 3:16-CV-00489-CWR-JCG

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                  DEFENDANTS
 7

 8

 9              VIDEOCONFERENCE PROCEEDINGS
           BEFORE THE HONORABLE CARLTON W. REEVES,
10             UNITED STATES DISTRICT COURT JUDGE,
                       APRIL 9, 2021,
11                  JACKSON, MISSISSIPPI

12

13              (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

```
 1   APPEARANCES VIA VIDEOCONFERENCE:

 2      FOR THE PLAINTIFF:

 3          CHRISTOPHER N. CHENG, ESQ.
            SARAH G. STEEGE, ESQ.
 4          LAURA L. COWALL, ESQ.
            HELEN VERA, ESQ.
 5          ANGELA GIVENS WILLIAMS, ESQ.

 6      FOR THE DEFENDANTS:

 7          CLAIRE BARKER, ESQ.
            TONY R. GAYLOR, ESQ.
 8          RAYFORD G. CHAMBERS, ESQ.

 9      ALSO PRESENT:

10          ELIZABETH SIMPSON
            DAVID PARRISH
11          JIM MOESER
            RICHARD DUDLEY
12          SHERIFF LEE VANCE
            UNDERSHERIFF ALAN WHITE
13          CHIEF DEPUTY ERIC WALL
            WARDEN RICK FIELDER
14          ASSISTANT WARDEN CRANE
            CAPTAIN BURNLEY
15          CAPTAIN JONES
            SYNARUS GREEN
16          CREDELL M. CALHOUN
            ROBERT GRAHAM
17          FERNANDEZ FRAZIER
            DAVID ARCHIE
18          KENNY WAYNE JONES
            ROBERT FARR
19          DAVID MARSH
            GARY CHAMPION
20

21

22

23

24

25
```

**TABLE OF CONTENTS**

Style and appearances...................................1-2

    By Mr. Parrish...................................... 10

    By Ms. Simpson...................................... 15

    By Mr. Parrish...................................... 20

    By Ms. Simpson...................................... 34

    By Mr. Parrish...................................... 39

    By Ms. Simpson...................................... 45

    By Dr. Dudley...................................... 47

    By Mr. Moeser...................................... 56

    By Mr. Cheng...................................... 68

    By Mr. Gaylor...................................... 82

    By Ms. Barker...................................... 95

    By Mr. Gaylor......................................105

    By Sheriff Vance...................................113

    By Mr. Cheng......................................115

Court Reporter's Certificate..............................128

1          **PROCEEDINGS VIA VIDEOCONFERENCE, APRIL 9, 2021**

2

3          THE COURT:  You may be seated.

4          Good afternoon.  Can everyone hear me and see each

5     other, I guess?  All right.

6          I know we're appearing via Zoom.  The public has been

7     invited.  There is a conference call line that they can be on

8     this call if they wish to be.  I don't know if any is on the

9     call or anyone from the public is here, but it's open.

10         There is no one in the courtroom but the members of the

11    court staff and the court reporter, so I'll ask you when

12    you're speaking please make sure you're speaking at a pace at

13    which the court reporter can keep up with you.

14         This is the matter of United States versus Hinds

15    County, Civil Action No. 3:16-cv-489-CWR-JCG.  Today we're

16    here for a status conference.  It's a follow-up to the most

17    recent "site visit" which culminated in the monitor's filing

18    of her and her team's status report that was filed on

19    April 2nd, 2021, the 13th monitoring report.

20         As we've done in the past -- I guess first of all, for

21    the record, who is on the call for the United States?

22         MR. CHENG:  Your Honor, this is Christopher Cheng,

23    C-h-e-n-g.  I also have Laura Cowall, C-o-w-a-l-l; Sarah

24    Steege, S-t-e-e-g-e; Helen Vera, V-e-r-a; and from the U.S.

25    Attorney's Office, we also have today Angela Williams.

1          THE COURT:  Okay.  And I'll ask when you're not -- when

2     you're not speaking, just so we won't have any feedback at

3     all, please have your mike on mute.  So mute -- I guess -- I

4     assume you can mute yourselves?

5          MS. SUMMERS:  Yes.

6          THE COURT:  Okay.  So mute yourselves if you're not

7     speaking to reduce the possibility of any feedback.

8          Who's on for Hinds County?

9          MR. GAYLOR:  Your Honor, on behalf of Hinds County, we

10     have board president Credell Calhoun; board attorney, Tony

11     Gaylor; county administrator, Kenny Wayne Jones; and we also

12     have construction managers David Marsh and Gary Champion here;

13     along -- we also have the executive director for Henley-Young,

14     Mr. Fernandez Frazier, who's joined us; and we should have

15     Supervisor Robert Graham (AUDIO GAP) as well, as well as

16     Supervisor (AUDIO GAP).

17          THE COURT:  Okay.  Your microphone is picking up some

18     of what you said, Mr. Gaylor, but you said you are there; the

19     county administrator, Kenny Wayne Jones; president of the

20     Board of Supervisors, Credell Calhoun; and you mentioned

21     somebody right after that before getting to Supervisor Graham,

22     who is supposed to be on.  And I do know you said Fernandez

23     Frazier, but you said somebody else I think.

24          MR. GAYLOR:  Yes.  I mentioned the construction

25     managers, David Marsh and Gary Champion.

1      THE COURT:  Construction managers?

2      MR. GAYLOR:  Yes, Your Honor.

3      THE COURT:  Did everyone get their names?  I assume you

4  did.  Okay.  All right.

5      Did you, Twana, Ms. --

6      MS. SUMMERS:  I did.

7      THE COURT:  Okay.  Thank you.

8      Who's on for the sheriff?

9      MS. BARKER:  Good afternoon, Your Honor.  This is

10  Claire Barker on behalf of the sheriff's office.  In my office

11  with me, I have Sheriff Vance, Undersheriff White, Chief

12  Deputy Wall, I have Warden Fielder, Assistant Warden Crane,

13  Captain Burnley, and Captain Jones.

14      THE COURT:  Did the court reporter get all those names?

15      THE REPORTER:  Yes, sir.

16      THE COURT:  Okay.  Thank you.

17      Twana, did you?

18      MS. SUMMERS:  Uh-huh.

19      THE COURT:  All right.  Okay.  And for the monitors,

20  Ms. Simpson, you want to introduce your crew?

21      MS. SIMPSON:  Yes.  I'm Lisa Simpson, the monitor, and

22  my team is also on the call:  Dave Parrish, the correction

23  operations expert; Dr. Richard Dudley, mental health expert;

24  and Jim Moeser, juvenile justice expert.

25      THE COURT:  Okay.  Thank you.  I guess we will do what

```
1    we've done in the past.  We'll allow the --

2           MR. GREEN:  Your Honor?

3           THE COURT:  Oh, I'm sorry?

4           MR. GREEN:  This is Synarus Green.  I just wanted to

5    acknowledge I was on as well.

6           THE COURT:  Thank you, Mr. Green.

7           Anyone else from the County on?  Has Mr. Graham arrived

8    yet?

9           MR. FARR:  Your Honor, this is Robert Farr.  I'm acting

10   as the consulting corrections architect for the County in

11   support of the construction managers.

12          THE COURT:  You say Robert Farr?

13          MR. FARR:  Robert Farr, yes, sir.

14          THE COURT:  F-a-r-r?

15          MR. FARR:  That's correct, sir.

16          THE COURT:  Okay.  You said architect construction

17   manager.

18          MR. FARR:  I'm supporting the construction managers,

19   yes, sir.

20          THE COURT:  Okay.  Thank you, Mr. --

21          MR. GRAHAM:  This is Supervisor Graham.  I'm here.

22          THE COURT:  Okay.

23          MR. CHAMBERS:  And, Your Honor, Ray Chambers.  I'm also

24   here.

25          THE COURT:  Thank you, Mr. Chambers.  And we've got
```

1   Mr. Graham.

2        Anyone else from the County or the sheriff's

3   department?

4        All right.  Well, we will do what we've done in the

5   past, I think.  We'll proceed as we've done in the past.

6        Ms. Simpson, we'll allow you to give your report in any

7   way you see fit, and whatever portion of it you give, that's

8   fine.  Whatever portion you wish the members of your team

9   provide, that is fine, too, and then obviously you know I'll

10  have some questions at some point in time.  The County may

11  have questions, but they'll get an opportunity to respond in

12  any way it sees fit, and we will go from there, I think.

13       MS. SIMPSON:  Okay, Your Honor.  I'm going to ask

14  Mr. Parrish to be -- oh, I hear an echo.  Sorry.  -- to go

15  first.  I think the most pressing issues at the County are in

16  the area of corrections operations, the facility and the

17  staffing in particular.

18       The report was filed last week, and so it's fairly

19  up-to-date.  I do update it as I'm completing it.  You know, a

20  month has passed since the actual site visit.  So I don't

21  think we'll go through it in great detail unless Your Honor

22  requests that.

23       But I'll start with Mr. Parrish on corrections

24  operations.

25       THE COURT:  Okay.  Thank you, Ms. Simpson.

 1          Mr. Parrish?

 2          MR. PARRISH:  Good afternoon, Your Honor.

 3          THE COURT:  Good afternoon.

 4          MR. PARRISH:  Just for everybody's benefit, I'm getting

 5  a tremendous amount of reverberation back.  I hear, like, an

 6  echo (AUDIO GAP) speaks.

 7          THE COURT:  Okay.  Thank you.  Hold on.  Is everyone

 8  else receiving an echo?

 9          Okay.  And everyone has --

10          UNIDENTIFIED MALE:  Yes.

11          THE COURT:  And everyone has their -- raise your hand

12  if you've got your speaker muted, your -- okay.  Everybody's

13  muted, so hold on.

14          MS. WILLIAMS:  Your Honor, this is Angela Williams.  I

15  wondered if there were multiple people in the courtroom signed

16  into two different Zoom accounts who are near each other.

17  That can cause an echo.

18          THE COURT:  No.  Uh-huh.  We have one.  I'll try muting

19  myself while Mr. Parrish gives his report, and we'll see if

20  that helps.

21          MR. PARRISH:  Thank you, Your Honor.  When you speak,

22  it's clear as can be and I don't get the reverberation, but I

23  do when anybody else speaks.  And I'm still hearing it now, so

24  I'll leave you (AUDIO GAP) --

25          THE COURT:  Hold on for a second.  Hold on.  Hold on.

1          Okay.  At this point the only mike that is on is mine,

2     apparently.  Mr. Parrish, are you hearing any feedback?

3          MR. PARRISH:  No, sir.

4          THE COURT:  Okay.  Now, speaking -- and please,

5     participants, tell me if you hear any feedback when

6     Mr. Parrish is speaking.  Mr. Parrish is not speaking now, I

7     know, but, Mr. Parrish, say your name.  Give us -- say your

8     name and whatever else you want to say to see if there's any

9     feedback.

10          MR. PARRISH:  I'm not getting the reverberation back

11     now.  I heard it from myself earlier, so it appears to be

12     corrected.

13          THE COURT:  Okay.  You may proceed, then.

14          MR. PARRISH:  Thank you, sir.

15          Dealing with corrections operations, the three major

16     problems that we see are critical shortage of staff, serious

17     maintenance issues, and dangerous and unsanitary living

18     conditions at the Raymond Detention Center, particularly in

19     Alpha Pod.

20          The good news:  The average daily population has

21     hovered around 450.  Back about ten years ago, there were a

22     thousand people in the Hinds County jail system, so that

23     number has come down significantly, and it's made it possible

24     for them to deal with the problems that we have today.

25          Other thing is you can look at this from two sides.

1   The Jackson Detention Center has been closed for about a year

2   due to HVAC and plumbing problems.  Now, that's a problem, but

3   the good news is the side benefit of the County's inability to

4   maintain that facility is that it's closed, something that

5   we'd recommended quite some time ago, and that really works to

6   the County's benefit.

7        Now only the ground floor of the Jackson Detention

8   Center is operational.  Monday through Friday it serves as a

9   transfer waiting area in support of the courts, but it's not

10  housing inmates in the upper floors.

11       So this has allowed most of the JDC staff to be

12  transferred to the work center, which has helped out that

13  facility tremendously.  As a matter of fact, the work center

14  is now staffed above what is actually required, so this has

15  allowed the jail administrator to issue a memo, which he did

16  on March the 23rd, which requires the daily transfer of excess

17  officers at the work center to the Raymond Detention Center to

18  help fill vacant posts there.  So this is now being done on a

19  shift-by-shift basis.  If they have more officers report for

20  duty than are required to fill the necessary posts, the

21  surplus go to the Raymond Detention Center and help fill holes

22  there.

23       When C-Pod was reopened on October the 22nd, it was

24  supposed to operate under the principles of direct

25  supervision, but that's not what really happened.  Officers

1   were not given written directions regarding their duties and

2   responsibilities under direct supervision.

3        So I've spent quite a bit of time working with the jail

4   administrator over the past three months trying to develop

5   something that he could issue giving direction to them, and

6   the good news again is on April the 6th, just a few days ago,

7   he did issue a memo which lays out the duties and

8   responsibilities of officers who are working not only in C-Pod

9   but in other areas throughout the jail.  So it's not a policy

10   that's been adopted, but at least it's a working document that

11   staff can fall back on telling them what they can and cannot

12   do, what's expected of them.

13        In Alpha Pod at the Raymond Detention Center, the

14   shortage of staff still allows inmates to "escape" through the

15   roof in order to pick up contraband, drugs, cellphones,

16   *et cetera,* and bring them back into the jail.  Raymond

17   Detention Center is the only jail I've ever seen -- and I've

18   been through hundreds -- it's the only one I've ever seen

19   where the inmates break out only to pick up contraband in

20   order to take it into the facility, not to actually escape to

21   freedom.

22        I go back to 2014 in working with this system before we

23   even started the monitoring process.  My initial report was

24   used to help develop that, and during that time I'm only aware

25   of two people who actually physically escaped and broke away

1    from the facility, and that was solely because their buddies

2    on the outside did not drop off the contraband.  They realized

3    if they went back inside and didn't bring the stuff with them,

4    they were in real trouble, so they skedaddled and ran down the

5    road.  It's just a very, very unusual situation.

6        In Bravo Pod, CML has completed its work on security

7    doors, but, contrary to what we've been told, the major

8    maintenance issues were not completed.  They may have been

9    scheduled to, but they were not completed by the end of March.

10   In fact I'm of the opinion it's going to be many months before

11   plumbing, electrical, fire safety, and HVAC issues are

12   resolved.  That's not going to happen overnight.

13       In an effort to break the deadlock between the County

14   and the sheriff's office regarding facility maintenance, we

15   made a recommendation in this last report that the County

16   should put a line item in the sheriff's annual budget to cover

17   routine maintenance repairs.  I've just never run into this

18   where, even to get a fire extinguisher recharged, a work order

19   has to go to the County to be approved so the work can be

20   done.

21       In most major jurisdictions the sheriff's office, if

22   they're running a jail, has a line item that covers

23   maintenance for the facilities.  If it's a major thing, such

24   as putting a new roof on, putting in a new air conditioning

25   system, well, then that gets plugged into the next year's

1    budget request and that goes before the Board of Supervisors

2    for approval, but day-to-day things get taken care of by the

3    people who actually have to live with the problems, the people

4    that are in the jail system and the staff who work there.  And

5    that's something that Hinds County seriously needs to look at.

6         In Alpha Pod at the Raymond Detention Center,

7    sanitation, fire safety, and security are still totally

8    unsatisfactory.  Even the lighting system does not function

9    properly, and the inmates are routinely left in the dark, both

10   in their cells and in the dayroom area.  Finally, some cells

11   in the housing units in Alpha Pod are welded shut because of

12   prior security breaches.  Those cells now literally serve as

13   trash dumpsters within the housing units because inmates place

14   their trash there and staff have no way -- no ability to empty

15   and clean them because the doors are welded shut.  This has

16   been ongoing for a long, long time.

17        So in summary, some progress is being made.  I'm really

18   pleased to see the direction that was given for the duties and

19   responsibilities of officers working in the jail system and

20   particularly for the utilization of surplus staff at the work

21   center to help in the place that has the most problems, the

22   Raymond Detention Center.  So some progress is being made, but

23   we still have some very serious issues that need to be

24   addressed.

25        That's all I have, Your Honor.

1          THE COURT:  Thank you, Mr. Parrish.

2          MS. SIMPSON:  Your Honor, I will cover some of the

3    administrative areas.  Obviously, the condition of the

4    facility and the understaffing are the probably most troubling

5    issues and most challenging issues, so I will keep my report

6    somewhat brief and allow the focus to be on those issues.

7          Probably the most important administrative area is the

8    development of policies and procedures, again, there's been

9    some progress.  At the time of the monitoring report, we

10   reported that 28 policies have been approved by DOJ and

11   adopted.  Since that report went in last week, we have another

12   policy that's been approved on an interim basis and a policy

13   that it looks like will be approved by DOJ within a few days.

14   So that brings it up to 30 policies.

15         I should say that the sheriff's office has decided to

16   take a different approach to the development of the policies.

17   I have brought Karen Albert on to my team to facilitate the

18   development of policies and procedures.  That's been a slow

19   process.  I think there's difference of opinion as to why it's

20   been slow, but it has been slow.

21         The County has decided to -- or I should say the

22   sheriff's office has decided to develop the policies in-house,

23   and we received the first two policies prepared in that manner

24   last week, I believe, and I would say there's going to be a

25   learning curve there.  Hopefully that will improve, but at

```
 1   least one of the policies that was developed totally in-house

 2   is pretty rough, so we'll have to see how that new process

 3   develops.

 4        And as mentioned in the monitoring report, we do have

 5   concerns about whether the policies that have been adopted are

 6   actually being implemented.  We gave some examples in the

 7   report.  There were several use-of-force incidents that were

 8   reported in the incident reports, did go through internal

 9   affairs, and the officers were exonerated where those

10   use-of-force incidents appeared to be contrary to policy.

11        Another example is that the classification policies

12   require review by the classification committee of placement in

13   administrative segregation.  There is no such review taking

14   place, and classification reports that they typically don't

15   know why somebody is in administrative segregation.

16        So there are concerns as to whether the adopted

17   policies are actually being implemented.  No doubt training on

18   those policies is hampered by COVID, and that's

19   understandable.  But it appears that the supervisors are

20   not -- either not familiar with the adopted policies or not

21   requiring adherence to them.

22        The grievance system --

23        THE COURT:  Let me ask you this question.  I'm sorry to

24   interfere with the -- why do you say COVID has interfered with

25   training when we can meet as we are right now?  If it's going
```

1   over a policy, if it's educating people how to do things based

2   on a policy, how does COVID impact the ability of persons to

3   give that type of instruction?  You know, is it hand-to-hand

4   combat instruction?  What is it?  Because if it's instruction

5   that can be given by video, people here, the Marshals Service

6   and whatever, receive training by video, audio, and all kinds

7   of things in the era of COVID.  Why can't the sheriff's office

8   do the same?

9         MS. SIMPSON:  I think the sheriff's office probably can

10   better answer that.

11         THE COURT:  Okay.

12         MS. BARKER:  Your Honor --

13         THE COURT:  I'll give you an opportunity to answer it.

14   Just put a pin in it, then.  Since the monitor can't answer

15   it, I'll look to you to answer it, Ms. Baker.

16         All right.  Go ahead.

17         MS. SIMPSON:  Okay.  In the area of grievances, the

18   grievance coordinator continues to track grievances and

19   oversee response.  She's doing a very good job.  However,

20   there is an issue of either grievances not being responded to

21   at all or the responding individual is not putting it in the

22   secure system.  So -- and the grievance coordinator was out a

23   good part of the period leading up to the site visit, and so

24   that could be part of the issue as to why we saw a number of

25   problems there.

1    But just as an example, in January the system indicated

2    that 120 grievances had been filed.  Thirty-three of them had

3    no response, and four of them were late responses, and then an

4    additional 12 were filed as emergency grievances and were late

5    with respect to the time limit for emergency grievances.  So

6    there does appear to be a problem with getting the responses

7    either at all or into the system.  She's now back on the job,

8    and hopefully we'll see improvement by the time of the next

9    site visit.

10   Records has improved dramatically since we started the

11   monitoring.  The -- in the beginning when we started, there

12   were a lot of people that were in the system as in custody and

13   they weren't in custody, and there were a number of people

14   that should have been released that hadn't been released.

15   We've seen much less of that now, so they're tracking the

16   individuals much, much better.  And, again, that was an area

17   where they weren't actually in compliance with the policies

18   that had been adopted with respect to the organization of the

19   files, and we're starting to see that that's happening as well

20   as the appropriate number of audits are now taking place.  So

21   that was -- that's continuing to see improvement in that area.

22   Classification.  The classification does now appear to

23   be based on an objective classification tool.  That had been a

24   problem in the past where they were using the tool but then

25   they were routinely overriding it based on charge alone, and

1   now they do appear to be relying on the objective

2   classification tool for classification.

3         I did mention earlier that there is an issue about the

4   review of administrative segregation, and that, to my

5   knowledge, hasn't been addressed yet.

6         And in the area of pretrial, we've been told that the

7   County is applying to be a learning site with advanced

8   pretrial -- sorry, I'm forgetting that name, but that

9   application to be a learning site is due May 28th, and we're

10   told that the County is going to do that.

11         There's no guarantee that they will be accepted as a

12   learning site.  And as mentioned in the monitoring report, the

13   stipulated order required the County to bring in a consultant

14   to assist with the development of a pretrial program, and that

15   is long overdue.

16         So that covers most of the administrative areas.

17   There's obviously a lot more detail in the report, and we can

18   discuss any of those items that you would like.

19         THE COURT:  Okay.  I need to go back and ask

20   Mr. Parrish a question, and obviously any question that I ask

21   any of the monitors, DOJ can, you know, in its follow-up

22   respond in any way it wishes, and so can the County and the

23   sheriff's department.

24         And I apologize.  I called you "Ms. Baker," Ms. Barker,

25   and I apologize for that.

1      But let me -- Mr. Parrish, there was something in your

2 report -- there's a lot of stuff in your report that stands

3 out to me, but one of the things that I saw, fire safety

4 continues to be a life-threatening issue, and this deals with

5 the sprinkler system, I guess, the alarm system, and it's

6 inoperable.

7      Is it inoperable at every center at RDC and the worker

8 center or just one -- or is it inoperable in a particular pod

9 and not the other?  Tell me about that life-threatening issue,

10 Mr. Parrish.

11     MR. PARRISH:  Yes, sir.  At the work center they have

12 an alarm system and a sprinkler system, but for the past year

13 the sprinkler system has been nonfunctioning because of a

14 problem with a pump, and it's repaired and breaks down and

15 then is just left that way.  So you've got no sprinkler system

16 at the work center for the facility.

17     At the Raymond Detention Center, I wish I had been here

18 in 2011-2012 to look at it myself, because I've gotten so many

19 stories from people as to what really happened.  But my

20 understanding is that there was a sprinkler system throughout

21 the Raymond Detention Center, that during the riot of 2012,

22 the inmates tore everything up so badly and did so much damage

23 by breaking the sprinkler system that it was removed.

24     There are still sprinkler heads in the kitchen, in the

25 laundry, and the property room -- no, kitchen, laundry,

1   medical.  They don't function, but there are still sprinkler

2   heads there.  We don't see sprinkler heads throughout anywhere

3   else.  I guess they were just all taken out.  At least that's

4   the explanation that I've gotten.

5        Over the years I just kind of scratched my head and

6   couldn't understand why the state fire marshal had not held

7   somebody's feet to the fire -- poor choice of words, excuse

8   me. -- had not held them accountable to get things repaired

9   and was told that the -- since there was no requirement for a

10  sprinkler system in 1995 when the Raymond Detention Center was

11  built, that after it was torn out, they didn't have to put it

12  back in.

13       I just found that kind of incredible and tried to get

14  together with the state fire marshal and wanted a

15  representative to go through the facility with us.  That never

16  worked.

17       Finally, through the Department of Justice, they

18  contacted the people in the Insurance Department for the

19  State, and about two weeks ago I was finally put in contact

20  with deputy fire marshal for the State Fire Marshal's Service.

21  I talked with him at length and laid out all of my concerns.

22  He finally said, Why don't you document that and send it to

23  me, which I did.

24       Two weeks later I still didn't have a response, so

25  yesterday I sent him a note saying, Did you ever get a chance

1   to look at this?  We need to try and drill down on some of

2   these problems.  And he sent me a message this morning saying

3   he for some reason had not received my initial e-mail, but he

4   was going to look into it and would try to get back to me

5   ASAP.

6           So that's where I stand with the State Fire Marshal's

7   Office, but it's pretty incredible to have a major jail that

8   doesn't have fire suppression equipment in place like that,

9   and it's a dangerous thing.  There's really no excuse if

10  somebody dies or is injured as a result of a fire after all of

11  this.

12          THE COURT:  Okay.  In responding to that issue, and

13  again, I'm trying to continue to go in order and to have this

14  as orderly as possible.  But one of the questions that I will

15  have for the County and/or the sheriff is with respect to this

16  fire system:  When was the last time the State came out and

17  did an assessment?  Because I know private businesses each

18  year in the city of Jackson, at least, the fire department

19  comes around and do an inspection to make sure you have your

20  fire extinguishers and things like that in place.  And they

21  certify whether or not, you know, your fire extinguisher is in

22  the right place, whether it's operating.

23          I want to know when's the last time the state fire

24  marshal has inspected the facility.  I want to know what

25  grade -- what the findings were.  I also would want to know --

1   this is an issue that I have heard since I inherited this case

2   two years ago, and it still appears to not have been

3   addressed.  If this is a life-threatening matter, and you've

4   got several life-threatening matters, as I realize, how is the

5   County or the sheriff's department prioritizing what is or is

6   not going to get done?

7           As I said two years ago, the worst thing that can

8   happen is that you wake up and you find out that a bunch of

9   people die in that facility because of something like this or

10   something else, and I don't want to have any blood on my

11   hands.  And I've given the County and the department every

12   opportunity to fix that one thing, and I appreciate DOJ

13   contacting the fire marshal.  But we need to make sure there's

14   a plan in place to make sure that the fire marshal is doing

15   his job, and that's the State -- that's the commissioner of

16   insurance, I think, in Mississippi.  The state fire marshal is

17   the commissioner of insurance, and we need to make sure.  For

18   all we know, it may be prisons all throughout the state of

19   Mississippi without the ability to put out fires, and we

20   cannot neglect those people who are in these facilities.

21           And, again, the underlying thing with respect to these

22   detention centers is that these are supposed to be all

23   pretrial detainees, people who are shrouded with the

24   presumption of innocence, and for some reason they're being

25   housed because they cannot make bail or bond or for some other

1    reason.  They haven't been to trial yet, so these, by and

2    large, are people who are innocent as you and I are.

3            So I'll just leave that right there, and I'm sure the

4    County and the sheriff will respond.

5            Let me turn to some other points that I wanted to raise

6    with you, Mr. Parrish and Ms. Simpson, with respect to

7    facilities, because I've gone through the report and I've read

8    it, and I have, you know, some questions.  Again, I'm asking

9    you, and, again, DOJ will have an opportunity to respond, and

10   obviously the County and sheriff is on notice some of the

11   questions that I have.

12           There was -- in your report summary, Mr. Parrish, you

13   indicated about the staffing at the Raymond Detention Center

14   and the worker center.  Your summary suggests that the worker

15   center is probably overstaffed, that there are more than

16   sufficient number of employees for staffing, but RDC is

17   understaffed.

18           Now, what is so peculiar between the two facilities

19   that people cannot swap out and work -- you know, the big gap

20   that you have in between the overstaffing and the

21   understaffing, what's going on there, Mr. Parrish, from your

22   perspective as a person who's, you know, reviewing this matter

23   from a correctional point of view?

24           MR. PARRISH:  Your Honor, I think some of it goes back

25   to the history of this jail system.  When we started, the

1    three jails were three independent jails.  It was not a

2    system.  That's what was in place when I first came and looked

3    at it in 2014.  There was a jail administrator in name only in

4    charge of all the facilities, but she didn't run anything

5    except the Raymond Detention Center.  The Jackson Detention

6    Center was totally on its own.  The captain there did

7    everything on his own.  At the work center it was exactly the

8    same.  It was three silos.  It was not a system.  Nobody

9    transferred between facilities.

10         They finally put them all together and made a jail

11   system out of it, but we still have this long history of

12   independent thinking to overcome.  And so one of the issues

13   that has been raised many times when we have talked about

14   equitably distributing the work force, so everybody suffers to

15   the same level as opposed to letting one jail bear most of the

16   brunt, was if we reassign those people from the Jackson

17   Detention Center downtown out to Raymond, they'll quit, and

18   that won't do us any good at all.

19         Well, when we finally closed -- or when the County

20   finally closed the Raymond Detention -- excuse me, the Jackson

21   Detention Center because of maintenance issues, that was

22   something we had recommended before, to consolidate staff into

23   just two facilities instead of spreading out over three.  That

24   made it possible for that to happen, but we still had the same

25   issue:  I don't want to work at the Raymond Detention Center;

1    the work center's not as bad.

2         To overcome that, I think that what the jail

3    administrator has put in place is a "let's eat the elephant

4    one bite at a time" approach, which makes sense because

5    there's a long history of doing things differently to

6    overcome, and if they just -- I think the fear was that if

7    they just arbitrarily assigned people to Raymond permanently

8    there, that they would bail out and then they'd be sitting on

9    even more vacancies.

10        At least they're moving in the right direction so that

11   people can get used to it, and by making the Raymond Detention

12   Center truly function under the principles and dynamics of

13   direct supervision again, they will find that it's a safe

14   place to work, it can be a clean place to work, and so forth.

15   It's not yet, but it's getting there.  And once that is

16   accepted by staff, they're not going to have this reluctance

17   to work in that facility.

18        THE COURT:  I presume -- oh, I'm sorry.

19        I presume since JDC has been shut down, all women other

20   than the juvenile -- all women are being housed at the worker

21   center?

22        MR. PARRISH:  Yes, sir.  One of the four housing units,

23   Housing Unit 2, I think was turned over to female housing; and

24   then there are two five-cell lockdown modules for people who

25   have to be separated for one reason or another, whether it's

1    disciplinary or administrative; and then one of them takes

2    care of female inmates who have issues and can't stay in the

3    direct supervision housing area.

4         But the fact that it works as well as it does is proof

5    positive that direct supervision works.  And one of the things

6    that has helped is when they went truly to direct supervision

7    last year, when we put those cameras on the doors, to the fire

8    escape doors in the housing units at the work center, and the

9    alarm, we told them, Now you can take it from two officers

10    down to just one.  That saved a lot of staff.

11         Then with the additional staff that came from the

12    Raymond Center, that's why work center -- excuse me, they came

13    from the Jackson Center, that's why work center actually is

14    sitting on a surplus of staff right now.  There was a savings

15    by having only one officer work in a housing unit when there

16    use to be two, that's not necessary, and then bringing the new

17    people in.

18         So they're in better shape and -- well, it's just --

19    they're working through the rough edges of getting staff to

20    accept the fact that a jail is a jail and you don't get to

21    pick and choose which one you work in.

22         THE COURT:  And no males, I presume, are housed at the

23    worker center; is that correct?

24         MR. PARRISH:  Males are in three of the housing units.

25    Females are in one house unit.

1          THE COURT:  Okay.

2          MR. PARRISH:  So three-quarters of the jail is males;

3    one-quarter is females.  There are no females housed at the

4    Raymond Detention Center.  That's all males.

5          THE COURT:  Okay.  Is the worker center still designed

6    like a -- I guess when I was over there 18 months ago or so --

7    dormitory style -- it was an open area where all of the

8    inmates -- or many of the inmates -- as I recall, there was

9    open bedding and everything out, like, open, unlike the pods

10   at the RDC.

11         MR. PARRISH:  Yes, sir, that's correct.  There are no

12   lockdown cells in the housing units at the work center.

13   They're four 64-bed dormitories that have dayroom space in it

14   and then bunks.  If somebody acts out, then they have to be

15   taken out of the housing unit and placed in one of those two

16   five-single-cell lockdown units.

17         THE COURT:  And do we know how many women we have over

18   there?

19         MR. PARRISH:  I can't tell you the count today, but it

20   was in the neighborhood of 28 to 30 the last time I looked.

21         THE COURT:  Okay.  Let's go back to the RDC and the

22   A-Pod and the B-Pod and what is currently closed, what is

23   permanently closed, I guess, what will or will not be

24   reopened.  As I appreciate it, Pod C has been fixed.  It's

25   repaired; it's good to go.

1        MR. PARRISH:  Charlie Pod was repaired.  The doors were

2   fixed.  The glass in the cell doors is not adequate, and

3   inmates have been breaking them out right and left.  So that

4   has to be retrofitted.  Although Charlie Pod is the best in

5   the Raymond Detention Center, it still has tremendous plumbing

6   problems and so forth.  If you look at the work orders for the

7   past month of March, half of everything came from Charlie Pod.

8   You wouldn't think that with a place that has just been

9   renovated.

10        Bravo Pod is closed at the present time.  CML came in

11   and repaired the security doors, made them swinging instead of

12   sliding.  The County now has to repair cameras, lighting,

13   plumbing, electrical, you name it.  That's not going to happen

14   overnight.

15        Alpha Pod has not been retrofitted.  There were some

16   doors in the central part around the control room and into the

17   housing units that were changed to swinging.  But that was on

18   demonstration first to show that it worked, and then it was

19   done in the two other pods.

20        There is no plan at this time for the County to repair

21   Alpha Pod.  What we have been told is that once Bravo is

22   reopened, Bravo and Charlie will function, and Alpha will not

23   be repaired.  I think what we've said in our report is that if

24   it ever becomes necessary for the County to reopen Alpha,

25   they're going to have to put it in the same shape as Charlie

1  and Bravo.

2       THE COURT:  Has the County given you, Mr. Parrish, an

3  estimate as to when they intend for the B-Pod to be -- for the

4  Bravo Pod to be reopened?

5       MR. PARRISH:  Depends upon who I talk to.  The people

6  that handle maintenance within -- like the work orders, the

7  chief safety and security officer who deals with all of that,

8  the jail administrator who looks at it routinely know that

9  it's going to be many months down the road.  The contention

10  that we had at our last status hearing was that it would be

11  ready by the end of March.  That time has long since gone

12  past, and based on the experience that we had in Charlie, I'm

13  quite positive it's going to be a number of months down the

14  road.

15       THE COURT:  But the A-Pod is inhabited by individuals?

16       MR. PARRISH:  Yes, sir.

17       THE COURT:  And the A-Pod does not -- I don't know --

18  according to your summary, the A-Pod is one where you believe

19  it's unsafe and unsanitary in part because inadequate or no

20  lighting; is that correct?

21       MR. PARRISH:  Yes, sir.

22       THE COURT:  You said -- your report says inmates live

23  in darkness.  Now, is that an overstatement or -- I'm trying

24  to see how we can monitor a prison at nightfall, not

25  necessarily daylight but at nightfall, if there are no lights.

1    I'm just trying to -- and, of course, I'm going to give the

2    County and the sheriff an opportunity to respond, because if

3    they're doing it, they obviously can control it.

4         So tell me, Mr. Parrish, is this an overstatement?

5         MR. PARRISH:  First of all, there are windows into each

6    cell from the outside where natural light could come in.  But

7    they are quite heavily covered with steel mesh and everything

8    else, and so very, very little light can come in through those

9    windows.  There are no other windows that open to the dayroom

10   area of the housing units.

11        The lights in the individual cells by and large do not

12   work because the inmates have torn them up.  They've used them

13   to try and hook in chargers for their telephones and things

14   like that.  They tear up the light fixtures, and so they're

15   not functioning.

16        In the dayroom area, the light fixtures are more

17   difficult to get to, but the housing unit has electrical

18   problems, and lights often do not work.  They've been

19   repaired; then it goes out again.  It depends upon when you

20   walk in whether something is working or not.  It's not

21   pitch-black where you can't see in front of your face, but I

22   guarantee you it's not 20 footcandles when measured 30 inches

23   off the floor, which is a kind of nationally recognized

24   standard for what lighting should be in a jail.

25        THE COURT:  Let me ask you another point about the

1    summary of your report.  You indicated -- I think it's in

2    Pod A -- that -- or one of the pods, at least, that some of

3    the doors have been welded shut, and I think we got the

4    initial report on it being welded shut some time ago when

5    there was no locking mechanism for the doors, I guess.  But

6    you also indicated that the inmates are using those cell areas

7    as a dumping ground, basically, use them as garbage dumpsters,

8    I think is what the report says.  I mean, what does that do

9    with respect to the sanitary conditions over there in that

10   particular pod?

11        MR. PARRISH:  Well, sir, in Charlie Pod we don't have

12   that problem anymore, because the locks function.  And if

13   something is broken inside a cell, you can lock the cell door

14   shut, and the cell is taken off-line until such time as it can

15   be repaired.

16        In Alpha Pod that's not the case.  Locks don't

17   function, so they can't close the door and keep inmates out

18   from a cell where other inmates may have broken out through a

19   pipe chase or gone up through the ceiling or something like

20   that or destroyed plumbing.  And so the County's solution

21   there has been to come in and weld the doors shut.

22        This is not something new.  This has been going on for

23   years and years, and the doors that went to the rec yards were

24   welded shut at one point.  Doors to the officers' restroom,

25   when the officers were pulled out, the doors to the restroom

1     that the officers used to use was welded shut.  Doors

2     everywhere have been welded shut.  That's the answer to the

3     problem rather than fixing the problem.

4            And, unfortunately, then inmates go and dump stuff

5     through the broken window and that welded-shut cell turns into

6     a jail dumpster cell.  And when I say this is unsanitary,

7     you've got problems with vermin and everything else.  This

8     needs to be cleaned out, and the answer is we can't get in

9     there because it's welded shut.

10           THE COURT:  And I think this --

11           MR. PARRISH:  So this is an unsatisfactory solution to

12    a big problem.

13           THE COURT:  I think this might be the last question I

14    have for you at this particular point, Mr. Parrish, but I'm

15    looking at the report.  Page 4 of the report says that the

16    County reports that since the time of the most recent site

17    visit, I guess, it has invested a substantial amount of time

18    and money in repairing the detention facilities to comply with

19    the consent decree.  It reports that it has repaired the

20    lighting in Pod A where the detainees were living in the dark

21    for protracted periods of time.  These repairs have reportedly

22    been made while putting the majority of effort into repairing

23    Pod B so as to house the detainees presently residing in

24    Pod A.  The County reports that it has repaired doors,

25    installed fixtures for plumbing and fire protection, and

1    painted the pod.

2         Now, I know the monitors have not had an opportunity to

3    physically inspect that, but you indicated, Mr. Parrish, that

4    you've at least seen some invoices and stuff where repairs

5    were requested, at least, to particular areas.  But it seems

6    to me that that response does not fit well with what you've

7    reported on the other side of the page, the side of the page

8    of the questions that I've been asking about, what the pod at

9    least looked like then.  But I guess the County has told you

10   that they have sort of, I guess, addressed at least some of

11   the -- I'm going to hear from them.  But I guess they told you

12   that they've in part addressed at least a lot of your

13   concerns.

14        MS. SIMPSON:  Your Honor, if I could respond to that

15   one.

16        When I do the report, I send it to both DOJ and the

17   County and the sheriff's office and request that they provide

18   me any updates before I finalize it and have it filed.

19   Several days -- in fact, I think it might have just been the

20   day before I finalized the report, I received that information

21   from the county attorney.

22        We obviously did not have -- excuse me -- an

23   opportunity to confirm that even with the on-site staff, and

24   that is why I included it in the summary as the county

25   reports, because I have no knowledge -- no ability to confirm

1  that or didn't prior to filing the report.  So what's included

2  in the report is the information that I received, and as I

3  said, that's why I put it in as "the County reports."

4       MR. PARRISH:  And, Your Honor, we need to make sure

5  we're not mixing up Alpha and Bravo.  The County is putting a

6  lot of money and time and effort into repairing Bravo.  We

7  don't see work orders on that, because that's a separate thing

8  that's being done while that pod is shut down to be renovated.

9       We do see work orders that come in for Alpha or

10 Charlie.  So there are terrible problems in Alpha, and the

11 sooner they can get the inmates moved out of there, the

12 better.  But the County is making strides in trying to get

13 Bravo ready for occupancy.

14      My point is that it's not going to happen this week or

15 next week.  It's going to be a little ways down the road.

16      THE COURT:  Okay.  Thank you.

17      Ms. Simpson, with respect to the portion of the report

18 that you've been -- that you mentioned in your area, the big

19 question that I have, that I've had for months now, these

20 policies and procedures.  Now, you say that they might be

21 creating policies and getting some policies out, but policies

22 from my perspective -- and, again, I'm going to give the

23 County every opportunity to respond.

24      From my perspective, it makes no difference about

25 having a policy if you're not going to implement it, and I

1    think part of what you've addressed at page -- again, page 4

2    of your report, an area of major concern, according to the

3    monitor, is that as policies have been adopted, there appears

4    to be little commitment to actually implementing those

5    policies.  Now -- and you indicated that right now you believe

6    that there are at least 38 policies that have been, I guess,

7    adopted by the sheriff on a bunch of different things.  I

8    think you said the number 38.

9         MS. SIMPSON:  Twenty-eight, Your Honor.

10        THE COURT:  Oh, okay.  Oh, 28.  I'm sorry.  You said

11   the number 28, then.  So how many more policies do you expect

12   ought to be implemented?

13        MS. SIMPSON:  I have to get to that part of the report,

14   but I believe the table of contents identified 94 policies to

15   be adopted, and 48 of those were identified as priority

16   policies.

17        THE COURT:  So over the course of the -- so over the

18   course of the period of time that this -- I realize the

19   parties entered a stipulated agreement to put off the hearing

20   on the contempt matter, and that was about 14 months ago.  I

21   think the case was supposed to go to trial around Christmas of

22   2019, I think, December, January of 2019, but the parties

23   worked out an agreement.

24        And, again, to put everything in context, worked out an

25   agreement, there had been an election of new board members,

1    and so it was time to turn the page and get it all done.  But

2    even prior to December 2019, many of the agreed -- and DOJ

3    will have an opportunity to respond as well.  The policies and

4    the procedures that they agreed to, many of those were an

5    issue since this whole consent decree was in place; is that a

6    fair statement, Ms. Simpson?  Some, none, all?

7          MS. SIMPSON:  So when the monitoring started, it's my

8    understanding that there were no policies and procedures.

9    Then a draft set was prepared I believe within the year after

10   monitoring started, and it -- it was not going to receive DOJ

11   approval.  It was lacking.

12         And so then there was an effort on the part of the

13   County to contract with some individuals or entities to assist

14   them with the development of policies and procedures; that did

15   not move forward.  And so at that point, I brought Ms. Albert

16   on to the team to help facilitate the development of policies

17   and procedures.

18         THE COURT:  Right.  And Ms. --

19         MS. SIMPSON:  And --

20         THE COURT:  I'm sorry.  And Ms. Albert had been made

21   available as a fixture in this thing for months, but you're

22   saying -- as I recall, Ms. Albert was "loaned over to the

23   County" for the purposes of helping with these policies and

24   procedures, and I think what I heard you say today is that the

25   sheriff's department has decided that it would take a

1   different approach and work on drafting its procedures

2   without -- I guess without Ms. Albert's assistance.

3          Did the County tell you why it was ready to go that

4   route?

5          MS. SIMPSON:  So the process that Ms. Albert used was

6   to facilitate the development of policies and procedures and

7   not to actually write them herself, although she did a

8   significant amount of writing, prepared -- provided sort of

9   templates and worked through the development.  It did require

10  the jail staff to participate and to do some of the writing.

11  And it's our impression that that's what slowed down the

12  process, and so it was not progressing at a pace that any of

13  us wanted to see.

14         And so I understand that that's why the sheriff's

15  office has decided to put one person in charge of preparing

16  the policies, and as I understand it, they're borrowing from

17  one of the other counties.  And as I mentioned, we've just

18  received the policy -- draft policy that has been prepared in

19  that fashion.  Like I said, I think there's a learning curve,

20  and that policy was pretty rough, but hopefully with time

21  there will be improvement in what they prepare in-house.

22         THE COURT:  Ms. Simpson, do you know how many policies

23  were completed 60 days ago when we last met?

24         MS. SIMPSON:  I believe at that time 24 is what I'm

25  thinking, and as I mentioned, there are 28 that have been

1   approved and adopted now.  But there are two additional

2   policies that I think are being approved this week, so we're

3   up to 30.

4         THE COURT:  So the best assessment of that:  60 days,

5   six policies.  I mean -- and I realize two of the six have not

6   even been approved yet.

7         MS. SIMPSON:  Well, one of them has been approved.  And

8   the other one, DOJ and I have worked through the comments, and

9   it's being finalized.

10        THE COURT:  I failed to ask Mr. Parrish this.  I'm

11  trying to ask you all the questions I need to ask in the

12  segments in which you report.

13        Mr. Parrish, those welded doors, back to the welded

14  doors, how, if at all -- it may not, because I think you said

15  these doors are welded in the A-Pod, I guess, I think.  I

16  think that's where you said they're welded shut.  Does that in

17  any way affect or cause any type of a fire safety issue?

18        MR. PARRISH:  Depending upon what doors are welded

19  shut.  The doors I'm talking about, no.  Going into an

20  individual cell, there's nobody in it; it's not an exit door;

21  it's not a problem other than the collection of trash.

22        When the doors to the rec yards were welded shut, yes,

23  that was a fire safety issue.  They have been -- the welds

24  have been broken on those doors, though, so that's not the

25  case.

1          THE COURT:  With respect to the supervision of the

2     inmates, I believe it's at page 4 of the report that talks

3     about incident reports reflecting direct supervision of the

4     housing units, the confinement unit, and even the suicide

5     watch unit being left unattended.  Is that a supervision

6     issue?  Is that a policy and procedure issue?  Is that a

7     safety issue?  I'm just trying to find out.  It was important

8     enough for you-all to note it.

9          What type of -- what are your concerns with respect to

10    that, Mr. Parrish?

11         MR. PARRISH:  From my perspective, that's a total

12    breakdown of supervision.  When Charlie was opened, the

13    sheriff put out an order for staffing there, and it called for

14    one officer to work in each of the three direct-supervision

15    housing units and two officers to work in Charlie 4, which was

16    the confinement unit.  It called for an escort officer as well

17    and one in the control room.

18         Direct supervision is continuous, and there is no

19    provision whatsoever for leaving inmates unsupervised even for

20    five minutes, and that was not enforced, has not been enforced

21    by supervisors ever since Charlie Pod opened up in October.

22    Although I was not physically present to see it, by reading

23    the reports that they wrote about the activities that occur,

24    it's obvious that an officer had to run back into his empty

25    housing unit.

1    Or with regard to a suicide watch, there's supposed to
2    be somebody in there face-to-face with that inmate that's on a
3    suicide watch 24 hours a day, and there were multiple inmates
4    in places like that that got into fights.  They had all kinds
5    of problems, and there was nobody present.  And the officer --
6    a supervisor had to come and find them because somebody was
7    pounding on a window.

8        There are numerous examples that are proven by the
9    incident reports that were written that nobody was present,
10   both in direct-supervision housing units, the confinement
11   unit, and the suicide watch iso unit, and that's totally
12   unacceptable.  That's why I got back with the jail
13   administrator and said we need to have some written guidelines
14   for these people that say no exceptions.  No, you don't lock
15   inmates in their cells and feed them there.  This is direct
16   supervision.  They're supposed to be out in the dayroom.  You
17   know, and that's the kind of thing I was reading in the
18   reports.

19       So that's finally been put out, but as I say, that was
20   just April the 6th.

21       THE COURT:  And this may not be the right area to raise
22   this question, Ms. Simpson, and if it's not -- because I know
23   we need to talk about the other areas of your report, but I
24   think I recall reading in the report with respect to these
25   policies, for example, one of the explicit policies that is

1    being ignored is the use of -- not necessarily use of force

2    but use of chemical stuff, I think, as more than just a

3    defensive mechanism.  It's being used to discipline.  If I'm

4    mistaken about how I articulate this, please let me know.  And

5    if this is not the right area to ask that particular question,

6    that is something that I would like you to speak to,

7    Ms. Simpson.

8         I think that the report indicates that there are

9    time -- well, that there are actually rules in place, I think,

10   on the use of mace, pepper spray, or whatever they might be

11   using in the facility, and your report suggests, at least,

12   that it may be an erroneous use of the substance or an overuse

13   of it, I guess.

14        Could you speak to that?

15        MS. SIMPSON:  Yes.  I'll say just briefly and then turn

16   it over to Mr. Parrish, because the use of force is more his

17   area.  But there is a policy and procedure on use of force.

18   It does state that the OC spray, the chemical spray, should be

19   used only defensively to protect the officer or protect

20   another inmate.  And there were a number of incident reports

21   that indicated it was being used coercively, not as

22   discipline, but to coerce the inmate to do something.

23        So -- but I'll have Mr. Parrish speak to that in more

24   detail.

25        THE COURT:  Okay.  Mr. Parrish?

1      MR. PARRISH:  Your Honor, Ms. Simpson is absolutely

2  correct.  The policy on use of force has been in place for

3  over a year, and it's very explicit.  It's very specific

4  saying that OC, less than lethal weapons, are not to be used

5  as -- to coerce inmates to doing something, to make an inmate

6  do what an officer says to do.  It's used to defend the

7  officer, so the officer does not have to be injured.  It's

8  used to break up a fight between inmates so the officer might

9  not be injured -- doesn't have to be injured having to break

10  it up between multiple people.  That's an appropriate use of

11  OC.

12      But when an inmate refuses to enter his cell and the

13  officer says, "I told him three times to do it, and so then I

14  deployed OC," that's totally wrong, and that's a commonplace

15  practice.  "Inmate refuses to do what I said, so there my

16  answer is I spray them," and that's just completely in

17  violation of the sheriff's policy on use of force.  And not

18  only did supervisors not make notation of that and indicate

19  that something needed to be done to correct it, but it went

20  all the way to CID and IAD investigations, and even there the

21  officers were exonerated and there was no action taken.

22      So during our last site visit, we spent a lot of time

23  talking with the CID and IAD investigators as well as their

24  supervisors explaining that this is what we have to have, and

25  you are in a position to catch it when somebody else is --

1    when somebody's doing something wrong.  That's what IAD and
2    CID need to take a look at.

3         THE COURT:  Okay.  And this final point goes back to
4    the C-Pod and the sprinkler system.  I'm looking at page 51 of
5    the monitor's report, and it indicates that the sprinkler
6    system -- there's been no sprinkler system, no fire alarm
7    system at RDC since 2012.  And my question to DOJ, and this is
8    something you'll have to answer, DOJ, what -- you know, this
9    is nine years, almost ten years now.  And I want to know, has
10   the State of Mississippi inspected this place in ten years?
11   And I want to see every report that the state fire marshal has
12   of inspecting this place.

13        MR. PARRISH:  Your Honor, the last report that I was
14   able to obtain a copy of was in 2019, and I've got them going
15   back a couple of years.  They say there's -- one investigator
16   says this is your semiannual inspection, and then the next
17   inspection is a year later.  That was one of the questions I
18   had for the state fire marshal.

19        We've been trying to get them involved because what we
20   can't understand is, okay, you note that there's -- it just
21   says "sprinkler system."  It doesn't say anything about it.
22   It just puts a number down and says something about fire
23   suppression system, but there's nothing coming from the state
24   fire marshal saying what action has to be taken and what will
25   happen, what repercussions there are, for failure to comply.

1    That's what I can't comprehend, and that's what I'm trying to

2    get from the State Fire Marshal's Office.

3         Anywhere else that I've ever looked, when they say come

4    in and say do something, you drop what you're doing and get it

5    fixed, because they're going to come back and look at you

6    again and have the authority to shut you down if necessary.

7    But I don't know what the rule -- I don't know what the

8    regulations are here in Mississippi, and it just seems pretty

9    nebulous.

10        THE COURT:  Thank you.  Ms. Simpson, I'll let you --

11   how are you doing, Candice?

12        THE REPORTER:  I'm good.

13        THE COURT:  Ms. Simpson, I'll allow you to move forward

14   in the way that you wish, because I know there are some other

15   points that -- other areas that the monitors have focused on.

16        MS. SIMPSON:  Thank you, Your Honor.

17        And with respect to the fire suppression systems, I

18   think it might be helpful to look at one of the provisions of

19   the stipulated order that required the County to complete a

20   master plan.  And we spoke at the last status conference that

21   a master plan recommendation report had been finalized in

22   January, and as we mentioned, it looks like a very good

23   report.  It sets out some options and the cost of those

24   options.

25        It's not the master plan in itself.  It's the

1    recommendations, and the County has to decide on a master

2    plan.  The deadline for that actually has passed.  It is a

3    tough decision because all of the recommended options did, in

4    fact, have a pretty hefty price tag.  But the stipulated order

5    requires that the master plan will include deadlines for other

6    necessary safety and security repairs and renovations at all

7    three facilities as long as they remain open, including

8    deadlines for installing necessary fire suppression/prevention

9    systems.

10         The master plan recommendation report includes a very

11   good list of the repairs and renovations that would need to be

12   made for safety and security reasons for as long as the

13   facilities stay open, and I think that would be a very good

14   next step, consistent with the stipulated order, that a master

15   plan be adopted but especially that, using that list, some

16   timeline be made as to when those repairs and renovations

17   would be completed.

18         And I did want to mention two other administrative

19   areas.  The PREA coordinator appears to be doing a very good

20   job.  She is doing good reports.  She's connecting inmates

21   with services when that's needed.  She is developing some

22   materials that will inform inmates on how to report PREA

23   allegations.

24         The technical -- the IT person at the County has worked

25   closely with her to ensure that the reports through the secure

1  system can be made anonymously as required by PREA policy and

2  the regulations, and she's starting to do some training --

3  in-service training for staff.  That was one area of concern

4  in that a number of the incident reports indicated a PREA

5  incident that was not reported to the PREA coordinator.  So

6  training on those issues is going to be important, and she's

7  starting to do some of that training.

8        Another area of improvement is that the quality

9  assurance officer who started last summer is making progress

10  on developing templates for reporting some of the reports that

11  are required by the settlement agreement and working on

12  providing that sort of analysis and that that is intended to

13  be done as part of those reports.  So that's another area that

14  appears to be progressing well.

15        And so at this point, I'd like to turn it over to

16  Dr. Dudley to talk about the mental health issues of the

17  settlement agreement and stipulated order.

18        THE COURT:  Okay.  Thank you, Ms. Simpson.

19        DR. DUDLEY:  Good afternoon, Your Honor.

20        THE COURT:  Good afternoon, Mr. Dudley.  Hold on.  Hold

21  on.  I think -- Mr. Frazier, I think your microphone is not

22  muted.

23        MR. FRAZIER:  Okay.  Sorry, sir.

24        THE COURT:  All right.  I think it is now.

25        Mr. Dudley, can you hear me?

1            DR. DUDLEY:  Yes, I can.

2            THE COURT:  Okay.  You may proceed.

3            DR. DUDLEY:  With regard to the mental health unit, you

4    know, it's been known for a long time that that's something

5    that we have to do because of the volume of mentally ill

6    people being held in segregation.  I noted in the report that

7    the mental health caseload has grown in this last visit in

8    numbers and also in acuity.  I mean, there seem to be more

9    severely -- a high percentage are severely ill, mentally ill

10   in the facility, so that only increases the need for the

11   mental health unit.

12           Since the time of the visit, there was a

13   multidisciplinary meeting at the facility reviewing the plans

14   for the mental health unit, the physical space, what needed to

15   be done to make sure that that was going to be appropriate.

16   That's going to be part of the reopened B-Pod.  And that

17   meeting, by all reports, was very successful, and so that was

18   certainly a big step forward towards the opening of the unit.

19           And so what -- the next steps include finalizing some

20   of the policies and procedures for the operation of the unit;

21   the -- resolving issues related to classification and how --

22   the process of selecting and placing people on that unit;

23   staffing for the mental health staff for the unit and staffing

24   as it relates to security staff for the unit, identifying and

25   training security staff for that unit.  So those are the next

1    steps in that regard.

2         A second issue that I'd want to highlight is the MAC

3    meetings, the interdisciplinary administrative meetings where

4    security staff and medical staff are able to meet and discuss

5    a range of problems and concerns.  I think many of the issues

6    that came up in the report could have been addressed had there

7    been a functioning MAC, and so that -- I wanted to highlight

8    that we're pushing to make sure that those meetings occur.  So

9    the, you know, issues that came up in the report related to

10   safety of medical and mental health staff, just kind of basic

11   problems like internet service in the medical department or a

12   range of kind of problems that require kind of

13   interdisciplinary thought, like the misuse of suicide watch by

14   some of the inmates and things like that that could really be

15   worked out when security and medical can work together.  So

16   certainly number two would be to make sure that the MAC is

17   operational and serves the purpose that it's designed to

18   serve.

19        Third area is segregation.  When the mental health unit

20   finally opens, it will certainly be an alternative and more

21   appropriate placement for some of the individuals who are in

22   segregation more directly related to their mental health

23   problems, but there are other issues that need to be addressed

24   to deal with the issue of the mentally ill in segregation.  So

25   as has already been noted, implementation of the

1    classification committee with the policy that's been sitting

2    there for this time would make a big difference in that

3    regard, and the development of policy that deals with mental

4    health input in the disciplinary review process would be

5    another part of that, addressing this issue of the mentally

6    ill and segregation.

7         Finally, the other issue that I wanted to raise is

8    discharge planning.  There continues to be a problem that I

9    can't completely explain where there's still individuals who

10   are released from the facility who fail to pick up their

11   discharge package that may include things like medication that

12   they're on, a supply of medication; instructions for

13   referrals; *et cetera*.  And how that happens is still not

14   entirely clear to me, but there's a population of people who

15   fail to pick up those packages.

16        There's still a significant percentage of people who

17   don't show up for appointments that have been scheduled for

18   them upon release, whether they be for mental health services

19   or medical services.  And so that -- these issues still need

20   to be addressed.

21        We had begun to develop some groups and activities to

22   try to help people prepare for discharge.  They started; they

23   stopped during COVID; they started again.  The -- I'm a little

24   concerned, because the discharge planner who was doing those

25   groups has left the facility last week.  And so we're kind of

1    starting from scratch in that regard all over again, and

2    linking with services like Hinds Behavioral Health and their

3    coming to the facility and participating with discharge

4    planning and attempting to develop relationships with

5    individuals before they're discharged was another strategy

6    that was begun to work on and plan for.

7         And so the implementation of really a mix of strategies

8    to try to address the difficulties that have been there with

9    regard to discharge planning and the successful referral of

10   individuals for services when they leave the facility in an

11   attempt to keep them stable, so they don't come back to the

12   facility is still, I think, a major area of concern.

13        THE COURT:  Okay.  Thank you, Mr. Dudley.  I want to

14   direct a question to Ms. Simpson first, and it may dovetail --

15   go back to you, Mr. Dudley.

16        Does the County prepare a chart -- maintain or prepare

17   a chart that would show each individual that is in their

18   custody and how long they've been in their custody?  I mean,

19   what's the longest amount of time, for example -- is there a

20   report that you can turn to, you can flip to, that they might

21   prepare every 30 days or so -- I don't know -- that would show

22   you the length of time that any particular prisoner is at --

23   is either in RDC or WC or anywhere?

24        Because the next question that I have is for the mental

25   health component side, because I get the impression from

1    Mr. Dudley, he said the acuity has increased, the numbers are

2    increased.  And I realize COVID has been going on for a year

3    now.  And we -- on the federal side, we've not had many

4    trials, but the state side has really not slowed down at all,

5    to some degree.

6           Do we know how long each person is in any one of these

7    facilities?

8           MS. SIMPSON:  Yes, Your Honor.  That actually can be

9    run right out of the jail management system, the JMS data

10   system, so, yes, they can print out with the touch of a button

11   the length of stay of all of the different inmates.

12          THE COURT:  Is that something you generally request in

13   your report?

14          MS. SIMPSON:  Yes.  We typically get that in

15   preparation for the site visit, and they also have -- and I

16   don't think this is run out of the JMS, but they create a

17   separate document that has each inmate and how long they've

18   been in and also whether they've been indicted or have not

19   been indicted, and we typically get that report as well.

20          THE COURT:  As a part of your report on an ongoing

21   basis, I would like to see that when you file your -- I would

22   like to see the most recent report that you would have that

23   you would look at to make a part of your status report.  Do

24   you understand?

25          MS. SIMPSON:  Okay.

1     THE COURT:  Whichever report that is.  You know, I want

2   to see the names of each individual.  I want to see where they

3   are in the process of either being indicted, going to trial,

4   because it -- there are all dates for all of these things.  I

5   mean, people have dates by which they have their preliminary

6   hearing; they have an initial trial date, I guess; there's a

7   continuance order in place that tells you that there's a new

8   trial date.

9     But I also -- with respect to the people who are

10   waiting on mental health assessments, I would certainly like

11   to know how long somebody's in the detention center waiting to

12   be evaluated to determine whether or not they might even be

13   competent for trial.  And I know those are moving parts with

14   other agencies and things like that, but I think it's best

15   that it becomes part of our report.

16     MS. SIMPSON:  Your Honor, I can do that.  It has been

17   difficult to get an accurate listing of people who are waiting

18   for mental health assessments or waiting for a forensic bed at

19   the state hospital, and that is something that we've requested

20   and used to get a spreadsheet from the state hospital that at

21   least gave us how many were waiting for a state hospital bed.

22   I will check again to see if we can get the listing of people

23   that are waiting for beds or assessments.

24     THE COURT:  I mean, it seems to me that that list ought

25   to be maintained by the County and not the State, because

1    anytime someone has mental health as an issue and needs to be

2    evaluated, there's a court order tied to that.  A court has

3    determined that so-and-so so-and-so needs to be evaluated;

4    there's a court order.  So that would tell you that that

5    person is ordered for a mental assessment or evaluation, and

6    they're ordered to stay there until that is done.  I mean,

7    there's a court order that requires it, and so the County

8    ought to know who is it in their facility who is awaiting

9    being assessed by some mental health professional.

10         MS. SIMPSON:  Yes, I agree, Your Honor.  The difficulty

11   that's been explained to me is that those court orders

12   ordering a mental health assessment are not necessarily

13   provided to the jail.  You know, typically the orders that are

14   given to the jail involve holds or releasing or things of that

15   sort.  But they don't necessarily get every order that the

16   court enters, and an order for mental health assessment is one

17   they don't routinely get.  They do have access to the court --

18         THE COURT:  I'm sorry to cut across you, Ms. Simpson,

19   but the sheriff has custody of these people.  Are you telling

20   me that the sheriff does not get orders with respect to people

21   in their custody -- in his custody?

22         MS. SIMPSON:  Right.

23         THE COURT:  I mean, I'm just trying to think through

24   this thing logically here.  The sheriff has the responsibility

25   of maintaining the custody and the control of these

1   individuals, just like our Marshals Service has the duty to

2   maintain the custody of everybody who comes over here prior to

3   their being sent off to MDOC, and the marshal gets a copy of

4   every -- of everything affecting the people who they're

5   required to have custody over.  I just -- I just find that

6   hard to believe.

7          MS. SIMPSON:  That is what's been reported to me, that

8   they don't necessarily get orders for mental health

9   assessments routinely.  And maybe Ms. Barker knows more

10  particularly whether that's correct or not and -- yeah.

11         THE COURT:  Okay.

12         MS. SIMPSON:  So we certainly asked for a listing of

13  people waiting for assessments or state hospital beds, but we

14  have not received that.

15         THE COURT:  Okay.  I think on a going-forward basis, I

16  would like to see the most current list, whatever list that is

17  as of the day you file your report -- you know, a few days

18  before you file your reports or even weeks before while you're

19  compiling your report.  I'd like to see it.  And you can

20  submit it in a redacted sort of way to keep private

21  information available, or maybe for that list, it is sent *in*

22  *camera* only.  But we'll figure out a way to do it.  I want to

23  see it.

24         MS. SIMPSON:  Your Honor, would you like me to obtain a

25  current report in the next week or so and then send it to you?

1          THE COURT:  That would be helpful.

2          MS. SIMPSON:  Okay.

3          THE COURT:  All right.  Now, I know we still got a ways

4    to go, because I've been interjecting a bunch of questions

5    that I know the County and the sheriff will be able to answer,

6    and DOJ will, too.  But I know you have other areas that you

7    want to talk about, Ms. Simpson.

8          MS. SIMPSON:  Yes, Your Honor.

9          DR. DUDLEY:  Your Honor --

10          THE COURT:  Oh, I'm sorry, Mr. Dudley.  I'm sorry.  Go

11    ahead.

12          DR. DUDLEY:  I just wanted to note that in the report

13    we indicated that the state had begun to do these competency

14    evaluations via telepsychiatry.  And so there have been many

15    more of them done during this last period than had been done

16    during the time that I've been a monitor, because they started

17    doing them via telepsychiatry.  And my understanding is -- is

18    that apparently they've been able to do with -- except for one

19    or two exceptions of people who were so impaired that they

20    thought they still needed to bring them to the facility, to

21    get caught up on evaluations.

22          THE COURT:  Okay.  Thank you, sir.  Can I turn back to

23    Ms. Simpson, Mr. Dudley?  Are you through, Mr. Dudley?

24          DR. DUDLEY:  Finished.

25          THE COURT:  Okay.  Thank you, sir, so much.

1       Ms. Simpson.

2       MS. SIMPSON:  Okay.  At this point, I'd like to turn it

3  over to Jim Moeser to discuss the juvenile JCAs, the juveniles

4  charged as adults.

5       Jim?

6       MR. MOESER:  Thank you, Lisa.

7       And thank you, Your Honor.  As you can tell in reading

8  through the report, there's a number of areas that we've

9  talked about before that, you know, continue to be of concern,

10  so I just want to highlight a few of those and then answer any

11  questions.

12       Probably the most significant concern in this recent

13  visit were concerns about staffing, sort of from top to

14  bottom, at the time of the visit, the time of the calls.  The

15  executive director position was vacant again.  Fortunately,

16  now Mr. Frazier is back on the job and has been for I think

17  the last two or three weeks as far as I know.  But there have

18  been, again, continuing periods where there has not been an

19  executive director, and I think that continues to sort of

20  stall and affect any momentum and planning that is able to be

21  done over any consistent period of time.  So hopefully

22  Mr. Frazier is on board and will stay and be there for a while

23  and will be able to get a hold of things and move forward.

24       There's a training coordinator vacancy; there's a

25  personnel development coordinator that's relatively recent

1    that I think is a positive step; there's still a vacancy in

2    the psychologist or treatment coordinator position with the

3    exception of a few weeks in last fall.  But most significant

4    is a pretty sizable number of vacancies in the youth care

5    professional ranks where about a third of the positions really

6    are vacant.  That has risen over the last six to nine months

7    and has stayed pretty high and really makes it hard for them

8    to accomplish many of the tasks that I think are in the

9    agreement.

10         It challenges the leadership to just simply fill

11    shifts, keep things covered.  It sometimes means things don't

12    get done or staffing is not able to move kids where they need

13    to be moved and things like that, and that's a significant

14    concern.  And you'll see recommendation in the report about

15    that and concerns about that again as well.

16         The second area of concern is a rise in -- I think what

17    seems to be a rise in the number of more serious incidents,

18    fights among youth, a couple suicide attempts, things that

19    suggest the supervision and problems in supervising the youth

20    are increasing rather than decreasing.  And I understand from

21    the conversation that it's been a little better this last

22    month or so, but I was concerned about the number of incidents

23    in which youth were engaged in fights.

24         Admittedly, there's a smaller percentage of kids that

25    are involved and seem to be repeat offenders, but it's a

1   concern and needs to be -- and I think, again, indicative of

2   concerns about the quality and ability to provide supervision

3   on an ongoing basis with staff shortages in place, as well as

4   that leads to challenges in training them and supervising

5   them.

6           You'll see a note in the report that I think the

7   education program has regressed.  There were issues --

8   although there were challenges created by COVID and some

9   accommodations made for that for a period of time, more

10  recently it appears that given issues that have occurred in

11  the classroom area, only half the youth are in the classroom

12  at any one time, essentially meaning they're getting about

13  half of what they should get.

14          They do provide worksheets and things for youth on the

15  unit when they're not in the classroom, but that's a poor

16  substitute for direct teaching and is of great concern.  And

17  I'd be very concerned that that has to be addressed, and

18  whatever challenges in terms of operating the school program

19  in partnership with Jackson Public Schools need to be attended

20  to.  Significant attention needs to be provided to that.

21  Again, that may be something Mr. Frazier is able to dive into

22  and help work out.

23          Now, there are some physical plant things that are of

24  note in the report.  The extra classroom program areas were

25  completed.  The modules were added.  The fencing around them

1   had not been completed by the time of the visit, so it had not

2   been put in use.  Those would provide some additional

3   flexibility in where youth are for programming and education

4   as well, but the staff shortages will plague -- make that more

5   challenging as well.  Those may be technically in use now or

6   available for use, but they weren't at the time.

7        Other recommendations about the actual physical plant

8   in terms of the living units have remained the same and have

9   not been attended to.  And there's a recent development, a

10  relatively recent development, with loss of the electronic

11  door control system, and that is included in the master plan

12  that Ms. Simpson alluded to as an element that needs attention

13  in the master plan report.  But that has not been, to my

14  knowledge, repaired yet.

15       The other aspect I'll just mention in terms of a

16  concern is the relatively recent concern expressed by the

17  youth court judge as it relates to the separation of youth

18  court youth and the juveniles charged as adults.  Her

19  interpretation of the Mississippi statutes prevents them from

20  being not only housed together but essentially programmed

21  together, so that has limited the flexibility staff at

22  Henley-Young have in terms of how they move youth around the

23  facility and will create additional challenges in terms of

24  education and programming.

25       THE COURT:  Wait, wait, wait.  You said difference in

1   youth programatically?

2        MR. MOESER:  Yes.

3        THE COURT:  I mean, is there any dispute that children

4   who are charged as adults are entitled to the basic programs

5   that a juvenile who is treated as a juvenile -- I mean,

6   programatically is the problem that they cannot be "educated

7   together" and might have to be separated to receive the same

8   type of education?  Or we're saying that a child charged as an

9   adult might not be entitled to the same sort of programs?

10       MR. MOESER:  No.  I think, in fact, the commitment is

11   there that all those youth are entitled to both education and

12   other kinds of programming.  But it's a matter of how do you

13   program it in a facility that's not well structured for the

14   flexibility to do that?  And the Jackson Public Schools does

15   not staff the facility in a way that allows that to happen on

16   a continuing basis.

17       I think the commitment is there.  Judge Hicks is very,

18   I think, interested.  Although those juveniles charged as

19   adults are not under her jurisdiction, she's equally concerned

20   about them receiving appropriate services as well.

21       It does raise some -- has raised some discussion at the

22   local level that's beginning around the viability of

23   Henley-Young being the long -- the best facility or long-term

24   use of Henley-Young for both youth charged as adults and youth

25   court youth.  You may recall there's a cap or a limit of 32

1    spaces allotted under the SPLC agreement, and that seems to be

2    a functional number both because it complies with the

3    agreement but also is a logical number given the space.  Her

4    concern is that the County needs to begin some planning around

5    that issue in a way that doesn't run up against a limit for

6    youth, and it also provides the best facility for youth.

7         The master plan -- there's a recent addendum to the

8    master plan that Ms. Simpson alluded to, a reference that

9    provides some information about the potential of creating

10   essentially a standalone but connected unit to any potential

11   jail construction that would utilize some of the

12   infrastructure supports from the jail but the youths -- keep

13   juveniles charged as adults completely separate.  We just got

14   that addendum last week.  I haven't had a chance to look at it

15   in great detail.  But that's an issue that will, I think,

16   continue to evolve, and may or may not complicate what happens

17   with the youth charged as adults in the long run.

18        In any case, we have made it clear, and I think the

19   County clearly understands that no matter how they proceed,

20   where youth are housed, they need to meet the conditions of

21   the agreement, provide education, provide other kinds of

22   programming.  But it just needs to be continually assessed and

23   developed in a way that meets the agreement.

24        It is two years -- on a positive note, it's over two

25   years now, about February, since the last youth left the

1   Raymond facility.  That is a significant issue and really I

2   think is an important one to recognize that after taking a

3   step to move juveniles charged as adults to Henley-Young and

4   moving forward with that, they've managed to maintain that for

5   over two years now.  So that's positive.

6          The number of youth court youth at Henley-Young has

7   remained relatively low, but there are complications in the

8   housing unit, especially if there are girls housed there,

9   given the youth court judge's -- or the interpretation of the

10  Mississippi statute related to them being together in any way.

11  That will be, again, part of the discussion I think going

12  forward on the County's planning.  And so the fact that --

13  yeah, so those are some positives.

14         Oh, and the last thing is there does seem to be some

15  improvement on the indictment front.  Although there are still

16  a number of youth who are not -- who are there for over

17  90 days and not indicted, it does seem to be fewer.  So

18  whereas in the past, there might only be a quarter of the

19  youth there actually having been indicted, that has increased

20  to about two-thirds.  That does, though, continue to raise the

21  question, and the County is aware of it, in terms of managing

22  the population long run that there needs to be additional work

23  done through the courts to keep those youth cases moving.

24         Right now I think there are about -- about half the

25  youth at Henley-Young of about -- I think there are 21, maybe,

1    today, but at the time of the roster, I had was 20.  Half of

2    them were 17-year-olds, and the most common reason youth leave

3    Henley-Young is they are there so long and eventually turn 18

4    and then they go to jail.  There's very few youth who have

5    left Henley-Young actually making it through the whole court

6    process and being convicted and placed and sentenced, so that

7    needs to be continually worked on at the county level as well

8    with the courts.  And I'll leave it at that.

9         THE COURT:  Okay.  I'll take judicial notice that I

10   read the papers and see the news.  I know there appears to be

11   an uptick, at least in juveniles who have been arrested, at

12   least, and charged in certain crimes.  I think of a

13   13-year-old and a 15-year-old who were charged with the murder

14   of a woman on -- I can't think of the street off of Terry

15   Road, between Terry Road and Gallatin.  I think the local

16   people know who I'm talking -- the arrest that was made.

17        So with respect to the youth, though, Mr. Moeser, I

18   know you indicated that there's a new executive director

19   that's just been back on-site.  And I guess I'm sort of

20   forecasting what my question will be for the County, and you

21   don't have to respond, Mr. Moeser.  But I assume there's going

22   to be an effort to sort of hire those staff members that have

23   been vacant now that the executive director is back on board.

24   I think there's a treatment person that is still absent.

25        And let me ask you this, Mr. Moeser:  With respect to

1     the services that JPS -- the education -- I guess JPS provides

2     education for these kids.  During the COVID era, was JPS able

3     to do what it needed to do?  Because I assume most of the

4     learning, like for other kids, was virtual.  Was there any

5     virtual learning occurring there at the facility?

6              MR. MOESER:  Yes, Your Honor.  It's my understanding

7     they were doing some virtual work to the extent that they

8     could.  There are limitations within the facility as to how

9     many youth had access to internet capacity at any given time,

10    but they were given, again, a combination of sort of work

11    packets and some virtual learning.

12             I think -- I also believe that some teachers, and I'm

13    not going to have the specifics on this, came back into

14    Henley-Young and into the classroom for direct instruction

15    earlier than was typical in Jackson Public Schools as a whole.

16    So I think there was some effort by some of the teachers to

17    get back on-site and work with kids directly.  But, yes, there

18    was a long period of time where I think it was mostly virtual.

19             THE COURT:  Okay.  All right.  Thank you, Mr. Moeser.

20             Ms. Simpson?

21             MS. SIMPSON:  I think that concludes our report, but we

22    are -- certainly can answer any questions that you might have.

23             THE COURT:  I don't have any more questions right now.

24    What we're going to do, though, is we're going to take a

25    five-minute break to give my court reporter a breather and to

1   let everybody go get a sip of water or whatever they need to

2   do.

3          When we come back, though, this is the question for DOJ

4   and the County and the sheriff.  I'm looking at pages 9

5   through basically 23 of the report, which is the stip- --

6   chart of the stipulated order update that has been prepared by

7   the monitors, and it indicates what has been done as a go-to

8   reference, really easy, what -- whether the County has met

9   full compliance, no compliance, or not applicable, and when

10  that full compliance was achieved and the status update.  And,

11  basically, what I will want to know is there anything in that

12  little summary that the parties disagree with in how the

13  monitors have told me what is and -- what has and what has not

14  been done yet?

15         So we're going to take a five-minute break, and then

16  I'll be ready to hear from DOJ, the County, and the sheriff.

17  We'll be in recess.  You don't have to turn -- you don't have

18  to turn off your devices -- well, if you don't turn off your

19  devices, we can see what's going on, but we're going to be in

20  recess for five minutes.

21              (A brief recess was taken.)

22         THE COURT:  We're back on the record.

23         I did have a question.  Can everyone hear me?  Yeah?

24  Okay.  I did have a question, Ms. Simpson, because as I think

25  about how long we've been going, with respect, this complaint

1    itself was filed June of 2016, so we're getting into the

2    five-year period of the lawsuit.

3         There were several years, I think -- of course, the

4    case was not mine back then, but I think, Mr. Cheng, several

5    years prior to that the Department of Justice was looking into

6    the matter, and, actually, the filing of the lawsuit is a

7    culmination of something.  So I think you-all investigated and

8    went back and forth with one another and finally filed suit,

9    and as a part of the consent decree, the monitors have been

10   involved for a number of years.

11        And I assume, Ms. Simpson, you and your team, are you

12   the -- and I don't know what to -- who's paying the cost of

13   the monitors?  Is that being split between DOJ and the County,

14   or is the County bearing the full cost?

15        MS. SIMPSON:  The County bears the full cost.

16        THE COURT:  And on average, do you know what your bill

17   is each month or however the services are being billed,

18   quarterly, monthly, annually?

19        MS. SIMPSON:  They're billed -- they're billed monthly.

20   And it fluctuates quite a bit, because when we have a site

21   visit in preparation of the report, the bill is significantly

22   higher than the months in between.  I can tell you -- it will

23   take me a minute to pull it up.  I can tell you what the

24   annual total was for 2020.  The total for 2020 was around

25   275,000.

1        THE COURT:  Okay.  Now, I'm now going to give DOJ an

2   opportunity to come to me any way it wishes, but I guess the

3   first question I do have, Mr. Cheng, or the question that I

4   left you with before we broke:  The stipulated order update

5   chart that was prepared by the monitors, does DOJ disagree

6   with anything in that chart?

7        MR. CHENG:  No, Your Honor.  We generally agree with

8   the chart.  It is possible because of a few items that were

9   supposedly addressed after the report was filed, including the

10  supposed repairs to the physical plant in Raymond.  Some of

11  that has to be updated, but generally we agreed with the

12  chart.

13       THE COURT:  Okay.  And since the Department of Justice

14  entered its stipulated order with the County, I presume the

15  Department of Justice expected the County to be in compliance.

16  So, again, I'll let you address me any way you wish,

17  Mr. Cheng.

18       MR. CHENG:  Yes, Your Honor.  We do expect them to be

19  in compliance.  As a matter of fact, one of the first things I

20  was going to mention in my prepared remarks was that nearly

21  five years after the Court ordered the defendants to implement

22  the settlement agreement to remedy dangerous, unconstitutional

23  conditions, the monitor's report indicates that the defendants

24  are in sustained or substantial compliance with only eight of

25  the 92 provisions of the settlement agreement.  They are

1    noncompliant with 30 provisions, meaning they haven't even

2    done enough to do partial compliance.  And they are in partial

3    compliance with 53 provisions, but in many of those cases,

4    they actually need to do quite a bit more to obtain

5    compliance.

6         The whole point of doing a stipulated order was to

7    prioritize short-term action steps needed to attain

8    compliance.  The stipulated order was supposed to address some

9    of the most serious conditions and give them a foundation to

10   achieve full compliance, but as the monitors noted and by our

11   count, they've only complied with 12 of 44 provisions of the

12   stipulated order.

13        So what I was hoping to do today in my remarks was to

14   talk about the areas of overdue compliance and try to organize

15   them into some basic categories.  We have four in mind.  One

16   is protection from harm, which includes staffing and security

17   practices; the juveniles issue; the medical/mental health care

18   issues; and some systemic issues associated with CJCC.

19        By the time I'm done, I hope it will be very clear that

20   there is sort of a pattern here that may be interfering with

21   compliance and which really needs to be addressed.  And that

22   pattern is that the defendants don't seem to be really coming

23   up with a plan or a strategy to implement required remedies.

24   Oftentimes when they get something done, it is largely due to

25   the monitor's technical assistance or achievements by

1    particular groups within the defendant's organization.

2           So, for example, the architects and the designers were

3    able to complete their master plan.  Some members of the

4    sheriff's department have put in pieces of different types of

5    remedies, but when it comes to sort of a long-term strategic

6    plan or sort of broader thinking and oversight at the higher

7    levels, we're not always seeing that.  And that's getting in

8    the way of full implementation of both the stipulated order

9    and the settlement agreement.

10          Let me start first with the protection from harm

11   issues.  Even within protection from harm, there are some

12   subcategories:  staffing, policy implementation, the physical

13   plant deficiencies, and use of force.  I don't want to go too

14   much into it, because the monitors have covered it.  But

15   you've heard many of the same problems you've heard in the

16   past:  The staffing and security remain inadequate.  They

17   don't really have enough staff; policies aren't implemented;

18   the buildings remain unsafe and the maintenance process isn't

19   working.  And, you know, we have problems with harm, people

20   getting use of force, and then nothing is done in terms of the

21   investigations.  People aren't following the policies on use

22   of force, and so forth.

23          I think what you'll see in --

24          THE COURT:  Mr. Cheng, hold on for one second.

25   Remember the court reporter is taking down what's said, so

1    pretend you're here in the courtroom in Mississippi.  We

2    require you to speak slowly here, so just pretend you're here,

3    okay?  Get out of D.C. for a second.  Come back home to us.

4    Speak a little slower.

5          MR. CHENG:  I've been told I speak too fast for D.C. as

6    well.

7          THE COURT:  Okay.  Speak a little slower for --

8          MR. CHENG:  Maybe Philadelphia.

9          THE COURT:  Speak a little slower for us, please.

10   Thank you.

11         MR. CHENG:  So we look at the four different issues:

12   staffing, policies, the use of force, the juvenile issues.

13   And what really seems to be a concern is that there's no real

14   buy-in at the highest levels.  People don't show up at

15   meetings.  They don't do what they're supposed to do in terms

16   of approving outside consultants or making decisions, and so

17   even when pieces are remedied, even when you have Ms. Albert

18   working on a policy and procedure, even when you get some more

19   staff hired, some of the bigger-picture pieces are not done.

20         And I'll just use as one of the illustrations the

21   staffing retention issue.  We've known for some time that they

22   can't keep people.  They can hire people, but they can't keep

23   them.  There are a lot of reasons why that's the case, but

24   under the stipulated order, there were a few discrete things

25   they needed to do.  One of those was to hire a staffing

1    retention consultant.  We are now almost a year in, and they

2    still don't have a staffing retention consultant.

3         What troubles us particularly is that at the last

4    status conference, and even last year, there was a lot of talk

5    about Mr. Matthew Rivera being retained as the staffing and

6    retention consultant.  I believe Ms. Simpson had actually put

7    him on to the monitor's payroll in order to make sure that

8    some initial expenses were covered, and everybody was

9    proceeding as though this person would help them with

10   assessing why they can't keep people and what they can do to

11   improve their work culture and human resource practices so

12   that they have better retention.

13        We just heard, I think a day or two ago, that

14   Mr. Rivera was not a fit for the sheriff's department, and so

15   they are not going to proceed with Mr. Rivera.  Well, that

16   sets us back now on staffing retention.

17        I wish that was the only illustration where we sort of

18   get these types of unjustified delays, but we've had similar

19   problems with the development and implementation of policies.

20        I'm actually not quite as concerned about the drafting

21   of the policies.  That is actually a slow process, and we can

22   definitely speed it up a bit.  But at least under Ms. Albert,

23   so many of the priority policies have actually been completed.

24   Just to illustrate, the use-of-force policy, for example, was

25   completed.  Some of the other priority policies that have not

1   been done, while they are important, they aren't quite in the

2   same category of importance as the ones that have been

3   approved.

4        What's more problematic is that when investigators and

5   supervisors don't implement policies, there really is no one

6   coming back and saying, "You need to do this."  If anything,

7   there seems to be some pushback from high levels of the

8   sheriff's department where they just don't understand the

9   importance of policies or just don't need to force people to

10  implement the policies.

11       There's a similar problem with the maintenance issue.

12  We have the same sort of deficiencies showing up again and

13  again and again.  The stipulated order requires that they

14  develop a maintenance system.  They actually had one in place.

15  It was a little bit crude.  It ran a lot of the work orders

16  through the county administrator; and then for some reason at

17  the highest levels, they took that apart, there wasn't

18  anything in place for a while, and naturally things started

19  falling apart again.

20       We have known for some time that there are very serious

21  problems with the safety conditions inside Raymond Detention

22  Center, and even to some degree at the work center,

23  particularly regarding fire safety.  It is not clear to us why

24  the state fire marshal does not do more frequent inspections.

25  It's been sort of a puzzle from the beginning.  They are not a

1    party to this case, so their lack of action is not necessarily

2    an excuse for the County.

3           So under the stipulated order, we asked them to have

4    the architects and the master planning process address these

5    issues.  As Ms. Simpson has pointed out, the master planning

6    process has done a pretty good job of identifying the priority

7    repairs that need to be made.

8           In addition to the smoke detectors, fire detectors,

9    sprinklers, there are also problems with some of the kitchen

10   equipment, including a steam system that was an imminent life

11   safety issue.  I don't understand the full details of it, but

12   I believe the County has taken some interim steps to address

13   these issues.  But, again, there is no long-term plan to fix

14   them.  We can't get timetables.  We don't know exactly which

15   of the options the County is going to adopt to fix these

16   issues.

17          Let me move on to the JCAs and Henley-Young.  Again,

18   many of the deficiencies at JCAs are really similar to the

19   ones at the jail:  staffing retention, serious incidents that

20   don't always get followed up on, policies that aren't

21   developed, and some delays in implementing the programs that

22   would make it more of a manageable facility and might actually

23   help with some of the other issues because they can't seem to

24   fill vacancies in key positions.

25          The stipulated order required that they hire a

treatment director, for instance.  They filled the position

for a very short time.  The person left, and then, again,

there just isn't really any type of active effort to try to

fill that gap.  And I mean more than just reposting the

position.  I mean, it isn't just about filling a position.

It's about having a process in place so you can develop the

programs.  Filling the position is just the easiest part of

that system.  It's the most measurable.  But it requires much

more from the County, and I don't think the County is really

doing that.

        Some of the similar problems start showing up with

medical and mental health.  While the mental health unit has

made some progress, we are still at a pretty early planning

stage.  The stipulated order provided some additional

structure, both in substance and timing, to defendants'

existing obligation to provide mental health services.  In

March, we admit the relevant jail leadership and medical and

mental health staff had their initial planning meeting, but,

again, one joint conversation is not enough to make sure the

departments are moving forward to putting in the unit.

        The order requires, for example, that they hold regular

meetings each month, so that they can resolve administrative

concerns.  But they're not doing that.  The stipulated order

included some provisions to protect medical staff, such as

fixing security cameras and improving security and adding some

1   officers so the medical staff could do their jobs in the

2   mental health unit.  But right now our understanding is the

3   mental health staff are canceling appointments or pausing

4   medication pass, because security officers aren't there.

5       It has also been difficult for QCHC to find people to

6   staff Hinds County because of the jail's poor safety for

7   staff -- poor reputation for staff safety.  So, again, the

8   failure to address these sort of long-term strategic issues of

9   staffing and staff retention start affecting other things as

10  well, such as mental health care.

11      The problems of policy implementation affect medical.

12  There is actually some discharge planning built into policies

13  and procedures.  Right now our understanding is only

14  30 percent of inmates who are on the jail's mental health

15  caseload actually ever make it to their first appointment at

16  Hinds County Behavioral Health.  Additional QMHPs, qualified

17  mental health professionals, would help with discharge

18  planning, but the County has not made a commitment to actually

19  hire those people, or at least as of the most recent tour,

20  those people were not on-site yet.

21      There are things they could do to improve the discharge

22  planning process, like making sure that when detainees are

23  released, someone in security picks up the discharge packet

24  and makes sure that the people get their medications and their

25  appointments.

1          There are things they could do with administrative

2     segregation as well that they need to do that are actually in

3     the draft policies that have been approved but are not

4     actually being done.

5          So, again, it's not that there aren't pieces in place.

6     There are things being done with medical, especially by the

7     private contractor, Quality Correctional Health Care, that are

8     moving them towards a mental health unit and having a more

9     comprehensive mental health system, but until they really

10    start thinking in terms of "What do we need to prioritize?

11    What is our plan for getting the mental health unit physical

12    plant in place, getting staffing in place?" we have some

13    doubts about whether they'll make some progress in the next

14    couple months.

15         So the final issue I want to talk about briefly is the

16    CJCC.  This one has been an issue for a long time.  I don't

17    know how long Ms. Simpson has been asking them to appoint

18    someone to get the CJCC really up and running, someone to

19    handle the administrative issues, help with scheduling, a

20    full-time person dedicated to the work.  It was actually

21    something required in last year's stipulated order.  They

22    assigned an employee who had other duties.  Ms. Simpson has

23    repeatedly pointed out that this is not going to work, because

24    the person is too busy.  And that, frankly, the CJCC is still

25    not moving the way it should, which, again, impacts everything

1    else.  It slows down trying to get long-term planning, working

2    things out on education, it affects mental health services,

3    and discharge planning.

4         The stipulated order had a very simple, concrete

5    requirement for the County.  That minor requirement was part

6    of a bigger set of remedies and required more management,

7    administrative thinking that just hasn't occurred.  And until

8    it happens, we're not going to be able to make much progress.

9         So that's basically our view of what's going on.

10   There's been improvement, but we are in pretty serious need of

11   sort of leadership at the higher levels to keep things moving.

12        THE COURT:  So what does DOJ suggest this Court ought

13   to do?  Because I've heard you say all of this stuff before,

14   including at our last status conference and the status

15   conference before that.  So what is it that -- it's the order

16   that you agreed to with the County.  What do you suggest the

17   Court ought to do at this point?

18        MR. CHENG:  I think it's pretty clear that they're in

19   violation of that stipulated order.  What the next step is is

20   something we are deliberating on internally.  As you're aware,

21   Your Honor, there are a number of options if we believe

22   somebody is in contempt.

23        One of the things that we are thinking about is whether

24   we have to break up the chunks even smaller in order to make

25   sure the County does what it needs to do.  We do think that

1  having these regular status conferences has been helpful.

2  Just in the last couple of weeks right before this conference,

3  there was a spate of activity that moved some things along,

4  and I think that's one thing that is going to affect our

5  assessment of what needs to be done.

6         The other thing that I think is helpful for DOJ and

7  that would be helpful for the Court would be that if the

8  defendants come up with remedies or they talk about things

9  that they're doing.  Especially as this hearing proceeds, it's

10 important to listen carefully on whether they've actually

11 given clear timeframes and commitments.

12        We ourselves are often having a hard time trying to

13 figure out if something told to us is something that's really

14 being done, something that's sort of being thought about, or

15 something that they're actually committing to do.

16        Just to illustrate, for example, some of the life

17 safety issues, we've heard different things:  that they have

18 been fixed; that they are being fixed, but other things are

19 being done in the interim to deal with the problems.  But for

20 us that's not very concrete, and so until we can get sort of

21 more into the details, it's often hard to tell what exactly we

22 have to ask for.

23        To be a little more specific, take, for example, the

24 steam system.  Our understanding is that the architects said

25 this thing could blow up.  It needs to basically be fixed.  We

1    were originally told it's going to be fixed.  But then we

2    heard that the system is just turned off, and they're using

3    other things instead to try to sanitize dishes and pans and

4    make sure people get utensils.  Well, turning off the system

5    is not replacing the system.  So what does that really mean?

6          Likewise, you know, if the electrical system gets fixed

7    for a short time but there are deeper problems with lighting

8    or electricity or alarms or sprinklers, those really need

9    long-term fixes.  The architects, CDFL, have provided a pretty

10   good master plan that may give them the long-term fixes they

11   need, but the County has not committed to that.  Under the

12   stipulated order, they need to commit to which of the options

13   they're going to adopt into the master plan.

14         Likewise, even if they adopt long-term fixes, they need

15   a maintenance plan.  Well, they keep saying they have a

16   maintenance plan, but it's not clear to us what it is.  So

17   until we get something in writing and timeframes, it's not

18   particularly helpful.

19         So in summary, Your Honor, you know, to the extent that

20   the Court continues to hold all of us to account for making

21   sure that these remedies are real, that's going to be helpful.

22   But in terms of specifically what DOJ is going to ask for, I

23   think we're going to have to get back to the Court on that as

24   well.

25         THE COURT:  All right.  I'll now turn to the County and

1    sheriff, whichever way -- between the two of you, whoever

2    wishes to go first.  It sounds like you're on the defensive --

3    or you've been put on the defense, rather.  You may not be

4    defensive at all.

5          But, again, I harken back to the time that the parties

6    entered this stipulated order.  It was at the time that there

7    was a change of leadership on the Board of Supervisors and

8    within the sheriff's department itself.  It was about to be a

9    change in leadership.  The election had just occurred in

10   November, and the new people were going to be sworn in the

11   first day or so of January of 2020.

12         And now it's April 2021 and we're here talking about

13   things that was a problem then, and we've had several status

14   conferences in between the two.  And I know I've gotten

15   reassuring information from the County and the sheriff that

16   things are going to be different, that things are getting

17   done.  And I've just heard from the monitor and I've looked at

18   that chart, and I'm going to ask both the County and the

19   sheriff if they agree with what's in the chart, and then --

20   and now I've heard DOJ.

21         It still seems to me there's a whole lot of stuff that

22   has not gotten done, so I open it with that.  The first

23   question will be for the County and the sheriff:  Does either

24   party disagree with the chart that has been prepared by the

25   monitors that consists of page 9 through 23 of the monitor's

1      report?

2            MR. GAYLOR:  Your Honor, Tony Gaylor for the County.

3            Yes, Your Honor, we disagree with the -- not only the

4      chart but also the general tone with regard to how things have

5      been presented with regard to the progress we believe we've

6      made within the stipulated order.  We do acknowledge that

7      there is more work to be done; however, we would like to bring

8      to the Court's attention that we have done a substantial

9      amount, and we are certainly attempting to comply with the

10     consent decree.

11           As an example of that, Your Honor, over the last year,

12     the County has spent $3.4 million in attempting to repair the

13     facilities at both the detention center in Raymond as well as

14     Henley-Young.  Over the past two months, we have authorized

15     spending of roughly $700,000 to come into compliance with the

16     consent decree.  And really over the past eight years, it was

17     brought to my attention we've spent $10 million on the

18     facilities in Raymond and at Henley-Young.

19           And some would say that's probably spending a lot of

20     good money after bad, but we've been making the attempt to

21     come into compliance in every way along the way when things

22     are brought to our attention with regard to both life safety

23     issues and just general maintenance issues.

24           THE COURT:  Well, let me ask you this:  Are there

25     lights in Pod A?  Are inmates -- are inmates left there in the

1    dark in Pod A?  In Pod A, are there lights?

2         MR. GAYLOR:  Yes.  Your Honor, with regard to Pod A,

3    yes.  There are day lights within Pod A.  And when I say "day

4    lights," that means that in the room, the general room where

5    the residents are supposed to be gathering, there are lights

6    out there.

7         Now, with regard to the individual cells, the lights

8    were torn out by detainees.  And it's a life safety issue with

9    regard to having some of those lights in those cells, because

10   we've had incidents in other places where residents have

11   electrocuted themselves in dealing with those lights.  And so

12   there aren't lights in the individual cells.  There are lights

13   in the -- in the pod.

14        Now, as it was noted, that is an area that's supposed

15   to be -- the residents are -- detainees are supposed to be

16   transitioning out of that pod into Pod B, and we've made a

17   substantial amount of repairs in Pod B and are still making

18   those repairs to try and transition them out of Pod A into

19   Pod B.  As you can imagine, if we were to do a -- we can't do

20   a complete renovation of Pod A while the residents are there,

21   detainees are there, and Pod B is in disrepair, so we don't

22   have anyplace for them to go.  So we've placed Pod A in a

23   condition that is what we believe is inhabitable while we're

24   trying to make Pod B much more sufficient for their -- for

25   them to stay.

1      Now, I can go along the list of repairs that have been

2  made to Pod B to bring that to the Court's attention if it

3  likes.

4      THE COURT:  I guess the best place to start, then,

5  since DOJ says that they believe that the chart is relatively

6  accurate -- they said, you know, there's been some things that

7  have been done since then.  It might not reflect that, but the

8  County has said it disagrees with the chart.  What I want to

9  know is:  What are your areas of disagreement if we're going

10  to go down one by one or page by page starting with page 9?

11     Because I see this as an easy way of seeing whether the

12  County is in full compliance, noncompliance, or if it's not

13  applicable.  And if you're in compliance, when was the date

14  achieved?

15     So this is an easy reference point for me, because I

16  see a lot of noes.  And what I heard you say is some of these

17  noes are supposed to be maybes or yeses, I guess.

18     MR. GAYLOR:  Right, Your Honor.  Yes.  Okay.  So we can

19  start with page 9 if you'd like.  Where it says -- under

20  "stipulations," on the third line it says, "Within 30 days the

21  County will post at a locally competitive salary for a

22  full-time clinical social worker or psychologist to serve as

23  treatment director."  It says no.

24     We believe that that should say at least partial,

25  because we did post.  Not only did we -- have we posted for

 1   the position, but we filled the position.  And the person that

 2   filled the position has left that position.  And we've

 3   continued to post for that position, so I think it's not -- I

 4   don't think it's fair to say that we are just not complying or

 5   haven't attempted to comply.  We filled the position, and now

 6   the position is vacant again.  And --

 7        THE COURT:  And when was it last reposted?

 8        MR. GAYLOR:  It's posted right now, Your Honor.  It

 9   should be on the website as we speak for a clinical social

10   worker, for the treatment director coordinator position.

11        THE COURT:  Okay.

12        MR. GAYLOR:  I don't -- I'm not aware that it has not

13   been on the website.  It should be there as we speak.

14        Next, Your Honor, in the next position, it says that

15   the County should use a qualified security contractor with the

16   assistance/oversight of an architect with corrections

17   experience to accomplish the safety and security measures at

18   RDC.  The architect should conduct periodic inspections.

19        THE COURT:  Okay.  You need to slow down if you're

20   going to read.  I see it --

21        MR. GAYLOR:  Your Honor, the next -- the next box.

22        THE COURT:  Right.  I see it.  You need to slow down

23   for the court reporter, though, if you're going to read.

24        MR. GAYLOR:  I apologize.

25        With regard to that box, it says no.  Well, we've hired

1   Benchmark as our construction managers and experts, and we

2   also hired Cooke Douglass Farr Lemons as our architect.  And

3   obviously they have been assisting us all along the way in

4   making assessments and repairs to the facilities.  For some

5   reason it says no, that we're not in compliance.  It should at

6   least say -- I don't know why it would not say at least

7   partially compliant, because we hired them and they're here

8   right now.  And they're here right now, Your Honor, in this

9   hearing.

10      THE COURT:  I understand they may be there right now,

11   but the monitor says the monitoring team has not seen the

12   contract or documentation of any inspections by CDFL, although

13   Benchmark has generated a punch list.  Is that inaccurate?

14      MR. GAYLOR:  I don't think that's a fair assessment at

15   all, Your Honor.  And quite frankly, they have been in contact

16   with Benchmark consistently and have been in contact with

17   CDFL, and so to say that they have not been -- that they

18   haven't done -- that haven't seen the contract for them or

19   that they haven't seen any documentation of any inspections by

20   Rob Farr, I just don't -- when they've seen the master plan

21   that was created by them, I just don't think that's a fair

22   assessment, Your Honor.

23      MS. SIMPSON:  Your Honor, may I interject something?

24   If you look at the chart where it says yes or no, the question

25   is "Full compliance by due date."  So it may very well, such

1    as that one, be something that has been achieved but was not

2    achieved by the due date.  And then the next column is, "When

3    was full compliance achieved?"  And if it had been achieved,

4    the date of it is noted in that column.

5         So the noes and the yeses refer to whether compliance

6    was made by the due date, not -- not -- and like I said, it

7    could be something that has come into compliance, and then

8    there will be a date in the next column.

9         MR. GAYLOR:  That being the case, Your Honor, then we

10   understand that there are many things that have prevented us

11   from being in compliance on the due date that was initially

12   suggested, but due dates were initially suggested pre-COVID.

13   And so there are lots of things that we may have been a little

14   bit delayed in achieving compliance, but the general tenor

15   that is being presented is as if the County is not only not in

16   compliance but has not attempted to be in compliance with the

17   stipulated order.  And we just don't agree with the assessment

18   that's being relayed to the Court, Your Honor.

19        THE COURT:  Okay.

20        MR. GAYLOR:  So -- and so in that sense, you know, we

21   have strong disagreement with that environment in which things

22   are being presented on those things from the County's

23   perspective.

24        Going further down to page 14 where it talks about the

25   County installing fire hoses in secured cabinets as a part of

1    the renovation process of each pod, we want to bring to the

2    attention of the Court, as it has certainly brought attention

3    to the fact that we are lacking a fire alarm, detection, and

4    suppression system, that that has been ordered.  And we've --

5    we have a contractor in place for that, and the installation

6    of the fire alarm and suppression system starts next week,

7    Your Honor.  But we have made the appropriate note of that and

8    are attempting to remedy that situation.

9         Now, I think it's important that the Court understands

10   that the facility was designed without a sprinkler system, and

11   so this is one of the problems that we have with the poor

12   design of the facility.  And in that vein we've made plans,

13   Your Honor, not just to rebuild and repair the detention

14   center that's in place, but we have plans to build a new

15   facility.  And that is pursuant to the master plan that Cooke

16   Douglass Farr Lemons put forward to the Court.

17        We're going to have to do it in phases, though, Your

18   Honor, because the plan that was presented was basically a

19   $100 million plan, and we don't have the resources to build a

20   $100 million facility at one time, at once.  But we do intend

21   to build a facility probably in three, if not four phases, and

22   we've begun the process.  And the monitors are aware that

23   we've secured land for that facility as well.  And so we're

24   starting that process in terms of building soon hopefully,

25   Your Honor, but we have begun the planning process for that.

1      Now, Your Honor, if you would like, we can also --

2   well, there are a couple of other things with regard to the

3   stipulated order as well.

4      With regard to the development of the pretrial services

5   program, Your Honor, we are -- I believe the monitor has noted

6   that we are in the process of trying to establish that

7   program.  We have someone who is assisting us with the

8   establishment of that program.  The -- we are making -- we

9   have made plans -- we have made budget plans for a pretrial

10  services coordinator position, and we have not advertised for

11  that position yet.  But we are planning for the pretrial

12  services program.

13     With regard to the -- page 16, where it talks about the

14  engagement of stakeholders in the implementation of the CJCC,

15  we do disagree with the sentiment that we have not had a CJCC

16  or that we've not been attempting to meet properly.  We met --

17  the CJCC met in November and December, even though it's an

18  entity that's supposed to meet quarterly.  And it was noted in

19  December by the senior circuit judge, who is the chair of that

20  committee, that she would like for there to be a new chair for

21  that committee put in place.

22     We were scheduled to meet again last month, in March.

23  That meeting was postponed, but we do believe that the

24  stakeholders that need to be in place are at the table,

25  primary stakeholder being the District Attorney's Office,

1    which is certainly engaged in all that we're attempting to do

2    to move that project along.  So there's that.

3         Now, with regard to the -- two boxes down from there,

4    it talks about the -- again, it talks about the treatment

5    coordinator post, and it talks about the hiring of a clinical

6    social worker as well as contracting with and consulting with

7    an entity that has a psychologist.  Well, we do have a medical

8    care provider that has a mental health component, QCHC, but

9    we've also contracted with Hinds Behavioral Treatment.  And in

10   our conversations with them, they are aware that they're

11   supposed to be contracting with the psychologist, but they are

12   operating in a supportive capacity at this time until we can

13   get a treatment coordinator in place.

14        We don't like the -- we disagree with the sentiment

15   that we aren't attempting to adequately address mental health

16   treatment, both in Raymond as well as at Henley-Young.  The

17   attempts are being made.  The mental health professionals are

18   on-site, and they are treating residents and detainees.

19        We do acknowledge that we would like for a more

20   effective system to be put in place, but that's a work in

21   progress.  And the collaboration between -- we believe that

22   the collaboration between QCHC, Hinds Behavioral, as well as

23   our eventual replacement of a treatment coordinator will

24   address that.

25        One other thing, Your Honor, with regard to the

1    stipulated order in the chart.  It talked about the -- on page

2    19, it talked about the County completing a master plan to

3    determine the long-term use of each of the three facilities

4    and evaluating options of building a new facility or further

5    renovating existing facilities.  Your Honor, we've done all of

6    those things, both within the master plan as well as beyond

7    the master plan, planning the building of a new facility.

8    We've established that -- we have a lease with Jackson Public

9    School District for property in proximity to the existing

10   Henley-Young facility where we intend to build a new facility

11   in phases.

12        And so the tenor that's been presented to the Court

13   with regard to us -- the County not attempting to plan to

14   create a new facility or renovating the existing facilities I

15   don't believe is accurate at all, Your Honor, and so we

16   have -- we take major issue with that.

17        The sheriff's department may have additional objections

18   to what's been presented with regard to policies and

19   procedures, and I think they should address the Court at this

20   time with regard to that.

21        MR. CALHOUN:  (AUDIO GAP) that, Judge, Your Honor.

22        MR. GAYLOR:  Board President Calhoun, would also like

23   to address the Court with regard to something?

24        MR. CALHOUN:  And I would like for Supervisor Archie to

25   say a little something also.

1        But this board, in advance of us being sworn in,

2   started looking at jails.  We went with Benchmark to Coahoma

3   County and looked at the jail that they were building, and we

4   said that we were going to move as rapidly as the funds would

5   be available.  And we have come up with a funding source -- we

6   think we have, anyway -- to get this done.  And I can say this

7   board is doing financially as much as it can to comply with

8   this consent decree.

9        And, David, I want you to just say a couple words, but

10  don't be too long.

11       MR. ARCHIE:  Good afternoon, Your Honor.  David L.

12  Archie, vice president of Hinds County Board of Supervisors.

13       I would like to just add that it's been a difficult 12

14  to 16 months, now going into 16 months, for this new board.

15  We've had so many different issues other than the jail to have

16  to deal with, you know, concerning flooding, tornadoes, ice

17  storms.  I don't know.  It's just been -- COVID.  It's just

18  been one thing after another.

19       But not making any excuses for that, but what we are

20  saying is that we are committed to do everything in our power

21  as a Board of Supervisors to get from under this consent

22  decree.

23       Now, I think that we -- I know that President Calhoun

24  and Supervisor Graham and myself, we're always in conversation

25  concerning what can we do more about taking care of that jail?

1    I've gone down to the jail on several occasions.  I just pop

2    up sometime in the middle of the night -- not the middle of

3    the night but late evening.  I don't call the sheriff, and the

4    sheriff don't know I'm coming.  I don't call the board

5    president so the board president knows I'm coming.  I want to

6    see how things are going.

7         And in order to continue to work on these projects and

8    to make sure things are done the way the Court sees fit, then

9    I think the Board of Supervisors members got to get more

10   involved in order to not kick the can down the road but in

11   order to get things done, and this board is committed to

12   getting it done.  We're spending quite a bit of money there,

13   and we want to do what the Court asked us to do, this

14   particular board.

15        THE COURT:  Okay.

16        MR. ARCHIE:  Thank you, sir.

17        THE COURT:  I hear you, but I've also heard from the

18   monitors and I've also heard from DOJ.  I hear you.  But there

19   are some fundamental disagreements between the County and what

20   the monitors have said and what DOJ has said, and DOJ has the

21   power to sort of do something with respect to slow rolling on

22   the consent decree that the parties negotiated.  That's the

23   contract between the two of you, the County and the DOJ, to

24   stave off or to put off the trial that we were going to have

25   on whether or not the County could be found in contempt.

1    That's where we are.

2         DOJ chose not to push the contempt issue at the end of

3    2019 because -- in part because they explained that -- the

4    parties explained it that day; the then county attorney

5    explained where we were.  I think the new sheriff was in the

6    building at the time, said, Look, Judge, there's a new sheriff

7    here; Judge, there is a new Board of Supervisors here; and so

8    therefore, we think that it's in our best interest to resolve

9    this contempt hearing today and not move forward on contempt

10   because we -- DOJ believes us, that we're going to work and

11   get things done.

12        And we've been meeting with these status reports since

13   that time, and there are fundamental disagreements about where

14   you-all are; that is, the parties are, with the terms of the

15   agreement that you-all reached to stave off the hearing on the

16   motion for contempt.

17        So I hear the new board -- I hear the new president and

18   I hear the vice president.  But I want you to understand this

19   latest status report is viewed rather differently between the

20   monitors and DOJ and what I just heard.

21        But I'm going to give the sheriff an opportunity now to

22   tell me what it is, if anything, that they disagree with with

23   respect to the chart.  Because the chart is the easier thing

24   for me to look through and identify to see if there's been

25   full compliance and when there was full compliance and then in

1   those spaces where there are blanks, which means there has not

2   been full compliance reached.  And I think when the parties

3   negotiated their agreement back in 2019, I do think now --

4   maybe it may take some evidence and some hearing on it, but I

5   did think that by now the parties probably thought that most

6   of the stuff will have been done or at least certainly more

7   than what is identified on the chart as having been done or

8   having reached full compliance.

9        So I ask the sheriff the same question that I asked the

10  other parties about the chart:  Do you agree that the chart

11  that the monitors have prepared is correct?

12       MS. BARKER:  Your Honor, I -- the sheriff's office

13  will -- we have some contention with what is represented in

14  the chart.

15       First of all, I want to back up.  And, Your Honor, you

16  know, we -- the Court speaks about the timetable that this

17  stipulated order was implemented, and the Court is absolutely

18  correct.  It was implemented in December of 2019.  We had a

19  new sheriff come in January of 2020.  We had approximately six

20  months on the job and the entire world shut down, and the

21  fact, honestly, that half of the people on this call are still

22  here and that we haven't had a complete outbreak of COVID in

23  our jail and that we're finally seeing the light at the end of

24  the tunnel in this thing is miraculous.

25       So as I said at the last hearing, I do not believe that

1    the DOJ, the monitors, or the Court should hold the parties in

2    the same light under this stipulated order as we were whenever

3    we entered that order.  When we entered that agreement, we all

4    agreed that things were going to go along as planned, and we

5    were going to be able to have training in person; that we were

6    going to be able to rock along with these policies and

7    procedures; that we were going to be able to devote every

8    single inch of our time to this.

9         Instead what we had to do was stop everything, figure

10   out how the heck to address a pandemic, much less something

11   that no one knew anything about.  We didn't know if we could

12   contract this by touching people, through the air.  The CDC

13   didn't even know.  The whole world stood still.

14        And with that said, I think that it's extremely unfair

15   for the DOJ and the monitors to be so harsh on the County

16   given the fact that we have done a great job containing COVID,

17   and that we're all healthy and here sitting here talking to

18   Your Honor today.

19        In that same line, I would aver that what the DOJ said

20   about contempt, we have -- there is no way for us -- well, I'm

21   sorry.  There cannot be any argument for us to be held in

22   contempt given the fact that we have given -- made a good

23   faith effort given all of the challenges that we've been in

24   this year to comply with the consent decree.  We have made so

25   many strides in the face of a pandemic, and I think that that

1    needs to be commended.  Yes, there are downfalls.  Yes --

2         THE COURT:  Let me ask you this:  Does the sheriff

3    believe that -- for example, that training must be done in

4    person?  Is there any way to do training on certain of these

5    policies -- apparently, the monitors suggest there is no

6    training or no implementation of the training.  Is it -- I

7    guess the first question is:  Is that a correct assessment?

8    Is there training going on?  And if there is training going

9    on, how is that training occurring?

10        MS. BARKER:  Your Honor, that is an incorrect

11   assessment.  The -- we have been doing training through roll

12   call training, which, you're right, this is not an in-service

13   training.  We can't get into all the in-depthness as an

14   in-service training would be, but we have given our detention

15   officers roll call training on each and every policy.

16        To that end, we have hired a new training captain, who

17   is developing a curriculum per the stipulated order on each

18   policy, and we will have in-service training.  And that is

19   going to be -- that curriculum is going to be submitted within

20   the next week on that.  So we are taking strides to develop

21   that in-service, and now we do feel safe having in-person

22   training.

23        The conversation came up of Zoom training, and, Your

24   Honor, I don't believe that all of our detention officers even

25   have that capability to hop on Zoom.  You know, we're not

1    dealing with the employees at the federal court who, you know,

2    may or may not have those means.  I just -- you know, our

3    detention officers are getting paid $27,000 a year.

4         THE COURT:  No, but the training I'm talking about

5    occurs in-house, is in-house training.  It's just done over

6    the computer.  You're here at your job, and part of your job

7    is to attend the training.  So that's what baffles me with

8    respect to, you know, why something has not been designed to

9    train folk with respect to policies and procedures.  You know,

10   they're there at the job, but I guess what I read from the

11   monitor's report is that no training has been done because of

12   the in-person sort of fear or prohibitions or whatever.  So --

13   you know, so I don't know if, you know --

14        MS. BARKER:  Your Honor --

15        THE COURT:  Go ahead, Ms. Barker.

16        MS. BARKER:  Your Honor, our -- the way that our

17   facilities are set up, if our detention officers are manning

18   their post, we don't have the capability to have internet

19   service or anything like that in the pod.  That's just -- we

20   just do not have that technological capability, and we don't

21   have a computer training room.  You'll see that -- thank God

22   my office is large enough to space out, but this is the only

23   computer with a monitor on it.  That's why we're in my office

24   right now.  We just do not have those technological

25   capabilities.

1      THE COURT:  Okay.  So what else in the report does the

2  sheriff disagree with?

3      MS. BARKER:  I will go down line by line for the

4  policies that apply to the sheriff's office.  The first one is

5  page 11, section II.A.2, this states that a staffing plan

6  which optimizes the use of available staff to provide

7  supervision at all three facilities, including, among other

8  strategies, rotation of staff from JDC and the work center to

9  RDC to increase staff coverage.

10      Your Honor, this should not be a no.  It should be

11  either partial compliance or full compliance, because we have

12  done a directive to put the excess workers from the work

13  center to RDC to help with that deficiency.  Now, I have been

14  in contact with the monitors and with the Department of

15  Justice, and when they talk about a rotation, we were

16  confused.  And I believe that Your Honor brought up the fact

17  that you should perhaps assign different workers to different

18  facilities each day, and I had kind of thought that, too.

19  What's the big deal?  Why can't you do that?

20      Well, Mr. Parrish will agree that that goes directly

21  against the notion and the philosophy behind direct

22  supervision.  With direct supervision, you need to have those

23  officers assigned to that unit so they can get comfortable and

24  know the inmates.  Now, they are doing direct supervision at

25  the work center, which is open bay, and that's working out

1   really well.  So to, I guess, take those workers and mix it up

2   and put workers from RDC at the work center, that would create

3   more of a security problem than we have right now, and DOJ and

4   Mr. Parrish and Ms. Simpson all acknowledged that.  So why

5   this particular section is a no, we disagree with that.

6        The second section II.A.3, states that we need to

7   increase the time that officers are in the housing unit at RDC

8   by using the walkie-talkies.  It was noted in the monitor's

9   report that that didn't seem to be done, because it wasn't

10  reported on the logs.  We have addressed this with the warden

11  and assistant warden.  We are putting out another directive

12  and working with our staff on that.  And anytime that any

13  parties on this call want to review those logs, you're more

14  than welcome.

15       THE COURT:  What steps has the sheriff taken in making

16  sure that -- because one of the problems that the monitor has

17  addressed is not necessarily the adoption of policies but the

18  implementation of them, and what happens when people do not

19  comply with the directives coming from the sheriff?  What

20  happens?

21       MS. BARKER:  Your Honor, I'm going to be completely

22  candid with the Court.  We have had an issue in our training

23  department over the last year.  I think that with some of the

24  leadership and with the fact that we were dealing with COVID,

25  we've had a bit of a problem.  Now we have a new training

1    captain, who is very able and qualified for this position, who

2    actually has a lot of detention experience, and, you know,

3    there probably was a problem with just the policies not being

4    really trained on and getting down and trickling down to the

5    supervisors and the detention officers.  That is something

6    that we are working on, and we know and realize that that is

7    an issue.

8           THE COURT:  Okay.

9           MS. BARKER:  And in response to what we are doing about

10   it, we've had numerous terminations where officers, for

11   whatever reason, didn't follow one policy or another.  So when

12   it's being brought to our attention and we know that they have

13   been trained on it, of course they will be terminated.

14          Now, there have been some where it's been brought to

15   our attention and we've acknowledged that, you know what, we

16   can't discipline someone on an issue that they really haven't

17   fully been trained on.  And so we do know that is an ongoing

18   issue and it's something that we are addressing with the new

19   training captain and a new curriculum.

20          THE COURT:  All right.

21          MS. BARKER:  The next issue that applies to the

22   sheriff's office is III.B.1 on pages 11 and 12.  It states,

23   Within three months of the monitor's approval of each policy

24   and procedure, the County shall develop a curriculum.

25          Your Honor, I basically touched on that earlier.

1   Actually, the training captain is in here with us, and he

2   understands exactly what he needs to do.  I've already

3   reviewed a preliminary proposal for the curriculum on each

4   policy, and we are going to have in-service training.  We'll

5   be able to give DOJ and the monitors that curriculum and a

6   proposed calendar in the future, the very near future.

7         The next issue is II.B.2, and it states that within

8   three months of the U.S. and monitor's approval of each policy

9   and procedure -- it basically is the same -- the same issue as

10  the other one in the event -- in the fact that we are

11  developing curriculum and training.

12        THE COURT:  What was the timeline for -- I mean, I

13  guess you're disagreeing with -- you know, you're saying that

14  it's going to be done.  At the time that the monitors prepared

15  the report, it was not done.

16        MS. BARKER:  Right.

17        THE COURT:  And I guess -- so the monitor's report is

18  accurate as of April 2nd, 2021; right?

19        MS. BARKER:  You're correct, Your Honor, and I

20  apologize for any notion otherwise.  It is accurate.  However,

21  we don't feel that it puts in the -- what we are attempting to

22  do.  It basically just says no.  And I understand it's a

23  black-and-white document, but I wanted to update the Court on

24  everything that we are doing to comply with this.  Because

25  honestly, Your Honor, right now we are seeing the light at the

1    end of the tunnel.  People are getting vaccinated.  COVID is

2    down.  And so we are actually just feeling "normal" right now.

3    So now we're able to get back on track and to start

4    implementing this full force where we're not just trying to

5    keep our head above water and figure out what's going on with

6    the pandemic, so -- and that's our honest assessment of this.

7         Let's see.  I would like to address a couple of more.

8    I mean, without -- without belaboring the point, technically

9    the rest of these are correct.  However, I would like to note

10   what we are doing.  And if the Court would like for me to

11   continue to tell -- to update the Court on exactly what we're

12   doing to come into compliance with this, I will definitely do

13   that, but I don't know if the Court has other questions.

14        THE COURT:  No, I don't think that's necessary at the

15   time now.  I'm going to ask the monitor to help me understand

16   this process of you preparing your report.

17        I think -- does the draft go to the parties before you

18   make it final, Ms. Simpson?

19        MS. SIMPSON:  Yes, Your Honor.  I prepared the draft

20   report and provided it to the parties, and I believe the

21   timeframe is 30 days after the site visit, and then the

22   parties have, I believe, ten business days to propose any

23   corrections or provide any updates, and then I incorporate

24   those and create the final.

25        THE COURT:  So any updates and -- any updates that

1 would have corrected anything about the report would be in the

2 final report that comes to me, except for what you might have

3 received since April 2nd, I presume?

4     MS. SIMPSON:  Yes.  If I received updates or

5 corrections prior to April 2nd, they would be in the report.

6     THE COURT:  Okay.  I mean, to the extent any party

7 disagrees about what's in it, then it seems to me that you

8 would have had your chance ten business days before the

9 report -- or at least ten business days after you receive the

10 draft report, and I guess we just try to make a system that is

11 not as fluid, something that puts things in place, so that we

12 all could take advantage and have a good status conference and

13 knowing exactly what has and what has not been done.

14     I guess that leads to the question that I asked DOJ,

15 you know, and I guess I kind of asked the County now and the

16 sheriffs.  I mean, what am I to do?  I have to be more

17 concerned about the people who are pretrial detainees than

18 everybody here that's on this call, because they are under my

19 jurisdiction.

20     MR. GAYLOR:  Your Honor, if I --

21     THE COURT:  They're under my jurisdiction, and I have

22 to be concerned about them.  Because it seems to me that we

23 are forgetting about them.

24     MR. GAYLOR:  Your Honor, may I address that point --

25     THE COURT:  Yes.

1          MR. GAYLOR:  -- from the County's perspective?

2          THE COURT:  Yes.

3          MR. GAYLOR:  Yes.  Okay.  Your Honor, Tony Gaylor here

4     on behalf of the County.

5          First of all, Your Honor, in this particular instance,

6     we're dealing with a little bit of a different timeframe with

7     regard to responses and agreements.  We received Lisa's report

8     not an incredibly long period of time ago, but with regard to

9     that, there may not have been completely adequate time to

10    submit an alternative version of our own report.  But beyond

11    that, there are going to be points in which we just disagree.

12         For example, when statements are made with regard to

13    the inadequacy of programs at Henley-Young, there are going to

14    be things that we -- you know, some things are somewhat

15    subjective.  And to the extent that the representation is made

16    that educational services aren't being offered to youth down

17    there or programs aren't being provided to youth down there,

18    we disagree.  We just disagree with regard to JPS's provision

19    of educational services.  We just disagree.

20         Now, with regard to some of the sentiments that were

21    expressed by Attorney Cheng with regard to the boiler and some

22    of the life safety issues that are existing at the detention

23    center, the sentiment that is being presented to the Court is

24    as if the County is not attempting to (AUDIO GAP) and trying

25    to attempt to address those issues.

1          The boiler, for example, is not even necessary for the

2   use of the cleaning of the utensils.  In terms of utensils,

3   the resident detainees are not using metal objects.  They use

4   plastic objects, and so the boiler isn't used for that.  So

5   the boiler is being taken offline, or has been taken offline

6   and is not necessary for the preparation of the food and those

7   types of things that are needed down there right now or the

8   sanitation of plates and utensils.

9          And so I don't want the impression to be given to the

10  Court that here we have a piece of equipment that's about to

11  explode and kill people down there.  I mean, once it's being

12  brought to the attention that it's not something that's safe

13  to be used, we take it offline, and we're making the attempt

14  to provide a safe environment for the detainees down there.

15         I also need to -- I have to express, Your Honor, that

16  there are times when we are going to come into compliance with

17  regard to maintenance issues and then those issues are going

18  to come into disrepair, because sometimes lights are going to

19  be pulled down or sometimes things are going to be broken.  It

20  doesn't mean that the County did not come into compliance or

21  has not attempted to come into compliance, and when they get

22  into disrepair again, we fix them again.

23         That's why over the last year we've spent $3.4 million

24  trying to address problems that are occurring at the detention

25  facilities.  But if you were to just listen to what's being

1    reported, or at least the sentiment that's being expressed, it

2    would be as if we had done nothing over the last year to

3    address these problems.

4         THE COURT:  Well, is that $3.4 million including the

5    full restructuring and repair of Pod C, for example?  I

6    assume?  I may be wrong.  Are you talking about -- I mean, you

7    know, that's the construction of a whole -- that is a pod that

8    was destroyed nine years ago.  Are we talking about a lot of

9    that $3.4 million going toward fixing Pod C, which just got

10   back fixed after nine years?

11        MR. GAYLOR:  Well, Your Honor, a lot of it is going to

12   be spent on that.  But I also mentioned that over the last two

13   months since the last status conference hearing, we've spent

14   and authorized over $700,000 on Pod B.

15        THE COURT:  I understand authorized.  I understand

16   authorized.  I understand spent.

17        MR. GAYLOR:  Authorized and --

18        THE COURT:  Okay.  Pod B.  You know, but the monitors

19   came forward today and told me about Pod A, back on April 2nd,

20   no lights.

21        MR. GAYLOR:  And the lights are there now, Your Honor.

22   But I remind -- I would like to also remind the Court that the

23   facility was designed in a way that having those cell lights

24   in those cells was a hazard.  And those cell lights were

25   there, but they were destroyed by detainees that are in that

1   facility, Your Honor.  And so if we put them back there,

2   they're going to be -- not only is it putting probably good

3   money after bad, but if we put it there, they'll be torn down

4   again.  And possibly they will pose a life safety issue,

5   because there have been incidents in which people commit

6   suicide and electrocute themselves by messing with those

7   lights that are that accessible to the cells.  That's why,

8   Your Honor, we have undergone a process of trying to design a

9   new facility, so that there won't be instances in which

10  detainees can have that type of access to lights.

11      THE COURT:  But you're talking about designing a new

12  facility.  I don't know how long you're going to be trying to

13  raise money, for one thing, to design a new facility.  I don't

14  know how long it's going to take you to build a new facility.

15  But during that process, Hinds County is not going to stop

16  arresting people and not going to stop indicting people and

17  not going to stop holding people until their trial.  And I

18  guess my concern is that we have to be concerned about how we

19  treat these people during that time between the time they are

20  arrested and the time that they go to trial, because during

21  that time, so long as they don't have bond, they are going to

22  be in the custody of the sheriff's department and in Hinds

23  County.  So -- so I hear you.

24      And if the parties need to put more breathing room into

25  the time that there are these status conferences, if there

1    needs to be more time in between the time that somebody

2    receives a draft report and gets an opportunity to respond, it

3    seems to me that the parties might be able to work that out.

4          But as I see it, when I get the status report, that's

5    what I turn to to get educated on what has happened since the

6    last time we've had a status report.  And this status report

7    reflects, for example, turning to policies and procedures,

8    Attorney Cheng says, Well, Judge, it's not really so important

9    that we draft the number of policies and procedures, but it's

10   all about the implementation of that that we've drafted.

11         But I'm looking at the agreement saying that there are

12   going to be over 90 policies and procedures done at some point

13   in time, and in the last 60 days we've only had six.  So if I

14   take that out and say in the next 60 days, we get six more,

15   and in the next 60 days, we get six more, we're going to be in

16   2024 or 2025 before we even get all the policies in place, and

17   that is totally unacceptable.

18         And if you have a policy that says that you should not

19   use this pepper spray or mace or whatever it is on the inmates

20   as a matter of routine or as a matter of -- only for defensive

21   posture and it's being used regularly as a matter of course

22   and nothing is being done to those -- by supervisors to make

23   sure that employees don't do that, that's just like having a

24   use-of-force policy that says you can't go in there and blow

25   somebody's brains out with a gun -- and I know they don't have

1    guns there.  But you cannot beat them in the head, but

2    somebody goes around beating folks in the head, how am I

3    supposed to react to that if I see a policy that says you

4    should not do it, but then I see an incident report after

5    incident report after incident report showing that it is done

6    and nothing -- nothing is happening?

7           So, you know, I'm at, you know, wits' end; I am.  And

8    that's why I did ask DOJ, Well, what am I supposed to do at

9    this point?

10          MS. BARKER:  Your Honor, may I interject something at

11   this time --

12          THE COURT:  Yes.

13          MS. BARKER:  -- regarding that?  DOJ and the monitors

14   and the County, we spoke about this on the last conference

15   call about breaking it into chunks, and I know Attorney Cheng

16   recently stated that.  I think that that would be the best

17   thing to do in this situation.

18          I remember standing behind Judge Gargiulo on the Coast

19   probably in 2018 saying the same exact thing.  This consent

20   decree is like an octopus, and it has 90-something provisions,

21   and the fact that we're expected to use the little resources

22   that we have to comply with all 97 provisions at the same time

23   is insanity.

24          THE COURT:  But that's what you agreed to.  I mean,

25   that's the thing about it.  That's the beauty of a consent

1   decree, just like any settlement between private parties.

2        MS. BARKER:  Right.

3        THE COURT:  It's a settlement.  If you don't want to

4   agree to it, you don't have to agree to it.  But at that time

5   everybody around the table -- now, you can decide now that

6   maybe we need to unravel the agreement to some point and

7   restructure a different agreement.  You can do that.  But I'm

8   holding you to the agreement that you said -- that you stood

9   up in open court back in 2019 encouraging the judge to accept

10   this good faith agreement from all the parties so that we can

11   move forward.

12        MS. BARKER:  Your Honor, I agree with that, and as far

13   as the stipulated order goes, yes, that is something we

14   have -- the timelines have been not met on that, but we are

15   continuously working on that.  We're not totally ignoring

16   that.  And I think that -- like I said, I'm not going to go

17   back and say it about COVID, but that has affected this.

18        Now, going forward, if we want to try to make a good

19   faith effort to actually attempt to comply with this consent

20   decree, what needs to be done is a logical thing:  The monitor

21   should say, okay, next time I come, I want y'all to focus on

22   these five things.  Let's see some building blocks.  What's

23   the most important thing?  Safety and security?  Facility

24   maintenance?  Let's work on that first, all right?

25        And the Department of Justice and the County had talked

1    about maybe coming up with, like, some stipulations.  Okay.

2    Let's hit these things in the consent decree first, these

3    provisions, and then the monitor can update the Court on that.

4    Once that's done, that's going to give us a firm foundation

5    and a building block to go forward.

6         To try to do this the way that we have been doing it is

7    absolute insanity, and that's why we've been -- all have been

8    feeling like we're just treading water and trying to keep our

9    head above-water, because the demands of this -- and yes, yes,

10   I do agree the parties agreed to it.  But if we want to try to

11   comply with this, we need to have some sort of direction, some

12   sort of foundation, and some sort of building blocks to allow

13   all of this to happen for the sake of our inmates.

14        THE COURT:  Okay.  I think I saw Mr. Cheng's hand a

15   couple of times.  I'll give him an opportunity to respond.

16   And I know it's a Friday evening and it's -- for you people on

17   the East Coast, I know it's way into your weekend, and I'm not

18   going to be here much longer.  I'm thinking about -- I'm

19   hearing what the County and Ms. Barker have said on behalf of

20   the sheriff and -- but I want to hear from the Department of

21   Justice before I think about what I want to do next.

22        Mr. Cheng, you want to say --

23        MS. BARKER:  Your Honor --

24        THE COURT:  Go ahead, Ms. Barker.  You had something

25   else?

1         MS. BARKER:  I'm sorry.  Yeah.  Before the Department

2    of Justice answers your question, would you like to hear from

3    the sheriff?  I know he wants to address the Court real quick.

4         THE COURT:  Okay.  That's fine.

5         MS. BARKER:  Okay.  Thank you.

6         SHERIFF VANCE:  Good afternoon, sir.

7         THE COURT:  Good afternoon, Mr. Vance.

8         SHERIFF VANCE:  It kind of struck me when you mentioned

9    about the safety and your personal responsibility for the

10   people housed at the Raymond Detention Center.  Well, I

11   daresay you and I more than anybody else on this call share

12   that particular sentiment.  I take safety as the number one

13   priority as we deal with this entire situation, and I mean

14   safety of staff and safety of people who work there.

15        My assessment is most of the problems that we have are

16   narrowed down to the amount of staffing and the facility

17   itself, and I believe I heard Mr. Cheng say that hiring is

18   probably the easiest part of it.  Well, I don't know exactly

19   where he gets that from, but I will just say this:

20        During my time in office, we've hired 115 new detention

21   staff.  115.  Out of that 115, we probably still have about 60

22   vacancies, so I would agree that retention is a problem.  We

23   are trying to deal with that problem, but it's not as easy as

24   making one or two decisions.  It has to be made more of an

25   attractive job that people not only would like to get but

1    would like to keep.

2        I would also offer this to Your Honor, that retention

3    is a problem in every law enforcement job in America.  On a

4    yearly basis, we have people coming here from Atlanta; from

5    Dallas; from Houston, Texas, trying to hire police officers.

6    Those type of issues with retention cycle all the way down to

7    somebody that's in a detention capacity.

8        So what I would just offer up is that we are making

9    every effort that we can.  Because retention is important, it

10   also leads to some of these other issues that we're finding

11   ways to deal with through training, because our turnover goes

12   so fast that we don't have a lot of seasoned individuals

13   working on our detention staff.

14       So when certain officers that are brand new or haven't

15   been on the job but six or seven months get put in situations

16   where perhaps they are fearful of their own safety -- and I

17   will grant that training on when to use pepper spray, when not

18   to use pepper spray is something that we need to improve on.

19   But I would offer this to you, Your Honor, because this is the

20   most personal thing I can tell you:  I've been in law

21   enforcement 30-plus years, and as you know, before I became --

22   before I came to this job, I was chief of the Jackson Police

23   Department.

24       Nowhere in my career, especially since I've been in a

25   command position, have I allowed, tolerated, condoned, failed

1  to take action on any officer that abused somebody that was

2  under their authority, whether or not they were an arrestee,

3  whether or not they were a detainee.  I do not tolerate abuse.

4       So when officers are found to be in violation of rules,

5  regulations, policies, and procedures, you can take comfort,

6  sir, in the fact that they will be dealt with.  Now, I may not

7  fire or discipline as many people as the monitors or the

8  Department of Justice think I should, but I would also say

9  this:  We're going to treat people fairly and we're going to

10  hold people accountable.  And we're going to make sure that

11  they do their job properly.

12       Thank you, sir.

13       THE COURT:  Thank you, Mr. Vance.

14       Mr. Cheng, I'll hear you from before I think I'll be

15  ready to wrap up, and I think I got somewhat of a little plan

16  going forward.

17       MR. CHENG:  Your Honor, let me just be clear.  One

18  thing I don't think the defendants seem to recognize is in the

19  end, the monitors are here just to call it the way they see

20  it.  It isn't their job to go into their motivations or try to

21  find all the excuses for not complying with the stipulated

22  order.  There are very clear requirements in the agreement.

23  The monitors report what they found at any given moment in

24  time.

25       Now, what we choose to do with that is a different

1    question, and I think the idea that DOJ is being too harsh or

2    the monitors are being too harsh is a little ironic given how

3    much forbearance we've shown when I think, even by their own

4    admission, they're in violation of many provisions of the

5    stipulated order.

6          If you really break it down even further and go

7    through -- really go through each of the provisions, as you

8    asked the parties to do, that becomes even clearer when you

9    compare the actual deadlines for things that needed to be done

10   and when they often barely complied or in some cases didn't

11   comply at all.

12         And, again, just going back to the stipulated order,

13   just this one illustration, because I realize it's late in the

14   day, the very first item was due on February 16th, 2020:

15   Within 30 days, the County will retain an appropriately

16   credentialed corrections recruitment and retention consultant

17   with input from the monitor.  The monitor at the time of this

18   report said they were in compliance.  But as everyone has sort

19   of mentioned already, that person is already gone, because it

20   turned out the County was not prepared to proceed with this

21   person.

22         So there are multiple provisions in the stipulated

23   order that they then never complied with, and that was -- it's

24   just, like, a perfect illustration of how, no matter what they

25   say in court or what they represent, when you actually get

1    into the details, they are repeatedly in noncompliance.  We

2    end up playing this game of whack-a-mole where the monitor

3    warns them to do something, they might take some steps, and

4    then they fail to follow through.

5          Now, Ms. Barker has indicated perhaps they need more

6    time, or, you know, the Court has suggested we give them more

7    time to respond to these reports or have more time between

8    status conferences.  But as I mentioned during my original

9    remarks, a lot of the remedies they're talking about now are

10   things they literally did right before the status conference.

11   Taking scrutiny away from them is not going to make this move

12   faster.  It will probably slow things down.  Much of the

13   progress that has occurred that they've mention is stuff that

14   literally was adopted within this last couple weeks.

15         Again, going back to the stipulated order and some of

16   the stuff we talked about, the steam system and some of the

17   fire safety systems, they've literally just adopted the

18   remedies.  As Mr. Gaylor himself said, they contracted to do

19   some of these reforms.  They haven't actually implemented

20   them.  Now, that sounds great for the purposes of the status

21   conference, but when you look at the stipulated order and the

22   remedies and the notice that they had about these problems,

23   they've known about these problems since before the last

24   status conference.

25         I noticed that Mr. Farr, for example, is here.  I'm not

1    sure if anyone from Benchmark is here.  Benchmark gave them a

2    punch list of fire safety and life safety issues in November

3    of 2020.  So for our purposes, yes, Your Honor, we need to pay

4    attention to what's going on in that jail and what's happening

5    to the inmates.  We need to worry about the safety of the

6    inmates.

7         We are trying to strike that fine balance between

8    aggressively forcing the jurisdiction to do what it needs to

9    do while at the same time recognizing there are real issues,

10   like COVID, like the difficulties of just developing a master

11   plan.  But, you know, I don't think if we go into denial about

12   what's going on, that's going to help things.  What we need is

13   for the leadership to actually show as much commitment to

14   making strategic plans and reforms that they say they're

15   willing to do in the status conference.  We need to see that

16   when the judge isn't here.

17        THE COURT:  Some judges have done some innovative

18   things with respect to these sort of consent decrees.  When

19   there's been overcrowding, for example, in prisons they've

20   ordered the release of prisoners.  *Brown versus Plata*, I think

21   it is, and some others.

22        I know the County would not want this Court to even

23   consider the idea of saying that people will have to be tried

24   or go to trial within 270 days or be released, because if

25   these conditions persist, I don't know what the Court will be

1   left with.  It's a range of things, I'm sure, before that.

2        But if these conditions persist and they've been -- I

3   go back to this case -- Mr. Cheng, you can tell me.  I don't

4   know.  I wasn't here at the beginning, so I don't know how

5   long DOJ did its investigation prior to filing suit.  I

6   generally know the process and I know generally DOJ weighs in

7   and investigates, investigates, works, works, works.  I have

8   the mental health case, and I know that that's what they did

9   before filing suit.  And everything all collapsed, and then

10  the suit was filed.

11       This suit was filed in 2016.  How long was DOJ on the

12  ground looking at this -- at the facilities prior to that,

13  Mr. Cheng?  Do you know?

14       MR. CHENG:  My memory isn't great on this issue.  I

15  think it's at least two or three years beforehand.

16  Mr. Parrish actually on part of the original investigation

17  team.  I can actually pull it up and probably determine when

18  if you can give me just a minute, Your Honor.

19       MR. PARRISH:  Chris, I did my first investigation and

20  report in 2014, and then I did a supplement in 2015.

21       THE COURT:  Okay.  2014 with the lawsuit being filed in

22  2016, and I know there's been a lot of differences in what the

23  County looks like with respect to members of the Board of

24  Supervisors and even the sheriff's department over the period

25  of the time and other employees who report up and down.

 1    County administrator, county attorneys, I know it all has

 2    changed.

 3          But there's one thing:  Every one of them had an

 4    obligation to make sure that that suit was either defended,

 5    and once it was settled, that the settlement was implemented.

 6          Now, Ms. Barker mentioned the idea I think sort of

 7    taken from a comment Mr. Cheng made -- and I apologize if I

 8    keep saying your name in different ways, Mr. Cheng -- but do

 9    the parties think that this agreement could be carved out in

10    chunks and devote a particular time to a particular chunk?

11    And if so, what chunk is more important than the next chunk?

12          I mean, is that something DOJ could think about with

13    the parties or -- I heard it from Ms. Barker.  I didn't hear

14    from Mr. Gaylor, but I'm asking DOJ first.

15          MR. CHENG:  Your Honor, that is actually one of the

16    things we're taking into serious consideration.  Ms. Barker

17    brought it up.  We are trying to figure out if there ways to

18    do it.  One of the concerns is that the stipulated order was

19    itself in small chunks, and given the difficulties of getting

20    it implemented, is it enough to just do it with a stipulated

21    order again?  But that is actually one of the things we are

22    receptive to and we're thinking about.

23          I should also mention the first findings letter -- I

24    just looked it up -- was actually in 2015.  So the initial

25    investigation when we notified jurisdictions of our initial

1    findings, that would have been in 2015.  So, yes, this matter

2    has been going on for a while.

3         In terms of the idea of prioritizing remedies, one of

4    our concerns is that it really isn't up to the monitors or

5    even DOJ to say here are the five little things you should do

6    this week or next week or next month.  If we do that, we are

7    going to end up micromanaging the facility, and that itself

8    can be problematic.

9         Some of these types of decisions really require the

10   leadership of the jail to decide how they want to get to where

11   they need to go.  We can give them the benchmarks and sort of

12   the big items, but they still need to get into the details

13   themselves and deal with it.

14        So, for example, if we say write up a policy, but we

15   can't get the jail to send anyone to a meeting to talk about

16   policies, we could have a thousand stipulated orders.  It's

17   not going to go anywhere.  And so the only way people are

18   going to take those types of benchmarks seriously is if the

19   leadership of the County and of the sheriff's department

20   really push their people to do what needs to be done.

21        Now, it's possible they're doing it, and we just don't

22   see it.  But oftentimes we don't hear about things until the

23   last second.  So, for example, the board today talked about

24   trying to build the jail in three phases.  Today was literally

25   the first time we heard about it.  We have been asking about

 1    what they're going to do with the master plan and which option

 2    they're going to adopt since the master plan was issued.  We

 3    talked about it at the last status conference.  Presenting it

 4    today is not helpful.  I mean, if this is something that

 5    they're really going to do, it could be a great idea.  It

 6    could be something we could work out.  It's something that

 7    would alleviate any concerns about contempt, but it's

 8    something that needed to be brought with us and brought to the

 9    monitors much earlier on.

10          MR. GAYLOR:  Your Honor, if I may?

11          THE COURT:  Yes, you may, Mr. Gaylor.

12          MR. GAYLOR:  First with regard to the notion that we

13    have been planning a new facility, it has been brought to the

14    monitor's and everyone's attention some time ago when we first

15    got the lease from the Jackson Public School District to be in

16    close conjunction with Henley-Young.  I'm sure that they'll

17    have to recall several conversations we had during monitor's

18    visits, *et cetera,* with regard to that area and the -- and the

19    types of facilities we would build in that area.  We talked

20    about it quite a bit, actually.

21          But nevertheless, that being said, I do agree with the

22    notion that we should be able to split this into several

23    parts, if possible.  And, again, from a maintenance

24    standpoint, your County has devoted a large amount of

25    resources to attempting to make things safe down there, and we

1  will continue to do so as issues come about, because we know

2  that as we do repair things -- I think it has been brought out

3  even today, the repairs that have been made to C-Pod, there

4  are some of those that have come into disrepair again.  And so

5  we'll continue to try and patch this facility as long as we

6  have to.  As long as we've got detainees and residents there,

7  we'll continue to do our part for upkeep on our building.

8          THE COURT:  Okay.  We're about to get this all wrapped

9  up for today's purposes, I think.

10          I'm going to ask the parties to talk to each other

11  about how you might think -- when I say "the parties," this

12  includes the monitors with y'all.  How do you think we might

13  continue to move forward?

14          And we're going to come back on April the 28th --

15  that's a Wednesday -- at 10:00 a.m.  So I imagine there's

16  going to be a lot of talk about everything that's going to be

17  done between now and the 28th.

18          I'm not suggesting that I'm messing with the stipulated

19  order at all, and we may continue to do what we're doing.  But

20  I'm getting the impression that DOJ is -- and this is no

21  criticism of DOJ and the monitors or anybody, that you're

22  basically on the treadmill.  We're not getting where we need

23  to -- we're not getting to the point where we need to be.

24          If I were to set a -- the next status conference

25  60 days from now, I get the sense that we will feel like we

1   have simply treaded water for the next 60 days, and right up
2   to the point maybe there were some more things that was done.
3   Maybe we'll get more policies and procedures in place.
4        But I want to meet back with the parties on the 28th to
5   find out what you-all have talked about as far as how we're
6   going to make this thing work.  There would -- obviously by
7   that time, I assume the application process for the treatment
8   facility person or whatever these job vacancies announcements
9   will have -- I don't know if it will have concluded, but I
10  will be able to get some affirmation that it's been done.
11  I'll know how many more inmates -- not inmates.  Excuse me.  I
12  will know how many more COs have been hired, how many have
13  been fired, how many of them have quit.
14       I understand, Mr. Vance, it's tough to keep people here
15  at 8, 10, 12, 14, I don't know, dollars an hour or whatever
16  you might be paying when the next person over might be paying
17  more than that.  And I don't think it's 12 or $14 an hour.  I
18  don't know what you're paying.
19       But I will say this:  I have gone into public places
20  and I have seen the vacancy announcements or the job
21  announcements, I think, that you've authorized to be posted in
22  places saying -- and I've heard the radio announcements on the
23  radio, we're hiring correctional officers.  But I'm going to
24  put a pin in it for right now for us to come back on
25  April 28th at 10:00 a.m.  Oh, I'm sorry.  I'm sorry.  We

1   have -- COVID interferes with my ability to set things on my

2   own.

3          So it will have to be the afternoon, you say,

4   Ms. Summers?

5          MS. SUMMERS:  Yes, sir.

6          THE COURT:  Okay.  Thank you.  We'll do it at 1:30 on

7   the 28th.  I want to do it before the end of the month, and I

8   just want to hear what y'all say, how we chart a path forward,

9   because the path that we're on is not the -- may not be the

10  right one.  It may be, but it may not be the right one.  If

11  it's not the right one, we need to figure out how do we get a

12  path that's appropriate for everybody.

13         Hopefully by then the Department of Justice --

14  hopefully by then there will be some -- there will have been

15  some communication from DOJ -- I understand we can't make the

16  State of Mississippi come in because they're not a party, but

17  I think we can request information from them with respect to

18  this suit and ask them to give us information that they would

19  have some control over.

20         They know, for example, whether or not they've

21  inspected the facility, and there are probably reports out

22  there that are public of particular inspections of public

23  bodies.  In fact, one public thing that is used quite often --

24  I don't even know if there's a grand jury report, for example,

25  of Hinds County.  Part of what a grand jury does is

 1   investigate public facilities, and I don't know if the grand

 2   jury has ever been taken into the jail to sort of make any

 3   particular findings.  That is something that can be done.

 4          So I'm just going to leave you with the hope that you

 5   could figure out a path forward for us all.  I realize it's

 6   late on this evening.  We've gone far longer than what we

 7   intended, I would imagine, but I thank you for your patience.

 8   I understand you have heard my concerns, and I'm going to

 9   continue to be concerned so long as those pretrial

10   detainees -- and I cannot overemphasize that point.

11          MR. GAYLOR:  Your Honor?

12          THE COURT:  You know, the public understands -- sees

13   these people as inmates.  These people are detainees, and they

14   have the presumption of innocence, and some of them don't even

15   belong there because they are the misidentified person, the

16   totally innocent persons, and some of them just don't even

17   deserve to be in there.  But to the effect that they are

18   there, we need to make sure that they're protected.

19          Mr. Gaylor, did you have something?

20          MR. GAYLOR:  Yes, Your Honor.  Just for clarification,

21   are there any particular areas of the stipulated order you

22   want us to address prior to the 28th?

23          THE COURT:  Not really.  Not really.  I want the

24   parties to talk.  That's what I want to do.  Because the

25   parties disagree in what the monitor has filed on the docket.

1    I mean, you know there's disagreement with respect to even

2    that.  But I want the parties to talk, and we're going to come

3    back together and we're going to see if -- and I'm not

4    suggesting that there ought to be -- if the path forward can

5    be refined in some way.  I'm not suggesting there ought to be.

6          But I just want to stop where we are today, so that

7    you-all can go home for your weekend and have a great weekend

8    and all of that.  And start thinking about how to get things

9    better down there, because things are not where they ought to

10   be; that's for sure.

11         With that said, I have nothing further.

12         Does either party or monitors have anything else?

13         Okay.  Thank you.  I really appreciate your time and

14   your attention today.  Court is adjourned.

15   ****************************************************************

1    **COURT REPORTER'S CERTIFICATE**

2

3         I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded by

9    me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13        THIS the 23rd day of April, 2021.

14

15                    */s/ Candice S. Crane, RPR  CCR*

16                    Candice S. Crane, RPR, CCR #1781
                      Official Court Reporter
17                    United States District Court
                      Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25