IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                                    PLAINTIFF


VERSUS                    CIVIL ACTION NO. 3:16-cv-00489-CWR-JCG


THE HINDS COUNTY BOARD OF SUPERVISORS,
HINDS COUNTY SHERIFF, ET AL.                              DEFENDANTS



VIDEOCONFERENCE PROCEEDINGS
BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT COURT JUDGE
APRIL 27, 2021
JACKSON, MISSISSIPPI



(Appearances noted herein.)







REPORTED BY:

    TAMIKA T. BARTEE, BCR, RPR, CCR #1782
    OFFICIAL COURT REPORTER
    501 E. Court Street, Suite 2.500
    Jackson, Mississippi  39201
    Telephone:  (601)608-4188
    E-mail:  Tamika_Bartee@mssd.uscourts.gov

**APPEARANCES VIA VIDEOCONFERENCE:**

    FOR THE PLAINTIFF:

        CHRISTOPHER N. CHENG, ESQ.
        SARAH STEEGE, ESQ.
        LAURA COWALL, ESQ.
        HELEN VERA, ESQ.
        MITZI DEASE PAIGE, ESQ.

     FOR THE DEFENDANTS:

        CLAIRE BARKER, ESQ.
        TONY GAYLOR, ESQ.
        RAYFORD G. CHAMBERS, ESQ.
        GAIL LOWERY, ESQ.
        ALICE STAMPS, ESQ.
        JODY OWENS, ESQ.
        JAMIE McBRIDE, ESQ.

    ALSO PRESENT:

        LISA SIMPSON
        DAVID PARRISH
        JIM MOESER
        RICHARD DUDLEY
        SHERIFF LEE VANCE
        UNDERSHERIFF ALAN WHITE
        CHIEF DEPUTY ERIC WALL
        WARDEN RICK FIELDER
        LESLIE FAITH JONES
        CREDELL M. CALHOUN
        FERNANDEZ FRAZIER
        ASSISTANT WARDEN CRANE
        CAPTAIN JEFF BURNLEY
        RAY CHAMBERS
        KENNY WAYNE JONES
        ROBERT FARR
        DAVID MARSH
        GARY CHAMBLEE
        KEISHA STOKES-HOUGH
        ANNE NELSON

### TABLE OF CONTENTS

Style and appearances...................................1-2

    By Ms. Vera...........................................9

    By Mr. Parrish.......................................11

    By Mr. Gaylor........................................15

    By Mr. Marsh.........................................17

    By Mr. Chamblee......................................20

    By Mr. Frazier.......................................28

    By Mr. Lowery........................................35

    By Ms. Nelson........................................38

    By Mr. Frazier.......................................48

    By Mr. Moeser........................................55

    By Ms. Simpson.......................................61

    By Ms. Paige.........................................68

    By Ms. Simpson.......................................75

    By Ms. Barker........................................82

    By Mr. Parrish.......................................91

    By Mr. Owens.........................................93

    By Dr. Dudley........................................95

    By Mr. Gaylor.......................................102

Court Reporter's Certificate............................112

1            **PROCEEDINGS VIA VIDEOCONFERENCE, APRIL 27, 2021**

2

3            THE COURT:  You may be seated.

4            Good afternoon.  This is the matter of *United States v.*

5    *Hinds County*.  No. 3:16-cv-489-CWR-JCG.  Who do I have on for the

6    United States?

7            MS. VERA:  Good afternoon, Your Honor.  This is Helen Vera

8    for the United States.  We also have Laura Cowall, Christopher

9    Cheng, Sarah Steege; and from the U.S. Attorney's Office, Mitzi

10   Dease Paige.

11           THE COURT:  Okay.  Thank you, Ms. Vera.

12           Who do I have on for Hinds County?

13           MR. GAYLOR:  For the County, Your Honor, you have Tony

14   Gaylor, Ray Chambers.  You also have supervisor board president,

15   Credell Calhoun; as well as county administrator, Kenny Wayne

16   Jones; several of our experts -- I believe the sheriff's office is

17   on as well.  And Fernandez Frazier as well, Your Honor, the

18   administrator.

19           THE COURT:  Okay.  And who is on for the sheriff?

20           MS. BARKER:  Good afternoon, Your Honor.  Claire Barker on

21   behalf of the Hinds County Sheriff's Office.  I have with me,

22   Sheriff Vance, Undersheriff White, Chief Deputy Wall, Warden

23   Administrator Fielder, Assistant Warden Crane, and Captain Jeff

24   Burnley.

25           THE COURT:  Okay.  And I am going to ask all parties,

1  unless you're speaking to put your microphones on mute so that we

2  can reduce any feedback that we have.

3          Is anyone on from the District Attorney's Office?  Okay.

4  Is anyone on -- I see Ms. Gail Lowery here.  Ms. Lowery, are you

5  attending in your capacity as the public -- Hinds County public

6  defender, or you can be attending as a member of the public, I

7  don't know.

8          MS. LOWERY:  Yes, sir.  Thank you, Your Honor.  I am

9  attending as the Hinds County public defender.

10          THE COURT:  Okay.  Thank you, Ms. Lowery.

11          MR. OWENS:  Your Honor, apologies.  This is Jody Owens

12  from the district attorney's office, as well as Chief Assistant

13  District Attorney Jamie McBride.

14          THE COURT:  Okay.  Thank you.  Have I overlooked anyone?

15  I am going to turn to the monitors in a second.

16          MR. FARR:  Good afternoon, Judge.  This is Robert Farr.  I

17  am acting as the detention architectural consultant for Hinds

18  County.

19          THE COURT:  Robert Farr as the what consultant?

20          MR. FARR:  The detention architectural consultant for

21  Hinds County.

22          THE COURT:  Detention architectural consultant for Hinds

23  County.  Is that what you said?  Is that correct?

24          MR. FARR:  Yes, sir.

25          THE COURT:  Okay.  You're with Benchmark Construction

```
 1   or --
 2         MR. FARR:  We are separate from Benchmark, but we are
 3   working in collaboration.
 4         THE COURT:  Okay.
 5         MR. GAYLOR:  And, Your Honor, we also have David Marsh and
 6   Gary Chamblee with Benchmark Construction on the line as well.
 7         THE COURT:  David -- could you spell his last name?
 8         MR. GAYLOR:  M-a-r-s-h.
 9         THE COURT:  M-a-r-s-t?
10         COURT DEPUTY:  Marsh.
11         THE COURT:  Okay.  All right.  Thank you.  I am sorry.
12   And who is the second person, Mr. Gaylor?
13         MR. GAYLOR:  Gary, G-a-r-y; Chamblee, C-h-a-m-b-l-e-e.
14         THE COURT:  Okay.  And who is on for the monitors?
15         MS. SIMPSON:  Lisa Simpson for the monitors; and with me
16   is Dave Parrish, Jim Moeser and Dr. Richard Dudley.
17         And, Your Honor, if I might, we're getting quite an echo
18   the way we did the last time, and I think the last time something
19   was done on your end that fixed that, although I don't know what
20   it was.
21         THE COURT:  Hold on.  Let me put myself on mute where I
22   can't -- well, let me see.  If someone would start talking.  Let
23   me put my microphone on mute after you start -- Ms. Simpson -- or
24   Mr. Parrish, could you start talking?  You are on mute.
25         MS. SIMPSON:  Your Honor, I can start talking.  Good
```

1  afternoon.  It is good to see everyone again.

2      THE COURT:  Did anyone hear that excessive feedback when

3  she spoke that time?  Okay.  It is good?  I see people nodding

4  their heads so -- okay.

5      MR. GAYLOR:  It is fine, Your Honor.  I believe it is

6  fine, Your Honor.

7      MS. JONES:  Good afternoon, Judge Reeves.  I just wanted

8  to also say -- Leslie Faith Jones and Keisha Stokes for the

9  Southern Poverty Law Center.

10      THE COURT:  Yeah, I was going to ask.  Hold on.  Let me

11  get the monitors, though, first.

12      MS. SIMPSON:  That is all of us:  Lisa Simpson, Dave

13  Parrish, Jim Moeser and Dr. Richard Dudley.

14      THE COURT:  Okay.  Now, the interested parties are here as

15  well.  Ms. Jones, I believe you were identifying yourself and

16  Ms. Stokes.  Could you announce for the record again?

17      MS. JONES:  Yes, sir.  Leslie Faith Jones and Keisha

18  Stokes-Hough for the Southern Poverty Law Center.

19      THE COURT:  Okay.  Now, thank you all for making

20  yourselves available.  I know when we were last here I initially

21  set this call for April 28th, and within 24 hours I changed it to

22  today's date, and appreciate your accommodating me on that.

23      So since we were last here, I -- my chambers sent out to

24  the parties a list of questions and areas that the Court thought

25  the parties ought to be prepared to discuss during this status

1    conference.  I think I made clear that we may discuss many other

2    things, but I also wanted you to be prepared to discuss some

3    specific things.  I believe I sent out an e-mail to the parties on

4    April 27th, and I also sent out an e-mail yesterday that all the

5    parties should have received with respect to some additional

6    questions.  Yesterday the questions were focused on a review of a

7    report that the Court had obtained, or that Ms. Simpson had

8    provided to the Court, the list of the indicted and non-indicted

9    inmates who, at the running of the report, these inmates were

10   currently being held at the detention center.  The Court took a

11   review of that list and focused on those, according to the report

12   who have been in the -- who had been detained for more than a

13   thousand days.  Obviously, it was a few of them that the Court did

14   not inquire about that were 900-and-some-odd days.  And at the

15   time of this report to today's date, it actually would have been

16   probably a thousand, but I only looked at those on the report who

17   had been incarcerated for a thousand days and submitted questions

18   with respect to those.

19        I did receive, this morning, I think it was, a response to

20   each of the inmates for whom I raise those questions from the

21   district attorney's office, and we may get to that -- those

22   responses and other things as we go through the other questions

23   and things that the Court put in its e-mail earlier.  I don't know

24   where to begin because I literally don't know where we ended the

25   other evening.  I just know that I ended in a bit -- a little

1    frustrated, I think, but I guess -- I guess I'll start with one of

2    the issues that came up in the last call was this nagging issue of

3    these -- whether the facilities are adequately equipped with fire

4    safety measures.  And I think I -- I asked the government at the

5    time -- well, I guess in my questions the other -- in my e-mail,

6    and as a follow-up to what we were talking about the other week,

7    it is my belief that we need to figure out what is the status, or

8    what reports exists that the state of Mississippi has actually

9    inspected the facility, and where are those documents in the

10   state's possession that shows that the facility has passed

11   inspection or has been inspected at all.  And I think I made that

12   inquiry to the United States, and I'll follow up now.

13         Has the United States submitted any sort of request to the

14   state of Mississippi about that particular information?

15         MS. VERA:  Yes, Your Honor.  The United States did follow

16   up on that request.  Mr. Parrish had made a request, I believe, in

17   March and the monitoring team may want to follow up with more

18   information because I know they've reviewed these documents in

19   detail.  But we have now via the monitoring team, received those

20   reports.  Based on our review and our assessment of them at this

21   point, we do have concerns about fire safety and with the system

22   of inspection in general.  The reports list violations, but

23   sometimes it is hard to tell exactly what the violation is.  For

24   instance, my understanding is that in some cases the report may

25   list a violation without specifying the location of the violation.

1   The format used to be different and it was a little bit easier to

2   follow the status of certain violations and fixes, but our other

3   concern is that the state fire marshal apparently doesn't have

4   enforcement compliance authority, so it's our understanding that

5   while they might identify violations, they -- they don't

6   necessarily follow up on whether those violations have been

7   addressed.

8         So -- that's sort of where that stands.  We did receive

9   the reports, and we do have ongoing concerns about the fire safety

10  issues.  And I know that the monitoring team may have additional

11  information about that.

12        THE COURT:  Are you saying, Ms. Vera, that there have been

13  communications since -- communications with the state fire marshal

14  since our last status conference?

15        MS. VERA:  Yes.  We received the reports between the last

16  status conference and now.  I don't remember the exact date, Your

17  Honor.

18        THE COURT:  Okay.  Mr. Parrish, I know that has been up

19  under your bailiwick, with respect to the monitoring service, but

20  I'll turn to Ms. Simpson and she can instruct us on how to proceed

21  with respect to this issue of these fire inspection reports.

22        Ms. Simpson, if you want to speak that's fine; if you want

23  Mr. Parrish to speak, that's also fine.

24        MS. SIMPSON:  Thank you, Your Honor.  You're correct.

25  This has been in Mr. Parrish's wheelhouse, so I will turn it

1   directly over to him to respond.

2          THE COURT:  Thank you.

3          Mr. Parrish, make sure your microphone is on.  I know

4   you're following instructions real well since -- we're not talking

5   earlier.

6          MR. PARRISH:  I am sorry, Your Honor.  I've got two

7   places.  One up above it shows one way, and down below it shows a

8   different way and I was looking at the wrong place.

9          THE COURT:  Okay.  We can hear you now.

10         MR. PARRISH:  Very good.  I started dealing with Deputy

11  Chief Fire Marshal Malley -- back on March 27th I sent him an

12  extensive request for information.  I had a long conversation with

13  him first.  He never responded.  I followed up before after our

14  last status hearing, and he finally responded again and provided

15  me with the --

16         MS. BARKER:  I'm sorry.  Mr. Parrish, I hate to interrupt

17  the Court, but I am hearing a really bad feedback right now and I

18  can't -- we can't understand anything.  I don't know if anybody

19  else does.

20         MS. VERA:  Yes, it's an issue.

21         MS. BARKER:  I'm sorry; I apologize.

22         THE COURT:  Hold on for a second.

23         Mr. Parrish, see if you can talk without generating

24  feedback now.

25         MR. PARRISH:  Okay.  Is it better?  I hear you fine, Your

1    Honor.  I don't hear any feedback when you speak.

2         THE COURT:  I see others nodding their heads saying that

3    that's better.

4         MR. PARRISH:  I'll start again, then.  The -- I started

5    dealing with Deputy Chief Fire Marshal Malley back in March, and I

6    submitted a lengthy request to him after having a long

7    conversation; he never respond.  I followed up with another

8    request; he finally did respond.  And he provided me with copies

9    of all the inspection reports for the Raymond Detention Center

10   from 2012 up until the present, 2020.  That was the last

11   inspection that was done.  They have not done inspection of any

12   facility since the beginning of 2020 because of pandemic.

13        They provided two inspection reports for the Jackson

14   Detention Center back in 2012 to '14, and they provided no

15   inspection reports for the work center.  I know that's not correct

16   what they sent to me because from the sheriff's office, I have

17   previously obtained inspection reports for all three facilities

18   for 2017 and '18, and one into 2019, which I had explained to

19   Mr. Malley before he sent me incomplete information.

20        Another thing was that he did not answer my very specific

21   question about what their enforcement authority was, except to say

22   that they send notice to the sheriff, to the board of supervisors,

23   and to the county board attorney.  And then, it is up to them to

24   take care of things.  That's basically the way he responded to me.

25   I can tell you that in all the years that I've been doing this,

1    I've never seen anything coming back from the sheriff's office,

2    the board, or the county attorney indicating what's being done to

3    correct problems, and certainly nothing has been done, except in

4    2018 when DOJ submitted notice to the sheriff and the county

5    saying, "We've got real fire safety issues, you need to follow up

6    on this."  And they put together something which was much like the

7    stipulated order with a list of things that had to be done by

8    certain dates.

9         I've got a document that was on sheriff's office

10   stationary, the best that I can -- because it's not dated.  The

11   best I can get was February/March of 2018.  And it says that there

12   was a meeting with all these people in which they addressed issues

13   and this was dealing with the previous -- the original county

14   administrator that we dealt with, not the most recent one.  And

15   then it had a listing of things that were to be corrected or were

16   corrected for February and for March.  I'm sorry, but that

17   document has no validity because today, most of those -- most of

18   those issues are still uncorrected, regardless of what this

19   schedule says.

20        But that's the only thing that I've been able to locate in

21   all of this time with regard to that.  So apparently, the -- the

22   state fire marshal has no authority to enforce anything.  They

23   point things out.  As the Department of Justice just noted, their

24   original reports in 2012 to 2014 were fairly clear.  They

25   identified the facility that was inspected.  They said, "These are

1    the items that have not been corrected since we were last here,

2    and these are the items that we find that are wrong now."  Then

3    around 2015, they changed their whole format and made it

4    completely unintelligible.  You can't tell which facility is being

5    inspected unless you search through and find, "Oh, they're talking

6    about Charlie Pod, so that's got to be the Raymond Detention

7    Center."  It never identifies the facility.

8           And then, worst than that, all they do is make a listing

9    of codes that are listed in the state fire marshal's code, but it

10   doesn't explain anything; you can't decipher what they're saying.

11   Bottom line is, the inspection reports don't do a hell of a lot of

12   good -- excuse me.  They don't do a heck of a lot of good.

13          I've got to go back to one thing that did jump out at me.

14   When I looked at the report from 2012, which I'd never seen

15   before, it noted that the sprinkler system in Charlie Pod at the

16   Raymond Detention Center needed to be inspected.  Now, that's the

17   first time that we've ever seen that there actually was a

18   sprinkler system in the Raymond Detention Center in the housing

19   areas.  That was January of 2012.  The riots took place in July of

20   2012, that's when everything was destroyed and the sprinkler

21   system was removed.  There's been all kinds of things that have

22   been said since then about, 'there never was a sprinkler system,

23   or it's not necessary or what have you.'  All I can tell you was

24   from the state fire marshal's report back then, ten years ago,

25   there was a sprinkler system in the housing area at Raymond and it

1    was -- it doesn't -- it's not there now and it doesn't work now.

2         The other thing that comes up is that there's -- the

3    sprinkler system at the work center has been out of service for

4    the past year, and that just hasn't been corrected time after

5    time.  In September of 2020, the board of supervisors approved

6    $10,000 to repair the pump that's malfunctioned over there.  Now

7    that's six months after the problem arose, and as of today, we

8    don't have a functioning system.  Things just aren't happening.

9         So the state fire marshal has not pointed things out

10   properly.  It doesn't have any authority to fix things or to

11   enforce things, and the county, the sheriff, having come back with

12   a definitive plan or documentation which reflects how things are

13   going to be corrected, except when it's forced by DOJ in looking

14   at things, whether it be a specific letter or our inspection, or

15   the master plan.  I think I've said enough, sir.

16        THE COURT:  Okay.  I guess this question will be directed

17   to the county.  Does the county have in their records the copies

18   of what was obtained from the state?

19        MR. GAYLOR:  Your Honor, we do have those records, but

20   we'd certainly like for our construction specialist to address the

21   matters that Mr. Parrish just spoke about.

22        THE COURT:  I'll give him an opportunity in a second.

23   Does the county records -- this report from 2012 that Mr. Parrish

24   noted, does the county records reflect that an inspection was done

25   in or around January of 2012 which noted that the sprinkler system

1  was -- that a sprinkler system existed in Pod C?

2       MR. GAYLOR:  I am hearing that, Your Honor, but there is

3  some discrepancy with regard to whether or not that existed, which

4  is why I would like for our construction people to speak to that

5  if they could.

6       THE COURT:  Okay.  Again, I'll let the construction people

7  speak in a second.  One of the other questions that's related to

8  the sprinkler system or lack thereof, or whatever since the state

9  fire marshal says that it has no enforcement authority under the

10  county's -- presumedly the county has -- and I could be wrong, but

11  I assume the county has insurance on the facilities with respect

12  to the insurance and the underwriting.  Does the underwriting or

13  does the insurance require the county to have some sort of fire

14  mechanism, or does the insurance company ever have a reason to or

15  whatever to come out and inspect or observe or do whatever with

16  respect to underwriting or anything else?  Or does the -- or is

17  the county self-insured?

18       MR. GAYLOR:  Your Honor, we have insurance on our

19  buildings and vehicles through insurance companies, and I would

20  certainly imagine that inspections are done periodically with

21  regard to the underwriting process.  However, there's still some

22  discrepancy as to whether or not the language "fire suppression

23  system" versus "sprinkler system" is being used.

24       THE COURT:  Okay.  Now, I'll allow -- now I can hear from

25  your construction people or persons who want to speak to this

1    narrow issue with respect to the sprinkler system, and I'll follow

2    up from there.

3          MR. GAYLOR:  Yes.  Your Honor, I'll introduce Mr. David

4    Marsh and Mr. Gary Chamblee to the Court.

5          THE COURT:  Okay.

6          MR. MARSH:  Your Honor, there have been some repairs made

7    -- I am sorry.  My name is David Marsh, and I am with Benchmark.

8    We do the detention contractor's work for Hinds County.  There

9    have been some repairs made.  The firehoses that were installed

10   originally, that were taken out by, obviously, the inmates, they

11   have been put back in place.  There's been repair work done to the

12   fire pump; that work has been completed.  And let me clarify

13   something:  There has never been a fire sprinkler system in the

14   detention area.  I think they are confusing that with an alarm

15   system, and at one time there was an alarm system; that was

16   destroyed, but there's never been a sprinkler system.  The only

17   thing that has been there is the fire hose cabinet with the fire

18   hose.

19         And let's see.  Last week, I spoke at length with Mike

20   Chaney.  Mike Chaney is the state fire marshal.  He referred us to

21   Mr. Malley, and we had a long conversation with him today --

22   Benchmark did, and I am going to read from the recap of that

23   meeting and conversation.

24         THE COURT:  Mr. Marsh, this meeting is with who,

25   Mr. Malley?

1      MR. MARSH:  Yes, sir.  The same one that Mr. Parrish

2  mentioned.

3      THE COURT:  Okay.  That you.

4      MR. MARSH:  This is from Benchmark to Mr. Malley after our

5  conversation.

6      "I would like for you to confirm per our conversation that

7  once all the fire system riser parts and pieces are repaired, per

8  the inspection report attached, and are working properly at the

9  Raymond Detention Facility, that the fire suppression system that

10  is in place is acceptable per state of Mississippi fire code

11  requirements.  Those repairs to which he's referring are in

12  process now.  We've given the prices to the county, we are waiting

13  for approval, and those should be done just as fast as we can.

14  And again, I am repeating myself, once that has been done, it will

15  be acceptable per state of Mississippi fire code requirements."

16      THE COURT:  And what's your timeline, Mr. Marsh, for

17  making sure it gets done?

18      MR. MARSH:  Within 30 days.

19      THE COURT:  Thirty days from today or 30 days from

20  whenever you and Mr. Malley had that conversation?

21      MR. MARSH:  We had the conversation today, so I guess --

22  we can go as fast as we can, but, yes, sir.  Thirty days from

23  today, that's our anticipated completion time.  And again, we have

24  done work, and we have done investigative work to find out what

25  the problems were, so that we could repair them properly.  So this

1  has always been a high priority for us, as well as it was

2  challenging sometimes to find out exactly what the issues were.

3  But we do have those enumerated now and we've got the price of the

4  work, and we've got the subcontractors lined up to do it.

5       THE COURT:  And tell me again exactly what that work is

6  going to require.

7       MR. CHAMBLEE:  Gary Chamblee with Benchmark Construction.

8  There are several components that are malfunctioning, but we do

9  have a fire protection system.  The riser itself that's located in

10  the pods -- there are numerous things and it is listed in that

11  inspection report, plus other items that was in the reports that

12  were wrong.  Again, we checked all the available components, they

13  are readily available, and we hope to have that completed within

14  30 days.  And we will do it -- we will have a licensed fire

15  sprinkler inspector from the state of Mississippi inspecting that

16  system.

17       THE COURT:  You said you would have a licensed sprinkler

18  inspector to come review -- are you -- let me -- so will

19  sprinklers be -- what will they be coming to review?  The hoses or

20  will there be sprinklers added to the pods?

21       MR. CHAMBLEE:  No, sir, there would not be any sprinklers

22  in the pods.  He will be inspecting the fire hazard, which, it, in

23  the pump controls the sprinkler heads in the kitchen, the laundry

24  room, mechanical rooms, and the office area.  The pods have

25  firehose cabinets and we will verify the proper pressure on all

1  those cabinets for the fire hoses.  According to Mr. Malley (AUDIO

2  DROP) he is acceptable with that.

3          And I would like to address the work center if it is

4  possible, Your Honor.

5          THE COURT:  It is possible.  Go ahead.

6          MR. CHAMBLEE:  The work center -- the fire pump was

7  repaired, but when we had the deep freeze -- actually, it was

8  $22,000 spent on the fire sprinkler system at the work center, but

9  when we had that freeze back in March, it was -- it damaged that

10  fire pump again and it also damaged the fire tower that holds the

11  water.  We had prices, we have components to fix that, and that is

12  something else that we believe can be repaired within 30 days.

13          THE COURT:  You said that is something else you believe

14  that can be repaired -- what's the target repair date for that?

15          MR. CHAMBLEE:  It was put in -- it was put in place, I

16  believe, Thursday of last week and we -- like I said, 30 days from

17  Thursday, which was the 23rd. When we had that deep freeze, it

18  destroyed -- busted a valve in the Raymond.

19          THE COURT:  Could you say that again for me, please?

20          MR. CHAMBLEE:  When we had that real bad hard freeze, I

21  believe, it was back in March, it destroyed the valve in the fire

22  tower and the fire tower drained water, which is the reason it has

23  no water pressure to operate the fire sprinkler, plus the

24  fire pump busted also -- but we have already received the go-ahead

25  from the county to repair that.  I feel confident that by May 23rd

1    that we'll have that repaired.

2          THE COURT:  Okay.  Thank you, Mr. Chamblee.

3          All right.  To the monitors or anyone else, I am about to

4    shift to a different area.  Is there a question out there that

5    needs to be raised with respect to the fire suppression, or the

6    sprinkler system, or anything in that regard?

7          MR. PARRISH:  Your Honor, this is David Parrish again.  I

8    have a quick question for Mr. Chamblee and Mr. Marsh, if I may.

9          THE COURT:  You may.

10         MR. PARRISH:  The state fire marshal inspector who did the

11   2012 inspections of the facilities, his signature is Mr. Malley.

12   So it would be good to hear from him about the comments about the

13   sprinkler system in Charlie Pod at the Raymond Detention Center,

14   whether that was a misstatement.  The actual inspection report for

15   that facility is not signed by anybody, but there is a name that's

16   different down below.  But Mr. Malley did the other two

17   inspections within five days.  So he was contemporaneous and it

18   would be good to hear from him.  Everybody that I have talked to

19   since I started the monitoring process in the jail system has told

20   me that there used to be a sprinkler system in the housing areas.

21   Now, I wasn't there then.  When I went back and looked at this

22   inspection report, that kind of confirmed for me that there

23   actually was.  Now you're telling me something different now.  I

24   would like you to go back and confirm that with Mr. Malley and get

25   it straight.  Make him put it in writing because he's not good at

1    doing anything except verbally.

2         And then, with regard to fire suppression versus sprinkler

3    systems, one of the things that is required is to have fire hoses

4    in the housing units.  I don't believe that you're actually

5    putting them in to Alpha Pod at this point, because there are no

6    officers in those housing units, and the inmates would rip them up

7    as fast as you put them in. So please clarify that for us.  I know

8    that they have been put into Charlie Pod.  I know that they will

9    be put into Bravo Pod, which is vacant at the time.  When it

10   reopens, it is supposed to be direct supervision, and so you can

11   afford to put them back in there.  But Alpha Pod, I don't -- I am

12   not there.  We haven't been there for a year, but I can't believe

13   that you're actually installing fire hoses inside the housing

14   units in Alpha, because if you do, they're going to be torn up as

15   fast as you put them in, and I'd just like clarification on that.

16        MR. CHAMBLEE:  Sir, I am not familiar with 2012, but I

17   will tell you, since 2012, they have gone in and put some type of

18   security in Alpha, Bravo and Charlie Pods.  And in the process of

19   doing that, they may have -- I don't see any -- any sprinkler

20   hoses up in the attic or anything like that.  I don't know if they

21   were removed or -- and I am not sure when the ceiling was put in.

22   But anyway, I do know, and we're working on it right now is, when

23   they put that ceiling in -- stuff like strong smoke detectors and

24   everything got caught above the ceiling, so we dropped them all

25   down.  And as to whether there used to be a sprinkler system in

1  Charlie Pod, I couldn't honestly say so.  I do know that there is

2  a ceiling that's been installed in there.  There could have been a

3  sprinkler system there at one time, I have no idea. (AUDIO GAP).

4       MR. PARRISH:  What about the fire protection in A Pod?

5       MR. CHAMBLEE:  In A Pod, our goal is to go on and secure

6  those fire hose cabinets in A Pod and get fire hoses back in

7  there.  From what Mr. Malley told me this morning, the fire hoses

8  don't actually have to be in the inmate area, that they could be

9  in an adjacent room to be used in the time of emergency.  I'd

10  rather see them secured inside the inmate housing myself.  That's

11  what we ask -- that the fire hose cabinets -- (AUDIO DROP)

12       THE COURT:  Mr. Chamblee, can you repeat that?

13       MR. CHAMBLEE:  In A Pod, we are working with a fire

14  protection company, putting secure cabinets throughout the A, B,

15  and -- C already has them.  We're going to be doing it in B Pod,

16  and we're going to be doing it in A Pod.  Like I said, Mr. Malley

17  said, we don't have to keep the hoses in the inmate housing, we

18  could put them in an adjacent room and connect them in a time of

19  emergency.  I would prefer to have them in a secure cabinet in the

20  inmate housing so they are readily available to the guards if they

21  shall be needed.  And that's what our claim is, to secure them in

22  the inmate housing.

23       THE COURT:  Mr. Chamblee, after you've done the work that

24  you expect to do on the fire protection -- fire

25  suppression issues -- will the state fire marshal come back out to

1  inspect to see if it's where it needs to be?  Is that part of the

2  conversation that you and Mr. Malley had, or is that your

3  understanding, or is it your understanding that the -- you know,

4  that the State may not come back out?

5       MR. CHAMBLEE:  When I was talking to him this morning, he

6  said the hospitals, detention facilities, and I think the other

7  one was schools.  I believe there was some facilities they were

8  not inspecting at this time due to Covid.  But in the state of

9  Mississippi, we have licensed vendors that come out and inspect

10 fire suppression systems, fire sprinkler systems and stuff.  They

11 are individually, independently owned, and we'll have those

12 certified.  And then, once the state fire marshal starts doing

13 inspections, we'll be sure to get him out there as soon as

14 possible.

15      THE COURT:  Did I hear you say that you will have one of

16 the licensed vendors come out after the work is complete to

17 inspect?

18      MR. CHAMBLEE:  Yes, sir.

19      THE COURT:  Okay.  Thank you, Mr. Chamblee.

20      Okay.  I think I -- I think I've been sufficiently

21 informed with respect to the fire issues.  Now I am -- I do want

22 to make sure I repeat what we talked about the other week.  You

23 know, we are here just to follow up to the monitors -- I believe

24 it is the monitor's thirteenth monitoring report, which is

25 generated by the consent decree that the parties entered into

1    years ago.  That the consent decree in its current form is based

2    on the agreement between the United States and Hinds County.

3    Based on the agreement that they reached, I believe it was in

4    the -- the understanding here before the Court was in

5    December 2019, to sort of hold off the United States' motion to

6    find Hinds County in contempt of Court.  So I say that because I

7    don't want in any way for what we're doing here, what we've done

8    in the past, what we're doing in the future to -- to make -- to

9    put the United States in a position as if it cannot seek to take

10   whatever steps it believes are necessary to make sure that the

11   existing agreement is enforced.  I know when we left the last

12   time, I told the parties to discuss about a path going forward.

13   We're going to talk about the path forward, I think, or at least

14   I'll allow you all to tell me where you are with respect to that

15   path going forward, but I don't want anybody to be under the --

16   under the assumption that anybody is waiving whatever rights they

17   have by making the reports -- or to answer the specific questions

18   that I've either raised today, or that I've raised through my

19   correspondence with the parties.

20        So now I am about to shift and go to a different area, one

21   from the other week that I did not explore enough after reviewing

22   my notes.  I want to turn some attention to what is going on at

23   Henley-Young.  I do know that for a period of time there was no

24   executive director there.  I know for a period of time, I don't

25   think there has been a social worker there or certainly no -- no

1    psychiatrist, psychologist there.  But one of the questions that I
2    raised to the parties -- I need some clarification initially on
3    one thing about what resources are provided to juveniles who the
4    state is treating as adults who are being housed at Henley-Young.
5    Because based on the question, I believe that I asked you, I want
6    to make sure that my understanding is correct.  I do not want to
7    be operating under any false impressions.  What -- are there --
8    the resources that are being provided that this Court has ordered
9    to be provided to those juveniles who are being treated as adults?
10   Are those resources any different than -- or different from the
11   resources given to juveniles who are in the custody of Hinds
12   County who are placed at the detention center and who are not
13   treated as adult?  Because I think when we were here the last
14   time, I was under the -- and I want to ask you about the county's
15   particular -- I think when we were here last, the county mentioned
16   that the new county judge has made some sort of ruling or decision
17   about a difference between those two categories of individuals.
18   So I just want to make sure, how are the tools -- well, I guess,
19   first of all, how are the -- what resources are provided to the
20   students -- not to the students, to the juveniles who are being
21   jailed and would be treated as adults in the criminal justice
22   system?
23          Now -- if the county could answer, Mr. Gaylor or
24   Mr. Frazier -- somebody please help me with this.
25          MR. GAYLOR:  Your Honor, this is Tony Gaylor for the

1  County.  There is no -- there may have been a miscommunication or

2  misunderstanding placed before the Court at the last hearing.

3  There is no difference in the resources that are being provided to

4  juveniles charged as adults and the non-JCAs as we call them.  The

5  difference that you may have picked up on is that quite frankly,

6  we're not holding any non-JCAs for any particular period of time,

7  because we have so many juveniles charged as adults.

8       And so, when we're talking about the treatment that's

9  being rendered or the services that are being offered with regard

10  to education, programming or otherwise, it's for the most part

11  being rendered to juveniles charged as adults, not non-JCAs

12  because they are only there for a very short period of time, those

13  that are.  And I would allow -- I like to yield to Mr. Fernandez

14  Frazier who is our new re-appointed director for Henly-Young.  But

15  presently -- you also mentioned the lack of a, I believe it was a

16  treatment director.  We do not currently have a treatment director

17  on staff.  That person resigned several months ago.  But the post

18  is still being -- the position is still being posted.  We are

19  still seeking a treatment director.  They do still have other

20  social services.  They do have programming.  They do have

21  educational facilities.  They aren't housed with non-JCAs.  That

22  is the distinction I believe that you're referencing with regard

23  to Judge Hicks, the new county youth court judge.  We don't house

24  the two categories together.  But other than that, there is no

25  difference.

1        THE COURT:  When you say you don't house the two together,

2   is there separate housing available for the two groups at

3   Henley-Young?

4        MR. GAYLOR:  Yes, Your Honor.  In the sense that we have

5   presently -- and again, Mr. Frazier can clear this up a little

6   better than I can.  But we presently have roughly 20 juveniles

7   charged as adults.  We may have two or three non-juveniles charged

8   as adults, so we have an area in the facility where the non-JCAs

9   would be held where they would sleep, so to speak, versus the

10  juveniles charged as adults.

11       Mr. Frazier, if you could address the Court, please?

12       MR. FRAZIER:  In reference to the housing capacity, we

13  have four distinctive units; two of those units are designated for

14  the juveniles charged as adults, and we have one particular unit

15  that's identified as a male unit and another we identified as a

16  female unit, which makes up the capacity of the four units to be

17  able to house individuals being maintained here at Henley-Young.

18  Throughout the process of daily activities, there is no

19  deviation -- or differentiation --

20       THE COURT:  Mr. Frazier, slow down.  We are trying to make

21  a record, so just slow down, if you will.

22       MR. FRAZIER:  Sure, Your Honor.

23       THE COURT:  Okay.

24       MR. FRAZIER:  As I was saying, the daily activities in

25  regards to the structured activities provided for the youth, they

1    are all provided at the same rate and ability to be afforded them

2    the same distinction and care while they are in our custody.  We

3    have a structured program that we follow daily that we ensure that

4    all youth get access to all of the services to be rendered,

5    whether it is educational, recreational, as well as social and

6    leisure.  And with that being said, again, I think it was a

7    misnomer in regards to what was identified in regards to the

8    separation of units, based off of where they would be, based off

9    of their offenses, not because that they are here to be deemed or

10   separated differently.  Because the youth that are here as JCA, as

11   you know, they are in our custody for a much extended period of

12   time.  But we make sure that they are given the ample opportunity

13   to receive the same services as the non-JCAs.  So that's where we

14   are right now as far as Henley-Young, Your Honor, as far as the

15   unit.

16         As far as the position of the clinical positions --

17   clinical social worker, it is still advertised.  The clinical

18   social worker is still on the board as advertised.  I do have some

19   interviews lined up for the clinical social work clinician

20   position lined up for this week, as well as I interviewed a

21   candidate last week.  So hopefully within the next 30 days or

22   sooner, maybe we can have a more viable candidate to fill that

23   position, which will enhance the overall ability to provide

24   additional services.  We do have clinical staff.  We have two

25   certified clinical social workers on staff, as well as case

1    managers that do follow-up and daily tracking with the youth

2    assigned in the facility themselves.

3         Overall, the capacity -- the services that we provide in

4    an environment like this, I would say is very-well served.  The

5    recreational staff are doing a good job in regards to what we're

6    -- what programs they are affording the youth based off of the

7    limitations -- the structural limitations of the facility and its

8    design.  So that does bring challenges in regards to what we can

9    do and how we can do it.

10         THE COURT:  And the -- and if I am not mistaken, the --

11    there is a court order and a monitor specifically dedicated to the

12    Henley-Young Center and that is still ongoing.  Is that correct?

13         MR. GAYLOR:  Yes, Your Honor, it is.  And that

14    representative -- individual is by the name of Ms. Ann Nelson.

15         THE COURT:  Okay.  So with respect to the confusion that I

16    had that sort of reflected in the e-mail with respect to what I --

17    about any differentiation between the categories of students, if

18    there is a distinction that Judge Hicks is applying; that is,

19    juveniles who are being treated as adults are not physically

20    housed with the regular juveniles.  Is that what the distinction

21    is?

22         MR. GAYLOR:  That's the only distinction, Your Honor, that

23    they reside on a separate unit.  That's the only distinction.

24         THE COURT:  All right.  Now, Mr. Frazier, there was -- I

25    guess it is Part 4 of the e-mail that I sent that specifically

1   talks about Henley-Young.  It says, "With respect to Henley-Young,

2   the monitor's report says" -- and this may or may not have

3   happened, Mr. Frazier.  During the period of time you were no

4   longer with the county, but the monitor's report says, "There has

5   been a notable increase in the number of more serious incidents

6   involving JCAs, including fights, significant disruptions, suicide

7   attempts and possession of contraband items." And I said, "The

8   Court expects the county to explain these concerning events."

9          Now that you are back on, I don't know if -- I assume the

10  monitor's report, again, was submitted on April 2nd.  I don't know

11  when you came back on board, Mr. Frazier.  Do you know when you

12  came back on board?

13         MR. FRAZIER:  Yes, sir.  My date of reappointment was

14  April 1st.

15         THE COURT:  Okay.  Well, obviously you -- and April 1st.

16  How long had you been gone?

17         MR. FRAZIER:  Fifteen months, Your Honor.  I left

18  January 6, 2020.

19         THE COURT:  Okay.  So obviously, this did not -- I say,

20  "obviously."  I assume then that what the monitor's report

21  probably does not reflect that time period in which you were last

22  here before April 1st. So somebody from the county needs to be

23  able to talk about that noticeable increase in the number of more

24  serious incidents, including fights, significant disruption and

25  suicide attempts.  And I am concerned about the suicide attempts.

```
 1    Those attempts -- I want to know about those attempts.  Were they
 2    attempts made by, again, students, young men/young women, who are
 3    being treated as adults?  Or are they persons who are otherwise
 4    juveniles?  And what did those attempts -- the attempts that
 5    were -- what were the nature of the attempts and how could
 6    these -- how were these attempts discovered?  How were these --
 7    you know, what was the nature of the attempts?  Was it attempted
 8    hanging?  Was it attempted overdose on drugs?  Because, you know,
 9    those would generate their own sort of questions.  So do we know
10    anything about the particular attempts that were made?  Who made
11    them?  What type of treatment?  You know, what was or is the
12    county doing?  What assessments are being made of these
13    individuals when they are processed into the system?  What ongoing
14    assessments are made?  How are we having an increase in the
15    suicide attempts?  And then we'll ask about all the other things.
16    But I am asking about the suicide attempts first.  Who, if anybody
17    from the county -- from Henley-Young could give me some feedback
18    on that -- give us all some feedback on that.
19         MR. GAYLOR:  Your Honor, if I could start, and I believe
20    Mr. Frazier could probably assist me with this.  But with regard
21    to the suicide attempts, the vast majority of those attempts have
22    been made by one person.  That young man certainly has a condition
23    that needs significant treatment.  What we have been doing for the
24    last several weeks and months, actually, is attempting to get him
25    a bed at the state hospital.  He -- a psychiatric evaluation was
```

1    done on that JCA -- it was a juvenile charged as an adult.  And

2    actually, all of them have been juveniles charged as adults, no

3    non-JCAs.  But that particular individual has a psyche -- has a

4    court order from the senior circuit judge for a psychiatric

5    evaluation that requires a bed at the state hospital.  In spite of

6    the many calls that we have made to the state hospital, we have

7    yet to have been able to secure a bed for him.  As you may be

8    aware, Your Honor, that is not an uncommon problem throughout the

9    state of Mississippi, there being a shortage of beds at the state

10   hospital.  And so, until that time that we can get him to the

11   state hospital, we've done some additional monitoring of him to

12   try and make sure that there -- that we do everything that we can

13   to prevent him from committing additional suicide.  He's being

14   monitored.  There have been many other incidents with that

15   individual, incidents of violence, and certainly none --

16   misbehavior.  And some of the other incidents are all related to

17   that particular resident, quite frankly, Your Honor.  But we have

18   not been able to secure a state bed for him.  Until then, we'll do

19   everything we can to prevent -- to try and minimize the damage

20   that's being occurred.

21        Mr. Frazier, would you like to address that as well?

22        THE COURT:  Let me interject.  Let me ask this question:

23   What is that juvenile charged with?

24        MR. GAYLOR:  He is charged with strong-arm robbery, Your

25   Honor.

```
 1          THE COURT:  Has -- has he had a bond hearing?  Has bond
 2   been -- is he eligible to --
 3          MR. GAYLOR:  Yes, Your Honor.
 4          THE COURT:  I'm sorry?
 5          MR. GAYLOR:  Yes.  He can receive a -- he is eligible for
 6   a bond.
 7          THE COURT:  Has he had a bond hearing?
 8          MR. GAYLOR:  Mr. Frazier, do you have that in front of
 9   you?
10          MR. FRAZIER:  I do not have that in front of me, but I do
11   -- I am looking at my docket sheet here, my daily roster.  It says
12   that a bond setting was set for him, so I would assume that it
13   has.
14          MR. OWENS:  This is the district attorney, Your Honor.
15   That young man was given a bond, as I understand it.
16          THE COURT:  When you speak, please identify yourselves.  I
17   know that was Mr. Owens, right?
18          MR. OWENS:  That's correct, Your Honor.
19          THE COURT:  Is that individual -- I assume that individual
20   is represented by an attorney?
21          MR. OWENS:  Yes, Your Honor.  My memory of that
22   individual -- again, this is Jody Owens -- is represented by the
23   public defender's office, but Ms. Lowery might be able to speak to
24   that.
25          MS. LOWERY:  I apologize, Your Honor.  I'm not sure of the
```

1   person's -- I know that name is being withheld for purposes of his

2   age, but unless -- I don't have a file before me that is

3   indicating any substantive information on that right now.

4          THE COURT:  Okay.

5          MR. FRAZIER:  Yes, Your Honor.  I can speak on that.  He

6   is represented by an attorney, Your Honor.  That attorney of

7   record is Mr. Stamps.

8          THE COURT:  I'm sorry?

9          MR. FRAZIER:  That attorney of record is identified as

10  Mr. Stamps.  I apologize, Your Honor.  I don't believe Mr. Stamps

11  works for the public defender's office.

12         MS. LOWERY:  That would not be a public defender case,

13  Your Honor.

14         MR. FRAZIER:  Okay.

15         THE COURT:  Okay.  Does it have a first name for Stamps?

16  I do know there is a Stamps in the public defender's office.

17  You're saying, "Mr. Stamps."  Is there a first name with that

18  Mr. Frazier?

19         MR. FRAZIER:  No, I just have the initial A. Stamps, Your

20  Honor.

21         THE COURT:  A.  Stamps?

22         MR. FRAZIER:  Yes, Your Honor.

23         MS. LOWERY:  What's the initial?  I'm sorry, Your Honor.

24         MR. FRAZIER:  "A" as in apple.

25         MS. LOWERY:  That might be Alice Stamps, who is an

1    attorney in this office.

2         THE COURT:  All right.  I am not sure what resources can

3    necessarily be provided, but it sounds like that particular child

4    is not thriving in any way at the detention facility.  It seems to

5    me that the -- if this person is at risk, or increased risk for

6    suicide attempts and simply waiting on a bed, it seems like that

7    resources could be redirected to get this person the best help and

8    the most available help as soon as possible -- as soon as

9    possible, and not necessarily waiting on a bed because we know how

10   long that wait could be, based on what we -- what we've seen on

11   the list of the -- inmate list that the monitor prepared for us

12   the other week.  But with respect -- we've talked a little bit

13   about the suicide attempts.  We did not say what were the nature

14   of those suicide attempts, you know.  So what was it?  I mean, if

15   it was -- if it was stabbing himself with a knife, or shooting

16   himself with a gun, I would certainly have different questions

17   than if he tried some other method.  So what was the method of

18   suicide attempt?

19        MR. GAYLOR:  Your Honor, and Mr. Frazier can assist me

20   with this.  There were multiple attempts in different ways.  It's

21   my understanding that one was by hanging.  I believe another one

22   involved medication.

23        Mr. Frazier, were there different attempts other than

24   those two?

25        MR. FRAZIER:  No.  Those are the two that I've been made

1    aware of.

2         MR. GAYLOR:  Because there were four attempts.

3         MR. FRAZIER:  Okay.  No, those are the two that I've been

4    made aware of; that he had attempted the hanging, and I understand

5    that there may have been twice that he attempted to do that to

6    self-harm himself through the hanging process, or hanging.  And I

7    do know that he was made aware of the medication that he was not

8    taking -- properly taking his medication as he should have, or he

9    was hoarding medication.

10        THE COURT:  Okay.  And what has the county done with

11   respect to reduce the attempts -- if it's hanging, hanging by

12   what?  Sheets?  Shoelaces?

13        MR. FRAZIER:  Clothing.

14        THE COURT:  Clothing.

15        MR. FRAZIER:  Clothing, Your Honor.  As I was made aware

16   and briefed about it, that he took items and he had shredded them,

17   and during that process that it happened over in the evening time,

18   nighttime, early morning that he basically attempted at that time

19   when he would be, I guess, less than monitored as he should have

20   been or should be, and he was almost successful in doing that, in

21   completing that task.  But what we do do now is that his room is

22   searched multiple times during the shift to reduce any type of

23   contraband that he can have.  As well as now, we ensure that when

24   he goes to medication that it is totally observed with a physical

25   full observation with medical staff, as well as with the line

1   staff that require him returning back on to his unit.  Once he

2   goes to medical and receive his meds, that it can be shown that he

3   did swallow the medication or took it appropriately.

4       So on a regular basis, as well as he has a general

5   observation of a one-on-one through each shift, that he's not just

6   to be isolated by himself.  So we are trying to do as much as we

7   can to mitigate the ability for him to inflict self-harm while

8   he's here.

9       THE COURT:  Okay.  And it sounds as if no other issues

10  with none -- well, I guess -- well, let me -- I assume the monitor

11  in the other case has been informed of all of this.

12      MR. FRAZIER:  Yes, Your Honor.  For every incident that

13  occurs in the facility, we send her a direct response to -- in

14  regards to any incident that occurs -- that transpires with any

15  other youth, for her to review, to critique, to assess and

16  evaluate our responses concerning any issues that transpires

17  during the daily activities.  We do a weekly call with Ms. Nelson

18  every Friday, and we go back over any incidents that occurred in

19  the facility during the course of the week.

20      MR. GAYLOR:  And, Your Honor, Ms. Nelson appears to have

21  joined the hearing as well, Ms. Anne Nelson, if you'd like to

22  direct your questions to her as well.

23      THE COURT:  Okay.  Ms. Nelson, are you on the line?

24      MS. NELSON:  Yes, I am, Your Honor.  I apologize.  I

25  wasn't expecting to have to participate directly.  I was thinking

1    I was just going to be able to listen in, but I'll be happy to

2    help in any way I can.

3         THE COURT:  I guess my only question is, you heard what

4    has been said about the detention center, and I know you probably

5    prepare monitor reports in the related case -- and I guess my only

6    question is, do you disagree with anything that this Court has

7    been told about Henley-Young?

8         MS. NELSON:  Well, with a pretty major caveat that I

9    cannot and have not been able to be there for over a year, and I

10   have to rely on my review of documents, and the regular

11   conversations we have, and I -- I also conduct periodic interviews

12   by Zoom with staff.  I still do have concerns about the lack of

13   programming that is occurring, and particularly relative to school

14   attendance, but again, I am not able to be there in person.  I

15   recently had a conversation with the school principal and

16   requested a number of documents regarding the school attendance,

17   school recordkeeping, and some of that kind of information.  So

18   pending my receipt of that information, I can't really say more.

19   I do put a lot on the facility every week in terms of requests for

20   documents, and I do get a lot of documents from them, but there

21   are a lot of documents I request that I don't receive.  I don't

22   know if that means they don't exist or what.  I am a little bit

23   handicapped right now by the fact that I am reliant on reviewing

24   documents and not being able to be there in person, and the

25   documents that I do receive -- I don't always receive all the

1    documents that I request.

2        THE COURT:  Okay.  What type of documents is it that

3    you're requesting that you do not receive?

4        MS. NELSON:  A lot of times the incident reports that I do

5    receive need to have accompanying attachments, for example,

6    medical reports and things like that.  Incident reports seem to --

7    incidents seem to occur when -- based on the narrative information

8    in incident reports, it seems that the structured programming that

9    is scheduled and is being required is not occurring.  So I often

10   request copies of the program schedule and program log of what

11   actually occurs.  I do get the program information.  The program

12   coordinator has been great about sending me that information.

13   Unfortunately, that programming information that she sends seems

14   to always concur that the programming that she schedules for the

15   staff to implement does not get implemented.  And I think, in my

16   opinion, that seems to be contributing to the frustration and the

17   boredom on the part of the children at that facility, and they --

18   and that, of course, has been aggravated in the past year by their

19   extreme isolation from the pandemic.  And kids being kids, they do

20   what they can to alleviate boredom.  And in their case, that has

21   resulted in aggression and other kinds of violent acting out on

22   occasion.  And I -- from my experience, and from research I am

23   aware of, that structured programming would keep them too busy to

24   be so bored and to act out in those ways.  So that's one of the

25   things we've talked a lot about and we've tried to emphasize, and

1  I think that also would be helped by having a facility fully

2  staffed.  Since I've been involved, this facility has never been

3  fully staffed and it hasn't been unusual for this facility to be

4  down about a third of their direct-care staff, as well as some

5  other key positions that have been mentioned today.  The treatment

6  coordinator position is still vacant.  A training position has

7  been vacant for about a year-and-a-half because that individual is

8  on military leave.  One of the training positions is going to be

9  converted to a rec position.  I think that's a good idea to add

10  that additional recreational staff.  And like I said -- and then

11  training -- the training position has been vacant for the better

12  part of a year, and that position was filled a couple of months

13  ago, and the new person in that position is getting started with

14  implementing training.  But the facility is staffed with a lot of

15  fairly new and untrained staff who have bare minimum

16  qualifications, if that.  So that really handicaps the ability of

17  them to achieve compliance with the consent decree I am working

18  under.

19      THE COURT:  Okay.  Let me -- Mr. Frazier and Mr. Owens

20  could speak to this question.  Is there any juvenile being held

21  without bond?  And if so, how many of them are being held without

22  bond?

23      MR. FRAZIER:  Right now, Your Honor, as of today, looking

24  at the bond amount and the bond account on the daily activity log

25  on the roster, I have 11 youths that have identified with no bond.

1          THE COURT:  You say with no bond.  I guess, I meant to

2     direct the question to Mr. Owens.  That may be a different answer

3     for my question, Mr. Frazier, because a bond determination might

4     not have been held yet.  In some of those 11, has a court

5     determined that any particular youth should be detained and that

6     bond would be denied, is the question, to be held without bond?

7     The student is -- the child -- the juvenile shall be held by the

8     sheriff's department without bond.

9          Mr. Owens, do you -- are there any juveniles who are being

10    held without bond based on their crime?  I guess it can only be

11    based on their crime, I guess, the crime and the circumstances.

12         Presumedly, a juvenile has ties to the community because

13    he probably lives in somebody's house, I guess.  So Mr. Owens, are

14    you there, still?  Is there -- okay.  Is there anyone there from

15    -- Mr. McBride from the DA's office?

16         MR. GAYLOR:  They must have been disconnected, Your Honor.

17    We'll make sure they get back on.

18         MS. LOWERY:  Your Honor, this is Gail Lowery, public

19    defender.  I did get Attorney Stamps in to provide some

20    information.  I'm not sure if that will also address your present

21    concern about bond concerning the juvenile that we were speaking

22    of, if you had some specific questions regarding activities that

23    this office has been engaged in to try to assist.

24         THE COURT:  Okay.  Thank you, Ms. Lowery.  So with respect

25    to the individual who is being respected by the -- by your office,

1    there was a report that that individual may have attempted suicide

2    on more than one occasion.  It is my understanding, Ms. Stamps,

3    that the circuit court has determined that the child needs to be

4    evaluated or assisted in some way, but is awaiting on a bed at the

5    state facility.  Is there any -- has there been any attempt to --

6    to, I guess, remove him from that facility -- you know, get a bond

7    reduction, get something and maybe process him through some sort

8    of private way as opposed to a state bed?

9         MS. STAMPS:  Your Honor, the judge has actually signed an

10   order to have him transferred to the state hospital for a mental

11   evaluation.  He's already had one mental evaluation, which he was

12   found competent.  But that was done without all the medical

13   records, because this particular client has been in and out of ten

14   mental institutions before age 14.  And the first mental

15   evaluation was done without the medical records, so that's why

16   Judge Green ordered that he be reevaluated and reassessed at the

17   state hospital.  I sent letters to each of the ten mental health

18   facilities, one was even out of state, requesting that they send

19   all the medical records to the state hospital.  About three or

20   four of them have actually provided the records and also we're in

21   the process of trying to get the school records because the state

22   hospital requires the school records, too, as part of the mental

23   evaluation.

24        The DA's Office will not agree to bond because of the

25   charges, and I don't want to go too much into the facts, but there

1 are two charges which are considered violent crimes, so the DA's

2 Office will not agree to a bond.  And we've had a meeting between

3 myself, the assistant DA, and Judge Green, and the solution was

4 basically to try to get him evaluated by the state hospital as

5 soon as possible.  And I have been in constant contact with the

6 representative, Debra Gibbs, at the state hospital, stressing the

7 importance of trying to get this done as soon as possible because

8 he has attempted suicide three or four times.  They have not given

9 me any indication when they would be transferring him to state

10 hospital.  Often, they want all the records before they do the

11 mental evaluation, given the fact that it's ten different mental

12 health facilities, that is going to take some time.  But I have

13 contacted these facilities and asked them to provide those records

14 immediately, and we're still waiting for a lot of them to comply.

15     THE COURT:  Okay.  Thank you, Ms. Stamps.

16     I see Mr. Owens is back on the line.  Mr. Owens, I had

17 raised the question, are there -- apparently, there is no bond --

18 this is a -- the client of Ms. Stamps, apparently, is being held

19 without bond because, I think, she alludes to the fact that the DA

20 will not agree to bond.  So that means that person is being held

21 presumedly without bond.  Are there any other juveniles being held

22 without bond?

23     MR. OWENS:  Your Honor, to my knowledge, there are other

24 juveniles being held without bond.  As Ms. Stamps said, with

25 respect to not going into individual facts or names, generally it

1  is the case if an individual is deemed to have committed a violent

2  crime, generally murder, and still deemed to be a threat to public

3  safety, the judge would ask us our position, and we would ask for

4  no bond.  Ultimately, the county court judge would be the person

5  to make the decision whether bond would be offered or not, but we

6  would ask for no bond if a life was taken and we thought that

7  there was still a risk -- an immediate risk at that point in time.

8  The general practice, Your Honor, has been that the bonds are

9  reevaluated by the public defender's office, or the defense

10 lawyers, if the individual has been there and that case has not

11 moved quickly, which unfortunately, is generally the case we

12 define quickly in the manner that we would like the case to move

13 quickly.  We are presenting those cases to the grand jury at which

14 point in time within the ninety-day time frame that the

15 Mississippi Supreme Court and the Mississippi Court Rules

16 requires.  At said time, the individual's lawyers can request a

17 bond modification or a reduction of bond, which is what we usually

18 see at that point in time.  We do think that period of time has

19 allowed for generally more public safety, but also for a bond to

20 be reconsidered at that time.

21      MS. STAMP:  If I may, just for clarification.  I am not

22 going to go into the facts, but my client is charged with what is

23 considered a violent crime, but nobody was hurt and I -- I would

24 say that he is a good candidate for bond because I've been in

25 constant contact with his mother.  She would make sure that he

1    stays on his medication.  He was only 14 years old when he was

2    charged with this.  I don't want to go into the facts, but may I

3    at least tell you what he's charged with, or is that too much

4    information?

5         THE COURT:  I mean -- Those are matters that I don't want

6    to ever be perceived or look like that I am interfering with what

7    the state judges have to do or what they're authorized to do.  But

8    those bond evaluations are made by the circuit or either the

9    county court.  I am just concerned of how long this -- the

10   juveniles are -- because my other question to Mr. Frazier and

11   Mr. Owens and whomever was going to be:  What's the longest period

12   of time that any of the current occupants in Henley-Young have

13   been there the longest?  Who -- you know, what is the average

14   length of time, and who has been there the longest?  And how long

15   is that long time?  Do you have anybody, for example, in

16   Henley-Young who came in at 13 and now they're 18 and they are

17   still there?  I am talking about, you know, 300, 400, 500, 600,

18   700, a thousand days, because a thousand days is my cutoff on the

19   adult side.  Do you have any juvenile who has been there -- at

20   Henley-Young more than 270 days?

21        MR. OWENS:  Yes, Your Honor.  No to a thousand, Your

22   Honor, and no to 600, Your Honor.  We have, 1, 2, 3, 4, 5.

23        Your Honor, we have a few that have been there for

24   551 days.  All of those individuals have been indicted; they are

25   on the active case docket.  Again, all violent crimes.  They all

1    are being represented by counsel.  I am looking at a list that I

2    can provide to the Court specifically that tracks the days and the

3    crime is helpful, and we can redact the names if that's something

4    the Court would be interested in looking at.

5         THE COURT:  Okay.  Five hundred days means more than a

6    year.  It is approaching two years without a trial for a child --

7    I mean, that's in the context that I see things.  But again, those

8    are matters that can be taken up with the state court judges to

9    some degree.  But certainly, that impacts the programs and all of

10   those things that must be offered to these children during the

11   time of their detention.  You know, the longer they are there, the

12   more that the county is going to have to provide for their

13   wellbeing in a sense that otherwise, that the county would not

14   have to do it and that -- you know, but for the fact that they are

15   there.  So with respect to the -- Mr. Frazier, again, this all

16   occurred, apparently -- there is no doubt that some of this stuff

17   occurred during the 15 months that you were no longer there, but

18   the -- the violent incidents that the other -- other than the

19   suicide, the incidents that the monitor noted -- the serious or

20   significant disruptions and the finding of contraband, do you know

21   what type of contraband was found?  Obviously, contraband being

22   found at the general facility, that is, Raymond, suggests a whole

23   lot of lack of supervision, and it also suggests that there's a

24   contraband -- I guess in the RDC context, contraband, you know,

25   people can, as Mr. Parrish said, they can say people would break

1    out of the facility to bring in stuff.  I just want to know what

2    type of contraband are they finding on these children, and who's

3    bringing it in?  How are they getting it?  Has there been any

4    investigation done?

5         MR. FRAZIER:  Yes, Your Honor.  Since my return, I have

6    been briefed about some of those issues.  The issues of the

7    contraband, I understand that there was an individual who was

8    employed here had engaged in bringing in items that were not

9    authorized; i.e., tobacco, gifts to the youths, things that should

10   not be provided while they were here in our care and custody.

11        As far as the uptick in fights -- for individuals who

12   don't know -- a lot of the youth that are charged here as JCAs are

13   actually known individuals that are tagged in gang associations,

14   and we've had a lot of them who are -- who during that time period

15   were in rival gangs, which contributed to some of the hostilities

16   from the neighborhood associations, community associations which

17   continue to come into play.

18        The design and model of this facility, with the limited

19   bed space and limited ability to do continuous separation of

20   groups, and the thing with that -- it does become a challenge.

21   But I do know that in this facility, the staff that I have do a

22   very good job in trying to mitigate the issues that come up and

23   arise.

24        Going back to what Ms. Nelson said, the biggest challenge

25   is to be adequately staffed. That is a concern of mine, because

1    just as she said, right now, we are severely understaffed.  We

2    have a lot of staff that are working double shifts just to be able

3    to cover the shifts to provide the care and coverage that we need

4    that's required within the consent decree itself.  So we do try to

5    do things in a proactive manner to work to mitigate the issues

6    that arise.  This is not a perfect environment, but by the same

7    token, we are using the resources that we have to adequately deal

8    with what we have to deal with on a daily basis.  I do know that

9    since I've been back, we've put in some new security measures when

10   it comes to making sure that we address areas of concern to combat

11   the contraband introduction, or just to combat contraband being

12   utilized or being stored since I've been back.  Again, it's a

13   challenge to be in this environment.  But every day with the staff

14   that come here, I do feel that they are making a difference in the

15   lives of these individuals who are in our care and custody.

16        THE COURT:  Okay.  Thank you.  Before I -- before we leave

17   this area; that is, the area talking about the Henley-Young.  With

18   respect to Judge Hicks' interpretation of what the rules say has

19   to who can be housed with whom, is there -- is there a specific

20   order in place?  I think I raised that question with respect to

21   the parties.  Is there a written order in that respect?  Is there

22   a written decision?  Is there something that Judge Hicks relies on

23   in that regard?  I mean, because I -- I just want to be on the

24   same page that she's on.

25        MR. FRAZIER:  Well, Your Honor, in my conversations with

1  her, and as I recall, in the conversation previously with members

2  that was on a call, that she explained to them her interpretation

3  of the state law and how it requires a separation of the two when

4  it comes to that.  That she feels that in her interpretation of

5  the law, it says how it's written, that's why she would rule in

6  that capacity.

7         THE COURT:  Okay.  And I am just not familiar with which

8  particular law she's relying on.  Does anyone on this call know?

9         MS. VERA:  Your Honor, this is Helen Vera for the United

10  States.  Yes, I do know about that; I need to find that in my

11  notes.  But there is a state law that refers to youth under the

12  jurisdiction of the youth court not being housed -- I need to find

13  the exact language, but I can tell you, not being housed together

14  with other people under -- not under the youth -- not under the

15  jurisdiction.

16         THE COURT:  Not under the jurisdiction of the youth court.

17         MS. VERA:  And -- yes.  And my understanding is that the

18  youth court judge interprets that to mean that in her orders --

19  this may be -- I am not sure exactly how the procedure works, but

20  when she orders somebody to be held -- a youth court youth to be

21  held at Henley-Young, that that's part of the order.  But -- I did

22  do a little research on this and did not find any, you know, other

23  holdings like a -- you know, you asked about the Mississippi

24  Supreme Court and I didn't find anything about that.

25         THE COURT:  Okay.

1      MS. VERA:  And I can tell you it is Mississippi Code

2 Section 43-21-315.

3      THE COURT:  Thank you, Ms. Vera.

4      MS. VERA:  You're welcome, Your Honor.

5      And may I just -- I just want to make sure that we -- that

6 the record reflects answers to your previous question, if I may,

7 just say a couple of things about the incident at Henley-Young.

8      THE COURT:  Yes.

9      MS. VERA:  Thank you.  So my understanding, just to -- for

10 the sake of completeness to answer your question, Your Honor, is

11 that the -- the youth that we've spoken about a lot has had a lot

12 of problems and has attempt -- my understanding is that there was

13 one suicide attempt in the previous reporting period.  And then

14 since then, in February and March, there has been -- that same

15 youth attempted suicide two more times, at least, is my

16 understanding.  But my understanding is that there also was a

17 different youth who also attempted suicide, I believe at the end

18 of January.  So that was in the previous reporting -- this most

19 recent completed reporting period.  And there have been other

20 youths where there have been incidents of self-harm, as well, in

21 the previous reporting period.  And my understanding is there have

22 also been contraband incidents with metal shanks found, and

23 matches.  This is not complete at all.  I just -- I did some

24 research and reviewed the incident reports again that I had in

25 response to Your Honor's e-mail, and I did want to make sure that

 1    that was -- that you got the answer to your question.  I don't

 2    know if -- you know, if that's helpful to the Court.

 3            THE COURT:  It is helpful, but I would assume -- again, I

 4    would assume that each of those incidents or reports are being

 5    followed up or talked about in the other monitor's reports or the

 6    other -- because Henley-Young itself is specifically under the

 7    jurisdiction of Judge Jordan right now, I think.  And I -- with

 8    respect to reportings, and under a specific consent decree in and

 9    of itself.  Is that correct?

10            MR. GAYLOR:  Yes, Your Honor, it is.  It is Judge Jordan

11    and Judge Ball.

12            THE COURT:  And I presume any report of the incidents that

13    Ms. Vera is talking about would be included in any report of

14    Ms. Nelson or -- or -- I mean, because what Ms. Vera has said

15    seems to be -- I am not saying opposed to what -- it seems to be

16    more elaborate -- a more elaborate description of what her review

17    of some incident reports have shown.  It is not simply -- in other

18    words, it is not simply one juvenile who has attempted suicide,

19    it's at least two, maybe even three, and you're talking about

20    shanks and not just tobacco.  So if I wanted to be fully informed

21    of all of that, Ms. Nelson, will I be able to turn to a report

22    that you prepared, and will I be able to see those things in your

23    report?

24            MS. NELSON:  The last report I was asked to submit, I

25    believe, that was in January, and you certainly could access that

1   report, and I did go into quite a bit of detail.  I've also

2   submitted some updated information since that time.  I have sent

3   feedback to the parties -- the county and the plaintiff's

4   attorneys, as well as the facility administration regularly.  The

5   report I submitted in January detailed the compliance levels with

6   each of the provisions in that consent decree, but since that

7   report was submitted, it does seem that there has been no progress

8   in addressing the concerns I wrote about.  You know, there are

9   some -- Mr. Frazier talked about some newly-implemented security

10  practices, and that's a good thing to see because the facility,

11  for example, has a search -- a security searches policy and

12  procedure, but they have not followed it, so regular searches have

13  not been conducted of the living units or the individual sleeping

14  rooms, and that's -- somehow the children were getting ahold of

15  contraband and the staff were often not finding them through those

16  required searches and that seems -- they've implemented some new

17  practices to hopefully improve on that, but that's very

18  frightening.  It could be a danger to a child who could hurt

19  himself, or it could be a danger to another child or staff member

20  who could be hurt.  Smoking materials are just not unhealthy for

21  the smoker, but they can be -- I have consulted with facilities

22  where fires have occurred as a result of possession of smoking

23  materials.

24          So it -- you know, everything is kind of interrelated, and

25  a lot of it does continue to go back to the lack of enough staff

1    and the lack of staff training.

2         THE COURT:  Thank you, Ms. Nelson.

3         Mr. Frazier, I guess, one final wrap-up on Henley-Young.

4    How many females are being housed there?

5         MR. FRAZIER:  There are no females -- I have one, sorry.

6    One female.  That's not a -- it is a detention youth that came in.

7         THE COURT:  Okay.

8         MR. FRAZIER:  No, I'm sorry.  She was released yesterday.

9    I don't have any females as we speak.

10         THE COURT:  Okay.  And what's the total population that

11    you have at Henley-Young as of today?

12         MR. FRAZIER:  My total population as we speak today, I

13    have 19 JCAs and I have four non-JCA youth which are the regular

14    detention youth.  So a total count of 23 today.

15         THE COURT:  Okay.  Thank you.  I think at this time I am

16    going to give my court reporter a ten-minute break.  And I'll tell

17    you where -- unless someone has any follow-up with respect to

18    Henley-Young, obviously the conversation is now about to shift to

19    RDC and the worker's center and the -- the detainees there.  In

20    particular, the monitor notes that there continues to be

21    over-detention, for example.  We're going to talk about those

22    issues.  We're going to talk about -- obviously, we're going to

23    talk about the thing that I have been most concerned -- that I've

24    told the parties about on day one that I -- that this case was

25    handed to me; I didn't want anybody to die up under my watch.  So

 1    much for that; that has happened.  So we're going to talk about

 2    that.  We're going to talk about the Tyreik Lackey matter, and

 3    we'll talk in general about the -- the responses that the DA did

 4    to the questions with respect to the line of cases that I looked

 5    at.  And I want to emphasize, I only looked at people who have

 6    been detained for one thousand or more days.  Needless to say, the

 7    state -- the statutory speedy trial presumption is 270 days, which

 8    is 200 days longer than what our federal system is.  It is 70 days

 9    here; 270 days with the state, and I only looked at cases where

10    people have been housed for longer than a thousand days.  On this

11    list there are literally dozens and dozens, if not hundreds of

12    people who have been held for more than 270 days.  So we'll talk

13    about that as well.

14         But I am going to give my court reporter a break.  It is

15    about 3:25.  Be prepared to start back up at 3:40.  Fifteen

16    minutes.

17         MS. SIMPSON:  Your Honor, the juvenile expert of our

18    monitoring team would like to address some of the issues that have

19    been raised about Henley-Young, and it can certainly wait until

20    after the break.  But if he can have that opportunity, that would

21    be appreciated.

22         THE COURT:  No, no.  I appreciate you, Ms. Simpson.  Thank

23    you.

24         And Mr. Moeser, you would be allowed -- Moeser, right?  I

25    got you right?

1          MR. MOESER:  You got it.

2          THE COURT:  All right.  We'll take a 15-minute break.

3    Thank you.

4          (Recess Taken.)

5          THE COURT:  Okay.  Do we have everybody back on?  I

6    understand -- I know some others have -- I've gotten a note from

7    the DA, he is moving to another location.  Is everyone back on the

8    call?  Can we start back up?

9          All right.  Mr. Moeser, you wanted to follow up with

10   respect to some of the issues concerning Henley-Young.  You may

11   proceed.

12         MR. MOESER:  Thank you, Your Honor.  I will be relatively

13   brief.  You covered -- you have already covered quite a bit of

14   ground, so I don't need to go over much of that, but I want to add

15   just a few comments.  First, the easiest is to say the report

16   speaks for itself, and I think you've done a good job capturing

17   major concerns both that Ms. Nelson has expressed and that are in

18   the report related to programming, other kinds of services that

19   are provided for youth.  Although Ms. Nelson and I are operating

20   under different agreements, there are some similarities and we do

21   periodically communicate, but we still work independently.  I am

22   heartened that often our -- really, more often than not --

23   frankly, almost all the time, our observations are quite

24   consistent in terms of what we are seeing.  We may be looking at

25   slightly different things overall, but I think our observations

1    are really consistent, which I think is a positive, and she did a

2    good job summarizing some of the concerns she has beyond your

3    particular question.  Some -- much of which is also in my report.

4         Related to suicide issues over -- between November and

5    just into mid-March -- past last visit, just to be clear.  I -- I

6    got reports of seven different suicide self-harm attempts, four of

7    them by the one youth in question and three other separate youths.

8    And in all the conversations with staff there, knowing they have

9    well known the one youth in particular, but all of them have --

10   they have responded and most of them, if not all of them, have

11   pretty much situations of youth attempting to hang themselves or

12   choke themselves using a torn blanket or clothing.  And in a

13   couple of cases coming in perilously close, but in all cases,

14   staff has come upon them or looked in their room or checked on

15   them and interrupted the event.  And had they not done so, I think

16   we would be talking about one or more deaths.  So there are very

17   serious concerns and I think Mr. Frazier has upped some of the

18   efforts to things they have already to try and monitor that

19   particular youth.

20        Related to programming, I would characterize -- and your

21   concerns related to what started the question around Judge Hicks.

22   I would characterize my approach a little differently in terms of

23   I think -- and you alluded to it near the close of the first part

24   of this session.  There is a significantly higher level of both

25   responsibility and opportunity for youth who are there for long

1    periods of time.  It is not a fair question to say do they get the

2    same programming as short-term youth; they should obviously be

3    getting considerably more in all kinds of areas, whether it is

4    education, personal development, youth development, training,

5    recreation -- all the kinds of things that are critical during

6    these adolescent years of development.  So our agreement, and

7    maybe more so than the other agreement, is really geared more

8    towards some of those kinds of activities and programming versus

9    what you might think of as short-term activities.  That said,

10   Ms. Nelson and I have both continued to monitor what they are

11   attempting to do in terms of programming, and I would concur with

12   her review that their program person has been trying to develop

13   activities and things that are -- programs that are appropriate,

14   as well as some of the other mental health staff.  But the

15   challenge is in implementation, carrying them out in a facility

16   that's often short-staffed or poorly designed.  That's not an

17   excuse for what's happening or why it is not happening to the

18   degree we want, but it's -- it's a problem that still exists.

19         The lack of a treatment director has continued to plague

20   them.  The county alluded to the person having gone a few months.

21   In fact, that most recent person had only been there about three

22   weeks before she left.  In fact, the last time a full-time

23   treatment director or psychologist was on board was June of 20 --

24   I am going to say '19.  So it's well into 18 months, coming up on

25   two years where there's not been a treatment director for the

1   facility, and that's a significant concern.

2        So I would concur with most of what's been said,

3   especially by Ms. Nelson.  Mr. Frazier has added some information

4   that I think is appropriate and speaks to his concerns and efforts

5   that they'll be making, and I would hope we start to see some

6   stabilization and improvement.  I think the tone of my report

7   suggests that after making some progress for a while, with these

8   long-term youth -- I think there had been to regression in

9   education programming, initially due to Covid concerns, but I

10  think more recent due to other concerns.  And I think there is a

11  long way to go in that regard.

12        But again, just a matter of having a higher expectation

13  for mental health services, educational services, and other kinds

14  of programming for long-term youth, well above and beyond what you

15  might think of for short-term youth.  And there's nothing in Judge

16  Hicks' thoughts or interpretation that conflicts with that.  I

17  think she also was very concerned that youths get what they need.

18        So I'll leave it there unless you have some specific

19  question for me.

20        THE COURT:  Well, the question that -- and you can put a

21  pin in it, but the question that is nagging at me is, assuming --

22  and this goes to RDC as well, but assuming -- but in this

23  instance, assuming a child is successful at the ultimate goal of

24  committing suicide while at Henley-Young, what will the parties

25  ask the Court to do any differently than the Court is already

1    being asked to do?  Because it sounds to me, Mr. Moeser, that by

2    happenstance, luck, or whatever -- God's grace, the kids have not

3    been successful.  But it sounds like we've had a number of

4    attempts in the last three months, the last six months, right?  So

5    if you don't first succeed, try and try again.  Something is

6    nagging at a particular child, or particular children that they

7    are trying to find the opportunity to succeed at that suicide

8    attempt.  And if a child succeeds, what will the parties do then?

9    Come to the Court and ask the Court to do what?  I would rather do

10   what now than do what after we find a dead child based on suicide.

11   And that's a matter for DOJ, I think, to explore with the county,

12   and all that because there seems -- it is getting to the level

13   where there may be systemic sort of failures.  A kid can't get a

14   bed to a state hospital because DOJ already knows that the state's

15   mental health system is whacked up because their colleagues are in

16   this Court on our state mental health system.  But a child here

17   cannot get a bed, so we will then keep the child here until we

18   find a bed or -- you know, I heard that the charge may not be one

19   where the child is charged with murder, for example.  It may be

20   some other, quote, unquote, violent crime; it may not be as

21   violent as other crimes.  But I don't want the parties to come to

22   me and tell me after the fact that this is what you could have

23   done, or that you could do, or maybe, Judge, this is the fix and

24   it may have prevented that thing.  I want to do prevention on the

25   front end.  So I am -- you know, I'll ask each of you to put a pin

1    in there because we're going to move on to the other areas of the

2    report that I picked up -- from the monitor's report after our

3    hearing the other week.  But the monitor notes that there

4    continues to be -- No. 5 on my notes to the parties, that there

5    continues to be over-detention in some areas.  And some detainees

6    are being held beyond the 21 days allowed for probation violation

7    hearings to take place.  I want to address that issue.  Because,

8    again, I know there's been a significant reduction in the

9    population that are being held at RDC, but what about this -- this

10   notion that the monitor has picked up on about over-detention?

11   Because, again, I think that plays into the report itself that the

12   monitor provided to the Court and the parties the other week.

13   What is it about this over-detention with respect to being held on

14   these probation violations and things?  Can anybody address that?

15   Or would the monitor like to elaborate first, or can anybody

16   address it?

17          MS. BARKER:  Your Honor -- I am going to let Ms. Simpson

18   go ahead and then I can elaborate on that.

19          MS. SIMPSON:  Your Honor, I would like to put the issue of

20   over-detention in a slightly broader context.  This is an area

21   that's difficult to monitor.  I typically request, particularly

22   since we've been doing these remotely, 30 inmate files picked

23   randomly from the inmate custody list, and that's a fairly small

24   percentage of the people coming and going from the jail.  So it is

25   hit and miss whether I might pick up on somebody that's been

over-detained.  I also review a spreadsheet that the sergeant over

records keeps that lists the probation violation people, and when

the 21 days starts and when they were released; so that's helpful.

But it is a difficult area to identify people that might have been

over-detained, and there is one provision of the settlement

agreement that is particularly relevant to that, and that is -- is

Paragraph 101.  And 1 101(a) requires that the county keep a jail

log that documents the date each person was entitled to release.

The date when the jail received any relevant Court documents, and

the date that was prisoner was, in fact, released, some additional

things.  That log has never been maintained, and obviously if it

were, it would allow us to track over-detention much more

carefully and closely.  101(b) requires that there be an incident

report completed and follow-up investigation any time there is an

over-detention, and that has been a chronic deficiency that we've

pointed out in our monitoring reports over the years.  The -- I

think I've seen one incident report that involved a mistaken

release.  I don't believe I've seen any incident reports regarding

over-detention, although there may have been one or two in the

last three or four years.

        So compliance with that paragraph of the settlement

agreement would assist, not only the monitors, but also the jail

staff in -- in understanding the extent of when there is

over-detention or not.

        In the last monitoring report when we discussed the

1   over-detention for people waiting for probation violation

2   hearings, the spreadsheet is very helpful that the sergeant

3   maintains.  I do have some concerns about whether it was entirely

4   reliable.  One of the instances of over-detention that was

5   mentioned in the report was an instance that I had found by

6   looking at the grievances, which I also do in connection with the

7   monitoring visits.  And there had not been a grievance by somebody

8   who had been released, and I was able to confirm that with the

9   sergeant over at records.  So it certainly -- and I think the log

10  and the incident reports would be a very important aspect to

11  really having a handle as to what extent over-detention is an

12  issue.

13        And I will turn to Ms. Barker for the details on those --

14  on that particular issue, and then if there is some follow-up

15  needed, I can jump back in.

16        THE COURT:  Okay.  Well, let me ask Ms. Barker this

17  question first.  Does Hinds County agree that a jail log is not

18  being maintained?

19        MS. BARKER:  Yes, Your Honor.  We would agree to that, and

20  we have actually our quality assurance coordinator who can -- who

21  is doing a great job right now.  She is in a newly-created

22  position and she's basically, you know, taken that and really ran

23  with it.  And I think that this is something that could fall under

24  her wheelhouse, and we can go ahead and, you know, make sure that

25  this is added to her duties.

1              Ms. Simpson, would you agree with that aspect?

2              THE COURT:  Is there a reason why the jail log has not

3     been maintained since this order has been in place?  Is there a

4     reason?

5              MS. BARKER:  Your Honor, I can't identify a reason right

6     now.

7              THE COURT:  Is there any -- as I've read this area of the

8     monitor's report, apparently when someone is picked up for

9     probation violation or parole violation, I guess, and there's a

10    revocation.  Does that require 21 days for them to get before the

11    judge and to have at least that hearing, or get before a judge and

12    do something?  I read the report to suggest that many people who

13    fall into that category who are being housed and detained with --

14    for more than 21 days.

15             MS. BARKER:  Your Honor, from what I understand, the

16    inmates who are picked up on a parole violation do see a judge

17    within those 21 days, and if not, they are let go.  However, where

18    the confusion and the problem is, is that after that parole

19    violation hearing, there is either that the judges don't send over

20    an order, or we don't receive an order directing them where to go,

21    and that causes them to be held over for a little bit longer.

22    From what I understand, that is the problem.  And so, that's where

23    the breakdown is.

24             THE COURT:  There's a probation -- there's a -- a person

25    is arrested on a probation violation, goes before a judge and the

1    judge either revokes it or not.  And if they revoke it, I assume

2    the person returns to the custody -- if they revoke it and he's

3    given prison time, that person then returns to the custody of

4    MDOC, right?

5            MS. BARKER:  That's correct, Your Honor.

6            THE COURT:  So, at this revocation hearing, is an officer

7    from the DA's office -- I assume the DA is the one who prosecutes

8    probation and parole revocation -- is that correct -- before a

9    judge?

10           MR. OWENS:  Yes, Your Honor; that's correct.  We're

11   notified of the violation, and if there's an arrest on that

12   violation, then we take that back before the state court judge.

13           THE COURT:  Okay.  After that hearing, the judge makes a

14   decision.  Is that right, Mr. Owens?

15           MR. OWENS:  Yes, Your Honor.  The parole officer or

16   probation officer would bring the packet to us and the judge will

17   make the decision to revoke or not to revoke.

18           MS. SIMPSON:  Your Honor, if I may.

19           THE COURT:  Yes.

20           MS. SIMPSON:  My understanding of the situation is a

21   little bit different and, of course, I am not an expert on

22   Mississippi law by any means.  But my understanding from the

23   sergeant over records is that first of all, the 21 days applies

24   only to probation violations, and not parole violations, and

25   the -- the issue that they're having is when the person comes in,

1    the probation department needs to get the paperwork to the jail

2    and to the Court for the proceeding to take place.  And that's not

3    happening within the 21 days.  And so, the hearing is -- is not

4    happening, and under Mississippi law, the inmate is entitled to

5    release at that point.  And I should say that what she reports is

6    that typically when that 21 days hits, she notifies the jail

7    administrator and typically release is authorized.  But we

8    certainly find exception to the 21-day rule pretty much at every

9    site visit.  Not a lot, but two or three or four in any given site

10   visit.

11        THE COURT:  Okay.  So for probation violations, Mr. Owens,

12   does your office prosecute probation violations, or is that -- I

13   assume it's not done by the probation officer?

14        MR. OWENS:  No, Your Honor.  They all are -- they all are

15   done by our office, and to address the bond issue.  We schedule

16   these -- this is based on the Court's willingness to actually hear

17   it and their ability with their ongoing docket.  So as soon as we

18   get it, we request a hearing date as we would any motion, and

19   sometimes the Court can hear it immediately and sometimes they

20   can't, but for a variety of different reasons.

21        THE COURT:  Okay.  The jail log situation takes me to the

22   incident that I had noted in No. 6 of my e-mail.  A detainee,

23   Tyreik Lackey, who was sentenced by this Court on March 17, 2021,

24   to 121 months in prison on various charges.  Because he was in

25   this court on a writ from the Hinds -- from Hinds County Circuit

1    Court, he was returned to the state, Hinds County, on a detainer.

2    When he was returned, it is my understanding, that the

3    defendant -- that well, that now the convicted person, Mr. Lackey,

4    was released on bond.  I don't think he could have been

5    released -- he could have been released on bond, but there should

6    have been a notification to the federal officers because they had

7    a detainer.  So when he was released, he should have been sent

8    back over here to be held by the federal authorities.  How did

9    that happen?  And that responsibility -- whose responsibility is

10   it to see that that does not happen?  Do we know -- is Mr. Lackey

11   still out on bond?  Where is he?  What's going on with Mr. Lackey?

12   Ms. Barker?

13        MS. BARKER:  Your Honor, Mr. Lackey is in federal custody

14   at this time.  We were notified via U.S. marshals that Mr. Lackey

15   was not in federal custody sometime last week.  We sent our deputy

16   who works with the U.S. marshals, and she found Mr. Lackey and he

17   is now in custody.  We did a review of this incident; it was a

18   major breakdown on a lot of levels, honestly.  Whenever Mr. Lackey

19   came in, the records officer claimed that there was a detainer

20   from Madison County rather than the federal jail in Madison.  So

21   they were under -- it was a mistake and they were under the

22   impression that there was a hold for Madison County, not the

23   federal jail.  Then the supervisor signed off on that -- they just

24   did not put in that there was a federal detainer on this

25   individual.  When they went to records and that records

 1    officer did not -- that's supposed to be our checks and balances

 2    whenever there's a hold or a detainer on an individual, and that

 3    records officer failed to notice that the detainer was actually

 4    for federal jurisdiction, rather than Madison County.

 5         The -- one of the officers called over to Madison County,

 6    asked if there was a hold, Madison County said no, and so they

 7    released this person on bond.  Now, as a form of corrective action

 8    on this, we are doing an internal affairs review of this incident,

 9    and there will be disciplinary action taken.  However, going

10    forward, we have maintained that supervisors on the sergeant level

11    are the only officers who are to deal with the holds or detainees

12    if there is a detainer from another jurisdiction to make sure that

13    it is done right.  And we are having more training on that because

14    I believe we do have a policy that addresses the hold.  And we

15    will have retraining of everyone in our records and booking units.

16         MS. PAIGE:  Your Honor, this is Mitzi Dease Paige, and you

17    had also asked our office to look into that.  If you would like, I

18    can report on the information that I received regarding that

19    incident.

20         THE COURT:  Yes, ma'am.  Thank you.

21         MS. PAIGE:  According to the criminal chief, what I was

22    told was that a detainer was in place at the time of his release,

23    as Ms. Barker just said, but the additional information that I was

24    told was that the defendant had told the jailer that he was

25    sentenced to 120 months by Judge Wingate, and that he wasn't

1   supposed to be released, and they then told him that the Feds had

2   dropped his case.  That was the information that we were given

3   when we looked into that.  I just wanted the Court to be aware of

4   that.

5        THE COURT:  Okay.  Thank you.

6        Obviously, the sheriff's department disagrees with that

7   version, I am pretty sure; right?

8        MS. BARKER:  Not that we disagree with Ms. Paige at all,

9   we just -- I just didn't have that information.  That's not --

10  wasn't a part of our investigation.  It may come out, but I

11  appreciate Ms. Paige sharing that information.

12       MS. SIMPSON:  Your Honor, if I may?

13       THE COURT:  Yes.

14       MS. SIMPSON:  And as Ms. Barker mentioned, there are

15  policies related to this; the records policy, in particular.  And

16  it's another area where the policy is written, but it's not

17  actually being implemented fully.  And there are a number of

18  checks and balances that are provided for in that policy.  One

19  that we've talked about in the reports, and I think briefly in the

20  last status conference, is there is supposed to be a summary

21  status sheet.  And with that status sheet is supposed to have all

22  of the underlying documents that support the continued detention

23  or release for each type of case that is pending for that

24  individual.  The status sheet was discontinued for some time.  We

25  have worked with the staff to reinstate that, but it's not being

1  used entirely correctly, and the supporting documentation is not

2  being put behind that status sheet.  And the purpose of that, of

3  course, is to address specifically that -- this situation, so that

4  it only takes a quick look to see this is -- this person has been

5  sentenced, and here's the document, and you don't have to go

6  through a mountain of files.

7       It also -- the policy requires a Court card.  And what

8  that is, is whenever an individual goes to court, an NCIC is run

9  before they go to court, and the document goes with the officer

10  and the inmate that allows the officer to know exactly what all is

11  pending, if there are any holds or detainers, and whatever happens

12  in court comes back on that court card, so the records can then be

13  updated.  The -- any kind of status change of an individual

14  requires a peer review, and a peer signoff, and then there's a --

15  should be -- another review is required at the time of release.

16  And the other thing that is supposed to be done -- and I don't

17  know if it would have made a difference in this situation, but

18  they are supposed to run an NCIC check at the time of release.

19  And NCICs typically show whether there are any detainers or holds.

20  I don't know if it was run.  I don't know if it was run whether it

21  showed this particular detainer, but that also is required as part

22  of process.

23       So there are a number of checks and balances worked into

24  the records policy that -- some of which are followed, but some of

25  which have not been implemented or fully implemented.

1           THE COURT:  Ms. Barker, does the sheriff's department run

2    NCIC reports on each inmate who they are about to release to

3    determine whether or not there are detainers?

4           MS. BARKER:  Yes, Your Honor, it does.  And from what I

5    understand that this particular detainer would not have shown up

6    in the NCIC.  Umm, the --

7           THE COURT:  Why not -- why -- what information do you have

8    that suggest that the federal detainer would not show in NCIC,

9    because it happened too recent?

10          MS. BARKER:  What I am being told, Your Honor, once that

11   person is in custody, you're supposed to take them off of NCIC,

12   and that's one of the reasons that this would not have shown up.

13          THE COURT:  He was no longer in custody.  His detainer was

14   transferred to Hinds County.

15          MS. BARKER:  Correct, Your Honor; he was in our custody.

16          THE COURT:  I'm sorry?

17          MS. BARKER:  That's correct.  He was in our custody.  So

18   from what I understand, because he was in our custody, that that

19   particular detainer wouldn't show up on NCIC.  Is that right?

20          THE COURT:  Let's listen to ourselves on that one.  Let's

21   listen to ourselves on that one, there.  You mean to tell me that

22   a person's criminal status does not follow them?  Because he is --

23   he is in your custody, you are about to release him, and there is

24   nothing on the NCIC report that suggests that this defendant has a

25   sentence to be served?  That's what a detainer is, I assume.  I

1   mean, I am no -- I am just a judge here.  So it -- it would show

2   that he has a federal detainer on him, I would suspect?

3           MS. BARKER:  Your Honor, I am going to let the sheriff

4   answer that.  I believe they can provide a little bit more

5   information and clarity for the Court.

6           THE COURT:  Okay.

7           SHERIFF VANCE:  Good afternoon, Your Honor.

8           THE COURT:  Good afternoon.

9           SHERIFF VANCE:  In a situation where somebody is on NCIC,

10  and once they are placed into custody, then they should be cleared

11  off NCIC as far as having an active arrest warrant.  If you do not

12  do that, any time they come it contact with law enforcement, their

13  name is going to pop up on an NCIC check, and you would rearrest

14  them.

15          MS. SIMPSON:  Your Honor, if I may.  I agree with the

16  sheriff.  If the -- if the agency that has the warrant out, or the

17  detainer out, takes them into custody, they should clear their

18  warrant or their detainer.  But if the agency who has them in

19  their custody is different from the agency that has the detainer,

20  taking the -- the agency that has them in their custody wouldn't

21  clear the hold and, in fact, couldn't clear the hold because it

22  would have to come from the agency that has the hold.  So I think

23  that's some of the confusion here.

24          SHERIFF VANCE:  Sure.  And I agree with that.  But I think

25  the presumption would be that we would not have a breakdown like

1   what we had, and the detainer would have been loaded into the

2   system, therefore the transfer would have been made into federal

3   custody.  Since the detainer was not loaded in on this individual,

4   that's the only thing that really went awry.  The fact that he

5   should have been cleared off NCIC like any wanted person, that

6   would be the proper procedure, because again, if not, if that

7   individual is not cleared off, then that warrant for his or her

8   arrest would remain active, and any time they ran into law

9   enforcement and ran their name through a computer check or an NCIC

10  check, you're going to come up hot and that individual would get

11  arrested again.

12          THE COURT:  Maybe I am confused about what a detainer

13  does.  I think the detainer puts on notice of anybody who has

14  custody -- I said I may be confused -- puts anybody on notice who

15  has custody over the person that when you are about to release the

16  custody of this individual, that detainer shows up; so you return

17  the person to whoever has issued that detainer.  It happens, at

18  least on our side of the thing, all the time on immigration cases.

19  The INS, where a person might be arrested by the U.S. Attorney's

20  Office on one charge, and after that charge is disposed of, INS or

21  Homeland Security has its detainer -- its immigration detainer,

22  and that person is turned over to the immigration authorities

23  because that -- that detainer exists.  And I believe that the

24  federal detainer in this case where the marshals has said, this

25  guy has been sentenced to 121 months -- before you release him,

1   you need to send him back to us so that we have the right for him

2   to deal with our 121 months.

3       SHERIFF VANCE:  I am in complete agreement with you, Your

4   Honor.  I think the question was -- was about NCIC, in clearing an

5   individual out of the NCIC.  And my position is, that would be

6   under a circumstance when all those things that you just mentioned

7   have been satisfied.  The reason why it wasn't done is because the

8   detainer was not loaded into the JMS, and so this individual

9   should have been released.  They should have been turned over,

10  like Your Honor has already made reference to, to the federal

11  authorities.  Well because the detainer was not -- and that's

12  where the breakdown is -- my understanding is that the breakdown

13  was that the detainer that we're talking about was never loaded

14  into the system.

15      THE COURT:  Okay.  So it was supposed to be loaded into

16  the system by Bureau of Prisons here.  It was the fault of the

17  people on the federal side?

18      SHERIFF VANCE:  No, sir.  It was supposed to be loaded

19  into the system when we took custody of that individual.

20      THE COURT:  Okay.

21      SHERIFF VANCE:  Once -- I believe it was Judge Kidd who

22  had issued a $1,000 unsecured bond on that guy, and then when he

23  was returned to us, because of the failure on our end -- the

24  failure on our end when we first took him into custody, that the

25  detainer was not loaded into the system.  And so, when we get to

1    the back and the judge has said that he can go free on the $1,000

2    bond, the detainer did not show up because it was never loaded

3    into the system on our end.

4        MS. SIMPSON:  If I may.  I think we're talking about two

5    different systems.  There's the NCIC system and the JMS system.

6    And in -- I think it's clear that it wasn't loaded into the JMS

7    system.  But when the detainer was created by the federal court,

8    the U.S. marshals should have entered that detainer into the NCIC,

9    and the U.S. marshals would be the only ones that could lift it,

10   and that would be when he's back in U.S. marshal's custody.  So I

11   don't know if it was in the NCIC system -- it should have been,

12   but -- I haven't seen the NCIC printout.

13       SHERIFF VANCE:  The responsibility for this failure

14   strictly on the part of the Hinds County Sheriff's Department, let

15   me make it clear:  I was just trying to address the issue about

16   releases and clearing people off of the NCIC.  It is similar to if

17   you -- and what I am speaking of, it's similar to if you recover a

18   stolen vehicle, sir.  If you don't clear that car of the NCIC,

19   then the next time somebody gets stopped driving that car, the

20   existing warrants, or whatever it is that's attached to that

21   vehicle, is going to be visible to law enforcement, and that

22   vehicle is probably going to be taken into custody again, along

23   with the individual that's driving it.

24       THE COURT:  Okay.  We're going to move -- the last thing

25   we're going to talk about will be the death.  But before we get to

1    that point, I want to talk briefly about the criminal justice

2    coordinating committee and all the people who are responsible

3    dealing with the indicted and non-indicted inmate list.  Again, I

4    have focused, and I appreciate the district attorney with respect

5    to answering the questions raised about the specific individuals

6    that I e-mailed about yesterday.  Those were just some of the

7    e-mails who had been housed or detained for a thousand days or

8    more.  The list of 13 or so that you got does not entail the

9    complete list.  I did not include anybody on the list who has a

10   pending trial date, for example.  Several people have trial dates

11   coming up in June, July, August and November.  It says that there

12   are some activity in their case.  The district attorney has

13   responded, and I thank the district attorney for responding,

14   specifically, and it looks like there have been sufficient answers

15   with respect to the -- those who have been held for a thousand

16   days.  But a thousand days is a very long time.  Again, 270 days

17   is the rule.  The norm -- we did a rudimentary sort of calculation

18   based on the number of days that we have on this report; it looks

19   like the average number of days is in excess of 300-and-something

20   days for defendants.  We couldn't get this matter assembled to a

21   spreadsheet to do these easy calculations to find out what might

22   be the median or the mode, which would give us a sort of a much

23   more three dimensional sort of view on this.  But what is it that

24   the DA's Office, the Court -- what is it that they are doing to

25   make sure cases are processed through in a time -- I mean, I just

 1   think -- it's hard to swallow that somebody could stay in
 2   detention for two, three, four years without a trial date.  And
 3   again, the thousand days takes us over -- nearly -- so I think
 4   there were a couple of people had been -- one of them had been
 5   housed 1800 or 1900 days, which gets us to over the five-year
 6   period.  What's -- is there a breakdown?  I ask that question
 7   first.  Is it -- I mean, what's going on that justifies these high
 8   numbers of detention?  Again, these people -- I always emphasize,
 9   that these people are presumed to be innocent.  And -- you know,
10   what is it?  I know -- I guess I see that some defense lawyers are
11   agreeing to these continuances time and time and time again while
12   the cases get old and stale, and then maybe their client has a
13   fortunate opportunity to have a reduced sentence from, say,
14   capital murder down to manslaughter because witnesses are gone and
15   all that.  But how -- what are the parties -- and when I say, "the
16   parties," that includes the state courts.  What are they doing to
17   make sure that these cases are processed through?  Can anybody
18   provide any sort of answer?
19        MR. OWENS:  Your Honor, this is the district attorney,
20   Jody Owens.  I can explain it, but I can't excuse it.  And that's
21   really what we've been trying to evaluate over the last 14 months.
22   We've been trying to get that -- the best practices of arrests,
23   indictments to resolving a case in a year's time.  We know that
24   we're realistically closer to two-and-a-half to three, which is
25   unacceptable.  I think I gave a brief update before the Court last

1   time.  I'll tell you what we've done since then.

2         In Hinds County, for the murder cases, we have more than

3   200 outstanding autopsies.  And generally, that would mean we

4   can't proceed in those cases, and those are going to be a lot of

5   the individuals who are actually in the jail because we work hard

6   to get the non-violent individuals out of jail.  So we went and

7   met with the Commissioner of Public Safety, Shawn Tindle; and we

8   asked him for resources because Hinds County has the most

9   outstanding autopsies and we can't try the cases.  We then went to

10   the lieutenant governor, the governor, and the speaker, and we've

11   asked for more resources as a whole, and the Chief Justice of the

12   Supreme Court.  These are all individual meetings that we tried to

13   do.  We were allocated for the first time, a one-time funding for

14   additional staff that we should get in July.  Our plan is to use

15   that monies to staff the municipal court level to get rid of the

16   cases that shouldn't be in the jail in the first place, so that we

17   can focus on the more violent cases and try those cases.  If Judge

18   Green was on the call, she would tell the Court that we can't try

19   the cases or resolve the cases because the volume itself -- with

20   the four circuit court judges that exists and half of the docket

21   being civil, and half of the docket being criminal -- at best we

22   can only try 26 cases a year.  Over the last probably four months,

23   we've had five trials where we did not have enough jurors to have

24   a venire panel large enough to move forward.  So what happened to

25   those defendants, they were prioritized in the jail who had been

1    there the longest.  They go back to the jail and they go back to

2    the docket, and it is very difficult for the judges to create a

3    special setting for those individuals.  That's a small way of

4    saying, "Yeah, we're trying everything we can; it is not enough.

5    We need more guards, some more help."  The state's forensic lab

6    did not have a pathologist who could come testify over the last

7    six months, he is now coming back -- or that individual is now

8    coming back effective May 1st. We think we should see some

9    traction there, because when we make offers on these significant

10   cases, those offers -- there is no incentive to take the offers

11   because who wants to go to Parchman when you're in Raymond?

12   Parchman is hard life.  CMCF is hard life, so you'd rather stay in

13   Raymond.  And the offers are significant, they are 30 and 40-year

14   offers.  So we can't take expect our people to take trials unless

15   we are willing to take those pleas down, which, you know, we do

16   appreciate cases get worse with time; they don't get better, and

17   they are more difficult to try; witnesses disappear; police

18   disappear.  But we're trying to find that middle ground of

19   accountability to the public and move the docket.  But we are

20   consistently trying new things.  The sheriff's office sends the

21   DA's office those people who have been there the longest.  We get

22   that list every month and we try those cases -- try to push those

23   cases.  We don't control what gets tried.  We have not been able

24   to say to the Court, "Hey, this is the case we want to try because

25   the individual has been there the longest."  We have seen

1    instances where judges prioritize those cases whenever possible.

2    You saw the mental exams is an issue.  The autopsies and violent

3    crimes are an issue because they won't accept the plea offers

4    because we can't try the case.  So those are just the challenges

5    that we are looking at, but we do think it is a capacity issue.  I

6    believe I heard the Court say, you know, they have to try to get

7    with these special judges up in the Supreme Court, but we need

8    more circuit court judges that are fully staffed in Hinds County

9    if we're ever going to get to the bottom of this thing, and we are

10   currently going to continue trying to lobby and take that -- and

11   make that case and make that message clear that this one-time

12   appointment, or one retired judge helping with some appeals is not

13   what we need to fix this problem.

14        And we've been trying this, Your Honor, for two

15   legislative sessions.  This year we got some traction.  We've been

16   told that if we can show that we are responsible with the

17   resources and we can make a dent, that we're going to see

18   something happen there.

19        THE COURT:  Okay.  Well, I agree with you that -- I do

20   agree that you need more judges -- permanent judges here in Hinds

21   County, and the state has decided that additional judges should go

22   elsewhere in the state, to the neglect of Hinds County.  They

23   increased the number of circuit judges, I think, in Desota County,

24   and in Rankin County and/or Madison County, when Hinds County has

25   been bursting at the seams.  You're right; you only have four

1    circuit judges here.  And when those four circuit judges are

2    required to work 52 weeks a year, assuming one case takes a week

3    to try, then you can only try 52 cases a year without any breaks

4    for all four judges, and that's not happening because they have a

5    civil docket and because they have lives, too; they deserve time

6    off and all that kind of stuff.  So I do -- there are not enough

7    permanent resources in Hinds County.  But that also means that we

8    have to figure out a way to still process these cases through.

9         Let me ask you, Mr. Owens:  Does state law require that

10   autopsies be done by the state pathologist, and that those persons

11   employed by that office are the ones who will present the

12   testimony, or does -- or if the county had the resources, for

13   example, could they hire private persons to do autopsies?

14        MR. OWENS:  Your Honor, we can do private forensic

15   pathologists.  We've inquired about that.  The cost we got from

16   reexamining, reviewing the records and testifying is approximately

17   $10,000, a case.  The county, frankly, can't afford that.  For the

18   200 we have outstanding, I think, if my math is right, that's

19   about $2 million or 200,000.  And that's a significant issue --

20   trying to find people.  On that same conversation, we actually

21   reached out to University of Mississippi to see if we can find a

22   regular pathologist to testify.  But we are trying to look around

23   that way.  But judges have told us that -- the judges have told us

24   they are going to require us to try cases without the pathologist,

25   because that is our responsibility, being the State.  So we don't

1    know how that would play out, but we know everybody is getting fed

2    up about the delays independent of what's happening.

3         THE COURT:  Okay.  Does anyone want to wish to chime in or

4    follow up at all with respect to any of the stuff raised in the

5    monitor's report with respect to -- that's tied to the questions

6    that I sent out yesterday, as well as your -- your own observation

7    of the report?  All right.

8         Ms. Barker?

9         MS. BARKER:  I apologize.  We -- the sheriff's office

10   looked at these synopsis of the cases that the DA's office sent

11   over, and it appears to be about two people that it seems like the

12   sheriff's office had some -- we needed to do something and move on

13   those cases.  And we checked with that, and I sent an update back

14   to your Court.  One the individuals had already been sent to

15   MDOC -- I am sorry.  I'm sorry.  Both of those individuals have

16   been sent to MDOC so they are no longer in our custody.

17        THE COURT:  Okay.  So I did notice on the questions that I

18   asked yesterday that -- and between the time that the report was

19   printed and my e-mails that went out to you, persons had -- should

20   have been in the custody of MDOC, and it looks like they are now.

21   So MDOC is receiving inmates -- because I figured they were still

22   there in part because MDOC was still putting a hold on picking up

23   inmates.  Is MDOC picking up those persons who are in their

24   custody, transporting them to MDOC facilities?

25        MS. BARKER:  They are, Your Honor, but slowly.

1          THE COURT:  Okay.

2          MS. BARKER:  We are in constant contact with them, and

3     they have been picking them up a little bit more quickly, but now

4     it is an average of about a month to 30 days.  But we are in

5     constant contact with them on a weekly basis to check on the pick

6     up of those inmates.

7          THE COURT:  Okay.  Before I turn to Justin Mosely, I know

8     the Mr. Gaylor has the people from Benchmark and otherwise in. Is

9     there any sort of update that you need to share with me with

10    respect to the repairs, or the plans to repair, whatever is going

11    on in Pods C, B and A, or anywhere else among the facilities?

12         MR. GAYLOR:  Your Honor, I would say generally, and if

13    there are specific questions with regard to any particular item,

14    Benchmark is certainly here to say that.  But we want to submit

15    that we have a list of items that we've been working on to bring

16    Pod B into repair, and we believe that we'll be able to be

17    complete with Pod B over the next few months -- a couple of

18    months, so that we can transition detainees from Pod A into Pod B.

19         Additionally, Your Honor, we have submitted to the

20    Department of Justice and monitors, our plans to build a new

21    detention facility to alleviate and eliminate some of the problems

22    that we have right now with our outdated facility.

23         THE COURT:  Where would that facility be located?

24         MR. GAYLOR:  It would be near where Henley-Young is

25    located now.  It would be near, in that vicinity.  Right now the

1   area is wooded, but we have that under lease from the Jackson

2   Public School District.  Near Gallatin Street and McDowell.

3        THE COURT:  On the opposite side of Henley-Young where the

4   firing range is, or back on the same side as Henley-Young?

5        MR. GAYLOR:  It is sort of -- it is east of Henley-Young

6   in a wooded area.  Right now it is sort of wooded and undeveloped,

7   obviously.  But it's in that vicinity.  You won't -- you wouldn't

8   be able to recognize it, probably, just by driving by normally.

9   It's not -- it's near the same side where Henley-Young currently

10  sits, in that vicinity.

11       THE COURT:  Okay.  With respect to Pod A, I think we heard

12  about the report.  The monitor's report indicates -- and I think I

13  raised this the last time about this issue of no light.  Whether

14  there are no lights, skylights -- I am just trying to find out, is

15  there a time of day or anything where the detainees are in total

16  darkness?

17       MR. GAYLOR:  No, Your Honor.  That's not the case.

18       THE COURT:  Okay.  So it physically has lights that are

19  operable at night?

20       MR. GAYLOR:  Yes, Your Honor; they do.

21       THE COURT:  All right.  Now, are all the pods being

22  monitored, as they should be monitored, 24 hours a day?

23       MR. GAYLOR:  I leave that to the sheriff's department to

24  answer that question, Your Honor.

25       MS. BARKER:  Your Honor, can you clarify that?  Are you

1   talking about actual staffing inside the unit, or by camera

2   system?

3           THE COURT:  Staffing inside -- I mean, the way I

4   understand it is supposed to be staffed, is that someone should be

5   inside the unit, I think, all the time.  Help me out, monitors.

6           MS. BARKER:  You're correct on that assumption.  We have a

7   staff shortage, and so, the pods are being monitored, but they're

8   being monitored from either around the horseshoe, which is right

9   outside of the pod, or from the control pod.

10          THE COURT:  Okay.

11          MS. BARKER:  And we have -- we do have people inside the

12  housing unit in C-Pod.

13          THE COURT:  Okay.

14          MS. SIMPSON:  Your Honor, would you like the team to

15  address that?

16          THE COURT:  Yes, ma'am.

17          MS. SIMPSON:  Then I'll defer to Mr. Parrish on that.

18          MR. PARRISH:  Thank you, Lisa.  When C-Pod opened up, it

19  was supposed to open up under supervision -- that was October 22.

20  A staffing plan was laid out where there would always be an

21  officer inside each of the three direct supervision housing units,

22  and there would be two officers inside Charlie Four, which is

23  confinement.  There would be an escort officer in the horseshoe

24  and there be would another officer available to take care of the

25  iso units, plus there would be officers available to assist with

1   recreation.  That has never occurred.  I am sorry, I don't care

2   what anybody says, when you read through the incident reports and

3   find that officers are responding to the housing units that are

4   unattended when incidents breakout routinely, the staffing has not

5   met what it was supposed to be.  Also, there were no plans, no

6   orders for the staff on what they were supposed to do.

7        Now, I did work with the jail administrator and he and I

8   developed some duties and responsibilities for the officers that

9   were put on April 6th.  That should have happened back on

10  October 22nd, not on April 6th, but at least it has finally

11  happened.  I can tell you that within the past month, I read

12  incident reports on three fires that were set within a total of

13  45 minutes in housing units Charlie Four, which is lockdown, where

14  there are supposed to be two officers constantly.  There was

15  nobody present for any of the three fires.  An officer had to

16  respond from outside in each case.

17       So, even though I am not able to be there to see things

18  personally, from reviewing the incident reports that are generated

19  by the staff themselves, it is absolutely apparent that staffing

20  is not being kept up to the standard that's required for direct

21  supervision.  In Alpha Pod, staffing is even worse.  There is

22  nobody there.  I mean, you don't have anybody inside any of the

23  housing units even by design.

24       So the situation is improving, but it is totally

25  unsatisfactory at this point.  And I hope that they're able to

1   rectify that in short order.  I hope that the orders -- the duties

2   and responsibilities that are laid out for the officers that work

3   in direct supervision explain to them that they can't just lock

4   inmates down in their cells all the time.  They can't feed inmates

5   in their cells.  They are supposed to be out in the dayroom.  They

6   are supposed to be officers inside the confinement unit at all

7   times.  I hope that those things take place in the near future.

8   But that is the kind of thing that we keep putting into our

9   reports.  Hopefully, in the future it will be.  I can tell you

10  that as of right now, it is not.

11          THE COURT:  Okay.  Thank you, Mr. Parrish.  We'll put a

12  pin in that.  I want to talk briefly -- it may -- will only be

13  briefly because I don't want to interfere with any ongoing

14  investigation by anybody.  But I am deeply concerned about the

15  reports that the public has been informed of with respect to -- I

16  believe that the sheriff office has indicated about Justin Mosley

17  -- that Mr. Mosley was found hanging and that he hung himself, I

18  believe -- I mean, I think that's what the reports have suggested

19  -- on Sunday, April 18th.

20          What, if anything, do we need to know about that?  Can we

21  know about that?  Who's investigating it?  Is anyone investigating

22  it outside of the -- inside of the sheriff's office and/or outside

23  of the sheriff's office?

24          Ms. Barker, I guess you're the best person to start with

25  on that one.

1          MS. BARKER:  Yes, Your Honor.  Justin Mosley -- he was

2     arrested at the beginning of January 2020 for a double murder in

3     Edwards where he killed a 27-year old woman and a 57-year old man

4     in front of a six-year old, and two toddlers.  He has been a -- he

5     was in a lot of discipline problems while he was in our jail.  We

6     put him in the lockdown unit in C-Pod.  He continued to break out

7     of the C-Pod with the windows, because the windows could be broken

8     in the C-Pod in the lockdown units.  We then sent him to Adams

9     County for about a week because he was such a problem inmate and

10    destroying our jail.  And Adams County promptly called us and said

11    pick him up because he was destroying their jail.  So

12    approximately a week before April 18th, he grabbed a female

13    detention officer and exposed himself to her.  Because he would

14    always break out the windows in C-Pod, we put him in a booking

15    tank, which is the only place that we had left for him.  And he

16    was -- we did not have any indication that he was suicidal.  He

17    was not on suicide watch.  However, the reports that we -- our

18    internal investigation is not complete.  MI'S investigation is not

19    complete.  However, what I can tell you, Your Honor, just to be

20    upfront, there was a failure on our part -- not to prevent the

21    suicide, but he was supposed to be checked every 15 minutes.  None

22    of our records indicate that our officers were following that

23    protocol.  And in -- like I said, there was no indication that he

24    was suicidal.  There was no indication that the checks could have

25    prevented him from hanging himself, but that is everything that we

1    have discovered so far.  And we do have video of the incident

2    that's been over to IAD and MBI.

3         As far as corrective action, Your Honor, after that

4    incident, we have made sure that all of the detention officers are

5    following protocol and checking on those inmates in booking every

6    15 minutes.  We have revised the booking -- I'm sorry, the

7    observation log to note different activities that the inmate may

8    be doing.  Eating his food.  Is he sleeping?  What is he doing?

9    Additionally, we have placed two officers rather than one officer

10   in the control -- central control -- which you can see videos of

11   the entire facility from that.  Because one person -- that is just

12   too many videos for one person to look at; we discovered that as a

13   result of this.

14        MS. SIMPSON:  Your Honor, I think the monitoring team has

15   some comments when you're ready.

16        THE COURT:  Yes.  I'm ready, Ms. Simpson.  Thank you.

17        MS. SIMPSON:  And I am going to start with sort of some

18   general comments and then turn it over to Mr. Parrish.  This is

19   certainly a big concern to the monitoring team, in part because a

20   number of contributing factors are issues that we've been raising

21   for some time, and one of them being that those booking cells are

22   not appropriate for housing.  Mr. Parrish has said that

23   repeatedly.  It has been in our reports repeatedly and it's

24   actually in the stipulated order that they are not to be using

25   those booking cells for housing.  And the stated intentions some

1   years back before the renovations on C-Pod started, was that once

2   C-Pod was renovated, there would be no need to use the booking

3   cells.  As a result, the only booking cells that were modified to

4   allow officers to see through the doors and see what's happening

5   inside the cells were the multi-use cells and not the individual

6   cells, which are around the corner and that is one reason why they

7   are not appropriate for housing.  So that modification was not

8   made.  It's -- almost impossible to see what's happening within

9   the cells and -- we've certainly read the incident reports where

10  inmates have broken out of the windows of the doors in C Four and

11  then crawled out of those windows.  That's a problem that

12  obviously needs to be repaired.  It is much less of a problem if

13  the housing unit is staffed the way it is supposed to be staffed.

14  And as Mr. Parrish already mentioned, the incident reports make

15  clear that it frequently is not.  We agree with Ms. Barker that it

16  appears the 15-minute checks were not done.  That's also something

17  that's repeatedly been raised and we asked for those observation

18  checks.  But it appears from the incident reports that he hadn't

19  been checked on for some time.  There are really supposed to be

20  two officers on the floor in booking and they often are in

21  the administrative area and not on the floor.  Officers are

22  supposed to have keys to the cells when a key is necessary to open

23  it, and the floor officer did not have a key.  And then they are

24  also supposed to have what's called a 911 knife, so that a person

25  hanging can be quickly cut down.

1          So -- it is especially concerning that these issues have

2     been raised many times over for a long period of time and they

3     appear to be contributing factors and would allow this suicide to

4     take place.  And with that, I'll turn it over to Mr. Parrish to

5     add any further detail he wants.

6          THE COURT:  Thank you, Ms. Simpson.

7          MR. PARRISH:  Thank you, Lisa.  She really covered all the

8     pertinent facts.  Let me just state that this suicide reflects,

9     one, a lack of staff and staff in the wrong places.  There was one

10    officer taking care of wellbeing checks out on the floor, checking

11    people in, being booked in; there were four officers sitting

12    inside the office.  We've pointed that out time after time.  They

13    don't need to be sitting in the office; they need to be out on the

14    floor.  And the officer who was actually doing the work was a paid

15    overtime detail, filling in for the officer who should have been

16    doing it, who was sitting in the office.  The officer who was

17    doing the work out on the floor was never issued a set of keys.

18    My goodness, how can you be told to hold the job down and not even

19    have keys to get into the cells.

20         The second thing was a lack of supervisory responsibility.

21    The sergeant in charge of booking was also responsible,

22    apparently, for another housing area, and was back in Charlie Pod

23    at the time.  The sergeant also, according to the incident reports

24    that I read, directed the officer working in booking to "Stay away

25    from that inmate."  Absolutely contrary to complying with the

1   standard of doing a 15-minute wellbeing check.  I think that has

2   something to do with the disciplinary action that was made

3   reference to earlier.  Certainly failure to follow policy, doing

4   wellbeing checks.  The impact of maintenance problems ties into

5   this.  It is an ongoing problem that goes back to the beginning of

6   time in Hinds County.  Charlie Pod was allegedly repaired and

7   brought up to standards.  However, the windows in the cells are

8   less than secure.  Inmates can break them out.  They break them

9   out routinely.  As a result, this area that was supposedly going

10  to take care of the problems for the jail turned out to be

11  inadequate to take care of problem inmates, and therefore, they

12  went back to misusing booking holding cells.  I went in to booking

13  for the first time in 2014.  I found an inmate who had been housed

14  in a booking single cell for three-and-a-half years.  I pointed

15  that out in my initial reports.  Unfortunately, the problem just

16  has not gone away.  I don't care how many times we have talked

17  about it, it keeps coming up, as Ms. Simpson pointed out.

18        In a jail, a 911 knife is a specially-made knife that you

19  can't stab with, but it is used for cutting somebody down.  There

20  apparently was nothing available, they ended up having to go back

21  into the booking office to get a pair of scissors to try and cut

22  the man down.  When the nurse came on and tried to give CPR and so

23  forth, she had to go back to medical to get an AED(automatic

24  electronic defibrillator).  It's the kind of thing that should

25  have been in place in booking.

1      I am looking inside the cells and say how could he

2  possibly hang himself from a light fixture in the ceiling.  There

3  are two light fixtures in the ceiling, and I've got pictures of

4  them.  They are retrofitted things that are bolted into the

5  ceiling, and one of them had been pried down, and he was --

6  managed to put a sheet up through it, and that way he could tie it

7  off and hang himself.  Certainly something that should have been

8  spotted as people were doing their 15-minute wellbeing checks to

9  determine whether or not things were okay.  They should have seen

10  that he had a light fixture that's malfunctioning.  And as she

11  pointed out, the wellbeing checks, the last one was done and

12  recorded, according to what I've been told, at 11:05 in the

13  morning, and this occurred over three hours later.

14      At any rate, it is just a sad confluence of mistakes and

15  failures to follow things that have been set up in place

16  beforehand to resolve problems, and unfortunately it resulted in

17  this man's death.

18      MR. OWENS:  This is the district attorney.  May I say

19  something?

20      THE COURT:  Yes, Mr. Owens.

21      MR. OWENS:  Your Honor, again, our job in this role, as

22  far as an office to prosecute these crimes, while we do believe in

23  justice, we don't believe in vengeance.  I do want to remark that

24  the sheriff's office immediately notified me, personally.  I got a

25  call Sunday.  Almost immediately, we sent an investigator down to

1    the jail to assist MBI's investigation.  Because what happens in

2    these instances, if there is some foul play, or some criminal

3    negligence, that case would still be presented to the grand jury

4    after the district attorney's office.  And the one thing that

5    Attorney Barker mentioned that I thought was -- that was important

6    for this instance is that, as I understand the investigation, the

7    young man was in the cell he was in because he had just previously

8    either sexually assaulted, or inappropriately touched some female

9    guards in a sexual type of way.  And I think that almost

10   immediately preceded this in some form or fashion.  Again, not

11   excusing what happened.  I think it says a lot for the sheriff's

12   office to take responsibility for adopting where he was placed and

13   why.  It had something to do -- I will point that back to the

14   sheriff's office if that's accurate, but he had done something of

15   a sexual nature that had him detained there.

16        MS. BARKER:  That's exactly right, DA Owens.  The only

17   reason he was in this cell is because we tried everything with

18   this -- to place him in different facilities to another

19   jurisdiction.  We literally had nowhere else to put him, and he

20   was not in a single cell that had the mesh over it; he was in one

21   the multiple-use cells that were open, that we were -- that we

22   replaced the door with open window -- a Plexiglass window, I

23   should say.

24        So, you know, in this case where we have a facility that

25   is not working properly, we really had -- did try to put this

1    individual, who is a problem, and was assaulting people and

2    exposing himself, and tearing up the jail -- it was literally the

3    last place that we could have put him.  I am open to suggestions

4    as far as what else we could have done as far as putting him in a

5    cell to lock him down.  So this is -- we were -- this was

6    literally the last place to put him.

7           MR. OWENS:  And, Your Honor, this is DA Owens again.  I

8    understand that we have the responsibility as the county to house

9    people safe and secure independent of the challenges, but this

10   individual had a unique skill set.  He led the county on one of

11   the largest man hunts that we've had after the murders occurred.

12   He just had a unique survival instincts that is very difficult for

13   us to deal with, and that's how we were prioritizing his case.

14   And we had made an offer -- obviously it was large, because of the

15   two homicides on the case in conjunction with the families, and we

16   met with the families of both the decedents.  But that offer, to

17   the Court's larger question, doesn't help him move his case.  The

18   request would be for a mental exam to see if he is okay, and

19   that's going to be a delayed process, which puts us in this

20   position of a counter power kick, so to speak.  So thank you.

21          THE COURT:  All right.  We're getting ready to wrap up,

22   but --

23          DR. DUDLEY:  Your Honor --

24          THE COURT:  Yes, Mr. Dudley.

25          DR. DUDLEY:  I think there's another part of this case

1    that hopefully will get some attention when it's explored.

2    Just -- nobody has talked about kind of what is his mental health

3    history.  And just very briefly, he's what we would call an early

4    onset bipolar disorder, which means that instead of in his late

5    20s, early 30s, when he developed this disorder, he was first

6    hospitalized for it when he was 16 years old.  The significance of

7    that is that individuals with this kind of disorder have the manic

8    and depressive episodes swinging more rapidly than with the older

9    adults.  And because it's an onset so early in their developmental

10   years, it also interferes with development.  So you have someone

11   who is very immature and impulsive, you know, they never quite get

12   out of late childhood/early adolescence, and that really perfectly

13   describes him, this combination of difficulties.  And, you know,

14   this is the case in which the things that should be in place, like

15   segregation review and discipline review, this should be an

16   opportunity for mental health and security to work together to

17   figure out how to manage him.  With there not being in place, that

18   really didn't happen, and so a development of a joint plan could

19   have made a difference.  This is -- certainly, even though as

20   Ms. Barker noted, he doesn't have a history of making a suicide

21   attempt, but he has a history of all these other incredibly

22   problematic behaviors that are obviously symptomatic of his

23   psychiatric illness.  And so, he is the kind of guy who shouldn't

24   have been on suicide watch, but should have been on kind of a

25   next-level watch.

1        When you reviewed the records, you see there were a

2   variety of things that happened over the month or so prior to this

3   suicide that were clearly triggers for him.  Including kind of

4   realizing the gravity of the situation, it is all over his mental

5   health records, including the fact that he started refusing the

6   medication that he was on.  Although it had not fully stabilized

7   him, it at least kept him somewhat at bay.  He had access to some

8   contraband at one point.  So there was a variety of things that

9   kind of went on, and you could see in the record he was

10  deteriorating.

11       So again, not that he had been suicidal, but there is --

12  he's the kind of guy who should have -- we should have kept an eye

13  on, given what was going on with him.

14       THE COURT:  Thank you, Mr. Dudley.  I think right about

15  this time the other week, we were getting ready to close and I

16  told the parties; that is, DOJ and Hinds County, how do we see a

17  path going forward?  And that question still remains.  It is the

18  United States' satisfaction, if you will, of their motion for

19  contempt that put us back to where we have been operating under

20  for over the last year.  And I think I asked DOJ about what next

21  steps do they -- might they seek to take and, of course, they

22  said -- whatever they might do, you know, obviously requires

23  approval and authority from higher-ups.  But I guess the first

24  question to DOJ and Hinds County, since our last meeting, has

25  there been any communication, conversation about a path forward?

1   I'll start with you, Mr. Cheng -- excuse me, Ms. Moeser -- I

2   mean -- I don't see your name here anymore.

3           MS. VERA:  It's Ms. Vera.

4           THE COURT:  Ms. Vera, I'm sorry.

5           MS. VERA:  No problem, Your Honor.  Yes, we spoke with the

6   county last week, with the sheriff's office counsel and counsel

7   for the county board last week about, you know, thinking about

8   what the next step might look like.  And we agree with the Court

9   that the status quo is not sufficient to address the problems that

10  the consent decree is meant to address.  And we're getting close

11  to five years now that since -- since that consent decree was

12  entered into.

13          So as the Court knows, the -- the stipulated order which

14  was entered in early 2020 -- the purpose of the stipulated order

15  was to advance compliance with the consent decree.  Based on

16  everything that we've heard today and last time, and in February,

17  we believe that enhanced remedies are necessary at this time.  So

18  we began discussing these with the county and we've been

19  considering some different options and what that might look like.

20  We believe it is necessary to have more direct oversight over

21  operations at the jail.  And some of the options that we are

22  considering, and which we discussed with the county, are federal

23  receivership.  A lesser variant of federal receivership that would

24  still involve direct oversight and leadership authority, which one

25  idea is an independent compliance director who would have final

 1   authority over operations at the jail.  And we also have been

 2   considering other lesser variants of full receivership, such as a

 3   dedicated mentor who would work closely with the jail

 4   administrator, or a receiver-like person in charge of a particular

 5   issue area.

 6        We think this is necessary at this point because there are

 7   several ongoing problems -- not just in -- you know, today we've

 8   been discussing specific issues, but what would come up repeatedly

 9   is the interrelated nature of a lot of these issues, and the fact

10   that a lot of these problems are the result, or can be tied to

11   failure of leadership, or failure of planning, and sort of a lack

12   of big picture oversight, over how -- how compliance with the

13   settlement is going to be achieved.  So there are at least four

14   big categories that we see, a failure of leadership to promptly

15   address physical plans and life-safety issues, maintenance type

16   issues at the jail.

17        Second, leadership gaps that cause major upheaval in

18   provision of necessary services to detainees, both in the jail and

19   at Henley-Young.  The treatment director position at Henley-Young

20   is an example where there is vacancies that result in very real --

21   inadequate services being provided.

22        Third, staff training and supervision; holding staff to

23   account when they fail to follow policies.  Unfortunately, the

24   death of Mr. Mosely very recently is a prime example of multiple

25   policies that are in place that have been, you know, ongoing

1    serious issues that have been raised before the Court and in

2    monitoring reports repeatedly, and the breakdown there has real

3    harm.

4           And finally, staff recruitment and retention which is a

5    major issue both at Henley-Young and at the jail.  And an example

6    of how - there are many examples of how we believe that something

7    -- going above and beyond that we did with the stipulated order

8    may be necessary at this time.  I think staff recruitment and

9    retention provides a helpful example.  The stipulated order

10   included as one the first steps hiring a consultant to help with

11   staff recruitment and retention.  And eventually, the parties --

12   the parties identified a consultant; the defendants agreed to hire

13   that consultant.  They never actually did hire him, but the

14   monitor hired the consultant as part of the monitoring budget.

15   And then months later, the county informed the monitor and DOJ

16   that they didn't want to work with that consultant because the

17   consultant was not a good fit.  And meanwhile, you know, staffing

18   is still an issue; direct supervision is still not being

19   implemented; safety checks are still not happening.  And so, you

20   know, there are -- there are problems like that where the

21   stipulated order just has not achieved the progress that we

22   believe is reasonable at this point.

23          Finally, I'll just make a small note that's related to

24   these issues.  The Court mentioned the CJCC and how that -- the

25   work of the CJCC is supposed to sort of tie into some of these

1    bigger systemic criminal justice issues in Hinds County.  And I'll

2    note that the monitoring report, the 13th report, did talk about

3    partial compliance on a few of the CJCC provisions in the consent

4    decree.  And so, one -- one additional idea that I think would be

5    in addition to what I have just been talking about with enhanced

6    oversight, might be that we consider some additional oversight

7    over the CJCC provisions and how all of these interrelated issues

8    are being addressed. You know, Dr. Dudley talked about mental

9    health issues in Mr. Mosely's case, but, in fact, there are --

10   there were individuals with mental health issues on the Court's

11   list of detainees who have been there for more than a thousand

12   days, and mental health and the booking cell issue is a big, you

13   know, area of concern.

14       So the CJCC is one area where there is actually a lot

15   potential for improvement, but there may be a need for additional

16   oversight.  Perhaps, you know, one thing in the monitoring report

17   that the monitor noted was that the CJCC has not been meeting as

18   frequently as it should be, and some people have not been

19   attending, so perhaps a periodic reporting requirement about the

20   CJCC's activities might help in that regard.

21       But to go back to the main point, you know, the United

22   States' position at this juncture is that we should be considering

23   enhanced oversight, direct oversight, perhaps in the form of an

24   independent compliance director who would not be -- it would be

25   something short -- perhaps a full receivership, but would be a

1    person with that level of authority who could actually have the

2    authority and budgeting powers to implement changes at the jail

3    and -- at a faster pace than what we've seen.  And that's

4    something we've discussed with the county.  The last thing I'll

5    say is that when we discussed it with the county, they -- there

6    was some receptiveness to the idea; they did ask if we would

7    consider, you know, giving them a little more time to come into

8    compliance.  I think a very brief period of time might be

9    reasonable.  We could agree to, you know, perhaps 30 to 45 days

10   from today while that, you know, before we came back to the Court

11   with an order, proposed order, but, you know, at this point, we

12   don't believe the pace of compliance with the consent decree is

13   adequate to address the harm and risk of harm to detainees.

14          THE COURT:  I'll hear from the county and/or the sheriff.

15          MR. GAYLOR:  Your Honor, before the sheriff speaks, the

16   county speaks toward a couple of matters.  With regard to coming

17   into compliance on the maintenance end, I think the county has

18   demonstrated and presented to the Court that there is a period of

19   time necessary to come into compliance with renovations to Pod B

20   with regard to creation of new detention facilities, as well as

21   addressing all the life safety issues that have been brought to

22   the Court.  There is still a significant amount of dispute, we

23   believe, or disagreement with regard to what the life safety

24   issues are, and status of those life safety issues might be with

25   regard certainly to fire safety issues and perhaps other matters.

1          But as it's been reported, it's going to take a few months

2     before Pod B is finished, and that's just not something that a

3     compliance director or receiver or anybody else can make happen

4     particularly faster than it is happening right now.  Some matters,

5     you know, do take a significant period of time with regard to

6     repairs to facilities.  It took a period of time for us to repair

7     Pod C last year, and it is taking some time to finish Pod B this

8     year.  And so, we -- we contend that we are addressing that with

9     regard to that element of maintenance.

10          Now, with regard to -- another matter that was addressed,

11    the CJCC, I think there is still some level of confusion with

12    regard to our level of compliance with regard to the CJCC, in that

13    the CJCC was formed; it did meet; it came up with recommendations

14    with regard to some matters; and made a report to the Court.  Now,

15    with regard to any additional matters to be addressed by the CJCC,

16    there is some limited capacity with regard to other officials that

17    are -- that would be on the CJC -- that would comply with the

18    CJCC, including circuit judges and mayoral officials and all

19    manner of other officials.  And so, I think that I don't believe

20    that any expansion of the Court's order with regard to the CJCC is

21    warranted at this time.

22          Now, we did report that the CJCC did, in fact, meet last

23    year.  And although they have not met fully this year, that is

24    something that's in the -- in the works as well as a new director,

25    or new leader if that CJCC is appointed or voted upon.  But

1    nevertheless, we don't think that anything further with regard to

2    that committee should be overtaken by the Court's order.

3         Now with regard to compliance director, that is something

4    that the county has some level of agreement.  Although, from the

5    county's perspective, we have already begun a search for a

6    compliance specialist, so to speak, who can assist us with jail

7    management, jail staffing, retention issues, and other matters

8    with regard to the management of the detention facilities.  That

9    is something we are working on as we speak.  And so, we hope that

10   we're given some level of ability to put somebody in place who can

11   assist us with that -- from the county's perspective.

12        THE COURT:  Any word from the sheriff?

13        MS. BARKER:  Yes, Your Honor, we agree with everything

14   that Mr. Gaylor said; and also, Ms. Vera did a good job in

15   presenting the conversations between parties to the Court.  We

16   have realized -- and we take full responsibility that, yes, there

17   were two critical incidents that were a breakdown with our

18   staffing, following procedure, and following policy.  The

19   sheriff's office is of the opinion that we can show some forward

20   movement in this, and that we will request that we have a little

21   bit longer to reach compliance with that stipulated order.  We are

22   making a good faith effort to delve in to try to meet compliance

23   at all of these different areas.  But I think that's something

24   that has been fully displayed today, is that every single area of

25   the criminal justice system in Hinds County needs help --

1    everything single area.  There is shortage of judges; there is a

2    shortage of attorneys -- public defenders; there is a shortage of

3    the state pathologists -- can't even do their autopsies and come

4    and testify at trial.  There are shortages every single place that

5    you could think of, and that's only on the county side; let's not

6    even think about the moving counterpart with the City of Jackson

7    with the rising crime, with the administrative situations that are

8    going on on that side.

9         So, yes, we have been -- there were two unfortunate

10   incidents that highlighted the failures on a staffing level on our

11   -- on the sheriff's office part.  However, we are making a good

12   faith effort to address all of these needs.  The sheriff fully

13   understands the importance of this, and the -- and the fact that

14   this has got to be done.  There is no ifs, ands, or buts about

15   this.  And his side is committed to moving this forward.  I think

16   everybody wants that.  However, we do need a little bit more time.

17   And I hate to say this, but it is true; that last year, you know,

18   the sheriff came in, you know, new administration, everybody was

19   just learning, I guess, how to put one foot in front of the other

20   and where the bathrooms were, and then Covid hit.  And so we

21   really didn't have the opportunity to latch onto this thing the

22   way that we wanted to because we were trying to just keep our head

23   above water in a pandemic.  I think that we're at a good place

24   right now; that everyone is fully committed to seeing this thing

25   through; and we are putting a good faith effort into reaching

1    compliance.

2        THE COURT:  Well, to the United States, obviously -- and I

3    guess to Hinds County as well, federal receivership, you know, you

4    don't want to take that lightly at all.  I don't see any members

5    of the board of supervisors who are present in the room; they were

6    there earlier.  But a federal receivership would be better than

7    strong medicine, I presume.  I mean, that would place the managing

8    of the facility -- facilities under the direction of the receiver.

9    Is that right, Ms. Vera?

10       MS. VERA:  Yes, Your Honor.  And the idea behind our other

11   possible idea of an independent compliance director would be

12   similar to a federal receiver, in that it would be a person who

13   came in who had that -- to some degree, that level of authority,

14   but it would be different in that the person would not necessarily

15   supplant the existing leadership, but would rather work, you know,

16   alongside them, and in some cases have some authority, you know,

17   in cases if there was a disagreement.  But the details of all of

18   that could be worked out, but that's another option that we're

19   considering that would be just short of federal receivership.

20       THE COURT:  Does the United States have a list of

21   jurisdictions or where they propose either the compliance person

22   or the receivership?  Are there any existing jurisdictions under

23   receivership that was initiated by DOJ, or under the compliance

24   director, again, that was initiated by DOJ?  And you don't have to

25   tell me today, but I just want to know if there are others out

1    there.

2         MS. VERA:  Well, Your Honor, what I can tell you is that

3    we had -- we did undertake a similar -- compliance director model

4    in our New Orleans jail case where, you know, it's -- it obviously

5    to some of the points that the county has made we understand that

6    running a jail is no easy feat and it is an imperfect process, but

7    in this case, you know, it was a New Orleans jail's case, and I

8    believe the decision to install a compliance director in that

9    position was in 2016, and that case now -- there was significant

10    progress in that case.  So we do have an experience relative

11    recently, and that position has now been dissolved because the

12    jails came into material compliance, or sufficient progress that

13    the position was no longer needed. So it did result in progress --

14    faster process and significant progress.

15         THE COURT:  Okay.  All right.  I mean, that tells me

16    that -- that tells me that -- that reminds me, and that reminds me

17    to remind the parties that, you know, this ball is in DOJ's hand

18    for the most part, with respect to initiating what it believes

19    ought to be a next step.  Because the whole point of satisfying

20    the motion for contempt, and it can be argued in DOJ's eyes, is

21    that when that agreement was made to resolve the motion for

22    contempt, that there -- that it has not been complied with since.

23    So I wanted the parties to be thinking about, again, what the next

24    steps might be.  And I know the -- it's been tough on the monitors

25    because they have not had an opportunity to visit the facility in

1    nearly a year, or over a year, but they have been studiously doing

2    the best job that they could do based on the information that they

3    have to rely on, the county and others -- the sheriff's department

4    in providing to them.  But -- some things appear to be systemic,

5    and with the death of the inmate, and with the number of attempted

6    suicides by either one or more than one juvenile, obviously

7    concerns the Court a great deal.

8          So on a moving-forward basis, you know, I am leaning on

9    the parties to help me get to the next level, whether that is a --

10   some additional motion filed by DOJ, whether the parties agree --

11   can agree to doing something at a later date.  The parties come to

12   an agreement that, you know, maybe they can present something to

13   the Court within 30 days or 45 days; I am going to leave it up to

14   you all for the time being.  I guess, if I don't get any direction

15   from the parties, then I'll call you back and we will see what we

16   do.  But I think it's appropriate for DOJ to make their next move.

17         I wanted to have this hearing with the parties to hear --

18   so that everyone could be fully heard.  It is a public hearing.

19   It is important to the public.  This is a function that the

20   government should be in control of -- that is, our penal system.

21   I realize the state and federal entities found ways in which to

22   hand that out to private contractors.  Hinds County has chosen not

23   to, and agrees that it is a function of its government to make

24   sure that they can -- to make sure that the criminal justice

25   system moves efficiently and moves forward.

1        But I've had this case, I think, since 2019, I think -- I

2   think I took it up in January 2019, I think, or it could have been

3   before then.  And it has been troubling the whole time, not just

4   for me, but for the monitors, the parties, and everybody.  And

5   nobody wants to stay up under the arm of the Court forever, but

6   the Court obviously would not be adhering to its responsibility if

7   it walked away at this particular moment.  There are real concerns

8   with the Hinds County Jail.  I hear that the county now is

9   thinking about building a new facility, but, of course, if the

10  dirt were turned over tomorrow, we would still be talking about

11  two, three, four years away from opening the door, I would

12  imagine, to any new facility, and how good -- no matter how new

13  the facility is, if you don't have policies and procedures, and

14  you don't make people live by the policies and procedures, and

15  operate in the facility, it doesn't matter how new or pristine the

16  facility is.

17        So, I don't think we need to go any farther today, but

18  should the Court put a timeline for DOJ to tell me what they

19  intend to do next?  Or should the Court put a timeline for the

20  parties to meet and confer, and the parties tell me what, if

21  anything, they can agree to move forward jointly on?  I look to

22  you for my advice -- I look to you all -- you know, this is pretty

23  sudden and cold and, you know, the DOJ lawyers may need to talk

24  among themselves.  And the county and sheriff may need to talk

25  among yourselves; I don't know.  But you all have had at least

1    some communication and conversation before today in coming back

2    here, and it sounds like DOJ at least has been thinking about what

3    intermediate steps are necessary, or what might be the next step,

4    and it sounds like a federal receivership with direct oversight,

5    or the compliance officer model is what DOJ is sort of

6    contemplating.  I just need to know how soon we can move to the

7    next step, no matter what that step is.

8         Ms. Vera.

9         MS. VERA:  Thank you, Your Honor.  Yes, from our

10   perspective, having another status conference before the Court on

11   the calendar would, I think, be valuable.  As I said, in the next

12   30- to 45 days, you know, we would like to be able to proceed with

13   next steps, and I think -- I think setting another status would be

14   useful for that.

15        THE COURT:  What does the county say?  And what does the

16   sheriff say?

17        MR. GAYLOR:  Another status conference from the county's

18   perspective, perhaps, may be warranted, but we would request

19   preferably 60 days so that we could at least demonstrate that we

20   have made some of the repairs that we've stated that we were going

21   to make.

22        MS. BARKER:  We agree, Your Honor.

23        THE COURT:  Okay.  We'll do Wednesday June 16th, 9:30 a.m.

24   That gives you about -- well, we know it gives you at least

25   30 days.  It looks like it gives you about 45 days or so.  And I

1    would expect the parties will be able to tell me where we're --

2    where we go next.

3            Is there anything further from the monitors?  Ms. Simpson,

4    you and your team?

5            MS. SIMPSON:  No, Your Honor.

6            THE COURT:  Is there anything further from the United

7    States?

8            MS. VERA:  No, Your Honor.  Thank you.

9            THE COURT:  I am not going to force the parties to be here

10   in person that month due to where we are, so we will still do it

11   by video -- by Zoom or some other version of what we might have

12   here.  So you don't have to make plans to try to travel here.  So

13   we'll do it by Zoom or VTC or something.  And, you know, you'll

14   get your usual information on the link and all that stuff prior to

15   that date.

16           Is there anything further from the sheriff department?

17           MS. BARKER:  No, Your Honor.

18           THE COURT:  Anything further from Hinds County?

19           MR. GAYLOR:  No, Your Honor.

20           THE COURT:  All right.  This concludes all that the Court

21   has before it today.  This matter is now -- the Court is now

22   adjourned.  Thank you.

23           (Court adjourned at 5:43 p.m.)

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3          I, Tamika T. Bartee, Certified Court Reporter, in and for

 4     the State of Mississippi, Official Court Reporter for the United

 5     States District Court, Southern District of Mississippi, do hereby

 6     certify that the above and foregoing pages contain a full, true,

 7     and correct transcript of the proceedings had in the aforenamed

 8     case at the time and place indicated, which proceedings were

 9     recorded by me to the best of my skill and ability.

10          I further certify that the transcript fees and format

11     comply with those prescribed by the Court and Judicial Conference

12     of the United States.

13          THIS the 2nd day of June, 2021.

14

15

16                         s/ Tamika T. Bartee

17                    Tamika T. Bartee, BCR, RPR, CCR #1782
                      Official Court Reporter
18                    United States District Court
                      Tamika_Bartee@mssd.uscourts.gov
19

20

21

22

23

24

25
```