Court-Appointed Monitor's Fourteenth Monitoring Report
United States v. Hinds County, et al. Civ. No. 3:16cv489 -CWR-JCG

Elizabeth E. Simpson
Court-Appointed Monitor


David M. Parrish                    Jim Moeser                    Dr. Richard Dudley
Corrections Operations             Juvenile Justice              Corrections Mental Health

# EXECUTIVE SUMMARY

Because of the COVID-19 pandemic, this site visit was once again conducted remotely June 7-10, with additional interviews as explained below. The remote site visit was completed through conference calls and video conferencing with key personnel, members of the Monitoring Team and County and DOJ representatives.  The Compliance Coordinator provided extensive documentation electronically which made it possible to review many records that are normally examined on site. An off-site document review does limit the ability to verify some of the information as might be done with an on-site visit in which more substantial interviews/observations can be completed and additional documents reviewed.  Comments and other information in this report should be considered in light of that limitation.

**Update on COVID-19**

The Monitoring Team continues to be concerned about a potential spike in COVID infections within the facility.  More specifically, the vaccination rate within the facility and the community continues to be extremely low; therefore, the community and the facility are at high risk for a spike in infections, especially with the Delta variant of COVID-19; and so, it is far too early to relax efforts to avoid the spread of the disease, such as the use of masks, social distancing, and sanitation efforts.

The first doses of vaccines were given on June 29, 2021. The roster provided shows 116 vaccines were administered. On July 6, 2021 the Work Center discovered its first two positive coronavirus cases. On July 7, 2021 a staffer at the Work Center tested positive for Covid-19 who had access and contact with countless detainees.

The Mississippi State Health Department provided onsite testing on July 14 & 15, 2021. In total 217 people were tested (29 staff and 188 detainees); all test were voluntary so not all staff/detainees were tested. Of those tested, 66 tested positive (3 staff and 63 detainees). The 63 detainees who tested positive represented 34% of the total tested population. No mass testing has occurred since July 14th and 15th. All new arrestees are rapid tested. Any refusals are treated as positive. Detainees displaying symptoms are also tested with refusals treated as positive. Though no mass testing has occurred, detainees and staff who have become symptomatic are tested bringing the total number of positive cases within the Sheriff's Office to 94 (25 staff and 69 detainees). At least one staff member has been hospitalized and at least two detainees. One detainee is still hospitalized and is in critical condition (ventilator, intubated).

Due to limited spacing, few to no opportunities exist to quarantine or isolate individuals who have tested positive or who have been exposed to positive individuals within the jail system. Currently, it has been reported that RDC only has eight detainees in isolation with the remainder of the positive cases being held at WC.

**Corrections Operations**

Although the County and the Sheriff's Office have taken a number of positive steps in the last monitoring period including the hiring of a very well qualified Detention Administrator, the operations, particularly at RDC, have continued to be problematic and it could be said have worsened. There were a record number of fights and assaults at RDC in May, there continue to be fires set by inmates, there is an extremely large amount of contraband in the facility including drugs, there have been a number of overdoses although no deaths from those overdoses, and there have been three deaths, two by suicide. Although there is some cause for optimism with the new Detention Administrator being hired, this is a very disturbing trend.

A review of previous Monitoring Reports points to one commonality:  an ongoing shortage of staff and long-standing maintenance issues.  The problem was exacerbated in 2012, when the (then) Sheriff stopped operating the RDC as a direct supervision jail by pulling the assigned officers out of the housing units.  Since then, the failure to properly staff the RDC has resulted in a continuing series of major maintenance problems as inmates destroy the work of County and contract personnel almost as fast as it is completed.  Fortunately, the same action was not taken at the Work Center (WC).  The officers were never pulled from the housing units and, in fact, conditions have improved as that facility has evolved into a true direct supervision jail.

As of the end of May, there were still only 281 funded Detention positions.  The original Staffing Analysis called for over 400, but that number has been reduced with the closure of the Jackson Detention Center (JDC) and one of the three pods at the RDC.  Based on the Second Revised Staffing Analysis (April 2021), 318 positions are required to operate the WC and two pods at the RDC, as direct supervision facilities although with the return to an 8 hour shift, that number will increase.  Currently there are only 229 filled positions, two less than was noted in the 13th Monitoring Report.  In spite of the best efforts of the HCSO to hire new personnel, the number of filled positions has fluctuated between 204 and 256 over the past several years.  The turnover rate for Detention Services is projected to be 28% for 2021, based on the experience of the first five months.

Since direct supervision operation was recognized as the only way to retake control of the housing units at the RDC, the HCSO committed to direct supervision staffing when C-Pod was reopened in October 2020.  Unfortunately, that effort has been less than satisfactory.  In order for direct supervision to succeed, there must be commitment, adequate resources (staff) and effective supervisors.  Such is not the case at the present time.  As is documented in detail in this Monitoring Report, the C-Pod housing units are routinely left unattended. Consequently, the number of assaults and fires, as well as the amount of contraband found during shakedowns, is as high in C-Pod as it is in A-Pod where staffing is so low that, on occasion, the only officer present

is stationed in the control room.  Direct supervision is based upon the unit officer managing, controlling and being responsible for every aspect of his or her housing area.

The lack of maintenance has always been a problem in the Jail System.  Preventive maintenance is not routine.  During the June remote site visit, the Manager for Benchmark Construction followed through on concerns expressed by the Corrections Operations Member of the Monitoring Team regarding "trash dumpster cells" that have been reported on previously.  Those are damaged cells in A-Pod that were welded shut, rather than repaired.  Inmates filled them with trash which served as a breeding ground for vermin.  All told, 30 such dumpster cells were opened and cleaned.  Eleven were put back in service while 19 were resealed until repairs can be made.  When the problem of "trash dumpster cells" was brought to the attention of the Jail Administrator over a year ago, there were only a handful of such cells.  To find that the number has grown to 30 since then indicates that Detention Services and County Maintenance failed to take corrective action; instead, they allowed the problem to proliferate.  As was stated in the 13th Monitoring Report, the County should designate a line item in the HCSO annual operating budget so that Detention Services can promptly take care of routine maintenance issues.

During the February 2021, remote site visit, the Monitoring Team was told that B-Pod would be ready for occupancy in March.  During the June remote site visit that date was revised to September.  At that time, A-Pod is to be closed and not renovated unless the County decides to bring it up to direct supervision standards and to staff it accordingly.  That eventuality is most unlikely considering the fact that the HCSO does not even have enough Detention staff to open B-Pod as a direct supervision housing area.  It is unknown what will transpire when the September occupancy date for B-Pod runs head on into the lack of staff to operate it.

During the June remote site visit it was finally revealed that the inmate housing areas of the RDC were never equipped with a fire sprinkler system. Only certain support areas such as the Kitchen, Medical and Laundry were ever so equipped.  This information was derived from interviews with Detention staff members who worked in the RDC prior to the riot in 2012.  At the WC the fire sprinkler is operational again.

Booking cells have been used to house problematic inmates for many years, because cell doors and locks in the housing units at the RDC were/are inoperable.  In spite of the efforts of the Monitoring Team to end this practice, and the assurances of the HCSO that it would, inmates continue to be housed for extensive periods of time in Booking holding cells that are not supposed to confine a detainee for more than eight hours.  Unfortunately, the practice has resulted in an unmanageable inmate, who could not be effectively controlled in HU C-4 being moved to Booking for housing.  He subsequently committed suicide there.  As a result, one officer was fired and another was suspended for 15 days because they did not monitor and

conduct 15-minute well-being checks as required.  It is time to end the misuse of holding cells in Booking for the long term housing of inmates.

Finally, the HCSO needs to require that supervisors be held accountable at all levels.  That begins with enforcement of policies that have been approved and adopted.  It is not sufficient to simply have a policy.  It must be followed, and that can only be accomplished when supervisors ensure compliance.

**Medical and Mental Health**
The size of the mental health caseload has continued to grow, and also now the caseload includes a larger percentage of extremely unstable, acutely ill detainees.  In addition, as discussed in more detail in the body of this report, events of the last couple months have shed light on the need to review and make more rigorous the facility's suicide prevention program.  Furthermore, it is anticipated that the mental health unit will open several months from now.  Therefore, there is an urgent need for additional mental health staff, especially staff who have experience treating more acutely ill, complicated cases, and so QCHC and the County must work together to establish the additional mental health staff positions that are so severely needed.

The shortage of security staff continues to have a significant impact on the safety of medical and mental health staff and their ability to perform their duties.  Furthermore, the resultant need for medical and mental health staff to cancel and reschedule appointments, both on the units and in the medical department, consumes time that staff would otherwise be able to give to the medical and mental health treatment of detainees.  Given that providing adequate, appropriate and timely medical and mental health services is important to the effort to establish a safe and secure correctional facility, security support for these vital services must be more of a priority.

The recent upsurge in serious drug overdoses and other drug reactions is of grave concern.  The nature of these more serious clinical responses and the drug screens performed indicate that now opiates, an even more potentially dangerous class of drugs, are available in the facility.  It is imperative that the problem of drug contraband, especially opiates, be brought under control as quickly as possible, before there is a drug overdose-related death.

**Youthful Offenders**
As of the time of the June virtual site visit, there were twenty-five Juveniles Charged as Adults (JCAs), in the Henley Young facility, including two female JCA's. The Average Daily Population (ADP) since the last report has been a gradual upward trend. The Youth Court Judge and other County personnel express increasing concerns that as the population of both long and short-term youth increase it approaches the allowable capacity of 32 referenced in the SPLC agreement.  This has led to some initial discussions about the viability of maintaining JCAs at

Henley Young and what other alternatives could be developed.  There does not appear to be an imminent need to place JCA youth elsewhere, but that could change quickly.

There has been some reduction in the number of more serious incidents involving JCAs, including fights, significant disruptions, suicide attempts, and possession of contraband items. While difficult to fully quantify, this trend does not alleviate concerns about whether Henley Young is as safe an environment as it has been in the past. A major concern is the large number of Youth Care Professional (YCP) vacancies (26 out of 49 positions), those staff that are most responsible for providing day-to-day direct supervision of youth.  Increased recruitment efforts have been implemented including hosting a series of job fairs, and the job description has been modified to better reflect the role these staff members play in the facility, but the vacancies severely limit the ability of the program to move forward in meeting several requirements of the agreement.

The Executive Director position has been filled by Mr. Fernandeis Frazier, and the hiring of a Training and Development Coordinator who began in February is a positive step forward. Hopefully, that person can play an important role in the recruitment and retention of staff as well as developing a more comprehensive and progressive training program. The Program Coordinator position remains filled, and an additional Recreation staff member has been added to support the variety of programming developed.  The Treatment Coordinator was filled at the beginning of June on a half-time basis which was not consistent with the Stipulated Order but that person resigned in mid-July and the position is once again vacant.

Modular units to provide additional and more appropriate education, program, and treatment space are operational, but staffing shortages have made it difficult to utilize them. Additional recommendations related to facility plant improvements have not been implemented, and additional needs related to the security system and water system have developed and need to be addressed. The education program remains a concern, hampered in part by COVID restrictions and staff shortages, but the principal is actively making plans to improve that program by the fall term.

Related to the January 2020 Stipulated Order, the County did hire a half time Treatment Coordinator, a cornerstone position in terms of providing vision and leadership for the mental health services and integrating those with other aspects of the overall program.  Unfortunately, that person has resigned as of mid-July.  A more detailed daily schedule for all programming has been developed, and some improvements in actual implementation have been purported, but the overall quality and consistency of implementation is better assessed when the Monitor can be on site.

Overall, with a stronger leadership team in place there is some hope that progress can be made in the months ahead, but the priority must be getting qualified YCP staff on board so that basic safety, security, and programming can be implemented successfully.

**Criminal Justice and System Issues**

Some subset of the CJCC met in December although there are no minutes or list of attendees. COVID, no doubt, impacted the ability of the Criminal Justice Coordinating Council (CJCC) to meet. However, the CJCC will need to meet more frequently and with more full participation to be an effective body. Even before COVID, the CJCC had not had consistent participation by a number of stakeholders. This has limited its effectiveness. An effective CJCC or some collaborative body is needed to implement most jail population reduction strategies and other system efficiencies. At this time, there is no chair of the CJCC although the County Administrator has agreed to coordinate the CJCC until it is operational again and a new chair is identified. It has also been reported that a Circuit Court Judge has agreed to serve as Chair once operational. Given that the delays in the criminal justice process lead to prolonged stays of individuals in the Jail, particularly for those with mental illness, there should be increased emphasis on developing an effective CJCC.  Contrary to the requirements of the Stipulated Order, the County has not contracted with JMI or another consultant to assist in the development of a pretrial services program. The Criminal Justice and Quality Control Officer (sometimes called the Court Liaison) has submitted an application for being a learning site for implementation of the Arnold Public Safety Assessment. This would meet the requirement of the Stipulated Order but, even if selected, is long overdue. The Stipulated Order requires the County to hire a full-time qualified individual to implement the pretrial program. The County has now posted the position and the selection process is underway. When a pretrial director is hired, this should allow the Court Liaison to focus more on her other assigned position of CJCC Coordinator. However, she does have other assigned duties so it remains to be seen how much time she can devote to the CJCC.

As with the recent remote site visits, it was difficult to complete a review of the records remotely as the inmate files are too voluminous to scan. A copy of the inmate status/summary sheet and the chronological sheet was requested for 30 randomly selected inmates. However, it was not possible to compare these face sheets to the actual inmate files. The records provided for the June, 2021 site visit had status/summary sheets for the 30 inmates almost all of which were completed in the recommended format. At the time of the June, 2021 site visit the records continue to be audited at the pace required by policy. In the audits for May, 2021, the Records Supervisor reviewed the files and audits and provided additional notes. This added to the clarity of the audits and provided additional assurance that the files were in order. As noted below, the improvement in inmate records has been substantial since the beginning of monitoring and it is now uncommon to find inmates whose release has been delayed or who are listed as current inmates when they have actually been released.

That being said, there were several inmates who were detained beyond their release dates and at least one erroneous release. There was one person who was held beyond the 21 days allowed for a probation violation hearing to take place. Several others were held beyond their release date as a result of what was described as some confusion in the paperwork. The erroneous release was due to a hold being incorrectly entered into the system. There had not been anyone held in the Jail for some time on unlawful orders for fines and fees. However, the Jail has still been receiving such orders. Up until this reporting period, those individuals were being otherwise detained on felony charges and the Jail had not followed the process spelled out in the Settlement Agreement to have the orders corrected. During this reporting period, one individual had such an order and then was given an unsecured bond on his felony. At that point, he was being held on the unlawful fines and fees order. The Jail needs to have the unlawful orders corrected when they come in so this does not happen again. As reported in the prior reports, there continues to be a problem with identifying holds when those holds were entered after booking. This makes it difficult to contact the other jurisdictions in a timely manner. All of these issues should improve with the use of an up-to-date status sheet.

The Quality Assurance Coordinator is now preparing monthly reports based on information she gathers from the different departments. These reports provide analysis of trends and problem areas as is envisioned by the Settlement Agreement. She collects information by sending checklists to the different departments rather than relying on the JMS system. This has improved the accuracy of the underlying data reported. It is reported that her reports are reviewed by the command staff and Sheriff's Office and that they have prompted several efforts for improvement. There are still some items required by the Settlement Agreement that are not yet tracked and included in the monthly reports. However, the monthly Quality Assurance reports are a major step forward in this area.

The grievance system continues to improve, however, again, only with the labor-intensive creation of manual tracking systems as opposed to a functional electronic system. There continues to be a problem with staff either not responding to an assigned grievance or not entering a response in the system. A review of the manual spreadsheet indicated a large number of untimely responses. There was a significant increase in the number of grievances denied as non-grievable when they were, in fact, grievable. The Grievance Policy should be reviewed to address this issue. Although more grievances are now receiving a timely response, there is still no system to review whether responses are adequate and no oversight to determine that promised actions are actually completed. As the Quality Assurance Officer expands her focus on this area, an internal audit system should improve these outcomes.

**STIPULATED ORDER UPDATE**

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

## STIPULATED ORDER UPDATE

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes, but contract subsequently dropped without achieving significant results | 10/2019 but not currently | Consultant was retained through the Monitoring Team. However, there was not regular engagement by HCDS staff and the contract has now been dropped. |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | No | 3/2020 | Purchase Order submitted on 1/22/20; cameras were on back order; they have now arrived. As yet, there have been no video recordings of planned Uses of Force (UOF) *although there have been some incidents that should have been considered planned UOF.* |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | No | 5/22/20-but again vacant | Posted 1/8/20 but not posted as a treatment coordinator; Position posted correctly on 5/22/20. The Treatment Coordinator position was filled in late September, 2020 but only for about eight weeks.  The position was filled on a half-time basis on May 30, 2021 but is now vacant again. |

| | | | | |
|---|---|---|---|---|
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and security measures at RDC. The architect shall conduct periodic inspections. | No | 4/15/20 | The County has entered into a contract with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, Farr & Lemons Architects & Engineers (CDFL, PA). This was reportedly on 4/15/20. The Monitoring Team has not seen the contract or documentation of any inspections by CDFL. |
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |
| | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 | |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement-required policy review and approval process is completed. | Yes | 3/27/20 | |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the | | | The Revised Staffing Plan was developed in April 2020.  It |

| | | | | |
|---|---|---|---|---|
| | supervision of inmates at RDC. The plan shall include the following:<br>II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | Yes | 4/13/20 | specified direct supervision staffing for all three pods at the RDC.  On August 1, 2020, the Sheriff issued an order that called for direct supervision staffing in C-Pod upon its reopening (which occurred on October 22, 2020).  However, incident reports disclose that C-Pod is often not staffed according to the Plan and Order. The existing staffing plan for C-Pod is not consistent with the Second Revised Staffing Plan, April 2021 and needs revision. |
| | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | No | | The staffing plan does not address this paragraph. The Detention Administrator developed a plan for rotation of staff but this was put on hold because of COVID-19. In July 2021 the Jail System is scheduled to revert from the 12 hour shift back to the original 8 hour shift which is inconsistent with the Second Revised Staffing Plan. The JDC has been closed for almost a year. Since that time most of the JDC staff were reassigned to the WC which helped that facility but did nothing to increase coverage at the RDC. |
| | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare | | | Directive issued on 9/27/19 by the previous Jail Administrator; radios assigned. Review of incident reports discloses that the directive is not always being followed. |

| | | | | |
|---|---|---|---|---|
| | check sheets at the cell doors of those inmates held in segregation. | No | | |
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other areas or facilities. This work will be completed within 3 months. | Yes | 4/2/20 | The alarms and cameras were installed in April 2020. The operations did not shift to direct supervision with one officer in the unit until September. The staff savings can now be achieved. |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the curriculum and materials for training on the new policy or procedure. | No | | New policies have been provided to staff. In service training recommenced in April 2021, but all officers have not been trained on all new approved and adopted policies. |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | No | | Training on the Use of Force Policy, adopted 2/1/20, had been postponed several times due to COVID. In the interim, UOF training has been provided to all supervisors as of March 2020. In-service training has now recommenced but not all officers have been trained on UOF. |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include: | | | A more complete daily schedule has been developed that outlines times for more structured activities, but it is difficult from off-site to confirm to what extent those times are actually filled with activities outlined in the Stipulated Order.  Per staff involved in leading the activities there has been |

| | | | |
|---|---|---|---|
| | 1. Activities which are varied and appropriate to the ages of the youth; 2. Structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship; 3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and 4. Hinds County, by and through its County Administrator and/or Executive Director at Henley-Young, shall maintain exclusive control and maintenance of any facilities or technology that promotes compliance with this provision. | No | | improvement in attendance and increased expectations for staff to encourage attendance by not turning that time into "free time" in which youth play cards or watch TV. |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as: 1. cognitive behavioral programming; 2. independent living skill training; 3. relationship and positive communication skills; 4. anger management; 5. peer refusal skills; 6. trauma informed programming; and 7. pre-vocational skill building. | No | | The mental health team (Youth Support Specialists and QMHPs) have worked to identify and implement evidence-based curriculum/programs in the areas outlined.  The frequency and duration of those sessions remains a concern as well as integrating those activities into a facility-wide behavior management and skill development framework. |
| 05-16-20 | I.  A. 1. In any occupied pod, the County will convert all control room doors, housing | | | This has been completed in C-Pod and A Pod but not in B-Pod. |

| | | | |
|---|---|---|---|
| | unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically controlled swing doors to the control panel so they can be electronically operated with a CML type locking mechanism. | No | | Although the security doors in A-Pod have been changed from a sliding to a swinging configuration, and they now lock, their operation is still by key, not electronic control. The projected completion date for the renovation of B-Pod is expected to be in September. |
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | Yes | 4/30/20 | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | No | | The estimated completion date for this work is September. |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | | | Fire hoses have been installed in C Pod during the renovation. They have not been reinstalled in the other |

| | | | | |
|---|---|---|---|---|
| | | No | | 2 pods the renovation of which is now overdue. |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | Yes | 4/15/20 | CDFL and HDR, Architects, have been retained. |
| | I. B. 4. Form a committee to develop and implement the Master Plan, which will include the County Administrator, the Sheriff, the Jail Administrator, the facility captains, and the Board of Supervisors President. Other members may be included at the discretion of the County and the Sheriff. | Yes | 4/28/20 | County contracted with facilitators and formed a committee to work with the facilitators. The consultants completed the master plan recommendations on January 15, 2021. They are now working on phased implementation of Option 2 of the Master Plan. |
| | II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division specifically for recruitment of detention officers. | No | 6/1/20 | A full-time recruitment officer was hired in June, 2020. He has since resigned and another Detention Officer has since been placed in the position. |
| | II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | No | | A basic Recruitment Plan has been developed by the new Recruitment Officer. |
| | IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of | | | The County has not retained a consultant. The County is applying to be a learning site with Advancing Pretrial Policy and Research which if accepted would provide technical assistance. The application has been submitted. |

|  | | | |
|---|---|---|---|
|  | implementation of pretrial services programs. | No | |  |
|  | IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or within 12 months shall obtain certification by the National Association of Pretrial Services Agencies (NAPSA). | No | | The County has posted the position. As of the time of the June 2021 site visit the position had not been filled. |
|  | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | No | | The development of a pretrial program has been discussed at CJCC meetings but has not included all necessary stakeholders or focused on actual implementation. |
|  | IV. A. 4. The County shall provide the technical support for implementation of a risk assessment instrument for purposes of pretrial release decision-making. | No | | |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation | | | The position was not posted until 5/22/20. The position was filled in late September, 2020 with the hiring of a clinical social worker but she resigned after 8 weeks. The County has filled the position as of May 30, 2021 with a half-time person. The County had not contracted with a psychologist to provide any services needed in addition to the services provided by the social worker. |

| | | | | |
|---|---|---|---|---|
| | services needed in addition to the services of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | No | 9/2020 | |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train deputies on a Settlement-compliant use of force policy, including Settlement requirements for reporting of use of force. | No | | Training was scheduled but had been delayed due to COVID. UOF training is provided to new recruits during the basic academy. Now that in-service training has recommenced UOF training for existing staff is being provided but not all officers have been trained yet. |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | No | 9/2020 | Training on supervisory review of UOF incidents was included in the UOF training of the supervisors. Incident reports indicate that supervisors are approving reports that disclose improper use of force. Since the time of the supervisors' training, new supervisors have been promoted and need training. |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | No | | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be | | | Since the renovation of B Pod is still underway, A Pod continues to be used contrary to the time line in the |

| | | | | |
|---|---|---|---|---|
| | postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be converted to secure swinging doors and tied to a new control panel. | No | | Stipulated Order. However, the plan continues to be to eliminate its use once the renovation of B Pod is complete. |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | No | | Multiple person cell doors have been replaced but single cells continue to be used for housing without the required doors. It was anticipated that Booking would no longer be used for housing when C Pod opened. However, it continues to be used for housing. |
| | II. B. 4. Within 6 months, the County shall develop and implement a process that provides criteria for merit-based promotion and establishes a career ladder. | No | | A draft Career Development Plan has been submitted to the Board of Supervisors but as of the time of the site visit the BOS had not taken action on it. |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | Yes | 6/1/20 | The Jail Administrator was removed from his position in May 2021. A new well qualified person was hired in June 2021. |
| 8-16-20 (2 months to post, 4 months to | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility | | | |

| | | | | |
|---|---|---|---|---|
| offer, and 1 month evaluate structure | jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | No | | |
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the development of the pretrial program within 9 months. | No | | |
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | No | | |
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | No | | A Recruiting Officer is working on initiatives to hire qualified Detention Officers. |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | No | | The master plan recommendations report was completed on 1/15/21. The Master Planning Committee is now proceeding with planning a phased implementation of Option 2 of the Master Plan. |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. | Yes | | The master plan recommendations report includes a listing of necessary safety and security repairs. The County has not adopted a master plan with deadlines for making those repairs. |

| | | | |
|---|---|---|---|
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | No | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the information that is needed for the long-term planning process. | Yes | | |
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will notify the Monitor and DOJ of any anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | No | | The policy development and review process has been proceeding with 31 policies now approved. Not all projected deadlines have been met but progress was being made. |

**Monitoring Activities**

The Monitoring Team conducted a Remote Site Visit June 7, through June 11, 2021 with some follow up interviews. The site visit schedule was as follows:

Site Visit Schedule
June 7-11, 2021

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Richard Dudley | Jim Moeser |
|---|---|---|---|---|
| **June 7** 9:00 | Captain Crain **\*Zoom** | Captain Crain **\*Zoom** | Nurse Cable (covering HSA  12:00 position) Nurse Gray (Director of Nursing) and Nurse Buffington (Discharge Nurse) | Mr. Frazier, Executive Director **\*Google Meet** |
| 10:30 | Grievance Coordinator **\*Conference B** | Bob Brown, David Marsh and Gary Chamblee **\*Zoom** | **TEAM (TBA)** | Mr. Burnside, Operations Manager and Mr. Dorsey, Quality Assurance Manager **\*Google Meet** |
| 1:00 | Captains Simon, and Connor **\*Zoom** | Captains Simon, and Conner **\*Zoom** | Mental health team/staff-QMHP's Ms. Martin and Ms. Pippins | Mr. Caldwell, Principal **\*Conference A** |
| 2:30 | Sheena Fields **\*Conference B** | Miioka Laster **\*Conference A** | **TEAM (TBA)** | Youth Support Specialists Fernice Galloway, Tamika Barber and Carleslie Jones **\*Google Meet** |
| 3:30 | Tony Gaylor and County Administrator **\*Zoom** | Doris Coleman **\*Conference A** | Discharge Nurse Buffington (and Nurse Cable) **TEAMS (TBA)** | |
| **June 8** 9:00 | Martravius Elkins and Capt. Tyree Jones **Conference A** | Martravius Elkins and Capt. Tyree Jones **Conference A** | Representative from Nursing Staff **Zoom** | Ms. Brenda Frelix (QMHP) **\*Google Meet** |
| 10:00 | Priscilla Dawson **Conference B** | Lt. Cheryl Childs, and Marlo Brinnon **\*Conference A** | Medical Nurse Practitioner/Clinician Lot **Zoom** | |
| 1:00 | Inmate Interviews **\*Zoom** | Sgt. from Booking, Sgt. from RDC, and | Dr. Kern re mortality reviews | |

| | | Sgt. from WC (one after the other) | *Google Meet | Director Frazier |
|---|---|---|---|---|
| 3:00 | Jody Owens **Zoom** | | Nurse Cable and Nurse Gray **Google Meet** | |
| **June 9** 9:00 | Sgt. Mazie Jones ***Conference A** | Sgt. Mazie Jones ***Conference A** | person with full access to EMR **TEAMS** | |
| 10:30 | County Administrator; Robert Farr, CDFL Architects; Bill Prindle, HDR Architects; Tony Gaylor, County Attorney (and maybe others) to discuss Master Planning **Zoom** | County Administrator; Robert Farr, CDFL Architects; Bill Prindle, HDR Architects; Tony Gaylor, County Attorney (and maybe others) to discuss Master Planning **Zoom** | | Andrea Baldwin, Program Coordinator Candace Riddle, Treatment Coordinator |
| 1:00 | Sgt. Tillman re Records **Conference B** | Captain Jeff Burnley and Lt. Neal Knox ***Conference A** | Psychiatric Nurse Practitioner Bell **Google Meet** | |
| 3:00 | Claire Barker, Sheriff Vance, Allen White and Eric Wall ***Zoom** | Claire Barker, Sheriff Vance, Allen White and Eric Wall ***Zoom** | | |
| **June 10** 9:00 | HSA and QCHC Central Office (Krista Chick and Donald Kern) re Mental Health Unit **\*Zoom** | Marquette Funchess ***Conference (A)** Tony Hannah ***Conference A** | HSA and QCHC Central Office (Krista Chick and Dr. Donald Kern) Ms. Martin and Ms. Pippins re Mental Health Unit **Zoom** | Jacqueline Foster, Training and Learning Development Manager ***Google Meet** |
| 10:30 | | | | |
| 1:00 | Taneka Moore ***Conference (B)** | Bernard Moore, Recruiting **Zoom** | | Exit conference with Mr. Frazier **Google Meet** |

23

| 2:00 | Claire Barker, Synarus Green, Tony Gaylor, Sheriff and Board representative invited) **\*Zoom** | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited) **\*Zoom** | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited) **\*Zoom** | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited) **\*Zoom** |
| June 11 1:30 | | | | Carolyn Hicks, Youth Court Judge |
| June 15 | Two female inmates | | | |
| Jue 25 | Lt. George | | | |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |

| | | | | | |
|---|---|---|---|---|---|
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |
| 6/7-11/21 | 2 | 2 | 59 | 1 | 28 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;
    n.  Laundry;
    o.  Food services;
    p.  Hygiene;
    q.  Emergency procedures;
    r.  Grievance procedures; and
    s.  Sexual abuse and misconduct.

**Partial Compliance**

Pursuant to the Stipulated Order a list of 90 needed policies was developed. Of those, 48 were identified as priority policies. Twenty-seven of the priority policies have been approved by DOJ and adopted by the Sheriff. Three additional priority policies as well as the definitions for the policy manual are currently under review. Four non-priority policies have also been approved and adopted with one under review for a total of 31 approved policies and four under review. Of the 19 policy areas listed above, 16 have been addressed in whole or in part by policies that have been adopted. One more is addressed in policies currently under review and "Housing Assignments" has been addressed in a housing plan. Although progress is being made, the target dates for policy development have not been met.

The development of a complete set of policies, approved by the DOJ and adopted by the Sheriff, is moving forward but at a less than satisfactory rate.  The first two years of the monitoring process resulted in virtually no progress, but the addition of a coordinator employed through the Monitor resulted in positive movement. With changes in HCDS personnel there was less engagement by HCDS staff in the policy development process which slowed the pace. The Sheriff's Office has now designated a person responsible for drafting policies and she has drafted a number of policies. The quality of the drafts has improved which should quicken the pace of policy development. The new Detention Administrator has participated in the review of recent policy drafts which should also improve the process and final product of the policies.

As will be noted later in this report, annual in-service training recommenced in April, under the guidance of the new Training Director.  This will allow staff to become familiar with approved and adopted policies which will, hopefully, be reflected in compliance with expected operational procedures as well as improved accuracy and quality of incident reports.  While that training is taking place, a temporary step that was recommended in the 13th Monitoring Report should be put in place immediately.  Each post throughout the Jail System should be provided with a binder that contains copies of relevant policies and memo form directives that can be temporarily substituted for post orders.  Since these orders will not be developed until policies are in place, written guidance for staff is essential in the interim.  As a first step, the previous Jail Administrator issued a written directive on April 6, 2021, titled "Detention Officer's Duties".  In a memo published on the same date he ordered that every Detention Officer was to be provided a copy, for which he/she signed receipt, and that the material was to be covered at shift roll calls.

There is still a concern that some of the adopted policies do not appear to be implemented or fully implemented. Most notably, the Use of Force policy explicitly requires that chemical spray be used as a defensive measure, not as a tool to coerce compliance with officers' orders. As described below, chemical spray is still being used to coerce compliance. One example given in the 13th Monitoring Report of the failure to implement policies was the failure to do seven day reviews of people in segregation. There appears to be some progress on this issue. As stated in

that report, the Classification policies require that there be a Classification Committee and, among other duties, the Classification Committee is supposed to review all placements into administrative segregation and review the classification every seven days. There is still no Classification Committee or consistent consultation with Classification before someone is placed in administrative segregation. However, there are now 7-day reviews of inmates in segregation with the participation of mental health staff if the inmate has SMI. Without a Classification Committee, this does not fully comply with the Classification Policy but is a step in the right direction. There are still areas where policies are not being fully implemented. One barrier to this is that staff has not been receiving training on the new policies. The new Grievance Coordinator had not been given the Grievance Policy and, therefore, had not read it. Training on new policies was, no doubt, hampered by COVID and the chronic understaffing. The new Training Captain appears to be improving the training program which will hopefully help address this issue. As reported in the 13th Monitoring Report, it appeared that even the supervisors were unaware of the adopted policies or inconsistent in ensuring that they are followed. The new Detention Administrator will hopefully rectify this problem.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

Personnel changes at the top level have continued since the last Monitoring Report. The Jail Administrator was removed from his position by the Sheriff on May 10, 2021, and the Assistant Jail Administrator was designated as the Acting Jail Administrator. As has been previously reported, he has the requisite experience to hold his position, but he does not have the four-year college degree that the Settlement Agreement calls for.

After just one month, a new, well-qualified candidate for the Jail Administrator's position was selected and hired. Her experience and education exceed the Settlement Agreement's standard. In addition to managing both traditional and direct supervision jails, she has a Master of Science degree in Criminal Justice. Further, she has done extensive work for the National Institute of Corrections and has conducted business as a private consultant.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members. At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in

the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

Because of the COVID pandemic, it has not been possible to hold annual in-service training sessions for supervisors on all policies for the past year.  Regardless, those supervisors have been provided copies of the policies as they are approved and adopted.  In spite of that, there has been no noticeable improvement in supervisory review of incident reports. It is imperative that supervisors take their responsibility to approve, disapprove and recommend, to heart.

While most supervisors meet the education and experience requirements of this paragraph, some do not.  In the last Monitoring Report, it was noted that one of the three officers who was promoted to the rank of Sergeant, did not meet the experience requirement.  During the last four months only one officer was promoted to Sergeant, but that individual had been employed by the HCSO for less than one year and had no prior corrections experience.  This record of non-compliance with the terms of this paragraph puts it in danger of being downgraded to "Non-Compliant".

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Substantial Compliance**

The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check.  This was confirmed by the Background Screening Investigator and the Director of Human Resources, as well as by a review of the personnel files of recently employed Detention Officers.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

The HCSO has never addressed the requirements of this paragraph adequately.  In previous Monitoring Reports, it has been pointed out that the JDC cannot be operated as a direct supervision jail unless exorbitant expenditures are made to renovate it.  That problem now appears to be resolved in that the facility no longer houses inmates except for those being transferred to and from court via the first-floor processing area.  While the transfer waiting area needs to be renovated in order to make its operation safe and efficient, that matter is being addressed by the Master Planning Committee.

The WC was originally designed as a modified state prison style dormitory with two, 200 bed housing units.  It was subsequently modified to become a 256-bed facility comprised of four, 64 bed housing units.  Although it previously operated much like a state prison with more than one officer assigned to each housing unit, it now follows the principles of direct supervision with just one officer assigned to each housing unit.  This has resulted in a significant savings in manpower as well as better accountability for daily operations. While the WC does not house the most violent inmates in the Jail it does manage inmates more effectively than the RDC, primarily because it actually operates under the principles and dynamics of direct supervision.

The RDC was originally designed to be a direct supervision facility, but that ended in 2012, when the housing unit officers were pulled out and the inmates were left virtually unsupervised.  A major riot resulted, and C- Pod had to be closed for a complete renovation.   Subsequently, failure to adequately staff the RDC led to C-Pod being closed again to undergo a second complete renovation.  When it reopened in October 2020, it was supposed to be staffed for, and operate under, the principles of direct supervision, but that is not what has occurred.  A review of incident reports over the past seven months indicates that the housing units have not been adequately, or consistently, staffed.  The previous Jail Administrator issued a memo on August 1, 2020, which outlined required post assignments.  Unfortunately, it was not adequate to comply with direct supervision mandates.  When the 2020 Revised Staffing Analysis was updated in April 2021 (Second Revised Staffing Analysis), it specified personnel assignments more consistent with direct supervision.  To date they have not been met.  An examination of the Detention Services Post Assignment roster for May 31 through June 4, 2021, revealed that the number of personnel assigned to C-Pod is not sufficient to meet the requirements of the Second Revised Staffing Analysis.

The lack of personnel assigned to C-Pod is reflected in the number of incident reports that show inadequate supervision.  In numerous incident reports it is apparent that no officer was physically inside a direct supervision housing unit.  In C-4, which houses the most troublesome inmates in the Jail System, there should always be two officers present.  That is not the case.  In fact, there is seldom one officer present inside C-4.  The following incident reports reflect the absence of personnel. See IR's 210448, 210453 and 210455 which describe how three fires occurred in C-4 in a one-hour time frame during which there was never an officer present.  The three fires were all discovered by officers who were outside the housing unit (C-4).  It is unlikely that so many fires, assaults, breaches in security and management problems could occur in a properly staffed direct supervision environment.  There have been literally as many incidents in C-Pod (supposedly direct supervision) as in A-Pod (which is known to be woefully understaffed) (e.g. in May there were 27 incident reports for A-Pod and 27 incident reports for C-Pod).  No one works inside the housing units there and, as was noted in several incident reports, the only staff member in A- Pod is the Control Room Officer.

B-Pod is currently closed for renovation so that it can be brought up to the standards of C-Pod. Previously the County had indicated that it would be ready to be reopened, and staffed for direct supervision operation, in March 2021. Now, according to the County's maintenance contractor, Benchmark Construction, it is estimated to be September 2021. While that more realistic date may be achievable, it does not factor into account that the HCSO does not have the staff available to operate B-Pod as a direct supervision housing area. If C-Pod can still not be adequately staffed to maintain direct supervision operation, there is no way that B-Pod can be re-opened to do so as well.

Meanwhile, A-Pod continues to be an unmanageable housing area. Inmates are not supervised. According to the Lieutenant in charge of Booking (and Classification), "Some have developed their own committee system in which they choose who is accepted into their unit." Maintenance issues are completely unacceptable in this pod. As has been reported numerous times previously, rather than fix damaged cells, the County has simply welded some cell doors shut. Inmates are still able to fill those cells with trash through the broken door windows, thus turning them into unsanitary "trash dumpster cells" which serve as a breeding ground for vermin.

During the June remote site visit the Corrections Operations Member of the Monitoring Team spoke with the Manager of Benchmark Construction regarding the trash dumpster cell problem. He, in turn, connected with County and Sheriff's Office personnel, who began the process of reopening the welded doors. Each cell was then cleaned out and placed back in operation or closed again (with a welded steel plate over the door window and the space at the bottom of the door) depending upon the damage to the cell. A total of 30 trash dumpster cells were identified; 11 were reopened and 19 were sealed shut again. That number of cells (30) equates to a full housing unit in A-Pod—one quarter of the entire pod's capacity. This reduces the number of cells available to properly classify and house individuals. The most disturbing aspect of this situation is that the problem was brought to the attention of the County and Sheriff's Office over a year ago, long before the COVID pandemic forced the Monitoring Team to conduct remote site visits. But rather than address the issue when there were only a handful of trash dumpster cells, the Sheriff's Office and County continued the practice of welding cell doors shut. By continuing to do so, instead of repairing the damaged cells, the problem grew exponentially.

There is no plan to utilize A-Pod once B-Pod is reopened. Consequently, it will not be renovated and brought up to direct supervision standards unless the County opts to staff and occupy it. In the interim, the inmates assigned to A-Pod continue to be subjected to unsafe and unsanitary conditions. This reality is made more problematic by the fact that it is unlikely that the Sheriff's Office will be able to open B-Pod in September as a direct supervision housing area because there are insufficient staff available to do so. This will create a major conflict situation with the requirements of the Stipulated Order.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:
- i. There are at least two detention officers in each control room at all times;
- ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;
- iii. There are rovers to provide backup and assistance to other posts;
- iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;
- v. There are sufficient detention officers to implement this Agreement.

    b. Fund and obtain a formal staffing and needs assessment ("study") that determines ith particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:
- i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.
- ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.
- iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

    d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

e.  The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

The lack of staff has consistently been the underlying factor related to the inability of the HCSO and County to comply with the Settlement Agreement.  At the end of May 2021, the Human Resources Director reported that there was no change in the number of funded Detention positions (281), but that the number of filled positions stood at only 229.  In March 2021, that figure was 231.  Over the past four years the number of filled positions has fluctuated between 204 and 256.  In spite of the HCSO's best efforts, no progress has been made.  The reason that the work force has stagnated at an unacceptably low level has been explained in previous Monitoring Reports.  The entry level salary for Detention Officers is not adequate.  There is a limited career path and, for those officers who stay in grade, there is no step plan in place to encourage longevity.  Finally, the working conditions in the Jail System, particularly at the RDC, are known to be dangerous and frustrating.  While the HCSO has previously submitted a step pay plan to the County, no action was ever taken by the Board of Supervisors.  According to the Sheriff, that proposal has been included, again, in his current budget submission.

Recognizing all of the above noted problems, coupled with the fact that the Sheriff has been tasked with adequately staffing the Jail System, even if it means that law enforcement officers must supplement Detention Services, the recent transfer of three Detention Officers to Patrol appears to run counter to the requirements of the Settlement Agreement.

Excessive turnover continues to be a problem.  Based on the number of resignations during the first five months of the year (33), the turnover rate for 2021 is projected to be approximately 28%.  It should be noted that all but seven of the resignations in 2021, have been staff assigned to the RDC.  It was previously reported that the HCSO was supposed to hire an HR consultant.  Such a consultant was retained through the Monitoring Team. However, there was never full engagement with the consultant. A Detention Officer was assigned to recruiting.  He subsequently resigned and has since been replaced by another Detention Officer.  While the new Detention Officer is working diligently on recruiting applicants for Detention, the results of that effort are not apparent in the current staffing level.

When the original Staffing Analysis was completed in 2017, it specified the need for over 400 personnel to operate the three jails—RDC, JDC and WC.  That report was re-issued as the Revised Staffing Analysis in April 2020.  In the interim, the JDC has been closed due to plumbing and HVAC problems.  In addition, one of the three pods at the RDC has been closed for renovation for more than two years.  C-Pod has been reopened and B-Pod is scheduled to reopen in September.  At that time A-Pod is supposed to remain closed.  Given these considerations, the previous Jail Administrator published the Second Revised Staffing Analysis

in April 2021 that calls for 318 personnel.  That analysis was based on a 12-hour shift system that had been put in place earlier.  Since it now appears that Detention Services is going back to an 8-hour shift rotation, the Second Revised Staffing Analysis will have to be updated.  The relief factor for a 12-hour shift is more efficient than that of an 8-hour shift schedule.  In any case, as a result of the return to 8-hour shifts, the HCSO and County will need to create at least 11 additional positions making the total required number 329.4 instead of the 318 positions in the Revised Staffing Analysis, even if they are not funded, so that the HCSO is able to fund and fill them in a timely fashion should recruiting efforts bear fruit.

While inmates at the WC are supervised in accordance with the Settlement Agreement's requirement for direct supervision, the same cannot be said for the RDC.  There inmates are left unattended throughout the day and night, even in C-Pod which is supposed to be staffed to provide direct supervision.  Unfortunately, numerous incident reports show that such is not the case.  IR-210622 and 210739, reflect a failure of officers to staff their assigned housing units and to remain in critical posts (Pod Control).  IR-210622 revealed that no officer was present when a Sergeant and Detention Officer entered C-3 to conduct a "security check".  That is when they discovered a huge hole in the wall of cell 5506.  It would not have been possible for this to have occurred if an officer had been present inside C-3 because the noise of breaking concrete block would have been easily detected.  IR-210739 involved the control room officers of A-Pod and C-Pod, who both left their assigned posts to check on noise/inmate activity or to pass a message to the Sergeant.  In both cases it is improper for them to have left their control room posts unattended.  With no officers present, inmates could easily take over the control rooms and release the entire inmate population at the RDC.  Not only are direct supervision housing units (C-1, C-2 & C-3) frequently not staffed, but C-4 (the lockdown unit), which should have two officers inside at all times, is inadequately staffed.  Even inmates in the suicide watch unit (C-4-ISO) are not supervised constantly as they are supposed to be.  This problem appears to be a combination of insufficient staff and ineffective supervision in that Sergeants and Lieutenants do not require compliance with suicide watch procedures.  (See paragraph 44, below.)

The shortage of security staff, the apparent failure of at least some security staff to follow policies and procedures, and unresolved problems with the physical plant continue to compromise the safety of medical and mental health staff and often make it difficult for staff to perform their duties.

During the period covered by this site visit there were several incidences reported by medical staff that draw attention to concerns about the safety of medical and mental health staff, especially at RDC.  On 4 May 2021, as a result of the weather and a failed emergency response, the doors to the medical unit could not be opened, and staff were trapped for several hours, during which time they feared for their safety.  On 6 May 2021, the one officer assigned to a unit left the unit to deal with an emergency; the two QMHPs who were seeing detainees on the unit

were locked on the unit with the detainees without any security staff to protect them; and during this time, they feared for their safety.  On 18 May 2021, one of the nurses was hit by an inmate on C-1, knocking her down and causing considerable swelling and discoloration of her face (IR #210751). The first two incidents do not have incident reports reflecting the ongoing problem reported by the Monitoring Team with incidents reported by Medical not being entered into the JMS system.

During the period covered by this site visit, all staff interviewed reported multiple incidences where they were unable to appropriately perform their duties.  For example, the nurses and nursing administrators reported that due to a shortage of security staff and/or a failure of security staff to follow policies and procedures, there are times when medication pass and procedures performed during medication pass have to be postponed or even canceled; there are also times when these duties cannot be performed appropriately (for example, cell doors are not opened and so medication must be passed under the door, and the nurse is unable to determine whether or not the medication is taken or assess the status of the detainee). It is also not uncommon for security staff to fail to require a detainee who is refusing medication to attend med pass at least tell the nurse he is refusing medication and sign the medication refusal form, and so the nurse doesn't get to actually see the detainee and assess his medical or mental health status.  Mental health staff (QMHPs and the Psychiatric NP) reported that their visits to the units to see detainees must often be cancelled and rescheduled due to a shortage of security staff.  In addition, both medical and mental health staff reported that as a result of the shortage of security staff, detainees are often not brought down to medical for scheduled visits. This is usually noted in the EMR but not always and sometimes medical and mental health staff are not informed of why an appointment was missed. Despite the fact that security staff are notified a day in advance of scheduled visits, detainees are not prepared to be brought down at the appointed time. Even when/if detainees are prepared to be brought down, security staff might not be available to transport them; and if the one security staff person assigned to medical has to go to a unit to transport a detainee(s), that leaves medical without security staff and therefore unable to continue to see detainees.

As has been noted in prior monitoring reports, it is not always clear how the above noted issues are being addressed, if they are being addressed at all.  With regard to incidences where medical and mental health staff persons were harmed or placed at significant risk of harm (such as the three incidences described above), the mechanism for reporting these incidences isn't even clear. Reportedly, there continues to be discussion about the inclusion of such incidences in JMS, but even if the issue of reporting is resolved, the issues underlying/causing such incidences still need to be identified and addressed.  With regard to incidences where medical and mental health staff are unable to appropriately perform their duties, there is no mechanism for reporting, keeping track of, and/or quantifying the number of such incidences (although many such incidences may be noted in an individual detainee's medical record).  In addition, given the shortage of security staff, there is the issue of whether or not security support for the provision of appropriate medical

34

and mental health services can be made a priority. This would require, for example, assigning at least two security officers to medical instead of one, despite the shortage of security staff; and this might mean, for example, providing adequate security staff to support functions such as medication pass, on unit visits, and the transport of detainees to medical, despite the shortage of security staff.

It should also be noted that reportedly, general knowledge about the 'dangers of working at RDC' has made it difficult to identify and hire medical and mental health staff who would be willing to work at RDC.  Reportedly, the above-described difficulties have also contributed to the high turnover rate of medical and mental health staff, especially nurses assigned to RDC.

The provision of adequate and appropriate medical and mental health services significantly contributes to the development of a safe and secure environment for prisoners and staff. Assuring adequate security staff support for the provision of medical and mental health services is critical to the development of a safe and secure environment for prisoners and staff.

     f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

       i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

      ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

    iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

    iv.   The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

35

v.  The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi.  The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

Classification coverage has not changed since the last Monitoring Report.  The number of personnel is the same as was previously reported, with two vacancies still unfilled.  This puts a heavy strain on Classification personnel to provide 24-hour coverage with a limited workforce.

The issuance and use of wristbands still cannot be determined.  It will take an on-site visit to confirm whether or not they are being issued and utilized.

The Monitoring Team has in the past received conflicting information regarding whether inmates are housed by gang affiliation. During this site visit, it was confirmed by the Classification Supervisor and several inmates that A-Pod is being used to house inmates based on their gang affiliation. Equally troubling is information obtained during this site visit that the inmates in the different housing units formed "committees" to decide who they did not want in the unit. They would then harass those individuals by assaulting them and stealing their commissary until they were moved to another unit. There was conflicting information regarding whether this practice had been curtailed.

The Classification Supervisor reported that security often moves inmates to a different location without waiting for Classification to determine new housing as is required by policy. She reported that the Sheriff put out a memo requiring this to stop but this directive is only being followed on certain shifts.  She said that she is able to review these moves the following morning to determine whether or not they were appropriate and to take corrective action.

With regard to the utilization of Booking holding cells for housing purposes, at the time of the site visit there were four inmates housed in Booking. One was there for administrative segregation; one was the victim of an alleged PREA assault; and two were there for protective custody. The Monitoring Team has repeatedly stated that Booking is not appropriate housing. An inmate being housed in a Booking holding cell committed suicide there on April 18, 2021.  Not only was he inappropriately housed, but he was not monitored every 15 minutes as he should

have been.  As a result, one Detention Officer was terminated and one was suspended for 15 days.

A review of the initial classification scoring sheets for the first two weeks of May was completed.  A number of the practices that previously undermined the use of the objective scoring system have been rectified.  As was reported in the 13th Monitoring Report, the classification sheets indicate that Classification consistently uses an objective scoring system with no overrides, although some overrides would be acceptable. Previously, although using the scoring sheet, staff routinely did an override based on charge undermining the utility of the objective classification tool. Classification staff is now scoring offense history for those with a moderate history. Previously, they were scoring offense history only if it was in the high or highest category. This has been rectified. In the 13th Monitoring Report, it was noted that one officer was scoring the moderate offense history incorrectly assigning 2 points instead of 1 point. This appears to have been rectified. The other scoring error seen in several files during the last site visit, subtracting a total of one point for indicators of positive history instead of up to three appears to also have been rectified. Lastly, at the time of the last site visit, classification had only recently been provided access to the NCIC "rap sheet" but had not as yet used it to score the criminal history portion of the classification tool. The Classification Supervisor reported that they are now using the NCIC to score the criminal history. During the current site visit, there did not appear to be indications (such as reported probation but no scored criminal history or self-reported violent crime) of criminal history that was not scored. There were two files where incorrect scores were entered and one file where the math was incorrect but none of these would have changed the classification level. Overall, the classification scoring process appears to be going well.

The classification spreadsheet continues to show a number of male maximum security inmates being assigned to the Work Center. There appear to be about 10 maximum security females in a two-month period for whom there is not currently an alternative. However, there appear to be about 15 maximum security males. The Work Center being a dormitory style housing facility with unfortified walls would not be expected to house maximum security inmates. However, with the ongoing physical plant and understaffing issues at RDC, the direct supervision at the WC provides staff oversight of these individuals.

In the 13th Monitoring report, it was reported that security moved people to administrative segregation without Classification being consulted. This has reportedly improved with this happening less frequently. One of the reasons this was happening appeared to be that administrative segregation was being used instead of the disciplinary process.  It appears that there may be some improvement in this area. The segregation report for January for RDC showed 16 people were placed in administrative segregation while only two were placed in disciplinary segregation. The May report showed eight inmates in disciplinary segregation and

two in Admin/Disciplinary segregation. There were disciplinary reports for all eight inmates. There did not appear to be actual disciplinary hearings and the log does not reflect any but in three of the reports there were written statements from the inmate. There is still no Classification Committee. Such a committee should not only review placements into administrative segregation but all placements in restrictive housing within 24 hours and then conduct a review every seven days. Although there is no Classification Committee, it appears that seven-day reviews are now being conducted. A classification officer conducts the seven-day review. It was reported that when an individual is identified as having a serious mental illness, a person from the mental health staff participates in the review. This is documented on the seven-day review sheet. Now that this practice has started, a random sample of the seven-day review sheets will be requested as part of the next site visit. See paragraph 77(i) for further discussion of these reviews. It has also been recommended that the segregation log have a column added showing the date of the last seven-day review. The use of the disciplinary process and the conducting of seven-day reviews even though not fully in accordance with policy is a major step forward. Although this reflects some improvement in this area, one cause for concern is that the April incident reports reflect at least one individual who was moved to Booking for segregation who does not appear in the segregation report. At the WC, the segregation log reflects a disciplinary hearing date for most but not all of the people in disciplinary segregation and one randomly selected inmate reported that she had an in-person hearing before being placed in segregation.

One complication for Classification is the policy on holding newly booked misdemeanants in one of the housing units for 10 days before sending them to the WC if appropriately classified there. This is being done supposedly to quarantine for COVID. However, they are mixed with other inmates; people charged with felonies are not housed there for 10 days and women are not housed there at all. So, the policy does not implement an effective quarantine policy. This practice has made it difficult for Classification to place inmates in appropriate housing because this particular housing unit is being occupied for this purpose. The Monitoring Team has recommended that rapid tests be used instead of this ineffective quarantine policy.

Although improvements have been made in the area of Classification, it is still not the case that an objective risk instrument is governing the housing placement of inmates when there continue to be gang pods, inmate committees rejecting housing placements, security moving inmates without Classification involvement, lack of bed space and limitations on the use of some housing units.

      g.  Develop and implement positive approaches for promoting safety within the Jail including:
            i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

    ii.   Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

    iii.   Creating work opportunities, including the possibility of paid employment;

    iv.   Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

    v.   Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

    vi.   Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

    vii.   Providing reasonable opportunities for visitation.

h.   Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.   Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g)(i), five hours of outdoor recreation is provided to inmates each week at the WC based on a review of records and logs.  The same cannot be said for the RDC regardless of what records may show. They cannot be validated because the duty roster does not reflect that officers are ever assigned to recreation posts. In addition, the RDC has developed a new Recreation Log that is no longer consistent with what is used at the WC.  It does not indicate which housing unit was provided recreation, only the pod.  The documentation does not support a finding that inmates are being provided the required amount of recreation and several inmates reported that they had not. The October site visit is currently scheduled to be in-person.  A physical inspection of the facilities will make verification easier.

Regarding 42 (g) (ii) and (iii), there is no incentive program.  There are work opportunities at the WC, but not paid employment, and the only opportunity at the RDC is to work as a trusty.  The housing units at the JDC are currently closed.

Regarding 42(g)(iv) the mental health caseload has continued to grow; there are now about 177 detainees on the caseload; and this means that over the last two monitoring periods, the case load has increased by almost 45%.  In addition, as was detailed in the last monitoring report, the acuity of the population has also increased, meaning that there is a larger percentage of detainees on the caseload who are suffering from acute, extremely serious mental illness. For a significant sub-set of these more seriously ill and unstable detainees (about 34 detainees), their illness is having a significant impact on their ability to function within the facility. Although some of this sub-set of detainees have refused or been noncompliant with prescribed treatment, others have complicated diagnoses that have rendered them difficult to stabilize.

Since additional mental health staff were not included in the recently signed contract with QCHC, the size of the mental health staff has remained the same.  There are still only 2.5 QMHPs and a part time Psychiatric NP/prescriber; they are responsible for all mental health assessments, the development of treatment plans, the provision of treatment (individual and group therapy and medication management), the management of mental health emergencies (such as suicidal detainees), and the documentation of what they are doing in each detainee's medical record; and they also have other responsibilities, such as performing weekly mental health rounds for detainees held in segregation and advocating for the mentally ill detainees in segregation.  In addition, accomplishing these tasks is made all the more difficult by a variety of factors such as, the need for repeated attempts to assess detainees who continue to refuse a mental health assessment, the need for repeated efforts to even engage detainees who refuse or are noncompliant with treatment, and the need to cancel and reschedule appointments due to the shortage of security staff (i.e., an inadequate number of security staff to make it safe for mental health staff to work on the units or to prepare and transport detainees to medical in order for mental health staff to see them there).  Staff must also travel between facilities.  Furthermore, staff are faced with a high number of mental health emergencies that consume a considerable amount of staff time; referrals for suicidal detainees average about 12/week (although some of these end up being inappropriate referrals, all of them have to be taken seriously and addressed); and over the last about 1.5 months, there has been a significant increase in the number of serious emergencies related to the use/abuse of drugs (contraband).  With regard to the recent increase in serious substance use/abuse-related emergencies, the signs and symptoms associated with these emergencies, the reports of those involved and the results of the drug screens performed indicate that the drugs are opiates. This would indicate that opiates have been recently introduced to the facility or have become significantly more available in the facility; and given the seriousness of an opiate overdose, this finding is a major concern.

Although the existing mental health staff is working hard to provide as much treatment as they can, individual treatment sessions are not as frequent as they should be, there are no group therapy sessions, and the more rigorous set of interventions required for those who refuse treatment or are not fully compliant with treatment have not been initiated.  There are also other obviously needed interventions that have not yet been initiated, such as specific interventions designed for those with primary substance abuse difficulties, specific coordinated interventions for dual-diagnosis detainees (with substance abuse difficulties and other mental health difficulties), interventions for those with intellectual disabilities and/or other cognitive difficulties, and interventions for those with severe disabling trauma-related mental health difficulties.

Obviously, there is a need for more mental health staff.  The Monitoring Team has recommended hiring two additional QMHP's and expanding the Psychiatric NP/prescriber's line from part-time to full-time. The current projection is that this will be enough staff even once the Mental Health Unit (MHU) is opened, but it is the opinion of the mental health expert on the Monitoring Team that this projection should be viewed as subject to change once the clinical treatment program for the MHU is finalized and the real number of extremely unstable detainees is determined.   There is also the need for better security support for mental health staff, including the identification, training and assignment of a special set of security officers and supervisor(s) for the MHU.  In addition, it remains important to move towards the opening of a mental health unit where a program for the most severely ill and unstable population can be implemented.

Regarding 42(g)(vi) As has been noted in prior reports, the screening of new detainees for serious mental illness is part of the Jail's booking and initial health assessment process.  83% of the 177 detainees who are currently on the mental health caseload were identified during that screening process, which is a significant improvement over the findings of prior site visits.  It should be noted however that there are two parts to that mental health screening process – the initial health and mental health assessment performed by the intake nurse(s), and the 'Form 3', which is a form completed by each new admission as part of the booking process – and the data is not collected in a way that allows for a determination of what percentage of that 83% of detainees were identified during the nurse's intake screen, identified by the 'Form 3', or identified by both mechanisms.  Such an analysis should be considered as part of the quality review process, and the findings of such an analysis could help identify options for further improving the intake screening process with regard to the identification of new admissions with serious mental illness.

Although the number of detainees on the mental health caseload who were not identified during the booking and intake process is relatively small (30), it should be noted that about 50% of those detainees were later added to the mental health caseload after having been placed on suicide watch.  It is difficult to know if these detainees were suffering from or had suffered from

major mental health difficulties that had been missed during the booking and intake process, or whether their mental health status deteriorated while incarcerated, but either situation focuses attention on the need to be vigilant about issues related to the risk of suicide and the identification of suicidal detainees (see also section 42(h)).  In addition, the fact that about 20% of those detainees who were later added to the mental health caseload were self-referred raises similar questions (i.e., mental illness missed at intake and/or a deterioration in mental status while incarcerated).

Unlike with prior site visits where some intake screenings were delayed because the new admission would not or could not be interviewed (and the nurse failed to seek help from mental health), during the period covered by this site visit absolutely all intake screenings were done on the day of admission.  Whether this was due to the fact that there were no new admissions who were difficult to assess or whether it was due to the fact that the intake nurse immediately asked for help with any difficult new admission could not be determined without reviewing the medical records of all new admissions.  However, finding that there were no delays in performing intake screenings was a very positive finding.

With regard to the initial mental health assessments, performed on detainees referred to mental health for such an assessment, the timeliness of these assessments or at least the timeliness of attempts to perform these assessments has been good (with most performed on the day of referral), and the quality of these assessments has continued to be quite good.

Although the percentage of detainees who at least initially refused a mental health assessment remained unchanged (about 25%), that means that there is still a significant amount of staff time consumed by repeated attempts to perform initial mental health assessments on such detainees, especially since many of those who initially refuse require that staff make multiple attempts before a mental health assessment is finally performed.  Such a delay in obtaining an initial mental health assessment also delays the initiation of treatment, which can be especially problematic when the detainee is acutely ill.  Once the MHU is operational, such acutely ill detainees are likely to be placed on the MHU (even in the absence of a full mental health assessment) where a more rigorous effort to engage them is an integral part of the treatment program.

The requirement of 42(g)(vi) to provide therapeutic housing is addressed in paragraph 77(g) below.

Regarding 42 (g) (vii), no video visitation logs for the RDC and WC were provided for this site visit.  It will be necessary to review this sub-paragraph while on site in October.

Regarding 42 (h), suicide watch procedures for men and women are consistent even though the facilities for both are not identical.  At the RDC suicide watches for men are maintained in C-4 ISO, while at the WC, suicide watches for women are maintained in a Special Housing Unit dayroom.  Early on in the monitoring process, the Corrections Operations Member of the Monitoring Team worked with the Jail Administrator to develop practical procedures for constant supervision of inmates on suicide watch.  Those guidelines need to be formalized through a written order from the new Jail Administrator until such time as they are incorporated into a post order.  Policy 13-300, Suicide Prevention and Training, does not provide specific direction for the officer assigned to a suicide watch post.  Because of that, actual practice has not been consistent even to the point of the officer working outside of the suicide watch Isolation Unit instead of being physically present inside it at all times.  IR-210711 reflects that the Detention Officer was assigned outside of the ISO Unit, not inside.  The Sergeant made no comment or finding about the use of OC or the fact that the Detention Officer was supposed to be inside the ISO unit.  To the credit of officers who truthfully complete suicide watch logs, on occasion they actually record that they are assigned to work multiple housing units simultaneously, indicating that there is no way that they could have monitored a suicidal inmate continuously.  (See paragraph 44, below.)

The medical and mental health related circumstances where higher levels of supervision are required, which staff (medical, mental health and security) are responsible for providing such higher levels of supervision  and what their respective responsibilities are, and where a detainee is housed while being so supervised have all been described in prior reports.  Compliance with this provision remains variable.

Some special medical observation (for example, for acutely ill detainees) is managed in the medical unit, while other less severe situations (for example, uncomplicated withdrawal from substances) are managed on the detainee's regular housing unit, with visits to the medical unit as indicated.  In both situations there is an appropriate higher level of supervision provided by medical staff.  However, there are situations where a detainee refuses to comply with the recommendation that he be housed in the medical unit or make frequent visits to the medical unit. With the possible exception of a life-threatening situation, medical staff cannot force a detainee to comply. In such situations, the ability of medical staff to provide adequate supervision and care is compromised.  In addition, due to the shortage of security staff, the ability of security staff to provide a higher level of supervision to detainees on special medical observation is variable, both in the medical unit and on regular housing units, and it becomes even more variable if the detainee has to make frequent (such as daily) visits to the medical unit.

Suicide watch is managed typically in an ISO unit.  There is an appropriate higher level of supervision provided by mental health and medical staff.  Here too, due to the shortage of

security staff, the ability of security staff to provide a higher level of supervision to detainees on suicide watch is variable.

Although suicide watch is usually managed well by mental health staff (except for the above noted concern), during the period covered by this site visit there were two different cases that raise concern about certain other important aspects of the facility's suicide prevention program and related enhanced supervision issues.  Resultant areas of concern include (1) the capacity of all staff to identify and manage detainees who might be or are at high risk of becoming suicidal, (2) the management and supervision of more complicated cases, and (3) the performance of an interdisciplinary mortality review in instances where there has been a successful suicide.

The first case was a completed suicide; at present, a medical/mental health mortality review has not been completed and provided to the Monitoring Team; but what is known points to several issues that raise concerns.  More specifically, a completed suicide warrants a full, interdisciplinary mortality review. Information should be gathered from all staff who had contact with the detainee while he was detained at the facility; and the review report should include a full analysis of what occurred and recommendations for any corrective actions that might be indicated.  At present, there is no indication of an intent to perform such an interdisciplinary review, which is disconcerting, and as a result, it is extremely unlikely that there will be the type of collaborative, integrated, interdisciplinary corrective action plan that could decrease the risk of suicide within the facility.  In addition, there is the matter of whether or not the detainee should have been viewed as at high risk of becoming suicidal; the matter of how to share concerns about high-risk detainees with all staff who need to know and respond to the risk level; and the matter of what should done by mental health and security staff to best manage high risk detainees. Based on currently available information, things like the detainee's mental status, general behavior, and unrealistic expectations about his case, coupled with his anticipated court appearance and pre-court meeting with his attorney, should have alerted security or mental health staff that the individual was at risk of suicide. Corrective action is indicated in order to help all staff better identify detainees who are at high risk of suicide or becoming suicidal.  Furthermore, if something less than the current protocol for suicide watch is indicated for such detainees not threatening suicide but seen as potentially at risk due to behavior and circumstances, what type of higher level of supervision such high-risk detainees require must be clarified. As noted above, separate from the mental health concerns mentioned here, with respect to security operations, the inmate was inappropriately housed in Booking and the required frequency of well-being checks was not met.

The second case involves a JCA with an extensive history of mental health treatment, including hospitalizations, a history of suicide attempts (in the community and during a prior juvenile detention), and a family history of major mental illness.  Now, while detained, he has repeatedly made quite serious suicide attempts.  There are multiple different issues raised by this case as

well.  Although the JCA is no longer in a County facility, the situation should be reviewed so as to address any deficiencies in the future. First of all, he was clearly not stabilized while detained; so whatever treatment he was receiving wasn't working. This case should have been reviewed promptly, with an eye towards clarifying a diagnostic formulation for the case and the development of an appropriate emergency treatment plan.  Although old medical records are not routinely requested, this was an extremely complicated case, and so old medical records would likely have been extremely helpful to an effort to clarify a diagnostic formulation (a clear prerequisite to the development of an appropriate treatment plan).  Given that he remained dangerously unstable for such an extended period of time, this case should certainly have been considered an emergency; a much more rigorous assessment and emergency treatment planning process was indicated; and a consultation with a psychiatric diagnostician with expertise in the diagnosis and treatment of juveniles and/or some other type of case conferencing was also indicated.  Furthermore, the fact that he had been able to make so many serious suicide attempts raises concern about the higher level of supervision that should be being provided by security staff.

Until the mental health unit is open/operational, there really is no appropriate housing for detainees who require special mental health observation due to the fact that they are seriously impaired as a result of their mental illness.  Instead, such detainees continue to be placed on a segregation unit.  Although both mental health and security staff make regularly scheduled rounds on detainees who are being held in segregation, this does not constitute the higher level of mental health supervision that such severely mentally ill detainees require (which will hopefully be made available to them once the mental health unit is operational).

Regarding 42 (i), video surveillance capabilities at the RDC are severely hampered by the fact that approximately 60 cameras are out of service, primarily throughout the RDC including the medical unit.

While the CID and IAD investigators now have direct access to the video system, they still have to go through IT in order to obtain copies of videoed events.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

  a.  Staff vacancy rate of more than 10% of budgeted positions;
  b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;
  c.  A major disturbance resulting in the takeover of any housing area by prisoners;

d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e. Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

f. One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g. One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The new Quality Assurance Officer (QAO) is now generating a monthly report that should be of great benefit in responding to the requirements of this paragraph. As was mentioned previously, the biggest hurdle that the QAO has to overcome is how to have the required data submitted to her on a timely basis.

As of the end of May, 52 of the 281 funded Detention positions were vacant. The number of filled positions has fluctuated between 204 and 256 for the duration of the monitoring process. Currently that figure stands at 229. Detention Services has never come close to filling all of the funded positions, let alone the number that are required to operate the Jail System in its current configuration (318). Based on the number of terminations that have occurred during the first five months of the year, a turnover rate of 28% is projected for 2021, well over the 10% threshold of budgeted positions.

IR #210283 reflects a brief takeover of a housing unit on February 11, 2021. An inmate knocked an OC canister out of an officer's hand and began spraying it. The officers retreated to the hallway and the inmates hung blankets to block the view and barricaded the door with mats and a table. When assistance arrived, OC spray was used to re-enter the housing unit.

According to the Training Director, all new recruits go through basic training prior to assignment to a facility. This practice allows the HCSO to comply with the 90% standard set by this paragraph.

The number of incidents where inmates are assaulted and seriously injured continues at an unacceptable rate in the RDC with 23 fights or assaults at RDC in May. The same is not true at

46

the WC, where direct supervision makes such occurrences rare. While supervisors do supplement IR's the documentation does not indicate a meaningful review of incident reports. The spreadsheet shows that the reports are approved but without indication of recommendations or corrective action, it would not appear that the approval process is meaningful.

There have been three inmate deaths at the RDC since the last Monitoring Report. On April 18, 2021, an inmate who was being housed in a Booking holding cell, committed suicide by hanging. He was housed in Booking contrary to the Settlement Agreement requirement that inmates be moved to appropriate housing from Booking within 8 hours. On March 19, 2021, a Jackson Police Officer brought an arrestee into the Booking area to be processed. It required the assistance of a Detention Officer to get him out of the car and to a holding cell in Booking. Because of his condition a nurse was called from Medical; she determined that the arrestee had to be transported to the hospital. Subsequently the arrestee collapsed, the nurse was called back from Medical to perform CPR and, it appears, that the arrestee expired. The HCSO has taken the position that he was not an inmate because he had not been accepted/booked. Regardless, an incident report should have been generated and all of this information entered into the JMS system. Instead, individual memos were generated, but not Incident Reports. In both of these cases an After-Action Report was not generated, nor is there record of a Mortality Review. The most recent death was a suicide on July 5th. At the time of this writing, very little is known about the circumstances. From an initial review of the incident report, a major concern is that the two officers who initially found the inmate hanging, one being a Sergeant, did not immediately open the cell and lower the inmate to the floor. Instead, they went to C-Pod Control to report what they saw and only after that information was communicated to the Lieutenant, who was in Booking, did they return to the cell and attempt to assist the inmate. There are additional questions regarding this suicide, such as the frequency of well being checks while in C-4 segregation, which should be in the investigation, After Action Report, and mortality review. As noted elsewhere in this report, After Action Reports and mortality reviews have not been completed but should be.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate. To that end:

    a. Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b. All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

    c. Officers must only be permitted to enter data on these forms or logs at the time a round is completed. Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.  The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been previously reported, the Settlement Agreement calls for a higher standard for well-being checks than is required by the American Correctional Association's "Model Jail Standards" issued by the Commission on Accreditation for Corrections.  In an effort to move Detention Services forward, the Monitoring Team has approved the standard which is now incorporated into Policy 9-200, Supervision and Post Operations.  It calls for a documented 60-minute well-being check for inmates in general population, a 30-minute well-being check for inmates in lockdown status and a 15-minute well-being check for inmates held in Booking.

Since the JDC has been closed for over a year, it is not necessary to address compliance at that facility.  It will be necessary, however, for the officers assigned to the Transfer Waiting area on the ground floor to document well-being checks for inmates temporarily held in the holding cells Monday through Friday while waiting to go to court or return to the RDC or WC.  The standard for those checks is every 15 minutes.

Inmates under suicide watch are supposed to be constantly monitored but log entries are required every fifteen minutes.  A review of such logs for inmates held in Special Housing at the WC revealed that they are monitored appropriately.  Entries are actual time, not exactly on the quarter hour.  According to the facility Captain, an officer is physically located inside the Special Housing Unit.  At the RDC the same standard is not maintained.  While log entries are made in real time, not exactly on the quarter hour, the logs actually include comments that reflect that the assigned officer had more than one housing unit to take care of, making it impossible for him/her to be in two places at once.  One, dated May 18, 2021, stated "Working two units.  Booking 1420-1640."  Extensive gaps in time were noted, as would be expected under these

circumstances.  Obviously, the officer could not be in Booking for over two hours while conducting constant supervision on a suicidal inmate in C-4 ISO simultaneously.  The supervisor on duty should never have allowed such a situation to occur.

In Booking, 15-minute well-being checks are required on all inmates placed in holding cells, regardless of the duration of their stay.  While records appear to reflect general compliance with this standard, the fact that an inmate housed in Booking was able to commit suicide and that his records, which were frozen in time at that point, show that he had not been monitored for hours, calls the accuracy and validity of all Booking well-being checks into question.  A more accurate appraisal cannot be made until the Monitoring Team is able to be on site again for the next inspection.

Thirty-minute well-being checks are required for inmates in lockdown status.  At the WC that includes inmates held in Special Housing.  Individual logs indicate that procedure is being followed there.  At the RDC, individual logs often appear to reflect compliance, but the fact that no officers are assigned to work inside C-4 raises a flag as to their accuracy.  Virtually all incidents in that housing unit are detected after the fact, when officers respond to assaults, fires and facility damage.  Once again, it will not be possible to validate these concerns until an on-site inspection can be conducted in October.

General population inmates are supposed to be monitored every hour.  In direct supervision housing units entries do not have to be made during daytime hours, when inmates are off their bunks (WC) or out of their cells (RDC).  Those entries have to be made only during nighttime hours.  Unfortunately, no general housing unit logs were provided for this remote site visit, therefore, it will be necessary to wait till the next on-site visit to examine them.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

      a.  Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

      b.  Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement

that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c.  "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d.  Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.  Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

The HCSO continues to provide mandatory pre-service training for all new recruits in compliance with 45 (a).  It should be noted, however, that there appears to be an exceptionally high failure to graduate rate from the participants in those classes.  Of the last 36 candidates to

attend basic recruit training, only 23 graduated; approximately one third of new Detention Officers failed to do so.

Regarding 45 (b), there has been no change in post order training.  Since there are no approved post orders, the only training provided is on those post orders that were in place at the beginning of the monitoring process.

Regarding 45 (c), direct supervision training, which began in 2020, is part of the pre-service training program for new personnel.  Existing personnel are no longer involved in this component, but it is apparent that sending RDC officers and supervisor through the program would be beneficial.

Regarding 45 (d), the previous Jail Administrator was approved for, and attended, the American Jail Association's annual virtual conference in April, 2021.  Subsequently, he was removed from his position, but the new Jail Administrator has extensive experience as a trainer and instructor through NIC, so compliance with this sup-paragraph is not an issue.

While in service training has recommenced, it has not been possible to provide it to all personnel to date.  In May, Use of Force and Report Writing policy training was given to 135 Detention staff.  During that same month PREA/Sexual Safety policy training was given to 78 Detention staff.  It is anticipated that this training will be given again later in the calendar year.   Mental health training will resume with the July recruit class.

Training for critical posts or special management units is not on-going. As noted in prior reports, there is no additional training for security staff assigned to the medical department, which includes the small infirmary, the medical clinic and the mental health clinic.  As has also been noted in prior reports, given the security problems that can arise and have arisen when physically and/or mentally ill detainees are off their units/brought to the medical department, security staff assigned to the medical department would benefit from additional training, focused on the best security management of that critical post, including assuring the safety of medical and mental health staff.  It should again be noted that at present, there are an inadequate number of security staff assigned to the medical department (i.e., one security officer) and a shortage of security staff to transport detainees to and from the medical department.  Therefore, until the medical department is adequately staffed with security staff, any additional training that might be developed and provided will have to take this issue into consideration.

In anticipation of the opening of a mental health unit, security staff and security staff supervisors who will be assigned to that unit will have to be selected and given additional training.  Issues related to the identification and selection of security staff for the mental health unit, the reasons

why additional training will be required, and the nature of such additional training have all been outlined in prior reports.  An update on progress towards this goal is outlined in paragraph 77(g).

As noted in paragraph 42(h), some special medical observation is carried out on regular units; even once the mental health unit is operational, there will continue to be seriously mentally ill detainees on  regular units; and so since there will continue to be detainees with special medical and mental health needs on all units, it is important for all security staff to have a reasonable amount of training on serious medical and mental health difficulties and the management of detainees with such difficulties.  In addition, since security staff will continue to play an important role with regard to identifying detainees who might require special medical or mental health services, their training should also focus on enhancing their ability to suspect that a detainee might have special medical or mental health needs and how to facilitate their access to the medical or mental health services that they might require.

The mental health expert on the Monitoring Team has previously raised concern about the adequacy and appropriateness of some of the training on mental health included in the training on 'special needs inmates' and has urged a review of that training.  The concerns raised in this report regarding the facility's suicide prevention program focuses additional attention on the issue of mental health training for security staff.  During this site visit, it was reported that the mental health staff is scheduled to present a different mental health training unit that was developed by QCHC, which is a significant step in the right direction.  However, a review should still be conducted of other training that is being made available to all security staff in order to assure that all training on mental health issues provides security staff with a consistent perspective on the identification and management of detainees with mental health difficulties.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

      a.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

      b.  Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any

who are not already reporting to the Jail Administrator and the Jail's chain of
command. This provision covers road deputies assigned to supervise housing
units and emergency response/tactical teams entering the Jail to conduct random
shakedowns or to suppress prisoner disturbances.

c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing
units, and document the results of their rounds.

d. Ensure that staff conduct daily inspections of all housing and common areas to
identify damage to the physical plant, safety violations, and sanitation issues.
This maintenance program must include the following elements:

    i. Facility safety inspections that include identification of damaged doors,
locks, cameras, and safety equipment.

    ii. An inspection process.

    iii. A schedule for the routine inspection, repair, and replacement of the
physical plant, including security and safety equipment.

    iv. A requirement that any corrective action ordered be taken.

    v. Identification of high priority repairs to assist Jail and County officials
with allocating staff and resources.

    vi. To ensure prompt corrective action, a mechanism for identifying and
notifying responsible staff and supervisors when there are significant
delays with repairs or a pattern of problems with equipment. Staff
response to physical plant, safety, and sanitation problems must be
reasonable and prompt.

**Partial Compliance**

Throughout the duration of the monitoring process it has been questionable as to whether or not
the Jail Administrator actually had the power to manage the Jail System. His or her level of
autonomy has varied through three Sheriffs' administrations. The previous Jail Administrator
did not have the authority to make employment, promotional, disciplinary and management
decisions. Rather that rested with the Chief Deputy, Under Sheriff and Sheriff. Now that a new,
well qualified Jail Administrator has been brought on board, it is an opportune time for the Jail
Administrator to be allowed to manage the Jail System. She has extensive local corrections
experience including direct supervision operations.

Detention supervisors do not maintain a separate log to indicate whether or not they have made
rounds on a daily or shift basis. Rather they sign off on logs, well-being check sheets and other
documents that are maintained throughout the Jail. It should be noted that they rarely, if ever,
make comments and/or recommendations. The standard procedure for supervisors is to sign and
date their name on the bottom of a log or well-being check form. Their signatures are recorded,
but their observations, thoughts or comments are not.

While the requirements of sub-paragraph 46 (d) are not addressed by supervisors, their failure to do so is understandable since maintenance issues go for such a long time before being corrected. With all that they have to do, supervisors surely recognize that documenting the same maintenance discrepancies on a shift-to-shift basis is an exercise in futility. Through the efforts of the HCSO Chief Safety and Security Officer (CSSO) and Benchmark Construction, the maintenance problems are being slowly addressed. Unfortunately, County policies prevent more effective corrective action. An example is when a contract is awarded at an amount "not to exceed" and the work has to stop when that limit is reached. It then takes a new authorization to complete the project that was previously authorized. Additionally, the HCSO should have a line item in its budget to handle a specified level of maintenance without having to go to the County Administrator for approval. Since the last report, one minor step has been taken. The CSSO no longer has to submit a work order to have a fire extinguisher recharged. It can be done by a pre-approved vendor.

Communication with the CSSO and Benchmark representatives has revealed that the lack of preventive maintenance results in system failures, particularly at the RDC, where the HVAC system has been allowed to degenerate to the point that replacement is a more viable alternative than repair.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband. Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Substantial Compliance**

Shakedowns have become a routine procedure in both operational facilities. They are properly documented and Go-Pro video recordings are frequently made. The disturbing side of the shakedowns is the amount of contraband that is being found. No jail (RDC) can operate effectively when almost half of the inmates in a housing area have contraband cell phones, excessive amounts of illicit drugs, shanks and even cash. Based on the relatively few incident reports which reflect breaches in security and attempts to bring contraband into the facility, one would expect that there would be less contraband inside that jail than was the case in the past. Unfortunately, the variety and volume of contraband has increased, rather than diminished, particularly at RDC. The same is not true for the WC.

The following shakedown reports are indicative of the difference between the two facilities. IR-21-0746 indicated that a shakedown of the WC, Housing Unit 1, occurred on May 16, 2021. No contraband was found. By means of comparison, on May 26, 2021, a shakedown of Housing Units A-4 and C-3 at the RDC was conducted with the following results. Twenty-five cell

phones, 27 shanks (including six knives), a handcuff key, large amounts of drugs and even cash were confiscated.  Suffice it to say that too much contraband finds its way into RDC.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Partial Compliance**

This paragraph was upgraded from Non-Compliant to Partial Compliance because it was previously reported that the County had issued a request for proposal (RFP) which resulted in multiple bids being received.  Since that time the County has not provided any additional information.  If this matter is not updated prior to the next Monitoring Report it will be downgraded to Non-Complaint again.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for at least three years.  Since the JDC is closed due to maintenance problems, only the RDC and WC are currently affected.  Regardless, after an officer was initially assigned in 2017, to work on this issue, nothing further has been done.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:

    a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

    b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

d.   Prohibit the use of force as punishment or retaliation;

e.   Limit the level of force used so that it is commensurate with the justification for use of force; and

f.   Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

While training has been provided to both Supervisors and many staff, the problem still persists. The most representative example is an incident (IR-210773) in which an officer sprayed OC into a cell through a "crack of the door" in order to make the inmate comply with an order to "drop the object" that he held in his hand.  The actions of this officer represent a violation of Policy 5-500, Use of Force.  In addition, there was no supervisory review of this incident.  The Sergeant who reviewed the report should have noted the violation of policy and should have made a recommendation as to what should have been done to the officer.  (See paragraph 59, below.)

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

a.   Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b.   If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

i.   The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

ii.   Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

iii.   Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c.   Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and

health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

  i. a sign-out process for staff members to carry any type of weapon inside the Jail,

  ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

  iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

j. All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Partial Compliance**

Regarding 51 (a), incident reports still do not reflect that supervisory approval is obtained before less than lethal weapons are accessed and used.

There is no change in the status of the following sub-paragraphs.

Regarding 51 (b), contact with Medical regarding health risks and any information on their medical condition, or other circumstances that may increase the risk of death or serious injury from the use of force is not included in IR's.

Regarding 51 (c), Detention Services does not utilize the restraint chair. Handcuffs are sometimes used when physical restraint is required, but most frequently, when inmates need to be restrained, they are placed in a single cell.

Regarding 51 (d), Medical staff routinely examine inmates when a UOF incident results in them being referred to Medical.  The problem that persists is that medical staff do not have the capability of making JMS entries.  Not only should they be able to do so, but they should be able to initiate incident reports and prepare supplements.  Under the existing system their critical information is often lost.

Regarding 51 (e), there is no documentation to support supervisory approval of a planned use of force.  To date, incidents which should have been categorized as "planned" have been routinely treated as operational matters.

Regarding 51 (f), there is no record of a cooperative process being followed.  Security staff and Medical/Mental Health staff have never worked together in advance of a documented planned use of force.

Regarding 51 (g), the Jail has an inventory form that shows when less than lethal weapons are checked out and returned to the armory.

Regarding 51 (h), the Jail now has Go Pro equipment that makes the video recording of planned UOF cases possible.  This capability is utilized most frequently during shakedowns.  IR-210746 is an example of a shakedown where the Go Pro video recording system was utilized. IR-210283 is an example of a planned UOF that should have been videoed but was not.

Regarding 51 (i), supervisors are routinely notified after an incident escalates to the point that force must be used.

Regarding 51 (j), shift commanders are also routinely notified whenever incidents require the use of force.


**USE OF FORCE TRAINING**


52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.


**Partial Compliance**

As was previously reported in paragraph 45, UOF training has been given to 135 officers so far this year now that in-service training has recommenced.  All new recruits receive this training prior to assignment to a facility.


53. Topics covered by use of force training must include:
   a. Instruction on what constitutes excessive force;
   b. De-escalation tactics;
   c. Methods of managing prisoners with mental illness to avoid the use of force;
   d. Defensive tactics;
   e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been no change since the last reporting period.  The UOF training includes a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

The UOF policy was adopted by the Sheriff on January 27, 2020. Training has been provided to supervisors and most staff, but testing of five percent of staff is not yet a practicality; nor is it possible to make recommendations regarding changes to the UOF policy.  Staff are not able to articulate that they have a meaningful knowledge of the policy.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Not Applicable**

This paragraph is not applicable at this time.  The UOF policy was adopted over a year ago, but it has not been reviewed or revised since that time; therefore, UOF training has not been updated.

## USE OF FORCE REPORTING

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

The Use of Force Policy, 5-500, was adopted over a year ago.  It complies with the requirements of the Settlement Agreement, but even after a year of training of both supervisors (in-service) and officers (in the onboarding training for new officers; roll call training for current officers), it is not uniformly followed.  Incident reports continue to lack the basic information required. Although supervisors, who are personally involved in incidents, do write supplements, in many

cases, they fail to make recommendations or take corrective action regarding the actions of the initiating officer(s).  Incident Report 210743 is a case in point.  By reading this incident report it is not possible to tell whether one or two inmates were on suicide watch in C-4 ISO.  OC was used to force compliance with a verbal order, which is a violation of the Use of Force Policy. While the officer's supervisor was notified, there is no indication that she took any action. Incident Report 210711 is another example of the same thing.  Multiple inmates in C-4 ISO were supposedly under suicide watch, but the officer was located outside of the unit instead of inside where he should have been.  When an altercation began the officer used OC instead of trying to de-escalate the situation.  The reviewing Sergeant's supplemental report said nothing more than what was contained in the originating officer's report.  She made no comments, recommendations or findings.  Further, she did not even note the officer's failure to be posted inside the ISO unit.

On the other hand, two incident reports from the WC in May demonstrate good use of de-escalation techniques and thorough reporting of those actions. IR #210677 and IR #210741 are both excellent examples of proper de-escalation technique and good report writing.  In addition to being clear, complete easy to follow, they document proper inclusion of and reference to medical staff.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift.  Staff members must accurately complete all fields on a Use of Force Report.  The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.  Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Partial Compliance**
The incident reporting spreadsheet has been modified to add the creation date and creation time. It is now possible to determine if incident/UOF reports are completed by the end of the shift. A review of the May incident reports indicates that the reports are completed by the end of the shift. The paragraph is carried as partial compliance because incidents involving use of force are frequently not marked as being UOF.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:
      a.  A unique tracking number for each use of force;
      b.  The names of all staff members, prisoner(s), and other participants or witnesses;
      c.  Housing classification and location;
      d.  Date and time;

e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

g.  A description of the staff member's attempts to de-escalate the situation without use of force;

h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

i.  A description of any observed injuries to staff or prisoners;

j.  Whether medical care was required or provided to staff or prisoners;

k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The problems outlined in the 13th Monitoring Report have not been resolved.  UOF reports are not always properly identified as such. The reports do have a unique tracking numbers and typically identify the officers involved, but witness statements are seldom included.  A description of the injuries is sometimes included, but more often not. The classification of the housing area where the incident occurred is never specified.  Location is generally noted. The quality of the report writing often results in less detail and clarity than is required by this paragraph.

Incident Report 210505 is an example of poor report writing, inadequate documentation and lack of communication and cooperation between the initiating officer and his supervisor (Sergeant). Because the report was so confusing, it is not possible to determine whether or not the use of OC was entirely justified.  While it was necessary to disarm the inmate who was carrying a three foot fluorescent light, what led to that situation should have been resolved through other means.  The supervisor's supplemental report did little to clarify the situation. On the other hand, as noted above, two incident reports from the WC in May demonstrate good use of de-escalation techniques and thorough reporting of those actions. IR #210677 and IR #210741

**USE OF FORCE SUPERVISOR REVIEWS**

59.     The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:

      a.     A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

      b.     A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

      c.     Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

      d.     If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

      e.     Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

      f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

      g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Partial Compliance**

There has been no noticeable change in the status of this paragraph since the last reporting period.  On a day-to-day basis, supervisors are actively involved in dealing with incidents, sometimes more so than would be expected.  That is primarily due to the fact that supervisors at the RDC tend to handle routine matters, such as well-being and security checks, that should be the responsibility of Detention Officers.  This situation is primarily attributable to the shortage of personnel.  Supervisors follow through on UOF cases by notifying the appropriate chain of command and investigative authorities.  As has always been the case, however, supervisors do not evaluate incidents, reach conclusions and make recommendations. Future training for supervisors needs to concentrate on the fact that a signature is not sufficient.  A finding is required.  Incident Report 210743 is representative of the problem.  An officer who was assisting with med pass on C-4 ISO (suicide watch area) noticed that one of the inmates had on a pair of boxers. She gave three verbal commands to the inmate to give her the boxers. When he did not, she used OC spray to "gain control" and obtain the boxers.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

    a.    Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

    b.    Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

    c.    Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

    d.    Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

    e.    Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

There has been no change in the status of this paragraph since the last reporting period.  While supervisors have taken steps to improve their compliance with standards, as noted in paragraph 59, they have not met the requirements of this paragraph.  Specifically, they do not require that photographs be routinely taken, nor do they ever indicate that an inmate has refused to sign a waiver when photographs are refused.  Witnesses are seldom identified, nor are witness statements taken.  Finally, they do not explain why an incident was not recorded if there is no video evidence.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of this report for the past several reporting periods.  While the spread sheet on incident reports frequently reflects the supervisor's approval, there is no indication of findings or recommendations in the spread sheet or separate report. Command level Detention staff indicate that they review incident reports.

62. Reviewing supervisors must document the following:

    a.    Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

    b.    Witness statements;

    c.    Review date and time;

    d.    The findings, recommendations, and results of the supervisor's review;

    e.    Corrective actions taken;

    f.    The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

    g.    Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

        i.    The nature and extent of injuries, or lack thereof;

        ii.    The date and time when medical care was requested and actually provided;

        iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

    h.    Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

There has been no change is the status of this paragraph for the past several reporting periods. The incident report summary spreadsheet has a column for supervisors' notes.  While this would be an appropriate place for them to make comments/recommendations, their notes are generally limited to personal involvement in the incident(s).

**INCIDENT REPORTING AND REVIEW**

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners.  To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Partial Compliance**

This paragraph has been upgraded from Non-Compliant to Partial Compliance because Policy 1-500, Incident Reports, was approved and adopted on April 14, 2021. Now that it has been put in place, it is imperative that priority be given to training all officers and supervisors on its requirements. Incident reports need to be clear and comprehensive. They serve as documentation of what occurred, what steps were made to investigate and what corrective action may or may not be required. Now that a policy is in place, it is incumbent upon supervisors to ensure that it is followed.

64.     Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:
   a.     Tracking number for each incident;
   b.     The names of all staff members, prisoner, and other participants or witnesses;
   c.     Housing classification and location;
   d.     Date and time;
   e.     Type of incident;
   f.     Injuries to staff or prisoner;
   g.     Medical care;
   h.     All staff involved or present during the incident and their respective roles;
   i.     Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
   j.     External reviews and results;
   k.     Corrective action taken; and
   l.     Warden and Administrator review and final administrative actions.

**Partial Compliance**

Now that there is an approved and adopted policy regarding incident reports (1-500), it is up to supervisory staff to ensure that all incident reports meet the criteria of the policy. As has been pointed out in previous paragraphs, such is presently not the case. Tracking numbers (incident report numbers) are listed, as are the names of staff and inmates involved. Witnesses are seldom noted. The housing classification is never noted, but the housing unit location generally is. The facility is only listed sporadically. The date and time and type of the incident are always listed, but the type is often subject to question. As an example, a report may be listed as a "failure to comply" when in fact "use of force" would be more appropriate. Injuries to staff and inmates are sometimes listed, as is the requirement for medical care. All staff involved are generally listed, but supervisory findings, recommendation and case dispositions are not. External review, corrective action taken and command staff review (Jail Administrator) along with final administrative actions, are not noted.

Deficiencies in the incident reports have been noted throughout this monitoring report. Similarly, the inability of Medical to enter supplemental reports in the JMS system such that there is a lack of critical information related to an incident has been noted throughout this report. Either Detention staff need to collect the information from Medical and include it in their reports or medical staff need to be able to access the JMS system to report their involvement or both.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

    a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

    b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

    c.    Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Partial Compliance**

The discrepancies and shortcomings identified in the previous Monitoring Reports are still apparent, but this paragraph is upgraded to Partial Compliance because policy 1-500, Incident Reports, was approved and adopted.  While it specifies that an incident report must be written in cases of "…theft, or loss of property" it is not clear that this means the loss of inmate money or property.  In addition, it does not address the issue of a late or improper release.  Those two issues should be included in the next revision of the policy. Incident reports do reflect that supervisors respond to incidents and that inmates who need to be checked or treated are appropriately referred.  Supervisory review seldom includes witness statements and findings, but photographs are more frequently included.  Approval/disapproval statements and recommendations are routinely missing.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

    a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

    b.    Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

    c.    Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted.  Such

documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.      Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

The discrepancies and shortcomings identified in previous Monitoring Reports are still apparent. Incident reports do reflect that supervisors respond to incidents and that inmates who need to be checked or treated are appropriately referred.  Supervisory review seldom includes witness statement, photographs and finding.  Approval/disapproval statements and recommendations are routinely missing.  Incident Report 210597 is a case in point.  While a report was written by a Lieutenant, it simply stated that an inmate was released approximately 20 hours after his release was ordered.  There was no follow up by command staff associated with the incident report.

**SEXUAL MISCONDUCT**

67.      To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct.  Such policies and procedures must include all of the following:

a.      Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.      Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.      Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.  Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.  Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

The new PREA Coordinator continues to strengthen the program. The PREA Coordinator provides training to on-boarding officers in the training academy. In April, the PREA Coordinator completed a training at HY for 12 staff members. In May, she offered a two-hour in-service training to all HCDS staff over a ten-day period. This was attended by 128 staff members. This was intended to be a mandatory training; however, many staff members did not attend. The PREA Coordinator is going to set up another in-service training for those that did not attend the May training. As before, several incident reports indicate the need for additional in-service training which is complicated by the chronic understaffing.  As noted in the 12th and 13th Monitoring Report, there are incidents that should be referred to the PREA Coordinator that do not get referred. In this reporting period, an incident on February 23, 2021, IR # 210344, should have been referred to the PREA Coordinator; a grievance on April 27, 2021 was identified as a PREA grievance but was not referred to the PREA Coordinator; an incident on April 12, 2021, IR#210610 was not immediately reported to the PREA Coordinator but was referred by the CID investigator.  This indicates the need for continued in-service training of officers.

Nursing staff continue to be involved in the screening of newly admitted detainees in an attempt to identify those who may be sexually abusive or at risk of sexual victimization as part of the intake screening process, and new admissions so identified are referred to the PREA officer. If/when the PREA officer refers any identified new admissions to mental health, mental health will perform an assessment and provide any treatment that might be indicated.

If medical or mental health staff identify a PREA eligible detainee who was not previously identified at intake, that detainee is referred to the PREA officer. If there is an actual PREA defined incident, medical staff will perform or facilitate the performance of any indicated assessment and provide any medically indicated treatment; mental health staff will perform an assessment and provide any indicated mental health treatment; and medical and mental health staff will confirm that the PREA officer is aware of the incident.

The MOU with the Mississippi Coalition Against Sexual Assault is in effect and was being utilized at the time of the 13th Monitoring Report. An outside line has been implemented such that inmates can call the Coalition directly from the kiosk in the unit without charge. DOJ has highlighted a problem with reporting through the Coalition in that if the Coalition receives certain federal funds, it cannot pass on any PREA reports without a written release from the inmate. Third party reporting is still available through friends and family. PREA complaints can

also be reported through the kiosk directly to the PREA Coordinator or through submitting a grievance at the kiosk.

Both medical and mental health staff continue to provide any clinically indicated emergency and ongoing medical and mental health care for victims of sexual assault and/or sexual harassment. It should be noted that if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment, which includes the use of a rape kit.

The PREA Coordinator has put up temporary posters in the housing units with updated information. She has prepared pamphlets to be provided to current detainees and new bookings. However, the new Detention Administrator who is a certified PREA auditor has requested that the distribution be postponed until she has a chance to review the material. The PREA Coordinator had completed an education session with inmates by coordinating with a group being conducted by the discharge planning nurse. This may or may not have been the appropriate group of inmates if they were, in fact, close to discharge. The education should take place as early as possible during detention. However, the discharge planning nurse resigned and these groups were discontinued at least for now. The PREA Coordinator reported that she was working with the Program Officer to begin PREA education sessions in the program area. She also reported that she does walk-throughs of the housing units during which she talks with inmates about PREA. In addition, she reports that a TV has been ordered that would be used in the ID room of Booking with a video informing the inmates about PREA and the reporting process. The education process needs to continue to be expanded and the new Detention Administrator will no doubt be a valuable resource in this area.

As reported in the 13th Monitoring Report, the investigations by the CID officer have improved. There was only one PREA investigation by CID during this reporting period. The investigation report indicates that the investigator interviewed the victim, a correctional officer and prepared an affidavit to pursue charges. The PREA Coordinator also offered the officer her services but was not contacted.  One concern related to the ability to provide for sexual safety and adequately investigate allegations is that in February, the prior Detention Administrator reported that at RDC, 56 cameras were not working, 14 were missing and 10 needed adjusting.

There is also concern about the PREA Coordinator's access to IAD investigations. The PREA Coordinator made a referral to the IAD investigator regarding an incident that occurred in May that involved a supervisor ridiculing an inmate for a prior PREA complaint he had made. She was informed by the Undersheriff that her referrals to IAD had to be approved by the Undersheriff or the Sheriff. A review of the IAD spreadsheet indicates that this referral did not go through to IAD. The PREA Coordinator was also informed by IAD that she could not have

access to the reports/findings of the IAD investigation. Both of these directives are contrary to the Sexual Safety Policy and PREA.

The individual who committed suicide on April 18th was being housed in Booking because he had inappropriately touched a female officer. His actions were clearly inappropriate but there is no logic to housing him in Booking as a result. This was not a case where he had climbed through the cell door window of C-4 and so could not be contained in segregation. This individual was also a seriously mentally ill individual and an Interdisciplinary Team meeting would have been appropriate to consider an appropriate response to his behavior. The Monitoring Team has repeatedly stated that Booking is not appropriate for housing and that the required well-being checks were not being completed there. As noted in the 13th Monitoring Report, Booking was also being used to house alleged victims of PREA violations and one of those individuals is still there months later. It is essential for the sexual safety of staff and inmates that the housing units be adequately supervised and that Booking not be used for housing.

Given the various above noted roles and responsibilities that medical and mental health staff assume with regard to PREA and PREA-involved detainees, staff may have knowledge about and an understanding of any given PREA-involved detainee that is not readily available elsewhere. Therefore, when there is a PREA investigation, the investigator should fully gather and integrate information obtained from medical and mental health staff into the investigation. As has been noted in prior reports, although a considerable amount of such information will be available in the detainee's medical records, in many instances, actual investigatory interviews of medical and/or mental health staff might also be indicated.

In addition to the positive steps mentioned above, the PREA Coordinator reports that she has applied for a PREA grant to address maintenance issues such as doors and cameras so that there is a safer environment for the inmates and staff.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

       a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

            i.     Any prisoner exhibited a serious injury;

      ii.    Any staff member requested transport of the prisoner to the hospital;

     iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

     iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

      i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

      ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

     iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

      i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

      ii.    Any staff member requested transport of the prisoner to the hospital;

     iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

     iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

      i.    a brief summary of all completed investigations, by type and date;

      ii.    a listing of investigations referred for administrative investigation;

     iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

        iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

        v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

    g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Policy 1-600, Investigations, was approved and adopted on March 25, 2020.   It calls for a thorough review of CID and IAD investigations that are consistent with the requirements of the Settlement Agreement.  As was reported previously, a new CID investigator (the third in the past five years) was assigned to the position.  The original IAD investigator has been in place during the same time frame.

It now appears that both the CID and IAD investigators review all incident reports on a daily basis, not just those that are referred to them.  This is an effective process in that they are the best qualified personnel to determine whether or not an incident warrants their further review.  That is based on the fact that they have the most direct contact with Detention personnel, operations and incidents.  Their experience and expertise make them well qualified to analyze incidents.

Since the monitoring process began the CID investigators have conducted an increasing number of investigations.  Except for one year (2019) the number has grown annually.  In 2017, there were 39 CID investigations.  That was followed by 97 in 2018, 44 in 2019, 166 in 2020, and 88 year to date in 2021.  That number projects out to 206 for the entire year.  The dip in investigations during 2019, is probably attributable to the change of investigators.  During the current year, 70 cases originated at the RDC, 16 at the WC and two at Henley Young.  Of special interest is the fact that 21 of the RDC cases were associated with A-Pod while 37 were associated with C-Pod at that facility.  The remainder were spread out among Booking, Medical Henley Young and the WC.  Considering the fact that C-Pod at the RDC has supposedly operated as a direct supervision housing area since late October 2020, it is noteworthy that the majority of the incidents occurred in C-Pod.  One might think that such was the case because officers were present in each of the C-Pod housing units, and were thus able to detect and deal with incidents, whereas in A-Pod, with no officers assigned to the housing units, there was less likelihood that staff was aware of what was going on.  Unfortunately, that does not appear to be the case.  Many incidents in C-Pod occurred when no officer was present.  Because direct supervision is not actually being implemented at RDC, there does not appear to be a correlation

between supposed implementation of direct supervision and effective management of the inmate population in the RDC.

In the last Monitoring Report it was noted that a number of IAD investigations resulted in "exoneration" or "unfounded" when the officers involved in the UOF should have been found to be in violation of the UOF policy.  After this matter was pointed out to both investigators and their supervisors, in almost every case since then, appropriate findings have been rendered.

## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There has been no change in the status of this requirement. As stated in the 12th and 13th Monitoring Report, it will be necessary to track whether there is a concern about the confidentiality of the use of the grievance system once there was an officer consistently on the unit as required in C Pod by the Stipulated Order. As previously stated, the incident reports indicate that this is still not the case. Until then, it will not be possible to know if the physical setting of the kiosks which does not allow for privacy results in issues with the confidentiality of filing a grievance. However, it should be noted that inmates are using the system and there has been no stated concern about officers observing the use of the kiosk. There are some gaps in access to the kiosks. There are no kiosks in Booking where people are inappropriately housed as well as no kiosks in the ISO units.

The grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer. The grievance policy also requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It does not appear that this provision of the policy has been implemented or that the inmates have been informed of it. In addition, without an officer regularly on the unit in A Pod, an inmate would not have easy and confidential access to a Detention Officer.  Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.    Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

A Grievance Policy has now been approved and adopted. However, it should be noted that the Grievance Coordinator who took over the position on April 9th had not been given the Grievance Policy and had, therefore, not read it. Once the policy is fully implemented, it would be applicable and standardized across the entire Jail. At present, the kiosk system works the same across facilities. The new Grievance Coordinator stated that she now reviews all grievances including those at the WC, determines whether they are grievances and then assigns the grievance to staff for a response. She stated that this was implemented because the Grievance Officer at the WC was responding to grievances that weren't grievances. However, a review of the grievance responses indicates that the Grievance Officer at the WC is receiving grievances that she denies as not being a grievance even though this is supposed to be the role of the Grievance Coordinator. It appears that the system of having the Grievance Coordinator determine whether the grievance presents a grievable issue which is according to policy, is not being consistently followed leading to inconsistency in this area. However, the larger concern described below is the number of grievances that are inappropriately denied as not being grievances by both the Grievance Coordinator and the WC Grievance Officer. There is inconsistency in how grievances are responded to once assigned. In addition to some responders not providing any response through the system, described below, some responders research the grievance and respond substantively whereas others simply say the matter will be looked into. Even with the policy in place, there will need to be training on how to properly respond and ensure promised response to grievances are implemented in order to achieve consistency. The grievance policy requires that a percentage of grievance responses be audited on a periodic basis. Once this is implemented, it will be possible to target appropriate training and corrective action.

71.    All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the Grievance Coordinator maintains a spread sheet to track the grievances and grievance responses. Many of the fields are pulled electronically from the Securus system. However, she has to manually add the type of grievance, the date of response, and the date of an appeal. The Grievance Coordinator previously reported that some officers do not respond to grievances through the Securus system and, as a result, there is no documentation of a response to some grievances. This appears to be a significant problem. In February, 114 grievances were assigned; 30 of them had no response and 15 had an untimely response. In

March, 89 grievances were assigned; 32 of them had no response and 9 had an untimely response. In April, 76 grievances were assigned;13 had no response and 10 had untimely responses.  In May 67 grievance were assigned and 14 of the ones with responses due had no response and 14 had late responses. Of the untimely responses, a number of them were filed as emergency grievances which should receive a response in 24 hours. However, it appears that many of the emergency grievances were not emergencies. It will be important to educate the inmates on what constitutes an emergency so that true emergencies aren't overlooked among the many emergency grievances. The Grievance Coordinator has also suggested that a timely response to emergency grievances could be better ensured if the system had an alert signal for emergency grievances. The Grievance Coordinator works regular business hours and will not see an emergency grievance submitted in the evening or on the weekend until the next business day.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. It has been previously reported that one concern is grievances being denied as not a grievance when they actually are grievances. This is an increasing concern during this reporting period. February 25% of grievances were denied as not being a grievance; in March, 33%. This increased dramatically in April to 57% and in May to 64%. A review of the May grievances and responses disclosed a number of the denied grievances to actually be grievances. This included issues of alleged over-detention, failure to get prescribed medications, officer conduct, missing property, money being charged without commissary being received, and physical plant problems. As reported in the 12th Monitoring Report, one area of concern is that all grievances related to court proceedings are denied as not being a grievance. While this is usually true, there were several grievances denied as not being a grievance when the complaint was that the inmate was entitled to release and the Jail had not released him. It is certainly possible that the inmate is mistaken but this is a grievable issue. In fact, when over-detention was a more frequent occurrence, the grievance system was an important vehicle for identifying instances of over-detention. It will be important to identify alleged over-detention as a grievable issue and refer those grievances to Records. Another example of a legitimate grievance being denied because it was said to be a request was a grievance regarding not getting medications. This was denied as being a request, not a grievance. Although a request for some items might be simply a request; a complaint that prescribed and needed medications were not being provided would constitute a grievance.

There are still some where the adequacy of the response needs improvement. In many instances, the response is a promise of future action or that the officer "will look into it." There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. The new grievance policy requires that the Quality Assurance Officer do a monthly audit of grievances and responses to determine the

timeliness and appropriateness of the responses. This has not been implemented yet but should provide some oversight in this area.

With the turnover in medical staff, there is not a medical staff member assigned to and authorized in the system to respond to grievances. The Grievance Coordinator has to print out the grievance, walk it to medical, find someone to respond and then the Coordinator enters it into the system. This no doubt contributes to the delay in responding to some of the medical grievances and could cause some inaccuracy in the response. Medical and mental health related grievances are triaged by the HSA, and so there have been brief interruptions in this process during the period covered by this site visit due to multiple changes in the HSA.  However otherwise, documentation in Medical reflects that medical and mental health related grievances continue to be responded to in a timely manner, and when it appears to be an emergency, the response is immediate. The grievance spreadsheet does not always show a timely response. This could be because Medical is not entering the information in the Securus system. Although a file of medical and mental health grievances and written responses is maintained by the HSA, there is still no attached documentation of a resolution of the matter.  Therefore, such documentation of resolution must be added to the records maintained.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. Under this system non-English speaking persons and persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. The Securus system should at some point be programmed to include the most common foreign languages. There is no indication that this provision of the policy is being implemented or that inmates have been informed of this option. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner

rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The inmate handbook, which is given to all detainees during the booking process, is out of date and is not available in Spanish or any other language.  This shortcoming has been brought to the attention of the HCSO since the very first Monitoring Report, but resolution of the matter has never been adequately addressed.  Over the years, various command staff have been held responsible for revising and updating the handbook, but none of them have ever taken the required corrective action.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.      Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

Because of continuing violations of the housing requirement of this paragraph, it was downgraded from Partial Complaint to Non-Compliant in the last Monitoring Report.  Even prior to the monitoring process, the HCSO/Detention Services was put on notice by the DOJ that utilizing holding cells in Booking for the long-term housing of inmates was a gross violation of acceptable correctional standards.  At that time, one inmate had been housed in a holding cell for approximately three and a half years.  Since then, the HCSO has resolved to curtail the practice, time and time again, but in each instance, lack of confinement space or inoperable/un-securable doors have resulted in inmates being housed in Booking, where the cell doors could at least be locked.  Most recently, an unmanageable inmate, who was housed in Booking for a period of several weeks, committed suicide.  He was not being properly monitored and the subsequent investigation resulted in the termination of one officer and a 15-day suspension for another.  Inmates housed in eight hour holding cells do not have access to video visitation services or outside recreation.  They are simply let out of their cells periodically, in order to shower and make phone calls.

At present, placement in appropriate long-term housing is not happening for new admissions for whom 'appropriate long-term housing' would be a mental health unit.  This is because there is no mental health unit. There is no unit that even approximates 'appropriate' for such new admissions and those who are most unstable and unpredictable are likely to end up being placed

in segregation, which is clearly not appropriate housing.  However, once the mental health unit becomes operational, this should all change; it will be possible to immediately place seriously mentally ill detainees in more appropriate housing, directly from intake; and mental health and classification have been working out the details for how this will be accomplished.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

Segregation logs submitted for the previous site visit reflected better record keeping than had been maintained in the past, but there were inconsistencies noted between files from the WC as compared to the RDC.  Command staff need to set and enforce uniform procedures as well as standardized forms and documentation throughout the Jail System.

The Segregation Log now has a column to list the charge against an inmate, when he was placed in segregation, when a disciplinary hearing was held and when the inmate was returned to general population and to what location.  The WC appears to routinely include the charge and usually indicates the date of a disciplinary hearing and the number of days imposed; RDC does not. The Monitoring Team has recommended that the log include the date of the most recent seven-day review so that compliance with that policy requirement can be tracked.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for detainees who are being held in segregation.  When indicated, staff offers mental health services to a detainee who is not already on the mental health caseload.  When indicated, staff makes available adjustments in the treatment that is being provided to a detainee who is already on the mental health caseload, but currently (i.e., until the mental health unit becomes operational), "available adjustments in treatment" may be far less than what the detainee requires.

As has been noted in prior reports, the long-standing issue has been the failure to develop and implement a formal mechanism whereby any findings from these weekly mental health rounds (such as a deterioration in a detainee's mental health status) can be shared with security staff responsible for the placement in and removal of detainees from segregation and thereby possibly have an impact on any decisions made by security staff regarding the continuation or termination of a detainee's placement in segregation.  Then, even after the development and approval of a

policy that would establish such a mechanism, there was an unexplained delay in implementing the policy.  It should be noted however that while awaiting the implementation of that policy, mental health staff developed a meaningful working relationship with classification staff. In the context of that working relationship, attention was beginning to be paid to some of the more seriously mentally ill detainees who are being held in segregation and mental health and classification have developed an understanding about and moved towards the development of a policy and procedures for how detainees who are appropriate for transfer from segregation to the mental health unit (once the unit is operational) will be identified and managed. See paragraph 77(i) for mental health participation in the review of persons in segregation.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

     a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

     b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

     c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

     d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

     e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

     f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

          i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

  ii. The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

  iii. If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g. Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h. If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i. The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j. Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77 (a) at present, mental health staff are not involved in the decision to place someone in segregation whether disciplinary or administrative. As noted in prior monitoring reports, this provision applies to all detainees who are already on the mental health caseload, and those who are not already on the mental health caseload but exhibit behavior  around the time of the infraction that could reasonably lead security staff to suspect that they might be suffering from a mental illness.

The mental health assessment performed in connection with security's review of a detainee's infraction(s) should be focused on the following:

- Whether or not the detainee's mental status is such that he/she cannot credibly participate in the disciplinary review process
- Whether or not the detainee's infraction/behavior is actually a symptom(s) of or the result of his/her mental illness
- Given the detainee's mental status, whether or not the detainee is actually able to learn anything (or otherwise benefit) from being placed in segregation
- Whether or not placement of the detainee in segregation is likely to be harmful to the detainee/cause further deterioration of his/her mental status
- Whether or not, given the detainee's mental illness and current mental health status, there is an intervention that is more appropriate than placement in segregation, such as altering the detainee's mental health treatment plan and/or a punishment that doesn't include placement in segregation

Implementation of this policy will be more easily accomplished for those detainees who are housed on the mental health unit once created where the collaboration of mental health and security staff should be established.  If a detainee on the mental health unit commits an infraction, the treatment team (which includes security staff) will have the responsibility and authority to decide what should be done, the team's decision would be documented in the detainee's medical records, and an emergency treatment plan should be generated to further document the team's decision.

Regarding 77 (b) as has been noted in each prior report, there are detainees with serious mental illness housed on the segregation unit and held in segregation in the isolation sections of other units.  It is anticipated that the program design for the mental health unit will be such that these detainees can be moved to the mental health unit once it is operational. Given the high number of inmates with mental illness in segregation, it cannot be said that segregation is contraindicated as is required by paragraph 77(b) for detainees with serious mental illness.

Regarding 77 (c) at present, medical and mental health staff are not notified when an individual is placed in segregation not even when the detainee is known to be on the mental health caseload. Mental health staff reviews the housing location of individuals on their caseload on a daily basis

to determine if any of them have been placed in segregation. They also may learn that an inmate on the mental health caseload has been placed in segregation when they go to visit the inmate and find that he has been moved.

Regarding 77 (d) and (e) as noted in paragraphs 77(a) and 77(c), the mental health staff are not being offered the opportunity to assess any detainees prior to their placement in segregation. Therefore, the security policy and procedures that address this provision must be implemented.

Security staff are aware of the fact that there are seriously mentally ill detainees being held in segregation. However, there is not any specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation. In addition, the placement of these detainees in segregation has not been short term. Furthermore, there has only been one situation where an individualized plan was developed to get a detainee out of segregation as quickly as possible.

Although the opening of the mental health unit will provide a more appropriate housing option for seriously mentally ill detainees who are currently placed in segregation, it will still be important to develop and implement policies and procedures that would address this provision.

Regarding 77(f)(i) As part of medication pass, the nurses offer daily visits to detainees being held in segregation who are on medication. However, as noted in other sections of this report, there are times when nurses are attempting to pass medication that they are unable to actually even see some detainees due to the fact that there are not enough security staff available to support the medication pass function.

Regarding 77(f)(ii) detainees on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP, but due to the shortage of mental health staff, these sessions are not consistently scheduled on a weekly basis. Then, due to the shortage of security staff, the therapeutic sessions that are scheduled do not always occur; there are times when this is all further complicated by problems with the physical plant (for example, cell doors that don't lock, which makes it virtually impossible for security staff to assure the safety of the mental health staff who were scheduled to come on the unit) Although such cancelled sessions are rescheduled, this can take a while due to the shortage of mental health staff. These missed appointments are noted in the EMR but are not tabulated separately. In addition, when scheduled sessions do occur, due to the shortage of security staff they are often not out-of-cell sessions, but rather sessions held at the detainee's cell door.

Regarding 77(f)(iii) as noted above, a QMHP makes weekly rounds for all detainees being held in segregation, during which each detainee's mental status and need for mental health services is assessed. However, as has been repeatedly noted in prior reports, there is no on site jail medical

physician or psychiatrist; the responsibilities that might be assumed by such physicians are assumed by a medical/primary care nurse clinician/practitioner and a psychiatric nurse clinician/practitioner, both of whom have physician collaborators; and so therefore, since it is impossible to fully meet this provision as currently written, the parties need to come to some sort of agreement about how this provision will be addressed. Although there is a physician and a psychiatrist available for consultation, the Monitoring Team recommends a more formalized, weekly process such as weekly grand rounds.

Regarding 77(g) all detainees with serious mental illness housed in long-term segregation have been assessed by a QMHP, but to date, there has been no appropriate housing for such detainees that could be recommended based on those assessments (see paragraph 77(b) and (g)).  However, as noted in prior reports and in paragraph 77(b) of this report, it is anticipated that the new mental health unit will provide appropriate alternative housing for this population, at which point this provision can be more fully addressed.

Why the development of a mental health unit is required in order to address the needs of the seriously mentally ill detainee population and comply with this provision and many of the other provisions of this agreement has been outlined in prior reports.  The various issues that need to be addressed in order to get to the point where the mental health unit becomes operational have also been outlined in prior reports.  Therefore, all of the above noted will not be outlined again here.

The planning process for the mental health unit is well underway, and it is clear that information provided by the consultant and during the virtual site visit to a well-established jail mental health unit has helped focus the planning process.  There is a fully interdisciplinary planning team for the mental health unit. The team meets on a monthly basis, with full participation; and more detailed planning goes on in between the monthly meetings.  Critical operational policies and procedures are being developed. The clinical program/menu of therapeutic interventions is being developed and is designed to meet the needs of the population that is expected to be housed on the unit. A staffing plan is being finalized, including medical and mental health staff (a request for additional mental health staff has been submitted to the County and since rejected must continue to be pursued), and security staff and supervisory security staff (one security officer who will be assigned to the unit has already been identified, a process is underway to identify others, but identifying who will supervise the designated security officers will need to be determined as they will also need to receive special training). A training program for designated security officers and their supervisor(s) is being developed.

The renovation of the space for the mental health unit is underway, and the MHU planning team did have an opportunity to provide input into how the space would be renovated in order to make it as usable for this purpose as possible.  At present, it is projected that the renovations will be

completed by September. It should be noted that although still off in the future, a mental health unit is in the first phase of the County's plan to build a new jail, and so hopefully, lessons learned while operating a mental health unit in the repurposed space at RDC can help inform the design of the proposed MHU for the new jail.

Regarding 77(h) when it has been discovered that a detainee's mental health status has deteriorated while being held in segregation, this has usually been discovered by mental health staff during weekly segregation rounds or during an individual session with a detainee. Nursing staff have also identified such detainees during their weekly segregation rounds or during medication pass. It does not appear that security staff identify such deteriorating detainees. The reason(s) for this is unclear, and so this issue requires further assessment and then the development of a corrective action plan, but during the course of such an assessment, a lack of focus on this issue by security staff and/or the need for additional mental health training for security staff should be considered as possible contributing factors.

When it has been found that a detainee's mental health status has deteriorated while being held in segregation, mental health staff assess mental health treatment needs. If the detainee is already on the mental health caseload, any indicated changes to his/her treatment plan are made (when an 'indicated' treatment option is not currently available at the facility, the best available option is employed) and if the detainee is not already on the mental health caseload, he/she is added to the caseload and an appropriate treatment plan is developed.

See paragraph 76 with regard to the implementation of policy/mechanisms whereby mental health staff would have input into housing decisions being made for mentally ill detainees who are being held in segregation, including those who have deteriorated while being held in segregation. Ideally, the implementation of that policy will also help to establish an improved working relationship between classification, security staff responsible for disciplinary review and segregation review, and mental health staff, whereby appropriate housing for any given detainee who has deteriorated while being held in segregation can be discussed and addressed at any time (not just during a regularly scheduled meeting), especially when the deterioration is severe enough that the need for action has become urgent.

If a detainee's deterioration in mental status is such that the detainee is suicidal, alternative housing/placement is available in the form of suicide watch. However, as noted in prior reports and in other sections of this report, until the planned mental health unit is operational, there is no appropriate, alternative housing/placement for other acutely mentally ill and unstable detainees.

Regarding 77 (i) during this most recent site visit, it at least appeared that a mechanism for interdisciplinary review of detainees who are being held in segregation was finally being implemented. Essentially, based on a review of documentation forwarded to the monitoring team, there is now an every seven day review by security, classification and mental health. There

was a form for each detainee, signed by a security, classification and mental health staff person, but for the most part, each form simply indicated that the detainee's behavior (a product of the detainee's mental illness) was such that he couldn't be removed from segregation and housed in general population.

As noted in various sections of the agreement, no seriously mentally ill detainee should be held in long-term segregation; even placement in short-term segregation should only be for some documented, extraordinary reason and when a seriously mentally ill detainee is being held in segregation, there must be an interdisciplinary plan developed for removing him/her from segregation as quickly as possible.  The above-described review documentation does not reflect any of these issues or principles that underlie the need for an interdisciplinary review of seriously mentally ill detainees being held in segregation.  More specifically, there was no indication of the impact, if any, of segregation on the detainee's mental status. There was no indication of whether or not the detainee even understood why he/she was placed in segregation and so ultimately, there was no sense obtainable from the review forms whether placement in segregation was helpful or harmful to the detainee.  The review documents/forms do not include a plan for removal of each detainee from segregation (even such as altering the approach to treating an unstable detainee in an effort to better stabilize the detainee, or identifying an alternative "safe" but less restrictive placement for a vulnerable detainee) or some explanation as to why an implementable plan cannot be developed (for example, the absence of a mental health unit that would be a suitable alternative placement).  Instead, the review documents appear to indicate that segregation is the most appropriate place for each detainee, and there is not even a discussion about whether or not any adjustments could or should be made (like more out of cell time or increased access to more services or activities).  There is also no evidence that any effort was made to engage each detainee in the review process of his/her case, and there was no indication that each detainee had been found to be so incompetent (due to mental illness, intellectual disability or other cognitive difficulty) that he/she was unable to credibly participate. In addition, for any of the detainees who had refused treatment and were considered to be too dangerous to be housed in general population, there was no discussion about whether or not the degree of danger to others that they posed was enough that a plan should be made to initiate involuntary treatment.

Regarding 77(j), it does appear that security staff understand that they cannot make mental health treatment decisions or overrule physician medical orders.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482**.  Within six months of the Effective Date of this Agreement, the County will determine where it will**

**house youthful prisoners.  During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant.**  The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release.  **Within 18 months** after the Effective Date of this Agreement, the County will have **completed** transitioning to any new or replacement youthful prisoner housing facility.

**Sustained Compliance**

As of the recent virtual site visit in early June 2021, it had been over twenty-four months since the last youth under 18 was released from the Raymond Detention Center (RDC), essentially reaching the standard of sustained compliance.  However, On June 12 youth T.G. (age 15) was placed at RDC following release from the hospital where he had been admitted following a sixth suicide attempt/gesture while in residence at Henley Young.  Temporary placement of T.G. at RDC was ordered by the state Circuit Court judge.  That court order provided for the youth's separation from adults, constant supervision, and receipt of appropriate mental health services as determined by the mental health team at RDC.   As might be expected given the isolation required and lack of other appropriate programming with this placement at RDC, T.G.'s behavior continued to deteriorate and included two additional suicide/self-harm attempts.  Ultimately a plea was entered in T.G.'s case on July 1 in which he pled to various charges and was transferred to the Mississippi Department of Corrections on July 2.

Although the placement of this youth at RDC does violate this provision of the Settlement Agreement, this paragraph has continued to be listed as Sustained Compliance due to the fact that the Sheriff's Office was ordered by a court to hold the youth at RDC and took steps to modify that court order. However, if the placement of youth continues at RDC, the Monitoring Team will have no choice but to find the Sheriff in partial compliance with this provision.

It should be noted that placing youth in isolation inside an adult facility became an unfortunate feature of "sight and sound" separation requirements in the youth justice system since most adult jails are poorly equipped to meet the programming, supervision, and mental health needs of youth. The type of isolation  in T.G.'s case is the kind of situation that led to the most recent changes in the Juvenile Justice and Delinquency Prevention outlined below as well as pushing youth facilities to augment their services to deal with longer-term youth charged as adults.  This remains "a work in progress" around the country. Henley Young, although somewhat unique now, will be less so in the coming years.

Interestingly, while placement of T.G. at RDC seemed to spur additional parties to "come to the table" to resolve his situation, it is unfortunate that pleas by leadership at Henley Young to get this case "moving" in court were apparently met with a response that essentially "everything is

backed up by COVID" and no actions were taken to expedite his case.  While this may be true for the vast majority of adult and youth being held pre-adjudication/conviction, it is unconscionable that a youth with significant mental health challenges and multiple self-harm and aggressive behavioral incidents was essentially "left in the long line" of cases working their way through the courts.  T.G.'s case represents perhaps the extreme end (not by length of time but certainly by other elements of his situation) of a situation in which almost all Juveniles Charged as Adults are held pre-adjudication for many months, and even years, in some sort of "limbo".  A challenge for adults to be sure, but a youth's sense of time is markedly different than most adults (especially compared to adults in mid-20's and beyond), and these extended placements with no movement increases their sense of hopelessness and likely contributes to increasing behavior challenges at Henley Young.

As noted in the previous report, this primary requirement will need continued monitoring as discussions continue about a longer-term solution to housing youth charged as adults.  Not only will the question of whether the "best" place to house youthful offenders is at Henley Young, but the reauthorization of the Juvenile Justice and Delinquency Prevention Act (JJDPA) in December 2018 will alter some of the federal funding requirements for youth justice funding available to states.  The core requirement related to the separation of youth and adults in confinement facilities that has permitted youth (including those charged as adults) be held in an adult jail facility if separated has been amended to require that these youth be completely removed from those adult facilities no later than December 21, 2021.  There is an "interest of justice" exception to the requirement, but no specific criteria to be considered are included in the reauthorization. When the exception does apply there is a limit of 180 days maximum stay in an adult facility (separation requirements would still apply).  With youthful offenders currently housed at Henley Young, Hinds County would meet this requirement. However, with the transfer of the one JCA to RDC, Hinds County would not meet this requirement unless the "interest of justice" exception would apply. If, for some reason the JCA's are returned to RDC or some other adult facility, it may result in reduced funding to the State of Mississippi[1].  In most cases, a portion of these funds are then awarded to local units of government/tribes, and in some cases non-profit organizations to help achieve goals set forth by a State Advisory Group.  Issues related to the potential loss of these funds should be a relatively minor part of the overall consideration in how best to meet the housing and programming needs for youthful offenders in Hinds County or elsewhere.

As noted in the previous report current statutes prevent youth under the jurisdiction of the Youth Court from being housed in the same living units as youth charged as adults.  For the most part Henley Young has been managing this separation, although there is some "mixing" of youth for purposes of education, particularly given the limited space and teaching capacity.

---

[1] Note: FY 2020 Formula Funds awarded to Mississippi totaled over $524,000.

However, one of the consequences of this separation was realized (and has been on some other occasions) when there have been females charged as adults occupying one of the four housing units, leaving one housing unit for youth court males, two units for youth charged as adults and essentially "no" unit for housing youth court girls. On occasion, one or more youth have been housed in the intake/booking area until the needed unit(s) become available.   Fortunately, the number of both youth court and adult-charged girls has remained low, but on at least 18 days between February and May 20, 2020, there were both types of girls in custody, and as of the initial writing of this report this has also been the case for at least several more days.  Henley Young has done some creative things to abide by the required separation, but this is not a desirable long-term situation.

The current Youth Court Judge, Judge Carlyn Hicks, has expressed an appropriate perspective on this situation, both related to what youth need to be held by the Youth Court as well as overall concerns about the stability and sustainability of the current arrangement.  As noted in previous reports, recent Hinds County Youth Court Judges should be commended for supporting substantial reductions in the number of youths held by the Youth Court while at the same time carefully considering safety of the community as an important factor.  Recall that the maximum capacity of 32 youth at Henley Young provision in the SPLC agreement was established prior to the decision to house youth charged as adults there, so the question of how the courts and parties involved in this case and the SPLC case interpret that limit considering changes in youth held is something that will need to be sorted out.  In any case, the 32-youth maximum capacity limit is reasonable regardless of the nature of youth held, as there are considerable facility and staffing limitations that suggest going over that number is impractical.

Given these concerns, the Youth Court Judge and other county officials have continued discussions about how to best manage the JCA and non-JCA populations, including initial discussions about alternatives to house JCAs. It is beyond the scope of this report to detail the brief discussions the Monitoring Team has had with county officials, but from the point of being able to comply with conditions of this agreement: (1) Despite its shortcomings and needed improvements, Henley Young is the best option for the immediate future for housing youth charged as adults (JCAs) but the county needs to develop a more suitable longer-term plan for holding JCAs either through developing an alternative site or making needed modifications to the Henley Young facility and staffing plan; (2) Given sufficient support (fiscal, physical plant, personnel, etc.) and leadership, Henley Young can achieve compliance with this agreement; (3) It is inconceivable, short of monumental changes, that JCAs could be returned to/housed in a portion of any of the existing adult or planned adult facilities and reach compliance; and (4) Placing JCAs in facilities in other counties in the state does not alleviate the county's requirement to meet the conditions of the agreement, and there does not appear to be a suitable option in any case.

As noted in the prior report, use of the Minors Diversion Docket was suspended with the reassignment of Judge Johnnie McDaniels to a different division. While the focus of that effort was on the early stages (pre-indictment) of the court process, it did have some success in moving cases along in the system and allowing the court to consider additional information and revisit/possibly revise bond issues. Along with backlog in the adult court system resulting from COVID restrictions, the length of time for youth charged as adults confined at Henley Young is again increasing.  Any discussions with the District Attorney and judges to expedite JCA cases has not yet resulted in observable changes (e.g. creating some form of "rocket docket" for JCAs, regular status reviews by the assigned judge for JCAs to identify and resolve delays), but it remains likely that the number of JCAs held will be reduced as much, if not more, by shortening the length of stay than may occur through any reduction in admissions.  It is important to recall that essentially almost all the JCA youth have been through a youth court system in which the court process from filing to disposition was usually completed within 90 days or less and any length of confinement was usually limited to 21 days.

As referenced earlier, the parties involved need to collaborate and seriously consider actions that can be taken to "speed up" the court process for this most vulnerable population.  The eventual outcome on a case may not change but getting to resolution of the case in 12 months or less would be a big step forward in promoting greater stability at Henley Young. Successfully managing both the JCA and non-JCA populations will increase the likelihood Henley Young will be a safe option for youth confinement for the time being.

It is also noted that the County received a Final Jail Master Plan report earlier this year, commissioned in spring 2020 that outlines options for replacing one or more of the current adult jail facilities.  The plan did not include an option for housing JCAs so the contractors were asked to submit a Supplemental option for adding a JCA facility on the same site as the jail plan, making use of some of the infrastructure/supports but clearly separating youth from adults.  It is conceivable that the county could choose to add JCA those housing/services to a decision on the Master Plan, but to do so would require more planning and design work to meet the needs of youth and the provisions of this agreement as well as ensure that Hinds County is following pending JJDPA requirements noted earlier.

As of June 10,[2] there were 25 JCAs and 4 non-JCAs held at Henley Young. Some basic data includes:
- Twenty-three JCAs were male, 2 were female.
- Of the non-JCA youth, three were male and one was female.
- The roster indicated that of the 13 youth held for at least 90 days, 10 of them have been indicted. Chart 1 below shows the relative rates of indictment for JCAs held at Henley

---

[2] For purposes of "point in time" information, the June 10 roster is used; For purposes of other trends and longer-term data, the period covered is February 1 thru May 20,2021.

Young. There does appear to be some progress in getting JCA youth indicted in a more timely manner after initial placement than has been true in the past.  While the data is not fully complete, it was not uncommon in the past for less than a quarter of the JCA youth in custody to be awaiting indictment, often for exceptionally long periods of time. Progress in getting faster indictments now needs to be followed up on by ensuring there is greater attention to processing these cases through the court system more timely as well.  This challenge has been exacerbated by COVID restrictions through much of this past year.

- In terms of length of stay, the number of days in confinement ranges from 2 to 638, with four youth being held for over one year.
- The ages of JCA youth in custody is illustrated in Chart 2, showing that over one-half of JCA youth are 17, most of whom will "age out" yet in 2021.
- Chart 3 shows the Average Daily Population (ADP) at Henley Young from February through May 20. As in prior periods, note the very small number of girls, both JCA and Youth Court girls.
- Chart 4 shows a more detailed account of the ADP over this most recent period. This chart also illustrates (a) the trendline of ADP over this period, (b) the 32 person "cap" provided under the SPLC agreement, and (c) the "desired" ADP (applying an 85% flexibility factor to the 32-person cap – this "flexibility" provides for sufficient space to accommodate peak placements as well as some flexibility in properly classifying youth for housing purposes).
- In the period from February through May 20, 14 JCAs were admitted to and 10 released from Henley Young.



Chart 1: NUMBER/% OF JCA YOUTH INDICTED

NO < 90 DAYS, 12, 48%
YES, 10, 40%
NO > 90 DAYS, 3, 12%





(Note: The ADP for May is through May 20)



Observations about this data related to planning for the future of JCAs and other youth being confined at Henley Young include:

- As noted, many of the JCA youth will "age out" in 2021 but most of them do not turn 18 until the fourth quarter of the year. As noted in prior reports, the majority of JCA youth that are released from Henley Young are released as the result of turning 18 and being transferred to RDC.

- As referenced earlier, the desired ADP is based on the factor of 85% in part because although smaller, the volatility of the non-JCA population is somewhat higher and unpredictable. This is compared to a percentage sometimes used in the adult system of 90%.

Personnel Changes

There has been some progress in filling vacant leadership positions, in particular:  (1) Mr. Fernandeis Frazier has returned to the role of Executive Director, having previously filled that position in the second half of 2019 until early 2020; (2) Ms. Brenda Foster did start as the Learning and Development Manager in early February; (3) Ms. Andrea Baldwin has continued as the Program Coordinator and has gotten additional support from Mr. Frazier in hiring an additional Recreation Coordinator to help with some of the programming requirements. There had been progress in the Treatment Coordinator position with the hiring of a Licensed Clinical Social Worker on a half-time basis. Although that did not meet the goal and Stipulated Order requirement of hiring a full-time Treatment Coordinator, it was a step forward. However, she has since resigned and the position is vacant again. Based on multiple conversations with Mr. Frazier, it does seem that he is focused on addressing many of the challenges facing Henley

Young and is taking a proactive approach in appropriate performance expectations and moving all aspects of the program forward.  The more support that can be given for Director Frazier's efforts, the better.

The more immediate and critical staffing issue is that as of the writing of this report there are 26 **vacant Youth Care Professional** (YCP) positions. This represents a vacancy rate of approximately 50% in the positions that provide the most direct care and supervision of youth on a day-to-day basis.  This is a sizeable increase from the 17 positions vacant noted in the previous report and severely limits the ability of Henley Young to ensure a safe environment for youth and staff let alone make needed progress toward complying with more programmatic elements of this agreement.  One of the most critical factors in maintaining a safe and secure environment for youth is the nature of appropriate/positive developmental relationships between youth and pro-social adults, in this case focusing on the quality of relationships between YCP staff and youth. The constant "churning" of YCP staff severely hinders the ability of Henley Young to achieve success in providing this important "active ingredient" of programming.

In the time since the February report more staff have left (through resignation or termination) than have been hired, resulting in a downward spiral that makes it increasingly difficult to staff the facility to the minimum ratio of no more than 8 youth being supervised by one staff member or the more suitable ratio of one to six.  All parties cite the low pay[3] and lack of any pay progression/advancement system as a primary reason for the difficulty in recruiting and retaining well-qualified staff, but additional factors (e.g., benefits, difficult work schedules, too much overtime, disciplinary issues, limited training) should be at least assessed as part of developing a more comprehensive and sustainable recruitment and retention plan. Exacerbating the situation at Henley Young is that a raise in the starting pay for jail staff was approved by the county within the last two years but that increase was not applied to the salary for staff working at Henley Young who now work mostly with youth charged as adults.

Meeting the requirements of this agreement will depend on the county taking steps to overcome this challenge, although that presents a fiscal dilemma for the county as they face critical fiscal issues across all county departments. On a positive note, consistent with a previous recommendation, the Job Description for the Youth Care Professional position has been modified and posted and more accurately reflects the nature and scope of duties needed in that position.  Similarly, the YCP Supervisor position description has also been updated and posted on the county's website. Two additional recommendations to improve staffing remain: (1) increase the starting pay for the YCP position (and adjust any collateral positions as may be needed) and pay progression opportunities based on experience and/or training to preferably match those provided by MDOC but at a minimum to match adult jail staff;  and (2) develop a

---

[3] Refer to additional information in the previous report that provides some comparison of salary to comparable positions in other parts of the state and region.

progressive training curriculum that includes basic/orientation training, CPI (or comparable) training, frequent policy/procedure training, and more comprehensive training in working with adolescents (supervision and communication skills, de-escalation, team communication skills, dealing with trauma, brain and adolescent development, group facilitation skills, etc.). The first of these is clearly a fiscal issue, the second is something that  Mr. Frazier and the relatively new Learning and Development Manager are beginning to address.

Henley Young did conduct, with some success, a series of Saturday "Job Fairs" to recruit additional staff for the facility, and county leaders indicate they are in the process of evaluating the pay level(s) for staff with an eye toward making improvements in the 2021-22 budget (that budget would take effect in October of this year) that would make these and other positions in the adult jail system as well more competitive.   Additionally, Director Frazier has been able to implement an overtime process that will help fill critical shifts (at least on a temporary basis) and has reached out to the Sheriff to seek additional support by assigning adult jail officers to some shifts (assuming they get some basic training in working with youthful offenders).  These steps do confirm that leadership is committed to ensuring sufficient staffing, but it is likely that the staffing shortage at Henley Young will remain a significant issue for the foreseeable future. To be clear (perhaps redundantly), being able to fully meet many of the requirements of this agreement depends on being able to recruit, train, and retain an adequate number of well-qualified Youth Care Professional staff as well as successfully filling (and keeping) qualified individuals in key leadership and program positions.

Physical Plant Changes

Work on the modular program units has been completed and the units are available for use. While the units have been used up to two times/week, staffing shortages have prevented movement to/supervision of youth for programming purposes.  Staff indicate that the units are much more appropriate for conducting group discussion and other activities that often are conducted on the living units.  As noted in prior reports, the actual housing/living units are inappropriate and not properly furnished to make them a suitable space in which to conduct meaningful youth development activities. The living unit acoustics are worse than functional, furniture is not movable, and youth not directly participating in a scheduled activity distract those that are participating.

Additional physical plant changes that have been **recommended** in the past have not been addressed, including (1) dealing with limited use of outdoor recreation space related to weather (e.g. cold, rain, darkness). Whether one of the four new modular "rooms" created can be help address that remains to be seen; and (2) making changes in the living units to improve acoustics and furnishings to make those units more "livable" and appropriate for adolescents, particularly youth placed for long periods of time; and (3) creating more flexible use spaces that can be used

for "cooling off periods" or alternate supervision spaces so youth can be safely supervised without having to be placed in confinement for disciplinary purposes. Considerable reference has been made in prior reports about the importance of making these living unit changes and the benefit they will bring to overall program operations, including behavior management, so they will not be repeated here.  Suffice it to say, staff at Henley Young will continue to fight an "uphill" battle to properly program for and manage youth's behavior if these changes are not made.

The last report included reference to the "breakdown" of the master controls that allow remote operation of doors within the facility, requiring that all doors be operated manually.  This increases the time required for movement of youth throughout the facility and poses some additional security risk.  Per staff at Henley Young, work on that project is underway, with a hoped-for completion date by mid-July.

Maintaining sufficient water pressure in the facility continues to be a problem that creates an inconvenience for staff and youth.  This is compounded by poor infrastructure in the community, as evidenced by substantial water main breaks during cold weather. Conversely, when it does rain there are leaks in the roof, although those do not appear to impact directly on the living areas.  These issues are noted in the Jail Master Plan document as needing attention.

For any youthful prisoners in custody, the County must:

78.     Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II, a strength based assessment, and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two qualified mental health clinicians (QMHC), and the group work and counseling provided by the three (one position currently vacant) Youth Support Specialists (YSS). Unfortunately, one of the two QMHCs recently left the facility for a new employment opportunity, so that person will need to be replaced.

As noted earlier, the Treatment Coordinator is once again vacant. The most recent hire was on a half time basis. Going back to reports from 2018-19, it was clear that while Dr. Payne did good work for Henley Young in that role it was also clear that half-time was not enough to adequately take on all the desired duties. The county continues to post open positions for a Licensed Clinical

Psychologist and Clinical Social Worker in the hopes of recruiting someone who can take on that leadership role on a full-time basis.

During the period since the last visit, most of the programming provided by the mental health team members continued, including holding regular treatment team meetings and the provision of group programming by YSS and the Qualified Mental Health Clinicians (QMHC). The content of these group programs is appropriate but still evolving as they continue to gather materials and curriculum to use with youth.  Copies of some of the lesson plans and attendance records were provided for review, but it remains a challenge to track youth's actual attendance over time. The general expectation/plan is that each youth participate in 2-3 group sessions each week, but those sessions remain noticeably short (i.e., 30 minutes), and records indicate that some are not held due to staff shortages.  Although the added modular classrooms are ready for use and much more appropriate for groups than other areas of the facility, staff indicate they are generally unable to use them due to staff shortages and must conduct many of the groups on the living units as best they can.  While efforts by YSS and QMHC staff to implement these group programs are positive, (1) having to conduct groups on the living units is a significant barrier to effective program delivery, (2) limiting groups to 30 minutes (staff indicate that previous attempts to run groups longer led to more behavior issues) reduces the quality of programming, (3) YCP staff could benefit by learning to help facilitate some of the groups, but they are minimally involved in doing so at this point; and (4) there is not an overarching program framework into which these groups "fit" so that all aspects of the facility program work together so as to send a consistent message to youth.

One of the roles of a full-time Treatment Coordinator should be to work in collaboration with Director Frazier to develop a comprehensive facility wide framework (e.g Multitiered System of Supports for Residential Facilities, a facility-wide framework built on Dialectic Behavior Therapy principles, Character Counts). Ideally the Treatment Coordinator would be tasked to lead a team of others to help build that framework and integrate all aspects of the operation into a coherent treatment program for all youth as well as those needing more comprehensive mental health support.

That programming has been augmented by the activities developed by Ms. Baldwin, the Program Coordinator. To her credit, Ms. Baldwin has continued to evolve appropriate materials and curriculum that fit into the Unit Activities included in the daily schedule and with the assistance of a recently hired Recreation Coordinator.  Examples of themes/concepts covered by these activities include *Emotional Intelligence, Understanding/Managing Anger, health and physical fitness, creative writing, Life Skills,* etc. Ideally, YCP staff on the units will become increasingly involved in helping to facilitate some of those activities, but that remains a more distant goal. Concerns noted in the previous report that YCP staff were unsupportive and/or actively undermining her previous efforts seem to have been alleviated somewhat as the result of Director

Frazier making it clear that YCP staff need to support youth's involvement in those activities. Toward that end, one of the positive modifications in the updated job description currently posted for the YCP position includes language consistent with the expectation of supporting various programming efforts.

Ms. Baldwin has been working on implementing an incentive system separate from the basic point/level system, relying less on other staff to track and follow through with incentives. This has also been supported by Mr. Frazier and she expresses more optimism about its effectiveness than was true in prior discussions/reports. Whether and to what extent the programs she provides and the related reinforcements become integrated into an overall program and incentive system remains to be seen and can be assessed on future site visits. This is another example where involvement and leadership from a full-time Treatment Director would be helpful in establishing a consistent and coordinated framework for positively shaping youth's behaviors.

Something highlighted in the 13th Monitoring Report is that the January 2020 Stipulated Order related to programming combines some of the prior language of the SPLC agreement but adds the more therapeutic/treatment-oriented requirements of this agreement. This approach is reasonable given that JCA's housed at HY generally are there for much longer time periods than non-JCA's and therefore require more comprehensive programming.

Also on a positive note, the mental health team has continued holding treatment team meetings regularly, i.e. at this point every Wednesday, focusing on the individual assigned to the various YSS staff. That team meeting includes the YSS assigned, the assigned QMHP, Mr. Caldwell from the school program, the youth, and often a YCP staff member. Those meetings have been opened recently (post-COVID restrictions) for in-person attendance of a parent/guardian as well, which is positive. Those team meetings provide an opportunity for all parties to review the youth's progress toward meeting treatment goals, set new goals as appropriate, identify ways in which progress can be supported, answer questions the parent/guardian may have, and offer the youth an opportunity to provide input on how things are going at Henley Young.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Non-Compliant**
Evaluating the education program is one of the more difficult tasks for these "virtual site visits". The school Principal, Mr. Caldwell, did provide more information about the scheduling and student attendance for youth at Henley Young, but tracking individual youth through those records while "off-site" is challenging.

Mr. Caldwell presents as very interested and energetic in trying to evolve the education program at Henley Young, citing this past year's experience as one of learning how to best meet the incredibly diverse needs of youth in a facility that is poorly designed while working with facility staff to ensure a safe and secure learning environment.  To his credit, Mr. Caldwell does not seem to accept that meeting "minimal" requirements is an acceptable position for the program to be in; that the youth at Henley Young clearly need everything from remedial to special education to credit recovery options up through perhaps providing capacity for youth to gain enough credits to reach graduation requirements if they are placed there for a long time.

Mr. Caldwell indicated that two of the four classroom teachers have retired and will be replaced for the 2021-22 academic year with what he believes to be highly motivated and experienced teachers. This should be seen as a step forward, as he works to make changes to better individualize and accelerate the pace of learning for youth.  However, there remain significant challenges as described below.

Some additional efforts Mr. Caldwell has undertaken include: (1) restarting the "Safe Serve" certification program that teaches youth basic skills related to food service, a certification that they can carry with them going forward if/when the seek employment; even if that is not something that comes to fruition in the foreseeable future for youth, the notion that they can accomplish and be recognized for learning certain new skills is positive for them; (2) reaching out to the community for speakers that can come in and work with youth, especially reinforcing the importance of an education; (3) ordering more Chromebooks for the fall term, something that can help provide more individualized instruction with access to a variety of educational software; (4) bringing Positive Behavior Intervention Supports (PBIS) concepts to the school program; PBIS has proven to be a very successful framework that helps define and reinforce positive behaviors and develop specific intervention strategies for youth that need more attention. This PBIS approach is also the basis of one of the recommended frameworks for a facility-wide framework to promote safety and shape positive behaviors among youth; (5) regularly attending the weekly treatment team meetings for youth, a forum that helps maintain communication and coordination across the mental health and staff team at Henley Young; and (6) connecting with key leadership in the Jackson Public School (JPS) system to advocate for support in making improvements to the program at Henley Young (recognizing that JPS continues to be challenged to meet multiple demands across all its programs/levels).

Additionally, Mr. Caldwell has a stated goal of wanting every youth to come to class every day. This is an important goal as the recent history at Henley Young has continued to be an A/B alternating schedule in which some of the youth attended school on a day and the remaining youth received work assignments/packets to complete on their living unit and attended in-person class then on the next day.  Staff on the unit helped supervise completion of the work done on units and then that work was reviewed by teachers when the youth came to class the next day.

So, although youth were "attending" school every day, they in effect only received direct teacher instruction about one-half of the time.  This arrangement seems to have been necessitated by the convergence of two factors previously noted: (1) staffing shortage that made it difficult to assign enough staff to the school/classrooms for the full school period, and (2) as frequently noted in prior reports the limited space and poor configuration of the classroom area.  The addition of the two portable classrooms may provide some relief for this situation if/when additional staff becomes available.  Being able to get all students in teacher-led instruction classes every day should be viewed as a necessary but not sufficient element of providing an adequate and appropriate educational program at Henley Young.

The previous report indicated that the JCAs and the short-term youth at Henley Young were not "mixed" for school purposes, but that apparently is not the case.  Those youth are housed separately to meet the requirements noted by Youth Court Judge Hicks, but participation in some common school programs is one program area in which they may be together.  Finally, as previously reported, unless additional information is provided by the county and verified by the monitoring team, young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support.  Evaluating the education program is one of the more difficult tasks for these "virtual site visits".  The school Principal, Mr. Caldwell, did provide more information about the scheduling and student attendance for youth at Henley Young, but tracking individual youth through those records while "off-site" is challenging.

Mr. Caldwell indicated that two of the four classroom teachers have retired and will be replaced for the 2021-22 academic year with what he believes to be highly motivated and experienced teachers. This should be seen as a step forward, as he works to make changes to better individualize and accelerate the pace of learning for youth.  Only time will tell whether and to what extent he is able to successfully implement improvements, but in collaboration with Director Frazier there is reason to be more optimistic that the program will improve compared to observations noted in the last report.

Some additional efforts Mr. Caldwell has undertaken include: (1) restarting the "Safe Serve" certification program that teaches youth basic skills related to food service, a certification that they can carry with them going forward if/when they seek employment; even if that is not something that comes to fruition in the foreseeable future for youth, the notion that they can accomplish and be recognized for learning certain new skills is positive for them; (2) reaching out to the community for speakers that can come in and work with youth, especially reinforcing the importance of an education; (3) ordering more Chromebooks for the fall term, something that can help provide more individualized instruction with access to a variety of educational software; (4) bringing Positive Behavior Intervention Supports (PBIS) concepts to the school program; PBIS has proven to be a very successful framework that helps define and reinforce positive

behaviors and develop specific intervention strategies for youth that need more attention. This PBIS approach is also the basis of one of the recommended frameworks for a facility-wide framework to promote safety and shape positive behaviors among youth; (5) regularly attending the weekly treatment team meetings for youth, a forum that helps maintain communication and coordination across the mental health and staff team at Henley Young; and (6) connecting with key leadership in the Jackson Public School (JPS) system to advocate for support in making improvements to the program at Henley Young (recognizing that JPS continues to be challenged to meet multiple demands across all its programs/levels).

Additionally, Mr. Caldwell has a stated goal of wanting every youth to come to class every day. This is an important goal as the recent history at Henley Young has continued to be an A/B alternating schedule in which some of the youth attended school on a day and the remaining youth received work assignments/packets to complete on their living unit and attended in-person class then on the next day.  Staff on the unit helped supervise completion of the work done on units and then that work was reviewed by teachers when the youth came to class the next day. So, although youth were "attending" school every day, they in effect only received direct teacher instruction about one-half of the time.  This arrangement seems to have been necessitated by the convergence of two factors previously noted: (1) staffing shortage that made it difficult to assign enough staff to the school/classrooms for the full school period, and (2) as frequently noted in prior reports the limited space and poor configuration of the classroom area.  The addition of the two portable classrooms may provide some relief for this situation if/when additional staff, possibly including additional teaching staff, becomes available.  Being able to get all students in teacher-led instruction classes every day should be viewed as a necessary but not sufficient element of providing an adequate and appropriate educational program at Henley Young.

80.    Ensure that youth are properly separated by sight and sound from adult prisoners.

**Sustained Compliance[4]**
As noted earlier, the last youth "aged out" of RDC in February 2019, so as of this report, this complete separation has been in effect for over two years.  Transitioning Henley Young to serve these long-term youth has not been without substantial challenges but remains a significant achievement, even if viewed as a temporary solution.  The two key questions related to the future of this arrangement remain: (1) If Henley Young is seen as a "temporary" solution for housing JCAs, e.g. 3-4 years, what is the next step in the plan? And (2) If Henley Young is being viewed as the longer-term solution, e.g. 10-15 years, what changes are going to be made to make it a safer and more sustainable facility and program?  In any case, if a decision is made to move JCAs out of Henley Young, all the elements of this agreement need to be addressed.

---

[4] Note: The youth discussed in the June 16 Status Conference is no longer at RDC.  In any case, while at RDC he reportedly was kept separate from adults to meet this requirement.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**

There has been no substantial change related to compliance with this requirement although A copy of the most recent Classification Policy has now been provided along with a copy of the form used to document the classification information gathered that is intended to guide which of the JCA housing units the youth is assigned to.  While the policy is appropriate and staff purport they are considering relevant factors, use of the form to document placement decisions is still not being done. This then falls under the category of "…if it's not documented, it didn't happen", so until the use of the form can be verified, full compliance is not possible

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.  The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**

The Learning and Development Manager, Ms. Jacqueline Foster, began employment with Henley Young on February 1, roughly at the time of our last virtual visit.  Since that time Ms. Foster has been very active in scheduling and conducting trainings to help ensure that all staff receive adequate basic training in Policies/Procedures, Crisis Prevention Institute (CPI) (basic and refresher), Suicide Prevention (Basic and Refresher), and CPR.  The bulk of this training has been done in groups but given the nature of the 24/7 operation in which many staff have second jobs, Ms. Foster has been proactive in providing training as needed even on a one-to-one basis as needed.  Mr. Frazier and Ms. Foster also appear to promote good team approach to training, including (1) having Mr. Burnside (the Operations Manager)  conduct the CPI training (he has recently been certified to lead that training), which provides an opportunity for that training to be consistent with facility-specific policies/procedures; (2) utilizing Ms. Andrea Baldwin, the Program Coordinator, in working with staff to help outline what programs are being developed for youth and what role YCP staff can play in supporting those programs; and (3) utilizing the expertise of Ms. Frelix, QMHP, in training related to youth development and suicide prevention.

Ms. Foster reports that Director Frazier has been involving her in weekly consultation calls with Anne Nelson, the Monitor for the SPLC agreement, and that in those discussions there are additional training needs identified, for example working to improve report writing skills for identified staff members who can benefit from that support.

Ms. Foster has recently increased outreach to other resources including Hinds Behavior Health and the Mississippi Coalition Against Sexual Assault to develop a rotation of trainings that go beyond the basic training noted above.  This is a positive step forward toward reaching the goal of enhancing the variety and quality of training staff receive related to understanding how best to work with youth who have experienced significant trauma in their lives.  Following the discussion with her, she was provided with some additional on-line resources that she could reach out to for additional materials and trainings for working with youth in confinement. Expanding potential training through on-line resources is a challenge within Henley Young given the poor quality of network services but given Ms. Foster's proactive nature and the support of Mr. Frazier hopefully additional training can be provided that way.

Salary challenges aside, discussions with both Mr. Frazier and Ms. Foster reinforced the notion that the Youth Care Professional (YCP) position needs to be seen and reinforced as a "profession" defined by the knowledge, skills, and abilities (in essence the "tools") to work proactively with youth to prevent and successfully respond to behavior challenges youth may present.  The recently re-written job description for that position signifies a step forward in how that job is perceived and what can be expected of those that take the YCP position. Hopefully, that will be followed up by an increase in pay and opportunities for advancement as well without which HY will continue to struggle with recruitment and retention and the ability to develop sufficiently trained and experience staff.

Ms. Foster also provided a recently revised/reinstituted On-the-Job Training (OJT) form that will be used going forward to identify some of the basic required skills for duties related to Supervision of Youth, Central Control operations, Booking/Intake procedures, and Transporting Residents.  Additional skill checklists may be developed for other functions, but this OJT format is a good start toward making initial training more consistent and documenting skills demonstrated.

In summary, although not yet in full compliance, the addition of Ms. Foster to the leadership team is a positive step forward toward ensuring that there is a solid base of training for new staff and moving toward building on that foundation to the next level of training that will make staff more effective in supervision youth at Henley Young.  Ideally, by the time of the next site visit Ms. Foster will be able to provide a training plan for coming months that reflects further movement toward compliance.  As with other aspects of the program, her ability to make that progress is dependent on the recruitment and selection of a more stable staff.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general.  In addition:

a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes.  Such observation must be documented immediately after each check.

g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours.  If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional.  The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h.  If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i.  Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Non-Compliance**

Previous reports have indicated that Henley Young was in Partial Compliance with these requirements, in part as they had been making progress in reducing the use (both frequency and

duration) of segregation/confinement as a disciplinary tool and were utilizing other restrictions in lieu of segregation.  However, both as noted in the prior report and seen again in this last period some of the progress made toward reducing segregation has reversed.  Additionally, this report will cover in more detail the specifics of the sections above, noting that some may be in Partial Compliance, but overall Non-Compliance is the most appropriate characterization of current practice:

- Section a: (1) Policies and training do reinforce that staff should be utilizing verbal directions and other de-escalation strategies, and undoubtedly there are situations in which that is done properly.  In fact, based on conversations with leadership, there are some staff who do a good job observing and intervening in situations, reducing the likelihood of an incident that requires the use of segregation.  Since more serious incidents are prevented, it is not possible to fully evaluate how frequently staff prevent incidents, but it is fair to suggest they are in Partial Compliance at times.  (2) Situations that end up in written Incident Reports and ultimately the use of segregation rarely document substantive efforts to use verbal or other interventions beyond something along the line of "…directed youth A to do …." Or "…Told youth A to stop…".  The CPI training all staff receive does include skills related to verbal intervention/de-escalation, but it is difficult to tell to what extent those skills are utilized, particularly when relying solely on Incident Reports.
- Section b: Approved Policies/Procedures are consistent with this item, but it is difficult to tell whether staff follow through on this requirement.  There is an expectation that some additional documentation (beyond any Incident Report) be made in the Unit Log, but those will have to be inspected on an on-site vs. virtual visit to determine whether/how consistently that documentation is done.
- Section c:  Approved Policies/Procedures are consistent with this requirement, and there are some notes in Observation records and the confinement log that there are, in fact, times when a shorter length of time is used.  To properly track compliance with this item, it is recommended that an Incident Report be completed any time a youth is placed in a cell/room for more than 15 minutes.  Those reports could be reviewed during a monitoring visit.
- Section d: It is not clear what constitutes "crisis intervention" for this section, but general policies and practices do include involving one of the YSS or QMHP staff if the youth is agitated or evidencing some mental distress.  Also, Room Observation logs do seem to be used routinely when a youth is placed in confinement, albeit there are some questions about the consistent accuracy of the observation times (e.g., not uncommon to see observation entries that are exactly 15 minutes apart, not consistent with the commonly accepted practice of observing youth at irregular intervals not to exceed 15 minutes).
- Section e:  Staff are expected to record the use of segregation/isolation, and Mr. Dorsey does track it over time.  This is information provided to the monitors prior to the virtual

visit, although in this most recent period information from March was lost as the result of a computer failure.

- Section f: Observation logs are kept and a sample of them was provided for review. Note that (1) Policies provide that the log be kept on the door so the time can be noted as the observation is made, but it is not clear that is actually what happens; (2) As noted above, there are often notations made that are exactly 15 minutes apart, calling into question the accuracy and reliability of reporting; and (3) The goal for training is that YCP staff complete their basic training prior to assuming a full role on a shift, but given staff shortages and turnover, confirmation that this (staff doing the observation have "completed all training") is always the case could not be done.

- Section g:   This section has multiple layers/contingencies designed to limit, if not eliminate, the use of segregation beyond what may be needed to ensure the immediate safety of youth and staff.  Observations of practices includes:

    o The use of Behavior Management Isolations (BMIs) as a short-term (up to one hour), immediate response to issues in which some form of separation/segregation may be required to provide the youth a "cooling off" period from an incident and staff time to problem-solve with the youth on how to reintegrate the youth onto the unit.  The most recent Policy/Procedure provided is consistent with the intent of limiting use of this kind of "time out" to less than one hour and some of the records (e.g., Observation Logs, Incident Reports) do seem to reflect that there are situations in which short-time confinement is used to separate youth. There are a few notations on Observation Logs that a QMHP is engaged to see or assess the youth during these periods of confinement. Historically, any checks/assessment made by YSS/QMHP staff were kept in their records which were not available for review on a virtual visit.

    o There does seem to be good communication between the QMHP staff and the Executive Director as it relates to youth that might need more intensive mental health services.  The treatment team meetings (each youth is reviewed at least once every 3 weeks) provide an opportunity to discuss what the youth's needs are and whether those needs can be met at Henley Young.  Unfortunately, as we have discovered during the incidents with youth T.G., there are going to be situations in which there are no alternatives to Henley Young available.

    o Henley Young continues to use Due Process Isolations (DPI), most often for a period of up to 24 hours (i.e., of the 12 DPIs reported, 75% were for 24 hours). They are clearly used as a disciplinary tool, in contradiction of the agreement. On a positive note, although records for March were not available, the frequency of these DPIs was noticeably lower than the previous period reported (e.g., a DPI was imposed on 14 occasions in October alone); hopefully portending a trend back toward reduced reliance on DPIs as a "disciplinary tool".  The intent of the DPI Policy is that during this 24-hour period youth are allowed out of their room

for school and some other programming opportunities. The Observation Logs have been modified to add a code if the youth is out of their room, and there are some "out of room" times documented.  Practice should include that staff remind/offer youth the opportunity to participate in appropriate programming during the shift and make a note to that effect on the Observation Log along with any note that the youth chose not to come out of their room.  That reminder could be done, for example, at the start of school, after lunch, as programming is starting, etc.  Equally important, absent good documentation that a youth remaining in their room continuously for more than an hour is their choice and not one imposed on them, the use of DPIs cannot be considered to be in compliance. Ultimately the goal must be to move away from using room confinement as a disciplinary tool, but that will require modifications in the facility, improved staffing, and developing alternative means of responding to incidents.

o   In general, the use of DPIs continues as a relic of both adult and Henley Young operations and is based on concepts of general and specific deterrence; that is on the theory that imposing the right consequence following some undesirable behavior will have a deterrent effect for the youth/youths involved and may "send a message" to other youth in the facility.  While this is a common principle underlying the traditional criminal justice/corrections system, successfully modifying youth's behavior is much more complicated and requires a more comprehensive approach than can currently be implemented at Henley Young.

o   Section h: Policies and Procedures should be modified to reflect this requirement, and completion of the proper notifications needs to be documented and made available for monitoring.  The most recent policy provided reflects that the Supervisor is engaged/involved on BMIs that exceed one hour and that any time it is required longer than two hours the Operations Manager should be notified. Due Process Isolations operate on a different track, with a Due Process Hearing typically conducted by the Quality Assurance Manager, but both the Operations Manager and Executive Director are in receipt of Incident Reports and Due Process Hearing results.

Beyond the specifics of the agreement, the frequency of incidents that result in room confinements appears to be improved from the last period but continues to reflect some volatility of the day-to-day environment. Facility leadership needs to remain vigilant in ensuring that documentation related to the use of isolation, both for initial behavioral reasons or disciplinary reasons, is accurately completed and reviewed and made available for review on subsequent visits.  This includes documentation of whether youth do, in fact, take the opportunity to be out of their room during any disciplinary period and whether required mental health checks are being made.

84.     Develop and implement a behavioral treatment program appropriate for youth.  This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth.  The Jail's behavioral program must include all of the following elements:

      a.   The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.   An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues.  For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.   The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

Again, it was not possible to review youth point sheets during this offsite visit, and discussion related to the incentive system was limited to essentially indicating there have been no substantive changes over the last year. In fact, it sounds like there has been less attention paid to the incentive system and that staff are not properly utilizing the system. The County has not developed a true behavioral treatment program although some specific elements are in place including (1) there is on-going documentation of what youth earn and what incentives they select; (2) the system is broken up into appropriate blocks of time, providing an opportunity for youth to earn rewards for their behavior during various program periods/activities (an improvement from a system that simply tracks youth by larger blocks of time, e.g. a whole shift or even half-shift); and (3) it is reported that youth have daily access to their "point sheet" (vs. at the end of the week as had been the practice in for much of 2019-20).

However, more importantly, there remains a disconnect between how useful the incentive system can and should work and how it is applied by YCP staff.  Documentation of why youth earn/fail to earn points remains limited, and rather than being a tool for line staff to use in shaping youth behaviors it appears to be more of an "afterthought" in terms of how it is applied. Absent changes being made, the incentive system exists essentially "on paper" and is not achieving its potential in shaping youth's behavior over time.

The QMHP and YSS staff do maintain and regularly review individual treatment goals during treatment team meetings held every three weeks for each youth. That meeting includes the school principal, when possible, a parent/guardian, and YCP staff.  Those treatment goals are documented in the youth's mental health record(s).

Although there are some elements of a behavioral program partially developed, there is not what could be considered a behavioral treatment program in place, and they have not engaged sufficient technical assistance to adequately put together a "treatment program." There are competent and committed staff in many of the positions, and there seems to be mostly appropriate communication across staff.  However, there is not an articulated overarching treatment model/approach the ties together various program elements, the incentive/point system remains essentially disconnected from treatment goals established for youth, YCP staff are apparently unaware of what the individual youth's treatment goals are, it remains difficult to train staff in responding to youth in a consistent and trauma-informed/preventive approach, and there is no articulated way in which discipline (particularly the use of DPIs) fit with other treatment elements. As noted earlier, there are many other factors that get in the way of both developing and successfully implementing a successful treatment program including (1) staff shortages and turnover, (2) lack of a full-time Treatment Coordinator, (3) facility limitations, and (4) the excessive length of stay of youth with no progress on their case.

Ideally, a full-time Treatment Coordinator would be tasked by the Executive Director to lead a team of staff (e.g., YCP staff, YSS, QMHP, a leadership staff person, Learning/Development Coordinator, Program Coordinator) to develop a written Behavior Management plan that weaves together how each of the program elements and roles fit within a treatment model appropriate for youth held for longer periods of time in a youth facility such as Henley Young.  As that work is going on, that team may also look at the various aspects of the program and identify ways to improve them to fit within that consistent framework.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**

As was the case during the previous remote site visits, the quality of the inmate records was difficult to evaluate during the June 2021 remote site visit. Typically, the Monitoring Team is able to review the paper files and determine whether the appropriate paperwork is in the file. These are too voluminous to have scanned in for review. The documents requested were the status/summary sheet showing the detention status and the chronology sheet showing the activity related to the inmate's status. This was for approximately 30 randomly selected inmate files.

The status sheet is required by policies and procedures and should greatly assist in both the Jail staff and the Monitors assessment of whether the paperwork supports the booking and ongoing detention. It is a face sheet that lists each charge and the status of the charge such as whether there is a bond, an indictment, a next court date, a dismissal etc. It would also list any detainers/warrants with the jurisdiction and contact information. The use of the status sheet had been discontinued but by the February 2021 site visit, the practice had been reinstated. At that time, many of them were not filled out correctly so it remained difficult to determine the status of the inmates without having the Records Sergeant review the paper file. The status sheets for the June 2021 site visit showed much improvement with only a few looking like a condensed chrono sheet instead of a status sheet.  In one case, the sentence was not listed. This is particularly important in that it was reported that the JMS system does not accurately track sentences as a result of different release dates showing on different screens. The WC tracks release dates on a spreadsheet and reports to Records when an inmate is due to be released. It is unclear if anyone is tracking release dates for sentenced individuals at RDC. Another concern is the tracking of individuals waiting for a state hospital bed. It was learned during this site visit that at least two individuals have orders for an evaluation at the state hospital but are not on the state hospital list of those waiting for a bed. Another individual had an order of commitment to the Boswell Regional Center from 9/12/20. There was an assumption that he was still waiting for a bed there but no one had checked on the status of that commitment.  However, the use of status sheets and their overall content reflected significant improvement in this area. The file audits completed during this reporting period indicate that all of the files had the status sheet.

It should be noted that since monitoring began there has been significant improvement in the quality of the records, the accuracy of the JMS system, and the presence of paperwork supporting booking and detention. There continue to be improved systems in place to track individuals and release them timely. However, a few of the files were missing some orders supporting detention. One file did not include the order holding the inmate for the state hospital; one file did not have the sentencing order on one of the charges; one file did not have the probation warrants; one file had an old bond from an old charge that had not been entered in the JMS system. The Quality Assurance report for February indicated that there was one late release in February which was described as a problem with the paperwork. There is an incident report on a late release in April. There was another late release in April for someone held beyond the 21 days on a probation violation. There was a late release to a treatment facility in May when there

was "confusion as to who would transport." There was a mistaken release of an inmate with a federal hold when that hold was not correctly entered in the system.  There continues to be some difficulty in locating holds in the system when the hold is placed subsequent to booking. The records clerks have no way of knowing if a hold has come in. These holds are identified when the individual is otherwise entitled to release, but this causes some delay in determining whether the other jurisdiction wants to pick up the individual. Any holds coming in after booking should be provided to the records clerks to ensure timely release. This provision will remain in partial compliance until an on-site visit can be completed and the actual files reviewed.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**

This paragraph had been listed as in substantial compliance because even though some unlawful fines and fees orders were received, there were other charges holding the individual. No one had been held solely on an unlawful order. It was previously recommended that these orders be presented for revision even though they weren't holding the individual. The reason for this was clearly seen during the June site visit. One individual was booked in on felony and misdemeanor charges on March 4, 2021. A mittimus ordering him to work off fines and fees in jail was entered on March 12, 2021. He was given an unsecured bond on May 6, 2021 and ordered to go to treatment and was offered admission as of May 6th. However, he could not be released because of the mittimus. At that point, he was being held only on the unlawful order to work off fines and fees. On May 11, 2021, his attorney brought him back to Justice Court and a payment plan was entered. (His release was further delayed to May 21, 2021 because of "confusion as to who would transport.") There were several other unlawful fines and fees orders but all were individuals who had no bond on a felony charge. Nevertheless, these orders should be corrected so that release is not delayed if release conditions change or the charges are dropped). The County had previously arranged for education of the judges which should probably be considered again. It is beneficial to the individual to be able to get credit towards fines and fees if they are otherwise being held. In getting the orders corrected, one possibility is to advocate for credit as long as the individual is otherwise incarcerated but a specified payment plan upon release. As previously reported, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the Jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. It will be necessary to implement the process described below to ensure that this policy is followed.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**

See paragraph 86. When the change in practice requiring a finding of willfulness was introduced, the County was pro-active in ensuring that valid court orders were utilized. It appears that education in this area will need to be revisited. The policy on pre-booking is consistent with this paragraph and at the time of the four prior site visits there was no one in the facility for failure to pay fines and fees. However, as described above, one individual was confined on an unlawful order to pay fines and fees because the order was not timely corrected.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**

See paragraph 86.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**

See paragraph 86.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. There are no individuals currently incarcerated with an order to pay fines and fees but there was one during this reporting period. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court and the case manager typically provides court information upon request.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals working off fines and fees. The stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. The spread sheet appears to be consistent with this stated policy. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.      Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.      Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.      Examples of prisoners presumptively entitled to release include:

i.    Individuals who have completed their sentences;
ii.    Individuals who have been acquitted of all charges after trial;
iii.    Individuals whose charges have been dismissed;
iv.    Individuals who are ordered released by a court order; and
v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

As described in paragraph 85, there were four late releases that were noted during this reporting period. There may be others that were not identified. The Monitor reviews a random selection of inmate records as well as records audits, incident reports, grievances, the probation spreadsheet and Quality Assurance reports. Those documents that appear to raise questions are reviewed with the Records supervisor. The late releases identified were found by piecing together information from these sources. Pursuant to paragraph 101, the Jail is supposed to keep a log of the date and time an inmate was entitled to release and the date and time of release. This would provide much greater assurance that timely releases are consistently occurring. Paragraph 101 also requires that incident reports be prepared for late releases. Of the four late releases identified, only one had an incident report. Also, as mentioned in paragraph 85, it is reported that the JMS system does not accurately track sentences and it was unclear whether sentences were manually tracked at RDC. No one was identified as being held beyond a sentence completion. However, this process should be clarified. Although there has been ongoing improvement in the area of releasing, these incidents require ongoing work in this area.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As previously stated, the condition of inmate files has improved since monitoring began. As described in paragraph 85, the new Records policy establishes the use of a status/summary that should greatly improve the reliability of the prisoner record system. With the ongoing pace of auditing files, a review of all files should soon be completed. There are problems relying on the JMS system to accurately track the status of inmates. Holds that come in subsequent to booking are not routinely brought to the attention of Records staff. As a result, they are not able to contact the jurisdiction prior to the release date potentially causing a delay in releasing. Similarly, Records staff cannot reliably use the JMS system to identify people with a probation hold and, as

113

a result, they create a manual spread sheet to track this. This has the potential to miss individuals such as the individual who was over detained in January and did not appear in the manual spreadsheet. Reportedly the JMS system does not accurately track sentences and cannot run a report for anyone entitled to release on a sentence each day. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained although as mentioned above, these grievances are often denied as not being a grievance. The auditing process, however, has greatly improved since the June 2020 site visit and should help correct errors involving entry into the JMS system.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**
The electronic medical records system and the various tracking logs that are maintained by medical and mental health have been described in prior reports.  The various ways these records and logs are used has also been previously described. In some cases the mental health tracking log did not reflect work that had been completed as documented in the EMR. The tracking log is pulled electronically from the EMR so it would be important to determine why the information wasn't pulled accurately and ensure that all entries are made such that they will be pulled into the tracking log.

With regard to prisoners requiring forensic evaluations, these evaluations are performed by staff at the state mental hospital; medical and mental health staff are not informed when a Court orders such a forensic evaluation; and medical and mental health staff are only made aware of the fact that a forensic evaluation will be done shortly before it is to be done/when the state mental hospital submits a request for the detainee's medical records.  Historically, detainees waited an unacceptably long time for such forensic evaluations due to a shortage of beds at the state mental hospital.  However, at the time of the October 2020 site visit, the state mental hospital had begun to perform forensic evaluations by way of telepsychiatry; this practice has continued; but the limited role played by the facility's medical and mental health staff has remained the same.

As mentioned above, despite recommendation from the Monitoring Team the Jail had not obtained the state hospital list of inmates from Hinds County waiting for a state hospital bed. When this list was obtained by the Compliance Coordinator shortly before the June site visit, it was discovered that several individuals in the Jail who had orders to go to the state hospital were not on their list. Since these individuals often have long waiting list times and present some of the most difficult management issues in the Jail, it is imperative that there be frequent communication and coordination with the state hospital. In addition, there was one individual in the Jail that has been waiting for a bed in a treatment facility since September, 2020. No one was able to provide the status of that admission. Communication with treatment facilities is also critical to move inmates with special needs and court orders to treatment into more appropriate settings. Finally, several inmates had charges remanded so civil commitment could be commenced. There was also no status update available as to who was responsible for pursuing civil commitment and whether those proceedings were underway. As these inmates present some of the most challenging inmates and are in need of a more appropriate therapeutic setting, their status in the process should be tracked more closely.

Neither medical nor mental health staff play a significant role in the incident reporting and review process, and staff are rarely even consulted or interviewed as part of those processes (although there have been times when a section of a detainee's medical/mental health records were requested), even when an incident might indicate that medical and/or mental health staff were involved at some point during the incident or had information about the detainee(s) who was involved in the incident.  Therefore, there continues to be incident reports that do not include all potentially available and relevant information from medical and/or mental health, gathered at the time of the incident or during the incident review process.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time and they are returned to the Jail as other inmates. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC. Further collaboration with the courts will be necessary to allow for release from the court. In particular, the courts will need to develop the capability to provide a written release order in the courtroom for an individual to be released from court. In addition, HCDS staff will need to have a system to identify individuals with holds at the time of the court order releasing the individual to ensure that the individual does not have some other basis for detention.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been reviewed and is in the process of being finalized. This has been delayed in an effort to address the requirement of the prior paragraph that individuals be released from the court. However, with the new Detention Administrator on board, there is a planned effort to at least get an interim policy in place.

With regard to medical and mental health, the various different activities/tasks that need to be performed in order to comply with this provision have been described in prior site visit reports. Therefore, all of that will not be described in detail here, and instead, the monitor will simply offer a status report.

As was noted in the last monitoring report, a considerable amount of progress had been made with regard to moving towards full compliance with this provision.  However, not long after the last site visit, the discharge nurse left the facility. Recently, another nurse has been moved to the position of discharge nurse but reportedly, documents and reports generated by the prior discharge nurse, including a list of contacts for community-based medical and mental health services, are unavailable.  Therefore essentially, the new discharge nurse is starting over.

Given the above noted, during this site visit the monitor focused on outlining the roles and responsibilities of the discharge nurse and attempted to identify priorities (to help the new discharge nurse and her supervisor appreciate the scope of the discharge nurse's responsibilities). The most urgent priorities noted included:

- The identification of community-based medical and mental health service providers who will accept released detainees who require medical and/or mental health services (including regular outpatient treatment, day treatment and residential treatment); obtain a clear sense of the range of services they provide and/or the type(s) of individuals they are prepared to treat; and identify a person(s) at each place who can be contacted to discuss new referrals and make intake appointments
- In cooperation with the detainee's provider(s) of medical and/or mental health services and the detainee, develop a discharge plan for each detainee (focused on where he/she will go for community-based treatment services as well as other services he/she might require to make a successful return to the community, such as housing, etc.)
- Develop 'discharge planning groups', and work with other staff to develop other groups that prepare detainees for discharge, such as educational groups regarding illness, the need for ongoing treatment, medication management, and how to best participate in one's treatment, etc.
- Prepare a discharge packet for each detainee who is likely to be discharged that includes (in writing) important information that he/she will need (such as the program(s) to which he/she is referred, scheduled appointment information, contact information, and what to do if there is an emergency prior to the scheduled appointment, as well as information about where to go activate benefits or seek other assistance that might be required)
- Continue to work with security staff to assure that ALL detainees stop by medical as part of the release process in order to pick up their discharge packet and enough medication to carry them until their scheduled appointment with a community-based provider
- Track successful and unsuccessful referrals (i.e., track whether or not released detainees actually follow-through with appointments made for them), and attempt to determine what might be done to increase the percentage of successful referrals

Other more medium-range tasks and goals were also briefly reviewed.  For example, following up with discussions that had been held with Hinds Behavioral Health, regarding sending a staff person to the jail to meet with detainees who will be referred to Hinds Behavioral Health upon

their release, in order to begin to develop a working relationship with these detainees (in an effort to increase the possibility of a successful referral). A funding proposal to the County was made for this but has not been acted upon. As another example, exploring whether there might be steps that can be taken prior to a detainee's release to facilitate the establishment or re-establishment of needed benefits (in an effort to help detainees stabilize more quickly upon their release and have coverage for community-based treatment services as quickly as possible). And establishing a practice of interviewing those who return to the jail, regarding why they did or did not follow-through with obtaining the treatment services they required (in an effort to identify what discharge planning efforts work and what efforts could be improved upon).

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. Any post orders must:

    a.    Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

    b.    Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**
The County has not yet developed post orders in this area. The Records Supervisor and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders. Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner. The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**
At the time of the February 2020 site visit, the Booking staff reported that they run an NCIC check for outstanding warrants at the time of booking and again at release. When inmate files were last reviewed on site (February, 2020) NCIC reports run at the time of booking were in the inmate files. The files reviewed at that time did include a copy of the NCIC report at the time of release. The last three site visits and the present one, being remote, did not permit a review of the files.

As mentioned above holds coming in after booking may not come to the attention of Records. As a result, they are identified when the inmate is otherwise entitled to release. The process of then contacting the jurisdiction with the hold and determining if they want to pick up the inmate can delay the release.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.    How to process release orders for each court, and whom to contact if a question arises;

        ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

        iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

        iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. In addition, a staff member has updated and expanded the Booking and Release Manual which will provide the detailed guidance required by this paragraph. It is not clear that the updated Booking and Release Manual has been approved and is being utilized. As noted above, there is still an issue with detainers that come in after booking such that releasing is not delayed.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

    b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Partial Compliance**

This paragraph has been changed to partial compliance because of the improvement in the internal auditing process and the implementation of the status summary sheet. There is not a log required by subparagraph (a). The County has provided their list of releases but the list does not include the information required by subparagraph (a). Incident reports are not routinely prepared for over detention although this appears to happen much less frequently than previously. As mentioned above, this would greatly assist command staff and the monitors in tracking and addressing late releases or mistaken releases.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to

immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Non-Compliant**

The Sheriff's Office hired an individual with the title of Quality Control Officer in June 2020. Her list of duties includes monitoring records to ensure that inmate files are current. She has developed a timeline for the audits required by the Settlement Agreement and policies including inmate records. This work does appear to be on the right track. As described elsewhere, she has developed checklists to gather information for a very useful monthly Quality Assurance report. However, at this time, she has not completed the auditing required by this paragraph. It is recommended that a system be put in place to review inmate files periodically to incorporate this requirement in the quality assurance process.

103.     The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

There was one known erroneous release during this reporting period. An incident report was not prepared and it was only brought to the Monitoring Team's attention by the federal court. It appears from the documentation that was then provided that the incident was investigated and disciplinary and corrective action was taken.  As was previously noted, there have now been a few incident reports on erroneous releases and late releases. However, as identified above there have been late releases without an incident report being prepared. There should be clarification as to who has the responsibility for completing the report.  It was recommended by the corrections expert of the Monitoring Team that the Detention Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.

104.     The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There have not been any audits of release policies, procedures and practices.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

There has been no change in the status of this paragraph since the last reporting period.  At the WC the Captain's office and administrative area serve as the designated space for attorney/client visits.  When the WC is upgraded according to the guidelines of the Master Planning Committee, properly designed space should be allocated for this purpose.  At the RDC, no effort has been made to retrofit the attorney client visitation rooms in each pod that were originally designed for that purpose.  They have not been utilized for approximately ten years.  Instead, staff has been tasked with escorting inmates to a multi-purpose room near the front of the jail.  Not only is this inefficient, it is less secure than having attorneys visit with their clients in the pods.  The original concept of direct supervision should be reinstituted whereby services are taken to the inmates instead of moving inmates to services.

**CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE**

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

The Monitoring Team has received the electronic monthly reports on incidents which include the complete narrative of the primary report and supplemental reports. There is a field in JMS which appears on the spread sheet for checking use of force. However, this field is frequently not checked when force is used. A separate use of force report is supposed to be completed when

force is used. However, this is also frequently not completed even though force has been used. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include all of the information listed in paragraph 107 and 108 below and that would be needed to provide the information that could inform continuing improvement or quality assurance reports. The Quality Assurance Officer began creating a master spreadsheet with information on incidents, use of force, training activity and other areas. For the incident reports and use of force she was pulling the information from the JMS. However, it quickly became apparent that this was inaccurate. The use of force field was often not checked and the type of incident listed is inconsistent. The Quality Assurance Officer now uses checklists for the different departments. The checklist has boxes to fill in with the information needed. For example, the use of force checklist goes to the Lieutenant over Investigations. Because Investigations reviews every incident report for use of force, they can provide an accurate number of uses of force. However, the March Quality Assurance report indicated there is still some discrepancy in the numbers. IAD indicated that OC chemical spray was used twice but the report indicated OC was used six times. Officers should be encouraged through training to check use of force in the JMS system. Even though the checklists provide greater accuracy in the quality assurance process, it does not constitute an ongoing data base that could be used to run a statistical report. To do that, the information in the JMS system would have to have improved accuracy. There should also be some consideration of whether the JMS system could allow multiple incident types so that, for example, when an inmate burns county property both fire and destruction of property could be listed. Of significant concern is that there was no incident report prepared for the death of the arrestee in Booking. This appears to have been a deliberate decision which is not acceptable. However, it was clearly a reportable incident occurring in the Jail. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securus does not include some critical fields that are in the system but can't be pulled into the spreadsheet such as type of grievance and date of response. The Grievance Officer manually creates a separate spreadsheet that pulls the information from Securus and then manually inserts the type of grievance, the date of response and the date of the response to an appeal. There is also a limitation in that some staff do not respond to grievances assigned to them in the system. The Grievance Officer clears these out of the system when the inmate is released, but it is not possible to determine whether the grievance was responded to and what the response was. The policy to reject grievances that are actually inmate requests and direct inmates to use the inmate request category appears to be effective. This policy allows a more accurate depiction of grievances although, as mentioned above, a number of the grievances rejected for this reason should have been considered

grievances. The inmates seem to be using the Emergency Grievance form increasingly when in many cases, it is not an emergency but is a grievance. For an accurate picture of grievances, it would be preferable if the system could reflect that a submitted emergency grievance was a grievance but not an emergency rather than rejecting it.  The Quality Assurance Officer does have a checklist from the Grievance Coordinator but this does not include an assessment of the adequacy of the responses. This type of audit is required by the Grievance Policy but has not yet been implemented.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

      a.   Brief summary of all reportable incidents, by type, shift, housing unit, and date;
      b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
      c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
      d.   List and total number of incident reports received during the reporting period;
      e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The Quality Assurance reports now being prepared are a major step forward in compliance with this requirement and appear to have the envisioned effect of helping to guide quality improvement. As mentioned above, the Quality Assurance Coordinator is using checklists to compile accurate data so that trends and problem areas can be identified. She prepares a narrative that evaluates that data. The reports appear to be thorough and contain good analysis. More recently, the reports have been reviewed by the Sheriff 's Office and discussed in a monthly meeting. This has prompted focus on a number of problem areas such as report writing and training.  With action directly by the Quality Assurance Coordinator and support from the Sheriff, additional areas are being addressed.

This paragraph envisions a narrative like what is now being produced. It also envisions back up statistical data. As noted above, it will be difficult to produce that kind of data until the JMS system information is more reliable.  With the checklists being utilized, the information in the report is more reliable. The spreadsheet currently being provided has the text of the narrative of the initial incident report and the text of the supplemental reports. Additional information includes the date and time of the incident, the location, the type of incident, the name of the

inmate involved, the name of the initial responding officer, a field for use of force, the supervisor reviewing the report, the date and time of review, and whether the report was approved. At this time, it does not include all of the information required by this paragraph (e.g. use of restraints, segregation, referral to IAD) including information that would be necessary to be fully informed regarding the nature of the incident. (The segregation log could provide the needed information for segregation).

Most importantly, the spreadsheet does not have an actual summary of the incident. The spreadsheet now pulls in the first incident report and all supplements. This provides more information than was previously available. A brief summary of the incident that incorporates information from the various narratives and includes information from medical is often not included in the narratives should be incorporated. The JMS system includes a field for supervisor's notes. This does not appear in the current spreadsheet but would be a good location to include a brief summary of the incident as required by this paragraph (and findings or recommendations as required by paragraph 64).

Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate-on-inmate assault or an inmate on officer assault. Only by reading the narrative, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation. RDC and the WC are now using the same form for segregation. This is not in Excel but could be drawn from manually to create the same type of trend analysis envisioned by this paragraph. At this time, there is no report tracking the use of restraints.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

      a.      Summary of all uses of force, by type, shift, housing unit, and date;

      b.      List and total number of use of force reports received during the reporting period;

      c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The monthly Incident spreadsheet has a column for whether or not force was used. As noted above, this is not routinely checked when force is used so can't be relied upon for this information. The checklist being used by the Quality Assurance Coordinator should be producing more accurate data which is incorporated in the narrative summary report. This paragraph envisions back up statistical data which ideally would be run from the JMS system.

Also as noted above, the JMS system does not provide for a summary of the use of force. Neither does it have a field for referral for investigation. The spreadsheet being created by the CID and IAD investigator could be used to provide that listing.

109.   Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**

As mentioned above, the limitations of the reporting from the Securus system have led the Grievance Coordinator to manually create a spreadsheet. The spreadsheet has the location of the kiosk terminal where the grievance was submitted although this might not reflect the location of the event giving rise to the grievance. Neither system can generate a report by location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. Also, as mentioned above, some of the staff are not entering responses in the system. One option would be to expand the manual spreadsheet kept by the Grievance Coordinator to include the information required by this paragraph. This should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced maintaining an expanded manual spreadsheet would be a very time intensive process. At the present time, there is no management review process in the grievance system. The Quality Assurance Officer is reviewing the Grievance Coordinator's spreadsheet but is not yet reviewing and reporting on a review of a random sampling of grievances.

110.   Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:
>   a.   A brief summary of all completed investigations, by type, shift, housing unit, and date;
>   b.   A listing of investigations referred for disciplinary action or other final disposition by type and date;
>   c.   A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

d.    A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

The IAD spreadsheet tracks investigations according to most of this paragraph's criteria.  During the February through May 2021, time period a total of 34 cases were investigated.  Of those, 25 involved UOF, one was Conduct Unbecoming, five were Fact Finding, one was Employee Conduct and two were Dereliction of Duty. Unlike in the past, a number of UOF cases resulted in charges being sustained resulting in additional UOF training.  One officer was suspended for a day on a Conduct Unbecoming charge and one officer was fired and another suspended for 15 days resulting from the suicide case in Booking, as was previously reported.  IA investigations were more equitably distributed throughout the Jail System than was the case with regard to CID investigations, which tend to be concentrated in A-Pod and C-Pod at the RDC.

111.   Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.   Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows

identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Partial Compliance**

The previously created Quality Assurance spreadsheet indicated an initial implementation of an Early Intervention program. However, there has been no indication that such a program is currently active. This will be further evaluated during the next site visit.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.    Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

a.   Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.   Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Partial Compliance**

Medical staff are not included in the review of serious incidents. Mortality reviews have not been completed. There have been three deaths in RDC during this reporting period, each of which should have led to a mortality review within 30 days. There has been little communication between medical and security staff regarding interrelated issues. During the June site visit, there was a stated intention to convene interdisciplinary meetings starting later in June. The stated intention is to discuss interrelated issues between medical and security. It should be noted that this is different than the Interdisciplinary Team that is required for the review of individuals in segregation.

## CRIMINAL JUSTICE COORDINATING COMMITTEE

115.   Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had previously contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. Hinds County is to be commended for the initial implementation of CJCC . However, the CJCC has essentially disbanded. There was reportedly a CJCC meeting in December although there were no minutes kept and no list of attendees. By one report the meeting was a small group and was primarily informational from the chair regarding pretrial services or moving individuals through the criminal justice process

particularly during the time of COVID. Several people reported that the CJCC was not very functional. At this time, a major contributing factor is that there is no chair of the CJCC. Subsequent to the site visit, the Monitoring Team was informed that the County Administrator was willing to serve as chair to get the CJCC operational again and that a Circuit Court judge would serve as chair after that.

As has been previously reported, this paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI when they were providing consultation and the Monitoring Team have recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Among other duties, staff duties will include collection and analysis of data, facilitation, research and analysis, presentation, project management, consultation, and distribution of information to the policy makers on the committee so that they have the information they need to make policy decisions. The County had stated that it was going to hire a CJCC Coordinator. However, during the June, 2020 site visit, the Monitoring Team was informed that the Criminal Justice and Quality Control staff person (sometimes called the Court Liaison or Facilitator) was assigned to be the CJCC Coordinator and the Pre-Trial Services Director required by the Stipulated Order. This will not meet the requirements of this paragraph or the Stipulated Order as having both of these roles as well as the duties of her other full-time position does not allow her to devote sufficient time to any of these roles to be effective. The Court Liaison has been working on and has submitted a proposal for technical assistance in developing a pretrial program. She is also involved in the hiring of a Pretrial Services Director, a position that has been posted. When that position is filled, she will hopefully have more time to devote to supporting the CJCC. The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

The Sequential Intercept Mapping required by this paragraph has already taken place under a grant to the Hinds County Behavioral Health from the GAINS Center. A two-day meeting was held on August 16-17, 2017 with broad participation including the County and Jail.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the Jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of

the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping is now almost four years old. This would be a useful activity for the CJCC.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC has not met in full since February, 2020. Not all of the identified agencies have been invited or represented at prior meetings and the reported December meeting was a limited group. It was reported by at least one member that the County and the Sheriff's Office have not actively participated.  The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support and active participation by the County and the Sheriff's Office would assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Partial Compliance**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC in the past but there has not been much recent activity. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the Jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to

achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**

The County did contract with an outside consultant, JMI, to provide technical assistance in developing the CJCC. However, that contract did not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  That contract ended over a year ago and the County has not renewed the contract with JMI. Hinds County has applied to be a learning site with Advancing Pretrial Services and that application is under consideration. However, that assistance does not include the breadth of the efforts included in this paragraph.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

     a.     A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

     b.      Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The booklet sized version of the Settlement Agreement is provided to new staff as they go through basic training.  Existing staff previously received this booklet, and they have access to the same document through their roll call training.  However, a survey of three supervisors during the June remote site visit resulted in disappointing results from those assigned to the RDC.  They uniformly indicated that they did not have a copy of the Settlement Agreement and that they had not seen the most recent Monitoring Report.  Inmates have access to the Settlement Agreement through the kiosk system, but it is not possible to determine whether or not that is a practical option without being able to question inmates and inspect housing units.  At the very least, each control room and each direct supervision housing unit should have a copy of the Settlement Agreement booklet for inmates to review at their convenience.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**
An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert retained through the Monitoring Team to develop policies and procedures. A number of draft policies have been provided and at this time, 31 policies have been approved and signed. It does not appear that there is a system in the policy development process to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable. As noted above, there is the additional concern about the actual implementation of policies that have been adopted. As has been stated above, the process has slowed because of a lack of participation by HCDS staff and there is a major concern that even once adopted the policies are not being implemented.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**
Thirty-one policies and procedures have now been approved and several others have been drafted and circulated. There are many outstanding policies to be written but progress is being made. This does not meet the deadline set by this provision.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**
Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.     No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

In addition to completing the development of policies, this paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. Not all policies have been developed and training has not been completed on the ones that have been adopted. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff. Although training is hampered by COVID and understaffing, it is concerning that some supervisors seem unfamiliar with the requirements of newly adopted policies or disinclined to ensure those policy requirements are implemented  even those adopted long before COVID began.

134.     Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**

There have been thirty-one policies approved by DOJ and adopted. It does not appear that the policies have been fully incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must

describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities. Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**
At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph. A self-assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 or February, 2021 or June 2021 site visit. This paragraph is now carried as Non-Compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement. This person will serve as a primary point of contact for the Monitor. Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**
The County has designated a full-time Compliance Coordinator who is coordinating compliance activities.

**EMERGENT CONDITIONS**

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications are being provided. The County is not preparing incident reports or providing immediate notification of over-detention.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.