```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                         NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                       PLAINTIFF

 5   VERSUS                   CIVIL ACTION NO. 3:16-CV-00489-CWR-JCG

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                   DEFENDANTS
 7

 8

 9                  VIDEOCONFERENCE PROCEEDINGS
             BEFORE THE HONORABLE CARLTON W. REEVES,
10              UNITED STATES DISTRICT COURT JUDGE,
                       SEPTEMBER 15, 2021,
11                     JACKSON, MISSISSIPPI

12

13                  (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

```
 1   APPEARANCES VIA VIDEOCONFERENCE:

 2       FOR THE PLAINTIFF:

 3           CHRISTOPHER N. CHENG, ESQ.
             SARAH G. STEEGE, ESQ.
 4           LAURA L. COWALL, ESQ.
             HELEN VERA, ESQ.
 5           MITZI DEASE-PAIGE, ESQ.

 6       FOR THE DEFENDANTS:

 7           CLAIRE BARKER, ESQ.
             TONY R. GAYLOR, ESQ.
 8
         ALSO PRESENT:
 9
             ANTHONY NJOKU
10           ELIZABETH SIMPSON
             DAVID PARRISH
11           JIM MOESER
             RICHARD DUDLEY
12           SHERIFF MARSHAND CRISLER
             CAPTAIN JEFF BURNLEY
13           PRISCILLA DAWSON
             COMMANDER DENTON
14           KATHRYN BRYAN
             SYNARUS GREEN
15           CREDELL M. CALHOUN
             VERN O. GAVIN
16           FERNANDEZ FRAZIER
             KENNY WAYNE JONES
17           ROBERT FARR
             GARY CHAMBLEE
18           DAVID MARSH
             LEROY LEE
19           LESLIE FAITH JONES, ESQ.
             HON. TOMIE GREEN
20           ANNE NELSEN

21

22

23

24

25
```

**TABLE OF CONTENTS**

Style and appearances...................................1-2

    By Ms. Simpson......................................... 10

    By Mr. Parrish........................................ 12

    By Ms. Bryan.......................................... 30

    By Dr. Dudley......................................... 45

    By Ms. Simpson........................................ 51

    By Mr. Moeser......................................... 56

    By Mr. Cheng.......................................... 73

    By Mr. Gaylor......................................... 84

    By Mr. Farr and Mr. Chamblee.......................... 93

    By Mr. Frazier........................................ 99

    By Ms. Barker.........................................102

    By Ms. Bryan..........................................106

    By Mr. Crisler........................................108

Court Reporter's Certificate............................124

1      **PROCEEDINGS VIA VIDEOCONFERENCE, SEPTEMBER 15, 2021**

2

3          THE COURT:  This is United States versus Hinds County,

4      3:16-CV-489-CWR-JGC.  Who's on for the Government?

5          MR. CHENG:  Your Honor, this is Christopher Cheng,

6      C-h-e-n-g.  We also have Laura Cowall, C-o-w-a-l-l; Sarah

7      Steege, S-t-e-e-g-e; Helen Vera, V-e-r-a; and one of our

8      staff, Anthony Njoku, is also observing.

9          THE COURT:  Okay.  And I do see Attorney -- AUSA Mitzi

10     Dease-Paige as well.

11         MR. CHENG:  Yes, Your Honor.

12         Sorry about that, Mitzi.

13         THE COURT:  No problem.

14         Who's on for Hinds County?

15         MR. GAYLOR:  For Hinds County we have Attorney Tony

16     Gaylor, County board attorney; as well as Mr. Kenny Wayne

17     Jones, the County administrator; as well as the board

18     president, Supervisor Credell Calhoun.

19         THE COURT:  Who's on for the Hinds County Sheriff

20     Department?

21         MS. BARKER:  Good morning, Your Honor.  This is Claire

22     Barker on behalf of the Hinds County Sheriff's Department.

23     You will notice that there are a number of employees on the

24     line.  Most notably, the new jail administrator, Major Kathryn

25     Bryan, is on the line with us.

```
1           THE COURT:  The jail administrator, Ms. -- the jail
2   administrator.  Could you repeat her name?
3           MS. BARKER:  Kathryn Bryan, B-r-y-a-n.
4           THE COURT:  Anyone else from the sheriff's department
5   on?
6           MS. BARKER:  In my --
7           THE COURT:  Ms. Barker?
8           MS. BARKER:  In my office I have with me Captain Jeff
9   Burnley, and I believe we have a Ms. Priscilla Dawson, our
10  quality assurance coordinator, is on us with us as well.  I've
11  been notified that the sheriff is trying to call in at this
12  moment, Interim Sheriff Crisler.
13          MR. GREEN:  And, Your Honor, Synarus Green, compliance
14  coordinator, is also on for Hinds County.
15          MR. GAYLOR:  Your Honor, I believe we also have
16  Fernandez Frazier on the line with Henley-Young.  We do.
17          THE COURT:  Okay.  Anyone else from the sheriff's
18  department?  I heard Ms. Barker say that the interim sheriff
19  is trying to get on the line.
20          My monitors are here.  If you will, tell us who you
21  are, and this is primarily --
22          MS. SIMPSON:  Your Honor --
23          THE COURT:  -- for the public.  Excuse me.  Go ahead.
24          MS. SIMPSON:  Good morning, Your Honor.  This is
25  Elizabeth Simpson, Lisa Simpson, and my team is also on the
```

 1   line:  Dave Parrish, Jim Moeser, and Dr. Richard Dudley.

 2          THE COURT:  Thank you.  Any --

 3          MR. GAYLOR:  Your Honor --

 4          THE COURT:  Mr. Gaylor?

 5          MR. GAYLOR:  I'm sorry, Your Honor.  I also wanted to

 6   note that on behalf of the County, we have a number of our

 7   contractors:  Mr. David Marsh with Benchmark Construction as

 8   well as -- his team as well as Mr. Rob Farr with Cooke

 9   Douglass Farr Lemons.  We also have Mr. LeRoy Lee, who's our

10   maintenance director, on the line, on the call.

11          THE COURT:  Okay.  Thank you.

12          Any interested parties?

13          MS. JONES:  Yes.  Good morning, Judge Reeves.  This is

14   Leslie Faith Jones with Southern Poverty Law Center, and joint

15   expert Anne Nelsen is also with us.

16          THE COURT:  I'm sorry.  Could you repeat the second

17   name, Ms. Jones?

18          MS. JONES:  Yes, sir.  Anne Nelsen, N-e-l-s-e-n.

19          THE COURT:  Okay.  Anyone else who's involved in this

20   case?

21          All right.  The Court has set this call up, status

22   conference through Zoom, and we're doing something different

23   this time with respect to the Zoom connection.  The public has

24   been given access to these proceedings through Zoom.  You will

25   not hear from the public because we've made sure -- or at

1   least we will attempt to make sure that only those -- only the

2   participants are unmuted.  In the past the public has

3   participated, if you will, and observed these proceedings

4   through telephone connection, but we're trying something new

5   in allowing the public to actually see and participate in the

6   proceedings as if they are in court, and we'll see how that

7   works.

8        Before we begin with this status conference, I do want

9   to note that the sheriff, the sheriff that we know who has

10  been part of this case since 20- -- I guess as the elected

11  sheriff, I guess, the sheriff-elect and the sheriff, the

12  sheriff-elect during 2019 and became sheriff and took the oath

13  of office January 2020, that sheriff, Mr. Lee Vance, is no

14  longer with us.  He was a victim of -- from public sources and

15  everything, from COVID-19, something that we've all talked

16  about on these calls and others.  And the Court extends its

17  sympathies to Hinds County, to the sheriff's department, and

18  to Mr. Vance's family.  It's quite shocking to the Court,

19  quite shocking to the community, but this reminds each of us

20  how fragile life is and how temporary life is.

21       So I do offer from the Court my sympathies to Mr. Vance

22  and his family and friends and all those who know and love

23  him.  And I start off with that because I would like the

24  County and the sheriff's department to make an extraordinary

25  and concerted effort of getting this consent decree behind

1    you, if for no other reason, in the memory of Lee Vance.  You

2    need to make strong steps toward doing that, of getting

3    everything in place and getting everything involved.  Now, so

4    that's what I wanted to open up with.

5         The second thing that I would say, obviously with the

6    death of Mr. Vance come changes, and interim -- from public

7    sources, the Court itself is a constituent in Hinds County,

8    and the Court knows that the sheriff's department -- excuse

9    me -- that the Board of Supervisors has appointed an interim

10   sheriff, that an election has been announced, and I think that

11   the last the Court observed, there are, like, 13 candidates

12   running to -- for that office to complete the term of --

13   Mr. Vance's term.  And interim sheriff, Mr. Marshand Crisler,

14   was appointed by the sheriff's department -- excuse me -- by

15   the Board of Supervisors, and we know the election, I believe,

16   is November the 2nd.

17        The Court anticipates -- because, again, the Court does

18   not live in a vacuum and the Court has some history, the Court

19   expects there likely will be a run-off, and if there is a

20   run-off, the final election will be sometime later during the

21   month of November, I think, probably the Tuesday after

22   Thanksgiving, I think.  I'm not sure.

23        But, anyway, there's a lot of transition that will be

24   going on in the Hinds County Sheriff's Department.  There is a

25   lot of transition that's going on right now.  The one thing

1    that is not in transition is this consent decree and the

2    obligations that the County and the sheriff's department are

3    bound by right now.   The fact that Mr. Vance is no longer here

4    does not mean that the obligations of the County or the

5    sheriff's department have somewhat disappeared because of his

6    absence.   The terms of the consent decree are -- still govern

7    this action.

8          And so we're here today to discuss these matters, and

9    the Court has received the most recent monitoring report -- I

10   think it's the 14th monitoring report that was filed in July.

11   And I know we're getting ready for the next monitoring report

12   to be prepared based on the things that the monitors have done

13   since the last report.

14         So I guess the first thing that I'll do is allow the

15   monitors to give me some assessment of where we have -- where

16   we have come since our last status conference, which I believe

17   was in June of 2021, and I imagine there are -- according to

18   this 14th monitoring report, there are certain deficiencies

19   that are glaring deficiencies that hopefully have been

20   rectified or hopefully -- well, that I know will be discussed

21   today.

22         So I'll turn it over to you, Ms. Simpson, and you may

23   come in any way -- you and your team may come in any way you

24   wish.   I may interject and have a couple of questions for you

25   during the course of the proceedings, but please come in your

1    own way, Ms. Simpson.

2         MS. SIMPSON:  Thank you, Your Honor.

3         This has been, I think it's fair to say, a tumultuous

4    year for the jail and for Hinds County.  Some of it took place

5    prior to our June site visit.  It's been -- like I said, the

6    year as a whole has been a difficult one, and much of this was

7    reported in the newspaper, so I'm sure you're familiar with

8    some of this.

9         But there have been five deaths in the facility this

10   year, two suicides, one detainee was found unresponsive.  It

11   appears likely to be a drug overdose, but I don't believe

12   there's a final cause of death ruled.  One inmate -- or

13   actually arrestee died in booking.  I don't know that the

14   cause of death has been determined on that one either.  And

15   one inmate died of COVID.  So five deaths in this timeframe.

16        There has been an escape of two inmates --

17        THE COURT:  I'm sorry, Ms. Simpson.  I apologize.  Is

18   this five deaths this year or five deaths since we last spoke

19   in June?

20        MS. SIMPSON:  Five deaths this year.

21        THE COURT:  Okay.

22        MS. SIMPSON:  So I believe one of them -- one of the

23   suicides was in April, I think, and the death in booking I

24   think was prior to our last status conference.  But, yes, five

25   deaths this year, then the escape of two inmates.

1        There was -- is a surge in COVID.  It looks like that's

2   coming down now, but quite a few detainees and staff members

3   tested positive for COVID.  I believe it's in the 80s or 90s

4   combined detainees and staff.

5        And as reported in the last status conference, there

6   seems to be a high amount of contraband in the facility,

7   leading to a number of overdoses.  There was the one that

8   appears to be an overdose leading to death.  But in addition,

9   at least as of June, there were seven overdoses in the last

10  three months, and there have been several since then,

11  according to the incident reports.

12       And then, of course, the passing of Sheriff Vance

13  certainly is causing a transition as you described.

14       On the positive side, the new jail administrator is on

15  board.  As you probably know, shortly after she came on board,

16  she tested positive for COVID and so had to quarantine.  So

17  she's, in effect, really only been on-site for about a month

18  after coming back from her quarantine.  And COVID has created

19  other complications, which I think Major Bryan can be more

20  informative about in terms of how they're able to quarantine

21  so many individuals in the jail with -- who have tested

22  positive with, of course, limited areas that can be isolated.

23       So I wanted to start actually by turning it over to

24  Dave Parrish.  As before, some of the most intractable issues

25  are in his area, and that is primarily the staffing and the

1    facility.  And there are some others that he'll discuss.  So I

2    want to turn it over to Mr. Parrish first, and then Dr. Dudley

3    will talk about the medical and mental health issues.  And

4    I'll wrap up the adult side with some of the more

5    administrative issues.  So that's the road map here, and I'll

6    turn it over to Mr. Parrish now.

7         THE COURT:  All right.  Before you do that, I do want

8    the record to reflect that Sheriff Crisler is at the hearing.

9         So, Mr. Parrish, you may proceed.

10        MR. PARRISH:  Thank you, Your Honor.

11        Thank you, Lisa.

12        Well, as Lisa mentioned, in June the sheriff's office

13   hired a new jail administrator, Major Bryan, and she brings

14   better qualifications to hold that position along with her,

15   better than any of her predecessors that have been in that

16   position.  And I've been working on this project going back to

17   2014 for the Justice Department even prior to the settlement

18   agreement, so I've dealt with four different jail

19   administrators over that period of time.  Her presence is

20   refreshing.

21        During the past month, she and I have worked

22   collaboratively to do -- primarily on two projects:  One,

23   updating the revised staffing analysis; and, two, identifying

24   all detention positions within the sheriff's office in order

25   to make sure that they're appropriately allocated.

1          With regard to the revised staffing analysis, that

2     needs to be done on an annual basis.  But it also needs to be

3     done this year, because detention services recently reverted

4     to the eight-hour shift, and for the previous year they've

5     been on a 12-hour shift.  Since there are different relief

6     factors associated with that, it had to be redone anyway, but

7     she and I have spent quite a bit of time going through post by

8     post, position by position, and she brings a fresh approach to

9     how some people could be assigned.  So that work is still in

10    progress, but we're really making headway on it.  It should be

11    done shortly.

12         Identifying the positions within the sheriff's office,

13    Doris Coleman, the HR director, sent me a listing of all

14    sheriff's office positions, and according to that count, there

15    were 429 positions in the sheriff's office, of which

16    approximately two-thirds, 281, are assigned to detention

17    services.  So two-thirds of the sheriff's office is the jail

18    system.  This is for funded positions.  The other 148

19    positions are on the law enforcement and support side.  They

20    represent 34.5 percent of the sheriff's office.

21         And just as a side note, it's something that I looked

22    at because I had some members of the command staff make

23    comments about the ratio of female to male officers in the

24    jail system.  And so when I looked at those numbers, I came up

25    with a fairly accurate count showing that of the filled

1   detention services positions, 41 percent of the detention

2   officers are male, while 59 percent of the detention officers

3   are female.  That's pretty far out of balance with what you

4   find for the inmate population, which is currently

5   94.1 percent male and 5.9 percent female.  I just found it to

6   be an interesting statistic.

7        THE COURT:  Mr. Parrish, let me ask you this.  You

8   indicated that two-thirds of the employees with the sheriff's

9   department, two-thirds -- that's 66 percent of the sheriff's

10  department -- is assigned basically to the detention -- to

11  running the detention facilities.

12       MR. PARRISH:  That's correct.  It's 65.5 percent,

13  almost exactly two-thirds of the entire sheriff's office deals

14  with the jail system.

15       THE COURT:  And maybe the sheriff's department can tell

16  me this.  So that means the remaining people are support

17  people, deputies, and people doing all the functions of the

18  sheriff's department outside of the detention facilities.  And

19  I ask that question:  How are the -- I know there's a handful

20  of courtroom bailiffs that each of the circuit and chancery

21  court judges and maybe county court, too -- I don't know --

22  are assigned.  Are they calculated in that one-third number?

23       MR. PARRISH:  To the best of my knowledge, that's

24  correct.

25       THE COURT:  Okay.  And all -- and the deputies who have

1  to -- investigators and people who arrive on the scene when

2  there's something there going on in the county or any of the

3  municipalities in the county, those persons are part of the

4  one-third?

5      MR. PARRISH:  Yes, sir.

6      THE COURT:  Okay.  You may proceed, Mr. Parrish.

7      MR. PARRISH:  Thank you, sir.

8      While the new jail administrator is taking some very

9  proactive steps to address the long-standing problems, she

10  faces basically the same issues that the monitoring team has

11  brought before the Court since 2016, when Hinds County entered

12  into the settlement agreement.  Of course, those primary areas

13  are:  One, lack of staff; two, ongoing facility maintenance

14  issues; and, three, the inability of staff to be able to

15  properly implement direct supervision, primarily at the

16  Raymond Detention Center.  The work center is moving in the

17  right direction, but the Raymond Detention Center still has

18  some real issues there.

19      The most recent figures that I received from HR show

20  that only 226 of the 281 funded positions are actually filled.

21  Now, this may have changed since I got these numbers over a

22  week ago.  But that's about where the number has been for the

23  past two years, and I've never seen it exceed 256.  But it's

24  been in the neighborhood of 225 to 230 or so for basically the

25  past two years.  There really hasn't been any change.

1          And while maintenance issues have been more reasonably

2     addressed since the County brought on board Benchmark

3     Construction and the sheriff made Sergeant Winter the de facto

4     maintenance coordinator, we find that delays in renovating

5     first Charlie Pod and now Bravo Pod have been problematic.

6     Now, up until yesterday, I was not aware, but apparently Bravo

7     Pod is now being used.  I can't really answer that, because I

8     don't have any information on it yet.  But it was my

9     understanding that once it was finished with the renovation,

10    that it would reopen and would be staffed according to direct

11    supervision, as Charlie Pod was supposed to have been done in

12    October of 2020 when it reopened.  And at that point, we

13    anticipated that Alpha Pod would be closed.  But I'm going to

14    have to defer to the sheriff's office to explain exactly where

15    we stand on that right now.

16          The bottom line was that when Bravo Pod was scheduled

17    to be reopened, my concern was:  How is it going to be staffed

18    for direct supervision when the number of filled positions is

19    basically where we've been for the past two years and they

20    haven't been able to staff Charlie Pod properly for direct

21    supervision?  So now when we open up Bravo Pod and that's

22    supposed to be with direct supervision, I'm not sure where the

23    people come from.  It always seems to come back down to

24    bodies:  Do we have enough people to actually operate things?

25          And the situation in Charlie Pod has not really changed

1    over the past year since it reopened.  Housing units have been

2    all too routinely left unattended.  Sometimes the suicide

3    watch unit is even left unattended.  Inmates are routinely

4    locked down, or at least half of them are locked down in their

5    cells when they should all be out in the dayroom.  Just like a

6    direct-supervision dormitory works at the work center, all the

7    inmates are out all day, and they go to bed at night.  The

8    officer does not tell them half of them you have to stay on

9    your bunk and only half of you are allowed out at a time, but

10   that's the way things seem to operate at the Raymond Detention

11   Center.

12          So while the monitoring team is committed to working

13   with Major Bryan to address these long-standing problems, she

14   still has her hands full.  She's come in to take over some

15   real issues, and some things just go back for so much time.

16   Not to bring it up to explain why now or anything, but I'll

17   just give you an example.

18          When we started this monitoring process in 2016, one of

19   the first things that was pointed out was the inmate handbook

20   needs to be updated and reissued.  Five years later, it still

21   hasn't happened.  It's been handed off from one person to

22   another, one person retired who had that job, and so forth.

23   But the bottom line is that's something that really could have

24   been done within the first six months, but five years after

25   we've started, an issue like updating the inmate handbook and

 1    getting it out to the inmates is still up in the air.  We

 2    still don't have an answer on that.

 3         And then the issue of COVID has been devastating,

 4    because it brings on board an additional classification

 5    criteria that Hinds County certainly did not need.  It means

 6    that certain inmates need to be separated for that reason as

 7    opposed to charges or behavior or that sort of thing, and

 8    that's really created problems.  And so as a result, booking

 9    is still being used to house inmates.  In the latest figures

10    that I looked at from yesterday, there were seven inmates

11    housed in booking.  That's something we've tried to stop since

12    we started this process in 2016, but every time something --

13    we're moving in the right direction, something happens,

14    whether it's a maintenance issue that shuts down a part of the

15    jail or most recently COVID, which has created just an

16    additional layer of problems for the jail system.

17         So that concludes my presentation, sir.

18         MS. SIMPSON:  Actually, Dave, you mentioned that there

19    are 281 funded positions for detention, of which 226 are

20    filled, but could you give us the number of positions that are

21    actually needed based on your recent staffing analysis?

22         MR. PARRISH:  Yes.  Major Bryan and I are working on

23    the revised staffing analysis, which right now calls for

24    approximately 330 detention positions required to operate the

25    work center; the Raymond Detention Center; and then the first

1   floor, the transfer area, of the Jackson Detention Center,

2   where inmates go to and from court.  That's not open all the

3   time, but that's still part of the system.  Inmates are not

4   housed in that facility anymore.

5       That number is subject to change as she and I work on

6   that, but roughly speaking, 330.  That's also based on the

7   assumption that Bravo Pod is reopened and has a mental health

8   unit in it, which increases staffing required for that area.

9   So that's the assumption that underlies the revised staffing

10  analysis, but the bottom line figure's 330.

11      THE COURT:  All right.  Ms. Simpson, did you have

12  anything else?  I saw you.

13      MS. SIMPSON:  The only thing I would add is something

14  the Court may want to ask about, and I know we will be asking

15  about it during the site visit, is there's been some reference

16  in documents that have been provided that the sheriff's office

17  may decide to continue operating some of the housing units in

18  A-Pod.  And I have not heard of any definitive answer on that,

19  but it's important to remember that the stipulated order

20  requires that once B-Pod is renovated and opened, if A-Pod is

21  used, it needs to be renovated and brought up to the same

22  standard.  So I don't know where that stands, but I think it's

23  something that we want to make sure that we're all on the same

24  page about the criteria for continuing to use A-Pod.

25      And, Judge, did you have any questions for Mr. Parrish,

1    or should I have Dr. Dudley proceed?

2        THE COURT:  No, I have plenty of questions,

3    Ms. Simpson, and if Mr. Parrish can't answer them, whoever can

4    answer them should speak up.

5        And for the benefit of the public, before you begin to

6    speak, just announce who you are at all times for the benefit

7    of the public and the court reporter, but particularly for the

8    public.

9        Ms. Simpson opened up her remarks with the number of

10   deaths that have occurred in the detention center:  five

11   deaths and two suicides.  Mr. Parrish, what, if any,

12   information have you been able to glean from information

13   provided to you by the sheriff's department?  What is the

14   status of the -- I assume each of these instances are being

15   investigated -- each of these instances is being investigated

16   by somebody, either the sheriff's department, MBI, FBI, some

17   law enforcement entity, some investigatory entity or

18   investigating entity, somebody.

19       Do we know if each of these matters is being

20   investigated or has been investigated, Mr. Parrish?

21       MR. PARRISH:  Your Honor, our information is pretty

22   sketchy.  My understanding was that the sheriff's office was

23   going to have each death investigated by the Mississippi

24   Bureau of Investigation.  We have yet to receive a report from

25   MBI on any of these cases.  There was an IAD investigation on

1  the suicide in booking, Justin Mosley back in April, and the

2  sheriff's office has taken disciplinary action with regard to

3  that with termination and suspension.  But beyond that, we do

4  not have anything.

5       I have seen some e-mails that are going back internally

6  within the sheriff's office indicating that an IA

7  investigation was completed on at least one of these cases.  I

8  have yet to see it.  It may have gotten lost in cyberspace or

9  something, but we do not have more current information from

10 IAD on any of these others, which is the inmate death in

11 booking in March.  The sheriff's position originally had been

12 that that was not an inmate, because he hadn't been booked.

13 But I think the Justice Department made it clear that any of

14 those investigat- -- any deaths within the jail need to be

15 investigated per the policy that the sheriff's office had

16 issued.

17      And we have a JCA that was housed in booking, and then

18 we have a suicide in Charlie 4 back in July, and then we have

19 an inmate death in the hospital due to COVID, and finally we

20 have the escape.

21      I just saw an incident report on that that was sent to

22 us just a couple of days ago, but that was back in the

23 beginning of August, and we had never received anything more

24 detailed, not even a rapid notification report.  So we're

25 pretty far behind the curve on investigations, and with regard

1   to MBI, we have none.  There may be some out there from IAD

2   that have gone on within the sheriff's office.  They haven't

3   found their way to us yet.

4         MS. SIMPSON:  Your Honor, --

5         THE COURT:  Ms. Simpson, I'm sorry.

6         MS. SIMPSON:  -- I just wanted to add a little bit to

7   this discussion, and Dr. Dudley may have more to say as well.

8         I think the area of investigations has been of some

9   concern to -- of great concern, actually, I would say to the

10  monitoring team, and that is that even though IAD and

11  sometimes CID are -- investigations are completed, they really

12  don't do the kind of interdisciplinary investigation that

13  should be done on -- certainly on deaths but also on other

14  critical incidents.

15        The focus of the investigations that are done have

16  generally been, you know, is there a crime to be prosecuted or

17  is there a personnel policy to -- to enforce and has not

18  really been the interdisciplinary kind of investigation:  Was

19  this incident handled appropriately?  What kind of policy

20  changes might need to be made to ensure that it doesn't happen

21  in the future?

22        And I believe that Major Bryan has a fairly good

23  understanding of the type of investigation that needs to be

24  done, and so hopefully we'll start seeing these going forward.

25  But the investigations of these critical incidents has really

1    not been the type of intense interdisciplinary investigation

2    that needs to be done in this kind of situation.

3         So -- so as Dave Parrish said, we really haven't seen

4    the investigation reports on most of these recent deaths, but

5    what we've seen in the past on critical incidents is really

6    not the kind of investigation we would want to see.

7         THE COURT:  A going-forward basis might be a good idea

8    for those people who might be hurt in the future, but people

9    who have died in the detention center deserve the right to

10   have their matters investigated.  The public has a right to

11   know how they've been investigated.  The Court has a right to

12   know how they're being investigated, and I think the consent

13   decree itself requires that the parties, the DOJ, the

14   monitors, and all know how those are being investigated.

15        I think you said there were five deaths that was just

16   this calendar year and two suicides this calendar year?

17        MS. SIMPSON:  Actually, the five deaths -- this is Lisa

18   Simpson.  The five deaths include the two suicides.

19        THE COURT:  Okay.  So five deaths, but that would be

20   during this calendar year, 2021?

21        MS. SIMPSON:  Yes, Your Honor.

22        THE COURT:  Okay.  Now, who's speaking on behalf of the

23   sheriff's department to tell me where -- what's the status of

24   these investigations and if the Court needs to get Mississippi

25   Bureau of Investigation involved and as a part of this, or

1    whoever might be investigating this, if they need to be a part

2    of the next status conference, I'm willing to do that.  But I

3    need to know that there -- what's the status of these

4    investigations for these five deaths?

5         MS. BARKER:  Your Honor, this is Claire Barker on

6    behalf of the sheriff's office.

7         As far as any internal investigation on these deaths,

8    they have been done in our internal affairs division.  On the

9    suicides, the Justice Department and the monitors do have our

10   internal affairs investigation on that.  Disciplinary action

11   was taken.  They, I believe yesterday, received a large batch

12   of internal affairs files that included the investigation on

13   the drug overdose and the other suicide that occurred with our

14   disciplinary actions that were taken.

15        As far as the arrestee that died in booking, that was

16   a -- the Justice Department and the monitors should have our

17   IAD file on that as well, because disciplinary action was

18   taken on that.

19        There was a lag time in a couple of -- in the monitors

20   and the Department of Justice receiving the most recent IAD

21   investigation due to the fact that the disciplinary action

22   review committee had not been able to meet for obvious

23   circumstances with COVID and the death of Sheriff Vance.  We

24   finally met this week, and so those internal affairs files

25   were disclosed.

1      As far as the outside entity that is investigating

2  these deaths as well, MBI has not -- we have not received a

3  final conclusion on any of these investigations from MBI.  As

4  soon as we receive those, of course we will turn those over to

5  the monitors and the Justice Department.

6      And, additionally, there is -- pursuant to the consent

7  decree, there is a mortality review that needs to be done, and

8  Major Bryan I believe has been meeting with our medical

9  provider to get with them to ensure that they do a mortality

10  review.  And I believe -- if she wants to add anything to that

11  as well.

12      Major Bryan, if I missed anything.

13      They are to do a mortality review on all of these

14  deaths, so that is the status of all the investigations

15  regarding these deaths.

16      THE COURT:  Do you know if -- in the MBI's

17  investigation if people -- are you aware of any observations

18  of MBI having come to the facility to interview people or to

19  do -- I just want to know what's going on.  I mean, I know it

20  may take some time for MBI to complete the investigation, but

21  from the perspective of those in the sheriff's department,

22  does it appear that MBI is investigating these matters?

23      MS. BARKER:  Your Honor, I don't have any information

24  either that they are or they aren't.  I don't know if anybody

25  else on this call has observed that.  I do believe that one of

1   the issues with the time -- with the -- I guess a long time,

2   the delay in getting the investigations done is with the state

3   medical examiner's office.  I believe that there was a problem

4   with a backlog there, and that is just simply what I've heard.

5   I haven't actually confirmed that with someone at MBI, but

6   that's what someone from investigations has told me.

7        THE COURT:  Okay.  Well, I think it's going to behoove

8   us to find -- you know, because obviously these are detainees,

9   and if there are witnesses who are detainees, it seems to me

10  that at some point in time those witnesses are going to

11  disappear.  You know, they're going to be released; they're

12  going to be sent somewhere else.  Nobody remains permanently

13  at that place, and if MBI hasn't even been on the ground to

14  interview and talk to people, that's -- in my view, that's a

15  problem.

16       I mean, I'm no investigator, though.  They could tell

17  me that, you know, it is typical for us not to go on the

18  ground and talk to people and take statements.  They may say

19  that.  I don't know.  But it seems to me in my line of work

20  and having observed other investigations, there is --

21  investigators go to the scene and find out what evidence is on

22  the scene, and they take statements.  At least they do that.

23       So it's problematic that we've had five deaths in the

24  detention center this year, and that was the one thing that I

25  told the parties when I inherited this case that I did not

1    want to see happen under my watch.

2         The second thing, Ms. Simpson, from the report and,

3    Mr. Parrish, I note that in the synopsis -- this is a quote --

4    "There were a record number of fights and assaults at RDC in

5    May."  A record number.  We know that there have always been

6    fights and assaults, but in May you say that there's a record

7    number.

8         What, if any information, Mr. Parrish, are you -- have

9    you reviewed or received that shows those fights and assaults

10   have been investigated or are being investigated?

11        MR. PARRISH:  Your Honor, those are routinely

12   investigated by CID.  When we have inmate-on-inmate, that's

13   handled by CID, and they do follow up on them.  Unfortunately,

14   most inmates refuse to make statements or press charges, so

15   criminal follow up on those cases is very, very rare.  But the

16   sheriff's office is consistently there following up on those

17   cases as they are identified and reported.

18        THE COURT:  Okay.  And I --

19        MS. SIMPSON:  Your Honor?

20        THE COURT:  Go ahead, Ms. Simpson.  I'm sorry.

21        MS. SIMPSON:  No, I apologize for interrupting.

22        I just wanted to add that one of the things we've

23   mentioned, I believe in the June report but certainly in prior

24   reports, is that the investigations, the CID investigations,

25   could be more thorough.  One problem is that there are so many

1   cameras that are not functioning at RDC and so there --

2   normally an investigation would include reviewing the camera

3   footage to see what happened, and we see the staff at the work

4   center doing that now that they have functioning cameras that

5   record.  But so many of the cameras at RDC are not

6   functioning, and so that makes it difficult to actually do a

7   more thorough investigation.

8          And, again, I would say that CID -- the focus of CID is

9   generally to determine whether there should be a criminal

10  prosecution, but there also needs to be a more thorough

11  evaluation of some of these incidents to determine whether

12  there was a policy violation, whether there should be a policy

13  change to prevent that kind of incident in the future, and

14  that kind of evaluation has really not taken place in the

15  past.  And, again, I believe that Major Bryan has an

16  understanding of that, and hopefully we'll see it going

17  forward.  But it has been a problem.

18          THE COURT:  Okay.

19          MR. PARRISH:  Your Honor, --

20          THE COURT:  Yes.

21          MR. PARRISH:  -- this is David Parrish again.

22          If I could quickly follow up on what was just said.  An

23  example that we would love to see would be we have a problem

24  in a direct-supervision housing unit, fight between people.

25  From our reading of the incident reports, it appears that

1    nobody was present, and there's supposed to be an officer

2    inside the housing unit at all times.  That's never mentioned

3    in the CID investigation that there was no officer present

4    where there's supposed to be somebody 24 hours a day.  That's

5    the kind of thing that has never been included in the CID

6    investigations that would really be helpful for the

7    administration to be able to address the problem in the

8    future.  Just an example.  Thank you.

9         THE COURT:  Okay.  Thank you.

10        Turning back to the report, but before I do, I did see

11   that the sheriff had raised his hand at one point in time,

12   which is a good thing on the Zoom.  You can raise your hand,

13   and we can acknowledge that.  I don't see him on the line

14   anymore, but if there was a comment from the sheriff,

15   obviously he should speak.

16        MS. BARKER:  Your Honor, Major Bryan would like to

17   speak on this issue.

18        THE COURT:  Okay.

19        MS. BRYAN:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MS. BRYAN:  Kathryn Bryan, jail administrator for Hinds

22   County.

23        Circling back to the issue of investigations, there are

24   several issues to flesh out what's already been presented to

25   you, sir.  It's been my experience in the past that there are

1    tandem investigations that are conducted for an inmate death.

2    One is the criminal investigation, whether it's done by a

3    state and/or the local entity; the other is the administrative

4    investigation, whose purpose is strictly a policy and systems

5    review to shore up any deficiencies that may have led to the

6    inmate death.

7         That may or may not be being done, Your Honor.  I

8    cannot judge the efficacy of either investigation, because I

9    don't have access to those.  I have not had access to any of

10   those to date to make that judgment call, to make any

11   corrective measures that may need to be taken to prevent

12   another inmate death.

13        The other issue are the mortality reviews, as

14   Ms. Barker raised.  The medical staff had not been doing

15   mortality reviews.  I understand that that isn't necessarily

16   something that our medical vendor in general is familiar with.

17   So we finally had their version of a mortality review on just

18   three of the cases this morning, but they had not requested

19   nor had access to any autopsy or toxicology reports.  So for

20   them to formulate findings of preventability, not having those

21   documents is very problematic.  So we're still -- still have a

22   huge hurdle with that issue, sir.

23        THE COURT:  You indicated that there might be multiple

24   investigations going on at the same time.  Ms. Bryan, do you

25   have access to the internal affairs investigation?

1          MS. BRYAN:  I do not.

2          THE COURT:  You do not?

3          MS. BRYAN:  No, sir.

4          THE COURT:  Your policies don't allow you to -- well,

5    how are you expected to make corrective actions with people

6    who report to you if you are not aware of what internal

7    affairs has determined?  I'm just asking.  I mean, I'm just a

8    person who is there -- I guess that may be a rhetorical

9    question, but would it benefit you, Ms. Bryan, as you're the

10   jail administrator; right?

11         MS. BRYAN:  Yes, sir.

12         THE COURT:  These people who work in the detention

13   center ultimately report to you; correct?

14         MS. BRYAN:  They do.

15         THE COURT:  All right.  Okay.  Maybe we'll push that to

16   the side, because I do have more questions about something

17   else.  So thank you.

18         And I assume, then, the sheriff's wing of the criminal

19   investigation division, once that report is done or completed,

20   is that shared with you, Ms. Bryan?

21         MS. BRYAN:  Not to date, Your Honor.

22         THE COURT:  All right.  And, of course, any

23   investigation by Mississippi Bureau of Investigation, to the

24   extent any one has been completed at this time, that has not

25   been shared with you either?

1          MS. BRYAN:  Yes, sir, that's correct.

2          THE COURT:  All right.  Now, again, turning back to the

3     report, Mr. Parrish and Ms. Simpson, I've just mentioned the

4     fights and assaults.  You also indicate, "There continue to be

5     fires set by inmates."

6          What, if anything, do we know about the continuing

7     fires being set within the pods or within the facility?

8          MR. PARRISH:  Your Honor, the -- in that report we were

9     referring to a significant series of fires that were set by

10    inmates.  I think one of the points that we made there was

11    that in one case there were three fires set in the same

12    lockdown housing unit over a period of about an hour, and in

13    each of the incident reports, officers had to respond from

14    outside of the unit.  There was nobody inside there with them.

15         So lack of supervision is key.  If there had been

16    people in there, inside the housing unit, I don't think we

17    would have the same kind of problem.  That comes back to

18    staffing, but it also comes back to complying with the

19    provisions of operating a direct-supervision jail where you

20    have officers actually working inside the housing units.

21    Where if you're dealing with a lockdown unit like Charlie 4,

22    that you have multiple officers inside the housing unit, not

23    always responding from outside.  So, unfortunately, the

24    problem has been responding after the fact instead of being

25    proactive and having somebody in place.

1          THE COURT:  Okay.

2          MS. SIMPSON:  Your Honor --

3          THE COURT:  Oh, I'm sorry, Ms. Simpson.  I'm sorry.

4          MS. SIMPSON:  I'm sorry.  It takes me a second or two

5     to unmute, and I get a little behind on the conversation.

6          In terms of number, the -- looking at the incident

7     reports, it looks like there were maybe five fires in July and

8     a fewer number in August.  I would say this time around we

9     discovered that we actually were missing a number of incident

10    reports for kind of a technical issue, so I haven't reviewed

11    all of them from that time period, but certainly in July the

12    volume seemed to continue.  In August it looks a little bit

13    less.

14         THE COURT:  Okay.  Another point of reference in the

15    report which caught my attention, "There is an" -- this is a

16    quote:  "There is an extremely large amount of contraband in

17    the facility, including drugs."

18         Now, it's this court's experience that contraband is

19    brought into the prison by somebody.  A lot of times it's by

20    employees.  Other times it's by visitors.  But contraband, I'm

21    pretty sure, is not given because -- because the word

22    "contraband" itself means that it's not something that's

23    freely given by the sheriff's department, I would imagine, to

24    the individuals, so it's coming into the facility.

25         And when you say "an extremely large amount," it's very

1    concerning, and part of what the large amount is is drugs,

2    which even is more concerning, which leads to your next

3    statement in your report:  A number of overdoses, whether

4    people ultimately die from the drugs or not.  That is

5    concerning.

6         What -- Mr. Parrish, Ms. Simpson, what information have

7    you been provided to show that this extremely large amount of

8    contraband being on -- what investigations are being done?

9    What type of disciplinary actions have been taken?  What type

10   of referrals to the district attorney's office have been made?

11   What are -- what is the sheriff's department or the detention

12   center doing about the large amount of contraband as far as

13   the records and information that you've been provided and that

14   you see, Ms. Simpson and Mr. Parrish?

15        MR. PARRISH:  Your Honor, this is Dave Parrish.

16        Two primary ways that contraband gets into the

17   facility, particularly the Raymond Detention Center, is, one,

18   with the public bringing contraband up, throwing it over the

19   fence, inmates going up through the ceiling, particularly from

20   Alpha Pod where they don't have direct supervision and where

21   it has not been renovated, and going out and bringing the

22   contraband back in.  I think we've made reference back in the

23   past that we don't find people escaping to get out of the

24   jail; they break out to bring contraband back in.

25        The other way is not necessarily with visitors, because

1   they don't have face-to-face visitor contact there, but

2   perhaps through staff bringing it in.  The sheriff's office

3   has been proactive in taking disciplinary action and firing

4   and charging people who they have found who have done that.

5        But the problem of contraband is still there.  The

6   number of cellphones I don't think is as high as the

7   astronomical number that we first found when we went in.

8   There are still lots of cellphones and components that are

9   found, but I think the point that was made in this last report

10  was there seems to have been a shift toward more drugs, which

11  is then seen with inmates falling out every now and then,

12  apparently from drug overdoses.

13       So the County is supposed to have outside security

14  around the facilities at all times.  That post is left

15  unstaffed, so when somebody is sitting in the master control

16  and looks on a camera and sees a strange car driving around

17  the outside or something caught on the razor ribbon on the

18  fence, they call in somebody to take a look at things.  But

19  that's generally the way they find it from the outside, and

20  then they do check people out coming in to work, and that's

21  how they have found some cases from staff.

22       THE COURT:  And when you -- and I know contraband could

23  come in many sources.  I mean, money can be contraband, I

24  guess, and other things.  But when this report speaks of

25  contraband, Mr. Parrish and Ms. Simpson, what types of things

 1    are you talking about?

 2         MR. PARRISH:  We're finding drugs, cellphones,

 3    components, even weapons.

 4         THE COURT:  Okay.  Weapons.  What type of weapons?

 5    Shanks?

 6         MR. PARRISH:  Knives.  Obviously something that didn't

 7    come from inside the facility.  And, you know, they're doing a

 8    better job of shakedowns and recording the shakedowns, even

 9    using the GoPro cameras and keeping a record of it, and then

10    when we get an incident report, we'll get a picture attached

11    of this is not only a list of the items that were found but

12    here's pictures of various things, and it's pretty amazing to

13    look at some of those pictures.

14         THE COURT:  Okay.  Other areas that you noted in your

15    synopsis, I think -- obviously the C-Pod was closed at one

16    time, I think for renovations, I think, as I recall.  The

17    B-Pod was supposed to be ready by this time, I think by today

18    or maybe by the end of this month.  Do we know if B-Pod is

19    ready, Mr. Parrish?

20         MR. PARRISH:  Your Honor, that's what I mentioned

21    during my initial comments.  I don't really know.  I do know

22    from looking at a document that we got yesterday showing where

23    people are assigned who may be quarantine or have testing

24    status for COVID and so forth -- it was provided for a

25    different reason, but it reflected that inmates are now being

1    housed in Bravo 1, 2, and 4.  I didn't find anybody being

2    housed in 3.  Maybe there is somebody there, but I missed it.

3    And then I found seven people that were being housed in

4    booking.

5           So apparently Bravo is now open.  We've never received

6    any notice it was going to be reopened, how it was going to be

7    staffed, or whether all of the work was done.  I know the

8    primary work on the security doors done by CML was done some

9    time ago, but the County had a lot of other work to do, and I

10   can't answer that.  We're going to have to defer to the

11   sheriff's office for that answer.

12          MR. CHENG:  Your Honor --

13          THE COURT:  Who -- oh, I'm sorry, Mr. Cheng.

14          MR. CHENG:  Yes.  If I could interject here, there was

15   an all-parties conference just a few weeks ago to talk about

16   B-Pod.  At the time, our understanding was the sheriff's

17   department was trying to rush the opening of B-Pod.  Because

18   of the COVID situation and the need for quarantine housing,

19   they were trying to expedite some of the physical plant

20   improvements.  I think everyone recognized at the time that

21   these were not the complete remedies and improvements required

22   by the court orders, but there were sort of like interim

23   emergency steps being taken to try to get rid of the worst

24   issues in B-Pod and at least get it passably ready to get some

25   inmates into that unit.

1      I don't know exactly what the status of that was.  Our

2  understanding was it was fairly imminent, and so perhaps the

3  jail administrator or the folks from Benchmark and CDFL can

4  provide a little more detail of where exactly they are in

5  terms of B-Pod.

6      THE COURT:  Mr. Parrish, with respect to booking, you

7  indicated that there -- and that was an issue that has been

8  cited in previous reports, and even today you say that there

9  are about seven people who are being housed in the booking

10  area, I think.  Who are those people?  I mean -- and why are

11  they still being housed in booking?  Because I think that is

12  something that you said that the monitors have concluded

13  should not happen on an ongoing basis.  I think in the past

14  there were one or two people who might have been suffering

15  from some mental defect, I think, or maybe that person might

16  have been on suicide watch, as I recall, and that was one of

17  the excuses we heard that somebody was in booking.

18      Why do we have people housed in the booking area, if

19  you know, Mr. Parrish?

20      MR. PARRISH:  Your Honor, booking holding cells are

21  designed to hold people for no more than eight hours.  They

22  don't have a window; there's no recreation yard; they don't

23  have ready access to a telephone or visitation or anything.

24  That's not where somebody should be housed.

25      When we started the monitoring process, we found one

1    inmate who had been in a booking holding cell for three and a

2    half years.  That was one of our primary concerns was to try

3    and get that process ended, and over time it has stopped

4    briefly but then starts again, primarily because -- and the

5    reason it started was because locks didn't work in the housing

6    areas, in the pods, and so as Charlie was brought back online

7    and the locks were replaced and security was improved, we had

8    hope that using booking cells would stop for housing purposes.

9         Unfortunately, they've had problems with inmates

10   breaking windows out and without having enough individual

11   cells where they could isolate people, and so they've still

12   had to depend upon booking as an improper use of the booking

13   area.

14        The most recent reason people are in there is for

15   isolation for COVID, and that's the extra layer of

16   classification that I referred to which creates a huge problem

17   for the jail system, and now they have to be able to separate

18   people for an additional reason, not just because they're

19   codefendants or because they've got management issues or

20   something like that.  Now you also have because of COVID.

21        So they're looking at every little nook and cranny they

22   can throughout the jail system where they can isolate people

23   with regard to COVID.

24        MS. SIMPSON:  Your Honor, this is Lisa Simpson.

25        I think it might be helpful to hear from Major Bryan on

1    why people are being housed in booking.  I -- as Mr. Parrish

2    mentioned, I think it has changed over time, and in some cases

3    it's a very individual situation.  The monitoring team, of

4    course, doesn't think booking should be used for housing in

5    virtually any situation, but I think it would be helpful to

6    hear from Major Bryan on that.

7         THE COURT:  Major Bryan, do you wish to offer anything

8    in that regard?

9         MS. BRYAN:  Yes, sir, I would.  I'd like to begin by

10   saying that it goes against every jail philosophy I have to

11   ever house inmates in booking, and ultimately that is our

12   goal:  to have a policy that we adhere to to never house

13   inmates in booking.

14        For the last going on five weeks, we have conducted

15   weekly interdisciplinary team meetings where we gather medical

16   staff, mental health staff, classification staff, and the

17   discharge planner and myself, and we have weekly meetings to

18   discuss, inmate by inmate, all the inmates on the mental

19   health caseload, the seriously mentally ill, the suicide

20   watches, and all inmates housed for whatever reason in the

21   booking cells.

22        We evaluate every one of those inmates by the week to

23   see if it's possible to make some adjustments.  And right now,

24   sir, the best of the worst options I have are to have those

25   seven inmates in booking as of this time.

1          As we walk our way through better inmate behavior

2      management processes, as we walk our way through better staff

3      training on direct supervision, the inmates that are housed in

4      booking, because they are severe behavioral issues, the best

5      of the worst is to violate the stipulated order and house them

6      in there right now rather than move them on to the floor.  So

7      those are decisions that we make week by week.

8          We also evaluate those inmates to ensure that they have

9      as many of their programming needs met while they're in

10     booking as possible.

11         But right now that is the situation.  We are not

12     housing any inmates in there for COVID.

13         And speaking of COVID, we have been three days

14     facility-wide in RDC and the work center with no positive

15     COVID inmates, and we have a second wave of vaccinations

16     coming from the State next Friday.  We've had some holdup

17     problems getting vaccinations on-site from the State.  Once we

18     have a certain number of COVID-positive inmates, the State

19     declares us in outbreak status and they won't come with more

20     vaccines.  But we have an informed consent form that we

21     regularly circulate with inmates over and over and over again

22     in the hopes that they will agree to be vaccinated.  And our

23     vaccination rates have gone up tremendously, which I think may

24     indicate why we are in reasonably good stead with COVID right

25     now.

1        THE COURT:  Thank you.  That's helpful.  And on the

2   COVID issue, you indicated the vaccination rate is going up,

3   no positive COVID findings.  Does -- is there -- is there a

4   mask mandate there at the detention center for the employees

5   and staff?  Well, employees, staff, and prisoners?  I mean,

6   are detainees or people required to wear masks?

7        MS. BRYAN:  Yes, sir.  That --

8        THE COURT:  I'm sorry.  I ask that question because I

9   am aware that another local -- well, I am aware that the

10  Madison County detention facility does not require a mask of

11  its employees.  Do you-all at least require mask wearing?

12       MS. BRYAN:  Yes, sir.  That was the sheriff's policy,

13  that masks are required.

14       THE COURT:  Do we know what percentage, if any -- does

15  the detention facility keep track or -- of what percentage of

16  its employees are vaccinated, fully vaccinated?

17       MS. BRYAN:  Yes, sir.  We gathered that information

18  most recently -- I think it was last month and sent that to

19  the monitoring team.  We are currently -- our current process

20  is to keep track daily of all inmates in population and all

21  staff of their COVID status, whether they've tested positive,

22  whether they are symptomatic, where the inmates are housed, to

23  have that available for any interested parties, especially the

24  courts as inmates start to come back and forth through the

25  court system.  We want to make that information very available

1   to the justices to know the COVID status of the inmates coming

2   before them.  So we're tracking that daily for every single

3   inmate in the facility, sir, and again, we are approaching

4   inmates regularly weekly to see if they'll take a vaccination.

5        THE COURT:  Okay.  Now, that was the inmates.  I am

6   also concerned about the employees.  I assume there is not a

7   requirement that each employee must take a vaccination, but

8   does the -- does the sheriff's department know which of its

9   employees are vaccinated or unvaccinated?

10        MS. BRYAN:  So we're keeping track of the employees

11   that are vaccinated, but I'll defer the mandate to sheriff's

12   counsel.

13        MS. BARKER:  Your Honor, this is Claire Barker.

14        Yes, the sheriff's office does have a mandate that was

15   put in place by late Sheriff Vance that all employees get

16   fully vaccinated, and if they do not get fully vaccinated,

17   then they have the option of testing once a week and providing

18   that information to our human resources officer.

19        THE COURT:  Okay.  So does the sheriff, then, know the

20   percentage of its employees who are indeed vaccinated?

21        MS. BARKER:  I do not have that information right now,

22   Your Honor.  I would have to check with our human resources

23   officer to obtain that.

24        THE COURT:  Okay.

25        MR. GAYLOR:  Your Honor --

1          THE COURT:  And also would you know how many people are

2    being subjected to tests on a weekly basis?  I mean, because

3    that would suggest that they're not vaccinated, presumably.

4          MS. BARKER:  Right.  And I don't have that information

5    before me, Your Honor.  I can obtain that and get that to the

6    Court if you'd like.

7          THE COURT:  Okay.  I think Mr. Gaylor wanted -- I

8    think --

9          MR. GAYLOR:  Your Honor --

10         THE COURT:  Hold on.  I think Mr. Gaylor wanted to

11   speak.

12         MR. GAYLOR:  Yes, Your Honor.  I apologize for

13   interrupting, but if I may add, Hinds County implemented --

14   adopted a policy just about two meetings ago in which all of

15   the County employees are to be vaccinated and/or weekly

16   tested, and so it's something that's being implemented

17   county-wide, but it's obviously taking some time for all of

18   our employees to get acclimated to that mandate, and it's

19   something that all of our supervisors and administrators are

20   having some difficulty in getting their hands wrapped around

21   the process, so to speak.  But it is a mandate of the entire

22   county to get vaccinated or weekly tested.  So we're working

23   through that, Your Honor.

24         THE COURT:  Okay.  Thank you, Mr. Gaylor.

25         I think that's all the questions that I have of

1    Mr. Parrish's report.

2           Let me ask my court reporter how she's doing, if she

3    needs a break right now and -- which she may and -- and let me

4    see.

5           We're going to take a 15-minute break.  Just keep

6    yourself on the camera, keep yourself on mute, and we'll take

7    a 15-minute break.  We'll come back at 11:45 and then proceed.

8    I think Ms. Simpson wanted to go to Mr. Dudley, I believe, or

9    I'll just say Ms. Simpson can go however she pleases after

10   that point.

11          All right.  Thank you.  We are in recess.

12                  (A brief recess was taken.)

13          THE COURT:  All right.  Are we ready to resume?

14          MR. GAYLOR:  Yes, Your Honor.

15          THE COURT:  Okay.  Ms. Simpson?

16          MS. SIMPSON:  I think that we'll proceed with

17   Dr. Dudley.

18          THE COURT:  Okay.  Thank you.

19          MR. DUDLEY:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. DUDLEY:  I was going to highlight just three

22   things, two of which you've already had some discussion about,

23   so I should be relatively brief.

24          The first one is just adding a few comments on COVID.

25   As you know, the monitoring team has urged the County to

1     adhere to the CDC guidelines that were specifically designed

2     for jails and prisons, and they have now moved so much more in

3     that direction.

4          We've also encouraged -- recognizing that you can't

5     force detainees, but we've recommended a more rigorous

6     approach of repeatedly approaching detainees, educational

7     efforts, and there's even been some at least preliminary

8     discussion about incentives, and so all of that has been

9     helpful.

10          You've heard already about what's been done with regard

11     to employees.  And so there's been, I think, a lot of positive

12     efforts to contain COVID within the facility.

13          Vaccination rates among detainees is increasing, and

14     the percentage of detainees who have been tested has increased

15     as well, and so those are all good indicators.

16          You've also heard that there are challenges making sure

17     that the Department of Health continues to be on board doing

18     their part, but the big challenge being housing.  Even if

19     there were no other classification issues, figuring out how to

20     keep separate the various populations and subpopulations,

21     people who have been vaccinated, not vaccinated, tested, not

22     tested, tested positive, around somebody who tested positive,

23     new admissions, it's just dizzying to think of how you house

24     these various different populations given what you also know:

25     all the construction that's going on, the renovations, the

1    shortage of staff.  And so doing that in as thoughtful a way

2    as possible, of course, is a challenge.  But as I indicated,

3    you know, we've certainly seen progress and efforts to manage

4    and contain COVID.

5         The second issue that I was going to raise is this

6    issue of the review of deaths in the facility.  As Major Bryan

7    raised already, that there are these kind of tandem

8    investigations that are going on, whether they be medical or

9    IAD or whatever.  And I wanted to reemphasize that even if all

10   of those tandem investigations are done well, it's not really

11   enough.

12        Ultimately there has to be, as Major Bryan already

13   mentioned, an interdisciplinary review where all of these

14   people get together in the same room to really take a deep

15   dive into what happened, who knew what, who should have known

16   what, how it was communicated between medical and security,

17   and who did what they were supposed to do based on what they

18   knew, who might have done something different if they would

19   have had more information.

20        I mean, these are questions that go across the various

21   areas here involved, and it's only through an

22   interdisciplinary exchange and deep dive into what happened

23   that you can come up with some thoughts about corrective

24   actions that could be taken to avoid similar incidences in the

25   future, whether there's training issues or tweaking policies

1    or reemphasizing the need to follow existing policies or

2    whatever.  And so it's this full interdisciplinary review of

3    these deaths is what we're really looking for in addition to

4    the timely individual investigations that have already been

5    described.

6         The third issue that I wanted to raise is just kind of

7    an update on the mental health unit.  It's moving quickly.

8    The planning process is moving quickly.  The renovations are

9    moving at this point as well.  The -- yet there are still

10   things that need to be done before the unit can become

11   operational:  the final selection and training of security

12   staff for that unit; the finalization of a treatment menu that

13   would be used when developing individual treatment plans; and,

14   most importantly, also the need for -- the continued need for

15   some additional mental health staff to help staff that unit.

16        We're looking carefully at how this unit will become

17   operationalized as it relates to assuring that it's

18   operationalized in such a way that it's responsive to the

19   provisions of this agreement and also responsive to the fact

20   that many of the provisions of this unit -- provisions of this

21   agreement impact on each other.

22        So, for example, something as important as, you know,

23   what is going to be the admission criteria for this unit, we

24   envision that people who are noncompliant, resistant to

25   treatment would not be excluded from this unit, although maybe

1    in the outside world you would be looking for people who are

2    motivated for treatment.  That's not really the case here

3    because this unit is alternative housing for those seriously

4    mentally ill, so that means that the programming for the unit

5    has to be designed for that population as well.

6         For example, another example would be admitting people

7    to the unit with disciplinary charges.  Until we have a fully

8    operational policy and program whereby individuals brought up

9    on disciplinary charges are adequately evaluated to determine

10   whether their behavior is a result of their mental illness,

11   it's difficult to exclude individuals who are seriously

12   mentally ill who may have disciplinary charges from placement

13   on the unit.

14        So the finalization of these plans for the unit must

15   take into consideration the provisions of the agreement and

16   how the various different provisions of the agreement impact

17   on each other.

18        Finally with regard to the opening of the mental health

19   unit, as we kind of review incidences and medical records and

20   so forth, we're reminded of the fact that this mental health

21   unit will not serve the small female population despite the

22   fact that there are some seriously mentally ill women housed

23   at the facility, women going through substance withdrawal,

24   *et cetera*.  And so that although it's important that we open

25   the mental health unit, we also must simultaneously assure

1   that there's adequate programming for the female population

2   within the facility.

3        THE COURT:  Thank you, Mr. Dudley.  Let me ask you this

4   question about the mental health side of the thing:  Do we

5   know what number of detainees are awaiting to be seen or

6   evaluated by someone to determine whether or not they're

7   competent?  This has come up in another case of the Court with

8   respect to how inmates or detainees are being held across the

9   state in the local jail and facilities awaiting for beds or

10  other treatment facilities for assessment.

11       Do we know how many detainees currently are under some

12  order by the circuit judge to get a competency exam and are

13  awaiting to proceed with that particular order?

14       MR. DUDLEY:  We finally did get that information.

15  Unfortunately, it's not sitting in front of me right now.  But

16  we did get information on how many people were awaiting

17  competency exams, how many people were awaiting beds for

18  restoration of competency.  I just don't have the number in

19  front of me.

20       I think as I mentioned at the last status conference,

21  there was an effort to do some of those evaluations through

22  videoconferencing, identifying some people who actually didn't

23  need inpatient beds to have those evaluations done, and that

24  was having some positive impact on decreasing the number, but

25  there's still people who actually need to be in the state

1  hospital facility for their evaluations.

2       THE COURT:  Okay.  But that type of information is

3  something that you request and/or that you receive when you

4  are doing your particular assessment?

5       MR. DUDLEY:  Yes.

6       THE COURT:  Okay.  All right.  Ms. Simpson, I'll turn

7  to you.

8       MS. SIMPSON:  Thank you, Your Honor.

9       I will finish up the adult detention side with a few of

10  the more administrative-type issues, and I won't take long.

11      As I said in the beginning, the most intractable issues

12  have been staffing and maintenance of the facilities, and so I

13  think that's an important area.  Those are important areas to

14  focus in.

15      One thing I would report is that the develop of

16  policies and procedures has slowed down during this time of

17  transition, and I think it's in large part because of the

18  transition.  Major Bryan is very experienced in the

19  development of policies and procedures, and so I think the

20  process is changing to where she's much more involved in that

21  process, and I think the changing of the process has -- at

22  least during the transition, has slowed that process down a

23  little bit.  So -- and I think there's an effort to get that

24  back up and running, and once it is, with Major Bryan's

25  participation, I think we'll see a faster pace in pushing out

 1     these policies.

 2          One thing we haven't talked about, and Dave Parrish may

 3     want to talk about this a little bit more, is we've noted in

 4     the past that even when policies are adopted, that they don't

 5     always appear to be implemented and the supervision doesn't

 6     seem to sort of reinforce the following of the policies, and I

 7     think that's been a training issue.  There has not been a lot

 8     of inservice training, and part of that is due to COVID.

 9     Again, I think Major Bryan is looking at getting that up and

10     running again and is also looking at the content of the

11     training and whether it is sufficient to convey the material.

12          So those are areas where we hope to see improvement.

13     The development of policies and the training on those

14     policies, that hasn't happened yet, and we're hoping to see it

15     in the next several months.

16          On the positive note, the quality assurance reports

17     have been excellent.  There continues to be a problem with the

18     accuracy of the information in the quality assurance reports,

19     in large part because it's difficult to get accurate

20     information out of the JMS system, in part because of

21     limitations of the system and in part because of how

22     information is entered into the system.  So -- but the

23     analysis in the quality assurance reports has been very good,

24     and we certainly hope to see improvement in the accuracy of

25     the information, again, as training improves.

1          The incident reports, I would say in this recent

2     timeframe, actually appear to have perhaps gotten a little

3     worse as opposed to better, and I know there's recognition on

4     the part of the sheriff's office and the major that that's an

5     area in need of improvement.  It looks like even more in the

6     past, information is missing and potentially incident reports

7     aren't being completed on incidents where they should be.  So

8     that's an area hopefully that will get some focus as well.

9          One thing that came up in the 14th monitoring report

10    was the issue of fines and fees.  The settlement agreement

11    requires that nobody be held for fines and fees unless they

12    have had a hearing on whether or not there's an inability to

13    pay, and we've been finding the County in compliance with

14    that.  There have been mittimuses that had fines and fees, but

15    they were really not holding anybody specifically on those.

16         Unfortunately, in the last monitoring period that --

17    the trouble with that approach came home to roost in that

18    somebody who was being held on a new felony obtained an

19    unsecured bond, and so at that point the only thing holding

20    him in was a mittimus on fines and fees, and it took some time

21    to get that lifted so that he could go into a program that he

22    had been ordered to go in.

23         So it emphasizes the importance of actually dealing

24    with those mittimuses that are not compliant and taking care

25    of them even if the person is being held on another charge.

1    That other charge could go away and then they're just in on

2    fines and fees.

3         Grievances.  There was a change in the leadership on

4    the grievance area, and one of the things we observed and is

5    mentioned in the monitoring report is that quite a few

6    grievances were being denied as not a grievance when in fact

7    they were a grievance, and some of those in important areas,

8    such as people saying they were no longer -- they no longer

9    should be detained, that their court -- for whatever reason

10   their court work had completed and they were entitled to

11   release.

12        In the past that is often a way where we did find

13   people that were entitled to release, so it's important to

14   treat those as grievances and review them.

15        Records continues to improve.  That's an area that has

16   improved quite a bit since the beginning of monitoring, and it

17   appears that even more review is being done and more

18   documentation, so that's a great light area.

19        There are a number of requirements in the settlement

20   agreement and stipulated order regarding system issues on the

21   CJCC.  I'm looking forward to getting an update on that.  For

22   the past year, at least, it's been fairly nonfunctional, and

23   then more recently there was no chair, and I understand that

24   the County administrator is stepping in at least temporarily

25   as the chair and that a circuit court judge has agreed to be

1    the chair once it's back up and running.  So I don't have any

2    other update on that other than what I've just said, but we're

3    looking forward to getting an update at the time of the remote

4    site visit.

5         And similarly, the pretrial services director position,

6    our last information was that it was posted, but it's been

7    several months now without it being filled, so we're looking

8    forward to an update on that.

9         Just a few things, and this actually touches on some of

10   the areas of Dr. Dudley and Dave Parrish.  One of the things

11   I'm seeing in the incident reports is that the suicide

12   observation, at least in the reports, is stated to be

13   15-minute intervals as opposed to constant observation.  That

14   is not consistent with the policy that's been adopted and not

15   consistent with what should be done according to national

16   practices.  So we'll be looking to get an update on whether

17   that is in fact what's happening, but it is of some concern if

18   they're not doing constant supervision.

19        And with respect to facilities, one of the things we've

20   learned recently -- and we've talked with Major Bryan about

21   this so it's not a surprise.  In renovating B-Pod and starting

22   to occupy it, the command staff learned that the fire exit

23   doors in the housing units had been welded shut.  That

24   obviously is a fire safety hazard.  Apparently, replacing the

25   doors is -- can't be done quickly and is expensive we're told,

1    and so the interim plan is to put a padlock on the fire safety

2    doors, fire exit doors.

3           As an interim measure, that may be something that we

4    can live with if the housing units are constantly supervised.

5    Obviously to have the fire exit doors padlocked and no staff

6    in the unit would be a life safety risk.

7           So those are two things I wanted to bring to your

8    attention with respect to adult detention, and I think that's

9    it in my area.  Obviously there's more detail in the report

10   and will be more detail in the next report as well.

11          THE COURT:  All right.  Thank you, Ms. Simpson and

12   Mr. Dudley.

13          Who do you wish to defer to next, Ms. Simpson?

14          MS. SIMPSON:  I'm sorry, Your Honor.  Could you repeat

15   that?

16          THE COURT:  Who do you wish to speak next on your team?

17          MS. SIMPSON:  Thank you.  We would move to the juvenile

18   facility if you want to do that and with Jim Moeser.

19          THE COURT:  Okay.

20          MS. SIMPSON:  Okay.  Jim?

21          MR. MOESER:  All right.  Thank you, Lisa.

22          Thank you, Your Honor.  I can provide a relatively

23   brief update with some -- I think some positive and some

24   challenges remaining.

25          I think at the time of the last report, there were

1    around 25 youth charged as adults at Henley-Young.  I got the

2    roster for today, and that number is 18.  Most -- I think most

3    of the youth that have been released in the interim probably

4    were released because they turned 18 and went to probably the

5    adult facility, so that still remains an issue of moving cases

6    through the court system, but that is a much more manageable

7    number and will alleviate some of the immediate concern about

8    the population getting too large at Henley-Young overall.

9           However, of those 18, five of those youth have been

10   there a year or more, and there are two youth who have now

11   been there two years.

12          And not surprisingly, in review of incident reports

13   that were provided, many of the incident reports involve youth

14   (AUDIO GAP) on that long-term end.  A year, two years in

15   placement is simply too long for those youths to be going

16   nowhere, and so that still remains a concern in terms of

17   making sure cases are moving through the system.

18          There are an additional -- I think I counted six youth

19   who -- five or six youth who will turn 18 before the end of

20   2021, but I also am aware of sort of an increase in serious

21   crimes in Hinds County area, so hopefully that number can go

22   down, but, again, I want to raise the issue of case processing

23   and some of the challenges that the Court has had in moving

24   some of those cases through the system.

25          A key concern at the time of the last report and

1   continues to be is the staffing level.  The last report --

2   organization chart I had -- could find today -- I may have had

3   a more recent one with about 20 youth care professionals who

4   provide that direct supervision vacancies.  That's about

5   40 percent of the total.  That's a significant number.  It may

6   be down a little bit from prior reports, but in the interim,

7   there was a decision to reduce I think seven positions on the

8   budget to be able to transfer some of those funds to increase

9   the staff (sic) of the youth care professionals that were on

10  staff.

11       That has certainly been something that we've seen

12  consistently over the time of -- the low pay makes it very

13  difficult to retain staff, and I think Director Frazier made a

14  difficult decision, I'm sure, to help those staff who are on

15  board to get a little more money, but that's not a good

16  long-term solution, and the board certainly has to address

17  that longer term to provide a wage that attracts and helps

18  retain qualified staff.

19       There is a person on board now who is beginning to fill

20  that treatment coordinator role, Ms. Warfield, who does not

21  have necessarily the academic qualification or licensure that

22  was desired totally in the agreement but is a licensed mental

23  health person and has some additional community experience and

24  supervision experience that hopefully will bring some

25  leadership to the mental health team and help integrate mental

1    health services and the overall behavior management program.

2          We had a conversation -- both Anne Nelsen, who is the

3    monitor from the SPLC side, and I and Director Frazier had a

4    good conversation with Ms. Warfield earlier this week, and

5    we'll talk to her again next week, about sort of our hopes and

6    vision for that position, and she seems very eager to learn

7    from any information we can provide as well as sort of hit the

8    ground running in trying to identify some areas where she can

9    bring some additional coordination to mental health services

10   in the facility, and so that's a positive step forward.

11         We also will continue to talk about the need for a --

12   at least a consulting psychologist or contracted psychologist

13   in some way to provide and purchase additional consultation

14   assessment services as needed.  But I think it's early in her

15   tenure to necessarily define where that should go right yet,

16   but it will continue to be something we look at to try and

17   make sure there's a good range of mental health services

18   available for youth.

19         The education program has started again.  Obviously for

20   the fall term, I believe (AUDIO GAP) there's been a

21   conversation with Director Frazier.  They did attempt to get

22   all the youth involved in face-to-face classroom every day,

23   have experienced some problems, again, in which they had to

24   revert.  I don't know if it's temporarily or if it's still

25   going on.  We'll find out at our next call in a couple of

1    weeks.  Half -- some of the youth being -- receiving their
2    education on the units through work packets and other means
3    but not face-to-face direct instruction every day.
4         That's still the goal.  Mr. Caldwell, who is the
5    principal, and I had very positive conversations with in the
6    spring and was very optimistic and positive about bringing on
7    a couple different teachers for the fall, so I'll be anxious
8    to see and hear from him how that's going and how they can
9    eventually hopefully move to a more complete education program
10   going forward.
11        There have been a number of incidents, at least that
12   were reported, that we got through Mr. Green, immediate
13   notification reports, a fairly sizable number in July but half
14   as many in August and probably still catching up with some for
15   September, but, again, a series of incidents around sort of
16   fights among youth.  But I would say, again, the names that
17   most often appear in those are the kids that have been there a
18   long time and they're going nowhere and they're struggling
19   with still remaining there and nothing happening on the court
20   process as well.
21        There have been some COVID concerns.  Several staff
22   have been positive and remained off duty and/or quarantined in
23   some fashion.  I tried to find -- Director Frazier quickly
24   sent me an e-mail a couple weeks ago, which I couldn't find
25   for this call, but a couple youth also tested positive and

1   were being quarantined, I believe, and as a result of that,

2   taken much more proactive steps towards engage the health

3   department, have continued to offer and work towards trying to

4   get youth in the facility vaccinated to try and reduce any

5   potential spread among youth as well.

6        Director Frazier could respond to the specifics on the

7   current status but I think was fairly proactive in engaging

8   the health folks to say we need to consider this sort of a

9   hotspot given the confinement nature of the facility and the

10  age of the youth and numbers that had turned up positive in

11  some way.

12       The other programming, Ms. Baldwin had been off -- was

13  one of the people that was off duty with COVID concerns for a

14  while.  I think she's been back on now for a little while and

15  is beginning -- again, trying to implement some additional

16  programming, has been working with Ms. Nelsen to update a

17  behavior incentive point system in some fashion, and hopefully

18  be able to learn more about that at our October call, as well

19  to try and incentivize youth behavior, which I think still

20  continues to be a -- certainly still a work in progress of

21  trying to develop that system and fully engage the youth care

22  professionals in understanding the need for it and how to use

23  that kind of tool so it's not just a form to fill out or a

24  meaningless document but it really helps support some of their

25  behavioral aspects of the facility.

1        I think Ms. Baldwin, Ms. Warfield, Director Frazier are

2   working toward that end, and we'll look forward to seeing what

3   progress they can make now that they're all back on board and

4   healthy at this point.

5        I continue to be concerned about -- again, I continue

6   to be concerned about the number of staff.  Director Frazier

7   made some outreach efforts, some recruitment efforts to find

8   staff, and hopefully that will change, but it's certainly a

9   struggle to provide the level of supervision coverage if you

10  have 40 percent of the positions vacant.

11       And so that's where things are at now, and look forward

12  to the opportunity in a couple weeks to talk more about where

13  things are at.  Thank you.

14       THE COURT:  Thank you, Mr. Moeser.

15       Before we move on, I want to go back to a point just to

16  make sure that I heard everything correctly.  I think

17  Mr. Gaylor said that the -- and please correct me if I'm

18  wrong, that the County in a Board of Supervisors meeting a

19  couple of meetings ago, the County adopted a policy that all

20  of its employees would be vaccinated?  Is that what you said,

21  Mr. Gaylor?

22       MR. GAYLOR:  That's correct, Your Honor.  Vaccinated

23  and/or tested on a weekly basis.

24       THE COURT:  And/or tested on a weekly basis.  Okay.  So

25  one can either be vaccinated or subjected to a test on a

1   weekly basis?

2       MR. GAYLOR:  Yes, Your Honor.

3       THE COURT:  All right.  And it sounded like from

4   Ms. Barker's explanation of what's happening in the detention

5   center and in the sheriff's department that they have

6   implemented a similar policy, or I guess they implemented

7   their policy first and now they're adhering to the policy of

8   the County.  Because, Ms. Barker, you did say that everyone in

9   the sheriff's department is either fully vaccinated or being

10  tested on a weekly basis.

11      MS. BARKER:  That's correct, Your Honor.  Well, that's

12  the policy.  Like Attorney Gaylor said, we are still -- you

13  know the supervisors are trying to get a handle on how exactly

14  to keep up with that, but that is our policy, and I do know

15  that Major Bryan informed me that approximately 40 percent of

16  the inmates are vaccinated right now and 70 percent of our

17  detention officers are vaccinated.

18      THE COURT:  Okay.  But those -- that means 30 percent

19  are being tested on a weekly basis, then?

20      MS. BARKER:  That is the policy.

21      THE COURT:  Well, I hear what you're saying, but one of

22  the consistent things I've heard from Mr. Parrish and

23  Ms. Simpson is that we have these policies that are not being

24  enforced or either complied with, and we're going to talk

25  about that in some other areas.  So it makes no sense to have

1   a policy if it's not going to be enforced.  It makes no sense.

2       If you have detention officers who are around these

3   inmates -- there is no policy, for example, to force the

4   inmates to take a vaccination, but those detention officers

5   may have to bring or take those inmates to the courtrooms of

6   the local judges, and you mean to tell me that inmates and

7   detention officers, who may not have yet been tested because

8   nobody's adhering to the policy, goes into the courthouse and

9   put persons in the courthouse at risk because they're

10  unvaccinated, they're not being tested?

11      MS. BARKER:  No.  Your Honor, if inmates go to court,

12  they are being tested.

13      THE COURT:  But not the employee.

14      MS. BARKER:  The employees -- I do not have enough

15  information as to whether or not all of the employees are

16  being tested.  I know that Major Bryan is over her employees

17  in that area, and like I said, the policy is that they submit

18  to a test and submit it to human resources weekly.  Do I

19  represent to the Court that this may or may not be done

20  100 percent?  We don't know because it's a new policy, and

21  like Attorney Gaylor said, we're still trying to implement

22  that.

23      And on that note, Sheriff Crisler would like to address

24  the Court.

25      THE COURT:  Okay.  Good afternoon.

1          MR. CRISLER:  Good afternoon.  I had some audio issues

2     with my laptop, so I joined the attorney here.  And I'll

3     probably get an opportunity to make some more remarks later,

4     but specific to the topic we're talking about right now, I can

5     assure you as the sheriff that we are going to ensure Your

6     Honor that we do be vigilant and making sure each one of our

7     employees abide by the policies.  And as Attorney Barker said,

8     we have just recently adopted this policy, so we're putting

9     policies and procedures in place to ensure we can monitor this

10    and get 100 percent compliance, but this is a policy that we

11    take serious, and I just want to ensure the Court that we will

12    not only abide by the policy we created but the expectations

13    of the Court.  So I just wanted to make sure I went on record

14    to say that.

15          THE COURT:  Okay.  Well, the way my crazy mind thinks

16    and the way that I've been thinking about these things,

17    because, of course, we have inmates too who are currently

18    being housed for the most part in a place that is under no

19    rules and regulations with respect to vaccinations or even

20    mask wearing.

21          Correctional Officer A, who is not vaccinated, Hinds

22    County correctional officer is not vaccinated, he or she is

23    tested on a Monday.  That person tests negative.  That person

24    is in the community every day where we know the delta variant

25    is highly transmissible.  Monday, Tuesday, Wednesday,

1    Thursday.

2         Correctional Officer A is required to take Inmate B to

3    the Hinds County Circuit Court for a status conference on his

4    or her hearing.  Maybe not an initial appearance.  A motion

5    hearing, something, is required -- or maybe to go enter his

6    guilty plea.  Correctional Officer A transports Inmate B into

7    that courtroom.  That person has not been tested that day.

8    That person has not been tested Tuesday, Wednesday, or

9    Thursday.

10        That person could very well be positive at that point

11   with that inmate, who might not have been vaccinated because

12   you couldn't force him to, but that inmate might be tested

13   that Thursday morning before going to court on a rapid test,

14   or maybe he was tested the day before.  I don't know how y'all

15   do that with a specific inmate, if there's -- I assume you

16   don't do a swab.  I assume you do a temperature check and that

17   kind of stuff if the inmate has to go on that Thursday

18   morning.

19        But nothing assures the circuit judge or the circuit

20   court family over there that Correctional Officer A is free of

21   the virus.  That can be a potential problem, I think, with --

22   and for the sheriff or Hinds County to continue to say we have

23   a policy or if everyone -- we're trying to get a grip or

24   trying to encourage our supervisors to implement our policy, I

25   guess I've been sitting in this chair too long, because I feel

1    like when I sort of dictate something, it's done.  And I don't

2    mean dictate in the sense of being a dictator, but a policy --

3    I mean, we have to make sure that people are held accountable

4    for making sure that the policies and directives of the County

5    are adhered to.

6         If they're not, I suppose -- and we're going to hear

7    from DOJ, because they got time to talk today -- some steps

8    are going to have to be taken.  If Hinds County wants to be

9    entrusted with handling its correctional facilities, Hinds

10   County is going to have to be responsible.

11        JUDGE GREEN:  Judge Reeves.

12        THE COURT:  Yes.

13        JUDGE GREEN:  This is Judge Green.

14        THE COURT:  Yes, ma'am.

15        JUDGE GREEN:  May I have a word?  Let me be sure.  Is

16   it the representation that the detainees as well are being

17   tested when they're brought to court, all of them?  I just

18   want to be sure that I heard that correctly.

19        MR. GAYLOR:  No.

20        JUDGE GREEN:  Because I'm not sure that that's the

21   case.

22        MR. GAYLOR:  No.

23        JUDGE GREEN:  And I'm trying to find out if that is the

24   policy.

25        MR. CRISLER:  Judge Green, --

1          MR. GAYLOR:  No.

2          MR. CRISLER:  -- this is Sheriff Crisler.  That is the

3     policy.

4          JUDGE GREEN:  Okay.

5          MR. CRISLER:  And that is a policy that we will be

6     enforcing.

7          JUDGE GREEN:  I can't hear you.  I'm sorry.

8          MR. CRISLER:  I was saying, Judge Green, that is the

9     policy, and that is a policy that we will be enforcing.

10          And if I might with respect to Your Honor, Judge

11     Reeves, I do hear what you're saying, sir.  It is something

12     that we are taking very serious, and we are being vigilant on.

13     We have a lot of -- as you know, a lot of moving parts, and

14     when you -- I hate to put it this way.  When you have systems

15     that has a culture like we have adopted here, it takes a

16     little time to make sure that we are holding those employees

17     accountable when we put these policies in place, keeping in

18     mind that this has not been the standard in the previous

19     administration.  That's why we sit here before you right now.

20          So we're working tirelessly to ensure that we send a

21     strong message to the employees and everyone in the system

22     that we are taking this matter very seriously and people will

23     be held accountable if they are not adhering to the policy.  I

24     want to be very clear about that.  Thank you.

25          MR. GAYLOR:  And, Your Honor, if I may add, from the

1    County's perspective, again, the policy is that all of our

2    employees are vaccinated and/or tested weekly.  That's the

3    representation that we are making.  We're stating

4    affirmatively that that is where we are -- as a policy that's

5    where we're going.

6         We don't want to make any misrepresentations to the

7    Court that everybody has already adhered to the policy as it

8    is a new policy and it's something that our employees have to

9    get used to, the supervisors have to get used to, the judges,

10    administrators, everyone in the system has to get used to, a

11    new policy that was adopted only within a month.  So being

12    that this is a huge culture change, it's going to take a

13    minute for everyone to understand that this is in fact where

14    we're going.

15         And so I want to be clear that we are talking about

16    employees, Judge Green, as well.  We aren't making the

17    representation that all detainees are vaccinated.  I believe

18    the representation was made that 40 percent thus far have been

19    vaccinated, and we're certainly hoping through our educational

20    policies and educational processes and our directives that

21    that number will increase significantly.

22         DR. DUDLEY:  Your Honor?

23         JUDGE GREEN:  Like I said --

24         THE COURT:  Hold on.  Mr. Dudley?

25         JUDGE GREEN:  Let me clarify --

1          THE COURT:  Hold on.

2          JUDGE GREEN:  Let me clarify what my concern was.  This

3     is not the first time that we've dealt with COVID.  It's the

4     first time we've been dealing with the delta virus, but ever

5     since the delta virus has been in the jail, it has been the

6     concern of the judges that the detainees that were brought to

7     the courtroom, if they were brought, would certainly be

8     tested, that they would not be brought into the courtroom,

9     period, unless they had been tested for the virus.

10          And I'm not talking about taking the temperature.  The

11     temperature can be misleading and you'll end up with someone

12     in the courtroom.  For our July term, that has been a problem,

13     and basically some of the courts have shut down, and that

14     prohibits cases moving through the courts, not just so much

15     for the detainees and not so much for the workers being

16     tested, but once they hit the courthouse, our courthouse is

17     not just a courtroom.  It is a county building where people

18     who may be positive are then moving throughout the building.

19          Our courtrooms certainly are trying to abide by the

20     guidelines in terms of the people being apart, but the

21     qualification of 3 or 400 people on a Monday morning can

22     expose -- one person can expose that number of people to the

23     virus.  So it is going to be critical that everybody's tested

24     and that when we're talking about long-term hearings, that

25     there be some vaccinations.  And if you're not vaccinating,

1   then you're going to shut down the system where people cannot

2   come in and we've got to deal with a policy of whether indeed

3   the inmates are educated and that attorneys are involved in

4   whether they do get vaccinations if they're going to be in the

5   jail and there's going to be transport.

6        Essentially, last term we couldn't hardly move anybody

7   because everybody either was in quarantine or they had the

8   virus, and that wasn't just the detainees but that's staff as

9   well.  It was -- it was a mess.  That's all I can tell you.

10  And it went from about two people to seven to four people in a

11  matter of a week or so, and that's dangerous.  And in the

12  process, we lost the sheriff, but we also lost detainees.

13       So that's going to be crucial in order for the court to

14  move forward.  The chief justice has limited us in terms of

15  trials or allowed us not to do it.  A couple of judges

16  continue to try and have trials.  That's not my prerogative.

17  We do not bring in jurors in Hinds County and place them at

18  risk.  It is serious.  It is deadly to have a virus and think

19  that we can give people in certain positions choices.

20       We've never had this before, but it is deadly, and

21  extraordinary means and policies must be followed or people

22  can die, and nobody should be put at risk of dying simply

23  because people don't follow policies.  So that is a concern,

24  and I think that we're going to have to address it and address

25  it aggressively, because if they're not going to be testing

1    and it's a -- I need to know when it starts.  We're in a new

2    term, September to October, and I still don't know as the

3    senior judge whether there is testing or whether when someone

4    comes into the courthouse, whether they are deputies, whether

5    they are detention officers, whether they are detainees, I

6    can't tell and no other judge sitting in the circuit court can

7    tell whether we're at risk or whether we as judges are putting

8    others at risk.  But right now it's dangerous, and it's

9    dangerous for us all.

10            THE COURT:  Thank you, Judge Green.

11        Mr. Dudley, did you have anything you were saying, sir?

12            MR. DUDLEY:  I was just saying that your scenario

13   points to the fact that it's really not just one policy.  It's

14   about a combination of --

15            JUDGE GREEN:  Correct.

16            MR. DUDLEY:  -- policies that work together, like, you

17   know, continuing mandating the mask, *et cetera,* that requires

18   an adherence to all of those related policies becomes key.

19            THE COURT:  Okay.  Thank you.  Well, that's the point I

20   wanted to talk about with the policies, but I think now it's

21   time -- since I've heard the report from the monitors, I think

22   now is the opportunity to hear from the Department of Justice

23   and -- to hear from the Department of Justice, I think.

24   Obviously the sheriff's office and the County will have the

25   opportunity to respond.

1          I don't know how, in what order, the Department of

2    Justice might do its presentation, but one thing that the

3    Court has looked at, again, the synopsis, the report itself,

4    and also that portion of the report -- the chart which shows

5    the items in which the County has fully complied with

6    versus -- when I say "the County," and/or the sheriff's

7    department has fully complied with vis-à-vis those things that

8    they still have not complied with or have come into

9    substantial compliance with and how that might affect how the

10   Court ought to view the concerns of the Department of Justice.

11        But, Mr. Cheng, I'm assuming you'll be leading the

12   discussion on behalf of the Department of Justice.

13        MR. CHENG:  Yes, Your Honor.  I think I'll try to fill

14   in some of the blanks that -- I think the monitor has done

15   such a great job of covering the substantive, but there are a

16   few process issues and sort of overview issues I think the

17   Court should be aware of.

18        As an overview, the parties have been trying to address

19   some of these noncompliance problems.  DOJ sent a list of

20   priority deliverables on August 3rd.  At the time our feeling

21   was that we needed to narrow the issues a little bit to

22   identify things that could be done within about 30 to 90 days

23   and hopefully that would move the County towards compliance.

24        We were also responding to Ms. Bryan's request that

25   sort of we give them some of a heads-up as to what we really

1    thought needed to be addressed right away so she could work it

2    into her own action plan.

3         We provided those deliverables, which included specific

4    recommendations to improve pay and retention, address certain

5    physical plant items, and address COVID, which even at the

6    time of the monitor's report was starting to look like a

7    serious outbreak across the state of Mississippi and even in

8    the jail.

9         On August 3rd the parties held a teleconference and

10   discussed the COVID situation, and we explained our rationales

11   for the priority deliverables list.  As far as we know, the

12   County has not objected to anything on that list, and our

13   understanding is that the jail administrator has found it

14   helpful.  But then literally the next day, the sheriff passed

15   away; COVID broke out.

16        On August 9th the parties held another teleconference

17   and we followed up with more COVID questions.  We have had a

18   number of concerns for some time about the County's response

19   to some of our questions, that we ask questions that don't get

20   quite answered or can't be quite confirmed or answered kind of

21   vaguely.  Similar to saying, you know, we have a policy for

22   something.  Well, you know, like you said, Your Honor, who

23   knew what when?  What was actually done?  Some of the details

24   weren't always available.

25        So we sent out a detailed list of follow-up questions

1  on the COVID situation on August 23rd.  To Ms. Bryan's credit,

2  she did respond and provided a bunch of answers in an e-mail

3  that we received on September 8th.  Our understanding is the

4  board also issued ordered on employee vaccinations, which we

5  received on August 26th.

6       So I think it's fair to say that a lot of the things

7  that are being talked about even as reforms are, again, fairly

8  recent, but they are positive.  I mean, it's a good thing

9  they're being done, but unfortunately a lot of them sort of

10  postdate a very serious outbreak at the jail.

11       I want to go next into just sort of a broad overview of

12  sort of a pattern that we're seeing in the substantive issues.

13  And I don't know what's the best way to organize it, but let

14  me try first with the biggest one at the moment, which is the

15  COVID outbreak which appears to be out of control in

16  Mississippi.

17       This issue has been a serious risk for some time.  I

18  mean, we've been talking about it for months, and I think it

19  does outline how when recommendations are made by the CDC or

20  other experts, it's really important that the County deal with

21  them in a vigorous way and a detailed way right away.  There

22  was a certain lack of contingency planning on the COVID

23  situation.

24       I think it was -- without going too much into, you

25  know, who was infected when or where, because that's patient

1    privacy information, when COVID broke out in the jail, it

2    affected so many top officials and administrators all at once,

3    it really looked like something had broken down in terms of

4    the precautions.  While the County has represented for some

5    time that they have masks and they do testing, a failure like

6    that suggests that maybe things weren't really being

7    vigorously implemented or things weren't being taken as

8    seriously as they should be.

9         After the COVID outbreak, more problems erupted that,

10   again, suggested there was a real problem in the way the

11   County plans for emergencies.  Initially we had a lot of

12   trouble identifying who was actually in charge of the jail.

13   Now, I realize that, you know, nobody expected Sheriff Vance's

14   passing.  It really was sudden, and it was very tragic and a

15   shock to everyone here at DOJ as well.

16        The County was pretty good about appointing an interim

17   administrator, but at least in the first few days, it was not

18   at all clear if Ms. Bryan was running the jail.  We actually

19   asked a number of questions and got some very odd responses.

20   So we were trying to figure out, for example, if anyone had

21   investigated the COVID deaths, and some of the initial

22   responses suggested that one of the wardens had said that we

23   didn't need to investigate the death because everyone knew it

24   was COVID.  That would have been in violation of policy.  It

25   meant a warden was making a decision without the jail

1    administrator's concurrence.  There were -- just things like

2    that just raised a lot of questions for us.

3         We have spent the last couple weeks working with the

4    monitors and the defendants trying to clear some of that up.

5    At today's hearing we continue to hear some things that

6    trouble us.

7         Let me move from COVID to sort of the bigger-picture

8    issues; for example, the investigations.  It is appalling to

9    us that Ms. Bryan does not receive information from IAD.

10   We've known that this has been sort of a problem out there for

11   a while.  It was never really clear what was going on.  Even

12   as of a few weeks ago when we were dealing with the COVID

13   crisis and were pressing on the investigations as well, we

14   were sort of assured that investigations would be shared with

15   Ms. Bryan, but we're at the hearing today, Your Honor, and it

16   sounds like she's still not getting that information.

17        Likewise, there are a number of issues about the use of

18   booking, the mental health unit, the contraband, the reopening

19   of B-Pod and A-Pod.  You know, I don't need to repeat myself

20   or the monitors.  Your Honor, we've been talking about these

21   same issues for months, and we have given defendants every

22   opportunity to plan for these issues well in advance of these

23   hearings.  I would hope that when these hearings occur, they

24   would have a better answer for the Court and for DOJ.  You

25   know, what was the planning that was really being done to get

1   some of this stuff in place in the safest way possible?

2        Now, part of my job is to sort of be the enforcement

3   side of DOJ and to really press the defendants on this type of

4   issue.  We do recognize that they have had this sort of

5   unprecedented crisis.  We understand the issue with the

6   padlock fire doors is a, you know, bad solution to an even

7   worse problem.

8        I do want to make it clear, though, that DOJ has never

9   signed off on any of these sort of short-term terrible fixes.

10  You know, if anyone ever asks whether we've shown forbearance

11  towards the defendants and been patient with their problems, I

12  hope the Court will remember we have tried to take into

13  account their concerns.

14       What troubles us is that none of these problems are a

15  complete surprise.  The padlocked doors, problems with fire

16  safety, you know, weaknesses in the inspection process, we

17  brought these up in the last status conferences as well, and

18  we said to the County they really need to get some pieces in

19  place to deal with them.

20       I'll give you another example:  The retention issue,

21  The staffing issue, which has been such a huge problem.  In

22  our priority deliverables list, we actually listed a few very

23  specific things the board could do to try to address

24  retention.  We suggested that they adopt the last sheriff's

25  proposed step plan.  The salary ladder and an incentive

1     program to get people to stay, that's required by the

2     stipulated order and the consent decree, and, you know, even

3     though the sheriff's proposal wasn't ideal, it was a good

4     place to start.  As far as we know, the County hasn't actually

5     adopted it.

6          The investigations issue, I've mentioned that before.

7          Let me move on to sort of one of the biggest-picture

8     issues before I conclude, which is the criminal justice system

9     in general.  The CJCC was specifically included in the

10    settlement agreement so that they would have a forum to try to

11    take on a lot of the strategic planning and the big-picture

12    thinking needed so that they could get a better handle on the

13    broader community issues that affect the jail.

14         We made a very simple ask the last time I think we were

15    in front of this court.  We asked to observe a CJCC meeting,

16    but we still haven't received any such notice because

17    apparently there has still not been a CJCC meeting.  Now, the

18    board attorney has advised us that in practice members of the

19    CJCC have met to deal with the crises.  The district attorney,

20    the board members, the sheriff, they've had to deal with COVID

21    day in, day out.  They do meet and talk.

22         But this goes back to my broader point that there's a

23    certain lack of strategic planning and broader planning to

24    deal with problems.  Everything is an emergency crisis

25    meeting, and crisis meetings are not a substitute for sort of

1    the long-term plans and the organized way of fixing problems

2    that they need.

3         Now, DOJ can provide a priority list of deliverables,

4    but unless somebody does something with it in the County, you

5    know, we do fear that in a few months we're going to be back

6    where we are with another set of problems and, you know,

7    people just struggling to keep up with what they need to do.

8         The thing that's sort of positive is that Ms. Bryan, at

9    least, seems much more in tune with the monitoring team and

10   its priorities and understanding how reforms need to be

11   adopted.  But, again, Ms. Bryan is just one person.  There are

12   some big-picture pieces at the County level, the CJCC level,

13   the criminal justice level that need to be addressed.  The

14   least you would expect to see are regular meetings of the CJCC

15   or that there are similar mechanisms to the ones that have

16   been adopted by the jail administrator.

17        The jail administrator is having interdisciplinary team

18   meetings to talk about dealing with mental health cases.

19   Where is that type of regular meeting and process at the

20   County level between the sheriff's department and between the

21   board?  Who is actually in charge in the sheriff's department

22   for these types of big-picture policy issues?  And even if

23   they are doing these things, they need more transparency,

24   particularly in regards to providing agendas, action plans,

25   and other info that's been requested by DOJ and the monitors.

1      It really shouldn't take this long just to get a couple

2   investigations for deaths.  Even if you just want the interim

3   reports or at least want to ask the jail administrator what is

4   your first impression of what went wrong, in this jail it

5   takes months and months and months to get the most basic

6   information, and we're not sure why that's the case.  It seems

7   very unusual.  I don't think any of the experts or even

8   Ms. Bryan has ever seen anything quite like it.  It's not a

9   regular practice to withhold so much information from the jail

10  administrators.

11      I guess in conclusion I would just say that, again,

12  none of the problems we've talked about are a surprise.  We

13  flagged all of them at one time or another.  We've asked about

14  housing contingency plans in the event a COVID outbreak.

15  We've talked about what are they going to do if there's a

16  problem with their leadership because somebody gets infected?

17  We've talked about the need for testing and do they have

18  enough tests?

19      We get general answers at these hearings, but I think

20  it's become very, very clear the County needs to be able to

21  address these things in very specific ways with detailed

22  plans.  The board needs to commit specific funding and

23  resources for staffing.  It needs to decide how many staff is

24  it going to actually fund and at least approve in general

25  funding for the full-level staffing that's required.  We don't

1    expect them to be able to do everything right away or

2    implement everything right away.  But at the leadership level,

3    they need to be better prepared to handle issues before they

4    become crises.  If they don't, I think Your Honor is right

5    that DOJ definitely has to consider taking additional actions.

6         Thank you.

7         THE COURT:  Thank you, Mr. Cheng.

8         So, again, there are a number of concerns that the

9    Court heard today, and I think since this court has been

10   involved, I guess we're on the precipice of the third

11   administration, I think.  I think when I inherited the case,

12   Sheriff Mason was the sheriff, Sheriff Vance, now with interim

13   Sheriff Crisler.  And it remains to be seen if there will be a

14   change in the guard after the November elections.  And I say

15   "elections" because I'm assuming that there will be a runoff,

16   as I opened up with here.

17        But everyone has been aware of the problems since

18   before I got involved.  I guess there's been two different

19   board attorneys, and I know there have been a change in the

20   Board of Supervisors since I inherited the case.  But everyone

21   who becomes involved assures the Court and others that this

22   consent decree is a priority thing and that, you know, we will

23   seek to try to get from up -- out from up under the consent

24   decree.

25        But as is evident from this latest report; that is, the

1    14th report, I assume Ms. Simpson and her team is getting

2    ready to prepare the 15th report, and it will be quite

3    revealing, but I assume based on what I've heard today I

4    probably should not expect the 15th report to look

5    substantially different from this 14th report, which was no

6    real difference from the 13th report, *et cetera*, *et cetera*,

7    because I've got deaths in the prison -- in the detention

8    facility.  That is something that I have been adamant about to

9    the parties from day one that I never wanted to see.

10        I mean, people die of natural causes.  I know that.

11   But the deaths that we're having, the deaths that we have had

12   at this detention center, I'm not willing to presume that they

13   are by natural causes, and I won't be confident that they're

14   natural causes until these investigations have been completed.

15   And I'm not sure if at the end of the day one should be

16   satisfied with any investigation because we don't know what's

17   going on.  One of the things that I mentioned earlier is

18   whether or not anybody's statements have even been taken from

19   individuals during some of these investigations.

20        The problems are systemic.  The problems have long been

21   identified.  Some of the solutions have been offered and have

22   long been offered, but we are still at the point -- we are no

23   farther down the road than we were, again, when I got this

24   case I think in January 2019, and now we're almost to

25   January 2022, and there's no obvious information to me that

1    the County is equipped or that the County will be able to get

2    from up under the consent decree.  And at the rate that we're

3    going, the County, you know -- at the rate we're going.

4         We'll see what has to be done in the future.  I don't

5    want to presuppose any sort of judgment or any sort of

6    decision that I might have to make down the road, but I've

7    heard many of -- I've heard a lot of this stuff before, and I

8    suspect when we have the status conference in a few months on

9    the 15th report, we will be right back at this point, because

10   this feels to me exactly where we were in June.  And now I

11   know it becomes complicated with respect to the leadership

12   within the sheriff's department, but that's why you have to

13   have things in place and policies in place, procedures in

14   place, and that there has to be a commitment to honoring those

15   policies and procedures.

16        So I guess now that Mr. Cheng, DOJ, has had its

17   opportunity, obviously I must give the County an opportunity

18   to respond to any portion, all, none, of the monitor's report

19   and also give the sheriff the opportunity to respond as well.

20        Mr. Gaylor.

21        MR. GAYLOR:  Yes, Your Honor.  Just a couple of things

22   that I really want to submit to the Court in response to the

23   Department of Justice's contentions as well as the monitor's

24   contentions.

25        I think that it should be noted that our new jail

1    administrator has been in place for roughly a month.  Roughly

2    a month.  The monitor's report, everything that would have

3    taken place within that report would have taken place prior to

4    her coming on board.  And when I say "roughly a month," I mean

5    that she started in mid-July, and there was a COVID outbreak

6    that happened not very long after that, and so she's only been

7    in place really since, you know, second week of -- or first

8    week of August, so to speak.

9         I don't think it's fair for us to treat the obstacle of

10   COVID and the delta variant as if that is not an unprecedented

11   barrier to compliance.  Losing our sheriff the way we lost

12   him, losing other -- losing a detainee the way we lost him,

13   losing some of the other people that we have had in place, I

14   don't think that that is something that can be really swept

15   aside as if it's not something that's completely within our

16   control, because, as we've all observed, the delta variant is

17   something that is impacting us beyond just people that are

18   coming and going inside the detention centers.  We can catch

19   it at any time, at any place, anywhere, and so it's something

20   that we're trying to put contingencies in place for, but, you

21   know, it's not as if this is something that is very

22   precedented and very predictable, because it's not.

23        Those of us that have been vaccinated are still

24   catching the delta variant.  The sheriff had been vaccinated.

25   And so -- the jail administrator was vaccinated, our attorneys

1   have been vaccinated, and we're still catching the delta

2   variant.  And so we would submit that this is something that

3   we are trying to cope with.  We are putting measures in place.

4         THE COURT:  Well, let me just interrupt you right at

5   this point, and I apologize.

6         And, yes, COVID has been a different experience for us

7   all.  We thought we had gotten over that wave, and then the

8   delta variant came back, and a lot of that is because of how

9   we -- when I say "we," the American public, has reacted to

10  COVID-19 anyway.

11        But I hear you and I understand you, Mr. Gaylor.  But I

12  also heard you say we need time to implement our policy to

13  convert people who are under our authority, to persuade them,

14  to convert them, you know, old habits die hard or whatever I

15  heard.  I mean, we need time.

16        So if it's time that the County needs to implement the

17  policy that the Board of Supervisors adopted two meetings ago,

18  and that policy is that every County employee either is

19  vaccinated or is tested on a weekly basis, and I think I heard

20  you say that that was the policy that was adopted, and I've

21  heard you and I've heard Ms. Barker both say we need time.

22  And even Sheriff Crisler said we need time because this is

23  something new.  This is something different.  We have to

24  change the culture.

25        I'm just at a loss, because being vaccinated or not --

1    if you're going to be vaccinated, you go to Walmart, Walgreen,

2    Kroger, your doctor's office, your health department, other

3    stations.  It's readily available.  If you're going to be

4    tested, you designate a person -- how much time does the

5    County need, Mr. Gaylor, to make sure that the policy that the

6    Board of Supervisors adopted is implemented?

7         MR. GAYLOR:  Your Honor, with all due respect, I know

8    it's going to take more than two weeks.  We just implemented

9    this process a meeting ago, and it is something that you know

10   and everyone else would know that everybody is not going to be

11   happy about.  We know that there are court cases right now

12   coming before the Court challenging vaccine mandates, and we

13   have a policy that we're adopting and we're trying to

14   implement, and it's going to take a minute to get everybody up

15   to speed on that.  We have received --

16        THE COURT:  Is the County waiting to see if it's going

17   to be sued?  I mean --

18        MR. GAYLOR:  No, Your Honor.

19        THE COURT:  Because I understand you.  How much time

20   does the County need to enforce a policy that the Board of

21   Supervisors adopted?

22        MR. GAYLOR:  Your Honor, we've never said that it's not

23   being enforced.  It's being enforced as we speak.  But at the

24   same time, I don't want to make a representation to tell you

25   that everybody's buying in to it.  I can't give you the

1    representation that everybody has actually adhered to it.  But

2    it is a policy that is being enforced and has been enforced

3    since pen was put to paper on it.

4         THE COURT:  Has a memo gone out to the department

5    heads, for example, the people who are over County offices,

6    like the tax collector, the tax assessor --

7         MR. GAYLOR:  Absolutely.

8         THE COURT:  -- all of them, and say --

9         MR. GAYLOR:  Yes.

10         THE COURT:  -- you know -- okay.

11         MR. GAYLOR:  Yes, Your Honor.  Not only have they

12    received it, they've also received follow-up news articles

13    talking about the federal administration's enforcement of new

14    policies so that when they explain this policy to their

15    employees, they understand that this is something that's

16    coming down from D.C. as well so that they'll be more

17    compliant with the policy that is being put forward.  So

18    that's just one element of what we're talking about, Your

19    Honor.

20         In light of the fact that even though monitors have

21    expressed today that they're extremely pleased with what

22    they've seen with Major Bryan coming on board, obviously it's

23    going to take her some time to get all of her policies and

24    employees in the position that they need to be in as well.

25    That is something -- I would submit, Your Honor, that that is

1  a game changer, and it's not just me saying, but even the

2  monitor, Mr. Parrish, has stated that he's not encountered an

3  administrator as qualified as the one that we have just hired

4  over the last seven years of this consent decree being put in

5  place, so I would submit that that is, again, progress.

6       Now, you may not have seen much progress since June,

7  but I would submit that over a period of time, if our

8  administrator is given the opportunity and the County is given

9  the opportunity, you will see substantial changes.

10       Of course, I would also submit that the renovations in

11  C-Pod, the renovations that have taken place in B-Pod are also

12  changes and progress that has been made over the course of the

13  last year that is something that should be noted.

14       I believe that the sheriff's department and Major Bryan

15  can probably explain to the Court how it has implemented the

16  renovations within B-Pod more recently and how that was put in

17  place to address COVID as well.  But I don't think that it's

18  fair to submit to the Court, as DOJ has sort of alluded to,

19  that we have not had contingency plans in place, that we have

20  not had an administration in place to handle this problem.

21       With regard to the continuing concern that has been

22  expressed about CJCC not meeting on a regular basis, we've

23  consistently stated that under the consent decree the CJCC did

24  what it was supposed to do in putting together the

25  recommendations that it put together a very long time ago.

1        The Court and the consent decree does not have

2    jurisdiction over all of the people who would need to meet

3    within the CJCC, and that includes the mayor and the police

4    chief and some of the justice court judges and the district

5    attorney as well.

6        But even in light of that, it is clear that the

7    sheriff's department as well as the County as well as the

8    district attorney's office and judges have met routinely to

9    try and address the problems that we have with regard to the

10   criminal justice system.  We have done that on a relatively

11   regular basis, not just a random basis, but even with that, we

12   do have a CJCC meeting that is scheduled for next Friday, and

13   we will certainly get that information to the Department of

14   Justice so they can sit in or call in to be a part of that

15   meeting as well.

16       But that has been put in place because now the County

17   administrator is the interim chair of that committee, and as

18   the bylaws for that committee state, the County administrator

19   can be the chair of that meeting as well.  So we are

20   addressing a lot of things, Your Honor.

21       Now, we do not have control over MBI with regard to its

22   investigative process.  We don't have any control over the

23   State medical examiner, as that has been something that the

24   district attorney has expressed on a number of occasions and

25   has complained to the governor and lieutenant governor and

1    whoever else will hear him that the State medical examiner,

2    that department is a real barrier to getting investigations

3    done within this County.

4        And so we can't -- we don't have control over whether

5    or not they're going to do their jobs or how long it takes

6    them to get their jobs done, but that is a barrier to getting

7    the investigations completed as well.

8        THE COURT:  Has there been any conversation with MBI?

9    From what I heard Ms. Barker and what the others have said, we

10    don't know what's going on.  We don't know if they're

11    investigating.  We allude to the fact that, yes, there's a

12    backlog in the area of medical examiners, but have you been

13    told that that's the reason?  No.  That's not what I heard,

14    that that was the specific reason or that's the specific

15    status or that's what's going on with either the CID, the AID,

16    or the MBI investigation.  We don't know.  We're speculating

17    at this point.

18        I got five deaths.  One is early back in April, maybe

19    even before then.  Don't know the status.  Don't know if the

20    detention facility needs to be tweaking its policies or doing

21    anything differently because of the way something happened.

22    Don't know if there -- what -- even so, the jail administrator

23    has been blocked out of receiving any information about

24    anything with respect to people who have to report to her or

25    people who are within her custody.  That's problematic.

 1          I mean, I understand -- yes, I read the papers.  Yes, I

 2     see the news.  Yes, I'm aware of cases having to be continued

 3     and stayed because we don't have a medical examiner's report.

 4     But that does not stop people from doing an investigation.

 5     JPD is called out to the scene.  They do the investigation, I

 6     imagine.  They don't stop the investigation because they know

 7     that it might be two years before they get the autopsy results

 8     back.  I think they go forward with the investigation.

 9          So my problem is, yes, those are all points, and

10     they're well said and well documented.  But we don't know what

11     the status of any of these five deaths is, because either

12     we've not been told or we've not asked.

13          MR. GAYLOR:  So before I let the -- we'll defer to the

14     sheriff's department with regard to the investigation as well

15     as the administrator's ability to access files.  Do you want

16     us to address the renovations from the County's standpoint

17     before the sheriff's department weighs in, or do you want --

18          THE COURT:  Thank you.  Yeah.  You need to take that

19     up, because I know you've got Benchmark and the Farr group

20     here on your pay -- on your dime.  And they've been here since

21     the beginning, so I appreciate that.  They did need to be here

22     because there's some things with the facility itself that we

23     were assured at the last status conference, I think, that they

24     would be done by now, I think.  So yes, Mr. Gaylor, I would be

25     very much interested in hearing from them through you or from

1    them, however you wish that they chime in.

2         MR. GAYLOR:  I would like for Mr. Marsh to start the

3    process if he's still on the line.  I believe he is.

4         Mr. Marsh, can you hit unmute?  There you go.

5         THE COURT:  You're still muted.  Let me see.  It may be

6    something technical that we may have to fix on our end.

7         Are you unmuted, sir?

8         MR. GAYLOR:  I'm seeing that he's unmuted.  I just

9    can't hear him.

10         How about Mr. Farr?  Is Mr. Farr still on or

11   Mr. Chamblee?

12         MR. FARR:  Yes.  Attorney Gaylor, this is Rob Farr.

13         MR. GAYLOR:  There we go.

14         MR. FARR:  Okay.  We're in.  Gary Chamblee needs to

15   join in.

16         Gary, are you live?

17         MR. CHAMBLEE:  Yes, sir.

18         MR. FARR:  Okay.  All right.  So great progress has

19   been made in C-Pod, but -- and B-Pod as we move forward.

20   C-Pod is operational.  Gary is on the day-to-day activities of

21   trying to complete the renovation.  We've taken extraordinary

22   actions to get occupancy in the COVID response, which has

23   indeed been a stellar effort from all of the subcontractors

24   working in C.

25         Gary, do you want to outline for the judge our current

1    status?

2          MR. CHAMBLEE:  Yes, sir.  We're very close to finishing

3    everything in the B-Pod.  We had to do some temporary repairs,

4    such as the padlocks on the exit doors, but we hope to have

5    those repaired properly here soon.  We've finished the

6    windows, but we're very close to being through with B-Pod

7    alone.  We've got some other things to do in the rest of the

8    facility, but as far as B-Pod, we're close.

9          MR. FARR:  We've been focused on getting B-Pod

10   operational and completed.  I would say that we have made it

11   operational, but there are still some items, as we've already

12   discussed in the call, on the fire safety side that we've

13   taken some unfortunate but best of the worst approaches to

14   address in the short term.  That is ongoing, and we are

15   focused on completing that.

16         One of the commentary from the -- from Ms. Simpson

17   about the camera operations, that's an ongoing effort to bring

18   the cameras back online and get them where they're functioning

19   properly in the RDC, and I know Gary has been on top of that.

20   Some of it is equipment deliveries and some of it is just

21   getting the interconnection between the units properly working

22   again.

23         Gary, you want to touch on that?

24         MR. CHAMBLEE:  Yes, sir.  Hopefully by the end of next

25   week, we'll have all the workstations installed so we can

1  properly upgrade the servers and be able to see what cameras

2  are actually working and what cameras need to be replaced.

3  But I've been told by the staff that that will be completed by

4  the end of next week.

5       MR. FARR:  Thank you, Gary.

6       We have a projection of our last items in B-Pod that

7  can get us completely out and allow the sheriffs or the jail

8  administrator's team to occupy it?

9       MR. CHAMBLEE:  That's correct.  Yes, sir.  We made some

10 temporary repairs, not ideal repairs but just some temporary

11 repairs, such as the padlocks on the exit doors, just so they

12 could put some quarantined inmates in B-Pod.  They only had B2

13 and B4 occupied up until -- we were installing some windows --

14 view windows in the doors.  They in the last couple of days

15 moved some people out of 2 and 4 into 3 and 1 so that we could

16 do those, and we finished that.  We finished that yesterday, I

17 believe.

18       MR. FARR:  Okay.  Thank you.

19       We're working on a projection about the total

20 completion of B-Pod.  The biggest long-term lead item we have

21 is the replacement of fire doors and get rid of these

22 padlocks.  That's a material problem that we are in process of

23 completing.  And the County's been very supportive in

24 providing funds to accommodate these emergency activities and

25 to move forward expeditiously with it.

1        Gary, any summary update that we should provide the

2   judge?

3        MR. CHAMBLEE:  No, sir.  We're working on the fire

4   alarm system, we're working on the camera situation, and we

5   hope to get those completed soon.  I'm still waiting on

6   durations for material to come in on some of the items.

7        MR. FARR:  Thank you.  Thank you, Mr. Chamblee.

8        Judge, we can try to fill in any of the blanks for you,

9   but that's a summary of the current reconstruction of the

10  B-Pod and the general systems in the RDC.

11       Mr. Chamblee did mention the replacement and upgrading

12  of the overall fire detection system, and that is ongoing.

13  It's a process that has taken quite a bit of energy to retrace

14  the system's infrastructure so that we can keep it functioning

15  properly and get it back to a sustained and acceptable level.

16       THE COURT:  In looking at the available -- in looking

17  at the chart that has been made available to the Court, fire

18  hoses have been installed in the C-Pod, I think, but have not

19  been reinstalled in the other pods.  So we still got pods that

20  house prisoners and there are no fire hoses there?

21       I see Mr. Chamblee raising his hand.

22       MR. CHAMBLEE:  Yes, sir.  Yes, Your Honor.  The fire

23  suppression system as originally installed has not been

24  functioning.  The fire sprinkler -- what I'm calling the fire

25  suppression system is the fire hoses.  The only thing that's

1   not working is the fire alarm system, which they're still on

2   24-hour watch, fire watch.

3          THE COURT:  Okay.  So the suppression system itself

4   works, whatever systems are there to suppress a fire.

5          MR. CHAMBLEE:  Correct, Your Honor.

6          MR. FARR:  Yes, Your Honor.  That is correct.  And

7   we're making excellent progress on reconstructing the fire

8   alarm system throughout the whole facility.

9          THE COURT:  Okay.  Is there anything else you-all wish

10  to tell me about the renovation project, any renovation or

11  any -- I guess you're here to tell me -- I don't know if

12  you're the ones to tell me, but I guess all the jail locks,

13  doors, swing doors, all of that is now working?

14         MR. CHAMBLEE:  Your Honor, anytime you have an

15  electromechanical device, you're always subject to devices

16  failing.  We do have some proposals that we will be submitting

17  to do some maintenance on those devices.  It's not just in

18  B-Pod, but it's staggered throughout the facility.

19         MR. FARR:  Mr. Chamblee, this is Rob Farr again.

20         Judge, the replacement work that was in the stipulated

21  order has been completed with all of the locks and swing doors

22  and sliders and all the change-out.  We are having some

23  operational issues with each -- with some, very few but with

24  some, of the units that have been reconstructed, so that's

25  what Mr. Chamblee is referencing.  We're keeping them

1    operating and keeping them working.

2         We do have periodic failures of the devices, and we're

3    running those down.  We're also working on some of the doors

4    that were not originally outlined in the stipulated order,

5    bring those into operational security.

6         Would that be fair, Gary?

7         MR. CHAMBLEE:  Yes, sir.

8         THE COURT:  Okay.  Thank you.  Anything else with

9    respect to the facilities?

10        MR. CHAMBLEE:  I would like to mention that at

11   Henley-Young we have got the control board installed, and

12   everything's functioning there.

13        THE COURT:  Okay.  Thank you, Mr. Chamblee.

14        Mr. Gaylor?

15        MR. GAYLOR:  So, Your Honor, I would submit that based

16   on what you've just heard from our construction team, that we

17   are making significant progress with regard to renovations and

18   repairs and maintenance at all of our detention facilities.

19   We're not saying that everything's perfect at this time, but

20   we are certainly working very diligently to address the -- not

21   only the needs of the stipulated order and consent decree but

22   just in general with regard to repair and maintenance.

23        You've also heard from one of your monitors with regard

24   to the youth detention center, Henley-Young, that progress has

25   been made with staffing.  If you have additional questions for

1    Mr. Fernandez Frazier, he's on the line as well.  He may have

2    something that he wants to mention to the Court with regard to

3    progress that's being made out there.

4         But we also have been communicating with psychologists

5    with Hinds Behavioral Health and are putting that in place as

6    well as -- so that we can have another psychologist or another

7    mental health professional talking with our youth detainees as

8    well as our adult detainees.

9         Additionally, I think the sheriff's office and the

10   administrator -- jail administrator will speak to the progress

11   that is being made with regard to our medical contract

12   presently currently with QCHC.  But we're receiving a lot of

13   progress with regard to the staffing our medical staff for our

14   detention facilities.

15        Mr. Frazier, is there -- would you like to address the

16   Court?

17        MR. FRAZIER:  Just as you said, Attorney Gaylor, in

18   reference to Henley-Young, we've made some significant

19   advancements in regards to the overall staffing itself.  We'll

20   continue to be engaged and actively to hire.  The complement

21   of staff that we have here, we've been able to have a positive

22   effect on the overall day-to-day operation of the facility.

23        We have made some advancements with the assistance of

24   both Ms. Nelsen as well as Mr. Moeser and -- as we continue to

25   collaborate in regards to meeting the daily needs when it

comes to the mental health aspects of the youth that are here.
We have some challenges, but I know that over the last few
months we've actually had a positive impact in meeting those
challenges with those youth.

Just as identified, we were able to bring on Ms. Carol
Warfield, who is a leading mental health expert in the field
of child care and child development in the field mental health
itself.  She has a stellar background, and with the support of
the monitors, both Mrs. Nelsen and Mr. Moeser, we found it to
be a very viable fit.

We did have -- we recently had a collaboration meeting
to go over some things that we were looking to modify,
long-term goals that we're looking to -- a system that we put
in place at Henley-Young.  So with that, we plan to continue
to collaborate.  We have it set up, established now, where we
converse with her -- with them at least every -- no less than
a biweekly conference meeting with her assistance and just
overall structure of the mental health program for
Henley-Young itself.

So with that being said, I think that we'll see some
significant strides and continue to see improvements here at
Henley-Young.

I want to say thank you to the County supervisor,
because we have now had some facility maintenance issues
addressed with -- that are impacting and imperative in this

1    facility; i.e., the -- the control boards.  We've been working

2    with that.  That is now in place, which has been a very, very

3    positive -- has had a very positive impact on the overall

4    physical plant operation.  We continue to make strides and

5    address the issues from the standpoint of being a good steward

6    for the community and to work in the best interest of the

7    youth that are housed here.

8         THE COURT:  Thank you, Mr. Frazier.  I did not have any

9    specific questions from that area with respect to what's been

10   going on over there, so for the -- I guess for the benefit of

11   the parties and the -- I guess -- the Court did make a visit

12   over there to Henley-Young several weeks ago, I think back

13   in -- a few weeks ago, back in August, and got a chance to see

14   some things and talk to people over there, observe some

15   things.  So I did not have any questions about what's going on

16   over there from that meeting.

17        So, Mr. Gaylor, I believe you suggested that the

18   sheriff and -- the sheriff's counsel or the sheriff ought to

19   speak up on some things that they wish to.

20        MR. GAYLOR:  Yes, Your Honor.  I'm going to let them --

21   Ms. Barker and the sheriff and Major Bryan address some of the

22   other concerns with regard to the sheriff's department as well

23   as some of the progress that we've been making.

24        THE COURT:  Okay.

25        MS. BARKER:  Good afternoon.

1        THE COURT:  Good afternoon, Ms. Barker.

2        MS. BARKER:  I want to first address the issue of Major

3   Bryan having access to the internal affairs files.  Your

4   Honor, we became aware that that was a problem last week, we

5   are actually as we speak drafting a directive that allows her

6   complete access to those internal affairs files so that she

7   can participate and see if there is any problems and what type

8   of corrective measures need to be made from a policy

9   standpoint, and I want to make that abundantly clear.  If

10  Major Bryan needs access and this will help the process,

11  absolutely.  We are fixing that.

12        Additionally, Your Honor, Attorney Gaylor touched on

13  this, but I feel like it needs to be reiterated.  It is

14  incredibly unfair for the Department of Justice and the Court

15  to judge what's been happening in the sheriff's department

16  based on this last month and a half between the time that the

17  14th monitoring report came out, which, mind you, Major Bryan

18  was not on the ground at that time, and what's precipitated

19  between that time and this time.

20        Your Honor, it has been trying, to say the least, and

21  for the Court and for the Department of Justice to allege that

22  the sheriff's department doesn't have any policies in place or

23  anything to help the situation is entirely unfair.  Major

24  Bryan got here and she has been -- and the monitors and the

25  Department of Justice have acknowledged that for the first

1   time since this consent decree, we actually have a jail

2   administrator that is equipped to handle the problems and the

3   challenges that RDC and the criminal justice system of Hinds

4   County present.

5        Major Bryan got here mid-June, the very end of June.

6   She wasn't on board but yet a week and the entire command

7   staff, including myself, got COVID.  One of our officers was

8   in the hospital, and the sheriff died.  That has had a major

9   impact on the way that we have -- or the amount of things that

10  we've been able to accomplish.  We are mourning here at the

11  sheriff's department, and we're trying to sort things out.

12       Interim Sheriff Crisler has come on board and has done

13  an amazing job grasping these in-depth issues and has been

14  working with Major Bryan since she's been able to actually

15  have boots on the ground here.  And I want to commend her on

16  the amazing accomplishments that we've gotten in such a short

17  time, which I don't know that the Department of Justice fully

18  grasps.  I do know that our monitors are grasping it, because

19  they've had an open dialogue with her that I feel wasn't --

20  that they did not have with any of the past administrators,

21  and they've noted that she does get this.  She understands

22  policy and the big picture that the Department of Justice

23  keeps alluding to, and the fact that she has gotten anything

24  done is -- should be commended.

25       Additionally, yesterday the board gave 5 percent raises

1  to all the detention officers, and that has been something

2  that has been holding back our recruiting and retention

3  efforts.

4      THE COURT:  Okay, then.  So, Ms. Barker, hold on.  I

5  don't suggest you ought to be sounding defensive or attacking

6  DOJ or the Court, but the 5 percent raise, for example, why

7  couldn't that have been done a year ago, six months ago, five

8  months ago, three months ago, two months ago?  My point is at

9  the end of the day, it sounds like we're going to get this

10  next plea:  Give us more time.  And if I give you more time,

11  how much more time does the sheriff's department want?  If I'm

12  willing to give you more time, how much more time do you want?

13      I understand the major over the detention center was

14  just getting her toes wet.  How much time does it take to take

15  off these noes on this chart with respect to substantial

16  compliance, full compliance, no compliance?  How much time --

17  how much more time?  Because this has been pre-COVID, during

18  COVID, post-COVID, delta variant, and now, as you said, during

19  this mourning/grieving process.

20      So how much time does the sheriff's department need?

21      MR. CRISLER:  Judge, let me give my staff member an

22  opportunity to speak.

23      THE COURT:  We can't understand you, Sheriff Crisler.

24      MR. CRISLER:  Am I clear now?

25      THE COURT:  You're a little bit better.

1        MR. CRISLER:  Okay.  I was just making mention to y'all

2    that I would like for Major Bryan to have an opportunity to

3    address some of these issues, and I'll follow her up to see if

4    I can put you at ease in certain answers to your questions.

5    Is that okay?

6        THE COURT:  That's fine.

7        MR. CRISLER:  Thank you.

8        THE COURT:  Major Bryan, you may come forward in any

9    way you wish.

10       MS. BRYAN:  I don't mean to be obtuse.  I'm not real

11   clear on what I'm expected to address at this point.

12       THE COURT:  Well, I'll let Ms. Barker finish her set,

13   because I did cut across Ms. Barker, and I apologize for that.

14   So I'll allow Ms. Barker to finish her points.

15       MS. BARKER:  Your Honor, I understand the Court's

16   frustrations.  I share them.  It is not a good place to be

17   before the Court for the last six years and trying to explain

18   why things have not been done.  However, I can say to this

19   court that this is the first time we have had an actual jail

20   administrator with the focus on being an administrator.  I

21   believe that the fact that she has been here, has recovered

22   from COVID, has had a sheriff die, and has started to get

23   major policies in place, a medical contract in place, and has

24   started to try to implement more of a direct-supervision

25   concept with the jail in these four weeks that she has been

1   here is -- should be commended, and, you know, the fact that

2   the Court and the Department of Justice is saying oh, wait,

3   hold, on now Hinds County needs to have not control over the

4   jail, I think it is incredibly unfair.

5        And the Court asked how much time we need.  I don't

6   know.  I can't answer the Court on that.  But I do think that

7   the Court needs to have -- and the Department of Justice needs

8   to be able to hear from Major Bryan.  She brings an incredible

9   amount of knowledge and experience to this position, and I

10  think that she deserves a chance to be heard on this.

11       And I would ask Major Bryan just to briefly explain to

12  the Court just some of the top priorities that you have hit on

13  over the past couple of weeks that she's actually been in the

14  office and at the jail and not sick and just to explain to the

15  Court how we are actually getting some traction on some major

16  issues that are big-picture issues that can propel the

17  sheriff's department forward on this matter.

18       Major Bryan.

19       MS. BRYAN:  Your Honor, if I may, there have been some

20  areas of significant progress, in my opinion.  The medical

21  contract has -- I worked with the County attorney to

22  renegotiate the medical contract to increase the services with

23  a focus on cost containment.

24       We have proposed adding a mental health nurse

25  practitioner -- an additional mental health nurse

1  practitioner, an additional medical nurse practitioner, and an

2  additional mental health provider to staff the mental health

3  unit.  To that end, we have been meeting monthly.  The mental

4  health unit planning committee has been productively meeting

5  monthly to get that ready for occupancy.

6      We have a platform of mental health training being

7  delivered by one of the most credentialed instructors I've

8  ever had the privilege in my career to know.  It's a

9  three-part series.  We've identified 25 staff and the medical

10 practitioners to be involved in that training to staff the

11 mental health unit.  That is going very well, in my

12 estimation.

13     Policies are -- as Ms. Simpson referenced, policies are

14 being produced.  The person in charge of writing policies has

15 relocated her office next to me so we can be more productive

16 day to day.

17     Mr. Parrish has been an enormous help with the staffing

18 analysis, so that is progressing.

19     I'm reluctant to repeat anything that's been said

20 prior, but there are some areas within the jail that are

21 improving.

22     There is an inordinate amount of work to do, and it is

23 daunting.  It cannot be done by me in a vacuum.  I need

24 regular, regular substantial interaction with the sheriff's

25 office, with the County to support this.  If that effort is

1  front-loaded, if I get that at the front end, then in a

2  relatively short period of time, short maybe even by the

3  Court's estimation, we could be more much progressed than we

4  are now.

5       Sheriff Crisler in his very brief interim has expressed

6  some sincere intent to put the jail at the forefront of his

7  priority list.  It's early days, and yet I'm still hopeful

8  that we are assembling with the interim sheriff a tremendous

9  team with the ingredients we need to succeed.

10      And if there's anything else you'd like me to add, I'd

11 be glad to add them.

12      THE COURT:  Okay.  Thank you, Major Bryan.

13      Is there anything else that the sheriff's department

14 would like to say?  And I saw Mr. Moeser's hand.

15      MS. BARKER:  Your Honor, the sheriff would like to

16 address the Court.

17      THE COURT:  Okay.

18      MR. CRISLER:  Your Honor, I just wanted to say I

19 appreciate this opportunity.  I know on the front end I wasn't

20 able to introduce myself to the participants on this Zoom.  I

21 had some audio problems.

22      Let me just say this real quickly:  For those that

23 don't know me, my name is Marshand Crisler, and I do bring a

24 wealth of knowledge to this office.  I actually spent 20-plus

25 years in this very office under the leadership of Sheriff

1    Malcolm E. McMillin.  I am a law enforcement officer by trade,

2    but here's what I think the Court and everyone else needs to

3    take away from this.

4         I understand the role of the Hinds County Sheriff's

5    Department.  Its number one priority is and always will be the

6    detention center.  That experience I bring in working in every

7    aspect of this department better prepares me to be able to

8    deal with the situation at hand.  But let me tell you this,

9    Your Honor, and everybody listening:  I've only been here four

10   weeks, and I don't make any excuses.  I have done my utmost to

11   spend every waking hour to understand everything that has to

12   do with this consent decree and all of the requirements that

13   go along with it and trying to meet the needs.

14        I've taken copious notes today to try to address some

15   of the issues that the Court has with some of the integral

16   things.  But, you know, I'm not only a practitioner when it

17   comes to policy, I'm an academia.  My graduate degree is in

18   public policy administration, so I do understand and

19   appreciate policy.  And that is what we're putting in place

20   right now.  You mentioned earlier, Your Honor, about the

21   concern, and I think DOJ and others, Mr. Parrish, too, made a

22   note about the issue with IAD.

23        As my attorney just mentioned, I just learned that our

24   jail administrator did not have access to IAD files, so I made

25   an executive decision last week to get that document to her in

1   an executive order that will allow her to do that.

2        When I first took over this role, Your Honor, the jail

3   administrator was under my undersheriff.  The day I swore in,

4   I cut an executive order and put the jail administrator

5   underneath me, where it belong, and so I am adjusting to some

6   of the things that had not occurred prior to the four weeks of

7   me being in office.

8        So I would ask the Court to give some deference in

9   knowing that both myself and my jail administrator have been

10  here a month, and we have done, I think, a yeoman's job to

11  address a lot of these issues that haven't been addressed in

12  ten years, quite frankly, it looks like.

13       So the death investigation is something I'm concerned

14  with as well, Your Honor.  Our major investigator commander,

15  which is Commander Tyree Irving, has been in contact with MBI.

16  I don't have any reports in front of me or what that looks

17  like, but I can assure you next time we have this meeting,

18  I'll have some documentation and I'll have a report to report

19  to these courts -- to the Court, rather.

20       There is a lot going on right now.  One of the things I

21  take pride in -- you had asked about why didn't they do it

22  five years about getting these raises to the detention

23  officers, and, Your Honor, the best answer I can give you is

24  clearly it wasn't a priority, but it was for me.  So

25  yesterday, as we sat with the board, they were going to be

1    settling for a 2 percent raise, and I made it very clear, and

2    the president of the board was very accommodating, we got them

3    a 5 percent raise.  So I did that because I understand the

4    value of the detention center and its officers and its

5    personnel.  That is my priority.

6         I've tried my level best to stay out of Major Bryan's

7    way as she administers and conducts her business as the jail

8    administrator because I understand she's the expert, and she's

9    doing a fantastic job.  And I too am a little frustrated when

10   I hear that the expectation for us to have this fixed in four

11   weeks -- at least that's what it sounds like -- I don't know

12   how to respond to that.  I don't think that's realistic at

13   all, quite frankly.

14        But I will say this:  Give me 30 days and these

15   questions you're asking and the reports that you need to give

16   you at least a status report where we are, they will be

17   generated.  The policies we got in place with COVID, I can

18   assure you that we have a policy in place that's probably as

19   strict as they come:  If you do not get vaccinated you will be

20   tested.  If you do not be tested or vaccinated, you will be

21   terminated.

22        Now, understand that when that policy is executed, we

23   will have some vacuums in our staffing.  I don't have a

24   problem with that, Your Honor, because we're going to take

25   this very seriously.  I want to send a message to the

1    employees that we're taking it serious.  So I don't have a

2    problem with any of that, what I just said.

3         There are other things that need to be addressed.  One

4    of them was contraband coming into the jail.  As I mentioned

5    to you, I am 100 percent law enforcement, so if contraband is

6    coming to the jail, I'm going to make rounds personally to

7    ensure we keep it out, and that's exactly what I did last

8    week.

9         On last Thursday, we did two searches of the jail, one

10   at both the afternoon and evening shift change, and we got

11   phones, drugs, weapons, and all kind of contraband out of the

12   jail.  That's a proactive step to address it.  Now, we know

13   that that's going to take more than just sweeps to get that --

14   keep that from coming into the jail.  We have some internal

15   matters that we're investigating vigorously right now, and we

16   know that we have some internal issues with personnel, and I

17   can assure you that I'm going to do everything I can to

18   investigate the situation, and if I find anybody in violation

19   of the law, they will be prosecuted at the fullest extent of

20   the law.  And I do believe that exist in that jail.

21        So it's going to take a little time to weed out these

22   issues that we have, and I would just ask the Court to at

23   least acknowledge the fact that both myself and the

24   administrator are four weeks into this and we are burning

25   candles trying to make sure we correct this.  So I don't know

1    any way else to address that.  I am committed to this office.

2    I've committed my life to law enforcement and the detention

3    center, and we'll see what happens with the sheriff's

4    department.

5         So I'm passionate, as you probably can tell, Your

6    Honor, about this position I find myself in, but, again, I

7    would ask some leniency in terms of the timeframe that we have

8    been given to try to correct these things.  I know this has

9    been going on for a decade, and, again, the major and I have

10   been here four weeks, so if you could just give us an

11   opportunity to not only create the policies that we've already

12   done, but implement the policies, ensure that we hold people

13   accountable to following the policies, that's really all I'm

14   asking.

15        I don't know what the magic date is to say how long do

16   you need.  I definitely need more than four weeks to be able

17   to get this thing turned around, so I would hope that's a good

18   answer for you.  Thank you.

19        THE COURT:  Thank you, Sheriff Crisler.

20        Mr. Moeser, you had something you wished to say, I

21   believe.

22        MR. MOESER:  Yes.  Thank you, Your Honor.

23        I just wanted to follow up on the information about a

24   raise provided for detention officers.  It's my understanding

25   that did not include staff at Henley-Young or really almost

1  since the time we've started, the low pay has been a concern

2  at Henley-Young.  This is the second time I'm aware of that a

3  raise has been given to detention officers but not to

4  Henley-Young staff.

5       And as I alluded to earlier, in order to get some

6  additional funds for staff at Henley-Young, Director Frazier

7  had to transfer funds and delete a number of positions.

8       So ultimately I would be suggesting that those

9  positions be restored and an equivalent raise be provided for

10  staff at Henley-Young.  So unless there's some other -- and

11  maybe that's in the works.  I don't know.  But I'm just

12  concerned about that happening.

13       THE COURT:  Thank you, Mr. Moeser.

14       MR. GAYLOR:  I would like to address that, if

15  necessary, Your Honor, from the County's perspective.

16       THE COURT:  Yeah.  Okay.

17       MR. GAYLOR:  Okay.  Yes, sir.  There were raises given

18  to staff at Henley-Young, and we did achieve that some time

19  ago by eliminating some of the -- or at least temporarily

20  eliminating some of the vacant positions that had existed.

21  One of the problems that we had, obviously, was retention of

22  staff, and we were losing staff at a significant rate for a

23  number of factors, but pay being a very large factor.

24       And so with the assistance of Mr. Frazier, we

25  identified pins that had not been filled for some large amount

1    of time, extended period of time, and we were able to move

2    funds into the existing staff's paychecks.

3            It's understood that we will still, based on the

4    staffing analysis that's going to be completed at some point,

5    need to reinstate pins, perhaps, and put money into those

6    salaries.  We don't have a -- the County doesn't have a

7    problem in doing that once a staffing analysis has been

8    completed, and that's for both the sheriff's department as

9    well as at Henley-Young.  But I wanted to bring that to the

10   Court's attention that the staffing analysis has not been

11   completed.

12           So some of what has been done in the past in terms of

13   funding of the officers has been done without the best

14   information being in front of us in terms of what it was going

15   to take to properly staff both of those facilities, and so

16   that -- once that has been done, then we'll work to fund those

17   positions as well.

18           Now, at the same time, I shouldn't have to bring to

19   anyone's attention the fact that staffing is a concern --

20   staffing shortages are a concern in basically all facets of

21   the economy right now, and so obviously we're going to have

22   staffing shortages and problems in staffing and filling

23   offices, filling positions, with regard to detention services,

24   one of the more challenging jobs to fill anywhere in the

25   country.

1    And so right now with us also adding a vaccine mandate

2    in place, we are aware that we're probably going to lose some

3    more positions throughout the County, and so we're trying to

4    be prepared for that as well, and so we certainly want to

5    bring it to everyone's attention or remind them, at least,

6    that we know that we're going to have some staffing

7    challenges, and even more so that we've taken the steps to try

8    and have a safer environment.  And so we hope that the Court

9    and the Department of Justice will give us some level of grace

10   in that area as well.

11   But based on what we've heard from the monitors; the

12   sheriff's department; our administrator, new administrator;

13   Henley-Young administrator; as well as our construction team,

14   I think we've demonstrated that we have made some progress and

15   are certainly working to achieve even greater progress.

16   The question was asked how long?  Well, we've had

17   internal discussions with regard to how long it's going to

18   take us to implement the policies necessary to get out from

19   underneath the consent decree, and we feel pretty

20   optimistically internally now that we have our administrators

21   in place, both at Henley-Young as well as Raymond, that we can

22   make some significant progress toward getting out from

23   underneath this consent decree over the course of the next

24   several months.

25   Add to that the fact that we're going to be building a

1   new detention facility, we believe that we'll also have

2   facilities in place that will help us meet some of the

3   concerns that have been expressed.

4        So we hope that we are showing and demonstrating that

5   we are making progress, and we certainly have the intention to

6   make even greater progress now that we have the appropriate

7   administrators in place, Your Honor.

8        THE COURT:  Okay.  Is it a sure bet that the County is

9   moving toward getting a new detention facility, Mr. Gaylor?

10       MR. GAYLOR:  Absolutely.

11       THE COURT:  Okay.  All right.

12       MR. GAYLOR:  We've adopted the appropriate resolutions,

13  we've putting the funding and finances in place, and we feel

14  positive that we have taken those appropriate steps.

15       THE COURT:  All right.  Thank you.

16       Well, because this is before the Court with respect on

17  the consent decree that was hammered out by the parties, I

18  will let the Department of Justice have the last word today.

19       MR. CHENG:  Thank you, Your Honor.

20       The first thing I'd like to do is just get a little bit

21  of a clarification, if at all possible.  I believe the

22  architects and Benchmark folks mentioned fire suppression

23  systems in place.  I think they mean the fire hoses in place.

24  I'm assuming the sprinkler systems and the rest of the fire

25  alarm system are not really in place yet.

1       The reason that's important is that the padlocked

2  security doors, typically if you're going to do something like

3  that, you have to have other systems in place to offset the

4  risk that you're kind of assuming.  Our understanding is

5  Ms. Bryan is drilling her staff trying to make sure emergency

6  keys are readily available, doing some other things to offset

7  the lack of automated systems and the locked doors.

8       We would just note that, you know, if you're going to

9  adopt these alternatives, there's really no room for error,

10  and I do think it's important to put on the record, you know,

11  that this is not an area that people can slip up on.  It

12  really is a high-risk area.

13       It's also clear from what the defendants said that

14  they're relying on additional fire watches, which we believe

15  means they need to have staff to conduct the fire watches to

16  make sure those housing units are staffed.  As, I believe,

17  Mr. Parrish has indicated, the staffing is not great at

18  Raymond.  So, again, you know, these are sort of interim fixes

19  where it's not really clear if they can implement it.

20       All that said, we hear the defendants about the lack of

21  time that Ms. Bryan has had to implement her ideas, and we

22  totally understand that there's been a lot of stuff that's

23  been going on in the past few months, and if there's anything

24  I've said that suggests otherwise, you know, we don't want to

25  create any sort of misunderstanding on this issue.  We

1   understand some of these folks have been in place just a short

2   time.

3           But the Department's position from the start has been

4   this is about a system.  This is about an entire jail

5   operation, not about the individuals.  And when you're talking

6   about systems, you know, fixes cannot depend upon individuals.

7   It cannot depend on who's jail administrator or who's sheriff

8   at a particular moment.  And in that area, the County as an

9   entity and the sheriff's department as an agency hasn't really

10  been able to comply with the stipulated orders.  It has not

11  put in place detailed timetables and plans for where it's

12  going to go.

13          Even some of the stuff that Mr. Gaylor and Ms. Barker

14  have raised today are a little bit amorphous.  We're glad to

15  hear they've got a 5 percent pay increase.  They have provided

16  pay increases in the past, and sometimes those were

17  implemented; sometimes they weren't.  There have been salary

18  proposals and retention plans proposed to the Court in the

19  past.  Sometimes progress was made; most times nothing

20  happened.

21          Our view is that what matters is having something

22  that's actually real, that we can see is really being adopted,

23  and in that area the construction fixes are a very big

24  contrast from some of the operational and staffing fixes.

25  When we talk to the architects and the construction people,

1    they've got timeframes.  They've got plans.  They can tell us

2    what they're working on.

3         When we talk to the sheriff's department, we're not

4    sure if they're meeting with the jail administrator.  We're

5    not sure what they're actually doing in terms of the staffing

6    retention plan that is required by the Court's orders.

7         On things like pretrial services and criminal justice

8    reforms and bringing in outside consultants to fix those

9    operational pieces, you know, it's good to hear that people

10   are taking action.  What isn't clear is what's actually going

11   to be adopted.

12        And so, you know, I am positive in certain regards

13   about where this jail is going, but I don't think it's unfair

14   for us to ask the County to actually do what it already

15   promised to do in the agreements.

16        THE COURT:  Thank you, Mr. Cheng.

17        Ms. Simpson, you and your team, I imagine, are -- is

18   this the week that you are visiting with the County to start

19   your process of preparing for the 15th report?

20        MS. SIMPSON:  Actually, the interviews will take place

21   the week of October 4th.

22        THE COURT:  Okay.

23        MS. SIMPSON:  But we are in the process of getting

24   requested documents and reviewing those documents at this

25   point, and that will continue through the time of the

1    interviews as well.

2              THE COURT:  Okay.

3              MS. SIMPSON:  And unfortunately, as you probably know,

4    we're going to be remote again this visit.  We had hoped to be

5    on-site when everything seemed like it was going to look good

6    in May or June, and then, of course, everything -- COVID

7    exploded.

8              THE COURT:  Yeah.  Exploded for us all.  So okay.  We

9    hope you can make a personal visit at some point soon.  I'm

10   certainly not suggesting that you put yourself at risk, but

11   now that the County has an official policy where all employees

12   are vaccinated and all employees are required to wear masks or

13   either be -- and those who are not vaccinated are tested, and

14   if you refuse to take the test, you'll be fired sounds to me

15   that that's going along the lines of making the detention

16   center, at least, more safe.  But, again, I'm not expecting at

17   all for you or your team to put yourselves at risk.

18              As I've said all along, this is a huge source of

19   concern for the Court.  No one in the custody of the jail

20   administrator ought to die, and I know Major Bryan does not

21   want that to happen.  I know that the County, the sheriff,

22   doesn't want it to happen.  But when I read stuff in the

23   report, there is an extremely large amount of contraband,

24   record number of fights and assault; there continue to be

25   fires set; a number of overdoses.  When I see stuff like that,

1   again, it speaks to the systemic problems that the Department

2   of Justice has been alluding to.

3        Our major concern is making sure that these

4   detainees -- we always have to remember these are pretrial

5   detainees.  These are people who are presumed to be innocent.

6   They're there because they have not met bail for whatever

7   reason, and we have a duty to protect them so that they can

8   appear for their trial, so that they can ultimately face the

9   judgment of our judicial system, and we need to make sure that

10  that place is safe, decent, and in order for them.  And the

11  public needs to be assured that the County can provide this

12  delivery system, if you will.  And if the County cannot do it,

13  someone else has to.

14       But that's all that I have for this status conference.

15  The parties will -- you know, the monitors will prepare their

16  next -- complete their next round of business, including

17  submitting the 15th monitoring report, and we will pick up

18  from there.

19       I thank all of you for your participation, and I hope

20  you continue to take care of yourselves, your families,

21  friends, and all those who you're around, and that concludes

22  all that the Court has before it today.

23       The Court is now adjourned.

24       MR. CHENG:  Thank you, Your Honor.

25       MS. SIMPSON:  Thank you, Your Honor.

1          MR. GAYLOR:  Thank you, Your Honor.

2          MR. CRISLER:  Thank you, Your Honor.  Have a great day.

3    *************************************************************

1       **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded by

9    me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         THIS, the 12th day of October, 2021.

14

15                          /s/ Candice S. Crane, RPR, CCR

16                          Candice S. Crane, RPR, CCR #1781
                            Official Court Reporter
17                          United States District Court
                            Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25