Court-Appointed Monitor's Interim Report to the Court
Pursuant to Paragraph 151 of the Settlement Agreement
United States v. Hinds County, et al. Civ. No. 3:16cv489 -CWR-JCG

Elizabeth E. Simpson
Court-Appointed Monitor

| David M. Parrish | Jim Moeser | Dr. Richard Dudley |
| --- | --- | --- |
| Corrections Operations | Juvenile Justice | Corrections Mental Health |

The Hinds County Jail System has experienced six in custody deaths so far this calendar year. The most recent occurred on October 18, 2021. Although any death of a person in custody is cause for concern, this series of events is especially alarming. It raises serious concerns about the continued lack of compliance on the part of the County and Sheriff's Office with regard to the Settlement Agreement and the Stipulated Order.

The first in custody death occurred on March 19, 2021, when a Jackson Police Department Officer brought an arrestee into the Booking area to be processed. It required the assistance of a Detention Officer to get him out of the car and to a holding cell. Because of his condition, a nurse was called from Medical; she determined that the arrestee had to be transported to the hospital. Subsequently the arrestee collapsed, and the nurse was called back from Medical to perform CPR. When she asked why the individual had not been transported to the hospital, she was told that staff wanted another evaluation first. When an attempt was made to provide oxygen from an O2 concentrator, it would not turn on because of a faulty electrical outlet. An extension cord had to be obtained to reach another outlet so that the concentrator could work. There was no AED unit in Booking, so someone had to run back to Medical to obtain one. After it was delivered it was discovered that the AED unit had no pads. After the arrestee expired, the HCSO took the position that he was not an inmate because he had not been accepted/booked. Regardless, an incident report should have been generated and all available information entered into the JMS system. Instead, individual memos were written, but not incident reports. An After-Action Report has yet to be completed.

The second death, on April 18, 2021, was a suicide by an inmate who was being housed in a Booking holding cell, something that the Monitoring Team has repeatedly stated should not be done and is contrary to the Settlement Agreement. When an officer was called upon to help process two new arrestees into the facility, he saw the inmate hanging from a light fixture in holding cell 1124 (the one closest to the sallyport). The officer had not been issued a set of keys, so he had to obtain them from officers in the Booking office in order to enter the cell. The Detention Officer who was actually assigned to work the Booking floor (holding cell area) was not at his designated post. As has been noted previously, Booking officers often congregate in the office instead of being on the floor where 15 minute well-being checks must be conducted on all inmates located in the holding cells. Apparently, there was no Sergeant working in Booking at the time. The responding officers did not have a 911 knife; instead, they had to use a pair of scissors to cut the sheet from around the inmate's neck. Nurses who responded from Medical had to return to Medical to obtain an AED. This was the same problem that occurred just a month before. Obviously, no corrective action was taken. The sheet that the inmate used to hang himself was run though a bolt hole in a light fixture where it had been pried from the ceiling. The second light fixture in the cell had not been damaged, but it did not work. The last documented well-being check was made at 1105, more than three hours before the incident. As in the first case, an After-Action Report has yet to be completed.

A third inmate died on July 6, 2021.  He was found hanging from a light fixture in his cell in HU C-4 at the RDC.  He was discovered during a head count at shift change that was being conducted by a Sergeant and the Detention Officer assigned to C-4.  That officer was responsible for conducting 30-minute well-being checks on the inmates in that unit and for making 15-minute notations on inmates in C-4 ISO, the suicide watch unit, where observation is supposed to be constant.  One officer should never have been held responsible for both duties.  In addition, there are supposed to be two officers assigned to work inside C-4.  They are not supposed to leave the unit.  The lone Detention Officer assigned to C-4 not only had to leave the unit to perform checks on C-4 ISO, he also left the unit for other reasons as reported by other officers.  He did not complete an observation log because he reportedly did not have a log book.  He reported head counts every hour, but did not actually go inside the unit; instead, he looked in from the area of the "cage" from where he could not possibly see each inmate to conduct an accurate count.  Finally, both the Detention Officer, and the Sergeant who accompanied him, did not immediately open the cell door and lower the inmate to the floor when they found him hanging.  Instead, they went to C-Pod Control to report what they saw by telephone to a Lieutenant in Booking.  Only after doing so, did they return to the cell and attempt to assist the inmate.  An After-Action Report has not yet been generated.

A fourth death occurred from an apparent drug overdose on August 3, 2021, in HU C-1 at the RDC.  There have been numerous overdoses in this calendar year which, fortunately, did not result in death; however, this one appears to be a death as a result of an overdose.  An autopsy and toxicology report has not been completed but his cell mate reported that the decedent had been using spice that night. An IAD investigation is still underway, but inmates on the unit reported that they had been calling for assistance for five hours and that there had been no response to their cries for help.  This has not been confirmed. A report provided by Medical indicated that by the time they were called, rigor mortis had already set in indicating that he had been dead for some time.  As was noted in the 14th Monitoring Report, there has been a substantial amount of contraband confiscated in the RDC this year, including potent drugs.  An After-Action Report has not yet been generated.

A fifth death occurred on August 4, 2021, when an inmate passed away from complications associated with COVID while in the hospital. There has been no investigation of this death. Although the death appears to be medically related, there are questions regarding when his symptoms first appeared and whether they were timely and adequately responded to as well as the concerns the Monitoring Team has raised from the beginning of the pandemic about the adequacy of the precautions being taken by the Jail to prevent the spread of the virus.

The sixth and most recent death which occurred on October 18, 2021, was the result of an assault. This was on HU A-4 where the doors don't lock and there is minimal staff supervision. As has been reported, sometimes there is only an officer in the control room with no officers assigned to the housing units. At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and

then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later. This was despite the fact that breakfast and lunch was served and well-being checks were supposedly being made. Medical was called and arrived 6 minutes later. They did not perform CPR. The documents provided to the monitors do not have a time when the ambulance was called but it was called. In addition to the question as to how he could not have been discovered for nine hours, there is the additional question of why this activity was not observed on camera from the control room. The minimal incident reports provided on this death identify the incident as "Medical Report-injury" instead of assault raising additional cause for concern regarding the accuracy of reporting.

These deaths raise concerns that have been consistently raised in prior monitoring reports. Although the Monitoring Team does not have IAD investigations on some of these incidents and does not have any reports from the Mississippi Bureau of Investigations to which the cases have been referred, the information that is available points out the ongoing problems and practices that have been raised repeatedly by the Monitoring Team, are contrary to the Settlement Agreement and present life-threatening safety issues.

These include the following--
- The lack of direct supervision
- The lack of consistent well-being checks at the required time intervals
- The lack of meaningful well-being checks when they are done
- Housing inmates in Booking
- Housing inmates in units where cell doors do not lock
- Inadequate supervision
- The need for a Mental Health Unit with adequate mental health staffing
- Maintenance problems that include electrical outlets that do not work and broken light fixtures
- The failure to inspect life-saving equipment
- The lack of 911 knives
- The lack of policies and post orders, combined with the lack of training on the policies that have been developed
- The lack of a field training program for new officers
- The lack of a recruitment and retention plan with a commitment to dedicate the resources necessary to support it
- The lack of access to keys when emergencies occur
- The congregation of officers in control rooms and the Booking office instead of being present on the units/posts
- The lack of a dedicated officer for suicide watch (RDC)
- The proliferation of contraband in the facility (RDC)

In addition, the poor and inaccurate reporting that is reviewed and approved by supervisors, with no apparent corrective action, contributes to the risk of future deaths.

The Monitoring Team participated in the development of the Stipulated Order attempting to lay out a beginning road map to compliance. Many of the items in the Stipulated Order have not been met. The Monitoring Team also participated in the more recent development of a list of Priority Deliverables (Exhibit 1, 1-A, 1-B, 1-C). Most of those items have also not been implemented. The Monitoring Team continues to have confidence in the ability of the new Jail Administrator. However, the Monitoring Team has observed that there are institutional barriers to effectively implementing the Settlement Agreement and Stipulated Order. Most of those barriers are addressed in the Stipulated Order and list of Priority Deliverables. The latter can be made available to the Court. The Monitoring Team respectfully recommends that the Court set a status conference/hearing to address immediate measures that need to be taken to address the concerns raised above and prevent the future loss of life.