

————————————

No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.

*Defendants.*

————————————

ORDER TO SHOW CAUSE

————————————

Before CARLTON W. REEVES, *District Judge.*

In 2016, the United States Department of Justice brought this action to end unconstitutional conditions of confinement at Hinds County's Raymond Detention Center (RDC). The parties entered into a Consent Decree to correct the problems.

It is now 2021. Much has changed in the world, the United States, the State of Mississippi, and even in Hinds County. Not so for RDC. The unconstitutional conditions have not been remediated—they have no end in sight, in fact. And the County's failure to remedy the conditions has caused

"needless suffering and death," *Brown v. Plata*, 563 U.S. 493, 501 (2011), including six deaths so far this year.

Proceedings are therefore necessary to determine whether Hinds County should be held in civil contempt and RDC placed into federal receivership.

## I.    Factual and Procedural History

### A.    The Political Landscape

The Raymond Detention Center opened in 1994, when Malcolm McMillin was the Sheriff of Hinds County. He had been elected in 1991, replacing J.D. McAdory, who had served as Sheriff since 1972. Leah Rupp, *In the Limelight Again*, Clarion-Ledger (Nov. 18, 2007). McMillin, like McAdory, would remain in office for 20 years. *Id.*

The 2011 election saw the beginning of a series of one-term Sheriffs. That year, Tyrone Lewis unseated McMillin. *Former Hinds County Sheriff Malcolm McMillin dies*, WJTV (Dec. 22, 2016).[1] Four years later, the voters replaced Lewis with Victor Mason. Jimmie E. Gates, *Hinds to settle feds' OT case*, Clarion-Ledger (Dec. 28, 2016). In 2019 the voters rejected Mason after only one term, this time in favor of Lee Vance. Jimmie E. Gates, *Lee Vance defeats incumbent Hinds Sheriff Victor Mason in Democratic runoff*, Clarion-Ledger (Aug. 27, 2019). Sadly, Vance died on August 3, 2021. Therese Apel, *Sheriff Lee Vance Passes Away After A Medical Emergency At Home*, Darkhorse Press (Aug. 4, 2021).

---

[1] As Sheriff McMillian explained in testimony before the Department of Justice, Office of Justice Programs, the voters "turned him out to pasture." Review Panel on Prison Rape, Hearings on Rape and Sexual Misconduct in U.S. Jails 447 (Sept. 16, 2011) [hereinafter *OJP Testimony*].

The Hinds County Board of Supervisors appointed an Interim Sheriff until a special election could be held to fill the remainder of Vance's term. On August 16, 2021, the Board appointed Marshand Crisler to be that Interim Sheriff. *Marshand Crisler named interim Hinds County Sheriff*, Jackson Advocate (Aug. 16, 2021).

The special election was held on November 2. Thirteen candidates offered themselves to the voters. Brendan Hall, *Meet the Hinds County Sheriff candidates before casting your vote on Nov. 2*, WLBT (Oct. 30, 2021). When no candidate drew a majority of voters' support, a runoff was necessary between the top two candidates: Crisler and Tyree Jones, who was part of Vance's command staff.

The runoff election was held earlier today, November 23. At the time of the release of this Order, the winner has not been certified.

Like the Sheriff's Office, in the 27 years that RDC has existed, there has been considerable turnover in the Board of Supervisors. None of the current members of the Board were Supervisors when RDC opened. Only two current board members, Robert Graham and Bobby "Bobcat" McGowan, were Supervisors in 2014, when the U.S. Department of Justice notified Hinds County that it was "commencing an investigation into conditions of confinement at the Hinds County Detention Center." Docket No. 3-1. Graham and McGowan were also the only two sitting Supervisors in office when this action was filed on June 23, 2016.

### B.     The Conditions of Confinement

"There is a long tradition of professional excoriation of jail conditions." Margo Schlanger, *Inmate Litigation*, 116 Harv. L.

Rev. 1555, 1686 n.434 (2003). Experts have called jails "the worst blight in American corrections." *Id.* (citation omitted). They are "more dangerous" and "more chaotic" than prisons, with less regular routines, more idle time, and detainees who are more likely to be experiencing a crisis. *Id.* at 1686–87.

The Supreme Court summed up jails as "generally deplorable" institutions that can have a "destructive effect on human character." *Barker v. Wingo*, 407 U.S. 514, 520 (1972). "The time spent in jail is simply dead time." *Id.* at 532-33.

RDC in particular has been troubled since it opened. As one writer explained, since its inception, "the jail designed to improve conditions for detainees has faced a myriad of problems: structural deficiencies, chronic understaffing and poor management. But fixing those problems have been elusive under whatever sheriff and Hinds County Board of Supervisors are in elected office at a given time." Kayode Crown, *One Jail's Tale: Hinds County Detention Center At Risk Of Federal Takeover*, Miss. Free Press (Oct. 15, 2021).

Captain Diane Riley testified shortly after RDC's opening that "the new jail's doors were inadequate to provide security." *Dean v. Thomas*, 933 F. Supp. 600, 608 (S.D. Miss. 1996). That is, the cell doors failed to lock. Twenty-seven years later, the cell doors still fail to lock. *See* Docket No. 94 at 4 [hereinafter *Fourteenth Monitoring Report*]; *see also* Ruth Ingram, *Year after riot, cell doors at Hinds County jail still don't lock*, Clarion-Ledger (July 23, 2013); Ruth Ingram, *Officials: 'Antsy' juvenile inmates flood area at Hinds jail in Raymond*, Clarion-Ledger (July 19, 2013) ("We have doors with no locks," the Sheriff's spokesman candidly admitted.); Docket No. 31 at 20 ("the Jail continues to lack even the most basic security and safety features, such as lockable cell doors . . . ."); Docket No. 60 at 4 ("At RDC,

4

doors and locks are broken. Prisoners can break out of their cells, break out of their housing units and even enter a jail control room.").[2]

A significant riot in 2012 brought the facility's problems to the forefront. "[P]risoners destroyed fixtures and walls, sprayed water hoses and fire extinguishers, and left ceilings in shambles," the State's newspaper of record reported. Ruth Ingram, *Jail getting repairs; much more needed*, Clarion-Ledger (Nov. 7, 2012). "It's no secret that the door locks need to be replaced," Chief Deputy Chris Picou added. "I don't know that the jail has ever been up to industry standards." *Id.*

A series of escapes in 2012 and 2013 shed additional light upon the conditions at the jail. *See* Ruth Ingram, *Escape draws attention to jail, policies*, Clarion-Ledger (Apr. 22, 2013) ("Escapes this year and last have been blamed on faulty locks and security for jail and cell doors. The county last year ordered emergency repairs in April on doors that had been problematic and a security risk since the facility opened in 1994."). Sheriff Lewis, who had commissioned a 500-page report on the previous administration, blamed the escapes on

---

[2] The faulty locks have cost the County dearly. In one case, it was reported that Hinds County "agreed to pay . . . inmate Michael Burnley[] $3 million after another inmate jimmied open a cell door and attacked Burnley, leaving him paralyzed. . . . The county has spent at least $13 million on repairs since." Heather Civil, *Jail Conditions*, Clarion-Ledger (Aug. 15, 2008). In the lawsuit, Sheriff McMillin admitted that the locks were faulty and had been an ongoing problem. A member of the Board of Supervisors, meanwhile, explained that the settlement "was about the best deal" the County was likely to get, and he did not know "where the financially strapped county was going to get the money" to pay the settlement. *Mississippi Jail Prisoner Wins $3,000,000 in Failure to Protect Suit*, Prison Legal News (Aug. 2008) (brackets omitted).

"malfunctioning doors and conditions at the aging facility." Monique Valeris, *Lewis says he's not pointing blame at McMillin*, WAPT (Aug. 8, 2012).

In 2013, Hinds County Circuit Judge Tomie Green convened a special grand jury to investigate conditions at RDC. The reporting this time centered on safety concerns:

> On Sunday, a SWAT team stormed the facility after a dozen inmates broke out of their cells, in part because of faulty locks. Last week, a group of juveniles flooded a portion of the jail by turning on a fire hydrant. Reports also surfaced that several inmates were stabbed and a number of deputies and jailers sustained minor injuries. In June, one inmate died and another was hurt in a string of violent episodes that also left three deputies with injuries.

Emily Le Coz, *Grand jury probes Hinds jail issues*, Clarion-Ledger (July 26, 2013). The grand jury concluded that RDC was "in a deplorable condition and inadequately staffed." Docket No. 3-4 at 5.

In 2014 and 2015, the U.S. Department of Justice's Civil Rights Division investigated conditions at RDC and the two other facilities that comprise Hinds County's jail system: the Work Center and the downtown jail. Docket No. 3-1. It concluded that the County was violating the Eighth and Fourteenth Amendments by, among other things described in its 29-page report, failing to provide "minimum levels of protection from violence," failing to have "sufficient numbers of trained staff," and incarcerating persons "beyond their court-ordered release dates." Docket No. 3-3 at 2-3. The problems had

resulted in "at least three major riots, two alleged homicides, and numerous assaults on prisoners and staff members." *Id.* at 2. The Findings Letter resulted in the Mississippi Department of Corrections moving its state inmates from RDC. *State inmates removed from troubled jail in Hinds County*, Corrections 1 (May 27, 2015). "[W]e believe removing the state inmates is in the best interest of the State of Mississippi and the inmates," said State Corrections Commissioner Marshall Fisher. *Id.*

The Department of Justice filed this lawsuit in 2016. Its complaint described an inability to meet minimum constitutional standards with respect to detainee-on-detainee violence, staff-on-detainee violence, "dangerously low staffing levels," jail policies and procedures, housing and classification systems, the physical plant, internal investigations, detention of persons who should have been released, and the treatment of juvenile and suicidal detainees. Docket No. 1 at 3-5. The Department alleged that the constitutional violations "have been obvious and known to Defendants for a substantial period of time." *Id.* at 5. The Attorney General herself signed the complaint. *Id.* at 7, 10.

The parties immediately entered into a Consent Decree. Docket Nos. 3; 8-1. The Consent Decree required Hinds County to implement dozens of minimal constitutional standards. Hinds County expressly agreed that the Consent Decree was "narrowly drawn, extends no further than necessary to correct the violations of federal rights," and "is the least intrusive means necessary to correct these violations." Docket No. 8-1 at 61.

A Monitoring Team was also established. *Id.* at 54; *see also* Docket No. 10; *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir.

1974). It includes Elizabeth Simpson, David Parrish, Jim Moeser, and Dr. Richard Dudley. They are subject-matter experts in corrections, corrections operations, juvenile justice, and corrections mental health, respectively. The Monitors began to provide technical assistance, conduct regular site visits, and serve as the eyes and ears of the Court[3] as the parties attempted to meet the requirements of the Consent Decree.

Hinds County's efforts have borne fruit at one of its jails—the Work Center.[4] The Monitoring Team describes the Work Center as a functional jail for the citizens of Hinds County. *See, e.g.*, Fourteenth Monitoring Report at 29. This Court's own visit to the three facilities in 2019 confirms that something about the Work Center's culture is effective; it largely operates as a jail should.

The story is not the same for RDC.

In 2019, the Department of Justice filed a Motion for an Order to Show Cause outlining a litany of ongoing constitutional violations at RDC. Docket No. 31. It described the County's "continued failure to comply with nearly all provisions of the Settlement, including provisions regarding security, medical screening, suicide prevention, mental health care, youth services, fire safety, sanitary conditions, and release

---

[3] The Consent Decree and Monitoring Team were approved by U.S. District Judge William H. Barbour, Jr. The case was transferred to the undersigned in December 2018 upon Judge Barbour taking senior status. Immediately upon being assigned the case, this Court held a status conference and "received an update as to the progress toward compliance with the Consent Agreement from the parties and the Court Appointed Monitor." *See* Minute Entry of Jan. 15, 2019.

[4] Hinds County's third facility, the downtown jail, was closed in 2020.

procedures." *Id.* at 5. As any elementary school child under-
stands, the County was flunking, miserably. The result was
rioting, stabbings, a murder, staff-on-detainee assaults, and a
"major disturbance" during a Monitoring Team site visit that
resulted in eight emergency room transports. *Id.* at 7-8, 14. The
Department added that the situation on the ground was
"likely worse" than it could adequately summarize because
of poor record-keeping at RDC. *Id.* at 8.

The parties again avoided significant litigation by agreeing to
a Stipulated Order. *See* Docket Nos. 60 and 60-1; *accord Plata
v. Schwarzenegger*, 603 F.3d 1088, 1091 (9th Cir. 2010). This
Court grudgingly approved their agreement even though the
County had reached sustained compliance "in only one of the
92 requirements of the Consent Decree." Docket No. 60 at 7.
"While a finding of contempt is warranted," the undersigned
wrote, "the parties' stipulated order outlines what is perhaps
the most comprehensive remedial plan for Hinds County to
become compliant that the Court has seen from the parties."
*Id.* at 11. "Ten months from today, the County should have
made significant progress on developing and implementing
policies, making repairs to the physical plant and ensuring in-
carcerated youth have necessary programming, among other
necessary investments." *Id.* Monitoring continued; periodic
status conferences were held. The facility limped along into
the present.

The situation deteriorated significantly in the most recent
monitoring period. According to the Fourteenth Monitoring
Report,

> There were a record number of fights and as-
> saults at RDC in May [2021], there continue to
> be fires set by inmates, there is an extremely

> large amount of contraband in the facility in-
> cluding drugs, there have been a number of
> overdoses although no deaths from those over-
> doses, and there have been three deaths, two by
> suicide. Although there is some cause for opti-
> mism with the new Detention Administrator
> being hired[5], **this is a very disturbing trend**.

Fourteenth Monitoring Report at 3 (emphasis added). The sit-
uation became more uncertain when Sheriff Vance, the
elected official with primary responsibility for RDC,[6] passed
away unexpectedly on August 3, 2021.

### C.      The 2021 Death Toll

On October 18, 2021, RDC experienced its sixth death of the
year. The Monitoring Team filed an emergency report on Oc-
tober 27 characterizing the pattern of deaths as "especially
alarming." Docket No. 96 at 2 [hereinafter *October 27 Emer-
gency Monitoring Report*].

A brief summary of each death is provided here.[7]

The first death, on March 19, 2021, happened when a nurse
ordered an arrestee to be taken to the hospital and no one

---

[5] The Monitoring Team reports that the Detention Administrator is "very
well qualified." Fourteenth Monitoring Report at 3.

[6] As Sheriff McMillian explained at his OJP testimony, "I am, as Sheriff,
responsible for safely operating the correctional facilities in Hinds County
and take that responsibility seriously." *OJP Testimony* at 445.

[7] The Monitoring Report does not identify these individuals by name. But
for that reason, this Court would have given these individuals the dignity
of referring to each by their name. After all, they deserve respect. Deten-
tion does not strip an individual of his inherent dignity.

carried out her order. *Id.* at 2. The arrestee subsequently collapsed. An oxygen concentrator was obtained but would not turn on because the electrical outlet was faulty. Someone ran to get an AED unit from Medical, but the AED unit had no pads. The arrestee died. RDC staff then "took the position that he was not an inmate because he had not been accepted/booked." *Id.* An after-action report has not been completed for this death.[8]

The second death, on April 18, was a suicide by a detainee being housed in a booking cell, a practice "that the Monitoring Team has repeatedly stated should not be done and is contrary to the Settlement Agreement." *Id.* The Officer who discovered the body could not enter the unit because he lacked keys, and the Officer who was supposed to be on duty at booking was not at his post. "The last documented well-being check was made at 1105, more than three hours before the incident." *Id.* No after-action report was completed.

The third death occurred on July 6. It was another death by hanging—although the available record is silent on whether it was a suicide. The Officer charged with performing 30-minute head counts "left the unit" for unknown reasons. *Id.* at 3. When he returned to look in, he did so from a vantage point "from where he could not possibly see each inmate to conduct an accurate count." *Id.* No after-action report was completed.

Death number four was a drug overdose on August 3. "An IAD investigation is still underway, but inmates on the unit

---

[8] An after-action report is a way for officials and monitors to "gather facts, identify problems, examine staff performance, and develop a plan to prevent future" major disturbances. *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *11 (S.D. Miss. June 10, 2015).

reported that they had been calling for assistance for five hours and that there had been no response to their cries for help." *Id*. The condition of the body indicated that the detainee had been dead for some time when he was discovered. No after-action report has been completed.

The fifth death occurred the next day, when a detainee died in the hospital from COVID complications. "Although the death appears to be medically related," the Monitoring Team wrote, "there are questions regarding when his symptoms first appeared and whether they were timely and adequately responded to as well as . . . the adequacy of the precautions being taken by the Jail to prevent the spread of the virus." *Id.* No investigation into his death was conducted.

The sixth death, on October 18, was an assault in a unit where the doors do not lock and staff supervision is "minimal." *Id.* The Monitors' description relayed the following:

> At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later.

*Id.* at 3-4.

The Monitoring Team concluded its Emergency Report with a recommendation "that the Court set a status conference/hearing to address immediate measures that need to be taken to address the concerns raised above and prevent the future loss of life." *Id.* at 5.

On November 10, the Detention Administrator submitted her letter of resignation. She described "a distinct lack of support" and relayed in detail a recent directive from the Interim Sheriff that she found "reckless and dangerous." She had served for a total of only five months before submitting her letter of resignation.

This Order followed.

## II.    Law

### A.    Consent Decrees

"A consent decree is akin to a contract yet also functions as an enforceable judicial order." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Consent decrees are commonly used to address ongoing constitutional violations in jail and prison cases. *E.g., Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *3 (S.D. Miss. June 10, 2015).

Although "state and local authorities have primary responsibility for curing constitutional violations," *Hutto v. Finney*, 437 U.S. 678, 687 (1978), "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew*, 540 U.S. at 440.

### B.    Civil Contempt

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

To hold a respondent in civil contempt, the moving party must prove by clear and convincing evidence: "(1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987).

"The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). That means "[g]ood faith is not a defense to civil contempt." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

"If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Frew*, 540 U.S. at 440 (citation omitted); *see also Am. Airlines*, 228 F.3d at 585.

### C.    Receiverships

"[R]eceiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws." *Plata*, 603 F.3d at 1093–94 (collecting cases).

A "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution.'" *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (quoting Wright & Miller). In the prison context specifically, receiverships can be necessary

"to run institutions where constitutional violations [are] occurring. Such receiverships are generally ordered in the context of ensuring a governmental entity's compliance with court orders." *Id.* at 306 (collecting cases).

In *Plata*, a receivership was imposed "after the State admitted its inability to comply with consent orders intended to remedy the constitutional violations in its prisons." 603 F.3d at 1097.

> The court imposed the receivership not because it wanted to, but because it had to. After attempting less drastic remedies, and after long periods of working closely with State authorities to try to bring them into compliance with the orders to which they had stipulated, the district court justifiably concluded that the State's personnel simply could not or would not bring the State into constitutional compliance in the foreseeable future.

*Id.*

### D.     Other Remedies

Judges have occasionally taken creative measures to enforce consent decrees.

In a famous case in Alabama, Judge Frank M. Johnson, Jr. appointed the Governor to serve as the receiver and bring the correctional facilities into compliance. *Newman v. State of Ala.,* 466 F. Supp. 628, 635 (M.D. Ala. 1979); *see also* Jack Bass,

Taming the Storm 342 (1993).[9] "Time does not stand still, but the Board of Corrections and the Alabama Prison System have for six years," the Judge wrote. *Newman*, 466 F. Supp. at 635. "Their time has now run out." *Id.*

Decades later, New Orleans is presently struggling to implement a consent decree regarding its local jail. The United States moved for an Order to Show Cause. The parties negotiated and agreed to appoint an "Independent Jail Compliance Director" to "temporarily assume the duties and authority of the Sheriff as to all aspects of the jail's operations." *Jones v. Gusman*, 515 F. Supp. 3d 520, 530 (E.D. La. 2021). Control was returned to the sheriff four years later. *See* Nicholas Chrastil, *Sheriff Marlin Gusman to regain control of New Orleans jail*, The Lens (Aug. 5, 2020).

Unfortunately, a recent order reflects the district court's frustration with the subsequent lack of progress:

> The City, over many years and through multiple administrations, has been promising to abide by its obligation to implement a durable solution to the problem of housing special populations in the jail – to provide "a good and sufficient jail." Yet here we are in late 2020 with little to nothing to show for years of discussion, debate, handwringing, empty promises, and court orders regarding the treatment of special-needs inmates.

---

[9] Judge Johnson's successor, Judge Robert Varner, later held the Alabama Attorney General in contempt of court for interfering with implementation of the remedial order. Bass at 343.

*Jones*, 515 F. Supp. 3d at 525.

Receiverships are not the most drastic action a court can take to remedy persistent jailhouse constitutional violations. In one case, the Michigan Court of Appeals observed that the presiding judge could have simply "closed the jail until the final judgment was fully implemented." *Wayne Cty. Jail Inmates v. Wayne Cty. Chief Exec. Officer*, 178 Mich. App. 634, 660–61 (1989); *accord Newman*, 466 F. Supp. at 635 ("There is, of course, a more extreme alternative to a receivership. . . . [F]ailure to comply with the minimum standards set forth in the order would necessitate the closing of several prison facilities.").

Risks to public safety would be minimized, if not outright eliminated, if detainees were simply housed in functioning jails operated by neighboring or co-extensive jurisdictions. Indeed, in the New Orleans litigation, the parties reached an agreement with the State of Louisiana to house certain detainees at a state facility pending construction of a new local jail.[10] *Jones*, 515 F. Supp. 3d at 532.

### III.    Discussion

The concerns with RDC are known all too well. Years of detailed reports from the Monitoring Team document the problems with precision.

What follows are some of the most significant problems observed in the Thirteenth Monitoring Report, the Fourteenth

---

[10] The Court, however, is not oblivious to the issues being litigated concerning the alleged constitutional deprivations occurring in Mississippi's state prison system. *See Amos v. Cain*, No. 4:20-CV-7-DMB-JMV, 2021 WL 1080518 (N.D. Miss. Mar. 19, 2021).

Monitoring Report, the September 15 Status Conference, and the October 27 Emergency Monitoring Report.[11]

### A. Six People Have Died This Year

The deaths were described in detail above. It is troubling that they happened in the first place, and it is troubling how the County has responded—or failed to respond.

Violence at RDC is not new. *E.g.*, *Johnson v. Burnly*, No. 3:15-CV-881-CWR-FKB, 2018 WL 1341727, at *4 (S.D. Miss. Feb. 9, 2018) ("Shortly after he was transferred to Raymond, Johnson claims that a group of inmates entered his cell, assaulted him, and stabbed him."). The problem is its recent escalation with no end in sight. The loss of life cannot continue.

### B. The Jail Is Severely Understaffed

The First Monitoring Report got right to the point: "The over-arching problem facing the Hinds County Jail System is the inability to hire and retain enough qualified personnel (deputies) to staff required positions." Docket No. 12-1 at 2. "**No matter what other steps are taken to address operational problems within the facilities**," it concluded, "compliance with conditions of the Settlement Agreement **cannot be achieved** until this matter is successfully addressed." *Id.* (emphasis added). Years later, a January 2020 Order found that "RDC has less than half of the staff it needs to run safely." Docket No. 60 at 6.

Now in late 2021, the problem remains unresolved. Hinds County presently has 229 employees for a jail system that requires 318 employees. Fourteenth Monitoring Report at 3.

---

[11] *See* Docket Nos. 83, 94, 95, and 96.

This failure has consequences. As the Monitoring Team explained,

> the C-Pod housing units are routinely left unattended. Consequently, the number of assaults and fires, as well as the amount of contraband found during shakedowns, is as high in C-Pod as it is in A-Pod where staffing is so low that, on occasion, the only officer present is stationed in the control room.

*Id.* at 3-4. The staffing failure has also "resulted in a continuing series of major maintenance problems as inmates destroy the work of County and contract personnel almost as fast as it is completed." *Id.* at 3.

### C.    RDC Is at Risk of Burning Down

Indifference to fire safety remains a life-threatening concern. The Monitoring Team reports that there is no fire alarm system in the facility, no sprinkler system in the inmate housing areas of RDC, and that the sprinkler system at the Work Center is only now working after years of not functioning. Docket No. 83 at 3 [hereinafter *Thirteenth Monitoring Report*]; Fourteenth Monitoring Report at 4; *see also Gates*, 501 F.2d at 1300 ("there is a lack of adequate fire fighting equipment making it, as stated by the Penitentiary Superintendent, 'almost impossible to put out a fire at Parchman.'").

This problem is exacerbated by the number of fires at RDC. One illustrative incident report shows that inmates set three separate fires in a one-hour time frame, without any officers present in the area. *See* Fourteenth Monitoring Report at 29.

The potential ramifications are obvious and devastating. Still, the County has failed, if not refused, to take meaningful corrective action at RDC.

### D.     The Cell Doors Don't Lock

It has long been known that many of the security doors and locks at RDC are not functional. *See* Part I.B, *supra*. As best explained in the Sixth and Seventh Monitoring Reports, the control system for security doors is beleaguered by electrical and mechanical problems, rendering it inoperative. Docket Nos. 24 at 34; 27 at 33.

This is particularly pronounced when it comes to cell doors. *See* October 27 Emergency Monitoring Report at 4 (stating that "[h]ousing inmates in units where cell doors do not lock" is an ongoing life-threatening safety issue). Because the manual locks are located on the outside of the cell, if an officer enters a cell, he must leave the cell door propped open. Docket No. 27 at 33. Otherwise, the officer risks being locked in the cell. Of course, this is a two-fold issue as it also presents the inmate a way out. Even so, many of the cell doors simply do not lock at all. *Id.* Inmates can open and close the door, enter and exit, as opportunity permits.

It is true that some of the cell doors have been repaired in recent years. As it stands, however, the Fourteenth Monitoring Report and the October 27 Emergency Monitoring Report show that the doors remain in an unacceptable state of disrepair. *See* Fourteenth Monitoring Report at 2; October 27 Emergency Monitoring Report at 4.

### E.     "Trash Dumpster Cells"

Well over a year ago, the Monitoring Team reported that a handful of cells had become trash receptacles. *See* Thirteenth

Monitoring Report at 3; *see also* Fourteenth Monitoring Report at 4, 30. These "trash dumpster cells" were damaged cells that RDC chose to weld shut rather than repair. Inmates, meanwhile, were able to deposit trash through the cells' broken windows. As a result, the cells served "as a breeding ground for vermin." Fourteenth Monitoring Report at 4.

Since this issue was brought to the attention of RDC, the number of trash dumpster cells **increased** to 30. *Id.* Only recently have some of the cells been emptied and cleaned, while the majority remain welded shut, awaiting repairs. *Id.* There is no indication as to whether measures have been taken to avoid the same problem from happening again.

"Trash dumpster cells" are one of several unsafe and unsanitary housing conditions. *See* Thirteenth Monitoring Report at 3-4 (reporting on issues with heating, ventilation, and air conditioning, as well as non-functioning lights which left detainees primarily living and operating in darkness for long periods of time); Fourteenth Monitoring Report at 54 (finding that the HVAC system at RDC "has been allowed to degenerate to the point that replacement is a more viable alternative than repair.").

### F.     Unreasonable Levels of Drugs and Contraband

The Monitoring Team reports that increased quantities of drugs have contributed to "a recent upsurge in serious drug overdoses and other drug reactions." Fourteenth Monitoring Report at 5. The rise in opiate abuse is especially worrisome. *Id.* Failure to eliminate the importation of contraband, including opiates, into RDC raises the risk of additional fatal drug overdoses. Such results are as tragic as they are preventable.

21

Recent shakedowns reveal that "almost half of the inmates in a housing area have contraband cell phones, excessive amounts of illicit drugs, shanks and even cash." *Id.* at 54. Contraband comes in through a variety of channels. Some detainees escape the facility solely to transport "the contraband back in." September 15, 2021 Status Conference Transcript, Docket No. 95 at 34; *see also* Docket No. 60 at 5 ("In one incident described in Monitor's June 2019 report, two prisoners were found outside RDC, not to escape but to recover three bags of contraband to bring back into the facility."). Members of the public also bring contraband in by, for example, throwing it over the fence. Sept. 15 Tr. at 34. Staff also smuggle contraband into the facility. *See id.* at 35 (observing that "the sheriff's office has been proactive in taking disciplinary action and firing and charging people who they have found who have done that.").

### G.    Inadequate Medical and Mental Health Care

By all accounts, RDC's management of medical and mental health care remains abysmal. As the above discussion indicated, *see* Part III.A, *supra*, RDC fails to adequately respond to medical emergencies and deaths.

Many of the issues related to inadequate provision of medical and mental health care stem from perennial staffing shortages. *See* Fourteenth Monitoring Report at 32; *see also* Part III.B, *supra*. Personnel shortages often impede, or prevent outright, the provision of medical and mental health services, including scheduled visits and necessary follow-up care. Fourteenth Monitoring Report at 34. Indeed, as a result of these failures, staff report that "procedures performed during medication pass have to be postponed or even canceled," or are completed haphazardly. *Id.* "[T]here is no mechanism for

reporting, keeping track of, and/or quantifying" these failures. *Id.*

Mental health integration also remains poor. For instance, "mental health staff are not involved in the decision to place someone in segregation whether disciplinary or administrative." *Id.* at 81. RDC also fails to integrate mental health staff in forensic evaluations conducted by the state mental hospital via telepsychiatry. *Id.* at 114. This, despite the continual increase in the number of detained individuals with mental health needs, including "a larger percentage of extremely unstable, acutely ill detainees." *Id.* at 5.

An incident this summer involving a youth detained at RDC is illustrative. Senior Circuit Judge Green initially transferred the youth from Henley-Young to RDC, asserting that RDC was better equipped to respond to the youth's "numerous attempts of self-harm and suicide attempts." Docket No. 90 at 1. Tragically, though, the youth again attempted suicide at RDC. *Id.* at 2. Multiple subject matter experts from the Sheriff's Office responded by stressing that "'neither RDC nor Henley-Young offer appropriate facilities for the mental health needs of this minor.'" *Id.* at 4. The youth was ultimately transferred to a state facility better equipped to support his mental health needs. His situation highlights the lack of appropriate mental health supports at RDC.

### H.    Over-reliance on Chemical Spray

The Monitoring Team indicates that "chemical spray is still being used to coerce compliance." Fourteenth Monitoring Report at 26. Such usage violates the Use of Force policy, which "explicitly requires that chemical spray be used as a defensive

measure, not as a tool to coerce compliance with officers' orders." *Id.*

Chemical spray incidents also suggest inadequate supervision. *Id.* at 56. Prior reports note that officers who inappropriately used chemical spray later received the approval of their supervisors, who "signed off on the reports." Thirteenth Monitoring Report at 25. Indeed, "the Internal Affairs investigator exonerated the officers." *Id.* This conduct is unacceptable.

As underscored by the Monitoring Team, RDC should develop procedures whereby staff must receive supervisory approval for using chemical spray. *Id.* Following use of chemical spray, staff must produce a use of force report, which should include a description, as well as the number of discharges, of the chemical munition cannisters used in the incident. *Id.* at 58, 61. Most importantly, though, RDC must abate reliance on chemical spray as a coercive measure.

## I.     Detainees Run Parts of the Jail

The First Monitoring Report from 2017 was crystal clear: the lack of staffing "has left prisoners in charge, which resulted in riots, prisoner deaths and major structural damage to the facility." Docket No. 12-1 at 2.

The consequences of detainee control were on full display during three riots in June 2019. A previous Order recited how "prisoners effectively took over one of the three pods that make up RDC." Docket No. 60 at 3.

> The prisoners threatened to stab officers with shanks and took their keys. At some point, officers barricaded themselves into a control room for their safety – ceding control of the pod until

> help arrived. The officers planned to retreat into
> the control room's bathroom should the prison-
> ers breach the control room door, which thank-
> fully did not occur.

*Id.*[12] The risks persisted in the most recent monitoring period. The Lieutenant in charge of booking and classification reported that some detainees "have developed their own committee system in which they choose who is accepted into their unit." Fourteenth Monitoring Report at 30. A-Pod in particular was described as "unmanageable." *Id.*

In one troubling incident, the control room officers of A-Pod and C-Pod both left their assigned posts. *Id.* at 33. The control rooms were unattended. Detainees could have "easily take[n] over the control rooms and release[d] the entire inmate population at the RDC." *Id.* There is no telling if or when detainees might again take control of a pod, or in fact release everyone held at RDC.

### J.      COVID Continues to Be a Challenge

Since the onset of the COVID-19 pandemic, this Court has been in communication with the County about implementing adequate measures to protect detainees and staff. *See United States v. Hinds Cty.*, No. 3:16-CV-489-CWR-JCG, 2020 WL 1892259, at *1 (S.D. Miss. Apr. 16, 2020).

Unfortunately, as recent as the Fourteenth Monitoring Report, there were still "few to no opportunities [] to quarantine or isolate individuals who have tested positive or who have been exposed to positive individuals within the jail system."

---

[12] This Court has previously condemned prisons officials for ceding control of the prison to the inmates. *See Depriest*, 2015 WL 3795020, at *13-14.

Fourteenth Monitoring Report at 2. The facility remains "at high risk for a spike in infections." *Id.*

The COVID challenge illustrates an ongoing theme with Consent Decree compliance: RDC adopts policies yet fails to implement mechanisms to ensure that the policies are enforced. This was particularly apparent during the Court's last status conference. The Attorney for the Sheriff's Office represented that per RDC policy, all staff must be either vaccinated or tested for COVID-19 on a weekly basis. When pressed for detail, however, counsel could not point to any mechanism of enforcement, and simply retorted, "that is the policy." Sept. 15 Tr. at 63. She finally acknowledged, "Do I represent to the Court that this may or may not be done 100%? We don't know because it's a new policy[.]" *Id.*; *see also* Fourteenth Monitoring Report at 59 (noting that staff are "not able to articulate . . . meaningful knowledge" of the Use of Force policy that went into effect 18 months earlier).

### K.     RDC Detains Persons Adjudicated "Not Guilty"

A fundamental principle of corrections is that persons should be detained only as long as necessary to resolve the charges against them. Accordingly, RDC is required to release individuals found not guilty, acquitted of charges, or who have the charges against them dismissed, provided that they are not held on any other matter. Fourteenth Monitoring Report at 115.

Presumably, the only detainees housed at RDC are those who have failed to meet their bond obligations or are not entitled to bond, as one generally has the federal constitutional right to bond. *See United States v. Salerno*, 481 U.S. 739, 755 (1987). ("In our society liberty is the norm, and detention prior to trial

26

or without trial is the carefully limited exception."). The Mississippi Constitution also recognizes this right. As the Mississippi Supreme Court has explained, "there is a non-discretionary right to bail before conviction for all offenses, except those offenses punishable by death. . . . The Constitutional right to bail before conviction, less the exception, has become so fundamental that it is favored by the public policy of this State." *Lee v. Lawson*, 375 So. 2d 1019, 1021 (Miss. 1979). The Court cannot overlook this principle, which affords each detainee the presumption of innocence.

RDC nevertheless routinely fails to release individuals found not guilty, acquitted, or who have the charges against them dismissed. Fourteenth Monitoring Report at 115-16. The Monitoring Team counsels that "the courts will need to develop the capability to provide a written release order in the courtroom for an individual to be released from court." *Id.* at 116. But RDC also needs to develop a means of identifying and releasing those for whom no lawful basis of detention exists. *Id.*

### IV.    Conclusion

The Supreme Court has affirmed extraordinary federal intervention into correctional operations where constitutional violations persist "for years" and "remain uncorrected." *Plata*, 563 U.S. at 499. The record suggests that is the case today.

Within 21 days, Hinds County shall show cause and explain why it should not be held in civil contempt and why a receivership should not be created to operate RDC. A hearing will be scheduled shortly thereafter.

**SO ORDERED**, this the 23rd day of November, 2021.

s/ Carlton W. Reeves
*United States District Judge*