IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | Case No.: 3:16-cv-00489-CWR-RHWR |
| ) | |
| ) | |
| HINDS COUNTY, ET AL., ) | |
| ) | |
| DEFENDANTS. ) | |
| _____ ) | |

## Court-Appointed Monitor's Fifteenth Monitoring Report

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish          Jim Moeser          Dr. Richard Dudley
Corrections Operations    Juvenile Justice    Corrections Mental Health

## EXECUTIVE SUMMARY

Because of the COVID-19 pandemic, this site visit was once again conducted remotely October 4-8, 2021. The remote site visit was completed through conference calls and video conferencing with key personnel, members of the Monitoring Team and County and DOJ representatives. The Compliance Coordinator provided extensive documentation electronically which made it possible to review many records that are normally examined on site. An off-site document review does limit the ability to verify some of the information as might be done with an on-site visit in which more substantial interviews/observations can be completed and additional documents reviewed. Comments and other information in this report should be considered in light of that limitation.

**Corrections Operations**

While recent changes in the administration of the Hinds County Sheriff's Office (HCSO) were brought about by the untimely loss of Sheriff Vance, Interim Sheriff Crisler and Jail Administrator Bryan have an opportunity to address the needs of the HCDS in an innovative and positive manner in their new positions. They should push for the creation of incentives and practices that will enhance the ability of the HCSO to hire and retain qualified personnel. In addition, they can help the County to develop more efficient methods of dealing with the maintenance problems that have plagued the Jail System for years.

As always, the lack of personnel is the single greatest problem facing the Jail System. Without enough personnel to fill required posts it is unrealistic to expect compliance with the Settlement Agreement. Direct supervision cannot succeed if there is no officer available to staff each housing unit around the clock. Unfortunately, rather than improving, the staffing situation has regressed during the past four months. As of September 30, 2021, there were only 207 filled positions out of 281 funded slots. In May that figure stood at 229. For the past five years the number of filled positions has fluctuated between a low of 204 and a high of 256. Retention of staff has been an ongoing problem and, as a result, the Stipulated Order requires engaging a recruitment and retention consultant and development of a recruitment and retention plan. A number of measures to improve retention have been recommended. The County reports that it has adopted the 5% pay increase for detention personnel although it has not yet been implemented. The County should immediately adopt the additional recommendations submitted by the Jail Administrator and Sheriff to implement a career ladder for those officers so that they do not leave after a few years and to offer nominal incentives such as bi-weekly pay and direct deposit of paychecks, things that are available to most public service workers.

Direct Supervision of all facilities is mandated by the Settlement Agreement, but to date it has only been implemented successfully at the WC.  That facility has become the benchmark against which the rest of the Jail System must be measured.  It has fewer problems, less contraband, and a better record with regard to the quality of incident reports than the RDC which is located only a few hundred yards away.

The County's inability to provide adequate maintenance for the Jail facilities is problematic.  The employment of Benchmark Construction was the best step that has been taken to date to resolve the issue.  Unfortunately, the County still requires an excessive level of review before corrective action can be taken for routine maintenance projects.  Why, for example, should there still be 19 "trash dumpster cells" in A-Pod four months after this matter was brought to the attention of the Court in the 14th Monitoring Report?  They should have been repaired and put back on-line as quickly as possible.

Some serious problems associated with the Settlement Agreement continue to be unresolved, even after five years of monitoring.  The holding cells in Booking continue to house inmates for days, weeks, and months.  This violation of basic correctional standards needs to cease permanently.

Although improvements have been made in the area of Classification, it is still not the case that an objective risk instrument is governing the housing placement of inmates when there continue to be gang pods, inmate "committees" rejecting housing placements, security moving inmates without Classification involvement, lack of bed space and limitations on the use of some housing units. Lack of staffing in Classification does not allow for 24/7 coverage and as a result not all inmates are classified within eight hours of booking and Classification is not promptly involved in the movement of inmates by officers.

There continue to be incidences of over-detention with no related incident reports or corrective action. Although with the implementation of status sheets and records audits, the number of these has been reduced, but investigation and corrective action following these incidents needs to be implemented. A log of releases was available for the first time during this site visit which noted whether the release was timely. However, it did not include the underlying information such as the date and time of the court order that would allow for effective oversight of whether the releases were timely.

Of great concern is that there appears to be no functioning PREA officer at this time. A number of PREA related medical transports were identified by Medical, but there has been no investigation of these incidents. A number of incident reports also indicated PREA issues for which there was no follow up. In addition, during this time there has been no education of inmates on PREA and no training of officers.

3

On a positive note, the Quality Assurance Officer has been producing excellent reports which should be invaluable to the Sheriff's Office and command staff in identifying initiatives for improvement.

More recently, six inmates have died in custody so far this year—two in Booking, one in HU C-1 and another in HU C-4 at the RDC, one at Merit Health Hospital and one in HU A-4 at the RDC. While definitive causes of death have not yet been reported by the Mississippi Bureau of Investigation, one case appears to be due to COVID-19, two were due to an apparent drug overdose, two were suicides and the last was caused by an assault by other inmates. The interim report filed with the Court on October 28, 2021 provides more detail on these deaths. Subsequent to the interim report another inmate died of cancer on November 18, 2021. He was hospitalized at the time of his death. Nevertheless, a mortality review should be completed.

Finally, supervisors need to be held accountable for the actions of their officers. This issue has been covered in detail in each and every Monitoring Report. It is time for supervisors to be held to the standards that approved and adopted policies require. It is not sufficient to simply "sign and send" incident reports and logs which has been the norm in the HCSO for many years. They need to specify the actions of staff that are not consistent with expected/approved policy and recommend appropriate corrective action.

**Medical and Mental Health**

After medical staff logged incidences where the shortage of security staff has impacted on the delivery of medical and mental health services, an essential element required to assure a safe and secure facility, it is clear that the impact has been significant. Therefore, despite the shortage of security staff, a higher priority must be given to assigning security staff to support medical and mental health staff.

The number of recent deaths in the facility has focused attention on the importance of performing an interdisciplinary mortality review for each death. Such a review provides an opportunity to identify any underlying problems that might contribute to similar fatalities and implement any indicated corrective actions.

Plans for the much-anticipated Mental Health Unit are well underway, as is the renovation of the designated space for the unit. However, the unit will not be able to open until staffing issues are resolved, which will require approval and implementation of the QCHC contract by the County (which includes an increase in the number of mental health staff) and completion of the training of security officers who will be assigned to the unit.

4

Although the management of the range of COVID-19 related issues seems to have improved, there is still work to be done to increase the percentage of detainees who agree to be tested and vaccinated.  To accomplish this, a more enhanced educational effort should be undertaken and the County should fund incentive programs to encourage detainee participation in these life-saving interventions.

The detention facilities experienced a surge in cases in July, August and September with about 90 inmates and staff testing positive. It appears that the facilities have moved past the recent surge in cases, and so things are more manageable again.  However, during the surge, the housing of detainees who were infected or otherwise in quarantine was a challenge, due to space and the shortage of security staff.  This was particularly a problem with the female detainees requiring quarantine, who were housed in segregation cells in the WC. The females ended up taking all of the segregation cells instead of only half of the cells (usually designated for females who required placement in segregation) and there was still overcrowding.

There has been an increase in detainee testing and vaccinations as a result of education efforts by the Jail Administrator and the medical staff.  As of November 1st, at RDC 141 (35%) of detainees were fully vaccinated, 27 (7%) had a first dose, and 232 (58%) have refused vaccination. At the WC 62 (35%) were fully vaccinated, 10 (6%) had a first dose, and 100 (56%) have refused vaccination. A broader education effort (group education sessions, posters, a formal peer education effort lead by those already vaccinated, etc.) is indicated and should be encouraged. Testing and vaccinations also increased when the Jail Administrator offered incentives (pizza night, etc.).  However, the Jail Administrator has reported that the County has discontinued funding such incentives. The County should reconsider this decision.

Medical opines that staff mandates (vaccination or weekly testing) seem to be helping. It appears that staff compliance with mandates has at least decreased the entry of COVID into the facility, especially since new admissions are being are being tested and quarantined (making new admissions less of a problem with regard to bringing COVID into the facility). All of the described initiatives appear to be having a positive effect. It is still recommended that a routine contact tracing effort which is not currently being done be initiated.

**Youthful Offenders**

At the time of the October virtual site visit, there were eighteen Juveniles Charged as Adults (JCAs) placed at the Henley Young facility, including two females.  The Average Daily Population (ADP) since the last reporting period showed a notable decrease which helps alleviate some of the immediate concerns caused by the rising population reported last time. However, that does not negate the concerns that any sense of intermediate and/or longer-term planning related to the JCAs is at best unclear if occurring at all.

There has been some reduction in the number of more serious incidents involving JCAs, including fights, significant disruptions, suicide attempts, and possession of contraband items. While difficult to fully quantify, this does not alleviate the concerns about Henley Young being as safe an environment as it had been in the past, particularly given the large number of vacancies for the Youth Care Professional (YCP) that exist.  The YCP staff are the most responsible for providing day-to-day direct supervision of youth as well as supporting other staff in providing services.  Increased recruitment efforts have been implemented and the job description has been modified to better reflect the role these staff play in the facility, but vacancies and turnover severely limit the ability of the program to move forward in meeting several requirements of the Settlement Agreement. As noted below, seven YCP positions were eliminated to provide a raise to the current YCP staff. Although these positions were not filled, they are needed. The vacancy rate based on the staff positions including the seven eliminated positions is 60% (47% of staff positions excluding the seven positions.

On a positive note, Fernandeis Frazier has continued as Executive Director and all major leadership roles are filled.  In many ways, this is the most complete and solid administrative team that has been in place over the duration of the monitoring process.  The recent addition of a full-time Treatment Coordinator is an important step forward, as that person will play the lead role in establishing the vision and implementation strategies for a coordinated and integrated mental and behavioral management program.

Modular units to provide additional and more appropriate education, program, and treatment space are technically operational, but staffing shortages have made it difficult to utilize them. Additional recommendations related to facility plant improvements have not been implemented, and additional needs related to the security system and water system have been developed and need to be addressed. The education program remains a concern, hampered largely by COVID restrictions and staff shortages, although the principal is actively working to improve services to better meet the needs of a diverse youth population.

Related to the Stipulated Order, as noted above the County has hired a full-time Treatment Coordinator, a cornerstone position in terms of providing vision and leadership for the mental health services and integrating those with other aspects of the overall program. However, continued work needs to be done to secure additional psychological support/consultation to best meet the intent of the Stipulated Order. A vigorous daily schedule for all programming has been developed, and some improvements in actual implementation have been reported and documented. That said, the overall quality and consistency of implementation is better assessed when the Monitor can be on site.

Overall, with a stronger leadership team in place there is some hope that progress can be made in the months ahead, but the priority remains getting qualified YCP staff on board so that basic safety, security, and programming can be implemented successfully.

**Criminal Justice System Issues**

A CJCC meeting was held on October 1, 2021. There was not a quorum and the meeting was primarily informational. The CJCC continues to be essentially non-functional. It will be important for the County to provide leadership in the CJCC to work towards solutions to some of the criminal justice system issues that contribute to length of stay and overcrowding the Jail. The Monitoring Team has consistently recommended that staff support is essential for a functioning CJCC but this has not been provided. The length of stay at the Hinds County Jail continues to be approximately double the national average and puts a significant strain on the limited resources of staffing and the physical plant. An effective CJCC can assist in addressing this problem but requires the necessary investment to make it an effective body.

The County has hired a full-time individual to implement the pretrial program. The application to be a learning site for implementation of the Arnold Public Safety Assessment has been rejected because of lack of support by the City of Jackson. This would have met the requirement of the Stipulated Order, although long overdue, to retain a consultant to assist with the development of a pretrial program. Without technical assistance, development of a pretrial program is unlikely.

There continue to be discrepancies in the understanding of inmates waiting for state hospital beds. A listing of individuals ordered for a mental health evaluation has finally been initiated at the Jail but it was incomplete. The listing did not include the current status of the orders and so included individuals who had completed the evaluation with no explanation of why they were still in the Jail. The listing was not consistent with the state hospital listing with no communication about the difference. As the individuals with serious mental illness often stay a long time in the Jail and often pose significant management problems, this tracking and follow up should be prioritized.

**STIPULATED ORDER UPDATE**

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

**STIPULATED ORDER UPDATE**

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes, but not consistently utilized | 10/2019 | Consultant was retained through the Monitoring Team. However, there was not regular engagement by HCDS staff and the contract was dropped. The new Jail Administrator is now utilizing the contract |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | No | 3/2020 | Purchase Order submitted on 1/22/20; cameras were on back order; they have now arrived. As yet, there have been no video recordings of planned Uses of Force (UOF) although there have been some incidents that should have been considered planned UOF. |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | No | 5/22/20-but vacant and filled in mid-August 2021 | A full-time Treatment Coordinator was hired in mid-August 2021.  Her certification is at a master's level in counseling, and discussions will continue related to securing additional psychologist support and/or consultation. The opening for a psychologist remains posted. |
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and | | | The County has entered into a contract with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, |

| | | | | |
|---|---|---|---|---|
| | security measures at RDC. The architect shall conduct periodic inspections. | No | 4/15/20 | Farr & Lemons Architects & Engineers (CDFL, PA). This was reportedly on 4/15/20. The Monitoring Team has not seen the contract or documentation of any inspections by CDFL. |
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |
| | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 | |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement-required policy review and approval process is completed. | Yes | 3/27/20 | |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the supervision of inmates at RDC. The plan shall include the following:<br>II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | | | The Revised Staffing Plan was developed in April 2020.  It specified direct supervision staffing for all three pods at the RDC.  On August 1, 2020, the Sheriff issued an order that called for direct supervision staffing in C-Pod upon |

| | | | |
|---|---|---|---|
| | | Yes | 4/13/20 | its reopening (which occurred on October 22, 2020).  However, incident reports disclose that C-Pod is often not staffed according to the Plan and Order. A updated revised staffing plan was developed in October, 2021. |
| | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | No | | The staffing plan does not address this paragraph. The new Jail Administrator has identified individuals at the WC who can be reassigned to RDC and is in the process of implementing that plan. |
| | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare check sheets at the cell doors of those inmates held in segregation. | No | | Directive issued on 9/27/19 by the previous Jail Administrator; radios assigned. Review of incident reports discloses that the directive is not consistently being followed. |
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other areas or facilities. This work will be completed within 3 months. | Yes | 4/2/20 | The alarms and cameras were installed in April 2020. The operations did not shift to direct supervision with one officer in the unit until September, 2020. |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall | | | New policies have been provided to staff. In service training recommenced in April 2021, but all |

| | | | |
|---|---|---|---|
| | develop the curriculum and materials for training on the new policy or procedure. | No | | officers have not been trained on all new approved and adopted policies. |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | No | | Training on the Use of Force Policy, adopted 2/1/20, had been postponed several times due to COVID. In the interim, UOF training has been provided to all supervisors as of March 2020. In-service training has now recommenced but not all officers now new supervisors have been trained on UOF. |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include:<br>1. Activities which are varied and appropriate to the ages of the youth;<br>2. Structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship;<br>3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and<br>4. Hinds County, by and through its County Administrator and/or Executive Director at Henley-Young, shall maintain exclusive control and maintenance of any facilities or | | | A more complete daily schedule has been developed that outlines times for more structured activities. Per staff involved in leading the activities there has been some improvement in attendance and increased expectations for staff to encourage attendance by not turning that time into "free time" in which youth play cards or watch TV. Staff shortages interfere with attendance and completion of activities and attendance need to be documented. |

| | | | | |
|---|---|---|---|---|
| | technology that promotes compliance with this provision. | No | | |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as: 1. cognitive behavioral programming; 2. independent living skill training; 3. relationship and positive communication skills; 4. anger management; 5. peer refusal skills; 6. trauma informed programming; and 7. pre-vocational skill building. | No | | The mental health team (Youth Support Specialists and QMHPs) have worked to identify and implement evidence-based curriculum/programs in the areas outlined.  The frequency and duration of those sessions remains a concern as well as integrating those activities into a facility-wide behavior management and skill development framework. |
| 05-16-20 | I.  A. 1. In any occupied pod, the County will convert all control room doors, housing unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically controlled swing doors to the control panel so they can be electronically operated with a CML type locking mechanism. | No | | This has been completed in C-Pod and A Pod and now in B-Pod. Although the security doors in A-Pod have been changed from a sliding to a swinging configuration, and they now lock, their operation is still by key, not electronic control. |
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | Yes | 4/30/20 | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic | | | The work has now been completed in B-Pod although other issues prevent B-Pod from being fully occupied. |

| | | | | |
|---|---|---|---|---|
| | control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | No | 9/21 | |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | No | | Fire hoses have been installed in C Pod during the renovation. They have not been reinstalled in the other 2 pods the renovation of which is now overdue. |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | Yes | 4/15/20 | CDFL and HDR, Architects, have been retained. |
| | I. B. 4. Form a committee to develop and implement the Master Plan, which will include the County Administrator, the Sheriff, the Jail Administrator, the facility captains, and the Board of Supervisors President. Other members may be included at the discretion of the County and the Sheriff. | Yes but not fully because facility captains not included | 4/28/20 | County contracted with facilitators and formed a committee to work with the facilitators. The consultants completed the master plan recommendations on January 15, 2021. They are now working on phased implementation of Option 2 of the Master Plan. |
| | II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division | | | There has been frequent turnover in this position. It has been vacated several times and is now filled again. |

| | | | | |
|---|---|---|---|---|
| | specifically for recruitment of detention officers. | No | 6/1/20 | |
| | II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | No | | A basic Recruitment Plan has been developed by the Recruitment Officer. It did not address retention. The new Jail Administrator is working with the HR consultant to develop a complete plan. |
| | IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of implementation of pretrial services programs. | No | | The County has not retained a consultant. The County has not been selected as a learning site with Advancing Pretrial Policy and Research because not all stakeholders agreed to provide a letter of support. |
| | IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or within 12 months shall obtain certification by the National Association of Pretrial Services Agencies (NAPSA). | No | | The County has posted the position. The County has hired a Director who started on November 9, 2021. |
| | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | No | | The development of a pretrial program has been discussed at CJCC meetings but has not included all necessary stakeholders or focused on actual implementation. |
| | IV. A. 4. The County shall provide the technical support for implementation of a | | | |

| | | | | |
|---|---|---|---|---|
| | risk assessment instrument for purposes of pretrial release decision-making. | No | | |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | No | 9/2020 | The position was not posted until 5/22/20. The position was filled in late September, 2020 with the hiring of a clinical social worker but she resigned after 8 weeks. The County filled the position as of May 30, 2021 with a half-time person who left shortly thereafter. A new Treatment Coordinator began full-time in mid-August. As of October 2021. the County has not yet contracted with a psychologist to provide additional services or consultation. |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train deputies on a Settlement-compliant use of force policy, including Settlement requirements for reporting of use of force. | No | | Training was scheduled but had been delayed due to COVID. UOF training is provided to new recruits during the basic academy. Now that in-service training has recommenced UOF training for existing staff is being provided but not all officers have been trained yet. |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring | | | Training on supervisory review of UOF incidents was included in the UOF training of the supervisors. Incident reports indicate that supervisors are approving reports that disclose improper use of force. |

| | | | | |
|---|---|---|---|---|
| | complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | No | 9/2020 | Since the time of the supervisors' training, new supervisors have been promoted and need training. |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | No | 10/21 | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be converted to secure swinging doors and tied to a new control panel. | No | | Since the renovation of B Pod is still underway, A Pod continues to be used contrary to the time line in the Stipulated Order. However, the plan is now to continue to use two housing units and A-Pod which will require renovation. |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | No | | Multiple person cell doors have been replaced but single cells continue to be used for housing without the required doors. It was anticipated that Booking would no longer be used for housing when C Pod opened. However, it continues to be used for housing. |
| | II. B. 4. Within 6 months, the County shall develop and implement a process that | | | A draft Career Development Plan has been submitted to the Board of |

| | | | | |
|---|---|---|---|---|
| | provides criteria for merit-based promotion and establishes a career ladder. | No | | Supervisors but as of the time of the site visit the BOS had not taken action on it. |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | Yes | 6/1/20 | A new well qualified Jail Administrator was hired in June 2021. |
| 8-16-20 (2 months to post, 4 months to offer, and 1 month evaluate structure | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | No | | The new Jail Administrator has done an assessment and has a plan to move some supervisors from the WC to RDC. |
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the development of the pretrial program within 9 months. | No | | |
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | No | | |

| | | | | |
|---|---|---|---|---|
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | No | | A Recruiting Officer is working on initiatives to hire qualified Detention Officers. Retention has not been addressed. |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | No | 1/15/21 | The master plan recommendations report was completed on 1/15/21. The Master Planning Committee is now proceeding with planning a phased implementation of Option 2 of the Master Plan. |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. | No | 1/15/21 but not fully because deadlines for renovations not included | The master plan recommendations report includes a listing of necessary safety and security repairs. The report does not include and the County has not adopted a master plan with deadlines for making those repairs. |
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | No | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the information that is needed for the long-term planning process. | Yes | | |
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will notify the Monitor and DOJ of any anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The | | | The policy development and review process has been proceeding with 33 policies now approved. Not all projected deadlines have been met. Progress was stalled but with the new Jail Administrator progress is now being made. |

| | monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | No | | |
|---|---|---|---|---|

**Monitoring Activities**

The Monitoring Team conducted a Remote Site Visit October 4, 2021, through October 8, 2021 with some follow up interviews. The site visit schedule was as follows:

Site Visit Schedule

October 4-8, 2021

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Richard Dudley | Jim Moeser |
|---|---|---|---|---|
| **October 4** 9:00 | Major Bryan and Captain Simon **\*Zoom** | Major Bryan and Captain Simon **\*Zoom** | | |
| 10:30 | Jamekia Scott, Grievance Coordinator **\*Conference B** | Bob Brown, Gary Chamblee and Sgt. Winter **\*Zoom** | | Mr. Burnside, Operations Manager and Mr. Dorsey, Quality Assurance Manager **\*Google Meet** |
| 1:00 | Captains Simon, and Conner **\*Zoom** | Captains Simon, and Conner **\*Zoom** | | |
| 2:30 | | Miioka Laster **\*Conference A** | | Youth Support Specialists Tamika Barber and Carleslie Jones **\*Conference B** |
| 3:30 | Tony Gaylor and County Administrator Jones **\*Zoom** | Doris Coleman **\*Conference A** | | |
| **Oct. 5** 9:00 | Public Defender **Conference B** | Lt. Holmes, Investigators Elkins and Edwards **Conference A** | Nurse Cable, HSA and Nurse Gray, Director of Nursing **TEAM (TBA)** | Ms. Brenda Frelix (QMHP) **\*Google Meet** |
| 10:00 | Priscilla Dawson **Conference B** | Lt. Cheryl Childs, and Marlo Brinnon **\*Conference A** | Mental health team/staff-QMHP's Ms. Martin and Ms. Pippins **TEAM (TBA)** | Ms. Carol Warfield, Treatment Coordinator **Google Meet** |

| 1:00 | Inmate Interviews **\*Zoom** | Sgt. from Booking, Sgt. from RDC, and Sgt. from WC (one after the other) **Google Meet** | Discharge Nurse Buffington (and Nurse Cable, optional) **TEAMS (TBA)** | Director Frazier **Conference B** |
|---|---|---|---|---|
| 3:00 | Lt. George **Zoom** | | Representative from Nursing Staff **TEAMS** | Ms. Young, Youth Care Supervisor **Conference A** |
| **Oct. 6** **9:00** | Sgt. Mazie Jones **\*Conference A** | Sgt. Mazie Jones **\*Conference A** | Dr. Lot, Nurse Practioner **TEAMS** | |
| 10:30 | County Administrator; Robert Farr, Bill Prindle, Tony Gaylor, David Marsh, and Major Bryan (and maybe others) to discuss Master Planning **Zoom** | County Administrator; Robert Farr, Bill Prindle, Tony Gaylor, David Marsh and Major Bryan, (and maybe others) to discuss Master Planning **Zoom** | Dr. Bell **TEAMS** | Andrea Baldwin, Program Coordinator **Conference B** |
| 1:00 | Sgt. Tillman re Records **Conference B** | Captain Jeff Burnley and Lt. Neal Knox **\*Conference A** | Major Bryan, Nurse Cable (HSA), Krista Chick (QCHC Central Office, Mental Health), Dr. Kern (QCHC Central Office), Marlo Brinnen re mortality reviews **Google Meet** | Mr. Caldwell, School principal **Zoom** |
| 3:00 | Claire Barker, Sheriff Crisler, and Major Bryan **Zoom** | Claire Barker, Sheriff Crisler, and Major Bryan **Zoom** | | Mr. Caples, QMHP |
| **Oct. 7** **9:00** | HSA and QCHC Central Office (Krista Chick and Dr. Donald Kern) | | HSA and QCHC Central Office (Krista Chick and Dr. Donald Kern) Ms. Martin and | Ms. Foster, Training and Learning Development Manager **Conference B** |
| 10:30 | Ms. Martin and Ms. Pippins re | Tony Hannah **Conference A** | Ms. Pippins, and | |

|  | Mental Health Unit<br><br>**\*Zoom** |  | Major Bryan re Mental Health Unit<br><br>**Zoom** |  |
|---|---|---|---|---|
| 1:00 | Taneka Moore<br>**Conference (A)** | Bernard Moore, Recruiting<br>**Zoom** | Nurse Cable<br>**TEAMS** | Exit conference with Mr. Frazier<br>**Google Meet** |
| 2:00 | Claire Barker, Synarus Green, Tony Gaylor, (Sheriff and Board representative invited)<br>**\*Zoom** | Claire Barker, Synarus Green, Tony Gaylor (Sheriff and Board representative invited)<br>**\*Zoom** | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited)<br>**\*Zoom** | Claire Barker, Synarus Green, Tony Gaylor, and other attorneys (Sheriff and Board representative invited)<br>**\*Zoom** |
| Oct. 8<br>9:00 |  |  | person with full access to EMR<br>**TEAMS** | Carlyn Hicks, Youth Court Judge<br>**Zoom** |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |

| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
|---|---|---|---|---|---|---|
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |
| 6/7-11/21 | 2 | 2 | 59 | 1 | 28 | 92 |
| 10/4-8/21 | 3 | 0 | 59 | 1 | 29 | 92 |

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:
    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;

23

n.   Laundry;
o.   Food services;
p.   Hygiene;
q.   Emergency procedures;
r.   Grievance procedures; and
s.   Sexual abuse and misconduct.

**Partial Compliance**

The Stipulated Order calls for a total of 90 policies that need to be developed and implemented. Of those, 48 are identified as priority policies. Twenty-seven of the priority policies have been approved by DOJ and adopted by the Sheriff with one recently approved by DOJ but not yet adopted. So far, 33 policies have been approved by the DOJ and 32 have been adopted by the Sheriff.  Of the 19 policy areas listed above, 16 have been addressed in whole or in part by policies that have been adopted. One more is addressed in policies currently under review and "Housing Assignments" has been addressed in a housing plan. Although progress is being made, the target dates for policy development have not been met. With the change in Jail Administrator some policies that were previously identified as in the review process are being revisited. At this time there are four policies actively in the review process.

The development of a complete set of policies, approved by the DOJ and adopted by the Sheriff, is moving forward but this has been at a less than satisfactory rate.  The first two years of the monitoring process resulted in virtually no progress, but the addition of a coordinator employed through the Monitor resulted in positive movement. With changes in HCDS personnel there was less engagement by HCDS staff in the policy development process which slowed the pace. While the review process has never been accomplished at a satisfactory level, during the last four months it has slowed even further due to changes in personnel assigned to these duties.  Now that a new Jail Administrator has been put in charge of the Jail System, the effort to review and approve policies has taken on a new priority and draft policies that have languished in the process are being moved. This appears to be accelerating the pace of policy development and should also improve the final product of the policies.

In spite of the problems associated with the COVID pandemic, in-service training sessions recommenced on approved policies.  Between August 31 and September 3, 2021, approximately half of the current Detention Services work force received instruction on approved policies. They included:  01-100, Administration; 01-600, Review and Investigations; 04-200, Information Management; 06-100, Pre-Booking; and 06-200, Booking.  The remaining staff will be scheduled to attend at a later date.  While this is a step in the right direction, the shortage of staff makes it extremely difficult to pull officers from scheduled duties in order to attend training sessions.  In addition, only a few of the approved policies have been covered to date.  The backlog of required training is more than can be reasonably handled in a timely fashion considering the lack of available staff.

As has been previously noted, no Post Orders have been issued to date.  Their creation is dependent upon the implementation of Policies, many of which have yet to be developed.  The memo titled "Detention Officer Duties" that was issued by the previous Jail Administrator on April 6, 2021, failed to serve as a satisfactory interim measure.  While officers at the WC routinely comply with the standards set forth in the memo, the same cannot be said for the RDC.  This will be explained in greater detail later in the Monitoring Report.

There is still a concern that some of the adopted policies do not appear to be implemented or fully implemented. Neither the officers or supervisors have received in-service training on the policies although new cadets receive such training. The WC has been training on policies during roll call training which although limited in time is of some benefit. The RDC has not been providing roll call training. Most notably, the Use of Force policy explicitly requires that chemical spray be used as a defensive measure, not as a tool to coerce compliance with officers' orders. As described below, chemical spray is still being used to coerce compliance. There are numerous other examples of the failure to follow or implement adopted policies mentioned throughout this report such as the failure to provide constant supervision for suicidal inmates. In some cases, it is not a matter of training but a lack of implementation. An example, is the failure to create a Classification Committee. The new Detention Administrator will hopefully rectify these problems.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Partial Compliance**

The new Jail Administrator who was employed in June 2021, is well qualified for the job.  She meets all of the requirements specified in the Settlement Agreement with regard to education, experience and technical training.  She is the best qualified individual to hold the position since the monitoring process began.

As has been previously noted, the Assistant Jail Administrator was not qualified to hold his position based on his lack of education; he did not have a four-year college degree.  He was recently suspended for seven days without pay from September 27 through October 5, 2021, and now is reportedly terminated for cause on October 20, 2021.  The Captain who currently commands the WC is the acting Assistant Jail Administrator.  Although he does not currently

meet the education requirement, he has been enrolled in Hinds Community College since January of 2021.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

As was noted in Paragraph 37, in-service training has recommenced, starting with a review of several approved and adopted policies.  A concerted effort is required in order to provide that training to all supervisors on all such policies.  That has not been accomplished to date.

In the last Monitoring Report concern was expressed over the fact that in 2021, two officers, who were promoted to the rank of Sergeant, did not meet the experience requirement.  During the past four months that discrepancy has not reoccurred.  Of the three individuals who were promoted to Lieutenant, Sergeant and the specialty position of Grievance Officer, all were well qualified to fill the positions.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Sustained Compliance**

The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check.  The was confirmed by the Background Screening Investigator/Recruiting Officer and the Director of Human Resources, as well as by a review of the personnel files of recently employed Detention Officers.  Since Substantial Compliance has been maintained for 24 months, this paragraph is now upgraded to Sustained Compliance.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

The HCSO has not addressed the requirements of this paragraph adequately.  In the last Monitoring Report, a lengthy review of design, operation and staffing implications for each jail explained why this paragraph is carried as Non-Compliant.

While the JDC is no longer used for housing, the transfer waiting area on the ground floor needs to be renovated to eliminate the two existing holding cells and replace them with adequate holding cells to support the inmates going to and returning from court.

At the WC direct supervision has been in place effectively ever since the second officer was removed from each housing unit. Not only did that save on manpower, but it allowed the single housing unit officer to be completely in charge of, and fully responsible for, the operation of his/her housing unit. The fact that the WC housing units are designed as open bay dormitories, where the officer does not have the option of locking inmates down in cells for extended periods of time, actually made compliance with the principles and dynamics of direct supervision easier than has been the case at the RDC.

At the RDC, which was originally designed and operated as a direct supervision jail, the facility reverted to "podular remote surveillance" when the officers were pulled out of the housing units in 2012. Re-establishing direct supervision has not been possible since that time due to the lack of staff required to keep an officer inside each housing unit continuously. When C-Pod was reopened in October 2020, after being fully renovated for the second time since 2012, it was supposed to be staffed for, and operated as, a direct supervision housing area. A year later, that has still not occurred. Housing units are frequently left unattended and inmates are kept locked down in their cells for extended periods of time. The end result is that there has been extensive damage caused by inmates, the existence of contraband is still at an unacceptable level and assaults and conflicts between inmates are all too common.

Previously, documentation in support of these statements was provided by referencing specific incident reports. That was particularly important given that the Monitoring Team's site visits have been conducted remotely for over a year due to the COVID 19 pandemic. Fortunately, the recently assigned Quality Assurance Coordinator now publishes a monthly summary report which provides data and observations made on site. The following quotation is from the August 2021, Monthly Quality Assurance Summary. "Several walkthroughs of Raymond Detention Center in August have yielded similar or the same results. Staff in C-Pod are not stationed in the units as required. This pod is a direct supervision unit and should be staffed at all times. In one instance, detainees were observed sifting through staff's paperwork that was left in the unit when staff exited the pod." See e.g., 210962. There are supposed to be two officers assigned to work inside C-4. They are not supposed to leave the unit. On July 6th, IR 210983, an inmate committed suicide on C-4 when no officer was present. The Internal Affairs report disclosed that the lone Detention Officer assigned to C-4 had a habit of leaving the housing unit and left the unit that day as reported by other officers. He did not complete an observation log because he reportedly did not have a log book. He reported head counts every hour, but did not actually go inside the unit; instead, he looked in from the area of the "cage" from where he could not possibly see each inmate to conduct an accurate count. It is not always possible to tell from an

incident report whether there was an officer on the unit when an incident occurred. However, numerous incident reports suggest that to be the case. An example is IR #211071, in which on July 24th, officers entered C-4 to do count and found an inmate hanging in his cell from the light fixture.

As has been previously reported, officers spend time in the control room instead of being on the units. This has continued to be a problem. The QA Coordinator reported that when visiting the units, she often finds the officers sitting in the control room. This is apparent in some incident reports. On July, 26th, the Lieutenant responded to an assistance call regarding a fire in C-4 ISO. Upon arrival in C-Pod, she found the entire first shift and supervisor sitting in the control room. IAD reports disclose that on July 20th several Detention officers and two Sergeants were in A-Pod Control during the investigated incident. On May 29th, three Detention officers had a food fight in A-Pod Control with a supervisor present. There are other instances when officers leave their assigned posts. On September 6th, (IR #211241) an inmate housed in Booking was having his out of cell time. The officer assigned to Booking stepped away because he had a phone call. While he was gone, a fight occurred between that inmate and an inmate from the laundry room.

B-Pod has been closed for renovation so that it can be brought up to C-Pod standards.  Even though all required work was not complete, portions of the pod were opened beginning in August.  When the entire pod is brought back on line it is supposed to be operated as a direct supervision housing area.  Considering the fact that C-Pod still does not live up to that standard, it is unlikely that B-Pod will either.  Previously A-Pod was scheduled to be closed once B-Pod reopened, but now consideration is being given to keeping two housing units in A-Pod operational.  Not only does the County have no plan for renovating A-Pod, but the additional personnel required to operate any of A-Pod under direct supervision conditions is well beyond the current staffing level.  With only 207 positions filled as of September 30th, HCDS does not have enough personnel available to fulfill the requirements specified in the Stipulated Order.

- Direct supervision is effective at the WC.  IR's 211421 and 211433 are two examples of how the presence of an officer in the housing unit makes it possible for him/her to observe conflicts between inmates and to intervene before serious injury results.  IR's 211313, 211324 and 211358 reflect just the opposite at the RDC where direct supervision has not taken hold.  There the inmates have control of the housing units and staff usually respond to incidents after the fact.
- IR211313—Inmates in A-2 told the Detention Officer serving breakfast that they were in fear of their lives and asked to be moved.  This is a commonplace occurrence.
- IR211324—An inmate in B-1 ISO got out of his unit and into B-1.  From there he entered the recreation yard and then went into the outside fenced area.  He was able to do so because the outside door could not be locked and the door between B-1 ISO and B-1 was unsecured.  He was ultimately located in B-2.  This event occurred on September 25,

2021, which indicates that B-Pod was still not ready for occupancy, even though inmates had been held there prematurely since early August.

- IR211358—Jail staff were informed of an assault and the need for protective custody for an inmate in A-1 by the inmate's wife and his attorney who called the Jail with this information.  That is how staff located the injured inmate and sent him to the hospital for treatment.

The lack of control on the part of staff at the RDC is a direct result of the failure to implement direct supervision at that facility.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a. Hire and retain sufficient numbers of detention officers to ensure that:

        i. There are at least two detention officers in each control room at all times;

        ii. There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii. There are rovers to provide backup and assistance to other posts;

        iv. Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v. There are sufficient detention officers to implement this Agreement.

    b. Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

        iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c.   Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

    d.   The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement.  The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

    e.   The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

**Non-Compliant**

The inability of the HCSO to hire and retain enough Detention staff to operate its jail facilities in compliance with the Settlement Agreement has been the primary shortcoming during the past five years of monitoring.  The number of authorized positions has not changed except for the addition of nine Food Service slots that were transferred from a private contractor to the HCSO. That increased the number of funded Detention positions from 272 to 281.  That number is far short of the 329 positions that the Revised Staffing Analysis calls for to operate the RDC, WC and Transfer Waiting area of the JDC.

The number of filled positions as of September 30, 2021, was only 207.  That is down from 229 in May and 231 in February.  Since the beginning of the monitoring process the number of filled positions has fluctuated between a low of 204 and a high of 256.  The reason that the work force numbers have not improved is caused by the low salary, lack of a step plan and dangerous and frustrating working conditions, particularly at the RDC.  The Jail Administrator has added a new dimension to this situation by suggesting that employees should be paid every two weeks instead of once a month and that direct deposit of their paychecks should be made available.  These are reasonable accommodations that most public employees enjoy. In addition, the Sheriff and she proposed a 5% increase in salary. This was passed by the Board, then appeared to be rescinded and then was passed again. This has not yet been implemented and should be monitored to ensure that it is implemented in a timely manner and back pay provided to October 1, 2021. The step pay plan submitted to the Board by the Sheriff has never been acted upon.

Excessive turnover undermines the Detention Recruiter's best efforts.  Based on the number of resignations during the first nine months of the year, the turnover rate for 2021 is projected to be approximately 30% which is up an additional 2% over the figure that was projected in the last Monitoring Report.

When the original Staffing Analysis was completed in 2017, it specified a need for over 400 personnel to operate the three jails; RDC, JDC and WC. That report was re-issued as the Revised Staffing Analysis in April 2020. When the Revised Staffing Analysis was re-issued in April 2021, it reflected some significant changes. The JDC had been closed because of plumbing and HVAC problems. In addition, one of the three pods at the RDC had been closed for renovation. At that time A-Pod was scheduled to remain closed after renovation of B and C-Pods was completed; however, that is now subject to change. Finally, HCDS transitioned from an eight-hour shift to a twelve-hour shift schedule and those two schedules have different relief factors. As a result, the April 2021, Revised Staffing Analysis called for a total of 318 personnel to staff the Jail System. During the past two months the corrections operations member of the Monitoring Team and the Jail Administrator have worked jointly to develop another edition of the Annual Revised Staffing Analysis (October 2021). Recently completed, it calls for 329 personnel to staff all required positions assuming that A-Pod is no longer used after B-Pod becomes fully operational. In the event that two housing units in A-Pod must continue to be kept open, that number increases to 351.1. It is understood that this staffing level will be difficult if not impossible to achieve, but the Jail population continues to grow, now being at close to 600 indicating the need for greater system efforts such as adequate investment in a pretrial services program to reduce the Jail population.

While inmates at the WC are supervised in accordance with the Settlement Agreement's requirement for direct supervision, the same cannot be said for the RDC. There inmates are left unattended throughout the day and night, even in C-Pod which is supposed to be staffed to provide direct supervision. As described in paragraph 41, a number of incidents occurred when housing units were left unsupervised. Officers learn of assaults after the fact when the inmate comes to the cage seeking help (IR #211068, 7/24/21, A-1), when injuries are observed (IR #211098, 7/30/21, C-3)), or when other inmates knock on the window for help (IR #211153, 8/14/21, A-1), or as described in paragraph 41 when a family member calls to report the assault. On July 6th, a detainee was discovered by a Detention Officer during feeding to be bleeding. He had been stabbed 17 times. He reported that no officer was on the unit, C-3, at the time. IR #210990. In addition to assaults occurring in the absence of supervision, numerous incident reports disclose fires being set and on October 13th, IR #211406, a pass-through hole was discovered between units C-2 and C-3 reflecting that the lack of supervision will lead to the destruction once again of the renovated C-Pod.

As noted above, the WC is generally operated as a direct supervision facility. However, a failure to adhere to direct supervision on August 7, 2021 resulted in the escape of two inmates. The facility was short staffed and the inmates were allowed to be in the Rec yard without supervision. Two inmates squeezed between the wall and the fence to escape. One was recaptured.

Another disturbing situation arose in A-Pod during this monitoring period. During the COVID surge and the need to dedicate some housing areas for quarantine, inmates were assigned to sleep on the floor in A-Pod. They had no assigned cell so no access to a toilet. Without an officer present inmates had to ask the inmates in the assigned cells to use the toilet and sometimes were required to pay for the use. It was reported that this situation was rectified by designating a cell for access to the toilet for inmates on the floor. However, IR #211287 indicates that the situation continued until at least 9/17/21 where an inmate defecated in the shower because he was denied access to the "detainee toilet" by other inmates.

The shortage of security staff, the apparent failure of at least some security staff to follow policies and procedures, and unresolved problems with the physical plant continue to compromise the safety of medical and mental health staff and often make it difficult for staff to perform their duties. It has been clearly established that the provision of adequate medical and mental health care is among the major factors that contribute to the development of a safe and secure environment for prisoners and staff. The shortage of security staff and the apparent failure of at least some security staff to follow policies and procedures related to supervision continue to compromise the safety of medical and mental health staff and often make it difficult for staff to perform their duties.

During prior site visits, all medical and mental health staff interviewed reported multiple incidences where they were unable to appropriately perform their duties, virtually all of which occurred at the RDC. In so doing, they gave specific examples of incidences where the shortage of security staff, the failure of security staff to follow policies or procedures, or problems with the physical plant made it impossible or at least severely compromised their ability to perform their duties. In an effort to obtain a better sense of the magnitude of these difficulties, the Monitor asked the HSA to attempt to keep a log of such incidences. Therefore, for a period of about 50 days during the period covered by this site visit, the HSA attempted to keep such a log. It should be noted however that it is quite likely that the log provided to the Monitor under reports the number of incidences, because there were days (which totaled approximately one week) when the HSA was at Henley Young and was unable to keep the log for those days.

A review of the 50-day log indicates that at least one such incident/impediment occurred on about 50% of those 50 days. The most common problem (11 out of 50 days) was no security staff in the medical department, which meant that it was impossible to do scheduled sick call visits. Although when this occurred, staff would often try to go do visits on the unit, they were usually unable to adequately perform those visits on the unit (see below as to why that was usually the case). The absence of security staff in the medical department is even more of a problem when there is an inmate in the infirmary. When this is the case, the nurses are unable to open the cell door and attend to such an inmate (who is in the infirmary because he/she needs a higher level of nursing care); and this was the case on one of the days when there were no

security staff in the medical department. A related problem (3 out of 50 days) was an inadequate number of security staff on the units who could bring inmates to medical for sick call.

A second common problem (4 out of 50 days) was no security staff to cover medication pass or perform their responsibilities with regard to some type of medical procedure (such as alcohol or drug detox, preparation for some type of medical test, etc.). One of these incidences occurred in connection with one of the inmate deaths, in that as a result of no detention officers on the unit there was a delay in calling medical to a medical emergency, security staff did not initiate CPR, and other inmates reported to the nurses that they had been trying to call security staff to help their fellow inmate for a prolonged period of time before security staff finally responded.

It is also common for medical and mental health staff to experience difficulties when they attempt to provide services on the units (10 of 50 days). It is not uncommon for mental health staff to see inmates on the units and, as noted above, the nurse will often try to do sick calls on the units when there is no security staff in the medical department. Difficulties include no or inadequate lighting, difficulties with the door locks, and inadequate number of security staff to allow safe access to inmates, or some problem on the units that has so overwhelmed the capacity of the security staff that security staff are unable to assist medical and mental health staff.

As noted above, it appears that these difficulties are limited to RDC, and so the Monitor attempted to elicit the perspective of medical and mental health staff as to why they didn't experience these difficulties at the WC. Regardless of whether or not the factors staff identified actually account for the differences in their experiences at the RDC and the WC, they are the perceptions of medical and mental health staff, and making administration aware of such perceptions might be helpful. Factors noted include the differences in the inmate population at RDC v. WC; better working relationships between security staff and inmates at the WC, due to staffing levels and the direct supervision model (whereby security staff and inmates have more and better interaction/relationships with each other); and their sense that the more experienced security staff are at the WC, which also means that the staff at the RDC have fewer, more senior role models.

It is well recognized that the shortage of security officers and problems with the physical plant are major problems that impact on numerous provisions of the agreement, and are also major problems that demand the attention of senior staff at the facility and County decision-makers. As previously noted, the above-described effort was undertaken to obtain a better sense of the magnitude of the impact of these problems on the adequate provision of medical and mental health services. However, in addition, given the magnitude of the impact, it focuses attention on the importance of keeping the provision of medical and mental health services as one of the facility's priorities when making decisions about the assignment and use of scarce security resources.

During the period covered by this site visit there were fewer incidences where medical or mental health staff were physically harmed or at serious risk of harm. However, the most significant incident that did occur was quite disconcerting and is currently under investigation. It is described in CID Report 21-1470 and allegedly involves a detention officer failing to provide adequate supervision of a nurse on the unit and subsequently assaulting the nurse. As has been noted in prior monitoring reports, incidences where medical and mental health staff were harmed or at serious risk of harm have raised multiple underlying issues and concerns, over and above the shortage of security staff to support medical and mental health staff. See, for example, the discussion on incident reporting in paragraph 64 below.

f.   Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge. Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and maximum security prisoners in a maximum security unit). Additionally, the classification and housing assignment process must include the following elements:

   i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

   ii.   The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

   iii.   Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

   iv.   The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff. The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

   v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi.   The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

Classification coverage has not changed since the last Monitoring Report.  The number of personnel is the same as was previously reported, with two vacancies still unfilled.  This puts a heavy strain on Classification personnel to provide 24-hour coverage with a limited workforce. If one individual calls out, there is a lack of coverage. The lack of 24-hour coverage was apparent in IR #211263 when a Lieutenant moved an inmate on a Saturday and stated that this was until Monday when he could be seen by Classification.

The issuance and use of wristbands still cannot be determined.  It will take an on-site visit to confirm whether or not they are being issued and utilized.

The Monitoring Team has learned in recent visits that inmates are assigned to housing based on gang affiliation. This has continued to be the case.  While this practice was originally rectified early on in the monitoring process, it may have received de-facto acceptance once again.  The same applies to the issue of transfers and inmate movement.  While policy puts that responsibility in the hands of Classification, some incident reports make it appear that officers and supervisors sometimes make those decisions.  The Classification Supervisor reported that security is not moving inmates to a different location without waiting for Classification to determine new housing. However, there are still reports that suggest that officers move inmates without consulting Classification (e.g., IR #211107, IR #211183, IR #211229, IR #211383). In IR #211248, the Housing Unit officer found an inmate in a cell other than the one records indicated he was assigned to. The officer could not find a Movement Sheet which would have been completed by Classification but opined that the prior shift moved the inmate.

The Inmate Services Manager and the Classification supervisor indicated that the practice of unauthorized inmate committees controlling the units had calmed down. However, the QA Officer stated that they still ran the units in A-Pod and C-3. Several incident reports indicate that this is the case. In IR #211384, the officer stated that a detainee was being put out of A-4 by other detainees. They placed his property by the gate. He was moved to C-2. Again, in IR #211385 in A-3, several detainees called the officer over to say that two other detainees had to be moved. They then beat one of the detainees. It is not clear from the report if and where the detainees were moved.

Booking holding cells continue to be improperly utilized to house inmates for days, weeks or months rather than hold them for no more than eight hours.  At the time of the remote site visit there were a total of eight inmates being housed in Booking holding cells.  Two were there for discipline/administrative segregation; two were in protective custody as police officers; one was from the infirmary but was having behavior problems there; one was in protective custody but C-4 was full; and one was the individual who engages in sexual activity on the suicide unit. This practice has gone on for the entire duration of the monitoring process (and for many years prior to that).  The rationale given for violating accepted correctional practice has ranged from (1) locks which do not work in the housing areas to (2) unmanageable inmates who cannot be dealt with in population.  The Monitoring Team has repeatedly stated that Booking is not appropriate housing. Now that the cell door windows in C-Pod have been replaced, these individuals should be housed in C-4 if segregation is needed. The Classification Officer stated that they don't put real management problem inmates in C-4 because the officers had trouble putting them back in their cells. C-4 is supposed to have two officers in the unit. The segregation unit is intended to be operated and staffed for management problem inmates. The two police officers should be housed in an ISO unit together. Most recently COVID quarantine requirements have been used to justify the practice.  Once B-Pod becomes fully operational, it would be appropriate for the Jail Administrator to issue an order specifying that only inmates being processed in and out of the facility can be held in Booking holding cells, and then for no more than eight hours.

A review of the Classification Log for August indicated that some inmates were not classified in a timely manner. Nine inmates were classified after three days or more. One inmate was not classified for 11 days. The Classification Supervisor stated that they had probably been moved and then lost in the system. Inmates should not be moved until they are classified.

A review of the initial classification scoring sheets for the first two weeks of September was completed.  A number of the practices that previously undermined the use of the objective scoring system have been rectified. As previously reported Classification is now using the NCIC to score the criminal history. During the current site visit, there were 4 files where the current criminal history was not scored correctly. None of these impacted the custody level. One file showed no criminal history but there was an MDOC hold. Classification ran the NCIC and no criminal history appeared. Ideally, MDOC should be contacted to determine the nature of the conviction. Overall, the classification scoring process appears to be going well.

The classification spreadsheet continues to show a number of male maximum security inmates being assigned to the Work Center. The Work Center being a dormitory style housing facility with unfortified walls would not be expected to house maximum security inmates. However, with the ongoing physical plant and understaffing issues at RDC, the direct supervision at the WC provides staff oversight of these individuals. Nevertheless, the maximum security status should be overridden if the WC is an appropriate housing assignment.

The segregation logs for July and August show no inmates in disciplinary segregation but two in administrative segregation. A disciplinary process is in place but there do not appear to be any disciplinary hearings taking place. There is still no Classification Committee. Such a committee should not only review placements into administrative segregation but all placements in restrictive housing within 24 hours and then conduct a review every seven days. Although there is no Classification Committee, seven-day reviews are now being conducted. This is done weekly by a combination of security and mental health staff. Documentation of the mental health input is being kept in the EMR. It does not appear that anyone has been moved off of segregation as a result of this process. This should change with the opening of the mental health unit. See paragraph 77(i) for further discussion of these reviews. It has also been recommended that the segregation log have a column added showing the date of the last seven-day review.

Assigning appropriate housing for individuals has been complicated by the COVID outbreak that occurred during this monitoring period. Classification had stopped holding newly booked inmates in one of the housing units for 10 days. Instead, inmates are being tested for COVID and those testing negative are moved. However, with the surge in cases and the effort to quarantine positive inmates, housing options became limited. As a result, inmates were sleeping on the floor in A-3 and B-4 was opened where inmates were also sleeping on the floor. In addition, the population has been rising, further putting a strain on housing inmates appropriately. This situation will be monitored as having inmates sleeping on the floor is not a viable long-term solution.

Although improvements have been made in the area of Classification, it is still not the case that an objective risk instrument is governing the housing placement of inmates when there continue to be gang pods, inmate committees rejecting housing placements, security moving inmates without Classification involvement, lack of bed space and limitations on the use of some housing units.

g.  Develop and implement positive approaches for promoting safety within the Jail including:

   i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

   ii. Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

   iii. Creating work opportunities, including the possibility of paid employment;

   iv. Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

> v.   Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;
>
> vi.   Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;
>
> vii.   Providing reasonable opportunities for visitation.

h.   Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.   Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

**Partial Compliance**

Regarding 42 (g) (i), five hours of outdoor recreation is provided to inmates each week at the WC based on a review of records and logs.  The same cannot be said for the RDC regardless of what records may show.  They cannot be validated because the duty roster does not reflect that officers are ever assigned to recreation posts.  In fact, a supervisor indicated during the remote site visit that only one sixth of a housing unit comes out for recreation at a time.  That is not consistent with what recreation records show.  They reflect that the same inmates are out for up to six hours making it impossible for all inmates to be given an opportunity for recreation.  This inconsistency will have to wait for a physical on-site inspection to be resolved. One detainee housed on C-4 stated that he had not been out for recreation for months. This was not confirmed.

Regarding 42 (g) (ii) and (iii), there is no incentive program.  There are work opportunities at the WC, but not paid employment, and the only opportunity at the RDC is to work as a trusty.  The housing units at the JDC are currently closed.

Regarding 42 (g) (iv), again, during the period covered by this site visit, the mental health caseload has continued to grow; there are now about 193 detainees on the caseload. This means that over the last several monitoring periods, the case load has increased by almost 50%.  In addition, as was detailed in prior monitoring reports, the acuity of the population has also increased, meaning that there is a larger percentage of detainees on the caseload who are

suffering from acute, extremely serious mental illness. For a significant sub-set of these more seriously ill and unstable detainees, their illness is having a significant impact on their ability to function within the facility. Although some of this sub-set of detainees have refused or been noncompliant with prescribed treatment, others have complications that have rendered them difficult to stabilize.

Although the Jail Administrator has negotiated with QCHC/the Contract Provider for more mental health staff, at the time of the site visit, this newly negotiated QCHC contract had not yet been approved by the County.  Since the time of the site visit, the contract has been approved and includes three additional staff, a Mental Health Practitioner, a Medical Nurse Practitioner and a Qualified Mental Health Provider. However, at this time the size of the mental health staff has remained the same.  There are still only 2.5 QMHPs and a part time Psychiatric NP/prescriber. These individuals are responsible for all mental health assessments (which average about 24/week), the development of treatment plans and the regular review of those treatment plans, the provision of treatment (individual and group therapy and medication management), the management of mental health emergencies (such as suicidal detainees, with an average of about 10 on suicide watch each week), and the documentation of what they are doing in each detainee's medical record. They also have other responsibilities, such as performing weekly mental health rounds for detainees held in segregation and advocating for the mentally ill detainees in segregation.  In addition, accomplishing these tasks is made all the more difficult by a variety of factors such as, the need for repeated attempts to assess detainees who continue to refuse a mental health assessment, the need for repeated efforts to even engage detainees who refuse or are noncompliant with treatment, and the need to cancel and reschedule appointments due to the shortage of security staff (i.e., an inadequate number of security staff to make it safe for mental health staff to work on the units or to prepare and transport detainees to medical in order for mental health staff to see them there).  Staff must also travel between facilities.

Staff are also faced with a high number of mental health emergencies that consume a considerable amount of staff time. Referrals for suicidal detainees average about 12/week (although some of these end up being inappropriate referrals and although some detainees assert that they are suicidal because they are afraid and want to be removed from their unit, all cases have to be taken seriously and addressed). And over the last about 5 months, there has been a significant increase in the number of serious emergencies related to the use/abuse of contraband drugs (although in the last month it appears that there has been somewhat less of a problem). With regard to the recent increase in serious substance use/abuse-related emergencies, the signs and symptoms associated with these emergencies, the reports of those involved and the results of the drug screens performed indicate that the drugs are opiates. This would indicate that opiates have been recently introduced to the facility or have become significantly more available in the facility and given the seriousness of an opiate overdose, this finding is a major concern.  Finally, it should also be noted that mental health staff rotate weekend call for mental health emergencies

and the supervision of detainees on suicide watch. Given the shortage of mental health staff, they perform these weekend tasks without compensatory time off during the week; and so the issue of how best to cover these weekend responsibilities without further unfairly taxing the mental health staff must also be addressed.

Although the existing mental health staff is working hard to provide as much treatment as they can, individual treatment sessions are not as frequent as they should be, there are no group therapy sessions, and the more rigorous set of interventions required for those who refuse treatment or are not fully compliant with treatment have not been initiated.  There are also other obviously needed interventions that have not yet been initiated, such as specific interventions designed for those with primary substance abuse difficulties, specific coordinated interventions for dual-diagnosis detainees (with substance abuse difficulties and other mental health difficulties), interventions for those with intellectual disabilities and/or other cognitive difficulties, and interventions for those with severe disabling trauma-related mental health difficulties.

Obviously, there is a need for more mental health staff.  As noted above, the Jail Administrator has worked out a way to provide more mental health staff with QCHC/The Contract Provider; the current projection is that this will be enough staff even once the MHU is opened; but the contract has yet to be signed and implemented.  Given that the existing mental health staff is already overwhelmed with their current responsibilities, attempting to open the MHU without additional staff would be unconscionable.  There is also the need for better security support for mental health staff, including the identification, training and assignment of a set of security officers and supervisor(s) for the MHU.  It is imperative that these issues be addressed as quickly as possible, given that it remains extremely important to move towards the opening of the mental health unit where a program for the most severely ill and unstable population can be implemented.

Regarding 42 (g) (vi), As has been noted in prior reports, the screening of new detainees for serious mental illness is part of the Jail's booking and initial health assessment process.  At the time of this site visit, only 67% of the 193 detainees who are currently on the mental health caseload were identified during that screening process, which is a significant decrease from the 83% noted at the time of the last site visit, and more similar to the findings of earlier site visits. It should be noted that there are two parts to that mental health screening process – the initial health and mental health assessment performed by the intake nurse(s), and the 'Form 3', which is a form completed by each new admission as part of the booking process – and the data is not collected in a way that allows for a determination of what percentage of that 67% of detainees were identified during the nurse's intake screen, identified by the 'Form 3', or identified by both mechanisms.  Such an analysis should be considered as part of the quality review process, and

the findings of such an analysis could help identify options for further improving the intake screening process with regard to the identification of new admissions with serious mental illness.

The remaining 63 (about 33%) of the detainees on the mental health caseload were not noted as having been identified during the booking and intake process.  For about 19 of them (about 10% of the caseload) the referral source was not noted; so, it is unclear whether they were identified at intake or at some later point; but this high of a percentage does mean that an increased effort must be made to consistently capture and note the referral source.  A review of the remaining 44 detainees who were not identified during the booking and intake process, 16 (about 36%) were identified when later presenting as suicidal; 7 (about 16%) were self-referred; and the rest were identified by either mental health or medical staff, while there were no referrals from security staff.  As has always been the case, it is difficult to know if these detainees were suffering from or had suffered from major mental health difficulties that had been missed during the booking and intake process, and/or whether their mental health status deteriorated while incarcerated.  This is an issue that clearly requires further exploration once additional mental health staff are on board to review and assess this issue.

This is the second site visit where it was found that there were no delayed intake screenings because a new admission would not or could not be interviewed (and the nurse failed to seek help from mental health).  Whether this was due to the fact that there were no new admissions who were difficult to assess or whether it was due to the fact that the intake nurse immediately asked for help with any difficult new admission could not be determined without reviewing the medical records of all new admissions.  However, finding again that there were no delays in performing intake screenings was a very positive finding.

With regard to the initial mental health assessments, performed on detainees referred to mental health for such an assessment, the timeliness of these assessments or at least the timeliness of attempts to perform these assessments has been good (with most performed on the day of referral), and the quality of these assessments has continued to be quite good.

Although the percentage of detainees who at least initially refused a mental health assessment remained unchanged (about 25%), that means that there is still a significant amount of staff time consumed by repeated attempts to perform initial mental health assessments on such detainees, especially since many of those who initially refuse require that staff make multiple attempts before a mental health assessment is finally performed.  Such a delay in obtaining an initial mental health assessment also delays the initiation of treatment, which can be especially problematic when the detainee is acutely ill.  Once the MHU is operational, such acutely ill detainees are likely to be placed on the MHU (even in the absence of a full mental health assessment) where a more rigorous effort to engage them is an integral part of the treatment program.

The requirement of 42(g)(vi) to provide therapeutic housing is addressed in paragraph 77(g) below.

Regarding 42 (g) (vii), opportunities for video visitation are very limited in the Jail System. While that is the only form of visitation for family and friends, it has been restricted by the fact that those individuals cannot go to a free kiosk in the lobby of the RDC to conduct a visit because that access was shut down due to the COVID pandemic.  Instead, they must pay $12.99 for a 20-minute visit conducted by video from their home.  That charge has led to a reduction in the number of visits.  An analysis of the video visitation records covering two weeks in late September and early October revealed that 120 video visits were scheduled, but that only 65 were actually completed.  That equates to 4.64 hours per day or 1,693.6 hours when projected out over a year.  Considering the fact that the average daily census is approximately 600, that means that each inmate has an opportunity to complete only 2.82 video visits per year. Recognizing that the cost of video visitation has an impact on the ability of family and friends to visit with inmates, the Jail Administrator has proposed a significant reduction in the cost of video visits and telephone calls.  Under her proposed schedule the cost of a telephone call would drop from 50 cents per minute to 21 cents per minute, while the cost of a 20-minute video visitation would drop from $12.99 to $4.99.  The recommendation (as well as the recommendation for four additional video conferencing units) has been included in the recently approved contract with Securis but has not been implemented.

Regarding 42 (h), suicide watch procedures for men and women are supposed to be consistent for both even though male suicide watches are conducted at the RDC in C-4 ISO while female suicide watches are conducted at the WC in Special Housing.  It has become apparent, however, that the standardized procedures, which were put in place once female inmates were moved to the WC, are not being followed at the RDC.  A review of suicide watch logs/well-being check sheets and interviews with supervisors and command staff has revealed that inmates in C-4 ISO are sometimes locked inside individual cells and that the watch officer is physically located outside of the ISO unit making it physically impossible for him/her to have constant supervision of the inmate(s).  Based on discussion with the Jail Administrator, she intends to require inmates in the ISO unit to be kept in the dayroom area (not inside a cell), but that the assigned Detention Officer will still be seated outside of the ISO unit, watching what goes on through a window. Based on past experience, that officer will be called upon to perform other duties, or will take a break without relief, and will leave his/her post to do so.  The practical solution is to post the officer inside the ISO unit.  As was originally envisioned, he/she should be equipped with a desk, chair, telephone, radio and emergency means of calling for assistance.  The circumstances reported in IR#211075 show what happens when the assigned officer leaves his/her post unattended.  The Detention Officer was inside the C-Pod control room instead of inside C-4 ISO (or even at the door/window at the entrance to that unit).  Consequently, he was in no position to

prevent the assault or to take prompt action when two inmates got into an altercation.  It is also noteworthy that the Sergeant who wrote a supplement to the IR never even mentioned that the officer was in violation of policy by being inside the control room.  Another example appears in a disciplinary report which reflects that a suicidal inmate locked in a cell in the suicide observation ISO unit used exposed wires to start a fire. The Classification supervisor stated that the inmates on the suicide unit were locked in cells because some are homicidal. It is not appropriate for homicidal inmates to be housed in the suicidal unit with suicidal inmates.

The medical and mental health related circumstances where higher levels of supervision is required, which staff (medical, mental health and security) are responsible for providing such higher levels of supervision, what their respective responsibilities are, and where a detainee is housed while being so supervised have all been described in prior reports.  As noted below, there are some areas of compliance with this provision that remain variable.

Some special medical observation (for example, for acutely ill detainees) is managed in the medical unit, while other less severe situations (for example, uncomplicated withdrawal from substances) are managed on the detainee's regular housing unit, with visits to the medical unit as indicated.  In both situations there is an appropriate higher level of supervision provided by medical staff.  However, there are situations where a detainee refuses to comply with the recommendation that he/she be housed in the medical unit or make frequent visits to the medical unit. With the possible exception of a life-threatening situation, medical staff cannot force a detainee to comply and, in such situations, the ability of medical staff to provide adequate supervision and care is compromised.  In addition, due to the shortage of security staff, the ability of security staff to provide a higher level of supervision to detainees on special medical observation in the infirmary is variable. More specifically, as noted elsewhere in this report, on days when there are no security staff in the medical department, such detainees are locked in their cells within the infirmary and the nursing staff cannot enter their cells in order to attend to them.  If the detainee has to make frequent (such as daily) visits to the medical unit, both the shortage of security staff in the medical department and the shortage of staff on the units (to bring detainees to the medical department) can compromise care.

Suicide watch is managed in suicide-resistant cells.  There is an appropriate higher level of supervision provided by mental health and medical staff.  Here too, due to the shortage of security staff, the ability of security staff to provide a higher level of supervision to detainees on suicide watch is variable.  More specifically, there are times when there is no officer available to provide the supervision/checks of detainees on suicide watch that is required by approved policy and procedures. See paragraph 42(h) for more detail.

Although suicide watch is usually managed well (except for the above noted concern), the recent number of completed suicides raises concern about certain other important aspects of the

facility's suicide prevention program and related enhanced supervision issues that have been raised before.  Resultant areas of concern include (1) the capacity of all staff to identify and manage detainees who might be or are at high risk of becoming suicidal, (2) the management and supervision of more complicated cases, and (3) the performance of an interdisciplinary mortality review in instances where there has been a successful suicide.

Concerns about the capacity of all staff (security, medical and mental health staff) to identify and manage detainees who might be or are at high risk of becoming suicidal have been discussed in prior reports.  This continues to be a staff training and development issue that needs to be addressed.  Similarly, concerns about the capacity to manage and supervise more complicated cases has also been discussed in prior reports.  This too continues to be a staff training and development issue that needs to be addressed.

The recent suicides and other deaths at the facility has brought more into focus the issues related to the performance of an interdisciplinary mortality review.  As noted in paragraph 114 below, there have been three mortality reviews completed on three of the deaths this year. These were completed after the last monitoring report stated that mortality reviews were not being completed. The reports provided appear to be minimal and pro forma. More specifically, there has been no mortality review of the type where security, medical and mental health staff meet together with administration to review everything that each staff unit knew about the deceased, identify any problems in the treatment and management of the deceased, regardless of whether or not the problem was directly causative of the deceased's death, and develop a corrective action plan to address any identified problems.  So, the need for such an interdisciplinary mortality review process was discussed in some detail during this site visit.  Plans were made to move ahead with such a review process, document such a review and clearly outline and implement any indicated corrective action, despite impediments to obtaining some of the information that might be helpful to such a review (such as certain investigation reports) in a timely manner, if at all.

Until the mental health unit is open/operational, there really is no appropriate housing for detainees who require special mental health observation due to the fact that they are seriously impaired as a result of their mental illness.  Instead, such detainees continue to be placed on a segregation unit.  Although both mental health and security staff make regularly scheduled rounds on detainees who are being held in segregation, this does not constitute the higher level of mental health supervision that such severely mentally ill detainees require (which will hopefully be made available to them once the mental health unit is operational).  Although there are security staff who manage detainees who are being held in segregation, this does not constitute the higher level of security supervision that such mentally ill detainees require (which will hopefully be made available to them once the mental health unit is operational).

Regarding 42(i) video surveillance capabilities at the RDC are severely hampered by that fact that approximately 60 cameras are still out of service, including in Medical.  Seven "work stations" are currently being installed by Benchmark Construction in each control room and other selected areas.  Once they are in place it should be possible to identify which cameras need to be replaced and what other corrective action is required in order to have a fully functioning system.

While the CID and IAD investigators now have direct access to the video system, they still have to go through IT in order to obtain copies of videoed events.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

    a. Staff vacancy rate of more than 10% of budgeted positions;

    b. A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

    c. A major disturbance resulting in the takeover of any housing area by prisoners;

    d. Staffing where fewer than 90% of all detention officers have completed basic jailer training;

    e. Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

    f. One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

    g. One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**
The Quality Assurance Coordinator now generates a monthly report that has proven to be very useful to the Monitoring Team, particularly since site visits have been conducted remotely due to COVID considerations.  Visual and quantitative analyses help to supplement reports and logs.

As of September 30th, 74 of the 281 funded Detention positions were vacant.  The number of filled positions has fluctuated between 204 and 256 for the duration of the monitoring process. Currently that figure stands at 207, a staff vacancy rate based on needed staff of 37%.  (The staff shortage is not equal between the facilities with the staff vacancy rate based on needed staff at RDC is 47%) Detention Services has never come close to filling all of the funded positions, let alone the number that are required to operate the Jail System in its current configuration (329). Based on the number or terminations/resignations that have occurred during the first nine months of the year, a turnover rate of 30% is projected for 2021, well over the 10% threshold of budgeted positions.

According to the Detention Recruiter and the Training Director, new recruits are now put to work immediately upon employment, not when the next academy begins.  This is done to prevent approved candidates from moving on to another position instead of waiting for the academy to commence.  While this is a practical step toward retaining candidates, it will only be a successful alternative when the Field Training Officer (FTO) program is in place and pending candidates can be placed with a qualified FTO until recruit training begins.  In the interim better than 90% of all Detention Officers have completed basic training.

Inmate on inmate assaults continue at a high rate. Particularly concerning is the indication that many assaults go unreported. It may be that in some cases staff do not know that they have occurred since they are not in the housing units, but upon learning of the assault, an incident report should be prepared. See, e.g., IR# 210981 referencing an earlier assault for which there is no incident report and IR #211113 inmate taken to hospital to see if jaw broken, no incident report on the assault identified as the cause by medical. Medical reported that the jaw was broken and it was a result of an assault. That leaves some doubt as to the extent of underreporting of assaults. Even so, in July 13 assaults were reported at RDC; in September 12 assaults, and October through the 26th, 10 were reported.

During the current calendar year there have been six inmate deaths in the Jail System.
1.  The first occurred on March 17, 2021, in Booking.  An inmate who had been brought into the jail by law enforcement ultimately passed away.  A drug overdose is suspected as the cause of death.  The HCSO took the position that because he had not been "booked" into the facility he was not an inmate.  After this conflict with the Settlement Agreement was brought to the attention of the HCSO an IAD investigation was conducted which ultimately resulted in the resignation of one involved officer.
2.  The second occurred on April 18, 2021, in Booking.  In this case an inmate, who was being housed in a Booking holding cell, committed suicide by hanging.  An IAD investigation resulted in the termination of one involved officer for failing to conduct required well-being checks.

3. The third occurred on July 6, 2021, in Housing Unit C-4 at the RDC. In this case an inmate committed suicide by hanging in his confinement (lockdown) cell. He was found by a Sergeant and the officer assigned to the unit when they were conducting a well-being check. An IAD investigation resulted in the termination of the officer, because video evidence supported the fact that he had not conducted 30-minute well-being check inside the unit as required. Instead, he merely looked into the housing unit from where it was impossible to observe what was going on inside the individual cells. While the Sergeant was exonerated, the incident reports and supplements indicated that he left the inmate hanging in his cell and went to C-Control in order to call the on-duty Lieutenant in Booking. Only then did he return to the cell and help take the inmate down. When questioned during the remote site visit, the IAD investigator stated that the Sergeant's statements during the investigation did not reflect that. It appears that this conflict of written record and later statement need to be compared and validated so that appropriate disciplinary action can be taken or else the Sergeant's name be cleared.

4. The fourth occurred on August 3, 2021, when an inmate died of an apparent drug overdose in C-1 at the RDC.

5. The fifth occurred on August 4, 2021, when an inmate died at Merit Health Hospital, apparently of COVID.

6. The sixth occurred on October 18, 2021, when an inmate was found unresponsive in his cell in A-4 at the RDC. The information available to the Monitoring Team in the form of an incident report and supplement is sketchy at best. According to those documents, an officer entered the housing unit and found an inmate in his cell. That officer did not generate an incident report; rather it was written by the control room officer. His report was titled "Medical Report – Injury". The officer who opened the doors to the housing unit in order to allow entry wrote a supplement which provided the most information. Far more information was provided by two news media reports within 24 hours, one on television and the other in the local newspaper. They revealed that the "unresponsive" inmate was apparently beaten to death by other inmates. Supplemental verbal reports describing the video footage revealed that approximately nine hours passed from the time of the incident until the victim's body was found. During that time two meals were served and hourly well-being checks were supposedly conducted.

In all of these cases the Mississippi Bureau of Investigation (MBI) has assumed responsibility for conducting an investigation, but they have not provided a copy of any that has been completed to date. The explanation provided via IAD is that they (MBI) are waiting for an autopsy report before they will file anything with the HCSO. There have been no After-Action Reports provided to the Monitoring Team to date. Mortality Reviews were conducted on three cases, the third, fourth and fifth above, but the information that they contain appears to nominal and pro-forma.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

    a.  Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b.  All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

    c.  Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

    d.  The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

    e.  Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been previously reported, the Settlement Agreement calls for a higher standard for well-being checks than is required by the American Correctional Association's "Model Jail Standards" issued by the Commission on Accreditation for Corrections.  In an effort to move Detention Services forward, the Monitoring Team has approved the standard which is now incorporated into Policy 9-200, Supervision and Post Operations.  It calls for a documented 60-minute well-being check for inmates in general population, a 30-minute well-being check for inmates in lockdown status and a 15-minute well-check for inmates held in Booking.

Since the JDC has been closed for over a year, there is no need to address compliance at that facility.  It will be necessary, however, for the officers assigned to the Transfer Waiting area on the ground floor to document well-being checks for inmates temporarily held in the holding cells

Monday through Friday while waiting to go to court or to return to the RDC and WC.  The standard for those checks is every 15 minutes.

Inmates under suicide watch are supposed to be constantly monitored, but log entries are required only every 15 minutes.  A review of suicide watch logs for inmates held in Special Housing at the WC revealed that officers there continue to monitor inmates appropriately. Watch entries are noted at actual time, not exactly on the quarter hour.  At the RDC the same standard is not maintained.  While specific discrepancies were noted in the last Monitoring Report, a new problem has arisen.  Inmates who have been designated as problematic/homicidal by staff are locked in single cells inside the C-4 ISO unit making it physically impossible for the assigned Detention Officer to maintain constant supervision.  The problem is made worse by the fact that the officer is physically located outside of the ISO unit.  These practices were confirmed by interviews with supervisory staff during the remote site visit.  A review of suicide watch logs revealed that most entries are made properly within the 15-minute observation time frame, but some are consistently entered precisely on the quarter hour.   One officer acknowledged that he was required to handle other duties even though he was supposedly constantly monitoring a suicidal inmate.  The following notation is a direct quote from the Comments section of his log. "At beginning of shift officer was counting C-4, C-3 and C-1 until 1715."

In Booking, 15-minute well-being checks are required on all inmates placed in holding cells, regardless of the duration of their stay.  Records reflect that most well-being checks are recorded appropriately, however, a number of log sheets indicate that the inmate being monitored is on a suicide watch which should have required constant supervision. At least one incident report (IR211227) supports the fact that an inmate was placed on a suicide watch in a Booking holding cell, where he was already being housed.

In confinement housing (C-4, C-1 ISO, A-1 ISO and A-4 ISO) inmates are supposed to be monitored every 30 minutes.  Records reflect that, with some exceptions, well-being checks are entered timely in those areas.  When a well-being check is missed some log entries in the Comments section of the forms reflect why more than two hours passed between well-being checks—"Short of Staff".  The logs do not, however, disclose if well-being checks are being done appropriately.

General population inmates are supposed to be monitored every hour.  In direct supervision housing units, entries do not have to be made during daytime hours when inmates are off their bunks (WC) or out of their cells (RDC).  Those entries have to be made only during night time hours.  At the WC the unit officers still make hourly well-being check entries in their logs throughout the day.  While this creates a bit of extra work it ensures consistency.  At the RDC the A-Pod control room log reflects that some well-being checks are called in hourly, but there are no such checks recorded for eight hours during the 24 hour time frame that was provided for

October 21, 2021.  For C-Pod Control 10 hourly well-being checks were not recorded during the same time frame on October 21, 2021.  The unit logs for C-1, C-2, C-3 and C-4 reflect that the majority of the hourly well-being checks were recorded during night time hours, but they also indicated that there was no officer on duty for most units during the midnight shift.

It appears that even if rounds are recorded, they are not made adequately as in the case of the suicide death on July 6th where the officer described doing his round by looking through the cage. Rounds are supposed to be made by going from cell to cell. This does not appear to be standard practice as evidenced again by the death on August 3rd where the deceased inmate was not found until rigor mortis had set in or the most recent death on October 18th when the deceased inmate was not discovered for nine hours.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

    a.  Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve month period, the County must develop an in-house detention training academy.

    b.  Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

    c.  "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.  Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

    d.  Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to

the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.  Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

f.  Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.  Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.  Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

The HCSO continues to provide mandatory pre-service training for all new recruits, but for some it now follows a brief period of employment while they wait for the next academy to begin.  This change was brought about by the fact that some approved candidates moved on to other employment opportunities rather than wait for the academy to start.  This discrepancy with 45 (a) should be mitigated once the Field Training Officer (FTO) program is in place and new recruits are assigned to individual FTO's during the waiting period.  The high failure rate of new recruits continues to be a problem.  Approximately one third of each academy class fails to graduate due to attendance problems or resignation.

Regarding 45 (b), there has been no change in post order training.  Since there are no approved post orders, the only training ever provided was on those post orders that were in place at the beginning of the monitoring process.

Regarding 45 (c), direct supervision training, which began in 2020, is part of the pre-service training program for new personnel.  Existing personnel are no longer involved in this component, but it is readily apparent that sending RDC officers and supervisors through the program would be beneficial—even if they have been through it previously.  This recommendation is based on the fact that supervisors and officers at the RDC continue to display

a lack of understanding of how direct supervision is supposed to work.  This was confirmed by interviews with individual staff at the RDC during the most recent remote site visit.

Regarding 45 (d), the new Jail Administrator is in compliance with this paragraph based upon her experience as a trainer and instructor through the National Institute of Corrections.

Regarding 45 (e), in-service training on some approved and adopted policies was held from August 31st through September 3rd.  Approximately half of the available Detention staff attended. Another block of training will be scheduled to accommodate those personnel who were unable to attend the first session.

Regarding 45 (f), As noted in prior reports, there is no additional training for security staff assigned to the medical department, which includes the small infirmary, the medical clinic and the mental health clinic.  As has also been noted in prior reports, given the security problems that can arise and have arisen when physically and/or mentally ill detainees are off their units/brought to the medical department, security staff assigned to the medical department would benefit from additional training, focused on the best security management of that critical post, including assuring the safety of medical and mental health staff.  It should again be noted that at present, there are an inadequate number of security staff assigned to the medical department (i.e., one security officer); then, due to the shortage of security staff, there are days when there are no security officers in the medical department; and there are also days when there is a shortage of security staff to transport detainees to and from the medical department.  Therefore, until the medical department is adequately staffed with security staff, any additional training that might be developed and provided will have to take this issue into consideration.

In anticipation of the opening of a mental health unit, security staff and security staff supervisors who will be assigned to that unit will have to be given additional training.  Twenty five officers have been identified for possible assignment to the mental health unit. They have all received an initial training session for the assignment. A more detailed update on progress towards this goal is outlined in the paragraph 77 (g) below.

As noted in paragraph 42(h), some special medical observation is carried out on regular units; even once the mental health unit is operational, there will continue to be seriously mentally ill detainees on regular units. Since there will continue to be detainees with special medical and mental health needs on all units, it is important for all security staff to have a reasonable amount of training on serious medical and mental health difficulties and the management of detainees with such difficulties.  In addition, since security staff will continue to play an important role with regard to identifying detainees who might require special medical or mental health services, their training should also focus on enhancing their ability to suspect that a detainee might have

special medical or mental health needs and how to facilitate their access to the medical or mental health services that they might require.

The mental health expert on the Monitoring Team has previously raised concern about the adequacy and appropriateness of some of the training on mental health included in the training on 'special needs inmates' and has urged a review of that training.  The concerns raised in this report regarding the facility's suicide prevention program focuses additional attention on the issue of mental health training for security staff.  During the June site visit, it was reported that the mental health staff is scheduled to present a different mental health training unit that was developed by QCHC, which is a significant step in the right direction.  However, a review is still recommended of other training that is being made available to all security staff in order to assure that all training on mental health issues provides security staff with a consistent perspective on the identification and management of detainees with mental health difficulties.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a.   Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b.   Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c.   Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d.   Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i.   Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

    ii.  An inspection process.

    iii.  A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

    iv.  A requirement that any corrective action ordered be taken.

    v.  Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

    vi.  To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Partial Compliance**

The Jail Administrator's lack of authority to comply with this paragraph has long been a significant problem.  Now, with a new Sheriff and new Jail Administrator, there is an opportunity to resolve the matter satisfactorily.  While the Sheriff is the chief executive of the HCSO, the Jail Administrator needs to be involved, and have a say, in all matters related to the employment of new personnel, disciplinary and promotional recommendations, and management decisions.  To that end, the Sheriff has agreed to provide all CID and IAD investigative reports to the Jail Administrator and the reports have been made available to her.  It should then be incumbent upon her to make appropriate recommendations regarding their disposition.  It would be also be appropriate for the division commander associated with a disciplinary action to be a participant in the HCSO Disciplinary Review Board.

Detention supervisors do not maintain a separate log to indicate whether or not they have made rounds on a daily or shift basis.  Rather, they sign off on logs, well-being check sheets and other documents that are maintained throughout the Jail.  As a matter of practice, they simply sign, and virtually never make comments on those documents.  As stated in paragraph 44, well-being checks are often not being made or made appropriately. The QA officer states that the logs are not consistent with what she observes when she walks through the units. The supervisors should be providing similar oversight and providing correction although it is not apparent that they are doing so.

Facility and maintenance problems continue to plague RDC. The problem of "dumpster cells" in A-Pod at the RDC was included in the 14th Monitoring Report.  At that time 30 such cells were opened, 11 were put back on-line and 19 were welded shut again after being cleaned out.  To date the status of those cells has not changed.  Rather than repair them, they have been allowed to remain vacant and unusable.  This is a particularly serious failing on the part of the HCSO and County in that cells in B-Pod had to be opened in order to deal with the increased average daily census even though the work in B-Pod was not complete.  Numerous physical plant issues have

been detailed in prior reports particularly in A-Pod which continues to be used such as doors that don't lock, electrical and plumbing problems and the HVAC system. In addition, there are physical plant issues related to medical staff safety, such as inadequate lighting on the units, problems with door locks, and inoperable security cameras in the medical department.

As has been pointed out in previous Monitoring Reports, there has been little incentive for supervisors to keep track of maintenance issues, but at least they are now being tracked by the Chief Safety and Security Officer, who coordinates all work orders with Benchmark Construction.  The County's archaic system of review and approval of maintenance needs has not been streamlined beyond the employment of Benchmark Construction.  While that was a step in the right direction, the County should approve a substantial line item in the Sheriff's budget to handle routine maintenance.  Although this was previously recommended, the Board of Supervisors has not addressed the issue. One concern with respect to safety equipment is reflected in IR #211373. An inmate housed in Booking while out on rec time grabbed the fire extinguisher which should have been in a locked cabinet and sprayed it.  Although not a maintenance issue, a related concern is reflected in IR #211374 in which there was a fire in one of the Booking cells and the officer sprayed the fire extinguisher through the flap in the cell without removing the detainee.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Partial Compliance**

This paragraph is downgraded from Substantial Compliance and returned to Partial Compliance because conditions have reverted to their previous standard at the RDC.  An unacceptable level of contraband is still found when shakedowns are conducted, the frequency of shakedowns has not been accomplished in compliance with this paragraph.  In fact, in C-4 (a high security confinement/lockdown housing unit) a shakedown was not conducted for a period of four months.  When shakedowns are conducted, there is little difference between what is found in A-Pod and C-Pod even though C-Pod should have a much better record because it is supposedly a direct supervision housing area.  As an example of the seriousness of the problem at the RDC, on August 18th inmates broadcast a video via social media from within A-Pod utilizing contraband cell phones.  This is something that has occurred previously.  When cell phones are found by individual officers or as a result of formal shakedowns, no effort is made to determine how the items were introduced to the facility prior to referring the matter to CID.  Housing unit C-3 was known to have significant contraband yet the shakedown that was conducted on September 21, 2021 was the first shakedown since April. On October 21, 2021, a mass shakedown of A-Pod and HU C-2 and C-3 was conducted at the RDC.  According to IR #211444, the following items

were found—22cell phones, 30 phone chargers, 21 dollars in cash, several shanks and unspecified loose pills.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**
This paragraph was previously upgraded from Non-Compliant to Partial Compliance because the County had issued a request for proposal (RFP) which resulted in multiple bids being received, as was noted in the last Monitoring Report. Since that time the County has not provided any additional information.  With no change since then, it is now returned to Non-Compliant.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**
There has been no change in the status of this paragraph for the past four years.  Since the JDC is closed due to maintenance problems, only the RDC and WC are currently affected.  Regardless, after an officer was initially assigned in 2017, to work on this issue, nothing further has been done.

**USE OF FORCE STANDARDS**

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it.  To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force.  The policies and procedures must:
   a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
   b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;
   c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;
   d. Prohibit the use of force as punishment or retaliation;

e.  Limit the level of force used so that it is commensurate with the justification for use of force; and

f.  Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

Changing the culture of the Jail has not been easy.  In some individual cases, the officers involved have adequately documented the actions of the inmates involved and their responses. Incident Report #211108 is a case in point.  An inmate failed to comply with the officer's directive to put on his jumpsuit, but OC was not deployed until the inmate "took a stance" to hit the officer and a Sergeant had already attempted to guide him to his cell.  However, there are numerous instances when force was used (most frequently OC) in violation of the UOF policy. IR's 211315 211387, 211403, 211418 and 211449 document the inappropriate UOF (OC) when inmates failed to comply with verbal orders from staff.  The most egregious case of this violation of policy is recorded in IR 211376 regarding a search for contraband that occurred at the RDC. When an inmate, who was already prone on the floor, refused to put his hands behind his back to be handcuffed, the CID Investigator used his taser to gain compliance.  This was done in the presence of multiple officers and supervisors who could have assisted.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

a.  Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b.  If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

i.  The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

ii.  Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

iii.  Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

   i. a sign-out process for staff members to carry any type of weapon inside the Jail,

   ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

   iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

j. All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Partial Compliance**

Regarding 51 (a), incident reports still do not reflect that supervisory approval is obtained before less than lethal weapons are accessed and used.

There is no change in the status of the following sub-paragraphs.

Regarding 51 (b), there is no contact with Medical regarding health risks and any information on their medical condition, or other circumstances that may increase the risk of death or serious injury from the use of force is not included in IR's

Regarding 51 (c), Detention Services does not utilize the restraint chair.  Handcuffs are sometimes used when physical restraint is required, but most frequently, when inmates need to be restrained, they are placed in a single cell.

Regarding 51 (d), Medical staff routinely examine inmates when a UOF incident results in them being referred to Medical.  The problem that persists is that Medical staff do not have the capability of making JMS entries.  Not only should they be able to do so, but they should be able to initiate incident reports and prepare supplements.  Under the existing system, their critical information lost.  This problem has been pointed out in previous Monitoring Reports.

Regarding 51 (e), there is no documentation to support supervisory approval of a planned use of force.  To date, incidents which should have categorized as "planned" have been routinely treated as operational matters.

Regarding 51 (f), there is no record of a cooperative process being followed.  Security staff and Medical/Mental Health staff have not worked together in advance of a documented planned use of force.

Regarding 51 (g), the Jail has an inventory form that shows when less than lethal weapons are checked out and returned to the armory.

Regarding 51 (h), the Jail now has Go Pro equipment that should make the video recording of planned UOF cases possible.  This capability has been utilized most frequently during shakedowns; however, in the September Quality Assurance Compliance Report it was noted that these cameras no longer function.  "The cameras are still inoperable due to full memory cards and their inability to maintain a charge.  As a result, none of the shakedowns conducted at RDC in September 2021 were recorded.  New cameras are on order."

Regarding 51 (i), supervisors are routinely notified after an incident escalates to the point that force must be used.

Regarding 51 (j), shift commanders are also routinely notified whenever incidents require the use of force.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**

Use of Force training was previously provided to 135 officers prior to June 2021, but it was not included in the most recent round of in-service training that was conducted from August 31 to September 3, 2021; therefore, this paragraph's requirement has not been fully met.

53. Topics covered by use of force training must include:
- a. Instruction on what constitutes excessive force;
- b. De-escalation tactics;
- c. Methods of managing prisoners with mental illness to avoid the use of force;
- d. Defensive tactics;
- e. All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been no change since the last reporting period.  The UOF training includes a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

The UOF policy was adopted by the HCSO on January 27, 2020.  Training has been provided to the majority of supervisors and staff, but testing of five percent of staff is not yet a practicality; nor is it possible to make recommendations regarding changes to the UOF policy.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Not Applicable**

This paragraph is not applicable at this time.  The UOF policy was adopted almost two years ago, but it has not been reviewed or revised since that time; therefore, UOF training has not been updated.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

The Use of Force Policy, 5-500, was adopted almost two years ago. It complies with the requirements of the Settlement Agreement, but even after a year and half of training, it is questionable whether or not supervisors realize that they are to do more than sign off on reports. They should make comments, recommendations and approve or disapprove of the force use. That information is not contained in the UOF incident reports generated by officers and supplements, which are often written by supervisors.

Although the problems associated with the content and quality of UOF reports has been covered in previous Monitoring Reports, the same issues and shortcomings continue. The incident reports do not document use of force incidents as required. There is a check box to indicate whether force is used. This then requires additional information regarding the use of force. The box is rarely checked even when the narrative of the report is clear that force was used. As a result, the additional information required for instances of use of force is not provided.

At the WC the quality of UOF reports (and incident reports in general) has improved. They are generally properly titled and identified according to content. At the RDC many UOF reports are not identified as such. Unique tracking numbers and the officers involved are routinely included, but witness statements are seldom noted. A description of the injuries is sometimes listed. The classification of the housing or where the incident occurred is never specified. This applies to both facilities. Location is generally noted, but sometimes the facility is not even identified.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift. Staff members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Partial Compliance**

While it is not yet possible to determine when a UOF incident report was generated from the IR itself, that information is now available on the Incident Reporting Spreadsheet. A review of that document reflects UOF incident reports are completed by the end of the staff member's shift. Although that is an improvement, this paragraph is still carried as being in Partial Compliance because some incident reports involving the use of force continue to be titled as something other

than UOF and the use of force check box is not checked resulting in the additional required information not being provided.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

    a.  A unique tracking number for each use of force;

    b.  The names of all staff members, prisoner(s), and other participants or witnesses;

    c.  Housing classification and location;

    d.  Date and time;

    e.  A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f.  A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use).  For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.  A description of the staff member's attempts to de-escalate the situation without use of force;

    h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.  A description of any observed injuries to staff or prisoners;

    j.  Whether medical care was required or provided to staff or prisoners;

    k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

    l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The accuracy and quality of UOF reports has improved over time, but this paragraph is still carried as being in Partial Compliance because of significant discrepancies.  UOF reports are not always properly identified as such.  The reports do have a unique tracking number and do identify the officers involved, but witness statements are generally not included.  A description of the injuries is sometimes included.  The classification of the housing area where the incident occurred is never specified although the location of the incident is almost always noted.  While some reports are clear and comprehensive, all too often the lack of clarity and failure to provide

details (and witness statements) makes it hard to determine whether or not appropriate procedure was followed.

Incident Reports 211108 and 211229 are examples of reports that reflect the shortcomings noted above.  IR 2121108, titled "Comply - Failure to Obey/Comply with Lawful Order of a Detention Officer", should have been titled Use of Force because a Sergeant deployed OC on an inmate who "became aggressive" to an officer.  In this case OC was actually used to coerce an inmate into complying with an officer's order, which is contrary to HCSO policy.  The report does not state whether or not there were inmate witnesses.  The originating officer's statement did not indicate in what jail or housing unit the incident occurred, but the Sergeant's supplement did list the location at "Unit C2", but did not specify the facility.   IR 211229, titled "Assault – Assault or Attempted Assault (i.e., Sexual, Physical, etc.)", may or may not have actually covered a UOF incident.  The initiating officer said that he "was working C4" (the facility was not identified) when an inmate climbed out through his cell window and attacked another inmate who was in the dayroom.  The officer then stated that he, two other officers and a Sergeant "…went into C4 and seen inmate (name deleted) and (name deleted) fighting."  This makes it apparent that the Sergeant and officers were not actually inside C-4 when the incident occurred.  There are supposed to be two officers physically located inside C-4 at all times according to the direct supervision staffing standard for that lockdown/confinement unit.  Whether or not the three officers and Sergeant were required to use force to separate the inmates is not noted, but the report does state that one inmate was transported to Merit Health for treatment.  The lack of clarity and completeness in incident reports, particularly at the RDC is not consistent with the requirements of this paragraph.

## USE OF FORCE SUPERVISOR REVIEWS

59.    The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.  At minimum:
    a.    A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.
    b.    A supervisor must ensure that staff members complete their use of force reports by the end of their watch.
    c.    Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.
    d.    If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.   Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.   All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.   A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Partial Compliance**

The following comments appeared in the 14th Monitoring Report but they are still appropriate for this Monitoring Report.  There has been no noticeable change in the status of this paragraph since the last reporting period.  On a day-to-day basis, supervisors are actively involved in dealing with incidents, sometimes more so than would be expected.  That is primarily due to the fact that supervisors at the RDC tend to handle routine matters, such as well-being and security checks, that should be the responsibility of Detention Officers.  This situation is primarily attributable to the shortage of personnel.  Supervisors follow through on UOF cases by notifying the appropriate chain of command and investigative authorities.  As has always been the case, however, supervisors do not evaluate incidents, reach conclusions and make recommendations. Future training for supervisors needs to concentrate on the fact that a signature is not sufficient. A finding is required.

The above referenced improper use of OC spray and a taser should have resulted in corrective action by the supervisors. However, it appears that the supervisors approved the reports with no corrective action recommended or provided being noted in the reports.

60.   After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.   Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.   Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

    c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

    d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

    e.     Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

The following statement from the 14th Monitoring Report still applies.  There has been no change in the status of this paragraph since the last reporting period.  While supervisors have taken steps to improve their compliance with standards, they have not met the requirements of this paragraph.  Specifically, they do not require that photographs be routinely taken, nor do they ever indicate that an inmate has refused to sign a waiver when photographs are refused.  Witnesses are seldom identified, nor are witness statements taken.  Finally, they do not explain why an incident was not recorded if there is no video evidence.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There has been no change in the status of this paragraph for the past several reporting periods.  While the spread sheet on incident reports frequently reflets the supervisor's approval, there is little or no indication of findings or recommendations in the spread sheet or separate reports.  Command level Detention staff indicate that they review incident reports, but there is no record of their recommendations for change, update or action.

62. Reviewing supervisors must document the following:

    a.     Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

    b.     Witness statements;

    c.     Review date and time;

    d.     The findings, recommendations, and results of the supervisor's review;

    e.      Corrective actions taken;

    f.      The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

    g.      Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

        i.      The nature and extent of injuries, or lack thereof;

        ii.      The date and time when medical care was requested and actually provided;

        iii.      The names of medical or mental health staff conducting any medical or mental health assessments or care.

    h.      Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

There has been no change in the status of this paragraph for the past several reporting periods. The incident report summary spreadsheet has a column for supervisors' notes. While this would be an appropriate place for them to make comments/recommendation, their notes are generally limited to personal involvement in the incident(s).

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Partial Compliance**

This paragraph was upgraded from Non-Compliant to Partial Compliance because Policy 1-500, Incident Reports, was approved and adopted on April 14, 2021. Unfortunately, in service training that was conducted from August 31 through September 3, 2021, did not include training on this policy. The HCSO needs to put emphasis on proper training for supervisory personnel.

64.    Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:

    a.      Tracking number for each incident;

    b.      The names of all staff members, prisoner, and other participants or witnesses;

c.      Housing classification and location;
d.      Date and time;
e.      Type of incident;
f.      Injuries to staff or prisoner;
g.      Medical care;
h.      All staff involved or present during the incident and their respective roles;
i.      Reviewing supervisor and supervisor findings, recommendations, and case dispositions;
j.      External reviews and results;
k.      Corrective action taken; and
l.      Warden and Administrator review and final administrative actions.

**Partial Compliance**

A year and a half ago the approved and adopted policy regarding incident reports (1-500), was put in place. In spite of that formal action little has changed. Tracking numbers (incident report numbers) are listed, as are the names of staff and inmates involved. Witnesses are seldom noted. The housing classification is never noted, but the housing unit location generally is (even though the facility is not). The date and type of the incident are always listed, but the type is often subject to question. As an example, a report may be listed as a "Failure to Comply" when in fact "Use of Force" would be more appropriate. Injuries to staff and inmates are sometimes listed, as is the requirement for medical care. All staff involved are generally listed, but supervisory findings, recommendations and case dispositions are not. External review, corrective action taken and command staff review, along with final administrative actions, are not noted.

As previously noted, there is concern that incident reports are not prepared for all reportable incidents. In IR #210960, an inmate is taken to Medical after an alleged assault in A-1. An incident occurred while in Medical which is described in the incident report. However, there is no incident report on the alleged assault in A-1. Similarly, in IR #211113 there is an incident report stating that an inmate was transported to the hospital to see if his jaw was broken. There is no information in that incident report and no prior incident report on the events that caused the injury to his jaw. According to Medical, it was an assault and his jaw was broken. Similar questions arise from IR #211062 where an inmate was sent to the hospital with a broken wrist. According to the August QA report, there is a similar problem with fires being reported. Staff find fire extinguishers to be low or empty without a related incident report being prepared.

Many incident reports do not provide the information needed for an understanding of what actually happened. IR #211304 is an example. It was reported that a detainee approached the officer and said he needed to go to Medical. The officer noticed that the detainee seemed to have "a cup of blood" that "seemed to be coming from his mouth area." He was sent to Medical where he tested positive for some drugs. A supplement by a Sgt. stated that he went to Medical and the

67

detainee stated he was in a lot of pain. Medical stated that they were going to keep the detainee overnight and send him for X-rays in the morning. There is no additional information regarding why the inmate was bleeding, why he had a cup of blood, why X-rays were warranted, or what the outcome was. Another example is IR #211318. The incident begins in the courtroom. The detainee leaves the courtroom without permission and goes to an undisclosed location where he is asked by another inmate to open his door which he did. The officer tells the second inmate to get back behind the door and calls for assistance. The responding officer escorts the first inmate back to A-2.  There is no explanation as to how the first inmate left the courtroom and got to the undisclosed location where another inmate asked him to open his door, or how the first inmate was able to open another inmate's door. There was no supplemental report by the second officer involved.

A frequent omission discovered during this monitoring period was that officers were not entering the date and time of the incident. The date was often in the narrative but was not entered in the appropriate field. This impacted the accuracy of electronic reports listing incidents because they are run for specific dates and if the date isn't input in the correct field the report is not picked up in the electronic report. This impacts the accuracy of internal and monitoring reports. In June, 14 reports were missing; in July, 20 reports were missing; in August, 24 reports were missing. In September, 10 reports were missing. However, IT made those fields mandatory and this problem appears to be corrected as of mid-September. Prior QA and Monitoring Reports may have underreported areas of concern as a result of this problem.

An indication of supervisory review, or the lack thereof, is included in the Monthly Incident Narratives Report.  For the month of August virtually all IR's were carried as "approved" in spite of some obvious discrepancies which were ignored by the reviewing supervisor.  IR#211128 is an example.  Two officers entered HU C-3 at the RDC and stomped out a fire with their shoes. Obviously, there was no officer inside the unit at the time of the fire, but being a direct supervision housing area, it should have been staffed at all times.  This fact was not even mentioned by the supervisor who wrote a review of the incident.

Discussions about the most appropriate way for medical and mental health staff to report incidences raised the question of whether or not medical and mental health staff should have access to and directly file such reports in JMS.  This discussion has now evolved to a much broader discussion about medical and mental health access to JMS for various reasons (for example, assuring knowledge of all new admissions, confirming the classification and housing of detainees, discharge planning, etc.), whether or not there is ever a reason why medical and mental health staff should actually directly enter anything into JMS (instead of simply, or possibly more appropriately providing medical and mental health information to security staff who are responsible for JMS reports). These discussions have further broadened the discussion to

include a wide range of issues related to the role(s) of medical and mental health staff in incident reporting.

At present, incident reports filed by security staff may reference the direct involvement of medical or mental health staff and/or the transfer of a detainee to medical, but the reports virtually never include medical or mental health findings.  In addition, there are times when a review of related medical records provides additional information that should be included in the incident report (for example, that injury was the result of an assault that was not included in the incident report submitted by security staff, or the detainee's altered mental status was the result of a drug overdose that was not noted in the incident report submitted by security staff).  Therefore, these larger issues regarding how best to include information available from medical and mental health staff in incident reports need to be more fully explored and addressed.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

  a.  Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

  b.  Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

  c.  Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Partial Compliance**

The discrepancies and shortcomings identified in the previous Monitoring Reports are still apparent, but policy 1-500, even though not properly implemented, sets forth standards that are appropriate.  As has been noted previously, supervisory review seldom includes witness statements and findings.  Photographs are more frequently included in documentation.  Approval/disapproval statements and recommendations by supervisors are routinely missing. IR #211318 mentioned in paragraph 65 is an example of where an officer responding to an assistance call did not write a supplemental report. The recent death of an inmate also involved missing property when his family came to pick up his property. There is no incident report on the missing property. There were also at least two late releases for which there is no incident report. As previously reported, there are seldom reports on late releases or lost property.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

a.   Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

b.   Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

c.   Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted. Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.   Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Non-Compliant**

The discrepancies and shortcomings identified in previous Monitoring Reports are still apparent. Incident reports do reflect that supervisors respond to incidents and that inmates who need to be checked or treated are appropriately referred. However, supervisory review seldom includes witness statements, photographs and findings. Approve/disapproval statements and recommendations are routinely missing. Incident Report 211659 is a case in point. An officer reported that he was in C-Pod control and heard a disturbance coming from C-4 ISO (Suicide Watch). After responding, it was determined that one inmate had assaulted another. Consequently, inmates were (inappropriately) placed in single cells in the C-4 ISO unit. No officer was working inside the ISO unit as he/she should have been. The Supervisor who reviewed this incident made no mention of that fact, nor did she disapprove the actions of the officer (who should not have been inside C-Pod control) or make recommendations.

**SEXUAL MISCONDUCT**

67.   To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

a.   Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.   Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.      Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Non-Compliant**

This paragraph has been changed to non-compliant. The PREA Coordinator has been out since mid-July. It is reported that several officers have been assigned the PREA duties but there is no documentation that they have been trained on PREA or are undertaking those duties. There are no PREA reports for July, August, or September. During this reporting period there were three inmates transported to the hospital for the stated reason of "PREA evaluations." The July Quality Assurance report indicates that there was a PREA complaint in July. There are no PREA reports on these incidents. There were a number of incident reports during this time frame that should have been referred to the PREA Coordinator but no documentation of any referral or investigation. This indicates the need for continued in-service training of officers. The June Quality Assurance report states that there was a PREA training in June attended by 13 officers. There was no reported training of new cadets or any in-service training of current employees after that. It is essential that the status of the PREA position be determined.

Nursing staff continue to be involved in the screening of newly admitted detainees in an attempt to identify those who may be sexually abusive or at risk of sexual victimization as part of the intake screening process, and new admissions so identified are referred to the PREA officer. If/when the PREA officer refers any so identified new admissions to mental health, mental health will perform an assessment and provide any treatment that might be indicated.

If medical or mental health staff identify a PREA eligible detainee who was not previously identified at intake, that detainee is referred to the PREA officer. If there is an actual PREA defined incident, medical staff will perform or facilitate the performance of any indicated

assessment and provide any medically indicated treatment, mental health staff will perform an assessment and provide any indicated mental health treatment, and medical and mental health staff will confirm that the PREA officer is aware of the incident.

It should be noted that for much of the period covered by this site visit, the PREA Coordinator has been out on leave, and the medical and mental health staff have been unclear about who has assumed the responsibilities for PREA. Therefore, although both medical and mental health staff have continued to identify PREA-related cases and provide the above-described services to such identified individuals, there has not been any real coordination with a PREA officer.

Both medical and mental health staff continue to provide any clinically indicated emergency and ongoing medical and mental health care for victims of sexual assault and/or sexual harassment. It should be noted that if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment, which includes the use of a rape kit. It should also be noted that when indicated, medical and mental health services are also provided to alleged detainee perpetrators of sexual assault or sexual harassment.

The MOU with the Mississippi Coalition Against Sexual Assault is in effect and was being utilized at the time of the 15th Monitoring Report. An outside line has been implemented such that inmates can call the Coalition directly from the kiosk in the unit without charge. A PREA report in June states that an inmate was referred to MCASA when he did not want to talk with the PREA Coordinator. DOJ has highlighted a problem with reporting through the Coalition in that if the Coalition receives certain federal funds, it cannot pass on any PREA reports without a written release from the inmate. Third party reporting is still available through friends and family. PREA complaints can also be reported through the kiosk directly to the PREA Coordinator or through submitting a grievance at the kiosk.

The PREA Coordinator was not available during the site visit. As a result, there is no update on inmate education on PREA. There were no PREA education activities reported. The education process needs to be expanded and the new Detention Administrator will no doubt be a valuable resource in this area. There were no CID or IAD investigations on PREA complaints despite the incidents mentioned above.

One concern related to the ability to provide for sexual safety and adequately investigate allegations is that in February, the prior Detention Administrator reported that at the RDC, 56 cameras were not working, 14 were missing and 10 needed adjusting. The cameras were still not functioning at the time of the October site visit.

At the time of the June site visit, there was also concern about the PREA Coordinator's access to IAD investigations. She was informed by the Undersheriff that her referrals to IAD had to be

approved by the Undersheriff or the Sheriff. The PREA Coordinator was also informed by IAD that she could not have access to the reports/findings of the IAD investigation. Both of these directives are contrary to the Sexual Safety Policy and PREA. Because of the PREA Coordinator's absence, the status of these directives could not be confirmed.

There is one individual housed in Booking who is there because he alleges suicidal thoughts in order to be placed in the suicide ISO unit where he engages in sexual behavior. The Monitoring Team has repeatedly stated that Booking is not appropriate for housing. The suicide ISO unit needs to be under constant supervision by an officer in the unit such that it is safe for inmates. It is essential for the sexual safety of staff and inmates that the housing units be adequately supervised and that Booking not be used for housing.

Given the various above noted roles and responsibilities that medical and mental health staff assume with regard to PREA and PREA-involved detainees, staff may have knowledge about and an understanding of any given PREA-involved detainee that is not readily available elsewhere. Therefore, when there is a PREA investigation, the investigator should fully gather and integrate information obtained from medical and mental health staff into the investigation.  As has been noted in prior reports, although a considerable amount of such information will be available in the detainee's medical records, in many instances, actual investigatory interviews of medical and/or mental health staff might also be indicated.

One of the PREA cases that occurred during the period covered by this site visit demonstrates the fact that medical and mental health staff may have information that might be extremely relevant to a PREA investigation.  In this case, a detainee (detainee A) presented to medical, alleging that he had been sexually assaulted that day by another detainee (detainee B).  A review of medical and mental health records, along with interviews of medical and mental health staff revealed a more complicated story.  Essentially, detainees A and B had had a consensual sexual relationship that soured. The night before detainee A's allegation, detainee A had physically assaulted detainee B and then on the day of detainee A's allegation, detainee B responded to the prior nights assault by physically assaulting detainee A.  Both detainees have been receiving mental health services. Most of the above noted information is based on mental health records and interviews with mental health staff. The findings of detainee A's sexual assault assessment (performed on the day he was allegedly sexually assaulted by detainee B) were negative.

**INVESTIGATIONS**

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

    i.    Any prisoner exhibited a serious injury;

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

    i.    Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

    ii.    Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

    iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

    i.    Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

    ii.    Any staff member requested transport of the prisoner to the hospital;

    iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

    iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f. Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

 i. a brief summary of all completed investigations, by type and date;

 ii. a listing of investigations referred for administrative investigation;

 iii. a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

 iv. a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

 v. a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g. Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Policy 1-600, Investigations, was approved and adopted a year and a half ago (March 25, 2020).  It calls for thorough CID and IAD investigations that are consistent with the requirements of the Settlement Agreement.  As was noted in the last Monitoring Report, the number of CID investigations has risen substantially since 2017.  Consequently, a second investigator was assigned to handle Jail cases in early October.  This should allow for more emphasis to be placed on taking witness statements.  With upwards of 60 cameras malfunctioning or out of service at the RDC, the job of the investigators has been seriously hampered.  Without a video record of many incidents, they could not be definitively resolved.  This technical problem should be corrected before the next site visit.

A review of the CID spreadsheet for investigations conducted during June, July, August and September 2021, revealed that there were 69 cases.  The majority of those were Assaults at the RDC (25), followed by assaults at the WC (12).  There were 11 investigations regarding contraband at the RDC while there were none at the WC.  Likewise, there were five arson investigations at the RDC but none at the WC.  Beyond that, there was one assault on a law enforcement officer at the RDC and there were two inmates involved in an escape from the WC.

The location of these events within the respective facilities is not adequately documented on the spreadsheet.  At the WC the actual housing unit is listed (1, 2, 3 or 4), but at the RDC only the pod is noted (e.g., A-Pod or C-Pod), not the individual housing unit.  The specific housing unit should be indicated.  At the WC there was one investigation in HU-1, there were five in HU-2,

seven in HU-3 and two in HU-4.  At the RDC there were 21 investigations in C-Pod and 17 in A-Pod.  The importance of this is that C-Pod is supposed to be operated under the principles and dynamics of direct supervision.  If that were the case, one would expect to see fewer incidents in C-Pod than A-Pod where officers are not assigned inside the housing units and the actual level of staffing is lower than in C-Pod.  The statistics confirm that direct supervision is not in place in C-Pod.  There were two incidents in Booking and one in Medical.

Of the CID investigations during this three month period, eight were referred to IAD, two were referred to an Outside Agency, 12 were transferred to the Grand Jury, four were referred internally, and none resulted in criminal indictment.  Considering the significant number of assaults, the fact that none resulted in a criminal indictment is unusual.

There is a significant delay in IAD reports being made available to the Monitoring Team. This was also a concern with IAD reports being made available to the Jail Administrator, timely if at all. This has reportedly been rectified. In IR #210962 there was an incident that occurred in C-2 with no officer present. When officers arrived, an inmate had and used a canister of OC spray. As of the time of the site visit this incident was still being investigated. The IAD spread sheets show multiple incidents "currently under review" with subsequent spreadsheets showing no resolution.

The IAD spreadsheet tracks investigations according to most of this paragraph's criteria.  From June through August 2021, a total of 34 cases were investigated.  Among the most significant, 15 involved UOF, two were inmate deaths, one was an escape of two inmates from the WC, one was a fire and four involved unbecoming conduct on the part of staff.  As a result of all investigations, three officers were terminated and two resigned, but the disposition of some investigations is still pending.

IAD investigations were predominantly centered on events that occurred at the RDC.  Only three were at the WC.  At the RDC the majority of investigations dealt with events in C-Pod (13), A-Pod (8) and Booking (6).  It is noteworthy that there were more investigations on events in C-4, the lockdown/confinement unit, than in any other housing unit.


## GRIEVANCE AND PRISONER INFORMATION SYSTEMS

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

There has been no change in the status of this requirement. As stated in the 12th, 13th, and 14th Monitoring Report, it will be necessary to track whether there is a concern about the confidentiality of the use of the grievance system once there is an officer consistently on the unit as required in C Pod by the Stipulated Order. As previously stated, the incident reports indicate that this is still not the case. Until then, it will not be possible to know if the physical setting of the kiosks which does not allow for privacy results in issues with the confidentiality of filing a grievance. However, it should be noted that inmates are using the system and there has been no stated concern about officers observing the use of the kiosk. There are some gaps in access to the kiosks. There are no kiosks in Booking where people are inappropriately housed as well as no kiosks in the ISO units.

The grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer. The grievance officer was not able to confirm that there were paper forms in the housing units, booking or the ISO unit. She did not think there were envelopes but agreed to get some to the units. One inmate housed in the ISO unit indicated he would use the kiosk if there was one in the ISO unit. The grievance policy also requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It does not appear that this provision of the policy has been implemented or that the inmates have been informed of it. In addition, without an officer regularly on the unit in A Pod, an inmate would not have easy and confidential access to a Detention Officer.  Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

A Grievance Policy has now been approved and adopted. The Grievance Coordinator now has a copy of the policy and has reviewed it. There are still some aspects of the policy that are not fully implemented. Once the policy is fully implemented, it would be applicable and standardized across the entire Jail. At present, the kiosk system works the same across facilities. The Grievance Coordinator stated that she now reviews all grievances including those at the WC, determines whether they are grievances and then assigns the grievance to staff for a response. However, a review of the grievance responses indicates that the Grievance Officer at the WC is

receiving grievances that she denies as not being a grievance even though this is supposed to be the role of the Grievance Coordinator. It appears that the system of having the Grievance Coordinator determine whether the grievance presents a grievable issue which is according to policy, is not being consistently followed leading to inconsistency in this area. This appeared to be the case through August. However, in September, there were very few grievances denied by the WC Grievance Officer as not a grievance. There is inconsistency in how grievances are responded to once assigned. In addition to some responders not providing any response through the system, described below, some responders research the grievance and respond substantively whereas others simply say the matter will be looked into. The Grievance Coordinator stated that she advised staff to respond substantively to the grievances. There appears to be some improvement in this area but some responses are still inadequate. Even with the policy in place, there will need to be training on how to properly respond and ensure promised response to grievances are implemented in order to achieve consistency. The grievance policy requires that a percentage of grievance responses be audited on a periodic basis. Once this is implemented, it will be possible to target appropriate training and corrective action.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the Grievance Coordinator maintains a spread sheet to track the grievances and grievance responses. Many of the fields are pulled electronically from the Securus system. However, she has to manually add the type of grievance, the date of response, and the date of an appeal. The Grievance Coordinator previously reported that some officers do not respond to grievances through the Securus system and, as a result, there is no documentation of a response to some grievances. This appears to be a significant problem. During this reporting period there appeared to be some improvement until September. The timeliness of responses is also an issue. Standard grievances are supposed to receive a response within 7 days. Emergency and medical grievances are supposed to receive a response in 24 hours. The chart below reports the findings for late and no responses.

|  | Number Assigned | No Response | Late Response Standard | Late Response Medical | Late Response Emergency |
|---|---|---|---|---|---|
| June | 57 | 9 (1 medical) | 6 | 3 | 14 |
| July | 119 | 10 (2 medical) | 19 | 3 | 31 |
| August | 89 | 2 | 3 | 7 | 22 |

| September | 123 | 28 (2 emergency, 4 medical) | 2 | 9 | 9 |
|-----------|-----|-----------------------------|---|---|---|

In the review of grievances and responses for the month of August, it appears that many of the emergency grievances were not emergencies. It will be important to educate the inmates on what constitutes an emergency so that true emergencies aren't overlooked among the many emergency grievances. There appeared to be some improvement in September in this area. The Grievance Coordinator has also suggested that a timely response to emergency grievances could be better ensured if the system had an alert signal for emergency grievances. The Grievance Coordinator works regular business hours and will not see an emergency grievance submitted in the evening or on the weekend until the next business day.

Although the new system should ensure responses, there needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. It has been previously reported that one concern is grievances being denied as not a grievance when they actually are grievances. As reported in the 14th Monitoring Report, in February 25% of grievances were denied as not being a grievance; in March, 33%. This increased dramatically in April to 57% and in May to 64%. The percentage has dropped during this reporting period with 48% in June, 35% in July, 49% in August, and 36% in September. The Quality Assurance Officer and the Grievance Coordinator reviewed this issue during this reporting period and a review of the grievances for August indicates improvement. There are still some grievances that were denied as non-grievable but in fact were.  This included issues of alleged over-detention, failure to get prescribed medications, missing money, and failure to get an approved special diet. Another example of a legitimate grievance being denied because it was said to be a request was a grievance regarding not getting medications. This was denied as being a request, not a grievance. Although a request for some items might be simply a request; a complaint that prescribed and needed medications were not being provided would constitute a grievance.

There are still some grievances where the adequacy of the response needs improvement but this appears to be improving. There were still a few responses stating that the officer "will look into it." There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. There was one where the response was "resolved." One troubling area is the issue of alleged missing or the wrong laundry being returned. The response is routinely, "your laundry did come back" or "did not get mixed up."  There should be some inquiry as to whether an inmate has clothing or clothes that fit and in the long term, a system for tracking laundry. The new grievance policy requires that the Quality Assurance Officer do a monthly audit of grievances and responses to determine the

timeliness and appropriateness of the responses. This has not been implemented yet but should provide some oversight in this area.

As mentioned, a number of medical grievances had no or late responses in the system. Medical and mental health related grievances are triaged by the HSA.  A review of the HSA's grievance file indicates that medical and mental health related grievances are responded to in a timely manner, and when it appears to be an emergency, the response is immediate.  However, for the period covered by this site visit, the grievance file/system indicates that there were 7 medical grievances during this period that were never responded to and 22 medical grievances that were responded to but not in a timely manner (i.e., the response was not within 24 hours).  Since the reason(s) for this inconsistency between the file maintained by the HSA and the file/system maintained by the grievance coordinator is unclear, the HSA and the grievance coordinator should meet in an effort to identify and address the problem(s).

In addition, although a file of medical and mental health grievances and written responses is maintained by the HSA, there is still no attached documentation of a final resolution of each matter (i.e., whether or not the response to the grievance actually resolved the grievance matter). Therefore, such documentation of resolution must be added to the records maintained by the HSA.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. Under this system non-English speaking persons and persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. There is no indication that this provision of the policy is being implemented or that inmates have been informed of this option. An inmate on B-4 who stated he was unable to work the kiosk asked a Detention Officer for assistance but had not received assistance. He was recently booked, his medication had been changed and he was having trouble with his medications. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

The Securus system should at some point be programmed to include the most common foreign languages.

73.    The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The inmate handbook, which is given to all detainees during the booking process, is out of date and is not available in Spanish or any other language.  This shortcoming has been brought to the attention of the HCSO since the very first Monitoring Report.  Over the past five years, various command staff were assigned the task of updating the handbook, but it was never accomplished. The new Jail Administrator is aware of the problem and has now assumed responsibility for completion of the project.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.    Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

The Jail System is in compliance with the requirement that newly arrested inmates must be processed through Booking within eight hours.  However, it is not in compliance that those individuals are actually classified in that time frame. As noted above, the Classification log for August indicates that eleven inmates were classified two days or more after booking, up to eleven days. The explanation is that they are moved and then are lost in the system for some time. It is also clear from the incident reports that Classification does not consistently provide 24/7 coverage and so cannot be classifying all individuals within eight hours. Inmates should not be moved before they are classified. They may be moved to Intake Orientation Housing if further observation (or COVID precautions) require but they should still be seen by Classification. Incoming individuals are moved out the holding cells and placed in Intake/Orientation Housing, which most recently was changed from C-2 to B-4.  However, at least two incident reports

indicate that officers moved inmates to B-4 who were not incoming inmates. (IR #211229 and 211383)

The reason that this paragraph was downgraded from Partial Compliance to Non-Compliant in the 14th Monitoring Report is because, throughout the five years that the Settlement Agreement has been in effect, inmates have routinely been housed in Booking holding cells for extended periods of time.  Various excuses have been offered to explain why, including locks that don't work, and a lack of lockdown/confinement space.  Most recently it was because of COVID 19 quarantine and separation requirements.  Regardless, during the October remote site visit it was determined that eight inmates were being housed in Booking holding cells.  Inmates housed in eight hour holding cells do not have access to video visitation services or outside recreation. They are simply let out of their cells periodically in order to shower and make phone calls.

At present, some new admissions for whom 'appropriate long term housing' would be a mental health unit are not moved to more appropriate long term housing.  This is because there is no mental health unit; there is no unit that even approximates 'appropriate' for such new admissions; and those who are most unstable and unpredictable are likely to end up being placed in segregation, which is clearly not appropriate housing.  However, once the mental health unit becomes operational, this should all change; it will be possible to immediately place seriously mentally ill detainees in more appropriate housing, directly from intake Mental health and classification staff have been working out the details for how this will be accomplished.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**
Segregation logs submitted for the recent site visits reflect better record keeping than had been maintained in the past, but there were inconsistencies noted between files from the WC as compared to the RDC.  Command staff need to set and enforce uniform procedures as well as standardized forms and documentation throughout the Jail System.

The Segregation Log now has a column to list the charge against an inmate, when he was placed in segregation, when a disciplinary hearing was held and when the inmate was returned to general population and to what location.  The WC appears to routinely include the charge and usually indicates the date of a disciplinary hearing and the number of days imposed; RDC does not. During the current site visit it was learned that RDC had discontinued including disciplinary segregation in the Segregation Log. Because of the shortage of bed space, discipline less often includes segregation but these still need to be included in the Segregation Log. This was clarified with staff. The Monitoring Team has recommended that the log include the date of the most recent seven-day review so that compliance with that policy requirement can be tracked.

76.     Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for detainees who are being held in segregation.  When indicated, staff offers mental health services to a detainee who is not already on the mental health caseload.  When indicated, staff makes available adjustments in the treatment that is being provided to a detainee who is already on the mental health caseload, but however currently (i.e., until the mental health unit becomes operational), available adjustments in treatment may be far less than what the detainee requires.

As has been noted in prior reports, the long-standing issue has been the failure to develop and implement a formal mechanism whereby any findings from these weekly mental health rounds (such as a deterioration in a detainees mental health status) can be shared with security staff responsible for the placement in and removal of detainees from segregation and thereby possibly have an impact on any decisions made by security staff regarding the continuation or termination of a detainee's placement in segregation.  Then, even after the development and approval of a classification policy that would establish such a mechanism (seven-day reviews), there was an unexplained delay in implementing the policy.  The seven-day review process has now been implemented. (See paragraph 42 and 77(i) for additional information). It should be noted however that while awaiting the implementation of that policy,  In the context of that working relationship, increased  attention was beginning to be paid to some of the more seriously mentally ill detainees who are being held in segregation and in the context of that working relationship, mental health and classification also developed an understanding about and moved towards the development of a policy and procedures for how detainees who are appropriate for transfer from segregation to the mental health unit (once the unit is operational) will be identified and managed.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.  All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.  Segregation must be presumed contraindicated for prisoners with serious mental illness.

c.  Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

    i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

    ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

    iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic)

housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.  The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.  Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Non-Compliant**

Regarding 77(a), at present, there is no participation by a QMHP in the decision to place someone with serious mental illness in segregation and there is no policy that would address this provision. As noted in prior monitoring reports, this provision applies to all detainees who are already on the mental health caseload. It also applies to those who are not already on the mental health caseload but their behavior could reasonably lead security staff to suspect that they might be suffering from a mental illness.

The mental health assessment performed in connection with security's review of a detainee's incident(s) should be performed by a mental health clinician who is NOT the detainee's primary therapist, in order to avoid complicating the treatment process.  The assessment should be focused on the following:

- Whether or not the detainee's mental status is such that he/she cannot credibly participate in the disciplinary review process or classification process
- Whether or not the detainee's infraction/behavior is actually a symptom(s) of or the result of his/her mental illness
- Given the detainee's mental status, whether or not the detainee is actually able to learn anything (or otherwise benefit) from being placed in segregation
- Whether or not placement of the detainee in segregation is likely to be harmful to the detainee/cause further deterioration of his/her mental status
- Whether or not, given the detainee's mental illness and current mental health status, there is an intervention that is more appropriate than placement in segregation, such as altering

the detainee's mental health treatment plan and/or a punishment that doesn't include placement in segregation

The exception to this policy would be detainees who will be housed on the mental health unit.  If a detainee on the mental health unit commits an infraction, the treatment team (which includes security staff) will have the responsibility and authority to decide what should be done, the team's decision should be documented in the detainee's medical records, and an emergency treatment plan should be generated to further document the team's decision.

Regarding 77 (b) given the number of individuals with serious mental illness in segregation and the lack of process surrounding their placement and continued placement, it cannot be said that segregation of individuals with serious mental illness is contraindicated. As has been noted in each prior report, there are detainees with serious mental illness housed on the segregation unit and held in segregation in the isolation sections of other units. Housing in segregation can and has led to decompensation of those with mental illness. It is anticipated that the program design for the mental health unit will be such that these detainees can be moved to the mental health unit once it is operational.

Regarding 77 (c) at present, individuals on the mental health caseload are not being screened within 24 hours of being placed in segregation. In fact, mental health staff are not even notified when a detainee is placed in segregation, even when the detainee is known to be on the mental health caseload. As explained in prior reports, mental health staff review the housing location of those on the mental health caseload to determine if someone has been moved to segregation.

Regarding 77 (d) and (e) As noted in paragraphs 77(a) and 77(c), the mental health staff are not being offered the opportunity to assess any detainees prior to their placement in segregation. Therefore, the security policy and procedures that would address this provision must be developed and implemented.

Security staff are aware of the fact that there are seriously mentally ill detainees being held in segregation.  However, there is no specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation.  In addition, the placement of these detainees in segregation has not been short term.  Furthermore, there is only one situation within the last two years where an individualized plan was developed to get a detainee out of segregation as quickly as possible.

Although the opening of the mental health unit will provide a more appropriate housing option for seriously mentally ill detainees who are currently placed in segregation, it will still be important to develop and implement policies and procedures that would address this provision.

Regarding 77(f)(i) as part of medication pass, the nurses offer daily visits to detainees being held in segregation who are on medication.  However, as noted in other sections of this report, there are times when nurses are attempting to pass medication that they are unable to actually even see some detainees due to the fact that there are not enough security staff available to support the medication pass function.

Regarding 77(f)(ii) detainees on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP, but due to the shortage of mental health staff, these sessions are not consistently scheduled on a weekly basis.  Then, due to the shortage of security staff, the therapeutic sessions that are scheduled do not always occur. There are times when this is all further complicated by problems with the physical plant (for example, cell doors that don't lock, which makes it virtually impossible for security staff to assure the safety of the mental health staff who were scheduled to come on the unit) and although such cancelled sessions are rescheduled, this can take a while due to the shortage of mental health staff.  In addition, when scheduled sessions do occur, due to the shortage of security staff they are often not out-of-cell sessions, but rather sessions held at the detainee's cell door.

Regarding 77(f)(iii) as noted in paragraph 44(a), a QMHP makes weekly rounds for all detainees being held in segregation, during which each detainee's mental status and need for mental health services is assessed.  However, as has been repeatedly noted in prior reports, there is no on-site jail medical physician or psychiatrist. The responsibilities that might be assumed by such physicians are assumed by a medical/primary care nurse clinician/practitioner and a psychiatric nurse clinician/practitioner, both of whom have physician collaborators. Therefore, the parties need to come to some sort of agreement about how this provision will be addressed.

Regarding 77(g) all detainees with serious mental illness housed in long-term segregation have been assessed by a QMHP, but to date, there has been no appropriate housing for such detainees that could be recommended based on those assessments. However, as noted in prior reports and in paragraph 77(b) of this report, it is anticipated that the new mental health unit will provide appropriate alternative housing for this population, at which point this provision can be more fully addressed.

Why the development of a mental health unit is required in order to address the needs of the seriously mentally ill detainee population and comply with this provision and many of the other provisions of this agreement has been outlined in prior reports.  The various issues that need to be addressed in order to get to the point where the mental health unit becomes operational have also been outlined in prior reports.  Therefore, all of the above noted will not be outlined again here, and instead, a status update is offered.

The planning process for the mental health unit is well underway, and it is clear that information provided by the consultant obtained by the monitor and the information obtained during the

virtual site visit to a well-established jail mental health unit helped focus the planning process. There is a fully interdisciplinary planning team for the mental health unit. The team meets on a monthly basis, with full participation; and more detailed planning goes on in between the monthly meetings.  Based upon a review of the meeting minutes and interviews conducted during the site visit, critical operational policies and procedures are being finalized; the clinical program/menu of therapeutic interventions is being more fully developed, designed to meet the needs of the population that is expected to be housed on the unit, and a staffing plan has been finalized, including medical and mental health staff (a contract that includes additional mental health staff has been approved by the County). The planning process has not yet included any consideration for therapeutic housing for women who will not have access to the MHU. Initially, the plan was to have designated security staff and supervisory security staff for the MHU.  However, given the shortage of security staff, the current plan (which is already underway) is to provide additional mental health training to 25 security officers (phase one of the training has occurred), which will allow for more flexibility with assignments to the MHU on any given shift, and then to eventually provide this additional training to all security officers, which will allow for even greater flexibility with shift assignments to the MHU.  It should be noted however that although this approach does help to assure security coverage for the MHU despite the shortage of security staff, not having security officers who are fully designated to work on the MHU does mean that there will not be a set of security officers who will benefit from the type of on-the-job training that will come with consistent placement on the MHU. Finally, it is anticipated that finalized written documents concerning most of the above (for example, policies and procedures, menu of treatment services available, and the security staff training program) will soon be completed and submitted to the monitor.

The renovation of the space for the mental health unit is also well underway.  The MHU planning team did have an opportunity to provide input into how the space would be renovated in order to make it as usable for this purpose as possible, and at the time of the site visit, a full review of the final stages of the renovation was about to occur.  This input had previously been given but not incorporated into the renovation process. The new Jail Administrator ensured that this renewed input was incorporated. A projected date for completion of the renovations was not provided, but it was generally anticipated that the space might be available within the next couple months but will not be operated as an MHU until additional mental health staff have been hired (the positions are posted). Even when the space becomes available, the unit cannot be opened until sufficient mental health staff are approved and hired, and sufficient security staff have been identified and fully trained.  In addition, it should be noted that although still off in the future, a mental health unit is in the first phase of the County's plan to build a new jail, and so hopefully, lessons learned while operating a mental health unit in the repurposed space at RDC can help inform the design of the proposed MHU for the new jail.

Regarding 77(h) when it has been discovered that a detainee's mental health status has deteriorated while being held in segregation, this has usually been discovered by mental health

staff during weekly segregation rounds or during an individual session with a detainee.  Nursing staff have also identified such detainees during their weekly segregation rounds or during medication pass.  It does not appear that security staff identify such deteriorating detainees. The reason(s) for this is unclear, and so this issue requires further assessment and then the development of a corrective action plan. During the course of such an assessment, a lack of focus on this issue by security staff and/or the need for additional mental health training for security staff should be considered as possible contributing factors.

When it has been found that a detainee's mental health status has deteriorated while being held in segregation, mental health staff assess additional mental health treatment needs. If the detainee is already on the mental health caseload, any indicated changes to his/her treatment plan are made (when an 'indicated' treatment option is not currently available at the facility, the best available option is employed) and if the detainee is not already on the mental health caseload, he/she is added to the caseload and an appropriate treatment plan is developed.  Although this is documented in a detainee's medical records, it is not consistently documented in the records of segregation review meetings.

See paragraphs 76 and 77(a) with regard to the implementation of policy/mechanisms whereby mental health staff would have input into housing decisions being made for mentally ill detainees who are being held in segregation, including those who have deteriorated while being held in segregation.  Ideally, the implementation of that policy will also help to establish an improved working relationship between classification, security staff responsible for disciplinary review and segregation review, and mental health staff, whereby appropriate housing for any given detainee who has deteriorated while being held in segregation can be discussed and addressed at any time (not just during a regularly scheduled meeting), especially when the deterioration is severe enough that the need for action has become urgent.

If a detainee's deterioration in mental status is such that the detainee is suicidal, alternative housing/placement is available in the form of suicide watch in a suicide-resistant cell.  However, as noted in prior reports and in other sections of this report, until the planned mental health unit is operations, there is no appropriate, alternative housing/placement for other acutely mentally ill and unstable detainees.

Regarding 77 (i) during the June site visit, it at least appeared that a mechanism for interdisciplinary review of detainees who are being held in segregation was finally being implemented.  Essentially, based on a review of documentation forwarded to the monitoring team, there is now a seven-day review by security, classification and mental health, in the form of a joint MAC (Medical Administration Committee)/IDT (Interdisciplinary Team)/SEG (Segregation) review meeting.  However, although it appears that each detainee is discussed, the documentation simply indicated that the detainee's behavior (a product of the detainee's mental

illness) was such that he couldn't be removed from segregation and housed in general population.

As noted in various sections of the Settlement Agreement, no seriously mentally ill detainee should be held in long-term segregation. Even placement in short-term segregation should only be for some documented, extraordinary reason and when a seriously mentally ill detainee is being held in segregation, there must be an interdisciplinary plan developed for removing him/her from segregation as quickly as possible.  The above-described review documentation does not reflect compliance with any of these provisions or principles that underlie the need for an interdisciplinary review of seriously mentally ill detainees being held in segregation.  More specifically, there was no indication of the impact, if any, of segregation on the detainee's mental status, there was no indication of whether or not the detainee even understood why he/she was placed in segregation, and so ultimately, there was no sense obtainable from the documentation whether placement in segregation was helpful or harmful to the detainee.  The seven-day review documents/forms do not include a plan for removal of each detainee from segregation (even such as altering the approach to treating an unstable detainee in an effort to better stabilize the detainee, or identifying an alternative "safe" but less restrictive placement for a vulnerable detainee) or some explanation as to why an implementable plan cannot be developed (for example, the absence of a mental health unit that would be a suitable alternative placement). Instead, the review documents appear to indicate that segregation is the most appropriate place for each detainee, and there is not even a discussion about whether or not any adjustments could or should be made (like more out of cell time or increased access to more services or activities). There is also no evidence that any effort was made to engage each detainee in the review process of his/her case, and there was no indication that each detainee had been found to be so incompetent (due to mental illness, intellectual disability or other cognitive difficulty) that he/she was unable to credibly participate.  In addition, for any of the detainees who had refused treatment and were considered to be too dangerous to be housed in general population, there was no discussion about whether or not the degree of danger to others that they posed was enough that a plan should be made to initiate involuntary treatment.

Regarding 77(j), it does appear that security staff understand that they cannot make mental health treatment decisions or overrule physician medical orders.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482.  Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners. During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and

any other individuals or entities whose input is relevant. The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. Within 18 months after the Effective Date of this Agreement, the County will have completed transitioning to any new or replacement youthful prisoner housing facility.

**Sustained Compliance**

Except for the three-week placement of a youth under 18 at the Raymond Detention Center (RDC) as noted in the prior report, there have been no youth placed at RDC since February 2019. The court may recall the unique circumstances of that youth's (T.G.) placement but given the overall nature of the county's response it is appropriate to rate the status of this item to Sustained Compliance (vs. "restarting the clock").

The prior report includes a substantial discussion of potential changes in federal juvenile justice requirements that may impact future discussion of where the juveniles charged as adults (JCAs) are held, but there remains a lack of clarity of any intermediate or long-term plan related to housing JCAs. Henley Young remains the best short-term/intermediate option for holding JCAs, but the absence of physical plant improvements suggests that the county does not intend that to be an intermediate or longer-term solution. On the other hand, the County has opted to move forward with a limited option included in the overall facility Master Plan that does not include housing JCAs, suggesting that Henley Young does appear to be a longer-term plan. This seeming lack of an intermediate and/or longer-term plan leaves Henley Young as an "afterthought" in overall County planning.

The prior report also highlights the concerns expressed by the current Youth Court Judge, Judge Carlyn Hicks, that housing JCAs with youth under her jurisdiction is contraindicated by state statutes and the housing complications that result when there are JCA girls as well as Youth Court girls held at the same time because of limited options to maintain separation between JCA's and non-JCA's.  On almost all days between May 15 and September 15 this year, there was at least one adult court girl in placement, and on 77 of the 124 days (62%) there were both adult court and youth court girls in the facility. That is a significantly higher percentage of "dual use" than has been experienced in prior reporting periods. Although the overall number of youth in placement has stabilized and been reduced, the challenge of appropriately separating youth court and adult court residents, particularly girls, remains.  That challenge has been exacerbated by staffing shortages that will be discussed later in this report.

Concerns about the length of placements for JCAs at Henley Young remain, although there was some movement over the last reporting period. In fact, nine youth that had been admitted prior to this reporting period were released since June, the majority (but not all) released as the result of turning 18 and transferring to RDC. Of fourteen youth admitted since June, nine remain in

placement as of the time of this site visit. The slowness of the court process that impacts all confinement facilities in Hinds County remains a particular concern for youthful offenders.

After noting some progress in the prior report related to the speed of indicting JCA youth, Chart 1 below illustrates the indictment status of youth, with 50% of the total youth placed longer than 90 days still not indicted (note: three youth have been at HY less than 90 days).



There are multiple factors that are contributing to court delays, including limited judicial and judicial support staffing, limited prosecution/public defender staffing, delays in processing needed evidence at the state level, and others; all of which have been complicated by the effects of the spread of COVID-19. While not unique to the JCA population, it remains a recommendation that the court system continue to find ways to expedite court cases. It is true for both Henley Young and the adult facilities that the average daily population of the facilities is a function of the number of individuals admitted and their length of stay. It remains likely that the number of JCAs held, as well as adult inmates, will be reduced as much, if not more, by shortening the length of stay than may occur through any reduction in admissions. Ultimately that will have both a fiscal and operational benefit for the overall system.

As of October 5, there were 18 JCAs and no non-JCAs held at Henley Young. Some basic data includes:
- Sixteen JCAs were male, two were female.
- As noted above the daily roster indicated that only six of the JCAs held for at least 90 days have been indicted.
- In terms of length of stay, the number of days in confinement ranges from 19 to 755, with three youth being held for over one year.

- The ages of JCA youth in custody is illustrated in the chart below, showing that one-half of JCA youth are 17, most of whom will turn 18 before the end of 2021. Depending on the number of youth admitted to HY, this may portend a further reduction in the overall JCA population yet this year.
- Chart 3 shows the Average Daily Population (ADP) at Henley Young from June through September 15.





**CHART 3: HY ADP JUNE-SEPT 15, 2021**

| | JUNE | JULY | AUG | SEPT* |
|---|---|---|---|---|
| Non-JCA female | 1.3 | 1.0 | 0.7 | 1.6 |
| Non-JCA male | 3.3 | 2.1 | 4.3 | 2.6 |
| JCA Female | 1.8 | 1.0 | 1.2 | 2.0 |
| JCA male | 22.6 | 19.9 | 17.4 | 17.7 |

Legend: JCA male | JCA Female | Non-JCA male | Non-JCA female

<u>Personnel Changes</u>

Key leadership and programming positions are now filled with the start of Ms. Warfield taking the role of Treatment Director. Mr. Fernandeis Frazier has continued as Executive Director, Ms. Baldwin as Program Coordinator, and Ms. Foster as Learning/Development Manager. Added to the on-going leadership provided by Mr. Burnside as Operations Manager and Mr. Dorsey as Quality Assurance Coordinator, this represents the most complete and stable leadership team that has been in effect over the course of this agreement. A recent QMHP vacancy on the mental health treatment was filled quickly, and there have been several recent promotions of in-house staff to Senior and/or Supervisory Youth Care positions.

Based on multiple conversations with Mr. Frazier, it does seem that he is focused on addressing many of the challenges facing Henley Young and is taking a proactive approach in appropriate performance expectations and moving all aspects of the program forward.  The more support that can be given for Director Frazier's efforts, the better.

The more immediate, and critical, staffing issue remains the large number of vacant Youth Care Professional (YCP) positions.  An organizational outline provided on October 7 shows 18 of 42 YCP positions vacant (42% of currently authorized positions). However, that does not include an additional seven YCP positions that were recently eliminated to provide funds for a minimal raise for existing YCP staff. If those positions were included, as was true in the prior report, then there would in fact be 25 vacant YCP positions, a vacancy rate of a completely unworkable 60%.

The decision to eliminate needed YCP positions was in part necessitated when the County decided to raise the pay of adult detention officers without addressing the low pay for YCP staff. The raise for adult detention officers was done without requiring eliminating vacant adult detention officer positions, and there has been no indication from the County that the eliminated YCP positions will be reauthorized in the future or that additional compensation is being considered for YCP staff beyond the minimal raise resulting from eliminating YCP positions. This is patently unfair to the YCP staff at Henley Young, and budget reductions (personnel and/or operational) at Henley Young increase the potential for problems to occur and reduces the likelihood that conditions of this agreement can be met in the future. The constant "churning" of YCP staff severely hinders the ability of Henley Young to achieve success in providing adequate supervision and programming.

It is relevant to note the concerns of Youth Court Judge Carlyn Hicks that she is aware of situations in which the staff shortage also has a detrimental effect on the Henley Young youth under her jurisdiction; that the needs for adequate supervision, programming, and safety of youth Court youth is overwhelmed simply by the need to attend to the much larger number of JCAs. While those youth are not included in this agreement, they are clearly being monitored under the SPLC agreement and meeting the requirements of that agreement are equally important as the County allocates resources.

During the most recent court Status Conference, the County attorney proffered that the YCP positions were not permanently eliminated, although it remained unclear what their status was. There was also an indication that some sort of "staffing analysis" was going to be completed prior to any further action related to Henley Young staffing, but no one has indicated that to be the case to Mr. Frazier and the county has not provided confirmation as to who is doing any purported study or a timeline related to such an analysis.

The original configuration and complement of positions for Henley Young is appropriate to sustain their operations. Therefore, the specific recommendation is that the County restore the budget for the positions that were eliminated, increase the base pay for YCP staff, and develop a pay progression system across the board for staff at Henley Young to help recruit and retain qualified personnel.

If not already clear, being able to meet many of the requirements of this agreement depends on being able to recruit, train, and retain an adequate number of well-qualified Youth Care Professional staff as well as successfully filling (and keeping) qualified individuals in key leadership and program positions.

<u>Physical Plant Changes</u>

Work on the modular program units has been completed and the units are available for use. While the units have been used up to two times/week, staffing shortages have prevented movement to/supervision of youth for programming purposes in those units on any consistent basis. Staff indicate that the units are much more appropriate for conducting group discussion and other activities that too often are conducted on the living units. As noted in prior reports, the actual housing/living units are not properly furnished to make them a suitable space in which to conduct meaningful youth development activities. The living unit acoustics are worse than functional, furniture is not movable, and youth not directly participating in a scheduled activity distract those that are participating.

Additional physical plant changes that have been recommended in the past have not been addressed, including (1) dealing with limited use of outdoor recreation space related to weather (e.g., cold, rain, darkness). Whether one of the four new modular "rooms" created can help address this issue remains to be seen; (2) making changes in the living units to improve acoustics and furnishings to make those units more "livable" and appropriate for adolescents, particularly youth placed for long periods of time; and (3) creating more flexible use spaces that can be used for "cooling off periods" or alternate supervisions spaces so youth can be safely supervised without having to be placed in confinement for disciplinary purposes. Considerable reference has been made in prior reports about the importance of making these living unit changes and the benefit they will bring to overall program operations, including behavior management.

The last report included reference to the "breakdown" of the master controls that allow remote operation of doors within the facility, requiring that all doors be operated manually. Per Director Frazier that project has largely been completed, and the system is operational.

**For any youthful prisoners in custody, the County must:**

78.     Develop and implement a screening, assessment, and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**
Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young, including the use of initial screening tools (MAYSI-II and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two qualified mental health practitioners (QMHP), and the group work and counseling provided by the three (one position currently vacant) Youth Support Specialists (YSS). At the time of the last report, one of the two QMHPs had just left for another job, but that position was filled quickly.

96

As was expected, Ms. Riddley who had stepped in temporarily to fill the Treatment Coordinator role did leave, but Director Frazier was able to hire Ms. Carol Warfield, Licensed Counselor, to fill that role. She began work in August on a full-time basis. The County continues to hold open a position for a Licensed Clinical Social Worker, and we have had initial discussions about the need to develop additional resources (most likely on a contractual basis, as needed and/or part-time regular consultation) with a Licensed Psychologist to assist Ms. Warfield in ensuring that there is adequate assessment and treatment for youth in care. This may include reinstituting the use of a strength/needs type assessment that helps identify more detailed elements for a case plan as well as provide some ideas for how to program for youth more successfully.

Through resources secured by SPLC, Henley Young has engaged some additional technical assistance from R. Monique Khumalo (f/k/a Marrow), a co-author of the well-recognized Youth in Custody Practice Model (Georgetown University Center for Juvenile Justice Reform) and someone with extensive experience applying best practices for working with youth in custody. That technical assistance is just beginning and should be helpful as Ms. Warfield moves forward in developing a framework to ensure good assessment and case planning and integrating mental health and behavioral management components of the program at Henley Young. The frequency and duration of that technical assistance is not yet finalized.

Ms. Warfield estimated that approximately 75+% of youth are taking some form of psychotropic medications, suggesting a need for more time provided through the County's health care contract in which services are provided by Dr. Bell.  She is viewed positively by staff, but her availability is limited due to the large scope of her responsibilities in other facilities.  Again, as Ms. Warfield can fully assess the need for those services, it may be necessary to advocate for an increase in that support.

During the period since the last visit, most of the programming provided by the mental health team members continued, including holding regular treatment team meetings and the provision of group programming by YSS and the Qualified Mental Health Clinicians (QMHC). The content of these group programs is appropriate but still evolving as they continue to gather materials and curriculum to use with youth. Ms. Warfield has focused initial efforts on ensuring that case plans are individualized and that sufficient documentation is done to capture the work that is going on. The YSS staff have begun experimenting with different ways to deliver some of the group programs, hopefully moving forward with increasing the duration of group treatment programming.  Staff did provide some documentation of youth attendance, but issues remain with attendance and being able to conduct groups in an appropriate environment. Staff shortages have often resulted in groups either not being conducted or having to be done on the unit. That said, the general expectation remains that each youth participate in 2-3 group sessions each week, but those sessions mostly remain noticeably short (i.e., 30 minutes), which is simply not enough time to achieve any significant results.

In sum, while efforts by YSS and QMHC staff to implement these group programs are positive, (1) having to conduct groups on the living units is a significant barrier to effective program delivery, (2) limiting groups to 30 minutes (staff indicate that previous attempts to run groups longer led to more behavior issues) reduces the quality of programming, (3) YCP staff could benefit by learning to help facilitate some of the groups, but they are minimally involved in doing so at this point; and (4) there is not an overarching program framework into which these groups "fit" so that all aspects of the facility program work together so as to send a consistent message to youth.

That programming has been augmented by the activities developed by Ms. Baldwin, the Program Coordinator. To her credit, Ms. Baldwin has continued to evolve appropriate materials and curriculum that fit into the Unit Activities included in the daily schedule and are coordinated with the recently hired Recreation Coordinator. Examples of themes/concepts covered by these activities include *Emotional Intelligence, Understanding/Managing Anger, health and physical fitness, creative writing, Life Skills,* etc. With the support of two recreation staff Ms. Baldwin seems to have developed a solid plan to engage most of the youth in many of these activities, although again they are often conducted on the living unit.  Attendance seems to have improved for some of the programs, most likely the result of either identifying more "desirable" activities and/or providing added incentives for participation.  In any case, the daily schedule "on paper" provides a full day (especially weekdays when school is in session) of a variety of programs for youth to be involved in.  That is less true on weekends or at other times when school is not in session, and continued documentation of what groups are completed needs to be reviewed by Director Frazier and Ms. Warfield.

Ms. Baldwin has worked with others to again modify the daily "point" system, primarily by identifying more specific and observable behaviors that should be recorded. That system has been in place for about one month and there are varying reactions to it from staff. Some staff apparently report it to be "more work" to record, while others appreciate the specificity of what needs to be observed.  From an outside viewpoint, given the current makeup of staff and rotations of staff, developing a system that expects and tracks more specific behaviors is a positive step and provides a basic framework for an incentive-based system. The "Yes-No" nature of reporting on a series of behaviors also allows the "scoring" to be done in a way that fits into a "reward-level" system. Continued work on this system should include: (1) expanding the number and nature of incentives that youth can earn, (2) adding at least one individualized weekly goal for each youth that is consistent with their overall treatment plan, and (3) training staff in how to use the "tool" to help shape youth behaviors rather than view it simply as a "checklist" to complete at the end of a shift.

Also on a positive note, the mental health team has continued holding treatment team meetings regularly, i.e., at this point every Wednesday, focusing on the individual assigned to the various YSS staff. That team meeting includes the YSS assigned, the assigned QMHP, Mr. Caldwell from the school program, the youth, and when possible, a YCP staff member. Ms. Warfield's commitment to more fully engaging YCP staff members in the treatment team is a positive. Those meetings have been opened recently (post-covid restrictions) for in-person attendance of a parent/guardian as well, which is positive. Those team meetings provide an opportunity for all parties to review the youth's progress toward meeting treatment goals, set new goals as appropriate, identify ways in which progress can be supported, answer questions the parent/guardian may have, and offer the youth an opportunity to provide input on how things are going at Henley Young.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Partial Compliance**

As noted in the previous report, adequately assessing the school program is perhaps the most challenging aspect of conducting a virtual visit.  That said, conversations with the School Principal, Mr. Caldwell, were positive and reflected a strong and energetic commitment on his part to continually improve the program for youth. This is reflected in that he reports the two new teachers brought into the program have been a positive addition to the overall team and his efforts to better individualize programming for youth. He seemed to be particularly committed to identifying the older youth who may have a chance to become graduation-eligible before they turn 18 and leave Henley Young and has apparently identified some form of accelerated credit track such that there have been a few youth that have made it to being graduation-eligible, and he is focusing current efforts on those youth that are nearing 18 and may have enough past credits so an accelerated credit option could work for them. Mr. Caldwell brings a notable increase in energy and creativity to the program compared to prior years and appears to be ready to "break down" some of the institutional barriers of Jackson Public Schools to advocate for the youth at Henley Young.

Subsequent to the initial drafting of this report, one of the teachers at Henley Young is alleged to have inappropriately touched one of the youth and passed contraband items to him.  The incident was reported to the Sheriff's Office, and the teacher in question was immediately barred from the facility and has since been charged. The youth in question has since turned 18 and is now placed at RDC.

Unfortunately, the described progress remains offset by the challenges created by limited staffing at Henley Young and the inadequate education space of the facility. The program is further complicated by the variance between the needs of the Youth Court, short-term youth, and the

adult court JCAs. While the focus of this Settlement Agreement is on the JCAs, it is important to remember that the Youth Court youth also need adequate educational programming, which is difficult to deliver in a "mixed" environment and on such a short-term basis (i.e., 21 days placement limit).

The staff shortage and challenges of the facility itself has resulted in the unfortunate continuation of an "alternate day" school program for JCA youth in which one unit of JCAs receive classroom instruction on one day while youth in the other unit work on the unit with "homework" and other written materials. Those units alternate on what is simply referred to as an "A/B" schedule, and there is no way for this to be considered an adequate educational program until all youth receive the required 27.5 hours/weekly of direct instruction **every** day.

As noted in the last report, Mr. Caldwell has: (1) continued and hopes to expand the "Safe Serve" certification program that teaches youth basic skills related to food service, a certification that they can carry with them going forward if/when the seek employment. Even if that is not something that comes to fruition in the foreseeable future for youth, the notion that they can accomplish and be recognized for learning certain new skills is positive for them; (2) reached out to the community for speakers that can come in and work with youth, especially reinforcing the importance of an education; (3) worked with the district to provide more Chromebooks for the fall term, something that can help provide more individualized instruction with access to a variety of educational software; (4) worked with Director Frazier to increase the wireless capacity of the facility in the multi-purpose space (so that can be used for education and other programming), (5) brought Positive Behavior Intervention Supports (PBIS) concepts to the school program; (6) regularly attended the weekly treatment team meetings for youth, a forum that helps maintain communication and coordination across the mental health and staff team at Henley Young; and (7) connected with key leadership in the Jackson Public School (JPS) system to advocate for support in making improvements to the program at Henley Young (recognizing that JPS continues to be challenged to meet multiple demands across all its programs/levels).

Finally, as previously reported, unless additional information is provided by the County and verified by the Monitoring Team, young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support. Whatever progress youth have made in their education program while at Henley Young stops when they are transferred to RDC which does provide some GED preparation programming but little else. That fact has, in part, spurred Mr. Caldwell's strong interest in accelerating youth's progress as fast as possible while confined at Henley Young.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Sustained Compliance**

As noted earlier, the last youth "aged out" of RDC in February 2019, so as of this report, this complete separation has been in effect for over two years (with the brief exception for youth T.G. who was housed at RDC pursuant to a court order noted in the last reporting period). Transitioning Henley Young to serve these long-term youth has not been without substantial challenges but remains a significant achievement, even if viewed as a temporary solution.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**

There has been no change related to compliance with this requirement although staff purport that Policies/Procedures have been updated and documentation of classification is occurring. A copy of the most recent Classification Policy has now been provided along with a copy of the form used to document the classification information gathered that is intended to guide which of the JCA housing units the youth is assigned to. While the policy is appropriate and staff purport that they are considering relevant factors, use of the form to document placement decisions is still not being done. This then falls under the category of "…if it's not documented, it didn't happen," so until the use of the form can be observed and/or verified, full compliance is not possible. This can best be done via an on-site visit.

Note however, that classification at Henley Young is less of an issue than is true at RDC or a larger facility in that all youth essentially receive the same programming regardless of any classification. Additionally, Henley Young does have a well-documented process to classify youth related to levels of precautionary status in the event of suicidal ideation and/or attempts. That status can range from a low alert status in which staff are to be more aware of a particular youth's demeanor/behavior up through the highest level in which there may be one staff member assigned to always observe/monitor a youth. Appropriately, a youth can be placed on a precautionary status by a supervisor but only removed from that status by/after consulting a member of the mental health team.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**

The Learning and Development Manager, Ms. Jacqueline Foster, began employment with Henley Young on February 1, 2021.  Since that time Ms. Foster has continued to be active in scheduling and conducting trainings to help ensure that all staff receive adequate basic training in Policies/Procedures, Crisis Prevention Institute (CPI) (basic and refresher), Suicide Prevention (Basic and Refresher), and CPR. COVID-19 precautions made some of the group training, particularly of new staff, more difficult and only recently was a full new YCP "group" training completed.  Additional training has been in smaller groups and by Ms. Foster being proactive in providing training even on a one-to-one basis as needed.  Director Frazier and Ms. Foster also appear to promote a good team approach to training, including (1) having Mr. Burnside (the Operations Manager) in conducting the CPI training (he is certified to lead that training), which provides an opportunity for that training to be consistent with facility-specific policies/procedures; (2) utilizing Ms. Andrea Baldwin, the Program Coordinator, in working with staff to help outline what programs are being developed for youth and what role YCP staff can play in supporting those programs; and (3) utilizing the expertise of Ms. Warfield and Ms. Frelix, QMHP, in training related to youth development and suicide prevention.

Ms. Foster reports that Director Frazier has been involving her in in weekly consultation calls with Anne Nelson, the Monitor for the SPLC agreement, and that in those discussions there are additional training needs identified, for example working to improve report writing skills for identified staff members who can benefit from that support. Additionally, expanding training opportunities through on-line resources could be done despite the challenges of the poor network services/access at Henley Young.

Salary challenges aside, discussions with both Mr. Frazier and Ms. Foster reinforced the notion that the Youth Care Professional (YCP) position needs to be seen and reinforced as a profession defined by the knowledge, skills, and abilities (in essence the tools) to work proactively with youth to prevent and successfully respond to behavior challenges youth may present. The re-written job description for that position noted in the prior report signified a step forward in how that job is perceived and what can be expected of those that take the YCP position. Hopefully, that is followed up by an increase in pay and opportunities for advancement.

Ms. Foster also provided a copy of the On-the-Job Training (OJT) form that will be used going forward to identify some of the basic required skills for duties related to Supervision of Youth, Central Control operations, Booking/Intake procedures, and Transporting Residents. Apparently use of that form to document training has been inconsistent over the recent months, and it is recommended that Ms. Foster carefully monitor its utilization and completion in a timely manner. The overall structure of the basic training program and expectations seems appropriate but getting new staff on board has been difficult which means that getting a solid complement of well-trained staff on the units has been even more difficult. Having new staff with limited

training covering a lot of the shifts/units is a recipe for problems.  Importantly, that also does not begin to address the need for the beyond basic training components outlined in this agreement.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general. In addition:

    a.  Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b.  Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c.  Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat.  As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

    d.  If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

    e.  The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

    f.  A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitory any youth in segregation at least every fifteen (15) minutes. Such observation must be documented immediately after each check.

    g.  Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours. If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional. The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

    h.  If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

    i.  Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

Although issues remain, it is reasonable to return this rating to Partial Compliance, in large part as the result of a notable decrease in the overall use of what is called Due Process Confinements (DPC). As part of the monitoring process, Henley Young staff provide a log of these confinements and the Incident Reports associated with them. The log shows the use of DPC only once in June, six times in July, and once in August. There were no DPCs reported for the first half of September (the end date for which information was requested). This is a considerable reduction from levels reported in the prior reporting period and is hopefully reflective of two things: (1) better staff intervention in preventing the kinds of incidents that result in the use of DPC, and/or (2) some of the youth that were frequently involved in incidents in the earlier period have been released from custody/transferred to RDC after turning 18.  In any case, this is a positive step forward.

Two issues remain that need continued work and monitoring: (1) the period of DPCs in almost all cases was for 24 hours, which is within the time frame of the SPLC agreement but well beyond the one-hour limit of this Agreement; (2) there was an unreported number of administrative confinements in which youth are confined to their rooms for an extended period of time (most often as the result of a fight of some kind) pending development of a safety plan in which youth can be returned to their normal status on the unit; and (3) staff can implement a Behavior Management Isolation (BMI) confinement as may be necessary to separate youth for a brief period of time or allow a youth time to calm down after an incident.  The Incident Report form does provide for documentation of whether a BMI is used, but there is no central log of those brief confinements. Staff reference one incident over the summer in which Administrative Confinement was used, but in the absence of documentation it is difficult to confirm that was the only time. Again, the limited number of staff and the inflexibility of the facility are likely contributors to a decision to keep youth in their room under this administrative confinement time period.

The Monitor's request has included a request for Due Process Confinements, but future requests will be for documentation of any room confinement, regardless of what it is called, that is implemented for more than the one hour.

Prior reports also note that staff indicate that during this period of confinement youth are allowed out of their cells for specific programs and activities (e.g., school, groups, meals, recreation) and in fact there are some Observation Reports that reflect some limited times youth have been out of their room during this period. However, the accuracy of those reports remains questionable.

More specific information related to each of the sub-items in the requirement are addressed as follows:
- Section a: (1) Policies and training do reinforce that staff should be utilizing less restrictive techniques, and undoubtedly there are situations in which that is done properly.

In fact, based on conversations with leadership, there are some staff who do a good job observing and intervening in situations, reducing the likelihood of an incident that requires the use of segregation.  Since more serious incidents are prevented, it is not possible to fully evaluate how frequently staff prevent incidents, but it is fair to suggest they are in Partial Compliance at times; and (2) Situations that end up in written Incident Reports and ultimately the use of confinement rarely document substantive efforts to use verbal or other interventions beyond something along the line of "…directed youth A to do …." Or "…Told youth A to stop…."

- Section b: Approved Policies/Procedures are consistent with explaining to youth the reason for segregation, but it is difficult to tell whether staff follow through on this requirement. There is an expectation that some additional documentation (beyond any Incident Report) be made in the Unit Log, but those will have to be inspected on an on-site vs. virtual visit to determine whether/how consistently that documentation is done.

- Section c:  Approved Policies/Procedures are consistent with this requirement that youth be held in segregation only as long as it takes for the individual to regain self-control, and there are some notes in Observation records and the confinement log that there are, in fact, times when a shorter length of time is used. To properly track compliance with this item, future requests will include a log of any administrative-type confinements, specifically those that exceed one hour.

- Section d: It is not clear what constitutes "crisis intervention" for this section, but general policies and practices do include involving one of the YSS or QMHP staff if the youth is agitated or evidencing some mental distress. Also, Room Observation logs do seem to be used routinely when a youth is placed in confinement, albeit there are some concerns regarding consistent accuracy of the observation times as noted in Section f below.

- Section e:  Staff are expected to record the use of segregation/isolation, and Mr. Dorsey does track it over time. This is information provided to the Monitors prior to the virtual visit.

- Section f: Observation logs are kept and a sample of them was provided for review. Note that (1) Policies provide that the log be kept on the door so the time can be noted as the observation is made, but it is not clear whether that is actually what happens; (2) As noted above, there are often notations made that are exactly 15 minutes apart, calling into question the accuracy and reliability of reporting; and (3) The goal for training is that YCP staff complete their basic training prior to assuming a full role on a shift, but given staff shortages and turnover, confirmation that this (staff doing the observation have completed all training) is always the case could not be done. Overall, it seems unlikely that these logs are documented immediately as required.

- Section g:   This section has multiple layers/contingencies designed to limit, if not eliminate, the use of segregation beyond what may be needed to ensure the immediate safety of youth and staff. Observations of practices includes:

o The use of Behavior Management Isolations (BMIs) as a short-term (up to one hour), immediate response to issues in which some form of separation/segregation may be required to provide the youth a cooling off period from an incident and staff time to problem-solve with the youth on how to reintegrate the youth onto the unit. The most recent Policy/Procedure provided is consistent with the intent of limiting use of this kind of time out to less than one hour and some of the records (e.g., Observation Logs, Incident Reports) do seem to reflect that there are situations in which short-time confinement is used to separate youth. There are a few notations on Observation Logs that a QMHP is engaged to see or assess the youth during these periods of confinement. Historically, any checks/assessment made by YSS/QMHP staff were kept in their records which were not available for review on a virtual visit.

o There does seem to be good communication between the QMHP staff and the Executive Director as it relates to youth that might need more intensive mental health services.  The treatment team meetings (each youth is reviewed at least one every 3 weeks) provide an opportunity to discuss what the youth's needs are and whether those needs can be met at Henley Young.

o The intent of the DPI(C) Policy is that during this 24-hour period youth are allowed out of their room for school and some other programming opportunities. The Observation Logs have been modified to add a code if the youth is out of their room, and there are some "out of room" times documented. Practice should include that staff remind/offer youth the opportunity to participate in appropriate programming during the shift and make a note to that effect on the Observation Log along with any note that the youth chose not to come out of their room. That reminder could be done, for example, at the start of school, after lunch, as programming is starting, etc. Equally important, absent good documentation that a youth remaining in their room continuously for more than an hour is their choice and not one imposed on them, the use of DPI(C)s cannot be in compliance. Ultimately the goal must be to move away from using room confinement as a disciplinary tool, but that will require modifications in the facility, improved staffing, and developing alternative means of responding to incidents.

- Section h: Policies and Procedures should be modified to reflect the requirement that youth held in segregation longer than 2 hours require notification to the Jail Administrator, and completion of the proper notifications needs to be documented and made available for monitoring. The most recent policy reflects that the Supervisor is engaged/involved on BMIs that exceed one hour and that any time longer than two hours is required the Operations Manager should be notified. Due Process Isolations operate on a different track, with a Due Process Hearing typically conducted by the Quality Assurance Manager, but both the Operations Manager and Executive Director are in receipt of Incident Reports and Due Process Hearing results.

Facility leadership needs to remain vigilant in ensuring that documentation related to the use of isolation, both for initial behavioral reasons or disciplinary reasons, is accurately completed and reviewed and made available for review on subsequent visits.  This includes documentation of whether youth do, in fact, take the opportunity to be out of their room during any disciplinary period and whether required mental health checks are being made.

84.     Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

      a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

Although it was not possible to review youth's point sheets during this offsite visit, the latest modification of the point sheet that is used by staff to document daily behaviors was provided. As noted earlier, this most recent modification provides more observable, somewhat less subjective, measures of behavior for staff to track over the course of a shift and is hopefully a step forward in helping both staff and youth identify specific desired behaviors.  The format is broken into appropriate time periods/shifts throughout the day, and there is a complementary tool used for tracking youth's behaviors in school.

The point sheet does maintain similar incentives as the prior format, although continued work can be done to expand the type of incentives that youth can earn as a reward. Most of the items are properly framed in terms of the desired behavior vs. the often more common "do not" behaviors that one sees in a correctional program, including in many youth correctional programs. This positive frame is consistent with best practices, as it is often easy for youth to understand what not to do but substantive behavior change occurs only when they understand what that means they "should" do.

107

Three specific recommendations related to this aspect of the behavioral system remain: (1) increase and reinforce staff training in how best to use the point tool to shape youth behaviors, most often by actively engaging youth directly as behaviors are being observed and scored; and (2) adding one or more individualized goals for each youth that is/are consistent with their treatment plan, thus making this aspect of the program more integrated with other aspects of the overall mental health/behavioral program.  Reinforcing youth for new and improved behaviors is critical to successfully gradually shaping behaviors and moving youth closer to a situation in which they are more proactively involved in managing their own behavior vs. relying on outside forces/reinforcers; and (3) the format provides for written comments that staff can include to further explain what they observed, both positively and negatively.  A simple "No" for example tells the youth little about what they did wrong" and conversely a simple "Yes" can be reinforced with additional comments so a youth can understand what needs to be repeated.

The QMHP and YSS staff do maintain and regularly review individualized treatment goals during treatment team meetings held every three weeks for each youth. That meeting includes the school principal, when possible, a parent/guardian, and more recently a YCP staff if someone is available. It is important that a YCP staff member attend when staffing levels permit, and there has been discussion about the important role they can play in the treatment team.  YCP staff are, in fact, the staff that have the most contact with youth and can be critical in providing input to the treatment team as well as helping to reinforce treatment goals on a daily basis. YCP participation in the past has been rather passive, but Ms. Warfield is hoping to gradually train and support YCP staff to be a more integral part of the discussion going forward.  That is a good step toward more fully integrating treatment goals on a system-wide basis. Those treatment goals are documented in the youth's mental health record(s), although review of those records was not done on this off-site visit.

Discussions over the past few weeks and during this off-site visit with Director Frazier and Ms. Warfield have reiterated (from last report) that although there are some elements of a behavioral program partially developed, there is not what could be considered a behavioral treatment program in place, and they have not engaged sufficient technical assistance to adequately put together a treatment program. There are competent and committed staff in many of the positions, and there seems to be mostly appropriate communication across staff. However, there is not an articulated overarching treatment model/approach that ties together various program elements; the incentive/point system remains essentially disconnected from treatment goals established for youth; YCP staff are largely unaware of what the individual youth's treatment goals are; it remains difficult to train staff in responding to youth in a consistent and trauma-informed/preventive approach; and there is no articulated way in which discipline (particularly the use of DPIs) fit with other treatment elements.

As it relates to the requirement to develop the program with the assistance of a qualified consultant, that had simply not been done, albeit there was some technical assistance provided by both Mr. Leonard Dixon and Ms. Anne Nelsen, the monitors through the SPLC agreement. Since bringing Ms. Warfield on board there has been some progress, in particular (1) Both Ms. Nelsen and the juvenile expert of the Monitoring Team (Moeser) have had a number of discussions with Ms. Warfield and Director Dixon about this component and have provided her with a number of resource links (written and individual) that she can use to help develop a coordinated vision for  a behavioral program; and (2) As referenced earlier, SPLC has secured funding to engage Ms. Monique Khumalo, someone who clearly meets the criteria above to provide some technical assistance for Ms. Warfield and Director Frazier in how to improve the mental health and behavior management programs, from the point of initial assessment through implementing various program components.  The extent of this technical assistance is limited but is a good step forward.

Ultimately, the full-time Treatment Coordinator, Ms. Warfield, should be tasked by the Executive Director to lead a team of staff (e.g., YCP staff, YSS, QMHP, a leadership staff person, Learning/Development Coordinator, Program Coordinator) to develop a written Behavior Management plan that weaves together how each of the program elements and roles fit within a treatment model appropriate for youth held for longer periods of time in a youth facility such as Henley Young.  Progress toward that goal can be assessed over the course of the next 4-6 months.


**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**
As was the case during the previous remote site visits, the quality of the inmate records was difficult to evaluate during the June 2021 remote site visit. Typically, the Monitoring Team is

able to review the paper files and determine whether the appropriate paperwork is in the file. These are too voluminous to have scanned in for review. The documents requested were the status/summary sheet showing the detention status and the chronology sheet showing the activity related to the inmate's status. This was for approximately 30 randomly selected inmate files. In addition, a selection of grievances and program requests are reviewed for over detention issues and the status sheets for probation violations are reviewed.

The status sheet is required by policies and procedures and should greatly assist in both the Jail staff and the Monitors assessment of whether the paperwork supports the booking and ongoing detention. It is a face sheet that lists each charge and the status of the charge such as whether there is a bond, an indictment, a next court date, a dismissal etc. It would also list any detainers/warrants with the jurisdiction and contact information. The status sheets for the October 2021 site visit continued to have some in the incorrect format and some chrono sheets that were incomplete.  In one case, the face sheet indicated that a hold had been lifted. It had not and the individual should have been sent to the Brandon jail to complete 90 days there. Hopefully, this individual will get credit in Brandon for the time he spent in Hinds County. It continues to be unclear whether sentences are tracked in RDC. This is particularly important in that it was reported that the JMS system does not accurately track sentences as a result of different release dates showing on different screens. The WC tracks release dates on a spreadsheet and reports to Records when an inmate is due to be released. It is unclear if anyone is tracking release dates for sentenced individuals at RDC. A related concern is that individuals who have fines and fees are not getting credit towards them when at RDC on a new charge. For the inmates waiting for a mental health evaluation or commitment, the Court Liaison has started to keep a tracking log although it is still incomplete. However, it does not currently include the current status of the individuals who have had a mental health order of some kind. As a result, it can't be used at this time to compare to the state hospital list for people currently waiting for a state hospital bed. This situation needs to be clarified as described below. Once again there appeared to be individuals believed to be waiting for a state hospital bed that were not on the state hospital waiting list.  However, the use of status sheets and their overall content reflected significant improvement in this area. The file audits completed during this reporting period indicate that all of the files had the status sheet.

It should be noted that since monitoring began there has been significant improvement in the quality of the records, the accuracy of the JMS system, and the presence of paperwork supporting booking and detention. There continue to be improved systems in place to track individuals and release them timely. However, a few of the files were missing some orders supporting detention. One individual was released two months late. The release order was entered in the system but he was not released until two months later after submitting a program request asking about his release. Another individual was released a week after the 21 days had expired on a probation hold. There were no incident reports on these late releases. There

continues to be some difficulty in locating holds in the system when the hold is placed subsequent to booking. The records clerks have no way of knowing if a hold has come in. These holds are identified when the individual is otherwise entitled to release, but this causes some delay in determining whether the other jurisdiction wants to pick up the individual. Any holds coming in after booking should be provided to the records clerks to ensure timely release. This provision will remain in partial compliance until an on-site visit can be completed and the actual files reviewed.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**

This paragraph had been listed as in substantial compliance because even though some unlawful fines and fees orders were received, there were other charges holding the individual. No one had been held solely on an unlawful order. It was previously recommended that these orders be presented for revision even though they weren't holding the individual. The reason for this was clearly seen during the June site visit. One individual was entitled to release on his felony charge but he could not be released because of an unlawful mittimus on fines and fees. These orders should be corrected so that release is not delayed if release conditions change or the felony charges are dropped. The County had previously arranged for education of the judges which should be considered again. It is beneficial to the individual to be able to get credit towards fines and fees if they are otherwise being held and in getting the orders corrected this should be specified. At RDC, inmates have not been receiving credit towards fines and fees when they are otherwise held on a felony. This should be clarified with the judges and credit given. Reportedly, credit is given for individuals held at the WC although this does not appear in the spreadsheet maintained at the WC. As previously reported, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the Jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. It will be necessary to implement the process described below to ensure that this policy is followed.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the

sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**

See paragraph 86. When the change in practice requiring a finding of willfulness was introduced, the County was pro-active in ensuring that valid court orders were utilized. It appears that education in this area will need to be revisited. The policy on pre-booking is consistent with this paragraph and at the time of the four site visits prior to the June site visit there was no one in the facility for failure to pay fines and fees. However, as described above, during the June site visit one individual was confined on an unlawful order to pay fines and fees because the order was not timely corrected.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**

See paragraph 86.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**

See paragraph 86.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary

information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**

The WC continues to maintain a spreadsheet. The spreadsheet reflects that there are no individuals currently incarcerated with an order to pay fines and fees. It is reported that individuals otherwise incarcerated for a new felony but have an order for fines and fees receive credit towards those at the WC but that is not reflected in the spreadsheet. At RDC, inmates have not been receiving credit towards fines and fees when otherwise incarcerated. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court and the case manager typically provides court information upon request.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**

This has become a limited issue now that there are no individuals solely working off fines and fees. The stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.      Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.      Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.      Examples of prisoners presumptively entitled to release include:

          i.      Individuals who have completed their sentences;

         ii.      Individuals who have been acquitted of all charges after trial;

iii.     Individuals whose charges have been dismissed;
iv.     Individuals who are ordered released by a court order; and
v.      Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

As described in paragraph 85, there were two late releases that were discovered during this reporting period. Given the random review of a limited number of files, there may be others that were not identified. The Monitor reviews a random selection of inmate records as well as record audits, incident reports, grievances, the probation spreadsheet and Quality Assurance reports. Those documents that appear to raise questions are reviewed with the Records supervisor. The late releases identified were found by piecing together information from these sources. Pursuant to paragraph 101, the Jail is supposed to keep a log of the date and time an inmate was entitled to release and the date and time of release. This would provide much greater assurance that timely releases are consistently occurring. The Lieutenant over Inmate Services has started keeping a log. It does not provide all the information as described below so cannot be used to confirm that there are no late releases at this time. Paragraph 101 also requires that incident reports be prepared for late releases. Neither of the two late releases identified had an incident report. Also, as mentioned in paragraph 85, it is reported that the JMS system does not accurately track sentences and it was unclear whether sentences were manually tracked at RDC. No one was identified as being held beyond a sentence completion. However, this process should be clarified. Although there has been ongoing improvement in the area of releasing, these incidents require ongoing work in this area.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As previously stated, the condition of inmate files has improved since monitoring began. As described in paragraph 85, the new Records policy establishes the use of a status/summary that should greatly improve the reliability of the prisoner record system. With the ongoing pace of auditing files, a review of all files should soon be completed. There are problems relying on the JMS system to accurately track the status of inmates. Holds that come in subsequent to booking are not routinely brought to the attention of Records staff. As a result, they are not able to contact the jurisdiction prior to the release date potentially causing a delay in releasing. Similarly,

Records staff cannot reliably use the JMS system to identify people with a probation hold and, as a result, they create a manual spread sheet to track this. This has the potential to miss individuals. Reportedly the JMS system does not accurately track sentences and cannot run a report for anyone entitled to release on a sentence each day. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained as was the case with the inmate released two months late during this reporting period. The auditing process, however, has greatly improved since the June 2020 site visit and should help correct errors involving entry into the JMS system.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The electronic medical records system and the various tracking logs that are maintained by medical and mental health have been described in prior reports.  The various ways these records and logs can be used has also been previously described.  Essentially, this data collection record keeping and use of data addresses the section of this provision of the Agreement that are totally within the purview of medical and mental health.  It should be noted however that although these data and records are used by the Monitor to assess compliance, there is not an internal, formalized review of these data and records as part of a medical/mental health self-assessment process, largely due to the extreme shortage of staff.  It is anticipated that once additional medical/mental health staff are brought on board, a staff person can be designated to perform this more internal, ongoing, formalized self-assessment.

With regard to prisoners requiring forensic evaluations, these evaluations are performed by staff at the state mental hospital; medical and mental health staff are not informed when a court orders such a forensic evaluation; and medical and mental health staff are only made aware of the fact that a forensic evaluation will be done shortly before it is to be done/when the state mental hospital submits a request for the detainee's medical records.  Historically, detainees waited an unacceptably long time for such forensic evaluations due to a shortage of beds at the state mental hospital.  However, at the time of the October 2020 site visit, the state mental hospital had begun

to perform forensic evaluations by way of telepsychiatry; this practice has continued but the limited role played by the facility's medical and mental health staff has remained the same.

Information recently provided by the state mental hospital (at the end of September 2021) indicates that there is no longer a backlog of detainees awaiting initial competency evaluations. The information does indicate however that there is a small list of detainees (i.e., 4 detainees) who are awaiting the filing of a second court order for further evaluation and treatment at the state hospital (i.e., the further evaluation and treatment required cannot occur until the second court order has been filed), thereby asserting that the backlog in these cases is due to delays in obtaining a court order, not problems at the state hospital.

Neither medical nor mental health staff play a significant role in the incident reporting and review process, and staff are rarely even consulted or interviewed as part of those processes (although there have been times when a section of a detainee's medical/mental health records were requested), even when an incident might indicate that medical and/or mental health staff were involved at some point during the incident or it was apparent that medical and/or mental health was involved with or had information about the detainee(s) who was involved in the incident.  Therefore, there continues to be incident reports that do not include all potentially available and relevant information from medical and/or mental health, gathered at the time of the incident or during the incident review process.

Consistent with the prior recommendations from the Monitoring Team the Court Liaison had obtained a list from the state hospital list of inmates from Hinds County waiting for an evaluation or a state hospital bed. However, this list was not consistent with the list provided by the state hospital to the Monitor which listed many more individuals. Both lists appeared to be inconsistent with the internal tracking log that the Court Liaison had started. However, her list did not show the current status of mental health orders and it appeared that some on her list had an evaluation and were not waiting for one. It will be important to add to the tracking log the current status so that the Jail's list can be compared to the state hospital list. Again, during this site visit, the Jail records indicated that there are some individuals with an order for an evaluation that were not on the state hospital list. Because there were multiple state hospital lists and since these individuals often have long waiting list times and present some of the most difficult management issues in the Jail, it is imperative that there be frequent communication and coordination with the state hospital. Communication with treatment facilities is also critical to move inmates with special needs and court orders to treatment into more appropriate settings. Finally, several inmates had charges remanded so civil commitment could be commenced. There is still a lack of clarity as to who is responsible for pursuing civil commitment and whether those proceedings are initiated. It is most likely the defense attorney but these cases should be tracked. As these inmates present some of the most challenging inmates and are in need of a more appropriate therapeutic setting, their status in the process should be tracked more closely.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time and they are returned to the Jail as other inmates. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC. Further collaboration with the courts will be necessary to allow for release from the court. In particular, the courts will need to develop the capability to provide a written release order in the courtroom for an individual to be released from court. In addition, HCDS staff will need to have a system to identify individuals with holds at the time of the court order releasing the individual to ensure that the individual does not have some other basis for detention. The new Jail Administrator has been working on outstanding policies including the policy on Releasing which would address these issues.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

    a.    Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

    b.    Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

    c.    Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

    d.    Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when

releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been reviewed and is in the process of being finalized. This has been delayed in an effort to address the requirement of the prior paragraph that individuals be released from the court. However, with the new Detention Administrator on board, there is a planned effort to at least get an interim policy in place.

With regard to medical and mental health, the various different activities/tasks that need to be performed in order to comply with this provision have been described in prior site visit reports. Therefore, all of that will not be described in detail here, and instead, the Monitor will simply offer a status report.

As was noted in the last monitoring report, the discharge nurse who had the primary responsibility for compliance with this provision of the agreement left the facility; a new discharge nurse was designated but reportedly, since documents and reports generated by the prior discharge nurse, including a list of contacts for community-based medical and mental health services, were unavailable, the new discharge nurse was starting over.

Given the above noted, during the last site visit (June 2021) the Monitor focused on outlining the roles and responsibilities of the discharge nurse and attempted to identify priorities (to help the new discharge nurse and her supervisor appreciate the scope of the discharge nurse's responsibilities).  The most urgent priorities noted included:

- The identification of community-based medical and mental health service providers who will accept released detainees who require medical and/or mental health services (including regular outpatient treatment, day treatment and residential treatment); obtain a clear sense of the range of services they provide and/or the type(s) of individuals they are prepared to treat; and identify a person(s) at each place who can be contacted to discuss new referrals and make intake appointments
- In cooperation with the detainee's provider(s) of medical and/or mental health services and the detainee, develop a discharge plan for each detainee (focused on where he/she will go for community-based treatment services as well as other services he/she might require to make a successful return to the community, such as housing, etc.)
- Develop discharge planning groups, and work with other staff to develop other groups that prepare detainees for discharge, such as educational groups regarding illness, the

need for ongoing treatment, medication management, and how to best participate in one's treatment, etc.

- Prepare a discharge packet for each detainee who is likely to be discharged that includes (in writing) important information that he/she will need (such as the program(s) to which he/she is referred, scheduled appointment information, contact information, and what to do if there is an emergency prior to the scheduled appointment, as well as information about where to go to activate benefits or seek other assistance that might be required)
- Continue to work with security staff to assure that ALL detainees stop by medical as part of the release process in order to pick up their discharge packet and enough medication to carry them until their scheduled appointment with a community-based provider
- Track successful and unsuccessful referrals (i.e., track whether or not released detainees actually follow-through with appointments made for them), and attempt to determine what might be done to increase the percentage of successful referrals

Other more medium-range tasks and goals were also briefly reviewed. For example, following up with discussions that had been held with Hinds Behavioral Health, regarding sending a staff person to the jail to meet with detainees who will be referred to Hinds Behavioral Health upon their release, in order to begin to develop a working relationship with these detainees (in an effort to increase the possibility of a successful referral). In addition, exploring whether there might be steps that can be taken prior to a detainee's release to facilitate the establishment or re-establishment of needed benefits (in an effort to help detainees stabilize more quickly upon their release and have coverage for community-based treatment services as quickly as possible). And also, establishing a practice of interviewing those who return to the jail, regarding why they did or did not follow-through with obtaining the treatment services they required (in an effort to identify what discharge planning efforts work and what efforts could be improved upon).

During this site visit it was clear that the new discharge nurse had done a lot to begin to address the above noted. The new Jail Administrator had also negotiated a revision to the Securis contract that would provide additional video conferencing units that should allow for better communication with community providers (as well as attorney and family visits). This contract has been signed but not yet implemented. It was also clear that the new discharge nurse had begun to identify some of the same impediments to discharge planning that had been identified by the prior discharge nurse. So, at this point, it seems reasonable to say that substantial efforts are underway to rebuild the discharge planning process with regard to medical and mental health, and it seems reasonable to wait until the next site visit to more formally assess progress.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. Any post orders must:

    a.    Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

b.  Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area. The Records Supervisor and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

At the time of the February 2020 site visit, the Booking staff reported that they run an NCIC check for outstanding warrants at the time of booking and again at release. When inmate files were last reviewed on site (February, 2020) NCIC reports run at the time of booking were in the inmate files. The files reviewed at that time did include a copy of the NCIC report at the time of release. The last four site visits and the present one, being remote, did not permit a review of the files.

As mentioned above holds coming in after booking may not come to the attention of Records. As a result, they are identified when the inmate is otherwise entitled to release. The process of then contacting the jurisdiction with the hold and determining if they want to pick up the inmate can delay the release.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

a.  Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

b.  Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County

must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

    i.      How to process release orders for each court, and whom to contact if a question arises;

    ii.     What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

    iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

    iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. In addition, a staff member has updated and expanded the Booking and Release Manual which will provide the detailed guidance required by this paragraph. It is not clear that the updated Booking and Release Manual has been approved and is being utilized. The Records Supervisor appears to be knowledgeable in her duties and has good relationships with the courts and other agencies. There is no record of formal initial or in-service training for the booking and records clerks. As has been previously recommended, training of the relevant staff on the process on mental health related orders would be useful. As noted above, there is still an issue with detainers that come in after booking such that releasing is not delayed.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of

stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

a. A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

b. Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Partial Compliance**

This paragraph has been changed to partial compliance because of the improvement in the internal auditing process and the implementation of the status summary sheet. The Lieutenant over Inmate Services has started keeping a release log. It does not include all of the items required by subparagraph (a), most notably when the court order was entered and when it was received. It does include a column for whether the release was timely but this cannot be confirmed by the other information on the log. This is a time-consuming process for the lieutenant because she is not routinely involved in the release process and has to look up the information for each individual. It is recommended that the Booking Sergeant or Records Supervisor enter the information in real time. Incident reports are not routinely prepared for over detention although over detention appears to happen less frequently than previously. As mentioned above, the use of a log consistent with this paragraph and the completion of incident reports for over detention and erroneous releases would greatly assist command staff and the Monitor in tracking and addressing late releases or mistaken releases.

102. The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**

The Sheriff's Office hired an individual with the title of Quality Control Coordinator in June 2020. Her list of duties includes monitoring records to ensure that inmate files are current. She has developed a timeline for the audits required by the Settlement Agreement and policies including inmate records. This work does appear to be on the right track. As described elsewhere, she has developed checklists to gather information for a very useful monthly Quality Assurance report. During this reporting period, her QA report indicates that she audited 10 inmate record files. This is a good beginning for this process and this paragraph has been changed to partial compliance. It is recommended that the QA Coordinator review the Release Log once revised to include the required information. Understanding the court system and related paperwork is a formidable task and training for the QA Coordinator in this area is recommended.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**

There were at least two untimely releases discovered during monitoring. Neither had an incident report or an IAD investigation. This has been an ongoing deficiency. There should be clarification as to who has the responsibility for completing the report.  It was recommended by the corrections expert of the Monitoring Team that the Detention Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of

citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

The most recent change in the status of this paragraph is related to the planned integration of video conferencing for attorneys to meet with their clients as an adjunct to meeting with them face to face at the RDC and WC.  While there is little problem with connecting attorneys with their clients at the WC, communication problems and excessive delays at the RDC have made video conferencing a desirable alternative.  The restrictions imposed by COVID 19 requirements make this technological solution all the more attractive. The Jail Administrator negotiated with the video communication provider, Securis, to provide additional video terminals to allow for more accessible attorney visits via video. This contract has been approved by the Board but only after a two month delay. It is still to be implemented. In person visits at RDC continue to present delays and difficulties with insufficient staff available to move inmates to visitation areas. With direct supervision these difficulties would be minimized.

## CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

The Monitoring Team has received the electronic monthly reports on incidents which include the complete narrative of the primary report and supplemental reports. There is a field in JMS which appears on the spread sheet for checking use of force. However, this field is frequently not checked when force is used. For example, in July the incident reports indicate that OC spray was used 6 times. The use of force column was not checked for any of the 6. A separate use of force report is supposed to be completed when force is used. However, this is also frequently not completed even though force has been used. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include all of the information listed in paragraph 107 and 108 below and that would be needed to provide the

information that could inform continuing improvement or quality assurance reports. More problematic is that it has not been complete or accurate. The Quality Assurance Coordinator began creating a master spreadsheet with information on incidents, use of force, training activity and other areas. For the incident reports and use of force she was pulling the information from the JMS. However, it quickly became apparent that this was inaccurate. The use of force field was often not checked and the type of incident listed is inconsistent. The Quality Assurance Coordinator now uses checklists for the different departments. The checklist has boxes to fill in with the information needed. For example, the use of force checklist goes to the Lieutenant over Investigations. Because Investigations reviews every incident report for use of force, they can provide an accurate number of uses of force.

However, there still appears to be some discrepancies. In June, the QA spreadsheet shows 8 assaults. A review of the incident reports indicates 18 assaults. The August QA report indicated no use of OC. However, there is at least one incident report showing the use of OC spray. One issue was discovered during this site visit that may be part of the problem. A number of incident reports were missing from the spread sheet. In June, there were 14 missing reports; July 20; and August 24. It was discovered that the spread sheet is created by pulling all incident reports in a date range. If the officer has not entered a date on the incident report, the report will not be pulled into the spread sheet. Anyone relying on the spread sheet to quantify types of incidents will not get an accurate count. This may be why the use of OC spray in August was missed. It was in one of the missing reports. The IT personnel have now made that a mandatory field which should improve the accuracy going forward. Even though the checklists provide greater accuracy in the quality assurance process, it does not constitute an ongoing data base that could be used to run a statistical report. To do that, the information in the JMS system would have to have improved accuracy. Officers should be encouraged through training to check use of force in the JMS system and to accurately characterize incidents.  There should also be some consideration of whether the JMS system could allow multiple incident types so that, for example, when an inmate burns county property both fire and destruction of property could be listed. There continues to be a concern because of the lack of reports or the small number of reports that some types of incidents are underreported including late releases, use of force, and lost money and property. There were at least two late releases in this reporting period neither of which had an incident report and, as a result, there was nothing in the JMS to identify them.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securus does not include some critical fields that are in the system but can't be pulled into the spreadsheet such as type of grievance and date of response. The Grievance Officer manually creates a separate spreadsheet that pulls the information from Securus and then manually inserts the type of grievance, the date of response and the date of the response to an appeal. There is also a limitation in that some staff

do not respond to grievances assigned to them in the system. The Grievance Officer clears these out of the system when the inmate is released, but it is not possible to determine whether the grievance was responded to and what the response was. The policy to reject grievances that are actually inmate requests and direct inmates to use the inmate request category appears to be effective. This policy allows a more accurate depiction of grievances although, as mentioned above, a number of the grievances rejected for this reason should have been considered grievances. The inmates seem to be using the Emergency Grievance form when in many cases, it is not an emergency but is a grievance. For an accurate picture of grievances, it would be preferable if the system could reflect that a submitted emergency grievance was a grievance but not an emergency rather than rejecting it.  The Quality Assurance Coordinator does have a checklist from the Grievance Coordinator but this does not include an assessment of the adequacy of the responses. This type of audit is required by the Grievance Policy but has not yet been implemented.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:
    a.  Brief summary of all reportable incidents, by type, shift, housing unit, and date;
    b.  Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
    c.  The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
    d.  List and total number of incident reports received during the reporting period;
    e.  List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**
The Quality Assurance reports now being prepared are a major step forward in compliance with this requirement and appear to have the envisioned effect of helping to guide quality improvement. As mentioned above, the Quality Assurance Coordinator is using checklists to compile accurate data so that trends and problem areas can be identified. She prepares a narrative that evaluates that data. The reports appear to be thorough and contain good analysis. Under the last Sheriff, the reports have been reviewed by the Sheriff's Office and discussed in a monthly meeting. This prompted focus on a number of problem areas such as report writing and training. Hopefully, this process will be continued with the current Sheriff. With action directly by the Quality Assurance Coordinator and support from the Sheriff, additional areas are being addressed.

This paragraph envisions a narrative like what is now being produced. It also envisions back up statistical data. As noted above, it will be difficult to produce that kind of data until the JMS system information is more reliable.  With the checklists being utilized, the information in the report is more reliable but discrepancies still exist. The spreadsheet currently being provided has the text of the narrative of the initial incident report and the text of the supplemental reports. Additional information includes the date and time of the incident, the location, the type of incident, the name of the inmate involved, the name of the initial responding officer, a field for use of force, the supervisor reviewing the report, the date and time of review, and whether the report was approved. At this time, it does not include all of the information required by this paragraph (e.g. use of restraints, segregation, referral to IAD) including information that would be necessary to be fully informed regarding the nature of the incident. (The segregation log could provide the needed information for segregation).

Most importantly, the spreadsheet does not have an actual summary of the incident. The spreadsheet now pulls in the first incident report and all supplements. This provides more information than was previously available. A brief summary of the incident that incorporates information from the various narratives and includes information from medical, which is often not included in the narratives, should be incorporated. The JMS system includes a field for supervisor's notes. This does not appear in the current spreadsheet but would be a good location to include a brief summary of the incident as required by this paragraph (and findings or recommendations as required by paragraph 64).

Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate-on-inmate assault or an inmate on officer assault. Only by reading the narrative, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation. RDC and the WC are now using the same form for segregation. This is not in Excel but could be drawn from manually to create the same type of trend analysis envisioned by this paragraph. At this time, there is no report tracking the use of restraints.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

      a.     Summary of all uses of force, by type, shift, housing unit, and date;

      b.     List and total number of use of force reports received during the reporting period;

      c.     List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The monthly Incident spreadsheet has a column for whether or not force was used. As noted above, this is not routinely checked when force is used so can't be relied upon for this information. The checklist being used by the Quality Assurance Coordinator should be producing more accurate data which is incorporated in her spread sheet and the narrative summary report. However, as described above, there are still concerns about the accuracy of the QA spread sheet when compared to a review of the incident reports. This paragraph envisions back up statistical data which ideally would be run from the JMS system. Also as noted above, the JMS system does not provide for a summary of the use of force. Neither does it have a field for referral for investigation. The spreadsheet being created by the CID and IAD investigator could be used to provide that listing. Ideally, if relying on different documents to provide information required by this paragraph, those documents should at some point be brought together in a single packet for review.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**

As mentioned above, the limitations of the reporting from the Securus system have led the Grievance Coordinator to manually create a spreadsheet. The spreadsheet has the location of the kiosk terminal where the grievance was submitted although this might not reflect the location of the event giving rise to the grievance. Neither system can generate a report by location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. Also, as mentioned above, some of the staff are not entering responses in the system. One option would be to expand the manual spreadsheet kept by the Grievance Coordinator to include the information required by this paragraph. This should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced, maintaining an expanded manual spreadsheet would be a very time intensive process. At the present time, there is no management review process in the grievance system. The Quality Assurance Officer is reviewing the Grievance Coordinator's spreadsheet but is not yet reviewing and reporting on a review of a random sampling of grievances.

110.   Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

      a.   A brief summary of all completed investigations, by type, shift, housing unit, and date;

      b.   A listing of investigations referred for disciplinary action or other final disposition by type and date;

      c.   A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and

      d.   A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

The IAD spreadsheet tracks investigations according to most of this paragraph's criteria.  From June through August 2021, a total of 34 cases were investigated.  Among the most significant, 15 involved UOF, two were inmate deaths, one was an escape of two inmates from the WC, one was a fire and four involved unbecoming conduct on the part of staff.  As a result of all investigations, three officers were terminated and two resigned, but the disposition of many investigations is still pending. Since the first of June IAD has initiated 18 investigations where OC was used.  Only five of those have been resolved; two were "sustained", two were "exonerated" and one was never finalized because the officer involved was terminated on another charge.  Of the 18 investigations, 13 are still under review.

IAD investigations were predominantly centered on events that occurred at the RDC.  Only three were at the WC.  At the RDC the majority of investigations dealt with events in C-Pod (13), A-Pod (8) and Booking (6).  It is noteworthy that there were more investigations on events in C-4, the lockdown/confinement unit, than in any other housing unit.

111.   Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.   Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members.

The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

    a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

    b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

    **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

    d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

    e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

    f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Partial Compliance**

The previously created Quality Assurance spreadsheet indicated an initial implementation of an Early Intervention program. However, there has been no indication that such a program is currently active. This will be further evaluated during the next site visit.

113.    Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor

responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.   Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

a.   Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.   Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Non-Compliant**

Medical staff are not included in the review of serious incidents. Mortality reviews have been completed on some of the deaths during this calendar year. However, as noted above these appear to be minimal and pro forma. There has been little communication between medical and security staff regarding interrelated issues involved in assaults or deaths. The incident reports and mortality reviews reflect this lack of communication. The Jail Administrator reportedly is preparing an After-Action report on the death on October 18th. Ideally, this will reflect information obtained from medical staff.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.   Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such

individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had previously contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. The CJCC discontinued meetings when COVID hit and has not been functional since then. The term of the prior CJCC chairperson expired and for a period there was no one serving as chair. The County Administrator has agreed to serve as chair until the CJCC is functioning again. A meeting was held on October 1, 2021. There was not a quorum and the meeting was primarily informational. It will be important for the County to provide leadership in working towards solutions to some of the criminal justice system issues. This will encourage broader participation and begin to effectuate needed changes. The Jail Administrator has received approval for a Jail and Justice System Assessment to be completed by the National Institute of Corrections. The previous Sheriff declined to move forward with the assessment. This would greatly benefit the work of the CJCC and should be revisited.

As has been previously reported, this paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI when they were providing consultation and the Monitoring Team have recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Among other duties, staff duties will include collection and analysis of data, facilitation, research and analysis, presentation, project management, consultation, and distribution of information to the policy makers on the committee so that they have the information they need to make policy decisions. The County has designated the Criminal Justice and Quality Control staff person (sometimes called the Court Liaison or Facilitator) to be the CJCC Coordinator. To date, she has not performed the duties described above. This may be because she is also filling a number of other roles. She oversees GPS monitoring, tracks mental health evaluations and commitments, responds to queries regarding court cases, and has been overseeing efforts to implement a pretrial services program. A pretrial services program director has now been hired. This may give the Court Liaison/Facilitator more time to focus on the CJCC but she still has a number of other duties that so far have not allowed her to provide the staff support needed by the CJCC.  The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

As previously reported the Sequential Intercept Mapping required by this paragraph took place under a grant to the Hinds County Behavioral Health from the GAINS Center on August 16-17, 2017.  The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness.  The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the Jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping is now almost four years old. This would be a useful activity for the CJCC.

116.    The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors.  The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC met on October 1, 2021. A quorum was not met and the meeting was primarily informational. Not all of the identified agencies have been invited or represented at prior meetings. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support and active participation by the County and the Sheriff's Office will assist in engaging other stakeholders.

117.    The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Non-Compliant**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC in the past but there has not been much recent activity. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation. This paragraph has been down

graded to non-compliant due to the lack of any effort in this area since the strategic plan was adopted three years ago.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the Jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**
The County did contract with an outside consultant, JMI, to provide technical assistance in developing the CJCC. However, that contract did not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  That contract ended over two years ago and the County has not renewed the contract with JMI. Hinds County applied to be a learning site with Advancing Pretrial Services. The application has not been accepted because necessary stakeholders have not provided a letter of support. Even if acceptance can be obtained, that assistance does not include the breadth of the efforts included in this paragraph.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:
        a.    A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).
        b.     Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

The booklet sized version of the Settlement Agreement is provided to new staff as they go through basic training.  Existing staff previously received this booklet, and they have access to the same document on-line; however, some officers and supervisors have indicated that they do not have a copy when questioned during remote site visits.  It will take an on-site inspection to make a definitive determination.

## POLICY AND PROCEDURE REVIEW

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert retained through the Monitoring Team to develop policies and procedures. A number of draft policies have been provided and at this time, 33 policies have been approved and 32 have been signed. It does not appear that there is a system in the policy development process to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable. As noted above, there is the additional concern about the actual implementation of policies that have been adopted. The new Jail Administrator recently has been working on drafting policies and they are being submitted for review much more quickly than previously. This should result in significant progress towards the provisions regarding policies and procedures. There is still a major concern that even once adopted officers are not being trained on the policies and the policies are not being implemented.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Thirty-three policies and procedures have now been approved and several others have been drafted and circulated. There are many outstanding policies to be written but progress is being made. This does not meet the deadline set by this provision.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

In addition to completing the development of policies, this paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. Not all policies have been developed and training has not been completed on the ones that have been adopted. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff. Although training is hampered by COVID and understaffing, it is concerning that some supervisors seem unfamiliar with the requirements of newly adopted policies or disinclined to ensure those policy requirements are implemented even those adopted long before COVID began.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**

There have been thirty-three policies approved by DOJ and thirty-two adopted. It does not appear that the policies have been fully incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**

This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**
At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph.  A self-assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 or February, 2021, June 2021or October site visit. This paragraph is now carried as Non-Compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**

The County has designated a full-time Compliance Coordinator who is coordinating compliance activities.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications are being provided. Recently, the immediate notifications have not been uploaded in a timely fashion. This has been brought to the attention of the County. The County is not preparing incident reports or providing immediate notification of over-detention.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.