IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA                                                    PLAINTIFF

VS.                                                       NO.: 3:16-CV-489-CWR-RHWR

HINDS COUNTY, MISSISSIPPI, *et al.*                                         DEFENDANTS

## BRIEF IN RESPONSE TO [100] ORDER TO SHOW CAUSE

On November 23, 2021, the day Hinds County voters cast their votes in the run-off election

for their new Sheriff, the Court entered its [100] Order to Show Cause.  The Order concluded as

follows:

> Within 21 days, Hinds County shall show cause and explain why it
> should not be held in civil contempt and why a receivership should
> not be created to operate RDC.  A hearing will be scheduled shortly
> hereafter.

The Order begins by noting Hinds County entered into a Consent Decree with the United

States in 2016 in hopes of correcting on-going issues at the Raymond Detention Center (RDC).

The Court went on to note:

> It is now 2021.  Much has changed in the world, the United States,
> the State of Mississippi and even in Hinds County.  Not so for the
> RDC.  The unconstitutional conditions have not been remediated –
> they have no end in sight, in fact.  And the County's failure to
> remedy the conditions has caused "needless suffering and death,"
> (citation omitted), including six deaths so far this year.

The Court's frustration over the lack of meaningful changes is clear, and even

understandable, if the Court's understanding of the situation was correct.  Through this Response

and any hearings the Court orders, Hinds County intends to demonstrate that numerous, dramatic

changes have, in fact, occurred and the County is making significant progress in turning the RDC

battleship towards a new and better heading.

A few preliminary points.  Neither the monitors nor the DOJ have set foot in the RDC in over eighteen (18) months.  RDC staff has been there every single day during that time period, working to keep a flawed physical facility with numerous design and construction issues operating. Since it took office in 2020, the current Hinds County Board of Supervisors (the "Board") has poured millions of tax-payer dollars into construction, improvements and increased staff pay with unanimous support on every expenditure.  A new sheriff, Tyree Jones, was just elected and sworn into office on December 3, 2021, and he immediately met with RDC administrators and the Board and pledged his support to improve the RDC.

As the Court noted in its [100] Order, Hinds County hired Major Kathryn Bryan, an experienced, professional detention administrator who was recommended by the monitors and approved by the Department of Justice (DOJ), as its Detention Administrator.[1]  Although Major Bryan was hired in June 2021, she did not move to Mississippi until July 2021, and her first day on the job was July 19, 2021. During her first week, Major Bryan contracted COVID-19 at the same time as then-Sheriff Lee Vance.  Sadly, Sheriff Vance succumbed to the virus, whereas Major Bryan suffered through it for two weeks until she started work in earnest on August 9, 2021. Because Major Bryan and Interim Sheriff Marshand Crisler did not agree on numerous aspects of jail operations, she tendered her resignation on November 10, 2021, even though it was not to become effective until February 1, 2020.  In the wake of the sheriff's election, her meetings with Sheriff Jones and the Board of Supervisors, and the progress she has seen and brought to the RDC, Major Bryan has re-committed herself to getting the job done at RDC, as has her newly installed command staff, administrative staff and the employees.

---

[1] Major Bryan also is a American Jail Association Certified Jail Manager. *See* Decl. of Major Kathryn Bryan ("Bryan Decl.") ¶ 2, attached as **Exhibit A**.

While it remains far from a perfect facility, the County has made positive change throughout the RDC's structure and operations since the [60-1] 2020 Stipulated Order was entered on January 16, 2020. Medical and mental health care have improved immensely.  There are no COVID cases in the RDC as of this filing and there have not been for many weeks.  There have been no suicides on Major Bryan's watch, although there were at least two (2) attempts.  As mentioned in the Court's order, there has been one (1) death resulting from violence on Major Bryan's watch,[2] which she personally investigated and for which she authored an after-action report.  On her watch, there have been no other deaths resulting from unnatural causes.[3]

Defendants' design, construction and maintenance partners have completed their work at the RDC to meet the requirements of the [60-1] 2020 Stipulated Order, Section I(A) entered on January 16, 2020.  Consistent with the requirements of the [60-1] 2020 Stipulated Order, locks, control panels, and cell doors have been changed or upgraded. RDC command staff intends to close two of the four units on A Pod while renovating and using the remaining two units on A Pod as soon as detainee population and staffing make it safe to do so. Long-term plans include construction of a new detention facility at a different location, and the County has begun preliminary site work.  The logistics of such an undertaking are enormous, but the project is moving forward.

Sanitation, fire safety and contraband control processes are also being actively addressed. Staffing remains one of our biggest hurdles.  A five (5) percent raise for detention employees was recently implemented.  We have not had time to analyze its impact on recruiting.  Ultimately,

---

[2] A brief mention of the death almost seems to trivialize the loss of a human life, even though it is not meant that way.

[3] There was an additional death on November 15, 2021. Although a medical examiner's report has not yet been completed, Defendants expect the cause of death to be a pre-existing lung cancer condition.

3

recruiting has to do with more than money.  We hope the changes we are making will build a package that will make the RDC an attractive workplace, but only time will tell.  We also have information technology needs that must be addressed.  Issues with timely releasing detainees are being addressed and detainees are being released upon receipt of release orders from the Court. Structural issues involving leaking roofs and damaged ceilings are actively being addressed by maintenance staff and outside contractors.

All this activity is not to suggest the RDC is "fixed."  It is not.  The design and construction of the RDC building itself was flawed from the beginning.  But, much has changed at the RDC over the last two years, and the County has accomplished this significant change in the face of an ongoing, global pandemic unlike anything we had ever experienced and that hit the County (and the entire country) less than two months after entry of the [60-1] 2020 Stipulated Order.

Yet, to borrow a phrase from the poet, we "have promises to keep and miles to go before we sleep."[4] Put differently, turning a battleship is hard and slow. The County has a relatively new Board of Supervisors, a brand new sheriff (who has been in office a mere eleven days as of this Response) and a new Detention Administrator (who has been on the job for only four months as of this filing).  None of these individuals created the problems at RDC, and they should be given a reasonable opportunity (collectively) to change the situation.  Their actions thus far, and as will be detailed in this memorandum, demonstrate their determination to make changes.

The lack of will to make meaningful changes at RDC persisted for years through unstable, ever-changing leadership combined with an overall lack of political will to make changes.  Even when the will to effect change exists, changes of the magnitude needed at RDC cannot be made overnight.  It will take time.  The County cannot conscript citizens to work at RDC.  Staffing the

---

[4] Robert Frost, Stopping by Woods on a Snowy Evening.

RDC will take a renewed focus and much effort. But a lot has happened at the RDC since the Board was installed in 2020 and Major Bryan has brought significant operational progress. A new Board, a new Sheriff, a new Detention Administrator, and her new command staff at the facility are wrestling with a situation they inherited. They should not be held responsible for their predecessors' lack of action and neglect, and they deserve an opportunity to fix the RDC. It will not be an easy task and it will not be a quick fix. Hinds County taxpayers also need a voice in this ongoing battle to complete the facility's turnaround, as those same taxpayers will be asked to foot the bill. With all due respect, Defendants need space and time to let the substantive improvements they are making take root, to monitor the situation and make adjustments as needed, and to let them continue moving forward to solve the problems at hand.

The County thus respectfully requests this Court give them until July 1, 2022 to prove they can make even more significant, positive change at RDC before the Court decides whether to take the drastic, extraordinary steps it is considering taking.

## I. <u>Relevant Background</u>

Opening in 1994, the Raymond Detention Center is, pursuant to Mississippi law, the direct responsibility of the Hinds County Sheriff.[5] Mississippi law also makes clear that the Board controls the County's finances.[6]

Here, the County is governed by a five-person Board of Supervisors. The current Board members took their seats effective January 6, 2020,[7] and are as follows: Robert Graham (District

---

[5] *See* Miss. Code § 19-25-69 (providing that a county sheriff "shall have charge of the . . . jail of his county, of the premises belonging thereto, and of the prisoners in said jail").

[6] *See* Miss. Code § 19-3-40(1).

[7] *See generally* Minutes, Jan. 6, 2020 Regular Meeting of the Hinds County Board of Supervisors, *available at* https://www.co.hinds.ms.us/pgs/BoardMinutes/docs/January%206,%202020.pdf (last visited Dec. 14, 2021).

1), David L. Archie (District 2), Credell Calhoun (District 3), Vern O. Gavin (District 4), and Bobby "Bobcat" McGowan (District 5).[8] Three of the five board members (Supervisors Archie, Calhoun, and Gavin) were new to the Board in January 2020.[9] Thus, a majority of the Supervisors on the current Board were not in place at the time when the [8-1] Consent Decree was entered on July 19, 2016 or when the [60-1] 2020 Stipulated Order was entered on January 16, 2020.

In June 2021, the County hired Major Kathryn "Kat" Bryan to serve as the Detention Administrator for the RDC.[10] The County's decision to hire Major Bryan was consistent with the requirements of the [60-1] 2020 Stipulated Order,[11] and her first day at RDC was July 19, 2021.[12] In the days after starting the job, however, Major Bryan contracted COVID-19 and was out the weeks of July 26-30, 2021 and August 2-6, 2021.[13] As a result, Major Bryan did not effectively start her position as Detention Administrator until August 9, 2021.[14]

On November 23, 2021, Tyree Jones was elected Sheriff of Hinds County.  Jones replaces the late Sheriff Lee Vance, who passed away unexpectedly on August 4, 2021.[15]  Sheriff Jones was sworn in on December 3, 2021.[16]  Like a majority of the Supervisors on the Board, Sheriff

---

[8] *See* Board of Supervisors, http://www.hindscountyms.com/elected-offices/board-of-supervisors (last visited Dec. 11, 2021). Supervisor Calhoun serves as President and Supervisor Archie serves as Vice President. *Id.*

[9] *See id.*

[10] *See* Bryan Decl. ¶ 3.

[11] *See* [60-1] Stipulated Order at 5.

[12] Bryan Decl. ¶ 3.

[13] *Id.*

[14] *Id.*

[15] *Hinds County Sheriff Lee Vance's death is coronavirus related, coroner says*, Clarion Ledger, Aug. 5, 2021, available at https://www.clarionledger.com/story/news/local/2021/08/05/hinds-county-sheriff-died-covid-19-complications/5495795001/ (last visited Dec. 11, 2021).

[16] *Hinds County Sheriff Tyree Jones sworn into office 10 days after winning run-off election*, Clarion Ledger, Dec. 3, 2021, available at https://www.clarionledger.com/story/news/2021/12/03/tyree-jones-officially-becomes-hinds-county-sheriff-dec-3/8855000002/ (last visited Dec. 11, 2021).

Jones was not the Hinds County Sheriff in 2016 when the [8-1] Consent Decree was entered or in 2020 when the [60-1] 2020 Stipulated Order was entered.[17]

Consistent with the requirements of the [60-1] 2020 Stipulated Order, the County contracted with a qualified security contractor and an architect with corrections experience.[18] Namely, the County contracted with Benchmark Construction and CDFL Architects and Engineers to provide construction management and quality control services to the County.[19] Benchmark and CDFL not only have provide management and oversight of the County's venders as those vendors make required renovations to RDC,[20] but have also assisted the County in developing a master plan that includes construction of a new detention facility. The Board has considered and approved the construction of this new facility, and the County has begun initial site preparation for the new detention center.

Nevertheless, the Raymond Detention Center presently remains the primary detention center for the County, and it has faced a myriad of problems since opening.  These problems have resulted in the County spending millions of taxpayer dollars on maintenance and improvements to the facility. But it is no secret that problems persist at the facility. The County, however, remains committed and engaged in a comprehensive effort to address and improve the various areas of life at the Raymond Detention Center. Collectively, these efforts demonstrate the County's commitment to gaining control of and turning around the facility.

---

[17] At the time the [8-1] Consent Decree was entered, the late Victor Mason was the Sheriff of Hinds County.  After Mason left office in December 2019, *see* [60] Order at 7, the late Lee Vance took over as Hinds County Sheriff in January 2020. *See* Lee Vance: New Sheriff Sets Sights on Addressing Problems with Hinds County Detention Center, Northside Sun (Feb. 7, 2020) *available at* https://www.northsidesun.com/news-front-page-slideshow-breaking-news/lee-vance-new-sheriff-sets-sights-addressing-problems-hinds#sthash.0gXH1aaj.dpbs (last visited Dece. 11, 2021).

[18] *See* [60-1] Stipulated Order at 2-3.

[19] *See* Decl. of Gary Chamblee ("Chamblee Decl.") ¶ 3, attached as **Exhibit B**.

[20] *See id.* at ¶¶ 3-9.

A. **Ongoing Efforts to Address Staffing at Raymond Detention Center**

A critical aspect of serving as a detention administrator is the command staff supporting the administrator. When Major Bryan arrived at the RDC, she inherited the existing command staff and did not bring with her a command staff of her choosing.[21] Over the next four months, Major Bryan evaluated the existing command staff, made changes to that staff, and, as of December 1, 2021, Major Bryan now has in place a complete command staff of her choosing, and they have all been enrolled in training to obtain national certification as jail managers.[22]

Aside from now having her own command staff in place, Major Bryan has developed an updated staffing plan for the RDC, consistent with the requirements of the [60-1] 2020 Stipulated Order.[23] Pursuant to this updated plan, the facility is to be staffed for direct supervision.[24]

Because the County cannot simply let just anyone through the door to work at the detention center and because new recruits must undergo a four week training process,[25] hiring new detention staff for the Raymond Detention Center is a challenge for the County but not one the County ignores.  Before it can assemble and begin training a cadet class, the County must identify and vet potential new recruits.[26] The vetting process naturally renders some recruits ineligible for employment at the detention center due to failed background checks.[27]   Even for those recruits

---

[21] Bryan Decl. ¶ 4.

[22] *Id.* Importantly, the newly promoted Chief of Detention Officers for the RDC, Anthony Simon, previously served as the Work Center's Facility Commander, and Chief Simon successfully operated the Work Center given the same limited resources that exist at the RDC. *Id.*

[23] *See* [60-1] Stipulated Order at 4.

[24] Bryan Decl. ¶ 5.

[25] *Id.* at ¶ 6.

[26] Id. at ¶ 7.

[27] *Id.*  Specific to background checks, the County has achieved "sustained compliance" regarding the requirement that "no one [be permitted to] work[] in the [RDC] unless they have passed a background check, including a criminal history check." *See* [101] Fifteenth Monitoring Report at 26 (quoting Consent Decree item no. 40).

who do not fail a background check, Major Bryan and her staff must remain vigilant to intercept and remove recruits who have a previously undetected gang affiliation or who simply are foolish enough to attempt to bring contraband into the facility.[28]

Given the importance of detention staff training, the County transitioned responsibilities for the training program from the Sheriff to Major Bryan, and this allowed Major Bryan, in conjunction with her training officer, to plan improvements to the training curriculum for detention staff.[29] The County also reassigned recruiter Bernard Moore to Major Bryan in November 2021 to strengthen recruiting efforts related to the Raymond Detention Center and the Work Center by giving Major Bryan a dedicated recruiter focusing on identifying and attracting potential new recruits.[30] The County now holds four week long cadet classes for new recruits at least every other month, with the latest cadet class having started November 18, 2021 and expected to be completed on December 17, 2021.[31]

In addition to recruiting new staff, the County has taken key steps toward retaining the staff it has at the RDC, consistent with the requirements of the [60-1] 2020 Stipulated Order.[32] The Board approved a five percent pay raise for all staff at the RDC along with premium pay.[33] Their November 2021 paycheck included the raise and premium pay.[34]  In October 2021, Major Bryan coordinated with Matt Rivera, a third-party consultant recommended by the Department of Justice, to have Rivera conduct an analysis of and provide a report regarding retention efforts at the

---

[28] Bryan Decl. ¶ 7.

[29] *Id*. at ¶ 6.

[30] *Id*. at ¶ 8; *see also* [60-1] Stipulated Order at 4 (requiring, at item no. II.B.2., the County to "designate a full-time Recruitment Officer . . . specifically for recruitment of detention officers")

[31] Bryan Decl. ¶ 8.

[32] *See* [60-1] Stipulated Order at 4-5 (item nos. II.B.1., 3.).

[33] Bryan Decl. ¶ 9.

[34] *Id*.

Raymond Detention Center.[35] Rivera provided a report to Major Bryan in October 2021, and the two are currently in follow-up discussions related to the report and retention efforts at the facility.[36]

Beyond these efforts to recruit new staff and facilitate retention of existing staff, the County reallocated and repurposed existing staff at the Raymond Detention Center to more efficiently manage the facility. For example, in addition to Moore being reassigned to Major Bryan for recruiting efforts, Major Bryan tasked Miioka Laster, RDC's fire safety officer, with additional responsibility of serving as medical liaison, escorting detainees to and from the medical clinic and escorting medical staff on pill call at RDC.[37] Having a dedicated officer accompany medical staff during pill call greatly reduced the number of treatment- and medication-noncompliant detainees, and it similarly increased the ability of medical and mental health staff to interact with detainees.[38] Major Bryan and her staff are also working to install a field training officer ("FTO") program to help facilitate continued training of existing detention officers, and they currently are preparing a curriculum and scheduling FTO training for early 2022.[39]

**B**. **Ongoing Efforts to Protect Detainees from Harm at Raymond Detention Center**

The County's efforts to increase detention staffing and improve training is without a doubt a major part of the County's overall commitment to protecting detainees from harm, but there is more. A fundamental component of these efforts is the County's commitment to operating the Raymond Detention Center as a direct supervision facility.[40] Major Bryan's management

---

[35] *Id.*

[36] *Id.*

[37] *Id.* at ¶ 10. Having the fire safety officer assist as medical liaison alleviates command staff from having to pull other detention staff from their posts to escort medical staff. *Id.*

[38] *Id.*

[39] *Id.*

[40] *See id.* at ¶ 11.

philosophy centers on a direct supervision model.[41] The County also dedicated significant resources to renovating the living units at the facility for direct supervision, and as of the filing of this submission, Benchmark has overseen the County's vendors complete renovations to each of the four living units on pod B and those units are nearly ready for direct supervision.[42] Benchmark now is overseeing the County's construction vendors as they begin to make additional renovations to the viewing windows on cell doors throughout the units on pod C.[43]

The County also committed to ensure detention officers conduct security rounds at required intervals. The County recently approved Major Bryan's request for funding to purchase and install an electronic round system, which operates using buttons mounted on the walls throughout a living unit, to monitor whether and when officers make rounds.[44] The system requires officers, each of whom are assigned an electronic wand to keep with them during a shift, to physically walk to each button in the living unit to which they are assigned on a given shift and place the wand into contact with the button.  Doing so electronically documents that the officer walked by the button while making rounds in the units.[45] Once installed, the system will allow Major Bryan and her command staff to identify those officers who are properly conducting rounds and those who are not.[46]

As another indication of the County's commitment to protecting detainees from harm, Major Bryan conducted the first after action review related to a detainee death.[47] The County does

---

[41] *Id.*

[42] Chamblee Decl. ¶ 4.

[43] *Id.* The County's vendors previously completed numerous renovations to C Pod, but, when detainees were put back into the living units on C Pod, they damaged the renovated living units once again. *Id.*

[44] Bryan Decl. ¶ 12.

[45] *Id.*

[46] *Id.*

[47] In the course of reiterating that six detainees have died in 2021, the [100] Order to Show Cause also mentions violence at the facility and an escalation in violence. While no one on either side of the issues in this civil action wants to see even one detainee lose his life, it bears noting that only one of the six deaths

not in any way minimize the death of a single detainee, and an important part of keeping detainees safe is to understand what circumstances led to incidents such as the death of a detainee who was assaulted on October 18, 2021.[48] In November 2021, Major Bryan and her staff completed a detailed after action report into the circumstances surrounding this detainee's death, and that report will be used to aid Major Bryan and her staff in their effort to minimize the potential for a similar event in the future.[49]

**C.** **Ongoing Efforts to Improve Medical and Mental Healthcare**

With particular regard to medical and mental healthcare staffing at the facility, a new Health Services Administrator, Ebbonie Taylor-Winfield, was assigned to Raymond Detention Center in August 2021.[50] Since that time, Major Bryan and Taylor-Winfield have developed a solid working relationship.[51] The County also recently renegotiated its agreement with the contractor providing medical and mental healthcare at the facility, Quality Correctional Healthcare ("QCHC").[52] Pursuant to the new contract, Raymond Detention Center will have a full-time mental health nurse practitioner beginning in January 2022.[53] The new contract also provides for an additional mental health practitioner and an additional medical practitioner at the RDC.[54]

In addition, the importance of addressing issues related to mental health is being emphasized to detention staff. For example, the County has engaged in a comprehensive effort to

---

observed on page 18 of the [100] Order to Show Cause was attributable to any form of violence at the RDC. We are not suggesting that more cannot (and has been) done to prevent overdoses and suicides. But, deaths by overdose, suicide and violence are distinctly different matters.

[48] Bryan Decl. ¶ 13. This after action review is mandated by the [8-1] Consent Decree.

[49] *Id.*

[50] *Id.* at ¶ 14.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

train all detention officers related to handling detainees with mental health issues, and, to that end, Major Bryant  brought in a nationally certified mental health training professional to provide three separate, intensive sessions of mental health training to all detention officers.[55] Major Bryan also increased collaboration between medical and mental health staff and detention staff, and she points to this collaboration as leading to increased security for medical and mental health professionals at the facility and reduced turnover of those professionals.[56]

The County's efforts to provide better mental healthcare at RDC include the ongoing construction of a dedicated mental health living unit, Unit B-1.[57] Specifically, Unit B-1 is undergoing renovations which will allow the unit to serve as the facility's unit for detainees with serious mental illnesses, giving the facility much needed dedicated space for detaining such individuals and proving them therapeutic programming.[58] In addition to the renovations to B-1, the County is also adding mental health office space immediately adjacent to Unit B-1 to facilitate the provision of care between mental health staff and detainees in Unit B-1. As of this filing, Unit B-1 is expected to be ready for use as the facility's mental health unit within sixty (60) days.[59]

Since being made administrator of the Raymond Detention Center in August 2021, Major Bryan also has begun holding weekly interdisciplinary team meetings, or "IDT Meetings."[60] These meetings are attended by Major Bryan and members of the classification staff, mental healthcare staff, and detention staff.[61] The meetings allow these key players to come together on a weekly

---

[55] *Id*. at ¶ 15.  The first of these three training sessions has already taken place, the second sessions is scheduled for December 21, 2021, and the third is scheduled for early 2022.  *Id*.

[56] *Id*.

[57] *Id*. at ¶ 16.

[58] *Id*.

[59] *Id*.

[60] *Id*. at ¶ 17.

[61] *Id*.

basis, assess those detainees with mental health issues, and coordinate their efforts to provide care and security for those detainees.[62]

**D**. **Ongoing Efforts at Suicide Prevention**

The County's efforts to address and minimize the risk of suicides at RDC are ongoing and involve both structural changes to the RDC and staffing initiatives. Structurally, two padded rooms currently are under construction, and once completed, these rooms will be used to aid efforts to monitor and control detainees who present suicidal threats.[63] As the County continues to roll out the direct supervision model throughout the RDC, Major Bryan suspects the closer supervision will supplement ongoing suicide prevention efforts.[64] Major Bryan believes initiatives such as the IDT meetings have significantly helped address suicide risk and facilitate continuity of care for at risk detainees.[65]  Since September 2021, another staffing initiative has been in place pursuant to which medical staff no longer simply discharge detainees from suicide watch back into living units; rather, the facility uses a "step-down" system resulting in medical staff now placing detainees from suicide watch into medical observation for a limited number of days until the detainees are evaluated as being ready to return back to the living units.[66]

**E**. **Ongoing Efforts to Improve Fire Safety at RDC**

By its original design, the RDC was constructed with fire hoses installed in each pod such that fires within a particular living unit could be extinguished using the fire hoses as opposed to an overhead sprinkler system. These fire hoses were specifically addressed in the [60-1] 2020

---

[62] *Id.*

[63] *Id.* at ¶ 18.

[64] *Id.*

[65] *Id.* at ¶ 17.

[66] *Id.* at ¶ 18.

PD.36202166.1

Stipulated Order, which required that the County "reinstall the fire hoses in secured cabinets . . . ."[67] The County has completed the reinstallation of fire hoses throughout all three pods (A, B, and C) such that each pod now has its own operable fire hose system at the ready.[68] The County also has completed installation of fire alarms throughout each of the four living units in Pod B, and Benchmark is now overseeing installation of fire alarms in each of the four living units within Pod C.[69] RDC staff test the fire alarms on a monthly basis.[70]

In conjunction with the reinstallation of fire hoses and installation of fire alarms throughout the pods and living units, the County is also installing detention-grade light fixtures in the cells within renovated living units.[71] These detention-grade light fixtures are intended to help prevent detainees from destroying light fixtures in their effort to access the lighting system's wiring to create sparks.[72] Provided detainees do not devise a way to destroy these new light fixtures, their lack of access to electrical wires should greatly reduce the likelihood of fires at the RDC.

**F. Ongoing Efforts to Stop the Flow Contraband Into the Facility**

Major Bryan and her staff have engaged in a concerted effort to combat the introduction of contraband into the RDC. For example, on November 3, 2021, Major Bryan issued a directive to all staff related to contraband.[73] The key points of the directive include the mandate that all medical personnel will now be searched upon entry to the facility in the same manner as all security staff. All personnel are only permitted one bag with them, and all bags (including food bags) must now

---

[67] [60-1] Stipulated Order at 3.

[68] Chamblee Decl. ¶ 5.

[69] *Id.*

[70] Bryan Decl. ¶ 23.

[71] Chamblee Decl. ¶ 6.

[72] *Id.*

[73] Bryan Decl. ¶ 19; *see also* Nov. 3, 2021, Memo to All Staff re: Contraband Eradication Measures, attached as **Exhibit C**.

be clear/see-through.[74] In addition, a supervisor will be posted at the facility's entrance at the beginning of each shift and will not leave the entrance area until all staff have arrived for that shift and been searched.[75] Lastly, staff are no longer permitted to bring cell-phones into the facility, their vehicles are subject to search any time without notice, and once they enter the facility they are no longer permitted to exit the facility until the end of their shift.[76]

Major Bryan's directive has not been without impact. Within the last month, detention staff intercepted and stopped two staff members attempting to bring contraband into the facility.[77] What's more, the County is not simply terminating such staff when caught. Rather, the County is having those (former) staff members arrested and charged with crimes, and the staff who were recently caught in the act were no exception.[78]

The County also now has two investigators dedicated to the Raymond Detention Center, the second of which has only been at the facility since October 2021.[79] Major Bryan expects that over time the presence of two investigators at the facility will only serve to strengthen the County's ability to fight the introduction and possession of contraband at the facility.[80]

## G. Ongoing Efforts to Address Cell Door Locks

Consistent with the terms of the [60-1] 2020 Stipulated Order, the County is engaged in ongoing efforts to combat faulty locking mechanisms at the RDC. Namely, the County has refurbished all doors at the following points, with correct locking mechanisms being installed and

---

[74] *Id.*

[75] *Id.*

[76] *Id.* at 1-2.

[77] Bryan Decl. ¶ 19.

[78] *Id.*

[79] *Id.*

[80] *Id.*

each door being converted to a swing door: all doors going from the facility's Great Hall into the three pods, all doors leading into the living units on all pods, all recreation doors, and all cage doors.[81] This was a project required by the [60-1] 2020 Stipulated Order.[82] The County also has replaced all sliding doors in living units B-3 and B-4 with swinging doors and reinforced the cell doors in units C-1, C-2, C-3, and C-4, another project required under the [60-1] Stipulated Order.[83] The County also has replaced the control panel for the electronic door locks on B pod, C pod, and central control, as required by the [60-1] 2020 Stipulated Order.[84] The swing doors being installed have held up much better to detainees' efforts to defeat the locking mechanisms on those doors.[85] The County also moved quickly to vet and approve a contract with Georgia Detention Services, an experienced detention services contractor, pursuant to which Georgia Detention Services has replaced the locking mechanisms on various doors throughout the facility, is providing maintenance to those locks, and will provide maintenance training to County employees.[86]

**H**. **Ongoing Efforts to Eliminate "Trash Dumpster Cells" and Maintain the Facility**

The County continues its work to eliminate "trash dumpster cells" within the Raymond Detention Center and maintain the facility as a whole.  As the Court noted, these are cells which were welded shut after being damaged by detainees but which they (the detainees) were still able to throw trash into through the space beneath the welded doors and through broken cell-door windows.[87] As the Fourteenth and Fifteenth Monitoring Reports note, the County opened and

---

[81] Chamblee Decl. ¶ 7.

[82] *See* [60-1] Stipulated Order at 3, Nos. I.A.1., 3.

[83] *See* Chamblee Decl. ¶ 7; *compare* [60-1] Stipulated Order at 3, Nos. A.2., 5.

[84] Chamblee Decl. ¶ 7.

[85] *Id*.

[86] Bryan Decl. ¶ 20.

[87] *See* [100] Order at 21; *see also* Chamblee Decl. ¶ 8.

cleaned out these cells, and reduced the number of these cells during the time between the Fourteenth and Fifteenth Monitoring Reports from 30 cells to what the monitors claim are 19 cells.[88] Those cell doors that were welded shut had metal plates added to the bottom of the cell doors and had a plate welded over the cell door windows to prevent detainees from filling the off-line cells back up with trash and creating new "trash dumpster cells."[89]

Aside from these cells, the County is engaged in an significant effort to maintain and sanitize the RDC. The County has contracted with a third party pest-control company that treats the RDC on a monthly basis. Detainee-workers perform daily cleaning and sanitizing services throughout the RDC's common areas.[90]  In addition, facility management makes cleaning products available to detainees in their living units on a regular basis so that detainees can clean their personal living areas.[91]

With particular regard to maintenance of the facility, the County recently dedicated and assigned two maintenance employees to focus exclusively on maintenance issues at RDC.[92] In addition to these County employees, there are vendors onsite helping with facility maintenance issues as they arise.[93]  Thus, while some cells remain welded shut, the County is engaged in an ongoing multifaceted approach to facility sanitation and maintenance.

I. **Ongoing Efforts to Stop Detaining Persons Adjudicated "Not Guilty"**

The County is engaged in various efforts to address the issue of detainees being held at the RDC despite being adjudicated "not guilty." For example, the County is working with Securus, a

---

[88] *See* [101] Court-Appointed Monitors' Fifteenth Monitoring Report 3; *see also* Chamblee Decl. ¶ 8.
[89] *See id.*; *see also* Chamblee Decl. ¶ 8.
[90] Bryan Decl. ¶ 21.
[91] *Id.*
[92] *Id.* at ¶ 22.
[93] Chamblee Decl. ¶ 9.

third party contractor, to establish a virtual communications platform through which detainees will have greater ability to communicate with their attorneys while doing so in a private, secure setting.[94] In addition, RDC staff are conducting an ongoing audit of detainee files at the facility.[95]

The Monitors' Fifteenth Monitoring Report sheds additional light on the ongoing efforts to address detention of persons adjudicated "not guilty." Namely, the County has achieved "partial compliance" related to the Consent Decree's requirement that "[t]he County must ensure that the release process is adequately staffed[,]" which requirement also mandates training on "[h]ow and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty . . . ."[96]  Major Bryan, moreover, "has been working on outstanding policies including the policy on Releasing which would address" issues related to releasing individuals who are adjudicated not guilty.[97]

**J**. **Ongoing Efforts to Address COVID-19**

The monitors' Fifteenth Monitoring Report reflects the ongoing efforts of the leadership and staff at the RDC related to COVID-19. The monitors note that a surge in cases occurred in July, August, and September,[98] but they add that "[i]t appears that the [RDC] ha[s] moved past the

---

[94] Bryan Decl. ¶ 24. Notably, the monitors look favorably on this ongoing development, referring to the "planned integration of video conferring for attorneys to meet with their clients . . . at the" RDC and Major Bryan's "negotiat[ing] with . . . Securis[ *sic* ] to provide additional video terminals to allow for more accessible attorney visits" to be a "technological solution" made "all the more attractive" in light of the restrictive protections the County has put in place to guard against COVID-19. *See* [101] Fifteenth Monitoring Report at 124 (addressing Consent Decree item no. 105). As a result of this ongoing initiative, the monitors note "partial compliance" with the Consent Decree's requirement that the County "ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens . . . ." *Id*. at 123-24.

[95] Bryan Decl. ¶ 24.

[96] *See* [101] Fifteenth Monitoring Report at 120-21 (quoting paragraph 99.b.iv.).

[97] *See* [101] Fifteenth Monitoring Report at 117.  As of the end of November 2021, the "Release of Inmates" policy had been provided to the monitors for their review and approval.  Bryan Decl. ¶ ##.

[98] This surge was nothing unique to the RDC. It was a statewide surge impacting all of Mississippi. *See* Sarah Haselhorst, *The contracts of health care workers brought to Mississippi during the delta surge*

recent surge in cases, and so things are more manageable again."[99] The monitors also observe that "the management of the range of COVID-19 related issues seems to have improved . . . ." While the monitors also comment that the "percentage of detainees" tested and vaccinated should increase, they correctly recognize that it is ultimately up to the detainees to "agree to be tested and vaccinated."[100] Even so, the monitors note "[t]here has been an increase in detainee testing and vaccinations as a result of education efforts by the Detention Administrator and the medical staff."[101] As of this filing, there are no active COVID-19 cases at the RDC.

## II. <u>Argument and Authorities</u>

The [100] Order to Show Cause makes clear the Court is considering using its inherent powers to find the County in contempt and appoint a receiver to operate the RDC. The County respectfully submits that relevant legal authority, as applied to the unique facts before the Court, militates against such an extraordinary use of the Court's power just yet.

As a threshold matter, the County contends that there are not sufficient facts on which to find the County in civil contempt. To find a party in civil contempt, one must "establish[] by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (citing *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987)). Evidence of either "mitigating circumstances that might cause the district court to withhold the exercise of its contempt power,

---

*are expiring*, Mississippi Clarion Ledger Oct. 29, 2021, *available at* https://www.clarionledger.com/story/news/2021/10/30/mississippi-state-funded-health-care-workers-contracts-expire/6191296001/ (last visited Dec. 13, 2021) (describing surge in cases statewide in August and September 2021 and impact of that surge on Mississippi nurses).

[99] *See* [101] Fifteenth Monitoring Report at 5.

[100] *See* [101] Fifteenth Monitoring Report at 5.

[101] *Id.*

or substantial compliance with the consent order" are defenses to civil contempt. *Little Tchefuncte River Ass'n v. Artesian Util. Co., Inc.*, 155 F. Supp. 3d 637, 657 (E.D. La. 2015) (citing *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) *and Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987)). Here, the facts and evidence set forth in Section I, taken together with any evidence the County is permitted to put on at a future hearing, support a finding of mitigating circumstances emanating from the onset of an unprecedented global pandemic merely two months after the Court entered the [60-1] Stipulated Order. From these same facts and evidence, the record supports finding the County is in substantial compliance with the [60-1] Stipulated Order at this time, thus precluding a finding of civil contempt.

Nevertheless, the Court no doubt has inherent authority to take action to control its docket and promote efficiency. *See, e.g.*, *Coker v. Select Energy Servs., LLC*, 161 F. Supp. 3d 492, 494-95 (S.D. Tex. 2015). This inherent authority, however, must be exercised with restraint. *See, e.g.*, *Dietz v. Bouldin*, 579 U.S. 40, 48 (2016) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)) ("Because the exercise of an inherent power in the interest of promoting efficiency may risk undermining other vital interests related to the fair administration of justice, a district court's inherent powers must be exercised with restraint."); *Chambers*, 501 U.S., at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion.").

This is particularly so here, where the action the Court is considering—appointing a receiver to take over and operate a local county-run jail—is "an extraordinary remedy that should be employed with the utmost caution . . . ." [100] Order to Show Cause at 15(quoting *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)) (internal marks omitted). A receivership should be used with "utmost caution" because it is considered a "drastic" form of relief. *Bryant v.*

*Matvieshen*, 904 F. Supp. 2d 1034, 1047 (E.D. Cal. 2012) (citing *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009)).

Congress, moreover, has expressed a policy against federal courts becoming too involved in the day-to-day operations of running a prison, and this policy further militates against the already extraordinary nature of action the Court is contemplating taking through its inherent powers. In passing the Prison Litigation Reform Act (PRLA), Congress endeavored to "remove the federal district courts from the business of supervising the day-to-day operation of state prisons." *Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999) (citing *Imprisoned Citizens Union v. Ridge*, 169 F.3d 178, 189 (3d Cir. 1999)); *see also* H.R. REP. 104-21, n.2 (1995) (explaining that the PLRA's requirement that relief be the "least intrusive means" of curing a violation of a federal right "stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions" and "limits remedies to those necessary to remedy the proven violation of federal rights"). Without doubt, appointing a receiver to operate the RDC places the Court squarely at the center of day-to-day operations at the facility, contrary to the policy underlying the PLRA and relevant Fifth Circuit precedent. *See Ridge*, 169 F.3d at 189 (explaining that the PLRA advances an "unquestionably legitimate purpose[]—to minimize prison micro-management by federal courts and to conserve judicial resources"); *see also Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 468 (5th Cir. 2015) (warning against courts becoming "enmeshed in the minutiae of prison operations").

Against these legal principles, the numerous changes in the County's leadership cannot be overlooked. The ongoing, comprehensive efforts in which this new leadership is engaged to address the myriad issues at the RDC also cannot be ignored. When the many facts outlined in Section I, above, are measured against the extraordinary nature of the action the Court is

considering taking in an area in which there is a clear policy against courts becoming too involved, additional time is warranted before appointing a receiver to operate the facility.

To be clear, Hinds County is not saying the Court lacks authority to exercise its inherent powers, find the County in contempt, and appoint a receiver to operate the Raymond Detention Center.  However, we are a far cry from where the Court was in early 2020 when it entered the [60-1] 2020 Stipulated Order. At that time, the Court was faced with a situation in which both "the Sheriff and the Board of Supervisors took actions that were in direct contravention of the Consent Decree, *see* [60] Order at 11, and the Court's frustration at the time is understandable.

Today, the situation before the Court is in stark contrast. There is a new Board in place with a demonstrated commitment to righting the ship at the RDC, and the County has a newly elected Sheriff who has been in office less than two weeks. The RDC now is being managed by Major Bryan, a professional detention administrator who enjoys the trust and confidence of the Court-appointed monitors, she has been on the job for barely more than four months, she only recently has put in place a command staff entirely of her choosing.  The RDC also has a new health services administrator who enjoys Major Bryan's confidence. Moreover, since mid-2020, the County has contracted with a construction contractor and architecture firm, both of which are experienced in detention structures and services. These new players and the accomplishments the County has made to date toward satisfying the [60-1] 2020 Stipulated Order's requirements make the situation vastly different today. The County thus respectfully asks that the Court hold in abeyance any decision to engage in such an extraordinary use of power until July 1, 2022 to allow the County additional time to continue its ongoing efforts and to prove it can make even more significant, positive change at the RDC.

**III**. <u>Conclusion</u>

For the foregoing reasons, the County respectfully requests that the Court hold in abeyance any decision whether to hold the County in contempt and appoint a receiver until July 1, 2022.

Dated: December 14, 2021.

Respectfully submitted,

PHELPS DUNBAR, LLP

BY:   s/ *Reuben V. Anderson*

Reuben V. Anderson, MB #1587
W. Thomas Siler, Jr., MB #6791
Nicholas F. Morisani, MB #104970
4270 I-55 North
Jackson, Mississippi 39211-6391
Post Office Box 16114
Jackson, Mississippi  39236-6114
Telephone: 601-352-2300
Telecopier: 601-360-9777
Email: Reuben.Anderson@phelps.com
       Tommy.Siler@phelps.com
       Nick.Morisani@phelps.com

**ATTORNEYS FOR DEFENDANTS**

<u>CERTIFICATE OF SERVICE</u>

I, Reuben V. Anderson, hereby certify that I this day filed the foregoing Response with the Clerk of the Court, using the CM/ECF system, which sent notification to counsel of record.

SO CERTIFIED, this the 14th day of December, 2021.

*/s/ Reuben V. Anderson*

Reuben V. Anderson