IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.: 3:16-CV-00489-CWR-RHWR |
| | ) | |
| HINDS COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO TERMINATE,
OR, ALTERNATIVELY, MODIFY CONSENT DECREE**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 2

II.  BACKGROUND .......................................................................................................... 3

III. LEGAL STANDARD ................................................................................................ 6

IV.  ARGUMENT .............................................................................................................. 7

    A.   The Consent Decree Complies with the PLRA Because the Decree Remains
    Necessary to Correct Defendants' Current and Ongoing Constitutional Violations........ 7

        (1)  Constitutional Legal Standard................................................................... 8

        (2)  The Consent Decree is Still Necessary to Remedy the Unconstitutional
        Current and Ongoing Substantial Risk of Serious Harm at the Jail........................ 9

        (3)  Defendants are Deliberately Indifferent to the Substantial Risk of Serious
        Harm at the Jail ............................................................................... 28

    B.   A Receiver is Necessary to Remedy Defendants' Current and Ongoing
    Constitutional Violations. ................................................................................ 31

    C.   The Consent Decree is Not Immediately Terminable. .................................................. 31

    D.   Good Cause Exists to Postpone the PLRA's Automatic Stay........................................ 32

V.   CONCLUSION ........................................................................................................ 35

i

## I.   INTRODUCTION

The Court entered the Consent Decree to remedy Defendants' longstanding and widespread constitutional violations of detainees' rights at the Defendants' Jail.[1]  Since the Court entered the Consent Decree in 2016, Defendants have essentially disregarded the Decree and its remedial requirements.  The Monitor's most recent compliance report (November 2021) found that Defendants have substantially complied with just three of the Decree's 92 substantive provisions.  Defendants' compliance failures unsurprisingly and unfortunately have caused the continued widespread violations of detainees' constitutional rights, often resulting in serious harm.

Facing a hearing on contempt for the second time since January 2020—this time with the potential for the appointment of a receiver—Defendants filed the instant Motion to terminate, or, alternatively, modify, the Decree.  ECF No. 111.  Defendants' Motion invokes the termination provision of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626.  That provision makes the Consent Decree in this case terminable, unless the Court "makes written findings based on the record that [the] prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  *Id.* § 3626(b)(3).

This Court should deny this Motion because Defendants are engaging in current and ongoing violations of detainees' rights, and the Consent Decree's provisions comply with the

---

[1]  The Decree defines the Jail to include the Raymond Detention Center (RDC); the Work Center, the (now-closed) Jackson Detention Center, and any additional facility used to house County prisoners, which now includes the Henley-Young Juvenile Justice Center.  ECF No. 8-1 at ¶ 16.

PLRA's requirement that they remain "necessary to correct a current and ongoing" constitutional violation, extend "no further than necessary to correct the violation," and are "narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

Indeed, the Consent Decree does not extend far enough to correct the current and ongoing constitutional violations.  Defendants' widespread contempt of the Consent Decree shows they are unwilling or incapable of fixing the constitutional violations at the Jail on their own.  A receiver therefore is appropriate and necessary.

Additionally, this Court should dismiss Defendants' misguided technical argument that the Consent Decree is subject to immediate termination under PLRA § 3626(b)(2).  This Court should also find that good cause exists to postpone for 60 days the PLRA's automatic stay provision, which otherwise would stay the Consent Decree on February 20, 2022, just after the mid-February evidentiary hearing.

## II.     BACKGROUND

In June 2014, the United States began investigating Defendants for an alleged "pattern or practice" of unconstitutional conditions of confinement at the Jail pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997.  Ltr. from USDOJ Initiating Investigation of Hinds Cty. Det. Ctr., June 2, 2014, ECF No. 3-1.  In May 2015, the United States notified Defendants that the investigation had found that Defendants were engaging in a pattern or practice of constitutional violations at the Jail.  Ltr. from USDOJ to Peggy Calhoun, President, Hinds Cty. Bd. of Supervisors, Re: Investigation of the Hinds Cty. Adult Det. Ctr., May 21, 2015, ECF No. 3-3.  The United States filed this lawsuit on June 23, 2016.  Compl., ECF No. 1.  That Complaint detailed Defendants' "pattern or practice" of Eighth and Fourteenth Amendment violations related to detainee-on-detainee violence, staff use of excessive force,

dangerously low staffing levels, jail policies and procedures, housing and classification systems, the physical plant, internal investigations, detention of persons who should have been released, and the treatment of juvenile and suicidal detainees.  Compl., ECF No. 1 at 3-5.

The same day as the Complaint, the Parties moved this Court to enter a negotiated Consent Decree to resolve the Complaint and achieve constitutional conditions at the Jail. Joint Mot., ECF No. 2; Joint Mem. in Support, ECF No. 3.  The proposed Consent Decree resulted from lengthy settlement negotiations that began in the fall of 2015.  Joint Mem. in Supp., ECF No. 3 at 3.

The Court approved and entered the Consent Decree as a court order with an "Effective Date" of July 19, 2016.  Order, ECF No. 8; Consent Decree, ECF No. 8-1 at ¶ 10.  At that time, Defendants expressly agreed that the entire Consent Decree that they negotiated complied with the PLRA and was "narrowly drawn, extends no further than necessary to correct the violations of federal rights," and "is the least intrusive means necessary to correct [the] violations."  ECF No. 8-1 at ¶¶ 166-67; *see also* Joint Mem. in Supp., ECF No. 3 at 5.

Pursuant to the Consent Decree, the Court appointed a Monitor to assess Defendants' compliance with the Decree's requirements.  Joint Mot. to Appoint Elizabeth Lisa Simpson as Monitor, Aug. 18, 2016, ECF No. 9; Order, Aug. 18, 2016, ECF No. 11.  The Monitor has provided Defendants with extensive recommendations and technical assistance on how to implement the Consent Decree through, among other things, fifteen reports detailing Defendants' non-compliance.  *See, e.g.*, Monitor's Fifteenth Report, (Nov. 24, 2021), ECF No. 101. Defendants, however, have repeatedly ignored or dismissed technical assistance recommendations made by the Monitor, consultants, and the United States.

Due to Defendants' failure to comply with the Consent Decree, the United States moved for contempt in June 2019.  U.S. Mot. For Order to Show Cause, ECF No. 30.  The Parties settled that motion through a Stipulated Order, which the Court entered on January 16, 2020. ECF Nos. 60 & 60-1.  In adopting it, the Court noted that "a finding of contempt is warranted." ECF No. 60 at 11.  Nevertheless, this "Court grudgingly approved [the Stipulated Order] even though the County had reached sustained compliance 'in only one of the 92 requirements of the Consent Decree.'"  Order to Show Cause, ECF No. 100 at 9 (citing ECF No. 60 at 7).

The Stipulated Order granted "more specific remedial relief" to supplement the Consent Decree.  ECF No. 60-1 at 1-2.  That Order provided more specific requirements and timeframes to assist Defendants in achieving compliance with Consent Decree requirements regarding the Jail's physical plant, staffing, policies and procedures, and population management.  *See generally* ECF No. 60-1.  The Stipulated Order provided a road map of more immediate, short-term remedies to help Defendants get on track with implementing the Consent Decree.

Like the Consent Decree, Defendants negotiated the Stipulated Order's provisions and stipulated that the remedial relief was "narrowly drawn, extends no further than necessary to correct ongoing violations of federal rights agreed by the parties with the entry of the Consent Decree, and is the least intrusive means necessary to correct these violations."  ECF No. 60-1 at 2; *see also* Joint Mem. in Supp. Entry of Stipulated Order, ECF No. 54 at 1-2.[2]

Despite the Stipulated Order, Defendants continued in their pattern or practice of constitutional violations, and continued their widespread non-compliance with the two remedial

---

[2] Defendants also stipulated "that the Court may rely upon the entire record in these proceedings, including, but not limited to, previously filed monitor reports, as well as exhibits already entered into the record as part of the United States' [Contempt] Motion."  Joint Mem., ECF No. 54 at 2.

orders.  Indeed, nearly two years after the Stipulated Order, the Monitor's fifteenth and most recent compliance report of November 24, 2021, concludes Defendants are in substantial compliance with only three of the Decree's 92 substantive provisions.  ECF No. 101 at 22-23.

After several deaths in the past year, status conferences, and a series of oral and written reports from the Monitor and the Parties, the Court entered a 28-page Order to Show Cause, (Nov. 23, 2021), ECF No. 100.  That Order directed Defendants to "show cause and explain why it should not be held in civil contempt and why a receivership should not be created to operate" the Jail.  ECF No. 100 at 28.  The Court scheduled a show cause hearing for January 24, 2022, but continued that hearing to February 14, 2022, because Defendants moved to continue the hearing and Defendants warned that they intended to file a PLRA termination motion.  *See* Jan. 18, 2022, Order, ECF No. 109; Defs. Emergency Mot., ECF No. 108.  Defendants filed their Motion to Terminate, or, Alternatively, Modify Consent Decree on January 21, 2022.  ECF No. 111; *see also* Defs. Mem in Supp., ECF No. 112.

## III.    LEGAL STANDARD

The PLRA provides that in "any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party . . . 2 years after the date the court granted or approved the prospective relief."  18 U.S.C. § 3626(b)(1)(i).  Upon that motion, the court should terminate the previously ordered prospective relief unless the court "makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  *Id.* § 3626(b)(3); *see also Ruiz v.*

*United States*, 243 F.3d 941, 950 (5th Cir. 2001) ("[U]nless a court makes specific written findings regarding the continuing necessity of prospective relief, it must terminate such relief.").

The proponent moving for termination must initially establish the requisite passage of time. *Guajardo v. Tex. Dep't of Crim. Justice*, 363 F.3d 392, 395 (5th Cir. 2004)). The burden of proof then shifts to party opposing termination "to demonstrate ongoing violations and that the relief is narrowly drawn." *Id.* (citing 18 U.S.C. § 3626(b)(3)). In conducting the PLRA's necessary-narrow-intrusive analysis, the "court should engage in specific, provision-by-provision examination of the consent decree, measuring each requirement against the statutory criteria." *Ruiz v. United States*, 243 F.3d 941, 950 (5th Cir. 2001) (citation omitted). A "current and ongoing" violation is one that "exists at the time the district court conducts the § 3626(b)(3) inquiry." *Castillo v. Cameron Cty., Tex.*, 238 F.3d 339, 353 (5th Cir. 2001) (citations omitted). This "current and ongoing" inquiry, however, does not operate in a temporal vacuum. *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *8-9 (S.D. Miss. June 10, 2015). Past violations can provide an "appropriate factual foundation" and "reference point" to help establish "current and ongoing" constitutional violations. *Id.*

## IV. ARGUMENT

### A. The Consent Decree Complies with the PLRA Because the Decree Remains Necessary to Correct Defendants' Current and Ongoing Constitutional Violations.

As explained below, the Consent Decree's provisions comply with the PLRA because they remain necessary to remedy the unconstitutional substantial risk of serious harm at the Jail. Defendants are deliberately indifferent to that substantial risk of serious harm.

7

### (1) Constitutional Legal Standard

The Eighth Amendment bans "cruel and unusual" conditions of confinement that subject prisoners to an excessive risk of violence, illness, or injury. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). Jail detainees are entitled to even greater constitutional protection than convicted prisoners; "[f]or under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Thus, conditions imposed with intent to punish, or that are excessive or not reasonably related to a "legitimate governmental interest," will violate detainees' due process rights. *Bell*, 441 U.S. at 538-40. Because pretrial detainees' rights under the Fourteenth Amendments are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc) (citation omitted), Defendants must comply with the Eighth Amendment, at the very least. The Constitution requires Defendants to "provide humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (citation omitted).

Two elements establish an Eighth Amendment violation. Namely, Defendants violate the Constitution when (1) jail conditions subject prisoners to a "substantial risk of serious harm," and (2) Defendants are deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). As to the first element, the court determines whether objectively serious conditions pose a substantial risk of serious harm. *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The Fifth Circuit's test requires "extreme deprivation" of the "minimal civilized measure of life's necessities." *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998). The court measures "extreme deprivation" against "the evolving standards of decency that mark the progress of a maturing society." *See Trop v.*

*Dulles,* 356 U.S. 86, 101 (1958); *see also Wilson v. Lynaugh*, 878 F.2d 846, 848 (5th Cir. 1989).

In the Fifth Circuit, courts should consider the "totality of conditions" in making this

determination. *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (citing *Ruiz v.

Estelle*, 679 F.2d 1115 (5th Cir. 1982)).

Under the second element, jail officials must also act with "deliberate indifference"

toward those conditions. *Farmer*, 511 U.S. at 834. Deliberate indifference requires a showing

that jail officials: (1) are actually aware of "an excessive risk to inmate health or safety" or

should have noticed a risk that was obvious, *Farmer*, 511 U.S. at 837; *see also Blackmon v.

Garza*, 484 F. App'x 866, 873 (5th Cir. 2012); and (2) disregard that risk, *Farmer*, 511 U.S. at

837; *accord Williams v. Hampton*, 797 F.3d 276, 280-82 (5th Cir. 2015) (en banc). Conditions

may result in a constitutional violation "'in combination' when each would not do so alone"

where they have a "mutually enforcing effect" that results in the deprivation of a basic human

need. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (quoting *Wilson*, 501 U.S. at 304).

### (2) The Consent Decree is Still Necessary to Remedy the Unconstitutional Current and Ongoing Substantial Risk of Serious Harm at the Jail

Twice, Defendants have stipulated that the Court's orders meet the requirements of the

Prison Litigation Reform Act, ECF No. 2, 2-1, 2-3; ECF 53, 54, and the orders still do. Key

substantive provisions of the Decree tie the requirements to constitutional compliance. *See, e.g.*,

ECF No. 8-1 Part IV.A ("Consistent with constitutional standards, Defendants must take

reasonable measures [to implement provisions]"). On their face, remedies spell out minimum

requirements for any detention facility, such as having written policies, adequate numbers of

trained staff to supervise prisoners and implement policies, medical and mental health care, and

safe and sanitary physical conditions. *See Farmer v. Brennan*, 511 U.S. 825, 832-34 (1994); *Bell

v. Wolfish*, 441 U.S. 520, 545-46 (1979); *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). As

discussed in more detail below, ongoing violations of federal law clearly support the need to

retain the court-ordered relief agreed to by the Parties.[3]

### a. *Protection from Harm*

The Consent Decree's protection from harm section requires that Defendants "must take

reasonable measures to provide prisoners with safety, protect prisoners from violence committed

by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff."  ECF No.

8-1 Part IV.A.  That section also includes requirements for minimum jail administrator and staff

qualifications, a staffing study to determine required staffing levels, improvements to address

hiring and retention problems, improved training, the development and implementation of

written policies for safe jail operations, physical plant and safety equipment improvements, and

several outcome measures.  ECF No. 8-1 Parts IV.A, VI.  The Stipulated Order reinforced those

remedies by requiring a timetable for specific improvements to physical plant, staffing, and

policies.  Stipulated Order Parts I-III.  Defendants' failure to implement these remedies cause a

continued, current and ongoing substantial risk of harm.

These protection from harm provisions implement the constitutional mandate that

Defendants not subject detainees to a "substantial risk of serious harm." *Farmer v. Brennan*, 511

U.S. 825, 834 (1994).  "[A]ll jailers owe a constitutionally rooted duty to their prisoners to

provide them reasonable protection from injury at the hands of their fellow prisoners." *Stokes v.

Delcambre*, 710 F.2d 1120, 1124 (5th Cir. 1983) (reiterating court's prior holding that "failure to

---

[3]  Defendants make no assertion that they meet the Consent Decree's stipulated standard for termination, which requires Defendants "to demonstrate that" Defendants "substantially implemented each provision of the" Consent Decree, "and that such compliance was maintained continuously for the two years prior to filing of the motion" to terminate.  ECF No 8-1 at ¶ 165.

control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment"); *accord Longoria v. Tex.*, 473 F.3d 586, 592 (5th Cir. 2006).

Defendants' failure to implement the remedial orders' protection from harm provisions has caused, or contributed to, widespread, ongoing violence, deaths, assaults, suicides, and other serious harm—and overall a current and ongoing unconstitutional "substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The Monitor's most recent reports in October 2021 and November 2021 describe the unconstitutional harm caused by Defendants' failure to implement the Court's orders. *See* Monitor's Interim Report, (Oct. 28, 2021), ECF No. 96 at 2-5; Monitor's Fifteenth Report, (Nov. 24, 2021), ECF No. 101 at 4.

Most troubling are the six deaths that have occurred in the last year, and the related failures to comply with the Consent Decree. The March 19, 2021, suspected drug overdose death in the booking area revealed failures in emergency response training, electrical equipment, the use of booking cells, as well as incident reporting. Monitor's Interim Report, ECF No. 96 at 2. The April 18, 2021, suicide revealed failures with staffing and supervision, emergency response training, the use of booking cells, electrical equipment, mental health services, and coordination between security and mental health staff. *Id.*; Monitor's 14th Report, ECF No. 94 at 44. The July 6, 2021, suicide revealed problems with staffing and supervision, and supervision of staff. ECF No. 96 at 3. A preliminary review of the August 3, 2021, drug overdose death revealed problems with supervision and contraband. *Id.* An October 18, 2021, detainee's death by assault by other detainees indicated problems with staffing and supervision, emergency response training, and cameras. *Id.* These, and an August 4, 2021, COVID death, also revealed problems with how jail managers and staff review, investigate, report and respond after serious incidents. *Id.* at 2-4; *cf.* Consent Decree, ECF No. 8-1, Part IV.F, H. Instead of

implementing the ordered remedies, Defendants have instead delayed, ignored recommendations, and resisted required changes.

Protecting detainees from violence requires the Jail to provide adequate supervision and staffing. *Alberti v. Klevenhagen*, 790 F.2d 1220, 1225-27 (5th Cir. 1986) (upholding district court's order requiring specific staffing and hourly visual inspections by guards to address high violence and sexual assault at jails); *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977) (upholding requirement for hourly guard visits, and disapproving not having a guard on each floor); *Depriest*, 2015 WL 3795020 at *15 ("Obviously, prison officials cannot perform their 'constitutional duty to protect inmates from violence at the hands of other prisoners' if they are inadequately trained or if their numbers are too scarce to properly supervise." (citation omitted)). !

When staff are not at their posts, conducting rounds, or supervising their charges, the Jail's detainees and gangs run housing units. This lack of staff causes assaults and other harm. For instance, a detainee in C-pod was stabbed 17 times in July 2021; he reported that at the time, no officer was present on the unit. Monitor's 15th Report, ECF No. 101, at 31. An incident report reflects that several detainees on A-pod called an officer to say that two other detainees had to be moved from the cell, then beat one of the detainees. ECF No. 101 at 35. Without staffing and supervision, serious assaults, escapes, deaths, and a substantial risk of serious harm persist. *E.g.*, Monitor's 15th Report, ECF No. 101 at 27-29 (outlining recent serious harm from insufficient staffing and supervision).

For assaults overall, the most recent Monitor's Fifteenth Report finds that detainee-on-detainee "assaults continue at a high rate." Monitor's 15th Report, ECF No. 101 at 46; *see also id.* at 27 (finding "assaults and conflicts between inmates are all too common"). The Report indicates that many assaults, including one involving a broken jaw, appear to go unreported.

"Even so, in July 13 assaults were reported at RDC; in September 12 assaults, and October through the 26th, 10 were reported."  Monitor's 15th Report, ECF No. 101 at 46.

"In addition to assaults occurring in the absence of supervision," the Fifteenth Report relays numerous safety and physical plant hazards related to inadequate supervision.  For instance, "numerous incident reports disclose fires being set."  ECF No. 101 at 31.  In one incident, when a fire started in a booking cell, the officer sprayed the fire extinguisher through the cell's flap without first removing the detainee.  ECF No. Doc. 101 at 55.  In another, a suicidal detainee was locked in his cell in the suicide observation unit and started a fire with exposed wires.  ECF No. 101 at 43.  The Fifteenth Report also finds persistent problems with electrical systems and doors that do not lock in one of the housing pods.  ECF No. 101 at 54-55; *cf. Depriest*, 2015 WL 3795020 at *14 ("It is impossible for Defendant to provide protection from harm in a facility where inmates are aware that they can freely escape their cells.").

The Fifteenth Report also shows dangerous contraband still flows through the Jail.  *See* ECF No. 101 at 39 (noting a recent significant increase in serious emergencies related to the use of contraband drugs), 55-56 (noting a unit with known contraband issues had no shakedowns from April to September 2021, and cataloging items found in mass shakedown in October:  22 cell phones, 30 phone chargers, $21, several shanks, and loose pills).  Importantly, the Monitor downgraded the Jail's contraband compliance rating because "conditions have reverted to their previous standard."  ECF No. 101 at 55.

The above current actual harms and substantial risk of serious harm will not only continue, but undoubtedly increase, without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  Consent Decree, ECF No. 8-1 at ¶¶ 166-67.  This Court accordingly should find that that these

provisions comply with the PLRA and its necessary-narrow-intrusive requirements, namely that the provisions remain "necessary to correct a current and ongoing violation," extend "no further than necessary to correct the violation," and are "narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

### b.   Use of Force

The Consent Decree requires clear written standards and policies for use of force, use of force training, supervisor reviews, and reporting mechanisms.  Consent Decree, ECF No. 8-1, Part IV.B-F, M.  These remedies were designed to address an overall Jail culture that routinely allowed staff to use force improperly, without any accountability.  Defendants' failure to implement these use of force remedies causes a continued, current and ongoing substantial risk of harm from excessive force.  *See Hudson v. McMillian*, 503 U.S. 1, 4-7 (1992) (finding Eighth Amendment prohibits force subjectively applied to cause harm, and serious injury is not necessarily required); *Farmer,* 511 U.S. at 832-34 (finding Eighth Amendment prohibits substantial risk of serious harm and excessive physical force against prisoners); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (finding Fourteenth Amendment standard for excessive force against pretrial detainees requires only proof of objective unreasonableness).

With assistance from the Monitor and a process she facilitates, Defendants did finally draft and approve written policies on the use of force.  But this does little to prevent excessive force because Defendants have not implemented the policy.  *See* Monitor's 15th Report, ECF No. 101 at 57-65.  Staff are not following policies, and when supervisors review the uses of force, they are not documenting their findings and recommendations.  Other safeguards, like requiring video or camera photos, procedures for using force on persons with serious medical or

mental health conditions, post-incident review of medical records, collection of witness statements and other data, are not being implemented.  *Id*.

Meanwhile, the Monitor documents recent continued concerns about the Jail's use of force.  Monitor's 15th Report, ECF No. 101 at 57.  The latest Monitor's report identified multiple examples of staff using force in violation of the unimplemented policy.  These violations include a Sheriff's Department investigator using a taser on a prone detainee,[4] and staff failing to properly identify a use of force incident after a sergeant used OC spray coercively on a detainee in violation of Jail policies.  These examples illustrate broader patterns.  The facility's ability to identify and investigate uses of force remains suspect, because staff are not reporting uses of force.  For instance, in July 2021, incident reports indicated that staff used OC spray at least six times, but the Jail's electronic tracking and quality assurance system did not have the incidents marked as uses of force.  Monitor's 15th Report, ECF No. 101 at 61-63, 124; *cf.* Consent Decree, ECF No. 8-1 Part IV.M.

The above uses of force and substantial risk of excessive force will continue without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  Consent Decree, ECF No. 8-1 at ¶¶ 166-67.  This Court accordingly should find that that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

---

[4]  Based on information from the January 24, 2022, site visit, the United States understands that the Sheriff unilaterally equipped select deputies in the Jail with tasers, despite the Jail lacking any approved policy or training for the use of tasers in the Jail.  This is not only a violation of Decree requirements regarding policy development and implementation; the lack of guidance to staff also causes substantial risk of serious harm to detainees in the Jail.

### c.   *Reporting, Investigating, and Responding to Unconstitutional Conditions, Including Sexual Misconduct*

The Consent Decree has several administrative provisions that allow detainees and others to report unconstitutional conditions and other serious violations of detainees' rights.   ECF No. 8-1, Part IV.C-I, IV.M, VIII.   Addressed in several parts of the Decree, these provisions establish certain record-keeping and investigation requirements that are critical to detecting and correcting the unconstitutional, substantial risk of serious harm from assaults, excessive force, and other harms.  For instance, staff must fill out incident and use of force reports completely and accurately, supervisors must document that they are substantively reviewing reports, and supervisors must take corrective action when notified of serious misconduct or dangerous conditions.  The sections above addressed in more detail why such remedies are necessary to curb the lack of protection from harm and the use of excessive force.

Defendants' failure to comply with the Consent Decree's sexual misconduct section, ECF No. 8-1 Part. IV.G, also illustrates why such administrative remedies remain necessary, narrowly tailored, and the least intrusive means to address current and ongoing violations.  18 U.S.C. § 3626(b)(3).  The sexual misconduct section requires Defendants to "develop and implement policies and procedures to address sexual abuse and misconduct" and includes specific provisions such as a "zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act," (PREA), 18 U.S.C. § 15601, regular supervisory review of policy compliance, line staff training, and "[s]pecialized investigative procedures and training for investigators handling" sexual misconduct allegations.  ECF No. 8-1 Part. IV.G.

During the most recent monitoring period, the Monitor downgraded Defendants to non-compliance with the Decree's sexual misconduct provision.  Monitor's 15th Report, ECF No. 101 at 71-73.  At least three inmates were sent to the hospital for "PREA evaluation," (i.e., a

sexual abuse allegation requiring medical evaluation under PREA), and at least one complaint

was documented in quality assurance reports as a PREA complaint.  None of these incidents was

properly investigated while the Jail's PREA coordinator was on leave for several months.  Even

with an onsite PREA Coordinator, her authority is limited by lack of access to internal affairs

department investigations.  ECF No. 101 at 72-73.  The PREA Coordinator cannot even refer an

incident for investigation without the Sheriff or Undersheriff's approval, contrary to the

approved, written Jail policy.  *Id.*  Defendants also have not been training new cadets or

providing in-service training for current officers on PREA.  Monitor's 15th Report, ECF No. 101

at 3, 71.  This is all on top of Defendants' physical plant dangers where large areas of the Jail are

not under camera observation, which increases the risk of sexual abuse without detection.  *See,*

*e.g.*, Monitor's 15th Report, ECF No. 101 at 72 (noting 56 inoperative cameras at RDC).

      Defendants' failure to develop and implement effective reporting and investigation

mechanisms extends well beyond sexual misconduct.  The various administrative systems

overlap, and as discussed above, even the basic incident reporting process has been poorly

implemented.  For instance, a detainee was taken to the hospital to see if his jaw was broken; the

Jail's medical report identified an assault as the cause of the injury, but there was no incident

report on the assault.  ECF No. 101 at 46; *see also id.* at 67 (similar questions identified for

detainee with broken wrist).  The use of force reports suffer similar deficiencies.  The Monitor

recently found that "the poor and inaccurate reporting that is reviewed and approved by

supervisors, with no corrective action, contributes to the risk of future deaths."  Monitor's

Interim Report, ECF No. 96 at 4.

      Likewise, the grievance system also has serious deficiencies.  The Consent Decree

requires a functioning grievance and prisoner information system because "a reporting system

provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur." ECF No. 8-1 Part. IV.I. While there has been some progress with the grievance process, lack of staffing and implementation of policies means that current deficiencies remain with detainees' access to written forms, electronic kiosks, or other mechanisms for submitting grievances. This is particularly a problem for limited-English speaking detainees or those with disabilities. These and other problems with the grievance system have resulted in confusion and delays. For instance, detainee grievances about being detained past their sentence (over-detention), not getting medications, or disappearing funds, have been denied as non-grievable even though they are actually appropriately filed grievances. Monitor's 15th Report, ECF No. 101 at 76-80.

The above current failures in reporting, investigating and responding to unconstitutional conditions will continue, and increase, without the Consent Decree. These provisions are critical to detecting and correcting the unconstitutional "substantial risk of serious harm" from detainee assaults, sexual abuse, excessive force, and other more primary harms. *See Farmer*, 511 U.S. at 834. Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA. ECF No. 8-1 at ¶¶ 166-67. This Court accordingly should find that that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements. 18 U.S.C. § 3626(b)(3).

### d.   Restrictions on Segregation; Provision of Adequate Health Care

The Consent Decree has provisions regarding the use of segregation, which includes the Booking and certain holding cells, "to ensure compliance with constitutional standards and to prevent unnecessary harm to" detainees. ECF No. 8-1 Part IV.J. These segregation provisions complement other remedies regarding assessing new detainees, providing supervision for

detainees with mental health issues or other special needs, and general medical and mental health care.  ECF No. 8-1 Part IV.A, IV.B, IV.J.  These provisions implement the Eighth Amendment's requirement that jails provide medical and mental healthcare sufficient to meet detainees' serious medical and mental health needs.  *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).  The provisions also are to prevent a "substantial risk of serious harm," which includes harm from segregation.  *Farmer*, 511 U.S. at 834; *Gates v. Collier*, 501 F.2d 1291, 1304-05 (5th Cir. 1974) (finding segregation conditions and/or length of time can violate Eighth Amendment).

As discussed above, Defendants' failure to comply with the remedial orders has resulted in recent suicides and continues to put detainees, including those with serious mental health diagnoses, at substantial serious risk of serious harm.  *Farmer*, 511 U.S. at 832-34.  Defendants continue to place detainees with serious mental health and other conditions in segregation cells that are unsafe and poorly supervised.  When detainees deteriorate, security staff are not regularly identifying this serious change or notifying medical and mental health staff.  ECF No. 101 at 88-89.  Although Defendants have implemented a weekly interdisciplinary team meeting to review detainees held in segregation, this review does not result in more appropriate housing since none exists due to the lack of a mental health unit, ECF No. 94 at 84-85, 89-90, which continues to be on hold due to understaffing.  And there is still an insufficient day-to-day coordination between mental health and security, and inadequate training for both, to adequately manage detainees with serious mental illness—a gap the Monitor identified as a contributing factor in the April 2021 suicide.  ECF No. 94 at 44.

Moreover, Detainees who have serious mental health and medical conditions can languish in the Jail for years, because of problems with accessing hospital, community, and state mental health services.  Monitor's 15th Report, ECF No. 101 at 81-82.  Defendants have delayed

other necessary remedies, such as making sure Jail records on who needs a state hospital bed are accurate, and improving discharge procedures for persons with serious mental health issues. ECF No. 101 at 7, 83-90, 110, 118-19.

Defendants also fail to provide enough security staffing to ensure medical and mental health staff can do their jobs safely; as a result, detainees miss medication, medical and mental health appointments, and therapy sessions. *See, e.g.*, ECF No. 101 at 32-33 (log kept by health services administrator for 50 days quantified the impact of inadequate security staffing). Without progress in these critical areas, Defendants are unable to provide housing, staffing, and programs for detainees with serious mental health needs. Their continued use of booking, failure to supervise segregation cells, and failure to provide sufficient mental health care harms detainees and puts detainees at substantial risk of serious harm.

The above recent suicides, seriously deficient medical and mental health care, dangerous segregation, and other substantial risks of serious harms will not only continue, but actually increase, without the Consent Decree. Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA. ECF No. 8-1 at ¶¶ 166-67. This Court accordingly should find that that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements. 18 U.S.C. § 3626(b)(3).

### e. *Juveniles Charged as Adults*

The Consent Decree expressly requires Defendants to house the youth in a facility where they could be safely housed, supervised, managed, and provided juvenile programs. *See* ECF No. 8-1 Part IV.K. The remedy let Defendants find and choose an appropriate alternative placement, and they chose to move the youth to the Henley-Young Juvenile Justice Center, which at the time primarily operated as a short-term placement for non-adjudicated youth. The

Monitor's most recent report treated Defendants' decision to move the youth to Henley-Young as substantial compliance with one of the provisions of the Decree.  Monitor's 15th Report, ECF No. 101 at 80.  However, the Monitor also qualified the finding in her report, noting that "there remains a lack of clarity of any intermediate or long-term plan related to housing [Juveniles Charged as Adults]."  *Id.* at 91.  The Monitor then proceeded to identify numerous problems at Henley-Young.  Viewed in this context, Defendants are not complying with federal law designed to protect these youth, and the need for judicial relief remains.

Defendants have never met the Consent Decree requirements for the supervision and care of youth at the new youth facility.  Monitor's 15th Report, ECF No. 101 at 96-138.  Henley-Young does not have the staffing, supervision, or programs required to manage the youth charged as adults.  To address these ongoing deficiencies and Defendants' inability to come into compliance with the Consent Decree, the Parties negotiated a number of short-term, specific remedies in the Stipulated Order designed to expedite compliance with the Consent Decree.  Stipulated Order, ECF No. 60-1 Part V.  Defendants have not timely complied with those Stipulated Order requirements either.  *See* Monitor's 15th Report, ECF No. 101 at 11-12.

Defendants' failure to comply with the requirements in the Consent Decree and Stipulated Order as to the supervision, care, and treatment of youth place youth charged as adults at ongoing substantial risk of serious harm.  The risk of harm to youth in Defendants' custody is all the more serious because juveniles, by virtue of their physical and mental development, are entitled to less severe treatment than adults in the correctional system.  *See Miller v. Alabama*, 567 U.S. 460, 471-72 (2012) (discussing social science research and lesser culpability of youthful defendants in the context of criminal sentencing); *Roper v. Simmons*, 543 U.S. 551 (2005) (discussing differences between adults and juveniles as basis for prohibiting imposition of

21

the death penalty on children).  Children in correctional settings therefore are entitled to adequate

programs, protection, and educational services while awaiting trial.  *See, e.g.*, *Youngberg v.*

*Romeo*, 457 U.S. 307 (1982) (right to rehabilitation for institutionalized persons protected by the

Fourteenth Amendment); *Morgan v. Sproat*, 432 F. Supp. 1130, 1134-37 (S.D. Miss. 1977)

(juveniles have right to individualized treatment); Individuals with Disabilities in Education Act,

20 U.S.C. § 1401 (requiring individualized programs and services for children with disabilities

including those housed in public institutions).

　　　　As in the adult Jail facilities, one of the most notable problems at Henley-Young has been

Defendants' failure to provide adequate staffing and supervision, which in turn affects the ability

to provide mental health, behavioral, educational, and other services to which youth are entitled

under federal law.  *See* ECF No. 101 at 95 (noting that underfunding at Henley-Young, including

low youth care professional salaries and resulting vacancies and turnover, "severely hinders" the

ability to provide "adequate supervision and programming," and likewise "increase[s] the

potential for problems to occur").  Due to the high vacancy and turnover rates among Henley-

Young staff, Defendants have failed to train staff on the duties and requirements of the job,

including regarding safety, supervision, and reporting obligations.  ECF No. 101 at 102-03

("Having new staff with limited training covering a lot of the shifts/units is a recipe for

problems.").  In October 2021, Defendants had a vacancy in 18 of 42 youth care professional

positions.  A 42% vacancy rate was challenging enough.  But Defendants had actually slashed

the number of budgeted positions earlier by seven positions.  So, compared to earlier stages of

this case, the vacancy rate rose to 60%.  ECF No. 101 at 90-96, 100-09.  Leadership turnover,

delays in hiring clinical staff, and a lack of long-term planning have also slowed reforms.

Youth housed at Henley-Young continue to suffer harm as a result of inadequate mental health and behavioral programming. About 75% of youth are on psychotropic medications. ECF No. 101 at 97. While steps have been taken to provide behavioral and mental health services, they are at an early stage, and there is still insufficient mental health treatment and programming, and inadequate leadership. *Compare* Stipulated Order Part V *with* Monitor's 15th Report, ECF No. 101 at 58 (treatment director hired in August 2021, but psychologist position remains vacant); ECF No. 101 at 98 ("[T]here is not an overarching program framework into which [mental health and behavioral] groups 'fit'. . . ."). Compounding these deficiencies, youth at Henley-Young also continue to be placed in segregation for 24 hours at a time, and the required safety checks of youth during these confinements are not properly documented. ECF No. 101 at 104-05.

Nor do youth housed at Henley-Young receive adequate education. Largely due to supervision challenges caused by staff shortages, Henley-Young continues to provide school on an "'alternate day' school program for JCA youth in which one unit of JCAs receive classroom instruction on one day while youth in the other unit work on the unit with 'homework' and other written materials," supervised by line staff with no teacher instruction during those periods. ECF No. 101 at 100. All youth at Henley-Young, including those with special education needs, attend school on the "alternate day" schedule. *Id.* By contrast, only a program in which "all youth receive the required 27.5 hours/weekly of direct instruction **every** day" is adequate. *Id.*

Staffing and leadership inadequacies likewise place youth at ongoing risk of serious harm, including from suicide attempts and other self-harm, fights, and sexual abuse. *See, e.g.*, Monitor's Thirteenth Report, ECF No. 83, at 5-6 (attributing a "notable increase in the number of more serious incidents involving JCAs, including fights, significant disruptions, suicide attempts,

and possession of contraband items" to, in part, "the large number of vacancies in the Youth Care Professional (YCP) ranks which severely limits the ability of the program to move forward in meeting a number of requirements of the agreement. . . ."). Recently, a teacher was arrested after allegedly passing contraband and improperly touching a youth. ECF No. 101 at 99. The supervision, program, and safety situation has raised concerns with the youth court judge overseeing the facility, who has indicated that Defendants may be inappropriately housing youth charged as adults with those under juvenile court jurisdiction. ECF No. 101 at 91, 95.

The above current and ongoing failures in supervision, treatment, care, and education for youthful detainees will continue, and increase, without the Consent Decree. These provisions are critical to protecting youthful detainees from unconstitutional substantial risk of serious harm from physical violence, inadequate mental health care and other programming, and inhumane conditions of confinement. Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA. ECF No. 8-1 at ¶¶ 166-67. This Court accordingly should find that that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements. 18 U.S.C. § 3626(b)(3).

### f.   Lawful Basis for Detention

The Consent Decree contains safeguards designed to make sure that that the Jail has a lawful basis for detaining its incarcerated people. These provisions implement the Fourteenth Amendment's prohibition on deprivations of "liberty . . . without due process of law." U.S. Const. amend. XIV; *see also Jauch v. Choctaw Cty.*, 874 F.3d 425, 430 (5th Cir. 2017) ("The touchstone of due process is protection of the individual against arbitrary action of government." (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974))); *Traweek v. Gusman*, 414 F. Supp. 3d

847, 862–63 (E.D. La. 2019) ("There is no dispute that an incarcerated person's right to timely release from custody is clearly established [law].").

This Consent Decree section includes improvements to records and tracking systems to make sure the Jail knows when detainees are supposed to be released (or not released), verification of court orders to ensure that sentencing records are consistent across agencies and supported by law, tracking procedures for inmates who are involved with the criminal forensic process, and remedies to give attorneys more timely access to their clients.  ECF No. 8-1 Part IV.L.  While there have been some improvements to records, booking procedures, and video visitation, Defendants have failed to implement required critical remedies to protect against violating detainees' due process rights; the Monitor's latest report found Defendants had not substantially complied with any of the section's remedial provisions.  *See* ECF No. 101 at 109-24.  Defendants still have not implemented a process where acquitted detainees can be released directly from court rather than returning to the Jail in handcuffs, ECF No. 101 at 117, still do not "have an adopted policy on Releasing," *id.* at 118, and still do not investigate incidents of untimely or erroneous prisoner releases, *id.* at 123.  Most troubling, the latest Monitoring report notes discovering "at least two untimely releases," and continued confusion about mental health transfers.  ECF No. 101 at 123, 115-16.

These unlawful detentions, and substantial risk of unlawful detentions, will continue and increase without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  ECF No. 8-1 at ¶¶ 166-67.  This Court accordingly should find that that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### g.   *Criminal Justice Coordinating Committee*

Broader criminal justice system issues have long impacted conditions in the Jail, ranging from the misplacement of persons with serious mental illness to population management and access to the courts.  To address their effect on conditions at the Jail, the Consent Decree requires the creation of a Criminal Justice Coordinating Committee (CJCC) to "assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration," with a focus on "diversion of individuals with serious mental illness and juveniles."  ECF No. 8-1 Part IV.N; *see also* Stipulated Order Part IV.  The Court's orders, however, gave Defendants primary responsibility for addressing these types of issues and did not specify exactly how they should address these issues, so long as they set up the mechanisms needed for long-term Jail management.  The Decree does contain some specific requirements, such as implementing a CJCC with subject matter expertise and other representatives, ECF No. 8-1 at ¶¶ 115-16, coordinating with local behavioral health systems, *id.* at ¶ 117, and engaging an outside consultant to provide technical assistance, *id.* at ¶ 118.

But as with other Consent Decree areas, Defendants again did not implement the required remedies.  ECF No. 101 at 7, 131-34.  The Criminal Justice Coordinating Committee membership lacks the required expertise and regardless has not been meeting regularly.  Defendants have put no recent efforts into coordinating with local behavioral health systems, and have no current engagement with an outside technical assistance consultant.  Overall, the Monitor's latest report found that the "requirement that the Committee identify opportunities for diversion and recommend measures to accomplish has not been achieved."  ECF No. 101 at 132.

Failure to implement the CJCC compounds and facilitates the other constitutional violations and resulting harm noted above.  Current conditions demonstrate that merely requiring

improvements to staffing, physical plant, and medical and mental health services is inadequate to achieve constitutional compliance.  Recognizing the complexity of the problems with Jail conditions, the parties agreed to a mechanism for resolving broader criminal justice issues impacting the Jail, consistent with the PLRA's mandate that jail reforms address local public safety needs.  The CJCC is a forum for assessment and long-term planning to address issues such as systems for persons with mental health issues and identification of who should be incarcerated before trial.  Defendants negotiated the CJCC remedies and stipulated pursuant to the PLRA that these mechanisms were necessary to correct violations of detainees' federal rights.  This Court accordingly should find that the CJCC provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### h.    *Continuous Improvement, Quality Assurance, and Monitoring*

The Consent Decree has several provisions that support the substantive provisions.  They require self-assessment, reporting, policies and procedure reviews, and a monitoring process.  ECF No. 8-1, Part IV.M, V-XI.  For instance, the Consent Decree requires Defendants to track the various Consent Decree requirements, determine who is responsible for those provisions, and provide reports and other information to the Monitors.  ECF No. 8-1, Part VIII.  Notably, Defendants have neither implemented this provision, nor been able to timely implement substantive requirements.  ECF No. 101 at 137; *cf. Depriest*, 2015 WL 3795020 at *11 ("Misleading or missing status reports prevent the monitors from efficiently performing their tasks because it limits their knowledge of the real problems that may persist at the prison.  This is a dangerous practice that creates a substantial risk of harm to inmates by perpetuating an indifference to conditions as they may really exists." (citation omitted)).

As explained above, the Consent Decree's substantive requirements remain necessary to correct current and ongoing constitutional violations, comply with the PLRA's necessary-narrow-intrusive requirements, 18 U.S.C. § 3626(b)(3), and this Court should accordingly retain them.  Because the Court should retain the related substantive provisions, these supporting continuous improvement, quality assurance, and monitoring provisions also remain necessary and comply with the PLRA.  *Depriest*, 2015 WL 3795020 at *16 (finding monitor complied with PLRA because "the decree has not been terminated, [therefore] the requirement remains relevant and is not unnecessarily intrusive").

In sum, for the reasons above, this Court should find that the Consent Decree's provisions remain "necessary to correct a current and ongoing violation," extend "no further than necessary to correct the violation," and are "narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

### (3) <u>Defendants are Deliberately Indifferent to the Substantial Risk of Serious Harm at the Jail</u>

The ongoing incidents of serious harm, as well as the repeated notice from the United States, the Monitor, Defendants' own staff, and this Court, establish Defendants' knowledge of and deliberate indifference to the grave risk of serious harm at the Jail.  Above the United States has highlighted actual harm to detainees resulting from Defendants' subjecting detainees to substantial risk of serious harm—including the six deaths that have occurred on Defendants' watch in the last year.  Beyond this actual harm showing the obvious grave risk of serious harm at the Jail, the United States and the Monitor have provided Defendants extensive, constant notice of the dire conditions, actual harm, and grave risk of harm at the Jail needed to establish their deliberate indifference.  *See Depriest*, 2015 WL 3795020 at *12 ("Defendant's knowledge of circumstances posing a substantial risk of serious harm was informed by past events.").

Defendants have known about the serious harm and risk of harm at the Jail since at least May 21, 2015, when the United States sent them the findings of its CRIPA investigation. Findings Letter, ECF No. 3-3. That 29-page findings letter detailed the same constitutional violations that currently plague the Jail and relayed the minimum remedial measures necessary to correct those violations. *Id.*

Since the Court entered the Consent Decree, the Monitor has provided 15 comprehensive reports that detail Defendants' failure to comply with the remedial measures of the Consent Decree, and the resulting ongoing risk of serious harm at the Jail. *E.g.*, ECF No. 101. Despite this continuous notice, Defendants failed to take corrective action. The Monitor's fifteenth and most recent compliance report of November 24, 2021, found that Defendants are in substantial compliance with only three of the Consent Decree's 92 substantive provisions.[5] ECF No. 101 at 22-23; *see also* Consent Decree, ECF No. 8-1 at ¶ 150 ("Findings in the Monitor's Reports will be considered persuasive, but rebuttable, in Court."). Approximately a year earlier in December 2020, the Monitor's twelfth report found Defendants were in substantial compliance with just 7 provisions, ECF No. 77 at 24-25, as with the Monitor's ninth report in November 2019, ECF No. 46 at 9. These reports show Defendants' current and longstanding knowledge and deliberate indifference to the unconstitutional conditions at the Jail. *See Depriest*, 2015 WL 3795020 at

---

[5] Defendants' brief includes "partial compliance" to argue they have complied with nearly 70% of the Consent Decree's provisions. ECF No. 112 at 4. Partial compliance, however, means Defendants "achieved compliance with some of the components of the relevant provision of the [Consent Decree], *but significant work remains*." ECF No. 8-1 at ¶ 35 (emphasis added). Moreover, Defendants' partial compliance does not absolve or negate their deliberate indifference. *See Depriest*, 2015 WL 3795020 at *12 (finding "failure to *fully* comply with directives aimed at improving inmate safety implies indifference on the part of Defendant[s]" and dismissing contention "that some affirmative steps taken by them negate a finding of deliberate indifference") (emphasis added).

*12 (finding deliberate indifference when "monitors' reports informed [d]efendant about noncompliance areas and dangers the digressions present to inmates").

The United States also notified Defendants of serious harm and grave risk of harm through its motion for contempt in filed in June 2019.  ECF Nos. 30 & 31.  The Parties resolved that motion through a negotiated Stipulated Order.  As part of that stipulation, Defendants acknowledged (and this Court found) that Defendants "are not in compliance with all provisions of the" Consent Decree and that the Stipulated Order's "more specific remedial relief [was] necessary."  Stipulated Order, ECF No. 60-1 at 1.

This Court itself also provided notice in its order granting the motion to enter the Stipulated Order.  ECF No. 60.  This Court, among other things, found "violent" "[a]ssaults at the Jail remain commonplace," "with prisoners being sent to the emergency room for stab wounds, dislocations, broken bones, and collapsed lungs," as well as a "disturbing history of riots."  *Id.* at 2-3.  The Court found "[n]umerous incidents of excessive force by correctional officers."  *Id.* at 3.  Most importantly, the Court found an overall "continuing lack of safety" and pointed at Defendants' failure to implement the Consent Decree as the underlying cause.  *Id.* at 3, 4-20.  The Court summarized that Defendants have "subjected its prisoners, its corrections officers, and the broader community of Hinds County to danger from its repeated failure to take this Consent Decree seriously."  *Id.* at 20.

Given the ongoing actual incidents of serious harm, the constant notice of serious harm and substantial risk of serious harm from this Court, the United States, the Monitor, and Defendants' essentially complete failure to comply with the remedial Consent Decree, this Court should find that Defendants are deliberately indifferent to the substantial risk of serious harm to detainees at the Jail.  *See Farmer*, 511 U.S. at 834.

**B.   A Receiver is Necessary to Remedy Defendants' Current and Ongoing Constitutional Violations.**

Although the Consent Decree continues to be necessary and narrowly drawn to address ongoing constitutional violations, it is demonstrably inadequate to address the unacceptable levels of harm and risk of harm in the Jail.  As the United States will detail in its forthcoming proposed findings of fact and conclusions of law, a receiver is necessary to remedy Defendants' current and ongoing violations of detainees' constitutional rights and resulting grave harm. Defendants' widespread contempt of this Court's current remedial orders shows they are unwilling or incapable of fixing the constitutional violations at the Jail on their own.  A receiver therefore is appropriate and necessary.

**C.   The Consent Decree is Not Immediately Terminable.**

Defendants make a misguided technical argument that the Consent Decree is subject to immediate termination under § 3626(b)(2).  *See* Defs. Mem. in Supp., ECF No. 112 at 10-11. They contend that the Consent Decree does not contain written PLRA narrow-necessary-intrusive findings by the Court, only PLRA stipulations by the Parties.  *Cf.* Consent Decree, ECF No. 8-1 at ¶¶ 166-67.  Paragraph 166 stipulates that Consent Decree "complies in *all respects* with the requirements for prospective relief under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)."  ECF No. 8-1 at ¶¶ 166 (emphasis added).  Paragraph 167 separately stipulates that the Consent Decree satisfies the PLRA's narrow-necessary-intrusive requirement.  *Id.* at ¶ 167.  The Consent Decree, however, is a court order that adopted those PLRA stipulations as the Court's findings.  Since the PLRA does not apply to non-court-ordered settlements, the Parties' PLRA stipulations are superfluous and make no sense unless they contemplate that the Court is adopting them as findings when it enters the settlement as a consent decree.  Moreover, Paragraph 166's "all respects" language necessarily includes that, when adopted, the Consent

31

Decree complies with the § 3626(a)(1) requirement that the "court finds that" the Consent

Decree complies PLRA's narrow-necessary-intrusive requirement.  *See* 18 U.S.C. § 3626(a)(1).

This "all respects" Paragraph 166 stipulation covers more than the Parties' separate Paragraph

167 stipulation that the Decree meets the PLRA's narrow-necessary-intrusive requirement.

Regardless, this Court's analysis remains the same whether the remedial orders are

immediately terminable under § 3626(b)(2) or terminable after two years under § 3626(b)(1).

"[B]oth of these termination provisions are subject to the limitation of § 3626(b)(3)."  *Castillo v.*

*Cameron Cty., Tex.*, 238 F.3d 339, 351–52 (5th Cir. 2001); *accord Benjamin v. Jacobson*, 172

F.3d 144, 165-66 (2d Cir. 1999) (stating that the "written findings" requirement under §

3626(b)(3) renders the "immediate termination" provision under § 3626(b)(2) non-

instantaneous).  Thus, the relief continues if the Court makes written findings, as it should here,

that "current and ongoing violations" persist, and the relief still meets the narrow-necessary-

intrusive standard.  18 U.S.C. § 3626(b)(3).

**D.   Good Cause Exists to Postpone the PLRA's Automatic Stay.**

The PLRA provides that a termination motion shall trigger an automatic stay of the

challenged prospective relief beginning 30 days after the motion's filing date and continuing

until the Court decides the motion.  18 U.S.C. § 3626(e)(2).  The Court may postpone the start

date of the stay for an additional 60 days for "good cause." 18 U.S.C. § 3626(e)(3).  Defendants

filed their PLRA motion on January 21, 2022.  Thus, absent good cause, the automatic stay

would begin 30 days later on February 20, 2022.  This Court should find good cause exists here

because of:  (1) the evidence of a current constitutional violation and resulting harm; and/or

(2) the complexity of the issues that Defendants' termination motion involves.

The PLRA does not explain what constitutes good cause, other than stating that "congestion of the court's calendar" is not sufficient.  18 U.S.C. § 3626(e)(3).  The Supreme Court has characterized the PLRA's good cause standard as a "relatively generous" one.  *Miller v. French*, 530 U.S. 327, 340 (2000); *see also S.H. v. Reed*, 2:04-CV-1206, 2012 WL 13118333, *2 (S.D. Ohio 2012) (finding that "[w]hile Congress could have set forth [good cause criteria], it chose to give the court *broad discretion*, so long as 'good cause' is something more than a full court calendar.") (emphasis added).

**Current Violation.**  Given that an order granting postponement of the stay is not appealable, 18 U.S.C. § 3626(e)(4), relatively little case law exists.  The few district courts to address the issue have generally found "evidence of ongoing constitutional violations" constitutes good cause.  *Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 5735086, at *4–5 (M.D. Ala. Sept. 24, 2020) (collecting cases).  But the courts have differed on the showing necessary, requiring

> only "allegations" of constitutional deficiency, *see Skinner v. Uphoff*, 410 F. Supp. 2d 1104, 1112 (D. Wyo. 2006) (Brimmer, J.), "evidence arguably supporting" such allegations, *see Lancaster v. Tilton*, 2007 WL 4145963, at *1 (N.D. Cal. Nov. 19, 2007) (Alsup, J.), a "strong indication in the record that a constitutional violation persists," *Balla v. Idaho State Bd. of Corrs.*, 2019 WL 9831023, at *1 (D. Idaho Mar. 28, 2019) (Winmill, J.) (quoting 3 Michael B. Mushlin, Rights of Prisoners § 17:10 (5th ed. 2018)), or, most stringently, that the record already demonstrates "widespread constitutional violations," *see Merriweather v. Sherwood*, 235 F. Supp. 2d 339, 344 (S.D.N.Y. 2002) (McMahon, J.) [(dicta)].

*Braggs*, 2020 WL 5735086 at *4-5.  This Court should find that some evidence supporting a current violation constitutes good cause.  A higher standard, such as strong indication or "widespread constitutional violations," elevates "good cause" into a much higher standard that "resembles the preliminary injunction standard of likelihood of success on the merits."  *S.H. v. Reed*, No. 2:04-CV-1206, 2012 WL 13118333, at *2–3 (S.D. Ohio Dec. 28, 2012) (declining to

apply higher standard because it would conflict with the PLRA's plain language).  This higher standard also conflicts with the Supreme Court's characterization that the good cause standard is a "relatively generous" one.  *Miller*, 530 U.S. at 340.

Regardless, the United States meets even the higher standard here.  As detailed above, the Monitor's reports are sufficient record evidence of widespread constitutional violations.  *See supra* Part IV.A.  A stay of the Consent Decree will only add to the constitutional violations and resulting harm to detainees.  And Defendants will backslide even further without the Monitor's extensive and ongoing technical assistance, which a stay would suspend.[6]

**Complex Issues.**  This Court should also find that the complexity of the issues that the Parties must present evidence on and that the Court must rule on in writing constitute good cause to postpone the stay.  The *Braggs* court bypassed the current constitutional violations basis as unnecessary and found that the "complexity of the issues on which the parties must prepare to present evidence" independently was "good cause" to postpone the stay.  *Braggs*, 2020 WL 5735086 at *4.  That court found that:

> In light of the nigh-insurmountable difficulty that the 30-day default deadline places on parties preparing for such hearings when the remedial disputes are as expansive and nuanced as those presented here, Congress created the 60-day extension to allow the parties enough time to put together a fair and adequate case while still ensuring that the court rules promptly on termination motions.

*Id.* (citing *Plata v. Brown*, 754 F.3d 1070, 1082 (9th Cir. 2014) (Bybee, J., dissenting) ("Good cause presumably exists in unusually complex cases like this one.").

---

[6]  While the United States maintains the Monitor's reports provide more than sufficient evidence, if the Court wishes to consider evidence from the evidentiary hearing in deciding whether to postpone the stay, the Court could wait until the evidentiary hearing concludes and decide then whether the evidence justifies postponing the stay before it begins on February 20, 2022.

Here, the current Motion to terminate the 61-page Consent Decree in this "pattern or practice" CRIPA case is sufficiently complex to justify postponing the stay for 60 days.  Given the complexity, the Court set a week-long evidentiary hearing.  But the Court's actions also follow the PLRA's "promptly rule" command; the Court set an expeditious 10-day schedule for briefing the termination Motion and then the hearing for 14 days later—all occurring before the automatic stay begins on February 20, 2022.  Nevertheless, without the postponement, the Court would have approximately *one day* after the hearing to write the PLRA-required findings before the automatic stay begins.  Defendants have even acknowledged the complexity of the motion by requesting "to file post-termination-hearing briefs."  Mem., ECF No. 112 at 14 n.11.[7]  Despite the Parties and the Court acting with prompt speed, the complexity of the issues here prevents the Court from deciding the motion before the automatic stay begins.  This Court accordingly should find this complexity constitutes additional good cause to postpone the automatic stay.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Terminate, or, Alternatively, Modify Consent Decree, ECF No. 111, and postpone the PLRA's automatic stay for an additional 60 days.

Respectfully submitted,


DARREN J. LaMARCA                    KRISTEN CLARKE
United States Attorney                   Assistant Attorney General
Southern District of Mississippi            Civil Rights Division

---

[7]  Defendants also requested an emergency continuance of the evidentiary hearing when it originally dealt only with their contempt, which the Court granted.  *See* ECF Nos. 108 & 109.

STEVEN H. ROSENBAUM
Chief
Civil Rights Division
Special Litigation Section

MITZI DEASE PAIGE (MS #6014)          LAURA L. COWALL (DC #481379)
Assistant U.S. Attorney                Deputy Chief
MPaige@usa.doj.gov                     laura.cowall@usdoj.gov
U.S. Attorney's Office                 (202) 514-1089
Southern District of Mississippi       (202) 514-0212 (fax)
501 E. Court Street – Ste. 4.430
Jackson, MS 39201
(601) 973-2840
(601) 965-4409 (fax)

/s/ *Christopher N. Cheng*
CHRISTOPHER N. CHENG (PA #69066)
Trial Attorney
christopher.cheng@usdoj.gov
(202) 514-8892
(202) 514-4883 (fax)
SARAH STEEGE
Trial Attorney
sarah.steege@usdoj.gov
HELEN VERA
Trial Attorney
helen.vera@usdoj.gov
United States Department of Justice
Civil Rights Division
Special Litigation Section
150 M Street, N.E.
Washington, DC  20002

DATED:        January 27, 2022

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on January 27, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

    *s/ Christopher N. Cheng*
CHRISTOPHER N. CHENG
(PA#69066)
Attorney for the United States
United States Department of Justice
Civil Rights Division
Special Litigation Section
150 M Street, N.E.
Washington, DC  20002
(202) 514-8892

37