**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**VS.**                                      **CIVIL ACTION NO. 3:16-CV-489-CWR-RHWR**

**HINDS COUNTY, ET AL.**                                      **DEFENDANTS**

**DEFENDANTS' REPLY IN SUPPORT OF
MOTION TO TERMINATE OR, ALTERNATIVELY, MODIFY CONSENT DECREE**

Defendants, Hinds County, Hinds County Board of Supervisors, and Victor Mason, in his official capacity as Sheriff, respectfully submit this reply in support of the motion to terminate or, alternatively, modify consent decree between Plaintiff the United States of America (hereinafter "DOJ") and Defendant Hinds County, Mississippi.[1]  Agreement [8-1].

## I.      INTRODUCTION

DOJ attempts to constitutionalize the consent decree.  In doing so, DOJ throws in the kitchen sink, alleging that the County's detention facilities are across-the-board constitutionally deficient.  For example, DOJ repeatedly concludes in its response that, because the County isn't in absolute compliance with the decree's policies, then it follows that the County is currently violating the constitutional rights of each and every detainee (roughly 600 individuals) housed at the Raymond Detention Center, the Work Center, and Henley-Young.  What's equally as bad, DOJ then assumes, without any meaningful argument or authoritative support, that the decree's policies are necessary, extend no further than necessary, and constitute the least intrusive means necessary to correct the alleged violations.  *E.g.*, Response [114] at 16 ("Defendants' failure to comply with the Consent Decree's sexual misconduct section . . . illustrates why such administrative remedies

---

[1] For simplicity sake, Defendants refer to themselves as "Defendant," "Hinds County," or the "County."  And at times, the County collectively refers to itself and DOJ as the "Parties."

remain necessary, narrowly tailored, and the least intrusive means necessary to address current and ongoing violations.").

Don't buy the generality.  Such boilerplate conclusions stand at odds with the fundamental principles of the U.S. Constitution.  *See, e.g.*, *Hughes v. Judd*, 108 F. Supp. 3d 1167, 1246 (M.D. Fla. 2015) (stressing that the Eighth Amendment "is a mechanism to prevent cruel and unusual punishment . . . and not a mechanism to enforce the latest fashion in penological theory or the latest aspiration of the consultants").   They likewise belie the congressional intent of the Prison Litigation Reform Act (PLRA).  Indeed, the PLRA does not entitle detainees "to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Ball v. Leblanc*, 792 F.3d 584, 599 (5th Cir. 2015) (citation omitted).

## II.    ARGUMENTS & AUTHORITIES

Under the PLRA, the County bears the initial burden to prove that the decree is subject to termination or modification.  Given the circumstances at bar, the County pursues termination or modification under both 18 U.S.C. § 3626(b)(1) or § 3626(b)(2).  Starting with § 3626(b)(1), it's undisputed the consent is decree is terminable because four years have passed since this Court granted the Parties' prospective relief.  *See* 18 U.S.C. § 3626(b)(1)(i) (instructing that prospective relief "shall be terminable" two years after the date the court granted the consent decree); Order [8] (implementing the consent decree on July 19, 2016).  The County is also "entitled to the immediate termination" of the consent decree under § 3626(b)(2) because, at the time the decree was granted, the Court failed to enter a finding that "the relief [was] narrowly drawn, extend[ed] no further than necessary to correct the violation of the Federal right, and [was] the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(b)(2); *see* Order [8].

Regarding the immediate-termination provision, DOJ counters that the County's position is a "misguided technical argument."  Response [114] at 32.  Particularly, DOJ infers—absent any citation to authority—that the Court's order "adopted" the Parties' PLRA-related stipulations into its findings and then suggests that's enough.  *Id.* at 32–33.

It's not.  The Court is required to conduct an independent review of the consent decree's prospective relief and make express findings on the record consistent with § 3626's requirements.  For example, in *Jones v. Gusman*, the parties moved the district court to approve a proposed consent decree that provided prospective relief with respect to prison conditions.  296 F.R.D. 416, 426 (E.D. La. 2013).  Upon review, the court noted that although "[t]he parties to the consent [decree] ha[d] stipulated that it complies with PLRA, . . . the Court conducts an independent inquiry."  *Id.* at 429.  Other courts agree.  *See, e.g.*, *Doe v. Cook County*, 798 F.3d 558, 565 (7th Cir. 2015) ("The most one can say for the 2007 order is that the district judge recited that it complied with the PLRA.  The judge did not, however, make any of the findings that § 3626 requires.  A bald declaration of compliance, without the finding required by statute, is ineffectual under § 3626."); *Powers v. Evans*, No. 4:10-CV-57-GHD-RP, 2017 WL 10818720, at *6 (N.D. Miss. July 26, 2017) ("Where any prospective relief has been approved or granted in the absence of the required findings, a defendant is entitled to immediate termination of such relief." (citing 18 U.S.C. § 3626(b)(2))), *report and recommendation adopted*, 2019 WL 510450 (N.D. Miss. Feb. 8, 2019); *Vazquez v. Carver*, 18 F. Supp. 2d 503, 51 (E.D. Pa. 1998) (holding that where court failed to find that the prospective relief was narrowly drawn, extended no further than necessary to correct the violation of a federal right, and was the least intrusive means necessary to correct the violation, at the time relief was entered, immediate termination of the consent decree was warranted), *aff'd*, 181 F.3d 85 (3d Cir. 1999).

Nonetheless, this Court's § 3626(b)(3) analysis is the same under § 3626(b)(1) and § 3626(b)(2).  Motion [112] at 9; Response [114] at 33; *Castillo v. Cameron County*, 238 F.3d 339, 352 (5th Cir. 2001) ("[B]oth of these termination provisions are subject to the limitation of § 3626(b)(3)[.]").

In this vein, the burden shifts to DOJ, *see Guajardo v. Tex. Dep't of Crim. Justice*, 363 F.3d 392, 395–96 (5th Cir. 2004) (per curiam), to prove § 3626(b)(3)'s three substantive requirements: (1) "current and ongoing violation of the federal right"; (2) "extends no further than necessary to correct the violation of the Federal right"; and (3) "the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

To succeed on the first element, DOJ shoulders the burden to prove "current and ongoing," systemic constitutional violations.  *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 888 (S.D. Tex. 1999) (noting that system-wide relief, like consent decrees, "can only be justified by findings of a system-wide violation" (citing *Lewis v. Casey*, 518 U.S. 343, 359 (1996))), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001).

With regard to the "current and ongoing" element, courts must assess the conditions of confinement "at the time termination is sought," or, here, on January 14, 2022.  *Castillo*, 238 F.3d at 353; *Lancaster v. Tilton*, No. C-79-1630-WHA, 2007 WL 4570185, at *6 (N.D. Cal. 2007) (noting that while "[i]nstaneous snapshots are impossible," "facts in close temporal proximity are probative").  The inquiry is not focused on past or events that may occur in the future.  *See Castillo*, 238 F.3d at 353 (explaining that, under the PLRA, the focus of courts is not on "conditions that existed in the past or [on] conditions that may possibly occur in the future").  And "[t]he extent to which recent evidence may have been superseded by intervening events must be critically assessed, issue by issue."  *Lancaster*, 2007 WL 4570185, at *7.

### A.   DOJ fails to meet its burden by showing the existence of "current and ongoing" constitutional violations.

DOJ asserts that four "current and ongoing" constitutional violations exist at the County's facilities: conditions of confinement and inadequate medical care; excessive use of force; and unlawful detention.  Aside from the first two, which the County groups together, these claims bear unique legal standards.  The analysis that follows starts with conditions of confinement and inadequate medical care.  After, it addresses excessive force, then unlawful detention.[2]

### 1.

Within the conditions-of-confinement and inadequate-medical-care claims, DOJ contends there are specific violations pervasive throughout the County's detention facilities.  Those violations relate to (a) detainee safety, (b) segregation coupled with inadequate medical care, and (c) conditions of confinement at Henley Young.  Response [114] at 10–14, 16–18 (protection form harm); 18–20 (segregation); 20–24 (juveniles).

The United State Supreme Court has acknowledged that while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), it also does not permit the existence of those that are inhumane.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

---

[2] In the Fifth Circuit, courts recognize two types of *cases* brought by pretrial detainees for violations of their Fourteenth Amendment rights: (a) cases for unconstitutional conditions of confinement and (b) cases for unconstitutional episodic act or omission.  *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020) (citing *Hare v. City of Corinth*, 74 F.3d 633, 644–45 (5th Cir. 1996) (en banc)).  In this understanding, "conditions of confinement" cases challenge the constitutionality of pervasive, systemic policies and customs implemented at the detention facility.  *See id.*  By contrast, episodic-acts-or-omissions cases seek to redress harms arising from "the particular act or omission of one or more officials," rather than harms that result directly from an unconstitutional policy, practice, or rule of the facility.  *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019) (citation omitted).

"Conditions of confinement" is also a type of constitutional claim or *violation*.  Other examples include excessive use of force and inadequate medical care.  The case *sub judice* is similar to a "conditions of confinement" case that incorporates four types of "current and ongoing" constitutional violations: (1) conditions of confinement; (2) excessive use of force; (3) inadequate medical care; and (4) unlawful detention.

PD.36585971.1

Thus, "the treatment [a detainee] receives in [a detention facility] and the conditions under which he is confined are subject to the scrutiny under the Eighth Amendment."[3]  *Helling*, 509 U.S. at 31.

The Eighth Amendment prohibits punishments such as "physical and sexual assault, physically abusive guards, and deprivation of medical care." *Ruiz*, 37 F. Supp. 2d at 886.  It further imposes a duty on prison officials to  "provide prisoners with such minimum essentials as adequate food, shelter, clothing, medical care, and officials must also take reasonable measures to ensure the safety of inmates." *Id.*

Two subparts govern the Eighth Amendment inquiry; namely, the demonstration of a substantial risk of serious harm and deliberate indifference.  *Farmer*, 511 U.S. at 834.  When, as here, the violations alleged are systemic, "only those deprivations denying the minimal civil measure of life's necessaries are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal quotation marks and citation omitted).  So for DOJ to prevail on their assertions that the consent decree should continue to bind the County and to prove a "current and ongoing," systemic constitutional violation, DOJ must prove (1) a substantial risk of serious harm and (2) deliberate indifference—that is pervasive throughout the County's facilities.  Each subpart is taken, in turn.

**Substantial Risk of Serious Harm**.  Substantial risk of serious harm is an objective inquiry that requires satisfaction of two components: (1) harm and (2) risk.  With respect to the

---

[3] A state-custody convicted prisoner's constitutional rights emanate from the Eighth Amendment's guarantee against cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and a pretrial detainee's rights arise from the due process guarantees of the Fourteenth Amendment, *Bell v. Wolfish*, 441 U.S. 520, 537–37 (1979).  Regardless, and as DOJ correctly states, the Fifth Circuit has consistently held the Eighth Amendment's deliberate indifference standard applies equally to pretrial detainees traveling under the Fourteenth Amendment—at least in the context of conditions of confinement and inadequate medical care. *See infra* note 7; Response [114] at 9; *e.g.*, *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021); *Hare v. City of Corinth*, 74 F.3d 663, 648–50 (5th Cir. 1996) (en banc); *Graham v. Hodge*, 69 F. Supp. 3d 618, 627 (S.D. Miss. 2014).

6

"harm" component, courts must consider whether the alleged harm is "sufficiently serious." *Hudson v. McMillan*, 503 U.S. 1, 21 (1992).  As noted, in cases like this, the Fifth Circuit has worded the test as "requiring *extreme* deprivation of any *minimal* civilized measure of life's necessities."  *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (emphasis added) (internal quotation marks and citation omitted).  With respect to "risk," courts must consider whether there is a "substantial" risk that the alleged harm is likely to occur.  *Id.*  The majority of federal courts equate "substantial risk" with "pervasive conduct," as opposed to "isolated incidents," which results in a "real and proximate threat."  *Lakin v. Barnhart*, No. 1:11-CV-332-JAW, 2013 WL 5407213, at *7–8 (D. Me. 2013) (collecting cases).  "The possibility of harm is not equivalent to the substantial risk of harm."  *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 80 (D. Me. 2013).

**Deliberate Indifference**.  Deliberate indifference likewise requires satisfaction of two components: (1) the defendant's awareness "of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the defendant actually "draw[ing] the inference." *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc).  These components <u>cannot</u> be met if the defendant "responds reasonably" to substantial risks to inmate health or safety, "even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 845 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."); *see also Whitley v. Hanna*, 726 F.3d 631, 652 n.2 (5th Cir. 2013) (Elrod, J. concurring) (explaining that deliberate indifference occurs when the defendant is guilty of "turning a blind eye").

Against the backdrop of this constitutional standard, we move forward to the specific violations identified by DOJ: (a) detainee safety; (b) segregation coupled with inadequate medical care; and (c) the conditions of confinement at Henley-Young.

**a.**

Starting with detainee safety, DOJ alleges that because the County failed to fully implement the consent decree's protection-from-harm provisions and the Court's stipulated order, the County has "caused, or contributed to, widespread, ongoing violence, death, assaults, suicides and other serious harm." Response [114] at 12. According to DOJ, the "most troubling" statistic is the six deaths occurring in 2021.

This rhetoric is misleading.[4] Of those six deaths, only one death was related to detainee-on-detainee violence. While the County of course does not minimize the gravity of any detainee's death, DOJ has simply pointed to one isolated incident due to detainee-on-detainee violence. *Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1195 (D. Kan. 2008) ("Prison officials are not, however, expected to prevent all inmate-on-inmate violence." (citing *Farmer*, 511 U.S. at 844)). Far from "turning a blind eye" toward this violence, the County reviewed the underlying facts and circumstances leading to the detainee's death. Plus, the County terminated the employment of the staff members responsible for supervising those detainees.

DOJ next references the monitoring team's description of assaults as occurring at a "high rate." Particularly, they highlight thirteen (13) assaults in July 2021, twelve (12) assaults in September 2021, and ten (10) assaults in October 2021. Response [114] at 13–14. Not only do these cherry-picked statistics show a downward-trending rate of assaults—13, 12, and 10—at the RDC, the assaults must be reviewed in light of the County's system as a whole. *See Ruiz*, 37 F. Supp. 2d at 889 ("[W]hether evidence rises to a level of system-wide violations is based on a finding of a persistent pattern as determined by the logical evaluation of the trial judge."); *Riley v.*

---

[4] A seventh death occurred in November 2021. The death was medically-related, and the detainee passed away at the hospital. Report [101] at 4 (describing inmate who died of cancer while hospitalized on November 15, 2021).

PD.36585971.1

*Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (holding "isolated incidents" are insufficient).  In doing so, the statistics demonstrate that roughly 2.5% of the RDC's detainee population was subjected to an assault in October 2021 (and that's assuming ten different detainees were assaulted).  This *de minimis* percentage further undermines the pervasiveness of detainee-on-detainee violence in the County's facilities and therefore does not constitute a substantial risk of serious harm to detainees.  *Farmer*, 501 U.S. at 833–34 (noting that while it is settled that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners," it is equally settled that not "every injury suffered by one prisoner at the hands of another [prisoner] translates into constitutional liability for prison officials responsible for the victim's safety").

DOJ additionally discusses fires, problems with electrical systems, malfunctioning doors, and contraband infiltration as current harms constituting substantial risks of serious harm that "will not only continue, but undoubtedly increase, without the Consent Decree."  Response [114] at 13.  However, even assuming these alleged incidents and conditions amount to substantial risk of serious harm, the Eighth Amendment only requires the County to respond reasonably to abate substantial risks of serious harm of which the staff is aware.  It is of no moment whether harm was ultimately averted.  *See Farmer*, 501 U.S. at 844.

Lastly, DOJ focuses on the County's alleged failures to comply with provisions in the consent decree regarding recordkeeping, investigation, and reporting requirements.  Notably absent from DOJ's argument, though, is how any of the alleged failures of these reporting systems have actually caused a substantial risk of serious harm as it relates to sexual abuse, misconduct, use of force, the grievance system, and use of force reports.[5]  *See* Response [114] at 12–18.  Even assuming that recordkeeping, reporting, and investigation shortfalls culminate into a substantial

---

[5] Even less can be said for the Criminal Justice Coordinating Committee, Response [114] at 27, and "Continuous Improvement, Quality Assurance, and Monitoring", *id.* at 28, sections.

risk of serious harm to detainees, once again, DOJ has not shown that the County has been deliberately indifferent to the problems at the County's facilities related to sexual assault.  And, it is DOJ's burden to make this showing.

Indeed, DOJ does not allege that the County was subjectively aware that any detainee that fell victim to sexual misconduct faced a risk of serious harm.  Without such allegations, DOJ's system-wide, inmate-safety claim fails.  *See Escobedo v. Garza Cnty. Sheriff's Dep't*, No. 5:16-CV-16-BQ, 2017 WL 6759136, at *6 (N.D. Tex. Oct. 23, 2017) ("Absent factual allegations showing Defendants were subjectively aware that [the plaintiff] faced a risk of serious harm, [the plaintiff] cannot plead a cognizable constitutional claim for failure to protect." (citing *Brown v. Harris County*, 409 F. App'x 728, 731 n.7 (5th Cir. 2010))).

Furthermore, assuming a showing of substantial risk of serious harm, DOJ does not account for reasonable responses taken by the County to avert sexual-assault risks.  For instance, the County has contracted with Benchmark Construction to better equip the RDC facility as a direct supervision facility, which in turn aids in preventing sexual abuse.  *See Brown v. Collier*, 929 F.3d 218, 234 (5th Cir. 2019) (recognizing that the National Prison Rape Elimination Commission recommends direct supervision "because it is the most effective mode of supervision for preventing sexual abuse and other types of violence and disorder").  Further, "[n]ursing staff continue to be involved in the screening of newly admitted detainees in an attempt to identify those who may be sexually abusive or at risk of sexual victimizations as part of the intake screening process, and new admissions so identified are referred to the PREA officer."  Report [101] at 71.  And "if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment, which includes the use of a rape kit."  *Id.* at 72.  And in the absence of the County's PREA officer, "both medical and mental health staff

have continued to identify PREA-related cases and provide . . . services to such identified individuals[.]" *Id.* Clearly, the County has made reasonable responses to any substantial risk of serious harm caused by sexual misconduct; as a result, DOJ has failed to allege a current and ongoing constitutional violation of this nature.

**b.**

Next, we turn to segregation and inadequate medical care. DOJ argues that the consent decree's provisions "implement the Eighth Amendment's requirement that jails provide medical and mental healthcare sufficient to meet detainees' serious medical and mental health needs" and that the County's failure to comply with decree has resulted in suicides and puts detainees at substantial risk of serious harm.[6] Response [114] at 19. Specifically, while acknowledging the County's implementation of weekly interdisciplinary team meetings to review detainees in segregation, DOJ argues that the review does not result in more appropriate housing since none exists due to the lack of a mental health unit. *Id.* Further, DOJ cites inadequate coordination between, and insufficient training of, mental health and staff leads to a substantial risk of serious harm to detainees. Finally, DOJ alleges that detainees missed medication, appointments, and therapy sessions as a result of inadequate staffing. *Id.* at 20.

Again, DOJ has failed to describe in detail how any of these conditions of confinement places those detainees at a substantial risk of serious harm. Without doing so, DOJ failed to carry its burden to prove constitutional violations related to segregation and inadequate medical care. Sporadic instances of suicides are not enough—DOJ must demonstrate *pervasive* constitutional

---

[6] The constitutional standard for the conditions-of-confinement and inadequate-medical-care claims is the same. *E.g.*, *Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("Whether one characterizes the treatment received by [the prisoner] as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in [*Estelle v. Gamble*, 429 U.S. 97, 104 (1991)]." (first alteration in original) (citation omitted)).

11

violations to establish a substantial risk of serious harm. While the decree's provisions regarding the conditions of confinement for detainees suffering from mental health-related issues may "be a valuable way of preventing the deterioration of a segregated inmate's mental health, . . . the Eighth Amendment does not require the most effective solution." *Rasho v. Jeffreys*, Nos. 19-1145, 19-1975, & 19-1978, 2022 WL 108568, at *7 (7th Cir. Jan. 12, 2022) (citation omitted). Indeed, the Court must be careful not to conflate "what is constitutionally *adequate* . . . with what is constitutionally *required*." *Id.* at *6 (emphasis in original) (citation omitted).

Even if there is a substantial risk of serious harm to detainees facing mental health issues, the County has been far from deliberately indifferent to that risk. *E.g.*, *Haynes v. Bradley*, No. 5:18-CV-CWR-MTP, 2020 5032047, at *2 (S.D. Miss. July 17, 2020) ("Deliberate indifference 'is an extremely high standard to meet.'" (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006))). For example, the County has implemented reasonable responses to potential substantial risks of serious harm related to mental healthcare at the RDC. That includes a new health services administrator. Decl. Major Bryan, Dkt. 106 at 4, ¶ 14. The County also now has a full-time mental health nurse practitioner and an additional mental health practitioner and medical practitioner. *Id.* The RDC's administrators have further worked with a national, certified mental health professional to develop intensive training sessions in addition to increasing collaboration between medical and mental health staff and detention staff which has increased security for, and reduced turnover of, medical and mental health staff. *Id.* at 4, ¶ 15. Moreover, the County is constructing a dedicated mental health living unit to house detainees with serious mental illness, with forthcoming mental health office space directly next to the new unit. *Id.* at 4-5, ¶ 16. And along with weekly interdisciplinary team meetings implemented in August 2021, RDC staff are able to better assess detainees with mental health issues and coordinate efforts to provide care and security for those

detainees, which the County believes will help address suicide risks. *Id.* at 5, ¶ 18. The County is also constructing two padded rooms that will be used to monitor and control detainees presenting risks of suicide, and as of September 2021, detainees at risk of suicide are no longer discharged from suicide watch directly back into the regular living units without medical staff evaluations. *Id.* at 5, ¶ 18.

### c.

Finally, DOJ alleges that there are "current and ongoing" conditions-of-confinement violations regarding juvenile detainees at Henley-Young. Response [114] at 20–24. In a nutshell, DOJ blanketly alleges that because the County has never met the requirements of the consent decree, the County's has placed youth in an going substantial risk of serious harm. *Id.* at 22. Again, DOJ does not causally connect the County's staffing issues with any conditions-of-confinement constitutional violation. DOJ therefore fails to meet its burden and such failure is fatal to limiting termination of the consent decree's court-enforced prospective relief.

### 2.

In addition to conditions of confinement and inadequate medical care, DOJ alleges that the County has systemic violations related to the use of excessive force by its staff on detainees. Response [114] at 15–16. Under the Eighth Amendment, a pretrial detainee is protected form use of force constituting punishment. *Williams v. Rushing*, No. 3:17-CV-508-LRA, 2019 WL 4739690, at *2 (S.D. Miss. Sept. 27, 2019). Contrary to the subjective deliberate indifference standard governing conditions-of-confinement and inadequate-medical-care claims, "[t]he standard for a pretrial detainee's excessive force claim is a solely objective one."[7] *Id.* at *3 (citing

---

[7] In *Kingsley*, the Supreme Court held that courts must apply an objective test to excessive force claims brought by pretrial detainees. One year after *Kingsley* handed-down, the Ninth Circuit extended *Kingsley*'s objective standard to a pretrial detainee's claim for failure to protect. *See Castro v. County of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016). The Fifth Circuit, however, has declined to follow the Ninth

*Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, (5th Cir. 2021) (same); *Velazquez v. Baker*, No. 5:20-CV-78-BQ, 2021 WL 812505, at *5 (observing that *Kingsley* abrogated "lower courts' application of Eighth Amendment excessive force standards from *Hudson v. McMillian*, 503 U.S. 1 (1992) to pretrial detainees"). Still, in a PLRA case, which contemplates systemic violations, the excessive-force violations must establish an unconstitutional pattern or practice of the use of excessive force across the County's facilities.

Here, DOJ has not alleged any actions by the County's staff that amounts to system-wide violation relating to excessive force. By stark contrast, DOJ identifies to two specific incidents: an investigator's use of a taser on a prone detainee and a staffing failure to properly identify a use of force incident after a sergeant used OC spray on a detainee. Response [114] at 15. To DOJ, these *two* examples of use of force "illustrate broader patterns" regarding the County's ability to identify and investigate incidences of uses of force. *Id.*

Due to this, DOJ disregards the long-standing precept that detention facilities are "inherently dangerous places." *Weeks v. Warden*, No. 15-C-5234, 2017 WL 3404965, at *5 (N.D. Ill. Aug. 7, 2017) (citation omitted). And while the County acknowledges that a pretrial detainee's status is not synonymous to convicted prisoner's status, "use of force is not only a justified, but also a necessary, tool in the quest to maintain an institution's order, or a guard or [detainee's]

---

Circuit's lead. For instance, the Fifth Circuit affirmed the holding of the en banc court in *Hare v. City of Corinth*, which applies a "subjective deliberate indifference" standard to all failure to protect claims, regardless of whether the plaintiff is a pretrial detainee or a prisoner, and noted that the Ninth Circuit, at the time, was the only circuit to have extended *Kingsley* to a pretrial detainee's failure to protect claims. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 & n.4 (5th Cir. 2017); *see also Robertson v. Gautreaux*, No. 16-341-JJB-RLB, 2017 WL 690542, at *3-5 (M.D. La. Feb. 21, 2017) (discussing the *Kingsley*, *Castro*, and *Hare* cases and applying *Hare* standard to a detainee's failure to protect claim). Accordingly, it appears this Court must apply an objective standard to the excessive-force claims, but a subjective standard to the conditions-of-confinement claims.

safety." *Ruiz*, 37 F. Supp. 2d at 929.  Stated differently, DOJ must do more than merely critique the use of force at the County's facilities; DOJ must prove specific facts demonstrating that unconstitutionally excessive force is being used pervasively throughout the RDC, the Work Center,[8] and Henley-Young.  It has not done so.

Moreover, the record makes clear the County has not ignored detention staffs' use of force. For example, use of force "training now includes a continuum of appropriate force responses to escalating situations, de-escalation tactics, and defensive tactics[,]" Report [101] at 60, and in December 2021, the County began training detention officers related to handling detainees with mental health issues.  With respect to reporting when staff must use force, the County's has engaged in efforts to train staff to improve the quality of use of force reports.  *See id.* at 61, 62. Moreover, once detention staff use force, the record demonstrates that detention staff involve medical staff through post-force medical examinations.  *See id.* at 59.  In addition, classification staff, mental healthcare staff, and detention meet on a weekly basis to asses detainees with mental health issues and coordinate their efforts to provide security for those detainees.  Dkt. [106] at ¶ 17.

### C.

The last "current and ongoing" constitutional violation alleged by DOJ relates to the detainees' untimely release from the County's facilities.  Response [114] at 24–26.  Although "a [detainee] has a Fourteenth Amendment due process right to timely release from [jail]," *Traweek v. Gusman*, 414 F. Supp. 3d 847, 863 (E.D. La. 2019) (citing *Whirl v. Kern*, 407 F.2d 781 (5th Cir.

---

[8] In fact, the Work Center's operations demonstrate the complete lack of pervasiveness relative to the alleged substantial risks of serious harm of which the DOJ complains. "The Monitoring Team describes the Work Center as a functional jail for the citizens of Hinds County. [] This Court's own visit to the three facilities in 2019 confirms that something about the Work Center's culture is effective; it largely operates as a jail should."  Show Cause Order [100] at 8.

1968)), DOJ's arguments to this point are nothing more than conjecture.  In its brief, DOJ discusses two instances in which the monitoring team "discover[ed]" the detainees' untimely release. Response [114] at 26.  According to DOJ, "[t]hese unlawful detentions, and substantial risk of unlawful detentions, <u>will continue and increase</u> without the Consent Decree."  Response [114] at 25 (emphasis added).  But as the Eleventh Circuit noted in *Cason v. Seckinger*, "Congress intended 'current and ongoing' to mean a presently existing violation, <u>not a potential, or even likely, future violation</u>."  231 F.3d 777, 783 (11th Cir. 2000) (emphasis added) (cited by *Castillo* and *Depriest v. Walnut Gove Corr. Authority*, No. 3:10-CV-663-CWR-FKB, 20115 WL 3795020 (S.D. Miss. June 10, 2015)).

Even assuming that a pervasive violation could be established by the two incidents cited by DOJ, the monitoring team's most recent report describes that "there has been significant improvement in the quality of the records, the accuracy of the JMS system, and the presence of paperwork supporting booking and detention," and "[t]here continue to be improved systems in place to track individuals and release them timely."  Report [101] at 110.  Furthermore, a meeting held on January 27, 2022 between Erika Scott, RDC's court liaison, the Monitor, and counsel for the County and DOJ, signaled that marked improvements have been made regarding issues with untimely detainee releases.  For example, Scott affirmatively stated that she has a robust system in place for ensuring RDC has sufficient paperwork to hold detainees and that detainees are not held without an initial appearance.  Further, Scott indicated at the meeting that, in the past two months, no detainees were held longer than they should be.  Additionally, Major Bryan "has been working on outstanding policies including the policy on Releasing which would address" issues related to releasing individuals who are adjudicated not guilty. *Id.* at 117.  In light of these developments

occurring in the relevant timeframe—at the time the motion to terminate was filed—there is clearly not a current and ongoing substantial risk of serious harm related to untimely detainee releases.

*     *     *

Perhaps the most poignant example of the County's beyond-reasonable response to each of the aforementioned violations is its plan to construct a new facility and to completely phase out the RDC by 2025.  *Cf. Huerta v. Ewing*, No. 2:16-CV-397-JMS-MJD, 2018 WL 4922038, at *8–9 (S.D. Ind. Oct. 10, 2018) (recognizing construction of a new jail as a long-term solution to alleviate constitutional rights violations).  This multi-million dollar commitment, along with the County's already-implemented and ongoing reasonable responses to each alleged substantial risk of serious harm outlined above (which has additionally cost millions of dollars), show that the County has been far from deliberately indifferent to such risks.  For this additional reason, the Court should find that the County has responded reasonably to the alleged substantial risks of serious harm.

### B.    DOJ also fails to meet its burden that the consent decree's policies pass muster under the "narrowness-need-intrusiveness" test.

Assuming *arguendo* that DOJ can meet its burden to demonstrate "current and ongoing," systemic constitutional violations, they then must show that the remedy of the constitutional violation satisfies the "narrowness-need-intrusiveness" test.  *See Guajardo*, 363 F.3d at 394. Specifically, DOJ must prove that the relief granted in each subsection: (1) remains necessary to correct a current and ongoing violation of the detainees' rights; (2) extends no further than necessary to correct the identified violation; and (3) is narrowly drawn and the least intrusive means necessary to correct the identified violation.  18 U.S.C. § 3626(b)(3).

DOJ falls far short of satisfying its burden.  Particularly, DOJ rests solely on the County's alleged noncompliance and PLRA-related stipulations entered into by the parties.  This is improper

for two reasons.  First, the relevant inquiry is not whether the County is in compliance with the consent decree, rather, under the PLRA, DOJ bears the burden to prove that the decree's specific policies are currently necessary. *E.g.*, *See Hadix v. Johnson*, 228 F.3d 662, 673 (6th Cir. 2000). Second, the Fifth Circuit has made clear that it is "not enough under § 3626(b)(3) that orders, when entered, were sufficiently narrow considering the violations that existed at the time." *Castillo*, 238 F.3d at 353–54.  The court must make "new findings" about whether the relief currently complies with the PLRA's requirements for relief, given the nature of the current and ongoing violations. *See id.* at 354; *Cason*, 231 F.3d at 783–85.  This requires "particularized findings, on a provision-by-provision basis, that each requirement imposed by the consent decree [] satisfies the need-narrowness-intrusiveness criteria."  *Ruiz v. United States*, 243 F.3d 941, 950 (5th Cir. 2001) ("[This] procedure . . . is mandated by § 3626(b)(3) and cannot be circumvented by a mere recitation of the key statutory language.").

At bottom, it is not the County's burden to prove to the Court that the decree's sweeping policies are *unnecessary*.  Rather, DOJ, as the party seeking to prolong the consent decree, must demonstrate that each of the decree's policies and provisions satisfy the need-narrowness-intrusiveness test under the PLRA.  *See Ruiz*, 243 F.3d at 950 (explaining that if the plaintiff fails to prove the requirements of § 3626(b)(3), then the district court should terminate the relief).[9]

---

[9] DOJ appears to assume that the consent decree in this case applies to detainees housed at the Henley-Young facility.  It is unclear, however, that this Court has jurisdiction over Henley-Young. Nevertheless, putting that fundamental question aside, Plaintiffs cannot possibly demonstrate that the provisions of the consent decree in this case satisfy the need-narrowness-intrusiveness requirements: the Henley-Young facility is currently governed by an existing, court enforced consent decree specific to that facility.  *See J.H. v. Hinds County*, 3:11-CV-327-DPJ-FKB at [145].

PD.36585971.1

### C.     A receiver is unnecessary and constitutes the most-intrusive-means to cure the alleged "current and ongoing" violations.

Notwithstanding the irrelevance of the propriety of appointing a receiver to take control of the RDC in considering the motion to terminate, each of the County's reasonable responses discussed above demonstrate that even if DOJ has proved the presence of "current and ongoing" constitutional violations at the RDC, the appointment of a receiver is not necessary to remedy those violations, especially in light of the new prison facility being constructed.  A receivership should be used with "utmost caution" because it is considered a "drastic" form of relief.  *Bryant v. Matvieshen*, 904 F. Supp. 2d 1034, 1047 (E.D. Cal. 2012) (citing *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009)).  Such drastic relief is not necessary here when considering not only the myriad, ongoing improvements to RDC that have been made in the past year—with further improvements to be seen once new policies are implemented and have a chance to take hold—but also that such a remedy would stray further away from the PLRA's command for implementing the least intrusive means necessary to correct a federal violation.  18 U.S.C. § 3626(a)(1)(A); *see Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999) (Congress's intent behind the PLRA was to "remove the federal district courts from the business of supervising the day-to-day operation of state prisons." (citing *Imprisoned Citizens Union v. Ridge*, 169 F.3d 178, 189 (3d Cir. 1999))).

### D.     The County takes no position in whether this Court finds "good cause" to postpone the PLRA's automatic stay.

The PLRA mandates that a motion to terminate prospective relief triggers an automatic stay thirty (30) days after the motion is filed.  18 U.S.C. § 3626(e)(2).  If "good cause" is found, however, this Court may tack on an additional sixty (60) days following the thirty-day period.  DOJ urges this Court to find good cause and to extend the stay for sixty (60) additional days.

Response [114] at 33.  In reply, and in light of the current pandemic, the County takes no position as to whether "good cause" exists to extend the automatic stay.

### III.    CONCLUSION

To sum it up: DOJ's response confuses constitutional requirements with preferential "best practices" for jails.  *See Baze v. Reeves*, 553 U.S. 35, 51 (2008).  DOJ also fails to show the types of systemic constitutional violations that justify broad-scale, system-wide relief.  *See Lewis*, 518 U.S. at 359.  It further fails to demonstrate—or attempt to demonstrate—that the policies are necessary and the least intrusive means to correct the alleged violations.  "Termination of certain consent decree provisions does not mean that prison conditions will deteriorate.  Rather, it means that prison professionals, rather than a federal judge, will supervise the prison.  If it develops that the professionals fail and violate constitutional standards, then fresh injunctive relief may be sought by [the detainees]."  *Lancaster*, 2007 WL 4570185, at *6.  Given the stringent demands of the PLRA, coupled with DOJ's failures, this Court should grant the County's motion to terminate the consent decree.

This, the 31st day of January, 2022.

Respectfully submitted,

**PHELPS DUNBAR, LLP**


BY:   */s/ Nicholas F. Morisani*
        Reuben V. Anderson, MB #1587
        W. Thomas Siler, Jr., MB #6791
        Nicholas F. Morisani, MB #104970
        4270 I-55 North
        Jackson, Mississippi 39211-6391
        Post Office Box 16114
        Jackson, Mississippi  39236-6114
        Telephone: 601-352-2300
        Telecopier: 601-360-9777
        Email:  reuben.anderson@phelps.com
                tommy.siler@phelps.com
                nick.morisani@phelps.com

        **ATTORNEYS FOR DEFENDANTS**

PD.36585971.1

**<u>CERTIFICATE OF SERVICE</u>**

I, Nicholas F. Morisani, certify, that, on January 31, 2022, I had this REPLY electronically filed with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter.

*/s/ Nicholas F. Morisani*
Nicholas F. Morisani

PD.36585971.1