**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                         **PLAINTIFF**

**VS.**                                                  **NO. 3:16-CV-489-CWR-RHWR**

**HINDS COUNTY, ET AL.**                                         **DEFENDANTS**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO
CONTINUE AND FOR PRODUCTION OF DOCUMENTS AND OTHER DISCOVERY**

Defendants, Hinds County, Hinds County Board of Supervisors, and Victor Mason, in his

official capacity as Sheriff ("the County" or "Defendants"), respectfully submit this instant

motion to continue the consolidated evidentiary hearing and request for production and other

discovery.[1]

**REBUTTAL ARGUMENTS**

A.     **The United States' argument that the [121] Motion should be denied
       because it was filed after a deadline controlling *in limine* motions is
       swiftly disposed**.

Defendants did not file a motion *in limine*; rather, Defendants' [121] Motion requests a

continuance and production of information from the United States and the monitors.  Surely the

United States recognizes the utility of flexibility of motions as a procedural device for putting

requests before the Court and does not view this procedural device so narrowly.  Perhaps this is

why the United States does not go so far as to refer to the [121] Motion as an *in limine* motion.

---

[1] It's unclear whether this Court has jurisdiction to enforce the consent decree.  As noted in the motion to terminate and reply brief, this Court has never made the requisite findings under § 3626 to enforce or order the consent decree's prospective relief upon the County.  *Miller v. French*, 530 U.S. 327, 346 (2000) (explaining that "if prospective relief under an existing decree had been granted or approved absent such findings, then that prospective relief must cease, *see* § 3626(b)(2), unless and until the court makes findings on the record that such relief remains necessary to correct an ongoing violation and is narrowly tailored, *see* § 3626(b)(3)").

*Compare* Garner, Bryan A., BLACK'S LAW DICTIONARY 803 (8th ed.) (defining "in limine . . . (Of a motion or order)" as an adjective that describes a motion "raised preliminarily, esp. because of an issue about the admissibility of evidence believed by the movant to be prejudicial") *with* Glannon, Joseph W., EXAMPLES & EXPLANATIONS: CIVIL PROCEDURE at 621 (7th Ed. 2013) (describing a motion as "a direct application to the court for an order. . . . [T]he motion is a flexible device for seeking any type of action from the court. Other common examples are motions for further discovery . . . ."). Attempting to drive a square peg through a round hole, the United States' argument predicated on the *in limine* motions deadline should be rejected outright.

**B.      The United States' argument that the hearing should not be continued a second time because Defendants "[a]greed [the hearing] [s]hould [b]e [c]onducted in February" lacks merit.**

First, the substance of the United States' argument on this ground overlooks the factual background underlying Defendants' Motion. At the time Defendants announced on January 14, 2022 they intended to file a termination motion, a monitors visit had not been announced and no on-site visit had occurred in nearly two years. At the January 18 hearing, it was made clear that multiple monitors suddenly intended to be on the ground at the facility some part of the week of January 24. Defendants timely filed their [111] Motion to Terminate on January 21 (again, prior to any onsite visit taking place). On January 24, the onsite visit began, and it concluded February 3, 2022.

It is undisputed that the monitors toured the facility throughout the week of January 24, gained knowledge of and made observations regarding current conditions at the facility, requested and obtained hundreds of documents both known and unknown to Defendants' counsel at this time, and they interviewed numerous staff between January 24 and February 3. Against

this uniquely created backdrop, the current conditions at the facility are a central issue presented by the [111] Motion to Terminate. And, the United States repeatedly has made clear it intends to use the monitors to present its case against the [111] Motion to Terminate at the upcoming evidentiary hearing.[2]

The information contained in the Monitors' fifteen reports is almost entirely irrelevant to the central inquiry presented by Defendants' Motion to Terminate. With regard to the "current and ongoing" element, courts must assess the conditions of confinement "at the time termination is sought," or, here, on January 14, 2022. *See, e.g.*, [116] Rebuttal at 4 (citing cases).

Lastly, the United States' argument that Defendants can ask any questions they want of the monitors through informal interviews prior to the February 14 hearing is equally unpersuasive. This argument, perhaps an attempt to downplay the obvious prejudice to Defendants overlooks the fact that the monitors' responses to those questions would be outside the context of an oath and thus totally free from any requirement to provide truthful, complete responses. *Cf.* Fed. R. Civ. P. 32(c) (describing the oath under which a deponent is placed). Further, while Defendants readily agree that they have a right to join the monitoring visit, on the first day of the latest monitoring tour, Monitor Lisa Simpson appeared surprised Defendants' counsel intended to sit in on the first interview of the visit, even telling Defendants' counsel that it would be allowed so long as he was not disruptive or that it did not appear his present intimidated staff being questioned. Against this backdrop, one would be hard-pressed to contend the site-visit was an ideal circumstance in which to question the monitors at length about observations and opinions they were forming interview-by-interview.

---

[2] If the United States' oppositional brief does not provide enough evidence of this fact, *see* [124] at pp. 9-10, one need look no further than statements made by the United States' counsel during the February 1 status conference in which they repeatedly referred to the monitors as their experts. On the morning of February 3, 2022, Defendants requested a copy of the February 1 status conference transcript, but that transcript was not available to Defendants as of this filing.

Again ignoring the factual context from which the [121] Motion arises, the United States highlights the fact that Defendants sought a consolidated hearing at the earliest setting in February 2022. As carefully explained in their [122] Memorandum and above, *see supra*, this request was made known prior to it becoming known that the monitors were preparing to visit the facility and drastically transform the record on which such motion would be decided through their first visit in-person to the facility in nearly two years.  Thus, when viewed in context, each of the United States' arguments related to Defendants' agreement that the consolidated hearing take place at the earliest setting possible in February 2022 lack any persuasive merit.

C.   **Defendants respectfully submit that they should be entitled to obtain documentation, information, and testimony from the monitors**.

Nothing about the Consent Decree's provisions upon which the United States relies, *see* [124] at 5, addresses discoverability. Nor do those provisions identify any subset of "private" communications between a monitor and Defendants' own employees, *see* [124] at 6 (speaking of "private" communications between monitors and Defendants' own employees).  Far from citing anything approaching supporting authority for such a "monitor's privilege," the United States' argument is unconvincing.[3]  Still, even assuming the Consent Decree's confidentiality provisions

---

[3] DOJ fails to cite a *single* PLRA-related case in its response.  We do.  In PLRA cases, district courts have repeatedly permitted the parties to conduct reasonable discovery during interim period between the filing of the motion to terminate the consent decree and the corresponding evidentiary hearing.  *See, e.g., Graves v. Arpaio*, 623 F.3d 1043, 1046 (9th Cir. 2010) (explaining that although the *five-month interim* between defendants motion to terminate and the evidentiary hearing was "more rushed" than "desired," court needed to assess whether there were any "current and ongoing systemic violations of the rights of the pretrial detainees"); *id.* (including that parties then entered a report recommending a schedule for discovery in anticipation of the evidentiary hearing); *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008) (noting that district court allowed parties to take five depositions each, serve twenty-five interrogatories, obtain expert witnesses, and file supplemental memorandums with respect to already-filed motion to terminate); *Ruiz v. United States*, 243 F.3d 941, 944, n.4 (5th Cir. 2001) (warning in *dicta* that three years of discovery before evidentiary hearing is too long); *J.U. v. Salt Lake County*, No. 2:82-CV-1043-BSJ, 2019 WL 1170767, at *1–2 (D. Utah Mar. 13, 2019) (initially setting discovery deadline but then extending deadline by *six months*); *Graves v. Penzone*, No. CV-77-479-PHX-NVM, 2018 WL 4006748, at *3 (D. Ariz. Aug. 22, 2018) (disputing discovery for *five years* before evidentiary hearing).

somehow render confidential information <u>provided</u> <u>by</u> <u>employees</u> <u>of</u> a <u>party</u> <u>to</u> <u>that</u> <u>Consent</u> <u>Decree</u>, the Consent Decree actually contemplates the very request made by Defendants and now pending before the Court. *See* [122] at 5-8 (requesting a Court order directing production of documents, information, and testimony from the monitors).[4]

Turning first to the United States' argument related to the deliberative process privilege, this argument is rife with problems. The United States cites two cases for the proposition that "[c]ourts adjudicating discovery requests of quasi-judicial officers have routinely denied such requests." [124] at 6. *Gary W.*[5] involved a special master.   Neither the Monitor nor her consultants are special masters under Rule 53 of the Federal Rules of Civil Procedure or otherwise.   *Educare*[6] involved a court-appointed receiver.   Neither the Monitor nor her consultants are court-appointed receivers.  It is telling that the United States cited no authority barring discovery requests to monitors.

The United States next contends that "[d]isclosure of monitor notes would also impair the deliberations of quasi-judicial officers, contrary to principles analogous to the deliberative process privilege." [124] at 6.  The deliberative process privilege has no application here, by analogy or otherwise.   That privilege "is a form of executive privilege." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S.Ct. 777, 785 (2021).  The deliberative process privilege has no application to the judiciary or alleged quasi-judicial officers.  *Buford v. Holladay*, 133 F.R.D. 487, 494 (S.D. Miss. 1990) (declining to extend the deliberative process privilege to state

---

[4] In the first of many contradictory positions woven throughout the remainder of its oppositional brief, the United States' ill-advised argument related to confidentially plainly contradicts its earlier argument that the monitors were mere a phone call away from Defendants, ready to divulge anything Defendants' counsel could possibly need. *Compare* [124] at 3-4 *with* [124] at 5-6.

[5] *Gary W. v. La. Dep't of Health & Human Res.*, 861 F.2d 1366, 1368-69 (5th Cir. 1988).

[6] *Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.*, 2020 WL 4334765 at *3 (W.D. Tex. May 26, 2020).

governmental agencies because it applies only to the federal executive branch of government).  It is telling that the United States cited no authority extending the deliberative process privilege to a monitor or an alleged quasi-judicial officer.

Moreover, the deliberative process privilege "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Sierra Club*, 141 S.Ct. at 785. Under the Consent Decree, the Monitor and her consultants have no duties analogous to "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  The United States cites the *Gilby* case which notes that the rational of the deliberative process privilege "does not support privilege for communications where the agency is not the decision maker and the separation of powers veil has been pierced."  *Gilby v. Hughs*, 471 F. Supp. 3d 763, 767 (W.D. Tex. 2020).  The Monitor and her consultants are not "decision makers" are not analogous in any way to "decision makers" if federal agencies.  In this case, the Court—not the monitors or her consultants—is the decision maker, and no "separation of powers veil" has been pierced by Defendants' requests for information from the Monitor and her consultants. As noted above, the Monitor and her consultants are not Rule 53 special masters and have no authority to regulate proceedings or conduct evidentiary hearings.  *See* Rule 53(c)(1).

The Monitor and consultants are witnesses in this action have and apparently will continue to testify at hearings in this action; therefore, the United States' efforts to shield them from discovery are puzzling indeed.  Moreover, *Gary W.* and *Educare* discussed the "mental processes rule," not the deliberative process privilege.  The mental processes rule "protects quasi-judicial officials from 'compulsory testimony' as to the basis for their opinions." *Educare*

*Centre Servs., Inc.*, 2020 WL 4334765 at *2.  Here, the Consent Decree requires the Monitor's Report to disclose "the factual basis for each of the Monitor's findings."[7]  It follows from that requirement that the information the Monitor and her consultants received in formulating their findings is relevant and discoverable.  Indeed, the United States apparently intends to call the Monitor and her consultants at the hearing on this action, so the United States affirmatively intends to elicit testimony from the Monitor and her consultants regarding the basis for their findings (and their opinions, if the United States attempts to and succeeds in qualifying them as experts).  The United States cannot have it both ways—*i.e.*, that the Monitors and her consultants are quasi-judicial officers shielded from discovery but yet they can testify at hearings in this action regarding the very matters sought in discovery.  If the Monitors and her consultants are quasi-judicial officers shielded from discovery, then they should not be permitted to testify.

Finally, the United States claims that "the Monitoring team should not be required to search their files to reproduce documents already in the possession of the County and its staff." [124] at 7.  This misses the point.  Defendants were careful to ask for communications that did not involve Defendants' counsel.  It is disconcerting that the United States wants to deny Defendants the opportunity to review communications relevant to this action that Defendants' counsel have been excluded from.  It is telling that the United States cites no authority which prohibits a party from obtaining such relevant evidence in discovery.

The United States' appeal to preserving the Monitor's and her consultants' "time and focus" so that they can provide "information [the Court] needs" is ironic.  This is precisely why Defendants request a continuance.  Since Defendants announced on January 14 that they intended to seek termination of the consent decree, the Monitor and her consultants put together

---

[7] ECF 8-1. Consent Decree at ¶ 150.d.

an eleven-day monitoring visit that began January 24 and concluded February 3, 2022.  A continuance of the February 14 hearing would allow the Monitor and her consultants sufficient time to provide the requested information, would enable Defendants to receive and analyze that information, and afford Defendants a reasonable opportunity to question the Monitor and her consultants related to their observations and opinions before engaging in a two-week evidentiary hearing.  Putting aside the obvious extent to which a continuance would alleviate the prejudice Defendants face from the present schedule, a continuance of the hearing under these circumstances appeals to any notion of fairness.

The United States' arguments related to its counsel's communications with the Monitor and her consultants is predicated on a flawed view of the Consent Decree's provisions. While the Consent Decree certainly allows the parties to have ex parte communications with the Monitor, the Consent Decree's provisions say nothing about allowing ex parte communications with her consultants and nothing about preserving from discovery any communication with the Monitor. Reaching once again, the United States' reliance on *Educare* is misplaced.  *See* [124] at 8 (citing 2020 WL 4334765, at *3). Namely, that case arises from a distinct context and did not involve a request to take discovery from a court-appointed monitor.

Rather, in the context of a court-appointed monitor, persuasive authority makes clear the Monitor and her consultants should be subject to discovery, including depositions.  *See Arcuri v. Trump Taj Mahal Assocs.*, 154 F.R.D. 97, 111 (D.N.J. 1994). There, (and much like the United States here), a party attempted to use the deliberative process privilege as a sword to cut-off a party from deposing a court-appointed monitor, claiming the monitor was a "quasi-judicial officer." *See id*. at 110-11.  Rejecting that argument, the district court explained that "relevant cases which discuss the 'deliberative process[]' . . . [p]rincipally, . . . deal with the deliberations

8

and the decisions of administrative agencies and their officers . . . ."  *Id*. at 111 (citing cases).
The Court expressly focused on the fact that, contrary to an uninvolved third party, the "monitor,
court-appointed as he was, served a different function . . . affirmatively seeking to protect
specific interests in a way that none of the 'quasi-judicial' officers should or may."  *Id*. at 111.

Here, the facts and circumstances of this case make clear the Monitor and her consultants
cannot be considered "quasi-judicial officers."  Far from being anything akin to a neutral
decisionmaker, the Consent Decree's terms incentivize the Monitor and her consultants to
prolong the life of the decree: "[t]he cost of the Monitor's fees and expenses will be borne by the
County."  Moreover, United States' counsel have repeatedly referred to the Monitor and her
consultants as "their experts" both on informal teleconferences and during the Court's February
1, 2022, status conference, and the United States has acknowledged its history of actually relying
on the Monitor and her consultants as its experts. On such a record, the Monitor and her
consultants cannot be considered akin to "quasi-judicial officers." *See Arcuri*, 154 F.R.D. at 112
(rejecting effort to prevent deposition of court-appointed monitor reasoning, in part, that
"[t]ypical judicial and quasi-judicial officers function to apply rules, regulations, statutes and
case law impartially, without the affirmative "mission" of promoting the best interests of a
particular party or group").

With respect to witness preparation, *see* [124] at 9-10, the United States' argument takes
the terms of the Consent Decree significantly beyond the context and scope within which those
terms exist.  The United States appears to claim that its right to communicate ex parte with the
monitors somehow gives the United States the right to conduct ex parte witness preparation with
those same monitors.  The United States ignores, however, the context in which this right to ex
parte communications exists: the parties have a right to ex parte communications only in the

context of the Monitor's monitoring functions and "regarding th[e] Agreement." *See* [8-1] Consent Decree at 55 (¶141). In any event, this provision—even if somehow applicable—only relates to the Monitor—Lisa Simpson—and <u>not</u> her purported "Monitoring team," and the United States has not and cannot point to a provision to the contrary. *See id*.

Moreover (and worse), as has been repeatedly stated in this matter, the Monitor and her consultants are the eyes and ears of the Court. The United States makes no effort to reconcile this view of the Monitor and her consultants with its repeated references to the Monitor and her consultants as "their experts." Making the contradiction worse, the United States argues that these same monitors (who the United States allegedly should be allowed to privately meet with and witness prep), should be viewed as "quasi-judicial officers" from whom Defendants should have no right to obtain information through discovery. The complete lack of any fairness inherent in this flagrant level of contradiction must be prevented, and Defendants respectfully request the United States be precluded from engaging in or otherwise conducting witness preparation with the Monitor and her consultants.

## CONCLUSION

Defendants respectfully request that the Court continue the consolidated evidentiary hearing or, in the alternative only, bifurcate the hearing such that the show cause issue proceed on February 14 but the PLRA issue be continued to allow Defendants sufficient time to conduct the discovery requested in this Motion related to observations, impressions, and other information the monitors now have related to the current conditions and operations of the Raymond Detention Center, the Work Center, and the Henley Young Patton Detention Center.

This, the 4th day of February, 2022.

Respectfully submitted,

**PHELPS DUNBAR, LLP**

BY:   _/s/ Nicholas F. Morisani_
        Reuben V. Anderson, MB #1587
        W. Thomas Siler, Jr., MB #6791
        James W. Shelson, MB #9693
        Nicholas F. Morisani, MB #104970
        Loden P. Walker, MB #105996
        4270 I-55 North
        Jackson, Mississippi 39211-6391
        Post Office Box 16114
        Jackson, Mississippi  39236-6114
        Telephone: 601-352-2300
        Telecopier: 601-360-9777
        Email: reuben.anderson@phelps.com
              tommy.siler@phelps.com
              nick.morisani@phelps.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 4, 2022, I had this Memorandum electronically filed with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter.

*/s/ Nicholas F. Morisani*
Nicholas F. Morisani
