

————————————

No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.

*Defendants.*

————————————

FIRST ORDER OF CONTEMPT

————————————

Before CARLTON W. REEVES, *District Judge*.

The United States Department of Justice brought this action to end unconstitutional conditions of confinement at Hinds County's Raymond Detention Center (RDC).

In 2016, Hinds County's Board of Supervisors promised to fix the problems by agreeing to a Consent Decree. In 2020, facing the threat of being held in contempt of court, the Board of Supervisors again promised to fix the problems by agreeing to a Stipulated Order.

It is now 2022. Many of the problems the Board promised to address have not been corrected. Specifically, the County is non-compliant with more than two dozen provisions of the Consent Decree.

As explained below, therefore, Hinds County and its Board of Supervisors are in contempt of court.

## I.    Factual and Procedural History

RDC has been troubled since it opened in 1994. From its inception, "the jail designed to improve conditions for detainees has faced a myriad of problems: structural deficiencies, chronic understaffing and poor management. But fixing those problems ha[s] been elusive under whatever sheriff and Hinds County Board of Supervisors are in elected office at a given time." Kayode Crown, *One Jail's Tale: Hinds County Detention Center At Risk Of Federal Takeover*, Miss. Free Press (Oct. 15, 2021).

Captain Diane Riley testified shortly after RDC's opening that "the new jail's doors were inadequate to provide security." *Dean v. Thomas*, 933 F. Supp. 600, 608 (S.D. Miss. 1996). That is, the cell doors failed to lock. Nearly three decades later, the cell doors still fail to lock. *See* Docket No. 94 at 4 [hereinafter *Fourteenth Monitoring Report*]; *see also* Ruth Ingram, *Year after riot, cell doors at Hinds County jail still don't lock*, Clarion-Ledger (July 23, 2013); Ruth Ingram, *Officials: 'Antsy' juvenile inmates flood area at Hinds jail in Raymond*, Clarion-Ledger (July 19, 2013) ("We have doors with no locks," the Sheriff's spokesman candidly admitted.); Docket No. 31 at 20 ("the Jail continues to lack even the most basic security and safety features, such as lockable cell doors . . . ."); Docket No. 60 at 4 ("At RDC, doors and locks are broken. Prisoners can break out of their

cells, break out of their housing units and even enter a jail control room.").

A significant riot in 2012 brought the facility's problems to the forefront. "[P]risoners destroyed fixtures and walls, sprayed water hoses and fire extinguishers, and left ceilings in shambles," the State's newspaper of record reported. Ruth Ingram, *Jail getting repairs; much more needed*, Clarion-Ledger (Nov. 7, 2012). "It's no secret that the door locks need to be replaced," Chief Deputy Chris Picou added. "I don't know that the jail has ever been up to industry standards." *Id.*

A series of escapes in 2012 and 2013 shed additional light upon the conditions at the jail. *See* Ruth Ingram, *Escape draws attention to jail, policies*, Clarion-Ledger (Apr. 22, 2013) ("Escapes this year and last have been blamed on faulty locks and security for jail and cell doors. The county last year ordered emergency repairs in April on doors that had been problematic and a security risk since the facility opened in 1994."). Sheriff Tyrone Lewis, who had commissioned a 500-page report on the previous administration, blamed the escapes on "malfunctioning doors and conditions at the aging facility." Monique Valeris, *Lewis says he's not pointing blame at McMillin*, WAPT (Aug. 8, 2012).

In 2013, Hinds County Circuit Judge Tomie Green convened a special grand jury to investigate conditions at RDC. The reporting this time centered on safety concerns:

> On Sunday, a SWAT team stormed the facility after a dozen inmates broke out of their cells, in part because of faulty locks. Last week, a group of juveniles flooded a portion of the jail by turning on a fire hydrant. Reports also surfaced that

> several inmates were stabbed and a number of
> deputies and jailers sustained minor injuries. In
> June, one inmate died and another was hurt in
> a string of violent episodes that also left three
> deputies with injuries.

Emily Le Coz, *Grand jury probes Hinds jail issues*, Clarion-Ledger (July 26, 2013). The grand jury concluded that RDC was "in a deplorable condition and inadequately staffed." Docket No. 3-4 at 5.

In 2014 and 2015, the U.S. Department of Justice's Civil Rights Division investigated conditions at RDC and the two other facilities that comprise Hinds County's jail system: the Work Center and the downtown jail. Docket No. 3-1. It concluded that the County was violating the Eighth and Fourteenth Amendments by, among other things described in its 29-page report, failing to provide "minimum levels of protection from violence," failing to have "sufficient numbers of trained staff," and incarcerating persons "beyond their court-ordered release dates." Docket No. 3-3 at 2-3. The problems had resulted in "at least three major riots, two alleged homicides, and numerous assaults on prisoners and staff members." *Id.* at 2. The Findings Letter resulted in the Mississippi Department of Corrections moving its state inmates from RDC. *State inmates removed from troubled jail in Hinds County*, Corrections 1 (May 27, 2015). "[W]e believe removing the state inmates is in the best interest of the State of Mississippi and the inmates," said State Corrections Commissioner Marshall Fisher. *Id*.

The Department of Justice filed this lawsuit in 2016. Its complaint described an inability to meet minimum constitutional standards with respect to detainee-on-detainee violence,

staff-on-detainee violence, "dangerously low staffing levels," jail policies and procedures, housing and classification systems, the physical plant, internal investigations, detention of persons who should have been released, and the treatment of juvenile and suicidal detainees. Docket No. 1 at 3-5. The Department alleged that the constitutional violations "have been obvious and known to Defendants for a substantial period of time." *Id.* at 5. The Attorney General herself signed the complaint. *Id.* at 7, 10.

The parties immediately entered into a Consent Decree. Docket Nos. 3; 8-1. The Consent Decree required Hinds County to implement dozens of minimal constitutional standards. Hinds County expressly stipulated that the Consent Decree was "narrowly drawn, extends no further than necessary to correct the violations of federal rights," and "is the least intrusive means necessary to correct these violations." Docket No. 8-1 at 61.

A Monitoring Team was also established. *Id.* at 54; *see also* Docket No. 10; *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974). It includes Elizabeth Simpson, David Parrish, Jim Moeser, and Dr. Richard Dudley. They are subject-matter experts in corrections, corrections operations, juvenile justice, and corrections mental health, respectively. The Monitors began to provide technical assistance, conduct regular site visits, and serve as the eyes and ears of the Court[1] as the parties attempted to meet the requirements of the Consent Decree.

---

[1] The Consent Decree and Monitoring Team were approved by U.S. District Judge William H. Barbour, Jr. The case was transferred to the undersigned in December 2018 upon Judge Barbour taking senior status.

Hinds County's efforts have borne fruit at one of its jails—the Work Center.[2] The Monitoring Team describes the Work Center as a functional jail for the citizens of Hinds County. *See, e.g.*, Fourteenth Monitoring Report at 29. This Court's own visits to the facilities confirms that the Work Center largely operates as a jail should.

The story is not the same for RDC.

In 2019, the Department of Justice filed a Motion for an Order to Show Cause outlining a litany of ongoing constitutional violations at RDC. Docket No. 31. It described the County's "continued failure to comply with nearly all provisions of the Settlement, including provisions regarding security, medical screening, suicide prevention, mental health care, youth services, fire safety, sanitary conditions, and release procedures." *Id.* at 5. As any elementary school child understands, the County was flunking, miserably. The result was rioting, stabbings, a murder, staff-on-detainee assaults, and a "major disturbance" during a Monitoring Team site visit that resulted in eight emergency room transports. *Id.* at 7-8, 14. The Department added that the situation on the ground was "likely worse" than it could adequately summarize because of poor record-keeping at RDC. *Id.* at 8.

Hinds County again avoided significant litigation, and possible sanctions, by agreeing to a Stipulated Order. *See* Docket Nos. 60 and 60-1; *accord Plata v. Schwarzenegger*, 603 F.3d 1088,

---

Immediately upon being assigned the case, this Court held a status conference and "received an update as to the progress toward compliance with the Consent Agreement from the parties and the Court Appointed Monitor." *See* Minute Entry of Jan. 15, 2019.

[2] Hinds County's third facility, the downtown jail, was closed in 2020.

1091 (9th Cir. 2010). By the parties' admission, the Stipulated Order was "designed by the parties to be additional relief," and "d[id] not replace the Court's original consent decree." Docket No. 55 at 5. Instead, the Stipulated Order focused on the areas of "greatest concern," *i.e.*, "[t]he locks not working," "repairs to the physical plant," and "staffing enhancements, the creation of a staffing plan, better use of staff, recruitment, and retention." *Id.* at 16.

At a December 6, 2019 hearing, the parties also addressed the lack of a qualified jail administrator. Hinds County conceded that it did not "currently have an administrator who meets the requirements of Paragraph 38 of the agreement." *Id.* at 34. Accordingly, the Stipulated Agreement mandated "that the county hire somebody who does have those qualifications." *Id.*

When the Court inquired about the ability of the then-sitting Board of Supervisors to bind future Boards to the Stipulated Agreement, the attorney for the County assured the Court that such concerns were misplaced. He cited to Judge Barbour's prior observation that "it was irrelevant who the board was," as "[i]t's the county that is the party, and the county has constitutional obligations that it must obey." *Id.* at 55. As another attorney put it, "[y]ou don't get a fresh slate when you come into office." *Id.* at 56. Regardless of personnel changes, the County was bound to follow the Stipulated Agreement. At the close of the hearing, the attorney for the County entered a statement on the record, professing a desire to "make sure that the incoming supervisors, regardless of who they choose as counsel, know those words well," and quoted the Court's earlier warning that if the County "'remains uninterested in fixing this problem, the government will be doomed

to repeat it and repeatedly have to defend it in federal court.'" Counsel assured the Court that he and the County did "wholeheartedly hear" the Court's concerns regarding conditions at RDC. *Id.* at 99. He then, "on behalf of the county," vowed to "continue doing everything we can for whatever time we represent the county to make sure that no one is treated inhumanely at . . . county detention facilities." *Id.*

This Court begrudgingly approved their agreement even though the County had reached sustained compliance "in only one of the 92 requirements of the Consent Decree." Docket No. 60 at 7. "While a finding of contempt is warranted," the undersigned wrote, "the parties' stipulated order outlines what is perhaps the most comprehensive remedial plan for Hinds County to become compliant that the Court has seen from the parties." *Id.* at 11. "Ten months from today, the County should have made significant progress on developing and implementing policies, making repairs to the physical plant and ensuring incarcerated youth have necessary programming, among other necessary investments." *Id.* Monitoring continued; periodic status conferences were held. The facility limped along into the present.

The situation deteriorated significantly in 2021. According to the Fourteenth Monitoring Report,

> There were a record number of fights and assaults at RDC in May [2021], there continue to be fires set by inmates, there is an extremely large amount of contraband in the facility including drugs, there have been a number of overdoses although no deaths from those overdoses, and there have been three deaths, two by suicide. Although there is some cause for

optimism with the new Detention Administra-
tor being hired[3], **this is a very disturbing trend**.

Fourteenth Monitoring Report at 3 (emphasis added).

The situation became more uncertain when Sheriff Vance, the
elected official with primary responsibility for RDC, passed
away from COVID-19 on August 3, 2021. On August 16, 2021,
the Board of Supervisors appointed Marshand Crisler to be
Interim Sheriff. *Marshand Crisler named interim Hinds County
Sheriff*, Jackson Advocate (Aug. 16, 2021).

On October 18, 2021, RDC experienced its sixth death of the
year. The Monitoring Team filed an emergency report on Oc-
tober 27 characterizing the pattern of deaths as "especially
alarming." Docket No. 96 at 2 [hereinafter *October 27 Emer-
gency Monitoring Report*].

A brief summary of each death is provided here.

The first death, on March 19, 2021, happened when a nurse
ordered an arrestee to be taken to the hospital and no one car-
ried out her order. *Id.* The arrestee subsequently collapsed. An

---

[3] The Monitoring Team reports that the (now-departed) Detention Ad-
ministrator, Major Kathryn Bryan, is "very well qualified." Fourteenth
Monitoring Report at 3. Indeed, at a status conference following Major
Bryan's hiring, counsel for the County declared that Major Bryan "comes
with a wealth of information" and that "[t]he sheriff has 1,000 percent faith
and trust in her." Docket No. 93 at 52. The County's attorney went on to
state that "now with the addition of Ms. Bryan, I can represent to the Court
that things are going to be evolving at a very rapid pace, at a very positive
pace, and the safety and security of our inmates and our staff is the num-
ber one priority of the sheriff." *Id.* at 67. The Sheriff was even more effu-
sive. Analogizing to basketball, the Sheriff expressed his complete backing
of Major Bryan, emphasizing that "there's no need in having Michael Jor-
dan on your team if you're not going to let him shoot the ball." *Id.* at 60.

oxygen concentrator was obtained but would not turn on because the electrical outlet was faulty. Someone ran to get an AED (automated external defibrillator) unit from Medical, but the AED unit had no pads. The arrestee died. RDC staff then "took the position that he was not an inmate because he had not been accepted/booked." *Id.* An after-action report has not been completed for this death.[4]

The second death, on April 18, was a suicide by a detainee being housed in a booking cell, a practice "that the Monitoring Team has repeatedly stated should not be done and is contrary to the Settlement Agreement." *Id.* The Officer who discovered the body could not enter the unit because he lacked keys, and the Officer who was supposed to be on duty at booking was not at his post. "The last documented well-being check was made at 1105, more than three hours before the incident." *Id.* Again, no after-action report was completed.

The third death occurred on July 6. It was another death by hanging—although the available record is silent on whether it was a suicide. The Officer charged with performing 30-minute head counts "left the unit" for unknown reasons. *Id.* at 3. When he returned to look in, he did so from a vantage point "from where he could not possibly see each inmate to conduct an accurate count." *Id.* Again, no after-action report was completed.

Death number four was a drug overdose on August 3. "An IAD investigation is still underway, but inmates on the unit

---

[4] An after-action report is a way for officials and monitors to "gather facts, identify problems, examine staff performance, and develop a plan to prevent future" major disturbances. *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *11 (S.D. Miss. June 10, 2015).

reported that they had been calling for assistance for five hours and that there had been no response to their cries for help." *Id*. The condition of the body indicated that the detainee had been dead for some time when he was discovered. Again, no after-action report has been completed.

The fifth death occurred the next day, when a detainee died in the hospital from COVID complications. "Although the death appears to be medically related," the Monitoring Team wrote, "there are questions regarding when his symptoms first appeared and whether they were timely and adequately responded to as well as . . . the adequacy of the precautions being taken by the Jail to prevent the spread of the virus." *Id.* No investigation into his death was conducted.

The sixth death warrants a few more details. On October 18, was an assault in a unit where the doors do not lock and staff supervision is "minimal." *Id*. The Monitors' description relayed the following:

> At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later.

11

*Id.* at 3-4.[5]

The Monitoring Team concluded its Emergency Report with a recommendation "that the Court set a status conference/hearing to address immediate measures that need to be taken to address the concerns raised above and prevent the future loss of life." *Id.* at 5.

On November 10, Detention Administrator Bryan submitted her letter of resignation. She described "a distinct lack of support" and relayed in detail a recent directive from the Interim Sheriff that she found "reckless and dangerous." She had served for a total of only five months before submitting her letter of resignation. She planned to leave in mid-February 2022.

On November 23, 2021 a runoff election was held to replace Sheriff Vance. Interim Sheriff Crisler faced off against Tyree Jones, a member of Vance's command staff. That same day, after the polls closed and before the results of the election were known, this Court issued an Order to Show Cause directing the County to explain why it should not be held in contempt of court and why a receivership should not be imposed to run RDC.

Tyree Jones won the runoff election later that night. He was sworn into office in December 2021 and presently serves as Hinds County Sheriff.

On January 31, 2022, Major Bryan was relieved of her duties. This Order followed.

---

[5] The County submits that "Major Bryan personally investigated the incident and authored the after-action report" for this death. Docket No. 112 at 5.

## II.      Law

### A.      Consent Decrees

"A consent decree is akin to a contract yet also functions as an enforceable judicial order." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Consent decrees are commonly used to address ongoing constitutional violations in jail and prison cases. *E.g.*, *DePriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *3 (S.D. Miss. June 10, 2015).

Although "state and local authorities have primary responsibility for curing constitutional violations," *Hutto v. Finney*, 437 U.S. 678, 687 (1978), "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew*, 540 U.S. at 440.

### B.      Stipulations

"As a general rule, a stipulation is a judicial admission binding on the parties making it, absent special considerations." *Vallejos v. C. E. Glass Co.*, 583 F.2d 507, 510 (10th Cir. 1978) (citation omitted). Because a stipulation concedes "the truth of some alleged fact . . . *the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it and the other is not allowed to disprove it.*" *Vander Linden v. Hodges*, 193 F.3d 268, 279 (4th Cir. 1999) (cleaned up).

The Fifth Circuit strictly construes stipulations:

> Before agreeing to a stipulation, a litigant has a duty to satisfy himself concerning the matters which his opponent proposes for stipulation.

13

> Once the stipulation was made, any error in col-
> lating or tabulating its supporting documents
> was no longer [the plaintiff's] responsibility.
> The ultimate and underlying facts were ac-
> cepted by and binding upon both parties. . . .
> Once a matter is stipulated, it should then be
> laid to rest and should not be inquired into fur-
> ther unless the stipulation is vacated by consent
> or set aside by the court.

*Downs v. Am. Emp. Ins. Co.*, 423 F.2d 1160, 1164–65 (5th Cir. 1970) (citing Wigmore on Evidence).

Courts have every right to rely upon stipulations. "The power of the court to act in the disposition of a trial upon facts con-ceded by counsel is as plain as its power to act upon the evi-dence produced." *Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1880).

### C.      Judicial Estoppel

Judicial estoppel is defined as "taking a position clearly in-consistent with an earlier position that was accepted by a tri-bunal in circumstances that would create an unfair advantage or impose an unfair detriment on an opposing party." Wright & Miller, 18B Fed. Prac. & Proc. § 4477 (2d ed. updated April 2021). As the Supreme Court articulated long ago, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken . . . ." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895).

14

The purpose of judicial estoppel "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (cleaned up). The doctrine is an equitable one "invoked by a court at its discretion." *Id.* (citation omitted).

"In this circuit, at least two requirements must be met before a party's argument may be judicially estopped. First, the estopped party's position must be clearly inconsistent with its previous one, and second, that party must have convinced the court to accept that previous position." *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (cleaned up). That said, the doctrine "defies inflexible prerequisites or an exhaustive formula." *Id.*

### D.    Civil Contempt

"Civil . . . contempt is a sanction to enforce compliance with an order of the court." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (citations omitted). Courts have inherent power to enforce their orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). As for consent decrees, courts have "the power to enforce and modify the terms of the decree and to penalize the noncomplier through contempt proceedings or the issuance of injunctive relief." *B.H. v. McDonald*, 49 F.3d 294, 300 (7th Cir. 1995).

To hold a respondent in civil contempt, the moving party must prove by clear and convincing evidence: "(1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987).

"The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). That means "[g]ood faith is not a defense to civil contempt." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002). "An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently." *McComb*, 336 U.S. at 191.

"If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Frew*, 540 U.S. at 440 (citation omitted); *see also Am. Airlines*, 228 F.3d at 585.

### III. Discussion

Hinds County's new attorneys have filed a motion to terminate the Consent Decree. Docket No. 111. After stating for nearly six years that the provisions of the Consent Decree were necessary and in conformance with the Constitution, the County now says that the Consent Decree exceeds "the constitutional minimum necessary to provide the County's inmates with basic sustenance." Docket No. 112 at 2. In short, Hinds County says it is no longer violating its citizens' constitutional rights at RDC.

Needless to say, the available evidence does not support this proposition. *See, e.g.*, Docket No. 100 at 10-13 and 18-27. The motion instead appears to be a last-ditch effort to prevent a federal takeover of the Raymond Detention Center.

Given the evidence contained in the 15 Monitoring Reports, Hinds County's newfound position is very concerning. Fifth Circuit law on stipulations and judicial estoppel, recited above, does not favor parties changing their positions without

evidentiary support. Hinds County decided to commit to the Consent Decree and the Stipulated Order. Twice it agreed that their provisions were narrowly tailored and the minimum necessary. It should have to live with that choice until it fixes RDC.

To all this, the County's new lawyers swear that there's a "positive, upward trend of operations at the RDC." Docket No. 112 at 4. They minimize the number of deaths the facility saw last year, pointing out that there's a new Sheriff in town. And although the Sheriff's relationship with the Detention Administrator is "damaged," as the County concedes—so damaged that Major Bryan just left her job—it then says "operations and improvements at the RDC continue to take hold and move forward."[6] *Id.* at 5. But this Court visited RDC last week. It looked substantially the same as when the Court visited nearly three years ago.

Because the County has invoked the termination provisions of the Prison Litigation Reform Act, the Court will conduct an evidentiary hearing to determine which parts of the Consent Decree should continue to govern RDC into the future—if any. The hearing will commence February 14. The public is invited to attend and learn for itself whether there are ongoing constitutional violations at RDC.

For present purposes, though, the Court confines itself to the contempt issue. To that end, it now identifies several provisions of the Consent Decree that the County is violating, and

---

[6] We do not know whether Major Bryan was fired or resigned. Testimony at the evidentiary hearing may shed light on the subject.

which therefore warrant contempt of Court.[7] *See Petroleos Mexicanos*, 826 F.2d at 401.

In this inquiry the Court primarily relies upon the reports of the Monitoring Team, the subject-matter experts recommended by the parties and charged by Judge Barbour with being the eyes and ears of the Court. *See Eng. v. Cunningham*, 269 F.2d 517, 525 (D.C. Cir. 1959). As the Department of Justice explained in a recent memorandum,

> In many cases involving consent decrees and settlements with state and local governments, the use of monitors is essential to the successful implementation of the decree or agreement. Monitors serve a crucial role as an independent validator of a jurisdiction's progress in implementing the reforms required by a settlement. They are generally selected after an extensive negotiation between the parties, with approval by the supervising federal court. Because they are officers of the court, monitors act as neutral arbiters of a jurisdiction's compliance with a decree, a process that can increase the confidence the Court and stakeholders have in the settlement process.

Memorandum from Attorney General Merrick Garland to Heads of Civil Litigating Components and United States Attorneys at 2-3 (Sept. 13, 2021); *accord Juan F. By & Through*

---

[7] This Order contains the obvious shortfalls—the non-compliant provisions. After the evidentiary hearing, further findings may issue regarding the 59 requirements on which Hinds County is presently in "partial compliance."

*Lynch v. Weicker*, 37 F.3d 874, 880 (2d Cir. 1994) ("Defendants had conceded that they could not fully comply with the provisions in the decree, and the monitor's findings, analysis, and recommendations to the district court, all based on ample evidence, did no more than ensure compliance with the decree . . . . [T]he court monitor [ ], under the consent decree as modified by the monitoring order, is the centerpiece of the alternative-dispute-resolution process.").

Also at the Court's disposal, however, are numerous status conferences, hearing transcripts, and the County's response to the Court's Order to Show Cause. In that response, the County begged this Court to delay its decision on contempt until July 1, 2022, so that it could continue "turning the RDC battleship towards a new and better heading." Docket No. 105 at 1. Apparently, the County and its new attorneys decided to just abandon ship, and instead spent their time engineering a position antithetical to all of the County's prior representations.

Now to the civil contempt analysis.

The first two elements of the civil contempt standard are easily satisfied. There is no dispute that a Court Order was in effect that required certain conduct of Hinds County. The County agreed to a judicially-enforceable contract when its (previous) attorneys signed the Consent Decree.

The remaining element asks whether Hinds County failed to comply with the Court Order. Based on the facts contained in the Fifteenth Monitoring Report, the answer is a resounding "yes."

Hinds County's termination motion claims as victory every provision for which it is in sustained compliance (three of 92

requirements), substantial compliance (zero requirements), and even *partial* compliance (59 requirements). *See* Docket No. 112 at 4. But that leaves more than two dozen provisions where the County is simply non-compliant with a Court Order. For each of those, the County is in civil contempt.

The non-compliant paragraphs are as follows:

### Protection from Harm

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail. . . . (remainder omitted).

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process. . . . (remainder omitted).

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail. Installation must be completed within two years after the Effective Date.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

20

**Use of Force Training**

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action. The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Use of Force Supervisor Reviews**

60. After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions: a. Ensure the safety of everyone involved in or proximate to the incident. . . . (remainder omitted).

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

62. Reviewing supervisors must document the following: a.  Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor; . . . . (remainder omitted)

### Incident Reporting and Review

66. Ensure that Jail supervisors review and respond appropriately to incidents. At minimum: a. Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident. . . . (remainder omitted)

### Sexual Misconduct

67. To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following: . . . . (remainder omitted)

### Grievance and Prisoner Information Systems

72. The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

73. The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures. . . . (remainder omitted).

22

### Restrictions on the Use of Segregation

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness. . . . (remainder omitted)

### Lawful Basis for Detention

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. . . . (remainder omitted).

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise. . . . (remainder omitted).

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners. . . . (remainder omitted).

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. . . . (remainder omitted).

100. The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

103. The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator. The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures. Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

104. The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are

being released in a timely manner. The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above. The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Continuous Improvement and Quality Assurance**

111. Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations. The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews. These reviews and corrective actions must be documented and provided to the United States and Monitor.

113. Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security. The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner

privacy rights, system security, and audit mechanisms.

114. Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process. . . . (remainder omitted).

### Criminal Justice Coordinating Committee

117. The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

### Policy and Procedure Review

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

133. No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

135. The County must annually review its policies and procedures, revising them as necessary. . . . (remainder omitted).

**County Assessment and Compliance Coordinator**

159. The County must file a self-assessment compliance report. . . . (remainder omitted).

Imposition of "an appropriate sanction for that contempt" is reserved for future proceedings. *Petroleos Mexicanos*, 826 F.2d at 398 (collecting cases).

### IV.    Conclusion

For these reasons, Hinds County and its Board of Supervisors are hereby found to be in civil contempt of court.

**SO ORDERED**, this the 4th day of February, 2022.

s/ CARLTON W. REEVES
*United States District Judge*

27