```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                            NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                              PLAINTIFF

 5   VERSUS                     CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                         DEFENDANTS
 7

 8

 9                     VIDEOCONFERENCE PROCEEDINGS
                  BEFORE THE HONORABLE CARLTON W. REEVES,
10                 UNITED STATES DISTRICT COURT JUDGE,
                              FEBRUARY 1, 2022,
11                           JACKSON, MISSISSIPPI

12

13                     (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

1    **APPEARANCES VIA VIDEOCONFERENCE:**

2        FOR THE PLAINTIFF:

3            CHRISTOPHER N. CHENG, ESQ.
             SARAH G. STEEGE, ESQ.
4            LAURA L. COWALL, ESQ.
             HELEN VERA, ESQ.
5            MITZI DEASE-PAIGE, ESQ.

6        FOR THE DEFENDANTS:

7            WILLIAM T. SILER, ESQ.
             NICHOLAS F. MORISANI, ESQ.
8            JAMES W. SHELSON, ESQ.
             TONY R. GAYLOR, ESQ.
9            RAYFORD G. CHAMBERS, ESQ.
             JOHN C. HALL, II, ESQ.

10       ALSO PRESENT:

11           ANTHONY NJOKU
12           ELIZABETH SIMPSON
             DAVID PARRISH
13           JIM MOESER
             RICHARD DUDLEY
14           CREDELL CALHOUN
             SYNARIUS GREEN
15           LESLIE FAITH JONES

16

17

18

19

20

21

22

23

24

25

1

**TABLE OF CONTENTS**

2        Style and appearances.....................................1-2

3        Court Reporter's Certificate............................. 62

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     **PROCEEDINGS VIA VIDEOCONFERENCE, FEBRUARY 1, 2022**

2

3          THE COURT:  Good morning.  Can everyone hear and see

4     me?

5          MR. GAYLOR:  Yes, Your Honor.

6          MR. SILER:  Yes, Your Honor.

7          THE COURT:  All right.  Who do I have?  I just need to

8     do a roll call for the record.

9          Who do I have on for the Government?

10         MR. CHENG:  This is Christopher Cheng.  I also have

11    Helen Vera, Sarah Steege, Laura Cowall, and we also have one

12    of our staff members, Anthony Njoku.

13         THE COURT:  Okay.  And I see Ms. Paige is there from

14    the U.S. Attorney's Office as well.

15         MR. CHENG:  And Mitzi Paige.  Thank you.

16         THE COURT:  Okay.  Who is on for Hinds County?

17         MR. SHELSON:  Your Honor, for Hinds County are Jim

18    Shelson, Tommy Siler, and Nick Morisani.

19         MR. GAYLOR:  And, Your Honor, you also have Board

20    Attorney, Attorney Tony Gaylor, and Attorney Ray Chambers and

21    Board President Supervisor Credell Calhoun.  And you also have

22    on behalf of the sheriff, Attorney John Hall.

23         MR. GREEN:  You also have Synarus Green.

24         MR. GAYLOR:  Synarus Green is on as well.

25         THE COURT:  Okay.  Anyone else?

1          Thank you-all for making yourselves available.  I

2    wanted to talk to you about the upcoming hearing, which is due

3    to begin on the 14th.  The Court has received the County's

4    response to the Court's show cause order.  And so -- and the

5    Court, as the parties know, this hearing was originally

6    scheduled to begin yesterday, but we continued it in light

7    of -- we continued it in light of the COVID diagnosis of one

8    of the County's lawyers, and so we're set to go forward on

9    February the 14th.

10         I am aware that -- oh, I'm sorry; the monitors are on

11   the call, Ms. Lisa Simpson and Mr. Dave Parrish and --

12         MS. SIMPSON:  Your Honor?

13         THE COURT:  Go ahead.

14         MS. SIMPSON:  Yes, I was just going to say and also

15   with my team, Jim Moeser and Dr. Richard Dudley was -- oh,

16   there he is, yes.

17         THE COURT:  I don't see Moeser, but I see Dudley.  But

18   that's fine.  That's fine, and I think I announced everybody

19   who's on, who's present on the call.  Oh, I am aware that the

20   County has also filed its motion to terminate the

21   settlement -- well, terminate the consent decree under the

22   PLRA, and there's been a response filed by the Government.

23   And the County filed its rebuttal on yesterday, so the Court

24   will -- I wanted to talk with the parties about what this

25   hearing is to look like on the week of the 14th, and I will

1   hear from the Government.  And I will give you my thoughts as

2   well, but I'll hear from the Government and the defendant, the

3   defendants, and we will go from there.

4        Mr. Cheng, if you're prepared to speak on behalf of the

5   Government.

6        MR. CHENG:  I think we can at least provide our

7   tentative plan.  The assumption is we will take the bulk of

8   the two days with our direct examination of our experts.  We

9   will be disclosing our experts -- I should say experts.  We'll

10  be disclosing our witnesses next week to the defendants as

11  required by the scheduled order.  We would probably leave

12  sometime in that schedule, so the defendants can do their

13  cross-examination.  And we would assume the following two

14  days, the defendants present their case in chief, and we get

15  some time to do cross.

16       The Court had previously indicated that rebuttals would

17  be saved for Friday and should be fairly limited.  So we don't

18  know exactly how limited that would be, but we don't

19  anticipate extensive calling of rebuttal witnesses, provided

20  that the same rules apply to the defendants.

21       THE COURT:  Well, let me ask the Government this.  I

22  think one of the things that the Court talked to the parties

23  about is whether they're able to reach any or all or what

24  portion of stipulated facts have the parties reached or can

25  reach between now and the hearing?

1          MR. CHENG:  So, Your Honor, we have received a clear

2    answer from the defendants.  They will not stipulate to the

3    admission of the monitor reports.  They will also not

4    stipulate to anything regarding the monitors' qualifications

5    to testify in court, so it's likely we're going to have some

6    dispute over that during the hearing.

7          At the same time, our understanding is they may

8    actually try to call their own expert witnesses.  We have not

9    received any disclosures in that regard.  It is therefore

10   likely that we will be filing some type of motion *in limine* to

11   address some of these issues when those are due.

12         We have come to some agreement, or at least tentative

13   agreement, on exchange of exhibits before the hearing.  We

14   hope to able to resolve authentication challenges before the

15   hearing, but other evidentiary issues will be reserved for the

16   actual hearing.

17         We have also, at least tentatively I believe, come to

18   some partial agreement on what to do about personal identifier

19   information.  Our understanding is the defendants are favoring

20   sealing exhibits rather than redacting them, and so we still

21   have to hash out exactly how to do that and how that's going

22   to work out.  But it's likely the parties will be submitting

23   some type of motion to seal exhibits.  That's pretty much the

24   only agreement we've been able to come to, Your Honor.

25         THE COURT:  Okay.  I'll hear from the defendants with

1    respect to how the Government said that they intend to proceed

2    in accord with their understanding of the Court's guidance

3    from the other week.

4           MR. SHELSON:  Your Honor, this is Jim Shelson.  I'll

5    start for the County.  I don't have a lot to add to what the

6    Government just said.  You know, there's going to be I suspect

7    significant cross-examination in this case.  So if the

8    Government plans to use most of its two days for direct,

9    that's going to create problems, because as a good rule of

10   thumb, cross may last as long as direct.  So if the United

11   States is taking two full days of direct, it's just not going

12   to work from an timing perspective.

13          Beyond that, we're working on experts.  We (AUDIO GAP)

14   that's a work in progress, and so there's nothing to tell the

15   Government at this point other than we're working on it.

16          THE COURT:  Well, let's talk about that for a minute.

17   Is the Court wrong for treating this matter as the -- the

18   parties entered a consent decree.  The parties fashioned out

19   the terms of the agreement without the assistance of the

20   Court.  The parties were prepared to go forward with a

21   contempt hearing back in December of 2019 I do believe, and to

22   stave off that hearing at the end of that year, the parties

23   entered an agreement, another contract, the parties.  That was

24   negotiated by and between the lawyers and the affected

25   individuals in their official capacity, you know, the County,

1    everybody signed off on the agreement.

2         So somebody help me out, so the parties entered a

3    consent decree, and the parties, between each other, agreed

4    that this is what we will do or this is what -- yeah, this is

5    what we will do, because we don't want to go forward with the

6    contempt hearing.  Judge, will you please enter, sign off on

7    the agreement that we reached.

8         So what is it about the terms of that particular

9    agreement that necessitate the County now hiring experts to

10   tell me what's in the agreement between the -- I assume to

11   tell me what's in the agreement between the parties because

12   the Court -- and, please, help me if I'm looking at this

13   wrong.

14        The Court's show cause order is about whether the

15   County should be found in contempt for breaching the terms of

16   the agreement that the parties reached to stave off the last

17   contempt hearing.  So I'm just trying -- I'm perplexed to hear

18   that the County says now we have experts, or we will have

19   experts presumably to tell me what it is in the agreement that

20   they -- that is not an indication of a breach.

21        So help me, County.  Why is it the County believes that

22   it needs experts?

23        MR. SHELSON:  Your Honor, the 2019 (AUDIO GAP) is not

24   what's going to be tried on February 14th --

25        THE COURT:  Mr. Shelson, hold on; you're breaking up.

1           Now we don't hear you at all.

2           MR. SHELSON:  Is that better, Your Honor?

3           THE COURT:  Okay.  That's a little bit -- yeah, that's

4      better.  And by the way --

5           MR. SHELSON:  Thank you, Your Honor.

6           THE COURT:  Excuse me.  By the way, we do have a court

7      reporter present.

8           MR. SHELSON:  Yes, sir.  So, Your Honor, if I could

9      just run through the points you made in your question.  2019

10     is not -- are not the issues before the Court for

11     February 14th.  The motion for contempt is not before the

12     Court.  There's at least two places in the Government's

13     response to the PLRA motion where it says that their motion

14     for contempt is resolved.

15          The last report of the monitors is the 15th report,

16     that's going to be the closest thing to a written report we

17     have to go forward on.  The Court's show cause order is in the

18     context of the pending PLRA motion so --

19          THE COURT:  No.  No.  No.  No.  No.  No.  The Court

20     entered its show cause order in November.  The County

21     responded to that show cause order.  First of all, I think

22     asked for -- I don't know if they asked for an extension, but

23     the County responded to that show cause order.

24          The PLRA component of this was filed -- I may be

25     mistaken about what pleadings I've had before me.  But it's my

1    understanding the Court issued its order back in November,

2    gave the County an opportunity to respond, and the County did

3    in fact respond to that order, and part of that response was,

4    Judge, you should not hold us in contempt, because we have all

5    these moving parts and have all -- have had all these moving

6    parts.  We've had new sheriffs.  We've had new supervisors.

7    It's just been things going on here, so what the Court should

8    do is give us six months to rectify or to show you that we

9    have this under control; give us six months.

10          And then the County filed its separate motion, if I'm

11   not mistaken, and that's when the County added this notion

12   about dissolving the consent decree.  So I believe -- and I'm

13   going to hear from the Government -- I believe my hearing on

14   the motion for contempt is the one that is to be heard.

15          Now, does the County -- have I -- I guess have I

16   misrepresented the chronology?

17          MR. SILER:  You want me to respond?  Judge, this is

18   Tommy Siler.  Since I was involved when we started all of

19   this, I'll chime in on this.

20          No, your rendition of the chronology is correct.  But

21   two -- two things in answer to your question.  With respect to

22   the County needing expert witnesses, we do not contend we need

23   expert witnesses to tell the Court what is in the agreement.

24   What's in the agreement is there, the Court can read it, and

25   we're not asking experts to come in to tell you what's in the

1   agreement.

2          Our sole reason for needing experts is to help give the

3   Court information from which it can determine whether the

4   portions of the agreement have been complied with from a

5   factual standpoint.  So some of those -- some of the things

6   that are in the, I guess it's January 20th settlement

7   agreement, I think there's going to be a significant amount of

8   dispute over whether the County has met the criteria in that

9   agreement.  And I -- we would like our -- we would like to

10  have experts who could come in, go through the facility, and

11  opine as to whether they believe that we have met those

12  provisions in the agreement; that's number one.

13          THE COURT:  Well, let me ask you this --

14          MR. SILER:  Yes, sir.

15          THE COURT:  -- how then -- wait, wait, wait.

16          MR. SILER:  Okay.

17          THE COURT:  I'm sorry.  Let me ask you this:  How are

18  the experts who go into the facility today going to tell

19  anybody about what the facility was on the date of the show

20  cause order?  Because the date of the show cause order, in my

21  view, and I could be wrong, looks back, because it says please

22  show me why you should not be held in contempt for what you

23  have not done effective of the date of the show cause order.

24          So, for example, if there were doors that were not able

25  to be opened or doors that were locked or if there were fires

1    or something that the record suggests that occurred back on

2    October the 31st, how is it that an expert or anybody could go

3    into a facility today or tomorrow and tell me what has

4    happened back prior to the date of the show cause hearing?

5         And if I'm wrong about -- if the -- if I'm wrong about

6    how the Court should be looking at this contempt citation,

7    then, you know, we can figure that portion out.  But how does

8    an expert coming in today going to tell -- other than to

9    review records and things, how is an expert today walking

10   around the facility today going to tell me what the facility

11   was prior to the date of the -- the day before the entry of

12   the show cause order, which was I guess November the 21st,

13   November the 23rd.  It was the date of the -- it was the

14   night, at 7:01 p.m., of the run-off election; that was the

15   time; that was the date, and it looked back.

16        So how does an expert going into the facility today

17   going to tell me anything about what the facility was on the

18   night that the show cause order was entered?

19        MR. SILER:  Well, obviously, Your Honor, nobody that

20   was not in that facility on that day could tell you that,

21   including the Court monitors.  So if that -- you know, if that

22   is going to control what the witnesses can testify about, then

23   there's nobody, including these court monitors, that could

24   tell the Court that.

25        THE COURT:  The court monitors were doing their due

1    diligence for the last -- well, I guess since this whole

2    consent decree was in place, but in particular since January

3    of 2020.  And I realize that COVID became a matter of which

4    that prevented them from going into the facility, but it did

5    not impair their rights to file their monitoring reports.  The

6    County was complying.  The County was submitting documents.

7    The County was having interviews with the monitors.  The

8    monitors were doing their job over the last 24 months, the

9    last 36 months.

10          The monitors have been doing their job, and we've been

11   having status updates periodically.  No one has disagreed or

12   sort of challenged what the monitors were reporting to the

13   Court in every one of these status conferences that we were

14   having periodically in this case.  When we had these status

15   conferences in response to the submission of the monitors'

16   submission of their reports, we've had open hearings.  We've

17   had discussions.  We've had conversations.  We have records.

18   We have these transcripts of these hearings.

19          So I guess when cross-examining the monitors, what the

20   County and others might do is, you know, cross-examine them on

21   the basis that they were not at the facility.  They could not

22   come to the -- well, maybe they did not go to the facility,

23   and I'll remind the parties, you know, this Court was not

24   going to make the monitors go to the facilities.

25          The facility, I believe, is what led to the death of

1   the former sheriff and the infection of his entire team,

2   command staff, the undersheriff, his counsel, the jail

3   administrator all contracted COVID.  I was not about to send

4   anybody to that place, but that's going down a different path.

5         So tell me, why is it -- why the County might believe

6   that experts would need -- that they would need -- I mean,

7   because if you do need to call experts, you know, it may be

8   that we allow you to.  But just tell me, what is it that the

9   experts could tell the Court about why the County should or

10  should not be held in contempt as of the Tuesday before

11  Thanksgiving, which was the run-off date, and that was the

12  night the Court entered its order.

13        So what is it that experts could tell me leading up to

14  that that would be germane to what I believe is the issue

15  before the Court on February the 14th?

16        MR. SILER:  Your Honor, I would say that we -- nothing

17  that I'm aware of requires us to accept the conclusions or

18  opinions of the court monitors who have not been in that

19  facility.  They've been making -- they made decisions, drew

20  conclusions, formed opinions based on statistics and

21  conversations and comments, and I'm not aware of anything that

22  says the defendants are required to just accept that.

23        And we believe that we are entitled to have experts who

24  also review statistics, talk to people, look at this facility,

25  and ask them to draw opinions just like these monitors did.

 1    And if their opinions are different, I think the Court should

 2    know about that.

 3         THE COURT:  How about estoppel?  I mean, we've had

 4    hearings after each of these reports were submitted.  You

 5    know, nobody has contested what the monitors reported to the

 6    Court in the presence of everybody.  DOJ had an opportunity to

 7    not cross-examine, but to speak with the monitors in open

 8    court, as did the County.  When they reported to me on -- when

 9    they reported to the Court on each of the status reports that

10    have been entered, 1 through 14, I don't believe we've met

11    since the 15th, and maybe we have.  I have to go back and

12    look.  If the 15th monitor's report is one that maybe or maybe

13    not -- we may have or may not have had that.

14         So, I mean, again, the County took action based on the

15    earlier monitor's report.  The County went and hired

16    Benchmark, for example.  The County hired the current jail

17    administrator because of what the monitoring reports have

18    said.  The County adopted some certain procedures.  The County

19    accepted persons that the monitor gave to them to help them do

20    their procedures.  So why is it that estoppel does not apply

21    to -- I mean, you know, nobody has contested any of this --

22    any of this.

23         MR. SILER:  Your Honor, from our point of view --

24         MR. GAYLOR:  Excuse me, Tommy.

25         Your Honor, if I may just for one moment?  At each of

1   the hearings that we've held over the past two years, at no

2   point has the County conceded to every assertion that the

3   monitors or the Department of Justice have made.

4        In fact, Your Honor, there have been instances in which

5   reports have been made by the monitors during those hearings

6   that we objected to tremendously, because they were completely

7   inaccurate in terms of what was in the facility, when things

8   went into the facility, if things were ever in the facility.

9        Your Honor, at no point, if we go back through the

10  records of those hearings, can we assert that the County has

11  not objected to the characterizations that have been placed

12  out there by the monitors and the Department of Justice.

13  Certainly, Your Honor, we have agreed to do certain things at

14  times, we've accepted some recommendations, and have taken

15  steps to follow through in an effort to be compliant, Your

16  Honor.  But at no point did we not object to some of the

17  things that were asserted within those hearings.

18       THE COURT:  So is the County prepared, Mr. Gaylor, to

19  enter some sort of stipulation with the Government on those

20  things that the County agreed to do?

21       I mean, because what I'm hearing is there probably

22  won't be any stipulations, number one, and I heard Mr. Shelson

23  say if the County takes two days of putting on its witnesses,

24  it's going to take two days for us to cross-examine; that's

25  probably right.  And on the tail end of that what I hear is

1    that there's no way that this hearing that you want to have,

2    Judge, is going to be done in five days on the contempt

3    motion.

4         I haven't even gotten to the other side of the thing,

5    but on the contempt thing that even to have a hearing on

6    contempt is going to take more than five days.  And it seems

7    to me all the Court has to do is find out if -- if the County

8    is not in compliance with the terms of its agreement that it

9    negotiated with DOJ to stave off the last contempt hearing

10   that we were scheduled to have in December 2019.  So is the

11   County prepared to stipulate to those terms that it does

12   not -- stipulate to those things that it either agreed to and

13   has not complied with, or are there any stipulated facts?

14        MR. SILER:  Your Honor, it's hard to say in a global

15   sense that we'll stipulate to facts indicating that we are in

16   contempt of that January 20th order.  I mean, this -- there

17   are a lot of things going on here the Court needs to know

18   about, and we're not prepared to enter into these broad

19   stipulations that we are in contempt of that -- that

20   agreement.

21        THE COURT:  Okay.  All right.  Well, it takes me back

22   to the Government said that it is prepared to comply with the

23   Court's guidance with respect to two days here, two days there

24   for the other side, and the last day of rebuttal.  The

25   Government said that that's workable in their mind, but the

1    County, I take it, is saying that's not so in the County's

2    mind.

3         MR. SHELSON:  Judge, this is Jim Shelson again.  If

4    that's the impression I left with the Court, then I didn't

5    speak clearly enough, and I apologize.  You know, when the

6    Court -- as I understood what the Court did, each party had

7    two days.  For the parties to contemplate there would be no

8    cross-examination in their respective two days, I don't think

9    is realistic here.  So all -- I'm not saying we can't get done

10   in a week.  I'm saying that if the United States takes two

11   full days of direct examination, Judge, that's a problem we

12   just (AUDIO GAP) --

13        THE COURT:  You went out again.  You said that's a

14   problem?

15        MR. SHELSON:  If they take two full days -- their two

16   full days with direct, Your Honor, that doesn't leave us time

17   to present an affirmative case, and I'm not trying to be

18   difficult.  It's just temporally a fact.

19        THE COURT:  Okay.  What if we reduce the number of

20   days?  What if I give the Government a day, and we deal with

21   the time -- I'm trying to -- again, we haven't gotten to the

22   County's PLRA side of the motion.  The Government suggested in

23   response to that motion that there's good cause to stay that,

24   and at least part of their motion says -- part of their

25   response says that.

1          But what if the Court were to deal with the contempt

2    issue in two to three days, Monday or Tuesday, and be done

3    with it by Wednesday?  Because I see the contempt issue as

4    something that is narrowly focused, and I'm just trying to

5    figure out, you know, as of the -- and I guess I could pull up

6    the calendar.

7          As of the Tuesday before Thanksgiving, the day the

8    Court entered its show cause order, if there are things that

9    are relevant from that point backward, why could we not deal

10   with those things in a fashion that is done in, say, Monday,

11   Tuesday, and Wednesday; 14th, 15th, and 16th?  Is there any

12   reason to believe that we cannot have a contempt hearing in

13   those three days?

14         Mr. Cheng, I saw you light up like you wanted to say

15   something.

16         MR. CHENG:  Yes, Your Honor.  Just to clarify, we don't

17   really see the PLRA piece as being completely separate from

18   the contempt piece.  Many of the same facts that will

19   establish contempt and the harmful conditions will be useful

20   to the Court on making the assessment on the PLRA findings and

21   whether there are ongoing conditions that violate the due

22   process rights of the pretrial detainees.  So in that sense,

23   we don't see the need to assume there's going to be a separate

24   process.

25         In terms of trying to condense it, there are some

1    options here.  You know, if the Court wants to make sure

2    there's enough time for cross, it can reserve time on the

3    hearing days for cross.  We don't necessarily agree with

4    defendants that they have to have one to one.  They kept

5    talking about it as being necessary to build their case, but

6    that's why they have two days to present their case in direct.

7    They shouldn't be building their case through cross.  They

8    should be building their case on their own time.

9         But they do have a right to cross, and so, you know,

10   we're going to assume that we have to leave some time for them

11   to do cross on our two days.  And maybe we could be more

12   specific about that, or the Court can provide guidance on it

13   depending on what defendants think.  But it's -- it just seems

14   a little bit like they're trying to protect as much of their

15   right to take up as much time as they can, and we have limited

16   trial time.  So we can't all have what they want.  The United

17   States, for example, would probably want more rebuttal time

18   than the defendants wish for, but we're going to follow

19   whatever the Court directs.

20        THE COURT:  Well, you mentioned something that you do

21   not see the PLRA as separate from the contempt hearing.  Now,

22   maybe I'm wrong, but I do, because one of the PLRA findings

23   that the Court will have to find is whether the conditions are

24   current and ongoing -- current and ongoing.

25        And in my view, the contempt matter looks back into

 1   time, and there's a finite time that we look back to to

 2   determine whether they are in contempt of their own agreement.

 3         Now, if the Court finds they're in contempt or doesn't

 4   find, whatever the Court finds at the end of the day might

 5   inform the Court on any violation of the PLRA, I would think.

 6   You know, if they were not found in contempt, then, you know,

 7   the real focus is whether it's current and ongoing.

 8         But nothing about a contempt sanction -- and I may be

 9   wrong.  I need y'all to help me out.  Nothing about a contempt

10   sanction suggests to me that we need to get into a matter that

11   is current and ongoing.  It's what led up to the Court's show

12   cause order in my view.

13         Now, I could be wrong about that.  I could be wrong

14   about that.  And if we do get into what's current and ongoing

15   and what is the minimum constitutional floor and all the due

16   process rights, in my view -- and I could be wrong -- in my

17   view, if the parties negotiate an agreement, parties can

18   always negotiate an agreement that provides more protection

19   than what the constitution requires.  That's every day.

20         You could always contract to give more protections in

21   any context, even prison context I do believe, if you have an

22   agreement.  This is not necessarily court enforced; this is

23   court endorsed, because you-all brought this agreement to me

24   to stave off the first hearing.  You-all brought it to me,

25   informed by counsel, fully informed.  Judge, we do not need to

1    go forward with this hearing, because we have entered an

2    agreement and this is what we're going to do.  And as a part

3    of that, we're going to allow the monitors to still come in.

4    As a part of that, we're going to have these status

5    conferences.  As a part of that, we're going to do this.  But,

6    Judge there is no need to have a hearing on the contempt

7    finding or on the court-ordered consent decree that was

8    entered back with Judge Barbour, because that was the

9    operative agreement.

10          And then you-all come to me with more, and you said

11   that this here will help the County; that's what the parties

12   said.  This here will help the County to get on track, and

13   they've agreed to do these things.

14          So why is it, Government?

15          Why is it, Hinds County?

16          Why is the Court wrong about seeing the thing in the --

17   and, again, I can be -- I can thoroughly be convinced that I'm

18   wrong, so I'm giving y'all the opportunity to convince me that

19   I'm wrong.

20          MR. CHENG:  Your Honor, let me try to break this up

21   into a couple different pieces, because there's actually

22   several problems here.  The first is whether you can issue

23   contempt.  You know, that is based on the existing orders.  I

24   am not sure whether there is an direct effect from the PLRA on

25   contempt.  For example, it's possible that there could be an

1   order that ultimately gets challenged, but if somebody commits

2   contempt right in front of the judge, the judge still has some

3   authority through their inherent powers to find that party in

4   contempt.  But I think that issue is kind of complicated and

5   would probably require more briefing if that's where the judge

6   is going.

7          The second issue, though, is whether or not additional

8   relief can be entered without meeting PLRA requirements, and I

9   think that brings up the issue of the receivership and what

10  sanctions may be available if the Court decides to find

11  defendants in contempt.  And so that issue probably has to be

12  addressed head on.  You know, defendants have moved to

13  terminate the original orders, that they don't have to be

14  bound by them at all, and they're presumably also challenging

15  that there are any conditions that warrant further relief.

16  So at some point, the Court would have to address whether

17  there are current and ongoing conditions that warrant relief.

18         But the third point -- I did want to address something

19  that you raised, the current and ongoing and sort of what that

20  means, and I think the department has provided some briefing

21  on this issue in our response.  But there is, you know, some

22  case law that suggests that it isn't literally, like, what is

23  going on at this second.

24         The whole point of having current and ongoing, the

25  ongoing piece means you are allowed to look at a temporal

1    stream.  You're allowed to consider the full context when you

2    evaluate conditions.

3          So I'll just give you, like, sort of a quick example.

4    You know, we assume the Court is aware that Ms. Bryan has

5    resigned or rather been terminated by the sheriff.  You know,

6    if defendants were fair about this, they would have to

7    acknowledge it as part of the current and ongoing violations.

8          Now, when you're assessing whether or not this lack of

9    leadership at the jail creates a problem under the consent

10   decree, both for contempt reasons and to establish, you know,

11   there's lack of leadership and no efforts to address the

12   constitutional violations, nothing in the case law says that

13   the Court can't consider, you know, what was written in the

14   consent decree three years ago, what was represented about the

15   jail administrator two years ago, what happened, you know, six

16   months ago when the jail administrator was promising reforms

17   versus what the defendants, you know, just filed with the

18   Court claiming the jail administrator is making remedies.

19         You know, fundamentally, this is an equitable remedy,

20   so the Court has equitable powers when addressing the PLRA,

21   when addressing the consent decree.

22         As a bit of an addendum to that, I would also add that

23   while it is true the parties agreed to it, there might be some

24   question whether parties can agree to remedies that exceed the

25   scope of the PLRA.  Certainly defendants are claiming that

```
 1   when it exceeds the scope of the constitutional requirement,
 2   they have a right to challenge it.  We would just note that
 3   they have had many opportunities to challenge those remedies
 4   as exceeding the scope of what's constitutionally required,
 5   and they haven't been able to do so, and for good reason.
 6        The decree was, on its face, constitutionally
 7   compliant, because it has the stipulations required by the
 8   PLRA.  It also has a number of clauses built into it that
 9   allow the Court to tailor its enforcement to what is
10   constitutionally required.  So for a lot of reasons, we
11   actually don't think the PLRA challenge is legitimate.
12        But certainly if the Court holds a hearing when its
13   assessing whether they're in contempt and assessing whether
14   the conditions are so bad that remedies are required to
15   preserve the decree and present additional relief, it can do
16   so all in one hearing.  The PLRA is a back stop to prevent
17   abuses by the courts, but it isn't something that requires a
18   level of sort of micro assessment of everything the judge
19   does.  It does require more scrutiny than perhaps was required
20   in older case law, but at least on this record, we're fairly
21   competent the Court can assess the orders and grant additional
22   relief with this hearing.
23        THE COURT:  I just remember having been involved in at
24   least one case where the state authorities sought to terminate
25   a consent decree and under the PLRA.  It's the *DePriest* case,
```

1    and I know Mr. Siler is quite familiar with that case.  And I

2    realized that -- and I think about the hearing that we had in

3    that case, and I know there were fights about exactly what is

4    current and ongoing and how far back you can look, what is the

5    temporal proximity, and all of that.  And I do -- and I am

6    aware that the State was taking the position in that case that

7    basically current and ongoing were the things that were

8    happening right then.  That's what -- and the Court issued an

9    opinion in that, and that opinion was ultimately not

10   scrutinized by the Fifth Circuit because the case was later

11   dismissed on appeal or after the appeal, dismissed as moot.

12         So, again, in that context in my mind, in that context

13   whether they have been in contempt of their agreement that

14   they -- that the parties entered, I believe can be treated as

15   a separate question and allow the Court to look back in time.

16   This whole fight about what might be current and ongoing

17   might -- might be the time from the point forward that the

18   Court filed either -- I take it that the County's position

19   would be that current and ongoing starts at the point at which

20   they filed their motion to terminate, so you look at that

21   point and everything up until the day of the hearing or

22   through the day of the hearing basically.  And I know there

23   are going to be fights about that.

24         So, again, why can't we deal with the contempt stuff on

25   one hand and to the -- and I realize there may be some

1   overlap, because the Government takes the position that

2   current and ongoing, Judge, has to be sometime before the

3   County filed its motion, and it might take up some information

4   that would be heard or would have already been heard on the

5   contempt side of things.

6         So, you know, if the Court were to only take up -- in

7   the week of February the 14th, if the Court were to only take

8   up a couple of days on the contempt issue, two or three days

9   on the contempt issue, and allow the parties to begin

10  litigating in earnest whatever else they need to do beginning

11  that -- sometime that week.  It's a bench trial, we could pick

12  it up.  We can come and go when necessary.  I think we did

13  that in the *DePriest* case, I think, but we do it in any bench

14  trial.

15        And I will tell the parties this:  The trial that I had

16  scheduled for February 22nd is a jury trial, and it has now

17  been continued because of Special Order 17.  So guess what,

18  the Court in and of itself may be available that next week.  I

19  don't know what the parties or the witnesses might be like,

20  but the Court may.

21        And, finally, I'll ask this:  When we start speaking

22  about the PLRA, I mean, should I assume from -- and, please,

23  the County needs to let me know.  Again, the parties are not

24  agreeing it sounds like.  I'm not going to stipulate to any

25  facts --

1          MR. SILER:  Judge --

2          THE COURT:  -- any facts, so am I to assume that

3     because of the PLRA analysis, then there's going to be some

4     sort of testimony, evidence, discussion, whatever we want to

5     call it on each paragraph of the terms of the agreement that

6     the parties entered into under the PLRA?

7          I don't know if the parties agree that might have to

8     occur or disagree, but to the extent it has to occur, is that

9     where we might be headed?

10         MR. SILER:  Judge, from the County's perspective let me

11    make a couple comments.  One is that we're not -- I don't

12    think we're opposed to stipulating to various facts.  We're

13    just opposed to stipulating to broad conclusions that there --

14    people are starting off with facts and then ending up with

15    conclusions, but we're not -- we don't practice law that way.

16    If there are facts out there that we can agree to, we'll

17    certainly do that.

18         Secondly, this status conference is very helpful to us

19    from the standpoint of understanding what we're supposed to be

20    trying in a couple weeks, because it was our impression we

21    were going to be trying contempt of the original consent

22    decree that was signed back in 2016 because I don't recall the

23    show cause order discussing the 2020 stipulated agreement.

24    But if we're going to be trying that part of it, it's good for

25    us to understand what we're trying.

1          Thirdly, I would say that that's -- I think what
2     Mr. Cheng was alluding to earlier was the fact that even if we
3     tried the contempt hearing on what was the conditions of the
4     facility as of October 31st, 2021, if the Court is going to
5     contemplate a remedy that's going to be prospective in nature
6     going out into the future, then that's going to have PLRA
7     implications.  And that it might be more efficient, and
8     frankly we think it would be more efficient, to go ahead and
9     try everything in one sitting and get this thing under -- so
10    that everybody will know what the deal is.
11         If the Court concludes that we are in contempt of court
12    for events that occurred before October 31st and that it's
13    going to put in place the prospective relief of a receiver
14    going forward, we need to wrap this all up in one for the
15    judicial efficiency, the parties' efficiency, costs, and so
16    forth.  Put it all together in one package and move forward
17    with it, because it's hard to separate these two things out
18    from a factual standpoint.
19         MR. CHENG:  Your Honor, if I may.  If the defendants
20    are willing to stipulate the monitor reports can be admitted
21    only for their facts, and that the ultimate legal conclusions
22    are reserved for argument and the Court's decision, you know,
23    that might help streamline things a little bit.  I haven't
24    really pondered it that way, and I wasn't really sure if
25    that's what they're agreeing to.  But, you know, if that's the

1    case, it would be helpful to know that.

2        MR. SILER:  And so just to respond to that quickly,

3    we're not willing to agree to that, because we've got

4    reservations about the factual conclusions that were reached.

5    But, now, if you want to get down to individual facts and talk

6    about specific facts, we're happy to talk about those.

7        THE COURT:  I mean, one of the things that came up, for

8    example, in the status conferences based on the monitor's

9    report way back in one of the early monitoring reports, for

10   example, up until very recently, the Court asked what it

11   thought was a very basic question:  Is there fire protection

12   services there at the jail?  That was one of the questions

13   that the Court was concerned about at some point in the past.

14       Now, that question still lingers.  The answer may be

15   yes.  The answer may be no.  Judge, that's been taken care of.

16   You know, it's things like that to which a stipulation ought

17   to be reached.  Do the cell doors lock?  Do we have -- are

18   there locks on these cells that operate like they should?  Is

19   there a stipulation that could be reached on that?  Are there

20   any jail cells that are permanently, still permanently welded

21   shut?  Seems to me that's something that is a yes-or-no

22   matter.

23       Now, how does that finding inform the Court?  I don't

24   know, and maybe that's the County's reticence with --

25   hesitation with the filings or entering certain stipulations.

1          Are the cells being manned by two people or whatever --

2   whatever the term of are is.  It seems to me to be a yes-or-no

3   question, and maybe it's not.  Are we -- is the County still

4   housing people in the booking area?  Because the County said

5   it wouldn't do that.

6          Now, maybe the PLRA says, you know, all you have to do

7   is just have anybody in a cell somewhere in the facility.

8   Again, but the -- this is why I see it slightly different, but

9   I'm willing to go with the parties.  I'm willing to see it

10  slightly different, because if the County says we are not

11  going to have people in booking more than 24 hours a day --

12  more than 24 hours, because it is not the safest place for

13  people to be.  But the constitution may say it's okay for them

14  to -- you just need to be able -- you just need to have them

15  there.  I don't know.

16         But if the parties can stipulate that there are people

17  there more than 24 hours, then that's a fact issue that we

18  won't have to deal with.  Otherwise, you're going to have to

19  call witnesses on that.  That is one of the points.

20         So my thing is if we treat this matter as one big

21  matter, I take it we'll have to have evidence on each of the

22  paragraphs, particularly now since these monitor's reports --

23  you know, the parties are not going to stipulate that all of

24  those words in that monitor's report should be adopted by the

25  Court; that means there's going to have to be adequate

1   testimony on those reports.  And you-all know how voluminous

2   those monitor's reports are, you know what kind of detail is

3   placed in those monitoring reports.  Nobody, DOJ or the

4   County, has ever submitted anything to the Court, any writing

5   that is, that sort of says, Judge, I know you got that

6   monitor's report, but here's something, a rebuttal to that

7   report.

8         They got this chart where they said that, you know,

9   there were 18 -- well, they got this chart that says they got

10   this many number of complaints that came in or this many

11   assaults occurred at the facility during this finite period.

12   Judge, those numbers are not correct; those assaults did not

13   occur.  Nobody was taken to the hospital during this time

14   frame, and the monitoring report says 52 people were taken.

15   That's not right, Your Honor; here it is.

16         You know, so I'm just trying to figure out when we

17   begin this process, when might it end?  Because I will give

18   the parties -- I typically give parties whatever time that

19   they need, but I tell you, you know, we're not going to be

20   here two, three, four, five weeks dealing with the evidence

21   that has been before the Court since 2016.

22         MR. CHENG:  Your Honor?

23         THE COURT:  Yes.

24         MR. CHENG:  I think what you're talking about in some

25   ways is more about the logistics of presenting the testimony,

1    and, again, I'm not entirely sure the defendants understand

2    what the Department of Justice's position is, what the United

3    States' position is.  We agree it makes no sense to have the

4    monitors go line by line through the reports and reexplain

5    everything they've already put in these summaries.

6           There are a number of hearsay exceptions that allow the

7    reports to be admitted.  We're going to address those in a

8    motion *in limine* probably next week.  Among other things, they

9    are, at this point, government records.  They've been filed

10   with the court.  There are a number of indicia for why they're

11   accurate.

12          I mean, I'm sorry; we'll be getting the motion *in*

13   *limine* in today.

14          There are a number of reasons why they don't really

15   have to be excluded for hearsay reasons.  They should be

16   admitted as part of the record.  Now, just because the facts

17   can be admitted to help support the factual case doesn't mean

18   that we're asking the defendants to admit there have been no

19   changes or that even they have no right to challenge the

20   facts.  If they want to use their time to bring in evidence

21   that, you know, something's different, or the monitors' facts

22   are incorrect, we're not objecting to that.

23          We're just saying that for purposes of streamlining the

24   hearing, the reports should be admitted, pass the hearsay

25   objection, so that the Court can consider it as part of the

1    record.  We also think that's equitable, because as the Court

2    pointed out, the defendants had every opportunity to file more

3    formal objections when the reports were being gathered.  And,

4    you know, at least on most of the major facts, such as, you

5    know, the fire safety issues and the locks in the cells, you

6    know, they've never suggested those problems were fixed.  Even

7    in their response to the show cause order, most of the

8    response talks about things that are going to be done, not

9    that the issues were already resolved.

10          So at least we're going to argue in our motion that

11   it's reasonable for the Court, especially to streamline the

12   hearing, but just admit the expert reports and the monitor

13   reports and use that as part of the record.  We're just

14   befuddled why the defendants would object to admitting them.

15          THE COURT:  And, Mr. Cheng, you said the Government

16   intends to file a motion *in limine* on that point --

17          MR. CHENG:  Yes.

18          THE COURT:  -- today?

19          MR. CHENG:  Yes.

20          THE COURT:  Okay.  All right.  So if the Court hears

21   matters on February the 14th, begins this matter, and we just

22   go for as long as we can go during the week of the 15th and

23   take in whatever information everybody wishes to put in, are

24   we prepared to get it done the following week, the ensuing

25   week, just go straight through?

1          MR. SILER:  As far as the County is concerned, Your

2    Honor.

3          THE COURT:  Of course, we wouldn't have Monday, because

4    Monday would be a federal holiday, the 21st I think.

5          MR. SILER:  Well, so far as the County is concerned,

6    we're prepared to go straight through.

7          THE COURT:  Straight through and be done by the

8    following Friday?

9          MR. SILER:  Yes, sir.  Now, I would love to understand

10   or know what we're going to be trying, because I'm still not

11   clear.  Is the PLRA going to be part of this?  Is it just

12   going to be the contempt hearing?

13         If it's contempt, are we talking about the 2016

14   agreement or are we talking about the 2020 agreement or are we

15   talking about both?  It would be really helpful for us to

16   understand --

17         THE COURT:  To --

18         MR. SILER:  -- what the scope of the hearing would be.

19         THE COURT:  -- to the extent the 2020 agreement

20   incorporates whatever there was in the 2016 agreement --

21   again, I look at the 2020 agreement as the operative

22   agreement, but it could very well have taken in the -- I have

23   not gone back and looked at the specific terms of the

24   agreement, but I see the agreement as something that the

25   parties, in good faith, entered into.  And to the extent that

1    the 2020 agreement, like others might have said, the parties

2    agree that there's nothing deficient, for example.  You know,

3    they agree the 2016 agreement is good and valid, and there's

4    no question about it; it conforms with the PLRA.  Then to the

5    extent the 2020 agreement incorporates stuff from whatever,

6    the staffing levels were required.  But, you know, I'm looking

7    at the -- for the agreement reached by the parties in 2020

8    which could have said -- you know, again, I have not looked at

9    the language of the agreement.  But the 2020 agreement, I

10   suspect, incorporates things from 2016 and builds upon those,

11   because I do believe that the parties said -- took additional

12   measures, agreed to take additional measures in the 2020

13   agreement.

14        Now, so if we look at the 2020 agreement, and it

15   incorporates what's in 2016, that's fine, that whole are you

16   in contempt of the agreement?

17        Again, I think that might be one sort of question, and

18   then we begin into -- I mean -- and maybe like the Government

19   said, Judge, it's going to be hard or difficult and you really

20   can't do it.  And like the County says, because, you know, it

21   says something about the PLRA, then you know you have to have

22   evidence of current and ongoing.  And so we take up whatever

23   evidence that there needs to be had on the PLRA -- we take up

24   whatever evidence needs to be taken up, and the parties will

25   be permitted to put on their proof on these matters.

1          But my question is, if it's contempt plus PLRA -- if

2     it's contempt plus PLRA, is there any reason to believe that

3     it should take more than ten days?  Whether there are -- or

4     more than nine days, whether they are the first five days and

5     no matter when the next four days come, is there any reason to

6     believe it should take more than nine days?

7          MR. CHENG:  Your Honor?

8          THE COURT:  Yes, sir.

9          MR. CHENG:  If the defendants are given carte blanche

10    to just present anything they want on the case, we would have

11    an objection particularly to the introduction of new experts.

12    The timelines assumed that, you know, we're going to rely on

13    the monitors, and that they would have some witnesses of their

14    own.  But if they're going to bring in something completely

15    new, they have made no expert disclosures.  We have not

16    received conformation from them about whether they have

17    decided to bring in their own experts.  One of our motions *in*

18    *limine* will be to bar them from bringing in brand-new experts,

19    so I do want to flag that for the Court.

20         THE COURT:  Okay.  I mean, thank you.  I mean, I just

21    don't know how the experts, at this point, will inform the

22    Court on either what the findings were or what the evidence

23    shows at least prior to the November date of the show cause.

24    And I'm not sure if in this context -- I don't need the

25    experts to tell me what the law is.

1        One of the issues in the *DePriest* case seemed to me was

2    whether -- obviously that sort of set up -- assumed that the

3    parties had all the experts they need and whether the

4    conditions were current and ongoing.

5        The monitors were on site last week, as was counsel for

6    the parties, at least for the defendants, and the Court made a

7    surprise visit.  So with respect to what might be current and

8    ongoing, the parties were there with the monitors.  And I'm

9    sorry, I don't think the Government was present physically; I

10   don't think.  I never saw the Government there, but I saw a

11   host of attorneys and parties there with the monitors at least

12   last Monday.  I don't know what happened Monday afternoon

13   after about 12:30 forward.  I do -- I am aware that the

14   monitors, at least one of the monitors, was there for the

15   entire week.  So I assume like in other instances, the

16   parties -- obviously the parties were on notice that the

17   monitor would be there, not that the Court would be there.

18       So the lawyers walked around with the monitors, and the

19   lawyers saw what the monitors were looking at.  They were

20   there to take notes if they wanted to.  They heard some of the

21   questions that the monitors might have been asking certain

22   individuals, notes were taken.  And if the monitors are to

23   testify at this hearing about what they learned during the

24   week of their site visit, again, what would some other expert

25   tell the Court about what the conditions were, what the

1   conversations were, what these particular people observed

2   during the week of January 24th, which makes me correct

3   something I said earlier.  I think the hearing was supposed to

4   start last week and not yesterday.

5        And so what is it about that, and could not the

6   monitors provide testimony about whatever conditions that

7   they've observed even since they filed their 15th monitoring

8   report?

9        What other type of expert witness -- and I know you're

10  going to attack the credibility and whether these are experts,

11  but these are the Court's experts that the parties -- that the

12  Court appointed I think.  Judge Barbour appointed this

13  monitor, not me.  And this was the monitor that either he

14  appointed and that they agreed to, or he appointed informed by

15  whatever the parties told him and that the monitor would have

16  the ability to do certain things.

17       And in doing those certain things, it allowed the

18  monitor to do, the monitoring team to do whatever they did

19  back during the week of January 24th, and they've done the

20  same thing that is reflected in each of their monitoring

21  reports.  So if we took information in those monitoring

22  reports, the last one being filed in November -- they have now

23  done another visit, and it was in-person, because at least in

24  the County's response to the show cause order, the County says

25  the monitor hasn't been here in over 19 months.  And, you

1    know, when in fact during the status conferences, what we

2    heard from the County and others, well, Judge, COVID has made

3    things different -- COVID, COVID, and it had.  It kept my

4    monitors away; that's one thing COVID did.  And now they had

5    an opportunity to go back.

6          So in the County's view, does the County believe that

7    somehow some expert needs to go back to the place on January

8    24th, 25th, 26th, 27th, 28th when these monitors were there

9    just last week?  Or are they going to have an expert to come

10   out the week of February the 7th, immediately before this

11   hearing, and tell the Court what the conditions look like now?

12         MR. SILER:  Judge, it's not our contention that the --

13   that we need an expert to tell the Court anything about the

14   consent decree, the law, whether anything complies with the

15   law or doesn't comply with the law.  If we're going to try our

16   motion to terminate or modify under the PLRA and the contempt

17   proceeding at the same time, we're not required to accept the

18   monitor's reports.  We're not required to accept their

19   conclusions.  We're not required to accept that they're

20   neutral experts.  We want the opportunity to defend our client

21   and challenge those things.

22         And in further to that, there will not be a report

23   available to this Court from these monitors under the current

24   schedule, because they will not have been able to get a report

25   done.  They have 30 days after their visit to put a report

1  together and then ten days for us to respond to it before it

2  gets finalized, and that report won't even be finalized by the

3  time of this hearing.  So I don't --

4      THE COURT:  Well, maybe they -- I'm sorry to cut across

5  you, Mr. Siler, but maybe they don't need the report.  They

6  can testify about what they saw; right?

7      MR. SILER:  They certainly can, and we have the right

8  to question them about that, and to take issue with not only

9  what they saw, but the conclusions they reached and what they

10  based those conclusions on.  And we want to take every

11  opportunity we can to defend the County in this process.

12      We would like to have expert witnesses.  Now, the

13  problem is we've just been crunched so much on time trying to

14  find an expert witness at the last second to do something has

15  been virtually impossible, but we haven't given up on it.  And

16  we're working through all that, but those are just some of the

17  issues we're trying to deal with in defending the County in

18  this matter.

19      And I'm sorry if I'm being obtuse about this, Judge,

20  but I still don't fully appreciate what we're going to be

21  trying when we start this hearing.

22      THE COURT:  I guess what I've asked -- I guess

23  initially I've asked whether the contempt side of the hearing

24  could be tried in two to three days.  That's one of the

25  questions that I've asked, and we just move right on into

whatever else -- I guess whatever else it is that needs to be

heard, including the County's motion to terminate the consent

decree.  I've told you I have the following week that is open,

but, again, these hearings don't have to be in consecutive

days.  But, again, it's time to have something heard; that's

for sure.

And so, you know, the parties, again, got the order to

show cause on why it should not be held in contempt, and the

County responded to that saying that, in part, don't hold us

in contempt right now, because we are working on things.

We're getting things done.  Give us until June.  And the

next -- or at least a subsequent pleading by the County was

the pleading that asked the Court to terminate the settlement

agreement.

So, again, the County injected that part in it, so even

if we were to do the hearing on the contempt side of things,

we still have to, at some point, deal with the County's motion

to terminate.  And, you know, the County takes the position, I

think in its papers, that that filing should stay everything

else.  DOJ says no, it shouldn't.  There's good cause to at

least have the matters go forward or to not have the stay.

That's one thing.

And so the Court stands ready to hear some evidence on

whatever evidence there is that the parties want to put

forward.  And it's important to the Court, because, again,

1    this hearing was supposed to start last week.  It's important

2    to the Court that we start hearing something, and I've set

3    aside the week of the 14th for matters to be heard.  And

4    that --

5         MR. SILER:  Judge, as far as the County's concerned,

6    let's -- we're fine to go forward on everything and go through

7    that whole nine-day period and if we need to take other

8    time -- you're absolutely correct, your recollection was

9    correct about *DePriest*.  We had I think at least one fairly

10   lengthy period of time in that hearing in which we were in a

11   continuance and we'll -- if we have to go forward this

12   quickly, then let's just put the whole thing on, and let's do

13   it all in one setting.

14        THE COURT:  Let me hear from the Government.

15        MR. CHENG:  We agreed to get it all done in one

16   setting; let's do it.  I do think this idea that there are

17   really two different pieces, in practice when we actually

18   present the evidence, it's going to all be mingled together.

19        So, for example, when experts are talking about

20   violence or fire safety, those are all constitutional

21   concerns, and so whether you're looking at in terms of

22   violating the decree or violating the constitution, the

23   witnesses are only going to have to go up once.  You know, the

24   United States will present its witnesses, the defendants will

25   present theirs, and the testimony will just have to come in

1    the way it has to come in.

2          We do ask, however, that if we do have a nine-day

3    hearing or whatever it is, the Court should still bifurcate

4    it, so that each side gets roughly equivalent amounts of time,

5    and put some limits on, you know, what each side can do to

6    drag out the testimony.  You know, we lawyers have a tendency

7    to just go on and on if you give us all the time we want.  So,

8    you know, for the purposes of making this manageable, we do

9    think the structure originally setup for the contempt hearing

10   still works.

11         And as for the expert issue, we would ask the Court to

12   direct the defendants, if they're going to bring in experts

13   whenever they decide, if they're allowed to do so, we would

14   ask for some type of disclosures.  Rule 26 does require that

15   they provide CVs, publication lists, a report.  You know, they

16   have 15 monitoring reports to use to challenge the monitors,

17   and they want to be able to bring in completely new witnesses

18   for no particular reason, the least they can do is provide us

19   those types of minimal disclosures.

20         THE COURT:  Well, I will -- you know, I think the

21   Government said it's working on motions *in limine*, and I'll

22   take those up first.  I just haven't been completely convinced

23   that -- I have not at this point been completely convinced

24   that additional experts are pertinent I guess.  Not to say

25   that these experts cannot be challenged in any way, because

1    they can.  But I'm just trying to figure out a way to have

2    this hearing in a concise way, because I was not prepared to

3    give this amount of time right now to this -- to this case.

4    Because if the parties -- I think under the current schedule

5    that the Court entered, the parties were to exchange exhibits

6    and all of that.  The parties were to do proposed findings of

7    fact conclusions of law I think.  The parties might be

8    required to do some other things.

9         Obviously, if the Court says additional experts are

10   allowed, you know that cannot happen without Rule 26

11   disclosures.  So I'm wondering --

12        MR. CHENG:  Your Honor?

13        THE COURT:  Yes, Mr. Cheng.

14        MR. CHENG:  If I may preview, we are not going to

15   require total compliance with Rule 26, but we are requiring

16   something that's equitable.  So they need to provide some type

17   of expert summary, so that we know who's coming in.  For

18   number of reasons, we don't expect that Rule 26 perfectly

19   applies.  This is more within the discretion of the Court to

20   make sure the process is fair to both parties, and in that

21   sense, Rule 26 provides guidance.

22        THE COURT:  Okay.  I tell you what, my court reporter

23   needs a break and probably the parties, too.  We're going

24   to -- let's take about a 15-minute break and then we'll start

25   back up, and I don't think we'll be much longer.  But I will

1  say this, I will ask, and I'll tell you on the front end one
2  of the questions the County should be prepared to talk about
3  and discuss is the report that the Court read on the WLBT
4  website last night and that the Government I believe announced
5  today.  Major Bryan has either left on her own or been
6  terminated, and I can only think about the status conference
7  we had where it was announced that Major Bryan was here to
8  save the day.  I can go back and pull the transcript of the
9  Sheriff Lee Vance saying this is the best person in America,
10  something like that, who's here to help us.  We were able to
11  get her.
12        But I saw on the news report last night that the news
13  is at least reflecting that she's been terminated.  And so I
14  want to know who is the jail administrator, and I want to know
15  what that person's qualifications is to be the jail
16  administrator.  And we'll come back in 15 minutes.
17                  (A brief recess was taken.)
18        THE COURT:  I can't tell if everyone is back, because I
19  don't see everyone on one screen.  But I'm going to presume
20  everyone is, because it's been more than 15 minutes and I
21  apologize.
22        So I guess I left with the question about Major Bryan's
23  status.  Is the County prepared to say or tell me anything
24  about not necessarily her separation but -- well, is she the
25  jail administrator as of this moment?

1          MR. HALL:  Yeah.  Good afternoon, Your Honor.  May it

2    please the Court?

3          THE COURT:  Yes, Mr. Hall.

4          MR. HALL:  She is not the jail administrator at this

5    moment.  Can I give the Court some history?

6          THE COURT:  Yes.

7          MR. HALL:  I know that's what you've been asking for.

8    Major Bryan was brought on by the County back in June of 2021,

9    and I wasn't there at the hearing.  Sheriff Vance, at the

10   time, thought she was there to save the day; that was the

11   impression he was under at that time initially.

12         Everyone knows that Major Bryan, or former Major Bryan,

13   was brought on per the recommendation of one of the federal

14   monitors.  At any rate, Your Honor, approximately five months

15   after starting in November of 2021, Ms. Bryan tendered her

16   resignation to then Interim Sheriff Marshand Crisler.

17         A few weeks after that, she -- and in that initial

18   resignation letter, she stated she would stay on through

19   February 10th.  Later that month, she resigned again, and said

20   I'm leaving early.  I'm leaving November 29th.

21         Apparently, she changed her mind, and that was the

22   night of the election, Your Honor.  After the current sheriff

23   was elected, Major Bryan tendered him the same resignation

24   letter that was dated November 10th I guess reiterating her

25   intent to resign effective February 10th, 2022.  A lot has

1   happened since then, Your Honor.

2       THE COURT:  You're going in and out, Mr. Hall, so speak

3   a little bit slower.

4       MR. HALL:  Okay.  What part do I need to go back to?

5       THE COURT:  I think you're good, but you've been going

6   in and out periodically.

7       MR. HALL:  A lot has happened through the last couple

8   of weeks, couple of months, Your Honor, to the point where the

9   sheriff has lost confidence and trust in Major Bryan's ability

10  to lead the detention services of Hinds County under his

11  administration.  And as a result of that, as a result of her

12  failings that the monitors are aware of, because they've been

13  (AUDIO GAP) the last couple of weeks as well.

14      She was brought in and her resignation date was moved

15  up from February 10th to yesterday.  The person that's in

16  charge of the jail right now is the second in command, Captain

17  Anthony Simon, who has been in that role for the past two

18  years.

19      We also wanted to advise the Court that we are in the

20  process of finalizing details of Major Bryan's replacement,

21  who should be retained very shortly.

22      THE COURT:  Who should be retained very shortly?

23      MR. HALL:  Yes, sir.

24      THE COURT:  Does the County -- well, is the County

25  prepared to -- I don't know.  I can't remember how Major

1  Bryan -- what was the selection procedure used to get to Major

2  Bryan.  But I recall the former sheriff saying, I believe,

3  that they had advertised and done a lot of different things.

4  Is that something the County intends to do this time around?

5        MR. HALL:  With the individual that we've brought in

6  right now, Your Honor, that's going to be on an interim basis

7  while we do conduct a nationwide search.  The individual that

8  we have retained for right now is going to patch that bridge

9  to get a better search (AUDIO GAP) so we're not left in the

10  same predicament we were previously left in.

11        THE COURT:  Now, you indicated that Captain Simon would

12  be serving as the interim jail administrator; is that correct?

13        MR. HALL:  For a couple of weeks maybe.  We have

14  someone else besides Captain Simon we're bringing in, too,

15  with more experience to act as a bridge until we find a more

16  permanent replacement.

17        THE COURT:  Okay.  So I assume then, the sheriff and/or

18  County know who that person is; right?

19        MR. HALL:  Yes, Your Honor.

20        THE COURT:  And I assume --

21        MR. HALL:  I'm not trying to (AUDIO GAP) --

22        THE COURT:  I'm sorry?

23        MR. HALL:  Is the Court asking me to identify that

24  person?

25        THE COURT:  Well, at some point in time, I'm going to

1    need to know his qualifications, because, again, the County --

2    until this Court decides that the consent decree should be

3    terminated, the consent decree, as I understand it, is still

4    in force.  It's still in place; right?  Is it?

5         I mean, does the County's filing of the motion to

6    terminate end this Court's duty to at least the skeletal terms

7    of the agreement?  I mean, I'm asking; it may not.

8         Maybe the Court cannot inquire as to anything until it

9    hears the motion to terminate.  But I would think that rather

10   than hear whatever evidence there is to be heard on who this

11   person is and what their qualifications are, I presume that

12   information would be made available to the Department of

13   Justice and the monitors and the Court.

14        MR. SILER:  Your Honor, in our view the motion we've

15   filed under the PLRA does not create an automatic stay.  The

16   consent decree, both the 2016 and the 2020 agreements, are

17   still in force and effect.  As you know, there are time limits

18   that the PLRA imposes, initially a 30-day period, and the

19   Court can extend it for an additional 60 days.  So until that

20   90th day is reached after we filed the motion, the consent

21   decree -- both of those consent decrees are in effect, and the

22   Court has absolutely, I think, the right to ask what we're

23   doing with respect to replacing Major Bryan.

24        We -- our only reluctance in naming the person right

25   now is that we haven't dotted every "I" and crossed every "T"

1   to get this situation put in place.  But I can tell you it is

2   our hope and intention that this will be taken care of today,

3   and that our intention is to bring in her replacement as early

4   as -- to be in the facility as early as Thursday and Friday

5   this week, and I don't want to leave the Court with the

6   impression that this individual doesn't have some other

7   obligations that are going to delay full time into that

8   role -- full-time service in that role for another couple

9   weeks, but we hope to have him in town and in the facility

10  this week.

11          THE COURT:  Okay.  All right, then.

12          MS. SIMPSON:  Your Honor?

13          THE COURT:  Yes, Ms. Simpson.

14          MS. SIMPSON:  To the extent it's pertinent, I spoke

15  with Major Bryan this morning.  She indicated that she had not

16  resigned; that she informed the sheriff that her resignation

17  had been rescinded, or she had rescinded her resignation, and

18  that at that point, he terminated her.

19          THE COURT:  All right.

20          MR. HALL:  Your Honor, I was in the room, that's not

21  what happened, so --

22          THE COURT:  Well, you know, at some point in time, I

23  don't know how much -- whether that dispute becomes pertinent

24  or relevant to what we'll be doing on the 14th, but to the

25  extent it does, it will be taken up during the course of that

1    hearing.  I'm not sure who -- well, the parties are going to

2    exchange witness lists.  I'm not sure who intends to call

3    whom, what witnesses are going to testify about what.  But the

4    former jail administrator who has been there most recently,

5    even up to the filing of these pleadings, the only reason why

6    she would not have been in is that this hearing has not been

7    held yet.

8         So I don't know if anyone intends to call her or can

9    call her, but those will be issues that I imagine will be

10   dealt with at the hearing that begins on the 14th.  Because it

11   seems to me that she testifies about what procedures, what

12   things she put in place, what she did, why she did them.  One

13   thing that the -- again, the Court -- you know, the Court was

14   there last week, and one of the things that I heard in

15   response to a number of things about orders that had been made

16   and things being on order, the orders, the requisition

17   process, or whatever, things have been ordered a long time ago

18   and not yet arrived, and it's difficult getting things

19   ordered.  I've heard that before at the status conferences.  I

20   heard it again last week.

21        But Major Bryan may be a pertinent witness for somebody

22   in this case, maybe the Court, maybe the Government, maybe

23   Hinds County.  So to the extent that there's a disagreement

24   about why she's no longer the jail administrator, I guess

25   could be ferreted out at that point.

 1          Again, my hope is -- my initial hope was that we could

 2    complete this hearing the week of the 14th; that doesn't sound

 3    likely.  The trial that I had to begin on the 22nd is now

 4    continued.  I would hope -- as I went back and thought about

 5    it, I would hope that the parties could do everything they

 6    could to get this matter tried that first week plus a day or

 7    two that following week.

 8          When I went away for the break, I was thinking six

 9    days, three days between the parties, and maybe a day for the

10    closings being on Wednesday.  But I'm going to leave available

11    the Thursday and the Friday of the following week.  But I do

12    intend -- and I haven't heard from my monitors.  I don't even

13    know if they're available.  I do know that some might not be

14    available in-person during these proceedings, and I'm willing

15    to hear from them by video.  But it's my -- but as I told the

16    lawyers earlier, we will be in court.  We will institute all

17    the COVID protocols that we can.  The parties won't

18    necessarily -- the lawyers won't necessarily have to be on top

19    of each other.  We've got a full courtroom here, and so I know

20    if I ask the parties could this -- could the -- all the

21    evidence be heard in six days, I don't want to tie you into

22    that, but do you think it could be, all the evidence, heard in

23    six days?  That is Monday through Friday and Tuesday and with

24    the hope that there's ways to have the last day for closings

25    or something like that.

1          Again, I'm not necessarily going to tie you to that,

2    but I do know that we will not go beyond the following Friday

3    if we're going to do everything at once consecutively and not

4    do these five days and pick up another couple of days here and

5    another couple of days there.  So we should be prepared for

6    the 14th through the 18th, picking up on the 22nd, and being

7    done -- in earnest being done with everything on the 25th.

8    But obviously there will be no price that anybody has to pay

9    if we get done on the 24th or the 23rd.

10          A couple of other points, you know, the parties -- I

11   heard the Government say that they're working on motions *in*

12   *limine*; I'll receive them.  I understand, and I guess I may as

13   well broach this subject, but I've alluded to it I guess.  I

14   understand there's been a request for the monitors to turn

15   over their notes.  To the extent that the County or the

16   Government wants the notes of the monitors, you're going to

17   have to file a motion for that, and the Court will decide

18   whether its monitors' notes will be turned over.  And I

19   presume those notes were tied to the -- or are tied to the

20   visit, the site visit that was last week and what might be

21   going on now, because I understand there's still either

22   interviews and/or either something might still be going on

23   with respect to the visit from last week.  So if either party

24   wishes to get any information from the monitors prior to the

25   trial, you need to file a motion with the Court.

1        Is there anything else we need to take up?

2        MR. CHENG:  Yes, Your Honor.  I just wanted to flag

3   that DOJ's litigation support staff may be in touch with the

4   Court's staff just to work on getting the technology set up

5   for the virtual tour.  I think that was already noticed

6   earlier, but we just wanted to remind the Court that might

7   happen.  We also wanted to mention --

8        THE COURT:  Hold on for a second.  Hold on for a

9   second, Mr. Cheng.  You said for a "virtual tour?"

10       MR. CHENG:  I'm sorry, virtual testimony.

11       THE COURT:  Okay.  All right.

12       MR. CHENG:  We just want to make sure that all the

13   wires are connected.  I wish I could explain it better, but

14   that's why I have litigation support staff to work on it.

15       THE COURT:  Okay.  And they should be in contact with

16   either -- well, Ms. Summers is out today, but my law clerks

17   can put them in contact with our computer people here to make

18   sure everybody is well informed.

19       MR. CHENG:  Yes.  And the other thing is I wanted to

20   make a slight clarification about the contempt issue.  You

21   know, there is the process for the actual hearing itself and

22   what we're going to do to present evidence for all the

23   different issues pending before the Judge, but certainly, Your

24   Honor, you can decide parts of the case separately.  So, for

25   example, we do think it's possible for the Court to decide

1    initially whether the defendants are in contempt.  We argued

2    some weeks ago that even on the record before the Judge, you

3    could have already held that the defendants were in contempt

4    of the orders.

5         Now that the defendants have filed their PLRA motion

6    and there are additional legal issues that have to be resolved

7    before the Court can grant additional relief, and the Court

8    may also have to consider the validity of the orders that

9    would be the basis for contempt.  But we wanted to address

10   that issue, because there are some things the Judge said that

11   the way I responded may have been a little confusing.  I do

12   want to make it clear you can decide the contempt issue and

13   also separate the PLRA issues, but that it's not a reason to

14   break up the hearing.  The hearing can address all the factual

15   predicates at once, and that's it, Your Honor.

16        THE COURT:  Well, let me ask you this, Mr. Cheng, since

17   the Government does take the position there is enough here to

18   find them in contempt.  What if the Court does that in advance

19   of the hearing?  Certainly, then the hearing turns out to be

20   one that's focused on whether the consent decree itself should

21   be terminated; right?

22        I mean, there would be no need to -- obviously, we will

23   have evidence of some of the stuff that might have landed the

24   County in contempt, but that would allow -- if the Court were

25   to do that, then certainly the PL- -- if we're talking about

1   the PLRA side of things, we should -- there would be no reason

2   we could not get done in six or seven days, right, or do you

3   think that there --

4        MR. CHENG:  Yes, Your Honor.  As a matter of fact, you

5   know, depending on what happens with the motions *in limine*,

6   for example, we do think the hearing could be even shorter.

7   If, for example, the hearing focuses primarily on

8   receivership, you may still have to take in evidence on the

9   continued viability of the current consent decree in the

10  orders.  You might have to address some of the factual

11  predicates for granting a receivership.  So practically

12  speaking in terms of what evidence has to be presented at the

13  hearing, it may still be very similar, but it instantly

14  streamlines it.

15       Likewise, if, for example, the monitor reports are

16  admitted, you know, at least so that we can have a factual

17  record and streamline the factual record, the defendants may

18  still have a right to present witnesses to show there's no

19  longer a problem, or they were in contempt at one time, but

20  they don't think they're in contempt now.  You know, they can

21  still present their case.

22       But, you know, this is why it's very hard to predict

23  exactly how long the hearing will go.  A lot of it could be

24  resolved fairly quickly just in terms of how the motions are

25  addressed.

1          THE COURT:  Well, I'm going to set aside those five

2     days that first week and those four days that following week

3     with the hope that we don't have to soak up all of that time.

4     But I do want to avoid stepping on the toes or the rights of

5     any party to fully litigate their case in a way that they

6     think it ought to be fully litigated.

7          Okay.  Was there anything else?

8          I know when we last talked, there might have been some

9     issues with the members of the Board of Supervisors about

10    being present.  The board can choose to have whomever it is as

11    its representative at the hearing, so that's really no issue I

12    guess.

13         I see Mr. Siler has -- I know Mr. Shelson has come

14    aboard with respect to that sort of hiccup for Mr. Siler.  So

15    we are ready to go forward here at the court, so it's time to

16    move forward on this case.

17         Is there anything else from anyone else?

18         MR. SHELSON:  Your Honor, this is Jim Shelson.  The

19    witnesses that are going to appear by video, at some point is

20    it going to be disclosed who those witnesses are?

21         THE COURT:  I think it's actually -- I think we may

22    know who at least one of them is.  If I'm not -- Ms. Simpson,

23    I think it's Mr. Moeser; right?

24         I don't see Ms. Simpson.  Isn't it Mr. --

25         MR. PARRISH:  Your Honor?

1          THE COURT:  Yes, Mr. Parrish, go ahead.

2          MR. PARRISH:  Ms. Simpson had to -- she's pushed back

3     the interview that she had by a half hour, --

4          THE COURT:  Oh, okay.

5          MR. PARRISH:  -- and I think she went to that.  And

6     both she and I are scheduled to be in-person, and Mr. Moeser

7     is most likely going to be the one who has to do things

8     remotely.  And I'm not quite sure with regard to Dr. Dudley at

9     the moment.

10          THE COURT:  Right.

11          MR. PARRISH:  But I know she and I will be there.

12          THE COURT:  Okay.  Ms. Simpson and Mr. Parrish will

13     actually be here for the entire hearing.  It's possible that

14     Mr. Moeser and Mr. Dudley may have to testify by video, and

15     I'm willing to hear their testimony by video.

16          I'm not sure if there are other parties or other

17     witnesses, but you-all know you-all are on track to exchange

18     witness lists and things of that sort, exhibit lists, and

19     submit proposed findings.

20          MR. SHELSON:  Your Honor, so that's just --

21          THE COURT:  So when you exchange those lists, please

22     let each other know whether the person would be here live or

23     not if that helps.

24          Mr. Shelson?

25          MR. SHELSON:  Sorry, Your Honor, I didn't mean to

 1   interrupt.

 2        Just one other thing, I may have misunderstood, but to

 3   the extent DOJ's setting up those two monitors testifying

 4   remotely, will both parties have the opportunity to present

 5   documents to the witnesses appearing remotely?

 6        THE COURT:  Yeah.  Yeah.  Yeah, you will.  We've done

 7   it before.  Zoom and otherwise, people are able to see the

 8   documents and have the documents in their hand, if necessary,

 9   and all of that.  We'll work with our computer people here for

10   those purposes.

11        MR. SHELSON:  Thank you, Your Honor.

12        THE COURT:  All right.  Is there anything else?

13        All right.  Well, thank you-all for making yourselves

14   available.  That concludes all that the Court has in this

15   matter.  We are adjourned.

16   ****************************************************************

1                    **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded by

9    me to the best of my skill and ability.

10          I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13          THIS, the 4th day of February, 2022.

14

15                              /s/ Candice S. Crane, RPR, CCR

16                              Candice S. Crane, RPR, CCR #1781
                                Official Court Reporter
17                              United States District Court
                                Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25