IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.: 3:16-CV-00489-CWR-RHWR |
| | ) | |
| HINDS COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
RE:  FEBRUARY 14, 2022, EVIDENTIARY HEARING**

**TABLE OF CONTENTS**

I.   PROPOSED FINDINGS OF FACT ................................................................. 3

   A.   Background ...................................................................................................... 3

   B.   Defendants' Widespread Non-Compliance with the Court's Remedial Orders
       Places Detainees, Staff, and the Public at Substantial Risk of Serious Harm. ............... 10

   C.   Defendants' Failure to Implement Court Orders to Fix Critical Deficiencies
       Exacerbates the Ongoing Substantial Risk of Serious Harm in the Jail. ........................ 16

      (1)   Staffing and Supervision .................................................................... 16

      (2)   Incident Reporting and Use of Force ................................................. 28

      (3)   Physical Plant and Life Safety .......................................................... 33

      (4)   Unlawful Detention and the Criminal Justice Coordinating Committee ............ 36

      (5)   Medical and Mental Health Care ....................................................... 40

      (6)   Youth Charged as Adults ................................................................... 48

II.  PROPOSED CONCLUSIONS OF LAW .................................................... 55

   A.   The Consent Decree Complies with the PLRA ............................................. 55

      (1)   PLRA Legal Standard ........................................................................ 55

      (2)   The Consent Decree Complies with the PLRA Because the Decree Remains
           Necessary to Correct Defendants' Current and Ongoing Constitutional
           Violations. ........................................................................................ 56

   B.   Defendants are in Longstanding Widespread Contempt ............................... 75

      (1)   Contempt Legal Standard .................................................................. 75

      (2)   Defendants Have Been in Continuous Violation of the Consent Decree for
           Years. ................................................................................................. 76

      (3)   Defendants Have Not Offered Any Mitigating Circumstances for
           Withholding Contempt ...................................................................... 81

      (4)   Defendants are in Contempt ............................................................... 82

   C.   Defendants' Longstanding Widespread Contempt Necessitates a Receivership. .......... 84

      (1)   Receiver Legal Standard .................................................................... 84

      (2)   Receivership is Appropriate and Necessary to Address "Otherwise
           Uncorrectable Violations." ................................................................. 85

      (3)   The Appointment of the Receiver Complies with the PLRA. ............. 96

In July 2016, the Court entered the Consent Decree to remedy Defendants' longstanding and widespread constitutional violations of detainees' rights at the Defendants' Jail. Since then, Defendants have failed to implement its remedial requirements. Defendants' compliance failures unsurprisingly and unfortunately have caused the continued widespread violations of detainees' constitutional rights, often resulting in serious harm.

After six troubling deaths at the Jail in 2021 and a series of oral and written reports from the independent Monitor and the Parties, the Court entered an Order to Show Cause, ECF No. 100 (November 23, 2021). That Order concluded that Defendants "shall show cause and explain why [they] should not be held in civil contempt and why a receivership should not be created to operate" the Jail. ECF No. 100 at 28. Defendants filed a response to the show cause order on December 14, 2021. ECF No. 105.

Facing a hearing on contempt for the second time in two years—this time with the potential for the appointment of a receiver—Defendants then filed a motion to terminate, or, alternatively, modify, the Consent Decree on January 21, 2022. ECF No. 111. Defendants' motion invokes the termination and automatic stay provisions of the Prison Litigation Reform Act (PLRA). 18 U.S.C. § 3626(b) & (e). On February 4, 2022, the Court concluded that "good cause" existed to postpone the automatic stay until April 21, 2022. ECF No. 127 at 4; *see also* 18 U.S.C. § 3626(e)(3).

Also on February 4, 2022, the Court issued a First Order of Contempt. ECF No. 126. Based on Defendants' briefs not contesting some of the Monitor's findings of non-compliance, the Court found Defendants in contempt of 30 of the Consent Decree's 92 substantive provisions. ECF No. 126 at 19-27. The Court reserved judgment until after an evidentiary

hearing as to whether Defendants are in contempt of the other remaining provisions.  *See* ECF No. 125 at 18 n.7.

The Court set an evidentiary hearing for the week of February 14, 2022, to receive evidence on contempt, potential remedy, and the PLRA termination motion.  *See* Jan. 18, 2022, Order, ECF No. 109.  The Court directed the Parties to file proposed findings of fact and conclusions of law prior to that hearing.  *See* ECF No. 107 at 2.

The United States accordingly submits the below proposed findings.  Based on those findings and the forthcoming evidence at the hearing, this Court should:  (1) deny Defendants' PLRA termination motion because the Decree remains necessary to remedy Defendants' current and ongoing constitutional violations and complies with the PLRA; (2) find Defendants in longstanding and widespread contempt of the Consent Decree; and (3) find that ordering a receiver is necessary, appropriate, and complies with the PLRA.

## I.    PROPOSED FINDINGS OF FACT

### A.  Background

1.     On June 2, 2014, Plaintiff United States notified Defendants of its intent to investigate conditions of confinement at the Hinds County Jail[1] pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997.  Letter from U.S. Dep't of Justice Initiating Investigation of the Hinds Cty. Det. Ctr., June 2, 2014, ECF No. 3-1.

---

[1]  The subsequent Consent Decree defines the Jail to include the Raymond Detention Center (RDC); the Work Center, the (now-closed) Jackson Detention Center, and any additional or replacement facility used to house County prisoners, which now includes the Henley-Young Juvenile Justice Center.  ECF No. 8-1, PX-001, at ¶ 16.

2.    On May 21, 2015, the United States issued a letter providing notice to Defendants that Jail conditions violated detainees' constitutional rights through systemic deficiencies with Jail staffing, supervision, policies and practices, staff training, security equipment, physical plant, records, and detainee tracking and release procedures.  Letter from U.S. Dep't of Justice to Peggy Calhoun, Bd. President, Hinds Cty. Bd. of Supervisors, re. Investigation of the Hinds Cty. Adult Det. Ctr. ("Findings Letter"), May 21, 2015, ECF No. 3-3.

3.    The Parties negotiated the Consent Decree to resolve the United States' investigation and achieve constitutional conditions at the Jail.  Consent Decree, ECF No. 8-1, PX-001, at ¶¶ 2-3.

4.    The Court approved and entered the Consent Decree as an Order with an "Effective Date" of July 19, 2016.  Order, ECF No. 8; Consent Decree, PX-001, at ¶ 10.

5.    At the Parties' request, the Court appointed Elizabeth Simpson as the Court's Monitor ("Monitor").  Joint Mot. Appoint Elizabeth Lisa Simpson as Monitor, Aug. 18, 2016, ECF No. 9; Order, Aug. 18, 2016, ECF No. 11.  The Monitor then hired a team of subject matter experts to assess compliance with the Consent Decree.  CV of Elizabeth Simpson, PX-003, CV of David Parrish, PX-008, 009, 010, 011; CV of Dr. Richard Dudley, PX-004, 005, 006; CV of Jim Moeser, PX-007; Anticipated testimony of Elizabeth Simpson ("Tst. Simpson"); Anticipated testimony of David Parrish ("Tst. Parrish"); Anticipated testimony of Dr. Richard Dudley ("Tst. Dudley"); Anticipated testimony of Jim Moeser ("Tst. Moeser").

6.    The Monitor issues compliance reports that evaluate Defendants' compliance with the Court's remedial orders.  These reports have found that Defendants are not substantially complying with the Consent Decree.  *E.g.*, Monitor's 15th Report, (Nov. 24, 2021), ECF No. 101, PX-041.

7.     The Monitor and her experts have also provided Defendants with extensive recommendations and technical assistance on how to implement the Consent Decree.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Tst. Moeser; *see, e.g.*, Monitor's 15th Report, (Nov. 24, 2021), ECF No. 101, PX-041; Monitor's 14th Report, (July 7, 2021), ECF No. 94, PX-039; Monitor's 13th Report, (April 2, 2021), ECF No. 83, PX-038; Monitor's 12th Report, (December 4, 2020), ECF No. 77, PX-037; Monitor's Interim Report, (Oct. 28, 2021), ECF No. 96, PX-040.

8.     In addition to the Monitor and her experts providing technical assistance, the Monitor dedicated funds from her budget to pay for policy development and human resource consultants when Defendants failed to contract for such consultants as required by the Court's orders.  Tst. Simpson.

9.     Defendants have repeatedly ignored or dismissed technical assistance recommendations made by the Monitor, consultants, and the United States.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Tst. Moeser; Monitor's 15th, 14th, 13th, 12th, and Interim Reports, PX 041, 039, 038, 037, 040.

10.     In addition to notice of non-compliance from the Monitor, Defendants have been notified by the United States of their non-compliance with Consent Decree provisions.  In 2019, the United States notified Defendants that their breach of Consent Decree paragraphs 9, 22, 37-39, 41-42, 44-46, 50-62, 68, 78-84, 130-133, warranted contempt.  US Mot. for Contempt, ECF Nos. 30, 30-1, 30-2, 31.

11.     That contempt motion resulted in a remedial Stipulated Order.  ECF No. 60-1, PX-002.  In adopting the Parties' Stipulated Order, the Court noted that "a finding of contempt is warranted."  ECF No. 60 at 11.  Nevertheless, this "Court grudgingly approved [the Stipulated Order] even though the County had reached sustained compliance 'in only one of the 92

requirements of the Consent Decree.'" Order to Show Cause, ECF No. 100 at 9 (citing ECF No. 60 at 7).

12.    Defendants have repeatedly violated the Consent Decree and Stipulated Order. Substantial compliance with the Decree was due more than four years ago.  According to the Monitor's latest report, Defendants remain out of substantial compliance with nearly all Decree requirements.  Defendants currently have achieved sustained or substantial compliance with only 3 out of 92 substantive provisions.[2]  Monitor's 15th Report, PX-041, at 23; Tst. Simpson.

13.    The Monitor's reports document the Defendants' long history of non-compliance with court orders and missed deadlines.  Monitor's 15th Report, PX-041, at 22-23.  Tst. Simpson.

14.    Approximately a year before the latest report, the Monitor's Twelfth Report in December 2020 found Defendants were in substantial compliance with just seven provisions, ECF No. 77 at 24-25, and likewise just seven for the Monitor's Ninth Report approximately a year before in November 2019, ECF No. 46 at 9.  Defendants' compliance has regressed.

15.    The Stipulated Order provided a road map of more immediate, short-term remedies to help Defendants get back on track with implementing the Consent Decree.  The Stipulated Order required specified repairs to doors, locks, and other high priority physical plant problems at the Raymond Detention Center; the hiring of architects and others to develop a Master Plan for facility renovation, repair, and replacement; a staffing plan and the hiring of a retention consultant to help implement a staffing study (that had itself been delayed); creation of

---

[2] Those three compliant provisions are:  paragraph 40 (concerning background checks for hiring staff); paragraph 80 (regarding separating youth from adult detainees); and paragraph 160 (regarding designating a person to coordinate compliance with the Consent Decree).  ECF No. 101, PX-041, at 26, 91, 137-38.

a promotion and career ladder; retention pay; the hiring of a Jail Administrator who actually met
Consent Decree requirements; a process to speed up policy development, training and
implementation; measures to improve staff accountability for use of force; progress on
developing a pretrial services program to give the county long-term options for population
management; the hiring of a qualified treatment director for the Henley-Young Youth Detention
Center; and progress on developing a behavior and treatment program for youth.  Stipulated
Order, PX-002, at Part I (safety & security/physical plant), II (safety & security/staffing), III
(development and implementation of policies and procedures), IV (population management), V
(Henley-Young).

     16.     The Stipulated Order was designed to enable Defendants to attain more
immediately achievable steps that could improve conditions and expedite progress towards
compliance with the Consent Decree.  It did not achieve its designed purpose.  Tst. Simpson; Tst.
Parrish; Tst. Moeser; Monitor's 15th Report, PX-041, at 7-19.

     17.     Since entry of the Consent Decree and Stipulated Order, Jail conditions remain
unacceptably harmful and dangerous, and Defendants have made little progress in implementing
most of the provisions.  The most recent Monitor's Reports confirm continuing non-compliance
and dire conditions, as did the monitoring tour conducted beginning the week of January 24,
2022.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Tst. Moeser; *see generally* Monitor's 15th
Report; Monitor's 14th Report, Monitor's 13th Report, and Interim Report, PX-041, 039, 038,
040.  After the lead monitor and her corrections expert were both onsite at the Jail in January
2022, the lead monitor confirmed that the onsite visit substantiated a number of things seen in
previous remote site visits (conducted in that format due to COVID).  Tst. Simpson; Tst. Parrish.

18.     While the Monitor has reported some remedial efforts, including physical plant

upgrades, new policies, the hiring of a then new jail administrator,[3] and completion of a Jail

replacement plan, staffing and security remain grossly inadequate; the physical plant remains

insecure and unsafe; critical policies have not been implemented, or even drafted; incident

reviews and investigations are not conducted as required by the Court's orders; and use of force

is inadequately regulated.  Tst. Simpson; Tst. Parrish; *see generally* Monitor's 15th Report;

Monitor's 14th Report, Monitor's 13th Report, and Interim Report, PX-041, 039, 038, 040.

19.     On November 23, 2021, after six troubling deaths in the past year and a series of

oral and written reports of non-compliance from the Monitor and the Parties, the Court issued an

Order to Show Cause. ECF No. 100.  That Order concluded that Defendants "shall show cause

and explain why it should not be held in civil contempt and why a receivership should not be

created to operate" the Jail.[4]  ECF No. 100 at 28.  The Court scheduled a show cause evidentiary

hearing for January 2022.  ECF No. 107 at 2.

20.     Before that hearing occurred, however, Defendants filed on January 21, 2022, a

Motion to Terminate, or, Alternatively, Modify, [the] Consent Decree.  ECF No. 111.

---

[3]  As detailed more below, the Jail Administrator encountered such resistance from Defendants
that she currently no longer works at the Jail.  Kathryn Bryan Anticipated Testimony ("Tst.
Bryan").

[4] The Order explicitly referred to the Raymond Detention Center ("RDC"); however, to the
extent that leadership, budgeting, and funding issues need to be addressed in order for
Defendants to achieve compliance with the Consent Decree and Stipulated Order, the remedy
needs to apply to operation of all Jail facilities within the scope of this case.  Additionally, RDC
is part of a larger system run by Defendants, so system-wide relief is required to address the
more specific concerns at RDC.  To the extent that the same systemic problems result in
contempt of the Court's orders as to youth charged as adults, the remedy must apply, as
necessary, to Henley-Young or any other facility used to house detainees who would otherwise
be held at RDC.

Defendants' Motion invokes the termination and automatic stay provisions of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(b) & (e).  The United States opposed that termination motion.  ECF No. 114.  The Court found good cause to postpone the automatic stay pursuant to PLRA § 3626(e)(3) and postponed the effective date of the PLRA's automatic stay for 60 days, until April 22, 2022.  Feb. 4, 2022, Order, ECF No. 127.

21.     The Court reset the contempt evidentiary for the week of February 14, 2022, and added Defendants' PLRA motion to that hearing.  *See* January 18, 2022, Order, ECF No. 109. Subsequently, the Court found Defendants in contempt for violating thirty provisions – nearly one-third – of the Consent Decree.  1st Order of Contempt, ECF 126 at 2.  The Court noted that Defendants' prior brief had not contested some of the Monitor's findings of non-compliance.  In addition, even as Defendants claimed a positive trend, the Jail Administrator had left her job, and based on arguments and the record before the Court, Defendants were clearly in contempt.  ECF No. 126 at 16-27.  The Court reserved judgment until after the evidentiary hearing as to whether Defendants are in contempt of the other remaining provisions.  *See* ECF No. 126 at 18 n.7.

22.     The Court held the February 2022 hearing and heard the Parties' evidence on contempt and the PLRA motion.

23.     As explained below, the Court:  (1) denies Defendants' PLRA termination motion because the Consent Decree remains necessary to remedy Defendants' current and ongoing constitutional violations and complies with the PLRA; (2) finds Defendants in longstanding and widespread contempt of the Consent Decree; and (3) finds that ordering a receiver is necessary, appropriate, and complies with the PLRA.

### B. Defendants' Widespread Non-Compliance with the Court's Remedial Orders Places Detainees, Staff, and the Public at Substantial Risk of Serious Harm.

24.     The totality of conditions in the Jail actually harm an unacceptable number of detainees and pose a substantial risk of serious harm to all detainees.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Tst. Moeser; *see generally* Monitor's Fifteenth, Fourteenth, Thirteenth and Interim Reports, PX-041, 039, 038, 040.  Rampant violence, escapes, contraband, sexual misconduct, suicides, and misuse of force occur because Defendants have repeatedly failed to implement necessary remedial measures.  Such measures include improved staffing, supervision, and written policies; required use of force, sexual misconduct, grievance, incident reporting, and investigation programs; medical and mental health assessment and treatment; safeguards on the use of segregation; and a self-assessment and self-corrections process to address criminal justice and jail system issues that affect long-term and strategic management concerns.  *See* Consent Decree, PX-001, at IV-IX; Stipulated Order, PX-002, at I-V.

25.     The Jail is plagued with numerous detainee assaults and other serious incidents. Reports indicate 23 fights and assaults occurred at RDC in May 2021.  Tr. of Status Conference 13:21-23, (June 16, 2021), ECF No. 91, ("June 2021 Tr."); Inmate Assault Incident Report Summary Jan. 13, 2022, PX-032.  The Monitor noted 13 assaults in July, 12 in September, and 10 for October 1 through 26 at RDC, but she also found indications that "many assaults go unreported."  Monitor's 15th Report, ECF No. 101, PX-041, at 45-46.  Of those that were reported, several such incidents were linked to inadequate supervision.  *Id.* at 27-28 (citing incident reports where violence occurred while officers sat in control room or left their assigned posts); Tst. Simpson; Tst. Parrish.

26.     These incidents demonstrate Defendants' non-compliance with the Consent Decree and the substantial risk of serious harm that Hinds County detainees face on a daily basis.

Tst. Simpson; Tst. Parrish; Tst. Dudley; Tst. Moeser; Monitor's 15th Report, PX-041.  Consent

Decree Sections IV.A and G required Defendants to hire and train sufficient staff.  Additional

Consent Decree sections addressed violence by requiring Defendants to develop and implement

sound classification, direct supervision, housing assignment, welfare checks, and staff

management policies and practices.[5]  Consent Decree, PX-001, at ¶ 9, Parts IV.A-J.

27.     Within the last year, six detainees have died in circumstances reflecting

Defendants' repeated failure to address staffing, training, policy, physical plant, emergency

response, and other systemic deficiencies repeatedly identified by the Monitor.  Tst. Simpson;

Tst. Parrish; Tst. Dudley; Monitor's Interim Report, PX-040.  A seventh person reportedly died

of cancer in November 2021, but no mortality review was apparently completed.  ECF No. 101,

PX-041, at 4.

28.     The first of this recent spate of deaths occurred in March 2021.  On March 19,

2021, a new arrestee collapsed in the booking area.  A nurse told staff to transport the arrestee to

the hospital, but the staff delayed doing so because they decided to get another evaluation.  When

staff provided medical aid, an "O2 concentrator" failed because of a faulty electrical outlet.

There was no AED (automated external defibrillator) in the booking area.  Someone obtained

one from the medical unit, but brought back an AED without pads.  The Hinds County Sheriff's

Department staff did not complete an incident report or after-action report[6] after the arrestee's

death, because the Sheriff's Department took the position that the arrestee was not a detainee,

---

[5] The Consent Decree defines "direct supervision" more completely at paragraph 9.  This term of art involves placing officers in housing units so they have active, continuous interaction with prisoners.

[6] The Jail Administrator is required to complete an administrative review of all deaths.  Consent Decree, ECF No. 8-1, PX-001, at ¶ 43(f).

because he had not been accepted or booked.  Order, ECF 126 at 9; Tst. Simpson; Tst. Parrish; Monitor's Interim Report, PX-040; Death Records LW, PX-053, 054, 055, 056, 057, 058, 059, 060, 061.

29.     On April 18, 2021, another detainee committed suicide by hanging himself from a light fixture.  Due to increasing symptoms of mental illness and significant stressors at that time, he required enhanced monitoring but did not receive it.  Instead, the detainee was being housed in booking, which the Monitor has long warned is unsuitable for anything except short-term housing for new arrestees (eight hours or less) in part due to difficulties in monitoring the people there.  The officer who noticed the detainee hanging in the cell could not enter the cell, because he did not have keys.  This officer was in the area to help process two new arrestees.  The detention officer actually assigned to work the booking floor was not at the officer's post.  The Monitor has repeatedly noted that officers are congregating in offices and other spaces instead of covering their floor posts. The officers did not have a 911 knife to cut down the detainee.  Just like a month before, staff also did not have ready access to an AED.  The last documented well-being check on the detainee had occurred three hours before the incident.  More than six months after the death, when the Monitor notified the Court about the incident on October 28, 2021, the staff still had not completed any after-action report on this incident.  Order, ECF 126 at 10; Tst. Simpson; Tst. Parrish; Tst. Dudley; Anticipated testimony of Chalonda Mosley ("Tst. Mosley"); Medical Record JM pt. 1, PX-043; Monitor's Interim Report, PX-040; Death Records JM, PX-062, 063, 064, 065, 066, 067.

30.     On July 6, 2021, a detainee died in the C-4 unit.  This was a death by hanging, but the record is silent as to whether it was a suicide.  This incident also illustrates multiple staffing, supervision, and staff management issues.  The officer assigned to do 30-minute head counts

"left the unit" for unknown reasons.  When he returned to look in, he did so from a vantage point from where he could not possibly see each inmate to accurately conduct a count.  The officer had been inappropriately assigned to do both half-hour checks in C-4 and to make 15-minute watch notations for the C-4 Isolation ("Iso"/suicide watch) unit.  C-4 Iso is supposed to be under constant staff supervision.  There are supposed to be two officers in C-4, and they are not supposed to leave the unit.  In practice, the lone officer assigned to C-4 did leave the unit to do checks in C-4 Iso and for other reasons.  The officer did not have a log book so could not complete observation logs.  The officer found the deceased detainee during a head count at shift change.  A sergeant was present at the time.  The officer and sergeant could not immediately open the cell door to lower the detainee to the floor.  Instead, they went to C-pod control to call a Lieutenant in booking before finally responding.  No after-action report had been completed at the time of the Monitor's Interim Report in October 2021.  Order, ECF 126 at 10; Tst. Simpson; Tst. Parrish; Monitor's Interim Report, PX-040; Death Records JG, PX-051, 052.

31.     Both suicides showed deficiencies with staffing and supervision, the emergency response, and the follow-up investigation.  ECF No. 96, PX-040, at 3-4.

32.     On August 3, 2021, a detainee died of an apparent drug overdose.  Serious contraband and drug-overdose incidents have been repeatedly reported at the Jail.  There are indications that the detainee may have been dead long enough for rigor mortis to set in before being found.  No after-action report had been completed at the time of the Monitor's Interim Report in October 2021.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Monitor's Interim Report, PX-040.  The mortality review done later evaluated whether the health care providers could have acted differently in this case and did not assess what other actions, such as conducting more

frequent wellbeing checks and decreasing available contraband, could reduce the likelihood of future such deaths.  Order, ECF 126 at 10-11; Tst. Dudley; Death Records ST, PX-070, 071, 072.

33.     On August 4, 2021, a detainee died apparently of COVID.  No investigation was completed on this death.  There are indications that questions should have been asked about when the detainee's symptoms first appeared and the timeliness of staff response, at the very least.  Order, ECF 126 at 11; Tst. Simpson; Tst. Parrish; Monitor's Interim Report, PX-040; Death Records LB, PX-050.

34.     On October 18, 2021, a detainee was killed in A-4, a unit where doors do not lock and there is minimal staff supervision compared even to other units at the Raymond Detention Center.  In that unit, there is an officer in a control room, but there are no officers assigned to the actual housing units.  Early in the morning, other detainees assaulted the victim, dragged him across the mezzanine, propped the victim into a sitting position, and then laid the victim on a mat.  Officers did not discover the deceased detainee until about nine hours later, after breakfast, lunch, and a number of well-being checks should have been conducted.  Medical did not provide CPR. There are questions about why no one in control responded to the activity on the cameras.  A minimal incident report identifies the death as a "Medical Report-Injury" instead of an assault.  Order, ECF 126 at 11-12; Tst. Simpson; Tst. Parrish; Monitor's Interim Report, PX-040, ECF No. 96, PX-040, at 3-4; Death Records MR, PX-068, 069.

35.     Investigations of some of these deaths are ongoing, but there are still gaps in the actions taken following these deaths.  For instance, in late October, after-action reports had not been generated for the first four deaths (occurring on and before August 3, 2021); incident reports were not written for the March 19 death of the arrestee in booking, when they should have been; no investigation has been done of the COVID death, which could inform the ongoing

Jail response to the pandemic; and the "minimal incident reports" provided for the detainee-on-detainee assault identified it as "Medical Report-injury."  ECF No. 96, PX-040, at 2-4.

36.     The information reported from Jail staff may not be complete and accurate, and under-reporting—coupled with inadequate review by supervisors—contributes to the risk of future deaths.  *See* ECF No. 94, PX-039, at 28 (in July 2021, Monitor noted "no noticeable improvement in supervisory review of incident reports").  Even so, existing information reveals widespread harm, and substantial risk of serious harm, to detainees, staff, and the public.

37.     Detainees have historically climbed through the A-pod ceiling to bring in contraband or obtained it from staff.  September 2021 Tr. 34:15-35:4; ECF No. 94, PX-039, at 54 (Monitor noted "[n]o jail (RDC) can operate effectively when almost half of the inmates in a housing area have contraband cell phones, excessive amounts of illicit drugs, shanks [including knives] and even cash."); ECF No. 101, PX-041, at 55 (in August 2021, detainees broadcast a video on social media on a contraband cell phone from inside A-pod); November 2021 Quality Assurance Summary, PX-042 at 8 (listing contraband items found in November 2021 shakedowns).  After the jail administration took steps in order to prevent staff from bringing in contraband, detainees resumed going to the roof to retrieve contraband left outside the facility; in addition, Defendants admit that surveillance of staff for contraband has "tapered off," and "there has been a noticeable return to things being done as they were in the past."  December 2021 Quality Assurance Summary, PX-086 at 17.

38.     RDC continues to see a high amount of illicit and increasingly potent drugs.  June 2021 Tr. 13:23-14:3, 29:9-20.  The Monitor warned after the June 2021 site visit that drug contraband must be brought under control "as quickly as possible, before there is a drug overdose-related death."  ECF No. 94, PX-039, at 5; June 2021 Tr. 29:9-20.

39.     The August 3, 2021 death was an apparent drug overdose.  ECF No. 96, PX-040, at 3.

40.     There have also been a number of nonfatal overdoses where detainees were "unresponsive and had to be revived," and other detainees have exhibited "erratic behavior" and were found to have taken drugs.  June 2021 Tr. 13:23-14:3; September 2021 Tr. 11:5-11 (noting seven nonfatal overdoses in three months prior to June, and several reflected since then in incident reports); Monitor's 15th Report, ECF No. 101, PX-041, at 39 (noting "over the last about 5 months, there has been a significant increase in the number of serious emergencies related to the use/abuse of contraband drugs," though perhaps slightly less in the month before October site visit).

### C.  Defendants' Failure to Implement Court Orders to Fix Critical Deficiencies Exacerbates the Ongoing Substantial Risk of Serious Harm in the Jail.

41.     Defendants have been unwilling to implement required corrections to policies, procedures, and practices regarding protection of detainees from harm, use of force, incident reporting, sexual misconduct, grievance procedures, misuse of segregation, inadequate programs for youthful detainees, unlawful detention, and other relief that they agreed to.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Monitor's Interim Report, PX-040; Consent Decree, PX-001, at Section IV; Stipulated Order, PX-002, at Parts I-V.  This failure places detainees at ongoing risk of serious harm.

### (1) Staffing and Supervision

42.     To address staffing, supervision, and staffing-related deficiencies, the Consent Decree required Defendants to obtain a formal staffing and needs assessment within six months, i.e., by December 19, 2016.  Once completed, Defendants were supposed to develop a plan to

implement the recommended staffing levels and adopt strategies and policies to ensure adequate staffing. Court-ordered, agreed-upon requirements included an obligation to create a career ladder and retention bonus system, fill certain posts, and provide direct supervision or documented welfare checks of sufficient frequency based on the type of housing or detainee. Consent Decree, PX-001, at ¶¶ 41-44; Stipulated Order, PX-002, at Part II; HCDS Staffing Analysis 4/3/20, PX-016; HCDC Staffing Analysis 10/21, PX-049; NIC Staffing Analysis 9/7/14, PX-015; Step Plan, PX-021.

43.    The Consent Decree included outcome measures that could establish a rebuttable presumption that Defendants were not providing reasonably safe conditions. These included (a) a staff vacancy rate of more than 10% of budgeted positions; (b) a voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts; (c) a major disturbance resulting in the takeover of any housing area by detainees; (d) staffing where fewer than 90% of all detention officers have completed basic jailer training; (e) three or more use of force or detainee-on-detainee incidents in a fiscal year in which a detainee suffers a serious injury, but for which staff members fail to complete all documentation required by the Consent Decree, including supervision recommendations and findings; (f) one detainee death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased detainee (e.g., corporate medical director or outside, contract physician, when facility medical director may have a personal conflict); (g) one death within a fiscal year, where the death was a result of detainee-on-detainee violence and there was a violation of Jail supervision, housing assignment, or classification procedures. Consent Decree, PX-001, at ¶ 43.

44. At least five of the factors triggering a rebuttable presumption that the Jail is unsafe have occurred. Consent Decree, PX-001, at ¶ 42 (a, b, e, f, g). High staff vacancy levels, the failure to complete required reviews for the deaths over the past year, and other staffing and documentation issues trigger the rebuttable presumption that Defendants cannot provide reasonably safe conditions in the Jail. Monitor's 15th Report, PX-041, at 46-47; Tst. Simpson; Tst. Parrish.

45. High staff vacancy rates, in violation of Consent Decree ¶ 43(a), have persisted since the beginning of Consent Decree implementation. As of late September, with 207 filled positions, Hinds County Detention Center had a 37% staff vacancy rate, relative to needed staff. Monitor's 15th Report, PX 041, at 46. Staff numbers have only decreased since then. Tst. Parrish; Detention Services Staffing Report, PX 18; Detention Services Staffing Report, PX 25.

46. As noted below, the staff turnover rate is also high: projected at 30% for 2021. Monitor's 15th Report, PX-041, at 46. Failure to staff critical posts, in violation of Consent Decree ¶ 43(b), is evident in deaths and incident reports in RDC, and several of the 2021 deaths occurred where well-being checks were not done as scheduled. *See* ECF No. 96. In addition, C-pod—which reopened in October 2020 with the expectation of using direct supervision—still has a shortage of staffing that creates a risk of harm to detainees and staff. *See, e.g.*, June 2021 Hearing Tr. 20:8-21:4; ECF No. 94, PX-039, at 29, 33 (citing incident reports where three separate fires within an hour were responded to by officers coming from outside the unit). Even the published post assignments reflect parts of C-pod that are unstaffed. June 2021 Hearing Tr. 21:14-16. As to A-pod, the Monitor found it "continues to be an unmanageable housing area. Inmates are not supervised." Sometimes the only officer is in the control room, and some detainees have formed "their own committee system in which they choose who is accepted into

their unit." ECF No. 94, PX-039, at 29-30 (quoting the Lieutenant in charge of booking and classification), 36; Tst. Parrish.

47.     In addition to insufficient monitoring on A- and C-pods overall, booking, the lockdown unit, and the suicide watch units are not supervised as they should be. *See, e.g.*, ECF No. 94, PX-039, at 48-49 (citing log entry where officer was working on both booking and suicide watch, making it impossible to conduct the requisite monitoring in both places:  15-minute well-being checks in booking and constant observation of people on suicide watch).  And supervisors do not require compliance with suicide watch procedures.  ECF No. 94, PX-039, at 33, 43, 49.  In other words, even when staff leave their posts, fail to complete welfare checks, or otherwise endanger the facility, their supervisors do not address their failure when reviewing incidents and staff errors.

48.     Although the prior Jail Administrator recommended installing an electronic rounds system to assist in enforcing the requirement for officers to conduct these regular checks, the County still has not implemented it, months after a detainee died by homicide and was not discovered for several hours.  November 2021 Quality Assurance Summary, PX-042, at 18 ("This is yet another example of the County's procrastinating on an exceedingly vital issue."); Tst. Bryan.

49.     Incident reports documenting violent incidents also point to a lack of staff supervision.  Tst. Simpson, Tst. Parrish; Monitor's 15th Report, PX-041, at 28-29 (discussing assaults).  Detainee-on-detainee assaults continue at a high rate, and it appears many assaults go unreported.  Monitor's 15th Report, PX-041, at 45-46 (citing incident reports); *see also* ECF No. 94, PX-039, at 46-47.  Consent Decree, PX-001, at ¶ 43(e).

50.     For example, in October 2021, a detainee in unit A-1 was assaulted in the middle of the day by multiple other detainees, who beat him and stabbed him repeatedly with knives, requiring outside treatment at a hospital; no officer was present to intervene.  Tst. Godbolt, Tst. Simpson, Tst. Parrish; Immediate Notification – RDC – Assault and Medical Transfer – 211358, PX-031; CID Monthly Investigation 10/21, PX 23; Monitor's 15th Report, PX-041, at 28-29. After the assault was well underway, and the victim had been seriously injured, an officer eventually arrived at the scene of the assault because the detainee's wife and then his attorney called the Jail to request that he be housed in protective custody.  Tst. Godbolt, Tst. Simpson, Tst. Parrish; Immediate Notification – RDC – Assault and Medical Transfer – 211358, PX-031; Monitor's 15th Report, PX-041, at 28-29.

51.     The detainee who died after an assault from several other detainees on October 18, 2021, was housed in a unit where the doors do not lock; moreover, although the assault was captured on video, it is unclear why this activity was not observed from the control room.  The detainee was not discovered by officers for nearly nine hours, and the incident reports mis-identify it as a "Medical Report-injury."  ECF No. 96, PX-040, at 3-4.  Consent Decree, PX-001, at ¶ 43(g).

52.     Several other deaths this year did not involve the appropriate administrative review and mortality review, in violation of Consent Decree ¶ 43(f).  *See* ECF No. 96 (rebuttable presumption based on failure to conduct proper administrative and mortality reviews for any death).  For the October death, the since departed Jail Administrator actually completed a thorough after-action report, and the report noted failures in staff supervision, camera and control room problems, and medical staff's failure to take life saving measures.  After Action Report 11/15/21 – MR, PX 020.

53.     Staffing improvements would have helped Defendants reduce violence, implement required policies, improve delivery of necessary medical and mental health care, reduce the risk of excessive force, and more generally ensure the level of supervision needed to maintain the physical plant, respond to fires or other emergencies, and deliver detainee programs. Tst. Parrish; Tst. Simpson; Tst. Moeser; Tst. Dudley; *see generally* Monitor's 15th, 14th, 13th and Interim Reports, PX-041, 039, 038, 040.

54.     The Consent Decree required Defendants to hire a qualified Jail Administrator and supervisors; more trained, qualified detention officers; and enough medical and mental health staff to meet detainees' needs.  ECF No. 8-1, PX-001; Tst. Simpson; Tst. Parrish; Tst. Dudley.

55.     The Monitor and Jail Administrators have developed and revised a series of staffing plans for the Jail.  The most current Revised Staffing Analysis calls for 329 budgeted officer positions in the Jail.  Defendants have never funded staffing anywhere close to that level. Indeed, they have authorized only 272 positions for the Jail, and that number includes 9 food service staff slots that were recently transferred from a private contractor to the Sheriff's Office. Monitor's 15th Report at 43-44, PX-041; *see also* June 2021 Tr. 14:6-7, 17-20, 89:1-19; September 2021 Tr. 15:8-25, 18:18-19:10 (226 of 281 funded positions are filled, which has remained about the same for the past two years, when 330 are needed); December 2021 Quality Assurance Summary, PX-086, at 4 (noting "questionable numbers" in reporting detention positions, due to "inconsistencies between the number of PINs assigned to detention officers and detention PINs being assigned to other staff outside of detention services").

56.     Only 207 positions were filled as of September 30, 2021; there are now fewer than 200 positions filled.  Tst. Simpson; Tst. Parrish; Monitor's 15th Report, PX-041, at 30-31,

45-46; November 2021 Quality Assurance Summary, PX-042, at 4 (despite new cadet class, "many more are needed to meet the requirements of the new staffing analysis"); December 2021 Quality Assurance Summary, PX-086 at 3, 7-8  (in reviewing post assignments and accountability logs in December 2021, "it was observed that on numerous occasions," both RDC and WC "operated on skeleton crews on all shifts").

57.     Based on the number of terminations/resignations that occurred in the first nine months of 2021, the detention staff turnover rate was projected at 30% for 2021.  As of September 30, 2021, 74 of 281 budgeted positions were vacant.  The vacancy rate was well over the Consent Decree trigger threshold for vacancies, which is set at 10% of budgeted positions. Tst. Parrish; Monitor's 15th Report, PX-041, at 30-31, 45-46; *see* Consent Decree, PX-001, at ¶ 43 (exceeding the agreed-upon turnover rate establishes rebuttable presumption that Defendants cannot provide detainees with reasonably safe conditions).

58.     The Jail's average daily population often exceeded 600 in November 2021 and is expected to continue rising due to community crime rates, further exacerbating the staffing shortage.  Monitor's 15th Report, ECF No. 101, PX-041, at 31; Tst. Simpson; Tst. Parrish.

59.     Defendants have been repeatedly given technical assistance, and time, to implement steps needed to achieve staffing that complies with Court orders to provide reasonable safety and supervision.  But they have repeatedly delayed taking necessary short-term measures, such as a 5% pay raise discussed in 2021 that was not implemented until the eve of the 2022 evidentiary hearing, as well as more significant long-term improvements such as creating a career ladder, step pay, retention incentives, hiring a consultant to develop a retention and recruitment plan, and improving practices to address employee safety and working conditions. Tst. Simpson; Tst. Parrish; Tst. Dudley; Tst. Moeser; Monitor's 15th Report, PX-041, at 2-4, 5-7,

23-33, 45-46, 94-95; Monitor's Interim Report, PX-040, at 5; December 2021 Quality Assurance Summary, PX-086, at 16 (noting the 5% raise in December 2021 and three months of premium pay have "not improved workers' performance"); Consent Decree, PX-001, at ¶¶ 45-49; Stipulated Order, PX-002, at Section II, V.A; Step Plan, PX-021.

60.     Defendants' failure to come up with a working plan to implement staffing improvements has been longstanding and ongoing.  The Stipulated Order included a process to address this issue.  Within 30 days of the Stipulated Order, Defendants were required to retain a consultant to assist and, within four months, develop a recruitment and retention plan; within six months, implement criteria for merit-based promotion and established a career ladder; and within ten months, implement a plan for retention pay.  Stipulated Order, PX-002, at II.B.3-5.

61.     Defendants have done none of these tasks.  Monitor's 15th Report, ECF No. 101, PX-041, at 2, 16, 17, 30.  Defendants worked with a consultant procured and funded by the Monitor, but the Monitor found "there was never full engagement with the consultant" by Defendants, and Defendants ended the contract without making significant progress.  Monitor's 14th Report, ECF No. 94, PX-039, at 10, 32; June 2021 Tr. 14:21-24.  A draft career ladder plan was submitted to the County Board of Supervisors, with no action taken.  ECF No. 101, PX-041, at 2, 16-17, 30; ECF No. 94, PX-039, at 19.  Similarly, there has been no plan for retention pay. ECF No. 101, PX-041, at 17; ECF No. 94, PX-039, at 20.

62.     Defendants also lack a coordinated plan for implementing additional improvements when renovations are actually made in an area.  ECF No. 101, PX-041, at 28. Physical plant and other security improvements are not sustainable without improving staffing and implementation of security policies.

23

63.     For instance, even after fixing locks and spending significant funds to improve the physical plant at the Raymond Detention Center, Defendants did not ensure proper staffing and supervision in the renovated housing pods.  Instead of assigning adequate numbers of staff, and transferring all detainees to renovated units, they continue to use the dilapidated A-pod while leaving it "totally unstaffed."  ECF No. 101, PX-041, at 28; *see also* ECF No. 94, PX-039, at 3, 29 (noting sometimes the only officer in A-pod is in the control room and citing the exact same number of incidents in each pod in May); June 2021 Tr. 20:8-24.  Even the renovated C-pod is frequently left without adequate staffing and supervision.  ECF No. 101, PX-041, at 28, 31, 42, 50; June 2021 Tr. 20:8-24.

64.     Similarly, Defendants re-opened B-pod without having adequate staff and renovations in place, despite repeated warnings from the Monitor about Defendants' rushed approach.  ECF No. 101, PX-041, at 28; June 2021 Tr. 88:18-25; December 2021 Quality Assurance Summary at 14, PX-086 ("B-pod construction has not been completed"; "work is at a halt," with no "definitive timeline" to complete it.).

65.     The lack of staffing causes or contributes to a host of other violations of the Court's orders.  It impedes detainee supervision and security, medical and mental health services, recreation, maintenance, detainee programs, investigating and responding to serious incidents (including use of force and sexual misconduct), and implementation of required policies.  Without enough staff, inmates are left to defend themselves, and staff cannot readily deliver required services, or implement positive behavioral or activity programs.  Tst. Simpson; Tst. Parrish, Tst. Dudley, Tst. Moeser; Monitor's 15th Report, PX-041, at 94-95, Monitor's Interim Report, PX-040, at 4-5.

66.    Defendants have not been able to implement the classification, direct supervision and housing assignment policies developed and approved by the parties and the Monitor.  Some practices have actually gotten worse.  For instance, the Jail has started housing detainees based on gang affiliation, with staff ignoring policies and bypassing trained Classification staff.  Jail managers indicate that unauthorized "detainee committees" run some housing units, meaning that detainees are making decisions about which detainees are allowed to live on the unit and otherwise usurping staff control of the Jail.  At the same time, Defendants have made no progress staffing or implementing a gang program in the Jail.  Monitor's 15th Report, PX-041, at 37, 56, 94-95; Tst. Parrish; Tst. Simpson.

67.    More generally, the lack of staff affects implementation of policies in general, as lack of staff contributes to the Defendants' failure to provide medical and mental health services, respond to grievances and misconduct complaints, implement non-punitive behavioral approaches and inmate activities, reduce reliance on long-term segregation; provide programs for youth, or to maintain records or other basic administrative mechanisms that are the foundation for facility operations.  Monitor's 15th Report, PX-041, at 4, 10-11, 18, 23-25, 29-34, 87-90, 94-102, 108, 115; Tst. Simpson, Tst. Parrish, Tst. Dudley, Tst. Moeser.

68.    Ensuring stable, qualified jail leadership is so important that the Court's orders included provisions for leadership qualifications and safeguards to make sure the Jail Administrator and supervisors could implement approved policies and reforms.  Consent Decree, PX-001, at ¶ 38, 46, Stipulated Order, PX-002, at II.C.

69.    Facility leadership has been in turmoil for years, with a succession of top administrators leaving due to inadequate support from Defendants or interference with even limited reforms.  Since the Consent Decree was entered, there have been three Jail

Administrators.  Tst. Parrish.  The Sheriff compared hiring the most recent Jail Administrator, Kathryn Bryan, with having Michael Jordan on a ball team and assured the Court that he would let her shoot, Order, ECF 126 at 9.  However, that was not Ms. Bryan's experience, and she is no longer the jail administrator after serving for six months.  Tst. Bryan.  Defendants concede that "in-fighting" persists within the Board of Supervisors, and that "problems seem to also exist in the Sheriff's Department," which frustrate progress.  December 2021 Quality Assurance Summary, PX-086, at 18 (noting a "downward spiral" at the jail); *see also* Tst. Parrish.

70.     Most recently, the Jail Administrator who started in summer 2021 encountered such resistance from Defendants that she submitted a letter of resignation on November 10, 2021, effective February 2022; she currently no longer works for Defendants.  Tst. Bryan; Tst. Simpson.  The Jail Administrator had expressed concerns about the Sheriff interfering with basic personnel and operational decisions, most of which were governed by written policies that had previously been reviewed and approved by all parties.  Bryan Letter, PX-013; Tst. Parrish; Tst. Simpson; Tst. Bryan; November 2021 Quality Assurance Summary, PX-042, at 1 (noting Major Bryan was "experiencing a not so subtle lack of cooperation from the Board of Supervisors and other Hinds County employees"); December 2021 Quality Assurance Summary, PX-086, at 10 (Major Bryan "is not involved in the disciplinary actions concerning detention staff. Sheriff Jones and Major Bryan will have to discuss her role in this particular area.").

71.     On January 3, 2022, the Henley-Young Executive Director tendered his resignation after less than nine months in the job.  Frazier Resignation Letter, PX-012; Tst. Simpson, Tst. Moeser.  Among the reasons for his resignation, he cited the County's failure to support him in the role, staffing issues that he could not resolve due to resource allocations by the County, and the County's failure to approve a reasonable budget (specifically, for the current

26

fiscal year the Board approved a $3.288 million budget for Henley-Young, as compared with $4.109 million requested).  Frazier Resignation Letter, PX-012; Tst. Simpson, Tst. Moeser.

72.     The Jail Internal Affairs investigator also resigned in November 2021, noting a lack of support needed for investigations.  Brannon Letter, PX-014; Tst. Parrish; Tst. Simpson.

73.     In November 2021, a group of employees staged a walkout, complaining about pay and conditions.  Detention Needs and Concerns Letter, PX-024; Tst. Parrish; Tst. Simpson; November 2021 Quality Assurance Summary, PX-042, at 19.

74.     The Jail lacks administrative reporting, investigation, and staff accountability mechanisms to ensure that leadership properly supervises staff.  The failure to implement policies, training, incident reporting, use of force reporting, and other administrative procedures prevents implementation of the Court's orders.  Tst. Parrish.

75.     The lack of staff also impacts implementation of policies and procedures.  The failure to develop and implement written policies and procedures has been one of the primary problems with the Jail from the start of the monitoring process.  June 2021 Tr. 14:6-16. Although many policies—including one governing the use of force—have been drafted since the Stipulated Order was entered in January 2020, Defendants are not training on the new policies, do not have enough staff to implement the policies, and supervisors do not enforce the policies. *See, e.g.,* ECF No. 101, PX-041, at 23 (generally), 26 (supervision), 35 (classification), 38 (recreation), 54 (inspections and maintenance), 57 (use of force), 71-73 (sexual misconduct/Prison Rape Elimination Act), and 77-81 (grievances), 134-138 (distributing court order to staff, policy review, self-assessments, and emergency reporting).  And even the drafting of policies has slowed.  December 2021 Quality Assurance Summary, PX-086, at 4.

**(2) Incident Reporting and Use of Force**

76.     The Consent Decree includes administrative mechanisms for reporting and
investigating serious incidents, excessive use of force, improper use of segregation or restraints,
sex abuse, and other potential violations of detainee rights.  Consent Decree, PX-001, at Part
IV.B-G, J.  The Stipulated Order provided a more detailed timeline and more specific steps to
improve these mechanisms, particularly those involving use of force.  Stipulated Order, PX-002,
at Part III.C.

77.     Poor implementation of these mechanisms contributes to unconstitutional
conditions and results in the under-reporting of serious harm in the Jail.  The Monitor has
repeatedly found incomplete and inaccurate information in critical incident and use of reports, as
well as inadequate supervisor review of such reports.  *See* Monitor's 15th Report, PX-041, at 3-
4, 46, 59, 61-72; Monitor's 14th Report, PX-039, at 55-67.  To prevent a substantial risk of
serious harm, staff must fill out incident and use of force reports completely and accurately,
supervisors must document that they are substantively reviewing reports, and supervisors must
take corrective action when notified of misconduct or dangerous conditions.

78.     For instance, Jail staff did not complete after-action reports for four deaths
(occurring on and before August 3, 2021) an incident report for the March 19, 2021 death of the
arrestee in booking, incident reports for unlawful detentions (e.g. held two months and a week
past release dates), and did not investigate the COVID death.  Monitor's 15th Report, PX-041, at
110.  Incident reports have contained minimal information, such as the one for the detainee-on-
detainee assault that mis-identified it as a "Medical Report-injury."  Monitor's Interim Report,
ECF No. 96, PX-040, at 2-4.

79.     Defendants' failure to comply with the Consent Decree's sexual misconduct
section, ECF No. 8-1, PX-001, at Part. IV.G, also illustrates why such administrative remedies

28

are critical to protection from harm.  The sexual misconduct section requires Defendants to "develop and implement policies and procedures to address sexual abuse and misconduct" and includes specific provisions such as a "zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act," (PREA), 18 U.S.C. § 15601, regular supervisory review of policy compliance, line staff training, and "[s]pecialized investigative procedures and training for investigators handling" sexual misconduct allegations.  ECF No. 8-1, PX-001, Part. IV.G.

80.     During the most recent monitoring period, the Monitor downgraded Defendants to non-compliance with the Decree's sexual misconduct provision.  Monitor's 15th Report, ECF No. 101, PX-041, at 71-73.  At least three detainees were sent to the hospital for "PREA evaluation," (i.e., a sexual abuse allegation requiring medical evaluation under PREA), and at least one complaint was documented in quality assurance reports as a PREA complaint.  None of these incidents was properly investigated while the Jail's PREA coordinator was on leave for several months.  Even with an onsite PREA Coordinator, her authority is limited by lack of access to internal affairs department investigations.  ECF No. 101, PX-041, at 72-73.  The PREA Coordinator cannot even refer an incident for investigation without the Sheriff or Undersheriff's approval, contrary to the approved, written Jail policy.  *Id.*  Defendants also have not been training new cadets or providing PREA in-service training for current officers.  Monitor's 15th Report, ECF No. 101, PX-041, at 3, 71.  This is all on top of Defendants' physical plant dangers where large areas of the Jail are not under camera observation, which increases the risk of sexual abuse without detection.  *See, e.g.*, Monitor's 15th Report, ECF No. 101, PX-041, at 72 (noting 56 inoperative cameras at RDC).

81.     Defendants' failure to develop and implement effective reporting and investigation mechanisms extends well beyond sexual misconduct.  The various administrative systems overlap, and as discussed above, even the basic incident reporting process has been poorly implemented.  For instance, a detainee was taken to the hospital to see if his jaw was broken; the Jail's medical report identified an assault as the cause of the injury, but there was no incident report on the assault.  ECF No. 101, PX-041, at 46; *see also id.* at 67 (similar questions identified for detainee with broken wrist).  The use of force reports suffer similar deficiencies.  The Monitor recently found that "the poor and inaccurate reporting that is reviewed and approved by supervisors, with no corrective action, contributes to the risk of future deaths."  Monitor's Interim Report, ECF No. 96, PX-040, at 4.

82.     Likewise, the grievance system also has serious deficiencies.  The Consent Decree requires a functioning grievance and detainee information system because "a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur."  ECF No. 8-1, PX-001 Part. IV.I.  While there has been some progress with the grievance process, lack of staffing and implementation of policies means that current deficiencies remain with detainees' access to written forms, electronic kiosks, or other mechanisms for submitting grievances.  This is particularly a problem for limited-English speaking detainees or those with disabilities.  These and other problems with the grievance system have resulted in confusion and delays.  For instance, detainee grievances about being detained past their sentence (over-detention), not getting medications, or disappearing funds, have been denied as non-grievable even though they are actually appropriately filed grievances.  Monitor's 15th Report, ECF No. 101, PX-041, at 76-80.

83.     As for staff use of excessive force, Defendants did finally draft and obtain
approval for written policies on the use of force in approximately February 2020, but only with
assistance from the Monitor and a process she facilitates.  Tst. Parrish; Tst. Simpson.  But this
policy does little to prevent excessive force because Defendants have not implemented the
policy.  *See* Monitor's 15th Report, ECF No. 101, PX-041, at 11, 57-65.  Staff currently are not
following the policies, and when supervisors review the uses of force, they are not documenting
their findings and recommendations.  Other safeguards, like requiring video or camera photos,
procedures for using force on persons with serious medical or mental health conditions, post-
incident review of medical records, collection of witness statements and other data, are not being
implemented.  ECF No. 101, PX-041, at 8, 57-65; ECF No. 94, PX-039, at 10.

84.     Meanwhile, the Monitor documents recent continued problems with the Jail's use
of force.  Monitor's 15th Report, ECF No. 101, PX-041, at 57.  The latest Monitor's report
identified multiple examples of staff using force in violation of the unimplemented policy.
These violations include a Sheriff's Department investigator using a taser on a prone detainee,
and staff failing to properly identify a use of force incident after a sergeant used OC spray
coercively on a detainee in violation of Jail policies.  *See id.*

85.     As for the taser use, the Sheriff recently unilaterally equipped select deputies in
the Jail with tasers, despite the Jail lacking any approved policy or training for the use of tasers
in the Jail.  This is not only a violation of Decree requirements regarding policy development and
implementation; the lack of guidance to staff also causes substantial risk of serious harm to
detainees in the Jail.  Tst. Parrish; Tst. Simpson; Tst. Bryan.

86.     These examples illustrate broader patterns.  The facility's ability to identify and
investigate uses of force remains suspect, because staff are not reporting uses of force.  For

instance, in July 2021, incident reports indicated that staff used OC spray at least six times, but the Jail's electronic tracking and quality assurance system did not have the incidents marked as uses of force.  Monitor's 15th Report, ECF No. 101, PX-041, at 61-63, 124; *cf.* Consent Decree, ECF No. 8-1, PX-001, Part IV.M.

87.     Serious incidents occur without adequate supervisor review of generated reports. For instance, officers violate the use-of-force policy without substantive review.  The approved policy requires that chemical spray must be "used as a defensive measure, not as a tool to coerce compliance with officers' orders," but incident reports show it is still used in a more punitive manner to force compliance.  ECF No. 94, PX-039, at 26.  Supervisors do not ensure that serious incidents and use of force reviews include required documentation, photos, or other records; nor do they make findings or recommendations to improve practices or address noncompliance with policy by detention officers.  ECF No. 101, PX-041, at 15, 69-71.  Monitor's 14th Report, ECF No. 94, PX-039, at 62-65.

88.     For example, an officer sprayed OC into a cell through a "crack of the door" to make a detainee comply with an order to "drop the object" he held in his hand.  ECF No. 94, PX-039, at 56 (citing IR-210773).  The Monitor found this violated the use of force policy, but the sergeant who reviewed the incident report did not note this violation or recommend corrective action as to the officer.  ECF No. 94, PX-039, at 56.

89.     Another officer, located outside of the segregation and suicide watch unit, sprayed OC into the unit when an altercation began, rather than trying to de-escalate the situation.  The reviewing sergeant did not note the officer's failure to be posted inside the unit as required nor comment on the OC spray.  ECF No. 94, PX-039, at 59-60 (citing IR-210711); *see also id.* at 60,

62 (citing IR-210743 as another example of inadequate reporting of use of force with no action by supervisor).

### (3) Physical Plant and Life Safety

90. The Jail's physical plant problems are longstanding. Broken locks, inoperable doors, damaged cameras, fire, and other safety systems, easily penetrated ceilings and walls, and broken electrical and plumbing fixtures, have all made security and sanitary conditions poor. Tst. Parrish; Tst. Simpson; see, generally, Monitor's Fifteenth, Fourteenth, Thirteenth and Interim Reports, PX-041, 039, 038, 040. When Defendants were unable to address those problems, the parties agreed to the Stipulated Order, which spelled out a series of steps to jump start progress. Stipulated Order, PX-002, at 2-3; *see also* Consent Decree, PX-001, at ¶ 46.

91. After the Court entered the Stipulated Order, Defendants made some progress at renovating existing facilities and beginning work on a replacement Jail. Defendants were supposed to implement various physical plant and maintenance improvements. They had agreed to hire qualified contractors and develop a master plan for Jail renovation and replacement. They also had agreed to upgrade C-pod first, fixing locks, doors, and other physical fixtures, while also staffing it with trained officers, to make it useable as a direct supervision unit. After fixing C-pod, Defendants were supposed to repair B-pod, and A-pod, if they intended to keep using A-pod as detainee housing. Defendants missed several deadlines in the Stipulated Order, but hired a qualified contractor who made most of the physical plant renovations in C-pod. They have not met deadlines for B-pod and A-pod renovations, but house detainees in those units anyway. Stipulated Order, PX-002, at 2-3; Tst. Parrish; Monitor's 15th Report, ECF No. 101, PX-041, at 7-18, 28, 54-55; December 2021 Quality Assurance Summary, PX-086, at 14 (noting B-pod

construction is not done, with no timeline for completion); Final Jail Master Plan 1/15/21, PX-033.

92.    The A-pod is in particularly bad condition, with doors that do not lock, poor lighting, and plumbing, electrical, and HVAC problems.  Tst. Parrish; Monitor's 15th Report, PX-041, at 54-55.

93.    Despite repeated warnings from the Monitor, serious incidents, and the express language of Consent Decree ¶ 74, Defendants continue to house detainees for "days, weeks, and months" in booking, a segregation area that is poorly designed, hard to monitor, and physically inadequate, except as a temporary holding area to house new detainees for up to 8 hours.  ECF No. 101, PX-041, at 3, 36; ECF No. 96, PX-040, at 2, 4.

94.    After entry of the Stipulated Order, which again banned the use of booking for longer-term housing, Defendants promised not to use booking after C-pod reopened in October 2020, but they again failed to meet their commitments.  More than a year later, and even after a suicide in booking, Defendants have continued to house detainees there.  ECF No. 94, PX-039, at 19; Stipulated Order, PX-002, at I.A.7.  The number of detainees in booking actually doubled between the Monitor's June and October 2021 site visits.  ECF No. 94, PX-039, at 36 (four detainees housed in booking in June); Tr. of Status Conference, ECF No. 95, 18:9-16 (Sept. 15, 2021) ("September 2021 Tr.") (seven in mid-September); Monitor's 15th Report, ECF No. 101, PX-041, at 81-82 (eight in early October).  *See also* November 2021 Quality Assurance Summary, PX-042, at 18 (conceding detainees are still housed in booking, "which is in direct conflict with the consent decree"; other alternatives "have been explored but with so many inoperative cells and staffing deficiencies, there are no other immediate alternatives").

95.     Defendants' failure to address physical plant and maintenance issues includes their failure to deal with numerous "dumpster cells" that were damaged, filled with trash, and "served as a breeding ground for vermin."  Monitor's 14th Report, ECF No. 94, PX-039, at 4. The Monitor brought this to an earlier Jail Administrator's attention in 2020, when "there were only a handful of such cells," more than a year before the June 2021 site visit.  ECF No. 94, PX-039, at 4.  After that visit, when the Monitor once again raised this issue (this time, directly with the renovation contractor), 30 dumpster cells were opened and cleaned.  Eleven were put back into service, and 19 were re-sealed until repairs could be made.  Monitor's 15th Report, ECF No. 101, PX-041, at 3, 54.  Losing 30 cells—the equivalent of a housing unit—increased the Jail's difficulty in navigating longstanding classification and supervision challenges, which were then further exacerbated by the COVID outbreak and the need to quarantine detainees.  June 2021 Tr. 22:14-24:2. Meanwhile, Defendants continue to put detainees in booking, and in A-pod and B-pod, which have not been renovated as required by the Court's orders.  Stipulated Order, PX-002, at 2-3; Tst. Parrish; Tst. Simpson; Monitor's 15th Report, ECF No. 101, PX-041, at 7-18, 28, 54-55.

96.     Detainees keep setting fires in the Jail, using exposed wires and other methods that are possible because there are so few security staff monitoring housing that is in poor physical condition.  The risk of a major fire is made worse because fire safety precautions are so poor throughout the Raymond Detention Center.  There are no sprinklers in housing units, and the facility has a history of inoperative cameras, alarms, fire hose stations, and detectors.  Tst. Parrish; *see also* December 2021 Quality Assurance Summary, PX-086, at 14 (fire alarm wiring in RDC was scheduled to be installed in early November; postponed to December; still not completed).

97.     Routine maintenance is not completed in a "reasonable and prompt manner." Consent Decree, PX-001, at ¶ 46.  Defendants have not set up a routine maintenance system for the Jail, and instead, Jail Administrators must navigate a cumbersome County review and approval process to contract for even minor repairs.  Tst. Simpson; Tst. Parrish; Tst. Bryan; Monitor's 15th Report, ECF No. 101, PX-041, at 3, 53-55; *id.* at 55 (despite recommendations to Board of Supervisors, "[t]he County's archaic system of review and approval of maintenance needs has not been streamlined beyond the employment of Benchmark Construction.").

98.     The ongoing physical plant and equipment maintenance issues put detainees at risk of serious harm.  For instance, the person who committed suicide on April 18 did so using a light fixture he had pried from the ceiling; staff tried to use an AED with him, but it had not been repaired since staff discovered the month before that it lacked pads.  And the detainee killed by other detainees was housed on a unit where the doors do not lock, leaving him vulnerable to attack.  ECF No. 96.  Defendants have also had to allow staff to secure exit doors with padlocks, which is a fire safety hazard.  At the same time, they have not completed plans and upgrades for fire safety systems in facilities that do not even have sprinklers in housing areas.  ECF No. 101, PX-041, at 13, 18, ECF No. 94, PX-039, at 4; September 2021 Tr. at 55:19-56:10.

99.     As of the last Monitor's report, about 60 cameras are inoperative in the Raymond Detention Center.  ECF No. 101, PX-041, at 45, 55, 72, 75.  Inadequate camera coverage in the Jail impedes supervision, increases the risk of assaults and sexual abuse, and hampers investigations.  *Id.*

### (4) <u>Unlawful Detention and the Criminal Justice Coordinating Committee</u>

100.    Defendants agreed to remedies requiring new policies, procedures, and processes to address longstanding criminal justice issues that were contributing to constitutional violations

in the facility, such as poor recordkeeping and inadequate systems to prevent the unlawful detention of detainees, improper detention of detainees based on incomplete or facially inadequate outside requests or orders, unjustified delays in legal process, inadequate attorney visitation, and other criminal justice problems that denied detainees their constitutional rights, or contributed to crowding, inadequate mental health care, and inability to comply with the Court's orders.  Consent Decree Part IV.L-N; Tst. Simpson; Tst. Dudley; Tst. Moeser; Tst. Parrish; Monitor's 15th Report, PX-041, at 7, 110-113, 131-133; Indicted/Unindicted List, PX-019.

101.    While there have been some improvements to records, booking procedures, and video visitation, Defendants have failed to implement required critical remedies to protect against unlawful detention of detainees.  The Monitor's latest report found Defendants had not substantially complied with any of the Consent Decree unlawful detention remedial provisions. *See* ECF No. 101, PX-041, at 109-24.

102.    Defendants still have not implemented a process where acquitted detainees can be released directly from court rather than returning to the Jail in handcuffs, ECF No. 101, PX-041, at 117, still do not "have an adopted policy on Releasing," *id.* at 118, and still do not investigate incidents of untimely or erroneous detainee releases, *id.* at 123.[7]

103.    Defendants still do not regularly report on incidents when detainees have been improperly held past their sentence.  Tst. Simpson; Monitor's 15th Report, PX-041, at 110-113.

---

[7]  Defendants' procedures also cause continued confusion about mental health transfers.  ECF No. 101, PX-041, at 115-16.

104.     The latest Monitoring report notes discovering "at least two untimely releases." One individual was released two months late.  Another individual was released a week after the expiration of a 21-day probation hold.  ECF No. 101, PX-041, at 110, 123.

105.     Defendants' lack of attention to the overall size of the Jail population and lengths of stay roughly double the national average, which are caused by bottlenecks in the mental health and criminal justice systems, exacerbates many of the staffing and supervision shortfalls at the Jail.  *See* Monitor's 15th Report, ECF No. 101, PX-041, at 6-7.

106.     In the Consent Decree and Stipulated Order, Defendants agreed to establish a Criminal Justice Coordinating Committee (CJCC) to bring together the relevant stakeholders for systemic reform and implement a pretrial services program.  *See* Consent Decree, PX-001, at ¶ 115-118 and Stipulated Order, PX-002, at ¶ IV.A.  Defendants have largely ignored this process.  Given Defendants' inaction during the first few years of monitoring, the January 2020 Stipulated Order contained several specific provisions to move the CJCC forward, such as hiring staff, initiating a pretrial services program, sending personnel to training, and developing a risk assessment process.  Defendants did not meet those deadlines and are still not in compliance with the Stipulated Order provisions.

107.     For instance, the Stipulated Order required the County to contract within four months with a consultant experienced in implementing pretrial services programs.  Stipulated Order, PX-002, at ¶ IV.A.1.  Defendants contracted with a consultant, but with more limited scope than the Consent Decree required, and the contract ended in mid-2020.  Monitor's 14th Report, ECF No. 94, PX-039, at 132.  Defendants have no current engagement with the required outside technical assistance consultant.  ECF No. 101, PX-041, at 7, 131-34.  The Monitor personally provided extensive technical assistance and advice on how to develop risk

assessments and pretrial programs. As she explained, developing such a program could have helped address local public safety and criminal justice problems that are impacting the Defendants' ability to improve conditions in the Jail and the wider community. Defendants showed little initiative in taking this advice. Tst. Simpson; Elizabeth Simpson 2/1/22 E-mail and Attachments, PX-076-82.

108.    Nor have Defendants put any recent effort into the Consent Decree's requirement that they coordinate with local behavioral health systems. ECF No. 101, PX-041, at 7, 131-34; Tst. Simpson.

109.    By July 2021, according to the Monitor's most recent report, the CJCC had "essentially disbanded," and until recently, it had not met in full since February 2020. "There was reportedly a CJCC meeting in December [2020] . . . there were no minutes kept and no list of attendees." ECF No. 94, PX-039, at 129, 131. Even if some of the stakeholders discussed more immediate issues among themselves, the CJCC is intended to foster long-term, strategic planning and requires "more full participation to be an effective body." ECF No. 94, PX-039, at 7. Although the Defendants tried to reinvigorate the CJCC, first, with a meeting on October 1, 2021, the Monitor found it was "primarily informational," and "[t]he CJCC continues to be essentially non-functional." Monitor's 15th Report, PX-041, ECF No. 101, PX-041, at 6-7, 131-133; Tst. Simpson.

110.    Defendants have not used the CJCC remedy to assess their systems and develop a plan to address serious deficiencies that impact detainee rights. Defendants have not provided dedicated staffing for the CJCC; made no progress proceeding with recommendations from a criminal justice consultant retained pursuant to the Consent Decree; and made no progress with a process review offered by the National Institute of Corrections. Tst. Simpson.

111.    Defendants have not trained staff as required to implement booking, pre-booking, and records policies.  They assigned just one employee to the CJCC to serve as "Criminal Justice and Quality Control," but this person already had other duties such as serving as the Court Liaison.  Tst. Simpson; Monitor's 15th Report, PX-041, at 120-121.

112.    Overall, the Monitor's latest report found that the Consent Decree "requirement that the Committee identify opportunities for diversion and recommend measures to accomplish has not been achieved."  ECF No. 101, PX-041, at 132.

### (5) <u>Medical and Mental Health Care</u>

113.    Defendants' inadequate security staffing and housing options deny and impede detainee access to necessary medical and mental health care.  Without adequate supervision (e.g., welfare checks) and a Mental Health Unit (MHU), detainees who have special medical and mental health needs (e.g., detainees at risk of suicide or with serious mental health diagnoses) are assigned to places like booking, mental health segregation or other unsafe housing areas, without enough security or mental health staff to monitor and care for them.  Tst. Simpson; Tst. Parrish; Tst. Dudley; Monitor's 15th Report, ECF No. 101, PX-041, at 4, 37, 40-45, 52-53, 82-90; Tst. Mosley.

114.    The Consent Decree requires Defendants to develop and implement "policies and procedures to provide a reasonably safe and secure environment for prisoners and staff," including in medical and mental health care.  Consent Decree, PX-001, at ¶ 37.  Defendants must also provide "appropriate treatment and therapeutic housing" for detainees with serious mental illness (SMI).  Consent Decree, PX-001, at ¶ 42(g).  The Jail's failure to serve people with SMI has persisted.  June 2021 Tr. 16:25-17:7.

115.    In response to the Consent Decree, Defendants started to create a Mental Health Unit, which could better house and treat detainees with serious mental health issues than the Jail's poorly supervised and physically unsafe housing pods.  Tst. Dudley.  Defendants were also supposed to take steps to identify and track persons who need mental health services, and address barriers to care related to accessing state and community mental health services.  Monitor's 15th Report, ECF No. 101, PX-041, at 7, 115-116, 119, 132-138.

116.    Although the monitoring team has given Defendants extensive technical assistance on how to open a mental health unit for well over a year, Defendants have repeatedly changed their plans, delaying efforts to open the Mental Health Unit.  Tst. Dudley.

117.    For instance, Defendants spent months debating where to open the Mental Health Unit, but ultimately decided to use B-pod.  Although the Monitor and MHU planning committee gave input multiple times about how the MHU renovations should incorporate mental health programming needs, those plans were not incorporated into ongoing B-pod renovations until shortly after the October 2021 site visit.  *See* Monitor's 12th Report, ECF No. 77 at 36-37 (as of June 2020 site visit, "the stated plan was that a unit in C Pod was to become the mental health unit," and the Monitor had provided input about such renovations; as of October 2020 visit, "it has since been decided that . . . now a unit in B pod would be renovated" for that purpose, and "completion of that renovation is at least four months away"); Monitor's 14th Report, ECF No. 94, PX-039, at 83-84 (noting prior consultation with mental health unit planning team on renovations, with anticipated completion by September 2021); Monitor's 15th Report, ECF No. 101, PX-041, at 88 (MHU planning team input had "previously been given but not incorporated into the renovation process" until October 2021 site visit; no projected date to complete MHU

renovations was provided, but "it was generally anticipated that the space might be available within the next couple months," though it could not function as a MHU without more staff).

118.    The Mental Health Unit still has not opened.  Although Defendants admit that more work is required, they refuse to invest the necessary resources to make it happen.  For instance, security officers require training to be able to work in the MHU, but the second and third phases of this training have been delayed because the County has not yet paid the certified trainer for the first phase.  November 2021 Quality Assurance Summary, PX 042, at 6. Defendants admit this process is also frustrated by the overall shortage in security staff. December 2021 Quality Assurance Summary, PX 086, at 6, 15-16 (noting several reasons why MHU was still delayed in opening; prior progress "stalled," and "[t]hings seem to have taken a turn for the worse in December," with projects paused "due to funding issues with the County"); Tst. Dudley.

119.    Without the MHU, no appropriate housing exists for detainees who require special mental health observation and who thus continue to be placed on a segregation unit.  This housing is inappropriate because it does not provide the level of supervision these detainees need, yields even less access to mental health services than general population, and can even exacerbate mental illness.  ECF No. 94, PX-039, at 45; ECF No. 101, PX-041, at 82, 86-90 ("Housing in segregation can and has led to decompensation of those with mental illness," and mental health staff are not able to provide consistent access to medication and therapy in segregation); Tst. Dudley; Consent Decree, PX-001, at ¶ 77(f)-(i).  And even though Defendants have implemented a weekly interdisciplinary team meeting to review detainees held in segregation, this review does not result in more appropriate housing since none exists due to the lack of a mental health unit. ECF No. 94, PX-039, at 84-85, 89-90; December 2021 Quality

Assurance Summary, PX-086, at 16 ("Many of the issues addressed are the same in every meeting.").

120.    The Jail has not established a procedure by which mental health staff are consulted before detainees with mental illness are placed in segregation, as required by Consent Decree, PX-001, at ¶ 77(a).  Monitor's 15th Report, ECF No. 101, PX-041, at 85.  People with mental illness thus continue to be placed in segregation, where they are at significant risk of mental health decompensation.  *Id.* at 86; Tst. Dudley.

121.    Defendants have also subjected detainees with mental illness to discipline and placed them in disciplinary segregation, without review by mental health staff to see if the detainee's conduct was related to their mental illness.  Tst. Dudley; Monitor's 15th Report, ECF No. 101, PX-041, at 46, 85-86; Consent Decree, PX-001, at ¶ 77(a).

122.    Understaffing also plagues the delivery of necessary mental health care to detainees.  The Jail has needed additional mental health staff for years, in part to provide care in the MHU and in part to provide the sustained and repeated contact necessary to engage many detainees with SMI in treatment.  June 2021 Tr. 17:8-17; Tst. Dudley.

123.    This recommendation is more pressing now than ever before; during the first half of 2021, the mental health caseload increased by almost 45%, to 177 detainees, and more of them have "acute, extremely serious mental illness."  ECF No. 94, PX-039, at 40.  By October 2021, the caseload had increased to 193 detainees, and a larger percentage of detainees on the caseload were suffering from acute, extremely serious mental illness.  Monitor's 15th Report, ECF No. 101, PX-041, at 38.  By December, the caseload climbed to 202 detainees.  December 2021 Quality Assurance Summary, PX-086, at 16.

124.    As a result, the mental health staff are not able to visit detainees as often as needed to engage them in treatment or to provide all necessary services.  ECF No. 94, PX-039, at 40-41 (listing all treatment responsibilities of mental health staff, complicated by the need to reschedule visits due to lack of security staff support), 82 (noting that detainees on mental health caseload who are in segregation do not receive weekly therapy sessions, as required by Consent Decree ¶ 77(f)(ii)); ECF No. 101, PX-041, at 38-40 (no group therapy sessions are provided, and "the more rigorous set of interventions required for those who refuse treatment or are not fully compliant with treatment have not been initiated"); Tst. Dudley.

125.    Absent sufficient treatment, some detainees' mental health deteriorates, which puts them at risk of harm in jail.  For others, they are not engaged in treatment—including regular compliance with taking prescribed medications—while in jail, which increases the risk of recidivism if they cease taking medication when released.  Tst. Dudley.

126.    The Monitor has long recommended doubling the mental health staff to satisfy the requirements of the Consent Decree.  ECF No. 94, PX-039, at 41.  The Jail Administrator, who has since departed after facing resistance from Defendants, successfully renegotiated the contract with the Jail's health care provider to allow for additional staff, but Defendants concede the County did not approve the contract for an extended period.  Monitor's 15th Report, PX, ECF No. 101, PX-041, at 39; November 2021 Quality Assurance Summary, PX-042, at 6, 18 ("There is still a wait for mental health staff to be hired because of a significant delay by the County when they were slow to approve the contract in a reasonable timeframe.").  The MHU cannot open without sufficient mental health staff to operate it.  ECF No. 101, PX-041, at 88; Tst. Dudley.

127.     A recent increase in mental health staff is still insufficient.  Historically, the County has had a part-time psychiatric nurse practitioner and two qualified mental health professionals (QMHPs).  Although the County has a full-time psychiatric nurse practitioner as of January 2022, and has approved hiring one additional QMHP, this does not provide enough hours in the week for adequate mental health treatment to the current caseload.  Tst. Dudley. Additional staffing beyond this authorization will be necessary to open and run the MHU and to fulfill other functions required under the Consent Decree, such as reviewing detainees on the mental health caseload before they are placed in segregation.  Tst. Dudley.

128.     Thus, opening the Mental Health Unit has been long delayed due to Defendants' feet dragging, as well as the staffing and physical plant issues. Tst. Simpson; Tst. Parrish; Tst. Dudley; Monitor's 15th Report, ECF No. 101, PX-041, at 4, 37, 40-45, 52-53, 82-90.

129.     The Defendants have also failed to implement reforms designed to let them better track mental health cases, improve discharge planning, and address clinical coordination and criminal process issues that create barriers to care (e.g., barriers to accessing and communicating with state mental health services).  Monitor's 15th Report, ECF No. 101, PX-041, at 7, 115-116, 119, 132-138.  Detainees who have serious mental health and medical conditions can languish in the Jail for years, because of problems with accessing these services.  Monitor's 15th Report, ECF No. 101, PX-041, at 81-82.

130.     Security, medical, and mental health staff require more training to be able to identify and manage detainees who are not on suicide watch but may be at risk of becoming suicidal and need increased monitoring.  Monitor's 15th Report, ECF No. 101, PX-041, at 43-44; Tst. Dudley.

131.    One such detainee with mental illness—who required additional monitoring but was instead housed in booking, where even regular supervision is more difficult—committed suicide in April 2021, even after his mother warned the jail repeatedly about his need for care. Tst. Dudley; Tst. Mosley; ECF No. 96, PX-040, at 2; JM Medical Record, PX-044 (Medical Record JM pt. 2); PX 043 (Medical Record JM pt.1); Consent Decree, PX-001, at ¶ 42(h). Despite the multiple Jail departments at issue, there was no interdisciplinary mortality review to identify ways to decrease the future likelihood of such tragic incidents.  ECF No. 101, PX-041, at 44, 47.

132.    In addition, inadequate security staffing prevents medical and mental health staff from providing care to detainees and jeopardizes everyone's safety.  Medical and mental health staff report they cannot bring medications to the housing pods and provide care both at the pods and in the medical unit because there are not enough detention officers to accompany them.  June 2021 Tr. 29:3-8; Monitor's Fourteenth Report, ECF No. 94, PX-039, at 34-35; Monitor's 15th Report, ECF No. 101, PX-041, at 32-33 (citing 50-day log kept by Health Services Administrator to quantify difficulties for medical and mental health staff due to lack of security staffing and physical plant issues); November 2021 Quality Assurance Summary, PX-042, at 6; December 2021 Quality Assurance Summary, PX-086, at 6, 16 (noting "relapse[]" since prior month; "privacy and safety are again concerns" with medical and mental health care due to insufficient security staffing); Tst. Dudley.  The lack of security support has also meant many canceled appointments that result in delayed care, particularly since the shortage of mental health staff means it can take time to reschedule.  ECF No. 94, PX-039, at 5, 33-34; ECF No. 101, PX-041, at 33-34, 87.  Physical plant issues exacerbate the problem, such as cell doors that do not lock,

which makes it impossible for security staff to assure the safety of mental health staff on the unit. ECF No. 101, PX-041, at 87.

133.    Even when mental health staff are able to visit detainees on the housing units, there is no separate space to use for a confidential conversation.  Instead, they must conduct mental health assessments or provide therapy at the cell door, speaking with detainees through bars and with limited privacy from other detainees.  This makes it far less likely the detainee will engage with the mental health staff and severely compromises the effectiveness of treatment. Staff have found detainees often simply refuse to speak with them in this environment.  Tst. Dudley.

134.    The lack of security support has also put medical and mental health staff in unsafe positions.  For instance, in one incident, the one officer assigned to a unit reportedly left to deal with an emergency, leaving two mental health staff locked on the unit with detainees.  ECF No. 94, PX-039, at 5, 33-34.  In another incident, an officer allegedly provided inadequate supervision for a nurse on the unit, and the officer then assaulted the nurse.  ECF No. 101, PX-041, at 33-34.

135.    The mechanism for reporting when medical or mental health staff are harmed or placed at risk of harm has been unclear.  ECF No. 94, PX-039, at 34; ECF No. 101, PX-041, at 68-69.  The reputation of RDC as a dangerous place to work has made it difficult to recruit and retain medical and mental health staff.  Monitor's 14th Monitoring Report, ECF No. 94, PX-039, at 34-35.  The sufficiency of staffing—both of security staff and of medical and mental health staff—is thus crucial to ensuring detainees receive the health care they need.  December 2021 Quality Assurance Summary, PX-086, at 16 ("The number of mentally ill detainees are increasing while the number of staff are decreasing.").

**(6) <u>Youth Charged as Adults</u>**

136.     The Consent Decree and Stipulated Order require Defendants to improve the

supervision and management of youth charged as adults—and therefore in the Sheriff's

custody—to ensure that the conditions of confinement for these youth are consistent with federal

law.  Consent Decree, ECF No. 8-1, PX-001, at ¶¶ 78-84; Stipulated Order, ECF No. 60-1 at Part

V.  The Consent Decree expressly requires Defendants to house the youth in a facility where

they can be safely housed, supervised, managed, and provided juvenile programs.  *See* ECF No.

8-1, PX-001 Part IV.K.  The remedy let Defendants find and choose an appropriate alternative

placement, and they chose to move the youth to the Henley-Young Juvenile Justice Center,

which at the time primarily operated as a short-term placement for non-adjudicated youth.

137.     Defendants agreed to develop and implement a behavioral treatment program for

youth, Consent Decree ¶ 84; develop and implement a mental health treatment program for youth

with serious mental illness and disabilities, Consent Decree ¶ 78; ensure that youth receive

adequate education, Consent Decree ¶ 79; impose limitations on the use of segregation for youth,

including a prohibition on the use of segregation as a disciplinary sanction, Consent Decree ¶ 83;

ensure appropriate classification of youth, Consent Decree ¶ 81; and provide staff who supervise

youth with specialized training, Consent Decree ¶ 82.

138.     Defendants have never met the Consent Decree requirements for the supervision

and care of youth at the new youth facility.  Monitor's 15th Report, ECF No. 101, PX-041, at 96-

138.  Henley-Young does not have the staffing, supervision, or programs required to manage the

youth charged as adults.  To address these ongoing deficiencies and Defendants' inability to

come into compliance with the Consent Decree, the Parties negotiated a number of short-term,

specific remedies in the Stipulated Order designed to expedite compliance with the Consent

Decree.  Stipulated Order, ECF No. 60-1, PX-002, at Part V.  Defendants have not complied with

48

the Stipulated Order requirements regarding daily programming for youth.  *See* Monitor's 15th

Report, ECF No. 101, PX-041, at 11-12.  Defendants did not timely comply with the Stipulated

Order provision outlining steps toward hiring a qualified individual to run this required

programming; although Defendants eventually took some of the required steps, they have never

met all the requirements of this provision either.  *Id.* at 8, 15.

139.    Juveniles charged as adults have been housed at Henley-Young, rather than the

Jail, since February 2019.  Monitor's 15th Report, PX-041, at 91.  Henley-Young comprises four

housing units, or "pods," and has a population of mostly youth charged as adults and typically a

smaller number of children in the custody of the Youth Court.  The population of Henley-Young

varies; on October 5, 2021, there were 18 youth charged as adults housed at Henley-Young, and

no youth in the custody of the youth court.  Monitor's 15th Report, PX-041, at 92.

140.    The Monitor's most recent report treated Defendants' decision to move the youth

to Henley-Young as substantial compliance with one of the provisions of the Decree.  Monitor's

15th Report, ECF No. 101, PX-041, at 80.  The Monitor, however, also qualified the finding in

her report, noting that "there remains a lack of clarity of any intermediate or long-term plan

related to housing [Juveniles Charged as Adults]."  *Id.* at 91.  The Monitor then proceeded to

identify numerous problems at Henley-Young, which need to be remedied, if it is to otherwise

meet staffing, programming, education and other more specific requirements of the Consent

Decree.

141.    As at the Jail, Henley-Young leadership has long been unstable.  Since late 2016,

four different people have filled the Executive Director role, one for two periods of less than one

year each; for several months at a time, on multiple occasions, the position was vacant.  Tst.

Moeser.

142.    On January 3, 2022, the most recent Henley-Young Executive Director resigned, effective immediately.  As reasons for his resignation, he cited the County Board's unwillingness to provide necessary funding to improve staff pay, as well as a large disparity between his recommended budget and the budget approved by the Board ($3.288 million approved vs. $4.109 million requested).  Frazier Letter, PX-012; Tst. Parrish; Tst. Simpson; Tst. Moeser.  He also stated that his ability to lead effectively was undermined by a lack of support from County leadership and his exclusion from key decisions.  Frazier Letter, PX-012; Tst. Parrish; Tst. Simpson; Tst. Moeser.  The former Hinds County interim Sheriff is now serving as Interim Director of Henley-Young; plans for a permanent appointee to serve in the role have not been announced.  Tst. Moeser.

143.    The Sheriff controls staffing at all Jail facilities as well as Henley-Young. Therefore, resource deficiencies at Henley-Young reflect allocations by Defendants.  Staffing is an immediate, critical problem at the Henley-Young Juvenile Justice Center.

144.    As of October 2021, Henley-Young had 18 vacancies out of 42 Youth Care Professional positions, a 43% vacancy rate.  Monitor's 15th Report, PX-041, at 94-95; Tst. Moeser; HYJJC Organization Chart and Daily Schedule, PX-028.

145.    In addition to the 18 officially vacant positions, the previous director of Henley-Young agreed to the elimination of seven posts in order to fund a small pay raise to remaining staff.  Monitor's 15th Report, PX-041, at 94-95; Tst. Moeser; HYJJC Organization Chart and Daily Schedule, PX-028.  Thus, based on the number of authorized positions reflecting the staffing that existed at Henley-Young earlier in this case, the staff vacancy rate would be 60% — an "unworkable" rate, according to the Monitor.  Tst. Simpson; Tst. Parrish, Tst. Moeser; Monitor's 15th Report, PX-041, at 94-95; September 2021 Tr. 58:1-18 (40% vacant); June 2021

Tr. 31:10-18 ("essentially one half of their staffing positions" are vacant), 33:4-16 (staffing frustrates compliance with programming requirements in Court orders); ECF No. 94, PX-039, at 6 (same).

146.    The previous director of Henley-Young resigned in part because of the staffing issue.  Tst. Simpson; Tst. Parrish; Tst. Moeser; Frazier's Letter, PX-012.

147.    The lack of staff at Henley-Young has prevented implementation of other required reforms, such as development of age-appropriate programs, education, mental health service, and youth supervision.  Tst. Simpson; Tst. Parrish; Tst. Moeser; Monitor's 15th Report, ECF No. 101, PX-041, at 5-6, 94-102; Frazier's Letter, PX-012.  The Monitor's subject matter expert has cautioned repeatedly that the inability to hire and retain adequate staff at Henley-Young seriously hinders Defendants' ability to comply with the Consent Decree and Stipulated Order.  He has repeatedly made recommendations and provided technical assistance to address the low staffing and, in turn, the deficiencies in access to school, behavioral and mental health programming, supervision, and staff training to which they contribute.  Tst. Simpson; Tst. Parrish, Tst. Moeser; Monitor's 14th Report, PX-036, at 93; Monitor's 13th Report, PX-038, at 88; Monitor's 12th Report, PX-037, at 87; Monitor's 11th Report, PX-036, at 7, 88; Monitor's 10th Report, PX-035, at 91-92; Monitor's 9th Report, PX-034, at 71-72.

148.    The failure to adequately staff Henley-Young places detained youth at a substantial risk of serious harm because current staffing levels permit only the bare minimum of supervision, or less.  Tst. Moeser.  Typically, only one youth care professional can be assigned to a housing unit, sometimes supervising 10 or 11 youth, and leaving no room for error in the event of an emergency, the need for one-on-one supervision of a youth on suicide precaution status, or other inevitable special circumstances.  Tst. Moeser; *see also* December 2021 Quality Assurance

Summary, PX-086, at 13 (noting increase from 1 incident report at Henley Young in November to 9 in December, including two attempted suicides).

149.     Staff shortages at Henley-Young also place youth at a substantial risk of serious harm because shortages hinder the ability of youth care professionals to receive appropriate training as required by Consent Decree ¶ 82.  In January 2022, a youth care professional removed her own belt and used it to beat a child at Henley-Young.  Tst. Moeser; HYJCC IR 1/10/2022 at 1-7, PX-073.  The youth also reported that the youth care professional hit her.  Tst. Moeser; HYJCC IR 1/10/2022 at 1-7, PX-073.  The youth care professional had recently started working at Henley Young and had not received *any* training at the time of the incident.  Tst. Moeser; HYJCC Resident AR Emails 1/22, PX-075.

150.     In November 2021, a youth was physically assaulted and threatened by multiple other youth who came into his room, threw objects at him, took food from him, and refused to let him out of the room.  Tst. Moeser; Rapid Notification – HY – Assault – 11.23.21, PX__.  The youth reported that no staff were supervising the housing unit at the time, and a staff member who responded to the incident reported that the youth were subsequently ordered to their rooms on lockdown because "we were in a class and we were short on officers."  Tst. Moeser; HYJJC IR 11/23/21, PX-045.

151.     In October 2021, a female youth reported that another female resident touched her inappropriately and sat on her lap, despite the victim telling her not to do so, while they were left in an unsupervised visitation area.  Tst. Moeser; IR 10/9/21, PX-029.  The youth later reported that there was no staff present to ask for help during the incident.   Tst. Moeser; IR 10/9/21, PX-029.

152.    The same girl was also involved in another incident in November 2021, in which she and another female resident reportedly were permitted to sleep in the same room together and allegedly engaged in sexual activity.  Tst. Moeser; Witness Statement 11/14/, PX-030.  Reportedly, one youth care professional explicitly permitted this to occur and another knew about the incident but failed to report it for a week.  Id.

153.    In October 2021, a youth reported being attacked on his housing unit by another resident, who dragged him by his feet into an empty room, pulled down his pants, ripped his underwear, and touched his genitals.  The youth reported that the youth care professional assigned to the unit "never attempted to stop it" and two other residents ultimately pulled the other youth off the victim.  Tst. Moeser; HYJJC IR 10/8/21, PX-047.

154.    In October 2021, a teacher at the Henley Young school was arrested after reportedly passing contraband and improperly touching a youth.  ECF No. 101, PX-041, at 99.

155.    Youth housed at Henley-Young also continue to suffer harm as a result of inadequate mental health and behavioral programming.  About 75% of youth are on psychotropic medications.  ECF No. 101, PX-041, at 97.  While steps have been taken to provide behavioral and mental health services, they are at an early stage, and there is still insufficient mental health treatment and programming, and inadequate leadership.  *Compare* Stipulated Order, PX-002, at Part V *with* Monitor's 15th Report, ECF No. 101, PX-041, at 58 (treatment director hired in August 2021, but psychologist position remains vacant); ECF No. 101, PX-041, at 98 ("[T]here is not an overarching program framework into which [mental health and behavioral] groups 'fit'. . . .").  Compounding these deficiencies, youth at Henley-Young also continue to be placed in segregation for 24 hours at a time, and the required safety checks of youth during these confinements are not properly documented.  ECF No. 101, PX-041, at 104-05.

156.     Nor do youth housed at Henley-Young receive adequate education, as required by

Consent Decree ¶ 79.  Largely due to supervision challenges caused by staff shortages, Henley-

Young continues to provide school on an "'alternate day' school program for JCA youth in

which one unit of JCAs receive classroom instruction on one day while youth in the other unit

work on the unit with 'homework' and other written materials," supervised by line staff with no

teacher instruction during those periods.  ECF No. 101, PX-041, at 100.  All JCA youth at

Henley-Young, including those with special education needs, attend school on the "alternate

day" schedule.  *Id.*  By contrast, only a program in which "all youth receive the required 27.5

hours/weekly of direct instruction **every** day" is adequate.  *Id.*

157.     The failure to ensure that all youth are in school during school hours results in

youth spending more time on their housing units without sufficient programming or stimulation,

creating more opportunities for and substantial risk of conflict.  Tst. Moeser.  For example, in

October 2021, a fight broke out among youth on a housing unit at 9:30 a.m. on a weekday,

"while residents [were] doing school work on the unit."  Tst. Moeser; HYJJC IR 10/26/21, PX-

046.

158.     It is not clear that JCA youth can continue to be housed at Henley-Young in the

long term.  The youth court judge overseeing the facility has indicated that Defendants may be

inappropriately housing youth charged as adults with those under juvenile court jurisdiction, and

has also raised concerns about programs and services, similar to those raised by the Monitor.

ECF No. 101, PX-041, at 91, 95.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.   The Consent Decree Complies with the PLRA

#### (1) **PLRA Legal Standard**

159.    The PLRA provides that in "any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party . . . 2 years after the date the court granted or approved the prospective relief."  18 U.S.C. § 3626(b)(1)(i).  Upon that motion, the court should terminate the previously ordered prospective relief unless the court "makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  *Id.* § 3626(b)(3); *see also Ruiz v. United States*, 243 F.3d 941, 950 (5th Cir. 2001) ("[U]nless a court makes specific written findings regarding the continuing necessity of prospective relief, it must terminate such relief.").

160.    The proponent moving for termination must initially establish the requisite passage of time.  *Guajardo v. Tex. Dep't of Crim. Justice*, 363 F.3d 392, 395 (5th Cir. 2004).  The burden of proof then shifts to party opposing termination "to demonstrate ongoing violations and that the relief is narrowly drawn."  *Id.* (citing 18 U.S.C. § 3626(b)(3)).

161.    In conducting the PLRA's necessary-narrow-intrusive analysis, the "court should engage in specific, provision-by-provision examination of the consent decree, measuring each requirement against the statutory criteria."  *Ruiz v. United States*, 243 F.3d 941, 950 (5th Cir. 2001) (citation omitted).  A "current and ongoing" violation is one that "exists at the time the district court conducts the § 3626(b)(3) inquiry."  *Castillo v. Cameron Cty., Tex.*, 238 F.3d 339, 353 (5th Cir. 2001) (citations omitted).  This "current and ongoing" inquiry, however, does not operate in a temporal vacuum.  *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-

FKB, 2015 WL 3795020, at *8-9 (S.D. Miss. June 10, 2015).  Past violations can provide an "appropriate factual foundation" and "reference point" to help establish "current and ongoing" constitutional violations.  *Id.*

### (2) The Consent Decree Complies with the PLRA Because the Decree Remains Necessary to Correct Defendants' Current and Ongoing Constitutional Violations.

162.    As explained below, the Consent Decree's provisions comply with the PLRA because they remain necessary to remedy the unconstitutional substantial risk of serious harm at the Jail.  Defendants are deliberately indifferent to that substantial risk of serious harm.

### a.    *Constitutional Legal Standard*

163.    The Eighth Amendment bans "cruel and unusual" conditions of confinement that subject convicted prisoners to an excessive risk of violence, illness, or injury.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).  Jail detainees are entitled to even greater constitutional protection than convicted prisoners; "[f]or under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  Thus, conditions imposed with intent to punish, or that are excessive or not reasonably related to a "legitimate governmental interest," will violate detainees' due process rights.  *Bell*, 441 U.S. at 538-40.  Because pretrial detainees' rights under the Fourteenth Amendments are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc) (citation omitted), Defendants must comply with the Eighth Amendment, at the very least.  The Constitution requires Defendants to "provide humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the inmates."  *Farmer*, 511 U.S. at 832 (citation omitted).

164.    Two elements establish an Eighth Amendment violation.  Namely, Defendants violate the Constitution when (1) jail conditions subject detainees to a "substantial risk of serious harm," and (2) Defendants are deliberately indifferent to that risk.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

165.    As to the first element, the court determines whether objectively serious conditions pose a substantial risk of serious harm.  *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The Fifth Circuit's test requires "extreme deprivation" of the "minimal civilized measure of life's necessities."  *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998).  The court measures "extreme deprivation" against "the evolving standards of decency that mark the progress of a maturing society."  *See Trop v. Dulles,* 356 U.S. 86, 101 (1958); *see also Wilson v. Lynaugh*, 878 F.2d 846, 848 (5th Cir. 1989).  In the Fifth Circuit, courts should consider the "totality of conditions" in making this determination.  *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (citing *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982)).

166.    Under the second element, jail officials must also act with "deliberate indifference" toward those conditions.  *Farmer*, 511 U.S. at 834.  Deliberate indifference requires a showing that jail officials:  (1) are actually aware of "an excessive risk to inmate health or safety" or should have noticed a risk that was obvious, *Farmer*, 511 U.S. at 837; *see also Blackmon v. Garza*, 484 F. App'x 866, 873 (5th Cir. 2012); and (2) disregard that risk, *Farmer*, 511 U.S. at 837; *accord Williams v. Hampton*, 797 F.3d 276, 280-82 (5th Cir. 2015) (en banc).  Conditions may result in a constitutional violation "'in combination' when each would not do so alone" where they have a "mutually enforcing effect" that results in the deprivation of a basic human need.  *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (quoting *Wilson*, 501 U.S. at 304).

57

> ### b.  The Consent Decree Remains Necessary to Remedy the Unconstitutional Current and Ongoing Substantial Risk of Serious Harm at the Jail

167.    Twice, Defendants have stipulated that the Court's orders meet the requirements of the PLRA, ECF No. 2, 2-1, 2-3; ECF 53, 54, and the remedial orders still do.  Key substantive provisions of the Decree tie the requirements to constitutional compliance.  *See, e.g.*, ECF No. 8-1, PX-001 Part IV.A ("Consistent with constitutional standards, [Defendants] must take reasonable measures [to implement provisions]").  On their face, remedies spell out minimum requirements for any detention facility, such as having written policies, adequate numbers of trained staff to supervise detainees and implement policies, medical and mental health care, and safe and sanitary physical conditions.  *See Farmer v. Brennan*, 511 U.S. 825, 832-34 (1994); *Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979); *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). These remedies contain timelines and a step-by-step reform process, functioning together to address the systemic deficiencies that are causing serious harm and risk of serious harm. Without adequate staff and consistent leadership needed to implement policies and systems, the Defendants have made little progress with the parties' agreed-upon remedies and constitutional violations persist.  As discussed in more detail below, ongoing violations of federal law clearly support the need to retain the court-ordered relief agreed to by the Parties.[8]

---

[8]  Defendants make no assertion that they meet the Consent Decree's stipulated standard for termination, which requires Defendants "to demonstrate that" Defendants "substantially implemented each provision of the" Consent Decree, "and that such compliance was maintained continuously for the two years prior to filing of the motion" to terminate.  ECF No. 8-1, PX-001, at ¶ 165.

### i. *Protection from Harm*

168.    The Consent Decree's protection from harm section requires that Defendants "must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff." ECF No. 8-1, PX-001 Part IV.A.  That section also includes requirements for minimum jail administrator and staff qualifications, a staffing study to determine required staffing levels, improvements to address hiring and retention problems, improved training, the development and implementation of written policies for safe jail operations, physical plant and safety equipment improvements, and several outcome measures.  ECF No. 8-1, PX-001 Parts IV.A, VI.  The Stipulated Order reinforced those remedies by requiring a timetable for specific improvements to physical plant, staffing, and policies.  Stipulated Order, ECF No. 60-1, PX-002, at Parts I-III. Defendants' failure to implement these remedies cause a continued, current, and ongoing substantial risk of harm.

169.    These protection from harm provisions implement the constitutional mandate that Defendants not subject detainees to a "substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "[A]ll jailers owe a constitutionally rooted duty to their prisoners to provide them reasonable protection from injury at the hands of their fellow prisoners."  *Stokes v. Delcambre*, 710 F.2d 1120, 1124 (5th Cir. 1983) (reiterating court's prior holding that "failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment"); *accord Longoria v. Tex.*, 473 F.3d 586, 592 (5th Cir. 2006).

170.    Defendants' failure to implement the remedial orders' protection from harm provisions has caused, or contributed to, widespread, ongoing violence, deaths, assaults, suicides, and other serious harm—and overall a current and ongoing unconstitutional "substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.

171.    As described above, most troubling are the six deaths that have occurred in the last year, and the related failures to comply with the Consent Decree.  Detainee-on-detainee assaults continue at an unacceptably high rate.  Drugs and other dangerous contraband flow through the Jail.  Hazardous physical plant issues go unaddressed, including that detainees are able to set fires seemingly at will.  And many cell doors shockingly still do not have locks that work.  *Cf. Depriest*, 2015 WL 3795020 at *14 ("It is impossible for Defendant to provide protection from harm in a facility where inmates are aware that they can freely escape their cells.").

172.    Protecting detainees from violence and other serious harm requires the Jail to provide adequate supervision and staffing.  *Alberti v. Klevenhagen*, 790 F.2d 1220, 1225-27 (5th Cir. 1986) (upholding district court's order requiring specific staffing and hourly visual inspections by guards to address high violence and sexual assault at jails); *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977) (upholding requirement for hourly guard visits, and disapproving not having a guard on each floor); *Depriest*, 2015 WL 3795020 at *15 ("Obviously, prison officials cannot perform their 'constitutional duty to protect inmates from violence at the hands of other prisoners' if they are inadequately trained or if their numbers are too scarce to properly supervise." (citation omitted)).  !

173.    Yet staffing and supervision at the Jail remain grossly inadequate, and this staffing failure serves as a contributing factor for all of Defendants' constitutional violations.  Defendants currently are unable to maintain even key leadership staff personnel.  The desperately needed new Jail Administrator ran into resistance by Defendants, and now no longer works at the Jail.    !

174.    The above current actual harms and substantial risk of serious harm will not only continue, but undoubtedly increase, without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  Consent Decree, ECF No. 8-1, PX-001, at ¶¶ 166-67.  This Court finds that these provisions[9] comply with the PLRA and its necessary-narrow-intrusive requirements, namely that the provisions remain "necessary to correct a current and ongoing violation," extend "no further than necessary to correct the violation," and are "narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

### ii.    Use of Force

175.    The Consent Decree requires clear written standards and policies for use of force, use of force training, supervisor reviews, and reporting mechanisms.  Consent Decree, ECF No. 8-1, PX-001 Part IV.B-F, M.  These remedies were designed to address an overall Jail culture that routinely allowed staff to use force unconstitutionally, without any accountability.  Defendants' failure to implement these use of force remedies causes a continued, current and ongoing substantial risk of harm from excessive force.  *See Hudson v. McMillian*, 503 U.S. 1, 4-7 (1992) (finding Eighth Amendment prohibits force subjectively applied to cause harm, and serious injury is not necessarily required); *Farmer,* 511 U.S. at 832-34 (finding Eighth Amendment prohibits substantial risk of serious harm and excessive physical force against prisoners); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (finding Fourteenth

---

[9] Consent Decree paragraph 40 required Defendants to "[e]nsure that no one works in the Jail unless they have passed a background check, including a criminal history check."  ECF No. 8-1, PX-001, at ¶ 40.  The Monitor's latest report found sustained compliance with this provision.  ECF No. 101, PX-041, at 26.  The Court finds this provision is no longer necessary under the PLRA.  18 U.S.C. § 3626(b)(3).

Amendment standard for excessive force against pretrial detainees requires only proof of objective unreasonableness).

176.    Defendants are currently subjecting detainees to a substantial risk of serious harm from excessive force.  As detailed more above, Defendants have written but not implemented policies on use of force, and staff are not following policies.  The latest Monitor's report identified multiple examples of staff using force in violation of the unimplemented policy, including using a taser on a prone detainee and using OC spray coercively.  Use-of-force reporting and investigations remain inadequate and unreliable.  Monitor's 15th Report, ECF No. 101, PX-041, at 61-63, 124; *cf.* Consent Decree, ECF No. 8-1, PX-001 Part IV.M.

177.    The above uses of force and substantial risk of excessive force will continue without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  Consent Decree, ECF No. 8-1, PX-001, at ¶¶ 166-67.  This Court finds that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### iii.    *Reporting, Investigating, and Responding to Unconstitutional Conditions, Including Sexual Misconduct*

178.    The Consent Decree has several administrative provisions that allow detainees and others to report unconstitutional conditions and other serious violations of detainees' rights. ECF No. 8-1, PX-001, Part IV.C-I, IV.M, VIII.  Addressed in several parts of the Decree, these provisions establish certain record-keeping and investigation requirements that are critical to detecting and correcting the unconstitutional, substantial risk of serious harm from assaults, excessive force, and other harms.  Without tracking what potential misconduct, dangerous conditions, and other serious harms are occurring in the Jail, Defendants cannot possibly institute corrective action and detainees remain at a substantial risk of serious harm.

179.     As detailed above, Defendants' basic incident reporting system is poorly implemented.  This leads to lack of corrective action and ignored harm for such things as a detainee's broken jaw from an assault.  Potential sexual abuse and misconduct goes uninvestigated, and Defendant's inadequate grievance system leads to harms such as continued missed medications and unlawful over-detentions.  This stands on top of the harm from Defendants' deficient use-of-force reporting.  Indeed, the Monitor recently found that "the poor and inaccurate reporting that is reviewed and approved by supervisors, with no corrective action, contributes to the risk of future deaths."  Monitor's Interim Report, ECF No. 96, PX-040, at 4.

180.     The above current failures in reporting, investigating and responding to unconstitutional conditions will continue, and increase, without the Consent Decree.  These provisions are critical to detecting and correcting the unconstitutional "substantial risk of serious harm" from detainee assaults, sexual abuse, excessive force, and other more primary harms.  *See Farmer*, 511 U.S. at 834.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  ECF No. 8-1, PX-001, at ¶¶ 166-67.  This Court finds that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### iv.     Restrictions on Segregation; Provision of Adequate Health Care

181.     The Consent Decree has provisions regarding the use of segregation, which includes booking and certain holding cells, "to ensure compliance with constitutional standards and to prevent unnecessary harm to" detainees.  ECF No. 8-1, PX-001 Part IV.J.  These segregation provisions complement other remedies regarding assessing new detainees, providing supervision for detainees with mental health issues or other special needs, and general medical and mental health care.  ECF No. 8-1, PX-001 Part IV.A, IV.B, IV.J.  These provisions implement the Eighth Amendment's requirement that jails provide medical and mental health

63

care sufficient to meet detainees' serious medical and mental health needs.  *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).  The provisions also are to prevent a "substantial risk of serious harm," which includes harm from segregation.  *Farmer*, 511 U.S. at 834; *Gates v. Collier*, 501 F.2d 1291, 1304-05 (5th Cir. 1974) (finding segregation conditions and/or length of time can violate Eighth Amendment).

182.   As discussed above, Defendants' failure to comply with the remedial orders has resulted in recent suicides and currently continues to put detainees, including those with serious mental health diagnoses, at substantial risk of serious harm.  *Farmer*, 511 U.S. at 832-34. Defendants continue to place detainees with serious mental health care needs and other conditions in the booking area cells and segregation cells that are unsafe and poorly supervised, and detainees' safety and deterioration inside these improper placements goes mostly unnoticed. Defendants have dragged their feet on opening a much-needed Mental Health Unit, which could help remedy these harmful placements by providing an appropriate option.  Lack of both security and mental health staffing contribute to the delays in opening a Mental Health Unit and cause grossly inadequate mental health and medical care.  The dearth of staff causes missed health care appointments, medications, and seriously needed health care treatment generally.

183.   The recent suicides, seriously deficient medical and mental health care, dangerous segregation, and other substantial risks of serious harm will not only continue, but actually increase, without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  ECF No. 8-1, PX-001, at ¶¶ 166-67.  This Court finds that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### v.  *Juveniles Charged as Adults*

184.     The Consent Decree expressly requires Defendants to house the youth in a facility where they can be safely housed, supervised, managed, and provided juvenile programs.  *See* ECF No. 8-1, PX-001 Part IV.K.

185.     As detailed above, although the youth moved to the Henley-Young facility, Defendants have never met the Consent Decree requirements for the supervision and care of youth at the new youth facility.  Henley-Young does not have the staffing, supervision, or programs required to manage the youth charged as adults.

186.     Defendants' failure to comply with the requirements in the Consent Decree and Stipulated Order as to the supervision, care, and treatment of youth place youth charged as adults at ongoing substantial risk of serious harm.  The risk of harm to youth in Defendants' custody is all the more serious because juveniles, by virtue of their physical and mental development, are entitled to less severe treatment than adults in the correctional system.  *See Miller v. Alabama*, 567 U.S. 460, 471-72 (2012) (discussing social science research and lesser culpability of youthful defendants in the context of criminal sentencing); *Roper v. Simmons*, 543 U.S. 551 (2005) (discussing differences between adults and juveniles as basis for prohibiting imposition of the death penalty on children).

187.     Children in correctional settings therefore are entitled to adequate programs, protection, and educational services while awaiting trial.  *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) (right to rehabilitation for institutionalized persons protected by the Fourteenth Amendment); *Morgan v. Sproat*, 432 F. Supp. 1130, 1134-37 (S.D. Miss. 1977) (juveniles have right to individualized treatment); Individuals with Disabilities in Education Act, 20 U.S.C. § 1401 (requiring individualized programs and services for children with disabilities including those housed in public institutions).

188.     As detailed above, lack of staffing and youth supervision, and lack of staff training, causes current detainee-on-detainee and staff-on-detainee assaults.  Defendants' grossly inadequate staffing also contributes to other current youth harms.  These include failures in providing adequate and required mental health care, suicide prevention, and education, as well as overly-restrictive segregation.

189.     The above current and ongoing failures in supervision, treatment, care, and education for juveniles charged as adults will continue, and increase, without the Consent Decree.  These provisions are critical to protecting juveniles charged as adults from unconstitutional substantial risk of serious harm from physical violence, inadequate mental health care and other programming, and inhumane conditions of confinement.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  ECF No. 8-1, PX-001, at ¶¶ 166-67.  This Court finds that these provisions[10] comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### vi.     Lawful Basis for Detention

190.     The Consent Decree contains safeguards designed to make sure that the Jail has a lawful basis for detaining its incarcerated people.  These provisions implement the Fourteenth Amendment's prohibition on deprivations of "liberty . . . without due process of law."  U.S. Const. amend. XIV; *see also Jauch v. Choctaw Cty.*, 874 F.3d 425, 430 (5th Cir. 2017) ("The touchstone of due process is protection of the individual against arbitrary action of government."

---

[10]  Consent Decree paragraph 80 required Defendants "[e]nsure that youth are properly separated by sight and sound from adult prisoners."  Consent Decree, PX-001, at ¶ 80.  Defendants have reached sustained compliance with this provision because youth are no longer housed at the Jail.  Monitor's 15th Report, PX-041, at 91.  The Court finds this provision is no longer necessary under the PLRA.  18 U.S.C. § 3626(b)(3).

(quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974))); *Traweek v. Gusman*, 414 F. Supp. 3d 847, 862–63 (E.D. La. 2019) ("There is no dispute that an incarcerated person's right to timely release from custody is clearly established [law].").

191.     This Consent Decree section includes improvements to records and tracking systems to make sure the Jail knows when detainees are supposed to be released (or not released), verification of court orders to ensure that sentencing records are consistent across agencies and supported by law, tracking procedures for detainees who are involved with the criminal forensic process, and remedies to give attorneys more timely access to their clients. ECF No. 8-1, PX-001 Part IV.L.

192.     As detailed above, while there have been some improvements, Defendants have failed to implement required critical remedies to protect against violating detainees' due process rights; the Monitor's latest report found Defendants had not substantially complied with any of the section's remedial provisions.  *See* ECF No. 101, PX-041, at 109-24.  Defendants' failures cause a substantial risk that detainees will be unlawfully detained.  Defendants do not effectively track, report, or investigate unlawful detentions.  Most troubling, the latest Monitor's report notes discovering "at least two untimely releases."  ECF No. 101, PX-041, at 123.

193.     These unlawful detentions, and substantial risk of unlawful detentions, will continue and increase without the Consent Decree.  Defendants negotiated these Consent Decree provisions as necessary, and stipulated that they complied with the PLRA.  ECF No. 8-1, PX-001, at ¶¶ 166-67.  This Court finds that these provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### vii.     *Criminal Justice Coordinating Committee*

194.     Broader criminal justice system issues have long impacted conditions in the Jail, ranging from the misplacement of persons with serious mental illness to population management

and access to the courts.  To address their effect on conditions at the Jail, the Consent Decree requires the creation of a Criminal Justice Coordinating Committee (CJCC) to "assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration," with a focus on "diversion of individuals with serious mental illness and juveniles."  ECF No. 8-1, PX-001 Part IV.N; *see also* Stipulated Order, ECF No. 60-1, at Part IV.

195.    The Court's orders, however, gave Defendants primary responsibility for addressing these types of issues and did not specify exactly how they should address these issues, so long as they set up the mechanisms needed for long-term Jail management.  The Decree does contain some specific requirements, such as implementing a CJCC with subject matter expertise and other representatives, ECF No. 8-1, PX-001, at ¶¶ 115-16, coordinating with local behavioral health systems, *id.* at ¶ 117, and engaging an outside consultant to provide technical assistance, *id.* at ¶ 118.

196.    But as with other Consent Decree areas, Defendants again did not implement the required remedies.  ECF No. 101, PX-041, at 7, 131-34.  As detailed above, the CJCC membership lacks the required expertise and regardless has not been meeting regularly. Defendants have put no recent efforts into coordinating with local behavioral health systems, and have no current engagement with an outside technical assistance consultant.  Overall, the Monitor's latest report found that the "requirement that the Committee identify opportunities for diversion and recommend measures to accomplish has not been achieved."  ECF No. 101, PX-041, at 132.

197.    Failure to implement the CJCC compounds and facilitates the other constitutional violations and resulting harm noted above.  Current conditions demonstrate that merely requiring

improvements to staffing, physical plant, and medical and mental health services is inadequate to achieve constitutional compliance.  Recognizing the complexity of the problems with Jail conditions, the Parties agreed to a mechanism for resolving broader criminal justice issues impacting the Jail, consistent with the PLRA's mandate that jail reforms address local public safety needs.  The CJCC is a forum for assessment and long-term planning to address issues such as systems for persons with mental health issues and identification of who should be incarcerated before trial.  Defendants negotiated the CJCC remedies and stipulated pursuant to the PLRA that these mechanisms were necessary to correct violations of detainees' federal rights.  This Court finds that the CJCC provisions comply with the PLRA and its necessary-narrow-intrusive requirements.  18 U.S.C. § 3626(b)(3).

### viii.   *Continuous Improvement, Quality Assurance, and Monitoring*

198.    The Consent Decree has several administrative compliance provisions that support the substantive provisions.  They require self-assessment, reporting, policies and procedure reviews, and a monitoring process.  ECF No. 8-1, PX-001, Part IV.M, V-XI.  For instance, the Consent Decree requires Defendants to track the various Consent Decree requirements, determine who is responsible for those provisions, and provide reports and other information to the Monitors.  ECF No. 8-1, PX-001, at ¶ 159.  Notably, Defendants have neither implemented this provision, nor been able to timely implement substantive requirements.  ECF No. 101, PX-041, at 137; *cf. Depriest*, 2015 WL 3795020 at *11 ("Misleading or missing status reports prevent the monitors from efficiently performing their tasks because it limits their knowledge of the real problems that may persist at the prison.  This is a dangerous practice that creates a substantial risk of harm to inmates by perpetuating an indifference to conditions as they may really exists." (citation omitted)).

199.     As explained above, the Court retains the Consent Decree's substantive requirements as they remain necessary to correct current and ongoing constitutional violations, and comply with the PLRA's necessary-narrow-intrusive requirements. 18 U.S.C. § 3626(b)(3). Because the Court retains the related substantive provisions, these supporting continuous improvement, quality assurance, and monitoring provisions[11] also remain necessary and comply with the PLRA.  *Depriest*, 2015 WL 3795020 at *16 (finding monitor complied with PLRA because "the decree has not been terminated, [therefore] the requirement remains relevant and is not unnecessarily intrusive").

### c.  *Defendants are Deliberately Indifferent to the Substantial Risk of Serious Harm at the Jail*

200.     The ongoing incidents of serious harm, as well as the repeated notice from the United States, the Monitor, Defendants' own staff, and this Court, establish Defendants' knowledge of and deliberate indifference to the grave risk of serious harm and unlawfully punitive conditions at the Jail.

---

[11]  Consent Decree paragraph 160 required Defendants to "designate a full-time Compliance Coordinator to coordinate compliance activities required by" the Consent Decree, who "will serve as a primary point of contact for the Monitor."  ECF No. 8-1, PX-001, at ¶ 160. Defendants have reached sustained compliance with this provision.  Monitor's 15th Report, ECF No. 101, PX-041, at 137-38.  However, the Decree's requirement for a compliance coordinator is an ongoing requirement that is necessary in order to facilitate the Monitor's access to Jail staff, detainees, documents, and site visits to observe conditions.  Without the compliance coordinator, the Monitor would not have access to information that is necessary for the Monitor – and thus the Court – to ascertain whether Defendants have remedied the ongoing constitutional violations at the Jail.  Therefore, the Court finds this provision continues to be necessary under the PLRA. 18 U.S.C. § 3626(b)(3).

201.     Above the Court has found actual harm to detainees resulting from Defendants'
subjecting detainees to substantial risk of serious harm—including the six deaths that have
occurred on Defendants' watch in the last year.

202.     Beyond this actual harm showing the obvious grave risk of serious harm at the
Jail, the United States and the Monitor have provided Defendants extensive, constant notice of
the dire conditions, actual harm, and grave risk of harm at the Jail needed to establish their
deliberate indifference.  *See Depriest*, 2015 WL 3795020 at *12 ("Defendant's knowledge of
circumstances posing a substantial risk of serious harm was informed by past events.").

203.     Defendants have known about the serious harm and risk of harm at the Jail since
at least May 21, 2015, when the United States sent them the findings of its CRIPA investigation.
Findings Letter, ECF No. 3-3.  That 29-page findings letter detailed the same constitutional
violations that currently plague the Jail and relayed the minimum remedial measures necessary to
correct those violations.  *Id.*

204.     Since the Court entered the Consent Decree, the Monitor has provided 15
comprehensive reports that detail Defendants' failure to comply with the remedial measures of
the Consent Decree, and the resulting ongoing risk of serious harm at the Jail.  *E.g.*, ECF No.
101.  Despite this continuous notice, Defendants failed to take corrective action.

205.     The Monitor's most recent Fifteenth Report of November 24, 2021, found that
Defendants are in substantial compliance with only 3 of the Consent Decree's 92 substantive
provisions.  ECF No. 101, PX-041, at 22-23; *see also* Consent Decree, ECF No. 8-1, PX-001, at
¶ 150 ("Findings in the Monitor's Reports will be considered persuasive, but rebuttable, in
Court.").

206.    Approximately a year earlier in December 2020, the Monitor's twelfth report found Defendants were in substantial compliance with just 7 provisions, ECF No. 77 at 24-25, as with the Monitor's ninth report in November 2019, ECF No. 46 at 9.

207.    These reports show Defendants' current and longstanding knowledge and deliberate indifference to the unconstitutional conditions at the Jail. *See Depriest*, 2015 WL 3795020 at *12 (finding deliberate indifference when "monitors' reports informed [d]efendant about noncompliance areas and dangers the digressions present to inmates").

208.    The United States also notified Defendants of serious harm and grave risk of harm through its motion for contempt in filed in June 2019.  ECF Nos. 30 & 31.  The Parties resolved that motion through a negotiated Stipulated Order.  As part of that stipulation, Defendants acknowledged (and this Court found) that Defendants "are not in compliance with all provisions of the" Consent Decree and that the Stipulated Order's "more specific remedial relief [was] necessary."  Stipulated Order, ECF No. 60-1, PX-002, at 1.

209.    This Court itself also provided notice in its order granting the motion to enter the Stipulated Order.  ECF No. 60.  This Court, among other things, found "violent" "[a]ssaults at the Jail remain commonplace," "with prisoners being sent to the emergency room for stab wounds, dislocations, broken bones, and collapsed lungs," as well as a "disturbing history of riots." *Id.* at 2-3.  The Court found "[n]umerous incidents of excessive force by correctional officers." *Id.* at 3.  Most importantly, the Court found an overall "continuing lack of safety" and pointed at Defendants' failure to implement the Consent Decree as the underlying cause. *Id.* at 3, 4-20.  The Court summarized that Defendants have "subjected its prisoners, its corrections officers, and the broader community of Hinds County to danger from its repeated failure to take this Consent Decree seriously." *Id.* at 20.

210.    Defendants' brief includes "partial compliance" to argue they have complied with nearly 70% of the Consent Decree's provisions.  ECF No. 112 at 4.  Partial compliance, however, means Defendants "achieved compliance with some of the components of the relevant provision of the [Consent Decree], *but significant work remains*."  ECF No. 8-1, PX-001, at ¶ 35 (emphasis added).  Defendants' partial compliance does not absolve or negate their deliberate indifference.  *See Depriest*, 2015 WL 3795020 at *12 (finding "failure to *fully* comply with directives aimed at improving inmate safety implies indifference on the part of Defendant[s]" and dismissing contention "that some affirmative steps taken by them negate a finding of deliberate indifference" (emphasis added)).

211.    Nor do the Defendants' last-minute, piecemeal efforts constitute a reasonable response to the known unconstitutional levels of harm and risk of harm in the Jail.  Here, the Consent Decree spells out the reasonable response to the known substantial risk of serious harm and constitutional violations, and Defendants stipulated in the Decree for purposes of the PLRA that these measures were the minimal necessary response.  ECF No. 8-1, PX-001, at ¶¶ 166-67. Partially implementing a minimal reasonable response is not a reasonable response.  *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 397–98 (5th Cir. 2000) (A jailer has a "duty to not act with subjective deliberate indifference to a known substantial risk" and accordingly cannot "disregard . . . precautions he kn[ows] should be taken.")

212.    Given the ongoing actual incidents of serious harm, the constant notice of serious harm and substantial risk of serious harm from this Court, the United States, the Monitor, and Defendants' essentially complete failure to comply with the remedial Consent Decree, this Court finds that Defendants are deliberately indifferent to the substantial risk of serious harm to detainees at the Jail.  *See Farmer*, 511 U.S. at 834.

213.     This Court also finds that by refusing to comply with the Consent Decree despite repeated notice of the substantial risk of serious harm, Defendants intentionally or unlawfully imposed punishment upon detainees in violation of the Fourteenth Amendment's Due Process Clause. *See Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979).

-     -     -     -     -

214.     In sum, for the reasons above, this Court finds that the Consent Decree's provisions remain "necessary to correct a current and ongoing violation," extend "no further than necessary to correct the violation," and are "narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).  The Court retains them.  The Defendants did not move to terminate the Stipulated Order pursuant to the PLRA; its provisions remain in effect.

215.     In retaining such relief, the Court has carefully considered whether relief will have any adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626(a)(1).  Notably, Defendants did not implement key reforms designed to improve public safety and operational of the criminal justice system, including provisions designed to prevent jail violence and escapes and unlawful detention.  They also did not implement the CJCC, which is a necessary mechanism for coordinating jail operations with other parts of what Defendants have themselves admitted in the past is a broken local criminal justice system.  Maintaining the Consent Decree relief here reflects greater respect to public safety and local criminal justice needs than the Defendants' continued neglect of their obligations to those same interests.

## B.   Defendants are in Longstanding Widespread Contempt

### (1) <u>Contempt Legal Standard</u>

216.    Well established case law finds that district court judges retain the power to enforce consent decrees entered in their cases.  *See, e.g.*, *Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."); *Spallone v. United States*, 493 U.S. 265, 276 (1990).  "Courts possess the inherent authority to enforce their own injunctive decrees" and "do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender."  *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (quoting *Berry v. Midtown Serv. Corp.*, 104 F.2d 107, 110-11 (2d Cir. 1939)).  Instead, the Court "has the discretion—indeed, the duty—to take immediate action in a manner coextensive with the degree of ongoing and persistent harm."  *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932243, at *8 (N.D. Cal. May 10, 2005).

217.    To establish contempt, the proponent "bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quotation omitted); *see also Cooper v. Noble*, 33 F.3d 540, 545 (5th Cir. 1994) (affirming contempt when defendants failed to make reasonable effort to comply with decree), *supplemented*, 41 F.3d 212 (5th Cir. 1994).

218.    Clear and convincing evidence is the "weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, weighty and convincing as to enable fact finder to come to

a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost,*

*Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotes omitted).

219.    Contempt does not require a showing that the "contemptuous actions," or

inaction, are willful, "so long as the contemnor actually failed to comply with the court's order."

*Am. Airlines, Inc.*, 228 F.3d at 581 (citation omitted).  Thus, "[g]ood faith is not a defense to civil

contempt."  *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).  "When a

party violates a court order without objecting to it, asking the court to modify or vacate it, or

even informing the court why it cannot or will not obey it, the court may hold the party in

contempt without first deciding whether the disobedience was justified."  *Seven Arts Pictures,*

*Inc. v. Jonesfilm*, 512 F. App'x 419, 422 (5th Cir. 2013).

220.    Once the proponent shows a violation of a court order, the burden shifts to the

violator to demonstrate either substantial compliance with the court order or "mitigating

circumstances that might cause the district court to withhold the exercise of its contempt power."

*Whitfield v. Pennington,* 832 F.2d 909, 914 (5th Cir. 1987) (citing *Louisiana Educ. Ass'n v.*

*Richland Parish School Bd.,* 421 F. Supp. 973, 977 (W.D. La. 1976), *aff'd* 585 F.2d 518 (5th Cir.

1977) (holding that the district court abused its discretion in excusing defendants' clear violation

of court orders)).

### (2) Defendants Have Been in Continuous Violation of the Consent Decree for Years.

#### a.    *The Consent Decree and Stipulated Order Have Been in Effect for Years and Imposed Specific Requirements on Defendants.*

221.    In its First Order of Contempt, this Court already found that here the "first two

elements of the civil contempt standard are easily satisfied."  ECF No. 126 at 19; *see also id.*

("There is no dispute that a Court Order was in effect that required certain conduct of Hinds

County. The County agreed to a judicially-enforceable contract when its (previous) attorneys signed the Consent Decree.").

222.    On July 19, 2016, the Court entered the Consent Decree as an Order of the Court to remedy alleged unconstitutional conditions at the Jail.  ECF. Nos. 8 & 8-1.  That Consent Decree remains in effect today.

223.    The Consent Decree requires Defendants to implement and sustain specified remedial measures to remedy constitutional violations and ensure constitutional conditions at the Jail.  ECF No. 8-1, PX-001, at ¶¶ 2-3.  Those remedial measures included actions Defendants must take to protect detainees from harm, prevent improper use of force by staff, provide adequate, effective mental health services, and repair physical plant deficiencies.  ECF No. 8-1, PX-001, at Part VI.

224.    The Consent Decree specifically defines "Substantial Compliance" with a provision as when Defendants have "achieved compliance with the material components and has met the goals of the relevant provision."  The Order also defines "Non-compliance" as when Defendants have "not met most or all of the components of the relevant provision."  ECF No. 8-1, PX-001, at ¶ 35.

225.    Defendants expressly agreed that the Consent Decree was "narrowly drawn, extends no further than necessary to correct the violations of federal rights," and "is the least intrusive means necessary to correct [the] violations."  ECF No. 8-1, PX-001, at ¶¶ 166-67.

226.    Due to Defendants' failure to comply with the Consent Decree, the United States moved for contempt in June 2019.  U.S. Mot. For Order to Show Cause, ECF No. 30.  The Parties settled that motion through a Stipulated Order.

227.    The Court entered that Stipulated Order on January 16, 2020.  That Order remains in effect today.  ECF Nos. 60 & 60-1.

228.    The Stipulated Order granted "more specific remedial relief" to supplement the Consent Decree.  ECF No. 60-1, PX-002, at 1-2.  That Order provided more specific requirements and timeframes to assist Defendants in achieving compliance with Consent Decree requirements regarding the Jail's physical plant, staffing, policies and procedures, and population management.  *See generally* ECF No. 60-1, PX-002.

229.    Defendants expressly agreed that the Stipulated Order was "narrowly drawn, extends no further than necessary to correct ongoing violations of federal rights agreed by the parties with the entry of the Consent Decree, and is the least intrusive means necessary to correct these violations."  ECF No. 60-1, PX-002, at 2.

230.    In adopting that Stipulated Order, the Court noted that "a finding of contempt is warranted."  ECF No. 60 at 11.  Nevertheless, this "Court grudgingly approved [the Stipulated Order] even though the County had reached sustained compliance 'in only one of the 92 requirements of the Consent Decree.'"  Order to Show Cause, ECF No. 100 at 9 (citing ECF No. 60 at 7).

231.    In entering the Stipulated Order, the Court warned that "[t]en months from today [i.e., November 16, 2020], the County should have made significant progress on developing and implementing policies, making repairs to the physical plant and ensuring incarcerated youth have necessary programming, among other necessary investments."  ECF No. 60 at 11.

232.    Since the entry of both Court Orders, Defendants have been well aware of the specific requirements that the Consent Decree and Stipulated Order imposed on them.  Indeed, Defendants negotiated the terms of both consent Orders before this Court entered them.

Moreover, Defendants have received at least 15 monitoring reports detailing those Orders' requirements and specifically how Defendants continually failed to meet them. Indeed, when the Parties jointly moved for approval of the Stipulated Order, they agreed that such reports and other exhibits filed with the Court could be considered part of the record for approval of the Stipulated Order. ECF No. 54 at ¶ 5. Likewise, Defendants have participated in regular status conferences before this Court, at which the Monitor and her team have testified as to Defendants' failures to achieve compliance with the orders.

### b. *Defendants Have Continuously Failed to Comply with the Consent Decree for Years.*

233. The Court concludes that Defendants are in widespread violation of Consent Decree, and have been so for years.

234. The Consent Decree required Defendants to review and revise their policies by no later than January 19, 2017. ECF No. 8-1, PX-001, at ¶¶ 37, 68, 130-31. Defendants should have implemented all Consent Decree required policies by July 19, 2017. ECF No. 8-1, PX-001, at ¶ 120.

235. Defendants should have achieved substantial compliance with the remaining Consent Decree provisions by July 19, 2017, ECF No. 8-1, PX-001, at ¶ 120, except for the requirement for transitioning youth to an appropriate facility, which was due by January 19, 2018, *id.* at Part IV.K.

236. In its First Order of Contempt, this Court already found that Defendants are in contempt of 30 of the Consent Decree's 92 substantive provisions. ECF No. 125 at 19-27. The Court reserved judgment until after the evidentiary hearing as to whether Defendants are in contempt of the other provisions. *See* ECF No. 125 at 18 n.7.

237.    In its First Order of Contempt, the Court relied "upon the reports of the Monitoring Team, including subject matter experts recommended by the parties and charged by Judge Barbour as the eyes and ears of the Court." ECF No. 124 at 18.

238.    The Monitors' Fifteenth Report of November 24, 2021, concludes that Defendants are in substantial compliance with only 3 of the Consent Decree's 92 substantive provisions. ECF No. 101, PX-041, at 22-23. This and other evidence from the hearing is clear and convincing evidence that Defendants have "failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000); *see also* ECF No. 8-1, PX-001, at ¶ 150 ("Findings in the Monitor's Reports will be considered persuasive, but rebuttable, in Court.").

239.    Compare this lack of progress to the Monitor's Ninth Report that she submitted in November 2019 just before the Court entered the Stipulated Order. That Ninth Report shows Defendants were in compliance with just 7 of the Consent Decree's 92 substantive provisions. ECF No. 46 at 9. The Stipulated Order was intended to get Defendants on track to coming in compliance with the Consent Decree. Yet Defendants' compliance with the Consent Decree has backtracked since the Stipulated Order.

240.    In addition, the Court's recitation of some of the most troubling facts above clearly and convincingly shows that Defendants have failed to comply with multiple provisions of the Consent Decree for years.

241.    As noted above, the Court has already found Defendants in contempt of 30 of the Consent Decree's 92 substantive provisions. Based on the Monitor's reports and other evidence presented at the hearing, the Court now finds Defendants have failed to comply with all the Consent Decree's substantive provisions except three.

242.    Those three non-contempt provisions are as follows:

- Paragraph 40:  "Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check";

- Paragraph 80:  "Ensure that youth are properly separated by sight and sound from adult prisoners."; and

- Paragraph 160:  "The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement. This person will serve as a primary point of contact for the Monitor. Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours."

### (3) Defendants Have Not Offered Any Mitigating Circumstances for Withholding Contempt.

243.    With the Court having found clear and convincing evidence that Defendants are in widespread violation of the Consent Decree, Defendants have the opportunity to demonstrate "mitigating circumstances that might cause the district court to withhold the exercise of its contempt power."  *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987) (citation omitted). Defendants have demonstrated no such mitigating circumstances that merit this Court withholding finding them in contempt.

244.    Defendants proffered COVID-19 as a mitigating circumstance.  Defs. Br. Resp. Order Show Cause, ECF No. 105 at 4.

245.    While COVID-19 has changed all our lives, the pandemic cannot excuse Defendants' widespread violation of Stipulated Order and Consent Decree—the latter of which

has been in effect since July 2016.  *See Braggs v. Dunn*, No. 2:14CV601-MHT, 2021 WL 6117939, at *44 (M.D. Ala. Dec. 27, 2021) ("COVID-19 does not grant [the prison system] carte blanche to provide inadequate mental-health care for the duration of the pandemic. The Eighth Amendment does not have a force majeure clause."); *Unite Here Health v. M.L. Plaza Owner LLC*, 2020 WL 12441956 (N.D. Ill. 2020) (financial hardship caused by COVID is not equivalent to excuse of impossibility).  Nor does the pandemic explain why Defendants failed to develop interim measures or contingency plans so they could proceed with reforms, or to implement reforms that should not have been impacted significantly by COVID-19.  The pandemic does not completely pause the Court's remedial Orders and the constitutional rights of detainees at the Jail.

### (4) <u>Defendants are in Contempt.</u>

246.    Defendants' violations of the provisions of the Consent Decree and Stipulated Order are not merely violations of this Court's Orders.  Defendants' violations additionally cause the continued violation of detainees' constitutional rights.

247.    As noted above, Defendants stipulated that the remedial provisions of the Consent Decree and Stipulated Order are "narrowly drawn, extend[ ] no further than necessary to correct the violations of federal rights," and are "the least intrusive means necessary to correct [the] violations."  ECF No. 8-1, PX-001, at ¶ 167; *accord* ECF No. 60-1, PX-002, at 2.

248.    This Court's remedial Orders enforce the Constitution's basic requirement that prison and jail officials cannot disregard conditions of confinement that subject detainees to an excessive risk of violence, illness, or injury.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994); *see also Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (finding that pretrial detainees' rights under the Fourteenth Amendment's

Due Process Clause of the are "at least as great as the Eighth Amendment protections available to a convicted prisoner" (citation omitted)).  The Orders' provisions remedy the Jail's conditions that subject detainees to a "substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.

249.    Defendants' continuous longstanding violation of the Consent Decree also shows their deliberate indifference to not only the conditions that subject detainees to a widespread grave risk of serious harm, but also to serious harm itself.  *Cf. Farmer*, 511 U.S. at 834.

250.    In considering the previous contempt motion that resulted in the Stipulated Order, the Court noted that "[a]llowing the County to move forward without facing [contempt] accountability is concerning given the extent of the County's failings."  ECF No. 60 at 10.

251.    The Court stated that because the "evidence is overwhelming that the defendants failed to meet [the Order's] requirements," "the Court should find [Defendants] in contempt."  ECF No. 60 at 11.

252.    Nonetheless, because of the comprehensive requirements of the Stipulated Order, this Court deferred ruling on contempt and "grudgingly approved [the Stipulated Order] even though the County had reached sustained compliance 'in only one of the 92 requirements of the [Consent Decree].'"  Order to Show Cause, ECF No. 100 at 9 (citing ECF No. 60 at 7).

253.    But in deferring ruling on contempt, the Court warned that in 10 months, i.e., November 16, 2020, Defendants "should have made significant progress on developing and implementing policies, making repairs to the physical plant and ensuring incarcerated youth have necessary programming, among other necessary investments."  ECF No. 60 at 11.

254.    More than a year past that deadline, Defendants have ignored that warning and still have made no meaningful progress toward alleviating their continuous widespread violation of the provisions the Consent Decree entered on July 19, 2016.  Indeed, Defendants' compliance

with the Consent Decree has regressed. Unless the Court intervenes, Defendants' widespread

violations of the Court's Orders will undoubtedly continue to cause widespread constitutional

violations and grave danger and harm to detainees in the Jail.

255.    The Court will not give Defendants another pass, and accordingly finds them in

contempt of all provisions of the Consent Decree that are not yet in substantial compliance.

### C.  Defendants' Longstanding Widespread Contempt Necessitates a Receivership.

### (1) <u>Receiver Legal Standard</u>

256.    While receivership is an extraordinary remedy, the Court undoubtedly is

authorized to appoint a receiver to remedy "otherwise uncorrectable violations of the

Constitution or laws." *Plata v. Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010). "The

decision whether to appoint a receiver is a function of the court's discretion in evaluating what is

reasonable under the particular circumstances of the case. *Plata v. Schwarzenegger (Plata I)*,

No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005) (citing *Dixon v. Barry*,

967 F. Supp. 535, 550 (D.D.C. 1997) (granting motion to appoint a receiver over the District of

Columbia's Commission on Mental Health Services)).

257.    Significant precedent exists for this Court's use of a receivership in the

corrections context. *E.g., Plata I*, 2005 WL 2932253 at *23 (ordering receivership for the

delivery of medical services to all California state prisoners); *Inmates of D.C. Jail v. Jackson*,

158 F.3d 1357, 1359 (D.C. Cir. 1998) (recounting appointment of receiver for jail's medical and

mental health services); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) (appointing a

receiver over a jail, noting, "a court acting within its equitable powers is justified, particularly in

aid of an outstanding injunction in implementing . . . a receivership, so as to achieve compliance

with a constitutional mandate"); *Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (appointing receiver for Alabama State Prisons).

258.    The Supreme Court has affirmed extraordinary federal intervention into correctional operations where constitutional violations persist "for years" and "remain uncorrected." *Brown v. Plata*, 563 U.S. 493, 499 (2011).

259.    Courts have developed a multi-pronged test to guide this determination: (1) whether there is a grave and immediate threat or actuality of harm; (2) whether the use of less extreme measures of remediation has been exhausted or proven futile; (3) whether continued insistence on compliance with the Court's existing orders would lead only to confrontation and delay; (4) whether there is a lack of leadership to turn the tide within a reasonable period of time; (5) whether there is bad faith; (6) whether resources are being wasted; and (7) whether a receiver is likely to provide a relatively quick and efficient remedy.  *See Plata I*, 2005 WL 2932253, at *23 (collecting authorities).

260.    The first two prongs should be "given predominant weight."  *Plata I*, 2005 WL 2932253 at *23.  And the Court need not find bad faith to order a receiver.  *Id.* at *30 ("While lack of will thus is a key factor contributing to this crisis, the Court need not ascribe ill will to defendants as a predicate to appointing a Receiver, and the Court declines to do so.").

### (2) <u>Receivership is Appropriate and Necessary to Address "Otherwise Uncorrectable Violations."</u>

261.    In this case, all prongs except the bad faith prong weigh heavily in favor of appointing a receiver to run the Jail and bring the Jail into compliance with the Constitution.

262.    The factual and procedural record of this case shows the need for a receiver given Defendants' demonstrated repeated and widespread inability to comply with this Court's remedial Orders and correct the constitutional violations at the Jail.

### a. Defendants are Subjecting Detainees to Grave Danger.

263.    As detailed above, violence and other grave harm plagues the Jail because of Defendants' grossly inadequate staffing and supervision, an unsafe physical plant, insufficient mental health care, failure to implement key policies, inadequate training, and lack of leadership support.

264.    In just the past year, six detainees were killed, committed suicide, died of apparent drug overdose, or died of other unnatural causes at the Jail.  Detainee-on-detainee assaults are widespread at the Jail.  Seemingly ubiquitous contraband leads to violence, drug overdoses, and other serious harm.  Dangerous unaddressed physical plant problems, including cell doors that fail to lock and emergent fire hazards, cause assaults, fires, and other grave harm.

265.    Defendants' grossly inadequate staffing—both security and medical and mental health staff—and physical plant shortfalls also lead to suicides and harm from failing to meet the serious medical and mental health needs of detainees.  *See generally* ECF No. 96.

266.    When deaths, violent assaults, and other serious harm occur, Defendants fail to meaningfully investigate why the harm occurred and how to prevent similar harm from reoccurring in the future.

267.    All this shows not just a grave risk of harm, but that actual grave harm pervades the Jail.  This grave harm and substantial risk of serious harm are directly attributable to Defendants' failure to comply with the Court's remedial orders.

### b. Measures Short of Receivership Have Failed to Result in Reform.

268.    The Hinds County Jail has been under the original Consent Decree since July 2016.  The Monitor has given Defendants extensive technical assistance in the last several years. The Team has provided this assistance through monthly all-parties calls, frequent contact

between those calls, site visits three times each year, and prioritized recommendations both in the resulting reports and otherwise to help guide Defendants' efforts toward compliance. *See, e.g.*, Monitor's Priority Recommendations to Defs., (June 2018), ECF No. 30-8.

269.     Given Defendants' lack of progress in complying with the Consent Decree, the United States filed for contempt in June 2019.  The Parties settled that motion when Defendants promised to implement the Stipulated Order and its priority remedies.  ECF Nos. 30, 60-1.  At that time, the Court found a record of frequent assaults, a recent detainee-on-detainee homicide without accurate incident reports, broken doors and locks, and inadequate staffing and supervision, and an overall failure to comply with the Consent Decree.  Order Granting Mot. for Settlement at 2-7, (S.D. Miss. Jan. 16, 2020), ECF No. 60.  The Court noted these facts warranted a finding of contempt, but entered the Stipulated Order as "perhaps the most comprehensive remedial plan for Hinds County to become compliant that the Court has seen from the parties."  ECF No. 60 at 11.

270.     The Stipulated Order provided a road map of more immediate, short-term remedies to help Defendants get back on track with implementing the Consent Decree.

271.     Nearly two years later, despite the Stipulated Order, Defendants' compliance with the Consent Decree has regressed.

272.     In yet another attempt to help Defendants focus on short-term steps to avert imminent harm, the Monitor, in consultation with the United States, provided a list of Priority Deliverables to Defendants in August 2021.  *See* Priority Deliverables, (August 2021), ECF No. 96-1. Defendants did not contend these measures were outside the bounds of the Consent Decree, and the new Jail Administrator noted they were helpful in focusing her work.  Four months later, most of these measures have not yet been accomplished, in part because

Defendants had not empowered the new Jail Administrator or provided her the necessary resources to move forward with compliance.  That Jail Administrator ran into such resistance from Defendants that she no longer occupies the position.

273.    Despite the Monitor's constant technical assistance and the Stipulated Order that was intended to get Defendants on track to start to come into compliance with the original Consent Decree, Defendants currently have complied with only 3 of the Consent Decree's 92 substantive provisions.

274.    These dire circumstances closely resemble the circumstances leading the district court in California to put the California prison system in receivership in the *Plata* litigation.  In *Plata*, the district court appointed a receiver to reform and operate the medical care program in the California prison system, including developing remedial plans and renovating existing medical facilities.  *See Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010).  The Ninth Circuit upheld the appointment as an appropriate remedy that complied with the PLRA's requirements for prospective relief, 18 U.S.C. § 3626(a)(1)(A).  *Id.* at 1090.  The *Plata* plaintiffs moved for a receiver three years after entry of a voluntary consent decree, with one intervening remedial order, to which the parties had stipulated.  *Id*. at 1091.  The district court found that even with extensive technical assistance and status conferences, "defendants were able to enact only very limited and piece-meal measures, with no prospect for system-wide reform or restructuring."  *Plata I*, 2005 WL 2932253 at *26-27.  In appointing the receiver, the district court found, after an evidentiary hearing involving expert testimony as to the "incompetence and indifference" of prison officials, that a receiver was necessary to "dramatically overhaul[]" the operation.  *Plata*, 603 F.3d at 1091-92.

275.     The Ninth Circuit denied the state's challenge to the receiver appointment on the
basis that "the record simply does not support the State's contention that anything less than a
receivership would have remedied the undisputed constitutional deficiencies in detainees' health
care at the time the receivership was imposed." *Plata*, 603 F.3d at 1097.  Because the state had
stipulated to and failed to comply with both a consent decree and an additional remedial order,
"the district court justifiably concluded that the State's personnel simply could not or would not
bring the State into constitutional compliance in the foreseeable future." *Id.*

276.     As in *Plata*, this Court, the Monitor, and the United States have tried to
encourage, instruct, and compel Defendants to achieve compliance with the Consent Decree and
constitutional requirements.  The Hinds County Sheriff's Office and County have demonstrated
an unwillingness to do so.  The only viable option now is to appoint a receiver with the authority
to operate and staff the Jail.

### c.     Continued Lesser Efforts to Effect Compliance with the Current Remedial Orders Will Lead to Confrontation and Delay.

277.     Continuing remedial efforts short of receivership will only lead to further
confrontation, delay, and serious harm to the people confined to the Jail.  *Cf. Plata I*, 2005 WL
2932253 at *29 ("It is resoundingly clear to the Court that continued insistence on defendants'
compliance with Court orders would lead to nothing but further delay, as well as further needless
death and morbidity.").

278.     As to confrontation, this marks the second time the Court has considered finding
Defendants in contempt.  The United States moved for contempt previously in June 2019.  If the
Court orders anything short of receivership, another contempt proceeding will likely follow.

279.     Defendants also appear unwilling to implement the Monitor's technical
assistance.  As noted above, Defendants have received technical assistance from the Monitor

since 2016 through regular status conferences, site visits, monthly all-parties calls and contact in

between.  The Monitor also funded a policy development consultant under her budget to do work

that Defendants should have paid for directly and completed on their own.  Policy development

edged forward since the Stipulated Order, but as noted above, Defendants have delayed and fell

behind in training staff and implementing even approved policies.

280.    Similarly, the Monitor also funded a human resources consultant under her budget

to do work that Defendants should have paid for directly and completed on their own.  But

Defendants did not make use of the human resources consultant to boost their recruitment and

retention work.  Instead, severe shortages of desperately needed staff continue.  In June 2021, the

Monitor noted that Defendants were "just not making any progress" on increasing staffing after

five years.  June 2021 Tr. 19:13-25.

281.    Most importantly, after five years of Defendants' inaction and delays, the Monitor

found Defendants in compliance with only 3 of the Consent Decree's 92 substantive provisions.

282.    Although the Court could impose contempt sanctions short of a receiver, this

would simply prolong "the current dysfunctional system."  *Plata I*, 2005 WL 2932253 at *27.

Such sanctions would not substantively change the ability or willingness of Defendants'

bureaucracy to effect change, "and the system would still fall short of constitutional adequacy."

*Id.*

### d.    Defendants' Leadership Cannot or Will Not Comply in a Timely Manner.

283.    Defendants have taken virtually no action on the most critical overarching

reforms, showing they are unwilling or incapable of implementing those and other reforms in a

timely manner.  More than four years after compliance was due, this Court's finding of contempt

on the 30 provisions in non-compliance –  nearly one-third of the Decree's provisions – is alone enough to substantiate this factor.  1st Order of Contempt, ECF 126 at 2.

284.    Defendants' actions further demonstrate they will not timely comply.  For instance, Defendants hired a new Jail Administrator in June 2021 who is more qualified than any of her predecessors, and she had tried to further compliance.  But Defendants then failed to approve a number of important reforms that she started, such as providing support for a field officer training program, contracting to hire the mental health staff needed for the MHU, and reforming the maintenance program.  After just a few months on the job, Defendants' resistance to the Jail Administrator and failure to follow through on their commitments led the Jail Administrator to submit a letter of resignation, and she no longer works at the Jail.

285.    Defendants have barely begun to train and implement approved policies, including those that deal with supervising detainees, direct supervision, conducting welfare checks, use of force, incident reporting, and investigations.

286.    Supervisors are not doing their jobs to hold staff accountable for failing to follow policies.  When Defendants have stepped in to deal with staff supervision, all too often it has actually undermined the Jail Administrator or others' efforts to hold staff accountable.

287.    Most importantly, Defendants have not taken sufficient action to boost critically needed staffing.  This is despite significant technical assistance from the Monitor as outlined above.  Staffing has not improved in the last five years, which frustrates compliance with a host of other necessary remedies.  These other reforms include instituting direct supervision (which would decrease the violence in the Jail) and providing adequate medical and mental health care.

### e.    Bad Faith is Not a Necessary Predicate for Receivership.

288.    The Court will not go so far as to find Defendants have acted in bad faith.  This should not be interpreted as a finding that Defendants have operated in good faith.

289.    For example, the Court will note that Defendants delayed implementing small pay increases that they represented to the Court that they had approved to try to stem staff turnover. *Compare* September 15, 2021 Tr. 103:25-104:3 (county reporting a 5% pay increase to the Court as evidence of remedial effort), *with* ECF No. 101, PX-041, at 30 (discussing county delays in implementing the pay increase, which still had not actually been implemented in late November 2021).

290.    Defendants also continue to make personnel and administrative decisions without adequate input from Jail leadership and in ways that undermine staff efforts to comply with the Court's orders.  For instance, the Monitor noted in July 2021 that "the recent transfer of three Detention Officers to Patrol appears to run counter to the requirements of the Settlement Agreement."  ECF No. 94, PX-039, at 32.  Such a transfer reduces the officers available to meet the Jail's needs, and is questionable given that severe understaffing is an overarching problem the remedial Orders seek to fix.

291.    More globally, the Court has noted throughout this opinion that the Monitor has provided Defendants with extensive recommendations and technical assistance on how to implement this Court's remedial Orders.  Defendants accordingly cannot claim ignorance for their failure to comply.

292.    Regardless, the Court need not find bad faith to order a receiver.  *Plata I*, 2005 WL 2932253 at *30 ("While lack of will thus is a key factor contributing to this crisis, the Court need not ascribe ill will to defendants as a predicate to appointing a Receiver, and the Court declines to do so.").

### f.  *Defendants are Wasting Resources.*

293.   Defendants' continued, widespread noncompliance wastes time, money, and effort by Jail staff, the County Board of Supervisors, the Sheriff's Office, the Monitor, the United States, and this Court.  The Monitor has spent resources on at least 16 site visits in the last five years, in addition to countless hours working directly with Defendants, to assist Defendants in gaining compliance.  Despite this, Defendants' inaction forces the Monitor to investigate and chronicle unresolved problems year after year.

294.   For instance, as noted above, inadequate staffing frustrates compliance with all other Consent Decree and Stipulated Order provisions, and the Monitor has found longstanding issues with Defendants'

- shortage of security staff, ECF No. 101, PX-041, at 2, ECF No. 94, PX-039, at 3;

- insufficient mental health staff; *see, e.g.*, Monitor's 12th Report, ECF No. 77 at 35-36 (noting need for more staff); Monitor's 5th Report, ECF No. 23 at 4-5, 17 (noting "[t]here continues to be concern about the adequacy of mental health staffing levels," and "there is clearly inadequate psychiatric time to meet the provisions of the agreement"); and

- shortage of staff supervising youth at Henley-Young.  *See* Monitor's 15th Report, PX-041, at 5-6; Monitor's 14th Report, PX-039, at 93; Monitor's 13th Report, PX-038, at 88 (discussing low youth care professional pay and recommending increase in starting salary and implementation of progressive training and development program); Monitor's 12th Report, PX-037, at 87 (discussing salary survey of comparable positions and other factors indicating salaries for youth care professionals are not competitive, and stressing need for a pay progression system

93

and other incentives for retention); Monitor's 11th Report, PX-036, at 7, 88;

Monitor's 10th Report, PX-035, at 91-92; Monitor's 9th Report, PX-034, at 71-

72.

295.    Defendants have long failed to conduct routine maintenance, prioritize needed

maintenance, or approach maintenance problems with a long-term perspective rather than doing

short-term fixes.  Failures in staffing and preventive maintenance often create a self-perpetuating

cycle of health and safety challenges, such as the dumpster cells noted above and the repeated

need to keep repairing facilities that deteriorate without adequate staff supervision of detainees.

ECF No. 101, PX-041, at 3, 54-55; ECF No. 94, PX-039, at 3.

296.    The Monitor has suggested since at least April 2021 that the County designate a

line item in the Sheriff's Office annual operating budget so that routine maintenance issues do

not require specific County approval and can thus occur more expeditiously, ECF No. 94, PX-

039, at 4 (citing Monitor's 13th Report), but this has not occurred.  ECF No. 101, PX-041, at 55;

December 2021 Quality Assurance Summary, PX-086, at 6-7 (noting recommendation for line

item in budget for "routine repairs," which "has not yet been initiated").

297.    Because of Defendants' resistance to reform, the negative culture and safety

hazards that led to this litigation remain entrenched, which contribute to the 30% attrition rate

projected for this year among detention officers and to the health care provider's difficulty in

hiring and retaining medical and mental health staff.  ECF No. 101, PX-041, at 30; No. 94 at 3

(detention officer attrition projected at 28% during previous inspection), 35 (medical, mental

health staff).  Money is spent every time new security staff, medical staff, or administrators need

to be recruited, interviewed, screened, on-boarded, and trained.  When those staff leave in short

order, progress is lost and money is wasted.

298.    In the long run, a receiver focused on operating a constitutional Jail without further unnecessary delay and foot-dragging should conserve resources in the long run.

### g.    A Receiver Will Likely Provide a Relatively Quick and Efficient Remedy.

299.    While receivership is an extraordinary remedy, the Court is authorized to appoint a receiver when a defendant demonstrates an unwillingness to comply with the court's order. *Plata*, 603 F.3d at 1094; *Dixon*, 967 F. Supp. at 550.

300.    Since 2016, Defendants have failed to implement this Court's remedial measures and made almost no progress on addressing the widespread constitutional violations at the Jail. *Cf. Plata I*, 2005 WL 2932253 at *31 ("The Court believes that steady progress here under the direction of a Receiver is possible, that gains in patient care will be made along the way, and that this is far preferable to the current state of paralysis.")

301.    The Hinds County Jail and its detainees are not unique.  With competent leadership that is empowered with sufficient resources and authority to make important budgeting and operations decisions, coupled with policies and systems that reflect generally accepted correctional standards, the Jail can be operated in line with the Constitution and Defendants' responsibilities under the Consent Decree.  The road map to compliance and a constitutional Jail is there, but Defendants have demonstrated that a receiver is necessary to navigate that road.

302.    More generally, the Jail needs a leader who can ensure compliance by recruiting and promoting effective staff to implement the policies and practices essential to reform, while removing staff who refuse to adapt to the required changes.  With the proper authority, funding, and support, a receiver can enable the culture change that has kept Defendants from making

progress toward timely compliance.  A receiver can establish the systems of oversight of staff, physical plant, and Jail resources that have been lacking.

303.    Receivership is a temporary measure.  When the Court (with the Monitor's aid) finds that the receiver has enabled the Hinds County Jail to achieve substantial compliance with the Consent Decree, the Court will return authority to operate the Jail system to Defendants to demonstrate that they can sustain compliance throughout the two-year compliance period the Consent Decree requires.

### (3) <u>The Appointment of the Receiver Complies with the PLRA.</u>

304.    The Supreme Court has recognized that "[t]he PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations."  *Brown v. Plata*, 131 S. Ct. 1910, 1937 (2011).  At this point, a receivership is the most practical option to resolve the Jail's constitutional violations and is far more likely to lead to the end of federal oversight of this facility than any alternatives offered by the Defendants.

305.    The law thus authorizes this Court to appoint a corrections receiver to remedy "otherwise uncorrectable violations of the Constitution or laws."  *Plata*, 603 F.3d at 1094 (upholding appointment of prison medical receiver); *accord Inmates of D.C. Jail*, 158 F.3d at 1359 (noting with approval the appointment of receiver for jail's medical and mental health services).

306.    The Court has found above that Defendants' actions in this case conclusively show that this "otherwise uncorrectable violations of the Constitution" standard has been met. The analysis of the "uncorrectable violations" prongs above, e.g., "whether the use of less extreme measures of remediation has been exhausted or proven futile," "whether continued

insistence on compliance with the Court's existing orders would lead only to confrontation and delay," and "whether there is a lack of leadership to turn the tide within a reasonable period of time," also establish that appointment of the receiver here complies with the PLRA. That above analysis shows that the receiver complies with the PLRA's requirement that a remedy be "narrowly drawn, extends no further than necessary" and "is the least intrusive means necessary to correct" the constitutional violations in this case. 18 U.S.C. § 3626(a)(1).

307.    To address the long-standing constitutional and Consent Decree violations, the Court orders that the receiver shall have full authority to administer operations of the Jail, including the ability to discipline, reassign, terminate, and promote Jail employees; develop and implement policies and procedures; formulate a budget; allocate budgeted funds; and contract for Jail services in a more efficient and less wasteful manner.

308.    But as discussed above, the receiver's authority (and position) should terminate as soon as the Court determines that the Jail has achieved substantial compliance with the Consent Decree.

309.    In ordering the receiver, the Court has carefully considered whether the relief will have any adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626(a)(1). Like the Consent Decree retained above, ordering a receiver who will help bring the Jail conditions in line with the Constitution promotes public safety and local criminal justice needs.

310.    Defendants are in widespread violation and contempt of the Consent Decree, and the Court sees no reasonable prospect that they will move significantly toward compliance on their own.

311.    In this case where abundant technical assistance, an agreed order for more specific relief adopted to settle an earlier contempt proceeding, myriad status conferences, and 15 consecutive reports of non-compliance have not led Defendants to implement constitutionally necessary reforms, the Court finds that the appointment of the receiver complies with the PLRA as such relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1).

Respectfully submitted,

**FOR THE UNITED STATES:**

DARREN J. LAMARCA
United States Attorney
Southern District of Mississippi

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Civil Rights Division
Special Litigation Section

MITZI DEASE PAIGE (MS #6014)
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of Mississippi
501 E. Court Street – Ste. 4.430
Jackson, MS 39201
MPaige@usa.doj.gov
(601) 973-2840
(601) 965-4409 (fax)

LAURA L. COWALL (DC #481379)
Deputy Chief
laura.cowall@usdoj.gov
(202) 514-1089
(202) 514-0212 (fax)
*/s/ Christopher N. Cheng*
CHRISTOPHER N. CHENG (PA #69066)
Trial Attorney
christopher.cheng@usdoj.gov
(202) 514-8892
(202) 514-4883 (fax)

SARAH STEEGE
Trial Attorney

sarah.steege@usdoj.gov

HELEN VERA
Trial Attorney
helen.vera@usdoj.gov
United States Department of Justice
Civil Rights Division
Special Litigation Section
150 M Street, N.E.
Washington, DC 20002



DATED:      February 11, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

       */s/ Christopher N. Cheng*
       CHRISTOPHER N. CHENG (PA #69066)
       Attorney for the United States
       United States Department of Justice
       Civil Rights Division, Special Litigation Section
       150 M Street, N.E.
       Washington, DC 20002