**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**VS.**                              **CIVIL ACTION NO. 3:16-CV-489-CWR-RHWR**

**HINDS COUNTY, ET AL.**                                        **DEFENDANTS**

**HINDS COUNTY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**STATEMENT OF THE CASE**

Before the Court is Hinds County's (County) Motion to Terminate or, in the Alternative, Modify the Consent Decree [111] (Motion to Terminate).  Prior to an evidentiary hearing on the Order to Show Cause [100] and the Motion to Terminate beginning February 14, 2022, the Court entered its First Order of Contempt [126] finding the County in civil contempt of thirty (30) provisions of the Consent Decree [8-1] governing the County's detention facilities, but reserving judgment as to fifty-nine (59) remaining provisions of the Consent Decree [126].  Also prior to the hearing on the Order to Show Cause and the Motion to Terminate, the Court received the parties' proposed findings of facts and conclusions of law in support of their respective positions.[1]  After careful consideration of the submissions of the parties, the testimony of the witnesses, the arguments of counsel presented and evidence admitted at the hearing, and applicable law, the Court grants the Motion to Terminate the Consent Decree.  The Consent Decree [8-1] is hereby terminated and dissolved in its entirety.

---

[1] The parties' proposed findings of fact and conclusions of law both necessarily contain, by nature of their timing, obvious shortfalls—they are pre-evidentiary hearing renditions of findings related to facts yet to be discovered, testimony and evidence yet to be heard and admitted, and application of law to an incomplete record.  *See Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1457 (Fed. Cir. 1984) ("Where . . . the adopted findings are those proposed by a party *before trial*, a greater chance is created that those findings may be clearly erroneous." (emphasis in original)).

## PROPOSED FINDINGS OF FACT

### I.    Hinds County and its Detention Facilities

Hinds County currently operates three detention facilities: the Raymond Detention Center (RDC), the Work Center, and the Henley-Young Juvenile Justice Center (Henley-Young).  The County used to operate the Jackson Detention Center, but that facility closed in 2020 and no longer houses detainees.  Running a detention center in Hinds County is certainly no small task, especially considering the high volume of cases in the County.  In April 2021, Hinds County District Attorney Jody Owens described the efforts of the County to tackle its overwhelming case volume:

> In Hinds County, for the murder cases, we have more than 200 outstanding autopsies.  And generally, that would mean we cant proceed in those cases, and those are going to be a lot of individuals who are actually in the jail because we work hard to get the non-violent individuals out of jail.  So we went and met with the Commissioner of Public Safety, Shawn Tindle; and we asked him for resources because Hinds County has the most outstanding autopsies and we can't try the cases.  We then went to the lieutenant governor, the governor, and the speaker, and we've asked for more resources as a whole, and the Chief Justice of the Supreme Court.  These are all individual meetings that we tried to do.  We were allocated for the first time, a one-time funding for additional staff that we should get in July.  Our plan is to use that monies to staff the municipal court level to get rid of the cases that shouldn't be in the jail in the first place, so that we can focus on the more violent cases and try those cases.  If Judge Green was on the call, she would tell the Court that we can't try the cases or resolve the cases because the volume itself— with the four circuit court judges that exists and half of the docket being civil, and half of the docket being criminal—at best we can only try 26 cases a year.  Over the last probably four months, we've had five trials where we did not have enough jurors to have a venire panel large enough to move forward.  So what happened to those defendants, they were prioritized in the jail who had been there the longest . . . .  But we're trying to find that middle ground of accountability to the public and move the docket.  But we are consistently trying new things.  The sheriff's office sends the DA's office those people who have been there the longest.  We get that list every month and we try those cases—try to push those cases.  We don't control what gets tried.  We have not been able to say to the Court, "Hey, this is the case we want to try because the individuals has been there the longest."  We have seen instances where judges prioritize those cases whenever possible.  You saw the mental exams is an issue.  The autopsies and violent crimes are an issue because they won't accept the plea offers because we can't try the case.  So those are just the challenges that we are looking at, but we do think it is a capacity issue.  I believe I heard the Court say, you know, they have to try and get with these special judges

up in the Supreme Court, but we need more circuit court judges that are fully staffed in Hinds County if we're ever going to get to the bottom of this thing, and we are currently going to continue trying to lobby and take that—and make that case and make that message clear that this one-time appointment, or one retired judge helping with some appeals is not what we need to fix this problem.

And we've been trying this, Your Honor, for two legislative sessions. This year we got some traction. We've been told that if we can show that we are responsible with the resources and we can make a dent, that we're going to see something happen there.

Transcr. Vid. Conf. (Apr. 27, 2021) [87] at 77-80.

Hinds County is governed by a five-person Board of Supervisors. The current Board members took their seats effective January 6, 2020,[2] and are as follows: Robert Graham (District 1), David L. Archie (District 2), Credell Calhoun (District 3), Vern O. Gavin (District 4), and Bobby "Bobcat" McGowan (District 5).[3] Three of the five board members were new to the Board in January 2020.[4] A majority of the current Board was not in place at the time the Consent Decree [8-1] was entered on July 19, 2016.

While conditions at the detention facilities may not be ideal, it is not for lack of effort from the Board to respond to those conditions. An examination of the Board's minutes reveals a constant commitment to the betterment of conditions at the County's detention facilities. *See* Bd. Minutes Feb. 1, 2021 [Def. Ex. 56] at 5 (reviewing bid for inmate medical services at $239,583 per month); Bd. Minutes Apr. 5, 2021 [Def. Ex. 62] at 15 (committing funds for the purpose of complying with the Consent Decree. Bd. Minutes Apr. 19, 2021 [Def. Ex. 61] at 5 (approving application for $250,000 grant to maintain compliance with Prison Rape Elimination Act); Bd.

---

[2] *See generally* Minutes, Jan. 6, 2020 Regular Meeting of the Hinds County Board of Supervisors, available at  https://www.co.hinds.ms.us/pgs/BoardMinutes/docs/January%206,%202020.pdf (last visited Feb. 7, 2022).

[3] *See* Board of Supervisors, http://www.hindscountyms.com/elected-offices/board-of-supervisors (last visited Feb. 7, 2022).

[4] *See id.*

3

Minutes May 3, 2021 [Def. Ex. 65] at 10 (approving an agreement for renovations and repairs at the detention facilities at cost of $595,491; approving an amendment regarding the planning for new detention facility); *id.* at 11 (approval to hire HD Lang and Associates to complete an additional detention facility survey); *id.* at 12 (approving $2,485,440 per year contract through May 2024 to provide physician and related healthcare services to detainees in Hinds County); Bd. Minutes July 6, 2021 [Def. Ex. 70] at 5 (discussing potential remedies for the loss of detention officers at Henley-Young); Bd. Minutes July 19, 2021 [Def. Ex. 68] at 11 (approving renewed and extended emergency declaration for adult detention centers); *id.* at 13 (approving contract for $36,500 for detention center repairs; approving proposal for roofing repairs at Henley-Young at a cost of $65,250; approving a quote for cell safety padding at RDC at cost of $57,400);  Bd. Minutes Sep. 7, 2021 [Def. Ex. 74] at 15 (approving fire alarm services at Henley-Young; approving preventative maintenance services for HVAC system at the Work Center and Henley-Young); Bd. Minutes Sep. 20, 2021 [Def. Ex. 72] (approval of immediate ceiling repairs at the RDC at a cost of $61,890); Bd. Minutes Oct. 12, 2021 [Def. Ex. 50] at 1 (approving 5% pay increase for Hinds County detention officers); Bd. Minutes Oct. 18, 2021 [Def. Ex. 51] at 4 (approving contract to provide interpretive services for deaf detainees; approving entry into memorandum of understanding with surrounding agencies to render mutual aid and assistance to the County for shakedown and large-scale operations when needed); *id.* at 19 (approving 5% raise for detention center personnel);  Bd. Minutes Nov. 1, 2021 [Def. Ex. 53] at 3-4 (approving amendment to medical contract to include one mental health nurse practitioner, and one medical nurse practitioner); Bd. Minutes Nov. 15, 2021 [Def. Ex. 54] at 12 (approving contract to include four additional medical professionals).

In June 2021, the County hired Major Kathryn Bryan to serve as the Detention Administrator for the RDC.  Bryan Decl. [105-1] at ¶ 3.  Major Bryan's first day at RDC was July 19, 2021, but after contracting COVID-19, Major Bryan did not effectively begin her position as Detention Administrator until August 9, 2021.  *See id.*  After Sheriff Lee Vance succumbed to COVID-19 on August 4, 2021,[5] Sheriff Tyree Jones was elected Sheriff of the County and sworn in on December 3, 2021.[6]  Like the majority of the Board, Sheriff Jones was not in office in 2016 when the Consent Decree [8-1] was entered, nor was he in office in 2020 when the Stipulated Order [60-1] was entered.

Consistent with the requirements of the Stipulated Order [60-1],[7] the County contracted with Benchmark Construction and CDFL Architects and Engineers to provide construction management and quality control services to the County.[8]  Benchmark and CDFL have not only provided management and oversight of the County's vendors as those vendors make required renovations to RDC,[9] but have also assisted the County in developing a master plan that includes construction of a new detention facility.  *See* Final Jail Master Plan [Def. Ex. 133].  The Board has considered and approved the construction of this new facility, and the County has begun arranging financing for each phase of this project and moved forward with initial site preparation for the new detention center.

---

[5] *Hinds County Sheriff Lee Vance's death is coronavirus related, coroner says*, CLARION LEDGER, Aug. 5, 2021, available at https://www.clarionledger.com/story/news/local/2021/08/05/hinds-county-sheriff-died-covid-19-complications/5495795001/ (last visited Feb. 7, 2022).

[6] *Hinds County Sheriff Tyree Jones sworn into office 10 days after winning run-off election*, CLARION LEDGER, Dec. 3, 2021, available at https://www.clarionledger.com/story/news/2021/12/03/tyree-jones-officially-becomes-hinds-county-sheriff-dec-3/8855000002/ (last visited Feb. 7, 2022).

[7] *See* Stipulated Order [60-1] at 2-3.

[8] *See* Decl. Gary Chamblee [105-2] at ¶ 3.

[9] *See id.* at ¶¶ 3-9.

PD.36703291.1

In the interim, and until the new detention center is completed, RDC remains the primary detention center for the County and the County has gone to great lengths to renovate the RDC. To that end, Benchmark has renovated the four living units on B Pod at RDC, including preparation of the units for direct supervision. Decl. Gary Chamblee [105-2] at 1, ¶ 4. Fire hoses have been reinstalled in all three pods at RDC, fire alarm cabling has been installed in B Pod, and Benchmark is overseeing the fire alarm installations in C Pod. *Id.* at 1-2 ¶ 5. Further, Benchmark has installed detention-grade light fixtures in B Pod to prevent detainees from creating sparks with fixture wiring. *Id.* at 2, ¶ 6. And Benchmark has overseen the refurbishment of all doors going from RDC's Great Hall into the three pods, all doors leading into the living units in all of the pods, all recreation doors, and all cage doors. *Id.* at 2, ¶ 7. Moreover, all sliding doors in units B-3 and B-4 have been replaced with swinging doors, and cell doors in units C-1, C-2, C-3, and C-4 have been reinforced. *Id.* Control panels for electronic door locks in B Pod, C Pod, and central control have been replaced. *Id.*

Further, since August 2021, myriad improvements have been made at RDC. For example, RDC now has a new and updated staffing plan under which the RDC is to be staffed for direct supervision. Decl. Major Bryan [106] at 2, ¶ 5. New cadet hires now undergo a four-week training process. *Id.* at 2, ¶ 6. In addition to staff recruiting and retention efforts, the County has reallocated and repurposed existing staff at RDC to increase efficiency of operations. *Id.* at 3, ¶ 10. Further, in efforts to transition RDC to operate as a direct supervision facility, "the County has devoted resources to renovating the living units at the facility in an effort to set those units up for direct supervision." *Id.* at 3, ¶ 11. Additionally, a new electronic rounds system will allow command staff to identify officers not conducting their rounds. *See id.* at 3-4, ¶ 12. A new Health Services Administrator was assigned to RDC in August 2021 and the County renegotiated a contract with

Quality Correctional Healthcare to allow RDC to have a full-time mental health nurse practitioner and an additional mental health practitioner and medical practitioner. *Id.* at 4, ¶ 14.

The County is also constructing a mental health living unit to provide RDC with a dedicated space for detaining individuals with serious mental illness. *Id.* at 4, ¶ 16. Weekly interdisciplinary team meetings have been implemented to assess detainees with mental health issues and coordinate efforts to provide care and security for those detainees. *Id.* at 5, ¶ 17. Further, in addition to constructing two padded rooms to minimize the risk of suicides, medical staff no longer discharges detainees from suicide watch directly into living units, opting instead for a step-down system that incorporates medical observation. *Id.* at 5, ¶ 18. To combat the introduction of contraband into the facility, staff caught attempting to bring in contraband have been fired and referred to the authorities and the County now has two investigators dedicated to RDC. *Id.* at 6, ¶ 19. To lessen the risk of holding detainees adjudicated "not-guilty" at RDC, the County is working with a third party contractor to establish a remote communications platform, which will allow detainees greater access to their attorneys in a private, secure setting. *Id.* at 7, ¶ 24.

## II.     The Consent Decree and Stipulated Order

The United States filed suit against Hinds County, the Hinds County Board of Supervisors, and Victor Mason, in his official capacity as Sheriff, on June 23, 2016. Compl. [1]. In its complaint, the United States alleged that the County "subjected prisoners . . . to [an unconstitutional] systematic pattern or practice of conditions of confinement" and likewise "exhibited deliberate indifference to the life, health, and safety" of the prisoners in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution. Compl. [1] at 6. That same day, the parties jointly moved for entry of a Settlement Agreement [2, 3], which the Court granted on July 19, 2016. Order [8]. The parties entered into the sixty-four page, 167-requirement Consent Decree

to address "constitutional violations alleged by the United States" and to provide court-enforced prospective relief at "The Hinds County Adult Detention Center ('HCDC') [aka RDC] and Work Center ('Farm') in Raymond, Mississippi, and the Jackson Detention Center ('JDC') in Jackson, Mississippi . . . ." Consent Decree [8-1] at 4-5; *see also* Stipulated Order [60] at 1.

The Consent Decree grants prospective relief regarding conditions of confinement and mandates the County to adhere to numerous policies and provisions imposed through the Consent Decree. Consent Decree [8-1]. The Consent Decree created a monitoring team. Consent Decree [8-1] at 54-55. Until the week of January 24, 2022, the monitoring team and the United States had not set foot in RDC in over nineteen (19) months. The United States filed a motion for an order to show cause in June 2019. Mot. to Show Cause [30]. In its motion, the United States highlighted that the County "transition[ed] all youth to the Henley-Young Juvenile Detention Center."[10] *Id.* at 7. In that vein, the parties entered into the Stipulated Order [60-1] on January 16, 2020 that devised a "remedial plan for Hinds County to get on a path to compliance." Stipulated Order [60-1] at 10.

The monitoring team has now issued a total of fifteen (15) reports. *See* 15th Monitoring Report [101]. In its fifteenth report, the monitoring team found the County in at least partial compliance with nearly seventy (70%) of the Consent Decree's policies and provisions—a far cry from the monitoring team's first visit. 15th Monitoring Report [101] at 23.

## III.    The Show Cause Order and Hinds County's Motion to Terminate

On November 23, 2021, the Court *sua sponte* entered an order directing Hinds County to "show cause and explain why it should not be held in civil contempt and why a receivership should not be created to operate RDC. A hearing will be scheduled shortly thereafter." Show Cause Order [100] at 28. The County responded to the Show Cause Order on December 14, 2021.

---

[10] Henley-Young is subject to another consent decree of this Court. *See J.H. v. Hinds County*, 3:11-CV-327-DPJ-FKB (S.D. Miss.) [145].

Response [105].  On January 21, 2022, the County filed its Motion to Terminate the Consent

Decree.  [112].  The United States responded on January 27, 2022, [114], and the County filed its

reply on January 31, 2022.

On February 4, 2022, before the hearing on the Show Cause Order scheduled for February

14, 2022, the Court found that, "[b]ased on the facts contained in the Fifteenth Monitoring Report,"

the County "failed to comply" with thirty (30) provisions of the Consent Decree and held the

County in contempt of the Consent Decree.  First Contempt Order, [126] at 20-27.  The Court

reserved judgment as to whether to hold the County in contempt for fifty-nine (59) provisions of

the Consent Decree that the monitoring team found it was in partial compliance with.  *Id.*  A

hearing on the Motion to Terminate began on February 14, 2022.

## PROPOSED CONCLUSIONS OF LAW

### I.   Legal Standard

"[P]rison officials must maintain their facilities consistent with the restrictions and

obligations imposed by the Constitution."  *Lewis v. Casey*, 518 U.S. 343, 365 (1996) (Thomas, J.,

concurring).  To that end, the Prison Litigation Reform Act (PLRA) prevents federal courts "from

providing more than the constitutional minimum necessary" when exercising control over state-

run prisons and detention facilities.  *Jones v. Gusman*, 296 F.R.D. 416, 429 (E.D. La. 2013) (citing

*Frazar v. Ladd*, 457 F.3d 432, 438 n.19 (5th Cir. 2006)).  Indeed, Congress enacted the PLRA to

"extricate [federal courts] from managing state prisons."  *Brown v. Collier*, 929 F.3d 218, 219 (5th

Cir. 2019); *Brown v. Plata*, 563 U.S. 493, 530 (2011) ("The PLRA states that no prospective relief

shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than

necessary to correct the violation of a federal right, and is the least intrusive means necessary to

correct the violation." (citing 18 U.S.C. § 3626(a))).

PD.36703291.1

To terminate the Consent Decree, the County must first prove the terminability of the Consent Decree by establishing that two (2) years have passed since the Court granted prospective relief.  18 U.S.C. § 3626(b)(1)(i) (instructing that prospective relief "shall be terminable" two years after the date the court granted the consent decree); Order [8] (implementing the Consent Decree on July 19, 2016).  Under 18 U.S.C. § 3626(b)(2), a defendant is also "entitled to the immediate termination" of the consent decree when, at the time the prospective relief was granted, the court fails to enter a finding that "the relief [was] narrowly drawn, extend[ed] no further than necessary to correct the violation of the Federal right, and [was] the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(b)(2).  While the County is entitled to the immediate termination of the Consent Decree by way of Section 3626(b)(2) because the Court never made the requisite findings regarding the narrowness, necessity, and intrusiveness of the prospective relief granted by the Consent Decree, Order [8], the ultimate termination of the Consent Decree still rests upon 18 U.S.C. § 3626(b)(3).  Section 3626(b)(3) shifts the burden to the party opposing termination—here, the United States—to prove (1) the existence of a "current and ongoing violation" of a federal right; (2) that the prospective relief "extends no further than necessary to correct the violation of the [f]ederal right;" and (3) that "the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

## II.   Discussion

### A.   Current and ongoing constitutional violations

"The Court must consider only those findings which reflect conditions as they exist at the time of its § 3626(b)(3) inquiry."  *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-633-CWR-FKB, 2015 WL 3795020, at *8 (S.D. Miss. June 10, 2015) (citing *Castillo v. Cameron County*, 238 F.3d 339, 353 (5th Cir. 2001)); *see Castillo*, 238 F.3d at 353 (explaining that, under the PLRA,

PD.36703291.1

the focus of courts is not on "conditions that existed in the past or [on] conditions that may possibly occur in the future").  Indeed, while "[i]nstantaneous snapshots are impossible[,]" "facts in close temporal proximity are probative[.]"  *Lancaster v. Tilton*, No. C-79-1630-WHA, 2007 WL 4570185, at *6 (N.D. Cal. 2007).

The United States argues that four types of "current and ongoing" constitutional violations exist across the County's facilities: conditions of confinement; inadequate medical care; use of excessive force; and unlawful detention.  For conditions of confinement, the DOJ specifically contends that there are pervasive violations related to (a) detainee safety, (b) segregation coupled with inadequate medical care, and (c) conditions of confinement at Henley Young.  Response [114] at 10-14, 16-18 (protection from harm); 18-20 (segregation); 20-24 (juveniles).

**Constitutional Standard.**  The constitutional rights of a convicted prisoner in state custody emanate from the Eighth Amendment's guarantee against cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and a pretrial detainee's rights arise from the due process guarantees of the Fourteenth Amendment, *Bell v. Wolfish*, 441 U.S. 520, 537-37 (1979). Regardless, the Fifth Circuit has consistently held that the Eighth Amendment's deliberate indifference standard applies equally to pretrial detainees traveling under the Fourteenth Amendment.  *E.g.*, *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021); *Hare v. City of Corinth*, 74 F.3d 663, 648-50 (5th Cir. 1996) (en banc); *Graham v. Hodge*, 69 F. Supp. 3d 618, 627 (S.D. Miss. 2014).

The Fifth Circuit recognizes two types of cases brought by pretrial detainees for violations of their Fourteenth Amendment rights: (a) cases for unconstitutional conditions of confinement and (b) cases for unconstitutional episodic acts or omissions.  *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020) (citing *Hare*, 74 F.3d at 644-45).  "Conditions of confinement" cases

challenge the constitutionality of pervasive, systemic policies implemented at the detention facility. *See id.* By contrast, cases involving episodic acts or omissions seek to redress harms arising from "the particular act or omission of one or more officials," rather than harms that result directly from an unconstitutional policy, practice, or rule of the facility. *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019) (citation omitted). "Conditions of confinement" is also a type of constitutional claim or violation. Other examples include excessive use of force and inadequate medical care. This case fits the mold of a "conditions of confinement" case that incorporate allegations of four types of alleged "current and ongoing" constitutional violations: (1) conditions of confinement; (2) inadequate medical care; (3) use of excessive; and (4) unlawful detention.

**Systemic Claims.** In order to succeed on their conditions of confinement case against Hinds County, the United States needs to show that the condition of confinement is "not reasonably related to a legitimate, non-punitive government objective." *Cadena*, 946 F.3d at 727. The Fifth Circuit has stated that " a condition may take the form of 'a rule,' a 'restriction,' 'an identifiable intended condition or practice,' or 'acts or omissions' by a jail official that are 'sufficiently extended or pervasive.'" *Id.* (quoting *Estate of Henson v. Wichita County*, 795 F.3d 456, 468 (5th Cir. 2015)). "In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas County*, 765 F.3d 456, 468 (5th Cir. 2015) (quoting *Hare*, 74 F.3d at 645). "Proving a pattern is a heavy burden, one that has rarely been met in [Fifth Circuit] caselaw. Further, to constitute impermissible punishment, the conditions must be one that is 'arbitrary or purposeless' or, put differently, 'not reasonably related to a legitimate goal.'" *Id.* (quoting *Bell*, 441 U.S. at 539). Altogether, then, the United States must prove:

(1) "a rule or restriction or the existence of an identifiable intended condition or practice or the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective"; and (3) "which caused the violation of the inmate's constitutional rights."

*Cadena*, 946 F.3d at 727 (cleaned up).

"This standard is 'functionally equivalent to a deliberate indifference inquiry,' . . . because, in a true jail conditions case, the plaintiff has shown either an official policy, intentionally adopted, or a series of 'acts or omissions . . . sufficiently extended or pervasive, or otherwise typical or pervasive misconduct by other officials, to prove an intended condition." *Shepherd*, 591 F.3d at 455 (citations omitted). "Only when the plaintiff has made such a showing may [we] reasonably presume that the government acted with the requisite intent to punish." *Id.*

Against this backdrop, the United States has made no attempt to prove the second element of the test, an element necessary for a conditions of confinement claim to succeed. *See Belcher v. Lopinto*, 492 F. Supp. 636, 657 (E.D. La. 2020). That is, the United States fails to demonstrate that a restriction or condition at the County's facilities is *not* reasonably related to a legitimate goal. *Garza*, 922 F.3d at 632. Moreover, the United States has failed to prove—pointing to specific acts or omissions by the County's jail officials—that a *de facto* policy, pattern, or practice "caused the violation of the [detainees'] constitutional rights." *Cadena*, 946 F.3d at 727. For these reasons, the United States cannot prove that there are any "current and ongoing" violations of the detainees' rights.

The United States contends that there are specific violations pervasive throughout the County's detention facilities relating to (a) detainee safety, (b) segregation coupled with inadequate medical care, and (c) conditions of confinement at Henley-Young. Response [114] at 10–14, 16–18 (protection form harm); 18–20 (segregation); 20–24 (juveniles). The Supreme Court

has acknowledged that while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), it also does not permit the existence of those that are inhumane. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, "the treatment [a detainee] receives in [a detention facility] and the conditions under which he is confined are subject to the scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

The Eighth Amendment inquiry rests on two requirements: the demonstration of a substantial risk of serious harm and deliberate indifference. *Farmer*, 511 U.S. at 834. When, as here, the alleged violations are supposedly systemic, "only those deprivations denying the minimal civil measure of life's necessaries are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal quotation marks and citation omitted). Thus, to prove a "current and ongoing," systemic constitutional violation, the United States must prove (1) a substantial risk of serious harm and (2) deliberate indifference that is pervasive throughout the County's facilities.

**Substantial Risk of Serious Harm.** A substantial risk of serious harm requires that the alleged harm be "sufficiently serious," *Hudson v. McMillan*, 503 U.S. 1, 21 (1992), which requires demonstration of "extreme deprivation of any minimal civilized measure of life's necessities." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (internal quotation marks and citation omitted). And the risk of serious harm must be a "substantial" risk that the alleged serious harm is likely to occur. *Id.* A majority of courts equate "substantial risk" with "pervasive conduct," rather than "isolated incidents," that results in a "real and proximate threat." *Lakin v. Barnhart*, No. 1:11-CV-332-JAW, 2013 WL 5407213, at *7–8 (D. Me. 2013) (collecting cases). "The possibility of harm is not equivalent to the substantial risk of harm." *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 80 (D. Me. 2013).

**Deliberate Indifference.**  To prove that the County was deliberately indifferent to a substantial risk of serious harm, the United States must prove the existence of (1) the County's awareness "of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the County actually "draw[ing] the inference."  *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc).  Deliberate indifference cannot be proven where the County "responds reasonably" to substantial risks to inmate health or safety, "even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 845 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."); *see also Whitley v. Hanna*, 726 F.3d 631, 652 n.2 (5th Cir. 2013) (Elrod, J. concurring) (explaining that deliberate indifference occurs when the defendant is guilty of "turning a blind eye").

a.  <u>Detainee Safety</u>

The United States alleges that because the County failed to fully implement the Consent Decree's protection-from-harm provisions and timely implement the Stipulated Order, the County has "caused, or contributed to, widespread, ongoing violence, death, assaults, suicides and other serious harm."  Response [114] at 12.  According to the United States, the "most troubling" statistic is the six deaths occurring in 2021.[11]  The six detainee deaths in 2021 are indeed troubling and the Court does not minimize the significance of even one detainee's death; but where only one of the six deaths that occurred in 2021 involved violence between detainees, such an isolated incident is not sufficient to prove a violation of a federal right.  *See Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1195 (D. Kan. 2008) ("Prison officials are not, however, expected to prevent all inmate-on-inmate

---

[11] The Fifteenth Monitoring Report indicates that a seventh, medically-related death occurred in November 2021.  15th Monitoring Report [101] at 4 (describing an inmate who died of cancer while hospitalized on November 15, 2021).

PD.36703291.1

violence." (citing *Farmer*, 511 U.S. at 844)).  Rather than turning a "blind eye" to the detainee's death, the County reasonably responded to the detainee's death by reviewing the underlying facts and circumstances that led to the detainee's death and terminated the employment of staff members responsible for supervising the detainees involved.  *See Whitley*, 726 F.3d at 652 n.2 (Elrod, J. concurring); Reply [116] at 5.

Next, the United States references the monitoring team's description of assaults as occurring at a "high rate."  Particularly, the United States highlights thirteen (13) assaults in July 2021, twelve (12) assaults in September 2021, and ten (10) assaults in October 2021.  Response [114] at 13–14.  These assaults must be reviewed in light of the County's system as a whole.  *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 889 (S.D. Tex. 1999), *rev'd on other grounds*, *Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001) ("[W]hether evidence rises to a level of system-wide violations is based on a finding of a persistent pattern as determined by the logical evaluation of the trial judge."); *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (holding that "isolated incidents" are insufficient).  With a detainee population at RDC of around 400, this downward trend in assaults— not all of which involve assaults on inmates—seriously calls into question the pervasiveness of detainee-on-detainee violence in the County's facilities and, therefore, does not constitute a substantial risk of serious harm to detainees.  *Farmer*, 501 U.S. at 833–34 (noting that while it is settled that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners," it is equally settled that not "every injury suffered by one prisoner at the hands of another [prisoner] translates into constitutional liability for prison officials responsible for the victim's safety").

The United States additionally points to fires, problems with electrical systems, malfunctioning doors, and contraband infiltration as current harms constituting substantial risks of

serious harm that "will not only continue, but undoubtedly increase, without the Consent Decree." Response [114] at 13; *cf. Cason v. Seckinger*, 231 F.3d 777, 783 (11th Cir. 2000) ("Congress intended 'current and ongoing' to mean a presently existing violation, *not a potential, or even likely, future violation.*" (emphasis added)). However, even assuming these alleged incidents and conditions amount to substantial risk of serious harm, the Eighth Amendment only requires the County to respond reasonably to abate substantial risks of serious harm of which the staff is aware, which the County has done. *See, e.g.*, Decl. Gary Chamblee at 1-2 ("With respect to fire safety at the facility, Benchmark can verify that vendor has completed the reinstallation of fire hoses throughout all three pods . . . . Fire alarm cabling also have been installed . . . . Benchmark also can verify the installation of detention-grade light fixtures . . . to help prevent detainees from . . . create[ing] sparks."); *see id.* at 2 ("Benchmark has overseen the refurbishment of all doors at the following points, with correct locking mechanisms being installed and each door being converted to a swinging door . . . ."); Quality Assurance Report Dec. 2021 at 17 ("In December, two employees were arrested and subsequently terminated for bringing in contraband. The contraband eradication procedures previously introduced by the Detention Administrator appear to be working at RDC . . . .").[12] Whether harm is ultimately averted is of no moment. *See Farmer*, 501 U.S. at 844.

Furthermore, the United States focuses on the County's alleged failures to comply with provisions in the Consent Decree regarding recordkeeping, investigation, and reporting

---

[12] Further contributing to delays in achieving swift compliance with the sweeping Consent Decree is that "a requisition has to be completed and forwarded to the Board of Supervisors for approval before the purchase of any items or materials and the commencement of repairs." Quality Assurance Report at 6; *see* MISS. CODE ANN. § 31-7-13, *et seq.* (detailing the County's state-mandated process for procurement or "requisition"); Hinds County Purchasing Requirements, available at www.hindscountyms.com/departments/purchasing (last visited Feb. 9, 2022). Despite these hurdles, the County has managed to implement reasonable responses to potential substantial risks of serious harm.

17

requirements.  But the United States does not explain how any of the alleged failures of these reporting systems have actually caused a substantial risk of serious harm as it relates to sexual abuse, misconduct, use of force, the grievance system, and use of force reports.  *See* Response [114] at 12–18.  Even assuming that recordkeeping, reporting, and investigation shortfalls culminate into a substantial risk of serious harm to detainees, once again, the United States has not shown that the County has been deliberately indifferent to the problems at the County's facilities related to sexual assault.  Nor has the United States argued that these conditions are not reasonably related to a legitimate goal.  While it is the United States' burden to make these showings, the United States does not allege that the County was aware that any detainee that fell victim to sexual misconduct faced a risk of serious harm.  And without the above, the United States' system-wide, inmate-safety claims fail.  *See Escobedo v. Garza Cnty. Sheriff's Dep't*, No. 5:16-CV-16-BQ, 2017 WL 6759136, at *6 (N.D. Tex. Oct. 23, 2017) ("Absent factual allegations showing Defendants were subjectively aware that [the plaintiff] faced a risk of serious harm, [the plaintiff] cannot plead a cognizable constitutional claim for failure to protect." (citing *Brown v. Harris County*, 409 F. App'x 728, 731 n.7 (5th Cir. 2010))).

Furthermore, assuming a showing of substantial risk of serious harm, the United States does not account for reasonable responses taken by the County to avert sexual-assault risks.  For instance, the County has contracted with Benchmark Construction to better equip the RDC facility, which in turn aids in preventing sexual abuse.  Further, "[n]ursing staff continue to be involved in the screening of newly admitted detainees in an attempt to identify those who may be sexually abusive or at risk of sexual victimizations as part of the intake screening process, and new admissions so identified are referred to the PREA officer."  15th Monitoring Report [101] at 71.  And "if a detainee alleges having just been raped, the detainee is immediately sent to the hospital

emergency room for a full, forensic medical assessment, which includes the use of a rape kit." *Id.*
at 72.  In the absence of the County's PREA officer, "both medical and mental health staff have
continued to identify PREA-related cases and provide . . . services to such identified individuals[.]"
*Id.*  Clearly, the County has undertaken reasonable responses to any substantial risk of serious
harm caused by sexual misconduct; as a result, United States has failed to allege a current and
ongoing constitutional violation.

The United States also points to staffing troubles at RDC as a point of failure for the County
related to protection from harm.  Mississippi does not have its own minimum wage; instead, it falls
back on the federal default rate of $7.25 per hour.[13]  Despite this barrier to staffing the County's
detention facilities, in November 2021, the County implemented a five percent (5%) raise for its
staff.  *See* Quality Assurance Report Dec. 2021 at 16.  The County has also moved away from two
twelve (12) hour shifts per day in favor of three eight (8) hour shifts per day.  *Id.* at 2.  To the
extent understaffing has led to a substantial risk of serious harm, the County's pay raise and shift
policy change are certainly reasonable responses to that risk.

### b.  Segregation and inadequate medical care

Next, the United States argues that the Consent Decree's provisions "implement the Eighth
Amendment's requirement that jails provide medical and mental healthcare sufficient to meet
detainees' serious medical and mental health needs" and that the County's failure to comply with
the Consent Decree has resulted in suicides and puts detainees at substantial risk of serious harm.[14]

---

[13] *See Mississippi Minimum Wage for 2021, 2022*, available at https://www.minimum-wage.org/mississippi
(last visited Feb. 8, 2022).
[14] The constitutional standard for the conditions-of-confinement and inadequate-medical-care claims is the
same.  *E.g.*, *Helling*, 509 U.S. at 32 ("Whether one characterizes the treatment received by [the prisoner]
as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, it
is appropriate to apply the 'deliberate indifference' standard articulated in [*Estelle*, 429 U.S. 97 at 104]."
(first alteration in original) (citation omitted)).

PD.36703291.1

Response [114] at 19.  Specifically, while acknowledging the County's implementation of weekly interdisciplinary team meetings to review detainees in segregation, the United States argues that the review does not result in more appropriate housing since none exists due to the lack of a mental health unit.  *Id.*  Further, the United States cites inadequate coordination between, and insufficient training of, mental health and staff leads to a substantial risk of serious harm to detainees.  Finally, the United States alleges that detainees missed medication, appointments, and therapy sessions as a result of inadequate staffing.  *Id.* at 20.

The United States has failed to describe in detail how any of these conditions of confinement place detainees at a substantial risk of serious harm, or that the conditions are arbitrary or purposeless.  Without doing so, the United States has failed to carry its burden to prove constitutional violations related to segregation and inadequate medical care.  *See, e.g.*, *Estate of Henson*, 795 F.3d at 465-70.

Pointing to sporadic instances of suicides are not enough—the United States must demonstrate *pervasive* constitutional violations to establish a substantial risk of serious harm. While the Consent Decree's provisions regarding the conditions of confinement for detainees suffering from mental health-related issues may "be a valuable way of preventing the deterioration of a segregated inmate's mental health, . . . the Eighth Amendment does not require the most effective solution."  *Rasho v. Jeffreys*, Nos. 19-1145, 19-1975, & 19-1978, 2022 WL 108568, at *7 (7th Cir. Jan. 12, 2022) (citation omitted).  Indeed, the Court must be careful not to conflate "what is constitutionally *adequate* . . . with what is constitutionally *required*."  *Id.* at *6 (emphasis in original) (citation omitted).

Moreover, even if there is a substantial risk of serious harm to detainees facing mental health issues, the County has been far from deliberately indifferent to that risk.  *E.g.*, *Haynes v.*

*Bradley*, No. 5:18-CV-CWR-MTP, 2020 5032047, at *2 (S.D. Miss. July 17, 2020) ("Deliberate indifference 'is an extremely high standard to meet.'" (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006))).  For example, the County has implemented reasonable responses to potential substantial risks of serious harm related to mental healthcare at the RDC, including the addition of a new health services administrator.  Decl. Major Bryan [106] at 4, ¶ 14.  The County also now has a full-time mental health nurse practitioner and an additional mental health practitioner and medical practitioner.  *Id.*  The RDC's administrators have further worked with a national, certified mental health professional to develop intensive training sessions, while at the same time increasing collaboration between medical and mental health staff and detention staff which has improved security for, and reduced turnover of, medical and mental health staff.  *Id.* at 4, ¶ 15.

The County is also constructing a dedicated mental health living unit to house detainees with serious mental illness, with forthcoming mental health office space directly next to the new unit.  *Id.* at 4-5, ¶ 16.  And along with weekly interdisciplinary team meetings implemented in August 2021, RDC staff are able to better assess detainees with mental health issues and coordinate efforts to provide care and security for those detainees, which is geared toward addressing suicide risks.  *Id.* at 5, ¶ 18.  Moreover, the County is constructing two padded rooms that will be used to monitor and control detainees presenting risks of suicide and, as of September 2021, detainees at risk of suicide are no longer discharged from suicide watch directly back into the regular living units without medical staff evaluations.  *Id.* at 5, ¶ 18.

### c.   Juvenile detention at Henley-Young

The United States next alleges that there are "current and ongoing" conditions-of-confinement violations regarding juvenile detainees at Henley-Young.  Response [114] at 20-24.  But Henley-Young was not subject to the original Consent Decree.  *See generally* Consent Decree

[8-1].  Indeed, Henley-Young is mentioned once in the Consent Decree: "the County will consult with the United States, the monitor of Henley Young Juvenile Detention Center consent decree, and any other individuals or entities whose input is relevant."  Consent Decree [8-1] at 36.  Henley-Young was already under its own consent decree in 2016, and it remains governed by that consent decree.  *See J.H. v. Hinds County*, 3:11-CV-327-DPJ-FKB (S.D. Miss.) [145].

Even assuming the Court somehow has jurisdiction to rule on alleged constitutional violations at Henley-Young in its decision on the County's Motion to Terminate, the United States has still not demonstrated the existence of current and ongoing constitutional violations.  In a nutshell, the United States blanketly alleges that because the County has never met the staffing requirements of the Consent Decree, the County has placed youth into an ongoing substantial risk of serious harm.  Response [114] at 22.  The United States does not, however, causally connect the County's staffing issues with any conditions-of-confinement constitutional violation.  The United States therefore fails to meet its burden.

### d.  Use of excessive force

In addition to allegations regarding conditions of confinement and inadequate medical care, the United States alleges that the County has created systemic violations related to the use of excessive force by its staff on detainees.  Response [114] at 15-16.  Under the Eighth Amendment, a pretrial detainee is protected form use of force constituting punishment.  *Williams v. Rushing*, No. 3:17-CV-508-LRA, 2019 WL 4739690, at *2 (S.D. Miss. Sept. 27, 2019).  Contrary to the subjective deliberate indifference standard governing conditions-of-confinement and inadequate-medical-care claims, "[t]he standard for a pretrial detainee's excessive force claim is a solely objective one."[15]  *Id.* at *3 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *Welsh*

---

[15] In *Kingsley*, the Supreme Court held that courts must apply an objective test to excessive force claims brought by pretrial detainees.  One year after *Kingsley* handed down, the Ninth Circuit extended *Kingsley*'s

*v. Correct Care Recovery Sols.*, 845 F. App'x 311, (5th Cir. 2021) (same); *Velazquez v. Baker*, No. 5:20-CV-78-BQ, 2021 WL 812505, at *5 (observing that *Kingsley* abrogated "lower courts' application of Eighth Amendment excessive force standards from *Hudson v. McMillian*, 503 U.S. 1 (1992) to pretrial detainees"). Still, in a PLRA case, which contemplates systemic violations, the excessive-force violations must establish an unconstitutional pattern or practice, not reasonably related to a legitimate goal, of the use of excessive force across the County's facilities.

But the United States has not alleged any actions by the County's staff that culminate in system-wide violations related to excessive force. Instead, the United States identifies two incidents: an investigator's use of a taser on a prone detainee and a staffing failure to properly identify a use of force incident after a sergeant used OC spray on a detainee. Response [114] at 15. To the United States, these *two* examples of use of force "illustrate broader patterns" regarding the County's ability to identify and investigate incidences of uses of force. *Id.*

The United States' position, however, disregards the long-standing precept that detention facilities are "inherently dangerous places." *Weeks v. Warden*, No. 15-C-5234, 2017 WL 3404965, at *5 (N.D. Ill. Aug. 7, 2017) (citation omitted); *see Wilson*, 501 U.S. at 302 ("Where . . . officials act in response to a prison disturbance, their actions are necessarily taken 'in haste, under pressure,' and balanced against 'competing institutional concerns for the safety of prison staff or other

---

objective standard to a pretrial detainee's claim for failure to protect. *See Castro v. County of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016). The Fifth Circuit, however, has declined to follow the Ninth Circuit's lead. For instance, the Fifth Circuit affirmed the holding of the en banc court in *Hare v. City of Corinth*, which applies a "subjective deliberate indifference" standard to all failure to protect claims, regardless of whether the plaintiff is a pretrial detainee or a prisoner, and noted that the Ninth Circuit, at the time, was the only circuit to have extended *Kingsley* to a pretrial detainee's failure to protect claims. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 & n.4 (5th Cir. 2017); *see also Robertson v. Gautreaux*, No. 16-341-JJB-RLB, 2017 WL 690542, at *3-5 (M.D. La. Feb. 21, 2017) (discussing the *Kingsley*, *Castro*, and *Hare* cases and applying *Hare* standard to a detainee's failure to protect claim). Accordingly, this Court will apply an objective standard to the excessive-force claims, but a subjective standard to the conditions-of-confinement claims.

inmates.'" (quoting *Whitley*, 475 U.S. at 320)); *Stanley v. Hejirka*, 134 F.3d 629 (4th Cir. 1998). And while the County acknowledges that a pretrial detainee's status is not synonymous to convicted prisoner's status, "use of force is not only a justified, but also a necessary, tool in the quest to maintain an institution's order, or a guard or [detainee's] safety." *Ruiz*, 37 F. Supp. 2d at 929. Stated differently, the United States must do more than merely critique the use of force at the County's facilities; it must prove specific facts demonstrating that unconstitutionally excessive force is being used pervasively throughout the RDC and the Work Center.[16] It has not done so.

Moreover, the record makes clear the County has not ignored its detention staff's uses of force. For example, use of force "training now includes a continuum of appropriate force responses to escalating situations, de-escalation tactics, and defensive tactics[,]" [101] at 60, and in December 2021, the County began further training detention officers to better handle detainees with mental health issues. With respect to reporting when staff has been required to use force, the County has engaged in efforts to train staff to improve the quality of use of force reports. *See id.* at 61, 62. Moreover, once detention staff use force, the record demonstrates that detention staff involve medical staff through post-force medical examinations. *See id.* at 59. Finally, classification staff, mental healthcare staff, and detention meet on a weekly basis to asses detainees with mental health issues and coordinate their efforts to provide security for those detainees. Decl. Major Bryan [106] at ¶ 17. So, even if the United States had proven system-wide, pervasive excessive use of force, the County has not been deliberately indifferent to any excessive uses of force.

---

[16] In fact, the Work Center's operations demonstrate the complete lack of pervasiveness relative to the alleged substantial risks of serious harm of which the United States complains. "The Monitoring Team describes the Work Center as a functional jail for the citizens of Hinds County. [] This Court's own visit to the three facilities in 2019 confirms that something about the Work Center's culture is effective; it largely operates as a jail should." Show Cause Order [100] at 8.

PD.36703291.1

e.  Untimely release of detainees

The last "current and ongoing" constitutional violation alleged by United States relates to the detainees' untimely release from the County's facilities.  Response [114] at 24–26.  Although "a [detainee] has a Fourteenth Amendment due process right to timely release from [jail]," *Traweek v. Gusman*, 414 F. Supp. 3d 847, 863 (E.D. La. 2019) (citing *Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968)), the United States' arguments to this point are nothing more than conjecture.  In its brief, the United States discusses two instances in which the monitoring team "discover[ed]" detainees' untimely releases.  Response [114] at 26.  According to the United States, "[t]hese unlawful detentions, and substantial risk of unlawful detentions, *will continue and increase* without the Consent Decree."  Response [114] at 25 (emphasis added).  But as the Eleventh Circuit noted in *Cason v. Seckinger*, "Congress intended 'current and ongoing' to mean a presently existing violation, *not a potential, or even likely, future violation*."  231 F.3d at 783 (11th Cir. 2000) (emphasis added) (cited by *Castillo* and *Depriest*, 2015 WL 3795020 (S.D. Miss. June 10, 2015)).

Assuming, *arguendo*, that a pervasive violation could be established by the two incidents cited by the United States, the monitoring team's most recent report describes that "there has been significant improvement in the quality of the records, the accuracy of the JMS system, and the presence of paperwork supporting booking and detention," and "[t]here continue to be improved systems in place to track individuals and release them timely."  15th Monitoring Report [101] at 110.  Furthermore, a meeting held on January 27, 2022 between Erika Scott, RDC's court liaison, the Monitor, and counsel for the County and United States, signaled that marked improvements have been made regarding issues with untimely detainee releases.  For example, Scott affirmatively stated that she has a robust system in place for ensuring RDC has sufficient

paperwork to hold detainees and that detainees are not held without an initial appearance.  Further, Scott indicated at the meeting that, in the past two months, no detainees were held longer than they should be.  Additionally, the County "has been working on outstanding policies including the policy on Releasing which would address" issues related to releasing individuals who are adjudicated not guilty.  *Id.* at 117.  In light of these developments occurring in the relevant timeframe—at the time the Motion to Terminate was filed—there is not a current and ongoing substantial risk of serious harm related to untimely detainee releases.

Finally, perhaps the most important example of the County's beyond-reasonable responses to each of the aforementioned violations is its plan to construct a new facility and to completely phase out the RDC by 2025.  *Cf. Huerta v. Ewing*, No. 2:16-CV-397-JMS-MJD, 2018 WL 4922038, at *8–9 (S.D. Ind. Oct. 10, 2018) (recognizing construction of a new jail as a long-term solution to alleviate constitutional rights violations).  This multi-million dollar commitment further shows that the County has been far from deliberately indifferent to any substantial risks of serious harm.

### B.      Narrowness-need-intrusiveness test

Though the Court holds today that the United States has failed to prove current and ongoing constitutional violations at the County's facilities, the Court briefly addresses the parties' arguments regarding the "narrowness-need-intrusiveness" test.  *See Guajardo v. Tex. Dep't of Crim. Justice*, 363 F.3d 392, 394 (5th Cir. 2004) (per curiam).  To prevail on this element, the United States must prove that the relief granted by each provision of the Consent Decree: (1) remains necessary to correct a current and ongoing violation of the detainees' rights; (2) extends no further than necessary to correct the identified violation; and (3) is narrowly drawn and the least intrusive means necessary to correct the identified violation.  18 U.S.C. § 3626(b)(3).

Attempting to shoulder this burden, the United States rests solely on the County's noncompliance with the Consent Decree and its stipulations entered into by the parties. "As a general rule, a stipulation is a judicial admission binding on the parties making it, absent special considerations." First Contempt Order [126] at 13 (internal quotation marks omitted) (quoting *Vallejos v. C. E. Glass Co.*, 583 F.2d 507, 510 (10th Cir. 1978)). And while "[c]ourts have every right to rely upon stipulations," [126] at 14, the County's stipulations in the Consent Decree and the Stipulated Order regarding the provisions' narrowness, need, and intrusiveness speak only to the past characteristics of those provisions; the same stipulations have no bearing on the Court's inquiry today: whether those provisions are still narrow, necessary, and the least intrusive means of preventing violations of federal rights. The Court has found that the County to date has failed to comply with multiple provisions of the Consent Decree. First Contempt Order [126] at 20-27. But the relevant inquiry is not whether the County is in compliance with the Consent Decree. Rather, under the PLRA, the United States must prove that the decree's specific policies are currently necessary. *See, e.g.*, *Hadix v. Johnson*, 228 F.3d 662, 673 (6th Cir. 2000).

Indeed, the Fifth Circuit has made clear that it is "not enough under § 3626(b)(3) that orders, when entered, were sufficiently narrow considering the violations that existed at the time." *Castillo*, 238 F.3d at 353-54. The Court must make "new findings" about whether the relief currently complies with the PLRA's requirements given the nature of the current and ongoing violations. *See id.* at 354; *Cason*, 231 F.3d at 783-85. This requires "particularized findings, on a provision-by-provision basis, that each requirement imposed by the consent decree [] satisfies the need-narrowness-intrusiveness criteria." *Ruiz*, 243 F.3d at 950 ("[This] procedure . . . is mandated by § 3626(b)(3) and cannot be circumvented by a mere recitation of the key statutory language."). Because the United States has offered nothing more than citations to stipulations regarding the

27

"narrow-need-intrusiveness" test, even assuming the Court were to find that there was a substantial risk of serious harm that the County was deliberately indifferent to, the Court must still terminate the Consent Decree.  *See id.* (explaining that if the plaintiff fails to prove the requirements of § 3626(b)(3), then the district court should terminate the relief).

Further, with respect to the Work Center, the United States has not alleged a current and ongoing constitutional violation.  Indeed, as the Court already noted, the monitoring team "describes the Work Center as a functional jail for the citizens of Hinds County[,]" and the "Court's own visits to the facilities confirms that the Work Center largely operates as a jail should." First Contempt Order, [126] at 6.  It should therefore go without saying that any provisions of the Consent Decree directed at the Work Center would not meet the "need-narrowness-intrusiveness" test.

The same is true for the Henley-Young facility.  As noted by Hinds County, there is a consent decree currently in place over that facility.  *See J.H. v. Hinds County*, 3:11-CV-327-DPJ-FKB (S.D. Miss.) [145].  Doubling-down on the Henley-Young facility by requiring two consent decrees to control cannot and does not pass muster under the need-narrowness-intrusiveness test. The decree is terminated to the extent it possesses control over Henley-Young.

Finally, the record demonstrates that detainees are no longer housed at the County's downtown facility.  For this reason, the consent decree is no longer need nor necessary in this regard.

## CONCLUSION

Based on the record before the Court, the United States has failed to prove that there are current, pervasive risks of serious harm to the detainees at the detention facilities in Hinds County. Even had the United States carried this burden, the United States has also failed to prove either

that the County failed to reasonably respond to any substantial risk of serious harm or that the

prospective relief in the Consent Decree meets the PLRA's latter requirements that the relief be

narrowly-drawn, necessary to prevent a current and ongoing violation of a federal right, or the

least intrusive means necessary to remedy the violation of a federal right.  The Court therefore

grants the Motion to Terminate the Consent Decree, and the Consent Decree is hereby terminated

and dissolved in its entirety.

      This, the 11th day of February, 2022.


                                Respectfully submitted,

                                  **PHELPS DUNBAR, LLP**


BY:  */s/ Nicholas F. Morisani*
       Reuben V. Anderson, MB #1587
       W. Thomas Siler, Jr., MB #6791
       James W. Shelson, MB #9693
       Nicholas F. Morisani, MB #104970
       Loden P. Walker, MB #105996
       4270 I-55 North
       Jackson, Mississippi 39211-6391
       Post Office Box 16114
       Jackson, Mississippi  39236-6114
       Telephone: 601-352-2300
       Telecopier: 601-360-9777
       Email: reuben.anderson@phelps.com
           tommy.siler@phelps.com
           jim.shelson@phelps.com
           nick.morisani@phelps.com
           loden.walker@phelps.com

       **ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I, Nicholas F. Morisani, certify, that, on February 11, 2022, I had these Proposed Findings of Fact and Conclusions of Law electronically filed with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter.


*/s/ Nicholas F. Morisani*
NICHOLAS F. MORISANI

PD.36703291.1