# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


J.H., by and through his next friend
Terina Gray, on behalf of himself
and all persons similarly situated                    PLAINTIFFS

VS.                                    CIVIL NO. 3:11CV327-DPJ-FKB

HINDS COUNTY, MISSISSIPPI                               DEFENDANT




**STATUS CONFERENCE**




BEFORE THE HONORABLE DANIEL P. JORDAN III
UNITED STATES DISTRICT JUDGE
APRIL 24TH, 2018
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE PLAINTIFF:   MS. PALOMA WU
                     MR. JODY E. OWENS II
                     MS. ELISSA F. JOHNSON

FOR THE DEFENDANT:   MR. PIETER TEEUWISSEN
                     MR. ANTHONY R. SIMON


REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR

---

501 East Court Street, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4187

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 3 of 44
Case 3:11-cv-00327-DPJ-FKB Document 1317-5 Filed 12/14/18 Page 2 of 43

2

```
 1        (COURT CALLED TO ORDER)

 2           THE COURT:  Thank you.  You may be seated.  All right.

 3   Good morning.

 4        (ALL RESPONDED "GOOD MORNING")

 5           THE COURT:  We're obviously here in the case of *J.H.*

 6   *v. Hinds County*, 3:11cv327.  Let me ask counsel to introduce

 7   yourselves for the record.

 8           MS. WU:  Paloma Wu.  I'm a lawyer for Southern Poverty

 9   Law Center.

10           MR. OWENS:  Jody Owens, Your Honor.

11           MS. JOHNSON:  Elissa Johnson for the plaintiffs as

12   well, Your Honor.

13           MR. TEEUWISSEN:  Good morning, Your Honor.

14   Pieter Teeuwissen, board attorney for Hinds County, and Anthony

15   Simon, special legal counsel for Hinds County.  And we have

16   several county representatives present in the courtroom.  May I

17   introduce them?

18           THE COURT:  Of course.

19           MR. TEEUWISSEN:  Present, Your Honor, this morning we

20   have in the blue shirt Mr. Eric Dorsey, who is the quality

21   assurance officer at Henley-Young.  Next to him in the white

22   shirt is Mr. Eddie Burnside, the operations manager at

23   Henley-Young.  And next to him is Major Mary Rushing of the

24   sheriff's department, who is also involved in some matters

25   we'll be discussing this morning at Henley-Young.
```

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 4 of 44
Case 3:21-cv-00327-DPJ-FKB Document 134-5 Filed 12/14/18 Page 3 of 43

3

1          Thank you, Your Honor.

2          THE COURT:  Is that it?

3          MR. TEEUWISSEN:  Yes, sir.  Thank you, Your Honor.

4          MS. WU:  Your Honor, Mr. Dixon, the court's monitor,

5     is also here.

6          THE COURT:  Oh, hey.  Mr. Dixon, how are you?

7          MR. DIXON:  Good, Judge.

8          THE COURT:  I didn't see you.  Mr. Teeuwissen casts a

9     big frame there.  I didn't see you sitting behind him there.

10    All right.  The parties asked for this status conference.  So

11    how do you want to proceed?

12         MS. WU:  Thank you, Your Honor, for the opportunity to

13    speak and discuss the status of this matter.  We represent the

14    plaintiffs, who are all children who are residing at the

15    Henley-Young Detention Facility.  The reason for today's status

16    conference is that the parties moved jointly to extend the

17    consent decree through March of 2019.

18         Our purpose is to take this opportunity to ask for the

19    court's assistance in achieving success in the next eleven

20    months.  To that end we'd like to very briefly describe to the

21    court four key topics:  Where we've been recently, where we're

22    going, and where we are today, as well as what we're asking

23    from the court.

24         As far as where we've been recently, we recently

25    learned that Mr. McDaniels has temporarily or permanently

1    departed as head of the detention facility.  So it is worth

2    discussing moving forward how Henley-Young will have the

3    authority to make the types of decisions necessary to come into

4    compliance with certain provisions.

5            The second significant development is that beginning

6    in October of last year, the facility began housing a new

7    population of children who are being tried as adults.  Because

8    these children are children residing at the Henley-Young

9    detention facility, these children are equal class members in

10   this case in every respect.

11           Plaintiffs agree with the court's monitor that as

12   long-term residents the consent decree provisions relating to

13   post-disposition residents apply with equal force to the CTA

14   population because, as is in the consent decree, the

15   postposition population is a proxy for long-term resident, and

16   CTA is our long-term resident.  They are anticipated to have a

17   length of stay of between nine months to two years.

18           That the CTA population transition has gone so well

19   thus far is a testament to the structural and cultural

20   integrity of the administration at the facility.  It cannot be

21   overstated.  It is also a testament to the positive working

22   relationship with this court's monitor, Mr. Dixon, who we're

23   fortunate has both the knowledge and experience with housing

24   children under adult and youth court jurisdiction together.

25           It is fair to say that so far the facility has moved

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 6 of 44
Case 3:16-cv-00489-CWR-RHW Document 134-2 Filed 02/14/18 Page 6 of 44

5

1   mountains to come to the place where we are now with the

2   consent decree, and nothing that plaintiffs have to say

3   regarding the road to come is meant to detract or minimize from

4   this reality.

5          In order to talk about where we are now, we'd like to

6   draw the court's attention to the chart that we're putting up

7   on the Elmo.  And we can pass out copies to the court and to

8   opposing counsel.

9          The chart that's up right now on the Elmo shows all of

10  the 71 provisions in the original consent decree.  Across the X

11  axis are all 12 reports thus far that the court monitor has

12  provided.  We have color coded it to correspond with the

13  designations that the court monitor himself uses.

14  Noncompliance red, beginning compliance orange, yellow is

15  partial compliance, substantial compliance is green or is

16  black, depending on which amendment to the consent decree it

17  eliminated.

18         Right now, the 12th monitoring report tells us that

19  41 percent of all of the consent decree provisions have been --

20  achieved substantial compliance.  That is 29 of the original 71

21  provisions.  This 29 includes the 24 which have already been

22  eliminated by amendment.

23         What we'd like to do is to ask for the court's

24  assistance in achieving compliance with the three major subject

25  matter topics that we have had the most ground to cover in the

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 7 of 44
Case 3:16-cv-00327-CWR-FKB Document 134-5 Filed 02/14/18 Page 6 of 43

6

1    next eleven months.  These are mental health, medical, and

2    education.

3           Dr. Boesky is the medical expert in this case that

4    Mr. Dixon has chosen to work with.  Her third report makes, by

5    our count, approximately 150 recommendations.  When plaintiffs

6    tried to group those recommendations into the preexisting

7    categories provided by the provisions of the consent decree, we

8    found that they relate to approximately 25 provisions of the

9    consent decree, so not simply the mental health care section,

10   but other sections relating to intake screening and the like.

11          Of these 25 provisions, the facility is in substantial

12   compliance with only one.  This is less than half of

13   one percent.  They -- as to five of the provisions, five are

14   noncompliant and eleven have beginning compliance.

15          If I have permission to approach the bench, I would

16   like to give you a hard copy of it.

17          THE COURT:  Okay.

18      (DOCUMENT TENDERED TO COURT)

19          MS. WU:  We included at the top of the chart the

20   precise definition of the compliance code measurements that our

21   court monitor uses.  It's helpful to note that beginning

22   compliance only requires that a policy be written.  It requires

23   zero implementation.  So 16 of the 25 provisions relating to

24   mental health in the consent decree are either noncompliance or

25   only at beginning compliance.

Case 3:16-cv-00489-CWR-BWR Document 134-2 Filed 02/17/22 Page 8 of 44
Case 3:16-cv-00327-CWR-FKB Document 134-2 Filed 12/14/18 Page 8 of 44

7

1          Dr. Ezike is the medical expert in this case.

2    Dr. Ezike's most recent third report makes approximately 35

3    main recommendations.  Those recommendations by our analysis

4    fall into approximately 16 of the preexisting provisions of the

5    consent decree.

6          Two of those 16 provisions are in substantial

7    compliance, which is slightly more than a tenth of a percent.

8    And of those, seven are in beginning compliance, which means,

9    again, that no implementation has been made.

10         Finally, Dr. Brooks is the education subject matter

11   expert.  In her most recent third report she makes

12   approximately 25 main recommendations.  We categorize those

13   into five preexisting provisions of the consent decree.  Of

14   those the county has achieved substantial compliance in only

15   one of five.

16         It's fair to say that the most progress as to the

17   consent decree has been made in the last two years since

18   Mr. McDaniels took the helm and conditions have been friendlier

19   towards progress in those areas.

20         We feel that with 69 percent of the provisions

21   remaining to achieve substantial compliance it would be

22   extremely helpful if the court could provide concrete ways for

23   the parties to continue progress, particularly in these three

24   subject matter areas.

25         In general, we would ask for a schedule of status

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 12/17/22 Page 9 of 44
Case 3:16-cv-00327-CWR-FKB Document 131-5 Filed 10/14/18 Page 8 of 43

8

1    conferences in the next eleven months and some concrete dates

2    for production of policies.  In particular, many of the

3    provisions that defendants have not yet gained compliance with

4    the court monitor has noted that policies are under development

5    or being written.

6         Right now it would be very helpful if we knew which

7    policies were under development or being written.  It would be

8    helpful for plaintiffs if we were either included in in some

9    meaningful capacity the review of the remaining policy, only in

10   order to streamline the process, of course, not because those

11   policies require our approval, which they do not.

12        We would be interested to know what the mechanism is

13   that the defendants are using to have the subject matter

14   experts review the policies that are currently under

15   development and that are yet to be written.  And we also think

16   it would be helpful to track the types of hiring decisions that

17   the subject matter experts have recommended be made and the

18   types that have been made and are yet to be made.

19        As you can see, plaintiffs are discussing 30,000-foot

20   issues with regards to the next eleven months.  We're not

21   discussing any particular provisions.  We think it's premature

22   to discuss particular provisions, because we feel that the most

23   productive way to do that would be in the context of a

24   structured assistance with this court, meeting with this court,

25   meeting with defendants.

1      And we do believe that the county is amenable.  They

2  can, you know, attest for themselves.  But they have been --

3  you know, in the spirit of cooperation have absolutely been

4  willing to talk with us and we're hopeful for the next eleven

5  months.

6      THE COURT:  All right.  Thank you.  Mr. Teeuwissen.

7      MR. TEEUWISSEN:  May it please the court.

8      THE COURT:  Sure.

9      MR. TEEUWISSEN:  Your Honor, would you permit me a few

10  minutes to provide a little context, and then I'll specifically

11  address some of the areas that Ms. Wu has raised?  Thank you,

12  Your Honor.

13      Recently in this courthouse, Judge Barbour heard

14  testimony alleging all manner of mistreatment occurring at the

15  privately run East Mississippi Correctional Facility.  The

16  warden in that case testified that such was the nature of

17  prisons, the nature of the beast, something to that effect.

18  Regardless of the constitutional merits, the testimony

19  indicated a sad state of affairs.

20      Perhaps this is why Nelson Mandela said, "No one truly

21  knows a nation until one has been inside its jails."  Equally,

22  Douglas Hurd, British home secretary for Margaret Thatcher,

23  said, "Prison is an expensive way of making bad people worse."

24      Fortunately, the matter before this court, document

25  119, the joint motion to extend the consent decree, stands as

1    stark contrast to the litigation before Judge Barbour.  Here

2    the parties have been cooperative and followed the lead of a

3    federal monitor, a monitor, Your Honor, who guides us through a

4    collaborative problem solving process and a monitor who's not

5    afraid to scold us appropriately when necessary to move us

6    along.

7              Four years ago we stood in this same courtroom and the

8    best Hinds County could offer Your Honor was an argument that

9    somehow a settlement agreement wasn't a consent decree.  Your

10   Honor found that the county was at that time effectively in

11   contempt and had made no progress whatsoever, but withheld any

12   sanctions and gave us an attempt to start over.

13             Two years ago this court calmed and cajoled warring

14   parties into a tri-party peace treaty, document 106 in this

15   matter; and somehow that managed to stay out of the media.

16   Just this past December the Mississippi Supreme Court followed

17   the court's lead involving Jurist in Residence Hudson; and

18   there was an agreement reached between Judge Skinner, Judge

19   Priester and the county as to division of duties and funding

20   for various youth court needs.

21             All that circles us back to where we started in this

22   case, Your Honor, in 2011.  Are the juveniles in Henley-Young

23   detained in a manner so as to protect and promote their

24   constitutional rights?  The answer, Your Honor, is a healthy

25   yes.

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 12 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-2 Filed 11/14/22 Page 12 of 43

11

1      Juveniles are safe and secure.  Juveniles have access

2  to structured education.  Juveniles have access to appropriate

3  medical care.  The young folks eat well.  One young man put on

4  20 pounds in his first month at Henley-Young as opposed to

5  staying in Raymond.  But perhaps most importantly, the

6  juveniles now have access to case managers and mental health

7  personnel.

8      Finally, through the various court facilitators'

9  agreements, the number of youth detained for delinquency

10  averages about ten and their stay is limited to 21 days.  Gone

11  are the days of 89-day programs without any content.

12      Feeling frisky, Your Honor, the county made a bold

13  move in September of last year and began housing juveniles

14  charged as adults at Henley-Young.  While many of us held our

15  breath, we're pleased to announce that the integration is

16  working.  That's right.  Hinds County now has approximately ten

17  juveniles charged as adults receiving virtually the same

18  increased level of service as the delinquency juveniles.

19      Thus, we are diverting juveniles charged as adults

20  from the dysfunction at other county facilities and, hopefully,

21  offering them a second chance for those who deserve it.  And

22  this is done in an environment that is largely calm and

23  arguably calmer than the home life of many of the individuals

24  who we now house.

25      Again, these individuals are safe and secure.  The

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 13 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/18 Page 13 of 43

12

1  protection of harm issue has enjoyed sustained compliance.

2  That is the most important thing.

3         Now, Your Honor, Hinds County will concede that our

4  work is not done.  We need better educational services.

5  Jackson Public Schools just informed us that it did not have

6  funding for summer school at Henley-Young.  Seems hard to

7  believe that a district with a $300 million budget couldn't

8  come up with $100,000, but it is what it is.  That opens the

9  door for other approaches to education.

10        Likewise, our mental health services must continue

11  growing.  To this end, the county as of last week engaged the

12  services of a licensed psychologist, Dr. Nanetta --

13  N-A-N-E-T-T-A -- S. Payne, Ph.D.  She's licensed by the State

14  of Mississippi and she will provide services at Henley-Young

15  for 20 hours a week in addition to the case managers and mental

16  health personnel who are full-time.

17        A library and reading program would be nice.

18  Likewise, increased mentoring and discussion of career paths is

19  necessary.  Stated differently, various types of next-level

20  programming are needed to not only ensure constitutional

21  compliance but really make a difference in the social fabric of

22  the city and the county.

23        To this end the county has recently engaged a

24  leadership development professional.  This individual started

25  as a frontline youth detention officer in Ohio.  He has worked

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 14 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-5   Filed 12/14/18   Page 14 of 43

13

1    his way up through the ranks into administrative roles in both

2    youth and adult facilities.  He is licensed, some sort of

3    certified management professional.  And, best of all, he has

4    original ties to Hinds County.

5            Beginning in June he will take the next year to come

6    in and develop our shift supervisors, our frontline supervisory

7    personnel, as well as the administrative team to ensure that we

8    are all at every level promoting compliance, looking for new

9    ideas, and don't slide from the gains we have made.

10           Your Honor, Henley-Young is, in the best sense of the

11   word, a laboratory for improved detention conditions in

12   Mississippi.  We try, we fail, we try again, we fight, we

13   litigate, we listen, and then we try some more.  We are

14   building an innovative public facility.

15           Sure, we would all like it done faster.  No question

16   about that.  Your Honor expressed exasperation in 2014 at the

17   lack of progress and the pace at that time.  Since that time,

18   we have significantly increased our compliance in the

19   conditions for these youth.  Your Honor has been there.  He has

20   seen some of the changes firsthand.

21           And with all due respect to the SPLC, compliance and

22   culture change isn't a scorecard.  There's a lot more to it

23   than that.

24           We're proud of the facility we have now.  We feel

25   ourselves on the cutting edge by incorporating the juveniles

Case 3:16-cv-00489-CWR-BWR  Document 147-2  Filed 02/17/22  Page 15 of 44
Case 3:21-cv-00327-DPJ-FKB  Document 131-5  Filed 11/14/18  Page 15 of 43

14

```
 1    charged as adults.  And we see opportunity to improve what we
 2    were doing and being a model facility in the state of
 3    Mississippi and in the Southeast.
 4          As to several of the issues raised by Attorney Wu,
 5    Mr. McDaniels chose to run for the position of county court
 6    judge.  Your Honor is well versed in the history of animosity
 7    between the board of supervisors and the existing senior county
 8    court judge.
 9          Therefore, Mr. Simon and I, in conjunction with
10    Ms. Carmen Davis, the county administrator, who, Your Honor,
11    would have been here, but she's on medical leave, recommended
12    to the board that Mr. McDaniels needed to take a leave of
13    absence.  We have made too many gains with Judge Skinner to
14    risk the appearance of the board endorsing one candidate or
15    another.  So it was the board's decision upon the
16    recommendation of counsel and Administrator Davis to place
17    Mr. McDaniels on leave.
18          Clearly, if he wins that race, we'll be searching for
19    a new director.  If he does not, we will cross that bridge at
20    that time.  But, again, looking from the 30,000-foot view, it
21    seemed more important to avoid the politics than to simply keep
22    him in place on the payroll.
23          THE COURT:  When is that election?
24          MR. TEEUWISSEN:  That election is November, Your
25    Honor, nonpartisan election.  He went on leave effective
```

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 16 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-2   Filed 12/14/12   Page 15 of 43

15

1   April 1st.  The qualifying deadline is May 11th, Mr. Simon

2   says.  If somehow he were not to have an opponent, I think we

3   could return him to the facility; but if there's any chance of

4   it being a contested race, with the funding issues that have

5   arisen in the past, the board is going to stay away from it.

6           Meanwhile --

7           THE COURT:  Well, excuse me.

8           MR. TEEUWISSEN:  Yes, Your Honor.

9           THE COURT:  If it's uncontested -- I guess there's

10  been some -- I read some speculation that Judge Skinner might

11  run for county -- I mean for circuit?

12          MR. TEEUWISSEN:  And chancery.

13          THE COURT:  Okay.  But if McDaniels ends up being

14  unopposed, you would return him to the facility until November?

15  Is that the plan?

16          MR. TEEUWISSEN:  He would not -- the term does not

17  start until January.  We would return him to the facility if

18  he's unopposed until he took over his duties as judge, and then

19  we would have a transition period with him.

20          THE COURT:  And use that time to find somebody to

21  replace him?

22          MR. TEEUWISSEN:  Yes.

23          THE COURT:  And who is filling in for him now?

24          MR. TEEUWISSEN:  A combination of Mr. Burnside and

25  Mr. Dorsey.  They are the two most senior personnel and have

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 17 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-2 Filed 11/14/18 Page 16 of 43

16

1   been the most involved in consent decree matters since the

2   inception of this litigation.

3          Moreover, Mr. Simon has taken a larger role, as he did

4   in 2014, with Mr. Bluntson of advising the facility on a

5   day-to-day, every-other-day basis to help Mr. Burnside and

6   Mr. Dorsey and Major Rushing.  And Major Rushing is taking an

7   increased role even though she has a consent decree and plenty

8   of headaches herself because of the presence of juveniles

9   charged as adults.

10         Speaking of the JCA population as equal class members,

11  we absolutely agree they are equal class members.  It was a

12  challenging decision on how we would integrate those youth.

13  And at Mr. Dixon's recommendation, we have not moved youth who

14  were already detained in Raymond to the facility.  We started

15  in September with newly arrested youth who may be processed at

16  Raymond but then immediately brought to the Henley-Young

17  culture so that they are immersed in a positive culture from

18  day one as opposed to being exposed to the things that we

19  are -- the conditions that we are addressing in Raymond.

20         There is one individual who is 15 who's at Raymond,

21  Your Honor.  With Mr. Dixon's guidance, we will integrate him

22  to Henley-Young.

23         There are six other individuals, Major Rushing?  Five.

24         Five other individuals who are -- will age out this

25  year.  We will leave those individuals at Raymond.

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 18 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/12 Page 18 of 43

17

1    THE COURT:  And the JCAs, how long are they typically

2    staying at Henley-Young?

3    MR. TEEUWISSEN:  That's a very -- that's a concern,

4    Your Honor.  Right now we have had some who have been there

5    since the fall, and we've been unable to impress upon the

6    District Attorney's Office the need to move those individuals

7    through the system faster.

8    The good news is that they have public defenders

9    assigned by the Hinds County Public Defender's Office,

10   Ms. Michele Purvis-Harris and her staff, who are very

11   competent.  And those public defenders do routinely visit their

12   clients at Henley-Young.

13   What we've got to do now, Your Honor --

14   THE COURT:  I'm sorry to interrupt --

15   MR. TEEUWISSEN:  That's okay.

16   THE COURT:  -- but I want to make sure I understand.

17   In looking at the Second Amended Consent Decree, you know, it

18   has a cap of 21 days and I think it says for those youth under

19   the jurisdiction of the youth court.

20   MR. TEEUWISSEN:  Correct.

21   THE COURT:  And I assume that means that the JCA kids

22   are not subject to that provision, which triggers a couple of

23   the other provisions where there are requirements for people

24   who stay over 30 days, none of which wouldn't apply if you

25   didn't have the JCA kids there.

Case 3:16-cv-00489-CWR-BWR  Document 147-2  Filed 02/17/22  Page 19 of 44
Case 3:21-cv-00327-DPJ-FKB  Document 131-52  Filed 11/14/18  Page 19 of 43

18

 1          MR. TEEUWISSEN:  That's correct, Your Honor.

 2          THE COURT:  Okay.

 3          MR. TEEUWISSEN:  And we agree, and I'll take it a step

 4   further.  In cause number 3:16-cv-00489, which is the adult

 5   consent decree, *United States of America v. Hinds County,* in

 6   that cause number, document 2-1, section K, paragraphs 78

 7   through 84, found on page 36 through 39, addresses the services

 8   that we have to provide the JCAs.  And it is in large measure

 9   an overlap with the consent decree already in place before Your

10   Honor.

11          So we've got to provide those JCAs with the same level

12   of care that we -- and services that we provide the delinquency

13   people.  The question is which location.  Your Honor is right.

14   That means expanded services for the JCAs at Henley-Young.

15          The decision was made in consultation with Mr. Dixon

16   as well as Mr. Jim Mosler, who's a juvenile expert under the

17   adult consent decree, that the environment was significantly

18   better at Henley-Young and it was better for us to build upon

19   what we have done and provide some additional services at

20   Henley-Young for the JCAs.  So we realize that -- I don't want

21   to say it upsets the apple cart but places some additional

22   challenges on us and we accept that.

23          THE COURT:  All right.

24          MR. TEEUWISSEN:  There was also reference to the

25   mental health issues.  Those have been an ongoing challenge.  I

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 20 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/18 Page 19 of 43

19

1    would disagree with the SPLC that those are as bad as some

2    scorecard indicates, simply because two years ago we moved

3    funding from the youth court to the detention side to hire four

4    case managers, something that had not been done but that

5    Mr. Dixon had recommended.  We had to go through litigation on

6    whether the board had authority to budget for that, but it has

7    occurred.

8          We have hired the licensed psychologist and are

9    actively doing all we can -- let's not forget this is

10   Mississippi, Your Honor.  There's not a talent pool of

11   professionals who want to work in juvenile detention or

12   corrections settings.  I believe the litigation that was before

13   Judge Barbour reflected the difficulties of an adult prison run

14   by a private corporation to provide mental health services.

15   The county faces those same challenges on a more limited

16   budget.

17         We have cast a wide net.  We have called for CV's and

18   résumés.  It simply takes some time to find the right qualified

19   people to put into the environment.  We recognize that is a

20   challenge and want to proceed.

21         The education piece is perhaps the most challenging.

22   I was hoping the SPLC would have some answers as they joined --

23   took the position parallel with JPS with respect to charter

24   schools.  I would hope they could figure out how to get JPS to

25   put some resources in the Henley-Young.  It has not occurred.

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 21 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-2 Filed 11/14/12 Page 21 of 43

20

1           As Your Honor is well aware, JPS is a failing school

2     district.  It's a failing school district that the State of

3     Mississippi doesn't even want to take over.  They created a

4     different approach.  Well, that failing school district is our

5     current education provider, and I'm not sure what options we

6     have.

7           I will say this.  We have recently been connected with

8     an individual who wants to discuss offering alternative

9     education services.  This individual has done in it Washington,

10    D.C., is doing in it Orleans Parish, and provides a different

11    model.

12          We intend -- Mr. Simon and I intend to meet with him

13    in May in New Orleans to see what is being done there for

14    juveniles and see if we can develop a better program than

15    perhaps what JPS is offering or a program that can work in

16    conjunction with JPS to improve the offerings.

17          I'll just be candid, Your Honor, we can't have

18    juveniles in that facility all summer without education.  We're

19    going to provide something if we have to hire an instructor to

20    provide GED training.  One, it's unfair to the youth who need

21    the education.  Two, bored youth create problems at the

22    facility.  We need to keep their minds occupied, keep them

23    focused elsewhere.

24          There are no magic bullets for the mental health or

25    education.  We've just got to keep marching up the hill, Your

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 22 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/22 Page 22 of 43

21

1    Honor.  And to that -- and we certainly defer to the guidance

2    of Mr. Dixon.  He has done a yeoman's job at getting us where

3    we are, again, between educating us and scolding us.  He finds

4    a good balance to keep us moving.

5         He has the respect of the board of supervisors, and I

6    will tell you I don't see the county parting with his services.

7    I think he'd have to tell us he absolutely wouldn't do it

8    before the county would part with his services, whether on a

9    consent decree for this, for the adults or whatever.  The board

10   listens to Mr. Dixon and they accept his recommendations

11   wholeheartedly.

12        With that in mind, on the policies and procedures and

13   some of the other matters that I think Ms. Wu is much more --

14   and the SPLC are much more aware of the details than Mr. Simon

15   and I, I think it's best to defer to Mr. Dixon for explanations

16   about those items.

17        There are policies and procedures in place.  I

18   understand there may not have been an exchange or review of

19   those, but I think there are some explanations from either

20   Mr. Dixon or -- it would have to be from Mr. Dixon as to

21   perhaps why that has not occurred as envisioned.  But it's not

22   like we're running a facility without policies and procedures.

23        And, in fact, the juvenile monitor in the adult

24   consent decree has reviewed the policies and procedures and has

25   not criticized us.  In fact, out of all the monitors we have in

Case 3:16-cv-00489-CWR-BWR   Document 14752   Filed 02/17/22   Page 23 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-5   Filed 12/14/18   Page 23 of 43

22

1  the adult consent decree -- and we're currently running

2  somewhere in the neighborhood of six -- the juvenile monitor is

3  the only one who's saying we're doing something right.

4          And that's largely based on the efforts of the SPLC

5  and the county working at an arm's length but in a cooperative

6  adversarial sense.  I know it's somewhat of an oxymoron,

7  cooperative adversary, but that's what we've been doing.  And

8  so we've had -- ultimately, that means the DOJ has also looked

9  at what we're doing for the juveniles as well.

10          It's working.  It's a work in progress, but it's

11  working.  I don't think any of us are going to be satisfied

12  until we have exceeded every expectation that is here, but

13  culture change does not come easy.

14          Your Honor, that's all I have initially.  I'll answer

15  any other questions Your Honor may have about the facility or

16  about the decisions that Hinds County has made, any funding

17  decisions or other matters.

18          I certainly had -- if Your Honor needs to hear from

19  any of them, you're welcome to hear from Mr. Dorsey,

20  Mr. Burnside or Major Rushing.  I don't know that they can add

21  anything more specific; but if Your Honor wants to hear

22  anything, they're certainly here before the court and ready to

23  address any matters.

24          THE COURT:  All right.  Thank you.  Let me hear from

25  Mr. Dixon.  Does either side wish to have him sworn in?  I

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 24 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-2   Filed 11/14/18   Page 24 of 43

23

1    wasn't planning on doing that.

2              MR. OWENS:  Not for the plaintiffs, Your Honor.

3              THE COURT:  Mr. Dixon, you can either speak there if

4    you want to or come sit down up here.

5              MR. DIXON:  Morning, Your Honor.  Whatever you want to

6    do is fine.  I'll sit.  This was a comfortable chair the last

7    time too.  Any questions or --

8              THE COURT:  Well, I think Ms. Wu sort of gave us an

9    outline, and I do want to hear your thoughts on it and, you

10   know, I guess starting with Mr. McDaniels' departure, where we

11   are with that and then go down.  Let's hit on the education

12   component, the mental health component, as well as the

13   recommendations from the subject area experts.  Obviously, I've

14   read your report, but this morning puts it in a little

15   different context I guess.

16             MR. DIXON:  Okay.  We can start with the

17   administration piece of it with Mr. McDaniels.  The county has

18   put in a good team of folks.  One of the things that I did,

19   well, was to try to have a collective group of people to work

20   together as a team to get things accomplished.

21             The bulk of those things were done by the quality

22   assurance and the operations manager.  Mr. McDaniels' key role

23   was actually the administrative piece in trying to move things

24   along with the county board and those kinds of things and with

25   the county administrator and the attorneys.

Case 3:16-cv-00489-CWR-BWR  Document 147-2  Filed 02/17/22  Page 25 of 44
Case 3:21-cv-00327-DPJ-FKB  Document 131-5  Filed 12/14/18  Page 25 of 43

24

1      Based on what I have seen at this point, although he's

2      gone for this short -- for this period of time for ever how

3      long, I don't see anything falling apart based on that.  One of

4      the reasons is because the county attorneys and the county

5      administrator have been key partners in trying to ensure that

6      things happen properly at the facility.  And, to me, that's

7      always the major -- major part.

8          And the county board has also -- and I've met with

9      them on several occasions.  They have been very professional

10     and very engaging in trying to make sure that there was

11     resources there and moving resources around to do some of the

12     things that we need to have done.

13         As relates to the mental health, the key for me --

14         THE COURT:  I take it you're comfortable with the plan

15     of sort of waiting to see what happens with the election.  You

16     know, if he doesn't get elected, bring him back.  It sounds to

17     me like he's done a good job and that -- I mean the reports

18     seem to be favorable towards his -- and I know how hard it was

19     to find him.

20         MR. DIXON:  Right.

21         THE COURT:  But you're comfortable with sort of

22     playing it out, seeing what happens with the election; if he

23     doesn't prevail, he comes back.  If he's unopposed, he comes

24     back in an interim period where during that -- that would give

25     us time to find a permanent replacement?

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 26 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/18 Page 26 of 43

25

1          MR. DIXON:  Yes.

2          THE COURT:  Okay.

3          MR. DIXON:  I'm comfortable with that.  As it relates

4    to the mental health, Dr. Boesky has been very instrumental in

5    working with the current folks there.  One of the keys to this

6    is that they do have policies and procedures.  What was needed

7    was a professional there, which they have just hired, to ensure

8    that those things are implemented properly and that there is a

9    process by which those policies and procedures are carried out

10   and someone to identify when there are issues or problems and

11   things that need to be adjusted.

12          I think it's Dr. Payne.  I met her last Friday.  And

13   she appears to be competent and capable.  I put her together

14   with Dr. Boesky last Friday; and they're working out some times

15   to come down to work out all of the other details, because

16   mental health is -- well, let me back up a little.

17          The major concern at any institution is the safety and

18   security aspect.  If you don't have the safety and security

19   aspect, you won't be able to do mental health or anything else.

20   So the key for me was to ensure that we had a safe and secure

21   environment and then you tackle all of the other things.  And

22   that's what we have done.

23          I'm a firm believer that as Dr. Payne and Dr. Boesky

24   get together, that things will move a lot quicker, you know,

25   with mental health.  And I see the same thing happening, you

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 27 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/12 Page 26 of 43

26

1    know, with medical.

2            As I've told SPLC and I've also told the county,

3    there's a human factor involved in these things.  It's not as

4    simple as just writing some policies and this stuff just being

5    carried out.  People have to be trained.  You also have to

6    ensure that they are consistent in what they're doing.

7            And that does not mean that you won't have problems

8    from time to time.  Having a problem in an institution is, like

9    I've told people, you know, before, if you show me a school

10   where kids don't have problems, I'll show you one that's not

11   open.  And you have the worst of the worst.

12           And so it's not that there won't be problems.  The

13   issue is how do you resolve those problems and do you have the

14   resources in place and you can identify things to ensure that

15   you're taking care of kids.  And that's, you know, what should

16   be occurring.

17           The other thing that I've told them is that I don't

18   think people are giving folks enough credit of what has been

19   accomplished so far.  You started out with 77 or 80 kids in a

20   facility that was in horrible condition with no services at

21   all.

22           THE COURT:  Right.

23           MR. DIXON:  And now you're averaging about 20, 25

24   kids.  And, to me, most people in the country would love to be

25   able to do that.  That's something that I don't think people

1    have given folks credit on.

2              And also working through the bureaucracies.  If they

3    were easy to work through -- it's not like it's the private

4    sector where you say, *I want this done tomorrow*, or you can --

5    it doesn't work that way.  And so you have to have the reality

6    of what really happens, you know, in bureaucracy and government

7    to move things, you know, forward.

8              I also advised them there's a few facilities around

9    this country that have been in this thing for 25, 30 years.

10   That's not going to happen here.  And so I think we have to

11   give folks credit for what has been accomplished so far.  And I

12   don't think they get enough credit for that.  That's a major,

13   major accomplishment.

14             When I did this -- and I have experience in it -- it

15   took me nine years to get it where we needed to have it.  And

16   so that's why I'm not uncomfortable with what's going on in

17   the -- what's going on in this process.  Yeah, I would love to

18   have it done yesterday because I have other things I want to

19   do; but it doesn't work that way.

20             I think -- what was the other question?

21             THE COURT:  Well, there was a question Ms. Wu asked

22   about the policies that are under development I guess at this

23   point.

24             And, Ms. Wu, I guess, are you just asking -- I mean,

25   it's throughout his report.  But are you asking for like a list

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 29 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/18 Page 28 of 43

28

1  of the policies that are currently under development?  Is that

2  what you're getting at?

3          MS. WU:  Your Honor, we would respectfully disagree

4  that the policies and procedures are in place; they simply need

5  to lift off.

6          THE COURT:  No, no, no.  That's not what I said.

7  Maybe I misunderstood what you said.  His report indicates that

8  there's certain policies and procedures that are under

9  development.  Doesn't mean they've been implemented.  And I

10  thought you were asking for a list of the ones that they're

11  still working on.  Did I misunderstand that?

12          MS. WU:  No.  For the purpose of making sure we're

13  moving forward apace, we would like to distinguish between the

14  policies that the experts have reviewed, many of which they

15  have said need to be revised, the policies that have not yet

16  been written at all, and the policies that are vaguely under

17  development.

18          THE COURT:  Okay.  Mr. Dixon, I don't expect you to

19  rattle that off off the top of your head, but can you provide a

20  list that would provide that information?

21          MR. DIXON:  Yes.  I could get with Dr. Boesky and

22  those, and that's not a difficult task.

23          THE COURT:  I think she's just asking for, you know,

24  status, a more specific status as to policies and procedures

25  that are not yet at substantial compliance.

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 30 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-5   Filed 12/14/18   Page 29 of 43

29

```
1          MR. DIXON:  There's no question.  Yes.

2          THE COURT:  Okay.  All right.  Does either side have

3    any questions for Mr. Dixon?

4          MS. WU:  Mr. Dixon, do you see the county coming into

5    compliance in the coming year on March --

6          MR. DIXON:  Say it again.

7          MS. WU:  Do you see the county coming into compliance

8    by March 2019?

9          MR. DIXON:  I would hope so.  I never guarantee in

10   these things because you never know what's going to happen, and

11   I hate giving concrete because these are not concrete

12   environments.

13         This is not like putting a car together on the

14   assembly line.  Sometimes the parts don't work and you go back

15   and you readjust things and you try to get them there.  The

16   question is, really, are you making progress on what you're

17   trying to get accomplished.

18         MS. WU:  Would you say that in six months we would

19   know whether the county was going to achieve compliance by

20   March 2019?

21         MR. DIXON:  I think in six months you'll have some

22   idea of where you're trying to get to.  Again, I never

23   guarantee -- I never guarantee that.  I just -- I don't know

24   how you do that.  In my experience, you could start out and

25   something occurs, funding has to be readdressed, there's things
```

1   that could occur that you have no control over.  And you try to

2   put the best program you can in place and you try to get there,

3   but I never guarantee -- I learned that a long time ago.  You

4   don't do that.  I'd rather work on it and get there.

5          That's why I don't believe that you should have dates,

6   you know, in these things, because when you tell someone you're

7   going to finish something at a certain time and you don't know

8   all of the dynamics that's involved, then it's like, you know,

9   you didn't give them the correct answer and people are saying,

10  *Well, you didn't -- you said you were going to finish on this*

11  *date and you didn't.*

12         And what I've found in these experiences and my

13  experience in dealing with some of my other colleagues, they

14  start out saying, *Oh, we're going to finish this in two years*;

15  and here it is eight years later, they're still dealing with

16  it.

17         I don't see that happening here because I think

18  they're making tremendous progress.  But I never guarantee

19  dates.

20         MS. WU:  Is there anything that the court can do to

21  help ensure that the county achieves compliance by March 2019?

22         MR. DIXON:  Unless the court has a magic ball, I don't

23  know how you do that.

24         THE COURT:  I do.

25         MR. DIXON:  I don't know how you do that.  I know --

1  you asked me the same thing but different ways.  I'm going to

2  give you the same answer.

3        MS. WU:  Are you aware of whether the facility has

4  full authority without Mr. McDaniels in place to hire, fire,

5  create new positions, post new positions, hire for any

6  positions, adopt policies?

7        MR. DIXON:  Oh, no question.  No question.  And I

8  think with the -- with Dr. Payne coming in, I think that's

9  going to make it just that much better, because those are

10  professionals that's doing what needs to be done.

11        And Mr. Burnside and Mr. Dorsey have actually been the

12  key people in this process of moving things even before

13  Mr. McDaniels came.  They needed someone to help them move it.

14  And what I see happening in the county now is that I know --

15  and I show up on unannounced visits, and so I see that the

16  county is still moving in that direction.

17        The attorneys, you know, Pieter and Anthony and

18  Ms. Davis, everything I've seen they have not, you know,

19  slacked off or moved any different direction than where we need

20  to go.

21        MS. WU:  This may be a more technical question, but

22  are you aware of whether they have the institutional

23  organizational authority to sign off on policies to allocate

24  funding towards new positions, that kind of thing?

25        MR. DIXON:  No.  I think that with them getting with

Case 3:16-cv-00489-CWR-BWR   Document 147   Filed 02/17/22   Page 33 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-2   Filed 12/14/18   Page 33 of 43

32

1  the attorneys, based on what I've seen, that they have helped

2  them do that.  I think they've told them what they needed and

3  they've acquiesced to that.  So that's what I've seen.  Yeah.

4          MS. WU:  In about -- of the entire universe of

5  policies and procedures that need to be in place in order to

6  come into full compliance, about what percentage are in final

7  form and being implemented today?

8          MR. DIXON:  Oh, I don't know the percentage.

9          THE COURT:  He's going to provide a list that will

10 tell us.

11         MS. WU:  Okay.

12         If the court were to order that we have a 60-day or a

13 90-day status conference in order to check in about progress,

14 do you think that would help the county achieve compliance?

15         MR. DIXON:  That's a maybe.  Based on my experience in

16 working in Hinds County, they've actually made a lot of

17 progress without the court having any intervention except for,

18 you know, the extensions of stuff.  I think that -- you know,

19 my professional opinion, that they're moving the way they

20 should be moving.  I don't know how else to -- to place it.

21         One of the biggest recommendations that I would have

22 if I was going to have the court involved was to something

23 happen -- that something is put in place so that the kids

24 receive their educational services during the school -- during

25 the summer.

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 34 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 12/14/22 Page 33 of 43

33

1    To me, that would be one of the keys, because

2    education, mental health, medical, all those things, case

3    management, all come together.  And if a kid has some serious

4    educational deficiencies, then you want to be able to identify

5    those.  And if there's no school, then it's very difficult to

6    identify those.  And that's one of the key problems that you

7    have with our kids.

8    So -- and that would be one of the things that I would

9    ask the court to do if I was going to ask them to do anything.

10    MS. WU:  I just want to touch on a couple of things on

11    Dr. Boesky's report.  Are there still no mental health or

12    substance abuse treatment being provided to youth at

13    Henley-Young?

14    MR. DIXON:  Well, there's not the level I think that

15    she wants.  There's some services being provided, but it's not

16    at the level.  That's why it was a key to get the -- Dr. Payne

17    in so that she could move that to the next level.

18    You have your QMHPs now, but you don't have the --

19    they don't have the -- I want to say the medical knowhow to

20    look at the different diagnoses and the different programmatic

21    things that need to occur once the kids have been identified.

22    And that's what Dr. Boesky is there for.

23    And with Dr. Payne coming in, I think that's going to

24    pretty much reduce that, and they will have those things put in

25    place.  That's why I am not really concerned about the policies

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 35 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-2 Filed 11/14/22 Page 35 of 43

34

1  and procedures at this point, because they do have stuff.

2  However, Dr. Payne is going to codify those things better and

3  make them more -- I wouldn't want to use the word

4  "appropriate," for lack of a better term, but a better level of

5  services that the kids would get with a high-level professional

6  looking at it.

7          MS. WU:  Dr. Boesky's September 2016 report

8  recommended hiring at least two full-time licensed

9  doctoral-level clinical psychologists.  What yardstick will you

10  use to determine whether the current 30 hours per week

11  hiring --

12          MR. DIXON:  The number of kids.

13          MS. WU:  -- is sufficient?

14          MR. DIXON:  The number of kids you have.  You set your

15  systems up based on the population that you have in the

16  facility.  When we were looking at it, we were talking about if

17  the facility was full, what would you need to have.  And so

18  with the facility averaging, you know, 25, 30 kids, you know, I

19  don't think you need to have -- it's not necessary to have two

20  full-time, you know, folks.

21          I have a facility of 400 kids and we have three, you

22  know, licensed, you know, psychiatrists.  And so -- and it's

23  one -- and we have them broken up in centers.  And there's 30

24  kids to a center and there's one, you know, full-time

25  psychologist for those 30 kids.

Case 3:16-cv-00489-CWR-BWR Document 147 Filed 02/17/22 Page 36 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131 Filed 11/14/18 Page 36 of 43

35

1      THE COURT:  Mr. Dixon, let me ask you a question about

2  that.  You know, in some of these reports from the subject

3  matter experts, they make recommendations that are helpful,

4  instructive and good recommendations, but they may go beyond

5  what the consent decree requires.

6      And at this point I'm more concerned with making sure

7  that we address all of the problems identified in the consent

8  decree, which, as you've said, and I completely agree, there's

9  a lot of work that's been done.  There's a lot of work that

10  remains to be done.  And I'm afraid sometimes if you put too

11  many ornaments on a tree, it tips over.

12      And I don't really want the facility worrying about

13  things that are -- would be lagniappe at this point.  I want

14  the basics covered first.  And I'm wondering, when you go

15  through these reports and you make your report and your

16  recommendation is based on those reports, are you thinking in

17  terms of, *Okay.  This is -- this would be great, but this is*

18  *not required by this provision of the consent decree*?

19      MR. DIXON:  Yes, that was correct.  I'm not looking at

20  the pie in the sky.  I'm looking at do we have the basics in

21  place.  And my position has been if you have the basics in

22  place, then everything else will take care of itself.

23      THE COURT:  All right.  Thank you.  Anything else for

24  Mr. Dixon?

25      MS. WU:  With regards to the suicide prevention

Case 3:16-cv-00489-CWR-BWR    Document 147-2    Filed 02/17/22    Page 37 of 44
Case 3:21-cv-00327-DPJ-FKB    Document 131-5    Filed 11/14/18    Page 36 of 43

36

1   policies, is there -- are there plans to make a suicide

2   resistant room or is the new hire supposed to be creating

3   the -- doing implementation for the system?

4          MR. DIXON:  Yeah, that would be Dr. Boesky -- I always

5   get that -- and Dr. Payne.  That would be their -- what they

6   think should happen.  You know, some facilities I've worked in

7   they do have that; some facilities don't.  But, again, as I've

8   said, you know, in the past, we -- we have to understand that

9   this is supposed to be short term.

10         Juvenile detention centers are the emergency rooms of

11  the juvenile justice system.  They're not supposed to be the

12  kids stay there for long periods of time.  Now, the JCAs are

13  going to be there or the -- what do you call them?  That's what

14  they are?

15         MR. TEEUWISSEN:  Yes.

16         MR. DIXON:  They're going to be longer.  And, of

17  course, you have to modify your programming, you know, based on

18  that.  But it's still the idea of kids are only supposed to be

19  in for a very short period of time.  And you triage them and

20  you get some services together.  You -- it's the beginning of

21  the rehab process.  It's not the rehabilitation process.

22         And I think we have to educate people more on that.

23  And if we educate them more on that, you're not going to need

24  as much, because the kids are not going to be in there for a

25  long period of time.

Case 3:16-cv-00489-CWR-BWR Document 147-2 Filed 02/17/22 Page 38 of 44
Case 3:21-cv-00327-DPJ-FKB Document 131-5 Filed 11/14/18 Page 37 of 43

37

1          MS. WU:  It's not within the purview of the facility

2     to decide how long a CTA stays there.  Right?

3          MR. DIXON:  Beg your pardon?

4          MS. WU:  It's not within the purview of the facility

5     to decide how long the children charged as adults will stay in

6     the facility?

7          MR. DIXON:  No, no.  That's the court.  The court

8     determines that.

9          MS. WU:  And they may be there for a couple of years.

10          MR. DIXON:  They could be.  I have some that's been

11     for a couple of years.  But you have to modify your programs to

12     address those things.  That's why education, to me, is one of

13     the key components of your programming, because you have to

14     have ways of ensuring that kids have a structured program

15     daily.

16          And, to me, the educational program is a structured

17     program, which means you can also identify a lot of problems

18     that kids have.  If they're not in school, then it's very

19     difficult to deal with those problems or identify those

20     problems.

21          MS. WU:  That's all I have.  Thank you very much.

22          MR. DIXON:  Okay.  You're welcome.

23          THE COURT:  Mr. Teeuwissen, would you like to ask any

24     questions?

25          MR. TEEUWISSEN:  No questions, Your Honor, but I do

Case 3:16-cv-00489-CWR-BWR   Document 14752   Filed 02/17/22   Page 39 of 44
Case 3:21-cv-00327-DPJ-PKB   Document 13175-2   Filed 11/14/18   Page 38 of 43

38

1  have one brief but important matter I need to put on the

2  record.

3           THE COURT:  Okay.  Mr. Dixon, thanks.  You can return.

4           MR. DIXON:  Okay.

5           THE COURT:  Yes, sir.

6           MR. TEEUWISSEN:  Your Honor, one of the -- one of the

7  many challenges involves facility pay.  Mr. Dixon in the fall

8  through the efforts of Mr. McDaniels, Mr. Burnside and

9  Mr. Dorsey, identified some unappropriated funding within the

10 facility budget.  And I'd be remiss if I didn't give Ms. Davis

11 the credit.

12          Effective February 1st of this year, all frontline

13 detention personnel received an increase in pay so that they

14 are now making the same as the individuals who are providing

15 detention to the adults, who have also received an increase in

16 pay.

17          Now, Your Honor, the pay is still woefully below where

18 we would want it to be, but I do think it's important for Your

19 Honor to know that Mr. Dixon made that recommendation and that

20 funding -- existing funding was reprogrammed to promote that.

21          The importance of that is we hope to see a decrease in

22 staff turnover which, again, fosters a better environment.  And

23 I think Your Honor is well aware that in any detention facility

24 turnover is probably one of the largest challenges.

25          Ms. Davis also has -- addresses some of the issues

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 40 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-2   Filed 11/14/22   Page 39 of 43

39

 1  that SPLC has raised in terms of her authority.  Mr. McDaniels

 2  reported to her as county administrator.  And, again, she just

 3  went on medical leave.  It's about a six-weeks recovery time

 4  from her procedure.  She'll be back May 21st.

 5       So not only is there full authority to implement

 6  anything that's necessary, Ms. Davis worked with Mr. McDaniels

 7  to ensure that his transition into -- on leave status would not

 8  have any hiccups in the process by herself taking on additional

 9  responsibilities.  And she fully supports Mr. Burnside and

10  Mr. Dorsey from a day-to-day standpoint.  Thank you, Your

11  Honor.

12       THE COURT:  All right.  Thank you.  Well, let me just

13  say this quickly, and I guess I'll echo what Mr. Dixon said.

14  If you look at that chart, up until about June of 2014 or so

15  there was basically nothing that was done.  And that chart --

16  you can see where the contempt order was entered on that chart.

17  It's pretty obvious.  And then you can see later, once we sort

18  of worked out the who's-in-charge-type issues, you saw more

19  progress after that.

20       I never thought any of this would be easy.  I do think

21  that once the county took it seriously, there's been a lot of

22  progress made.  But if you hand any organization the number of

23  requirements that we have handed this organization, even a good

24  organization would have a hard time implementing everything

25  that's on the list.  And so it's not something that happens

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 41 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-5   Filed 11/14/18   Page 41 of 43

40

1    overnight.  It is cultural.

2            It has been impacted by turnover, not only in the

3    administration, but also -- of the facility, but also just the

4    employees of the facility.  It's a process and the process, you

5    know, takes time.  It is not a case that I would like to hand

6    over to another judge when I retire.

7            And I do -- Mr. Teeuwissen and Mr. Simon, I do want to

8    thank the both of you because I think that you've been somewhat

9    implemental in -- let me say irreplaceable in getting the

10   county on board with what we need to do.  Unfortunately,

11   there's still a lot more to do.  And you just signed an

12   agreement that you're going to make a lot of progress in the

13   next 90 days, which is ambitious, but that's what you've agreed

14   to.

15           I don't -- you know, I'm not opposed to having status

16   conferences.  Mr. Dixon doesn't seem to think that's helpful.

17   I don't mind doing it.  I'm reading these reports anyway and if

18   the parties, you know, want to add something to what's already

19   been written.  I do think that given the 90-day period that

20   you've put into this Second Amended Consent Decree that it

21   would make sense to have a little checkup in about 90 days just

22   to see where we are on all that.

23           And, Mr. Dixon, how long do you think you need to

24   prepare that -- just the list of policies and procedures and

25   where they are in terms of status?

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 42 of 44
Case 3:21-cv-00327-DPJ-FKB   Document 131-5   Filed 11/14/18   Page 41 of 43

41

1        MR. DIXON:  Probably in the next couple of weeks.

2        THE COURT:  Okay.  If you would, provide that to the

3   parties and also a copy to me.  The obvious block that sort of

4   stands out here is the mental health component.  And it

5   certainly seems now that you've hired a licensed psychologist,

6   that that's one of the requirements that Mr. Dixon has listed

7   throughout that section and it also touches on some other

8   sections, like intake, for example, as I recall.  So I would

9   expect to see some pretty good progress in the next 90 days in

10  that area.

11       I guess I'll just ask the parties to contact

12  Ms. Powell here and get it on the calendar.  I don't know that

13  we need to do this in open court.  I feel like a lot of times

14  these types of conversations are more productive in my

15  conference room, but y'all wanted this on the record.  I'll do

16  it however you want to do it.

17       And let me I guess add one last thing.

18  Mr. Teeuwissen, I'm going to ask the county to within two weeks

19  docket a report explaining your plans to the extent they've

20  been worked out regarding the summer school issue.  You

21  indicated that JPS has I guess pulled the plug financially, but

22  that the county's committed to providing something.  And I know

23  that's going to be a challenge.  So just give us an update in

24  about two weeks, because the summer is rapidly approaching.

25       MR. TEEUWISSEN:  Yes, sir, Your Honor.

Case 3:16-cv-00489-CWR-BWR   Document 14752   Filed 02/17/22   Page 43 of 44
Case 3:21-cv-00327-DPJ-PKB   Document 131-5   Filed 11/14/18   Page 43 of 43

42

```
 1              THE COURT:  All right.  Ms. Wu, is there anything else
 2    that you would like to cover or take up at this time?
 3              MS. WU:  Not at this time, Your Honor.  Thank you.
 4              THE COURT:  All right.  Mr. Teeuwissen, how about you?
 5              MR. TEEUWISSEN:  No, Your Honor.
 6              THE COURT:  All right.  Mr. Dorsey and Mr. Burnside,
 7    thank you for being here, and I appreciate it.  I met you guys
 8    over at the facility and I've seen you in action, so to speak.
 9    Appreciate your efforts and appreciate you stepping up here
10    while Mr. McDaniels is out.
11              Mr. Dixon, as always, thank you for your help.
12              And if there's nothing else, we're adjourned.  Yeah,
13    there is something else.
14              MS. WU:  Pardon me, Your Honor.  I would like to enter
15    in as an exhibit the chart, if possible.
16              THE COURT:  Not a problem.  Make that P-1.
17              MS. WU:  Thank you, Your Honor.
18          (EXHIBIT P-1 MARKED)
19              THE COURT:  All right.  Anything else?
20              MS. WU:  No.
21              THE COURT:  All right.  We're adjourned.  Thank you.
22          (HEARING CONCLUDED)
23
24
25
```

Case 3:16-cv-00489-CWR-BWR   Document 147-2   Filed 02/17/22   Page 44 of 44
Case 3:16-cv-00489-CWR-BWR   Document 131-5   Filed 11/14/18   Page 43 of 43

43

```
 1                     CERTIFICATE OF REPORTER

 2

 3         I, MARY VIRGINIA "Gina" MORRIS, Official Court

 4   Reporter, United States District Court, Southern District of

 5   Mississippi, do hereby certify that the above and foregoing

 6   pages contain a full, true and correct transcript of the

 7   proceedings had in the aforenamed case at the time and

 8   place indicated, which proceedings were recorded by me to

 9   the best of my skill and ability.

10         I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         This the 17th day of September, 2018.

14

15                     s/ Gina Morris
                       U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```