IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                          PLAINTIFF

VERSUS                  CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

THE HINDS COUNTY BOARD OF SUPERVISORS,
HINDS COUNTY SHERIFF, ET AL.                      DEFENDANTS



EVIDENTIARY HEARING


VOLUME II


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT COURT JUDGE
FEBRUARY 15, 2022
JACKSON, MISSISSIPPI


(Appearances noted herein.)






REPORTED BY:

    TAMIKA T. BARTEE, B.C.R., RPR, CCR #1782
    OFFICIAL COURT REPORTER
    501 E. Court Street, Suite 2.500
    Jackson, Mississippi  39201
    Telephone:  (601)608-4187
    E-mail:  Tamika_Bartee@mssd.uscourts.gov

**APPEARANCES:**

FOR THE PLAINTIFF:

    CHRISTOPHER N. CHENG, ESQ.
    SARAH G. STEEGE, ESQ.
    LAURA L. COWALL, ESQ.
    HELEN VERA, ESQ.
    MITZI DEASE-PAIGE, ESQ.

FOR THE DEFENDANTS:

    NICHOLAS F. MORISANI, ESQ.
    JAMES W. SHELSON, ESQ.
    TONY R. GAYLOR, ESQ.
    RAYFORD G. CHAMBERS, ESQ.
    JOHN C. HALL, II, ESQ.

ALSO PRESENT:

    ANTHONY NJOKU
    ELIZABETH SIMPSON
    DAVID PARRISH
    CREDELL CALHOUN
    SYNARIUS GREEN
    SHERIFF TYREE JONES
    LESLIE FAITH JONES

TABLE OF CONTENTS

Style and appearance......................................1-2


**WITNESS:  DAVID PARRISH**

Ctd. Direct by Mr. Cheng..................................200

Cross-Examination by Mr. Morisani.........................245

Redirect..................................................296

Examination by The Court..................................313

Further Direct............................................324

Further Cross.............................................327

**WITNESS:  CHALONDA MOSELY**

Direct by Ms. Steege......................................342

Examination by The Court..................................373

**EXHIBITS**

Plaintiff's Exhibits 54, 56-59............................204

Plaintiff's Exhibits 62-67................................205

Plaintiff's Exhibits 51-52................................206

Plaintiff's Exhibit 50....................................207

Plaintiff's Exhibit 26....................................214

Plaintiff's Exhibit 23....................................227

Plaintiff's Exhibit 24....................................228

Plaintiff's Exhibit 43....................................355


Reporter Certificate......................................384

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | **IN OPEN COURT, FEBRUARY 15, 2022**                                     |
| 2  |                                                                          |
| 3  | THE COURT:  You may be seated.                                           |
| 4  | Good morning.  I assume there's nothing we need to take                  |
| 5  | up.  I haven't heard otherwise, so Mr. Parrish, you may return --        |
| 6  | oh, I'm sorry.                                                           |
| 7  | MR. SHELSON:  Your Honor, I just want to let the Court                    |
| 8  | know we did have a witness in here yesterday in violation with the       |
| 9  | rule, and we are withdrawing her.                                        |
| 10 | THE COURT:  Oh, you had a witness?                                       |
| 11 | MR. SHELSON:  Yes, sir.  It was our fault.  It was                        |
| 12 | miscommunication, but we've notified the plaintiff that we would         |
| 13 | not be calling her.                                                     |
| 14 | THE COURT:  Okay.  All right.  Thank you, Mr. Shelson.                    |
| 15 | Mr. Parrish, you may return to the stand.  I'll remind                    |
| 16 | you, sir, you are still under oath.                                      |
| 17 | THE WITNESS:  Yes, sir.                                                   |
| 18 | THE COURT:  You can take off your mask, if you wish.                      |
| 19 | DAVID PARRISH,                                                           |
| 20 | Having been previously sworn and examined, testified as follows:         |
| 21 | CONT. DIRECT EXAMINATION                                                 |
| 22 | BY MR. CHENG:                                                            |
| 23 | Q.   Good morning.  Mr. Parrish, when you were the jail commander        |
| 24 | at Hillsborough County, did you ever have any unnatural deaths in        |
| 25 | your jail?                                                               |

1   A.   Yes.  Over a period of 27 years, we had several.

2   Q.   Did you ever have as many as six deaths in a year that were

3   unnatural?

4   A.   No.

5   Q.   Did you ever have multiple riots where they kept taking over

6   the same housing units?

7   A.   No, we never had that occur.

8   Q.   And how many inmates did you house in direct supervision in

9   the Hillsborough County Jail?

10  A.   At its highest level, we had 4,000-plus inmates, 4,637 was

11  our highest average daily population.

12  Q.   In reviewing the deaths for your report, did you look at any

13  incident report or CID investigation documents?

14  A.   Yes, they are generally associated with the files that are

15  put together on each case.

16        MR. CHENG:  May I approach the witness, Your Honor?

17        THE COURT:  You may.

18  BY MR. CHENG:

19  Q.   Mr. Parrish, I believe you actually have a copy of these

20  binders behind you.  Will you turn to Binder No. 2 or 4 of the

21  U.S. exhibits?  If you could look at Plaintiff's Exhibit 54.

22        THE COURT:  Hold on for one second.

23        (Brief pause.)

24        THE COURT:  You may proceed, Mr. Cheng.

25        MR. CHENG:  Thank you.

1 BY MR. CHENG:

2 Q. I believe we were at Plaintiff's Exhibit 54?

3 A. Yes, sir.

4 Q. Do you recognize Plaintiff's Exhibit 54?

5 A. Documents related to the internal affairs investigation on

6 the inmate who was brought into jail and appeared to succumb to a,

7 maybe a drug overdose, never actually got booked because he wasn't

8 in condition to be booked as he was brought in.

9 Q. Was this the individual L.W. who died in March of 2021?

10 A. Yes, sir.

11 Q. And did you rely on these materials as part of -- in order to

12 help form your opinion?

13 A. Yes.  The incident reports, the investigative reports and so

14 forth.

15 Q. If you could next turn to Plaintiff's Exhibit 56.  And do you

16 recognize these materials?

17 A. There appears to be more documentation relative to the same

18 case.

19 Q. What were these materials?

20 A. Internal affairs investigation.  And then we have

21 disciplinary letters, either issued or rescinding the other

22 status.

23 Q. And did you rely on any of these materials in forming your

24 opinion about this death?

25 A. Yes.

1   Q.   If you could turn to Plaintiff's Exhibit 58.  What are these

2   materials -- rather, let me ask, do you recognize these materials?

3   A.   Yes.  These are documents generated by the Jackson Police

4   Department relative to the same case.  And these are things that

5   transpired before he was brought into the jail.

6   Q.   Was it the Jackson Police Department who brought the

7   individual into the jail?

8   A.   Yes.

9   Q.   And did you rely on these materials in forming your opinion

10  about what happened in this death?

11  A.   Yes.  They helped lead up to what occurred.

12  Q.   Could you turn to Plaintiff's Exhibit 59.  Do you recognize

13  Plaintiff's Exhibit 59?

14  A.   Yes.  These are documents that were generated by the

15  then-jail administrator to assure summarizing what occurred.  This

16  was done initially at the point where the sheriff's office

17  position was that he was not one of their inmates because he

18  hadn't been booked.

19  Q.   And so, when you testified earlier they were originally not

20  going to investigate this, is this one of the memos that went into

21  your opinion?

22  A.   Yes.

23  Q.   Did you rely on these materials, as well, in forming your

24  opinion about what happened in this case?

25  A.   Yes.

1          MR. CHENG:  Your Honor, at this time, I would like to move

2   for admission of Plaintiff's Exhibit's 54, 56, 58 and 59.

3          THE COURT:  Any objection?

4          MR. MORISANI:  Just to Exhibit PX-54, your Honor.  There

5   is a document on the front page, but it doesn't appear to be

6   related at all.  It's like a news article clipping.

7          THE COURT:  Could you pull it up for me so I could see it?

8          MR. CHENG:  That would be Plaintiff's Exhibit 54, page --

9          MR. MORISANI:  First page, Your Honor.

10          MR. CHENG:  First page.

11   BY MR. CHENG:

12   Q.   Mr. Parrish, do you know what this document is that's in

13   front of you?

14   A.   I think it's a news story that was copied and then attached.

15   Q.   Okay.

16          MR. CHENG:  Your Honor, then we move only for admission of

17   Plaintiff's Exhibit 54 excluding that first page of the news

18   story.

19          THE COURT:  Okay.  Any objection?

20          MR. MORISANI:  No objection to that, Your Honor.

21          THE COURT:  All right.  P-54, minus that first page of the

22   news clipping would be received into evidence, along with P-56,

23   P-58 and P-59.

24          (Plaintiff's Exhibits 54 and 56-59 entered.)

25   BY MR. CHENG:

```
 1    Q.   You also reviewed a death of an individual in April 2021, a
 2    suicide in booking.  If we could turn to Plaintiff's Exhibit 62 in
 3    the book.  Do you recognize Plaintiff's Exhibit 62?
 4    A.   Yes.  These are some documents associated with that case
 5    indicating times that officers signed in and signed out of work.
 6    Q.   Did you rely on these documents in forming your opinion about
 7    that case?
 8    A.   Yes.  These are attached to a number of other documents that
 9    provided the information necessary to review it.
10    Q.   If you could turn to Plaintiff's Exhibits 63, 64, 65, 66 and
11    67.  63 through 67.
12    A.   Yes, sir.
13    Q.   Do you recognize those documents?
14    A.   These are the documents associated with this case, incident
15    reports, investigative reports.
16    Q.   And did you review these documents in forming your opinion
17    about the death in this case?
18    A.   I did.
19         MR. CHENG:  At this time, we'll move for admission of
20    Plaintiff's Exhibit 62 through 67.
21         THE COURT:  Any objection from defendant?
22         MR. MORISANI:  No objection, Your Honor.
23         THE COURT:  All right.  P-62, 63, 64, 65, 66 and 67 are
24    received into evidence.
25         (Plaintiff's Exhibits 62, 63, 64, 65, 66 and 67 entered.)
```

```
 1   BY MR. CHENG:
 2   Q.   Do you recall testifying about a suicide in C-Pod in
 3   July 2021?
 4   A.   Yes, sir, in Charlie four.
 5   Q.   If you could turn to Plaintiff's Exhibit 51 through 52?
 6   A.   I'm sorry.  Can you say those numbers again?
 7   Q.   51 and 52.
 8   A.   Yes, sir.
 9   Q.   Do you recognize Plaintiff's Exhibits 51 through 52?
10   A.   These are the documents associated with that incident,
11   reflecting how the sergeant and officer responded and found an
12   inmate hanging in Charlie four and what followed afterwards.
13   Q.   Did you rely on these documents in forming your opinion about
14   what happened in that death?
15   A.   I did.
16        MR. CHENG:  Your Honor, we move for the admission of
17   Plaintiff's Exhibits 51 through 52.
18        THE COURT:  Any objection?
19        MR. MORISANI:  No objection, Your Honor.
20        THE COURT:  All right.  P-51 and 52 are received into
21   evidence.
22        (Plaintiff's Exhibits 51 and 52 entered.)
23   BY MR. CHENG:
24   Q.   If you could take at look at Plaintiff's Exhibit 50.  Do you
25   recall testifying about a COVID death, Mr. Parrish?
```

1   A.   Yes, sir.

2   Q.   And do you recognize Plaintiff's Exhibit 50?

3   A.   Yes.

4   Q.   What is Plaintiff's Exhibit 50?

5   A.   An incident report indicating that an inmate had passed away

6   at the hospital due to COVID.

7   Q.   And did you rely on these materials in evaluating the death

8   of the inmate who died of COVID?

9   A.   They provided the information so that I was aware of what

10  happened, yes.

11       MR. CHENG:  Your Honor, at this time we move for the

12  admission of Plaintiff's Exhibit 50.

13       THE COURT:  Any objection?

14       MR. MORISANI:  No objection.

15       THE COURT:  P-50 will be received into evidence.

16       (Plaintiff's Exhibit 50 entered.)

17  BY MR. CHENG:

18  Q.   All right, Mr. Parrish, let me talk a little bit more about

19  the maintenance situation.  Did you ever make a recommendation for

20  the County to develop a more efficient and timely maintenance

21  system?

22  A.   Yes.  From the very beginning of our monitoring process.

23  Q.   What were you recommending?

24  A.   Among other things, we recommended that the County provide

25  the sheriff's office with a line item covering basic maintenance

1    requirements so that the County -- the sheriff's office would not

2    have to go through the requisition and ordering process for each

3    routine item or service.

4    Q.   Let's start with that one.  Why did you make that

5    recommendation?

6    A.   Well, the system that is in place is very bureaucratic and

7    very time-consuming.  If a toilet is plugged up, it meant

8    submitting a requisition to have something done; it had to go

9    through to the county maintenance people and a decision would be

10   made whether somebody inhouse would take care of it or somebody

11   had to be called in.  If electrical problems were being requested

12   to be serviced, same kind of thing, even to the point of getting a

13   fire extinguisher recharged required submitting a requisition

14   before something could be done.

15   Q.   Was the county maintenance department inside the sheriff's

16   department or outside of the sheriff's department?

17   A.   No.  The sheriff's office does not have any maintenance

18   people per se on staff.  They're county employees.

19   Q.   And was the county maintenance department maintaining its own

20   list of work orders from the jail?

21   A.   The county maintained a spreadsheet that showed the status of

22   work orders, but there was no central control with the sheriff's

23   office at the time.  And therefore, there was no accountability as

24   to what happened.  When I would question people they would say,

25   Well, I submitted a work order.  But when was that?  Maybe months

1  ago, but there was no follow-up to be able to see when and how

2  things were resolved.  That was subsequently changed when the

3  sheriff's office created the position of special chief safety and

4  security officer.  And that person, who was a sergeant, served as

5  a focal point for all work orders from the sheriff's office to go

6  through him.  And then he, in turn, would coordinate with the

7  county's maintenance people and subsequently with Benchmark

8  Construction when they came on board to keep track of all of those

9  orders.

10  Q.   Who was the sergeant you were dealing with?

11  A.   That sergeant, his name was Sergeant Winter.

12  Q.   And were you providing technical assistance to Sergeant

13  Winter in setting up maintenance programs for the jail?

14  A.   I coordinated with him.  I did not provide technical

15  assistance on doing maintenance.  His job was not to do any

16  maintenance.  It was to coordinate the collection of the work

17  order requests and keep track of them and then put out, like, a

18  monthly update on what work had been done and the status of those

19  work orders.

20  Q.   So has the problem with the delays in the requisition process

21  been fixed?

22  A.   No, it is not fixed, but they are at least dealing with fire

23  extinguishers.  They no longer have to submit a requisition.  The

24  fire safety officer has gotten approval to take fire extinguishers

25  to a particular place and have them recharged.

1   Q.   So are there any parts of your recommendation about the

2   requisition process that still needs to be adopted?

3   A.   Well, I would still recommend, and we stand by the original

4   recommendation, that the sheriff's office should have a line item

5   to take care of routine things.  If it is something major, like

6   huge roof repair or camera replacement, or something like that, by

7   all means, a requisition goes through.  The County goes through

8   the bidding and purchase price system.  But for routine things,

9   like fixing a lock, unplugging a toilet and doing whatever

10  throughout the jail system, up to a certain level, it would make

11  sense to have the sheriff's office have the authority to bring in

12  vendors up to a certain level and have work done instantly.  They

13  need some preapproved vendors to handle certain basic things that

14  occur constantly.

15  Q.   Do you know when you first made these recommendations to the

16  defendant?

17  A.   Probably the first -- within the first year of our monitoring

18  process, that was one the first things that struck us as we looked

19  at it.

20  Q.   Did the defendants' failure to implement your recommendation

21  contribute to the unsafe or unhygienic conditions in the jail?

22       MR. MORISANI:  Objection to the form, Your Honor.  That

23  question -- there is no obligation to follow these

24  recommendations.  That's why they are recommendations.

25       THE COURT:  I'm sorry?

1          MR. MORISANI:  Object to the form of the question because

2     it assumes that there is an obligation to accept the gentleman's

3     recommendations and the recommendations are just that.

4          THE COURT:  All right.  Objection overruled.

5     BY MR. CHENG:

6     Q.   You can answer the question, Mr. Parrish.  Did the

7     defendant's failure to adopt your recommendations contribute to

8     the unsafe or unhygienic conditions in the jail?

9     A.   By not adopting that recommendation, the problems that we

10    identified from the very beginning continued, and that affects

11    sanitation, safety and everything throughout the operation of the

12    jail system.

13    Q.   So it affects the timeliness of fixing locks?

14         MR. MORISANI:  Objection, Your Honor.  It is leading.

15         THE COURT:  Objection overruled.

16         THE WITNESS:  Yes.

17    BY MR. CHENG:

18    Q.   Does it affect the timeliness of repairing the alarm system?

19    A.   Yes.

20    Q.   Does it affect the timeliness of repairing the hall security

21    doors?

22         MR. MORISANI:  Objection, Your Honor.  He is leading the

23    witness.

24         THE COURT:  Objection overruled.

25         THE WITNESS:  Please restate that.

        BY MR. CHENG:

1   Q.   Does it contribute to delays in repairing the hall security

2   doors?

3   A.   Delays in securing --

4   Q.   In repairing hall security doors?

5   A.   Hall security doors.  Yes.  That's all part of the

6   maintenance process that's delayed.

7   Q.   Did the County ever retain contractors to help them identify

8   and make needed repairs?

9   A.   Yes.  After several years, they brought on board CML.  It is

10  a major contracting company for jails and prisons out of Texas.

11  That company services the entire Harris County jail system, which

12  is 9,000 beds.  It is one of the biggest in the country, so they

13  are a well-known and very competent company.  They were brought on

14  board to put Charlie Pod back online with working doors and

15  changing the doors to control rooms and to safety vestibules from

16  a sliding to a swinging configuration, and doing the same sort of

17  thing for cell doors.  They did a lot of work on Charlie Pod, but

18  at some point they stopped doing work for the county.  And my

19  understanding is, it was subsequently replaced by Georgia

20  Detention Services, a firm that then-Major Bryan brought on board

21  to provide that kind of service for Bravo Pod and to go back and

22  fix things that had broken down again in Charlie Pod.

23  Q.   Were you satisfied with the work, physical renovation work

24  that CML completed in C-Pod?

1    A.    CML was a very competent company, and they did good work.

2    Q.    So you testified earlier that C-Pod still has some broken

3    locks or some damage to physical plants?

4    A.    That is correct.

5    Q.    How does that happen if the construction work is adequate?

6    A.    CML fixed everything before they opened up Charlie Pod in

7    October of 2020.  But then, since it was not operated at all times

8    as a direct-supervision housing area and housing units were left

9    unattended, inmates still had the opportunities to break locks,

10   doors, and cause things to malfunction.  And that's what occurred

11   over the past year and three or four months.

12   Q.    If we could turn to Plaintiff's Exhibit 26.  And I might want

13   to check the binders behind you, Mr. Parrish.  Do you recognize

14   Plaintiff's Exhibit 26?

15   A.    Yes, sir.  It is a memo that was given to then Major Bryan by

16   Georgia Detention Services reflecting what their observations were

17   as they went through the facility, what things needed to be

18   repaired.  What their observations were and reflecting the -- what

19   they were -- would then have to look at to repair things for the

20   county.

21   Q.    Did you consider these materials as well in forming your

22   opinion about maintenance and conditions in the jail?

23   A.    Yes, sir.

24         MR. CHENG:  Your Honor, I would like to move in the

25   admission of Plaintiff's Exhibit 26.

1            THE COURT:  Any objections?

2            MR. MORISANI:  Just to completeness, Your Honor.  There is

3       a spreadsheet referenced in the second paragraph of this first

4       page of the letter.  It is not attached.

5            THE COURT:  Do you know what the spreadsheet is?

6            MR. CHENG:  Your Honor, I am not sure.  I would just note

7       that just because there is a reference to it doesn't necessarily

8       mean it was attached.  It could be referenced in another document.

9       Certainly, because it comes from the defendants, if it is needed

10      for completeness, they should be able to produce it themselves.

11           MR. MORISANI:  Your Honor, we have a copy of the

12      spreadsheet.  If they want to attach the spreadsheet, we wouldn't

13      have an objection to it.

14           THE COURT:  All right.  Thank you.

15           P-26 will be received into evidence.  The referenced

16      spreadsheet, if that is the appropriate one, will be made a part

17      of that exhibit.  Just makes sure it gets into the record in the

18      form it needs to be.  It will be received.

19           (Plaintiff's Exhibit 26 entered.)

20           MR. CHENG:  Yes, Your Honor.

21      BY MR. CHENG:

22      Q.  So, Mr. Parrish, in the first paragraph, there is a

23      discussion about the GDS team, their observations upon first

24      entering the facility.  And there is a mention about how, "The

25      gates being left open for workers to go in and out, along with all

1   the doors through B-Block into the hallway were all propped open."

2       Earlier you had testified about doors being propped open.  Is

3   this description similar to what you've seen, as well, on your

4   site visit?

5   A.  Yes, sir.  His report reflects the exact same things that I

6   saw when I went through there, that I saw routinely when I went

7   through there.

8   Q.  Just a few weeks ago, you did a site visit, right?

9   A.  Yes.

10  Q.  And at the time, were the legal proceedings pending,

11  including this show cause order for contempt?

12  A.  Yes.

13  Q.  Did the defendant and jail managers know you were coming to

14  this site visit?

15  A.  Yes.

16  Q.  And they knew you were going to do an inspection?

17  A.  Yes.

18  Q.  At the time, did you still find doors propped opened?

19  A.  Yes.

20      MR. CHENG:  At this time, I would like to introduce

21  Exhibit 48.

22  BY MR. CHENG:

23  Q.  Do you recognize Plaintiff's Exhibit 48?

24  A.  I do.

25  Q.  What is Plaintiff's Exhibit 48?

1   A.   Originally, Alpha Pod was slated to stay closed once the

2   repair work was done on Bravo, but the plan later changed to keep

3   housing units three and four open.  And in order to utilize those

4   housing areas with as little major overhaul as possible, the

5   major's proposal was to use those two housing units as

6   direct-supervision dormitories by removing the doors off of all

7   cells and making all the listed maintenance upgrades that were

8   necessary to be able to use that housing area on a continuing

9   basis.  And this was a list that was generated by Benchmark

10  Construction reflecting what work needed to be accomplished before

11  Alpha Pod 3 and 4, housing units 3 and 4 could be utilized as

12  direct-supervision dormitories.

13  Q.   And did you rely on this document in forming your opinion

14  about conditions in the jail?

15  A.   Yes.

16  Q.   At the time of your last visit, had these repairs all been

17  completed?

18  A.   No.

19       MR. CHENG:  At this time, Your Honor, I would move for the

20  admission of Plaintiff's Exhibit 48.

21       THE COURT:  Any objection?

22       MR. MORISANI:  No objection.

23       THE COURT:  P-48 will be received in evidence.

24  BY MR. CHENG:

25  Q.   Did the County also work with architects to develop a master

```
 1   plan for a new jail?

 2   A.   Yes.  With CDFL and HDR.

 3        MR. CHENG:  If we could introduce Plaintiff's Exhibit 33,

 4   please?

 5   BY MR. CHENG:

 6   Q.   And, again, this material is in the binder right behind you,

 7   Mr. Parrish, if you need to look at them.

 8        Do you recognize Plaintiff's Exhibit 33?

 9   A.   Yes.  CDFL put together a master planning preliminary report.

10   And it says, "Final master plan report," but it is far from final.

11   This was generated just over a year ago and laid out what the

12   County planned to do to build a new facility in closer to the

13   downtown area, right near Henley-Young, and to build it in

14   increments to ultimately replace the Raymond Detention Center and

15   possibly the work center.  This was the first phase of all of

16   that.  So it laid out plans and options, which were then later

17   fine-tuned and covered in a master planning committee report that

18   I sat in on and the monitor sat in on remotely.  I was there

19   personally at the end of my site visit in January.

20   Q.   So over time, the master plan has evolved?

21   A.   It is evolving yet.

22   Q.   And under the current plan, when is the anticipated opening

23   date for the new facility?

24   A.   It is estimated to take about five years to replace the

25   Raymond Detention Center.  I can't give you the exact dates
```

1    when --

2    Q.   Is between --

3    A.   When it would be built.

4    Q.   Between the report in 2022 and 2021, have there been any

5    delays in getting the new jail built?

6    A.   Well, the County is moving forward fairly expeditiously on

7    the planning for the new facility.  It is a long process to build

8    a new jail.  It is not something that happens overnight.  You

9    don't just grab something off the shelf and build it.  There is no

10   standard prototype that you go to.  This has to be designed to fit

11   that particular site.  There are water access considerations to

12   have a complete water supply that's separate from the city's water

13   supply and so forth that all deal with this project.  It is very

14   complicated.

15   Q.   After sitting through the most recent master planning session

16   and looking at the most recent records, do you have any concerns

17   with the direction the County is going with the new master plan?

18   A.   Well, the County is going the right direction and things are

19   best done incrementally, as opposed to all at once.  So I agree

20   with their step-by-step process.  I think that there needs to be

21   significant review of how things are to work and how things are to

22   be designed for operation, but that's part of the design process

23   that we can offer technical assistance on.  Then, if they want to

24   accept that, that's fine.  If not, well, then that's their

25   decision ultimately to live with.  But that's the kind of thing

1    that still needs to be done, and then linked to that needs to be

2    the things that I mentioned yesterday, which include the priority

3    list of things that need to be done with the existing facilities,

4    that right now, many of those items are listed in this master plan

5    report, but none of them are prioritized and there is no

6    commitment as to which ones will actually be done and which ones

7    are just things that we've looked at and said, this is something

8    that should be done.

9    Q.   And why do you recommend that they have some type of priority

10   for this process?

11   A.   Why do I recommend that they have some type of -- I missed

12   that word.

13   Q.   Why do you recommend that they develop priorities?

14   A.   Priorities, it's required by the stipulated order.

15   Q.   And what benefit is there to the safety of the jail if they

16   can develop priorities for fixing conditions in the jail?

17   A.   Well, things need to be done in significant order.  Those

18   things that will most significantly affect the safety of the staff

19   and of the inmates need to be accomplished first, and then other

20   things done later.  And they need to constantly review and update

21   what things are critical, what things we'll get to shortly and

22   what things we'll eventually get to.  And that is what needs to be

23   laid out.  It is called for in the stipulated order, but nobody

24   seems to have grasped the importance of complying with that yet.

25   Q.   Until they get the new jail open and set up some type of

1    priority list, will the conditions in the Hinds County Jail remain

2    unacceptably dangerous?

3    A.    Right now, there is no direction as to what needs to be done

4    first.  There is a long list of things that Benchmark has put

5    together and said need to be accomplished, but we don't know if or

6    when they will be.  And that will certainly affect the safety of

7    staff and inmates in the jail.

8    Q.    Was Major Bryan working on developing those types of

9    priorities?

10   A.    She was working with CDFL and HDR.  I don't know where they

11   stood on developing the priorities because nobody has been able to

12   provide us with an answer on that.  And that goes back over six

13   months that we've been requesting it.  We were promised it in

14   December.  It never materialized, and during the most recent site

15   visit, we reiterated the need to get that done quickly.

16   Q.    Let's move on to a different area, the incident reports, use

17   of force and investigation.  Have you ever reviewed the consent

18   decree incident use-of-force and investigation report

19   requirements?

20   A.    Yes.

21   Q.    What do those provisions require?

22   A.    Well, they require, for instance, that an incident report be

23   generated whenever there is use of force; that there be a

24   use-of-force supplement or report attached to that; that it be

25   reviewed by a supervisor; and that recommendations be made,

1    findings, by the supervisory staff; and that all that be taken

2    into account as they look at the policy into the future.  That is

3    the basic flow of what's supposed to happen.  And use-of-force

4    cases are then reviewed by internal affairs to determine

5    compliance with policy and whether anything needs to be done.

6    Q.   And if somebody doesn't complete an incident report, or

7    doesn't complete it accurately, does this throw off the flow of

8    that investigative process?

9    A.   Certainly.

10   Q.   Do you consider the incident reporting process to be one of

11   the fundamentals to basic recordkeeping in the jail?

12   A.   Yes.  Any jail has to maintain written records of what

13   transpires on a daily basis, and incident reports cover everything

14   that goes on in the jail, not just use of force.  I mean, whether

15   there's a mechanical issue or some kind of a personnel problem or

16   whatever may be occurring within the jail system, an incident

17   report should be generated so that there is some record of it and

18   so that supervisory and command staff have the opportunity to know

19   what's going on with a great level of detail throughout the entire

20   jail system on a daily basis.

21   Q.   Are incident reports necessary if the administrators want to

22   be able to supervise their staff to make sure they are complying

23   with a policy?

24   A.   Certainly.

25   Q.   Do incident report requirements allow administrators to

1    address problems before they endanger --

2         MR. MORISANI:  Objection.  Leading.

3         THE COURT:  Objection sustained.  Try to avoid leading the

4    witness.

5         Rephrase your question.

6         MR. CHENG:  Yeah.

7    BY MR. CHENG:

8    Q.   How do incident reports get used in order to ensure safety in

9    a jail?

10   A.   Well, incident reports provide information to the upper

11   levels of the jail administration, and they get to see trends,

12   certain things that keep happening over and over again.  Maybe

13   there's an instance of OC being used by certain officers, or only

14   in certain areas of the jail these certain things happen.  So then

15   you're able to identify issues, whatever they may be, and address

16   them if they need corrective action.  That's how things come to

17   your attention.  The administrator and command staff can't be on

18   the front lines at all times.  They depend upon the officers who

19   are handling the day-to-day activities to generate reports of

20   significant events, whatever they may be, whether it's

21   a mechanical problem or an operational one, or, as I said, a life

22   safety one.  And that information needs to go routinely to and be

23   reviewed on a daily basis by the command staff.

24   Q.   Are incident reports also used to identify trends of behavior

25   activities in the jail?

1  A.   That's what I was making reference to.  Yes.  When you see a

2  certain event happening over and over again that has never

3  occurred before, it causes one to say, What's going on?  What's

4  different?  Has there been a change of some type?

5  Q.   After they had a couple of deaths in booking, did they stop

6  using booking for people with mental health issues?

7          MR. MORISANI:  Objection, Your Honor.  Leading.

8          THE COURT:  Objection overruled.

9          THE WITNESS:  Booking has continued to be used for the

10  most difficult and obstreperous inmates, regardless of what's

11  happened over the past five years.

12  BY MR. CHENG:

13  Q.   Have the defendants been requiring incident records to be

14  completed when staff hold detainees past the release date?

15  A.   I apologize.  I couldn't understand the last part of that.

16  Q.   Sure.  Have the defendants been requiring incident reports to

17  be completed when staff hold detainees past their release date?

18  A.   That has been ordered, but it's still not occurring.

19  Q.   Have there also been some incidents where medical staff may

20  have identified a sex abuse case which was not investigated?

21  A.   I'm sorry.  Please repeat that one.

22  Q.   Have there also been some incidents where medical staff may

23  have identified a possible sex abuse case which has not been

24  investigated?

25  A.   I understand now.  There are instances where people end up in

1   medical, and there is no record of how they got there or why.

2   Medical looks at them and determines that something has happened,

3   such as possibility of sexual abuse, and that's where the

4   information comes from, as opposed to what even caused them to be

5   transported to medical.  Yes.

6   Q.   I think yesterday you mentioned something about assaults in

7   incident reports.  Have there been any situations where assaults

8   were not reported as assaults?

9   A.   Where assaults were not reported as assaults?

10  Q.   Right.

11  A.   Yes.  That's been a long-standing problem, that incident

12  reports are, in my words, mislabeled.  They're titled with the

13  wrong thing.  It may reflect disorderly conduct or something like

14  that when it's actually an assault of one person on another or

15  that sort of thing.  And so there have been continuing efforts on

16  the part of staff -- command staff and IT to try and force

17  officers to make the right selections.  They've made some changes

18  towards that, but it continues to be a problem with the wrong

19  titles being associated with incident reports, and sometimes it's

20  necessary to read the incident report to figure out what it really

21  was, what the incident was really about, as opposed to what the

22  title says it was.

23  Q.   Have you made recommendations on how to improve that

24  reporting process?

25  A.   Well, among other things, we suggested that supervisors, when

1  they review it, make that change.  You know, that's the purpose of

2  supervisory review is this was misstated.  Your incident report

3  talks about something happening and it's really something else

4  completely different.  That's what supervisory review is supposed

5  to help with.

6  Q.  And is that type of supervisory review going on?

7  A.  By and large, supervisory review does not result in changes

8  to anything.  It just simply means that it's passed through the

9  supervisor.  As I made reference to yesterday, the sign-and-send

10  mentality as opposed to the review, make recommendation and

11  suggestions that are necessary.

12  Q.  Yesterday you talked about the death of MR, who was killed by

13  other inmates during an assault.  How was that incident report

14  originally captioned?

15  A.  I'm sorry.  I don't mean to be obtuse here, but did you say

16  MR or what?

17  Q.  Well, let's just talk about the death.  Yesterday you talked

18  about an inmate who was killed by other inmates?

19  A.  Yes.

20  Q.  Were there any issues with the way that incident report was

21  originally described?

22  A.  Oh, yes.  Now, this is the incident in Alpha 4 where an

23  inmate was beaten and died and was found some nine hours later.

24  And that initial report just talked about inmate injury.  It

25  doesn't -- it was not reflective of what really occurred at all,

1  and it was, like, about one minor paragraph long.  Subsequently,

2  there was a great deal more information generated.

3  Q.   Do they have any tracking or early warning system to identify

4  problem staff or inmates?

5  A.   No.  And that's a process that should be in place in a jail

6  to keep track of, for instance, the number of times use of force

7  is attributed to a particular officer.  And then you look at is it

8  because of where he or she may be assigned and the type of inmates

9  he has to deal with, or is it because of his or her predilection

10  for turning to that as the first alternative, as opposed to

11  deescalation techniques.  That's the kind of thing that is put in

12  place in good operations to be able to track things and then

13  identify potential problems and try and get them resolved so it

14  does not continue.

15  Q.   When you were reviewing incident reports, did you find

16  reports which suggested that the officers did not discover an

17  assault and someone else had to report the assault?

18  A.   That's very routine that inmates self-report that they've

19  been assaulted, or other inmates report that somebody in their

20  housing unit has been assaulted, or worse yet, sometimes

21  information gets out to family or friends on the outside and it's

22  been called in to the jail, and that's how the staff finds out

23  about what's actually happening within the facility.

24  Q.   And does that raise any concerns to you about the level of

25  staffing or supervision in the jail?

1    A.   It just supports the proposition that we've been pointing out

2    all along, that there is inadequate supervision, that direct

3    supervision is not in place, and therefore the officers in the

4    jail are responsive to problems, not able to prevent problems.

5            MR. CHENG:  If we could introduce Plaintiff's Exhibit 23.

6    BY MR. CHENG:

7    Q.   Do you recognize Plaintiff's Exhibit 23?

8    A.   Yes, sir.  This is an incident report dealing with the last

9    thing that I mentioned, with a family member calling in to the

10   jail and advising them of an assault that occurred within the

11   jail, and that's reflective of that.

12   Q.   Did you ever consider this type of -- this incident in

13   forming your opinion?

14   A.   Yes.

15           MR. CHENG:  Your Honor, at this time, we'd move to admit

16   Plaintiff's Exhibit 23.

17           THE COURT:  Any objection?

18           MR. MORISANI:  No objection.

19           THE COURT:  P-23 will be received into evidence.

20           (Plaintiff's Exhibit 23 entered.)

21   BY MR. CHENG:

22   Q.   If we could turn to Plaintiff's Exhibit 74, on page 4.  Let's

23   first turn to page -- Exhibit 74.  And let's go to page 4.

24   A.   Thank you.

25   Q.   Did you ever review this incident report in forming your

1  opinion?

2  A.   Yes.

3       MR. CHENG:  Your Honor, I would like to move for the

4  admission of Plaintiff's Exhibit 74.

5       THE COURT:  Any objection?

6       MR. MORISANI:  No objection.

7       THE COURT:  P-74 will be received into evidence.

8       (Plaintiff's Exhibit 74 entered.)

9  BY MR. CHENG:

10 Q.   And was there anything about this incident that raises

11 concerns on your part about the staffing or supervision in the

12 jail?

13 A.   Well, in addition to the fact that it dealt with a situation

14 that's carried over outside of the jail even, it pointed out the

15 lack of cooperation between security staff and medical staff, lack

16 of support for medical staff.  That was a pretty concerning

17 incident report.

18 Q.   Let's move on to another area.  Do detainees with serious

19 mental illness pose any special challenges for security staff?

20 A.   Certainly.

21 Q.   Does the jail provide detainees with serious mental health

22 conditions the type of supervision they need for a reasonable

23 degree of safety?

24 A.   Not at the present time.

25 Q.   Do they provide them with humane living conditions?

1  A.   Do they provide them with...?

2  Q.   Humane living conditions.

3  A.   That's not possible at the present time.

4  Q.   And why do you consider these detainee conditions to be

5  unsafe or inhumane?

6  A.   Well, they are not safe or humane for the general population.

7  SMI inmates, special -- or serious mental health inmates are even

8  more problematic than general population.  If anything, they

9  require even more intensive supervision, and just -- that's not

10  possible at the present time, so therefore, they react violently

11  on many occasions.  And there is a huge percentage of the inmate

12  population that has serious mental health needs.  It's approaching

13  about 33 percent of the total population in the Hinds County Jail

14  system.

15  Q.   So where do they place the most challenging detainees with

16  serious mental health conditions in the jail?

17  A.   What happens is, some of them are placed in Charlie 4, which

18  is the confinement area.  Sometimes they're placed in an iso unit.

19  There are two, four, six iso units at the Raymond Detention

20  Center.  That's where there are four cells in a small area, like a

21  junior version of a housing unit.  And sometimes they are even

22  placed in a holding cell in booking.

23  Q.   And what are conditions like in those confinement units?

24  A.   Those are the most severe within the jail system.  They're

25  the most restrictive as to inmate movement or activity.

1    Q.   Do you consider them safe?

2    A.   Well, the attempt is to isolate those people so that they are

3    not a danger to themselves or others, but all too often in those

4    areas, there have been serious assaults anyway because of the

5    inability to keep people confined in their cells, or suicide

6    attempts or even successes.

7    Q.   Are those confinement units appropriate physical facilities

8    for having programs or therapy?

9    A.   They don't have the space for that, and the jail does not

10   have the support staff for that at the present time.

11   Q.   Is the jail working on a mental health unit?

12   A.   Yes.

13   Q.   Does a mental health unit -- how does a mental health unit

14   combine security with mental health care?

15   A.   Well, a mental health unit would have a dedicated area for

16   that type of inmate, dedicated staff, not just any officer.  It

17   would have to be properly trained officers who routinely work

18   there.  That makes a difference when you're working with mental

19   health inmates.  Not every officer can work with that kind of

20   person.  And then it requires dedicated mental health staff to

21   support that, to be able to provide the programming and assistance

22   that's necessary, linked together with medical.

23        And the idea is to take a housing unit in Bravo and make that

24   a dedicated mental health unit with support office space in the

25   back of the control room, with dedicated space on the either side

1   where they used to have noncontact visitation that's not used

2   right now, and where they have just an open visitation space

3   that's not dedicated for any particular use right now.

4       To put those things in place, to provide the specialized

5   training for the officers, and to provide the supplemental mental

6   health staff to deal with them, that's how they're approaching it,

7   and it's the right way to try and do things.

8   Q.   When did you first recommend opening up a mental health unit?

9   A.   Well, it may be more appropriate to question Dr. Dudley about

10  that, but this goes back years.

11  Q.   And has a mental health unit been opened?

12  A.   It has not been opened yet.

13  Q.   Why couldn't a jail administrator just take their mentally

14  ill patients and ship them to outside hospitals or the state

15  hospital?

16  A.   It's a phenomenon in the United States that over the past 60

17  plus years, close to 600,000 mental health beds in the United

18  States have been closed, and as a result, the states have gotten

19  out of the business of providing mental health care for people who

20  require it, and the alternative as been to put them in jail.  So

21  jails are now the largest mental health facilities in the United

22  States.  They were not designed for that, they are not equipped

23  for it, and it's a totally unsatisfactory solution to the problem.

24      But it's because back in the days of the Vietnam War, the

25  decision was made to shut down these facilities and provide

1    community-based service.  The community-based service was never

2    provided because all the money started going to the Vietnam War,

3    and the federal government never picked it up after that.  But

4    states got the message and realized we can save a lot of money if

5    we shut down mental hospitals.  And so that's what has happened.

6    It's a nationwide phenomenon.

7    Q.   Did the CJCC allow jail officials to work with community

8    mental health officials to deal with these issues?

9    A.   Yes.  It's an important part of a well-run operation to link

10   with the community services to either bring them into the jail or

11   to provide support, however possible.

12   Q.   I'd like to talk a little bit about, if we have to talk

13   about, remedies.  Do you have any opinion as to whether the

14   deficiencies in the jail are a grave and immediate threat of harm

15   to detainees in the jail?

16   A.   I think the summation of my testimony has been that that's a

17   significant problem, yes.

18   Q.   And what's the basis for that opinion?

19   A.   Unfortunately, it's based on statistics and personal

20   observations.  Statistics regarding the number of assaults, the

21   number of problems that occur within the jail system, the staffing

22   levels, the downward trend in staffing instead of improving, and

23   personal observations regarding really significant maintenance

24   issues that have been there from the very beginning of our

25   monitoring process.  And in spite of all the best efforts on the

1  part of the County to correct things, insufficient progress has

2  been made.  And unfortunately, even after repairing things,

3  sometimes two times, over a period of 12 years, I mean, a whole

4  pod, has being destroyed again because of lack of supervision,

5  because of lack of the ability to implement direct supervision in

6  the housing units.

7  Q.  Have measures less drastic than a federal takeover been

8  attempted in this matter?

9       MR. MORISANI:  Your Honor, we'd object.  Based on the

10  discussion we had yesterday, this witness has not been proffered

11  as an expert on remedies.  And even if he has, they never

12  disclosed his opinions related to remedies.

13       THE COURT:  Objection overruled.

14  A.  Would you please restate it.

15  BY MR. CHENG:

16  Q.  Have measures less drastic than a federal takeover been

17  attempted to achieve compliance in this matter?

18  A.  During the duration of the monitoring process, certainly we

19  worked with the County and the sheriff's office to try and put

20  together priority recommendations after each monitoring report so

21  that they would concentrate on significant things.  So the next

22  time, hopefully, it would not see that issue in the monitoring

23  report.  Subsequently, there was ultimately a stipulated order

24  which was put in place two years ago to reduce the number of,

25  basically, priority items for the sheriff's office and County to

1    zero in on.  And that has led us to today, where we're trying to

2    make a decision.

3    Q.   They failed to implement any of the provisions of the

4    stipulated order?

5    A.   They have implemented some of the provisions of the

6    stipulated order, yes.  But there are significant ones that have

7    not be corrected.

8    Q.   Which ones have not been corrected?

9    A.   They haven't solved the staffing problem.  They haven't given

10   the list of corrective actions for the existing facilities in

11   priority order.  We still don't have dedicated mental health unit.

12   We still have issues across the board.

13   Q.   But they keep on using booking?

14   A.   Booking continues to be used to house inmates, and that's not

15   supposed to continue.

16   Q.   Did they ever grant retention bonuses to people --

17          MR. MORISANI:  Objection, Your Honor.  Leading.

18          THE COURT:  Try not to lead the witness.

19          Objection sustained.

20   BY MR. CHENG:

21   Q.   Do you have an opinion as to what will happen if this case

22   does not get a receiver or some type of outside jail manager?

23   A.   I don't see any solutions to the problems.

24          MR. MORISANI:  Your Honor, we just renew our objection.

25   We were never provided opinions related to remedies.

```
 1            THE COURT:  Objection overruled.
 2    BY MR. CHENG:
 3    Q.   And what's the basis for this opinion?
 4    A.   I apologize.  I can't hear you.
 5    Q.   What's the basis for your opinion?
 6    A.   There has been excessive turnover of people at the command
 7    levels in all areas of county and sheriff's office operations.  I
 8    mean, we dealt with five different sheriffs, four jail
 9    administrators, either three or four county administrators.
10    Unfortunately, we, on the monitoring team, now look upon ourselves
11    as the walking historians that we know the history of what went on
12    here better than many of the primary decision makers that are
13    involved in this.  And every time we look at what is going to be
14    done, it's -- we're a new broom, we're just starting and that's
15    why we're here.  So I have problems with an expectation that
16    suddenly everything is going to turn around.
17            MR. MORISANI:  Move to strike, Your Honor.  Nonresponsive.
18            THE COURT:  Objection overruled.
19    BY MR. CHENG:
20    Q.   Has spending money by itself been able to solve the problems
21    at the jail?
22    A.   Well, spending money on the right things certainly helps.
23    But spending money alone is not the solution.  It needs to be
24    spent on the right things.  Yesterday I think I made a mention of
25    a recommendation that we made to spend just a little bit of money
```

1    on a camera and alarm on each of the fire exit doors in the four

2    housing units of the work center.  By doing that, which was a

3    nominal expense, we were able to save the County the salaries of

4    20.4 officers from here on.  And that's a lot of money over time.

5    So that -- if the emphasis is put in the right places, spending

6    money is absolutely beneficial, but it needs to be well tailored.

7    Q.   Have the defendants been spending the resources in a prudent

8    manner to try to fix the jail?

9    A.   They have been spending their resources trying to fix the

10   jail, but I think the real issue is that until they are able to

11   take control of those areas that have been repaired through the

12   implementation of direct supervision, it is going to be a

13   recurring cycle of damage and repair, damage and repair.  That

14   doesn't make good economic sense.

15   Q.   There was some discussion, I think in the introduction from

16   the defense, about some of these other facilities, like the work

17   center and Henley-Young.  If Henley-Young were no longer used to

18   house youths, could the jail provide the required services to the

19   youth?

20   A.   Short answer is no.  They would have to go back into the

21   facility and they were moved out because the jail could not

22   provide what was necessary.  And worse yet, it allowed for mixing

23   of adults and juveniles.  Even though they were always supposed to

24   be kept separate, that didn't happen in reality.  And that was why

25   it was a good move on the part of the County to physically move

1    them to a juvenile facility.

2    Q.   Have the defendants themselves created any of the barriers

3    for compliance with the Court's orders?

4         MR. MORISANI:  Objection.  Leading.

5         THE COURT:  Objection sustained.  Rephrase your question.

6    BY MR. CHENG:

7    Q.   What types of institutional barriers remain for the County in

8    order to get into compliance with the Court's order?

9    A.   The first thing that I think I would like to see is better

10   communication between the County and the sheriff's office to be

11   able to jointly move forward with things that are necessary to

12   deal with salaries, benefits, career path, maintenance, priority

13   repair issues, master planning for the new facility.  The board of

14   supervisors, for instance, is not going to manage the jail, but

15   they are funding it, and they should have some input into what

16   kind of facility is planned for and designed.  That's important.

17   It is a joint decision.  I would like to see more open and

18   complete communication between them, and then when decisions are

19   made, basically, all parties standing together and saying this is

20   the way we are going to move.  They are both parties to the case

21   and that would be, I think, a refreshing change.

22   Q.   Have the defendants ever made promises to do things that they

23   did not keep?

24   A.   Well, there have been lots of things that have been proposed.

25   When you say "promises," I do not have access to written documents

```
 1   that say, This is what we're going to do.  I can give you an
 2   example, though, in that the County at one point hired a different
 3   local architect and planned to temporarily shut booking down, move
 4   it to the work center and then refurbish booking as an open
 5   booking concept, and then put a drive-thru sally port at the work
 6   center, build another housing unit there.  This is before the
 7   Jackson Detention Center was closed, with the object being to be
 8   able to move all the female inmates to that facility, use that as
 9   booking temporarily and then when it was no longer used as the
10   interim booking, make the work center be a five-unit housing
11   facility.  That architect spent a lot of time and effort
12   developing some pretty comprehensive plans, and then the whole
13   thing suddenly died.  And it -- you can equate that to making a
14   promise or a move forward in one direction, but then just
15   stopping.
16   Q.   If the Court terminates the consent decree, do the defendants
17   currently have the capacity to protect detainees from assaults or
18   violence?
19   A.   Mr. Chen, I'm sorry.  I couldn't understand.
20   Q.   If the court terminates the consent decree do the defendants
21   currently have the capacity to protect detainees from assaults or
22   violence?
23        MR. MORISANI:  Objection.  Leading.
24        THE COURT:  Objection, overruled.  You could repeat the
25   question if you don't -- it looks like he does.
```

1          THE WITNESS:  I have it.  No.  They are not prepared to

2     provide the level of supervision and provide the security that's

3     necessary.

4     BY MR. CHENG:

5     Q.   If the jail is not made safe and secure, will that have any

6     impact on public safety or the criminal justice?

7     A.   In one sense, it's kind of out of sight, out of mind.  But if

8     the problem gets put on the jail and the jail administration, it

9     doesn't necessarily mean that it affects the safety of the

10    community, but certainly it affects the expeditious processing of

11    the criminal justice system if people are held in jail either

12    overly long or without being charged or -- there is a tight

13    relationship between the operation of the jail and the criminal

14    justice system.  The two are tightly in link and one affects the

15    other.  And to that extent, that is the best answer I can give

16    you.

17    Q.   Does what happens to the detainees in the jail affect their

18    condition when they are released?

19    A.   Well, I am sure that anything that happens to somebody while

20    they are in jail kind of stays with them after they get out.

21    Unfortunately, there is no prerelease program in place to prepare

22    people to be released.  There is nothing that provides them with

23    resources to turn to once they get out of jail to make sure that

24    they are able to find employment or where to turn to for medical

25    or mental health care or that sort of thing.  That's something

1    that should be in place, particularly in a prison, but certainly

2    in a jail because of the high turnover that jail is experiencing.

3    Q.   What does turnover have to do with release?

4    A.   I think a lot of people don't realize that there are about

5    between 10 and 12 million people a year that go to jail.  The

6    numbers are staggering.  We've got about two million people

7    incarcerated in the United States.  About a million-and-a-half of

8    them are in prison.  About 600,000 plus are in jails.  But coming

9    to and getting out of jail on a daily basis, on an annual basis,

10   between 10 and 12 million.  Those are huge numbers.  And all of

11   those people need some attention so that they don't keep coming

12   back.

13   Q.   And how would you assess Hinds County's ability to deal with

14   that kind of turnover compared to other places?

15   A.   It is not on the drawing board right now to deal with.  The

16   real issues are dealing with being able to properly secure and

17   supervise the inmates while they are in jail.

18   Q.   So are the defendants paying any attention to this issue?

19   A.   I can't really speak to that, except it's not at the top of

20   the list of priorities because it's important, but critical are

21   the things that we've been talking about here, safety and

22   security.

23   Q.   Does the jail currently provide a reasonable degree of safety

24   to detainees?

25   A.   No.

```
1    Q.   Do you think the jail will ever become reasonably safe if the
2    consent decree were to be terminated?
3    A.   We're here because the problem existed and the settlement
4    agreement is addressing the problem and the problem has not gone
5    away.  So if the settlement agreement is terminated, I don't see
6    any change in the status.
7              MR. CHENG:  Thank you, Mr. Parrish.  We're done.
8              THE COURT:  Thank you, Mr. Cheng.
9              We're going to get ready to take our morning break before
10   -- because I assume there's some cross-examination.  But for the
11   record, with respect to the objection related to Mr. Parrish
12   testifying about the remedy portion, I've looked back at Docket
13   No. 134-1.  Mr. Parrish was designated as an expert in the area --
14   in several areas -- well, I think three areas are specifically
15   indicated, but I see in the disclosures he's a subject matter
16   expert for corrections, penology, detainee security, jail safety,
17   jail management and administration.  And part of what he'll be
18   testifying about, according to the disclosures, his role and
19   duties as a monitor, the monitoring process, and his historical
20   observations and interactions with defendants.  Those observations
21   are reflected in part and summarized in the monitoring reports,
22   including defendants' compliance with the Court's orders:
23   Protection of harms, use of force, incident reports,
24   investigations, segregation, and grievances, and a litany of other
25   things, including staff turnover, training and management of jail
```

1  staff, and defendants' lack of planning and progress into --

2  progress in coming into compliance with the court orders and

3  policies and procedures.

4       So if this witness can -- is providing testimony about

5  what the defendants have not done and what they continue not to

6  do, I think that this expert's, and these experts who will be

7  testifying -- I've looked at one of the other witness's

8  disclosures as well.  If the County -- if their testimony is that

9  the County has not been complying with the Court's orders, they

10  certainly ought to be able to talk about and testify about the

11  appropriate remedies.

12       I think part of the testimony is, in fact, that there were

13  stopgap measures that were used and this Court noted back when the

14  stipulated order was entered, that order itself was -- was

15  fashioned after the defendants failed to comply back in 2019 on

16  the heels of the consent decree.  So these experts ought to be

17  able to testify about the historical record in this case.  This

18  court is aware of the status conferences that are a part of or

19  will be a part -- well, they are part of the judicial record.

20  They're on the docket, the status conferences where commitments

21  were made, promises were made, and other things.

22       And so the parties are on notice.  As this Court has

23  already told the parties in the most recent status conference, in

24  preparing for this hearing yesterday, I specifically asked the

25  parties -- the parties have given up names of receivers, but I

1    also asked the parties to -- is there anything less than that that

2    might be appropriate, or is there anything greater than a

3    receivership?  We're looking at the wide continuum of things, so I

4    am going to allow those experts who have been designated so far to

5    testify about those areas.

6         The County pushed for a nonbifurcation of these

7    proceedings and initially tried to walk back from it, but the

8    County has chosen to bring this matter as it is in its current

9    form.  So these experts will definitely be able to offer opinions

10   as to what the appropriate remedy is, or what are the range of

11   remedies that this court has.  And it may be that at the end of

12   the day, the -- who knows?  The testimony might reveal that the

13   Court should do nothing more than what's been done over the last

14   six years.

15        So -- so I wanted to get some further clarification so

16   that the parties will know how we'll be proceeding.  I don't want

17   anybody to be blindsided.  I want people to put on their best

18   case, and that's why we're here, and that's why we will continue

19   to be here for as long as we need to be here.

20        We are going to take a 20-minute break, and then I presume

21   the County will begin its cross-examination of Mr. Parrish.

22        (Recess taken.)

23        THE COURT:  You may be seated.

24        Mr. Parrish, you may return to the stand.

25        A couple of housekeeping matters.  I assume the witnesses

1    who are watching in have had no problem.  Have they reported any

2    problems with seeing, hearing?  I assume that they have not.  I

3    have not received any message that they have not been able to.

4    Yeah, I just wanted to make sure.

5         The other thing.  I am going to ask the parties again, you

6    can go at whatever pace you wish to.  But I did note that I think

7    with all the exhibits that came in, there were only two of which

8    that were -- had some sort of question about.  One exhibit dealt

9    with the -- I think that was P-54 that had the news story article

10   as the first page, and then the other one -- there was an

11   objection to another one that was -- it may not have been

12   complete.  I don't think there were any real substantive

13   objections to any of the other exhibits.  And I want the parties,

14   if they can, at some point in time take some steps to stipulate to

15   these exhibits if there are no objections.  That will help move

16   things along.  Otherwise, we have to go through the formal process

17   of making sure that there's testimony that supports them and then

18   move them into evidence.  But there have been no real objections

19   to them.

20        So I know the parties have not been able to reach

21   agreement on a number of things, but hopefully, during some point

22   in time, we can reach agreement on some of these or all the -- we

23   went through a whole bunch of exhibits, so it's more than half of

24   them now.  But if there is any need to -- if we can jettison the

25   idea of laying a foundation for each of the future exhibits,

1  hopefully, we can get to that point.

2        But, Mr. Morisani, that's all I had, and you may proceed

3  with your cross-examination.

4                        CROSS-EXAMINATION

5  BY MR. MORISANI:

6  Q.  Mr. Parrish, you started out with the Hillsborough County

7  Sheriff's office as a certified law enforcement officer, didn't

8  you?

9  A.  I actually started out as the planning, research, and

10  training officer, which initially was a civilian position.  Within

11  a year, I went through the Tampa Police Academy and became a sworn

12  law enforcement officer, that's correct.

13  Q.  And to this day, you're not a certified correctional officer,

14  are you?

15        THE COURT:  Keep your voice up, Mr. Parrish.

16        And what did you say, Ms. Bartee?  Okay.

17        Slow down just a little bit, Mr. Morisani.  Hold on one

18  second.

19        MR. MORISANI:  Thank you, Your Honor.

20  BY MR. MORISANI:

21  Q.  Mr. Parrish, you've never been certified as a detention

22  officer, have you?

23  A.  No, sir.

24  Q.  And your first position, as you mentioned, with the

25  Hillsborough County Sheriff's Office, it involved law enforcement

```
 1    training, did it not?
 2    A.   Yes, sir.
 3    Q.   It also involved speech writing, correct?
 4    A.   Yes.
 5    Q.   And it involved federal grant management?
 6    A.   Yes.
 7    Q.   And budget presentation?
 8    A.   Yes.
 9         THE COURT:  You need to slow down just a little bit.
10         MR. MORISANI:  Yes, sir.
11         THE COURT:  Does he need to remove his mask?  Would that
12    help?
13         You're fine.  You just need to slow down.
14         MR. MORISANI:  Yes, sir.  I'd be glad to remove it if you
15    want me to.
16    BY MR. MORISANI:
17    Q.   So you moved from there into a roll, as I understand it, as a
18    major in charge of the administrative division of the Hillsborough
19    County Sheriff's Office, didn't you?
20    A.   Yes.
21    Q.   In that role, your responsibilities included serving as
22    personnel director, correct?
23    A.   At that time, that was included under administration, yes.
24    Q.   And you also, I think, directed civil process and court
25    service bureaus, right?
```

1    A.    Yes.

2    Q.    And from there it looks like you briefly served as commander

3    of the services division; do I have that right?

4    A.    That's correct.  We created a new division called services

5    and broke that out separate from administration.

6    Q.    And in that role you were responsible for technical support,

7    correct?

8    A.    That's correct.

9    Q.    Electronic maintenance?

10   A.    Yes.

11   Q.    Vehicle maintenance?

12   A.    Yes.

13   Q.    And you were also responsible for communications, correct?

14   A.    Yes.

15   Q.    Now, you were named commander of the department of detention

16   services in 1981; do I have that correct?

17   A.    August of 1981.

18   Q.    I want to understand and put it all together.  You went

19   straight from your role as commander of the services division to

20   commander of the department of detention services, right?

21   A.    Back then it was called the board of criminal justice.  That

22   was the title that was created when all of the jails that were run

23   by the City of Tampa, the police department, the city sanitation

24   department, board of county commissioners, and the Tampa Police

25   Department, were all consolidated by a special act of the

1    legislature as a separate entity administered by the sheriff.  It

2    was called the board of criminal justice, and that's what I was

3    put in charge of.

4    Q.   Thank you for that, Mr. Parrish, but my question is more

5    simple.  You didn't do anything in between those two roles,

6    correct?

7    A.   No.

8    Q.   Now, as commander of the department of detention services,

9    you were the administrator of the jail system, correct?

10   A.   Yes.

11   Q.   You had supervisors that worked under you, right?

12   A.   Yes.

13   Q.   So it really wasn't your job to supervise any particular part

14   of operation of the jail system, booking or otherwise, because you

15   had supervisors to do that, right?

16   A.   I was responsible for the total operation.

17   Q.   I'll take -- that's an -- that's a yes to my question?

18        MR. CHENG:  Objection, Your Honor.

19        THE COURT:  Objection overruled.

20        THE WITNESS:  I did not directly supervise a particular

21   component of the jail system.  I supervised the entire jail

22   system.

23   BY MR. MORISANI:

24   Q.   And you had supervisors to do that for you, correct?

25   A.   Yes.

1    Q.   Okay.  It was your job to make sure the whole system ran

2    properly, right?

3    A.   Correct.

4    Q.   So before assuming the role as commander of the Department of

5    Detention Services, you never served as jail manager, did you?

6    A.   No, I did not.

7    Q.   And in your own words, I think you said you came through the

8    side door.  Is that correct?

9    A.   When I started with the sheriff's office, I was the only

10   person in the whole organization with a master's degree in

11   criminal justice, and that's how I came into that position.

12        MR. MORISANI:  Your Honor, I'd move to strike as

13   nonresponsive.

14   BY MR. MORISANI:

15   Q.   And the question was simply:  In your own words, have you

16   described that as coming in through the side door?  Yes or no?

17   A.   I think that's the wording that I used, yes.

18   Q.   And again, using your own words, you never came up through

19   the ranks, did you?

20   A.   No, I did not.

21   Q.   Now, I think you acknowledged in the Shields case that your

22   primary role was administrative, wasn't it?

23   A.   Yes.

24   Q.   In that administrative role, you reviewed and authorized

25   Hillsborough County detention policies and procedures, didn't you?

```
 1    A.   Yes.

 2    Q.   And you tasked others to write those policies and procedures,

 3    and you would review and approve them, correct?

 4    A.   Yes.

 5    Q.   And those policies and procedures are still in place today?

 6    A.   Well, they have been modified since I was there, but they

 7    still have policies and procedures, yes.

 8    Q.   Are the bones of the policies still yours?

 9    A.   I couldn't answer that.  I've been retired from Hillsborough

10    for 13 years.

11    Q.   And you never worked as a guard assigned to the booking

12    process, did you?

13    A.   No.

14    Q.   What was that?

15    A.   I said no.

16    Q.   Thank you.  And in fact, you never worked as a jail security

17    guard, did you?

18    A.   No.

19    Q.   Mr. Parrish, your resume, it doesn't list anything about use

20    of force or use-of-force training, does it?

21    A.   Not in my resume, no.

22    Q.   Now, you testified yesterday that you were a colonel in the

23    Hillsborough County Sheriff's Office.  I think that was your rank.

24    Do I have that right?

25    A.   Yes.
```

```
 1   Q.   And you served, as we talked about a moment ago, as director

 2   of detention services from '81 until 2008.  And during that time,

 3   you managed more than one jail, correct?

 4   A.   Yes, sir.  Multiple jails.

 5   Q.   And there was also a work center, correct?

 6   A.   Yes.

 7   Q.   And you had a budget of $108 million at one point, correct?

 8   A.   Yes.

 9   Q.   And that budget swelled to 146 million, did it not?

10   A.   I'm sure that it did.

11   Q.   And the jail system that you had was 1,400 employees,

12   correct?

13   A.   It actually reached 1500:  1,000 sworn and 500 civilians.

14   Q.   And combined, the average daily population was about

15   4,600 detainees; do I have that right?

16   A.   Yes.  The highest average daily population was 4,637 inmates.

17   Q.   And you'd agree with me that bad things happen in jails,

18   correct?

19   A.   I'm sorry.  Could you please --

20   Q.   You'd agree with me that bad things can happen in jails,

21   correct?

22   A.   Oh, absolutely?

23   Q.   And no jail is perfect, correct?

24   A.   Correct.

25   Q.   That's even the jails for which you had responsibility,
```

```
1  right?
2  A.   Correct.
3  Q.   Now, you've talked a little about detainee assaults at
4  Raymond Detention Center, and from time to time, I may refer to
5  that as RDC.  Can we agree that I'm talking about Raymond
6  Detention Center?
7  A.   Yes, sir.
8  Q.   And you've talked about detainee assaults at RDC.  Would it
9  be true that you had detainee assaults in the jails for which you
10  were responsible?
11  A.   Absolutely.
12  Q.   And you had detainee fights in the jails for which you were
13  responsible?
14      THE COURT:  Slow down some, Mr. Morisani.
15  BY MR. MORISANI:
16  Q.   It would be true, too, that you had detainee fights in the
17  jails for which you were responsible, correct?
18  A.   Yes.
19  Q.   And did those fights occur in jails that were fully staffed
20  with detention officer to your standards?
21  A.   Yes.
22  Q.   Same thing for assaults.  Did they happen in jails that were
23  fully staffed to your standards?
24  A.   Yes.
25  Q.   The point being, Mr. Parrish, that simply having a full staff
```

1  does not prevent fights in jails, does it?

2  A.   No.

3  Q.   And it doesn't prevent assaults in jails, does it?

4  A.   No.

5  Q.   And you've had detainee deaths in the jails for which you

6  were responsible, haven't you?

7  A.   Yes.

8  Q.   Do you recall how many times?

9  A.   No, I can't answer that.

10  Q.   Are you familiar with the Bureau of Justice Statistics?

11  A.   Yes.

12  Q.   Would you be surprised to hear that the Bureau of Justice

13  Statistics reports that between 2000 and 2007, Hillsborough County

14  had 35 detainee deaths?

15          MR. CHENG:  Objection.

16          THE COURT:  Objection overruled.

17          THE WITNESS:  I don't know what the report says, but I

18  would take it for its face value.

19  BY MR. MORISANI:

20  Q.   And is it fair to say, that Hillsborough County operated its

21  detention facilities using direct supervision when these 35 deaths

22  occurred?

23  A.   Some deaths occurred while we were under direct supervision,

24  certainly.

25  Q.   And those detention facilities were fully staffed to your

1  standards with detention officers when these death occurred?

2  A.  Yes.

3  Q.  Is it fair to say, too, Mr. Parrish, that you've been

4  responsible for jails in which staff have injured detainees?

5  A.  Certainly.

6  Q.  In fact, in January of 2008, a detention officer who was

7  conducting the booking process actually dumped a quadriplegic

8  detainee out of his wheelchair, correct?

9  A.  Yes.

10  Q.  And earlier in January, that very same officer in booking

11  snatched a female detainee by the back of her head and slammed her

12  against the wall, correct?

13  A.  I'm sorry.  I don't recall that one.

14  Q.  Around the same time in 2008, maybe you'll recall this one,

15  another detainee suffered a broken bone in her arm after a

16  detention officer struck her after she kept knocking on the

17  holding cell in which she was being held?

18  A.  I don't have specific recollection, but it's possible.

19  Q.  Now, after these incidents, the Hillsborough County Sheriff

20  created an independent commission in February of 2008; do you

21  recall that?

22  A.  Yes.

23  Q.  And the commission's purpose was to examine the policies,

24  practices and procedures of the Orient Road and Falkenburg Road

25  jails, correct?

1  A.  Yes.

2  Q.  And the results of the commission's work was in September 10,

3  2008's final report, right?

4  A.  Yes.

5  Q.  You are aware of this report, aren't you?

6  A.  Certainly.

7  Q.  In fact -- strike that.  Now, the commission noted that

8  detention personnel in the Hillsborough County jails were

9  concerned about understaffing, didn't it?

10  A.  That was one the things that they reported.

11  Q.  It was one of several, wasn't it?

12  A.  Yes.

13  Q.  And you agree that there was an ongoing staffing shortage at

14  the Hillsborough County jail system, don't you?

15  A.  I think what I pointed out was that we brought people on

16  board and they moved onto the law enforcement side at high rates,

17  yes.

18  Q.  The commission pointed out that there was an ongoing staffing

19  shortage at the Hillsborough County jail system, didn't they?

20  A.  They pointed that out based on what information we provided

21  to them.

22  Q.  Now, you'd agree there was an ongoing staffing shortage in

23  your jail system?

24  A.  There was always an issue of keeping all positions filled,

25  yes.

1  Q.   The commission noted that staff shortages in booking made it

2  difficult for staff to do their job in booking, didn't they?

3  A.   When we booked too many people in one day, yes.

4  Q.   In fact, isn't it true the commission reported that

5  Hillsborough County detention services had about 88 unfilled

6  staffing positions over the course of the year prior to the

7  report?

8  A.   That's probably accurate.

9  Q.   The point is, Mr. Parrish, you had staffing challenges too,

10 didn't you?

11 A.   Yes.

12 Q.   But you did the best that you could?

13 A.   Yes.

14 Q.   And the commission made numerous recommendations as parts of

15 the report, didn't it?

16 A.   Yes.

17 Q.   One was clarification and dissemination of the definition of

18 use of force in the policy, wasn't it?

19 A.   That's what was in the report.

20 Q.   That was a recommendation made by the independent committee,

21 wasn't it?

22 A.   Yes.

23 Q.   It was that the purpose of the recommendation, according to

24 the committee was so all deputies would understand what use of

25 force is and what must be reported, wasn't it?

1   A.   That's what they stated.

2   Q.   There was also a recommendation for updates to the inmate

3   handbook so that inmates would better understand the grievance

4   process, correct?

5   A.   Yes.

6   Q.   In all, the commission made 40 recommendations for change at

7   the Hillsborough County jail system, didn't they?

8   A.   I don't remember the exact number, but that's approximately,

9   correct.

10       MR. CHENG:  Can we get a clarification on what number is

11  this is.

12       MR. MORISANI:  It's D-149.

13  BY MR. MORISANI:

14  Q.   Mr. Parrish, I placed on the Elmo Defendant's Exhibit 149.

15  If you would, could you read the title of this document?

16  A.   I can read it, "Independent review commission on Hillsborough

17  County jails.  Final report September 10th, 2008."

18  Q.   Is this the reported we've been discussing, Mr. Parrish?

19  A.   Yes.

20  Q.   And if this report contains 40 recommendations for change at

21  the Hillsborough County jail system, you don't have any reason to

22  dispute that it contains those recommendations, do you?

23  A.   No.

24  Q.   Now, the date of that report was September 10, 2008, correct?

25  A.   Yes.

1  Q.   And within six days of that report being released you retired
2  from the Hillsborough County jail system, didn't you?
3  A.   I retired on September the 27th, 2008.
4  Q.   But you took immediate leave of absence on September 16th,
5  correct?
6  A.   I took vacation until I retired, yes.
7  Q.   I'm sorry.  Go ahead.
8  A.   That's correct.
9  Q.   You didn't work another day after September 16, 2008, did
10  you?
11  A.   No.
12  Q.   I want to talk about a little bit about the facility tour.
13  Before we talk about the facility tour, a couple of other
14  questions, Mr. Parrish.  You would agree that even if a facility
15  has all the right policies, facility administration must see that
16  those policies are implemented, right?
17  A.   Yes.
18  Q.   And this implementation is a never-ending battle, isn't it?
19  A.   It is ongoing, yes.
20  Q.   I think your exact words were, it's a "never-ending battle";
21  is that correct?
22  A.   I don't remember when I said that, but I agree with it, yes.
23  Q.   And this battle will never end in any other jurisdiction,
24  will it?
25  A.   I don't think it will, no.

```
1   Q.   And you testified earlier about watches not being recorded or
2   maintained properly; do you recall that?
3   A.   Yes.
4   Q.   However, simply -- you'd agree that simply failing to
5   properly document or maintain a watch is not a violation of the
6   law, is it?
7   A.   No.
8   Q.   Now, Mr. Parrish, I want to shift to the tour, January 24th
9   to the 28th, of the RDC.  Do you recall that?
10  A.   Certainly.
11  Q.   And you and I spent a lot of time together during that time,
12  didn't we?
13  A.   You were with me on a great portion of it, yes.
14  Q.   Prior to that point, when was the last time that you visited
15  the facility?
16  A.   About 19 or 20 months previously.
17  Q.   Can you tell me when it was?
18  A.   I can't tell you the exact date.  I'm sorry.
19  Q.   Don't recall?
20  A.   I can't remember the exact date.  It was a little bit less
21  than two years ago, yes.
22  Q.   And prior -- well, I walked with you throughout the facility
23  multiple days that week, didn't I?
24  A.   On several days you were with me, yes.
25  Q.   With respect to the kitchen that we went in, you don't
```

 1  dispute that the outer roof had problems leaking at one point, do

 2  you?

 3  A.   It did.

 4  Q.   And you also don't dispute that the roof has been completely

 5  fixed on the outside such that it is no longer leaking, do you?

 6  A.   That's what I was told, correct.

 7  Q.   Did you personally observe it leaking the week of

 8  January 24th?

 9  A.   I could not see any leakage coming through while I was there.

10  Q.   And you didn't go outside and get on top of the roof at any

11  point during that week, did you?

12  A.   No.

13  Q.   So would it be accurate to say, Mr. Parrish, that nothing has

14  been done about the kitchen area for as long as you have been

15  coming to the facility?

16  A.   No.

17  Q.   And, of course, you're familiar with the term "trash dumpster

18  cells," aren't you?

19  A.   Yes.

20  Q.   And I think you talked about those a little bit yesterday,

21  right?

22  A.   Yes.

23  Q.   Now, there are still cells that have been taken offline and

24  welded shut at the facility, aren't there?

25  A.   Yes, there are.

1   Q.   And at one point they were welded shut and they were filled

2   with trash, correct?

3   A.   That's correct.

4   Q.   Subsequent to that, though, did the County not open the cells

5   back up and clean the trash out?

6   A.   They did.

7   Q.   And then they welded the doors back shut, didn't they?

8   A.   Yes.

9   Q.   But not on all of the cells, did they?

10  A.   Not initially, no.

11  Q.   And they repaired some of the cells, didn't they?

12  A.   They did during that week.  That's what I was told, yes.

13  Q.   Do you have any reason to believe they were not, that some

14  cells were repaired?

15  A.   Of the 30 that were opened up during that remote site visit,

16  approximately 11 were put back online and 19 were welded shut

17  again.

18  Q.   Does it cost money to put cells back online?

19  A.   Certainly.

20  Q.   And it can be pretty expensive, depending on the damage,

21  right?

22  A.   Yes.

23  Q.   So you have no -- well, let me back up.  While there in

24  January, you never had anyone get you into one of the cells that

25  remains welded shut to see whether there is indeed trash in those

```
 1   cells today, did you?

 2   A.   No.

 3   Q.   And when they welded the cells back shut, they added

 4   additional protection to keep things outs of the cells, didn't

 5   they?

 6   A.   Yes.

 7   Q.   So you have no personal knowledge as you sit in that chair

 8   whether or not those cells are actually trash dumpster cells

 9   today, do you?

10   A.   They are welded-shut cells.

11   Q.   And they are offline, right?

12   A.   Yes.

13   Q.   Because repairs to offline cells can be expensive, can't

14   they?

15   A.   Yes.

16   Q.   You recall going to the B-Pod, don't you?

17   A.   I'm sorry, sir, what?

18   Q.   Do you recall going into B-Pod?

19   A.   Yes.

20   Q.   While there, we looked at the new mental health space that

21   the County is building in that pod, didn't we?

22   A.   Yes.

23   Q.   And you'd agree with me, wouldn't you, that building out a

24   mental health space for the population at the RDC is a reasonable

25   response to the population, correct?
```

1    A.   Yes.  I am glad they are doing it.

2    Q.   In fact, I think you noted while we were there that day that

3    this was great, didn't you?

4    A.   Yes, much improved.

5    Q.   Also, staying on B-Pod, we looked at the officer stations

6    being constructed so that these pods can be run through a

7    direct-supervision management philosophy, didn't we?

8    A.   Yes.

9    Q.   And if we're going to try to manage the living units at RDC

10   until we can get the new facility built, if we're going to try to

11   manage the RDC through a direct-supervision philosophy, it is

12   pretty smart to build out officer stations on those pods, isn't

13   it?

14   A.   Yes.  That's an important part of direct supervision.

15   Q.   Because we want officers to do paperwork, as well as roam

16   around, don't we?

17   A.   Yes.

18   Q.   And they can do paperwork at those stations, can't they?

19   A.   Yes.

20   Q.   Now, you recall also that we moved to A-Pod, correct?

21   A.   Yes.

22   Q.   And we spent some time in the A-Pod control room?

23   A.   Yes.

24   Q.   And there you learned that there were sergeants making rounds

25   on A-Pod earlier that day?

1    A.    Yes.  There were two sergeants who came in and made the

2    rounds because there was no officer present to do it.

3    Q.    Is it better to leave the units in A-Pod unoccupied without

4    any officers making any rounds or to have sergeants make those

5    rounds?

6    A.    It is better to have the sergeants come and help.

7    Q.    So it is incorrect, then, to say what you said yesterday,

8    that there were no officers working on A-Pod that day?

9              MR. CHENG:  That's confusing, Your Honor.

10             THE COURT:  Rephrase your question.  Slow down for me.

11             MR. MORISANI:  Yes, Your Honor.

12             THE COURT:  All right.  What was the question?

13   BY MR. MORISANI:

14   Q.    It is incorrect, then, to say there were no officers working

15   on A-Pod that day?

16   A.    No.  There was an officer working in the control room.  My

17   point was that there were no officers assigned to the floor of

18   that pod.  Sergeants who had other duties came in and did the

19   duties that should have been done by an officer assigned to that

20   area.

21   Q.    But you would agree, having those sergeants come in and do

22   those duties is better than neglecting the duties, correct?

23   A.    No, I agree with that.  Yes.

24   Q.    And you'd agree with me that each of the three pod control

25   rooms that we went into that week had a copy of either the 14th or

1   the 15th monitoring reports, correct?

2   A.   Yes.

3   Q.   We spent some time talking to the laundry officer, I think

4   it's Officer Montgomery, correct?

5   A.   Yes.

6   Q.   The laundry officer said -- well, let me back up.

7        When detainees are booked and classified at RDC, where are

8   they issued their uniforms?

9   A.   During the booking process, they change out from civilian

10  clothes to a uniform.  They are issued two uniforms and other

11  linens before they are moved to housing.

12  Q.   And you never asked anyone in booking whether detainees only

13  received one uniform, did you?

14  A.   No.

15  Q.   Now, am I right in thinking that you have never worked for

16  the Hinds County sheriff in detention services, have you?

17  A.   That's correct.

18  Q.   And you've never submitted a requisition through Hinds

19  County's requisition process, have you?

20  A.   No, I have not.

21  Q.   And you are not here to testify as to why the County's

22  requisition process is set up the way it is, are you?

23  A.   No.

24  Q.   And you're not here to testify as to why Mississippi law

25  places restrictions on the expenditure of public funds, are you?

1    A.   No.

2    Q.   Do you recall also, Mr. Parrish, being in a meeting with

3    myself, Mr. Shelson, Ms. Lisa, Tony Gaylor and Kenny Wayne Jones

4    at the county offices?

5    A.   I do.

6    Q.   I think it was January 25th.  Does that sound right to you?

7    A.   I think so.

8    Q.   Isn't it true that during that meeting, you referred to the

9    RDC's design as an archaic design?

10   A.   I did.

11   Q.   Isn't it also true you referred to things like the rec yard

12   as the work center as being a design flaw?

13   A.   Yes.

14   Q.   Is that correct?

15   A.   That's correct.

16   Q.   Now, you would agree with me, would you not, that the County

17   has to use its judgment when deciding the extent to which it would

18   devote its resources to repairing an archaic facility versus

19   devoting those resources to building a new, appropriately-designed

20   and constructed facility, correct?

21   A.   I do.

22   Q.   Do you recall being in a meeting with Doris Coleman, the

23   county human resources and payroll director, on January 26 of

24   2022?

25   A.   Yes.

```
 1   Q.   And you recall at that meeting that while 48 -- well, let me
 2   back up.
 3        We learned at that meeting together, didn't we, that 48
 4   detention pins had been defunded, correct?
 5   A.   That's correct.
 6   Q.   We also learned that 57 law enforcement positions had been
 7   defunded, correct?
 8   A.   No, that's not correct.  It is was a total of 57 sheriff's
 9   office pins were defunded.  48 of them were in detention and the
10   remainder were on the law enforcement side.
11   Q.   As you sit here today, do you know how many pins are on the
12   law enforcement side?
13   A.   I can't answer the question right now, no.
14   Q.   Do you know how many pins are on the detention side?
15   A.   Yeah, 233.
16   Q.   But you don't know how many on the law enforcement side, do
17   you?
18   A.   I apologize, what?  Regarding the number of pins?  233 are
19   what exists today.
20   Q.   And you don't know how many are on the law enforcement side,
21   do you?
22   A.   I can't remember the exact figure.  It used to be 432 for the
23   entire sheriff's office.  281 were for detention.  The remainder
24   were for law enforcement, whatever that number is.  But 281 was
25   reduced to 233.  So, you can extrapolate the math from there.  But
```

1    I can't do it in my head, sorry.

2    Q.   And because you don't have the law enforcement total, you

3    don't know what impact that change may have had on the law

4    enforcement side of the house, do you?

5    A.   No.  But there were only seven, eight, nine positions on the

6    law enforcement side that were deleted versus 48 on the detention

7    side.

8    Q.   But again, you don't know how many law enforcement officers

9    started with, do you?

10   A.   Not the exact number.  I can't tell you off the top of my

11   head.

12   Q.   Isn't it true, too, in that meeting with Ms. Coleman, you

13   asked Ms. Coleman to confirm whether there had been any change to

14   the recruitment process because Bernard Moore and the County were

15   doing the right things.  Is that true?

16   A.   That's correct.

17   Q.   Now, from there, on January 26, we went from Ms. Coleman's

18   office downtown to meet with Mioka Laster, the fire safety officer

19   at RDC, correct?

20   A.   Yes, sir.

21   Q.   In fact, I was running a little late leaving downtown and you

22   all were so kind enough to start that meeting without me, the

23   County's counsel, didn't you?

24   A.   I don't remember.

25   Q.   The County keeps two fire extinguishers in the control

1   centers for each of the three housing pods, don't they?

2   A.   No.   What they do is they keep one fire extinguisher in each

3   control room.   And when Charlie reopened, each direct-supervision

4   housing unit and Charlie 4 were all supposed to have a fire

5   extinguisher inside the housing units.   That was done initially,

6   but that fell apart in Charlie 2 when I went in there.

7   Q.   Do you recall telling Mr. Laster that your recommendation was

8   to add two more fire extinguishers to each control pod in addition

9   to the two that they had in there already?

10  A.   What I recommended was that they keep at least two in the

11  control room.

12  Q.   Mr. Parrish, if you'll answer my question, you can explain,

13  but I would ask you to answer the question first.   Is it true that

14  you recommended to Mr. Laster that they keep two additional fire

15  extinguishers in each control pod so that there could be a total

16  of four in each control pod.   Is that true?

17  A.   That's not the way I remember it at all.   What I said was

18  that they needed to -- if there was no fire extinguisher in the

19  direct-supervision pod, instead of letting it go somewhere else,

20  it needed to come back to the control room.   That would mean that

21  there would be four fire extinguishers in the control room, that's

22  correct.

23  Q.   What did Mr. Laster say in response to your recommendation?

24  A.   He agreed, and he said he would do it.

25  Q.   And this, the fire extinguisher, they are in addition to fire

1  hoses installed throughout that facility, correct?

2  A.   There are no fire hoses in Alpha Pod whatsoever, except in

3  the control room.  There were fire hoses being installed in Bravo,

4  but they are not in place yet.  In Charlie, they were all

5  installed in each of the housing units and in the horseshoe, but

6  they had been pulled out of Charlie 2 because of inmate damage in

7  that housing unit.  That's where they stand right now.

8  Q.   So if we have a maintenance officer testify that there are

9  fire hoses installed in that facility, in each of the locations

10  that you just described there were not fire hoses, would you say

11  he is a liar?

12  A.   I would say he is incorrect.

13  Q.   And the last time you looked at those fire hoses was when?

14  A.   When I was there the week of the 20th to the 25th or '6th.

15  Q.   And staying on our meeting with Mr. Laster, you would agree

16  with me that it's reasonable to put in place at that facility a

17  fire safety officer, don't you?

18  A.   Oh, yes.

19  Q.   And during our meeting with Mr. Laster, you would agree as

20  well that wiring -- well, during that meeting with Mr. Laster, you

21  would agree that we learned that the wiring is the primary source

22  of ignition to lead the fires at that facility, correct?

23  A.   That's what he indicated, correct.

24  Q.   And when wiring is the ignition source, it's the detainees

25  that are using the wires to create the ignition, isn't it?

1    A.   Yes.

2    Q.   It is not the staff playing with wires, correct?

3    A.   No.

4    Q.   And you recall Mr. Cheng asking Mr. Laster -- he was on the

5    telephone -- he asked Mr. Laster if he was also a medical liaison,

6    don't you?

7    A.   Yes.

8    Q.   And Mr. -- what was Mr. Laster's response?

9    A.   He said that he spent a portion of each day assisting medical

10   staff to help them do med pass because there was no officer

11   available to go with them.

12   Q.   And again, it would be better to have an officer, even though

13   this might not be his primary job -- would it not be better to

14   have an officer going around with the medical folks during med

15   pass?

16   A.   Yes.

17   Q.   Because we don't want the medical folks walking around

18   without an officer escort, do we?

19   A.   No, sir.

20        THE COURT:  Can I ask you to slow down just a bit,

21   Mr. Morisani?

22        MR. MORISANI:  Yes, sir.  I apologize.

23   BY MR. MORISANI:

24   Q.   And in fact, I think you noted -- well, strike that.

25        You would agree with me that having Mr. Laster escort the

1   nursing staff around is a reasonable response to having short

2   staff, isn't it?

3   A.   Yes.

4   Q.   Now, you recall we also met Lieutenant George in

5   classification on January 6th -- January 26, right?

6   A.   Yes.

7   Q.   And as you sit here today, you don't disagree that there is

8   80 percent of the detainee population at RDC and the work center

9   are gang affiliated, do you?

10  A.   That is what her percentage computation was, correct.

11  Q.   Do you have any reason to dispute that?

12  A.   No.

13  Q.   And when you learned of this percentage, this 80 percent gang

14  affiliation, I think your word was that was a huge percentage; is

15  that correct?

16  A.   It is.

17  Q.   With respect to roll call training -- before we go on, what

18  was your gang affiliation percentage in Hillsborough County?

19  A.   I can't tell you.

20  Q.   It wasn't 80 percent, was it?

21  A.   No, sir.  No.

22  Q.   You were not a jail manager anyway, were you?

23  A.   I was not a jail manager.

24  Q.   With respect to roll call training, the lieutenants and the

25  sergeants conduct roll call training, don't they?

1  A.   Yes.

2  Q.   Now, you sat in on a roll call during that week, didn't you?

3  A.   I did.

4  Q.   Only one, though, right?

5  A.   That's correct.

6  Q.   You didn't meet with and interview each of the lieutenants

7  and the sergeants who were doing the roll call training in every

8  one other than the one you sat in on, did you?

9  A.   No, I didn't.

10  Q.   You didn't ask those lieutenants and sergeants about the

11  topics that they cover in roll call training, did you?

12  A.   No.

13  Q.   And you would agree with me that only sitting in one roll

14  call training is a small, small sample size when roll call

15  training is done before every shift three shifts a day?

16  A.   I agree that it is a small percentage, but roll call training

17  is not done on every shift around the clock.  I went to the

18  lieutenant who was in charge of roll call training, Lieutenant

19  McBride, and he provided me with statistics, shift by shift, and

20  the material that was covered, yes.

21  Q.   So again, is doing some roll call training better than doing

22  none?

23  A.   Absolutely.

24  Q.   So if you sit in that chair today, the one roll call training

25  that you attended, that was the only one that you ever attended at

1   RDC; is that correct?

2   A.   There was no roll call training at that roll call.  That was

3   the first roll call that I have been able to sit in on.  I didn't

4   happen to come by when it was going on in the past.  This time it

5   worked out, so I asked if I could sit in and the sergeant

6   graciously let me sit in.

7   Q.   And you recall also that we met with Lieutenant Knox on

8   January 27, 2022, correct?

9   A.   Yes.

10  Q.   And Lieutenant Knox is the training officer at the facility,

11  is he not?

12  A.   Yes.

13  Q.   And you don't have any issues with Lieutenant Knox's training

14  credentials, do you?

15  A.   No, sir.

16  Q.   I was in his office with you, wasn't I?

17  A.   Yes.

18  Q.   That man has training credentials on both sides of his wall,

19  and they are covered, aren't they?

20  A.   Yes.

21  Q.   So he is well trained, isn't he?

22  A.   Yes.

23  Q.   And he is our training officer, isn't he?

24  A.   For detention, yes.

25  Q.   Now, you have no issues with his certifications, do you?

1   A.   No.

2   Q.   And isn't it true that as we sat in that meeting, you told

3   him that nationwide, there is a detention staffing problem?

4   A.   Yes.

5   Q.   The County has paid you $291,000 over the course of your

6   involvement with this matter, haven't they?

7   A.   I'll take your word for it, yes, sir.

8   Q.   You talked earlier about suicide, particularly the two that

9   unfortunately occurred in 2021.  Do you recall that?

10  A.   Yes.

11  Q.   Your jail system in Hillsborough County experienced three

12  suicides in the year leading up to 2001, didn't they?

13  A.   That's correct.  We went for ten years with only one suicide,

14  and then in one year we had three, so I brought in a suicide

15  prevention expert in the National Institute of Corrections to do

16  an analysis.  It is always helpful to have somebody from outside

17  look at your operation.

18  Q.   Now the April 18th -- we'll come back to that -- the

19  April 18, 2021, suicide, that didn't occur on this sheriff's

20  watch, did it?

21  A.   No.

22  Q.   And the July 6th, 2021, suicide didn't occur on this

23  sheriff's watch, did it?

24  A.   No.

25  Q.   In fact, none of the deaths occurred on that man's watch, did

1  they?

2  A.   No, they did not.

3  Q.   Now, would it surprise you to learn that between 2008 and

4  2018, that ten years after you exited abruptly the Hillsborough

5  County jail system, there were 42 deaths in that jail system?

6  A.   I don't have any idea.

7  Q.   That jail system is still being run on the bones of your

8  policies and procedures, aren't they?

9        MR. CHENG:  Objection, Your Honor.  Calls for speculation.

10        THE COURT:  It's been asked and answered.

11        Objection sustained.

12  BY MR. MORISANI:

13  Q.   Now, problems with booking, you talked a little bit about

14  that yesterday.  Do you recall that, sir?

15  A.   Yes, sir.

16  Q.   Problems with booking are not unique to the RDC, are they?

17  A.   No.

18  Q.   In fact, the independent commission that reviewed your jail

19  system observed concerns about the accurate and prompt assessment

20  of inmates; isn't that right?

21  A.   I don't remember specifically, but it sounds correct.

22  Q.   And with respect to booking, do you recall telling Major

23  Bryan that the decision to start having a sergeant or a

24  supervisor, I think is what you said, to go out and take a look at

25  the individual being brought into the facility at booking was a

1  good quality control measure?  Do you recall that?

2  A.   Yes, sir.  I agree with that decision completely.

3  Q.   And you also told her during this most recent visit, you were

4  in booking and saw well-being checks being made, correct?

5  A.   Yes.

6  Q.   And you'd agree with me, too -- well, strike that.

7       You talked a little bit yesterday about safety vestibules.

8  Do you recall that?

9  A.   Yes.

10  Q.   Safety vestibules are not required anywhere in that

11  stipulated order, are they?

12  A.   No.

13  Q.   You talked a little bit, too, about COVID-19 and its impact

14  on your monitoring visits.  Do you recall that?

15  A.   Yes.

16  Q.   I think you described that because of COVID-19, you chose to

17  stay home and not conduct in-person facility visits; is that

18  accurate?

19  A.   It was a joint decision.  It wasn't my decision.  But yes.

20  Q.   Joint decision among the monitors, correct?

21  A.   Among the monitors and the Department of Justice.

22  Q.   And the Department of Justice.  Okay.  The County, though,

23  they couldn't just shut down the RDC because of COVID-19, could

24  they?

25  A.   No.

```
1   Q.   The officers that walked those halls, those jail security

2   guards, they couldn't just stop coming to work because of

3   COVID-19, could they?  Is that correct?

4   A.   That's correct.

5   Q.   And have you ever done any study on the impact of COVID-19 on

6   the Mississippi workforce?

7   A.   Have I done a study of the impact of COVID-19 on the

8   Mississippi workforce?

9   Q.   Correct.

10  A.   No.

11  Q.   The exit interview on the monitoring tour in January, do you

12  recall talking about that yesterday?

13  A.   Yes.

14  Q.   You pointed out people that weren't there.  I remember that.

15  But was the County's attorney present at that meeting?

16  A.   Yes, I think so.  But we did it by Zoom, and I wasn't able to

17  see everybody who that was on the meeting.  I defer to somebody

18  that had view of everybody that was on the screen.

19  Q.   You also talked about direct supervision prior to the time

20  that you were at the facility.  Do you recall that?

21  A.   At what point was I discussing direct supervision and with

22  whom?

23  Q.   Let me ask it this way:  When was the first time you came

24  into the RDC?

25  A.   2014.
```

```
 1   Q.   And you talked yesterday about direct supervision in 2012.
 2   Do you recall that?
 3   A.   That's correct.
 4   Q.   Is it fair to say, then, you never saw that facility in 2012,
 5   correct?
 6   A.   No, I did not.
 7   Q.   So you don't know as you sit in that chair whether that
 8   facility was being operated by direct supervision in 2012, do you?
 9   A.   Well, I do from people who actually worked there at that
10   time, going back into the 1990s.  They explained to me how it
11   operated, and these were command-level people that were still on
12   board when I started the monitoring process.
13         MR. MORISANI:  Just to keep things moving along, Your
14   Honor, I'm going to ask for some help, and I'll move on.  But
15   we'll come back to that.
16   BY MR. MORISANI:
17   Q.   Now, tasers.  You remember talking about tasers yesterday?
18   A.   Yes, sir.
19   Q.   Has a taser been discharged in that jail in the last month?
20   A.   Yes.
21   Q.   Okay.  Were you there personally when the taser was
22   discharged?
23   A.   No.
24   Q.   Did you personally observe it being discharged?
25   A.   No.
```

1  Q.   Now, the tasing that you testified about yesterday, an

2  investigator using a taser, when did that take place?

3  A.   October of last year.

4  Q.   Before this man ever came in charge, correct?

5  A.   That's correct.

6  Q.   And who was the jail manager in October of last year?

7  A.   That would have been Major Bryan.

8  Q.   Kat Bryan?

9  A.   Yes.

10  Q.   Now, when you were at your last site visit in January of

11  2022, did you sit in or attend a new cadet training class?

12  A.   No, I did not.

13  Q.   And did you sit in or attend any in-service training?

14  A.   No.

15  Q.   Now, you've talked a lot about direct supervision.  And

16  direct supervision, you would agree with me, is not the only way

17  to run a jail, is it?

18  A.   It's not the only way, but it's the best way.

19  Q.   That's your opinion, though, correct?

20  A.   Certainly is my opinion, yes.

21  Q.   The Constitution doesn't say a thing about running it by

22  direct supervision, does it?

23  A.   It does not.

24  Q.   And there's alternative ways to run it, aren't there?

25  A.   Yes.

1    Q.   Indirect supervision is one of those ways?

2    A.   Yes.  There are three types of jail operations:  linear

3    intermittent surveillance, podular remote surveillance, and

4    podular direct supervision.

5    Q.   And when you testified in the Shields case, your first

6    deposition in December 2008, you said that same thing.  But am I

7    correct as well, you testified that direct -- that indirect

8    supervision, there are no bars or barriers between the officers

9    and the detainees, correct?

10   A.   In direct supervision.  Not in indirect.

11   Q.   Correct.  When I walk onto those living unit floors at the

12   RDC, what do I see when I look to my right and my left?  I see

13   cells, don't I?

14   A.   I'm sorry.  I'm losing you.  What are you asking?

15   Q.   When I walk into a living area, say Pod A-4, if I look to my

16   right and left, I see cells on the each side, don't I?

17   A.   There are cells on the ground level and there are cells on

18   the mezzanine level, yes.

19   Q.   And those cells are barriers between the inmates and the

20   officers, aren't they?

21   A.   Yes.

22   Q.   Now -- so you acknowledge, though, that there's another way

23   to run -- there's two other ways to run jails, correct?

24   A.   Historically, jails were linear intermittent surveillance.

25   That's the way they have built jails for 200 years in this

1    country, and they're cells in a long line.  Much like the

2    Jackson Detention Center.  That was a linear intermittent jail.

3    Podular remote is the way Raymond is working right now.  It's a

4    pod -- well, you used different terminology here.

5         It's a unit with inmates inside and somebody sitting back

6    here in a control room.  Podular direct is where there's an

7    officer inside the housing unit directly with the inmates, not

8    just sitting back in a control room.  That's the three different

9    types.

10   Q.   I'll take that as a yes to my question.

11   A.   And what was your question?

12        MR. CHENG:  Objection.

13        THE COURT:  You want to repeat the question?

14        THE WITNESS:  What was your question?

15        MR. MORISANI:  I'll move on, Your Honor.  I apologize.

16   BY MR. MORISANI:

17   Q.   Now, the Jackson -- the RDC is designed with a pod with an

18   officer sitting in a control center, correct?

19   A.   It's designed with a control room inside each pod, and then

20   originally there was supposed to be an officer inside each of the

21   four housing units as well.

22   Q.   But you don't have to do it that way, do you?

23   A.   No, you don't.

24   Q.   And there's a central control at the RDC, too, isn't there?

25   A.   And there's a what control?

1    Q.   A central control.

2    A.   Master control, correct.

3    Q.   Now let's talk about maintenance.  The County has dedicated

4    two maintenance employees to the facility, haven't they?

5    A.   Yes.  That was done recently.

6    Q.   When C-Pod reopened, you'd stated that that's when damage

7    occurred.  Do you recall that?

8    A.   When C-Pod reopened, I stated what?  I apologize, but I can't

9    pick up on it.

10   Q.   You stated that when C-Pod was reopened, damage occurred.  Do

11   you recall that?

12   A.   After C-Pod reopened and direct supervision was not

13   implemented properly, damage occurred, yes.

14   Q.   But again, we know that bad things happen in jails that are

15   even run by direct supervision, don't we?

16   A.   Yes, they do.

17   Q.   And you didn't see that damage happen.  You didn't personally

18   see it, did you?

19   A.   No.

20   Q.   Now, the County retained Benchmark to oversee maintenance.

21   Is that correct?

22   A.   Yes.

23   Q.   You don't have any issue with Benchmark, do you?

24   A.   That was an excellent move on the part of the County.

25   Q.   The County retained CDFL to oversee renovations at RDC and

1    the design of the new facility, correct?

2    A.   I got my initials mixed up?  Did you say CDFL or CML?

3    Q.   CDFL.

4    A.   CDFL was the architectural firm that was brought on board in

5    conjunction with HDR, a national firm, to work on the plans for

6    the new jail.  That's correct.

7    Q.   No issues with CDFL, right?

8    A.   No.

9    Q.   I'm glad you mentioned CML, too.  CML was brought in to fix

10   the locks, were they not?

11   A.   Yes.  That's correct.

12   Q.   And that was early on in 2020, wasn't it?

13   A.   Yes.  It goes back farther than that.  2019.

14   Q.   Thank you for that.  You'd agree with me, then, that shows it

15   was a priority, doesn't it?

16   A.   Certainly was.

17   Q.   Now, CDFL, they brought in HDR, too; is that right?

18   A.   Yes.  CDFL is a local firm here in Jackson, and HDR is a

19   national firm, and the two of them are working together.

20   Q.   And I've talked to the folks from HDR.  You've worked with

21   them before, haven't you?

22   A.   Yes, I have.

23   Q.   They like you, don't you -- don't they?

24   A.   I hope so.

25   Q.   And you like them, too, don't you?

```
 1    A.   They have a good reputation.
 2    Q.   That's a good move, too, by the County to have HDR on the
 3    site, isn't it?
 4    A.   Absolutely.
 5    Q.   And as you sit here today, you can't tell us when that new
 6    facility will be done, will you -- can you?
 7    A.   No, I cannot.
 8    Q.   As you sit here today, are you aware that when the -- that
 9    facility is being built in phases.  Are you aware of that?
10    A.   Oh, yes.
11    Q.   And are you aware that when phase one is done, it will be
12    able to immediately house 180 detainees?  Are you aware of that?
13    A.   I think the number is 192.
14    Q.   Thank you for that.  But are you aware of that, though?
15    A.   Yes.
16    Q.   That's a reasonable response to the situation at RDC, isn't
17    it?
18    A.   That's a good step in the right direction, yes.
19    Q.   You talked a little bit, too, about SMIs, seriously mentally
20    ill detainees, being in isolation cells.
21    A.   Yes.
22    Q.   Did you do any type of study to find out why each and every
23    one of those SMIs were placed in that cell behind the door?
24    A.   No.
25    Q.   So as you sit here today, you don't know why they were placed
```

1 in those cells, do you?

2 A. No, I can't answer that question.

3 Q. And who was the -- you talked, too, about needing and wanting

4 a list of maintenance priorities.  Do you recall that?

5 A. Yes.

6 Q. That was in late 2021, right?

7 A. In October of 2021, we covered that during the remote site

8 visit saying that we were supposed to have had that, and CDFL said

9 that we would get a list of priorities and such by December.

10 Q. Who was the jail manager at that time?

11 A. In October?

12 Q. Of 2021.

13 A. That would have been Major Bryan.

14 Q. And you didn't get that list of priorities when you wanted

15 it, did you?

16 A. No.

17 Q. Would you agree with me when I say Gary Chamblee --

18 Benchmark, right?  He's a Benchmark employee?

19 A. Yes.

20 Q. Would you agree with me that Gary Chamblee is central to the

21 maintenance that is going on at the RDC?

22 A. Yes.  He's a conscientious employee and has made a huge

23 difference in the process.

24 Q. The County brought him on, didn't they?

25 A. Yes, they did.

1   Q.   Has anyone from the County ever rejected your request for a

2   list of priorities of maintenance issues at RDC?

3   A.   No.  But the problem is that CDFL can't give us that.  It has

4   to be a joint decision of the County, the sheriff, the jail

5   administrator, and CDFL to come up with that list of priorities.

6   All that CDFL has done so far is make a list of items that they

7   think need attention without regard to priority or completion date

8   or authorization to do the work.

9   Q.   Now, you talked a little bit about incident reporting.  Do

10  you recall that.

11  A.   Yes.

12  Q.   You don't dispute that the County has a use-of-force policy

13  in place at the RDC, do you?

14  A.   No.  They have one.

15  Q.   It's one that you approved, correct?

16  A.   Yes.  I was a part of the approval process.

17  Q.   And you're used to approving policies because that was your

18  main role at Hillsborough County, wasn't it?

19       MR. CHENG:  Objection.  Mischaracterizes his credentials.

20       THE WITNESS:  It was part of my --

21       THE COURT:  Hold on.

22       What was your objection, Mr. Cheng?

23       MR. CHENG:  Objection.  It's mischaracterizing

24  Mr. Parrish's credentials.

25       THE COURT:  Objection sustained.

```
 1   BY MR. MORISANI:

 2   Q.   You also talked about -- I think it was this morning.  Could

 3   have been yesterday.  You talked about continuing efforts on

 4   command staff -- I'm sorry, by command staff and IT to help

 5   officers with reporting.  Do you recall that?

 6   A.   Yes.

 7   Q.   Would you agree with me, that's the type of never-ending

 8   battle that you spoke of in that deposition, isn't it?

 9   A.   Yes.  That's something that needs to be an effort at all

10   times.

11   Q.   That's a reasonable response to use-of-force reporting, isn't

12   it?

13   A.   That's something that I would expect to be done, yes.

14   Q.   You talked about assaults yesterday.  I think you were

15   testifying about a report that someone else had prepared, correct?

16   A.   That's correct.

17   Q.   Who prepared that report?

18   A.   That report's prepared by the monitor.

19   Q.   That's Ms. Lisa?

20   A.   Ms. Simpson, yes.

21   Q.   Okay.  Now, when she prepared that report, when Ms. Simpson

22   prepared that report, did you see -- did you watch her prepare

23   that report?

24   A.   No.

25   Q.   As you sit here today, can you tell me how many of those
```

1    assaults, the 77 assaults that Ms. Simpson and you contend have

2    occurred -- let me back up.

3        It's Ms. Simpson's and yours contention that 77 assaults

4    happened, but over what period of time?  That wasn't clear to me.

5    A.   Over a period of four months, October, November, December,

6    and January.

7    Q.   All of January?

8    A.   Yes.

9    Q.   Okay.  So in October, November and December and January.  Can

10   you tell me as you sit in that chair how many assaults took place

11   in Pod A, Unit 1?

12   A.   I can't tell you that without looking at the report.  It's

13   contained in the report.

14   Q.   So it's contained in the report?

15   A.   Yes.

16   Q.   Okay.  Now, what do you contend -- what do you contend is an

17   assault?  How do you define assault in the detention setting?

18   A.   It could be wrestling; it could be punching; it could be

19   stabbing.  Any kind of physical violence between inmates or

20   between -- if inmates do that to staff.

21   Q.   So you'd agree with me, then, that determining whether an

22   assault occurred depends on, one, how you define assault, correct?

23   A.   Yes.

24   Q.   And two, the facts specific to that incident, correct?

25   A.   Correct.

1   Q.   Now, you talked a little bit, too, about how when you walked

2   into the facility, you saw certain -- when you walked down that

3   great hall.  You recall that?

4   A.   Yes.

5   Q.   And you saw certain doors that were open, propped open?

6   A.   Yes.

7   Q.   Correct?

8   A.   Yes.

9   Q.   And I think Mr. Cheng was kind enough to show you the letter

10  from Georgia Detention Centers this morning, right?

11  A.   That's correct.

12  Q.   You would agree with me, as the jail manager, Ms. Bryan was

13  responsible to make sure those doors were shut, wasn't she?

14  A.   She should make sure that the staff follows procedure and

15  keeps the doors properly closed.  The problem is that the doors

16  there don't function, so they're left propped open.

17  Q.   Did you check any of those doors that were propped open to

18  see if they functioned?

19  A.   I didn't personally check it.  I talked to the supervisor in

20  charge and asked about it.

21  Q.   But as you sit here in that chair, you don't know -- you have

22  no personal knowledge whether those doors actually work, do you?

23  A.   I can't tell you because I haven't checked.  But I can tell

24  you, like, the door going into Bravo Pod has been broken for as

25  many years as I can remember doing this monitoring process.

1   Q.   But you never checked whether any of those doors actually

2   worked, did you?

3   A.   I don't do that, no.

4   Q.   Is that -- strike that.

5        Now, you talked a little bit about staffing, and you'd agree

6   with me that raising staff pay is a reasonable response to the

7   staff situation at RDC, is it not?

8   A.   It is.  It's a good step in the right direction.

9   Q.   You'd agree with me that switching staff pay to bimonthly

10  instead of once a month is a reasonable response to the staffing

11  situation?

12  A.   Absolutely.

13  Q.   And you'd agree that putting direct deposit in place is a

14  reasonable response to the staffing issue?

15  A.   Yes.

16  Q.   Do you have any knowledge as you sit in that chair of how

17  frequently the sheriff and the board of supervisors are

18  communicating about the RDC?

19  A.   No, I have no idea.

20       MR. MORISANI:  Your Honor, if I might grab an exhibit that

21  was entered yesterday?

22       THE COURT:  Okay.  What number?

23  BY MR. MORISANI:

24  Q.   I am going to, for the record, show you what's been marked as

25  Plaintiff's Exhibit 13.

1      Now, Mr. Parrish, do you recall discussing this letter

2  yesterday?

3  A.   I remember discussing this.

4  Q.   And is it -- am I correct in understanding from your

5  testimony that you have no idea whether the information on this

6  second page and the remainder of this exhibit -- you have no idea

7  whether that was actually attached to this letter, do you?

8  A.   I can't tell you that.  All I can tell you is that when I

9  received this letter, the backup information came with it.  So I

10  don't know whether it was attached when it was submitted to the

11  sheriff -- the interim sheriff at that time or not.

12  Q.   So you don't know whether the interim sheriff ever received

13  all this information in this exhibit, do you?

14  A.   I can't speak to that, no.

15      MR. MORISANI:  Your Honor, I may be finished.  If I can

16  just have a brief indulgence just to look through.

17  BY MR. MORISANI:

18  Q.   Mr. Parrish, just a few more questions.  If there is not 100

19  percent compliance with the consent decree, is there a risk of

20  inmate -- is there a risk to inmate safety?

21  A.   If there is not 100 percent compliance, is there a risk to

22  inmate safety?  I don't --

23      MR. CHENG:  Objection.  Confusing question, Your Honor.

24      THE COURT:  Objection overruled.

25      THE WITNESS:  I don't really know how to answer your

1    question.  If there are certain paragraphs of the settlement

2    agreement that are not met that deal with, for instance, staffing

3    or such things that are as important as that, or not implementing

4    direct supervision, then even if all the rest of the paragraphs

5    are met, yes, there's a danger to inmate safety by the fact that

6    those critical issues have not been met.  But I can't say which

7    other ones you would say make it in compliance or not and create a

8    greater risk to safety.  Some are administrative things, keeping

9    records properly.  Some are life-safety issues and security issues

10   like being able to close and lock doors and have a working

11   fire system and so forth.  I don't know how to answer your

12   question better than that.  I'm sorry.

13   BY MR. MORISANI:

14   Q.   You recall referring to consent decrees as becoming a bit of

15   a paper chase?

16   A.   Parts of it appear to be documentation being the most

17   important thing, yes.

18   Q.   Do you recall referring to it as it becomes basically more

19   administrative than not?

20   A.   In some cases, yes.

21   Q.   You'd agree with me that that gets in the way of solving the

22   real basic problems at a facility, don't you?

23   A.   Well, no.  I think it's kind of like asking for a list of

24   priority items to be corrected on the facilities.  I think the

25   most important one -- things need to be done first and then the

1   other administrative things need to be dealt with subsequently.

2   Q.   Now, we talked about the CJCC.  Do you recall that?

3   A.   Yes.

4   Q.   Is the state Department of Health a party to this lawsuit, to

5   your knowledge?

6   A.   No.

7   Q.   Is the district attorney of Hinds County a party to this

8   lawsuit, to your knowledge?

9   A.   No.

10  Q.   Is the Jackson Police Department or the City of Jackson a

11  party to this lawsuit, to your knowledge?

12  A.   No, sir.

13  Q.   What about the chancery court judge?

14  A.   No, sir.

15  Q.   What about the circuit court judge?

16  A.   No.

17  Q.   And you'd agree with me, then, that there is no way for Hinds

18  County single-handedly to ensure that the criminal justice system

19  works optimally, don't you?

20  A.   Hinds County Board of Supervisors, you're referring to?

21  Q.   No.  I'm asking you -- there's -- do you agree with me that

22  there's no way that Hinds County itself, by itself, can ensure

23  that the criminal justice system operates optimally?

24  A.   No.  That's a joint effort of all the parties in a criminal

25  justice coordinating committee or, as I said in Florida, a public

1    safety coordinating council.

2    Q.   And the receiver is not going to do anything to change that,

3    is it?

4    A.   The receiver doesn't have legal authority to change that, no.

5    Q.   And the receiver is not going to snap their fingers and fix

6    every one of the problems at the RDC, is it?

7    A.   Can't be done instantly, no.

8         MR. MORISANI:  Your Honor, I tender this witness.

9         THE COURT:  Okay.

10        Mr. Cheng, I don't know how long you're going to be with

11   this witness on redirect, but this may be an appropriate time for

12   us to take our lunch break.

13        MR. CHENG:  It shouldn't take too long, Your Honor.  I'm

14   estimating maybe 10 or 15 minutes.  But I do have a

15   tendency sometimes to --

16        THE COURT:  Yeah.  I think -- I think this is a good

17   breaking point in time for us to take our lunch break.  It's

18   approximately 12:15 -- 12:13 or so.  Let's meet back at 1:35, and

19   then we'll resume -- you'll begin the redirect of Mr. Parrish and

20   proceed from there.

21        We're in recess.

22        (Recess taken.)

23        THE COURT:  You may be seated.

24        I presume there is nothing to take up.

25        Mr. Parrish, you may return to the stand.

```
 1                       REDIRECT EXAMINATION

 2    BY MR. CHENG:

 3    Q.   Good afternoon, Mr. Parrish.  When Mr. Morisani was

 4    cross-examining you, he asked you about use-of-force credentials.

 5    In your consulting work and as a jail administrator, did you

 6    review use-of-force policies and procedures?

 7    A.   On numerous occasions, yes.

 8    Q.   Did you develop training programs on the use-of-force

 9    policies and procedures?

10    A.   I did not personally develop training, but my direction, my

11    input, caused our training division within the sheriff's office to

12    modify training for detention so that it was appropriate for use

13    within the jail system and not identical to what's used for

14    teaching officers on the street.

15    Q.   And where do you get information about what is an appropriate

16    use-of-force policy?

17    A.   Good examples come from the American Correctional

18    Association, the American Jail Association, National Institute of

19    Corrections.  They give you good references.  Then, I have found

20    over the years that it's worthwhile to collect information from

21    other recognized standard-bearer agencies, good jails around the

22    country that are of similar size.

23    Q.   Have you done any consulting or technical assistance for

24    smaller jails that are smaller than Hillsborough County?

25    A.   Yes, sir.
```

1    Q.   And can you describe some of that work?

2    A.   I've done work on an Indian jail, on a number of smaller

3    jails around the country.  I've done work on jails of all sizes,

4    from as big as Harris County, 9,000 plus beds, to jails that are

5    down to 100 beds, and also did work extensively after I retired

6    for the California Prison receivership, which was in California.

7    They were planning to build 10,000 beds of medical and mental

8    health to deal with the receiver operation of the California state

9    prison system.  And I was brought in to teach direct supervision

10   to them because they were going to our Falkenburg Road Jail

11   dormitory as the model for their construction.

12   Q.   And have you seen smaller jails that are able to adopt direct

13   supervision to improve safety in the jails?

14   A.   Direct supervision doesn't work for really small jails

15   because you have to have adequate capacity to separate people, and

16   if the housing unit's too small, it is totally inefficient.  But

17   certainly from 200, 250 beds on up, direct supervision can work

18   very well and does.

19   Q.   And would those jails, 250 beds up or higher, be similar to

20   Hinds County jail in terms of its size or its design or makeup?

21   A.   Certainly.

22   Q.   There was also some discussion about whether you've

23   personally tested the doors.  Did you personally observe the

24   conditions of any of those doors?

25   A.   I'm not a mechanic, and I didn't do that kind of analysis.  I

1    observed whether or not the doors were operating.  I talked with

2    the officers working the posts, and I talked with supervisors and

3    maintenance people and found out the status of the doors.

4    Q.   Did you observe any of the officers opening or unlocking

5    those doors?

6    A.   I found doors that were permanently propped open or not

7    latched but -- closed but not secured, and that's the -- as close

8    as it came to securing them because they did not function.  So

9    some doors were left -- if they were sliders, left permanently

10   open.  Some swinging doors were left permanently open because if

11   they latched, then you couldn't access the housing unit through

12   that.  You would have to go around through the rec yard to get

13   into it, and I found doors that were just left propped open.

14   Q.   A number of times Mr. Morisani asked you whether something

15   was, quote, "a reasonable response," unquote.  Do you remember

16   that?

17   A.   Yes.

18   Q.   When you say something is a "reasonable response," does that

19   mean the same thing as that the defendants have done the minimum

20   necessary or the minimum that is adequate?

21        MR. MORISANI:  Objection.  Leading.

22        THE COURT:  Objection overruled.

23        THE WITNESS:  Just please restate the first question so

24   that I make sure I answer it properly.

25   BY MR. CHENG:

1   Q.   So when you said something was a "reasonable response," does

2   that mean that they've done the minimally adequate solution?

3   A.   A reasonable response may be the lesser of two evils, and if

4   that's done to try and mitigate a problem and it's a better

5   solution than doing nothing at all, yes, that's reasonable, but

6   it's not necessarily a solution.

7   Q.   Is it a minimally-adequate solution?

8   A.   Not necessarily, no.

9   Q.   Is it the minimum necessary to fix a problem to just do

10  something that's reasonable?

11  A.   It depends upon the individual case.

12  Q.   At one point, also, Mr. Morisani was asking whether or not

13  you're a jail administrator or jail manager.  Do you consider

14  yourself a jail administrator?

15  A.   Yes, I am.  Or I was.  I'm not now.  I'm retired.

16  Q.   And do you consider yourself a jail manager?

17  A.   I don't know what the difference would be between jail

18  manager, jail administrator, colonel, whatever.  The person in

19  charge of a jail system.

20  Q.   So do you consider yourself a jail manager?

21  A.   I consider myself a jail -- I considered myself a jail

22  administrator.  That was the title that we used.

23  Q.   There was also some discussion about the deaths at

24  Hillsborough.  I think there was some mention of 35 deaths.  Do

25  you know if that number included natural and unnatural deaths?

1   A.   I'm not familiar with the statistics.  I would have to assume

2   that it's a listing of all deaths regardless of cause.

3   Q.   So when you answered that question, did you have any personal

4   information as to whether that number was even correct?

5   A.   No.

6   Q.   The other thing that came up was this report, I guess from

7   your independent commission at Hillsborough County.  Do you

8   remember that?

9   A.   Yes, sir.

10  Q.   And there was some discussion about strategies to address

11  staffing.  Do you recall that discussion?

12  A.   Yes.

13  Q.   Do you feel like -- well, let me ask you this:  Does the jail

14  administrator have an obligation to try to implement strategies to

15  address staffing, even if it is a continuing struggle to have

16  enough staff?

17  A.   Certainly.  It's something that the jail administer has to

18  stay on top of.  I spent an inordinate portion of my time working

19  with recruitment and screening to bring on board qualified

20  candidates.

21  Q.   And so even if staffing was a challenge, would you have felt

22  it is okay to not deal with staffing just because it is always

23  going to be a challenge?

24  A.   No.  That was an important part of my job that I concentrated

25  on.

1  Q.   There was also some discussion about the, I guess, your

2  retirement.  How was your retirement date set from Hillsborough

3  County?

4  A.   In Florida, near the end of my career, the legislature passed

5  something called the DROP Program, Deferred Retirement Option

6  program.  It was an effort on the part of the legislature to

7  encourage people in public safety positions -- law enforcement,

8  corrections -- to retire and make room for new people to come on

9  board.  It was a financial incentive.  So typically for a law

10  enforcement officer or a correctional officer, at the end of

11  25 years, you could put in for deferred retirement and then work

12  for up to five more years.  And during that time frame your

13  retirement benefit calculated at that date would go into an escrow

14  account.  At the end of that time, when you finally retired, you

15  would have a huge lump sum that could go into an annuity, plus

16  your regular retirement.  It was an incredibly generous program.

17  I topped out even because I had one year of civilian service and I

18  was able to go 30 years before I went in the DROP program, which

19  increased my benefits significantly.  So I retired five years with

20  -- actually, 2003, 2004, and went into the DROP program, but

21  continued to work for the next five years.  And I was due to

22  retire on -- like March the 16th of 2009; that would be the end of

23  my five years of DROP.  Six months before that happened, I was

24  offered the opportunity to work on the California prison

25  receivership because they wanted to build, as I said, 10,000 beds

1   of medical and mental health direct-supervision housing, and the

2   California Department of Corrections had no direct-supervision

3   jails or facilities.  So they offered me the opportunity to work

4   on that project, and they said we need you right now, not in six

5   months when you're due to retire.  And I thought about it.  And it

6   was a once-in-a-lifetime opportunity.  And so I took it.  I left

7   the sheriff's office six months before I had intended to.  By

8   doing so, I lost six months of my DROP money, but I also made a

9   great deal of money working on the California prison receivership,

10  and I would fly out to California, to Sacramento, every week to

11  work on it and then come back to Tampa.  It was an opportunity I

12  could not pass up and I got to work with 200 of the best

13  corrections people in the business for over half a year.

14  Q.   So did the issuance of the report have anything to do with

15  the setting of your retirement date?

16  A.   No, sir.

17  Q.   And this report that was -- they asked questions about -- so

18  this report that the defendant asked you about but did not

19  introduce, did it say good things about you as well?

20  A.   Yes.  There were a great number of things that were in that

21  report that were very complimentary of the sheriff's office, the

22  jail system, the administration of the jail, the operation, the

23  fact that -- I mean the kinds of things that came out through

24  verbal and other orientation sessions were such as there are 3,300

25  jails in the United States.  At that time Hillsborough County was

1    one of the only 120 jails that was accredited by the American

2    Correctional Association.  There were all kinds of things that

3    were done to indicate -- that were passed along to that commission

4    that reflected the kind of operation that we had.

5    Q.   There is a paragraph on page 5 of the report that says, "This

6    specific incident notwithstanding, the commission has documented

7    many more strengths than weaknesses in the Hillsborough County

8    jails.  This finding is confirmed by local groups who represent

9    various constituencies in the jail and by officials representing

10   the other components of the criminal justice system in the

11   jurisdiction.  It is confirmed by national experts who report to

12   us that the Hillsborough County jails enjoy a stellar reputation

13   nationwide.  This reputation is further confirmed by the extent to

14   which Cornell David Parrish is called upon to advise his peers

15   nationwide and his longstanding leadership in national

16   organizations."

17        Is that paragraph talking about you?

18   A.   Yes, sir.

19   Q.   And earlier on that same page --

20        THE COURT:  If you're going to read, just slow down a

21   little bit.

22   BY MR. CHENG:

23   Q.   Earlier on that same page, there is a comment that said,

24   "Third, the commission wishes to recognize and commend the great

25   degree of cooperation between the sheriff's office, public

1 defender, state attorney and chief judge, which is so essential to

2 the smooth and professional functioning of the criminal justice

3 system in Hillsborough County.  As we learned, such cooperation is

4 longstanding and ongoing and the commission believes that it is a

5 model for the components of the criminal justice in each of

6 Florida's counties."

7   Is that also one of your obligations, to help maintain

8 cooperation between components?

9 A. Yes.

10 Q. And then on page 6, there is a paragraph that says, "We

11 recognize that bad incidents occur in even the best run

12 institutions.  The key is how an institution responds to such

13 events.  The response of the Hillsborough County Sheriff's Office

14 has been very strong, conveying clearly and publicly its

15 accountability to its constituency and its commitment to

16 preventing future incidents."

17   Was that in reference to your department's response to the

18 death or to the incident?

19 A. Yes, sir.

20 Q. And then on page 7 -- I don't want to have to go through the

21 whole report, but I am just going to hit a few highlights.  On

22 page 7, it says, "In any organization, it is the corporate

23 culture, the pattern, customs and practices of accepted conduct

24 that defines the parameters of accepted behavior.  Especially in a

25 law enforcement agency, it is imperative that such patterns of

 1  behavior, customs and accepted practices meet the highest

 2  professional standards.  The commission's review indicates that

 3  the written policies and stated practices of the Hillsborough

 4  County Sheriff's Office set a high bar for professional conduct.

 5  In addition, in individual meetings and during a number of the

 6  cell represented meetings attended by commission members, even

 7  inmates made favorable comments about the detention personnel

 8  supervising them in facility housing."

 9       Is that a culture that you believe is necessary in a

10  detention center?

11  A.   It is.  That's what we work hard towards at all times.

12  Q.   And is that culture found in Hinds County today?

13  A.   No, sir.

14  Q.   There was also some questioning of whether or not documenting

15  safety watches violates the law.  Why do you believe they need to

16  document safety watches?

17  A.   If you don't document things, you can't ever prove that they

18  were done if there is no record of it.  There is no standard to be

19  met.  In any jail, it's imperative that records be kept of the

20  activities of staff to fulfill their obligations, their

21  supervisory obligations, their custodial obligations.  That's what

22  well-being checks are for, to document routinely that staff has

23  been around, checked on the well-being of the inmates and verified

24  that everything is okay.

25  Q.   Now, if you're in an indirection supervision jail, is it okay

 1   to skip doing safety checks or welfare checks?

 2   A.   It doesn't matter what kind of a jail it is, no.  The answer

 3   is no.  It doesn't matter what kind.  Well-being checks are

 4   required regardless.

 5   Q.   Mr. Morisani also mentioned how during the last tour, you

 6   complimented them on setting officer stations in B-Pod?

 7   A.   Yes.

 8   Q.   What are those officer stations?

 9   A.   Well, if an officer is going to work in a direct supervision

10   pod, he or she needs a work station, a place to keep paperwork, a

11   place where hopefully there will be a telephone.  Hopefully in the

12   future they will have a computer terminal there so they can access

13   information and answer questions for inmates, a place to keep the

14   officers's necessary work items.  At that's what it is for.  It is

15   a place to go back to.  That is what it is for; it's kind of a

16   place to go back to.  It is not a separate room.  It's just a

17   station out in the middle of the housing area.

18   Q.   Was there furniture and, like, a phone or electrical set up?

19   A.   It's designed differ -- in some places it is a desk and a

20   chair and some places it is a little wraparound thing like you

21   might find at the airport or at a train station, and the

22   configuration can vary.  But in Hinds County, it is about one step

23   up from the ground level.  It's not elevated.  It's just a little

24   bit up, and there is a partition so that the officer can see over

25   and talk to inmates, but has a little bit of a separation when

1    they are working on paperwork.

2    Q.   And did you recommend putting in these work stations in the

3    housing units?

4    A.   Yes.  I mean, they used to have work stations in the housing

5    units when it was a direct supervision jail.  They all came out

6    when the officers were pulled, and as it was reopened for direct

7    supervision, we asked that that be a part of it.  That's a part of

8    direction supervision.  The officer has to have a work station.

9    Q.   And how long did it take for them to put in the work station

10   after you recommended it?

11   A.   I can't say exactly when the work stations went in.  What I

12   can say is that there is still no furniture inside Charlie Pod for

13   the inmates.  This is a year and three or four months after it

14   opened and there are still no tables and chairs for them to be

15   able to sit down and eat their meals.

16   Q.   There was also a discussion about the fire safety officer,

17   Mr. Laster; is that Sergeant Laster?

18   A.   No.  I could be wrong, I know him as Mioka Laster.  I am

19   sorry.

20   Q.   That's fine.  So there was some discussion about how inmates

21   start fires or damage the wiring.  What does that have to do with

22   security or supervision?

23   A.   Well, there are an inordinate number of fires set in the

24   Raymond Detention Center routinely.  And inmates set fires just to

25   create distractions or for whatever reason.  They set fires by

1    using apparently battery, electrical wires and I don't know what

2    other things to get clothing, sheets, other things set on fire

3    either in their cell, in front of their cell.  That's the way it

4    generally happens in both Charlie Pod and Bravo Pod.  That's where

5    most of the fires are.  There are actually fewer fires in Alpha

6    Pod.

7    Q.   There was some discussion about how, you know, even a

8    fully-staffed jail might have some of these same problems.  Can

9    you talk about how staffing at levels can reduce or prevent these

10   types of serious incidents?

11   A.   I think I made reference earlier to the fact that law

12   enforcement arrests people who have been charged with violating

13   the law.  Takes them to one place.  They all get put into a

14   facility.  They go into housing units.  That doesn't make them

15   suddenly great people who are going to abide by all the rules and

16   regulations.  We have already taken them off the street for that

17   reason.  Even putting direct supervision into place doesn't

18   guarantee that there won't be problems.  But having an officer

19   directly supervising the inmates in the housing units reduces the

20   level of tension, reduces the opportunity for inmates to act out

21   and to assault each other and provides for almost instantaneous

22   response on the part of staff, as opposed to an inmate banging on

23   the window saying, I need help.  Somebody got beat up in here.  So

24   that's the difference of direct supervision versus remote

25   surveillance.

1   Q.   So is having enough staff still necessary to improve safety

2   or provide reasonable --

3   A.   Having enough staff is a critical component of the operation

4   of any jail.

5   Q.   Can you explain what roll call training is?

6   A.   There are three shifts, first, second and third.  And when

7   the officers come on board, the supervisor meets with them in a

8   roll call room.  They cover necessary information that they need

9   to be aware of toward the oncoming shift.  And they take that

10  opportunity, while they are together for a few minutes before they

11  go on post, to, for instance, cover a policy and make sure that

12  the officers on that shift are familiar with a new policy that was

13  recently approved and authorized.  And that's what roll call

14  training is.

15  Q.   So about how long is such training?

16  A.   It is a very short duration.  Just a few minutes.

17  Q.   Is it equivalent to providing pre service training before you

18  put officers in the housing unit?

19  A.   No, it is not at all the same as doing 40 hours of in-service

20  training for four or eight hours at a time, that one associates

21  with in-service training, but it certainly complements what is

22  done in in-service, and the advantage of it is that it stays more

23  current because it's done more frequently.  So smaller bites, but

24  more frequently.

25  Q.   There was also some talk about Mr. Knox's qualification.  Has

```
 1   Lieutenant Knox been the training officer this entire time period
 2   during the compliance period?
 3   A.   Not for the entire time, but for the past several years.  He
 4   worked under -- there were several different captains that held
 5   the responsibility for training for the sheriff's office and then
 6   he took on responsibility to coordinate training for detention.
 7   Q.   Is he currently the training officer at the jail?
 8   A.   He is responsible for training at -- in detention.  And the
 9   last that I heard, but I have not seen anything in writing, is
10   that he has been reassigned back under the training commander, the
11   captain, but still has the same responsibility.  So he would not
12   be considered a detention employee per se, but he handles and
13   specializes in detention training.
14   Q.   Previously when he provided detention training, did he report
15   to the jail administrator?
16   A.   In the past, he did not.  I mean, he reported to the captain
17   in charge of training.  For a brief period of time he was assigned
18   to report to the jail administrator and handle training for
19   detention.  That was my understanding.  And then my understanding
20   also is that since -- since the previous jail administrator is not
21   there, he has been reassigned to the training captain.  I can't
22   confirm that with writing.  It's just what I've been told.
23   Q.   Did you recommend that he be placed in detention or that he
24   should report to the regular training captain?
25   A.   I did not recommend either way.
```

1    Q.    The new sheriff, did he ever work in the jail?

2    A.    Not to my knowledge.

3    Q.    There was also some talk about Major Bryan and how you

4    praised her for a quality control measure, having a sergeant go

5    out and confirm things.  Do you recall that?

6    A.    She did not actually start that.  That was started under her

7    predecessor, but it is a procedure that apparently continued.

8    Q.    Is this the same Major Bryan who was terminated?

9    A.    Yes.

10   Q.    There is also some talk about the control room and direct

11   supervision.  The control rooms in this jail, do they have direct

12   line of sight into the housing unit?

13   A.    The control room sits in the middle.  There is what's called

14   a walkway around that.  Officers refer to that as the horseshoe.

15   And there are one, two, three, four housing units around that.  So

16   there is glass that the control room officer can look through

17   across the horseshoe corridor and into a portion of the housing

18   unit, but you can't really see what's going on inside the housing

19   units, and it is impossible to have it completely visible all

20   over.  But there is some line of sight into the housing units from

21   the control room in the three pods, but it requires going around

22   to look at the various ones.  They also have cameras that can

23   provide some level of surveillance when they are working.

24   Q.    So is placing an officer in the control room an adequate

25   substitute for having officers in the housing units?

1   A.   No.

2   Q.   There was also some talk about how the board doesn't control

3   the State Department of Health or other public service -- or

4   public entity.  When you were with the Hillsborough County

5   Sheriff's Department, did you control the district attorney?

6   A.   No.

7   Q.   Did you control the state?

8   A.   No.

9   Q.   Did you control any other entities outside of your own

10  department?

11  A.   No.  I just worked with them.

12  Q.   So how does someone who doesn't control those other entities

13  work with them in order to get things better in a jail?

14  A.   It takes a collaborative effort.  And that's what we refer to

15  as the public safety coordinating counsel that included all of

16  those people you just mentioned, all those agencies, and the

17  sheriff's office and the jail and somebody from the City of Tampa

18  and somebody from the board of county commissioners.  And we all

19  worked together to try and make the criminal justice system

20  operate efficiently and effectively.

21  Q.   You were also asked some questions about whether you knew how

22  frequently the sheriff communicates with the board.  Do you recall

23  that?

24  A.   Yes.

25  Q.   Are you aware that the sheriff did communicate to the board

1    that a member who disrupts the board meeting, may have to be

2    arrested?

3    A.   Am I aware that the sheriff may have to do what?

4    Q.   Are you aware that the sheriff communicated to the board

5    members that if one of them disrupts a board meeting they may have

6    to be arrested?

7    A.   I think I saw some news articles that made reference to

8    incidents on the board, but I am not familiar with any particular

9    communication.

10        MR. CHENG:  Thank you.  No further questions, Your Honor.

11        THE COURT:  Mr. Parrish, I have a few questions and the

12   parties will be able to follow up based on the questions that I

13   have asked, starting with the United States as the plaintiff.

14        Now, you were last at the facility in January of this

15   year.

16        THE WITNESS:  Yes, sir.

17        THE COURT:  The week of January 24th, I believe.

18        THE WITNESS:  Yes, sir.

19        THE COURT:  You testified that -- I think.  And I am just

20   looking at my notes here.  There are some doors that you contend

21   were either propped open or ajar or could not be closed during

22   that time period that you were there.

23        How long were you there during the week of -- how many

24   days were you there during the week of January 24th?

25        THE WITNESS:  I was in the facility each day, Monday

1    through Thursday, four days.

2         THE COURT:  Okay.  Now, I guess there's been some

3    indication that maybe you didn't try to close the door or you

4    didn't check the door.  I think you testified that you talked to

5    command staff?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  You talked to other employees?

8         THE WITNESS:  Yes.

9         THE COURT:  And did you talk to anybody about those doors?

10        THE WITNESS:  I dealt with Benchmark Construction,

11   Gary Chamblee, and over the years, supervisors that were familiar

12   with the operation or were in charge at the time.

13        THE COURT:  During the week of January 24th, did you ask

14   any particular person if those doors were not operable or can they

15   close -- I know you saw them propped open, you testified.

16        THE WITNESS:  Yes, sir.  I had a lieutenant standing next

17   to me when I was looking at a door going into a particular area

18   and asked why it was still standing open.  Well, it hasn't

19   functioned for quite some time and it hangs up so we just leave it

20   open.

21        THE COURT:  And do you expect those officers at the

22   facility to be truthful to you?

23        THE WITNESS:  Yes.  The staff in the jail system have been

24   very forthright and forthcoming in answering our questions.  We've

25   had great cooperation that way.

1          THE COURT:  Now, at some point in time, I think this

2     was -- this was during your direct testimony, I think you

3     testified about the long-standing problem of how incident reports

4     may be labeled or maybe mislabeled, I think was your testimony.

5     And you have to read the entire report and -- somebody may call it

6     disorderly conduct, is I think what your testimony was in response

7     to some question and -- but in reading the incident report itself

8     when it is prepared, it's from the reading of the report that you

9     have determined that -- that there might have been an assault at

10    the facility.  I mean, an assault might have generated the

11    incident report.

12          THE WITNESS:  That's correct, sir.

13          THE COURT:  Okay.  Now, you also indicated that sometimes

14    there were references, I guess, to inmates, what inmates might

15    have said about a particular incident, and then you learn from

16    that that there may have been an assault or some other thing that

17    was reported or should have been reported?

18          THE WITNESS:  Yes, sir.  I think what I was referring to

19    was the fact that staff finds out about what's going on in the

20    jail or in the housing units, sometimes by observing firsthand;

21    sometimes by having inmates come to them and report something or

22    there's a problem with somebody else, you need to go and check on

23    him; and sometimes from outside, much less frequently, but on

24    occasion, a call from outside saying I got a call from inside the

25    jail and this is what is going on with my son or somebody else and

1    you need to go check on it.

2        THE COURT:  And I guess if you do get the call from the

3    outside -- let's start with that first.  You get the call from the

4    outside from a sister or brother, mother, who says, I've heard

5    from my child.  Heard from my brother, my son, that this is

6    happening.  Could you check on them?  I mean, do they have any

7    obligation to make that check?

8        THE WITNESS:  Well, yes they do.  And from what I have

9    read, they do follow up.  Maybe there may be cases where that

10   information came in and somebody did not take action, but I can't

11   tell there.  All I can look at is an incident report that reflects

12   that's the action that was taken and that's how it happened, so...

13       THE COURT:  And to the same extent, when an officer

14   receives some information from an inmate about another inmate, is

15   that something that they should follow up on?

16       THE WITNESS:  Absolutely.  And as long as they document

17   it, then we have a record of it.  And that's what we depend upon,

18   is the records that are generated by staff indicating what

19   happened and then what action they took.  And if they saw it

20   firsthand, they still need to generate a report which reflects

21   that.  So we need documentation on all three types.

22       THE COURT:  I want to spend some time on one of the

23   incidents that you talked about.  I am not sure if I heard

24   everything right.  And I want to make sure that my notes are

25   correct.  You talked about an incident where I believe an inmate

```
1    was tased.  And he was tased as a part of an investigation.  I
2    believe that's what you testified to.
3              THE WITNESS:  That's correct.
4              THE COURT:  I want to hear more about, what do you know
5    about that -- what have you learned about that particular incident
6    in doing your monitoring.  I am just -- it may be a part of the
7    monitoring report separately, and that's fine.  But what can you
8    tell me about that particular incident?
9              THE WITNESS:  This was an incident that occurred in
10   October of last year.  And one of the CID investigators went into
11   a housing unit where they were having -- they had information of
12   some issue.  We don't know exactly what that was from the report
13   itself, but the investigator and some command staff up to a level
14   of a captain went into that housing unit and tried to get an
15   inmate to comply with their orders:  come in, go out of your cell,
16   we need to check something.  The inmate was uncooperative and the
17   investigator wanted to handcuff him.  The inmate was on his face
18   down on the floor, refused to show his hand behind his back so
19   that the investigator could handcuff him.  The investigator gave
20   him several orders to do so, and when he failed to do so,
21   according to the investigator's own report, he deployed his taser
22   for several seconds to get him to comply.  That is a direct
23   violation of the use-of-force policy done by the investigator who
24   is supposed to be looking at issues within the jail by detention
25   inmates and so forth.  That information was all included in a
```

1    report that we reviewed.  We made mention of it in our most recent

2    site visit in January.  We sat down with Internal Affairs and

3    asked about the status of that because we had not seen anything in

4    the IAD reports that reflected there was an investigation with

5    regard to the inappropriate actions of the investigator in that

6    incident.  They didn't have an answer for us and so we got from

7    them a copy of the incident report and turned it over to IAD and

8    suggested that they look into that to see what appropriate action

9    should or should not be taken.  And that's the extent of what we

10   have right now.  I have not seen anything come back from IAD yet,

11   but it's been a short time ago and rather fluid since then.

12           THE COURT:  Has the sheriff told you whether or not that

13   person has been reported to law enforcement?

14           THE WITNESS:  I have no idea what's been done within the

15   sheriff's office.

16           THE COURT:  If a person tasers an individual who is

17   already handcuffed -- he was not already handcuffed?

18           MR. SHELSON:  Your Honor, he was not already handcuff --

19           THE WITNESS:  He is correct, Your Honor.  He was not

20   handcuffed at the time.  The officer was trying to handcuff him,

21   wanted him to pull his hands out from underneath and come behind

22   his back so he could be handcuffed.  He refused to do it.  So the

23   officer tased him and then got his arms up and did it.  And part

24   of the problem was there were several ranking officers standing

25   right there, multiple officers that could have easily each grabbed

1    an arm and pulled it out and cuffed him.  It wasn't necessary to

2    use a taser to coerce him into doing something, and that is an

3    improper use of the weapon anyway.  So that was the point of it.

4    But he had not been handcuffed to that point.  And so, that's now

5    in the hands of IAD to investigate and decide what they are going

6    to do.

7         THE COURT:  Has an after-action report been filed in that

8    particular matter?

9         THE WITNESS:  No, sir.

10        THE COURT:  Speaking of after-action report, let me hear

11   what your definition is of after-action report and what it is for.

12        THE WITNESS:  Okay.  There are two kinds of reports that

13   sometimes get confused.  One is a mortality review; that is a very

14   brief statement.  It is generally one page and it is done by

15   medical to look at the circumstances of the inmates's death.  And

16   that's done basically routinely in-house.  But they never say too

17   much.  They only deal with medical.  And after-action report is

18   something that should be done any time there is an inmate death or

19   something significant; say there was an escape or something

20   significant, not just an assault.  And an after-action report

21   covers every aspect of the operation.  It looks at what the

22   security officers did.  It looks at what medical's involvement may

23   have been.  It looks at was there compliance with policy?  Was --

24   whatever.  All aspects of it need to be examined.  And the purpose

25   of that is to identify and correct problems so that they don't

1    reoccur, as opposed to just, well, it happened.  And so, that kind

2    of thing has not been routinely done within detention.  The last

3    one that we had seen until recently was done quite some time ago

4    under Major Fielder.  And it was not real comprehensive.  But at

5    least it was considered an after-action report.  There's only been

6    one done since then, and that was on the death that occurred by

7    beating in Alpha 4.  And Major Bryan did an excellent after-action

8    report that covers six or seven pages.  It is comprehensive.  That

9    is a document that should stand as a model on how to do it.

10         THE COURT:  That was for which death?

11         THE WITNESS:  The inmate beating death in, I think it was

12   Alpha 4, that occurred in October.  And she prepared herself the

13   after-action report on that.  That was, like I said, that was an

14   excellent document.  I have had to do those things myself.  That

15   set a benchmark.

16         THE COURT:  Have you seen any other after-action reports

17   for the other five deaths?

18         THE WITNESS:  No, there have been none.

19         THE COURT:  Do after-action reports you mention for things

20   like escape, big things -- well, you know, things like that.

21   Would after-action reports be done for contraband, I don't know --

22         THE WITNESS:  No, sir.  After-action reports are for

23   inmate deaths, an escape, something that's -- like if there was a

24   riot or anything like that; that would be an after-action report.

25   It is not done routinely on everything that happens within the

 1  jail system.  It is a time-consuming and detailed process when

 2  done right.  And like I said, the most recent one was excellent.

 3  That's what should be used as the model for future things.

 4        THE COURT:  There was a riot at this particular facility

 5  at Raymond?

 6        THE WITNESS:  Yes.  There have been riots there, but

 7  that's years back and we weren't doing anything like this then.

 8        THE COURT:  No action report was done back then,

 9  particularly for the most recent riot, which --

10        THE WITNESS:  No.

11        THE COURT:  Now --

12        THE WITNESS:  Your Honor?

13        THE COURT:  Yes.

14        THE WITNESS:  I might need to correct myself.  You asked

15  about the most recent form of riot that they had there.  I was

16  still thinking of 2012, when Charlie was taken over.  I would have

17  to go back and look at my notes to see what Major Fielder wrote

18  about in his one or two after-action reports that he did, and it

19  may have dealt with a disturbance in the housing area.  I can't

20  speak to that right now.  But it hasn't been done for other

21  things.

22        For instance, there was an escape from the work release

23  center several months ago.  One inmate was recaptured.  The other

24  ones is still on the lam.  There has never been an after-action

25  report done on that.

1          THE COURT:  Did the consent decree require after-action

2    reports?

3          THE WITNESS:  I can't tell you exactly what paragraph, but

4    that's the kind of thing that's required, yes.

5          THE COURT:  Did the stipulated order require an

6    after-action report?

7          THE WITNESS:  I honestly can't remember whether that's

8    specified in the stipulated order.  I'd have to go back and review

9    it.

10         THE COURT:  But in management of corrections, one would --

11   you would --

12         THE WITNESS:  That's --

13         THE COURT:  Go ahead.

14         THE WITNESS:  That is expected, yes, sir.

15         THE COURT:  Okay.  Now, I want to be sure about your time

16   at Hillsborough, and I just have a couple of questions about that.

17   Now, I think on direct -- well, on direct examination, I believe,

18   the jails for which you had been over during the time that you

19   were at Hillsborough, I believe you said that they -- you never

20   had six deaths in one year.

21         THE WITNESS:  I think the question dealt with six deaths

22   through assaults or that sort of thing.  There may have been six

23   natural deaths in a year.  I can't remember on that.

24         THE COURT:  Okay.  This number that I heard earlier on

25   cross-examination from the exhibit that was never introduced into

1  evidence, I don't think, 39 or 40, 41, 42, do you know what time

2  period that was?

3       THE WITNESS:  I can't recall.  It was over a period of

4  years, as I recall from the -- from the examination.  But I'm

5  sorry.  I don't have that kind of number off the top of my head

6  and can't tell you.

7       THE COURT:  During the time that you were administrator or

8  whatever your title was at Hillsborough County, were you -- was

9  Hillsborough County under a consent decree with the Department of

10  Justice?

11       THE WITNESS:  No, we never have been.

12       THE COURT:  Was it under a stipulated order between

13  Hillsborough County and the Department of Justice or someone?

14       THE WITNESS:  No.

15       THE COURT:  Now, you've been a part of the monitoring team

16  since 2016; does that sound about right?

17       THE WITNESS:  Yes, sir.  That's when we started.

18       THE COURT:  But prior to that, I think you said you did an

19  initial report at the request, the behest, or as a part of the DOJ

20  investigation going back to 2012; is that correct?

21       THE WITNESS:  Yes, sir.  In 2014 I was asked by the

22  Department of Justice to come in and do an analysis of the Raymond

23  Detention Center and the Jackson Detention Center.  I also, at the

24  time, got to look at the work center, but I wasn't tasked with

25  reporting on that.  And I prepared that report in 2014 and did a

1    supplement to it in 2015 based on some additional questions, and

2    it's my understanding that that was used as the foundation for

3    laying out the settlement agreement.

4              THE COURT:  And during the time that you've been with this

5    monitoring team, I know sheriffs have changed and I know members

6    of the board of supervisors have changed and even attorneys have

7    changed.  But since 2014, in particular since 2016, when you

8    became a part of this monitoring team, has anybody from the County

9    ever suggested to you that you were not an expert?

10             THE WITNESS:  Not that I recall, no, sir.

11             THE COURT:  Have they ever challenged you in any way about

12   the things that you were recommending to them?

13             THE WITNESS:  No.

14             THE COURT:  And since 2016, I think the attorney for the

15   County pointed out that you've been paid approximately $291,000.

16   That's over a period of more than five years, right?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  So that's roughly less than $60,000 a year.

19             THE WITNESS:  Yes.  I think I average a little bit more

20   than that, but I don't know exactly what the number is.

21             THE COURT:  The United States may follow up based on the

22   questions that I've asked.

23                          CONTINUED EXAMINATION

24   BY MR. CHENG:

25   Q.   Mr. Parrish, was there a history in this jail of people

1    escaping from the jail to get contraband and bring it back in?

2    A.   Yes.  This is an unusual situation.  I've seen jails where

3    people escape to become free, and Hinds County was unusual in that

4    inmates would generally break out through the roof of the Raymond

5    Detention Center, go out to the fence, collect contraband that

6    their friends would bring, and then they'd come back in with it.

7    So they would escape to bring things back in.

8         There was one exception to that where two inmates went out to

9    collect contraband and bring it in.  Their buddies did not drop

10   anything off for them, and they realized that if they went back in

11   without the contributed, they were going to be in real trouble

12   with the inmates in their housing area, and rather than face that

13   music, they decided to escape to get away.

14        But other than that, routinely it was a very strange

15   situation that inmates would physically break out of the jail only

16   to retrieve contraband to come back in.  I'd never seen anything

17   like that before.

18   Q.   So it sounded like earlier when you were answering the

19   judge's questions, contraband don't get an after-action report but

20   escapes do get an after-action report.  So in that scenario,

21   should there be after-action reports?

22   A.   Well, there never have been.  Perhaps someday they should get

23   to that point, but right now they should start with deaths and

24   escapes where people break out to freedom like the two from the

25   work center.

1   Q.   Is the jail still at any risk from contraband or escapes?

2   A.   Certainly.  There are still contraband issues:  cell phones,

3   drugs, weapons.  They are found quite routinely at the Raymond

4   Detention Center, less frequently at the work center.

5   Q.   Are they still found at the work center?

6   A.   On occasion they find things, but they are not at the same

7   level or quantity or type.

8   Q.   And when you say they're found with some frequency at

9   Raymond, what type of frequency are you talking about?

10  A.   Well, it depends on how frequent they do shakedowns.  So when

11  we read a record of a shakedown generally at the Raymond Detention

12  Center, contraband is found.  In Charlie Pod, they went for four

13  months without having a shakedown, so we -- they didn't find much

14  in the way of contraband.  But once they started reinstituting

15  shakedowns, then they found more.  So it's basically related to

16  the frequency of shakedowns.

17  Q.   And is the defendant providing a reasonably safe facility if

18  they don't conduct shakedowns?

19  A.   Is what if they don't do shakedowns?

20  Q.   Can they maintain a reasonably safe facility if they don't do

21  regular shakedowns?

22  A.   No.  That creates all kinds of problems if they don't do

23  shakedowns.  There have been many instances over the past several

24  years where it's even made it into the news media where a

25  broadcast is put out live from within the jail on a contraband

 1    cell phone which then goes out and goes on social network, and we

 2    can get a copy of it, and I've actually looked at videos that were

 3    broadcast from within Raymond by inmates.  I mean, that's the kind

 4    of thing that's pretty incomprehensible.  That should not be

 5    happening.

 6         MR. CHENG:  Thank you, Mr. Parrish.

 7         THE COURT:  Any follow-up from the County based on

 8    questions that I've asked?

 9         MR. MORISANI:  Yes, sir.

10                    FURTHER CROSS-EXAMINATION

11    BY MR. MORISANI:

12    Q.   Mr. Parrish, you talked a little bit about the after-action

13    report written by Major Bryan.  Do you recall that?

14    A.   Yes.

15    Q.   And I'm going to show you a copy of the after-action report.

16    I believe it's already been shown before, yesterday.

17         Mr. Parrish, is this the after-action report that you are

18    referring to?

19    A.   Yes, it is.

20    Q.   It's PX-20?  Is that the same one?

21    A.   Yes.

22    Q.   Now, you testified a little bit about the importance of

23    after-action reports, and if I heard you correctly, just -- I want

24    to run through some of these things.  You said they're important

25    to identify and correct problems so they don't recur; is that

1   correct?

2   A.   Yes.

3   Q.   And I guess included within that, would you also expect the

4   names -- for example, if in an incident you had, you know, certain

5   staff members that blatantly violated rules or policies and

6   procedures, wouldn't you want to know who those staff members are

7   in an after-action report?  Wouldn't that be part of the report?

8   A.   May or may not be, depending upon the agency's procedures.

9   But at some point, if not mentioned in the report, there should be

10  some linkage to the name of the person, yes.

11  Q.   And if you don't have the name of the person in the report,

12  would it be even more important to describe conduct by that

13  person, even if you don't have their name in the report?

14  A.   Would it be more important to describe comments?

15  Q.   I'm sorry.  Conduct.

16  A.   Conduct.

17  Q.   If their conduct blatantly violated the policies and

18  procedures of the facility, if you're not going to mention anybody

19  by name, wouldn't it be even more important to have their conduct

20  described in the after-action report?

21  A.   Well, I guess that's the purpose of the after-action report

22  is to look at was there a violation of policy and procedure; did

23  officers follow that; was there a staffing issue; were there any

24  number of things.  That's the purpose of it is to compile the data

25  reflecting on the circumstances of the situation.

1    Q.   So, for example, if you had a staff member sleeping on the

2    job, it would be critical to put that in the after-action report,

3    correct?

4    A.   If that was available at that time, yes, but it may be

5    something that got referred to internal affairs for them to follow

6    up with.

7    Q.   And if you had an employee just committing blatant negligence

8    that led to the incident that's the subject of that report --

9    A.   Yes.

10   Q.   -- would you not want to include the negligent conduct in the

11   report?

12   A.   That's what you're looking for, was there negligence, yes.

13        MR. MORISANI:  Now, Your Honor, if I may approach the

14   witness with this document, Exhibit No. 20.

15        THE COURT:  You may.

16        MR. MORISANI:  I'm going to give him a chance...

17   BY MR. MORISANI:

18   Q.   Now, Mr. Parrish, you have the document before you, but do

19   you see anywhere in that document where it describes or even

20   identifies any of the officers that were involved in this -- in

21   this incident that's the subject of the after-action report?

22   A.   I don't see the names of officers in this report, no.

23   Q.   Do you see anything describing conduct of officers that may

24   have led to this incident?

25   A.   Well, I can go back to areas of improvement and corrective

1  action, and that's kind of what the purpose of this is to go back

2  and look at how can things be best addressed.  What else do you

3  want from me?

4  Q.   Do you see anything about conduct, specific conduct of an

5  officer that may have led to this incident?

6  A.   It talks about doing rounds and having proper well-being

7  checks.

8  Q.   Did it talk about an officer sleeping?

9  A.   No, it does not.

10  Q.   And if that was the case, wouldn't you expect that to be in

11  an after-action report?  Correct?

12  A.   It depends upon how you want to approach it.

13  Q.   So it's not an --

14  A.   An after-action report is not a disciplinary action.  It's a

15  report on practice and procedure.  I don't know whether she was

16  aware of people sleeping on duty or not at that point.  Maybe she

17  was.  I can't tell you from this.

18  Q.   Now, you also talked a little bit about --

19       MR. MORISANI:  Your Honor, if I may approach the witness?

20       THE COURT:  You may.

21  BY MR. MORISANI:

22  Q.   You also talked a little bit about shakedowns.  So -- and

23  tell me if I heard you wrong, but it sounds to me like you don't

24  disagree with the statement that the facility conducts shakedowns,

25  correct?

```
 1   A.   They do do shakedowns, just not as many as should be done or
 2   could be done.
 3   Q.   Are the shakedowns they do conduct better than doing no
 4   shakedowns?
 5   A.   Oh, they are absolutely worthwhile, yes.
 6   Q.   And during the four-month period that no shakedowns were
 7   conducted -- I think in C-Pod; is that correct?
 8   A.   Yes.
 9   Q.   During that four-month period, were shakedowns conducted in
10   other locations in the facility?
11   A.   I can't tell you off the top of my head, but probably.
12   Q.   Now, Mr. Parrish, you testified as well about the use of
13   tasers, and the incident that Judge Reeves had asked you about, I
14   think it was a tasing involving an investigator.  Do you recall
15   that?
16   A.   Yes.
17   Q.   Now, the use-of-force policy, does it not allow -- well, let
18   me show you a copy of a document.
19        THE COURT:  Is that -- is it an exhibit number associated
20   with that document?
21        MR. MORISANI:  No, sir.  It's just a document I just
22   wanted to show the witness.  He talked about the use-of-force
23   policy.  I want to just confirm.
24        THE COURT:  For the record, you need to describe that
25   document, Mr. Morisani, because we don't have it in as an exhibit.
```

```
 1            MR. MORISANI:  Yes, sir.
 2    BY MR. MORISANI:
 3    Q.   Mr. Parrish, can you read for the Court the title of this
 4    document?
 5    A.   "Hinds County Detention Services."  It's "Safety and urgency
 6    use of force."
 7    Q.   So having looked at this document, can you describe for the
 8    record what this document is?
 9    A.   It's the guidelines for detention officers regarding the use
10    of force within a jail system.
11    Q.   And is this the policy -- is this the procedure and policy
12    that's been approved for this facility?
13    A.   Yes, sir.  This is one we've referenced before.  It's been in
14    effect for approximately two years.
15    Q.   And if you will, for the record, what is Section 5-501?
16    A.   "Use of force generally" is what it says.
17    Q.   And then if you'll read that first highlighted portion up
18    here, below "authorized use of force," what does that say, F?
19    A.   "Overcome active physical resistance to a lawful command."
20    Q.   And can you -- if you will, if you'll read the use-of-force
21    levels further below, if you'll read the highlighted portion
22    beginning with "active resistance"?
23    A.   Okay.  On the left side, it says "active resistance" and
24    examples being evasive movements that are a threat to safety and
25    use of electronic call -- use of chemical devices, use of
```

1    electronic control device.

2    Q.   Now, having reviewed the use-of-force policy here, reviewed

3    the highlighted sections of it, you would agree this policy

4    applies to RDC, correct?

5    A.   It was written for that, yes.

6    Q.   And with respect to the incident that we just described, the

7    use of the taser, a taser is an electronic control device,

8    correct?

9    A.   Yes.

10        MR. MORISANI:  No further questions, Your Honor.

11        THE COURT:  All right.  Before you get back up, Mr. Cheng,

12   I've got a few questions myself, and you can follow up based on

13   the questions that I've asked.

14        And I'm sorry to keep you here longer, but turning to the

15   use-of-force thing that was just talked about, Mr. Parrish, if

16   something less than tasers could have been used, it should have

17   been used, right?

18        THE WITNESS:  Yes.  Force starts out with hands on, and

19   that's what needs to be done until there's some danger either to

20   the officer or other inmates, and that's when you turn to a

21   defensive device like that.  But the policy is written such that

22   anything like OC or any other device --

23        THE COURT:  OC is, for the record?

24        THE WITNESS:  OC, being pepper spray, is not to be used in

25   a coercive manner to force an inmate to comply with a verbal

1   order.  And that's exactly what we had in this case:  the inmate

2   on the ground, on his stomach, and the officer telling him I want

3   your hands behind you so you can be cuffed, and he refused to do

4   that.  The officer was in no danger at that point.  He used the

5   device to coerce the inmates -- the inmate into putting his hands

6   behind his back so he could be cuffed.  That's a violation of the

7   policy.  And that's what we would like IAD to look into, and they

8   can make a decision based on that.

9        THE COURT:  Do we know from whatever reports that you've

10  seen exactly how many officers were there?

11       THE WITNESS:  To the best of my recollection, there were

12  four people there.  I may be have it -- I may be off one way or

13  the other.  But there were several up to the rank of a captain.

14       THE COURT:  Was this in a particular jail cell, or was

15  this out in the hallway?  Where was this?

16       THE WITNESS:  I think it was outside of the cell, and

17  beyond that I don't have off the top of my head the details.

18       THE COURT:  Now, the County referred to Exhibit 20, which

19  was, I believe, Major Bryan's after-action report.  And I'm

20  looking at page 6 of the report, "areas of improvement."  This is

21  in Paragraph III(a)(i).  "Areas of improvement, corrective action,

22  A-Pod control room."  It says, "Officer, the A-Pod control room

23  video footage was reviewed against the times in the unit from 0524

24  hours to close to 0700 hours.  There was an officer in the chair

25  in front of the monitors/controls.  However, there was so little

```
 1    observable movement from the officer that it was difficult to

 2    discern the level of alertness toward the camera or any other

 3    activity in the pod.  Further, from 7:00 a.m. until nearly

 4    8:00 a.m., there was not an officer in the pod control chair."

 5          It seems to me that part of the corrective active plan

 6    might be to look and see from 0524 hours to close to 700 hours

 7    what was either going on or not going on with the particular

 8    officer assigned to that thing.  Is that a fair reading of that?

 9          THE WITNESS:  Yes, sir.

10          THE COURT:  And I think this is the one -- this

11    after-action report is about the death of the inmate -- the

12    assault on the inmate that led to his death, that he was propped

13    up in his cell and was not discovered dead for nine hours.  That's

14    the after-action report.  Is that the one?

15          THE WITNESS:  That's correct, sir.

16          THE COURT:  So to identify what officers were on duty, I

17    think you testified earlier that they should do wellness checks

18    sometimes as often as every 15 minutes, or at least sometime

19    during the shift.  It's easy for the County to find out who was

20    employed in that pod on that day during those nine hours, right?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  And it's safe to say that those individuals

23    did not do a physical wellness check, did nothing during that

24    nine-hour period if somebody is sitting up dead in a cell and

25    nobody sees it.
```

1    THE WITNESS:  That's correct.  And during that time frame,

2    there was supposed to be hourly well-being checks, there were

3    supposed to be two head counts, and two meals were served.

4    THE COURT:  Two meals were served?  How are they giving

5    the meals?

6    THE WITNESS:  Unfortunately, the officers just take the

7    food in, leave it and allow inmates to pass it out instead of

8    making each one come up and receive it individually from the

9    officer.  That's done just to expedite things.

10    THE COURT:  So based on your review of the records, the

11    County would know -- I guess to answer my -- I guess to make this

12    point, the County knows who was employed that day, right?

13    THE WITNESS:  Yes.

14    THE COURT:  The County knows who was supposed to go in

15    there.  The names of individuals did not necessarily have to be an

16    after-action report, right?

17    THE WITNESS:  No, sir.  An after-action report is not a

18    disciplinary review report.  That's handled separately.  An

19    after-action report analyzes what transpired and what corrective

20    actions can be taken.  This is the first time there's been a

21    comprehensive after-action report.

22    THE COURT:  Have you seen a disciplinary report for that

23    incident?

24    THE WITNESS:  We don't see those, sir.

25    THE COURT:  You don't see those?

1          THE WITNESS:  No.

2          THE COURT:  I want to follow up -- and this is an area

3    that has not been covered, except for the County, and I failed to

4    ask you about it.  The County did -- you agree that for a period

5    of time, there were no on-site visits by the monitors?

6          THE WITNESS:  That's correct.

7          THE COURT:  For maybe as many as 19 months?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And to accommodate your absence from the

10   facility, how did you all do your reports?  How did you get the

11   information to do your reports?

12         THE WITNESS:  We had two means of communication during the

13   remote site visit, which would cover the best part of a week, just

14   like an on-site visit.

15         THE COURT:  Well, let me stop right there first.  Did the

16   County object to the remote site visit?

17         THE WITNESS:  No.  And we did that through Zoom and

18   conference calls that were scheduled through the coordinator and

19   set up with a schedule in advance, and we met with individuals as

20   necessary.

21         Accompanying that was an extensive review of documentation

22   provided by the sheriff's office, the detention center, through

23   the coordinator, who downloaded it so that we had access to it on

24   a bi-month basis, and we could get the various reports that we

25   requested.  And then the monitor would submit a report in advance

1    of the site visit specifying any additional documents that were

2    requested.

3            THE COURT:  And these meetings were set up right when the

4    COVID variant began.  We didn't know anything about it, correct?

5            THE WITNESS:  Yes.

6            THE COURT:  No vaccination was available for anyone when

7    these remote site visits began, right?

8            THE WITNESS:  That's correct.

9            THE COURT:  And it's fair to say we didn't even know much

10   about the virus when these remote site visits began?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  And during the time that these remote site

13   visits were occurring, do you know if the County, if the detention

14   center had a policy with respect to mandatory mask wearing, at

15   least, mask wearing by the employees?

16           THE WITNESS:  There were a series of directives that were

17   given to deal with it.  It changed over time as we became -- as

18   everybody in the country became more familiar with what was most

19   recommended.  And initially it was that masks were made available.

20   Later they were specified, but they were not worn by inmates when

21   we went through the jail system in January.

22           THE COURT:  And with respect to corrections and COVID,

23   jails are not the ideal place for persons to be with a virus like

24   that, correct?

25           THE WITNESS:  That's correct.

1          THE COURT:  Because the CDC first said the first thing you

2     must do, one of the things, is frequent washing of hands, right?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Separation of individuals, right?

5          THE WITNESS:  Yes.

6          THE COURT:  And let me ask you about the separation of

7     individuals part.  The cells that these inmates are in, are

8     they -- is there more than one person in a cell?

9          THE WITNESS:  The vast majority of them are two-person

10     cells.  At the Raymond Detention Center, there are a few single

11     cells.  At the work center, they're dormitories, so it's

12     impossible to separate into a cell except for the ten confinement

13     beds that they have there.

14          That -- the problem of classification and separation that

15     a jail always faces was exacerbated by the COVID situation.  It

16     just puts another layer on top of everything else that creates

17     problems, and that was also used as one of the explanations as to

18     why certain inmates were housed in booking.  It was an effort to

19     try and isolate them from other inmates in the jail.

20          THE COURT:  And during the course of time that you were

21     doing remote visits, Mr. Parrish, did the monitor team learn that

22     persons on the sheriff's command staff got COVID?

23          THE WITNESS:  Yes, sir.  Including the jail administrator,

24     I think the chief deputy or maybe it was the undersheriff, and the

25     sheriff himself.  The legal adviser.

1          THE COURT:  Do you recall -- and you may not.  Do you

2    recall whether the County -- the attorney for the County telling

3    the Court during a status conference that the County did not

4    require wearing of masks at some point in time?

5          THE WITNESS:  Did not require?

6          THE COURT:  Did not require.

7          THE WITNESS:  For inmates?

8          THE COURT:  For employees at least.

9          THE WITNESS:  For employees.  At one point they did not,

10   but then subsequently they did.

11         THE COURT:  And the Court -- for the record, I'm looking

12   at Docket No. 85 at pages 76 through 78.  We can talk about that

13   later and see if I'm incorrect, but that's what I recall hearing.

14         Any follow-up based on what I've asked, Mr. Cheng?

15         MR. CHENG:  Yes, Your Honor.  The only thing we ask is

16   that defendants mark for identification the use-of-force exhibit.

17   It hasn't been admitted in any way, but just for the record, we

18   need to know what was being referenced in the record.  Otherwise,

19   no questions for Mr. Parrish.

20         THE COURT:  Okay.  Any follow-up, Mr. Morisani, based on

21   what I've asked?

22         MR. MORISANI:  No, sir.

23         THE COURT:  Mr. Parrish, you may finally step down.  Thank

24   you for your testimony.  You're free to stay in the room.

25         And I imagine the United States reserves the right to call

1   him as a rebuttal if you need to?

2          MR. CHENG:  Yes, Your Honor.

3          THE COURT:  All right.  Who is your next witness?  Who is

4   your next witness?  I just need to know who it is.

5          MR. CHENG:  United States will be calling Chalonda Mosley,

6   Your Honor.

7          THE COURT:  I think we'll go ahead and take a 15-minute

8   break now, and then we'll start with her in about 15 minutes.  The

9   Court is going to be in recess.

10         (Recess taken.)

11         THE COURT:  You may be seated.

12         Is the United States ready to call its next witness?

13         MS. STEEGE:  Yes, Your Honor.  Chalonda Mosley.

14         THE COURT:  Chalonda Mosely.  All right.

15         (Witness sworn.)

16         THE COURT:  Ms. Mosley, before you is a microphone, and

17  I'm going to need you to speak into it loudly and clearly.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Speak at a pace at which the court reporter

20  can keep up with you, because she's taking down everything that's

21  being said.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Make sure all your responses are verbal.  If

24  you're going to nod or shake your head, say "yes" or "no."  Try to

25  avoid "uh-huh" and "uh-uh."  They're spelled the same way.  I'm

1   going to be monitoring that myself.  One of the more important

2   things, though, is please allow the lawyers to finish what they're

3   saying before you begin to speak so that the two of you will not

4   be speaking at the same time.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  All right.  Now, for the record, could you

7   state and spell your name.

8          THE WITNESS:  Chalonda Mosley.  C-h-a-l-o-n-d-a, last name

9   is M-o-s-l-e-y.

10         THE COURT:  Okay.  Thank you.

11         You may proceed.

12                        CHALONDA MOSLEY,

13      Having been duly sworn and examined, testified as follows:

14                      DIRECT EXAMINATION

15  BY MS. STEEGE:

16  Q.  Good afternoon.

17         THE COURT:  Is your microphone on?

18         MS. STEEGE:  Better?

19         THE COURT:  That's better.  And make sure you continue to

20  speak up because you have a soft voice.  I don't mean to look like

21  a big bad wolf up here.  You're looking like -- no, no.  Just

22  relax.  Just speak loudly, that's all.

23         MS. STEEGE:  Thank you, Your Honor.

24  BY MS. STEEGE:

25  Q.  Good afternoon, Ms. Mosley.

1    A.    Good afternoon.

2    Q.    Where do you live?

3    A.    I live in Edwards, Mississippi.

4    Q.    And how long have you lived there?

5    A.    I've been there 49 years.

6    Q.    Ms. Mosley, who is your son?

7    A.    My son is Justin Mosley.

8    Q.    And could we speak of him by name here?

9    A.    You can.

10   Q.    Would you rather that we refer to him as Justin or

11   Mr. Mosley?

12   A.    Justin.

13        MS. STEEGE:  Your Honor, is that all right with you?

14        THE COURT:  That's fine.

15   BY MS. STEEGE:

16   Q.    Now, was Justin previously incarcerated at the Hinds County

17   Detention Center?

18   A.    He was.

19   Q.    And then he died in prison?

20   A.    He did.

21   Q.    What did he like doing when he was growing up?

22   A.    Justin was an avid -- Justin was an avid sports person.

23   Comical.  Very adventurous.  There was no sport he did not like.

24   Basketball was his preference.  He liked to be engaged with

25   friends.  Math was one of his strong points.

1   Q.   Could you tell us about his personality?

2   A.   He had a very outgoing personality.  He kind of took to all

3   of the kids within the community, as well as the elderly people.

4   He was a free spirit.  He liked to go and come.  He did not like

5   to be restrained or confined, so he did like to go and travel, do

6   different things.  Very inquisitive.

7   Q.   Now, at some point, did he start having symptoms of mental

8   illness?

9   A.   He did.

10   Q.   When did that happen?

11   A.   I don't have an exact date, but there are dates that come to

12   mind.  I lost -- we lost his godfather in July of 2012, and

13   six months later we lost my maternal grandmother, who was living

14   with us, so you started to see -- some behavior issues started to

15   come up from the school at around 2013, 2014.

16   Q.   Now, roughly when was he first diagnosed?

17   A.   Estimated, around 2014.

18   Q.   And what was that diagnosis?

19   A.   He had an initial diagnosis of --

20        MR. SHELSON:  Objection, Your Honor.  Hearsay.

21        THE COURT:  Objection overruled.  The initial diagnosis of

22   her son?

23        MR. SHELSON:  There's been no foundation laid for how she

24   knows that, Your Honor.  That's part of problem.

25        THE COURT:  Okay.  Lay the foundation, please.

```
 1    BY MS. STEEGE:
 2    Q.   Now, when Justin was diagnosed -- well, when Justin was
 3    diagnosed, was he living with you?
 4    A.   Justin was living with me, yes.
 5    Q.   And were you caring for him at that time?
 6    A.   I was his primary caregiver.
 7    Q.   And were you involved in helping him obtain mental health
 8    treatment?
 9    A.   I was.
10    Q.   What was his first mental health diagnosis?
11    A.   His initial diagnosis per his discharge summery was ADD and
12    oppositional defiance.
13    Q.   Okay.  And did that diagnosis change?
14    A.   That diagnosis soon changed and escalated to bipolar and then
15    to bipolar manic with borderline schizophrenia.
16    Q.   And during this time when he was living with you, what kind
17    of mental health treatment did he receive?
18    A.   He received inpatient treatment, as well as outpatient.
19    There were some acute stays; there were some long stay at
20    Brentwood Medical Center, Mississippi State Hospital, Cares, Mill
21    Creek were some of the institutions that he was -- he received
22    care at.  Some 10 to 14 days, some six months, some 28 days.
23    Q.   And in the course of receiving the care, did that involve
24    therapy?
25    A.   That involved therapy, individual as well as family.
```

```
 1    Q.   And did that involve medication?

 2    A.   It did involve medication.

 3    Q.   Now, when you mention medication, did this involve

 4    prescription drugs?

 5    A.   These were prescription drugs as prescribed by a physician.

 6    Q.   Did he ever take street drugs?

 7    A.   There were cases where I did find where Justin was taking

 8    street narcotics.

 9    Q.   Now, how could you tell when he was taking drugs?

10    A.   As a parent, you get to the point where you know your kid.

11    There's different behavior patterns.  There's the high escalation,

12    the constant argumentiveness.  He started -- his hygiene would go

13    to poor hygiene.  He started to wander, where he would be gone for

14    long periods of time.  There's a pattern that he would make with

15    his forehead as if he was in a state of daze or confusion.  And

16    all these you could see -- sleep pattern is off.  Staying up for

17    longer than 24 hours in a day before just crashing and going to

18    sleep.  Again, behavior issues, and just the escalation in his

19    voice would change.

20    Q.   So were you familiar with his manners and how he looked when

21    he was taking drugs?

22    A.   I became familiar with those as time progressed.

23    Q.   Did you -- you mentioned behavior issues.  Did you ever have

24    to call the police about behavior issues?

25    A.    I initially thought to use that as maybe a scare tactic.  I'm
```

1    dealing with a 13-, 14-year-old.  When you call the police, you

2    can kind of scare them into doing the right thing.  Under the

3    advisement of his physician, we started to call AMR, which is our

4    rural ambulatory services, but because Justin was a flight risk,

5    he is considered -- of the three Fs, he was the fight or flight.

6         So when he knew that, when ambulatory services were coming,

7    they were coming to -- you're going to Brentwood -- well, first

8    you're going to go to the hospital, UMC or Central, whichever one

9    dealt with adolescents at that time.  He would start to run.  And

10   the paramedics were not able to run or get him down.  So we

11   started to call for AMR, but we would ask for a Hinds County

12   deputy to come as an assistant to accost him to get him into the

13   ambulance.  But we never called without letting them know that the

14   adolescent had a diagnosis that had been diagnosed by Social

15   Security as well as state hospital.

16   Q.   When you say "AMR," is that a medical response?

17   A.   That's the ambulatory services in the area.

18   Q.   Brentwood, is that an inpatient behavior --

19   A.   Brentwood is inpatient behavior.

20   Q.   So were there things that worked or that didn't work when

21   police would come out?

22   A.   I'm sorry.  I didn't hear you.

23   Q.   Were there things that worked or that didn't work when police

24   would come out when he was in crisis?

25   A.   There were some things that definitely did not work.  If he

1    was under the influence, compliance was one of the issues that we

2    had with him, and you can kind of tell by the day that he had had

3    at school, or if an incident or something had happened at school,

4    you can kind of tell.  Because at this time, I'm giving him his

5    medications, so if you are supplementing your prescribed

6    medications with street medications, that combination did not

7    work.  So when it escalated and it escalated to the point where I

8    couldn't get a word out otherwise and -- I mean, Justin's gone

9    from my baby at this time to a 6 feet 1 inch, young man.  So he's

10   preteen.  So it's not -- momma's not scaring you anymore.  The

11   yelling and screaming is not working; I'll deal with my

12   punishment.

13        So once the street drugs were introduced -- which I didn't

14   find out until the blood work was done at the hospital to show

15   what was there up until the point where the one time when there

16   was not marijuana but the behavior was so erratic, it was

17   determined that he had been given spice and he thought he had

18   marijuana.

19   Q.   Now, did you become familiar with ways of deescalating the

20   situation with Justin when he was in crisis?

21   A.   Through time, you find out that yelling does not work.  When

22   you start to yell, he shuts down and he does not hear what you're

23   saying.  I found out -- and that's after being so full and fed up

24   to where I just wanted to have him just emancipated, you know; I

25   can't deal with this anymore.  You're raised in a home where

```
 1    there's discipline.  That's what you're supposed to do.  You tell
 2    a child what to do; that child does that.  You don't go back and
 3    forth.
 4        After therapy and just going through different things, you
 5    find out what his triggers were, and you try to do with that.  So
 6    I found out that the yelling, he's not going to hear you when you
 7    yell.  When you become abusive or physical with him, then his
 8    sense of survival kicks in.  So now he's not hearing you because
 9    you're yelling, and his mind is totally geared on what do I do and
10    how do I protect myself and how do I get out of this?
11        So I've seen some issues where I always asked, whenever AMR
12    came out, if I asked for county assistance, I've always asked to
13    let them know that the person that's here, we're dealing with a
14    person who has a mental health issue.  And you can tell when there
15    was someone who was trained to deal with people to deescalate the
16    situation, and I did experience Hinds County officers who were,
17    and to the point where they were like, they, I work this area; if
18    I get the call, I'll try to come in; and they could deescalate it.
19        Ultimately he was going to get the help, especially when I
20    know -- feel that there are some drugs that are there.  But if
21    there was ever an officer came in that didn't believe that there
22    was a mental health issue, it became physical because it would get
23    to the yelling and the screaming back and forth and I'm -- you're
24    going to do what I say right now.  But there was no control over
25    that without being under his medications, and with the outside
```

 1   influence of the street meds, he was not hearing what they were

 2   saying.

 3   Q.   Now, did he go to Hinds County Detention Center in

 4   November 2018?

 5   A.   Let me see what year.  He did.  November 23rd, 2018.

 6   Q.   And how long was he there?

 7   A.   He was there from November 2018 until May 2019.

 8   Q.   Were you able to visit with him while he was there?

 9   A.   I was not able to have contact visiting with him, but they

10   did have what they call video visits where you could see him over

11   the monitor.

12   Q.   Were you able to speak with him otherwise?

13   A.   Over the phone was one of the requirements that I required of

14   him while he was incarcerated, that he call and speak with me

15   every day.  Because if you call every day, although the calls were

16   expensive, I can kind of gauge what type of day he was having,

17   what mood he was in, or which way he was going, because

18   unfortunately, at the detention center, it was not like his other

19   inpatient treatments where, Hey, you have a right to refuse these

20   meds if you like, but as long as you refuse these meds, then -- at

21   state hospital, then your stay goes from 28 days to 60 days.  So

22   that was kind of his peer point for going home.

23       Well, at Hinds County Detention Center, he didn't have that.

24   He could deny, or just say, Hey, I don't want to take these

25   medications.  I had asked the judge -- the attorney asked the

```
 1   judge about him being --
 2         MR. SHELSON:  Your Honor, I'm sorry, but the answer is
 3   starting to get nonresponsive to the question.
 4         THE COURT:  All right.  Make sure you answer her question.
 5         THE WITNESS:  Yes.
 6         THE COURT:  Objection sustained.
 7   BY MS. STEEGE:
 8   Q.   Now, was Justin taking drugs while he was in the jail?
 9   A.   He was.
10   Q.   How could you tell?
11   A.   By his own admission that he was.  That was what helped him
12   to sleep.  When I would call because I hadn't heard from him in a
13   couple of days -- because he knew he should call me daily, and
14   when I would call to find out that he was placed on -- I guess
15   they would call it isolation or where he was in a restricted
16   environment where he couldn't place calls -- he only came out
17   maybe for an hour a day for showers or recreation, and there was
18   an incident where when I called over to ask, you know, why, you
19   know, what has happened, what did he do, and they was like we
20   found paraphernalia on him.
21   Q.   And when you were talking to him on video, how could you
22   tell?
23   A.   Talking to him on video, you can see the behavior and the
24   mannerism.  You can hear the escalation in the voice.  You could
25   see the mood pattern and behavior changes.
```

1   Q.   Now, how old was he?

2   A.   When he initially went to the detention center, he was 19.

3   Q.   And were you concerned about the mental health treatment that

4   he received during that stay, 2018 to 2019?

5   A.   I was.

6   Q.   Why was that?

7   A.   Because he was not receiving any.  There was allegedly a

8   monitor or someone who -- like an interventionist who was supposed

9   to have come to see him, but to my knowledge, he did not see

10   anyone.  When I called to ask the nurse about his medications and

11   his plan of care, being his primary care provider, she advised

12   that those were records of the County and I would have to get

13   those from the County.

14       They told me that a psychiatrist usually came over on

15   Saturday.  I asked them had he been evaluated since the request

16   was denied that we -- that he see his own psychiatrist.  They

17   said -- they denied that they had a psychiatrist that could

18   evaluate him, but the findings that they told me was that there

19   were no findings.  He was found to be okay by the Hinds County

20   psychiatrist.

21   Q.   Now, did he go back to the Hinds County jail?

22   A.   He did.  He went back in January 2020.

23   Q.   And when he went back to the jail, did you send any documents

24   to the jail to try to help them to meet his mental health needs

25   while he was there?

```
 1   A.   When he went back, I faxed over -- he had had an accident in

 2   November 2019.  He had an automobile accident where he suffered a

 3   C7 fracture and a collapsed lung.  So when he went back over, I

 4   sent over that information from UMC.  I sent over his discharge

 5   summary from Mississippi State Hospital.  I sent over some of his

 6   discharge summaries from Brentwood that would kind of list

 7   diagnoses, let them know that there is a mental health issue that

 8   was there, that this was not something that I was making up or

 9   trying to get preferential treatment for him.  And I also sent

10   them over documentation that he was receiving SSI to let them know

11   that three other -- four other psychiatrists had deemed him to

12   have a mental health issue.

13   Q.   I'd like to bring up what's been marked as PX-43.

14        THE COURT:  Make sure you're speaking into the microphone.

15   The court reporter needs to hear.

16        MS. STEEGE:  And if you can see it on the monitor, and if

17   I may approach, I also have a paper copy to provide.

18        THE COURT:  You can give a paper copy to me.  Show it to

19   the other side.

20        THE WITNESS:  Thank you.

21   BY MS. STEEGE:

22   Q.   Do you recognize those documents?

23   A.   I do.

24   Q.   Would you identify them?

25   A.   The first one is a discharge summary from Brentwood showing
```

 1    his diagnosis of bipolar manic and cannabis abuse.

 2    Q.   Are these some of the documents that you sent over to the

 3    jail --

 4    A.   It is.

 5    Q.   -- in February 2020?

 6         MS. STEEGE:  I would like to move for admission of PX-43.

 7         THE COURT:  I'm sorry?

 8         MS. STEEGE:  I would like to move for admission of PX-43.

 9         THE COURT:  Oh, okay.  Any objection from defendants?

10         MR. SHELSON:  I'm not sure, Your Honor.  Is the testimony

11    that this is the document she faxed to someone at Hinds County

12    Detention Center?

13         MS. STEEGE:  I believe so.

14         MR. SHELSON:  Pardon?

15         MS. STEEGE:  That's what I understand.  I'm sorry?

16         THE COURT:  Well, wait.  Let me -- P-43 is a discharge

17    summary from Brentwood.  I guess the question was -- I'm just

18    trying to figure out is this something that this witness said she

19    faxed over to the detention center?  I'm asking.  What was your

20    question, ma'am?  I'm sorry.

21         MS. STEEGE:  Well, before moving for admission, I had

22    asked her, yes, if this was part of documentation that you had

23    provided to the jail.

24         THE WITNESS:  Yes, ma'am.  You can see my fax number at

25    the top of the document where I faxed it to Hinds County Detention

```
 1   Center.
 2           MS. STEEGE:  Okay.  And --
 3           THE COURT:  Okay.  Let me -- hold on.
 4           Is there an objection?
 5           MR. SHELSON:  Not with that clarification, Your Honor.
 6           THE COURT:  Okay.  All right.  Thank you.  P-43 will be
 7   received in evidence.
 8           (Plaintiff's Exhibit 43 entered.)
 9   BY MS. STEEGE:
10   Q.   If you wouldn't mind turning to, I believe, the second to
11   last page.
12   A.   Is there a page number on there?
13   Q.   It should be page 15 of the PDF.
14   A.   Yes, ma'am.  I have it.
15           THE COURT:  I'm going to ask you just to speak up a bit.
16   I don't know if you feel comfortable taking off your mask, but my
17   realtime has gone out here.  My battery has gone out, so I can't
18   read.  I need to be able to hear you and understand.
19           MS. STEEGE:  I appreciate the request.
20           THE COURT:  I apologize.  Go ahead.
21   BY MS. STEEGE:
22   Q.   Ms. Mosley, do you see the handwritten message there?
23   A.   I do.
24   Q.   Is that your handwriting?
25   A.   That is my handwriting.
```

1   Q.   And whom were you directing this document to?

2   A.   I initially sent it to the attention of jail administrator

3   Rankin.  And when I continued to call to ask if she had received

4   it, I was advised that she was no longer with the County, so I

5   forwarded it to the attention of Nurse Simms, and my attorney at

6   that time sent it to, I believe, Warden Rick Fielder to make sure

7   that he had a copy as well.

8            THE COURT:  All right.  Hold on.

9            Any objection?

10           MR. SHELSON:  I object and move to strike that answer,

11  your Honor.  There was multiple hearsay in it, and there was no

12  foundation laid for whether -- for how she knows that her attorney

13  sent this on to a third party.  She may be able to establish that,

14  but she didn't establish that in her answer.

15           THE COURT:  Okay.  See if you can get her to establish

16  that.

17  BY MS. STEEGE:

18  Q.   As to what was recorded on the fax here, Ms. Mosley, I

19  believe you testified that you sent it to two people at the jail?

20  A.   Yes, ma'am.  Anytime I sent a fax, I follow up with a call.

21  When I spoke with Nurse Simms, she did advise that she had

22  received it and had it in record, but all of these were still

23  documentation of the County.  I continued to call to request to

24  speak to, at the time, Sheriff Vance.  I was transferred to Alan

25  White, who transferred me to Sergeant Rick Fielder.  He did advise

 1    that he had received the documentation and that they were

 2    processing it and that it had become a part of Justin's record.

 3    Q.   Now, why did you send Justin's mental health records to the

 4    jail?

 5    A.   I sent his mental health records to the jail because in the

 6    past, because of some of the conditions and some of the things

 7    that had happened, I wanted to make sure that his sickness or his

 8    illness was treated and not punished.  He was not going to be able

 9    to take the severe beatings that he had endured on the last time

10    due to the accident and the -- C7 fracture is no more than a

11    broken neck, as well as the collapsed lung.  So I wanted to make

12    sure that they had this in hand so that when I get the call about

13    what's going on -- what I shared with Rick -- with Warden Fielder

14    at the time was is he on his medications; they told me that he

15    would see a psychiatrist; and at that request, I was told that the

16    psychiatrist -- the nurse -- all the nurse can give at the jail, I

17    believe, was either Ibuprofen, Tylenol.  The doctor would have to

18    come in -- the psychiatrist would have to come in to write the

19    prescription, but if I could send them over something that stated

20    what medications he was on and what was working, then they could

21    go from there.  They could get that faxed over to the doctor.  So

22    they told me that they had submitted it to the doctor for review.

23         MS. STEEGE:  If you could take the exhibit down, please.

24    Thank you.

25    BY MS. STEEGE:

```
 1   Q.   Now, were you able to visit him at RDC in those first few

 2   months before COVID hit?

 3   A.   We did the -- COVID hit like -- when Justin was initially

 4   arrested, he went to Fayette.  He was returned to Raymond in

 5   February, and COVID was the early part of March, so no, I did not.

 6   Q.   Were you able to speak with him otherwise?

 7   A.   We were talking on the phone, yes.

 8   Q.   Were you able to get a feel for how he was doing on a

 9   day-to-day basis?

10   A.   Yes.

11   Q.   Was he still able to continue accessing drugs while he was in

12   the jail in 2020?

13   A.   Even more so now because he was established.  He established

14   his presence when he was there in 2018, 2019.  There were some

15   people there -- still there that were there when he left.  There

16   was -- he didn't have to feel the ropes out.  When he was

17   initially there at the age of 19, he didn't come up on the phones

18   and the contraband that was in the jail until towards the end of

19   his stay when he was about to be released.  So this time when he

20   went in, he went in with a head start to know where the cell

21   phones were, know where the drugs were, know where to get it from

22   and to be able to survive.

23   Q.   And how could you tell that he was taking drugs in the jail

24   at that time?

25   A.   When they would call, you could hear it.  All that party.
```

1    Justin would call sometimes, voice elevated.  And I'm like, Okay,

2    first of all, I can't hear you if you're screaming, so I need you

3    to calm down, first of all.  And he would be yelling erratically.

4    And I would tell him, Justin, what's going on?  What have you

5    taken?  What do you have?  If he's taking something, he was one of

6    those persons where he would let you know eventually if it was

7    really the case.  Because that was one of the things -- when I

8    tell you something and you're not believing me, that only

9    escalates the situation.  So when he was actually wrong, he would

10   admit that and he would go back and he would apologize to some of

11   the detention officers when he knew he had done some things he had

12   no business doing.

13       But when the drugs were -- there was a little bit more -- the

14   pattern was more erratic.  It was more extreme, the yelling, the

15   screaming.  It ended up being physical.

16   Q.   Now, in February -- I'm going to fast-forward here.  In

17   February 2021, did someone call you from the jail?

18   A.   On February 2021, I got a call from the Hinds County

19   Detention Center with Justin's voice, but when I answered and

20   said, Hey, what's going on, you know, as we normally do when he

21   calls, and there was another voice that was not Justin's.  It was

22   another one of the detainees, and he explained to me who he was.

23   He said, Ms. Mosley, I'm calling because -- he called him by his

24   nickname.  He said he was calling -- he said, He said he's having

25   strange feelings.  He's talking about hurting himself.  I said,

1   Tell Justin I'm on the phone.  You have me on the phone.

2           MR. SHELSON:  Objection, Your Honor.  Hearsay.

3           THE COURT:  Objection sustained.

4           MS. STEEGE:  May I, your Honor?  I would offer that it was

5   an excited utterance.

6           THE COURT:  Excited utterance?  Objection sustained.  You

7   can have her testify about what she did after learning.

8           MS. STEEGE:  All right.

9   BY MS. STEEGE:

10  Q.   After this person called you from the jail, could you hear

11  anything else in the background?

12  A.   After hearing his voice yelling "Mama," I advised -- asked --

13  I told the young man to hang up, I was going to call over to the

14  jail, and to let Justin know that you had reached me and

15  everything will be okay.

16  Q.   Now, did you end up reaching out to the jail at that time?

17  A.   I did.  I directly called the jail from a separate line.

18  Q.   And were you able to speak with Justin at that time?

19  A.   I was not able to speak with Justin.  I was able to speak

20  with one of the detention officers who said that she would have

21  the person in charge to give me a call back.  They were dealing

22  with a situation at that time.  They were aware that there was a

23  situation.

24  Q.   And what was that situation?

25  A.   The situation was that he was making threats to harm himself.

1    Q.   When did you next hear from the jail?

2    A.   I received a call from Assistant Warden Travis Crane about

3    2:30, 3 o'clock that afternoon.

4    Q.   And how long -- can you orient us?  How long after the first

5    call that you received from the jail did you hear from Warden

6    Crane?

7    A.   Without -- with that being absolutely a year ago to date, it

8    was about a two-to-three-hour period before he called me back to

9    let me know that the situation had been stabilized, that Justin

10   had made -- said that he was having suicidal thoughts, thoughts of

11   hurting himself, and I said, Can I -- but he responded.  He said,

12   But he's fine.  I said, Can I speak with him?  He said, No, ma'am;

13   the procedure for suicidal watch is that he's placed in isolation

14   by himself.  He had to remove all of his clothing or whatever, do

15   the padding.  He said, that he would not be able to make a phone

16   call for 24 hours.  I said, Would you just let him know that I

17   know -- that, you know, I'm okay, I know that everything's okay,

18   and I'll talk to him within 24 hours.

19   Q.   Now, when did you next hear from the jail?

20   A.   I got a call from a person of concern to let me know that I

21   needed to get to the jail immediately because they believed that

22   Justin was dead.  And I said, No, I -- you know, I got the call

23   yesterday.  I understand.  I said, Assistant Warden Crane called

24   to assure me that everything was okay; Justin was fine.  They

25   said, No, ma'am.  You need to get over here right now.  Justin has

1  been handcuffed and beaten, and he does not look like he is alive.

2  Q.   And that person who called, was that another detainee, or was

3  that a detention officer?

4  A.   This was a detention officer.

5      THE COURT:  I'm sorry.  Repeat that.

6  BY MS. STEEGE:

7  Q.   The person who called at that point, was that another

8  detainee, or was that a detention officer?

9  A.   That was a detention officer.

10      THE COURT:  Let me just try to clear something up.  Do you

11  recall what time that call came?

12      THE WITNESS:  That call came in about 11 o'clock that

13  morning.  We were in the middle of an ice storm, so I can

14  remember, because I drove over that that day.

15      THE COURT:  So -- but prior to that, you got the 2:30

16  call, 2:30 in the afternoon?

17      THE WITNESS:  2:30 was the previous day.

18      THE COURT:  Right.

19      THE WITNESS:  The following day, it was about 11 o'clock

20  that morning I got a call that he had been beaten, handcuffed and

21  beaten.

22  BY MS. STEEGE:

23  Q.   Now, you mentioned that you drove over there.  Was this after

24  the call that you received from the detention officer?

25  A.   Yes, ma'am.  Because I made several calls, and after speaking

```
 1   to the person and telling them, I said, He's fine.  I said, I

 2   spoke to Assistant Warden Crane on yesterday.  He said that Justin

 3   was just cutting up and wanting to have his way.  That was the way

 4   he described it.  I said, He's fine.  And they were like, No,

 5   ma'am; assistant Warden Crane is the one who did the beating.

 6   Q.   And when were you able to see Justin?

 7   A.   I scheduled -- I went over Wednesday.  As soon as I heard the

 8   call, I drove over.  I was able to see and speak with Warden

 9   Crane.  We had an interaction at that time after threatening to go

10   to the media and calling my attorney.  He called back several

11   times.  Justin's father, Rogee, actually called and spoke with at

12   that time Sergeant Tyree Jones, who assured him that everything

13   was okay.

14           MR. SHELSON:  Objection, Your Honor.  She's talking --

15   she's testifying now about what I think Justin's father said, and

16   that would be hearsay.

17           THE COURT:  Okay.  It would be.  Let me ask this.

18           THE WITNESS:  Okay.

19           THE COURT:  Let me ask this question.

20           THE WITNESS:  Yes, sir.  Your Honor, do you mind if I take

21   my mask off?

22           THE COURT:  Oh, absolutely.  Absolutely.  Please take it

23   off.  Yes.  Thank you.

24           You said you drove down there to the --

25           THE WITNESS:  I drove there.  His father called.
```

 1        THE COURT:  I'm just trying to figure out what -- was

 2   that -- did you drive down there the same day that you received

 3   the 11 o'clock call?

 4        THE WITNESS:  Yes, sir.  I drove that day.

 5        THE COURT:  Do you recall what time it was that you drove

 6   over there?

 7        THE WITNESS:  With the ice on the highway and having to

 8   travel 467, it probably went from a 10-to-15-minute drive to an

 9   hour drive to get there just because of road conditions.

10        THE COURT:  So you would have got there, you said, before

11   1 o'clock; is that --

12        THE WITNESS:  Yes, sir.

13        THE COURT:  Okay.  You may follow up.  Just make sure

14   she's not testifying as to hearsay.

15   BY MS. STEEGE:

16   Q.   I believe you testified that you drove over to the jail and

17   you talked to Assistant Warden Crane?

18   A.   Crane.

19   Q.   Were you able to talk to Justin at that time?

20   A.   No, ma'am, I was not.  But they did set up a meeting for me

21   to see him because I asked for a wellness check to see him that

22   day because of the call.  Warden Crane did call back several

23   times, and he initially set up a visit for me to see Justin that

24   Friday.

25   Q.   Okay.  And were you then able to see him on Friday?

```
 1   A.   I was.

 2   Q.   What did he look like?

 3   A.   Lethargic, broken.  He was quiet.  The meeting was not a

 4   meeting where you could be comfortable.  The meeting consisted of

 5   myself, Justin, Warden Crane, and Warden Fielder.  So there was,

 6   as -- there was no privacy, but they gave me a chance to see my

 7   baby, to physically see him.  I had not seen him in over a year.

 8   So it gave me an opportunity to hold him.  Yeah, they did do that.

 9   Q.   Now, after that time in February 2021, when he was on suicide

10   watch, did you observe a change in his behavior after February?

11   A.   There was some change.  The suicide watch only lasted, what,

12   24 hours.  There was some change where the mood swings started to

13   kick in.  Happy one day, sad the next.  Laying around, sleeping

14   more.  Up late hours, not sleeping at night.

15   Q.   How was he when you would talk to him on the phone?

16   A.   He always tried to be strong to let me know that everything

17   was okay when I asked the questions, how are you, how are you

18   doing?  Not just physically at this time, mentally how are you

19   doing.  He would always say, "Mom, I'm okay.  I know you are going

20   to take care of me."  I know you always say you're going to do

21   what you're going to say, you're going to do it.  I said, Okay.

22   Just know that we're here and we're working.  I mean, that was

23   pretty much what we could do.

24   Q.   I think you had testified that one concerning sign for you

25   would be that hygiene was slipping.  Did you observe that at this
```

1   time?

2   A.   Upon asking him several times, and that was sort of our

3   routine, what are you doing, have you eaten?  Of course, the

4   noodles are one of the only things on the commissary that they can

5   buy.  The food is -- I mean, that's their option.  Now he's been

6   placed on a blood pressure pill because of high blood pressure, so

7   I'm asking him what have you eaten today, you know, are you not

8   consuming as many noodles.  Because you can see physically his

9   appearance has started to change where it's a lot of fluid.

10  Q.   Could you tell if he was still showering regularly?

11  A.   I asked, you know, Hey, have you had your shower yet?  No,

12  ma'am.  Justin, you have do that on a daily basis.  And if he had

13  his shower, he would say -- because normally we would end the call

14  with, Momma, let me go take my shower.

15  Q.   And was he taking nonprescription drugs around that time as

16  well?

17       MR. SHELSON:  Objection, Your Honor.  There's no basis for

18  her having personal knowledge of that.

19       THE COURT:  What was your question, ma'am?

20       MS. STEEGE:  Whether he was taking nonprescription drugs

21  at that time.  I believe she's previously testified to the way she

22  could observe that in his physical appearance and speech.

23       THE COURT:  Only if he -- well, did he tell you he was

24  taking anything?

25       THE WITNESS:  Your Honor, he did, and because they had

```
1   cell phones in there, he would call through Facebook video.  I'm
2   his mother.  This is my 20-year-old son, so I'm going to want to
3   see him.  There's been times where I've seen them.  They've
4   actually shown it to me, you know, what they have.  I'd say,
5   Justin, you shouldn't have it, you know, in your hand or what have
6   you.  Momma, this is not -- I have this; I'm going to sell this so
7   you won't have to spend so much money on the calls or whatever.  I
8   said, You don't have even need to have any contact with that.  You
9   know if you take it what's going to happen behaviorally.  You're
10  not going to be able to control it.  You have no control.  So by
11  his admission, Justin -- Justin was smoking marijuana as well as
12  whatever they got ahold to, which was pills, marijuana, spice,
13  everything.
14          THE COURT:  Okay.  Objection overruled.
15  BY MS. STEEGE:
16  Q.  Now, did Justin get assigned to booking in April 2021?
17  A.  He did.
18  Q.  And how did you find out about that?
19  A.  I had not heard from him.  At this time he had a personal
20  cell phone in the -- in his pod.  I called that phone.  I texted
21  that phone.  Other detainees would answer.  I would ask them, and
22  they advised he had been taken to booking.
23          So I called down and I asked what had happened, what was the
24  issue.  I spoke with Sergeant Hudson.  You could hear Justin
25  yelling and screaming in the background, and at that point I
```

1    advised Sergeant Hudson, I said, He's manic.  I said, He's manic.

2    I said, You're not going to control -- I said, He can't be

3    isolated at this time by himself.  You're going to have to get him

4    some help.  I said, He's in a manic state.  If not, you're going

5    to kill him.  She said, Well, ma'am, we can't let him kill us.

6    When she described the incident that resulted in him being placed

7    in booking.

8    Q.   Now, did Justin have a bond hearing that week?

9    A.   I found out -- after calling his attorney, I found out that

10   his bond hearing would be held that Wednesday.

11   Q.   Okay.  And this was Wednesday, the second week of April?

12   A.   It would have been, I believe, April 15th.

13   Q.   And were you able to attend that bond hearing?

14   A.   I was.

15   Q.   How did it go?

16   A.   This was the first positive information or positive -- there

17   were no promises, but this was the first positive bond hearing

18   that we had had in a year-and-a-half.  Normally, he went for his

19   bond hearing and, due to COVID, I was not there.  I didn't even

20   know when they were scheduled.

21        I saw him via video visitation.  I presented the information

22   at that time to the judge, and she said upon careful

23   consideration, she was not going to rule that day but give her

24   until that Monday and she would let us know.

25   Q.   When you say "a positive bond hearing," were you hoping that

1   that might lead to a state hospital evaluation?

2   A.   Positive in that she didn't say no, as in the past it had

3   been a definite no.  So my hopes and prayers were that it -- it

4   would either end in a financial bond, monetary bond, which at that

5   time Dr. Roger was ready to receive him, or that he would get the

6   treatment that he needed for his illness and not be punished.

7   Q.   When you say "punished," what do you mean by that?

8   A.   Punished for his illness.  Mental illness needed to be

9   treated.  I needed him to be compliant.  I needed him to dry out.

10  There was nothing I could do for him as long as the drugs were in

11  his system.  If he was home, I would have been able to intervene.

12  I didn't have that option.  And my voice fell on deaf ears in

13  asking for assistance to get him that help.

14  Q.   Were you able to talk to him that second week in April?

15  A.   He was not able to make phone calls.  I asked him would he

16  get recreation time.  I was told Warden Crane had ordered that he

17  be placed there.  He had not showered.  He had a spider bite which

18  had drawn -- it was infected.  His leg was messed up.

19       When I finally spoke to him, it was after the bond hearing.

20  There was a Sergeant Gateright (phonetic).  She let him have a rec

21  -- she pulled him out that Thursday night.  He called me about

22  11:45.  We talked from 11:45 to about 12:00, and I asked him, I

23  said, Have you had a shower?  He said, I'm about to get a shower

24  now.  So from that Monday to that Thursday, he had not showered.

25  Q.   I just want to make sure I understood.  Warden Crane had said

```
 1   no recreation for him?
 2   A.   They were short-staffed, so it was if someone would be able
 3   to get to him, because he was -- had to have one-on-one, being in
 4   isolation in booking.
 5   Q.   And you -- well, you described access to him.  Were you
 6   calling to try to talk to him during that week?
 7   A.   I was, but I was told I would have to talk to Warden Crane,
 8   who was on leave for whatever reason and would not be back until
 9   that Sunday.
10   Q.   How long had he been in the jail at that point?
11   A.   How long had Justin been in the jail?
12   Q.   Uh-huh.
13   A.   He had been there from January 2020 up until April 2021.
14   Q.   And when you first found out that he had passed away, did you
15   learn of it from the jail?
16   A.   No.  I got a call from an individual in the community asking
17   me had I heard Justin was dead.  And I told them, I said, No.  But
18   this is not the first time I've gotten this type of phone call.
19   Anytime he had endured some type of beating or something while
20   he -- physical beating while he was there, I would get those
21   calls.  I was like, Okay.  My normal routine:  Let me call you
22   back.  Let me make a call.
23        At this time I called the Hinds County Detention Center, and
24   Officer Keys is a voice that I knew because I've been speaking to
25   her now for over a year-and-a-half.  She answered the phone, so I
```

1    said, Officer Keys, this is Chalonda.  I'm calling because I heard

2    that Justin was dead.  She said, Ms. Mosley, she said, hold on.

3    Wait a minute.  That's not normally her response.  Normally her

4    response is, He's fine.  He's back there.  Everything is okay,

5    Ms. Mosley.  And that's not what I got.

6         So, again, I got up and I drove over to the jail and asked

7    the gentleman at the front desk if he could just tell me Justin

8    was okay.  He said, Ma'am, because of privacy policy or whatever,

9    he couldn't tell me, but that Warden Crane and Fielder would be up

10   soon.  And at that time, no answer kind of let me know that he was

11   gone.  I'm thinking this is something that had just happened, to

12   find out that they didn't know how long he had been deceased.

13   Q.   And were you able to see him when you went to the jail, then?

14   A.   I asked and I begged if I could just see him, and they told

15   me that he was -- he was property of the State at that time and I

16   wouldn't be able to see him.  So from April the 18th until

17   May 14th, after they had frozen him, I wasn't able to see him.

18   And I begged, I pleaded, just let me see him.  Even if I have to

19   see him at the crime lab, let me identify him.  They told me

20   because he was property of the State, that it was taken care of

21   that way.  So the next time I saw my child, it was May 14th, which

22   was four days -- four days before his 22nd birthday.

23   Q.   And this was all -- all this happened after you sent the jail

24   his prior mental health records?

25   A.   It is all the records I had.  I talked to as many people as

1   would answer the phone.  As many people that would listen.  Nurse

2   Simms actually thought she had hung up the phone one time.  And I

3   could hear her in the background saying, Oh, well, now, she wants

4   to be mother of the year.  I had detention center officers who

5   told me this is not Burger King; they don't get it their way.

6   Some would tell me that they understood mental health issues.

7   They had family members who battled it or they suffered from it.

8   But in their opinion that there was nothing wrong with Justin.

9   Q.   Could you briefly explain why you agreed to testify today?

10   A.   I don't know how many of you are parents.  I could be selfish

11   and make it all about Justin.  But through much prayer you find

12   out that it is bigger than Justin.  It is not just about Justin.

13   It is about the culture that's over there.  It's about the culture

14   in that institution.  And no parent, no person, no individual,

15   should have to go through that.  So if my words can lay upon

16   anybody's heart, anybody's heart, no mother should have to bury

17   their child.  Things happen, realistically; optimistically you

18   hope and pray that there is some type of rehabilitation over

19   there.  I have gone through three sheriffs each time.  They come

20   out and they are running for office.  They all run and they tell

21   me what they are going to do for mental health issues.  And then

22   it turns a deaf ear.  Justin's death was April the 18th.  My

23   neighbor's death at that same institution was six months later on

24   the 18th.  So our church home has been hit so hard.  The last

25   detainee to die from there sat there for hours before being

1    discovered.  Nobody, no community should have to go through that.

2    No mother, no father.  Animals are treated better.  So if my voice

3    can help anybody else, not just the detainees, but also the

4    officers over there who are crying for help, who are scared daily

5    for their lives because they don't know what they are coming into;

6    they don't have the support.  That's my reason for testifying.

7          THE COURT:  Hold on.  Objection?

8          MR. SHELSON:  I think at this point, Your Honor, the

9    answer is becoming nonresponsive.

10         THE COURT:  Sustained.  Thank you.

11         MS. STEEGE:  That's all I have.  Thank you.

12         THE WITNESS:  Thank you.

13         MR. SHELSON:  Good afternoon, Ms. Mosley.

14         THE WITNESS:  Good afternoon.

15         MR. SHELSON:  I just want to tell you, I am sorry for your

16   loss.  I know this must be very hard on you.  So thank you for

17   coming to court today to testify.

18         THE WITNESS:  Yes, sir.

19         MR. SHELSON:  No questions, Your Honor.

20         THE COURT:  Thank you.  Before you step down, I just want

21   to make sure I've got my timeline right.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  I am going to ask you just a couple of

24   questions.

25         THE WITNESS:  Yes, sir.

1          THE COURT:  I'm going back to the day back in February, I

2    think it is, that you said you got a call at 11:00 and you said

3    you drove over there and arrived sooner than 1:00.

4          THE WITNESS:  1:00.  Yes, sir.

5          THE COURT:  And you asked for a meeting with the Assistant

6    Warden Crane.  Is that the same day?

7          THE WITNESS:  That is when I was speaking to Warden Crane.

8    We actually did speak.

9          THE COURT:  And then you indicated that you were able to

10   see Justin Friday --

11         THE WITNESS:  Physically, I was able to see Justin that

12   Friday.

13         THE COURT:  What, if anything, happened that Thursday?

14         THE WITNESS:  Nothing happened that Thursday.  I was not

15   able to talk to him.  Warden Crane made multiple calls to me on

16   that Wednesday.  He asked me --

17         THE COURT:  Okay.  You're going back to Wednesday.

18         THE WITNESS:  Wednesday.  The day he called.  The 11

19   o'clock call.

20         THE COURT:  Okay.

21         THE WITNESS:  He made multiple calls and I told him I

22   wanted to do a wellness check.  I needed to either hear from

23   Justin or see him.  And he asked me if he could have Justin to

24   call, to give me a call.  He called me back to tell me that Justin

25   was asleep and he wouldn't call.  I said, Warden Crane, something

 1   is wrong.  If Justin knows that his mom is on the phone, other

 2   than being dead, he's going to come to the phone.  He got him to

 3   the phone.  Justin couldn't talk because of the hoarseness and the

 4   raspiness in his voice.  And that is when I shared with him that I

 5   wanted a wellness check done from an outside source to know that

 6   he was okay.

 7        He advised that Justin had received a -- I can't recall

 8   the name of the shot that he had given him.  I asked him, I said,

 9   Why did you give him that shot?  What was the reason?  I said ---

10   they said you beat him.  He gave him a shot because Justin was out

11   of control.  He went into -- he said, "We had to give him

12   something to calm him down."  I said -- he said, "Ms. Mosley, how

13   about this?  This is what I can do for you.  This is outside of

14   getting an attorney or someone coming in to do a physical welfare

15   check on Justin."  He told me that I could come over Friday; he

16   would schedule a time for me to be able to see Justin physically

17   with my own eyes to see that he was okay.

18        THE COURT:  And that's the conversation that occurred

19   on --

20        THE WITNESS:  Wednesday.

21        THE COURT:  -- Wednesday?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  He said he could arrange a visit for you on

24   Friday?

25        THE WITNESS:  Yes, sir.

1          THE COURT:  Did you talk to anybody at the facility on

2     Thursday?

3          THE WITNESS:  No, sir.

4          THE COURT:  You did mention a couple of different times

5     about a beating, I think is what your testimony was.  A beating.

6          THE WITNESS:  Yes.

7          THE COURT:  Did -- did Justin ever tell you he was beaten

8     there in jail?

9          THE WITNESS:  He did.  And one of the cases there was an

10    internal affairs charge that was filed because they advised me,

11    they was like, we hadn't -- they were telling me that there were

12    cameras there.  And he said, "No, ma'am."  He named the name of

13    the room.  He said, "Momma, they took you off of the pod."  He

14    said -- and there are no cameras in his room.  But he said, "They

15    can see that I have been moved."  And you have to -- from my

16    understanding, you have to have an order to remove an inmate, even

17    if they are just going to the nurse.  So when they pulled the

18    cameras back, they did see that he had been moved and without

19    reason; there was nothing -- he wasn't going for a nurse's call or

20    he wasn't being reassigned to another pod or anything like that.

21    But after the beatings continued, what he shared with me, was,

22    "Momma, you only make it worse when you call over here."

23          THE COURT:  What do you recall -- do you recall what year

24    that was?

25          THE WITNESS:  This was -- it first initially started 2019.

 1   And 2020 when he was there, it was as often as any time you see an

 2   incident report with Justin, there was a case where, I guess they

 3   do what they do, shut -- I think they call them shakedowns.

 4   Justin had gotten on his medications; he was compliant with meds

 5   at that time.  He was taking the blood pressure pill, as well as

 6   one of the antipsychotics.  So they were giving him the

 7   antipsychotics, to a person that they said didn't have an issue.

 8         He went to sleep, and I guess when they did this, it was

 9   about two or three o'clock that morning.  And the order is for

10   everybody to stand up beside their bed and, I guess when they are

11   doing these shakedowns to check for contraband or whatever, he

12   didn't get up.  At this time, they came in with beanbags and they

13   ended up shooting him with a blank at that point in time.  He was

14   actually shot in the face and in the stomach.

15         THE COURT:  Did he tell you he was shot in the --

16         THE WITNESS:  He described all of this.  He said, "Momma,

17   they trying to kill me."  I said, "What happened?"  And I told

18   him, I said, "You high, aren't you?"  I said, "You high over there

19   and you sleep and you couldn't wake up."  He said, "Momma, I had

20   taken them medications.  That's another reason not to take my

21   medications because if I'm sleeping they come in here on me" and

22   he's not going to wake up out of those sleeps, and they wanted him

23   to.

24         THE COURT:  And you indicated that he gave you specific

25   names of officers who have beat him before?

```
1                THE WITNESS:  Yes.

2                THE COURT:  I think you mentioned Assistant Warden

3    Crane --

4                THE WITNESS:  Warden Crane.

5                THE COURT:  Did he give you any other names.

6                THE WITNESS:  He did.  And I have those names written

7    down.  They are a part of that internal affairs report.

8                THE COURT:  Is that a report you've seen?

9                THE WITNESS:  That's a report I made over at the Hinds

10   County Detention Center.  Now, whether they filed it and put it on

11   file, I don't know.

12               THE COURT:  Do you recall going over there and making that

13   report?

14               THE WITNESS:  I physically went in there and filled that

15   report out.  By nature, I am an auditor, so I write things down,

16   dates, times, who I talked to and what they said at that time.

17   And I know that as far as the paper trail is concerned, I have

18   phone records where I could go back and pull my phone records and

19   it would show you where I called at this point in time.  And

20   handwritten notes.  I don't have them here with me today, but I

21   have the information of the names of the officers, because some of

22   them he called by nicknames.  And I was like, I can't use

23   nicknames, Justin; I need a name.  And he gave me those names.

24               THE COURT:  But I want to be clear.  You went down there

25   to the --
```

1          THE WITNESS:  Yes, sir.

2          THE COURT:  -- to the detention center or the sheriff's

3     department?  Where did you go?

4          THE WITNESS:  I went to the detention center at that time

5     and someone came out.  Over to Raymond Detention Center.  And a

6     gentleman came out and he filed a report.  That was when he told

7     me Justin had contraband.

8          THE COURT:  Did he -- I am just trying to figure out, how

9     did you participate in the report?  Did he ask -- did you talk to

10    him and he wrote notes, or did you write something yourself?

11         THE WITNESS:  They took a statement from Justin and I

12    wrote down what Justin had shared with me on the paperwork that

13    they brought out.  There were two that came out.

14         THE COURT:  Okay.  They brought out paperwork to you?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Two officers.

17         THE WITNESS:  They was one who came out and initially

18    spoke with me and it was another one that he told me would accept

19    the report.

20         THE COURT:  And you wrote down what you had learned or

21    what you wanted to report?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  And you gave that to them?

24         THE WITNESS:  Right.  At that point in time, the officer

25    or lieutenant or whatever his title was, was the one who told me,

1    "Ma'am, we can't move detainees from place to place without having

2    an order."  So there would be an order in the system.  And that is

3    when I shared that with Justin.  He said, "Momma, they did."  He

4    said the camera should have caught -- I said, "Well, would the

5    camera catch you walking down the pod?"  And he did catch that.

6    But at that point in time when you ask what happened, they said

7    that was a personnel issue, but the internal affairs report had

8    not been filed.

9          THE COURT:  Do you recall what month or date that was?

10         THE WITNESS:  I don't, because that was -- the internal

11   affairs was his first stay there.

12         THE COURT:  Okay.  And that first date was what year?

13         THE WITNESS:  That would have been 2018 to 2019.

14         THE COURT:  Okay.  All right.  Did you ever get any result

15   from the detention center or the sheriff's department about what

16   was the result of that investigation or what they found based on

17   the information you gave them?

18         THE WITNESS:  I did not.  They never followed up with

19   anything.  And that's when it got to the point where Justin was

20   like, "Momma, just stop calling down here.  You make it harder on

21   me."  And at that point I told him, "It's hard on you and I'm not

22   -- whether I call or I don't call," you know.

23         THE COURT:  Okay.  All right.  Thank you.  Any follow-up

24   based on what I've asked, starting with the United States?

25   BY MS. STEEGE:

```
1    Q.   Ms. Mosley, who was the IA officer?

2    A.   I don't have his name with me.

3              MS. STEEGE:  Nothing further.  Thank you.

4              THE COURT:  But do you have his name?

5              THE WITNESS:  It should be written down on the paperwork

6    who I spoke with, but that paperwork, of course, is at my house.

7              THE COURT:  Any follow-up from Hinds County?

8              MR. SHELSON:  No, Your Honor, but with the Court's

9    permission, if I could make a brief statement on our

10   evidentiary -- we're obviously not going to object to the Court's

11   questions, but I just want to point out for the record, Your

12   Honor, that our position is that the statements that have been --

13   that Ms. Mosley testified she heard from her son are hearsay and

14   that they are not based on personal knowledge.  And at various

15   times her son has been described by her as manic and on drugs.

16   And so that is the context those statements were made in.  And I

17   just wanted to make that statement on the record.  And thank you,

18   Your Honor, for letting me do so.

19             THE COURT:  Thank you, Mr. Shelson.

20        Ms. Mosley, I am going to ask if you can get that

21   information about who you talked to for internal affairs to see if

22   you could find out what date that was or who you talked to, who

23   took that information from you.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  And I am interested in knowing the date and
```

```
 1    who that person was.  And obviously, if there is an internal

 2    affairs record of that, the County would have it.  That's all I

 3    have.  If you can get that -- if you have access to that

 4    information and you could get it, please give it to one of the DOJ

 5    attorneys.

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  All right.  Okay.  Thank you.

 8              THE WITNESS:  You're welcome.

 9              THE COURT:  And I am not going to excuse this witness

10    because we might have to follow up with some of this testimony.

11              Ms. Mosley, do you hear me?  So don't talk to anyone about

12    your testimony.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  You are not excused.

15              THE WITNESS:  Yes.

16              THE COURT:  All right.  Let me ask the parties, who is the

17    next witness?

18              MS. COWALL:  The United States' next witness is

19    Ms. Katherine Bryan.

20              THE COURT:  We're going to start on Ms. Bryan tomorrow

21    because it is at the end of day.  There is no need to start.  I am

22    pretty sure she's going to be longer than 25 minutes.

23              MS. COWALL:  Yes, Your Honor, she will be.

24              THE COURT:  Tell her to get plenty of rest tonight.

25              MS. COWALL:  Will do, Your Honor.
```

1          THE COURT:  It is 4:32 now.  No need to break anything up.

2     I know we may be going a little bit slower than what we

3     anticipated, but we have to get all -- everybody needs to get the

4     evidence that they seek to get in.  So we will start with her in

5     the morning where -- I tell you what, though, since we're breaking

6     30 minutes early today, is it possible that we can begin tomorrow

7     at 8:45 just to get a few more minutes in?  Is that problematic

8     for the -- the United States?

9          MR. CHENG:  No, Your Honor.

10         THE COURT:  For Hinds County?

11         MR. SHELSON:  Not a problem, Your Honor.

12         THE COURT:  Okay.  Thank you all so much for being

13    generous.

14         We finished our second day of trial.  Is there anything we

15    need to take care of before we dismiss for the day?

16         MR. CHENG:  No, Your Honor.

17         THE COURT:  Thank you all.  Court is going to be adjourned

18    for today.  You are excused.

19         (Court adjourned at 4:34 p.m.)

20

21

22

23

24

25

1                      COURT REPORTER'S CERTIFICATE

2

3            I, Tamika T. Bartee, Certified Court Reporter, in and for

4      the State of Mississippi, Official Court Reporter for the United

5      States District Court, Southern District of Mississippi, do hereby

6      certify that the above and foregoing pages contain a full, true,

7      and correct transcript of the proceedings had in the aforenamed

8      case at the time and place indicated, which proceedings were

9      recorded by me to the best of my skill and ability.

10           I further certify that the transcript fees and format

11     comply with those prescribed by the Court and Judicial Conference

12     of the United States.

13           THIS the 15th day of February, 2022.

14

15

16                   s/ Tamika T. Bartee

17                   Tamika T. Bartee, B.C.R., RPR, CCR #1782
                     Official Court Reporter
18                   United States District Court
                     Tamika_Bartee@mssd.uscourts.gov
19

20

21

22

23

24

25

DAILY TRANSCRIPT