```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                      PLAINTIFF

 5   VERSUS              CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                  DEFENDANTS
 7

 8

 9              EVIDENTIARY HEARING, VOLUME 1,
            BEFORE THE HONORABLE CARLTON W. REEVES,
10             UNITED STATES DISTRICT COURT JUDGE,
                    FEBRUARY 14, 2022,
11                  JACKSON, MISSISSIPPI

12

13              (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

***DAILY TRANSCRIPT***

1    **APPEARANCES:**

2        FOR THE PLAINTIFF:

3            CHRISTOPHER N. CHENG, ESQ.
             MATTHEW DONNELLY, ESQ.
4            SARAH G. STEEGE, ESQ.
             LAURA L. COWALL, ESQ.
5            HELEN VERA, ESQ.
             MITZI DEASE-PAIGE, ESQ.

6

7        FOR THE DEFENDANTS:

8            NICHOLAS F. MORISANI, ESQ.
             JAMES W. SHELSON, ESQ.
9            TONY R. GAYLOR, ESQ.
             RAYFORD G. CHAMBERS, ESQ.
10           JOHN C. HALL, II, ESQ.
             REUBEN ANDERSON, ESQ.

11       ALSO PRESENT:

12           ANTHONY NJOKU
             MICHAEL DENAULT
13           ELIZABETH SIMPSON
             DAVID PARRISH
14           CREDELL CALHOUN
             SYNARUS GREEN
15           SHERIFF TYREE JONES
             LESLIE FAITH JONES
16           CINDY MOHAN

17

18

19

20

21

22

23

24

25

---
***DAILY TRANSCRIPT***

**TABLE OF CONTENTS**

Style and appearances.....................................1-2

Plaintiff's Exhibits 34 through 41 entered................  5

OPENING STATEMENTS:

    By Ms. Vera........................................... 29

    By Mr. Shelson........................................ 41

WITNESS:  DAVID PARRISH

    Direct by Mr. Cheng................................... 56

    Plaintiff's Exhibits 8, 9, 10, and 11 entered...........63

    Plaintiff's Exhibits 15, 16, and 18 entered............131

    Plaintiff's Exhibit 49 entered.........................132

    Plaintiff's Exhibit 42 entered.........................140

    Plaintiff's Exhibit 86 entered.........................141

    Plaintiff's Exhibits 71 and 72 entered.................163

    Plaintiff's Exhibits 68, 69, and 70 entered............167

    Plaintiff's Exhibit 24 entered.........................180

    Plaintiff's Exhibit 21 entered.........................183

    Plaintiff's Exhibit 13 entered.........................193

Court Reporter's Certificate.............................196

1            **IN OPEN COURT, FEBRUARY 14, 2022**

2

3            THE COURT:  Make sure your microphone is on.

4            Okay.  Exhibits what, Mr. Cheng?

5            MR. CHENG:  I believe they are Plaintiff's Exhibits 34

6    through 41, the monitoring reports 9 through 15 and the

7    interim reports.

8            THE COURT:  I guess I should do this.  We're going to

9    call the case first.  I'm sorry.  This is United States of

10   America vs. Hinds County, et al., Cause No.

11   3:16-cv-489-CWR-RHWR.

12           And I assume everyone has given the court reporter your

13   names and stuff already.  If not, we do need to go around the

14   table to make sure everybody's identified.

15           Okay.  Mr. Cheng, will you identify the persons on your

16   team, please.

17           MR. CHENG:  This is Christopher Cheng, C-h-e-n-g.  We

18   also have Helen Vera, V-e-r-a; Laura Cowall, C-o-w-a-l-l;

19   Sarah Steege, S-t-e-e-g-e; Mitzi Paige with the U.S.

20   Attorney's Office, P-a-i-g-e.  We also have Michael Denault,

21   who is assisting us with the trial presentation software.

22   Also in the courtroom, we have Matthew Donnelly, who just

23   entered his notice of appearance, and Anthony Njoku,

24   N-j-o-k-u.

25           THE COURT:  Okay.  Mr. Donnelly entered an appearance

1    yesterday or today, I think.

2         MR. CHENG:  Yes.

3         THE COURT:  Okay.  Okay.  Well, let me give the

4    defendants the courtesy of announcing who's here for them,

5    please.  Good morning.

6         MR. SHELSON:  Good morning, Your Honor.  For the

7    defendants, I'm Jim Shelson; Attorney Nick Morisani; Attorney

8    Reuben Anderson; Cindy Mohan, Ms. Mohan is a paralegal;

9    Attorney John Hall, Your Honor; Sheriff Tyree Jones; and

10   Attorney Tony Gaylor.

11        THE COURT:  Okay.  Thank you.

12        Now, Mr. Cheng, we'll go back to your housekeeping

13   matters.  You say Exhibits 34 through 41.

14        MR. CHENG:  Yes, Your Honor.  We move to admit them.

15        THE COURT:  Which are the monitor's reports 9 through

16   15 and the interim report, which would be Plaintiff's

17   Exhibit 40.

18        What says the defendant?

19        MR. SHELSON:  Your Honor, the defendants understand the

20   Court's already ruled on this issue, but the defendants

21   maintain their objections.

22        THE COURT:  Okay.  All right.  The Court has ruled that

23   those will be admitted into evidence.

24             (Plaintiff's Exhibits 34-41 entered.)

25        THE COURT:  Hold on for a second.  Okay.  Mr. Cheng.

1      MR. CHENG:  The parties also have an issue about

2  sealing some exhibits, Your Honor.  The United States and the

3  defendants would like to seal U.S. Exhibits 19, 32, 88 through

4  90.

5      THE COURT:  Hold on.  Hold on.  Okay.

6      MR. CHENG:  And defendants have asked to seal Exhibits

7  34, Defense Exhibit 39, and Defense Exhibit 41.

8      THE COURT:  Okay.  Both parties agreed to seal 19, 32,

9  88, 89, 90; that's fine.  You said the Government seeks to

10 seal 34?

11     MR. CHENG:  Both parties are willing to seal

12 Defendant's Exhibits 34, 39, and 41.

13     THE COURT:  Okay.  Those exhibits will be placed under

14 seal and will be handled accordingly.

15     MR. CHENG:  The third issue, Your Honor, is the

16 sequestration of witnesses.  The United States would like to

17 confirm that experts can stay in and observe the proceedings,

18 including the monitor and her team, and Ms. Bryan.

19     The other issue we'd like to raise about sequestration

20 is whether defendants have designated who their party

21 representatives should be.  We spoke a little bit this morning

22 with Mr. Shelson.  We feel that there should only be one party

23 representative for each of the defendants, and one for the

24 County board, and one of the sheriff, and they should be their

25 designated representative for the whole week.

 1           And the other issue related to sequestration, Your

 2    Honor, is one to determine what the rule would be from the

 3    Court.  I think there are several options:  One is that nobody

 4    should be allowed to sit in court; nobody should be allowed to

 5    view transcripts or watch on video; nobody should be allowed

 6    to have someone tell them what happened in court; and once a

 7    witness is on the stand, no one should be allowed to talk to

 8    them about the substance of their testimony.  So that's sort

 9    of our reading of the rule and what we would like, but we have

10    not gotten an agreement with the defendants.

11           THE COURT:  Well, obviously the rule will be invoked.

12    That rule does not apply to experts.  And it will not apply to

13    the monitors, whether they're going to be experts or not.  I

14    understand there's been some disagreement as to whether they

15    will be experts, but that rule will not apply to the monitors.

16           Now, with respect to the other witnesses, who is the

17    County -- who is the representative for Hinds County?

18           MR. GAYLOR:  Your Honor, this morning the County's

19    representative today is Mr. Stephen Hopkins, who is the

20    director of administration for Hinds County.  Obviously, we

21    also have the sheriff for the Sheriff's Department.

22           THE COURT:  Okay.

23           MR. GAYLOR:  But we do expect later this week to have

24    the Hinds County Board president as well as perhaps Mr. Kenny

25    Jones, the -- Hinds County's administrator.

 1          THE COURT:  One or the other, or both?  I mean, I guess

 2   both at different times or --

 3          MR. GAYLOR:  Correct.  The Board president will be here

 4   primarily, but, of course, Mr. Jones will be in the courtroom

 5   as well.

 6          THE COURT:  And when you say "Mr. Jones," you're

 7   talking about --

 8          MR. GAYLOR:  Kenny Wayne Jones.

 9          THE COURT:  That's Attorney Tony Gaylor.  I'm sorry.

10          The parties have a right to designate whom will be

11   their representatives, and those representatives -- the County

12   can choose to have whoever its representative is on any given

13   day or at any given hour.  So they can have multiple

14   representatives, but only one representative will be in court

15   at any given time.  Now -- and, obviously, those

16   representatives will be able to discuss whatever they need to

17   discuss with their lawyers, what they've heard in court or at

18   all, because I cannot interfere with that attorney-client

19   relationship.

20          However, the parties -- if the sequestration order is

21   in place, obviously, the lawyers know how to instruct their

22   clients with respect to communicating with others about the

23   testimony that has occurred in the courtroom on any given day.

24          So -- and any witnesses who are nonexpert witnesses or

25   party representatives will not be permitted to hear any

1   portion of the trial unless that person has either testified

2   or has been fully released as a witness.  So that's what the

3   ruling of the Court is.

4        MR. CHENG:  Your Honor, the other housekeeping matter

5   is about notice for witnesses.  We have not been able to come

6   to agreement with the defendants on how much advance notice we

7   should give each other at each hearing day.  We would like to

8   have at least 24 hours of notice before they call their

9   witnesses.  So, for example, we notified them on Saturday who

10  we would be calling today.  We would like 24-hour notice on

11  who they will be calling when it's their turn to call

12  witnesses.  I'm sorry.  We notified them yesterday.

13        THE COURT:  Okay.

14        MR. CHENG:  The issue also is because they've

15  identified quite a few witnesses, but they're all listed as

16  "may call witnesses"; they have not submitted any "will call

17  witnesses," which makes it very hard for us to prepare for who

18  they're going to be calling if they don't tell us.

19        THE COURT:  Well, obviously the parties have been

20  before me before -- well, maybe -- you-all have not, but some

21  of you have, and the courteous thing to do in making sure that

22  these are orderly proceedings is for persons to identify what

23  witnesses will be coming up on the next day of trial.  It only

24  makes sense.  I realize this case is slightly different from

25  others in that there's not been much discovery taken and

1   typically parties will know who the witnesses are and what

2   they might generally say, but in this instance, I guess, you

3   don't have that, so...

4        MR. SHELSON:  Your Honor, may I address this point?

5        THE COURT:  Yes.

6        MR. SHELSON:  I don't want the Court to be left with

7   the impression that we've stonewalled on this issue.  What we

8   offered was for the first day of the party's case in chief,

9   each side gives each other 24 hours' notice of who they'll

10  call their first day of their case in chief.  We said we'd do

11  that.  We're going to do that.  We also said that at the end

12  of each trial date, we're willing to tell each other who the

13  witnesses are the next day.  We remain fully willing to do

14  that.  We think it's a reasonable approach, and it's worked

15  well in other cases.  And they want more notice, but we think

16  the notice we're more than willing to give them is more than

17  sufficient, and it's in line with what Your Honor just alluded

18  to.

19       THE COURT:  Right.  I expect you-all to tell each other

20  who the witnesses are at the next day of the trial, and that

21  can be done at the close of the existing day of trial.  For

22  example, I expect that the Government today will let you know

23  who the witnesses are -- and I know we have two governments

24  here.  I would expect that the United States would say who its

25  witnesses are for tomorrow by -- at some portion today, to

1    disclose that to you, and when the -- and when -- if the -- if

2    Hinds County elects to put on evidence, it will let the United

3    States know the expected witnesses to be called the next day.

4    And even in what order, if you know at that time, but at least

5    the witnesses.  So that's how we typically do it here in this

6    courtroom, Mr. Cheng, so that's how we'll do it today.

7         MR. CHENG:  Yes, Your Honor.  Just to clarify.  So when

8    they designate, will they also be designating these are will

9    calls and not just simply saying --

10        THE COURT:  No, these will be witnesses who they expect

11   will be called for the next day.

12        MR. CHENG:  And I think --

13        THE COURT:  Hold on.

14        MR. SHELSON:  Yes, Your Honor.  If we tell somebody

15   we're calling them the next day, we're going to call them the

16   next day.  Yes, sir.

17        THE COURT:  Right.  Right.  Yeah.

18        MR. CHENG:  And I think the last issue for housekeeping

19   is whether there is a public link to this hearing.

20        THE COURT:  You need to speak into your microphone.

21   Come up to your microphone.  I'm trying to do everything I can

22   do to avoid people having to take off their masks.  So -- and

23   part of that is, we have set up a courtroom next door; right,

24   Mr. Paige?  Okay.  Part of that is, we may reduce the number

25   of people in this courtroom.  There's audio and video

 1   available in that adjacent courtroom because we do have a lot

 2   of people in here, and I'm very sensitive to the COVID

 3   omicron -- whatever the next version might be.  So we're going

 4   to try to keep on our masks as much as possible, but if the

 5   court reporter cannot hear you or understand, I will allow you

 6   to remove your mask.  And the witnesses, obviously, will be

 7   testifying without the mask on.

 8          MR. CHENG:  Thank you, Your Honor.

 9          THE COURT:  You may proceed, Mr. Cheng.

10          MR. CHENG:  I think that might actually answer the

11   question.  We were just trying to check if there was going to

12   be a Zoom link or something like that for --

13          THE COURT:  There's not a Zoom link.  We've made this

14   proceeding accessible to the public by having the courtroom

15   next door open, and persons who are sitting in that courtroom

16   will have audio feed and video feed, so they will be able to

17   see what's happening.  But there's nothing that allows the

18   public to see from a distance.  They still have to come into

19   the courtroom.

20          MR. CHENG:  That's fine.  Thank you, Your Honor.  I

21   think that's the last housekeeping matter for the U.S.

22          Oh, Your Honor, I guess that is one question regarding

23   two of the monitor witnesses, Dr. Dudley and Mr. Moeser.  I

24   believe they're permitted to testify from offsite because of

25   their --

```
 1          THE COURT:  They are.  And we will -- we have -- I
 2   think we've arranged for that to happen.  They are -- will be
 3   testifying offsite, and we will be able to see and hear them.
 4          MR. CHENG:  Is there any way for them to listen in on
 5   the hearing just as with the monitor who's permitted to remain
 6   in the courtroom?  Is there any way for those monitor
 7   subject-matter experts to listen in on the hearing?  The age
 8   of COVID, Your Honor, always something new.
 9          THE COURT:  Yeah.  We'll have to take a break to
10   discuss that.  You would be asking them to be here for the
11   entire time, I presume?
12          MR. CHENG:  Yes.
13          THE COURT:  And I stand corrected.  There is no video
14   feed next door.  There's just audio feed.  We'll have to take
15   a break to take up that particular issue, but there is one
16   other issue.  I know there has been an objection with respect
17   to the monitors being experts.  There's also an objection, I
18   think, the -- with respect to the defendants.  The
19   defendants -- I think the United States -- in addition to the
20   monitors being an expert, the United States says that Major
21   Bryan is an expert.  And so we -- and I presume there's still
22   disagreement about that; is that correct?
23          MR. SHELSON:  As far as the defendants know, Your
24   Honor, that's still correct.
25          THE COURT:  I'm sorry?
```

1          MR. SHELSON:  As far as the defendants know, that's

2     still correct.

3          THE COURT:  Then, that's an issue we might need to take

4     up, because I presume if Ms. Bryan is not an expert, she's a

5     regular witness, and she'll be subject to the sequestration

6     order.  She's not been designated by a party as a party

7     representative.  So let's talk about whether she's an expert,

8     Mr. Cheng.

9          MR. CHENG:  Your Honor, I don't think she's been

10    designated as a party representative.  She is just an

11    independent individual.  But the United States does believe

12    she should be designated as an expert.  I believe there is a

13    motion to strike pending.  I'm going to defer to Mr. Donnelly

14    to address this issue about the monitors and the experts.

15         THE COURT:  Okay.  That's fine.  I only need to take it

16    up now, I think, because of the sequestration issue.

17         MR. DONNELLY:  Good morning again, Your Honor.  Matt

18    Donnelly for the United States.  I guess the major question is

19    whether the defendants' former jail administrator is an

20    expert.

21         THE COURT:  Yes, sir.

22         MR. DONNELLY:  I believe that they hired her as a jail

23    administrator under the assumption of her subject matter

24    expertise, so that sort of takes care of that provision.

25    Personally, I don't understand what the objection would be to

1    her testifying as an expert.

2         THE COURT:  Well, let me hear from the defendants as to

3    the number of and litany of reasons why their former employee

4    ought not be an expert for the other side.

5         MR. SHELSON:  May I come to the podium?

6         THE COURT:  Yes, you may, Mr. Shelson.  And we have the

7    Clorox wipes there for you-all to use and wipe the area down

8    between persons, if necessary.

9         MR. SHELSON:  May I proceed, Your Honor?

10        THE COURT:  Yes, you may.

11        MR. SHELSON:  And if Your Honor can't hear me, please

12   let me know.

13        Your Honor, as I understand, the issue immediately is

14   whether Kathryn Bryan should be permitted to testify as an

15   expert.  She should not, Your Honor.  The issue isn't simply

16   whether she's an expert; it's whether, assuming she is, her

17   opinions were adequately disclosed in compliance with Rule 26.

18   They weren't, Your Honor.  They -- she was designated by the

19   plaintiff as a nonretained expert.  Nonretained experts don't

20   have to write Rule 26 reports, but, Your Honor, Rule 26

21   requires the disclosure of, one, the subject matter of the

22   witness's testimony and, two, a summary of the witness's

23   opinions.

24        Even if the Court construes the expert disclosures the

25   plaintiff made, I believe, on last Friday as disclosing the

1    subject matter of Ms. Bryan's testimony, which we dispute,

2    there's absolutely no summary in the expert disclosure of her

3    opinions.  To this day, we don't have a summary of Ms. Bryan's

4    opinions in any form.

5         Your Honor, the plaintiff's expert disclosure is

6    Exhibit 1 to the defendants' motion to strike, which is

7    ECF-134.  And, of course, the Court's free to examine that

8    document.  There is no disclosure of a summary of Ms. Bryan's

9    opinion in the plaintiff's expert disclosure.  There's no

10   written report.  The defendants simply, to this day, have no

11   summary of the opinions that Ms. Bryan purports to offer.

12        The issue of whether she is an expert in some subject

13   matter is not the issue of whether she should be permitted to

14   testify.  The rule isn't if you're an expert, then you

15   automatically get to testify.  If you're a retained expert,

16   you have to write a Rule 26 report.  If you're a nonretained

17   expert, you still have to disclose the subject matter and the

18   summary of the opinion.  That has not been done with respect

19   to Ms. Bryan.  Particularly, there's no disclosure of her

20   purported opinion, and therefore, Your Honor, we respectfully

21   submit that Ms. Bryan should not be permitted to testify as an

22   expert.

23        Subject to any questions the Court may have, Your

24   Honor, that concludes my argument.

25        THE COURT:  Thank you, Mr. Shelson.

1          MR. SHELSON:  Thank you, Your Honor.

2          THE COURT:  Now, Mr. Donnelly, you may respond.

3          MR. DONNELLY:  Your Honor, when we originally made our

4    disclosure, we thought it was plain that the defendants would

5    know based on the circumstances of their former jail

6    administrator leaving that the opinion she was going to give

7    about her experiences there were going to be negative.

8    Apparently, that was not the case; so we attempted to, in our

9    response, make it a little bit more clear.  And what we've

10   done, we've laid out that her facts and opinions are going to

11   be that defendants have not met the requirements of the

12   consent decree.  And particularly regarding her, the

13   requirements regarding the role of the jail administrator,

14   which she certainly has expertise to talk about that, and also

15   opinions about defendant's general efforts to resisting her

16   efforts to obtain compliance with the consent decree.

17          And so we think that our opinions have been fairly

18   disclosed.  The rule just requires a summary.  It doesn't

19   require a line-by-line list of every possible opinion she

20   might give.

21          THE COURT:  Why does the United States need her to

22   offer opinion?  I'm looking at what -- at Docket No. 134-1.

23   You've identified Ms. Bryan as the former jail administrator.

24   "She will testify about facts and opinions developed in the

25   course of her work at the Jail and her personal observations."

1    If you strike the word "opinions," then it's all fact with

2    respect to "developed in the course of work at the Jail and in

3    her personal observations."

4        Your next sentence says, "She will testify about the

5    defendants' compliance efforts."  A fact witness -- I mean,

6    you know, she can testify about what the defendants did with

7    respect to the compliance efforts, barriers to reform,

8    planning, and leadership.  These are things she observed,

9    witnessed, participated in, and all that.

10       And then you say, "She may testify about conditions in

11   the Jail," which is something that she saw, something that she

12   was in the middle of, something that she was responsible for

13   trying to take care of, I presume.  "Staffing and

14   supervision," again, something that she was in the middle of.

15   "Jail security," something that the jail administrator is in

16   the middle of.  "Staff training; leadership -- staff training;

17   leadership and operations of the sheriff's department;

18   physical plant, maintenance and fire safety; use of force,

19   incident reporting, and investigations; and policy development

20   and implementation."

21       Why do we need opinion evidence from her on those

22   things when you have the monitors, number one, but you also

23   have her.  Couldn't she testify about all the facts, all the

24   observations she had, all the interactions she had with

25   others, and with respect to what her role was in trying to, in

1  her mind, either, you know, take the necessary steps to do

2  whatever's necessary with each administration, with each

3  sheriff, whatever it is?  Why is it necessary for her to offer

4  opinion evidence on these things in the United States' view?

5      MR. DONNELLY:  Your Honor, we listed her as a

6  nonretained expert as sort of an abundance of caution.  I

7  think what is likely going to happen is she will testify about

8  her work as the jail administrator, and she's going to testify

9  that she's gotten resistance regarding that.  And as part of

10  that testimony, she will, expecting, likely give testimony

11  about, this is what a normal jail administrator is allowed to

12  do; this is the amount of resistance they should or should not

13  get from, you know, the sheriff.

14      THE COURT:  But she could testify that with respect to

15  her experience in the capacity of being a jail administrator.

16  If that evidence becomes relevant, she can testify about that

17  without being an expert; right?

18      MR. DONNELLY:  I guess if Your Honor is saying so, then

19  that sounds fine to me.  I just -- out of an abundance of

20  caution, we were -- if that is an expert opinion -- in my

21  experience, a jail administrator, and this is the minimum that

22  a jail administrator is allowed to do, and if that's not an

23  expert opinion and we all agree on that, then that sounds

24  fine.

25      Your Honor, I've obviously just been handed a note as

 1   well.

 2           THE COURT:  No problem.

 3           MR. DONNELLY:  I think she also has expertise as a jail

 4   administrator about remedies.  That's what jail administrators

 5   do; they fix problems.  And she's going to have, I think,

 6   subject-matter expertise as a jail administrator on the

 7   appropriate remedies should the defendants be found to still

 8   have current and ongoing violations.

 9           THE COURT:  You were trailing off.

10           MR. DONNELLY:  Moving to the last one, so that was the

11   problem.  She will obviously have -- as a jail administrator

12   with the expertise in how to fix jails, would have relevant

13   subject-matter expert testimony about the potential remedies

14   this court should enter if there's a liability finding and if

15   there's a contempt.

16           And just to make it even a little bit more plain, Your

17   Honor.  Your Honor has suggested, and it's certainly on the

18   table, whether or not a receivership is something that should

19   be a result.  And as the jail administrator, she probably has

20   subject-matter opinion, expert, about whether or not a

21   receivership here is appropriate and necessary as somebody who

22   both worked there and also has the expertise about what it

23   takes to get jails into compliance with federal law.

24           THE COURT:  So if that's the case -- if that -- if it's

25   exclusively dealing with what the remedy might be, then could

```
1   we deal with that portion of the -- should we deal with that
2   portion separately from -- from what we're here about today?
3   I mean, sort of -- in our minds, sort of bifurcate, at least,
4   remedy from liability of having to terminate the consent
5   decree, because that's why we're here now.  We're also here --
6   I understand, I've already found the County in contempt and
7   we're going to have to deal with remedy.  Can remedy we
8   separated from the finding of whether the consent decree
9   itself ought to be terminated?
10       MR. DONNELLY:  Are you -- I apologize, Your Honor.  Are
11  you suggesting that we're going to come back and have another
12  remedy hearing?
13       THE COURT:  No, no, not another remedy hearing, but
14  could we take up the evidence as to remedy separate from the
15  evidence that's going to -- will be the bulk of the evidence?
16  I mean, can we?
17       MR. DONNELLY:  I mean, I don't think so, Your Honor.
18  And the reason why I say that is my impression of what the
19  monitoring team is going to testify to is they will also be
20  giving expert opinions on a remedy --
21       THE COURT:  A remedy.
22       MR. DONNELLY:  -- and whether or not -- what's
23  appropriate.  And so, if they're going to testify that way, I
24  would say that the former jail administrator should also be
25  able to testify that way.
```

1          THE COURT:  But they'll -- but I think, though, to

2     defendant's point, I understand they hired Major Bryan

3     because -- there are many statements as to why they hired

4     Major Bryan.  She was the Michael Jordan of the outfit and,

5     you know, all those glowing things that they've said about

6     her.  But at this point, though, to defendant's point, without

7     knowing exactly what she might say, in summary or otherwise,

8     how would it be fair to them that one of their former

9     employees provide expert testimony about this particular case?

10          MR. DONNELLY:  If I understand the question, how is it

11     fair to the defendants --

12          THE COURT:  How is it fair to the defendants if one of

13     their former employees providing expert testimony about --

14     offer expert testimony in this case when they have not been

15     given any idea what that expert testimony will be in summary

16     fashion like the rules require?

17          MR. DONNELLY:  Well, I guess as far as remedy, Your

18     Honor, I apologize if it wasn't clear.  I believe she will

19     testify as things currently stand, that the remedy should be a

20     receivership.  And to the extent that's not correct, I

21     apologize.

22          THE COURT:  I mean, for example, nothing in the summary

23     that's been provided by the United States that's directed

24     toward what it is -- the disclosures that are given under

25     subparagraph (e) of 134-1 says anything about her opinions,

1   about what the remedy might be, for example.  It says, "Her

2   opinions developed in the course of her work at the Jail and

3   her personal observations."  It does not say that she believes

4   that a receivership, for example, is necessary because of all

5   the things I've observed as an employee or as the jail

6   administrator at the facility.  And I presume the monitors

7   will be offering that type of testimony, and we'll have

8   argument on counsel because I asked -- everybody has provided,

9   like the Court requested, the names of potential receivers in

10  this case.

11        So after hearing the evidence, I assume the parties

12  will be in a position to argue that after the evidence -- I

13  mean during the course of -- you know, I think I told the

14  parties on the status conference the other day what is it

15  short of a receivership that the Court may do?  And what is it

16  that the Court might do that's beyond a receivership?  I told

17  the parties to please be looking at a wide range of things,

18  so...

19        But what is it in -- what the United States has said

20  that Kathryn Bryan ought to be an expert on, what is it in

21  that paragraph that suggests to the defendants what her

22  testimony might be with respect to appointing a receiver, for

23  example?

24        MR. DONNELLY:  Well, Your Honor, the word

25  "receivership" or "receiver" certainly does not appear in

1   there, so that's certainly fair.  But I guess we thought --

2   given the circumstances of her resignation, or however we're

3   framing it, and the disclosure about her opinions as she

4   worked there, and now she doesn't, we felt like that gave

5   notice what she was going to say that my work as the jail

6   administrator wasn't effective, they were resisting me, and

7   therefore I don't think that currently the consent decree

8   itself is sufficient.

9          THE COURT:  But that's all fact evidence.  I mean,

10  these are things that she's observed, experienced, heard, you

11  know, statements that she's heard from officials that would

12  bind the County.  Again, her observations.  Again, you know, I

13  would think as a fact witness, she could testify about all of

14  those things, and the Court can come up with whatever

15  conclusion it does from the evidence.  I just -- I don't want

16  the United States to tread over into an area that might have

17  us back here trying this case again, because others will

18  review this and make decisions on, I assume -- assuming that

19  I'm not the last person to speak to this case, others may --

20  you know, they will have the benefit of looking at the entire

21  record and maybe concluding that would be error.  And I don't

22  want anybody to invite error into the case.

23         MR. DONNELLY:  Yes, Your Honor.  So with -- given that,

24  we -- I think that the best case we, the United States, would

25  propose right now is that we can somehow later figure out Your

1    Honor's idea about maybe bifurcating her testimony, but for

2    right now, I guess we'll have to concede that she'll just

3    testify as a fact witness.

4        THE COURT:  And as a fact witness, she will be

5    sequestered.  So that's my only point.  Right now she'll be

6    only allowed to testify as a fact witness.

7        MR. DONNELLY:  Yes, Your Honor.

8        THE COURT:  All right.

9        MR. DONNELLY:  Thank you, Your Honor.

10       THE COURT:  All right.  Is there anything we need to

11   take up from the County?

12       MR. SHELSON:  No, Your Honor.  The County has no

13   housekeeping or other matters.  Thank you, Your Honor.

14       THE COURT:  All right.  Thank you, Mr. Shelson.

15       And the parties know the order -- I think I heard

16   Mr. Cheng mention that the Government disclosed their

17   witnesses for today on yesterday.  They've already disclosed

18   that.

19       MR. CHENG:  Yes, Your Honor.

20       THE COURT:  All right.  We're going to take about a

21   15-minute recess.  I need to discuss some things about what we

22   just talked about.  And hopefully when we return -- my mask

23   broke too, so I'm going to get a different mask.  Also when we

24   return, we'll begin the openings.  And the parties did get the

25   e-mail about the openings; right?  Okay.  Let me take about a

1    15-minute recess.

2                    (A brief recess was taken.)

3            THE COURT:  You may be seated.

4            I have a few housekeeping matters.  First of all, we

5    do -- to the United States, the expert witnesses who are

6    offsite are able to hear and see these proceedings.  They have

7    a Zoom link where they are hearing and watching the

8    proceedings, so they're here.

9            The second thing is, I want to make absolutely certain

10   with respect to the members of the press -- and I need to make

11   sure that any member of the press has followed the Court's

12   protocols with respect to the order that was entered on Friday

13   afternoon.  Each person with the press would have the ability

14   to use electronic devices for taking notes and transmitting

15   information, not the use of taking photographs.

16           But I need to make sure, get a representation from

17   those who are here from the press that you've read that order,

18   number one, and, number two, that you've signed the

19   declaration that this court requires that you complete and

20   that you either turned it in to the court security officer or

21   either to the Clerk of the Court.  And if each of you has done

22   that, that's fine.  If you've not, please let us know; we have

23   extra copies here for you to do it.

24           Does anyone from the press need the order and/or the

25   declaration?  I see no takers.  Okay.  So I don't want anyone

1 to risk jeopardizing sanctions as to you and your employer,

2 then, with respect to that.  So I just wanted to make sure

3 that everyone was aware.  I know it did not go out until

4 late -- until about 4:00 or a little bit later on Friday

5 afternoon, but those are the protocols under which we will be

6 operating.

7      Again, the experts are participating by Zoom.

8 Hopefully there will be no distractions, because we should not

9 see them.  Their cameras should be off, but they can hear and

10 see us, I think, or at least hear us for sure.

11      So that's what I wanted to take up.

12      Now -- and persons could distance yourselves as best as

13 possible, if you wish.  I see there's room over on that side

14 of the courtroom.  Again, I want to be very, very clear -- and

15 I think we do have video in the next room, in the next

16 courthouse.

17      Now, is that right, Ms. Summers?

18      MS. SUMMERS:  Yes, sir.

19      THE COURT:  So if you prefer to sit over there with

20 those who are over there and hear and observe the proceedings

21 in that way, you certainly may.  And if at any time the

22 lawyers are -- either one -- anytime either lawyers want to

23 spread out even more, you can.  There's a jury box there.

24 This is a bench trial.  Today I'm not only the traffic cop,

25 but I'm everything.  So I usually yield to my jury on most

```
 1    things, so I wanted to make sure that we're doing all that we
 2    can do to remain safe.
 3          Who will do openings for the Government?
 4          MS. VERA:  Helen Vera, Your Honor, for the United
 5    States.
 6          THE COURT:  Okay.  And it sounds like you have such a
 7    soft voice, so I'm going to ask you to take off your
 8    microphone -- I mean, your mask -- I'm sorry -- to make sure
 9    that the court reporter will be able to hear you.  And I've
10    already warned you.  I don't know if you're from Mississippi,
11    but we try to speak Mississippi in this courtroom, real slow.
12          All right.  Turn the microphone on.  Is there a green
13    light?
14          MS. VERA:  There we go.  Okay.
15          THE COURT:  And if you need to adjust the podium, it
16    could rise or lower with a button over there.
17          MS. VERA:  Thank you, Your Honor.
18          And before I start, I did just want to mention that the
19    compliance coordinator is present for the County.  But we just
20    wanted to note that for the Court and leave it up to the Court
21    to decide whether that's all right.
22          MR. SHELSON:  He's here on his own, Your Honor, and
23    he's not on the witness list, so...
24          THE COURT:  Oh, he's not on the witness list?
25          MR. SHELSON:  No, sir.
```

1          THE COURT:  Okay.  Thank you.

2          MS. VERA:  Thank you.  And good morning, Your Honor.

3          THE COURT:  Good morning.

4          MS. VERA:  May it please the Court.  Helen Vera on

5     behalf of the United States.

6          We're here today because defendants' inability to

7     protect detainees' constitutional rights have caused people to

8     die, suffer serious injuries, and live in ongoing danger.  In

9     2016, defendants signed the consent decree, and it became an

10    order of this Court.  Yet more than five and a half years

11    later, the absence of progress continues to harm pretrial

12    detainees.  Significantly, as Your Honor is well aware, the

13    2016 consent decree isn't just any old contract.  It's an

14    agreement to remedy long-standing and widespread

15    constitutional violations of detainees' rights.

16         Defendants promised to provide pretrial detainees with

17    reasonable safety, protection from harm, and constitutionally

18    adequate conditions.  They weren't doing that before, which is

19    what led to the agreement in the first place.  Unfortunately,

20    all these years later, and well over four years after

21    compliance was due, not much has changed.  And what this means

22    is that pretrial detainees in Hinds County Jail remain in

23    danger, and children charged as adults and in the County's

24    custody are at serious risk of harm too due to defendants'

25    failure to comply with the consent decree.

1          Indeed, this is not the first time the Court has

2    considered whether the defendants are in contempt.  In 2019,

3    the United States asked the Court to find defendants in

4    contempt.  And on the eve of trial, recognizing their ongoing

5    violations, defendants agreed to enter into another agreement,

6    the stipulated order, which became an order of the Court in

7    early 2020.  That agreement was an attempt to break down

8    defendants' constitutional obligations into smaller,

9    manageable steps to help them come into compliance with the

10   consent decree.  But here we are, back almost where we

11   started, and they remain very far from that goal.  In fact,

12   defendants are in substantial or sustained compliance with

13   fewer provisions now than in 2019.  Due to the defendants'

14   compliance failures, detainees' constitutional rights continue

15   to be violated.  And without further intervention, the harm

16   will continue.

17          I want to take a moment to consider the experience of

18   these detainees, these people for whom the County has tasked

19   itself with responsibility.  Many of these people have not

20   been convicted of a crime, and, Your Honor, the jail is not a

21   good place to be.  As the Court will hear in the coming days,

22   the jail is a dangerous place.  Officers are absent from

23   housing units for long periods of time, and emergency

24   responses are not adequate.

25          In the absence of officer presence, gangs run the pods;

 1   extortion and violence pervade the housing unit; illicit drugs

 2   come in and out and are freely abused.  Doors don't lock;

 3   toilets don't work; lighting is poor; outdated fixtures are

 4   broken and often remain unfixed.  When they do get fixed, lack

 5   of officer supervision results in them being torn out again by

 6   detainees who have nothing to do all day.  That's because

 7   there's no programming.  The days unfold slowly with long

 8   stretches of time unoccupied.

 9        As the jail administrator will testify, when she tried

10   to address the lack of activities, supplies, and other

11   dysfunction, she ran up against a broken requisition and

12   budget process that the County has been unwilling to fix

13   despite the monitors advising them to do so for years.

14        These conditions at the jail do not paint a picture of

15   innocent until proven guilty.  They paint a picture of harsh

16   and inhumane punishment.  Although they have known of these

17   problems for years, and indeed acknowledged them in the

18   consent decree and in other representations to the Court,

19   defendants have failed to do what they said they would do.

20   Time and time again, they have appeared before Your Honor, and

21   instead of offering updates on actual progress or solutions to

22   issues, they have offered excuses.  Excuses for why, after

23   more than five years, they have not done what they pledged to

24   do when they agreed to the consent decree.

25        Our case in chief is fairly straightforward, Your

1   Honor, and frankly, what you'll hear from the United States'

2   witnesses over the next few days won't be any surprise

3   because, unfortunately, you've heard it before.

4       You will hear, as Your Honor has heard before, about

5   the serious harm and risk of harm to detainees at the jail,

6   including avoidable deaths.  In 2021, seven detainees died at

7   the jail.  One was killed by other detainees, and his body was

8   not discovered by staff until nine hours later.  At least two

9   detainees died by suicide.  Another died of an apparent drug

10   overdose.  You will hear about life at the jail, about the

11   deteriorated physical plant and about rampant contraband.  You

12   will hear about fires and other dangerous disturbances, and

13   you'll hear about violent incidents.

14       In the second half of 2021, 75 reported fights and

15   assaults occurred at the Raymond Detention Center, 21 in

16   November alone.  Many of them were attributable to inadequate

17   supervision.  And these numbers are only based on reported

18   incidents, Your Honor.

19       As the Court will hear over the next few days, ongoing

20   serious lapses in incident reporting mean the numbers actually

21   are higher because they just don't have enough staff to

22   supervise the units.  And on top of that, cameras are broken.

23   These incidents reflect the ongoing harm and risk of harm that

24   detainees in Hinds County are exposed to due to defendants'

25   failure to comply with the agreement.

1          The United States intends to call as witnesses the four

2    members of the monitoring team, the former jail administrator,

3    and two additional fact witnesses.

4          Elizabeth Simpson, the court monitor, will testify

5    about defendants' lack of planning and progress in coming into

6    compliance with the consent decree.  She will explain how

7    leadership and staff turnover has hindered progress.

8    Ms. Simpson will testify about defendants' failure to

9    implement adequate policies and train staff.  And she will

10   testify about serious lapses in completion of incident

11   reports, after-action reviews, grievance responses, death

12   reviews, and other required documentation.  Incident reports

13   show how staff are often at a loss for how to effectively

14   perform their jobs.  These failures to follow basic policies

15   and procedures have resulted in grave harm to detainees; for

16   example, when staff need to respond to emergencies.

17         Ms. Simpson also will testify about the County's

18   failure to investigate and assess bottlenecks in the criminal

19   justice system, which can lead to over detention and other

20   serious constitutional problems.  As she will testify,

21   defendants have failed to make good on their promise to form a

22   functioning Criminal Justice Coordinating Committee to tackle

23   longstanding challenges like developing a mental health

24   diversion program and a pretrial release program.  As

25   Ms. Simpson will testify, this failure has resulted in ongoing

 1    strain to jail resources.

 2         David Parrish, the monitor's correctional security

 3    expert and a former jail commander and manager, will testify

 4    that supervision issues and operational conditions at the jail

 5    are inadequate to ensure a safe and secure facility.  The

 6    jail's staffing level, as you will hear, is grossly inadequate

 7    and nowhere near what the consent decree requires.

 8         Mr. Parrish will explain how these persistently high

 9    staff vacancy rates make it impossible for defendants to keep

10    detainees in their care safe from violence and to perform

11    necessary rounds and safety checks such as suicide watch.

12         Mr. Parrish also will explain how defendants' failure

13    to complete and implement policies and staff training is

14    particularly acute with use of force, an area requiring

15    heightened attention.

16         As Mr. Parrish will testify, staff lack appropriate

17    guidance for applying and reporting force, and supervisors

18    fail to ensure that force is adequately reviewed or addressed.

19    Even simple requirements, like videotaping planned force, have

20    not been implemented, and staff have been equipped with Tasers

21    without appropriate policies or jail-specific training.

22         Mr. Parrish also will testify about physical plants and

23    life-safety conditions in the jail and the problematic systems

24    that impede even basic, routine maintenance repairs from being

25    made.  He will explain how the jail still lacks some of the

 1    most basic security and safety reform -- safety features such

 2    as lockable cell doors, secure control rooms, alarms, cameras,

 3    secure unit doors, fire suppression systems, lighting, secured

 4    electrical system, and key controls.  Mr. Parrish will explain

 5    how these problems compound the risk of assaults and other

 6    harm.

 7            Dr. Richard Dudley, the monitor's medical and mental

 8    health care expert, will testify about how the lack of

 9    security staff and the lack of coordination at the jail

10    hinders the ability of medical and mental health staff to meet

11    detainees' health needs, including basic things like passing

12    out medication and providing care on the units -- and

13    providing adequate care in the medical unit.

14            Dr. Dudley will testify about how detainees with

15    serious mental illness are locked away alone in segregation

16    because there's nowhere else to go; and for many, how their

17    symptoms only get worse while they're there.

18            Dr. Dudley also will testify about how defendants' own

19    plan to build a new mental health unit remains an elusive goal

20    because they have not provided enough support to make it

21    happen, despite significant time and effort from the

22    monitoring team to guide the way.

23            Jim Moeser, the monitor's juvenile justice and

24    administration expert, will testify about the conditions of

25    detention for some of Hinds County's most vulnerable citizens:

1  children charged as adults and detained in the sheriff's

2  custody.  Mr. Moeser will testify about conditions of

3  confinement at the Henley-Young Juvenile Justice Center, where

4  defendants have chosen to confine youth.

5       As the Court will hear from Mr. Moeser, extreme

6  staffing shortages at Henley-Young place youth charged as

7  adults at risk of harm because staff are not available to

8  prevent and respond adequately to critical incidents.

9       Mr. Moeser will testify about how staff vacancies and

10  turnover strain the abilities to train staff and provide

11  adequate educational, mental health, and other necessary

12  programming and services to youth.

13       Kathryn Bryan was Hinds County's jail administrator

14  between June 2021 and January 2022.  She will testify about

15  her experience attempting to implement the consent decree.

16  Before coming to Hinds County, Ms. Bryan had implemented jail

17  reform and advised jails about how to improve conditions.  She

18  understood the basic building blocks that have been missing

19  from Hinds County's Jail, including adequate staffing,

20  training, and access to basic supplies and tools.  She will

21  explain to the Court how despite her best efforts to engage

22  County leadership in strategic planning and examination of

23  broken processes, she was met with inaction, delay, and

24  rejection of her proposals without suggestions for

25  alternatives.  She will explain what happens when local

1    government thinks of a jail as an afterthought and refuses to

2    dedicate basic resources needed for a jail to function.

3    She'll provide illumination about why the jail continues to

4    hemorrhage staff and lack basic security function, placing

5    detainees and staff at risk every day.

6         The Court also will hear from two individuals who have

7    experienced firsthand the harm caused by failure to ensure

8    detainees rights are protected at the jail.

9         Calvin Godbolt, a former detainee at the Raymond

10   Detention Center, was brutally beaten and stabbed by several

11   other detainees in October of 2021.  He will testify about the

12   assault, the serious harm he continues to suffer as a result,

13   and about the lack of supervision and delayed response on his

14   housing unit where it took place.  He also will testify about

15   the living conditions at Raymond.

16        And finally you'll hear from Chalonda Mosley.

17   Ms. Mosley's son, Justin, died by suicide in the jail last

18   April.  Ms. Mosley will testify about the multiple times she

19   warned the jail about Justin's unmet mental health needs, the

20   trauma he experienced in jail, and the lack of response she

21   received from the jail as she tried to help her son.

22        As of the last monitor's report, as Your Honor is

23   aware, and as you'll hear more about today, defendants have

24   achieved sustained or substantial compliance with only three

25   of 92 substantive provisions in the consent decree.  They're

1  partially compliant with another 59 provisions and

2  noncompliant with 29.  Your Honor already found the defendants

3  in contempt of the Court's order as to the 29 provisions that

4  are noncompliant.  And defendants' noncompliance with those 29

5  provisions, and their failure to substantially comply with an

6  additional 59 provisions, as they agreed to do, mean that the

7  jail is unsafe and that detainees housed there are at

8  significant risk of serious harm.

9       The consent decree to which defendants agreed was

10  clear.  They were to have achieved substantial compliance with

11  all provisions of the agreement more than four years ago.  The

12  Court should find defendants in contempt of the consent decree

13  as to all of the three provisions in substantial or sustained

14  compliance.

15       Defendants may argue that they shouldn't be held in

16  contempt, or that they're not violating the Constitution

17  because they've made some good faith effort.  Well, first of

18  all, that's not a legal defense to contempt, but it's more

19  importantly just not true.  If they had made such efforts, the

20  monitor would have found them in substantial or sustained

21  compliance with more than three provisions after all this

22  time.  In fact, since the Court last considered whether

23  defendants are in contempt, they've back slid.  At the time,

24  the parties entered into the stipulated order, the monitor had

25  found defendants in sustained or substantial compliance with

1     seven provisions, a number that's now down to three.

2         As the monitors' compliance assessments show in report

3     after report, the defendants have been in continuous violation

4     of the consent decree for years.

5         And as you'll hear from Ms. Simpson and her team, the

6     monitor has made recommendation after recommendation to

7     defendants, and yet defendants haven't done what the monitors

8     have suggested, and haven't come up with alternative ways to

9     achieve compliance.  Defendants still have no chance for

10    achieving compliance.  And, in fact, the little progress they

11    have made has been because after defendants didn't do anything

12    on their own, Ms. Simpson took it upon herself to hire someone

13    to help defendants with policies and another person to help

14    with recruitment and retention.

15        Ms. Simpson's policy consultant connected the County

16    with former jail administrator Kathryn Bryan.  And none of

17    defendant's delayed measures set in motion by the monitor

18    should obscure the fact that as you'll hear, doors still don't

19    lock, there's still not enough staff, and detainees are

20    getting hurt.

21        Faced with the prospect of additional remedies to

22    address contempt of Court, defendants have moved to terminate

23    the consent decree pursuant to the Prison Litigation Reform

24    Act.  Given the current ongoing and continuous harm at the

25    jail, the consent decree is clearly necessary.  Defendants'

1  inability to implement basic reforms to provide an adequately

2  safe and secure environment is well established, as is the

3  unstable, dysfunctional leadership that has long plagued Hinds

4  County.  These failures demonstrate not only that the consent

5  decree remains necessary, but that more oversight, not less,

6  is needed to bring the defendants into constitutional

7  compliance.  They were unable to do so on their own years

8  after the deadline for compliance with the consent decree,

9  despite extensive ongoing technical assistance from the

10 monitor.  They were unable to do so with the more incremental

11 steps outlined in the stipulated order.  They were unable to

12 do so with a qualified jail administrator.  Over and over,

13 defendants have promised that change is just around the

14 corner.  When there's a new jail administrator, a new sheriff,

15 some incremental progress every time without result.  We

16 always returned, as we do today, to where we started with

17 nothing but wasted time and resources to show for it.  This

18 history demonstrates that a court-appointed receiver is

19 necessary.  Someone supervised by the Court who has the

20 independent authority and qualifications to ensure jail

21 operations are adequately funded and to make personnel and

22 management decisions to achieve compliance with the Court's

23 orders and the Constitution.  Without such a step, the

24 unconstitutional conditions will continue.

25         In conclusion, Your Honor, through their past and

1  present noncompliance, defendants have exposed detainees to

2  serious harm and the risk of serious harm in violation of

3  their constitutional right to reasonable safety while in the

4  custody of Hinds County.  People are being seriously hurt,

5  some have died.  The County has demonstrated that it will not

6  bring its jail up to constitutional standards without outside

7  intervention, and is it for that reason that we ask the Court

8  to remedy defendants' contempt by ordering appropriate relief

9  in the form of a Court-appointed receiver with authority over

10 funding and personnel under the supervision of the Court.  And

11 because the consent decree remains necessary to fix dangerous

12 unconstitutional conditions, we ask the Court to deny

13 defendants' motion to terminate the consent decree.  Thank

14 you.

15         THE COURT:  Does the County wish to make an opening?

16         MR. SHELSON:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. SHELSON:  Can I get the Elmo on, Your Honor?

19         THE COURT:  Yeah.

20         MR. SHELSON:  May I proceed, Your Honor?

21         THE COURT:  Yes, you may.

22         MR. SHELSON:  Thank you, Your Honor.

23         Your Honor, everyone wants a better jail:  The Court

24 does, DOJ does, and the County does, too.  The consent decree

25 and the stipulated order were entered in to with the best of

```
 1    intentions, but the passage of time has shown, one, that they
 2    contain requirements that are not reasonably achievable; and
 3    two, that exceed constitutional minimums.  But, Your Honor,
 4    the County is trying, and I'll talk about that more later.
 5          So what went wrong, Your Honor?  Two things:  First,
 6    the consent decree itself, and, second, the RDC facility
 7    itself.  I say that, Your Honor, with respect to the consent
 8    decree, because the consent decree tried to do too much.
 9    Among many other things, it bundles all in one decree the work
10    center; Henley-Young; JDC; the criminal justice system as a
11    whole, in Hinds County, at least; and the RDC, which, of
12    course, is the Raymond Detention Center.  Your Honor, the main
13    event here is RDC.
14          In plaintiff's opening statement, Ms. Vera barely
15    talked about anything else.  Your Honor, bundling -- the
16    bundling that's occurring in the consent decree is not helping
17    make RDC better.
18          Your Honor, first things first in that regard:  the
19    work center and Henley-Young.  Your Honor has addressed the
20    work center.  In the Court's show cause order, ECF-100, which
21    is page 8, and I'm not going to read this whole thing.  But
22    the Court found that, "Something about the work center's
23    culture is effective.  It largely operates as a jail should."
24          Plaintiffs submitted recently a 101-page proposed
25    findings of fact and conclusions of law.  Your Honor, it's
```

1   ECF-138.  Plaintiff mentions the work center one time in that

2   document.  They mention it on page 3 in a footnote in the

3   context that the consent decree contains a definition of jail

4   and that definition includes the work center.  Other than

5   that, plaintiff said nothing at all about the work center in

6   its proposed findings of fact and conclusions of law.  The

7   work center meets constitutional minimums and should not be

8   under a decree any longer.

9        Henley-Young, Your Honor, the words "Henley-Young" are

10  not in the complaint that initiated this whole thing.

11  Henley-Young, the words are not within the definition of jail

12  in the consent decree.  The words "Henley-Young" are not in

13  the consent decree.  But in the definition of jail in the

14  consent decree that I mentioned a minute ago are the words

15  "replacement facilities."

16       At the time the decree was entered into, youth were

17  housed at RDC.  They no longer are.  They are housed at

18  Henley-Young.  But the decree followed the youth at

19  Henley-Young.  That was a mistake, Your Honor, especially in

20  terms of trying to better the RDC.  Henley-Young at the time

21  was under a separate decree.  It still is.  We have dueling

22  decrees dealing with Henley-Young.  We don't need that.

23       In the 15th monitoring report, there are eight

24  provisions -- there's a section in the decree called

25  youthful -- useful provisions, I believe, Your Honor, and

1    anyway, there are eight provisions in that part, and that's

2    the part that has been morphed into dealing with Henley-Young.

3    In any event, Your Honor, in the 15th monitoring report, the

4    monitors found sustained compliance with two of those

5    provisions and partial compliance with six.  Henley-Young

6    meets constitutional minimums.  No constitutional -- excuse

7    me.  No decree is necessary with respect to Henley-Young.

8         JDC should be even easier, Your Honor.  It's moot.

9    It's closed as a jail.  It's now merely used as a temporary

10   holding facility for court appearances.  There is no reason

11   for the JDC to be under a consent decree.

12        The consent decree, though, Your Honor, doesn't stop

13   merely at bundling too many facilities under one decree.  It

14   seeks, as Ms. Vera alluded to, to address in some respects the

15   criminal justice system as a whole.  It does so, Your Honor,

16   in paragraphs 115 through 118, which Ms. Vera correctly noted

17   is the Criminal Justice Coordinating Committee, or CJCC.  And

18   just briefly, Your Honor, paragraph 115 of the decree says,

19   "The CJCC will assist in streamlining criminal justice

20   processes," and then it goes on to list a number of things.

21        We submit, Your Honor, that putting all those

22   facilities, especially RDC, and everything that supposed to be

23   done under the CJCC into one document is more -- is more

24   than -- is biting off -- it bites off more to chew than any

25   one consent decree should be asked to handle.  But the CJCC is

1    even more expansive than that.  It calls for coordination with

2    all these entities listed here, Your Honor:  Hinds County

3    Behavioral Health Services; JPD; Department of Mental Health;

4    Department of Human Services; judges from circuit, chancery,

5    county, youth, and justice courts; the DA's Office; public

6    defender's office; relevant Jackson city officials; private

7    advocates; and other interested community members.  Your

8    Honor, those kind of expansive efforts, while well

9    intentioned, are not moving the ball on making the RDC better

10   and are actually hindering that effort.  That kind of thing is

11   more -- the passage of time has shown is more aspirational

12   than realistic, especially considering all of the bundling

13   that is occurring in the consent decree.

14       Your Honor, there's a lot going on in Hinds County and

15   Jackson.  We don't say this to -- as Ms. Vera put it, to make

16   excuses.  It's reality, Your Honor.  The Court -- the Court is

17   probably aware of these things on its own.  There's water

18   issues, billion dollar infrastructure issues, Your Honor.

19   There's road and bridges issues.  There's a global pandemic.

20   Your Honor, this isn't an excuse.  This is -- it caused the

21   monitors to change how they conducted their monitoring in this

22   case, and there is a labor phenomenon that's been dubbed "The

23   Great Resignation."

24       We mention this now only to point out that the County

25   operates in a world of a finite budget, and that's just a

1    reality, and I'm going to talk a bit later about what the

2    County's done with that budget.  But, Your Honor, there's

3    going to be a finite budget regardless of who is at the helm,

4    so to speak.

5         That said, Your Honor, the decree exceeds

6    constitutional minimums.  Your Honor, the word "ensure"

7    appears in the decree 78 times.  I looked it up.  Ensure is

8    commonly defined as making -- make certain that something

9    shall occur or be the case.  The provisions in the decree,

10   Your Honor, are detailed, and they're rigorously interpreted

11   by a four-person monitoring team we think beyond the scope of

12   what the decree calls for, and we'll address that later and

13   during cross-examination.

14        But, Your Honor, there are 92 substantive provisions

15   that the monitors evaluate for compliance.  Ninety-two, Your

16   Honor.  There's got to be a better way to streamline this

17   process, especially with respect to RDC, which is the main

18   event, and a significant number of those 92 have to do with

19   the bundling of other facilities in addition to RDC in this

20   "improving the criminal justice as a whole" concept.  But

21   ensuring 78 separate detailed items exceeds constitutional

22   minimums.  Ninety-two substantive provisions the passage of

23   time has shown exceeds constitutional minimums.

24        The Court has heard a lot about policies and

25   procedures.  Ms. Vera alluded to them again.  The consent

 1    decree and the stipulated order call for the 90 policies to be

 2    developed and implemented.  Now, of course, Your Honor,

 3    policies and procedures are important.  They're important.

 4    But this is a three-way street here, Your Honor.  It's not

 5    just that the County's not writing policies.

 6           It's one thing for the County to write policies.  It's

 7    quite another, Your Honor, to have to have those policies

 8    approved by DOJ and a four-person monitoring team.  So, Your

 9    Honor, it's not simply the County is not writing policies.

10    And I think what's illustrative of that, Your Honor, and I

11    think Your Honor has heard this name at some of the hearings,

12    Karen Albert.  Ms. Albert has been retained by the monitor to

13    chiefly, as I understand it, help write policies and

14    procedures that will satisfy DOJ and the monitors.  The County

15    has paid Ms. Albert $76,592.48 just to do that, Your Honor.

16    Now, we would submit that having to spend -- having to pay

17    somebody $76,000 to write policies and procedures that satisfy

18    the DOJ and the monitoring team is illustrative of a decree

19    that exceeds constitutional minimums.

20           Also illustrative of a decree that exceeds

21    constitutional minimums is paragraph 42 of the decree.  Your

22    Honor, paragraph 42 starts on page -- bottom of page 11 of the

23    decree.  It consumes all of page 12, it consumes all of page

24    13, it consumes all of page 14, and it consumes more than half

25    of page 15.  Your Honor, paragraph 42 contains nine subparts,

1    A through I.  There are 21 subparts to the A through I

2    subparts.  Paragraph 42 is so long, the monitors don't

3    evaluate it as a single paragraph.  There's not a single

4    compliance evaluation for paragraph 42.  Indeed, it's so long,

5    Your Honor, that it's broken up into three separate compliance

6    evaluations.  It addresses staffing, classification, and

7    promoting safety.  Whatever the constitutional minimum is for

8    those three things, paragraph 42 exceeds it.

9        Next, Your Honor, the RDC facility itself.  There was a

10    hearing -- excuse me, a status conference in this case back in

11    October 2017.  So that one was not held before Your Honor, but

12    it was held before the magistrate judge in Gulfport.  And I'd

13    like to share with the Court from the transcript, which is

14    ECF-18, Your Honor, what the then County attorney said to the

15    Court at that time.  And, Your Honor, I'm reading from page

16    56, lines 20 through 25, and it goes over to page 57, line 1.

17        But it says this, Your Honor:  "Your Honor, the

18    facility, the Raymond facility, the main facility, was built

19    in 1994.  The day after it opened, there were lawsuits about

20    the design and the construction.  It's an albatross that this

21    sheriff and this board inherited, and they are collectively

22    trying to do their best job at tackling the maintenance

23    issues.  We suspect that's going to be an issue.  We just need

24    it to be a smaller issue."

25        That sums it up, Your Honor, about as well as it can be

1    summed up.  The RDC facility itself works against compliance.

2    It's not because after all these years the County just wants

3    to have a poor facility.  Your Honor, this facility was doomed

4    from the start.  The County attorney years back ago nailed it:

5    This facility is an albatross.  It's an albatross around every

6    board's neck who's had it and every sheriff who has had to

7    deal with this facility.

8          The RDC was designed as a direct-supervision facility,

9    but it was poorly designed as a direct-supervision facility.

10   Your Honor, the RDC facility is too broke from the inception,

11   from the get-go, to be fixed to a good direct-supervision

12   facility, which is why this Hinds County Board of Supervisors

13   is building a new jail, which I'll talk about in a minute.

14         Your Honor, I next I want to talk about compliance.

15   I'm going to say this, and I think the testimony and evidence

16   will show, that the compliance standards in the consent decree

17   are not a model of clarity.  Then there's also the issue of

18   compliance as defined by the decree versus compliance as

19   interpreted by the monitors, which we think the evidence will

20   show are two quite different things.

21         I also want to address, Your Honor, this notion of

22   sustained compliance.  We've heard about it frequently.

23   Ms. Vera mentioned it three times in her opening statement.

24   Your Honor, sustained compliance is not a thing in the decree.

25   What do I mean by that?  This is the decree, Your Honor.

1    Paragraph 35, it defines compliance.  There's three standards

2    of compliance in this decree:  substantial compliance, partial

3    compliance, noncompliance.  Each one of those things is a

4    defined term.  Sustained compliance is not.  What's more, Your

5    Honor, the monitors are not charged with evaluating sustained

6    compliance, whatever that is.

7         This is paragraph 150(a).  This is where -- this is the

8    section of the decree that describes the monitors' duties.

9    150(a), Your Honor, reads, "The monitors must evaluate the

10   status of compliance, reach provision of the agreement using

11   the following standards."  These are the only standards the

12   monitors are authorized to use.  Number one, sustained

13   compliance; number two, partial compliance; and number three,

14   noncompliance.  To the extent -- I don't know exactly where

15   the monitors got it from.  I have my -- I think it's here,

16   Your Honor, but I won't speculate on that.  They can answer

17   for it themselves.  But I think they may be conflating

18   compliance with termination.

19        If you turn to section 11 of the agreement, it's

20   construction and termination.  There's paragraphs 164 and 165.

21   Paragraph 164 deals with how the agreement would terminate if

22   the parties jointly stipulate to termination, and it says in

23   part that if the parties jointly stipulate that the County has

24   achieved and maintained substantial compliance with the

25   agreement for at least two years, then the agreement can

1    terminate if the Court approves.  But, again, Your Honor, no

2    mention there of sustained compliance.

3         Same is true of paragraph 165.  If the parties do not

4    jointly stipulate to termination, then the County can move to

5    terminate, and if the County does that, then the County has

6    the burden to demonstrate that the County substantially

7    implemented each provision of the agreement and that such

8    compliance was maintained continuously for two years prior to

9    the filing of the motion.

10        Now, this is important, Your Honor.  Termination under

11   164 speaks to substantial compliance.  Under 165, it speaks to

12   substantially implemented.  That's clearly intended to be a

13   lower standard, and substantially implemented, Your Honor, is

14   not tied to either substantial compliance or partial

15   compliance.  And what's more, Your Honor, there is absolutely

16   nothing in this decree to the effect that thou shalt be in

17   sustained compliance by X date.  In fact, there is no date at

18   all in this agreement for either substantial compliance with

19   the agreement for two years or substantially implemented --

20   the "substantially implemented" concept in paragraph 165 of

21   the consent decree.

22        I know this, Your Honor:  I personally word-searched

23   the consent decree multiple times, and I stand to be

24   corrected, but the words "sustained compliance" are not in

25   that document.

1        Your Honor, this is again from the plaintiff's proposed

2   findings of fact, conclusions of law, ECF-138.  I want to note

3   this from the outset, Your Honor.  They quote -- the plaintiff

4   quotes the Court's show cause order at ECF-100, page 28.  What

5   they do, Your Honor, is change up -- where Your Honor said

6   "RDC," plaintiff says "the jail."  And here's what I mean by

7   that.  This is Your Honor's show cause order, ECF-100, page

8   28, and what the Court said is that "Hinds County shall show

9   cause and explain why it should not be held in civil contempt

10   and why receivership should not be created to operate RDC."

11   In their proposed findings, plaintiffs cross out "RDC" and

12   insert "the jail."  We hope that the court order where it says

13   "RDC" stands.

14        Your Honor, I said at the beginning, and I come back to

15   my statement, that the County is trying.  Ms. Vera said

16   there's been a lot of wasted time and resources.  We

17   respectfully see it differently, Your Honor.  The County has

18   responded reasonably, not perfect but reasonably, and here are

19   just some of the reasons we say that.

20        $4 million.  The current Hinds County Board of

21   Supervisors came into office in approximately January 2020.

22   Since that time, that board has approved $4 million be spent

23   for detention-related matters with the bulk of that money

24   going to the RDC.  So if the RDC facility is not satisfactory

25   to the monitoring team, which it clearly is not, it's not

1  because the Hinds County Board of Supervisors have not been

2  trying with what they have at their disposal, which is money,

3  and they're putting money towards attempting to fix the issues

4  with what's been from the get-go a bad facility.

5      Your Honor, the next set of numbers we think are

6  telling as well.  $18 million, $10 million, 56 percent.  The

7  sheriff is trying too, Your Honor, the sheriff's office.  The

8  sheriff has a budget of approximately $18 million annually.

9  Approximately $10 million of that budget goes to detention.

10  Your Honor, 56 percent of the sheriff's budget goes to

11  detention.  That is trying, Your Honor.  It's not indicative

12  of turning a blind eye in any way, as plaintiff might suggest.

13      Your Honor, $1,233,185.50.  That's the amount of money

14  since, I believe, the end of December 2021 that the County has

15  paid to the monitors.  Your Honor, the point is when Ms. Vera

16  got up here and said all the things she said that are not

17  being done, in the plaintiff's view, correctly to -- at RDC,

18  Your Honor, our point is that although well intentioned, the

19  consent decree and the monitors are not helping.

20      Your Honor, next, 68 percent, that comes from the 15th

21  monitoring report.  As I mentioned earlier, there are 92

22  substantive provisions that are evaluated by the monitors.

23  The monitors found that the County is in sustained compliance,

24  although I've already talked about that, but that's what they

25  found, sustained compliance or partial compliance with

 1   68 percent of the substantive provisions.  Your Honor, turning

 2   to paragraph 165 of the consent decree, we would say that

 3   68 percent is indicative of substantially implemented, which

 4   is the standard announced in paragraph 165.

 5        Next, Your Honor, $68 million.  That's the projected

 6   cost of the new jail that the Hinds County Board of

 7   Supervisors has approved.  That is a huge, a huge sum of

 8   money, $68 million.  Your Honor, it is indicative of the

 9   seriousness with which the board takes these issues.  It is

10   equally indicative of the board's commitment to dealing with

11   those issues.

12        Your Honor has heard and will hear a lot more about

13   recruiting and retention.  This board recently approved

14   raising detention staff starting salary to $31,000 a year,

15   which is a competitive salary in this marketplace and is

16   intended, Your Honor -- this is one of a series of pay

17   raises -- this is the latest -- but it's intended, Your Honor,

18   to further address the board's efforts to assist with

19   recruiting and retention.

20        Finally, Your Honor, 100 percent.  As I mentioned, the

21   current board came into office January 2020.  Since that time,

22   a number of measures have come up for vote before the board

23   regarding detention issues.  Your Honor, every one of those

24   measures that came up for vote, 100 percent were approved by

25   the board.  And if I'm not mistaken, every single one of those

1   votes on detention issues was unanimous.

2         Subject to any questions the Court may have, that

3   concludes my presentation.

4         THE COURT:  Thank you, Mr. Shelson.

5         MR. SHELSON:  Thank you, Your Honor.

6         THE COURT:  Is the United States ready to call its

7   first witness?

8         MR. CHENG:  Yes, Your Honor.  The United States would

9   like to call David Parrish.

10        THE COURT:  All right.

11        (Whereupon, the witness was placed under oath.)

12        THE COURT:  Mr. Parrish, you may remove your mask if

13   you wish.

14        THE WITNESS:  Thank you, Your Honor.

15        THE COURT:  All right.  I'm just going to ask that you

16   allow the lawyers to finish their question before you begin to

17   speak, so that you won't be speaking over each other.  Make

18   sure that you're speaking at a pace at which the court

19   reporter can keep up with you.  And please, sir, try to make

20   sure all your responses are verbal.  If you're nodding or

21   shaking your head, please give me an affirmative or negative

22   answer along with it.  It's my job to sort of monitor all

23   that, so don't necessarily worry about it.

24        But if you will, for the record, could you state and

25   spell your name.

1          THE WITNESS:  Yes, sir.  David --

2          THE COURT:  Turn on your microphone.  Is the green

3   light on?  Hold on.  Hold on.

4          THE WITNESS:  It's showing on.

5          THE COURT:  I'm sorry, ladies and gentlemen.  We've got

6   a technical difficulty that we need to get this fixed.

7          MR. CHENG:  I'm sorry, Your Honor.  But this gentleman

8   here is with our office, so he's assisting with our

9   technology.  This is human error on my end, but I think that's

10  a court technology issue, Your Honor.

11         THE COURT:  It is.

12         THE WITNESS:  Okay.  Now?

13         THE COURT:  Yes.

14         THE WITNESS:  Okay.

15         THE COURT:  That's it.  Okay.  For the record,

16  Mr. Parrish, could you state and spell your name.

17         THE WITNESS:  Yes, sir.  My name is David M. Parrish,

18  P-a-r-r-i-s-h.

19         THE COURT:  Thank you.  You may proceed.

20                    **DAVID M. PARRISH,**

21            **having been first duly sworn, was examined and**

22  **testified as follows...**

23                    **DIRECT EXAMINATION**

24  **BY MR. CHENG:**

25  Q.  Mr. Parrish, could you describe your professional

1    background, please.

2    A.   Yes, sir.  I grew up outside of Philadelphia, graduated

3    from high school in that area, graduated from Penn State --

4         THE COURT:  I was about to say, we got a Philadelphia

5    here.  So when you say "Philadelphia," we think about our

6    Philadelphia.  Please, for the record, you're talking about

7    the original Philadelphia; right?  Pennsylvania?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  All right.  Okay.

10   A.   My accent probably identifies where -- from Philadelphia,

11   Pennsylvania, and graduated from Penn State with a bachelor's

12   degree in history; spent four years in the Navy as an officer;

13   went back to graduate school, got a master's degree in

14   criminology and corrections from Sam Houston State University

15   in Huntsville, Texas; and then went to work for the

16   Hillsborough County Sheriff's Office in Tampa, Florida, where

17   I worked for 34 and a half years in various capacities.

18        Would you like me to go into the --

19   BY MR. CHENG:

20   Q.   Yes.  Once you went to Hillsborough, can you describe

21   your career at the Hillsborough County Detention Center.

22   A.   Yes, sir.  I started work in the Hillsborough County

23   Sheriff's Office in Tampa, Florida, in March of 1974 as a

24   planning, research, and training officer, and I held that

25   position for several years and then ultimately became the

1    major in charge of the administrative division in about 1978.

2         Held that position for several years until I was

3    reassigned to the services division in 1981 and later in that

4    year was transferred to the jail system of the sheriff's

5    office.  At that time it was referred to as the board of

6    criminal justice, but it later became the detention department

7    of the sheriff's office.

8         So I was put in charge of the jail system in August of

9    1981, and I held that position as a major for several years

10   until I was promoted to a new rank in the sheriff's office of

11   colonel around 1985, and I held that position until I retired

12   in the end of September, September the 27th of 2008.  So I was

13   the commander of the consolidated Hillsborough County Jail

14   System for 27 years.

15   Q.   And about how many inmates were in that system?

16   A.   When I took over the jail system in 1981, we had 1200.

17   By the time I retired, we had topped out at just over 5,000.

18   On our heaviest year, which was around 2006, we averaged 4,637

19   inmates for the entire year.

20   Q.   And as the jail commander, did you have to work with

21   other criminal justice actors in your county?

22   A.   Yes, sir.  The impact of the efficiency and interaction

23   of the rest of the criminal justice system has a tremendous

24   effect on the day-to-day operation of the jail, so I spent a

25   great deal of time working with the public defender, with the

1    state attorney, with the chief judge, with the clerk of the

2    circuit court, and other participants to make sure that the

3    criminal justice system worked effectively together.

4         In Florida we have something that's required by the state

5    legislature referred to as the public safety coordinating

6    council.  Each county is required to have one.  It's comprised

7    of all the players in the criminal justice system plus elected

8    officials at the county and municipal level, and that is

9    required in each -- each county, so I spent a lot of time

10   working with that group.

11   Q.   And do you have any licenses or certifications?

12   A.   I sat on the original commission that created the

13   Certified Jail Manager program for the American Jail

14   Association, so I was one of five people that helped write the

15   first CJM examination, and I served as a Certified Jail

16   Manager from then on.  There are about 350 such people in the

17   United States.  I'm a past president of the American Jail

18   Association.  I'm past treasurer for the American Correctional

19   Association.  I served on the Board of Governors two times for

20   ACA and on the executive committee twice, and I also served on

21   the standards committee for a period of six years in the 1990s

22   helping to write the standards that ACA publishes for jails,

23   prisons, juvenile facilities, and community corrections.

24   Q.   After you retired as a jail commander, did you begin your

25   own business?

1  A.  Actually, I started doing consulting work in 1987.  I did

2  my work primary work with the National Institute of

3  Corrections generally doing operational assessments of jails,

4  and then through that I became known and I did work for

5  private attorneys or directly for sheriff's offices or jails,

6  most generally defending jails or sheriff's offices with

7  regard to litigation, but I spent a great deal of my time

8  doing that in the form of operational assessments.

9       Then I also did work for organizations like the American

10  Correctional Association and the International Association of

11  Chiefs of Police.  I've done consulting work as far away as

12  Australia, Israel, South Korea, all over the United States.

13       Since I retired in the end of 2008, I got to the point

14  where I had to turn down work.  But I most recently

15  concentrated on primarily projects such as this one, working

16  for the Department of Justice.  I helped with monitoring the

17  corrections system in the U.S. Virgin Islands, St. Croix; I

18  did work in Louisiana on the New Orleans jail system; and at

19  the present time I primarily concentrate on this project.

20  Q.  Have you ever done any teaching or lecturing?

21  A.  When I was working for the sheriff's office, I taught at

22  the local community college, but subsequently through my

23  involvement with the American Jail Association, American

24  Correctional Association, I've given many presentations on

25  jail operations, particularly with regard to direct

1    supervision.

2        Also done that sort of thing through something that's

3    called the Large Jail Network coordinated by the National

4    Institute of Corrections.  You have to have a thousand beds or

5    more to even be invited to participate, and they meet twice a

6    year, and it's the jail administrators from the biggest jails

7    in the country who get together to pick their own topics and

8    make presentations, and I did quite a bit of that kind of

9    work.

10   Q.  As part of your consulting business, do you have a

11   curriculum vitae or biographical material?

12   A.  Yes.  I provide a one-page short biographical sketch

13   which explains basically my background and then a full-length

14   resume which includes my complete work history and published

15   articles, accomplishments while I was a jail administrator in

16   Hillsborough County, that sort of thing.

17   Q.  If we could bring up Plaintiff's Exhibit 8, 9, 10, 11.

18   Let's go with 8 first.  Do you recognize Plaintiff's

19   Exhibit 8?

20       THE COURT:  Hold on.  No.  No.  He can't see it yet.

21   Okay.

22   A.  Yes, sir.

23   BY MR. CHENG:

24   Q.  And what is Plaintiff's Exhibit 8?

25   A.  This is the --

1          THE COURT:  If it works better for you to have a hard

2    copy, if you have a hard copy for him.

3          THE WITNESS:  I'm good here.

4          THE COURT:  You're good?  Okay.

5          THE WITNESS:  I'm better yet now.  Thank you.

6    A.   That's my short biographical sketch, the one-page

7    synopsis.

8    BY MR. CHENG:

9    Q.   If you could bring up Plaintiff's Exhibit 9.

10   A.   Yes, sir.  This is something that's required in federal

11   cases generally where you provide a synopsis of expert witness

12   service over a period of time, and I update that periodically.

13   Q.   And have you served as an expert witnesses in other

14   cases?

15   A.   Yes, sir.  I've done through -- been accepted both during

16   deposition and in court during trial.

17   Q.   If we could bring up Plaintiff's Exhibit No. 10, and do

18   you recognize this exhibit?

19   A.   Yes, sir.  That's my synopsis since 1997.

20   Q.   Bring up Plaintiff's Exhibit 11, and do you recognize

21   Plaintiff's Exhibit 11?

22   A.   Yes, sir.  This is the beginning of my full resume, which

23   goes back to when I started work for the Hillsborough County

24   Sheriff's Office.

25         MR. CHENG:  Your Honor, we would move to admit

1    Plaintiff's Exhibits 8 through 11.

2         THE COURT:  Any objection from the defendant?

3         MR. MORISANI:  No objection to those exhibits, Your

4    Honor.

5         THE COURT:  All right.  Exhibit 8, 9, 10, and 11 will

6    be received into evidence.

7         (Plaintiff's Exhibits 8, 9, 10, and 11 entered.)

8    BY MR. CHENG:

9    Q.   In this case, what is your role?

10   A.   I serve as a member of the monitoring team.  I report to

11   the monitor, to Ms. Simpson, and my area of expertise is in

12   corrections operations.

13   Q.   Do you know how you were selected to join that team?

14   A.   Actually, I -- I was brought on board in 2014 to do a

15   review of the Hinds County Jail system.  Actually, the Jackson

16   Detention Center and the Raymond Detention Center.  I wrote a

17   report for DOJ in 2014, supplemented in 2015.  That, my

18   understanding is, was used as the basis for developing the

19   consent decree.  And subsequently I was questioned as to my

20   interest in serving as the monitor, and I indicated that

21   that's not a job that I want to take on because its extremely

22   time-consuming and has a lot of administrative

23   responsibilities that I had happily retired from.  And so

24   subsequently I was questioned and asked by the monitor if I

25   would be a member of the monitoring team, and I agreed to

1   that.

2   Q.   And when did you begin working as a subject matter expert

3   for the monitoring team?

4   A.   For this monitoring team?

5   Q.   Yes.

6   A.   Yes, sir.  We started in -- at some point in 2016.  I

7   don't remember the exact date.

8   Q.   How do you conduct your assessments of your subject

9   matter area for this case?

10  A.   Well, I handle them much like I do when I do an

11  operational assessment of a jail.  I go into the facility -- I

12  like to start at the point of entry.  So I go to the sally

13  port where prisoners are delivered and work my way back

14  through the booking process, and then back into housing, and

15  then in all the support areas; that's just my normal form for

16  inspecting a facility.  And while I'm at that, then I question

17  people of various ranks, from command staff on down to

18  entry-level officers and supervisors in between, and I

19  question inmates.  And I've got a habit of something that I

20  learned a long time ago, which is not to ask a leading

21  question:  Do you do this?  Because, of course, the answer

22  always is yes.  And, instead, I say, How do you handle this?

23  If the individual cannot articulate it, then they're not doing

24  it.  If they give me a bogus answer, I know they don't

25  understand what the answer should be.  That's the way I

1    address it in doing things.

2        And then I also, at the same time, look at documents.

3    And that entails looking at well-being checks that may be

4    posted on the wall next to a cell; that may be in a

5    housing-unit log; that may be in a control-room log; that may

6    be in an administrative office, and look for how they're being

7    recorded, what's being recorded, what kind of housing area is

8    it, what kind of inmates are we talking about?  For instance,

9    in booking there's a requirement for a well-being check every

10   15 minutes.  In general population, that's not the same, it's

11   not as stringent.  In confinement housing, it may be every 30

12   minutes, so those are the kinds of things that I look at.

13       And I look at the physical plant.  It's been my

14   experience that when things start going bad, people just get

15   used to it and it becomes part of the woodwork, and after a

16   while, it's like, well, so what?  And that's the kind of thing

17   you look for when you look at a place as opposed to, is it

18   neat, clean, polished, immaculate, well-maintained, am I proud

19   of where I work?  That's the kind of thing that I look for

20   when I go into any facility.  That basically summarizes it.

21   Q.  The methods you use to assess the facility, do they

22   include looking at documents?

23   A.  Yes, sir.

24   Q.  And what type of documents do you review for your

25   assessment?

1    A.   Well, as I mentioned, I look at well-being checks; that's

2    an important one.  I look at logs that are maintained in the

3    various areas.  If someone is on suicide watch, I want to see

4    what kind of log is maintained.  I want to see how the entries

5    are made every 15 minutes.  Is it every 15 minutes on the

6    quarter hour, the half hour, the three-quarter hour?  Or is it

7    the actual minute when it was actually done?  I like to watch

8    and see if somebody is going to do a well-being check.  Are

9    they actually doing what I'm finding in the logs, or is this

10   something that is it being done either in advance or after the

11   fact and made to look good?  So that's the kind of thing that

12   you look at.

13        And then, when you look at records, when you go in to

14   classification, you look at classification logs, look at

15   inmate files on what -- look at incident reports.  Do they

16   make sense?  Are they comprehensive?  When a supervisor

17   reviewed them, did they take some action and say, "This is

18   good, or this is satisfactory and needs to rewritten, or this

19   is an abuse of use of force compared to our policy, and

20   something needs to be done, or this needs to be needs to be

21   referred to CID or IAD, criminal investigation or internal

22   affairs.  Those are the kinds of documents that you have to

23   look at routinely to see what's going on.

24   Q.   Do you also review staffing information?

25   A.   Absolutely.  And that's a critical part of this

1  monitoring project.

2  Q.   Do you review investigations?

3  A.   Yes, sir, both.  Look at criminal investigations, which

4  are basically investigated to look at issues of inmate on

5  inmate violence or that sort of thing, as opposed to internal

6  affairs investigations which are dealing with, did officers

7  follow policy or did they abuse their authority, or were they

8  inconsistent or so forth?  Two areas of investigation there.

9  Q.   How about quality assurance documents, do you review

10  those?

11  A.   Quality assurance, as in the quality assurance reports

12  that are generated now?

13  Q.   Do you review quality assurance documents?

14  A.   Yes.  You have to look to see whether things are being

15  done properly, not just being done.  And my question just now,

16  I guess, was because recently Hinds County has a quality

17  assurance coordinator who puts out a monthly report now, which

18  is basically built on what's required by the consent decree,

19  by the settlement agreement to cover certain areas.  And it's

20  a comprehensive report by somebody who's in-house, a

21  self-analysis if you will, and it's good to be able to compare

22  that perception with what we see from doing our inspections on

23  site or remote, either one.

24  Q.   Do you also review the consent decree or the Court's

25  orders before you do your inspections?

A.  Yes.  Before I come to do an inspection, I go back over

what was done in the last one, and that's the starting point

for each one.  Because there has to be a measure of what has

changed since the last time; has there been improvement?  Has

it dropped off?  Has it been continuation of the status quo?

Those are the kinds of things that you need to look at.  And

everything that we write in our three-time-a-year report is

based upon the various paragraphs of the settlement agreement.

Q.  So these three-time-a-year reports, are you referring to

the monitoring reports?

A.  Yes, sir.

Q.  So the monitoring reports provide the monitors with

reports assessing the County's compliances and orders.  Are

you familiar with those assessments in the monitoring report,

the conclusions of partial, substantial and noncompliance?

A.  Yes, sir.

Q.  Do you agree with the assessments in those monitoring

reports?

A.  Yes.  As we -- each of us has a portion of the report

that we work on, and we submit all of that to the monitor who

compiles the whole thing and makes it seamless, because we

have four individuals working on it.  And if, for instance, I

look at an issue dealing with staffing and find that it has

dropped off precipitously, or something, and I suggest that we

change it from one category to a lower level, this is no

1   longer in partial compliance, it's noncompliant.

2       Well, that goes to the monitor, and if the monitor has

3   any question about that, then she gets in touch with me and we

4   go back and forth until we're in agreement on it so that we're

5   consistent in the way that we look at it.  So that's a group

6   effort, yes, sir.

7   Q.  When you're doing your review, does your method include

8   giving the staff an opportunity to talk to you about what they

9   think about the conditions?

10  A.  I try to do that with every visit.  And even when it was

11  being done remotely, I came here -- excuse me.  I came here

12  about three weeks ago and spent a week here.  That's the first

13  time I've been here in about 20 months.  Prior to that, all

14  the visits were on site.  But even when I was doing my portion

15  remotely, by Zoom or conference call, I would try to have

16  conversations with individuals.  I even started to the point

17  of scheduling an interview with, for instance, three

18  sergeants.  I wanted a sergeant from booking; a sergeant from

19  housing at RDC; and a sergeant from the work center.  And then

20  I would ask each of them a broad series of questions.  Like I

21  said earlier, the open-ended things, not yes or no.  And then

22  I would find out, do they really understand?  Do they know

23  the -- something as simple as the order of feeding.  Is it a

24  hot meal for breakfast, a hot meal for lunch and a cold meal

25  for dinner, or do you have some other perception?  And if I

1   get some weird answers from a supervisor, that gives me cause

2   for concern.  And I ask the same thing about well-being

3   checks.  Tell me, what are the well-being checks requirements

4   for various categories?  And if I start getting answers from a

5   supervisor in a particular area that doesn't jive with what

6   the settlement agreement calls for, then that's an eye opener;

7   that's the kind of thing you get from doing that kind of work.

8   And I do it face-to-face when I go around to the control rooms

9   and inside the housing units, when I was on site.  And when I

10   was doing it remotely, I did it individually with people like

11   that.

12   Q.  So let's talk a little bit about the virtual visits.

13   Were those virtual visits planned with the County?

14   A.  Yes.

15   Q.  And who was helping coordinate the virtual visits?

16   A.  The coordinator, Synarus Green.

17   Q.  And do you know who Mr. Green works for?

18   A.  He works for both the County and the sheriff.

19   Q.  Does Mr. Green also maintain files or record systems that

20   you can access in doing your tours?

21   A.  Yes.  We don't -- he downloads our document requests so

22   that we can access them and print out copies at home if we

23   want to, or review them if they're like spreadsheets or

24   something like that.  And we get immediate notification of

25   categories of significant events if there's something serious,

```
 1    like, somebody had to go to the hospital, or an assault or an
 2    officer injured or something.  We'll get an immediate
 3    notification of that.  And then we also get a log or an
 4    inventory of all the incident reports, and you can read
 5    through the entire spreadsheet as to what each one said.  And
 6    then if there's a supervisor review later on, you can see
 7    whether a supervisor said anything or just sent it through.
 8    Q.   So if somebody dies in the jail, do you receive an
 9    immediate notification?
10    A.   Yes, sir.
11    Q.   And when you say "immediate notification," is that a
12    descriptive phrase, or is it actually a term of art at the
13    jail?
14    A.   When I say, "immediate notification," that's just the way
15    it's titled.
16    Q.   So the document or the notice actually says "immediate
17    notification"?
18    A.   Yes.  Yes.
19    Q.   And these virtual tours during the period of COVID, how
20    long did those last where you did virtual tours instead of
21    going on site?
22    A.   A little bit less than two years.
23    Q.   And during that time period, do you know if any staff or
24    administrators got sick from COVID?
25    A.   Yes, sir.
```

1  Q.   And do you know if any inmates got sick from COVID or

2  tested positive?

3  A.   Yes.

4  Q.   Do you think it was a reasonable precaution to do the

5  site visits virtually at the jail?

6  A.   Yes.  At the time, we didn't have vaccinations or

7  anything initially, and over time I think the whole country's

8  gotten more familiar with how to deal with it just by witness

9  of everybody wearing a mask and what we do here right now.

10 Q.   Early on during the pandemic, did you ever participate in

11 Zoom or videoconferences with the defendants?

12 A.   Yes, sir.

13 Q.   And when you observed the staff, were they taking

14 precautions on the videos, like, social distancing or wearing

15 masks during those conferences?

16 A.   Sometimes I couldn't really tell.  Somebody would be

17 sitting up in the foreground and somebody's sitting in the

18 background.  That's the best I can answer.

19 Q.   All right.  When was the most recent time that you

20 actually went on site?

21 A.   Around the 20th of January I was here for a week, or five

22 days.

23 Q.   And can you describe the activities you engaged in order

24 to do your assessment during that week?

25 A.   Yes, sir.  I don't want to be repetitious, but the things

1  that I said before are the way I handled this time.  I started

2  out by going back to booking.  We had a large number of people

3  that came through for the tour on Monday morning, and we

4  started back in booking.  Went out to the sally port to see

5  whether the rollup doors on each side still work or not,

6  started coming on through, checked on things, like, does it

7  still say that it's a pat-down search, or has it reverted to a

8  strip search like it was originally and so forth.  Right on

9  through looking at holding cells, finding inmates still being

10  housed in booking.  That's been a problem that's existed since

11  the beginning of this process.  It precedes the monitoring

12  process by years because nothing has worked within the jail

13  system; they've misused the holding cells for housing.  And

14  that was one of the very first things that I saw when started

15  going through.

16  Q.  Mr. Parrish, let me ask you at the end of these site

17  visits, do you do an exit interview?

18  A.  Yes, we do.  And we used to do it in the Board of

19  Supervisors' boardroom.  And all the key players that were

20  involved would sit in there, and then the monitor would give

21  an overview and then ask each of us to provide a synopsis of

22  our observations and findings and if there are any specific

23  recommendations that we wanted to pass along at that time,

24  just so that everybody would have a feel for what we saw and

25  found while we were on site.  We did the same thing with the

1    remote sites when we could.

2    Q.   And during these exit interviews, do you provide

3    recommendations on things they can do before your report comes

4    out?

5    A.   Certainly.

6    Q.   During the most recent live visit, did you conduct an

7    exit interview this time as well?

8    A.   Yes.  It was after I returned to Tampa from my site visit

9    we had it by Zoom on a following Monday, I think.

10   Q.   Was the sheriff participating in that exit interview?

11   A.   I don't think so.

12   Q.   Do you know if any of the Board of Supervisors

13   participated in that exit interview?

14   A.   I don't have a list of everybody that was there, but I

15   don't remember from the Board, maybe there was one.

16   Q.   Can you say whether or not the attendance at this exit

17   interview was different from the level of attendance in

18   previous exit interviews?

19   A.   Well, when we had exit interviews on site, there was a

20   significant turnout; everybody was there.  Even

21   representatives from the private healthcare provider would be

22   there.  People from the County, from the sheriff's office,

23   from the administrative or law enforcement side of the

24   sheriff's office would be in attendance and so forth.  It was

25   much better and broader attendance when we did that on site

1    than when we did it remotely.

2    Q.   When you did the previous virtual site inspections last

3    year or the year before, were there other employees or

4    healthcare representatives on those exit interviews?

5    A.   I honestly can't remember who was in attendance for

6    those.

7    Q.   Having conducted your assessment, do you feel like you

8    have enough information to form an opinion about the

9    defendant's level of compliance with the consent decree?

10   A.   Yes, I do.

11   Q.   And do you feel like you have enough information to form

12   an opinion about what measures are needed for them to achieve

13   compliance with the Court's orders?

14   A.   I would ask you to repeat that.  With regard to what

15   measures?

16   Q.   Do you have information adequate to form an opinion about

17   what measures are needed to achieve compliance with the

18   Court's orders?

19   A.   Yes.

20        MR. MORISANI:  Your Honor, we would just object to this

21   line of questioning, because he hasn't even been tendered as

22   an expert at this time.

23        MR. CHENG:  Well, Your Honor, I would tender

24   Mr. Parrish as the Court's subject matter expert on

25   corrections and corrections administration and jail

1    operations.

2         THE COURT:  Do you wish to voir dire him, or do you

3    object?

4         MR. SHELSON:  I'm sorry, Your Honor.  This isn't my

5    witness.  Can I hear those three again?  I heard corrections.

6         THE COURT:  Repeat that, Mr. Cheng, if you will.

7         MR. CHENG:  Corrections, corrections administration,

8    and jail administration.

9         THE COURT:  Go ahead and repeat that, Mr. Cheng.

10        MR. CHENG:  If I could have just one moment to make

11   sure I get this exactly right.

12        THE COURT:  I think you said corrections, corrections

13   administration, and jail administration.

14        MR. CHENG:  Yes, Your Honor.

15        THE COURT:  Anything additional?

16        MR. CHENG:  No, Your Honor.

17        THE COURT:  What says the defendant?

18        MR. MORISANI:  Your Honor, the defendant would object,

19   I guess, on two grounds.  The first is that we understand the

20   Court made a ruling on our motion, Docket 134.  We would just

21   renew that objection because the opinions were never disclosed

22   prior to coming here today.  And in addition to that, the term

23   "corrections" is exceedingly broad, and on top of that they've

24   have thrown in "corrections administration" I think.  So I

25   would ask for some clarity on that first one, corrections

1   because that could include anything.

2          THE COURT:  The objections will be overruled.  This

3   defendant will be allowed to testify as an expert in

4   corrections, correction administration, and jail

5   administration.  This is one of the subject-matter experts who

6   was appointed by -- who was brought in on to the monitors'

7   team by the monitor, pursuant to the stipulated -- pursuant to

8   the consent decree that the parties entered into in 2016.

9   Mr. Parrish has always been deemed an expert in these areas

10  throughout from 2016 forward, and he will continue to be an

11  expert today and through the course of this trial.

12         MR. CHENG:  Thank you, Your Honor.

13         MR. MORISANI:  Thank you, Your Honor.  If I may just

14  briefly, rather than disrupt proceedings going forward, could

15  we have a standing objection on the related to Docket No. 134,

16  and the facts that opinions were not provided?

17         THE COURT:  I'm sorry?

18         MR. MORISANI:  Could we have a standing objection

19  related to Docket No. 134 and that the opinions were not

20  provided before the hearing?

21         THE COURT:  Yes, you'll have -- that is noted, and it's

22  a standing, continuing objection with respect to Docket Entry

23  No. 134, which I believe the defendants say even if he's

24  deemed an expert, his -- the proposed testimony and opinion

25  was never disclosed to the defendants.  Is that the basis of

1    the continuing objection?

2         MR. MORISANI:  Yes, sir, that is the basis.

3         THE COURT:  Okay.  Thank you.

4         MR. MORISANI:  Thank you.

5         THE COURT:  All right.  It's overruled.

6         Mr. Cheng, you may.

7         MR. CHENG:  Thank you.

8    BY MR. CHENG:

9    Q.   Mr. Parrish, in one of your roles as a subject-matter

10   expert for the monitor, do you have to provide technical

11   assistance to the defendants?

12        THE COURT:  Let me interject right here.  Since we've

13   just qualified him as an expert, I suspect this witness might

14   be a little long; right?

15        MR. CHENG:  A little longer, yes, Your Honor.

16        THE COURT:  Right.  I think this may be an appropriate

17   time to take our lunch break.  I know I had said that

18   generally the schedule will operate at 12:30.  But I believe

19   this is a great point to stop right now, and we'll pick up

20   with his -- with his testimony, which I imagine will include

21   some of his findings as well as other things about his visit.

22   So we're going to -- I think it's appropriate to put -- that

23   we break here now.

24        MR. CHENG:  Yes, Your Honor.

25        THE COURT:  And we'll start back up at 1:15.

1            Now, I did hear an electronic device go off.  Now, I

2    don't think it was the press, and I want to go ahead and say

3    this.  I don't know this court's -- this courthouse's standard

4    order of electronic devices, only lawyers are allowed to bring

5    cellphones into the courthouse, only lawyers.  Now, the press

6    has been given an exemption for this particular case because

7    they have elected to sign off on the declaration.

8            If there is anyone else, a party or anyone of that

9    nature, who wishes to have a phone, you have to get permission

10   from the Court, but no one else should have an electronic

11   device.  And I'm going to ask to make sure that the CSOs

12   downstairs have taken care of the business of the Court down

13   there.

14           But I just say that -- I realize the sheriff has a

15   cellphone, and I'm going to allow him; he's the sheriff.

16   Ain't no telling what's going to go on in Hinds County during

17   the course of this trial.  I mean, Mr. Shelson went through a

18   litany of things that the County is trying to take care of.

19   But for purposes of that, I just want to say that because when

20   you go back downstairs and you come up, you may be asked to

21   turn in your phone.

22           Now, it just doesn't have to be lawyers who are

23   involved in this case, because lawyers know -- lawyers --

24   lawyers know what the rules are, so it doesn't matter.  It's

25   just that you are a practicing lawyer here and you're free to

1    bring them, but no one -- well, members of the lawyers'

2    team -- I mean, obviously, the paralegal, I think that person

3    or the assistants as well.  It just doesn't have to be -- the

4    people on the trial team may have access to a cellphone, but

5    otherwise no one else should.

6         All right.  Thank you.  We'll be back at 1:15.

7         MS. SUMMERS:  All rise.

8              (A lunch recess was taken.)

9         THE COURT:  You may be seated.  I apologize for

10   returning a little late.  Is there anything we need to take

11   care of before we begin?

12        MR. HALL:  Your Honor, real briefly, the Court advised

13   of its phone policy, *et cetera*.  We have our PREA coordinator

14   who is here in the courtroom monitoring this afternoon.  I ask

15   for permission for her to have her phone, because if something

16   happens at the jail that's PREA related, they notify her, and

17   she has to handle it immediately.

18        THE COURT:  Okay.  All right.

19        MR. HALL:  Thank you, Your Honor.

20        THE COURT:  Thank you.  You were instructed about the

21   policy, though, it needs to be silent and all of that; right?

22        MR. HALL:  Yes, Your Honor.

23        THE COURT:  Okay.

24        MR. CHENG:  Your Honor, I should probably clarify.  The

25   PREA coordinator is an employee of the County.  Is she --

```
 1          THE COURT:  She's not going to testify, I presume.

 2   She's not a witness.

 3          MR. HALL:  She's not a witness, Your Honor.  She won't

 4   testify.

 5          MR. CHENG:  That's fine.

 6          THE COURT:  All right.  You may proceed.

 7          MR. CHENG:  Thank you, Your Honor.

 8   BY MR. CHENG:

 9   Q.   Mr. Parrish, do you provide technical assistance as part

10   of your duties on the monitoring team?

11   A.   Yes, I do.

12   Q.   And what type of technical assistance do you provide on

13   your visits?

14   A.   Over the years I've tried to provide a broad range of

15   recommendations and references for them to be able to address

16   their problems, starting off with initially trying to bring on

17   board somebody who could coordinate the consolidation of

18   records and classification into one unit.  And I worked with

19   my contacts at the National Institute of Corrections to

20   research several candidates, and finally the monitor brought

21   on board my top recommendation, a woman named Karen Albert,

22   who was brought on board to do that function.  Subsequently

23   she took on other responsibilities dealing with policies, but

24   that's not what she was brought on board for.

25   Q.   When you say "brought on board," was she brought on board
```

1   by you, or was she brought on board by someone else?

2   A.   No, sir.  I just made recommendations on a qualified

3   person.  I looked at several candidates that were recommended

4   through the National Institute of Corrections, and through my

5   contacts with them and my discussions with those individuals

6   as to what we were looking for, that got passed along to the

7   monitor for her to be able to make a decision.

8   Q.   And did the County consent to working with Ms. Albert?

9   A.   Yes.  And she was very helpful.  That was just one aspect

10  of the kind of work that I did.  There were a number of other

11  things, such as making recommendations to go to American Jail

12  Association or American Correctional Association conferences

13  so they could go through the exhibit hall and meet with

14  vendors who would be able to provide furniture --

15  corrections-type furniture, not ordinary furniture; security

16  and hardware specialists; and so forth.

17       And then I made suggestions on a number of other things,

18  including through NIC to bring on trainers to help train the

19  trainers for direct supervision.  And ultimately they did do

20  that, and that was brought on board at no charge to the

21  County.  Just a broad range of things like that that I've done

22  over the years to try and help and refer them to people who

23  can help and provide services.

24  Q.   Now, before Ms. Albert -- well, let me ask you, when did

25  Ms. Albert start working with them on policies and procedures?

1   A.   Probably three years ago.

2   Q.   Before Ms. Albert was brought on, how were they doing in

3   terms of implementing the court orders on policies and

4   procedures?

5   A.   The County -- or the sheriff's office did not have

6   anybody that was well qualified to do that, and they would

7   turn it over to a certain individual to work on or they would

8   try to get together a group to work on, and there was no

9   coordination and there was no consistency in the type of

10  documentation that was being developed or consistency with

11  what's provided in other jurisdictions.

12       For instance, I provided a copy of the Hillsborough

13  County Sheriff's Office policies and procedures.  It's two

14  manuals about this thick.  It's very comprehensive because

15  it's a huge agency.  I then provided the similar thing from

16  Volusia County, which is very similar -- that's Daytona,

17  Florida, very similar in size to Hinds County -- to use as a

18  model.  I gave them examples of incident reports, of

19  use-of-force reports, and then the policies and procedures,

20  and said here are agencies that are accredited by ACA, are

21  doing it right; it's a good model for you to follow.

22       And that's the kind of thing that I provided to them.

23  But they didn't have somebody with the historical background,

24  the experience doing it, or the technical skills, and so

25  that's what -- she kind of fell into that, because they

 1   desperately needed somebody who could help coordinate the

 2   process.

 3   Q.   So early in that process, did they actually have a policy

 4   and procedure manual for the jail?

 5   A.   There was a policies and procedures manual that was

 6   provided to us in about 2017.  When the monitoring team and

 7   the Department of Justice looked at it, we found it to be

 8   totally inadequate.  It was very poorly written.  It did not

 9   address comprehensive issues that are required by the

10   settlement agreement, and it was not worthy of being used.  So

11   it was rejected out of hand.

12   Q.   Was that policy and procedure sufficient to provide

13   reasonable safety in the jail?

14   A.   It was totally inadequate across the board.  They just

15   were not good policies and procedures.

16   Q.   And were the staff actually familiar with that policy and

17   procedure manual at the time?

18   A.   I can't actually recollect doing an analysis of

19   familiarity.  My experience has been in going around to the

20   various facilities and into the control rooms and so forth

21   asking for a copy of the policies and procedures manual or are

22   you familiar with it, I would get negatives.  They couldn't

23   find the manual; they weren't familiar with it.  And one of

24   the things that we pushed for and they basically have in place

25   now is at least in each control room a copy available.  It

1    doesn't mean people review it, but at least it's there and

2    available.

3    Q.   So let's talk now a little bit about the -- actually,

4    it's not a little bit.  Let's start talking about the

5    substantive areas of the consent decree.

6         In the monitor's reports, there's a overview/background

7    section that talks about the overall status of compliance.  Do

8    you have any opinion about what your -- let me put it this

9    way:  How would you summarize your overall assessment of

10   defendants' compliance with the consent decree?

11   A.   Well, there are very few polic- -- or very few paragraphs

12   of the settlement agreement where there is compliance, and we

13   listened to those numbers earlier today in the reports that

14   were presented to the Court.  There are a majority of the

15   paragraphs that are in partial compliance.  Partial compliance

16   does not mean that they're in compliance.  It means that they

17   have made some steps towards something.

18        There are some policies and procedures written, but

19   certainly not all of them.  They have not been all adopted and

20   implemented through training and such, and so that may be

21   partial compliance, and that's the way most of them are

22   carried, somewhere in between.

23        There are a number which are totally in noncompliance.

24   As an example, staffing.  Staffing is at an all-time low right

25   now.  In the past five years, the staffing level has

1  fluctuated for detention between 205 and 256 officers.  As of

2  the end of January, that number was 191.  That's totally

3  unacceptable.

4      So those are certain categories that fall into the

5  noncompliance area.  So across the board, they're far from

6  being close to being in compliance.

7  Q.  So did you hear the defense counsel talk about the

8  differences between the different levels of compliance:

9  sustained compliance and partial compliance and noncompliance?

10  Did you hear any of that?

11  A.  Yes, sir.

12  Q.  Would the partial compliance with the decree actually

13  allow them to meet the goal of providing adequate security in

14  the jail?

15  A.  No, sir.  That was my point, that partial compliance does

16  not mean compliance.  It means that you're moving toward it,

17  but it's not in compliance at this point, and --

18  Q.  And how does their current compliance status overall

19  compare with how they did in the past in your previous

20  reports?

21  A.  Well, nothing has changed significantly over the past

22  several years.  We find one paragraph may move up to

23  compliance and then because of whatever happens in the next

24  inspection, it drops back to noncompliance.  So the numbers

25  have remained relatively stable but flexible, slightly up or

1    down, in each category over the past several years.

2    Q.   And after your most recent visit, how would you describe

3    the defendants' overall compliance with the consent decree?

4    A.   They're in noncompliance.  I look at the most critical

5    areas.  My area is corrections operations.  To run a jail, you

6    have to be able to close and lock the doors.  You have to be

7    able to keep inmates confined into their living units.  The

8    doors that get you between areas of the facility have to

9    function.  They have to operate as a jail should operate.  A

10   safety vestibule should be available to go in and out of the

11   control room.

12        None of the control rooms at Raymond have a safety

13   vestibule.  A safety vestibule is two doors to get in.  The

14   first opens, individual goes inside, that door closes, then a

15   second door opens and then you can come through.  That way you

16   can never have a crowd of inmates or anybody come charging

17   through.

18        In the places where there are safety vestibules in the

19   Raymond Detention Center, they're not utilized.  When I would

20   go from the administrative area of the jail back to what's

21   referred to as the great hall about 600-foot-long hallway that

22   runs the length of the building, master control would pop both

23   doors open at once.  We'd just go wandering through, and then

24   I'll stand.  I do this every time I come in.  I stand there

25   and wait; when are they going to finally close the doors?  And

1    eventually they close the doors.  They should be open one, go

2    in, close, open the second.  So not only do we have design

3    problems that have never been addressed of putting in proper

4    safety vestibules that get you into each control room, all of

5    the control rooms at Raymond have only one door.  And if you

6    pop it open, that's it.

7    Q.   During your most recent site visit, did you see those

8    type of issues with the doors?

9    A.   Yes.  What I just explained to you is exactly what

10   happened as I went into the building this time.  When I went

11   from there to go back to booking, there's a door that comes

12   off the great hall that gets you into booking.  The laundry is

13   on the right-hand side.  That door was standing open for the

14   entire duration of my inspection in January, and when I asked

15   why that door was always standing open, which allows complete

16   access between booking, transportation, laundry, out to the

17   great hall, it's that door hasn't worked, so we just leave it

18   open.

19   Q.   Have you seen that door on previous occasions, on

20   previous visits?

21   A.   That problem has persisted over the years that I've been

22   coming through here.  Sometimes it works and then it's out of

23   service again.

24   Q.   And were there actually inmates in any of these areas who

25   could move around past the doors?

1  A.   Absolutely.  And recently there was a case where an

2  inmate came out of his cell in booking.  He was being housed

3  in booking.  He ended up running down the hallway, passed the

4  lieutenant's office, grabbed the fire extinguisher, discharged

5  it, ran out through the door that I just said is always

6  standing open, was out into the great hall, and had to be

7  chased down out there.  That -- that's not the way you run a

8  jail.

9  Q.   So when there are these types of gaps in the security,

10  does it pose any risk to the inmates' safety?

11  A.   It poses risk to the inmates' safety and to the safety of

12  the staff.

13  Q.   And how does it pose a risk?

14  A.   If inmates are locked up, for instance, in a holding cell

15  in booking because they're so unmanageable anywhere else in

16  the building, it certainly doesn't make sense that they should

17  be allowed to defeat your security and run out into the great

18  hall from there.  That's not the kind of person you want

19  running loose in the -- you don't want any inmate running

20  loose in the jail.

21  Q.   And early when you first started working on this case,

22  were these types of breaches in security responsible for any

23  major incidents at the jail?

24  A.   Let me back up for just a moment.  We heard that the

25  Raymond Detention Center was a poorly designed

1   direct-supervision facility.  I agree with that.  But it

2   worked.  There are lots of problem with that building, both as

3   to its design and its actual construction.  But it worked.  It

4   was at the time the largest direct-supervision jail in the

5   state of Mississippi.  Opened up around '94, held over 600

6   inmates.  There was an officer assigned inside each housing

7   unit at all times.  The facility worked from 1994 until 2012.

8   The then sheriff for some reason decided to pull all the

9   officers out of the housing units, perhaps as a

10  manpower-saving issue.

11          MR. MORISANI:  Objection, Your Honor.  It's hearsay

12  testimony.

13          THE COURT:  I'm sorry?

14          MR. MORISANI:  Objection.  He's saying what the sheriff

15  said.  It's hearsay testimony.

16          THE COURT:  Objection overruled.

17  BY MR. CHENG:

18  Q.   You may proceed --

19  A.   I'm sorry.  I was not attempting to say what the sheriff

20  said --

21  Q.   You may proceed, Mr. Parrish.

22  A.   -- but it was that he pulled the inmates --

23          THE COURT:  Okay.  Hold on.  Hold on.

24          MR. MORISANI:  Your Honor --

25          THE COURT:  What's your objection, Mr. Morisani?

1          MR. MORISANI:  My colleague reminded me, too, that this

2     is in 2014 before the monitor ever even came on scene, so we

3     would object on that ground as well.  He has no personal

4     knowledge of this.

5          THE COURT:  Objection overruled.

6          I'll allow you, Mr. Cheng, to close the gap.

7     BY MR. CHENG:

8     Q.  Why don't we just proceed.  You were talking a little bit

9     about the history, but let's pry it back to the present and

10    how it affects your current opinion.

11    A.  I guess the point I was trying to make was that it worked

12    under direct supervision but when the officers came out,

13    that's when there was a major riot in 2012.  That's a matter

14    of record, and the inmates tore up housing pod Charlie to the

15    extent that it had to be shut down for two years to be

16    rebuilt.  About three years ago, Charlie needed to be rebuilt

17    again because it had been destroyed over the years because no

18    inmates -- no officers worked inside the housing units.

19         The idea was that when it reopened in October of 2020, it

20    would be opened as a direct-supervision housing area.  That

21    means an officer would be assigned inside each housing unit at

22    all times.  In the confinement area, Charlie 4, there would be

23    two officers at all times.  There would be an escort officer.

24    Q.  If I could ask, when you say "confinement area,

25    Charlie 4," what is a confinement area?

 1    A.   A confinement area is where inmates who can't get along

 2    in general population are locked in isolation in single cells,

 3    and they generally come out of the cell one hour a day for

 4    time to shower, use the telephone, and then they're locked

 5    back down.  So it's the high-security inmates who are

 6    separated from general population.

 7    Q.   Would this be one of the areas that's covered by the

 8    segregation provisions of the consent decree?

 9    A.   Yes.  That's a different term that applies to the same

10    thing.  It's just -- I call it confinement.  I just found that

11    term to be better.

12    Q.   So you were talking a little bit, again, about C-Pod when

13    they were supposed to reopen it as a direct-supervision unit.

14    A.   Yes, sir.  And so when it opened in October of 2020, it

15    was supposed to operate as a direct-supervision facility,

16    staffed appropriately.  Unfortunately, that never happened,

17    and over the past year and three months, four months, the

18    housing units have routinely been left unattended.  Officers

19    come out to do other jobs.  They're short of staff.  There's

20    nobody assigned.  Consequently, the inmates have had free rein

21    to tear things up again.  And even after all the work that was

22    done by CML, a private detention security company out of Texas

23    that the County contracted with, a lot of that work's been

24    destroyed again and there are doors in C-Pod that do not work

25    at all right now.  Charlie 2 being an example.

Q.   Now, this reopening of C-Pod, was that something covered
by the stipulated order?

A.   Yes, sir.  That was the contention was that to keep
control of the facility as it was rehabbed, it would be
operated under direct supervision.  So the stipulation was
that when C-Pod opened up, it would be direct supervision.
Subsequently, when B-Pod was refurbished, it too would then
open up in direct supervision.  And in the event that A-Pod
had to be used, it would be refurbished and then opened up in
direct supervision.  But in between, there was a plan to shut
A-Pod down entirely, which is now in a state of flux.  The
plan is tempor- -- at least use two of the four housing units
in A-Pod.

Q.   So the stipulated order, is it a shorter set of
requirements than the consent decree itself?

A.   Shorter?  Yes.  I think the terminology that was used was
an effort to deal with a specific number or a lesser number of
priority items to help the County move along towards
compliance with the whole settlement agreement.

Q.   When the stipulated order was entered, do you remember
there was actually a hearing on that stipulated order?

A.   Yes, sir, about two years ago.

Q.   And at the time, did the defendants say anything to
suggest they would be unable to implement the stipulated
order?

1   A.   My recollection is that they felt that that was a good

2   solution towards improving their chances of compliance.

3   Q.   Now, your team has also assessed their compliance with

4   the stipulated order; is that right?

5   A.   Yes, sir.

6   Q.   And what did you conclude about their compliance with the

7   stipulated order?

8   A.   They have complied with some of the provisions with

9   regard to hiring certain people that were required and so

10  forth.  They have not solved the problem that goes basic to

11  everything of adequate staffing.  One of the examples that to

12  me is the most critical or very critical deals with master

13  planning, and the County is moving forward with the master

14  planning committee to work on plans for a new replacement jail

15  to be built closer to downtown.  And I agree with the concept,

16  but as a part of that, they were required to come up with

17  priority measures that would be taken to repair and maintain

18  the existing facilities because no new jail will come along

19  for a number of years and they're going to have to continue to

20  use the Raymond Detention Center and the work center.  And

21  that part has been totally ignored, and we have asked time

22  after time to get that list of priority recommendations on

23  what does the Board of Supervisors agree to for funding

24  purposes; what does the sheriff agree to as priority what

25  needs to be done for his jails; what does the jail

1    administrator agree to; and then the architect, which is CDFL,

2    and HDR, who are working with them now, in moving forward to

3    make those repairs with time certain when each of them would

4    be corrected so we could see what order some things are going

5    to be done or are there some things that were originally

6    proposed that are not necessary now and they should be taken

7    off the table.  That we're still waiting on.

8    Q.   So let's talk about a few of those small items, those

9    specific items.  You mentioned something about A-Pod.  Were

10   they allowed to use A-Pod to house inmates?

11   A.   They have continued to use A-Pod, even though no

12   renovations have been done there, out of necessity.  What

13   happened was there are three pods at the Raymond Detention

14   Center.  Each holds roughly 200 inmates, and each is comprised

15   of four housing units:  Alpha, Bravo, and Charlie.

16        Alpha has never been rehabbed.  It's in the worst case --

17   in the worst shape of all the housing units.  Charlie has been

18   rebuilt twice and has now got maintenance problems because of

19   the failure to implement direct supervision.  Bravo was shut

20   down when Charlie was completed, the idea being to bring in

21   the vendors, rehab that, fix the doors, fix the locks,

22   electrical and so forth.  That work is not complete yet, and

23   yet it has been reopened since about October at least they've

24   been putting inmates in there.  They haven't used all four

25   housing units, but generally they use three of the four

1   housing units to keep inmates.

2   Q.   So this most recent site visit, did you go into the

3   A-Pod?

4   A.   I went into A, B, and C, yes.

5   Q.   And how would you describe the physical condition of

6   A-Pod?

7   A.   A-Pod is a disaster.  It's filthy; lights don't work;

8   locks don't work; doors can't be secured; cells don't have

9   lights inside them.  Inmates since they can't even close the

10  doors, end up hanging blankets down in front of them to have

11  makeshift privacy to their cells.  Showers don't work.

12  Everything in the place is torn up.  It's just a very bad

13  mess.  There's no fire extinguishers inside, of course,

14  because the inmates control that place.  There are no officers

15  who work inside the housing units in Alpha.  There are no fire

16  hoses.  There are not even fire hoses out in the corridors,

17  around the control room in Alpha.  That area is ill equipped

18  across the board.

19  Q.   Are there fire hoses in B or C-Pods?

20  A.   In Charlie there are fire hoses in the -- what's referred

21  to as the horseshoe that goes around the control room.  That's

22  the officers' corridor.  There's a fire hose inside the

23  control room.

24       There are fire hoses in Charlie 1, 3, and 4.  In

25  Charlie 2 there used to be a fire hose, but it's been taken

1   out because that housing unit was left unattended so long that

2   the inmates tore everything up in there.  There's no fire

3   extinguishers in any of the housing units in Charlie.  You

4   have to go back to the control room to get a fire extinguisher

5   in the event of a problem.

6        In Bravo we don't have anything yet.  No fire hoses

7   inside the housing units.  Even in the horseshoe, on one side

8   the fire hose box is hanging this far out of the wall --

9   Q.   If you don't mind, when you say that --

10  A.   -- and has not been repaired.

11  Q.   -- nobody has that on a written record.  So about how

12  much distance is it hanging from the wall?

13  A.   Probably six to eight inches hanging out of the wall.

14  Q.   Were they supposed to be able to house inmates in B-Pod

15  before the fire safety issues were addressed?

16  A.   No.  The idea was that Bravo would not open until it

17  was -- all repairs were completed, but because the population

18  has hovered around 600 and there are not sufficient beds

19  available, the decision was made in-house there within the

20  jail system to open up areas in Bravo Pod before the work was

21  done, and that's been -- as I said, been going on since last

22  October.

23  Q.   And when they started using B and A-Pods, did they have

24  the staff to cover all those housing units?

25  A.    No.  The staffing situation is so critical that, for

1    instance, on Monday, the first day of my most recent site

2    inspection, when we went into Alpha Pod, there was one officer

3    working in the whole pod in the control room.  There were no

4    officers on the floor for all four housing units.  None.

5            In Charlie the situation was better, but -- in the

6    direct-supervision housing units.  But in Charlie 4, which

7    we've referred to earlier as the confinement area where there

8    are supposed to be two officers at all times, there was nobody

9    assigned in there.  There was one officer who was sitting in a

10   chair outside of Charlie 4 and adjacent to Charlie 4 iso,

11   which is a 4-cell isolation unit.  It's a little subdivision,

12   which is used for suicide watch, and there was initially one

13   inmate locked inside a cell inside the iso unit, which makes

14   him totally invisible to the officer who's supposed to have

15   him under constant supervision.  Physical impossibility.  And

16   that one officer was also responsible for doing the 30-minute

17   well-being checks on all the inmates in Charlie 4.  So we have

18   one officer who's doing the job of three.  And I don't mean to

19   be flip, but I asked the officer if he was being paid triple

20   because he was doing the work of three people, and it wasn't

21   getting done.  It was impossible for one person to handle all

22   of that.

23   Q.   If they hired three people, do you think it would cost

24   more than 31,000 a year?

25   A.   If they hired three --

```
 1   Q.   Three people, would it cost more than $31,000 a year?
 2   A.   It would be more like $93,000 a year plus benefits.
 3   Q.   So -- okay.  Take aside the staffing issue in the housing
 4   units.  Are there fire sprinklers in those housing units?
 5   A.   Initially I was given some bad information when I first
 6   starting doing this and I thought that the sprinkler system
 7   had been removed from the housing areas.  Apparently there
 8   never was a sprinkler system built into the housing area at
 9   Raymond.  There is a sprinkler in the administrative wing, in
10   the laundry, in the kitchen, and medical.  It was not
11   functioning, but it is now.
12   Q.   How about --
13   A.   But it's not in the housing units.  It was never designed
14   for that.
15   Q.   How about smoke detectors and alarms in the housing
16   units?
17   A.   An alarm system has not functioned at the Raymond Center
18   for I don't know how long, but it does not now.  It has to be
19   rewired and then a new alarm system put in place.
20   Q.   Well, how about security cameras?  How is the security
21   camera system doing at Raymond?
22   A.   There are a number of cameras throughout the facility,
23   but for the past year at least, there have been approximately
24   60 cameras that are not functioning or out of action for one
25   reason or another, and every time we ask about it, it's
```

1   somebody's going to come in and look at it and we're going to

2   get this fixed; and the next time we come back to inspect, the

3   same situation exists.  And that's the way it is today, and

4   I've been told that there's a local firm that's supposed to

5   come in and do an analysis and then hopefully get standardized

6   servers that control all of them and a proper recording system

7   and then get those 60 or so cameras back online at the Raymond

8   Detention Center.

9   Q.   In your experience, does staffing have anything to do

10  with the physical condition of the facility?

11  A.   Well, staffing is critical to everything in the operation

12  of a jail.  If an area is left unattended, then the inmates

13  have control of things and staff can do nothing more than

14  respond to problems.  I guess that's why it's built into the

15  settlement agreement that we need to return to the

16  direct-supervision method of operation.  That's where an

17  officer is inside the housing unit with up to 64 inmates

18  face-to-face just like you and me without even this kind of

19  barrier in between, but that's 24 hours a day, seven days a

20  week.

21       I equate direct supervision to like a teacher being in

22  the classroom.  If the teacher is in the classroom, the

23  children can be learning.  If the teacher's down the hall on a

24  break or in this instance sitting in a control room, the

25  inmates run everything.  And the inmates then have control of

 1   nine-tenths of the jail, all the living area, and the staff

 2   has one-tenth, the hallways and the control rooms.  So who's

 3   in charge here anyway, them or us?  And, quite frankly, it's

 4   them.  That's why direct supervision is the only practical way

 5   to run a jail, to run the whole place and be in charge of

 6   everything.

 7   Q.   Are cameras a substitute for having staff in the housing

 8   units?

 9   A.   Cameras are -- they're not a substitute.  They

10   complement.  They make it possible to go back and look at

11   incidents after the fact and look at recordings and determine

12   exactly what happened.  They give a second set of eyes to

13   people that may be in remote areas, such as a master control

14   or a pod control area, but they can't take the place of a

15   human being, an officer being inside each housing unit.

16   Q.   Let me take another one of the stipulated order remedies.

17   Does the stipulated order address the use of booking cells?

18   A.   I'm quite sure that the book- -- I can't remember exact

19   wording of everything.  I know that booking cells have -- are

20   not supposed to be used for housing, and that's built in from

21   the very beginning of the settlement agreement.  I'd have to

22   go back and read it again to get me the exact paragraph.  I

23   can't come up with it off the top of my head.  But that has

24   been such a long-standing problem that it's critical that they

25   not be used for housing of inmates.

1    They were designed to hold people for no more than eight

2   hours.  They have no windows.  There's no recreation area.

3   There's no visitation space.  There's only one shower that

4   services the whole area, and that's not even located right

5   there.  It's down around the corner.  It's not designed for

6   housing, so --

7   Q.  So did the defendants stop using the booking cells in

8   order to comply with the Court's orders?

9   A.  No.  That has continued as long as we've been doing the

10  monitoring process, and it went on for long before.  When I

11  first inspected the facility before the monitoring process

12  began, I found an inmate who had been locked up in one cell,

13  and staff told me that he had been in that cell for three and

14  a half years.

15  Q.  And so during the most recent round of inspections, have

16  you continued to find inmates being housed in the booking

17  areas?

18  A.  Yes, sir.  On the last day of my inspection, I

19  double-checked.  The first day they were there.  There were

20  inmates who were housed in there.  I waited till the end of

21  the week.  I went back and asked again and looked, and there

22  were -- at that time on Thursday, there were still four

23  inmates being housed in booking.

24  Q.  And does the jail have some type of plan or procedure

25  that tells them what type of inmates to house in booking?

A.   No.  And that's not something that could be included in a

policy because it would be contrary to policy, so it's just

done on an *ad hoc* basis.  When somebody becomes too

problematic in the housing area, a decision is made at some

level to say put that person in a holding cell in booking.

Q.   Are they housing anybody in booking who might have a

serious mental health issue or medical condition?

A.   Well, for serious mental health issues, yes, there have

been several people who have been housed in booking who had

problems there, including one suicide that records showed had

serious mental health problems.

Q.   We'll talk a little bit more about the deaths later, but

let me ask you more broadly.  Have the defendants implemented

the consent decree provisions that are reasonably necessary to

protect detainees from violence by other prisoners?

A.   I'm sorry.  I missed the last part of that.  That --

Q.   Sure.  Have the defendants implemented the consent decree

provisions that are reasonably necessary to protect detainees

from violence by other prisoners?

A.   I think the statistics show that that's not the case,

that there are an excessive number of assaults.  It's a

constant ongoing problem throughout the Raymond Detention

Center.  I looked at the spreadsheet that the monitor put

together on assaults of all types covering the last four

months, and it came out to approximately 77 over a four-month

1   period of time.  That's about 20 per month, one of them being

2   an assault that resulted in the inmate being beaten to death.

3   Some of them were minor.  Some of them were stabbings.  Some

4   of them were serious beatings.  That's -- that kind of routine

5   activity at the Raymond Detention Center is out of line with

6   what would be the case if it were operated under direct

7   supervision.

8   Q.   Have the defendants implemented the consent decree

9   provisions requiring them to provide detainees with safe and

10  sanitary physical shelter and living conditions?

11  A.   Safe and sanitary --

12  Q.   Physical shelter and living conditions?

13  A.   And living conditions.  I'll give you the example of the

14  laundry situation at Raymond right now.

15  Q.   Well, if we could, if you could answer first the question

16  and then you can discuss it.

17  A.   Excuse me.

18  Q.   Have the defendants implemented the consent decree

19  provision requiring them to provide detainees with safe and

20  sanitary shelter and living conditions?

21  A.   The answer is no.

22  Q.   Now, what -- what is it about the laundry that suggests

23  there's a problem with living conditions?

24  A.   Well, there now is a policy on laundry, and it specifies

25  the number of items that are supposed to be provided at the

1    point of booking, and it specifies the frequency of laundry

2    exchange and so forth so that inmates have clean clothes,

3    clean linens, and that standard is met at the work center, but

4    at the Raymond Detention Center, over 50 percent of the

5    laundry equipment does not function.

6        So there are four washers.  Two of them don't work.

7    There are three driers.  Two of them do not work.  So there's

8    only one drier that functions.  The laundry officer told me

9    that they have been down for over two months.  I interviewed

10   inmates as well to confirm what the laundry officer said about

11   the issuance, and she indicated they now only issue half of

12   what the policy requires.  They only give one uniform.

13   Inmates confirmed that was the case, and if they want to get a

14   clean uniform, they have to take off theirs, turn it then and

15   at some point in the future, hours or maybe the next day, get

16   a replacement.  In the meantime they're running around in

17   their underwear.

18   Q.   When you were walking through the facility, did you

19   notice anything about the condition of their uniforms and

20   clothing?

21   A.   Inmates are always supposed to be dressed in the proper

22   jumpsuit, and that's not the case at -- at Raymond.  It was

23   substantiated by what I was told by the laundry officer and

24   the inmates themselves.

25   Q.   When you say "proper jumpsuit," do they assign different

1   types of jumpsuits to the inmates?

2   A.   Yes.   They actually have some different colors that go to

3   the inmates that are housed at the work center versus those

4   that are housed at the Raymond Center and inmate workers

5   versus general population, that sort of thing.

6   Q.   So when you go through the jail, can you tell from their

7   uniforms what security level an inmate is?

8   A.   Not necessarily.   Inmates can swap out uniforms any time

9   they want to, that's why I like the idea of just one standard

10  uniform, unless you're in a lockdown environment, but...

11  Q.   Do they use wristbands to identify inmates?

12  A.   One of the paragraphs require that the wrist bands, every

13  inmate has to wear a wrist band.   There are no inmates in the

14  jail system right now wearing wristbands.   I never saw one, no

15  matter where I went.   And when I questioned that, I was told

16  the Clincher wristband machine had died about six months ago

17  and no wristbands had been issued since then.   The inmates

18  would rip them off, so nobody is using a wristband.   And

19  wristbands should have the heavy-duty version of what you get

20  in the hospital with a picture, and it says, "Here's a picture

21  of David Parrish, and here's David Parrish's information."   So

22  if I look at this and look at my face, you know, I got the

23  right person."   Okay.   You can go over there when I do head

24  count.   That's the kind of thing that's supposed to be in

25  place for inmates to have access to the privileges they're

1   supposed to, whether it be food or recreation or whatever.

2   Q.   So are the wristbands used like an identification of some

3   sort?

4   A.   Yes, sir.

5   Q.   And you mentioned recreation, how are they used for

6   recreation?

7   A.   Well, the officer needs to know who he or she is dealing

8   with.  So if he's taking a certain number of inmates and

9   allowing them for recreation, he really needs to know who it

10   is.  So that's the purpose of a wrist band.  Whether it's a

11   head count or for any other activity, or to make sure that

12   each inmate gets his or her meal, that sort of thing.

13   Q.   How about medications, do they use wristbands?

14   A.   For medication when the nurses come around to make sure

15   that the right inmate is getting the medication that he's

16   supposed to.

17   Q.   Have there been any security incidents with the handing

18   out of medications in the jail?

19   A.   Yes.  There's always supposed to be an officer along with

20   the medical staff when they're doing medical services, taking

21   meds out to inmates and so forth, and there have been people

22   who have been assaulted during that time frame.

23   Q.   When you say "people" --

24   A.   Nursing staff.

25   Q.   Have those types of security issues led to tensions

1   between security and medical staff?

2   A.   Well, medical staff is frustrated that there are not

3   enough officers available to go with them.  So I observed when

4   I was there several weeks ago, two nurses handling med pass by

5   themselves with no officer present.

6   Q.   I want to talk about another area just broadly first.

7   Have the defendants implemented the consent decree provisions

8   that are reasonably necessary to protect detainees from

9   unnecessary or excessive use of force by staff?

10  A.   They have put in place a policy that deals with use of

11  force that sets an appropriate standard.  It specifies that

12  something such as OC not be used in a coercive manner to force

13  an inmate to follow your verbal directions; that it be used to

14  break up fights or to protect staff or other inmates.  And

15  initially, that did not seem to have any effect.  In fact,

16  many of the cases where OC was improperly used in a coercive

17  manner, the investigation by IAD exonerated the use of force.

18  So when we finally brought it to their attention --

19  Q.   If you don't mind, what is OC?

20  A.   OC is pepper spray.  It comes in two forms:  There's a

21  spray which is generally used out on the street; and there's a

22  foam which is preferred for use inside a jail, because it

23  doesn't get sucked up into the air conditioning.  But it's

24  something that an officer carries in a small canister to

25  protect him or herself, or to keep inmates from hurting each

1    other.

2    Q.   And what is IAD?

3    A.   Internal affairs investigations.

4    Q.   And you were talking about the internal affairs

5    investigation clearing the use of force; is that right?

6    A.   They were exonerating those across the board until we

7    brought it to their attention in a recent site visit.  And

8    that paid dividends because the then IAD investigator went

9    back to the policy and started enforcing that, and we found

10   that some officers who misused OC, for instance, were held

11   accountable by IAD, which then ultimately could result in

12   disciplinary action.  So things have gotten better.  There has

13   been training starting with supervisors.  There has been

14   training for officers, and it is moving in the right

15   direction.

16   Q.   Now, this IAD officer, what was the name of the IAD

17   officer who held some of the staff accountable?

18   A.   His name was Marlo Brennen.  He'd been in that job as

19   long as we had been doing the monitoring, but he resigned in

20   November to go to work for the state.

21   Q.   Does the use-of-force policy cover Tasers?

22   A.   No.

23   Q.   Do they use Tasers in the jail?

24   A.   Tasers were recently introduced into the jail, but

25   they're not covered by policy at the present time.

1    Q.   Do you know who introduced the Tasers to the jail?

2    A.   I don't know who actually gave the order for it, but it

3    did not come from the jail administrator was my understanding.

4    Q.   Could it have been introduced without the sheriff's

5    approval?

6    A.   I would think not, but I don't know for a fact.

7    Q.   All right.  Does the consent decree have provisions

8    governing the use of force?

9    A.   Yes.  There's a major section covering use of force.

10   Q.   Does every staff member who supervises prisoners receive

11   at least eight hours of pre-service use-of-force training and

12   annual use-of-force refresher?

13   A.   Okay.  New officers who come on board go through what

14   we'll call a basic recruit academy, which includes that

15   training.  That is supposed to be followed up on an annual

16   basis with in-service training.  They're moving that

17   direction.  I'm waiting for the most recent report to come

18   from the training director that will cover the last few

19   months.  But, at least, new officers coming on board go

20   through an academy.  But the way it was originally set up was

21   that that would precede being assigned anywhere in the jail.

22   Unfortunately, some people decided they couldn't wait for the

23   next academy to start, and then took a job somewhere else.  So

24   they have brought people on board, put them with another

25   officer temporarily until the next academy started up as a

1    means of trying to keep that new applicant to stay with the

2    sheriff's office.

3    Q.   But if they started before they complete the academy,

4    would they have completed use-of-force training before they

5    started working in the jail?

6    A.   No, they would not.  But the concept is that they would

7    work with another officer, not be cut loose.

8    Q.   Were they supposed to set up a field officer training

9    program to train these new recruits?

10   A.   Yes.  I made recommendations for a field training officer

11   program, probably four years ago.  That was one of the

12   technical assistance things that I didn't mention earlier when

13   we talked about technical assistance.  I gave them our FTO

14   manual, our training program, and all that had been used.

15   Over the years there has been a long-standing plan to do that,

16   but it never got off the ground.  Within the past 6, 8 months

17   two lieutenants, one from detention training, and one from

18   law-enforcement training went through an FTO training program

19   so that they could implement that.  My understanding during

20   the most recent site visit, though, was that the lieutenant

21   from the work center was actually tasked with starting the FTO

22   program, rather than the people that were assigned in

23   training.  So they have started an FTO program -- I'm just

24   glad to see something happening -- it just got convoluted in

25   the implementation stage.

1   Q.   As far as you know, the lieutenant from the work center,

2   has he completed an FTO program himself?

3   A.   I'm not aware of it.

4   Q.   So you mentioned they pulled someone from the work

5   center.  Is staffing completely separated between the work

6   center, Jackson, and the Raymond Detention Center?

7   A.   No.  Initially -- before we started, there were three

8   stand-alone facilities that were independent.  Under the

9   settlement agreement, it was supposed to be consolidated into

10  one jail system; that's the case.  However, there's a certain

11  amount of inertia to overcome, and people who had worked at

12  the Jackson center for many years were not interested in

13  driving out to Raymond to work.  Those people that had worked

14  at the work center for years, did not want to go work at the

15  Raymond Detention Center.  So each jail basically kept its own

16  employees, and then there was higher turnover at Raymond than

17  at the other facilities.  So most of the new people went to

18  Raymond.  I'm just giving you historically.

19       Recently, because of the critical shortage of staff, the

20  number of officers who were moved from the work center --

21  excuse me -- who were moved from the Jackson Detention Center

22  when it was closed to the work center were then moved to

23  Raymond Detention Center, including a number of supervisors to

24  try and supplement the work force at the Raymond Detention

25  Center.  So inmate -- excuse me -- officers can be moved

1   between facilities.  Historically, there was hesitancy to do

2   that, but under the previous jail administrator, she made some

3   of those moves to try and equalize the work load.

4   Q.   So what was the purpose of consolidating three different

5   jails into one structure?

6   A.   Well, before the monitoring process, there were three

7   separate jails that ran like three islands.  I mean, they were

8   each independent.  A captain in charge of a facility

9   controlled all the staff that was there, and if they needed

10  somebody else, they were hired and brought in right there.  It

11  didn't go through a central point.  It wasn't a jail system;

12  it was three independent jails working for the sheriff's

13  office.  And there was a person who designated as the jail

14  administrator, but she had no power over anything except the

15  Raymond Detention Center.  When the monitoring process began,

16  that ended and the jail administrator took charge of all three

17  jails.

18  Q.   And are there any advantages from having one jail

19  administrator controlling all three facilities?

20  A.   Certainly.  I mean, it's a system.  Each facility has to

21  help support the others.  They're not identical; they can't

22  stand alone.  You can't have one jail say, Well, you can't

23  send me that kind of inmate because this is my jail.  You need

24  a central point of control of everything.  Classification, for

25  instance, needs to make the decision on where inmates go

1   between facilities and within a facility.  You can't have

2   independent supervisors or independent captains in charge of

3   facilities making decisions on which inmates I'll accept and

4   which I will not.  That doesn't work.

5   Q.   So as they're set up right now, how are the types of

6   inmates sent to the work center different from the ones who

7   are held at Raymond?

8   A.   Everybody is booked at the Raymond Detention Center:

9   men, women, everybody.  All the women are housed at the work

10  center.  So regardless of their charge or classification

11  category, they're all housed in Housing Unit 2 at the work

12  center.  That's because there are only about 30 women in the

13  whole jail system.  They can't afford to dedicate more than

14  one housing units to taking care of women.

15       By and large, the work center is considered a minimum or

16  low custody facility -- because it was designed as a work

17  center.  It was originally a joint County-state work center.

18  And state prisoners who came back were used out on the street

19  cleaning, cutting grass, working in the gardens, and

20  low-custody inmates in the jail system were used the same way.

21  So it was not a secure facility.  Over the years, the use of

22  that facility has morphed, its changed.  It now has to serve

23  as a jail because the Jackson Detention Center is no longer

24  operational because of plumbing and HVAC problems that shut it

25  down two years ago.  So they have to use that as a jail.

1    Sometimes people are housed there who are considered too high

2    a risk for that facility, but out of necessity, some people

3    like that go there.  As long as they behave, that's where the

4    classification criteria of behavior becomes critical even more

5    so than charge.

6    Q.   Is it possible for the sheriff's department to fix

7    everything at the Raymond Detention Center and not have any

8    control over the work center?

9    A.   For the sheriff's office to fix --

10   Q.   Could a jail administrator fix the problems at Raymond

11   Detention Center even if they had no control over what happens

12   at the work center?

13        MR. MORISANI:  Objection, Your Honor, calls for

14   speculation.

15        THE COURT:  Objection overruled.

16   A.   It still needs to operate as a system.  There's no one

17   facility that can take care of Hinds County's total inmate

18   population; the two have to work in concert with each other.

19   So the jail administrator has to be able to manage both

20   facilities today, plus the ground level of the Jackson

21   Detention Center which has not been closed down.  There are no

22   holding cells in the courthouse.  So when people go to court,

23   they have to go into the holding cells on the ground level of

24   the old Jackson Detention Center, and that has to still

25   operate Monday through Friday during the day time to get

1   people to and from court.  And around the clock, that control

2   room has to be operated to get people in and out of the

3   building or there's no way to get in and out because the entry

4   on the administrative level shuts down at 5:00.

5   BY MR. CHENG:

6   Q.   And could they have different policies and procedures for

7   the work center from the Raymond Detention Center?  Could that

8   system operate for different policies and procedures?

9   A.   They should not have different policies and procedures.

10   They can have different post orders, that's something that has

11   never been developed.  There are no post orders and they need

12   to be written after the policies have been adopted -- approved

13   and adopted and implemented.  But based on what the policies

14   are, each post in each jail is a little bit different.  And

15   post orders need to be written for that area so that when an

16   officer is standing post in Charlie 2, it's different

17   responsibilities than if he's working in Charlie 4, which is

18   lockdown, or between facilities the same way.

19   Q.   All right.  Let me go back again to the use-of-force

20   standards.  Does the County randomly test at least 5 percent

21   of jail staff members annually to determine whether they have

22   a meaningful working knowledge of all use-of-force policies

23   and procedures?

24   A.   No, that has never been done.

25   Q.   Does the County update use-of-force training within

1   30 days after any revision to a use-of-force policy or

2   procedure?

3   A.   There have been no revisions to use-of-force policy since

4   it was implemented.

5   Q.   By the way, what is the difference between a post-order

6   and a policy?

7   A.   A policy explains how things are to be done in general;

8   and it may be very specific, but it's not post oriented.  It's

9   -- if you're working in direct supervision, these are the

10  things you need to do.  If you're working in confinement,

11  maybe these are things that you need -- if you're working in

12  booking, these are things that apply.

13       But if you're assigned to a particular post within a

14  jail, that post is supposed to have post orders that are based

15  on the policy that governs that general area.  They're much

16  more specific; they don't apply anywhere else, only to that

17  one post.  So if you're standing -- the officers post in

18  booking who has to do well-being checks in the holding cells,

19  there needs to be post orders that explains exactly what that

20  person does.  There's no place else where it would say what he

21  or she is supposed to do.

22  Q.   Do post orders get incorporated into training for staff?

23  A.   Well, they will be eventually, but they don't exist now,

24  so haven't been.

25  Q.   So if staff aren't trained on, say, use-of-force policy,

1    does that pose any risk to the inmates or to staff?

2    A.   Well, to both because officers would not necessarily know

3    what or what not to do, and inmates would not be treated the

4    same by all staff.  That would be counterproductive.

5    Q.   I think you talked earlier about the use of OC spray to

6    enforce compliance or use it for -- I forget the term.  Was it

7    coercion or compliance?

8    A.   Coercion should not be used to coerce an inmate into

9    doing something, like, get into your cell and the inmate

10   refuses.  And so, if you don't get into your cell, I squirt

11   you with OC.  That's against the policy.

12   Q.   Why is that against the policy?

13   A.   Because that kind of nonlethal weapon is supposed to be

14   used to protect the officer if somebody is trying to assault

15   him, or to break up a problem where two inmates may be

16   fighting, or multiple, and the officer doesn't need to be hurt

17   by getting into the middle of the mix, so you can spray then.

18   But it's not meant to punish somebody:  Do what I say or I'm

19   going to spray you.  Come out of that cell or I'm going to

20   spray you.  I mean, that's the kind of thing that happens and

21   that's why it's written in the policy.

22   Q.   Are most of the inmates in the jail pretrial detainees?

23   A.   Yes.

24   Q.   So if somebody used pepper spray on an inmate to make

25   them come out of the cell, are they punishing the person or

1   the detainee?

2        MR. MORISANI:  Your Honor, objection, calls for

3   speculation.

4        THE COURT:  Objection overruled.

5   A.   It's an inappropriate use of a viable resource given to

6   the officer.  So, yes, it's punishment.  It's inappropriate.

7   It should be used to protect either inmates from each other,

8   or officers from inmates.  Because officers don't have to take

9   the first punch before they do something; they can protect

10  themselves.  But they can't say, Do what I say, or I'm going

11  to hit you with this.

12  BY MR. CHENG:

13  Q.   Does the jail actually have a disciplinary policy if

14  inmates break the rules or don't obey instructions?

15  A.   There is a disciplinary review board that's administered

16  on the -- primarily on the law enforcement side of the

17  sheriff's office.  There may be input from detention -- now,

18  I'm not exactly sure how it works under the current

19  administration.  But they review things that had been referred

20  to them as, here's an officer who failed to follow procedure,

21  or who brought contraband into the facility, or did whatever.

22  And then the disciplinary review board makes a recommendation

23  which goes to the sheriff who then authorizes whatever

24  disciplinary action is necessary.

25  Q.   Does that disciplinary procedure allow officers to use

 1   pepper spray without any type of disciplinary process?

 2   A.   No.

 3   Q.   Let's talk a little bit more about staffing.  Does the

 4   consent decree require a staffing analysis?

 5   A.   Yes, sir.

 6   Q.   And did you ever work with the defendants to develop a

 7   staffing analysis?

 8   A.   Yes, on several occasions.

 9   Q.   Was that some of the technical assistance you provided?

10   A.   That's some of it, yes.

11   Q.   Before you started working on it, had they completed a

12   staff analysis as required by the decree?

13   A.   No.  The sheriff's office had brought in the National

14   Institute of Corrections to get technical assistance on how to

15   do a staffing analysis.  They brought in an expert named Rod

16   Miller who is one of the best in the business, as far as

17   knowledge about that.  He did not do the actual staffing

18   analysis.  He laid out how the staffing analysis was to be

19   conducted, what weight should be given to determining a relief

20   factor, whether you're on a 12-hour shift, an 8-hour shift,

21   how much sick time, vacation time, and so forth.  So you

22   compute all of that and come up with a proper relief factor.

23   The jail is unique in that it has to operate 24 hours a day.

24   So when you say, "I need an officer in this post," it really

25   takes about 1.5 personnel to staff that one post 24 hours a

1  day, seven days a week.  It gets complicated when you're

2  talking about a shift that's only operated, Monday through

3  Friday, day shift, or seven days a week, but only on one shift

4  or two shifts.  So he didn't do that.  But when I came on

5  board, I took what he had; I sat down with the then jail

6  administrator and her staff, and --

7  Q.  I'm sorry.  Who was that jail administrator?

8  A.  Major Rushing.  And I helped walk them through the

9  process.  And I had them independently do it using the

10 guidelines, and I independently did it, and then we compared

11 notes.  And we were like very, very close; it was a good

12 process.  That called for roughly 421 personnel to run the

13 whole jail system at that time.  That's when we had the

14 Jackson Detention Center, the work center, and the full

15 Raymond Detention Center operational, none of it shut down.

16 Then --

17 Q.  If I could -- before you move on.  Did they ever budget

18 enough positions to meet the staffing requirements?

19 A.  No.  The most officers that have ever been budgeted was

20 281.  And in the December, the County just unfunded 48

21 detention positions, taking it down to 233.

22 Q.  So when you say "December," do you mean December 2021?

23 A.  Yes, sir.

24 Q.  So in December 2021, how many budgeted staff, detention

25 officer positions were --

1  A.   The end of December, 2021, 233 authorized detention

2  staff.

3  Q.   So we talked about the staffing analysis when there were

4  three facilities.  Was that staffing analysis ever updated?

5  A.   Yes.  It's been updated multiple times since then because

6  there have been a number of changes:  One, the closing of the

7  Jackson Detention Center; two, the jail system went from an

8  eight-hour shift to a 12-hour shift.  That's a little bit more

9  efficient and that effects the number slightly.  And then

10  subsequently, the jail system returned to the eight-hour

11  shift.  So there have been two additional staffing analyses

12  that have been done.  Since then, the most recent one being --

13  I think, around October of last year, I worked with then Major

14  Bryan to develop that, and that current staffing analysis

15  calls for a total of 329 officers required, if all of Alpha

16  Pod remains closed, and 351 officers required if Alpha 3 and 4

17  are kept open.

18  Q.   So how many officers do they currently need to safely

19  operate the jail?

20  A.   Right now?

21  Q.   Yes.

22  A.   Well, they've got more open right now than the plan calls

23  for, so that would throw my numbers off a little bit.  If they

24  closed half of Alpha and used the other half of it, and kept

25  all of Bravo open, then it would be 351.

1   Q.   And how many officers do they actually have in the jail?

2   A.   As of the end of January, the number was 191; it's the

3   lowest it's ever been.

4   Q.   So Paragraph, or rather, Section 4(a) of the consent

5   decree deal with staffing and supervision.  Do you have an

6   opinion about whether defendants are complying with the

7   consent decree requirements for staffing and supervision,

8   Section 4(a)?

9   A.   I've had a constant problem with supervisors not

10  performing supervisory duties.  I've been quoted a number of

11  times as saying that supervisors have a habit of signing and

12  sending.  They put their signature on something, on a

13  document, on an incident report, and send it forward.  They

14  don't make -- on occasion, they do now.  But, routinely,

15  supervisors do not make findings, recommendations,

16  suggestions, rejection, because of whatever's in the report;

17  send it back, redo this; this needs to be referred off to IAD;

18  it needs to be referred to CID.  They simply send it on

19  through.  So supervisors are derelict, by and large, in their

20  duty with supervisors.

21       Another example would be when a supervisor comes around

22  and signs off on well-being checks that are kept in a log,

23  well-being checks that are kept on the wall, a suicide log, at

24  the bottom of the form, or in the log, the supervisor is

25  supposed to put his or her name and any comments.  They put

1    his or her name, they never put any comments.  If there are

2    suicide watch entries missing, they just sign at the bottom.

3    There's no suggestion; no question about, why did you miss

4    these?  There may be some logical reason for it, the officer

5    was called off on some emergency.  But there's virtually never

6    any supervisory documentation to reflect that they have come

7    to a decision or made some finding when looking at something.

8    Q.   Do they have a written policy for direct supervision?

9    A.   No.

10   Q.   Do they have a written policy for classification?

11   A.   Yes.

12   Q.   And what is classification?

13   A.   Classification is looking at the history of someone who

14   comes into the jail system to determine how you to best handle

15   them, where they should be housed.  So you look at the instant

16   criminal charge.  You look at the criminal history.  You look

17   at previous institutional history, if you have access to that.

18   You look at medical or mental health issues that may be

19   available.  Medical screening gets done as somebody comes in.

20   So there's all sorts of information that gets collected when

21   somebody comes into the jail system, and classification can

22   make a decision as to where this person should be housed.

23   Q.   So have they implemented the classification policy?

24   A.   Yes.  But, unfortunately, there are portions of it that

25   have been overridden by the fact that they don't have a way to

 1   control gang affiliation housing, so they still -- they still

 2   house inmates according to gang affiliation.

 3   Q.   So do they have a form to assess these different factors?

 4   A.   Yes, sir.

 5   Q.   And do they fill out the form?

 6   A.   Yes, sir.

 7   Q.   And then when they make the housing assignment, are they

 8   using that form in a meaningful way to make the housing

 9   assignments?

10   A.   They are to a certain extent.  But it gets overridden as

11   I indicated by charge, for gang-affiliation information, as an

12   override, instead of by behavior.  That's because it's not

13   direct supervision.

14   Q.   So what's the consequence of overriding the

15   classification system with those types of decisions?

16   A.   Well, I think it is seen as the lesser of two evils.

17   Mixing those people without proper supervision would leave

18   them more susceptible to injury and assault.  And so, I think

19   that's the reason that classification is basically violating

20   its own policy in order to try and keep a lid on things.

21   Q.   Does it work?

22   A.   It's a partial fix.  It's not a solution.

23   Q.   So does it give any power to the gangs?

24   A.   Yes.  It plays into their hands in one sense that we're

25   special.

 1   Q.   Do you consider that to be an appropriate security

 2   solution for their supervision and gang issues?

 3   A.   It's not an appropriate solution, but under the current

 4   circumstances, I can't even recommend something that would

 5   solve the problem for them unless they had enough officers to

 6   staff each housing unit and run it as a direct-supervision

 7   housing unit.

 8   Q.   So is the solution to have enough officers?

 9   A.   They have to have more officers, that's critical.

10   Q.   And then, do they also have to adopt direct supervision?

11   A.   Yes.

12   Q.   Otherwise, will they ever get a handle on their gang

13   problem?

14   A.   No.

15   Q.   Do you think the defendants have enough trained staff to

16   provide a reasonable level of safety and security in the jail?

17   A.   They have dedicated training staff.

18   Q.   Not training staff.  Do they have enough trained staff --

19   A.   Trained staff, excuse me.

20   Q.   -- to provide a reasonable level of safety and security

21   in the jail?

22   A.   Well, on paper, they have trained staff to deal with many

23   of the issues, but they don't have proper supervision to see

24   that it's adequately implemented.

25   Q.   Do they have enough staff to cover all the posts in the

1   housing units?

2   A.   No.

3   Q.   Do they have enough staff to conduct safety and welfare

4   checks in the housing units?

5   A.   No.

6   Q.   Do they have enough staff to conduct safety and welfare

7   checks?

8   A.   No.

9   Q.   Do they have enough staff to do suicide watch in the

10  housing units?

11  A.   No.

12  Q.   Is the level of staffing sufficient to meet the minimum

13  requirements for operating a jail safely?

14  A.   No.

15  Q.   Does the lack of detention officers create an

16  unreasonable risk of violence?

17  A.   Both to inmates and staff.

18  Q.   Does the lack of officers limit their ability to deliver

19  medical or mental health services?

20  A.   Yes.

21  Q.   How does security staff play into providing medical or

22  mental health services?

23  A.   When nurses make med pass, they have to have an officer

24  with them.  Oftentimes there's nobody available and they're

25  not able to do it.  In the medical area itself, it has some

1    housing at each end.

2        The housing at one end, none of the cells can be used

3    because they've all been destroyed.  None of the locking

4    mechanisms work, and all of the doors are sealed shut with a

5    hasp and a padlock.  So the inmates that are kept there when

6    they come back from the hospital or somewhere else, they're

7    just kept out in the dayroom area.  They're not able to put

8    them in cells.

9        On the other end, there use to be two suicide watch

10   cells, which were closed down years ago.  That area should not

11   be used for anything until some staffing factor is built in

12   because there's nobody assigned to work there, but on occasion

13   inmates are housed there temporarily.

14   Q.   And are the inmates housed there inmates with special

15   needs or at higher risk?

16   A.   Generally speaking, they are people that require some

17   kind of special observation or analysis and are brought to

18   medical for that reason.

19   Q.   If we could introduce Plaintiff's Exhibit 15.  Do you

20   recognize Plaintiff's Exhibit 15?

21   A.   Yes, sir.  This is the study that I referred to that was

22   done by Rod Miller prior to the monitoring process beginning.

23   It's dated 2014.

24   Q.   If we could bring up Plaintiff's Exhibit 16.

25   A.   I apologize, sir.  What?

1   Q.   We're bringing up Plaintiff's Exhibit 16.  Do you

2   recognize Plaintiff's Exhibit 16?

3   A.   Okay.  This is what I worked on with the County on the

4   staffing analysis.

5   Q.   Is this the original staffing analysis?

6   A.   I think the original one was done in 2017.  This was a

7   follow-on.

8   Q.   Is this the one you worked on with Warden Rushing?

9   A.   I worked on the one in 2017 with her.  I think I worked

10   on this one with Major Fielder.

11   Q.   So how many staff were recommended when you were working

12   with Major Fielder?

13   A.   I have to go back and refresh my memory on that.  I

14   don't -- they changed in between.  They were not significantly

15   different except for whether Alpha was going to be kept open

16   or not and 12-hour versus eight-hour.  So the numbers were not

17   radically different, but the latest one is based on eight

18   hours and keeping Alpha 3 and 4 open and Jackson closed except

19   for the ground floor.

20   Q.   Did the defendants ever meet the staffing requirement of

21   the 2020 staffing study with Major Fielder?

22   A.   No.

23   Q.   And at the time how many facilities were they operating?

24   A.   I think by 2020 is when -- when the Jackson center was

25   closed.

1    Q.   Would it refresh your memory to review the report from

2    2016?

3    A.   I'd have to look through the whole thing.  I can't

4    remember the exact dates on opening and closing of things.

5    Q.   Why don't you take a quick look at that exhibit.

6         MR. CHENG:  And if we could scroll through it for him.

7         THE COURT:  You want to give him a hard copy?

8         THE WITNESS:  Thank you.

9    BY MR. CHENG:

10   Q.   If you don't mind, have you had a chance to refresh your

11   recollection?

12   A.   Yes, sir.

13   Q.   I'll take it back.  Thank you.  So what was the

14   recommendation for staffing in the 2020 study?

15   A.   That one called for 423 positions.  That's when the

16   Jackson Detention Center was still open.

17   Q.   And how many staff did they actually have at the time?

18   A.   At that time I can't tell you exactly, but it fluctuated

19   between 205 and 256.

20   Q.   And did they ever budget 400 plus positions at the --

21   A.   No.  The most that's ever been budgeted was 281.

22   Q.   If we could introduce Plaintiff's Exhibit 18.

23        THE COURT:  You said 18?

24        MR. CHENG:  18, yes, Your Honor.

25   BY MR. CHENG:

1   Q.   Do you recognize Plaintiff's Exhibit --

2        THE COURT:  Was that -- I heard you say 15 and 16.  Did

3   you show him 18?

4        MR. CHENG:  No, we haven't shown him 18.  We're showing

5   him now.

6        THE COURT:  Oh, you're showing him.

7   BY MR. CHENG:

8   Q.   Do you recognize Plaintiff's Exhibit 18?

9   A.   Yes, sir.  This is a report that comes from sheriff's

10  office HR on a monthly basis.  It shows the number of people

11  assigned to the various areas, and it shows that there are

12  currently -- this was as of the end of December 2021 -- 199

13  people working in detention.

14       MR. CHENG:  At this time, Your Honor, I would like to

15  move in Plaintiff's Exhibits 15, 16, and 18.

16       THE COURT:  Any objection?

17       MR. MORISANI:  No objection.

18       THE COURT:  Okay.  15, 16, and 18 will be received into

19  evidence.

20       (Plaintiff's Exhibits 15, 16, and 18 entered.)

21  BY MR. CHENG:

22  Q.   If we could introduce Plaintiff's Exhibit 49.  Do you

23  recognize Plaintiff's Exhibit 49?

24  A.   Yes, sir.  This is the latest revised staffing analysis

25  that I developed in conjunction with Major Bryan.

1   Q.   And how many staff are recommended in your most recent

2   staffing analysis?

3   A.   I can't see it here, but my recollection is that there

4   were 329 required if Alpha Pod was left completely closed and

5   351 if Alpha 3 and 4 were kept open.

6   Q.   And we've talked earlier about how -- have they actually

7   closed Alpha Pod?

8   A.   All of Alpha Pod is functioning right now except for the

9   trash dumpster cells throughout that housing pod that have

10  been welded shut over time.

11       MR. CHENG:  I move for the admission of Plaintiff's

12  Exhibit 49, Your Honor.

13       MR. MORISANI:  No objection.

14       THE COURT:  P-49 will be received into evidence.

15           (Plaintiff's Exhibit 49 entered.)

16  BY MR. CHENG:

17  Q.   In terms of the average daily population of the jail, do

18  you know what the average daily population of the jail is?

19  A.   It's approximately 600 for both facilities.

20  Q.   And about how many detainees are booked into the jail on

21  a daily basis?

22  A.   They book an average of ten people a day.  Last year they

23  booked somewhere in the neighborhood of 3700 plus inmates.

24  Q.   Do you know what the average length of stay is for an

25  inmate in the jail?

1  A.   When I computed it last, which is probably two years back

2  or more, it was 53 days.

3  Q.   Do you know how many of the -- or what percentage of the

4  inmates in the jail are pretrial detainees versus convicted

5  prisoners?

6  A.   I can't give you an accurate number, but most of them are

7  pretrial.  There are very few sentenced to local time.

8  Q.   So when you say "pretrial detainees," that's somebody who

9  has not yet been convicted of a crime?

10  A.   That's correct.

11  Q.   You've mentioned much earlier something about a quality

12  assurance review or quality assurance report.  How many

13  quality assurance reports have been conducted?

14  A.   Have I conducted?

15  Q.   No.  How many have been completed?

16  A.   Oh.  Either four or five have been done by the new

17  quality assurance coordinator.

18  Q.   Are quality assurance reports required by the consent

19  decree?

20  A.   Yes.

21  Q.   And what benefit is it to have a quality assurance

22  report?

23  A.   It really helps to have somebody who's inside on a daily

24  basis, not coming in just once every four months to inspect,

25  and who can be there at all hours on all days of the week,

1    because things can be very different on a weekend or a holiday

2    weekend than they would be Monday through Friday on the day

3    shift.

4    Q.   Do the quality assurance reports help the jail managers

5    run the facility?

6    A.   They're a great management tool, because they consolidate

7    in about a dozen pages all the primary concerns that the

8    settlement agreement calls for.  It doesn't go through every

9    single thing, but it covers things from staffing to well-being

10   checks to changes in policy to anything across the board.

11   It's an excellent tool for management.

12   Q.   If we could introduce Plaintiff's Exhibit 42.  Do you

13   recognize Plaintiff's Exhibit 42?

14   A.   Yes, sir.  It's the quality assurance summary for the

15   month of November 2021.

16   Q.   Have you heard the defendants say in the past that

17   they're hiring or holding a number of training classes to hire

18   new cadets?

19   A.   Yes.  That's something that we hear in each site visit.

20   Q.   If they hire cadets but they can't retain them, will they

21   be able to meet the staffing requirements of the staffing

22   studies?

23   A.   That's part of the problem.  There's a high turnover of

24   new personnel who do not get through the academy because they

25   fail to maintain their attendance or opt for other

1   opportunities.

2   Q.   Do you see the --

3        MR. CHENG:   If we could keep the exhibit up.

4   BY MR. CHENG:

5   Q.   Do you see the second paragraph about Major Bryan?

6   A.   Yes, sir.

7   Q.   It talks about how she's implementing changes and she has

8   a firm grasp on the scope of work required, but it talks about

9   her being impeded from utilizing her skills.

10       Do you agree that that was happening with Captain -- with

11  Major Bryan?

12  A.   Yes.  She initiated a number of innovative methods of

13  trying to retain personnel, to attract personnel, to make

14  their job more satisfying and reasonable.  As an example, she

15  asked for direct deposit of their paychecks instead of having

16  to wait for a paper paycheck.  Most jurisdictions, you can

17  have your month- -- your biweekly pay put directly into your

18  account.  She asked to have pay made biweekly instead of once

19  a month, because the officers were being paid only once a

20  month.  She made a number of recommendations like that that

21  would be beneficial for staff and would be well received by

22  them.

23  Q.   And were they implemented?

24  A.   I have not seen that they are.  There have been

25  discussions about the requirement to change the County's

1   payroll system and so forth, but to the best of my knowledge,

2   it has not been actually implemented yet.

3   Q.   What difference does it make to staff if they get paid

4   electronically?

5   A.   Well, if you're working the midnight shift and you got

6   off at 7:00 in the morning and the paychecks are not issued

7   until 9:00 that day, then you have to stick around for two

8   more hours to pick up your paycheck to take it home with you

9   or wait and come back and get it some other time.  It's just a

10  minor convenience that all of us take for granted in most

11  jurisdictions that it's going to happen automatically.  If I

12  want to have direct deposit, I can do it.  That's kind of the

13  standard that is used whether it has to do with getting your

14  income tax refund back or whatever.

15  Q.   What difference does it make to an officer whether they

16  get paid twice a month or once a month?

17  A.   Well, I lived with both.  When I started work, we were

18  paid once a month.  It was a real chore by the time you got to

19  the end of the 30 days to make sure you had enough money left

20  in the bank to cover everything, and when you got paid on a

21  biweekly pay plan, it just made life a lot easier.  That's

22  personal experience, so...

23  Q.   Do these types of small things have any effect on morale

24  or retention of staff?

25  A.   They are absolutely critical.  Detention staff spend more

1    time on the job than they do in any other single activity of

2    their life.  If life is miserable because of the working

3    conditions, then life is pretty miserable.  If you can make

4    the job safer, saner, more gratifying, then you stand a better

5    chance of recruiting and retaining quality people.  That's

6    important.  And having continuity; that is, consistency of the

7    same staff, is incredibly important, because every time you

8    have a changeover, you have to start from scratch, training,

9    going through the whole process, and getting them oriented.

10   Q.   Do they have a pool of experienced officers to train new

11   officers?

12   A.   I'm going to say no, but they have a few people that the

13   lieutenant who's handling, like, the FTO program is utilizing,

14   and that's a positive thing to do, to limit it to a few

15   well-qualified people as opposed to spreading it around

16   amongst --

17   Q.   And has that been implemented yet?

18   A.   That has started, yes.

19   Q.   It has been completed?

20   A.   Well, it's just started, so it's only been a month or two

21   that that's been in place.

22   Q.   So was it started after the show cause order was issued?

23   A.   Yes.

24   Q.   If we could stick to that exhibit and go to page 4 of

25   Exhibit 42, do you see the third paragraph?

1  A.   Yes, sir.

2  Q.   Do you agree with this statement that they need to

3  continue to developing for this plan for recruitment career

4  ladders in detention?

5  A.   Yes, they definitely need a career ladder.  The way

6  things work right now, if somebody comes on and makes $31,000

7  a year without a career ladder, in five years they're still

8  going to be making $31,000 a year.  There's no incentive to

9  stay on board.  I mean, there needs to be some merit-based or

10  step increase plan in place that gives you some return, if you

11  will, for loyalty and effort, and that's important.  It

12  doesn't have to continue forever, but it needs to get off

13  ground zero and move up to a higher point to give people an

14  incentive.

15  Q.   Do they have sergeants as an officer level inside the

16  jail?

17  A.   Sergeants?

18  Q.   Yes.

19  A.   Yes, sir.

20  Q.   And sort of what level of supervision are sergeants?

21  A.   Like, a sergeant would be responsible for the booking

22  area.  A sergeant would be responsible for maybe a pod at the

23  Raymond Detention Center.  On occasion there's only one

24  sergeant to take care of two pods, but that's not the way it's

25  designed.  There would be a sergeant on duty at all times at

1    the work center as, like, a shift commander.

2    Q.   So do having enough experienced sergeants affect the

3    ability to supervise the line staff?

4    A.   Certainly.

5    Q.   And if you don't have enough sergeants who are

6    experienced, does that have any impact on the safety of the

7    inmates or the jail?

8    A.   Yes.

9    Q.   And in what way does it affect safety and security?

10   A.   Well, what I have observed is that because of the

11   shortage of staff, sergeants are pulled from their supervisory

12   duties to doing officers' duties, helping doing well-being

13   checks.  They shouldn't have to do that.  They should be

14   making sure the that officers are doing it instead of

15   physically doing it themselves.  Sergeants should not be

16   responsible for going along on med pass.  That should be an

17   officer's duty.  Sergeants shouldn't have to transport inmates

18   up and down the hallways to go between one area or another.

19   That should be an officer's duty.  It pulls supervisors away

20   from their supervisory responsibility, which I guess is an

21   explanation partially for why some of what we see is the sign

22   and send mentality.

23   Q.   So when supervisors are pulled from supervisor duties,

24   what happens to the quality of incident reports or

25   use-of-force reports?

1   A.   Well, supervisor should ensure quality, and unless they

2   are not satisfied with things, if they just automatically

3   accept whatever comes through, it's not going to get any

4   better.

5   Q.   If we could pull up Plaintiff's Exhibit 42 again, page 4,

6   to the section that talks about detention services remains a

7   need of detention officers?

8   A.   Yes, sir.

9   Q.   So do you agree that just having a cadet class was not

10   enough, they still need more to meet the requirements of the

11   new staffing analysis?

12   A.   Getting five more officers is good news, but it's just a

13   drop in the bucket compared to what they need.

14        MR. CHENG:  At this time I would move to admit

15   Plaintiff's Exhibit 42, Your Honor.

16        MR. MORISANI:  No objection.

17        MR. CHENG:  If we could introduce --

18        THE COURT:  P-42 is received into evidence.

19            (Plaintiff's Exhibit 42 entered.)

20        MR. CHENG:  At this time I'd like to introduce

21   Plaintiff's Exhibit 86.

22   BY MR. CHENG:

23   Q.   Do you recognize Plaintiff's Exhibit 86?

24   A.   Yes, sir.  It's the December quality assurance summary

25   prepared by the quality assurance coordinator.

```
 1    Q.   If we could go first to page 3.  Do you see the

 2    discussion in the first through sixth paragraph about

 3    staffing?

 4    A.   Yes, sir.

 5    Q.   And do you agree that these types of data about staffing

 6    are accurate?

 7    A.   Well, what she has basically done is take the staffing

 8    analysis that we prepared and plug those figures into her

 9    monthly report.  That's where they came from.

10    Q.   So do you agree that this is accurate?

11    A.   Yes, sir.

12    Q.   I'm sorry.  Was that a --

13    A.   Yes, sir.

14         MR. CHENG:  At this time I'd move to admit Plaintiff's

15    Exhibit 42.

16         THE COURT:  You mean 86?

17         MR. CHENG:  I'm sorry.  Plaintiff's Exhibit 86, Your

18    Honor.

19         THE COURT:  Any objection?

20         MR. MORISANI:  No objection, Your Honor.

21         THE COURT:  P-86 is received in evidence.

22            (Plaintiff's Exhibit 86 entered.)

23    BY MR. CHENG:

24    Q.   Does the level of staffing affect your ability to provide

25    visitation or attorney visitation?
```

1    A.    Certainly.

2    Q.    And how does it affect the visitation?

3    A.    For family and friends, visitation is done by video, so

4    an inmate has to schedule that along with the person on the

5    outside to be able to hold a visit, and then they have to pay

6    for it.  An officer should be there to help coordinate that.

7    In a direct-supervision setting, that's the norm.  It's much

8    more difficult for an inmate who has no -- no officer to fall

9    back on to assist with the process.  And then an officer

10   should be in the housing unit to make sure that the inmate is

11   able to actually conduct his visit.

12       For attorneys, the lack of staff is even more problematic

13   in that the way the jail was originally set up attorneys would

14   go back to the pods and have attorney-client visits there so

15   the inmates did not have to be moved around the jail.  That's

16   the concept of direct supervision is you take all of the

17   services to the inmates.  You don't move inmates around.

18       That practice stopped a long time ago when direct

19   supervision ended.  And in order to have an attorney-client

20   visit at the present time, an officer has to leave his or her

21   post, take an inmate up to the front of the Raymond Detention

22   Center, and get them together with an attorney who comes in to

23   meet with them.  So it's an extra drain on staffing to have to

24   deal with attorney-client visits right now.  That problem did

25   not exist for the first 15 years or so of operation, but

1  it's --

2  Q.   And when there's shortages of staff to provide for

3  visitation, does that affect the ability of the attorneys to

4  meet with their clients in a timely way?

5  A.   Yes.  Attorneys have to wait inordinate amounts of time

6  or officers have to be pulled from critical posts to move

7  somebody to another area of the jail and leave their area

8  unattended.

9  Q.   Are you familiar with the consent decree's provisions

10  about unlawful detention?

11  A.   Yes.

12  Q.   Can you summarize what those provisions require?

13  A.   Well, when an inmate is held in a jail, if he's allowed

14  to be released by the courts, then he should be released that

15  day.  If his sentence is up, he should be released at the end

16  of his sentence.  If he's able to post bond, he should be

17  released then.  If he's transferred from another facility to

18  Hinds County, then he should be released when local matters

19  are resolved.  If he's sent to another jurisdiction with a

20  hold to come back to Hinds County, then all of those things

21  need to be taken into account and recorded properly and the

22  inmate released at the appropriate time.  If it's not -- if it

23  doesn't happen, then some corrective action should be taken.

24      But in Hinds County, they don't document that kind of

25  thing.  There are no incident reports written.  Action may be

1   taken.  The inmate may be released, but we find out about it

2   by reviewing inmate records.  The monitor handles that portion

3   of the process in more detail than I do, and she's able to

4   determine a number of people who should have been released a

5   day before or sometime later, and bad releases happen all too

6   frequently.

7       There's no documentation to reflect that to correct the

8   problem, and that's one of the things that we have looked at

9   from the very beginning when we questioned the sergeants about

10  that who handles that sort of thing and said well, where's the

11  incident report?  We don't write anything down about that.

12  Well, you have to, and that's something that needs to be put

13  in place.  It's specified now, but it still hasn't happened.

14  Q.  So if they do have incidents, do they actually have

15  incident reports and use-of-force report policies?

16  A.  Yes.

17  Q.  Are they implementing them?

18  A.  They have had training on it, and some incident reports

19  are better than they have been in the past.  I have been in

20  literally hundreds of jails all over the country and around

21  the world.  I have never read worse incident reports than what

22  I routinely read in Hinds County.  Initially they were inept,

23  unintelligible, incomplete, and we have spent a great deal of

24  time working with IT to try and standardize the process to try

25  and force certain things to be documented and with staff for

1   training to improve on that.

2       I can tell you that some of the reports that I read now

3   at the work center are better than anything that I have seen

4   in the past.  They actually reflect what happened.  You can --

5   without being there you can figure out what went on.

6       Routinely that was not the case in the past.  The form

7   would not say even which jail it occurs in, what housing unit,

8   what was going on or anything.  You have to figure it out by,

9   oh, I see a certain housing unit; well, then that has to be at

10  this jail.  You know?  And so some things are better.  I've

11  got to give them credit there that they're working on it, but

12  it's a piecemeal process, and it's starting slowly at the work

13  center.  It needs to carry over that way at the Raymond

14  Detention Center, and that has not yet happened.

15  Q.   What's the difference between why the work center is able

16  to get its incident reporting process in order and the Raymond

17  Detention Center doesn't have that?

18  A.   I've always been a strong believer that one person can

19  make a difference.  The facility commander there took his job

20  seriously.  He's now the assistant jail administrator.

21  Q.   Who is that?

22  A.   Captain Simon now, acting jail administrator Simon is my

23  understanding, and he made a difference there.  They had

24  direct supervision.  He was able to understand it and

25  implement it.  He accepted recommendations and seemed to

1    appreciate them and carried them forth on his own.  And so

2    when we would make notations or explanations that would go

3    around, he took it upon himself to try and push those things.

4    That has made a difference.

5        Part of it is that the Raymond -- excuse me, the

6    Jackson -- I apologize.  The work center was direct

7    supervision in name only.  They had two officers inside each

8    housing unit, but when you have two people in charge, one plus

9    one is not two.  One plus one turns out to be about .75

10   because nobody's in charge, and they always point a finger at

11   somebody else.  I wasn't doing that.  That was his job.

12   Pardon me.

13       We made a recommendation on putting in a camera and an

14   alarm on each fire exit door in each of the four housing

15   units, which allowed them to save one officer assigned to each

16   of those four housing units.  That's 20.4 positions, and we

17   got a better product as a result of doing that, because now

18   there's only one officer inside each housing unit, and that

19   officer is responsible for everything.  So if there's anything

20   wrong in there, you go to that officer.  Why is this?  If the

21   report doesn't make any sense, you can go back to that officer

22   and say, Why didn't you write something that made sense?  And

23   that was the beginning of moving in the right direction at the

24   work center.

25   Q.  Has the lack of staffing and supervision led to actual

1   harm to any detainees?

2   A.   Yes.   There have been a number of inmates who have been

3   very seriously assaulted.   We've had a number -- there have

4   been a number of deaths that occurred because there was no

5   supervision, and the death wasn't even found until hours

6   later.

7   Q.   Can we bring up Plaintiff's Exhibit 88?   What is a

8   monthly incident narrative?

9   A.   Monthly incident narrative is like a spreadsheet that

10   lists all of the incident reports, where they occur, the

11   number, the date, the officer involved, and then -- and acts

12   like a verbatim statement from the incident report itself that

13   appears on this one spreadsheet.   So instead of going through

14   hundreds of individual incident reports and documents, on one

15   spreadsheet you can basically track everything that occurred

16   in a month's time.

17   Q.   And there's another version of the monthly incident that

18   has the narratives; is that right?

19   A.   That's what I was explaining.   That's the narrative

20   spreadsheet.   The incident report itself stands alone.   It's

21   an 8-1/2-by-11 document that we read, and then that

22   information gets transcribed into a spreadsheet that is then

23   made available to us.   So on one long document we can review

24   all of the incidents over a period of one month.

25        MR. CHENG:   I believe this document is actually sealed,

1   Your Honor, so let me -- let me make sure we get that cleared

2   before we proceed with it.  But let me at least ask a few

3   questions about it.

4   BY MR. CHENG:

5   Q.   You mentioned earlier that there are a number of assaults

6   that occur at the jail?

7   A.   Yes, sir.

8   Q.   Did you draw that information from incident reports, or

9   how did you get that information?

10  A.   The monitor puts together a really excellent spreadsheet

11  on assaults based on her analysis of each incident report.

12  This is a time-consuming process.  It's not based on what the

13  report is titled as because officers use the wrong titles for

14  things all the time, and if that's what you went by, the

15  numbers that you would get are not reflective of reality.  So

16  she reads through, determines what it actually is, and lists

17  them all together, and that covers a period of four months,

18  and then she does it again.

19  Q.   So those reports --

20       THE COURT:  Hold on.

21       Is there an objection?

22       MR. MORISANI:  Well, Your Honor, we would object to him

23  testifying about a document that I don't think we've ever

24  seen.  It sounds like it's a document -- I'm piecing it

25  together, but it sounds like it's a document that's created by

1    the monitor.  I don't know that we've ever seen that.

2          THE COURT:  What document number is that?  Is that one

3    of the exhibits?

4          MR. CHENG:  88 and 89.

5          MR. MORISANI:  88 and 89 are the monitor's summary that

6    he's discussing.

7          MR. CHENG:  Well --

8          THE COURT:  P-88 and P-89, have those been shared with

9    the parties?

10         MR. MORISANI:  I've seen P-88 and P-89, yes, sir, but

11   I'm hearing -- what I think I'm hearing is, the monitor is

12   taking that information and creating a spreadsheet that he's

13   been testifying about.  And that's a document, Your Honor,

14   that we've never seen before.  It that's -- if my hearing is

15   correct.

16         MR. CHENG:  I think we may have a little confusion

17   here.  We'll have to resolve it at a different point, but let

18   me address it first.

19   BY MR. CHENG:

20   Q.   Do the defendants themselves provide a spreadsheet of

21   monthly incidents?

22   A.   I'm sorry.  Could you please repeat that?

23   Q.   Do the defendants maintain a shared drive that provides a

24   summary of an incident reports?  Do they provide a summary of

25   incident reports?

1    A.   They provide an incident report summary that has the

2    narrative from each incident report, yes.

3    Q.   And what is that document called?

4    A.   The incident report narrative, that's what we talked

5    about initially.

6    Q.   But you also mentioned Ms. Simpson does something with a

7    spreadsheet.  Is there a different spreadsheet that

8    Ms. Simpson does?

9    A.   Working document that takes all of that information and

10   tries to compile them accurately.  Because if you go by the

11   titles of the incident reports themselves, you would get a

12   totally inaccurate summation of what's there.  Things are

13   listed as something completely different from an assault, for

14   instance, and that's what she compiles.

15           MR. CHENG:  If I may?

16           THE COURT:  Show it to the other side first and make

17   sure that they have it.

18   BY MR. CHENG:

19   Q.   Do you recognize Plaintiff's Exhibit 88?

20   A.   It appears to be an incident report summary without the

21   actual narratives listed, unless they were all redacted from

22   this.  I can't tell.

23   Q.   And then could you look at Plaintiff's Exhibit 89?

24   A.   This appears to be the listing of incident reports

25   without the detailed information without the narratives.  The

```
 1   first one 88 that I looked at, the way the categories were

 2   spread out, it looks like maybe there was a narrative in there

 3   and it doesn't show on this because it's been redacted out,

 4   but I can't tell.  I don't know what the difference would be

 5   between the two.

 6   Q.   Do you review a monthly incident narrative?

 7   A.   Yes.

 8   Q.   Is it a spreadsheet or is it some other type of document?

 9   A.   It's a spreadsheet that is so wide that I can't print it

10   out at home because my computer system won't handle it.  So I

11   have to sit there on the computer and scan back and forth on

12   each one to read each thing down.

13   Q.   Do you also check any of the incident reports that are

14   referenced in the incident report narrative?

15   A.   Excuse me.  We do not get each a copy of every single

16   incident report individually, but we get a lot of them that

17   are submitted on rapid notifications, or immediate

18   notifications.  And when those come through, we see both the

19   synopsis that's prepared possibly by a supervisor, and the

20   actual incident reports behind it.  And so I get a broad range

21   of them, but not all of them.

22   Q.   Have you also reviewed any records involving any deaths

23   at the jail?

24   A.   Yes.

25   Q.   And did you see a monitor's interim report, No. 96 -- I'm
```

1   sorry, plaintiff's exhibit?  Have you ever read the monitor's

2   interim report?

3   A.   Have I ever read the monitor's --

4   Q.   Interim report.

5   A.   -- interim report?  Yes, sir.

6   Q.   And did you agree with the findings and recommendations

7   in the interim report?

8   A.   Yes.

9   Q.   So let's talk about some of those deaths.  You mentioned

10  earlier there had been some deaths.  Do you recall an incident

11  from April 18, 2021, that was a suicide?

12  A.   I think you're referring to a suicide that occurred in

13  Charlie 4.  I don't remember the dates on things specifically.

14  If it was not that, it was one that occurred in booking.

15  Q.   Well, let me see.  Let's say, do you recall the death of

16  an individual whose initials are J.M.?

17  A.   That was in booking, yes.

18  Q.   And what were your concerns and findings regarding the

19  death of J.M.?

20  A.   First of all, that he was housed in booking.  He

21  shouldn't have been.  The officer who was working in booking

22  that day found him hanging from a light fixture.  The officer

23  did not have a set of keys to get into the holding cell, and

24  yet he was working in booking.  So he had to go to the booking

25  office to get a set of keys.  They did not have a 911 knife.

1   A 911 knife is a specially made hooked knife that's designed

2   to cut somebody down in the event of something like that.  It

3   can't be easily used as a weapon as an inmate but it's the

4   kind of thing that's supposed to be kept in each general area

5   or control room for immediate use.

6   Q.   How about there was another death of an individual who

7   died of COVID in the past year; do you recall that?

8   A.   Yes.  I think that person died in the hospital actually.

9   Q.   Was that person's initials L.B.?

10  A.   I'm sorry.  But I can't remember the initials.

11  Q.   Would it refresh your recollection if we showed you the

12  interim monitoring report?

13  A.   Okay.

14  Q.   Do you recognize Plaintiff's Exhibit 40?

15  A.   Yes, sir.

16  Q.   And have you refreshed your memory after looking at

17  Plaintiff's Exhibit 40?

18  A.   Yes.

19  Q.   So let's talk about that individual, L.B., with the COVID

20  situation.  Did you have any concerns about how that death was

21  reviewed?

22  A.   Well, there was no after-action report.  Every time

23  there's an inmate death, there should be an after-action

24  report which reviews policy, procedure, every aspect of what

25  was done and what was not done, and what could be done to

1  prevent that kind of problem from happening again.  And

2  after-action reports are not routinely done in detention.

3  There were one or two that were done when Major Fielder held

4  the position, nothing since then until I think the last death

5  that occurred in, I believe, it was Alpha 4.  And in that

6  case, Major Bryan did a very comprehensive after-action

7  report, but that's the only one that I've seen.

8  Q.   When you say, "detention," do you mean in detention

9  services division, or what is detention?

10  A.   When I say refer to "detention," I'm talking detention

11  services, or the division, the jail system.

12  Q.   If somebody dies of a natural cause, say COVID, what

13  difference does it make to security officers and

14  administrators to do an after-action report?

15  A.   Well, one needs to see if proper procedure was followed.

16  It's not just a medical issue.  Its did we get him to the

17  hospital on time?  Were things handled properly?  Were

18  concerns brought to the attention of staff and they never

19  passed them along to supervisors?  Was there a breakdown in

20  the system somewhere, or was everything perfect, you know?

21  That's the kind of analysis that needs to be done to determine

22  whether things are working the way they should or whether

23  corrective action needs to be taken.

24  Q.   Was there also a suicide in July of 2021 in C-Pod?

25  A.   Yes, sir.  In Charlie 4, an inmate hanged himself.

1   Q.   Did you raise any concerns about that death?

2   A.   Absolutely.  A sergeant and an officer were conducting

3   rounds together.  They found the inmate hanging in his cell.

4   Instead of going in and taking some action to cut him down, or

5   do anything, they left him hanging there and went back to the

6   control room in Charlie where the sergeant called up a shift

7   commander in booking to let him know what was going on.

8        Ultimately, they went back to the same cell in Charlie

9   and cut him down.  Now, he may have been dead all along, I

10  don't know.  But the first action should have been to take him

11  down, and that was with a supervisor right there.  There was

12  nothing ever written up about that in the IAD investigation,

13  and I questioned that.  It didn't seem to me that the

14  supervisor was being held accountable for his lack of action.

15  Q.   And was that a sergeant?

16  A.   Yes, sir.

17  Q.   Is this the same C-Pod where sometimes there's only one

18  officer covering both the main housing unit and the isolation

19  unit?

20  A.   That's the confinement unit that I spoke of earlier where

21  inmates are relegated to their individual cells for about

22  23 hours a day, and then come out just for an hour for a

23  shower, that sort of thing.  It's a lockdown unit.

24  Q.   And in March of '21, did an inmate come into the jail, a

25  new arrestee who fell?

```
 1   A.   Yes.  The Jackson Police Department brought an inmate in
 2   who was originally thought to be under his own power, but
 3   subsequent review revealed that he was not, and he probably --
 4   Q.   Sorry.  What subsequent review?
 5   A.   There was no subsequent review initially until we
 6   indicated that an investigation needed to be completed,
 7   whether he had been booked into the facility or not.  The jail
 8   and the sheriff's office took the position that since he had
 9   not been physically booked, even though he was held in a
10   holding cell, he was not their inmate.  And that was contrary
11   to what the settlement agreement calls for, and we asked to
12   have an investigation conducted.  That revealed a broad range
13   of problems, including the lack of emergency equipment in the
14   booking area, no AED available, medical was running back and
15   forth between medical and up front into booking.  And
16   ultimately, the individual passed away, probably of a -- I
17   don't have the medical aspect.  But it was assumed to be a
18   drug overdose, and that's when the investigation was finally
19   completed.
20   Q.   And if you had not pressed for an investigation, would an
21   investigation have been completed at all?
22   A.   No.
23        MR. MORISANI:  Your Honor, we object, calls for
24   speculation.
25        THE COURT:  Sustained.  Calls for speculation unless he
```

1    can base that answer on something that the defendants have

2    told him.

3    BY MR. CHENG:

4    Q.   Let me ask you then, did you ask for the investigation

5    documents after you learned of the death?

6    A.   Yes.  And we were told that he was not an inmate;

7    therefore, there was no need for an investigation.  We pointed

8    out that there was.

9    Q.   After they mentioned an investigation, you mentioned

10   something about the AED.  What is an AED?

11   A.   An automatic electronic defibrillator.  And it's the kind

12   of thing that's kept there to kind of shock somebody back to

13   life if they're not breathing well or passing out.  And that

14   equipment was not available in booking where it should have

15   been.

16   Q.   Were there any problems with the electrical outlets in

17   that booking area?

18   A.   Yes.  There are always problems with electrical and

19   lighting areas not functioning properly.

20   Q.   Did that have an effect as well on how they responded in

21   that case?

22   A.   Well, when they tried to hook things up, things did not

23   work, and so they had to move and try again.  That was the

24   whole situation.

25   Q.   Was there also a death in August --

```
 1          THE COURT:  Hold on for a second, Mr. Cheng.  Since
 2   we're moving to -- this is a great breaking point.  You're
 3   moving to another death after this one where the guy was in
 4   booking.  We're going to take our afternoon break at this
 5   time, give my court reporter an opportunity to get a break.
 6   It's going to be about 20 minutes, and then we'll just pick
 7   back up from there.  So we'll be in recess for 20 minutes.
 8          MR. CHENG:  Thank you, Your Honor.
 9               (A brief recess was taken.)
10          THE COURT:  We've attempted to adjust the air.  You
11   may -- is there anything we need to take up?
12          Okay.  You may continue.  And this is going to be the
13   game plan.  Probably when Mr. Cheng gets through, whenever
14   that is, we're done for the day.  So, you know, even if it's
15   in the next 10 or 15 minutes, unless it's going to take
16   Mr. Morisani, you know, less than 30 minutes to cross-examine,
17   and I don't think so.
18          MR. MORISANI:  That's correct, Your Honor.
19          THE COURT:  All right.  You may proceed.
20          MR. CHENG:  Thank you, Your Honor.
21   BY MR. CHENG:
22   Q.   Mr. Parrish, in April of 2021, was there a suicide in
23   booking?
24   A.   Yes, sir.  We had an inmate who hanged himself in a
25   holding cell.
```

1   Q.   Was there an officer on the post at the time?

2   A.   There was an officer, but he had not done any well-being

3   checks on that inmate.

4   Q.   And were there any issues with the 911 tool or the AED?

5   A.   Yes.  They did not have a 911 tool there right away.  I

6   can't remember with regard to the AED on that one.  Excuse me,

7   I may be getting my cases mixed up.

8   Q.   Again, would it refresh your memory if you saw the

9   monitor's report at that time?

10  A.   Yes, sir.  Yes, sir, I'm familiar with this.

11  Q.   Earlier you talked about the use of booking, or the

12  inappropriate use of booking.  Does this death indicate or

13  reflect that inappropriate use of booking?

14  A.   Yes.  This was an inmate who had been housed in booking,

15  instead of, for instance, Charlie 4.

16  Q.   And how would you describe the emergency response to this

17  incident?

18  A.   Well, it was discovered by an officer who was working in

19  booking who did not have a set of keys to get into the cell,

20  had to go to the office for that.  There was no sergeant

21  available in booking at the time.  It was later determined

22  that there had been a lapse of about three hours without any

23  well-being checks on him, and it should have been done every

24  15 minutes.  The nurse who came to booking had to go back to

25  medical to get an AED to try and revive him.  He was hanging

1    from a light fixture with a sheet in the holding cell.  Part

2    of the problem with housing somebody there, if he was just

3    somebody who was being booked, he would not have been issued a

4    sheet in his holding cell.  And that's just a related factor.

5    Q.   How would the inmates access the lighting system in

6    booking?

7    A.   Well, there are two lights inside each of the larger

8    holding cells.  One of them worked, the other one did not.

9    And it had been pulled apart to the extent that he was able to

10    run a sheet up through it and hang from the ceiling.

11    Q.   And in this case, was there an AED available?

12    A.   No, there was not.  They had to go back to medical to get

13    that.

14    Q.   In August 2021, was there a death from somebody who might

15    have died of a drug overdose?

16    A.   There was -- are we talking about the case that was in

17    housing?  We talked previously about a case like that that was

18    in booking.  There was a case like that in housing.  I think

19    it was housing unit or housing pod Charlie, and an inmate was

20    found to be unresponsive in his cell, and it was thought

21    initially that he died of a drug overdose.

22    Q.   Was this incident you're talking about in housing unit

23    C-1?

24    A.   Charlie 1, yes, sir.

25    Q.   And can you describe whether you had any concerns about

1    the way security dealt with that death?

2    A.   If I had any concerns with regard to?

3    Q.   How security dealt with that death.

4    A.   How security?  I'm sorry.  I'm missing something.

5    Q.   Did you have any -- did that death -- did you form any

6    opinion about whether security properly responded to that

7    death?

8    A.   Well, to the best of my recollection, it was not an

9    immediate response to anything.  He was not immediately moved

10   to medical.  He was notified by an officer -- excuse me, an

11   inmate.  It should have been a direct supervision housing

12   unit, so the officer should have been aware of what was going

13   on in the housing unit; instead, it was an inmate who brought

14   it to the officer's attention, and apparently he had been dead

15   for some time.

16   Q.   Were there any security issues that contributed to that

17   death?

18   A.   Well, it all goes back to staffing.  If it was a direct

19   supervision housing unit that was properly staffed and the

20   officer was doing his job as he should have, he would have

21   been on top of that.  There may still have been a loss of

22   life, but certainly the notification and action would have

23   taken place much quicker.

24   Q.   So how did officers realize that that person had died?

25   A.   Another inmate came forward and said that his cellmate

 1   was unresponsive.

 2   Q.   Were safety checks being conducted in that housing unit?

 3   A.   They're supposed to be.  And that's part of the problem.

 4   We can't really tell what happened.  We don't have a record

 5   that reflects.

 6   Q.   Was there any indication that this person had been dead

 7   for a while?

 8   A.   To the best of my recollection, he had a form of, like,

 9   rigor mortis had set in, and, yes, he had been dead for some

10   time.

11       MR. MORISANI:  Your Honor, we object to this testimony.

12   He's not qualified to make that statement.

13       MR. CHENG:  I think I can follow up on that.

14       THE COURT:  Objection overruled.  Rephrase your

15   question.

16   BY MR. CHENG:

17   Q.   Did you review any of the records associated with this

18   individual's death?

19   A.   I'm sure I have, but I'm not completely familiar with all

20   of them at the moment.

21   Q.   Okay.  If we could bring up Plaintiff's Exhibit 71, and

22   if we could just pace through it.  Do you review incident

23   reports when you review the deaths?

24   A.   I do when they're made available to me.

25   Q.   And do you recognize Plaintiff's Exhibit 71?

1   A.   Yes.  This incident report explains how the officer, who

2   was helping with the feeding in Charlie 1, was told by an

3   inmate that his roommate was unresponsive and couldn't get up.

4   Q.   If we could bring up Plaintiff's Exhibit 72.  If we could

5   page through it.  All right.  Now, do you recognize

6   Plaintiff's Exhibit 72?

7   A.   Yes.

8   Q.   Now, what is 72?

9   A.   Well, the incident report's indicating that an officer

10  responded, that one officer was assisting with feeding.

11  What's not clear is whether there was actually an officer in

12  the housing unit at the time as a unit officer, but the inmate

13  made him aware his roommate was unresponsive.  They called for

14  medical and medical responded, and he was ultimately removed

15  from the housing unit.

16       MR. CHENG:  We would move for the admission of

17  Plaintiff's Exhibits 71 and 72, Your Honor.

18       THE COURT:  Any objection?

19       MR. MORISANI:  No objection.

20       THE COURT:  P71 and P72 will be received into evidence.

21       (Plaintiff's Exhibits 71 and 72 entered.)

22  BY MR. CHENG:

23  Q.   In October of 2021, was there an inmate who was killed by

24  other inmates?

25  A.   In October, there was an inmate who was apparently beaten

1   to death by other inmates in Alpha 4.

2   Q.   If we could bring up Plaintiff's Exhibit 68.  Do you

3   recognize -- well, let's go through it first, page through it.

4   Do you recognize Plaintiff's Exhibit 68?

5   A.   Yes.

6   Q.   And what is it?

7   A.   Okay.  We've got an incident report and investigation

8   into the death of an inmate in Alpha 4 who was found hours

9   after he was assaulted.  The best estimate based on review of

10   the video and the facts was that it was about nine hours

11   later.  During that time frame, there were supposed to be

12   hourly well-being checks conducted.  There's no record of

13   that.  There were two meals that were served, and that did not

14   bring it to the attention of the officers involved.  And there

15   were at least two head counts that occurred during that time

16   frame, so there was a breakdown of procedure across the board.

17        And a review of video showed that the officer in the

18   control room had appeared to go to sleep during the late hours

19   of the night, and that another officer was actually inside the

20   control room, for whatever reason, instead of out on the

21   floor.  So it was a bad situation.

22   Q.   If we could also introduce Plaintiff's Exhibit 69, and do

23   you recognize Plaintiff's Exhibit 69?

24   A.   Yes, sir.  These documents tend to reflect and support

25   what I just explained.

1   Q.   If we could introduce Plaintiff's Exhibit 70, so if we

2   could hold this for a second on Plaintiff's 70.  I think we

3   might have had a little bit of confusion before on my part.

4        Was there a mortality review done for this inmate who was

5   killed by other inmates?

6   A.   As I'm looking at the mortality review that was done,

7   names redacted, but I'm -- this is -- this is from August.  I

8   thought we were talking about a case for October.

9   Q.   So for the individual earlier that we talked about who

10  may have died of a drug overdose, was a mortality review done

11  for him?

12  A.   This is reflecting that a mortality review was done for

13  the case in August.  A mortality review is separate from an

14  after-action report.  A mortality review is done by the

15  medical staff to determine whether there were any

16  medical-related issues involved or things that could have been

17  done differently.

18       In general, we find that a mortality review is basically

19  a one-page, pro forma statement.  And the after-action report

20  that I referred to with regard to the case in October that was

21  done by Major Bryan is a much more comprehensive review of all

22  aspects of the incident.  It's much lengthier and much more

23  detail involving all personnel involved.  And after-action

24  reports are what are generally missing, except in that one

25  case.  Mortality review cases are done much more frequently.

1  Q.   But for the death in August, the jail's mortality review

2  noted that this detainee had some rigor mortis; is that right?

3  A.   I'm sorry.  Could you please repeat that?

4  Q.   The first paragraph?

5  A.   Okay.  Rigor mortis.  Excuse me.  Yes.

6  Q.   So earlier we talked about the death of the possible drug

7  overdose.

8  A.   Yes.

9  Q.   You had mentioned that there were indications that they

10 weren't being checked enough?

11 A.   Yes.

12 Q.   Was rigor mortis one of the issues that also got brought

13 up?

14 A.   I mean, that would indicate that the incident had

15 occurred sometime before and should have been noted sometime

16 before if hourly well-being checks were actually done.  And

17 when well-being checks are done, they're supposed to be making

18 sure that everybody is okay, not just counting bodies that may

19 be totally unresponsive.

20      MR. CHENG:  So at this time, Your Honor, I'd move to

21 admit Plaintiff's Exhibits 68 through 70.

22      THE COURT:  That would be 68, 69, and 70?

23      MR. CHENG:  Yes.

24      THE COURT:  What says the defendant?

25      MR. MORISANI:  No objection.

1          THE COURT:  Those exhibits will be received into

2     evidence.

3               (Plaintiff's Exhibits 68, 69, and 70 entered.)

4     BY MR. CHENG:

5     Q.   All six of these deaths, were they in the past year?

6     A.   Yes, sir.

7     Q.   And did you think that those deaths were in any way

8     caused by a lack of staffing or supervision?

9     A.   Some of them, certainly.

10    Q.   And which ones?

11    A.   Suicide in booking, suicide in Charlie 4, assault in

12    Alpha 4.

13    Q.   The assault in Alpha 4, which one is that one?

14    A.   I can't put the dates on them, but the assault in Alpha 4

15    was -- that was October.

16    Q.   Was that the individual who was killed by other inmates?

17    A.   Killed by other inmates and dragged in there and then not

18    found until 13 hours later, yeah.

19    Q.   And did any of the deaths reflect the inappropriate use

20    of the booking cells?

21    A.   Yes, the suicide that I mentioned.

22    Q.   Were any of the deaths associated with the failure to

23    implement security and supervision policies?

24    A.   Failure to follow policies.  They may have been put in

25    place and trained but not followed.  With regard to the

1    suicide in Charlie 4, my recollection is the officer involved

2    in that case was ultimately terminated, because the video

3    showed that he had not conducted his well-being checks as his

4    log showed that he had.

5    Q.   Were any of the deaths associated with a lack of

6    supervision by sergeants or higher-level supervisors?

7    A.   The last case that I just mentioned, there was a sergeant

8    involved who did not take appropriate action when he found the

9    body hanging in the cell in Charlie 4.  Instead he ran down to

10   the control room and called booking.

11   Q.   What should he have been done?

12   A.   He should have cut the inmate down immediately.  He may

13   have been dead already, but he should have taken immediate

14   action to make sure that if there was a possibility of saving

15   him, they could have, instead of leaving him there and just

16   making an assumption that he was dead.

17   Q.   Do the deficiencies shown by these deaths show an ongoing

18   risk of serious harm to inmates?

19   A.   Well, statistically the numbers are -- are frightening,

20   and they reflect that procedures were not followed for various

21   reasons: misuse of holding cells, failure to conduct proper

22   security and well-being checks.  Those are two primary issues.

23   Q.   If we could introduce Plaintiff's Exhibit 32.

24        THE COURT:  You said 32; right?

25        MR. CHENG:  Yes, Your Honor.

1    A.   Yes, sir.  I'm familiar with this.

2    BY MR. CHENG:

3    Q.   Do you recognize that plaintiff's exhibit?

4    A.   That is the spreadsheet log of assaults that I made

5    reference to earlier.  I was talking about making reference to

6    the last four months, but it goes back to 2018.

7    Q.   So when you said the numbers are statistically

8    frightening, were you referencing the numbers from this

9    spreadsheet?

10   A.   No.  Specifically just a moment ago when I made that

11   comment, I was making reference to the number of deaths that

12   occurred in one year that were due to significant problems of

13   misuse of housing areas, failure to follow proper procedures

14   on well-being checks and such.  The list of assaults is a

15   different but related matter.

16   Q.   So what is Plaintiff's Exhibit 32?

17   A.   It's a list of incident reports that reflect assaults of

18   inmates on inmates, inmates on staff, month by month, by

19   location, incident report number, whether somebody was

20   seriously injured, killed, had to be hospitalized, or so

21   forth.  So it's a spreadsheet that compiles all of that data.

22   Q.   And did you review this material when you were forming

23   your opinion about the level of violence in the jail?

24   A.   That's one of the things that I looked at, yes.  That

25   document over the past four months reflects, according to my

1    count, 77 assaults that occurred from October through January;

2    that comes out to almost 20 per month.  Some of them minor.

3    Some of them very serious, and one of them being a death.

4         MR. CHENG:  At this time, I'd like to move in

5    Plaintiff's Exhibit 32, Your Honor.

6         THE COURT:  Hold on for one second.  Any objection?

7         MR. MORISANI:  Your Honor, I just -- the record is not

8    clear who has authored this document.  I don't -- it's not

9    clear.

10        MR. CHENG:  I believe, Your Honor, this was a document

11   previously noticed to the defendants as a compendium document

12   that was established by the monitor and Mr. Parrish and

13   others, so they had notice of the document before I believe.

14        THE COURT:  32 is a sealed exhibit; is that correct?

15        MR. CHENG:  Yes, Your Honor.

16        THE COURT:  And who prepared it?  The County?

17        MR. CHENG:  No.  It would have been a compendium of

18   documents that are reviewed by the monitoring team, the

19   assaults and incident reports, and instead of bringing in all

20   the incident reports, we're using it as a compendium.  And it

21   had been noticed to the defendants before.

22        THE COURT:  Did Mr. Parrish prepare the document, or

23   did one of the other monitors prepare it?

24        THE WITNESS:  I did not prepare the document.  The

25   monitor prepared it.

1          THE COURT:  The monitor prepared it?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  All right.  Any objection?

4          MR. MORISANI:  Our objection would just be maybe this

5     is better brought in through the monitor than Mr. Parrish who

6     didn't prepare it.

7          THE COURT:  All right.  That's what we'll do then.  The

8     objection will be sustained as to this witness --

9          MR. CHENG:  Yes, Your Honor.

10         THE COURT:  -- as far as moving it in as an exhibit.

11    He can testify to what he knows about it.

12    BY MR. CHENG:

13    Q.   Mr. Parrish, do they actually have a gang program in the

14    jail?

15    A.   No, sir.  It was something that they looked at initially

16    when the monitoring process began, but nothing ever came of

17    it.

18    Q.   Does the failure to develop a gang program or gang

19    policies create a serious risk of harm in the jail?

20    A.   Yes.  It's one of the paragraphs that's covered in the

21    settlement agreement as a requirement.

22    Q.   Does the failure to develop the direct-supervision

23    policies pose a serious risk of harm to inmates in the jail?

24    A.   Yes.  That one is particularly important.

25    Q.   Does the failure to implement post-incident reviews or

1  action -- after-action reviews pose a risk of serious harm to

2  inmates in the jail?

3  A.   After-action reports are critically valuable information

4  that needs to be developed whenever there's a serious incident

5  like that so that the problems can be addressed in the future,

6  so the answer is yes.

7  Q.   Does the failure to have supervisors review use-of-force

8  and incident reports pose a serious risk of harm to inmates in

9  the jail?

10  A.   Yes, it does.  Supervisors need to review every single

11  incident report and particularly those with -- involving use

12  of force to determine whether policy is being followed and

13  whether corrective action needs to be taken or a commendation

14  for doing the right thing.

15  Q.   Does the jail have maintenance policies or safety

16  inspection policies?

17  A.   Does the jail have maintenance inspection policies?  No.

18  Q.   Does the jail have a fire safety inspection policy?

19  A.   It does not have a fire safety inspection policy.  It has

20  a fire safety officer.

21  Q.   Who is that officer?

22  A.   Mioka Laster.

23  Q.   Does the lack of a maintenance inspection policy pose a

24  serious risk of harm to inmates in the jail?

25  A.   It adds to the problem, absolutely.

1   Q.   Did you ever refer to some of the cells as "trash cells"?

2   A.   Yes, I referred to them as trash dumpster cells.  They're

3   located in Alpha Pod.

4   Q.   And what are those?

5   A.   They are approximately 30 cells that have been damaged,

6   and rather than repair them, the County's solution has been to

7   weld the doors shut.  Inmates then fill the cells up with

8   trash by throwing in the broken-out windows or sliding it

9   under the door.  They become a sanitation issue, a health

10   issue, if you will, and they have been addressed in the past

11   on several occasions.

12      The County during, I think, two site visits back

13   indicated that they were -- during the site visit, which was

14   remote, they were opening up all 30 cells, fixing those that

15   they could, and putting them back online and resealing the

16   others.  There were about 19 that were resealed, I was told at

17   that point.

18      Subsequently the Benchmark representative who works

19   directly in the jail, Benchmark Construction, informed me that

20   as of June, there were about 30 trash dumpster cells still in

21   operation.  When I went through the facility in January, I

22   went in and did a test sample of one housing unit, Alpha 1.

23   In that particular housing unit, I found seven welded-shut

24   trash dumpster cells.  Multiply that out times four, that's

25   28, so his figure is probably pretty close at 30.

1  Q.   Does the failure to address the trash dumpster cell issue

2  affect the security of the jail?

3  A.   It just certainly adds to the problem.  I mean, from an

4  operational point of view, they're short of space, so now we

5  have 30 cells that are shut down and can't be used.  That's

6  the equivalent of a whole housing unit.  That's 60 beds.  And

7  that hurts classification's ability to separate people and put

8  them in the proper places.  And from a sanitation point of

9  view and an operational point of view, it's totally

10 counterproductive to a well-run jail.  You don't just weld

11 doors shut and seal them up because things are broken.  You

12 fix them.  And that's an ongoing problem that has yet to be

13 resolved.

14 Q.   Now, is there a master plan for building a new jail?

15 A.   Yes, sir.

16 Q.   Does the master plan address things like how to deal with

17 trash dumpster cells?

18 A.   No, that's not something they've addressed at all.  I

19 would hope that they would never see anything like that in the

20 future.

21 Q.   So you talked earlier about the stipulated order and the

22 master plan.  Are there things they should be addressing in

23 the current facilities in terms of physical plant even before

24 they build a new jail?

25 A.   Absolutely.  They have to, because a new jail isn't going

1    to be coming online for four or five years.  A jail takes a

2    good lead time to be built.  In the meantime, they have to

3    continue to use their existing facilities, so I use one

4    example.

5        There has been discussion of and plans for padding a

6    safety vestibule going into each of the three control rooms in

7    Alpha, Bravo, Charlie, putting a safety vestibule into master

8    control.  Right now there's just a single door.  Doing the

9    same thing in the control room in the Jackson Detention

10   Center, which is still going to continue to operate on the

11   ground floor.  That's just a single door to get in and out of

12   that control room.

13   Q.  How about trying to get trash dumpster cells or other

14   inoperative cells back into operation?  Should that be

15   covered?

16   A.  That's one of the things that should be covered.  What

17   they need to do is list all of the problems that need to be

18   addressed, whether it has to do with fire safety, cameras,

19   doors that don't lock, things we just talked about right now,

20   safety vestibules, sally ports.  At the work center there's no

21   such thing as a sally port, so they have to drop the inmates

22   off out on the street and then walk them into the jail, and

23   make a list like that and then prioritize them, say this is

24   the most important thing and we're going to do this first and

25   it's going to be finished by whatever date and then go through

1   each thing like that and then get commitment from the Board of

2   Supervisors that has to provide the money to do it, from the

3   sheriff, from the jail administrator as to getting those

4   things done.  And until there's commitment from all of those

5   bodies, all the promises in the world don't mean anything, and

6   that's a very important part of the stipulated order that

7   needs to be accomplished expeditiously.

8   Q.   And have you provided recommendations to address these

9   issues before?

10  A.   We have not provided a list in priority order.  That's

11  for the master planning committee to do.  We have listed

12  things that we think are important, such as safety vestibules,

13  a drive-through sally port, a working smoke detector and alarm

14  system, that sort of thing.  But it's up to them to decide

15  what order they need to be done in and when they will be done

16  and will they be funded.

17  Q.   But did they ever come up with a plan to try to address

18  these things in a priority order?

19  A.   No.  It's never been done.

20  Q.   And if they don't address these types of things in the

21  short term, will solving -- will building a new jail address

22  these problems in the next couple years?

23  A.   The short answer is no.  A -- if you can't manage your

24  existing facility, just building a new facility is not going

25  to solve the problem.  If they don't have sufficient staff to

 1   operate it, the inmates will tear it apart as fast as they

 2   tear apart Raymond.  Those basic things need to be solved.  A

 3   new building is not necessarily the answer.  It would

 4   certainly be a much improvement -- it would be a huge

 5   improvement over the design of the Raymond Detention Center.

 6   I acknowledge it's not a good design.  But it has to be

 7   operated properly, and until that problem has resolved, just

 8   building a new building is going to be very expensive and will

 9   give the inmates a lot of new material to destroy.

10   Q.   Now, your monitoring team, you've made recommendations,

11   but have the jail administrators or staff reported any of

12   these type of problems as well to their own supervisors?

13   A.   Have the jail administrator and staff, officers --

14   Q.   Reported these types of problems themselves.

15   A.   Indicated that they have problems like I've just

16   described?

17   Q.   Yes.

18        MR. MORISANI:  Your Honor, I object, calls for

19   speculation.

20   BY MR. CHENG:

21   Q.   Only if you know, Mr. Parrish.

22        THE COURT:  I'm sorry.  Hold on.  Objection is

23   overruled.  You may re-ask -- ask your question again, though.

24   BY MR. CHENG:

25   Q.   Have jail administrators and staff reported these same

1  types of problem as well to their supervisors?

2  A.   Yes.  During each of our site visits, we talk with people

3  at all levels, as we indicated earlier, and certainly they

4  have to live with it every day, and they make us aware of

5  major issues that they have.  Sometimes as a result of

6  questions that we ask; other times it's just because they see,

7  hear somebody who's looking at what our issues are, and they

8  volunteer information.  And from command staff and the

9  administrators, we certainly get a straight-up reporting each

10  time we do a site visit.

11  Q.   Did the staff ever stage a walkout at the jail in the

12  last several months?

13  A.   Yes.  Back on November the 13th of 2021, I received a

14  call from a sergeant.  It was on a Saturday, I believe, and he

15  indicated that the officers had reported to work at the

16  Raymond Detention Center but refused to go inside the facility

17  to work.  They were standing out front and wanted to talk to

18  command staff.  The interim sheriff responded, the jail

19  administrator responded, spent quite a bit of time talking

20  with them out there.  They submitted a list of concerns, some

21  of the things that we heard about earlier, such as salaries,

22  direct deposits, and so forth, and a step plan, radios, on and

23  on.

24        And in the meantime, that same sergeant called me back

25  again to inform me that he was one of only three people

1   actually working inside the jail at the time.  So we had two

2   officers and a sergeant taking care of a 600-bed facility and

3   nobody else inside.  That was a dangerous situation.

4   Q.   If we could introduce Plaintiff's Exhibit 24.  Do you

5   recognize Plaintiff's Exhibit 24?

6   A.   Yes, sir.  This is the detention needs and concerns.

7   This is the list, and it covers things like radios, signal

8   boosters, handcuffs and shackles, chemical agents, locks,

9   cleaning supplies -- that's a constant complaint that we don't

10   have adequate cleaning supplies from staff -- shortage of

11   staff, heaters -- that's one I have not heard about -- chairs

12   for staff to sit in, so forth.  It was a long list of things

13   that they wished to be addressed.

14   Q.   Are these long-standing demands of people --

15   A.   Well, some of them obviously are, and some of them are

16   based on more current events.

17   Q.   You mentioned earlier something about a career ladder or

18   step pay.  Has anyone ever proposed a career ladder or step

19   pay plan?

20   A.   That goes back about three years and back under -- I

21   think it was Sheriff Vance who actually pushed that request

22   through, but I don't know in what form, to the Board of

23   Supervisors, but it never got off the ground.

24   Q.   What happened to Sheriff Vance?

25   A.   Sheriff Vance passed away of COVID.

1          MR. CHENG:  At his time, Your Honor, I'd like to move

2     to admit Plaintiff's Exhibit 24.

3          THE COURT:  Any objection?

4          MR. MORISANI:  No objection, Your Honor.

5          THE COURT:  P24 will be received in evidence.

6               (Plaintiff's Exhibit 24 entered.)

7     BY MR. CHENG:

8     Q.   If we could introduce Plaintiff's Exhibit 21.

9     Mr. Parrish, do you recognize -- do you recognize Plaintiff's

10    Exhibit 21?

11    A.   Yes, sir.  This is the step plan that I referred to that

12    was proposed.

13    Q.   And so has that step plan ever been approved by the

14    board?

15    A.   No.

16    Q.   Did you hear earlier something about a five percent pay

17    increase?

18    A.   Yes.

19    Q.   So how long did it take -- well, let me ask you:  Do you

20    know, when did you first hear about a proposed five percent

21    pay increase for the staff?

22    A.   That goes back to the term of Sheriff Vance as well.

23    Q.   And how long did it take to get the five percent pay

24    increase implemented?

25    A.   Probably a year.

1   Q.   And would that five percent pay increase make the

2   detention officer pay competitive enough to stabilize

3   staffing?

4   A.   It raises it to approximately $31,000 entry level, which

5   is better than what it was when we started the monitoring

6   process.  At that point it was in the neighborhood of 27,5 to

7   28,000.  This makes it somewhat comparable to what the

8   Mississippi Department of Corrections pays.  We'll have to see

9   whether that's going to make a sufficient difference.

10  Q.   Does raising pay alone remedy the staffing and

11  supervision issues?

12  A.   No.  Part of it becomes almost a self-fulfilling prophecy

13  in that when the public becomes aware of violent and dangerous

14  working conditions within the jails, it tends to push

15  candidates away.  Why would one want to take a job where it's

16  dangerous when you could just as easily go to some fast-food

17  or commercial agencies and get a job where you're not facing

18  things like that?

19  Q.   And the most recent time you assessed these issues, what

20  was the turnover rate for the jail staff?

21  A.   The turnover rate has been in excess of 25 percent

22  routinely.

23  Q.   And what is the vacancy rate?

24  A.   The vacancy rate depends upon how you measure it.  I

25  mean, back when there were 281 authorized positions and there

1   were 205 people actually on board, that was almost a third of

2   the work force was not filled.

3   Q.   How about most recently compared to then?

4   A.   Well, right now it depends upon how you measure it.  If

5   you abolish a lot of the funded positions and now have only

6   233, the vacancy rate looks better, but the reality is that

7   there are few people than ever before, so that's not really an

8   accurate way to measure it anymore.

9   Q.   So comparing it with the number of staff recommended in

10  the staffing analysis, what is their vacancy rate right now?

11  A.   Say 329 for both facilities minus all of Alpha Pod, and

12  there's 199, that leaves you well over 100 vacancies, which

13  means well over 33 percent vacancy.

14  Q.   Does the consent decree have a presumption based upon the

15  vacancy rates at the jail?

16  A.   The paragraph talk about the vacancy rate and also the

17  turnover rate.  So there are sections in the paragraph that

18  apply to both.

19  Q.   So in all the years you've been at the jail, have their

20  vacancy and turnover rates exceeded the presumptions under the

21  consent decree?

22  A.   Yes, they have always exceeded it.

23  Q.   So under the consent decree, is there a presumption that

24  those rates are high enough that the jail is considered

25  unsafe?

1  A.   Based on what's in the settlement agreement, it's lack of

2  compliance, yes.

3  Q.   So leaving aside the consent decree, do you consider the

4  turnover and vacancy rates at the jail to be high?

5  A.   Yes.

6  Q.   And do you think those high rates are creating a

7  dangerous situation in the jail?

8  A.   They create a dangerous situation for both inmates and

9  staff, as I've indicated before.  It affects both parties.

10       MR. CHENG:  At this time, Your Honor, I'd move to admit

11  Plaintiff's Exhibit 21.

12       THE COURT:  Any objection?

13       MR. MORISANI:  No objection, Your Honor.

14       THE COURT:  P-21 will be received into evidence.

15          (Plaintiff's Exhibit 21 entered.)

16  BY MR. CHENG:

17  Q.   Now, we've talked a lot about security and staffing, sort

18  of the law enforcement/detention officer side of the jail.

19  Are there more positive ways of managing the behavior of

20  inmates rather than just using security or supervision?

21  A.   Are there more ways of managing inmates?

22  Q.   Well, let me phrase it differently.  In running a jail

23  and trying to deal with the inmate behaviors, are there

24  positive behavioral approaches to dealing with inmates?

25  A.   Yes.  And when housing conditions are normalized, to the

1  extent possible, through utilization of direct supervision, it

2  becomes possible for the officer in the housing unit to become

3  a mentor for the inmates.  Inmates can have such benefits as

4  maybe a coffee machine or a microwave, access to different

5  things, normal furnishings, ordinary -- jail-quality but

6  ordinary tables and chairs that are movable as opposed to the

7  huge steel things that are bolted to the floor.  All of those

8  things tend to normalize the daily life of the inmates, and it

9  takes the pressure off of everything.  It doesn't mean that

10  everything is going to be wonderful.

11      When you arrest a lot of people who have violated the law

12  on the street and put them all together in one place, it's not

13  suddenly magic they're all going to behave because of direct

14  supervision, but it's much easier to manage and prevent

15  problems from escalating in a direct-supervision environment.

16  Q.  Would providing recreation be a positive behavioral

17  approach to --

18  A.  Recreation should be able on a daily basis as needed for

19  inmates.  Unfortunately, the design of the Raymond Detention

20  Center and the work center make housing units to share rec

21  yards.  Each housing unit should have its own rec yard.  It

22  should be an integral part of that housing unit.  I hope

23  that's something they design into their new facility.  That

24  makes management so much easier it's one more thing to be able

25  to go outside and get some fresh air, to have a cover over

1   part of it so in the event of rain, you can still get some

2   fresh air and not get soaked, and that's the kind of thing

3   that needs to be in place to help alleviate the situation, to

4   help reduce the tension level to make the job of the officer

5   easier and to make daily interaction of inmates more normal.

6   Q.   Under the new sheriff, have they allowed the use of

7   Tasers that would violate the use-of-force policies?

8   A.   Yes.  I've never seen anything in writing about it, but I

9   have been told and I saw firsthand that a number of

10   upper-level supervisors were carrying Tasers when I went

11   through in January.

12   Q.   Has any officer misused the Taser?

13   A.   Has any officer used a Taser?

14   Q.   Misused the Taser.

15   A.   Misused.  Yeah.  I pointed out one example of an

16   investigator who used a Taser to coerce an inmate into putting

17   his hands behind his back so he could be handcuffed.  He was

18   laying flat on his face on the ground, and nobody ever did

19   anything about that with internal affairs, so we provided them

20   with a copy of the incident report and said that's something

21   you should certainly take a look at.  Here's the investigator

22   who's looking into criminal problems within the jail and he

23   abuses the use-of-force policy by using a Taser in a coercive

24   manner to put your hands behind my back while he has

25   supervisors up to the rank of captain standing around him.

1   Q.   In addition to requiring general staffing improvements,

2   does the consent decree also have provisions to improve the

3   leadership of the jail?

4   A.   Yes.  We've recommended that they take care -- take

5   advantage of the resources that are available through NIC,

6   ACA, and AJA in particular, and that was recommended, but

7   funding has not been made available yet to provide that kind

8   of training to the very top command staff, captains and

9   assistant jail administrator.

10  Q.   Does the consent decree require hiring a qualified jail

11  administrator?

12  A.   Yes.

13  Q.   And why is it necessary to have a qualified jail

14  administrator to improve security at the jail?

15  A.   It's necessary to have enlightened leadership as opposed

16  to someone who is in that position just based on seniority and

17  this is the way we've always done it, so that's what we're

18  going to continue to do.  Good leaders are those that have a

19  combination of education, experience, and forward thinking,

20  and that's what the settlement agreement calls for.

21  Q.   And does it help to have good middle-level managers as

22  well at the jail to implement the consent decree?

23  A.   Certainly.  When there's a breakdown somewhere in the

24  chain of command, it destroys everything.  I mean, the command

25  level may have the best intentions, the best knowledge,

1   starting the best programs.  If it breaks down somewhere in

2   between, what the front-line officers know is exactly what's

3   passed on to them by the level above, and so it's important

4   that everyone in the chain of command be on the same page.

5   Q.   Did you ever see the resignation letter from Ms. Bryan,

6   the jail administrator?

7   A.   Yes.

8   Q.   If we could introduce Plaintiff's Exhibit 13.  Do you

9   recognize Plaintiff's Exhibit 13?

10  A.   I do.

11  Q.   And what is Plaintiff's Exhibit 13?  What is Plaintiff's

12  Exhibit 13?

13  A.   Oh, excuse me.  The letter of resignation from Major

14  Bryan dated November the 10th indicating that because of

15  concerns she had, she was giving notice that she would resign

16  effective February the 10th, 2022, but in the interim she

17  would continue to perform her duties as necessary.

18  Q.   Did Major Bryan's resignation cause you any concerns

19  about the leadership being provided by the defendants?

20  A.   Well, this was done when we had an interim sheriff, and

21  she backed this letter of resignation up with a number of

22  documents which reflect why she had come to this decision,

23  which included the fact that she was not getting the staffing

24  support that she needed to operate the jail, that they were

25  required to accept people into the jail who had medical issues

1   that were being turned down by medical and yet was overridden

2   and told to take that person in.  That's contrary to policy,

3   and she said, I'm supposed to be able to manage the jail, and

4   that's why she submitted her resignation.

5   Q.   Would admitting somebody into the jail even though the

6   policy says not to, would that pose a risk of serious harm to

7   those inmates?

8   A.   Certainly.  That's why the policy's in place, and it can

9   be badly abused.  I -- we actually had the Tampa Police

10  Department try to deliver an inmate to us in central booking

11  at the Orient Road Jail one time who was dead, and they passed

12  him off as being passed out.  We don't take somebody who's

13  unconscious.  We don't take somebody who's got serious medical

14  issues.  Any jail needs to operate that way.  That was built

15  into the policy that was issued here on booking procedures and

16  acceptance, and medical staff and jail staff were trying to

17  follow that when they were overridden from above and told take

18  this person in regardless.

19  Q.   And who overruled Major Bryan and forced her to admit the

20  person with medical issues?

21  A.   I'd have to go back and look at it, but I think the

22  document that I looked at showed a signature from the

23  undersheriff.

24       MR. CHENG:  I'd like to move at this time the admission

25  of Plaintiff's Exhibit 13.

```
1          THE COURT:  Any objection?

2          MR. MORISANI:  Yes, Your Honor.  We object on the

3    grounds that it's not clear from the first page that all this

4    other stuff was attached to this letter, and I don't think --

5    maybe getting ahead of myself, but it may not -- this witness

6    may not be able to testify to that.  It's not his letter.

7          THE COURT:  What does the letter say?  I'm in search of

8    reference to any attachments.

9          MR. MORISANI:  It does not -- the letter does not

10   reference any attachments, and yet there are several various

11   attachments to this letter that's presented to us by

12   plaintiff's counsel.

13         THE COURT:  What does the Government say about that?

14         MR. CHENG:  Your Honor, first it's a party-opponent

15   admission.  Secondly, if you look on page 2 of the letter,

16   there are numerous internal citations.

17         THE COURT:  Hold on.  Is this something that the

18   monitors reviewed in preparing either their interim report or

19   report number 15?  Is this something they reviewed to prepare

20   for this?

21         MR. CHENG:  Yes, Your Honor, I believe so, but also if

22   you look at the letter itself, it references the attachments.

23   See incident 2152, 211512, reference to policy 6100, so

24   clearly the letter came with attachments, and they're

25   referenced directly in the letter.
```

```
 1          MR. MORISANI:  Your Honor, if I may just briefly
 2   respond to that?
 3          THE COURT:  Hold on.  Hold on.
 4          MR. MORISANI:  Yes, sir.
 5          THE COURT:  The letter of resignation is two, three
 6   paragraphs long; right?  That's the letter of resignation.
 7   That's what you're asking about?
 8          MR. CHENG:  No, Your Honor.  It's actually several
 9   pages long.  If you look at the exhibit, Plaintiff's 13.
10          THE COURT:  It's a one-page letter of resignation.
11   That's what you asked him about; right?  That's what you asked
12   him about, the letter of resignation?
13          MR. CHENG:  My apologies.  Yes, you're right.
14          THE COURT:  Okay.  So I realize what is P13 is the
15   letter of resignation, and then page 2 of that is what and
16   page 3?  I mean, I see it's something submitted, written,
17   signed off on by Kathryn Bryan, but what is it?
18          MR. CHENG:  Well, let me see.
19   BY MR. CHENG:
20   Q.   Mr. Parrish, did Ms. Bryan also write a letter explaining
21   what happened with the admission of the medically ill
22   detainee?
23   A.   There's a backup to this.  It doesn't start out with a
24   header, but it's on sheriff's office stationery which explains
25   that and then is signed off as well.  I can't speak as to
```

1  format of her letter.

2  Q.  Did you have a chance to review that letter as well --

3  that part of the letter as well?

4  A.  Yes.

5  Q.  And did that help form your opinion about what happened

6  with Ms. Bryan's departure from the jail?

7  A.  That's what generated her resignation letter initially

8  under the previous sheriff, yes, the interim sheriff.

9  Q.  So when she submitted her one-page resignation letter,

10  did she also explain -- did you have some reason to believe

11  she explained why she had to submit a letter of resignation?

12  A.  When I got this information to look at, the backup

13  material came with it.  I don't know in what form it was

14  delivered to the sheriff.

15  Q.  Did the information come from the sheriff's department?

16  A.  Everything that we get comes through the compliance

17  coordinator.

18  Q.  So when you were told -- when you were given information

19  indicating that Major Bryan was resigning, this additional

20  material was provided with it as well from the sheriff's

21  department?

22  A.  Yes.

23      THE COURT:  Okay.  Any now -- okay.  Any objection,

24  Mr. Morisani?

25      MR. MORISANI:  We do object, Your Honor, and I'll state

1  it briefly.  The letter -- November 10th letter may be a

2  standalone letter.  We don't know, and this is not the witness

3  to tell us that.  Secondly, what they're purporting as the

4  second letter is not addressed to anyone.  It's just a

5  document attached to this.  The page numbers are DOJ page

6  numbers, so can't really go by that.  And then on top of that,

7  again, there's a better witness to get this -- to look at this

8  document.  It's odd that they're trying to get it in through

9  this witness.

10       THE COURT:  I will sustain the objection with respect

11  to all --

12       MR. CHENG:  Your Honor, just should mention that the

13  attachment to it is also dated November 10th.  I mean, it's

14  clearly meant to be contemporaneous, and, you know, if it

15  comes from the defendants themselves explaining the situation,

16  it should be an admission at least.

17       THE COURT:  Well, I guess the question would be show it

18  to the witness and ask him if he's reviewed it in preparation

19  of his testimony today.  Has he?  I don't know.

20       MR. CHENG:  Okay.

21  BY MR. CHENG:

22  Q.   Mr. Parrish, did you review these materials in

23  preparation for your testimony today?

24  A.   Yes, sir.  That's what I explained earlier, that I looked

25  at it.

1   Q.   And when you drew conclusions about the leadership of the

2   jail, did you consider this material in forming your opinion?

3   A.   Yes.

4        THE COURT:  Okay.  All right.  I'm going to allow him

5   to -- I'm going to admit them.  I imagine they're going to

6   come in through Kathryn Bryan as well and somebody else.  They

7   are the documents that -- well, we believe they're the

8   documents that belong to the defendants anyway.

9            (Plaintiff's Exhibit 13 entered.)

10       MR. CHENG:  If we could bring up Plaintiff's

11  Exhibit 14.

12       THE COURT:  We're about to move to a different exhibit?

13       MR. CHENG:  Yes.

14       THE COURT:  Okay.  It's after 5:00.  This is a good

15  place to end it for the day.  But before we do, I want to make

16  sure -- my notes show that you did not, Mr. Cheng -- my

17  notes -- I'm going to have to get with Ms. Summers, too, but I

18  just want to make sure you did not move to admit 68 and 69 --

19  oh, he did?  68, 69, and 70 got in; right?

20       MS. SUMMERS:  Yes, sir.

21       THE COURT:  Okay.  Sorry about that.  Did you move to

22  admit 32?

23       MR. CHENG:  No, Your Honor.

24       THE COURT:  Okay.  All right.

25       MR. CHENG:  Well, we moved it.  It wasn't admitted.

1    I should mention one thing.  I believe the health

2    service administrator, Ms. Ebbonie Taylor-Winfield, may be in

3    the audience.  I wasn't sure if that needs to be addressed.

4    THE COURT:  I presume that -- I know you're concerned

5    about these witnesses.  I take it that the Government -- I

6    mean, we may not hear from any witnesses from the County.  I'm

7    not tipping their hand for you, but if these people are coming

8    in and they know them, these attorneys know what their

9    obligations are.

10    MR. CHENG:  Yes, Your Honor.  We just want to make a

11    note of it.  It will be fine, I'm sure.

12    THE COURT:  Yeah.  I don't know if you've listed any of

13    them in your --

14    MR. CHENG:  We have not.

15    THE COURT:  -- version of the pretrial order.  Okay.

16    As may calls or anything; right?  Okay.  All right.

17    MR. CHENG:  Correct.

18    THE COURT:  All right.  Well, Mr. Parrish, you may step

19    down.

20    THE WITNESS:  Thank you, Your Honor.

21    THE COURT:  We're wrapping up our first day.  It's a

22    tedious process, I understand.  And, again, I will not step on

23    the parties' feet in any way in the presentation of the case,

24    because it was important to all sides to make sure everything

25    is covered.  We will -- Mr. Parrish 's testimony will resume

1    at 9:00 a.m. tomorrow morning.  That concludes all that we

2    have today.  If by chance there's something that arises among

3    or with the parties that we need to take care of before --

4    before we begin, please e-mail chambers, call chambers,

5    because we are generally here very early in the morning.  And

6    we can take care of things by, you know, 8:15, 8:30, or

7    whatever we need to do.  But I would like to get the testimony

8    started again at 9:00.

9         That's all that I have.  Take advantage of whatever is

10   left of this Valentine's Day.

11   ****************************************************************

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **COURT REPORTER'S CERTIFICATE**

2

3    I, Candice S. Crane, Official Court Reporter for the

4 United States District Court for the Southern District of

5 Mississippi, do hereby certify that the above and foregoing

6 pages contain a full, true, and correct transcript of the

7 proceedings had in the forenamed case at the time and place

8 indicated, which proceedings were stenographically recorded by

9 me to the best of my skill and ability.

10    I further certify that the transcript fees and format

11 comply with those prescribed by the Court and Judicial

12 Conference of the United States.

13    THIS, the 15th day of February, 2022.

14

15        */s/ Candice S. Crane, RPR, CCR*

16        Candice S. Crane, RPR, CCR #1781
         Official Court Reporter
17        United States District Court
         Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25