```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                         PLAINTIFF

 5   VERSUS              CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                     DEFENDANTS
 7

 8

 9               EVIDENTIARY HEARING, VOLUME 3,
             BEFORE THE HONORABLE CARLTON W. REEVES,
10              UNITED STATES DISTRICT COURT JUDGE,
                      FEBRUARY 16, 2022,
11                   JACKSON, MISSISSIPPI

12

13                  (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

———***DAILY TRANSCRIPT***———

1  **APPEARANCES:**

2      FOR THE PLAINTIFF:

3          CHRISTOPHER N. CHENG, ESQ.
           MATTHEW DONNELLY, ESQ.
4          SARAH G. STEEGE, ESQ.
           LAURA L. COWALL, ESQ.
5          HELEN VERA, ESQ.
           MITZI DEASE-PAIGE, ESQ.
6
       FOR THE DEFENDANTS:
7
           NICHOLAS F. MORISANI, ESQ.
8          JAMES W. SHELSON, ESQ.
           TONY R. GAYLOR, ESQ.
9          RAYFORD G. CHAMBERS, ESQ.
           JOHN C. HALL, II, ESQ.
10         REUBEN ANDERSON, ESQ.

11     ALSO PRESENT:

12         ANTHONY NJOKU
           MICHAEL DENAULT
13         ELIZABETH SIMPSON
           DAVID PARRISH
14         CREDELL CALHOUN
           SYNARUS GREEN
15         SHERIFF TYREE JONES
           LESLIE FAITH JONES
16         CINDY MOHAN

17

18

19

20

21

22

23

24

25

———————————***DAILY TRANSCRIPT***———————————

1                      **TABLE OF CONTENTS**

2    Style and appearances..................................385-386

3    WITNESS:  KATHRYN BRYAN

4        Direct by Ms. Cowall...................................389
         Plaintiff's Exhibit 91 entered........................392
5        Defendants' Exhibit 4 entered.........................406
         Plaintiff's Exhibit 20 entered........................414
6        Plaintiff's Exhibit 76 entered........................423
         Cross by Mr. Shelson..................................437
7        Defendants' Exhibit 102 entered.......................463
         Defendants' Exhibit 108 entered.......................466
8        Defendants' Exhibit 6 entered.........................469
         Defendants' Exhibits 114 and 115 entered..............471
9        Defendants' Exhibit 119 entered.......................474
         Defendants' Exhibit 128 entered.......................488
10       Defendants' Exhibit 126 entered.......................489
         Redirect by Ms. Cowall................................499
11       Examination by the Court..............................507
         Further Redirect by Ms. Cowall........................522
12       Further Examination by the Court......................523
         Recross by Mr. Shelson................................524

13   WITNESS:  RICHARD DUDLEY, M.D.

14
         Direct by Ms. Steege..................................529
15       Plaintiff's Exhibits 4, 5, and 6 entered..............535
         Voir Dire Examination by Mr. Shelson..................540
16       Voir Dire Examination by Ms. Steege...................543
         Further Direct by Ms. Steege..........................545

17
     Court Reporter's Certificate..............................585
18

19

20

21

22

23

24

25

─────────────────────***DAILY TRANSCRIPT***─────────────────────

```
 1              IN OPEN COURT, FEBRUARY 16, 2022

 2

 3         THE COURT:  You may be seated.

 4         Good morning.  I assume there's nothing we need to take

 5    up before we call the next witness, so if the Government will,

 6    who's your next witness?

 7         MS. COWALL:  Your Honor, the United States calls

 8    Ms. Kathryn Bryan.

 9         THE COURT:  Okay.  Thank you.  Sounds like I won't have

10    any problem hearing you, and that's good.

11         MS. COWALL:  I hope not, Your Honor, but let me know if

12    you do.

13         THE COURT:  All right.

14         (Whereupon, the witness was placed under oath.)

15         THE COURT:  Ms. Bryan, you may remove your mask, and I

16    just want to make sure that you talk at a pace at which the

17    court reporter can keep up with you.  Allow the lawyers to

18    finish their statements before you begin to speak so that the

19    two of you will not be speaking at the same time.

20         Please make sure all your responses are verbal.  If

21    you're going to nod or shake your head, please give me verbal

22    responses as well.  I'll try to watch that and we'll try to

23    avoid using "uh-huh" and "uh-huh" because they can be spelled

24    the same and have totally different meanings, but I'll be

25    trying to monitor that.
```

1          If you will, for the record, could you please state and

2    spell your name.

3          THE WITNESS:  Yes, sir.  First name Kathryn,

4    K-a-t-h-r-y-n, last name Bryan, B-r-y-a-n.

5          THE COURT:  Okay.  Thank you.  And you can speak

6    directly in to that microphone and talk to the lawyer.

7                          **KATHRYN BRYAN,**

8              **having been first duly sworn, was examined and**

9    **testified as follows...**

10                        **DIRECT EXAMINATION**

11   **BY MS. COWALL:**

12   Q.   Good morning, Ms. Bryan.  How are you today?

13   A.   Good morning.

14   Q.   Ms. Bryan, I'd like to start out by asking you what is

15   your relationship to the Hinds County Jail?

16   A.   I'm the former jail administrator.

17   Q.   And could you just briefly summarize what the jail

18   administrator does at the Hinds County Jail.

19   A.   The jail administrator is the top supervisor of the jail

20   responsible for all jail operations.

21   Q.   And is that a position set forth in the consent decree,

22   if you know?

23   A.   I believe it is, yes.

24   Q.   Now, before we talk about your experience as the jail

25   administrator at Hinds County Jail, I'd like to talk a little

1   bit about what you did before you became the Hinds County Jail

2   administrator.

3       Can you tell us a bit about what positions you held

4   before becoming the Hinds County Jail administrator?

5   A.   So my civilian law enforcement career started in law

6   enforcement.  I held a variety of positions there to include

7   investigations, narcotics, training patrol.  The last

8   12 years, I've been a jail administrator in now three separate

9   facilities.

10  Q.   And did you obtain any licenses or certifications before

11  becoming the Hinds County Jail administrator?

12  A.   So in the state of North Carolina, I hold certifications

13  as a law enforcement officer, a detention officer, and a

14  telecommunicator.  I also hold a certification with the

15  American Jail Association as a Certified Jail Manager, and I'm

16  certified through the National Institute of Corrections as a

17  technical resource provider.

18  Q.   You mentioned being a technical resource provider.  What

19  kind of experience, if any, do you have providing technical

20  assistance?

21  A.   I've had experience providing technical assistance to a

22  local confinement facility that was struggling to be in

23  compliance with state standards, and I've also delivered

24  training as a technical resource provider.

25  Q.   What kinds of trainings did you deliver as a technical

1    resource provider?

2    A.   Executive jail administration training offered through

3    the National Institute of Corrections, or NIC.

4    Q.   And do you have any other -- or do you have any

5    consulting experience?

6    A.   I do.  I've owned and run a consulting firm since 2015

7    for detention operations.

8    Q.   I'd like to show you what's been marked as Plaintiff's

9    Exhibit 91.  It's actually in one of the binders that you have

10   up on the witness stand, Ms. Bryan, or you can look on the

11   screen if that's easier.

12   A.   Okay.

13        THE COURT:  There is no binder on the witness stand for

14   her, is there?

15        MR. CHENG:  It's behind her.

16        THE COURT:  Behind her?  Oh, okay.

17        You can use that, or if you choose to use the monitor,

18   that's fine, just whatever you can see better.

19        THE WITNESS:  Yes, sir.

20   BY MS. COWALL:

21   Q.   Ms. Bryan, do you recognize what Plaintiff's Exhibit 91

22   is?

23   A.   Yes.  It's my CV.

24   Q.   And does it accurately summarize your background and

25   experience?

1    A.   It does.

2         MS. COWALL:  Your Honor, we'd move to admit Plaintiff's

3    Exhibit 91.

4         THE COURT:  Has that been -- I don't have it on the

5    witness -- on the exhibit list that I've been operating from.

6    Is it on the list?

7         MS. COWALL:  I believe it's on the list that we

8    e-mailed to Ms. Summers on Monday.

9         THE COURT:  Okay.  Hold on for a second.  Well, let

10   me -- is there any objection to it?

11        MR. SHELSON:  No, sir.

12        THE COURT:  Okay.  All right.  P-91 will be received

13   into evidence.

14             (Plaintiff's Exhibit 91 entered.)

15   BY MS. COWALL:

16   Q.   Now I'd like to talk to you about your experience as the

17   Hinds County Jail administrator, Ms. Bryan.  First of all,

18   what were the approximate dates of your tenure as the Hinds

19   County Jail administrator?

20   A.   I was hired June 10th of '21 and left January 31st of

21   '22.

22   Q.   And how did you end up becoming the jail administrator in

23   Hinds County?

24   A.   I got a call in early June -- I think I got a call in

25   early June from Tony Gaylor with the County telling me that

 1   they had a vacancy and would I be interested in having a

 2   conversation about that.

 3   Q.   And who's Tony Gaylor?

 4   A.   Counsel for the County.

 5   Q.   So the County contacted you in regards to the position as

 6   jail administrator?

 7   A.   Yes, ma'am.

 8   Q.   And do you know how the County found you?

 9   A.   I'm not certain.

10   Q.   And why did you decide to come to Hinds County to be the

11   jail administrator?

12   A.   So at the time I got the call, I had been retired from

13   law enforcement for some months, still running my consulting

14   business.  But I was -- I was intrigued by my conversation

15   with Mr. Gaylor and agreed to fly down to Hinds County to meet

16   with Sheriff Vance and take a tour of the facility and just

17   see what it was and if I thought I could be of some

18   assistance.

19        So I flew down June or July and met with Sheriff Vance

20   and quite a few people with County and Sheriff's

21   administration.  I toured the work center.  I toured the

22   Raymond Detention Center.  And after a few talks with Sheriff

23   Vance, I was offered the position.

24           THE REPORTER:  Could you get closer to the mike,

25   please?

```
 1          THE COURT:  You can move the mike closer to you if you
 2   wish, if that's easier.
 3   BY MS. COWALL:
 4   Q.   Did you have experience improving jail conditions in
 5   other jails before?
 6   A.   Yes, I had.  I had been the jail administrator for two
 7   previous facilities and also the technical resource provider
 8   for another jail in crisis, so I had had three pretty
 9   successful goes at improving jail conditions prior to coming
10   to Hinds County.
11   Q.   In your experience, what factors were important in
12   improving jail conditions in other facilities?
13   A.   The buy-in from the stakeholders, County and Sheriff's
14   administrations, and the laser focus on fixing the jail above
15   other items on to-do lists.  There had to be complete buy-in
16   from the sheriff and from the County.
17   Q.   And what did you find with regard to those factors when
18   you came to Hinds County?
19   A.   When I met with Sheriff Vance, I was convinced beyond all
20   doubt that he was focused on fixing his jail and would do
21   everything within his power to do that, and I wanted to be a
22   part of his team to make that happen.  I was convinced that
23   the County was right-minded the same way in wanting to fix the
24   jail, so much so that I uprooted everything to come here to do
25   just that.
```

1   Q.   You said that you were convinced.  Did you change your

2   mind over time?

3   A.   With the unfortunate passing of Sheriff Vance, it seemed

4   that that drive and gusto went with him, and we never got that

5   same footing again with subsequent administrations.

6   Q.   And you say "subsequent administrations."  How many

7   administrations have there been since then?

8   A.   Two.

9   Q.   I'd like to move on and talk about some of the major

10  areas of the consent decree and your experience in working

11  towards implementation.  I'd like to start with correctional

12  staffing and retention.

13       Did you have any concerns about the level of correctional

14  staffing while you were the Hinds County Jail administrator?

15  A.   I did.

16  Q.   And can you describe for us what those concerns were?

17  A.   Jail operations only -- anything to do with a jail only

18  works when there's an appropriate amount of staff and the

19  appropriate kind of staff in certain areas.  Everything hinges

20  on staffing in a jail, so unless and until that is at an

21  adequate level, nothing else will work for very long.  We can

22  cobble things together and things can work episodically, but

23  unless staffing is firm, nothing else will work in a jail, so

24  that was of utmost concern.

25  Q.   What was your understanding about the level of staffing

1   at the jail as compared to what it should be?

2   A.   I understood that staffing at the jail was at an all-time

3   low, that it was the lowest it had been recently in the last

4   seven years.

5   Q.   And did you have any observations with regard to staff

6   turnover?

7   A.   From what I saw, there was a high level of turnover.

8   Q.   And what kind of points of comparison do you have to say

9   the turnover was high?

10  A.   My previous facility, although smaller, I was the jail

11  administrator for five years before I retired.  And when I

12  took over, we were critically short-staffed, and within a

13  short period of time, we remedied that, and for four and a

14  half years we never had a vacancy beyond a couple of days.

15  Not one vacancy.

16       So comparatively speaking, anecdotally speaking, when you

17  have a critical staff shortage and you continue to see people

18  resign, leave, quit, get fired, there was a significant

19  turnover at the Hinds County Jail.

20  Q.   I'd like to ask you about any recommendations or

21  proposals that you made to address those issues that you just

22  mentioned regarding Hinds County Jail, and I'd like to ask you

23  first if you made any recommendations regarding amount of pay

24  for correctional staff in the Hinds County Jail.

25  A.   Sure.  So really early on, I started to have

1    conversations about raising the base salary, raising the

2    salaries across the board, to do something quickly just to

3    stop the hemorrhage of officers leaving.  That seemed to be

4    the low-hanging fruit in the recruiting and retention issue.

5         Recruiting somebody is a longer-term process.  To get a

6    human being trained and in uniform and on the floor of a jail

7    takes a while.  I needed to focus immediately because it was

8    an urgent need for bodies, to keep the ones that we had, the

9    ones that had already passed through training, their

10   certification training, the ones who were already there and

11   had some level of knowledge on how to work a jail.  We needed

12   to keep them.  So early on we talked about a salary increase,

13   including some other incentives to keep people employed.

14   Q.   And when you say "early on," do you know approximately

15   when that was?

16   A.   It was right around the time I got here in July -- July,

17   August.

18   Q.   And what was the County's response?

19   A.   The County's response was very positive.  They -- I think

20   they had an understanding that the salary levels were not

21   competitive, and they supported that effort.

22   Q.   And when you say "they supported that effort," what

23   happened?

24   A.   I'm not sure of the time frame, but there came a time

25   that the Board of Supervisors approved a 5 percent raise for

1    all jail -- for all jail staff.

2    Q.   Did you ever suggest anything more than a 5 percent raise

3    with regard to staff starting salaries?

4    A.   So over time I was able to talk to staff to find out what

5    it was that they felt was critical for their compensation

6    package, and I -- so subsequent to that I proposed

7    twice-a-month pay, direct deposit, uniform allowance, and all

8    of those things would have been both a recruiting effort and a

9    retention effort.

10   Q.   I'll ask you about each of those in turn.  With regard to

11   the 5 percent pay raise, do you know when that took effect?

12   A.   I don't.

13   Q.   And with regard to amount of pay, did you ever suggest

14   pay parity for detention and patrol officers --

15   A.   I did.

16   Q.   -- in the Hinds County Sheriff's Office?

17   A.   I did.

18   Q.   And what was the response to that?

19   A.   I proposed that to Sheriff Jones, and he told me that

20   that wouldn't be happening, that jailers weren't on the same

21   level as law enforcement officers and that there always needed

22   to be a pay gap between the two entities.

23   Q.   Now, you mentioned a recommendation about direct deposit.

24   Why is that significant?

25   A.   So if we put ourselves in the shoes of one of my -- one

```
 1   of the jailers, let's say the jailer is a single mom and she
 2   is making the base salary of a detention officer, 27, $28,000
 3   a year, and they get paid once a month in a paper check.
 4        So the rule was officers had to have 100 hours of
 5   personal leave saved up before they were eligible for direct
 6   deposit.  So if this officer lived in North Jackson and
 7   commuted to Raymond to work and the pay day was a day off,
 8   they would have to drive to Raymond to pick up their check or
 9   drive to Jackson to pick up their check and deposit it.  And
10   if they deposited it after hours or on a holiday weekend, then
11   there were several more days that that check wouldn't clear
12   for them to pay their bills.  And to expect someone who is not
13   making a living wage to balance their budget for 30 days and
14   feed their families and then put gas in their car, maybe leave
15   a second job that they are working on their day off or have to
16   pay an extra day of daycare to go pick up their paper check to
17   me seemed overly burdensome.
18   Q.  Do you recall when you made recommendations with regard
19   to direct deposit and biweekly pay to the County?
20   A.  So that would all have been around the same time that we
21   were having these discussions.  They weren't individual
22   discussions per suggestion.  It was all a big soup of
23   conversation about it.
24   Q.  And did you say that was in approximately July 2021?
25   A.  It might have been August.
```

1  Q.  And what was the response you got when you suggested

2  biweekly pay and direct deposit?

3  A.  So it was very positive.  I had had a conversation with

4  Mr. Stephen Hopkins with County administration, and he said he

5  had proposed that some time ago.  So the County seemed aware

6  that was a positive direction to move in.  I'm not sure what

7  that initial -- where that initial proposal went, but when we

8  talked about it again, it was reinvigorated.  And I believe

9  the County was moving forward with some expediency on direct

10  deposit and two-times-a-month pay.

11  Q.  Did the sheriff advocate for direct deposit and

12  two-times-a-month pay for jail detention officers?

13  A.  In a meeting that I had with Sheriff Jones where we

14  talked about the two-times-a-month pay -- and I may be wrong,

15  but I believe it's a software platform that they need to have

16  in order to make this happen -- the sheriff asked me if all

17  County employees would benefit from this two-times-a-month

18  pay.  And I said yes, eventually that they would, but that it

19  was a jail initiative and that the County was going to start

20  with the jailers and then eventually march it out to other

21  County employees.  And he told me that if all County employees

22  were going to be affected by that, then that was not his

23  responsibility to present it to the board but the

24  responsibility of other department heads to present that and

25  he would not be presenting that to the board.

```
 1    Q.   Shifting gears a little bit, do detention officers get a
 2    stipend for their uniforms?
 3    A.   They do not.
 4    Q.   Is that something that you addressed?
 5    A.   It is.
 6    Q.   And did that happen?
 7    A.   It did not.
 8    Q.   Did you advocate for anything with regard to the use of
 9    law enforcement officers to staff the jail?
10         MR. SHELSON:  Object to leading, Your Honor.
11         THE COURT:  Objection overruled.
12    A.   Can you ask the question again, please?
13    BY MS. COWALL:
14    Q.   Sure.  Did you advocate for anything regarding the use of
15    law enforcement to staff the jail?
16    A.   I did.
17    Q.   And what did you advocate?
18    A.   In my previous experience, when there have been
19    incidences in a jail where we require additional staffing; for
20    example, if narcotics or patrol does a large-scale operation
21    resulting in a large-scale arrest, the normal -- even with
22    sufficient staffing in the jail, that can put a burden on the
23    existing staff.  So from my experience, it's been beneficial
24    to pull from law enforcement officers to come help the jail.
25         So when I proposed this to Sheriff Jones and to interim
```

1   Sheriff Crisler, the previous sheriff, and asked for law

2   enforcement help to supplement jail staff, because we were

3   critically short -- we were not manning critical posts in the

4   jail, and was told -- and made some suggestions on how that

5   has worked in the past.

6       One of the suggestions was if there are off-duty

7   assignment availabilities for law enforcement officers -- for

8   example, we all see law enforcement officers at the grocery

9   stores working security or at the bowling alley or at clubs or

10  wherever.  If we could perhaps suspend that for a short period

11  of time, since overtime was -- the County -- let me back up

12  then and fill in a blank there.

13      The County, in an extraordinary effort to help with jail

14  staffing, approved overtime positions at the jail for law

15  enforcement officers.  Up to four positions per shift.  There

16  are three shifts in a 24-hour period.  The County approved

17  overtime for law enforcement officers.  We had heard from law

18  enforcement officers asking about the possibility of working

19  overtime in the jail, that they were very interested in that.

20      So we had interested people, we had the funding for it,

21  and my suggestion to Sheriff Jones was if we can suspend those

22  external contracts for a short period of time, offer overtime

23  to law enforcement officers in the jail, then we could have

24  some supplemental staffing.  And the sheriff adamantly said

25  no, that that was not going to happen.  And I then said to

1   him, I've run out of suggestions on how to make that happen.

2   He told me that he was short-staffed on patrol.  I don't know

3   if there had been a needs assessment done of patrol staffing

4   or other staffing; for example, call volumes, peak hours for

5   call volumes, time on call, to see if any staff could be freed

6   up.  But he did tell me no.

7       I asked him if he had any suggestions.  If he wasn't a

8   fan of my suggestions, we could put that to bed, but did he

9   have any suggestions of his own to help with law enforcement

10   staffing at the jail.  And he said no, he didn't.  So we never

11   did get law enforcement assistance for staffing.

12   Q.   And did the reverse actually happen?  Did detention staff

13   ever get transferred away from the jail to patrol or some

14   other part of the sheriff's office while you were the jail

15   administrator?

16       THE COURT:  Before you answer that.

17       MR. SHELSON:  Objection.  Leading.

18       THE COURT:  Objection overruled.

19   A.   So yes, it did.  During my time there and during Sheriff

20   Jones's administration, there were at least two detention

21   officers who were transferred out of detention services,

22   unbeknownst to me.  I didn't know until I got the order that

23   they were being transferred.  In addition, there were some

24   personnel actions taken to fire jail staff.  Those firings

25   happened midshift, so we were critically short that day and

1    days after that.

2    BY MS. COWALL:

3    Q.   Were you consulted regarding the midshift terminations of

4    staff who were working in the jail?

5         MR. SHELSON:  Your Honor, objection.  Leading.

6         THE COURT:  Objection overruled.

7    A.   I was not.

8    BY MS. COWALL:

9    Q.   Was there ever a recruiting or retention plan developed

10   while you were the Hinds County Jail administrator?

11        MR. SHELSON:  Your Honor, objection.  Leading.

12        THE COURT:  Objection overruled.

13   A.   Yes, there was.

14   BY MS. COWALL:

15   Q.   I'd like to show you what's been marked as Defendants'

16   Exhibit 4.

17        MS. COWALL:  Your Honor, may I approach the witness,

18   please?

19        THE COURT:  You may.

20   BY MS. COWALL:

21   Q.   Do you recognize what's been marked as Defendants'

22   Exhibit 4?

23   A.   I do.  It's the recruitment and retention report from the

24   human resources consultant.

25   Q.   Who is the human resources consultant?

1    A.   Matt Rivera.

2    Q.   And do you know -- who is Matt Rivera?  Was he contacted

3    by the County or the monitors?

4    A.   He was recommended by the monitors, and I believe the

5    County contracted with him.

6    Q.   Are you aware of any other recruiting or retention plans

7    that have been developed by the County with regard to jail

8    staffing?

9    A.   I am not.

10   Q.   Were you ever involved in any meeting with County

11   leadership regarding this report?

12        MR. SHELSON:  Objection, Your Honor.  Leading.

13        THE COURT:  Objection overruled.

14   A.   No, I did not meet with anyone about this report.

15   BY MS. COWALL:

16   Q.   Were you aware of any meetings that happened that you

17   were not part of?

18   A.   No, I'm not aware of anything.

19   Q.   Did you ever see any plan from the County to implement

20   this report?

21        MR. SHELSON:  Your Honor, we respectfully submit

22   virtually every question is leading, and so, again, objection

23   to leading.

24        THE COURT:  Okay.  Objection sustained.

25   BY MS. COWALL:

 1   Q.   Did you have any discussions with anyone from County

 2   leadership about implementing this report?

 3   A.   I did not.

 4        MS. COWALL:  Your Honor, the United States would move

 5   to admit Defendants' Exhibit 4 into evidence.

 6        MR. SHELSON:  No objection, Your Honor.

 7        THE COURT:  D-4 will be received into evidence.

 8            (Defendants' Exhibit 4 entered.)

 9   BY MS. COWALL:

10   Q.   Shifting gears a little bit, in your experience, were all

11   officers who are assigned detention positions or pins actually

12   working in the jail?

13   A.   No, they're not.

14   Q.   And how do you know that?

15   A.   We were working on a staffing analysis with the monitors

16   for Raymond Detention Center and the work center.  And to do

17   that, we needed a list of officers and positions available for

18   officers, so we requested that from the County HR person.  And

19   when we got that list of all of the detention positions, in

20   looking at that list, there were some of those people who were

21   not assigned to detention services.

22   Q.   Can you think of any examples?

23   A.   Not -- not right now, I can't.

24   Q.   Okay.  Do you recall the approximate number of people you

25   identified who were assigned detention positions who were not

1    actually working in the jail?

2    A.   We had just started going through the list and at the

3    time had only yet found two, maybe three.

4    Q.   Now, in your experience as Hinds County Jail

5    administrator, was there any impact on staffing levels from

6    officers not showing up for work?

7    A.   Yes.

8    Q.   And did staff talk to you about why they were not showing

9    up for work?

10   A.   Some of them did, yes.

11   Q.   What did they say?

12   A.   The few staff that I talked to about that, some of them

13   told me that they made more money working a second job, so it

14   benefited them to not come to work as a detention officer, to

15   work their second jobs; and some told me they didn't come to

16   work on certain days or certain shifts with certain other

17   officers because they were afraid of where they might be

18   positioned in the jail.

19   Q.   And when you say "they were afraid," did they provide any

20   more information about that, or what were they afraid of?

21   A.   Sure.  So they would tell me that on certain shifts with

22   the certain demographic of officers, they could be assigned to

23   one of the pods and they were afraid to work a pod, so they

24   would call out sick or just not show up for work.

25   Q.   With regard to inmate behavior management, did you try to

1   make any improvements with regard to inmate behavior

2   management?

3   A.   Yes.

4   Q.   What did you try to do?

5   A.   So inmate behavior management always starts with

6   understanding the inmate population.  So it always starts with

7   conversations with inmates, which I started to do,

8   large-scale, one-on-one conversations with inmates about what

9   their needs were, what the problems were, what their

10   perception of things were.  And I quickly got an understanding

11   that they had a long list of needs and wants that were being

12   unmet, so we started to work on that.

13   Q.   Did you take any actions to try to improve behavior

14   management among inmates?

15   A.   I did.

16   Q.   And what did you do?

17   A.   Well, first and foremost, if we put ourselves in an

18   inmate's shoes for a minute to illustrate this point, I have

19   an inmate, 20-year-old inmate with 20-year-old energy and no

20   outlet for that energy.  No mental stimulation.  Their

21   criminogenic needs not being met at a minimum.  They don't

22   have a place to sit to eat their meals.  They don't have a

23   book cart.  They have a tiny TV way up on a pole to watch with

24   60 other inmates.  They don't have a law library.  They don't

25   have a good ability to visit with their loved ones.  They

```
 1  don't have anything to meet their programming needs.
 2      So I know that meeting some of those needs takes a long
 3  time, so a quick fix was to put up bigger TVs for them.  They
 4  said that that would be a benefit to their living conditions.
 5  So I immediately ordered 55-inch TVs for the pods.
 6      The other -- some of the longer-term things, we were in
 7  the works with a vendor to bring in tablets for inmates.  And
 8  on the tablets is a law library, books, music, videos, U.S.
 9  postal mail on the tablets.  But that was going to take a
10  little longer.
11  Q.  Did you run into any difficulty in trying to get
12  activities for inmates on the units?
13  A.  I got significant pushback about the TVs.  I was asked
14  why I needed them, why did I need 55-inch TVs, I probably
15  wouldn't get them because I was told in the past some of those
16  things that were requisitioned for inmates would actually find
17  their way in to administrative staff offices.  There was a lot
18  of back and forth before those TVs eventually showed up.
19  Q.  Did you have to go into your own pocket to get any
20  activities for inmates that you felt were needed?
21  A.  I did.
22  Q.  What did you do?
23  A.  There came a time that I realized that the process to get
24  things was taking an awful lot longer than had been my
25  previous experience in other facilities, and to get inmates
```

1    under control as fast as possible, I needed to get them things

2    to distract them as soon as possible.  So I bought board games

3    for the pods out of my pocket, about a thousand dollars' worth

4    of board games.  It wasn't because I was denied that request

5    from the County.  I just was not willing to wait months and

6    months for something to give them -- to give my inmate

7    population as a good faith showing of if they behave, then

8    they can be rewarded for that behavior.  That needed to be an

9    early lesson.

10   Q.   Shifting gears a little bit, I'd like to talk about

11   supervision of inmates in the jail.  Did you have concerns

12   about the staff supervision of inmates in the jail?

13   A.   Can you clarify?  Do you mean with the staffing numbers?

14   Q.   Did you have concerns about -- or observations about the

15   staff's ability to actually watch what's going on in the

16   units?

17   A.   So in -- there are three -- talking about Raymond

18   Detention Center, there are three housing areas.  Each of them

19   have four subunits.  So in one of those pods, A-Pod, for

20   example, there's a control room officer and four pods to

21   watch.  So at a minimum, that's five officers that we need to

22   watch inmates.  There are other positions on top of that, but

23   at a minimum we're talking five officers.  During my tenure

24   there, we were lucky on a shift to have three officers.  There

25   were times that we just had one officer.  So that one officer

```
 1   is in the control room, and those pods that hold approximately
 2   60 inmates apiece were unmanned.  So, yes, I was gravely
 3   concerned.
 4   Q.   And did what you've described with regard to manning the
 5   pods lead to any harm to detainees?
 6   A.   So --
 7        MR. SHELSON:  Objection, Your Honor.  Leading.
 8        THE COURT:  Don't lead the witness.
 9        Objection sustained.
10   BY MS. COWALL:
11   Q.   What were your observations with regard to harmed
12   detainees in light of what you described regarding the
13   staffing levels on the pods?
14   A.   So my observations with -- given the staffing levels,
15   anytime a group of people is left unsupervised -- it can be a
16   classroom of elementary kids; it can be a college forum.
17   Anywhere that there's a large group of people left
18   unsupervised, naughty things can happen.  And when you have
19   inmates in a jail with no distractions whatsoever -- they're
20   aware that some of the cameras don't work, and they're aware
21   that staff comes to look in on them intermittently and usually
22   only as a response to something, not as a proactive measure --
23   bad things happen in a jail.
24   Q.   Are you familiar with the homicide of MR that occurred in
25   October 2021?
```

 1    A.    Yes.  There was a homicide, a murder, on October 18th of

 2    2021.

 3    Q.    How are you aware of that incident?

 4    A.    I was the jail administrator at the time.

 5    Q.    Did you do any review of that incident?

 6    A.    I did.  After a critical incident, it's important to do

 7    what's called an after-action review and issue a report of the

 8    findings.

 9    Q.    And did you do an after-action review of the MR homicide

10    in the jail in October of 2021?

11    A.    I did.

12    Q.    I'd like to show you what's been marked as Plaintiff's

13    Exhibit 20.  It should be in your binder if you'd like to look

14    there, or you can look on the screen as well.

15           THE COURT:  If you prefer to use the binder, it's one

16    that they've set down there.  It looks heavy, doesn't it?

17    BY MS. COWALL:

18    Q.    Do you recognize what's been marked as Plaintiff's

19    Exhibit 20?

20    A.    I do.  It's my after-action review from that incident.

21    Q.    And what did you find in your after-action review of the

22    MR homicide?

23    A.    I found in general that there were systems failures that

24    led to that event.

25    Q.    Do you recall what kinds of systems failures?

1    A.   So there were failures of staffing, of following policies

2    and procedures; there were failures by the medical staff for a

3    medical response.

4    Q.   Did you make any recommendations associated with your

5    after-action review of the MR homicide?

6    A.   I did.

7    Q.   Did the County discuss your recommendations with you?

8    A.   They did.

9    Q.   What did you recommend?

10   A.   Some of the recommendations -- one of the recommendations

11   was the configuration of the pod control room.  Officers

12   seated in there are to watch the cameras, anything else they

13   can see from pod control.  And they weren't configured

14   conducively to focusing on the cameras, so the County approved

15   the funding to rearrange pod control.

16        The other recommendations that I submitted -- less than

17   two weeks after the event, I submitted two bids for an

18   electronic rounds system, which is a basic thing that most

19   jails and prisons have had in their facilities for decades,

20   which requires officers to go in the unit and around to

21   officer stations in that unit to check on inmates, and we

22   didn't have that.

23   Q.   Did that get implemented by the time you finished your

24   tenure as jail administrator?

25   A.   Partially.

1   Q.   And can you explain what "partially" means?

2   A.   Oh, sure.  So one of the vendors was chosen, a contract

3   was approved, and we had received -- before I left, we had

4   received the hardware for that technology and we were -- when

5   I left, we were still waiting on IT and the server to come in.

6   Q.   Had you implemented a system like this in other jails?

7   A.   I have.

8   Q.   How long did it take in your experience there?

9   A.   Just a few months.

10  Q.   Moving away --

11       MS. COWALL:  Well, actually, Your Honor, I'd like to

12  move to admit Exhibit PX-20.

13       THE COURT:  Any objection from the defendant?

14       MR. SHELSON:  No, sir.

15       THE COURT:  P-20 is received into evidence.

16           (Plaintiff's Exhibit 20 entered.)

17  BY MS. COWALL:

18  Q.   Moving away from this particular incident and speaking

19  more broadly, in your experience were there any physical plant

20  issues that caused supervision difficulties?

21  A.   Well, there's physical plant issues and there is -- there

22  are camera issues.  A lot of the cameras don't work.  Physical

23  plant issues, some of the lights in the cells don't work.  The

24  doors don't lock.  All of those make it more difficult to

25  supervise inmates.

1  Q.   Did you make any suggestions, for example, with regard to

2  lighting?

3  A.   So there were meetings with County maintenance and with

4  maintenance vendors about fixing the lights, but before that

5  could happen, that was part of the suggestion for a uniform

6  stipend, was also a requisition for flashlights for officers,

7  because they didn't get them issued to them.  If they had

8  them, they bought them out of their own pockets.  So I

9  submitted a requisition for flashlights specifically designed

10  for what we needed.

11  Q.   Did you get those flashlights?

12  A.   We did not.  Not before I left.

13  Q.   I'd like to move on and talk a bit about training.  Did

14  you have any concerns about staff training while you were the

15  Hinds County Jail administrator?

16  A.   I did.

17  Q.   And could you explain what your concerns were.

18  A.   So I've come with a strong training background and like a

19  robust training program for my jails.  And when I got to Hinds

20  County and looked into what training was mandated, available,

21  and offered to jailers, what I found was that after their

22  initial certification course, there was very little

23  in-service-type training offered after that.  A majority of

24  the officers only got training on the policies as they were

25  approved, and that was not sufficient for me at all.

1  Q.   Can you describe the training on the policies?

2  A.   The training on the policies were, as they were approved

3  and implemented, the training officer would read the policies

4  to all staff, and staff would sign the acknowledgment that

5  they had read and understood the policies.

6  Q.   Did you believe that was adequate?

7  A.   I did not.

8  Q.   Did you make any requests with regard to improving

9  training?

10  A.   I did.  I requested that detention training fall under my

11  authority so that I could create a training program.  I put in

12  some requests for training for line officers, for supervisors,

13  and for the command staff team.

14  Q.   Did you ever get any responses that funding was an issue

15  for training you requested?

16  A.   I did.  I got several responses, that there wasn't enough

17  money for the training and -- well, just that there wasn't

18  enough money for the training.

19  Q.   I'd like to ask you about some of the specific types of

20  training.  Did you make any recommendations regarding field

21  officer training?

22  A.   I put in a requisition for detention field training

23  officer course and detention field training officer

24  supervisor.  It's been my experience in my career that

25  oftentimes detention training is nothing more than a law

1   enforcement training platform where they scratch out the word

2   "law enforcement officer" and add the word "detention

3   officer."  And that's not quality detention training.  It

4   needs to be developed by and for detention officers.  And

5   there is such a program for detention field officer and

6   detention field officer supervisor, so I put in a requisition

7   for that and it was denied.

8   Q.   How about mental health training for staff?  Did you make

9   any requests for mental health training for staff?

10  A.   So we were in the works to open a mental health unit for

11  inmates, and I wanted to have specially trained staff man that

12  unit.  And there is a nationally recognized trainer in that

13  arena who offers an extraordinarily high-quality training

14  product for detention officers.  She's a former detention

15  officer at Raymond Detention Center, and she had three

16  offerings of training for detention staff.

17       We got through one of those.  Then there was some delay

18  and difficulty with her being paid for that training, so that

19  delayed -- I didn't want to schedule -- we couldn't schedule

20  the second one until she was paid on the first one.  So then

21  we scheduled the second one, but the day before that, several

22  of my officers were fired.  Some of them -- some of those were

23  supposed to be in that class.  And that left me unable to fill

24  that class because I didn't have enough staff to backfill the

25  students going to that training.  So at the time of my

```
 1   departure, we had only had one of three of those training
 2   courses.
 3   Q.   And were you consulted about those officers being fired?
 4   A.   No.
 5   Q.   Did you try to bring in any outside training besides the
 6   mental health training that you just mentioned?
 7   A.   No.  I don't think I had started that yet.
 8   Q.   You had mentioned NIC.  Did you try to bring in any
 9   training based on NIC?
10   A.   I don't think I had done that yet, no.
11   Q.   Now, moving on to use-of-force training.  Did you have
12   any concerns with regard to use-of-force training for Hinds
13   County Jail detention officers?
14   A.   I did.
15   Q.   And what were your concerns?
16   A.   From what I understood, the training the officers got on
17   use of force started and stopped at cadet school, that that
18   was one of the topics that was covered in their initial
19   detention officer certification course and there wasn't any
20   significant training after that on use-of-force issues.
21   Q.   Was that significant?
22   A.   It is.  Especially when you have staff that are
23   inappropriately applying force.  It is.
24   Q.   And was that your experience in Hinds County Jail, that
25   staff were inappropriately applying force?
```

```
 1    A.    Yes.
 2    Q.    Does Hinds County Jail have any scenario-based training
 3    on specific force tools?
 4    A.    No.
 5    Q.    Would that include Tasers?  Does Hinds County Jail have
 6    any scenario-based training on Tasers?
 7    A.    No.
 8    Q.    Is there a policy on Tasers?
 9    A.    The policy on use of force was approved and implemented
10    prior to Tasers being introduced to officers, to detention
11    officers.  And it doesn't -- in that policy it doesn't mention
12    Taser technology.  It makes a glancing reference to electronic
13    control devices, but there's not a section in the use-of-force
14    policy on Taser technology or other electronic control
15    devices.  So detention officers who aren't savvy to that
16    technology may or may not understand when they were read that
17    policy that electronic control devices means Taser technology.
18    Q.    So it's not clear what it is, let alone how to use it?
19    A.    It is not.
20    Q.    Going back to scenario-based training.  Can you just
21    briefly explain what that means?
22    A.    So there's different levels of understanding of things.
23    There's an academic understanding of something that you learn
24    in a classroom.  Somebody says things to you, describes things
25    to you, and you nod your head and say, yes, academically I
```

1    understand that.  I understand that I should do A, B, and C in

2    a use-of-force scenario.

3         Unfortunately, if training stops with that, when they go

4    out on the floor and they encounter what they feel could be a

5    use-of-force incident but it doesn't fit the A, B, and C they

6    learned in the classroom, then they have difficult- -- people,

7    in my experience, have difficulty applying what they learned

8    and putting it into practice.  There needs to be a nexus

9    between the academic understanding and the practice of the

10   thing.

11        So to give officers a depth of understanding so that they

12   can apply it to any scenario that would come into play, you

13   take the policy, you take the classroom instruction, and then

14   you create scenarios in a housing unit.  So we would have role

15   players.  We would have detention officers role-playing the

16   roles of inmates.  And we would create a scenario that they

17   may encounter that will cause them to apply what they learned

18   in the classroom and actually physically make them go through.

19        So people -- there are different types of learning.

20   There's people that are visual learners.  There are people

21   that only -- that learn the best by reading a thing.  There

22   are people that are auditory learners, where they learn the

23   best by hearing something.  A large majority of human beings

24   are tactile learners.  They want to put their hands on a thing

25   and do a thing.  That muscle memory gives them a deeper

1    understanding than just a classroom learning of a thing.

2        So when you're talking about a constitutional issue like

3    use of force, it is critically important that there be

4    extensive scenario training on all the myriad of situations

5    that officers could find themselves in and require them to use

6    force, not just Taser force but any force.

7    Q.   Can lack of scenario-based training have an effect on

8    staff retention?

9    A.   I'm sorry.  Staff retention?

10   Q.   Yes.

11   A.   Yes, I believe so.  When -- in my experience, when

12   detention officers are afraid of inmates or uncertain about

13   their own abilities to use force or uncertain about their own

14   abilities to make good decisions with use of force, it causes

15   officers to do a couple of things.  It causes officers to

16   avoid it at all costs, to avoid having to use force; it forces

17   officers to call out and not show up to work; and it also

18   causes officers to go heavy-handed.  If they're not good at

19   making decisions about use of force and they're afraid, then

20   they overuse force.

21   Q.   Did you see those kinds of things happening in the Hinds

22   County Jail?

23   A.   I did.

24   Q.   Now, do any officers in the jail currently have Tasers?

25   A.   When I left, about a dozen officers had Tasers.

1    Q.    How did they get them?

2    A.    Before I moved to Hinds County, I had several wonderful

3    conversations with sheriff staff about tools of the trade.

4    And my question was:  What are officers armed with and what

5    could they be armed with?  And I understood that they didn't

6    have Tasers at the time.  I asked if the sheriff, then Sheriff

7    Vance, would approve that technology and was told yes.  And I

8    believe that that sheriff's administration put in for Tasers

9    for jailers, was told that they -- the Tasers were in when I

10   got here but that they hadn't ordered the ancillary items to

11   go with Tasers:  holsters, batteries, cartridges.  So we had

12   to wait some more for that.

13        Then came to an understanding that those Tasers had been

14   diverted to law enforcement officers.  Sheriff Jones made a

15   concerted effort to find us Tasers, to start having Tasers on

16   the floor.  And he found -- freed up, found, about a dozen of

17   them, which was terrific, terrific support.

18        The problem was that to introduce such advanced

19   technology needs to be a thoughtful, planned-out process.  And

20   I wasn't given an opportunity to do that.  Sheriff Jones made

21   the decision to give Tasers to detention officers that were

22   certified to carry them immediately.

23   Q.    Who did he give that order to?

24   A.    He gave it to my subordinate, Chief Simon.

25   Q.    Do you believe that was appropriate?

1    A.   No.

2    Q.   Did you express any concerns to the sheriff regarding the

3    introduction of Tasers into Hinds County Jail that he ordered?

4    A.   I did.  I sent an explanatory e-mail voicing my concerns.

5    Q.   I'd like to show you what's been marked as Plaintiff's

6    Exhibit 76.  It should come up on your screen.

7        Is this the e-mail where you expressed your Taser

8    concerns to the sheriff?

9    A.   It is.

10    Q.   Did you receive any response to this e-mail?

11    A.   I don't remember.  I don't believe I did.

12    Q.   Did you receive any response to the request at the end of

13    the e-mail for a meeting with the sheriff?

14    A.   There was never a meeting.

15        MS. COWALL:  Your Honor, we'd move to admit Exhibit

16    PX-76 into evidence.

17        THE COURT:  Any objection?

18        MR. SHELSON:  No, sir.

19        THE COURT:  Okay.  P-76 will be received in evidence.

20        (Plaintiff's Exhibit 76 entered.)

21    BY MS. COWALL:

22    Q.   I'd like to shift gears and talk about the requisition

23    process.  What was your experience with using the requisition

24    process to get supplies and services for the jail?

25    A.   It was at times difficult, at other times impossible to

1    get things that we needed for the jail through the existing

2    requisition process.

3    Q.   Did you try to address problems with the requisition

4    process?

5    A.   I did repeatedly.

6    Q.   What happened?

7    A.   We didn't gain a whole lot of traction there.

8    Q.   Can you think of any examples of how the requisition

9    process impacted your ability to administer the jail.

10   A.   So if I put in a requisition for something, in my

11   experience, it was always helpful to know what the status of

12   that request was throughout its life until we got the thing.

13   Asking for the thing, getting the thing, it's important to

14   know what the progress was because we had to plan for whatever

15   we were doing with the thing.

16        So I would put in a requisition and wait a little bit and

17   then ask the people in charge what the status of it was.  And

18   I never got an answer that was helpful in the planning

19   process.

20        There were a couple of meetings with people in charge of

21   the requisition process where they explained to me how the

22   current requisition process works, but never any substantive

23   meetings on how we could make it more efficient for jail

24   needs.

25   Q.   Did the requisition process cause any risk of harm by

1   inability to procure supplies?

2            MR. SHELSON:  Objection, Your Honor.  Leading.

3            THE COURT:  Objection overruled.

4   A.   So sure.  A lot of things -- a lot of jail requests, from

5   a layman's perspective, may not look urgent or important, but

6   a lot of jail requests are urgent and important.  And so when

7   urgent and important things aren't procured in a timely

8   manner, it can cause harm.

9        For example, we put in a requisition for cleaning

10  supplies, and we were on a quarterly allowance with funding.

11  So every quarter the line item for cleaning supplies would be

12  replenished from the County coffers.  So I put in the req- --

13  unbeknownst to me, I put in the requisition early in that

14  quarter and was told that there wasn't enough money to fill

15  that entire order, that we had to wait two months until the

16  next quarter replenished that money.

17       So there were times that we would run out of cleaning

18  supplies.  During the pandemic, we ran out of officer sterile

19  gloves and garbage bags.

20       And then being told that there wasn't enough money for

21  training, anytime that we miss an opportunity for training,

22  that has a potential to cause harm.

23  BY MS. COWALL:

24  Q.   On a related note, I'd like to talk about the jail

25  budget.  Were you asked to be part of any budget planning

1   process for this fiscal year?

2   A.   No.

3   Q.   What was the implication of you not being involved in

4   jail budgeting?

5   A.   I think it took away the ability to be fiscally

6   responsible with a very large jail budget, with the jail

7   administrator not being involved in budget preparation.

8   Q.   Did you have any observations about the format of the

9   Hinds County Jail as opposed to your experience with other

10  jails?

11  A.   I did.  So to prepare for a jail budget -- to prepare for

12  a County budget for an office-based system -- so if you work

13  in the -- say the tax office and you're getting ready to

14  prepare your budget for the tax office, there are standard

15  quantities of things that you know you're going to need to

16  have that office running.  You need so much paper, so many

17  office supplies; you have so many staff.  And those numbers in

18  general can remain pretty static year over year.

19       In a jail setting, that is entirely not the case.  So

20  budget preparation needs to factor in any criminal justice

21  reforms, any new legislation that could impact our jail

22  population, because with a single inmate comes a litany of

23  things that you need for an inmate:  uniforms, bedding,

24  supplies, all sorts of things.

25       So budget preparation has to look at a three-year -- a

1    good budget preparation could look at a three-year average of

2    inmate population and trends in the criminal justice system.

3    It can look at what the upcoming needs for repair are, what

4    the upcoming year's needs are for training.  That might be

5    different from years previous.  So it's an educated guess

6    system on how much money you'll need so that you don't have to

7    keep going back in to the County to ask for more money.  So

8    that's part of what's so important.

9         The other part that I found here that was different from

10   what I experienced in the past and in teaching jail budgets to

11   other entities, a jail budget has a lot of things to it, as

12   opposed to an office budget that may have office supplies,

13   salaries and training, say, to simplify things.  A jail has an

14   extraordinary amount of things.

15        So my previous jails, I would have -- they're called line

16   items.  You fund a line item just like you do your household

17   budget.  I would have 25 line items, and I would specifically

18   go in and prepare a projection for each of those line items:

19   How many staplers do I think I'm going to need this year as

20   opposed to last year?  Well, if I had an increase in

21   administrative staff or we tore up a bunch of staplers last

22   year or there's a new law on the books that says you have to

23   have two staplers per person, then I would project how many

24   staplers I need, I would fund that line item with that amount

25   of money, and I would be able to track quarter over quarter

1    what percentage I've spent out of that to make that money last

2    for staplers all year long.  That's being fiscally responsible

3    with a jail budget.

4         But with the jail budget that I got here, there were just

5    a handful of line items.  And that makes it difficult to be

6    able to plan and project a year-long spending of an

7    extraordinarily large budget.  Because it doesn't allow me to

8    finish.  It doesn't allow me to prioritize -- my stapler

9    example.  So if I only am buying staplers out of a stapler

10   line item, I know exactly how much money I'll have at the end

11   of the year.  So if in December I need to buy a stapler, I

12   need to save money for December.  If everything is coming out

13   of a huge pot of money, other things may take priority and I

14   won't know I don't have enough money come December until it's

15   too late.

16   Q.   And did you ask for things and were told other things

17   were taking priority?

18        MR. SHELSON:  Objection, Your Honor.  Excuse me.

19   Objection.  Leading.

20        THE COURT:  Objection overruled.

21   A.   No, I was not specifically told other things took

22   priority.  I was just told at times that there wasn't enough

23   money for my requests.

24   BY MS. COWALL:

25   Q.   Shifting gears again.  Based on your experience operating

1    the Hinds County Jail, what observations do you have about any

2    threat of harm to detainees there?

3    A.    I think anytime you have a combination of an inadequate

4    number of staff, inadequately trained staff, physical plant

5    issues, I think there's a clear -- a clear risk of harm to

6    detainees and to staff.

7    Q.    And did that harm actually happen at Hinds County Jail,

8    in your experience?

9         MR. SHELSON:  Objection, Your Honor.  Leading.

10        THE COURT:  Objection overruled.

11   A.    It did.  There were -- there was the incident in October.

12   There were other assaults on staff and between inmates.  Yes.

13   BY MS. COWALL:

14   Q.    What were your observations about the levels of harm here

15   as compared to your past experience?

16   A.    That they were much higher.

17   Q.    Based on your experience operating the Hinds County Jail,

18   will defendants do the things required by the consent decree

19   if there is no court order?

20   A.    No.

21        MR. SHELSON:  Objection and move to strike, Your Honor.

22   Calls for speculation.

23        THE COURT:  Objection overruled.

24   BY MS. COWALL:

25   Q.    Do you think the consent decree is enough to make the

1    jail reasonably safe and humane?

2         MR. SHELSON:  Objection, Your Honor.  It's asking for

3    opinion testimony, and this witness has not even been

4    proffered as an expert.

5         THE COURT:  Let me hear the response from the

6    Government with respect to that.

7         MS. COWALL:  Your Honor, this type of opinion testimony

8    is appropriate under Rule 701 because it's rationally based on

9    Ms. Bryan's perception when she ran the Hinds County Jail for

10   the last six months.  It's helpful to understand the facts at

11   issue here.  We're talking about levels of harm.  We're

12   talking about constitutional violations.  We're talking about

13   what should be done as a result of those things.  And it's all

14   based on Ms. Bryan's experience running the jail for the last

15   six months as compared to her experience running other jails

16   and providing technical assistance to other jails.

17        THE COURT:  Objection overruled.

18   A.   Could you ask the question again, please?

19   BY MS. COWALL:

20   Q.   Do you think the consent decree is enough to make the

21   jail reasonably safe and humane?

22   A.   I think on its face, my first answer is, yes, it is

23   enough.  If the appropriate amount of attention and support

24   and resources are given it is enough.  From my experience

25   there, that did not prove out, so no, it's not enough.

1   Q.  Based on your experience in working with the sheriff's

2   administration, did the sheriff seem interested in

3   implementing the consent decree?

4   A.  No.

5   Q.  Did his actions indicate that implementing the consent

6   decree was a priority?

7        MR. SHELSON:  Objection.  Leading, Your Honor.

8        THE COURT:  Don't lead the witness.

9   BY MS. COWALL:

10   Q.  What did the sheriff's actions indicate to you with

11   regard to how he viewed the consent decree in this case?

12   A.  There was not a sufficient amount of time and attention

13   and effort expended by the sheriff's administration towards

14   compliance with the consent decree.

15        THE COURT:  I want -- I need some clarity with respect

16   to that answer.  She's served under three sheriffs, I think.

17   So what --

18   BY MS. COWALL:

19   Q.  Let me clarify and ask as to the current sheriff, Sheriff

20   Jones.

21   A.  So that would be my answer for this current

22   administration.

23        THE COURT:  Thank you.

24   BY MS. COWALL:

25   Q.  Based on your experience operating the Hinds County Jail,

1   do you think County resources are being efficiently allocated

2   to address issues in the jail?

3   A.   I do not.

4   Q.   And why not?

5   A.   A specific example, when I first got there, after I was

6   there, I came to understand that the County was going to rent

7   tents for COVID inmates for the jail that were very expensive

8   to rent by the month.  And I found out about that while they

9   were -- while these tents were coming.  I wasn't involved in

10  the planning of it or given an opportunity to give my opinion

11  about that.  And they were -- they were going to be very

12  expensive, but we hadn't had time to talk about it or

13  implement policies or how we were going to staff it or put

14  cots in there.  I didn't know anything about any of that.  It

15  was a huge, huge amount of money, that we didn't need.

16       In addition to that specific example --

17  Q.   What happened with regard to that?

18  A.   I asked that the tents go away and not come.

19  Q.   And just to clarify, why did you ask for them to go away?

20  A.   Because it was an extraordinary waste of County

21  resources.

22  Q.   And why was it a waste?

23  A.   Because we can -- we did -- we could and did address the

24  issue with the COVID pandemic in that jail without the tents

25  very successfully.  And I am dedicated to save money.  I don't

```
 1    want to spend my way out of any issue, and I want to be just
 2    as frugal with a County dime as I am my own dimes, even more
 3    so.
 4         The other example is there is an extraordinary effort
 5    toward repairs at the jail, but until we get staffing up to
 6    par, we don't have enough staff to supervise inmates, they
 7    will continue to tear up that building.
 8    Q.   Ms. Bryan, as Hinds County Jail administrator, how much
 9    time did you spend on an average week working at the jail or
10    on jail issues?
11    A.   Sixty to 70 hours a week.
12    Q.   And you're no longer the jail administrator, correct?
13    A.   Correct.
14    Q.   What are the circumstances regarding the termination of
15    your employment with the jail?
16    A.   I got a call from Sheriff Jones on July 31st midmorning
17    asking if I could come to his office at 4:00 that afternoon.
18    I said I could.  And he said, well, we'll see you there.
19    So --
20    Q.   Did you say July 31st?
21    A.   I'm sorry.  My error.  January 31st.  So when I showed up
22    in his office, Sheriff Jones was there; his attorney,
23    Mr. Hall, was there; and the human resources director,
24    Ms. Coleman, was there.  And the sheriff read me a letter he
25    had prepared.  And in that letter it talked about the
```

 1   resignation letter that I had submitted back in November with

 2   an end date of February 10th.  That resignation had since been

 3   rescinded, but the sheriff told me in that meeting that I

 4   didn't rescind it properly, according to the attorneys, and

 5   that he was making it effective immediately.  And he asked if

 6   I under- -- and terminating my employment.  And he asked me if

 7   I understood that I was resigning.  And I told him, no, that

 8   was not my understanding.  I understood that he was

 9   terminating my employment.

10       Because I had rescinded that resignation, and he and I

11   had had a talk about that prior to this meeting January 31st,

12   where he was aware I had rescinded my resignation.  He told me

13   that it basically didn't matter, he was the sheriff.  He read

14   to me out of a statute and then told me to go clean out my car

15   and find a way home.

16   Q.   You mentioned a letter of resignation.  I'd like to show

17   you Plaintiff's Exhibit No. 13.  Is this the letter of

18   resignation that you submitted to the County?

19   A.   It is.

20   Q.   What does this document consist of?

21   A.   It was my letter of resignation and giving a 90-day

22   notice.

23   Q.   And are there two letters or just one?

24   A.   So this that we see here, this exhibit, is the cover

25   letter for the rest of the resignation.  And that letter went

1    into more detail about why I was resigning, why I was

2    submitting my letter of resignation.

3    Q.   Did you send both letters to the County?

4    A.   I did.

5    Q.   Why did you submit this letter of resignation to the

6    County?

7    A.   It had been extraordinarily difficult for me to get done

8    what I needed to get done.  There was pushback and opposition

9    from the sheriff's administration, the previous sheriff's

10   administration, Sheriff Crisler and this one, Sheriff Jones.

11   The pushback I was initially -- I didn't get pushback from the

12   County so much as just a little bit of lack of support.  Over

13   time that improved.

14        So I was then left with the -- the directed opposition

15   from sheriff's administration.  And I submitted this letter

16   primarily to wake everybody up that we really needed to get

17   serious.  This was after the events of October 18th.  And I

18   knew something had to change on the heels of that murder.

19   Q.   Were you still interested in helping things to change

20   when Sheriff Jones terminated your employment as jail

21   administrator?

22   A.   Very much.

23        MS. COWALL:  I have nothing further, Your Honor.

24        THE COURT:  Is -- I'm assuming the second letter of

25   resignation is either in evidence or --

 1          MS. COWALL:  My recollection, Your Honor, is that the

 2    entirety of Plaintiff's Exhibit 13 was admitted into evidence.

 3          THE COURT:  Okay.  And it includes all three of them or

 4    four?

 5          MS. COWALL:  It includes both of the letters with

 6    attachments.  We had some discussion yesterday, and so I

 7    wanted to clarify with Ms. Bryan what that document consisted

 8    of.

 9          THE COURT:  Okay.  We're going to deviate from the

10    schedule just a little bit.  I think right now is a good time

11    to take a 15-minute break to prepare for Major Bryan's

12    cross-examination.

13          I'm going to ask that you not talk to anybody about the

14    testimony that you've given to this point, but you're free to

15    step down.

16          And we will return at -- well, let's say 10:40, which

17    is about 20 minutes.

18                    (A brief recess was taken.)

19          THE COURT:  You may be seated.

20          Ms. Bryan, you may return to the witness stand.  Major

21    Bryan I think is your title.

22          Hold on one second, Mr. Shelson.

23          MR. SHELSON:  May I proceed, Your Honor?

24          THE COURT:  You may, sir.

25          MR. SHELSON:  Thank you, Your Honor.

1   **CROSS-EXAMINATION**

2   **BY MR. SHELSON:**

3   Q.   Good morning, Major Bryan.  We met one time before today.

4   I believe it was January 20th, 2022, in your office.  Is that

5   consistent with your recollection?

6   A.   Yes, sir.

7   Q.   Prior to today, have you testified either in court or by

8   deposition in other proceedings?

9   A.   Yes.

10  Q.   And have you testified in other cases as an expert

11  witness?

12  A.   No.

13  Q.   Have you given depositions in other cases as an expert

14  witness?

15  A.   Yes.

16  Q.   Have you written expert reports in other cases?

17  A.   I'm sorry.  Have I written what?

18  Q.   Have you written expert reports in other cases?

19  A.   Yes.

20  Q.   What was your first day at work at the Raymond Detention

21  Center, approximately?

22  A.   I believe it was July 19th.

23  Q.   All right.  And I'm going to refer to the Raymond

24  Detention Center as "RDC."  Will that be okay?

25  A.   Sure.

```
 1   Q.   Thank you.  Now, sometime after July 19th, 2021, did you

 2   get COVID?

 3   A.   I did.

 4   Q.   And what period of time were you out from work while

 5   recovering from COVID-19?

 6   A.   The two weeks after the week of July 19th of '21.

 7   Q.   And so approximately what day did you return to work?

 8   A.   Early August.

 9   Q.   So just an approximation, approximately how many days did

10   you work as the jail administrator of RDC while Sheriff Vance

11   was still alive?

12   A.   A week.

13   Q.   And did you say you returned to work approximately on

14   August 3rd, 2021?

15   A.   I can't remember what day.  I know it was at the end of

16   two weeks after the week of July 19th.

17   Q.   Roughly end of July or early August?

18   A.   It was definitely in August.

19   Q.   Okay.  Thank you.  And to your knowledge, did

20   Sheriff Vance pass away on August 4th, 2021?

21   A.   I believe so, yes.

22   Q.   And you said on direct that the drive and gusto went with

23   Sheriff Vance.  Do you recall that?

24   A.   Yes.

25   Q.   And so you had actually had about one week of overlap
```

1  with Sheriff Vance before he passed away; correct?

2  A.   Yes.

3  Q.   On direct you gave the example of a jailer as a single

4  mom.  Do you recall that?

5  A.   Yes.

6  Q.   All right.  What percentage of the guards at RDC are

7  female?

8  A.   I don't know.

9  Q.   More than 50 percent?

10 A.   I don't know that number.

11 Q.   Do you have any thoughts on whether that single mom who's

12 a jailer on the floor of a housing unit at RDC might have a

13 different perspective, say, than a monitor regarding whether

14 the use of OC spray is to coerce compliance or for

15 self-protection?

16 A.   I'm sorry.  I don't understand your question.  Can you

17 rephrase?

18 Q.   What don't you understand about it?

19 A.   I don't understand what you're asking.

20 Q.   Based on your experience, could a female jailer have a

21 different perspective on whether her use of chemical spray was

22 to coerce compliance or for her personal safety than a monitor

23 may have reading a report about that incident?

24 A.   Yes.  The officer would have a subjective opinion about

25 her use of force.

```
 1   Q.   You mentioned that you saw things regarding the overuse

 2   of force while you were the jail administrator.  Do you recall

 3   that?

 4   A.   I do.

 5   Q.   What did you do about it when you saw that?

 6   A.   That was part of the reason that we were going to start

 7   having use-of-force training that was scenario based, not just

 8   use of force on Tasers but all uses of force.

 9   Q.   So you addressed it?

10   A.   We were in conversation about it, yes.

11   Q.   You mentioned that at some point in time while you

12   were -- excuse me, while you were jail administrator, that you

13   made a request for Tasers; is that correct?

14   A.   Yes.

15   Q.   And you very rapidly got 12 Tasers; is that correct?

16   A.   No, that's not correct.

17   Q.   When you requested Tasers, did you get Tasers?

18   A.   When I requested Tasers back in June, we finally got

19   Tasers in July -- or December or January.

20   Q.   Okay.  At some point in time did you request Tasers from

21   Sheriff Jones?

22   A.   Yes.

23   Q.   Okay.  How long after you requested Tasers from

24   Sheriff Jones did you get the Tasers?

25   A.   Not long after.
```

```
 1    Q.   When you became jail administrator at RDC, what did you
 2    do to educate yourself about the County's requisition process?
 3    A.   I asked people how -- what I was supposed to do about
 4    requisitions.
 5    Q.   To whom did you submit requisitions?
 6    A.   To Major Pete Luke and to Jerry Arinder.
 7    Q.   And were those the right people to submit requisitions
 8    to?
 9    A.   As far as I knew.
10    Q.   Are you sure about that?
11    A.   Absent the sheriff's administration when I got there
12    telling me what that process was, and Major Pete Luke or
13    Jerry Arinder didn't tell me anything different, I assumed
14    that that was what I was supposed to do.
15    Q.   Do you know whether you were recommended for the job of
16    jail administrator by Lisa Simpson?
17    A.   I believe she put my name as a potential applicant, gave
18    my name to somebody.
19    Q.   Major Bryan, I will recommend -- excuse me.  I will
20    represent to you that the document I'm displaying now is the
21    United States' expert disclosures in this case.  Have you seen
22    this document before today?
23    A.   My screen is not on.  I can't see what you're displaying.
24         MS. SUMMERS:  Is it showing up?
25         THE WITNESS:  It's black.
```

```
 1          THE COURT:  The screen must not be on -- well, it was
 2  on earlier.  It was on earlier.  Do you have a hard copy for
 3  her, because her screen is not --
 4          MR. SHELSON:  Yes, Your Honor.  May I approach?
 5          THE COURT:  You may.
 6          THE WITNESS:  Thank you.
 7  BY MR. SHELSON:
 8  Q.   Major Bryan, have you seen the document I just handed you
 9  before today?
10  A.   No, sir, I don't think so.
11  Q.   The pages are unnumbered, but on the bottom of the page I
12  just handed you is there a reference to Kathryn Bryan?
13  A.   There is.
14  Q.   All right.  Did you know that the United States had
15  designated you as an expert witness in this case?
16  A.   Yes, I think so.
17  Q.   Did you consent to being an expert witness for the United
18  States in this case?
19  A.   I agreed to come and testify.
20  Q.   But did you consent to be an expert witness for the
21  United States in this case?
22  A.   I don't know that I was asked that specific question, but
23  I was asked if I would come and testify, and I said yes.
24  Q.   You don't claim to be an expert regarding whether a jail
25  meets constitutional minimums, do you?
```

```
 1    A.   I'm sorry.  Can you say that again?
 2    Q.   You don't claim to be an expert regarding whether a jail
 3    meets constitutional minimums, do you?
 4    A.   No.
 5    Q.   On direct did you testify that you were the top
 6    supervisor of the jail when you were the jail administrator?
 7    A.   Yes, sir.
 8    Q.   And you testified that you worked 60 to 70 hours a week;
 9    correct?
10    A.   Yes.
11    Q.   And you did a good job, didn't you?
12    A.   Yes.
13    Q.   And you were dedicated to your job; correct?
14    A.   Yes.
15    Q.   And so you accomplished a good many things while you were
16    the jail administrator, didn't you?
17    A.   Yes.
18    Q.   What accomplishment as jail administrator are you most
19    proud of?
20    A.   I think what I'm -- one of the things I'm most proud of
21    is that we went three consecutive months without an inmate
22    overdose.  And I'm most proud of that because operationally,
23    things had to be going better for that to happen.
24    Q.   And you also have some accomplishments regarding staffing
25    in attempting to make -- in attempting to improve recruiting
```

```
 1   and retention of detention staff?
 2   A.   I do.
 3   Q.   All right.  And one of those things is you were
 4   instrumental in getting the detention staff starting salary
 5   increased to $31,000 a year?
 6   A.   It was -- by the time I left, it had been voted on but
 7   not implemented yet.
 8   Q.   Well, you consider voting on but not yet implemented a
 9   step in the right direction?
10   A.   Yes.
11   Q.   Okay.  And you pushed hard for that, didn't you?
12   A.   Yes, sir.
13   Q.   Okay.  Tell the Court what compression issues are
14   relative to raising salaries.
15   A.   In general, compression is when there's no system for an
16   adequate difference between the levels of officers, an
17   adequate financial difference between the levels of officers.
18   Q.   And increasing the detention staff salaries to $31,000
19   per year, would that result in 64 percent of all line staff
20   receiving a salary increase?
21   A.   Approximately.
22   Q.   And would increasing salaries to $31,000 avoid
23   compression issues?
24   A.   It wouldn't lead to a compression problem, especially
25   since that was just the first phase of what the proposals were
```

1  going to be for salaries.

2  Q.  All right.  So let's talk about what happened with

3  salaries before that $31,000 pay increase -- that increase to

4  $31,000 was approved.  You testified that at some point in

5  time there was a 5 percent pay increase; is that correct?

6  A.  Yes.

7  Q.  Approximately when was that?

8  A.  It was late 2021.

9  Q.  All right.  And at some point when you were the jail

10  administrator, was there -- well, was there a COVID pay

11  supplement which was in the range of 2,000 to $4,000?

12  A.  Yes.

13  Q.  And did you support that?

14  A.  I didn't have anything to do with that, but I did support

15  that.

16  Q.  You believed that that helped with recruiting and

17  retention?

18  A.  Since it was a onetime thing, I don't think it helped

19  with recruiting, but I believe it helped with retention, yes.

20  Q.  Were direct deposit and twice-a-month pay approved by the

21  County as of January 31st, 2022?

22  A.  Not to my knowledge.

23  Q.  You don't know one way or the other?

24  A.  I do not.

25  Q.  On direct, you remember testifying that you wanted pod

1    control rearranged?

2    A.   Yes.

3    Q.   And is it your testimony that by the time you had left,

4    that that had partially been done?

5    A.   Yes.

6    Q.   And you testified on direct about that you wanted

7    training at the detention center put under your authority; is

8    that correct?

9    A.   Yes.

10   Q.   Was that -- was that done?

11   A.   Yes.

12   Q.   When you were the jail administrator at RDC, did you

13   believe that incidents were being accurately -- strike that.

14   Let me start over.

15          MR. SHELSON:   Sorry, Your Honor.

16   BY MR. SHELSON:

17   Q.   When you were the jail administrator at RDC, did you

18   believe that incidents were being accurately reported?

19   A.   I want to be clear what your intent with that is.  Do I

20   believe that the incidences were -- if a report was done for

21   an incident, that it was accurate?  Then yes, I do.

22   Q.   Thank you.  That was my question.

23   A.   Okay.

24   Q.   I'm sorry for not asking a good question.

25          And you testified on direct also about 55-inch TVs for

1   the RDC; is that right?

2   A.   Yes.

3   Q.   All right.  So tell us, what did you have done regarding

4   55-inch TVs at RDC?

5   A.   Put in a requisition for them and got them.

6   Q.   Okay.  So when you left RDC on January 31st, 2022, where

7   were those TVs?

8   A.   Most of them had been installed in the housing units.

9   Q.   Did you receive any positive feedback from the detainees

10  about that?

11  A.   Yes.

12  Q.   And I may have this slightly wrong, so please correct me.

13  Was -- there's some -- was there some dance in connection with

14  TVs going into place?

15  A.   Yes.

16  Q.   Would you tell the Court about that, please.

17  A.   Sure.  So shortly after we installed the 55-inch TVs, I

18  had two computer monitors at my desk.  One had an array of

19  cameras, surveillance cameras, and the other was my

20  workstation.  And in a jail, any quick movement for any reason

21  is cause for concern.  So keeping an eye on the cameras out

22  the corner of my eye, I see a lot of movement in the housing

23  unit.  And as I was scrambling up out of my desk and grabbing

24  my radio to go down the hall, I took another look to see what

25  they were doing, and they were dancing.  And when we got down

1    into the unit to find out what was going on, every inmate

2    looking up at this 55-inch screen TV were watching a music

3    video and dancing.

4    Q.   And so I conclude from that you believe the TVs were good

5    for -- well, you already answered that.  Never mind.  Well,

6    no, you didn't.

7         So I take it from your answer that you believe that the

8    TVs were a good step for detainee morale?

9    A.   I do.

10   Q.   And you just mentioned about TV monitors at your desk.

11   During your tenure as jail administrator, if you saw an issue

12   based on what you saw on those monitors, did you address it?

13   A.   Yes.

14   Q.   When you were the jail administrator, were you in the

15   process of adding smaller TVs to medical housing?

16   A.   Yes.

17   Q.   And were you in the process of getting an electronic

18   rounds system for RDC?

19   A.   Yes.

20   Q.   Would you explain to the Court, please, what an

21   electronic rounds system is?

22   A.   Sure.  So it's pretty simple technology.  What it does,

23   there are buttons that go on the wall, and officers get what's

24   called a pipe that's programmed to them.  And as they touch

25   the pipe to the button around the walls, it records that

1    information.  And if those buttons are strategically placed

2    primarily in a housing unit, it forces the officers to go to

3    each button and pass each cell.

4        And it functions as a closed-circuit system.  So if one

5    of those buttons is missed, it doesn't close that circuit and

6    show as a complete surveillance round.  So at any given time

7    when those pipes are downloaded, it will show a spreadsheet of

8    which officer touched which button.  And it gives some

9    assurance that officers are going in and doing a sufficient

10   surveillance round, not peeking through a door but that

11   they're actually having to physically walk to each corner of a

12   housing unit.

13   Q.   And so I think as you just alluded to, the idea is that

14   it actually makes the officers do proper rounds?

15   A.   Yes.

16   Q.   And do you recall approximately how much that system

17   cost?

18   A.   I believe the ballpark was 40 to 50 for the system and

19   10,000 for a server.  And that amount would serve both RDC and

20   the work center and could potentially be removed and relocated

21   to a new facility.

22            THE COURT:  I'm sorry, Mr. Shelson.

23            And when you say "40 to 50," presumably you're saying

24   40 to 50,000?

25            THE WITNESS:  Yes, sir.

```
 1          MR. SHELSON:  Thank you, Your Honor.

 2   BY MR. SHELSON:

 3   Q.   And as of January 31st, 2022, where were you -- excuse

 4   me.  Let me strike that.

 5          As of January 31st, 2022, where were -- where were you in

 6   the process of getting the electronic rounds system

 7   implemented?

 8   A.   So the contract had been approved, signed, and funded,

 9   and I believe the hardware for the system was on-site, and we

10   were still waiting for the server.

11   Q.   And as jail administrator, did you take steps to get a

12   mental health unit for RDC?

13   A.   I believe that was already in the works when I got there,

14   but, yes, I was furthering that effort.

15   Q.   Thank you.  And what efforts did you take to further that

16   effort?

17   A.   For staffing and staff training, we had identified some

18   staff that were interested in working the unit and had started

19   the training program for them.  We had had mental health unit

20   planning meetings with jail staff, medical staff, and mental

21   health staff.  We had started construction on officer

22   workstations in the units and reconfiguring pod control and

23   started construction on the mental health office that would be

24   in the pod.

25   Q.   As of January 31st, 2022, when was the last overdose
```

1  before then at RDC?

2  A.   I believe we had gone three months without one.

3  Q.   How do you believe -- well, do you believe that health

4  services were doing great at RDC when you were the jail

5  administrator?

6  A.   Can you repeat the question, please?

7  Q.   Yes.  I'm sorry.  Do you believe that health services

8  were doing great while you were the jail administrator at RDC?

9  A.   I believe that the health services vendor that we had

10  were doing a good job, yes.

11  Q.   And that was QCHC?

12  A.   Yes.

13  Q.   And did you have any involvement in -- with the contract

14  that brought QCHC into RDC?

15  A.   No.

16  Q.   Do you know approximately what the annual cost to the

17  County is of that contract?

18  A.   No, sir.

19  Q.   Did RDC become a cleaner facility when you were the jail

20  administrator?

21  A.   A cleaner facility?

22  Q.   Yes, ma'am.

23  A.   Yes.

24  Q.   And what did you do to make that happen?

25  A.   Emphasize the importance of keeping a clean facility.

1   Q.   Did you get detainees involved in cleaning?

2   A.   They had always been involved in cleaning.

3   Q.   Did you get detainees more involved in cleaning?

4   A.   Yes, I believe so.

5   Q.   Did you testify on direct that while you were the jail

6   administrator, that you thought the handling of COVID-19 at

7   the jail was very successful?

8   A.   I don't think I testified on direct to that topic, no,

9   sir.

10  Q.   Do you think the handling of COVID-19 when you were the

11  jail administrator was very successful?

12  A.   Yes.

13  Q.   How many -- approximately how many detainees had COVID-19

14  as of January 31st, 2022?

15  A.   I don't know that.  I don't know.

16  Q.   It was a small number, though, wasn't it?

17  A.   I believe so, yes.

18  Q.   If any.  Let me ask this question:  Do you know on

19  January 31st, 2022, whether any detainees at RDC had COVID-19?

20  A.   I don't know.

21  Q.   You mentioned tablets during your direct.  Do you recall

22  that?

23  A.   I do.

24  Q.   Would you tell the Court, please, what you were trying to

25  do with the tablets?

1    A.   Sure.  So the vendor that we currently have for inmate

2    phone service and inmate video visitation also offers inmate

3    tablets, which are essentially iPads for inmates with no

4    internet access.  And it provides a multitude of programming

5    opportunities for inmates.  And we had had a presentation by

6    the vendor and were working toward getting inmate tablets.

7    Q.   Why did you think that was a good idea?

8    A.   For inmate programming needs, for inmate behavior

9    modification, and just to bring some civility to the inmate

10   population.

11   Q.   Was it your belief that having tablets could cut down on

12   contraband?

13   A.   I don't know that I have an opinion about the nexus

14   between the tablet and contraband, no.

15   Q.   Did you think it may reduce it because there would be

16   less reliance on mail?

17   A.   Yes, it could.  The tablets also provide a mechanism for

18   inmates' loved ones to send mail to a receiving facility and

19   then the receiving facility scans it into the tablet, so the

20   inmates are actually reading their mail on a tablet and they

21   can store it on there.  So, yes, that could cut down on

22   contraband coming into the facility.

23   Q.   And as of January 31st, 2022, where were you in the

24   process of getting tablets into the RDC?

25   A.   We had talked with the vendor about it, but it hadn't

1    happened yet.

2    Q.   Who is Bernard Moore?

3    A.   The recruiter.

4    Q.   At RDC?

5    A.   The detention recruiter, yes, sir.

6    Q.   What was your assessment of his job performance?

7    A.   I think he did an excellent job at recruiting.

8    Q.   Did he take initiatives, like getting arena football

9    players on-site?

10   A.   He was working on that, yes.

11   Q.   Okay.  Is it -- if you would let me know, can you still

12   not see that?

13   A.   I still got nothing.

14        MS. SUMMERS:  It's black.

15        THE COURT:  See if the monitor is on.  Somebody could

16   have knocked it.

17        MS. SUMMERS:  Keithfer's going to have to reset it.

18        THE COURT:  We have our technical person coming,

19   Mr. Shelson.  If you want to take a five-minute break, we can,

20   or if you want to ask something else until he gets here, we

21   can.  Whatever your pleasure is.

22        MR. SHELSON:  Thank you, Your Honor.  I'll try to keep

23   it moving.

24        May I approach the witness?

25        THE COURT:  Yes, you may.

1    A.    Thank you.

2    BY MR. SHELSON:

3    Q.    Major Bryan, the document I just handed you is marked as

4    Exhibit D-6.  Have you seen this document before today?

5    A.    Yes.

6    Q.    What is this document?

7    A.    This is a memorandum to all jail staff entitled

8    "Contraband Eradication Measures."

9    Q.    Did you author this memorandum?

10   A.    I did.

11   Q.    And just briefly, what is the purpose of this memorandum?

12   A.    Primarily this was designed to change the way employees

13   came in and out of the facility with their belongings to try

14   to cut down on the amount of contraband that employees were

15   introducing into the facility.

16   Q.    And did you implement this -- these contraband

17   eradication measures?

18   A.    Yes.

19   Q.    And how were they working?

20   A.    Very well.

21   Q.    I'm turning to page 2 of the memo, Major Bryan, last

22   paragraph.  You see there where it said that you have zero

23   tolerance for contraband?

24   A.    Yes.

25   Q.    And to the best of your ability, did you try to implement

1  a zero-tolerance policy for contraband while you were the jail

2  administrator?

3  A.   Yes.

4  Q.   Thank you.  You may just set that aside.

5       Were the accomplishments and initiative we've just

6  discussed reasonable responses to the issues you were dealing

7  with at RDC?

8  A.   For the contraband?

9  Q.   We discussed a lot more than contraband.  I'm talking

10 about everything we discussed from staffing, TVs, *et cetera*.

11 Were those measures reasonable responses to the issues you

12 were dealing with at RDC?

13 A.   I believe they were reasonable efforts, but not

14 sufficient, no -- some of them were not sufficient, but they

15 were all reasonable efforts.  Yes.

16 Q.   Did you do the best you could under the circumstances?

17 A.   With respect to what?

18 Q.   Being the jail administrator.

19 A.   Yes.

20 Q.   Have you heard the term "life safety issue"?

21 A.   Yes.

22 Q.   What does that term mean to you as a jail administrator?

23 A.   Anything that puts people's lives in danger are life

24 safety issues.

25 Q.   Are life safety issues important to you?

1   A.   Yes.

2   Q.   Did you encounter any life safety issues at RDC when you

3   were jail administrator?

4   A.   Yes.

5   Q.   Did you personally respond reasonably to them?

6   A.   It's hard to quantify.  That's a broad question.  There

7   were many life safety issues at the jail.

8   Q.   And -- well, did you ignore them?

9   A.   No.

10  Q.   Did you turn a blind eye to them?

11  A.   No.

12  Q.   Have you previously given opinions as an expert on

13  whether you believed somebody was deliberately indifferent in

14  a jail?

15  A.   Can you ask that again, please?

16  Q.   Have you personally written an expert report regarding

17  whether a sheriff was deliberately indifferent in a jail?

18  A.   Yes.

19  Q.   Were you deliberately indifferent to life safety issues

20  at RDC?

21  A.   No.

22  Q.   Did you ignore the welfare of the detainees at RDC when

23  you were the jail administrator?

24  A.   No.

25  Q.   When you were the jail administrator, did you ever see

1  any instances where you believed there was a risk of harm to

2  detainees?

3  A.   Yes.

4  Q.   Did you respond reasonably to those instances?

5  A.   Well, the example that comes to mind is I saw a risk of

6  harm daily with the low staffing levels.  And I did take

7  efforts to address that, but not very successfully.

8  Q.   Did you ever see an instance where there was an immediate

9  threat to life safety issues regarding detainees where you

10  took no action?

11  A.   Describe what you mean by "immediate threat."

12  Q.   I mean a threat of imminent harm.

13  A.   No.

14  Q.   Talk about maintenance.  At some point did County

15  maintenance personnel get assigned to RDC?

16  A.   They did.

17  Q.   Approximately when was that?

18  A.   I can't recall when that was.

19  Q.   That's fine.  But it was while you were jail

20  administrator?

21  A.   It was.

22  Q.   And did you request that?

23  A.   I did.

24  Q.   All right.  And how many County maintenance personnel

25  were assigned to the RDC?

1   A.   Two.

2   Q.   And how good of a job, based on your observations, did

3   those two County maintenance personnel do?

4   A.   They did a very good job.

5   Q.   As of -- well, as of when we met on January 20th, 2022,

6   had you been happy for quite a long time regarding the

7   responsiveness of those County maintenance workers to work

8   orders?

9   A.   I believe they were very responsive to the work orders.

10  Q.   And who is LeRoy Lee?

11  A.   He is the head of County maintenance.

12  Q.   When you were the jail administrator, did Mr. Lee keep

13  track of maintenance work orders and forward them to jail

14  staff?

15  A.   I don't know.

16  Q.   I want to talk next, Major, about gangs.  In your

17  experience, is there a hierarchy in everything?

18  A.   I'm sorry.  Can you say that again?

19  Q.   In your experience, is there a hierarchy in everything,

20  including jails?

21  A.   I don't know that I understand your question.  I'm sorry.

22  Q.   In your experience, is there a hierarchy among detainees

23  in jails?

24  A.   Yes.

25  Q.   To some degree -- excuse me.  Is some degree of gang

1   control in jails just the natural order of things?

2   A.   I don't know that I can speak to just jails in general.

3   Q.   The jails you've been the administrator of.

4   A.   No.

5   Q.   In your experience, is it unusual to have gang committees

6   in jails?

7   A.   From the jails I've run, yes, it is unusual.

8   Q.   In your experience as a jail administrator, is there a

9   pod boss in every facility?

10  A.   No.

11  Q.   When you first became jail administrator, did gangs have

12  control of any of the pods at RDC?

13  A.   I believe so.

14  Q.   When you were the jail administrator, did you take

15  control back from the gangs at RDC?

16  A.   I think it would be better answered to say that we

17  were -- that the jail staff were regaining control of the

18  units.

19  Q.   When you were the jail administrator, did jail staff have

20  access to all of the pods at RDC?

21  A.   Not at all times.  There were times that they didn't have

22  access to it.

23  Q.   In January 2022 did jail personnel go into A-Pod anytime

24  they wanted to?

25  A.   Yes.

1  Q.   When you were the jail administrator, did gangs control

2  the distribution of meals at RDC?

3  A.   Yes.  There was a time that inmates controlled the

4  distribution of food.  I don't know if it was gang-driven.

5  Q.   At some point did you put a stop to that?

6  A.   At some point we put a measure in place to take the

7  authority for meal distribution away from inmates and put it

8  back where it belonged, with the officers, with limited degree

9  of success.

10  Q.   What did you do to implement that?

11  A.   I issued a memo about meal service outlining what the

12  directives were on how meals were to be delivered to inmates.

13  Q.   And so you were in the process of addressing that issue,

14  correct?

15  A.   Yes.

16  Q.   And who is Anthony Simon?

17  A.   He's the chief of detention officers.

18  Q.   When you were the jail administrator, did you and

19  Chief Simon do camera audits at RDC?

20  A.   Camera audits?

21  Q.   Yes.

22  A.   I don't know.  Can you explain what you mean by a camera

23  audit?

24  Q.   If you don't know what I mean by that, I'll move on.

25       When you were the jail administrator, did you make good

1    progress on getting policies drafted and approved?

2    A.   I don't believe we were making good progress, but we were

3    making some progress, yes.

4    Q.   You believe the holdup was entirely on the jail's end?

5    A.   No.

6    Q.   Why not?

7    A.   Well, I'd like to take that back.  I do believe the

8    holdup was on the jail's end.

9    Q.   You -- after the policies were drafted, did they have to

10   be submitted to DOJ and the monitors?

11   A.   They had to be approved by DOJ, yes.

12   Q.   And you never encountered any delays on that end of it?

13   A.   Not any significant delays, no.

14   Q.   What are you calling a "significant delay"?

15   A.   Well, it didn't -- there wasn't a one-day turnaround.

16   Sometimes it took a little while, but it wasn't an onerous

17   delay.

18            MR. SHELSON:  May I approach the witness, Your Honor?

19            THE COURT:  Yes, you may.

20   BY MR. SHELSON:

21   Q.   Major Bryan, I've just handed you Exhibit D-102.  Do you

22   recognize that document?

23   A.   I do.

24   Q.   What is that document?

25   A.   This is an e-mail thread between me and Ms. Lisa Simpson

 1   and Ms. Karen Albert on a policy.

 2   Q.   Okay.  And was this the health care policy?

 3   A.   Yes.

 4   Q.   All right.  Is the bottom e-mail on the page dated

 5   October 26, 2021, from Lisa Simpson to you and Karen Albert?

 6   A.   Yes.

 7   Q.   And does Ms. Simpson say that looks like this one has

 8   been approved?

 9   A.   Yes.

10   Q.   And what was your response?

11   A.   A big woo-hoo.

12   Q.   And why was it a big woo-hoo?

13   A.   Because that's a big policy.

14        MR. SHELSON:  Your Honor, we move to have Exhibit D-102

15   admitted into evidence.

16        THE COURT:  Any objection?

17        MS. COWALL:  No, Your Honor.

18        THE COURT:  D-102 will be received into evidence.

19          (Defendants' Exhibit 102 entered.)

20        MR. SHELSON:  May I approach the witness, Your Honor?

21        THE COURT:  Yes, you may.

22   BY MR. SHELSON:

23   Q.   Major Bryan, I've just handed you Exhibit D-108.  Do you

24   recognize this document?

25   A.   I do.

1    Q.   And let me start with the bottom e-mail on D-108.  Is

2    that an e-mail from Karen Albert dated October 12th, 2021, to

3    Lisa Simpson and to you?

4    A.   Yes.

5    Q.   Does it concern the policy for population management?

6    A.   Yes.

7    Q.   And in that e-mail does Karen Albert tell you and

8    Ms. Simpson that "Here is another procedure"?

9    A.   Yes.

10   Q.   And what was Ms. Simpson's reply that same day?

11   A.   She says, "We're going to have a hard time keeping with

12   you two."

13   Q.   Is that in reference to keeping up with you and

14   Ms. Albert regarding policies?

15   A.   That's how I interpreted it, yes.

16   Q.   Thank you.  And so the top e-mail on the page is from you

17   to Priscilla Dawson dated October 13th, 2021; is that correct?

18   A.   Yes.

19   Q.   And who is Priscilla Dawson?

20   A.   She's the quality assurance officer at the jail.

21   Q.   And this e-mail on October 13th is discussing this same

22   population management policy?

23   A.   Yes.

24   Q.   And did you write to Ms. Dawson that "I think Lisa is

25   happy about the new pace of policies going to DOJ" --

```
 1    A.    I did.

 2    Q.    -- with four exclamation marks?

 3    A.    Yes.

 4    Q.    And when you said "Lisa" there, were you referring to

 5    Lisa Simpson?

 6    A.    I was.

 7    Q.    And why did you believe on October 13th, 2021, that Lisa

 8    was happy about the new pace of policies getting to DOJ?

 9    A.    Because of her previous comment.

10    Q.    Which was?

11    A.    "We're going to have a hard time keeping up with you

12    two."

13              MR. SHELSON:  Your Honor, we move to admit

14    Exhibit D-108 into evidence.

15              THE COURT:  Any objection?

16              MS. COWALL:  No, Your Honor.  The United States,

17    however, would reserve its right to object to any hearsay in

18    e-mails later.

19              THE COURT:  I'm sorry?

20              MS. COWALL:  We don't object to the admission of this

21    exhibit, but we also don't want to waive our right to object

22    to hearsay in other e-mails the defendants might proffer

23    later.

24              THE COURT:  Oh, okay.  All right.  It will be received

25    into evidence.
```

```
 1              (Defendants' Exhibit 108 entered.)
 2   BY MR. SHELSON:
 3   Q.   I want to shift gears, Major Bryan, to the population of
 4   inmates at RDC.  Does RDC house only felons?
 5   A.   It houses some misdemeanants.
 6   Q.   But are the misdemeanors a very small percentage of the
 7   population of inmates at RDC?
 8   A.   Yes.
 9   Q.   Because RDC houses almost exclusively felons, does that
10   mean there's no dilution of the detainee population?
11   A.   No dilution?
12   Q.   Dilution.
13   A.   Can you explain what you mean?
14   Q.   No dilution between felons and misdemeanor.
15   A.   I'm not sure I understand your question.
16   Q.   If virtually everyone at RDC who's an inmate is a felon,
17   that population is not diluted by having any significant
18   number of misdemeanor inmates; is that correct?
19   A.   Yes.
20   Q.   And in practical terms, in your experience, how does very
21   little dilution of the detainee population affect jail
22   operations?
23   A.   I don't have any other experience with that demographic
24   of inmate population.
25   Q.   You were previously the jail administrator at the
```

1  Beaufort County Detention Center; is that correct?

2  A.   Yes.

3  Q.   What was the population of that facility relative to

4  felony -- felons and misdemeanors?

5  A.   We averaged about 50/50.

6  Q.   And approximately what was the jail population of the

7  Beaufort County Detention Center when you were the jail

8  administrator of that facility?

9  A.   That's a small facility.  About 100.

10  Q.   And roughly what was the population of just RDC when you

11  were the jail administrator?

12  A.   Approximately 400.

13  Q.   When you were the jail administrator, was Priscilla

14  Dawson the quality assurance officer?

15  A.   Yes.

16  Q.   Did she write quality assurance summaries?

17  A.   She did.

18  Q.   How would you describe your working relationship with

19  Ms. Dawson?

20  A.   We had a good working relationship.

21  Q.   Did you ever make redline edits to drafts of Ms. Dawson's

22  quality assurance summaries?

23  A.   So when Ms. Dawson would prepare her draft monthly

24  report, she would have a meeting with jail staff for our input

25  on its accuracy and anything that we needed to clear up before

 1    she issued her final report.  And so there were times, yes,

 2    that I made some corrections in her report.

 3           THE COURT:  Okay.  At this time we do have our

 4    technical person here to -- you're about to put something back

 5    on the Elmo?  Hold on for one second, Mr. Shelson.

 6           You can step aside, Ms. Bryan.  We're going to see if

 7    we can get that monitor to operate.

 8           I tell you what.  Let's take a five-minute recess while

 9    we take care of this technical glitch.  We'll be in recess.

10                   (A brief recess was taken.)

11           THE COURT:  You may be seated.

12           Hold on.  Before you come back up, Major Bryan.

13           Mr. Shelson, we have a technical issue that we believe

14    can be resolved over lunch.  You know, I leave it to you

15    whether you want to go forward now until about 12:30, or do

16    you want to take your lunch break now and come back about 1:15

17    or so to start up?

18           MR. SHELSON:  Thank you, Your Honor.  I think I can get

19    pretty close to being finished by 12:30.

20           THE COURT:  Okay.  All right.

21           Major Bryan, you may come back up.

22           MR. SHELSON:  Can I have the Elmo to at least show the

23    Court?

24           Your Honor, I'd like to -- during the break it was

25    pointed out to me that I did not move to admit Exhibit D-6

1    into evidence, and I had asked Major Bryan about this

2    document.  So, anyway, I move to admit Exhibit D-6 into

3    evidence.

4         THE COURT:  Any objection from the defendant --

5    plaintiff?  Excuse me.

6         MS. COWALL:  No objection from the United States, Your

7    Honor.

8         THE COURT:  All right.  Thank you.  D-6 will be

9    received in evidence.

10            (Defendants' Exhibit 6 entered.)

11         MR. SHELSON:  May I approach the witness, Your Honor?

12         THE COURT:  You may.

13   BY MR. SHELSON:

14   Q.  Major Bryan, what is Exhibit D-114?

15   A.  It's the -- it looks like the September quality assurance

16   summary.

17   Q.  So is the document you're holding that's marked D-114 an

18   e-mail from you to Priscilla Dawson dated October 12, 2021?

19   A.  Yes.

20   Q.  And is the document that is marked Exhibit D-115 the

21   attachment to the e-mail that is D-114?

22   A.  I think so, yes.

23   Q.  All right.  And so with respect to D-115, if you flip

24   through that document, do you see redline changes to that

25   document?

1   A.   Do I see them?  Yes, I do.

2   Q.   Yes.  And did you make those redline changes to D-115?

3   A.   I don't know that -- I don't know that I did.

4   Q.   Is D-115 the draft quality assurance summary for

5   September 2021?

6   A.   It appears to be a draft, yes.

7   Q.   Major Bryan, on the bottom of these pages, there's a

8   Bates number.  Could you turn to D1023, please?  Do you see

9   where it says "commented KB2."  Is that you?

10  A.   Yes.

11  Q.   And so wherever it says "commented KB" in the document

12  that's marked D-115 those are your comments; correct?

13  A.   Without looking at each one, I would presume so, yes.

14       THE COURT:  I notice some of them are KB1 and some of

15  them are KB2, and it's your representation KB applies to her?

16       MR. SHELSON:  Yes, Your Honor.  They're numbered

17  sequentially, Your Honor.

18       So, Your Honor, we did mark them as separate exhibits,

19  but we would move to enter D-114 and D-115 into evidence as a

20  single exhibit because it's an e-mail with an attachment as

21  D-114.

22       THE COURT:  Go ahead and just keep them as is for the

23  purposes of the courtroom deputy.  114 will be the e-mail, and

24  the 115 is the -- well, wait.  What is it on your document?

25       MR. SHELSON:  That's it, Your Honor.  So we do move to

1    admit D-114 and D-115 into evidence.

2         THE COURT:  Okay.  All right.  We're going to keep it

3    for purposes -- I think it will make it simpler.  Well, let me

4    ask the Government -- the United States.  Any objection?

5         MS. COWALL:  No objection, Your Honor.

6         THE COURT:  All right.  D-114 and D-115 will be

7    received in evidence.

8         (Defendants' Exhibits 114 and 115 entered.)

9    By MR. SHELSON:

10   Q.  Major Bryan, when you were the jail administrator, how

11   was the work center doing?

12   A.  We didn't have as many issues arising from the work

13   center as we did RDC.

14   Q.  You think the work center was doing good?

15   A.  I think it was, yes.

16   Q.  When you were the jail administrator, how frequently did

17   you communicate with Lisa Simpson?

18   A.  I don't know the exact frequency, but we did communicate,

19   yes.

20   Q.  Was it daily?

21   A.  No.

22   Q.  Was it weekly?

23   A.  No.

24   Q.  Can you give any better estimate at all?

25   A.  I really can't.  I know we were in communication, but to

1    quantify it, I don't know that I can do that.

2    Q.   When you were the jail administrator, did you and

3    Dave Parrish have any disagreements regarding safety

4    vestibules?

5    A.   No, I don't believe we had a disagreement.

6         MR. SHELSON:  Your Honor, may I approach the witness?

7         THE COURT:  You may.

8    BY MR. SHELSON:

9    Q.   Major Bryan, do you recognize Exhibit D-119?

10   A.   I do.

11   Q.   All right.  Is Exhibit D-119 a series of e-mails

12   involving you and Lisa Simpson and others?

13   A.   Yes.

14   Q.   Okay.  I want to direct your attention to the second

15   e-mail from the top of the page.  It's from you to

16   Lisa Simpson dated September 16th, 2021.  Do you see that

17   e-mail?

18   A.   I do.

19   Q.   Does it say, "Okay.  Seems Dave and I are going to

20   disagree on some issues, but I will present this information

21   to the master planning group to see where we go from here"?

22        Did I read that correctly?

23   A.   You did.

24   Q.   And is the subject of this e-mail "control room

25   vestibule"?

473

1   A.   Yes.

2   Q.   And is that the same thing as a safety vestibule?

3   A.   A safety vestibule for this control room is what it's

4   talking about.

5   Q.   Thank you.  And so with all that said, where you wrote to

6   Ms. Simpson that Dave and you are going to disagree on some

7   issues, what were you referring to?

8   A.   The control room vestibule.

9   Q.   And what was the disagreement?

10  A.   It was my understanding that Dave felt that that was a

11  need for -- to have some sort of security vestibule prior to

12  entering or exiting the control room for controlled access.

13  At the time -- this was right after I got here -- I didn't

14  have a good understanding of what the scope of that was.  And

15  I also at the time, since I had just gotten there, didn't

16  understand -- or disagreed with the priority level that I felt

17  Dave was assigning to it based off of what I was seeing on the

18  ground.  That has since changed and we have moved forward with

19  planning on security vestibules.  But at the time we had a

20  difference of opinion on those.

21  Q.   All right.  And so when you were jail administrator what

22  was done, if anything, regarding these safety vestibules?

23  A.   So recently we were planning on how those were going to

24  work, how they were going to be designed or constructed or

25  what some options were for the safety vestibules into the

```
 1   control room as well as the safety vestibule for the work
 2   center's sally port area.
 3   Q.   And so that was in progress as of January 30th, 2022?
 4   A.   Yes, we had begun to talk about it.
 5   Q.   Thank you.  You may set that document aside.
 6        MR. SHELSON:  Your Honor, we move to admit
 7   Exhibit D-119 into evidence.
 8        THE COURT:  Any objection from the United States?
 9        MS. COWALL:  No, Your Honor.
10        THE COURT:  Okay.  D-19 will be received into evidence.
11   D-119.
12        (Defendants' Exhibit 119 entered.)
13   BY MR. SHELSON:
14   Q.   Major Bryan, were you the jail administrator of the
15   Beaufort County Detention Center from July 2015 to
16   September 2020?
17   A.   Yes.
18   Q.   During that period were you ever sued in your capacity of
19   jail administrator of Beaufort County Detention Center?
20   A.   It's Beaufort County.
21   Q.   Sorry.  Thank you.
22   A.   And, yes, I was.
23   Q.   All right.  Were you sued one time by Alexander Lee
24   Simpson?
25   A.   I believe so.
```

1   Q.   And another time by Marquel Warren?

2   A.   Yes.

3   Q.   And did you recall any other instances where you were

4   sued in your official capacity?

5   A.   I believe there were a couple more arising from a similar

6   issue.

7   Q.   So with respect to Simpson and Warren, do you recall

8   whether you prevailed on summary judgment?

9   A.   We did.

10   Q.   All right.  But that kind of thing nonetheless comes with

11   the territory, getting sued in your official capacity as jail

12   administrator?

13   A.   That was the first time I had been sued as a jail

14   administrator.

15   Q.   Do you recall being an expert in a case called *Kent*

16   *versus Duncan*?

17   A.   Yes.

18   Q.   All right.  And in that case who were you an expert for?

19   A.   The defendant.

20        MR. SHELSON:  May I approach the witness, Your Honor?

21        THE COURT:  You may.

22   BY MR. SHELSON:

23   Q.   Major Bryan, I've handed you a copy of the reported case

24   of *Kent versus Duncan*, 2020 WL 133390.  Do you see the section

25   there that's captioned "Background" on the right column, first

1    page?

2    A.   Yes.

3    Q.   Does it say "The Plaintiff's claims arise from the

4    Defendants' alleged failure to provide Ms. Smiley with

5    emergency medical treatment and/or transportation to the

6    hospital for such treatment while she was experiencing a

7    severe drug overdose, which resulted in her death, during her

8    detention at the Buncombe" -- how do you pronounce that?

9    A.   Buncombe.

10    Q.   Thank you.  -- "County Detention Center."

11         Did I read that correctly?

12    A.   Yes.

13    Q.   And you were an expert for the defendants in that case?

14    A.   Yes.

15    Q.   I'm on page 3 of this opinion, top of the page, right

16    column.  I've highlighted it on the screen anyway, which you

17    can't see.  But "The parties complied with the Court's request

18    and proffered the following details surrounding the factual

19    and legal circumstances of this matter."

20         Do you see that?

21    A.   I do.

22    Q.   And then I'm down at the bottom of the page, paragraph

23    that's numbered 11.  "After being placed in the cell alone,

24    Ms. Smiley rolled around on the floor for nearly an hour, and

25    then exhibited seizure-like movements, went into cardiac

1    arrest, and stopped breathing.  During that time, the County

2    Defendants failed to place Ms. Smiley on a four-times-per-hour

3    direct observation watch, as required by" -- and it has a

4    County policy number -- "and she subsequently died from

5    methamphetamine toxicity."

6         Did I read that correctly?

7    A.   Yes.

8    Q.   And what was your opinion in that case regarding the

9    defendants?

10   A.   I had many opinions in this case regarding the

11   defendants.  And the defendants that I'm referring to are the

12   sheriff's defendants and the -- I can't remember exactly on

13   this case, but I believe it was the sheriff and his staff

14   defendants that I rendered opinions on.

15   Q.   Did you conclude that the sheriff and staff defendants

16   had no liability?

17   A.   I did not make that legal conclusion.

18   Q.   What -- in summary, what conclusion did you make about

19   those two defendants?

20   A.   In general the conclusion that I made was that they --

21   and again, I'm making generalizations since I don't have my

22   report in front of me and that was some time ago -- that there

23   hadn't been a substantial violation of their policies or

24   violations of administrative code.

25   Q.   That there had or had not been?

1   A.   Had not.

2   Q.   All right.  You can set that one aside, please.

3        Were you an expert witness in a case called *Short versus*

4   *Stokes*?

5   A.   Yes.

6   Q.   Who were you an expert for in that case?

7   A.   The defendant.

8   Q.   Do you recall which defendant?

9   A.   I'm sorry.  The defendant sheriff and sheriff's staff, I

10  believe.

11  Q.   Thank you.  So I'm showing you a reported decision in

12  that case of *Short versus Stokes*, 2021 WL 620933.  Let me see

13  if I can get you a copy.

14        MR. SHELSON:  May I approach, Your Honor?

15        THE COURT:  Yes, you may.

16  BY MR. SHELSON:

17  Q.   All right.  Major Bryan, I'm directing your opinion to

18  the right-side column below where it says "Memorandum Opinion

19  and Order."  And do you see there where it says the plaintiff

20  "filed this action against multiple defendants allegedly

21  involved in the events at the Davie County Detention Center,

22  which led to Ms. Short's suicide in 2016"?

23  A.   Yes.

24  Q.   Was Ms. Short found hanging by a bedsheet attached to her

25  neck from the cell door?

1   A.   Yes.

2   Q.   And I'll show you this, ma'am.  It's on page 4.  It's

3   the -- a little more than halfway down, there's a paragraph

4   that begins with asterisk 5, and then a policy of the jail is

5   bolded and underlined.  Do you see that?

6   A.   I do.

7   Q.   And this is the jail policy, and it read, "It is

8   important to begin 10-to-15 minute checks on a suicidal

9   inmate, even if he or she is in a multi-occupant cell.  This

10  must be documented."  And it goes on to say "Ms. Short alleges

11  that despite these policies, Ms. Short was not monitored, was

12  placed in isolation and was given a bedsheet, resulting in her

13  death."

14       Did I read that correctly?

15  A.   Yes.

16  Q.   And with respect to the sheriff and his staff, what was

17  your opinion in that case?

18  A.   I'm at a bit of a disadvantage not having my expert

19  report in front of me to remember what opinions I rendered on

20  these cases.

21  Q.   Do you recall what your opinion was?

22  A.   Again, without having my report in front of me, I'm

23  having a hard time remembering what my opinions were on these

24  cases.

25       MR. SHELSON:  May I approach the witness, Your Honor?

 1          THE COURT:  Yes, you may.

 2   BY MR. SHELSON:

 3   Q.   I'll represent to you, Major, that the document I've just

 4   handed you is a media account dated -- if you look at page 2,

 5   dated November 16th, 2020.  And do you see it's talking about

 6   the Beaufort County -- did I say it right that time?

 7   A.   Yeah.

 8   Q.   Thank you.  Beaufort County Detention Center.  I'd like

 9   to direct your attention to the third page.  Do you see where

10   it says "Kathryn Bryan is the former jail administrator and

11   said inmates are unable to get time outdoors for fresh air and

12   are not able to visit with their children."  Is that -- is

13   that referring to you?

14   A.   It is.

15   Q.   Do you see the quote attributed to you in the next

16   paragraph which reads, "I cannot count the number of times I

17   heard inmates tell me, directly, that they were going to plead

18   guilty to their charges just to get out of that jail."

19          Do you see that?

20   A.   Yes.

21   Q.   Did they accurately quote you?

22   A.   They did.

23   Q.   Okay.  So as of November 16th, 2020, how long had it been

24   since you'd been the jail administrator of that facility?

25   A.   I retired in September of '20.

1    Q.   When you were the jail administrator of the

2    Beaufort County Detention Center, did you conduct an

3    evaluation of that facility which ended up being a six-page

4    evaluation published by the Beaufort County Sheriff's Office?

5    A.   I don't know if they published anything that I created.

6    Q.   Well, was there an evaluation created that you authored?

7    A.   I did.

8    Q.   Right.  And did it --

9    A.   I created a couple of them.

10   Q.   Did one of them identify ten current problems with the

11   county detention center?

12   A.   I don't remember what -- I don't remember.

13   Q.   Did one of the problems listed concern supervision in the

14   surveillance system?

15   A.   It might have been, yes.

16        MR. SHELSON:  May I approach the witness, Your Honor?

17        THE COURT:  Yes, you may.

18   BY MR. SHELSON:

19   Q.   Major Bryan, this is a media account.  It's dated

20   September 17th, 2015, so I'm going to have to ask you whether

21   it's accurate or not.  So page 1, bottom, "The Beaufort County

22   Sheriff's Office sent out a six page evaluation that

23   highlights 10 current problems with the county detention

24   center."  Is that accurate, to your recollection?

25   A.   So I don't remember if the sheriff's office sent out an

1  annual -- what this is a picture of is an annual

2  state-of-the-jail report that I would write and submit to my

3  sheriff.  I don't know if they sent it out, but that's what

4  that picture is.

5  Q.  But you remember writing this type of evaluation; is that

6  correct?

7  A.  I do.

8  Q.  Would you turn to page 2, please.  The first paragraph at

9  the top of the page, second sentence, referring to the

10  evaluation and it says "It states that 'there is no intercom

11  system in the inmate housing unit.'"

12      Was there any intercom system in the inmate housing unit

13  while you were the jail administrator at Beaufort County

14  Detention Center?

15  A.  There was.

16  Q.  And where it says that "the current method of

17  communication is for the inmates to wave a towel or sheet at

18  the surveillance camera until noticed," was that your

19  evaluation?

20  A.  At the time that's how they had to communicate with

21  master control, yes.

22  Q.  And then it says further down "Last December the board

23  voted to keep the county from building a new jail."  Is that

24  consistent with your recollection?

25  A.  Yes.

1   Q.   And then does it say "This decision came after nearly

2   $1.5 million had already been spent to create a plan for the

3   new jail and hire architects."  Is that consistent with your

4   recollection?

5   A.   Yes.

6   Q.   Did you agree or disagree with the decision not to build

7   a new jail?

8   A.   Oh, I disagreed with that decision.

9   Q.   And why did you disagree with that decision?

10  A.   Because the current jail was built completely underground

11  with no fresh air, no sunlight, no opportunity for outside

12  recreation, no sally port, and we were a block and a half from

13  a river, so we flooded regularly, and we -- to me -- I offered

14  up some alternatives, but those were the conditions at the

15  jail.

16       The jail had been originally built in the '60s.  Then

17  after an incident, they expanded, but the expansion caused two

18  housing units to face each other.  So architecturally it was

19  built improperly.  And again, being a block and a half from a

20  river, we had severe flooding problems.

21  Q.   Based on your observations while you were the jail

22  administrator at RDC, did you believe that that facility was

23  architecturally built improperly?

24  A.   I don't know that I can speak to how something was built

25  architecturally.

1   Q.   I'm sorry.  I'm just trying to use as close as I could

2   the same words that you just used.  Let me re-ask it, please.

3        Based on your experience as the jail administrator at

4   RDC, did you believe that was a well-designed facility for a

5   jail, a direct-supervision jail?

6   A.   I did.

7   Q.   Do you see below the paragraph we just looked where it

8   refers to somebody named Commissioner Jerry Langley?  Do you

9   recall that person?

10  A.   Yes.

11  Q.   All right.  And then it quotes Mr. Langley as follows:

12  "The jail was grandfathered in.  It's really the obsolete

13  jail.  So the only way to modernize it is if you gut the

14  entire thing.  So basically just building a new facility is

15  the most cost effective way to remedy the entire problem."

16       Did I read that correctly?

17  A.   Yes.

18  Q.   Do you agree with what is said there?

19  A.   Yes.

20  Q.   Are you aware that the County has approved -- strike

21  that.

22       Are you aware that Hinds County has approved building a

23  new jail?

24  A.   Yes.

25  Q.   Do you agree or disagree with that decision?

1   A.   I -- I could agree or I could disagree.  And I want to

2   clarify that.  I think we -- I agree with that decision.

3   Q.   Why do you agree with that decision?

4   A.   Well, while -- I believe that the problems with jail

5   operations can be fixed in place.  They can be fixed in that

6   jail.  The current Raymond Detention Center isn't that old.

7   Operationally we can improve it in place.

8        If people smarter than me decide that it's a better

9   decision to build a new jail, then I'm going to agree with

10  that.  If the decision had been made to remedy in place

11  completely and never build a new jail, I would agree with

12  that.  The point being, whatever the decision is, I need to

13  work with what I've got and support that effort.  So if the

14  decision was made before I got here to build a new jail, then

15  I will support that.

16  Q.   And alluding to what you just said, do you believe that

17  the RDC can be improved into a better jail without a receiver?

18  A.   I don't know that I'm equipped to answer that question.

19  Q.   Did you submit a declaration in this case in

20  December 2021?  Let me --

21       MR. SHELSON:  May I approach the witness, Your Honor?

22       THE COURT:  You may.

23  BY MR. SHELSON:

24  Q.   Let me re-ask that question, Major.  Is the document I

25  just handed you a declaration that you submitted in this case

1    that was filed on December 17th, 2021, in this case as

2    ECF-106?

3    A.    Yes.

4    Q.    Do you stand by the statements you made in this

5    declaration?

6    A.    Yes.

7    Q.    I did not bring an extra copy of this, Major Bryan, but

8    we'll work this out.  I'll represent to you that the United

9    States filed in this case, on February 11th, 2022, their

10   proposed findings of fact and conclusions of law.  It's

11   ECF-138.  It's a 101-page document.  Have you seen that

12   document, to your recollection?

13   A.    I don't think -- I don't know.

14        MR. SHELSON:  May I approach, Your Honor?

15        THE COURT:  You may.

16   BY MR. SHELSON:

17   Q.    That's just the first page of it.  Does that refresh your

18   recollection one way or the other?

19   A.    I'm not sure, Mr. Shelson.  I'm sorry.

20   Q.    Okay.  That's fine.  I'll represent to you -- and I'm

21   looking at footnote 3 on ECF-138.  And it makes a reference --

22   well, here.  I'll just read it to you.  It says "As detailed

23   more below, the jail administrator encountered such resistance

24   from defendants that she currently no longer works at the

25   jail."  And then it says "Kathryn Bryan anticipated

```
1    testimony."  And it abbreviates that as "TST Bryan."  Okay?
2          And then in paragraph 69, it says "However, that was not
3    Ms. Bryan's experience, and she is no longer the jail
4    administrator after serving six months."  And it says
5    "Testimony Bryan."  And then there's another place in here
6    where it actually quotes your testimony.
7          And here's my question:  Do you have any idea how the
8    United States knew what you were going to testify here today
9    before you ever came and testified?
10   A.   I don't know.
11         MR. SHELSON:  May I approach the witness, Your Honor?
12         THE COURT:  You may.
13         MR. SHELSON:  Can I have 128 and 129, please?
14   BY MR. SHELSON:
15   Q.   Major Bryan, is the document that's labeled D-128 an
16   e-mail chain that involves yourself?
17   A.   Yes.
18   Q.   All right.  If I could direct your attention to the
19   bottom e-mail that is dated August 11th, 2021, is that an
20   e-mail from you to Felicia Johnson and others?
21   A.   It is.
22   Q.   And does the first sentence read, "Now that I have my
23   feet on the ground and have recovered from COVID, I'm anxious
24   to get started working toward compliance with the consent
25   decree"?
```

1    A.   Yes.

2    Q.   All right.  And so as of August 11th, approximately how

3    long had you been back at work at RDC following your bout with

4    COVID?

5    A.   Maybe a week or so.

6         MR. SHELSON:  Okay.  Your Honor, we move to admit

7    Exhibit D-128 into evidence.

8         THE COURT:  Any objection?

9         MS. COWALL:  No, Your Honor.

10        THE COURT:  D-128 will be received in evidence.

11           (Defendants' Exhibit 128 entered.)

12        MR. SHELSON:  Your Honor, may I approach the witness?

13        THE COURT:  You may.

14   BY MR. SHELSON:

15   Q.   Major Bryan, is Exhibit D-126 an e-mail chain between you

16   and Lisa Simpson?

17   A.   It is.

18   Q.   And is the bottom e-mail an e-mail from you to

19   Ms. Simpson dated August 29th, 2021?

20   A.   Yes.

21   Q.   And does the first sentence of that e-mail say "It has

22   become nearly impossible for me to do the job for which I was

23   hired"?

24   A.   It does.

25   Q.   And so at that point when you take out the period you

1    were out because of COVID, had you been on the job roughly one

2    month?

3    A.   Yes.

4         MR. SHELSON:  Your Honor, we move to admit Exhibit

5    D-126 into evidence.

6         THE COURT:  Any objection?

7         MS. COWALL:  No, Your Honor.

8         THE COURT:  D-126 will be received in evidence.

9         (Defendants' Exhibit 126 entered.)

10   BY MR. SHELSON:

11   Q.   I'm sorry, Major Bryan.  Before I leave Exhibit 126,

12   would you look at the last paragraph in your e-mail to

13   Ms. Simpson dated August 29th, 2001 *[sic]*.  Does it read, "I

14   understand that we may transition to a change in

15   administrative personnel, whether whole or in part, in

16   November.  However, I feel it is important to officially

17   notify you of this situation as I am currently assessing my

18   options with regard to continued employment with Hinds

19   County."

20        Did I read that correctly?

21   A.   Yes.

22   Q.   And what options were you assessing?

23   A.   Just on what I was going to do if conditions didn't

24   change.

25   Q.   And what type of things were you considering doing if

1   conditions didn't change?

2   A.   At that time I didn't know yet.

3   Q.   All right.  At any point in time while you were jail

4   administrator, did acting Sheriff Crisler suggest to you

5   moving detainees from A-Pod to Madison and Rankin Counties?

6   A.   He made that recommendation in a meeting that we had with

7   a lot of people in attendance.  He didn't make that

8   recommendation to me, but he did make that recommendation.

9   Q.   So did you reject that recommendation?

10  A.   Well, again, he didn't make the recommendation to me.  I

11  did not support that recommendation.

12  Q.   Why did you not support that recommendation?

13  A.   Well, we hadn't had much luck in housing inmates in

14  adjoining counties when we had tried.  And it's expensive to

15  house -- it can be expensive, in my experience, to house

16  inmates in other counties.  And we're still responsible for

17  them regardless of where they're held, so...

18  Q.   Is -- is there an organizational chart for the Hinds

19  County Sheriff's Office?

20  A.   Yes.

21  Q.   Is the sheriff at the head of the organization?

22  A.   Yes.

23  Q.   And on the organizational chart, as jail administrator,

24  were you in the tier below the sheriff?

25  A.   Yes.

```
1   Q.   All right.  So the sheriff was your boss?
2   A.   Yes.
3   Q.   Just from your perspective, do you believe you were ever
4   insubordinate to Sheriff Jones?
5   A.   No.
6   Q.   Did you and Sheriff Jones ever have a discussion
7   regarding his perspective on that issue?
8   A.   His perspective on what?
9   Q.   On whether he believed you were insubordinate.
10  A.   He -- there were time- -- there was a time that he -- I
11  believe there was a time that he said to me in a call or
12  during a meeting -- it might have been during a call -- that
13  he felt that I was usurping his authority.
14          MR. SHELSON:  Can I have the Elmo on?
15          Your Honor, I'm going to ask permission to approach the
16  witness and show her Exhibit P-13, which is her letter of
17  resignation dated November 10th, 2021, and which is already
18  admitted into evidence as P-13.
19          THE COURT:  You may.
20  BY MR. SHELSON:
21  Q.   Is P-13 a letter of resignation from you dated
22  November 17th -- excuse me, November 10th, 2021?
23  A.   It is.
24  Q.   All right.  So how many times while you were jail
25  administrator at RDC did you submit a resignation?
```

1    A.    Two.

2    Q.    And so what was the other time besides November 10th,

3    2021?

4    A.    It was -- I don't remember exactly when it was, but it

5    was after November 10th.

6    Q.    And so when you submitted your second resignation, who

7    was the sheriff at the time?

8    A.    Sheriff Crisler.

9    Q.    Did you ever tell Sheriff Jones that you could not work

10   with him?

11   A.    That was part of what I said about that, yes.  The entire

12   part was I couldn't work with him under the same

13   circumstances, that we needed to find a way to be able to work

14   together.

15   Q.    How long after Sheriff Jones had took office did you have

16   the discussion you just mentioned with him?

17   A.    We only worked together for two months, so it wasn't long

18   after the election.

19   Q.    All right.  And Exhibit P-13, as we've established, I

20   don't mean to be redundant, but dated November 10, 2020, was

21   that about a week after the sheriff's election?

22   A.    I'm not sure.

23         THE COURT:  I think you misspoke.  You said 2020.  It

24   should have been 2021, I believe.

25         MR. SHELSON:  Thank you, Your Honor.  I did mean 2021.

```
 1            THE COURT:  Okay.  I just want the record to be clear.

 2   BY MR. SHELSON:

 3   Q.   On December 28th, 2021, did DOJ send you an e-mail asking

 4   whether you'd like to be included on a call to discuss the

 5   issue of a compliance director?

 6            MR. SHELSON:  May I approach the witness, Your Honor?

 7            THE COURT:  Yes, you may.

 8   BY MR. SHELSON:

 9   Q.   If I may, does the document I just handed you refresh

10   your recollection about what I just asked you?

11   A.   I remember this e-mail, yes.

12   Q.   Okay.  So did you take -- did you discuss with DOJ the

13   issue of compliance director that's referenced in the

14   December 28, 2021, e-mail I just handed to you?

15   A.   I did not.

16   Q.   Do you recall testifying on direct that recruiting

17   someone is a longer-term process?

18   A.   I believe I said it's a longer-term process than

19   retaining a current employee, yes.

20   Q.   Right.  And that was certainly true for you as the jail

21   administrator?

22   A.   About my --

23   Q.   No, just that recruiting someone is a longer-term process

24   than retaining them.

25   A.   Yes.  Well, in the context that I said that under direct,
```

1    it was -- we were talking about salaries and increasing

2    salaries, and that was a quicker remedy for a retention effort

3    than it would have been for a recruiting effort.

4         THE COURT:  As I recall her testimony, she was talking

5    about correctional officers, whether they would be -- whether

6    the onetime payment might be better to retain them or allow

7    them to be retained or -- because the recruiting process of

8    getting people on board is much longer.  Where those people

9    who already work there get a 2,000 to 4,000 COVID bump or

10   either get a salary increase, that can be much quicker than

11   trying to bring in people and have them there for a period of

12   time.  I think that was the comparison in her testimony.

13        MR. SHELSON:  Yes, Your Honor.  I appreciate that.  I'm

14   inartfully trying to get to a different point, but that's my

15   fault.

16        THE COURT:  Okay.

17        MR. SHELSON:  Thank you, Your Honor.

18   BY MR. SHELSON:

19   Q.   So let me cut to it, Major Bryan.  Do you agree that for

20   whomever the jail administrator is at RDC, there are going to

21   be recruiting and retention challenges?

22   A.   Yes.

23   Q.   And the same would apply to a receiver, wouldn't it?

24   A.   I'm not familiar with how a receiver works.

25   Q.   Well, no one -- do you agree that no one has a magic wand

1    to fix the recruiting and retention issues at RDC?

2    A.   I never believed there's a magic wand, but there is a fix

3    to recruiting and retention issues at RDC.

4    Q.   And it's a long-term process, though; do you agree with

5    that?

6    A.   It doesn't necessarily have to be.

7    Q.   Did the number of detention staff go up or down during

8    your tenure as jail administrator at RDC?

9    A.   I don't know -- I don't know for sure because I don't

10   know what the staffing levels were when I started.  I know

11   that there was a monitoring report that said that staffing

12   levels were at the lowest they've been in seven years.

13   Q.   Do you agree that staffing levels did not significantly

14   increase during your tenure?

15   A.   I would agree with that, yes, sir.

16   Q.   Do you recall seeing several memos through both direct

17   and cross that you authored while you were the jail

18   administrator at RDC?

19   A.   I'm sorry.  Memos about what?

20   Q.   Well, like, one was the contraband memo.  That was one

21   example.

22   A.   Oh, yes.

23   Q.   Did you ever write a memo to anyone about whether a

24   receiver should be appointed?

25   A.   No.

1           MR. SHELSON:  May I approach the witness, Your Honor?

2           THE COURT:  Yes, you may.

3           MS. COWALL:  Your Honor, could we please get a copy of

4    what Mr. Shelson has handed to the witness?

5           MR. SHELSON:  I'm fixing to display it, but it's P-20

6    that's been admitted into evidence.

7           MS. COWALL:  Thank you.

8    BY MR. SHELSON:

9    Q.   I've handed you Exhibit P-20, Major Bryan.  Do you

10   recognize it?

11   A.   I do.

12          MR. SHELSON:  And, again, Your Honor, I'll say for the

13   record, this document has been admitted into the record by the

14   plaintiff.

15   BY MR. SHELSON:

16   Q.   Is this an after-action review dated November 15th, 2021?

17   A.   It is.

18   Q.   All right.  And does this concern the homicide of MR that

19   you were asked about on direct?

20   A.   Yes.

21   Q.   All right.  You weren't here, but I'll represent to you

22   yesterday that Mr. Dave Parrish testified to the effect --

23   well, strike that.

24          How many after-action reviews did you prepare while you

25   were the jail administrator of RDC?

1   A.   One.

2   Q.   Why did you prepare only one?

3   A.   I'm trying to remember if there was an incident prior to

4   this incident that would have prompted me to do an

5   after-action.

6   Q.   Had there been such an incident, you would have prepared

7   an after-action review; correct?

8   A.   Yes, sir.

9   Q.   So the reason why there is only one after-action review

10  during the time period you were the jail administrator of RDC

11  is because you think -- you thought there was only one

12  incident that occurred that warranted an after-action review;

13  is that correct?

14  A.   There are incidents that warrant a review.  In my

15  opinion, a formal after-action report is warranted in critical

16  incidences.  But there were things -- there are things that go

17  on in the jail that require an after-action review of a less

18  formal nature than a formal report.  But yes, this -- to your

19  point, this was the first time I felt that I needed to write a

20  report.

21  Q.   Now, with respect to the incident that is described in

22  this after-action review that's P-20, which is the homicide of

23  MR, what disciplinary action did you take while you were jail

24  administrator?

25  A.   I did not take disciplinary action.

1   Q.  Did Sheriff Jones take disciplinary action against three

2   detention officers on approximately December 27, 2021,

3   regarding the homicide of MR?

4   A.  He did.

5   Q.  And what disciplinary action did he take?

6   A.  He fired -- terminated three employees.

7   Q.  And do you recall testifying on direct about that a

8   training session did not occur because three officers were

9   terminated?

10   A.  Yes.

11   Q.  Are the three officers that Sheriff Jones terminated in

12   connection with the homicide of MR the same three officers

13   that were terminated that caused you to lose the training

14   session?

15   A.  Yes.

16       MR. SHELSON:  May I have a moment to confer, Your

17   Honor?

18       THE COURT:  All right.

19       MR. SHELSON:  Thanks for your time today, Major Bryan.

20       Your Honor, no further questions.

21       THE COURT:  All right.  Thank you.

22       It's now the appropriate time for us to break for our

23   lunch.  It's 1:00 now.  Let's start back up at 2:15.

24       And is there anything, Mr. Cheng?

25       MR. CHENG:  Yes, Your Honor, just one thing.  If we

1    could get some type of IT check for the Zoom setup as well.  I

2    understand there's some tech issues, but because the afternoon

3    witnesses might be on Zoom, it's helpful to make sure that's

4    working as well.

5            THE COURT:  Okay.  We'll be in recess till 2:15.

6                (A lunch recess was taken.)

7            THE COURT:  You may be seated.

8            Major Bryan, you may return to the stand for redirect.

9            I presume there is some?

10           MS. COWALL:  Yes, Your Honor.

11           THE COURT:  Okay.  You're still under oath, Ms. Bryan.

12                    **REDIRECT EXAMINATION**

13   **BY MS. COWALL:**

14   Q.   Good afternoon, Ms. Bryan.  Do you recall before the

15   break that Mr. Shelson asked you a number of questions and one

16   of his questions was about training, and you talked about

17   training being put under your authority at the Hinds County

18   Detention Center.

19           When that was done, were you offered any resources from

20   patrol or the rest of the sheriff's office?

21   A.   No.

22   Q.   Do you recall having a discussion with Mr. Shelson about

23   whether if a report was done for an incident, it was accurate?

24   A.   I do.

25   Q.   What did you mean by that?

```
 1   A.   I tried to clarify the question and ask if he meant if a
 2   report was generated, if the report was factually accurate,
 3   and to that I answered yes, I did believe that.
 4            THE COURT:  I'm going to ask you to speak up just a
 5   little bit for me.  You may continue.
 6            MS. COWALL:  Thank you, Your Honor.
 7   BY MS. COWALL:
 8   Q.   Did you mean to suggest that you had no concerns about
 9   how incident reports were completed?
10            MR. SHELSON:  Objection.  Leading, Your Honor.
11            THE COURT:  Objection overruled.
12   A.   I just meant that it was my opinion that the reports that
13   were generated were accurately reflecting the incident that
14   they were recording.
15   BY MS. COWALL:
16   Q.   Did you have any concerns about incident report writing
17   by staff?
18   A.   I did.
19   Q.   And what were those concerns?
20   A.   I'm sorry?
21   Q.   What were those concerns?
22   A.   In general, the quality of the report writing could have
23   been improved.
24   Q.   And do you recall speaking with Mr. Shelson about the
25   implementation of an electronic rounds system?
```

1   A.   I do.

2   Q.   Does implementing an electronic rounds system require IT

3   services?

4   A.   It does.

5   Q.   What was your experience with the IT services provided to

6   the jail?  Did you have any concerns with them?

7   A.   I did.  The IT position is a part-time position, and in

8   any jail, much less a jail needing a lot of technology

9   attention and upgrades, it wasn't as efficient or timely or as

10  responsive as it needed to be to get things moving quicker.

11  Q.   Did IT services impact the opening of the mental health

12  unit?

13  A.   It was one of the things that we were waiting on, yes.

14  Q.   Now, you also spoke with Mr. Shelson about working to

15  deal with COVID-19 inside the jail.  Do you recall that?

16  A.   Yes.

17  Q.   Did you spend any of your own personal money on those

18  efforts?

19  A.   Oh, on COVID?  Yes.  The County paid for some incentives

20  for inmates to get vaccinations at one point, and we had

21  received assurance from them that they would do it again.  But

22  then they didn't do it again.  But it was very successful, so

23  I paid for pizzas for inmates as an encouragement for them to

24  get a COVID shot.

25  Q.   And how much money did you spend on that?

1    A.    Maybe 5 or $600.

2    Q.    Do you recall speaking with Mr. Shelson about the

3    performance of the medical contractor at Hinds County Jail,

4    QCHC?

5    A.    I do.

6    Q.    Do security staff levels affect the delivery of medical

7    services in the Hinds County Jail?

8    A.    Yes, they do.

9    Q.    How so?

10   A.    Medical staff roam around the jail conducting their

11   duties.  They go to housing units to deliver medications.

12   They go to housing units to conduct mental health wellness

13   checks on inmates.  They see inmates in the clinic.  And all

14   of those activities, anytime a medical provider is in contact

15   with an inmate, we need to have security staff with them to

16   make sure they're safe.

17        When staffing's low, I have to make the best of the worst

18   options.  Do I take them out of -- staff out of a pod to

19   assign them to the nursing staff or what?  So when security

20   staff aren't available, medical staff has difficulty tending

21   to all the needs that they need to do.

22   Q.    And does that impact detainees' access to medical and

23   mental health care?

24   A.    Yes, it does.

25   Q.    Now, you also spoke with Mr. Shelson about monthly

```
 1   quality assurance reports.  Do you recall that discussion?
 2   A.   Yes.
 3   Q.   And do you recall talking about monthly quality assurance
 4   report meetings?
 5   A.   Yes.
 6   Q.   Did Sheriff Jones ever participate in those monthly
 7   quality assurance meetings?
 8   A.   Not to my knowledge.
 9   Q.   And do you recall speaking with Mr. Shelson about the two
10   County maintenance employees working at the jail?
11   A.   Yes.
12   Q.   Are those two maintenance employees able to fix all the
13   maintenance problems?
14   A.   No.
15   Q.   Are there still maintenance problems that haven't been
16   fixed?
17   A.   Yes.
18   Q.   And do you think those maintenance problems pose a
19   substantial risk of harm to detainees and staff?
20            MR. SHELSON:  Objection.  Leading.
21            THE COURT:  Yeah.  Don't lead the witness.
22   BY MS. COWALL:
23   Q.   Do those maintenance problems have any impact on staff
24   and detainees?
25   A.   Yes.  It renders some areas unsafe when things don't work
```

1   properly.

2   Q.   Do you recall speaking with Mr. Shelson about safety

3   vestibules?

4   A.   Yes.

5   Q.   And do you recall that at some point there may have been

6   a disagreement between you and the monitoring expert,

7   Dave Parrish, about that issue?

8   A.   Yes.

9   Q.   And you said that your opinion had changed; is that

10  correct?

11  A.   Yes.

12  Q.   Why did your opinion change?

13  A.   Initially I think I had a misunderstanding about what

14  Mr. Parrish was talking about with those safety vestibules is

15  part of it.  The other part was, when I got there and started

16  to do some assessments, I wasn't sure that that was as high of

17  a priority as perhaps he thought it might have been.  As -- I

18  later decided during more assessments that he was spot on,

19  that we needed to address those safety vestibules as a

20  priority and then had an understanding of what exactly it was

21  that he was proposing.

22  Q.   Do you recall speaking with Mr. Shelson about

23  Sheriff Jones taking disciplinary action with regard to three

24  employees with respect to the MR homicide?

25  A.   Yes.

```
 1   Q.   Did Sheriff Jones consult you regarding those
 2   terminations?
 3   A.   No.
 4   Q.   If he had consulted you, would you have done anything
 5   differently?
 6   A.   That's hard to say.  I hadn't seen all of the information
 7   from that investigation, so I don't know what I would have
 8   said.
 9   Q.   Why hadn't you seen the information from the
10   investigation?
11   A.   I'm not sure.
12   Q.   Did you ask to see that information?
13   A.   I don't know if I specifically asked to see that
14   information since the decision had already been rendered.
15   Q.   Do you recall speaking with Mr. Shelson about
16   Beaufort County Detention Center?
17   A.   Yes.
18   Q.   How did the levels of harm to detainees at
19   Beaufort County Detention Center compare to those at Hinds
20   County Detention Center?
21   A.   So obviously the jail's construct was different.  But in
22   general -- so in North Carolina, jails are subject to be
23   inspected by state jail inspectors twice a year.  There's a
24   list of about 147 criteria that they inspect.  And they come
25   every six months, and they're rigorous inspections.  And when
```

1   you have a jail that was built in the '60s that's underground,

2   when I inherited it, the doors didn't work; the locking

3   mechanisms would fail.  There were some challenges there.

4       But the five years that I was the jail inspector, we had

5   four back-to-back perfect jail inspections.  So two years in a

6   row, we came out with not one deficiency.  And when you have a

7   facility that can pass such a rigorous inspection, I will

8   opine that it's a safer environment for inmates and staff.

9   Q.  Do you recall Mr. Shelson asking you whether you claim to

10  be an expert regarding whether jails meet constitutional

11  minimums?

12  A.  Yes.

13  Q.  Do you have experience working to achieve reasonably safe

14  jail conditions?

15  A.  I do.

16  Q.  And do you believe the goal of reasonably safe jail

17  conditions was achieved before Sheriff Jones terminated your

18  employment?

19  A.  No.

20      MS. COWALL:  Thank you.  I have nothing further, Your

21  Honor.

22      THE COURT:  All right.  I have a few questions, and,

23  Major Bryan, the United States will be able to follow up based

24  on any questions that I ask, and so will Hinds County.

25                        **EXAMINATION**

1    **BY THE COURT:**

2    Q.   I just want to get my understanding on some things.  You

3    mentioned that, I believe, you hold certifications with the

4    National Institute of somebody, I think; is that correct?

5    A.   Yes, sir, the National Institute of Corrections.

6    Q.   Okay.  Tell me, how does one go about getting a

7    certification for that?  What does that entail?

8    A.   So it's not a certification *per se*, Your Honor.  The

9    National Institute of Corrections offers technical assistance

10   to jails out in the field.  And they offer -- part of that is

11   they offer training for that.  And until recently, there were

12   no laypeople that were approved to teach their curriculum out

13   in the field.

14        Several years ago myself and a colleague were vetted and

15   approved to teach National Institute of Corrections training

16   criteria.  As far as I know, we're the only two in the country

17   that are permitted to do that.

18   Q.   And who would you teach it to, I guess?

19   A.   Other jail people, jail executives.

20   Q.   Would that include jail administrators?

21   A.   Yes, sir.

22   Q.   Now, do you hold any other certifications with respect

23   to -- as a jail administrator?

24   A.   I hold a certification through the American Jail

25   Association as a Certified Jail Manager.

1   Q.   Okay.  And tell me, what does one need to do to get the

2   certification from the American Jail -- to whatever you said

3   that was that you had.

4   A.   You have to meet certain criteria in order to qualify to

5   sit for a national test.  It's criteria based on your

6   practical experience running a jail, any training that you've

7   received at the executive level as a jail person, any training

8   you've delivered, your professional affiliations, all manner

9   of criteria that you have to meet.  It's on a points system.

10  And once you have enough of those points, then you can apply

11  to sit for this exam.

12  Q.   Okay.

13  A.   And once you pass the exam, then you're a Certified Jail

14  Manager.

15  Q.   Okay.  And you've sat for the exam?

16  A.   Yes, sir.

17  Q.   And passed it?

18  A.   Yes, sir.

19  Q.   Are there any other certifications you hold with respect

20  to correctional issues?

21  A.   No, sir.

22  Q.   Do you know if the person who replaced -- do you know the

23  person who replaced you?

24  A.   No, sir.

25  Q.   Okay.  I guess that person has not -- I think Mr. Simon's

 1   name has come up as somebody who's running the facility right

 2   now, I think.  I think that's what the evidence is.

 3          THE COURT:  Anthony Simon, is he the person?  I don't

 4   want to misstate anything, so --

 5          MR. SHELSON:  No, sir.  Chief Simon is the interim

 6   administrator until Frank Shaw comes on board.

 7          THE COURT:  He's the interim administrator right now?

 8          MR. SHELSON:  Yes, sir.

 9   BY THE COURT:

10   Q.   Do you know, Major Bryan, if Mr. Simon holds either of

11   those certifications?

12   A.   He does not, no, sir.

13   Q.   Now, you also testified that you own and run -- or at

14   least back in 2016 forward, you owned and ran a consulting

15   firm?

16   A.   Yes, sir.

17   Q.   Okay.  And what did your consulting firm do?

18   A.   Provide expert witness reports.  We also provide training

19   and PREA audits and operational assessments for jails.

20   Q.   Okay.  You said expert reports and provide training.

21   Training to whom?  To who?

22   A.   To jail executives and jail staff.

23   Q.   Would that include jail -- I understand you're using the

24   word "executives," but does that include jail administrators?

25   A.   Yes, sir.

 1  Q.   Okay.  And who -- what type of entities would retain you

 2  to consult with?  Is it states entities, is it county, is

 3  it -- what type of entity?  Private companies?

 4  A.   So for the expert witness reports, Your Honor, when

 5  sheriff's offices and counties are sued in federal court for

 6  conditions of confinement, the insurers may or may not hire

 7  out an expert as a consultant to that case.  So I'm retained

 8  by attorneys working for the insurance carrier of the

 9  defendants, or the plaintiffs contact me.  That's for the

10  expert witness work.  For the training and operational

11  assessments, that's usually directly from a facility.

12  Q.   Directly from the facility?

13  A.   Yes, sir.

14  Q.   Okay.  And I think you testified you served as a

15  technical resource provider before?

16  A.   That's the same thing we talked about earlier, about NIC

17  with the training.

18  Q.   Okay.  All right.  Now, I also think that you testified,

19  and correct me if I'm wrong, you've also done -- as a part of

20  this training that you've done, what type of things is the

21  training that you provided?  For example, what type of -- if

22  you were called to consult with Hinds County, what type of

23  training might you provide?

24  A.   So some of the standard training platforms that we use a

25  lot, there's one on budget preparation and budget management

1    for jails, there's one on detention contracts, and then

2    there's the jail administrator training from NIC that we

3    deliver to the top people of jails.

4    Q.   Would your training module at all include anything about

5    the day-to-day running of a facility?

6    A.   So that training that I deliver comes from -- when I

7    teach the basic jailer schools across the state in North

8    Carolina, that's the day-to-day curriculum that I teach.

9    Q.   Okay.  Is that all -- as a part of the training that you

10   provide, I think I heard your testimony about persons needing

11   to be trained at Hinds County.  For example, I think -- I'm

12   specifically recalling the testimony of the three gentlemen

13   who were training officers, I think, who were ultimately fired

14   or whatever, and part of, I think, your testimony was you

15   wanted to get that training for some of the individuals done.

16   I could be wrong about that testimony.

17       But in any event, what about the day-to-day management,

18   the training of the specific correctional officers that you

19   might do or that you would expect or that you might be

20   consulted on?

21   A.   As a jail administrator, I provide the training for the

22   use-of-force scenarios.  I provide training for inmate

23   behavior management and how to work in a direct-supervision

24   environment.  I do a lot of that training.  And then some of

25   the training lesson plans that I have, I deliver those to my

1    jailers as well.

2    Q.   So I think that gives me my answer.  Use of force, you

3    know something about the levels of force that -- you train

4    people on the levels of force that can or should be used in a

5    facility?

6    A.   Yes, sir.

7    Q.   Okay.  With respect to -- there was testimony earlier

8    about the policies and procedures.  And there has been

9    references to electronic control technology, I think is the

10   word that we've seen or that might be used in their

11   procedures.  I guess a Taser is an electronic control device?

12   A.   Yes, sir.

13   Q.   Are there any other devices that could be categorized as

14   electronic control devices?

15   A.   There may be.  I don't know if there are.  Taser is a

16   trademark name.  So I think a lot of policy writers are

17   reluctant to put the word "Taser" in a policy.  But electronic

18   control devices are Tasers.

19   Q.   Okay.  Would shock batons be electronic?  Is there such

20   thing as a shock baton, for example?  Is that something?

21   A.   I don't know, but that would be cool.  I don't know, Your

22   Honor.  I'm not aware.

23   Q.   Does one need special training on the use of Tasers?

24   A.   Yes.

25   Q.   And I think your testimony was that you actually were the

1  one who -- well, tell me.  I think you requested Tasers, but

2  Tasers had already been on order and they came through later?

3  A.   That's correct.

4  Q.   Okay.  Did you request Tasers when you first came on

5  board?

6  A.   Yes.

7  Q.   Okay.  And for whom would you issue those -- to whom

8  would you issue those Tasers to?

9  A.   That's a tough question to answer, Your Honor.  It

10  depends on how many Tasers, how many people we can cycle

11  through to give them the use-of-force scenario training, and

12  what shifts they work, where they're stationed.  So they would

13  go to people that were certified to carry a Taser that had

14  gone through the use-of-force training, and depending on how

15  many Tasers we would need to make sure that we had disbursed

16  them across all three shifts in as many areas of both

17  facilities as we could.

18  Q.   Was it your plan to make sure that persons were properly

19  trained to use the Tasers?

20  A.   Yes, sir.

21  Q.   And that part of their training would be that they would

22  have to go through a use-of-force scenario; is that --

23  A.   Yes, sir.

24  Q.   Now, did you provide any of that particular training to

25  the individuals whose hands these Tasers ended up in?

1  A.   No, sir.

2  Q.   After a Taser is used at a correctional facility, is

3  there any need to do any sort of report with respect to that

4  use of a Taser?  And I was going to say "electronic control

5  device," but I'm calling it a Taser.

6       Would there be -- is there anything in your training that

7  says that after it is used in some way, that there should be

8  some sort of follow-up, some sort of report or anything done

9  in that way?

10 A.   So after every use of force, whether it's with a Taser or

11 not, they're required to do a report for that event, yes, sir.

12 Q.   Off of every use of force?

13 A.   Yes, sir.

14 Q.   That would include hands?

15 A.   Yes.

16 Q.   That would include sticks or whatever?

17 A.   Yes.

18 Q.   Okay.  And what's the importance of having that report

19 after the use of force is used?

20 A.   Well, using force is a constitutional issue, and we need

21 to make sure that we accurately document what happened.  We

22 need to accurately document it so that we can review it for --

23 to make sure that everything was done right.

24 Q.   Now, there was testimony about you learning that the

25 County was -- had in place or had already -- had rented or was

1   about to sign off on a contract with respect to tents for the

2   COVID-infected inmates.

3   A.   Yes, sir.

4   Q.   Okay.  Were there any tents ever installed at Hinds

5   County while you were there?

6   A.   No, sir.

7   Q.   Okay.  And how did you learn that they were ordering

8   those tents or that that had been a part of the conversation?

9   A.   I don't remember who I talked to or what the

10  circumstances were, but somebody mentioned that and somebody

11  asked me -- or somebody asked me where I wanted them to go, to

12  be put.  And that was the first I had learned about the tents.

13  Q.   And when was that?  Was that in August or was that in

14  June or July?

15  A.   Sir, it probably would have been August or September, but

16  I don't remember.

17  Q.   Okay.  Now, I believe you and Mr. Shelson were talking to

18  each other and you-all knew the vernacular way better than I

19  did, and I did not interrupt.  But he was talking about

20  hierarchy among detainees in jail and he mentioned "pod boss."

21  What is a pod boss?

22  A.   So a pod boss is a term that we use to talk about whoever

23  is in that unit who kind of runs the show, kind of directs the

24  activities of other inmates.

25  Q.   You're talking about another inmate?

1    A.    Yes.

2    Q.    And a gang committee was something else Mr. Shelson

3    mentioned.  And you seemed to know about that.  I did not, so

4    tell me what a gang committee is.

5    A.    I've never heard the term "gang committee," so I --

6    Q.    Okay.  I do think Mr. Shelson asked you something about a

7    gang committee.  So I was not sure if that was a committee of

8    gang members or a committee of correctional officers who

9    oversee the gangs.  So we'll figure that out later, I guess.

10          Now, when you decided to come to Hinds County, what was

11   your understanding after you got here?  How was Major --

12   excuse me.  How was Sheriff -- were you on Sheriff Vance's

13   command staff?

14   A.    Yes, I believe so.

15   Q.    Okay.  I mean -- and who else was on that command staff?

16   A.    I'm not sure exactly, Your Honor.  I would think it would

17   be the top people in the sheriff's office.

18   Q.    Do you recall any of those top people in the sheriff's

19   office?

20   A.    Yes, Alan White and Eric Wall I know that were on his

21   command staff.  Who else he had designated, I'm not sure.

22   Q.    Okay.  Now, when you agreed to come on to Hinds County,

23   were you aware that Hinds County was under a consent decree?

24   A.    Yes, sir.

25   Q.    Were you aware that Hinds County was under a stipulated

1  order?

2  A.   I'm not sure at the time I knew all of the rest of that,

3  but I knew it was under a consent decree.

4  Q.   You knew it was under a consent decree?

5  A.   Yes, sir.

6  Q.   Okay.  Did you -- at the time that you came on board, did

7  you know that monitors had the right to on-site visits and ask

8  for documentation and whatnot, that monitors had been

9  appointed by the Court for the purposes of the consent decree?

10 A.   Yes.

11 Q.   And what was your understanding of what the monitors'

12 role was?

13 A.   I understood that they did quarterly site visits to

14 assess where we were with making things better in the jail.

15 Q.   Okay.  And, I mean -- and where did you get that

16 understanding from?

17 A.   I'm not sure who told me that.  It wasn't a formal

18 meeting about what all that was.  Somebody told me, though.

19 Q.   Okay.  Might it have been Sheriff Vance?

20 A.   It might have been, sir.  It might have been his counsel

21 at the time.  It might have been his counsel at the time to

22 give me an overview of that.

23 Q.   And his counsel at that time was Claire Barker?

24 A.   Claire Barker.

25 Q.   There's been -- there was testimony that you had to come

1   out of your pocket to buy certain things, I think including

2   board games and other things.  I want to ask you specifically

3   about tables and chairs for use inside of the pods for the

4   detainees to eat.

5       Are there any tables and chairs in any of the pods for

6   the use of detainees to eat their meals?

7   A.   There are some, very few, seats, but at the time I left,

8   we don't have tabletops yet, but that plan was in place, to

9   put tabletops on the existing tables without them and to

10  potentially put in tables that were going to be removed from

11  Henley-Young and replaced.  We were going to take those as

12  well.  That hadn't happened by the time I left, but the plan

13  was there for that to --

14  Q.   When you say "the plan was there," had any been ordered?

15  A.   I'm not sure where the logistics of it were, if they had

16  been ordered or approved, but I know we had a plan.

17  Q.   Okay.  Did you -- as the jail administrator, do you think

18  it's important for the inmates to -- excuse me, not inmates --

19  for the detainees to have tabletops or something where they

20  can eat their meals?

21  A.   It's so important.

22  Q.   Had anyone told you that this court had already inquired

23  about the tables and chairs going back to August 2019?

24  A.   No, sir.

25  Q.   Do you know how many detainees died while you were the

1    jail administrator, whether it's natural death or death

2    related to unnatural causes?

3    A.   Three.

4    Q.   Three?

5    A.   Yes, sir.

6    Q.   Okay.  And I noticed that you've already testified about

7    the one after-action report that you completed with respect to

8    the death of MR, I believe is the initials, back in October.

9    Did you complete -- what action did you take, if any,

10    upon learning of the other deaths that occurred during the

11    time that you were administrator?

12    A.   The other two deaths were medical deaths that occurred

13    outside the facility, and we conducted a mortality review on

14    those deaths, but I didn't do an after-action review on them.

15    Q.   Okay.  Is your mortality review something that's done in

16    writing?

17    A.   Yes.

18    Q.   Okay.  And did you prepare the mortality review?

19    A.   No, sir.  Our physician does.

20    Q.   The physician does?

21    A.   Yes, sir.

22    Q.   Did you see the mortality review?

23    A.   Yes, I believe I did.

24    Q.   Okay.  You indicated -- and I think this is wrapping up

25    the questions that I had.  You indicated that you may have --

1    I want to be clear.  You ordered or you asked for flashlights

2    to be ordered for officers?

3    A.   Yes.

4    Q.   And I think your testimony was that they never received

5    the flashlights?

6    A.   Correct.

7    Q.   While you were there?

8    A.   Yes, sir.

9    Q.   Okay.  Do you know when you first requested that they...

10   A.   If it wasn't the end of November, it was sometime early

11   in December for the initial request.

12   Q.   Okay.  And why did you believe that the officers should

13   have flashlights?

14   A.   In any jail that I've been in, there are some places that

15   are not as well lit even when the lights are working.  Or in

16   the event of a power failure, they need to have flashlights.

17   And when they are doing cell searches and they want to look

18   under bunks or in darker areas, they need to have a

19   flashlight.  Flashlights are also beneficial when you're doing

20   a search because sharp things glitter in that light.  It makes

21   it easier to identify them.

22   Q.   Okay.  And as you know, I visited the jail; right?

23   A.   Yes, sir.

24   Q.   I was there in January along with you and others; right?

25   A.   Yes, sir.

521

1   Q.   At that time weren't many of the jail cells without

2   lights at all on the inside?

3   A.   Yes, sir.

4   Q.   And would it be important to be able to see in the

5   particular jails where the detainees are housed?

6   A.   Yes, sir.

7   Q.   And your last day at Hinds County was January 31st?

8   A.   Yes, sir.

9   Q.   Between the week that I was there -- the day that I was

10  there was January the 24th.  Between that day and January the

11  31st, were the lights repaired in any of the cells?

12  A.   Not to my knowledge, no, sir.

13  Q.   Then you also indicated as part of the physical plant

14  issues that you were going down with the United States on, you

15  said lights don't work; you said locks don't work.  Where are

16  those locks that you're talking about that are not working?

17  A.   Some of the cell door locks; some of the locks to

18  hallways, some of those doors have locks that don't function.

19  Q.   And you also mentioned cameras don't work.  Again, I was

20  there on January the 24th.  You were there until January the

21  31st.  Between the 24th and the 31st, did the cameras become

22  operable, those cameras that were not working?

23  A.   No, sir.

24  Q.   Had you asked about getting those replaced or repaired?

25  A.   Yes, sir.

1    Q.   With respect to the locks, they were not working on the

2    24th.  Any of those locks -- to your knowledge, were any of

3    those locks fixed between the 24th and the 31st, the ones that

4    were not -- the one that you contend were not -- the ones that

5    you contend were in disrepair?

6    A.   No, sir.

7         THE COURT:  Okay.  Those are all of my questions,

8    Major Bryan.  I appreciate it.

9         I turn to the Government.  Is there any follow-up that

10   the United States has with respect to the questions that I've

11   asked?

12        MS. COWALL:  Just one or two follow-up questions, Your

13   Honor.

14        THE COURT:  You may proceed.

15                    **FURTHER REDIRECT EXAMINATION**

16   BY MS. COWALL:

17   Q.   Ms. Bryan, are there other force tools used in the jail

18   besides Tasers?

19   A.   The officers have OC spray.

20   Q.   And are there bean bag guns in the jail?

21   A.   Yes.

22   Q.   Is there any scenario-based training for those other

23   force tools that you just mentioned?

24   A.   Not for OC spray.  And from my understanding, the

25   detention officers aren't certified with the bean bag shotgun,

1    so I don't know if that scenario training is available for the

2    people that are certified to carry those.

3    Q.   So -- I'm sorry.  Could you just repeat your answer with

4    regard to the bean bag shotgun?

5    A.   Sure.  I'm sorry.  It's my understanding that none of the

6    detention officers are certified to carry those, so I'm not

7    sure if scenario training is available to the others who are

8    certified to carry them.

9    Q.   But bean bag guns are in use in the jail?

10   A.   Yes.

11        MS. COWALL:  Thank you, Ms. Bryan.

12                     **FURTHER EXAMINATION**

13   **BY THE COURT:**

14   Q.   If they are in use, who's using them?  The correctional

15   officers or --

16   A.   No, sir.  Law enforcement officers.

17   Q.   Law enforcement officers when they come on -- law

18   enforcement officers are not there every day; right?

19   A.   No, sir.

20        THE COURT:  All right.  Thank you.

21        Mr. Shelson?

22        MR. SHELSON:  May I proceed, Your Honor?

23        THE COURT:  Yes.  Yes.

24        MR. SHELSON:  Thank you, Your Honor.

25                     **RECROSS-EXAMINATION**

1    **BY MR. SHELSON:**

2    Q.   Just a few questions, Major.  Did you conduct any

3    training at RDC when you were at RDC?

4    A.   No.

5    Q.   While you were at RDC, did you conduct training at any

6    other facilities?

7    A.   No.

8    Q.   The Court asked you a question of whether you had to buy

9    board games with your own money.  Do you recall that?

10   A.   Yes.

11   Q.   Not to quibble, but did you have to do that, or did you

12   choose to do that?

13   A.   I think I said earlier that I hadn't requisitioned those,

14   but I knew that I needed them quickly, so I chose to do that.

15   Q.   Do you know whether you were at RDC -- whether there were

16   any board games at that facility that you did not buy?

17   A.   Yes, there were some.

18   Q.   Are you aware of an incident that occurred while you were

19   the jail administrator at RDC where a detainee was Tased while

20   he was lying on the ground?

21   A.   Yes.

22   Q.   Okay.  Was that before -- did that incident occur before

23   Sheriff Jones came into office as the sheriff?

24   A.   Yes.

25   Q.   All right.  So that incident had nothing to do with the

1  Tasers that Sheriff Jones introduced to the facility; is that

2  correct?

3  A.   That's correct.

4  Q.   Did you ever have a discussion with Sheriff Jones about

5  flashlights?

6  A.   I don't think so.

7  Q.   Let me put it this way:  If you did, you don't remember

8  it?

9  A.   That's correct.

10  Q.   All right.  Just about done, Major.  And this is in

11  connection with a question the Court asked.  Were the three

12  officers that Sheriff Jones fired in connection with the MR

13  homicide, were those officers training officers?

14  A.   No.

15  Q.   Okay.  What type of officers were they?

16  A.   Line officers.

17       MR. SHELSON:  Thank you, Major Bryan.

18       Thank you, Your Honor.  That's all the questions.

19       THE COURT:  Okay.  Bear with me for one second.  I

20  apologize for the delay.

21       Major Bryan, thank you for your testimony.

22       Is this witness finally excused?  Is not?  Okay.  I'm

23  sorry.

24       MS. COWALL:  Your Honor, there's a possibility that we

25  may need to call her as a rebuttal witness --

```
 1              THE COURT:  Okay.
 2              MS. COWALL:  -- as noted in the witness list, so we
 3    wanted to clarify whether she could be in the courtroom,
 4    particularly in light of the fact that Mr. Shelson seemed to
 5    be asking her a lot of expert-type questions.
 6              THE COURT:  I presume he did that to show that she's
 7    not an expert, I assume.  Although -- well, I didn't hear any
 8    objections from the Government, so I don't think it's
 9    appropriate because this court has not deemed her to be an
10    expert, a fact witness only.  So as a witness, she should
11    still be sequestered.
12              So, Major Bryan, I'm going to ask that you not speak
13    with anyone about your testimony or not allow anyone to talk
14    to you about your testimony.  The Government may call you in
15    rebuttal at some point in time again.
16              THE WITNESS:  Yes, sir.
17              THE COURT:  All right.  Thank you so very much.
18              Who is the Government's next witness?
19              MS. COWALL:  Your Honor, the United States will be
20    calling Dr. Richard Dudley, and he'll be appearing virtually.
21              THE COURT:  Okay.  Richard, we're getting some feedback
22    here.
23              Let's try it again, Ms. Summers.  It's good?  Okay.
24              Dr. Dudley, you've been called in this case as a
25    witness.  Can you hear us fine?
```

```
 1              THE WITNESS:  You're a little faint, Your Honor.
 2              THE COURT:  Oh, I wasn't on the mike.  Can you hear me
 3    fine now?
 4              THE WITNESS:  Ah.  Yes, I can.
 5              THE COURT:  All right.  I'm going to turn off my mike
 6    and make sure that the only mike in this courtroom that's open
 7    is the one of the lawyer questioning you.  But first we're
 8    going to give you an oath -- administer an oath for you,
 9    Dr. Dudley.
10              (Whereupon, the witness was placed under oath.)
11              THE COURT:  I know with you proceeding remotely, there
12    may be some delay in between the time that you are asked a
13    question and then for you to answer.  But take whatever time
14    you need, and please make sure you hear the question that is
15    asked or the questions that are asked.  And if at any time you
16    don't understand a question that's being asked, please let us
17    know, Dr. Dudley.
18              You may proceed.
19              MS. STEEGE:  Thank you, Your Honor.
20              THE COURT:  Is your microphone on?
21              MS. STEEGE:  It is.  Can you hear me?
22              THE WITNESS:  You're a little faint, but I can hear
23    you.  But the screen is not showing you.  It's showing someone
24    who's called in.
25              MS. STEEGE:  All right.  Well, there should be --
```

```
 1          THE COURT:  The screen is showing someone who's called
 2     in?  Is there a number or something that you see there,
 3     Dr. Dudley?
 4          THE WITNESS:  Yes.  (601)608-4000.
 5          THE COURT:  Okay.  That's our number here at the court.
 6          MS. STEEGE:  Am I on any of the screens, or no?
 7          THE COURT:  That's us communicating with IT.
 8          Now, can you see the people in the courtroom now on
 9     your screen, Dr. Dudley?
10          THE WITNESS:  I'm only seeing some now.
11          THE COURT:  But are you seeing the lawyer standing up
12     with the mask?  She's the one who is about to start
13     questioning you.
14          THE WITNESS:  Only in the thumbnail.
15          THE COURT:  Only what?
16          THE WITNESS:  Only -- I only see her in the small
17     thumbnail picture.  The main picture is the telephone.
18          THE COURT:  Oh, the main picture is the telephone.
19     That can be very distracting, I'm sure.  Oh, that's what he
20     sees.
21          MS. STEEGE:  Is the other primary photo of the district
22     court seal?
23          THE COURT:  Hold on.  We're going to try to get some
24     help for you, Dr. Dudley.
25          Yeah, let's take five minutes while we try to get this
```

```
 1   taken care of.  We're in recess.
 2                    (A brief recess was taken.)
 3            THE COURT:  I think we have all the technical things
 4   fixed up until the gremlins raise their heads again.
 5            So, Dr. Dudley, you've been placed under oath.  Can you
 6   hear me fine right now?
 7            THE WITNESS:  Yes, I can, Your Honor.
 8            THE COURT:  All right.  Thank you.
 9            Are you ready to proceed?
10            MS. STEEGE:  I am.  Thank you.
11            THE COURT:  You may.
12            MS. STEEGE:  Thank you.
13                         RICHARD DUDLEY, M.D.,
14              having been first duly sworn, was examined and
15   testified as follows...
16                         DIRECT EXAMINATION
17   BY MS. STEEGE:
18   Q.   Dr. Dudley, could you give your current occupation?
19   A.   I'm a physician with a specialty in psychiatry.
20   Q.   Could you describe your education, please.
21   A.   I'm having a hard time hearing you.
22   Q.   Could you describe your education?
23   A.   I'm a graduate of the Temple University School of
24   Medicine, where I obtained my medical degree in 1972.
25   Following that, I completed an internship and then a residency
```

1    in psychiatry at the Northwestern University Medical Center in

2    Chicago, Illinois.

3    Q.   Okay.  Could you describe your experience with providing

4    mental health services?

5    A.   When I completed my residency, I came to New York, where

6    I worked for the New York -- what was then called the New York

7    City Department of Mental Health, Mental Retardation and

8    Alcoholism Services, initially as a special assistant to the

9    commissioner and then as a deputy commissioner, where it was

10   my responsibility to oversee the City's mental health system.

11         And then when I left the department, I became the medical

12   director of the Washington Heights-West Harlem Community

13   Mental Health Center, where I opened up and started a

14   community mental health center that covered the northwest part

15   of Manhattan.

16         Following that, I worked for Hoffman-La Roche for a

17   while, and then I went into private practice.

18         And my private practice included a clinical practice, as

19   a direct provider of services, and a forensic practice, where

20   I testified as an expert in criminal and civil proceedings

21   around the country.  And I also continue to do some

22   consulting.

23   Q.   And in your practice, have you treated people with

24   similar diagnoses to what you've seen in Hinds County

25   detainees?

```
 1   A.   In my private practice, I've treated people with similar
 2   diagnoses.  And then in the forensic practice, I obviously saw
 3   lots of individuals with similar diagnoses.
 4   Q.   Now, do you have experience with assessing people's
 5   mental health status and needs when they're in correctional
 6   facilities?
 7   A.   Yes.
 8   Q.   Could you talk about that?
 9   A.   Well, during the course of about 30 years that I
10   practiced as a forensic psychiatrist, the -- you know,
11   individuals that I saw were either in jail or in prison, so I
12   was performing assessments of them within that setting,
13   simultaneously reviewing their medical records from the
14   facility as well as other records that they might have, and
15   talking with them about the care they received inside and
16   outside the facility.
17   Q.   And do you have experience with coordinating mental
18   health and medical care in a correctional context?
19   A.   The -- when I was working for the Department, the New
20   York City Department of Mental Health, Mental Retardation and
21   Alcoholism Services, we had to deal with all the services
22   provided by the Department.  And back then the services in the
23   jail were provided through the Health and Hospitals
24   Corporation, and so we had to be involved with that.
25        When I left the Department, as I indicated, I started
```

```
 1   doing some other consulting as well.  And so I provided some
 2   training for mental health staff who worked in the jail, I
 3   also provided training for mental health staff that worked in
 4   the juvenile detention facility, and also consulted with the
 5   Department of Juvenile Justice about the condition of mental
 6   health services within the juvenile facilities.
 7   Q.  And have you served on any boards or commissions to use
 8   this expertise?
 9   A.  Eventually I served on the Commission on Safety and Abuse
10   in America's Prisons.  It was a bipartisan commission that
11   looked at a range of safety issues within prisons across the
12   country, including the provision of health and mental health
13   services.  So we held hearings around the country.  We also
14   visited prisons looking at the delivery of services within
15   prisons and how that impacted on safety and use and security
16   issues within facilities.
17   Q.  And do you have experience with providing or overseeing
18   treatment for people with infectious disease?
19   A.  Yes.  At the outset of the HIV epidemic, I was working at
20   Lincoln Hospital in the consultation liaison service.  And so
21   we were -- Lincoln Hospital's in the South Bronx of New York.
22   So we were pretty overwhelmed with HIV-related issues.
23        At that time was when it became clear that HIV was also a
24   problem within the IV drug use population, and so we were
25   seeing a lot of cases and addressing it then.
```

```
 1        Around about the same time, I became involved in other
 2   HIV epidemic-related issues, whether it be in education or the
 3   provision of services.  So in sitting on the board, for
 4   example, of Housing Works and sharing the medical board that
 5   oversees our clinical programs at Housing Works, we have the
 6   same sorts of issues.
 7   Q.   Now, other than in Hinds County, have you evaluated a
 8   correctional facility's work in planning for discharge and
 9   connecting people with community-based resources and
10   treatments?
11   A.   Yes.
12   Q.   Could you speak about your work in that respect?
13   A.   In the early 2000s, I started consulting with the
14   Department of Justice, and so I was doing -- on the
15   investigation teams for facilities that they were
16   investigating.  And so it was in that context that I begun
17   participating in these investigations, and then subsequent to
18   that, I accepted a monitoring position.
19   Q.   I'm sorry.  I missed the last part of that sentence.
20   A.   I said subsequent to that I accepted a monitoring
21   position.
22   Q.   So have these prior consulting obligations included work
23   in evaluating a correctional facility's work for discharge
24   planning?
25   A.   Yes.
```

1   Q.   And have they involved evaluating how a correctional

2   facility was providing mental health services?

3   A.   Yes.

4   Q.   What kind of work went into doing that evaluation?

5   A.   When we're doing the investigations, you mean?

6   Q.   Yes.  Were there interviews involved?

7   A.   I'm sorry.  Could you just repeat the question?

8   Q.   Sure.  When you've been evaluating correctional facility

9   work in other places as to how they're providing mental health

10  services, what kinds of resources do you draw on in making

11  your determinations?

12  A.   We look at -- I look at records, various records and

13  documents.  So these could include policies and procedures,

14  any sort of tracking log and records that they keep, any sort

15  of internal assessment documents that they might have.  I look

16  at medical records as well.  I interview staff who are working

17  in the facility and get a sense of how they think things are

18  going and problems and difficulties that they might have.  And

19  I would also interview, depending on the facility, whether

20  it's detainees or inmates.

21  Q.   Other than in Hinds County, you mentioned that you've

22  served as a monitor elsewhere.  Would the kind of evaluation

23  that you just described from multiple sources also be part of

24  that monitoring experience?

25  A.   Yes.

1   Q.   Have you consulted directly with any correctional

2   facilities on how they can improve their mental health service

3   delivery system?

4   A.   Yes, I have.

5   Q.   Could you turn your attention --

6        MS. STEEGE:  I'd like to bring up the documents marked

7   as PX-4, 5, and 6.

8   BY MS. STEEGE:

9   Q.   This is the document marked as PX-4.  Do you recognize

10  this document?  I'm sorry.  And this is the document marked as

11  PX-5.

12  A.   PX-5 is my curriculum vitae, and PX-4 is an addendum that

13  provides some additional detail about my -- the experiences

14  that I've had as they relate to correctional services.

15  Q.   Okay.  Let's turn to --

16       THE COURT:  Hold on for one second.  We might have an

17  objection here.

18       MR. SHELSON:  No, Your Honor.  The opposite.  If it

19  speeds things up, we do not object to the admission of P-4, 5,

20  and 6.

21       THE COURT:  Okay.  P-4, 5, and 6 will be received into

22  evidence.

23       (Plaintiff's Exhibits 4, 5, and 6 entered.)

24  BY MS. STEEGE:

25  Q.   Could you please briefly describe your duties and

1   responsibilities on the Hinds County monitoring team?

2   A.   On the Hinds County monitoring team, I was initially

3   brought on as the mental health consultant.  And then the

4   person who was doing the health consulting left the team at a

5   time when the problems with health services were largely

6   administrative in nature as opposed to clinical in nature, and

7   the monitor asked me to continue to work on both.

8   Q.   So when did you first tour the Hinds County Detention

9   Center?

10  A.   I believe in January 2018.

11  Q.   And since then, up until COVID, have you had about three

12  visits a year?

13  A.   Yes.

14  Q.   And each of those visits then leads to a monitoring

15  report?

16  A.   Yes.

17  Q.   So that would be, so I'm clear, from spring 2018 till the

18  present?

19  A.   Yes.

20  Q.   What's the most recent site visit that you've been on to

21  evaluate the jail, whether remotely or in person?

22  A.   January of this year.

23  Q.   When touring in person, what did you do to make your

24  assessment?

25  A.   When touring in person, I would meet with the different

1    staff members and interview and talk with them.  I would have

2    access to the same records and documents that I outlined

3    before, ranging from logs that keep record of the work that

4    they're doing; I review medical records that I choose to

5    review.  And when I -- when I was on-site, I also would

6    interview detainees and do things like go with the nurses on

7    med pass, things like that.

8    Q.   Would you also review incident reports?

9    A.   I would review incident reports.  The other members of

10   the team have primary responsibility for that, but incident

11   reports that involved some sort of medical or mental health

12   issues are then sorted out and forwarded to me for review.

13   And then I may also, for those same individuals, look at their

14   medical records if there were clearly medical or mental health

15   issues involved.

16   Q.   And would your review include the delivery of both

17   medical care and mental health care?

18   A.   Yes.

19   Q.   Now, have these tours been remote for you since COVID

20   started?

21   A.   Yes.

22   Q.   How have you made your assessment during remote tours?

23   A.   I've basically done the same things except for

24   interviewing detainees.

25   Q.   Do you feel that you've had sufficient information to

```
1   form opinions about compliance, whether through remote or
2   on-site tours?
3   A.   Yes.
4   Q.   And are you in contact with the medical and mental health
5   staff at the jail in between tours?
6   A.   On an as-needed basis, yeah.
7   Q.   What kinds of issues might that address?
8   A.   Well, when we were -- when policies were being developed,
9   for example, and we were reviewing policies, I might call them
10  to ask them a question just to confirm that what was in the
11  policy was something that they were comfortable with, or if
12  there was some conflict between -- or apparent conflict
13  between a policy that was being developed and other health and
14  mental health policies, either at the facility or within the
15  contractor's policies and procedures, books, and that.
16  Sometimes if there's an incident that occurs, we get immediate
17  notifications of those.  I have a question, I might contact
18  them about something like that.
19  Q.   You mentioned the contractor.  Is that QCHC?
20  A.   Yes.
21  Q.   Could you just briefly explain QCHC's role at the jail?
22  A.   They're a contract provider of medical and mental health
23  services, and so they provide all of the medical and mental
24  health staff at the facility to provide those services.  They
25  also have the responsibility for interacting with
```

 1   administration staff at the facility and corrections officers

 2   in any way that are outlined in their policies and procedures.

 3   Q.   You mentioned the corporate staff.  Do you speak with

 4   corporate staff at QCHC as well between site visits?

 5   A.   Yes, I do.

 6   Q.   And what kinds of issue might that address?

 7   A.   I may have similar questions for them.  If a question

 8   comes up with regard to their own policies and procedures that

 9   are central to QCHC, I may be contacting them about that.

10   Sometimes it's simply for an update.

11        We've been doing a lot of working and planning with the

12   anticipated opening of the mental health unit, so that -- some

13   of the kind of leadership on that has been out of their

14   central office.  I may contact them about that for an update

15   on the status of that work.  If they send me the reports of

16   the planning meetings that they've been having, if there's a

17   question, I may contact them about that.

18   Q.   Are you familiar with the consent decree in this case?

19   A.   Yes, I am.

20   Q.   And are you familiar with the stipulated order?

21   A.   Yes.

22        MS. STEEGE:  The United States tenders

23   Dr. Richard Dudley as an expert in jail mental health,

24   psychiatry/medicine, discharge planning, and hospital and

25   non-correctional mental health treatment options as provided

```
 1   for in our expert disclosures.
 2           THE COURT:  Can I get you to repeat those areas,
 3   please.
 4           MS. STEEGE:  Sure.  Jail mental health,
 5   psychiatry/medicine, discharge planning, and hospital and
 6   non-correctional mental health treatment options.
 7           THE COURT:  Okay.  The United States tenders Dr. Dudley
 8   as an expert in the areas of jail mental health,
 9   psychiatry/mental health, discharge planning, and hospital and
10   non-correction mental health treatment options; is that --
11           MS. STEEGE:  Yes.
12           THE COURT:  All right.
13           MS. STEEGE:  Yes.  Thank you.
14           THE COURT:  Let me hear from the County.
15           MR. SHELSON:  We'd like to voir dire the witness,
16   Your Honor.
17           THE COURT:  Okay.
18                       **VOIR DIRE EXAMINATION**
19   **BY MR. SHELSON:**
20   Q.  Good afternoon, Dr. Dudley.
21   A.  Good afternoon.
22   Q.  We haven't met.  I'm Jim Shelson, and I represent the
23   defendants in this case.  I just have a few questions for you
24   at this point.  And it's mostly about the areas that you just
25   heard counsel tender you as an expert in.
```

1          The first one is jail mental health.  What is your

2    understanding of that field?

3    A.   I understand it to be how mental health services are

4    delivered in jail.

5    Q.   You were also tendered in the field of medicine, which

6    seems pretty broad to me.  What is your understanding of the

7    scope of being tendered as an expert in medicine?

8    A.   I mean, I am a physician, but I'm -- I believe that we

9    were talking about the delivery of services, of medical and

10   mental health services, delivery systems.

11   Q.   You're board certified in psychiatry and neurology,

12   correct?

13   A.   Correct.

14   Q.   All right.  Are you board certified in any other medical

15   specialties?

16   A.   No.

17   Q.   And briefly, what is the field of neurology?

18   A.   It's the study of the nervous system and the brain.

19   Q.   All right.  Doctor, are you qualified to conduct

20   autopsies?

21   A.   No.

22          THE COURT:  What was your response, Dr. Dudley?

23          THE WITNESS:  No.

24   BY MR. SHELSON:

25   Q.   Do you agree that a forensic pathologist is a

1  subspecialist in pathology whose area of special competence is

2  the examination of persons who die suddenly, unexpectedly, or

3  violently?

4  A.   Yes.

5  Q.   Do you agree that the forensic pathologist is an expert

6  in determining cause and manner of death?

7  A.   Yes.

8  Q.   Are you a forensic pathologist?

9  A.   No.

10  Q.   Are you a pathologist?

11  A.   No.

12  Q.   Lastly, Dr. Dudley, you were tendered in the field of

13  hospital and non-correctional mental health treatment options.

14  What does that subject matter mean to you, please?

15  A.   It means to me, you know, again, what are the service

16  delivery systems, whether they be hospital based or community

17  based.

18        MR. SHELSON:  Your Honor, may I respond to the tender?

19        THE COURT:  Yes, you may.

20        MR. SHELSON:  So, Your Honor, subject to the

21  defendants' objections stated in the motion to strike, which

22  is ECF-134, objecting to expert testimony on the grounds

23  primarily that it was a summary of opinions that were not

24  adequately disclosed, and maintaining those objections, the

25  area that we object, of the areas that we object to the

1    tender, is medicine as overly broad, but if it's defined as

2    how Dr. Dudley defined it, which I believe was the delivery of

3    mental health services, we do not object to it with that

4    limitation.

5           And in particular, Your Honor, we want the designation

6    of medicine to not include determining cause and manner of

7    death.  But, Your Honor, our objection, I think

8    understandably, is just that medicine is incredibly broad on

9    its own.  And so that's why we're asking for the limitations I

10   just described.

11          THE COURT:  Okay.  Thank you.

12          Any response from the United States?

13          MS. STEEGE:  Thank you, Your Honor.  May I ask

14   Dr. Dudley a few questions?

15          THE COURT:  I'm sorry?

16          MS. STEEGE:  May I ask Dr. Dudley a few questions?

17          THE COURT:  Yes.

18                     **VOIR DIRE EXAMINATION**

19   **BY MS. STEEGE:**

20   Q.   Dr. Dudley, do you have experience in evaluating the

21   delivery of psychiatry and medical services in correctional

22   facilities?

23   A.   Yes.

24   Q.   Is this specialized knowledge?

25   A.   I believe so.

1  Q.  And separate from being the one performing an autopsy, do

2  you have specialized knowledge as it relates to reviewing

3  death reports and causes of death in correctional facilities?

4  A.  In reviewing those documents?

5  Q.  Correct.

6  A.  I'm just having trouble hearing you.

7  Q.  I'm sorry.  Do you have experience with -- separate from

8  being the one who is doing an autopsy, do you have experience

9  with reviewing autopsy reports and other documents related to

10  deaths in correctional facilities?

11  A.  Yes.  Yes.

12  Q.  Would you consider those to be specialized knowledge?

13  A.  Yes.

14      MS. STEEGE:  Your Honor, I would offer that Dr. Dudley

15  should be able to testify to the delivery of both psychiatry

16  and medical services in correctional facilities.

17      THE COURT:  I note the defendants' objection.

18  Dr. Dudley will be allowed to offer his expert testimony on

19  the areas designated by the United States.  I think any

20  other -- to the extent the -- Hinds County believes that those

21  matters are broader than what would be necessary, you'll be

22  allowed to cross-examine the witness on those issues.

23      He's an expert.  You may proceed.

24      MS. STEEGE:  Thank you, Your Honor.

25              **FURTHER DIRECT EXAMINATION**

**BY MS. STEEGE:**

Q.  Let's start with the big picture here, Dr. Dudley.  The 15th monitor's report found sustained compliance with three and substantial compliance with zero provisions.  Do any of the compliance provisions held -- I'm sorry.

     Do any of the provisions held in sustained compliance govern medical or mental health care?

A.  No.

Q.  And do you generally agree with the compliance findings on the medical and mental health provisions of the monitoring reports?

A.  Yes.

Q.  Let's first talk about the jail's work in screening detainees for mental illness and providing them with appropriate treatment.  And within that, I'd like to first talk about staffing.  You --

A.  What?

Q.  Staffing.  You testified that you speak with the Hinds County medical and mental health staff both at the monitoring visits every few months and between those visits and review certain records they produce.

     Could you briefly describe what the medical staff do on a weekly basis to meet detainees' basic medical needs?

A.  The medical staff are responsible for the initial screenings that are done at intake, which are medical and

1    mental health screenings that are done at intake.  If there's

2    someone -- if there's an emergency situation, they handle it

3    right away or they -- if it's not an emergency, they'll refer

4    individuals either to the medical care clinic or to mental

5    health if they identify needs in any of those categories.

6         Then the medical staff also runs what would be in the

7    community an outpatient clinic, a chronic care clinic, where

8    they're seeing individuals who have chronic medical conditions

9    and making sure that they are adequately assessed and managed

10   in an ongoing way.

11        The medical staff were also responsibility for --

12   responsible for medication pass, which is the distribution of

13   medication to all detainees who are taking medication, whether

14   that's for medical problems or mental health problems.

15        They also handle medical emergencies that come up,

16   injury, someone becomes acutely ill, or whatever; screen them;

17   treat them if they're treatable at the facility; send them to

18   the hospital if they require hospitalization, either for an

19   assessment or treatment.

20        They also run an infirmary where they'll see -- where

21   individuals who might need more enhanced attention and

22   monitoring by the nurses can be housed so that they have

23   access to that more intense observation and monitoring.  These

24   can be people who are coming back from the hospital or people

25   who were sick that didn't need hospitalization but they don't

1    want to send them back to the floors.

2        And then the medical staff also has a responsibility for

3    monitoring individuals who are in special circumstances.  So,

4    for example, individuals who are on suicide watch, they're

5    responsible for monitoring them.  Individuals who are being

6    held in isolation or segregation, they have a responsibility

7    for regularly checking and monitoring them as well.

8    Q.   And when you refer to the "infirmary," is that also known

9    as the medical observation unit?

10   A.   Yes.

11   Q.   Now, we've talked about the medical staff.  Could you

12   briefly describe what the mental health staff need to do each

13   week to meet the detainees' basic mental health needs?

14   A.   The medical -- the mental health staff then do a more

15   elaborate and in-depth mental health assessment for

16   individuals who are referred to them from that booking, that

17   initial nurse's screening that's done at the time of booking.

18   When an individual's referred to them, they do a more

19   extensive mental health evaluation.

20       They're also performing such more extensive mental health

21   assessments on individuals who were not referred to them at

22   the time of booking but who were later referred to them.  And

23   that could be because they were identified by security staff

24   or medical staff as possibly in need of mental health

25   services.  Or they may have been self-referred, something has

1    come up for them and they self-refer to be seen by mental

2    health, at which point there would be an initial mental health

3    assessment.

4        Once those assessments are performed, they're deemed in

5    need of mental health services, the mental health staff has to

6    develop a treatment plan for them and then attempt to provide

7    them with the services that they require.  They're required to

8    see individuals on the mental health caseload at least once a

9    month, but they obviously see them a lot more frequently if

10   the situation is more acute or an individual is in some sort

11   of crisis or having some sort of difficulty.

12       The mental health staff are also responsible for the

13   management of suicidal detainees.  They have to do suicide

14   assessments.  Those that are placed on suicide watch have to

15   be seen on a daily basis while they're on suicide watch and

16   then assessments to remove them from suicide watch.

17       They're also responsible for doing weekly rounds on

18   everyone who is being housed in segregation to assess their

19   mental health status and determine whether anyone is in need

20   of new or additional mental health services or other sorts of

21   interventions as a result of changes in their mental health

22   status while being held in -- in segregation.

23   Q.   Now, you talked about urgent situations that might arise

24   in the medical side.  Does that also occur sometimes on the

25   mental health side?

1   A.   Yes.

2   Q.   Could you talk a little more about the staff involvement

3   in providing emergency care?

4   A.   On which side?

5   Q.   The mental health.

6   A.   On the mental health side, they'll be called for

7   emergencies as well.  Sometimes it's by security staff.

8   Sometimes it's identified by medical staff.  Sometimes it's

9   just identified when they go on the unit.  And they will see a

10  person on an emergency basis when that's indicated.  If it's

11  someone who they already know because they're on the mental

12  health caseload, that comes into play.  But sometimes it's

13  someone who they haven't had contact with before, and this may

14  be their initial contact.  And so that -- the assessment, of

15  course, takes much longer when the person is previously

16  unknown to them.

17       And then they will do whatever's required as an emergency

18  intervention in the sense of trying to calm the emergency

19  situation down, provide the individual with whatever support

20  they need.  If medication is indicated, they call immediately

21  to have a prescriber come and see them as well.  So it kind of

22  depends on the nature of the emergency.

23  Q.   Now, do all of these functions require documentation that

24  they've been done?

25  A.   Yes.  They are all responsible for entering into the

1   electronic medical record system all of their contact and

2   involvement with detainees.  There are forms for medical

3   assessments and mental health assessments of different types,

4   whether it be the prescriber or the qualified mental health

5   professional or the nurse or the prescriber on the medical

6   side, so that those evaluations have to be completed when

7   they're done.

8       When an individual is going to be seen for follow-up,

9   then all those contacts have to be charted and noted.  There

10  are forms maintained for all the prescriptions that are made.

11  There are forms the nurses have to complete with regard to

12  whether individuals took their medications or not.  So all of

13  these activities that we're talking about have to be

14  documented within the medical record.

15  Q.  And is this the kind of documentation that you review in

16  the course of your monitoring work?

17  A.  Yes.

18  Q.  Now, do the mental health staff also have regular

19  meetings?

20  A.  Yes.

21  Q.  Both within the mental health team but also with other

22  folks in the jail?

23  A.  They have meetings within the mental health team, and

24  then they also in recent months have been having

25  interdisciplinary team meetings again with security staff.

1    Q.   Okay.  So what -- is that also referred to sometimes as

2    an IDT meeting?

3    A.   Yes.

4    Q.   In case the acronym comes up.

5         What is an IDT, or interdisciplinary team, meeting?

6    A.   It's an opportunity for medical staff, mental health

7    staff, and senior security staff to meet together to really

8    talk about overlapping and shared concerns that might come up

9    and to come up with, you know, options for addressing those

10   concerns.  And so it may be a discussion of problems that

11   detainees might be having that have been observed by medical

12   or mental health staff that they have -- it's an opportunity

13   for them to share some of that information with security staff

14   and talk about what might be done.

15        They've been using these IDT meetings also to discuss

16   detainees who are particular management problems, especially

17   those who have serious mental illnesses that may be less than

18   fully compliant with their medication regimen and therefore

19   their symptoms are not really well controlled and so they are

20   talking -- they use this as an opportunity to talk about

21   sometimes individual detainees and try to come up with a plan

22   for how to best manage some of those problems as well.

23   Q.   Now, separate from having the meeting, what is the goal

24   of having IDT meetings?

25   A.   Well, the -- I mean, obviously you have a medical and

1  mental health staff within a facility because people need

2  medical and mental health services, so that, you know, first

3  and foremost, they're a provider of those medical and mental

4  health services.  The -- however, the provision of adequate

5  medical and mental health services is also something that

6  contributes to the overall safety and security within the

7  facility.  And so the -- maintaining a -- developing and

8  maintaining a good working relationship between medical and

9  mental health staff and security staff is what's required to

10  obtain that benefit, having medical and mental health staff

11  contribute to the overall safety and security of the facility.

12      And so that through the IDT meetings, you hope to develop

13  that sort of working relationship at the most senior level and

14  then hope that that begins to impact on the larger culture of

15  the facility and eventually develop that sort of cooperative

16  working relationship with front-line officers and medical as

17  well.

18  Q.  Separate from having that cooperative working

19  relationship at the upper levels, are there concrete steps

20  that would need to be taken in order to help operationalize

21  that at lower levels?

22  A.  The -- well, what you hope is that the senior staff,

23  recognizing the importance of this, you know, as they

24  supervise those under them, that they instill that kind of

25  change of culture as part of their supervision.

1      In the course of the meeting, the IDT meetings, I think

2   you also have an opportunity to determine whether there's

3   specific more formal procedures that you might want to put

4   into place to facilitate that as well.  So it's a combination

5   of identifying any formal procedures that you might want to

6   identify and use supervision and monitoring of the senior

7   staff impact on the culture, so --

8   Q.   When you mention "specific more formal procedures," could

9   you give an example of that?

10  A.   Well, the IDT meetings, for example, happen on a weekly

11  basis, but there are times when you don't want to wait for an

12  IDT meeting to discuss a problematic inmate.  So, for example,

13  if mental health staff become aware of the fact that a

14  particular inmate is deteriorating and they're trying to see

15  them more frequently and it would be helpful if security staff

16  could keep an eye on them, the -- you would want the

17  front-line security staff and the mental health staff

18  communicating in such a way so that they can work that out

19  together.

20      And I guess what I'm saying is that it's up to senior

21  security staff to determine how is the best way for that to

22  happen.  Do they really give the -- at what level do the

23  front-line security staff have the ability to make those

24  decisions about how they can be helpful?  In what situations

25  should that be taken to a supervisor?  You know, which things

1    require kind of formalized mechanisms and which things can be

2    done -- worked out between an officer and medical or mental

3    health.

4    Q.   And I'll ask some more questions later about the medical

5    and mental health security coordination.  But I wanted to ask

6    a bit more about the work that's done currently by mental

7    health staff.

8         You listed a whole bunch of different activities.  Do any

9    of those activities include work to run a mental health unit?

10   A.   No.

11   Q.   And does mental health staff currently have a role in

12   reviewing disciplinary decisions for people who are on the

13   mental health caseload?

14   A.   No.

15   Q.   Are those two functions required under the consent

16   decree?

17   A.   Yes.

18   Q.   Now, you said --

19        THE COURT:  Hold it.

20        MR. SHELSON:  Your Honor, we move to strike the answer

21   if he's not going to identify what paragraph of the consent

22   decree he's alluding to.

23        THE COURT:  Okay.  Could you point him to it.

24        MS. STEEGE:  If we could bring up PX-1, please.  And

25   let's go forward to -- I believe it's page 11.  Page 12.

1          I apologize, Your Honor.  If you'll give me a second.

2          THE COURT:  No problem.

3          MS. STEEGE:  If we could turn to the next page.  And to

4     the next.  I apologize.  We'll move on shortly.  Next one.

5     BY MS. STEEGE:

6     Q.   If you could look, Dr. Dudley, and sort of -- the very

7     top part that's cut off a bit that refers to providing

8     prisoners with appropriate treatments and therapeutic housing.

9     Has that provision 42(g) on therapeutic housing been

10    interpreted by the parties to mean building a mental health

11    unit?

12    A.   Yes.

13         MR. SHELSON:  Object to Dr. Dudley answering how both

14    parties interpret that provision, Your Honor.  Dr. Dudley

15    can't --

16         THE COURT:  What provision is it?

17         MS. STEEGE:  42(g).

18         THE COURT:  I'm sorry.  The highlighted portion?

19         MS. STEEGE:  Correct.

20         MR. SHELSON:  My point, Your Honor, is Dr. --

21         THE COURT:  Hold on.

22         MR. SHELSON:  Yes, sir.

23         THE COURT:  Can I see that full sentence, that full --

24    is there a paragraph 6?  Is that it?

25         MS. STEEGE:  Yes, that's correct.

 1          THE COURT:  I tell you what.  I'll pull it up here.

 2     What exhibit -- is this 8-1?

 3          MS. STEEGE:  Correct.

 4          THE COURT:  Hold on.

 5          MS. STEEGE:  It's also been marked as Plaintiff's -- it

 6     is on the docket as CM/ECF-8-1.  It's also been marked as

 7     Plaintiff's Exhibit 1, whichever is easier.

 8          THE COURT:  Okay.  Now, now that I've seen 8-1 -- I'm

 9     looking at the docket entry 8-1, paragraph 4(a) --

10          MR. SHELSON:  Your Honor, it's 42 --

11          MS. STEEGE:  42(g), part 6.

12          MR. SHELSON:  42(g)(6).

13          THE COURT:  42(g)(6).  Okay.  So what was your specific

14     question to Dr. Dudley about that, if you recall?  If you

15     could tell me.

16          MS. STEEGE:  Well, first I had asked about whether the

17     mental health staff's current work includes any role in

18     reviewing disciplinary decisions for people who are on the

19     mental health caseload.

20          THE COURT:  And no; his answer was no?

21          MS. STEEGE:  And then was asking if those two

22     functions, building the mental health unit and reviewing

23     disciplinary decisions for people on -- well, having mental

24     health have a role in reviewing disciplinary decisions for

25     people on the mental health caseload were required under the

1    consent decree.

2         THE COURT:  Now, what's the basis for your objection,

3    Mr. Shelson?

4         MR. SHELSON:  Your Honor, I apologize if I

5    misunderstood the question, but I thought the question was to

6    the effect of how do the parties interpret.  And if that

7    wasn't the question, again, I apologize, but if that was the

8    question, I object to Dr. Dudley answering for how the

9    defendants interpret any provision in this consent decree.

10        THE COURT:  Okay.  That objection is sustained as to

11   how the County may have interpreted.  However, how did the

12   parties proceed under that consent decree in the monthly

13   visits or whatever, I think you certainly can ask that

14   question.

15   BY MS. STEEGE:

16   Q.   Dr. Dudley, in your work evaluating compliance under

17   consent decree paragraph 42(g), has that included evaluating

18   the defendants' progress on building a mental health unit?

19   A.   Yes.

20   Q.   Now, I'd like to look at some other functions that the

21   mental health staff currently do and hear a little more about

22   that.

23        You testified that the mental health staff currently are

24   able to -- well, that they aim to see people on the mental

25   health caseload monthly.  Are they actually able to do that?

1    A.   No.

2    Q.   Could you speak more on the frequency that they're

3    actually able to see detainees who are on the mental health

4    caseload?

5    A.   Well, there had been two qualified mental health

6    professionals, and they recently obtained approval for a third

7    one.  And they were -- at the time of my last conversation,

8    they were interviewing for that third person.

9         There are a little over 200 people on the mental health

10   caseload.  The -- and so that's a lot of people to see.

11   Q.   I'm sorry.  I can't hear you, Dr. Dudley.  It looks like

12   you're speaking.

13        Dr. Dudley?

14        THE COURT:  Hold on, Dr. Dudley.

15        MS. STEEGE:  I'm not sure if he can hear or see me

16   right now.

17        MR. MORISANI:  You want to show it to him?

18        THE COURT:  He can't see that.

19        MS. STEEGE:  Valiant effort.  I mean, I literally was

20   doing like this, yeah.

21        THE COURT:  Could you put the camera on me?

22        THE REPORTER:  Judge, do you want to go off the record?

23        THE COURT:  Yes.

24           (An off-the-record discussion was held.)

25        MS. STEEGE:  Dr. Dudley, can you hear and see me?

1         THE WITNESS:  I can talk a little louder, though.

2         MS. STEEGE:  Can you hear and see me?

3         THE WITNESS:  Yes.

4         MS. STEEGE:  And without echo?

5         THE WITNESS:  Yes.

6         MS. STEEGE:  Excellent.  All right.

7         THE COURT:  You might want to maintain a position very

8    close to the mike like this, because your voice does fade away

9    pretty quickly.

10        THE WITNESS:  Now you're back on the screen.

11        MS. STEEGE:  Now I'm back where?

12        THE WITNESS:  You're on the screen.

13        MS. STEEGE:  Excellent.  Now, I was getting some

14   feedback just now.

15        THE COURT:  I just turned off my mike.

16        MS. STEEGE:  Can you try again does that produce

17   feedback?

18        THE WITNESS:  Am I supposed to be on the phone or on

19   the computer?

20        THE COURT:  Stay on the phone.

21        MS. STEEGE:  Well, we can see you.  Please stay on the

22   phone.  We can still see you and hear you at this point.  Are

23   you okay with the sound and video on your end?

24        THE WITNESS:  Yes.

25        MS. STEEGE:  Okay.  Well, I'm not getting any feedback.

1          THE WITNESS:  You want me to use the phone for the

2     audio?

3          MS. STEEGE:  Let's stick with that.  Yeah.  I'm getting

4     some nods over here.  All right.  So, yeah, I'm not getting

5     feedback at this point here.  Are you okay there as well?

6          THE WITNESS:  Yes, I am.

7          MS. STEEGE:  Okay.  Thanks for everyone's patience

8     here.  Technology is an adventure sometimes.

9          All right.  I think we're ready to proceed.

10         THE COURT:  You may proceed.  I'm sorry.

11         MS. STEEGE:  Thank you.

12    BY MS. STEEGE:

13    Q.  So I'd like to continue reviewing some of the functions

14    of the mental health staff.  Of the functions that they

15    currently do, are they able to do that at the level of

16    frequency and intensity that is required to meet detainees'

17    mental health needs?

18    A.  No.

19    Q.  What are some of the functions that they would need to be

20    doing either at a greater level of frequency or intensity?

21    A.  They're unable to see detainees as frequently as they

22    would like to, and so what happens, for example, is that a

23    detainee who has not yet developed insight and understanding

24    of the fact of their need for medication may use medication

25    for a couple of days after you see them, but then they can't

1  get back to see them again and the detainee stops taking the

2  medication and they start to deteriorate again.

3      So the frequency with which they would need to see some

4  of the detainees is not possible because they are too busy

5  handling even more urgent situations, like suicide watch or

6  intake or the reviews, for example, of individuals who are on

7  segregation.

8      They haven't been able to develop any sort of group

9  programs at all because there hasn't been time for that.  And

10 so some of the things that they want to do and there's a need

11 to do, such as psychoeducation and the discharge planning

12 group that would increase the possibility that individuals

13 would follow up with outpatient services when they're

14 released, as opposed to what happens now where they kind of go

15 out, drop them, and they end up being -- you know, being sick

16 again and end up being rearrested.  So they're not able to do

17 things like that.

18 Q.   I think that the sound is coming through, but if you

19 wouldn't mind slowing down a bit in speaking and just make

20 sure that your hand is -- yeah, there you go -- not over the

21 speaker.

22     And I'll ask some further questions later on some of the

23 items that you brought up.  But I first wanted to clarify.

24     So how many detainees are currently on the mental health

25 caseload?

1    A.   At last count, it was 202.

2    Q.   And could you just give us a general sense of how they're

3    doing?  Are they -- at what level -- what percentage of them,

4    roughly speaking, have serious mental illness?

5    A.   Virtually all of them.  There's only a handful of people

6    who are on the mental health caseload at this point due to

7    some kind of short-term crisis.  Everyone else has a serious

8    mental illness.

9    Q.   Okay.  And could you just clarify.  What level of mental

10   health staffing do they currently have?

11   A.   As I indicated, there have been -- there have been two

12   qualified mental health professionals, and they've recently

13   received approval for and are interviewing for a third.  One

14   of the two existing positions is vacant, so they're actually

15   interviewing to refill that position and then for a third

16   position.  And there is a psychiatric nurse practitioner who's

17   full time and who became full time on January 1st, had been

18   part time prior to that, and she is the prescriber.

19   Q.   Okay.  Now, we've briefly touched on a couple things that

20   they're not currently doing, the mental health -- anything

21   related to the mental health unit and reviewing disciplinary

22   decisions for people on the mental health caseload.

23        If we're just looking at what they're currently doing, do

24   they have enough staff to be able to do that?

25   A.   No.  Well, what they're currently supposed to be doing?

1    Q.   Correct.

2    A.   Or trying to do?

3    Q.   Correct.

4    A.   No.

5    Q.   Could you speak more about that?

6    A.   The -- you know, if you look -- if you just count hours,

7    like, it would be the hours that they spend seeing

8    individuals -- an individual; the hours that they spend doing

9    intake assessments; the hours that they spend monitoring --

10   doing suicide watch assessments and monitoring people on

11   suicide; the hours that they spend going to all the isolation

12   and segregation units that they need to do segregation rounds.

13   And then on top of that they have emergencies or urgent

14   situations that come up where they have to kind of drop

15   everything else and see those individuals.  There's just --

16   the -- when you add up all of those hours of work on a weekly

17   basis, that's much more hours than three people can provide.

18   Q.   Now, does this --

19   A.   And like I said, they're not even doing some things that

20   they know they need and want to do, like certain sets of

21   groups that they want to do.

22   Q.   And we'll get more into those groups later.

23        Have you previously recommended that Hinds County hire

24   more mental health staff?

25   A.   Yes.

```
 1   Q.   When was the first time that you made that
 2   recommendation?
 3   A.   At least in 2000 -- the end of 2018, the beginning of
 4   2019.
 5   Q.   And what have you recommended over that time?
 6   A.   Pardon?
 7   Q.   What have your recommendations been during that time?
 8   A.   I had indicated that they needed at least two additional
 9   qualified mental health professionals and that they should
10   expand the time of the psychiatric nurse practitioner.
11   Q.   And just to clarify, what is that two additional over --
12   what is the baseline when you're talking about those two
13   additional --
14   A.   That was when they had two.  They had two already, and I
15   was recommending that they bring in two more.
16   Q.   Okay.  And since you first started recommending that they
17   have four total qualified mental health professionals, or
18   QMHPs, on staff, has the mental health caseload changed?
19   A.   Yes.
20   Q.   How has it changed?
21   A.   It's continued to grow.
22   Q.   Now, you've talked about the increase in the mental
23   health caseload in the jail.  In your experience, what other
24   settings can provide treatment to people with serious mental
25   illness?
```

1    A.   You mean any individuals with serious mental illness?

2    Q.   Other than jails, would hospitals, for example, provide

3    treatment to people with --

4    A.   Yes.  Hospitals; a variety of outpatient clinic settings;

5    and then there's in between, kind of a residential treatment

6    sort of setting as well.

7    Q.   Are there methods that can be used to divert people with

8    mental illness from a jail setting?

9    A.   In jurisdictions that have mental health courts or

10   diversion programs for people with serious mental illness,

11   they -- they very often divert seriously mentally ill people

12   from jail into those services.

13   Q.   Now, in your work in other states, have you seen some of

14   these other services that are available in situations that

15   instead lead to jail time for people in Hinds County?

16   A.   Yes.

17   Q.   And if those options are inadequate to meet the needs of

18   people with serious mental illness, does that affect the

19   jail's mental health caseload?

20   A.   It's going to bump up the caseload.  Yes.

21   Q.   In your experience, is it important for a correctional

22   facility to have a discharge planning program to prepare

23   people to use community-based resources when they're released?

24   A.   Yes.

25   Q.   Why is that?

1  A.   The -- I mean, what you hope to do during the period of

2  time they're in jail is to stabilize them and to help them

3  come to appreciate their need to continue in treatment upon

4  their release and to appreciate what their roles and

5  responsibilities are for seeing that they continue in

6  treatment upon their release.  And that's all a part of

7  discharge planning.  You know, you're trying to prepare people

8  to be released.

9      Also, you are trying to link them up in some meaningful

10 way with a community-based provider so that -- to increase the

11 possibility that they will actually follow through with

12 appointments that you may have made for them and thereby

13 receive the outpatient treatment that they need to remain

14 stable instead of going out, not doing anything, their mental

15 health status deteriorating again.  And then they end up

16 getting in trouble again and rearrested.

17 Q.   So is just giving someone an appointment when they're

18 released from jail enough to make that connection happen?

19 A.   No.

20 Q.   Why not?

21 A.   The -- well, first of all, if a person doesn't have any

22 appreciation of their need for treatment, there's no reason to

23 comply with the appointment.  But then, you know, you also

24 have people who -- you know, this is a population that is more

25 likely to follow up if you could develop a program where they

1  have some sort of knowledge of where they're going and in the

2  best of all possible worlds have had some sort of contact with

3  who they're going to, which then makes them more comfortable

4  following up.

5  Q.  Okay.  And is it important for people to be released from

6  a correctional facility with those community-based resources

7  already lined up?

8  A.  Yes.

9  Q.  I think you've touched on this, but in your experience,

10  what happens if people are released without these resources or

11  without being ready to use them?

12  A.  Then they won't take advantage of them and they then go

13  untreated.

14  Q.  And what -- in your experience, what can happen if folks

15  are released from jail, go untreated for mental illness, and

16  are then back in the community without such resources?

17  A.  You know, their mental health status deteriorates again,

18  and they're subject to get into the same sorts of difficulties

19  that had them arrested in the first place.

20  Q.  Okay.  Let's talk about the impact of staffing on

21  programs.  In the Hinds County Detention Center, does the

22  number of the medical and mental health staff overall affect

23  their ability to prepare detainees to use these

24  community-based resources once released?

25  A.  I'm sorry.  Could you repeat that?

1  Q.   Sure.  You've described the role in some ways of

2  discharge planning in terms of preparing folks to then be

3  released into the community.   In Hinds County Detention

4  Center, focusing here, does the number of medical and mental

5  health staff overall affect their ability to prepare detainees

6  to use community-based resources once they're released?

7  A.   Well, there's a discharge nurse position.  And the

8  discharge nurse would be kind of responsible for coordinating

9  the discharge planning process.  But that nurse cannot provide

10  all of the kind of preparatory work that would be part of the

11  discharge planning process; for example, the psychoeducation

12  groups or the medication education groups that would be part

13  of the -- of launching a discharge effort.

14      That would have to be performed by other staff.  And as I

15  indicated earlier, there's not enough mental health staff for

16  them to even have begun to develop a group therapy program of

17  any type, including those groups that would be focused on

18  discharge planning.

19  Q.   Okay.  So I'm going to ask a bit more about those groups

20  in a moment.

21      But first, just to clarify, in the last year, has Hinds

22  County consistently had someone in place as a discharge

23  planner to be able to facilitate referrals to community-based

24  resources?

25  A.   No.

1  Q.   Do they currently have someone in that job?

2  A.   At the time of the site visit, there was no one in that

3  job, but they were looking to replace the discharge planning

4  nurse who had left.

5  Q.   Has there been some turnover in that position?

6  A.   Yes.

7  Q.   Does that turnover affect someone's ability to facilitate

8  referrals as that job would require?

9  A.   It makes it more difficult in that the discharge planning

10  nurse is the one who has the contacts with community-based

11  providers of all types and not only knows who the

12  community-based providers are, the organizations, the clinics,

13  the programs.  But, you know, that nurse also develops a real

14  working relationship with each of those providers so that she

15  can make a call and facilitate getting someone who is expected

16  to be released into the program, making appointments, and so

17  those working relationships are important.  And so, you know,

18  when there's turnover, there's a setback, and that has to

19  be -- those working relationships have to be reestablished

20  with a new person.

21  Q.   Now, you mentioned psychoeducation groups.  Could you

22  explain how those psychoeducation groups would meet detainees'

23  serious mental health needs?

24  A.   You know, for many with serious mental illness, by

25  definition they don't have insight or understanding of the

1    fact that they have a mental illness that impairs their

2    ability to function in significant ways and may be

3    contributing to how they found themselves in the Hinds County

4    Detention Center.  And so that -- and this is true in any

5    mental health program, not just within a jail.

6         An important part of providing treatment is helping

7    individuals to increase their insight and understanding into

8    the nature of their illness and that it's an illness that can

9    be treated and managed if they responsibly participate in

10   that.  And nobody takes medication, nobody goes to treatment

11   if they don't understand that they have an illness that can be

12   treated and it's to their benefit to have it treated.

13        And so that these sorts of group programs are focused on

14   that educational process.  It's been pretty well demonstrated

15   that that's best done in a group setting.  I mean, even though

16   your individual -- in the individual sessions, something like

17   that would be brought up, but being in a group with others who

18   have similar needs and experiences helps to reinforce that

19   message.

20   Q.   Okay.  So you've described groups that would educate

21   people about the importance of taking medication.  How is this

22   different from what the prescriber currently does?

23   A.   Well, what the prescriber currently -- to -- for people

24   who are on medication, you know, the prescriber sees them

25   every couple months to renew their medication unless something

1    comes up, right?  And so for somebody who you're trying to

2    help to gain some appreciation and understanding of their need

3    for medication and they're not there yet, you know, these

4    groups would be something that would meet every week; right?

5    And so it's a much more intensive effort to educate people and

6    impact on their health care behavior.

7    Q.   So if someone is taking medication for just a couple days

8    in a row, is that enough to then stabilize them?

9    A.   No.  Most of the psychoactive medications, you know,

10   take -- you have to be on them for a while for them to be able

11   to have an effect.  And so that if somebody takes them for

12   four or five days and then doesn't take them for two or three

13   weeks, sees the provider again, may take them for a couple

14   days, that's really not doing much of anything.

15   Q.   And have you seen that pattern, in terms of folks taking

16   prescription medication for a couple days and then falling

17   off, have you seen that pattern in the records that you've

18   reviewed in Hinds County?

19   A.   Yes.

20   Q.   So you've described the importance of discharge planning

21   groups and these psychoeducational groups.  When the jail is

22   not currently providing these groups, does that create a

23   substantial risk of serious harm to detainees?

24   A.   It presents a potential risk of harm because people are

25   off their medications.  People who need to have medication in

1    order to manage their behavior are not consistently taking it,

2    and not even consistently taking it enough for it to have a

3    real effect.

4    Q.   I'm sorry.  Could you repeat that a little bit slower?

5    A.   I said they're not consistently taking their medication

6    and not even consistently taking it enough for it to have a

7    real effect.

8    Q.   And what is the impact on detainees themselves when they

9    have prescription psychiatric medication that they're not

10   taking consistently?

11   A.   Well, it depends on the specific serious mental illness

12   that they're suffering from, but those who have -- we have

13   individuals in the jail who have various types of psychotic

14   disorders.  And so in that case their symptoms might return.

15   They may hear voices.  They may get paranoid.  And those sorts

16   of paranoid thoughts, of course, are going to make their

17   interaction with others in the facility -- complicate their

18   interaction with other inmates or staff in the facility.

19   There are those who have major mood disorders, and so if they

20   go off their medication, they may be manicky or hyperactive or

21   overreactive in some sort of a way, which then results in

22   behavioral problems and there may be conflicts with other

23   detainees or with staff.

24   Q.   So do those conflicts create a risk in terms of safety or

25   security as well?

1   A.   For themselves, for other detainees, as well as the

2   staff.

3   Q.   Okay.  Let's turn to other aspects of mental health work.

4   Does the number of mental health staff affect how often they

5   can provide individual therapy to detainees?

6   A.   Yes.

7   Q.   What does that affect?

8   A.   Like I said, I mean, they have an intent to see them.

9   It's just that all the emergency things that they have to do

10  that are more urgent end up taking precedent.  And so they

11  don't get to see individuals who -- as frequently as they want

12  to.

13  Q.   Have you made any findings about the impact on detainees

14  of not being seen for therapy as often as they should be?

15  A.   Different things happen.  Like I said, sometimes they go

16  off their medication.  Sometimes they'll put in a sick call

17  because they haven't been seen and so they'll put in a sick

18  call to kind of precipitate an appointment.  If they go off

19  their medication, they may have some difficulties.  So it,

20  again, depends on the nature of the mental illness itself.

21  But these different sorts of problems can and do occur.

22  Q.   Now, have you seen Hinds County take steps to adequately

23  fund the level of mental health staff that is necessary to

24  meet detainees' mental health needs?

25  A.   As I indicated, there's -- the psychiatric nurse

1   practitioner's time was expanded from half time to full time,

2   and that was really great.  They added one qualified mental

3   health professional's position, which brings the total

4   positions up to three.  So they -- I think that steps have

5   been taken.

6        A full appreciation for how much work the mental health

7   staff is being asked to do I think is lacking and so that,

8   hence, maybe not fully appreciating the need for more staff.

9   And that's, again, without the opening of the mental health

10  unit, which is going to then be a separate set of demands.

11  Q.   Okay.  Let's turn to the effect of correctional staffing

12  on medical and mental health care, and I'd like first to look

13  at the correctional staffing in the housing units themselves.

14       When medical and mental health staff go out to the

15  housing units to distribute medication for med pass or to

16  provide care otherwise, is it important for them to go with

17  security staff?

18  A.   Yes.

19  Q.   Why is that?

20  A.   It's a matter of safety and security for the medical and

21  mental health staff.

22  Q.   And have there been issues when there was lack of

23  correctional staffing for the medical and mental health staff?

24  A.   Yes.  I mean, there's the -- there's not always security

25  staff available.

1  Q.   Okay.  You mentioned it's a safety issue.  Can you

2  describe that in more detail?  Why is there a safety issue

3  when there's not correctional officers available to go with

4  the medical and mental health staff?

5  A.   Well, when they go in the -- I mean, the mental health

6  staff, you know, frequently -- and the medical staff as well,

7  they frequently go to a unit to provide a service, either to

8  see someone or to handle an emergency or whatever.  The -- you

9  know, ideally you want to bring people out, depending on what

10 it is that you have to do to see them.

11 Q.   I'm sorry.  When you say "bring people out," what does

12 that mean?

13 A.   Out of their cell to see them.  But the issue is that

14 there needs to be security staff, so whatever it is that

15 they're doing, I mean, it can be done safely.

16 Q.   So are the medical and mental health staff consistently

17 able to bring detainees out of their cells to provide care

18 now?

19 A.   Usually not.

20 Q.   And what kind of care are they providing at the cell

21 door?

22 A.   So the mental health staff will see someone at the door

23 and try to talk with them through the door.

24 Q.   Okay.  And we'll talk more about that as well.  And

25 that's true for the mental health staff.  Are the nurses doing

1    med pass through the door?  How does that work?

2    A.   The nurses are doing med pass at the entrance to the

3    pods.  So they're doing it the way they would normally do it,

4    through a gate.  It's just that security staff are required to

5    have that done in an orderly fashion and to make sure people

6    come out for their medication and receive the medication and

7    actually take the medication.

8    Q.   So what is the correctional officer's role during that

9    process?

10    A.   Is to, you know, maintain order.  You know, when the

11    nurse comes through the unit, she has a lot of medication to

12    pass.  She may have to take a needle stick for a diabetic.  I

13    mean, she has all sorts of things that she may need to do.

14    And so that having the -- maintaining order among the

15    detainees who are waiting for their medication, making sure

16    that they've gotten out of bed and come down to get it, you

17    know, all of that becomes the responsibility of the officers

18    on the unit, while at the same time someone is staying with

19    the nurse for that -- security purposes, you know, the cart,

20    the medication cart with medication and with needles and other

21    things on it.  So, you know, security is making sure that that

22    remains -- that the nurse and her cart remain safe and secure.

23    Q.   Is this a new problem in terms of --

24    A.   And that she's not, you know, otherwise harassed or...

25    Q.   Has this issue that -- you're describing an issue of

1  having adequate correctional staff to support medication pass.

2  Is this a new issue?

3  A.  No.

4  Q.  How long has this been a problem in the jail?

5  A.  Well, I know it's been a problem as long as I've been

6  there.

7  Q.  And just so we recollect, that was 2018?

8  A.  Yes.

9  Q.  Okay.  Has Hinds County taken any steps to increase

10  security officer availability for this?

11  A.  I mean, recently there was a plan to assign sergeants to

12  go on med pass with the nurses to ensure that at least someone

13  was with the nurses.  But I think that the shortage was so

14  great that they were periodically pulled away from that

15  responsibility, so it continues to be a challenge.

16  Q.  Okay.  And does that continue through the January site

17  visit this year?

18  A.  Yes.

19  Q.  Is this an issue in segregation units as well as on the

20  regular housing units?

21  A.  On the segregation unit, it's different because the

22  nurses actually have to go cell to cell to give the medication

23  as opposed to the detainees coming to the gate to receive

24  their medication.  And so the availability of security staff

25  to actually take them on the unit and go cell to cell is a

1    somewhat different level of involvement.

2    Q.   Okay.  And what happens if the nurses are not able to go

3    door to door in segregation to provide medication?

4    A.   Then medication pass gets postponed.

5    Q.   Does that result in a delay in care for the detainees who

6    are housed there?

7    A.   Yes.

8    Q.   You talked about the role of correctional officers on the

9    pods in helping get folks out of their cells to take

10   medication.  What happens if someone refuses to take their

11   medication?

12   A.   If someone refuses to take their medication, they're

13   supposed to still come down to see the nurse.  There's a

14   medication refusal form that they're supposed to sign and --

15   to document that they refused to take their medication as

16   opposed to that they've just slept through the medication pass

17   or weren't called or didn't feel like getting up or whatever.

18   But it also gives the nurse an opportunity to lay eyes on them

19   so that the nurse has an opportunity to see, you know, how

20   they're doing.

21   Q.   Okay.  Now, when -- you've talked about med pass.  When

22   mental health staff go on the housing units, are they able to

23   provide initial assessments or therapy to detainees in a

24   private location?

25   A.   Usually not.

```
 1   Q.   Could you describe where they're providing treatment to
 2   detainees?
 3   A.   Mostly at the door.
 4   Q.   I'm sorry?
 5   A.   At the door to their cell.
 6   Q.   Okay.  So are other people nearby in that scenario?
 7   A.   It depends on the availability of corrections officers
 8   and their ability to keep other people away.  You're talking
 9   through a door, so it's not necessarily as private and
10   certainly as comfortable as would be ideal to perform a mental
11   health assessment.
12   Q.   So is there an impact on the likely efficacy of that
13   assessment by virtue of having to have it at the cell door?
14   A.   Well, I think two things happen.  They -- there's the
15   issue of some detainees simply refusing to do that.  And we've
16   been looking at that because there have been detainees who
17   refuse to even have an assessment under those circumstances.
18   And when they would arrange to bring them out of their cells
19   and move them down to medicine -- to the medical unit for the
20   assessment, they've been more successful.  But then some who
21   do go forward are not necessarily comfortable enough to
22   provide all the information that's required to adequately
23   complete a mental health assessment.
24   Q.   And is there an impact on detainees who are unable to
25   complete that first assessment in a timely way?
```

1   A.   Well, if no assessment is done, then, you know, it's

2   difficult to initiate treatment because you don't know what

3   you're really treating.  So there could be a delay in the

4   initiation of treatment because of problems obtaining an

5   adequate mental health assessment.

6   Q.   And does that delay in obtaining an initial mental health

7   assessment create a risk of harm to detainees?

8   A.   Certainly if people go untreated.  I mean, there are

9   people who -- I mean, what they try to do is that if a person

10  was, for example, recently treated at one of the outpatient

11  clinics, I think they attempt to get the records so that they

12  can see what medication a person might be on.  And that's

13  often helpful because sometimes people say they're on

14  medication but they don't know what medication they're on.

15  And so that, you know, you can make some clinical judgment as

16  to whether you want to initiate something that they've been on

17  before until you can get a more complete mental health

18  assessment, but that's not always possible.

19  Q.   I'm sorry.  What was the last?

20  A.   But getting those records is not always possible.

21  Q.   Okay.

22  A.   And getting them in a timely way as an alternative.

23  Q.   Okay.  Now, do security staff consistently bring

24  detainees from the housing units to the medical units for

25  these clinical assessments or therapy?

1   A.   They're not always able to do that.

2   Q.   Can you talk more about that?

3   A.   Well, there's two levels of issues.  One is that, you

4   know, medical and mental health will send to the unit, you

5   know, who has appointments today.  And so the security staff

6   from the unit have to make sure that those individuals are up

7   and ready and dressed and ready to go down at the appointed

8   hour.  And then someone has to go with them to transport them

9   from the unit down to medical, and then someone has to be in

10  medical with them to cover the security needs there.

11       And, you know, with the shortage of security staff

12  somewhere in that chain can break down.  You know, someone

13  will go up to get them and they're not ready or they'll get

14  ready and there's nobody to transport them, and then you face

15  the question of is the person going to leave the unit to take

16  them down to medical?  Is somebody going to come from medical

17  to pick them up?  So any step in that process can become a

18  problem.

19  Q.   You described a multistep process for security staff

20  necessary to get detainees down to medical units for clinical

21  assessments and therapy.  Can you give a ballpark sense of how

22  often that process works?

23  A.   Well, during -- in between -- I guess it was before the

24  last site visit, not this January one, I had asked the medical

25  and mental health staff to just keep a log of times when there

```
 1    were significant delays or things were canceled or postponed
 2    as a result of just not having enough security staff support.
 3    And it was a really big problem in the evenings and on the
 4    weekends.  But even during the week, there were several days
 5    each week where there would be inadequate coverage either in
 6    medical or to deal with the transport or to deal with
 7    preparing people on the unit to come down to medical.
 8    Q.    And do they sometimes schedule medical or mental health
 9    appointments in the medical unit in the evenings or on
10    weekends?
11    A.    Yes.  And there's a med pass in the evening.
12    Q.    I'm sorry?
13    A.    And there's a med pass in the evening.
14    Q.    One more time.
15    A.    And there is a medical pass.  One of the medical passes
16    is in the evening.
17    Q.    Okay.
18    A.    I understand that's also a demand for security time.
19              MS. STEEGE:  I'd like to bring up PX-42.
20              THE COURT:  Hold on.  Before we --
21              MS. STEEGE:  Sure.
22              THE COURT:  How much longer do you think you'll be?
23    I'm not trying to rush you.  This might be a good breaking
24    point.  I mean, it's at the very end of the day for everybody.
25              MS. STEEGE:  There is a bit left.
```

```
 1              THE COURT:  A bit left?

 2         MS. STEEGE:  Quite a bit.

 3         THE COURT:  Okay.  All right.  Dr. Dudley, we're going

 4    to end your testimony at this point.  It is only 5:30 here,

 5    and I think you're on the East Coast.  So it's 6:30 where you

 6    are.  So we're going to start back up tomorrow, and they're

 7    going to continue with your testimony tomorrow morning.

 8              Will we be prepared to resume at 9:00 a.m.?

 9         MS. STEEGE:  I would suggest, if possible, if we could

10    reconvene with Dr. Dudley a bit earlier to try to iron out any

11    tech issues in advance.

12         MR. ANDERSON:  We didn't hear that, Your Honor.

13         THE COURT:  No, no.  She wants to try to get with him a

14    little bit early to make sure we have the technical issues

15    tied up.  We hope to start at 9:00, so that means my staff and

16    the technical people will be here a little bit before then to

17    try to make sure that we get things wound up, ironed out.

18         MS. STEEGE:  Thank you, Your Honor.

19         THE COURT:  But, yeah, this is the prime opportunity

20    for us to break for the rest of the day.

21              Dr. Dudley, you are not allowed to discuss your

22    testimony -- well, you're not under cross-examination yet, so

23    you may discuss it to the extent that anybody needs to work

24    with you for tomorrow's testimony.

25              So is there anything else we need to take care of
```

1    before then?

2          All right.  We will -- the court is now adjourned.

3          Counsel, please be ready to start up at 9:00 a.m.

4    ****************************************************************

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            **COURT REPORTER'S CERTIFICATE**

2

3      I, Candice S. Crane, Official Court Reporter for the

4 United States District Court for the Southern District of

5 Mississippi, do hereby certify that the above and foregoing

6 pages contain a full, true, and correct transcript of the

7 proceedings had in the forenamed case at the time and place

8 indicated, which proceedings were stenographically recorded by

9 me to the best of my skill and ability.

10      I further certify that the transcript fees and format

11 comply with those prescribed by the Court and Judicial

12 Conference of the United States.

13      THIS, the 16th day of February, 2022.

14

15                     /s/ Candice S. Crane, RPR, CCR

16                     Candice S. Crane, RPR, CCR #1781
                       Official Court Reporter

17                     United States District Court
                     Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25