1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                       NORTHERN DIVISION

3

4   UNITED STATES OF AMERICA                        PLAINTIFF

5   VERSUS                 CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

6   THE HINDS COUNTY BOARD OF SUPERVISORS,
    HINDS COUNTY SHERIFF, ET AL.                    DEFENDANTS

7

8

9              EVIDENTIARY HEARING, VOLUME 4,
           BEFORE THE HONORABLE CARLTON W. REEVES,
10             UNITED STATES DISTRICT COURT JUDGE,
                     FEBRUARY 17, 2022,
11                  JACKSON, MISSISSIPPI

12

13             (Appearances noted herein.)

14

15

16

17

18

19

20

21

22  REPORTED BY:

23      CANDICE S. CRANE, RPR, CCR #1781
        OFFICIAL COURT REPORTER
        501 E. Court Street, Suite 2.500
24      Jackson, Mississippi  39201
        Telephone:  (601)608-4187
25      E-mail:  Candice_Crane@mssd.uscourts.gov

———————————***DAILY TRANSCRIPT***———————————

1  **APPEARANCES:**

2      FOR THE PLAINTIFF:

3          CHRISTOPHER N. CHENG, ESQ.
           MATTHEW DONNELLY, ESQ.
4          SARAH G. STEEGE, ESQ.
           LAURA L. COWALL, ESQ.
5          HELEN VERA, ESQ.
           MITZI DEASE-PAIGE, ESQ.
6
       FOR THE DEFENDANTS:
7
           NICHOLAS F. MORISANI, ESQ.
8          JAMES W. SHELSON, ESQ.
           TONY R. GAYLOR, ESQ.
9          RAYFORD G. CHAMBERS, ESQ.
           JOHN C. HALL, II, ESQ.
10         REUBEN ANDERSON, ESQ.

11     ALSO PRESENT:

12         ANTHONY NJOKU
           MICHAEL DENAULT
13         ELIZABETH SIMPSON
           DAVID PARRISH
14         SHERIFF TYREE JONES
           LESLIE FAITH JONES
15         CINDY MOHAN

16

17

18

19

20

21

22

23

24

25

———***DAILY TRANSCRIPT***———

1                     **TABLE OF CONTENTS**

2    Style and appearances.................................586-587

3    WITNESS:  RICHARD DUDLEY, M.D.

4        Continued Direct by Ms. Steege.........................590

5        Defendants' Exhibit 77 entered.........................598

6        Plaintiff's Exhibit 44 entered.........................625

7        Cross by Mr. Shelson...................................666

8        Plaintiff's Exhibit 90 entered.........................694

9        Redirect by Ms. Steege................................711

10        Examination by the Court..............................719

11        Further Cross by Mr. Shelson..........................734

12    Court Reporter's Certificate..............................744

13

14

15

16

17

18

19

20

21

22

23

24

25

***DAILY TRANSCRIPT***

**IN OPEN COURT, FEBRUARY 17, 2022**

1

2

3          THE COURT:  You may be seated.

4          Good morning.  I understand we're still having a few

5     technical difficulties.  I hope we can get them ironed out

6     maybe before the next witness, but we'll see how this works

7     today.  I assume we're ready to resume?

8          MS. STEEGE:  I believe so, Your Honor.  We haven't done

9     a full tech check here, or at least I have not.

10          THE COURT:  Okay.  Come up to the mike and see if it

11     works.

12          MS. STEEGE:  Dr. Dudley, good morning.  Can you hear

13     me?

14          THE WITNESS:  Yes, I can hear you.

15          THE COURT:  All right.  How are we doing on feedback?

16          THE WITNESS:  Pardon?

17          MS. STEEGE:  Is there feedback when I speak?

18          THE WITNESS:  No.

19          MS. STEEGE:  And are you getting feedback when you're

20     speaking?

21          THE WITNESS:  No, I'm not.  A little, but not

22     distracting.

23          THE COURT:  I think you're at the appropriate distance

24     from the mike today, I think, so just make sure you're

25     speaking into the microphone.  Your voice is so soft, and I

1    need you to speak up just a little bit more.

2         MS. STEEGE:  All right.  Is that all right on sound

3    there?

4         THE COURT:  I'm sorry?

5         THE WITNESS:  I can hear you.

6         THE COURT:  Okay.  As long as he hears you, that's

7    fine, but I would like to, too, but I have the transcript.  I

8    would like to hear you, so just make sure you're speaking into

9    the microphone at all times.

10        MS. STEEGE:  I will do my best on that, but I

11   appreciate reminders there if I don't.

12        THE COURT:  Okay.  All right.

13        MS. STEEGE:  All right.  I believe we're ready to

14   proceed here.

15        THE COURT:  You may proceed.

16        MS. STEEGE:  Thank you, Your Honor.

17                    **RICHARD DUDLEY, M.D.,**

18        **having been first duly sworn, was examined and**

19   **further testified as follows...**

20                    **CONTINUED DIRECT EXAMINATION**

21   **BY MS. STEEGE:**

22   Q.  Dr. Dudley, yesterday we were discussing issues around

23   medical and mental health staffing, and I'd like to ask a

24   couple more questions about that before we move on.  First,

25   I'd like to show you PX-42, which has already been admitted

1   into evidence.

2        Dr. Dudley, is this the November 2021 quality assurance

3   summary?

4   A.   Yes.

5   Q.   And is that part of what you review as well during the

6   monitoring process?

7   A.   Yes.

8   Q.   I'd like to highlight an example of one of the issues

9   that you've already identified.  Let's turn to page 6, and I'm

10  just going to sort of expedite this here.  Let's see.

11  "Medical and mental health staff reported that some problems

12  have resumed with medication pass and mental health visits

13  during this reporting period.  As a result of staffing

14  shortages especially at night and on weekends, there isn't an

15  officer available to escort them during medication pass.

16  Mental health staff are not always accompanied by an officer

17  as previously mandated.  This will be addressed with the

18  facility captain.  There are still concerns" --

19       THE COURT:  Hold on one second.  A reminder, when

20  you're reading, please slow down for the court reporter's

21  benefit.

22  BY MS. STEEGE:

23  Q.   "There are still concerns about the lack of privacy when

24  conducting visits in the pods.  It would be preferable if the

25  detainees could be transported to the medical department for

1  mental health consults, but this is not always possible due to

2  staffing shortages.  This should cease being a problem once

3  the mental health unit opens in B-Pod."

4      Dr. Dudley, does this description align with your

5  findings?

6  A.   Yes.

7  Q.   Okay.  I'd like to take that exhibit down and show you

8  what -- PX-86 which has also been admitted.  This is the

9  December 2021 quality assurance summary?

10  A.   Yes.

11  Q.   Let's turn to page 16, and I'll just read briefly.

12  "Mental health and medical staff reported problems with

13  medication pass and mental health visits in the past.

14  Detainees were rushing the cage when their staff attempted to

15  perform their duties.  A new process whereby a supervisor

16  and/or officer accompanied them on their rounds to improve

17  safety and allow privacy for detainees and staff has

18  faltered."

19      So does this -- another month later after the prior

20  report, does this align with your findings?

21  A.   Yes.

22  Q.   Okay.  Let's take that one down.

23      Now, when medical and mental health staff have to provide

24  a lot of care at the cell door, does that meet detainees'

25  serious health needs?

1    A.   Not consistently, no.

2    Q.   And why is that?

3    A.   The mental health staff is just not conducive to the type

4    of engagement and assessment that is required, they're

5    attempting to do, and even for the nursing staff, when that's

6    coupled with other facility problems, lighting in the cell,

7    things like that, it's difficult for them to make the adequate

8    kinds of observation that they're required to make.

9    Q.   So how does lighting in the cell factor into their

10   medical and mental health staff ability to meet detainees'

11   needs?

12   A.   Well, for the nursing staff, I mean, while they're doing

13   various other functions, like medication pass as indicated

14   yesterday, they're also observing detainees, particularly

15   those who might have abused particular medication just to get

16   a sense of what their medical status is, to the extent they're

17   being affected by medication refusal.  During mental health

18   rounds, they're looking at things like the conditions of the

19   cell and trying to observe the behavior of a detainee to see

20   if their mental health status has deteriorated, so the more

21   contact they can have with them the better.  As they can't

22   adequately see into the cell, it's difficult for them to make

23   that type of assessment.

24   Q.   Now, you've talked about the ability or the difficulty

25   that staff may have in reaching detainees.  Are there

1  detainees that refuse to be seen after outreach from staff?

2  A.   Yes.

3  Q.   And how are staff able to respond to that?

4  A.   They keep trying.  They keep trying to meet with them,

5  keep trying to perform an assessment.  More recently,

6  particularly since the psychiatric nurse clinician position is

7  now full time instead of half time, they made some attempts to

8  have some of these more resistant and difficult detainees

9  brought down to medical.  And it's a big deal because they

10  have to be escorted and the shortage of staff, of course, has

11  been difficult, but they have been able to demonstrate by

12  doing that that bringing these detainees to a different

13  setting where they can sit down with them and try to perform

14  their assessment has been much more successful than trying to

15  approach them at the door.

16  Q.   So it's possible to do more complete assessments when

17  they're done in the medical unit; is this fair -- do security

18  staff consistently support mental health staff by bringing

19  folks down to the medical unit for assessments like that?

20  A.   Well, that's the problem.  With the shortage of security

21  staff, it's just extremely difficult for them to do that

22  particularly with the more difficult and acutely ill mental

23  health detainee.

24  Q.   Do you have an opinion about the effects on detainees of

25  delaying access to medical care?  I'll turn to mental health

1    care in a moment, but let's first focus on mental health care.

2    A.   It really depends on what's going on.  I mean, I have

3    reviewed charts, for example, where someone was injured and

4    required ongoing wound care that they then refuse to do it so

5    of course, that places them at risk of complications of the

6    healing of that wound, possible infections of that wound, so

7    that's the kind of thing that can happen when a detainee

8    refuses follow-up medical care.

9    Q.   Okay.  And is that also a situation where if the person

10   were able to be cared for outside the cell that might have an

11   impact on their refusal?

12   A.   It's a combination of issues.  It's in part that.  It's

13   in part, you know, one of the processes of getting them to

14   medical, so it's a combination issue.

15   Q.   Could you talk about the effect on detainees of delaying

16   access to mental health assessments or therapy in particular

17   based on lack of correctional staffing?

18   A.   Well, you know, what we're seeing in individuals with

19   serious mental illnesses, their illness is in the acute stage,

20   meaning that they're actively symptomatic and with delusions

21   or hallucinations and so that -- until they receive treatment

22   they continue to be symptomatic and in some cases acting or

23   responding to those symptoms of the mental illness which can

24   result in them having behavioral difficulties while detained.

25   Q.   Now, if someone's mental health status is acutely

1   deteriorated, does it make a difference when mental health

2   staff is able to see them in terms of that particular state

3   versus later?

4   A.   In terms of what?

5   Q.   In terms of, say, now versus several hours or the next

6   day?

7   A.   Well, the more quickly they can see them, then the

8   better.

9   Q.   And would a delay affect their ability to make an

10  accurate assessment?

11       MR. SHELSON:  Your Honor --

12  A.   Well, you're only better able to make --

13       THE COURT:  Dr. Dudley, before answering, I'm sorry,

14  you don't see it, but there's an objection.  Hold on for one

15  second.

16       MR. SHELSON:  Your Honor, I've not been objecting

17  because of the remote difficulties and so on and trying to be

18  reasonable here.  But we would respectfully request less

19  leading questions, and so I object to leading.

20       THE COURT:  Okay.  Please make sure you don't lead the

21  witness.  All right?

22  BY MS. STEEGE:

23  Q.   Dr. Dudley, would the likelihood of a delay in care be

24  different with the mental health unit?

25  A.   Yes.

1  Q.   How so?

2  A.   The -- with the mental health unit would -- the program

3  design at the mental health unit is one that allows ongoing

4  daily contact with each of the detainees that are housed

5  there, and so there's a -- there's a higher level of

6  management and a more intensive level of care that would be

7  offered on that unit.

8  Q.   And would there be a difference in particular for

9  detainees who are currently in segregation?

10  A.   Yes, when reviewed at various different times which

11  detainees would be a priority when transferred to the mental

12  health unit once it becomes available, the detainees with

13  serious mental illness who are now in segregation or isolation

14  at the top of the list.

15  Q.   I'm hearing a sound in the background there.  I'm not

16  sure if that's --

17  A.   I'm hearing that, too.  It just stopped.

18  Q.   All right.  I just want to make sure it's -- other folks

19  can hear, including the court reporter.

20       All right.  Well, you described the impact on treatment

21  on the housing units due to insufficient security staff, and

22  I'd like to briefly turn to the care provided in the medical

23  unit itself.  When mental health and medical staff are

24  providing care there in the unit, is it important for security

25  staff to be present?

1   A.   Yes.

2   Q.   Why is that?

3   A.   Well, it's important for the safety and security of the

4   inmate being treated there.  There are detainees who may be in

5   the medical unit at the same time and also the safety and

6   security of the medical and mental health staff.

7   Q.   Okay.  Did you hear testimony yesterday about a new

8   health care management policy that was approved?

9   A.   Yes.

10  Q.   I'd like to pull up what's been marked as Defendants'

11  Exhibit 77.  Is this that health care management policy?

12  A.   Yes.

13          MS. STEEGE:  I'd like to move for mission of

14  Defendants' 77.

15          THE COURT:  Any objection from the defendant?

16          MR. SHELSON:  No, sir.

17          THE COURT:  All right.  Thank you.  D-77 will be

18  received in evidence.

19              (Defendants' Exhibit 77 entered.)

20  BY MS. STEEGE:

21  Q.   Let's turn to page 4, and let's look at 13101, paragraph

22  21, which requires that detention officers are assigned to and

23  remain in the clinic and the medical units when inmates are

24  present according to the staffing plan.  Have you found in

25  monitoring that there are security staff that are consistently

1  assigned to and remain in the clinic and medical units?

2  A.   Not consistently.

3  Q.   How often are security staff, in fact, available for the

4  medical unit?

5  A.   How often?

6  Q.   Yes.

7  A.   As I indicated, during the prior monitoring period, I

8  tried to get a more concrete sense of that by asking the

9  medical and mental health staff to -- to keep track of it

10  specifically, and the finding was in the evenings and on the

11  weekends, there were often no security staff available in the

12  medical unit and that during the day Monday through Friday,

13  there was also something that would happen, you know, a couple

14  times a week for periods of time.

15  Q.   Are there functioning cameras in the medical unit that

16  would display what's happening there to control room staff?

17  A.   The cameras -- most of the cameras in the medical unit

18  have not functioned.

19  Q.   Is it important to have functioning cameras in the

20  medical unit?

21  A.   Yes, that would be the case even if it was adequately

22  staff by security staff.

23  Q.   And why is that?

24  A.   The way that the medical unit is laid out, you know, even

25  if there were two officers, they can't be in every corner of

1   the medical unit, and so that the cameras would be an

2   additional way of keeping track of what's going on in the

3   unit.

4   Q.   How long have the cameras in the medical unit been

5   broken?

6   A.   I don't know that they've been broken since I've been on

7   the monitoring team.

8   Q.   Which was beginning of 2018?

9   A.   Yes.

10  Q.   Have you brought this problem to the jail's attention?

11  A.   Yes.

12  Q.   And when was that?

13  A.   I don't remember exactly, but its definitely been about

14  two or three years.

15  Q.   Okay.  When security staff aren't available to be in the

16  medical unit, does that affect detainees' access to care?

17  A.   Yes.

18  Q.   How so?

19  A.   Well, if there are no security staff there, then

20  detainees can't be brought down to medical, and so that

21  medical and mental health assessments don't happen at all.  In

22  a less serious situation so that there's only one officer

23  who's in medical that there's difficulties in the unit, that

24  officer might have to leave medical to go pick up detainees

25  from the unit to bring them down to medical.  So that means

1  that they can't do anything while that officer is gone, and so

2  that it would still be delaying and understaffing the schedule

3  in medical and mental health.  So it could range from them

4  unable to see people at all to delays for the need to cancel

5  and reset.

6  Q.  Okay.  And I believe you spoke yesterday about an

7  infirmary as part of the medical unit also known as medical

8  observation.  Why would someone be placed under medical

9  observation?

10  A.  Because they need a heightened level of nursing care and

11  monitoring.

12  Q.  Can you give an example of what kind of situation that

13  might be?

14  A.  It might be a person who was injured at the facility,

15  sent to the hospital.  Upon return from the hospital, they're

16  saying that it looks like the person might have had some sort

17  of concussion or something, so the hospital is requesting that

18  the person be observed for a period of time to see whether

19  there will be any complications.  And so they may keep that

20  person in medical observation, so that the nursing staff are

21  able to have some access to them and observe them for a

22  designated period of time.

23  Q.  So you said that part of the idea of medical observation

24  is for nursing staff to have access to the person.  What

25  happens if there's no correctional staff in the medical unit

```
 1   at a time when nursing staff wants to go in and see that
 2   person?
 3   A.   Then they're unable to do that.
 4   Q.   Okay.
 5   A.   They, the nurses, I mean.
 6   Q.   Does the current level of correctional support that's
 7   available for medical and mental health staff enable those
 8   staff to meet detainees' basic needs?
 9   A.   Not consistently.
10   Q.   And have you made recommendations about whether there's
11   sufficient correctional staffing available to support medical
12   and mental health work?
13   A.   Well, what I --
14          MR. SHELSON:  Objection, Your Honor.
15          THE COURT:  Wait, wait, wait.  There's an objection.
16          MR. SHELSON:  Yes, sir.  Cumulative.  This has been
17   asked multiple times.
18          MS. STEEGE:  I believe we've addressed the staffing
19   issues but not his recommendations.
20          THE COURT:  You may repeat the question.
21   BY MS. STEEGE:
22   Q.   Have you made recommendations about whether there's
23   sufficient correctional staffing available to support medical
24   and mental health work?
25   A.   As I said repeatedly before, that is the case.
```

1  Q.   What have you recommended?

2  A.   Well, the way the team is structured, I mean, I've

3  recommended that, you know, recognizing the shortage that

4  security support, the delivery of medical and mental health

5  services continue to be among the highest (AUDIO GAP).

6  Q.   And does the lack of adequate correctional staffing for

7  this purpose create a substantial risk of serious harm to

8  detainees?

9  A.   Yes.

10  Q.   Why is that?

11  A.   Certainly those with more serious medical and mental

12  health difficulties, leaving them untreated causes, you know,

13  pain and suffering for those individuals and for those with

14  serious mental health difficulty cases that are at risk of

15  other confrontations and behavioral difficulties while

16  detained.

17  Q.   Okay.  I'd like to ask a few questions now moving on from

18  staffing about the use of segregation.  Have you visited

19  segregation cells at the jail?

20  A.   Yes, I have.

21  Q.   How many times have you done that?

22  A.   I've done that during each of the visits while I was

23  doing on-site visits.

24  Q.   And have you reviewed records of Hinds County detainees

25  with serious mental illness who are in segregation?

1   A.   Yes.

2   Q.   What kinds of records?

3   A.   I reviewed their medical records.

4   Q.   Okay.  Would those records include notes taken by mental

5   health staff?

6   A.   Those records include notes taken by mental health staff,

7   notes taken by medical staff, the assessments that might have

8   been done or attempts to perform assessments.  They've been

9   prescribed medication that would include the assessments that

10  were done by their prescriber and provides a record about

11  whether they actually took the medication or not.  So it

12  includes all of that.

13  Q.   And I believe you noted yesterday that interdisciplinary

14  team meetings or IDTs have resumed.  Do those produce

15  documentation as well?

16  A.   The IDT meetings, as I indicated yesterday, have included

17  a review of -- they've incorporated into the IDT meetings what

18  would be called segregation review at various different

19  facilities where the security staff of the medical and mental

20  health staff have an opportunity to review each person held in

21  segregation.

22  Q.   Okay.  Do you have an opinion about whether being in

23  segregation has had an impact on these detainees' mental

24  health status?

25  A.   For some of them the -- the acutely ill, particularly

1  those who are acutely psychotic, there's really nothing to --

2  when you're held in segregation like that, there's nothing to

3  distract them from the delusional thinking or voices that they

4  may be hearing in contrast to what would be the plan if they

5  were in therapeutic housing where they could be pulled out on

6  a daily basis and otherwise engaged, and so that you have kind

7  of a spiraling-down effect when you're isolated like that and

8  simply living with those delusional thoughts.

9  Q.   Okay.  How do people with serious mental illness come to

10  be in segregation in the Hinds County Jail?

11  A.   For the most part it's a matter of either one of two

12  things.  One is that behavior is such that they can't be

13  managed on the general population unit, or they're perceived

14  as vulnerable, particularly vulnerable to victimization in the

15  general population.

16  Q.   If someone with serious mental illness does something

17  that gives rise to a disciplinary charge, does Hinds County

18  have a policy that factors in their illness in determining

19  consequences?

20  A.   Effective policy has not been developed and formalized.

21  Q.   Are mental health staff consulted before someone who's on

22  the mental health caseload is put in segregation?

23  A.   Not to my knowledge.

24  Q.   Would that kind of consultation be important?

25  A.   I'm sorry.  Repeat that.

1  Q.   Is it important for mental health staff to be consulted

2  before someone on the mental health caseload is put in

3  segregation?

4  A.   Yes.

5  Q.   Why is that?

6  A.   Well, there's several issues.  One is to be clear that in

7  a disciplinary review the person is able, competent to

8  represent themselves in such a setting.  The second question

9  is whether the behavior for which they have been charged is

10 actually a product of their mental illness or not so that

11 should be a consideration during disciplinary review.  And

12 then the third question is, are there medical or mental health

13 implications related to the various different sorts of actions

14 that could be taken following disciplinary review.

15      In other words, for example, is placement in segregation

16 is something that can be particularly harmful to this inmate?

17 Is changing the approach to treatment a more appropriate

18 intervention?  Is there some sort of less than segregation,

19 you know, some sort of restrictions, taking away privileges

20 combined with treatment that might be a more appropriate

21 intervention?  So it's an opportunity to talk about, in light

22 of those things, their mental health status, what might be the

23 most useful and appropriate intervention.

24 Q.   Does Hinds County avoid using segregation unnecessarily

25 for people with serious mental illness?

```
 1   A.   Could you repeat the question, please?

 2   Q.   Does Hinds County avoid the unnecessary use of

 3   segregation for people with serious mental illness?

 4        MR. SHELSON:  Objection.

 5        THE COURT:  Hold on for a second before you answer

 6   that, Dr. Dudley.

 7        MR. SHELSON:  Your Honor, I thought you were --

 8   objection, Your Honor.  No predicate's been laid for

 9   "unnecessary."

10        THE COURT:  Objection's going to be overruled.

11   BY MS. STEEGE:

12   Q.   Dr. Dudley, does Hinds County avoid the unnecessary use

13   of segregation for people with serious mental illness?

14   A.   I mean, there are people with serious mental illness that

15   we know are in segregation and that is not the appropriate

16   housing for them.  The -- at present there's no alternative

17   appropriate housing.

18   Q.   What would that alternative be?

19   A.   The therapeutic housing.

20   Q.   And we'll talk about that a bit more later.  For right

21   now let's focus on the January 2022 site visit.  Did you come

22   across any detainees with serious mental illness in

23   segregation?

24   A.   Yes.

25   Q.   And did you review records for people with serious mental
```

1    illness who were there in segregation because they weren't

2    able to be in the general population?

3    A.   Yes.

4    Q.   You talked about the difficulty of engaging people with

5    serious mental illness in treatment.  Does that finding apply

6    to people with serious mental illness in segregation as well?

7    A.   Yes.

8    Q.   How so?

9    A.   The -- as I said before, I mean, the -- the difficulty of

10   being able to meet with them in a setting where they're more

11   likely to be engaged is -- makes it more difficult.

12   Q.   Separate from difficulty of engaging people in mental

13   health treatment, are there other types of harm that you've

14   observed in people who are held in segregation?

15   A.   For those who are most acutely ill, they really need to

16   be in a setting where they're seen on a daily basis, and

17   that's difficult, if not impossible, to do under those

18   conditions.

19   Q.   Have you come across detainees in segregation who were

20   having physical health difficulties?

21   A.   Yes.

22   Q.   Could you give an example?

23   A.   You know, there are individuals who are promised medical

24   care that don't have access to it.  And then in this last

25   visit, there was also one who was injured.

```
 1   Q.   I'm sorry.  I missed the last sentence there.
 2   A.   I said in the last site visit, there was also one who was
 3   injured.
 4   Q.   On this last site visit, there was a detainee who was
 5   injured in segregation?
 6   A.   Yes.
 7   Q.   Let's go back.  What kind of injury was that?
 8   A.   An injury, he had several cuts and bruises around his
 9   head and face, his eye.
10   Q.   Was he able to receive care at Hinds County, or did he
11   have to get sent to the hospital?
12   A.   The nurse came back from medical, and he was seen then
13   and sent to the hospital.
14   Q.   Okay.  Did the medical staff make any findings as to how
15   those injuries might have occurred?
16   A.   When he was seen in the -- he was seen by the nursing
17   staff in medical.  And he was on the mental health caseload,
18   so he was also seen by the mental health staff in medical, who
19   he knew, and he reported to them that he had been assaulted.
20   Q.   I missed the last word there.
21   A.   He reported to the mental health staff that he had been
22   assaulted.
23   Q.   I'm sorry.  One more time.
24   A.   He reported to the mental health staff that he had been
25   assaulted.
```

1   Q.   Okay.  If he's in segregation, is he supposed to be

2   locked up by himself?

3   A.   Yes.

4   Q.   Okay.  Now, did any other issues arise for this

5   individual in terms of the care that he was receiving in

6   segregation?

7   A.   Did any -- could you repeat that, please?

8   Q.   Did any other issues arise for this individual in terms

9   of the access to care that he had while in segregation?

10  A.   The -- when he returned from the hospital, he was held in

11  medical observation for a bit and then returned to

12  segregation, and I mean, at which point he then refused later

13  medical care.

14  Q.   What kind of mental health treatment had he received

15  while he was in segregation prior to this injury?

16  A.   He had been prescribed medication which he was not

17  totally compliant with.

18  Q.   Had mental health staff tried to see him to encourage

19  compliance?

20  A.   Yes.

21  Q.   Could you speak more about that?

22  A.   Well, they -- I mean, they check to see about compliance

23  whenever they're meeting with them, and not just the

24  prescriber but the other mental health clinicians also try to

25  encourage those who are prescribed medication to continue to

1    take them.  So it becomes -- you know, when they know the

2    person is not taking the medication, it becomes a discussion

3    about what they're seeing.  I think the point I've been trying

4    to make is in the -- with adequate staffing and a therapeutic

5    unit, that effort could be much more consistent and

6    aggressive.

7    Q.   Okay.  I believe yesterday you talked about segregation

8    rounds as one thing the mental health staff do.

9    A.   Yes.

10   Q.   Would you consider segregation, those weekly segregation

11   rounds to be mental health treatment?

12   A.   No.

13   Q.   Why not?

14   A.   These are -- these rounds, they check in on individuals

15   in segregation.  Like I said, they have to do this for

16   everybody who is in segregation, not just individuals on the

17   mental health caseload, and so it's a quick assessment of

18   their mental status to see whether that might have changed in

19   any sort of way.  And that quick check includes not only

20   talking to them but looking at the conditions of their cell,

21   things like that, that might be indicators of a deterioration

22   in mental status, and they're also checking to see whether

23   there's any suicidality, whether they may be requesting

24   additional mental health treatment or need anything.  So it's

25   not a therapeutic intervention.  It's really more of a

1    monitoring check.

2    Q.   Now, focusing on the individual we've been discussing, I

3    believe you noted there was difficulty engaging him with

4    medication.  Do you recall when or roughly how long he had

5    been in segregation leading up to this January injury?

6    A.   I can't remember.

7    Q.   Okay.  By the time he incurred these injuries in January,

8    could you describe his mental health status?

9    A.   His mental health status was variable.  There were

10   periods of time where he would take medication and there were

11   periods of time when he didn't, and when he wasn't taking it,

12   his mental health status was much more deteriorated.  He'd be

13   acutely psychotic.

14   Q.   Okay.  Was this individual able to consistently get meals

15   while on segregation?

16   A.   That was part of them doing the rounds.  I think both the

17   nursing staff and the mental health staff have been concerned

18   about that with him and some of the other individuals in

19   segregation, that they weren't consistently getting full

20   meals.

21   Q.   Has that issue with detainees in segregation not

22   receiving full meals been raised beyond medical and mental

23   health staff discussions with you?

24   A.   Yes.

25   Q.   What form and how so?

1    A.   Well, the -- by then the interdisciplinary team meetings

2    had been restarted, and so they brought their concern to the

3    interdisciplinary team meetings.

4    Q.   Okay.  Was that issue in terms of access to food in

5    segregation fixed when it was first raised in IDT meetings?

6    A.   Not when it was first raised, but it was eventually

7    addressed.

8    Q.   Have medical and mental health staff raised issues at IDT

9    meetings about adequate hygiene for detainees in segregation?

10   A.   Yes.

11   Q.   And were those issues resolved after staff raised them in

12   IDT meetings?

13   A.   I believe it's the same thing, that eventually those

14   issues were responded to.

15   Q.   I'm sorry.  What?

16   A.   Eventually those issues were responded to.

17   Q.   I'd like to ask some more general questions about the

18   services available in segregation.  You've talked about the

19   weekly visits.  Do -- well, weekly segregation rounds.  Do

20   detainees in segregation currently have access to therapeutic

21   sessions with a mental health provider?

22   A.   The mental health staff attempt to see individuals who

23   are being held in segregation, but as I said, I mean, it's

24   difficult to engage and work with people under those

25   conditions and so then the services they're able to provide

1   are minimum and/or the individual just refuses.

2   Q.   Does access to security staffing also affect the level of

3   mental health services that detainees in segregation receive?

4   A.   In part because the -- you know -- get- -- taking these

5   detainees out of their cells and bringing them down to medical

6   is extremely difficult to do, so that that doesn't happen as

7   an alternative.  And seeing individuals at the door, as you

8   saw in the reports, is difficult because they can't -- it's

9   difficult to establish a sufficient sense of privacy to try to

10  engage someone in a therapeutic session.

11  Q.   I want to take a quick step back.  There were two issues

12  that you mentioned had been raised in interdisciplinary team

13  meetings, one, the issue of inadequate food; and, two,

14  inadequate access to hygiene support.  Was there a delay in

15  between when those issues were first raised at IDT meetings

16  and when there were steps taken to address them?

17  A.   Yes.

18  Q.   Could you estimate how long that took?

19  A.   It took several weeks because it kept coming up in the

20  minutes of IDT meetings for several weeks.

21  Q.   And could you give an estimate as to when there were

22  steps taken to resolve those issues?

23  A.   I would say that it was relatively recent.  You know,

24  December, January.

25  Q.   Was that after the contempt proceedings began in this

1   case?

2   A.   Yes.

3   Q.   I'd like to return to the general level of mental health

4   services in segregation.  Is the current level of mental

5   health services there enough to meet the serious mental health

6   needs of detainees held in segregation?

7   A.   No.

8   Q.   Why is that?

9   A.   As I indicated, these are people who are acutely ill and,

10  I mean, on the outside they would need to be placed in the

11  hospital so these -- they moved to have a setting where you

12  can constantly engage them in some sort of meaningful way to

13  get them to the point where they can thrive with treatment.

14  For those who do take medication from time to time, they

15  really should follow them so that that compliance with

16  medication is sustained long enough for it to have a

17  therapeutic effect on them.  So they need to get their

18  symptoms under control, and once you get their symptoms under

19  control, then you can begin to work with them to sustain that.

20  So it's -- they need a setting where you can work with them on

21  a daily basis until you get to that point.

22  Q.   Okay.  And do your findings on this relate to a

23  substantial risk of serious harm for detainees?

24  A.   What's happening, in the absence of that, there's no --

25  there's no movement, no resolution of their mental health

1   difficulties.

2   Q.   And how -- is there a risk of serious harm when people's

3   mental health difficulties are unresolved?

4   A.   Yes, and maybe I've not been clear.  When you are

5   experiencing these psychotic symptoms, you believe that that

6   is real, and people will act on that accordingly.  So that if

7   you're paranoid and you're afraid that people are after you,

8   you not only have the destructive personal distress associated

9   with a belief, a thought that you might act on them, manifests

10   itself in behavioral difficulty within the facility.

11   Q.   Okay.  Let's --

12   A.   And in the process of that, they're at risk of harm and

13   those around them are at risk.

14   Q.   I'm sorry.  I missed the last sentence there.

15   A.   I said because they might act out on those beliefs, those

16   delusional beliefs, they're at risk of harm and people around

17   them are at risk of harm.

18   Q.   Okay.  Let's turn to the use of booking.  Have you

19   reviewed records of Hinds County detainees who are housed in

20   booking for more than eight hours?

21   A.   Yes.

22   Q.   What records have you reviewed?

23   A.   The medical records.

24   Q.   Is that similar medical records that you described for

25   folks in segregation?

1   A.   Yes.

2   Q.   When people with serious mental illness are in booking,

3   does that afford adequate monitoring by security staff?

4   A.   I think that's a better -- that's a question better asked

5   of Mr. Parrish.

6   Q.   What harm can result from housing people in booking?

7   A.   It's quite similar to being housed in segregation, as

8   almost like an alternative unit in that sense -- at least from

9   an access to mental health treatment and medical treatment

10  point of view.

11  Q.   Have you made recommendations about Hinds County's

12  practice of housing detainees with mental illness in booking

13  and in segregation?

14  A.   I indicated that neither is an appropriate placement for

15  people with serious mental illness, particularly those who are

16  acutely ill, and that the opening of the therapeutic housing

17  unit would be the more appropriate placement for them.

18  Q.   When did you first make those recommendations?

19  A.   I believe that's in the recommendations since I've been

20  there.

21  Q.   I'd like to turn to some of the deaths that occurred in

22  the jail in 2021.  Have you reviewed records for people who

23  died while at the jail?

24  A.   Yes.

25  Q.   And have you spoken with Hinds County staff about what

1   happened at the jail before those deaths?

2   A.   In some cases, yes.

3   Q.   Okay.  I'd like to start with the person who committed

4   suicide on April 18, 2021.

5        MS. STEEGE:  And, Your Honor, I'd like to -- unlike

6   other detainees, I'd like to use his name because we've

7   already heard from his mother if that's all right?

8        THE COURT:  That would be permissible.  The April 21st

9   suicide of the --

10       MS. STEEGE:  Yes.  April 18, 2021.

11       THE COURT:  Ms. Mosley's son; right?  Okay.  You can

12  use his name.

13       MS. STEEGE:  Thank you.

14  BY MS. STEEGE:

15  Q.   Dr. Dudley, did you review Justin Mosley's records?

16  A.   Yes, I did.

17  Q.   What records did you review?

18  A.   I reviewed his medical records and everything that was

19  included in his medical records, and I also interviewed staff.

20  Q.   Okay.  Did you look at any incident reports for him?

21  A.   I have seen incident reports with him as well.

22  Q.   And did you review any forms regarding whether he was

23  taking medication?

24  A.   Well, that's in his medical records.

25  Q.   Okay.  Had he been diagnosed with a mental illness?

1   A.   I'm sorry, could you repeat that?

2   Q.   Had he been diagnosed with a serious mental illness?

3   A.   Yes.

4   Q.   And what was that diagnosis?

5   A.   He was diagnosed with early-onset bipolar disorder with

6   psychotic features.

7   Q.   What symptoms would you expect from that diagnosis?

8   A.   Well, bipolar disorder usually manifests itself in late

9   20s to early 30s.  Early-onset bipolar disorder manifests

10   itself as a -- it's a less frequently occurring onset.  It

11   manifests itself during adolescence, so you can see the mood

12   swings that you see in bipolar disorder with episodes of

13   depression and episodes of mania.  But often in those

14   early-onset forms, the swings are what we call rapid where

15   they can have swings in moods on a daily or every couple of

16   week basis as opposed to the more sustained periods of mood

17   disturbance that you see in the population who manifest its

18   illness when they're older.

19        The other thing is that for a developing adolescent,

20   these mood swings are very disruptive, and they don't

21   understand what's happening to them.  And given that it's an

22   important developmental period, you also tend to see other

23   developmental difficulties associated with this, so the person

24   may end up appearing to be very immature and childish because

25   of those developmental difficulties that occurred after the

1   adolescent years.

2   Q.   So how would you -- well, would you expect those symptoms

3   to affect his behavior in the jail?

4   A.   Well, you would expect both -- both the immaturity that's

5   associated with the disorder to affect his behavior in the

6   jail, and then when he's exhibiting either symptoms of mania

7   or he's hyper-elated and more irritable and he is -- his

8   judgment is impaired because of the mania, and he may be

9   grandiose and acting out in a variety of ways.

10       When he's on the depressed end, he could be suicidal,

11   hopeless, desperate, so that the depressive symptoms or the

12   manic symptoms or the immaturity, all of which sets him up to

13   have different sorts of behavioral difficulties while

14   detained.

15   Q.   And did you see those behavioral difficulties manifested

16   in the jail records that you reviewed like incident reports?

17   A.   Yes.

18   Q.   Would those symptoms affect how security staff should

19   work with him in the jail?

20   A.   Yes.

21   Q.   How so?

22   A.   Well, ideally this is a -- he would be a candidate for

23   the therapeutic unit where you have security staff who, as

24   already has been discussed, are interested in and trained to

25   work with a population of people with serious mental illness.

1  They would appreciate the extent to which his symptoms are a

2  result of his mental illness, and they would be working with

3  mental health staff to support his treatment as opposed to

4  feeling that the most effective intervention is to punish him.

5  Q.   In looking at records, did you see indications that

6  security staff recognized his mental health needs?

7  A.   No.

8  Q.   What did you find regarding how security responded to his

9  mental health needs?

10  A.   He -- I mean, it would appear as though he needed to be

11  controlled and punished.

12  Q.   Okay.  What did you find regarding the mental health

13  treatment that he received?

14  A.   The -- I found that initially the -- the bipolar nature

15  of his illness was not initially recognized, but then

16  eventually it was.  It was difficult to get him to

17  consistently comply with medication.  The -- they attempted to

18  see him -- when I say "they," the mental health staff as well

19  as the prescriber attempted to see him more frequently which

20  he clearly needed, and so that they were attempting to

21  increase their efforts with him.

22  Q.   You said there was difficulty with ensuring he was taking

23  his medication consistently.  Why is that important for

24  someone with his diagnosis?

25  A.   Well, you can't medicate away the immaturity.  But you

1  can control the manic symptoms and you can control the

2  depressive symptoms, and those are the symptoms that are most

3  likely to result in harm.

4  Q.   Did Mr. Mosley have access to education about the

5  importance of taking medication?

6  A.   To the extent that -- I would say no to that, although he

7  was repeatedly encouraged to take his medication.

8  Q.   Okay.  In your opinion, did he need more mental health

9  treatment than he received?

10  A.   Yes.

11  Q.   How so?

12  A.   The -- as I indicated, this is a person who would be

13  ideal for a therapeutic unit.  With the kind of rapid swings

14  in his mood, being able to see him -- have eyes on him on a

15  daily basis would certainly have been preferable.  Being able

16  to engage him on a daily basis, allow his medication

17  compliance would have been preferable, and a combination of a

18  more aggressive approach to treatment coupled with closer

19  monitoring would have been preferable.

20  Q.   Let's focus on early 2021.  What did you conclude about

21  the development of his mental illness at that time?

22  A.   The -- I think that by then it was clear that, you know,

23  he had these more serious mental health difficulties, and over

24  the early months, the mental health staff were trying to see

25  him more frequently.

1  Q.  Okay.  Did you see evidence he was under any particular

2  psychosocial stressors at the time?

3  A.  Yes.  The notes and the -- the treatment notes and during

4  my interview with mental health staff, you know, they had had

5  contact with him when he was previously incarcerated, and they

6  noticed a distinct increase in the level of his distress

7  during this particular incarceration.  And in the past he was

8  not there for a long, long time, not facing very serious

9  difficulty, and this time it was much more serious and led to

10  the possibility of a more extended incarceration.  And so that

11  he may have felt, and the notes reflect and the interviews

12  reflect, that he was much more stressed out than he had been

13  in the past.

14  Q.  Okay.  And did you observe change in his symptoms as well

15  in terms of bipolar, more manic tendencies?

16  A.  Well, I mean, it's an episodic illness, and so, you know,

17  in the early spring, you know, he began to evidence symptoms

18  of bipolar symptoms.

19  Q.  And how is he doing in terms of medication compliance at

20  that time?

21  A.  He was still inconsistent.

22  Q.  Okay.  I'd like to bring up what's been marked as PX-44.

23  Have you reviewed a lot of chart notes for people in the Hinds

24  County Jail?

25  A.  Yes, I have.

1   Q.   Do you recognize this one?  Maybe we'll zoom in a little

2   bit.

3   A.   Do I recognize the chart note or what he was actually --

4   Q.   Yeah.

5   A.   Yes.

6   Q.   Looking at the URL on the bottom left corner,

7   hinds.coremr.kalio.net, does that indicate to you that it came

8   from the Hinds County medical contractor?

9   A.   Yes.

10  Q.   Did you also review this record in its regular format

11  while accessing the EMR system itself?

12  A.   Yes.

13  Q.   Let's look at the columns there on the right.  Do those

14  names in the column third from the right indicate the name of

15  the medical or mental health staff person who recorded that

16  chart note?

17  A.   Yes.

18  Q.   And on the far left, does that far left column indicate

19  the date and time that that note was entered?

20  A.   Yes.

21  Q.   Okay.  Now, was this part of the medical and mental

22  health record file that you reviewed for Mr. Mosley?

23  A.   Yes.

24       MS. STEEGE:  I'd like to move PX-44 into evidence.

25       THE COURT:  Any objection from Hinds County?

1          MR. SHELSON:  No, sir.

2          THE COURT:  All right.  P-44 will be received into

3    evidence.

4               (Plaintiff's Exhibit 44 entered.)

5    BY MS. STEEGE:

6    Q.   Okay.  Let's look at the records for January 11, 2021,

7    and January 13, 2021, and for expediency I'll just read these

8    out.  On January 11th it says, "Due to security, unable to

9    give meds and do seg rounds check as normal."  On January 13th

10   it says, "No able to see this individual today.  He has been

11   placed on lockdown because of his recent aggressive behavior."

12          What do these notes indicate to you about the

13   availability of security staff to support mental health staff?

14   A.   They indicate two things.  One is that it's just an

15   example of the fact that there's not more security staff

16   available for medical and mental health staff to be able to

17   see an individual.  And the second note also was an example of

18   a less than adequate working relationship between security and

19   mental health staff and to kind of be on the same page

20   recognizing that this is somebody who needs more mental health

21   services than -- and security observation as opposed to less.

22   Q.   Okay.  Let's pull up PX-44 again, and I'd like to look at

23   the chart notes for February 16, 2021.  I realize there's two

24   entries there.  Just for expediency again, I'm going to read

25   them out here.

1         At 1:57 p.m. on February 16th, it says, "Individual was

2    brought to medical by officers with acting out behavior.  He

3    was yelling and screaming, 'I'm going to kill you.'  The

4    officers tried to get him to calm down.  After a few minutes,

5    mental health was called to come to the male side of medical

6    by Nurse Davis.  She asked this writer to call Dr. Bell to get

7    an order for something to help calm this individual down.  AW

8    Crane, Dr. Bell gave a verbal order for medication."

9         And then at 2:36 p.m., it says, "Inmate in medical,

10   yelling, cussing, and threatening.  Dr. Bell notified.  Orders

11   given for Haldol, dosage information.  Orders noted and

12   carried out per writer."

13        Would you describe someone with this -- with those

14   indications as being in crisis?

15   A.   Yes.

16   Q.   What do you think about this as a response to someone in

17   crisis?

18   A.   This meaning the -- the emergency medication?

19   Q.   Yes.

20   A.   I think the emergency use of medication was appropriate.

21   Q.   Okay.  Let's sort of zoom out a bit to see some of the

22   time after February 16th.

23   A.   I'm sorry.

24   Q.   I'm asking for assistance here to -- if we can zoom out

25   and see some of the time period after February 16th.  I'm

1   sorry, staying on that first page.  I'm just looking at the

2   week or two after February 16th.

3        What kind of follow up would you expect after a crisis

4   like this?

5   A.   I would expect him to be seen at least, you know, the

6   next day and the next week probably.

7   Q.   Do you see that kind of response for Mr. Mosley?

8   A.   Pardon?

9   Q.   Do you see that kind of immediate follow-up for

10  Mr. Mosley?

11  A.   Well, it appears that mental health attempted to see him.

12  Q.   Okay.  Yeah.  I think on 2/18 it says, "Not able to see

13  this individual today.  No security available."

14  A.   Correct.

15  Q.   Let's fast-forward to the chart note for April 16, 2021,

16  which I believe is on the next page, and I'll again just read

17  that.

18       On April 16th, "Spoke to individual through the door.  No

19  security officer was available.  Individual stated it was all

20  good.  He wanted to see the nurse about a spider bite and was

21  informed to let them know when they came down to pass out

22  meds" --

23       THE COURT:  Slow down if you're going to read.  Slow

24  down.

25  BY MS. STEEGE:

1    Q.   "He stated he was ready to come off the tank because he

2    would be going home soon.  He stated the judge finally decided

3    to give him a bond.  Therapist will reschedule to see client

4    on Monday."

5         MS. STEEGE:  You can take it down.  Thank you.

6    BY MS. STEEGE:

7    Q.   Do you have an opinion about the ability of the mental

8    health staff to monitor and respond to someone in this

9    situation?

10   A.   The --

11        THE COURT:  Hold on.  Before you answer, we may have an

12   objection.

13        MR. SHELSON:  Your Honor, we'd just like to renew our

14   objection to the admission of expert testimony for the reasons

15   stated in our motion to strike -- it's ECF-134 -- and we ask

16   for a standing objection to opinion testimony.

17        THE COURT:  All right.  You do have a standing

18   objection to this testimony --

19        MR. SHELSON:  Yes, sir.

20        THE COURT:  -- of this particular expert, and it will

21   be applicable to any other expert who may testify.  I think

22   the only one left who has not testified are Ms. Simpson and

23   Mr. Moeser -- or Dr. Moeser.  But, yes, that objection --

24   those objections, you've renewed it, and it applies.  And it

25   is overruled, Mr. Shelson.

```
 1              MR. SHELSON:  Thank you.
 2              THE COURT:  You may proceed.  I'm sorry.
 3    BY MS. STEEGE:
 4    Q.   Dr. Dudley, do you have an opinion about the ability of
 5    the Hinds County mental health staff to respond and monitor to
 6    someone in this situation?
 7    A.   I'm not entirely sure what you're asking me.
 8    Q.   Let's bring those chart notes back up.  Can we look at
 9    PX-44, second page, and let's focus on April 16th and
10    April 18th entries.  We just looked at the April 16th entry
11    where the mental health note indicates that they spoke to him
12    through the door.  "No security officer was available.
13    Therapist will reschedule to see client on Monday."  Is this
14    the level of -- you had indicated he was experiencing some
15    particular stress at this time.  Is this level of frequency
16    that mental health staff are able to see him what you would
17    expect for someone in Mr. Mosley's situation at that time?
18    A.   For someone in his situation, I think that it would have
19    been good to see him more frequently and for him to be more
20    closely observed.
21    Q.   Okay.  So that was April 16th, and then April 18th that's
22    the note recording medical's response to him which includes,
23    "CPR stopped after various levels of medical intervention
24    after he was cut down from the ceiling."
25              THE COURT:  Make sure you keep your voice up.  You're
```

 1   trailing off and just -- I'm sorry.

 2       MS. STEEGE:  No, I appreciate the reminder.  I'm just

 3   noting the April 18th entry includes notes that he,

 4   Mr. Mosley, had to be cut down from the ceiling and then

 5   various medical interventions were started.  At the end of the

 6   note, it indicates that CPR was stopped.

 7       We can take the exhibit down.  Thank you.

 8   Q.   Now, you noted that you would expect more monitoring for

 9   someone in that situation.  Are there other situations,

10   stepping back, where mental health staff would ramp up

11   monitoring of someone in conjunction with security?

12   A.   You mean have I seen that?

13   Q.   Well, are there situations where they should, where you

14   think it's clinically indicated that mental health staff

15   should ramp up monitoring for someone working with security to

16   do so?

17   A.   I think that should be the case in any situation where

18   there's an inmate in acute distress who is suffering from the

19   type of mental illness that's going to result in unpredictable

20   behavior.

21   Q.   Okay.  Could you give some examples of things that --

22   factors that might contribute to that unpredictable behavior?

23   A.   In this case, such dramatic mood swings coupled with the

24   psychosocial stressors that he was suffering from.  There

25   could be a case where there's an active delusions or

1    hallucinations, and, again, resulting in kind of, you know,

2    unpredictability about what the person might do.

3    Q.   And would you expect the mental health staff to be able

4    to recognize and monitor those factors?

5    A.   I expect the mental health staff to be able to recognize

6    and be more vigilant and aggressive in their attempt to

7    stabilize the individual, and you would also hope to have a

8    mechanism or practice through which they can communicate with

9    security staff and so that they can be more vigilant as well.

10   Q.   Okay.  Did Hinds County provide the care and monitoring

11   necessary here to achieve basic levels of safety?

12   A.   No.

13   Q.   If security is having difficulty managing someone in

14   regular housing who's on the mental health caseload, what

15   would you expect them to do?

16   A.   I'm not sure what you mean by what would I expect them to

17   do.

18   Q.   Well, if security is -- if someone is having behavioral

19   problems in regular housing and they're on the mental health

20   caseload, how would you expect the security staff to respond

21   to that?

22   A.   I'm still -- are you asking me what -- what they do or

23   what I would hope that they would do?

24   Q.   What do you expect them to do to meet detainees' needs?

25   A.   I expect them to -- I would expect them to meet with

1    mental health staff and discuss the problems they're

2    experiencing and then jointly they would come up with a plan.

3    Q.   Okay.  In Mr. Mosley's case, did delaying medical

4    assessments due to the lack of security staff pose a serious

5    risk to him?

6    A.   I think that the -- that the -- that he -- the fact that

7    he couldn't be seen as often as they were attempting to see

8    him interfered with efforts to provide treatment.  It also

9    interfered with efforts to adequately monitor him.

10   Q.   Okay.  At the time that Mr. Mosley committed suicide,

11   where was he housed in the jail?

12   A.   He was in booking.

13   Q.   Was that an appropriate housing location for him?

14   A.   No.

15   Q.   Why not?

16   A.   As I indicated, given his mental status and the

17   psychosocial stressors, he would have been an ideal candidate

18   for a therapeutic unit.

19   Q.   Why would booking -- well, would you expect booking would

20   have an impact on his mental health while there?

21   A.   Any relative isolation with somebody who's going through

22   something like that, you know, they have nothing else to focus

23   on but the disturbances in their thinking and that factor, so

24   there's nothing attempting to -- there's no activity that is

25   attempting to distract them from that.  In other words, it

1    becomes a much more significant impact on their ability to

2    function.

3    Q.   Now, you talked about the interdisciplinary team meetings

4    that are now occurring.  Would it be enough for security and

5    mental health staff to review someone like Mr. Mosley at one

6    of those weekly IDT meetings?

7    A.   While I think that the review of individual detainees at

8    the multi IDT meetings is a pretty significant step, as I

9    testified before, having that same sort of interdisciplinary

10   cooperation work its way down to the front lines, so that on a

11   day-to-day basis, there could be that sort of communication

12   and working relationship between medical and mental health and

13   detention officers is critical because, you know, changes in

14   mental status occur more than once a week.  So you would want

15   to have a culture and procedures to address those things when

16   they come.

17   Q.   And I just want to clarify.  Are the interdisciplinary

18   team meetings weekly or monthly?

19   A.   Weekly.

20   Q.   Weekly.  Okay.  All right.  And did you see that kind of

21   day-to-day discussion and coordination in Mr. Mosley's case?

22   By discussion I mean between security and mental health staff?

23   A.   No.

24   Q.   And did that lack of coordination create a serious risk

25   of harm in this case?

1    A.   Yes.

2    Q.   Is an interdisciplinary review after a death like this

3    necessary?

4    A.   I'm sorry?

5    Q.   Is an interdisciplinary review after a death like this

6    necessary?

7    A.   Yes.

8    Q.   Why is that?

9    A.   It's an opportunity to look at all -- everything that was

10   going on from all players, and, you know, what was known or

11   should have been known, what was done, what should have been

12   done just to determine not only whether existing policies and

13   procedures were followed, but it's an opportunity to look at

14   should some policies and procedures be adjusted, or are there

15   training needs that might have made a difference or were there

16   other operational things that maybe we should adjust that

17   might make a difference to decrease the risk of another

18   incident, even if those changes might not have prevented this

19   particular death.

20   Q.   Based on your review of records and your monitoring

21   visits since April 2021, has such a review occurred in this

22   case?

23   A.   Not to my knowledge.

24   Q.   Now, did you hear his mother testify earlier this week?

25   A.   Yes.

1   Q.   Did that -- did her testimony include any issues that to

2   you illustrated a substantial risk of serious harm?

3   A.   I'm sorry.  Could you repeat the question?

4   Q.   Did her testimony include any issues for you that

5   illustrated a substantial risk of serious harm?

6   A.   Well, there -- I mean, I think that a couple issues were

7   raised.  One is the -- I mean, the first is the issue of

8   having medical and mental health information from past

9   treatment.  You know, when they're available for people who

10  have had treatment prior to becoming a detainee, you know,

11  those records are often enormously helpful as part of the

12  assessment process.  The -- when I reviewed his medical

13  records, the records that she had sent to the facility were

14  there in his medical chart.  I can't -- you can't tell from

15  reviewing the records exactly when they went in the chart.

16      But more importantly, it's unclear as to whether there's

17  an alert mechanism so that staff know that these new records

18  are put into the chart.  I mean, whenever a staff person goes

19  to see someone, they don't read the entire chart, and so they

20  would need to be alerted to such an entry in order to review

21  it, and that's unclear.

22      Certainly what she said with regard to punishment and an

23  immediate response to this behavior versus treatment is

24  something that I think is important and consistent with what

25  I'm saying here, and that that was an important part that she

 1   could provide as well.

 2        MS. STEEGE:  Okay.  Your Honor, I'm at a transition

 3   point here.  I'm happy to keep on going, or if you want to

 4   take the morning break now.  I just wanted to flag I'm at a

 5   stopping point if that's helpful to the Court and others.

 6        THE COURT:  Okay.  We'll take our morning break at this

 7   time.  Thank you for that.  We're going to be in recess for

 8   15 minutes.

 9        Dr. Dudley, your testimony has been fine except for a

10   couple of glitches.

11        THE WITNESS:  I can't hear you.

12        THE COURT:  I'm sorry.  We're about to take our

13   15-minute break.  I didn't have my microphone on.  Your

14   testimony, we've been hearing you fine, and we have not been

15   hearing much of any background noise since right before we

16   started.  So take your break, keep everything like it is, so

17   you can keep your telephone on, microphone on, whatever you

18   have.  Don't do anything to adjust it.  But everybody does

19   have the right to go -- as somebody used to tell me all the

20   time, go powder your nose.  It's 15 minutes.  We'll take our

21   morning recess.

22             (A brief recess was taken.)

23        THE COURT:  I believe we tracked down the gremlin;

24   right?  Okay.  I assume there's nothing to take up.  Are you

25   ready to resume your direct?

```
 1            MS. STEEGE:  Yes, sir.
 2            THE COURT:  All right.  Please come forward.
 3   BY MS. STEEGE:
 4   Q.   Dr. Dudley, can you hear me?
 5   A.   Yes, I can.
 6   Q.   Let's turn to another person who popped --
 7   A.   Can you just wait one second?  Let me turn off the phone
 8   since it appears to me we're okay.
 9   Q.   Let's -- okay.
10   A.   Okay.
11   Q.   We still good?
12   A.   I believe so.
13   Q.   All right.  Let's go.  Let's turn to another person who
14   passed away at the jail last year.  Did you review records for
15   someone who passed away from an apparent drug overdose in
16   August on C-Pod?
17   A.   Yes.
18   Q.   What records did you review for that person?
19   A.   I reviewed his medical records, and I reviewed a
20   mortality review report.
21   Q.   Okay.  Did you see any other kind of review like an after
22   action report for this person?
23   A.   No.
24   Q.   What's the purpose of a mortality review?
25   A.   A mortality review is simply a medical review about what
```

```
 1    medical did in response to an incident.  You would expect that
 2    to be incorporated with the rest of the facility in doing the
 3    larger after incident report.
 4    Q.   So what kinds of questions would you expect a mortality
 5    review to address?
 6    A.   Well, they're addressing what was the response of
 7    medical, but that's in isolation.  They're purely looking at
 8    medicals.
 9    Q.   Okay.  And in looking at that response, is that focused
10    only on whether things could have been differently in that
11    particular case, or are there other questions to look at?
12    A.   Well, if there's a -- I mean, in a mortality review, even
13    though it's a specific part of the review, I mean, if
14    difficulties are identified, it may explore those other
15    difficulties.
16    Q.   I'm sorry.  What?
17    A.   If medical management difficulties were identified, then
18    those should be further explored.
19    Q.   Can you explain what you mean by "further explored"?
20    A.   I mean, if the mortality review indicates that medical
21    staff should have done something differently, then it should
22    include an explanation about why they didn't do something
23    differently.
24    Q.   Okay.  Do mortality reviews answer questions around
25    trying to prevent future harm?
```

```
 1    A.   Only to the extent that the identified problem was the
 2    absence of medical care before the death.
 3    Q.   Okay.  How would a mortality review be documented?
 4    A.   There should be a report.
 5    Q.   Is that documentation important?
 6    A.   Yes.
 7    Q.   Why is that?
 8    A.   Well, I mean, it shows that you are doing as diligent as
 9    you're supposed to, to assess a death and identify any
10    opportunities for corrective action.
11    Q.   Okay.  Let's turn to PX-70 which has already been
12    admitted.  Is this the mortality review you looked at for this
13    individual?
14    A.   Yes.
15    Q.   And as the only review that we're aware of after this
16    person's death, does this review cover the scope of topics
17    that you would expect to see after a death?
18    A.   No.
19    Q.   Why is that?
20    A.   Well, as I indicated the larger after-action review would
21    be what I would expect to see after a death.
22    Q.   Now --
23    A.   That would include --
24    Q.   I'm sorry, go ahead.
25    A.   That would include everybody, you know, medical,
```

1   security, *et cetera*.

2   Q.   Okay.  Have you observed a change in the amount of drug

3   use in the jail over the last several months?

4   A.   Well, early in last year, it became evident that there

5   was a new class of drugs in the facility and/or more access to

6   the new class of drugs in the facility, because we were seeing

7   a type of drug reaction that we weren't seeing before.  And so

8   that I -- and in doing some lab tests, it confirmed that this

9   was a different class of drugs than we had been seeing before,

10  and so I had raised concern about this particularly as it

11  relates to the lethality of that, of overdoses with this

12  particular class of drugs.

13  Q.   And when did you first raise those concerns?

14  A.   It was earlier in the year.

15  Q.   Can you give a rough season, winter, spring, summer?

16  A.   Spring.

17  Q.   Now, does this review indicate whether someone observed

18  this individual taking drugs before he died?

19  A.   No.

20  Q.   Does it indicate whether someone observed him with the

21  effects of drugs before he died?

22  A.   No.

23  Q.   Would a review that considers those questions contribute

24  to safety in the jail?

25  A.   Yes.

1   Q.   How so?

2   A.   Well, with this particular -- the drugs were available --

3   it's our understanding that the drugs were available in pills

4   and so it's not like you take a pill and immediately die.

5   The -- and so there are symptoms of overdose before the point

6   of death, and the -- in such cases when individuals are caught

7   at that point, the effect of the drug is reversible.  And, in

8   fact, there have been other cases in the facility where

9   individuals had been found exhibiting these symptoms, and the

10   appropriate intervention was done to reverse the drug effect.

11   I mean, that's how we knew this was in the facility already.

12   Q.   Okay.  So if you are reviewing those issues, how would

13   that address safety?

14   A.   So that you would want to know whether the appropriate

15   safety and well-being checks were being done, number one, and,

16   number two, whether they were being done in a vigilant enough

17   way that they would have been on the lookout for this sort of

18   symptom.  And then if they saw it, did they immediately

19   contact medical and to attempt to intervene.

20   Q.   Now, separate from this individual, I believe you

21   testified that from the spring time at least of the year you

22   were aware that there were new and more lethal drugs in the

23   facility.  In light of that knowledge, would you expect any

24   different responses in coordination between medical staff and

25   security?

```
 1    A.   Well, I would expect the -- I mean, the security
 2    response, the appropriate security response was let's be more
 3    rigorous about contraband into the facility, so that was a
 4    very reasonable and expected response.  What I'm saying,
 5    however, is that if there was a good working relationship
 6    between medical, mental health, and security, a response could
 7    have also been while we're attempting to get a better handle
 8    over contraband; that we should be particularly vigilant about
 9    identifying inmates who are showing symptoms of overdose early
10    on so that we can intervene.
11    Q.   Now, did that security response to be more vigilant about
12    contraband, did that occur soon after these drugs were
13    identified as an issue?
14    A.   I believe that the response of let's -- you mean the
15    second piece that I'm describing?  I don't believe so.
16    Q.   Well, I guess I'm referring to the -- what I heard you
17    describe was two different things, one, addressing contraband
18    and, two, working relationship between mental health and
19    security.  I'd like to start with the first one.  If you know,
20    did security respond promptly to these identified concerns
21    about drugs in the facility?
22    A.   That I don't know.
23    Q.   Okay.  And as to the second, was there -- has there been
24    an improved relationship or coordination between medical and
25    security?
```

1    A.   When Major Bryan came and started having the IDT

2    meetings, which hadn't been occurring for a very, very long

3    time, I think that was the beginning of trying to develop a

4    better relationship between -- better working relationship

5    between medical, mental health, and security.

6    Q.   Would you say that working relationship now is at a point

7    necessary to protect detainees' basic health needs?

8    A.   Not yet.

9    Q.   Let's go back up to PX-70, and just for expediency, I'll

10   read out for the summary of events.  "This individual was

11   found unresponsive by an officer in his housing unit.  Medical

12   assistance called and medical arrived within five minutes of

13   being called.  Rigor mortis noted.  CPR performed, but

14   unsuccessful."

15        Can you just explain what rigor mortis is?

16   A.   Rigor mortis is a state, a physical state that sets in

17   after death where the body becomes stiff and rigid.

18   Q.   And how much time does it typically take for that state

19   to set in?

20   A.   It could take anywhere between one to six hours,

21   typically occurs after maybe two or three hours.

22   Q.   Okay.  Based on that do you have an opinion about how

23   much time went by after this detainee passed away and before

24   he was discovered by an officer?

25        THE COURT:  Before you -- before you answer that

1    question, what's your objection?

2         MR. SHELSON:  Objection, Your Honor.  Dr. Dudley,

3    although well qualified in the field of psychiatry admitted

4    during voir dire that he's neither a forensic pathologist or a

5    pathologist and I don't think he's qualified to answer this

6    question.  That's our objection.

7         THE COURT:  Okay.  Objection overruled.

8    BY MS. STEEGE:

9    Q.   Dr. Dudley, do you have an opinion about how much time

10   went by after this detainee passed away and before he was

11   discovered by an officer?

12   A.   I could only say that it was -- that it was more than an

13   hour or two.

14   Q.   Do effective reviews after a death evaluate whether

15   security staff followed applicable policies?

16   A.   I'm sorry?

17   Q.   Do effective reviews after a death evaluate whether

18   security staff followed applicable policies?

19   A.   Yes.

20   Q.   Why is that?

21   A.   You mean why should that be part of the review?

22   Q.   Correct.

23   A.   Because that -- I mean, you're -- if you identified the

24   fact that an issue was that staff were not following policy,

25   then you know what corrective action or at least what should

1   be on your list of corrective actions you might take.

2   Q.   And would that policy review include whether security

3   staff were providing direct supervision?

4   A.   Well, whatever the policy was, I mean, you would -- you

5   would -- one of the things you'd be looking at, was the

6   security staff in some reasonable way either doing their

7   supervision as outlined in the policy, whether that's direct

8   supervision or well-being checks or whatever it is by policy

9   they were supposed to be doing.

10  Q.   And given that this is the only review done in this case,

11  do you see any indication in this mortality review that that

12  kind of policy evaluation occurred?

13  A.   No.

14  Q.   Since this death have you discussed the importance of

15  mortality reviews with health care staff at the jail?

16  A.   Yes.

17  Q.   And since that time has it become an institutional

18  practice to do substantive mortality reviews?

19  A.   Well, there was the one after-incident review that was

20  discussed already, and that's the only one I've seen.

21  Q.   Has anyone passed away in the jail since that time?

22  A.   I think there was one death since then.

23  Q.   But have you seen -- excuse me -- a mortality review for

24  that death?

25  A.   No.

1  Q.   Let's switch gears here.  Earlier we discussed the

2  requirement for Hinds County to build therapeutic housing for

3  detainees with serious mental illness.  Have the current

4  mental health staff at the jail or the contractor, QCHC, run a

5  mental health unit before?

6  A.   No.

7  Q.   Have you provided technical assistance about how Hinds

8  County should renovate an existing pod to build a mental

9  health unit?

10 A.   Yes.

11 Q.   And have you provided technical assistance about what

12 programs would be necessary in the mental health unit?

13 A.   Yes.

14 Q.   Could you describe the technical assistance that you've

15 provided?

16 A.   Well, after having some initial discussions about

17 programming and running the mental health unit, that sort of

18 became clear that this was going to be a new endeavor.  And so

19 I put them in contact with other facilities that had had

20 functional mental health units, and we did a virtual site

21 visit with one of those.  And the virtual site visit included

22 medical and mental health staff as well as security staff, so

23 that they could -- so both mental health and medical and

24 security staff could kind of appreciate the working

25 relationship between the two in the mental health unit that we

1    visited.  And the presentation and tour and discussion was

2    led, co-led by the security staff and the mental health staff

3    at that facility, and they also offered to provide any -- we

4    provided them with documents that they had generated, plans,

5    *et cetera*.  And they offered to be available for consultation

6    as needed, and then we came back and discussed that

7    consultation.

8    Q.   Now, since that site visit have you provided additional

9    technical assistance for the Hinds County mental health and

10   the QCHC staff as they've been navigating the planning process

11   for this therapeutic housing space?

12   A.   Since they've been navigating the planning process,

13   they've been having meetings.  They send me minutes of the

14   meetings, and I discuss with them anything that's just not

15   clear to me from the minute meetings (sic) or if I have

16   questions about things that they're considering.

17   Q.   Have you provided guidance about the policies that would

18   govern the mental health unit?

19   A.   Yes.

20   Q.   Can you give an example of that guidance?

21   A.   Well, for example, when they were laying out the

22   policies, part of that was, you know, what would be the

23   admission criteria for the mental health unit, and in the

24   early drafts, they had talked about not accepting people who

25   were noncompliant with their medication.  And I guess I went

1   back and had a discussion with them about, you know, that's

2   exactly the population who need the mental health unit, and

3   so, you know, asked them to rethink that.

4   Q.   And has that policy since been amended?

5   A.   Yes.

6   Q.   Would having therapeutic housing available change how the

7   jail provides services for detainees with serious mental

8   illness including those who are currently in segregation?

9   A.   Yes.

10  Q.   How so?

11  A.   Well, it would provide a setting where treatment could,

12  in fact, occur, where people could be taken out and sit down

13  and meet with them and attempt to engage them.  Equally as

14  important is that you could do that much more aggressively.

15  You could see them every day and attempt to work with them.

16  It's also a unit whereby the -- all staff, including security

17  staff, would be working together as a team towards the

18  individualized goals for each of the people housed on that

19  unit so that their behavior -- to the extent that their

20  behavior was a product of their mental illness, it would be

21  viewed as such by all staff and addressed as such by all

22  staff.

23       And that unit would include some of the kinds of

24  additional programming that's currently not available to

25  educate people and help people gain insight into their nature

1    of their illness and how its affected them and the

2    availability of treatment and how that could be helped.

3    Q.   You mentioned that security staff would be involved in,

4    it sounds like, an interdisciplinary way with mental health

5    treatment on the MHU, on the mental health unit.  Without

6    technical assistance, do you expect Hinds County would be able

7    to work out that relationship going forward?

8    A.   The -- I mean, it's a new thing for Hinds County, and

9    even when we did the site visit, the staff -- I chose a place

10   for the site visit where they went through the process of not

11   having done this before and doing it for the first time, and

12   so that they shared a lot about what they learned from that

13   experience, which was very helpful to the staff at Hinds

14   County to hear this developmental process, not just that they

15   were operating it.  And so the -- you know, there's a lot to

16   work out as that's developed, access to records, treatment

17   team meetings that would include security staff that, you

18   know, that would be worked out once the unit actually opens.

19        And that even with the additional training that Ms. Bryan

20   talked about during her testimony for security staff who will

21   be on that unit, once they are actually up and running,

22   there's an ongoing learning process as they work with mental

23   health staff to form a team that would actually be working

24   with the detainees housed there.

25   Q.   Let's take a step back here.  How will people be assigned

1  to the mental health unit?

2  A.   They will be evaluated by mental health staff and

3  identified as appropriate for the mental health unit, and then

4  they would have to be cleared for placement there by

5  classification to make sure there's no contraindication for

6  them being placed on the unit with somebody whose already

7  there or any other particular reason that classification might

8  be concerned about their placement on the unit.  But it's

9  primarily based on the findings of the mental health

10 assessment.

11 Q.   Is security involved in that decision as well?

12 A.   Only to the extent that that classification might find

13 some reason why the person shouldn't be placed.

14 Q.   How would you describe the relationship among security

15 classification and mental health now, in terms of determining

16 people's housing assignments?

17 A.   Well, mental health doesn't have any real input into that

18 now.

19 Q.   Okay.  Have you provided technical assistance towards

20 developing that relationship with an eye towards implementing

21 this therapeutic housing?

22 A.   Yes, to the extent that I tried to make it clear that

23 mental health staff both locally and at the QCHC headquarters

24 had to begin to meet with security -- I mean, with

25 classification to hammer out exactly how they would accomplish

1  this, which they did do.

2  Q.   I'm going to clarify, which they -- meaning they've had a

3  meeting or --

4  A.   They have been working -- they have worked out that

5  relationship, that working relationship.

6  Q.   Are you referring to the IDT meetings in that context?

7  A.   No.  I'm talking about the planning meetings for the

8  mental health unit.

9  Q.   Okay.  Do you believe they worked out that relationship

10 as necessary to implement day-to-day mental health unit needs?

11 A.   I believe they worked out that relationship at least

12 enough to get people assigned to the mental health unit.

13 Q.   Do you believe they worked out that relationship as

14 necessary to then run the mental health unit going forward?

15 A.   I mean, issues remain to be worked out and resolved.  So,

16 for example, what to do with -- how to clarify how

17 disciplinary difficulties on the unit will be managed and, you

18 know, is that going to be, like, disciplinary difficulties are

19 handled elsewhere in the facility, or will there be a

20 different approach for people on that unit?  Will that be

21 handled on the unit itself?  Things like that have yet to be

22 resolved.

23 Q.   Without technical assistance, do you expect Hinds County

24 will be able to work out that process going forward?  And by

25 that, I mean figure out how disciplinary review would occur on

1    the mental health unit?

2    A.   That, again, is something that they've not been involved

3    in before, so I think technical assistance that provides them

4    with, you know, a range of options that people have learned

5    from in various other facilities about how to manage that,

6    what kind of disciplinary options they could have that could

7    be incorporated into a mental health unit, that sort of

8    technical assistance would be enormously helpful.

9    Q.   Has the mental health caseload changed since you first

10   started providing technical assistance, working with Hinds

11   County to build therapeutic housing?

12   A.   Yes.

13   Q.   How so?

14   A.   It's gotten -- the mental health caseload has gotten much

15   larger as has the number of very seriously acutely ill

16   detainees.

17   Q.   You mentioned a question about training that Major Bryan

18   had also testified to.  I'd like to bring up PX-86 which has

19   already been admitted into evidence.  First, I'd just like to

20   go back up a step.  You mentioned the mental health caseload

21   had increased.  Why -- why is that?

22   A.   I don't know that I have the full answer to that.  I just

23   know there's a larger number of people on the mental health

24   caseload than there used to be.

25   Q.   Okay.  So we're going to page 16 of PX-86, which is the

1  December 2021 quality assurance report.  And I'll, just for

2  expediency, read aloud, "It will be difficult to effectively

3  operate a mental health unit with inexperienced and

4  undertrained officers.  The first phase of the training has

5  been conducted, but the second and third phases have been

6  delayed for an unspecified time because the County has not

7  compensated the nationally certified trainer.  In December

8  2021, Hinds County Detention Services had 202 mentally ill

9  persons, with 153 of those being SMIs, seriously mentally ill

10 detainees, of which 54 are noncompliant with medication.  This

11 can be a very difficult population to work with, and specified

12 training is required."

13      Does this align with your findings?

14 A.   Yes.

15 Q.   What is the current status of the mental health unit?

16 A.   It's my understanding that there's still work to be done

17 to finish preparing the unit, the physical unit, the space.

18 My under- -- it's my understanding that a particular concern

19 is the -- some of the IT work that has to be done to install

20 and make operational the computer systems for security as well

21 as for the mental health staff.

22      The second issue is the -- not just the training of

23 security staff who have been assigned to that unit but making

24 sure that there are security staff to be assigned to that unit

25 given the overall shortage of security staff and then the

1   program -- the treatment program for the unit has been

2   designed and developed, but the implementation of that

3   treatment program is going to be difficult with the number of

4   mental health staff they currently have.

5   Q.   Just to clarify, could the mental health unit provide

6   minimally necessary services with the current level of mental

7   health staffing?

8   A.   Not really.

9   Q.   And could they provide -- excuse me -- the minimally

10  necessary services with the current level of security staffing

11  that's available to help mental health and medical staff?

12         MR. SHELSON:  Objection.  Leading.

13         THE COURT:  Objection overruled.

14  A.   I don't believe -- I don't know the answer as to whether

15  enough of the limited number of security staff that are

16  available can be prioritized to place on the mental health

17  unit.  I don't know the answer.

18  BY MS. STEEGE:

19  Q.   Okay.  Have you observed that prioritization being placed

20  at this point?

21  A.   Well, I mean, it's been a problem with the delivery of

22  all the other medical and mental health services.  Yes.

23  Q.   Will the mental health unit serve women as well as men?

24  A.   No.

25  Q.   How does the jail plan to serve women with serious mental

1  illness?

2  A.  Well, the mental health unit will not be available to

3  them.  They can't be housed there with the men, and so what

4  we've been working on is a program for the most seriously

5  mentally ill women, you know, how can that be done.

6  Q.  Do the women -- I'm sorry, go ahead.

7  A.  How can that be -- how can that be structured and done

8  for women with serious mental illness.

9  Q.  Do women --

10  A.  There are women with mental illness on the caseload who

11  are receiving treatment.  But there is a small number of women

12  who are particularly ill, and so they've been working on

13  how -- what -- you know, what could be provided to that

14  population.

15  Q.  Do women with serious mental illness in Hinds County Jail

16  currently have access to minimally necessary health services?

17         MR. SHELSON:  Objection.  Leading.

18         THE COURT:  Objection overruled.

19  A.  The -- I would say that the majority of the women on the

20  mental health caseload could be serviced by the services that

21  are available if there were an adequate enough staff to see

22  them with the frequency and intensity that they would like to,

23  which is not the case.  The -- a small subset of women with

24  much more serious and acute mental health problems who need

25  much more attention, they're not getting it.  I mean, they're

```
 1   getting more attention but not as much as they need.

 2   BY MS. STEEGE:

 3   Q.   I'm sorry.  What was the end?

 4   A.   They're giving -- they're trying to give them more

 5   attention, but not as much as they need.

 6   Q.   One more time.  I'm sorry.

 7   A.   I said they -- the small number of women who have more

 8   serious and acute difficulties, they recognize that the women

 9   need more attention and they try to do that.  But, you know,

10   given the number of staff, they're not giving them as much as

11   they feel these women might need.

12   Q.   Is there a risk of harm to these women from not receiving

13   sufficient care?

14   A.   Yes.

15        MR. SHELSON:  Objection.  Leading.

16        THE COURT:  Don't lead the witness.

17        MS. STEEGE:  May he answer the question?

18        THE COURT:  Yeah.  Go ahead.

19   A.   It's similar to the men.  I mean, they continue to

20   suffer, and they can continue to evidence symptoms of illness

21   that result in difficulties for them in the facility, either

22   conflicts with other women or staff.

23   BY MS. STEEGE:

24   Q.   Okay.  Without the requirement for Hinds County to

25   provide therapeutic housing for detainees with serious mental
```

1   illness, would Hinds County provide the resources necessary to

2   meet detainees' basic mental health needs?

3   A.   In the absence of that requirement?

4   Q.   Yes.

5   A.   I don't believe so.

6   Q.   Why is that?

7   A.   I believe it's that requirement that prompted the efforts

8   that have been made so far.

9   Q.   I want to be clear about what you've testified to today.

10  Can you just clarify what standard you're holding Hinds County

11  to?  Is that a best practices standard?  What's minimally

12  necessary to meet detainees' serious mental health needs, or

13  is there another standard?

14  A.   Would be what's minimally necessary to detainees' mental

15  health needs.  But in talking with them, I tried to share with

16  them what had been best practices, what has worked in other

17  facilities to give them some options to think about as we

18  focus on, you know, how do we meet basic mental health needs.

19  Q.   Okay.

20  A.   I'm not suggesting they should be -- I'm not monitoring

21  them again, you know.  Can you be the best mental health unit?

22  Can you have the best discharge planning program?  So we're

23  talking about what's the minimal basic sort of program you can

24  have so that people receive their treatment.

25  Q.   All right.  Now, you've testified about a number of ways

1    in which the medical and mental health care provided at the

2    jail is currently inadequate to meet those needs.  Are there

3    any common causes underlying these inadequacies?

4    A.   Yes.

5    Q.   Could you describe those?

6    A.   I would say that -- so the one issue is the issue that I

7    keep bringing up which is, you know, what's the working

8    relationship between security and medical mental health, so

9    that there's an appreciation for the importance of delivering

10   these services and an interdisciplinary approach to improving

11   safety in the jail.  Number two is the issues that have been

12   brought up much better by Mr. Parrish as it relates to the

13   shortage of officers and some of the difficulties with the

14   physical plant that, as I've tried to explain, have a direct

15   impact on the ability of staff, medical and mental health

16   staff, to perform their duties and an indirect impact as it

17   relates to just injuries and substances and things like that.

18        The third issue would be inadequate number of mental

19   health staff to accomplish all the things that they're

20   supposed to be doing, and that's even before you go into the

21   mental health unit.  And then the fourth issue would be

22   opening up a mental health unit.

23   Q.   Okay.  Now, without the consent decree requirements, do

24   you think that Hinds County will improve the coordination and

25   working relationship between mental health and security?

 1   A.   I think that improving that working relationship is an

 2   ongoing process.  When I first started monitoring, it was

 3   really bad.  When Ms. Bryan came, I think she -- by starting

 4   the IDT meetings and things was an important step towards

 5   doing that, and during the last site visit, we discussed how

 6   do you move that forward and how do you move that down to the

 7   front line and change the culture?  It's an ongoing process

 8   that needs a lot of support and effort.

 9   Q.   And do you think that support and effort will be

10   forthcoming without the consent decree's focus on this work?

11   A.   No, because of the -- people will lose focus in the

12   process of doing some of the others.

13   Q.   Okay.  Without the consent decree requirements, do you

14   think Hinds County would be capable of achieving a security

15   staffing level that's adequate to deliver necessary medical

16   and mental health care to detainees?

17   A.   I'm certainly concerned about that, but I think that's a

18   question better put to other members of the monitoring team.

19   Q.   Have you seen in your experience whether security staff

20   is sufficiently prioritized to be assigned to medical and

21   mental health needs at this point?

22   A.   Well, that's a little clearer in that, you know, every

23   attempt to do that seems to quickly fade, security concerns

24   arise.  And so I think it's either not placing medical and

25   mental health as a sufficient priority or just inability to do

1   that because the staffing shortage is so severe.

2   Q.   Without the consent decree -- please go ahead.

3   A.   I mean -- that's it.

4   Q.   Without the consent decree requirements, do you believe

5   Hinds County will ensure they have enough mental health staff

6   to provide adequate care?

7   A.   No.

8   Q.   Why is that?

9   A.   An apparent lack of appreciation for how much the mental

10  health staff are being asked to do.  The -- it's prompting me

11  during this site visit to try to detail that more

12  specifically, because other than the mental health staff

13  themselves who are overwhelmed by the amount of work they're

14  being asked to do, no one else -- no one else seems to

15  appreciate that.

16  Q.   Without the consent decree requirements, do you believe

17  Hinds County will successfully build and run therapeutic

18  housing?

19  A.   The successfully opening and running the therapeutic

20  housing is -- you know, relates to the issues that are above

21  the working relationship and the adequate security staff,

22  adequate mental health staff, and so to the extent that those

23  continue to be issues, being able to open an appropriately run

24  therapeutic housing unit is going to be impossible.

25  Q.   Have the defendants' actions or inactions affected the

1    timing of opening the therapeutic housing?

2    A.    Well, I think in some areas that's difficult for me to

3    answer.  I mean, I understand that, as has already been

4    testified to, that, you know, completing the construction of

5    the physical place is complicated.  I mean, that it involves

6    these different levels of the government and stuff, things

7    that I don't really -- I'm not really involved in, so that the

8    delays in creating the physical space, precise issues that

9    could hinder the matter is something that I don't feel I can

10   speak to, although I know that it's been delayed.

11        The shortage of staff and the difficulty in getting the

12   security staff and getting security staff trained is also, I'm

13   sure, a complicated issue, and so it's somehow difficult for

14   me to say what's going on there; that that's the case only to

15   know that it's been delayed.  The shortage of mental health

16   staff, I think, is a little bit more stunning given the fact

17   that the program for the unit has been designed, and it should

18   be clear how much energy it's going to take to run a program

19   for such a severely ill population.

20   Q.    Without the consent decree, will the defendants provide

21   the mental health training both for security staff and medical

22   and mental health staff that's required to meet detainees'

23   serious needs?

24   A.    That I don't know.

25   Q.    Do you think any provisions of the decree are unnecessary

1   or superfluous to providing minimally necessary medical and

2   mental health services?

3   A.   No.

4   Q.   Why is that?

5   A.   It really -- it really talks to the provision of

6   reasonable services.  I mean, it talks about, in essence, you

7   know, basic tasks related to providing medical and mental

8   health services in the sense of clinic visits and treatment.

9   It talks about documenting that work.  It talks about doing it

10  in a timely fashion with time standards that are very

11  reasonable.  It talks about an internal capacity to review

12  what you're doing with regard to medical and mental health

13  services, to assure that you are doing these things that need

14  to be done in a timely manner.

15       It talks about some basic things in the sense that what

16  medical and mental health staff should otherwise be

17  contributing to the safety and security, things like

18  segregation rounds to check on people being held in

19  segregation, you know, being in -- offering input into things

20  like disciplinary hearings, you know, very basic things that

21  relate to providing basic medical and mental health treatment

22  and working with security staff in some sort of reasonable,

23  cooperative way to enhance safety and security in the

24  facility.

25       Particular subsections about suicide and suicide watch,

1    obviously, you know, a basic necessary service, as is things

2    like medical observation and ability to transfer the most

3    seriously ill to the hospital when the hospital treatment is

4    needed.

5    Q.   Could you explain whether the provisions of the decree

6    have any impact on public safety as it relates -- well,

7    whether the medical and mental health provisions of the decree

8    have any impact on public safety?

9    A.   They do.  I mean, people are released and they're

10   released back to the community, and what -- as I had testified

11   to, I think, yesterday, that to the extent that you have a

12   program where individuals can be stabilized and while they're

13   in the facility and come to appreciate their need for ongoing

14   treatment and can be connected to community-based services in

15   a way that, you know, maximizes the possibility for successful

16   transfer to community-based services.  That has a very

17   positive impact on public safety as opposed to their leaving

18   the facility just as ill as when they came in, or that they

19   leave the facility and don't continue to be engaged in

20   treatment and end up behaving in a way that gets them back in

21   the facility.

22   Q.   Has the County's delay in providing adequate treatment

23   impacted detainees with serious mental illness?

24   A.   Yes.

25   Q.   How so?

1   A.   In the ways that I've described, in not -- not getting

2   treatment or none at all or not getting adequate treatment.

3   Q.   And does that lack of treatment create a substantial risk

4   of serious harm to those detainees?

5   A.   Yes.

6        MS. STEEGE:  If I might confer, Your Honor?

7        THE COURT:  Yes, you may.

8   BY MS. STEEGE:

9   Q.   Dr. Dudley, you talked about the likelihood of Hinds

10  County's success in meeting detainees' serious health needs

11  and so forth without the consent decree.  Moving forward, if

12  they were just left with the consent decree as we've been

13  operating, do you think that they'll succeed in being able to

14  meet detainees' serious medical and mental health needs?

15  A.   When I pull back and look at the larger picture that we

16  kind of ended up with, I would say that the improvements in

17  those areas have been very minimal and do not clearly reflect

18  an appreciation for their significance.  And so I think it's

19  difficult to predict to -- to be assured that they will

20  continue to progress.

21       MS. STEEGE:  Thank you.  Nothing further, Your Honor.

22       THE COURT:  Thank you, Dr. Dudley.  It is an

23  appropriate time for us to break for lunch.  We will -- we

24  should be ready to return at 1:40.  That gives you about an

25  hour and 15 or 20 minutes so -- and then we will pick up from

1    there.  Thank you.  We are in recess.

2                 (A lunch recess was taken.)

3         THE COURT:  You may be seated.

4         I assume there's nothing for us to take up before we

5    begin cross-examination.  Oh, I'm sorry.  There may be.

6         MR. SHELSON:  Your Honor, there is one issue.  Before

7    the trial the United States told us their position on the rule

8    of sequestration is that the defendants combined get one

9    representative without violating the rule.  The defendants'

10   position is that there are three defendants, and each

11   defendant is entitled to have a corporate representative

12   present.  So far only the sheriff has been present, but we

13   want to know whether, going forward, a representative of the

14   Board of Supervisors and a representative of Hinds County can

15   be present in addition to the sheriff without violating the

16   rule.  And before we brought any of those individuals into the

17   courtroom, we thought it would be a good practice to get a

18   ruling from the Court on that issue.

19        THE COURT:  Isn't Hinds County and the Hinds County

20   Board of Supervisors one defendant?  Isn't that the same

21   person for practical purposes under the law?  Hinds County is

22   the --

23        MR. SHELSON:  I see Your Honor's pointing, but they are

24   named separately in the complaint.  But if that's the case,

25   that's why we're asking.  So then if that's the point then, in

1    addition to the sheriff, can we have a representative for

2    Hinds County Board of Supervisors also present?

3         THE COURT:  Yes, absolutely.  I mean, I thought -- I

4    know for the whole time somebody has been here "for the Board

5    of Supervisors" because I did notice no member of the Board of

6    Supervisors is but the Deputy County Administrator has been

7    here or the finance person or whatever that person's name and

8    a couple of other people have been here.

9         MR. SHELSON:  We want to -- to cut right to it, we

10   wanted to bring in one of the supervisors or the County

11   Administrator, not both at the same time, but one or the other

12   who are both on the witness list.

13        THE COURT:  Yes.

14        MR. SHELSON:  Thank you, Your Honor.

15        THE COURT:  Well, let me hear from the United States.

16        MR. CHENG:  No objection, Your Honor.

17        THE COURT:  All right.  Are we ready -- I'm sorry.  Are

18   we ready for the cross-examination then of Dr. Dudley?

19        MR. SHELSON:  Yes, Your Honor.

20        THE COURT:  You may proceed.

21        MR. SHELSON:  Thank you, Your Honor.

22                          **CROSS-EXAMINATION**

23   **BY MR. SHELSON:**

24   Q.   Good afternoon, Dr. Dudley.

25   A.   Good afternoon.

1   Q.   I want to pick up with Justin Mosley.  Dr. Dudley, are

2   you able to see the document I'm attempting to display from

3   the courtroom?

4   A.   Yes.

5   Q.   Thank you.  This document is P44.  Do you remember being

6   asked about this document on direct?

7   A.   Yes.

8   Q.   I'm not going to go through each of these entries on this

9   medical record for Justin Mosley, but I want to direct your

10  attention to this one here that's dated January 15, 2021.  Do

11  you see there the last sentence where it says, "He was asked

12  if he was suicidal and he denied"?

13  A.   Yes, I do.

14  Q.   All right.  I'll represent to you that that's the only

15  place on page 1 where the issue of suicide is mentioned.  Have

16  you reviewed Mr. Mosley's complete medical records at RDC?

17  A.   Yes.

18  Q.   This is page 43 from the document that has been marked as

19  Plaintiff's Exhibit 90.  Let me show you.  Do you recognize

20  this document as a medical record of Mr. Mosley that you

21  reviewed?

22  A.   I believe so.

23  Q.   Let me direct your attention to the highlighted part.  Do

24  you understand that Deborah Bell is the psychiatrist?

25  A.   She's the psychiatric nurse practitioner.

1   Q.   Psychiatric nurse practitioner.  And you see the entry

2   dated April 14, 2021?

3   A.   Yes.

4   Q.   And do you see the highlighted part where it said, "He

5   denied that he was having any thoughts of self-harm"?

6   A.   Yes.

7   Q.   Okay.  So I want to go back to P-44 which is the document

8   you were asked about on direct.  Now, you agree between

9   April 14th and April 18th, 2021, there are only -- there's

10  only one entry on this record between those two dates?

11  A.   Could you give me the dates again, please?

12  Q.   Between April 14, 2021, on the record we just looked at

13  and April 18, 2021.

14  A.   That's correct.

15  Q.   Okay.  And on April 16, 2021, the record reports that the

16  individual, which is Mr. Mosley, stated that it was all good;

17  is that correct?

18  A.   That's correct.

19  Q.   So at no time -- at least on P-44, which starts at

20  December 19th, 2020, and the date of Mr. Mosley's death, is

21  there anything indicating a suicidal ideation?  Is there?

22  A.   No.

23  Q.   Doctor, did you testify that you listened in to the

24  testimony of Mr. Mosley's mother?

25  A.   Yes, I did.

1   Q.   I'll represent to you that the record I'm displaying now

2   is -- I'll just show you.  It's part of Exhibit -- Plaintiff's

3   Exhibit 90, and it's page 490 of that exhibit --

4        MS. STEEGE:  Your Honor, this exhibit was under seal --

5   was to be placed under seal, if admitted, and it has not yet

6   been admitted.  Regardless as a document we agreed would be

7   placed under seal, it shouldn't be published to the courtroom.

8        THE COURT:  Hold on.  I need you to repeat that.

9        What's your objection?

10       MS. STEEGE:  The document marked as PX-90 was supposed

11  to be sealed, if admitted, and, therefore, should not be

12  published if Mr. Shelson is going to be using it.

13       THE COURT:  We'll publish it to the witness, though;

14  right?  We won't publish it on the screen.

15       MS. STEEGE:  Thank you, Your Honor.

16       THE COURT:  All right.  You can show it to the witness.

17       MR. SHELSON:  Well, Dr. Dudley, can you see that

18  document if its placed on the Elmo?

19       THE WITNESS:  Yes.

20       THE COURT:  Okay.  All right.

21  BY MR. SHELSON:

22  Q.   All right.  Thank you, Dr. Dudley.  Do you know -- are

23  you familiar with Brentwood Behavioral Healthcare of

24  Mississippi?

25  A.   Only that it exists.

```
 1   Q.   Okay.  Do you see indications of this document having

 2   been faxed at the top of the page?

 3   A.   Yes, I do.

 4   Q.   So do you see that both fax dates are in February 2020?

 5   A.   Yes.

 6   Q.   And that was approximately one year before Mr. Mosley's

 7   suicide; is that correct?

 8   A.   That's correct.

 9   Q.   And do you see on this record that the date of admission

10   is October 21, 2015?

11   A.   Yes.

12   Q.   Do you know whether Mr. Mosley's mother faxed any records

13   to RDC that were later in time than October 2015?

14   A.   I don't remember off the top of my head.

15   Q.   All right.  And do you see the section "History of

16   Present Illness" and it mentioned among other things, "Out of

17   control aggression, threatened behavior, mother is fearful for

18   her safety"?  Do you see that?

19   A.   Could you -- you just removed it.  I'm sorry.

20   Q.   I'm sorry.  I'm right here.

21   A.   Yes, I see it.

22   Q.   Okay.  Based on your review of Mr. Mosley's records, did

23   you make any determination whether he had a propensity for

24   violence?

25   A.   Yes.
```

1   Q.   What was your determination?

2   A.   That he had at times been violent.

3   Q.   And given that history, do you think it was appropriate

4   for RDC to take that history into account in how it managed

5   Mr. Mosley?

6   A.   I think they had to take that into account.

7   Q.   In reviewing the records on Mr. Mosley, did you see

8   anything regarding his criminal history?

9   A.   Yes, but not really -- it wasn't really in the medical

10  records that I reviewed.

11  Q.   Okay.  Let me just ask it this way.  If you don't know,

12  I'll move on.  Do you know what he was charged with at the

13  time of his death?

14  A.   No, I don't.

15  Q.   Okay.  You talked on direct about both therapeutic

16  housing and a mental health unit.  Are those one thing, or are

17  those two different things?

18        THE COURT:  Hold on one second.  Hold on.

19        We're getting interference from a separate courtroom.

20        (An off-the-record discussion was held.)

21        MR. SHELSON:  We're on a pause for a moment,

22  Dr. Dudley.

23        THE WITNESS:  I understand.

24        THE COURT:  You may proceed.

25        MR. SHELSON:  Thank you, Your Honor.

```
 1  BY MR. SHELSON:
 2  Q.   I'll re-ask that question, Doctor.  So you referred
 3  during direct to both therapeutic housing and mental health
 4  unit.  And now as you used those terms in your testimony, were
 5  you referring to one thing by two different terms, or are
 6  those two different things?
 7  A.   One thing.
 8  Q.   Okay.  You talked during direct about RDC not having a
 9  mental health unit and needing more staff, but we do know that
10  RDC at present does not have a mental health unit and that you
11  think they need more mental health staff; is that correct?
12  A.   Correct.
13  Q.   So how did RDC do, in your judgment, in terms of
14  delivering medical and mental health services with the
15  resources that it actually has?
16  A.   It's just they're unable to -- on the mental health side,
17  they're unable to keep up with the work.
18  Q.   Are they -- do you think that they're doing the best that
19  they can with the resources that they have?
20  A.   Yes.
21  Q.   Doctor, well, first of all let me ask you:  What is
22  serious mental illness?
23  A.   It's defined differently at different places.  So some
24  places limit it to a list of disorders, the -- schizophrenia
25  and the other psychotic disorders, major mood disorders, major
```

1    depression, bipolar disorder, and significant intellectual

2    impairments.  Other facilities include other disorders that

3    are coupled with significant functional impairment, which

4    could include anxiety disorder to, like, trauma-related

5    disorders.

6    Q.   Is there a known cure for serious mental illness or SMI?

7    A.   There are known ways to control the symptoms, so it's not

8    a cure in the sense that it's a chronic disorder.  But there

9    are known treatments that can help to stabilize the person and

10   gain some control over the symptoms.

11   Q.   Is SMI a chronic disorder that even with the best of

12   treatment waxes and wanes?

13   A.   It depends on when you get them.  In other words, with

14   the best of treatment, most people can be stabilized if they

15   comply with treatment.  With some of the psychotic disorders,

16   if the person -- if you don't catch the person and start

17   treatment until they're much older, then they're much -- it's

18   much more difficult to gain consistent control over their

19   symptoms even if they're cooperating.

20   Q.   So the point I'm getting to is in the jail setting, is

21   the goal in terms of mental health treatment to stabilize the

22   individual?

23   A.   The goal of treatment should be to stabilize the

24   individual, and once you do that, to attempt to help them

25   understand their illness and their needs for treatment.

1    Q.   And that's because, as you've said I believe, people with

2    SMI don't necessarily recognize that they have an issue?

3    A.   That's correct.

4    Q.   So that brings us to public safety you were talking

5    about.  Doctor, when you were talking about public safety,

6    what you were really getting at, are you talking about a

7    handoff from the jail to community-based services?

8    A.   Well, I was talking about whether people become ill again

9    once they reenter the community, and part of your way of

10   addressing that is trying to have a better handoff to a

11   community-based service provider with the intent of trying to

12   increase the possibility that people will obtain continue to

13   obtain treatment in the community and remain stable.

14   Q.   And this issue of a handoff, that's present -- that issue

15   exists whether the individual is being released from an

16   institution, an emergency room, or a jail; is that correct?

17   A.   That's correct.

18   Q.   Okay.  Now, do you know what community-based services are

19   offered in Hinds County?

20   A.   Some.

21   Q.   Do you know which ones?

22   A.   Well, the most expansive one is Hinds Behavioral

23   Services.

24   Q.   Right but what I'm asking you is:  Do you know what

25   specific community-based services that Hinds Behavioral Health

1   offers?

2   A.   Yes.  I met staff from the jail, and I have met with them

3   on numerous occasions where they've reviewed the range of

4   programs and services that they provide.  I'm not sure that I

5   can remember all of them sitting here, but it ranges from some

6   regular outpatient services.  They have some case-managed

7   services where they have case managers to help to work with

8   maintaining people in treatment.  So they have a full range of

9   resources, if I remember from my meetings with them.

10  Q.   Doctor, in your experience, have you ever seen any data

11  regarding how successful various community-based services are

12  at preventing rehospitalization?

13  A.   It depends on the design of the program.  You know

14  whether they have emergency services, whether they have case

15  management services, whether or not they have partial

16  hospitalization or residential programs, so it kind of depends

17  on what program mix they have.

18  Q.   Do you agree that assertive community treatment is the

19  most intensive community-based service?

20  A.   Pardon?

21  Q.   Do you agree that assertive community treatment, ACT, is

22  the most intensive community-based service?

23        MS. STEEGE:  Your Honor, this is beyond the scope of

24  direct.

25        THE COURT:  Objection overruled.

1   A.   Do you mean the ACT program?

2   BY MR. SHELSON:

3   Q.   Yes, sir.

4   A.   And your question is as to what?

5   Q.   Is that the most intensive community-based service?

6   A.   No.

7   Q.   Okay.  I'll move on.  If the jail can get a person to a

8   community health center and arrange for an appointment within

9   seven days of the release of that person and the person didn't

10  keep that appointment, in that example would you fault the

11  jail for anything?

12  A.   I would say it would depend on whether the jail had done

13  anything to prepare the person for release and handoff to that

14  community-based program.

15  Q.   Such as?

16  A.   Such as psychoeducation and their active involvement of

17  the individual in his own discharge plan.

18  Q.   Are you familiar with the consent decree in this case?

19  A.   I believe I am.

20  Q.   Does the consent decree expressly require discharge

21  planning?

22  A.   I believe it does.

23  Q.   What provision?

24  A.   I don't know the number.

25  Q.   Okay.  But you think the words "discharge planning" are

1   in the consent decree?

2   A.   I believe so.

3   Q.   What was the other one you mentioned about education?

4   A.   Psychoeducation.

5   Q.   Is it your understanding that the words "psychoeducation"

6   are in the consent decree?

7   A.   No.  But that would be included under discharge planning.

8        MR. SHELSON:  May I display this document to

9   Dr. Dudley?

10  BY MR. SHELSON:

11  Q.   Dr. Dudley, this document is -- I think it's Exhibit 70

12  which you were asked about on direct.  It's the mortality

13  review for the August 3rd, 2021, death.  Do you recall this

14  exhibit?

15  A.   Yes, I do.

16  Q.   All right.  So obviously with respect to this event, a

17  mortality review was completed; is that correct?

18  A.   Yes.

19  Q.   So what exactly is your criticism of this mortality

20  review?

21  A.   I don't have a criticism of the mortality review.  I'm

22  just saying that it's not the same as an after-incident

23  review.

24  Q.   Did you hear Major Bryan testify yesterday?

25  A.   Yes, sir.  Yes, I did.

1   Q.   Did you hear her testify that during her tenure as jail

2   administrator there was only one event that in her judgment

3   warranted an after-action review, and this event of

4   August 3rd, 2021, was not one of them?

5   A.   Yes.

6   Q.   Counsel also showed you this document on direct.  It's

7   Plaintiff's Exhibit 86.  It's a quality assurance summary

8   dated December 2021.  Do you recall this document?

9   A.   Yes, I do.

10  Q.   Do you recall counsel asking you about the paragraph

11  where there's a little yellow highlight out to the left?

12  A.   Yes.

13  Q.   Can you see that provision okay?

14  A.   Yes, I can see it.

15  Q.   Okay.  I'll represent to you that this document was

16  prepared by a person named Priscilla Dawson.  Have you met

17  Ms. Dawson in your monitoring activities?

18  A.   No.

19  Q.   Do you know what Ms. Dawson's qualifications are, if any,

20  regarding mental health?

21  A.   No.

22  Q.   Okay.  Do you see -- Doctor, who delivers medical and

23  mental health services at RDC?

24  A.   It's delivered through a contract with QCHC.

25  Q.   Based on the reviews you've conducted, is QCHC doing

```
 1   anything good in terms of providing medical services at RDC?
 2   A.   Yes.
 3   Q.   Like what?
 4   A.   I think that they're -- I think that they're clinically
 5   competent providing assessments and -- both assessments and
 6   treatment.
 7   Q.   Anything else?
 8   A.   I think that's the essence of the work.  I mean, they're
 9   providing assessment and treatment.  They keep good records of
10   the work that they're doing.  Also they -- I'd helped them at
11   the very beginning to develop good logs and tracking systems
12   to look at the work they're providing for their own internal
13   review and assessment.
14   Q.   Would your answer be the same regarding whether QCHC does
15   anything good regarding the provision of mental health
16   services at RDC?
17   A.   It would be essentially the same.
18   Q.   Do you know on average how many detainees QCHC treats at
19   RDC on a daily basis?
20   A.   Not off the top of my head.  You're talking about on the
21   medical side?
22   Q.   Well, let's break it down.  Yes, on the medical side.
23   A.   Yeah, not off the top of my head.
24   Q.   What about on the mental health side?
25   A.   I don't know on a daily basis off the top of my head
```

1   either.

2   Q.   Okay.  Do you know how much approximately on an annual

3   basis the County spends on medical and mental health services

4   at QCHC?

5   A.   No, I don't.  I mean, I've seen it.  I don't remember.

6   Q.   That's fine, Doctor.  I'll move on.

7       Doctor, you testified about this most recent site visit

8   which I believe you said began on January 24, 2021; is that

9   correct?

10   A.   Correct.

11   Q.   And so, Doctor, was your participation in that site visit

12   remote or on site?

13   A.   Remote.

14   Q.   When was the last time you were at the RDC facility?

15   A.   Prior to the onset of the pandemic, so it would have been

16   the beginning of 2020.  I think that's right.

17   Q.   Approximately how many times have you been to RDC?

18   A.   I've been on every site visit since the beginning of

19   2018.

20   Q.   Okay.  So since the beginning of 2018, however many

21   on-site visits, you've been on all of those except the most

22   recent one?

23   A.   I've been on -- I've been on -- yeah, I've been on all

24   the on-site visits since the most recent one.

25   Q.   Since 2018?

1      MS. STEEGE:  I just wanted to clarify.  The question

2  was when the most recent site visit was, and Mr. Shelson asked

3  with regard to 2021.  I believe that to be 2022.

4  BY MR. SHELSON:

5  Q.  Counselor's right, Dr. Dudley.  I got my years wrong.  So

6  you were --

7  A.  I'm sorry.

8  Q.  -- so the most recent site visit was January -- began

9  January 24, 2022; is that correct?

10  A.  That's correct.

11  Q.  And the last time you were on site was approximately

12  sometime before the COVID pandemic hit, and that may have been

13  2020?

14  A.  That's correct.

15  Q.  Okay.  Under the consent decree, how frequently must a

16  detainee with SMI who is in segregation be offered a

17  therapeutic session?

18  A.  They're supposed to be offered a therapeutic -- everybody

19  on the mental health caseload should be offered a therapeutic

20  session at minimum once a month and then more as needed.

21  Q.  You were asked on direct about the minimum necessary for

22  medical and mental health services.  Do you recall that?

23  A.  Yes.

24  Q.  Can you tie what you believe is the minimum necessary to

25  any specific provisions of the consent decree?

1  A.  I mean, the only -- the ties in that regard are -- are in

2  different sorts of forms.  There's specifics in the consent

3  decree that relates to the timeliness with regards to the

4  provision of certain services, and then there's other terms in

5  the consent decree that use terms more like "appropriate" or

6  whatever.

7      So, for example, it talks about "medication management."

8  We know that the minimum -- it doesn't actually state the

9  minimum standard, but the minimum standard by, you know,

10  medical standards is that you will see a person every three --

11  at least every three months which is what they do -- try to do

12  at Hinds County so that they adopt that minimum standard even

13  though it's not -- the three-month date is not necessarily

14  articulated in the consent decree, and that they were testing

15  for drug-adverse effects, for example, when doing medication

16  reviews is articulated as a minimum standard in the consent

17  decree.

18      So some things that are referred to -- specifically some

19  things are referred to with terms like "appropriate" or

20  'indicated' or "as needed."

21  Q.  Doctor, in those instances where the consent decree does

22  not actually state the minimum standards, could you use your

23  own judgment to fill the gaps?

24  A.  In those places where it doesn't state a minimum

25  standard, I used what I believed to be generally considered to

1  be the minimum standard.

2  Q.   Doctor, in your experience as a psychiatrist is there a

3  nationwide mental health workforce shortage?

4  A.   I don't know.

5  Q.   Remember being asked a series of questions on direct

6  about whether you believe Hinds County will have adequate

7  mental health or medical services at the jail without the

8  consent decree?

9  A.   Yes.

10  Q.   But was it also your testimony that under the consent

11  decree Hinds County does not have adequate mental health and

12  medical services at the jail?

13  A.   Yes.

14  Q.   So have you considered -- have you even considered the

15  possibility that the consent decree is not helping the

16  situation?

17  A.   I've considered that possibility.

18  Q.   And why did you consider that possibility?

19  A.   It's reasonable to consider.

20  Q.   If my notes are correct, every time on direct when

21  counsel asked you whether something or another increased the

22  risk to detainees, you answered yes.

23        Do you recall that line of questioning?

24  A.   Yes, I do.

25  Q.   All right.  So in those instances, for any of those

1    instances, are you able to quantify the increase in risk?

2    A.   Well, as I indicated, it depends in part on the nature of

3    the illness that you're treating, and so it's going to differ

4    from one person to the next.

5    Q.   One of the instances you discussed on direct was where

6    there was no after-action review in connection with a drug

7    overdose death.

8         Do you recall that discussion?

9    A.   Yes.

10   Q.   Can you quantify the risk associated with there not being

11   an after-action review with respect to that incident?

12   A.   Can I quantify it?

13   Q.   Yes, sir.

14   A.   Only in descriptive terms.  Is that acceptable?

15   Q.   Well, would you tell us what you mean by that, please?

16   A.   Well, I can describe what I -- in my view would have been

17   the benefit of an after-action review, what issues might have

18   come to fore, what corrective actions might have been put into

19   place so I could -- I could talk about that.  I can't give a

20   percentage or something like that in the sense of quantifying.

21   Q.   All right.  Doctor, I'll move on.  You talked several

22   times on direct about technical assistance, and in your view

23   as a monitor, do you believe that the technical assistance you

24   offered to the County is binding on the County?

25   A.   No.  I just believe that giving them access to

1    information and the experiences of others is a part of the

2    monitoring process and part of helping them think through what

3    their options might be to address the provisions of the

4    settlement.  So I think that I'm trying to be helpful and

5    sharing information with them is an important part of the

6    monitoring process.  So in each case it's about, you know,

7    here's some information for you to think about.

8        So, for example, when we did the -- when I set up a tour

9    for them with an established mental health unit, it was

10   really, you know, information that they could take and use in

11   whatever way they were going to take and use it.

12   Q.  Do you remember the discussion you had on direct about a

13   detainee who I believe had SMI, but regardless, who the

14   records indicated had injuries and was sent to the medical at

15   RDC and then from there was sent on to the hospital?

16   A.  Yes, I remember.

17   Q.  So my question at least from a medical perspective, once

18   the detainee's injuries were discovered, didn't the system

19   work?

20   A.  In the sense of?

21   Q.  That the detainee was found to be injured, he was sent to

22   medical, and then he was sent on to the hospital.  Is that

23   what you would expect to happen for a medical perspective?

24   A.  From a medical perspective, yes.

25   Q.  You also testified that the faster a person with acute

1  symptoms is seen, the better.  Do I have that down correctly?

2  A.   That's correct.

3  Q.   Is that true everywhere?

4  A.   Not sure what you mean --

5  Q.   That's not unique to a jail that the faster a person with

6  acute symptoms is seen, the better?

7  A.   You mean would it be true in other settings?

8  Q.   Yes, sir.

9  A.   Yes.

10  Q.   Based on your review of the consent decree, does the

11  consent decree set any standards for response times for either

12  medical or mental health issues?

13  A.   Yes.

14  Q.   Do you happen to -- can you identify that provision from

15  memory?  If you were here, Doctor, I would gladly show you the

16  64-page decree, but I don't think we can do that efficiently

17  by Zoom.  So I'm not even going to try.  I'm not trying to do

18  a memory test.

19      Do you know what provision sets those standards?

20  A.   I don't know the number.

21  Q.   Okay.  I'll move on.  Does RDC have a policy for when

22  inmates refuse to take their medication?

23  A.   Is there a policy, you said?

24  Q.   Yes, sir.

25  A.   There is a policy.

```
 1   Q.   All right.

 2        MR. SHELSON:  Can I display this to Dr. Dudley, please?

 3   BY MR. SHELSON:

 4   Q.   Doctor, this is Exhibit D-77.  Is this the -- and I'm

 5   going to show you so it's not a memory contest, but is this --

 6   I'm referring to here the policy for when a detainee refuses

 7   to take psychotropic medications.

 8   A.   Yes.

 9   Q.   Okay.  So you see paragraph 6?  I'm just going to read it

10   into the record.  "When all last restrictive or intrusive

11   measures have been employed or have been judged by the

12   treating nurse practitioner with consultation with the

13   physician or psychiatrist to be inadequate, forced

14   psychotropic medication may be employed upon a court order."

15        Did I read that correctly?

16   A.   Yes.

17   Q.   And then I'm not going to read the whole thing.  You can

18   review it yourself.

19   A.   I'm familiar with it.  Thank you.

20   Q.   Right.  Okay.  Thank you.  So -- but does paragraph 7

21   provide that in emergency situations the court order can be

22   dispensed with?

23   A.   Yes.

24   Q.   So under this policy if a detainee refuses medication,

25   there's a process that must be followed; is that correct?
```

1   A.   That's correct.

2   Q.   And part of that process is, if there's time, to attempt

3   to obtain a court order; is that right?

4   A.   You're asking me two different things.  The first -- the

5   first part of that section refers to the refusal of any

6   medication, and as you've indicated, the steps that should be

7   taken any time an inmate, a detainee refuses medication, to

8   have them sign a medication refusal form, *et cetera*, and for

9   them to actually interact with the nurse in order to do that.

10       The second section of that deals with a different

11  circumstance.  It deals with not just the day-to-day

12  administration of medication, but situations in which as a

13  result of taking -- not taking their medication the individual

14  becomes a danger to themselves or others under which case this

15  issue of forced medication should be considered, and then

16  there's a whole separate protocol and set of procedures for

17  that.  So it's really two different sorts of situations.

18  Q.   So I'm sorry if I wasn't clear.  I was talking about the

19  latter situation --

20  A.   Okay.

21  Q.   -- for forced psychotropic medications.  So in that

22  latter scenario, is the first step if there's -- if they

23  refuse other preliminary steps, then if there's time, there's

24  supposed to be an attempt to obtain a court order; is that

25  correct?

```
1   A.   That's correct.
2   Q.   Okay.  So would you say it's a big deal to force
3   somebody -- to force a detainee to take psychotropic
4   medications?
5   A.   Is it a big deal?
6   Q.   Yes, sir.
7   A.   I think it's a serious -- it's something that should be
8   taken very seriously and not lightly.
9   Q.   All right.  What are the standards for compliance in the
10  consent decree?
11  A.   With?  Standards for the compliance with what?
12  Q.   In the consent decree is there substantial compliance,
13  partial compliance and so on?
14  A.   Yes.
15  Q.   To your understanding, are there any other standards of
16  compliance other than substantial compliance and partial
17  compliance?
18  A.   Noncompliance.
19  Q.   Okay.  What is your involvement in the compliance
20  determinations that are made in the monitoring reports?
21  A.   Those determinations are made by the monitor, and if she
22  has some particular question and is clarifying the findings I
23  presented, then she would discuss it with me.
24  Q.   So is the process, for example, something related to
25  mental health or medical, you present your findings to Lisa
```

1   Simpson and then Ms. Simpson makes the compliance

2   determination whether non, partial or substantial?

3   A.   I present my findings and I present, you know, my

4   recommendation of things that need to be addressed, and then

5   as I indicated, I'm available to her for further discussion of

6   those issues if she needs to make a determination.

7   Q.   So do you weigh in on any of the provisions of the

8   consent decree besides the ones that address medical or health

9   issues?

10   A.   No.

11   Q.   Doctor, I'm about to show you the consent decree.  It

12   will appear in a moment.  Doctor, this is the consent decree,

13   Exhibit P1.  I want to direct your attention to paragraph

14   42(g)(6).  This is 42(g)(6), and the (6) part reads,

15   "Screening prisoners for serious mental illness as part of the

16   jail's booking and health assessment processes and then

17   providing such prisoners with appropriate treatment and

18   therapeutic housing."

19        Do you see that, Doctor?

20   A.   Yes, I do.

21   Q.   You testified earlier that there's some provisions of the

22   consent decree that, for instance, use the word "appropriate"

23   in the context of medical or mental health treatment.  Is this

24   one such example?

25   A.   Yes, it is.

```
 1   Q.   Okay.  So "appropriate treatment," do you know if that
 2   term is defined by the consent decree?
 3   A.   Not specifically.
 4   Q.   Is the term "therapeutic housing" a defined term under
 5   the consent decree?
 6   A.   Not specifically.
 7   Q.   Does the consent decree enumerate any specific criteria
 8   for therapeutic housing?
 9   A.   I don't believe so.
10   Q.   Does the consent decree enumerate any specific criteria
11   for appropriate treatment?
12   A.   Well, I mean, there are other places in the consent
13   decree where it talks about things like individual and group
14   therapy, medication management, so in a sense those would be
15   with their kind of -- I would consider those subsections of
16   appropriate treatment.
17   Q.   You talked about interdisciplinary planning team, I
18   believe, on direct.  Is my recollection correct?
19   A.   The IDT meetings, the IDT treatment meetings, IDT team
20   meetings?
21   Q.   Yes, the IDT meetings.  Do you view it as a positive
22   development that IDT meetings were introduced at RDC?
23   A.   Yes.
24   Q.   Do you find that the -- well, based on your most recent
25   visit or remote visit, were the IDT meetings ongoing?
```

1    A.    Yes.

2    Q.    Doctor, to your recollection, does the -- is there any

3    provision of the consent decree that requires mental health

4    courts?

5    A.    I'm sorry?

6    Q.    Is it -- to your recollection, is there any provision of

7    the decree that addresses mental health courts?

8    A.    I don't remember that specifically in the agreement.

9    Q.    Do you remember any provision of the consent decree that

10   addresses warm handoffs?

11   A.    What do you mean by "warm handoffs"?

12   Q.    Handoff from the -- from the jail to a provider in the

13   community.

14   A.    Certainly the term "warm handoff" is not in the

15   settlement agreement, but it talks about discharge.

16   Q.    I'm in the process of displaying another document,

17   Doctor, and it will pop up in a minute.

18          MR. SHELSON:  May I display this?

19   BY MR. SHELSON:

20   Q.    Doctor, this is Exhibit P-49.  It's the Hinds County

21   Detention Services Annual Revised Staffing Analysis.  It's

22   dated October 2021.  Have you reviewed this document before

23   today?

24   A.    No.

25   Q.    Do you know whether anything is included in the staffing

1    analysis regarding mental health practitioners?

2    A.   I've not seen this document.

3    Q.   Have you received any information from any other monitors

4    regarding whether there's a specified number of mental health

5    practitioners in any of the staffing analysis?

6    A.   No.

7    Q.   So was it your testimony on direct that there should be

8    two more mental health practitioners?

9    A.   That there were two during the time that I've been there,

10   and when there was a discussion of increasing that number, it

11   was my recommendation that there be two more.

12   Q.   Okay.  Do you know if those two additional mental health

13   practitioners that you recommended are required by the consent

14   decree?

15   A.   There's no particular number of mental health

16   practitioners required by the consent decree that I'm aware

17   of.

18        MR. SHELSON:  Your Honor, before I move on to the next

19   area, I neglected -- I started out with Dr. Dudley with

20   Exhibit P-90 which is approximately 754 pages of Mr. Mosley's

21   medical records, and if they have not been offered into

22   evidence, I do offer Exhibit P-90 into evidence.

23        THE COURT:  Any objection?  I know they're under seal.

24        MS. STEEGE:  No objection, subject to their being under

25   seal.

```
 1          THE COURT:  All right.  P-90 will be received in
 2   evidence.
 3               (Plaintiff's Exhibit 90 entered.)
 4          THE COURT:  You mentioned how many pages there are.  Is
 5   it on a separate CD or something of that sort?
 6          MR. SHELSON:  I'm not sure how the plaintiff submitted
 7   that one, Your Honor.
 8          THE COURT:  I'm just thinking about the record.
 9          MS. STEEGE:  Yes.  Currently it's all saved as one PDF.
10          THE COURT:  It's one PDF?
11          MS. STEEGE:  Correct.
12          THE COURT:  Okay.  All right.
13   BY MR. SHELSON:
14   Q.  All right.  Dr. Dudley --
15          THE COURT:  Hold on.  The documents will remain under
16   seal, we agree; right?
17          MS. STEEGE:  Yes, Your Honor.  Thank you.
18          THE COURT:  All right.
19   BY MR. SHELSON:
20   Q.  Dr. Dudley, all of the monitoring reports that have been
21   admitted into evidence, do you recall any discussions
22   throughout your involvement in this case about forensic bed
23   availability?
24   A.  At the state hospital?
25   Q.  Yes, sir.
```

1    A.    I remember, yes, there have been discussions about that.

2    Q.    And there is a difference between forensic beds and acute

3    psychiatric beds?

4    A.    Yes.

5    Q.    Briefly what's the difference?

6    A.    The forensic beds are for two purposes.  They could be

7    for performing competency evaluations of people facing charges

8    to determine whether they're competent to proceed, and if they

9    are incompetent, they could be sent back to a forensic bed for

10   an attempt to restore their competency.

11   Q.    And there's also the category of not competent and not

12   restorable; is that correct?

13   A.    Yes.

14   Q.    All right.  And do you know whether Mississippi has a

15   civil commitment process?

16   A.    I believe they do.

17   Q.    Okay.  And so the category of people who are found not

18   competent and not restorable, do you know whether they become

19   subject to the civil commitment process?

20   A.    That I don't know.

21   Q.    Okay.  In your experience generally, if a person is

22   civilly committed to a state hospital, does that person go to

23   a forensic bed or to an acute psychiatric bed?

24   A.    It differs from one jurisdiction to another.

25   Q.    Okay.  And do you know what it is in Mississippi?

1    A.   No, I don't.

2    Q.   All right.  Let me move on to -- do you agree that the

3    consent decree discusses both SMI and intellectual disability?

4    A.   Yes.

5    Q.   And those are two different things, correct?

6    A.   It depends on how a facility defines SMI.

7    Q.   Well, you defined SMI earlier and told us there were --

8    there's not a universal definition of it; is that correct?

9    A.   Correct.

10   Q.   Okay.  So let me just ask you this:  How would you define

11   intellectual disability?

12   A.   I mean, I would consider intellectual disability a mental

13   illness, and so that if there's -- it's conceivable to me that

14   if it results in serious impairment of the ability to

15   function, it should be considered an SMI.  I could also

16   appreciate how a facility might want to define its

17   intellectually disabled inmates or detainees separate.

18   Q.   To your understanding, has COVID-19 reduced the available

19   number of forensic beds nationally?

20   A.   I don't know the answer.

21   Q.   Okay.  Do you have any understanding regarding whether

22   COVID-19 has reduced the availability of forensic beds in

23   Mississippi?

24   A.   No, I don't.

25           MR. SHELSON:  Can I display this document, please?

1              THE COURT:  Sorry about that.  We have to reconnect.

2    That's all.

3              Sorry, Dr. Dudley, we apologize for that glitch.  Are

4    you still on?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  We're about to resume.

7    BY MR. SHELSON:

8    Q.  Dr. Dudley, I displayed the stipulated order in this

9    case.  Are you familiar with this document?

10   A.  Yes.

11   Q.  I just wanted to ask you briefly, do you see that at the

12   top it indicates the stipulated order was filed on

13   January 16th, 2020?

14   A.  Yes.

15   Q.  And was that --

16             MS. STEEGE:  I apologize, I would note it said it's

17   filed 2019.

18             THE COURT:  I'm sorry, you read that -- you said it was

19   filed January 16, 2020?

20             MR. SHELSON:  I did, but I'm looking at the wrong date,

21   Your Honor.  I think I'm right.  It says, "So ordered,

22   January 16, 2020."

23             MS. STEEGE:  Oh, I apologize.  I thought you were

24   reading the earlier line referring to the --

25             THE COURT:  The stipulated order was entered on

1  January 16, 2020.

2       MR. SHELSON:  Yes, sir.

3       THE COURT:  All right.

4  BY MR. SHELSON:

5  Q.  So with that, Doctor, here's what I'm trying to get to.

6  Was that about the time COVID-19 hit?

7  A.  Yes, just prior.

8  Q.  Correct.  So the stipulated order entered literally just

9  days before COVID-19 was first discovered in the United

10 States?

11 A.  Sir, is that a question?

12 Q.  Yes, sir.

13 A.  Yes.

14 Q.  Now, we talked some about discharge planning and

15 ultimately the consent decree would speak for itself, and I

16 know you're not -- it's not available for you to look through,

17 so with that said, is it your testimony, based on your

18 recollection, that the words "discharge planning" are in the

19 consent decree?

20 A.  I believe so or something to that effect.

21 Q.  Doctor, you have a forensic psychiatric practice; is that

22 correct?

23 A.  I do.

24 Q.  Did you until fairly recently or when did you cease

25 having a forensic practice?

```
 1    A.   I tried to retire about ten years ago, and I have since
 2    retired.
 3    Q.   Was your practice primarily based in New York City?
 4    A.   My office was in New York City.  The cases that I had
 5    were around the country.
 6    Q.   From January 1976 to December 1977, I believe you worked
 7    for what was at least then called the New York City Department
 8    of Mental Health Mental Retardation and Alcoholism Services;
 9    is that correct?
10    A.   That's correct.
11    Q.   And did you have any involvement with Rikers Island in
12    that capacity?
13    A.   Only that we funded the mental health services there, and
14    so we had some responsibility for looking at them and
15    assessing them, but not for the actual day-to-day running.
16    Q.   And is Rikers Island one of the New York City jails?
17    A.   Yes, it is.
18    Q.   Did you ever provide any mental health services at Rikers
19    Island?
20    A.   I never worked on Rikers Island.
21    Q.   Have you ever provided mental health services at any jail
22    or other correctional facility?
23    A.   No.
24    Q.   Have you ever had any forensic clients who were in a New
25    York City jail?
```

1   A.   Yes.

2   Q.   Have you ever had any forensic clients who were in a jail

3   that was subject to the *Nunez* consent decree?

4   A.   No.

5   Q.   Do you know what the *Nunez* consent decree is?

6   A.   I know it involves the jail.

7   Q.   Okay.  Doctor, do you happen to read the New York Times

8   at all or from time to time?

9   A.   Only occasionally.

10   Q.   This is an article that was published in the New York

11   Times on January 28, 2022, it's headlined "16 Men Died in New

12   York City Jails Last Year.  Who Were They?"  Did you happen to

13   see this article?

14   A.   No, I didn't.

15   Q.   First photograph said, "The first to die last year was

16   found in January hanging from a sprinkler head in his jail

17   cell just a week after his arrival.  The second one was found

18   strangled about a month later."

19        MS. STEEGE:  Your Honor, I'd object to it both as

20   hearsay and on the basis of not being relevant to his role in

21   this case.  It's not pertaining to the time during which he

22   was working for the New York department.

23        THE COURT:  Objection, sustained as to hearsay.

24        MR. SHELSON:  I haven't asked my question yet.

25        THE COURT:  Okay.  You haven't asked your question yet.

1    Okay.  Ask your question.

2         MR. SHELSON:  Well, what I was going to do, Your Honor,

3    here's what the question was going to be:  I was going to read

4    that paragraph and ask him assuming that were true, if that

5    would surprise him.  So it's not being offered for the truth

6    of the matter asserted.

7         THE COURT:  You would ask -- you would read that first

8    paragraph and ask him if that would surprise him?

9         MR. SHELSON:  If it were true.

10        THE COURT:  If it were true?

11        MR. SHELSON:  Yes, sir.

12        MS. STEEGE:  I'd renew the objection as to both

13   relevance and hearsay.

14        THE COURT:  I'll allow you to ask it.

15   BY MR. SHELSON:

16   Q.   Doctor, the first paragraph reads, "The first to die last

17   year was found in January hanging from a sprinkler head in his

18   jail cell just a week after his arrival.  The second was found

19   strangled about a month later, his head forced through a slot

20   in his jail cell in what was later ruled a suicide."

21        If that were true, would it surprise you?

22   A.   All I know is that there have been lots of problems at

23   Rikers, and there has been a movement to close it.  And those

24   problems have included the mental health services, but I don't

25   really know any of the details other than there's lots of

1   problems.  And so I wouldn't -- I wouldn't have known that

2   this level of difficulty was going on.

3   Q.   That third paragraph, first sentence where it reads, "At

4   least 16 people died in the custody of New York's troubled

5   jails in 2021."

6        Do you know whether that is true or not?

7   A.   No, I don't.

8   Q.   And then the next highlighted paragraph, "In 2013, there

9   were 23 deaths, and that number routinely rose above 30 in the

10  1990s.  In 1990 alone 36 inmates died in custody."

11       Do you know whether any of that is true?

12  A.   I don't.

13  Q.   Are suicides unique to the Rankin -- excuse me -- to the

14  Raymond Detention Center?

15  A.   Are suicides?

16  Q.   A unique phenomenon -- strike all that.

17       Do suicides occur in jails other than RDC?

18  A.   Yes.

19  Q.   All right.  And so jail suicide is not a phenomenon

20  unique to RDC, is it?

21  A.   No.

22  Q.   Did you listen to Dave Parrish's testimony from the other

23  day?

24  A.   Yes, I did.

25  Q.   Did you hear Mr. Parrish testify that the RDC facility is

1  poorly designed?

2  A.   I believe so, yes.

3  Q.   Do you agree with that from a mental health perspective?

4  A.   I mean, in the sense -- I mean, I would agree that it

5  doesn't include a physical space that would be specifically

6  designed for a therapeutic unit.

7  Q.   Right.  And is that what you meant when you were talking

8  about having an appropriate setting of engagement for

9  detainees with SMI?

10  A.   No.

11  Q.   Okay.  So let's back up then.  Do you agree that the RDC

12  was designed without a mental health unit or therapeutic

13  housing?

14  A.   Yes.

15  Q.   Do you know whether the planned new jail is designed with

16  a mental health unit?

17  A.   Do I know?

18  Q.   Do you know?

19  A.   Yes.

20  Q.   And I didn't ask a good question.  Is it your

21  understanding that the new jail is designed with a mental

22  health unit?

23  A.   That is my understanding.

24  Q.   Okay.  So when you were talking about a setting of

25  engagement for detainees with SMI, what were you talking

1    about?

2    A.   I was talking about being able to do things such as have

3    a space where you could sit down one to one in a private

4    setting and meet with and talk with a detainee, for example.

5    Q.   And based on your observation of RDC, does it allow for

6    such a setting?

7    A.   Currently?

8    Q.   Yes.

9    A.   No.

10   Q.   And it's been that way from the inception of the

11   facility, hasn't it?

12   A.   Well, I wasn't around at the inception of the facility,

13   but I believe it's been that way since I've been there.

14   Q.   I can show it to you, Doctor, if I need to, but your CV,

15   which is Exhibit P-4 in this case, says that you've been

16   involved in monitoring two facilities.  One is obviously the

17   one here in Hinds County.  What is the other one?

18   A.   In the -- in St. Croix, the U.S. Virgin Islands.

19   Q.   Your CV also says that you have been a consulting

20   expert -- excuse me, a consulting mental health expert with

21   the United States Department of Justice.  How many times have

22   you been a consulting mental health expert for DOJ?

23   A.   I think five or six.

24   Q.   Without going into each one of them, what generally was

25   the subject matter of those engagements?

```
 1  A.   Some combination of the -- the delivery of mental health

 2  services, the placement of mentally ill individuals in

 3  segregation, the issue of mental health status being taken

 4  into consideration in disciplinary proceedings for planned

 5  uses of force, how that was managed.

 6  Q.   That's fine, Doctor.  How did you become a monitor in

 7  this case?

 8  A.   I was contacted by Ms. Simpson.

 9  Q.   Did you know Ms. Simpson prior to when she contacted you?

10  A.   Not really.

11  Q.   Do you know how she learned about you to contact you?

12  A.   No, I don't.

13  Q.   Has the United States asked you to testify as an expert

14  in this case?

15  A.   Yes.

16  Q.   When did they first ask you approximately?

17  A.   I don't remember the date.  I think, you know, when it

18  was clear that the hearing would proceed.

19  Q.   Did you consent to testify as an expert in this case for

20  the United States?

21  A.   Yes.

22  Q.   Approximately how long ago was that?

23  A.   When they asked me.

24  Q.   Was that in January of 2022 or before January 2022?

25  A.   I don't remember exactly, but it was certainly at least
```

1   by the beginning of the year.

2   Q.   Beginning of 2022?

3   A.   2022.  I'm sorry.

4   Q.   Approximately how much has the County paid you for your

5   monitoring services since you've become involved in this case?

6   A.   I don't know.

7   Q.   Is it approximately $128,000?

8   A.   I don't know.

9        MR. SHELSON:  Can I have a moment, Your Honor?

10       THE COURT:  You may.

11       MR. SHELSON:  No further questions, Your Honor.

12       THE COURT:  Okay.  Thank you, Mr. Shelson.  I imagine

13   the Government has some redirect.

14       MS. STEEGE:  Yes, Your Honor.  If we might have a few

15   minutes to get ready for that?

16       THE COURT:  You think it's long?

17       MS. STEEGE:  I don't think so.  Do you have a time

18   frame?

19       THE COURT:  I tell you what.  We'll take a 15-minute

20   break right here.

21       Dr. Dudley, just in case you need a break, we'll take

22   our afternoon break right here at this point.  Let's take

23   about a 20-minute break, so that will take us until 3:30.  And

24   let me talk to the parties.  You can go away, Doctor -- well,

25   you can go about your business, Dr. Dudley.

 1           Let's talk to the parties about how we're looking as

 2     far as schedule-wise, so that we can have some idea of where

 3     we're heading.  I presume that the United States is going to

 4     call at least three other witnesses.  Oh, you're not?  Two

 5     witnesses?

 6           MS. STEEGE:  Two more, Your Honor.

 7           THE COURT:  Okay.  So that would be -- who are those

 8     two witnesses?

 9           MS. STEEGE:  Mr. Jim Moeser and Ms. Lisa Simpson.

10           THE COURT:  So the other witness you decided not to

11     call?

12           MS. STEEGE:  That's correct, Your Honor.

13           THE COURT:  I mean at least -- is your mike on?

14           MS. STEEGE:  It appears so.

15           THE COURT:  Okay.  It's on now.  I mean, yeah.  Who is

16     your next witness if we get to it today?

17           MS. STEEGE:  After Dr. Dudley, it would be Jim Moeser.

18           THE COURT:  Jim Moeser.  Okay.  And if -- okay.  We'll

19     see what we get to with respect to Dudley if we even begin

20     with Moeser today.  Now, if we don't get to Moeser -- to

21     Mr. Moeser until tomorrow, what does the Government -- you

22     know, how does the Government believe that will shape up their

23     case?  And I'm not putting pressure on you to be through

24     tomorrow; I'm not.  I'm just trying to find out how we're

25     looking.

1          MR. CHENG:  Your Honor, we did drop one witness.  We

2     notified defendants.  That will help us a little bit, and

3     Mr. Moeser should be shorter.  So he's closer to Dr. Dudley

4     than Mr. Parrish, and we're hoping to make Ms. Simpson's a

5     little bit shorter, too.  So we anticipate if Mr. Moeser --

6     we're hoping to get him in today.  If we get him started

7     today, finish tomorrow, and we can start Ms. Simpson.

8          If we do run over, we'd run over to maybe part of the

9     next day.  There is a chance we might finish with her

10    tomorrow, but I don't want to overpromise.  She may be a

11    little bit longer than Mr. Moeser.

12         THE COURT:  Okay.  Now, if the Government changed how

13    it was going to try its case trying to get through before

14    tomorrow, I don't want -- I mean, there's no need for any of

15    the parties to change or do things differently because you

16    think -- I have all next week available.  I'm just trying to

17    figure out where to plug things in.  Because one of the things

18    I am going to ask the Government to do is ask Major Bryan if

19    she would return before Ms. Simpson testifies, because I

20    failed to ask her a couple of questions that I wanted to ask

21    her.  And I wanted to make sure that she can testify and --

22    hopefully testify before Ms. Simpson testifies, and I don't

23    think -- I don't think the questions from me will be long.  I

24    just want to make sure that I ask the question that I wanted

25    to ask yesterday and neglected to do so.

 1          MR. CHENG:  If the Court doesn't mind us putting her a

 2     little out of order to get that resolved, I think we can do

 3     that and put her on tomorrow morning.  My understanding is she

 4     is trying to make herself available this week.

 5          THE COURT:  Okay.  All right.

 6          MR. SHELSON:  Your Honor, from the defendants'

 7     perspective, it would be optimistic to finish with the United

 8     States' case tomorrow, and if we do, it will be towards the

 9     end of the day.  So for planning purposes, can we just assume

10     that the defendants' case is starting on Tuesday at whatever

11     point the United States --

12          THE COURT:  Well, no, no.  I already anticipated it's

13     going to be Tuesday before you put on anything, because

14     depending on how tomorrow goes, I was going to try to reward

15     everybody -- y'all been working pretty hard this week, and

16     we'll try to leave a little bit early because I was thinking

17     the Government's case might --

18          MR. SHELSON:  Yes, sir.

19          THE COURT:  I don't want us to be here all day

20     tomorrow, but if the Government wants to seek to try to get

21     all this evidence in tomorrow, that's fine.  So -- but, no, I

22     don't think you ought to be rushed in putting on your case.

23          I don't know who you intend to call at this point.  I

24     don't know how much you intend to get into.  I do know that,

25     you know, a lot of the exhibits that at least were exchanged

 1  are not in evidence yet, but the way things have been going

 2  over the last couple of days -- I mean, tomorrow is just one

 3  day and we have two experts, so I just don't see the County

 4  putting on any witnesses tomorrow.

 5       MR. SHELSON:  I just wanted to make sure the Court

 6  wasn't expecting witnesses from me.

 7       THE COURT:  No, I'm not.  I'm not.

 8       So if you will, go ahead and during this break contact

 9  Ms. Bryan to see if she can be in tomorrow for questions that

10  I have for her.

11       MS. COWALL:  Yes, Your Honor.  Is there a particular

12  time that you would like Ms. Bryan to show up?

13       THE COURT:  No particular time.  I mean, sometime

14  tomorrow morning is fine with me, because I just want to make

15  sure I ask her these questions before Ms. Simpson testifies.

16       MS. COWALL:  Okay.  Yes, Your Honor.

17       THE COURT:  All right.  We're in recess.

18            (A brief recess was taken.)

19       MS. COWALL:  I spoke with Ms. Bryan, and she will be

20  able to come back first thing tomorrow morning if that's all

21  right with the Court.

22       THE COURT:  It is.  Thank you.

23       Are we ready for the redirect of Dr. Dudley?

24       Dr. Dudley, can you hear?

25       THE WITNESS:  Yes, I can.

1           THE COURT:  Okay.  All right.  You may proceed.

2           MS. STEEGE:  Thank you, Your Honor.

3                    **REDIRECT EXAMINATION**

4    **BY MS. STEEGE:**

5    Q.   Dr. Dudley, can you hear me here?

6    A.   Yes, I can.

7    Q.   Great.  You were asked some questions about the contents

8    of the consent decree, and I just wanted to talk through a

9    couple things.

10          MS. STEEGE:  Could we bring up what's been marked as

11   PX-1, please?

12   BY MS. STEEGE:

13   Q.   Let's go to page 41.  Looking at page 94 -- I'm sorry,

14   paragraph 94, does that speak to tracking requirements for

15   people with mental illness?

16   A.   Yes.

17   Q.   What about -- flip to the next page here, still part of

18   paragraph 94.  Where it refers to the jail's requirement to

19   improve individual treatment, supervision and community

20   transition planning for prisoners with serious mental

21   illness --

22   A.   Yes.

23   Q.   -- what does "community transition planning" mean?

24   A.   That means treatment planning.

25   Q.   Does that include discharge planning?

1    A.    Yes.

2    Q.    Let's go to page 43, and let's look at paragraph 96(d),

3    which refers to, "Including mechanisms for notifying community

4    health providers, including the County's program of assertive

5    community treatment team when releasing a prisoner with series

6    mental illness so they can transition safely back to the

7    community."

8         And then it refers to certain other requirements as well.

9    What does this section address?

10   A.    It also addresses discharge planning.

11   Q.    Okay.  I believe Mr. Shelson also asked some questions

12   about whether the consent decree requires services at a

13   particular frequency, and you indicated that in some places it

14   does.  Let's -- I'm sorry, I'm going to walk through a little

15   more.  We're going to go to page 35 of the consent decree,

16   looking at paragraph 77(f).  Okay.  I'm looking at Section 2

17   which appears -- which looks like its requires that prisoners

18   with serious mental illness placed in segregation be offered a

19   face-to-face, therapeutic, out-of-cell session with a

20   qualified mental health professional at least once a week.

21   A.    Yes.

22   Q.    When you're evaluating compliance with the consent

23   decree, is that one of the provisions that you're looking at?

24   A.    Yes.

25   Q.    And I believe you talked about paragraph 42(g), which is

1    the one that talks about providing individuals with

2    appropriate treatment and also individual or group treatment?

3    A.   Yes.

4    Q.   Do you evaluate the County's compliance with those

5    provisions in each monitoring report?

6    A.   Yes.

7    Q.   And do those monitoring reports explain how you come to a

8    determination about compliance with a particular provision?

9    A.   Yes.

10   Q.   Do other aspects of your monitoring process present

11   opportunities to explain that reasoning and provide notice to

12   the County about its obligations?

13   A.   I don't understand your question.

14   Q.   Well, let's go back a second.  You testified that the

15   monitoring reports would explain your reasoning for

16   compliance.  Could you speak more about that?

17   A.   Well, I explained the findings, which is, you know, based

18   on a review of records, interviewing with staff, looking at

19   their logs so, for example, you know, based on all that

20   information, you know, I know that they're not able -- they're

21   not providing group therapy sessions of any type.  But in

22   exploring that further, I also comment on the fact that it's

23   because the staff are so sufficiently taxed with providing

24   other even more urgent services that they're unable to.

25   Q.   Okay.  And when you're evaluating other provisions of the

1    consent decree, do you provide similar levels of description

2    about your thought process behind those determinations?

3    A.   Yes.

4    Q.   You were asked a few questions also about Mr. Mosley?

5    A.   Yes.

6    Q.   Do people who are suicidal sometimes deny thoughts of

7    suicidality?

8    A.   There are two separate issues, one is that individuals

9    who are suicidal may deny suicidality particularly when

10   they're intent on committing suicide.  And then there's other

11   people who are at high risk of committing suicide who can in a

12   very short period of time become suicidal and may deny being

13   suicidal at the moment you asked.

14   Q.   Would a mental health professional need to be told that

15   someone is suicidal before assessing whether they might be?

16   A.   No.

17   Q.   What other signs might someone look to?

18   A.   Well, like, for example, I mean, specifically what I

19   would just said, that if a person is at high risk -- there's a

20   reason why they were so repeatedly asking him about whether he

21   was suicidal or not, and that's because it's well established

22   what the high-risk factors are for people becoming suicidal

23   while incarcerated.  And he has most of the things on that

24   list, and so that he was recognized as being at high risk; and

25   that's why they were asking him.

1  Q.   Okay.  You were also asked about records from a couple

2  years prior to his jail stay.  What kind of past mental health

3  diagnoses would be potential warning signs even if they had

4  occurred a couple years previously?

5  A.   What would be potential warning signs are two different

6  sorts of things.  One, indications of functional difficulty.

7  I mean, you're looking at, you know, what kind of --

8  difficulties in his ability to function he had evidenced over

9  time, because that's often the most objective findings in

10  folks' mental health records.  And then you're looking at a

11  diagnosis or what opinions that people who have evaluated him

12  before had from the standpoint of the underlying cause of the

13  dysfunction that he presented with.

14       Among those diagnoses, there are disorders that are

15  clearly chronic in nature, and once you have them, they're not

16  going to go away.  You can try to stabilize the person.  You

17  can try to control the symptoms, but the illness doesn't

18  disappear.  So when you find those sorts of disorders, then

19  you know the person continues to suffer from those disorders

20  when not in treatment.

21  Q.   And did Mr. Mosley have a diagnosis that falls within

22  that category of disorders?

23  A.   Yes.

24  Q.   Should the mental health needs of detainees be taken into

25  account in determining where to house them?

1   A.   Yes.

2   Q.   Why is that?

3   A.   Because they have special needs.  They have special needs

4   as it relates to their ability to interact with other

5   detainees.  They might have special needs with regard to their

6   vulnerability for being victimized by other detainees.  They

7   may be less able to handle some of the things that might be

8   going on on the regular unit.  They may need additional

9   monitoring and observation that other detainees don't need.

10   So for a combination of those reasons, it's important to take

11   that into consideration.

12   Q.   Should the mental health needs of detainees be taken into

13   account in making discipline decisions?

14   A.   Yes.

15   Q.   Why is that?

16   A.   As I indicated earlier, the issues related to even their

17   ability to participate in a disciplinary proceeding is

18   something that's important to consider.  Whether the behavior

19   was really actually better understood as a symptom of their

20   illness would be something that's important to consider, and

21   that would have a direct effect on a decision that might be

22   made about what's the most appropriate thing to do.

23        It's also important to consider, you know, what are the

24   mental health implications of the different choices that could

25   be made with regard to how to handle a situation.  Is this

1   person going to be harmed by being put in segregation or some

2   other discipline that might be employed?  Is this person going

3   to benefit from some sort of adjustment in their treatment

4   regimen?  So all of those things should be on the table when

5   considering disciplinary charges for people who are seriously

6   mentally ill.

7   Q.   Okay.  Now, are -- those two findings that need to be

8   taken into factor in the mental health needs of detainees in

9   terms of where to house them and making discipline decisions,

10  does that still hold true even if that detainee is potentially

11  violent?

12  A.   Yes.

13  Q.   Why is that?

14  A.   The fact that they're potentially violent makes them no

15  less mentally ill.  And the difficulties that they can cause,

16  too, with regard to safety and security within the facility is

17  a big concern, but also trying to stabilize them so that they

18  don't continue to present those difficulties in the facility

19  is of equally great concern as well as their own personal

20  distress.

21  Q.   Now, you were asked about whether -- your assessment as

22  to how the current medical and mental health staff are doing

23  in providing care, and I believe you were asked about whether

24  effectively they were doing the best they can do at this time.

25  Is this best they can do given the current resources they

```
 1    have, is that sufficient to meet detainees' needs?
 2        I'm not sure if the sound is okay.  Dr. Dudley?
 3    A.   Yes.  No is the answer.  Can you hear me?
 4    Q.   Yes.  Thank you.  Is the best the staff can do, given the
 5    current resources they have, is that minimally adequate to
 6    meet detainees' needs?
 7    A.   No.
 8    Q.   You were asked about your provision of technical
 9    assistance.  Did your provision of technical assistance
10    contribute to the contractor QCHC being able to provide
11    competent assessment and treatment and tracking of how they're
12    doing with those?
13    A.   I believe so.
14    Q.   We also looked at one of the health care policies
15    involved.  During the policy review and approval process, have
16    there been policies adopted that would require mental health
17    services and mental health units?
18    A.   I'm sorry.  Could you repeat that?
19    Q.   Sure.  During the policy review and approval process with
20    the County and monitors and Department of Justice, have there
21    been policies adopted that require mental health services and
22    a mental health unit?
23    A.   Yes.
24    Q.   And does the consent decree require implementation of the
25    policies that are developed during that process?
```

1    A.    Yes.

2    Q.    You were also asked about certain incidents on Rikers

3    Island.  Is Rikers Island larger than the Hinds County

4    Detention Center?

5    A.    Considerably.

6    Q.    Any idea by how much?

7    A.    No, not exactly.

8    Q.    What are --

9    A.    It's multiple facilities out there.

10   Q.    Okay.  Is it --

11   A.    It's a campus of multiple jails.

12   Q.    Okay.  Hundreds, thousands?  Do you recall that?

13   A.    Yes, thousands.

14   Q.    Okay.  Now, do you consider yourself the United States'

15   expert or an expert working with the Court's monitor assessing

16   compliance?

17   A.    The latter.

18         MS. STEEGE:  That's all for me.  Thank you.

19         THE COURT:  Dr. Dudley, we'll be through with you in a

20   few minutes.  I have a few questions I wanted to ask that I

21   just wanted to get some clarity on.  Can you hear me fine?

22         THE WITNESS:  Yes, I can Your Honor.

23                          **EXAMINATION**

24   **BY THE COURT:**

25   Q.    I think it's your testimony that the records and

1    information you reviewed show there are somewhere in the

2    neighborhood of 200 people in the Raymond Detention Center who

3    suffer from SMI?

4    A.   There are 200 people on the mental health caseload for

5    all of the facilities, for both facilities.

6    Q.   Okay.  For the facilities that are before the Court?

7    A.   Right.

8    Q.   Okay.  And the Raymond Detention Center itself, I think

9    the evidence will show that the population is not above 500

10   right now.  Is that a fair statement?

11        THE COURT:  If the lawyers want to answer that, that's

12   fine with me.  The number is 400 something; right?  Scratch

13   the question.  Scratch the question.  I'm not going to ask the

14   lawyers to testify.  I'm not going to do that.

15   BY THE COURT:

16   Q.   But your records, Dr. Dudley, show that there are 200

17   people who are receiving mental health services?

18   A.   That's correct.

19   Q.   And of that number, do you know how many you classify as

20   severely mentally ill, I guess, is my question?

21   A.   The majority of them.  It ranges as low as

22   three-quarters, like 75 percent of them, so it's around there

23   to a little higher, depending on how you define "seriously

24   mentally ill."

25   Q.   Now, you testified about persons who suffer from drug

1    overdose.  I think you testified earlier about those persons.

2    First of all, you said that there was a new class of drugs

3    that have entered that you now find in the facility; is that

4    what your testimony was?

5    A.   Yes, Your Honor.

6    Q.   Does that new class of drugs have a name or a description

7    of some sort?

8    A.   Yes, Your Honor.

9    Q.   Okay.  What is that new class of drugs?

10   A.   Opiates.

11   Q.   Opiates.  Okay.  Are those opioids being prescribed by

12   the health professionals there?

13   A.   No.

14   Q.   Would the opioids -- I guess if they're not prescribed by

15   the doctors, they should not be in there.  Is that a fair

16   statement?

17   A.   Yes, Your Honor.

18   Q.   Now, you indicated that there were some detainees who

19   have died of a drug overdose, and I think your testimony was

20   that there are occasions when overdoses are -- do not

21   necessarily have to lead to death, something in that regard.

22        But I guess my question was, I think you said there's

23   matters that you could take that are reversible and

24   appropriate intervention to reverse what might lead to one's

25   death because of drug overdose, and I think you talked about

1    certain symptoms of overdose.  I need to know what type of

2    symptoms of overdose that a medical professional like yourself

3    could recognize to sort of prevent that person's death?

4    A.   May I try to explain?

5    Q.   Yes, sir.

6    A.   What I was attempting to say was that early last year --

7    I believe I even mentioned this in court in one of our status

8    conferences that we -- there have always been drug-related

9    incidences in the facility, but that we were seeing a

10   different type of drug-related incidence where an individual

11   may be found on the floor of a unit unresponsive, for example.

12   We hadn't been seeing something like that before, and when we

13   started -- the medical started doing blood -- you know, would

14   intervene and do blood tests is when they discovered that

15   there were individuals who were taking and using these opioid

16   substances.  And we hadn't seen that in the facility before.

17        So the point that I was trying to make was -- and I

18   raised the concern then that overdose of these drugs as

19   opposed to taking a lot of marijuana, you know, some of the

20   other drugs was potentially more lethal which was of concern.

21        So what -- the point I was trying to make is that when

22   these -- these medications are being taken in a pill.  They're

23   taken orally; that a person may initially just feel very, very

24   sleepy or have difficulty being aroused from sleep, or they

25   may have some shortness of breath before they sink to the

1    point where they actually are at risk of dying from the

2    overdose.

3        So my point was -- is that while a fight against

4    contraband in the facility is an obvious thing that has to be

5    done to try to stop drugs from coming into the facility, but

6    while doing that we might want to alert corrections officers

7    that when doing their well-being checks, you know, if a person

8    is just -- seems to be asleep in the cell, maybe until we get

9    this under control, that's not enough.  And you should go and

10   make sure they're arousable, not oversedated, not too sleepy,

11   and if you find that, then you should call med because we can

12   give them Narcan.  It can reverse the effect of opioids, and

13   you know, possibly save their life.  Is that clearer?

14   Q.   Yes, sir.  In that regard, did you make those type of

15   specific recommendations to the persons with whom you dealt

16   with at RDC?

17   A.   I made those specific recommendations to the health care

18   staff, and I have consistently raised the recommendation that

19   a better working relationship between health care and security

20   staff to kind of problem solve around issues that -- medical

21   and mental health issues that come up, like the series of

22   overdoses they have seen there already before this one, would

23   be an important thing to do.

24       In other words, if they could have sat down together, how

25   are we going to combat this?  What should we be asking

1   corrections officers to do?

2   Q.   And when you came on the site visit, how many days were

3   you with the team on those occasions when the site visits

4   occurred?

5   A.   You mean historically?

6   Q.   Right.  Right.  The site visit when y'all came to the

7   facility for the site visit, were you with the -- how many

8   days were you there as a part of the monitoring team on a

9   sample week, for example?

10  A.   I was there the whole week with the rest of the team.

11  Q.   Okay.  You were there that whole week.  And just describe

12  for me what it is you would do during that week because I

13  heard what Mr. Parrish would do.  Tell me what you would do

14  during that week that you were at the -- participating in the

15  visit?

16  A.   I would meet with individual staff members and groups of

17  staff members, so I would start out with the HSA, the

18  administrator for the medical and mental health programs.  I

19  would meet with the nursing staff.  I would meet with the

20  discharge nurse.  I would meet with mental health staff.  I

21  would meet with the individual nurse practitioners who were

22  the prescribers of the medication.

23       When I was on site I would go on medication passes with

24  the nurses when they were doing their medication pass.  I

25  would go and see individuals who were seriously mentally ill

1  who were being held in segregation, and they also meet and do

2  a brief assessment of an individual that was described as a

3  problem, a treatment problem for them.

4      And I would also review medical records.  When I was on

5  site, I would myself go into the medical records systems and

6  review charts and medical records.  When I've been off-site, I

7  have to have the assistance from the HSA to do that, because

8  there's no outside way to get into the portal.  And so she

9  navigates it for me under my direction.

10      I also -- even when I was on site reviewing medical

11  records, I would do it with staff.  So as questions came up,

12  things weren't clear, I'd be able to ask them about them and

13  not just review the medical records in isolation.  I would

14  also -- when I first started, I helped them develop logs where

15  they could chart things -- where they could log when

16  assessments were done, how often people were seen, when their

17  treatment plans were completed, whether they were on

18  medication, when was the next time they were scheduled to see

19  visits, and then over time, we refined those logs.

20      And so when I'd go, I'd also review those logs as an

21  indication of compliance, that they're doing things in a

22  timely way.  If there's a problem, if the logs indicate that's

23  not the case, then I have an opportunity during the visit to

24  discuss with them, you know, why -- what's going on that the

25  treatment plans aren't being done in a timely manner, for

1  example.

2      So with regard to even making adjustments of how that log

3  is kept, initially it was seeming like it was taking an

4  awfully long time to get a lot of mental health assessments

5  done.  And then we looked case by case at the ones that seemed

6  to be made and discovered how common it was that people

7  refused assessments, and they had to keep going back.  So we

8  added that to the log, so that it would reflect what it is

9  they had to go through to try to get assessments done.

10      So we can kind of problem solve and identify problems

11  while we're there, reviewing some of the documents that they

12  provide for me.

13  Q.   Okay.  Thank you.  And you used the word "HSA," I think.

14  Tell me exactly -- you know, tell me exactly what that is.

15  A.   That's the health services administrator.  So there's a

16  staff person who is a nurse who is kind of the administrative

17  head of the on-site medical and mental health staff.

18  Q.   And as a part of the team -- well, let me ask you this.

19  Did the team meet with the sheriff and/or his designees before

20  the site visit would begin?

21  A.   It differed from site visit to site visit.  Sometimes

22  that would occur.  I may be called in for a meeting, say, for

23  example, when we were talk -- we've had meetings about the new

24  proposed jail.  You know, we all meet together to look at what

25  that design is and our respective, you know, questions about

1    that design.  So we would all meet together as opposed to

2    having separate meetings with each one of us about issues such

3    as that.

4        A lot of times when Mr. Parrish or Ms. Simpson are

5    reviewing incident reports, they might have some sort of

6    concern and would ask me to then go look at the person's

7    medical records as it relates to that incident.  So the team

8    also would meet during the course of a week to pass questions

9    and concerns on to each other.  So, for example, back when I

10   was there and I was looking at the space for the proposed

11   mental health unit, I certainly wanted to consult with

12   Ms. Simpson and Mr. Parrish about that.  So they would also

13   have thoughts about that.  So the team also meets during the

14   rest of the week to exchange information with each other and

15   ask for assistance from each other.

16   Q.   Thank you.  And then also as the -- as the group wrapped

17   up its site visit, was there an exit interview or anything of

18   that sort that was done?

19   A.   There's an exit conference where we share at least, you

20   know, kind of major issues or concerns that would ultimately

21   be addressed in the report or a hearing in front of Your

22   Honor.

23   Q.   Okay.  Now, I only have, I think, a couple more

24   questions, but I wanted to -- I was looking back at my notes,

25   and we were talking about Justin Mosley, whose name is part of

1   the record now.  As the Court recalls, he was the young man

2   who -- well, let me ask you this:  You indicated there were

3   things about him -- I believe you indicated there was things

4   about him where the persons running the facility, the

5   correctional officers and/or medical or whatever knew that --

6   well, let me ask you this:  Did Justin present any indications

7   that he was suffering from mental illness on his initial entry

8   into the facility -- his entry immediately prior to his death

9   basically?

10       Because his mother testified that he came into the

11  facility at some point in time on that day -- or what is it

12  about any of his conditions during the time that he stayed

13  there where the officials responsible for his care should have

14  known that he was suffering from a mental health -- from

15  mental health issues, I guess, and you can describe those

16  issues, if you will.

17       I didn't want to call them crises.  But is there anything

18  about his condition that would have taught a trained

19  professional, either in medicine or corrections, that Justin

20  Mosley was suffering from mental illness?

21  A.   Yes.

22  Q.   And what was that?  What were those things?

23  A.   There's two -- two separate issues to consider here.  One

24  is his underlying mental illness and what -- as I testified

25  yesterday, the nature of his mental illness is such that you

 1    have, if you would like, two separate sets of symptoms.  One

 2    of the symptoms of bipolar disorder, which are these swings in

 3    his mood from times where he is profoundly depressed and

 4    moments where he's hyper, overactive, talking fast, thinking

 5    fast, with or without irritability.  And as I indicated

 6    yesterday, he had what we call the rapid cycling type, which

 7    means that that behavior can change from day to day.

 8         The second set of symptoms are a result of the fact that

 9    the onset of his symptoms is when he was a teenager, and so

10    it -- that kind of thing going on in your life when you're a

11    teenager disrupts normal development.  So the other thing that

12    was always obvious about him, and maybe even most obvious to

13    the casual observer, is that he was developmentally immature.

14    And so that the -- and so both of those sets of symptoms were

15    evident in him during his stay at the facility.

16         Now, in addition to that, the point that I was trying to

17    make was -- is what -- what makes him at high risk of harm,

18    and the point I was trying to make is that we have a good

19    understanding of what kinds of people are at high risk of

20    becoming suicidal and that -- and that he has a lot of those

21    high-risk factors.  So, for example, if you look at his entire

22    medical record, he had been incarcerated or held or detained

23    at the facility before.  He had been on suicide watch before.

24    So he has a history of suicidality.

25         Number two, he has a serious mental illness.  Number

three, he has a serious mental illness of the type that is
characterized by impulsive and unpredictable behavior.  Number
four, he was also under a lot of psychosocial stress facing
the possibility of a lot of time, much more serious charges
than he had been before.  All of those things are high-risk
factors as well.

The -- you know, we have a suicide program for people who
are acutely suicidal.  What we don't have is a working
relationship between the mental health staff and security
staff for people who are at high risk of becoming acutely
suicidal who we should be keeping just kind of an extra eye
on.  Not taking their clothes and putting them on suicide
watch, but keeping an extra eye on them.  These are people who
could become suicidal very quickly.

Q.  So let me ask you this question about his prior
detentions, I guess, or detention.  You said he had prior --
he had been in the past placed on suicide watch, and he had
been detained before.  I presume that the County maintains a
record -- does the facility maintain a record of persons who
have been in the facility and who reenter the facility?

A.  Yes, Your Honor.

Q.  Okay.  So --

A.  I'm sorry.  You mean medical records?

Q.  Medical records or records that -- records, like for
Mr. Mosley.  He's been on suicide watch before.  He comes into

1    the jail six months or a year later.  He's placed back in

2    detention.  You know, he's turned in to -- he comes in.  Is

3    there anything which -- during his intake process where the

4    jail administrator, the correctional officers or anyone should

5    learn anything about his health needs at that point?

6    A.   The intake process includes asking questions about all of

7    that, you know, whether you've ever had psychiatric treatment,

8    whether you've ever been in the hospital?  It asks all those

9    history questions.

10        Now, does everybody always answer those honestly?  Not

11   necessarily.  But if you've been in the facility before, those

12   medical records are available.  So if you go into -- they're

13   certainly available from the time the electronic medical

14   records system was put into place.

15   Q.   And I believe my last question regards an exhibit that

16   Mr. Shelson showed you.  I believe it might have been from

17   either the consent decree or the stipulated order.  I think it

18   was a paragraph 77(f) that talked about face-to-face visits

19   that persons should have with the inmates.  Do you recall

20   that -- him pointing to you that area of the document?

21   A.   Yes, I do.

22   Q.   Okay.  And my only question is:  What's the -- is there

23   anything important about a face-to-face visit?  If there is,

24   what is important about it?

25   A.   I think what I've been trying to explain is that being

1    able to sit down face-to-face with someone when you're asking

2    them to talk about, you know, deeply personal things, you

3    know, where you have privacy, you're sitting down with them

4    face-to-face is a very different experience than standing in

5    the hallway talking to them through a door with other people

6    walking around.  You can't expect someone to engage with you

7    in that sort of extremely personal and intimate sort of

8    discussion without the kind of privacy that you would have if

9    you're sitting down with them in a room and being able to be

10   attentive in that sort of way without the distraction of

11   whatever's going on outside of yourself as you're standing at

12   the door and they're standing.

13   Q.   And I think that area of the document suggests

14   face-to-face visit at least once a week.  Is that what I

15   recall it saying?

16   A.   Yes.

17   Q.   And what is the -- is there anything -- apparently the

18   order or whatever suggested or required that -- why that

19   particular number, Mr. Dudley, is the one to one -- excuse me.

20   Is there anything special about once a week face-to-face

21   visit?

22   A.   Well, for the seriously mentally ill individuals, I think

23   that number -- I mean, I didn't write the agreement, but

24   you're trying to help them maintain their stability.  As I

25   testified the other day, if you look at the medical records

1    for many of these individuals who are noncompliant and you

2    look at the treatment notes, you'll see that they'll meet with

3    Dr. Bell or they'll meet with one of the other members of the

4    mental health staff.  And they may take their medication for

5    the next several days and then it kind of drops off, and so

6    that having that sort of frequency of contact is going to

7    increase the possibility of compliance, and if they're not

8    taking their medication all the time, then their symptoms

9    never remit.

10       You know, taking it for a couple days isn't enough when

11   you skip the next two weeks to have symptom remission, and

12   it's not until you have symptom remission that you can move to

13   the next step of helping them understand that they have an

14   illness that requires treatment.

15       So you have to get rid of the delusions or hallucinations

16   before you can get them to reflect on the fact that was a

17   symptom of their mental illness and not real, and it's

18   something they can learn to control and manage if they comply

19   with treatment.  So not being able to obtain stability doesn't

20   even allow you to help them understand and gain insight into

21   the nature of their illness.  And that requires rather

22   constant intervention with them, not -- you know, not

23   infrequent intervention with them.  And you -- and I indicated

24   that you can see that if you look at individual charts.

25   Q.  Okay.  Well, let me ask you this:  Are there occasions,

1    if you were treating an individual or if you were working in

2    such a facility where you would require if you had your

3    wishes, where you would require more than one face-to-face

4    visit each week?  Is there anything that might require someone

5    being seen more frequently than that?

6    A.   Yes.

7         THE COURT:  Okay.  I have no further questions for

8    Dr. Dudley.  Does the United States have any follow-up based

9    on what I've asked?

10        MS. STEEGE:  No, Your Honor.  Thank you.

11        THE COURT:  Does Hinds County have any follow-up based

12   on what I've asked?

13        MR. SHELSON:  Yes, sir.  May I proceed, Your Honor?

14        THE COURT:  You may.

15        MR. SHELSON:  May I display this to Dr. Dudley?

16                   **FURTHER CROSS-EXAMINATION**

17   **BY MR. SHELSON:**

18   Q.   Dr. Dudley, this is part of Mr. Mosley's medical records

19   P-90, page 13.  Do you see here the interview date --

20        MS. STEEGE:  Your Honor, just for a reminder, can we

21   not publish this one since it's under seal?

22        THE COURT:  P-90.

23        MS. STEEGE:  P-90.  Thank you so much.

24   BY MR. SHELSON:

25   Q.   Do you see the date?

```
 1   A.   Could you blow it up a little?

 2        THE COURT:  I'm sorry, Dr. Dudley.  Can you hear us

 3   now?

 4        THE WITNESS:  Yeah.  I said, can he blow up the exhibit

 5   a little bit?  I'm just having difficulty.

 6   BY MR. SHELSON:

 7   Q.   Is that better?

 8   A.   Thank you.  I think that's a lot better.

 9   Q.   Sorry.  So do you see that on July 30, 2018, Mr. Mosley

10   was administered the Columbia Suicide Severity Scale?

11   A.   Yes.

12   Q.   And the response to every item was no.  Do you see that?

13   A.   Yes.

14   Q.   So Mr. Mosley been admitted multiple times to RDC; is

15   that correct?

16   A.   That's correct.

17   Q.   So on this admission what more did you expect them to do

18   with respect to the suicide issue at the time of admission

19   than what they did?

20   A.   As part of the admission?

21   Q.   Yes, sir.

22   A.   I wouldn't expect them to do anything.

23   Q.   Anything further; is that correct?

24   A.   Not at the time of the admission, no.

25   Q.   All right.  Then can you see this, Doctor?
```

1  A.   Yes, I can.

2  Q.   And this is an intake history and physical assessment

3  dated November 16, 2018.  Do you see here a series of

4  questions about whether he wished to be dead?

5  A.   Yes.

6  Q.   And then there's a series of -- the next two questions

7  are in regards to suicide thoughts.  Do you see that?

8  A.   Yes.

9  Q.   And then the bottom two with regard to suicide and --

10  well, this one is suicide intent without specific plan and

11  then the suicide intent with specific plan, and the answer to

12  all those is no; is that correct?

13  A.   That's correct.

14  Q.   So on his admissions was Mr. Mosley assessed for suicide?

15  A.   Every one's assessed for suicide upon admission.

16  Q.   Okay.  So I'll represent to you that the admission

17  beginning January 29th, 2020, was his last admission, and do

18  you see the highlighted part where, suicidal, and the answer

19  is no?

20  A.   Yes, I see it.

21  Q.   And then same day, there were three more questions on the

22  intake regarding suicide, and they were all no; is that

23  correct?

24  A.   That's correct.

25  Q.   And do you recall the Court asking you about if he was --

1  if Mr. Mosley was visited in-person?  Do you recall that?

2  A.   Not really, but yeah, okay.

3  Q.   Regardless this highlighted entry that's dated April 14,

4  2001, (sic) does it indicate whether Mr. Mosley was seen

5  in-person?

6  A.   Yes.

7  Q.   What does it say in that regard?

8  A.   That he was seen on the pod.

9  Q.   And was that appropriate?

10 A.   I don't know what you're asking me.

11 Q.   Well --

12 A.   That he'd been seen?

13 Q.   Right.  Isn't that what one of the criticisms is, that he

14 wasn't being seen in-person?

15 A.   I don't -- I didn't say that he wasn't being seen

16 in-person.

17 Q.   Well, is it your testimony to the Court that he was being

18 seen in-person?

19 A.   He was being seen in-person.  My testimony, I believe,

20 was that, you know, was he being -- that he was being seen

21 in-person; that given his mental status, the opportunity to

22 spend more time with him, the opportunity to have him better

23 observed by security was of concern to me, not that he was

24 never being seen.

25 Q.   Okay.  So, I mean, this is hardly a situation where the

1    jail did nothing with respect to his suicide risks that you

2    mentioned earlier to the judge; correct?

3    A.    Where they did nothing?

4    Q.    Correct.  They actually did quite a bit, didn't they?

5    A.    I think that the mental health staff attempted to see him

6    as frequently as they could.

7    Q.    And they, in fact, saw him just within a few days of his

8    death, didn't they?

9    A.    That's correct.

10   Q.    Now, how would you characterize -- well, what

11   antipsychotic medications was Mr. Mosley on at the time of his

12   death?

13   A.    I'm trying to remember which ones.

14   Q.    Abilify?

15   A.    I think that's right.

16   Q.    Do you characterize Zoloft as an antipsychotic?

17   A.    No.

18   Q.    Okay.  So do you recall with what frequency Mr. Mosley

19   was taking Abilify, say, in the month or so before he died?

20   A.    I don't remember exactly, but I know that his taking of

21   medication had been inconsistent.  I don't remember exactly.

22   Q.    And I'll agree with you that's what the records show.  So

23   given the policy of forcing somebody to take an antipsychotic

24   medication that we went over earlier in your testimony, what

25   was your expectation of what the jail would do specifically

1  given Mr. Mosley's inconsistent taking of his antipsychotic

2  medication?

3  A.   I would expect them to try to meet with him as frequently

4  as possible to encourage him to take it.

5  Q.   And there is evidence they met with him frequently and

6  did encourage him to take it; correct?

7  A.   That's correct.

8        MR. SHELSON:  No further questions, Your Honor.

9        THE COURT:  And for the record one of the exhibits that

10  you mentioned, I think you said April 14, 2001.  I just want

11  to make sure that the record -- that didn't sound right --

12  it's April 14, 2021.

13        MR. SHELSON:  Thank you, Your Honor.

14        THE COURT:  Okay.  I think, Dr. Dudley, we're

15  through -- we're finally through with you for the day, and I

16  guess it is at the end of the day.

17        So I know the Government has another witness.  What

18  does the Government say with respect to starting that witness

19  or not?  Because it's -- well, let me ask you this:  Is it

20  likely that the Government will complete its direct in an hour

21  or less?

22        MS. STEEGE:  No, Your Honor.

23        THE COURT:  Okay.  Well, no, there's no need for us to

24  even chart into that area then.  I don't think so.

25        MS. STEEGE:  That's fine, Your Honor.

 1          THE COURT:  All right.  Thank you.  And for the record

 2    I'll also -- and I know the Government has not objected.  I

 3    misstated with respect to certain things about the suability,

 4    if you will, of the word.  There's only one defendant to be

 5    sued in this case, and that's Hinds County.  It is the entity.

 6    However, this case -- this whole proceeding, this proceeding

 7    and everything about this case going back to the investigation

 8    that ended up with the initial consent decree before Judge

 9    Barbour, the sheriff's department, the sheriff has always been

10    a defendant in his official capacity.  His lawyer has always

11    signed off on every document and submitted every -- and came

12    to every status conference along with members of the Board of

13    Supervisors when they could.

14          In other words, the sheriff's department itself is not

15    a political subdivision in Mississippi law nor is the Hinds

16    County Board of Supervisors.  It is Hinds County.  In that

17    regard, though, the Hinds County supervisors, like I said,

18    they've been attending every status conference, and the

19    attorney for the County signed off on every document, the

20    consent decree, the stipulated order, things of that sort.  So

21    each entity, again, will be allowed to have a representative

22    in this proceeding; that is, the sheriff or his designee as

23    well as the Board of Supervisors can have someone sit in to

24    represent them as the County's representative.

25          There's *Tuesno* -- *Tuesno versus City of Jackson* and

 1    some other cases that are -- *Hearn versus Board of Supervisors*
 2    is one that I'm familiar with.  2012 WL 3913423, at page 4,
 3    Southern District of Mississippi, September the 7th, 2012.
 4    And *Tuesno*, T-u-e-s-n-o, *versus Jackson*, 2009 WL 1269750, at
 5    page 1, and I think that is a Southern District case as well.
 6    But that's just a technical issue.  I don't think there's any
 7    problem with the members of the Board of Supervisors
 8    designating their designee to be here and the sheriff and/or
 9    his designee being in the courtroom throughout the
10    proceedings.
11         Mr. Cheng?
12         MR. CHENG:  Your Honor, just one point, when you
13    mention the party as Hinds County, I should mention there is
14    something a little unusual because of the way CRIPA is
15    written.  I think there's a good deal of case law that says
16    when you're attacking the sheriff, you're really attacking the
17    County or State government, because CRIPA says you can't go
18    after the department or the official.  There is not a ton of
19    case law on the issue.  A lot of the doctrines about suing the
20    State, they raised immunity issues.  None of that really
21    applies, so we do have to be a little careful about applying
22    some of that language.
23         I'm saying you may be correct in terms of the
24    representation here.  It won't make any difference, but we do
25    want to clarify there is a legal issue there that's a little

1    more complicated.

2         THE COURT:  All right.  And that's fine.  I know about

3    our case from a long time ago when we sued the Department of

4    Public Safety.  And I probably shouldn't say "we", but I was

5    at the U.S. Attorney's Office when we did it.

6         But in any event, these parties are allowed to have

7    their representative throughout the course of this thing.

8    They've been participating in this matter from day one at

9    everything.  Again, your designee or the -- well, the board's

10   designee and the sheriff and/or his designee.

11        With respect to tomorrow morning then, is it possible

12   that we start with Major Bryan?  Is that possible?

13        MS. COWALL:  Yes, Your Honor, it is.

14        THE COURT:  Okay.  I think we'll start with her in the

15   morning.  I do not think it will be long.  I just have a

16   couple of questions that I failed to ask, and then we'll move

17   on to Mr. Moeser and from there to -- we'll see where you get

18   to with respect to how far we get and what time of day it is

19   because I'm hoping -- because you-all have been good sports

20   this whole week, I'm hoping -- but I realize you may have --

21   nobody may have set aside Tuesday as well.  So I'll deal, you

22   know -- I'm hoping we can end early tomorrow.  But, again, I'm

23   not trying to mess up the presentation of anybody's case,

24   because we've got all next week.  And now that the trial that

25   I had for next week is gone, that trial was supposed to last

1    more than seven, eight days.  So that means I have the

2    following week open after that, too.  So I'm not suggesting

3    that you fill it up with this, but it's open.

4         So, again, we'll start up at 9:00 tomorrow morning.

5    Until then, the Court is adjourned.  Have fun the rest of the

6    evening.

7    **************************************************************

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **COURT REPORTER'S CERTIFICATE**

2

3        I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded by

9    me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13        THIS, the 18th day of February, 2022.

14

15                        /s/ Candice S. Crane, RPR, CCR

16                        Candice S. Crane, RPR, CCR #1781
                          Official Court Reporter
17                        United States District Court
                          Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25

———***DAILY TRANSCRIPT***———