IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                           PLAINTIFF

VERSUS                    CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

THE HINDS COUNTY BOARD OF SUPERVISORS,
HINDS COUNTY SHERIFF, ET AL.                       DEFENDANTS



EVIDENTIARY HEARING, VOLUME 5,
BEFORE THE HONORABLE CARLTON W. REEVES,
UNITED STATES DISTRICT COURT JUDGE,
FEBRUARY 18, 2022,
JACKSON, MISSISSIPPI



(Appearances noted herein.)












REPORTED BY:

    CANDICE S. CRANE, RPR, CCR #1781
    OFFICIAL COURT REPORTER
    501 E. Court Street, Suite 2.500
    Jackson, Mississippi  39201
    Telephone:  (601)608-4187
    E-mail:  Candice_Crane@mssd.uscourts.gov

1   **APPEARANCES:**

2      FOR THE PLAINTIFF:

3          CHRISTOPHER N. CHENG, ESQ.
           MATTHEW DONNELLY, ESQ.
4          SARAH G. STEEGE, ESQ.
           LAURA L. COWALL, ESQ.
5          HELEN VERA, ESQ.
           MITZI DEASE-PAIGE, ESQ.
6
       FOR THE DEFENDANTS:
7
           NICHOLAS F. MORISANI, ESQ.
8          JAMES W. SHELSON, ESQ.
           TONY R. GAYLOR, ESQ.
9          RAYFORD G. CHAMBERS, ESQ.
           JOHN C. HALL, II, ESQ.
10         REUBEN ANDERSON, ESQ.

11     ALSO PRESENT:

12         ANTHONY NJOKU
           MICHAEL DENAULT
13         ELIZABETH SIMPSON
           DAVID PARRISH
14         SHERIFF TYREE JONES
           LESLIE FAITH JONES
15         CINDY MOHAN

16

17

18

19

20

21

22

23

24

25

1                      **TABLE OF CONTENTS**

2    Style and appearances................................785-786

3    WITNESS:  KATHRYN BRYAN

4        Examination by the Court.............................789

5        Further direct by Ms. Cowall.........................824

6        Further examination by the Court.....................829

7        Further direct by Ms. Cowall.........................836

8        Further recross by Mr. Shelson.......................838

9    WITNESS:  JIM MOESER

10       Direct by Ms. Vera...................................855

11       Plaintiff's Exhibit 12 entered.......................885

12       Plaintiff's Exhibit 73 entered.......................911

13       Plaintiff's Exhibit 75 entered.......................911

14       Plaintiff's Exhibit 28 entered.......................918

15       Plaintiff's Exhibit 45 entered.......................946

16       Plaintiff's Exhibit 46 entered.......................954

17       Plaintiff's Exhibit 47 entered.......................956

18       Plaintiff's Exhibit 29 entered.......................963

19   Court Reporter's Certificate............................974

20

21

22

23

24

25

1          **IN OPEN COURT, FEBRUARY 18, 2022**

2

3          THE COURT:  You may be seated.

4          Good morning.  I assume there's nothing to take up?

5          Oh, okay.  Ms. Cowall?

6          MS. COWALL:  No, Your Honor.

7          THE COURT:  Okay.  Thank you.  Yesterday I think I

8    asked the parties -- I asked the United States to make sure

9    that Major Bryan was here this morning because I did have a

10   few questions I wanted to ask her.  And I think she's in the

11   courtroom; is that correct?

12         Major Bryan, you may return to the stand.  Good

13   morning.

14         THE WITNESS:  Good morning.

15         THE COURT:  You can remove your mask, and I'll remind

16   you that you're still under oath, ma'am.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  And I apologize.  I failed to ask you the

19   other day a couple of questions that I wanted to make sure

20   that I asked or make sure that they were asked, and they could

21   have been, but I don't think so from reviewing my notes.

22                        **KATHRYN BRYAN,**

23           **having been previously duly sworn, was examined**

24   **and further testified as follows...**

25                        **EXAMINATION**

**BY THE COURT:**

Q.   But do you recall the instructions -- I mean, have you spoken with anyone about your testimony?

A.   No, sir.

Q.   Okay.  Has anyone attempted to talk to you about your testimony?

A.   No, sir.

Q.   Before you, I think, on your witness table is PX-13.

A.   Yes.

Q.   Okay.  You see it?

     THE COURT:  I'm going to give the parties an opportunity.  She has the Court's Exhibit PX-13.  It's in evidence, and since I don't have the Elmo up here with me, I have a -- no, I have a copy.  PX-13, everybody has it?  Okay.

BY THE COURT:

Q.   Now, Major Bryan, PX-13 I believe is the letter of resignation.  Is that what you have before you?

A.   It is.

Q.   The letter of resignation that you wrote to Sheriff Crisler?

A.   Yes, sir.

Q.   All right.  I want to direct your attention to a couple of things in that particular letter of resignation.  I just want to make sure about some things.  In the first paragraph of that letter, you say, "I was assured from all parties, from

1   sheriffs to County officials."

2       Now, I see sheriffs is plural there. So what, if any,

3   sheriffs were you referring to in your letter of resignation?

4   A.   Sheriff Vance and Sheriff Crisler.

5   Q.   Okay. And you mentioned -- and you say, "I was assured

6   from all parties, from sheriffs to County officials."

7       What County officials specifically assured you that they

8   would have -- you say, "I would have the support."

9       What County officials, if any, did you talk to or who

10   assured you they would have your support -- or that you would

11   have their support?

12   A.   This is probably not an all-inclusive list, Your Honor.

13   Tony Gaylor, Mr. Credell Calhoun, Mr. Stephen Hopkins,

14   Mr. Kenny Wayne Jones, two or three --

15       MR. ANDERSON: Your Honor, I'm sorry, but I'm not

16   hearing her.

17       THE COURT: Oh, you're not hearing? Okay.

18       Could you speak up, please. Make sure that mike --

19   make sure the speaker is turned on.

20       THE WITNESS: Can you hear me now?

21       THE COURT: Hold on.

22       THE WITNESS: Now can you hear me?

23       THE COURT: Yes. Bring the microphone just a little

24   bit closer. One thing that's a disadvantage to those out

25   there is that you're turning your attention directly to me.

1   BY THE COURT:

2   Q.   But you mentioned Tony Gaylor, Mr. Credell Calhoun,

3   Mr. Stephen Hopkins.  Who is Mr. Stephen Hopkins?

4   A.   The assistant administrator for the County.

5   Q.   Okay.  And you said Mr. Kenny Wayne Jones.

6   A.   Yes, sir.

7   Q.   He's the current County administrator?

8   A.   Yes, sir.

9   Q.   Any others?

10  A.   Several of the commissioners.

11  Q.   When you say "commissioners," are you talking about the

12  Board of --

13  A.   Board of Supervisors.

14  Q.   Board of Supervisors?

15  A.   Yes, sir.  And there were others.  Everybody I talked to

16  offered support, but those are the ones I can think of by name

17  right now.

18  Q.   Okay.  Thank you.

19       Now, I know there was testimony, I think, but in that

20  second paragraph of your resignation, you refer to having

21  discovered in the last four months a distinct lack of support.

22  Tell me again, what did you believe was a lack of support for

23  you to do your duties?

24  A.   In general, Your Honor, everything was difficult.  Every

25  request I had, I had to go through so many people and so much

1    administration and so many logistics to get simple things

2    done.

3         There never seemed to be an opportunity for strategic

4    planning, long-term planning, short-term planning for jail

5    improvements, small and large.  There was very little

6    collaboration and, it seemed, very little -- the atmosphere

7    was resistant, in my opinion, to support the jail.  The words

8    were there.  I believe for some the intent was there.  But

9    when it came to actually supporting the jail, there wasn't

10   enough support to get much done.

11        And I know the pace that it should have taken because I

12   have fixed jails before.  If I hadn't fixed jails before, I

13   might have presumed that this was the normal pace of things,

14   but it isn't.  And those -- and they -- in my opinion, sir,

15   they were artificial barriers.

16        My mama always said, "If there was a million dollars

17   attached to you doing something, if you were going to gain by

18   doing something, would you put forth more of an effort?"  And

19   it just didn't seem to me that people in general had a good

20   appreciation for what was happening in the jail even after the

21   deaths.

22   Q.   And that death was the death in October?

23   A.   The sum of --

24   Q.   Is that -- you said --

25   A.   The sum of all deaths up to and including a murder.

1    There still was never a meeting, a strategic plan on if I'm

2    having difficulties accomplishing things, how can we pave a

3    way forward to make some of those things happen more

4    expeditiously or at all?

5    Q.   Okay.  Now I'm going to get you to turn to page 2 of that

6    exhibit.  Now, I think you -- I'm not sure what all testimony

7    was about this particular page or pages of the -- of this

8    particular exhibit, but can you tell me what this is?  What is

9    page 2?  Tell me, what is page 2 and the documents associated

10   with it?

11   A.   Yes, sir.  So in its entirety, this exhibit was my letter

12   of resignation.

13   Q.   The entire thing?

14   A.   The entire thing.

15   Q.   Okay.

16   A.   I did a cover let- -- knowing that information can be

17   requested by the public, I wanted to keep the details of it on

18   a separate document so that if information was requested about

19   my resignation, the County could offer page 1 and meet that

20   request, and then I wanted to put in more detail what had

21   happened, which was about the final straw of me having

22   difficulty being given the authority to run the jail, that

23   other entities had their hands in running the jail in a way

24   that was counter to the way I believed the jail needed to be

25   run.  So page 2 is details for that final event.

1    Q.   And that final event, tell me -- I understand what's on

2    this paper, and I've read it.  But for the record, could you

3    tell me what that -- what you consider that final event to be?

4    A.   Yes, sir.  So prior to November 8th, prior to this

5    incident, we had an incident that was almost exactly the same

6    present itself to the jail, prior to this, that ended very

7    badly.  The same circumstances presented themselves again on

8    November 8th, and this time it wasn't going to end badly

9    because all staff involved in this event did things exactly

10   how they should have.  They learned from the first event that

11   was a catastrophic failure, and they did a really good job

12   this time with this inmate for this incident.

13   Q.   And when you say "they learned from the first event," is

14   that the event that you described in that last paragraph from

15   March 2021?

16   A.   Yes.  Yes, sir.

17   Q.   Okay.  And do you recall just briefly -- I want to make

18   sure I'm clear on the event.  Is that where a person

19   presented -- well, tell me, what's that event?

20   A.   Well, a person came into booking and later died in

21   custody in the booking area.  It was found that staff didn't

22   do what they needed to do.  This time they did.  And after

23   they did what they needed to do appropriately and in

24   accordance with their policies, they received a call from

25   Sheriff Crisler telling them to do something different than

1    what their policies told them to do, and it caused great

2    consternation with the staff because they knew there was a

3    conflict between what they were being told by their boss, the

4    sheriff, and what their policies drove them to do.

5        And this had been occurring with the sheriff's

6    administration, not with Sheriff Crisler himself.  This was an

7    isolated incident with him.  But with that sheriff's

8    administration, there were people that were either directing

9    me to do something counter to how I knew the jail should be

10   run or circumventing me and speaking with my subordinates and

11   telling them to do things counter to how the jail needed to be

12   run.

13   Q.   But the -- go ahead.  I'm sorry.  That "sheriff's

14   administration," you're talking about the Crisler sheriff

15   administration?

16   A.   Yes, sir.

17   Q.   All right.  It had only been in place, though, for some

18   time after Sheriff Vance had died.  He was made the interim

19   sheriff by the Board; is that correct?

20   A.   Yes, sir.

21   Q.   Okay.  And he was interim sheriff on the date of this

22   letter, November the 10th -- I mean 10/20/21, he was interim

23   sheriff then?

24   A.   Yes, sir.

25   Q.   All right.  I see on page -- it's what is PX-13, page 3.

1    In that first paragraph beginning "Immediately upon accepting

2    an arrestee" and then you conclude that paragraph with, "This

3    unnecessary drain on scant resources is counter to my e-mail."

4         Could you elaborate on that, if you will, for me?   In

5    reviewing the sum total of your letter, what is this about,

6    the scant resources and unnecessary drain on your scant

7    resources?

8    A.   Yes, sir.  So when someone is arrested off the street by

9    an arresting officer from a municipality and they're presented

10   to the jail as an arrestee, before the jail accepts custody of

11   them, if they identify -- either the jail staff or jail

12   medical staff identify that that arrestee is in need of

13   medical care, they direct the arresting officer to turn around

14   and take that arrestee to get medically cleared for custody.

15        So let's say the arrestee was involved in a fight, has a

16   head wound, and he's bleeding.  The jail staff by policy does

17   not accept custody of that inmate because they're not fit

18   medically for confinement.  So the arresting officer is

19   directed to take them to the hospital.  At that point they

20   don't belong to the Hinds County Detention Center.  We don't

21   have to pay for that medical bill.

22        If we accept that arrestee, the minute we accept that

23   arrestee and then turn around and send him out to the

24   hospital, we are going to incur that medical bill, whatever

25   it's going to be.  So if we catch it soon enough, we can not

 1   only avoid serious medical issues in custody, we can avoid the

 2   cost of that.

 3   Q.   So in this instance on the night of November 8th, someone

 4   was arrested, brought to the detention facility.  Nursing

 5   staff or the booking people thought that the person needed

 6   medical attention, and they were following their -- what you

 7   thought the -- they were following what the procedures were,

 8   and they directed that the officer take the person to go get

 9   medical treatment before being booked in; is that --

10   A.   That's correct.

11   Q.   Is that what happened?

12   A.   That's what started to happen.

13   Q.   That's what started to happen.  And then, I mean, is that

14   the appropriate -- are those the appropriate procedures?  Is

15   that what should happen?

16   A.   Yes, sir.

17   Q.   Okay.  Now, in your last paragraph you say, "As dire as

18   the situation here is with detention services and as much

19   effort that is being applied to better the circumstances and

20   move toward compliance, this directive by the sheriff is

21   reckless and dangerous."

22       Now, what directive -- what specific directive are you

23   referring to in that letter?

24   A.   At the time, Sheriff Crisler called the jail and spoke to

25   someone in the jail and directed them to accept custody of

1    this arrestee.  In doing so, it -- again, in doing so, if that

2    arrestee had come in and had a medical event in custody, he

3    could have been seriously injured.  He could have died at a

4    maximum.  At a minimum, the minute we were told to accept that

5    arrestee, we were going to incur the cost from that point

6    forward for any medical attention he received outside the

7    facility.

8    Q.   And you describe it.  You say this directive is reckless

9    and dangerous.  Why do you say that directive was reckless?

10    A.   Your Honor, anytime you have someone who is -- who has

11    subject matter expertise in an area and you don't -- had he

12    called me, I could have explained this to him, and he would

13    have been better armed with all of the information with which

14    to make a good decision.  If he then made the same decision,

15    still having the information that I gave him, then we would

16    have continued to do what we were told to do by the sheriff.

17    But my job as the jail person is to give as much information

18    to the decision-makers about jails that I know they don't

19    have, any more than if I went to NASA, I'm not going to make

20    decisions for NASA without getting all the information about

21    building a rocket that I could get from those subject matter

22    experts.

23        And what was continuing to happen in this sheriff's

24    administration, Sheriff Crisler, that parlayed into the next

25    sheriff's administration was that I was being circumvented so

1  that they could continue -- sheriffs and sheriffs' senior

2  staff could continue to apply law enforcement reasoning, law

3  enforcement remedies to a detention problem, and that never

4  works.  It might work by accident once, but that's not a

5  sustainable model for a successful jail.

6  Q.   And I'm going to ask you, you used the term "reckless and

7  dangerous," and I'm going to ask you the same question.  Why

8  did you say it was dangerous?

9  A.   It is dangerous, Your Honor.  If the inmate comes in and

10 is clearly in -- is so clearly in need of medical attention

11 and medical clearance for custody that the medical staff and

12 the jail staff say the same thing, "This arrestee needs to be

13 seen, treated, and stabilized before we accept custody," then

14 we know what can happen.  If we don't send that inmate out for

15 higher-level treatment at a medical facility than they can get

16 inside and we put them in the holding cell or we have them in

17 a jail.  We know what can possibly happen with arrestees in

18 this state.

19 Q.   Do you recall how much longer the Crisler -- I guess the

20 Crisler administration was in place after you sent this

21 letter?

22 A.   I'm not for sure, sir.

23 Q.   Okay.  When that administration came to an end, were

24 there any other leadership changes within the organization of

25 the sheriff's department associated with the jail?

1    A.   As far as I know, just the sheriff changed.

2    Q.   Now, I note also in that the very next sentence of your

3    letter after you describe what you thought was the sheriff

4    actions, you say, "As a detention administrator and expert on

5    jail matters."

6         Now, I'm going to ask you, did you consider yourself an

7    expert on jail matters?

8    A.   I do.

9    Q.   You were hired by Sheriff Vance.  Did Sheriff Vance view

10   you as an expert on jail matters?

11   A.   I believe he did.

12   Q.   Okay.  Now, when you came on to the job, you've described

13   how you learned about the job, but I guess did you have a job

14   description that was given to you by the sheriff's department

15   or Hinds County?  Had you ever had a job description?

16   A.   No, sir.

17   Q.   What were you told you would be doing?  I mean, how did

18   you know what to do?  I mean, how did -- how was your -- I

19   mean, well, was there an offer letter to you?  Was there

20   something in writing to you?

21   A.   I don't believe there was, no, sir.

22   Q.   Okay.  So you showed up on the job.

23   A.   I did.

24   Q.   What were you asked to do?

25   A.   Sheriff Vance asked me to run the jail and get it out of

1    the consent decree, to get it compliant with the consent

2    decree.

3    Q.   Did you report to anyone other than him?

4    A.   No, sir.  And, again, I worked for him for a week, so

5    during that week I reported, I believe, directly to Sheriff

6    Vance.

7    Q.   Okay.  I guess on your first day of the job, did you have

8    a meeting with any persons affiliated with the detention

9    center?

10   A.   I believe my first day on the job was the same day that

11   the Board of Supervisors met, so we met down there, but that

12   wasn't a full meeting, so I believe shortly after that, I just

13   went to the jail.

14   Q.   Okay.  And as best as you can, tell me about any meetings

15   that you had with anyone, how you were intro- -- you know,

16   you're a new person who came from -- I know how you were

17   introduced to the Court at our status conference, but I'm just

18   trying to find out how you might have been introduced to

19   persons at the detention center.  You know, was there a

20   meeting of the correctional officers and "This is your new

21   boss," anything like that done?

22   A.   No, sir.

23   Q.   What was done?

24   A.   Nothing.

25   Q.   I'm going to direct your attention to page 7 of that

1    exhibit.  I'm going to give you an opportunity to review

2    page 7.  Was this part of the information that you sent as a

3    part of your resignation letter?

4    A.   No, sir, I don't believe it was.

5    Q.   Oh, you don't believe page 7 was?

6    A.   No, it -- make a correction.  I believe it was, yes, sir.

7    Q.   Okay.  Tell me what that document is, please.

8    A.   So we had had some inmates be sent out by our medical

9    staff for external medical treatment of some acuity, and once

10   those inmates went to their medical appointments, they were

11   refusing treatment.  I believe one -- in this circumstance, I

12   believe one of them had a broken jaw, and once he got to the

13   medical center, he refused treatment, and we are not

14   sufficiently able to care for his medical needs in the Raymond

15   Detention Center if he doesn't get treatment for his broken

16   jaw.  So this letter -- this e-mail is a request to sheriff's

17   counsel to research this issue and draft up a letter that we

18   could present to medical staff about this issue.

19   Q.   Okay.  And that was -- you say "sheriff counsel."  That

20   was Claire Barker?

21   A.   Yes, sir.

22   Q.   And the date of it is October 15, 2021, and -- well, I

23   guess your e-mail to her is October the 14th, 2021; right?

24   A.   Yes.

25   Q.   And you say, "I feel that we need to have something

1   drafted up to present to outside providers."  And explain what

2   your recommendation to her was.

3   A.   So this e-mail was a follow-up to a phone call that we

4   had had, so I didn't go into detail about what we needed

5   drafted up here.  In my previous facilities, counsel would

6   draft up a letter to outside providers telling them that

7   there's a difference with our inmates in custody and whether

8   they can or cannot refuse treatment.  And so that's what I was

9   asking Ms. Barker to do here was to research what we could do

10  here in this area to address this.

11  Q.   In your review of the policies or whatever, policies or

12  practices there at the detention center, such letter did not

13  exist?

14  A.   No, sir.

15        THE COURT:  By the way, for the parties, I do note that

16  PX-13, page 7, has a phone number there that I think needs to

17  be redacted, so we need to make sure that redaction -- that

18  redaction will be made by the courtroom deputy, that phone

19  number.

20        I assume that's your personal phone number.

21        THE WITNESS:  Thank you.

22        THE COURT:  Ms. Summers, you get that?  All right.

23  BY THE COURT:

24  Q.   Now, returning to that document, though, the last

25  sentence of -- I guess it was your e-mail to Ms. Barker, you

said, "There is some urgency with this request as we have an

inmate in custody housed in booking with a broken jaw who

refused surgery yesterday."

Do we know how that -- you describe him as an inmate in

custody.  Do you know how his jaw was broken?  Was that

someone -- well, do you know?  That's the first question.

A.   Not to swear to it.  My memory is he -- we believe he was

in an altercation but didn't admit to being in an altercation,

telling medical staff that he had fallen, but I'm not sure.

But it happened in -- whatever it was, we believe that it

happened while he was in our care.

Q.   Okay.  It happened in the detention center?

A.   Yes, sir.

Q.   Okay.  Do we know for how long his jaw was broken?

A.   I don't remember.

Q.   Do we know if there's an incident report or anything to

that effect that accounts for that broken jaw?

A.   I believe there was, yes, sir.

Q.   Okay.  Direct your attention to page 19.  I'll give you

an opportunity to review that.

You've reviewed it?

A.   Yes, sir.

Q.   All right.  Tell the Court what this document -- well,

first of all, was this part -- was this -- this is an e-mail,

I see.  Was it included with the attachment that you submitted

1   as a part of your resignation from your duties?

2   A.   I don't believe it was, Your Honor.

3   Q.   You don't believe this e-mail was?

4   A.   No, sir.

5   Q.   Well, tell me, then, what is this -- tell me what this

6   e-mail is.

7   A.   This e-mail direct- -- or dated November 8th, 2021, from

8   me to Sheriff Crisler was an e-mail after several

9   conversations about --

10  Q.   Wait, wait, wait.  Who all was copied on that e-mail?

11  A.   Anthony Simon, Claire Barker, Kenneth Wayne Jones,

12  Synarus Green, Tony Gaylor, and Tanecka Moore.

13  Q.   Tanecka Moore, it's the first time I've seen that name, I

14  believe.  Who is that person?

15  A.   An attorney with the County, sir.

16  Q.   Okay.  You may proceed.

17  A.   The subject is "Urgent Assistance Requested."  I had

18  asked Sheriff Crisler several times about help with staffing

19  at the jail.  Staffing at the jail did get worse during my

20  tenure.  This document described how bad it was getting by

21  listing the number -- listing the number of posts that we were

22  missing officers on a -- just a given day.  I just picked a

23  day, I picked a shift, and listed out the officers -- or the

24  posts that weren't filled by officers on that day and

25  referenced the fourteenth monitor's report where that was

1    addressed as well.

2    Q.   And there you say --

3         THE COURT:  I'll remind the parties you're responsible

4    for making sure that you have your one representative in the

5    courtroom if you intend to call any persons.  I think --

6         MR. SHELSON:  Yes, sir.  Thank you.  I think it's moot

7    in the sense that Mr. Calhoun is -- other than the sheriff,

8    the only other witness -- the only other person on our witness

9    list is Mr. Calhoun, and we understood the Court --

10        THE COURT:  No, no.  Mr. Calhoun can stay in.  Someone

11   else came in who might be a -- I don't want to --

12        MR. SHELSON:  Thank you, Your Honor.  So the only two

13   people in the courtroom right now on our witness list are the

14   sheriff and Mr. Calhoun.

15        THE COURT:  Right.  Someone walked in.  Mr. Hall is

16   taking care of that, and it was a County administrator.

17        MR. SHELSON:  Thank you, Your Honor.  We appreciate

18   that.

19   BY THE COURT:

20   Q.   Now, in this e-mail you say, "The jail system has fallen

21   below what should be considered minimum staffing levels, and

22   we are now unable to provide basic jail functions and

23   adequately address life safety concerns."

24        Tell me what those basic jail functions are that you

25   thought that you-all could no longer provide as of November

1   the 8th, 2021.

2   A.   Yes, sir.  So if we look at the list of nine positions

3   that were unfilled on this particular day on this particular

4   shift, we were unable to run pod control in one of the pods.

5   Pod control officers are responsible for opening and closing

6   doors; for watching the monitors, the cameras, surveillance

7   system.  So we didn't have an officer for that post.  We

8   didn't have officers in -- watching four of the housing units,

9   so they weren't doing -- they weren't -- we weren't doing

10  direct supervision there, and if we're missing two officers

11  for A3 and A4, that left a minimum complement of officers to

12  do wellness checks on all the inmates in all four pods of

13  each -- of all four units in each pod.

14  Q.   I want you to go back and explain something to me.  You

15  said we were missing two officers in A3, I believe -- A3 and

16  A4.  Okay.  So one officer was missing out of A3?

17  A.   Yes, sir.

18  Q.   One officer was missing out of A4?

19  A.   Yes, sir.

20  Q.   Okay.  And that's all in Pod A?

21  A.   Yes, sir.

22  Q.   Okay.  One officer was missing in B-Pod control?  Is that

23  what that represents?

24  A.   Yes, sir.

25  Q.   One officer was missing from B2?

1   A.   Yes, sir.

2   Q.   One officer was missing from C1?

3   A.   Yes, sir.

4   Q.   One officer was missing from booking ID?

5   A.   Yes, sir.

6   Q.   Medical security.  You've got two officer posts there in

7   parentheses.  What does that mean?

8   A.   When we have officers in -- working medical security, one

9   officer is posted in the medical unit to provide security for

10  the clinical functions that go on in the medical clinic.  The

11  other officer is responsible for perhaps escorting nurses down

12  the hall to conduct medication pass, to escort mental health

13  personnel down the hall to do their wellness checks, or to go

14  get inmates from the housing units and bring them to the

15  medical unit.

16      So when we don't have a full complement of the officers

17  assigned to medical security, there are times that medical and

18  mental health staff cannot fulfill their medical duties, so

19  they're put off for another day or another shift or another

20  time, but they're not conducted when medical and mental health

21  need them to be conducted.

22  Q.   And you mentioned -- is that one officer as a hall escort

23  who's missing?

24  A.   Yes, sir.  The hall escort officer is also responsible

25  for walking the hall and pulling inmates out of housing units

1   for attorney visits or to go to court or for any other

2   administrative-type functions.  Absent someone in that post,

3   then officers assigned to the housing units have to pull the

4   inmates out and they themselves have to leave the housing unit

5   to escort the inmate wherever they need to go.

6   Q.   Okay.  And then the next item is property room/laundry.

7   Was there a person who's missing from that area?

8   A.   Yes.

9   Q.   Okay.  So -- and this represents persons who were absent

10   on one particular shift?

11   A.   Yes, sir.

12   Q.   And at the time the shift was a -- what, an eight-hour

13   shift?

14   A.   Yes.

15   Q.   Your -- that sentence says, "We are now unable to provide

16   basic jail functions."  You've described that.  But you go on

17   to say, "and adequately address life safety concerns."  Tell

18   me what you meant by that.

19   A.   So to adequately address life safety issues in the jail,

20   we have to be conducting robust surveillance of inmates.  We

21   have to be watching inmates, interacting with inmates,

22   responding to inmates, preventing inmates from whatever

23   they're up to.  We have to provide security in the medical

24   unit.  We have to facilitate medical treatment to the inmates.

25       Not facilitating medication pass or medical or mental

1   health attention can be a life safety issue.  Not watching the

2   cameras in a pod control can be a life safety issue because

3   inmates are completely unsupervised for large periods of time.

4   Q.   You -- in the next paragraph, you say, "I've attached a

5   roster from yesterday at RDC as an example," and I presume

6   page 21 is that roster; is that correct?

7   A.   That's correct.

8   Q.   All right.  "It shows how desperately short-handed we are

9   even with no one out sick, on vacation, *et cetera*.  The

10  officers reflected on the roster as 'officers off today'" --

11  that's in quotes -- "'officers off today' are on their

12  regularly scheduled days off, eight-hour shifts.  With this

13  complement of officers, we are not able to provide direct

14  supervision, not able to" -- well, let's talk about not able

15  to provide direct supervision.

16       Was direct supervision required?

17  A.   It's my understanding from the consent decree -- first of

18  all, that facility was designed, physically designed, to be a

19  direct-supervision facility, and at one time it was run as a

20  direct-supervision facility.  It's my understanding that the

21  consent decree requires us to be a direct-supervision facility

22  again.  And we cannot be a direct-supervision facility without

23  officers stationed in those pods 24 hours a day.

24  Q.   Even if it is not -- even if direct supervision is not

25  required, in your view, is direct supervision important?

1    A.   It is critically important, yes, sir.

2    Q.   You also indicate there -- in addition to not being able

3    to provide direct supervision, you say, "not able to provide

4    breaks."  Tell me -- that was important enough for you to put

5    it in, so tell me, why is that important?

6    A.   So changing focus from inmates to my staff, to the staff,

7    we weren't able to provide respite breaks for officers.  If

8    there's no one to come -- if an officer is working pod control

9    and running the cameras and opening and closing doors,

10   watching for fires, watching for disturbances, and that

11   officer needs to take a break during their eight-hour shift to

12   go to the restroom or to take a meal or just to rest their

13   brain and there's no one to replace them, then they either

14   don't go on a break and don't rest their brains and fatigue

15   themselves, so that perhaps they're not operating at peak

16   capacity as officers, or they take a break and leave their

17   post unattended.

18   Q.   And you say -- associated with not being able to provide

19   things, you said, "not provide inmate meals on time."  Why is

20   that in this memo?

21   A.   When there are no -- when there is not a sufficient

22   amount of officers to go get the meal carts from the kitchen,

23   bring them down the hall, and distribute them to inmates and

24   we go hours past when the mealtime is scheduled to be

25   delivered, that can cause a great disturbance in our inmate

1    population when they're not fed on time or when they're fed

2    cold meals that were hot when they came out of the kitchen but

3    by the time they found officers enough to go get the meal

4    carts, the meals are cold.  That leads to inmate disturbances.

5    Q.   And then your letter goes on to identify those persons --

6    those category of people or positions that were vacant or

7    absent because no correctional officer there on staff, and

8    then you -- the last paragraph of the -- of that letter -- of

9    that memo or e-mail, you say, "Below are sections from the

10   fourteenth monitor's report that I have copied."  And that

11   portion of the report says "Recognizing all of the above noted

12   problems coupled with the fact that the sheriff has been

13   tasked with adequately staffing the jail system," and so forth

14   and so on.  It's there.  It's in evidence.

15       Why did you think it was necessary to put in this e-mail

16   a quote from -- I guess at that time it was the most recent

17   monitor's report; is that correct?

18   A.   That is, yes, sir.

19   Q.   So why did you feel the need to put that in this e-mail?

20   A.   So past relationships I've had with previous sheriffs,

21   because I've always worked for a sheriff's office, I felt it

22   my role to do the heavy lifting for my boss, and if I could

23   put everything in writing that they might need for leverage if

24   they needed help getting something to help the jail, if I

25   could put it all in writing, all the justification, so that

1    they could then turn around and just give my memo to whoever

2    they needed to give it to to get something for the jail -- I

3    don't know if I'm explaining this very well, but I want to

4    document all the leverage I could possibly think of to help

5    the sheriff leverage a change or to -- this provides a service

6    to my boss so that he can see all the information that's

7    available to make his priority decision.

8         If I do a lesser professional job and I just say,

9    "Sheriff, we need more people.  We're short-handed," then he

10   doesn't know how to prioritize my request because nothing in

11   that request indicated a sense of urgency, and another aspect

12   of his agency might give rise to a higher sense of urgency in

13   that moment for staffing.

14        So if I can provide all the justification I possibly can

15   to educate my boss to make the best decision, that's why I

16   added that last paragraph from the monitor's report as if to

17   say, "Sheriff, this is also on the monitor's radar," to help

18   increase awareness to what the sense of urgency was not just

19   from me and from the facts that I presented but also from the

20   monitors.

21   Q.   I want to turn your attention, same e-mail and going back

22   to the first paragraph, the second sentence says "I am

23   respectfully requesting immediate assistance with staffing the

24   jail until such time as a recruiting and retention plan bears

25   fruit and we can adequately staff the facilities with

1    detention officers as required by the federal government."

2        Let me ask you this question:  First of all, did you ever

3    receive a response to this e-mail?

4    A.   No, sir.

5    Q.   From no one, a written response?

6    A.   No, sir.

7    Q.   Did you ever get a verbal response to this e-mail?

8    A.   No, sir.

9    Q.   Did anyone ever talk to you about fulfilling the requests

10   that you have here, this need for immediate assistance with

11   staffing?

12   A.   No, sir.

13   Q.   At the particular time you said, "until such time as a

14   recruiting and retention plan bears fruit," did the County

15   have a recruiting and retention plan in place on this

16   particular day?

17   A.   No, sir.  Not yet.

18   Q.   Prior to your -- I may have asked -- I'm asking it in a

19   different way now, but prior to your -- I think you've already

20   said you never received a response to this.  You left

21   January 31st?

22   A.   Yes, sir.

23   Q.   Right?  Of 2022; right?

24   A.   Yes, sir.

25   Q.   You never received -- obviously this letter was written

 1    to Sheriff Crisler, but there were others who were copied.

 2    Did you ever get a response at all to the next sheriff -- at

 3    all from the next sheriff, which was Sheriff Jones?

 4    A.   No, sir.

 5    Q.   Did you and Sheriff Jones ever talk about the staffing

 6    needs of the facility?

 7    A.   Yes, sir, we did.

 8    Q.   Okay.  And what were those conversations about?

 9    A.   They were similar --

10    Q.   If you recall.

11    A.   Yes, sir.  They were similar in nature to this e-mail

12    request.  It was an in-person meeting asking for help with

13    staffing with Sheriff Jones for the jail.

14    Q.   Did any of the other people cc'd on that e-mail respond

15    in any way?

16    A.   No, sir.

17         THE COURT:  Now, for the parties I note -- I just want

18    to make sure my record is clear.  Your PX page 16 is a blank

19    sheet.  It's blacked out.  Is that intentionally done in some

20    way?  I -- just for your record so that your record -- so that

21    your record could be clear.

22         MS. COWALL:  Your Honor, we're checking on this.  One

23    moment, please.

24         THE COURT:  Okay.

25         MS. COWALL:  Your Honor, that page that was blacked out

1    was redacted because it was part of a medical record.  It

2    probably was overredacted, and we're happy to provide the

3    Court with a version that does not contain the redactions.

4          THE COURT:  Whatever the pleasure of the parties are.

5    It's your record, not mine, so --

6          MS. COWALL:  We'll do that, Your Honor.

7          THE COURT:  Okay.  Are we ready to resume or...  Are

8    we?  I mean, we don't -- I mean, are we ready?

9          MS. COWALL:  Yes, Your Honor.  We'll have to take some

10   time to get the Court an unredacted version and request it be

11   filed under seal.  We don't have that available at this very

12   moment.

13         THE COURT:  Okay.  No problem, unless we get an

14   objection from the County in that regard.

15         MR. SHELSON:  We can make that decision, Your Honor,

16   once we see it.

17         THE COURT:  Once you see it?

18         MR. SHELSON:  Yes, sir.

19         THE COURT:  Okay.

20   BY THE COURT:

21   Q.  Well, let me ask you this, Major Bryan.  And we're

22   wrapping up with the questions that I have, I think.

23   Beginning at P-9 -- excuse me, page 9, rather, page 9 I

24   believe are the policy with the subject of the chapter being

25   "Health Care," the subject being "Health Care Management."

1    Page 9 shows Procedure 13-101, "General."

2        Page 10 -- well, you go from -- you know, again, I was

3    reading these, and I just want to make sure.  I guess it's

4    your testimony that you also included portions of the

5    procedures that you -- well, let me ask you:  Are these

6    portions of the procedures that you contend that -- provided

7    for how the nursing and booking people should have responded

8    in the November 8th or 9th incident -- November the 8th

9    incident?

10   A.   Yes, sir.

11       THE COURT:  Now, I notice page 9 is what appears to be

12   a page 1 of Policy Number 13-100.  Page 10 of the exhibit

13   shows page 3.  Should there be a page 2?

14       I'm asking the people who prepared this exhibit, and it

15   looks like every odd page is here and none of the even pages.

16   I'm just asking so that the record could be clear, because it

17   does not look like all the paragraphs of Procedure 13-101 are

18   in evidence -- I mean is a part of this.

19   BY THE COURT:

20   Q.   And I just want to know:  Did you make -- what did you --

21   you said you understood that you were doing page 1 here, you

22   know, understanding that matters of public record may -- the

23   sheriff's office would be able to report to the public this is

24   your letter of resignation, and you said you attached other

25   documents.

1    I just want to know:  Of the documents that's submitted

2 here, those are the documents, because I think you've already

3 testified that you do not believe that page 19 of the exhibit

4 was attached as a part of it.  But of the procedures that you

5 attached, are those -- the ones that are included in that

6 packet, would that include all the pages that you would have

7 made part of the letter of resignation?

8 A.   So, again, Your Honor, I'm not -- I cannot recall if the

9 e-mail about the staffing shortage was part of the resignation

10 letter.  I can't recall one way or the other.  I do recall

11 that the policies were included.

12 Q.   Okay.  The full -- now, does this represent the full

13 policies that you provided?

14 A.   So I can't recall if it had the even pages.

15 Q.   Okay.

16 A.   But I did include the policy.

17 Q.   And tell me, why did you include either all or a portion

18 of the various policies that you included?

19 A.   It's always been my intent as a jail administrator to

20 take every opportunity I can to educate everyone on jail

21 operations, because I find that many people involved with the

22 jail know very little about how it should be correctly run.

23 They might know a lot about how it has been currently running,

24 but every chance I get to educate anybody involved in the

25 jail, I take that opportunity.

 1          Part of that is to show, here is the policy.  Here's why

 2     detention staff was doing what they were doing in that booking

 3     area during that November event, to educate the sheriff on

 4     this is why what you said to them was counter to the policy.

 5     So that's the intent of including the policies, Your Honor.

 6     Q.   Okay.  Now, again, you left employment with the County on

 7     January 31st, 2022.  You began working for a new sheriff,

 8     Sheriff Jones; is that correct?

 9     A.   Yes, sir.

10     Q.   Okay.  So from the time that you were there, you worked

11     under Sheriff Vance, Interim Sheriff Crisler, and then Sheriff

12     Jones?

13     A.   Yes, sir.

14     Q.   Is that correct?

15          Now, at some point in time before -- between Vance's

16     death and Crisler's appointment as interim sheriff, somebody

17     served as -- somebody, I mean, because there was no sheriff in

18     place.  Do you know who that person was?

19     A.   I believe that was Mr. Eric Wall.

20     Q.   Did you ever have any sort of conversation with Mr. Eric

21     Wall?

22     A.   I did as part of a larger conversation when Sheriff Vance

23     was here, but I don't recall if I had a meeting with Mr. Wall

24     while he was serving in between those two administrations.

25     Q.   All right.  And that period was not very long, was it?

1    A.   No, sir.

2    Q.   All right.  Now, do you know where Sheriff Crisler is?  I

3    mean, do you know if he holds any position in the County

4    organization at this time?

5    A.   At the time I left, he was the director of the

6    Henley-Young youth facility.

7    Q.   On your letter of November 10th, 2021, the letter of

8    resignation, you say, "During the next three months, as the

9    County retains my replacement, I will continue to work as

10   diligently as I have since I've been here and will help my

11   successor in their transition."

12        Did you discuss with anyone about assisting the -- your

13   successor in the transition?

14   A.   No, sir.

15   Q.   Did you assist in any way?

16   A.   I didn't have a successor while I was there.

17   Q.   Okay.  You didn't have a successor while you were there?

18   A.   Right.

19   Q.   All right.  As of November the 10th, you were willing to

20   aid any successor in your transition?

21   A.   Yes, sir.

22   Q.   Were you willing to aid anyone in your -- any successor

23   from January 31st, 2022?

24   A.   Yes, sir.

25   Q.   Now, I think there was some testimony -- well, let me ask

1    you this:  Based on your conversations with Sheriff Jones

2    about the detention center, do you know if you -- well, first

3    of all, did you have any conversations with Sheriff Jones

4    about the detention center?

5    A.    We did.

6    Q.    Based on those conversations -- approximately how often;

7    how many?

8    A.    Maybe two.

9    Q.    Two?  Did you-all have a staff meeting or anything in

10   that regard to talk about the ongoings of the detention

11   center?

12   A.    No, sir.

13   Q.    Did you-all discuss the consent decree or the stipulated

14   order in any way?

15   A.    Nothing more than a reference to it during a

16   conversation.

17   Q.    And what -- any -- you say a "reference to it."  Tell me

18   about that discussion about the detention center.

19   A.    We had a meeting regarding the termination of jail staff.

20   In that meeting was Sheriff Jones, Anthony Simon, myself, and

21   Lieutenant Cheryl Childs from investigations, and there was

22   some disagreement between Sheriff Jones and I about my

23   participation in a discussion or decision-making process about

24   personnel issues with the jailers, and when I said to Sheriff

25   Jones that it was part of the consent decree that the jail

1   administrator be an integral part of personnel matters with

2   detention officers, his words to me, and I quote, were, "Prove

3   it."

4        So I pulled out the consent decree and showed him the

5   section that was relevant, and he read it and told me that he

6   disagreed and interpreted it differently than that.  So that

7   was what I would reference.  That would have been the

8   reference to the consent decree during the course of the

9   conversation.

10  Q.   Any meeting about Sheriff Jones would have started

11  sometime after the Court entered its show cause order; right?

12  If I tell you that the record would reflect that the Court

13  entered its show cause order after the polls closed on the

14  night of the runoff election, then Sheriff Jones would have

15  become in office at some point after that.  If I make that

16  representation.

17        MR. SHELSON:  We'll stipulate to that, Your Honor.

18        THE COURT:  Okay.  All right.

19  BY THE COURT:

20  Q.   Was there a conversation between you and Sheriff Vance --

21  excuse me, Sheriff Jones with respect to this court's show

22  cause order?

23  A.   No, sir.

24  Q.   Okay.  You submitted a declaration as a part of some

25  documents, and I think the lawyers have spoken with you about

1  that.  Was Sheriff Jones a part of you -- assisting with you

2  preparing your declaration?

3  A.  No, sir.

4  Q.  Okay.  What was your perception of how -- you had dealt

5  with Sheriff -- well, let me ask you this:  When you came on

6  with Sheriff Vance, and I realize the overlap there was a week

7  or so, but even prior to that, was it your understanding that

8  you would have a part in -- as a jail administrator, you would

9  have some say-so with respect to the management of employees

10  there?

11  A.  I so believed that from Sheriff Vance that I closed part

12  of my consulting business, uprooted my entire life, came out

13  of retirement, and moved to Mississippi because I so believed

14  Sheriff Vance when he told me that I would be able to run the

15  jail.  I think the words that he or someone in his

16  administrative staff said to me was, "We're going to give you

17  the keys to the kingdom and let you do what you do."  That's

18  how deeply I believed in Sheriff Vance.

19  Q.  Now, what was your -- you alluded to -- well, not you

20  alluded to.  We've talked about the letter of resignation

21  submitted to Sheriff Crisler, and I -- what was your

22  perception, if you will, about the priority of the consent

23  decree based on your conversations with Sheriff Jones?

24  A.  Given that we never did have a meeting, a strategic plan,

25  or a targeted conversation about the consent decree, it

1    appeared that it wasn't as high a priority as I felt it should

2    have been.

3         THE COURT:  Those are all the questions that the Court

4    has, and I know they turned out to be more than what I sort of

5    indicated to the parties on yesterday.  But I've covered the

6    issues, I believe, that I wanted to cover.

7         I turn to the United States.  You may follow up based

8    on some of the questions that I've asked.

9         MS. COWALL:  Thank you, Your Honor.  I'll do that.

10                    **FURTHER DIRECT EXAMINATION**

11   **BY MS. COWALL:**

12   Q.   I'd like to pull up Plaintiff's Exhibit 13, please.  And

13   if we could turn to page 3 of that exhibit.  And if we look at

14   that first paragraph, the second sentence, stating "This

15   unnecessary drain on scant resources is counter to my e-mail

16   to the sheriff on Monday, November 8, 2021, (see e-mail and

17   shift roster attachments) where I address an urgent need for

18   staffing support."

19        Ms. Bryan, does that indicate to you whether the e-mail

20   we've been discussing was attached to your letter of

21   resignation?

22   A.   Can you ask that again, please?

23   Q.   Sure.  If you look at the second sentence in the first

24   paragraph on page 3 of PX-13, does that refresh your

25   recollection as to whether the e-mail regarding staffing that

1  we've been discussing was attached to your letter of

2  resignation?

3  A.   Yes, I believe it was.

4  Q.   So is it your recollection that the e-mail regarding

5  staffing that we've been discussing was indeed attached to

6  your letter of resignation sent to the County?

7  A.   Yes.

8       MR. SHELSON:  Objection.  Leading.

9       THE COURT:  Objection overruled.

10 BY MS. COWALL:

11 Q.   I just have a few follow-up questions as to what we've

12 been discussing this morning, Ms. Bryan.  When you spoke about

13 the detainee who was accepted into the jail contrary to jail

14 policy, if the jail had turned this detainee away, who would

15 be responsible for watching that detainee?

16 A.   The arresting officer.

17 Q.   And if the jail accepted the detainee into the jail, who

18 would be responsible for watching that individual?

19 A.   Jail staff.

20 Q.   So did that also have an effect on your correctional

21 officer staffing?

22 A.   It did.

23 Q.   And we talked a bit about some information on page 19 of

24 PX-13.

25       MS. COWALL:  If we could pull that up, please.

```
 1   BY MS. COWALL:

 2   Q.  Now, under the list of posts where officers were not

 3   present during this date, we talked about how one officer was

 4   missing.  Did that mean there was any officer on the posts

 5   listed in this list of nine posts?

 6       And if you could take them one by one, that might be

 7   easier.  So let's start with A3.  Does this mean there was

 8   anybody on A3 that day?

 9   A.  No.

10       MR. SHELSON:  Objection.  Leading.

11       THE COURT:  Objection overruled.

12   A.  As indicated by the shift post assignment on page 21 of

13   this exhibit, A3 was blank, indicating that there were no

14   officers assigned to that post.

15   BY MS. COWALL:

16   Q.  So it's not just that one officer was missing on A3; it's

17   that nobody was on A3; is that correct?

18       MR. SHELSON:  Objection.  Leading.

19       THE COURT:  Don't lead the witness.

20   BY MS. COWALL:

21   Q.  What does this indicate with regard to A3 with regard to

22   whether any officer was on the unit that day?

23   A.  As reflected on the post assignment roster, when you see

24   A3 and no officer assigned to that post, that indicates that

25   no officer was on that post.  So --
```

1   Q.   And is that -- I'm sorry.

2   A.   I'm sorry.  So if officers needed to go to A3, they would

3   come from one of the other posts that they were on, and they

4   would leave that post to go to A3 to attend to whatever needed

5   to happen in A3.

6   Q.   And is that the case for all the posts listed in that

7   list of nine?

8   A.   It is.

9   Q.   Now, if you look further down on that same page to the

10  reference from the fourteenth monitor's report, there's a

11  reference to the recent transfer of three detention officers

12  to patrol.  Do you know what that's referring to?

13  A.   I believe this was the time frame where there were three

14  detention officers who were also law enforcement certified and

15  they were pulled out of the jail and put on patrol.

16  Q.   Was that the only time it happened?

17  A.   The only time what happened?  I'm sorry.

18  Q.   Oh.  Were you aware of any other times that officers were

19  pulled from detention to other parts of the sheriff's office?

20  A.   Yes.  During my tenure that happened -- that did happen

21  where detention officers holding detention positions were

22  taken from detention services and transferred to the

23  operations in various positions there.

24  Q.   And you discussed some meetings with Sheriff Jones in the

25  context of references to the consent decree.  Did your

1  meetings with Sheriff Jones also address your requests for

2  additional jail staffing?

3        MR. SHELSON:  Objection.  Leading.

4        THE COURT:  Objection overruled.

5  A.  Yes.

6  BY MS. COWALL:

7  Q.  What did Sheriff Jones say regarding your request for

8  additional jail staffing in those meetings?

9  A.  So in those conversations, I offered some suggestions on

10  how that could happen, how law enforcement could be freed up

11  to come work in the jail temporarily.  The sheriff denied

12  those suggestions.  He said that he wasn't going to support

13  those.  And then after that I asked him if he had any

14  suggestions on how we could reallocate sheriff's resources to

15  prioritizing the jail, and he said he did not.

16        MS. COWALL:  I have nothing further, Your Honor.

17        THE COURT:  Thank you.

18        Mr. Shelson, you may proceed.

19        MR. SHELSON:  Your Honor, defendants request a

20  30-minute recess to prepare their examination.

21        THE COURT:  A 30-minute recess?

22        MR. SHELSON:  Yes, Your Honor.

23        THE COURT:  Okay.  Well, before we do that, then --

24  because you might need more than 30 minutes, because I got a

25  couple of other questions.

```
 1        MR. SHELSON:  Yes, sir.

 2        THE COURT:  And the Government will have an

 3   opportunity.  And I'm sorry.

 4                        EXAMINATION

 5   BY THE COURT:

 6   Q.   Major Bryan, page 21 of P-13, this was the post

 7   assignment sheet that you attached to your e-mail of November

 8   the 8th, 2021?

 9   A.   Yes, sir.

10   Q.   Okay.  And it identifies -- your e-mail identifies the

11   positions that were vacant on that date because people were

12   off work, basically; is that right?

13   A.   Yes, sir.

14   Q.   Okay.  I just want to know this:  On your sheet there,

15   it's the second shift under A-Pod floor.  A1 identifies a

16   person who was there, Princess Gardner; correct?

17   A.   Yes, sir.

18   Q.   A2, Marcus Wilson was there.  A3 -- well, first of all,

19   approximately how many inmates are in A1?

20   A.   I don't know off the top of my head.  There's about 60 in

21   each.

22   Q.   In each...?

23   A.   Unit.

24   Q.   In each unit.  And is A a unit?

25   A.   A is a pod.
```

```
 1   Q.   A is a pod.

 2   A.   A1 would be a unit.  A2 would be a unit.

 3   Q.   So each pod holds approximately 200 people?

 4   A.   Yes, sir.

 5        MR. SHELSON:  No.

 6        THE COURT:  I'm asking.  I know that would be 240 based

 7   on what she said.

 8        MR. SHELSON:  I'm sorry.  Is Your Honor asking the

 9   capacity or how many people were there at --

10        THE COURT:  I'm trying to figure out how many people --

11   we can go back and look at the records on that particular day,

12   I guess.  That might be in a particular monitor's report.  But

13   I'm just trying to find out.  Obviously this is from November

14   the 7th, 2021.

15   BY THE COURT:

16   Q.   So how many persons does a pod hold, approximately?

17   A.   It varies.  About 64.

18   Q.   It's designed to hold a pod?

19   A.   About 64.

20   Q.   Sixty-four people?

21   A.   Yes, sir.

22   Q.   Okay.  So in A1, is it fair to say 25 percent of that 64

23   is in A1?

24   A.   To clarify, each unit holds approximately 64.  Each of

25   the four units holds --
```

1    Q.    Each of the four units -- A1 would hold 64?

2    A.    Yes, sir.

3    Q.    A2 would hold approximately 64?

4    A.    Yes, sir.

5    Q.    A3 would hold approximately 64?

6    A.    Yes, sir.

7    Q.    But on this day on this shift, nobody was in A3?

8    A.    Correct.

9    Q.    Was somebody supposed to be in A3?

10   A.    Yes, sir.

11   Q.    A4.  Nobody was on A4; is that correct?

12   A.    Yes, sir.

13   Q.    Was somebody supposed to be on A4?

14   A.    Yes, sir.

15   Q.    Were detainees there in A4 on that day?

16   A.    Without having the proper records, I would presume so,

17   that that unit was full, was -- had -- occupied.

18   Q.    Occupied.  I'm not talking about full, but did they have

19   any detainees in that particular unit?

20   A.    Yes, sir.

21   Q.    To your knowledge?

22   A.    Yes, sir.

23   Q.    Any in A3 on that day?

24   A.    Again, without having the records in front of me, I

25   assume that it was occupied.

1   Q.   Okay.  All right.  With respect to the B-Pod floor that's

2   referenced here, there's an individual who's there at B1.

3   There's a name there.  There's no name at B2.  Would there be

4   a person who's expected to be on B2?

5   A.   So while I was there, Your Honor, there were varying

6   stages of construction going on, and some of the units at some

7   points were empty of inmates.  I can't say with a certainty

8   where inmates were housed.  To say that they all would have

9   been occupied, I don't want to make that assertion without

10  having the documents in front of me, but I can assure you that

11  these posts that are vacant on the sheet, some of them were

12  occupied with inmates.

13  Q.   And the ones specifically that you mentioned in your

14  e-mail you had identified as ones that -- that's P-19?

15  A.   Yes, sir.

16  Q.   I mean page 19.  I'm sorry.  Page 19 in your e-mail, you

17  list them, some, as we talked about, where there were persons

18  who were not on those particular posts on that given day?

19  A.   Yes, sir.

20  Q.   Okay.  So, again, A3 would have housed inmates on that

21  day?

22  A.   Yes, sir.

23  Q.   A4 would have housed inmates on that day?

24  A.   Yes, sir.

25  Q.   And you have B-Pod control on this sheet, page 19, and

1    B-Pod control on your post assignment sheet is vacant?

2    A.   Yes.

3    Q.   So somebody was supposed to be in B-Pod control?

4    A.   Yes, sir.

5    Q.   Now, does that mean that there was no one in B-Pod

6    control?

7    A.   It was likely that the officer assigned to B1 went into

8    B-Pod control to watch the cameras.

9    Q.   Okay.  So that person could just watch the cameras but --

10   A.   They would also have been responsible for wellness checks

11   on inmates in B1 and B2.

12   Q.   And the way that you generally staff it is that at least

13   someone is in control and at least someone is in each pod?

14   A.   In each unit of the pod, that's correct, yes, sir.

15   Q.   In each unit of the pod.  So in C1, the records would

16   necessarily show at some point, I guess, or could show that

17   C1, no one was there, according to the post assignment sheet;

18   others were in C2, C3, and C4.  So there were at least some

19   inmates in C1?

20   A.   Correct.

21   Q.   Thank you, Major Bryan.

22        THE COURT:  I'll give the -- the United States will

23   have an opportunity to resume after this 30-minute break,

24   because I'm going to give it to the County, this 30-minute

25   break, and then we will start up at that point.

 1          MR. SHELSON:  One thing for consistency, Your Honor.

 2   Exhibit P-13, page 20, also has the major's cell phone number

 3   on it, so if that could be redacted as well.  I just wanted to

 4   point that out.

 5          THE COURT:  Thank you so much, Mr. Shelson.  Page 20?

 6          MR. SHELSON:  It's at the top of the page.

 7          THE COURT:  Right.  We'll make sure it's redacted on

 8   the record.

 9          We'll be in recess until 11:05.

10                    (A recess was taken.)

11          THE COURT:  You may be seated.

12          Does the Government wish to follow up with the matters

13   after this break based on the questions that I've asked?

14          MS. COWALL:  Yes.  Just a few follow-up questions, Your

15   Honor.  But before we start, we conferred with defense counsel

16   during the break, and they have no objection to submitting to

17   the Court an unredacted version of PX-13 and requesting that

18   it be under seal.

19          THE COURT:  PX-13 or just that one document in PX-13?

20          MR. SHELSON:  Your Honor, if I could confer with

21   counsel?

22          THE COURT:  Okay.

23          MS. COWALL:  So what we're proposing is that there be

24   two versions of PX-13 and this second version could be, for

25   example, PX-13-1, and it would be unredacted and we would

 1   submit it under seal.

 2        THE COURT:  Y'all agree to do it?

 3        MR. SHELSON:  Yes, Your Honor, we agree.

 4        THE COURT:  And is that suitable, Ms. Summers?  We'll

 5   figure it out.  Okay.  All right.

 6        Oh, Major Bryan, you may return to the stand, please.

 7        MS. COWALL:  I have one more housekeeping matter before

 8   we start, actually.

 9        THE COURT:  Yes.

10        MS. COWALL:  And it's with regard to the question about

11   only the odd-numbered pages being included in that medical

12   policy attached in PX-13.  That's the way that the United

13   States received PX-13, that document.  We received it from the

14   County's compliance coordinator, but if the Court wants to see

15   a full version of that, it's Defense Exhibit 77.

16        THE COURT:  Okay.  Thank you so much.  I just wanted to

17   make sure that PX-13 is fulsome, I mean, you know, it's what

18   the United States intended to put in evidence.  That's all.

19        MR. SHELSON:  Just so the record's a little more clear,

20   there's actually two different policies attached to

21   Exhibit P-13, and one of them, one of those two, has been

22   admitted into evidence as D-77.  The other one has not been

23   admitted into evidence.

24        THE COURT:  Okay.  All right.  Thank you.

25                    **FURTHER REDIRECT EXAMINATION**

**BY MS. COWALL:**

Q.   Ms. Bryan, before the break, we talked about an example roster attached to your letter of resignation.

     MS. COWALL:  Can we go ahead and pull up PX-13, again, please, and could we look at page 19.

BY MS. COWALL:

Q.   And we talked about those two medical security posts that were unfilled on that date.  Ms. Bryan, how often were the medical security posts short-staffed during your tenure as jail administrator?

A.   Without having an array of records, on average we typically had just one medical security officer.

Q.   And did that impact the delivery of medical and mental health care?

A.   It did.

Q.   How so?

A.   I would get e-mails from the health service administrator or from other mental health staff documenting the times that they couldn't provide their services because we didn't have staff to escort them.

Q.   And we also talked about units occupied by inmates or detainees that operated without any officer assigned.  Do you recall that?

A.   Yes.

Q.   How often did that happen, that there were occupied units

1  without any officer assigned?

2  A.   Regularly.

3  Q.   And when you say "regularly," is that -- is there any way

4  you can quantify that?

5  A.   On any given day -- in general, on any given day on any

6  given shift -- let me back up.

7      I don't recall ever seeing a post assignment sheet that

8  was full while I was there.  So on any given day on any given

9  shift, there were vacancies.

10 Q.   Does that impact safety and security in the jail?

11 A.   Of course.

12 Q.   How so?

13 A.   Inmates require supervision.  Policy requires wellness

14 checks.  Jail operations require officers to do those

15 ancillary functions.  Anytime we don't have staff to fulfill

16 those duties, they get left undone.  And in the jail, lots of

17 things are priorities.  Lots of things can be tied either

18 directly or indirectly to life safety.  So it is -- it is of

19 great impact to have low staffing levels, consistent low

20 staffing levels.

21      MS. COWALL:  Thank you, Ms. Bryan.

22      I have nothing further at this time.

23      THE COURT:  Okay.  Thank you.

24      MR. SHELSON:  May I proceed, Your Honor?

25      THE COURT:  Yes, you may.

1                        **FURTHER RECROSS-EXAMINATION**

2   **BY MR. SHELSON:**

3   Q.   Good morning, Major.

4   A.   Good morning, sir.

5   Q.   Major Bryan, when you were the jail administrator, did

6   you have a written employment contract with the County?

7   A.   I did not.

8   Q.   Did you ever draft or prepare a strategic plan?

9   A.   I presented plans of action.

10   Q.   Right.  And do you agree with me that when the Court was

11   asking you questions, you made specific reference to a

12   strategic plan?

13   A.   Yes.

14   Q.   And that's the testimony I'm talking about.  So

15   specifically with regard to a strategic plan, did you ever

16   draft one?

17   A.   I never drafted anything titled "Strategic Plan," no.

18   Q.   We visited about this the first time you were here.  On

19   approximately November 3rd, 2021, did Sheriff Crisler offer

20   that detainees in A-Pod could be moved to Madison and Rankin

21   Counties?

22   A.   Did he say that to me?

23   Q.   Yes.  I think your testimony on last time was -- the

24   answer to that question was yes.

25   A.   So there was a meeting with County officials where I

1    believe Sheriff Crisler offered that as an option, to move

2    inmates out to adjoining counties.

3    Q.   And did you reject that offer?

4    A.   Again, it was a generalized meeting.  He wasn't directing

5    that to me, but I raised some concerns about that because we

6    hadn't had a chance to sit and talk about what that would

7    entail.

8         MR. SHELSON:  May I display this, please?

9    BY MR. SHELSON:

10   Q.   You agree your resignation letter that's marked

11   Exhibit P-13 is dated November 10th, 2021?

12   A.   Yes.

13   Q.   Is the meeting that you're talking about where the issue

14   of moving A-Pod detainees to Madison and Rankin Counties, did

15   that meeting occur before November 10th, 2021?

16   A.   I don't recall when that meeting was, but if it was

17   November 3rd, then, yes, it would have been prior to this

18   letter.

19   Q.   All right.  Page 1 of Exhibit P-13, Major Bryan, do you

20   remember the Court asking you some questions about whether you

21   were willing to help your successor in transition?

22   A.   Yes, sir.

23   Q.   And you testified that you never had a successor; did I

24   get that correct?

25   A.   Yes.

1    Q.   But is it your position that you rescinded this

2    resignation?

3    A.   Yes.

4    Q.   Are you able to see this, Major?

5    A.   Yes.

6    Q.   Thank you.  I'm turning to page 3 of Exhibit 13, this

7    first highlighted sentence where it talks about an unnecessary

8    drain on scant resources.  Is that in reference to medical

9    care?

10   A.   That sentence is in reference to the staffing support in

11   that e-mail.

12   Q.   Okay.  And so what costs are you complaining about that

13   should not have fallen on the detention center?

14   A.   So that sentence that refers to an unnecessary drain with

15   regards to staffing support, when we accept an arrestee into

16   the facility and then have to transport them to the hospital,

17   then that falls on detention staff to do that transport, not

18   just transporting but staying with the inmates while they're

19   at the hospital for treatment.

20   Q.   But are you suggesting that ultimately somebody other

21   than the County would have bore those costs?

22   A.   So if we don't accept the arrestee?

23   Q.   Right.

24   A.   It was my understanding that if we do not accept that

25   arrestee into custody and have the arresting officer from the

1    municipality take them to the hospital, then those costs are

2    not borne by us.

3    Q.    Who is "us"?

4    A.    The County.

5    Q.    That's your understanding?

6    A.    That was my understanding, yes.

7          MR. SHELSON:  May I approach the witness, Your Honor?

8          THE COURT:  You may.

9    BY MR. SHELSON:

10   Q.    Major Bryan, is Exhibit D-77 one of the two policies

11   that's attached to Exhibit P-13?

12   A.    Yes.

13   Q.    Do you know one way or the other whether the odd-numbered

14   pages are omitted from P-13 because you just didn't copy them?

15   A.    I don't know why they're omitted.

16         MR. SHELSON:  May I approach the witness, Your Honor?

17         THE COURT:  You may.

18   BY MR. SHELSON:

19   Q.    I've handed you a copy of Exhibit P-13.  Will you turn to

20   page 9, please.  Is this Policy Number 13-100?

21   A.    I'm sorry.  The pages aren't numbered in this packet.

22   Q.    Is this Policy Number 13-100?

23   A.    Yes.

24   Q.    Okay.  So what policy are you saying was violated?

25   A.    This policy.

```
 1    Q.   I know.  What specific provision of that policy are you
 2    saying was violated?
 3    A.   Can you give me a minute to review the entire policy to
 4    select those areas?
 5    Q.   Sure.
 6    A.   So it would begin with Section 13-101, subsection 2,
 7    where it says, "Health care-related judgments are made by the
 8    physician, psychiatrist, nurse practitioner, or dentist
 9    working under contract with HCDS."
10    Q.   What provision was that?
11    A.   13-101, subsection 2.
12    Q.   Major Bryan, let me stop you there.  Isn't Policy 13-100
13    applicable to once the detainee is already at RDC?
14    A.   Right.  So that arrestee was at RDC.
15    Q.   Right.  He would -- let me rephrase that.
16         13-100 applies to people who are already admitted as
17    detainees at RDC; correct?
18    A.   I don't know.  I'd have to review the --
19    Q.   All right.  Let's move on, then.  Let me show you -- let
20    me just display this to you.
21         MR. SHELSON:  Well, first of all, may I confer with
22    counsel?
23         THE COURT:  Yes, you may.
24         MR. SHELSON:  So what I'm about to show the witness
25    were two instances where there should be a redaction where
```

1  there's not, so can we not display this beyond the witness?

2         THE COURT:  Okay.  All right.

3         MR. SHELSON:  I can deal with it, Your Honor.

4         THE COURT:  Can you show it to her?

5         MR. SHELSON:  Yes, sir.

6  BY MR. SHELSON:

7  Q.   I'm going to ask you about that page, Major.  If I can

8  take my doc- --

9         THE COURT:  If you want to -- I'm sorry.  If you want

10  to retrieve it, Ms. Summers can assist you now.

11         MR. SHELSON:  Thank you, Your Honor.

12  BY MR. SHELSON:

13  Q.   I'm going to ask you some questions about that.  So do

14  you now know who I'm talking about when I --

15  A.   Yes.

16         MR. SHELSON:  So can I display this just to the witness

17  and not publicly?

18  BY MR. SHELSON:

19  Q.   All right.  This is the person we're talking about where

20  you took issue that this person was admitted to RDC over your

21  objections; is that correct?

22  A.   I believe so, yes.

23  Q.   Okay.  So what was that person arrested for?

24  A.   I don't know.

25  Q.   All right.  If that person was arrested for domestic

1    violence, does -- do you know whether under Mississippi law

2    that person must be detained?

3    A.   Can you rephrase your question?

4    Q.   If this arrestee was arrested for domestic violence, do

5    you know whether under Mississippi law that person must be

6    detained?

7    A.   Yes.  I believe so, yes.

8    Q.   And he was, in fact, detained?

9    A.   When you say "detained," do you mean by the arresting

10   officer or --

11   Q.   No.  I mean detained -- I mean in this instance detained

12   at RDC.

13   A.   Yes.

14   Q.   Okay.  And was he, in fact, detained at RDC?

15   A.   Yes.

16   Q.   Over your objection?

17   A.   It wasn't my objection to accept him into custody.  It

18   would have been my recommendation to send him out for medical

19   treatment prior to accepting him into custody.

20   Q.   And this arrestee, though, he was sent out -- he was sent

21   to the hospital, wasn't he?

22   A.   It appear- --

23   Q.   Right here.  "Was taken to UMMC and refused treatment."

24        Did I read that correctly?

25   A.   The entirety of that sentence says, "Prior to coming to

1    RDC," so it would appear from this document that the arresting

2    officer had presumably taken him to the medical center.

3    Q.    Right.  So the arresting officer took this arrestee to

4    UMMC, and the arrestee refused treatment; correct?

5    A.    Yes.

6    Q.    And then he was brought to RDC and he was placed into

7    custody because he was charged with domestic violence;

8    correct?

9    A.    Initially the report I got from the officers and medical

10   staff was that they were asking the arresting officer to take

11   that arrestee to the medical clinic for clearance.

12   Q.    Okay.

13   A.    And then he was later accepted into the facility.

14   Q.    And do you know one way or another whether placing him in

15   custody for his domestic violence charges was consistent with

16   Mississippi law?

17   A.    Yes, it was.

18   Q.    Did you have any discussion while all this was going on

19   with Sheriff Crisler on what his rationale was for wanting

20   this arrestee placed in custody?

21   A.    Yes.  After the event, we did.

22   Q.    And did he mention to you the domestic violence issue?

23   A.    He did.

24   Q.    Do you recall being asked by the Court about this e-mail,

25   Major Bryan, which is page 19 of Exhibit P-13?

1   A.   Yes.

2   Q.   All right.  Do you recall being asked whether Sheriff

3   Jones had any discussions with you about the e-mail that's on

4   page 19 of Exhibit P-13?

5   A.   Yes.

6   Q.   All right.  How do you know whether Sheriff Jones ever

7   saw this e-mail?

8   A.   I don't.

9   Q.   Did you have some sort of expectation that Sheriff Jones

10  would review the e-mails that had been sent to his

11  predecessor?

12  A.   I don't know that I had any expectations one way or the

13  other for that.

14  Q.   Let's talk about staffing.  Would you agree that more

15  than 90 percent of what we're here talking about during this

16  hearing relates one way or another back to staffing issues?

17  A.   I don't know if I can quantify the percentage of what

18  we've talked about.  I know we've talked about staffing.

19  Q.   Is there any issue more important to RDC than staffing?

20  A.   Staffing is critically important, yes.

21  Q.   Can you think of any other issue that's more important?

22  A.   Physical plant is as important as well.

23  Q.   But don't you agree you need staffing to make sure that,

24  once repairs are made, the inmates don't tear it back up

25  again?

1    A.    Yes, that's important.

2    Q.    That's staffing issue; right?

3    A.    Yes.

4    Q.    All right.  And look at page -- this is page 21 of

5    Exhibit P-13.  Everything on this page is a staffing issue,

6    isn't it?

7    A.    Yes.

8    Q.    And there's ripple effects.  So, like, the heading

9    "Medical Security," so staffing impacts issues like med pass

10   and so forth, doesn't it?

11   A.    I'm sorry.  Can you rephrase your question?

12   Q.    Staffing impacts other issues; for example, if there's

13   enough people to escort medical personnel to see somebody, to

14   see a detainee in a unit?

15   A.    Yes.

16   Q.    And hall escort, you need staffing to have hall escorts,

17   don't you?

18   A.    Yes.

19   Q.    Do you contend that Sheriff Vance told you that staffing

20   did not need to increase at Rankin -- excuse me, at RDC?

21   A.    I don't recall having a conversation with Sheriff Vance

22   about that.

23   Q.    Do you recall any sheriff telling you that they were of

24   the belief that staffing did not have to increase at RDC?

25   A.    If I understand your question, you're asking me if any

1    sheriff told me that staffing did not have to increase?

2    Q.   That's my question.

3    A.   No, I do not recall that.

4    Q.   Did anybody with the Board of Supervisors tell you that

5    or any words to that effect?

6    A.   No.

7    Q.   Did you ever meet with Sheriff Jones before he took

8    office regarding RDC?

9    A.   So I'm unsure how to answer that.  I believe I met with

10   Sheriff Jones after he was elected, but not before he was

11   elected, no.

12   Q.   Okay.  So did you meet with Sheriff Jones on

13   approximately November 24th, 2021, in the Board of

14   Supervisors' conference room?

15   A.   I don't recall the date, but, yes, that was where we met.

16   Q.   So if it was Oct- -- excuse me.

17        If it was November 24th, 2021, I will represent to you

18   that that was about a day after the show cause order was

19   entered.  Okay?  At that meeting on or about November 24th,

20   2001 *[sic]*, were you, Supervisor Calhoun, Sheriff Jones, and

21   Tony Gaylor present?

22   A.   Yes.

23   Q.   All right.  And is it your testimony that the consent

24   decree was not discussed at that meeting?

25   A.   I believe that was one of the things that was brought up,

1    yes.

2    Q.   And it was brought up and it was discussed in some amount

3    of detail, wasn't it?

4    A.   I don't recall exactly what was talked about in that

5    meeting.  We covered a lot of areas.

6    Q.   Do you recall if at that meeting Sheriff Jones told you

7    that you were his field training officer on the consent

8    decree?

9    A.   I do.

10   Q.   He told you that?

11   A.   He did.

12   Q.   Did you tell -- well, strike that.

13        Did you say at that meeting, "I'm not sure we're going

14   into receivership, but if we do, there's a strong possibility

15   I'll be the receiver," or words to that effect?

16   A.   I did not.

17   Q.   You deny that?

18   A.   I do.

19   Q.   As of December 1st, 2021, did you have a command staff in

20   place of your choosing?

21   A.   Mostly, yes.

22   Q.   Do you remember talking about this the other day on

23   cross-examination?  Is this your declaration that was filed on

24   December 17th, 2021, ECF-106?

25   A.   Yes.

1   Q.   At paragraph 4 does it read, "As of December 1, 2021, I

2   now have in place a command staff of my choosing"?

3   A.   Yes.

4   Q.   Does paragraph 6 read in part, "The County recently

5   transitioned the training program to me from the sheriff, and

6   this has allowed me, in conjunction with the training officer

7   on my staff, to plan improvements to the training curriculum

8   for detention staff"?

9   A.   Yes.

10  Q.   Does paragraph 8 in part say "In November 2021 recruiter

11  Bernard Moore was reassigned to me to strengthen recruiting

12  efforts related to the RDC and the work center"?

13  A.   Yes.

14  Q.   Paragraph 9 read in part, "With respect to staff

15  retention, Hinds County Board of Supervisors approved a

16  5 percent pay raise for all staff at the RDC along with

17  premium pay"?

18  A.   Yes.

19  Q.   Did you view those things as a distinct lack of -- strike

20  that.

21       Did you view those things as a distinct lack of support

22  from the County?

23  A.   No.

24  Q.   Paragraph 11 of your declaration, does it read in part,

25  "To date, the County has devoted resources to renovating the

1    living units at the facility in an effort to set those units

2    up for direct supervision"?

3    A.   Yes.

4    Q.   Paragraph 12, in part does it say "We also have looked to

5    make certain that detention officers conduct security rounds

6    at required intervals.  To that end, the County recently

7    approved a request for funding to purchase and install an

8    electronic rounds system"?  Does it say that?

9    A.   Yes.

10   Q.   Does paragraph 14 say in part "The County also has

11   renegotiated its agreement with Quality Correctional Health

12   Care (QCHC), the contractor providing medical and mental

13   health care at RDC"?  Does it say that?

14   A.   Yes.

15   Q.   Now, I think I may have asked you this -- I apologize --

16   from the first time you were here, but do you know the cost of

17   that contract to the County?

18   A.   I don't.

19   Q.   Okay.  Paragraph 16:  "The County also has under

20   construction a dedicated mental health living unit, Unit B1.

21   The unit is undergoing renovations which will allow it to

22   serve as the RDC's unit for detainees."

23        Did I read that correctly?

24   A.   Yes.

25   Q.   Paragraph 18:  "With respect to efforts to address and

1  minimize the risk of suicides at RDC, we currently have two

2  padded rooms under construction, and once completed, these

3  rooms will be used to aid efforts to monitor and control

4  detainees who present suicidal threats."

5      Did I read that correctly?

6  A.   Yes.

7  Q.   And we talked last time about the County providing two

8  assigned maintenance employees to focus exclusively on

9  maintenance issues at RDC.  Do you recall that?

10 A.   Yes.

11 Q.   And you were pleased with the performance of those two

12 maintenance employees; correct?

13 A.   Yes.

14 Q.   And is any of what I've just gone over with you in your

15 declaration indicative of what you referred to on page 1 of

16 P-13 as a distinct lack of support from the County?

17 A.   No.

18      MR. SHELSON:  May I have a moment to confer, Your

19 Honor?

20      THE COURT:  You may.

21 BY MR. SHELSON:

22 Q.   Major Bryan, I want to clear up one more thing.  When the

23 Court was asking you questions, was it your testimony that you

24 had not discussed the consent decree with the sheriff or

25 anyone else with the County?

1    A.   No.  I believe what I said was we hadn't had meetings

2    specifically targeting the consent decree.  I don't believe I

3    said we've never talked about it.

4    Q.   Okay.  So --

5    A.   If I did, I misspoke.

6    Q.   So you think that you answered with regard to

7    specifically targeting, but you do acknowledge that you had

8    discussions regarding the consent decree with Sheriff Jones

9    and other County officials?

10   A.   Yes.

11   Q.   Do you know approximately how many times?

12   A.   No, I don't.

13   Q.   On approximately November 18th, 2021, did Alan White, an

14   undersheriff of Hinds County, issue a memo authorizing Hinds

15   County Sheriff Office deputies to work overtime at the

16   detention center?

17   A.   Yes.

18   Q.   Was that indicative of a distinct lack of support?

19   A.   Issuing a memo, while supportive, isn't as supportive as

20   concerted efforts to change staffing levels at the jail

21   pursuant to that memo.

22   Q.   And things to assist, though, with that are things like

23   pay raises?

24   A.   No.  Specifically about that memo, if the memo -- The

25   memo was issued to authorize deputies to work overtime.

 1   Q.   Do you acknowledge that the County took efforts to

 2   increase staffing?

 3   A.   Well, if I could finish my first comment.

 4   Q.   I'm sorry.  I thought you were done.

 5   A.   No, sir.  So the memo was issued about deputies working

 6   overtime at the jail.  That is supportive.  However, if that

 7   memo doesn't change anything because of a lack of emphasis put

 8   on that by senior staff at the sheriff's office, then that's

 9   not as supportive as it could be.

10   Q.   Well, that was one thing the County did regarding

11   staffing.  You acknowledge, though, there are other things --

12   we just went over some of them -- that the County did

13   regarding staffing?

14   A.   I did, yes, sir.

15   Q.   The most recent of which was a starting salary pay raise

16   to $31,000?

17   A.   Yes.

18          MR. SHELSON:  No further questions, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Is this witness finally excused, or does the Government

21   wish to reserve the right to call this witness as a rebuttal?

22          MS. COWALL:  Your Honor, we'd reserve the right to call

23   this witness as a rebuttal witness, if necessary.

24          THE COURT:  All right.  In that regard, Major Bryan,

25   you shall remain sequestered; that is, do not discuss your

1   testimony with anyone or allow anyone to discuss it with you.

2   I would imagine you are excused for the day for sure, and the

3   parties will contact you if you're needed to testify again.

4           THE WITNESS:  Yes, sir.  Thank you.

5           THE COURT:  But thank you for accommodating me.

6           We are now at our lunch hour.  I think we should go

7   ahead and take it now.  I know the next witness is not going

8   to be less than an hour, so let's be prepared to start back up

9   at 1:10 p.m. and we'll just go from there.  We'll go from

10  there.  1:10 p.m.  Thank you.

11          We're in recess.

12                  (A lunch recess was taken.)

13          THE COURT:  You may be seated.

14          I assume there's nothing that we need to take care of.

15  Is the United States ready to call its next witness?

16          MS. VERA:  Yes, Your Honor.  The United States calls

17  Jim Moeser.

18          THE COURT:  Okay.

19                          **JIM MOESER,**

20          **having been first duly sworn, was examined and**

21  **testified as follows...**

22                      **DIRECT EXAMINATION**

23  **BY MS. VERA:**

24  Q.   Good afternoon, Mr. Moeser.  How are you today?

25  A.   Good.

1  Q.   Could you please tell us your current occupation?

2  A.   I'm currently retired with the exception of a periodic

3  consulting work and this monitor project.

4  Q.   And where do you live?

5  A.   In Wisconsin.

6  Q.   Do you have expertise in juvenile custody issues?

7  A.   Yes.

8  Q.   Juvenile programming needs?

9  A.   Yes.

10  Q.   And in that area of juvenile justice, do you have any

11  specialty areas?

12  A.   I think programming is one of them; discipline, sort of

13  discipline/behavior management would be another; some work and

14  expertise in facility design and construction, not as an

15  architect but in terms of operations and program general

16  supervision and management experience and expertise.

17  Q.   Have you worked as an administrator with responsibility

18  for youth justice programming?

19  A.   Yes.

20  Q.   Have you worked as an administrator with responsibility

21  for facilities holding youth?

22  A.   Yes.

23  Q.   And responsibility for training relevant to juvenile

24  justice?

25  A.   Yes.

1   Q.   Do you have other consulting experience in juvenile

2   justice and administration?

3   A.   I've done other work in sort of evaluating facilities

4   operations, also have done a fair amount of consulting around

5   issues of population management and control and also in more

6   community-based probation operations and also victim-offender

7   conferencing and other gang prevention.  There are kind of a

8   variety of other work that I've done in those areas.

9   Q.   Do you have experience implementing reform in a custodial

10   setting, a youth custodial setting?

11   A.   Yes.

12   Q.   And can you briefly summarize your educational

13   background?

14   A.   So I have a bachelor's degree in social work from the

15   University of Wisconsin-Oshkosh; I have a master's degree, a

16   60-credit master's degree, from Arizona State University in --

17   counseling degree with a focus on community agency counseling;

18   and I did complete additional work towards a PhD in counseling

19   psychology as well as -- as well as quite a range of hundreds

20   of hours of other workshops and trainings.

21   Q.   Have you served on committees or working groups in the

22   juvenile justice area?

23   A.   Yes.  Quite a few.  I've been involved -- been on

24   committees related to the development of curriculum for youth

25   supervision staff in juvenile facilities.  Detention officers

 1    is the term Wisconsin uses for that.  So I worked for the

 2    group developing the curriculum components for that, for the

 3    training for that.

 4         I was on a committee that also wrote the -- what became

 5    the regulations for operating detention facilities in the

 6    state of Wisconsin.

 7         I've worked on numerous other committees.  I served on

 8    the federal Advisory Committee for Juvenile Justice and was

 9    the chair and vice chair of that group.

10         I served a couple different terms on the Governor's

11    Juvenile Justice Commission.

12         I've been involved working with other committees on

13    developing model probation guidelines.

14         And there's many more.  I'm not thinking of all of them

15    off the top of my head.  Those are probably the relevant ones.

16    Q.   Okay.  And have you authored publications regarding youth

17    in the criminal justice system?

18    A.   Yes.  Kind of both in terms of -- some in terms of

19    specifically related to confinement facilities.

20         I was a coeditor of a project focusing on confinement --

21    or reentry strategies for confinement facilities, and I was

22    coeditor and wrote a couple chapters of that publication.

23         Wrote several chapters in what is called the Desktop

24    Guide to Best Practice -- or Good Practice for Confinement

25    Facilities -- for Juvenile Confinement Facilities.  That is

1  now part of the National Institute of Corrections' library.

2  That was done through the National Partnership for Juvenile

3  Services.

4      I've written -- I published, oh, four or five articles on

5  other aspects of the juvenile system related to balance and

6  restorative justice, reentry issues, and those are the ones

7  that come to mind.

8          MS. VERA:  Could we pull up the exhibit marked PX-7,

9  please?

10 BY MS. VERA:

11 Q.   Mr. Moeser, do you recognize this document?

12 A.   Yes.

13 Q.   And what is it?

14 A.   That looks like the resume or CV that I sent to

15 Department of Justice late last year.

16 Q.   And is this an accurate summary of your work experience

17 and educational background?

18 A.   Yes.  You know, for the most part.  I mean, there may be

19 a few dates here and there that are -- as I tried to

20 recollect, may be quite -- not quite correct, but otherwise

21 the general -- the elements are correct and the time frames

22 are basically correct.

23         MS. VERA:  Your Honor, the United States moves to admit

24 P-7 into evidence.

25         THE COURT:  Any objection?

1           MR. MORISANI:  No objection.

2           THE COURT:  PX-7 will be received into evidence.

3           (Plaintiff's Exhibit 7 entered.)

4           MS. VERA:  Thank you.  And, Your Honor, the United

5    States tenders Jim Moeser as an expert in juvenile justice and

6    administration.

7           THE COURT:  Any objection?

8           MR. MORISANI:  Your Honor, just subject to the -- I

9    think it was Docket Number 134, but I think Your Honor

10   addressed it yesterday, so...

11          THE COURT:  Okay.  Subject to the objection -- the

12   continuing objection?

13          MR. MORISANI:  Yes, sir.

14          THE COURT:  Okay.  Mr. Moeser will be allowed to

15   testify in the designated areas.

16          MS. VERA:  Thank you, Your Honor.

17   BY MS. VERA:

18   Q.   Mr. Moeser, I'd like to talk briefly about your role in

19   this case.  Could you briefly describe your area of

20   responsibility on the monitoring team?

21   A.   So I've had the primary responsible *[sic]* for assessing

22   the conditions of the agreement as it relates to youthful --

23   what the agreement calls youthful prisoners.  These are youth

24   under the age of 18 who are charged as adults.

25   Q.   And is there a specific terminology that the County uses

1    for those youth who are charged as adults?

2    A.    They use the term "JCAs," juveniles charged as adults.

3    Q.    And in your capacity as a member of the monitoring team,

4    when did you first tour the jail in Hinds County?

5    A.    The baseline visit in October of 2016 was the baseline

6    visit, and the monitoring activities started in spring of --

7    or early after the new year of 2017.

8    Q.    And when did you first tour Henley-Young Juvenile Justice

9    Center?

10   A.    At that first baseline visit in the fall of 2016.

11   Q.    Let's talk about the activities that you've engaged in

12   since then to monitor compliance.  How many visits total have

13   you made to Hinds County to visit the jail or Henley-Young?

14   A.    In all total, counting the baseline visit, there have

15   been 17 visits, with ten of those being on-site, the last

16   seven being virtual.

17   Q.    And did you visit Henley-Young in all of the on-site

18   visits?

19   A.    Yes.

20   Q.    And what was the most recent on-site visit?

21   A.    I think February of 2020.

22   Q.    And what was the most recent virtual visit?

23   A.    I did virtual visit the week of January 31st, a couple

24   weeks ago.

25   Q.    2022?

1    A.    2022.  And I should add that for a period in 2017 and

2    '18, I visited both Henley-Young and -- while there was still

3    a fair number of youth at RDC, I was in both facilities for

4    those visits.

5    Q.    Okay.  And how many monitoring reports have you assisted

6    with?

7    A.    Fifteen.  I have submitted at least my report as it

8    relates to the most recent one, which I think would be the

9    16th.

10   Q.    To do monitoring visits and assessments, whether on-site

11   or remote, do you review documents?

12   A.    Yes.

13   Q.    And in the context of remote visits, how are you able to

14   review documents?

15   A.    So before the remote visits, we would request through

16   Ms. Simpson a list of documents that we'd like to get

17   electronically.  That was one source, and the staff at

18   Henley-Young would put together a package of materials.  Those

19   would typically go to the compliance coordinator for Hinds

20   County, and he would download them on to a drive that we could

21   access.

22        Also during the term of the -- kind of over time, he also

23   adds things as they occur, so things like incident reports are

24   considered immediate notifications.  Some things like that are

25   also downloaded by him, and we're able to access those as

1  well.

2  Q.   And have you been able to conduct interviews for these

3  remote visits?

4  A.   Yes.  Combination.  Most recently all by Zoom, which was

5  helpful for the purpose.  Initially some of those were more so

6  by phone and sort of increasingly used Zoom as a tool to do

7  interviews.

8  Q.   About how many interviews have you conducted in the past

9  several remote visits?

10  A.   I would say its range is from eight to ten.

11  Q.   And do you do that over the course of a day, a few days,

12  a week?

13  A.   It's usually three days, so it's maybe into a fourth day

14  depending on scheduling.  There's been times when I follow it

15  up even on a fifth day if there was somebody not available

16  during that first part of the week.

17  Q.   For the monitoring reports going back to the beginning

18  all the way through the present, to make your assessment, do

19  you talk with staff?

20  A.   Yes.

21  Q.   Do you review staffing figures, numbers, shift reports?

22  A.   I have more recent- -- well, I guess there's a history;

23  right?  So initially during the actual site visits, I would

24  typically ask about staff vacancies, how many there were, kind

25  of what were the trends in that.

1       More recently in the last few years, last two or three

2   years, been getting periodic organizational charts that show

3   vacancies, and I can actually look at those numbers.  I've

4   periodically asked for a more current organizational chart and

5   then discuss -- either at the time of the site visit or on

6   occasion in between if we had a conversation, I might ask

7   about vacancies.

8   Q.   Do you review programming schedules?

9   A.   Yes.  I review -- I typically review a sample of

10  programming schedules.  Well, there's two things.  One is

11  there's a daily schedule for activities that are supposed to

12  occur on the unit.  There's a -- that's available.  When

13  on-site, you can look at a unit log to compare, you know, what

14  was scheduled versus what was actually conducted.

15      I also get a -- request a sample of program activities

16  that are conducted by the youth support specialists or the

17  clinicians in terms of the content of the groups -- the

18  content of the session and sort of the attendance.

19      I do not get reports on, for example, when they go out

20  for recreation activities, out to the backyard.  I don't get

21  reports for those kinds of things, but I do for the actual

22  programs that are scheduled and run by the youth support

23  specialists.

24  Q.   You mentioned youth support specialists a couple times.

25  Could you just explain what that is?

1   A.   Yes.   The youth support specialists were added to the

2   contingent of staff at Henley-Young prior to my arrival as

3   part, I think, really of the agreement with Southern Poverty

4   Law Center.   They are, I think -- originally had been called

5   case managers.   They have sort of a day-to-day, sort of

6   nuts-and-bolts interaction with youth around how the day is

7   going.

8        For example, the youth support specialists help maintain

9   family contact.   They help with scheduling of treatment team

10  meetings, and then they also have -- run different -- a

11  variety of different programmatic groups with youth over the

12  course of a week.   They respond usually following an incident

13  to check on the youth if there's been some incident of

14  significance.

15       So they're kind of a day-to-day -- sort of a day-to-day

16  counseling focus, not a therapeutic focus in the long run, but

17  for day-to-day counseling approach.

18  Q.   Okay.   Going back to what you do to make your

19  assessments, do you review school attendance records?

20  A.   I have when I've gotten them.   I was able to do that

21  easier on-site.   The last virtual visit, not this one in

22  January but prior to that, I'd gotten some attendance records

23  that were, frankly, hard to decipher.   This time I did not --

24  I asked for but did not get attendance records.

25  Q.   Do you review incident reports?

A.   Yes.  Again, up until October of last year, I would ask
for specific types of incident reports, suicide, self-harm
incidents, incidents in which maybe a youth was injured, and
then I would also ask for a sample of incident reports rather
than every incident report.

     Starting in October, I've been getting a -- usually on
Mondays, a document that contains a copy of the incident
reports from the prior week so I can review those.  I also
get -- also many of those are sent to Synarus Green as the
compliance coordinator, and after -- he puts them in the
shared drive that I can access, and he will usually send an
e-mail saying he's added to the drive.

Q.   Do you review documentation of observation of youth who
are in their rooms for periods of time and not allowed to
leave their rooms?

A.   What I asked for and what I got, kind of slightly
different.  I asked for observation logs of any youth that
were confined for disciplinary reasons.  I also asked for --
and I got those.  I asked for observation logs of any youth
that were confined for more than an hour for any other reason.
I think that's still a work in progress to try and get that
information documented.  For the youth that were in rooms for
disciplinary reasons, formal disciplinary reasons, I did get
observation logs.

Q.   Have you reviewed existing policies for Henley-Young?

```
 1   A.   Yes, although I have -- many of them are 2015 or 2017.  I
 2   read them earlier in my time with them.  They haven't changed.
 3   I wouldn't say I was familiar or overly fresh on every detail
 4   of the policies.
 5   Q.   When you have been on-site in the past, have you observed
 6   operations?
 7   A.   Yes.
 8   Q.   Have you walked through the facility?
 9   A.   Yes.
10   Q.   Have you interviewed residents?
11        MR. MORISANI:  Objection.
12   A.   Yes.
13        MR. MORISANI:  Leading.
14        THE COURT:  Objection overruled.
15   BY MS. VERA:
16   Q.   Have you interviewed residents?
17   A.   Yes.  In two different ways.  I've on some occasions
18   asked to meet with youth individually.  On some occasions I've
19   gone on to the unit and talked with maybe a small group of
20   youth.
21   Q.   And have you reviewed residents' records?
22        MR. MORISANI:  Objection.  Leading.
23        THE COURT:  Objection sustained.
24        Don't lead your witness, please.
25   BY MS. VERA:
```

1  Q.   What else did you review when you would go on-site,

2  Mr. Moeser?

3  A.   I usually would start the on-site visit by -- kind of the

4  typical process was to first meet with the executive director,

5  get a sense of maybe any changes that had occurred, any

6  concerns that had developed.  This is when there was an

7  executive director.  If not, I would meet with the operations

8  manager to get a sense of any changes, you know, concerns they

9  may have.

10       I would then ask for and got what was called -- it was

11  called the residence master file for every youth that was

12  there, all the JCA youth that were there, and I would go

13  through those records.  Those master files contain information

14  from their admission, their initial screening at intake, a

15  note about their response on the mental health screening tool,

16  incident reports, observation logs if they were confined for a

17  period of time.  And I think prior -- you know, any prior

18  admissions they had had at the facility I believe were also in

19  those files.

20       And I would use those files to kind of then create a --

21  probably of series of sort of questions in particular around

22  certain things that might have occurred.

23       I would then have meetings established with school

24  principal, the operations manager and the quality assurance

25  manager, selected staff.  I would tour the facility, sit on

1    the -- you know, on the unit, spend some time on the unit,

2    spend some time in the school classroom, things like that.

3    Q.   You said that -- excuse me.

4        You said that during these on-site visits, you met with

5    the executive director, the school principal, the operations

6    manager, the quality assurance manager, and other staff.

7    A.   Yes.

8    Q.   Have you met with -- have you met with those individuals

9    remotely since the onset of the COVID pandemic?

10   A.   Yes.  By and large, it's the same -- it's the same group:

11   the youth support specialists, when there's been a -- the

12   clinical staff -- clinicians for therapy, if there's been a

13   treatment director, kind of the whole leadership team,

14   training director.  Those are also the same folks I would talk

15   with virtually.

16   Q.   Have you reviewed the settlement agreement and stipulated

17   order?

18        MR. MORISANI:  Objection.  Leading.

19   A.   Yes.

20        THE COURT:  Objection overruled.

21   BY MS. VERA:

22   Q.   And do you make assessments in the monitoring reports?

23   A.   Yes.

24   Q.   What are those assessments?

25   A.   I try to make an assessment as to -- as to whether they

1   are really meeting the -- you know, the conditions that are

2   listed, you know, to what extent they're meeting them, what

3   are they doing to try and meet them if they haven't already,

4   you know, do they have plans for improvement to meet them, and

5   try and assess, you know, kind of to what extent they meet

6   those conditions.

7   Q.   And the conditions you're referring to are based on what?

8   A.   Well, the conditions that are a number of items in the

9   original consent decree.  I don't remember how many.  Ten or

10  12, somewhere in that range.  There are several additional

11  items or more specific items in the settlement -- in the

12  settlement agreement from January of 2020, so those kind of

13  form the outline of the -- of my focus.  I mean, I do see

14  other things and notice other things, but my, really, focus is

15  on what extent they're meeting those particular items.

16  Q.   When you talk about noticing other things, not

17  specifically, but what do you mean?  What other things would

18  you notice?

19  A.   Well, I notice kind of the general condition of the

20  facility.  Is it clean?  Are there -- I ask about, for

21  instance, are there physical plant issues that they're

22  struggling with?  Do they have safety concerns or issues that

23  are of concern?  Are the youth active -- actively engaged in

24  something or are they kind of milling around.  Look at the

25  individual -- look at some -- I don't always look at all --

1    certainly don't look at all the rooms but look at a room,

2    cell, you know, what's the condition of the cell?  Is the

3    water pressure working?  That's something that I've noticed in

4    the past.  Are there, you know, kind of the general

5    environmental factors that contribute to the facility and

6    contribute to the safety of the youth?

7    Q.   And in your monitoring -- in the monitoring reports and

8    the assessments you make in those reports, whether the more

9    recent ones where you've done a remote visit or in the past

10   when you've visited on-site, in all of the reports, are you

11   confident that you've had enough information to make those

12   assessments?

13   A.   Yes.  I mean, there are some limitations to not being

14   able to be on-site.  I mean, there's always -- I always would

15   prefer to talk to somebody directly.  I had hoped to get down

16   there this last visit as well.  Unfortunately, I was diagnosed

17   with COVID a few days before, you know, and I haven't seen the

18   physical plant for a while, including the -- I have not

19   actually seen the portable classrooms that they did add to see

20   how they're located and how manageable that might be for them

21   to be used.  So there are some limitations, but in terms of

22   the actual agreement or -- excuse me, the items in the consent

23   decree or the settlement agreement, I'm confident that I have

24   enough information.

25   Q.   And do you have contact with Henley-Young employees in

1    between the official monitoring tours?

2    A.   Some.  Sometimes it's a follow-up from something they've

3    sent me, maybe an incident, an update about COVID issues, for

4    example.  As I get incident reports, if I see something that's

5    particularly alarming, I may follow up and contact someone to

6    get more information.  I wouldn't say -- I periodically send

7    materials to the director.  I've sent materials to

8    Ms. Warfield, who's the treatment coordinator.  I send e-mails

9    periodically about training programs I see online through the

10   National Partnership for Juvenile Services.  I don't have a

11   regular routine all (AUDIO GAP).

12   Q.   Does your role in this case also include providing

13   technical assistance?

14   A.   Yes.

15   Q.   To what extent?

16   A.   Well, I would say I provide limited technical assistance,

17   and generally it's, again, around a specific issue.  I

18   provided feedback on, for example, the classification

19   checklist that they supposed to -- are supposed to use.  I

20   provided materials to Ms. Warfield about other sort of program

21   models.  I've linked the director, or Mr. Burnside as the

22   operations manager, to various training programs or resources

23   for information.

24       I -- there's kind of a balance that I in my mind do

25   probably less than some of the other members of our team.

1   There are also -- and for a couple of reasons.  One is the
2   agreement itself has a provision that they obtain services
3   from someone to help them develop a behavioral management
4   program, and they really need to do that.  I don't want to --
5   typically don't want to start giving advice about a particular
6   program that I'm not then able to spend the time to follow
7   through and train staff, much more -- much more time than I
8   would be able to commit.
9        They also have been -- they've been getting some
10  assistance from Anne Nelsen, who is the monitor from the SPLC
11  agreement.  She has a weekly call with them, and they have
12  just recently, with the help of SPLC, retained the services of
13  a consultant who is well respected in the field to help with
14  some of the initial assessment, case planning, and hopefully
15  ultimately behavior management issues.
16       I have been trying to stay in touch with Ms. Nelsen, for
17  example.  I'm concerned about making sure we're not giving
18  conflicting directions or advice, so I take a little bit more
19  of a back seat on that.
20  Q.   And so just to clarify, when you're talking about
21  Ms. Nelsen and the SPLC agreement, what agreement are you
22  referring to?
23  A.   I believe the Southern Poverty Law Center, you know,
24  filed a suit of some kind and have an agreement with
25  Henley-Young in particular that goes back a number of years

```
 1   prior to our involvement and relates a lot to sort of the
 2   numbers of youth, some of the programming issues, and some of
 3   the mental health treatment components.
 4   Q.   And -- excuse me.
 5        And Ms. Nelsen is who?
 6   A.   Ms. Nelsen is a, you know, monitor.  She's -- lives in --
 7   I want to say Utah or Idaho.  I forgot.  Utah, I believe.
 8   Yeah, Utah.
 9   Q.   That's okay.  In the context of the other agreement, what
10   is her role?
11   A.   Yeah.  She is the monitor for that agreement and also
12   does provide some weekly contact with them and gives them some
13   advice and program ideas.
14   Q.   And you said you're in communication with her?
15   A.   Yes.
16   Q.   About how often do you speak with Ms. Nelsen to
17   coordinate as you described?
18   A.   Probably speak to her twice a month, probably another
19   couple e-mails a month back and forth.  Some of that depends
20   on timing.  For example, she was just there on-site recently,
21   so she was able to provide me with some information.  I'll do
22   the same, you know, after -- at some point here soon after to
23   say, okay, here's my observations from the last visit, the
24   last virtual visit.  If there's a particular issue of concern,
25   whether it's an incident or some changes they're making to
```

1    some significant part of the program, we might communicate

2    about that.

3    Q.   Let's move on and talk about Henley-Young and the

4    facility and the people who work there.  Who currently resides

5    at Henley-Young?

6    A.   There are two types of youth.  There are -- the largest

7    percent -- the largest number of youth are juveniles charged

8    as adults that are housed there pursuant to being charged as

9    an adult through the adult court system, and they're housed

10   there.

11        And then there are a number of -- smaller number,

12   typically much smaller number, of youth held through the youth

13   court system, traditionally for short -- typically for much

14   shorter periods of time.  For whatever reason, either --

15   typically youth that are held at secure detention in

16   situations like that are youth who are either deemed to be a

17   risk of harm to the community or a risk of -- sort of high

18   risk of running away so that they can't be processed through

19   the system.  Those decisions are made by the youth court

20   judge.

21   Q.   So with regard to the JCAs, how long do they typically

22   stay at Henley-Young?

23   A.   Well, there are, you know, kind of a handful over the

24   course of time that come and go fairly quickly, either get

25   bailed or bond out somehow, but otherwise they stay for pretty

1    extended periods of time.  It's difficult to say an average,

2    but I would say nine to -- nine months to two years would

3    be -- capture most of them.

4    Q.   Do any youth stay for longer than two years?

5    A.   There have been.  There's a youth there now that's been

6    about 880 days, two years and four or five months.  I think --

7    I'm trying to remember whether there's been other kids that

8    have been there two years or more.  With the initial group of

9    kids when I first came, there had been some youth who'd been

10   RDC for more than two years.

11   Q.   What's the approximate population of Henley-Young total?

12   A.   I think the average is probably around 27.  The JCA

13   numbers -- and that's perked up recently, so they've been much

14   closer to 30 to 32 youth with as many as 28 JCA youth and half

15   a dozen youth court youth.

16   Q.   And is there a breakdown as to boys and girls in the

17   facility?

18   A.   Sure.  The vast, vast majority are boys, whether

19   either -- whether it's JCA youth or youth court.  Probably, I

20   would say on average, there's only one -- if you took an

21   average, there's maybe one girl, JCA girl, maybe only one

22   youth court girl.  There will be times when there will be two

23   or three and days where there will be zero.

24   Q.   And where do the -- where do the youths, the JCAs and the

25   youth court youth, where do they -- where do they sleep; where

1    do they stay?  What's the configuration for housing?

2    A.   There are four living units, or pods, within

3    Henley-Young, all equal size.  I think all have the capacity

4    for 21 -- directly 21 youth is the largest capacity.  The JCA

5    boys are traditionally housed in two of those units.  There

6    are then -- there's then a unit where there's a smaller number

7    of youth court boys, and then there's a girls' -- and then

8    there's a fourth unit that houses girls that may have a mix of

9    JCA and youth court girls.

10        And given the number of JCAs, there have recently been a

11   couple JCA youth boys on the -- they call -- formerly called

12   the youth court boys' unit.  So they try and balance the youth

13   out a little bit so as not to overwhelm any of the units and

14   also try and make sure the youth are safe in their units.

15   Q.   Other than -- well, can you describe the facility layout

16   briefly to some extent?

17   A.   Well, you know, the front entry area and part of the --

18   part of Henley-Young itself is really a youth court facility.

19   So there's a section of the facility that is a youth court,

20   has some -- I guess I would say they're court officers or --

21   excuse me, probation officers perhaps.  I'm not sure of their

22   official title.

23        You come into the facility.  It's a fairly good-size

24   lobby, waiting area, of parents that are coming to court with

25   their youth for youth court to wait there.  And then there's a

1    hallway into more of an administrative area where the

2    operations manager, training folks, quality assurance managers

3    are.  There's then another entry into the secure part of the

4    facility.  There's a control -- kind of a central control area

5    there initially that has the ability to observe and control

6    doors.

7         Once you enter the secure portion, you can take a couple

8    different directions, but basically there's a multipurpose

9    room that gets used for kind of all kinds of things.  It's not

10   very large.  There's a school -- the classroom area comes in

11   there fairly quickly.  There are four -- I think four

12   classrooms in there, fairly cramped setup.

13        And then you come to kind of what I'd just simply say a

14   T.  You come to a T, a fork in the road, whatever you want to

15   call it.  One direction you go leads off to two of the pods.

16   The other direction leads off to two of the other -- the other

17   two pods.  It goes then -- you get to a point where you go to

18   the right for one pod, to the left for another pod.  And then

19   there's a recreation area in the back that's fenced in.

20        The individual pods them selves are multi- -- two-story.

21   I think there's 20 rooms altogether.  Open steel tables bolted

22   to the floor, poorly furnished, acoustically terrible, and

23   that's where they basically live and do a lot of their

24   activities.

25   Q.   You said there are steel tables in the pods and that

1    they're poorly furnished.  Can you just explain what you mean

2    by that?

3    A.   Well, you know, youth -- I mean, there are a whole range

4    of things, but youth need a place to sit down and relax a

5    little bit, whether it's watching TV or reading a book or

6    playing cards with a friend or -- friend or one of the other

7    residents, however they're called.  And there's no extra

8    chairs, there's no extra tables, so there's no extra furniture

9    for them to utilize in any way.  Anything they do has to be

10   done at those steel tables, which means all the youth are

11   essentially together sort of at one table -- or two tables,

12   really.  I think there's three tables, but it's spread across

13   two tables usually.  And that's about it.  I mean, there's

14   no -- yeah, there's no ability to do anything else other than

15   if you're going to sit down, you sit at those steel tables,

16   picnic tables.

17   Q.   You testified earlier about therapeutic activities or

18   groups, I believe?

19   A.   Yes.

20   Q.   Where do they do those?

21   A.   Well, they do them where they can.  They are sometimes

22   done in the multipurpose room, which is off the unit, if they

23   can -- if they have staff available to bring youth to the

24   multipurpose room.  Otherwise, they basically do them on the

25   unit itself.  They did add a couple portable classrooms kind

1   of in the back of the facility that were intended to be used

2   for small group work, but they don't have the staff available

3   to always escort and supervise youth out in that area.  So

4   most of the groups are run in the multipurpose room, I think.

5       There's one small office for the psychologist -- or

6   there's one small office there that's used for therapy or some

7   of the staff, but there's very other little space for any kind

8   of therapeutic activities or group activities.

9   Q.   What about bathroom and shower facilities?

10  A.   Well, each of the units have a shower and, you know,

11  bathroom area that youth can access, and there are, you know,

12  times through the day when they -- when they have time where

13  they can use a shower if they need to, if they do.  Assuming

14  there's water pressure.

15  Q.   Pardon?

16  A.   Assuming there's water pressure.

17  Q.   Is that an issue?

18  A.   It has been.  You know, infrastructure problems in that

19  area seem to pop up either through cold weather or other

20  reasons.  I mean, it's not -- several times a year, if not

21  more, when there's not sufficient water pressure at

22  Henley-Young for the shower or flush toilets.  So they have to

23  escort the youth and try and get the youth to Raymond, RDC,

24  for showers.  They use bottled water to try and accommodate

25  that for as long as it takes.

```
 1    Q.   And you said that has happened several times a year?
 2    A.   Yes.
 3    Q.   Do you know when the most recent time might have been?
 4    A.   You know, I don't.  I'm sure it was -- I'm sure it was
 5    within the last quarter of 20- -- excuse me, last quarter of
 6    last year, but I don't have a date.
 7    Q.   Do you know of any other infrastructure issues?
 8    A.   The roof leaks.  I think that is an issue.  I think it's
 9    sort of -- you know, sort of increasingly a problem, I think,
10    areas that are either stained or affected by that.  One of the
11    staff did report that the roof leaks often end up shorting out
12    the Wi-Fi for youths for school, for teaching, but I think
13    that's -- they had repaired -- did a good job repairing the
14    control units in the control area that operate the doors.
15    That's been replaced and repaired, I believe.
16    Q.   Do you know how long --
17    A.   The roof, I think -- the roof, I think, is budgeted for.
18    I'm not sure it's been bid or contracted for yet.
19    Q.   Do you know how long the roof has had these leaking
20    problems?
21    A.   I would say I first heard about it about a year ago,
22    probably.
23    Q.   Let's talk about the leadership of Henley-Young.  Who's
24    in charge of the facility?
25    A.   There is a director.  Currently the interim director is
```

1    Mr. Crisler.  Other members of what I would consider sort of a

2    leadership team would be a quality assurance manager.  That's

3    Mr. Dorsey.  The operations manager is Mr. Burnside.  There is

4    now a treatment coordinator, Ms. Warfield.  There's a training

5    director, sort of learning and development director.  There's

6    a program coordinator --

7    Q.    Let's just talk about the direct- -- oh, go ahead.

8    A.    Okay.  Yep.

9    Q.    So you said that there -- sorry, Mr. Moeser.  Go ahead,

10    please.

11    A.    I was just going to say there's also, you know, mental

12    health clinicians that I wouldn't necessarily consider -- I

13    mean, I would consider them obviously critical members, not

14    necessarily from a management point of view.

15    Q.    So for the executive director position, you said that

16    Mr. Crisler is the interim director.  How long has he held

17    that position?

18    A.    I believe since January 5th.

19    Q.    And who was the director before that?

20    A.    Fernandez Frazier.

21    Q.    And for how long was Mr. Frazier the director?

22    A.    He was there, I think, from April of '21 until

23    January 3rd of '22.

24    Q.    And does the new interim director have experience with

25    youth detention?

1   A.   Not to my knowledge, no.

2   Q.   Does he have experience with youth programming?

3   A.   Not to my knowledge.

4   Q.   What was Mr. Crisler's position prior to becoming the

5   interim director of Henley-Young?

6   A.   He was the interim sheriff appointed to follow after the

7   passing of Sheriff Vance.

8   Q.   And did he run for sheriff in the recent election toward

9   the end of last year?

10   A.   He did.  He did.

11   Q.   Since 2016 when you started in your role on the

12   monitoring team, how many different directors have there been?

13   A.   There have been four different people, five different --

14   see if I can -- see if I can explain this as good as I can.

15   There have been five different person- -- excuse me, four

16   different persons who have been director and essentially five

17   occasions.

18       Mr. Frazier served as the director for a period prior to

19   this most recent time, up until, I think, January of 2020.

20   He'd been there about six months, I believe.

21       Mr. McDaniels, who now is Judge McDaniels, when I first

22   came.  Then Mr. Frazier.  He was discharged, I think, in

23   January of 2020.  I believe there was a gap.

24       Mr. Harrington came in for a while after a gap, and there

25   was another gap.

1           Then Mr. Frazier came back.

2           Then he left, and now Mr. Crisler.

3           And many of those interim times, the facility has been

4     managed really by the operations manager and the quality

5     assurance manager kind of as a team.  There was a point where

6     I think Judge McDaniels was designated as sort of an interim

7     executive director even when he was judge, but I'm not sure

8     how that -- whether he actually functioned that way or not.

9           Probably of the roughly five years since we've started,

10    there's been, I would say, 12 to 14 months where there has not

11    been a formal director on staff.

12    Q.   How would you characterize the leadership situation at

13    Henley-Young over the past several years?

14    A.   It's really a -- sort of a roller coaster, sort of two

15    steps forward, one step back or one step forward, two steps

16    back.  I'm not sure.  Someone comes on board, may or may not

17    be a good fit, but really rarely has been somebody who's had

18    experience in youth confinement programming.  Well, there

19    really hasn't been anybody with that experience.

20          They stay for a while and for one reason or another

21    leave, and I think the facility has been sort of, you know,

22    patched together by some of -- the operations manager and the

23    quality assurance manager who have been there awhile to try to

24    keep things going forward.

25    Q.   You testified that Mr. Frazier had last served as

885

1    director as of January 3rd, 2022?

2    A.   I believe that's correct, yes.

3    Q.   And what were the circumstances of him ending that role?

4    A.   He resigned.  He became frustrated with questions, kind

5    of a range of things that he detailed eventually in a

6    resignation letter.  Frustrated with the support from sort of

7    above in terms of the County operation and difficulty in

8    getting equipment and difficulty getting staff salaries the

9    way they should be.

10        MS. VERA:  Can we pull up the exhibit that's been

11   marked PX-12, please.

12   BY MS. VERA:

13   Q.   Do you recognize this document, Mr. Moeser?

14   A.   I do.

15   Q.   And can you identify it, please?

16   A.   This is a letter that Mr. Frazier delivered to the County

17   administrator on January 3rd.

18        MS. VERA:  The United States moves to admit PX-12 into

19   evidence.

20        THE COURT:  Any objection from the defendant?

21        MR. MORISANI:  No objection.

22        THE COURT:  PX-12 will be received into evidence.

23             (Plaintiff's Exhibit 12 entered.)

24   BY MS. VERA:

25   Q.   All right.  And if we could look at the first two

1    paragraphs, please, of this letter.

2    A.   Okay.

3    Q.   Mr. Moeser, do you see in the second sentence there that

4    Mr. Frazier writes that he's writing this letter "after

5    examining the many obstacles faced since accepting the

6    position"?

7    A.   Yes.

8    Q.   And do you see in the next paragraph the second and third

9    lines where he says he has not -- "I have not had the

10   necessary support as an administrator"?

11   A.   Yes.

12   Q.   Do you know what that means?

13   A.   Well, I think -- I think at least the conversations I had

14   with him directly were around support from sort of the --

15   whether it was the board or the administrator, I'm not sure,

16   but support, for example, in getting supplies or ordering

17   things or kind of getting -- you know, if there were things he

18   needed, it seemed like there were obstacles to getting them.

19        In particular, he was -- later the letter talks about the

20   difficulty in dealing -- trying to get the staff salary up to

21   a more reasonable level in particular, and he mentions, again,

22   in the letter two things, that he was either excluded from

23   some meetings and wasn't -- did not seem to -- he did not feel

24   he had the authority to do what he needed to do.

25        My conversations with him were mostly about challenges he

1   seemed to face sort of dealing with the County administration

2   and the Board in terms of getting things done that he thought

3   needed to be.

4   Q.   You said that he had issues with supplies and ordering

5   things.  Could you please elaborate?

6   A.   You know, I don't -- I don't recall discussing any real

7   specific things with him in that regard.  I know at the time

8   of the -- whether it's, for example, the roof issue, it taking

9   a long time to get that bid and get that work done, and it's

10  still not done.  There was fairly prompt response to getting

11  the control panel upgraded and changed.  That was a positive,

12  but I didn't talk really specifics with him very much about

13  what he was trying to do and what his -- what the roadblocks

14  were.

15        MS. VERA:  Could we turn to page 2, please.

16  BY MS. VERA:

17  Q.   Did Mr. Frazier refer in his letter to the budget for

18  Henley-Young?

19  A.   Yes.  Yes.

20  Q.   And did Mr. Frazier make a budget request for the current

21  fiscal year?

22  A.   Apparently he did, yes.  I was not aware -- I was not

23  aware of that at the time, but in his letter it's clear.

24  Q.   And so where it says "The current" -- "The current fiscal

25  budget is funded at the rate of 3. -- $3,288,843.84," he says,

```
 1    "The facility was requested to be funded at approximately

 2    4.1 million."  He refers to this --

 3    A.   Yes.

 4    Q.   -- as "a drastic difference in funding."

 5         Mr. Moeser, was the approved budget sufficient to operate

 6    Henley-Young?

 7    A.   You know, I did not go over with him details about that

 8    budget.  I can -- certainly as it relates to staff salaries,

 9    those have been insufficient.

10    Q.   Does Henley-Young --

11    A.   Other kinds of --

12    Q.   Go ahead.

13    A.   I was going to say other kind of changes that I've

14    proposed that I think he's supported, you know, weren't able

15    to be done.  This looks to me like --

16    Q.   What other changes?

17    A.   Well, I think some -- maybe some additional furniture,

18    some of the things that I -- some things I think would improve

19    behavior management at the facility.

20    Q.   What furniture purchases are you -- what recommendations

21    did you make about furniture purchases?

22    A.   Well, I've continued to recommend, probably since 2017 to

23    varying degrees of detail in my reports, that they get rid of

24    those steel tables, buy detention -- you know, durable

25    detention-grade chairs and tables that can be reconfigured or
```

1    placed around the unit in a different way, that can be brought

2    together for groups or separated for individual purposes; a

3    chair -- a decent chair that a youth could sit in to read a

4    book or watch TV without sitting on the steel tables.  So

5    I've -- so it's been really trying to make that a more sort of

6    normative environment to sort of calm down things in the units

7    themselves.

8    Q.   And when did you first make that recommendation about

9    furniture and other items that might make -- improve the

10   facility?

11   A.   I don't -- I can't say for sure, but my guess is it was

12   probably no later than May or June of 2017.

13   Q.   Okay.  And do those tables that you're referring to that

14   you recommended in 2017, do those tables cost money to

15   purchase?

16   A.   Yes.

17   Q.   More money than the approved budget would potentially

18   allow for, given the other operational needs of the facility?

19   A.   Apparently.  And I very early on and probably in one of

20   the periods when Mr. Burnside was working as -- while he was

21   the operations manager, but he had -- he had developed

22   essentially a purchase list.  They had been trying to get it

23   funded almost -- almost from the time I first talked with him

24   about it.  So he -- they had a notion of what they needed to

25   buy.  They just could never get the money to do it.

1    Q.   You mentioned that Mr. Frazier's concerns also included

2    staff salaries.  Can we look at the second paragraph here

3    that's in the portion that's blown up on the screen?  Do you

4    see where he writes of "several failed attempts to get

5    authorization and support from the County administrator and

6    Board of Supervisors" for higher salaries to improve staffing?

7    A.   Yes.

8    Q.   Is staffing an issue at Henley-Young?

9    A.   Yes.

10   Q.   And do you know what failed attempts he's referring to?

11   A.   I know that during his first tenure as director, he had

12   actually done the work of developing -- kind of gathering

13   information, kind of a comparison study of what other counties

14   in Mississippi, other counties -- I don't know -- I don't know

15   the counties well enough to know the comparisons, but other

16   counties that had youth facilities, what they were paying for

17   the kind of youth care staff that sort of -- you know, the

18   frontline staff.  He had done developed a comparison study.

19   So well over -- well over a couple years ago, he had developed

20   that and I think presented it sort of up the chain.  He

21   obviously didn't get any response.

22   Q.   You said he did not get any response to that study?

23   A.   Correct.

24   Q.   And what were the recommendations in this study?

25   A.   Well, I don't know if he had a specific amount.  Not too

1  long ago, the Mississippi Department of Corrections posted

2  jobs with less requirements and, frankly, less work for around

3  $30,000 a year.  So I think -- I don't think back in that

4  original study he was necessarily proposing a rate that high.

5  He was more or less just trying to show that Hinds County was

6  below the -- well in the bottom third or quarter of counties,

7  and then I think when the Department of Corrections made their

8  salary higher, he then began proposing that as a salary basis.

9  Q.   You talked about a salary for the Department of

10  Corrections of $31,000.  What is the salary for staff that

11  supervise youth at Henley-Young?

12  A.   Right now the job is posted at about 27,000.

13  Q.   Okay.

14  A.   Which is a -- which is an increase, I should point out,

15  one of the increases he got by limiting the other positions.

16        MS. VERA:  So let's look at the last sentence -- or,

17  sorry, the -- well, yes.  Let's zoom back out again, please,

18  on the exhibit and just zoom in only on that second paragraph.

19  BY MS. VERA:

20  Q.   Mr. Moeser, do you see at the -- towards the end of the

21  third line, Mr. Frazier writes, "I had to initiate a reduction

22  of positions to fund a slight salary increase for certain

23  staff members.  Is that what you were just referring to?

24  A.   Yes.  It was my understanding that -- and this was in

25  part parallel with increases that were being made for jail

1    officers at RDC who were getting increases that were not given

2    to staff at Henley-Young.  He felt he needed to do something

3    for the staff at Henley-Young to, you know, show support for

4    them as much as he could, so he came up with this idea of

5    reducing some positions in the budget and using those dollars

6    to increase the salary for the staff that were there, for the

7    youth care professionals, the frontline staff only.  There was

8    not an increase for supervisors or other management.

9    Q.   And do you know -- Mr. Frazier says that he initiated a

10   reduction of positions to fund that.  Can you please explain

11   what that refers to?

12   A.   So I believe in the budget, there were 49 -- originally

13   49 youth care professional positions authorized.  Those youth

14   care professionals are the frontline staff supervising the

15   youth daily.  In order to fund an increase for other staff, he

16   proposed -- or they agreed to reduce seven -- eliminate seven

17   of those positions from the 49 in the budget, leaving them

18   with 42 budgeted positions.

19   Q.   And do you know of any plans to reinstate those seven

20   positions?

21   A.   No.

22   Q.   What kind of a salary increase did the elimination of

23   those seven positions facilitate?

24   A.   I think it was -- I think -- I think it was about

25   10 percent.  I mean, it was a notable jump from where they

1    were a couple years ago.  I don't know about the -- and I
2    don't know.  There's been discussion back and forth about this
3    5 percent increase, and I don't know if that's taken effect or
4    still being talked about.  But it's -- it went from about --
5    it was about a 10 to 15 percent increase from where they were.
6    Q.   And did doing that lead to more stability in staffing or
7    fewer vacancies at Henley-Young?
8    A.   Not yet.  It's --
9    Q.   Did anyone --
10   A.   That was done, I think, in September, maybe.
11   Q.   Did anyone from Hinds County ask for the monitoring
12   team's input regarding the elimination of seven positions?
13          MR. MORISANI:  Objection.  Leading.
14          THE COURT:  Don't lead the witness.
15   BY MS. VERA:
16   Q.   Mr. Moeser, when did you find out about the elimination
17   of those seven positions?
18   A.   After it happened.  And I don't, frankly, recall whether
19   it was a conversation or an e-mail.  I think it was a phone
20   conversation where we might have been talking about something
21   else and he mentioned it.
22   Q.   You mentioned and Mr. Frazier's letter mentions a
23   5 percent across-the-board pay increase to staff.  Did that
24   pay increase apply to Henley-Young staff?
25   A.   I don't know.

```
1   Q.   Can you look at the last sentence of the paragraph in the
2   exhibit?   "However, an across-the-board 5 percent pay increase
3   for staff has been proposed" --
4   A.   Sure.
5   Q.   -- "which has had an impact on the morale and focus of
6   the staff employed at Henley-Young."
7   A.   Sure.
8   Q.   What does he mean where he says that that has had an
9   effect on the morale and focus of his staff?
10           MR. MORISANI:   Objection.
11  A.   Well, I don't --
12           MR. MORISANI:   Calls for speculation.
13           THE COURT:   There's an objection, calls for
14  speculation.   Objection sustained.
15  BY MS. VERA:
16  Q.   We can move on.
17  A.   Okay.
18  Q.   Since Mr. Frazier resigned, has the County approved any
19  salary increase for Henley-Young staff?
20  A.   Not that I'm aware of.
21  Q.   And the 27,000 number that you testified to earlier, is
22  that the current salary?
23  A.   That's the current salary that's posted on their website.
24  Q.   Do you believe Mr. Frazier had the County Board's support
25  to operate Henley-Young safely?
```

```
1    A.   No.

2    Q.   Do you believe prior directors had that support?

3    A.   No.

4    Q.   Are the funding and staffing issues we've been speaking

5    about likely to change with the new sheriff?

6         MR. MORISANI:  Objection.  Calls for speculation.

7         THE COURT:  You can re-ask your question.

8    BY MS. VERA:

9    Q.   Is it your understanding, Mr. Moeser, that the funding

10   and staffing issues are -- continue to this day?

11   A.   Yes.

12   Q.   Let's talk a little more about the staffing and

13   supervision at Henley-Young.  So we talked about the -- you

14   mentioned the -- you called them frontline staff, youth care

15   professionals.  Those are called YCPs by folks who work at

16   Henley-Young?

17   A.   Yes.

18   Q.   Okay.

19   A.   Yes, the acronym is YCP.

20   Q.   And is it accurate that the YCPs supervise the youth at

21   Henley-Young?

22   A.   They have lots of functions, but one of the primary ones

23   is certainly the direct supervision of youth in the facility.

24   Q.   Do they supervise both the JCAs and the youth court

25   population?
```

1   A.   Yes.

2   Q.   What are the duties of YCPs?

3   A.   Well, they vary.  I mean, there's -- or there -- there's

4   a variety of things they would be responsible for over the

5   course of a day.  You mentioned the -- sort of the direct

6   supervision of youth on the unit, so depending on what time of

7   day and what's happening -- excuse me -- they would be

8   responsible.

9        So, for example, in the morning, they get up, making sure

10  they're getting up -- excuse me -- getting their rooms cleaned

11  or whatever other sort of requirements they have.  They

12  serve -- make sure the youth get their meals.  They supervise

13  youth in the showers, clothing allotments and changes, sort of

14  all the things that it takes to sort of run day to day.

15       They would then, you know, supervise youth, making sure

16  youth get to whatever programmatic activity they're supposed

17  to be involved in.  So they may be escorting youth to the

18  school or to the recreation area.  They escort youth to the

19  medical area or to the -- working with one of the therapists

20  to the multipurpose room.

21       So they're all -- they're constantly with the youth

22  providing direct supervision and care.  They intervene in --

23  try and intervene or, ideally, prevent incidents from

24  occurring.  They do room observations, wellness checks, kind

25  of that whole variety of activities.  They ideally would

1   support the youth support specialist or other program staff in

2   conducting activities, social activities, self-development

3   activities.

4        They would, you know, escort youth to visitation -- you

5   know, kind of as visitation -- kind of all the day-to-day

6   things that happen over the course of a day, up through meals,

7   up through programs, up until it's time to go to bed at night.

8   They do room checks.  They do searches when youth move

9   throughout the facility when needed.  A whole variety of

10  things.

11  Q.   You mentioned responding to incidents and, ideally,

12  preventing incidents.  So does that mean that they're

13  responsible for safety and supervision of youth?

14  A.   Yes.

15  Q.   Would you say that the YCPs have an important job?

16  A.   Oh, absolutely.  I mean, all of the positions at

17  Henley-Young working together is what really makes the program

18  function, but the YCPs are the ones that are in most contact

19  with the kids day in and day out.  They have the most --

20  they're the most time with the youth.  They have the most --

21  probably the biggest impact on the youths' behavior and

22  emotions.  They have the biggest impact on how youth feel

23  about being in the facility, whether they feel safe or not, so

24  it's really an important role.

25  Q.   Is it a difficult job?

```
1    A.   Yes.  Yes.

2    Q.   What are the challenges?

3    A.   I've done that.

4         Well, it depends on -- well, a lot of things.  One is

5    it's a full day.  It's a busy day.  It's -- you know, you're

6    trying to -- especially if you've got a good program, you're

7    responsible for making sure youth are getting to where they're

8    supposed to be.  You're making sure that -- I mean, there are

9    all the little things throughout the day in terms of safety

10   and security that you monitor, have to be aware of.  You have

11   to work -- you know, interact with the youth in a positive way

12   so that hopefully they don't get angry and disruptive.  You

13   have to be -- you have to be attentive all the time to the

14   mood and things you might hear between youth, so really play

15   an absolutely significant role.

16        The best safety really within the facility other than

17   sort of the physical plant things, which we're not talking

18   about, but other the physical plant things, the greatest

19   contributor to safety within the facility is the relationship

20   that they have in supervising youth and how the youth view

21   them and how youth respond to them.

22   Q.   How would you describe the work environment, the YCP's

23   environment?

24   A.   Well, I would say a couple things.  The way things are

25   now, given the staff shortage, it's very -- extremely
```

1   challenging.  It's hard to do all the things you're supposed

2   to do and do them well.  The physical plant itself is not

3   particularly comfortable.  Again, oftentimes that's -- the

4   staff, the only place they can sit is at one of the steel

5   tables.  Acoustics within the units themselves are terrible.

6   It echoes.  It echoes so much, it's hard for me to hear,

7   anyway, when I'm there, not to mention the sort of challenges

8   the kids present.  So it's a whole other area.  But the

9   physical plant, there's no natural light within the units.

10  It's not a particularly great place to be for eight-hour

11  shifts.  So it's a tough -- it's a tough environment.

12  Q.   Is there an educational requirement for YCPs?

13  A.   I believe it's a high school degree.  I don't know

14  offhand if a GED equivalent meets that or not.  I think it

15  does, but I'm not 100 percent sure.

16  Q.   When someone starts as a YCP, do they typically have

17  experience with youth custody?

18  A.   No, I don't think so.  There's really -- I'm not sure

19  there's any other places like that around there that they're

20  drawing from.  My guess is certainly that if they're finding

21  somebody with experience, they've been working at a higher pay

22  somewhere else, but I don't think there's many people like

23  that.

24  Q.   What are the types of jobs and employers that

25  Henley-Young has to compete with for potential applicants?

1  A.   You know, I don't know the job market there very well,

2  but it certainly has everything from fast-food places to, you

3  know, warehouse-type jobs.  You know, I don't -- I don't have

4  a good handle on necessarily all the different things that are

5  there.  I know in the past they've talked about some

6  warehouse-type jobs coming in they also have to compete with.

7  Now they have to compete with jail officers and they have to

8  compete with the Mississippi Department of Corrections.

9  Q.   You just said "they've talked about warehouse jobs."  Who

10  is "they"?

11  A.   Usually I think it's probably been either the director

12  or -- and/or Mr. Burnside or Mr. Frazier or Mr. Dorsey.  It

13  would be sort of a casual conversation about staffing levels

14  and the challenges they're having when they try to hire

15  people.

16  Q.   Does the YCP position require training?

17  A.   Yes.

18  Q.   Does that training go to the YCP's understanding of

19  rules, policies, and procedures?

20       MR. MORISANI:  Objection.  Leading.

21       THE COURT:  Objection overruled.

22  A.   Well, when it's -- yeah.  So the ideal would be that they

23  would have at least 40 hours of fairly formal training that

24  would include a review of policies and procedures for the

25  facility.  That's, I think, set for about eight hours of a

1   40-hour formal process.  That's -- you know, that's not --

2   it's okay to sort of let staff know where policies are, but

3   it's certainly not enough to cover all the policies and

4   procedures in any depth.

5       They do a -- what's called Crisis Prevention Institute

6   training.  I think that's a 16-hour program within that

7   40 hours.  That's both a CPI -- CPI is a process of working

8   with youth that includes both sort of deescalation skills as

9   well as some physical restraint skills.

10      They usually do some training on report writing a little

11  bit.  I'm trying to think of other elements of the 40 hours.

12  But some basic training like that for the 40 hours and then

13  ideally at least 40 hours of on-the-job training with

14  mentoring from someone else would be at least -- that would be

15  the minimum that somebody should get.

16  Q.   The minimum for what?

17  A.   From the time someone is hired to before they're actually

18  placed supervising youth on a unit, and ideally I would want

19  them to at least spend a couple more weeks not as the sole

20  staff member on a unit.

21  Q.   And are YCPs at Henley-Young receiving that minimum level

22  of training before they do those things?

23       MR. MORISANI:  Objection.

24  A.   I think not --

25       THE COURT:  Hold on.  There's an objection on the

1    floor.  Mr. Moeser, hold on.

2              MR. MORISANI:  Leading.

3              THE COURT:  Don't lead the witness.

4    BY MS. VERA:

5    Q.   Mr. Moeser, you just testified to a number of criteria

6    that you consider to be the minimum before YCPs supervise

7    youth on the unit; correct?

8    A.   Yes.

9    Q.   Do YCPs receive the minimum training?

10             MR. MORISANI:  Objection.  Leading.

11             THE COURT:  Objection overruled.

12   A.   Not always.

13             MS. VERA:  Can we pull up PX-1, please, at page 37.

14   And can we zoom in to paragraph 82?

15   BY MS. VERA:

16   Q.   Mr. Moeser, this is the consent decree in this case.  Is

17   this the paragraph that you evaluate as to staff training?

18   A.   Yes.

19   Q.   And the consent decree says "Provides that staff members

20   who are assigned to supervise youth are to receive training on

21   youth-specific policies and procedures as well as on

22   age-appropriate supervision and treatment strategies."  Then

23   it reads that these staff are to receive "specialized

24   training," and that is to include training on the "supervision

25   and treatment of youth, child and adolescent development,

1    behavioral management, crisis intervention, conflict

2    management, child abuse, juvenile rights, the juvenile justice

3    system, youth suicide prevention and mental health, behavioral

4    observation and reporting, gang intervention, and

5    deescalation"; correct?

6    A.    Yes.

7    Q.    And are the defendants in compliance with this provision

8    of the settlement agreement?

9    A.    Not to my -- no.  I tend to rate it as partial

10    compliance.

11    Q.    And do you believe that these training topics are

12    necessary to ensure youth safety and programming needs are

13    met?

14    A.    Yes.  I should add, also, just for the record, I guess,

15    that eventually staff are required to go through a 120-hour

16    program that's provided by some State definition of detention

17    officer of some kind.  Some of -- a couple of these things are

18    included I think in that (AUDIO GAP).

19    Q.    In your role on the monitoring team, have you made

20    recommendations about training and professional development?

21    A.    I've made recommendations about professional development

22    and some online training options or ideas.

23    Q.    We've talked about staffing issues a little bit.  Do

24    staff vacancies have an impact on the ability to train staff?

25    A.    Yes.  And there's a number of ways that that's happening.

1    I believe one is that -- one is staff come in, get some

2    initial training, that very basic training that I kind of

3    alluded to.  They may not stay long enough to get any more

4    advanced training.

5        There are some -- you know, opportunities for additional

6    training that staff can't take advantage of because they can't

7    be freed up from a shift of work to go to the training.  And

8    frequently when asked about training or other things going on,

9    it would be mentioned that partly because of the -- well,

10   largely because of the low pay, many of the YCP staff had

11   second jobs or in many -- in some cases this was their second

12   job.

13       So it's very difficult to -- there's not enough YCP staff

14   to schedule training in a way that gets them free from a

15   shift, it's difficult to do it before and after a shift, and

16   the turnover is high.  So they really never get beyond these

17   sort of basic elements of training.

18   Q.  Mr. Moeser, you testified that there are times when YCPs

19   supervise youth before they've received the full complement of

20   required trainings.  I want to ask you about an incident that

21   occurred on January 10th.

22       MS. VERA:  Can we please pull up PX-73?

23   BY MS. VERA:

24   Q.  Mr. Moeser, are you familiar with this incident?  If you

25   need to look at other pages of it, that's fine.

1    A.    That's good.  I recall it.

2    Q.    Okay.  Are you familiar with this incident?

3    A.    Yes.

4    Q.    Can you briefly describe what happened in this incident?

5    A.    Yeah.  This is an incident where, I think, two -- I think

6    there were only two girls, or at least there were two girls --

7    it may have been another girl or two on the unit, but I think

8    there were only two girls on the facility who were in, I

9    think, the visitation area making their way back to the living

10   unit, to the pod.

11        As they go back, they are, you know, loud and boisterous

12   and apparently trying to yell or make contact through doors of

13   the boys' unit and the staff member is, you know, trying to

14   get them to get back to the unit where they're supposed to be

15   and kind of things escalate from there.  The youth threaten

16   the staff member, begin to physically approach her in a

17   threatening way.  She removes her belt and starts swinging it

18   around.

19        Apparently one of the youth said she kind of slammed it

20   on the table, but it became sort of escalated and verbal to

21   the point where one of the youth was struck with the belt and

22   also then engaged in a physical wrestling match with the staff

23   member.  The girl was taken for medical care and had some cuts

24   and bleeding and injury to her lip and, I think, a cut on

25   her -- the side of her face, I think.  So it was a --

1    Q.   Mr. Moeser -- go ahead, please.

2    A.   Well, it just kind of escalated to a physical

3    confrontation and ultimately the staff member used the belt as

4    a weapon, essentially.

5    Q.   So on the first page of this incident report, do you see

6    at number 7 of this checklist it says "Was force used," and

7    the check box is checked for "Yes."

8    A.   Yes.

9    Q.   And it says "Pinned her to the floor"?

10   A.   I see that, yes.

11   Q.   What is that line typically for that was filled in here?

12   A.   That's meant for the -- this form itself is completed by

13   the supervisor in reviewing the incident report that the staff

14   member writes.  So this is meant to -- the form itself is

15   meant as kind of a quality assurance check of what's in the

16   report, does it include the basic elements that are consistent

17   with best -- with expected practice so you see things like

18   "Was verbal de-escalation used," and the "Yes" box is checked.

19   Well, I'm not sure that's true, but, you know, this gets

20   checked like that.

21        This particular line item usually is meant to reflect

22   what level of force, if some kind of restraint was used.

23   Through the CPI training, there are particular kinds of

24   restraints that are taught.  So typically you'll see an

25   incident report that talks about maybe a type of hold or a

1    type of restraint.  That's what's included here, or if there
2    was any other force used of some kind.
3    Q.  And just to clarify, you were just referring to CPI
4    training, which you had testified about a bit earlier.  Is
5    "pinned her to the floor" a use of force that would be covered
6    in a training?
7    A.  No.  And any -- you know, taking kids to the floor is
8    often sometimes referred to as "taking them to the floor" in
9    facilities.  It's risky and dangerous and can be -- result in
10   injury.  Certainly any kind of situation in which a youth is,
11   you know, thrown on the floor and a staff member puts weight
12   on them could restrict their breathing, *et cetera*.  So
13   anything along the line of "to the floor" is not an
14   appropriate technique.
15        MS. VERA:  Could we please look at the lower half of
16   this page?
17   BY MS. VERA:
18   Q.  Mr. Moeser, what is this "Comments" portion and signature
19   line on the form for?
20   A.  It's meant, again, to -- it's meant for an opportunity
21   for the supervisor to make any additional comments about the
22   incident or the incident report itself.  They may, you know,
23   gather some additional information in talking with the staff
24   member that could become kind of a supplement.  It may be a
25   comment about whether what the staff did was proper or not.

908

1    It may include -- you know, maybe they interview another --

2    oftentimes in situations like this, there's more than one

3    staff member who ultimately gets involved.  It may include

4    reference to any conversations with that person.  But this

5    section is almost -- I rarely see anything written in this

6    section by any supervisor.

7    Q.   Do you review these supervisor checklists and sign off on

8    other incident reports?

9    A.   Yes.

10   Q.   And, Mr. Moeser, you had just testified that on Number 3

11   on this checklist, the question about verbal de-escalation,

12   you said something like you're not sure it's true.  Can you

13   elaborate, please?

14   A.   Well, especially in this report, I don't recall anything

15   in particular that referenced that at all, and, you know, it

16   really begins with sort of the youth were making threats and I

17   told them to get to their unit.  That's -- and there's no

18   reference to any kind of -- as I recall -- and I could reread

19   the incident, but I don't recall anything in particular that

20   would describe any real meaningful or verbal de-escalation

21   attempt, and that's fairly common as well.  These often -- you

22   know, often verbal de-escalation from the staff -- what's in

23   the incident report will be the staff member saying, "Well, I

24   told them to go to a different part of the room," and they --

25   it's more of a command than it is any attempt at verbal

1   de-escalation.  There's rarely any reference to -- rarely, if

2   ever, frankly, any reference to taking the youth aside,

3   talking with -- trying to get them to calm down.  There are

4   occasions like that, but relatively rare, so it seems like

5   this almost gets checked regardless of what's in the report.

6   Q.  And who checks all of these boxes, just so that we're

7   clear?

8   A.  The supervisor for each -- each shift has one or more

9   supervisors on duty at the time, so it would be one of those

10   supervisors.

11   Q.  And when the supervisors fill out this form, does that

12   constitute a meaningful review?

13   A.  I don't think so.  I mean, I like the form.  I think it's

14   intended to be used, but I don't think most supervisors have

15   the time or -- the quality of that review is, I think, very

16   limited.

17   Q.  Why do they not have the time to do a better quality

18   review?

19   A.  Well, the staff shortage creates issues.  So oftentimes

20   shift supervisors are actually performing the duties of a YCP

21   to cover a shift because there's not enough YCPs to cover a

22   shift.  So this becomes sort of a, you know, thing I got to

23   do, get it off my list so I can go back to doing whatever I

24   was doing, which may mean supervising -- which may mean

25   actually supervising a unit.

1       Now, I can't speak to this particular incident, what was

2   going on, whether that was the case or not, but given --

3   looking at shift reports and in discussions in this last

4   interview series, supervisors would essentially say they don't

5   have the time to be a supervisor, they're busy covering

6   shifts.

7   Q.   Mr. Moeser, is a limited review like this sufficient?

8   A.   Well, I would -- I would say there's -- I would say this

9   is the first step, if it's done well, of a review in the sense

10  of the supervisor needs to play that role of reinforcing and

11  teaching and training the YCPs.  They may get some initial

12  training on, okay, if you -- if an incident occurs, you have

13  to fill out a report.

14      The best training comes from what's -- sort of what's

15  reinforced over time.  So as a process, this is a -- could be

16  a good tool if it's used properly as the first step.

17  Subsequently, typically the operations manager sees these, and

18  I think now the director gets all of these as well.  That's

19  another sort of review where they can sort of push back and

20  sort of hopefully gradually improve the quality of the

21  incident reports themselves and ultimately the quality of work

22  the staff used, but as sort of a teaching tool, something like

23  this could be useful.  Staff do what gets reinforced, and if

24  nobody's asking them these questions, they just -- they won't

25  bother.

```
 1           MS. VERA:  Your Honor, the United States moves to admit
 2    PX-73 into evidence.
 3           THE COURT:  Any objection?
 4           MR. MORISANI:  No objection.
 5           THE COURT:  PX-73 will be received into evidence.
 6                (Plaintiff's Exhibit 73 entered.)
 7           MS. VERA:  Can we pull up PX-75, please?
 8    BY MS. VERA:
 9    Q.   Mr. Moeser, do you recognize this document?
10    A.   Yes.
11    Q.   Please identify this document.
12    A.   This is the start of an e-mail chain between myself and
13    Mr. Crisler and kind of in follow-up to the incident we just
14    discussed, as I recall, and although I don't do it very often,
15    if I see an incident that causes concern, especially if it's
16    an issue of, you know, a staff member that may have acted
17    inappropriately to the point where I'd be concerned about
18    safety, I would send an e-mail or call.  This one I sent an
19    e-mail.  So this is his response to the questions I asked him.
20           MS. VERA:  The United States moves to admit PX-75.
21           THE COURT:  Any objection?
22           MR. MORISANI:  No objection.
23           THE COURT:  PX-75 will be received into evidence.
24                (Plaintiff 's Exhibit 75 entered.)
25    BY MS. VERA:
```

1    Q.   Mr. Moeser, how did Mr. Crisler, who is the current

2    interim director of Henley-Young, explain the officer's

3    conduct in response to this incident?

4    A.   You know, his basic response is that she was new, had not

5    gotten any formal training, that, you know, she did this to

6    protect herself, and that she would be sent for training

7    coming up, but that she was not adequately trained and not

8    able to do what she should have done.

9    Q.   And so are you referring to paragraph numbered 1 where

10   Mr. Crisler writes that that YCP "has yet to receive any

11   formal training"?

12   A.   Correct.

13   Q.   Was this YCP supervising the girls' unit on her own when

14   the incident occurred?

15   A.   I believe so, yes.

16   Q.   And how much experience did she have on the job?  We can

17   look back at --

18   A.   Well, he said a little over two -- yeah, a little over

19   two weeks, really, so pretty limited.

20   Q.   Should this YCP have been supervising youth on her own?

21   A.   No.

22   Q.   Why was the YCP supervising youth on her own?

23   A.   You know, I didn't ask that specifically, but I can only

24   assume that -- that they had --

25         MR. MORISANI:  Objection.

1          THE COURT:  Hold on.  Hold on, Mr. Moeser.  There's an

2     objection.  Hold on, Mr. Moeser.  Hold on.  Hold on.

3          The objection?

4          MR. MORISANI:  Just to speculation.  He said he'd have

5     to assume.

6          THE COURT:  What was your question again?

7          MS. VERA:  I asked why this YCP was supervising youth

8     on her own.

9          THE COURT:  And what's your response to that,

10    Mr. Moeser?

11         THE WITNESS:  Well, knowing that they have a staff

12    shortage and that there were only two girls on the unit, my

13    assumption, right or wrong, was that they --

14         THE COURT:  No.  Objection sustained.  You cannot make

15    an assumption.  You cannot assume it, but based on your

16    reviews or conversations with -- I'll allow you to ask your

17    questions.  Excuse me.  Ask your question again.

18    BY MS. VERA:

19    Q.   Okay.  Mr. Moeser, why was the YCP supervising youth on

20    her own?  If you don't know, you can say you don't know.

21    A.   I don't know.

22    Q.   In paragraph number two of Mr. Crisler's e-mail, do you

23    see where he writes about YCP Cooper's calls for assistance?

24    A.   Yes.

25    Q.   What circumstances would lead to a call for assistance?

1    A.   Anytime there's, oh, clearly physical -- physical

2    restraints being needed or physical intervention that's being

3    needed, staff will do what they call a code yellow, which is

4    meant to bring other staff to that area.

5         MS. VERA:   Can we please return to PX-73, page 2.   If

6    we can zoom in on the narrative portion.   Yeah.   Thank you.

7    BY MS. VERA:

8    Q.   Mr. Moeser, this is the same incident report we were

9    discussing previously.

10   A.   Yes.

11   Q.   This is page 2 of that document.   Who is the person

12   reporting on this page?

13   A.   This is the Youth Care Professional Cooper.

14   Q.   And is that the YCP who swung her belt and hit the girl

15   with her belt?

16   A.   Yes.

17   Q.   So below in the narrative section, where it says "I,

18   Youth Care Professional Brenda Cooper, was returning back to

19   JFK from giving phone calls to residents," and the names of

20   the residents, do you see that?

21   A.   Yes.

22   Q.   Okay.   And then towards the end after Ms. Cooper has

23   described her account of the incident, do you see where it

24   says, "I grabbed her and forced her to the floor.   I held her

25   so she couldn't hit me until someone came.   YCP Jamal Pierce

1  and SYCP Darius Ellis came and told me to let her go.  We got

2  her"?

3  A.   Yes.

4  Q.   Okay.  Did Ms. Cooper continue to supervise youth

5  following this incident?

6  A.   In looking at -- well, she was, I believe, given a

7  several-day suspension, and in looking at shift reports in the

8  last couple weeks, she has been on them, I think, in almost

9  all cases, if not all cases, with another staff member.

10 Q.   Okay.  But she did continue to supervise youth following

11 the incident?

12 A.   Yes.

13 Q.   I'd like to move on to other staffing issues.

14      MS. VERA:  Your Honor, I'm happy to continue, but this

15 is a point where I was going to stop discussing those

16 exhibits.

17      THE COURT:  Okay.  This will be an appropriate time for

18 our afternoon break.  And let's just talk about -- it sounds

19 like you might have a ways to go.

20      MS. VERA:  Yes, Your Honor.

21      THE COURT:  It looks like we won't get to his

22 cross-examination this afternoon.  To be fair to you-all, I

23 don't want to rush anybody.  So take whatever time you need,

24 and we will take up a couple of other matters before we close

25 today related to this case, but nothing about scheduling

1    anything.  There's a motion and stuff that the parties have

2    responded to, for example, and there's a couple other things I

3    just want to say.

4        It's 2:55.  Let's come back at 3:15 for our afternoon

5    break, and we're in recess.

6            (A brief recess was taken.)

7        THE COURT:  You may be seated.

8        All right.  I failed to do one thing that I always do

9    throughout the course of my trials, in every trial and

10   everything that I have, and I learned this from a wise old

11   man -- well, not an old man then.  He was not old.

12       You can take this case out of my hands or the hands of

13   the jury at any time you want.  There's no harm in getting

14   your case resolved at every stage of the proceeding.  I

15   usually say that at any portion of the case, whether it's

16   after any witness, after any thing, after any ruling.  The

17   case is in the parties' hands at all times, and you can always

18   seek to get it resolved.  That's all.  I learned that from

19   somebody long ago.

20       So is the United States ready to continue?

21       MS. VERA:  Yes, Your Honor.

22       THE COURT:  All right.

23   BY MS. VERA:

24   Q.  Mr. Moeser, earlier on we were talking about the director

25   of Henley-Young and that currently the interim director is

1  Mr. Crisler.  Are there any plans for a permanent director?

2  A.   To my knowledge, the job is posted on the County website.

3  Whether they're doing any additional recruitment, I don't

4  know, but they are posting and presumably going to accept

5  additional applications.

6  Q.   Okay.  I'd like to move on to discuss staffing issues in

7  a little more detail.  We were discussing that earlier.

8         MS. VERA:  Can we please look at Plaintiff's Exhibit

9  PX-28.

10  BY MS. VERA:

11  Q.   Mr. Moeser, have you reviewed this document?

12  A.   Yes.

13  Q.   And what is it?

14  A.   This looks like their basic organizational chart showing

15  what personnel are on the staff and kind of what their

16  positions are.

17  Q.   And is this the organizational chart that was provided as

18  part of the documents obtained for the October 2021 site

19  visit?

20  A.   I believe so, yes.

21         MS. VERA:  The United States moves to admit PX-28 into

22  evidence.

23         THE COURT:  Any objection?

24         MR. MORISANI:  No objection, Your Honor.

25         THE COURT:  P-28 will be received into evidence.

```
 1                    (Plaintiff's Exhibit 28 entered.)

 2           MS. VERA:  Is it possible to zoom in on the bottom

 3  half?  Thank you.

 4  BY MS. VERA:

 5  Q.   Mr. Moeser, does this part of the chart show the YCP

 6  positions and then above them it's the senior youth care

 7  professionals and above that the youth care supervisor

 8  positions?

 9  A.   Correct.

10  Q.   So the boxes with either somebody's name or the word

11  "vacant," are those YCP positions?

12  A.   Correct.

13  Q.   How many YCP positions or identified posts for YCPs are

14  there for Henley-Young?

15  A.   There are 42 on this chart.

16  Q.   And of those 42, how many were vacant as of the date of

17  this chart?

18  A.   I think I counted this as -- I think 17 if my counting

19  was correct.  Sixteen.

20  Q.   I'm counting 16 as well.  Okay.

21  A.   Yeah, 16.

22  Q.   And have current staffing numbers changed since October?

23  A.   Yes.  It's kind of a moving target.  I think an

24  additional chart I got more recently, I think there were 20

25  vacancies and then the more recent one was back to, like, 18.
```

1   So it's kind of a rolling target as they bring people on and

2   people leave.

3   Q.   On this chart how many YCP positions are there per shift?

4   A.   Well, the first shift has 18.  The second shift and third

5   shift have 12 assigned to those shifts.  People are hired for

6   those shifts in terms of (AUDIO GAP).

7   Q.   And what are the -- do you know the hours of the three

8   different shifts?

9   A.   I think they work on, like, 7:00 to 3:00 and 3:00 to

10  11:00 and 11:00 to 7:00 hours.

11  Q.   How many YCPs typically cover a shift?

12       Sorry.  I failed to ask the question I was going to ask

13  you before that.

14       Do you review shift reports?  You talked about reviewing

15  shift reports for the facility?

16  A.   I do.

17  Q.   And do those -- do those tell you how many YCPs are on a

18  given shift?

19  A.   How many YCPs and supervisors are on a shift, yes.

20  Q.   And how many YCPs and supervisors are typically covering

21  a shift?

22  A.   Oh, I would say the day shift, the 7:00-to-3:00 shift,

23  has typically seven to nine.  The second shift often has six,

24  maybe seven, but more often six, sometimes five.  The night

25  shift is five or six, more often five.

1  Q.   And how many YCPs on a given shift are covering each

2  unit, each housing unit or pod?

3  A.   Of course, it depends on how many they have on that

4  particular shift.  Sometimes there are two.  More often there

5  is one person.  There may be a supervisor covering one of the

6  units.  They also have to cover intake, the control center, so

7  they're spread across all those areas.

8  Q.   Looking back at the chart, there are seven blank

9  rectangles along the bottom.  What are those?

10  A.   Those are -- represent the seven positions that were

11  eliminated in the budget during the allotment so that other

12  staff could get a salary increase.

13  Q.   Are those the same seven positions we were discussing

14  earlier that are referenced in Mr. Frazier's resignation

15  letter?

16  A.   Yes.

17  Q.   Is there a standard ratio needed to operate a juvenile

18  justice facility safely?

19  A.   Well, so the number of staff -- well, I guess let me

20  think the best way to answer that.

21       Well, let me start with the number of staff depends

22  clearly on the number of youth.  It also depends on what the

23  configuration of the facility is and how easy it is to monitor

24  youth, how many different areas have to be staffed, whether or

25  not there is a control center that's critical to operations.

1    There may be other functions.

2        For example, in this case they often escort youth to

3    youth court.  Depends on how many youth have to go to medical

4    at any given point in time.  So it's not a simple, you know,

5    for, in this case, 32 kids, you need X number of staff.

6        In terms of direct supervision, there is a standard PREA

7    expectation, the Prison Rape Elimination Act, of a minimum of

8    one staff member serving every eight youth or greater.

9    Operationally, my experience is that that's the absolute

10   minimum and not just --

11       THE COURT:  Hold on.  Hold on, Mr. Moeser.  It seemed

12   like there's some unreadiness.  Can you understand him?

13       MR. SHELSON:  I'm sorry, Your Honor.  We heard "one"

14   and then it sort of cut out, so we just didn't hear his

15   answer.  That's all.

16       MS. VERA:  Thank you.  I was going to clarify the same

17   thing.

18   BY MS. VERA:

19   Q.  Mr. Moeser, what's the ratio required under PREA?

20   A.  A minimum of one staff member for every eight direct --

21   in terms of directly supervising youth.

22       THE COURT:  Is that -- did you say one for every eight?

23       THE WITNESS:  Yes.

24       THE COURT:  Okay.  Thank you.

25   BY MS. VERA:

1   Q.   Mr. Moeser, are there currently enough YCPs on staff at

2   Henley-Young?

3   A.   No.

4   Q.   Have you made recommendations about YCP staffing,

5   vacancies, retention, or pay?

6   A.   Yes.

7   Q.   When did you first make such recommendations?

8   A.   I think probably late in 2019.  It had been something

9   that I sort of monitored along the way in terms of how many

10  vacancies there were.  There were always some vacancies, but

11  oftentimes Mr. Burnside, because of the frequency with which

12  he was actually running the show, more or less, would -- we

13  would talk about that and he would talk about pay being a

14  critical factor.

15       So we would talk about the number of vacancies, what the

16  trends were, what steps were they trying to take to recruit

17  people, things like that.  So I began recommending more

18  directly two things:

19       One is an increase in pay or referencing that it really

20  was -- needed to be upgraded somehow.  More recently, once the

21  Department of Corrections set their number, it was clear that

22  had to be at least the benchmark.

23       And then I also recommended some sort of, you know, pay

24  progression or advancement system in which staff who stayed

25  could gradually see an increase in their pay based on usually

1  some sense of longevity.  You could tie in some merit increase

2  if you wanted, but basically some pay progression system or a

3  step system so that, you know, the longer you were there, you

4  would get -- you would get more money.

5  Q.   And is there any such pay progression system or step

6  system in place at Henley-Young for YCPs?

7  A.   No.

8  Q.   Do staff vacancy levels affect the ability to ensure that

9  staff supervising youth are adequately trained?

10  A.   Yes.  I've talked about the difficulty in getting them

11  off shift for training or to schedule training, not having

12  enough staff to cover the units the way they should and trying

13  to pull them off.  The -- many of them have second jobs and

14  can't be trained.  The lack of step -- step system or the lack

15  of -- sort of where you're not retaining people, you're really

16  spending most of your time just recycling the basic training

17  versus trying to get to any advanced training.

18  Q.   Do staffing levels have an impact on defendants' ability

19  to provide adequate supervision of the youth?

20  A.   Yes.

21  Q.   How so?

22  A.   Well, the -- you know, I look at -- I guess the best way

23  for me to look at it, I think of safety and security within a

24  facility as kind of three -- for lack of a better term, a

25  three-legged stool that includes the physical, environment,

1    the physical plant, safety features, the doors, you know,

2    those kinds of -- the design itself.

3         The programming pieces that keep youth busy contribute a

4    lot towards safety and security.

5         And then ultimately the staffing level in terms of staff

6    being able both to adequately observe youth constantly, be

7    able to prevent incidents by intervening or, you know, taking

8    a youth aside when we see them getting agitated or basically

9    being able to prevent incidents from blowing up into fights or

10   more serious incidents.

11        And then ultimately if something does occur, having

12   enough staff available to intervene safely so you don't end up

13   having to implement some form of either a restraint or any

14   kind of physical contact that could result in injury.

15        You also want to be able to have staff available to -- if

16   you're dealing with a particularly disruptive youth or maybe a

17   fight between a couple kids, somebody who could kind of step

18   in and monitor the other youth and sort of keep them from

19   becoming engaged in the incident itself.

20        So there's a lot of situations that can be prevented by

21   good staffing; and even after incidents occur, they can

22   prevent them from becoming more serious and escalating

23   further.

24   Q.   Do staffing levels have an impact on defendants' -- on

25   staff's ability to assist with programming goals, including

1    mental health and behavioral programming?

2        MR. MORISANI:  Objection.

3    A.   I think --

4        THE COURT:  Hold on.  We've got an objection.

5        MR. MORISANI:  Leading.

6        THE COURT:  What's the basis of your objection?

7        MR. MORISANI:  Leading.

8        THE COURT:  Objection's going to be overruled.

9    A.   Can you just ask that again?

10   BY MS. VERA:

11   Q.   Do staffing levels have an impact on the ability of the

12   YCPs to assist with mental health and behavioral programming

13   goals?

14   A.   Yes.  Let me start with the behavioral management and

15   other kinds of programming that's involved; keeping youth

16   active in constructive activities; being able to assist, for

17   example, the youth support specialist in going along and being

18   able to help facilitate a group or at last be in the group to

19   provide some backup if situations occur; being able to get

20   youth -- for example, we talked about the portable classrooms

21   that had been purchased and installed, but there's not

22   sufficient staff to take them out to that area for some of the

23   programming.  So those areas would be much more conducive and

24   more appropriate for a small-group program that they currently

25   have available either in the classrooms or the multipurpose

1   space, so that in terms of programming, that's significant.

2       The behavior management aspect is -- I would say is more

3   complex in terms of staff being able to interact with youth

4   promptly and efficiently.  When they see things either in

5   terms of incentivizing behavior or redirecting the youth, it

6   needs to be done promptly and, again, keeping things from

7   being, from escalating as kids manage to go from one level of

8   emotion to another in an instant.  There have to be staff

9   available to watch that, monitor that, prevent that from

10  blowing up.  So there's lots of ways they contribute to sort

11  of behavior management components as well.

12      Mental health, certainly as it relates to providing a

13  safe environment, we know most of these youth have had

14  significant experiences with trauma, witnessing violence, all

15  kinds of other -- transiency, all kinds of other trauma in

16  their life, and the ability of staff to provide a safe, calm

17  environment is critical to them not sort of experiencing that

18  in the facility.

19  Q.   Are the defendants in compliance with the provisions of

20  the settlement agreement requiring mental health and

21  behavioral programming, specifically paragraphs 78 and 84?

22  A.   Partially.

23  Q.   Do staff vacancy levels affect the ability to facilitate

24  adequate school?

25  A.   Yes.  For a considerable length of time now, I've -- it

1   was true in the -- even the last time I was physically there

2   in February of 2020, there have been periods of time,

3   significant lengths of time now, when youth have -- they have

4   not been able to take all the youth to be at school for the

5   day.  So they've implemented what they call an A/B system,

6   which one unit is in school and the other unit and group of

7   youth are on their individual pod supposedly working on work

8   packets the teachers provide.

9        So out of -- so they're really only going to school half

10  the days they should be, and the main reason for that is the

11  limited number of staff available to -- well, there's two

12  reasons.  One is the limited number of staff available to go

13  and be in the school and still be able to provide supervision

14  for youth who are otherwise not in school for illness or other

15  reasons, maybe court, maybe -- you know, maybe therapy,

16  whatever, might have to see the nurse, things like that; and

17  the school area itself, it's very compact and not very

18  conducive to a safe environment for school.

19  Q.   Are the defendants in compliance with paragraph 79 of the

20  agreement, which requires that they ensure that youth receive

21  adequate, free, appropriate education including, special

22  education?

23  A.   No.

24  Q.   And about how --

25  A.   Well, there --

1    Q.   Go ahead.

2    A.   Well, there is a -- there is a staff member who is their

3    special ed teacher, who does -- they do get IEPs for kids with

4    individualized education plans for youth.  So they get those.

5    She does try and provide extra support for those youth.  They

6    don't have another special ed teacher currently, so that

7    limits that as well, along with the fact that they're only in

8    class half the time they should be.

9    Q.   And when you say "they're only in class half the time

10   they should be," are you talking about JCAs?

11   A.   Yes.

12   Q.   And are you talking about all JCAs?

13   A.   Yes.

14   Q.   Okay.  Paragraph 83 of the agreement refers to the use of

15   segregation.  It prohibits the use of segregation as a

16   disciplinary sanction and provides for a number of --

17   subsections (a) through (i) provide for a number of

18   documentation requirements and other requirements related to

19   the use of segregation.

20        Are the defendants in compliance with paragraph 83?

21   A.   No.

22   Q.   Are they adequately documenting segregation as required

23   by the agreement?

24   A.   I don't believe so, no.  They have significantly reduced

25   the use of what they would call due process confinement in

1    which following an incident a youth would be confined to their

2    room for up to 24 hours with the opportunity, they say, to get

3    out for school or some other special -- you know, other kinds

4    of programs.  That's been significantly reduced, and we'll see

5    where that goes going forward.

6         There are other circumstances in which youth are, both

7    anecdotally and I've tracked some of the incident reports,

8    placed in their room on what they call emergency behavior

9    management confinement or administrative confinement as a

10   cooldown period.  That's not documented often on the incident

11   report itself, and there's no other place where that's

12   documented, and so it's -- and yet, for example, there's an

13   incident which -- there will be an incident where it talks

14   about returning a youth to their room, but there's no

15   information on the incident report itself on the bottom where

16   that should be documented.  So we don't know how frequently or

17   often they use any kind of other behavior management isolation

18   for a short period of time.

19   Q.   So paragraph --

20   A.   Secondly --

21   Q.   Oh, sorry.  Go ahead.

22   A.   Let me just add -- I'll add one more thing, and that is I

23   do get the observation logs for the youth on the due process

24   isolation, and that's helpful when I get them, but there's no

25   documentation, for example, of being checked by the mental

1   health person, or the incident report itself really doesn't

2   include any information about, you know, letting the youth out

3   of their room at some point.  So it's not very well documented

4   that they're able to meet these conditions.

5   Q.   Paragraph 83(e) requires that the County "specifically

6   document and record the use of segregation on youths."  Is

7   that happening?

8   A.   Not consistently at all, no.

9   Q.   And subsection (f) requires that "a qualified medical

10  professional or staff member who has completed all training

11  required for supervising youth must directly monitor every

12  youth in segregation at least every 15 minutes.  Such

13  observation must be documented immediately after each check."

14  Is that happening?

15  A.   I don't believe so.

16  Q.   Why not?

17  A.   Well, there's two parts to that.  One is the qualified

18  medical professional.  That's never documented, from what I

19  can tell.

20       The other -- the reference to other staff supervising

21  youth, completed all training, if we even -- if we assume --

22  and I think the staff have received -- for the most part

23  received their basic training.

24       You must check at least every 15 minutes.  Those are

25  recorded on an observation log and are supposed to be taped to

1    the door that the youth is in so that as the staff member goes

2    to the door, they can look and check and, if need be, go into

3    the room and check, but, you know, write it right at the time.

4    All too often you see an observation log that simply is every

5    15 minutes.  It appears that somebody has at the end of the

6    shift or somewhere during the shift just decided, well, I

7    guess we have to fill this form out, so I'll put down 12:00,

8    12:15, 12:30, 12:45, 1:00, 1:15, 1:30, *et cetera*.  That's

9    not -- that's not a reliable record.

10   Q.   And you review those logs, Mr. Moeser?

11   A.   I do.

12   Q.   And just so I understand, the agreement requires

13   15-minute increment observations on the logs.  So what is the

14   problem with every 15 minutes?

15   A.   Well, the problem from my end is the documentation leads

16   me to believe that that's not being done, that it's simply not

17   feasible or logical that someone gets it 15 minutes exactly

18   every -- 24 hours straight.  It's just not how it's going to

19   happen, especially as they have staff shortages and other

20   things.  I can't -- it's hard for me to believe that that's

21   what's happening.

22   Q.   And have you discussed this concern with leadership and

23   other staff at Henley-Young?

24   A.   I have -- I have mentioned it, and I have included it in

25   my report probably ten times.  I would say I have discussed it

 1    with them less than that, maybe half a dozen times, usually as

 2    part of an exit interview, exit discussion, and suggest that

 3    they -- that, A, this is a -- again, a supervisor is supposed

 4    to sign off on these every hour.  It's hard for me to believe

 5    that's -- a supervisor wouldn't catch that or push that

 6    forward as these are turned in to the quality assurance

 7    manager or someone above that they don't go back, and I think

 8    on one or two occasions, Mr. Dorsey has said to me, "Yeah, we

 9    talked to staff about that," but it doesn't seem to change.

10    Q.   Paragraph 83 also provides, "Segregation may be used on a

11    youth only when the individual's behavior threatens imminent

12    harm to the youth or others."

13         Are defendants in compliance with that portion of

14    paragraph 83?

15    A.   So I would say especially given the reduction in the use

16    of what they've called -- in the past called due process

17    confinements, which are clearly an after-the-fact discipline

18    tool, if they get those down to zero, which they did in, I

19    think, December and maybe January as well for that matter,

20    that's a big step forward.  What that doesn't capture are

21    these other periods of time when, after an incident, youth are

22    placed in their room for an undetermined amount of time and

23    there's no documentation.

24         So an incident report says youth were -- you know, "I

25    escorted the youth to their room" or "Youth on the unit were

1   put down."  That's not documented anywhere that I could tell,

2   and there's no verification of when they go in and when they

3   go out.

4   Q.   So in the type of incident that you were just describing

5   where youth on the unit are put down, does that mean that

6   other youths other than the individual with the problem

7   behavior are also being locked in their rooms?

8   A.   Well, I think it happens in -- the impression I get -- I

9   mean, in reading the incident reports, what you see are

10  situations in which quite a few youth are involved, and in

11  that case maybe even most of the kids on the unit might be put

12  down for a short period of time or a period of time that we

13  don't know.

14       There's also -- again, given staff shortages, there's two

15  other scenarios that occur.  One is you may -- if there's been

16  a particularly difficult incident, you may want to have

17  youth -- move all the other youth in their room and then be

18  able to bring them out, for example, one by one to question

19  them, ask them what happened.  So that may take a little time.

20  It might be a youth that wasn't directly involved in a fight,

21  for instance, or -- ideally you don't want to do that.  You

22  want to find another way to do that, but I would say it could

23  happen.

24       The other type is given they're short-staffed, there have

25  been occasions both verbally told to us, to me, and also at

1    least one incident that I read, if there's a ruckus or a code

2    yellow in Unit A, for instance, you might -- a staff member in

3    Unit D might have all the residents go to their rooms, lock

4    them in, and then go assist staff in Unit A, because they're

5    the only staff available to assist.

6        There are different scenarios in which this happens, none

7    of which really is documented in a significant way.  Verbally

8    they will say, yeah, we bring kids out as soon as we can.  I

9    don't know if that's the case one way or the other.  We -- you

10   know, some reports seem to reflect a longer period of time,

11   but there's nothing documented.

12   Q.   What is the harm of isolation on youth?

13   A.   Well, there's any range of things.  One is there's some

14   pretty good research around youth being isolated for any

15   extended period of time, more than a couple hours really in

16   terms of sort of their ability to process that isolation, and

17   they can become actually more agitated and be

18   counterproductive in terms of changing -- certainly

19   counterproductive in terms of changing their behavior.

20       There you have the risk, depending on the situation,

21   anytime youth are in their rooms for disciplinary reasons in

22   particular -- and this can work both ways.  A youth who

23   isn't -- wasn't in the incident but is stuck in their room

24   feels like they're treated unfairly and can get upset and

25   disruptive, maybe even make some sort of self-harm gesture

1    that would be of concern, or youth who were more involved and

2    agitated, getting them calmed down and being able to bring

3    them out and work with them is much safer than having them in

4    a room isolated where they may act out in some other way,

5    whether it's pounding on the walls or running water or other

6    behaviors that they -- kids act out often sort of

7    experimentally when they're angry and will do anything they

8    can to express their frustration.  Sometimes that's certainly

9    counterproductive to safety of the facility.

10   Q.   Mr. Moeser, just returning briefly to the half-time

11   schedule you referred to, I just want to clarify why that

12   half-time schedule occurs.

13   A.   Related to school, you mean?

14   Q.   Yes.  Sorry to backtrack briefly.

15   A.   Okay.  You know, what they tell me is that -- and I have

16   talked with both the principal and Mr. Burnside, and this has

17   been an ongoing issue that the principal would like there

18   to -- and I would argue there should be a staff member in the

19   classroom with kids while they're in the classroom.  That

20   helps the teacher.  If there are behavioral issues, it's

21   another set of eyes on the youth.

22        If, for example, a teacher is spending some one-on-one

23   time with a youth, let's say, in a corner, there are things in

24   the school that kids maybe shouldn't get ahold of, and you

25   want to have somebody available to watch who can help keep the

1    kids sort of on task.  So having a staff member in there

2    for -- both to prevent incidents or if something does happen

3    is important.  So you need a staff member in each classroom.

4         You then also would want a staff member nearby or in the

5    hallway or available if needed pretty expeditiously to help,

6    if needed, to escort -- if a disruption occurs and you need to

7    escort a youth back to their unit for some reason.

8         So historically, as I -- when I've looked at the staffing

9    levels, there are not enough staff on a shift for them -- for

10   there to be four or five staffs associated with the school and

11   still covering the central patrol, maybe another unit or a

12   couple other units where the kids are, and so it's -- sort of

13   just a basic safety supervision standpoint, they have made the

14   choice to split them and minimize the number of youth in the

15   classroom area at any one time, minimize the number of staff

16   that are available, and they can cover.

17   Q.   And what do the youth do if they're not -- if for the

18   half-time -- for the 50 percent of the school time that

19   they're not actually in the Henley-Young school?

20   A.   Well, a couple things.  One is teachers do provide them

21   with various kinds of worksheets, let's say, basic math

22   worksheet or word search puzzles or things that are, you know,

23   fairly rudimentary in nature, things you might give your child

24   to kill some time.  May or may not be part of a, you know,

25   curriculum in some way.

1        I think they do try and give -- you know, try and give

2   certain kids certain things that are at the appropriate level,

3   but it's difficult, so they'll give a set of maybe some

4   worksheets a kid is supposed to work on on the unit.

5        When we were there in 2019 and '20, very few kids were

6   working on that, and that's kind of the report from staff now

7   as well, that they basically -- if it takes them an hour,

8   that's the most a kid will work on it, but it's much more

9   common they take that largely as free time.

10       And, in fact, at one point Ms. Warfield sort of took the

11  approach -- it hasn't held up partly because of COVID and

12  other reasons -- that, well, if they're not going to be doing

13  schoolwork, let's try and do some group counseling stuff in

14  the morning and use that time for that.  So I think there's

15  clearly an issue with those are not meaningful academic days

16  for those youth.

17  Q.   So the work that -- just so that I understand, are you

18  saying that the work that they do on the housing units, is

19  that work comparable to going to school that day?

20  A.   No.

21  Q.   And it takes about how long for them to do it?

22  A.   I think in Mr. Caldwell's case, he talked about an hour.

23  Other staff talked about an hour, if they work on it.

24  Q.   So how many hours per week does each JCA spend in

25  school -- in the Henley-Young school with a teacher?

1   A.   Well, over the course of two weeks -- because of

2   alternating days, over the course of two weeks, they would

3   get -- each JCA would get 330 minutes over the course of two

4   weeks.  The standard is 330 minutes every week.

5   Q.   Have you made recommendations regarding the amount of

6   time youth should be in school?

7   A.   I don't -- I don't recall making recommendations other

8   than pointing out that that's clearly not adequate, both in

9   terms of quantity and quality.  These youth are way behind.

10  If anything, we should be catching them up and accelerating

11  their learning, not slowing it down.

12  Q.   And when have you pointed out --

13  A.   But I don't think -- I don't think I've made any specific

14  recommendations beyond that.  Maybe in the past I recommended

15  using various software programs so kids could be self-paced

16  learning, but I don't recall much beyond that.

17  Q.   When have you pointed out what you just talked about,

18  pointing out to leadership that the number of hours is not

19  sufficient?

20  A.   Well, I think the first I would have mentioned it would

21  have been after the February 2020 visit because we, I think,

22  observed them not doing much.  I don't recall in the interim

23  period other than asking about it and trying to determine if

24  that was still the case.  I think there were periods where

25  they tried to do it better.  COVID was in that period, which

1    made it difficult as well, but now post-COVID they're

2    continuing.

3    Q.   And have you discussed the number of hours youth are in

4    school with the leadership at Henley-Young?

5    A.   I think, again, other than to sort of note it and put it

6    in the report, but it's not been a focal point of the

7    discussion.

8    Q.   All right.  Mr. Moeser, let's talk about your review of

9    incident reports, which you said is part of your regular

10   monitoring activities.

11        In the most recent monitoring period from October 2021 to

12   about the present -- is that right?

13   A.   Yes.

14   Q.   Did you review incident reports?

15   A.   Yes.

16   Q.   And do you review a sampling or all the incident reports

17   for that period?

18   A.   Since early after the October visit, I began requesting

19   all of the reports weekly.  Anne Nelsen from SPLC had been

20   getting them and -- kind of on a regular basis, and I thought,

21   frankly, rather than have Mr. Dorsey, you know, try and pull

22   together special ones for me on a visit, that I might as

23   well -- he just add me to the e-mail, so roughly since October

24   I've been getting all of them as well as ones that, again,

25   Synarus Green may have put on the shared drive, which often

1   I've already had.

2   Q.   And about how many incident reports did you receive for

3   that period?

4   A.   About 80.  Eighty or 90.

5   Q.   And what are the different categories of incidents in the

6   reports that you reviewed?

7   A.   Yeah.  The major ones that I kind of look at are

8   self-harm.  So one category would be self-harm, suicidal

9   incident -- related incidents.  Those can range from verbal

10   expressions of harm or a youth may say something like, you

11   know, "I'm going to get out of here one way or another.  I'm

12   not going to be here tomorrow," or they may not make a direct

13   kind of threat, but they may say something.  And then on some

14   occasion, often perhaps with their therapist, they may express

15   something.

16        So there are a handful of those, but the larger category

17   are where a youth actually make some sort of active step,

18   tying a sock around their neck or a bedsheet or something that

19   could -- could end up in death.  That's one category.

20        Contraband of various kinds is another category.  That's

21   three -- the top three would be suicide, contraband, and

22   various fights or assaultive behavior.  Those take up about 60

23   of the 80, roughly.

24   Q.   And what are the other categories?

25   A.   Well, I'll look at -- there are some where there's

1  assault on staff, where the assault is with -- toward a staff

2  member.  There have been a few of those.  There's some that

3  they list as -- you know, they'll categorize them as

4  noncompliant, which is just a way to document that a youth is,

5  you know, not cooperative with returning to an area or

6  disruptive in some other way, you know, maybe at school, maybe

7  in multipurpose room.

8      There are incidents that will get -- at least in my

9  tracking of them will get designated as a PREA-related

10  incident that may have some sexual contact or sexual behavior

11  associated with it.  There may be a few others that just don't

12  seem to fit any category, for example.  (AUDIO GAP) would be

13  an example, just something to document a youth's behavior that

14  doesn't fit any of the other categories.

15  Q.   Earlier we were discussing an incident involving an

16  officer use of force.

17  A.   Yes.

18  Q.   Do you review incident reports where that's recorded?

19  A.   I do.  I mean, that's -- they don't have a use-of-force

20  particular special report.  It's just within the body of the

21  incident reviews.

22  Q.   So of the 80 to 90, you said that one of the top three

23  categories are suicide attempts or other suicidal ideation of

24  some sort.  Is there a -- about -- do you know about how many

25  of the 90 or 80 to 90 involved --

1    A.   I think about 20 -- about 20.  And that's not 20

2    different youth.  I mean, it's not uncommon to have one youth

3    account for four, five, six of those.

4    Q.   And you talked about actual suicide attempts.  Were there

5    any -- are youth at risk of suicide at Henley-Young?

6    A.   Yes.

7    Q.   You also talked about contraband in some of the incident

8    reports?

9    A.   Yes.

10   Q.   What kind of contraband do you see in those reports?

11   A.   The largest category is some kind of tobacco, lighting --

12   a lighter, tobacco products of one kind or another.  There

13   have been -- excuse me -- several with, for example, half a

14   scissors and then another one with the other half of the

15   scissors.  One references a shank of some kind that a youth

16   created out of something.  So they're mostly -- they're

17   largely tobacco.  There have been a couple incidents of staff

18   smelling smoke or something obviously has been burning, but

19   they can't locate what it is.

20        Contraband, there was one incident of a youth being able

21   to sneak a Chromebook out of school to take back to the unit.

22   I think -- I'm trying to think if there were any with -- I

23   don't recall any with drugs.  I don't recall any with even

24   marijuana.

25   Q.   When youth have contraband, like tobacco or a lighter,

1   how are they able to get ahold of contraband like that?

2   A.   Well, there's no contact visitation going on, so the only

3   way they could get it is if staff are bringing it in and

4   allowing them to have it, giving it to them or allowing them

5   to have it.  You could -- there may be a situation where staff

6   could be careless or something, but they shouldn't be smoking

7   in there anyway, so it's got to be a staff member that's

8   bringing it to them or giving it to them.

9   Q.   And regarding the risk of suicide at Henley-Young, can

10  you just elaborate briefly as to why youth at Henley-Young are

11  at risk of suicide?

12  A.   Well, yes.  I mean, lots of things going on, but -- so

13  youth -- one is that a lot of -- you know, a fair amount of

14  youth behavior is experimental.  They have little to no

15  emotional control.  They have little to no appreciation for

16  consequences of their actions.  They are very susceptible to

17  urgent both risk and rewards, so they have very short-term --

18  no ability to delay gratification.

19       So you're describing, right, somebody who acts very

20  impulsively, whether it's out of anger or frustration.  They

21  have -- most often have had experience with a lot of trauma or

22  adverse experiences in their childhood that increase the risk

23  of suicidal behavior.  They have -- so they're just -- they

24  have -- you know, a significant -- a significant number of

25  them have diagnosed mental health issues and they're on

 1    medications.  So they're in a very high-risk category to start

 2    with in an environment that, if not properly managed, really

 3    exacerbates those risks, like being isolated in a room, for

 4    example, especially being isolated in a room when they don't

 5    think they should be, conflicts with other youth where they

 6    get frustrated.

 7         They don't think of a -- you know, their only way out is

 8    to -- it's either a meaningful sort of suicide threat or it's

 9    meant to sort of express their frustration in some way.  So

10    they'll take a sock or a shirt or part of a bedsheet and tie

11    it around their neck.  They'll crawl under the bed and hide

12    from staff and try and get away from them, and fortunately

13    there have not been any deaths, although there have been --

14    there was another -- there was a close call this time, in the

15    last few months, and prior -- earlier in the year.

16    Fortunately, staff -- or at least the ones -- reports we get,

17    staff are seeing them and intervening.

18    Q.   And what do you mean by a "close call"?

19    A.   Well, I think -- I think by the time they got to the

20    youth, he was unresponsive and they ended up having to

21    transport him to the medical facility.  I think he was revived

22    on the way and returned to the facility, but he was apparently

23    unresponsive on the unit.

24         The challenge with staff, again, short staffing, they

25    have a policy that requires youth on suicide precaution in

1    some cases to have a one-on-one staff member who has eyes on

2    them all the time.  And there are those sort of periodic room

3    checks that in some cases are supposed to be done at least

4    every five minutes for youth on suicide precautions.  And if

5    they're short of staff, that increases the risk.  So there are

6    things that increase the risk of a -- for a volatile and

7    impulsive population.

8    Q.   I'd like to switch gears and talk about some of the

9    incident reports.

10        MS. VERA:  Could we get PX-45 up, please?

11   BY MS. VERA:

12   Q.   Mr. Moeser, this is titled "Unusual Incident Report."

13   A.   Yeah.

14   Q.   You see where it says the date of occurrence is 11/23/21?

15   A.   Yeah.  Yes.

16   Q.   Is this an incident report that you are familiar with?

17   A.   Yes.

18   Q.   Can you briefly describe the nature of this incident?

19   A.   So I think this was an incident -- I believe was one in

20   which quite a few youth on the unit became engaged in some

21   disruption or fighting of some kind, and you can see in this

22   report that -- I believe there were a couple staff members who

23   were in training that came to assist and they -- and this is

24   example where they say residents were put up, meaning they all

25   went back to their room, or they were all placed in their room

1    for some period of time.  We don't know how long.

2         MS. VERA:  Your Honor, I'd like to -- I move to admit

3    PX-45 into evidence.

4         THE COURT:  Any objection?

5         MR. MORISANI:  No, sir.

6         THE COURT:  PX-45 will be received into evidence.

7              (Plaintiff's Exhibit 45 entered.)

8    BY MS. VERA:

9    Q.   And, Mr. Moeser, do you see where it says that this --

10   the YCP says that he was called to Walter Payton for a

11   disturbance call?

12   A.   Yes.

13   Q.   And it says all the residents were trying to fight one

14   resident?

15   A.   Yes.

16   Q.   And it says "Still myself and SYCP Marshall told YCP

17   McGee to put everyone up."

18        Is that what you were just reading from?

19   A.   Correct.  I think both those -- I believe, if I'm

20   remembering this one right, both staff were in a training

21   program and directed the staff -- Youth Care Professional

22   McGee to just lock everybody up.

23   Q.   And who wrote this page, this report?

24   A.   This was written by Officer -- Senior Youth Care

25   Professional Collins.

1    Q.   I'm turning to page 2.  And is this witness statement

2    written by another employee?

3    A.   Yes.  This is the other supervisor who I think was in the

4    training as well and responded to the unit.

5    Q.   Okay.  And then page 3, please?

6    A.   And I should add, as alluded to, the time issues, you'll

7    notice on Mr. Marshall's report he talked about they should be

8    in their rooms until the end of class.

9    Q.   Okay.  Who wrote the witness statement that's on page 3

10   of this exhibit?

11   A.   This is Mr. Caples.  He was one of -- at the time one of

12   the qualified mental health clinicians at Henley-Young.

13        MS. VERA:  And finally can we please look at page 4?

14   This is the last page of the exhibit.

15   BY MS. VERA:

16   Q.   Who wrote page 4?

17   A.   This was, I believe, the youth that was referred to

18   earlier as having been, you know, assaulted, picked on by

19   other youth on the unit.  They often may ask -- frequently

20   will ask a youth to write a statement of some kind, and this

21   is what it is.

22   Q.   Does this incident report include a report by the officer

23   who apparently was stationed on the unit where this incident

24   occurred?

25   A.   It does not.

```
 1   Q.   Was anyone supervising the pod?  Can we tell from these
 2   reports?
 3          MR. MORISANI:  Objection.
 4          THE COURT:  Hold on before you answer, Mr. Moeser.
 5          What's your objection?
 6          MR. MORISANI:  It calls for speculation.  I don't know
 7   if there's any way that he would know that answer.
 8   BY MS. VERA:
 9   Q.   Can we tell from these reports which YCP was supervising
10   the pod?
11   A.   We can tell that Officer McGee was supposed to be
12   supervising the pod.
13   Q.   And how can you tell that from the report?
14   A.   Because in the earlier report, you see the supervisors
15   coming in and telling Mr. McGee to put the youth up.  So
16   Mr. McGee was the YCP for that pod.
17   Q.   And do the reports describe Mr. McGee taking action in
18   light of the incident?
19   A.   No.
20   Q.   From these reports do you believe adequate supervision
21   was in place?
22   A.   No.  And I would only say that because -- I mean, in part
23   based on the youth's statement but also Mr. McGee, clearly
24   being assigned to that unit, should have been the one to write
25   an incident report to start with, and the other two would have
```

1  been essentially witness or collateral statements.  The fact

2  that he did not, that's certainly not adequate performance,

3  you know, whether or not he was on the unit, either way.

4  Q.   Can we go back --

5  A.   Obviously he's the one -- he's apparent- -- he's

6  obviously the one that made the call for assistance, and

7  that -- there should be report from him as well.

8       MS. VERA:  Can we go back to page 2, please?

9  BY MS. VERA:

10  Q.   Mr. Moeser, where in the unit did this assault occur?

11  A.   Say that again.

12  Q.   Where in the unit did this assault occur?

13  A.   I think this -- I think this is the one where the youth

14  said that he had -- he was -- he was in his room or around his

15  room, but he was in his room, I believe.  They went into that

16  room, and that's where they were bothering him, bullying him,

17  you know, telling him they wanted their snacks, that kind of

18  thing.  So it was in his room where much of the incident

19  occurred.

20  Q.   Now, the date of this report is November 23, 2021.

21  A.   Yes.

22  Q.   The report in this part of the report identifies that as

23  a Tuesday at approximately 9:45; is that correct?

24  A.   Yes.  Correct.

25  Q.   Would that typically be school time?

1   A.   Yes.  Well, that would be -- right.  I mean, the school

2   time for those that are in school, but it's theoretically work

3   time on the unit for the youth that are not in school.

4   Q.   And I don't think we covered this when we were discussing

5   the A/B school schedule.  Who supervises the youth when

6   they're doing the schoolwork on the units?

7   A.   The youth care professional would be responsible for, you

8   know, sort of making sure the youth have their packet.  I

9   think the teacher brings them, but the youth care professional

10  then is responsible for supervising the youth, encouraging

11  them to do the work.

12       In the best of all worlds, I think there are some staff

13  who try and help youth with some of the things if they don't

14  understand something.  But it's the youth care professional

15  that direct who's doing that.

16  Q.   Mr. Moeser, in your experience, are -- how are youth able

17  to go into another youth's room when they're on a unit

18  together?

19  A.   Well, my -- certainly I think the proper procedure -- and

20  I'm -- and I'm told by staff, by leadership there, the proper

21  procedure is when youth are out of their cells -- what you

22  would do is bring youth out of their cells or their rooms for

23  the day or for a significant period of time.  You'd bring them

24  out for school.  You bring them out to go to recreation.

25  Whatever you bring them out to do, you would then shut their

1  room so they cannot go in and out of their rooms so that this

2  kind of stuff can't happen.

3     And that's even in a situation where you may even have a

4  better-aligned facility, but at Henley-Young the rooms are all

5  out in the open.  There's no reason they shouldn't be locked

6  once the kids are out for the morning for whatever -- if

7  they're supposed to be doing work on the unit, they should not

8  be able to go in and out of the rooms.

9     I would -- I would want to -- if a youth needed something

10  out of the room or for school or for working on something or

11  they forgot their glasses or who knows what, a legitimate

12  purpose, I would then go open the room, let them get what they

13  need, and come back out, then lock the room after.

14     MS. VERA:  Can we please pull up PX-46?

15  BY MS. VERA:

16  Q.  Mr. Moeser, is this an incident report for a fight on

17  October 26, 2021?

18  A.  Yes.

19  Q.  Are you familiar with this incident?

20  A.  Yes.

21  Q.  Can you briefly describe what happened here?

22  A.  So this is an incident where, as it says on there, youth

23  were at -- some were working on their schoolwork and one

24  resident was getting shoes from another room and sort of in

25  and out of the area and that the staff member noticed sort of

1  a resident, as he says, head nod towards another youth and

2  they began punching a third resident, a third youth, who

3  was -- my understanding was at the table working on

4  schoolwork.

5      So it was again, you know, youth milling around a little

6  bit, and I think -- I think, as I recall this incident, one or

7  two of the assaulting youth expressed that this other youth

8  had been bullying them or picking on them earlier and that was

9  why they (AUDIO GAP) --

10 Q.  And what's the date of this incident report?

11 A.  I think -- it looks like 26th of October.

12 Q.  And is that --

13 A.  It's a little small, but yes.

14 Q.  Do you see where it says -- the youth care professional

15 writes that they were "monitoring male residents on Ossie

16 Davis B-Pod while residents were doing schoolwork on the

17 unit"?

18 A.  Yes.

19 Q.  What does that indicate to you?

20 A.  Well, that just means that that group of youth were not

21 in the classroom, obviously, and that at least some of the

22 youth were either -- probably some of the youth were doing

23 work at the tables.

24 Q.  The report also, as you noted, indicates that the youth

25 were wandering around the unit and getting their shoes out of

1   rooms.  Why were they able to do that?

2   A.   You know, again, the doors obviously were left open.  You

3   know, that's -- I mean, the typical routine would be get all

4   your stuff, come on out, lock your door.  Doors should not be

5   left open for youth to wander in and out.

6   Q.   All right.  Was the YCP in this instance providing

7   adequate supervision?

8   A.   It looked -- on this one, as I read it, it looked like he

9   was there.  He was engaged and intervened as soon as he could.

10   As soon as the other youth attacked, I mean, you could see

11   that he was observant enough to notice some kind of apparent

12   signal from one to the other.  Whether he could have --

13   whether he could prevented it or not, it's hard to tell, but

14   there was obviously something that led to this.  But it looked

15   like he was fairly observant.

16   Q.   Is there any after-action report or documentation here

17   indicating an assessment of how this fight came about?

18   A.   I think -- if I remember, this is one where I think the

19   clinicians, maybe both clinicians, met with -- each of the

20   youth there are assigned to one of two clinicians, the

21   qualified mental health people, and now there's only one on

22   staff, so that's a problem.  But nevertheless, at this time

23   there were two.

24       I believe this is the incident in which each of them

25   spoke to their assigned clinician, who wrote additional

1  reports, and I think one of them indicated that at least one

2  of the youth that did the assaulting was frustrated and felt

3  he had been bullied or bothered by the third youth earlier in

4  the day or the day before.  I don't know.  There was some kind

5  of prior conflict between those youth.

6        MS. VERA:  Let's move on to PX-47, please.

7  BY MS. VERA:

8  Q.  Mr. Moeser, I'd like to talk about a couple incidents

9  involving sexual misconduct.

10 A.  Yes.

11       MS. VERA:  Your Honor, I apologize.  Did I move to

12 admit Plaintiff's Exhibit 46?

13       THE COURT:  Any objection from the defendant?

14       MR. MORISANI:  No, sir.

15       THE COURT:  PX-46 will be received into evidence.

16            (Plaintiff's Exhibit 46 entered.)

17       MS. VERA:  Thank you.  My mistake.

18       So we can move on to 47.

19 BY MS. VERA:

20 Q.  Mr. Moeser, are you familiar with this incident dated

21 October -- the incident report dated October 8th, 2021?

22 A.  Yes.

23 Q.  And how is this incident report categorized at the top?

24 A.  "Assault."  "Report of an Assault."

25 Q.  And did this incident involve a sexual abuse or

1   misconduct allegation among the youth?

2   A.   Yes.

3   Q.   Can you briefly describe what happened in this incident?

4   A.   So it gets a little tricky when there's so many

5   redactions in there, but essentially my recollection is that

6   at some point in the afternoon -- so this is around 3:00.  So

7   Mr. Caples, who wrote this report, is one of the mental health

8   therapists, and a youth reported to him that he had been

9   earlier that day -- excuse me -- earlier that day had been

10  grabbed by another resident.  A couple other residents kind of

11  stood by, but this youth -- this youth says he was dragged

12  into his room earlier that day, that he was -- that the

13  youth -- that the assaulting youth pulled his pants down,

14  started ripping his underwear, touched his penis, "private

15  parts" in this case, it says, and that the YCP on duty did not

16  attempt to stop it.

17       Eventually, as I recall, either the -- I don't know if it

18  was the initial two, but a couple other youth came in and sort

19  of pulled the assaulting youth off of him.

20  Q.   And based on your experience, Mr. Moeser, should a staff

21  member be available to intervene in an incident like that?

22  A.   Absolutely.

23       MS. VERA:  Your Honor, the United States moves to admit

24  PX-47.

25       THE COURT:  Any objection from the defendant?

```
1            MR. MORISANI:  No objection.

2            THE COURT:  PX-47 will be received into evidence.

3                 (Plaintiff's Exhibit 47 entered.)

4   BY MS. VERA:

5   Q.   Mr. Moeser, did you discuss this incident with

6   Henley-Young employees?

7   A.   I did.

8   Q.   Who did you discuss it with?

9   A.   I think both Mr. Burnside, who was the operations

10  manager, and Ms. Foster, who is the PREA -- designated PREA

11  coordinator.

12  Q.   And do you know if there was further review or

13  investigation beyond this report?

14  A.   Yes.  In talking with Mr. Burnside, he indicated that he

15  reviewed the video or the cameras associated with this unit.

16  Of course, he could not see into the -- there are not cameras

17  in the youth rooms themselves, but he could see the youth

18  being dragged into the unit and who was involved.  He could

19  see that happening.  He could see -- as I recall, Officer

20  McGee was on the unit sitting at a table and did nothing.

21       Also then this was referred to Ms. Foster as the PREA

22  coordinator.  She did some further questioning, I believe.

23  I'm not sure who she all spoke to, but she ended up concluding

24  that this was a founded -- agreed with the complaint this had

25  happened in talking with, I think, some other youth and the
```

1    victim.

2    Q.   And in an incident like this, was there any systemic

3    after-action review?

4    A.   Given the -- there's two aspects to that.  One is there's

5    kind of the -- the PREA report was filed by Ms. Foster.  So

6    her aspect of it in terms of whether there was sexual contact

7    was followed up on, and she did do a report.

8         In terms of the incident, you know, grabbing the youth,

9    dragging him into a room, regardless of what happened in the

10   room, the lack of staff response, there was no after-action

11   report or further investigation that I received.  And I think

12   I asked -- I know I asked for something.  I think I even might

13   have asked for had Mr. McGee written an incident report and

14   have not received -- and I asked for that and have not gotten

15   anything, so I don't believe he did.

16        So there was no -- sort of no follow-up investigative

17   report on the other aspects of the behavior other than the

18   PREA piece, at least documented in any way.

19   Q.   Yes.

20        MS. VERA:  And I'll just proffer for the record that

21   PX-47 is one page, so it's accurate that there is not a report

22   included by the YCP on duty.

23   BY MS. VERA:

24   Q.   Mr. Moeser, earlier you testified about the type of

25   supervision that is appropriate when youth have some amount of

1   free time or freedom to move around.

2   A.   Sure.

3   Q.   Was appropriate supervision in place here?

4   A.   No.

5        THE COURT:  Let me make sure I'm correct on something.

6   PX-47 is just one page?

7        MS. VERA:  That's right, Your Honor.

8        THE COURT:  I'm sorry?

9        MS. VERA:  Yes, Your Honor.

10       THE COURT:  Is it -- well, I heard you say you're

11  proffering that it's only one page.  Should it be more than

12  one page?

13       MS. VERA:  No, Your Honor.  Mr. Moeser had mentioned

14  that he did not believe that there was another report written

15  by the officer on duty and that the report we had -- the

16  report that is PX-47 was written by a different staff member,

17  and I was just noting for the record that that was accurate.

18  The exhibit does not include a report written by the officer

19  who was on duty.

20       THE COURT:  Okay.  Should it -- I guess the question

21  for me is:  Should it have been written by the person on duty?

22  You could ask Mr. Moeser that question.

23       MS. VERA:  Pardon?

24       THE COURT:  You could ask Mr. Moeser that question.

25  BY MS. VERA:

1    Q.   Mr. Moeser, should there be a report included by the

2    officer who was supervising?

3    A.   Absolutely.

4         THE COURT:  Thank you.

5         MS. VERA:  Thank you.

6    BY MS. VERA:

7    Q.   And when we talk about --

8    A.   And -- and -- I would say, and I would argue there should

9    be some kind of investigative or after-action report written

10   by Mr. Burnside or Mr. Crisler.  Well, this wasn't

11   Mr. Crisler's time, so...

12   Q.   And with regard to those -- those points about adequate

13   documentation and report writing and after-action reports, is

14   that something you've recommended?

15   A.   I have mentioned it on several occasions.  I think I have

16   included it in my monitoring reports at least a couple times

17   and will again on this next one.  It's -- I'm not able -- I'm

18   not getting documentation about any action taken, you know,

19   following that, and whether it's a personnel investigation

20   kind of report or a report -- sort of critical incident

21   debriefing of some kind, there should be documentation of that

22   in whatever form is proper at the time.

23   Q.   What is the value of such a corrective action report?

24   A.   Well, first of all, it documents that they're actually

25   doing something, some kind of follow-up.  So, for example, a

 1   critical incident debriefing process or something where people

 2   get together and say, here's what we did right; here's what we

 3   did wrong; here's what we could have done better; here's how

 4   this incident occurred; here's perhaps even something we could

 5   change in policy and practice.  Having that in any particular

 6   case is very helpful.

 7        As an administrator, then you also want to look for

 8   patterns that might occur over time.  So you may begin to

 9   see -- you may -- by virtue of doing these -- doing the

10   debriefings or whatever, you'll see patterns that emerge that

11   speak to policy or things you need to change in the facility.

12        They also -- those kind of debriefings also become -- can

13   be used as a training tool both at the time for staff that are

14   involved or subsequent training where you can come in and say,

15   "Here's an incident that happened.  Here's the kind of

16   information we gathered after this.  This tells us that we

17   should be doing X, Y, Z differently than we're doing."  So

18   there's multiple reasons to have it, the first of which is you

19   just need to be able to say you did some kind of legitimate

20   administrative management review.

21   Q.   All right.

22        MS. VERA:  Let's pull up PX-29, please.

23   BY MS. VERA:

24   Q.   Mr. Moeser, is this the same type of supervisor checklist

25   we were discussing earlier?

```
 1   A.   Yes.
 2        MS. VERA:  Let's turn to the second page of the
 3   exhibit, please.
 4   BY MS. VERA:
 5   Q.   Mr. Moeser, are you familiar with this incident report?
 6   A.   Yes.
 7   Q.   Can you briefly describe what occurred here?
 8   A.   Yes.  This is an incident, again reported to a therapist,
 9   in this case Ms. Frelix.  Now Mr. Caples is one of her -- one
10   of the girls during a session reported sort of a confrontation
11   she had with another youth while they were in visitation on
12   that prior Saturday.  So this would have been Monday that the
13   session was occurring, and then she reported what had
14   happened.
15        She relayed that this other girl had been bothering her,
16   touching her, sitting on her lap, you know, some things like
17   that, and that she finally got frustrated and grabbed the
18   offending girl around the neck, in this case says -- said she
19   got scared because she saw that resident -- that youth's eyes
20   roll back in her head and she let go.
21        So this happened in the visitation area.  No staff
22   report.  Clearly in this case no staff available is referenced
23   here as well, and it's completely unclear how they could end
24   up in the visitation area unsupervised, again, other than the
25   staff shortage, which can be particularly difficult on
```

1   weekends because there's less structured time as well and

2   staff take off weekends if they can, and in this case

3   apparently they were allowed to be in the visitation area

4   without supervision.

5   Q.   And just to be clear, this is an incident report

6   involving sexual misconduct?

7   A.   The discussion -- you know, she's not real specific about

8   where -- you know, what touching or what she was touching, but

9   I -- so I guess I can't answer exactly what the nature of the

10  contact was.

11  Q.   Okay.

12  A.   These go to Mr. Burnside, who makes a determination

13  whether to refer it to Ms. Foster for a PREA investigation.  I

14  don't believe he did in this.

15       MS. VERA:  Can we look back on page 1, please.  We

16  don't have to zoom in.

17  BY MS. VERA:

18  Q.   So who signed off on this report?

19  A.   Mr. Dorsey.  So Mr. Dorsey, who is the quality assurance

20  manager.

21  Q.   And he checked off all --

22  A.   So he would -- yeah.  He would be -- when these are done

23  typically by some -- he has some responsibility for the youth

24  support specialists and the clinicians in terms of

25  administratively, so that's why he's signing off as if he

 1   were -- essentially were the supervisor of Mr. Caples or

 2   Ms. Frelix in this case.

 3   Q.   And is -- are there any comments or follow-up indicated?

 4   A.   No.

 5   Q.   Do you think this constitutes a meaningful review of the

 6   report itself?

 7   A.   I guess I don't know the answer to that.  I think it

 8   would certainly be helpful to have some additional comments

 9   related to -- for example, you know, investigated why they

10   were alone in the visitation area or sort of what were some of

11   the factors that contributed to it or in this case, yes or no,

12   whether it was referred for a PREA investigation.  So I guess

13   I would say it's not adequate, should be done better.

14          MS. VERA:  Your Honor, the United States moves to admit

15   PX-29.

16          THE COURT:  Any objection?

17          MR. MORISANI:  No, Your Honor.

18          THE COURT:  PX-29 will be received into evidence.

19              (Plaintiff's Exhibit 29 entered.)

20          MS. VERA:  So, Your Honor, I'm close here, but I

21   recognize that it's Friday and the Court had other -- the

22   Court had mentioned other things that Your Honor wanted to

23   discuss.  I'm happy to continue.  I just wanted to pause for a

24   moment just in case.

25          THE COURT:  How much longer do you think you have with

1    this witness?  How many more exhibits?

2         MS. VERA:  I think 30 minutes, Your Honor.  It could be

3    less, but I don't want to overpromise.

4         THE COURT:  I guess we'll stop for the day.  I mean,

5    it's late.  I mean, we can -- let me -- I'm looking -- we're

6    not going beyond 5:00, so we may as well stop now.

7         MS. VERA:  That's fine.  Thank you, Your Honor.

8         Thank you, Mr. Moeser.

9         THE COURT:  Mr. Moeser, thank you for being with us

10   today.  Yeah, this is a -- as I said, you-all have done a

11   great job this week.  So we will allow the Government to put a

12   pin in it right there and we'll pick back up on this on

13   Monday.

14        There are -- oh, I'm sorry.  Not Monday.  Not Monday.

15   If you show up Monday, man, that door will be locked outside.

16   The whole courthouse will be dark.  The Government lawyers

17   knew I didn't mean Monday.  No, we'll start up Tuesday

18   morning.  I'm sorry.

19        The Court is -- the Court received a filing from one of

20   the interested parties about having access to the sealed

21   records, and initially that filing was submitted under seal,

22   but I decided I would give the lawyers -- well, it was

23   submitted in camera, I guess, under seal, and I gave the

24   parties an opportunity to respond.

25        The request -- part of the request, part A of the

1    request, was to allow the interested parties -- allow the

2    particular interested party who filed the motion to have

3    access to the sealed records, the sealed documents that are

4    sealed in this case, and I think from -- each party in this

5    matter, each objected to that.  So the Court is going to deny

6    that request.  I don't think having access to the sealed

7    records in this case -- we'll do a text order or something,

8    but I wanted you to know I'm denying that aspect of it.

9          And the interested party, I think, is in the courtroom,

10   and I did not advise her, but if there's anything else the

11   interested party wishes to say on the second portion of that

12   motion; that is, that they be allowed to participate in this

13   matter virtually while this trial continues next week, I don't

14   think the Government spoke to that aspect of the motion.  I

15   think the defendant said you can if you want to or did not

16   oppose it.

17         But, Ms. Jones, if you wish to add anything else to the

18   request, you may.  I do have a couple of questions, if you

19   will, about that particular request.  You can come forward.

20         MS. JONES:  Good afternoon, Your Honor.  Thank you.

21         THE COURT:  Good afternoon.  And for the record, you

22   are?

23         MS. JONES:  Leslie Faith Jones.  I'm with the Southern

24   Poverty Law Center, and I'm here on behalf of interested

25   parties JH (AUDIO GAP), and we are interested parties in the

1    case of JH versus Hinds County.

2         THE COURT:  Now, the request is that you-all

3    participate virtually through Zoom for at least some portion

4    of the rest of the trial, I think.  Is that the case?

5         MS. JONES:  Yes, sir.  So given the way that the

6    proceedings have occurred so far, I made arrangements so I

7    should be able to be here next week.  Now, if you go beyond

8    that, I don't want to -- if you're going to grant my motion, I

9    don't want to give up a chance to have a Zoom link, but next

10   week I will be at my --

11        THE COURT:  Oh, next week?

12        MS. JONES:  Yes.

13        THE COURT:  We expect to be -- possibly be through next

14   week.  Because one of the questions that I would have had is,

15   you know, are there other lawyers who could actually

16   participate?  The defendants have somewhat received the sting

17   of that earlier motion with respect to that and got

18   Mr. Shelson involved at the very last minute because, you

19   know, we had to move forward and Mr. Siler could not be here.

20   So is there any other lawyers in the SPLC who could actually

21   be here and do whatever that is -- whatever you're doing with

22   respect to, you know, the participation that you're doing now?

23        MS. JONES:  So I'm the only one that can be here in

24   person.  The other couple of people would have to do virtual

25   participation.  So since we didn't have that option, we just

1    made other arrangements.

2          THE COURT:  No other paralegal or anyone -- I mean, I'm

3    not suggesting that a paralegal is equivalent to you and what

4    you're doing.

5          MS. JONES:  I understand.  It's not a problem.  In this

6    moment I didn't have anyone on deck who could come, so the

7    virtual participation was for myself and another.  If you're

8    open to granting that, then I can share that information, but

9    I will be here.

10          THE COURT:  No.  At this point I'm going to deny

11    without prejudice that portion of it, the request to

12    participate virtually, deny without prejudice since you're

13    going to be here next week, and you can bring it back up if

14    this matter goes forward through the following week.

15          MS. JONES:  Yes, sir.

16          THE COURT:  Okay.

17          MS. JONES:  I do have a question for clarification.

18          THE COURT:  Yes.

19          MS. JONES:  And that's with regards to access to the

20    transcripts and the nonsealed evidence that's been provided

21    with the exhibits.  That's really the information I was

22    seeking.

23          THE COURT:  You will -- oh, the nonsealed evidence --

24          MS. JONES:  Yes, sir.

25          THE COURT:  -- and the transcripts?

```
 1          MS. JONES:  Yes, sir.

 2          THE COURT:  You'll have to work with the -- I mean,

 3    right now I think the parties -- with respect to the

 4    transcripts, you can work with the court reporter.

 5          MS. JONES:  Yes.

 6          THE COURT:  And like any other person, you will be able

 7    to purchase or whatever it is that you have to do --

 8          MS. JONES:  Yes.

 9          THE COURT:  -- with respect to the transcripts, but

10    work with the court reporters on that.

11          MS. JONES:  Yes, sir.

12          THE COURT:  But whatever information is on the docket,

13    you already have access to, I think.  Whatever public

14    information, you will have access.  Right now the exhibits

15    have not been uploaded, I don't think, because the trial is

16    still going along.

17          MS. JONES:  Yes.  Which is why we filed the motion, to

18    see if we can access that in real time as opposed to having to

19    wait.

20          THE COURT:  To have access to what?

21          MS. JONES:  To the exhibits.

22          THE COURT:  The exhibits are generally put in the

23    record.  Work with Ms. Summers.  I don't think we use the --

24    we put the -- we make the exhibits available to the public

25    until at the close of the trial.
```

1          MS. JONES:  Yes, I understand.  And so as interested

2     party, we were asking if we could have access before that

3     time.

4          THE COURT:  Okay.  That's putting a little bit of

5     burden on my staff.  You could probably check with the parties

6     and see if you can get a copy of their exhibits.

7          MS. JONES:  Sure.  I can do that.  I just -- I asked

8     and --

9          THE COURT:  They're free to give you whatever.

10         MS. JONES:  Okay.

11         THE COURT:  They're not barred from giving you anything

12    they wish for you to have other than sealed exhibits.

13         MS. JONES:  Yes, sir.  No, I understand sealed exhibits

14    are not accessible, and that's not a problem.  When I asked, I

15    was told to file a motion.  So I was just following

16    instructions --

17         THE COURT:  Oh, okay.  Okay.  Sure.

18         MS. JONES:  -- to make sure we're not doing anything

19    that's not acceptable.

20         THE COURT:  Right.  And with respect to access to the

21    transcript, talk to the court reporter about how that access

22    is gotten by you.

23         MS. JONES:  Yes, sir.

24         THE COURT:  By the interested party, if you will.

25         MS. JONES:  Thank you.

 1          THE COURT:  Thank you.

 2          Now, with respect to the other issue, I know we got --

 3     we'll have to finish with Mr. Moeser and, you know, the

 4     defendants still at least have one other witness.  I'm not

 5     sure -- I suspect that Ms. Simpson will testify at some point

 6     in time, and we know how long Mr. Parrish was, we know how

 7     long Mr. Moeser was, and we know how long Mr. Dudley was.  So,

 8     you know, the idea of the Government finishing up on Tuesday

 9     is probably not likely.  I mean, so -- so I guess in saying

10     that, the defendant -- you know, still give them 24 hours'

11     notice of -- or more of who your witnesses will be the

12     following day or whatever.  But I do have this one other

13     question that the parties will probably have to spend some

14     time on over this weekend.

15          I've been looking at -- in my view, y'all correct me if

16     I'm wrong, but we're operating as if it is.  In my view, the

17     consent decree is still in place.  The stipulated order is

18     still in place.  What we have here is that the defendants have

19     moved to terminate that particular order.

20          The detention center for right now is without a jail

21     administrator, I think.  You have an interim person; is that

22     correct?  I understand the interim person is Mr. Simon.  I

23     think that's what I've been hearing from the evidence.

24          MR. SHELSON:  That's correct, Your Honor.

25          THE COURT:  Okay.  I don't know -- and I've been -- I

1    know at the status conferences, the County has represented

2    that they are in the process of at least putting a person,

3    whatever the status is between interim and permanent, I guess.

4    Acting.  Acting.  I believe that's the word you-all told me.

5         MR. SHELSON:  Yes, sir.  It's Chief Simon as we speak.

6    Frank Shaw is the person who Mr. Hall identified to the Court,

7    I think, on the last status conference before trial, and

8    Mr. Shaw will be at the facility on Monday.

9         THE COURT:  This is the question that I have.  The

10   consent decree, paragraph 38 of the consent decree identifies

11   the experience that a person is to have, and I just want to

12   make sure that the persons who are acting as jail

13   administrators or who will serve as jail administrator

14   actually meets the qualifications that are set forth in the

15   consent decree or are set forth in what has been represented

16   by the monitors and the parties all along, because we had

17   Ms. Rushing there when I first picked up this case.  Then

18   there was Officer, or whatever his title was, Felder, and I

19   think, looking at the status report, Mr. Felder, in the words

20   of, I believe, the monitor's Docket No. 79 at 22, "Felder had

21   the requisite experience and qualifications necessary.  Felder

22   had education, experience, and supervisory experience that --

23   of which Ms. Rushing did not have."

24        Now, we've talked about over the course of the day and

25   we've talked about on the status conferences all along the

1    experience that Major Bryan had, and I think everybody, at

2    least those persons who were responsible for hiring Major

3    Bryan, considered that she had the appropriate experience.  So

4    I want to make sure what the parties deem the appropriate

5    experience is under paragraph 38 of the consent decree and how

6    the parties have discussed or how the parties have directed

7    that since 2016.

8         I mean, what type -- what is that experience that -- I

9    know it says five years of supervisory experience or five

10   years in experience.  I do know that there is something much

11   different than jail and prisons.  There is a difference, and

12   so we need to make sure that someone with experience is

13   prepared to lead the detention center and we will -- the

14   parties need to make sure that there is somebody there,

15   because that detention center is not going anywhere.  It still

16   has inmates -- excuse me, it still has detainees.

17        So -- and if there is no one there with the requisite

18   experience, what does that do with the status of the -- the

19   County being in compliance or out of compliance, and if that

20   is an issue that we'll have to get to next week, then we'll

21   take the time to get into that issue next week, but I do --

22   I'm not giving anybody homework.  Definitely giving the

23   parties something to think about.

24        And as I told you when I walked back in today, as I

25   usually do in every case that I've sat up here before, every

1    motion that I've had, civil, criminal, the case is in the

2    parties' hands.  And as I learned as a very -- even -- as a

3    very, very young lawyer, I was always told, "I don't want

4    nobody deciding my fate, jury or otherwise."  People -- but

5    y'all know me.  I was always told, "I don't want nobody,

6    persons on the jury who I don't know, deciding what I must

7    do," so I encourage the parties to think about where we are.

8         At this point we've had a full week.  This is -- this

9    is why I'm here.  There's no problem.  We're willing to take

10   whatever time we need to take to get the cases heard on our

11   docket.  So we do what we have to do.  We do what the law

12   requires, and I would just encourage the parties to think

13   about where we are in this case with respect to -- where we

14   are.

15        I mean, Major Bryan has been gone all of this month,

16   and I don't know if the detention center has -- I don't know.

17   Maybe Monday the new person will come aboard who has the

18   requisite skills and experience that the consent decree

19   require.

20        So that's all that I have.  I hope you-all enjoy your

21   long weekend, and if the lawyers and the monitors are staying

22   over this long weekend, spend a whole lot of money in Jackson

23   for us.

24        All right.  That is all.  Please have a good weekend,

25   and I'll see you-all Tuesday morning.  We'll start up at 9:00.

```
1   ****************************************************************

2

3                   COURT REPORTER'S CERTIFICATE

4

5        I, Candice S. Crane, Official Court Reporter for the

6   United States District Court for the Southern District of

7   Mississippi, do hereby certify that the above and foregoing

8   pages contain a full, true, and correct transcript of the

9   proceedings had in the forenamed case at the time and place

10  indicated, which proceedings were stenographically recorded by

11  me to the best of my skill and ability.

12       I further certify that the transcript fees and format

13  comply with those prescribed by the Court and Judicial

14  Conference of the United States.

15       THIS, the 19th day of February, 2022.

16

17                          /s/ Candice S. Crane, RPR  CCR

18                          Candice S. Crane, RPR, CCR #1781
                            Official Court Reporter
19                          United States District Court
                            Candice_Crane@mssd.uscourts.gov
20

21

22

23

24

25
```