1                   IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                         NORTHERN DIVISION

3


4     UNITED STATES OF AMERICA                           PLAINTIFF

5     VERSUS                   CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

6     THE HINDS COUNTY BOARD OF SUPERVISORS,
      HINDS COUNTY SHERIFF, ET AL.                        DEFENDANTS
7

8

9                   EVIDENTIARY HEARING, VOLUME 6,
              BEFORE THE HONORABLE CARLTON W. REEVES,
10                UNITED STATES DISTRICT COURT JUDGE,
                          FEBRUARY 22, 2022,
11                        JACKSON, MISSISSIPPI

12

13                   (Appearances noted herein.)

14

15

16

17

18

19

20

21

22    REPORTED BY:

23        CANDICE S. CRANE, RPR, CCR #1781
          OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi  39201
          Telephone:  (601)608-4187
25        E-mail:  Candice_Crane@mssd.uscourts.gov


                    ***DAILY TRANSCRIPT***

```
1    APPEARANCES:

2       FOR THE PLAINTIFF:

3            CHRISTOPHER N. CHENG, ESQ.
             MATTHEW DONNELLY, ESQ.
4            SARAH G. STEEGE, ESQ.
             LAURA L. COWALL, ESQ.
5            HELEN VERA, ESQ.
             MITZI DEASE-PAIGE, ESQ.
6
        FOR THE DEFENDANTS:
7
             NICHOLAS F. MORISANI, ESQ.
8            JAMES W. SHELSON, ESQ.
             TONY R. GAYLOR, ESQ.
9            RAYFORD G. CHAMBERS, ESQ.
             JOHN C. HALL, II, ESQ.
10           REUBEN ANDERSON, ESQ.

11      ALSO PRESENT:

12           ANTHONY NJOKU
             MICHAEL DENAULT
13           ELIZABETH SIMPSON
             DAVID PARRISH
14           SHERIFF TYREE JONES
             LESLIE FAITH JONES
15           CINDY MOHAN

16

17

18

19

20

21

22

23

24

25
```

———***DAILY TRANSCRIPT***———

1                    **TABLE OF CONTENTS**

2   Style and appearances.................................975-976

3   WITNESS:  JIM MOESER

4       Continued Direct by Ms. Vera.........................978

5       Plaintiff's Exhibit 30 entered.......................987

6       Cross by Mr. Morisani...............................1003

7       Defendants' Exhibit 156 marked for ID...............1035

8       Redirect by Ms. Vera................................1036

9       Examination by the Court............................1052

10      Further Cross by Mr. Morisani.......................1060

11      Further Redirect by Ms. Vera........................1065

12      Defendants' Exhibit 157 marked for ID...............1067

13  WITNESS:  ELIZABETH SIMPSON

14      Direct by Mr. Cheng.................................1069

15      Plaintiff's Exhibit 3 entered.......................1072

16      Voir Dire Examination by Mr. Shelson................1073

17      Continued Direct by Mr. Cheng.......................1075

18      Plaintiff's Exhibit 88 entered......................1100

19      Plaintiff's Exhibit 32 entered......................1103

20      Plaintiff's Exhibit 27 entered......................1107

21      Plaintiff's Exhibit 31 entered......................1109

22      Plaintiff's Exhibit 14 entered......................1116

23      Plaintiff's Exhibit 19 entered......................1138

24      Plaintiff's Exhibits 77-83 entered..................1168

25  Court Reporter's Certificate...........................1183

————***DAILY TRANSCRIPT***————

```
 1              IN OPEN COURT, FEBRUARY 22, 2022

 2

 3         THE COURT:  You may be seated.

 4         Good morning.  I apologize for the delay.  Hope

 5  everyone had a good, long weekend.  Is there anything we need

 6  to take up?

 7         All right.  All right.  Well, Government, you may

 8  resume your direct examination of Mr. Moeser.

 9         MS. VERA:  Thank you, Your Honor.

10              CONTINUED DIRECT EXAMINATION

11  BY MS. VERA:

12  Q.  Good morning, Mr. Moeser.

13  A.  Good morning.

14  Q.  I'd like to continue.  We had discussed when we left off

15  on Friday some incidents involving sexual misconduct at

16  Henley-Young.  I want to discuss one more incident report from

17  Henley-Young, and that's the exhibit marked PX-30.

18       Mr. Moeser, this is an incident report dated November 14,

19  2021, involving alleged sexual activity between two girls at

20  Henley-Young.  Are you familiar with this incident?

21  A.  Yes.

22  Q.  Could you please briefly describe what happened in this

23  incident?

24  A.  So this report was made about a week after the -- excuse

25  me -- after the actual incident occurred.  This particular
```

1    part of the report was written by one of the mental health

2    clinicians who had been asked to come in and help interview

3    one of the -- at least one of the girls, maybe both girls

4    involved in the incident the week before.

5        In this particular incident the staff member on duty

6    allowed two girls to stay in the same room overnight together

7    and in the report additional information gathered by in this

8    case by Ms. Drake that there had been sexual activity, sexual

9    contact overnight, that they had -- one of the girls had

10   configured her bed so it would look like somebody was sleeping

11   in case the staff member looked through the window, that their

12   actual discovery of them being in the same room happened the

13   next morning when doors were being opened for breakfast, I

14   believe.  And neither the staff member involved allowing it to

15   happen, the overnight person did not discover this -- well,

16   she may have -- the overnight person maybe did because they

17   get up early.  It might have been the overnight person who let

18   them out in the morning, but neither person reported that

19   immediately to any supervisor or anyone else.

20       Somehow over the next week as the girls talked or

21   information came out, eventually got to Mr. Burnside who came

22   to the facility to find out, I think, for another reason but

23   came and was confronted with this information.  He decided it

24   would be more appropriate for Ms. Drake to interview the youth

25   so he called her in to do the interviewing as to what had

 1  happened the week before.

 2  Q.   Okay.  So this incident, just so we're clear, what date

 3  did the incident occur on?

 4  A.   November 7th, the night of November 7th.

 5  Q.   And what's the date of this report?

 6  A.   Well, it's -- the day is listed as the 14th.  I think she

 7  actually signed it on the 15th, but I think she wrote it after

 8  midnight or right away the next morning.  But the date she

 9  came in was the 14th.

10  Q.   Okay.  And do you see about halfway down the selection we

11  have here where it says, "The resident stated she did not tell

12  Mr. Frazier everything because she did not want to get YCP

13  Burrell in trouble."

14       Is YCP Burrell the YCP who was on duty who permitted the

15  girls to sleep together?

16  A.   Yes.

17       MS. VERA:  If we could look at sort of the bottom half

18  of this narrative.

19  BY MS. VERA:

20  Q.   And so, Mr. Moeser, if you look sort of about two-thirds

21  down, it says, "The resident stated that she went to sleep and

22  then the first shift came in.  YCP Leslie Smith came in, and

23  opened her door and saw the other resident inside and asked

24  her what she was doing there."

25  A.   Okay.  Yeah.

1   Q.   So is that the other YCP who you said was involved here?

2   A.   Yes.

3   Q.   And did Ms. Smith -- is Ms. Smith one of the YCPs who did

4   not report this until later?  Can you just explain the

5   chronology of reporting of this incident, Mr. Moeser?

6   A.   Yeah, I believe -- I believe somewhere about as it got

7   about a week later that I think it was Ms. Smith that

8   mentioned it to -- maybe, I think, her supervisor might have

9   been -- Senior YCP Brown called in Mr. Burnside who then

10  called in Ms. Drake.  So I think it was eventually Ms. Smith,

11  I think, was the one who said she finally had something to

12  report.

13  Q.   Okay.  And in this incident report, is there a report or

14  statement written by Senior YCP Brown?

15  A.   I don't -- I know there -- I know Mr. Frazier wrote one.

16  I don't recall if Ms. Brown did or not.

17  Q.   Okay.  We can --

18  A.   I don't think she did.

19        MS. VERA:  We can page through and look at page 2.  We

20  don't have to zoom in.

21  A.   I think page 2 is -- yeah, I think page 2 is a

22  continuation from Ms. Drake, I believe.

23  Q.   Yeah.

24        MS. VERA:  And then page 3, please.

25  BY MS. VERA:

***DAILY TRANSCRIPT***

```
1    Q.   This is the last page.

2    A.   Yeah.

3    Q.   This report --

4    A.   Yeah.

5    Q.   Who is this report by?

6    A.   This is written by Mr. Frazier who is the director.

7    Q.   Okay.  So is there a report or a statement from a

8    supervisor, YCP senior or YCP supervisor?

9    A.   Not that I know of.

10   Q.   And is there a report by Ms. Burrell or Ms. Smith, the

11   YCPs who were involved?

12   A.   Not that I'm aware of.

13   Q.   And here we're looking at Mr. Frazier's report, and do

14   you see in the bottom paragraph he says that he reinformed

15   Ms. Smith she needed to write a report concerning what

16   transpired?  "Again, I asked why she went a whole week without

17   reporting this incident.  At that time she had no response."

18   A.   Correct.

19   Q.   So, Mr. Moeser, was this incident properly reported?

20   A.   No.

21   Q.   Do YCPs have reporting obligations with regard to sexual

22   abuse or sexual misconduct incidents?

23   A.   Yes.

24   Q.   And what are those -- what are their obligations?

25   A.   Their obligation would be to write an incident report and
```

1    pass that up usually then to Mr. Burnside who would -- who

2    would read it, review it, presumably take any immediate action

3    if something was needed for safety reasons but then also pass

4    the report on to Ms. Foster who is the PREA coordinator.

5    Q.   And was there a supervisor on duty when this incident

6    occurred?

7    A.   I don't know.  I mean, I'd have to go back and look at

8    that particular shift report.  On some shifts as a result of

9    short staffing, a supervisor could have been assigned to a

10   unit, and there might have been a senior -- a senior youth

11   care professional kind of fills that role when there's not a

12   supervisor on-site so I don't know for sure.

13   Q.   Okay.  And is there a policy that would -- is there a

14   policy regarding two underage girls being permitted to sleep

15   together in the same room at Henley-Young?

16   A.   The only policy I can think of is that youth are assigned

17   to their room and are supposed to be in there -- you know,

18   locked in their room at night.  I don't know specifically --

19   Q.   Okay.

20   A.   (AUDIO GAP) -- say something -- that would, say, be in

21   their room.

22   Q.   Mr. Moeser, is adequate staff and supervision important

23   to prevent and detect sexual abuse?

24   A.   Yes.

25   Q.   How is it important?

```
 1   A.   In a couple different ways.  One would be to -- you know,
 2   in terms of being able to be -- have time to observe and
 3   interact with youth in a way that -- so they might overhear
 4   something.  They may say -- they might be able to head off
 5   some incident if they sense something is going to happen, and
 6   then certainly in terms of supervision and monitoring room
 7   checks and monitoring all the youth both during the day and at
 8   night and in all areas of the facilities so they're not left
 9   alone anywhere and also make sure -- do adequate room checks
10   of the -- or when -- any time kids are in the room.
11        If there are not enough staff, probably what happens is
12   the staff are not always in a place to head off or prevent
13   something and interact with the youth beforehand and may --
14   there is some risk of not being able to do some room checks.
15   Q.   And is staff training important to prevention and
16   detection of sexual abuse?
17   A.   Yes.
18   Q.   How so?
19   A.   Well, both in terms of making sure staff are aware of
20   PREA, the importance of PREA regulations and procedures in
21   terms of reporting and also in terms of signs to watch for,
22   understanding, for example, teen sexuality issues particularly
23   with girls many of whom have a history of abuse and may act
24   out in ways that are inappropriate.  So they need to
25   understand who they're dealing with, what are the risk factors
```

1  or signs of potential problems.

2  Q.   And is adequate staffing and supervision important to

3  allow supervisors to do supervisory duties such as reviewing

4  reports, counseling staff?

5          MR. MORISANI:  Objection.  Leading.

6          THE COURT:  Don't lead the witness, please.

7  BY MS. VERA:

8  Q.   Is adequate staffing and supervision important to

9  permitting supervisory duties?

10  A.   Could you say that one more time again?

11  Q.   Is adequate staffing and supervision a factor in terms of

12  permitting supervisors to perform supervisory duties?

13          MR. MORISANI:  Objection.  Leading.

14          THE COURT:  Try not to lead the witness.

15  BY MS. VERA:

16  Q.   Does having adequate supervision by supervisors have

17  anything to do with staffing issues?

18  A.   Yes.  And in particular one of the things that's an issue

19  here is the inability of supervisors to basically supervise in

20  the sense that they're often assigned to supervise units

21  themselves and are not able to move around the facility or

22  sort of do the kind of quality assurance checks that we want

23  them to do.  So it's important that -- and supervisors really

24  play that key role between sort of policy and practice in the

25  sense of making sure that staff understand when they're not

1    doing something right that it's corrected immediately.

2    They're really the -- they're really the teachers of staff and

3    they reinforce what you want staff to do.  So when they're not

4    able to perform that job, staff may or may not be following

5    proper procedures.

6         THE WITNESS:  Your Honor, may I just interject quickly?

7    The only camera I see is you, which is fine with me, but I

8    cannot see Ms. Vera.

9         THE COURT:  Okay.  We'll get that fixed.

10        THE WITNESS:  Okay.  There we go.  Sorry, Your Honor.

11   BY MS. VERA:

12   Q.   Mr. Moeser, do staff vacancies at Henley-Young increase

13   the risk of sexual abuse?

14   A.   Yes.

15   Q.   Can you please describe how?

16   A.   Well, again, the -- it's important that staff are aware

17   of youth's emotions, what they're saying, how they're

18   interacting with each other.  That requires them to be very

19   observant to be in places where they can listen and observe

20   properly, interact to the extent possible, sort of get to know

21   the youth involved and be able to, again, take the youth aside

22   and head off things that might occur.

23        Ultimately them being able to do the proper -- do the

24   proper observation, do the room checks that are required and

25   to refer -- if they are concerned about particular issues,

1    being able to hear them observe them, report them to the

2    supervisor or to mental health folks to deal with.

3            MS. VERA:  Your Honor, the United States moves to admit

4    PX-30.

5            THE COURT:  Any objection?

6            MR. MORISANI:  No objection.

7            THE COURT:  PX-30 is received into evidence.

8                 (Plaintiff's Exhibit 30 entered.)

9    BY MS. VERA:

10   Q.   Mr. Moeser, did you review or assess any other

11   allegations of sexual abuse at Henley-Young?

12   A.   So this was the incident -- there was an incident I think

13   we talked about Friday, although that seems like a long time

14   ago, of a youth touching another youth in their room.  There

15   was one more incident that I did not review detail of, and

16   that was the allegation of (AUDIO GAP) improperly touching a

17   student.

18   Q.   And is that the October 2021 incident that's mentioned in

19   the monitoring report?

20   A.   Yes.

21   Q.   The fifteenth monitoring report?

22   A.   Yes, I think it was early -- relatively early October,

23   around the time we were drafting that report.

24   Q.   And what happened in that case?

25   A.   It's my understanding through subsequent conversations

1    and e-mails that that -- the teacher -- the student was in the

2    classroom with the teacher after hours, after normal school

3    hours and touched the student sexually, and that was

4    subsequently reported and observed on the video and the

5    staff -- the teacher was immediately discharged or barred from

6    coming back to Henley-Young.

7    Q.   And was the teacher criminally charged for that incident?

8    A.   It's my understanding he was arrested, taken into

9    custody.  I don't know the ultimate decision on charging.

10   Q.   Okay.  I wanted to just switch gears briefly and talk

11   about a couple of topics that we discussed on Friday in a

12   little bit more detail.

13        First of all, I just wanted to clarify something in the

14   record, Mr. Moeser, from Friday when we were talking about the

15   time that youth at Henley-Young or that the JCAs specifically

16   spend in school.

17   A.   Yes.

18   Q.   And I just wanted to clarify that because on Friday you

19   said -- you talked about a 330-minute requirement.  Is that --

20   A.   Yes.

21   Q.   Is that a state law requirement?

22   A.   I believe it's a state -- yes, I believe it's a state

23   regulation and that may or may not be the same in all states,

24   but at least in Mississippi that's the number.  I don't know

25   if there's a number of days required in Mississippi.

1    Oftentimes states will say days and minutes.  In this case

2    it's 330 minutes a week.

3    Q.   So I just wanted to clarify whether it's 330 minutes a

4    week or per day.  330 minutes -- 330 divided by 60 is 5.5.  So

5    it would be half and a half hours.

6    A.   Correct.

7    Q.   Is that a daily requirement for school?

8    A.   I can't -- the only requirement I know is 330 minutes.  A

9    school -- because I don't know if there's an option for a

10   school to schedule differently, for example, if they wanted to

11   do a four-day week, could they do it differently?  I don't

12   know the answer to that.

13   Q.   Okay.  But it would -- is it your understanding that the

14   required numbers of hours or minutes would be equivalent to

15   five and a half hours per day?

16   A.   Yes.

17   Q.   Okay.  Okay.  Thank you.  And then one more area that I

18   wanted to ask about in more detail is the settlement agreement

19   provisions regarding mental health and behavioral programming.

20   So on Friday, Mr. Moeser, you testified that defendants are in

21   partial compliance with these provisions, paragraph 78

22   covering mental health programming and paragraph 84 of the

23   settlement agreement covering behavioral programming; is that

24   right?

25   A.   Yes.

1          MS. VERA:  Can we pull up PX-1, please, at page 38?

2    And let's look at paragraph 84.

3    BY MS. VERA:

4    Q.   Mr. Moeser, is this the settlement agreement paragraph

5    regarding behavioral treatment programming?

6    A.   Yes.

7    Q.   And this provision requires defendants to develop and

8    implement a behavioral treatment program appropriate for

9    youth; right?

10   A.   Yes.

11   Q.   So what does that mean?

12   A.   Well, it would mean having -- in my opinion, it would

13   mean having a -- both a sort of mental health -- integrated

14   mental health components as well as sort of the behavior

15   management piece, sort of melding them together in some way

16   that reinforces and rewards, incentivizes the behavior that

17   you want to achieve and deals with when there are issues

18   dealing with some of the underlying issues that led to the

19   behavior and having that set up in a way that is consistent

20   for youth.

21   Q.   Is there a program -- oh, sorry.

22   A.   Well, that just sort of cross all aspects of the program.

23   People are working towards that end.

24   Q.   And is such a program in place at Henley-Young?

25   A.   Well, I've always included this as partial.  They have a

1    point system that is fairly rudimentary.  It's not well used.

2    There are programmatic components as well in terms of some of

3    the -- some of the groups are often too short and difficult to

4    run.  So there are parts of it there.  There are staff who

5    have been working to try and pull those pieces together and

6    Ms. Warfield, as the treatment coordinator, is hopefully going

7    to be leading efforts to sort of pull that all together.

8    Q.   You said the behavioral groups are difficult to run.

9    A.   Yes.

10   Q.   Can you describe what that means?

11   A.   The biggest problem in the past has been they have

12   initially tried to schedule them for 45 minutes, maybe a

13   little longer.  They found that was -- they could not

14   successfully run groups for that long, so they cut that to

15   half an hour.  So some of the groups around, let's say,

16   decision-making skills, anger management, different -- so they

17   do have some curriculum and programmatic materials they use,

18   but all of those really require a half-hour shot of that,

19   including time to get to the group and back is really not

20   sufficient.  I really don't think you're going to accomplish

21   much based periodically, depending on -- staffing can run the

22   group in the multipurpose room, which is okay but not the best

23   facility, not the best spot.  They periodically because of

24   short staffing have to try and run the group on the unit with

25   a lot of distractions and noise.  So it's really a quality

 1    issue and a sort of fidelity to the kinds of curriculum that

 2    they have, unable to really fulfill.

 3    Q.   In terms of mental health treatment, how many mental

 4    health providers are on staff at Henley-Young?

 5    A.   There are -- well, there are two spaces, two positions

 6    for qualified mental health practitioners with various

 7    certifications.  Ms. Warfield, as a third, has some sort of

 8    appropriate certifications.  So she has -- because of the

 9    vacancy of one of the clinicians has been trying to fill in

10    some of that gap.  Ms. Drake is the other one who has been

11    trying to work extra hard.

12         They have three positions for youth support specialists,

13    who are designed to provide more of a day-to-day, short-term,

14    you know, how is today going kind of intervention support.

15    They also help run -- they also really help coordinate if

16    there are a number of groups.  So on paper when they're all

17    staffed, their population is -- stays modest.  They have a

18    pretty good number of mental health folks on the team.

19    Q.   And so just to clarify, you said there are two qualified

20    mental health professional positions, but one of those is

21    currently vacant?

22    A.   Yes.

23    Q.   And of the case manager or YSS positions, are there --

24    are those fully staffed currently?

25    A.   I don't -- I don't think they are.  The -- there's

1    actually -- there's a fourth youth support specialist assigned

2    from the jail who does some work with youth and tracks and

3    transitions them as to go through RDC.  I think of the three

4    YSS positions, I honestly don't recall right now off the top

5    of my head right now if they're all filled or not.

6    Q.   Okay.  Are the mental health providers supported in their

7    work?

8    A.   I guess I'm not sure how to answer that question.

9    Q.   Do they face challenges in performing the work of

10   providing mental health care?

11   A.   Yeah.  I think -- I think and all of them, when I talk to

12   them, mention the staffing shortage as an issue and being able

13   to run their groups in the way they would like to, for

14   example, making use of the portable classrooms the County has

15   purchased and installed would be a better environment for

16   running groups, but they're rarely able to go there because of

17   a staffing shortage.  So that's a big issue.  To varying

18   degrees, staff -- YCP staff are supportive when they are

19   running groups.  Occasionally some -- and this would be the

20   fewer number -- are sort of engaged as well and may even

21   assist in a group, for example.  By and large, they're not

22   engaged in the group often because there are youth to

23   supervise who are not in the group.

24       So I think ideally and one of the things I keep looking

25   for is how to engage the youth care professionals in -- along

1    with, for example, the youth support specialists in managing

2    those groups so that the youth care professional is both

3    understands what the kids are learning and can then reinforce

4    it.  On the unit it also -- it makes a positive impact on the

5    relationship between them and the youth.

6    Q.   Why is it important to have an overarching program for

7    mental health and behavioral treatment?

8    A.   It's important so that everybody in the facility

9    understands what they're trying to accomplish, and in terms

10   of -- and what techniques and strategies they're using to

11   reinforce the behavior they want and reduce the behavior they

12   don't want.  Youth are -- for lack of a better word, their

13   lives have been full of inconsistencies, trauma, and other

14   things that have made it difficult for them to learn, and

15   youth need constant and consistent reinforcement to learn new

16   skills or to change their behavior, shape their behavior.

17        So if it's intermittent, if one staff member approaches

18   it one way and another a different way, youth -- A, they never

19   learn really, they never change and, B, they tend to drive

20   wedges between staff they like or don't like and it becomes

21   really problematic.  So the reason to have sort of an

22   overarching blue -- I would call it a blueprint for how we're

23   going to deal with behavior issues and mental health issues

24   means that everybody is on the same page moving forward.

25   Every time a youth acts a certain way, they're going to be

1    reinforced the same way no matter which staff member is there

2    on the premises and be as consistent as possible in shaping

3    their behavior in a positive way.

4    Q.   And, Mr. Moeser, paragraph 84 provides, "This program

5    must be developed with the assistance of a qualified

6    consultant who has at least five years of experience

7    developing behavioral programs for institutionalized youth."

8    Did the defendants ever hire a qualified consultant with five

9    years' experience developing such programs?

10   A.   Generally no.  More recently the Southern Poverty Law

11   Center has received a grant to have some assistance --

12   practical assistance by Monique Khumalo.  I have not -- I

13   don't know to what extent she would -- I know she has the

14   background and the experience and the knowledge.  Whether --

15   to what extent she's going to focus on this particular

16   paragraph, I don't know.  They have received periodic

17   technical assistance from prior SPLC monitor, Mr. Dixon, and

18   they do get a weekly call with Ms. Nelsen, who is the current

19   monitor, and she will periodically advise them on certain

20   aspects.  In terms of what I would consider a development of a

21   program like this would be much more than what is currently

22   being provided, and we'll see if Ms. Khumalo was in -- works

23   on this at all.

24        MS. VERA:  And if we could pull up PX-2, that's the

25   stipulated order at page 7, please, and let's look at

1    paragraph A, please.

2    BY MS. VERA:

3    Q.   So the stipulated order includes these provisions,

4    "Within 30 days the County will post at a locally competitive

5    salary for a full-time clinical social worker or psychologist

6    to serve as a treatment director or coordinator."  And then a

7    little bit below that, "If a clinical social worker is hired

8    for the position, the County will contract with a psychologist

9    to provide any assessment, therapeutic or consultation

10   services needed in addition to the services of the clinical

11   social worker."

12        Mr. Moeser, are these requirements related to the ones we

13   were just looking at from the settlement agreement?

14   A.   Yes.

15   Q.   And what -- what were these requirements in the

16   stipulated order?  What was the goal -- what's the goal or

17   importance of those requirements?

18   A.   Well, the goal was -- the goal was -- and this goes back

19   to the original agreement which required the hiring of a

20   psychologist, which they were full time, which they were not

21   able to do, so in the stipulated order, they wanted to sort of

22   open the door for sort of a different role as a treatment

23   director or coordinator, what was probably the terms I used at

24   the time, or we used.  They help provide leadership for the

25   clinicians, the youth support specialist to interact with the

```
 1    other leadership, youth care professionals to put together
 2    sort of the blueprint and pieces of an integrated behavioral
 3    management and behavioral health plan and having someone who
 4    could lead that effort and that that -- not so much that that
 5    person would be a therapist per se themselves but would both
 6    have sufficient knowledge of mental health issues to make sure
 7    that the initial assessments were done, that case plans were
 8    done properly, things like that, but also lead the effort to
 9    develop this program across the facility.
10    Q.   Did defendants ever hire a treatment coordinator?
11    A.   They -- well, they -- they did not post it within
12    30 days, but they eventually hired -- I think it was about
13    90 days it was posted, and this was -- so this is back in
14    2020.  There was a period of time where there was nobody in
15    that position.  I think in the summer or so of '21 Mr. Frazier
16    found a -- someone who was, I think, a part-time teacher at
17    one of the universities but also came in part time to do some
18    work and then eventually Ms. Warfield was hired right around
19    the start of September of '21.  So much of the time between
20    this agreement and '21, there was nobody.  I'm trying to
21    remember if there was somebody in 2020 at all.
22    Q.   That's okay.  What are --
23    A.   Yeah.
24    Q.   So Ms. Warfield -- you said Ms. Warfield has been in this
25    position of treatment coordinator since about September?
```

1    A.    I believe so, yes.

2    Q.    And what are her qualifications?

3    A.    She's a - she's a master level social worker.  I don't

4    think it's -- it's not clinical social work.  It's -- oh, the

5    initials escape me, but it is a master's level experience.

6    She has some experience providing community-based treatment

7    for youth, adolescents and working with kind of various

8    treatment programs with youth.

9    Q.    And have they ever contracted with a psychologist?

10   A.    No.  They have a contract with Hinds Behavioral Health

11   who provides an additional person who comes in periodically

12   for therapy.  I don't know if its weekly, but that person does

13   not report to Ms. Warfield and does not -- doesn't necessarily

14   do what Ms. Warfield thinks needs to be done.

15   Q.    And why is a consulting psychologist necessary?

16   A.    Well, I -- my interest in this was that it's another

17   level of expertise around assessment dealing with kids with

18   more perhaps, let's say, acute mental health issues and that

19   as they deal with youth, both in terms of initial upfront

20   assessment, making sure their assessments are complete and put

21   them on the right track for a case plan and treatment.  But

22   also as they experience problems with youth, there may be a

23   need for additional assessments that a psychologist could

24   provide to provide some guidance for intervention of

25   treatment.  So my experience is that many kids will respond to

1   sort of the basic programming and assessments, and that's

2   fine.  But ultimately, and especially with these kids, there's

3   a higher level of need often that may need additional

4   assessments beyond what they can do in-house.

5   Q.   And what's the harm of not receiving that higher level of

6   treatment?

7   A.   Well, the harm is not fully understanding what's going on

8   with the youth and either -- either essentially keep doing

9   what you're doing and it's not working or theoretically do

10  something that just makes things worse.  But it's more of an

11  issue of not being able to find the right intervention for a

12  particular youth and for -- in this case the youth will

13  continue to act out, maybe harm themselves, maybe harm other

14  youths, maybe even staff, so it's important to, especially in

15  those more complicated cases, get an outside view -- a

16  consultation of trying some different things.  It's another

17  person in the room who can maybe help come up with an

18  individualized plan that can be successful.

19  Q.   Okay.  Mr. Moeser, based on everything you've done to

20  assess Henley-Young conditions, the conditions for JCAs in

21  Hinds County, did you form an overall opinion about whether

22  Hinds County is in compliance with the consent decree?

23  A.   Yes.

24  Q.   What's that opinion?

25  A.   I -- well, most -- I typically say "partial compliance."

```
 1    They have pieces in place.  Some things have moved forward
 2    somewhat and then get stuck, but partial compliance is a fair
 3    assessment in general.
 4    Q.   Do you believe additional recommendations and technical
 5    assistance will lead to compliance with the consent decree?
 6    A.   I believe, for example, with the behavioral health
 7    programming of engaging a consultant would be beneficial.
 8    Someone who's had experience in developing a comprehensive
 9    behavioral health plan in a facility would be helpful.  I
10    think the basic recommendations that we've already made in the
11    elements of the agreement are sufficient.  I don't know if
12    there need to be any more beyond that right now.
13    Q.   For all the provisions that concern JCAs, what do you
14    believe is necessary to achieve compliance?
15    A.   The primary issue is getting -- is recruiting, retaining,
16    training the youth care professional staff because they're the
17    most involved with youth and the most critical to really all
18    aspects of the programming.  I think second would be the sort
19    of the -- sort of developing of a coordinated or a blueprint
20    for a behavior health plan.  Those would be the two things I
21    would focus on.
22    Q.   And based on your work on the monitoring team since 2016,
23    do you believe that the defendants will do those things on
24    their own?
25    A.   You know, I'm an optimist, but I don't, given the
```

1  challenge and difficulties and sort of one step forward, two

2  steps back way we've done things, I'm not sure they can.

3  Q.   Do you think defendants will be able to keep youth

4  reasonably safe and provide the necessary programming if the

5  consent decree were to be terminated?

6  A.   No.

7  Q.   Why not?

8  A.   Well, I think the elements of the consent decree are all

9  very legitimate expectations and achievable.  I think those

10  are the elements that are going to be, you know, provide the

11  most safety in the long run.  I don't -- I guess I don't know

12  if -- if those were gone where the motivation or pressure

13  would be to do all the things that are in the agreement since

14  they haven't done -- completed many of the things that are in

15  the agreement.

16  Q.   Do you think any of the provisions pertaining to JCAs in

17  the agreement are unnecessary or superfluous?

18  A.   No.  I think -- I think they're a reasonable number, not

19  over-the-top number of expectations and again, I think fit

20  together to what would be needed to have a properly running

21  safe facility.

22  Q.   Mr. Moeser, do you have an opinion about whether the

23  provisions of the decree have any impact on public safety?

24  A.   I do.

25  Q.   And what is that opinion?

A.   Well, a couple things.  One is there are some youth that come in and out of Henley-Young in either relatively short periods or maybe a period of a few months.  And certainly the -- whatever they experience in the facility helps shape their behavior.  So to the extent that might be harmful or unsafe is bad.  Ultimately, really almost all of the youth, with the rare exceptions, every youth at Henley-Young is going to get back out into the community at some point.  They may end up with a prison sentence.  They may end up at RDC and ultimately a prison sentence or a youth correctional sentence, but they're going to get out.  And I believe it's really important to -- long-term public safety to take the opportunity you have with youth in a controlled setting like this to teach them skills that they can use, prosocial skills they can use when they get out, problem-solving skills, help them develop the capacity to think before they act.  Help them with things like peer refusal skills, independent living skills, job skills, all the kinds of things we want youth to be able to learn to be successful members of our community.

This is, in fact, the place that, right or wrong, most potentially has a tremendous capacity to take behavior of youth if done well.  Youth who have experienced trauma, who have trauma backgrounds, if they are in a facility where there's violence and victimization they -- it tends to exacerbate that and they come out and are more likely to re

1    offend.  So it's really important to the future of the

2    community that we take the opportunity that we have with them

3    to have them come out better than when they came in.

4         MS. VERA:  Thank you, Mr. Moeser.  Your Honor, I don't

5    have any further questions at this time.

6         THE COURT:  Okay.  Thank you.

7         MR. MORISANI:  May I proceed, Your Honor?

8         THE COURT:  You may.

9                        **CROSS-EXAMINATION**

10   **BY MR. MORISANI:**

11   Q.   Good morning, Mr. Moeser.  How are you?

12   A.   Good morning.  Well.  Thank you.

13   Q.   All right.  In your role as administrator of the division

14   of juvenile corrections you worked for the Wisconsin

15   Department of Corrections; is that right?

16   A.   Correct.

17   Q.   And in that role were you ever sued in your official

18   capacity?

19   A.   I don't -- boy, I don't recall if I was or not.  I know I

20   was in my -- there was one case in my County experience.

21   Q.   You broke up a little bit.  There was one case in what?

22   A.   Well, there was one, I think one court case in my County

23   experience that was simply a habeas corpus situation, but I

24   don't recall a suit in the state time.

25   Q.   And did you ever give a deposition when you were in the

1   position with the Department of Corrections?

2   A.   Not that I recall, no.

3   Q.   Ever testify in court while you were in that position?

4   A.   Not -- no, I don't believe so.

5   Q.   And has a court ever qualified you as an expert?

6   A.   No.

7   Q.   Have you ever written an expert report related to

8   litigation?

9   A.   No.

10  Q.   Have you ever testified in any way as an expert in

11  deposition or court or otherwise?

12  A.   No.

13  Q.   And when you operated juvenile detention facilities you

14  had to operate those facilities on a budget, did you not?

15  A.   Yes.

16  Q.   And when you served as the juvenile court administrator

17  in Dane County, you had to operate within a budget in that

18  position as well, didn't you?

19  A.   Yes.

20  Q.   And the budgets that you requested weren't always granted

21  just the way you requested them, were they?

22  A.   That's correct.

23  Q.   And at times did you also not experience budgetary

24  constraints trying to provide the services offered by the

25  juvenile court?

1   A.   Yes.

2   Q.   And as the juvenile court administrator you had issues

3   with staffing level and quality, didn't you?

4   A.   Pretty limited.  We had -- we had -- really staff very

5   rare vacancies and relatively few disciplinary issues.

6   Q.   I'm going to show you a document on the screen.

7   A.   Okay.

8   Q.   Mr. Moeser, just bear with me as I get everything set up.

9   And Mr. Moeser, will you let me know if you can see this

10  document?

11  A.   It's a little small, but --

12  Q.   Let me see if I can focus it for you.

13  A.   Sure.  Expand my view here.

14  Q.   Is that better at all?  Just a little bit?

15  A.   Just a little bit.  I really can't read it.

16  Q.   Well, can you see the title of the article?

17  A.   Not very well.  Sorry.

18  Q.   That's all right.  That's all right.  How about now?

19  A.   Okay.

20  Q.   Is that "Juvenile --

21  A.   "Juvenile group homes are" -- yes.

22  Q.   -- you can go ahead and read it.  Go ahead.

23  A.   "Juvenile group homes are tough operations."

24  Q.   And the article, for the record, was January 19, 2007?

25  A.   Yes.

```
 1   Q.   I'm going to flip to a quote attributed to you.  And I'm
 2   going to read it and you let me know if I read it correctly.
 3   "The staffing level and quality certainly has been a concern
 4   says Moeser.  And as kids have gotten tougher I think that's
 5   even more apparent."
 6        Did I read that correctly?
 7   A.   Yes.
 8   Q.   Would that be reflective of the type of staffing
 9   challenges you had while you were juvenile court
10   administrator?
11   A.   Periodically, yes.
12   Q.   Okay.  And despite those challenges though, you did the
13   best that you could with the resources that you had in that
14   role as juvenile court administrator, didn't you?
15   A.   Yes.
16   Q.   And the same is true when you operate a juvenile
17   detention facility; is that right?
18   A.   Yes.
19   Q.   And the truth is, and I think you've written about this
20   in the past, that even a well-run institution under the best
21   of circumstances will have challenges with staffing and
22   meeting the needs of youth; isn't that right?
23   A.   Yes.
24   Q.   And incidents, whether considered assaults, fights, uses
25   of force by staff, they happen at juvenile detention
```

1   facilities, don't they?

2   A.   Yes.

3   Q.   And these incidents can happen in facilities that are

4   sufficiently staffed up to your standards; isn't that true?

5   A.   They can, yes.

6   Q.   And isn't true that one of the reasons for this is that

7   juvenile detainees' behavior will continue to be a challenge,

8   that's one of the reasons they're there in the detention

9   facility; right?

10  A.   That's correct.

11  Q.   And you agree that also -- well, we'll come back to that.

12  Have you ever served as a federal monitor for the DOJ before

13  this matter, Mr. Moeser?

14  A.   No, I have not.

15  Q.   How is it that you became to be a monitor -- a member of

16  the monitoring team in this case?

17  A.   I only know that I was contacted by the Department --

18  someone in the Department of Justice and interviewed, you

19  know, provided information and was interviewed by them.

20  Q.   And did you know Ms. Lisa Simpson before serving in this

21  case?

22  A.   I did not.

23  Q.   And what is your involvement in the compliance

24  determinations contained in Ms. Simpson's reports?

25  A.   So I'm the principal author of the sections on youthful

1008

```
 1   prisoners, youthful offenders.  I complete my draft, forward
 2   that to Ms. Simpson and she reviews it.  We may have some
 3   questions and then ultimately gets included in the full
 4   report.
 5   Q.   So you're actually writing those sections dealing with
 6   the youthful prisoners?
 7   A.   Yes.
 8   Q.   And did you meet with the DOJ attorneys at any point in
 9   time prior to giving your testimony in this matter?
10   A.   We had several Zoom meetings, yes.
11   Q.   And did you discuss your testimony with the DOJ attorneys
12   prior to giving your testimony Friday and today?
13   A.   Yes.
14   Q.   And what about with Ms. Simpson?  Did you meet with her
15   at any point in time prior to testifying in this matter Friday
16   and today?
17   A.   No, I did not.
18   Q.   And is it -- isn't it true that the County has paid you a
19   total of $95,587.88 throughout the course of your serving as a
20   member of the monitoring team in this matter?
21   A.   I don't think that's exact -- that's about the right
22   number, yes.
23   Q.   And the County is also paying Ms. Nelsen related to
24   Henley-Young as well, isn't it?
25   A.   I believe so, yes.
```

```
1    Q.   And is it fair to say you're not here to offer testimony

2    about the separate consent decree governing the non JCA youth

3    at Henley-Young, are you?

4    A.   Correct.

5    Q.   Now, the modular units that have been added, I think you

6    testified about this on direct, the modular units that have

7    been added -- well, I'll say put in place to provide

8    additional and appropriate education program and treatment

9    space, that project is finished; correct?

10   A.   Correct.

11   Q.   And these units are being used for this space; are they

12   not?

13   A.   On occasion, yes.

14   Q.   And as it stands today, the facility itself, Henley-Young

15   is a clean facility; is that correct?

16   A.   I haven't physically been there for a while, so I can't

17   speak to that.

18   Q.   Well, you'd agree, at least, that it's a well-organized

19   facility; correct?

20   A.   I'm not sure what "well-organized" means through what

21   you're -- what aspects of it --

22   Q.   Well, there's not trash laying all over the floors and

23   the facility, is there?

24   A.   There wasn't when I was last there, no.

25   Q.   And there's not today; correct?
```

1    A.   I don't know.

2    Q.   And the facility is well-taken care of, isn't it?

3    A.   So my experience was a couple of things.  One is I know

4    there are some roof leaks there that are problematic.  And I

5    know the water system fails periodically.  They have repaired

6    the -- sort of the main control board, so that was done fairly

7    promptly.  But, again, I haven't been there for a couple of

8    years now.

9    Q.   I want to ask you about a couple things you just

10   mentioned.  The control boards, you said that was done fairly

11   promptly.  That was a good thing to do, wasn't it?

12   A.   Absolutely, yeah.

13   Q.   And as you sit here today, I take it you're not aware of

14   what work is being done on the roof at Henley-Young, are you?

15   A.   I'm not aware.  I know there had been discussion about

16   getting bids or submitting bids, but I don't know what stage

17   that's at.

18   Q.   Okay.  And as far as you're aware -- well, I guess, as

19   you sit here today, you're not aware of any work that is being

20   done to address the water situation at Henley-Young, are you?

21   A.   Correct.  I'm not aware of anything.

22   Q.   And in your -- in your latest site visit, the virtual

23   visit, I think it was the last -- it was January 31st that

24   week, I think?

25   A.   Correct.

1   Q.   Am I correct that you did not interview any of the YCP

2   staff to see if they feel safe at Henley-Young, did you?

3   A.   I did not interview any YCP staff.

4   Q.   And you have not -- I think you mentioned this before,

5   but I want to clarify it.  You have not been to the facility

6   recently to see -- well, we'll strike that.  We'll move on.

7        Now, during that site visit you interviewed

8   Carol Warfield, I think you said; is that right?

9   A.   Yes.

10  Q.   And you interviewed Eric Dorsey?

11  A.   Yes.

12  Q.   And Marshand Crisler?

13  A.   Yes.

14  Q.   Brenda Drake as well?

15  A.   Yes.

16  Q.   Did you interview anyone else?

17  A.   I interviewed Ms. Foster.  I interviewed --

18  Q.   Do you have Ms. Foster's first name?

19  A.   I believe it's Janine.  I interviewed two of the youth

20  support specialists.  I interviewed Kenneth Marshall, whose a

21  supervisor.  And I interviewed Lilly Young, who's a -- was a

22  supervisor and has now moved back to the training unit.  I'm

23  forgetting someone else I think.

24  Q.   Well, having interviewed each of these individuals, would

25  you agree that each of them are committed to the youth at

1   Henley-Young?

2   A.   Yes.

3   Q.   Now, I want to talk a little bit about the resignation

4   letter at PX-12.  Its Fernandez Frazier's resignation letter.

5   Bear with me.  I'm going to -- now, you're not here to testify

6   as to why -- well, let me put the letter up before I ask you

7   that question.  All right.  Mr. Moeser, we're going to try to

8   make sure you can see it.  Can you see the writing on the

9   letter?

10  A.   Yes, I can.

11  Q.   PX-12.  All right.  I'm going to flip to the second page.

12  And there was some discussion in the letter about the fiscal

13  budget here.  I'm going to --

14  A.   Yes.

15  Q.   See the sentence, it's the current fiscal budget?

16  A.   Yes.

17  Q.   Now, you're not here to testify today as to why the

18  County funded the fiscal budget at a little less than

19  3.3 million instead of the 4.1 million requested, are you?

20  A.   No.

21  Q.   And you're not here to testify about why the County's

22  requisition process is set up the way it is, are you?

23  A.   No.

24  Q.   And you're not here to testify about why Mississippi law

25  has certain restrictions on the expenditure of public money,

1    are you?

2    A.   No, I'm not.

3    Q.   And am I correct in thinking that you haven't talked with

4    Mr. Frazier about the letter in Exhibit PX-12, have you?

5    A.   I did not talk about the letter.

6    Q.   So you're not here to testify about the breakdown in the

7    relationship between Mr. Frazier and the youth court judge,

8    Judge Hicks, are you?

9    A.   I am not.

10   Q.   And so you don't know what -- well, strike that.

11        You don't know the extent to which his resignation was

12   based on the conflicts that he was having with the youth court

13   judge, do you?

14   A.   I do not know.

15   Q.   Now, Mr. Moeser, as you sit here today, do you know what

16   the current unemployment rate in Mississippi is?

17   A.   I don't.

18   Q.   And as a former juvenile court administrator, you're

19   familiar with the constraints that can be created by the

20   reality that your County is operating on a finite budget; is

21   that correct?

22   A.   Yes.

23   Q.   And low staffing levels, would you agree, those are not

24   unique to Hinds County, are they?

25   A.   They are not.

1  Q.   And I think as you've told PBS Wisconsin back on

2  December 28, 2015, it's always a challenge in an institution

3  of making sure they have enough staff and the right staffing

4  configuration.  Do you recall that?

5  A.   I recall something like that, yes.

6  Q.   And you'd agree that staffing is a struggle nationally

7  right now, isn't it?

8  A.   It is.

9  Q.   And you'd agree too that when you have a 24/7 -- 24-hour,

10  seven-day a week operation like a detention facility that

11  scheduling staff can be challenging, too?

12  A.   Yes.

13  Q.   And as you sit here today, Mr. Moeser, you can't quantify

14  the extent to which low staffing increases the risk of sexual

15  abuse, can you?

16  A.   I can't quantify it.

17  Q.   You just think that it increases the risk; is that fair

18  to say?

19  A.   Yeah.  I think it increases the conditions that could

20  lead to it, but it's a risk that I can't quantify.

21  Q.   And you'd agree though that the County is not ignoring

22  the staffing problem at Henley-Young, is it?

23  A.   I guess that -- to the extent that we've been

24  recommending addressing salaries and pay progression for

25  almost five years, it's only recently happened, I guess I

1    don't -- they ignored it for a while.

2    Q.   But you'd agree that currently they're not ignoring it;

3    correct?

4    A.   I don't know what discussions are going on above and

5    beyond what's already been done perhaps.

6    Q.   Well, let's start with the raise that was put in place

7    when Mr. Frazier was director.  You recall that; correct?

8    A.   Yes.

9    Q.   That's a step that addresses low staffing; does it not?

10   A.   Yes.

11   Q.   And it certainly would address staff retention as well,

12   wouldn't it?

13   A.   It would help, yes.

14   Q.   It's a reasonable thing to do; correct?

15   A.   Correct.

16   Q.   And you'd agree that increasing starting salaries for the

17   YCP staff also indicates a desire to address the staffing

18   issue; does it not?

19   A.   I believe so.

20   Q.   And it would also help with staff retention; would it

21   not?

22   A.   It should, yes.

23   Q.   And the treatment team, you talked a little bit about the

24   treatment team, and you'd agree that staff at Henley-Young

25   hold treatment team meetings every three weeks; correct?

1   A.   Well, they hold -- yes, they actually hold treatment team

2   meetings every week for a third of the group.  So they meet

3   every week.  Each youth gets a team meeting every three weeks.

4   Q.   And at these meetings mental health staff maintain and

5   review individualized treatment goals, don't they?

6   A.   Yes.

7   Q.   And that's for each of the offenders; correct?

8   A.   Yes.

9   Q.   And Ms. Warfield, she serves as the full-time treatment

10  team coordinator; is that right?

11  A.   Yes.

12  Q.   And who is Debra Bell?

13  A.   I believe Debra Bell is the psychiatric nurse

14  practitioner that provides medication assistance and some

15  other issues related to psychiatric needs.

16  Q.   You'd agree that Ms. Bell also attends the treatment team

17  meetings at Henley-Young; is that right?

18  A.   I know there have been discussions to get her to attend.

19  I honestly don't know if she's able to attend them all or not.

20  I believe that she has been attending recently.

21  Q.   And you'd agree, would you not, that the County's effort

22  to put in place this treatment team at the facility indicates

23  a desire to provide mental health support to the juveniles at

24  Henley-Young; is that right?

25  A.   Yes.

1   Q.   Now, you're familiar with Eric Dorsey.  I think we talked

2   about him a moment ago; right?

3   A.   Yes.

4   Q.   He's quality assurance officer at Henley-Young?

5   A.   Yes.

6   Q.   He's doing good work, isn't he?

7   A.   I believe so, yes.

8   Q.   Now, as he -- as he reviews incident reports, if

9   Mr. Dorsey does not understand an incident report, he'll

10  review the security camera footage of the incident to gain a

11  better understanding of it; isn't that right?

12  A.   Well, I think -- I think Mr. Burnside is the more

13  frequent reviewer of incident reports and the camera.  I think

14  it's not uncommon for Mr. Dorsey to join him, so they may

15  review it together.

16  Q.   So there's at least two folks at the facility reviewing

17  incident report camera footage at times; correct?

18  A.   Yes.

19  Q.   And you'd agree from your January 31, 2022 interview that

20  Mr. Dorsey understands the importance of good incident report

21  writing at Henley-Young, doesn't he?

22  A.   He does.

23  Q.   And you'd agree that good report writing is something

24  that he's working with staff to address on an ongoing basis,

25  isn't he?

1    A.   I think both he and Mr. Crisler are trying to focus on

2    better report writing.

3    Q.   And you agree that staff cannot spend all their time

4    writing incident reports, can they?

5    A.   No.

6    Q.   Isn't it true that a good incident report -- well, isn't

7    it true that good incident report writing in a detention

8    setting requires striking a balance, on the one hand between

9    spending all your time writing the reports, and on the other

10   hand capturing those fundamental details?

11   A.   Well, I certainly wouldn't want them spending all their

12   time writing reports.  But I believe, again, with appropriate

13   staffing they would have sufficient time to write a quality

14   report.

15   Q.   And you don't know one way or the other, do you, whether

16   Mr. Dorsey or Mr. Burnside reviewed the incident report

17   identified at PX-73 before it was given to you, do you?

18   A.   I'm not sure which one that is.  Is that the most recent

19   one we talked about?

20   Q.   I can show it to you.

21   A.   Okay.

22   Q.   All right.  Mr. Moeser, I'm going to use our friend the

23   Elmo here.  It's PX-73.

24   A.   Okay.

25   Q.   I don't know if you can see the top of it.

1    A.    Yes, okay.

2    Q.    It's the incident January 10, 2022?

3    A.    Understood, yes.

4    Q.    So I'll just -- I'll repeat my question.  You don't know

5    one way or the other whether Mr. Dorsey or Mr. Burnside

6    reviewed this report, do you, before it was provided to you, I

7    should say?

8    A.    Oh, well, I guess I can't speak to the timing.  I know

9    it's been reviewed by Mr. Burnside at least, but I -- whether

10   he did it before I got it or not, I'm not sure, because I

11   don't know exactly when I got it.

12   Q.    Okay.  And I want to talk a little bit about some of

13   these incident reports and go through a couple of these that

14   were discussed with you on direct.  The first is PX-45.  It's

15   the incident dated November 23rd of 2021 on Walter Payton pod.

16   The Exhibit 45, I'm going to slide it down and back it up.

17   Let me know if you have trouble seeing it.

18   A.    That's good.

19   Q.    Okay.  Now, you're not -- you testified a little bit

20   about this report, and I just have a couple questions about --

21   based on your testimony.  You're not saying that SYP Marshall

22   and SYP -- I'm sorry.  SYCP Marshall and SYCP Collins should

23   not have assisted YCP McGee, are you?

24   A.    No.  They definitely should have assisted, yes.

25   Q.    So you'd agree it's a good thing they came -- the staff

1020

1    responded to the incident like this where you had multiple

2    juvenile detainees involved; right?

3    A.   Yes.

4    Q.   All right.  We're going to switch gears to PX-29.  It's

5    an incident dated October 9th of 2021, and it was on JFK pod.

6    Here's the exhibit number.  I'm going to slide it down so you

7    can see the date and the details.  Now, you testified again

8    about this incident.  Do you recall that?

9    A.   Yes.

10   Q.   Now, you didn't review -- well, strike that.  You haven't

11   talked to the resident who claims that she choked the other

12   resident out, did you?

13   A.   I have not.

14   Q.   And I take it you didn't talk to the resident who was

15   allegedly choked out, did you?

16   A.   I did not.

17   Q.   And you didn't review any camera footage to determine if,

18   in fact, what the resident claims actually took place, did

19   you?

20   A.   I did not.

21   Q.   And I guess then you didn't do anything to verify what

22   the resident claimed regarding there being no staff available

23   at the time, did you?

24   A.   Say it one more time.

25   Q.   I take it then you didn't do anything to verify what the

1   resident claims in this incident report, that there were no

2   staff available at the time, and I'll flip the page to the

3   statement.

4   A.   I did not verify independently, no.

5   Q.   Okay.  Did you do anything to verify it?

6   A.   No.

7   Q.   We're going to talk now about Exhibit PX-47.  There's the

8   exhibit, and I'll drop it down so you can see the detail.

9   It's an incident for the record that took place on October 8,

10  2021, on Ossie Davis pod, and do you recall testifying about

11  this on your direct examination, Mr. Moeser?

12  A.   I do.

13  Q.   You never interviewed YCP McGee about this incident, did

14  you?

15  A.   I did not.

16  Q.   And you didn't do anything to verify whether there was

17  anything to the resident's the claim in this report that YCP

18  McGee never did anything to stop the incident, did you?

19  A.   I talked to Mr. Burnside about follow-up about this

20  incident.

21  Q.   Well --

22  A.   He had reviewed -- he had reviewed the incident video

23  footage.

24  Q.   When you talked to Mr. Burnside, did you verify whether

25  YCP McGee even was aware the incident was taking place while

1    it was taking place?

2    A.   All I recall was Mr. Burnside saying, Officer McGee just

3    sat there.

4    Q.   Okay.  So I take it you didn't do anything to verify

5    whether McGee knew the incident was taking place as it was

6    going down, did you?

7    A.   Correct.

8    Q.   Talk about Exhibit PX-46.  It's an incident from

9    October 26, 2021, on Ossie Davis pod.  I'm going to drop it

10   down a little bit more for you.

11        Now, as you sit here today, you don't know how many

12   residents were on the pod when this incident described in

13   PX-46 occurred, do you?

14   A.   I don't know.

15   Q.   And you'd agree this report indicates that staff were on

16   the pod monitoring the residents when the incident occurred;

17   right?

18   A.   Yes.

19   Q.   The report also indicates that the staff responded to the

20   incident and moved in to stop it; right?

21   A.   Yes.

22   Q.   And you want your staff to be on the pod monitoring the

23   juvenile detainees, wouldn't you?

24   A.   Correct.

25   Q.   And you'd want them to respond to an incident as it

1  occurred; correct?

2  A.  Yes.

3  Q.  You'd want them to stop it; right?

4  A.  Yes.

5  Q.  And when the staff member on the pod called for backup,

6  the backup came according to this report; is that correct?

7  A.  Correct.

8  Q.  And you'd want your staff to respond when there's a call

9  for backup, wouldn't you?

10  A.  Yes.

11  Q.  And as the next page indicates, I'll flip it for you - as

12  the next page of PX-46 indicates, mental health staff saw the

13  detainees within less than an hour of the incident going down;

14  is that right?

15  A.  That's correct.

16  Q.  And you'd want your mental health staff to do that in

17  these type of incidents, wouldn't you?

18  A.  Yes.

19  Q.  Now, you'd agree then, Mr. Moeser, that the staff

20  response to this incident was appropriate, was it not?

21  A.  Yes, I would.  I think they -- I think the staff member

22  on the unit obviously was alert enough to see this occur and

23  intervened, assistance came, and Ms. Drake intervened and

24  followed up with one of the youth on her caseload to kind of

25  find out what happened.

1    Q.   And the qualified mental health practitioner was in a

2    conference room attending PREA training; isn't that true?

3    A.   Yes.

4    Q.   And you'd want your staff to attend PREA training, too,

5    wouldn't you?

6    A.   Yes.

7    Q.   Now, I want to talk a little bit about education provided

8    at the facility.  There was some testimony in your direct

9    examination about that.  You'd agree that -- well, before we

10   move on to that one question about it, there was an incident

11   we didn't -- the report was not -- I don't believe the report

12   was used during your direct examination, but you talked about

13   an incident involving a teacher and alleged sexual conduct

14   with a detainee.  Do you recall that?

15   A.   Correct.

16   Q.   I think it was in October of 21; is that right?

17   A.   Yes.

18   Q.   You'd agree that having that teacher arrested related to

19   that incident is a reasonable response to the incident taking

20   place, is it not?

21   A.   Yes.

22   Q.   Now, back to education, the -- would you agree that

23   offering juvenile detainees education through the

24   alternate-day school schedule that you've described is better

25   than simply having them sit on the pod and work on written

1    homework five days a week, is it not?

2    A.   Yes.

3    Q.   And the alternate-day schedule is certainly better than

4    no education at all; correct?

5    A.   Sure.

6    Q.   And you'd agree that providing juvenile detainees

7    education through this alternate-day schedule reveals an

8    intent by the County to provide these juvenile detainees with

9    an education, does it not?

10   A.   With some education, yes.

11   Q.   Now, with respect to the behavioral programming that you

12   talked about towards the end of your examination earlier this

13   morning, now, you'd agree that it's not about a lack of effort

14   by the County to provide behavioral programming.  It's more

15   about the quality of the behavioral programming that's being

16   provided.  Is that fair to say?

17   A.   It's -- I would say it's the quality and the

18   implementation aspects of it, yes.

19   Q.   It's certainly not that they're not providing it;

20   correct?

21   A.   I would say that's correct.

22   Q.   And the -- you've -- I guess how many detainees are

23   presently -- well, let me ask you this way.  How many

24   detainees at Henley-Young today are repeat detainees?

25   A.   Well, I don't know the exact number.  I know that staff

1  have frequently said many of those youth -- many of the youth

2  that are there as JCAs have been there at Henley-Young as a --

3  through the youth court process.  I don't know a percentage or

4  a number.

5  Q.  And you've been a -- can you repeat that?  I'm sorry.  I

6  was talking over you, and I apologize.

7  A.  I'm sorry.  I almost finished.  I don't have a percentage

8  or an exact number.

9  Q.  And you've been a monitor for how long?

10  A.  Well, I was on the baseline visit in the end of 2016 and

11  ever since then.

12  Q.  All right.  So 2016 to 2022, okay.

13     The contract with Hinds Behavioral Health services, that

14  contract provides for a psychologist to be on-site; isn't that

15  right?

16  A.  I don't believe it does, but I haven't seen the contract.

17  There's not a psychologist that comes, I don't believe.

18  Q.  Well, let me ask you this.  You testified that -- another

19  thing you testified to this morning was that all of the -- you

20  testified that all the provisions of the consent decree remain

21  necessary.  Do you recall that?

22  A.  Yes.

23  Q.  And I should clarify my question.  It's more of all the

24  provisions related to the youthful offenders remain necessary;

25  is that correct?

1  A.   Correct.

2  Q.   Now, you'd agree, though, that with respect to those

3  provisions that you found in substantial -- I'm sorry -- in

4  sustained compliance, those are no longer necessary, are they?

5  A.   The -- well, I think the only one that I've - that's

6  sustained is the separation from adults, I believe, but, yes,

7  I would I guess -- to me it's still necessary because they

8  could choose to do something else, I suppose, but they've

9  complied.  I have no reason to think they won't continue to.

10  Q.   So if you found them in sustained compliance with respect

11  to a provision related to youthful offenders those provisions

12  are no longer necessary.  You'd agree with that; correct?

13  A.   No.  I -- no.

14  Q.   Did you not just testify that there's no reason to think

15  they would not continue to comply?

16  A.   I would assume they would, but I really don't know.  I

17  don't -- and if they -- I don't see any reason not to have it

18  continue.

19  Q.   Now, you talked a little bit about suicide.  I think it

20  was on Friday, suicide attempts?

21  A.   Yes.

22  Q.   And you'd agree with me that suicides can happen at

23  juvenile detention facilities, can't they?

24  A.   They can.

25  Q.   And if a suicide can happen, then it stands to reason

1    that a suicide attempt can happen; correct?

2    A.   Yes.

3    Q.   And the -- in the past year, the average daily population

4    of JCAs at Henley-Young, it's hovered around 30 juveniles,

5    give or take a few; is that correct?

6    A.   Yes.

7    Q.   Now, you're a member of the National Partnership for

8    Juvenile Services; is that right?

9    A.   Correct.

10   Q.   I'm going to show you a document and ask you a question

11   about it.

12          MS. VERA:  Sorry, Counsel, could I see the --

13          MR. MORISANI:  Sure.

14          MS. VERA:  Thank you.

15   BY MR. MORISANI:

16   Q.   All right.  Mr. Moeser, can you see this document?

17   A.   Yes.

18   Q.   The "Position Statement Adopted by NPJS Board of

19   Directors October 20, 2014."  Did I read that correctly?

20   A.   Yes.

21   Q.   Can we agree that NPJS is the National Partnership for

22   Juvenile Services?

23   A.   Correct.

24   Q.   That's the same group you're a member of?

25   A.   Correct.

```
 1  Q.  I'm going to read for you the highlighted portion of this
 2  position statement that was adopted on October 20, 2014, "A
 3  study of youth in detention found one in ten had thought about
 4  killing themselves in the past six months, and a little over
 5  one in ten had made an actual suicide attempt at some point in
 6  their lives with many trying to kill themselves more than
 7  once."
 8      Did I read that correctly?
 9  A.  Yes.
10  Q.  So do you agree with those statistics, Mr. Moeser?
11  A.  I don't recall that specific research behind it, but I
12  would agree that that's realistic and that group does a good
13  job.
14  Q.  Now, you talked a little bit, too, about the metal tables
15  at Henley-Young.
16  A.  Yes.
17  Q.  And you'd agree, though, that the metal tables that are
18  in place there today, they can be -- they could used to sit
19  down on; correct?
20  A.  Yes.
21  Q.  And they can be used to eat; correct?
22  A.  Correct.
23  Q.  And they can be used to sit and engage in conversation,
24  play games, do other type activities; right?
25  A.  Yes.
```

```
 1    Q.   And the -- I want to talk a little bit about the
 2    detainees that are in a facility like this, like Henley-Young,
 3    the JCAs, juveniles charged as adults.  You'd agree that these
 4    individuals are smart enough to know when a staff member
 5    working the facility is inexperienced; right?
 6    A.   Yes.
 7    Q.   And they're not always honest and truthful, are they?
 8    A.   No, that's correct.
 9    Q.   They can be difficult; right?
10    A.   Yes.
11    Q.   And they can take advantage of inconsistencies in staff
12    approach; can't they?
13    A.   Correct.
14    Q.   And I think you talked this morning about these juvenile
15    detainees driving wedges between staff.  So I take it you'd
16    agree that they can be manipulative, can't they?
17    A.   Yes, they are.
18    Q.   And they can even be dangerous; right?
19    A.   Can be, yes.
20    Q.   All right.  Now, Mr. Moeser, the -- I want to talk a
21    little bit about - you're familiar with Berrien County,
22    Michigan; correct?
23    A.   Yes.
24    Q.   I think on February 10th of this year you gave a report
25    to their board, the Board of Supervisors, I think, is what
```

1  they call it up there; is that correct?

2  A.   Correct.

3  Q.   And I think, like your work here, you told the Board that

4  your role was an independent evaluator of the facility's

5  operations; correct?

6  A.   Correct.

7  Q.   And I think you actually went on-site in November of 2021

8  to that facility; correct?

9  A.   That's correct.

10 Q.   And would you agree that staffing -- that you told the

11 Board that staffing was the most critical issue that their

12 facility faced; correct?

13 A.   Yes.

14 Q.   And would you agree that you told the Board that COVID

15 had been a stressor for everyone.  Do you recall saying that?

16 A.   Correct.

17 Q.   And that's no different than in Hinds County; correct?

18 A.   That's true.

19 Q.   And I think you also testified that -- it wasn't

20 testimony.  People -- you said that people that take care of

21 their facility says something about how they view the facility

22 as well; is that right?

23 A.   Yes.

24 Q.   And I think your PowerPoint -- I'll put it up on the

25 screen here.  Is this -- I think that's you there in the top

1  right corner, Mr. Moeser; is that right?

2  A.   It looks like it, yes.

3        MS. VERA:  Counsel, sorry.  Could I take a look at this

4  one, too?  Thank you.

5  BY MR. MORISANI:

6  Q.   Does that -- does this document here reflect the

7  PowerPoint presentation you gave on February 10, 2022?

8  A.   It looks like it, yes.

9  Q.   Okay.  Now, I'm going to put up the slide for recruitment

10  and retention.  Do you see that?

11  A.   Yes.

12  Q.   Now, I think your PowerPoint tells the board here that

13  recruitment and retention are challenges not unique to Berrien

14  County Juvenile Center; is that correct?

15  A.   That's correct.

16  Q.   And the same for Hinds County; correct?

17  A.   Correct.

18  Q.   And some of the reasons that your PowerPoint gave for the

19  recruitment and retention issues were changing economics --

20  I'm looking here.

21  A.   Sure.

22  Q.   Changing economics, COVID and competition from other

23  industries; is that correct?

24  A.   Correct.

25  Q.   And your PowerPoint also told the Board, I think, that

1  the salary they were paying officers was low compared to other

2  facilities particularly given the expected role; is that

3  right?

4  A.   Correct.

5  Q.   And like Berrien County, Hinds County expects its staff

6  to perform a lot of duties in that role, don't they?

7  A.   Correct.

8  Q.   And your PowerPoint included a list of ideas under the

9  heading "Searching for the Magic Incentive."  Do you see that?

10 A.   Yes.

11 Q.   Now, you'd agree that a receiver is not going to have

12 that magic incentive any more than the folks at Berrien

13 County, Hinds County or any other public entity that's dealing

14 with the national issue of staffing, is it?

15 A.   I don't know what authority a receiver would have, so I

16 don't know.

17 Q.   Now, Mr. Moeser, one couple --

18      MR. MORISANI:  Well, Your Honor, if I may just briefly

19 confer.  I may be finished.

20 BY MR. MORISANI:

21 Q.   And, Mr. Moeser, I just want to make sure it's clear

22 before I conclude.  The number of JCAs at the facility,

23 it's -- I think you testified earlier, I just want to make

24 sure that I recall it correctly, the number is around 30.

25 It's between 27 to 30, the average daily population of JCAs at

1  Henley-Young; is that correct?

2  A.   I would say of JCAs that have been -- it's increased to,

3  I would say, between 25 and 29 more recently for JCAs and five

4  to seven youth court youth.

5  Q.   Okay.  Now, you'd agree with me, Mr. Moeser, that you're

6  an advocate for juvenile justice reform.  Would you agree with

7  that?

8  A.   Yes.

9  Q.   And I think you've even advocated from removing youth

10  from any sort of incarceration or confinement, haven't you?

11  A.   No, not that I recall.

12  Q.   I'm going to show you, Mr. Moeser, an article that was

13  written -- it's April 10th of 2015.  It was written by

14  yourself entitled, "First Do No Harm, Reducing Youth in

15  Institutionalization."  I'm just going to show it to the DOJ,

16  and then I'll put it up on the screen for you.

17       All right.  Mr. Moeser, I'm going to give it a moment

18  to -- do you see the title, Mr. Moeser?

19  A.   Yes.

20  Q.   All right.  I'm going to flip to the second page and I'm

21  going to read a highlighted excerpt and I want you to tell me

22  if I've read this correctly.  It says, "But reducing

23  institutionalization is about something more than numbers.  It

24  is about understanding that incarceration, taking away

25  someone's freedom, is not only morally wrong but delays normal

```
1    patterns of aging out of delinquent behavior because it
2    interrupts a child's natural engagement with families, school
3    and work.  Advocates are making progress in sharing this
4    broader understanding of what it means to reduce
5    institutionalization, but our work is far from done."
6         Did I read that correctly?
7    A.   Yes.
8    Q.   And that's an article that you wrote; correct?
9    A.   Yes, looks like it is.
10        MR. MORISANI:  All right.  Your Honor, I have no
11   further questions.
12        THE COURT:  I know you questioned him about that
13   document.  You need to make that part of the record as an
14   exhibit, not necessarily for identification purposes.
15        MR. MORISANI:  For identification?
16        THE COURT:  Uh-huh.
17        MR. MORISANI:  Yes, sir.  May I approach, Your Honor?
18        THE COURT:  You may.  That will be D-156 for ID
19   purposes.
20     (Defendants' Exhibit 156 marked for identification.)
21        THE COURT:  Any redirect of this witness?
22        MS. VERA:  Yes, Your Honor.  If it would be acceptable
23   to the Court, I could use a few moments to prepare, but I can
24   proceed now if that would be preferable.
25        THE COURT:  We'll take a 15-minute break right now.
```

1    MS. VERA:  Thank you, Your Honor.

2    THE COURT:  Court will be in recess.

3         (A brief recess was taken.)

4    THE COURT:  You may be seated.

5    Is the Government ready for redirect?

6    MS. VERA:  Yes, Your Honor.

7    THE COURT:  All right.

8                    **REDIRECT EXAMINATION**

9    **BY MS. VERA:**

10   Q.  Mr. Moeser, in your past experience, have you run

11   juvenile justice programs?

12   A.  Yes.

13   Q.  Have you testified to state legislatures or served on

14   committees and task forces relative to this expertise?

15   A.  Yes.

16   Q.  And have you been hired to consult on a variety of

17   projects?

18   A.  Yes.

19   Q.  I just wanted to circle back on your testimony about who

20   you interviewed in your monitoring activities.  Do you also

21   interview Mr. Dorsey?

22   A.  Yes.

23   Q.  And did you interview Mr. Burnside?

24   A.  Yes.

25   Q.  And did you interview YCP supervisors?

```
 1   A.   Two, Marshall and Lilly Young, who had been a supervisor.
 2   Q.   You testified about staffing issues on cross-examination.
 3   You testified that staffing is not the only solution to the
 4   issues at Henley-Young; correct?
 5   A.   Correct.
 6   Q.   Does it make it any easier to run a juvenile justice
 7   facility if you don't have enough staff?
 8   A.   If you don't have enough staff, it's much harder to run.
 9   Q.   And if there's high staff turnover?
10   A.   That makes it difficult as well.
11   Q.   And how many vacancies are there currently among the YCP
12   staff positions?
13   A.   I think the last chart I saw in December there were 17.
14   Q.   And that's out of how many?
15   A.   Forty-two.
16   Q.   And if Henley-Young were staffed as they have determined
17   it should be staffed, do you think they could prevent more
18   harmful incidents from happening?
19   A.   Yes.
20   Q.   And could they respond better as well?
21   A.   Yes.
22   Q.   Does the fact that staffing is a challenge in other
23   jurisdictions justify the staffing situation that you've found
24   in Hinds County?
25   A.   No.
```

1    Q.   How does a functional juvenile justice facility succeed

2    despite staffing challenges?

3    A.   Well, staffing challenges create issues even in good

4    facilities, but what is in place that can help with that is

5    consistent leadership and good supervision, so that practices

6    and policies that are in place are adhered to and that's

7    really the best -- the only way to really overcome any

8    shortage at all.

9    Q.   And have they had consistent leadership at Henley-Young?

10   A.   No.

11   Q.   So you talked with Mr. Morisani about a raise for YCP

12   staff.  Is that the raise that you testified about earlier

13   that Mr. Frazier got by eliminating seven positions?

14   A.   I believe it is, yes.

15   Q.   Is a raise like that enough to fix the staffing problems?

16   A.   No.

17   Q.   Have you recommended a career ladder or salary

18   progression?

19   A.   Yeah.  I've recommended some sort of pay progression

20   system that's based on longevity.  And if there's some

21   combination of merit, that's fine, but longevity so that more

22   experienced staff get paid more.

23   Q.   And have they done that yet?

24   A.   No.

25   Q.   Have staff vacancy or retention issues improved since the

1  staff did get this raise?

2  A.   Not noticeably.  It's relatively early I think after

3  that, so I think we'll have to see over the next six months,

4  but not yet.

5  Q.   And do you know if this recent raise keeps up with the

6  rising cost of living?

7  A.   I don't know for that area how to compare it.

8  Q.   Has staff received cost of living increases each year?

9  A.   No.  At least in my time there, I think was one, maybe a

10  second cost of living increase.  There was also -- and I think

11  the earliest cost of living increase was a result of

12  eliminating positions as well at the time.

13  Q.   And this raise that came about from eliminating the seven

14  positions, when did that take effect?

15  A.   I don't know exactly when it started.  I know that that's

16  -- the current salary has increased.  I suspect that that

17  raise took place fairly soon thereafter, which is in the fall,

18  sometime in the fall.

19  Q.   And how long was it before that that staff had gone

20  without a raise?

21  A.   I don't recall the timing of any cost of living raise.

22  Again, you know, I'm only aware of I think one cost of living

23  raise that occurred maybe right around the time I started and

24  one since then, but I don't recall when that was.

25  Q.   Do YCPs make as much as the detention officers at the

1  jail?

2  A.   They do not.

3  Q.   They make less?

4  A.   Yes, they make less.

5  Q.   Okay.  You spoke about Mr. -- you've testified about

6  Mr. Frazier's resignation letter.  When's the last time you

7  spoke with Mr. Frazier?

8  A.   I spoke to him briefly on January 3rd.

9  Q.   Was the date of his letter?

10  A.   Yes.

11  Q.   And did you speak with him before or after that?

12  A.   I spoke to him on January 2nd.  He had -- and then I

13  spoke to him, you know, certainly off and on over the time

14  there.  But January 2nd and 3rd about that letter or about his

15  resignation --

16  Q.   And in those conversations on and about the date of the

17  resignation letter, did you discuss the circumstances of his

18  resignation?

19  A.   No.  It was more general or a more general discussion

20  about his sort of frustration and feeling like he was -- kept

21  running into walls essentially.  And then the January 3rd

22  conversation was simply to confirm that -- on January 2nd, it

23  was sort of, you're planning to do this.  On January 3rd, I

24  talked to him just to confirm that he had actually submitted

25  it before I, you know, shared that information with anyone in

1  any way.

2  Q.  So you talked with him before and on the date of the

3  resignation about the date of the resignation?

4  A.  About the fact that he was resigning, yes.

5  Q.  You've testified also about the physical conditions that

6  Henley-Young and the status of needed repairs.  You testified

7  that you weren't aware of what work was done to address the

8  roof or water situation.  Is it the County's job to provide

9  information necessary for you to make an update compliance

10  determination?

11       MR. MORISANI:  Objection.  Leading.

12       THE COURT:  Objection overruled.

13  A.  Well, I -- it would be -- you know, it would certainly be

14  my job to sort of inquire about those sort of things and get

15  an answer.  It would be helpful if the County was more

16  routinely updating us on progress of things.  So rather than

17  having to ask on a site visit or call, I did not ask about the

18  roof specifically this time, which maybe I should have.

19       Ideally it would be sort of a, you know, this is what

20  we're doing, an update kind of information on a fairly regular

21  basis.

22  BY MS. VERA:

23  Q.  How long has the roof been a problem?  How long have they

24  had a leaking issue with the roof?

25  A.   I couldn't give you a date, sort of a rough date, but I

1  think at least over the last year.

2  Q.   And what about the water pressure?  Can you just describe

3  what that issue is with the showers and the water going out?

4  A.   Yeah.  It's my understanding, and I've been there when

5  the water is out.  There's no sort of pressure, and it's

6  partly a function of the infrastructure in Jackson.  If it's

7  cold weather and the water breaks, many areas of the city,

8  it's my understanding, go out.  I've seen news reports about

9  that.

10      Additionally Henley-Young is on a small rise in the area,

11  and so when the water pressure is significantly reduced for

12  any reason in that area of the city, they cannot get

13  sufficient water pressure to flush toilets or shower.

14  Q.   And about how --

15  A.   So they have to make other arrangements.

16  Q.   -- about how often does that happen?

17  A.   I would say several times a year it seems like.

18  Q.   And as of the most recent monitoring tour where you

19  conducted interviews in January and February of this year, to

20  your knowledge is that still an issue?

21  A.   Yes.

22  Q.   And when this happens where do the children charged as

23  adults take their showers?

24  A.   They do a couple things to sort of deal with this.  They

25  bring in -- they have bottled water for drinking.  They use

1    buckets of water to help flush toilets.  And then they

2    transport -- they work with the sheriff's department to

3    transport youth to Raymond for showers.

4    Q.   You talked about the tables with Mr. Morisani on cross.

5    You testified that they do provide a place to sit.  So -- yet,

6    you've raised issues about the tables, so can you describe

7    what those issues are?

8    A.   Yeah.  The steel tables are bolted down.  They're not

9    very comfortable to sit on for any length of time certainly.

10   They're not able to move them around the unit in any way to

11   reconfigure for any purpose, such as, you know, a small group

12   of youth playing Dominos in the corner or -- or if a mental

13   health person wants to come in and talk with a youth, to go

14   and sit at a table off to the side somewhere where they're not

15   sitting right at the table.  It allows some separation and

16   space for the youth, which they need and can benefit from, as

17   well as some reasonable, just more comfort in terms of the

18   living arrangement.

19        So you couldn't -- if you need to bring them together for

20   a large group for some reason, you can, but it also gives you

21   the flexibility to separate youth a little more often and keep

22   them from sitting on top of each other right next to each

23   other all the time.

24   Q.   And what's the harm of them sitting right next to each

25   other all the time?

1  A.   Well, they just -- they're -- A, everyone wants a certain

2  amount of personal space.  Youth are -- they're the -- just

3  the institutional nature of the tables reinforces the -- the

4  institutional expectations.  They are much -- it's much --

5  much more often that they will have conversations next to each

6  other -- if something happens and something breaks out it's

7  hard -- and more youth will get involved because they're all

8  sitting right there.  So it's -- you know, there's just --

9  there's a great reason to sort of spread them out a little bit

10  within the unit, maybe have some furniture that they can sit

11  at and read a book that's comfortable when they want to have

12  quiet time.

13  Q.   And have you discussed this need for different furniture

14  with leadership at Henley-Young?

15  A.   Yes.

16  Q.   When did you first raise it?

17  A.   I think probably in the first visit in 2017.  I don't

18  recall if it's in the report, but I remember talking with

19  Mr. Burnside very, very early on about that.  And that he had

20  gone as far as to identify furniture that they would like to

21  purchase.

22  Q.   Did Mr. Burnside agree with you that the tables were

23  necessary?

24  A.   Yes.

25  Q.   And have other leadership others in leadership roles

1   agreed with you that the tables would improve conditions?

2          MR. MORISANI:  Objection.  Leading.

3          THE COURT:  Objection overruled.

4   A.   Well, I know Mr. Crisler has said that.  I don't

5   specifically recall a conversation with Mr. Frazier about

6   that, but that's to the best of my recollection.

7   BY MS. VERA:

8   Q.   You were asked about verifying the contents of incident

9   reports.  When you're conducting your duties as a member of

10  the monitoring team do you draw on information provided by the

11  County?

12  A.   Yes.

13  Q.   And is it the County's responsibility to make sure their

14  providing you complete and accurate incident reports?

15  A.   I believe so, yes.

16  Q.   Mr. Morisani brought up a couple of the incident reports

17  that we had spoken about on direct.  One of them was PX-46.

18  In that incident you discussed whether the staff response was

19  appropriate when they intervened in a fight.  But in that

20  incident was the youth, in fact, punched by at least two other

21  youths before the YCP was able to stop the fight?

22  A.   Yes.

23  Q.   And before the fight broke out were the youths doing

24  schoolwork on the unit?

25  A.   Well, let me just refresh my memory in a minute.  I'm

1    trying to remember.

2    Q.   Can we pull it up; it's Plaintiff's 46.

3    A.   Yeah, that would be helpful.

4    Q.   Thank you.  So were the youths -- in this case before the

5    fight broke out, were the youths doing schoolwork on the unit?

6    A.   That's what the report says, yes.

7    Q.   And were they going in and out of resident's rooms and

8    getting shoes and doing other things?

9    A.   Yes.

10   Q.   Can we look at PX-47, please?  So this was one of the

11   reports involving Officer McGee.  You said you had spoken with

12   Mr. Burnside, who had reviewed the video, and he said that in

13   the video McGee just sat there; correct?

14   A.   Correct.

15   Q.   What was the significance of Mr. Burnside saying McGee

16   just sat there?

17   A.   Well, one, it confirmed that he had followed up and

18   looked at the incident.  Certainly that the officers staff

19   members, YCPs response was not appropriate and just to confirm

20   that was inappropriate essentially.

21   Q.   And would the YCP on duty have been in the unit -- based

22   on your knowledge of how these units are configured, would a

23   YCP on duty in the unit have been within sight and sound of an

24   incident that was occurring?

25        MR. MORISANI:  Objection --

1047

```
1    A.   Yes.  Absolutely --
2            THE COURT:  Hold on, Mr. Moeser.
3            MR. MORISANI:  Objection.  The objection is leading.
4            THE COURT:  Objection sustained.  Try not to lead the
5    witness.
6    BY MS. VERA:
7    Q.   In the incident report, is it clear that McGee was in the
8    housing unit?
9    A.   Well, this -- again, this is a report to the clinician
10   later.  The youth alleged that the officer was there, but did
11   not attempt to stop it.  And Mr. Burnside confirmed that he
12   was there.
13   Q.   Why would the YCP on duty not know an incident or fight
14   was happening?
15   A.   They'd have to -- well, there's no reason they wouldn't
16   know, so they'd have to potentially ignore it or be asleep.
17   Q.   You also talked about report writing issues and the sign
18   off or review of reports by supervisors; correct?
19   A.   Yes.
20   Q.   And Mr. Morisani asked you if, you know, Mr. Burnside and
21   Mr. Dorsey sometimes review incident reports; correct?
22   A.   Yes.
23   Q.   What is the function of having a YCP supervisor review
24   incident reports?
25   A.   Well, the supervisor, and then they eventually have to go
```

1   to Mr. Burnside or Dorsey.  But the supervisor -- the

2   intention is to make sure that the report covers the basic

3   elements of what happened before and during the incident to

4   make sure that anything related to, for example, verbal

5   attempts to de-escalate are noted.  If there's any reference

6   to something that could have resulted in an injury, the

7   appropriate action was taken to refer the youth to for medical

8   check.

9       So it's a quality assurance step and then also kind of a

10  teaching step to be able to go back to the YCP and say, well,

11  you know, A, what happened, and help them gradually over time

12  train them to write better reports, so that they accurately

13  reflect what happened.  And that's the importance of the

14  supervisor role in this is, again, people tend to do what's

15  reinforced.  So the supervisor gradually teaches them how to

16  write a better report and document, so that ultimately the

17  facility has good documentation on incidents.

18  Q.  You testified that incident reporting, report writing and

19  review of these reports is something they're still working on.

20  How long have they been working on this issue?

21  A.  Well, I think there's been a re- -- I think there's been

22  a strengthened interest recently in sort of report writing.  I

23  know they're trying to get staff through report writing, and

24  Mr. Crisler is concerned about report writing.  It's been sort

25  of a frequent or sort of constant point of discussion in

1049

1    interviews in the past of -- you know, I see reports where the

2    item is checked that the staff member attempted to verbally

3    de-escalate things, but there's nothing in the report that

4    would indicate that very rarely.  I mentioned the other day

5    that if any short-term room confinement is used, that's not

6    always noted.  It's sort of a quality control issue.

7    Q.   Mr. Moeser, you talked about the youths who are in

8    Henley-Young and how some of them may not always be truthful

9    or may try to manipulate staff.  What are the ways that a

10   functional facility would deal with those potential problems?

11   A.   Well, that's one reason why it's important for staff to

12   be consistent, because the more inconsistent you are, the more

13   opportunities there are for youths to, again, manipulate the

14   staff and, you know, sort of -- I use the term "drive a wedge"

15   between staff.  So youth -- it wouldn't be uncommon for a

16   youth to say, well, this YCP allows us to do X.  Why don't you

17   allow us to do X?  That happens almost all the time, whether

18   it's these youths or teenagers in your own home for that

19   matter.

20        These youths have gotten particularly good at it over

21   time.  They've survived that way.  So to the extent that staff

22   are inconsistent it creates opportunities for youths to

23   manipulate the situation.

24   Q.   So is staff training --

25   A.   So that helps you --

```
1    Q.   Go ahead.

2    A.   Yeah.  So training staff to -- making sure -- well, it's

3    the training -- initial training, but, again, supervision of

4    making sure people are following the policies and procedures

5    you trained them on.

6    Q.   Okay.

7    A.   The second aspect is the relationship development.  So to

8    the extent that staff have a respectful positive relationship

9    with youths they're more likely to be truthful, find someone

10   they can trust, for example.  That's why you see in a couple

11   of these the actual report is made through their clinician,

12   not to the direct staff involved, which suggests that they

13   trust that clinician for one reason or another, probably

14   because of their relationship.

15   Q.   You are --

16   A.   Kids are reluctant to criticize a youth care professional

17   who then has authority over them to another youth care

18   professional, so they don't know what's going to happen if

19   they do.

20   Q.   You were asked about statistics on suicidality among

21   youths in detention facilities.  To keep these youths safe, is

22   it necessary to have adequate mental health care?

23   A.   Yes.

24   Q.   And suicide prevention measures?

25   A.   Yes.
```

1  Q.   Other forms of programming?

2  A.   Yes.

3  Q.   And finally, I wanted to ask you about the article that

4  Mr. Morisani pointed out, D-156.

5       MS. VERA:  And I don't have that to put up right now.

6       THE COURT:  You can get it.  It's there.

7       MS. VERA:  Oh, thank you.

8  BY MS. VERA:

9  Q.   So Mr. Moeser, is this the article that you were

10 discussing?

11 A.   Yes.

12 Q.   And I'm going to turn to page 2.

13 A.   Okay.

14 Q.   So some of the isolated statements that Mr. Morisani was

15 pointing out are highlighted here on this copy, but I just

16 wanted to give you a chance to elaborate on the statements and

17 what the article was about.

18 A.   Well, this I think was written for the National Juvenile

19 Justice Network, if I'm not mistaken, which I was also a

20 member of.  And what I argue in most situations and -- and

21 this was about reducing institutionalization of youth, and

22 that locking youth up when there's not a public safety

23 imminent or immediate public safety concern is harmful, in

24 that there's sort of two ways we harm youth:

25      One is locking them up when they don't need to be locked

1   up when they can be managed in the community in some way.

2       And, secondly, having them stay in a facility too long,

3   so longer than they need to.  So they need to be reintegrated

4   back into the community.

5       And, third, really is the quality of any institutional

6   placement.  So the concern is that too often -- and this is

7   back in 2015 -- that too often youths that don't need to be

8   locked up are confined for some reason or confined and that

9   the quality of programming and services is not always up to

10  what you want it to be, and then oftentimes youths are held

11  too long.  And that, in the long run, does more harm than

12  good.

13      There are certainly youth that will need to be confined

14  for some periods of time to help ensure public safety,

15  certainly in the immediate or short run.  How long that goes

16  on and what happens while they are locked up is a huge factor

17  in whether it's harmful or not.

18  Q.  And is reduced institutionalization of youth a national

19  trend?

20  A.  Yes.

21      MS. VERA:  I have no further questions.  Thank you.

22      THE COURT:  All right.  Mr. Moeser, I have just -- oh,

23  I'm sorry.

24                         **EXAMINATION**

25  **BY THE COURT:**

————————————***DAILY TRANSCRIPT***————————————

1   Q.   I just have a couple of questions I think and then the

2   United States will have an opportunity to follow up, as will

3   the lawyers for Hinds County.

4        I think on Friday you testified, Mr. Moeser, that you

5   first toured the facility, I think in October of 2016.  At

6   that time, who was the administrator, if you recall, assigned

7   to Henley-Young?  Who was over Henley-Young at that time?

8   A.   I believe it was Johnnie McDaniels.

9   Q.   Okay.  And after Mr. McDaniels, then there was -- I'm

10  looking at the next name that came up on my list is

11  Mr. Frazier; is that correct?

12  A.   Correct.

13  Q.   Okay.  And then there was a person named Harrington?

14  A.   Correct.

15  Q.   Is that -- okay.

16  A.   That's correct.

17  Q.   What was Mr. Frazier's experience, if you recall.  With

18  respect to his background or experience that would qualify him

19  to lead Henley-Young?

20  A.   Well, my recollection is that Mr. Frazier early in his

21  career had done some youth work in, I believe -- I think in

22  child protective services, but the bulk of his experience had

23  been in the federal prison system as an administrator and

24  different roles.

25  Q.   And what about the Harrington person?

1    A.   I honestly, Your Honor.  I don't recall how long he was

2    there, and I don't recall much about his background at the

3    time.

4    Q.   And then I think you said there was a gap next between

5    Harrington, and I guess Mr. Frazier coming back on in April of

6    2021.  But -- and I think was that gap -- did you say that gap

7    was between 12 and 14 months?

8    A.   I think what I intended to reflect is that in the total

9    roughly five years there had been 12 to 14 months where there

10   was not a permanent administration.  I think the gap between

11   Mr. Harrington and Mr. Frazier, that particular gap was

12   probably more like six months.

13   Q.   More like six months?

14   A.   Yeah.

15   Q.   And if there was no administrator there for six months

16   what, if any, effect would that have on the running of the

17   facility?

18   A.   Well, it has an impact on, you know, asking -- in this

19   case particularly Mr. Burnside and Mr. Dorsey to assume

20   additional duties that makes it, you know, just difficult to

21   do more than one job for an extended period of time.  Things

22   tend not to -- what happens when you change directors or

23   administrators is things tend to just sort of plateau.  You

24   just kind of sit.  Whatever progress you were making towards

25   something usually just stops waiting for the next person to

1  come, and that's really been one of the challenges over

2  Henley-Young's time of administrators coming and going.  So

3  you really reach a plateau of functioning, but never really

4  move beyond it.

5  Q.  And is that -- and over that 12 to 14-month gap between

6  the time that you started, and I guess today, you say it's a

7  total of 12 to 14 months is what the --

8  A.  I believe that's --

9  Q.  Is what Henley-Young --

10  A.  My estimate is --

11  Q.  I'm sorry.  Go ahead.

12  A.  I believe that's about right, yes, Your Honor.

13  Q.  And the testimony -- is the testimony you gave about the

14  six-month period relative to the entire time period when there

15  is that gap, the total amount?

16  A.  Yes.

17  Q.  Now, Mr. Frazier was brought back, I think in April of

18  2021, and his last day was January 3rd, 2022, and at some

19  point in time Mr. Crisler became the head of Henley-Young; is

20  that correct?

21  A.  Correct.

22  Q.  Do you recall on or about what day it was?

23  A.  I believe he was either appointed or actually started on

24  January 5th.

25  Q.  Okay.  Now, with respect to the appointments of the -- of

1056

1    Mr. Frazier, do you know who -- the first time Mr. Frazier was

2    appointed, do you know who appointed him?  Was it the Board of

3    Supervisors?

4    A.   I believe it was the Board of Supervisors, yes.

5    Q.   And who appointed Mr. Harrington?

6    A.   It would be the same board.

7    Q.   And when Mr. Frazier came back on board, who appointed

8    Mr. Frazier?

9    A.   It would be the Board of Supervisors.  I think there had

10   been some changes on membership, but it would be the Board of

11   Supervisors.

12   Q.   And who appointed, if you know, Mr. Crisler?

13   A.   Well, I believe, given the speed of that it was -- I

14   guess I don't know for sure, but the county administrator or

15   in consultation with at least some members of the board, I

16   assume.

17   Q.   Okay.  And with respect to Mr. Crisler's background and

18   experience you don't -- you said you don't know what

19   Mr. Harrington's background, but you did say that Mr. Frazier

20   worked for child protective services at some point in his

21   career.  What, if any, experience did Mr. Crisler have that

22   you would think would qualify him to be the administrator of

23   Henley-Young?

24   A.   Well, he has, you know, significant law enforcement

25   experience, I think both with the city of Jackson and with the

1   county sheriffs.  He has an academic background in sort of

2   management-type issues.  He does not have, however, that I'm

3   aware of any substantive experience with youthful offenders,

4   other than perhaps as arresting officer or operating a youth

5   facility for youthful offenders.

6   Q.   And I think you testified the other day that there is a

7   job posting vacancy or announcement which now exists.  Is it

8   your understanding that the County is seeking to hire a

9   permanent person for that particular position?

10  A.   Yes.

11  Q.   In speaking with the County officials or whomever you

12  speak with during your monitoring, has the County indicated to

13  you when they expect that position to be filled or their

14  target date?

15  A.   I did not speak to anybody about a target date.

16  Q.   What is the value of having permanent leadership as

17  opposed to interim leadership at Henley-Young or acting

18  leadership?

19  A.   Well -- sure.  Well, a couple of things.  One is, you

20  know, the acting leadership, usually which has been done

21  through Mr. Burnside and Mr. Dorsey is -- has been -- has

22  helped take them from years ago in the SPLC agreement and make

23  some progress, but, again, it kind of plateaus without the

24  director leadership.  All the hiring that's done, you know, is

25  done then by an acting person, so that the director comes in

1 and inherits who was hired, so regardless of whether they're

2 the best fit or not.

3     But it's really that sort of leadership and providing

4 vision over time, and an equally big concern or one of my

5 biggest concerns has been sort of the rotation of folks.  You

6 know, really to get through this you need somebody who knows

7 what they're doing and can stick with it for at least three to

8 five years.  And you -- just changing leadership is just a

9 start-and-stop situation all the time.

10 Q.   And during the time that you've been a monitor, has the

11 County officials ever questioned whether you could provide

12 them particular expertise in the area that you were assigned

13 to do?

14 A.   You know, I've had periodic conversations usually with

15 the director or Mr. Burnside or more recently Ms. Warfield,

16 kind of learning more about what they're doing and providing

17 suggestions and materials that they can read.  But I haven't

18 gotten, you know, let's say routine requests or regular

19 request of any kind.

20 Q.   No.  No.  I guess that maybe you misunderstood my

21 question.

22 A.   Sure.

23 Q.   Have the County officials in any way challenged you --

24 challenged your expertise and authority, I guess, in providing

25 and performing your monitoring role?

1    A.   No, sir.

2    Q.   Have they ever questioned your ability to serve as a

3    monitor in this case?

4    A.   No, sir.

5    Q.   Now, there was some talk between you and the United

6    States lawyer as well as Mr. Morisani about the steel tables,

7    the furniture there at that particular facility.  Do you

8    recall that conversation or those --

9    A.   Yes.

10   Q.   -- conversations, Mr. Moeser?

11   A.   Yes.

12   Q.   I think on redirect you said you've talked to maybe

13   Mr. Burnside and maybe some others about the furniture as

14   early as 2016; is that correct?

15   A.   Certainly as early as very early in 2017.  I don't

16   recall -- I know it's not -- may not be in the baseline

17   report.  I don't recall a conversation in the fall of 2016.

18   It wouldn't surprise me if I did, but I'm sure in 2017.

19   Q.   Okay.  You're sure in 2017?

20   A.   Yes.

21   Q.   Did you find that a problem in 2018 still?

22   A.   Yes.

23   Q.   Did you find that a problem in 2019?

24   A.   Yes.

25   Q.   2020?

1    A.    Yes.

2    Q.    2021?

3    A.    Yes.

4    Q.    The last time you -- I guess you haven't visited the

5    facility, but if the furniture is still like it was in 2021,

6    if it were like -- if that is -- if it'S configured like that

7    today, would that still be a problem in your view?

8    A.    Yes.

9            THE COURT:  All right.  All right.  Those are all the

10   questions that the Court has.  Well, hold on for one second.

11   Those are the questions from the Court.

12           Does the United States wish to follow up based on what

13   I've asked?

14           MS. VERA:  No, Your Honor.

15           THE COURT:  To Hinds County?

16           MR. MORISANI:  May I proceed, Your Honor?

17           THE COURT:  Yes, you may, Mr. Morisani.

18           MR. MORISANI:  Thank you.

19                       **FURTHER CROSS-EXAMINATION**

20   BY MR. MORISANI:

21   Q.    Hi, again, Mr. Moeser.  Just a couple of questions to

22   follow up from the Court's questions.  I guess, the chairs,

23   starting with the chairs, are those chairs -- I guess the --

24   tell me, what chairs are you proposing be put in place of the

25   metal tables?

1  A.   There's a couple options for furnishing a youth facility

2  and an adult facility for that matter.   There are sort of, for

3  example, molded furniture that's heavy, can't be picked up and

4  thrown, that can be rearranged in a facility, can make kind of

5  a couch or a single chair of some kind.   Those could be placed

6  around the unit for watching TV or youth to read or even moved

7  around for a small group.

8       Then there are chairs that can be used at -- if you have

9  separate tables, they're usually a durable plastic-type chair

10 that can be moved and reconfigured, so you can sit at a table

11 with a chair.

12 Q.   Does the consent decree in your view require molded

13 chairs as you described a moment ago?

14 A.   No.

15 Q.   Does the consent decree require the plastic chairs that

16 you described a moment ago?

17 A.   No.

18 Q.   And I take it the plastic chairs can be moved; correct?

19 A.   Yes.

20 Q.   If they can be moved, they can be picked up; correct?

21 A.   Correct.

22 Q.   And if they can be picked up, they can be used as a

23 weapon, can't they?

24 A.   They can be thrown or used to, you know, push somebody

25 away, for example.

```
 1    Q.   And the metal -- the current metal tables and chairs that

 2    are set up, I know we went over it earlier, but those are

 3    secured to the floor; correct?

 4    A.   Correct.

 5    Q.   And those aren't cheap, are they?

 6    A.   Which ones?

 7    Q.   The metal chairs are not cheap; correct?

 8    A.   The steel tables, I really don't know.  I've never tried

 9    to purchase those.

10    Q.   Okay.  Now, you talked a little bit, too -- the Court had

11    asked you about Mr. Crisler, and you agree, he's interim

12    director at the time -- at the moment; correct?

13    A.   Correct.

14    Q.   And at the facility as well, you have Mr. Burnside and

15    Mr. Dorsey; correct?

16    A.   Correct.

17    Q.   And Mr. Burnside and Mr. Dorsey have -- they have

18    experience; correct?

19    A.   Yes.

20    Q.   They're a good team, aren't they?

21    A.   Yes.

22    Q.   I'm going to show you a document, and you agree, too, the

23    County is looking, actively looking for a permanent director,

24    don't you?

25    A.   It's my understanding the job is posted on their website,
```

1   yes.

2   Q.   Mr. Moeser, I'm going to show you one of the slides from

3   your PowerPoint to Berrien County.  Do you see that,

4   Mr. Moeser?

5   A.   Yes.

6   Q.   Berrien County was looking for a facility director, too,

7   weren't they?

8   A.   Yes, they are.

9   Q.   And you have a slide here dedicated to the fact they were

10  looking for a facility director, and I think I'll read it

11  where I'm pointing.  "The next facility director has a good

12  team to join, but needs to..."  And there's an ellipsis.

13       Do you see that?

14  A.   Yes.

15  Q.   Just like Hinds County, the next facility director here

16  has a good team to join, doesn't it?

17  A.   I would say there's a -- there's a good team, yes.

18  Q.   Among the other -- among the things that you recommend is

19  someone who would be on-site, visible and actively engaged

20  with staff; right?

21  A.   Correct.

22  Q.   And do you have any reason to believe that Marshand

23  Crisler has not been on-site, visible and actively engaged

24  with staff as interim director right now?

25  A.   I don't have any reason to believe he's not been there

```
 1   regularly.
 2   Q.   And you also recommend that someone who would celebrate
 3   other's success and hard work; right?
 4   A.   Yes.
 5   Q.   And you don't have any reason to believe that Marshand
 6   Crisler would not do that, do you?
 7   A.   You know, it's been a relatively short time, but
 8   certainly the conversations have been positive.
 9   Q.   All right.  And you'd recommend someone who would listen,
10   don't you?
11   A.   Yes.
12   Q.   And you don't have any reason to believe that Marshand
13   Crisler will not do that, do you?
14   A.   I don't.
15   Q.   And you recommend that someone should be transparent in
16   making changes, don't you?
17   A.   Yes.
18   Q.   No reason to think Marshand Crisler will not do that if
19   it calls -- if the situation calls for it, do you?
20   A.   I would hope so.  I don't know him well enough to say.
21   Q.   And you also recommend someone who would model and
22   promote fairness and equity; right?
23   A.   Yes.
24   Q.   No reason to think Marshand Crisler would not do that;
25   correct?
```

```
 1   A.   Correct.

 2   Q.   And, lastly, you recommend someone who would be an

 3   advocate for all staff to stakeholders and decision-makers.

 4        Do you see that?

 5   A.   Yes.

 6   Q.   No reason to think Marshand Crisler will not do that, do

 7   you?

 8   A.   Correct.

 9   Q.   And I don't see anything mentioned on here that the next

10   director should stay two to five years.

11        Do you mention that?

12   A.   I did not.

13        MR. MORISANI:  No further questions, Your Honor.

14        MS. VERA:  May I follow up, Your Honor?

15        THE COURT:  Yes, you may.

16                  FURTHER REDIRECT EXAMINATION

17   BY MS. VERA:

18   Q.   Mr. Moeser, you just testified there's no provision in

19   the agreement specifically requiring what kind of furniture

20   they need at Henley-Young; right?

21   A.   Correct.

22   Q.   Do you think that this discussion about the furniture is

23   relevant to compliance?

24   A.   Yes.

25   Q.   How so?
```

1   A.   Well, and I've made a number of recommendations about the

2   physical environment.  Youth are particularly sensitive to the

3   physical environment, to the level of noise, to comfort, to in

4   this case the ability to separate from others when they want

5   to.  Youth are particularly all of -- all of -- all those

6   things contribute to sort of an emotional level that elevates

7   their -- their level that elevates their emotional reaction

8   above and beyond sort of thinking and thinking clearly about

9   things.  So all of these things are those things, whether it's

10  the furniture or I recommend acoustical changes that would

11  make the environment -- help contribute to managing the

12  behavior of the youth and make it more comfortable to the

13  extent they are more comfortable and have some personal space

14  easily.  It will have a positive impact on their behavior.

15  Q.   And is the furniture that you've recommended and that

16  you've discussed with leadership at Henley-Young detention

17  grade or otherwise appropriate for a facility like this?

18  A.   Yes, this is the kind of furniture that's used in

19  facilities all around the country, and I think many adult

20  facilities as well.  It's durable.  It's -- it has --

21  multi-functional in terms of being able to move it around as

22  you need to.

23  Q.   Have you talked with Mr. Crisler about changes that he

24  wants to make?

25  A.   About changes he wants to make?

1    Q.   Yes.

2    A.   Well, frankly, the two things that we talked about that

3    he expressed an interest in was staff salaries and

4    furnishings, whether he -- I don't know that he -- I don't

5    recall a specific, you know, I'm going to do X, Y, Z to do

6    that, but he did express some interest in those items.

7    Q.   And are those issues or goals that Mr. Crisler has, have

8    other directors of Henley-Young attempted to make those types

9    of changes?

10   A.   Yes.

11        MS. VERA:  Thank you.  No further questions.

12        THE COURT:  All right.  Does the County wish to follow

13   up in any way?

14        MR. MORISANI:  I don't believe so, Your Honor.  I just

15   would like to mark this for identification, the PowerPoint, if

16   I could?  May I approach?

17        THE COURT:  Right, you may.  That will be D-157, I

18   think, for ID only.

19        MR. MORISANI:  Yes, sir, for ID only.

20     (Defendants' Exhibit 157 marked for identification.)

21        THE COURT:  We're at the noon hour.  Who is the

22   Government's next witness?  We won't start.  We're going to

23   take our lunch break, but who is the Government's next

24   witness?

25        MR. CHENG:  We'll be calling Ms. Lisa Simpson.

───***DAILY TRANSCRIPT***───

```
1            THE COURT:  Okay.  All right.  All right.  It is now
2    12:01.  Let's start back up at 1:30.  I've got a couple of
3    errands to run, and I want to make sure we get enough time.
4    And y'all have lunch to do, so we'll start back up at 1:30 and
5    we'll go from there.
6                    (A lunch recess was taken.)
7            THE COURT:  You may be seated.
8            Is there anything we need to take up?  Is the
9    Government ready to call its next witness?
10           MR. CHENG:  Yes, Your Honor.  The United States calls
11   Elizabeth Simpson.
12           THE COURT:  Okay.
13           MR. CHENG:  If we could bring up Plaintiff's Exhibit --
14           THE COURT:  Hold on one second.  Ms. Simpson, you've
15   been in the courtroom the entire time, so you know how this is
16   done.  You can remove your mask and just follow the rules that
17   I've given everybody else.
18           THE WITNESS:  Thank you, Your Honor.
19           THE COURT:  Mr. Cheng, you may proceed.
20           MR. CHENG:  Thank you, Your Honor.  If we could bring
21   up Plaintiff's Exhibit No. 3, PX-3.
22           THE COURT:  Is your microphone on, Mr. Cheng?
23           MR. CHENG:  Yes.  How is that?
24           THE COURT:  That's much better.
25           MR. CHENG:  Very good.
```

1    **ELIZABETH SIMPSON,**

2    **having been first duly sworn, was examined and**

3    **testified as follows...**

4    **DIRECT EXAMINATION**

5    BY MR. CHENG:

6    Q.   Ms. Simpson, could you provide us with your educational

7    background?

8    A.   Yes.  I graduated from Penn State University with a major

9    in political science; that would have been in '76.  And then I

10   went on to law school at Harvard Law School and graduated from

11   Harvard in 1981.

12   Q.   And can you provide us with any licenses and

13   certifications?

14   A.   I'm a member of the New Mexico bar and admitted to

15   practice in federal court in Tenth Circuit and U.S. Supreme

16   Court.

17   Q.   And could you describe and summarize your professional

18   work history?

19   A.   After law school, I clerked at the Ninth Circuit.  The

20   central office of staff attorneys, and during that time I was

21   assigned in chambers to Judge Pregerson in Los Angeles and

22   Judge Boochever in Alaska.  I then worked for the law firm of

23   Luebben Hughes Tomita Bork Simpson & Edy, in Albuquerque, New

24   Mexico, and initially specialized primarily in Indian law, but

25   that sort of morphed into civil rights and specifically

1  representing individuals in jail and prison, including a

2  couple of class actions regarding jail conditions.

3      I then founded and was the director of a program called

4  Crossroads For Women, which is a reentry program for women

5  coming out of jail and prison with co-occurring mental health

6  disorders and substance abuse disorders.  I then went to -- I

7  was then hired by the Vera Institute to start a pretrial

8  services program for the City of New Orleans, and after that I

9  came back to Albuquerque and was on contract with the county

10 primarily to work on jail population reduction strategies,

11 including criminal justice system reforms and mental health

12 diversion programs.

13 Q.   Do you have any experience implementing criminal justice

14 coordinating committees or reentry programs?

15 A.   Yes, both.  Crossroads, of course, was a reentry program,

16 and while on contract with the county, we created a supportive

17 housing program for frequent utilizers in the jail.  We also

18 created a discharge planning team, and we created a reentry

19 center that had -- that all people being released from the

20 jail would go through and could access services, and then on

21 the criminal justice reform side, excuse me, the -- certainly

22 creating the pretrial program in New Orleans was creating

23 criminal justice reform, and actually even when I was with

24 Crossroads, I was involved in a lot of committees and task

25 forces that looked at improvements in the criminal justice

1   system.  And then again when I was on contract with the

2   county, a lot of my work was implementing criminal justice

3   system reform.

4   Q.   And have you done any consulting or monitoring experience

5   or expert testimony in this area?

6   A.   I have not done expert testimony.  I have done consulting

7   for the Vera Institute regarding pretrial services programs

8   and CJCCs, criminal justice coordinating councils.  And I'm

9   sorry.  What else did you ask about?

10   Q.   Monitoring, expert, or consulting expert work.

11   A.   Monitoring.  When I was still in private practice, I was

12   one of several attorneys representing the subclass of

13   detainees with mental health disorders in our local jail.  And

14   we entered into a consent decree, and I did monitoring in that

15   case after the entry of the consent decree for about five

16   years, and then, of course, the monitoring in this case.

17   Q.   Have you done any teaching, lecturing or publications in

18   the fields of pretrial release or the prisoner complaints?

19   A.   I did a lot about -- of presentations, I guess you would

20   call it, where I would present on CJCC issues or pretrial

21   services issues, and that included, you know, sort of judicial

22   conclaves or legal education, district attorneys, public

23   defenders, national association of counties, for some reason

24   California probation officers, and many other presentations of

25   that sort.  No publications.

```
 1   Q.   Did you do any work with the New Mexico Supreme Court?

 2   A.   I was involved in the effort to make some legislative

 3   changes in the area of pretrial, and that had been spearheaded

 4   by the Supreme Court.  I was then appointed to serve on --

 5   appointed by the New Mexico Supreme Court to serve on the

 6   committee to rewrite the court rules related to pretrial

 7   release.

 8   Q.   And do you recognize Plaintiff's Exhibit 3?

 9   A.   Yes.

10   Q.   And what is Plaintiff's Exhibit 3?

11   A.   That is my resume or CV.

12        MR. CHENG:  We would move to admit Plaintiff's

13   Exhibit 3, Your Honor.

14        THE COURT:  Any objection?

15        MR. SHELSON:  No, sir.

16        THE COURT:  All right.  P-3 will be received in

17   evidence.

18             (Plaintiff's Exhibit 3 entered.)

19        MR. CHENG:  And at this time we tender Ms. Simpson as

20   an expert in prisoner reentry and discharge, detainee

21   complaint and grievance procedures, criminal justice

22   coordination programs, and community corrections.

23        THE COURT:  Any objections other than the continuing

24   objection, or would the defendant like to voir dire the

25   witness?
```

***DAILY TRANSCRIPT***

1    MR. SHELSON:  I'd like to voir dire the witness, Your

2  Honor.

3    THE COURT:  Okay.  All right.

4    MR. SHELSON:  May I proceed, Your Honor?

5    THE COURT:  Yes, you may.

6    **VOIR DIRE EXAMINATION**

7  **BY MR. SHELSON:**

8  Q.  Good afternoon, Ms. Simpson.

9  A.  Good afternoon.

10  Q.  You have a detention officer certification?

11  A.  No.

12  Q.  Are you a Certified Jail Manager?

13  A.  No.

14  Q.  Do you have any certifications regarding jails?

15  A.  No.

16  Q.  Have you ever worked in a jail?

17  A.  I've spent a lot of time working in jails but not as a

18  jail employee.

19  Q.  Do you have any use-of-force training?

20  A.  No.

21  Q.  Are you a medical expert?

22  A.  No.

23  Q.  Are you a mental health expert?

24  A.  With respect to running a reentry program for persons

25  with mental disorders, I would say I have that expertise.

1   Q.   Do you claim expertise in the field of mental health

2   itself?

3   A.   No.

4   Q.   Have you ever been the receiver of a jail?

5   A.   No.

6   Q.   Until today have you ever been tendered as an expert

7   before in any proceeding?

8   A.   No.

9   Q.   So obviously then you've never been accepted or

10  rejected --

11  A.   That's right.

12  Q.   -- as an expert?

13       MR. SHELSON:  All right.  Thank you, Your Honor.

14  That's all the questions I have.  Your Honor, in addition to

15  our standing objection, we object to the fields that

16  Ms. Simpson was tendered as.

17       THE COURT:  Thank you, Mr. Shelson.

18       Any response from the Government?

19       MR. CHENG:  Your Honor, I think her direct shows that

20  she's actually worked in this area and provided advice and

21  opinion to the New Mexico State Supreme Court.  She also ran

22  an actual pretrial release program.  She has practice in the

23  area as an attorney.  All of these areas are within her

24  expertise.  She lectures and teaches in the area.  I think

25  it's sufficient to demonstrate her expertise on these issues.

```
 1          THE COURT:  Okay.  The Court will allow this witness to
 2     testify as an expert in the designated area, and I do
 3     understand what the defendants' continuing objection is.
 4          You may proceed.
 5          MR. CHENG:  Thank you.
 6                    CONTINUED DIRECT EXAMINATION
 7     BY MR. CHENG:
 8     Q.   Ms. Simpson, what is your role in this case?
 9     A.   I'm the lead monitor for the monitoring team.
10     Q.   And how were you selected?
11     A.   Well, I understand that my name was suggested to the
12     defendants, and I was asked to meet with the defendants and
13     talked with defense counsel and some of the defendants prior
14     to my appointment.  And I understand that they agreed to my
15     appointment, and then I was appointed by the Court.
16     Q.   And when did you begin monitoring in this case?
17     A.   Well, I actually had my first visit to the jail I believe
18     in the summer of 2016 when the defendants wanted to meet me
19     prior to agreeing to my appointment.  So I visited with
20     defense counsel and the sheriff and the major and toured the
21     jail at that time, but the monitoring didn't start until
22     October 2016.
23     Q.   As the monitor, do you get to pick a group of subject
24     matter experts to assist you with your assessment?
25     A.   Yes.
```

1   Q.   And how did you pick your monitor subject matter experts?

2   A.   Well, the Department of Justice had recommended several

3   individuals in different roles, and I interviewed those

4   individuals and reviewed their resumes and selected those

5   individuals.  The medical expert of the team eventually left

6   because of health issues, and I brought on Dr. Dudley at that

7   point, also through review of resumes and interview process of

8   several candidates.

9   Q.   Did the defendants also get to have any input into

10  selection of subject matter experts?

11  A.   I believe they had that opportunity.  I don't think I

12  received any input.

13  Q.   Did they provide you with any separate resumes?

14  A.   No.

15  Q.   Did they object to any of the people you hired as subject

16  matter experts?

17  A.   No.

18  Q.   Let's talk a little bit about, you know, the activities

19  you engage in for your monitoring compliance.  Can you

20  estimate the number of site visits or virtual visits you've

21  conducted in this case?

22  A.   Well, we last did the fifteenth monitoring report, and

23  there was a baseline visit.  And then we did one in January,

24  so that would be 17.

25  Q.   And some of those, were they virtual visits?

```
 1    A.   Yes.  We had an on-site visit in February 2020, and then
 2    the next five were virtual.
 3    Q.   And why did they have to be virtual?
 4    A.   Because of COVID and the risk of infection.
 5    Q.   When establishing the virtual site visit protocols, did
 6    you talk with the defendants about how to run those?
 7    A.   Yes.  And probably especially with the compliance
 8    coordinator to figure out how to manage the technology and the
 9    document production, but, yes.
10    Q.   Do you include a schedule of interviews in all of your
11    monitoring reports?
12    A.   I do.
13    Q.   And does that schedule, does that describe the people you
14    try to interview during each of those visits, your site
15    visits?
16    A.   Yes.  Sometimes we have to adjust, but the -- from the
17    initial schedule, but the schedule that goes into the
18    monitoring report is what we actually did.
19    Q.   In addition to interviewing people on the schedule, do
20    you also review documents?
21    A.   Yes.
22    Q.   How does that process work?
23    A.   Typically the -- well, we receive documents on a monthly
24    basis that are uploaded by the compliance coordinator into
25    Google Docs, a web-based platform, so we review those on a
```

Se

1078

1   monthly basis.

2        But then there are documents that we request in

3   conjunction with the upcoming site visits, and we send out a

4   document request and those documents are uploaded into Google

5   Docs.  Sometimes we don't get some of the things we request

6   but quite a -- we do review quite a few documents.  And then

7   more documents might be mentioned in the course of the site

8   visit, and we will request those if we feel we need to review

9   them.

10  Q.   You mentioned something about monthly documents.  What

11  types of documents are provided monthly?

12  A.   The -- there's a spreadsheet that includes a lot of

13  information pulled from the incident reports, including the

14  narratives and the supplemental narratives, so we review that.

15  The CID, the criminal investigation division, reports are

16  reviewed.  The IAD, internal affairs division, reports are

17  reviewed, various spreadsheets related to both of those.

18       Classification and records produces a packet that

19  includes file audits and classification logs, release logs,

20  more recently transfers between facilities, the

21  indicted/unindicted list.  So that's generally what's in

22  there.

23  Q.   These packages that have been prepared monthly, can you

24  describe a little bit about how this process was developed

25  over the course of your monitoring?

1    A.   So part of it -- I guess it got really expanded once we

2    started doing our remote site visits, because previously we

3    would often read, review those on-site.  But when we were

4    doing them remote, obviously we weren't reviewing them

5    on-site.  So we had developed much more of a process of

6    getting documents and reviewing them prior to the site visit,

7    which was quite efficient and we'll certainly continue doing

8    that.

9         And there also had been some improvement in the ability

10   to sort of -- the defendant's ability to send us documents in

11   an efficient way, particularly the spreadsheet on the incident

12   reports.  We used to get all of the individual incident

13   reports, which was intensive for them and was not as useful to

14   us because it didn't have as much information.  So the

15   development of the spreadsheet was quite an improvement.

16   Q.   Does the consent to decree require defendants to create

17   these type of spreadsheets or systems for tracking

18   information?

19   A.   Yes, it does.

20   Q.   Do you also interview or communicate with detainees?

21   A.   Yes.

22   Q.   And outside of the site visits, do you also communicate

23   with defendants or their staff about this case?

24   A.   Yes.

25   Q.   And what types of calls do you -- or communications do

1   you have to engage in?

2   A.   Well, certainly as a follow-up to site visits I often

3   have follow-up questions, like with classification or with

4   Sergeant Tillman on records just clarifying things as --

5   typically as I'm preparing the report.  I do try to stay on

6   top of things that happen in between site visits.  With the

7   most recent jail administrator, we had intended to have

8   biweekly check-ins.  It actually ended up being much more

9   irregular, but I would have check-ins with her.  And my team

10  would have communications with individuals in between site

11  visits as well relevant to what they're looking at, and then I

12  also communicate with the attorneys as needed.

13  Q.   Do you have monthly calls with the parties?

14  A.   Yes.

15  Q.   And do you also have regular calls with other types of

16  stakeholders in this case?

17  A.   Yes.  I don't know how regular, but I -- you know, have

18  talked with the district attorney, the public defender,

19  behavioral health services, mostly before Dr. Dudley came on

20  board, and other such individuals.

21  Q.   And for these types of communications, do you provide

22  technical assistance through any of this process?

23  A.   Yes.  Yes, we certainly attempt to do so.

24  Q.   And besides the communications you engage in, do your

25  subject matter experts get involved in these communications as

1    well?

2    A.   Yes, and they have their own as well.  But, yes, I mean,

3    for example, Mr. Parrish did the staffing analysis, and that

4    involved a great deal of communication with employees of the

5    defendant.

6    Q.   Do you know if Mr. Parrish also communicated with former

7    jail administrators?

8    A.   Yes, as well as the most recent one.

9    Q.   And what are these communications for?

10   A.   Technical assistance, check-ins, just developments seeing

11   if we can be of assistance in some areas.

12   Q.   Are the defendants supposed to provide you with immediate

13   notifications when there's a major, serious incident?

14   A.   Yes.

15   Q.   And how does that process work?

16   A.   I believe the compliance coordinator reviews the incident

17   reports, and there's a separate document called the rapid

18   notification.  And those I believe go to the compliance

19   coordinator and then he uploads them into Google Docs, and

20   sometimes he e-mails us that there's been a new one uploaded.

21   Q.   If you don't check Google Docs, do you know that there

22   has been a rapid notification or immediate notification?

23   A.   No.  Like I said, sometimes he would send us an e-mail,

24   but not always.

25   Q.   Are they required to notify you immediately when a

1   serious incident occurs like that?

2   A.   Yes.

3   Q.   Do you feel as though the information you've received is

4   sufficient to form an opinion about compliance and the

5   measures needed to achieve compliance?

6   A.   Yes.

7   Q.   How much time have you spent on this matter as a monitor?

8   A.   A lot, much more than I anticipated.

9   Q.   Let's talk a little bit about the type of technical

10  assistance you provide.  Can you describe the types of

11  technical assistance you provide to the defendants?

12  A.   Well, there's been a lot.  Initially we -- after every

13  site visit, we did priority recommendations and that -- there

14  was complaint that was too overwhelming.  So at one point, I

15  switched to writing what I called a road map, which was steps

16  to achieve, at least address the -- the staffing.

17       I then worked pretty closely with Mr. Teuwissen and

18  Ms. Barker, the prior board attorney and the prior sheriff's

19  attorney, to turn that document into what became their

20  proposal for the stipulated order.  I met with justice court

21  judges to talk about the fines and fees issue.  I met with

22  Judge Green to talk about pretrial services.

23       I -- and we do -- I do a lot of work on policies and

24  procedures.  At one point -- well, the defendants had sought

25  some individuals to do the policies and procedures, and none

 1   of those efforts worked out.  In the meantime, Mr. Parrish had

 2   talked with the NIC, the National Institute of Corrections,

 3   about providing technical assistance in the area of booking

 4   and records, and funding from the NIC fell through at that

 5   point in a change of administration.  And so he interviewed

 6   the individuals they would have selected and recommended

 7   Karen Albert.

 8        The defendants asked if I would take her onto my team and

 9   bill her through my contract, so she began the work on records

10   and bookings.  And the defendants liked working with her and

11   asked if she would continue on doing the policies, which she

12   has, so that's billed through my team.

13   Q.   Slow down.  Let me break up a few of those pieces.

14   A.   Okay.

15   Q.   Let me ask you first about Karen Albert.  Were the

16   defendants supposed to pay for Karen Albert?

17   A.   Yes.

18   Q.   Okay.  Whose contract is she actually under?

19   A.   She is under my contract.  But I bill her, and the County

20   does pay for her services, but through my contract.

21   Q.   All right.  But when she does work under your contract is

22   she drawing funds that otherwise would be paying your

23   services?

24   A.   Yes.

25   Q.   And you also talked about the stipulated order.  When the

1    defendants approached you with the stipulated order, was that

2    when DOJ had moved for contempt?

3    A.   Yes.  And they didn't approach me with an order.  We

4    worked together to develop something.

5    Q.   And so was that process going on outside of whatever was

6    going on with the Department of Justice at the time?

7    A.   No.  I think they transmitted that proposal to the

8    Department of Justice and then the attorneys took it from

9    there.  I wasn't involved after that.

10   Q.   All right.  As the stipulated order was being revised

11   initially was that -- who was involved in that process

12   initially?

13   A.   Well, when I was working with Mr. Teuwissen and

14   Ms. Barker.

15   Q.   Was DOJ involved at that stage of the process?

16   A.   No.  No.

17   Q.   Now, let's talk a little bit about the policy writing

18   process.  Can you describe the policy drafting and

19   implementation process that's been adopted?

20   A.   Well, it's changed over the years.  Initially, Ms. Albert

21   was working with a policy committee that was comprised of

22   staff from the detention center -- detention services.  And

23   she was facilitating it, so she would, like, provide a

24   skeleton or an outline, and then the committee -- it would be

25   assigned to a member of the committee who would work with the

```
 1   individuals that worked in that area and flesh out the outline
 2   specific to Hinds County.  Then it would come back to the
 3   committee for further editing and back to Ms. Albert.  Then at
 4   that point when they felt they had a draft, they would send it
 5   to me, I think, and I would send it to my team and to DOJ, and
 6   we would get comments back.
 7        And this is the part that changed over the years.  It
 8   would go back to the committee, and the committee had a very
 9   difficult time dealing with the comments and ended up spending
10   most of their time on revisions instead of developing new
11   policies.  So I became involved -- I don't know -- maybe three
12   years ago.  And when the comments come back, I work with
13   Ms. Albert, and most recently with Major Bryan, to try to
14   address the comments and get to a place where we have an
15   agreed-upon policy.
16   Q.   And who was actually on the policy review committee?
17   A.   It was a number of different people over the years.
18   Captain Sandra Dalton was a very effective member until she
19   retired.  I believe Major Fielder, or Warden Fielder was on.
20   Felicia Johnson was on.  I think Kenisha Jones was on, and I'm
21   sure there were others I'm not remembering.
22   Q.   About how many policies have actually been approved by
23   the committee and through this process?
24   A.   I think we're at 39 at this point.
25   Q.   About how many policies still need to be drafted?
```

```
 1   A.   About 50.
 2   Q.   Did the policies that got approved include a mental
 3   health policy?
 4   A.   Yes.
 5   Q.   And does that policy include requirements for a mental
 6   health unit?
 7   A.   Yes.
 8   Q.   Does it also include requirements for discharge planning?
 9   A.   Yes.
10   Q.   Have you facilitated other types of technical assistance
11   to the defendants from other groups?
12   A.   Well, it became apparent very early on that staffing was
13   a huge issue.  And so in the fall of 2019, I recommended an
14   individual that specialized in human resources in correctional
15   facilities, and he met originally with Mr. Teuwissen and
16   Ms. Barker.  And they --
17   Q.   I'm sorry.  Who is that?
18   A.   His name is Matt Rivera.  He met with Mr. Teuwissen and
19   Ms. Barker, and they liked his services, his approach.  He did
20   a site visit in, I believe February 2020, and then intended to
21   continue providing that consultation.  His services really
22   weren't utilized very efficiently or effectively, and
23   eventually it pretty much just stopped.
24        And then when Major Bryan came on, I told her about the
25   history and that he would still be available.  And then I
```

1    clarified with Mr. Teuwissen and Ms. Barker that it was okay

2    to start him up back again.  And Ms. -- Major Bryan worked

3    with him in more recent months.

4    Q.   So there's a recruitment or retention study that was

5    completed earlier this year.  Is that Mr. Rivera?

6    A.   I believe he worked together with Ms. -- Major Bryan to

7    complete that.

8    Q.   And were there other opportunities for technical

9    assistance that were missed by the defendants?

10   A.   I'm not remembering anything else right now.

11   Q.   Well, let me ask, were there other organizations that

12   tried to provide technical assistance here in the County?

13   A.   Well, the Justice Management Institute, JMI, they

14   provided -- they were in contract with the County to provide

15   assistance in developing the CJCC and sort of a proposal for

16   developing pretrial services.  The breadth of that contract

17   was not as broad as required by the settlement agreement, and

18   it -- and it was stopped at some point without the additional

19   services that were required in the settlement agreement.

20   Q.   And how about work from NIC; did Ms. Bryan do anything

21   with NIC?

22   A.   She got approval to have them do what's called a JJSA,

23   jail justice something assessment, and NIC was willing to do

24   it.  And it involves looking at the coordination between the

25   jail system and the justice system.  The -- several sheriffs

1    back rejected the opportunity.

2    Q.   Just to be clear, who is Mr. Teuwissen and Ms. Barker?

3    A.   Mr. Teuwissen was the board attorney up until the end of

4    2019, and Ms. Barker was the sheriff's attorney up until

5    November of 2021.

6    Q.   And you talked a little bit about the JMI project not

7    being as complete as it should have been.  What was it

8    supposed to do?  What was JMI supposed to be doing?

9    A.   Well, they were to assist the County in getting a CJCC up

10   and running and focus on diversion strategies and actually

11   assist in implementing diversion strategies as they were

12   developed by the CJCC.

13   Q.   And just to be clear, what does the CJCC stand for again?

14   A.   Criminal Justice Coordinating, either Council or

15   Committee, depending on the jurisdiction.

16   Q.   And what's the purpose of having the CJCC?

17   A.   It brings all of the justice stakeholders together to

18   address any barriers or problems in the criminal justice

19   system that impact the efficiency and fairness of the system.

20   Q.   And what type of stakeholders would be included in such a

21   CJCC?

22   A.   Typically the chief judge of any courts that are within

23   the jurisdiction, the district attorney, the public defender,

24   the mayor, the police chief.  And then on the County side, a

25   representative of the board and the county administrator, and

1  typically, but not always, somebody from the behavioral health

2  system and sometimes juvenile justice representatives are

3  included.

4  Q.   Let's move on to just sort of getting an overview on what

5  you're finding in terms of compliance.  It's previously been

6  entered into the record your fifteenth monitor's report.

7  Could you summarize what defendants' overall status is in

8  terms of compliance with the consent decree based on that

9  report?

10 A.   Well, they are not in compliance.  Many provisions are

11 listed as noncompliant.  Many more are listed as partial

12 compliance, and there's a few that are entered as substantial

13 compliance or sustained compliance.

14 Q.   Do you provide a chart in your reports where you identify

15 sort of the number of items that are in partial or non or

16 substantial compliance?

17 A.   Yes, I do.

18 Q.   And after your most recent tour, when do you anticipate

19 issuing your sixteenth report?

20 A.   Well, it would be in early March.  Although setting aside

21 these weeks has slowed the process, but we'll probably still

22 try to aim for that.

23 Q.   And you mentioned earlier you did an on-site inspection;

24 is that right?

25 A.   Yes, I did partial on-site.

1    Q.   And which part was virtual?

2    A.   So Mr. Parrish was on-site for the week.  I was on-site

3    for the first two days and then remote for two days of that

4    week.  And then some things had to be rescheduled into the

5    following week, so those were remote as well.

6    Q.   Based on your team's most recent assessment of conditions

7    in the jail, what do you anticipate will be the defendants'

8    overall status of compliance with the consent decree and the

9    stipulated order?

10   A.   There are lots of areas in which they are out of

11   compliance.

12   Q.   And also entered into the record were your ninth, tenth,

13   eleventh, twelfth, thirteenth, fourteenth and interim reports.

14   Are you familiar with those reports?

15   A.   Yes.

16   Q.   How would you compare the defendants' current state of

17   compliance with what you found over these prior reports?

18   A.   I think the numbers have changed a little, not a lot, and

19   I would say the overall condition of the facility and sort of

20   the inmate experience is pretty much the same as when we

21   started.

22   Q.   How about for staffing and supervision; what's been the

23   trend?

24   A.   Well, staffing is as low as it's ever been since we

25   started, lower than it's ever been.  And as a result,

1    supervision is even less than it's been in the past.

2    Q.   And when you say "numbers of provisions," are you talking

3    about the number of provisions in compliance, or what do those

4    numbers refer to?

5    A.   Well, for each paragraph we have a finding of compliance

6    or noncompliance or partial, and so I add those up.  And many

7    of the paragraphs have multiple requirements, so, for example,

8    paragraph 42 has staffing requirements, classification

9    requirements, mental health requirements.  And if -- typically

10   if any part of the paragraph has been -- has had some

11   improvement, we'll list it as partial compliance, even though

12   some other part of the paragraph may be woefully out of

13   compliance.

14   Q.   Have you noticed any trends or patterns with leadership

15   at the jail?

16   A.   Well, the leadership has changed frequently since we've

17   been monitoring, not just at the administrator position, but

18   at the command level position as well.

19   Q.   Have you noticed any trends or patterns with the way they

20   do planning or try to come into compliance with the consent

21   decree?

22   A.   It really seems to be sort of episodic in that there will

23   be some activity or a plan going in one direction, and next

24   thing we know, that didn't happen.  Something either is a

25   completely different approach.  And especially with change in

1    leadership, there seems to be changes in direction frequently.

2    Q.   Did Ms. Bryan have any plans in the works before she was

3    terminated?

4    A.   She had quite a few things that she was hoping to

5    implement as I understand it.

6    Q.   And had your team made any assessment about the quality

7    of some of those plans or the promise of those plans?

8    A.   Well, I think a lot of what she was proposing and

9    attempting to accomplish were good measures.  It wasn't going

10   to be sufficient to bring the jail into compliance in the

11   short term, but they were good measures.

12   Q.   Have you noticed any trends or patterns over the years

13   with the defendants' ability to self-assess or correct

14   violations of the Court's orders?

15   A.   Well, the settlement agreement includes a requirement for

16   self-assessment that's supposed to be done before every site

17   visit, and I think over the course of the five years we've

18   received that twice, once early on and once a couple years

19   later.  Other than that, we have not received self-assessment

20   on the settlement agreement.

21       Now, we do get assessment of the stipulated order.  It

22   doesn't always appear to be accurate, but we do get it.

23   Q.   And why do they need to be able to self-assess and

24   self-correct their violations?

25   A.   So they can take control of the coming into compliance

1   process.  So they understand what the deficiencies are, and

2   essentially have an action plan and assigned personnel to

3   accomplish whatever the action items are.

4   Q.   We talked a little bit about the policies and procedures

5   process.  Let me ask, is writing a policy the same thing as

6   implementing one?

7   A.   No.

8   Q.   And how are they different?

9   A.   Well, you can write a policy, and if there's not training

10  around it or sort of supervisory oversight of the practices in

11  the jail, it will just sit there in the books.  There has to

12  be a process to roll out a policy and train and sort of

13  correct.

14  Q.   Have the defendants implemented all necessary policies

15  and procedures to provide a reasonably safe and secure

16  environment for detainees?

17  A.   No.

18  Q.   In general, what harm or serious risk of harm results

19  from the failure to implement necessary policies?

20  A.   Well, the lack of supervision to inmates obviously leads

21  to events in the jail, such as assaults and fires that present

22  a safety hazard, and similarly with the ability to provide

23  medical and mental health care, the appropriate use of force,

24  all of those things impact safety within the jail.

25  Q.   And what impact does this have on defendants' ability to

1   hold staff accountable for violations of policy?

2   A.   Well, if the supervisors aren't adequately trained, they

3   can't hold the deputies to -- to proper actions through the

4   policies.  And that has been a problem when you review their

5   incident reports and see some pretty clear violations of

6   policy with no corrective action happening.

7   Q.   Are you familiar with Ms. Bryan's resignation letter?

8   A.   Yes.

9   Q.   Is there a policy about admitting people into the jail

10  who are medically ill?

11  A.   Yes.

12  Q.   Was Major Bryan's resignation associated with that

13  policy?

14  A.   I believe there was an event where medical had declined

15  booking an individual for medical reasons, and there was a

16  director from -- directive from above to admit that individual

17  anyway.

18  Q.   What serious harm, if any, can result from that kind of

19  decision to override the policy in question?

20  A.   Well, certainly there's potential harm to the individual

21  that's booked.  Although there's medical on-site, it's nothing

22  like a hospital or an emergency room.  So that's potential

23  harm to the individual, as well as potential liability on the

24  sheriff's department.

25  Q.   In that particular situation, would a decision by the

1   sheriff also be an overriding of a medical staffer's

2   recommendation?

3   A.   Yes.

4   Q.   Let's talk about the protection from harm provisions in

5   the consent to decree 4(a).  Have the defendants implemented

6   consent decree provisions protecting inmates from serious

7   inmate on inmate violence?

8   A.   No.

9   Q.   What serious harm or risk of harm does this pose for

10  detainees?

11  A.   Well, they can be assaulted by other inmates, and some of

12  those assaults can be extremely serious, including death, as

13  we know from this past fall.

14  Q.   And based on your most recent assessment, can you talk

15  about how they're violating this provision?

16  A.   Well, a number of the housing units are pretty

17  unsupervised.  So, for example, in early January there was at

18  least one weekend where they only had three officers assigned

19  to the pods for the weekend, so one officer in each control

20  room and no officers on the floor.  So that lack of

21  supervision can definitely result in inmate-on-inmate

22  violence.

23  Q.   How about their implementation of direct supervision or

24  classification policies?

25  A.   Well, the lack of supervision is certainly not consistent

1  with the principals of direct supervision.  It's not really

2  consistent with any principals of supervision in that you have

3  to be able to have supervision of one type or another, and

4  they pretty much don't.

5      And classification is an issue.  As we talk about in our

6  reports, they use gang pods.  They have one gang in one unit

7  and another gang in another unit, and then I think there's one

8  unit that is a little bit of a mix.  They have inmate

9  committees, as they're called, who essentially decide if

10  somebody isn't welcome in the unit, and then they're moved.

11  They have security staff moving people without consulting

12  classification.

13      They have space limitations, particularly when COVID was

14  surging, that creates difficulties.  So the end result is that

15  classification isn't always by an objective tool as it's

16  supposed to be.  All of these things impact the placement of

17  individuals.

18  Q.  When you say "inmate committees, as they are called,"

19  what do you mean by that?

20  A.  This is a term that we learned from the administrative

21  lieutenant.  She produced a document some months back that

22  listed the difficult inmates, detainees, and had notation as

23  to why they were considered difficult, and a number of

24  detainees were identified as being on the inmate committees.

25  So that was the first I had heard that term, and essentially

1    it is detainees who essentially control the unit and decide

2    who can be there and who can't.  And if they don't want

3    someone there, they'll set up assaults or harassment until

4    they leave.

5    Q.   So how does this kind of interference affect the

6    classification system as it was written?

7    A.   Well, the settlement agreement requires the use of an

8    objective classification tool, and that should determine

9    placement of the detainee.  But when you have an inmate

10   committee that is overriding that, they're not being placed

11   based on the objective tool.  It's something else.

12   Q.   Now, it sounds like you mentioned detainees.  Can you

13   talk a little bit about what types of inmates or detainees are

14   housed in the jail, what the different categories are?

15   A.   Well, in Hinds County the vast majority of detainees are

16   detainees; they are pretrial.  They do have some convicted

17   misdemeanants, but not very many compared to national

18   statistics.  And then they have individuals that are within

19   the detainee category; they have individuals who are charged

20   with felonies and then some with misdemeanors.  The

21   misdemeanants don't stay near as long, so they're a smaller

22   proportion as well.

23   Q.   Is there any intersection between the forensic mental

24   health or civil commitment process and the population in the

25   jail?

1    A.   There is.  The individuals that have an issue of

2    competency raised in their criminal proceeding will be in the

3    jail.  They may be waiting for a state hospital bed for the

4    competency evaluation.  They may not.  They can also be

5    evaluated outside of the state hospital.  So there's some in

6    the jail who are waiting for a competency evaluation, either

7    in the community or in the state hospital.  Then they

8    potentially come back, and if they're found competent, their

9    case proceeds.  If they're found incompetent, there's a second

10   question of whether they're restorable or not, if their

11   competency is restorable.  And that will also usually involve

12   waiting for a state hospital bed.

13        Although the state hospital had set up a restoration

14   program within Hinds County, I don't know if that's still

15   happening.  And then if they're found to be incompetent and

16   nonrestorable, then typically they are supposed to move over

17   to the commitment proceeding.

18   Q.   So these are people who are potentially civil detainees

19   only?

20   A.   That's the way it has seemed to me; that once they're

21   incompetent and nonrestorable, their criminal case is

22   remanded.  And I don't know to what extent Mississippi law

23   authorizes them to continue to be held in the jail once their

24   case is remanded.

25   Q.   If somebody has a family member who needs civil

1    commitment and they take them to the state system and there

2    are not enough beds, does the sheriff play any role as part of

3    that process?

4    A.   Again, that's a question of Mississippi state law.  I

5    believe that the state law authorizes the sheriff to pick up

6    and bring to the proceeding the individual that -- once a

7    commitment proceeding has been filed.

8    Q.   Will these people ever be in the custody of the sheriff

9    or the jail?

10   A.   I think they can be.

11   Q.   You talked a little bit about the monthly reportings.

12   Can we bring up Plaintiff's Exhibit 88?  It's not showing on

13   my screen, Plaintiff's Exhibit 88, and there's a binder behind

14   you as well.  If you want to look at the binder, it might be a

15   little easier.

16   A.   Okay.

17   Q.   Do you recognize Plaintiff's Exhibit 88?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   That is a printout of the spreadsheet we get that

21   includes data points from the incident reports, including the

22   narrative and the supplemental narratives.

23   Q.   And with the one you received, is that -- did you say

24   it's on a spreadsheet?

25   A.   It's an Excel spreadsheet that is uploaded into the

```
 1   computer, so I don't print it out.  I review it on the
 2   computer.
 3   Q.   Why don't you print it out?
 4   A.   Because it ends up looking like this exhibit.
 5   Q.   But you do recognize this document?
 6   A.   Yes.
 7        MR. CHENG:  Your Honor, we move for the admission of
 8   Plaintiff's Exhibit 88.
 9        THE COURT:  Any objection from the defendant?
10        MR. SHELSON:  No, sir.
11        THE COURT:  All right.  P-88 is received into evidence.
12   It's under seal.
13            (Plaintiff's Exhibit 88 entered.)
14   BY MR. CHENG:
15   Q.   Just for the sake of everyone looking at it, if someone
16   were to try to lay out this exhibit on a piece of flooring,
17   how would you put it together so you could actually read it?
18   A.   Well, I would refer to the page numbers.  But this page
19   has the first six columns, and there's probably about 10 or 12
20   of those pages.  And then the next group has the next number
21   of columns, and similarly another 10 or 12 pages and so on
22   until the entire spreadsheet is put together.  And then I
23   think this one goes through -- the first groups go through the
24   first half of the month, and then there's a second group that
25   goes through the second half of the month.
```

1    Q.   And the date on the spreadsheet, who puts the date in

2    there?

3    A.   That comes from the JMS report.  It's programmed to put

4    it in.  I think the IT person at the County created the

5    report.

6    Q.   And so the report gets generated from other types of

7    entries.  Who puts in the entries before it gets reported?

8    A.   The officers who are writing those incident reports,

9    officers or supervisors.

10   Q.   When you and your team are reviewing incidents, have you

11   been trying to track the number of assaults between inmates?

12   A.   Yes.

13   Q.   Okay.  And what process do you use to track assaults?

14   A.   So I reviewed the incident reports, and if there are

15   assaults that are reflected in those reports, I include that

16   on a log that I keep.  And then I also review the CID reports,

17   the criminal investigation division reports.  I review the

18   immediate notifications.  I -- sometimes there are medical

19   transports that suggest that there had been an assault, in

20   which case, I'll ask Dr. Dudley to review the medical records

21   and see if it was reported to medical as an assault, and

22   that's mostly it.

23        Sometimes I will learn of assaults through the file

24   audits or potentially through grievances.  So all things I

25   review on a monthly basis anyway, that material gets drawn

1   into that log.

2   Q.   Do you or your team members also review the incident

3   reports themselves?

4   A.   Yes.  Through the spreadsheet and occasionally for

5   whatever reason, we'll ask for the actual report but mostly

6   through the spreadsheet.

7   Q.   Why was it necessary for you to create your own list of

8   inmate assaults?

9   A.   Well, I started it back in 2018, and there were just so

10  many assaults it was hard to really have a handle on are they

11  going up, are they going down, are they occurring in one unit

12  more than the others, and some of the same individuals

13  involved over and over.  So it just was very difficult to keep

14  all of that information sort of in mind and to be able to

15  analyze it.

16  Q.   And why have Dr. Dudley look at medical reports when

17  checking assaults?

18  A.   Because sometimes -- and I think there's an example in

19  the fifteenth monitoring report.  There was a medical

20  transport that was to the hospital to look at a broken jaw,

21  but there was no indication why there was a broken jaw.  And

22  actually in this most recent period, there was something

23  similar where there was a medical transport for a broken hand,

24  but no indication of why there was a broken hand.  So when Dr.

25  Dudley looks at the medical records, he can see whether the

```
 1   inmate reported to medical that it had been an assault.
 2   Q.   We have Plaintiff's Exhibit 88.  It's sealed, but it is
 3   available behind you if you don't mind.
 4   A.   What was the number?
 5   Q.   Eighty-eight.
 6   A.   I thought that was the last --
 7   Q.   I'm sorry.  No. 32.  Plaintiff's Exhibit 32, which is
 8   also sealed.
 9   A.   Yes.
10   Q.   Do you recognize Plaintiff's Exhibit 32?
11   A.   I do.
12   Q.   What is that exhibit?
13   A.   That's the log that I keep on inmate assaults.
14   Q.   And do you rely upon that document as well for helping to
15   form your opinion?
16   A.   Yes.
17        MR. CHENG:  United States moves to admit Plaintiff's
18   Exhibit 32, which is sealed.
19        THE COURT:  Is it -- no, is it -- any objection?  It's
20   sealed, but it's not admitted yet.  Any objection from the
21   defendant?
22        MR. SHELSON:  No objection, Your Honor.
23        THE COURT:  All right.  PX-32 will be received in
24   evidence.
25             (Plaintiff's Exhibit 32 entered.)
```

```
 1   BY MR. CHENG:
 2   Q.   When you're doing your site visit and you're evaluating
 3   protection from harm, do you also go through inmate
 4   grievances?
 5   A.   Yes.
 6   Q.   And when you're looking at grievances, do you assess the
 7   response by the staff to the grievances?
 8   A.   Yes.
 9   Q.   What's the purpose of doing that?
10   A.   Well, the settlement agreement requires a timely and
11   appropriate response to inmate grievances.
12   Q.   If we could bring up Plaintiff's Exhibit 27.  Before it
13   gets to this exhibit, what is the benefit of doing a timely
14   response to a grievance?
15   A.   Well, the benefit to the inmate, of course, is that he
16   gets his complaint addressed.  To the staff in the jail as a
17   whole, it enables the jail to address potential inmates or
18   potential problems within the facility that need to be
19   corrected.
20   Q.   Does that include violence between inmates?
21   A.   It can.
22   Q.   Does that include abuse or staff abuse or use of force?
23   A.   It can.
24   Q.   Does it include physical plant problems that are bad for
25   health or safety?
```

1    A.    Yes.

2    Q.    Do you recognize Plaintiff's Exhibit 27?

3    A.    Yes.

4    Q.    And what happened in this situation?

5    A.    You mean what does the detainee say?

6    Q.    Sure.  What does the detainee complain about?

7    A.    That he was stabbed in various locations.  His eye socket

8    is cracked.  He filled out a protective custody form that was

9    ignored by the officers, "which led up to me almost losing my

10   life.  I'm partially blind in my right eye.  I can't sleep at

11   night because I'm traumatized.  I was brutally beaten by

12   multiple guys.  This would never have happened if they would

13   have put me on protective custody like I asked."

14   Q.    And then how did the jail respond to this grievance?

15   A.    "I understand your complaint, but this is a grievance

16   form.  What is your grievance so I direct you to the right

17   person?"

18   Q.    Did you have any concerns about how this response was

19   provided?

20   A.    Yes.  He -- I would have interpreted that grievance to be

21   that the protective custody request was ignored, and that

22   should have been investigated and corrected.

23   Q.    When your team was assessing the grievance process, did

24   you find other cases that were like this one where the

25   grievance response was not appropriate?

1    A.    Yes.

2    Q.    And did you make any recommendations or findings about

3    that issue?

4    A.    We have reported repeatedly that a number of grievances

5    are denied as not being grievances as well as a number of

6    responses that really don't address the problem.   In some

7    instances they say, you know, I'll look into it, but that

8    doesn't tell you that there's been an appropriate response.

9         So we've mentioned that repeatedly in reports.   I believe

10   it's been mentioned repeatedly in the jail's quality assurance

11   reports as well.

12   Q.    When you say "repeatedly," about how far back have you

13   been complaining about the grievance process?

14   A.    I don't recall when the electronic system came into

15   place.   That's been quite some time, and I would say it's from

16   as long ago as when that started.

17   Q.    What risks of harm, if any, can result from improperly

18   handled grievances of this sort?

19         MR. SHELSON:   Objection.   Calls for speculation.

20         THE COURT:   Objection overruled.

21   A.    Well, such as in this case, if there's an issue of

22   protective custody requests being ignored, the potential is

23   just somebody doesn't get protective custody and that issue

24   isn't addressed.   And the potential harm is what's described

25   here, an inmate assault.

1     MR. CHENG:  Your Honor, we move to admit Plaintiff's

2 Exhibit 27.

3     THE COURT:  Any objection from the defendant?

4     MR. SHELSON:  No, sir.

5     THE COURT:  PX-27 will be received in evidence.

6         (Plaintiff's Exhibit 27 entered.)

7     MR. CHENG:  We can now introduce Plaintiff's

8 Exhibit 31.

9 BY MR. CHENG:

10 Q.   Do you recognize Plaintiff's Exhibit 31?

11 A.   It's an incident report from October 2nd, 2021.

12 Q.   And what happened in this situation?

13 A.   The jail received a call from a detainee's wife saying

14 that her husband needed to be placed on protective custody,

15 and the jail captain at the time said don't do anything until

16 I get there.  And then it looks like the attorney had also

17 called and stated -- oh, sometime after that initial call, the

18 attorney called and said that his client had been attacked

19 subsequent to the wife calling and asking that the husband be

20 put in protective custody.  And so then the officers went

21 and -- to the unit and found the detainee with blood on his

22 face and clothes and had been attacked to the point where he

23 needed to go to the hospital.

24 Q.   And were there any concerns about this situation?

25 A.   Yes.  You know, if someone -- a request for protective

1    custody should be addressed as promptly as possible because of

2    the potential for an assault.

3    Q.   So we talked earlier about self-assessment and systems to

4    identify patterns or trends.  Does the jail have in place any

5    type of self-assessment, early warning, other types of systems

6    to pick up on patterns or problems with their jails?

7    A.   Well, starting -- oops, starting in, I think it was

8    summer of 2020, they have a quality assurance officer who

9    reviews different data points and creates a quality assurance

10   report.  So that's -- it's not exactly a -- it doesn't present

11   in terms of a data report, but it's a narrative that covers

12   some of the issues in the jail.

13   Q.   Does it get down to sort of the microlevel, trying to

14   detect if there's a problem with a staffer or particular

15   inmates?

16   A.   I would say occasionally it addresses such an incident,

17   but mostly it's at a higher level of assessment.

18   Q.   Does the consent decree require defendants to have

19   systems to identify potential problem inmates or detainees at

20   a microlevel?

21   A.   Yes.

22   Q.   And what progress, if any, have they made in that area?

23   A.   We don't really receive any compilation of data that

24   reflects that.

25          MR. CHENG:  Your Honor, I would move to admit

```
 1   Plaintiff's Exhibit 31.
 2           THE COURT:  Any objection?
 3           MR. SHELSON:  No, sir.
 4           THE COURT:  P-31 will be received into evidence.
 5               (Plaintiff's Exhibit 31 entered.)
 6   BY MR. CHENG:
 7   Q.   By the way, do you know if those two documents 27 and 31,
 8   are they the same inmate?
 9   A.   I do not recall the inmate that wrote the grievance.  I
10   do know the inmate that was involved in the incident report.
11   They are potentially the same.
12   Q.   Based on your most recent assessments, what patterns or
13   trends can you report about the level of violence in the jail?
14   A.   I would say it's a high level of violence.
15   Q.   And the protection from harm provisions, do they include
16   requirements for trying to improve retention and staffing?
17   A.   Yes.
18   Q.   Did they ever adopt the retention bonuses required by the
19   consent decree or court order?
20   A.   No.
21   Q.   Did they ever adopt a salary ladder or career ladder?
22   A.   No.
23   Q.   Did they ever adopt salary step increases?
24   A.   No.
25   Q.   Did they ever empower the jail administrator enough to
```

1  let them run the jail professionally?

2  A.   No.

3  Q.   Have you ever reviewed Mr. Shaw's curriculum vitae?

4  A.   Yes.

5  Q.   In your team's opinion or in your view, does Mr. Shaw

6  meet the qualification requirements of the consent decree,

7  paragraph 38?

8  A.   I'm remembering paragraph 46, but I know there's a

9  requirement that the individual have five years' experience in

10  operating a major jail, I believe is the wording.

11  Q.   And why is Mr. Shaw not able to meet that requirement?

12        MR. SHELSON:  Objection.  No foundation.

13        THE COURT:  Objection overruled.

14  A.   In reviewing his resume, it appears that all of his

15  experience, professional experience is in running prisons and

16  not jails.

17  BY MR. CHENG:

18  Q.   If you could bring up Exhibit 4, Defendants' Exhibit 4.

19  Do you recognize Defendants' Exhibit 4?

20  A.   Yes.

21  Q.   And is this the Matt Rivera report you mentioned earlier?

22  A.   Yes.

23  Q.   Do you generally agree with what Mr. Rivera recommended

24  or found?

25  A.   Yes.

1   Q.   Do you think that recent promises to raise salaries alone

2   will lead to adequate staffing and supervision?

3   A.   No.

4   Q.   Did you tell the defendants that?

5   A.   I believe I have over time.

6   Q.   And why did you think it was not enough to raise salaries

7   alone?

8   A.   Well, particularly the retention issue is related to many

9   things, not just pay, as this has been discussed over the

10   years.  Exit interviews that have been done by Doris Coleman,

11   the HR person at Hinds County, have indicated that departing

12   employees have given a number of reasons for leaving,

13   including safety, including what they considered arbitrary

14   treatment, including other people less experienced, less

15   knowledgeable people being promoted over them, a variety of

16   complaints regarding why people are leaving.

17        Salary is an issue, but there's a lot of other issues,

18   and not just -- and the salary that has been addressed has

19   been a starting salary, so without a career ladder, that also

20   doesn't contribute to retention.

21   Q.   And did Mr. Rivera make a number of recommendations of

22   how to provide short, intermediate, and long-term improvements

23   to retention and staffing?

24   A.   He did.

25   Q.   About how many recommendations did he make?

1  A.   I don't know that I counted, but there's probably -- he

2  had different areas of concern, and I would say in each area

3  there were probably -- I don't know -- ten recommendations in

4  each of those time categories.

5       MR. CHENG:  At this time I'd move to admit Defense

6  Exhibit 4, but it's possible it's already been admitted.

7       All right.  It's already been admitted, very good.

8  BY MR. CHENG:

9  Q.   Did the defendants ever provide a plan with reasonable

10  likelihood of success outside of Mr. Rivera's plan?

11  A.   I don't think we've seen any plan regarding --

12  particularly regarding retention.  I think there was a short,

13  one-page document that was created by the recruitment officer

14  that talked about recruitment activities, but it was not what

15  I would call a recruitment and retention plan.

16  Q.   And you mentioned how Ms. Bryan worked on this to get

17  this out.  Can you describe what Ms. Bryan and Mr. Rivera were

18  doing to try to complete this process?

19  A.   I know they had conversations about the direction.  I

20  don't know how extensive those conversations were, and then

21  Mr. Rivera provided the draft document to Major Bryan.  I

22  think she provided feedback.  She then requested I look at it

23  and asked if I could share it with Mr. Parrish as well, and we

24  both had a few comments.

25  Q.   I think we've heard a number of times this week about a

1    5 percent pay increase.

2    A.   Yes.

3    Q.   Does that sound familiar?

4    A.   Yes.

5    Q.   Besides the 5 percent pay increase, were there other

6    financial efforts that Mr. Rivera recommended that would help

7    with recruitment and retention?

8    A.   I don't recall to what extent they were in the report.  I

9    know that Major Bryan had suggested, and I think it was

10   conveyed to Mr. Rivera as well, that there be -- that the

11   payroll be biweekly and that there be direct deposit.  I think

12   they also recommended -- or she recommended a uniform

13   allowance I believe as well as the bigger incentives that

14   we've talked about with the career ladder and such.

15   Q.   How about a cost of living adjustment?

16   A.   Yes, I know that's in Mr. Rivera's report.

17   Q.   Has the County's ability to keep up with inflation been

18   an issue in the past with retention?

19        MR. SHELSON:  Objection.  No foundation.  Leading.

20        THE COURT:  Could you rephrase your question, please?

21   BY MR. CHENG:

22   Q.   Did Mr. Rivera address cost of living issues in his

23   report?

24   A.   Yes.

25   Q.   And what did he find?

1    A.   My recollection is that he recommended that there be cost

2    of living increases for the obvious reason that if you don't

3    keep up with inflation, your real income is going down.

4    Q.   And did he also address issues with technology or the way

5    the recruitment office actually works?

6    A.   Yes, quite a bit.

7    Q.   And what did he say?

8    A.   He recommended that the County use much -- have a much

9    higher use of technology in the application process such as

10   web-based portals and, you know, being able to submit an

11   application not just on paper, being able to track applicants,

12   and so on.

13   Q.   Right now do you have to submit a paper application to

14   get a job at the jail?

15   A.   That's what I understand.

16   Q.   Did he have high-speed internet access for the

17   recruitment staff?

18   A.   No, I believe not.

19   Q.   Did your team ever recommend at hearings that they should

20   do some more to be more technologically savvy with

21   recruitment?

22   A.   Yes, I think we did.  I don't remember to what extent

23   that came from Mr. Rivera or from us but certainly using

24   social media and other web-based resources.

25   Q.   And over the years, have they made much inroads in terms

1   of adopting modern technology for the recruitment process?

2   A.   I don't believe so.

3   Q.   Did Mr. Rivera also make some recommendations about

4   leadership and culture?

5   A.   Yes.

6   Q.   What types of recommendations did he make?

7   A.   My recollection is that he said that sort of the --

8   creating a positive culture within the jail needed to start at

9   the top, and in that regard, it was important that there be

10  sort of a clear understanding of the mission and principles of

11  the organization of those, including treating people fairly

12  and so on.

13  Q.   Who is Marlow --

14  A.   Brennan.

15  Q.   Who is Marlow Brennan?

16  A.   He was the IAD investigator.

17  Q.   And did your team ever work with him?

18  A.   Yes.

19  Q.   And how was the experience in terms of working with him?

20  A.   Mr. Parrish was the main contact with Mr. Brennan.  I

21  think it was mainly positive.

22  Q.   When you say "he was the investigator," what were his

23  duties?

24  A.   He was to investigate any allegations of misconduct by

25  staff, and as part of that, he reviewed all of the incident

1116

1    reports, not just the ones that were referred to him, to

2    determine if misconduct of staff was involved and then

3    investigated it.

4    Q.   And where is he now?

5    A.   He's no longer with the sheriff's office.

6         MR. CHENG:  If we could bring up Plaintiff's

7    Exhibit 14.

8    BY MR. CHENG:

9    Q.   Do you recognize Plaintiff's Exhibit 14?

10   A.   Yes, I've seen this -- I have seen this before.

11        MR. CHENG:  Your Honor, we move to admit Plaintiff's

12   Exhibit 14.

13        THE COURT:  Any objection from the defendant?

14        MR. SHELSON:  No, Your Honor.

15        THE COURT:  Okay.  P-14 will be received into evidence.

16            (Plaintiff's Exhibit 14 entered.)

17   BY MR. CHENG:

18   Q.   We talked a lot about their ability to detect their own

19   problems.  Have your team members ever identified issues with

20   the way they do investigations?

21   A.   Yes.

22   Q.   And what types of problems have they found?

23   A.   Well, they're variable.  The -- so, for example, with the

24   criminal investigation, they're definitely hampered by the

25   fact that very few cameras function, are operable, so when

1    they know an incident has occurred, at RDC anyway, they're

2    unable to review video footage to get a better handle on what

3    happened, unless per chance it happened in front of one of the

4    functioning cameras.

5        I would also say that the investigations, again, on the

6    CID side, have improved over the years, but they're still not

7    very thorough.  And on the IAD side, we actually don't -- it's

8    very difficult for us to track the reports on the IAD side,

9    because we sometimes don't get any report and sometimes get it

10   very, very late.  And it's hard to track what's happening from

11   a potential complaint or use of force to how it was resolved.

12   Q.   Do these problems with getting IAD or CID reports include

13   trying to get reports for deaths?

14   A.   Yes.  I would say we typically do get CID reports.  The

15   IAD reports have been much harder to get in a timely fashion.

16   Q.   What concerns, if any, does that raise in terms of the

17   safety of the jail?

18   A.   Well, certainly our not getting the reports impacts our

19   ability to provide direct assistance and to inform the Court

20   in that area for proper response.  To the extent that staff

21   who need to see those reports don't get them, it certainly

22   impacts the ability for that staff to take appropriate

23   corrective or remedial action.

24   Q.   When you say "corrective or remedial action," does that

25   include holding staff accountable or inmates accountable if

1  they do something wrong?

2  A.   Yes.

3  Q.   Mr. Brennan's letter mentioned something about needing

4  three people to do the job.  Does your team have any opinion

5  about or did you form any opinion or make any recommendations

6  about the number of investigators?

7  A.   I think that we recommended additional assistance on the

8  CID side.  I would have to ask Mr. Parrish on the IAD side.

9  Q.   So we've talked in abstract about tracking grievances or

10  tracking incident reports.  When your team assesses that

11  issue, sort of what is the model for how that process should

12  really work?

13  A.   Well, so like with grievances, the relevant information

14  should be included in this spreadsheet, and it is.  They do

15  keep a spreadsheet, although a lot of that has to be done

16  manually, and then the coordinator, the grievance coordinator

17  should be looking to see that grievances have a response and

18  that that response is timely.  And if it's not, to talk

19  initially with the assigned individual to respond to the

20  grievance.

21       If that still doesn't get a response, then that should go

22  up to a higher level.  There also should be an audit, and it's

23  set out in the grievance policy.  I think it recommends an

24  audit of 10 percent of the grievances on a quarterly basis, so

25  that those kind of problems can be identified.  And it

```
 1   includes not only is there a response, but is the response
 2   appropriate.
 3   Q.   Are those audits occurring?
 4   A.   No.
 5   Q.   Are they required to also track trends or graph data?
 6   A.   The -- ideally the grievance would be able to be sorted
 7   by area and by officer, by type.
 8   Q.   When you say "area," do you mean like housing area?
 9   A.   Yeah, the location and by type.  The system that is used
10   to file the grievances and track the grievances does not
11   allow -- it does not pull that information into the
12   spreadsheet.
13   Q.   Is that system the JMS system?
14   A.   No, it's the Securus System.
15   Q.   Let me move on to the reporting provisions of the consent
16   decree.  There are several about the reporting and
17   investigation and the forms that are used.
18        Have the defendants implemented the consent decree
19   provisions that are reasonably necessary to protect detainees
20   from unnecessary or excessive use of force by staff?
21   A.   No.
22   Q.   If not, then what serious risk, if any, does this pose to
23   detainees?
24   A.   Detainees can be injured by the excessive use of force.
25   Q.   Does the policy that you worked on on use of force forbid
```

1    using force to compel compliance?

2    A.   Yes.

3    Q.   And you heard testimony earlier this week about an inmate

4    who was Tasered while face down?

5    A.   Yes.

6    Q.   What's wrong with Tasering him under the policy that was

7    approved by the County?

8    A.   Well, the policy also includes sort of the incremental

9    use of force, so that if compliance were -- the action that's

10   being desired can be accomplished by a lower level of force,

11   then that lower level of force should be used.  And in the

12   case that was discussed, there were several officers in the

13   area that could have ensured that his arms were out and behind

14   his back to be cuffed.

15   Q.   Would that particular provision about using force on

16   people who refuse to obey orders, does that have any

17   implication for detainees with mental health issues?

18   A.   Yes.

19   Q.   Why?

20   A.   Well, a couple of things.  The settlement agreement

21   requires that the mental health provider be involved in the

22   decision to use force and certainly an evaluation of it

23   afterwards.  But the issue is a lot of -- I mean, detainees

24   with mental health issues may be acting out because of their

25   mental illness and not because of an intention to create a

1    problem.  And they also can have mental health impact trauma,

2    sort of re-creating the trauma by the use of force on them.

3    Q.   We talked a little bit earlier about tracking incidents.

4    With tracking use of force, are there similar issues with the

5    data systems used for tracking use of force as there are with

6    incident reports?

7    A.   Yeah.  It's actually the same system.  The issue that has

8    made it difficult to use the database to track force is a

9    couple of things.  One is that the type of incident that is

10   put into the incident report doesn't necessarily indicate that

11   use of force.  It might be failure to comply, and then you

12   read the incident report and you see that it was a use of

13   force.

14       The other issue is that there's actually a box in the JMS

15   system when you do the incident report that asks if force has

16   been used.  And again -- and if that box is checked, then

17   additional information is required on that use of force.  In

18   the past that box has rarely been checked, even when force has

19   been used.  I believe there's a plan to -- for the IT person

20   to make that a mandatory field.  I don't know if that's

21   happened.

22   Q.   Under the approved policies were Tasers allowed to be

23   distributed to staff inside the jail?

24   A.   The use-of-force policy does not -- it talks about

25   electronic devices, but it doesn't authorize or not authorize

1    them.  They would be considered fairly high on the incremental

2    list of force that can be used.

3    Q.   Does the policy require training before somebody can

4    bring a weapon like that into the facility?

5    A.   Yes.

6    Q.   Does it require inventory controls or tracking of those

7    types of devices?

8    A.   Yes.

9    Q.   Do they have any of those types of tracking systems for

10   the Tasers in the jail?

11   A.   I don't know that they have instituted an inventory

12   system for the Tasers.  They did have one for the shotguns.

13   Q.   So these types of data and tracking systems, if someone

14   doesn't have these systems, what risk, if any, does it pose

15   for the safety of inmates or staff?

16   A.   The potential is that those devices could be used and not

17   reported in an incident report, in such that the supervisors

18   can know that they've been used and can evaluate whether they

19   were properly used.

20   Q.   How about, like, the data systems for tracking trends in

21   incident reports or grievances or use-of-force reports, if the

22   jail doesn't have these type of systems for tracking trends,

23   what risk, if any, does that pose to the safety of detainees?

24   A.   Well, again, if they're not evaluating that, they can't

25   address any problems that those data systems might disclose,

1  including problems that present a risk to inmates.

2  Q.   Although this is technically still part of the protection

3  of harm and use-of-force issue, I'm going to start talking a

4  little bit about physical plant conditions.  Have the

5  defendants implemented the consent decree provisions requiring

6  them to provide detainees with safe and sanitary physical

7  shelter and living conditions?

8  A.   No.

9  Q.   Does this have any impact on the health or safety of

10  inmates?

11  A.   Yes.

12  Q.   And how so?

13  A.   Well, there are -- certainly in A-Pod there are still

14  doors that don't lock, the HVAC system doesn't work, and I

15  believe there's plumbing issues and electrical issues.  All of

16  which -- particularly the cell doors not locking when there's

17  no supervision in the units, that presents a tremendous risk

18  to inmates, and there's certainly problems in the other areas

19  as well.  It has been talked about.  C-Pod has no fire alarm

20  system.  B-Pod has no -- does not yet have a fire alarm

21  system.  There's at least one incident report from January

22  that talks about the doors in B-Pod not functioning, whereas

23  those were supposed to be repaired.

24      And the January quality assurance report had some really

25  troubling information about the cleanliness on the unit where

1   most of the individuals with severe mental illness are housed.

2   Q.   What types of issues are on that unit?

3   A.   What she described in the January report was that there

4   were conditions regarding the cleanliness of the facility and

5   the inmates and the detainees, including two detainees that

6   were covered in feces and had had serious weight loss and were

7   covered in sores, such that one of them had to be transferred

8   to the hospital for treatment.

9   Q.   What is the weight loss issue?

10   A.   I believe that what was described in the report is

11   that -- two things.  Major Bryan had learned that the staff

12   were providing the food to the inmates by just wheeling the

13   carts in, and the other inmates were distributing the food.

14   And that is not supposed to happen, because, again, the inmate

15   committees or the pod boss, whatever they're called, can

16   withhold the food from some people.

17        She had corrected that, but apparently that has fallen

18   back.  And one of the issues is that the inmates distributing

19   the food on that particular unit were not giving food to some

20   of the inmates.  And then there was also reference in the QA

21   report that there was in particular one inmate who was taking

22   people's food from them.

23   Q.   When you say these other inmates whose food was taken

24   away, were they inmates with serious mental illness?

25   A.   According to the QA report, yes.

```
 1   Q.   That QA report, what date was that?
 2   A.   This was the January report.  I don't --
 3   Q.   Was this after or before your tour?
 4   A.   We received it after the tour.
 5           THE COURT:  I just want to be clear.  January 2022?
 6           THE WITNESS:  Yes, Your Honor.
 7           THE COURT:  Okay.
 8   BY MR. CHENG:
 9   Q.   And were the renovations for the physical plant completed
10   according to this QA report?
11   A.   No.  It said that the renovations in B-Pod have been
12   halted, and there's no timeline for completing them.
13   Q.   What type of renovations in B-Pod still need to be
14   completed?
15   A.   Quite a few.  There are -- I think there's an officer's
16   station that's in the process of being built in B3, not in the
17   other pods or the other units.  The fire alarm system as I
18   mentioned, and I think there are still a number of doors that
19   don't function, including the door into B-Pod from the great
20   hall.
21   Q.   Were there actually any fires --
22           THE COURT:  Hold on one second, Mr. Cheng.
23           We're going to get you some water.  I'm sorry.
24           MR. CHENG:  Thank you.
25   BY MR. CHENG:
```

```
 1   Q.   Have there actually been any fires during this last

 2   quality assurance review period?

 3   A.   Yes, I don't recall the number.

 4   Q.   Have there been continuing staffing or supervision

 5   issues?

 6   A.   Yes.  She described -- the report describes that, when I

 7   mentioned earlier, there was one weekend when there were only

 8   three officers covering all the pods.  And I believe she

 9   continued to mention problems with the observation logs not

10   being accurate and with -- I believe she mentioned in this

11   report, I know it's been in prior reports, where the officers

12   are frequently sitting around in the control room instead of

13   overseeing the units.

14   Q.   We've heard from various people that they do hire new

15   people in their incoming classes.  Have there been any issues

16   with the recruitment of new personnel, according to this

17   latest QA review?

18   A.   I think there was a question of whether appropriate

19   individuals are being recruited and hired.

20   Q.   When people get recruited, do they ever quit before they

21   complete the program?

22   A.   Yes.

23   Q.   Does that happen even today?

24   A.   Yes.

25   Q.   And even after someone starts working, do they lose
```

1   people fairly early in the process as well once they start

2   working in the jail?

3   A.   Yes.

4   Q.   According to the latest quality assurance review, have

5   there been any issues with getting County approvals for

6   necessary reforms in this case?

7   A.   Yes.  I think the QA report includes that they were

8   trying to get furnishings for the mental health unit, and they

9   were not able to just go out and buy furnishings.  They had to

10   get them from surplus furniture in the County, and so they

11   did.  They selected the surplus furniture, and then they had

12   to submit a purchase order to obtain that furniture.  And

13   that, according to the report, has been denied.

14        And upon inquiry, the QA officer was told that the

15   sheriff's office would have to wait on any items requested for

16   detention services.

17   Q.   All right.  Let me finish up a little bit on the physical

18   plant issue.  Does the jail provide fire safety inspection

19   reports to your team?

20   A.   Yes.  Mr. Parrish handles that primarily.

21   Q.   And who handles the fire safety side for the County?

22   A.   For the sheriff's office, it's Mioka Laster.

23   Q.   Does the state fire marshal do regular inspections of the

24   jail?

25   A.   Not that we've seen.  There have been some, but I

1    wouldn't call them regular.

2    Q.   We talked earlier about your list of assaults.  I did

3    want to bring up the case of MR, who died.

4    A.   Yes.

5    Q.   There was some discussion about it being labeled a

6    medical report injury.  Do you recall that?

7    A.   I do.

8    Q.   What issue is raised with that type of a category?

9    A.   Well, that appeared to suggest that it was -- the death

10   was not a result of the assault but rather some medical

11   episode that happened after the assault.

12   Q.   So if you try to categorize that incident just on the JMS

13   label, would that have any affect on the accuracy of the

14   reporting of the incident?

15   A.   Well, if you tried to run a report from the JMS that

16   pulled all inmate assaults, it would not pick up that

17   incident.

18   Q.   The supervisors in the jail, when they are doing their

19   own self-assessment, do they need to go look beneath the

20   surface reporting to assess what happened with incidents?

21   A.   Yes, and certainly reading the incident reports at a

22   minimum and the supplements.  But for a serious incident,

23   reviewing camera footage, *et cetera*.

24   Q.   Does the QA report that came in January also address the

25   Prison Rape Elimination Act, P-R-E-A, PREA issues?

1    A.   I believe so.

2    Q.   Have you assessed the PREA compliance as well when you're

3    doing your site visit?

4    A.   Yes.

5    Q.   And how do you do that?

6    A.   Well, if there are PREA reports, I review the PREA

7    reports.  I ask the PREA coordinator about any inmate

8    education activities or staff training activities.  I look for

9    posters in the units, and I look at any utilization of

10   follow-up services after a PREA complaint.  And Dr. Dudley

11   communicates with the medical staff -- medical and mental

12   health staff about PREA issues.

13   Q.   So based upon your most recent reviews, have the

14   defendants implemented the consent decree provisions requiring

15   them to protect detainees from sexual abuse?

16   A.   Not at this time, no.

17   Q.   What harm or risk of harm does this pose for detainees?

18   A.   They can potentially be subjected to sexual assault

19   without -- without remedial measures and education and

20   training, such that staff are aware and the inmates are aware

21   of how to address those issues.

22   Q.   And when you were doing your review, have you found

23   incidents that weren't properly followed up on under PREA?

24   A.   I have.  Most -- I would say during most site visits, I

25   see some incident reports and some grievances that involve

 1   PREA issue that have not been referred to the PREA officer.

 2   Q.   You talked earlier about the difference between CID

 3   versus IAD.  What is that difference?

 4   A.   CID is intended to investigate criminal activity,

 5   typically involving an inmate that's being investigated.  And

 6   IAD involves investigating of staff persons regarding

 7   potentially criminal activity, but also violations of policy

 8   and procedure.

 9   Q.   So out of these processes, can the sanctions be

10   administrative or criminal?

11   A.   They could be either.

12   Q.   So if there's a PREA allegation, which channel should it

13   be funneled to?

14   A.   If it involves an officer, it would typically go to IAD.

15   If it involves inmate on inmate, it would typically go to CID.

16   Q.   And where does the PREA officer fit in that process?

17   A.   The PREA officer should really be involved in the

18   investigation and do her own inquiry as to what happened and

19   then make the referral and then get the information back from

20   either CID or IAD.  And it would be her responsibility, unlike

21   CID or IAD, to ensure that the detainee's mental health issues

22   related to the PREA incident are addressed and their comfort

23   level and their safety in the facility.

24   Q.   I think you mentioned "this should be the way it works,"

25   but what is actually happening?

1   A.   Well, it has really changed over time.  And most

2   recently, I'll certainly be looking at the next site visit in

3   terms of where they're at.  But the PREA coordinator had been

4   out since I believe mid-July through sometime in December, I

5   think, or early January.  And during that time, there were

6   PREA incidents that weren't investigated.  There was no

7   education of inmates being done.

8        It was reported that there was some training on PREA in

9   the cadet academy.  We haven't received the curriculum yet to

10  confirm that.  So in this time period, there has not been much

11  PREA compliance.

12  Q.   Have you requested the training curriculum for the cadet

13  academy?

14  A.   Mr. Parrish has.

15  Q.   And that curriculum, is that for the entire basic

16  academy?

17  A.   I believe so.

18  Q.   Have they ever produced such a training curriculum?

19  A.   Not pursuant to the recent request.

20  Q.   Have the defendants implemented the consent decree

21  provisions on grievances?

22  A.   They're relatively close on grievances, but as has been

23  mentioned, there are still an unacceptable number that receive

24  no response and receive late responses, a number that are

25  denied as not being grievances, and a number that are accepted

1   as a grievance but don't have an appropriate response.

2   Q.   What impact, if any, does this have on the safety of

3   detainees?

4   A.   Well, if grievances aren't responded to, it potentially

5   affects the safety of that individual who submitted that

6   grievance.  But it also -- it makes it more difficult for the

7   facility to make improvements in response to those grievances.

8   Q.   And based on your most recent review, have the defendants

9   implemented the consent decree provisions on segregation?

10  A.   No.

11  Q.   And in what way have they failed to meet the requirements

12  for segregation?

13  A.   Well, a lot of those are mental health requirements, and

14  I think Dr. Dudley addressed them to a great extent.  But

15  the -- it requires the involvement of the mental health staff

16  before placing an individual in segregation.  It requires the

17  involvement of the mental health staff in disciplinary

18  proceedings that result in segregation.  And it requires

19  well-being checks, I believe at 30-minute intervals, which are

20  not being done.  And I think there are others that I'm not

21  remembering right now.

22  Q.   And these are things that are or are not being done?

23  A.   Are not being done.

24  Q.   And what impact does this have on the detainees?

25  A.   Particularly the individuals with mental illness end up

1    largely being housed in segregation and it can result in

2    decompensation of their mental status.

3    Q.   Does the consent decree -- let's move on to another area.

4    Does the consent decree require defendants to place juvenile

5    charged as adults at Henley-Young?

6    A.   Not at Henley-Young, but not in a facility with adult

7    individuals.

8    Q.   So whatever facility they use, are there requirements for

9    what that facility must be able to provide the juveniles?

10   A.   Yes.

11   Q.   Have the defendants implemented the consent decree

12   provisions regarding juveniles charged as adults?

13   A.   No, I rely on Mr. Moeser for that area of the report, but

14   I know from his submissions that they are not in compliance.

15   Q.   And why are they not in compliance?

16        MR. SHELSON:  Objection.  She's not qualified to

17   address this.  She just admitted it.

18        THE COURT:  Objection overruled.  She said she relies

19   on Mr. Moeser to come up with her conclusions.  She said

20   that's his part of the report.  That's part of what he does in

21   reporting to her; right?

22        MR. SHELSON:  Right.  And if she's just repeating what

23   Mr. Moeser said, then I object to hearsay.

24        THE COURT:  Objection overruled.

25   A.   So the issues with respect to the JCAs and Henley-Young

```
 1   are not all that different from many of the issues at RDC:  A

 2   lack of staffing, lack of supervision, lack of programming,

 3   some physical plant issues.

 4   BY MR. CHENG:

 5   Q.   What harm, if any, does the failure to comply with the

 6   provisions have on these juveniles?

 7   A.   It potentially places the juveniles at risk of harm,

 8   certainly physical harm, but also institutionalization,

 9   decompensation, impact on their mental health.

10   Q.   The next area I'd like to talk about is unlawful

11   detention.

12        MR. CHENG:  I'm going to go through it in a little bit

13   more detail, Your Honor, so I don't know if this is a good

14   time --

15        THE COURT:  This is a good time for us to take our

16   afternoon break.  It's about 3:26.  We'll take about

17   20 minutes.

18        Ms. Simpson, you may step down.

19        THE WITNESS:  Thank you.

20        THE COURT:  We're in recess.

21            (A brief recess was taken.)

22        THE COURT:  You may be seated.

23        Ms. Simpson, you can return to the stand.

24        THE WITNESS:  Your Honor, I forgot my reading glasses.

25        THE COURT:  Okay.  You can step down.
```

1    MR. CHENG:  Can you hear me?

2    THE WITNESS:  Yes.

3  BY MR. CHENG:

4  Q.  All right.  Thank you.  Ms. Simpson, does the consent

5  decree have provisions requiring them to prevent the unlawful

6  detention of detainees?

7  A.  Yes.

8  Q.  Can you summarize what that requires?

9  A.  It requires that the appropriate paperwork be provided at

10  the time of booking that warrants the booking and that people

11  be released the day they're entitled to release.  And it also

12  has a number of provisions related to fines and fees and the

13  appropriate paperwork for fines and fees.

14  Q.  And when you say "the appropriate paperwork," why does

15  paperwork matter for these types of issues?

16  A.  In order to have clear documentation that taking the

17  person into custody is warranted.

18  Q.  And do you review that documentation for your site

19  visits?

20  A.  Yes.

21  Q.  Historically, did this jail have any issues with people

22  being unlawfully detained?

23  A.  Yes.

24  Q.  Now, what types of problems did they have?

25  A.  They had people that were booked in without an arrest

1    report that might have been promised later.  They had issues

2    of holding people based on a hold that they had no paperwork

3    to support.  The fines and fees issue --

4             THE COURT:  Is there an objection?

5             MR. SHELSON:  Yes, sir.  The objection is that it's not

6    established that the historical period she's talking about is

7    the monitoring period.  Because it's outside the monitoring

8    period, there's no foundation.

9             THE COURT:  Okay.  Thank you.

10            Yes.  Confine your -- well, for historical purposes,

11   you can go beyond that, but we need to know specifically -- we

12   need to know what your testimony is about what has happened

13   since the consent decree has been in place.

14            MR. CHENG:  So if she could finish then just on the

15   historical piece, at least.

16   BY MR. CHENG:

17   Q.   And if proper, try to keep it within the period when

18   you're actually on the case.

19   A.   So these were things that we were seeing at the beginning

20   of the monitoring period.

21   Q.   And you mentioned fines and fees issues.  What were

22   those?

23   A.   That a number of people were being held on fines and fees

24   without the underlying finding by the Court that the failure

25   to pay was willful.

```
 1   Q.   Were there also issues with people being in the jail for
 2   long periods of time without being unindicted?
 3   A.   Yes, and there still is.
 4   Q.   And did any of these issues raise concerns with other
 5   stakeholders besides the defendants themselves?
 6   A.   I would say most of the stakeholders in the criminal
 7   justice system, such as the circuit court, the public
 8   defender, and the district attorney are concerned about the
 9   length of time before indictment.
10   Q.   Are these stakeholders included in the CJCC?
11   A.   Yes.
12   Q.   Would addressing unlawful detention of detainees be
13   something that should be brought up with the CJCC?
14   A.   If there are system issues, yes.
15   Q.   If we could bring up Plaintiff's Exhibit 19.  It's
16   sealed, but I believe you have it on the binder.
17   A.   Yes.
18   Q.   Do you recognize Plaintiff's Exhibit 19?
19   A.   Yes.
20   Q.   And what is that document?
21   A.   This is the list that they keep to track indicted and
22   unindicted individuals in the jail.
23   Q.   And when you talked earlier about the numbers of people
24   who are in the jail who were unindicted, is this one of the
25   documents you relied upon to form your opinion?
```

```
 1    A.   Yes.
 2         MR. CHENG:  Your Honor, I move for the admission of
 3    Plaintiff's Exhibit 19.
 4         THE COURT:  What says the defendant?
 5         MR. SHELSON:  No objection, Your Honor.
 6         THE COURT:  Okay.  P-19 will be received in evidence
 7    and it's under seal.
 8              (Plaintiff's Exhibit 19 entered.)
 9    BY MR. CHENG:
10    Q.   So when you look at these types of lists, you know, what
11    conclusions, if any, have you drawn about sort of length of
12    stay of detainees in the jail?
13    A.   Well, the -- you can compute the average length of stay
14    with a particular formula.  And I worked with the IT person
15    and the prior -- a prior court liaison, Kenny Lewis, and
16    figured out the length of stay in Hinds County jails.  And
17    their length of stay, average length of stay approaches
18    50 days, a little bit less than that.  It varies over time.
19    But that's about twice the national average.
20    Q.   And what consequence, if any, does it have on their
21    ability to comply with the consent decree?
22    A.   Well, having individuals stay in a jail that long on
23    average impacts a lot of things.  I mean, it means your
24    population is -- is high, because it's not turning over.
25    People are not being released as one -- as quickly as one
```

1   would expect them to be.  And so the higher your population,

2   the more staff you need to supervise that population.

3        It also has an impact over time, in that the longer

4   individuals who are considered low or moderate risk stay in a

5   jail the more likely their recidivism is.  Certainly for

6   people with mental health disabilities, it can result in a

7   decompensation and so.

8   Q.   Let's talk a little bit about one particular issue, the

9   issue of people who are overdetained.  During this site visit

10  did you assess the issue of overdetention?

11  A.   Yes.  I look for that every site visit.  A lot of times

12  the files I review are randomly selected, but I also look at

13  files where there's, I would say, a red flag, either because

14  of a grievance or a program request or something in a file

15  audit.  And so based on that, I identify usually around 25

16  files that I review, usually with -- almost always with

17  Sergeant Tillman.  So I sit down with her, and if in-person we

18  go through the paper files in the JMS.  If remote, she goes

19  through those paper files and looks things up on the JMS.

20       So I did that on this visit and located six people that

21  appeared to have been overdetained.

22  Q.   When you say "overdetained," about how much were they

23  overdetained by?

24  A.   The one with the lengthiest overdetention was 16 days.

25  At the last site visit, there was someone who had been

1140

1    overdetained by two months.  But this time it was -- 16 days

2    was the max.

3    Q.   Was there any jail system issues associated with this

4    overdetention issue?

5    A.   There are a couple of ways that there are system issues.

6    One is an odd quirk in the JMS system, where if you look up

7    the release date or if you calculate the release date from the

8    date that appears on the jacket screen, you will get a

9    different release date than if you calculate it based on the

10   charge screen.  And so there was some decision as to what

11   screen was supposed to be used for that.  And in one instance,

12   the wrong screen was used.  In the other incident involving

13   that, no matter which screen you looked at, the person was

14   overdetained.

15   Q.   And what type of tracking systems do they have to try to

16   monitor their detention dates?

17   A.   Well, one of the issues at RDC is that they don't have a

18   tracking system for people completing sentences at RDC.  The

19   JMS system does not flag sentence release dates, and they

20   don't have a spreadsheet on that.  They -- it was described

21   that they just have to remember who's there on a sentence.

22   And most sentence individuals are there at the work center,

23   but there are some at RDC.

24        So another system issue is that the JMS system, like with

25   sentences, does not flag when people have completed the

1   21 days for probation violations.  Probation violators are

2   supposed to go before -- have a probation hearing before

3   21 days, and when that 21 days runs, they're supposed to be

4   released if they haven't had a hearing.  And there's no

5   system -- no way in the JMS system that they can flag that.

6   So a number of the overdetentions are in the area of the

7   probation violations.

8   Q.   Are there any data quality issues with their systems for

9   tracking overdetentions?

10  A.   There are.  For example, with the probation violations,

11  if some appear -- according to Sergeant Tillman, some booking

12  clerks will enter the probation violation as a charge, and

13  some will enter it as a hold.  And so it's not possible to run

14  one report out of the JMS system showing who all is in on a

15  probation violation.  There also have been issues with holds

16  being properly entered and being followed up on in a timely

17  manner, and then there are -- I mean, the individual that was

18  released two months late in the last reporting period, he had

19  a release order come in that just hadn't been entered.

20  Q.   Do staffing or policy or training issues have anything to

21  do with these types of problems?

22  A.   Yes.  You know, the policies don't get to the level of

23  detail of how you enter a particular item, but there had been

24  a booking and release manual that was developed by now a

25  former employee and that had a good level of detail.  But

1   that's never actually been implemented, so that would

2   certainly be a good measure to make sure that the entering of

3   information is more accurate and consistent.

4   Q.   Why was it never implemented?

5   A.   It's unclear.  I have not had a clear answer to that.

6   Q.   When somebody's overdetained, do they do an incident

7   report?

8   A.   It's required by the settlement agreement, but, no.

9   Q.   So I guess is that, no, that it's not required by the

10  settlement, or that they don't do the incident reports?

11  A.   It is required by the settlement agreement.  We have

12  raised it repeatedly that no incident reports are being

13  prepared for overdetention.  They still haven't.

14  Q.   You talked about sort of the history of the unlawful

15  detention provisions.  Are there other problems that have

16  existed historically that continue to this day?

17  A.   Well, there's also an issue of mistaken or unauthorized

18  releases that have occurred in the past and continue to occur.

19  Q.   What are ins and outs?

20  A.   An in-and-out is where somebody is booked in on an arrest

21  report that says, "Hold for X hours and then ROR."

22  Q.   What's "ROR"?

23  A.   Release on own recognizance.

24  Q.   Do you have any concerns about that practice?

25  A.   Yes.  I would not consider that to be an authorized

1    release.

2    Q.   And why is it not an authorized release?

3    A.   When somebody is booked into the jail, it typically takes

4    a court order for them to be released.  There is such a thing

5    as delegated release authority, and that requires either a

6    state statute or a court rule or a court order that gives the

7    authority to the jail, or sometimes a pretrial agency, to

8    release individuals in certain conditions.  But a police

9    officer does not have the authority to authorize the release

10   when somebody is booked.

11   Q.   So if an officer is the one who authorizes release, why

12   does anyone care whether a court has to approve it or not?

13   A.   Well, one, it's, I would say, a legal requirement.  But,

14   two, it really requires the judicial determination that

15   somebody is entitled to release.  And they may release

16   somebody that is dangerous.  And, you know, it's a court that

17   should be making that decision or a danger to themselves.

18   Q.   But if the officer thinks the person can be released on

19   their own recognizance, aren't they still letting the person

20   go free?

21   A.   They are letting the person go free.

22   Q.   So who gets to make that decision to let them go free?

23   A.   Well, what's happening is that the jail is releasing them

24   on the authority of the arresting officer when that officer

25   doesn't have the authority to give that.

```
 1   Q.   Does that raise any concerns about the original arrest
 2   and booking into the jail?
 3   A.   No.  If there's a valid arrest report, it's a proper
 4   booking.  It's just not an authorized release.
 5   Q.   And about how often do you see ins and outs at the jail?
 6   A.   I don't know.  From talking with jail personnel, it's not
 7   uncommon, but I can't quantify it.
 8   Q.   Is this something you intend to assess more carefully in
 9   the future?
10   A.   Yes.
11   Q.   And why do you think it needs to be more carefully
12   assessed?
13   A.   Well, partly because the settlement agreement requires
14   the proper paperwork for booking and for release.  It also
15   exposes the sheriff's office to liability if they're releasing
16   somebody who they're not authorized to release and something
17   could happen to that individual or someone else.
18   Q.   What if the issue is the arrest report is flawed, would
19   that be a potential risk as well for the sheriff?
20   A.   I'm sorry.  Could you repeat that?
21   Q.   If there's a problem with the original arrest report or
22   the police officer's arrest, would that create an issue for
23   the sheriff and the jail as well?
24   A.   Yes.
25   Q.   Why would there be a problem there, too?
```

1    A.   Well, if the paperwork doesn't support the booking, then

2    that person is being falsely imprisoned.

3    Q.   Would that be -- when you say "falsely imprisoned," what

4    do you mean by that?

5    A.   That there's not a lawful basis to hold the individual,

6    and the sheriff's office is potentially liable.

7    Q.   And are they tracking these detentions that they hold for

8    X hours and then release on their own recognizance?

9    A.   Not that I know of.  It came to my attention because I

10   was looking at a classification record, and on the front of

11   it, it said, "In and out."  And so I questioned the

12   classification supervisor as to what that meant, and she

13   described that.  I have not seen any paperwork that lists the

14   ins and outs.

15   Q.   This type of issue, is it just a technical issue, or does

16   it have any impact on the rights of detainees?

17   A.   Well, certainly people that are overdetained or -- or not

18   properly booked in the first place have -- are harmed by the

19   overdetention or the booking.

20   Q.   Do you know what the current population is of the jail?

21   A.   I think the total is around 600.

22   Q.   Let's talk next about the medical and mental health care

23   provisions.  Is there a separate medical or mental health

24   section in the consent decree or stipulated order?

25   A.   No, there is not.

1  Q.   Are there provisions in other sections?

2  A.   Yes.

3  Q.   Have the defendants implemented the consent decree

4  provisions regarding medical and mental health care?

5  A.   Not all of them, no.

6  Q.   Have they provided training for staff assigned to the

7  mental health unit?

8  A.   No.  Well, they provided the first segment of the

9  training but not the second two segments.

10  Q.   Have they opened the mental health unit?

11  A.   No.

12  Q.   What impact, if any, does inadequate medical -- does

13  inadequate mental health training for staff have on detainees?

14  A.   In a number of ways.  One is they might not refer

15  detainees to mental health when a referral would be

16  appropriate because they're not recognizing the symptoms.

17  They might perceive behavior as more of a disciplinary issue,

18  and if they don't recognize that that behavior is the result

19  of a mental health issue, they might not properly recognize a

20  suicidal detainee.

21  Q.   Does it have any impact on some of the issues you brought

22  up earlier in the quality assurance report about conditions in

23  segregation?

24  A.   Yes.

25  Q.   And in what way?

```
 1    A.   Well, it would suggest that the individuals with severe

 2    mental illness in their housing unit are not getting the

 3    supervision that they need in order for them not to be

 4    victimized.

 5    Q.   When you say "supervision," does that include security

 6    supervision?

 7    A.   Yes.

 8    Q.   And in what way does security supervision affect whether

 9    people with mental illness lose weight or lie in their feces

10    or live in those conditions?

11    A.   Well, those conditions should be observed by the housing

12    officer and a referral made to the mental health staff if

13    it's -- somebody's covered in feces and sores, that should be

14    observed and referred.

15    Q.   Even if they're referred, how do you address those types

16    of issues in the context of a jail?

17    A.   Well, ideally you have a mental health unit and

18    individuals like that would be placed on the mental health

19    unit where there's specially trained staff and a much higher

20    level of mental health services.

21    Q.   And have there been significant delays in getting

22    therapeutic housing programs for people with serious mental

23    illness?

24    A.   Yes.

25    Q.   And can you describe what those delays have been in this
```

1148

1    case?

2    A.   Well, we started talking about a mental health unit.  I

3    think back in the beginning of 2020, or if not before, when

4    there was discussion about renovations, and that during the

5    renovations, that would be the perfect time to renovate one of

6    the units as a mental health unit.  And so we were originally

7    talking about one of the units in C-pod because that was the

8    first to be renovated.  And the decision was made not to

9    include the mental health unit in C-Pod, so that meant it had

10   to wait until B-Pod was renovated.  And -- and the -- the unit

11   that's been designated to be the mental health unit is not

12   ready for occupancy, and it doesn't have the needed

13   furnishings for opening the unit as a mental health unit.

14       And then as we've talked about, the officers haven't been

15   trained and -- to work on the mental health unit.  And right

16   now there's a significant shortage of medical and mental

17   health staff, so it really isn't sufficient mental health

18   staffing to open it either.

19   Q.   Let's move on to another area.  Have the defendants

20   implemented the consent decree provisions requiring continuous

21   improvement and quality assurance?

22   A.   Not -- not entirely.

23   Q.   What still needs to be done?

24   A.   Well, there are specific requirements within those

25   paragraphs that are not fully implemented.  The -- the work of

1 the quality assurance coordinator has been very good.  Her

2 reports are very thorough and analytical.  There are missing

3 data points, and also unfortunately the data that appears in

4 the reports, the underlying data, even though her narrative is

5 good, the underlying data is often very incorrect.

6      So, for example, in December she reported there had been

7 two uses of chemical spray during the month when, in fact, if

8 you review the incident reports, there actually had been eight

9 uses of chemical spray.  The same was true with fires and

10 assaults, that her numbers were significantly off.  And the

11 provisions require a little more data compilation than what

12 she's doing.

13 Q.   And who is this quality assurance officer?

14 A.   Her name is Priscilla Dawson.

15 Q.   What impact did these deficiencies have on the

16 defendants' ability to self-correct a dangerous or

17 unconstitutional condition?

18 A.   Well, you really have to know what's going on in the jail

19 in order to address any problems.  So having the numbers on

20 the use of chemical spray be four times off is a significant

21 difference.

22 Q.   Under the consent decree are defendants supposed to do

23 annual reassessments of their own compliance?

24 A.   I believe so, yes.

25 Q.   Are they doing that?

1    A.   Not that I've seen.

2    Q.   Are they supposed to do periodic reviews of their own

3    policies and procedures, even the ones that have been

4    approved?

5    A.   Yes.

6    Q.   Have they been able to do that?

7    A.   No.

8    Q.   What happens if somebody doesn't review their own

9    policies and procedures?

10   A.   Well, then they don't get updated if they need to be

11   updated, and there may have been problems or it may be -- it

12   may become apparent that certain aspects of a policy aren't

13   implementable, and there has to be some look to revise them.

14   Q.   When the sheriff brought more Tasers into the facility,

15   would that be an issue that would warrant a policy review?

16   A.   Yes, because they hadn't been there before.  Even though

17   the policy addresses electronic devices, there -- it wasn't

18   really fully thought out whether all of the things needed for

19   implementation of that were in the policy.

20   Q.   And what types of things would you have addressed in a

21   policy review over the use of Tasers?

22   A.   I think you'd want to do some of the things we talked

23   about before.  You'd want to make sure it included inventory

24   review training for those officers that are allowed to carry

25   them, whether they should be maintained in the armory or, you

1  know, be on person at all times, and who those persons would

2  be.

3  Q.   So did the sheriff's department consult with you before

4  bringing in more Tasers?

5  A.   No.

6  Q.   Let's move on to the CJCC.  I know we talked about it a

7  bit, so let's go into it a little more depth.  Have the

8  defendants implemented the consent decree provisions regarding

9  the Criminal Justice Coordinating Committee?

10 A.   Not entirely.

11 Q.   In what way have they not implemented the provisions?

12 A.   Well, the provision for the CJCC requires that it have

13 sufficient expertise to do the work of the CJCC, and they do

14 not have a staff person who is doing the sort of data

15 compilation and analysis and sort of research on best

16 practices and providing that staff support that gives it the

17 expertise that's needed for the stakeholders to make the

18 decisions they need to make.  It also requires -- the consent

19 decree also required that there be work specifically on

20 diversion programs.

21     I believe that was included in the strategic plan that

22 was done when JMI was still involved, but there has not been

23 any specific initiatives related to the diversion that have

24 been developed by the CJCC.  And it requires that the CJCC

25 consultant be kept on to implement the diversion strategies,

1    and that has not been done.

2    Q.   So this diversion program and JMI, is this the same JMI

3    that did not get to complete its project that you talked about

4    earlier?

5    A.   Yes.

6    Q.   Have you ever worked with a CJCC yourself?

7    A.   Yes.

8    Q.   And can you describe sort of how that process worked?

9    A.   Well, when I started with Bernalillo County, there was --

10   it was coincidentally at the same time that there was

11   legislation creating a body that -- within Bernalillo County

12   that was much like a CJCC, although it wasn't called that, and

13   so when I started working on criminal justice reforms, I

14   worked very closely with the CJCC and created what we called

15   the core working group which was a working group of --

16   eventually became called the committee of the CJCC, and we

17   worked through the nuts and bolts of a lot of initiatives to

18   improve the system and reduce the jail population.

19        I also -- as I was describing, as needed -- did a lot of

20   research on best practices.  I worked with some data people to

21   compile data that we needed.  I wrote grant proposals.  We

22   eventually became an official CJCC and did articles of

23   incorporation and joined the national CJCC network, *et cetera*.

24   Q.   So this sort of network of sources, did you connect the

25   defendants to any of these networks for technical assistance?

1   A.   Well, JMI is certainly -- would have been in a position

2   to continue providing that kind of technical assistance.   I

3   also connected them to the National Institute of Corrections

4   that has training and has a lot of resources, but has training

5   for pretrial services programs and directors and -- and I --

6   I'm trying to think.   Certainly some web-based resources in

7   that regard.

8   Q.   And what type of follow-up did the County do or the

9   defendants do with this type of technical assistance?

10  A.   Well, the national CJCC network has some very good

11  resources on their website regarding what a CJCC should look

12  like and the importance of staffing a CJCC and what that

13  staffing should look like.   There's no indication that the

14  defendants reviewed or relied upon those to work with the

15  CJCC.

16  Q.   Let's talk about that staffing issue.   Have you

17  recommended that they staff the CJCC?

18  A.   Yes.

19  Q.   And what did you mean by staffing of the CJCC?

20  A.   Well, as I described, there needs to be staff that sort

21  of research the data and the best practices to develop

22  initiatives that would improve the criminal justice system and

23  potentially reduce the jail population.

24  Q.   And who would the staff report to, or who would they give

25  their information to?

1154

1    A.   It can -- it's done in various ways in various

2    jurisdictions, but they can potentially be under the Court.

3    They can be under the County.  They can be under the City.

4    The jurisdiction itself would decide where they want to locate

5    them.

6    Q.   Have they assigned employees from the sheriff's

7    department to work on the CJCC?

8    A.   Yes, there is one individual that's assigned.

9    Q.   So does that count, in your view, to staffing?

10   A.   No.  For one thing, she has a lot of other duties, and so

11   she really has not performed the things that I've described in

12   terms of data analysis and researching and presenting that

13   information to the CJCC.  What I've seen of her work, it's

14   been more ministerial, keeping minutes, setting an agenda,

15   *et cetera*.

16   Q.   Scheduling?

17   A.   Scheduling.

18   Q.   So you talked about sort of their noncompliance with the

19   CJCC committee provisions.  What impact does this

20   noncompliance have on jail conditions?

21   A.   Well, the goal of CJCC -- well, the CJCC has to set its

22   own goals.  And there is a strategic plan that was developed

23   under JMI, and it includes diversion.  And I believe it also

24   includes a pretrial services program, and both of those things

25   impact conditions in the jail in that they might reduce the

1   population of the jail so that it's not too -- gets them down

2   to a number where they might be able to provide appropriate

3   supervision.  But the diversion programs as well ideally

4   address the ability to get mentally ill individuals out of the

5   jail, and those individuals often provide particular

6   management problems.

7   Q.   When you assess the CJCC, have you required them to adopt

8   one remedy or another to reduce the population?

9   A.   No.

10  Q.   Have you assessed whether the CJCC is functional?

11  A.   Yes.

12  Q.   And does it appear to be functional to you?

13  A.   It has not.

14  Q.   Has the CJCC been meeting regularly in the last two

15  years?

16  A.   No.

17  Q.   And how often do they seem to meet?

18  A.   I don't know that there is a regular pattern.  I'd say at

19  best it's been -- well, they haven't had meetings with a

20  quorum, and it's been suggested that some meetings have taken

21  place with a small number of individuals and no minutes, and

22  then in some instances, a larger number of individuals but

23  still a lack of a quorum, so maybe an average of two a year.

24  Q.   Did you hear the defense counsel's question what the

25  County could do about making other CJCC members such as the

1  DA, the mayor the City, the city police to participate in the

2  CJCC?

3  A.   Yes.

4  Q.   Is there anything the County can do, the defendants can

5  do to make the CJCC more effective?

6  A.   Well, again, I would go back to staff, professional staff

7  that engages with the stakeholders and develops initiatives

8  that make it in the interest of the various stakeholders to

9  participate.

10  Q.   And are there things that the County itself could do to

11  improve its own practices that would make the CJCC a useful

12  tool?

13  A.   Well, I think it's important that they provide leadership

14  in participating in the CJCC.  I think at the last CJCC

15  meeting there was participation by the sheriff and the County

16  administrator and the jail administrator.  There hasn't always

17  been participation by all of those individuals in the past.

18  Q.   Does the stipulated order include more specific

19  requirements for the CJCC?

20  A.   It does include a requirement to hire a pretrial services

21  director and implement a pretrial program and hire a

22  consultant to assist in the development of that program.

23  Q.   And what is the compliance status with the defendants of

24  this provision of the stipulated order?

25  A.   This past November they hired a person to be the pretrial

1    services director.  She has not yet received the training that

2    she needs, and there's no consultant to assist her in

3    implementing the program.  And even what they have done is far

4    overdue under the stipulated order.

5    Q.   You believe defendants have made a good faith effort to

6    address their criminal justice issues through the CJCC?

7    A.   No.

8    Q.   If the defendants don't make a good faith effort to

9    address the criminal justice issues, what effects will that

10   have on their efforts to implement the jail reforms?

11   A.   Well, in almost anything impacting the number of people

12   in the jail, it requires the participation of other

13   stakeholders.  It can be all of them or some subgroup of them,

14   and so it's really important that there be a forum for

15   addressing the jail-related issues that require the

16   participation of other stakeholders.

17   Q.   Will their implementation of the diversion programs have

18   any effect on the mental health population of the jail?

19   A.   It should.  Typically that's the target population for

20   diversion programs.

21   Q.   Is there anything about Hinds County that makes that

22   particular issue worth attention?

23   A.   They have an unusually high percentage of people with

24   mental illness in their jail and pretty high acuity of

25   illness.  So in -- and people with mental illness tend to stay

1   quite a bit longer than people without mental illness.

2   Q.   Over the years you've been working with various

3   defendants.  Have they ever commented to you about issues with

4   state or community mental health programs that impact on the

5   jail?

6   A.   Yes.  There have been concerns about the length of time

7   it takes to get somebody into the state hospital.  That's been

8   an issue.  There is an issue with -- even though Hinds County

9   Behavioral Health is a good organization, there's is an issue

10  with there being sufficient services and appropriate services

11  in the community to address this population.  There's also an

12  issue of trying to develop a program with Hinds County

13  behavioral health where they come in and do their initial

14  assessments in the jail so that there can be a more smooth

15  transition into the community.

16  Q.   Is that a discharge planning issue?

17  A.   It's a discharge planning issue, but it's also sort of

18  what's considered in-reach that discharge planning very often

19  refers more to identifying the services a person needs in the

20  community and referring them to those services.  A good

21  transition program also has in-reach where the community

22  provider comes into the jail so that the person is introduced

23  to that provider and is already in their system prior to

24  release.

25  Q.   You may have heard defense counsel allude to the sheriff

1   having officers in the field and questioning whether

2   Mr. Parrish understood what other priorities the sheriff's

3   department may have in the community.  Do you recall that?

4   A.   Yes.

5   Q.   If the defendants don't implement the CJCC, could there

6   be any impact on local public safety or the criminal justice

7   system generally?

8   A.   Yes.  Well, first of all, I would think -- I would

9   consider the detainees and staff within the jail to be members

10  of the public, and so their -- some of these initiatives would

11  impact their safety.  In addition, as I mentioned before,

12  there's very good research that if low- and medium-risk

13  individuals are held in the jail for even relatively short

14  periods of time as opposed to being released more promptly,

15  there's an amazingly high incident of recidivism, and

16  certainly with respect to mental health individuals, the --

17  the risk to both that individual and the public is enhanced

18  without getting them diverted into appropriate programs.

19  Q.   You talked earlier about in and outs when an officer

20  arrests someone, and then they're released on their own

21  recognizance?

22  A.   Yes.

23  Q.   Does that have any potential effect on public safety if

24  it's not done correctly?

25  A.   Yes.  I mean, you know, there's a process that exists for

```
 1    a reason, and that's -- a judge makes that decision, or it's
 2    delegated to the jail with specific criteria.  So if that
 3    decision is being made without those safeguards, there's a
 4    potential that somebody is released that poses a risk to
 5    public safety.
 6    Q.   When you talked about delegation to the jail, what are
 7    the type of standards that could be used to delegate to the
 8    jail?
 9    A.    Typically the release authority delegated would include
10    the specific type of charge that can -- the person can be
11    released on and infrequently some criteria related to the
12    individual's criminal history, like perhaps it's their first
13    offense or maybe only limited prior low-level offenses, so
14    that's the type of document order Court rule that you would
15    expect to see that delegates release authority.
16    Q.   So when you say "delegate release authority," who does
17    the delegating?
18    A.    The court.
19    Q.    Is it something that can sort of be done by local
20    officers?
21    A.    No.
22    Q.    Have you ever heard that at the jail they have some
23    issues with people charged with domestic violence, that
24    there's some rule about whether they can release people
25    charged with domestic violence?
```

1   A.   I heard testimony sort of related to that.

2   Q.   Would that be a category that could be covered by some

3   type of policy on who can be released or not released?

4   A.   Yes.  I mean, when the delegated release authority is

5   fleshed out it could exclude the authority to release

6   individuals charged with domestic violence.

7   Q.   And would this be the type of issue that should be

8   brought up with the CJCC?

9   A.   It's an issue that certainly could be.

10  Q.   Have they actually tried to address this type of issue

11  with the CJCC?

12  A.   The domestic violence issue?

13  Q.   Yes.

14  A.   Not that I know of.

15  Q.   I'm going to talk more generally about the stipulated

16  order.  Have the defendants implemented the stipulated order?

17  A.   Some provisions of it, but not in its entirety.

18  Q.   And in your monitoring reports you describe what they

19  have complied with and what they haven't complied with?

20  A.   Yes.

21  Q.   To the extent they have not implemented the stipulated

22  order what harm or serious risk of harm will result or could

23  result from this failure?

24  A.   Well, there's a number of provisions, so different harm

25  might result from different provisions.  You know, for

1    example, they're not supposed to be using the individual cells

2    in booking for housing without having changed the doors to

3    include a way to see in to those cells.  The idea was once C4

4    opened, they wouldn't use those individual cells at all.  But

5    if they are using them they're supposed to have the window so

6    it can be seen in.

7        So, you know, without that, bad things can happen,

8    including the suicide that happened there last spring.  You

9    know, the sort of failure to renovate the pods in the time

10   frame that was set forth in the stipulated order certainly

11   contributes to harm in that, you know, they still have

12   detainees in A-Pod without -- without doors that lock, so and

13   so on.

14   Q.   Were there also requirements for staffing or jail

15   leadership?

16   A.   Yes.

17   Q.   And did they comply with those provisions?

18   A.   The -- I think it required that they post -- they revise

19   the jail administrator position and post that, which they did.

20   And then the -- I can't remember if that hiring process was

21   timely.  So that's what I remembering.

22   Q.   Was that the process that led to hiring Ms. Bryan?

23   A.    It resulted in the hiring of, they called him

24   Warden Fielder first.  And then he left the position and then

25   Major Bryan was hired in it.

```
1    Q.   Did they go through that process for hiring Mr. Shaw?
2    A.   I don't know that the position was posted that I'm aware
3    of.
4    Q.   So if it wasn't posted would it have been in compliance
5    with the stipulated order?
6    A.   I don't believe so.
7    Q.   Did they implement the pretrial services provisions of
8    the stipulated order?
9    A.   Well, they have now hired a pretrial director.  That was
10   very much after the deadline included in the pretrial -- in
11   the stipulated order.  And they did not hire or contract with
12   a consultant to assist with that implementation.  And so the
13   other provisions related to pretrial are similarly overdue.
14   Q.   And was Mr. Rivera's hiring also covered by the
15   stipulated order?
16   A.   It is, yes.
17   Q.   And were there any delays with implementing that
18   provision?
19   A.   There weren't any delays.  As I've mentioned, the County
20   did not contract with him, but they agreed to pay for his
21   services through my contract.
22   Q.   Let's go back to pretrial services.  The current pretrial
23   services director, did you mention something, did you say
24   something about they need -- they were going to go get some
25   more training?
```

1    A.   The stipulated order requires that they participate in

2    the NIC training for new pretrial services directors.

3    Q.   And before the new director gets the training is the

4    director qualified to provide or develop a pretrial services

5    program?

6    A.   Well, she's not really knowledgeable about what a

7    pretrial services program is.  You know, there's not a program

8    running right now.  So as its developed she would hopefully

9    develop that knowledge base.

10   Q.   If we could pull up Plaintiff's Exhibit 76.  And it might

11   be easier to go through 76 through 83 in the binder, if you

12   could go through those at once.

13   A.   Yes, I have it.

14   Q.   Do you recognize Plaintiff's Exhibit 76 through 83?

15   A.   Through 83 did you say?

16   Q.   Yes.

17   A.   Yes.

18   Q.   Actually, let me correct.  That's actually Plaintiff's 77

19   through 83.

20        Do you recognize Plaintiff's Exhibit 77 through 83?

21   A.   Yes.

22   Q.   And what are those exhibits?

23   A.   Those are some resources that I provided to the

24   pretrial -- the new pretrial services director, as well as

25   Ms. Tanecka Moore.

1   Q.   And have you provided these materials before to

2   defendants?

3   A.   Most of them, yes.

4   Q.   And why did you provide these materials?

5   A.   They provide a pretty good basis for understanding pretty

6   -- a pretrial services program and how to develop one and what

7   it includes.

8   Q.   Who else have you shared this type of technical

9   assistance material with over the years you were serving as

10  monitor?

11  A.   I provided it to the County administrator Carmen Davis

12  and the person who was designated at one point to work on a

13  pretrial program, Kenny Lewis.  I believe I've provided it to

14  counsel when I provided it to Ms. Davis, and then to

15  Ms. Moore, and then ultimately to Ms. Boykins (phonetically).

16  Q.   And what progress, if any, did they make with the

17  pretrial program when you provided these materials?

18  A.   None really.

19  Q.   Did they do anything with your recommendations about

20  pretrial services?

21  A.   Well, they did hire somebody recently to serve as the

22  pretrial services director but -- and Ms. Moore did submit an

23  application to be a learning site for pretrial, but that

24  application was denied.

25  Q.   Why was it denied?

1166

```
 1   A.   Because the -- it didn't have the support of the city of
 2   Jackson and the Jackson Police Department is what we were
 3   told.
 4   Q.   Can you describe what each of these documents, in a
 5   summary way, what they are for or why you think they're
 6   useful?
 7   A.   Well, the link to the advancing pretrial implementation
 8   guide is sort of different modules that actually walk a
 9   jurisdiction through implementing a pretrial program.
10        MR. CHENG:  If I could interrupt.  I understand
11   Dr. Dudley and Mr. Moeser just got cutoff from Zoom.  Can we
12   maybe -- right now for a moment --
13        MS. SUMMERS:  I know.  I was waiting for you to --
14        MR. CHENG:  Does that work or we can continue?
15        THE COURT:  Just hold on for a second.
16        MR. CHENG:  May I continue?
17   BY MR. CHENG:
18   Q.   So going back, what are these different documents you're
19   providing to the County?
20   A.   So I don't know if you want me to go through them one by
21   one, but they are -- well, one is a paper put out by the
22   chiefs of police recommending the use of pretrial services
23   programs.  It's somewhat dated, but I don't know that there's
24   been a subsequent document by the International Association of
25   Chiefs of Police.  And when Ms. Moore indicated that one of
```

1   the difficulties was that the chief of police didn't support

2   the pretrial program, I sent her this document to share with

3   the chief of police that it's -- pretrial programs are

4   generally considered a better public safety measure than bail,

5   which is --

6   Q.   Is this the same chief of police who because of their

7   nonparticipation, the NIC assistance failed?

8          MR. SHELSON:  Objection.  Leading.

9          THE COURT:  Don't lead the witness.  Objection

10  sustained.

11  BY MR. CHENG:

12  Q.   Which chief of police are we talking about?

13  A.   The city of Jackson chief of police who reportedly did

14  not support the application for becoming a learning site.  The

15  other, sort of more generally, are kind of primers on what a

16  pretrial services program looks like, what risk assessment

17  entails.  And, yeah, they're pretty good primers.  The last

18  one I think is the National Association of Pretrial Services

19  Agencies standards on pretrial release.

20  Q.   So what are these organizations that you're getting the

21  materials from?

22  A.   It include the National Institute of Corrections, the --

23  Q.   Is that the federal National Institute of Corrections?

24  A.   Yes.  And the National Institute of Justice, I think the

25  Pretrial Justice Institute was the author of one of the

1    documents.  And the National Association of Pretrial Services

2    Agency was the author of one of them or the standards.

3            MR. CHENG:  Your Honor, at this time I move for the

4    admission of Plaintiff's Exhibits 77 through 83.

5            THE COURT:  Any objection from defendant?

6            MR. SHELSON:  No, sir.

7            THE COURT:  That's 77 through 83?

8            MR. CHENG:  Yes.

9            THE COURT:  They'll be received into evidence.

10           (Plaintiff's Exhibits 77 - 83 entered.)

11   BY MR. CHENG:

12   Q.   Let me cover a few things I need to follow up on.  You

13   talked earlier about Hinds County Behavioral Health?

14   A.   Yes.

15   Q.   In addition to people coming on-site, do health providers

16   also sometimes use virtual methods in order to provide

17   consultation or services in the jail?

18   A.   Yes.  In some jurisdictions they do.

19   Q.   Are there any issues with trying to provide those

20   services in this particular jail, the Hinds County Jail?

21   A.   I think one of the ideas with getting the additional

22   video kiosks that had been included in the new Securus

23   contract was that they could be used, not just for attorney

24   visits or personal visits, but also for medical and mental

25   health consultations.

1    Q.   What happened with that initiative?

2    A.   The contract was approved.  The units are not on-site at

3    this time.  I don't know the reason why.

4    Q.   We talked a little bit about in-reach.

5    A.   Yes.

6    Q.   Would video consultation be related in any way to

7    in-reach?

8    A.   In-reach could be done through video consultation.

9    Q.   Let me go -- let's go back to Plaintiff's Exhibit 76.

10   A.   That's about Tasers?

11   Q.   Yes.  I believe it was previously admitted as Plaintiff's

12   Exhibit 76.

13   A.   Yes.

14   Q.   Did you have any concerns when you heard about this issue

15   from Ms. Bryan?

16   A.   Yes.

17   Q.   And what were your concerns?

18   A.   Well, one concern was that the sheriff issued the

19   directive to Chief Simon instead of communicating with

20   Major Bryan.  The other concerns that Major Bryan raised in

21   this e-mail seem to be legitimate concerns.

22   Q.   We talked earlier also about the in and outs?

23   A.   Yes.

24   Q.   Would having a pretrial services or a pretrial program be

25   better than the in and outs approach?

1    A.    Well, it's not uncommon for pretrial services agencies to

2    have some form of delegated release authority.  It would still

3    require that there be a court order or a court rule that sets

4    forth what that delegated release authority is.  And it often

5    does include the ability of a pretrial agency to release

6    individuals.  Typically it's done after running the criminal

7    history and doing an interview, so that it would be based on

8    solid information.

9    Q.    What benefits would there be to having a pretrial program

10   instead of some of these other methods being used by the Hinds

11   County Jail for deciding who comes in and out of the jail?

12   A.    Well, there's usually a process, like I said, by which

13   they run the criminal history and they interview the defendant

14   and they communicate with the Court if there's a question.

15   And they -- and their authority is circumscribed by a document

16   from the court, so that it's consistent and, you know, within

17   the authority that's delegated.

18   Q.    Within the authority set by the court?

19   A.    Yes.

20   Q.    You mentioned earlier risk assessments.  What do risk

21   assessments have to do with the pretrial program?

22   A.    So typically what a pretrial services program does is

23   that it uses an objective tool to measure the risk that a

24   defendant poses on two scales.  One is risk of reoffense, and

25   the other is the risk of failure to appear.  And it usually

1   comes up with a numerical score.  Either one score that

2   encompasses both or, like, the Arnold Public Safety Assessment

3   has a different score for those two axes.  And then that

4   information is reported to the judge, so that the judge can

5   utilize that in making a release decision.

6   Q.   And would a system like that, you know, have any

7   advantages over, say not admitting misdemeanants?

8   A.   Yes, because there are potentially violent individuals.

9   There are individuals with a history, a criminal history that

10  would indicate likelihood of re offense.  And they might be

11  charged with a misdemeanor on that particular occasion.  And

12  so even though they're charged with a misdemeanor that may be

13  somebody that you don't want to release or the court doesn't

14  want to.

15  Q.   So would requiring the defendants to implement the

16  pretrial program requirements -- the stipulated order -- be of

17  any benefit to the local criminal justice system or public

18  safety?

19  A.   Yes.  You know, I mean, moving to a risk-based system of

20  making release decisions is definitely in the interest of

21  public safety.  And I -- obviously the judges currently are

22  making decisions based on the level of risks they perceive a

23  defendant to have.  But, you know, certainly the research is

24  that using an objective risk-based tool, a risk assessment

25  tool has proven more effective in actually identifying people

1    that pose a risk.

2    Q.   When you were discussing the in and out system, was there

3    any indication that the arresting officers make the same types

4    of assessments the judges make?

5    A.   Again, I think they're probably making a subjective

6    decision with respect to risk.  But like, with judges,

7    subjective decisions have proven less accurate than an

8    objective risk assessment tool.

9    Q.   And these objective risk assessments, do they gather any

10   information or additional information for that decision-making

11   process?

12   A.   Yes.  So, for example, the public safety assessment,

13   often called the Arnold tool requires extensive information on

14   the criminal history, how many prior convictions the

15   individual has, whether those convictions are for a violent

16   offense, how many prior FTAs, whether the person is under

17   supervision at the time of the alleged offense, and so on.

18   Q.   What's an FTA?

19   A.   A failure to appear.

20   Q.   Are pretrial systems are pretrial programs like you're

21   describing novel to Mississippi?

22   A.   Well, the federal court system adopted a pretrial program

23   I think back in the 1960s, so that's in existence.  I would

24   assume here in Mississippi, it's been part of the federal

25   system for decades.

1   Q.   Did you explain that to any of the defendants or their

2   staff?

3   A.   I think -- I know I talked about it with Ms. Boykin,

4   because I suggested she might consider visiting with the

5   pretrial program in the federal system here.

6   Q.   Have you told any of the County administrators?

7   A.   I believe I talked with Ms. Davis about it.

8   Q.   And who is Ms. Davis?

9   A.   Carmen Davis was the County administrator when we started

10  monitoring.  And I believe I had the conversation with

11  Ms. Barker and the compliance coordinator Synarus Green

12  regarding that, too.

13  Q.   I want to talk a little bit about sort of some of the

14  causes or issues that seem to affect the jail.  Have other

15  corrections professionals besides your team expressed concerns

16  about the dangerous systemic conditions in the jail?

17       MR. SHELSON:  I object, Your Honor, if she's going to

18  testify as to hearsay.

19       THE COURT:  Is that information part of her reports,

20  any of her monitoring reports?

21       MR. CHENG:  Some of it is.  I think I can make it a

22  little clearer on that issue.

23       THE COURT:  Okay.

24  BY MR. CHENG:

25  Q.   Have other corrections professionals working for the

1    sheriff's department expressed concerns about dangerous

2    systemic conditions in the jail?

3    A.   Yes.  I mean certainly Major Bryan has talked about that.

4    And that has been -- well, so for example, in the last quality

5    assurance report -- well, in most of the quality assurance

6    reports the QA officer has talked about dangerous conditions.

7    The January one was pretty stark in that she said that most of

8    the female officers won't go into housing unit A1 because of

9    their fear, and that she, in fact, had decided not to go in to

10   A1 because of her fear.  So, yeah, and we hear from other

11   officers as well that one of their concerns is the safety of

12   working there.

13   Q.   Is this something that just happened in the last year or

14   has it been a longer standing issue?

15   A.   It's been a longer standing issue.

16   Q.   How about lower-level staff?  Have you heard anything

17   from jail captains, lieutenants, or line-level officers

18   expressing concerns about the dangerous conditions in the

19   jail?

20   A.   Yes.  Well, like the comment in the QA report coming from

21   female officers that was lower-level officers.  And, for

22   example, there was an incident report in January where the

23   officer indicated feeling in danger because cells didn't lock

24   or didn't function -- cell doors.

25   Q.   And have staff actually walked out of the jail because of

1  the conditions?

2  A.   Yes, there was a walkout.  I think it was in November or

3  late October or early November.

4  Q.   You know, the defendants have now moved to terminate the

5  consent decree.  Are you aware of that?

6  A.   Yes.

7  Q.   Given the defendants' present course of action, do you

8  think their new jail administrator will be able to make the

9  jail a safe and constitutional facility?

10  A.   No.

11  Q.   Why not?

12  A.   Well, as previously mentioned, I have some concerns about

13  whether the new jail administrator is -- has the appropriate

14  experience to do his job.  I also am somewhat confused as to

15  whether he's an interim jail administrator or is intended to

16  be permanent.  We have been told at one point that there would

17  be a national search, but it now seems that it's represented

18  that he's the jail administrator.  So I don't know if we're

19  still in a period of transition and don't even know who the

20  new jail administrator is or will be.

21  Q.   Let me follow up on that.  This national search, when did

22  they say they would do a national search?

23  A.   My recollection is that it might have been during the

24  site visit, that that was the representation.  No, that

25  wouldn't be -- I'm sorry -- because she was still on board at

1    that time.  Sometime after.  It might have been one of the

2    status conferences that we had with the Court.

3    Q.   But as far as you know, was there ever a national search

4    for the jail administrator?

5    A.   Not -- not in this time frame.

6    Q.   Now, we talked earlier about technical assistance.  Do

7    you also provide an exit interview after each site visit?

8    A.   Yes.

9    Q.   Do you provide recommendations for technical assistance

10   at the exit interviews?

11   A.   Yes.

12   Q.   And in years past, who normally showed up at the exit

13   interviews?

14   A.   Well, both on-site and remotely, we usually had pretty

15   broad participation.  It was usually the jail administrator

16   and the assistant administrator and the captains and the

17   sheriff and the undersheriff and the sheriff's attorney and

18   the board attorney and the County administrator and the --

19   usually some representation from the Board of Supervisors

20   and -- yeah.

21   Q.   Any health care contractors or other contractors attend?

22   A.   Yes.  I think maybe not as routinely, but I think they

23   sometimes did.

24   Q.   And after the exit interviews, do you ever do any

25   follow-up to see whether anyone took your advice from the exit

1  interview to do anything?

2  A.   Well, sometimes we have further communication with them

3  either to provide that technical assistance to move those

4  suggestions forward or in some cases follow-up questions or

5  follow-up requests for documents.  So there is communication

6  in between site visits in which we sort of check in and see

7  what's happening.

8  Q.   Did any of the defendants or their employees attend the

9  most recent interview?

10  A.   One of the defense attorneys did.

11  Q.   Anyone else?

12  A.   Ms. Moore.  Tanecka Moore.

13  Q.   Who is Tanecka Moore?

14  A.   I understood her to be called the court liaison, but I

15  think her real title is something else.  It's court -- I'm

16  sorry; I'm not remembering.

17  Q.   Did that attendance level concern you?

18  A.   Well, it seemed like we weren't getting the information

19  out to everybody that could potentially use that information.

20  Q.   And would that have any impact on the defendants' ability

21  to implement the consent decree or the stipulated order?

22  A.   I think -- I mean, they'll eventually get that

23  information in the form of a report, but it would be useful to

24  get it during an exit conference when it could be discussed

25  and questions answered.

```
 1    Q.   How would you characterize the amount of work that still

 2    needs to be done in order for the jail to be a reasonably safe

 3    and secure detention facility?

 4    A.   A lot of work needs to be done.

 5    Q.   Do you have any opinion as to whether there's a grave and

 6    immediate threat of harm to detainees in the jail?

 7    A.   Yes.

 8    Q.   And what is that opinion?

 9    A.   I believe there is.

10    Q.   And what's the basis for saying that?

11    A.   The number of assaults that we see and the seriousness of

12    those assaults is very troubling.  It suggests that the

13    detainees are at serious risk of harm.

14    Q.   So have you addressed any of these grave risks in your

15    monitoring reports?

16    A.   Well, we always talk about the level of staffing and the

17    lack of supervision of the inmates as well as cell doors that

18    still don't lock, and, of course, the mental health issues

19    that are not being adequately addressed.

20    Q.   How about use of force?

21    A.   The use of force, we talk about the uses of force that

22    are in violation of the policy in the settlement agreement.

23    Q.   How about the lack of investigations or reporting does

24    that pose any type of grave danger to inmates?

25         MR. SHELSON:  Objection.  Leading.
```

1    THE COURT:  Objection sustained.

2  BY MR. CHENG:

3  Q.   Let me ask you another question.  Have lesser measures to

4  achieve compliance with the Court's orders been attempted?

5  A.   Well, certainly starting out with priority

6  recommendations was an effort to provide sort of good guidance

7  on how to come into compliance.  As that progressed and we

8  weren't having a lot of success there, I actually started

9  doing a weekly action item list that I provided to the

10 defendants.  Ms. Barker took that over for a little while, but

11 then it sort of disappeared.

12      And then there was the road map that I provided to try to

13 give step by step how to move towards compliance, and then the

14 stipulated order itself, of course, was intended to provide --

15 to break the steps up into more manageable steps to achieve

16 compliance.

17 Q.   And how did the defendants do at implementing these

18 lesser measures?

19 A.   Not -- not well.  They always -- it always seemed to sort

20 of dissipate.  There would start out to be some energy around

21 it, and then it would dissipate.

22 Q.   What will happen if we continue this case without a

23 receiver or outside management of the jail?

24 A.   I think we will not see the kind of improvements that we

25 need to see.

```
1    Q.   And why do you believe that?

2    A.   Well, because we've been at this for five years, and as

3    you asked, we made a lot of efforts to try to assist

4    defendants to come into compliance and without seeing much

5    fruition there as well as sort of the -- what we often see is

6    sort of an effort made and then it goes away, or something

7    that's represented and then it doesn't happen, lengthy delays.

8    So there just isn't a strong indication of progress.

9    Q.   What if the Court issues more orders requiring specific

10   remedies.  Will that result in timely compliance with the

11   consent decree?

12   A.   Well, based on the results of the last stipulated order,

13   I would say no.

14        THE COURT:  At this time, I believe it's an

15   appropriate -- I think it's a shifting point for you.

16        MR. CHENG:  Yes, Your Honor, I feel like I should

17   follow Ms. Vera's lead.  We're at that point of just a few

18   more questions, but maybe in the morning would be the easiest

19   way to wrap up.

20        THE COURT:  Let's do that.  It's after 5:00 now, and

21   we've been going all day practically.  So we'll -- again, I'm

22   giving you all the time that you need.  I don't want anyone to

23   feel rushed.  But this will conclude our testimony for today,

24   and we will be prepared to start back up at 9:00 in the

25   morning.
```

1        Is the expectation on the Government, or the United

2   States, that the United States may rest its case in chief

3   tomorrow?

4        MR. CHENG:  Yes, Your Honor.

5        THE COURT:  Okay.  And depending on what time that

6   might be, the defendants ought to be prepared to begin their

7   case.  It just depends on how long everything goes.  You

8   should be prepared to begin to put on your witnesses tomorrow.

9        MR. CHENG:  Your Honor, my understanding is they have

10  notified us they intend to call two witnesses, Mr. Farr and

11  Mr. Chamblee.  I believe that's correct; right?

12       THE COURT:  Okay.  Mr. Chamblee.  And who is the second

13  one?

14       MR. CHENG:  Mr. Farr.

15       THE COURT:  Oh, Farr and Chamblee.  All right.

16  Anything else we need to take care of?

17       MR. CHENG:  The only question is it's just going to be

18  the two, knowing that we should be wrapping up tomorrow

19  morning with the U.S. case in chief.

20       THE COURT:  I'm sorry?

21       MR. CHENG:  I guess the only question on our end is

22  whether there will only be two witnesses for the defendants

23  tomorrow.  Assuming we wrap up pretty quickly tomorrow

24  morning --

25       THE COURT:  Well, it depends on how -- let's just say

1  that Ms. Simpson doesn't get off the stand completely until

2  noon and then we take our lunch break, and then I don't know

3  how long Mr. Farr or Mr. Chamblee will be.  But if those

4  are -- if those are the only two people you know about, those

5  would be the only two people who will testify tomorrow

6  regardless of where we are.

7          MR. CHENG:  Fair enough, Your Honor.

8          THE COURT:  Anything else we need to take up?

9          MR. CHENG:  No, Your Honor.

10          THE COURT:  All right.  Okay.  All right.  Well, we'll

11  be in -- court is recessed.  We'll start back up at about 9:00

12  tomorrow morning.  Thank you so much.

13  ****************************************************************

14

15

16

17

18

19

20

21

22

23

24

25

1                 **COURT REPORTER'S CERTIFICATE**

2

3        I, Candice S. Crane, Official Court Reporter for the

4 United States District Court for the Southern District of

5 Mississippi, do hereby certify that the above and foregoing

6 pages contain a full, true, and correct transcript of the

7 proceedings had in the forenamed case at the time and place

8 indicated, which proceedings were stenographically recorded by

9 me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11 comply with those prescribed by the Court and Judicial

12 Conference of the United States.

13        THIS, the 22nd day of February, 2022.

14

15                      /s/ Candice S. Crane, RPR, CCR

16                      Candice S. Crane, RPR, CCR #1781
                        Official Court Reporter

17                      United States District Court
                        Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25