1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2              NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA                    PLAINTIFF

5    VERSUS              CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

6    THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                 DEFENDANTS
7

8

9             EVIDENTIARY HEARING, VOLUME 7,
        BEFORE THE HONORABLE CARLTON W. REEVES,
10         UNITED STATES DISTRICT COURT JUDGE,
                 FEBRUARY 23, 2022,
11              JACKSON, MISSISSIPPI

12

13            (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
        CANDICE S. CRANE, RPR, CCR #1781
23      OFFICIAL COURT REPORTER
        501 E. Court Street, Suite 2.500
24      Jackson, Mississippi  39201
        Telephone:  (601)608-4187
25      E-mail:  Candice_Crane@mssd.uscourts.gov

━━━***DAILY TRANSCRIPT***━━━

1    **APPEARANCES:**

2        FOR THE PLAINTIFF:

3            CHRISTOPHER N. CHENG, ESQ.
             MATTHEW DONNELLY, ESQ.
4            SARAH G. STEEGE, ESQ.
             LAURA L. COWALL, ESQ.
5            HELEN VERA, ESQ.
             MITZI DEASE-PAIGE, ESQ.
6
         FOR THE DEFENDANTS:
7
             NICHOLAS F. MORISANI, ESQ.
8            JAMES W. SHELSON, ESQ.
             TONY R. GAYLOR, ESQ.
9            RAYFORD G. CHAMBERS, ESQ.
             JOHN C. HALL, II, ESQ.
10           REUBEN ANDERSON, ESQ.

11       ALSO PRESENT:

12           ANTHONY NJOKU
             MICHAEL DENAULT
13           ELIZABETH SIMPSON
             DAVID PARRISH
14           SHERIFF TYREE JONES
             LESLIE FAITH JONES
15           CINDY MOHAN

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

Style and appearances.................................1184-1185

WITNESS:  ELIZABETH SIMPSON

    Continued Direct by Mr. Cheng........................1187

    Cross by Mr. Shelson.................................1195

    Defendants' Exhibit 101 entered......................1228

    Defendants' Exhibits 98, 99, and 100 entered.........1232

    Defendants' Exhibits 81 and 82 entered...............1233

    Defendants' Exhibit 78 entered.......................1278

    Plaintiff's Exhibit 106 entered......................1284

    Defendants' Exhibit 97 entered.......................1290

    Defendants' Exhibit 92 entered.......................1291

    Redirect by Mr. Cheng................................1307

    Plaintiff's Exhibits 1 and 2 entered.................1348

Court Reporter's Certificate.............................1354

<pre>
 1              IN OPEN COURT, FEBRUARY 23, 2022

 2

 3          THE COURT:  You may be seated.

 4          Is there anything we need to take up?

 5          All right.  Ms. Simpson, will you return to the stand?

 6    I'll remind you you're still under oath.

 7          THE WITNESS:  Yes, Your Honor.

 8          THE COURT:  All right.

 9             CONTINUED DIRECT EXAMINATION

10    BY MR. CHENG:

11    Q.   Good morning, Ms. Simpson.

12    A.   Good morning.

13    Q.   Ms. Simpson, I wanted to follow up a little bit on your

14    virtual site visits.  When you conducted your actual site

15    visit in January were you able to substantiate any of the

16    things you identified on virtual site visits?

17    A.   Yes.

18    Q.   And what types of verification were you able to confirm

19    when you did the live visit versus the virtual visits?

20    A.   Actually, the areas that I look into are not that

21    different between remote site visit and a virtual site visit,

22    because they're very document intensive.  And so reviewing

23    them -- excuse me -- reviewing them remotely is very similar

24    to being on-site.

25          There's a few differences.  One is with respect to the
</pre>

1  inmate files, the records.  I -- during the time that we

2  started doing the remote site visits was also the time that

3  they were trying to implement a legal status sheet and a

4  ChronoSheet.  And so during the remote site visits, I

5  requested those for a certain number of files.  In theory,

6  they could have been created as they were provided to me.  So

7  it was good to be on-site and see that the files pulled at

8  that time did, in fact, have the status sheets and the

9  ChronoSheets, so that was a good thing.

10 Q.  Was there anything when you did your live visit that

11 turned out to be different from what you found out during the

12 virtual visit?

13 A.  No.  Actually, I also found that the interviews of the

14 detainees tended to be more effective in the remote site

15 visits.  I think it was maybe a little bit disruptive or

16 intimidating to have a bunch of people coming into the unit

17 that they didn't know.  So sometimes the interviews on-site

18 were less productive than the interviews we did remotely.

19 Q.  Did that difference, in terms of the quality of

20 interviews on-site, affect in any way your opinion?

21 A.   No.  I just had less information than when doing the

22 inmate interviews remotely.

23 Q.  Do you have an opinion about what would most likely

24 provide the quickest route to compliance and the most

25 efficient way to resolve this case?

1    A.    Yes.

2    Q.    And what is that opinion?

3    A.    Well, at this point I think having a receiver is probably

4    the most effective way to move towards compliance.

5    Q.    Have the defendants demonstrated to you the ability to

6    comply with the court's orders?

7    A.    That has not been the case.

8    Q.    And why do you say that?

9    A.    Because they have not complied with the stipulated order

10   or the settlement agreement.

11   Q.    Have the defendants made any promises in court that did

12   not pan out when you conducted your compliance review?

13   A.    Well, as I mentioned, things seemed to start and stop at

14   times.  And so, for example, we're told that the work in B-Pod

15   is progressing and then we read in the QA report that the work

16   in B-Pod has halted with no timeline for continuing.

17   Q.    And is that type of halt -- stop and halt something

18   that's happened before over the course of your monitoring?

19   A.    Yes.  Another example I guess would be the use of the

20   cells in booking, that those cells -- the individuals cells

21   were going to be -- the use of those was going to be

22   discontinued once C-Pod opened.  And C-Pod opened, and the

23   cells continued to be used.

24   Q.    Over the history of this case, have you noticed whether

25   the defendants waste time or resources as they try to

1   implement the terms of the consent decree?

2   A.   I would say yes.

3   Q.   And in what way?

4   A.   Again, there seems to be a lot of stopping and starting

5   and going in one direction and then -- and then going in a

6   different direction.  Like the mental health training of the

7   staff, it starts and then it stops.  And I don't -- different

8   officers may, at that point, be involved, there may be an

9   issue of starting over.  But that kind of thing has not been

10  unusual.

11  Q.   Do you have an opinion as to whether there's a grave and

12  immediate threat of harm to detainees in the jail?

13  A.   Yes.

14  Q.   And what is that opinion?

15  A.   Based on the number of assaults, the lack of sufficient

16  medical and mental health care, staff, the condition of the

17  facility, yes.  There's significant risk of harm.

18  Q.   If the defendants were to try to move inmates to other

19  facilities would that resolve the defendants problems with the

20  jail?

21  A.   No.  They'd still need to -- assuming they intend to move

22  them back at some point they would still need to fix the

23  facility and hire sufficient detention staff and get them

24  trained.

25  Q.   In terms of trying to find a remedy to address the

1    problems in the jail, is there anything else you think the

2    Court should consider that we haven't already covered?

3    A.   Not that comes to mind right now.

4    Q.   Do you think the defendants will be able to protect

5    detainees from inmate-on-inmate violence if the consent decree

6    were to be terminated?

7    A.   No.

8    Q.   Do you think the defendants would be able to provide

9    detainees with hygienic and safe living conditions if the

10   consent decree were to be terminated?

11   A.   No.

12   Q.   Do you think the defendants would be able to provide

13   detainees with medical and mental health care for serious

14   conditions if the consent decree were to be terminated?

15   A.   No.

16   Q.   Do you think the defendants would be able to protect

17   detainees from staff abuse if the consent decree were to be

18   terminated?

19   A.   No.

20   Q.   Do you think the defendants will remedy practices that

21   result in the unlawful detention of detainees if the consent

22   decree were to be terminated?

23          THE COURT:  Hold on one second.

24          MR. SHELSON:  Objection.  Leading.

25          THE COURT:  Don't lead the witness.

```
 1   BY MR. CHENG:
 2   Q.  Let me ask you why do you believe the defendants would be
 3   unable to protect detainees if the consent decree were to be
 4   terminated?
 5   A.  Well, I think the consent decree provides some objective
 6   steps for ensuring the safety of detainees and that that sort
 7   of provides some benchmarks that the Court and the monitors
 8   and the defendants themselves can measure in terms of
 9   progressing towards being able to provide that safety.
10   Q.  What about unlawful detention?  Could they just handle it
11   on their own without a consent decree?
12   A.  No.  I think that, again, the consent decree provides
13   some very specific benchmarks to move them towards compliance
14   or towards being able to do that.
15   Q.  Have they ever developed their own internal benchmarks to
16   guide their improvements?
17   A.  No.
18   Q.  Are there any provisions of the decree that you consider
19   no longer necessary to protect the rights of detainees?
20   A.  No.
21   Q.  What impact, if any, do the court orders have on the
22   local criminal justice system or public safety?
23   A.  Well, as I mentioned earlier, I think of the detainees
24   and the staff of the facilities as members of the public.  And
25   they definitely -- the Court orders definitely have an impact
```

1    on the safety of those individuals.  But also as we've talked

2    about, certainly providing mental health care in the facility

3    provides some stability for the individuals when they're

4    released into the community, which certainly addresses public

5    safety.  And sort of prolonged stays in jails tend to

6    contribute, definitely contribute towards recidivism.  So to

7    the extent some of the provisions address reducing that length

8    of stay and improving the conditions, reducing contraband,

9    reducing assaults, reducing gang activity, that would address

10   recidivism and also addressing public safety.

11   Q.   We talked yesterday about your indicted/unindicted list

12   that's kept at the jail?

13   A.   Yes.

14   Q.   Are there any conclusions that can be drawn from the

15   information in that list about public safety?

16   A.   Well, not -- individuals tend to or have stayed in the

17   jail for really long periods of time before being indicted.

18   And just the slow process of the criminal justice system.  Up

19   to indictment, and even after indictment, again contributes to

20   recidivism and increases risk to public safety.

21   Q.   And how long do people sometimes end up in the jail

22   without being indicted?

23   A.   I don't know the longest, but the stays in Hinds County

24   jail facilities has been remarkably long.  They've had people

25   there for up to six years, seven years.

```
 1   Q.   And are there any characteristics of the people who are

 2   held for a very long time that you've noticed?

 3   A.   A lot of the individuals that are there for a long time

 4   have mental health issues and typically are charged with

 5   felonies, of course.

 6   Q.   And at the end of the whole criminal justice process,

 7   where do people with these types of serious mental illness end

 8   up?

 9   A.   Some of them end up in the state hospital.  But some of

10   them end up in prison, and some of them are not convicted.

11   Q.   And if they end up in the community, does that have any

12   impact on the criminal justice process out in the community?

13   A.   Well, in terms of public safety, if they've spent six

14   years in jail, that's not a -- that's not something that

15   contributes to being able to be stable in the community.

16   Q.   Does the CJCC address these type of community safety

17   issues?

18   A.   It should.

19        MR. CHENG:  We have no further questions on direct for

20   this witness, Your Honor.  And at this time, the United States

21   has no more questions for direct.  We would move for directed

22   verdict in favor of the United States before turning this over

23   to defendants.

24        THE COURT:  Are you saying that the United States

25   rests?
```

1    MR. CHENG:  Yes, Your Honor.

2    THE COURT:  I mean, well, the Government -- I mean, the

3    Government has the right to cross-examine this witness -- the

4    defendant has the right to cross-examine this witness.

5    MR. CHENG:  And of course the right to rebut later.

6    Thank you.

7    MR. SHELSON:  May I proceed, Your Honor?

8    THE COURT:  Yes, you may, Mr. Shelson.

9                    **CROSS-EXAMINATION**

10   **BY MR. SHELSON:**

11   Q.  Good morning, Ms. Simpson.

12   A.  Good morning.

13   Q.  There's a notebook to your left if you'd like to refer to

14   it.  There's a number of exhibits there and they are tabbed.

15   I want to start out with the consent decree, Exhibit P-1,

16   page 55, paragraph 139.

17   MR. CHENG:  Your Honor, the exhibits don't seem to be

18   coming up on --

19   THE REPORTER:  Turn your mike on.  I can't hear you.

20   MR. CHENG:  Thank you, Your Honor.

21   BY MR. SHELSON:

22   Q.  Paragraph 139 of the consent decree, "The monitor only

23   has the duties, responsibilities, and authority conferred by

24   this agreement.  The monitor must be subject to the

25   supervision and orders of the Court and applicable law."

1      Did I read that correctly?

2   A.   Yes, sir.

3   Q.   And are the monitors required to comply with

4   paragraph 139 of the consent decree?

5   A.   Yes.

6   Q.   And are they only to exercise the duties,

7   responsibilities, and authority conferred by this agreement?

8   A.   Yes.

9   Q.   Do you know how many deaths there were at the RDC in

10  2016?

11  A.   I know there's been one death.  I think that would have

12  been at the end of 2016.

13  Q.   Was there one death at RDC in 2017?

14  A.   That could be.  I don't recall.

15      MR. SHELSON:  Ms. Summers.

16  BY MR. SHELSON:

17  Q.   Were there no deaths at RDC in -- excuse me.  Was there

18  one death at RDC in 2018?

19  A.   That could be.

20  Q.   Were there no deaths at RDC in 2019 and 2020?

21  A.   I believe that's correct.

22  Q.   And were there seven deaths at RDC in 2021?

23  A.   Yes.

24  Q.   And no deaths so far this year at RDC?

25  A.   That's right.

```
 1   Q.   So for the years 2016 through 2021, that's a total of ten
 2   deaths, which by my math comes out to 1.7 deaths a year.  Is
 3   that consistent with your recollection?
 4   A.   I trust your math more than mine.
 5   Q.   Okay.  And so does 2021 appear to be an anomalous year in
 6   terms of the number of deaths at RDC?
 7   A.   I don't know if it's anomalous until we see what happens
 8   in the next upcoming years.
 9   Q.   Was it anomalous relative to the number of deaths from
10   2016 through 2020?
11   A.   It's certainly higher than the prior years, much higher.
12   Q.   Are the monitors compensated for their time in this case
13   based on an hourly rate?
14   A.   Yes.
15   Q.   Is that rate $175 per hour for each of the monitors?
16   A.   Yes.
17   Q.   So, for example, 175 times four is a combined hourly rate
18   of $700 an hour.  Do you agree with that?
19   A.   Yes.
20   Q.   If it's an eight-hour day, eight times 700 is 5,600?
21   A.   Yes.
22   Q.   So, for example, if the monitors -- this proceeding lasts
23   nine days and the monitors average eight hours a day,
24   $5,600 times nine days is $50,400?
25   A.   Yes.
```

1   Q.   So that would be the cost to the County of the monitors

2   participating in this hearing?

3   A.   Yes.  We actually have a daily rate that we use for site

4   visits and when we're required to be on-site for a full day,

5   so it would be the daily rate.

6   Q.   What is the site visit rate?

7   A.   It's $1,500 a day.

8   Q.   For all four monitors combined?

9   A.   No.  For each monitor.

10  Q.   Do you have an annual budget for your monitoring

11  activity?

12  A.   Yes.

13  Q.   Do you submit that budget to the County at some point in

14  connection with each year?

15  A.   We haven't submitted it each year.  It was submitted the

16  first year and it has carried over.

17  Q.   So you haven't submitted a new budget for 2022?

18  A.   No, not yet.

19  Q.   What is the amount of the budget that is carried over?

20  A.   I think it's -- I would have to look again, but I think

21  it's around 275,000.

22  Q.   I'm showing you, Ms. Simpson, Exhibit P-3, which has been

23  admitted into evidence.  Is this your resume or CV?

24  A.   Yes.

25  Q.   And here -- I'm sorry.  How do you pronounce that County?

1  A.   Bernalillo.

2  Q.   Bernalillo.  When in 2019 did you stop working for

3  Bernalillo County approximately?

4  A.   I think early fall.

5  Q.   And I'm asking you this because the only other position

6  listed after that is the compliance monitor in this case?

7  A.   Yes.

8  Q.   Have you held any other employment since you stopped

9  working for Bernalillo County in the fall of 2019?

10  A.   No.

11  Q.   Do you consider Dr. Dudley, Jim Moeser, and Dave Parrish

12  all three monitors in this case?

13  A.   Yes.

14  Q.   How did Dr. Dudley come to your attention?

15  A.   As I mentioned, the medical expert that we had on the

16  team dropped off the team because of medical issues, and I

17  wanted to bring on someone more focused on the mental health

18  aspects of the agreement.  I asked DOJ for recommendations.

19  They gave me three possibilities.  I reviewed resumes and

20  interviewed and selected Dr. Dudley from that.

21  Q.   Did Jim Moeser come to your attention through DOJ as

22  well?

23  A.   Yes.

24  Q.   And what about Dave Parrish?

25  A.   Yes.

1   Q.   Is the word "monitor" a defined term under the consent

2   decree?  Paragraph 17, page 7.

3   A.   Yes.

4   Q.   And I'll just read.  "Monitor means an individual in his

5   or her team of professionals, if any, who are approved by the

6   Court pursuant to the provisions of this agreement to oversee

7   and facilitate implementation of the agreement."

8        Did I read that correctly?

9   A.   Yes.

10  Q.   You were approved by order of the Court; is that correct?

11  A.   Yes.

12  Q.   And that's shown here on ECF-11 which was entered on

13  August 18, 2016; is that correct?

14  A.   That's what it says, yes.

15  Q.   To your knowledge, have any of the other monitors been

16  appointed by order of the Court?

17  A.   I don't know.  Not to my knowledge I guess.

18  Q.   Ms. Simpson, there's a document in the notebook.  It's

19  D-142.

20  A.   Yes.

21  Q.   This is the document we prepared based on invoices the

22  monitors have submitted to the County.  This first page is

23  what we calculated the monitors billings to be for each

24  year --

25          MR. CHENG:  Objection, Your Honor.  No foundation.

```
 1          THE COURT:  Ask your question and let me hear the
 2   question first.  Objection overruled.  Let me hear your
 3   question, and then you can object to it after the question.
 4   BY MR. SHELSON:
 5   Q.   The numbers on page 1, are they consistent with your
 6   recollection of the monitors' fees by year?
 7   A.   That could be.  I don't know the total.
 8   Q.   You don't know.  Do you know how much you personally
 9   billed since you became a monitor?
10   A.   No, not really.  I think it averages somewhere between 70
11   and 80,000 a year.
12   Q.   The number I have through January 3rd, 2022, is $566 --
13   excuse me.  $566,000.62.  Is that number consistent with your
14   recollection?
15   A.   No.
16   Q.   Okay.  What number is consistent with your recollection?
17   A.   Like I said, based on my 1099s, it averages somewhere
18   between 70 and 80,000 a year, so whatever that works out to.
19   Some of these figures in my column look like they would be the
20   total billed for the team and not for me personally.
21   Q.   So 75 times six would be about 450,000?
22   A.   That could be, but we're not at six years yet I don't
23   think.
24   Q.   Does the -- what's your best estimate of how much you've
25   billed personally since the beginning?
```

```
 1    A.   Like I said, I think based on the 1099s it averages out

 2    to probably around 70 -- probably less than that in the early

 3    years.  And as I did more and more technical assistance, it's

 4    been closer to 80,000 in the later years.

 5    Q.   Does the consent decree incorporate by reference or adopt

 6    any national or other standards for jails?

 7    A.   I'd have to look through it.

 8    Q.   Do any come to your mind?

 9    A.   I'm trying to think if it incorporates any ACA standards,

10    but I don't recall there being a reference to the ACA.

11    Q.   Would you look at the consent decree, please.  Paragraph

12    35, page 10.

13    A.   Yes.

14    Q.   Does paragraph 35 discuss substantial compliance, partial

15    compliance and noncompliance?

16    A.   Yes.

17    Q.   And does it define each of those terms?

18    A.   Yes.

19    Q.   Are there any other categories of compliance than those

20    three that are defined in the consent decree?

21    A.   No.

22    Q.   Are the words "sustained compliance" anywhere in the

23    consent decree?

24    A.   No.

25    Q.   All right.  Let's look at the definition of partial
```

```
1  compliance, please.  It reads, "partial compliance indicates
2  that the County achieved compliance with some of the
3  components of the relevant provision of the agreement, but
4  significant work remains."
5       Did I read that correctly?
6  A.   Yes.
7  Q.   In doing your compliance evaluations, how did you apply
8  the partial compliance definition, particularly the part where
9  it says "with some of the components of the relevant
10 provision"?
11 A.   That's how we try to apply those terms.  The example I
12 gave earlier was with respect to classification in
13 paragraph 42.  A lot of paragraph 42 has significant work
14 remaining.  But it's carried as partial compliance because
15 they have moved to an objective classification tool.
16 Q.   Did you attempt to quantify some of the components?  Did
17 you attempt to quantify that in any way?
18 A.   No.
19 Q.   So substantial compliance definition, "Substantial
20 compliance indicates that the County has achieved compliance
21 with the material components and has met the goals of the
22 relevant provision of the agreement."
23      Did I read that correctly?
24 A.   Yes.
25 Q.   Does the agreement identify which components are the
```

1   material components?

2   A.   No.

3   Q.   In any of your monitoring reports did you identify any

4   components as material components?

5   A.   I don't think we used that term.

6   Q.   Do any provisions of the consent decree expressly

7   identify any goals?

8   A.   I'd have to look through.  I don't think they do

9   expressly.  Except, I think, like, with the policy and

10  procedure, I think there's an introductory paragraph that says

11  it addresses the detainee's protection from harm.  I think

12  there's a few provisions like that or statements like that in

13  the settlement agreement.

14  Q.   Right.  But those introductory paragraphs, you did not

15  evaluate those for compliance, did you?

16  A.   No.  The only one that we list a compliance result for in

17  introductory paragraph is the beginning of the youthful

18  offenders section.  But that isn't included in the tally,

19  because it is an introductory paragraph.

20  Q.   How did you evaluate the difference between substantial

21  compliance and partial compliance?

22  A.   If there are components of the provision that have not

23  yet been complied with.

24  Q.   Then it was what?

25  A.   Then it's still partial.

1  Q.   Well, are you saying that 100 percent of the components

2  of a provision must be complied with for there to be

3  substantial compliance?

4  A.   We have some paragraphs that are in substantial

5  compliance.  I would look at them to see if it's 100 percent.

6  I would say 100 percent, but maybe it wouldn't have to be

7  100 percent at all times.  If there's -- so, for example, with

8  the youthful offenders, there was a period when there was a

9  youth that was ordered by the circuit court to stay in RDC,

10 even though that was contrary to that paragraph.  We did not

11 drop that down to partial compliance.  It was still listed as

12 substantial compliance.

13 Q.   How did you evaluate the difference between noncompliance

14 and partial compliance?

15 A.   Again, as defined here, if there was compliance with some

16 component of the provision we listed it as impartial

17 compliance.

18 Q.   Did you apply noncompliance to mean that the County was

19 literally not in compliance with all of the components of

20 whatever provision you were evaluating?

21 A.   Generally that's the standard that we applied.  Although

22 I see in the settlement agreement it says that indicates that

23 the County has not met most or all of the components.  So

24 it's -- there -- it may have met some, but so minimally that

25 we continued to carry it in noncompliance.

1   Q.   I understood -- and you heard Dr. Dudley testify; is that

2   correct?

3   A.   Yes.

4   Q.   I understood him to testify that he conferred with you

5   regarding the medical and mental health aspects of the consent

6   decree and then you make the compliance finding?

7   A.   I would disagree with Dr. Dudley on that.  As you

8   probably noticed, most of the mental health provisions are

9   embedded in larger provisions.  And so if the larger provision

10   is going to be carried as partial compliance, then I don't

11   necessarily have a separate finding from Dr. Dudley.  But if

12   it's a provision that's solely mental health, which I'm not

13   sure there are any, then I confer with Dr. Dudley to determine

14   what the finding should be.

15   Q.   And is that the same process you also used with

16   Mr. Moeser and Mr. Parrish?

17   A.   No.  No.  When they send me their sections of the report

18   they have a finding of partial or non or substantial

19   compliance.

20   Q.   So is it accurate to say that with respect to the medical

21   and mental health provisions, you and Dr. Dudley work together

22   to determine the compliance evaluation?

23   A.   I would say that if it's not embedded in another

24   provision that already sort of governs what the finding is

25   going to be, then Dr. Dudley -- then I ask Dr. Dudley for the

1 compliance finding.

2 Q.   Okay.  And then with respect to the provisions of the

3 consent decree that Mr. Moeser and Mr. Parrish weigh in on, do

4 they determine the compliance evaluation?

5 A.   Yes.  And if I have a question for whatever reason, I

6 would confer with them and discuss it, but I don't recall ever

7 having a change in the compliance finding that they've sent

8 in.

9 Q.   Let me -- I'm going to refer you now to Exhibit P-41,

10 which is the fifteenth monitoring report, page 22.  You see

11 the highlighted sentence on the monitor?

12 A.   I do.

13 Q.   A count of 92 requirements as determined by the number of

14 settlement agreement paragraphs which have substantive

15 requirements.

16       Did I read that correctly?

17 A.   Yes.

18 Q.   And those are paragraphs 37 through 161 of the consent

19 decree; is that correct?

20 A.   No.  There are some paragraphs that are not included

21 because they relate to things such as the effective date of

22 the agreement, the monitor duties, *et cetera*, so I don't have

23 them included in there.  You can see, like, on page 134 where

24 it says paragraphs 119 and 120 are not listed, and on page

25 137, paragraphs 136 through 158 are not listed.

1   Q.   Okay.  So the paragraph -- the 92 paragraphs -- excuse

2   me -- the 92 provisions, they're -- they start on paragraph

3   27.  Look at page 27 of your fifteenth monitoring report.

4   A.   Got there.

5   Q.   And then if you look at on page 138, what's the last

6   paragraph you evaluate?

7   A.   Page -- I'm sorry -- paragraph 161.

8   Q.   So you evaluate beginning at paragraph -- excuse me --

9   beginning at paragraph 37 and ending at paragraph 161,

10  although as you just pointed out, some paragraphs in between

11  are not evaluated?

12  A.   That's right.

13  Q.   All right.  So let me go back to page 22, and is there a

14  table that begins on page 22 and goes over to page 23?

15  A.   Yes.

16  Q.   And does it list the dates of each site visit?

17  A.   Yes.

18  Q.   And so if we look at page 23, what is the first remote

19  site visit?

20  A.   On page 23 or 22?

21  Q.   Well, you tell me.  When is -- I didn't think there were

22  any remote site visits on --

23  A.   Oh, remote.  I'm sorry.  The first remote site visit was

24  June 2020.  Yes.  June 2020.

25  Q.   So from -- for everything -- so let me see.  There were

1  five site visits beginning in June 2020 that were done

2  remotely?

3  A.   Yes.

4  Q.   Do you agree that the word "ensure" is used multiple

5  times in the consent decree?

6  A.   I heard that said.  I did not look at that myself, but,

7  yes, it's definitely in there.

8  Q.   How did you apply the word "ensure" as used in the

9  consent decree when you did your compliance evaluations?

10  A.   I'd have to look at the context of the particular

11  provisions that use that word.

12  Q.   What provision of the consent decree requires the County

13  to create spreadsheets for the monitors?

14  A.   There are requirements in the -- sorry.  There are

15  requirements that they do data compilations in terms of

16  quality assurance, *et cetera*.  It's not -- those requirements

17  are not for the purpose of creating them for the monitors, but

18  rather it's part of their business process.

19  Q.   Will you look at paragraph 144 on page 55?

20  A.   All right.

21  Q.   Is that the paragraph you had in mind?

22  A.   No, I was actually thinking about the substantive

23  paragraph related to continuous improvement in quality

24  assurance that began on page 46.  But you're right, paragraph

25  141 does address access to information and documents.

1  Q.   What paragraph did you just refer me to, the substantive

2  provision?

3  A.   The substantive provision was the paragraphs on

4  continuous improvement and quality assurance.

5  Q.   What's the number of the paragraph?

6  A.   It's page 46.  It talks about maintaining a database and

7  computerized tracking system to monitor all reportable

8  incidents, uses of force and grievances, and that's 106 and

9  goes on to 107.  There should be an incident summary report on

10  a monthly basis and so on, requires various reports and

11  databases.

12  Q.   Was it your testimony yesterday that the consent decree

13  requires the County to create spreadsheets for the monitors?

14  A.   I don't believe I said they're required to create

15  spreadsheets for us.

16  Q.   What provision of the consent decree requires the jail to

17  be delegated release authority?

18  A.   That what?

19  Q.   That requires the jail be delegated release authority?

20  A.   That -- it's not in the settlement agreement.  It's law.

21  Q.   What do you mean "law"?

22  A.   Actually, let me take that back.  Paragraph 85 requires

23  that there be a legal basis for continued detention or

24  release.

25  Q.   As I understood, your testimony yesterday was in the

1    context of a pretrial program, and you were talking about that

2    jails can be delegated release authority for things such as

3    domestic violence.  Did I misunderstand your testimony?

4    A.   Yeah.  So it doesn't have to be in the context of a

5    pretrial services program.  It could be even without a

6    pretrial services program.  But the court in any particular

7    jurisdiction can delegate authority to the jail to release

8    individuals when they meet -- typically when they meet a

9    required set of criteria.  It would be unlikely for that to

10   include domestic violence, but in theory a court could

11   delegate release authority in that situation.  More often it's

12   very nonviolent misdemeanors with little or no criminal

13   history.

14   Q.   If the courts in Hinds County did not delegate release

15   authority to the jail, are you contending that that violates

16   the consent decree?

17   A.   If it's an unlawful, unauthorized release, it does.

18   Q.   Well, what if it's not?

19   A.   Then it would not.

20   Q.   What provision of the consent decree is violated when

21   recruits quit a training program?

22   A.   I'd have to look at the training provisions of the

23   settlement agreement, but I don't know that that specific

24   event would violate the settlement agreement.  If appropriate

25   resources aren't dedicated to create an effective training

1  program, and as a result, cadets drop out, that would be

2  something that we look at to see if there's a compliance

3  issue.

4  Q.  I'll represent to you that when I say "consent decree,"

5  I'm talking about Exhibit P-1.  Can we have that

6  understanding?

7  A.  Yes.  Yes.  I've been calling it the settlement

8  agreement.

9  Q.  That's fine.  So when you refer to the settlement

10  agreement, are you referring to Exhibit P-1?

11  A.  Yes.

12  Q.  You're welcome to refer to it as the settlement agreement

13  if you'd like to.  In fact, I'll switch.  Does the settlement

14  agreement establish the length of time for waiting for a state

15  hospital bed?

16  A.  It would take me a minute to find it.  There is a

17  provision, I believe, related to discharge planning that I

18  think talks about efforts to facilitate getting people into

19  the state hospital.  It does not set a specified length of

20  time.  I believe that's paragraph 94.

21  Q.  And does it or does it not set a time limit for waiting

22  for state hospital beds?

23  A.  It does not set a time.  It says, "Jail staff must

24  develop and use records about prisoners with serious mental

25  illness to more accurately and efficiently process prisoners

1   requiring forensic evaluation or transport to mental hospitals

2   or other treatment facilities."

3   Q.   Does the settlement agreement enumerate the services that

4   Hinds County Behavioral Health must offer to jail detainees?

5   A.   It doesn't -- it doesn't direct Hinds County Behavioral

6   Health to provide specific services.

7   Q.   Do you remember testifying yesterday about in-reach

8   services?

9   A.   Yes.

10   Q.   All right.  Does the settlement agreement require that

11   in-reach services be provided at RDC?

12   A.   The same paragraph, 94, requires jail staff to improve

13   individual treatment, supervision, and community transition

14   planning for prisoners with serious mental illness.  I would

15   say the community transition planning should include

16   appropriate connection with community-based services.

17   Q.   According to whom?

18   A.   That's what community transition planning is.

19   Q.   Does it -- does paragraph 94 contain the words "in-reach

20   services"?

21   A.   No.

22   Q.   Does the settlement agreement establish the standard for

23   recidivism rates?

24   A.   No.

25   Q.   Sorry.  Does the settlement agreement establish a

1    standard for over detention?

2    A.   No.

3    Q.   Does the settlement agreement establish any sort of

4    length of stay limitation for RDC?

5    A.   Yes, in paragraph 95 it says, "All individuals who were

6    found not guilty or acquitted or had charges brought against

7    them dismissed and are not being held on any other matter,

8    they must be released directly from court unless the Court

9    directs otherwise."

10        And then in paragraph 92, it says, "Prisoners are

11    entitled to release if there is no legal basis for their

12    continued detention.  Such release must occur no later than

13    11:59 p.m. on the day that a prisoner is entitled to be

14    released."

15    Q.   So let's look at paragraph 92.  Does it contain any words

16    to the effect that there's a length of stay standard that RDC

17    must adhere to?

18    A.   No.

19    Q.   So here's where I'm going.  I'll cut right to it.  So,

20    for example, I understood your testimony to be that the length

21    of stay at RDC is longer than the national average.  Was

22    that --

23    A.   Yes.

24    Q.   So that's what I'm asking.  In that context, does the

25    settlement agreement provide any benchmarks for average length

1  of stay?

2  A.  No.

3  Q.  Do you recall testifying yesterday about exit interviews?

4  A.  Yes.

5  Q.  Does the settlement agreement require exit interviews?

6  A.  No.  It seemed to me that there was some requirement that

7  we share our observations, but I'm not seeing it right away.

8  Q.  So does the settlement agreement contain any requirements

9  regarding who must attend an exit interview from the County?

10  A.  No.

11  Q.  All right.  I'm going to direct your attention,

12  Ms. Simpson, to -- back to P-1, the settlement agreement,

13  paragraph 43, page 15, please.

14  A.  Yes.

15  Q.  Okay.  Do you agree that paragraph 14 refers to outcome

16  measures for the items enumerated as subparagraphs A through

17  G?

18  A.  Yes.

19  Q.  Okay.

20      THE COURT:  Hold on for one second.  You said paragraph

21  14?

22      MR. SHELSON:  No, Your Honor.  Paragraph 43, page 15.

23      THE COURT:  Thank you.

24      MR. SHELSON:  Yes, sir.

25  BY MR. SHELSON:

1    Q.   So, Ms. Simpson, other than the outcome measures listed

2    in paragraph 43 of the settlement agreement, are there any

3    other outcome measures in the settlement agreement?

4    A.   There are, I would say a number of objective

5    requirements, but not specific outcome measures that I recall

6    at this time.

7    Q.   So are there any specific outcome measures for public

8    safety?

9    A.   Well, I would consider some of these outcome measures

10   related to public safety.

11   Q.   Any other than those in paragraph 43?

12   A.   Like I said, there are some objective requirements in

13   terms of how often well-being checks have to be made, the

14   timeliness of reporting, things of that sort that are

15   objective requirements and related to public safety.  But they

16   don't have something like, you know, if 10 percent of

17   well-being checks are missed, that's a presumption of

18   unreasonably unsafe conditions.

19   Q.   This is page 46 of the fifteenth monitoring report,

20   Exhibit P-41, and you're welcome to look at it.  But I'm going

21   to refer you to the sentence here that's highlighted which

22   reads, "Inmate-on-inmate assaults continue at a high rate."

23   A.   Yes.

24   Q.   What is your source for a high rate?

25   A.   I would say compared to the facilities I am familiar with

  1    and also comparing notes with Mr. Parrish in the facilities

  2    he's familiar with.

  3    Q.   Is there a provision of the settlement agreement that

  4    establishes any rate at all for inmate-on-inmate assaults?

  5    A.   The paragraph 43 talks about three or more use-of-force

  6    or prisoner-on-prisoner incidents which are where there's a

  7    failure to complete all documentation, including supervision,

  8    recommendations and findings.  That would be true of all the

  9    incident reports that -- all the assaults that we see, and

 10    there's definitely more than three a year.

 11    Q.   But you're not saying that this paragraph 43(e) says that

 12    three or more use-of-force or prisoner-on-prisoner incidents

 13    without more is an outcome measure, are you?

 14    A.   That would be correct.  It's talking about three or more

 15    without appropriate documentation.

 16    Q.   Right.  So is it your position that paragraph 43(e)

 17    establishes what constitutes a high rate of inmate-on-inmate

 18    assaults?

 19    A.   No.

 20    Q.   You remember testifying yesterday about how you tallied

 21    up the number of assaults from time to time?

 22    A.   Yes, all the time, every month.

 23    Q.   When you did -- I'm sorry.  When you did so, did you

 24    distinguish between assaults with serious injury and assaults

 25    without serious injury?

1   A.   I included any assault that got to the level of being

2   physical.  A verbal altercation I did not include, but if it

3   was physical, I included it, and there is a column for whether

4   the individual was hospitalized or not.  And then in the notes

5   there's sometimes a reference to the injuries, but a lot of

6   times I -- that's not included in the incident report.  So I

7   don't know the severity of the injuries a lot of the time.

8   Q.   Does the consent decree or settlement agreement contain

9   any outcome measure for the number of escapes?

10  A.   No, I don't believe so.

11  Q.   Do any of the monitoring reports indicate the number of

12  detainees that needed medical service but that did not get the

13  service?

14  A.   I think Dr. Dudley talks about the inability to provide

15  services because of the lack of detention staff.  I don't

16  know -- I don't recall whether it's quantified or not.

17  Q.   Same question about mental health.  Do any of the

18  monitoring reports indicate the number of detainees that

19  needed mental health services but that did not get them?

20  A.   I don't -- I think the October 2021 monitoring report

21  includes his -- his tally of the number of days where services

22  couldn't be provided because of the lack of detention staff.

23  It's tallied in terms of number of days, but I don't think

24  it's number of detainees.

25  Q.   All right.  Would you look at the settlement agreement,

1   please, P-1, paragraph 13, page 6?

2   A.   Yes.

3   Q.   Is -- do you see that the words "implement" or

4   "implementation" are defined terms?

5   A.   Yes.

6   Q.   All right.  So in some of the provisions of the

7   settlement agreement in the context of discussing policies,

8   does it also talk about implementing the policy?

9   A.   Yes.

10  Q.   And when you evaluated those provisions for compliance,

11  did you apply the definitions in paragraph 13 of the

12  settlement agreement?

13  A.   Yes.

14  Q.   There's, of course, a definition as we've established,

15  but is there any outcome measure for implement or

16  implementation?

17  A.   Not an outcome measure.

18  Q.   So if a policy were not implemented properly 100 percent

19  of the time, how did you -- how did you evaluate that?

20  A.   Depending on the policy, I don't think we would look for

21  100 percent implementation.  There are -- there certainly

22  could be times when proper training was provided and an

23  officer did not follow the policy and was corrected as a

24  result of not following that policy.  That sequence of events

25  would suggest that implementation occurred but that an officer

1  made a mistake or --

2  Q.   Do policies have to be implemented properly 100 percent

3  of the time to obtain substantial compliance?

4  A.   I would say they have to be implemented according to that

5  provision, like 100 percent of the policies, but there will be

6  occasions when an officer does not follow policy and then

7  should be subject to corrective action.

8  Q.   What percentage of proper implementation is sufficient

9  for substantial compliance?

10  A.   Well, like I said, I think all of the policies need to be

11  implemented, but that doesn't mean they won't be followed

12  100 percent of the time as long as we see corrective action

13  when they aren't followed.  So, yes, we would expect all of

14  the policies to be implemented.

15  Q.   I'm going to direct your attention back to the consent

16  decree, page 24, paragraph 56.  It reads, "Develop and

17  implement use-of-force reporting policies and procedures that

18  ensure that jail supervisors have sufficient information to

19  respond appropriately to use of force.

20  A.   Yes.

21  Q.   So you evaluated a provision of paragraph 56 and found

22  that the use-of-force policies were implemented properly eight

23  out of ten times, how would you evaluate that?

24  A.   I think -- when I think of implementation, I go back to

25  that definition that includes proper training and education,

1   and so I would expect it to be fully implemented with that

2   training and education.  If I saw somebody who didn't follow

3   that policy, I would expect to see corrective action

4   indicating that the supervisor recognized that that policy

5   wasn't followed and was providing that corrective action.

6   Without seeing that corrective action, I would not consider

7   the policy to be fully implemented.

8   Q.   So would that, in your view, that example, be a partial

9   compliance?

10  A.   Yes.

11  Q.   Does the settlement agreement contain any standards of

12  care for medical services?

13  A.   I think there's some provisions that relate to medical

14  care.  For example, the initial assessment when an individual

15  is booked into the facility, I don't think it references a

16  national standard with respect to that.

17  Q.   Does the settlement agreement reference a national or

18  other standard with regard to standard of care for mental

19  health services?

20  A.   I don't think it references a set of national standards.

21  Q.   I believe you testified this morning that you believe

22  there's a grave and immediate threat to detainees in the jail?

23  A.   Yes.

24  Q.   All right.  And what are you using as your standard for

25  grave and immediate?

A.   I think the level of violence that is present in the

jail.  When you have staff members that are afraid to go into

certain housing units and won't go into them, that indicates a

grave and immediate danger to me, and the number of assaults,

the inmate committees, the gang pods, the level of contraband,

the lack of staff supervision.

Q.   Are there any provisions of the settlement agreement

which quantify or give a standard for what constitutes a grave

or immediate risk?

A.   I believe the ones that you referenced earlier that had

certain benchmarks.  I'm forgetting what paragraph that is,

but other than that, there aren't benchmarks in the settlement

agreement.

Q.   You were asked on direct mostly yesterday several times

about whether something or another creates a risk.  Do you

recall that?

A.   Yes.

Q.   And I think you answered yes every time you were asked.

Do you recall that?

A.   That could be.

Q.   Can you quantify any of those risks?

A.   Mathematically, no.

Q.   Can you quantify the risk of not having a data tracking

system?

A.   In numerical terms, no.

1   Q.   Can you quantify the risk of not checking a box on a

2   use-of-force form?

3   A.   Again numerically, no.

4   Q.   Can you quantify the risk to the public of not having a

5   pretrial services program?

6   A.   Well, there's very good research, as I mentioned, on

7   detaining people, low-risk and moderate-risk people in jails

8   and their much higher rates of recidivism by being detained

9   very short periods of time beyond when they could have been

10   released by a pretrial services program.  So there's research

11   that does have quantification, but it's statistical.

12   Q.   Is -- strike that.  If the County is in substantial

13   compliance with the substantive provisions of the settlement

14   agreement, is risk eliminated?

15   A.   No.

16   Q.   What is the difference in risk between something that is

17   in substantial compliance and something in partial compliance?

18   A.   Well, in some instances it's very significant, such as

19   paragraph 42, which addresses staffing levels.  It's carried

20   in partial compliance, as I mentioned, because they're using

21   an objective classification tool.  But they're still woefully

22   inadequate in the staffing levels, and so if that paragraph

23   were to move to substantial compliance, the risk would be

24   significantly reduced.

25   Q.   Can you quantify that numerically?

1    A.   No.

2    Q.   Does the consent decree require the monitors to conduct

3    on-site visits at least every four months after the initial

4    baseline visit?

5    A.   Yes.

6    Q.   And there were instances where that was not done because

7    of COVID-19; is that correct?

8    A.   I don't think we missed any site visits.  I think when

9    the June 2020 site visit would have otherwise been scheduled

10   in May, that was our first remote site visit, and there was a

11   little sort of start up time figuring out how it was going to

12   be done.  Other than that, I think we've been in the

13   four-month range.

14   Q.   Right.  Do you understand a remote visit to constitute an

15   on-site visit within the meaning of the consent decree?

16   A.   I don't know if there's a definition, but I think in the

17   circumstances it was appropriate.

18   Q.   Was the consent decree ever amended to allow for remote

19   visits?

20   A.   Again, I don't know what the -- where the requirement is

21   in the settlement agreement.  I'd have to look at it, but it

22   was not amended.

23   Q.   As monitor do you experience situations where the County

24   attempted to draft policies on its own?

25   A.   Yes.

1    Q.   And how did that work out?

2    A.   I believe in early 2017 they provided the monitors and

3    Department of Justice with a set of policies and the opinion

4    of the monitoring team and, I believe, DOJ was that those were

5    not sufficient.

6    Q.   And so was Karen Albert brought in to assist after that?

7    A.   Yes, not directly.  As I mentioned, she was asked

8    initially to assist in dealing with the issue of booking

9    clerks and records clerks, not coordinating and communicating.

10   She did that by development of policies in that area.  And

11   then the County was pleased with her work and asked me to

12   continue billing her through my contract, so she could help

13   with the policies and procedures.

14   Q.   Let me show you a transcript in this case from a hearing

15   conducted May 9, 2019.

16   A.   Yes.

17   Q.   Do you see here that you're talking to the Court?

18   A.   Yes.

19   Q.   All right.  And you're talking about Karen Albert?

20   A.   Yes.

21   Q.   I want to direct your attention to starting on page 12,

22   line 22 where you said, "So they're certainly overdue, but it

23   also, I would say, is a good process in sort of building

24   policies that are tailored to this facility and that the

25   command staff have a good understanding of by the time they're

1    adopted.  So it could probably go faster, but it's a good

2    process I would say."

3    A.   It was at that time.

4    Q.   On 2/26/2020 did you tell the Court that "with regard to

5    policies and procedures, tremendous progress has been made"?

6    A.   I don't recall.  If you have a transcript, I would

7    imagine it's correct.

8    Q.   Let's see if this refreshes your recollection.  June 26,

9    2020?

10   A.   Yes.

11   Q.   ECF-73?

12   A.   Yes.

13   Q.   Do you see the highlighted sentence?

14   A.   Yes.

15   Q.   "With regard to policies and procedures, tremendous

16   progress has been made"?

17   A.   Yes.

18   Q.   Did the drafting of policies slow down for a period of

19   time after Major Bryan became the jail administrator?

20   A.   No.

21   Q.   Let me show you a transcript.  It's marked ECF-95,

22   September 15, 2021.

23   A.   Yes.

24   Q.   This is you addressing the Court.

25   A.   Yes.

1  Q.   This is page 51, line 15 through 18, "One thing I would

2  report is that the developed policies and procedures has

3  slowed down during this time of transition, and I think it's

4  in large part because of the transition."

5  A.   Yes.

6  Q.   So did policies and procedures slow down for a period of

7  time when the transition was made to Major Bryan?

8  A.   I think it slowed down when there was no jail

9  administrator, and actually it slowed down prior to that when

10  the policy committee really sort of disbursed.

11  Q.   All these exhibits I'm about to show you are in the

12  notebook if you'd like to flip them, but I'm going to display

13  them all on the screen.

14  A.   Okay.

15  Q.   This is Exhibit D-101.

16  A.   Okay.

17  Q.   And is this an e-mail chain that involves you, Kathryn

18  Bryan, and Karen Albert?

19  A.   Yes.

20  Q.   And if you look at the last-in-time e-mail on

21  Exhibit D-101, is this e-mail chain referring to the health

22  care policy?

23  A.   Yes.

24  Q.   And does this e-mail indicate that the health care policy

25  was approved?

1    A.   Yes.

2    Q.   And it got a "woo-hoo" from Major Bryan and you

3    commented, "I know, it's a big one"?

4    A.   Yes.

5    Q.   And is your e-mail at the top of the page dated

6    October 26, 2021?

7    A.   Yes.

8         MR. SHELSON:  Your Honor, we move to admit

9    Exhibit D-101 into evidence.

10        THE COURT:  Any objection?

11        MR. CHENG:  No objection, Your Honor.

12        THE COURT:  D-101 will be received into evidence.

13            (Defendants' Exhibit 101 entered.)

14   BY MR. SHELSON:

15   Q.   I'm going to refer you to Exhibit D-98.  I'm going to

16   start with the bottom e-mail dated October 25, 2021.  Is this

17   an e-mail from Mr. Cheng to you and others?

18   A.   Yes.

19   Q.   And is it attaching DOJ's comments to the population

20   management training administration and telephone policies?

21   A.   Yes.

22   Q.   And if you look at page -- excuse me, Exhibit D-99, is

23   that the mail policy?

24   A.   Yes.

25   Q.   So on page 2 of Exhibit D-99, there's a comment, and you

1  see it's KA1?

2  A.  Yes.

3  Q.  Is that Karen Albert?

4  A.  I believe so.

5  Q.  And then on page 5 are there more comments from

6  Karen Albert?

7  A.  Yes.

8  Q.  You see a comment from KB.  Is that Major Bryan?

9  A.  I believe so.

10  Q.  Exhibit D-100, is that the telephone policy?

11  A.  Yes.

12  Q.  Do you see comments A1, A2, and A3 on page 1 of

13  Exhibit D-100?

14  A.  Yes.

15  Q.  Do you know whether those are DOJ comments?

16  A.  Well, A2 has the initials DMP at the end of it, that's

17  David Parrish.  A1, I don't know -- oh, that's DOJ, and A3 is

18  DOJ.

19  Q.  So here's my question, is -- was the process to get

20  policies approved is that -- they drafted at least for a

21  period of time with the assistance of Karen Albert, and then

22  they would have to go through review by the monitors and by

23  DOJ?

24  A.  Yes.  Generally Karen Albert provided a skeleton of the

25  policy and then worked with jail staff to flesh that out, so

1  it's particularized to the facility.  And then once it is to

2  their liking, then it gets sent to me, and it goes to my team

3  for comment.  I believe under the settlement agreement our

4  approval isn't required, but we are supposed to review and

5  comment.  And then it goes either simultaneously or

6  sequentially to DOJ for their comments, and their approval is

7  required.

8  Q.  Based on your observations, how extensively did DOJ

9  comment on draft policies?

10  A.  They have extensive comments.

11  Q.  Based on your experience, approximately how long did it

12  take to get DOJ's comments from the time a policy was

13  submitted to DOJ for review?

14  A.  Actually, they were timely in terms of getting their

15  comments back.

16  Q.  When you say "timely," can you give any sort of time

17  frame?

18  A.  I think the stipulated order requires that they get

19  comments back in, I think it says two weeks, and they were

20  typically well within that.

21  Q.  What about the monitors?

22  A.  The same, it was very timely.  I mean, getting to a final

23  was a time-consuming process, but it wasn't typically a delay

24  in getting comments back.

25  Q.  Roughly how long did it take to get to a final policy?

1   A.   It varied.  As you could probably tell from the e-mail,

2   the health services policy was quite a long time, maybe even

3   six weeks.  We included QCHC, the medical contractor, in that

4   policy.  It doesn't direct them to do things, but the policies

5   include expectations of what they would be doing.  And so we

6   wanted to make sure that they were comfortable with that

7   policy.  So that one probably took -- I don't know -- maybe

8   six weeks, maybe even longer.

9        MR. SHELSON:  Your Honor, we move to admit

10   Exhibits D-98, D-99, and D-100 into evidence.

11        THE COURT:  Any objection?

12        MR. CHENG:  Objection, Your Honor, only to the extent

13   that the e-mail addresses are listed for some of the

14   individuals, including Ms. Simpson, which should be redacted.

15        THE COURT:  Okay.  That's a personal identifier I

16   guess.  All right.  We'll just make sure it's redacted.  D-98,

17   D-99, and D-100 are received into evidence.  Are you

18   suggesting that all the e-mails should be redacted?

19        MR. SHELSON:  Yes, sir.  We can get with --

20        THE COURT:  I mean, because it's more than

21   Ms. Simpson's e-mails on these.  I think the e-mails of all

22   the lawyers and other copied people are on those documents I

23   think.

24        MR. CHENG:  Your Honor, only the personal addresses.

25   DOJ addresses -- our government addresses are public, so I do

1  actually receive e-mail from anyone.  But the monitors are

2  private addresses, because they're personal addresses.  They

3  should be redacted.

4         THE COURT:  Okay.

5         MR. SHELSON:  So, Your Honor, we can get with

6  Ms. Summers and take care of that.

7         THE COURT:  That's fine.  D-98, 99, and 100 will be

8  received into evidence.

9         (Defendants' Exhibits 98, 99, 100 are entered.)

10  BY MR. SHELSON:

11  Q.   Let me show you what's been marked as Exhibit D-81.  Is

12  this an e-mail from you to Karen Albert and Kathryn Bryan

13  dated January 19, 2022?

14  A.   Yes.

15  Q.   And does it concern the training administration policy?

16  A.   Yes.

17  Q.   And did you write in this e-mail, "I received comments

18  back from DOJ.  I think Dave was fine with the policy except

19  for a few comments, so I haven't sent it back to him.  I think

20  we can address DOJ's comments, and I'll send it to DOJ and

21  Dave"?

22  A.   Yes.

23  Q.   Is this illustrative of the process that the policies

24  went through?

25  A.   Yes.  I mean, in this situation I apparently didn't

1    circle back to Dave first and then DOJ, but I did as we said

2    here.  But generally that's the case.

3    Q.   And Exhibit D-82, is that a draft of the training

4    administration policy?

5    A.   Yes.

6    Q.   And comment A1, is that DOJ?

7    A.   Yes.

8    Q.   Do you know who comments A2 and A3 are?

9    A.   A2 is Mr. Parrish.  A3 I think is either Major Bryan or

10   Ms. Albert.

11   Q.   What about A4?

12   A.   That would be DOJ.

13   Q.   A5?

14   A.   I believe that would be Major Bryan.

15        MR. SHELSON:  Your Honor, we move to admit

16   Exhibits D-81 and D82 into evidence.

17        THE COURT:  Any objection from the defendant, other

18   than if there are personal identifiers on them?

19        MR. CHENG:  No objection other than those, Your Honor.

20        THE COURT:  D-81 and D-82 will be received into

21   evidence.

22        (Defendants' Exhibits 81 and 82 entered.)

23   BY MR. SHELSON:

24   Q.   Let's talk about staffing if we could.  Has the County

25   made any efforts to hire and retain detention staff during the

1    period of time you've been the monitor?

2    A.   Well, they've hired quite a few individuals, so, yes,

3    there's been efforts in hiring.  And more generally there have

4    been -- I mean, there's a recruitment officer who does job

5    fairs and things of that sort with respect to his efforts in

6    hiring.

7    Q.   I'll show you a transcript from this case, ECF-18 was

8    October 25, 2017, which was pretty early on; is that correct?

9    A.   Yes, that would be.

10   Q.   Page 9, lines 14 through 18, "I should mention that they

11   did adopt in the budget a base salary increase for detention

12   officers, and that brings them much closer -- similar to other

13   correctional officers in the area.  So that makes them much

14   more competitive, and that was included in this fiscal year's

15   budget."

16   A.   I see that.

17   Q.   Did you say that to the Court?

18   A.   I'm assuming that's me.

19   Q.   That's you.  And that was back in October of 2017?

20   A.   Yes.

21   Q.   And you're welcome to look at it, but you agree that

22   paragraph 42 of the settlement agreement, which is

23   Exhibit P-1, addresses staffing?

24   A.   Yes.

25   Q.   And this will probably be easier to look in the notebook.

1   I want to ask you about paragraph 42.

2   A.   Okay.

3   Q.   Is this the paragraph you referenced earlier that you

4   break up the evaluation of?

5   A.   Yes.

6   Q.   And do you break it up in to three parts?

7   A.   Yes.

8   Q.   And each of those three parts receive a different

9   evaluation?

10  A.   They do.  Although they -- in the tally there's only one

11  score for that paragraph.

12  Q.   All right.  Does the settlement agreement mandate the

13  salaries that the County must pay detention officers?

14  A.   No, I don't believe so.

15  Q.   Does the consent decree mandate that the County have a

16  step plan?

17  A.   No.

18  Q.   Does the consent decree mandate that the County have a

19  career ladder?

20  A.   No.

21  Q.   Does the consent decree mandate that the County give

22  bonuses to detention staff?

23  A.   No.

24  Q.   Does the consent decree mandate that the County give cost

25  of living adjustments?

1    A.   No.

2    Q.   All right.  I'm going to refer you, Ms. Simpson, to your

3    fifteenth monitoring report, Exhibit P-41, page 30, please.

4         THE COURT:  Mr. Shelson, is this a good place we could

5    take a 15-minute break?

6         MR. SHELSON:  Yes, sir.

7         THE COURT:  Okay.  Let's do that for the court

8    reporter.

9         MR. SHELSON:  Yes, sir.

10        THE COURT:  We'll take our morning break.  It's 10:41.

11   Let's come back at 11:00, and we'll start back up.

12        Ms. Simpson, you're under cross-examination.  Do not

13   discuss your testimony with anyone.

14        THE WITNESS:  Yes, Your Honor.

15        THE COURT:  All right.  We are in recess.

16             (A brief recess was taken.)

17        THE COURT:  You may be seated.

18        Thank you, Ms. Simpson.

19        Mr. Shelson, you may proceed when you're ready.

20        MR. SHELSON:  Thank you.

21   BY MR. SHELSON:

22   Q.   Ms. Simpson, I'm directing you back to fifteenth

23   monitoring report, Exhibit P-41, page 30.

24   A.   Yes.

25   Q.   First highlighted sentence here, "Inability of the HCSO

1   to hire and retain enough detention staff to operate its jail

2   facilities in compliance with the settlement agreement has

3   been the primary shortcoming during the past five years of

4   monitoring."

5       Did I read that correctly?

6   A.   Yes.

7   Q.   Did that conclusion change in any way following your most

8   recent site visit?

9   A.   No.

10  Q.   And then the next highlighted sentence, "The reason that

11  the work force numbers have not improved is caused by low

12  salary, lack of a step plan, and dangerous and frustrating

13  working conditions, particularly at the RDC."

14      Did I read that correctly?

15  A.   Yes.

16  Q.   What do you consider to be low salary?

17  A.   Mr. Parrish prepares this section of the report, although

18  I review and agree with it.  I know there was at least one QA

19  report that -- quality assurance report that indicated that

20  the detention officers were making less than they might make,

21  than they would make working at McDonald's or Starbucks, I

22  believe were the two comparisons.  So I would say that getting

23  paid less than working in a fast food establishment would be a

24  low salary.

25  Q.   And do you know what salary was being referred to in the

1   quality assurance report you just referenced?

2   A.   I believed it was either the November or December quality

3   assurance report.  So it would have been I believe after the

4   five percent raise, but before the raise that has been

5   promised now.

6   Q.   Well, you testified yesterday that Priscilla Dawson is

7   the person who authors the quality assurance reports?

8   A.   Yes.

9   Q.   And in the quality assurance report you just mentioned,

10  did Ms. Dawson cite the salary she was referring to at

11  McDonald's or Starbucks?

12  A.   I don't think that the wage amount was actually

13  referenced.

14  Q.   And how do you know that she was correct?

15  A.   I don't.

16  Q.   Does the settlement agreement authorize you to hire

17  consultants?

18  A.   Yes.

19  Q.   Have you ever retained a consultant to do any sort of

20  labor market analysis concerning staffing at the jail?

21  A.   Mr. Rivera was -- has been on my contract not to do the

22  market analysis.  He was asked to do recruitment and retention

23  plan, and part of that plan is that a market analysis should

24  be done.

25  Q.   Did you ever hire a consultant to analyze the impact of

```
 1   COVID-19 on the County's ability to hire and retain detention
 2   staff?
 3   A.   No.
 4   Q.   Do you know whether it has had any impact?
 5   A.   No.
 6   Q.   Have you heard of the great resignation?
 7   A.   The great resignation?
 8   Q.   Yes.
 9   A.   I'm not sure I've heard it referred to in that way.
10   Q.   Have you heard it referred to in any way?
11   A.   I think you're talking about Major Bryan's resignation,
12   in which case I would say it's been referred to as
13   Major Bryan's resignation.
14   Q.   No.  I'm talking about in the labor market generally --
15   A.   Oh, oh, okay.
16   Q.   -- that people are resigning in large numbers?
17   A.   I actually haven't heard that term, but I do know that
18   the labor force has decreased.
19   Q.   Do you know whether that's had any impact on the ability
20   of the County to retain and hire detention staff?
21   A.   No.
22   Q.   I'm just going to show you a report that was recently
23   issued and ask if you've heard this information before.  This
24   is a report from the Mississippi Economic Council from last
25   Wednesday.  It found that "The number one issue facing growth
```

1   in Mississippi can be summed up easily.  There are not enough

2   qualified workers for current jobs and even those willing to

3   enter the work force are not prepared for the task at hand."

4        Have you heard that before today?

5   A.   I've heard generally that on a national level that some

6   businesses are struggling to hire enough people.

7   Q.   Do you know whether that's had any impact on the RDC's

8   ability to hire people?

9   A.   No, I don't.

10  Q.   Have the monitors ever made any recommendation regarding

11  what salary the County should pay to detention staff?

12  A.   No.

13  Q.   What facts do you have that increasing the salary to any

14  particular level would enable the County to materially

15  increase detention staff?

16  A.   Well, I believe that Doris Coleman, the HR person for the

17  County, does exit interviews when people leave, and among

18  other reasons citing for leaving is low pay.

19  Q.   Okay.  So that's my point.  So what is sufficient pay, do

20  you know?

21  A.   No, that's why there should be a market analysis done.

22  Q.   What facts do you have that biweekly pay would materially

23  increase detention staffing?

24  A.   Only that that's one of the requests that was made by the

25  detention staff when they did the walk-out.

1   Q.   Any other facts?

2   A.   Any other what?

3   Q.   Facts.

4   A.   On that issue, no.

5   Q.   What facts do you have that a step plan would increase

6   detention staffing?

7   A.   It's one of the recommendations I believe of the human

8   resources consultant.

9   Q.   But do you know of any facts?

10  A.   I mean, I would say that's a fact, but it's recommended

11  by an expert in the area.

12  Q.   What facts do you have that direct deposit would increase

13  detention staffing?

14  A.   That was also one of the requests of the staff that did

15  the walk-out.

16  Q.   What facts do you have that a career ladder would

17  increase detention staffing?

18  A.   Again, that's a recommendation from an expert in that

19  area.

20  Q.   That's Matt Rivera?

21  A.   Yes.

22  Q.   And D-4, is that the report from Mr. Rivera --

23  A.   Yes.

24  Q.   -- that you refer to?

25  A.   Yes.

1    Q.   Is Mr. Rivera's report, that's Exhibit D-4 and already

2    admitted into evidence, dated January 10, 2022?

3    A.   Yes.

4    Q.   Do you know whether Mr. Rivera ever consulted with

5    Sheriff Jones regarding this document?

6    A.   I don't know, but I don't believe so.

7    Q.   Do you know when Sheriff Jones first saw this document?

8    A.   I don't know.

9    Q.   Do you know whether Mr. Rivera ever sought the input of

10   the Board of Supervisors regarding his analysis?

11   A.   Mr. Rivera was on site in February 2020.  I believe he

12   met with County employees as well as sheriff's department

13   employees, but I don't know who specifically he met with.

14   Q.   Do you know whether Mr. Rivera met with the county

15   administrator?

16   A.   I believe he did at the time he was on site, but, again,

17   I don't know.

18   Q.   So I'm going to refer you to page 3 of Mr. Rivera's

19   report.  Does he list bullet point several strengths on that

20   page?

21   A.   Yes.

22   Q.   Is one of them "Detention has an experienced skilled and

23   courageous leader" at the top?

24   A.   Yes.

25   Q.   That "Hinds County Sheriff's Office has recently approved

```
 1   five percent pay increases across the board"?

 2   A.   Yes.

 3   Q.   "And that recruitment has a dedicated and qualified

 4   professional to perform duties"?

 5   A.   Yes.

 6   Q.   That "The time to hire is relatively short"?

 7   A.   Yes.

 8   Q.   That "Recruited candidates are believed to be qualified

 9   and generally available"?

10   A.   Yes.

11   Q.   And that "Support staff and limited resources are

12   provided to assist with recruitment efforts"?

13   A.   Yes.

14   Q.   And that "The recruiter has established relationships and

15   maintains a presence at job fairs"?

16   A.   Yes.

17   Q.   So is it the monitor's position that the County has not

18   tried to hire additional staff, or that it has tried and has

19   been unsuccessful?

20   A.   Actually, I think they've hired enough staff that would

21   fill all the positions, but they don't seem able to retain the

22   staff.  In fact, Mr. Rivera's report indicated in those

23   strengths that sourcing does not appear to be an issue,

24   because they are hiring enough staff and just not retaining

25   them.
```

```
 1   Q.   And so the noncompliance that you -- the monitors found
 2   regarding staffing is more towards retention than recruiting?
 3   A.   Well, the noncompliance is not having sufficient staff,
 4   but it appears from the number that have been hired and
 5   leaving that retention is more of an issue than hiring.
 6   Q.   Is there any disparity of pay requirement in the
 7   settlement agreement between detention officers and law
 8   enforcement officers?
 9   A.   No.
10   Q.   To your knowledge, do certified law enforcement officers
11   have more training than detention officers?
12   A.   I do not know.
13   Q.   Do you know whether certified law enforcement officers
14   must complete a 14-week training course?
15   A.   I don't know.
16   Q.   Do you know whether the difference in the criteria to be
17   a certified law enforcement officer versus a detention officer
18   should explain the pay differences between those two
19   positions?
20   A.   I do not know.
21   Q.   Do you agree that Mr. Rivera's report contains several
22   short-term, mid-term, and long-term recommendations?
23   A.   Yes.
24   Q.   Does it apply any time limits to those short-term versus
25   mid-term versus long-term?
```

1   A.   I believe in the early paragraphs it -- excuse me -- it

2   gives a time frame for those.   I don't recall specifically.

3   Q.   This report has been issued for approximately 43 days?

4   A.   That sounds right.

5   Q.   And do you know whether any of the timelines have been

6   exhausted at this point?

7   A.   I would think not.

8   Q.   Let me show you what's marked as Exhibit P-76.

9   A.   Yes.

10   Q.   Do you recall being asked about this yesterday?

11   A.   Yes.

12   Q.   Direct your attention to page 2 of P-76.   The highlighted

13   sentence, "I, again, respectfully request that you reconsider

14   your position on a plan to supplement jail staff and law

15   enforcement personnel."

16        And that was in an e-mail from Major Bryan to

17   Sheriff Jones and others; is that correct?

18   A.   Yes.

19   Q.   All right.   Do you know whether Sheriff Jones has any

20   surplus law enforcement personnel?

21   A.   Surplus, no.

22   Q.   Do you know whether Sheriff Jones has -- has the number

23   of law enforcement officers that he's supposed to have?

24   A.   I do not know.

25   Q.   Okay.   So you don't know one way or the other whether

```
 1   Sheriff Jones can transfer law enforcement personnel to the
 2   RDC without impacting his patrol officers' staffing?
 3   A.   I don't know.
 4   Q.   Do you know what the minimum wage is in Mississippi?
 5   A.   No.
 6   Q.   I'll represent to you that it's the federal rate, $7.25
 7   per hour.
 8   A.   Okay.
 9   Q.   So I did the math.  A 40-hour work week, 52 weeks, 2,080.
10   2,080 divided into 31,000, I got $14.90 per hour.
11   A.   Okay.
12   Q.   Does that seem like a reasonable starting detention staff
13   salary to you in Mississippi?
14   A.   I would say no.
15   Q.   Okay.  So I asked you earlier whether you had a
16   recommendation for the detention staff salaries.  Did you say
17   no?
18   A.   Whether I had a recommendation?  Yes.  I said no.
19   Q.   So if you don't think 31,000 is a reasonable salary, what
20   do you think is a reasonable staffing salary?
21   A.   I think there needs to be market analysis to determine
22   that.
23   Q.   You heard Mr. Parrish testify about the staffing analysis
24   he's performed over time?
25   A.   Yes.
```

1  Q.   Did you ever consider that it may not be reasonably

2  achievable for the County to hire and retain the number of

3  employees that the staffing analysis contemplates for the

4  jail?

5  A.   Yes.  Based on the history of what we have seen, it does

6  seem like unless -- unless practices change significantly that

7  those numbers won't be achieved.

8  Q.   Does that lead you to conclude that the numbers just are

9  not achievable?

10  A.   No, it doesn't.  It's my understanding that RDC ran as a

11  direct-supervision jail with that level of staffing in the

12  past so it was achievable at some point.  We did make

13  recommendations -- a recommendation that JDC be changed to

14  just a court holding facility so as to reduce the number of

15  staff that were required by that staffing analysis that was

16  done when they had three facilities so as to reduce the number

17  of staff they would have to reach.  But, yes, I think it's

18  achievable.

19  Q.   So what facts do you have to support that?

20  A.   Well, like I said, it previously ran as a

21  direct-supervision facility with the required number of

22  staffing, so it appears that it is achievable.

23  Q.   When did it last run as you just said?

24  A.   My understanding is that it was under Sheriff McMillin.

25  Q.   What year?

```
 1    A.   I don't know what year that would be.  I think around
 2    2010, 2009, maybe a little earlier.
 3    Q.   So your testimony that it was done 12 years ago --
 4    12 years ago or so means that it can be done now?
 5    A.   It's one fact that supports that, yes.
 6    Q.   What other facts support that?
 7    A.   I think the fact that they're able to hire a sufficient
 8    number of people to become fully staffed suggests that they
 9    could fully staff the facilities if they dealt with their
10    retention issues.
11    Q.   By doing what?
12    A.   The things that we've talked about, career plan,
13    stepladder, improving conditions so that it's a safe facility
14    to work in.
15    Q.   You can't tell us what salary should be without a labor
16    market analysis; is that correct?
17    A.   That's correct.
18    Q.   What about for a career ladder, can you tell us what
19    those numbers should be?
20    A.   No.
21    Q.   I remember, I believe, you've testified about moving
22    detainees in A-Pod to other jurisdictions?
23    A.   I don't believe I testified about that.  Maybe I did.
24    Q.   Did --
25    A.   I was not aware of that suggestion.
```

1  Q.  Do you see any problem with moving detainees in A-Pod to

2  other jurisdictions?

3  A.  Well, it's a balancing of issues that the County would

4  have to make, you know, transporting detainees back and forth

5  for court can be logistically difficult and a potential

6  liability.  It makes it difficult for detainees to meet with

7  their attorneys.  Typically other jurisdictions charge a daily

8  rate.  Often they're selective about which detainees they'll

9  take, so it would -- there would be a number of factors for

10  the County to consider.

11  Q.  Do you agree that it's at least a viable option?

12  A.  It's -- yeah, it's an option.  I don't know -- I remember

13  the counties were mentioned.  I don't know which counties they

14  were and how far the transport would be and how expensive it

15  would be.  But, yes, it's an option.

16  Q.  Let's talk about the quality assurance reports.  Did you

17  know that Major Bryan was editing the quality assurance

18  reports?

19  A.  No.

20  Q.  Let's talk about the January 2022 quality assurance

21  report which you talked about yesterday.  Did you testify that

22  the data in that report are incorrect?

23  A.  I was referring to the December quality assurance report

24  when I talked about the incorrect data.

25  Q.  Was the data correct in the January 2022 report?

1   A.   I have not had an opportunity to compare it to the

2   incident reports.

3   Q.   How do you know the statements that are made in the

4   January 2022 quality assurance report are accurate?

5   A.   Some of them are consistent with our observations, our

6   being the monitoring team, and others, I don't know.

7   Q.   This is the January 2022 quality assurance report.  I

8   want to direct your attention to here.  "After visiting that

9   area, talking about A-Pod Unit 1, it was clear why some female

10  staff were apprehensive about entering the unit.  This was the

11  only unit I did not enter because I did not feel comfortable

12  doing so even though I had male staff accompanying me.  A few

13  of the detainees made lewd and crude remarks and generally

14  acted out.  My visit to this unit ended abruptly."

15  A.   Yes.

16  Q.   So is this Ms. Dawson saying the only unit she did not

17  feel comfortable entering was A-Pod Unit 1?

18  A.   That's right.

19  Q.   And what is the reason she says she felt uncomfortable?

20  A.   She doesn't say why she was uncomfortable.  She

21  references that, after saying she was uncomfortable, a few of

22  the detainees made lewd and crude remarks and generally acted

23  out.

24  Q.   Does she identify anything other than the lewd and crude

25  remarks?

```
 1   A.   No.
 2        THE COURT:  Let me ask a question, Mr. Shelson.  You
 3   say that's a quality assurance report from January 2022?
 4        MR. SHELSON:  Yes, sir.
 5        THE COURT:  Is it a part of any exhibit or not --
 6        MR. SHELSON:  Not on anyone's exhibit list, Your Honor.
 7   I think it was just a matter of timing.  I think it probably
 8   came out after the exhibit lists was due.  I'm not sure --
 9        THE COURT:  I know there's been some references to it,
10   I think, in some of the earlier testimony.
11        MR. SHELSON:  There are, Your Honor.
12        THE COURT:  Okay.  All right.
13        MR. SHELSON:  So, I mean, you can talk to the --
14        THE COURT:  I'll let the parties decide.  I mean,
15   because I didn't have it here, and I know there's been
16   references to it.
17        MR. SHELSON:  Either making it an exhibit or viewing it
18   for ID, but I'll confer with them at the break.
19        THE COURT:  I'll let the parties confer.  I apologize
20   for cutting across you.
21   BY MR. SHELSON:
22   Q.   Is direct supervision effective at the work center?
23   A.   Again, I rely on Mr. Parrish for making that kind of
24   judgment, but, yes, that's what we've reported.
25   Q.   I'll rephrase these questions then.  In the fifteenth
```

1  monitoring report, did the monitors report that medical and

2  mental health staff are able to appropriately -- appropriately

3  perform their duties at the work center?

4  A.   Yes, that's in the report.

5  Q.   Is it in the fifteenth monitoring report that five hours

6  of outdoor recreation is provided to inmates each week at the

7  work center?

8  A.   Yes.

9  Q.   Does the fifteenth monitoring report state that a review

10  of suicide watch logs for inmates housed in special housing at

11  the work center revealed that officers there continue to

12  monitor inmates appropriately?

13  A.   Yes.

14  Q.   Do you recall being asked any questions at all on direct

15  about the work center?

16  A.   No.  Some of the more general questions would potentially

17  apply to the work center as well but none specific to the work

18  center.

19  Q.   Do the monitors contend that the work center is currently

20  in violation of any of the provisions of the consent decree or

21  stipulated order?

22  A.   I would have to go through our report more thoroughly.  I

23  think there are understaffing issues at the work center.  I

24  think there are occasions when medical care is not available

25  there.  I think there are issues with grievances there and

1  some classification issues, so I'd have to go through the

2  monitoring report.

3  Q.   Did you write in the fifteenth monitoring report that

4  since the JDC has been closed for over a year, there is no

5  need to address compliance at that facility?

6  A.   That was provided by Mr. Parrish, but, yes, that's in the

7  monitoring report.

8  Q.   So the monitors are no longer even assessing the JDC for

9  compliance?

10  A.   I -- we have not been on-site there.  I know that there

11  have been issues related to the physical plant even being used

12  as a holding facility.

13  Q.   You -- you testified on direct that you don't believe

14  there are any provisions of the consent decree that are no

15  longer necessary.  Do you recall that?

16  A.   I do.

17  Q.   Why in the world would the JDC have to be under the

18  consent decree?

19  A.   I don't know that there are provisions that are specific

20  to the JDC.  I don't recall that there are.

21  Q.   Should the JDC still be under the consent decree?

22  A.   If there's an intention of continuing to use it, most

23  definitely.  If it's used as a holding facility, it still

24  should be subject to the physical plant requirements that I

25  think may be in paragraph 42.  I'm not sure where those are,

1  but that it be properly maintained.

2  Q.   And you'd maintain the consent decree as to JDC for that

3  alone?

4  A.   Well, detainees are held there, and so the physical plant

5  and the staffing are relevant, as well as policies and

6  procedures to ensure their safety, ability to provide medical

7  care, if needed.

8  Q.   They're held there as a holding facility for court

9  appearances?

10  A.   I'm sorry.  What?

11  Q.   They're held there as a detaining facility for court

12  experiences?

13  A.   I'm sorry.  One more time.

14  Q.   What are they held there for?

15  A.   Oh, typically they are going -- being held there to go to

16  court.  It's my understanding they don't have holding cells in

17  the courthouse, so they're held there.  I think there was also

18  some discussion that JDC may become the releasing facility in

19  an effort to comply with the settlement agreement requirement

20  for release from court.  It wouldn't quite be release from

21  court, but it would be release from downtown.

22  Q.   How -- how is the JDC not compliant with paragraph 42 as

23  a holding facility?

24  A.   Sorry.  It's not paragraph 42.  It's a paragraph that is

25  related to the physical plant, and I don't recall which

1  paragraph that is.  But there have been lots of issues at JDC

2  with respect to plumbing and general upkeep.

3  Q.   What -- can you cite one specific example, as you sit

4  here today, of JDC being out of compliance?

5  A.   Like I said, they -- the physical condition of the

6  facility.  I believe there's been ongoing plumbing issues and

7  HVAC issues, which is why it wasn't being used as a -- to hold

8  detainees.

9  Q.   Can you name one?  Can you identify one --

10  A.   One --

11  Q.   -- that's in violation?

12  A.   I said the difficulties with the HVAC and the plumbing

13  have made it a facility that's not in compliance with the

14  maintenance provision of the settlement agreement.

15  Q.   And name me a provision that the work center is not in

16  compliance with.

17  A.   I believe that they do not have sufficient staffing.  I

18  know that that's one cause for the escape that happened is

19  they did not have a staff officer supervising recreation, and

20  as I said, I think there are issues with classification and

21  grievances.

22  Q.   Are you aware the Court found that the work center

23  operates like a normal jail should?

24  A.   Yes.

25  Q.   So even when a facility's operating like a normal jail

1  should, you still think there's a need for a consent decree

2  with respect to that facility?

3  A.   I think there's still areas of noncompliance that require

4  the use of a consent decree.

5  Q.   You're telling me that in the fifteenth monitoring

6  report, there's a noncompliance finding as to the work center?

7  A.   I don't believe that I separated out the different

8  facilities.  But many of the issues with respect to grievances

9  involve the work center.  Classification issues involve the

10  work center.  PREA issues involve the work center.

11  Q.   To what degree?

12  A.   I would say a large number of the grievances that are

13  inappropriately denied are coming from the work center.

14  Q.   So you would keep the work center under a consent decree

15  because you concluded a number of grievances were being

16  improperly denied?

17  A.   And the classification issues and the staffing issues,

18  the combination of those.

19  Q.   So does -- so what sort of perfection does the work

20  center have to do to get out from under the decree?

21  A.   I -- I would leave that to the Court, but my

22  recommendation would be they are not there yet.

23  Q.   When will they be there?

24  A.   I think when they approach or achieve compliance with the

25  settlement agreement.

1   Q.   What are you defining as compliance?  What's overall

2   compliance?

3   A.   I'm sorry.  What?

4   Q.   What is overall compliance?

5   A.   When they have achieved substantial compliance with the

6   majority, if not all, of the material provisions of the

7   settlement agreement.

8   Q.   But you don't separate that out in your reports?

9   A.   No.

10  Q.   So, I mean, how is the Court supposed to know that the

11  work center or the JDCs not in substantial compliance when

12  it's not even separated out in your reports?

13  A.   Well, we evaluate the jail as a jail system, not as three

14  individual facilities.

15  Q.   I understand you do it that way, but you're unwilling to

16  let anything at all go from under the consent decree and JDC

17  is not even -- look at Exhibit P-41 please, page 48.

18  A.   Yes.

19  Q.   Do you see the sentence highlighted in orange on the

20  screen, "Since the JDC has been closed for over a year, there

21  is no need to address compliance at that facility."

22       Did I read that correctly?

23  A.   Yes.

24  Q.   And so according to the fifteenth monitoring report, the

25  monitors are no longer addressing JDC for compliance, but you

1  still think it should be under the consent decree?

2  A.   I read that statement as referring to that specific

3  paragraph.

4  Q.   The -- so you're saying that the JDC is being evaluated

5  for compliance for other provisions than paragraph 44?

6  A.   Yes.

7  Q.   Can you show me -- can you show me any reference at all

8  in the fifteenth monitoring report, the JDC, other than

9  paragraph 44?

10  A.   Staffing at -- again, like I said, we evaluate the jails

11  as a jail system, and so our comments on staffing refer to

12  staffing at all of the facilities.

13  Q.   No.  I'm saying JDC or Jackson Detention Center, does

14  that appear in the fifteenth monitoring report other than

15  paragraph 44?

16  A.   I don't -- I don't know that there's a separate reference

17  to it.

18  Q.   Based on your observations does the condition of the RDC

19  facility contribute to the recruiting and retention issues?

20  A.   I would say yes.

21  Q.   Since you have been the monitor, has the County made any

22  efforts to improve the condition of the RDC facility?

23  A.   Yes.

24  Q.   To your knowledge, what efforts has the County made to

25  improve the condition of the RDC facility?

1  A.   Well, C-Pod was renovated, including repairing the doors

2  to a swinging door as opposed to a sliding door as well as

3  various other doors in C-Pod going into the housing units and

4  into the control room.  And then B-Pod was started on; it is

5  reported that the work in B-Pod has halted with no timeline

6  for continuing.  And I believe there's been roof repair that's

7  not quite completed, but it has been worked on.  They created

8  a padded cell in the medical area.  Those are most of what I

9  remember.

10  Q.   Is it your position the County should not invest anymore

11  money in the jail until it hires more staff?

12  A.   I think the concern is without more staff that

13  detainees -- to provide appropriate supervision, adequate

14  supervision, the detainees will destroy the work that is done,

15  but I would say that those two efforts need to be addressed

16  simultaneously.

17  Q.   Now, does staffing impact virtually every substantive

18  provision of the settlement agreement?

19  A.   Quite a few.  I'd have to look to see if there's some

20  that aren't related.

21  Q.   In applying the settlement agreement, is there any

22  difference between recommendations from the monitors and

23  technical assistance?

24  A.   I would say recommendations are a form of technical

25  assistance.

1    Q.   Let's look at Exhibit P-1, the settlement agreement, page

2    59, paragraph 155.

3    A.   Yes.

4    Q.   "Monitor will provide the County with technical

5    assistance as reasonably requested.  Technical assistance

6    requests must not interfere with the monitor's independence

7    and ability to assess compliance."

8         Did I read that correctly?

9    A.   Yes.

10   Q.   So are the monitors supposed to provide technical

11   assistance only when reasonably requested by the County?

12   A.   I don't think we're limited to providing it only when

13   requested.

14   Q.   Do you read the first sentence to allow for technical

15   assistance in instances where it's not requested from the

16   County?

17   A.   Yes.

18   Q.   And does the second sentence say to you that the

19   technical assistance request can be denied if they interfere

20   with the monitoring independence and ability to assess

21   compliance?

22   A.   Yes.

23   Q.   Is whether the County filed the monitor's recommendation

24   a factor in your compliance evaluations?

25   A.   No.

1  Q.  Is whether the County followed the monitor's technical

2  assistance advice a factor in your evaluations?

3  A.  Is that the same question?  I said no.  I think --

4  Q.  The first was recommendations.  The second was technical

5  assistance.

6  A.  No.

7  Q.  Do the recommendations or technical assistance, advice of

8  the monitors become provisions of the settlement agreement in

9  your view?

10  A.  No.

11  Q.  Is it your understanding that the stipulated order

12  requires the County to make priority recommendations?

13  A.  I'm not sure what provision you're talking about.  The --

14  there is a provision that requires the -- I believe it's

15  referred to as the master plan to include a list of

16  renovations and repairs that need to be done in the interim as

17  a new facility is constructed and to prioritize those and have

18  a timeline for those.

19  Q.  Do you recall hearing Dave Parrish testify about priority

20  recommendations?

21  A.  I'm sorry.  I don't remember what he said about priority

22  recommendations.

23  Q.  In your fifteenth monitoring report -- it's at page 27 if

24  you'd like to look -- did you find that there was an

25  unacceptable level of contraband at RDC?

1    A.   I haven't flipped to that page, but, yes, I recall that.

2    Q.   Does the settlement agreement set a threshold for

3    acceptable versus unacceptable levels of contraband?

4    A.   It's not quantified.

5    Q.   Did you fill the gap?

6    A.   Did I what?

7    Q.   Did you fill the gap?

8    A.   We did not quantify.  But the volume of contraband in the

9    facilities is such that it's definitely a danger to the

10   detainees.

11   Q.   Well, you do agree you characterized it as an

12   unacceptable level?

13   A.   Yes.

14   Q.   And is there an outcome measure for the level of

15   contraband?

16   A.   No.

17   Q.   Do you recall testimony regarding Justin Mosley?

18   A.   Yes.

19   Q.   What was he charged with?

20   A.   I don't recall now.

21   Q.   Have you -- have you heard the 9-1-1 call from that

22   incident?

23   A.   No, I have not.

24   Q.   Could you look at Exhibit P-41, the fifteenth monitoring

25   report, paragraph 56, page 61, please.

1    A.    Yes.

2    Q.    And paragraph 56 -- well, it reads, "develop and

3    implement use-of-force reporting policies and procedures that

4    ensure that jail supervisors have sufficient information to

5    analyze and respond appropriately to use of force."

6          Did I read that correctly?

7    A.    Yes.

8    Q.    Has the County developed use-of-force policies and

9    procedures?

10   A.    Yes.

11   Q.    Have those policies and procedures been approved by DOJ

12   and the monitors?

13   A.    Yes.

14   Q.    Did the policies and procedures require reports?

15   A.    Yes.

16   Q.    Are the reports being submitted?

17   A.    For the most part, no.  Incident reports are submitted,

18   but the -- if the box is checked for use of force, it pulls up

19   a new window which requires additional information, and that

20   window is very seldom, if ever, checked, even though force is

21   used.

22   Q.    And is that the type of deficiency that leads you to

23   believe there should be a receiver?

24   A.    That's one issue, yes.

25   Q.    So you find that not checking a block on a form that you

1    believe should be checked is grounds for a receiver?

2    A.    As I said, it pulls up a window that requires sufficient

3    information to analyze and respond appropriately, and that

4    information is not being filled out.

5    Q.    Right.  So what I'm asking you, that kind of deficiency,

6    you believe, justifies a receiver?

7    A.    I think that's one factor.

8    Q.    You testified I believe that you have found instances

9    where you took issue with the use of OC spray at the RDC?

10   A.    Yes.  And, again, I should say I rely primarily on

11   Mr. Parrish to make those judgments.  But I usually agree or

12   always agree, and it's included in our reports.

13   Q.    Did you take issue with the use of OC spray because you

14   felt it was used to coerce compliance?

15   A.    In some instances, yes.

16   Q.    What percentage of the instances where you found that OC

17   spray was used to coerce compliance involved a female guard?

18   A.    I do not know.

19   Q.    Was one of your criticisms of use-of-force documentation

20   that you found that photographs were not routinely taken?

21   A.    That's in our report.

22   Q.    Do you know in what percentage of instances that is?

23   A.    I can't give you a specific percentage.  It's

24   substantially -- it's a substantial number.  They're most

25   often not included.

1   Q.   And did you also criticize that not asking for waivers to

2   take photographs of use-of-force incidents was an issue?

3   A.   That's in the report.

4   Q.   Is not asking for a waiver to take photographs the type

5   of deficiency that leads you to believe there should be a

6   receiver?

7   A.   It's a factor sort of.  Among all the issues, it's a

8   minor factor, but it reflects not following proper procedures

9   with respect to reporting.

10  Q.   Is not explaining why an incident is not recorded when

11  there's no video evidence the type of deficiency that leads

12  you to believe there should be a receiver?

13  A.   Again, it relates to the overall quality and thoroughness

14  of the reporting, but that specific aspect is not a major

15  factor.  It's a factor.

16  Q.   Is there a question of what constitutes a riot?

17  A.   There is an issue of definition, yes.

18  Q.   This is Exhibit P-41, the fifteenth monitoring report,

19  page 67.  That sentence highlighted in yellow reads, "Many

20  incident reports do not provide the information needed for an

21  understanding of what actually happened."

22  A.   Yes.

23  Q.   An understanding by whom?

24  A.   The reader.

25  Q.   And that's based on your reading of them?

1   A.   Yes.

2   Q.   Is that the type of deficiency that leads you to believe

3   there should be a receiver?

4   A.   It's a factor.

5   Q.   Page 68 of the fifteenth monitoring report, it reads, "A

6   frequent omission discovered during this monitoring period is

7   that officers are not entering the date and time of the

8   incident."

9        Is that the type of deficiency that leads you to believe

10  there should be a receiver?

11  A.   I go on to say in that paragraph, it's not -- we were

12  unable to pull accurate electronic reports as a result of

13  that, and having accurate electronic reports for data

14  compilation is important, so, yes, it's a factor.

15  Q.   It's important chiefly from an administrative point of

16  view?

17  A.   From an operational point of view.

18  Q.   Remember this Exhibit P-19?

19  A.   Yes.

20  Q.   Turn it around.

21       MR. CHENG:  I believe this document is under seal, Your

22  Honor.

23       THE COURT:  Oh, okay.  Is that P-19?

24       MR. SHELSON:  Yes, sir.

25       THE COURT:  P-19 is an exhibit, and it is in evidence.

1   So you can put it up there, and only you, the lawyers, and

2   Ms. Simpson will be able to see it.

3   BY MR. SHELSON:

4   Q.   You testified about people in the jail not being

5   indicted.  Do you recall that?

6   A.   Yes.

7   Q.   Who does the indictments?

8   A.   The district attorney brings the indictment to the Court.

9   Q.   So when there's not an indictment, what do you want the

10  jail to do?

11  A.   I think that they have been attempting to address it by

12  getting the information to the chief or the senior circuit

13  judge, and a decision is being made as to whether the

14  individual can be released on some appropriate conditions.

15  So, yeah, I think that is good.  I think having the effective

16  CJCC that can address the systemic barriers to getting people

17  indicted is a good approach as well.

18  Q.   Even with an effectively functioning CJCC, can the County

19  tell the district attorney what to do?

20  A.   Not tell the district attorney what to do, no.

21  Q.   Can the County tell the judges what to do?

22  A.   No.

23  Q.   Can the County tell the judges to hold court when they're

24  not holding court because of COVID-19 or other reasons?

25  A.   No.

1    Q.   Let's talk about records.  This is ECF-61, January 24,

2    2020, page 23, "Records are very much improved.  Again, there

3    were some issues which will be detailed in the monitoring

4    report, but the files are in much better order."

5         Did I read that correctly?

6    A.   Yes.

7    Q.   This is also January 24, 2020.  "We did spend quite a bit

8    of time, like I said, with our regular review, but I wanted to

9    focus, as I said, on the stipulated order, and we did see many

10   encouraging things."

11        Did you say that?

12   A.   Yes.

13   Q.   This is ECF-95, September 15, 2021.  You tell the Court

14   that "Records continues to improve.  That's an area that has

15   improved quite a bit since the beginning of monitoring, and it

16   appears that even more review is being done and more

17   documentation, so that's a great light area"?

18   A.   I can't imagine "a great light area" is what I said, but

19   other than that.

20   Q.   This is ECF-85, April 9, 2021, "Records has improved

21   dramatically since we started the monitoring.  In the

22   beginning when we started, there were a lot of people that

23   were in the system, as in custody, and they weren't in

24   custody.  And there were a number of people that should have

25   been released that hadn't been released.  We've seen much less

1   of that now, so they're tracking the individuals much, much

2   better."

3        Did you tell the Court that?

4   A.   Yes.

5   Q.   I want to talk next about grievances.  This is ECF-43,

6   September 26, 2019.  Did you tell the Court, "And on the

7   positive notes, there are areas that continue to see

8   improvement, some of them marked improvement.  One of those

9   areas is the grievance system.  That's been a problem sort of

10  adjusting to the electronic system and figuring out what it

11  can do and what it can't do and making adjustments for what it

12  can't do.  And that has proceeded to pace"?

13  A.   Yes.

14  Q.   Did you tell the Court on January 24, 2020, that you

15  "Found very good progress in the area of grievances"?

16  A.   Yes.

17  Q.   This is ECF-73, June 26, 2020.  You tell the Court that,

18  "The grievance system is working much better over the last

19  couple of years"?

20  A.   Yes.

21  Q.   This is ECF-79, February 9, 2021.  You tell the Court

22  that, "The PREA coordinator is doing very well.  The quality

23  of her reports have really improved, and she's really circling

24  back to ensure that victims are getting the services that they

25  need.  So that's been a good area of improvement"?

1   A.   Yes.

2   Q.   Direct your attention to wristbands.  Is it your

3   understanding that the consent decree requires the use of

4   wristbands at the jail?

5   A.   I believe so.

6   Q.   If you look at Exhibit P-1, consent decree, page 14.

7   A.   Yes.  Yes.

8   Q.   Is this -- I'll represent to you that this is part of

9   paragraph 42, which starts on page 11, but this highlighted

10  subpart, "The County may continue to use wristbands to help

11  identify prisoners, but personal identification of individual

12  prisoners and may not substitute for a staff-controlled and

13  centralized prisoner tracking and housing assignment system."

14       Did I read that correctly?

15  A.   Yes, you did.

16  Q.   Is that the provision you believe requires wristbands?

17  A.   That would suggest they're not required.

18  Q.   Let's talk next about mental health.  Is it your

19  understanding that Mississippi has something called a lunacy

20  court?

21  A.   I have heard that, yes.

22  Q.   Have you ever figured out whether there is such a thing?

23  A.   I believe it is chancery court, but -- well, no.  I think

24  it's part of chancery court.  They used to hold the hearings

25  in the upper level of JDC, and at least the proceedings there

1   were referred to as lunacy court.

2   Q.   I mean, are you using that in a colloquial sense?

3   A.   That was what the local people called it.  I would not

4   generally use that term.

5   Q.   Okay.  So did you tell the Court in May of 2019 that

6   you've had trouble wrapping your head around the competency

7   process for criminal defendants --

8   A.   Yes.

9   Q.   -- in Mississippi?

10  A.   Yes.

11  Q.   Have you obtained a better understanding of it over the

12  years?

13  A.   I believe so.  There are probably still a few gaps, but I

14  believe I am getting closer.

15  Q.   Is it your understanding that when a person in

16  Mississippi is found non competent and non restorable that she

17  is civilly committed to a forensic bed or to an acute

18  psychiatric bed, or do you not know?

19  A.   I know they're civilly committed.  I don't know if in

20  that process the type of bed is identified.

21  Q.   Have you -- during the course of you being monitor,

22  reviewed Mississippi's civil commitment statute?

23  A.   I have.

24  Q.   Have you reviewed Rule 12 of the Mississippi Rules of

25  Criminal Procedure?

1    A.   I believe I have, but I'm not remembering specifically.

2    Q.   On January 4th, 2020, did you tell the Court that "QCHC

3    has actually been very responsive to concerns both in the

4    medical and mental health area"?

5    A.   I don't recall that, but I would agree with that.

6    Q.   You testified that you reviewed Mississippi's Civil

7    Commitment Statute.  Did you find that that statute controls

8    civil commitment?

9    A.   I don't remember specifically what I found, but the title

10   would suggest it controls civil commitment.

11   Q.   Did you find in your review that Rule 12 of the

12   Mississippi Rules of Criminal Procedure controls forensic

13   issues?

14   A.   I really don't recall.

15        MR. SHELSON:  I'm going to show her that.  May I

16   approach, Your Honor?

17        THE COURT:  You may.

18   BY MR. SHELSON:

19   Q.   Is the first tab the index to the Mississippi Rules of

20   Civil Procedure?

21   A.   Actually, criminal procedure.

22   Q.   Excuse me.  Criminal procedure.  Thank you.  And the

23   second tab, is that Rule 12?

24   A.   Yes.

25   Q.   Just -- there are several subparts; is that correct?

1    A.   Yes.

2    Q.   Just flip through it real quick, please, and tell me when

3    you're done.

4    A.   Well, it would take me a while to get through it.

5    Q.   Well, just read it to yourself, the headings of the

6    rules.

7    A.   Okay.  Yes.

8    Q.   And does that refresh your recollection of whether

9    Rule 12 of the Mississippi Rules of Criminal Procedure address

10   forensic issues?

11   A.   Oh, it definitely addresses forensic issues, yes.  Oh,

12   sorry.  I got distracted.

13   Q.   Based on your observations, is part of the problem with

14   suicide observation at RDC that the facility itself is not

15   really suitable for that?

16   A.   I don't know that I agree with that.

17   Q.   This is ECF-18, a transcript from October 25, 2017 --

18   A.   I don't have that on my screen.  It says out of range.  I

19   can look at the hard copy if there's a number.

20        MR. SHELSON:  May I approach, Your Honor?

21        THE COURT:  Yes.  Well, hold on.  We need to -- it's

22   not showing up at all.  Her screen is totally blank.

23        THE WITNESS:  No, it just says out of range.

24        THE COURT:  Totally black.  Could you hand her the --

25   we'll see what's --

1  BY MR. SHELSON:

2  Q.  Looking at lines 13 through 19, can you read that to

3  yourself and tell me when you're finished, please?

4      THE COURT:  Identify the page number of that too, for

5  the record, Mr. Shelson.  What page number is that?

6      MR. SHELSON:  Page 43.

7      THE WITNESS:  Yes, I see that.

8  BY MR. SHELSON:

9  Q.  Read the highlighted sentence, please.

10  A.  "And part of the problem with that is the facility itself

11  is not really suitable."

12  Q.  What were you referring to when you said that?

13  A.  The area of the facility that they were using was not

14  suitable.  It was a very large cell in the medical area.

15  Q.  Well, I'll bring this over to you, but this is ECF-61,

16  transcript from January 24th, 2020.

17      MR. SHELSON:  And I'm going to direct your attention,

18  Your Honor, to page 13, lines 21 through page 14, line 2.

19  A.  Do you want me to read it out loud?

20  BY MR. SHELSON:

21  Q.  Yes, please.

22  A.  "One of the difficulties for the County and for the

23  sheriff is knowing where to invest their money.  Is RDC going

24  to be used in the long-term, is it not, the same with JDC and

25  it's understandably difficult to invest a whole lot of money

1   in a facility that may not be used.  But that end game needs

2   to be identified so that what we do in the short run is --

3   becomes clear and makes sense.  And so that's really

4   important."

5   Q.   And so is that what the County has done with respect to

6   building a new jail?

7   A.   Yes.  I think they have made the decision to build a new

8   jail that will eventually hold all of the detainees in the

9   system.

10  Q.   And do you think that makes sense?

11  A.   I don't disagree with the decision.  It's really a

12  decision for the County to make.  You have to balance how much

13  investment would have to be made in the other facilities and

14  what you would end up with after that investment.  So I think

15  it is probably a reasonable decision.

16  Q.   I'll show this to you, but this is ECF-61, January 24,

17  2020, and I'll come hand this to you.  But my question is:  Do

18  you make reference here that "In a jurisdiction where funds

19  are limited, which is true in every jurisdiction, but perhaps

20  has been more of a problem here"?

21  A.   Yes, I say that.  I mean, it's a part of a sentence, not

22  a full sentence.

23  Q.   This is ECF-79.  It's dated February 9, 2021, and I'll

24  come show it to you.  But it reads, "I wanted to mention some

25  things that have been very good milestones.  One is that the

1  contractor, the consultants that were retained to prepare a

2  master building report have, in fact, completed that report

3  and have made some recommendations, some recommended options

4  for the County to consider.  We've reviewed the report.  We

5  have not -- I think I'll talk with them tomorrow.  But we had

6  the report to review, and it really is a very good report, I

7  believe.  They did an excellent job of sort of assessing what

8  it would take to make the current facilities operational and

9  what the costs would be as well as some options for new

10  facilities."

11       MR. CHENG:  Objection, Your Honor.  Improper

12  characterization.

13       THE COURT:  Objection overruled.

14       MR. SHELSON:  I'd do it differently if I had a

15  functioning Elmo, Your Honor.

16       THE COURT:  I'm sorry?

17       MR. SHELSON:  I'd do it differently if she could see

18  the screen, but I'm kind of constrained on how I can do it.

19  A.   The question is did I say that?

20  BY MR. SHELSON:

21  Q.   Yes.

22  A.   Yes, it appears I did.

23  Q.   When Major Bryan was the jail administrator, how

24  frequently did you communicate with her?

25  A.    It was somewhat irregular I would say, depending on

1   whether we had a site visit or whether something had occurred.

2   We had intended to have a biweekly check-in.  I don't -- like

3   I said, it was not that regular.  It may have turned out to be

4   about every other week on average.

5   Q.   Well, you can't see this --

6            THE COURT:  Hold on.  Hold on for one second.

7            THE WITNESS:  Is there a button I can push?

8            THE COURT:  Okay.  We're just going to have to fix it

9   at -- okay.  We've already contacted -- do you have a separate

10  copy of it or just one copy, Mr. Shelson?

11  BY MR. SHELSON:

12  Q.   This is -- I've handed you a copy of D-78, Ms. Simpson.

13  Is that an e-mail from Kathryn Bryan to you dated

14  January 22nd, 2022?

15  A.   Yes.

16  Q.   Did she offer -- did Kathryn Bryan offer you the use of

17  her Jeep for your most recent site visit?

18  A.   She did.

19  Q.   Did you accept or decline that offer?

20  A.   Declined.

21            MR. SHELSON:  Your Honor, we move to admit Exhibit D-78

22  into evidence.

23            THE COURT:  Is there any objection to D-78?

24            MR. CHENG:  We question its relevance, but we're not

25  going to object, Your Honor.

1       THE COURT:  All right.  D-78 is received into evidence.

2           (Defendants' Exhibit 78 entered.)

3    BY MR. SHELSON:

4    Q.  I want to ask you next about Frank Shaw.  Do you have an

5    understanding one way or the other whether he is an interim

6    director -- excuse me -- interim jail administrator?

7    A.  I'm a little unclear.  I -- I think an earlier

8    representation was that he would be interim and there would be

9    a national search.  And more recently, I've had the impression

10   that he's talked about as the permanent jail administrator, so

11   I don't know.

12   Q.  Would you look at Exhibit P-1, the settlement agreement,

13   paragraph 38, page 11, please?

14   A.  Yes.

15   Q.  Is this one of the paragraphs that addresses

16   qualifications of jail administrator?

17   A.  Yes.

18   Q.  Is jail administrator a defined term under the settlement

19   agreement?

20   A.  No, I don't believe so.  Well, I don't know; I'll have to

21   look.

22   Q.  Look on page 7, please.  I'll represent to you that the

23   definitions are alphabetical.

24   A.  Yes, I don't see jail administrator.  I see jail.

25   Q.  Right.  And that refers to the facilities -- the certain

1  facilities; is that correct?

2  A.   Yes.

3  Q.   Turning back to page -- excuse me, paragraph 38.

4  A.   Yes.

5  Q.   Do you see where it references training and experience in

6  the management of a large -- of a large jail?

7  A.   Yes.

8  Q.   Does the settlement agreement define what constitutes a

9  large jail?

10  A.   Well, as you pointed out, it defines jail, but not large

11  jail.

12  Q.   Do you know whether the American Jail Association defines

13  a large jail of 250 to 999 bed capacity?

14  A.   I -- I know that Mr. Parrish has talked about the Large

15  Jail Network.  I believe it was somewhat larger than that, but

16  I don't have personal knowledge.

17  Q.   You heard Major Bryan testify twice already; is that

18  correct?

19  A.   Yes.

20  Q.   Did she manage a large jail?

21  A.   I don't recall the capacity of her jails.  They were

22  smaller than Hinds County I believe.

23  Q.   Do you believe there's a difference between a prisoner

24  and a detainee?

25  A.   Yes.

1   Q.   What is your understanding of the difference?

2   A.   A detainee is somebody who is being held prior to

3   conviction and a prisoner is a broader term.  I would say it

4   could encompass a detainee, but it would also encompass

5   convicted individuals.

6   Q.   Is one of the things you were tendered as an expert in

7   yesterday an expert in prisoner reentry and discharge?

8   A.   Yes.

9   Q.   Would you turn to paragraph 45(d) on page 18 of the

10   consent decree, please?

11   A.   Yes.

12   Q.   Does that provision address jail administrator training?

13   A.   Yes.

14   Q.   Do you see the last sentence -- well, I've highlighted

15   the last sentence on the Elmo.  But in any event, you can see

16   it there.  It reads, "Training comparable to the jail

17   administration curriculum offered by the National Institute of

18   Corrections will meet the requirements of this provision."

19   A.   I see that.

20   Q.   Do you know whether Frank Shaw has received training

21   comparable to the jail administration curriculum offered by

22   the National Institute of Corrections?

23   A.   I do not.

24   Q.   Do you have Exhibit P-2 in your notebook, the stipulated

25   order?

1    A.    Yes.

2    Q.    Would you turn to page 5, please?

3    A.    Yes.

4    Q.    This is in section II, subpart C.  Does that address the

5    hiring of a jail administrator?

6    A.    Yes.

7    Q.    Do the subparts 1, 2, and 3, to paragraph C there set

8    certain timelines for the County to hire a jail administrator?

9    A.    Yes.

10   Q.    Okay.  Do those -- in your view, do those timelines reset

11   when the jail administrator resigns?

12   A.    Which jail administrator?

13   Q.    Major Bryan.

14   A.    I believe these timelines ran from when the stipulated

15   order was entered.  I don't know; I guess I wouldn't

16   necessarily interpret them as kicking in again when another

17   administrator resigns.  I guess that's a possible

18   interpretation.

19   Q.    Okay.  But -- so the stipulated order was entered, and

20   then at some point, Major Bryan was hired; is that correct?

21   A.    Well, the stipulated order was entered and the job

22   description was revised and posted, and then Warden Fielder

23   was hired pursuant to this timeline.

24   Q.    Well, so in your view, does this timeline even apply to

25   anybody past Warden Fielder?

1  A.   Fielder.

2  Q.   Fielder.

3  A.   It -- it doesn't explicitly.

4  Q.   Okay.  But if it applies to the jail administrator

5  following the resignation of Major Bryan, none of these

6  timelines have ran yet, have they?

7  A.   No.

8  Q.   Are you recommending the removal of Mr. Shaw?

9  A.   I don't know him.  I haven't met him.  I've only seen his

10  CV, and my role is at this point to determine for purposes of

11  the next monitoring report whether he meets the requirements

12  of paragraph 38.

13  Q.   Do you have any understanding one way or the other

14  whether prisons typically have more expansive facility and

15  services than jails?

16  A.   Did you say prison facilities have more expansive?

17  Q.   Yes.

18  A.   I would say they have different services.  Ideally, they

19  have services that are designed for people that are going to

20  be in prison for longer periods of time, and ideally address

21  programming that will assist with education and vocational

22  services upon release.

23  Q.   From reading his CV, are you aware that Mr. Shaw was the

24  warden at East Mississippi Correctional Facility?

25  A.   I recall that, yes.

1    Q.   Do you know whether that facility has specifically

2    dedicated mental health facilities?

3    A.   I don't.

4    Q.   Do you know whether it has specifically dedicated medical

5    facilities?

6    A.   I don't.  I would assume it has at least an infirmary.

7         THE COURT:  Mr. Shelson, I don't know how much longer

8    you have, but it's -- we're into what our usual lunch break

9    is.  And I don't want to -- you know, if you only have a

10   couple more minutes, I'll let you get through, but otherwise I

11   think it's time for us to take our lunch break.

12        MR. SHELSON:  Yes, sir, I have more than a few minutes.

13        THE COURT:  Okay.  All right.  It's 12:36.  Ladies and

14   gentlemen, thank you.  We're going to be in recess until 2:00,

15   and that will give us an opportunity -- we'll start back up at

16   2:00 p.m.  We will be in recess.

17             (A lunch recess was taken.)

18        THE COURT:  You may be seated.

19        Ms. Simpson, would you return to the stand, please.

20        MR. SHELSON:  May I proceed, Your Honor?

21        THE COURT:  You may.

22        MR. SHELSON:  Your Honor, the parties have conferred

23   and stipulate to the admission of what's been marked as P-106,

24   which is the January 2022 quality assurance summary.

25        THE COURT:  P-106 will be received in evidence.

1        (Plaintiff's Exhibit 106 entered.)

2    BY MR. SHELSON:

3    Q.   Ms. Simpson, I had another question about the exit

4    interviews.  During the very last exit interview, do you know

5    if that -- if the exit interview was scheduled at the same

6    time as a board meeting was occurring?

7    A.   I don't know.  I learned, I believe that day that the

8    board meeting would be that morning and I don't know how long

9    the board meeting went.

10   Q.   Prior to the very last exit interview did members of the

11   County administration attend the other exit interviews?

12   A.   Yes.

13   Q.   Is a market analysis needed to determine whether

14   compliance with the staffing analysis numbers is even

15   possible?

16   A.   I don't know that it's required.  Yeah.  I don't know

17   that it's required.  I think it's recommended to determine

18   what might impact the staffing levels.

19   Q.   Would a market analysis also be important for retention

20   purposes?

21   A.   Definitely.

22   Q.   Ms. Simpson, is your monitor working?

23   A.   Yes.

24   Q.   Okay.  This is the fifteenth monitoring report, P-41,

25   page 85.  This is the narrative for paragraph 77(a).

```
 1   A.   Yes.
 2   Q.   And you're welcome to read that if you want and let me
 3   know when you're finished, but I mainly wanted to ask you
 4   about the bullet points that are highlighted in blue on the
 5   left.
 6   A.   Okay.
 7   Q.   The bullet points that are listed on page 85, where did
 8   those come from?
 9   A.   Dr. Dudley prepared this section of the report.
10   Q.   Are the matters listed in the bullet point enumerated in
11   paragraph 77(a) of the settlement agreement?
12   A.   I'd have to look.
13   Q.   Go ahead.  Page 34 of P-1.
14   A.   Well, 77(a) requires the input of a QMHP, and these
15   bullet points are spelling out what the QMHP should look at in
16   providing that input.
17   Q.   Right.  So that's -- so the bullet points are
18   Dr. Dudley's opinion of what should be included in QMHP's
19   evaluation?
20   A.   Yes.
21   Q.   But are the bullet points themselves enumerated in
22   paragraph 77(a)?
23   A.   No.
24   Q.   I'm going to show you exhibit -- excuse me -- D-126,
25   which is also in your notebook, but I'm going to refer you to
```

1  the bottom e-mail.  Is that an e-mail from Kathryn Bryan to

2  you dated August 29, 2001?

3  A.   Yes.

4  Q.   First sentence reads, "It has become nearly impossible

5  for me to do the job for which I was hired"?

6  A.   Yes.

7  Q.   And then did you respond to that e-mail on August 29,

8  2001 [sic]?

9  A.   Yes.

10  Q.   And does the first two sentences of your e-mail read,

11  "Hi, Kat, I'm really sorry to hear that the administration is

12  making your job so difficult.  I did let the judge know about

13  the problem and asked him to emphasize the importance of

14  getting the cooperation of the administration"?

15  A.   Yes.

16  Q.   And August 29th, 2001, [sic] do you recall who the

17  sheriff was then?

18  A.   2021?

19  Q.   Yes.

20  A.   I think by then it was Sheriff Crisler.

21  Q.   And did you communicate with Sheriff Crisler about

22  Major Bryan's concerns?

23  A.   No.

24  Q.   Is there any reason why you didn't ask the sheriff for

25  his perspective?

1  A.   When I have communication with the sheriff or with the

2  board, I typically go through their attorney.

3  Q.   Did you go through the sheriff's attorney to get the

4  sheriff's perspective on the concerns that Major Bryan raised

5  on August 29, 2021?

6  A.   I think I had a conversation with Ms. Barker.  It seems

7  to be reflected in this e-mail as well.

8  Q.   Did Ms. Barker have a different perspective than

9  Major Bryan?

10  A.   I don't recall that.  And I actually don't recall if in

11  the reference to the administration that we were talking about

12  the sheriff's administration or the County administration.

13       MR. SHELSON:  Okay.  Your Honor, I don't recall if this

14  is -- if D-126 is into evidence, but in any event, we move to

15  admit D-126 into evidence.

16       THE COURT:  It's in evidence already.

17       MR. SHELSON:  Thank you, Your Honor.

18       THE COURT:  Uh-huh.  Thank you.  Through Major Bryan.

19  BY MR. SHELSON:

20  Q.   I'm going to show you Exhibit D-97.  Is this an e-mail

21  from Kathryn Bryan to you dated November 3rd, 2021?

22  A.   Yes, it appears to be.

23  Q.   And does it show the election results for the Hinds

24  County Sheriff?

25  A.   Yes.

1    Q.   And does, in the e-mail Major Bryan write to you, "Looks

2    like a runoff in two weeks"?

3    A.   Yes.

4    Q.   Is there any particular reason why you and Major Bryan

5    were communicating about the sheriff election results?

6    A.   I don't actually remember reading this e-mail, but I

7    think she was concerned about getting some stability with a

8    new sheriff.  And the fact that there would be a runoff put

9    that off by whatever that was, three weeks or something like

10   that, two weeks apparently.

11   Q.   Did Major Bryan ever express to you a preference for who

12   she wanted to be the sheriff?

13   A.   No, she did not.

14   Q.   Did -- how did Major Bryan come to your attention as a

15   candidate to be jail administrator?

16   A.   Ms. Albert, who was on my team, I believe had worked with

17   her through some NIC projects.  And when there was going to be

18   an opening -- actually, both the first time when Warden

19   Fielder and the second time when Major Bryan was hired,

20   Ms. Albert recommended her and I passed that information on to

21   the County.

22   Q.   Did you also pass it on to DOJ?

23   A.   Not that I recall.

24   Q.   Did you interview Major Bryan regarding the jail

25   administrator position?

1   A.   No.  At some point during the hiring process, she asked

2   if she could have a phone call with me to talk about what the

3   monitoring process was like, and I did that.  But that was not

4   an interview.

5   Q.   Did you have any discussions with Major Bryan about a

6   receiver being appointed?

7   A.   Yes.

8   Q.   Did Major Bryan ever say anything to you about wanting to

9   be the receiver?

10  A.   No.

11  Q.   What was the substance of your discussions with

12  Major Bryan regarding the receiver issue?

13  A.   I think initially it was asking what a receiver was and

14  how that worked.  And then at one point, she asked if it was

15  possible to have a receiver that would still allow her to run

16  the day-to-day operations of the jail.

17  Q.   What was your response?

18  A.   I said -- at that point, I think the parties were talking

19  about negotiating a receiver, and I said that it could be

20  structured that way.  It would be up to the parties if they

21  negotiated it or up to the Court if the Court decides it.

22       MR. SHELSON:  Your Honor, we move to admit D-97 into

23  evidence.

24       THE COURT:  Any objection?

25       MR. CHENG:  No objection.

```
 1          THE COURT:  D-97 will be received in evidence.
 2              (Defendants' Exhibit 97 entered.)
 3    BY MR. SHELSON:
 4    Q.   Show you what's been marked as Exhibit D-92.  Is this an
 5    e-mail from you to Major Bryan dated December 14, 2021?
 6    A.   Yes.
 7    Q.   And do you ask her to find some time for a conversation
 8    to get an update on how she thought things were going with the
 9    new sheriff?
10    A.   Yes.
11    Q.   And was that new sheriff Sheriff Jones?
12    A.   Yes.
13    Q.   Did you ever have the discussion with Major Bryan where
14    she gave you an update on how things were going with
15    Sheriff Jones?
16    A.   I'm sure I did.
17    Q.   Was it a negative report from Major Bryan?
18    A.   I don't recall at that time whether it was negative or
19    not.  Things definitely soured at some point.
20    Q.   At any point after December 14, 2021, did you talk to
21    Sheriff Jones to get his perspective?
22    A.   I e-mailed Mr. Gaylor and Mr. Chambers and asked who was
23    representing the sheriff at that point and requested that we
24    set up a conversation.
25    Q.   Was that done?
```

1   A.   No.

2   Q.   When was the first time that you personally spoke to

3   Sheriff Jones?

4   A.   It might have been at the site visit.  Well, I actually

5   had spoken to him at earlier site visits when he was over CID

6   investigations.

7   Q.   When was the first time you spoke with Sheriff Jones

8   after he became sheriff?

9   A.   I believe it was at the site visit.

10  Q.   And was that the meeting in the sheriff's office on about

11  January 25th, 2022?

12  A.   That sounds right.

13  Q.   Did you tell the sheriff at that meeting that monitors

14  try not to take sides in personnel disputes?

15  A.   Yes.

16  Q.   And is that still the monitor's position?

17  A.   Yes.

18      MR. SHELSON:  Your Honor, we move to admit Exhibit D-92

19  into evidence.

20      THE COURT:  D-92?

21      MR. SHELSON:  Yes, sir.

22      MR. CHENG:  No objection.

23      THE COURT:  All right.  D-92 will be received in

24  evidence.

25          (Defendants' Exhibit 92 entered.)

1   BY MR. SHELSON:

2   Q.   I want to ask you next, Ms. Simpson, about the CJCC, and

3   I'm referring you to paragraph 116 of the settlement

4   agreement, which is Exhibit P-1.

5   A.   Yes.

6   Q.   Have you had a chance to look at -- let me know when

7   you've had a chance to review paragraph 116, please.

8   A.   Yes, I'm fine.

9   Q.   Do you see the second sentence where it says, "The County

10  will also seek representation from..." and then it lists a

11  number of entities?

12  A.   Yes.

13  Q.   Do you understand -- do you have an understanding whether

14  the County can require those entities that are listed to

15  participate?

16  A.   I have an understanding that they can't require those

17  independent agencies to participate.

18  Q.   Do you have an understanding as to whether any of the

19  entities that are listed in the second sentence of paragraph

20  116 are before the Court in this matter?

21  A.   They are not.

22  Q.   And did I understand your testimony on direct to be that

23  you believe a receiver should be appointed?

24  A.   Yes.

25  Q.   And in your view would a receiver be able to direct the

1  actions of the entities listed in the second sentence of

2  paragraph 116?

3  A.  No, a receiver could not.

4  Q.  Does the settlement agreement contain any time limit by

5  which the County must achieve compliance?

6  A.  I think there are time limits on various provisions.

7  Q.  Let me rephrase that question.  Does the settlement

8  agreement contain a time limit by what -- by which the County

9  must obtain overall compliance?

10  A.  I don't recall.

11  Q.  Ms. Simpson, is this an e-mail from Mr. Cheng dated

12  December 28th, 2021, that you were copied on?

13  A.  Yes.

14  Q.  Does -- the second sentence, does it read, "We have

15  discussed this proposal with the monitor, Ms. Simpson, and

16  would be happy to have a discussion with you as well"?

17  A.  Yes.

18  Q.  Is this the proposal that's referenced in the

19  December 28, 2021, e-mail?

20  A.  I think it probably is.

21  Q.  And did, in fact, the DOJ discuss this proposal with you?

22  A.  Yes.  There might have been an e-mail exchange.  I'm not

23  sure.  Yeah, I think we did talk about it.

24  Q.  Did you have any comments regarding the proposal?

25  A.  I think we talked about sort of designating the role that

1    the compliance director vis-à-vis the jail administrator would

2    have under this order.  Other than that, I don't think I had

3    comments.

4    Q.   Did -- is compliance director the same thing as a

5    receiver?

6    A.   I don't fully know, but I think it is something

7    different.  It's like a receiver but with less broad powers is

8    my understanding.

9    Q.   You -- when you stated that there should be a receiver,

10   what do you think the scope of the receiver's power should be?

11   A.   I think that what I'm familiar with with receivers, which

12   is not extensive, but I think the power should be to be able

13   to have the contracting, personnel, budgetary powers to ensure

14   that the detention services gets the support that it needed --

15   needs.  And then depending on the skill and experience of the

16   jail administrator, it could be also to include the actual

17   running of the jail.

18   Q.   So would -- under your recommendation to have a receiver

19   be appointed, would the monitoring team continue in place as

20   well?

21   A.   It's my understanding that that's how it works even with

22   a receiver appointed.

23   Q.   Well, is that what you -- is that what you're

24   recommending, that there be a receiver and that the monitoring

25   team continue?

1    A.   I think that the requirement for our team to monitor

2    would still be active in the settlement agreement, and I think

3    that it would be -- it's certainly appropriate to see if the

4    progress is being made with the receiver.  Presumably, less

5    technical assistance would be needed.

6    Q.   So I'm going to represent to you that the pages on this

7    proposed order were not numbered, so I handwrote page numbers

8    on it.  I'm referring you to page 2, this highlight here.

9    "The compliance director shall have the duty to control,

10   oversee, supervise, and direct all administrative personnel,

11   financial, accounting, contractual, legal, and other

12   operational functions for the Hinds County Jail, which in

13   accordance with this Court's orders includes the Raymond

14   Detention Center, work center, and any other placement

15   facilities used by the County's detainees."

16        Are you recommending similar powers for the receiver you

17   recommended in this case?

18   A.   Well, I didn't recommend a specific receiver, but, yes, I

19   think this is a good description of -- of the duties.

20   Q.   Turning to page 3, the section, "See caption, Budgeting

21   and Accounting" reads in part, "The compliance director shall

22   determine the annual Hinds County Jail budget, including for

23   staff salaries and benefits, medical and mental health

24   services, including the medical provider contract, physical

25   plant improvements, fire safety, and any other remedies needed

1    to address the deficiencies documented in this case for Hinds

2    County Jail detainees and youth charged as adults.  A budget

3    will include funds to implement the master plan and new jail

4    construction."

5        Are you -- are you recommending similar authority for the

6    receiver in this case?

7    A.   I think it would be appropriate.

8    Q.   Are you recommending any limits on the budget that the

9    receiver could set for the Hinds County Jail?

10   A.   If I recall this document, and I only reviewed it once,

11   there's a provision for disagreements about the budget to be

12   presented to the judge, and I believe that's a good safeguard

13   on the size of the budget.

14   Q.   What about any limits on the staff salaries and benefits?

15   A.   I would say the same.

16   Q.   Same for everything listed there?

17   A.   Yes.

18   Q.   Page 5, Section 3A, "General Powers," I want to talk

19   about this sentence here.  "The defendants' exercise of the

20   above powers as to the Hinds County Jail is suspended for the

21   duration of the compliance director's term."

22       Are you recommending that the defendants' exercise of all

23   powers vested by law in the defendants in this case as they

24   relate to the administration, control, management, operation,

25   and financing of Hinds County Jail be suspended while there's

1    a receiver in place?

2    A.   I think my comment to DOJ was that I thought there should

3    be, as I mentioned, clarification of the role of the

4    compliance director and the role of the jail administrator

5    during the compliance director's term.

6    Q.   This subsection B, the first sentence, page 5, reads,

7    "Compliance director shall have the power to hire, fire,

8    suspend, supervise, promote, transfer, discipline, and take

9    all other personnel actions regarding Hinds County Jail

10   employees or contract employees who perform services related

11   to the operation of Hinds County Jail."

12   A.   I see that, yes.

13   Q.   Are you recommending similar power for the receiver?

14   A.   With the same caveat that I was suggesting there be some

15   clarification of the role of the jail administrator versus the

16   compliance director.

17   Q.   Last sentence in the subparagraph B, "Personnel.  The

18   compliance director shall also be empowered to negotiate new

19   contracts and to renegotiate existing contracts in the event

20   that such action is necessary for the compliance director to

21   fulfill his or her duties under this order."

22        Are you recommending similar powers for the receiver?

23   A.   Yes.

24   Q.   What if -- what about a contract that's in existence

25   regarding the jail that hasn't run its term?

1   A.   I think that's something that would have to be evaluated

2   in terms of any penalties under the contract.

3   Q.   Page 6, C, "Requisition Process" reads, "The compliance

4   director shall have the power to acquire dispose of,

5   modernize, repair and lease property, equipment and other

6   tangible goods and services as necessary to carry out their

7   duties under this order.  No additional authorization for the

8   acquisition or disposal of property shall be required from any

9   governmental entity."

10       Are you recommending similar power for the receiver?

11   A.   Yes.  And as I said previously, I think that there's a

12   general provision which allows for going to court -- going

13   back to the Court if there's a dispute on some of these

14   matters, and I think that provides a safeguard.

15   Q.   Do you believe that the receiver should or should not be

16   subject to state procurement laws?

17   A.   That's a legal question I don't know the answer to.

18   Q.   Do you have a recommendation in that regard?

19   A.   My recommendation would be that the law be adhered to.

20   Q.   Would that be the same with respect to any other

21   applicable state laws?

22   A.   Well, I mean, the law being adhered to in that if there

23   is some law regarding the primacy of a federal court order,

24   vis-à-vis state procurement laws.  Whatever the outcome of

25   that research would be is -- that's what should be followed.

1    Q.   Section 4, "Office of the Compliance Director."  This is

2    subpart A, "Compliance director shall be paid a reasonable

3    compensation for his or her services in an amount to be

4    approved by this Court."

5         Do you have any understanding of what typically

6    constitutes reasonable compensation for a receiver?

7    A.   I do not.

8    Q.   Then subpart B says in part that, "The compliance

9    director shall establish an office of the compliance director

10   in a location to be determined in consultation with the Court

11   with staffing necessary to fully carry out his or her duties

12   as set forth in this order, including legal representation for

13   the compliance director and any necessary staff and/or

14   consultants to be paid by defendants."

15        Do you believe that an office of compliance director

16   should be established with such staffing authority?

17   A.   My knowledge of receivers does not get to this level of

18   detail, but it would seem that some staff would be needed to

19   fulfill the duties.

20   Q.   So under the receivership you're recommending there --

21   tell me if I'm correct -- there would be a receiver, the

22   four-person monitoring team would continue, there would be an

23   office of the receiver with authority to hire staff and legal

24   representation all at the County's expense?

25   A.   Yes.

1   Q.   And do you have any idea how much that would cost on an

2   annual basis?

3   A.   No.

4   Q.   So we know that the four-person monitoring team costs

5   about $275,000 a year?

6   A.   I think we've usually been a little under budget, but,

7   yes, in that range.

8   Q.   So then the receiver and the receiver's office staff and

9   legal representation would, of course, be in addition to that

10  amount?

11  A.   Yes.  Although as I mentioned, I think we would probably

12  be providing less technical assistance if there was a

13  receiver.

14  Q.   Do you have any recommendation regarding for how long a

15  receiver should be appointed?

16  A.   I don't.  I think the goal would be to achieve

17  compliance, so at sometime -- at that point and once there's

18  sustained compliance, I think the receivership wouldn't go

19  beyond that.

20  Q.   When you say "to achieve compliance," can you be any more

21  precise than that?  What do you mean when you say "to achieve

22  compliance"?  What would that look like?

23  A.   I think that would be what's spelled out in paragraph

24  164.  Although, I have not given the duration of the

25  receivership a lot of analysis.  I think it could be less than

 1    full compliance, and it could taper off in different ways

 2    where the County took on more and more of the receivership's

 3    duties.  So I think it could be designed in different ways.

 4    Q.   What about paragraph 165 of the settlement agreement,

 5    have you consideration to termination under that provision?

 6    A.   Are you asking if it would terminate if the --

 7    Q.   Well, do you agree that paragraph 164 references

 8    substantial compliance?

 9    A.   Yes.

10    Q.   Do you agree that paragraph 165 references substantially

11    implemented?

12    A.   Yes.

13    Q.   Okay.  Do you have an understanding of what substantially

14    implemented means?

15    A.   I'm not sure how it would be very different from

16    substantial compliance.

17    Q.   Is substantially implemented a defined term under the

18    settlement agreement?

19    A.   It may be.  I can look.

20    Q.   If you would look at the definitions, I think it would

21    probably be around page 8 or 9.

22    A.   No, I don't see it.

23    Q.   Have you reviewed the resumes of the three individuals

24    that DOJ recommended to be receiver?

25    A.   I have not.

1    Q.   So I take it, then, you did not -- well, did you

2    recommend any of them to DOJ?

3    A.   I did not.  My team reviewed them, and I passed on their

4    comments.

5    Q.   Did you pass on comments regarding more than the three

6    who have been proposed to the Court?

7    A.   Yes.

8    Q.   Do you know whether any of the three individuals proposed

9    to be the receiver in this case by DOJ previously resigned any

10   other monitor positions?

11   A.   I don't know.

12   Q.   Do you know whether any of the three candidates proposed

13   by DOJ previously worked for DOJ?

14   A.   I don't know.

15   Q.   I understand you to testify on direct that the most

16   efficient and quickest way to compliance is a receiver?

17   A.   I believe so.

18   Q.   When you say "quickest way," how quick did you have in

19   mind?

20   A.   I don't know.

21   Q.   You said "efficient."  Efficient in what sense?

22   A.   Well, we've been doing the monitoring -- excuse me -- for

23   over five years now, and there has not been a lot of progress.

24   There's been a lot of starting and stopping, going in

25   different directions.  And I think that has been a very

1    inefficient way of moving towards compliance, and that a

2    receiver would not have the same approach.

3    Q.    Do you agree that Hinds County's budget in any given year

4    is a finite sum of money?

5    A.    I'm sorry.  Could you repeat that?

6    Q.    Sure.  Do you agree that in any given year, Hinds

7    County's budget is a finite sum of money?

8    A.    I believe that's generally the case, yes.

9    Q.    And do you agree that if more money is shifted to

10   detention, then that's less money for something else?

11   A.    That would generally be true except possibly in the area

12   of capital expenditures.

13   Q.    So, for instance, if a receiver wanted more money for

14   detention service that could mean, for example, less money for

15   roads and bridges?

16   A.    I'm not real familiar with Hinds County budget or

17   government budgets generally.  At times the funding for roads

18   and bridges is predominantly federal, and that I don't believe

19   could be redirected to detention services.

20   Q.    But the part of Hinds County budget that does go to roads

21   and bridges, if more money were directed towards detention

22   service, then that would be less money available for other

23   things such as roads and bridges; is that correct?

24   A.    If that's all general fund, yes, that would be the case.

25   Q.    Do you know whether Hinds County's required by law to

1  have a balanced budget?

2  A.  I'm not familiar with the law, but I think generally

3  there's supposed to be a balanced budget.

4  Q.  How, if at all, would a receiver be accountable to the

5  people?

6  A.  I think, once again, that the protection of being able to

7  return to the Court if there are disagreements between the

8  receiver and the County is -- provides a safeguard for being

9  accountable to the people.

10  Q.  But do you agree that a receiver would not be directly

11  accountable to the voters?

12  A.  That would be true.

13  Q.  And is it your understanding that the Hinds County Board

14  of Supervisors are elected officials?

15  A.  Yes.

16  Q.  And that the sheriff is an elected official?

17  A.  Yes.

18  Q.  And that the board and the sheriff are accountable to the

19  people through the voting process?

20  A.  Yes.

21  Q.  I believe you were asked on direct about remedies less

22  intrusive than a receiver.  What remedies, if any, less

23  intrusive than a receiver have you considered?

24  A.  Well, the stipulated order was a remedy less than a

25  receiver, and I've certainly thought about whether another

1  stipulated order would be an appropriate remedy.

2  Q.   And you may have just answered, but let me narrow my

3  question.  Have you considered any remedies that are less

4  intrusive at this time than a receiver?

5  A.   I think my answer would be the same.  It wouldn't

6  necessarily have to be a stipulated order, but one option

7  would be an order that lays out specific, objective,

8  measurable steps as was done in the stipulated order.

9  Q.   And is that a potentially viable option in your view?

10  A.   I don't believe so.

11  Q.   Why not?

12  A.   Because the stipulated order that was previously entered

13  did not prove to be effective in achieving the compliance.

14  Q.   Okay.  The stipulated order was operational while all of

15  the other provisions of the consent decree were also

16  operational; is that correct?

17  A.   That's correct.

18       MR. SHELSON:  Can I have a moment, Your Honor?

19       THE COURT:  Okay.

20  BY MR. SHELSON:

21  Q.   Do you know what the jail population was before you

22  became the monitor?

23  A.   I understand it was significantly higher, like, maybe

24  around 1,000.  I am not sure.

25  Q.   And the population has gone down over time?

```
 1   A.   Yes.
 2   Q.   And the thousand you referenced, was that RDC, or was
 3   that more than RDC?
 4   A.   I believe that was total.
 5   Q.   Do you know what RDC was?
 6   A.   No, I don't.
 7   Q.   Do you know what RDC is now?
 8   A.   I believe it's around 400.
 9   Q.   Do you know what RDC was, the population, when you became
10   monitor?
11   A.   I don't recall.
12   Q.   Do you know if it was a little more or less than 400?
13   A.   I believe it was more.
14   Q.   Do you know whether the staffing back in 2013 -- well, I
15   think you said 2009 or 2010 is an apples-to-apples comparison
16   of the facts on the ground now regarding the labor market?
17   A.   I don't know what the labor market was like at that time
18   here.
19   Q.   But you do know there was no COVID-19 at the time?
20   A.   Yes, I agree to that.
21   Q.   And there was not a great resignation labor phenomenon
22   going on at the time?
23   A.   Not that I know of.
24   Q.   And do you know if -- do you know if wages at places like
25   Starbucks and McDonald's were -- where they were in relation
```

1   to Mississippi's minimum wage at the time?

2   A.   I do not.

3       MR. SHELSON:  Thanks for your time, Ms. Simpson.

4       Your Honor, no more questions.

5       THE WITNESS:  Thank you.

6                    **REDIRECT EXAMINATION**

7   BY MR. CHENG:

8   Q.   Ms. Simpson, let's start first with the deaths that have

9   occurred at the jail.  With the several deaths that occurred

10  in 2021, what was the situation in terms of the jail's

11  compliance with the consent decree before those deaths

12  occurred?

13  A.   Mostly noncompliant or partially, but significantly far

14  from compliance.

15  Q.   And had there been status conferences to talk about

16  trends and conditions in the jail?

17  A.   Yes.

18  Q.   And had anything been discussed at those status

19  conferences about the direction the jail was going towards in

20  terms of compliance?

21  A.   I believe so.

22  Q.   Again, what types of trends had been identified?

23  A.   Well, certainly a major concern is that the staffing

24  level is at an all-time low, lower than when we started the

25  monitoring process.

```
 1   Q.   And had the defendants been warned that the staffing was
 2   headed towards a low?
 3   A.   Well, we consistently reported on the staffing levels,
 4   and they were going down.
 5   Q.   And at the time, the stipulated order, was that in effect
 6   before the deaths occurred?
 7   A.   Yes.
 8   Q.   And had there been warnings about the use of booking
 9   cells --
10   A.   Yes.
11   Q.   -- for housing mentally ill patients?
12   A.   Yes.
13   Q.   Were there other warnings to the defendants that things
14   were not headed in the right direction?
15   A.   I would say our monitoring reports indicated some serious
16   problems we were observing.
17   Q.   And over the history of this case, have there been female
18   administrators or female officers who did a good job at the
19   jail?
20   A.   Yes.
21   Q.   Under Warden Rushing, did she need to use Tasers in order
22   to force compliance on inmates?
23   A.   They did not have Tasers at that time.
24   Q.   And who is Captain Dalton?
25   A.   Captain Dalton is Sandra Dalton.  She was the captain at
```

 1    JDC before her retirement.

 2    Q.   And how did she do at JDC?

 3    A.   She ran a very good facility there.

 4    Q.   Now, was she able to correct the deficiencies in JDC?

 5    A.   Well, not the building itself certainly.  But -- and

 6    there were issues that were systemwide that were still

 7    problematic, such as the lack of policies and procedures, but

 8    she generally did a good job with what she had.

 9    Q.   Did she need to use Tasers to force compliance on her

10    inmates?

11    A.   No.

12    Q.   In your own reports, did you describe whether the deaths

13    that arose in 2021 occurred because of systemic policy and

14    supervision issues that you've already discussed?

15         MR. SHELSON:  Object to leading.

16         THE COURT:  Do not lead the witness.

17    BY MR. CHENG:

18    Q.   All right.  Did you draw any conclusions about whether

19    systemic violations led to deaths in 2021?

20    A.   Yes.

21    Q.   And when did you do that?

22    A.   I believe both in the context of our monitoring reports

23    and also the interim report that we prepared.

24    Q.   Let's talk a little bit about the types of remedies that

25    have been adopted in this case.  When the consent decree was

1    entered, was there a PLRA stipulation?

2    A.    Yes.   I've read that in the agreement.

3    Q.    So at the time the decree was entered, did you have any

4    understanding about whether the remedies were constitutionally

5    required?

6    A.    That was stated in the settlement agreement.  I didn't

7    make an independent determination as to what was required

8    under current case law.

9    Q.    Has anything occurred in the last year or two that would

10   suggest that those remedies are no longer required?

11   A.    Not to my knowledge.

12   Q.    And when you discussed the deaths or assaults that were

13   brought up by Mr. Shelson, does any of that change your

14   opinion about whether the remedies are still required?

15   A.    No.

16   Q.    Let's talk a little bit about your subject matter

17   experts.   We covered some of this already on your direct, but

18   did the County ever suggest alternative names to serve as your

19   subject matter experts?

20   A.    No.

21   Q.    Has the County ever objected to any of their expertise

22   until the recent round of litigation?

23   A.    No.

24   Q.    And who do you and your subject matter experts actually

25   report to in this case?

1    A.   The Court.

2    Q.   Are you independent experts, or do you report in any way

3    to the defendant or to the United States?

4    A.   Independent experts, we are.

5    Q.   In terms of your billing, does your billing also cover

6    the time you spend on technical assistance?

7    A.   Yes.

8    Q.   And what else does it cover besides the time you spend on

9    your tours?

10   A.   The preparation of the report, certainly follow-up

11   questions in connection with preparing the report or

12   determining whether there's been any additional information

13   relative to the report before its filed.  And as you said,

14   technical assistance and a lot of review of documents on a

15   monthly basis.

16   Q.   Does that include the policy and procedure review?

17   A.   Actually, that would be another item.  I think of that as

18   technical assistance, but that's actually a substantial part

19   of my time.

20   Q.   And when the County attorneys have questions or if a

21   party has questions for you, do you bill for that as well?

22   A.   Yes.

23   Q.   If the County had taken more steps to come into

24   compliance, would that have effected the amount of time the

25   monitoring team had to spend on this case?

1    A.   Yes.  I would say yes.

2    Q.   Can you give any examples of initiatives or policies that

3    took more of their team's time than it might have if the

4    County had taken recommended actions?

5    A.   Well, the policy and procedure is a good example.  They

6    had looked at contracting with some consultants to facilitate

7    the preparation of the policies and procedures.  And if they

8    had followed through with those contracts, my billing would

9    certainly have been less.

10   Q.   Did the lack of information systems or data systems

11   effect the amount of time you need to monitor?

12   A.   Yes.  I mean, if the data system was in fact able to put

13   out reports, there would still be some auditing that would

14   need to be done, but it would not take as much time to drill

15   down into the underlying documents.

16   Q.   So, for example, the monthly incident reporting

17   spreadsheet, does that spreadsheet help improve the efficiency

18   of monitoring?

19   A.   Well, if it -- if one were able to run accurate reports

20   out of it, the monitoring could be more efficient.  But since

21   that's not the case, we really need to review all of the

22   incident report narratives and supplemental narratives.

23   Q.   There was a lot of discussion about what compliance means

24   or sustained compliance.  Does the decree have a construction

25   and termination section?

1    A.   It does.

2    Q.   And does your team consider the construction section when

3    assessing levels of compliance?

4    A.   We certainly use the terms noncompliance, partial

5    compliance, and substantial compliance.

6         MR. CHENG:   If we could pull up Plaintiff's Exhibit 1,

7    paragraphs 164 and 165.   Paragraphs 164 and 165.

8    BY MR. CHENG:

9    Q.   So there's some discussion about what sustained

10   compliance means.

11   A.   Yes.

12   Q.   Do any of these provisions affect your use of that term?

13   A.   Paragraph 164 talks about substantial compliance for at

14   least two years, and that is the benchmark we use to identify

15   something that was what we called sustained compliance.

16        Oh, I don't have the -- I mean, I have the consent decree

17   here, but my screen is blank again.

18   Q.   All right.   If you can see it on paper --

19        THE COURT:   We'll have the monitor checked, but look at

20   your consent decree.   If you don't mind, look at the hard

21   copy.   I'm sorry about our technical glitch.

22        THE WITNESS:   Yeah.

23   BY MR. CHENG:

24   Q.   There's also some discussion about additional benchmarks

25   or measurables to try to gauge compliance.   Would adding

1   additional benchmarks have improved the ability of the

2   defendants to comply with the decree?

3         MR. SHELSON:  Objection, Your Honor.  There's no

4   foundation and it calls for speculation, because there's

5   nothing before the witness of what the benchmark would be.

6         THE COURT:  Rephrase your question.

7   BY MR. CHENG:

8   Q.   Do you recall Mr. Shelson asked about whether you had

9   specific measurable data or measurables for gauging

10  compliance?

11  A.   Yes.

12  Q.   If the decree had those types of measurable outcomes,

13  would the defendants have been able to better comply with the

14  decree?

15  A.   I would say no.

16  Q.   And are there actually objective requirements in the

17  decree?

18  A.   Yes.

19  Q.   And have they been able to meet the objective

20  requirements that are in the decree?

21  A.   No.

22  Q.   Have they been able to make sure they have one officer in

23  every housing unit?

24  A.   No.

25  Q.   And how about the -- are there rebuttable presumptions in

1    the decree?

2    A.   No.

3    Q.   And have they triggered any of those rebuttable

4    presumptions?

5    A.   Yes.

6    Q.   Have the defendants previously argued that the decree is

7    too complicated, or there's already too much in it for them to

8    comply with?

9    A.   I've heard that, yes.

10   Q.   Would adding more provisions make it easier for them to

11   comply with it?

12   A.   No.

13   Q.   Has the County had the opportunity after you submit draft

14   reports to provide comments to you about your reports?

15   A.   Yes.

16   Q.   And do you consider those comments before you finalize a

17   report?

18   A.   Yes, I do.

19   Q.   Do you illustrate in any way things you've changed in

20   those reports in consideration of their comments?

21   A.   I've only received comments once from defense counsel,

22   and I did make changes in the report as a result.

23   Q.   I believe Mr. Shelson also asked a series of questions

24   about whether certain facts were specifically identified in

25   the consent decree, such as, like, the length of stay or the

1   wait for a hospital bed, whether any of those were actually

2   mentioned in the decree.  Do you recall that --

3   A.   Yes.

4   Q.   -- series of questions?

5       Why are such facts relevant to assessing compliance?

6   A.   Because they are potentially measures that could be

7   addressed by the CJCC, or in some instances by the county jail

8   staff to reduce the population of the jail, and thereby have

9   less burden on the officers providing the supervision.

10  Q.   Do they affect your recommendations on what are good

11  remedies?

12  A.   Yes.

13  Q.   When we talked about the unindicted/indicted list, for

14  example --

15  A.   Yes.

16  Q.   -- why go into those types of facts when trying to assess

17  compliance with the decree?

18  A.   Again, those are -- those relate to issues that could

19  potentially be addressed by the CJCC, or in some instances by

20  the County independently depending on the nature of the

21  initiative, that would potentially reduce the jail population

22  and take the burden off the staff.

23  Q.   Do they also address causation?

24  A.   I'm not sure I understand.

25  Q.   Okay.  They also, I believe, identified a number of

1    places where you talked about positives or improvements that

2    have been made --

3    A.   Yes.

4    Q.   -- and that sort?

5         When you report something positive in your reports, does

6    that mean they're complying with the consent decree?

7    A.   No.

8    Q.   And when you recognize an improvement, does that mean

9    they complied with the provision?

10   A.   No.

11   Q.   Do you separately identify whether they're in compliance

12   in your report?

13   A.   That's right.

14   Q.   You also mentioned something about stopping and starting.

15   So Mr. Shelson, a number of times, pointed to things that

16   happened in 2017 or 2018 or 2019.  So take, for example,

17   salaries, has there been any stopping and starting with trying

18   to improve salaries?

19   A.   Yes.  It's my understanding that -- I believe in late

20   2019, a five percent pay raise was authorized by the board.

21   That authorization was rescinded.  Then the idea of a

22   five percent raise came up again, I think in connection with

23   the current fiscal year budget, and it was represented that it

24   would be passed.  My understanding is that the budget was

25   passed without the five percent raise, and then subsequently

1  the five percent raise was passed.

2  Q.   Was there -- at some point, the five percent raise, was

3  it ever rescinded or the offer was rescinded?

4  A.   Between 2019 and 2020, yes.

5  Q.   And in 2021 after it was promised, how long did it take

6  before it actually got implemented in paychecks?

7  A.   I believe it was either late November or late December.

8  Q.   So how much time passed between the time it was proposed

9  and actually implemented?

10  A.   Well, I think the budget would have been effective

11  October 1st, and so between that effective date and

12  implementation, it would have been two or three months.

13  Q.   Let's go back to that issue of detainees waiting for

14  state hospital beds.

15  A.   Yes.

16  Q.   How does that particular fact relate to the requirements

17  in the consent decree paragraph 94?

18  A.   The requirement in the consent decree is that "Jail staff

19  must develop and use records about prisoners with serious

20  mental illness to more accurately and effectively process

21  prisoners requiring forensic evaluations or transport to

22  mental hospitals or other treatment facilities."  And then

23  goes on to talk about transition planning.

24       The requirement to track individuals waiting for forensic

25  evaluations or otherwise waiting for a state bed enables jail

1  staff to be able to make sure they're on the state hospital

2  list, determine whether they're prioritized within that state

3  hospital list, also to make sure that after competency

4  evaluation is completed that they can be in touch with the

5  attorneys to make sure that the court hearing that is needed

6  after the evaluation is requested and set.  So it enables them

7  to make sure that process is moving as quickly as it can.

8  Q.   Is there only one solution to comply with this provision?

9  A.   No.

10 Q.   If they did not have the list that they came up with,

11 would they be in compliance with this provision?

12 A.   I don't think so in that there is a specific requirement

13 about having accurate records regarding that process.

14 Q.   We talked earlier about the indicted/unindicted list.

15 A.   Yes.

16 Q.   Is that used in any way to help in tracking unlawful

17 detentions?

18 A.   Not necessarily.  Although, I understand there is a Fifth

19 Circuit case that considers the incarceration of unindicted

20 individuals beyond, and I think it's 90 days, to be

21 unconstitutional.  So there is a legal issue there.

22 Q.   Does the consent decree have standards for what counts as

23 overdetention?

24 A.   Yes.  I don't recall the number, but I believe it says

25 people have to be released the day that they are entitled to

1   release prior to 11:59 at night.

2   Q.   Have the current defendants ever asked you how they

3   should prioritize the requirements of the decree?

4   A.   I don't know if we were asked, but we did provide

5   priority recommendations early on.

6   Q.   And even if they had a board meeting at the exit

7   interview, did they ever ask you for guidance on how to

8   implement the decree afterwards?

9   A.   Do you mean after this particular site visit?

10  Q.   Yes.

11  A.   No.

12  Q.   How about beforehand?  Have the defendants asked you for

13  guidance on how to implement the decree?

14  A.   I think I and my team have had conversations with this

15  and prior jail administrators about sort of what needs to be

16  done in different areas.

17  Q.   We talked earlier about some of the assaults.  I do want

18  to check, is it one of your duties to assess detainee

19  assaults?

20  A.   Yes.

21  Q.   And does your assessment include the data or number of

22  assaults?

23  A.   I don't know that it specifies that I have to track the

24  number of assaults, although it is referenced in the outcome

25  measures paragraph.  But certainly the level of harm in the

1    facility is something I'm supposed to be tracking.

2    Q.   So were the defendants themselves tracking the outcomes,

3    measures of assaults?

4    A.   In theory, it could be run out of the JMS system if the

5    information was accurately input.

6    Q.   But is it being accurately inputted to provide that kind

7    of a report?

8    A.   No.

9    Q.   And why is it important to track that kind of data?

10   A.   Well, the data itself certainly tells you if things are

11   getting better or worse in terms of inmate safety.  But also

12   it can highlight whether some units are more problematic in

13   terms of assaults, whether some shifts are more problematic,

14   and, you know, what the supervision level might have been when

15   the assaults occurred, and how that impacts the assaults

16   having happened.

17   Q.   Let's talk a little bit more about the staffing issue.

18   Mr. Shelson asked you about the -- I believe it was the 2017

19   status conference where you said something about compensation

20   being improved for staffing or the base compensation?

21   A.   Yes.

22   Q.   Do you remember?

23   A.   Yes.

24   Q.   Later did you not say, "In this area, as with staffing,

25   that all of these areas need to be attended to to make sure

1   that there is not backsliding.  The staffing needs are now in

2   the budget, but they need to continue to be prioritized."

3       Does that sound familiar to you?

4   A.  It sounds like something I would have said at that time.

5   Q.  And then, you know, some years later in 2020, did

6   Ms. Prince, the county administrator at the time, acknowledge

7   that the rate of pay for Hinds detention officers is not

8   comparable to other agencies in the area?

9   A.  I recall that.  I don't recall who said it, but I recall

10  that being the case.

11  Q.  And was there some comparison with, like, neighboring

12  counties and how much they pay their officers?

13  A.  I believe so, and possibly the Department of Corrections

14  as well.

15  Q.  And in Mr. Rivera's report, which was Defense Exhibit 4,

16  wasn't there also some discussion about how salaries don't

17  appear to be comparable with other jurisdictions?

18  A.  I did not recall that, but if that's in there, that would

19  make sense.

20  Q.  Would it refresh your memory if you saw that report?

21  A.  Yes.  And I think I probably have it here.

22  Q.  If we could take a look at Defense Exhibit 4, page 5.

23  A.  I'm sorry.  I do not have Defense Exhibit 4.

24      THE COURT:  Is that an exhibit that you're referring

25  to?

1323

```
 1        MR. CHENG:  Yes, Your Honor.  It's the Rivera report.
 2   Let me cross-reference -- it might also be --
 3        THE COURT:  Hold on.  Which exhibit is it?
 4        MR. CHENG:  Defense Exhibit 4, but let me
 5   cross-reference.
 6        THE COURT:  Hold on just a second.  We can give her a
 7   copy of what's been provided to the Court I think.
 8   A.   What did you want to direct my attention to?
 9   BY MR. CHENG:
10   Q.   Page 5.  Does reviewing page 5 refresh your recollection
11   about Mr. Rivera's comments about salary and compensation?
12   A.   Yes.  In paragraph 6 it says -- oh, okay.
13   Q.   So what do you recall Mr. Rivera also saying about
14   compensation and benefits or compensation and salaries?
15   A.   That the sheriff's office and County leadership did not
16   appear to adequately prioritize the need for higher salaries
17   of detention.
18   Q.   Even before the pandemic started, did the jail have
19   problems hiring or retaining personnel?
20   A.   They definitely had trouble retaining personnel.
21   Q.   And did the monitors try to warn the defendants whether
22   they needed to take some action to deal with potential changes
23   in economic circumstances or conditions at the jail if they
24   wanted to do long-term planning for staffing?
25   A.   Well, we certainly recommended that some more extensive
```

1  planning and assessment was needed in that area, which was why

2  we recommended Mr. Rivera as an HR consultant.

3  Q.   And Mr. Rivera, he actually started when?  In 2020?

4  A.   I think he actually started in the fall of 2019, but he

5  did his site visit in I think January or February 2020.

6  Q.   And then what did the defendants actually do with the

7  retained services of Mr. Rivera in early 2020?

8  A.   Well, their engagement with the process dropped off

9  pretty quickly and dramatically.

10  Q.   Did Mr. Rivera's report -- at one point Mr. Shelson

11  mentioned some of the positives in the jail.  Do you recall

12  that?

13  A.   Yes.

14  Q.   Did Mr. Rivera refer to an experienced, skilled, and

15  courageous leader at the top?

16  A.   Yes.

17  Q.   What is your understanding of who he's referring to?

18  A.   That would have been Major Bryan at the time.

19  Q.   And did Mr. Rivera identify problems being more with

20  retention or with recruitment?

21  A.   With retention.

22  Q.   Does the inability to retain staff have anything to do

23  with working conditions in the jail?

24  A.   Yes.

25  Q.   In what way?

1   A.   The conditions particularly at RDC are perceived as being

2   unpleasant at best and dangerous at worst.

3   Q.   And how would those conditions compare with, say

4   McDonald's, or working in some other service industry?

5   A.   Generally not -- there's not a risk of danger of assault.

6   Although there are occasions when people in any industry are

7   subject to criminal activity, criminal behavior.

8   Q.   There's also been a number of questions about the Jackson

9   Detention Center or the work center versus Raymond.

10  A.   Yes.

11  Q.   How does the decree itself define the Hinds County Jail?

12  A.   I believe it defines it as all of those facilities as

13  part of the jail.

14  Q.   Could the work center be governed separately from the

15  rest of the jail?

16  A.   It shouldn't be.

17  Q.   Why not?

18  A.   Because they are interrelated in terms of staffing and

19  policy and procedure and training.  So all of those things are

20  done as a jail system and need to be consistent with each

21  other.

22  Q.   And even for the work center, you've mentioned there are

23  still some issues at the work center; is that right?

24  A.   That's correct.

25  Q.   And what types of serious concerns do you still have

1   about the work center?

2   A.   Well, there continue to be assaults there and staffing

3   has continued to be an issue.  Not -- it's not as understaffed

4   as RDC, but it is understaffed.  There's issues with

5   recreation in that the rec yards aren't divided, so I believe

6   they share a rec yard between units.  So that limits the

7   amount of rec time and is a particular problem with respect to

8   the men and women who are both housed -- the women are now

9   housed there.

10       There's other structural issues that impact the ability

11  to sort of safely supervise the prisoners, including the lack

12  of a sally port and the lack of safety vestibules, both to the

13  units and to the control room.  So there are facility issues

14  such as that.

15  Q.   During cross you mentioned an escape.  What happened with

16  the escape?

17  A.   They were short-staffed that day, and the officer on the

18  unit was instructed to -- by his supervisor to allow the

19  inmates, the prisoners in that unit to go out into the rec

20  yard without there being a rec officer in the rec yard.  And

21  two inmates were able to squeeze through the building and the

22  fence and escape.

23  Q.   And, again, just to make sure, was this at the work

24  center?

25  A.   Yes.

```
 1   Q.   And the Jackson Detention Center, we talked earlier about
 2   Captain Dalton and how much she was able to achieve.
 3   A.   Yes.
 4   Q.   After you stopped assessing conditions in the work
 5   center, were inmates still being housed -- I'm sorry.  After
 6   you stopped assessing the Jackson Detention Center, were
 7   inmates still being housed in the -- well, let me describe --
 8   is it being used as a court holding center?
 9   A.   Yes.
10   Q.   Where are the inmates housed?
11   A.   They're not really housed.  They're in the booking area,
12   and I would say we didn't stop assessing it.  Mr. Parrish has
13   continued to assess it, and, in fact, toured that area in the
14   last site visit.  But, yes, they're in the booking area;
15   that's the area they use for the court transport.
16   Q.   Is that on the first floor?
17   A.   Yes.  It's on the bottom floor, whatever that's referred
18   to.
19   Q.   The Jackson Detention Center, does it have housing
20   facilities anywhere else besides that booking area?
21   A.   Yes, it has sort of the traditional style of jail on the
22   next levels up.
23   Q.   And are they housing any inmates in those housing areas?
24   A.   My understanding is no.
25   Q.   If they suddenly put inmates back in those housing areas,
```

1  were those housing areas ready to house inmates when they were

2  closed?

3  A.   No.

4  Q.   Are you asking for perfection in terms of compliance with

5  the consent decree?

6  A.   No.

7  Q.   Let me move on to use of force reporting and incident

8  reporting, and there was some discussion about, you know,

9  whether that would, you know, lack of reporting justifies a

10  receiver or the necessity of reporting.  Why does reporting

11  matter in this case?

12  A.   It is essential for the supervisors and the command staff

13  to have a handle on what's going on in the jail, and whether

14  the officers are handling incidents appropriately, whether

15  they need additional training or correctional -- corrective

16  action, whether there might be other types of remedial

17  measures that are needed, so things of that sort.

18  Q.   Mr. Shelson pointed to one of the issues about whether

19  people check a box --

20  A.   Yes.

21  Q.   -- in the incident reports?

22  A.   Yes.

23  Q.   Why was that important to your team, whether they were

24  checking the box?

25  A.   Well, it's not -- as I mentioned, it's not just checking

1   the box.  If you check the box that force was used, a new

2   window opens up and requires information specifically to that

3   use of force and whether it was appropriately used.  So

4   it's -- it's what triggers getting the information that's

5   needed on the use of force.

6   Q.   So if the officer doesn't check the box, do they fill out

7   all the use-of-force reporting information?

8   A.   No.

9   Q.   There was also a little bit of discussion about

10  wristbands.  Are wristbands the only way to identify inmates?

11  A.   No.

12  Q.   Does the consent decree require defendants to be able to

13  identify and track their own inmates in their own facility?

14  A.   Yes.

15  Q.   And why does being able to track and identify your own

16  inmates matter?

17  A.   Well, you need to know that you have the right

18  individuals in the jail, and if there are incidents that

19  occur, you know who's involved in those incidents.  And that

20  if particular inmates have medical needs, that it's that

21  inmate that's getting medical needs.  You have to get the

22  right inmate to court.  You have to release the right inmate.

23  Q.   Let me move on a little bit to the issue of mental health

24  and mental health diversion.  I believe you mentioned

25  something about the challenges of trying to determine the

1     forensic or mental health commitment process --

2     A.   Yes.

3     Q.   -- in the County?

4          Why was that so complicated to figure out?

5     A.   Well, it wasn't initially clear to me what the process

6     was, and there actually weren't any jail staff that were

7     informed enough to be able to explain it, which is why I, at

8     one point, did review the criminal court rules and the statute

9     and actually had a fairly lengthy conversation with the

10    district attorney about it.  And it's important to understand

11    that process so -- excuse me -- so you know where in that

12    process the inmate is and can alert the appropriate entity if

13    there's something that needs to be done to move that process

14    forward.

15    Q.   This idea of alerting the appropriate entity, you heard

16    Mr. Shelson say, you know, the County doesn't control the DA,

17    the County doesn't control these other people.  What does the

18    jail control that would let them deal with these types of

19    issues?

20    A.   Well, if they accurately tracked them, they would -- they

21    would be able to make the -- the communications that are

22    needed.  I believe in the October site visit, we discovered

23    that there were people in the jail that the jail had orders

24    for competency evals that the state hospital did not, but

25    there was no communication to make sure that the state

1    hospital had the person on their list.  So that's what the

2    jail can control is having that information and contacting the

3    correct entities.

4    Q.   Would that help facilitate the provision of mental health

5    services?

6    A.   Well, if the person was moved through the process to the

7    point of either being released or convicted, that would

8    alleviate the burden on the mental health services in the

9    jail.

10   Q.   Likewise with the indicted/unindicted list or other

11   systems like that for tracking inmates, do those systems help

12   the jail communicate with other criminal justice stakeholders?

13   A.   Yes.

14   Q.   And how does that help conditions in the jail?

15   A.   Again, if they move through the system to the point where

16   they're either released or convicted, it reduces the

17   population of the jail and the burden on the staff.

18   Q.   Moving aside the population issue, does it also help

19   protect the rights of the detainees?

20   A.   Yes, in terms of being processed efficiently.

21   Q.   Does it also help with making sure no one's held longer

22   than they're supposed to be held in the jail?

23   A.   Yes.

24   Q.   Does it help with making sure -- whether the provisions

25   regarding unlawful detention are complied with?

```
 1              THE COURT:  Before you answer.
 2              MR. SHELSON:  Your Honor, objection.  Leading.
 3              THE COURT:  Objection overruled.
 4     A.   Yes.
 5     BY MR. CHENG:
 6     Q.   And how?
 7     A.   If you're tracking the various inmates and where they are
 8     in the criminal justice process, you are locating inmates that
 9     are potentially entitled to release and the issue of
10     unindicted individuals spending great periods of time in the
11     jail can be brought to the attention of the circuit judge, the
12     way that the process is that has been set up, so that they can
13     consider other options.
14     Q.   There may have been some discussion about the difficult
15     choices the County has to deal with about whether to build a
16     new jail or renovating a jail and so forth.
17     A.   Yes.
18     Q.   Does the consent decree give the defendants some options
19     to pick their own choices?
20     A.   Yes, I mean, certainly in that situation.  Some things
21     are mandated, but not that.
22     Q.   Now, whatever choice they make, are they required to
23     comply with the consent decree?
24     A.   Yes.
25     Q.   And are constitutional standards one of the requirements
```

1  they have to comply with?

2  A.   Yes.

3  Q.   Let me ask briefly, there was also a little discussion

4  about the assaults that you looked at.  In terms of the

5  severity of the assaults, were any of these assaults serious

6  or severe assaults that you reviewed?

7  A.   Definitely, yes.

8  Q.   Was the recent death of MR, was that an assault case?

9  A.   Yes.

10 Q.   Mr. Shelson also brought up I guess it was some type of

11 Blue Cross/Blue Shield report about challenges in finding

12 employees.  Do you recall that document?

13 A.   Yes.

14 Q.   Now, if there are challenges to find employees, what can

15 the County do to deal with that challenge?

16 A.   Well, in addition to various recruitment efforts, they

17 can certainly make the job more attractive.

18 Q.   How about pay, would that help?

19 A.   Yes.

20 Q.   Did you hear any indication defendants always knew they

21 had challenges recruiting people?

22 A.   Yes.  Although as I said, the issue is actually more

23 retention than recruitment, but they certainly have known that

24 keeping -- getting and keeping staff has been a big part of

25 the problem.

1    Q.   And over the course of your monitoring, have they ever

2    demonstrated sort of the initiative or planning to show

3    they're trying to get ahead of that issue?

4    A.   I'm sorry?

5    Q.   Over the course of your monitoring, have they ever shown

6    the sort of initiative or planning needed to get ahead of this

7    issue?

8            MR. SHELSON:  Objection.  Leading.

9            THE COURT:  Objection overruled.

10   A.   Really the only thing I think I've seen is the pay raises

11   that we've talked about.  The -- the issues related to

12   retention have really never been addressed at a high level.

13   BY MR. CHENG:

14   Q.   You know, Mr. Shelson asked you if you recalled whether

15   retention bonuses or career ladders were in the consent

16   decree.  Do you recall that?

17   A.   That's right.

18   Q.   And I believe you said you didn't think they were in

19   there.  Would it surprise you if they are actually in the

20   consent decree?

21   A.   I guess the answer to that would be yes.

22   Q.   Well, would it help refresh your recollection if you took

23   a look at the provision in question?

24   A.   Yes.  And I do have the consent decree.

25   Q.   If you could turn to Plaintiff's Exhibit 1, page 13,

1  paragraph 42(e).

2  A.   I'm sorry.  Which subparagraph did you refer to?

3  Q.   42(e).  Does that help refresh your recollection?

4  A.   Well, it does say that -- if I'm at the right place,

5  42 --

6  Q.   It's on page 13.

7  A.   Okay.  (e), "Once the staffing and needs assessment is

8  completed, the County must provide the U.S. and the monitor

9  with a copy of the study and the plan for implementation" --

10  Q.   I'm sorry.  That's C.  Paragraph (e).

11  A.   Oh, I did forget to bring my reading glasses.

12       THE COURT:  And while reading, just slow down a little

13  bit.

14  A.   Okay.  "The County will also create, to the extent

15  possible, a career ladder and system of retention bonuses for

16  jail staff."

17  Q.   So there was a requirement for a career ladder and

18  retention bonuses in the original decree?

19  A.   Yes.

20  Q.   Wasn't there also such a requirement in the stipulated

21  order?

22  A.   Yes.

23  Q.   Captain Simon, who is Captain Simon?

24  A.   He was the captain of the work center, and more recently

25  Major Bryan asked him to be the assistant jail administrator.

 1    Q.   After Captain Simon left the work center, was there any

 2    backsliding in the conditions at the work center?

 3         THE COURT:  Hold on for one second.  No, no, go ahead.

 4         I'm sorry.  Repeat your question if you need to.

 5    BY MR. CHENG:

 6    Q.   After Captain Simon left the work center, was there any

 7    backsliding at the work center?

 8    A.   I think that we saw that there was -- there were fewer

 9    staff.  And as a result, there were occasions when one staff

10    officer was asked to supervise more than one housing unit, and

11    that was going back with respect to direct supervision.

12    Q.   And did that end up reducing the level of supervision in

13    any of the units?

14    A.   Yes.

15    Q.   There's also some discussion about the hiring of a jail

16    administrator.  Do you recall the timelines that are set by

17    the stipulated order?

18    A.   Yes.

19    Q.   Can you give a little more context for why a jail

20    administrator -- well, let me ask you:  Did you work with the

21    defendants in trying to come up with a way to hire a jail

22    administrator?

23    A.   Yes.

24    Q.   And did the stipulated order include the results of your

25    discussions with the defendants?

1    A.   Yes.

2    Q.   After you were able to hire -- after the County was able

3    to hire a jail administrator, was there ever any assumption

4    that they no longer needed a jail administrator if their

5    administrator quit?

6    A.   If I understand your question correctly, no, there was

7    never an assumption that they didn't need a jail

8    administrator.

9    Q.   And if that provision was no longer applicable, what do

10   you look at instead for assessing compliance with the jail

11   administrator provisions?

12   A.   Well, there are provisions in the settlement agreement

13   itself that would still apply.

14   Q.   So if they don't go through the process again --

15        MR. ANDERSON:  Excuse me, Your Honor.  I didn't hear

16   that response.

17        THE COURT:  Okay.  Could you repeat that response,

18   Ms. Simpson?

19   A.   I said there are still provisions in the settlement

20   agreement that would apply.

21   BY MR. CHENG:

22   Q.   And at the time the stipulated order was proposed as a

23   remedy for jail administrators, were they in violation of the

24   consent decree provisions on jail administrators?

25   A.   I believe so.  Although, I would probably confer with

1    Mr. Parrish on that.

2    Q.   There were a number of e-mails brought up regarding

3    Ms. Bryan talking to you about her concerns.  Do you recall

4    that?

5    A.   Yes.

6    Q.   Did the defendants ever voluntarily disclose to you that

7    they were having problems with Ms. Bryan or that she was about

8    to leave?

9    A.   No, not until the site visit.  I would say in the

10   conversation with the sheriff, he disclosed that he was having

11   communication issues with Major Bryan.

12   Q.   And they actually submitted a declaration of Ms. Bryan in

13   support of them for the show cause order; correct?

14   A.   I know that, yes.

15   Q.   Did they update you to advise you that maybe Ms. Bryan

16   was starting to have some concerns with what the sheriff was

17   doing after the declaration was entered?

18   A.   No, not defense counsel.

19   Q.   Have you dealt with other sheriffs over the course of

20   this case?

21   A.   Yes.

22   Q.   And other jail administrators?

23   A.   Yes.

24   Q.   Have other jail administrators advised you when a new

25   sheriff or new elected officials were coming into office?

```
 1   A.   We typically knew when a new sheriff was coming in, but I
 2   don't know that we were advised of that by the jail
 3   administrator.
 4   Q.   Did it ever come up during the regular reportings with
 5   the County?
 6   A.   Yes.
 7   Q.   When you have a jail administrator dealing with a new
 8   sheriff, have you asked jail administrators in the past how
 9   they're doing under their new sheriff?
10   A.   Yes.
11   Q.   And why do you ask that?
12   A.   It's sort of a general check-in related to how things are
13   going in the facility, just are things changing, are policies
14   changing?  Are there developments we need to know about?
15   Q.   I think you mentioned briefly that you actually have met
16   the sheriff before or talked to the sheriff before he was
17   sheriff; is that right?
18   A.   Yes.
19   Q.   And what was his role at the time?
20   A.   He was over seeing the CID division.  He may have had
21   other duties, but that's the context in which I talked with
22   him.
23   Q.   Roughly about what time period?
24   A.   The visit was remote, so probably 2020.
25   Q.   Were there any concerns about the way investigations were
```

1   being handled by CID at the time?

2   A.   Yes.

3   Q.   And what were those concerns?

4   A.   That the investigations did not seem very thorough, and

5   the reports were not very thorough or complete.

6   Q.   And in what way were they not thorough?

7   A.   Witnesses were not interviewed, camera footage was not

8   reviewed, records, relevant records were not obtained.

9   Q.   Let's also talk now about the CJCC and what the County

10  can or cannot do to get other people to participate.  Did you

11  ever make any recommendations about how to get other

12  stakeholders involved in the CJCC?

13  A.   Yes.  One recommendation is that having the appropriate

14  staff to support the CJCC certainly made it a more a effective

15  body, and as an effective body, it would get more

16  participation.  Also recommended identifying a sort of small

17  issue that could be analyzed and researched and addressed.

18  Having some initial success in dealing with a system issue can

19  encourage greater participation, and there were times when

20  there was not participation from the County or sheriff,

21  higher-level employees, and that would also encourage greater

22  participation by other stakeholders.

23  Q.   And why does involving higher-level employees, like the

24  sheriff or others, improve the odds of getting others involved

25  in the CJCC?

```
 1   A.   Well, for one, it reflects an opinion that the body is
 2   important, and that the time other stakeholders would spend
 3   there would be well spent.  And it enables issues to be
 4   effectively addressed when you have the actual decision-makers
 5   there.
 6   Q.   And did they ever get back to you about those
 7   recommendations?
 8   A.   No.
 9   Q.   Did they ever at least hire staff to work for the CJCC?
10   A.   There is one individual who is assigned to provide some
11   support to the CJCC.  She has a number of other duties, and
12   either all she has time for or all she's able to do is, as
13   I've mentioned, some administrative duties related to
14   scheduling and taking minutes, *et cetera*.
15   Q.   When you say an "assigned staffer," do you mean a
16   full-time staffer?
17   A.   No.  She's not full time.
18   Q.   But did you want a full-time staffer?
19   A.   Well, ideally it would be a full-time staffer, but it
20   could be somebody with related duties that are fairly clearly
21   defined so it allowed her or him to have as much time as
22   needed by the CJCC.
23   Q.   In the past have you brought in the jail administrators
24   when there were disputes between the parties, and you were
25   trying to figure out a way to deal with a problem?
```

1   A.   Have I brought in the jail administrator?

2   Q.   Yes.  Have you involved the jail administrators when

3   there were disputes between the parties, and you were trying

4   to resolve a problem?

5   A.   Well, as I mentioned, I worked fairly -- that was with

6   the defense attorneys.  I think with respect to trying to sort

7   of make some progress -- and I believe the parties were

8   approaching the contempt process -- we certainly talked with

9   the jail administrator about making improvements in achieving

10  some progress.

11  Q.   So if there were, let's say, a dispute over policies and

12  procedures, did you ever talk with Warden Rushing about that?

13  A.   I was not too involved in that process when Major Rushing

14  was there.  I was involved in that process when Warden Fielder

15  was jail administrator and certainly had conversations with

16  him about resolving the policies and procedures.

17  Q.   And when there were impediments with reopening C-Pod or

18  bringing in direct supervision, were any members of your team

19  involved in talking to the jail administrators to get those

20  issues addressed?

21  A.   Yes.  Mr. Parrish had a lot of communication with Warden

22  Fielder.

23  Q.   There was some discussion by Mr. Shelson about a limited

24  County budget.  Let's talk a little bit about the budget

25  issues.  Are there benefits to the County when they provide

1  adequate or mental health care to their inmates?

2  A.   Yes.

3  Q.   In what way?

4  A.   Well, certainly in that care being provided to

5  individuals that are citizens of this County is a benefit in

6  itself.  But also if they get the care that they need in the

7  facility and become stabilized and are released with

8  connection to community providers, they are less likely to

9  come back to the jail as well as less likely to utilize

10  emergent services of different types.

11  Q.   So when people are assaulted and sent to the hospital,

12  does that impose costs onto the budget?

13  A.   Yes.

14  Q.   And does it affect staffing costs or transportation

15  costs?

16  A.   Yes.

17  Q.   And, you know, when people are hurt or things happen in

18  the jail, can that result in legal liability or financial

19  cost?

20  A.   It can.

21  Q.   Through legal fees?

22  A.   It can.

23  Q.   And just more broadly, are there benefits to society or

24  public safety that can come from improving conditions in the

25  jail or spending the money they need to spend in the jail?

1    A.   Yes.

2    Q.   And in what way?

3    A.   Well, again, if people are stabilized either through

4    medical or mental health care or other types of services that

5    provide for them to become more stable members of the

6    community, that definitely benefits the County as a whole.

7    Q.   And if they can get people who don't belong in the jail

8    out of the jail through pretrial services or not unlawfully

9    detaining them, does that have any economic impact on the

10   County?

11   A.   Well, as I mentioned, the research is remarkably clear

12   that getting low- and medium-risk people out of the jail

13   quickly reduces their risk of recidivism substantially.

14   Q.   Have the defendants offered a viable alternative to

15   receivership?

16   A.   Not that I know of.

17        MR. CHENG:  No further questions.  Thank you.

18        THE COURT:  All right.  We're going to take our

19   afternoon break, and while we're taking that break, the IT

20   person is going to see about swapping out that monitor.  Of

21   course as is the Court's practice, I typically would have

22   questions of the witness after each party has had their

23   chance, and I expect that to happen.  So there won't be any

24   other witnesses today.

25        MR. SHELSON:  Thank you, Your Honor.  That's what I was

1    going to ask.

2         THE COURT:  And we may not even do my part today

3    because I do have several questions, and I know the parties

4    would want to answer them -- ask them right then.  But when we

5    come back, we'll talk about the rest of today and tomorrow,

6    and we'll talk about some housekeeping things that I think I

7    just need to make sure of that are done.  But let's give

8    ourselves about 20 minutes.

9         I will not begin my questions of this witness this

10   afternoon, because I'll give you-all an opportunity to follow

11   up and it wouldn't be fair to rush you.  So you can stand down

12   for the rest of the day.  When we come back in about

13   20 minutes, then we'll figure out how to close up today to

14   begin tomorrow.

15                  (A brief recess was taken.)

16        THE COURT:  You may be seated.

17        I wanted to talk about some housekeeping logistics

18   things.  As I said, tomorrow -- because it won't be today --

19   I'll have a few questions for Ms. Simpson and obviously give

20   the United States the opportunity to come back with questions

21   based on those that I've asked and then the County.

22        And I presume after that is done, the United States

23   will rest, but I want to make sure -- I think on Friday

24   Ms. Mosley testified, Justin Mosley's mother testified, and I

25   think I had asked her to make sure -- if she had a copy of the

1  document that she referred to.  She said there was a -- she

2  was asked to give an incident report or participate in an

3  incident report, and I think I specifically asked her that if

4  you were able to find anything in writing to give it to the

5  Government, so that we could have it.

6       Has there been any more contact with Ms. Mosley?

7       MS. STEEGE:  Yes, Your Honor.  She's provided the date

8  of the incident and also the date on which she filed an

9  internal affairs report.  We've been speaking with co-counsel

10  about their trying to produce a copy of that report, because

11  I've not received one from Ms. Mosley.  I will say that the

12  date of the incident matches up with the incident report.

13       THE COURT:  What now?

14       MS. STEEGE:  The date of the incident as she reported

15  it matches with the date of the incident report that we have

16  in our files, the regular reporting received from County.

17       THE COURT:  Okay.  So --

18       MS. STEEGE:  That would be the incident report

19  recording events in the jail, not documentation of the

20  complaint filed thereafter.

21       THE COURT:  Okay.  But I think her testimony was that

22  she had to go back in one day or she sat down -- well, she was

23  there with two officers -- I think is what her testimony

24  was -- and they took information from her.  And I took it that

25  that information might not be what the incident report is.  I

1    mean, didn't we -- I mean, I could be wrong, but I did ask her

2    to please contact you-all, and she did do that.

3        MS. STEEGE:  She did do that, yes, Your Honor.  And we

4    have the date on which -- on which she said she -- that she

5    filed that complaint, and the defendants, I think, are working

6    on producing any documentation resulting from that.

7        THE COURT:  Right.  And that complaint would have been

8    a part of an internal affairs investigation --

9        MS. STEEGE:  Right.

10       THE COURT:  -- I presume based on how she testified

11   about it.  Okay.  Now, do you -- and right now you do not have

12   a copy of that internal affairs complaint?

13       MS. STEEGE:  That's correct.  And I think they've been

14   working on that.  We do have the dates, as I mentioned, but we

15   do not yet have anything in writing, you know, documentation

16   of that investigation.

17       THE COURT:  And then I turn to the County.  Has the

18   County been able to find anything about that?

19       MR. SHELSON:  Your Honor, we initially looked for an

20   incident report and clarified it more.  Maybe it was just our

21   fault on the front end, not clarifying it, but we understand

22   that we're more precisely looking for an IAD report.  So we're

23   making that inquiry.

24       THE COURT:  Okay.  All right.  I just wanted to make

25   sure that we hadn't forgotten about that.

```
 1          MS. STEEGE:  Thank you, Your Honor.

 2          THE COURT:  All right.  Thank you.

 3          Other housekeeping things, as I said the United States

 4    will likely be resting once we're through with Ms. Simpson.

 5    Now, I did not check with the courtroom deputy, but my notes

 6    do not show that Exhibits 1 and 2 are in evidence.  They're

 7    not in evidence.  I assume the parties anticipate -- well, I'm

 8    going to ask that you put the settlement agreement and the

 9    stipulated order in evidence.  I know I could take judicial

10    notice of it, of those, but they're not in evidence in this

11    record yet.

12          MR. SHELSON:  So, Your Honor, we thought they were, but

13    the defendants have no objection to P-1 and P-2 being admitted

14    into evidence.

15          THE COURT:  And I presume the Government does not

16    either; right?

17          MR. CHENG:  Correct, Your Honor.

18          THE COURT:  So those will be received in evidence.

19          (Plaintiff's Exhibits 1 and 2 entered.)

20          THE COURT:  Now, then as I go through the list of

21    exhibits which have not been asked to be placed in evidence,

22    PX-17 is not in evidence; correct?

23          And I have not reviewed my notes with my courtroom

24    deputy.  She's the one who has the official tally of it.

25          MS. SUMMERS:  What number was that?
```

```
 1              THE COURT:  PX-17.

 2         MS. COWALL:  That is correct, Your Honor, but we plan

 3    to move to introduce it into evidence before we conclude with

 4    the proceedings.

 5         THE COURT:  Okay.  Okay.  Well, you may have plans for

 6    some of these other -- I mean, is there any need for me to go

 7    down one by one with respect to the documents which are not in

 8    evidence yet?  Like, PX-22 is not.  I don't know if the United

 9    States intends to, but PX-22 is not in evidence according to

10    my records.  PX-25 is not.  I'm not -- did the Government ever

11    move to -- for the admission of PX-33, the jail master --

12    final jail master plan?  I don't have a record that -- I know

13    Mr. Parrish testified about it.

14         MR. CHENG:  We would move to admit PX-33, Your Honor.

15    We did not -- we are probably not going to move in the other

16    three exhibits.  But PX-33, that was an oversight, and we

17    would move to, yes, sir.

18         THE COURT:  Okay.  PX-33 for the County is the final

19    jail master plan, 1/15/21.

20         MR. SHELSON:  One moment, Your Honor.

21         THE COURT:  All right.  And we don't have to do this

22    today.  I just wanted to make sure, for the record, that these

23    documents have not been admitted quite yet.  If the County

24    needs time to look and figure out if there's something they're

25    going to object to, I'll give you that time.
```

1       MR. SHELSON:  Your Honor, the County does not object to

2   P-33.

3       THE COURT:  Okay.

4       MR. CHENG:  And I should probably correct, as

5   Ms. Cowall mentioned, for PX-17, we may introduce it later..

6   but at this point, we understand it has not been admitted.

7       THE COURT:  Okay.  All right.  My next one is PX-53,

8   which is part 1 of LW death records.  Now, I know there was

9   testimony about 54, and it appears to be for the same person I

10  guess.

11      MR. CHENG:  So PX-53, 55, 57, 60, and 61, we think they

12  may be duplicates.

13      THE COURT:  Oh, okay.  All right.  And the next one

14  that I have -- the next ones are 84, 85, and 87; there's been

15  no testimony about either of those quite yet.  So you may be

16  intending to put -- get that in in some kind of way.  I don't

17  think there's been any testimony.  PX-84, rapid notification

18  from 1/17/22.  Rapid notification of what -- I don't -- I

19  mean, it could be some testimony about it.

20      MR. CHENG:  That's correct, Your Honor.  We have not

21  introduced it yet.

22      THE COURT:  Okay.

23      MR. CHENG:  PX-87 is literally just an attachment that

24  came in an e-mail -- PX-87 is just like a sheriff's insignia

25  that comes stamped on an e-mail.  It showed up as an

1    attachment, and we didn't want any questions about the

2    authenticity of the e-mail, that we left it out.  But it

3    doesn't need to be admitted.

4         THE COURT:  Okay.  And PX-85 is a hearing transcript

5    from September 2019.  Those are the ones that I have, and I

6    think that was the list that I was given, it must have been

7    last -- the Thursday before the original deadline.

8         Now, I do understand that there was a final exhibit

9    list that includes more than those documents.  I think going

10   from -- mine ended at 90, but I know 91 has been admitted into

11   evidence.  And I think we're up to 106, so there must have

12   been some others, but I don't have that before me.

13        So just make sure that the exhibits that you listed on

14   the final one are all the exhibits that you wanted to be in

15   are actually in evidence.

16        MR. CHENG:  Yes, Your Honor.  Thank you.

17        THE COURT:  All right.  Now, tomorrow morning we will

18   start with my questions of Ms. Simpson, and then presumably

19   the Government -- again, the United States will have an

20   opportunity to follow up based on the questions that I've

21   asked, and then so will the County.

22        I suspect we may be done with that by midmorning or it

23   depends on -- I do have several questions, so I'm not going to

24   say otherwise.  So the County will, though, be able to start

25   putting on its proof, and depending on how long Mr. Farr and

1    Mr. Douglass -- Mr. Farr -- not Farr.  It's Farr, Douglass,

2    but it's somebody else.

3         MR. MORISANI:  Mr. Chamblee.

4         THE COURT:  Mr. Farr and Chamblee.  The County ought to

5    be prepared to -- if they intend to put on any other witnesses

6    -- to be prepared to put on other witnesses tomorrow, and I

7    don't know how many more witnesses -- I'm, again, not rushing

8    anybody.  Take the time that you need to take to close out

9    your case, and then the United States would have to determine

10   whether it would seek to put on any rebuttal.

11        Again, the trial that I had to start yesterday is gone,

12   so it was a ten-day trial or so.  So I'm open next week as

13   well, and we're trying to figure out things in that regard.  I

14   think we may be through, but I'm not rushing anybody because

15   we -- at the end of it, you know, you'll have your opportunity

16   to do closing argument, questioning, or whatever.  I mean,

17   because we do have to determine -- the Court will probably

18   take some closing/argument on what might be the appropriate

19   relief, and if the Court is going to grant any relief,

20   including termination.  So we'll have to set out the

21   appropriate time for all of that as well.

22        Any other sort of housekeeping things in advance of

23   tomorrow?

24        MR. SHELSON:  Not from the defendants, Your Honor.

25        THE COURT:  Okay.

1        (An off-the-record discussion was held.)

2        THE COURT:  Anything else we need to take care of?

3    I'm sorry.  Mr. Cheng?

4        MR. CHENG:  I have a quick question.  I believe

5    Ms. Simpson asked the question, if the hearing does run

6    another week, would it be possible for the monitor and her

7    team to participate by video?  I should probably let them

8    speak, but it was just something that --

9        THE COURT:  Yes.  I think when we had originally set

10   this hearing that was a concern about it possibly leading over

11   into another week.  I will be willing to.  But, you know, I'll

12   give the defendants an opportunity to raise any sort of

13   objections, and then I'll consider it.  But I'm inclined that

14   if it goes beyond Friday that we'll take up the other

15   witnesses, as we've done Mr. Moeser and Mr. Dudley -- I mean,

16   the monitoring team that is.  The Hinds County witnesses will

17   be here live and in-person, and they're just right around the

18   corner, I think.

19       But that's all that the Court has.  I mean, I'll

20   reserve ruling on it, because I haven't heard from the

21   defendants.  I'll give you until tomorrow to weigh in on that

22   request of the monitors.  But that concludes all that we have

23   for today I believe.  Is it?

24       Well, we are adjourned.  Thank you so much.

25   ****************************************************************

**COURT REPORTER'S CERTIFICATE**

I, Candice S. Crane, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 23rd day of February, 2022.


/s/ Candice S. Crane, RPR CCR

Candice S. Crane, RPR, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov