```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                            NORTHERN DIVISION

 3

 4    UNITED STATES OF AMERICA                            PLAINTIFF

 5    VERSUS                      CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

 6    THE HINDS COUNTY BOARD OF SUPERVISORS,
      HINDS COUNTY SHERIFF, ET AL.                        DEFENDANTS
 7

 8

 9                     EVIDENTIARY HEARING, VOLUME 8,
                   BEFORE THE HONORABLE CARLTON W. REEVES,
10                   UNITED STATES DISTRICT COURT JUDGE,
                             FEBRUARY 24, 2022,
11                         JACKSON, MISSISSIPPI

12

13                      (Appearances noted herein.)

14

15

16

17

18

19

20

21
      REPORTED BY:
22
          CANDICE S. CRANE, RPR, CCR #1781
23        OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi  39201
          Telephone:  (601) 608-4187
25        E-mail:  Candice_Crane@mssd.uscourts.gov
```

1   **APPEARANCES:**

2      FOR THE PLAINTIFF:

3          CHRISTOPHER N. CHENG, ESQ.
           SARAH G. STEEGE, ESQ.
4          LAURA L. COWALL, ESQ.
           HELEN VERA, ESQ.
5          MITZI DEASE-PAIGE, ESQ.

6      FOR THE DEFENDANTS:

7          NICHOLAS F. MORISANI, ESQ.
           JAMES W. SHELSON, ESQ.
8          TONY R. GAYLOR, ESQ.
           RAYFORD G. CHAMBERS, ESQ.
9          JOHN C. HALL, II, ESQ.
           REUBEN ANDERSON, ESQ.
10
       ALSO PRESENT:
11
           ANTHONY NJOKU
12         MICHAEL DENAULT
           ELIZABETH SIMPSON
13         DAVID PARRISH
           SHERIFF TYREE JONES
14         LESLIE FAITH JONES
           CINDY MOHAN
15

16

17

18

19

20

21

22

23

24

25

1                      **TABLE OF CONTENTS**

2  Style and appearances...............................1355-1356

3  WITNESS:  ELIZABETH SIMPSON

4      Examination by the Court.............................1358

5      Further Direct by Mr. Cheng..........................1410

6      Further Cross by Mr. Shelson.........................1415

7      Further Examination by the Court.....................1451

8      The United States Rests..............................1455

9  WITNESS:  GARY CHAMBLEE

10      Direct by Mr. Morisani...............................1456

11      Defendants' Exhibit 9-18 entered.....................1497

12      Cross by Mr. Cheng..................................1498

13      Redirect by Mr. Morisani.............................1515

14      Examination by the Court............................1518

15  WITNESS:  ROBERT EARLE FARR, II

16      Direct by Mr. Morisani...............................1534

17      Cross by Mr. Cheng..................................1564

18      Redirect by Mr. Morisani.............................1575

19      Examination by the Court............................1577

20      Further Cross by Mr. Cheng...........................1581

21      Further Redirect by Mr. Morisani.....................1582

22  Court Reporter's Certificate...........................1586

23

24

25

1                    **IN OPEN COURT, FEBRUARY 24, 2022**

2

3          THE COURT:  You may be seated.

4          Good morning.  Is there anything we need to take up

5    before we begin?

6          All right.  Ms. Simpson, you may return to the stand.

7                             **EXAMINATION**

8    **BY THE COURT:**

9    Q.   I'll remind you you're still under oath and just make

10   sure you're speaking into the microphone because you tend to

11   direct your -- I'll be asking some questions so I know you're

12   going to have your -- you're going to be looking at me, and

13   people might not be able to hear you well because you'll have

14   your back to them.  So just make sure you're speaking into the

15   mike.

16   A.   Yes, sir.

17   Q.   And I know you've been testifying, I guess, since the day

18   before yesterday so we're going to try not to be too long

19   here.  But since you've been a monitor, how many sheriffs have

20   there been, if you can recall?

21   A.   Four.

22   Q.   Either permanent or interim?

23   A.   Four sheriffs.

24   Q.   Four sheriffs?

25   A.   Yes.

1    Q.   And those would be?

2    A.   Sheriff Mason, Sheriff Vance, Sheriff Crisler, and now

3    Sheriff Jones.

4    Q.   And during that same time period, do you know how many

5    County administrators you've had?

6    A.   I believe three.

7    Q.   And those would be, if you can name them?

8    A.   Ms. Davis, Ms. Prince, I want to say, and now

9    Mr. Johnson.

10   Q.   Mr. Jones?

11   A.   Jones.  Jones or Johnson, Jones.  Kenny Wayne.

12   Q.   And what about Jennifer Riley Collins, wasn't she an

13   administrator for some period of time?

14   A.   Yes.  So I think that's four.

15   Q.   So at least four?

16   A.   I believe so.

17   Q.   And how many jail administrators have there been at RDC?

18   A.   There was Major Rushing, Warden Fielder, sorry,

19   Major Bryan and now, I guess, Mr. Shaw, Major Shaw.

20   Q.   And between Bryan and Shaw is?

21   A.   Chief Simon.

22   Q.   And was there anybody between Fielder or Bryan?

23   A.   I believe Crane.  Mr. Crane would have been acting jail

24   administrator in that interim.

25   Q.   Okay.  Do you know who's responsible for appointing the

1   County administrator?

2   A.   I would assume the Board of Supervisors.

3   Q.   And we know the public, the people are responsible for

4   electing the sheriff?

5   A.   That's right.

6   Q.   Who is appointed -- who is responsible for appointing the

7   jail RDC administrator?

8   A.   Well, the administrator is for all the facilities and I

9   believe the sheriff is responsible for appointing that

10  individual, but I think the Board has to approve the contract

11  with that individual.

12  Q.   Okay.  And during the same time that the consent decree

13  has been in place, how many persons have been designated to

14  oversee that or be the administrator or whatever the title is

15  over at Henley-Young, if you can recall?

16  A.   I -- I heard Mr. Moeser's testimony the other day.  Seems

17  like it's four or -- maybe five hires but four people since

18  one came back.

19  Q.   No reason to disagree with what Mr. Moeser testified to?

20  A.   No reason to disagree.

21  Q.   Now, you were appointed to be a monitor by -- through an

22  order by Judge Barbour; is that correct?

23  A.   That's correct.

24  Q.   Prior to being the monitor, did you have any

25  conversations with persons from Hinds County?

1    A.    Yes.

2    Q.    And what were those conversations, if any?

3    A.    Well, I -- when my name was first presented to Hinds

4    County -- well, I don't know when it was first presented, but

5    at some time after that and before I was appointed,

6    Mr. Teeuwissen, who was the Board attorney at the time, called

7    and asked to meet with me.  And so I -- I was in New Orleans

8    at the time so I drove up here, met with Ms. Barker, who was

9    the sheriff's attorney at the time and Sheriff Mason.  We

10   drove out to the jail to RDC and I met Major Rushing and

11   probably some other employees at the jail, but I don't

12   remember who.  Then I met with Mr. Teeuwissen and Mr. Anthony

13   Simon as well.

14   Q.    And Anthony Simon being -- there are two Anthony Simons.

15   A.    Yes, sir.

16   Q.    So I want to make sure, Anthony Simon being the

17   attorney --

18   A.    Yes.

19   Q.    -- for the Board of Supervisors?

20   A.    Yes.

21   Q.    And in any of those meetings with those individuals, did

22   anyone ever question -- did they ever indicate to you that

23   they thought you were not qualified to be a monitor?

24   A.    No.

25   Q.    And after being selected as a monitor, has anyone from

1    Hinds County questioned your ability to be the monitor?

2    A.   No.

3    Q.   And in becoming the monitor, what did you understand were

4    your duties and responsibilities?

5    A.   Well, it was those that are set out in the settlement

6    agreement to do a baseline visit, see where the facilities

7    were at in terms of compliance with the settlement agreement,

8    then do the three monitoring visits in a year and measure

9    their progress -- the facilities' progress towards compliance

10   with the settlement agreement as well as provide technical

11   assistance when requested or as we felt needed.  The

12   settlement agreement also requires our team to provide

13   feedback in addition to the report but to make recommendations

14   in how to move forward towards compliance, and that's what I

15   recall at this time.

16   Q.   As the monitor, did you believe you had the authority to

17   hire others to assist you in your duties?

18   A.   Yes.

19   Q.   And where did that authority come from in your view?

20   A.   That's also in the settlement agreement that I can hire

21   consultants to assist with the work.

22   Q.   And the consultants whom you've hired, we've heard at

23   least three of them testify:  Mr. Parrish, Mr. Moeser, and

24   Mr. Dudley.  After retaining each of them, has anyone from

25   Hinds County ever asserted, argued, suggested, objected to --

1    and that's a compound question.  Let me ask:  Has anyone ever

2    objected to the hiring of any of those individuals?

3    A.    No.

4    Q.    Anyone from Hinds County?

5    A.    No.

6    Q.    Okay.  Any of the sheriffs?

7    A.    No.

8    Q.    Any County administrator?

9    A.    No.

10   Q.    Has anyone from the County or any sheriff asserted to you

11   that they thought that any of those individuals were not

12   qualified to be consultants for you?

13   A.    No.

14   Q.    At some point in time in your monitoring, like you

15   mentioned, that Major Rushing -- I'm not sure if her title was

16   major, but Ms. Rushing headed up RDC, I believe.  She was the

17   jail administrator for RDC; is that correct?

18   A.    She was the jail administrator for the jail system, but

19   she was primarily located and, I would say, focused on RDC.

20   Q.    But it was for the entire -- for the system?

21   A.    That's right.

22   Q.    All right.  And at some point in time, she was no longer

23   the person in that position?

24   A.    That's correct.

25   Q.    And what is the reason why you believe that she was no

1    longer in that position?

2    A.   Well, she, I believe, resigned when the new sheriff came

3    in and I don't know if that's why, but that was the timing of

4    it.

5    Q.   Oh, okay.  Did she meet the qualifications to be the jail

6    administrator under the terms of the consent decree?

7    A.   No, she did not.  I believe she did not meet the

8    education requirement.

9    Q.   Okay.  And did -- and the person who replaced her was?

10   A.   Warden Fielder.

11   Q.   Warden Fielder, did he meet those qualifications?

12   A.   I believe he did.  He did have an education -- excuse

13   me -- and the experience required.

14   Q.   Okay.  And there was some time before Major Bryan came

15   aboard; is that a fair statement?

16   A.   Yes, that's correct.

17   Q.   And she was hired when Sheriff Vance was in office; is

18   that correct?

19   A.   That's correct.

20   Q.   And based on your conversations with the sheriff, based

21   on your -- based on what you learned from your monitoring

22   experience, how did the sheriff administration at least feel

23   about the hiring of Major Bryan?

24   A.   It appeared that they were quite excited about having

25   Major Bryan come on board.  She was interviewing and, I

```
 1    believe, hired during our June site visit so we were -- we had
 2    a remote session with the sheriff and the sheriff's attorney
 3    and Major Bryan was there and participated, and it appeared
 4    that everybody was quite excited about Major Bryan coming on
 5    board.
 6    Q.   Did the -- in your view, did the sheriff believe she was
 7    qualified to be --
 8    A.   Yes.
 9    Q.   -- the jail administrator?
10    A.   Yes, he expressed that very directly.
11    Q.   Do you recall if Ms. Barker expressed those same sort
12    of -- the belief that Major Bryan was qualified to be the jail
13    administrator?
14    A.   Yes.
15    Q.   Did anyone -- with respect to the people who you dealt
16    with in your capacity as monitor, anyone from Hinds County
17    ever suggest to you that Major Bryan was indeed not qualified
18    to be the jail administrator?
19    A.   No, they did not.
20    Q.   Now, at one time before Mr. Dudley came on board -- or
21    Dr. Dudley came on board, there was someone else doing the
22    medical portion that you had retained; is that correct?
23    A.   That's correct.
24    Q.   And who was that individual?
25    A.   Her name was Jacqueline Moore.
```

```
1    Q.   Did anyone from the County, the sheriff or the County
2    object to the hiring of Ms. Moore?
3    A.   No.
4    Q.   Now, you've testified a little bit about -- well, you've
5    testified some, but I want to ask you a couple of questions
6    about classification --
7    A.   Okay.
8    Q.   -- of detainees because the detention center is for
9    detainees primarily; correct?
10   A.   That's correct.
11   Q.   At one time the detention center might have held or did
12   hold State inmates who had been convicted, but they no longer
13   do that, I don't believe; is that correct?
14   A.   That's correct.
15   Q.   So most of the people here are pretrial detainees?
16   A.   That's correct.
17   Q.   And pretrial detainees, in your experience, are innocent
18   of any particular crime; correct?
19   A.   That's correct.
20   Q.   Because they've not been adjudicated guilty of anything?
21   A.   That's correct.
22   Q.   All right.  Now, with respect to classification, I think
23   you testified yesterday that -- well, let me ask you this.
24   What all is used -- what information is used to classify -- to
25   do an appropriate classification for any particular individual
```

1    who presents himself or herself to the detention center?

2    A.    There is an objective classification tool that is used,

3    and it scores different factors.  The factors include the

4    severity of the current offense, the criminal history of the

5    individual, whether there have been any escape attempts of the

6    individual.  I believe it includes -- and that's part of the

7    institutional history that is scored.  Then there are some

8    positive scores, so if a person has been in school and is over

9    a certain age, is -- has lived in the same place for some

10   length of time and then there's also a score, a negative

11   score, if they have a history of substance abuse that's

12   impacted their lives and I think that covers all of the

13   factors.

14   Q.    Okay.  In getting to those factors, you mentioned

15   criminal history.  Would the person's criminal history --

16   well, would the person's history of having been there before

17   have any effect on the person's classification, having been a

18   resident or having been detained there before?

19   A.    Well, it's supposed to score prior convictions, but the

20   classification staff generally knows if a person has been

21   charged with a crime but not whether they've been convicted.

22   So it would score -- they would be scored if they were charged

23   with a crime, whether it's in that facility or elsewhere.  But

24   typically they would see on the JMS system that a person was

25   previously booked in on a prior charge, and it also looks at

1   institutional history so if -- so that is impacted by whether

2   the person has been there before.  But there's not a specific

3   score for, you know, if you've been in the Hinds County Jail

4   system before you get a point.  It's related to prior charges

5   and prior institutional history.

6   Q.   Is that supposed to be an objective sort of criteria to

7   classify people?

8   A.   Yes.

9   Q.   And I'm thinking about Justin Mosley, for example.

10  That's an individual who I think the testimony has shown had

11  been detained there before and had also -- I believe the

12  records would show that he had suffered some sort of mental

13  frailties before?

14  A.   Yes.  Yes.

15  Q.   So if Justin Mosley were to come back the second or the

16  third time, would the fact that he had been assessed or

17  diagnosed or treated as if he had suffered from a mental

18  illness before, would that information be available for the

19  persons when he comes back again, or should it be available?

20  A.   Yes.  There's another part of the classification form

21  that has -- that's not scored, but it should be filled out and

22  it indicates whether the person has any special management

23  issues and that includes gang affiliation, physical

24  impairment, but it also includes mental health issues.  So

25  that should be checked and, yes, classification would know

1  if -- through the JMS system, if the person had previous

2  mental health issues.

3        There's also a question -- a list of questions that are

4  asked of the inmates or the people being booked and the

5  classification officer asks those questions and one of the

6  questions is whether there's any mental health history and

7  that questionnaire is included with the classification scoring

8  sheet.

9  Q.   Now, I think yesterday you testified other things that

10  might help one to assist in classifying individuals and moving

11  individuals from one unit to another or something.  I think

12  yesterday your testimony was that if information comes in from

13  the public -- from a family member, for example, I think you

14  gave the example of a family member having called in and said

15  that they believe or they've heard that a detainee might be in

16  danger or jeopardy.  Is it typical to use that information,

17  information like that, to help classify someone?

18  A.   Yes.  That would very well result in somebody either

19  being moved to another unit or being placed in protective

20  custody.  It's not so much a classification category which is

21  usually minimum, medium, and maximum, but there are types of

22  confinement and protective custody is sort of a type of

23  housing, I guess you would say.  But, yes, in that situation

24  the individual could very well end up in protective custody.

25  Q.   Okay.  Well, so help me out.  Is classification

1   different?  I mean, you mentioned custody status?

2   A.   Right.  So there's classification levels and then there's

3   custody status, but they're both overseen by the

4   classification division or department.

5   Q.   Okay.  And performing your monitoring duties, where do

6   you gather your information.  Tell me all the places you might

7   gather the information that you have to use to perform your

8   duties.  And I realize you've hired consultants to do their

9   specific things and they may look to other sources, but what

10  do you look to to perform your duties?

11  A.   Well, there are lots and lots of documents that I review.

12  It includes the incident report spreadsheet that has most of

13  the information from the incident reports, including the

14  narratives and the supplemental narratives in the various data

15  fields that are drawn from the incident report in the JMS

16  system.  I look at usually a two-week or a month-long group of

17  documents, including the scoring sheet, the classification

18  scoring sheet, and look at the print out of the -- all the

19  people that have been classified in a certain time period.

20      I look at a packet I get that is called the

21  classification report, and that includes grievance log.  It

22  includes the file audits that have been during that month, it

23  includes the classification logs, it includes the

24  indicted/unindicted list.  It includes transfers, segregation

25  logs, disciplinary reports.

1       I also look at rapid notifications.  I look at the CID

2   reports, the criminal investigation division reports, and as

3   well as a log that they produce.  Same with IAD, they have a

4   log and any reports that are provided during that period.  I

5   look at the QA reports.  I look at the grievances and program

6   requests for usually an identified period.  The -- when I'm

7   on-site, I look at the actual inmate files and the

8   classification files looking for the documentation that

9   supports the detention, and, of course, the site visit, I

10  interview quite a few people, including -- with records.  It's

11  sort of an interactive visit in that the -- the records

12  supervisor accesses the JMS system while we're talking about

13  the different files.  So I'm not looking directly into the JMS

14  system, but she's holding up the individuals as we discuss

15  them, and information comes to me in between site visits

16  through discussions with staff, with attorneys.

17      Oh.  Also, I look at documents related to the facility

18  such as updates on the renovations and repairs being done.

19  The -- I look at the master plan although that was produced at

20  one point in time but it's a big document, and I go back to

21  review it.

22      I also get updates on the mental health unit and follow

23  those updates.  I'm involved in the policy and procedure

24  process so I know the new policies that have been adopted and

25  that's relevant to the report.  And I get records from the --

1    Ms. Moore that includes population reports, length of stay,

2    and to some extent some documents related to people waiting

3    for the State hospital.  That's what comes to mind right now.

4    Q.   Okay.  And during the course of the period of time

5    between one report and the next, do you have conversations

6    with the other consultants about -- the consultants that you

7    have, in particular, Dr. Dudley, Mr. Moeser, and Mr. Parrish?

8    A.   Yes, very much so.

9    Q.   Okay.  And how frequent do you talk to them about what

10   they may be doing?

11   A.   Well, typically after a site visit, we actually have a

12   Zoom meeting usually before the exit conference and again

13   after, and when we were doing on-site visits and we're all

14   here, that was in-person before the exit conference, and then

15   lots of e-mails back and forth especially as I'm preparing the

16   report and get their sections.  I typically have a lot of

17   questions and either e-mail back and forth or have a phone

18   conversation.  And I speak frequently even separate from the

19   report about developments in Hinds County, particularly with

20   Dr. Dudley and Mr. Parrish because I'm more familiar with the

21   adult system.

22        If I get -- if there's a policy that we're reviewing that

23   relates to medical or mental health, I'll be in conversations

24   with Dr. Dudley about it.  I may ask him to join a policy

25   discussion similarly with Mr. Parrish with policies that

1    relate to corrections operations.  If there's a question that

2    I want his input on, I'll include him in the conversation, and

3    just as questions arise as we get updates, if there's an area

4    where I feel that we or I or we the team should provide some

5    input or some recommendations, I'll touch base with the

6    relevant team member before making that kind of

7    recommendation.

8    Q.   Do you look at any public sources for information to

9    guide you in your monitoring responsibilities, for example,

10   public hearings or press reports on things that are affecting

11   the jail, things of that sort?  Do you keep up with -- well,

12   do you inform yourself by looking to public sources for

13   information?

14   A.   Yes.  I subscribe to the Clarion Ledger, so I get that

15   and review it.  I also see news reports on television news as

16   well as some of the other web-based sources.  And I will, on

17   occasion, review Board minutes of the Board of Supervisors or

18   the Board agenda, and we sometimes hear from members of the

19   public.  They are able to contact us and provide their

20   concerns typically.  It's often family members or people that

21   have been incarcerated in Hinds County.

22        And I -- I have at different times talked with people at

23   the State hospital about -- about receiving detainees from

24   Hinds County mostly but also the way the system works and

25   restoration, *et cetera*.  I've talked with people at Hinds

1  County Behavioral Health mostly around re-entry and discharge

2  planning, and I've talked with individuals in the criminal

3  justice system, not -- not specific to the jail, such as the

4  district attorney, the public defender, the justice court

5  judges, the chief judge of circuit court and others, I

6  believe.

7  Q.  All right.  And throughout this process, you've always

8  talked with employees with the County; is that correct?

9  A.  That's correct.

10 Q.  All right.  There were questions that came up about an

11 individual who was brought to RDC by, I believe, a Jackson

12 police officer who may have been injured and medical decide --

13 medical's response was he needs to go to the hospital or he

14 needs to get medical attention that we can't provide.  Do you

15 recall that testimony?

16 A.  Yes.

17 Q.  I think Major Bryan was also asked about what her

18 knowledge was about whether or not if an individual presented

19 himself and had been charged with domestic violence, whether

20 or not that person had to be detained?

21 A.  That's correct.

22 Q.  Now, if that person was taken to the hospital because he

23 suffered injuries, could he not have been held in custody at

24 the hospital?

25 A.  Yes, he could have been.

1   Q.   I mean, isn't that typically done on individuals who are

2   hurt in the jail, for example, and have to go to the hospital,

3   they still remain in custodial status even when they're in the

4   hospital; correct?

5   A.   That's correct.

6   Q.   I mean, you just have to assign an officer to make sure

7   that person does not escape, for example; correct?

8   A.   That's correct.

9   Q.   And the night of that incident, if reading -- if Hinds

10  County's procedure says that -- well, tell me what Hinds

11  County procedures say in that instance when someone presents

12  himself who needs medical attention?

13  A.   The medical staff are to make a decision as to whether

14  he's in sufficiently stable condition to be booked.  If they

15  conclude that he is not, then the booking staff are not to

16  book the individual but leave him in the custody of the police

17  department.

18  Q.   And does the procedure state whether or not the

19  sheriff -- and it may.  The policy may state the sheriff can

20  override any decision because ultimately people are in the

21  sheriff's custody.  Do the procedures make that point?

22  A.   No.  No.  It leaves that decision in the hands of medical

23  providers because it's a medical decision.

24  Q.   Now, you indicated that you inform yourself on the public

25  information that sort of touches on the detention center, and

 1    I'll ask you if you recall of a situation back in, I think,

 2    September of 2021 where there was a lot of press coverage on a

 3    particular individual whose name I don't know, but it was a

 4    detainee who was moved from the facility and there was some

 5    question as to who authorized the move of that particular

 6    individual?

 7    A.    That's correct.

 8    Q.    And there was some discussion in the media at least that

 9    a person had been directed -- well, that the sheriff had

10    directed someone moved.  The sheriff said its typically done

11    all the time, I believe was his response, but there was also a

12    conversation of whether that removal of that inmate had been

13    directed by the president of the Board of Supervisors.  Do you

14    recall reading about that?

15    A.    Yes, I do.

16    Q.    Okay.  Now, does the -- if it's true that the president

17    of the Board of Supervisors ordered or asked or requested

18    someone to move, does the policy allow for that type of

19    instruction/direction from the president of the Board of

20    Supervisors?

21    A.    The policies don't address that situation.  The policies

22    do require that people be housed consistent with their

23    classification level so if it was a request that was

24    inconsistent with the classification level of the individual,

25    it would be contrary to policy.

1   Q.   And, I mean, would it be -- is it contrary to policy for

2   a noncorrectional officer other than the sheriff to have a

3   hand in how one is classified or how one would be situated?

4   A.   The policies put that decision in the hands of the

5   classification officers and there's no discussion of whether

6   others can make a request, but it does put the decision in the

7   hands of the classification officers.

8   Q.   Would you expect, though, in order to run the facility

9   appropriately, would you expect for members of the Board of

10  Supervisors to dictate where one is housed?

11  A.   No, I would not expect that.  I mean, I would not expect

12  a member of the Board of Supervisors to dictate where someone

13  is housed.  That would interfere with the classification

14  process.

15  Q.   You testified on direct and maybe even cross-examination

16  about the inappropriate use of force, and I think you were

17  specifically asked if the inappropriate use of force could

18  lead to injuries to detainees.  That may have been the

19  question, but can it lead to injuries of a detainee?

20  A.   Yes.

21  Q.   Can it also lead to injuries of correctional officers?

22  A.   Yes.

23  Q.   Can it lead to death of a detainee?

24  A.   It can.

25  Q.   Okay.  Can it lead to death of a correctional officer?

1   A.   It can.

2   Q.   All right.  Now, I think on direct and cross-examination

3   you indicated that the PREA -- the person who is the PREA

4   officer, I think -- tell me her name again.

5   A.   Ms. Sheena Fields.

6   Q.   Ms. Fields?

7   A.   Yes, Sheena Fields.

8   Q.   I think the testimony was for some period of time she was

9   out?

10  A.   That's right.

11  Q.   And I believe the testimony was that she was out for an

12  extended period of time, for months?

13  A.   Yes, that's correct.

14  Q.   Now, during that time, did the County, did the sheriff's

15  office or the detention center appoint -- put in an interim

16  person in that position, or did they just assign her duties to

17  someone else?

18  A.   We were notified that her duties had been assigned to, I

19  believe, a lieutenant and maybe several supervisory officers.

20  I don't recall exactly, who but not a dedicated individual,

21  not an individual trained in PREA -- PREA duties.

22  Q.   Now, tell me what's so important about PREA, if anything?

23  A.   Well, it is important.  PREA stands for the Prison Rape

24  Elimination Act.  And so the purpose of it is to eliminate or

25  certainly reduce the sexual assaults and violence in

1 incarceration settings, and certainly historically that's been

2 a problem nationally, the inmate-on-inmate but also on

3 staff-on-inmate and inmate-on-staff sexual assaults and

4 violence.  So it's very important.

5 Q.   And I noticed when I was there, there were placards or

6 signs talking about PREA in various areas throughout the

7 facility; is that correct?

8 A.   That's correct.

9 Q.   All right.  The person who was assigned those duties when

10 Ms. Fields was out, was that person relieved of the other

11 duties that a person would normally do?

12 A.   No.

13 Q.   Okay.  And based on your understanding of what the PREA

14 coordinator does -- I mean, what were -- and I'm sorry.  I may

15 have missed it.  What were her specific duties as PREA

16 coordinator?

17 A.   Well, the duties include ensuring that incoming detainees

18 get an initial orientation.  And after they're booked and

19 housed, that they get a more in-depth education regarding the

20 zero tolerance, but also how to report what constitutes

21 inappropriate sexual behavior and so on.  It also -- the

22 duties also include providing training in the cadet academy

23 but also ongoing training in in-service.  It includes

24 preparing reports regarding PREA allegations, receiving those

25 allegations either directly from the detainee or also from

1   staff members through the grievance system, sort of keeping

2   the cell phone which is linked to the reporting on the kiosk

3   so that those calls go directly to the PREA coordinator,

4   working with the individual after an alleged incident to

5   ensure that they get the services that they need and that they

6   are safe in the facility, coordinating with the service

7   provider, which can either be QCHC, the medical provider at

8   Hinds County, or they also have a contract with the

9   Mississippi Coalition Against Sexual Abuse to provide

10  services.  So coordinating with them, ensuring that the

11  policies are followed, keeping record of investigations,

12  coordinating with CID or IAD depending on the nature of the

13  incident to ensure that it's properly investigated.  Those are

14  the points that come to mind.

15  Q.   Now, I think on direct examination, so this would have

16  been before yesterday, I think, the first day, you talked

17  about an inmate -- in the same sentence with the inmate, you

18  talked about feces.

19  A.   Yes, sir.

20  Q.   I think that was your testimony.  I want to hear more

21  about that.

22  A.   This was in the quality assurance report for January.

23  What it says in the report is that the -- there were concerns

24  about the cleanliness of the unit where the SMIs, the severely

25  mentally ill detainees, are typically housed.  And then it

1    goes on to read that I believe medical staff reported that

2    there were two detainees on that unit that were found covered

3    in feces and who had notable weight loss and were also covered

4    in sores.  And the one individual was -- the sores were in

5    such serious condition he had to go to the hospital for

6    treatment of them.

7    Q.   Did they say where this inmate may have been covered in

8    feces?

9    A.   You mean where on his body?

10   Q.   Uh-huh.

11   A.   No.  The report just said he was covered in feces, and we

12   only recently got this report.  It was after our site visit,

13   and, in fact, I didn't read it until I was here for this

14   hearing so I haven't had the opportunity to follow up on the

15   information in that report.

16   Q.   But the report itself that's prepared by the County --

17   A.   Yes.

18   Q.   -- had that information in it?

19   A.   Yes.

20   Q.   And that would have been -- you did not learn about that

21   during your visit in January 24th; correct?

22   A.   That's correct.

23   Q.   You learned about it after?

24   A.   That's correct.

25   Q.   Okay.  So that would have been since January -- you left

1    that facility January 27th or 28th or so; is that correct?

2    A.   Yes.  I think a few days before that because I did kind

3    of a hybrid visit, but, yes, in that week.

4    Q.   Okay.  And that was the quality assurance report that is

5    in evidence at P-106, I think.

6    A.   That sounds right.

7    Q.   Is it appropriate to have inmates covered in their --

8    severely mentally ill inmates covered in feces?

9    A.   No, not at all.

10   Q.   You indicated that the QA report suggested or said that

11   the person -- at least one individual had sores on his body.

12   Have you been able to -- do you typically, as a part of what

13   you do or what your staff does, obtain the medical records of

14   any of these individuals?

15   A.   Dr. Dudley does on occasion when -- yes, we request for a

16   particular individual and then it's usually reviewed

17   electronically, but, yes, he will review the medical records.

18   Q.   Now, do the policies of the institution say how often

19   inmates are checked on?  I mean, is there a routine that -- is

20   there a routine or a timeliness, a timing that the cells are

21   checked on a daily basis?

22   A.   There is, yes.  There is a policy, and it's also in the

23   settlement agreement that there's supposed to be a well-being

24   check.  The policies say every hour for people in general

25   population and every 30 minutes for people in segregation and

1    every 15 minutes for people in booking.

2    Q.   Okay.  Does the QA say anything about -- if you recall,

3    does it say anything about what steps the County -- I don't

4    know.  Should a quality assurance report say what steps will

5    be done next to avoid that happening again, or is that some

6    other report or some other guidance that's provided?

7    A.   The QA report does include recommendations.  I don't

8    recall whether there was a recommendation specifically on that

9    although she did talk about the cleanliness of the unit and

10   ensuring that the cleanliness was maintained.  She has, I

11   believe in this report and in past reports, talked about the

12   observation logs not being completed accurately and implicit

13   in that is the suggestion, I would say, that the rounds be

14   done and done correctly and timely.

15   Q.   Who is responsible for the cleanliness of the cells?

16   A.   Well, the housing unit officers would normally be,

17   although as has been talked about, there are often no officers

18   on the unit.  There is a sanitation officer, and there are

19   trustee -- inmate trustees that assist with the cleanliness

20   and the detainees themselves assist with keeping it clean, but

21   it would be the housing unit officer that would be responsible

22   for the housing unit and ensuring that it had the necessary

23   cleaning items and that it's being kept clean.

24   Q.   Turning to Detainee MR.

25   A.   Yes.

1    Q.   I believe that's the detainee who back in October was

2    discovered to have been assaulted and killed, to have been --

3    to die from assault injuries, I guess --

4    A.   Yes, yes.

5    Q.   -- there at the facility, and your investigation

6    revealed, I believe, that the person had been dead for a

7    number of hours?

8    A.   That's correct.

9    Q.   And I believe the testimony is up to nine hours?

10   A.   I -- yes.  After writing the interim report and actually

11   just in this last site visit, we were given the IAD reports on

12   the incident, and I believe the IAD report said it was eight

13   hours.  I had heard nine hours at the time I wrote that

14   report.

15   Q.   Okay.  So eight hours.  That person was in general

16   population, or was that person --

17   A.   Yes, that person was.

18   Q.   And in general population that person's well-being check

19   would have occurred at a minimum of one time per hour?

20   A.   It should have, yes.

21   Q.   And so in an eight-hour period, the person would have

22   been checked on, confirmed to have been checked on eight

23   times?

24   A.   It should have been -- should have been, yes.

25   Q.   Tell me, what is -- I mean, what is a well-being check?

1    I mean, is a well-being check just looking in through the bars

2    and walking by?  What is a well-being check?

3    A.   Well, to be done correctly, the well-being check should

4    actually ensure that the individual is alive and well, and in

5    this case I believe the video footage -- and, again, this

6    comes from the IAD report.  The video footage shows that there

7    was one well-being check during that time frame, and the

8    officer was inside the unit which isn't always the case.

9    Sometimes they just look through the outside, what's called

10   the cage into the unit as a whole.

11        In this instance, the officer was inside the unit and the

12   individual was at that point either laying down or propped

13   against the wall and the officer did not ensure that the

14   individual was still alive.

15   Q.   Is the IAD report a part of any of your monitoring

16   reports?

17   A.   It will be referenced in our upcoming monitoring report,

18   but like I said, we just received it in January.

19   Q.   If in doing the well-being check the officer concluded or

20   surmised that an inmate is having a drug overdose, should

21   action be taken in that regard?

22   A.   Yes.  Yes, medical should be called and the individual

23   taken to medical or have medical come to the unit, depending

24   on the condition.

25   Q.   And if the person is in any apparent distress at all to

1   the person who's doing the well-being check, should any report

2   or something be filed by somebody?

3   A.   It would certainly go -- medical would include it in

4   their medical records, but it also should result in an

5   incident report as well as being included in the logs.

6   Q.   You testified the other day that persons have expressed

7   concern about the dangerousness of the facility and I think

8   you said you either talked to them specifically.  You

9   indicated correctional officers as one source of persons.  You

10  may or may not have said members of the public.  Did you say

11  members of the public?

12  A.   Yes.  I would say we've heard from former detainees or

13  their family regarding the facility being dangerous.

14  Q.   Right.  And the public -- the assault leading up to the

15  death of MR was not the first assault that occurred in that

16  place?

17  A.   That's right.

18  Q.   There were other assaults that have led to lawsuits

19  against the County --

20  A.   That's right.

21  Q.   -- correct?

22  A.   That's right.

23  Q.   To the extent you're able to, do you also inform yourself

24  on other litigation that might have been filed against the

25  County involving the inmates or the detainees?

1   A.   I have not sought out that information, but I am aware of

2   other litigation and -- regarding assaults and other

3   conditions.

4   Q.   In your conversations with -- you mentioned correctional

5   officers.  In your conversations with any Hinds County

6   employees, whether elected or appointed, have any of them in

7   your conversation spoke to you about what they believe might

8   be dangerous conditions inside the facility?

9   A.   I'm sorry.  With correctional officers?

10  Q.   Correctional officers, anyone, the sheriff, any sheriff,

11  anybody within that system, any other Hinds County official.

12  A.   Yes, we've certainly heard it from Hinds County Jail

13  employees.  Yes, actually I recall, especially during the

14  campaign for sheriff, there was a lot of discussion about the

15  conditions at the jail and recognition by the candidates that

16  the jail was a dangerous place.  I think we've heard it

17  uniformly actually in conversations with staff and officials.

18  Q.   And periodically and routinely, you are aware that there

19  are coordinated efforts to retrieve contraband at the

20  facility; is that correct?

21  A.   Yes.

22  Q.   I mean, you know, they do a search, and what are some of

23  the items in doing those -- I don't know what they call them

24  raids --

25  A.   Shakedowns.

```
 1   Q.   Shakedowns, right.  During those shakedowns, what are
 2   some of the things you have learned, as monitor, that the
 3   sheriff's department or the sheriff or correctional officers
 4   have found inside the facility?
 5   A.   The volume of contraband is really very striking.  Lots
 6   and lots of cell phones and cellphone chargers, razors,
 7   shanks, knives.
 8   Q.   Hold on.  Let's go down step by step.  What's wrong with
 9   having a cellphone inside a correctional facility?
10   A.   It allows for coordination of bringing in contraband.  It
11   potentially allows for coordination for an escape.  It
12   potentially allows coordination for a hit, an assault either
13   within the jail or outside the jail.  So, yes, you definitely
14   don't want cellphones in the jail.
15        The other thing in mentioning cellphones reminds me that
16   we have seen video that the detainees have taken and put it on
17   social media, and that's a source of information for us as
18   well.  A strange one but that exists.  So, yes, those are the
19   problems with cellphones.
20   Q.   And have you seen videos of individuals who claim to have
21   been assaulted there --
22   A.   Yes.
23   Q.   -- in the facility?
24   A.   Yes.  Yes, videos of the assault.
25   Q.   You mentioned cellphones.  I guess, cell chargers are
```

 1    equally wrong because it charges the phones that might be

 2    used.

 3    A.    That's correct.

 4    Q.    You also mentioned razors.

 5    A.    Yes.

 6    Q.    What's wrong with having razors in the facility?

 7    A.    That's a potential weapon.

 8    Q.    What about shanks?

 9    A.    Shanks are definitely a weapon.

10    Q.    I think you mentioned knives?

11    A.    Yes.  Same thing, a weapon.

12    Q.    What other contraband, if any?

13    A.    Tobacco.

14    Q.    What's wrong with having tobacco in the facility?

15    A.    Well, in addition to the health effects of tobacco and

16    secondhand smoke, it ends up also being a currency for sort of

17    a black market within the facility.

18    Q.    Is there a policy against smoking in the facility?

19    A.    Yes.

20    Q.    Okay.  Any other type of contraband?

21    A.    Drugs.

22    Q.    Is that -- you say drugs?

23    A.    Yes.

24    Q.    All drugs?  I mean, some drugs are legal; some are

25    illegal, so help me out.

1    A.   Mostly illegal drugs, marijuana, to some extent.   More

2    often I read spice and opiates.   And a lot of times it's not

3    identified.   It's a little orange pill or a little white pill

4    or something that's listed in the contraband.

5    Q.   And can legal drugs also be a contraband item?

6    A.   Yes, if they're not prescribed to that individual.   Well,

7    they wouldn't have it on them anyway.   Prescribed drugs are

8    dispensed through med pass, so, yes, legal drugs would be

9    contraband.

10   Q.   And during, I guess -- I know that part of the report or

11   that part of the consulting was primarily done by Mr. Parrish;

12   is that right?

13   A.   Yes, that's correct.

14   Q.   Any reason to disagree with any of the findings that

15   Mr. Parrish has presented to you on those subjects with

16   respect to contraband being in the facility?

17   A.   No reason to disagree.

18   Q.   Would money be a contraband item there?

19   A.   Yes, and that is sometimes recovered.

20   Q.   Okay.   So the inmates are not allowed to -- excuse me --

21   the detainees.   I don't want us to be mixing up the two.   The

22   detainees, are they not allowed to have money or --

23   A.   That's correct.

24   Q.   Okay.

25   A.   I mean, they can have money on their books, but they

1  can't have physical money.

2  Q.   Do you know if the Mason administration -- if Mason did

3  shakedowns, do you recall?

4  A.   I think the lack of shakedowns was -- has been an issue

5  all along.  They're supposed to be far more regular than they

6  have been but there are periods of time when they've been

7  somewhat regular.  But then there are periods of time even

8  recently when shakedowns haven't occurred in various units for

9  long periods of time, months.

10  Q.   But each time there is a shakedown that has occurred

11  during the time that you've been a monitor, you will have

12  learned of it in some way; correct?

13  A.   Correct.  There should be an incident report as well as a

14  shakedown log that records the shakedown.

15  Q.   And are you aware the sheriff's department has conducted

16  a shakedown and did not find anything?

17  A.   It may have occasionally happened.  It's probably -- I

18  think it's probably happened at the work center.  It's rare at

19  RDC for them to find nothing.  I don't think there's been a

20  shakedown without finding some contraband.

21  Q.   At RDC in particular?

22  A.   Yes, yes.  And I should say that shakedowns are supposed

23  to be video recorded with a GoPro camera, it's called.  But

24  the GoPro cameras at RDC have not functioned for some time and

25  so the shakedowns have not been recorded.

1  Q.   Is that part of the -- recorded based on the agreement

2  the parties have, or is that part of the policy that has been

3  implemented by the sheriff's department, the videotaping?

4  A.   I think it is in policy.  I'm not sure if it's in the

5  settlement agreement.

6  Q.   Okay.  Now, there was some discussion on direct and

7  cross-examination with respect to the current, the next,

8  Frank Shaw?

9  A.   Yes.

10 Q.   And his -- again, we don't know what his -- I'm not

11 specifically sure what his specifically title is at this

12 point.  I believe he may be interim or either acting jail

13 administrator because I think there has been an affirmative

14 representation that they're going to do a nationwide --

15 they're going to do a search for a permanent person.  That may

16 or may not have changed.  I don't know.  They'll tell us.

17      You testified that you don't believe he meets the

18 criteria set out in the consent decree or the settlement

19 agreement.  I think you in particular pointed to paragraph 38.

20 Tell me why you don't believe Mr. Shaw meets the criteria to

21 be jail administrator.

22 A.   The criteria in the settlement agreement requires, I

23 believe it's five years' experience, supervisory experience in

24 a large jail, and Mr. Shaw's experience, it looks from his

25 resume to be exclusively in prisons not jails.

1 Q.   Oh, okay.  And what's the difference between a prison and

2 a jail?

3 A.   From a management standpoint and, again, I would probably

4 defer to Mr. Parrish, but I'm knowledgeable about the

5 difference as well.  From a management standpoint, they're

6 very different.

7      A jail has very rapid people coming and going, so a lot

8 of bookings in a day, a lot of releases in a day, which is

9 very different from the prison setting.  So booking and

10 release operates completely differently, 24/7, which is

11 typically not the case in a prison.

12     People are coming directly off the streets so you have a

13 lot of potential substance use issues, potentially medical

14 issues, unaddressed mental health issues, and they're not

15 coming from a facility where they've been assessed and

16 treated.  They're coming right off the streets so you don't

17 necessarily know what you're getting, and they have to be

18 assessed promptly and sort of figure out what it is that might

19 be an issue for them.

20     Whereas, again, in a prison most individuals have been in

21 another facility or under some level of supervision, and

22 they've been assessed.  They're stable.  You know who they are

23 coming in.  There is a classification process in prison, but

24 most prison systems are -- the classifications are just

25 divided by facility so you don't have the full mix of

1    different classification levels in one facility.

2        Typically in prison you don't have males and females,

3    whereas in jails you often do.  You don't have the level of

4    programming and sort of routine in a jail that you have in a

5    prison setting.

6        Property is a different issue.  You have to ensure that

7    property is -- is held and maintained and released with the

8    individual again potentially in short periods of time.

9        You have a lot of transport issues, transport to court,

10   and there are some transport issues in prisons, but in a jail

11   that can be -- you know, depending on the size of the jail,

12   that could be a pretty large number on a daily basis.  So

13   those are some of the issues that come to mind.

14   Q.   Right.  Prison offers programming that jails do not?

15   A.   Typically do not.  I mean, programming in a jail, it's

16   expected to be short term, although in Hinds County, it's not

17   always that short term, but it will be more limited and

18   typically no vocational opportunities.  Ideally some

19   therapeutic activities but much, much less programming than in

20   a prison system.

21   Q.   Right.  I think the law acknowledges that jails -- that

22   prisons provide more by way of programming than jails do

23   because prisoners are expected to be there for a much longer

24   period of time?

25   A.   That's correct.

1  Q.   There are a number of services that persons might get in

2  prison that they will not, including therapeutic services that

3  they -- that are just not available to them in jails; is that

4  correct?

5  A.   That's correct.  I mean, ideally, typically therapeutic

6  services are available in jails.  But, yes, other services,

7  occasional, educational opportunities are typically more

8  available in prisons, if not exclusively available in prisons.

9  Q.   And you mentioned that, you know, the rapid turnaround.

10 Someone should be arrested and because, again, they're

11 innocent, ultimately in many instances, released.

12 A.   Yes.

13 Q.   And I think you said they're generally held a little bit

14 longer in Hinds County; I think we all can agree?

15 A.   Yes, yes.  And, Your Honor, you raised a good point

16 there.  Because they are detainees, they can't actually be

17 punished, and so some of the rules with respect to what you

18 can impose upon detainees are different from what you can

19 impose upon convicted prisoners.

20 Q.   Now, with respect to the information that you review and

21 receive about the quality of life, if you will, of the

22 inmate -- of the detainees, I think you rely on information

23 that you might get from the public.  You might get it from

24 other sources.  I think there's been testimony like in Justin

25 Mosley's case where his mother said she was calling in, I

 1  think, a number of times, I think.

 2      Do the records or anything show where there is some

 3  rapport for inmates to come to the staff and report to the

 4  correctional officers things that are affecting them in some

 5  way, whether they're reporting on another inmate or whether

 6  they're reporting on a correctional officer or whether they're

 7  reporting on things that are out of whack in a facility?

 8  Should the records reflect that there's -- well, should the

 9  correctional officers have a rapport, if you will, with the

10  inmates?

11  A.   So some of those communications, if made orally, may or

12  may not be included in an incident report.  We actually see

13  frequent incident reports where a detainee states to the

14  correctional officer that he is in fear for his life.

15  Typically in that situation they're asking to be moved to a

16  different unit or to be put in protective custody.  So that

17  kind of statement ends up in an incident report, and like I

18  said, we see a lot of those.  I mean, I think there are

19  probably statements made between the detainees and the staff

20  that do not end up in an incident report for whatever reason.

21      There's also a grievance system, as we've talked about,

22  and they can -- the detainees can submit a grievance or a

23  programming request which is a different type of

24  communication, and that goes into the kiosk system.  And those

25  grievances and requests are kept electronically, but they can

1    be printed out and reviewed.

2    Q.   Now, you've been a monitor on this case since 2016; is

3    that correct?

4    A.   That's correct.

5    Q.   And from 2016 at least until the end of 2019, I think the

6    only document in place that the parties -- was it your

7    understanding the parties had agreed to the settlement

8    agreement?

9    A.   Yes.

10   Q.   Okay.  And what is that -- the lawyer for Hinds County

11   signed off on the agreement?

12   A.   I don't recall the signatures, but I would assume so,

13   yes.

14   Q.   Okay.  And the record will reflect, if you look at it,

15   that the attorney for the sheriff's department signed off on

16   the settlement agreement as well?

17   A.   That could be.  I haven't looked at the signature lines,

18   but it sounds right.

19   Q.   Okay.  But that was the agreement that was in place?

20   A.   Yes.

21   Q.   For a number of years?

22   A.   Yes.

23   Q.   For at least through December 2019; is that your

24   understanding?

25   A.   Yes, yes.

1    Q.   What happened to cause the next order to be in place?

2    Because there's a stipulated order.

3    A.   That's correct.

4    Q.   So what led to the parties entering a stipulated order?

5    A.   The Department of Justice filed a motion for contempt for

6    failure to comply with the terms of the settlement agreement,

7    and a hearing was set.  It was briefed, I believe, and a

8    hearing was set and a stipulated order was agreed to

9    immediately prior to the hearing.

10   Q.   Okay.  And with respect to that stipulated order -- well,

11   that stipulated order, did the parties consult with you about

12   the terms or the conditions that ought to have been placed in

13   that -- or that would be placed in any stipulated order?

14   A.   Yes.  I actually worked with Mr. Teeuwissen, the board

15   attorney and Ms. Barker, the sheriff's attorney to flesh out

16   an initial draft of their proposal to the Department of

17   Justice for the stipulated order.  Once it was conveyed to the

18   Department of Justice, I really wasn't involved in the

19   conversations from that point on.

20   Q.   But what was the purpose of the stipulated order as

21   you -- I mean.  What was the purpose of the stipulated order?

22   A.   My understanding of what the parties were looking for was

23   sort of a discrete set of concrete steps that would move them

24   towards compliance, so something less than the 170 whatever

25   paragraphs of the settlement agreement, something that was

1  more manageable, concrete and with specified timelines.

2  Q.   And during the course of the -- under the provisions of

3  the -- between the time -- during the time before the parties

4  entered the stipulated order, was the Court holding regular

5  status conferences with the parties?

6  A.   Yes, I believe so.  Yes.

7  Q.   And at the status conferences, what would occur at the

8  status conferences if you attended?

9  A.   I did attend the status conferences.  My recollection is

10  that it was normally a report by myself on progress towards

11  the compliance with the settlement agreement and then

12  typically some discussions by the counsel regarding where they

13  were at and what barriers they were experiencing or what

14  concerns they had about not moving towards compliance more

15  promptly.

16  Q.   Based as a monitor -- during the time between the

17  settlement agreement and the time of the stipulated order, as

18  a monitor do you believe that the County was in full

19  compliance with the terms of the settlement agreement?

20  A.   No.

21  Q.   Okay.  Turning to the time that the stipulated order has

22  been in place, do you believe as a monitor that the County has

23  been in full compliance with the terms of the stipulated

24  order?

25  A.   No.

1    Q.   And as a monitor do you believe that some oversight is

2    still justified from -- some oversight of persons not -- some

3    oversight is justified, whether it's the Court or a receiver,

4    a compliance officer, a monitor, that some oversight is

5    justified even today with respect to the jail system there in

6    Hinds County?

7    A.   Yes, most definitely.

8    Q.   And why is that?

9    A.   Because even with oversight we have not seen progress

10   towards compliance at any kind of reasonable rate, and there

11   has not been what appears to be a commitment to provide the

12   resources, both human and financial, to obtain compliance.

13   Q.   Now, this is the last question.  Then we're going to take

14   a 15-minute break because I'll have to consult with my lawyers

15   to see if I've missed anything that I need to ask.

16        Your rate of pay --

17   A.   Yes.

18   Q.   -- your rate of pay and the rates of pay for the

19   consultants that assisted you --

20   A.   Yes.

21   Q.   -- did you discuss your rate of pay at any point with the

22   County?

23   A.   Yes.

24   Q.   You did?

25   A.   I don't know that there was a full discussion, but there

1  was certainly disclosure in the budget that I prepared of what

2  the rate of pay was.

3  Q.   And was that budget presented to any County officials

4  prior to them hiring you?

5  A.   I believe so.  It might be that they had agreed to the

6  appointment before the budget was presented, but I believe the

7  budget was presented first.  It was around the same time.

8  Q.   Did the attorneys ever -- did the attorneys for the

9  County or the sheriff ever tell you they thought your rate was

10  unreasonable?

11  A.   No.

12  Q.   That your rate was too high?

13  A.   No.

14  Q.   That they were not willing to pay that rate?

15  A.   No.

16  Q.   Did they ever tell you they thought that that rate was

17  unfair?

18  A.   No.

19  Q.   For you or your consultants?

20  A.   No, they never did.

21  Q.   Did they ever tell you that that's a rate that they could

22  not afford to pay?

23  A.   No.

24  Q.   Have you charged the County for any work that you did not

25  do?

1  A.   No.

2  Q.   Do you believe that any of your consultants have charged

3  work to the County that they did not perform?

4  A.   No.

5       THE COURT:  At this time we're going to take a

6  15-minute break.  Ms. Simpson, you may step down.  No need to

7  discuss with anyone about your testimony.

8       We'll be in recess for 15 minutes -- I don't think I

9  have any more -- well, I can't say that because my lawyers

10  might have some more questions, but if I do, I don't think

11  there will be many, and then I'll be returning to the

12  United States.  We'll be in recess.

13            (A brief recess was taken.)

14       THE COURT:  You may be seated.

15       I have no further questions.

16       THE WITNESS:  Your Honor, may I mention something in

17  connection with an earlier answer to one of your questions?

18       THE COURT:  Oh, please.

19       THE WITNESS:  You had asked if there had been any

20  objection from Hinds County individuals regarding me or my

21  team's qualifications.  At least I understood your question to

22  be about our qualifications, and there has not been any

23  objection to our qualifications.

24       Shortly after Major Bryan came on, she had a

25  conversation with Mr. Parrish after which she complained, I

1  would say, about his demeanor.  And that complaint was

2  conveyed to me by Ms. Barker and it was discussed and resolved

3  and there did not continue to be any problems between

4  Mr. Parrish and Major Bryan.  In fact, they've gotten along

5  quite well, or had gotten along quite well, or my team with

6  Ms. Barker.  But I wanted to make sure that -- I didn't know

7  if your question was limited to qualifications or if it also

8  included this discussion we had about demeanor.

9       THE COURT:  Okay.  Any -- well, I was specifically

10  talking about qualifications, but in that regard, any other

11  reports on Mr. Dudley, Mr. Moeser, the other medical person

12  who was there before, Mr. Dudley?

13       THE WITNESS:  No, not that I recall.

14       THE COURT:  Okay.

15  BY THE COURT:

16  Q.  Oh, I did not ask this question.  I want to make sure I'm

17  clear on this inmate committee thing that you learned about

18  apparently.  Tell me about this inmate committee.  Because I

19  think I heard testimony -- and correct me if I'm wrong -- one

20  was inmates being assigned to issue meals.  I thought I also

21  heard some testimony about inmates deciding who might be next

22  up to be assaulted and, therefore, that person is not entitled

23  to be in our particular unit or whatever.  Tell me about this

24  inmate committee system that you have -- that your reports or

25  that your notes or whatever it is that you've learned about

1    that system, please tell me.

2    A.   At some point, I believe, in 2021 -- I'm not sure when we

3    received a document from the jail that was said to be a list

4    of the inmates/detainees that created the most difficult

5    management problems for whatever reason, and it listed the

6    detainee.  I think it listed whether they were on the mental

7    health caseload.  It might have had some other columns, and

8    then it had a column for notes.  And on various of the

9    detainees, it was -- it would say, you know, noncompliant with

10   medication or whatever the issue might be, and on a number of

11   them, it said, "Is on the inmate committee."

12       And that was the first I'd heard of that.  The person who

13   prepared that list was Lieutenant George, the administrative

14   lieutenant.  And so in talking with her, I believe, during the

15   site visit, I asked what the inmate committees were, and she

16   was the one that told me that in the various housing units

17   that there is a committee of detainees that essentially run

18   the unit and among other things they decide if there's someone

19   on the unit that they don't want on the unit.  And if that's

20   the case, they will harass, steal from, assault that inmate

21   essentially until that detainee requests to be moved.

22       In some -- in one incident report, they actually took

23   that target detainees' property and took it out of the cell

24   and put it next to the cage door in advance of him even asking

25   to be moved but made the message clear.

1      And it is somewhat related to the issue of detainees

2   being the ones passing out food because the committee may also

3   decide that you don't get a tray.  So you don't -- you don't

4   eat that meal or that day, which is why it was important to

5   move away from having the detainees passing out the food.

6   That's not proper procedure anyway and unfortunate that at

7   least in the recent site visit it appears has backslid some.

8      So that's how the inmate committees were described to me,

9   and since then I usually make a point on the site visits to

10  confirm whether the inmate committees are still functioning.

11  And in this most recent site visit, that was confirmed, that

12  these -- they are still functioning, particularly, I think it

13  was said, on A1, A3, and C3 at least one person reported that

14  they pretty much run those units, but they are potentially

15  present on every unit.  And I think I have the A units

16  correct.  I think it was A1 and A3.

17  Q.   That was still in existence when you had your most recent

18  visit?

19  A.   Yes, yes.

20  Q.   Now, on this most recent visit, I just want to be clear.

21  On this most recent visit, you still found that there were

22  cell doors that were not locking?

23  A.   Yes, again, that's an area that Mr. Parrish covers.  But

24  certainly on A-Pod, they haven't been repaired at all.  So

25  they don't lock.  But some of the doors on B-Pod were not --

1  cell doors and some of the doors, like going out to the rec

2  yard or in between units, *et cetera*, there were still doors

3  that did not lock.  In fact, the door going into B-Pod from

4  the great hall hasn't worked for years.  It's just propped

5  open.

6  Q.  Now, with respect to the inmate committee, does -- as

7  you've learned as recent as January, how does the existence of

8  those committees affect how the prison -- excuse me -- how the

9  jail is operated, or how does it affect the ability to reach

10  full compliance with the terms of the stipulated order and/or

11  consent decree?

12  A.  Well, it certainly results in housing decisions not being

13  made by classification because in that situation it's the

14  detainees that are deciding where somebody gets housed.  It

15  also contributes to the safety and welfare of the detainees,

16  particularly the ones that are targeted by these committees.

17  Q.  And you are aware, I think, that I toured the facility in

18  August of 2019?

19  A.  Yes.

20  Q.  You were there then, I believe.

21  A.  That's correct.

22  Q.  So was Mr. Parrish, I think.  And I also toured the

23  facility in January of 2022.  Many of the cells don't have

24  lights in them.

25  A.  That's correct, or functioning lights.

1  Q.   Functioning lights, how does that affect the ability for

2  the officers to -- well, does it affect the ability of the

3  officers to do wellness checks in any way?

4  A.   Yes, it would because without lights and particularly the

5  old cell doors, it's very difficult to see in those windows

6  anyway, and if its dark in there it's very difficult.  You

7  really can't see what's going on in the cell from outside.

8  Q.   And why is it important to see what's going on in the

9  cell?

10  A.   Because lots of things could be going on.  There could be

11  contraband.  There could be fights.  Somebody could be

12  injured, could be ill, could be overdosing.  So, yes, you need

13  to see what's -- in the well-being checks, you need to be able

14  to see the individual.

15  Q.   Are the cells generally occupied by more than one inmate

16  or more than one detainee -- excuse me?

17  A.   In the segregation unit, it's one person per cell.  In

18  the general population units, I believe it's two people in the

19  cell.

20  Q.   Do you recall in 2019 after the visit that we had the

21  Court raising the issue about in several of the units, or

22  maybe in all of the units in RDC at the time, there were no

23  tables and chairs -- or no tables on which the inmates could

24  eat?

25  A.   That's correct.

```
 1   Q.   Do you recall --
 2   A.   Yes.
 3   Q.   -- me raising that issue at the detention facility
 4   itself?
 5   A.   Yes.
 6   Q.   Do you also recall me raising the issue at the status
 7   conference?
 8   A.   Yes.
 9   Q.   In 2019?
10   A.   Yes.
11   Q.   Okay.  When you were last there in 2022, do you believe
12   that issue had been addressed?
13   A.   No, it had not.
14   Q.   And where would you -- where are the detainees expected
15   to eat their meals?
16   A.   Well, they either eat them in their cells or they sit on
17   the stairs or they possibly potentially sit on the floor.
18   Q.   I heard you mention, I think, in your testimony -- I know
19   there's been testimony in the course of this trial about
20   plumbing might be an issue from time to time?
21   A.   Yes.
22   Q.   Is that plumbing inside of the cells?
23   A.   Yes, there are toilets inside the cells and they
24   sometimes -- sometimes they're stopped up by the detainees,
25   but they sometimes leak.  The showers have been sort of a
```

1  consistent problem.

2  Q.   And if you -- describe for me -- and I know maybe

3  Mr. Parrish may be the person who -- or maybe the official.

4  You've been in one of those cells before?

5  A.   Yes, I've been in them before.  You're right.

6  Mr. Parrish normally covers the facility issues, but I've been

7  in them.

8  Q.   Just give me a description of what the cell looks like.

9  A.   Well, these are just pretty plain.  I think in the

10  general population units, I think there's, like, a bunk bed

11  and there's a toilet.  There's no table or chairs.  They're

12  pretty small, I assume they meet the ACA criteria, but they're

13  definitely small.  They're dark.  There's no outside lighting.

14  As you mentioned, the interior light often doesn't work.  I

15  guess, that's how I'd describe them.

16  Q.   Okay.  And do you recall the Court raising the issue of

17  persons having to sit inside of their cells and eat their

18  meals in the same room where the plumbing is not working?

19  A.   Yes.

20        THE COURT:  I have no further questions.  The

21  United States may proceed.

22        Thank you, Ms. Simpson.

23        THE WITNESS:  You're welcome.

24

25

1                 **FURTHER DIRECT EXAMINATION**

2   **BY MR. CHENG:**

3   Q.   Ms. Simpson, earlier in your testimony, you talked about

4   classification versus custody level.  Could you clarify what

5   the difference is between those?

6   A.   There's a -- you can be classified as minimum, medium, or

7   maximum, and that is based on the objective score and

8   designates the level of security that you should be considered

9   in the housing decision.  Custody status is -- can be

10   protective custody, disciplinary segregation, administrative

11   segregation, kind of a special needs-type designation.

12   Q.   So are these decisions all made by the classification

13   staff?

14   A.   Yes.  Yes.  It can and probably should involve input from

15   housing unit officers or the mental health staff, depending on

16   what's at issue.

17   Q.   So if we say something like A1 or A3, would one of those

18   units have a classification level?

19   A.   In theory.  But that's one of the problems at RDC is -- I

20   believe A1 and A3 are actually gang pods.

21   Q.   In terms of the documents you reviewed, did those also

22   include investigations or mortality reviews?

23   A.   Yes, there are some.  Yes.

24   Q.   Are there death records or packages prepared for deaths

25   that you review?

1  A.   Yes.  I mean, mostly I have those documents from other

2  locations, but they have at times put together a packet of all

3  documents related to an individual who has died.

4  Q.   When we were talking -- when we were hearing you talk

5  about the PREA process --

6  A.   Yes.

7  Q.   -- the PREA coordinator has a cellphone; is that right?

8  A.   That's correct.

9  Q.   What is that cellphone for?

10 A.   The kiosk system is -- has, as I understand it, I'm not

11 great with technology but it has -- can program in certain

12 numbers.  It's usually like 888 or 999, something like that,

13 and by that programming have the call go directly to a

14 particular location, in this case the PREA officer's

15 cellphone.

16 Q.   So if someone has a complaint or wants to report

17 something about PREA, they would call that cellphone number?

18 A.   Not that cellphone number.  They would go to the kiosk

19 and dial -- I forget what the numbers are -- like, 888 or

20 something, and the kiosk would forward it to that cellphone.

21 Q.   So when the PREA coordinator was out, who had the

22 cellphone?

23 A.   The PREA coordinator.

24 Q.   Did someone else have the cellphone while she was out?

25 A.   No.

1   Q.   So if any messages came in, where were they going?

2   A.   They were going to that cellphone.

3   Q.   Would the acting PREA coordinators have had access to

4   that cellphone?

5   A.   I'm told they did not.

6   Q.   You also talked about cellphones being found during the

7   shakedowns and that there are lots of them.  When you say

8   "lots," can you give sort of a number?  Are we talking 5 to

9   10, 11 to 20, 20 or more?

10  A.   It varies.  On any given shakedown, I think I've

11  certainly seen it be more than 10 from a unit.  I know

12  Mr. Parrish has described to me seeing three milk crate

13  containers full of cellphones that had been obtained in a

14  shakedown.

15  Q.   Under the policy for investigations, do investigations

16  start only if someone inside the jail reports an incident?

17  A.   They should not be limited to that.

18  Q.   So if Ms. Mosley or a family member from outside reports

19  an assault or a beating or some event to the jail, under the

20  policy would there be an expectation that an investigation

21  could still be opened?

22  A.   Yes.

23  Q.   And if an investigation report is not found, would that

24  raise any concerns?

25  A.   Well, it would raise the concern that the complaint was

1  not investigated, and there could potentially have been

2  wrongdoing that is not being addressed.

3  Q.   Earlier you also talked about the differences between

4  jails and prisons, and one of the issues was, like, how much

5  time people spend in prisons versus jails.  Do you recall?

6  A.   That's correct.

7  Q.   So is there a sort of a benchmark or some way to

8  determine, you know, how long are people normally held in

9  jails?

10 A.   Well, there's the average length of stay, but that's an

11 average.  So you have people that are booked and released

12 fairly quickly and those that stay much longer than that

13 average length of stay.  I -- it depends on how functional the

14 criminal justice system is in the area, but normally I would

15 say you would expect your longest people to be in a jail

16 18 months to 2 years, and that would be an unusual -- that

17 would be a very serious charge with somebody who couldn't be

18 safely released.

19 Q.   And in Hinds County Jail, are there people being held

20 longer than you would expect in a jail?

21 A.   Definitely.

22 Q.   And if someone's held for longer periods of time in a

23 jail, would you expect certain programs or services or

24 treatment because they're long-term inmates that might be

25 different if they were short-term?

1    A.   That would be ideal certainly.  I mean, there have been

2    people there for -- I know I've seen up to six years, maybe

3    even longer, and if somebody's going to be in a facility for

4    that long, you would want programming.

5    Q.   How about for things like mental health treatment, if

6    they're in there waiting for beds for mental health care?

7    A.   You know, whatever reason they're in there, you would

8    want adequate mental health care, not only for them but for

9    the safety of the staff and the functioning of the facility.

10   Q.   And we talked earlier about how these are mostly pretrial

11   detainees so they're awaiting criminal prosecution.

12   A.   Yes.

13   Q.   Are there also people who are technically civil detainees

14   whose criminal charges have either been dismissed or not

15   pending at all or just waiting for some type of civil

16   commitment?

17   A.   That's what I understand.  There are people who had

18   charges remanded but they remain in the jail for civil

19   commitment.

20        MR. CHENG:  Thank you, Ms. Simpson.

21        THE COURT:  You can take your time, Mr. Shelson.

22        MR. SHELSON:  May I proceed, Your Honor?

23        THE COURT:  Yes, you may.  Yes, you may.

24

25

1    **FURTHER CROSS-EXAMINATION**

2    **BY MR. SHELSON:**

3    Q.   Good morning, Ms. Simpson.

4    A.   Good morning.

5    Q.   I promise to take less time than yesterday.

6    A.   Thank you.

7    Q.   The Court asked you whether the County has ever

8    questioned whether you were qualified to be the mediator.  Do

9    you remember that?

10   A.   The monitor, yes.

11   Q.   Excuse me, the monitor.  Thank you.

12        When was approximately the first time you were designated

13   as an expert in this case?

14   A.   I don't know that there is a designation of expert except

15   in the course of this proceeding.  I was designated as a

16   monitor.

17   Q.   Right.  And so do you know whether the County is

18   objecting that you're not qualified to be the monitor or

19   whether it's objecting to the sufficiency of the expert

20   designation that in fairness you did not prepare?

21   A.   I think what's involved in this proceeding is the

22   designation as an expert.

23   Q.   Okay.  Now, you probably don't recall this, but I showed

24   you yesterday the order of appointment appointing you as

25   monitor and it's ECF-11.

1  A.   I recall that.

2  Q.   Do you recall the joint memorandum that's ECF-10 that

3  preceded that order?

4  A.   I do not.

5  Q.   Okay.  I can read them if you'd like me to, but I'll

6  represent to you that you were designated as an expert in this

7  case -- excuse me -- you were tendered as an expert in this

8  case in four subject matter areas by the United States.  Do

9  you know whether any of those four subject matter areas are

10 listed or referenced in the memorandum in ECF-10?

11 A.   I do not.  I'm not sure I've read the memorandum.

12 Q.   And did you review the County's motion to strike the

13 United States' expert designation in this case which I think

14 is ECF-134 and the associated memoranda?

15 A.   I believe I did read that memoranda.

16 Q.   And do you recall the County raising the issue of whether

17 the United States' summaries of opinions you would offer in

18 this hearing were sufficiently disclosed by the United States?

19 A.   I recall reading that in the memo, yes.

20 Q.   And until the United States designated you as an expert,

21 which I believe occurred in February 2022, there was no

22 opportunity for the County to raise any issues regarding the

23 sufficiency of the United States designating you as an expert?

24 A.   Right.  With respect to that designation, there wouldn't

25 have been an opportunity to object until it was made.

1  Q.   Right.  And so do you agree that back in 2016, when you

2  were appointed as monitor, the County had absolutely no reason

3  to know that in February 2022 you would be designated as an

4  expert by the party adverse to the County in this proceeding?

5  A.   I don't actually know that.  I think monitors, when there

6  is a court proceeding during the course of a case that's under

7  a settlement agreement with monitors, I think it's not

8  uncommon for monitors to be called upon to testify.  So if

9  there was a concern about their qualifications or their

10 expertise, that would potentially be something to think about

11 at the time they are selected as monitor or monitoring team,

12 but I don't -- that's, to some extent, supposition.  I'm not

13 sure I can answer your question.

14 Q.   So in October of 2022, did the County know what subject

15 matters you would be designated as an expert in by the

16 United States in February of 2022?

17 A.   No.

18 Q.   Did -- in October -- well, in the fall of 2016 when you

19 were appointed monitor, did the County have any information on

20 the sufficiency of the United States' disclosures regarding

21 the summaries of opinions that you would give in

22 February 2022?

23 A.   No.

24 Q.   All right.  So in your reading of the consent decree or

25 the settlement agreement, P-1, is there a difference between a

1   consultant and a monitor?

2   A.   I think the lead monitor is referred to as the monitor

3   and the team would be the consultants, I believe.

4   Q.   Okay.  Would you look at P-1 settlement agreement,

5   paragraph 141, page 55.

6   A.   What paragraph did you say?

7   Q.   Paragraph 141.

8   A.   Okay.

9   Q.   Have you had a chance to review paragraph 141?

10  A.   Yes.

11  Q.   So having reviewed it, you believe Dr. Dudley,

12  Mr. Parrish, and Mr. Moeser are consultants within the meaning

13  of paragraph 141?

14  A.   Yes, it doesn't use the word "consultant," but it says,

15  "The monitor may contract or consult with other individuals or

16  entities to assist in the evaluation of compliance," and I

17  would say that's Dr. Dudley, Mr. Parrish, and Mr. Moeser.

18  Q.   So just to be clear, we looked at this yesterday.  This

19  is the consent decree, the settlement agreement, P-1,

20  paragraph 17, page 7, the definition of a monitor.  So it's

21  your testimony that Dr. Dudley, Mr. Parrish, and Mr. Moeser

22  are not monitors in this case?

23  A.   By that definition it would include the team.

24  Q.   So you read monitor in paragraph 17 and the people you

25  can contract with or consult with in paragraph 141 to -- can

1   be the same thing?

2   A.   I don't know.

3   Q.   Okay.  And so I think you testified yesterday that you

4   don't know of any order appointing Dr. Dudley, Mr. Parrish, or

5   Mr. Moeser as monitors; is that correct?

6   A.   I don't know if there was an order or if the -- I didn't

7   read the order you showed me yesterday very closely if that

8   approves a team or just me.

9   Q.   The order that does appoint you, do you know whether it

10  says anything about your qualifications?

11  A.   I don't recall but I -- yes, I don't recall.

12  Q.   And the record will reflect it, but if there are no

13  orders on the docket appointing Dr. Dudley, Mr. Parrish, or

14  Mr. Moeser, then obviously there is no order setting forth

15  their qualifications, is there?

16  A.   That would be true.

17  Q.   All right.  I'd like to direct your attention,

18  Ms. Simpson, back to the settlement agreement, P-1,

19  paragraph 38, page 11, please.

20  A.   Yes.

21  Q.   I won't belabor this because we went over it yesterday,

22  but let's focus on the term "large jail."  Was it your

23  testimony yesterday that you don't know one way or the other

24  whether Major Bryan satisfied that criterion?

25  A.   I don't recall the number of detainees in the jails that

1   she managed, and I don't know that there's a clear definition

2   of large jail.  So my testimony would be the same, yes.

3   Q.   And since there's -- well, since -- there's no definition

4   of "large jail" at all, is there?

5   A.   In the settlement agreement?

6   Q.   Correct.

7   A.   That's correct.

8   Q.   So, well, there being no definition, it's an unknown of

9   exactly what that's referring to, isn't it?

10  A.   Unless there's an outside standard, but I'm not sure

11  there is.

12  Q.   If there is, it is incorporated into the settlement

13  agreement?

14  A.   Not by reference.

15  Q.   Okay.  There was a discussion about interim and acting.

16  Do you know -- well, I'll come back to that.

17        Do you agree that not all qualified hires work out for

18  what they were hired to do?

19  A.   Yes.

20  Q.   So you agree that no matter how qualified a person is,

21  that person still has to perform in his or her job?

22  A.   Yes.

23  Q.   All right.  The Court asked you about the number of

24  sheriffs and JAs and, I believe, County administrators during

25  the time you've been a monitor.  Do you recall that?

1    A.   Yes.

2    Q.   All of that -- all of that change, at least with respect

3    to the sheriffs and the Board of Supervisors, is a function of

4    the democratic process; correct?

5    A.   Yes, with respect to the Board of Supervisors and the

6    sheriff, that's true.

7    Q.   All right.  And since I believe you testified that it's

8    your understanding that the Board of Supervisors appoint the

9    County administrators at least indirectly the -- who as the

10   County administrator is likewise a function of the democratic

11   process?

12   A.   It's a little more attenuated, but there's a relation

13   there.

14   Q.   The voters elect the people who pick the County

15   administrator?

16   A.   That's correct.

17   Q.   And if the people of Hinds County want to change the

18   sheriff, they can do that when they vote; correct?

19   A.   When an election comes up, yes.

20   Q.   And the same thing for the Board of Supervisors?

21   A.   Yes.

22   Q.   All right.  Justin Mosley, do you recall being asked

23   about that by the Court?

24   A.   Yes.

25   Q.   Do you understand that -- one way or the other whether

1    the County is disputing that Mr. Mosley had SMI?

2    A.   I didn't realize the County was disputing that, though.

3    Q.   I don't think they are.  That's my point.

4    A.   Oh, okay.

5    Q.   So have you reviewed P-90, which is about a 740-page

6    exhibit that's been admitted into evidence and that consists

7    of Mr. Mosley's medical and related records, have you reviewed

8    that?

9    A.   Have I reviewed it?  No.

10   Q.   Do you know whether the County affirmatively diagnosed

11   him with SMI?

12   A.   If the County what?

13   Q.   Affirmatively diagnosed him as having a serious mental

14   illness?

15   A.   I believe that he was on the mental health caseload.  As

16   to what his diagnosis was, I don't know.

17   Q.   Okay.

18   A.   Or I don't recall.  I did know at one point.

19   Q.   That's fine if you don't know.  So do you know whether

20   while he was at -- while Mr. Mosley was at RDC he was

21   prescribed by the County -- he was prescribed antipsychotics

22   by the County mental health personnel?

23   A.   I don't know the course of his medical history well

24   enough to answer that.

25   Q.   Do you know whether Mr. Mosley was administered

1    antipsychotic medication by the County mental health staff?

2    A.    That sounds familiar.  I recall reading Dr. Dudley's

3    summary of his mental health care.  It sounds familiar, but I

4    don't really know the details.

5    Q.    Do you know whether at the time of his death Mr. Mosley

6    was housed in booking?

7    A.    Yes.

8    Q.    All right.  Do you know why he was being held in booking?

9    A.    I do.

10   Q.    What is your understanding?

11   A.    There had been an incident in the housing unit that he

12   had been in.  I don't recall if it was during med pass or some

13   other occasion, but he inappropriately touched a female

14   officer.

15   Q.    And so it's your understanding that Mr. Mosley was in

16   booking for the reason you just testified to as opposed to

17   indications of suicide?

18   A.    That's -- I mean, they're not mutually exclusive, but I

19   don't believe he was on suicide watch.

20   Q.    You mentioned to the Court that -- I think you did --

21   that you subscribe to the Clarion Ledger?

22   A.    Yes.

23   Q.    Did you happen to see the article that was published in

24   the Clarion Ledger on January 18, 2022?  And I'll be glad to

25   show it to you on my cellphone anyway.  The headline is

1    Yazoo City federal prison has nearly 500 inmates with

2    COVID-19, most among federal prisons.  Did you read that

3    article?

4    A.   I did not read that article.

5    Q.   Were you aware that nearly one-third of the inmate

6    population at the Yazoo City federal prison has COVID-19?

7    A.   I was not.

8    Q.   Do you know whether that facility is under a consent

9    decree?

10   A.   I do not.

11   Q.   Okay.  Do you remember when the Court asked you about the

12   person who was admitted to RDC by the sheriff who had an issue

13   about whether that person needed to be treated first at a

14   hospital?

15   A.   Yes.

16   Q.   Okay.  This is -- this is P-13.  I'm not sure if this is

17   in your notebook or not, but in any event, can you see it

18   on -- well, can you see it on the monitor?

19   A.   Yes.

20   Q.   Okay.  Thanks.  I'm going to refer you to page 14 --

21   excuse me -- page 4 of Exhibit P-13, and I won't belabor this

22   because I think we covered it with Dr. Dudley, but this is the

23   individual we're talking about, and do you see there the

24   highlighted part where it says was taken to UMMC and refused

25   treatment?

1    A.    Yes.

2    Q.    Okay.  So this individual was, in fact, taken to the

3    hospital; is that correct?

4    A.    That's correct.

5    Q.    Okay.  So when you testified to the Court about the --

6    about what policy applies to this situation, what policy were

7    you referring to?

8    A.    I believe it's in the prebooking policy, although it

9    might also be in the health care services policy.

10   Q.    So what does the policy say when a detainee is taken to a

11   hospital for treatment and he refuses treatment, and by that I

12   mean, what happens next with regard to whether or not the

13   individual is booked at RDC?

14   A.    The medical staff at the facility still need to make

15   their own judgment as to whether he is in sufficient condition

16   to be booked.  I believe what most facilities do in this

17   situation is they have a form that is signed by the hospital

18   staff that the individual is safe to be discharged from the

19   hospital or to leave the hospital, and I don't believe Hinds

20   County has developed such a form.  But that's -- I believe

21   that's what most facilities do in that situation.  But, like I

22   said, medical still has to use their independent judgment as

23   to whether the individual should be booked into the facility.

24   Q.    So if -- if an individual is taken to the hospital and

25   refuses treatment, then comes to RDC, and the medical staff

1   thinks that person should be evaluated at a hospital, does the

2   policy you're referencing require that the individual be taken

3   back to the hospital a second time?

4   A.   Well, if the -- if the criminal justice system

5   coordinated, the police would know that's what's needed to

6   book the individual into the jail.  So when such a process is

7   established, the police could get that form signed at the

8   hospital before bringing him in to booking.

9   Q.   But my question is:  Does the policy that you referenced

10  require that?

11  A.   No.  It requires that they not be booked, but that is one

12  way that other jurisdictions handle that situation.

13  Q.   But, I mean, how do we avoid limbo here, you know?

14  A.   By develop -- oh, sorry.

15  Q.   He refused treatment, and either you're testifying they

16  have to take him back a second time or not?

17  A.   They don't necessarily have to take him back a second

18  time if the process is developed where the form agreed upon by

19  the hospital, the police, the jail, is used by the -- the

20  police officer can present it to the hospital that this person

21  has refused treatment but is in sufficient condition to be --

22  to leave the hospital safely.  But there is the potential for

23  limbo if the jail says the person can't be booked and the

24  hospital won't sign such a form, the person is in the custody

25  of the police, and it would be their responsibility to deal

1  with that until the person is medically cleared to be booked.

2  Q.   And State law will speak for itself on this issue and the

3  Court can make this determination, but if State law does, in

4  fact, require individuals charged with domestic violence to be

5  booked into jail, then is -- is it your testimony that State

6  law should be disregarded in this instance and an individual

7  not booked into the jail?

8  A.   I guess I would want to see the State law and whether it

9  says they have to be booked or they have to be arrested.  This

10  is not to say that they should be released.  It's just that

11  they remain in the custody of the police department as opposed

12  to the jail until the person can be safely booked.

13  Q.   All right.  And do you know what injury this person had?

14  A.   I think your document suggested it was a possible broken

15  hand.

16  Q.   And do you know whether this individual actually had a

17  broken hand?

18  A.   I don't.

19  Q.   Do you know whether it was actually unsafe for this

20  individual to be booked into the jail from a medical point of

21  view?

22  A.   No, I wouldn't make a medical opinion.

23  Q.   Okay.  Let's talk about PREA, and you talked about there

24  was a period of time when the PREA coordinator was on leave?

25  A.   Yes.

1   Q.   Was that during the time period that Major Bryan was jail
2   administrator?
3   A.   Yes.
4   Q.   Would you have liked to see Major Bryan appoint a
5   dedicated interim PREA coordinator?
6   A.   Yes.
7   Q.   I believe you told the Court that there were a number of
8   individuals who dealt with PREA issues while Ms. Fields was on
9   leave?
10  A.   Yes.  Well, we were informed of that, and I did see -- I
11  don't recall if it was December or January, but there was a
12  report that was done in the form of an incident report by one
13  of the individuals that I believe was taking on some of those
14  duties.
15  Q.   Okay.  And did you tell the Court that you would have
16  liked to seen that person relieved of the other duties that he
17  or she normally would do?
18  A.   I think I was asked if the person was relieved of their
19  other duties.  I'm not sure if I was asked for my opinion.
20  Q.   Okay.  Fair enough.  Did you testify that the person was
21  not relieved of his or her other duties?
22  A.   That's correct.
23  Q.   Excuse me.  Do you think Major Bryan should have done
24  that?
25  A.   I think that the duties probably were not -- did not

1   require full-time assignment particularly in those

2   circumstances.  I would actually be more concerned that the

3   individual didn't get any sort of training related to PREA

4   other than what officers have generally had, but training with

5   respect to being a PREA coordinator and having duties in that

6   area.

7   Q.  Do you know whether Major Bryan reported to anyone that

8   she assumed all of the PREA related duties during Ms. Fields'

9   absence because Major Bryan was a PREA auditor?

10  A.  I think at one point I did hear that she had assumed

11  those duties and then subsequently had an e-mail identifying,

12  I think, two individuals that were assuming those duties.

13  Q.  Did you ever specifically follow up with Major Bryan

14  regarding the details of all of that?

15  A.  I think we had either an e-mail exchange or it might have

16  been covered in one of our phone conversations.

17  Q.  Do you know whether Major Bryan ever denied PREA services

18  to a detainee while Ms. Fields was on leave?

19  A.  I know that that was reported and I asked her about that

20  and she had a different rendition of what happened.

21  Q.  Did anyone advise you during your most recent site visit

22  that Major Bryan was the PREA person during the period that

23  Ms. Fields was on leave?

24  A.  Oh, well, I did talk with Sheena Fields on our site

25  visit.  I don't recall if she said that or not, and I don't

1  think I would have heard it from anyone else.

2  Q.   Are there PREA compliance officers at RDC other than

3  Ms. Fields?

4  A.   I think there is somebody that might be designated that.

5  I've never seen any work product from anybody other than

6  Ms. Fields with respect to PREA.

7  Q.   And are there PREA compliance officers at the work center

8  or Henley-Young?

9  A.   I believe there is at Henley-Young and I think

10  Ms. Jackson is -- may be designated as such at the work

11  center.  Again, I haven't seen any work product from her

12  related to PREA.

13  Q.   I want to ask you next about the January 2022 quality

14  assurance summary and the incident or the part that the Court

15  asked you about.

16  A.   Yes.

17  Q.   At the bottom of page 5, if you just read this paragraph

18  to yourself and tell me when I need to turn the page, because

19  I want to ask you some questions about it.

20  A.   Yes.  Just that first paragraph, yes, I'm done.

21  Q.   Okay.  Do you see this second sentence where it says,

22  "During rounds, it was observed"?

23  A.   Yes.

24  Q.   Does it say -- does it identify who observed what

25  follows?

1   A.   I would read that as the mental health staff rounds which

2   they do for SMIs.

3   Q.   But -- if your reading is correct, does it identify who

4   on the mental health staff made these observations?

5   A.   No, not the particular individual.

6   Q.   And does -- and you testified that you have not verified

7   one way or the other the information in this paragraph; is

8   that correct?

9   A.   That's correct.

10  Q.   So even assuming this is accurate, does it say how long

11  the two individuals were covered in feces before they were --

12  before it was detected?

13  A.   No, it does not.

14  Q.   Does it identify how long the individual or individuals

15  had been experiencing sores before that issue was detected?

16  A.   No, it does not.

17  Q.   To be clear, these quality assurance summaries, in your

18  review of them, have you found that the underlying data

19  regarding things such as incidents and assaults and so on is

20  not accurate?

21  A.   From my review of the incident reports compared to the

22  numbers in the QA reports, it is typically -- the numbers are

23  usually underreported in the QA report.

24  Q.   So something like this paragraph that we're looking at

25  now that begins with "Mental health staff reported," would you

1   like to see some amount of factual substantiation rather than

2   just conclusions?

3   A.   From my work I would probably ask Dr. Dudley to review

4   the medical records.

5   Q.   Would the monitoring team like to see some factual

6   substantiation in these reports?

7   A.   I think that the -- it would be good as is put in the

8   settlement agreement that there be data compilations to

9   accompany the narrative.  I don't know that the narrative

10  itself has to have proof of everything that's stated in it.

11  Q.   Okay.  So did you interview Major Bryan on your last

12  visit to the jail?

13  A.   Yes, I did.

14  Q.   Did she tell you anything about this paragraph on page 5

15  of the January 2022 quality assurance report that we're

16  talking about now?

17  A.   No, she did not.

18  Q.   If this occurred as stated in the report, would you have

19  expected her to?

20  A.   It does seem like that should have been a reported

21  incident somewhere.  I don't know if I asked a question that

22  called for that information, but, yes, I would have liked to

23  have learned about that during the site visit.

24  Q.   Let me shift gears to MR.  Do you know who I'm talking

25  about that the Court asked you about?

1  A.    Yeah.

2  Q.    Well, you were present both times that Major Bryan

3  testified so far; is that correct?

4  A.    That's correct.

5  Q.    And did you hear her confirm that Sheriff Jones fired

6  three detention officers in connection with the MR incident?

7  A.    Yes, I did.

8  Q.    And do you know of any disciplinary action that Major

9  Bryan took with respect to that incident?

10  A.    No.

11  Q.    And is it your understanding that Major Bryan feels

12  aggrieved by the sheriff's decision to fire those three

13  individuals?

14  A.    It's my understanding that she believes she should have

15  been involved in the decision.

16  Q.    All right.  You disagree with the sheriff's decision to

17  fire those three individuals?

18  A.    I only recently read the IAD reports.  They were only

19  recently provided.  I would want to look at them closer.  I

20  certainly agreed that -- agree that discipline was

21  appropriate.  Whether there were extenuating circumstances or

22  retraining, I would not at this point express an opinion on

23  that.  I would also want to know the officers more and what

24  their history with the jail was and their disciplinary

25  history.  I think all of that would need to be taken into

1    account in making a disciplinary decision.

2    Q.    All right.  The Court, in connection with asking you

3    about whether the facility was dangerous, asked you some

4    questions about speaking to various people with the County.

5    Do you recall that?

6    A.    Yes.

7    Q.    All right.  And I know you don't know the exact number,

8    but the County employs an awful lot of people, doesn't it?

9    A.    I believe so.

10   Q.    And so the universe, even in the context of your County

11   employees, in the context of your monitoring activities,

12   that's a lot of people, isn't it?

13   A.    Yes.

14   Q.    Okay.  And so in talking to County employees generally in

15   the context of your activities as the monitor, did anyone tell

16   you that it's a dangerous facility, but we're not going to do

17   anything about it or words to that effect?

18   A.    No.

19   Q.    I want to ask you next about contraband.  Generally how

20   do you learn that there's contraband at RDC?

21   A.    How do I learn personally?

22   Q.    Yes.

23   A.    Well, reviewing incident reports.  In many of the

24   incident reports, there's presence of contraband.  More to the

25   point is they do records shakedowns and record, write down

1   that the shakedown has occurred and contraband has been found.

2   And they do an incident report for shakedowns as well.

3   Q.   So to the extent that shakedowns are conducted and

4   contraband is found, that -- the shakedown provision of the

5   settlement agreement is being adhered to?

6   A.   I think that the provision has a -- I'd have to look at

7   it, but I think there's a provision as to how often shakedowns

8   are supposed to be done.

9   Q.   Right.   But -- but if there's -- if there's a shakedown

10  and it finds contraband, the shakedown did what it was

11  intended to do?

12  A.   That's right.

13  Q.   Okay.   So is it your understanding -- and I don't mean

14  just that these little words are in there, but is it your

15  understanding under the settlement agreement there's no

16  provision to the effect that there shall be no contraband in

17  the facility?

18  A.   I don't think there's such a provision.

19  Q.   And there is a provision, though, that shakedowns should

20  be conducted at certain intervals?

21  A.   I believe that's correct.

22  Q.   So in applying these provisions of the settlement

23  agreement in your evaluations, do you view the presence of

24  contraband as essentially being a strict liability-type issue

25  in the sense that if there's contraband in there, then the

1  County's in violation of the agreement?

2  A.   No.

3  Q.   Okay.  You believe that the County can be -- well, strike

4  that.

5      Do you believe that the County can ensure that no

6  contraband makes its way into RDC?

7  A.   I don't believe there can be something to prevent any and

8  all contraband.  Some contraband is going to make its way into

9  the facility.

10 Q.   Are there -- are there jail investigators assigned to

11 RDC?

12 A.   Yes.

13 Q.   How many currently?

14 A.   Right now there's two CID investigators, and at the time

15 of the site visit, there was not an IAD investigator, although

16 there was one slated to fill that position.

17 Q.   Was one of the two CID officers recently added?

18 A.   Yes.

19 Q.   Okay.  And do you have an understanding one way or the

20 other whether the addition of that second CID officer is to

21 assist with issues such as attempting to reduce the

22 introduction of contraband into the facility?

23 A.   I know that at least one of the CID investigators made

24 recommendations with respect to contraband mitigation efforts.

25 I -- I did not know it was a newly assigned officer.

```
1    Q.   Right.  And I'm sorry.  I'm not asking you specifically
2    newly assigned officers -- officer did that.  What I'm asking
3    you is:  Is it your understanding that the duties of the CID
4    officers at RDC include attempting to reduce contraband into
5    the facility?
6    A.   I know they've taken that on.  I don't know what their
7    job description is.
8    Q.   Okay.  Let's talk about Frank Shaw.  Was it your
9    testimony that there's more programs, at least generally
10   speaking, in prisons than in jail?
11   A.   That's typical, yes.
12   Q.   So how could all of that indicate Frank Shaw is not
13   qualified to be the jail administrator in your opinion?
14   A.   It does not.
15   Q.   I want to go back to paragraph 38 of the settlement
16   agreement.  Exhibit P-1, page 11.  I believe you were asked --
17   well, there was reference made to whether Mr. Shaw is interim
18   or acting jail administrator?
19   A.   Yes.
20   Q.   Do you understand there to be a substantive distinction
21   between the word "acting" and "interim"?  I'll strike that.
22        I looked it up.  The definition I found of acting is
23   temporarily doing the duties of another?  Would you agree
24   that's --
25   A.   That sounds right.
```

1  Q.   -- the definition?

2       An interim you find as entered for the intervening --

3  strike that -- enter for the intervening period, provisional

4  or temporary.  Is that a fair definition of interim?

5  A.   That sounds right.

6  Q.   Do you see a substantive difference between the two?

7  A.   I guess, in hearing those definitions, I would say an

8  acting person maintains their original title but is serving --

9  Q.   Temporarily?

10 A.   -- temporarily serving someone else's position, whereas

11 the interim actually holds that position.

12 Q.   So let's look at the last sentence of paragraph 33.

13 "When the jail administrator is absent or if the position

14 becomes vacant, a qualified deputy administrator with

15 comparative education, training and experience must serve as

16 acting jail administrator."

17      Did I read that correctly?

18 A.   Yes.

19 Q.   So the jail administrator position became vacant when

20 Major Bryan resigned; is that correct?

21 A.   Well, I understand there's a dispute as to whether she

22 resigned or was terminated, but it did become vacant.

23 Q.   Okay.  So when it did become vacant, do you believe this

24 second sentence of paragraph 38 applies to an interim or

25 acting jail administrator?

1   A.   I understand the wordsmithing is important here, but I

2   would say it applies to the acting jail administrator, which I

3   understood to be Chief Simon.

4   Q.   And you don't think this provision could apply to

5   Frank Shaw if he is the acting jail administrator?

6   A.   I guess I think of him as the interim jail administrator

7   or currently the jail administrator, not the acting jail

8   administrator.

9   Q.   And if -- so on that distinction you just drew, it would

10  turn for you on whether this sentence applied to Frank Shaw or

11  not?

12  A.   I believe he's been hired as the jail administrator so

13  he's not an acting jail administrator, but I could be wrong

14  there.

15  Q.   Okay.  You don't know the terms of his retention, do you?

16  A.   No.

17  Q.   The Court asked you a couple of times whether the County

18  is in full compliance with the settlement agreement.  Do you

19  recall that?

20  A.   Yes.

21  Q.   Okay.  So is "full compliance" a compliance term that's

22  actually used in the settlement agreement?

23  A.   I don't know if it's used in paragraph 164.  No, it's

24  substantial compliance.

25  Q.   Okay.  So I'm asking you strictly in the context of when

1    you told the Court this morning that the County is not in full

2    compliance.  When you said that, how are you defining "full

3    compliance"?

4    A.   Compliance with the provisions of the settlement

5    agreement, not partial but full substantial...

6    Q.   The Court asked you some questions about whether the

7    County ever objected to your rate of pay.  Do you recall that?

8    A.   Yes.

9    Q.   All right.  And the Court asked you whether the County

10   ever told you that it could not afford your rate.  Do you

11   recall that?

12   A.   Yes.

13   Q.   All right.  And so when you became -- when you initially

14   became the monitor in the fall of 2016, was there just one

15   monitor?

16   A.   Well, there was my team.

17   Q.   Well, how long -- I mean, on the day you were appointed

18   monitor by Judge Barbour, were the three team members retained

19   at that point?

20   A.   I don't recall at what point I had retained the team,

21   whether it was before or after that appointment.

22   Q.   Okay.  I'll move on.  So do you know one way or the other

23   whether -- when you became monitor in the fall of 2016,

24   whether the County knew it would still be under the settlement

25   agreement in February 2022?

1   A.   I do not know.

2   Q.   And do you know whether the County's concern at this

3   point is with your rate of pay or whether the possibility of

4   there being a receiver, an office of the receiver with staff

5   and legal and the four-person monitoring team in place all at

6   once, all at the County's expense?

7        MR. CHENG:  Objection.  Compound.

8        THE COURT:  Rephrase your question, Mr. Shelson, if you

9   will.

10        MR. SHELSON:  Yes, sir.

11  BY MR. SHELSON:

12  Q.   Do you know if the County's concern is with your rate of

13  pay or that they may also have to pay for a receiver?

14  A.   I think they are concerned about the cost of a receiver.

15  Q.   Do you know if the County is also concerned about funding

16  an office of the receiver?

17  A.   I haven't heard specific discussion about that, but,

18  yeah, it would be in connection with the cost of a

19  receivership generally.

20  Q.   As would the staff and legal costs of the receiver?

21  A.   Yes.

22  Q.   And so going forward, there are potentially costs on the

23  horizon for the County that are in addition to the cost of the

24  monitoring team?

25  A.   Yes.

```
 1    Q.   The Court asked you about length of stay at RDC?

 2    A.   Yes.

 3    Q.   Okay.  And I think you agreed yesterday that there is

 4    a -- no standard in the settlement agreement that specifies a

 5    length of stay for RDC?

 6    A.   That's correct.

 7    Q.   And I believe you told the Court that -- well, in your

 8    answer to the Court, did you refer to a national standard?

 9    A.   There's a national average for length of stay.

10    Q.   And what's the source of that?

11    A.   The Bureau of Justice Statistics.

12    Q.   Okay.  Are the Bureau of Justice Statistics incorporated

13    by reference into the settlement agreement?

14    A.   No.

15    Q.   The Court also asked you about programming for detainees

16    in the context of long-term and short-term detentions.  Do you

17    recall that?

18    A.   Yes.

19    Q.   And did you testify that it would be ideal to have

20    programming for long-term detainees?

21    A.   Yes.

22    Q.   Is programming for long-term detainees required by the

23    settlement agreement?

24    A.   There are certainly therapeutic services are required

25    which would include what you might call programming, such as
```

1  groups and things like that.  I don't recall if there -- I

2  don't believe there's a requirement for, like, vocational

3  programming or educational programming.  There is for youth,

4  of course, but I don't think there is in the settlement

5  agreement for adults.

6  Q.   So in terms of the County's compliance with the

7  settlement agreement, are we here about what would be ideal or

8  about what the settlement agreement actually requires?

9  A.   What the settlement agreement requires.

10  Q.   In the context of the County's compliance, are we here

11  about what would be a best practice or what the settlement

12  agreement actually requires?

13  A.   It's what the settlement agreement requires, but as

14  you've mentioned, not everything is defined, and so there has

15  to be some judgment as to what is required when determining

16  compliance.

17  Q.   Have you reviewed any information regarding Frank Shaw's

18  qualifications to be the jail administrator other than your

19  review of his CV?

20  A.   No.  I take that back.  I don't -- it's not directly

21  related, but I did read the opinion from the lawsuit against

22  the Eastern Mississippi Correctional Institute, which I

23  understand he was employed there, although I don't know the

24  chronology as to when he was employed and when that litigation

25  occurred.

```
1   Q.   And was that -- was that opinion authored by
2   Judge Barbour?
3   A.   Could be.  I didn't look to see who authored it.
4   Q.   Okay.  Well, based on your reading of the order you just
5   mentioned, did the Court make any assessment regarding
6   Mr. Shaw's performance?
7   A.   Again, I skimmed it.  I don't -- I didn't know the
8   chronology of when he was employed and when the litigation
9   commenced and when it concluded.  I didn't know his role in
10  that time frame.
11  Q.   Okay.  So we can agree that the order will speak for
12  itself?
13  A.   Yes.
14  Q.   And the Court asked you some questions about what I would
15  characterize as remedy, and I -- this isn't verbatim, but I
16  summarized.  I wrote down you testified that you believe some
17  oversight continues to be justified because even with
18  oversight we have not seen progress for compliance at a
19  reasonable rate?
20  A.   That's correct.
21  Q.   Okay.  And then you continued that you believe there's a
22  lack of commitment for resources and personnel?
23  A.   Yes.
24  Q.   So when you say that you believe there's a lack of
25  commitment to resources, what more precisely are you referring
```

1   to?

2   A.   Well, there's been a number of examples, most recently

3   the failure to get the furnishings for a mental health unit,

4   the work that has not been done to complete B-Pod renovations,

5   the failure to have tables and chairs, the failure to get

6   GoPro cameras, just a lot of things that never materialized.

7   Q.   I'm not going to go through all those, but did you, for

8   example, in your last site visit speak with the County

9   administrator about the GoPro cameras?

10  A.   Yes.

11  Q.   Did he give you an explanation of his perspective on

12  that?

13  A.   I can't recall specifically.  It might have been that

14  they have been ordered but not received.  I don't know if that

15  was the case with the GoPro cameras.

16  Q.   Now, let me ask about one more.  B-Pod, do you know -- do

17  you know the status -- do you know why the construction on

18  B-Pod has been paused?

19  A.   I don't.

20  Q.   And then so that commitment to personnel, what more

21  specifically do you have in mind there?

22  A.   I think some of the measures that we've talked about to

23  increase staffing are needed to retain sufficient staff, and

24  we've also talked about needing to hire a staff person for the

25  CJCC so some of the systemic changes that are needed are

1  pursued.  Those are the ones that come to mind.

2  Q.  So some measures to retain staff.  What measures do you

3  have in mind?

4  A.  I believe the ones that we've talked about, the career

5  ladder, potentially retention bonuses, increasing salary, cost

6  of living raises.

7  Q.  Did you say "retention bonuses"?

8  A.  Yes.

9  Q.  Do you know one way or the other whether, under State

10  law, the County can pay bonuses whether retention bonuses or

11  other type of bonuses?

12  A.  I do not.

13  Q.  On the issue of remedy, do you have any facts which would

14  indicate what the rate of progress would be under a receiver?

15  A.  No.

16        MR. SHELSON:  May I have a moment to confer, Your

17  Honor?

18        THE COURT:  Okay.

19  BY MR. SHELSON:

20  Q.  I'm almost finished, Ms. Simpson.

21       Do you know one way or the other whether the County is

22  conducting a search for a full-time jail administrator?

23  A.  I do not.

24  Q.  If the County is conducting a search for a full-time jail

25  administrator, would that indicate to you that Mr. Shaw is an

1    interim or acting administrator?

2    A.   I would say that makes him an interim administrator, not

3    an acting administrator.

4    Q.   What is your understanding that -- regarding the number

5    of detention staff as of the last site visit?

6    A.   I believe at the end of January it was reported to be

7    191.

8    Q.   And were those 191 individuals at Major Bryan's disposal

9    to deploy as she saw fit when she was jail administrator?

10   A.   I think that was one of the concerns is that she wasn't

11   given the authority to make personnel decisions, but they were

12   in theory under her.

13   Q.   Well, do you know -- did you ever question Major Bryan's

14   failure to redeploy those 191 individuals to cover shifts in

15   A-Pod?

16   A.   We continuously expressed concern that housing units are

17   not being supervised.  191 is way below the number needed to

18   provide adequate supervision in the jail, and for the most

19   part, we have not questioned how that minimal staff has been

20   deployed, given that she doesn't have the staffing to cover

21   the jail.

22   Q.   Okay.  So I'm not asking you to be clear whether any

23   redeployment would have met the benchmarks in the staffing

24   analysis.  Okay?  Do you know whether Major Bryan could have

25   deployed any detention staff to augment the shifts covering

1    A-Pod?

2    A.   I don't know.

3    Q.   Did you ever have any discussions with Major Bryan

4    regarding whether given that there were not enough staff to

5    fully cover detention shifts under the staffing analysis

6    that -- whether it was a possibility to send detainees to

7    facilities in neighboring counties?

8    A.   I do not have any knowledge that had been suggested until

9    this litigation actually.

10        MR. SHELSON:   Thank you, Ms. Simpson.   That's all the

11   questions I have.   Thank you, Your Honor.

12        THE COURT:   All right.   Thank you, Mr. Shelson.   I do

13   have a couple other points just for the record to show.

14        First of all, I think yesterday, Mr. Shelson, this

15   witness was cross-examined on the -- I think a compliance

16   director draft of a report that is not in evidence, I don't

17   think.   I think she participated in the drafting of an order

18   about a compliance director or a compliance coordinator.   I

19   think you cross-examined her with respect to that point.

20        MR. SHELSON:   Yes, sir.   There was an e-mail from DOJ

21   and attached to it was a proposed order that was circulated to

22   Ms. Simpson among others, and I just --

23        THE COURT:   I'm not asking you to make it an

24   affirmative exhibit.   I'm just asking you to give it to the

25   Court to make it a part of the record for ID only because she

1   was questioned about it.

2          MR. SHELSON:  Yes, sir.  We can do that, Your Honor.

3          THE COURT:  It doesn't have to be now.

4          MR. SHELSON:  Yes, sir.  We'll do that.

5          THE COURT:  Before the record is closed on it.  That's

6   all.

7          MR. SHELSON:  Anything else, Your Honor?

8          THE COURT:  I guess I might have been confused with

9   using the words "interim" and "acting."  I know Mr. Simon was

10  something, and I know Mr. Shaw is something.  I just don't

11  know exactly what they are because I don't think there's

12  anything in the record right now that shows what either

13  person's title is other than what persons have been

14  speculating as to what it might be.  So I don't know if the

15  County intends to put on proof of what -- of what their actual

16  positions are.

17         I don't even know if it matters, but I may have been

18  the one that's been confusing the terms because at a --

19  because I know at a status conference I was told that

20  Mr. Simon was there and that they were working on getting a

21  new person in, that the contract had to be approved by the

22  Board of Supervisors, and I assume that meeting of the Board

23  of Supervisors just occurred.  And this person was supposed to

24  start -- or maybe it occurred sometime after the status

25  conference, I think, and that person reported on Monday.  I

1    think that's what we heard last week.  So I don't know what

2    the titles are, and to the extent I've confused what the

3    titles are, that might be on me.

4         MR. SHELSON:  No, sir.  We're not faulting the Court.

5    So just to digress, so I don't see a substantive difference

6    between the two terms.  Ms. Simpson does, but neither of us is

7    the decider.  So to maybe clear it up, I think this issue came

8    up a few status conferences ago, I think maybe February 1st.

9    So here's what happened.  Mr. Siler and Mr. Hall addressed the

10   Court's questions that day, and at the time they were

11   finalizing the retention of Mr. Shaw on a temporary basis.

12        He could not regardless because of a prior commitment.

13   He could not come to the facility until this past Monday.  So

14   somebody had to fill in for, I think it was roughly that

15   two-week period, and that was Captain Simon.

16        So I don't know acting or interim with Mr. Simon, but

17   that was the whole point.  There had to be somebody in place

18   until Mr. Shaw could get there to be the jail administrator on

19   a temporary basis to allow time for a search for a full-time

20   jail administrator.

21        THE COURT:  Okay.  I presume --

22        MR. SHELSON:  So I'm not -- I don't -- I'm just -- I

23   frankly don't know if his exact title is acting or interim,

24   but I can find out.

25        THE COURT:  Right.  I assume there might be some

1   testimony since that person is here now, what his job is or

2   what his title is, I mean.

3          Okay.  I guess I'm through for you right now,

4   Mr. Shelson.  But there are a couple of other things I do want

5   to ask Ms. Simpson while you're still on the stand.

6                      **FURTHER EXAMINATION**

7   **BY THE COURT:**

8   Q.   You were asked by Mr. Shelson about the FCC Yazoo City

9   and the 500 prisoners who are there who contracted COVID.  The

10  reports are they contracted COVID, and there's not a consent

11  decree, I believe was the question that Mr. Shelson asked, and

12  you said, no, you're not aware.

13  A.   I'm not aware.

14  Q.   Are you aware that they're under any stipulated order?

15  A.   Not that I know of.

16  Q.   Are you aware that they have been found to have been

17  accused of violating the constitutional rights of the inmates

18  and thus being -- I don't know if DOJ would sue itself because

19  that's the Bureau of Prisons up there, but is there any

20  indication that they've been taken to court for that?

21  A.   I have not followed that situation so I don't know.

22  Q.   Okay.  We've been talking about retention staff and

23  ladders and pay raises and all of that.  Since you are an

24  expert in this, if there has been testimony that the County is

25  in the process of building a new jail or in the process of

1    building a new jail -- I believe there's some testimony to

2    that effect; right?

3    A.   Yes.  There's been a master planning process that

4    outlined various options and I believe the plan is to go

5    forward on one of the options that involves building a new

6    jail.

7    Q.   Okay.  And building a new jail, if they were to start

8    building a new jail today, does that say anything about where

9    they are with respect to today on how they are treating the

10   particular detainees who are in their custody right now?

11   A.   No, it does not.

12   Q.   And how long has the fact that if -- if the Board of

13   Supervisors decided in Tuesday's meeting, this past Tuesday's

14   meeting to adopt all of the things that they need to adopt in

15   your view to increase staffing, if they were to do bonuses,

16   whether that -- assuming they are allowed by law, if they were

17   to do pay increases, if they were to do the stepladder

18   increases, if they did all of that in the last three days, the

19   last two weeks or the last month or the last two months, what

20   does that say about the existing situation at the detention

21   center?

22   A.   Nothing as to the conditions right now.

23        THE COURT:  All right.  Now, anybody wish to follow up

24   on those two points?

25        MR. CHENG:  No, Your Honor.

1        THE COURT:  Mr. Shelson?

2        MR. SHELSON:  No, sir.

3        THE COURT:  And then this is for the attorneys.

4        So I'm through with you now, Ms. Simpson, I think.  You

5    can sit there, but it's for the attorneys and we'll be done.

6        I know and this may be a point -- this may be a legal

7    point for the attorneys to think about when we think about not

8    necessarily remedy but when we think about authority and who's

9    who and all that and there may be some argument on this, but

10   whether Ms. Simpson is an expert, I turn to -- I point the

11   lawyers to Docket Entry No. 9, the Joint Motion to Appoint

12   Elizabeth Simpson as Monitor, "Plaintiff United States of

13   America and Defendants Hinds County, collectively the parties,

14   Hinds County, et al. hereby jointly and respectfully request

15   this court appoint Elizabeth Lisa Simpson as the monitor in

16   this case.  Under the terms of the settlement agreement

17   ("agreement"), the monitor will serve as a court-appointed

18   expert to ensure implementation of and compliance with the

19   agreement.  See settlement agreement, paragraph 136, Docket

20   No. A-1.  In support of this motion, the parties submit a

21   memorandum of law and attach a proposed order."

22       And, again, that will be a subject of debate and

23   argument about -- and argument about what that means, but I

24   also, in that vein, want to turn the parties to Docket Entry

25   No. 10, which is the Memorandum of Law that was in support of

1    the joint motion to appoint Elizabeth Lisa Simpson as monitor

2    and in Footnote 1 on page 1, the settlement agreement also

3    states that "The monitor may retain subject matter experts to

4    assist her in evaluating various provisions of the agreement."

5    Settlement agreement, paragraph 141, Docket B-1.

6         "For instance, the monitor may retain a medical health

7    professional to assist her in assessing the defendants'

8    compliance with the mental health provisions in the agreement.

9    It is the parties' understanding that Ms. Simpson will retain

10   several subject matter experts to assist her particularly in

11   the areas of medical and mental health, juveniles and

12   security."

13        Again, we can argue about that later, but I think the

14   fact that Ms. Simpson has testified as an expert as this

15   court -- the court-appointed expert that I inherited from

16   Judge Barbour allows her or qualifies her to be an expert on

17   the parties' joint motion to -- for the Court to fulfill its

18   obligation of this case that has been filed and that has been

19   in this court since 2016.

20        It is now 12 :46.  Again, we can take up all those

21   issues when we're arguing about the law, the facts, and

22   everything else in this case.  But it's 12:46 right now.  If

23   you will, we will report back at 2:00.

24        At that time, I guess the United States will be

25   prepared to rest, I think, and then the -- Hinds County should

1   be prepared to start -- to call its first witness to the

2   extent -- obviously a party is not required to call anyone,

3   but I think there will be, so the County ought to be prepared

4   to start its case.  So let's just start back at 2:05.

5                  (A lunch recess was taken.)

6           THE COURT:  You may be seated.  All right.  I turn

7   to -- we're back in court.  Thank you.

8           Is there anything we need to take up before we start?

9           In that case I turn to the United States.  What says

10  the United States?

11          MR. CHENG:  The United States rests at this time, Your

12  Honor, reserving the right to bring in rebuttal witnesses.

13          THE COURT:  Okay.  All right.  Thank you.

14          Does the Hinds County wish to call any witnesses?

15          MR. MORISANI:  Yes, sir, Your Honor.

16          THE COURT:  Okay.

17          MR. MORISANI:  The County would call Gary Chamblee as

18  its first witness.

19          THE COURT:  All right.

20          MR. MORISANI:  Your Honor, may I place a few exhibits

21  on his --

22          THE COURT:  Yeah.

23          MR. MORISANI:  Thank you.

24          (Whereupon, the witness was placed under oath.)

25          THE COURT:  Well, we know your microphone works.

1    Mr. Chamblee, the court reporter is taking down

2    everything that's being said.

3    THE WITNESS:  Yes, sir.

4    THE COURT:  So please speak at a pace at which she can

5    keep up with you.  Allow the lawyers to finish their questions

6    before you begin to speak so that the two of you will not be

7    speaking at the same time, and make sure all your responses

8    are verbal.

9    If you're going to nod or shake your head, please give

10   some sort of oral answer with that, and I'll try to monitor

11   whether you're saying "uh-huh" or "huh-uh" and we'll just try

12   to avoid that, but for the record, could you state and spell

13   your name.

14   THE WITNESS:  Gary Chamblee, that's G-a-r-y,

15   C-h-a-m-b-l-e-e.

16   THE COURT:  Thank you so much.

17   MR. MORISANI:  May I proceed, Your Honor?

18   THE COURT:  You may.

19   MR. MORISANI:  Thank you.

20                       **GARY CHAMBLEE,**

21        **having been first duly sworn, was examined and**

22   **testified as follows...**

23                    **DIRECT EXAMINATION**

24   **BY MR. MORISANI:**

25   Q.  Mr. Chamblee, if you will, please describe your

1    background for the Court.

2    A.   I've been working for Benchmark Construction for the last

3    25 years, studied electrical engineering at Mississippi State

4    University, electronics at RETS Electronics.  I've been in

5    construction since '72.

6         THE COURT:  And you can remove your mask while you're

7    testifying.

8         THE WITNESS:  Thank you, Your Honor.

9         THE COURT:  Yes.

10   BY MR. MORISANI:

11   Q.   You said you've been in construction since 1972; is that

12   correct?

13   A.   Yes.

14   Q.   I guess that puts us right around 50 years?

15   A.   Yeah, unfortunately.

16   Q.   And what year did you begin with Benchmark?

17   A.   '97.

18   Q.   And you've been employed with Benchmark ever since?

19   A.   Yes.

20   Q.   I guess throughout your employment with Benchmark, what

21   roles have you had?

22   A.   Well, I started out as superintendant, but that only

23   lasted a couple of months but mainly just project management.

24   Q.   And I guess, what type of work have you been doing for

25   Benchmark during that time?

1   A.   We started out in commercial construction, but for the

2   last 20 years, I've just been dealing with detention

3   facilities.

4   Q.   And when you say "detention facilities," are you

5   referring to jails, prisons, or both?

6   A.   Mainly jails, detention facility -- county, county

7   detention facilities.

8   Q.   Okay.  About how many detention facilities would you say

9   you've worked on during that time?

10  A.   We've probably done 18 to 20.

11  Q.   And what does your work -- when we say work on detention

12  facilities, what does that consist of?

13  A.   That's new construction we've done as far as designing,

14  done the programmings, stuff like that and actually

15  constructed the facility.

16  Q.   Have you also -- have you done anything else besides

17  design and construction, anything else?

18  A.   We've done some renovations, and we've done some

19  evaluation on some facilities, also.

20  Q.   What are -- if you can, just give us a couple of examples

21  of the facilities that you've worked on?

22  A.   Renovation?

23  Q.   Sure.

24  A.   We've done Panola County.  Of course, we've done -- we

25  did some evaluations at Walnut Grove Juvenile Facility,

1    Wilkinson, Parchman.

2    Q.    And you'd also consider Raymond Detention Center as well?

3    A.    Yes.

4    Q.    And is your -- based on your own perception and opinion,

5    is Benchmark qualified to serve as a contractor, managing the

6    work that's being performed at the RDC?

7    A.    Yes.

8         MR. CHENG:  Objection, Your Honor.  Calls for opinion

9    testimony.

10        THE COURT:  Objection overruled.

11        The question was:  Do you -- based on your perception,

12   are you qualified to manage work basically?

13        MR. MORISANI:  Yes, sir.

14        THE COURT:  Overruled.

15   BY MR. MORISANI:

16   Q.    And I should have clarified this for the record, but when

17   we say RDC, can we agree it's Raymond Detention Center?

18   A.    Yes, sir.

19   Q.    Okay.  Now, how often would you go to the RDC, would you

20   say?

21   A.    Two, three times a week.

22   Q.    And why is it that you're having to go to RDC that often?

23   A.    Ongoing issues, whether its maintenance or upgrades made

24   to the facility.

25   Q.    And what -- I guess, what -- tell us what specifically is

1  Benchmark's role when it comes to the renovations at RDC?

2  A.  Well, we're just -- we're not performing the work.  We're

3  just overseeing the work.  Anything that is required to be

4  done, we go out, solicit proposals from qualified vendors and

5  get those proposals.  And once the work has been approved to

6  proceed, we oversee, make sure it's done correctly, proper

7  materials.

8  Q.  Is it safe -- it sounds to me like -- I guess, would you

9  describe it as sort of managing the work that's being done?

10 A.  What we're asked to manage, yes.

11 Q.  Okay.  And as far as the -- you mentioned vendors.  Is

12 there some sort of license trade for working on detention

13 facilities?

14 A.  Not as -- you know, as far as a detention license, I

15 don't think so.  I mean, you have detention contractors but --

16 Q.  But go ahead.

17 A.   -- and security contractors, but you've got roofing,

18 plumbing, electrical, HVAC, but there's a little bit different

19 ways and means when you're working in a detention facility.

20 Q.  And that's what I'm getting at, different ways and means.

21 Is it -- are you there to sort of make sure that those ways

22 and means are adequate for a detention facility?

23 A.  Yes, sir.

24 Q.  Because not any contractor can do the work in a detention

25 facility, correct?

1    A.    Correct.  They usually have experience if they've worked

2    in a detention facility.  I just -- I just make sure that I

3    see the materials that they're going to use, make sure that

4    they're, let's say, detention-grade materials if needed.

5    Q.    Would you consider -- the process, in doing that, would

6    you consider it almost a little bit like quality control

7    almost?

8    A.    Correct.

9    Q.    And sort of the eyes and ears for the County in that

10   respect?

11   A.    Yes.

12   Q.    And I guess, how many different vendors -- I might refer

13   to them from time to time as contractors, but how many

14   different vendors would you say that Benchmark is overseeing

15   at RDC currently?

16   A.    At this time probably seven or eight.  Seven or eight,

17   yeah.

18   Q.    What about throughout the life of Benchmark's involvement

19   at RDC, how many contractors would you say that you have

20   overseen?

21   A.    Probably 40, 50, somewhere.

22   Q.    Okay.  And I realize I didn't clarify either.  I guess

23   when did Benchmark start having involvement with the RDC?

24   A.    January 2020.

25   Q.    Okay.  Now, does Benchmark do anything -- once a vendor

1    does work, performs work at the RDC, does benchmark have any

2    involvement, any review of that work or anything?

3    A.    Yes, you know, we have a person on-site.  I have a

4    superintendent on-site.  If there's any problems or anything,

5    he communicates with me.  He has daily reports that he fills

6    out and takes pictures, and then the vendor will send me the

7    invoice and I'll approve or disapprove and forward it to the

8    County to be paid.

9    Q.    And we'll talk a little bit about it later, but the

10   pictures that you referenced -- well, I guess let's back up.

11   Before we talk about the pictures, the individual that's there

12   on-site, he's a Benchmark employee?

13   A.    Yes.

14   Q.    And he's the one taking pictures?

15   A.    Yes.

16   Q.    I guess, what is done with those pictures once they're

17   being taken?

18   A.    It's just a software that we have on his phone that he's

19   able to do daily reports that details who's there, the vendor

20   that's there working, what they're doing, what they're working

21   on, and he'll just take pictures of the work.

22   Q.    Of the work.  Okay.  And if along the way you or the

23   gentleman who's on-site all the time, the Benchmark employee

24   who is on-site all the time, if along the way you identify

25   work that needs to be done, what, if anything happens from

1  there?

2  A.   We just notify the jail administrator and the facilities

3  supervisor.

4  Q.   Notify them of what, the work that needs to be done?

5  A.   Yeah.  We'll notify them of any problems that, you know,

6  may arise.  Yeah.

7  Q.   And do you -- as far as any other on-site checking or

8  anything like that, that you do, is there anything else you do

9  besides what you've talked about?

10  A.   Well, I do inspections for the insurance, MASIT, the

11  County's insurance company.

12  Q.   And when you do those insurance inspections, what are the

13  kind of things you're looking for, I guess?

14  A.   Your normal fire safety inspections, roof inspections,

15  you know, kitchen vent hoods, fire extinguishers, stuff like

16  that.

17  Q.   Is it safe to say life safety issues?

18  A.   Yes.

19  Q.   And does Benchmark ever on occasion have its own

20  employees that are doing work at the facilities?

21  A.   Very rarely.  I can name two occasions that we did.

22  Q.   And --

23  A.   Three.  I'm sorry.  Three occasions.

24  Q.   Okay.  Do you recall what the type of work was on those

25  three occasions that Benchmark was actually doing?

1  A.   Yes, we built the officer workstations in B-Pod in the

2  dorm units.  We replaced the polycarbonate glazing in the view

3  windows in the cells in B-Pod and the broken ones in C-Pod and

4  we helped with the -- removing the trash out of the cells in

5  A-Pod.

6  Q.   And when it's not Benchmark doing the work, does

7  Benchmark have any sort of -- does Benchmark perform any type

8  of review or just any sort of check on the materials that a

9  vendor might be using?

10  A.   Yes.  When a vendor is performing work out there, we make

11  sure that the materials that they're using are correct and

12  installed properly to the manufacturer's spec.

13  Q.   Would it also include checking to see whether those are

14  detention-grade materials?

15  A.   Oh, yes.  Depending on what it is, you know, whether it

16  might be a plumbing fixture that's in an inmate's cell or

17  detention-grade light fixtures, stuff like that, you know,

18  tamper proof screws, fasteners.

19  Q.   Okay.  And during this process that we've been talking

20  about, do you have occasion to meet with officials from the

21  County, whether it be employees at the facility, the jail, or

22  folks, you know, downtown at the County offices?

23  A.   Yes.

24  Q.   And how many times would you say over the past two

25  years -- I think you said it was January 2020 when y'all

1   started?

2   A.   Right.

3   Q.   Since January 2020 how often would you say you've met

4   with County employees regarding the RDC?

5   A.   At least once a month.  I would say at least once a

6   month, but there's been occasions there were more, especially

7   when we had work going on in pods that were occupied.

8   Q.   Okay.  And would you say you meet more or less frequently

9   with folks actually at the facility?

10  A.   I meet more with the people at the facility.

11  Q.   Do you have any sort of approximation of how many times

12  you've met with people at the facilities in the past two

13  years?

14  A.   Probably at least, you know, twice a month, maybe 40 or

15  50 times.

16  Q.   Okay.  You've met with them a good deal, haven't you?

17  A.   Yes, sir.

18  Q.   And I guess, how often would you say -- and I may have

19  asked you this earlier.  If I didn't, I apologize -- or if I

20  did, I apologize.  About how often over the past two years

21  have you personally been out there to the RDC?

22  A.   Two or three times a week.

23  Q.   And the -- I want to talk a little bit now about a

24  document I believe is already in evidence.  It's the

25  stipulated order.  Its PX-2?

1           MR. MORISANI:  Your Honor, if I may approach him, I did

2      not leave this document with him.

3           THE COURT:  All right.  No problem.

4      BY MR. MORISANI:

5      Q.   And, Mr. Chamblee, I'll represent to you this is the

6      Court's stipulated order.

7      A.   Right.

8      Q.   It was filed January 26, 2020.  Have you seen this

9      document before?

10     A.   Yes, sir.

11     Q.   Now, this may be -- it may get a little tedious.  I want

12     to -- I'll try to move us along the best I can, but I want to

13     walk through some of the provisions in this order.  Okay?

14     The -- and as we go, I want to ask you just a little bit about

15     what the County may have done related to each provision.

16     Let's look first at page 3, if you will, of the stipulated

17     order.  Its PX-2, and we're going to look at item Roman

18     Numeral No. I, Section A, No. 1, and if you'll just take a

19     moment to read this provision and let me know when you're

20     ready, I'll have a couple questions.

21     A.   Okay.

22     Q.   Has Benchmark overseen any work related to this provision

23     in the stipulated order?

24     A.   Yes.

25     Q.   Okay.  Tell us about that.

1   A.   Okay.  The B- and C-Pod had -- those doors have been

2   converted and connected to an electronic -- or touch screen

3   control panel in the control room.  A-Pod, any doors were

4   converted to swing doors, but they are not connected to the

5   new electronic control panel.

6   Q.   And let me just -- for the clarity of the record, you

7   said B and C have been converted.

8   A.   Right.

9   Q.   Can you just clarify, converted to what?

10  A.   To an electronic touchscreen control panel.  They were

11  converted from -- any sliders were converted to swing doors

12  and they're electronically controlled in B- and C-Pod.

13  Q.   So I want to make sure I understand that.  Any sliding

14  door was converted to a swing door?

15  A.   Right in Item No. 1.

16  Q.   Okay.  Was there any work done on -- in B- and C-Pod, was

17  there any work done on control room doors or housing unit

18  entry doors?

19  A.   Yes.

20  Q.   What was done to those doors?

21  A.   They were converted to swing doors if they weren't

22  already and then hooked into the new electronic control panel.

23  Q.   Same question for any rec doors, recreation doors,

24  isolation doors or cage doors, same question.

25  A.   Yes.

```
1   Q.   They were all converted?

2   A.   Yes.

3   Q.   Okay.  Are they also on the electronic panel?

4   A.   Yes.

5   Q.   Okay.  And so I guess, can you just for the benefit of

6   the record, can you just explain -- now that the doors are on

7   the electronic panel, can you explain how they operate now?

8   A.   Well, the officer has a touch screen monitor in his

9   control room.  He can open and lock the doors from the touch

10  screen, or they can also be opened with a key.

11  Q.   Okay.  And that just, again, for clarity that -- the

12  electronic panel can allow you to lock them or unlock them;

13  correct?

14  A.   Correct.

15  Q.   Based on your personal knowledge and your own perception,

16  has the work required by Roman Numeral I, Section A, No. 1

17  been completed in B and C pods?

18  A.   Yes.

19  Q.   And in addition to this work, was there any work done to

20  the lights on B-Pod?

21  A.   Yes.

22  Q.   Can you tell the Court about that?

23  A.   B-Pod, when we went in there, didn't have any lights in

24  the cells.  So we had a vendor install new detention-grade

25  light fixtures.  We had to install wiring and everything in
```

1    the cells in B-Pod plus we check all the emergency lights the

2    exit lights.  We pit in a containment fence outside of B-Pod,

3    got a fire alarm in B-Pod working now.

4    Q.   Was there any work done on the fixtures in B-Pod?

5    A.   New fixtures were put in.

6    Q.   Can you describe for the Court what you mean by new

7    fixture wi- --

8    A.   When we went in to B-Pod, there was no light fixtures in

9    the cell.  The wires were gone, the light fixtures were gone

10   so we had them put in new light fixtures.

11   Q.   If in B-Pod you found a cell with a missing sink or a

12   broken toilet, what would you do?

13   A.   Well, those were repaired, and I think we put in six

14   shower units in B-Pod.

15   Q.   Okay.

16   A.   New shower units.

17   Q.   Was there any work done on the -- or related to the HVAC

18   system in B-Pod?

19   A.   They converted all the pneumatic controls to electric

20   controls and put in thermostats in B-Pod.

21   Q.   Okay.  And to your knowledge, as you sit here today, just

22   based on your own experience with the stipulated order, was

23   that -- was any of that work we just described, this

24   additional work, was it required by the stipulated order?

25   A.   In some instances, no, but, you know, the lights, we

1    could consider that a life safety issue.

2    Q.   Okay.  Let's look back now at page 3 in that stipulated

3    order.  We're going to look at Roman Numeral I, Section A,

4    No. 2.  If you just take a moment to read that provision, let

5    us know when you're ready.  I have a couple more questions

6    about that.

7    A.   Okay.

8    Q.   I guess, tell the Court, if you would -- this provision,

9    it deals with reinforcement of C-Pod cell doors.  I guess,

10   tell the Court, if you will, what was done to the C-Pod cell

11   doors?

12   A.   There was a strip of steel added to the jamb to prevent

13   the detainee from pushing the door open.  It's a sliding door

14   so when it closed, it was a strip of steel so it was more

15   secure.

16   Q.   And you mentioned sliding doors.  Were those sliding

17   doors replaced with swing doors as well?

18   A.   No, sir.  Not in C-Pod.

19   Q.   So in C-Pod.  Okay.  So I guess, based on your personal

20   knowledge and your own perception, has the work required by

21   Roman Numeral I, Section A, No. 2 been completed?

22   A.   Yes.

23   Q.   Let's look at Roman Numeral I, Section A, No. 3, same

24   thing.  If you'll just take a moment to review it, I have a

25   couple of questions.

1  A.   Okay.

2  Q.   I want to make sure, too, that -- make sure I don't leave

3  something a little muddy in the record.  In C-Pod the -- am I

4  correct in understanding your testimony that all control room

5  doors, housing unit entry doors, recreation yard doors,

6  isolation doors, and cage doors have been converted from the

7  swing doors to the sliding doors; correct?

8  A.   That's correct.

9  Q.   But the cell pod doors in C-Pod are still sliders?

10 A.   That's correct.

11 Q.   But you added the metal to reinforce them; correct?

12 A.   That's correct.

13 Q.   So now, shifting back to No. 3 on here, I guess, tell the

14 Court, I guess, has Benchmark overseen any work related to

15 this provision dealing with the B-Pod doors and control of

16 those doors?

17 A.   Yes.  Okay.

18 Q.   Yeah, go ahead.  You can tell the Court about it.

19 A.   All right.  In B-Pod we converted all the doors in the

20 horseshoe, what I call -- which is your housing unit doors,

21 cage doors, control room doors, then the rec yard doors, exit

22 doors, whatever they were, if they were sliding, they were

23 converted to swing.

24 Q.   Okay.

25 A.   There was locks put on both sides.  In B3 and B4, the

1    cell doors were converted to swing doors.

2    Q.   Okay.

3    A.   And everything was hooked to a new electronic control

4    panel.

5    Q.   And was there any work done on that -- you know, at the

6    facility you have the great hall and off of the great hall --

7    A.   Right.  You've got the entrance door.

8    Q.   Yeah.  Was any work done on B-Pod's entrance door?

9    A.   Yes.

10   Q.   Tell the Court about the work that was done on the B-Pod

11   entrance door.

12   A.   It's a swing door that's operated off the control room

13   door.

14   Q.   It's an electromechanical lock?

15   A.   Yes.

16   Q.   Okay.  And I guess, based on your personal knowledge and

17   your own perception, has the work required by Roman Numeral I,

18   Section A, No. 3 been completed?

19   A.   Yes, sir.

20   Q.   All right.  Let's move down one to Roman Numeral I,

21   Section A, No. 4 on PX-2.  If you'll take a moment to review

22   that, I have a couple questions.

23   A.   Okay.  Go ahead.

24   Q.   Has Benchmark overseen any work related to the fire hoses

25   at RDC?

1  A.   Yes, sir.

2  Q.   Can you tell us about that work?

3  A.   Okay.  There was 14 fire hoses, 7 were installed in C-Pod

4  and 7 in B-Pod.  They were -- we had the inspector come out

5  and certify them.

6  Q.   And based on -- I guess, based on your personal knowledge

7  and your perception, has the work on the fire hoses in B-Pod

8  and C-Pod been completed?

9  A.   Yes, sir.

10  Q.   I understand -- I guess as we sit here today, are there

11  any of the hoses in B-Pod or C-Pod that are not working right

12  now?

13  A.   There's one in the horseshoe in B-Pod.  B-Pod, yes, sir.

14  There is.

15  Q.   Okay.

16  A.   My understanding is somehow the cabinet got damaged and

17  the hose is laying in the control room.  The hose with the

18  valve and everything is in the control room.

19  Q.   As you sit here today, do you know how that happened?

20  How that damage happened?

21  A.   Only by what I was told.

22  Q.   But you don't have any personal knowledge how it

23  happened, do you?

24  A.   No, sir.

25  Q.   And let's move now to Roman Numeral I, Section A, No. 5.

1   Same thing, if you'll take a moment to review that, I have a
2   couple of questions.
3   A.   Okay.
4   Q.   I guess, can you just explain, is there any such thing as
5   a CML locking mechanism?
6   A.   The CML is the name of the company that installed the
7   locking mechanism.  They didn't manufacture it, no.
8   Q.   Okay.  Okay.  It's an electromagnetic locking mechanism,
9   though?
10  A.   Yes, it's -- electromechanical.
11  Q.   Electromechanical, excuse me.  And, I guess, has
12  Benchmark overseen any work related to this provision in the
13  stipulated order?
14  A.   Yes, they converted B3 and B4 -- CML converted B3 and B4
15  to swinging doors.  They went through -- and during that time,
16  they went through all the doors, the sliders and everything.
17  They made sure they were operating.  The one thing that we
18  didn't do was the strip of steel like we did in C-Pod.  B-Pod
19  had a different design and manufacturer of doors, and it was
20  not required.  It wouldn't have done any good.  We did
21  actually ask them to do some other work to make up for the
22  cost that they had provided for doing that.  So we had them do
23  some other work.
24  Q.   What other work did you have them do?
25  A.   Doors.  The mechanical room doors in the pods, we had

1475

 1   them work on those and provide new ones.

 2   Q.   And just if you can, tell us what was done to those

 3   mechanical room doors on those pods?

 4   A.   They were new doors installed, new doors locks.

 5   Q.   And as far as the -- you mentioned the steel strip wasn't

 6   added.  What pods in -- I'm sorry, what units in Pod B, you

 7   know --

 8   A.   1 and 2, Units 1 and 2.

 9   Q.   Those are the two units that did not have the steel strip

10   added?

11   A.   That's correct.

12   Q.   And did you talk to anybody about that?

13   A.   I believe I informed Mr. Parrish, yes.

14   Q.   Did he -- did he have any issue with not adding those

15   steel strips to B1 and B2 doors?

16   A.   I don't believe so.

17   Q.   And based on your personal knowledge and your perception

18   of the work, has the work required by Roman Numeral 1,

19   Section A, No. 5 been completed?

20   A.   Yes.

21   Q.   Let's move down to Roman Numeral I, Section A, No. 6.  If

22   you'll take a moment to review that, I have a couple of

23   questions.

24   A.   Okay.

25   Q.   I guess, what work has Benchmark overseen related to

1    A-Pod, recreation yard doors and cage doors?

2    A.   CML converted those to swing doors.

3    Q.   From the sliders?

4    A.   That's correct.  Any door that was a slider, they

5    converted to a swing.

6    Q.   Let's move now to Roman Numeral I --

7    A.   Other than the cell doors.

8    Q.   Sure, sure.  Let's move now to -- I guess, in the cell

9    door -- that's a good point.  For the cell doors in Unit A,

10   what would be the most important thing, the one necessary

11   thing you would need before you could change the locking

12   mechanisms and the doors out in Pod A?

13   A.   I'm sorry.  Ask that question again.

14   Q.   Sure, sure.  You mentioned the work wasn't done on the

15   cell doors in Pod A, and I guess my question is, what would be

16   the most important thing you would need to happen with Pod A

17   before you could get into those cells and work on the locking

18   mechanisms of those cell doors?

19   A.   I guess we just need to decide if they're going to use

20   A-Pod first.

21   Q.   Would it help to have the detainees removed out of Pod A?

22   A.   Yes.

23   Q.   And then once it's empty, you could get in there and work

24   on those cell doors?

25   A.   That's correct.

1    Q.   And I guess, let's move now to Roman Numeral I,

2    Section A, No. 7.  If you'll take a moment to review that,

3    just let me know when you're ready.

4    A.   Okay.

5    Q.   Has Benchmark overseen any work related to the holding

6    cell doors in the booking area?

7    A.   Yes.

8    Q.   Tell us about that.

9    A.   Okay.  The four doors that -- or four cells that are

10   across from booking, we modified or CML modified those doors

11   where they have a full-view panel at the bottom and top.

12   Q.   All right.  Let's move now to page 4.  Well, I guess, was

13   there any other work done in booking?

14   A.   We just made sure all the locks were operating correctly.

15   Q.   And let's move now to page 4, Roman Numeral II,

16   Section A.  It's No. 4 that I'm looking at?

17   A.   Okay.

18   Q.   And this No. 4 deals with the work center.  Now, we're

19   sort of transitioning from the RDC to the work center, and it

20   deals with the alarm system.  And I guess my question is:  Has

21   Benchmark overseen any work related to the alarm system and

22   fire exits at the work center?

23   A.   Yes.

24   Q.   Can you tell us what that is?

25   A.   They installed door monitoring switches on the doors, the

```
 1   exit doors in each housing unit, installed the camera at each
 2   one of the doors, and I believe that was -- as far as this
 3   this is what was done at Item 4.
 4   Q.   Okay.  What about the camera system at the work center?
 5   Has Benchmark overseen any work related to it?
 6   A.   Yes, we had the recorders replaced, the recorders and a
 7   few of the cameras that needed replacing.
 8   Q.   Was there any work done on the server that had the
 9   camera --
10   A.   Servers, recorders.  I'm sorry.
11   Q.   I can repeat -- I'll repeat my question.
12        Mr. Chamblee, I know we're having sort of a conversation
13   here, but if you'll just wait for me, I'll finish the question
14   and then you can go ahead and answer.  I guess, was any work
15   done on the servers that the camera system at the work center
16   use?
17   A.   Yes.
18   Q.   Tell us about that.
19   A.   Well, the servers and the recorders were a self-contained
20   unit.
21   Q.   Okay.
22   A.   So they were replaced.  They were replaced with a new
23   digital system that's capable of taking digital cameras, even
24   though there's still analog cameras at the facility.
25   Q.   Was any work done related to -- well, let me strike that
```

1   and re-ask it.  Were any cameras added at the work center?

2   A.   Four.

3   Q.   Go ahead.

4   A.   At each exit door in the units.

5   Q.   Now, based on your personal knowledge and your perception

6   of the work, has the work required by Roman Numeral II,

7   Section A, No. 4 been completed?

8   A.   Yes.

9   Q.   Now, Mr. Chamblee, are you familiar with the master plan

10  that's referred to?  It begins -- if we go back a page, I

11  skipped over this by accident, but it begins on the very

12  bottom of page 3, paragraph B, and it goes over to page 4.

13  You have numbers 1, 2, 3, and 4.

14  A.   Yes.

15  Q.   My question is:  Are you familiar at all with the master

16  plan that's referred to in those paragraphs?

17  A.   Yes.

18  Q.   And I guess for the record, it's Roman Numeral I,

19  Section B and 1 through 4.  Have you had any involvement with

20  the master planning process, Mr. Chamblee?

21  A.   Yes.

22  Q.   Can you tell us what that involvement is?

23  A.   Just working with County officials and the architects on

24  designing a new facility and renovations to the existing

25  facility.

1  Q.   Have you provided any guidance during that -- in that

2  process?

3  A.   Yes, sir.

4  Q.   What's that guidance relate to?

5  A.   I got them to not put sliding doors in, to design all

6  swinging doors, go to a single-story facility in Phase 1A --

7  1A, yeah.

8  Q.   When you say -- just for the clarity of the record, when

9  you say that, are we talking about a different facility?

10  A.   Yes, sir.

11  Q.   That's the new facility; right?

12  A.   Right.

13  Q.   Okay.  Just in general, though, with respect to the work

14  under the -- pursuant to the master plan, have you provided

15  any guidance, for example, related to materials?

16  A.   Yes.

17  Q.   What have you done with respect to materials in terms of

18  providing guidance?

19  A.   Mostly the electronics and security equipment and the

20  doors.

21  Q.   And as far as construction means and methods, have you

22  provided any guidance related to that?

23  A.   Yes.  Yes.

24  Q.   Can you describe what an example of that would be?

25  A.   Just a concrete structure.  Yeah.

1   Q.   Okay.  And how many meetings -- well, I guess, let me ask

2   it this way:  Have you attended any meetings related to the

3   master plan?

4   A.   Yes.

5   Q.   How many would you say?

6   A.   We normally have two a week -- two a month.

7   Q.   And how long do you think that's been going on?

8   A.   That's been going on for at least 18 months.

9   Q.   So about 36 --

10  A.   Probably longer than that.

11  Q.   At least 36 meetings?

12  A.   Probably so.  Yes, sir.

13  Q.   And that's related to the master plan?

14  A.   Yes, sir.

15  Q.   All right.  Now, did COVID-19 have any impact on the

16  repair work at the RDC?

17  A.   We did experience a little delay in some materials.  We

18  did shut -- the facility was closed to us on two different

19  occasions once -- I want to say it was in the latter part of

20  2020 and the first part of 2021.  They had some outbreaks.  So

21  we were shut down from working there.

22  Q.   Can you give the Court just an estimate, an approximation

23  of how many months the facility may have been shut down where

24  you couldn't access it?

25  A.   Weeks, a couple months maybe.

1    Q.   And despite the -- go ahead.

2    A.   I'm not sure that the facility was closed down for that

3    long a period of time but to reschedule -- the company they

4    were using was from out of town.  So it was a scheduling

5    conflict there, but there was -- it was probably a couple

6    months.

7    Q.   Okay.  Did you experience any issues with just manpower

8    during COVID-19 at its height?

9    A.   Still am.

10   Q.   Do what?

11   A.   Still am.

12   Q.   Now, I want to talk a little bit about the fire detection

13   and suppression -- fire detection and suppression at the RDC.

14   I guess, is there a fire sprinkler system anywhere at the RDC?

15   A.   Yes.

16   Q.   Where at the RDC?

17   A.   It is located in the laundry room, kitchen, and

18   mechanical room.

19   Q.   And what about housing units, Pods A, B, and C, have they

20   ever had a fire sprinkler system?

21   A.   Not according to the plans nor have I seen any evidence

22   of one.

23   Q.   What do those units have for fire suppression?

24   A.   Just fire hoses.

25   Q.   And what other work has been performed related to RDC's

1  fire detection and suppression system?

2  A.   We went through and got all the fire pumps, fire

3  sprinkler riser, all that's been either replaced or

4  refurbished and certified.

5  Q.   Was any work done on the backup fire pump?

6  A.   Both fire pumps have been rebuilt or -- yeah, they were

7  both rebuilt.

8  Q.   So -- and the fire pump, what does it feed?  What its

9  purpose, the fire pump?

10  A.   Fire sprinkler and fire suppression, which is the fire

11  hoses.

12  Q.   And you mentioned certifying --

13  A.   We had a vendor that is capable of certifying fire

14  sprinkler risers and fire equipment come in and certify

15  everything.

16  Q.   The fire pumps, the fire hoses?

17  A.   Fire pumps, fire hoses.

18  Q.   The fire sprinklers?

19  A.   Fire sprinklers, fire riser, valves.

20  Q.   Was any work done in the kitchen area related to fire

21  detection or suppression?

22  A.   Other than the certification of the fire sprinkler, we

23  had the Vent-A-Hoods, made sure they were certified,

24  inspected.  That was done last year.

25  Q.   Was any work done to the ancillary system?

```
 1   A.   It was brought up to -- you know, brought it up to code
 2   and certified.  I think it had a leak in it at one time.
 3   Q.   But today it's certified --
 4   A.   Right.
 5   Q.   It's working?
 6   A.   It's working.
 7   Q.   Okay.  And I guess you -- I think you alluded to it
 8   earlier, fire alarms.  I guess, do you -- I guess, tell us
 9   about, is there any other work being done related to fire
10   alarms at the RDC?
11   A.   Yes.  We just got through having the fire alarm put
12   online in B-Pod.  We're trying to get the rest of the
13   facility -- the fire alarm installed in it, throughout the
14   whole facility.
15   Q.   And do we -- do we have -- we already -- am I correct in
16   thinking we already have a contract for the devices --
17   A.   Right.
18   Q.   -- related to the fire alarm equipment --
19   A.   Right.
20   Q.   -- in B and C?
21        I'm sorry.  In A and C?
22   A.   A and C and the -- the whole facility.  They have the
23   room.
24   Q.   Okay.  And what's left to do with respect to the fire
25   alarms in A -- in Pod A and Pod C?
```

1   A.   We need to coordinate with the officials to get in there

2   and do the cabling for the fire alarms.

3   Q.   And once the fire alarms are installed in Pods A and C,

4   what will be the product of the fire detection and suppression

5   system?

6   A.   It will -- and once we get it done in the -- the whole

7   facility, it would be -- it would be back to the way it was

8   designed in the beginning.

9   Q.   Well, it be a complete system per the design?

10   A.   Yeah, per the original design, yes.

11   Q.   And as far as just -- we talked about the stipulated

12   order and some of the work that's been done there.  Can you

13   tell us about the work that's currently being done at the

14   Raymond Detention Center?

15   A.   Let's see.  We're just finishing up replacing ceilings

16   throughout administration, mainly in the kitchen.  We're

17   having an environmental study done in the kitchen area to make

18   sure that it's safe.  We're working on fire alarm, working on

19   the roof.  Let's see we've got some work that we're doing on

20   the chillers.

21   Q.   And you mentioned the roof.  I just wanted to clarify.

22   All right.  What -- has the -- has work taken place on the

23   roof above the kitchen?

24   A.   Yes, that's been completed.

25   Q.   And you mentioned the kitchen ceiling tiles have also

1    been replaced now?

2    A.   Right.   The grid and ceiling tiles have been replaced.

3    Q.   Where if, at all, are we doing roof work on the roof now

4    at the RDC?

5    A.   A-Pod.

6    Q.   And what kind of work is being done on the roof in A-Pod.

7    A.   Well, we had some breaches in A-Pod, so we're waiting on

8    some decking, which is a structural material to put in A-Pod

9    so we can get it watertight.

10   Q.   All right.   And then as far as the cameras, has any work

11   been done on the cameras?   Is any work being done on the

12   cameras currently?

13   A.   Yes, sir.   We just cut through -- you know, we've

14   replaced the servers.   We've replaced all the workstations.

15   We're going to sit down and we've already evaluated which

16   cameras are working, which ones are not, and we're in the

17   process of getting a drawing put together so we can put a

18   price together on getting it upgraded.

19   Q.   The camera system?

20   A.   Right.

21   Q.   Okay.   And has there been any work done with respect to

22   padded cells at the RDC?

23   A.   I'm sorry?

24   Q.   Has there been any work done recently with respect to

25   padded cells at the RDC?

1   A.   They're going to install some padded cells next week.

2   Q.   And where are those padded cells going to be installed?

3   A.   There's two of them going in the female side of medical.

4   Q.   Anywhere else?

5   A.   No.

6   Q.   Okay.  And the -- as far as the water supply for RDC, has

7   there been any -- or is there any work going on with respect

8   to the water supply for RDC?

9   A.   Well, we've rebuilt the primary pump.  It's complete.

10  We're waiting on a new secondary pump.  It will be in, I

11  think, March the 11th.

12  Q.   Okay.  Any other work that's currently ongoing at RDC?

13  A.   I do have -- I'm trying to get some -- a few doors

14  situated at RDC, not that work's going on, but we're in

15  progress of getting that done.

16  Q.   Is it replacement of doors or just --

17  A.   No, it's locks, mainly locks.

18  Q.   How many doors would you say?

19  A.   I've got approximately 20 doors in medical, four doors in

20  booking, and two doors in B-Pod and two doors in C-Pod.

21  Q.   And it's work related to the locking mechanisms?

22  A.   Yes, we're trying to identify all the problems right now.

23  Q.   Okay.  And so I take it, though, the work is intended to

24  correct any issues with those locking mechanisms on those

25  doors?

1    A.    Right.

2    Q.    Now, I want to talk a little bit about work related to

3    the mental health unit at the Raymond Detention Center.  I

4    guess where will the mental health unit be located at RDC?

5    A.    We had done some work for Kathryn Bryan in B1 isolation.

6    Q.    That's -- B1 is where the mental health unit will be?

7    A.    B1 isolation.

8    Q.    B1 isolation?

9    A.    Yes.

10   Q.    And what work related to the mental health unit in B1

11   isolation has been completed as we sit here today?

12   A.    We just did some renovations in the control room for an

13   office for the mental health workers.  We did some

14   modifications to some existing visitation areas so that the

15   mental health nurse could communicate with the detainee.

16   Q.    Has there been any work done with respect to the doors in

17   B1 isolation, the cell doors?

18   A.    Yeah, we're -- yes, we -- at the Major's direction, we

19   removed all the doors except for one.

20   Q.    Okay.  And as far as other things within those cells in

21   B1 isolation, have you removed anything else?

22   A.    Just incidentals, you know, a TV, TV mounts.  We

23   installed a view partition in front of the shower, you know,

24   for privacy, a privacy partition.

25   Q.    Those incidentals you mentioned, are those things that

1    could be used by a detainee to harm himself?

2    A.   Yes, there's just -- you know, just protrusions, pieces

3    of metal that are sticking out, anything that could --

4    somebody could harm themselves with, yes.

5    Q.   That's the kind of stuff that we're removing, right?

6    A.   Right.

7    Q.   Okay.  And what's the status of the nursing station?  Has

8    that been built out in B1 isolation?

9    A.   Yes.

10   Q.   Is that the nursing station off the control room in B?

11   A.   Yes, yes.

12   Q.   And are you familiar with the term "trash dumpster cells"

13   Mr. Chamblee?

14   A.   Yes.

15   Q.   What is that referring to?

16   A.   That was some cells in A-Pod that were being used as a

17   trash cell.

18   Q.   I guess were they sealed up?

19   A.   The doors were welded shut, yes.

20   Q.   Okay.  But they weren't sealed up; right?

21   A.   That's correct.

22   Q.   And I guess, how was the trash getting in those cells?

23   A.   They have windows -- or the windows were broken out or

24   there was just places underneath the doors.  They could throw

25   stuff, had a little opening about maybe six or eight inches

1   tall at the bottom.

2   Q.   And has the County done anything about these cells?

3   A.   Yes, they went in and cleaned them all out.  We went

4   back, sealed the doors, put plates over the windows, and at

5   the bottom, trying to prevent any more trash being

6   accumulated.

7   Q.   And you said we -- I guess, how did we seal the bottoms

8   of the doors?

9   A.   We put a metal plate at the bottom and welded it on there

10  and also over the window.

11  Q.   And I guess, to your knowledge, as someone who's inside

12  RDC, you know, a whole lot of time, are there any trash

13  dumpster cells at the facility at this time?

14  A.   Not that I'm aware of.

15  Q.   Have those welded plates, have they been able to keep

16  things from getting shoved under that door and through the

17  windows?

18  A.   Yes, sir.

19  Q.   Were there any cells -- when the County went in and

20  opened those cells up and cleaned them out, were there any

21  cells the County could put back online through repairs?

22  A.   I believe there was possibly eight, seven to nine, seven,

23  eight, or nine.  Yeah, there was about eight of them, I think.

24  Q.   Okay.  With respect to the others, were they just -- they

25  were pretty badly damaged, never put them back online?

1   A.   Either the plumbing fixture was damaged or there was

2   breaches in the walls.  We didn't have enough time to do the

3   repairs so we just sealed the cell back up.

4   Q.   Okay.  And I want to talk now -- we sort of talked a

5   little bit about it earlier, but the work center, I want to a

6   talk a little bit about the work center.  I take it you've

7   been to the work center?

8   A.   Oh, yes.

9   Q.   And how often would you say you've been there?

10  A.   Probably at least once a month, maybe twice a month.

11  Q.   Is it safe to safe you're familiar with the physical

12  plant conditions?

13  A.   Yes.

14  Q.   At the work center?

15  A.   Yes.

16  Q.   What work is currently being done at the work center

17  today?

18  A.   We're waiting -- let's see -- we're waiting on HVAC Units

19  one and eight to be replaced.  We're supposed to have the

20  control board for the sprinkler system installed next week.

21  Q.   Okay.  And that's the fire sprinkler system?

22  A.   Yes.

23  Q.   At the work center?

24  A.   Yes.

25  Q.   Okay.

```
1    A.   Repaired the fire alarm here within the last couple of
2    weeks.
3    Q.   Any work done on the vent hoods or the ancil system --
4    A.   Yeah, all that's been inspected, repaired, and certified.
5    Q.   Are we going to have the -- I guess, is the intent to
6    have the fire alarm system certified once it's completed, the
7    work on the --
8    A.   Well, it's got a working fire alarm system right now.
9    It's just in trouble mode.
10   Q.   Okay.
11   A.   It's in trouble mode.  We've got some devices that need
12   to be replaced.  So once we replace those devices, it will be
13   fine.
14   Q.   It will remain certified; correct?
15   A.   Yeah.
16   Q.   In your opinion -- based on your knowledge of the work
17   center, what is your opinion of the work center?
18   A.   We just about replaced all the units on the roof.  We got
19   two more to go.
20   Q.   When you say "the units," you're talking about the HVAC
21   units?
22   A.   Right.
23   Q.   Now, there's a third facility that I want to talk about
24   and I don't think we've talked about it yet.  Are you familiar
25   with Henley-Young --
```

```
 1    A.   Yes, sir.

 2    Q.   -- Patton?

 3    A.   Yes, sir.

 4    Q.   And have you been involved in any way with any of the

 5    work at Henley-Young?

 6    A.   Yes, sir.

 7    Q.   How often would you say that you go to Henley-Young in

 8    your role as a Benchmark employee?

 9    A.   Probably twice a month.

10    Q.   When is the last time you were at Henley-Young?

11    A.   Let's see, it was Tuesday.

12    Q.   All right.  Can you describe for the court some of the

13    work that's being done at Henley-Young?

14    A.   Right now they're repairing the roof at Henley-Young.

15    You said "ongoing work" or --

16    Q.   Yeah, ongoing work on the roof work?

17    A.   I think that we've got it pretty well in shape right now.

18    Q.   What's the overall physical plant condition at

19    Henley-Young?

20    A.   Good.  Good.

21    Q.   Has there been any work done as far as maintenance issues

22    at Henley-Young recently?

23    A.   Well, since Benchmark's been involved, you know, we added

24    the classrooms.  We -- they've upgraded the door controls.

25    All the door controls have been replaced.  Intercom stations.
```

1   Visitation, HVAC rooftop units have been replaced, a lot of

2   them have.  I don't know how many are left up there, but the

3   majority of the rooftop units have been replaced.  And we've

4   done ongoing stuff repaired sally ports and there's an

5   environmental study going on there also.

6   Q.   Okay.  Now, Mr. Chamblee, I've placed some exhibits there

7   to your left.  It's documents -- it's exhibits -- for the

8   record, it's D-9 through D-18.  They've been premarked as D-9

9   through D-18?

10  A.   Yes, sir.

11  Q.   And if you'll just take a moment to look through those, I

12  just -- I want to ask you a couple questions about those.

13  A.   Okay.  These --

14  Q.   I was going to ask you:  Do you recognize those

15  documents?

16  A.   Yes.

17  Q.   What are they?

18  A.   These are our invoices.

19  Q.   When you say "our invoices," the Benchmark --

20  A.   Benchmark's invoices.

21  Q.   Okay.  And what's the date of that first invoice, D-9?

22  A.   March 3rd, 2021.

23  Q.   And is it -- is the date of D-18, the very last one at

24  the bottom, is the date -- or I guess, tell us what the date

25  is on that invoice, D-18, Defendants' 18?

```
 1   A.   December the 3rd, 2021.
 2   Q.   Okay.  And as you sit here -- you know, you're welcome to
 3   look through these invoices, but my question is -- or I guess,
 4   let's -- if you will, can you pull out D-13?  It's the
 5   July 1st invoice.
 6   A.   Okay.
 7   Q.   And if you'll turn with me to -- there's a number on the
 8   bottom of that document.
 9   A.   Yes, sir.
10   Q.   Can you turn to page D-230?
11   A.   230?
12   Q.   Yes, sir.  D-230.
13   A.   Okay.
14   Q.   And this is a little redundant, but I'm going to display
15   it on the Elmo as well.
16        And, Mr. Chamblee, we talked a little bit about -- and if
17   you can flip to D-231 as well.  We talked a little bit earlier
18   about the fire dumpsters -- the trash dumpster cells.  Is --
19   as you flip through there, this invoice, the July 1st invoice
20   in D-13, is this reflective of the work that was done on those
21   trash dumpster cells?
22   A.   Yes, sir.
23   Q.   These are -- are these the pictures you were saying
24   earlier that the Benchmark employee takes?
25   A.   Yes, sir.  This is done by my superintendent,
```

```
 1   Willie Edmond and he -- this is a program or an app we have on
 2   his phone.  He's able to take pictures and detail work going
 3   on.
 4   Q.   Okay.  And then I take it he submits those pictures, that
 5   documentation in these invoices?
 6   A.   It goes out as -- it goes out as an e-mail.
 7   Q.   Okay.
 8   A.   And it's sent to a designated group of people such as
 9   myself.  I believe our quality assurance person in the office
10   also gets it.
11   Q.   Okay.
12   A.   And I believe a few other people in our office get it.
13   Q.   Okay.  And as far as these invoices, D -- these exhibits
14   before you, are they true and correct copies of the invoices?
15   A.   They -- yes, they appear to be the same.  They consist of
16   time sheets and --
17   Q.   Okay.
18   A.   -- and daily reports, yes.
19   Q.   That's a good point.  Let me ask you this, too:  Are
20   these the only invoices that the County gets related to work
21   Benchmark is overseeing?
22   A.   No.
23   Q.   What invoices do these reflect?
24   A.   These are just Benchmark's invoices.
25   Q.   What other invoices --
```

1   A.   All the vendors -- when the County authorizes work to be

2   done, whether it's through a purchase order or a contract that

3   we draw up between the County and the vendor, the vendor then

4   submits their invoices to us.  We approve them or disapprove

5   them and forward them to the County.

6   Q.   So in addition to these, the County gets those vendor

7   invoices as well?

8   A.   Right.

9   Q.   But those aren't reflected here; correct?

10  A.   Right.

11       MR. MORISANI:  Your Honor, we'd move to admit D-9

12  through D-18 into evidence.

13       THE COURT:  Any objection from the United States?

14       MR. CHENG:  D-9 through D-18 will be received in

15  evidence.

16       (Defendants' Exhibits 9 through 18 entered.)

17  BY MR. MORISANI:

18  Q.   Now, Mr. Chamblee, since the County retained Benchmark,

19  has the County been paying Benchmark for its construction

20  management services?

21  A.   Yes, sir.

22  Q.   And how much money has the County spent on the work that

23  Benchmark has overseen at the RDC to date?

24  A.   At RDC?

25  Q.   At RDC only for now.

1    A.   Just the invoices that we, Benchmark, has approved has

2    been around 3.2 million.

3    Q.   And do you know how much the County has spent on work

4    that Benchmark has overseen related to all facilities?  And

5    when I say that, I mean related to the RDC, Henley-Young.  We

6    talked about the work center but also the Jackson Detention

7    Center?

8    A.   Yes, sir.  It's a little under 4.3 million altogether at

9    all four facilities.

10   Q.   In your opinion, is the County ignoring the physical

11   plant conditions at the Raymond Detention Center?

12   A.   I don't think so.

13   Q.   And in your opinion, is the County ignoring the physical

14   plant conditions at the work center?

15   A.   Huh-uh, no, sir.

16   Q.   And in your opinion, is the County ignoring the physical

17   plant conditions at Henley-Young?

18   A.   No, sir.

19        MR. MORISANI:  Your Honor, if I may briefly confer, I

20   think I may be finished.

21        THE COURT:  All right.

22        MR. MORISANI:  No further questions, Your Honor.

23        THE COURT:  All right.

24                       **CROSS-EXAMINATION**

25   **BY MR. CHENG:**

```
1   Q.   Good afternoon, Mr. Chamblee.  How are you doing?
2   A.   Pretty good, sir.
3        THE COURT:  Make sure you -- make sure you adjust your
4   microphone.  Make sure it's on.
5        MR. CHENG:  Thank you, Your Honor.
6   BY MR. CHENG:
7   Q.   Can you hear me?
8   A.   Yes, sir.
9   Q.   Mr. Chamblee, I heard your testimony about all the work
10  you've been doing.  Are you suggesting that the work is
11  finished at the Hinds County Jail?
12  A.   No, sir.
13  Q.   What additional work still needs to be done?
14  A.   We --
15  Q.   Is that too big a question?
16  A.   Yeah.
17  Q.   Should I -- so let's break it up.  For doors, security
18  doors, what additional work still needs to be done to make the
19  detention center comply with the Court orders?
20  A.   Well, I feel comfortable B- and C-Pod, we're through with
21  the doors there.  We do need to -- and I'm working on that
22  right now, is medical, the doors in medical and the doors in
23  booking.
24  Q.   And A-Pod, do they actually have inmates in A-Pod?
25  A.   Yes, sir.
```

1  Q.   So if A-Pod is to be rendered safe, what type of door

2  work has to be completed there?

3  A.   Well, first of all, they need to determine if they're

4  going to use A-Pod as a -- the doors -- the cell door is not

5  operational so they're really not doing anything right now,

6  so...

7  Q.   Do they have inmates in the areas where the doors are not

8  operational in A-Pod?

9  A.   The cell doors not operational.  All the other doors are

10 operational in A-Pod, the housing unit doors.

11 Q.   But do they have inmates in the housing units where the

12 cell doors are not working?

13 A.   Yes.

14 Q.   And are there doors to the hallways or from the hallways

15 of Raymond Detention Center that need to be repaired?

16 A.   From the great hall?

17 Q.   Yes.

18 A.   Right now I have all those doors working.  B-Pod, C-Pod,

19 and A-Pod doors working.

20 Q.   And when did those get put into operation?

21 A.   C-Pod -- C-Pod and B-Pod, those doors have been working

22 for awhile.  A-Pod, that door malfunctioned here a couple of

23 months ago, and we got it repaired again in December.

24 Q.   And how about the alarm and smoke detectors in the jail,

25 how are those?  What still needs to be done with those?

1  A.   Cabling.  We're working on getting the cabling done right

2  now.

3  Q.   So even though you have some of the alarm parts, are the

4  alarms actually working?

5  A.   We have a functioning fire alarm in B-Pod.

6  Q.   And how about C- or A-Pod?

7  A.   No, sir.

8  Q.   How about at the work center, are the alarms and

9  detectors working at the work center?

10  A.   Yes, sir.

11  Q.   Is the sprinkler working at the work center?

12  A.   It will be next week.  We'll get that control board in.

13  Q.   How about the control panels for the doors, the

14  electronic control panels, what still needs to be done for the

15  electronic control panels?

16  A.   We have central, B-Pod and C-Pod.  Those are up and

17  running as of right now.

18  Q.   And how about B-Pod?

19  A.   It's C, B-Pod, C-Pod, and central are working right now.

20  Q.   How about A-Pod?

21  A.   A-Pod, no, sir.  It's not working.

22  Q.   And you mentioned something about the fire hoses.  The

23  pumps are working, but are the hoses actually installed where

24  they're supposed to be installed at Raymond?

25  A.   Yes, sir.  In B-Pod, C-Pod, and the administration area,

1    yes, they are.

2    Q.   Okay.  How about A-Pod?

3    A.   No, sir.

4    Q.   Have the defendants ever put in security vestibules over

5    at Raymond?

6    A.   At RDC?

7    Q.   Yes.

8    A.   They did in the housing units.

9    Q.   The cages?

10   A.   Yes, sir.

11   Q.   But did they put one in for master control?

12   A.   No, sir.

13   Q.   And did they put one in like right outside of the control

14   rooms --

15   A.   No, sir.

16   Q.   -- to each of the housing pods?  And even though repairs

17   have been made at Raymond, are there any physical features of

18   Raymond that continue to make it sort of an unsafe facility or

19   unable to hold inmates?

20   A.   There's some structural issues.

21   Q.   Like the roof?

22   A.   Yeah.

23   Q.   Are there issues with the roof?

24   A.   Yes, sir.

25   Q.   Have those issues been eliminated?

1    A.   No, sir.

2    Q.   And what are those issues with the roof?

3    A.   At one point they came in and put in a metal ceiling

4    throughout the facility, and it's -- it presents some issues

5    with its structure.

6    Q.   And when you say "presents some issues with its

7    structure," do you mean, is it unable to be secured, or what

8    is the issue?

9    A.   Being secure.

10   Q.   Was it an issue about the materials that are being used

11   or the design?

12   A.   Design.

13   Q.   And what -- we're lay folks, but is there some way to

14   explain what the design issue was?

15   A.   Well, there's a pole -- they installed poles to support

16   the steel ceilings.  My understanding, the inmates are going

17   up those poles, through the roof and out the roof.

18   Q.   So the inmates can climb the poles up to the roof?

19   A.   Yes, sir.

20   Q.   How do they cut through the roof?

21   A.   I'm not sure, sir, but they are.  Somebody is.

22   Q.   How about the walls and the grouting, are there issues

23   with the Raymond Detention Center walls and grouting?

24   A.   Yes, sir.  The walls are hollow-core CMU blocks.

25   Q.   What's wrong with that?

1   A.   They -- I would think they'd need to be filled with

2   concrete.

3   Q.   Otherwise the inmates can just break through those, too?

4   A.   Yes, sir.

5   Q.   And I know -- again, I know you've done tons of work

6   here, but are you saying the work was completed by the

7   deadlines set by the Court orders?

8   A.   No, sir.

9   Q.   Why were there delays getting things done?

10  A.   I'm not sure.  We just didn't have the time to do it.

11  And when I came on board, there was not enough time to

12  complete all that.

13  Q.   Have all of your invoices been paid by the County on

14  time?

15  A.   We're pretty up-to-date, yes, sir.

16  Q.   I think we heard something about a work stoppage on

17  B-Pod.  Do you know anything about that?

18  A.   A work stoppage?

19  Q.   Yeah, that they've stopped work on B-Pod?

20  A.   I'm not aware of it.

21  Q.   All right.  Let me move on.  I think we also heard you

22  testify -- well, actually the stoppage was in December.  Does

23  that sound familiar, 2021?

24  A.   In 2021?

25  Q.   Right.

1   A.   We were pretty much through with B-Pod in December.  You

2   know, we were doing some things like adding those workstations

3   in the units, each individual units.  We did some work in the

4   mental health in December, but as far as I know, we were

5   pretty much through with all the work in B-Pod.

6   Q.   You also mentioned earlier the mental health unit.  I

7   think the reference was to B1 iso.  So the mental health unit

8   is actually B1, right, not just the iso unit?

9   A.   And my understanding is that they were transforming

10  the -- transforming the B1 iso into the mental health.  Now,

11  if they were doing the whole B1 unit, I wasn't -- I wasn't

12  aware of that.  That may have been a communication problem on

13  my fault.

14  Q.   And I guess in trying to create office space for mental

15  health staff so that the staff could talk with detainees,

16  could you describe what the goal was?  What were you trying to

17  do with the space?

18  A.   We were asked just to provide a -- you know, there was a

19  lot of equipment and stuff in that room that we had to take

20  off the walls and put in a door so they could close the door,

21  and this is in the control room area.  And we got some

22  electrical, fixed the lights.

23  Q.   So were these renovations that made it possible for staff

24  to do sort of one-to-one interviews with the patients?

25  A.   That was the intent, my understanding, yes, sir.

```
 1   Q.   But were you adding additional --  a large classroom
 2   space or space for group therapy or program space?
 3   A.   No, sir.
 4   Q.   I think you also mentioned Ms. Bryan worked with you?
 5   A.   Yes.
 6   Q.   At the January 2022 meeting with the CML folks to talk
 7   about the master plan, do you recall that meeting?  There was
 8   a virtual tour --
 9   A.   Yes, yes.
10   Q.   -- and a conference call.  Hadn't seen everybody in a
11   while but you were on video?
12   A.   Right.
13   Q.   At the time were some nice things said about Ms. Bryan
14   and her input into some of the renovations and plans for the
15   new jail?
16   A.   Yes, sir.
17   Q.   Was she helpful in guidance for what could be done to
18   make the plans better?
19   A.   Yes, sir.
20   Q.   Now, even after repairs are made, do they get broken by
21   the inmates in the jail?
22   A.   Oh, yes, sir.
23   Q.   Do they get broken at a pretty high rate or pretty
24   frequently?
25   A.   You have to understand, I only hear about it once -- you
```

1    know, once they do a work order.  So I guess it is -- you

2    know, pretty common.

3    Q.   Ever get one of those moments, like, we just fixed this

4    and its broken again, right?

5    A.   Yes, sir.

6    Q.   Okay.  And, you know, you think it's possible the reason

7    you have to keep going back in is because the inmates are

8    given a little too much free rein to damage this gear and the

9    equipment that's been put in?

10   A.   I'm not sure about that.

11   Q.   When your teams are in there, have you seen inmates sort

12   of get out of their housing units or get a little too close to

13   your work teams?

14   A.   Well, normally, especially in A- and C-Pod, when we're in

15   there working, the inmates are in the rec yard.  While we're

16   actually in the housing unit working, they put them in the rec

17   yard.  In C-Pod they're able to lock them down into the cells.

18   So it's a little bit easier now that we've got the C-Pod and

19   B-Pod operational.

20   Q.   But A-Pod is still --

21   A.   Yeah, they have -- we have to wait until, you know, the

22   weather is good or they usually lead them out to the rec yard.

23   Q.   And as you worked on this master plan, is the assumption

24   going to be that once the new facilities are opened, they're

25   going to have to be fully staffed?

1  A.   Yes, sir.

2  Q.   And as you were planning renovations for Raymond

3  Detention Center, was there also a plan for how inmates would

4  be moved into different housing units as they were reopened?

5  A.   Yes, sir.

6  Q.   And as those units were reopened, they had to be staffed,

7  correct?

8  A.   Yes, sir.

9  Q.   Do inmates still break the locks in B- or C-Pod?

10  A.   Right now in C-Pod we have two sliding doors that are not

11  working.  One of them, it looks like somebody has put

12  something inside it.

13  Q.   Do you provide any guarantees or warranties for your

14  workmanship or the work that's done by your vendors?

15  A.   Yes, there is.

16  Q.   Can we assume that the standards for those doors and

17  sliders are good standards?

18  A.   Yes, sir.  A little bit difficult to provide a warranty

19  for an electromechanical device.  You know, you need to keep

20  it properly maintained and stuff.

21  Q.   So is maintenance important, too, to keep those systems

22  working?

23  A.   Yes.

24  Q.   Do you know how the maintenance system works for the

25  County to maintain those doors and locks?

1    A.   No, sir.  I did have a company come in in December and

2    train two of the maintenance workers.

3    Q.   This is the two maintenance workers that have been

4    assigned to work at the jail?

5    A.   Yes, sir.

6    Q.   When did they actually get assigned?

7    A.   I think it was around October or November.

8    Q.   Over the time you've been working here, have there been

9    some occasional surprises that got in the way of trying to get

10   things done?

11   A.   I mean, just your normal everyday --

12   Q.   Right.

13   A.   -- maintenance issues.

14   Q.   I think that's happened when you've got a big project.

15   That may interfere with construction and the COVID-19

16   pandemic, and the supply chain shortages.

17   A.   Yeah, yes, sir.

18   Q.   And then at one point, didn't Jackson, like, lose water?

19   A.   Yes, sir.

20   Q.   Did that affect your work as well?

21   A.   No, sir.  We didn't have a problem at RDC or anything

22   like that.

23   Q.   That's good.

24   A.   We did -- we did install a booster pump at Henley-Young.

25   Q.   Because Henley-Young lost water?

```
 1    A.   Yeah, they've always had a problem with the water.

 2    Q.   How long have they had problems with their water supply?

 3    A.   Probably for -- ever since it was constructed.  I do know

 4    there's plans -- there's a design going on right now for a new

 5    water tower and well for Henley-Young plus the new facility.

 6    Q.   And sometimes when leaders change in the organizations

 7    you're dealing with, does that also affect getting approvals

 8    for changes or fixes?

 9    A.   Could you repeat that?

10    Q.   Sure.  Sometimes when leaders change, you know, like, if

11    there's a new sheriff or a new Board --

12    A.   Yes.

13    Q.   -- does that also affect -- impede progress?

14    A.   Yes, everybody has different priorities.

15    Q.   Now, for somebody in your business, though, do you have

16    to build into your plan ways to deal with those types of

17    delays?

18    A.   It can be challenging, yes, sir.

19    Q.   But with some planning, is that something that helps

20    with --

21    A.   Yes.

22    Q.   -- dealing with unforeseen circumstances?

23    A.   Yes, yes.

24    Q.   If you don't have a plan, when something goes wrong, what

25    happens?
```

1    A.   It shuts down.

2    Q.   There's been some talk about all the money that's spent

3    on the jail.  If they don't spend the money for these types of

4    repairs, could there be even more damage to the physical

5    plant?

6    A.   Yes, sir.

7    Q.   If the doors don't work, inmates can do even more

8    damage --

9    A.   Yes.

10   Q.   -- to the rest of the plant?

11   A.   Yes, sir.

12   Q.   If we could bring up Plaintiff's Exhibit 33 and turn to

13   page 44 to 47, which on the plan itself is 38 to 41.  And

14   there's a binder behind you.  It's sometimes easier to look at

15   the binder if you want to go through pages 44 through 47.

16        THE COURT:  If you want a piece of paper, the

17   Government will get it for you, if you prefer that, or if you

18   can see the screen.

19   A.   I can see it.

20   BY MR. CHENG:

21   Q.   If we could page through to 44 through 47.  Just let us

22   know when you're ready, and we'll move through the pages.

23   A.   You said page 44?

24   Q.   They're showing it for you.  So it's Exhibit No. 33.  Our

25   page is 44, but the actual master plan page is page 38.  Does

```
1   that make sense?  So it starts with life safety issues?

2   A.   Yes, sir.

3   Q.   And if we could go to the next page, do you recognize the

4   master plan?

5   A.   Yes, sir.

6   Q.   It continues onto the next page.  And the next page.

7        So those items listed before, were those items that were

8   recommended for the master plan as possible things to fix but

9   which were never actually approved?

10  A.   Yes, sir.  Yeah.

11  Q.   So for example is there any plan to put in a sprinkler

12  system at the Raymond Detention Center?

13  A.   No, sir.

14  Q.   And even the work center, which you said it's in pretty

15  good condition, right?

16  A.   Yes, sir.

17  Q.   It does still need some upgrades; right?

18  A.   Yes, sir.

19  Q.   So, for instance, it wasn't really built to be a jail,

20  was it?

21  A.   No, sir.

22  Q.   So it still needs a secure perimeter fence?

23  A.   It does have a perimeter fence.  It doesn't have a sally

24  port.

25  Q.   Okay.
```

```
 1        THE COURT:  Mr. Chamblee, you need to make sure you
 2   turn your microphone towards you -- no, no, that's fine.
 3        No, no.  Just turn it towards you.  Just make sure the
 4   court reporter can hear you.
 5        MR. CHENG:  I've been doing that all week.
 6   BY MR. CHENG:
 7   Q.   So it does need a sally port, right?
 8   A.   Yes, sir.
 9   Q.   Are there other things it needs to make it more secure if
10   it's going to serve as a jail?
11   A.   Yes, sir.
12   Q.   Let's bring up Plaintiff's Exhibit 26.  Have you worked
13   with Georgia Detention Services?
14   A.   Yes, sir.
15   Q.   What is your working relationship with them?
16   A.   They did a good job, yes, sir.
17   Q.   So one of their things they did was they wrote this
18   report where they mention in the first paragraph, "Upon entry
19   the first notice was the gates being left open for workers to
20   go in and out along with all the doors through B block into
21   the hallway were all propped open."
22        So even the doors and locks worked on the great hall, if
23   they're left open, does that defeat the security?
24   A.   Say the last part again.
25   Q.   So even if the locks and doors technically work --
```

1    A.   Yes, sir.

2    Q.   -- if the staff leave them open, does that defeat the

3    security features?

4    A.   I'm sorry.  Say that last --

5    Q.   Does that defeat the security features?

6    A.   Yes, sir.  I will say that that Gate B that was in B3,

7    that is how we use that B3 to bring material in and out of the

8    B-Pod.

9    Q.   What is B3 material?

10   A.   B3, we were using B3 as a staging area for all the

11   vendors, whether it was the ones working on the fire alarm or

12   the ceiling tile or just -- we were using B3 as a staging

13   area.

14   Q.   Okay.  So workers were going back and forth through

15   B-Pod?

16   A.   Yes, sir.  B3.  Yes, sir.

17   Q.   B3.  Okay.  Are there going to be maintenance issues even

18   in well-operated facilities?

19   A.   Yes, sir.

20   Q.   Would you consider the Raymond Detention Center to be a

21   well-operated facility?

22   A.   It has a lot of issues, maintenance issues.

23   Q.   Okay.  Thank you, Mr. Chamblee.

24        MR. MORISANI:  May I proceed, Your Honor?

25        THE COURT:  You may.

1    **REDIRECT EXAMINATION**

2    **BY MR. MORISANI:**

3    Q.   Mr. Chamblee, to close the loop on that last question you

4    got, every facility is going to have maintenance issues, isn't

5    it?

6    A.   That's correct.

7    Q.   And when you were asked a couple questions about the fire

8    sprinkler system, is it feasible to put, to install a fire

9    sprinkler system into the living units at RDC with the

10   condition of the facility it's in today?

11   A.   I don't believe so.

12   Q.   And is that because installing a fire sprinkler system in

13   those living units would require tearing those living units

14   apart, wouldn't it?

15   A.   Pretty much.

16   Q.   And the money, you were asked about money being spent.

17   What is that money being spent -- when its paid to Benchmark,

18   what is that money being spent to do at the RDC?

19   A.   Repeat that again.

20   Q.   I'll see if I can rephrase it.  Is that money being spent

21   to keep the RDC in operation?

22   A.   What money?

23   Q.   The money that's being paid to Benchmark, you were asked

24   about the invoices and the money that was being spent, being

25   paid to Benchmark, and I guess my question is:  Is that money

1  being spent for Benchmark's work; correct?

2  A.   Yes.

3  Q.   And the money is then being spent to keep the facility in

4  operation, is it not?

5  A.   Yes.  Well, make repairs, yes, and renovations.

6  Q.   To keep it habitable?

7  A.   Yes.

8  Q.   And you testified a little bit about -- or you were asked

9  about the roof, and as I appreciate it, when was the last time

10 Benchmark was at the RDC working on the roof?

11 A.   This week.

12 Q.   Okay.  In what pod are we talking about, when we're

13 talking about working on the roof, what pod?

14 A.   Right now we're presently on A-Pod.

15 Q.   Okay.  Is that the same pod where folks are accessing the

16 roof?

17 A.   Yes.

18 Q.   And is the work -- so the work's being done to keep that

19 roof secured; correct?

20 A.   Yes.

21 Q.   Okay.  To prevent that from continuing to happen; right?

22 A.   Yes.

23 Q.   And also the -- you were asked about, I think, fire hoses

24 in Pod A, and are there fire hoses installed in the horseshoe

25 on Pod A?

1   A.   No.

2   Q.   Okay.  Are there -- well, let me ask you this:  As far as

3   the -- the -- well, did -- did COVID-19, did it -- you were

4   asked about delays in work.  Do you recall that?

5   A.   Yes.

6   Q.   Did COVID-19 contribute to those delays?

7   A.   Yes.

8   Q.   And did the supply chain issues that came about as a

9   result of COVID-19 contribute to that delay?

10  A.   Yes.

11  Q.   And has -- at any point in time, has Sheriff Jones

12  instructed you to alter your work schedule or work plans at

13  the RDC?

14  A.   No, sir.

15  Q.   And you mentioned earlier you were having trouble hiring

16  folks, staff.  Why is that?

17  A.   I don't know.  It's just hard to -- everybody's suffering

18  from manpower, everybody.

19  Q.   Okay.

20  A.   All the vendors.

21       MR. MORISANI:  Your Honor, I have no further questions.

22       THE COURT:  All right.  We're going to take a 15-minute

23  break right now.  Mr. Chamblee, I'm going to ask that you step

24  down and do not discuss your testimony with anyone and when we

25  return, I'll have a few questions for you.

```
 1                    (A brief recess was taken.)

 2              THE COURT:  You may be seated.

 3                          EXAMINATION

 4    BY THE COURT:

 5    Q.   Mr. Chamblee, I have a few questions --

 6    A.   Yes, Your Honor.

 7    Q.   -- that I'll ask.  You're still under oath?

 8    A.   Yes, sir.

 9    Q.   And after I finish, the United States will be able to

10    follow up based on the questions that I ask, and so will

11    Hinds County.

12    A.   Okay.

13    Q.   All right.  I believe your testimony was that you began

14    to work on this project if you -- and I'm going to call it a

15    project.  Benchmark was hired by the County beginning

16    January 2020; is that correct?

17    A.   Yes, Your Honor.

18    Q.   Okay. All right.  And what was Benchmark's understanding

19    as to what task it was supposed to perform?

20    A.   Well, we were -- my understanding was that we were trying

21    to help them out with the physical plant or the buildings,

22    RDC, JDC, to get them out from under the consent decree, and

23    the stipulated order is what they were asking for in the

24    stipulated order.

25    Q.   Okay.  And you were -- you were asked, had Sheriff Jones,
```

1    for example, I believe one of the final questions, had Sheriff

2    Jones instructed you or given you instructions on changing --

3    not changing work orders but directing you to do -- I can't

4    remember the question, but it was -- I think you were asked if

5    Sheriff Jones was asked -- reassigned certain projects to you

6    or something to that effect?

7    A.   Yes, sir.

8    Q.   I mean, do you recall the question?

9    A.   Yes, sir, I do.

10   Q.   Okay.  And do you recall what that question was?

11   A.   Something that Sheriff Jones directed me in doing

12   anything as far as stopping work?

13   Q.   Right.  Stopping work or the priorities or whatever?

14   A.   Yes, sir.

15   Q.   And stopping work.  And your answer to that was?

16   A.   No, sir.

17   Q.   No?

18   A.   Right.

19   Q.   So January of 2020, there have been a few other sheriffs

20   in place.  Have any other sheriffs -- would your answer to

21   that question that was directed as to Sheriff Jones, if that

22   answer were asked about any of the other two sheriffs, what

23   would your answer be?

24   A.   No, sir.

25   Q.   Who did Benchmark get its instructions from as to what

1  order the priorities should be taken?

2  A.   Well, in 2020 when we first started, I went through and

3  made my own priority list, and I pretty much was dealing with

4  Major Fielder, Rick Fielder at the time, and Ms. Collins who

5  was the County administrator at that time.

6  Q.   Okay.  And that's Ms. Jennifer Riley-Collins?

7  A.   Yes, sir.  Yes, Your Honor.

8  Q.   So you dealt with Fielder?

9  A.   Yes, sir.

10  Q.   He was the jail administrator at that time; correct?

11  A.   Yeah, he was -- he was the interim jail administrator and

12  then he became the jail administrator in the summer of 2020.

13  Q.   Okay.  So who do you take your instructions from today?

14  A.   I have not met the new jail administrator yet.

15  Q.   But you expect to be directed in what you need to do by

16  the jail administrator?

17  A.   Yes, Your Honor.

18  Q.   Okay.  Do you also expect the County administrator to be

19  involved in any way?

20  A.   Yes, Your Honor.

21  Q.   Okay.  All right.  And I think your testimony was that

22  Benchmark rarely had to do any work, and I think you

23  identified three specific areas that you worked, that you did

24  the workstations in B-Pod, Benchmark did?

25  A.   Yes, Your Honor.

1  Q.   Benchmark did something with the glazing of the windows

2  in B-Pod?

3  A.   Correct.

4  Q.   And removed trash in C-Pod?

5  A.   Correct.  We had a welder come in.  I got a welder that

6  works for me.  He came in and cut open the doors and welded

7  and sealed them back.

8  Q.   Sealed them back.  Are those -- are they still sealed?

9  A.   Yes, Your Honor.

10 Q.   So they're not capable of being used to house inmates

11 then, are they?

12 A.   No, they're not.

13 Q.   And I know you testified earlier about all the different

14 jails throughout the state in Panola County.  I think you

15 mentioned as many as 18 --

16 A.   Yes, sir.

17 Q.   -- to 20 facilities that you worked at?

18 A.   Yes, sir.

19 Q.   Any other facilities have cell doors which were welded

20 shut?

21 A.   There is a facility down in Lincoln County.

22 Q.   Okay.  Of the ones that you -- of the 18 or 20 that

23 you've worked in, you've only seen one where cell doors were

24 welded shut?

25 A.   Yes, Your Honor.

```
 1   Q.   So you would not think that would be a common thing;
 2   right?
 3   A.   No.
 4   Q.   With respect to the cells being used for storage of
 5   trash, because that's what they were used for; right?
 6   A.   Yes, Your Honor.
 7   Q.   How common have you seen that done?
 8   A.   I haven't, Your Honor.
 9   Q.   You haven't?
10   A.   No, sir.
11   Q.   Now, when you work in these -- I think you testified
12   A-Pod is under -- either under current renovation or was at
13   one time, and when you-all are performing your work there --
14   and if I got the pod wrong, just correct me.
15   A.   Okay.
16   Q.   But when you-all are working in there, the detainees are
17   moved to the recreational area?
18   A.   Yes, Your Honor.
19   Q.   How long is your work day?
20   A.   Well, the -- the work that we had to do didn't take a
21   full day to do.  We -- the only thing that we've had to do in
22   those pods, we repaired some duct work to get the air
23   conditioning going, but -- and other than the -- when we went
24   in there to do trash or the doors that we had to change to
25   swing doors.
```

1    Q.   But during the time that you did that work --

2    A.   Right.

3    Q.   -- how long did it take?

4    A.   I want to say that the longest that we were in there

5    working at one time is when we were in there working on the

6    doors and converting a few doors to swing doors and some of

7    those inmates were moved to another unit and some of them were

8    put outside.

9    Q.   And when you say "put outside," the recreation area --

10   A.   In the rec yard.

11   Q.   But the recreational --

12        THE COURT:  I'm sorry.  Candice, I apologize.

13        THE REPORTER:  It's okay, Judge.

14   BY THE COURT:

15   Q.   -- area is outside, is it not?

16   A.   Yes, Your Honor.

17   Q.   Is it covered?

18   A.   Yes, Your Honor.

19   Q.   It is covered?

20   A.   Yes.

21   Q.   But it's outside between the two units?

22   A.   Yes.

23   Q.   Okay.  So if it's raining when y'all were doing the work,

24   the detainees would not be rained on?

25   A.   Correct.  And we didn't schedule anything when it was

1   raining.

2   Q.   Okay.

3   A.   We only scheduled when it was a clear day.

4   Q.   Now, when you came on in January of 2020 to begin --

5   well, were you given a copy of the stipulated order?

6   A.   Yes, Your Honor.

7   Q.   Okay.  And did you use it as an opportunity to go around

8   and see what all needed to be done?

9   A.   Yes, Your Honor.  I was -- I got the consent decree and

10  the stipulated order, and that's how I performed my list.

11  Q.   Okay.  And on that first day, what did -- what did you

12  have to do to inform yourself of what was needed to do what

13  was needed on the list?

14  A.   I'm sorry, sir?

15  Q.   Okay.  At some point in time, you were given the list.

16  It could have been before you arrived there.  I don't know.

17  It could have been the date that you arrived.  But upon

18  getting the list, what did you do?

19  A.   Well --

20  Q.   What did Benchmark do?

21  A.   Well, I immediately started negotiating the contract with

22  CML and Hinds County.  We had a lot that was going on the

23  first three or four months that we were hired, and I was

24  communicating a lot with Ms. Collins at that time.  You know,

25  we had those classrooms that we were doing at Henley-Young.

1    We were trying to get the contracts settled between CML and

2    Hinds County.  We were working on the main items that were in

3    the stipulated order.  That's -- that was our priority because

4    they had a time limit on them.

5    Q.   Okay.  And you said the first three or four months you

6    were negotiating contracts?

7    A.   Right.  Negotiating the contract between CML and Hinds

8    County or the vendor that we purchased -- they purchased the

9    trailers, getting electrical to the trailers, getting

10   plumbing, getting sidewalks done, removing fence, putting up

11   fence.  I spent time on -- when we first were hired, they

12   had -- they had a contract with the fence company, but the

13   fence that they were going to install wasn't going to -- it

14   wasn't going to help them anyway.  So we sat down and

15   developed a layout for the fence so that they could use the

16   fence to contain the inmates instead of just throwing up a

17   fence.  It's just a little planning.

18   Q.   And what did you learn about that fence?  I mean, I guess

19   its good to mention that.  When was that fence that you had

20   learned about-- that was set to go in place, I presume?

21   A.   Yes, sir.

22   Q.   It was set to be built; right?

23   A.   Yes, sir.

24   Q.   Okay.  When was that fence set to be built, if you know?

25   A.   Like I said, they already had a contractor purchase order

1    when we were hired, but when I looked at what they were doing,

2    I didn't see how it was going to benefit them.  So we just

3    relaid out the fence so that they would be able to get the

4    best bang for their buck, I guess, you know, be able to use

5    the fence accordingly instead of the way it was originally

6    laid out.

7    Q.    Okay.  And when you say you don't believe it would have

8    benefited them --

9    A.    That's correct.

10   Q.    -- tell me what that means.

11   A.    Well, it wasn't going to serve any purpose as far as

12   keeping the inmates in.  So what I did is I sat down and I

13   went with the fence contractor and we laid it out so that they

14   could use the fence.  If they had an emergency, a fire or

15   something like that, they could let the inmates out of the

16   pods and still keep them in a contained area instead of

17   running wild throughout -- you know, if you've ever been to

18   the facility, it's a pretty big area around the jail that's

19   fenced in, and this way we were able to keep them contained

20   more.

21   Q.    Any reason to believe that had you not started on your

22   job in January 2020 that that fence would have not been built

23   like they had ordered it to be built?

24   A.    It probably would have been built the way they originally

25   thought it was, yes, Your Honor.  We did change it --

1    Q.   Okay.

2    A.   -- when we were hired, yes, sir.

3    Q.   Any other changes that you thought were necessary based

4    on your objective review that started in January of 2020?

5    A.   Well, just working with the administrator or the wardens,

6    that's -- that's where I get my ideas, is when you've got an

7    administrator and you have to look at these and say, "Okay.

8    What's your plans?  What do you think you need?"  And then I

9    can help them out then.

10   Q.   Okay.  And when you say "an administrator," are you

11   talking about the jail administrator --

12   A.   Yes, Your Honor.

13   Q.   -- or you talking about the County administrator?

14   A.   Yes, Your Honor.

15   Q.   The jail administrator?

16   A.   Yes, Your Honor.

17   Q.   Okay.   All right.   Now, are there any existing plumbing

18   problems at RDC?

19   A.   Well, there -- you know, just -- other than your -- like

20   I said, we've got the secondary water pump coming back online

21   here in the next couple of weeks, but just normal toilet

22   stopped up, water leaks here and there.  They had a major leak

23   in the kitchen when we first came on from that steamer, they

24   had a boiler in there.  It was pretty hazardous.  But they

25   did, they shut the boiler down.  We put in gas kettles instead

1    of steamer kettles and stuff.  So I feel like, you know,

2    they've got -- they're approaching the hazards as they see

3    them.

4    Q.   And there's been some questions about sprinklers and

5    issues with some of the facility not having sprinklers?

6    A.   Right.

7    Q.   Based on your experience with having worked at other

8    facilities, do you think it's dangerous not to have sprinklers

9    in a place that houses so many people?

10   A.   Well, to be honest, Your Honor, I don't know at the time

11   the building was designed if that -- you know, you will need

12   to ask somebody if that was the code or not.  But all of our

13   facilities have sprinklers.

14   Q.   All of your what?

15   A.   Facilities have sprinklers.

16   Q.   The ones you've worked on?

17   A.   Yes.

18   Q.   The last 18 or 20 of them?

19   A.   Yes, Your Honor.

20   Q.   How far back was the oldest one built?

21   A.   1999, 1998.

22   Q.   Okay.  When you came on to the job in January of 2020,

23   looking at the facility on your first day, whatever day that

24   was, based on what you saw, is it likely -- is it likely that

25   all that needed to be done occurred no later than

1   December 2019?

2   A.   All that needed to be --

3   Q.   All that needed to be done the day that you came on to

4   the job, would you say that the work that needed to be done

5   all happened December 2019?  You came on in January of 2020,

6   right?

7   A.   Yes, Your Honor.

8   Q.   My question is:  Did it -- I know you don't know when it

9   all started, but did it appear that what needed to be done all

10  happened the month before?

11  A.   It was hard for me to tell, but as far as the

12  deficiencies, yes, it was done before 2020.

13  Q.   Done before 2020?

14  A.   Yes, Your Honor.

15  Q.   Some of the deficiencies done in your estimate before

16  2019?

17  A.   Can I -- and when you're asking me, what exactly are you

18  referring to was done?

19  Q.   I'm talking about all the things that you're having to

20  fix starting in 2020?

21  A.   Yes, Your Honor.

22  Q.   You were given a list of priorities.

23  A.   Oh, yes, Your Honor.

24  Q.   Do you believe that all of those priorities only came to

25  be the month before?

```
 1   A.   Oh, I don't believe so, no, sir.

 2   Q.   I mean, like you say, there was something wrong with the

 3   roof, for example; right?

 4   A.   Yes, Your Honor.

 5   Q.   Is it likely that whatever was wrong with the roof had

 6   been wrong with the roof for more than 30 days?

 7   A.   Yes, Your Honor.

 8   Q.   Okay.  So let's go back 30 days or 60 days?

 9   A.   It appears they had had a problem for a long time.

10   Q.   Okay.  That's all I'm just trying to figure out.  In

11   other words when it came to you, to try to get it fixed, a lot

12   of the stuff needed to be repaired for a long time.  Would

13   that be correct, based on your working with people around

14   there and hearing and/or seeing things?

15   A.   Yes, and there's -- there's a difference between

16   maintenance items that probably needed to be done --

17   Q.   Right.

18   A.   -- and items such as the fire alarm system, or the -- you

19   know, getting the fire sprinkler system up.  I could see where

20   the roof would be an ongoing issue throughout its lifetime.

21   It would, you know, just like any roof, any roof on your

22   house, you're always going to have to do maintenance on it and

23   stuff.  But as far as addressing stuff like the fire alarm

24   and, you know, the problems that they had with the -- I mean,

25   that could have been done -- you know, started earlier, yes,
```

```
 1   sir.
 2   Q.   It could have been started earlier?
 3   A.   Yes, sir.
 4   Q.   2019?
 5   A.   Sure.
 6   Q.   2018?
 7   A.   Sure.
 8   Q.   2017?
 9   A.   From whenever it was, deemed you know, inadequate.
10   Q.   Based on -- you've indicated that you have things coming
11   in.  You have work orders in place.  There are some other
12   things that need to be done; is that correct?
13   A.   Yes, Your Honor.
14   Q.   All right.  Will they all be fixed by July of 2022 in
15   five months?
16   A.   I do not know, sir.  I do not know.
17   Q.   Can they all be fixed by July 2022?
18   A.   And, again, it would have to -- if you're talking about
19   adding a fire sprinkler system or things like that --
20   Q.   I'm talking about the things on your stipulated order
21   that the County has -- the County has told you the things in
22   the stipulated order are what your priority is; right?
23   A.   Right.
24   Q.   Will the priority items as you see them, can they all be
25   done by July of 2022?
```

1   A.   It will be close but, Your Honor, but the majority of the

2   items in the stipulated order have been done.  It's the

3   consent decree I'm working on now.

4   Q.   It's the consent decree you're working on now?

5   A.   Life safety issues.

6   Q.   Life safety issues?

7   A.   Yes, Your Honor.

8   Q.   Will all those be done by July of 2022, those in the

9   consent decree, the things you deem life safety issues?

10  A.   At this time I'm not able to say that they will be done.

11  Q.   I think you testified earlier about lights.  And I just

12  want to -- are there working lights in each of the cells in

13  all of the pods where there are detainees kept?

14  A.   No, sir.  In A-Pod there's not.

15       THE COURT:  Thank you, Mr. Chamblee.  I have no further

16  questions, but I do turn to the United States to see if they

17  have any follow-up based on the questions that I've asked.

18       MR. CHENG:  I have no questions, Your Honor.  Thank

19  you.

20       THE COURT:  Hinds County?

21       MR. MORISANI:  Your Honor, if I may briefly confer just

22  one second.

23       THE COURT:  Yes, you may.

24       MR. MORISANI:  Your Honor, we have no further

25  questions.

```
 1          THE COURT:  All right.  Thank you, Mr. Chamblee.  You

 2   may step down and return to whatever duties you need to return

 3   to at 4:20 in the afternoon.

 4          THE WITNESS:  Thank you, Your Honor.

 5          THE COURT:  All right.  Who is the County's next

 6   witness?

 7          MR. MORISANI:  Your Honor, we would call Rob Farr.

 8   Your Honor, may I place a --

 9          THE COURT:  Yeah.

10          MR. MORISANI:  -- a stack of these?

11          THE COURT:  Right.  Place your left hand on the Bible

12   and raise your right hand.

13          (Whereupon, the witness was placed under oath.)

14          THE COURT:  You may remove your mask to testify.  So I

15   just ask that you speak loudly and clearly enough for the

16   court reporter to hear you and speak at a pace at which she

17   can keep up with you.  Please allow, sir, the lawyers to

18   finish their questions, and Mr. Morisani is going to slow down

19   a little bit so that the two of you won't be speaking at the

20   same time because it makes it difficult.  And if you're going

21   to nod or shake your head in response to questions, just give

22   me a verbal response as well, but to start this process off,

23   would you please state and spell your name for the record?

24          THE WITNESS:  Robert Earle Farr, II.  Robert,

25   R-o-b-e-r-t, Earle, E-a-r-l-e, Farr, F-a-r-r, and II.
```

```
 1              THE COURT:  Thank you, sir.  You may proceed,
 2    Mr. Morisani.
 3              MR. MORISANI:  Thank you, Your Honor.
 4                        ROBERT EARLE FARR, II,
 5                 having been first duly sworn, was examined and
 6    testified as follows...
 7                        DIRECT EXAMINATION
 8    BY MR. MORISANI:
 9    Q.   Mr. Farr, where are you employed?
10    A.   I'm employed at Cooke Douglass Farr Lemons Architects
11    Plus Engineers, PA.
12    Q.   Can you agree as we go through today the examination, if
13    I refer to CDFL, I'm referring to Cooke Douglass Farr?
14    A.   I certainly would agree.
15    Q.   And if you would, please tell the Court what CDFL does.
16    A.   CDFL is an architectural engineering design firm based in
17    Jackson.  We provide architectural and engineering development
18    for the built environment.
19    Q.   And what kind of experience does CDFL have with respect
20    to detention facilities?
21    A.   The firm and myself, for the last 46 years, has been
22    involved with correctional facilities that started with the
23    development of the Central Mississippi Detention Center at
24    Whitfield.  We were a part of the master planning group and
25    part of the implementation for the architectural and
```

1    engineering development for that center.

2        We also provided the design, strategy and development for

3    the South Mississippi Correctional Facility for the State of

4    Mississippi along with our other team members, and we were

5    part of the design and development team for the federal

6    facility at Yazoo City.

7        We have also provided design services, both planning and

8    strategic in construction period services for 13 county

9    justice facilities in the state of Mississippi from --

10   covering from the Delta through the Coast and up into

11   Arkansas.

12   Q.   And I guess, what is your role with CDFL?

13   A.   I'm a senior managing principal.  I'm a design

14   strategist.  I also provide quality control review and cost

15   estimating.

16   Q.   And when did CDFL first became involved with Hinds County

17   as it relates to the Raymond Detention Center?

18   A.   We were asked to be part of the team that was being

19   assembled by the County in response to the stipulated order in

20   December 2019.  Our first engagement with the County was in

21   January of 2020 to answer the requirements of the stipulated

22   order.

23   Q.   Did the County first contact CDFL in December of 2019?

24   A.   2019 was the initial discussions in conjunction with our

25   partner Benchmark Construction as construction manager.  We

1    were working together to assist the County in addressing the

2    requirements that were outlined in the stipulated order.

3    Q.   And what role did CDFL ultimately take up with the County

4    as it relates to the stipulated order?

5    A.   The initial commission was to act as the architectural

6    corrections consultant for the work specified in the

7    stipulated order as per the stipulated order's requirements

8    and working in conjunction with the construction manager to

9    outline the requirements beyond and including the stipulated

10   order that would be required for the repairs at Raymond

11   Detention Center.

12   Q.   And did it also -- well, I guess, is it safe to say that

13   CDFL has been working with the County since January of 2020?

14   A.   Yes, we've been engaged with the County on an ongoing

15   basis since January of 2020.

16   Q.   Now, are you the only person from CDFL that's working

17   with the County?

18   A.   No.  Our entire architectural and engineering team has

19   had opportunities to support the County's endeavors.  That

20   includes my son, Robert Earle Farr, III, AIA, who is an

21   architect, our engineering staff, Jessie Browning, PE, our

22   electrica l, and Ben Fulton for mechanical.  We also have

23   engaged our construction administration group, Rob Herald, and

24   another senior partner, Chris Myers, AIA, as part of the

25   service to the County.

1   Q.   Now, when you hear the phrase "master plan" and I think

2   you may have used it as well describing some of the prior work

3   that CDFL had done, what does that phrase "master plan" mean

4   to you?

5   A.   Well, the general concept of master planning is to

6   provide analysis of the needs, identify the requirements and

7   offer options to meet the requirements that have been

8   developed as the plan is unfolded.  So the concept of planning

9   is to establish a direction that a progressive and appropriate

10  approach would be taken to meet a specific need.  The concept

11  to master in that regard would be an overarching approach

12  toward linking all of the requirements together and providing

13  optional directions for that development.

14  Q.   And in this situation the plan is being prepared for

15  Hinds County; correct?

16  A.   Yes, as part of the stipulated order, there was a

17  requirement for the County to enter into a master plan for the

18  detention system.

19  Q.   And I take it CDFL has experience developing such plans?

20  A.   CDFL has experience.  I personally have had experience in

21  that regard, but in the particular needs of the detention

22  master planning, we reached to an ongoing relationship that we

23  have with HDR, which is a national/international design

24  organization based in Omaha, Nebraska.  We have had an ongoing

25  relationship with their detention group out of Dallas, Texas,

1    and so we asked them to be part of the dialogue because they

2    brought an expansive knowledge of not only the current

3    requirements of the ACA, American Criminal Association, and

4    the development of best practices but they offered access to

5    the ability to do data analysis of the County's population,

6    its incarcerated population, and process of dealing with our

7    needs for medical and mental health.

8    Q.   And I appreciate you mentioning that.  One thing I wanted

9    to just clarify, in your response you said "the ACA."  That's

10   the American --

11   A.   -- Correctional Association, yes.

12   Q.   -- Correctional Association.  Now, so HDR was brought in.

13   Was anyone else brought in in addition to CDFL and HDR for the

14   design issues?

15   A.   We have -- let me look at my -- I can't remember the

16   gentleman's name, but --

17   Q.   Sure.  That's exhibit --

18   A.   -- also part of the team was Mark Martin from MJM who

19   consulting on staffing.

20   Q.   So as part of the -- well, now, I guess, as part of this

21   process, has a master plan been developed for Hinds County?

22   A.   Yes, the team provided the master plan from the

23   beginning, meeting in April of 2020, and submitted the initial

24   draft for the County's review in December, November/December

25   of 2020 when the board then -- the Board of Supervisors

1  adopted the master plan January 15th of 2021.

2  Q.   And I take it when the Board adopted it, that's where we

3  find the master planning report.  I think I laid an exhibit

4  there.  It's below your folder.  It's there.  There's an

5  exhibit in there if you could just state it for the record.

6  A.   This is the Final Jail Master Plan Recommendations as

7  adopted by the County dated January 15, 2021.

8  Q.   And that's PX-33 just for the record; correct?

9  A.   (Nods affirmatively.)

10 Q.   Now, I guess, can you talk a little bit about what the

11 purpose was for that report?

12 A.   The master plan was outlined in a series of five steps.

13 It was developed about best practices and planning goals where

14 we state the concept of how the County should pursue in

15 integrating the national best practices and developing

16 standards that would allow that to be achieved.  It had an

17 assessment of current facilities as part of the overall

18 development, looking at what the three current detention

19 centers were functioning like at the time and how were they

20 comprised.  It had a capacity and needs analysis where we were

21 looking at the demographics of the County, the incarceration

22 rates within the County itself, and the detention capacities

23 of the existing facilities.  It had a facility program

24 development where we were looking at what would be needed to

25 meet those capacity requirements in the future, and we were

1   looking at a 25- to 30-year horizon.  So we're looking at how

2   the County's detention system could develop to meet the needs

3   of the community and looking forward into that horizon, and

4   then we developed a series of options as to directions the

5   County could take to meet those recommendations.

6   Q.   And with -- now, I understand, if I heard you correctly,

7   that there was an assessment of the existing facility;

8   correct?

9   A.   Yes.  Part of the planning effort was to assess the

10  existing facilities to determine their capacity, conditions,

11  and methodologies to meet the projected requirements of the

12  detention system itself.

13  Q.   And when you say "facilities," just so that the record is

14  clear, would that have included the Raymond Detention Center,

15  Henley-Young, and then at the time was being used, Jackson

16  Detention Center?

17  A.   There were actually four areas of interest which you've

18  already indicated, the Raymond Detention Center, the work

19  center, the Jackson Detention Center, and Henley-Young as the

20  juvenile center.

21  Q.   Now, in addition to that assessment, there was also -- I

22  think you mentioned there was planning regarding a new

23  facility; is that correct?

24  A.   Well, the intent of it was to explore the viability of

25  either reinvesting in the existing facilities or the potential

1   for creating a replacement facility.  Any time you're

2   operating in the adult population three detention centers, you

3   are not effectively meeting the needs of your staffing

4   requirements because of the cost implications.  So one of the

5   arrangements was what would be involved if you could

6   consolidate the three into a single facility.  It's also a

7   consideration due to the uniqueness of having the Raymond

8   Detention Center and the work detention center 18 miles from

9   the demographic center of the community, adding additional

10  travel time, staff time, and cost that would -- is required to

11  manage the current facilities.

12  Q.   Now, with respect to -- well, I guess, one question,

13  follow-up question about what you just mentioned.  It sounds

14  like it would be more difficult to operate three separate

15  adult facilities rather than just having them consolidated in

16  a single facility; is that correct?

17  A.   Well, that was the analysis of the plan is that there was

18  not -- the efficiencies were lost in managing three

19  facilities.

20  Q.   Now, with particular regard to constructing a new

21  facility, what did the report provide?

22  A.   The report recommended that the most effective way to

23  meet the requirements of the detention system for Hinds County

24  would be to develop a new facility that could be used -- could

25  be developed in stages that would allow for the consolidation

1   to a single facility.

2   Q.   Did it provide for any sort of, I guess, any number of

3   options for the County to consider with respect to a new

4   facility?

5   A.   The plan put forth four options for consideration that

6   went all of the intent of eventually being able to

7   consolidate, but the options included a major rebuild of the

8   Raymond facility which would be problematic because of the

9   issues that were developed in the facility analysis to the

10  creation of a -- what's being referred to as a central

11  detention center that would be closer to the demographic of

12  the County inside the city limits of Jackson.  That would

13  allow for a much more cost effective and timely management of

14  detainees and intake and release.

15  Q.   And as far as the -- I want to talk more about the option

16  that the County ultimately chose, but before we do that, what

17  impact, if any, did COVID-19 have on developing the master

18  plan?

19  A.   Well, COVID-19, of course, had an impact on all

20  development on every activity of our collective lives, but it

21  did impact us in the ability to have access to the exiting

22  facilities.  The impact is we had several instances where the

23  sheriff's staff was in quarantine.  We had instances where the

24  monitors were unable to make site visits because of COVID.  So

25  we had no face-to-face activity even with the monitors or the

1    Department of Justice during that time frame.  But it did

2    impact the review, development and strategy timeline.  I think

3    we overcame that over time by maximizing the availability of

4    technology and to address how we could move forward without

5    having the ability to do it face to face.

6    Q.   And thinking of moving forward, ultimately was a master

7    planning committee created?

8    A.   The stipulated order required a master planning committee

9    to be part of the overall planning process, and, yes, the

10   committee was formed, COVID did have an impact on the ability

11   of the committee to act as a whole.  We had quite a bit of

12   change of personnel during the development of the master plan.

13   We had the untimely death of the sheriff.  We had an interim

14   sheriff appointed for that period of time, but we did manage

15   to work successfully with all the parties that we would need

16   to have access to their information.

17   Q.   Now, you've talked a little bit a moment ago about an

18   assessment of the existing facilities, and I want to sort of

19   bore down into those assessments just a little bit.  What

20   problems, if any, were identified during the functional

21   assessment of RDC?

22   A.   Well, there are a plethora of them within the development

23   of the review.  Many of the initial ones were established in

24   the stipulated order, and we were, you know, charged with

25   validating the ability of the County to meet those

1   requirements.  Many of those were dealt with the security

2   operations, the ability to manage the cell doors, protecting

3   the core section of the housing units by changing the sliding

4   doors out to swing doors.  Those were security components that

5   were based in the hardware aspects of it.

6       We also discovered there were operational problems within

7   that management where we had inadequate capacity in the

8   control boards and they had been to be upgraded for the

9   electronic controls and that was based in C-Pod, which there

10  were three pods in the Raymond Detention Center known as

11  Alpha, Bravo and Charlie.  Alpha was in operation, and Bravo

12  was in operation.  At the time we started the assessment,

13  C-Pod, Charlie, was actually in the state of repair and

14  undergoing renovation.

15      So we dealt with those items.  We dealt with the -- we

16  looked and evaluated the life safety requirements of the

17  facility, which had been damaged in subsequent previous inmate

18  disturbances, and we evaluated how we could bring the fire

19  detection and smoke detection systems up to operational

20  integrity.

21      We looked at the ability to bring the CCT, the closed

22  circuit television controls, up to operational integrity

23  inside of the overall complex, and we went beyond that in our

24  analysis of starting to understand how the building's

25  infrastructure was functioning, and there are many issues

 1    within the building's actual infrastructure.  The air

 2    conditioning system, the ventilation system, the electrical

 3    system, the lighting system.

 4         The Raymond Detention Center was at its end of usable

 5    life without significant investment, and maintenance had been

 6    an ongoing concern and systematic problem for keeping the

 7    systems operating.  You add, too, the inmate impact on the

 8    facility, and you had a whole series of infrastructure

 9    concerns.

10         We have plumbing leaks, plumbing concerns where we have

11    flooding.  We have systemic problems within the original

12    construction of the facility.  The exterior walls are not

13    grouted.

14         The roof has been problematic, water intrusion for a long

15    period of time causing concerns for environmental elements of

16    mold and mildew collection for that, and ability to meet the

17    requirements of just quality housing were a challenge in the

18    existing pods.  When you go into the support areas of the

19    facility and there were --

20    Q.   Before we jump into the support areas, before we leave, I

21    want to stay in the housing units for a moment.  You mentioned

22    something.  I just wanted to see if you can elaborate.  You

23    mentioned systemic problems with the construction.

24    A.   Yes, sir.

25    Q.   What -- if you could just enumerate those problems, what

1  are we looking at there?

2  A.   Well, the facility was built or occupied in '94.  The

3  access to -- well, a couple of major areas, the perimeter

4  walls are not grouted, meaning there are concrete masonry

5  units that are open cell concrete block.  The cells were not

6  grouted.  So there's not a consistent structural wall for the

7  ability to actually penetrate the perimeter wall and exit the

8  facility is possible.

9       The roof itself was a pre-engineered metal structure and

10  was not joined to the other adjacent wall structures.  So we

11  were having water intrusion at the perimeters of the wall and

12  roof junctions, accompanying that.  Those are systemic.

13  They're really not correctable without rebuilding in the

14  process.

15       We found where we had grout in the original construction

16  had been placed in some -- by mistake hopefully, placed in

17  some of the drainage systems.  So we had consistent backup of

18  that, and they were unable to clean those out for proper

19  function for them.

20       The mechanical system, as far as the original design, you

21  would access all of the air handling units from the housing

22  pods, and you had no real access to plumbing chases as opposed

23  to contemporary design for those.  So anything that broke, you

24  had to enter into the housing units to address them to clean

25  them out, unstop things that get stopped up.

1   One of the more difficult elements was the ability to

2   manage and maintain the air handling units that provided the

3   environmental controls within the pods because they were

4   inside of the pod security area causing concerns for their

5   maintenance and activity.  In fact, there had been times we

6   had identified where detainees had actually gotten into the

7   mechanical systems and had a bit of destruction to them.  So

8   these are systemic, organizational pieces that are based on

9   the layout and original design of the building.

10  Q.   Is it safe to say that that original design was poor?

11  A.   It is not contemporary to today's requirements or needs.

12  So, yes, I think you could make the analysis the original

13  conceptional development of the facility in 1992 to 1994 had

14  some systemic flaws in it, yes.

15  Q.   Now, you mentioned, too, plumbing issues.  I think you

16  mentioned mechanical system issues, electrical system issues.

17  These were all things -- I guess, how were these things

18  identified?  Was there an assessment done on those systems as

19  well?

20  A.   We provided an assessment working with the jail staff who

21  knew many of these ongoing concerns.  It had also been

22  significant destruction in the 2012 incident with the

23  detainees that had actually destroyed some of the building

24  systems and they had been replaced, but they were then

25  vulnerable to additional disruption if not managed correctly

1  forward.

2      We discovered the fire detection system was not

3  functioning in all areas.  We discovered that there was a loss

4  of lighting in some of the pods where light fixtures had been

5  removed, security light fixtures had been removed and not

6  properly replaced.  So there was some continual system-related

7  struggles that the center was undergoing.

8  Q.  And were these -- you know, these issues regarding

9  mechanical, electrical, plumbing, the CCTV, the closed caption

10  TV, were they all part or, I guess, uncovered during the

11  physical plant assessment that's discussed in the master

12  planning report?

13  A.  They were defined and annotated in the master plan

14  effort, yes.

15  Q.  And you also talked -- I think when we got going with all

16  this, I think you talked about issues with just the layout and

17  the capacity.  I guess, were there any issues related to the

18  intake and release area of the facility?

19  A.  There certainly are.  There are concerns about the

20  current design for security, the intake in the booking side is

21  open.  In fact, some of them were actually pointed out in the

22  stipulated order where the booking cells are not in direct

23  supervision of the booking counter, not providing direct

24  visual access to people who are being processed.  There are

25  concerns that the central control is embedded in the

1   initial -- in the central booking section where -- without

2   proper security sally ports in place.

3       So there is a potential for a loss of control by someone

4   who entered the central control from the booking before they

5   had been properly classified and triaged, coming in.  So those

6   were concerns for the structure.  So the overall plan itself

7   is inherently flawed, in our opinion, based on contemporary

8   standards where that proper management can't be negotiated

9   without significant, if not just complete rebuilding of that

10  section of it.

11      The general support areas were also reviewed.  The

12  medical clinic or medical area in contemporary time is

13  undersized and was not actually being totally utilized at the

14  beginning of this analysis.  The kitchen and support for food

15  service and laundry were in need of significant investment and

16  repair to bring them online.  Those were brought forward in

17  the facility analysis.  Many of those were in process by the

18  County's maintenance people in trying to address those, but we

19  were able to explain how that could be effected to it.

20      We also discovered sections of the fire suppression

21  system that were not indicated in the stipulated order that

22  needed to be updated and put it back into function.  And the

23  fire suppression system operates in the support areas of the

24  facility under the B occupancy as opposed to the I occupancy

25  under the code, and those were discovered to be nonfunctioning

1    at the time and efforts were made to bring those back online.

2    Q.   And can you just explain the B versus the I?  Is that --

3    A.   I is institutional occupancy under the current

4    international building code where you'd -- housing and

5    sleeping.  B is an office building fundamentally.  So medical

6    clinics, officing, food service, those fit under the B.

7    Intake and release and booking fit under the B.  So you're not

8    in a 24-hour situation in those.  From the code standpoint

9    those are the two primary divisions between the overall

10   development of the facility.

11   Q.   And these -- is it fair to sort of -- well, I guess, was

12   there any issue with classification and housing under the new

13   classification policy when we're looking at the RDC?

14   A.   We expressed the opinion in the analysis that the

15   facilities did not allow for the operations of the detention

16   system to utilize their classification properly, that you did

17   not have clear and manageable separation between the different

18   classifications of detainees, that you didn't have the

19   flexibility that you would desire to be able to separate high

20   risk from minimum risk to low risk, from medical concerns to

21   behavioral concerns, that the existing plant did not have the

22   flexibility to allow for the classification to be properly

23   utilized.

24   Q.   And were these issues, the food service area you

25   mentioned, intake, release, classification, the capacity

1    issues, the layout, were these all issues that were identified

2    in the functional assessment that's contained in the master

3    planning report?

4    A.    In both the functional assessment and the operational

5    component, yes.

6    Q.    Now, Mr. Farr, is continuing to use the RDC a viable,

7    long-term option for the County?

8    A.    In the opinion of the team, as we'd produced the plan

9    that the sustainability of RDC without really rebuilding it

10   completely was not sustainable, that the contemporary

11   requirements of best practices were not easily or even

12   potentially manageable within the confines of the existing

13   building at the Raymond Detention Center.

14   Q.    And can some of those systemic problems that we talked

15   about a moment ago, can they be solved at RDC?

16   A.    Virtually everything can be addressed, but it would take

17   a complete rebuilding in our opinion of the housing pods to

18   accommodate the best practices that would be brought forward,

19   and that would literally be taking them down and rebuilding

20   them.

21   Q.    And you talked earlier about the location of the

22   facility.  If you did that, if you rebuilt the facility, that

23   location's not going to change; correct?

24   A.    We did express significant concerns about the efficiency

25   of the location and how that added additional strain on both

1    the staffing time and cost to manage the detention system, so

2    the location would not move in that situation.  So it did not

3    answer the question about how you would best provide a

4    consolidation of systems management.

5    Q.   And I want to sort of shift gears now.  We've talked

6    about RDC.  I guess, talk a little bit about what the County

7    is doing to address how it will safely and securely house

8    pretrial detainees in the long term?

9    A.   Well, the Board of Supervisors adopted what we referenced

10   as option two in the master plan, and I'll explain option two.

11   Option two is a staged development of a new facility.  The

12   intent was to locate it on land that they were leasing and did

13   lease from the Jackson Public School System, 16th section land

14   that's available undeveloped in an area that is properly zoned

15   for a detention center in an area that is easy access to the

16   demographic center of the community and easy access to the

17   interstate, easy access to the courthouses that are currently

18   located downtown in the CBD, Central Business District.

19        The option two envisioned this could -- this new facility

20   could be developed in stages.  We had determined that the work

21   center in Raymond -- and the stages are based on the capacity

22   and the ability of the County to fund a new facility at one

23   time, and so part of the option -- option A -- option one --

24   excuse me -- is basically build a new 722-bed facility on the

25   new site and do it at one time.

1    Option two conceptualizes creating a facility that moves

2    all operations of the detention system to the new facility and

3    provides up to 600 beds in that facility to allow for maximum

4    medical mental health classification, the intake, the release,

5    all centralized in one place, developed in one phase.  That

6    would allow -- that would leave the work center as an option

7    for the County to continue operating for a period of time.

8    Option two also envisions that eventually as quickly as

9    possible the facility would be expanded to complete the total

10    number of beds and the total operation so that it could be

11    consolidated in one location, that is the option the County

12    adopted and is currently pursuing in the development stages.

13    Q.   How many -- you mentioned there was a phase where you

14    would have -- and if I've got the number wrong, please tell

15    me.  There was a phase, I take it it's Phase 1 where you had

16    600 beds; is that correct?

17    A.   The original option two envisioned a Phase 1 that would

18    have 400 beds plus all the supporting required administrative,

19    management and medical mental health.  In the subsequent

20    development we've expanded that to look at a 600-bed facility

21    that would allow for a replacement of the 596 beds that are

22    currently provided at Raymond.

23    So the intent is in what we reference as Phase 1 to be

24    able to accommodate a facility that would allow for in as

25    quick a period of time as possible the closure of the Raymond

1    Detention Center.

2         To do that, we are currently projecting that to be done

3    in two construction phases.  We call it Phase 1A, Phase 1B,

4    and that is based on funding streams that would be in place.

5    We're looking at the construction start by November of 22 and

6    a construction completion of Phase 1A and 1B by June of '26.

7    But the potential interphase that we would be able to operate

8    the initial 200 beds and all of the operational components of

9    the facility in June of '25.

10   Q.   So that would be Phase 1A in June of --

11   A.   Phase 1A and Phase 1B.  Phase 1A will develop that

12   600-bed capacity, complete facility, only leaving the work

13   center as a flexible space for however the County's management

14   would like to use it until Phase 2 could be completed.

15   Q.   And when is Phase 2 projected to be completed?

16   A.   We would project Phase 2 to be another 18 months based on

17   funding stream.  So you would be looking into June -- January

18   of '28.

19   Q.   Okay.  So let me -- I want to make sure the record's

20   clear.  So by June 2025, the projection is 200 beds and all

21   administrative space at the new facility; correct?

22   A.   That's correct.

23   Q.   By June of '26, the projection is four -- I'm sorry

24   600 beds at the new facility?

25   A.   Including the medical and mental health component.

1    Q.   And then the completion would be January of '28 -- 2028

2    and you'd have 792 beds?

3    A.   792 beds is the total target for the facility, yes.

4    Q.   Now, I want to talk more specifically about some of these

5    areas in the new facility.  Let's start, I guess, with the rec

6    area.  Will the new facility have recreation areas for the

7    detainees?

8    A.   Absolutely, working with best practices under the ACA,

9    each housing unit will have its individual rec area that is

10   managed by detention staff in that housing unit and would

11   allow for flexibility within the overall management of the

12   structure.

13   Q.   What about the medical unit?  What are some of the

14   features of the new facility's medical unit?

15   A.   The medical unit is developed with three major

16   components, male and female mental health acute services, and

17   an infirmary that would actually act as the medical clinic.

18   All three of those are supported by a central clinical support

19   area where staff would be housed and be able to work

20   effectively to support the components of the medical mental

21   health section.  The infirmary would allow for both physical

22   and mental action, but the medical component is not a

23   hospital.  It is a triage clinic that would allow for services

24   to be provided detainees and evaluation in crisis for medical

25   components.

 1     The mental health area is viewed as an acute services

 2  section to use as an interdiction in crisis mode to allow the

 3  staff to stabilize individuals who are showing extreme mental

 4  difficulty, allowing that to be both treated in an open ward

 5  but also in an isolation section and basically hospital rooms

 6  to accommodate their needs on both the male/female side so

 7  that those are separated.

 8     The infirmary is developed in a modular way so that any

 9  individual room and sections could be used for male or female,

10  depending on how they entered into the infirmary to be able to

11  keep the sex component separated during any treatment areas.

12  Though, it's a significant impact on the ability of the County

13  to meet the medical and mental health needs of the detainees.

14  You know, you're going from four treatment rooms at Raymond to

15  24 treatment sections in the new infirmary, and you went from

16  no mental health capacity at Raymond to 24 on the male side

17  and 12 on the female side with a series of those being in

18  potential isolation sections.

19     The other capacity of that in the plan is to use the

20  housing units, and flexibility is important in this facet of

21  it because sometimes we're seeing as much as 40 percent of the

22  detainee population of having mental health component, mental

23  health issues, but to use the housing pods as stepdown areas

24  so that once people are stabilized, they would be able to be

25  placed in a safe and secure housing environment that would be

1    managed by the detention staff and not necessarily put back in

2    the general population.

3        So that's an approach when the overall concept of all the

4    medical and mental health needs of the facility would be an

5    enhancement, a dramatic change from the current structure.

6    Q.   Would the medical unit have an acute care clinic?

7    A.   Yes.  The acute components are actually set up inside of

8    the male and female mental health sections.

9    Q.   Okay.  How many beds are we talking about in the acute

10   care -- or I'll call it ACU?

11   A.   The ACU has a capacity in the plan for 24 on the male

12   side and 12 on the female side.

13   Q.   I guess, what's the bed capacity on the infirmary that

14   you mentioned?

15   A.   Infirmary is 24.  That's open ward and individual

16   isolation.  There is no isolation, like infectious disease

17   isolation in the current facility.  So the infirmary would

18   have the capacity as would the acute care centers to have

19   environmental isolation also at a critical point of medical

20   care.  So particularly in this time of COVID, you can actually

21   separate and isolate in proper airstreams.

22   Q.   Sort of switching back to the mental health unit, what is

23   the bed capacity in the mental health unit in the new

24   facility?

25   A.   The acute center -- well, the way the flexibility is

1   developed and the strategy is that you could take one of the

2   housing units which would be the single-story units that would

3   house between 48 and 60, depending on which housing unit you

4   chose, and be able to operate that as a mental health unit.

5   Q.   Okay.  So you could, I guess, in theory, you could have,

6   if you chose, a 60-bed unit and you could have 120 if you

7   chose two units?

8   A.   If the population required that, you'd be able to manage

9   it in that direction, yes.

10  Q.   And I think you mentioned a high security for males; is

11  that correct?

12  A.   Certainly you would have to have a maximum security

13  section that would require separation all within the

14  perimeters of management, but individual cells and managed on

15  a time basis within the structure, still using the concept of

16  maximizing direct supervision.

17  Q.   What's the bed -- the number of beds in that high

18  security area?

19  A.   Sixty-eight is the projected number.

20  Q.   Now, I guess, tell me just a little -- tell the -- I

21  guess, for the benefit of the Court, are there any plans to

22  address the water situation at the new facility?

23  A.   Well, as all of us that live in Jackson know, we have

24  concerns about the durability of our water system, and the

25  site that has been proposed and chosen does have water

1  pressure problems that we've already identified because

2  Henley-Young has water pressure concerns.  So the County has

3  initiated development using their CARES dollars to start the

4  development of an aquifer in an elevated water tank that would

5  serve the detention center site and the Henley-Young site with

6  an independent water system that is separated from the City's

7  water structure.

8  Q.   And I guess, what's the total projected cost of the

9  construction of this new facility?

10  A.   Well, the facility currently is projected at

11  approximately 123 million at total development.  The water

12  tower, water well and utility access and support of

13  Henley-Young is projected at approximately ten and a quarter

14  million so you're looking at approximately $133 million

15  investment to accommodate the total plan.

16  Q.   And as far as the Raymond Detention Center, the County is

17  certainly not ignoring that facility in the meantime; correct?

18  A.   No, the ongoing investments in the Raymond Detention

19  Center are intended to keep it functioning through the '26

20  time frame and to make sure that the facility meets the

21  requirements of both the stipulated order and the consent

22  decree that is possible.  It is managing the continuing

23  challenges of keeping that facility operational, but the

24  investment is being made in it to accommodate those, and

25  investments in some of the areas that were identified in the

1    physical analysis that were security driven, you have to

2    address those to be able to maintain and continue a safe

3    facility.

4    Q.   And just to wrap it up, Mr. Farr, in your opinion, based

5    on your own perception, has Hinds County completed the work

6    from the stipulated order as it concerns the master plan?

7    A.   In my opinion, the County has fulfilled the requirements

8    of the master plan.  There is a facility plan that has been

9    developed with the strategy outlined and the County has

10   adopted that plan and that also includes investments into the

11   work center and the Raymond Detention Center.

12       I believe we go back and mention that part of the initial

13   efforts of the plan was to close the Jackson Detention Center

14   so we're only focused on -- that was an immediate

15   recommendation because of the systemic problems with that

16   facility.  So we're focused on those two existing facilities

17   and how to move forward with that and then the recommendation

18   as to create the centralized facility.  So, in my opinion, the

19   County has fulfilled that master planning effort.

20   Q.   And in your opinion, Mr. Farr, has Hinds County ignored

21   the issue of how it will safely and securely house pretrial

22   detainees in the future?

23   A.   Since our involvement with the County in December of '19

24   moving forward in to 2020, the County has been moving

25   aggressively to address the needs of the facilities and to

1    bring them into compliance with the stipulated order and to

2    work diligently to get to a point that the consent decree is

3    satisfied.

4         MR. MORISANI:  May I briefly confer, Your Honor?

5    BY MR. MORISANI:

6    Q.   And one final question, just to clarify the record, what

7    steps -- you know, we talked a lot about the future plans of

8    the new facility, but where is the County -- I guess, what

9    steps is the County taking today currently with respect to

10   that new facility?

11   A.   Well, the County issued a professional services contract

12   to our company in July of '21 to proceed with the -- what

13   we're calling the early site development, which is the water

14   supply system and for the development of the documents to

15   allow for pricing and construction of the new facility as

16   we've outlined in our multiple phases.  So at this time we are

17   proceeding aggressively with the development of the pricing

18   documents, working in conjunction with the construction

19   manager who they've also hired, so the team is in place to

20   accommodate and meet the requirements of this direction.

21        Our goal, our more than a goal, our mandatory completion

22   of our pricing documents is August 1st of 2022 with

23   anticipated construction beginning -- that's for the new

24   facility with construction to begin by November of '22.  We

25   will have the water tower and the well documents onto the bid

1    market by the end of April with an anticipated start of the

2    development for the water support and the early site by June

3    of '22.

4    Q.   And -- go ahead.  Finish up.

5    A.   The County is aggressively pursuing those as their plans

6    to meet the requirement and establish the new central

7    detention center.

8    Q.   Is it safe to say that today, currently, we are working

9    on the schematic documents related to this new facility?

10   A.   We're past schematics.  We're working on the early site

11   package of the new facility.

12   Q.   And when the facility is complete, the new facility is

13   complete, would you characterize that facility as being state

14   of the art?

15   A.   It will be -- yes, state of the art is a good term.  It

16   will meet the best practices that are established by the ACA

17   and benefit the County in the ability to manage and develop a

18   structure that will fulfill the requirements of the detention

19   system, yes.

20   Q.   And, I guess, one final question.  We talked earlier

21   about the fire sprinkler system at the RDC and the fact

22   that -- the housing units do not have a fire sprinkler system;

23   correct?

24   A.   That's correct.

25   Q.   At the time that the RDC was constructed back in '92

1   through '94, was that facility without fire sprinklers, was

2   that consistent with the code at the time?

3   A.   At the code, the code -- at that time, the code did not

4   require a fire sprinkler system in the housing units.  It did

5   address the fire suppression system which was contained with

6   the stand pipe and the hose reels that would allow for fire

7   fighting inside of the housing units.  Part of the stipulated

8   order was that those fire reels be reinstalled, which they

9   have been.  So under the code of 1992-'94, the housing

10  components did not require the direct fire sprinkler system.

11      The construction of the housing units make it problematic

12  to be able to install a secure fire sprinkler system in those

13  housing units without rebuilding them at this point.

14          MR. MORISANI:  Your Honor, I have no further questions.

15          THE COURT:  All right.  Is the Government prepared to

16  cross-examine this witness?

17          MR. CHENG:  Yes, Your Honor.

18          THE COURT:  I mean, how long do you think it will be?

19  Your mike is not on.

20          MR. CHENG:  I think about a half hour, Your Honor.

21          THE COURT:  Okay.  If that's good with court reporter.

22  That's good with the court reporter?

23          THE REPORTER:  Yes, sir.

24          THE COURT:  Okay.  This will give us one less witness

25  to have to deal with tomorrow, and I'll say on the front end,

1    I don't think I have any questions for this witness.

2                        **CROSS-EXAMINATION**

3    **BY MR. CHENG:**

4    Q.   Good afternoon.

5         THE COURT:  Make sure the microphone is on, Mr. Cheng.

6    BY MR. CHENG:

7    Q.   Good afternoon, Mr. Farr.  I think at one point you were

8    looking at a document when you were trying to identify who

9    your consultants were.

10   A.   Yes.

11   Q.   Is that the master plan?

12   A.   Yes, that's the master plan.  It's identical to the

13   element entered in evidence.

14   Q.   Very good.  And you enlisted a consultant to help you

15   with the corrections staffing analysis?

16   A.   Yes.

17   Q.   And who is that?

18   A.   I will refer so I get it completely correct.  It is Mark

19   Martin from MJM.

20   Q.   Do you know what Mr. Martin's background is in?

21   A.   He is a -- has been in correction services for most of

22   his adult life.  He also sits on the ACA recommendation -- or

23   ACA panels dealing with staffing activities for those related

24   to support.

25   Q.   Has he been a former jail administrator?

1   A.   I believe he has.

2   Q.   And with what facility?

3   A.   That I don't know.  I would have to research that to tell

4   you.

5   Q.   You also worked with jail administrators in Hinds County

6   on the master plan?

7   A.   We did, yes.  Major Fielder initially and then

8   Major Bryan in the ensuing period of that.  They were the two

9   that were primarily involved in the development of the plan.

10  Q.   And are we entering a critical phase now as we move

11  towards the construction of the jail?

12  A.   We are.  You know, we've had great dialogue with -- well,

13  in the interim with Major Bryan, when she was on staff of the

14  planning to develop strategies about what was needed and

15  required.  Currently Chief Simon is filling that role for us

16  and answering -- being a resource base and a sounding board

17  working within the staff of the centers, yes.

18  Q.   And, Ms. Bryan, when she was the jail administrator

19  during the most recent virtual site visit, I believe you were

20  the one who said that she had been helpful with the master

21  planning process; is that right?

22  A.   Well, the master plan -- the master plan was actually

23  created and approved prior to her approval and appointment.

24  So we were working with the sheriff's office, Major Fielder,

25  when he was in that position establishing the direction of the

1    master plan, and that was in the analysis phase, when we were

2    going through and doing the facility reviews and developing

3    and learning what they saw from the inside, you know, things

4    that you would not normally be able to understand unless you

5    were actually operating the facility.

6    Q.    So what was Ms. Bryan's contribution?

7    A.    Ms. Bryan actually worked with us more appropriately as

8    we were developing the design of the new facility.

9    Q.    So was she assisting, for example, in trying to figure

10   out the configuration for the medical and mental health units?

11   A.    Yes, we had that as part of our conceptual development,

12   and so she was part of discussion about how to validate the

13   directions that the team had organized and placed in position,

14   recognizing that the County currently did not have a facility

15   of the scope and scale that we were proposing in the

16   development of the facility.  So that was beneficial because

17   in the end she brought in the medical team that had been part

18   of the County's development to go through and analyze the

19   needs and how the flows would work and what would the capacity

20   requirements be so, yes.

21   Q.    Until the new facility is completed, will they still need

22   to have some type of medical and mental health facility in the

23   current facility?

24   A.    Absolutely, yes.

25   Q.    And are you aware that the Raymond Detention Center is

1    supposed to have a mental health unit?

2    A.   It's supposed to, yes.  It had been reconstructed

3    recently and re -- been put back in to more serviceable

4    operation recently.

5    Q.   What is the capacity or at least the planned capacity for

6    Raymond Detention Center's mental health unit?

7    A.   Currently it's four treatment spaces, so that's the

8    current status of that.

9    Q.   That's if they just use the isolation cells, right, but

10   if they were to open one of the pods for capacity --

11   A.   To take the pods -- if there are opportunities to take

12   some of the pods and place them into what we would -- what you

13   would reference as a mental health services area where you

14   would have more direct supervision and the opportunity to meet

15   those immediate needs and particularly separating population,

16   so, yes, that is plausible.

17   Q.   If we could be a little careful.  I think sometimes you

18   answer before I finish the question.  It makes it a little

19   more challenging for Ms. Crane.  So I'll try to be a little

20   slower, and we'll see what we can do.

21        If they were to open up one of the pods, what is the

22   anticipated capacity for the mental health pods?

23   A.   My memory is that we could get 12 units -- well,

24   depending on how many pods you would use, so...

25   Q.   And how many housing areas are there in the medical area

1   of the jail?

2   A.   Housing units, there really isn't any housing per se in

3   the medical unit.  You have treatment rooms and four isolation

4   rooms.

5   Q.   So those four isolation rooms, how many people could they

6   handle in the medical unit?

7   A.   It would be four.

8   Q.   So in the new facility, there are going to be, I believe,

9   something like 24, 12 acute medical and mental health beds; is

10  that right?

11  A.   The plan is for 24 male acute treatment areas and

12  12 acute mental health female areas.

13  Q.   Are those only for acute mental health, or do they also

14  include medical?

15  A.   And there's 24 units, 24 beds in the infirmary, which

16  would be the clinic.

17  Q.   So in theory, there could be up to 48?

18  A.   48 plus 12, so it would be 60.  60 places that you could

19  interface with a detainee, yes.

20  Q.   Now, besides Mr. Simon, are you currently dealing with

21  Mr. Shaw as a point of contact for the master planning

22  process?

23  A.   Mr. Shaw started his tenure on the 21st, and we have not

24  had the opportunity to have a work session with him.  We have

25  been working with Sheriff Jones as an overview of the planning

1   process.

2   Q.   And under the current master plan, there is a recognition

3   that the work center, even though you're going to keep

4   operating it, it isn't really appropriate at this time as a

5   jail; is that right?

6   A.   That is correct.

7   Q.   And what still needs to be done to render it appropriate

8   as a jail facility?

9   A.   We have recommended additional sally ports both for

10  arrival and departure.  We have recommended additional

11  security divisions inside of the work center to allow for more

12  secure separation, allowing it to be more appropriately

13  addressed as a jail.  Those are articulated in the planning

14  document.

15  Q.   And there was some discussion earlier about the support

16  service areas inside the Raymond Detention Center.  What

17  issues still remain in terms of getting those areas

18  operational?

19  A.   They have been returned to an operational status on the

20  environmental side, meaning the air conditioning, the fire

21  detection system, the flooring, general building maintenance

22  components have been underway and are continuing to be

23  addressed all the way from the removal of the grease from the

24  grease trap to re-establishing the fire suppression system in

25  the kitchen hood, so that's an ongoing process.

1    Q.   But are appliances still needing to be replaced or

2    reinstalled?

3    A.   There are appliance upgrades that are required -- should

4    be required.

5    Q.   Does that include the laundry room?

6    A.   That does include the laundry.

7    Q.   You talked earlier about the lifespan of the Raymond

8    Detention Center and how it's approaching the end of its

9    lifespan.  If maintenance had been better over the course of

10   its life, would its lifespan have been extended?

11   A.   In my opinion, it is at that period where systems are

12   going to require replacement.  It may become more acute based

13   on maintenance components, but it is at that 25-year plus age

14   where equipment has to be addressed.

15   Q.   But once it's addressed, would that help extend its

16   lifespan?

17   A.   It would within that, but there are some -- at least in

18   our opinion, systemic components of it that are making it more

19   difficult to maintain.  The lack of access that is not in the

20   housing units is a significant part of that where it becomes a

21   deterrent for maintenance to be properly handled.

22   Q.   Have you or the County come up with sort of a maintenance

23   priority plan to try to get those systems intact and keep them

24   in place?

25   A.   Yes.  Working with the construction manager and with the

1    County's maintenance components, we're trying to build a

2    preventive maintenance approach so that you can make sure

3    you're addressing things before they become critical.

4    Q.   Is that a work in progress?

5    A.   That's definitely a work in progress.

6    Q.   With the mental health, acute mental health units and the

7    pods that might be set up for mental health patients, does

8    your planning also address the mental health staffing that's

9    required for those units?

10   A.   We have made projections of the requirements for that and

11   the original plan outlined what the staffing requirements

12   would be.  That will also be an ongoing development to be able

13   to find and hire, in my opinion, the proper staff for those.

14   Q.   And at this time does the jail have that number of staff?

15   A.   To my knowledge, no.

16   Q.   And his master plan also includes projected security

17   staffing requirements; correct?

18   A.   It does.

19   Q.   So can we actually identify what page option two begins

20   on in PX-33?

21   A.   Option two is summarized on page 112 -- apologize.

22   111 -- nope, nope.  I'm looking.  Yes, option two, I apologize

23   again.  It actually begins on 108.

24   Q.   Is that page 108 of the plan or page 108 of the exhibit?

25   A.   Of the -- of the --

1   Q.   Plan itself, I believe.

2   A.   Yeah.  It's 108 of the plan book.

3   Q.   So I believe that would be Plaintiff's Exhibit 33, page

4   114 if we could bring that up.  So is it accurate to say the

5   estimated staffing is 256.5 full-time employees?

6   A.   That was of the -- yes, that was of the plan's approach

7   towards the benefit of that based on the staffing analysis,

8   yes.

9   Q.   And the staffing analysis is the one produced by the

10  monitors and Ms. Bryan?

11  A.   No.  That staffing analysis was produced by Mark Martin.

12  Q.   I see.  So even a separate staffing analysis confirmed

13  you'll need about 256 staff?

14  A.   Yes, I believe so.

15  Q.   Thank you.  And I take it at this time the County does

16  not have 256 detention officers; is that right?

17  A.   I'm not -- on a daily basis I'm not aware of the exact

18  number of the detention staff.

19  Q.   But over time when you've been working with them on the

20  master plan, have they ever had 256 staff?

21  A.   To my remembrance, no.

22  Q.   I'm sorry for asking, but have the defendants paid your

23  bills on time?

24  A.   They have.

25  Q.   And at this time have they already confirmed the

1    financing to build the new jail?

2    A.    They have, to my knowledge, or within our plan there is a

3    strategy to accommodate the financing.  It will require action

4    of the Board to raise millage.

5    Q.    And the Board, has it actually raised the millage yet?

6    A.    The Board has raised the millage one time of a plan for

7    millage increase.  So one of the millage increases is in

8    place.

9    Q.    How many more still need to be approved?

10    A.    It will be three more.

11    Q.    So at this time the financing is not yet fully in place

12    for the new jail; correct?

13    A.    That would be correct.

14    Q.    And just to be clear, I think you mentioned it before,

15    but if everything goes as planned, when will the new jail be

16    completed?

17    A.    In our projections the Phase 1 will be June of '25 for

18    the first phase of that.  Phase 2 -- we call it Phase 1A and

19    Phase 1B.  Phase 1B would provide the 600 beds, and that would

20    be June of '26.

21    Q.    And meanwhile they have to keep using the older

22    facilities; right?

23    A.    Yes.

24    Q.    And you're all trying to come up with some sort of

25    temporary measures to keep the current facilities operational

1    and satisfactory; correct?

2    A.   There's an ongoing effort to continue the investment in

3    the facilities to, one, keep them operating and, two, to make

4    the improvements to the facilities that meet the outline of

5    the plan.

6    Q.   And you earlier talked about how the master plan meets

7    the requirements of the stipulated order.  Do you remember

8    that?

9    A.   Yes, sir.

10   Q.   You're not suggesting that just by having the plan

11   they've complied with the Court's orders, are you?

12   A.   No.   That was not my intent.

13   Q.   They still have to actually get things built?

14   A.   Yes, sir.

15   Q.   And even with the interim measures they've got in place,

16   do you remember coming to court and talking a little bit about

17   the master plan at one of the status conferences?

18   A.   Yes.

19   Q.   And you refer to sort of the choices being made as -- I

20   believe the term was "the best of the worst options"?

21   A.   Within the sequence of how to get to the end product,

22   yes.

23   Q.   All right.  Thank you.

24        THE COURT:  Any redirect of this witness?

25        MR. MORISANI:  Just briefly, Your Honor, if I may?

1    THE COURT:  You may.

2                    **REDIRECT EXAMINATION**

3    **BY MR. MORISANI:**

4    Q.   Mr. Farr, I just want to clarify something that my friend

5    from the DOJ asked you.  I'm going to place on the ELMO PX-2

6    and I just -- it's the stipulated order for the record, PX-2,

7    back up here.  Can you see that okay?

8    A.   Yes.

9    Q.   Okay.  Now, I think he asked you a question about the

10   master planning requirement of the stipulated order.  Do you

11   require (sic) that?

12   A.   Yes.

13   Q.   And I think he asked you something along the lines of it

14   requires something to be built; correct?

15   A.   Well, the master plan provides the options for the

16   approach to meet the requirements of the plan, yes.

17   Q.   And what I want to ask you about is the stipulated order

18   paragraph.  It's on page -- it begins on the bottom of page 3.

19   It's paragraph Roman Numeral I, and then its paragraph B -- or

20   Section B, I should say, and zoom in just a little bit.

21       Now, the -- is it -- and, Mr. Farr, you can read

22   paragraph or Section B, and let me know when you're ready and

23   I'll turn the page.  I'd like for you to read the three -- or

24   the four subparagraphs.

25   A.   Yes, okay.

1   Q.   And the four subparagraphs are here at the top, one, two,

2   three, four.  If you'll just take a moment to look at those, I

3   just have a single question.

4   A.   Okay.

5   Q.   Now, do you see anywhere in Roman Numeral I, Section B,

6   paragraphs 1 through 4 a requirement that anything be built?

7   A.   No.

8   Q.   There certainly are renovations talked about in

9   subparagraph 2; correct?

10  A.   That is correct.

11  Q.   And we talked earlier in your direct about the

12  renovations that are ongoing at the RDC; correct?

13  A.   That is correct.

14  Q.   And Benchmark would know a lot about those renovations;

15  correct?

16  A.   We've been in a collaborative development with Benchmark,

17  yes.

18  Q.   And with respect to implementing the master plan, those

19  steps that you described that we're currently undertaking

20  right now, that's implementation of the master plan; is it

21  not?

22  A.   Those are the steps that are required to implement the

23  master plan in my opinion.

24       MR. MORISANI:  No further questions, Your Honor.

25       THE COURT:  I do have one question, and I apologize.

**EXAMINATION**

**BY THE COURT:**

Q.   But, Mr. Farr, you mentioned that in response to the question from the Government about the current facility at RDC.  You said it's at the end of its lifespan.  That was roughly your testimony that repairs would be more acute and have to -- things break down, I believe, is what your testimony is.

     I guess, based on that answer, what do you anticipate the lifespan of the building of the new facility that you-all are -- that is in the plan of being built?  In other words -- and go ahead, answer that first.

A.   Yes, sir.  We utilize a planning horizon of 30 years for a facility that we anticipate meeting the needs of its use. There's two facets to that.  If it is developed in a strategy that allows for flexibility in the future, that could extend well past the 30 years as an operational center.  However, the building systems that are integral to the facility will have a 25- to 30-year lifespan before they are required to be significantly modified or replaced.

     There is always a maintenance and ongoing effort to keep those systems functioning properly.  So from a planning standpoint, we use that 30-year horizon at a time that additional investment would be required to extend the life of a facility into the future.  I hope that addresses your intent

1    question.

2        You can look at facilities that have lasted 250 years,

3    and they're still functioning properly if they have the

4    infrastructure updated in the sequence of use.

5    Q.   And taking that -- the system updated and all of that

6    with respect to the existing facility, if -- is there

7    anything -- because it's at the end of its lifespan, I

8    believe, is what's your testimony.  Is there anything the

9    County could have done to extend its lifespan?

10   A.   The continuing maintenance of the facility would help in

11   the expansion of that, but we are at a point that mechanical

12   components of the systems are beyond their usable life and

13   will require replacement.

14   Q.   Okay.  You said "the kettle"?

15   A.   The --

16   Q.   "Kettle components"?

17   A.   Mechanical.

18   Q.   Oh, mechanical components.

19   A.   The motor drivers, the control systems, they require

20   replacement.

21   Q.   Will there be motor control systems and stuff in the new

22   facility?

23   A.   There will be, but we have been able to advance those

24   systems in the interim years.  We've moved from fundamentally

25   pneumatics which are hoses and air compressors to digital

1   which run through the Ethernet.  So we've made great strides

2   in the ability to maintain and extend the viability of

3   building systems in the last 25 years.

4        So we see those as very positive steps for all of our

5   investments, going forward.  We still have bearings and belts

6   and things that just wear out that have to be constantly

7   evaluated and bring forward.

8   Q.   Will the -- I guess those who are involved in planning

9   and maintaining a facility such as this, I guess you're not

10  the first one to suggest, I guess, I don't know, that the

11  lifespan for this facility is 25 or 30 years.  Would you be

12  the -- I mean, you're involved in this in the business.  Are

13  there others who are informed of what the lifespan of this

14  facility is?

15  A.   I would assert there would be, sir, that you would see a

16  similar opinion based on the functional operation and the

17  current condition of it.  And I'm not asserting that if you

18  had an ongoing replacement structure that you couldn't extend

19  that longevity.  I do assert that some of the original

20  planning decisions that were made in the facility have made

21  that much more difficult and in some cases even problematic

22  that they would be successful.

23  Q.   And if you had been a part of this -- and I don't want to

24  use the word "team" because I'm not suggesting you're on

25  anybody's side, but if you had been a part of -- if you had

1    been consulted 15 years ago, would you have been advising the

2    County to start planning for the end of the life of this

3    facility?

4    A.   In my opinion, looking at how the facility was originally

5    designed and organized, yes, sir.

6    Q.   And in that regard, you would have taken steps to replace

7    it sooner than now?

8    A.   That would have been one of the options that would be

9    available.

10   Q.   And, again -- not again, because I didn't ask this,

11   but -- but are there any routine maintenance issues that if

12   they're taken care of would extend the life of any -- well,

13   this particular facility, and when I say -- I'm talking about

14   RDC.

15   A.   Yes, sir.  Routine maintenance is critical to the

16   longevity of all facilities, and that is particularly

17   important in dealing with a correctional facility and any

18   place that we house individuals for a 24-hour period.

19   Q.   And the fact that you house these individuals for 24-hour

20   periods, does that tend to expose the facility to damage and

21   other things, you know, if those persons are there unattended?

22   A.   Yes, sir.

23   Q.   All right.  I did say I didn't have any follow-up, but I

24   did so the Government is free to.

25            MR. CHENG:  I just have a couple more questions.  Of

1    course, I forgot to turn on the mike.

2                    **FURTHER CROSS-EXAMINATION**

3    **BY MR. CHENG:**

4    Q.   In the master plan on page 114, there are some costs

5    listed for option two, like 68 million for a new jail,

6    2.9 million.  Does that include maintenance costs?

7              THE COURT:  Hold on a second.

8              MR. MORISANI:  I just would object.  This is outside of

9    anything that Your Honor asked him about.

10             THE COURT:  I just asked him about maintenance, though,

11   I think.

12             MR. MORISANI:  He's asking about costs, though --

13             THE COURT:  No, he's free to follow up.

14   BY MR. CHENG:

15   Q.   Does that include maintenance costs?

16   A.   That does not include maintenance costs.

17   Q.   I see.  So this is just the money it's going to cost for

18   a new --

19   A.   This is an initial investment estimate.

20   Q.   And is any of this federal money?

21   A.   No, sir.

22   Q.   Does the federal government provide -- is this CARES Act

23   money?  Does that provide for maintenance?

24   A.   No, sir.

25   Q.   It's only for the construction?

1   A.   It's for the initial investment.

2   Q.   About how much money will be put towards the construction

3   for the federal money?

4   A.   Well, we have that as the water system.  So we are

5   anticipating ten and a quarter million being part of that

6   discussion.

7          MR. CHENG:  All right.  Thank you very much, Mr. Farr.

8          THE COURT:  All right.  Mr. Morisani?

9          MR. MORISANI:  Thank you, Your Honor.

10                    **FURTHER REDIRECT EXAMINATION**

11   **BY MR. MORISANI:**

12   Q.   Mr. Farr, the maintenance issues that the Court had asked

13   you about, am I correct in understanding that those

14   maintenance issues, that maintenance that you were asked about

15   would not do anything to replace or prolong the lifespan of

16   mechanical components that are at the end of their life; is

17   that correct?

18   A.   That would be a reasonable statement.  When the systems

19   have reached their usable direction, life, they will generally

20   require replacement.  Incremental replacement is also an

21   option.

22   Q.   And the maintenance issues that the Court had asked

23   about, is that not precisely what Benchmark in conjunction

24   with CDFL is there at RDC doing now?

25   A.   Yes.

```
 1          MR. MORISANI:  No further questions, Your Honor.

 2          THE COURT:  All right.  But maintenance is required

 3     through the life of the facility; right?

 4          THE WITNESS:  Yes, sir.

 5          THE COURT:  Okay.  All right.  Okay.

 6          Mr. Farr, you may step down, sir.  Thank you so much

 7     for your testimony.

 8          MR. MORISANI:  I was going to ask, may we finally

 9     excuse this witness?

10          THE COURT:  Yes, he's finally excused.

11          MR. MORISANI:  And I forgot to do that with

12     Mr. Chamblee.  Is that --

13          THE COURT:  He's finally excused as well.

14          THE WITNESS:  Thank you, Judge.

15          THE COURT:  Thank you, sir.

16          We're at the end of the day, I know.  Road map as far

17     as tomorrow, do we -- the County know who its witnesses are?

18          MR. SHELSON:  Yes, sir.  And we told, yesterday,

19     United States that tomorrow -- well, our next three witnesses

20     are Calhoun, Kenny Jones, and the sheriff.  Mr. Calhoun is

21     having a medical procedure in the morning.  So we just would

22     like to flip the order, Kenny Jones go first, then

23     Mr. Calhoun, then the sheriff.

24          THE COURT:  Okay.  All right.

25          MR. ANDERSON:  Could I visit with counsel and
```

1   co-counsel before we decide on that, Your Honor?

2          THE COURT:  Yes.  I mean, I don't need to know who -- I

3   just need to know the gentlemen who's going and in what order.

4          MR. SHELSON:  So, Your Honor, that will be the order.

5   Mr. Kenny Jones, Credell Calhoun, and then the sheriff.

6          THE COURT:  Okay.  All right.  And after that does the

7   County expect to call any other witnesses?

8          MR. SHELSON:  The County does not, Your Honor.

9          THE COURT:  All right.

10         MR. CHENG:  Your Honor, we brought up the issue

11  yesterday about whether or not the monitors -- we brought up

12  the issue yesterday of whether the monitors could participate

13  virtually, Your Honor.  I haven't been able to converse with

14  Mr. Shelson.  We mentioned it briefly, but haven't had a

15  chance to talk.

16         THE COURT:  Have the parties come to an agreement on

17  that?

18         MR. SHELSON:  We think Mr. Parrish should stay, Your

19  Honor.  I'm kidding, Your Honor.  Your Honor, we're fine with

20  that, but since the remote experience -- I don't know if

21  they're going to call on any of the monitors in rebuttal, but

22  to the extent they do, if they would have hard copies of P-1,

23  P-2, P-41 available, we would be all right with them appearing

24  remotely if necessary.

25         THE COURT:  Okay.  And if there are any other

1  exhibits -- I know right now you say those three, but if there

2  are any other exhibits, I think we'll be able to make sure

3  that they have access to them in some way; is that correct?

4       MR. SHELSON:  Right, yeah.  Just in particular, P-1,

5  the consent decree and the P-41, the fifteenth monitoring

6  report, they're voluminous.  And so we're asking that they do

7  so because it's hard to show them a 64- or 150-page document

8  via Zoom.

9       THE COURT:  All right.  Can DOJ accommodate them in

10 that request?

11      MR. CHENG:  Yes, I think they may already have them,

12 but we'll be happy to send it to them as well.

13      THE COURT:  Okay.  All right.  So are they excused

14 today, since they won't be testifying tomorrow?

15      MR. SHELSON:  That's fine with the defendants, Your

16 Honor.

17      THE COURT:  Okay.  All right.

18      MR. CHENG:  That's fine with us, too.

19      THE COURT:  Okay.  If you want to participate remotely

20 tomorrow, you may, and for the rest of the trial.  And I'm so

21 sorry about the uncomfortable seats that are out there in the

22 audience.  I know they're uncomfortable.  I've heard that

23 before.  But we'll see.  But is there anything else we need to

24 take up?

25      We will start up tomorrow morning at 9:00 a.m.

```
 1    ****************************************************************
```

**COURT REPORTER'S CERTIFICATE**

```
 3

 4          I, Candice S. Crane, Official Court Reporter for the

 5    United States District Court for the Southern District of

 6    Mississippi, do hereby certify that the above and foregoing

 7    pages contain a full, true, and correct transcript of the

 8    proceedings had in the forenamed case at the time and place

 9    indicated, which proceedings were stenographically recorded by

10    me to the best of my skill and ability.

11          I further certify that the transcript fees and format

12    comply with those prescribed by the Court and Judicial

13    Conference of the United States.

14          THIS, the 24th day of February, 2022.

15

16                        /s/ Candice S. Crane, RPR CCR

17                        Candice S. Crane, RPR, CCR #1781
                          Official Court Reporter
18                        United States District Court
                          Candice_Crane@mssd.uscourts.gov
19

20

21

22

23

24

25
```