```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                      PLAINTIFF

 5   VERSUS               CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                 DEFENDANTS
 7

 8

 9              EVIDENTIARY HEARING, VOLUME 9,
           BEFORE THE HONORABLE CARLTON W. REEVES,
10            UNITED STATES DISTRICT COURT JUDGE,
                    FEBRUARY 25, 2022,
11                 JACKSON, MISSISSIPPI

12

13              (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601) 608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

***DAILY TRANSCRIPT***

1   **APPEARANCES:**

2     FOR THE PLAINTIFF:

3       CHRISTOPHER N. CHENG, ESQ.
      SARAH G. STEEGE, ESQ.
4       LAURA L. COWALL, ESQ.
      HELEN VERA, ESQ.
5       MITZI DEASE-PAIGE, ESQ.

6     FOR THE DEFENDANTS:

7       NICHOLAS F. MORISANI, ESQ.
      JAMES W. SHELSON, ESQ.
8       TONY R. GAYLOR, ESQ.
      RAYFORD G. CHAMBERS, ESQ.
9       JOHN C. HALL, II, ESQ.
      REUBEN ANDERSON, ESQ.
10

11     ALSO PRESENT:

      ANTHONY NJOKU
12       MICHAEL DENAULT
      ELIZABETH SIMPSON
13       DAVID PARRISH
      SHERIFF TYREE JONES
14       LESLIE FAITH JONES
      CINDY MOHAN
15

16

17

18

19

20

21

22

23

24

25

————***DAILY TRANSCRIPT***————

1    **TABLE OF CONTENTS**

2   Style and appearances................................1587-1588

3       Defendants' Exhibit 158 marked for identification.....1595

4   WITNESS:  KENNETH WAYNE JONES

5       Direct by Mr. Anderson................................1596

6       Defendants' Exhibit 142 entered......................1610

7       Cross by Ms. Steege..................................1610

8       Examination by the Court.............................1669

9       Further Cross by Ms. Steege..........................1689

10      Redirect by Mr. Anderson.............................1690

11      Defendants' Exhibit 159 marked for identification.....1691

12      Plaintiff's Exhibit 116 marked for identification.....1693

13  WITNESS:  CREDELL CALHOUN

14      Direct by Mr. Anderson................................1694

15      Defendants' Exhibits 48-74 entered...................1707

16      Cross by Mr. Cheng...................................1707

17      Redirect by Mr. Anderson.............................1733

18      Examination by the Court.............................1735

19      Further Cross by Mr. Cheng...........................1758

20      Further Redirect by Mr. Anderson.....................1760

21  Court Reporter's Certificate...........................1770

22

23

24

25

———***DAILY TRANSCRIPT***———

|     |                                                        |
| --- | ------------------------------------------------------ |
| 1   | **IN OPEN COURT, FEBRUARY 25, 2022**                   |
| 2   |                                                        |
| 3   | THE COURT:  You may be seated.                         |
| 4   | Good morning.  Is there anything we need to take up    |
| 5   | before we begin?                                       |
| 6   | MS. STEEGE:  We have two housekeeping matters, Your    |
| 7   | Honor.  The first is that we have a redacted version of |
| 8   | PX-106, the January 2022 QA summary.  It's got a couple names |
| 9   | that are redacted in this version.  We'd like to sub out the |
| 10  | version the Court currently has, if that's all right.  |
| 11  | THE COURT:  Is there any problem substituting the      |
| 12  | redacted version for the one that the Court has?  Is that what |
| 13  | you're saying?                                         |
| 14  | MS. STEEGE:  Correct.  We've conferred with opposing   |
| 15  | counsel.                                               |
| 16  | THE COURT:  The redactions are to names or something?  |
| 17  | MS. STEEGE:  Correct.  I've got --                     |
| 18  | THE COURT:  So we're going to substitute that redacted |
| 19  | version for --                                         |
| 20  | MS. STEEGE:  Yes.                                      |
| 21  | THE COURT:  Okay.                                      |
| 22  | MS. STEEGE:  Yes, Your Honor.                          |
| 23  | THE COURT:  Okay.  All right.                          |
| 24  | MS. STEEGE:  Thank you.  And the other matter, the     |
| 25  | Court had inquired as to the status of the follow-up   |

```
 1    information from Ms. Mosley about the complaint that she filed

 2    in the 2018 to 2019 incarceration.  We've provided the date of

 3    the incident and the date of the complaint as she related them

 4    to me to the County, and they've been unable to locate

 5    anything filed for those dates.

 6         THE COURT:  The defendant was able to locate?

 7         MS. STEEGE:  They were unable to locate any

 8    documentation pertaining to those dates.  So I just wanted to

 9    provide that update, Your Honor, and also inquire if

10    Ms. Mosley might be released as she was not released at the

11    end of her testimony.

12         THE COURT:  Okay.

13         MS. STEEGE:  I wanted to raise the question and inquire

14    if there was anything further that Your Honor would like us to

15    do.

16         THE COURT:  Well, I was just -- as I recall -- I just

17    want to make sure.  As I recall her testimony, she either

18    stated that she was requested to or she came back to the

19    facility with the -- for the purpose of them taking a

20    statement from her.  That was her testimony, I think, and

21    there were two officers there, I think is what she testified

22    to, and she either wrote out a statement or either they

23    questioned her and wrote out the statement as a part of what

24    they -- what she said was their investigation.

25         MS. STEEGE:  That's my recollection as well, Your
```

1    Honor.

2         THE COURT:  Okay.  And now we're saying that there is

3    no documentation that supports that sort of testimony; is

4    that --

5         MR. HALL:  That's correct, Your Honor.  We ran a search

6    two ways, because I remember Ms. Mosley stating that she --

7    the complainant -- the person who was allegedly at fault was

8    somebody by the name of Crane, so we ran a search for Crane as

9    well as Mr. Mosley, and there was no internal affairs

10   investigations open in 2019 about a Mr. Mosley, nor was there

11   any -- or '18, for that matter, nor was there any open for Mr.

12   Crane.

13        THE COURT:  In 2018 or 2019, nothing?

14        MR. HALL:  Correct.

15        THE COURT:  No internal affairs investigation has been

16   opened that references Mr. Mosley?

17        MR. HALL:  Correct.  That's per the IAD lieutenant.

18        THE COURT:  But there were many allegations that

19   Mr. Mosley was assaulted by an officer; right?

20        MR. HALL:  They said there was an incident report in

21   2019 that they have, but as far as an actual internal affairs

22   report or any type of investigation, that does not exist, or

23   anything to reflect or corroborate what Ms. Mosley said, that

24   she came down and filled out a statement.  We don't have that.

25        THE COURT:  But the incident report, what does the

 1   incident report say about an incident involved with Mr. Mosley

 2   and a correctional officer?

 3         MS. STEEGE:  So Ms. Mosley provided the names of the

 4   officers that she said were included in the internal affairs

 5   complaint, and those match the names of officers on a

 6   complaint -- I'm sorry, on an incident report filed the date

 7   of the incident as she related it to me.

 8         THE COURT:  I'm going to ask you to repeat -- let me

 9   see.

10         MS. STEEGE:  So she provided the date on which the

11   incident occurred, and she also provided me the names of the

12   officers that she said were included in the internal affairs

13   complaint, and in the course of our regular reporting from the

14   County, we have an incident report from the date of that

15   incident with those officers' names.

16         THE COURT:  And what does that incident report say

17   about the incident?  Do we know?

18         MS. STEEGE:  It includes -- well, it includes some

19   conduct that could have resulted in injury to Mr. Mosley, but

20   I don't want -- all I have is --

21         THE COURT:  It's in evidence; right?

22         MS. STEEGE:  It is not.

23         THE COURT:  It is not.  May I see the incident report?

24         MS. STEEGE:  We can provide it to the Court.

25         THE COURT:  Yeah, just provide it to the Court

1  before -- during our lunch break, at least.  I don't want to

2  release Ms. Mosley quite yet for that reason.

3          Is there anything further, Mr. Hall?

4          MR. HALL:  No, Your Honor.

5          MS. STEEGE:  Thank you, Your Honor.

6          THE COURT:  Is there anything further?

7          MS. STEEGE:  I can provide the redacted version as

8  PX-106.

9          THE COURT:  Okay.  The United States has rested.  So

10  Hinds County has elected to put on its case.  So is Hinds

11  County ready to call its first witness?

12          MR. SHELSON:  We are, Your Honor, but we have one

13  housekeeping matter.

14          THE COURT:  Oh, I'm sorry.

15          MR. SHELSON:  That's okay.  Your Honor, we have the

16  e-mail and proposed order that Your Honor referenced

17  yesterday, and we're prepared to offer that, I presume for

18  identification only.

19          THE COURT:  Yes, sir.  Thank you so much.  That was the

20  e-mail from DOJ or the monitors that had the compliance -- the

21  questions about the compliance officer, compliance director or

22  whatever; right?

23          MR. SHELSON:  Yes, sir.

24          THE COURT:  Okay.  It will be marked for identification

25  only.  D-158, ID only.

1       (Defendants' Exhibit 158 marked for identification.)

2       THE COURT:  Are we ready to proceed?  Okay.

3  Whenever -- the County may call its witness whenever it's

4  ready.

5       MR. ANDERSON:  Kenny Wayne Jones.

6       (Whereupon, the witness was placed under oath.)

7       THE COURT:  Mr. Jones, I'm going to ask -- you can

8  remove the mask.  Speak into the microphone.

9       THE WITNESS:  Thank you.

10      THE COURT:  The court reporter is taking down

11 everything that's being said, so please speak at a pace at

12 which she can keep up with you.  Allow the lawyers to finish

13 their questions before you begin to speak so that the two of

14 you will not be speaking at the same time.  Try to make sure

15 if you're going to nod or shake your head in response to an

16 answer that you also give a verbal response and try to avoid

17 using "uh-huh" and "uh-uh."  They're spelled the same and they

18 have totally different meanings from time to time, so

19 we'll just -- I'll be monitoring that as well.

20      So for the record, could you state and spell your name.

21      THE WITNESS:  Kenneth Wayne Jones, K-e-n-n-e-t-h,

22 W-a-y-n-e, J-o-n-e-s.

23      THE COURT:  All right.  Thank you.

24      You may proceed.

25      MR. ANDERSON:  Thank you, Your Honor.

1                   **KENNETH WAYNE JONES,**

2              **having been first duly sworn, was examined and**

3    **testified as follows...**

4                   **DIRECT EXAMINATION**

5    **BY MR. ANDERSON:**

6    Q.   Who are you employed by?

7    A.   Hinds County Board of Supervisors.

8    Q.   Tell us what's your educational background, beginning

9    with college.

10   A.   Jackson State University, BS in technology; Jackson State

11   University, master's of education technology; Business

12   Advantage Program, executive certification, Else School of

13   Management.

14   Q.   Is that Millsaps College?

15   A.   That's Millsaps College.

16   Q.   Do you have any military service?

17   A.   I do.

18   Q.   Tell the Court about it.

19   A.   Twenty-four years, retired veteran in the medical field.

20   Q.   And an honorable discharge?

21   A.   Yes.

22   Q.   What is your position with Hinds County?

23   A.   County administrator.

24   Q.   And how long have you held that position?

25   A.   A little over a year.

```
 1   Q.   And did you have any position with Hinds County before
 2   you were the administrator?
 3   A.   I did.
 4   Q.   And what was that?
 5   A.   Before that I was the director of administration; and
 6   before the director of administration, I was the federal
 7   lobbyist for the County.
 8   Q.   Have you held public office before?
 9   A.   I have.
10   Q.   And tell the Court about it.
11   A.   Twelve years as a city councilman in Canton, Mississippi.
12   Eight years as a state senator out of District 21.
13   Q.   And did you hold any leadership positions in the
14   legislature?
15   A.   I did.
16   Q.   What were they?
17   A.   Other than the regular chairmanships of your committees,
18   chairman of the Legislative Black Caucus for four years.
19   Q.   I'll hand you a document --
20        MR. ANDERSON:  May I approach the witness, Your Honor?
21        THE COURT:  Yes, you may.
22   BY MR. ANDERSON:
23   Q.   Tell the Court what that document is.
24   A.   This is a breakdown of our -- Hinds County Board of
25   Supervisors' '21-'22 budget.
```

```
 1    Q.   Was that document generated by you and your office?

 2    A.   Yes, it was.

 3    Q.   Is it a public document of Hinds County?

 4    A.   It is.

 5    Q.   Tell the Court what Hinds County's general fund -- the

 6    amount of it.

 7    A.   The general fund is 80.5 million.

 8    Q.   And how much is the sheriff's budget?

 9    A.   28 million.

10    Q.   And what is the detention budget?

11    A.   The detention budget is 18 --

12         MS. STEEGE:  I'm sorry.  If counsel could identify

13    which document this is.

14         THE COURT:  I'm sorry?

15         MS. STEEGE:  Could you identify which document?

16         THE COURT:  Oh, is that one of the exhibits?

17         MR. SHELSON:  No, sir.  He's just using it as a

18    demonstrative for testimonial purposes.

19         THE COURT:  Do you all see it on your screen?

20         MS. STEEGE:  We do.  Thank you.

21         THE COURT:  Do you want to take a copy of it?

22         MS. STEEGE:  Could you provide a copy of it?

23         MR. ANDERSON:  I'm trying to find it.  Hold on.

24         THE COURT:  They got a copy.

25         MR. ANDERSON:  I've got a copy somewhere, Your Honor.
```

```
 1            THE COURT:  They have it.  They have it now.
 2            MS. STEEGE:  Thank you.  Yes.  Thank you.  Appreciate
 3     it.
 4     BY MR. ANDERSON:
 5     Q.   Would you tell the Court about the percentages as it
 6     relates to the budget.
 7     A.   Yeah.  Broken down into its entirety, if you look at the
 8     total County budget, the sheriff budget is going to be
 9     34 percent of the entire County budget, which is 80.5 million,
10     and 60 percent -- 66 percent of the sheriff's budget go to
11     detention, which is 22 percent of the entire budget, once
12     again the 80.5 million.
13            MR. ANDERSON:  Your Honor, I'd like to have this
14     document entered into evidence.
15            THE COURT:  You're just using it for demonstrative
16     purposes?
17            MR. ANDERSON:  Okay.  Thank you, Your Honor.
18     BY MR. ANDERSON:
19     Q.   This document was generated by your office and is
20     accurate as of the time that it was prepared?
21     A.   That's it.
22            MR. ANDERSON:  I'd like to hand Mr. Jones another
23     document, Your Honor.
24            THE COURT:  All right.
25            MR. ANDERSON:  I think this document has previously
```

1    been submitted to the Court and to the United States as

2    D-1357; am I correct?  D-142.

3    BY MR. ANDERSON:

4    Q.   Mr. Jones, do you see this document?

5    A.   Yes, I do.

6    Q.   Did your office generate it?

7    A.   Yes, we did.

8    Q.   And is it accurate?

9    A.   It's accurate.

10   Q.   And on the first page of this document, tell the Court

11   how much money was paid to the monitors for the years

12   enumerated.

13   A.   Total budget of 1.2 has been paid out.

14   Q.   Okay.  This amount --

15   A.   1.2 million.

16   Q.   The amount that's paid to the monitors, is that amount

17   part of the budget of Hinds County?

18   A.   No, it's not.  That's not budgeted in our regular budget,

19   additions for the year when we do our budgeting process.  This

20   whole thing has not been a part of our budget.

21   Q.   Tell the Court what -- the position of Hinds County Board

22   of Supervisors as it relates to the payment to the monitors.

23   A.   The Hinds County Board of Supervisors take the position

24   that because we're under a consent decree, that anything that

25   comes in from the monitors is paid or looked at or acted upon

1    without question.

2    Q.   Are the amounts paid to the monitors in any form or

3    fashion scrutinized by your office or by the Board of

4    Supervisors?

5    A.   Not at all.  Not at all.

6    Q.   I'd like for you to look at page 2 of this document.

7    Would you tell the Court the amount that was paid to one of

8    the monitors, Ms. Simpson, for December, January, February,

9    and March of 2019 and '20.

10   A.   December -- December, it appears we paid 35,000; January,

11   we paid 19,000; February, we paid 20,000; and subsequently

12   27,000 the next month.

13   Q.   These amounts were paid mostly during the COVID period,

14   were they not?

15   A.   Yes, they were during the COVID period.

16   Q.   Do you know whether or not the monitors made visits to

17   Hinds County or Mississippi during that time?

18   A.   Not during that time.

19   Q.   Did you or your office audit any of these numbers?

20   A.   No, we didn't.  We just looked at what was presented and

21   sent it to be paid.

22   Q.   Going forward, how does Hinds County budget the monitors'

23   fees going forward?

24   A.   We're going to look at it because all of this has cost

25   Hinds County budget.  Process is in disarray with operations

1    facilities and also administration, so with this being

2    unbudgeted, we have to monitor what we're doing going forward.

3    Q.   I know you haven't been here during most of the trial and

4    you've got duties else places, but there was testimony by

5    Major Bryan that she spent 600 to $700 out of her own pocket

6    to buy pizzas to incentivize the detainees to get COVID

7    vaccines.  What do you know about that?

8    A.   I remember -- I met with the director of administration,

9    and I remember issuing a purchase order and telling them to go

10   ahead and do it, to buy the pizzas to give them some type of

11   incentive for vaccination at the prison since we had had a

12   major COVID outbreak.

13         Now, the second time around, I questioned the director of

14   administration and slowed him up a little bit because I told

15   him I never got a report on if we were successful with the

16   first round of pizzas, so I wanted to know if it increased the

17   number, did it stay the same, or what.  I never did get that.

18         Anyway, I allowed the second group -- I allowed the

19   second purchase of the pizzas, so I don't know anything about

20   Kat Bryan buying pizzas, because that came through my office.

21   Q.   The County and the taxpayers paid for those pizzas?

22   A.   They did.

23   Q.   Would you tell the Court about the procurement process in

24   place at Hinds County.

25   A.   Our procurement process is by law.  It's the same

1    procurement process everywhere.  5,000 -- up to $5,000,

2    general services.  Past $5,000, you've got to get a couple of

3    quotes.  Past $50,000, three bids.  Just the regular things

4    that we deal with in that process.

5    Q.   You and every other County?

6    A.   Yes.

7    Q.   And if the procurement process for some reason is abused,

8    what happens?

9    A.   Well, first of all, who -- you're going to pick out who

10   identified the procurement process, who violated it, because

11   it becomes a matter of the state auditors regulating that.

12   You could have some personal -- personal issues behind that

13   and paying it back.

14   Q.   The testimony in this case has been critical of the

15   purchasing process for Hinds County.

16   A.   Okay.

17   Q.   Has there ever been a time or an occasion that you or

18   your office violated any of the procurement process efforts?

19   A.   No, there hasn't been any time.  If there was anything

20   that was questioned by my facilities people or administration,

21   it was coming directly from me because I wanted to make sure

22   that we were in proper form of what we were doing.  If we

23   designated something an emergency, that gave us a little more

24   leeway to purchase immediately than the normal process.

25   Q.   Am I to -- what is the personal responsibility that

1    people have for violating those state laws?

2    A.   Well, if they violate that state law, they got to pay

3    that money back.  That's a personal liability.

4    Q.   There's been testimony in this case about a meeting that

5    took place January the 25th of 2022, and that meeting involved

6    Ms. Simpson and Mr. Parrish.  Were you at that meeting?

7    A.   I was.

8    Q.   Would you tell the Court what you remember about that

9    meeting.

10   A.   Well, what I remember about that meeting is we were

11   getting ready to go down to see and talk to Ms. Simpson and

12   Mr. Parrish about everything.  I believe that my attorney

13   instructed me after a while to just, you know, let him do it

14   because I think I got emotional because my purpose in why I

15   got emotional is because half of the things that

16   Ms. Simpson -- we have been working so diligently trying to do

17   this, but half of the things Ms. Simpson brought to the table,

18   I'd never heard before.  And if we've had a jail administrator

19   for seven or eight months, almost, then why are we being faced

20   with things that we don't know anything about when we're

21   controlling the purse strings to get everything done?

22   Q.   What items were brought to your attention in that

23   meeting?

24   A.   There were numerous items that were brought, but the ones

25   I remember that were my first time hearing, they talked about

1    the cameras, tables, uniforms, and none of that had been

2    addressed with anybody from my office at any time.

3    Q.   And for those items to be secured, would it have to come

4    through your office?

5    A.   It would -- it would have.

6    Q.   Tell the Court about the QCHC contract and what it is.

7    A.   That's our inmate -- that's our inmate medical.  That's

8    who we use.  We pay them over $3 million a year to provide

9    medical service to our inmate population, and they're a

10   company based out of Alabama.

11   Q.   How long has that contract been in place?

12   A.   From what I could see, going back I know over ten years.

13   Q.   Are there other medical contracts in place for the

14   detainees at the Hinds County Detention Center?

15   A.   There are.  If they have to go to -- have an emergency,

16   we take them to Merit Health and, you know, we have to

17   compensate them also.

18   Q.   What, if you recall, was paid to Merit Health last year,

19   2021?

20   A.   I think we paid close to $2 million, just from my

21   recollection.  It was close to 2 million.  It may have been

22   more on health problems that we had within the jail.

23   Q.   What other services do the taxpayers of Hinds County

24   provide to the detainees at the detention center?

25   A.   When you say "what other services," you're talking about

1  clothing?  You're talking about clothing --

2  Q.  We're aware of that, but I'm talking about:  Does Hinds

3  County provide the public defender program?

4  A.  Oh, they do.  They do.  If you cannot afford, we do

5  provide a public defender program.

6  Q.  And do you know how much that public defender program

7  cost Hinds County?

8  A.  Roughly 1.8 million last year once we looked at it.  The

9  public defender program.  We spent 1.822 on the public

10  defender program.

11  Q.  The testimony in this case has been that Hinds County

12  Detention Center is in need of a recruiting and a retention

13  effort.  Do you know anything about that?

14  A.  Oh, yes.  We've talked about that numerous times on how

15  we could do it.  So we did the 5 percent increase because,

16  talking to the monitors, they said that would be good for us

17  to do.  So the Board voted unanimous on trying to get that to

18  them.

19      The other thing we did, the baseline salary -- we met

20  with the sheriff.  He gave us a figure.  We added an

21  additional 31,000 right now in real time to improve the base

22  salary.  So we've been working on that.

23  Q.  There's been testimony in this case, especially from

24  Ms. Simpson, that there's never been a -- the County has never

25  addressed retention.  Is that accurate?

1    A.   Not at all.

2    Q.   Has the County attempted to put a program to have direct

3    payment in a checking account for employees?

4    A.   Now, when you say "direct payment," do you mean direct

5    deposit?

6    Q.   Yes.

7    A.   We've always had direct deposit.  It's just from a human

8    resource and labor law standpoint, in order for us not to pay

9    employees more when they separate from Hinds County, they have

10   to meet the criteria of the hours and the leave time in order

11   to be eligible for direct pay.

12   Q.   As a part of the retention and recruiting efforts, was it

13   ever brought to your attention that the employees should be

14   paid twice monthly rather than monthly?

15   A.   Well, they said it would be better.  We talked about it.

16   I remember Ms. Simpson bringing it up.  We started to act on

17   it then, and we are currently in the process of getting the

18   biweekly pay.  It takes a little while because you have to

19   look at the providers.  We don't want the employees to lose

20   pay at the inception.  So we are working on that now, but it

21   was voted on almost three months ago.

22   Q.   Has there been an effort to pay detention employees a

23   bonus?

24   A.   Well, they asked for a bonus.  They tried to see -- and

25   when I say "they," some of our legal people, some of our

1    accounting people tried to see if there was a bonus or anybody

2    eligible for it, but bonuses are against the law, and once we

3    found out that bonuses were against the law, then we knew we

4    couldn't do bonuses.

5    Q.   Did you pay any amount to the employees at the detention

6    center that was --

7    A.   We did.  We went ahead and did -- when we got our money

8    from the federal government, we looked at the premium pay

9    status, based on the criteria, and we went from the lowest pay

10   to the highest pay, and we did adjust that salary.  So it went

11   from 4,000 to 2,000.  The lowest paid got 4,000 extra dollars;

12   the middle pay, they were at three; and the highest pay were

13   at two.

14   Q.   Since the time you've been the County administrator, you

15   have attended the board meetings of Hinds County?

16   A.   I have.

17   Q.   You have witnessed all of the requests that have come to

18   the Board of Supervisors from the sheriff's office and from

19   Mrs. -- her name escapes me now, but the administrator of the

20   jail.

21   A.   Okay.

22   Q.   And was there ever a time or an occasion that any request

23   to the Board of Supervisors was rejected?

24   A.   There was never, and besides the Board of Supervisors

25   meeting, we were having additional meetings with all the

 1    stakeholders so that the continuity and what everybody wanted

 2    was, we were doing that also.  So we knew everything that was

 3    being asked of us, and everything that was asked of us, we

 4    would take it to the Board.  The Board would vote unanimously

 5    for everything that they've asked for.

 6         MR. ANDERSON:  Let me -- may I approach the witness,

 7    Your Honor?

 8         THE COURT:  You may.

 9    BY MR. ANDERSON:

10    Q.   Are you in charge of the minutes of the Board of

11    Supervisors?

12    A.   No, I'm not.  That would be chancery, but I'm aware of

13    the minutes.

14    Q.   Okay.

15         MR. ANDERSON:  Give me just a second, if you would,

16    Your Honor.

17    BY MR. ANDERSON:

18    Q.   Mr. Jones, there's been testimony in this case about

19    cameras at the detention center.

20    A.   Right.

21    Q.   GoPro cameras.  What do you know about those cameras and

22    the discussions relating to it?

23    A.   The only time, and I mean the only time, that I've heard

24    anything about a GoPro camera was when Ms. Simpson walked in

25    that meeting and asked me about GoPro cameras, and I had not

1   heard one iota about that at any time before then or now.

2   Q.   Since that time has there been any effort to secure those

3   cameras?

4   A.   Yes.  The facility manager, I called him in.  I called

5   the facility manager in to the meeting so that they could talk

6   about these specific things, because that would be in his

7   area.  So at that time he started to look at and add that to

8   his list of things that he already had.

9          MR. ANDERSON:  Your Honor, I'm through, and I'd like to

10  request the admission into evidence of D-142 that Mr. Jones

11  has testified about.

12         THE COURT:  D-142?

13         MR. ANDERSON:  Yes, sir.

14         THE COURT:  Any objection from the United States?

15         MS. STEEGE:  No objection.  Thank you.

16         THE COURT:  Okay.  D-142 will be received into

17  evidence.

18             (Defendants' Exhibit 142 entered.)

19         MR. ANDERSON:  I'm through, Your Honor.

20         THE COURT:  All right.  Any cross-examination of this

21  witness?

22         MS. STEEGE:  Yes, Your Honor.

23         THE COURT:  All right.  You may proceed.

24                      **CROSS-EXAMINATION**

25  **BY MS. STEEGE:**

1  Q.   Good morning, Mr. Jones.

2  A.   Good morning.

3  Q.   My name is Sarah Steege.  It's good to meet you.

4  A.   Nice to meet you, too.

5  Q.   Let's start with the jail administrator position.

6  Mr. Jones, you received Major Bryan's November 2021,

7  resignation letter; is that right?

8  A.   Did I do what now?

9       THE COURT:  It will probably help -- I'm sorry -- if

10 you take off your mask and speak directly into the microphone.

11 Your voice is light.

12      MS. STEEGE:  Is this better?

13      THE COURT:  That's better.

14 BY MS. STEEGE:

15 Q.   Mr. Jones, you received Ms. Bryan's November 2021

16 resignation letter; is that right?

17 A.   I did not.

18 Q.   You were aware that she had intended to resign, though?

19 A.   I wasn't aware, but I was told by the sheriff's

20 department that there was some document of resignation, but

21 nothing ever came to my office.

22 Q.   When did you first become aware of that plan?

23 A.   I'm not sure.  I think it was later on in the year

24 because it was going to be -- what I recall, it was going to

25 be effective for February, and I remember telling the sheriff

1    if we were going to accept it, just accept it.  We'll move

2    forward.

3    Q.   Did you ever try to speak with the sheriff -- and when

4    you say "the sheriff," was this Interim Sheriff Crisler or

5    Sheriff Jones?

6    A.   It was Sheriff Crisler beginning, and later on when the

7    resignation letter was talked again -- talked about again, it

8    was our current sheriff.

9    Q.   Did you ever speak with either sheriff to try to convince

10   either sheriff to give Major Bryan the support that she had

11   asked for?

12   A.   Yes.  Originally from the beginning, we said we were

13   going to give her everything that she needed, and we did that.

14   Q.   You'd agree, though, that she had identified some gaps in

15   that support before she left?

16   A.   I'm not going to agree to that because I don't know.  No

17   one ever talked to me about any gaps or anything else.  All I

18   know is you had three sheriffs.  You had the first sheriff,

19   the second sheriff, and the third sheriff, and there were

20   always issues.  And I don't even know what the issues were

21   because it never got to my office, but out of three sheriffs

22   that each one of them had over 20 years' experience, at some

23   point somebody would have known what they were doing, and it

24   appeared that there kept on being rifts between administration

25   and what the administrator was doing, but we were not aware of

1  it.

2  Q.  Do you meet regularly with jail administration?

3  A.  No, I do not.

4  Q.  Okay.  So after Major Bryan left, Chief Anthony Simon was

5  the interim jail administrator; correct?

6  A.  I don't know.

7  Q.  Okay.  There wasn't a contract presented for Chief Simon

8  to the Board of Supervisors; is that right?

9  A.  It may have been, but it would have gone through legal.

10  Q.  Okay.  I'd like to show you what's been marked for

11  identification only as PX-113.  I'll first provide it to

12  counsel.

13      MS. STEEGE:  If I may approach, Your Honor?

14      THE COURT:  You may.

15  A.  Thank you.

16  BY MS. STEEGE:

17  Q.  Is this document the board meeting agenda for the

18  February 7th meeting --

19  A.  Yes.

20  Q.  -- 2022?

21      And do you see on the top where it indicates Sheriff

22  Jones had put forward a jail administrator contract?

23  A.  I see it.

24  Q.  Would that have been the contract for Mr. Frank Shaw?

25  A.  February 7.  I would assume so, but I'm not sure.

1  Q.   Did you view the contract in question?

2  A.   I did not.

3  Q.   And was that contract discussed at the meeting?

4  A.   No.  We did have a discussion at some point after the

5  resignation that we needed to do something.  I -- I had to

6  call together my administration, the legal team, the sheriff

7  to talk about our new plan since Major Bryan had given her

8  resignation, so that I did do.  We talked about the sheriff

9  just doing what he had to do going forward.  Now, as far as

10  what's in the contract, I didn't see it.

11  Q.   So as of February 7th, did you have an understanding as

12  to whether this jail administrator contract going forward was

13  for a temporary or a permanent position?

14  A.   It would be temporary till we could do a search.

15  Q.   Now, again, that was the contract for Mr. Shaw?

16  A.   Yes, I believe that name -- that's it.

17  Q.   He was moving here from Florida; right?

18  A.   Now, I want to be specific with my answers, and if I

19  don't remember something, I'm not comfortable with it.  I

20  think, I'm not sure, where he was coming from because I wasn't

21  that close to him.

22  Q.   Sure.

23       MS. STEEGE:  If we could pull up Defendants'

24  Exhibit 154.  And I apologize.  If we could avoid publishing

25  it.  It includes some personal information there.

1615

```
 1   BY MS. STEEGE:
 2   Q.   You'd agree that the address on the top left indicates a
 3   Florida residence?
 4   A.   Yes.
 5   Q.   All right.  Thank you.  Now, Mr. Frazier, Fernandez
 6   Frazier at Henley-Young, he sent you his January 2022
 7   resignation letter; is that correct?
 8   A.   He took it to human resources.  To date I haven't seen
 9   it.
10   Q.   Did you understand what might happen if he resigned?
11   A.   No, I did not.  That's a staffing issue to me.  They told
12   me he resigned.  I put somebody else there in two days.
13   Q.   Did you talk to the board or the sheriff about any
14   support that Mr. Frazier might have requested?
15   A.   Yes, I did.  We've always talked to the former sheriff
16   and this sheriff about Henley-Young and providing them the
17   services that they need.
18   Q.   Okay.  But you'd agree that Mr. Frazier had identified
19   some gaps in support prior to his resignation?
20   A.   Yes.  He talked about -- I don't know if it was
21   necessarily gaps in support.  He talked about staffing issues.
22   He talked about the lack of support within the facility, but I
23   don't know if he talked about gaps with the sheriff.
24   Q.   Okay.
25        MS. STEEGE:  Let's pull up PX-12.  12.
```

1   BY MS. STEEGE:

2   Q.   Mr. Jones, is this the -- well, this is the resignation

3   letter for Mr. Frazier.  That wasn't addressed to you; is that

4   right?

5   A.   Yes, it is.

6   Q.   Do you meet regularly with the Henley-Young

7   administration?

8   A.   I do not.  My director of administration does.

9   Q.   Okay.  During this status conference, you previously told

10  the Court that the County needed to do its part to support

11  Mr. Frazier; is that right?

12  A.   To support the overall consent decree, including

13  Mr. Frazier.

14  Q.   Okay.  But I believe you also spoke specifically to

15  Mr. Frazier's staffing needs relative to the County's support

16  to meet them?

17  A.   Right.  I asked everybody to do what they had to do to

18  make sure that we were doing our part in trying to increase

19  the staff and all of that.

20  Q.   Sure.  And that included a previous statement to this

21  court?

22  A.   Yes.

23  Q.   Okay.  So remind me.  When were you appointed County

24  administrator?

25  A.   March the 1st, 2021.

1  Q.   Okay.  So you've been there for, let's say, 11 months?

2  Late February.  Nearly a year?

3  A.   A year.

4  Q.   All right.  And that includes your time as interim

5  administrator?

6  A.   Yes.

7  Q.   Okay.  And part of your role as County administrator is

8  to oversee the Criminal Justice Coordinating Committee, or

9  CJCC?

10  A.   Yes.  We met three times to be exact.

11  Q.   But you didn't hold any meetings between April and

12  September 2021?

13  A.   I don't think so.  I think in the process of us changing,

14  we put it back together, but we did have -- we did have one

15  meeting late last year to reintroduce the committee, and we've

16  had a couple since then.

17  Q.   Okay.  So there was a meeting, I believe, in

18  September 2021?

19  A.   May have been.  I'm not sure.

20  Q.   Okay.  Any other meetings since that September meeting?

21  A.   With that committee?

22  Q.   With the CJCC.

23  A.   Yes.  We've had either one or two meetings since that

24  meeting, because now we're trying to identify who we're going

25  to bring back.  So it may be one more meeting since then.

1  Q.   Okay.  At the September meeting, just to confirm, the

2  CJCC didn't have a quorum?

3  A.   They didn't have a quorum.

4  Q.   And at that one or two meetings that you mentioned since

5  September, was there a quorum present at those meetings?

6  A.   There was not a quorum because that's why we had to

7  rebuild it to find what members we were going to put back on

8  there.

9  Q.   So it didn't have representation from a range of

10  stakeholders identified in the consent decree?

11  A.   Well, it didn't have representation from the City of

12  Jackson and the police department.  All of the County

13  stakeholders were there.

14  Q.   Was there representation from Hinds County Behavioral

15  Health Services?

16  A.   Behavior Health?

17  Q.   Uh-huh.

18  A.   I'm not sure, because there's a number of people that's

19  in the room that I don't know.

20  Q.   Okay.  Was there representation from the Mississippi

21  Department of Mental Health?

22  A.   I'm not sure.

23  Q.   What about the Hinds County Circuit, Chancery, and other

24  County courts?

25  A.   Yes, they were there.

1  Q.   The circuit court was there?

2  A.   The circuit and chancery, Judge Green and a few more.

3  Q.   What about the district attorney's office?

4  A.   Yes, we had representation from the DA's office.

5  Q.   And the public defender's office?

6  A.   Yes.

7  Q.   So just to confirm, there were no meetings from when you

8  started as administrator till September, and there's been one

9  or two since that meeting in September?

10  A.   Right.

11  Q.   So you'd agree there was some delay in getting the CJCC

12  moved forward in this transitional period?

13  A.   Right.

14  Q.   Now, under the consent decree, the County's required to

15  engage an outside consultant to provide technical assistance

16  on pretrial diversion; correct?

17  A.   You're asking me something that's out of my purview, but

18  I would assume so.

19  Q.   Sure.  We can pull up PX-1, which is the consent decree,

20  page 51 of the document, and let's look at paragraph 118,

21  which says "The County will select and engage an outside

22  consultant to provide technical assistance to the County and

23  the CJCC about, among other things, strategies to reduce" --

24  well, "strategies to reduce the jail population and diversion

25  from criminal justice involvement."  And that technical

1   assistance will then lead to a public report as well.

2       That report hasn't been completed; correct?

3   A.   Not -- not to my knowledge.

4   Q.   And that kind of report would be provided to your office?

5   A.   It would not be.

6   Q.   You oversee the CJCC, though; right?

7   A.   Right.  That report would go first with our legal

8   committee to see if everything in there is accurate, and then

9   that report would be filed with my office.  So I haven't seen

10  that report or even with the process on this report, none of

11  it's coming directly to me.

12  Q.   So just to confirm, this is -- these provisions

13  include -- well, paragraph 118 was part of the original

14  consent decree.

15  A.   Okay.

16  Q.   Which means it was entered in 2016.  Just to confirm, I

17  guess, six years and we've not implemented this provision?

18  A.   With me being there a year, I would just say, hey, it's

19  all the same thing and we're relevant to doing everything

20  that's here.  All I know, we've tried to pull all this

21  together in the process of the last year.  So when you start

22  talking about anything that happened before then, I see where

23  it talks about the diversion and the recidivism.  We've

24  discussed all that and tried to do what we had to do.

25  Q.   Okay.  But just to confirm, this report has not yet been

1    completed and put in practice with the CJCC's work?

2    A.   No, not to my knowledge.

3    Q.   Okay.  Now, when a report goes to the legal committee,

4    you would be aware of their work in reviewing it; correct?

5    A.   I would be.

6    Q.   And so you're not aware of any report like this having

7    been submitted to that legal committee?

8    A.   I'm not.

9    Q.   Now, you talked about your involvement with reviewing

10   repairs for maintenance and so forth at the jail.  There's no

11   requirement for how quickly the Board has to decide on a

12   maintenance request for the jail; is that right?

13   A.   That's up to the director of facilities.  The director of

14   facilities give report on what they're working on directly to

15   my office, but as far as the hands-on process, he makes the

16   determination if we need to do something right away or if he

17   needs to put his hand on something.  That would be his

18   professional -- just to try to do what he got to do.

19        Now, I will say this:  I've had some problems with some

20   of the things that were going on where we had to go back and

21   look and see contracts that were a part of what we were doing

22   with the consent decree, and I told the director of

23   facilities, when it comes down to doing things at the jail,

24   make sure we are where we are, because we don't just have an

25   open checkbook to do everything.  So make a determination of

1    what's priority and what possibly can wait.

2    Q.   Okay.  Who's the director of facilities that you're

3    referring to?

4    A.   Mr. LeRoy Lee.

5    Q.   And does Mr. LeRoy Lee have authority to prioritize some

6    maintenance requests over others?

7    A.   Yes, he does.

8    Q.   Do you approve any jail maintenance requests as well?

9    A.   Well, he would approve them and bring them to my

10   attention.  That's the process we put in place from the

11   administrator standpoint.

12   Q.   Okay.  Now, after Mr. Lee reviews these requests, they go

13   to you after that?

14   A.   After Mr. Lee reviews the request, Mr. Lee makes a

15   determination on the request and then lets me know that this

16   determination has been made and this is what we're doing at

17   the jail, whether it's in the pod or anywhere else

18   facility-wise within the County.

19   Q.   Sure.  And how long does that process typically take from

20   the request being made, to go to Mr. Lee, to get to you?

21   A.   That's -- all of that is in the same vein.  Now, where we

22   do have problems at, Mr. Lee may have to get equipment from

23   somewhere based on our procurement procedures, and with COVID

24   we don't have an avenue sometime to get things as fast as we

25   would.  But we do have the right to make an emergency

1    designation, and we can go outside of our perimeters on

2    procurement to get what's needed if it's something that's

3    going to cause health or anything else, and we've done that

4    before.

5    Q.   I believe you said that anything above a $5,000 amount

6    has to go to the full board?

7    A.   Well, anything above the $5,000 amount has to get a

8    couple quotes, and we easily get the quotes.  And getting the

9    quote is a phone call.  So that's not taking days to do that.

10   Q.   Okay.  So what level has to go to the Board, then?

11   A.   Anything that goes -- well, the Board has already given

12   us the authority to do what we do.  Now, if we've got to take

13   some bids, we go back to the Board and say, "We may have some

14   bids on this," and we go through the bidding process and we'll

15   alert the Board to what we're doing, but we don't have to wait

16   on the Board to do what needs to be done on the consent decree

17   at the jail.

18   Q.   So I think you talked about overall the Board raising

19   detention officer salaries.

20   A.   Yes.

21   Q.   That does have to go through the Board; right?

22   A.   Right.  That did go through the Board.

23   Q.   All right.  So can you give other examples of things that

24   you can approve -- well, that would have to go to the Board at

25   the jail?

1    A.   Well, anything that would be constituted salary-wise,

2    fiduciary issues like that.  Where we're going to give

3    employees additional incentive money or anything, it goes to

4    the Board.  Anything that we need to do from a facility

5    standpoint that does not hinder anything, we meet every two

6    weeks so we put it on the agenda to approve it.  So once it's

7    approved, we go with it.

8    Q.   There's no requirement that something raised at one board

9    meeting has to get voted on at that meeting; right?  It could

10   get held off to a subsequent meeting?

11   A.   It very well could.  That depends on what the Board wants

12   to do with it.  If the Board want to put it off, if the

13   administrator wants to put it off, we can put it off.

14   Q.   And do jail supplies have to go through the Board?

15   A.   No.  No.  Jail supplies were basically -- was at the

16   determination of Mr. Lee and our vendors on what could be

17   done, because that budget was already there.

18   Q.   So when Mr. Lee receives a request for supplies and so

19   forth, that's coming from the sheriff; correct?

20   A.   Well, it very well could be coming from the sheriff,

21   because they work -- they work together.  The sheriff may want

22   this or that.  Mr. Lee may accommodate that request, or

23   Mr. Lee may go to purchasing to accommodate that request.

24   Q.   Okay.  But the jail administrator wouldn't go directly to

25   Mr. Lee to request supplies; is that right?

1  A.   Well, she should.  She should go directly to Mr. Lee

2  because that's the process we had in place.  Now, when we did

3  have some issues, that was the issue I had, because I couldn't

4  by law let the jail administrator have a purse string.

5  Q.   I think we're talking about different questions.

6  A.   Okay.

7  Q.   I just want to clarify.

8  A.   All right.

9  Q.   So when the jail administrator identifies a need for more

10  supplies --

11  A.   Okay.

12  Q.   -- they would have to go to the sheriff?

13  A.   She could either go to the sheriff or she could talk to

14  Mr. Lee.  She had every avenue that she needed to get what she

15  asked for.

16  Q.   Okay.  There's no separate budget for supplies, though.

17  That's within the jail administrator's purview; correct?

18  A.   Well, we have line items.  We have line items that we get

19  things out of just for our bookkeeping purposes.  We can

20  understand what we're doing and why we pull it out of there,

21  because that's a part of our regular budget.  So the

22  sheriff -- the sheriff has his budget that we've already

23  talked about.  So when anything is needed, go through the

24  sheriff to get it or other areas, but it's all there.

25  Q.   How many line items are available for jail maintenance?

1  A.   I don't know.  I have no idea.

2  Q.   Just to clarify, I'm not referring to how many line items

3  the sheriff him or herself would have.  There's no line items

4  specifically for the jail administrator to use for

5  maintenance; is that correct?

6  A.   I'm not sure.  That would come from the sheriff's office

7  if they were going to use a particular line item for what the

8  jail administrator wanted.  Whatever process they were going

9  to use, it would come from the sheriff.

10 Q.   So the sheriff would have to decide whether to allot a

11 line item --

12 A.   Oh, yeah.

13 Q.   -- for the jail administrator to then use for

14 maintenance?

15 A.   Right.

16 Q.   Let's switch gears briefly here.  You mentioned that you

17 attend the meetings of the Board of Supervisors?

18 A.   Yes.

19 Q.   And you read the meeting agendas and minutes when that's

20 involved?

21 A.   Right.

22 Q.   So you're generally familiar with the initiatives that

23 are brought before the Board?

24 A.   I see them on the agenda.

25 Q.   Sure.  And you're familiar, then, with requests for

1    County funding?

2    A.   When you say "County funding" --

3    Q.   Requests from different departments to use County funds

4    for their purposes.

5    A.   I don't think I'm sure -- I'm not -- can you say that

6    another way so I can understand?

7    Q.   Well, let's look at something more specific.

8    A.   Okay.

9    Q.   I'd like to bring up what's marked for identification as

10   PX-114.

11   A.   Thank you.

12   Q.   And these are the Board meeting minutes from the

13   December 6, 2021, meeting.

14   A.   Okay.

15   Q.   Let's turn to page 5 under the second discussion item

16   where it says -- next -- the second "Discussion" item under

17   "Request for Short and Long Term Housing for Psychological and

18   Medical Needs."

19        "Supervisor Archie introduced Hazel Meredith Hall to

20   discuss Short and Long-Term Psychological and Medical Housing

21   needs.  She stressed that the county jail should not be used

22   for housing these individuals and she hoped the Board of

23   Supervisors would assist with housing of these individuals.

24   Supervisor Gavin requested that the County contract and work

25   with the Mental Health Center to see what could be done to

1    provide assistance."

2        Was this the first time that you were aware of a

3    significant number of detainees with mental illness who were

4    housed in the jail?

5    A.    Mental illness and the medical needs have been talked

6    about the whole time I've been there.  This was not the first

7    time.  So we did want to talk about with this, and the reason

8    why some of this came up in December was because there were

9    some contracts that were not -- they were not legal contracts,

10   and we had to go back and go through all of that, talk about

11   mental health, because it was my understanding, the report

12   that I got in my office, was that they had mental health

13   training going on at the jail and there were no contracts for

14   anybody to do mental health.  So, of course, that's a problem

15   because that violates procurement.  So when we talked about

16   this, it was not the first time, but there were other

17   variables that brought this to the table.

18   Q.    You're referring to contracts for training.  You'd be

19   responsible for reviewing contracts submitted for approval;

20   right?

21   A.    The legal team first and then signed off on.  So without

22   a contract, you cannot provide any services to the County till

23   we have proper documentation.  That's anywhere.

24   Q.    Okay.

25        THE COURT:  Make sure -- Mr. Jones, make sure you're

1   always speaking into the microphone.

2       THE WITNESS:  Okay.

3       THE COURT:  You can turn it -- shift it around if you

4   wish.

5       THE WITNESS:  Thank you.

6   BY MS. STEEGE:

7   Q.   So I believe you said these contracts would go to the

8   legal committee.  You'd be aware of when any such contracts

9   were submitted to the legal committee for review?

10  A.   I would be.

11  Q.   Okay.  So you testified there was an issue with the

12  contracts for the mental health training.  Is this training

13  for the detention officers?

14  A.   It was training for the detention officers, and we were

15  talking about the mental health needs of the inmates

16  themselves where we were paying over $3 million and didn't

17  have any -- anything that was constituted as providing these

18  services.  So those are things that we were looking at so that

19  we could streamline where we needed to to fix some of the

20  problems we were aware of.

21  Q.   And this was around the time that the -- well, that there

22  was concern about taking months to pay the mental health

23  trainer for services already provided?

24  A.   Well, you're talking about one particular need in

25  particular.  I'm not going to pay you and I don't have the

1   documentation, because from a fiduciary standpoint somebody's

2   going to be liable for that.  And, now, if you're going to

3   operate within the procurement of the County, you will use the

4   procurement of the County.

5   Q.   Sure.  Just to clarify, contracting issues were the

6   reason there was a months-long delay --

7   A.   Before you go doing the work, you don't go do work just

8   because somebody tell you to go to work.

9   Q.   Sure.

10  A.   You go put a contract in place like anybody else would

11  do, sign off on the contract, and then go provide the service

12  you just said you would provide.

13  Q.   Okay.  I understand that as you described the contracting

14  process, but just to confirm, that -- the contracting process

15  was the holdup in being able to pay the mental health trainer?

16  A.   Exactly.

17  Q.   And you talked about concerns about the contract with

18  QHC.  You haven't appointed a medical contract monitor for

19  that?

20  A.   No, we haven't.  We are looking at some local individuals

21  who probably could look at that contract to see if they could

22  provide what we needed, but we have not been able to find

23  anybody relevant enough that can provide all the services that

24  we're looking for on a local basis, so we've stayed with them.

25  Q.   Sure.  And you've had that contract with QCHC for a

1   number of years now?

2   A.   Right.

3   Q.   Now, the document that we were looking at, the meeting

4   minutes, referred to the mental health center.  That was

5   referring to the Hinds County Behavioral Health Center; right?

6   A.   If the sheriff brought it up and the sheriff addressed

7   it, I'm not sure exactly what agency they were discussing.

8   Q.   Well, it was brought up by a supervisor.

9   A.   Well, yeah.  I'm not sure what -- I don't know because it

10  wasn't a part -- if you look on it, we all have our specific

11  areas that we cover.  So if -- I probably was sitting there

12  looking at what I had to do while they were talking about the

13  mental health.

14  Q.   So towards that, have you or the Board taken any action

15  in working with Hinds County Behavioral Health since that

16  December 6th meeting?

17  A.   I think we've talked to Behavioral Health, Hinds County

18  Behavioral Health, on a number of occasions, because I have

19  talked to Hinds County Behavioral Health on some of these

20  issues to look at it, and they did do an assessment at some

21  point while I was County administrator.  And that's when they

22  came back and said due to the number that we have and what

23  we're looking at, they may not be able to provide the services

24  from a standpoint of operations.  So I've had a discussion.

25  Q.   That was looking at providing services -- basically

1  meeting the needs of detainees that are currently being met by

2  QCHC; correct?

3  A.   Right.

4  Q.   The County has previously gotten a request for funding in

5  order to reduce recidivism; Hinds County Behavioral Health

6  could come into the jail and meet with detainees with mental

7  illness before they were released; correct?

8  A.   I don't know the process on that.  I don't know the

9  process on that.

10  Q.   Are you aware of that having been a request?

11  A.   No.

12  Q.   Okay.

13       MS. STEEGE:  Let's pull up PX-39 at page 117.

14  BY MS. STEEGE:

15  Q.   This is the monitor's fourteenth report.  At the very

16  bottom it says "Other more medium-range tasks and goals were

17  also briefly reviewed....  following up on discussions that

18  had been held with Hinds Behavioral Health about sending a

19  staff person to the jail to meet with detainees who will be

20  referred to Hinds Behavioral Health upon their release, in

21  order to begin to develop a working relationship with these

22  detainees (in an effort to increase the possibility of a

23  successful referral)."  And then it says "A funding proposal

24  to the County was made for this but has not been acted upon."

25       Just -- do you read the monitoring reports in this case?

```
 1   A.   Well, I talked about the monitoring reports with the
 2   attorney.  Are you asking me a question?
 3   Q.   So you don't read the monitoring reports yourself?
 4   A.   No, I don't read the monitoring reports.
 5   Q.   And you weren't aware of this funding request for Hinds
 6   County Behavioral Health to provide in-reach in the jail?
 7   A.   No, I'm not.
 8   Q.   So just to clarify, the prior County administrator didn't
 9   mention this request when you started?
10   A.   No, not at all.
11   Q.   Okay.  So Hinds County Behavioral Health is part of the
12   CJCC; right?
13   A.   It's supposed to be, yes.
14   Q.   Okay.  And as chair of the CJCC, you'd agree that at the
15   next meeting it would be helpful to talk about this proposal?
16   A.   Definitely.
17   Q.   Okay.  Now, part of your job is overseeing various County
18   agencies; right?
19   A.   Right.
20   Q.   And you're aware that within the sheriff's office,
21   detention staff make less money than law enforcement?
22   A.   Well, yes.
23   Q.   And that disparity can mean that detention officers
24   pursue advancement in the patrol ranks instead of staying in
25   detention?
```

1  A.   Well, I think there may be some certifications involved

2  in that.  I'm not sure.

3  Q.   Okay.  Well, separate from certifications, you'd agree

4  that a pay disparity between these two types of jobs can lead

5  detention officers to pursue advancement in the patrol ranks

6  instead?

7  A.   If I gave you that, it would be my opinion, because I

8  don't know for sure.

9       MS. STEEGE:  Let's pull up Defendants' Exhibit 4.  And

10  we're looking at page 7 of the PDF.

11  BY MS. STEEGE:

12  Q.   Do you recognize this report?  I'm sorry.  I should have

13  asked you on page 1.

14       MS. STEEGE:  If we could return to page 1 of the PDF.

15  Thank you.

16  BY MS. STEEGE:

17  Q.   This is the recruitment and retention report commissioned

18  by the Hinds County Sheriff's Office by Mr. Matt Rivera --

19  A.   Okay.

20  Q.   -- issued on January 10th of this year.  Are you familiar

21  with that report?

22  A.   I'm not.

23  Q.   No one's shared this report to you before?

24  A.   I've seen the heading right here, "Recruitment and

25  Retention Report" in a meeting, but I'm not -- I'm not aware

1    of what was in the report, but I do remember seeing "K&E

2    Solutions" and "Recruit and Retention Report."  But I don't

3    know the contents.

4    Q.   Sure.  So you've not had any meetings yet to discuss this

5    report?

6    A.   I haven't had any, right.

7    Q.   And as County administrator, you'd be involved in

8    implementing any strategies related to recruitment and

9    retention?

10   A.   Well, it depends on who was being called to the meeting.

11   It could have been the director of administration with the

12   sheriff and some others.

13   Q.   Who is the director of administration?

14   A.   Stephen Hopkins.

15   Q.   As with the legal committee, were there to be any

16   discussions among those people, they would then report those

17   discussions to you, though; right?

18   A.   They would.  They would give me a briefing and a report.

19   Q.   And you've not gotten any briefing or report along those

20   lines?

21   A.   Not that I know of.

22   Q.   So we were talking about the disparity in pay between

23   detention staff and law enforcement.  Let's return to page 7

24   of the PDF, and this is two -- among the two recommendations

25   that are "absolute must-haves for the agency to realize any

 1    gains.  One is to look at working conditions, and the other,"

 2    it says, "is to recognize the importance of detention

 3    personnel."  Midway through that second paragraph, it refers

 4    to "The disparity in pay between the two roles shows a

 5    distinct philosophical preference towards patrol and

 6    undermines the work and importance of detention officers" --

 7    A.   I can't --

 8         THE COURT:  Whoa, whoa, wait, wait, wait.  One person

 9    at a time.  When you're reading, just slow down.  Just slow

10    down.

11         MS. STEEGE:  Thank you.

12    A.   So the highlighted area, that's what you're reading?

13    BY MS. STEEGE:

14    Q.   I am, yes.  And it continues to say that "This disparity

15    drives internal competition that promotes a divisive culture

16    and hierarchy between the roles with detention officers

17    pursuing advancement in the patrol ranks."

18         Do you disagree with that finding from the retention

19    consultant?

20    A.   I don't know if this is divisive culture, a hierarchy.

21    What I do know is that we've discussed this and the payment

22    based on the fact of the monitors telling us that we should

23    have direct supervision in a system that cannot support direct

24    supervision.  So we couldn't start to pay anybody because they

25    couldn't do anything that they were doing previously and stay

```
 1   safe.  So those are the type of things that we take in

 2   consideration.

 3        I see what you're saying here, but an internal

 4   competition because they feel like they're getting paid more

 5   and want to go to patrol, that's a choice.  I haven't seen a

 6   hierarchy.  The only time I've seen a hierarchy is when

 7   somebody was forced to walk out of their job based on somebody

 8   else telling them this is what they should do.

 9   Q.   Do you agree that sometimes people make employment

10   choices based on being able to make more money elsewhere?

11   A.   I agree with you.

12   Q.   And the salary is a choice, a policy decision, that the

13   County makes?

14   A.   Right.

15   Q.   I just want to clarify.  You referred to direct

16   supervision and safety concerns.  You're saying that providing

17   direct supervision in the jail or supervising in the jail is

18   currently unsafe?

19   A.   When we started -- when I began talking to the monitors

20   on -- one of the big things that the monitors were telling us

21   we needed to fix was direct supervision.  Okay.  Now you're in

22   a facility that was designed wrong from the beginning.  So

23   direct supervision at any point would jeopardize and put

24   people lives at risk, and, I mean, it's just the truth of the

25   matter.
```

1    So it's easy to get up and say you need direct

2  supervision, but you can't take an officer and put them with

3  ten prisoners and expect everything is going to be okay.  And

4  if the federal government doesn't understand that, we have to

5  understand that as the County, because it puts us in harm's

6  way.  So those are the things that we were discussing how to

7  get around.  And from a facility standpoint, there was nobody

8  to blame.  It was just the fact that we had to deal with what

9  we had, and what we had was not sufficient.

10  Q.   So staffing in the jail is currently not enough?

11  A.   If we were going to staff it, we had to figure out how to

12  staff it and staff it safely, you know, because we're trying

13  to keep down incidents.  So all of our conversations that I've

14  had as County administrator was with the sheriff's department.

15  How can we do this safely?  How can we put personnel?  Let's

16  give them 5 percent.  Let's increase the base salary.  But we

17  still got to keep them safe.  So you're talking about the

18  preference toward patrol undermining the importance of

19  detention officers.

20    Well, you go through the process.  You've got to pass

21  your application, your psychological, and your drug.  Once you

22  get that done, then you go through the process and it's you,

23  if you want to do something different.

24    But what we're finding out that's not in the report is

25  that even when you are paid a significant amount of money,

1    contraband still makes its way into the jail.  So if we're

2    undermining anything, we're undermining what we're doing to

3    keep everybody safe.

4    Q.    Okay.  So contraband is still a safety concern in the

5    jail?

6    A.    It definitely is.

7    Q.    Okay.  And I just want to clarify.  Your testimony was

8    that, given the current level of insufficient staff, that

9    providing direct supervision in the jail is unsafe for them?

10   A.    Huh-huh, that's not what I said.  I said that the way

11   that the direct supervision was talked about, if we would have

12   implemented it in your current facility, it would have been

13   unsafe.

14   Q.    Okay.  But I believe you referred to some of the efforts

15   the County has taken towards retention as well.

16   A.    Right.

17   Q.    And we'll talk about that in a bit.  But you'd agree that

18   the jail's ability to put forth enough staff would affect

19   their ability to provide direct supervision?

20   A.    It would be a determination of the sheriff to give us

21   that, but I do believe that if we put enough people down

22   there, we could do better in watching, the surveillance, but I

23   don't know if it would be -- even if we put one to one, I

24   don't know if you'll be safe with direct supervision in our

25   current facility.

1    Q.   Okay.  So you mentioned the sheriff.  It's up to the

2    sheriff, then, to put forth the proposals for the jail to the

3    Board?

4    A.   Well, the sheriff looks at, makes determination,

5    presents, and says, "This is what we're looking for, this is

6    what we're going to do, and this is my recommendation."

7    Q.   Okay.  And then the Board would act on that?

8    A.   Yes.

9    Q.   All right.  You mentioned both the sheriff leadership and

10   the Board.  You'd agree that County executives haven't always

11   advocated for detention staff in the same way that they

12   support law enforcement?

13   A.   I'm not sure.  I don't know, because I can't speak for

14   anybody outside of my administration and what I've seen.  I

15   don't know what previous executives have done toward getting

16   to where we are now.

17   Q.   So you've been there for about the last year; right?

18   A.   Yeah.

19   Q.   Let's stay in the same document and go to page 6 of the

20   PDF, and this is still the report issued January 2022.  Let's

21   look at the sixth item there.  It says "HCSO," I assume Hinds

22   County Sheriff's Office, "executive leadership and County

23   executives are not believed to advocate for detention staff in

24   the same way that they champion law enforcement staff," and it

25   brings up the salary issue again.

1    Do you disagree with that finding from the retention
2    consultant?
3    A.   That would be, to me, hearsay at best, because from all
4    the meetings that I've had with our leadership and the Hinds
5    County sheriff, they've always advocated for detention staff,
6    and there hasn't been any time when they didn't.  So I
7    wouldn't understand where somebody would make a determination
8    where the executives are not believed to advocate, because I
9    haven't seen that.
10   Q.   Okay.  Mr. Rivera was the person that the County
11   contracted with to do a recruitment and retention plan; right?
12   A.   Okay.
13   Q.   And that plan was required by the stipulated order?
14   A.   You're asking me a question?  What was it again?  I'm
15   sorry.
16   Q.   You'd agree that a recruitment and retention plan was
17   required by the stipulated order?
18   A.   Yes, it was.
19   Q.   You mentioned that you were -- had -- well, we're, I
20   think, questioning this finding.  Did you talk to any of the
21   officers who walked out of the jail in November out of
22   dissatisfaction?
23   A.   No, I did not.  That was a jail issue.  I let -- I did
24   have a conversation with Major Bryan, and Major Bryan informed
25   me that she was trying to avoid another walkout, and at that

 1   time I told her that I'm waiting on the sheriff to give us
 2   some direction on that, but I told her my personal opinion as
 3   the County administrator, if they walk out this time, we're
 4   going to give them a recommendation.  Even with us being
 5   short, there's just certain things you can't -- if you're
 6   going to walk out of your job every time -- and that was the
 7   first time we've ever had a walkout, because I went back and
 8   looked.  I went back and looked to see when the last time we
 9   had a walkout in the jail, and we hadn't had one in all the
10   years you've had this consent decree.
11        So now all of a sudden you got a walkout in the jail and
12   you don't think that comes from inside from somebody?  So I
13   asked the sheriff to do an investigation to find out where he
14   thought this possible disruption could come within our
15   leadership.
16   Q.   All right.  Going back to the report briefly, you'd agree
17   the Rivera report identifies recommendations?
18   A.   Yes, it does.
19   Q.   You don't have a written plan to put those
20   recommendations into practice, though, yet; right?
21   A.   No, we don't.  We don't.
22   Q.   Okay.
23   A.   Not my office, anyway.  Now, the sheriff's office might,
24   but not my office.
25   Q.   But you haven't met with the sheriff to talk about any

1    such plan?

2    A.   No.  The sheriff has been looking at -- you know, like I

3    said, this is the third sheriff.  So I've been through three

4    sheriffs, and all three sheriffs have been trying to do

5    everything they could do, you know, so -- and I guess what I'm

6    saying, when I sit there in a meeting and I hear what's being

7    said, I see what's being -- what's being done, and then come

8    in and sit and see the presence and the direction has been

9    inconsistent and actions do not match, then I feel the same

10   way I felt when I was sitting there meeting with the monitors

11   and hearing all of that that I hadn't seen, because I'm seeing

12   something completely different.

13   Q.   Sure.  So when you're referring to the meeting with the

14   monitors, that was the January 2022 tour?

15   A.   Right.

16   Q.   So you hadn't heard about any of those problems before?

17   A.   No.

18   Q.   Just to confirm, you don't read the monitoring reports?

19   A.   We go through the monitoring reports when we're talking

20   with legal and all of that.  But when we got to spend money on

21   something, that's a request, and I'm going to see the request

22   because I got to sign off on it.  So when you look at anything

23   that's got finances in there, then I'm going to see that we

24   got to do this -- even if it's the sheriff's department, I see

25   it.  So now you're facing me with a whole lot of information

1  that you're putting in front of me that I've never seen before

2  when I've been signing off on everything coming.

3  Q.  So your awareness of problems in the jail comes from the

4  funding requests that you received for approval?

5  A.  Right.

6  Q.  And you haven't gotten any funding requests to approve

7  for those items that the monitors were referring to in

8  January?

9  A.  Didn't know anything about them.

10  Q.  Okay.  So retaining -- shifting gears here a little bit.

11  A.  Okay.

12  Q.  Retaining detention staff has been a long-standing

13  challenge; right?

14  A.  Right.

15  Q.  But Sheriff Jones hasn't asked the County to make

16  detention staff salaries in Hinds County comparable to

17  neighboring jurisdictions; right?

18  A.  Yes, he did.  He did, actually.  That's why we started

19  doing it.  In fact, he was the one who showed us the report

20  with the numbers on there of what the surrounding counties

21  were making.  That's why we went back and talked about the

22  $31,000 base salary, which was to 65 percent of his officers,

23  and that was a figure that we agreed upon to find that money.

24  So that comes directly from the sheriff.

25  Q.  So just to confirm, the 31,000 that's now the base salary

1   for detention officers, that's 65 percent of the starting

2   salary for law enforcement?

3   A.   No.   We were talking about the detention officers.   We

4   wanted to see, and just like you just asked about him bringing

5   us recommendations of getting that base salary where it needs

6   to be to be comparable with other areas, it was going to cost

7   us $31,000 at the time to get them up to where the other areas

8   were.   So we agreed to go ahead and do that.

9        Now, with that $31,000, it was not going to touch

10  everybody because of the pay scale, but that $31,000 was

11  enough to touch 65 percent of his detention staff.

12  Q.   Got it.   That was the 65 percent.

13  A.   Right.

14  Q.   Thank you.   Now, when the sheriff brought this to you,

15  that was after this Rivera report was released?

16  A.   After the what?

17  Q.   You mentioned the sheriff had mentioned --

18  A.   This was February.

19  Q.   Okay.   So this was February that y'all had this --

20  A.   This was before.

21  Q.   Okay.   So when did you have this discussion about

22  raising --

23  A.   January.

24  Q.   Okay.   January 2022?

25  A.   Yeah.   We've had it January -- if I'm not mistaken, yeah.

 1   It was after Christmas.  So when we made it back, we discussed

 2   this.  That was one of the first issues we dealt with, so...

 3   Q.   Okay.  So that was after these contempt proceedings had

 4   started?

 5   A.   No.  We were already discussing this.  We met about it

 6   probably after that, but the discussion was already in play.

 7   Q.   Okay.

 8   A.   We got held in contempt in the midst of discussing all of

 9   this, and we had different issues that we were discussing, and

10   the salary had always been on the table.  He just had to go

11   back once he won his election and put us some numbers together

12   to see what we had to do.  The contempt came in the midst of

13   that, so we were discussing this already.

14   Q.   Okay.

15   A.   Right.

16   Q.   You'd agree that the County has promised to have a

17   comparable rate of pay with other agencies in the area for at

18   least two years, though; right?

19   A.   Yes.

20   Q.   In fact, the prior County administrator represented to

21   this Court two years ago that the County would be raising

22   salaries, so that you would already be comparable within the

23   next few years?

24   A.   Okay.

25   Q.   Just to clarify, has that increase in base salary been

647

1    implemented yet?

2    A.   It's in process of being implemented.  It has been

3    implemented.  We've already put it in the checks that's coming

4    out.  So we've implemented that already.  It's being done now.

5    Q.   But it hasn't shown up in checks quite yet?

6    A.   I'm not sure.  I'm not sure on the -- I know it's done.

7    I just don't know when it's going to come through the pay

8    scale.

9    Q.   All right.  And there's still -- there's no regular

10   cost-of-living adjustment for detention officers?

11   A.   There's no cost-of-living for any Hinds County employee.

12   I would love that.

13   Q.   And Sheriff Jones also hasn't requested a uniform

14   allowance for detention officers; is that right?

15   A.   Well, that would be administrative from him to give to

16   us.  So I don't know what my director of administration or the

17   sheriff have talked about on uniforms.  The first time I heard

18   about the uniforms was in the meeting, so probably after that.

19   They have met on the uniforms.

20   Q.   Okay.

21        MS. STEEGE:  Let's pull up Defendants' Exhibit 4, and

22   we're going to page 5 of the PDF.

23   BY MS. STEEGE:

24   Q.   Number 4, it says "The agency does not provide stipends

25   for the uniforms and accoutrements needed to perform, and

1   department resources...are not believed to be assigned

2   equitably when compared to law enforcement."

3        Do you disagree with that finding?

4   A.   Can you repeat that again for me and go a little slower?

5   Q.   Sure.  Number 4.

6   A.   Right.

7   Q.   It says "The agency does not provide stipends for the

8   uniforms and accoutrements needed to perform, and department

9   resources, i.e., department-issued vehicles and life safety,

10  are not believed to be assigned equitably when compared to law

11  enforcement."  Do you --

12  A.   And your question is?

13  Q.   Do you disagree with that finding?

14  A.   If you're talking about equal -- equal assignments when

15  compared to law enforcement, you're talking about patrol and

16  detention?

17  Q.   I am.  But I wanted to focus on the finding from the

18  recruitment and retention consultant that the agency doesn't

19  provide stipends for the uniforms.

20  A.   Okay.

21  Q.   Do you agree that -- given this report was issued

22  January 10, 2022, you'd agree the agency is not yet --

23  A.   No.  What I'm saying, that would be outside -- that would

24  be outside of what I'm able to speak to one way or another.

25  Q.   Okay.  All right.

1    A.   That would come in line with what the sheriff is doing.

2    Q.   Okay.

3    A.   So anything that the agency does not provide for uniforms

4    or other resources, that would be brought to me by the

5    sheriff.

6    Q.   Okay.  So you don't need to sign off on funding for

7    uniforms, but the County -- you do need to sign off on certain

8    repair requests?

9    A.   Yeah.  Exactly.

10   Q.   And you do need to sign off on, for example, approving

11   the mental health training contract?

12   A.   Yes.  That comes through legal and then comes through the

13   County administrator, right.

14   Q.   Going back to salaries, the County hasn't implemented a

15   career ladder for detention staff; is that right?

16   A.   Right.

17   Q.   And that career ladder has been in the works for at least

18   two years; right?

19   A.   I'm not sure.

20        MS. STEEGE:  Let's pull up the transcript from the

21   December 16, 2019, status conference.  Turning to page 74.

22   December 16th, 2019.  And we're looking at line 3.  Well, I'm

23   sorry.  Let's go back to the previous page so we can see who's

24   speaking.

25   BY MS. STEEGE:

1    Q.    Okay.   This was Mr. Teeuwissen, who at that time

2    represented the County, and he said, "The hope is that that is

3    presented, then the board and the sheriff can work through the

4    budget process, which they have to do regardless, and that

5    these merit-based or retention-based career ladder, whatever

6    it is, comes into effect October 1 of 2020."

7        That's, I believe, the next section down from what's

8    currently highlighted on the screen.

9        THE COURT:   What you're reading from is not on the

10   screen, so if you'll reread it.   This is Docket Entry -- I

11   realize you indicated the date of December 17, 2019, but for

12   ease of reference, it is Docket Entry Number 55 on the record,

13   and whatever page number you're referring to would be helpful.

14       MS. STEEGE:   Thank you, Your Honor.

15   BY MS. STEEGE:

16   Q.   It's page 74.   We're looking at lines 8 through 12.   And

17   Mr. Teeuwissen was referring to the budget process and the

18   sheriff presenting his proposed budget to the Board.   And he

19   said, "So, again, the hope is that that is presented and then

20   the board and the sheriff can work through the budget process,

21   which they have to do regardless, and that these merit-based

22   or retention-based career ladder, whatever it is, comes into

23   effect October 1 of 2020."

24       So that career ladder hasn't happened yet?

25   A.   I'm not familiar with a career ladder anywhere in the

1   County, let alone here.

2   Q.   I'm sorry?

3   A.   I'm not familiar with a career ladder on merit-based,

4   retention-based, or anything in the County.

5   Q.   Okay.

6   A.   Not only with the sheriff's department but within the

7   County itself.

8   Q.   And that includes it's not happened within the jail?

9   A.   I'm not sure.  I'm not sure.

10       MS. STEEGE:  Let's pull up PX-106, and we're looking at

11   page 3, the fourth paragraph.

12   BY MS. STEEGE:

13   Q.   This is the January 2022 Quality Assurance Summary from

14   the sheriff's office.  The last line of that fourth paragraph

15   says "The career ladder is still pending.  It will require the

16   input of the County in order to be viable."

17       So you'd agree there is no current career ladder in the

18   jail?

19   A.   I would agree.

20   Q.   Okay.  Now, Mr. Rivera listed a whole bunch more needed

21   improvements beyond the 5 percent pay increase that I

22   understand y'all have worked on.

23       MS. STEEGE:  Let's go back to Defendants' Exhibit 4,

24   and let's go to the last page.

25   BY MS. STEEGE:

1    Q.   Now, that sort of summarizes the recommendations made and

2    indicates that there are over 80 recommendations made broken

3    into short-, medium-, and long-term interventions.  You'd

4    agree the County hasn't yet written a plan on how to implement

5    these recommendations?

6    A.   What I would agree to is that with these 80

7    recommendations that accompany this in the consent decree that

8    we've looked over, some of them you just weren't going to

9    obtain anyway.  That's why I asked our lawyers to talk to see

10   how we could reevaluate what the whole consent decree was

11   based on because every recommendation that come, what we've

12   been able to do, we would do that without any resistance, but

13   we're looking at things that's in the recommendations that the

14   County is just not able to do.  And that was before this legal

15   team, that was before this administrative team, you know, and

16   it was just -- if we had to do this now, you would not have

17   those same recommendations in there based on anything that

18   I've seen.  So I would not agree with that.

19   Q.   Okay.  On direct you were asked about the monitoring

20   budget and certain numbers between December 2019 and early

21   2020.  That was when the United States previously had to move

22   for contempt; right?

23   A.   I'm not sure, because I had just made it to the County,

24   right.

25   Q.   And the prior County administrator didn't fill you in on

1   the contempt proceedings?

2   A.   No.

3   Q.   Okay.  Now, you talked about the monitoring reports.

4   Have you asked the monitors for briefings on the consent

5   decree requirements?

6   A.   Well, I asked my attorney.  When I don't sit in on the

7   monitoring reports or the briefings, I asked the attorney to

8   bring me up on where we are, what they talked about, because

9   the attorney is the number one go-to to deal with our federal

10  monitors.

11        Now, I've had the opportunity to sit in on a few of those

12  Zooms to find out as much as we could so that we could

13  understand what we needed to do.  So, you know, that's my

14  involvement.

15  Q.   Okay.  But when you refer to "those Zooms," are those the

16  exit interviews after a monitoring tour?

17  A.   Say that again.

18  Q.   You referred to sitting in on some Zooms?

19  A.   Yes.

20  Q.   What Zooms are you referring to?

21  A.   With the monitors.

22  Q.   Okay.  And is that after -- is that during a status

23  conference or...

24  A.   I don't know what they would be labeled as, the status

25  conferences or if they would be planning -- I don't know what

1    it was label-wise.  I just know we were there.

2    Q.   Sure.  Was the judge involved --

3    A.   Yes.

4    Q.   -- on these Zooms?

5    A.   Yes, yes, yes.  A couple of them.  And some of them were

6    with them alone.

7    Q.   So separate from those Zooms -- were those typically when

8    the monitors were reporting findings after a compliance tour?

9    A.   Right.  Yes.  Uh-huh.

10   Q.   So separate from those, you've not requested briefings

11   from the monitors to follow up or clarify?

12   A.   No, I haven't.  Huh-huh.

13   Q.   You're allowed to talk to the monitors in between those

14   meetings, though; right?

15   A.   I don't talk to the monitors between those meetings

16   because I would allow and expect the attorney, the County

17   attorney, to talk to the monitors to give administration the

18   direction that it needs.

19   Q.   All right.  We talked a bit about the budget.  Does QCHC

20   have to ask your permission before spending up to that $5,000

21   procurement amount?

22   A.   5,000 -- the 5,000 -- you're talking about in their

23   processes?

24   Q.   Yes.

25   A.   Their processes are in the contract that was approved

1    already.

2    Q.   Okay.  So their operating budget is solely within that

3    contract?

4    A.   Well, it's in the contract already, so any fiduciary

5    bidding quotes, whatever, was already done when we got them to

6    do our inmate.  So they're operating basically on what we're

7    being paid -- what we're paying them based on services only.

8    They don't have -- they have a set fee that we pay them per

9    month, and, like I said, it was over three plus million

10   dollars a year, so all of that is already there.

11   Q.   Okay.  So there's not a separate process --

12   A.   Right.

13   Q.   -- for emergency funding --

14   A.   Right.

15   Q.   -- for them?  Got it.

16        Now, you talked about some of the jail procurement needs

17   do need to go to Board meetings.  There's not a process to

18   expedite emergency needs past those Board meetings, though;

19   right?

20   A.   Yes, there is.  The emergencies can by determined by the

21   facility manager, director, and make a determination.  If it's

22   an emergency, they're going to write in to getting what you

23   need in the process.  So there is an emergency stipulation in

24   getting things for the jail.  The only thing that go on the

25   Board agenda are things that are not time-sensitive.  If it's

1   not time-sensitive and we know in the planning that this is

2   what we need based on what other vendors, like Benchmark, tell

3   us, we put it on the agenda, but if you need something today

4   that affects the direct operation of what goes on, then we're

5   going to get that.

6   Q.   Okay.

7   A.   Right.

8   Q.   You'd agree that getting cleaning supplies and garbage

9   bags during a pandemic might be considered an emergency

10   request?

11   A.   Well, it depends on if they deem it an emergency.  It has

12   to be deemed an emergency by somebody.  So, now, if somebody

13   at the jail, whether it comes from the sheriff's department or

14   if it comes from the facilities manager, if they say, "We

15   don't have this," and it's an emergency, then we get that

16   right then.

17   Q.   Were you aware that the jail, in fact, ran out of

18   cleaning and other supplies during the COVID pandemic?

19   A.   No.

20        MR. ANDERSON:  Your Honor, hold on.  I missed that

21   completely.

22        THE COURT:  Repeat that question, please.

23        MS. STEEGE:  Sure.

24   BY MS. STEEGE:

25   Q.   Were you aware the jail, in fact, ran out of cleaning and

1    other supplies earlier during the COVID pandemic?

2    A.   No, I was not.

3    Q.   Okay.  I'm just making sure I'm not double asking

4    questions here.

5    A.   Okay.

6    Q.   You referred to the first time -- well, you said that

7    somebody has to declare a request to be an emergency for it to

8    go through that expedited process?

9    A.   Yes.  We've allowed the facilities -- from an

10   administration side, we've allowed the facilities director to

11   make a determination when something is an emergency.  He

12   communicates to purchasing, and it goes right then.  The

13   sheriff department has the same leeway.

14   Q.   So within the jail, the person who declares that

15   something is an emergency to get past the regular process, is

16   that person the Board or the sheriff?

17   A.   No.  That person would be whoever the sheriff said that

18   person would be within the jail.  Those are the -- those are

19   the responsibilities that were given to the jail administrator

20   when she made it there, talking about Kathryn Bryan.

21   Q.   All right.  You were talking about cameras, the GoPro

22   cameras, that were raised at the January 2022 meeting with the

23   monitors, and I believe you testified that was the first time

24   you'd heard about those cameras?

25   A.   Right.

```
 1   Q.   So the sheriff's office hadn't previously put in a
 2   request for funding for GoPro cameras?
 3   A.   I don't know what the sheriff office had put in.  All I
 4   know is by the time the monitors were talking to me on some of
 5   the concerns, that was the first time I heard it.
 6   Q.   Okay.  So when someone puts in a request for budget
 7   items, though, like the cameras --
 8   A.   Right.
 9   Q.   -- that would be brought to --
10   A.   That would --
11   Q.   -- to you for review?
12   A.   That would come to the sheriff.  That would come to the
13   sheriff, and if we need to take further action, then we will.
14   It would come to me or the Board if we got to do something
15   different.
16   Q.   Okay.  So if it's the level of expenditure that requires
17   Board approval, that would go through you?
18   A.   Yeah.  We'd put it on the agenda, right.
19   Q.   And you'd agree cameras are pretty expensive; right?
20   A.   I don't know anything about the cameras.
21   Q.   But there was no request put in for your review for the
22   cameras?
23   A.   Right.
24   Q.   Let's see.  You talked about increasing the starting
25   salary.  The starting salary is more focused on recruiting,
```

1   right, than about retention?

2   A.   Now, when you say -- talk about starting salaries, we

3   talked about all salaries, the retention part of it, the

4   recruiting.  Recruiting would be based on what they make

5   coming through the door.  We talked about the ones that were

6   already there, lifting theirs up, basically bringing them up.

7   So we talked about salaries in general holistically.

8   Q.   But if you're talking about the entry-level salary,

9   increasing the starting salary --

10  A.   Okay.

11  Q.   -- that's about bringing people in; right?

12  A.   Right.

13  Q.   Not about keeping them there?

14  A.   But those are the ones that we discussed, how much would

15  it cost for us to make those comparable with other areas, and

16  that was the 31,000 that I talked to you about in that meeting

17  with the sheriff that we agreed to.

18  Q.   Sure.  But you agree that the level of starting salary --

19  well, you were relating a concern about whether starting

20  salaries would be comparable with other areas.  You'd agree

21  that when someone is coming on board, that's when they're

22  looking at a starting salary; right?

23  A.   Right.

24  Q.   They're not looking at -- in evaluating whether to

25  stay --

1    A.   Right.

2    Q.   -- with the sheriff's office, they're not looking at the

3    starting salary?

4    A.   They're looking at how much it pays going in.  Okay.

5    Q.   And that $31,000, that's the new starting salary?

6    A.   I think it's somewhere between -- I'm not sure.  But the

7    31,000 was to accommodate what was already there, because

8    somewhere we were around 27, 28, and we wanted to bring it up.

9    So when we did the 31,000, that was to accommodate the

10   salaries that were there to bring them up to that level.

11   Q.   Okay.  So the entry-level person is making 31,000 or no?

12   A.   I don't know what they're making now.  We raised it up.

13   So I know they were at -- they had 28 coming in, close to 28,

14   and we put the money so they -- I don't know what they're

15   making right now.

16   Q.   Okay.  So when you were looking at trying to make

17   incoming salaries comparable to neighboring departments, was

18   that based on a salary study?

19   A.   Well, the first -- the first incremental salary study I

20   got was from Lee Vance.  They gave me a document that show

21   what they had been requesting, which would get us.  So in the

22   process of that, this sheriff has implemented what that step

23   was that we were looking at at that time.  So we've already

24   looked at that, passed that fiduciary standpoint, and given

25   them what that previous sheriff said we needed to do.  So it's

 1   there now.

 2   Q.   Okay.  So the $31,000 number came from the sheriff --

 3   A.   Well, the --

 4   Q.   -- Sheriff Vance?

 5   A.   Well, the $31,000 came from this sheriff.  What that

 6   sheriff did was show you documentation on how you could make

 7   your salary comparable with other areas.  That was the first

 8   time I saw that.  So in talking about that document with the

 9   course of the next two or three sheriffs, we implemented what

10   was on that document now.

11   Q.   So the first time that you saw a plan to make incoming

12   salaries comparable with other jurisdictions, that was under

13   Sheriff Jones?

14   A.   That was under Sheriff Vance.

15   Q.   Sheriff Vance.  Okay.  And Sheriff Jones proposed the

16   specific $31,000 number?

17   A.   Yeah.  Exactly.

18   Q.   And that wasn't -- so that wasn't based on a salary

19   study?

20   A.   It may have been based on a salary study that was already

21   with the sheriff's department, but I'm not sure.

22   Q.   Okay.  But any salary study wasn't shared with the

23   monitors; right?

24   A.   I don't know.

25   Q.   Do you see exit interviews from staff when they leave

1  working at the jail?

2  A.   No.  It would be human resources.  It goes in their file.

3  Q.   Okay.  Do you review reports from human resources about

4  what common reasons for leaving might be?

5  A.   The only issues that I would deal with are staffing

6  issues where there are potential problems or potential

7  litigation that may come out of it because employees are

8  having problems one way or another.  But if it goes through

9  the regular process of hiring, terminations, resignations,

10  then that's with human resources.

11  Q.   Other than those reports that you might review, are there

12  any issues that have come up in terms of reasons why staff

13  might have left the jail?

14  A.   Not that I know of other than me hearing that they wanted

15  more money.  So, you know, I haven't seen any documentation

16  where somebody has written that on an exit interview.  It's

17  just the fact of being the County administrator, you hear want

18  more money, want more money.

19  Q.   Sure.

20  A.   Right.

21  Q.   And state and local law doesn't bar you from raising

22  salaries; right?

23  A.   No.  No.  No, not at all.

24  Q.   And it doesn't bar you from providing biweekly pay?

25  A.   No.

```
 1   Q.   Or direct deposit?
 2   A.   No.
 3   Q.   Or a career ladder?
 4   A.   Your labor laws determine your -- what you're going to do
 5   with your direct deposits, because now you're getting into
 6   banking institutions and what you're going to do.  So labor
 7   law contributes to that to let you know, and then our policy
 8   has to make sure that when we talk about direct deposit, if
 9   you quit today, where our cutoff is.
10   Q.   Sure.  But state laws don't prohibit you from starting --
11   A.   No.
12   Q.   -- direct deposit?
13   A.   Not at all.
14   Q.   What's the criteria in terms of hours and leave time that
15   you need in order to be eligible for direct pay?
16   A.   I'm not sure.  That would be human resources.
17   Q.   So that comes from HR?
18   A.   That comes from HR.  Right.
19   Q.   Okay.  So the County's not planning to provide direct
20   deposit to employees when they first start out?
21   A.   Well, they can, but they got to get to their number --
22   their regular number of accrued hours and leave time before we
23   can, because that's a -- that's a County policy.
24   Q.   Okay.  So that's a County policy but not -- like a County
25   human resources policy?
```

```
 1   A.   Yes.   That's a County policy, right.   Human resources.
 2   Q.   Okay.   And you were referring to funding received from
 3   the federal government for raising pay.   Was that COVID relief
 4   money?
 5   A.   You're talking about premium pay?
 6   Q.   I'm sorry?
 7   A.   Are you talking about premium pay?   What are you asking
 8   me about with the COVID money?
 9   Q.   Okay.   Well, you mentioned premium pay.
10   A.   Right.   Now, that's American Rescue.   COVID -- the COVID
11   money was the initial, and then they came back.   The federal
12   government came back with the American Rescue, so the American
13   Rescue funds were used for premium pay.
14   Q.   So is that a short-term premium pay?
15   A.   That premium pay is based on -- it was based on what they
16   determined a certain amount of -- if you deem your employees
17   essential during the pandemic, then you could give them up to
18   so much money or however much it was.   So we did give them
19   premium pay around October or November, somewhere around
20   there.
21   Q.   Okay.   But that's not an ongoing pay?
22   A.   No.   No, no, no.   Huh-huh.   We can choose to do it again
23   based on the money we got from the federal government, but
24   it's not ongoing.
25   Q.   So that was October until when exactly?
```

1   A.   Until they got -- if it was $4,000, until that $4,000 was

2   put in your check.  Once it was completed, that's when it was

3   over.

4   Q.   Just to clarify, how many months?

5   A.   It just depends.  October, some people if they were

6   getting 2,000, probably did it in October or November.  Some

7   people, they were getting 4,000, probably got finished in

8   January or whenever, depending on how it was broken down when

9   they put the data in for the payments.

10  Q.   Sure.  How much did the County get from the federal

11  government from the American Rescue Plan?

12  A.   Our first payment, 25.  Our second payment will be 25

13  million.

14  Q.   So two different payments of 25 million?

15  A.   Yes.

16  Q.   Okay.  Just to clarify, I think earlier you said that you

17  had -- well, when we talked about what Ms. Prince, the prior

18  County administrator, had said about raising salaries to be

19  comparable with other jurisdictions and I believe earlier you

20  said that you had already raised salaries as she had promised

21  with federal money.

22  A.   I didn't say that, and I definitely didn't mention

23  anything about Ms. Prince.  I don't know what you're speaking

24  of now.  What I did say was that when the money came in from

25  the federal government, we gave the premium pay to put them

1    where they were, because we offered them that because we

2    couldn't give bonuses.

3            MS. STEEGE:  Your Honor, if I might have a moment to

4    confer?

5            THE COURT:  Okay.

6            MS. STEEGE:  Thank you.  Just a couple more, Your

7    Honor.

8            THE COURT:  No problem.

9    BY MS. STEEGE:

10   Q.   You mentioned retention bonuses.  Even if state law

11   wouldn't allow retention bonuses, you're allowed to give

12   additional money for seniority; right?

13   A.   That would be however the sheriff had the payment

14   structured for his detention officers and patrol.  I don't

15   know.

16   Q.   Okay.  But that's not a --

17   A.   But seniority is just a basic tool used for giving

18   substantial more amounts of money.  So your question to me is?

19   Q.   State law would not prohibit you from paying more money

20   based on seniority?

21   A.   No.

22   Q.   And you'd agree that six years into this consent decree,

23   the County's efforts to retain jail staff still has a ways to

24   go?

25           MR. ANDERSON:  Your Honor, excuse me.  I didn't hear

1    that.

2          THE COURT:  You need to repeat that.  Slow down and

3    speak up a little bit.

4          MS. STEEGE:  Sure.  My apologies.

5    BY MS. STEEGE:

6    Q.  You'd agree that six years into this consent decree, the

7    County's efforts to retain jail staff have a ways to go?

8    A.  I know where we are now, the -- I would agree that I know

9    now that we got a ways to go to get where we're going.  I

10   don't know about six years ago.

11   Q.  Well, the six years reference was how long this consent

12   decree has been operational, but at this point --

13   A.  Okay.

14   Q.  -- you'd agree that there's a ways to go on

15   successfully --

16   A.  Yes.  Yes.

17   Q.  -- retaining staff?

18   A.  Right.

19   Q.  And you'd agree that at least some of the recommendations

20   in Mr. Rivera's recruitment and retention report were promised

21   by the County some years ago?

22   A.  Yes.

23   Q.  And not yet completed as promised?

24   A.  I don't know.  That's a fine line, because we may not

25   have had what we needed to complete some of it, because there

1  are budgetary constraints that we're doing all over the

2  County, and even though there may have been some

3  recommendations made, we still got to operate in the confines

4  of what we can do or can't do.  So, no, I don't agree with

5  that.

6  Q.  I think you're referring to constraints.  You'd agree

7  that some of those reforms, though, were not completed as

8  promised?

9  A.  Right.  Just like I've stated to you earlier, I still

10  feel like some of them couldn't be done, so I don't know which

11  ones you're referring to.

12       MS. STEEGE:  All right.  Nothing further at this time.

13  Thank you.

14       THE COURT:  All right.  Thank you.

15       This is an appropriate time for us to take our morning

16  break, and then we'll come back with the redirect of this

17  witness.  I don't know how long it's going to be, but I wanted

18  to go ahead and take the break for the court reporter.

19       Mr. Jones, you may step down.  Do not discuss your

20  testimony with anyone at this time.

21       We're in recess for -- it's approximately 11:25.  We'll

22  come back at 11:40.

23                 (A brief recess was taken.)

24       THE COURT:  You may be seated.

25       Any redirect of this witness?

1    MR. ANDERSON:  No, Your Honor.

2    THE COURT:  Okay.  I've got a few follow-up questions

3  that I'll ask, and then after I ask these questions,

4  Mr. Jones, the Government will -- the United States will be

5  able to follow up, as will the attorneys for the County.

6                         **EXAMINATION**

7  **BY THE COURT:**

8  Q.  And in that regard during your testimony several times,

9  you -- I just want to make sure the record is clear -- you

10  refer to -- you say "my attorney."  Would that be the attorney

11  for the Board of Supervisors?

12  A.  The County attorney.

13  Q.  The County attorney.  Okay.  Thank you.

14  A.  Yes.

15  Q.  Now, you -- I think your testimony about the direct

16  supervision of the facility was that the facility was not

17  designed for direct supervision, and I think -- and correct me

18  if I'm wrong.  I did not write exactly what you said about the

19  direct supervision.

20    Well, let me ask you this:  Are you aware that the

21  consent decree itself, that -- well, you're aware the County

22  is -- the consent decree or the settlement agreement is

23  something that the County agreed to.  Do you understand that?

24  A.  I do, Your Honor.

25  Q.  And are you aware that paragraph 41 of that agreement

```
 1    says that the County shall "ensure that jail policies and
 2    procedures provide for the 'direct supervision of all jail
 3    housing units'"?
 4    A.   I do, Your Honor.
 5    Q.   Okay.  Now, I think your testimony was that you became
 6    County administrator in March, on March 1st, 2021.
 7    A.   That's correct.
 8    Q.   Okay.  And immediately prior to you, though, who was the
 9    County administrator?
10    A.   Jennifer Riley-Collins.
11    Q.   Okay.
12    A.   No, it was Scherrie Prince.
13    Q.   Scherrie Prince?
14    A.   Right.
15    Q.   Okay.  And do you know how long Scherrie Prince was
16    County administrator?
17    A.   About three months.
18    Q.   And prior to Ms. Prince, who was the County
19    administrator?
20    A.   Jennifer Riley-Collins.
21    Q.   And how long was -- do you know how long
22    Ms. Riley-Collins was --
23    A.   About eight months to nine months, something like that.
24    Q.   Okay.
25    A.   Yeah.
```

1   Q.   And immediately prior to Ms. Collins, who was the County

2   administrator?

3   A.   It was Carmen Davis.  She was there 12 years.

4   Q.   Okay.  Carmen Davis.  And the Board of Supervisors is

5   responsible for appointing the County administrator; is that

6   correct?

7   A.   That's correct.

8   Q.   Okay.  As County administrator, have you adopted or --

9   have you adopted any different policies that were in place

10  with respect to procurement that were in place --

11  A.   No.

12  Q.   Okay.  Let me -- have you implemented any policies --

13  what policies have you implemented that might have been

14  different -- well, that you saw that needed to be --

15  A.   Well -- well, we may have done some procedurally, but

16  we've adopted some for the first payment of 22.5 million and

17  the subsequent is a payment of 22.5 million.  We had to adopt

18  some other policies to deal with the criteria of federal

19  money.

20  Q.   Okay.  So the policies that you've implemented were tied

21  to the receipt of the American Rescue money?

22  A.   Right.

23  Q.   And the COVID money?

24  A.   Exactly.  Exactly, right.

25  Q.   As County administrator, have you saw the need to

1    implement any other different policies?

2    A.   We're looking at it now in light of some of the things

3    that's happened in the County.  There's some -- there's some

4    procedural procurements.  We've got to stay within context of

5    the law, but we also got to change some things in-house for

6    accountability.

7    Q.   Okay.  Are the current policies that you're operating

8    under the same that were in place when Ms. Prince was there?

9    A.   Yes, Your Honor.

10   Q.   Are they the same that were in place when

11   Ms. Riley-Collins was there?

12   A.   Slightly.  Ms. Riley-Collins had changed the PO form

13   where all POs, instead of going to purchasing, came to the

14   County administrator.  But that process has been given back to

15   chancery and purchasing since then.

16   Q.   Okay.  And PO is what?  Purchasing and --

17   A.   Purchase order.

18   Q.   Purchase order?

19   A.   Purchase order, right.

20   Q.   Did changing it -- I guess where it is now and the way

21   that you do it now, have you found that to be more efficient?

22   A.   No.

23   Q.   No?

24   A.   No.  That's why we're reexamining now how we want to go

25   back and look at procurement.  We want to look at POs,

1   requisitions, the whole ball to see how can we be more

2   streamlined and efficient with our processes, and we're not

3   necessarily there right now.

4   Q.   Okay.  And I know you were not there when

5   Ms. Riley-Collins was there.

6   A.   Right.

7   Q.   But apparently as County administrator, she changed what

8   the process --

9   A.   She changed some things, but we did -- we did change it

10   for -- with the consent decree, even though I halted raises, I

11   put a hiring freeze on because of budgetary restraints that

12   were coming in, we still allowed for emergency purchases

13   containing -- pertaining to the consent decree.

14   Q.   Now, with respect to the consent decree, are you aware

15   that the monitors do issue a report, a status report, on a

16   periodic basis?

17   A.   Yes, Your Honor.

18   Q.   And after the report is issued, the Court holds a status

19   conference with the parties?

20   A.   Yes, Your Honor.

21   Q.   And you've participated in that, those status

22   conferences, before?

23   A.   I have.

24   Q.   Okay.  On those status conferences where you do not

25   participate, do you get a report from anyone about what has

1  occurred --

2  A.   The County --

3  Q.   -- at the status conference?

4  A.   The County attorney.

5  Q.   Okay.  And do you get a report in writing, or do you just

6  meet?

7  A.   We meet.

8  Q.   Okay.

9  A.   We meet and go over some of the specifics or the

10  highlights or things that we need to do or look at.

11  Q.   The specifics of things that were brought up --

12  A.   Right.

13  Q.   -- at the status conference?

14  A.   Exactly.

15  Q.   Now, I think your testimony was that until -- I guess you

16  only become aware of what the jail needs when you receive

17  specific requests either for purchases or for orders or

18  whatever?

19  A.   That's correct.

20  Q.   Okay.  If you don't receive a request about a matter --

21  well, whose responsibility -- under the system that exists now

22  with you being County administrator, who's responsible for

23  submitting the request to you?

24  A.   The current system would be the jail administrator

25  alerting the sheriff, and the sheriff alert our facilities

1    director, and it comes to me then.  That's the process.

2    Q.   Okay.  You said that's the process right now?

3    A.   Right.

4    Q.   How long has that process been in place?

5    A.   Basically right after we hired Kathryn Bryan.

6    Q.   Okay.  So prior to you hiring, Kathryn Bryan was hired

7    around June of 2021?

8    A.   Somewhere around there.

9    Q.   Okay.  So what was the process from March to June?

10   A.   It was done under the jurisdiction of the sheriff to ask

11   for or request what he needed.  Once we hired a jail

12   administrator, in order for the Board to interact and give the

13   jail administrator what was needed to optimize what had to be

14   done, that's when we changed the policy.

15   Q.   Okay.  Now, do you have any idea what the process was

16   before March 2021?

17   A.   No.  Because it was under the -- it was our regular

18   procurement, and it was the sheriff's determination whether

19   they needed it at the jail.  So before -- before we did get

20   Kathryn Bryan, information that I received would come either

21   from the sheriff's department or from the attorney or from the

22   facilities director.

23   Q.   Okay.  But, again, prior to your getting there, do you

24   have any knowledge what the process entailed before March 1,

25   2021?

***DAILY TRANSCRIPT***

```
 1   A.   I really don't.
 2   Q.   Okay.
 3   A.   I really don't.
 4   Q.   I think you said that you are not aware of a request --
 5   when did you first learn there was a need at least for tables
 6   and chairs within the detention center for the inmates?
 7   A.   The meeting with the monitors.
 8   Q.   And that was in January 2022?
 9   A.   Right.
10   Q.   You said that was the first time you heard of it?
11   A.   First time.
12   Q.   Okay.  I'm going to represent to you this is going to be
13   from a status conference that was held in -- before your time.
14   A.   Okay.
15   Q.   So you're in luck.
16   A.   Good.
17   Q.   Docket Entry Number 55 at page 96 through 97.  This is at
18   a status conference, and I'm just going to ask you if you have
19   any reason to disagree with what the Court was advised at that
20   status conference.  The Court said at page -- line 12, "When I
21   went out to the detention center back in August, and when we
22   came and had our status conference in September, I raised the
23   question, and I need to know the answer:  Are there tables
24   that those -- for the -- do we have" -- I was cut off because
25   Mr. Teeuwissen stood up.
```

1    He said, "I shot up on that one, Judge."

2    "Yeah, you shot up there.  But they do have tables and

3    chairs -- tables to eat off of now?" is my question.

4    And Mr. Teeuwissen said, "I can verify as an officer of

5    the Court, my personal inspection Thursday before last, that

6    what you witnessed in August is no longer occurring.  There's

7    appropriate modular furniture, both chairs and tables that was

8    bought for Pod C.  The other Pod C isn't done.  We've said

9    that.  And that furniture was Major Rushing put all of that in

10   Pod B, and yesterday they were using it.  Some of those tables

11   have a game top.  Others don't, but it is there."

12   And I -- the Court's response was, "Please tell me it got

13   there in October."

14   Mr. Teeuwissen said, "I'm not sure when it got there.  I

15   wasn't in charge of that, Your Honor."

16   And I said, "Okay."

17   And Mr. Teeuwissen goes on to explain, "I was not going

18   to come back before Your Honor without having at least those

19   two answers.  And those two answers -- and so I'm proud --

20   that's why I shot up.  I'm proud to say that, based on our

21   inspection, that furniture is in place and is working

22   appropriately."

23   And because tables and chairs have been a concern, the

24   only other time that you received any report that there was a

25   need for tables and chairs -- oh, by the way, this was in --

1    the transcript was prepared 12/17/2019, but the record will

2    reflect that the status conference might have occurred a

3    little bit before then.  But you did not -- you say the first

4    time you learned of the need for tables and chairs or tables

5    for the inmates to eat off of was in January of 2022?

6    A.    That's correct.

7    Q.    Since you've been County administrator, Mr. Jones, how

8    many administrators have there been over the Raymond Detention

9    Facility?

10   A.    Only two that I know of.  I know there was one there that

11   I was unfamiliar with before and Kathryn Bryan.

12   Q.    Okay.  And who is serving as jail administrator on this

13   day, today?  Who's the jail administrator today?

14   A.    Frank -- I don't know.  I've only met with him once.

15   Q.    Mr. Shaw?

16   A.    Frank Shaw.

17   Q.    Okay.  You testified about your experience having served

18   on the city council and the legislature and your management

19   degree from Millsaps and other things.  How important is it to

20   have consistent leadership in any organization, in your view?

21   A.    In my view, from a management standpoint, it's very

22   important, because that defines all your processes and it

23   defines whether your organization is actually functioning,

24   working, and if it's completing its mission.  So in my view, I

25   look at it like your leadership from a management standpoint

1    has to know what's going on, and there has to be continuity

2    with all of your aspects so that everybody know what they're

3    doing.

4        I do see some things with the consent decree that I feel

5    a certain way about, but that's neither here or there from a

6    management standpoint.  But I will say that from a management

7    standpoint, you've had four County administrators and three --

8    three sheriffs with over 20 years' experience each in law

9    enforcement, and they have not been able to give us an

10   accurate path to this consent decree.  And two of those

11   administrators were lawyers.  So somewhere in there with all

12   of that, there should have been a clearly defined path on

13   where we were going, but we're still here today.

14   Q.   Which of the jail administrators were lawyers?  Are you

15   talking about jail --

16   A.   No, the --

17   Q.   -- County administrator?

18   A.   -- County administrators, right.

19   Q.   Okay.  And that would be Ms. Collins?

20   A.   And Ms. Prince.

21   Q.   And Ms. Prince?

22   A.   Right.

23   Q.   But the Board of Supervisors is responsible for

24   appointing the County administrators; correct?

25   A.   That's correct.

1   Q.   Is the Board of Supervisors also -- who is responsible

2   for appointing the jail administrators?

3   A.   That would be -- that would fall up under hiring of the

4   sheriff unless it had to be done from a decree like we have

5   now, that we needed to get a jail administrator.  Then we

6   would put it on the agenda and make it happen and let the

7   sheriff put his processes in play.

8   Q.   So since the consent decree is in place, what is the

9   process for the County in selecting a jail administrator?

10  A.   Well, we listened to the monitors on what possibly needed

11  to be done from a jail administrator standpoint, and that's

12  when we took the lead in it.  If we were not under a consent

13  decree, then it would be up to the sheriff to hire his jail

14  administrator.

15  Q.   Okay.  Do you know if the County consulted with the

16  monitors in the hiring of Kathryn Bryan?

17  A.   I don't know other than talking to the County attorney

18  that there was a recommendation from the monitors that she

19  would be good.

20  Q.   Do you know what process was used to now get to Mr. Frank

21  Shaw?

22  A.   No, I don't.  All I know is the resignation was accepted

23  and the sheriff informed us in the meeting that we had to move

24  forward quickly to keep the consent decree in compliance.  So

25  I guess he used his own resources, and then once we found out

```
 1   potentially that Frank Shaw had the experience from our hiring
 2   attorneys, then that's when we put our initial meeting
 3   together to meet with Mr. Shaw.
 4   Q.   Now, with respect to Henley-Young, there have been how
 5   many administrators over Henley-Young since you've been County
 6   administrator?
 7   A.   Only two.
 8   Q.   Okay.  And who is responsible for appointing the
 9   administrator for Henley-Young?
10   A.   That would be me.
11   Q.   That would be you?
12   A.   Yes.
13   Q.   Is that a different process than other -- those two
14   individuals, I presume, is Mr. Frazier, Fernandez Frazier?
15   A.   Right.
16   Q.   And now who is the County -- who is the administrator
17   over it?
18   A.   Marshand Crisler.
19   Q.   Were you responsible for appointing Mr. Frazier?
20   A.   No.  I mean, yes.  Mr. Frazier and Mr. Crisler, yes.
21   Those were my hires.
22   Q.   Those were your hires?
23   A.   Right.
24   Q.   And what process did you use to --
25   A.   Just your regular -- just your regular human resources.
```

1  Q.   Human resources?

2  A.   Right.

3  Q.   And what did that process entail?

4  A.   Application for the job, interviews.  Mr. Frazier had

5  previously been with the County, brought a lot of good skills

6  coming from the jail.  We based it on that.  The federal jail

7  in Yazoo City, we based it on that.  We hired him to the

8  County.  He resigned.  We had Mr. Crisler that's been familiar

9  with the consent decree and what was going on, so that was his

10 replacement, but those were regular hires.

11 Q.   And Mr. Frazier has served as the administrator there

12 before; correct?

13 A.   Yes.  Yes.

14 Q.   All right.  Was there an application process -- you

15 indicated there's an application process.  Was there an

16 application process after Mr. Frazier resigned --

17 A.   Yes.

18 Q.   -- and when Mr. Crisler was appointed?

19 A.   Same process.

20 Q.   Same process?  Did any other people apply?

21 A.   They did.

22 Q.   Okay.  Does the County have their applications on file?

23 A.   Human resource has them.

24 Q.   Okay.  And you indicated that Mr. -- part of what

25 Mr. Crisler had, he had experience with the consent decree.

1   Did that experience -- what level of -- I mean, what -- did

2   that experience with the consent decree come to him through

3   the time that he was interim sheriff --

4   A.   Yes.

5   Q.   -- or before?

6   A.   Yes, it did.

7   Q.   And how long did he serve as interim sheriff?

8   A.   About three months.

9   Q.   The report that is D-4, the report from the retention --

10   the hiring and retention report that Mr. Rivera did, I believe

11   it's D-4.  I just have a question about that, not specifically

12   about the report but the timing.  I believe the record will

13   show that that report has a date on it of January the 10th,

14   2022; is that correct?  I don't see it before me, but I wrote

15   it down.  I just want to make sure.

16        MS. STEEGE:  Yes, Your Honor.

17        THE COURT:  Okay.

18   BY THE COURT:

19   Q.   When was that firm, Mr. Jones, retained to do this

20   particular report?

21   A.   I'm not sure, Your Honor.

22   Q.   You're not?

23   A.   Right.

24   Q.   Well, do you know when Mr. -- how long it took Mr. Rivera

25   to do that report?

1   A.   I don't.

2   Q.   Do you know for how long -- do you know what Mr. Rivera

3   did to prepare that report?

4   A.   I do not.

5   Q.   Okay.  Now -- I think I'm wrapping up with my questions.

6   You testified about a walkout that occurred at the detention

7   facility; is that correct?

8   A.   That's correct.

9   Q.   Do you remember the date --

10  A.   No.

11  Q.   -- the date or time -- the date of that walkout?

12  A.   I don't, Your Honor.  I can't remember the specific date.

13  Q.   Okay.  I think you had testified that you had a

14  conversation with the sheriff about --

15  A.   I did.

16  Q.   -- that walkout.

17  A.   I did.

18  Q.   Okay.  Who was the sheriff at that point in time?

19  A.   Crisler.

20  Q.   Okay.  So -- and I think your testimony was that he

21  sought to investigate?

22  A.   I asked him to investigate.

23  Q.   You asked him to investigate the walkout?

24  A.   I asked him to investigate the walkout, because there had

25  been no inkling beforehand one way or another that there was

```
 1   that amount of discourse where employees were going to walk
 2   off the job.  When that is there, you know about it
 3   beforehand.  It happened, and I think it happened -- from my
 4   opinion, it had to be -- it happened because it was instigated
 5   to happen.  Because after it happened and we told them that
 6   that's unacceptable, it has not even been threatened again for
 7   the same things that they said, and nothing has changed.  So
 8   if you walk out the first time based on what you said, if it
 9   was true to you, you would walk out again.
10   Q.   What did the -- you asked Sheriff Crisler to investigate
11   it.  Did he, in fact, investigate it?
12   A.   He did.
13   Q.   And what did he conclude?
14   A.   It was orchestrated.
15   Q.   It was orchestrated?
16   A.   Right.
17   Q.   Did he conclude by whom it was orchestrated?
18   A.   By the jail administrator and another young lady that I
19   don't know.
20   Q.   By the jail administrator?
21   A.   By the jail administrator and by another young lady name
22   that I'm not familiar with.
23   Q.   And at the time the jail administrator was who?
24   A.   Kat Bryan.
25   Q.   Okay.  And what did Sheriff Crisler do about it if the
```

1    jail administrator was responsible for orchestrating a

2    walkout?

3    A.   If I can remember, there was supposed to be some meetings

4    with some of the staff, and there were some staff members that

5    did give testimony.  Now, was it documented?  I don't know,

6    because it would fall under the sheriff.

7         But, you know, during those rumblings and what we had to

8    deal with, I just remember getting the report verbally.  "It

9    was orchestrated, Mr. Jones.  We've got some evidence.  We've

10   got some people that testified.  We've got some people to give

11   testimony."  That was the word that was used on what happened,

12   because there's a couple of folks scared to lose their jobs.

13   And my contention, because of that, I talked directly by

14   e-mail to Kat Bryan, and I said, "If we have another walkout,

15   they will be looking for somewhere else to work."

16   Q.   And the County has that e-mail, presumably?

17   A.   I'm sure it's -- I'm sure it's there.

18   Q.   Okay.  Were any employees disciplined for the walkout?

19   Do you know?

20   A.   I don't know.  I don't know about any disciplinary

21   actions that were taken against them for the walkout.

22   Q.   Okay.  The walkout occurred during the time that there

23   was a contested election for the sheriff's race; is that

24   correct?

25   A.   That's correct.

1    Q.   Do you know whether or not Mr. Crisler attributed the

2    walkout in public to someone other than Major Bryan?

3    A.   No.

4    Q.   Okay.  Do we know if Major Bryan was ever disciplined for

5    orchestrating the walkout?  Do you know?

6    A.   I don't know.  I don't know.

7    Q.   You were asked about the monies paid to the receivers in

8    this case.  How do the invoices or bills -- how do those bills

9    for payment, whatever they may be called, invoices -- I don't

10   know how they come to you.

11   A.   They don't come to me.  They come to the County.

12   Q.   When you say "they come to the County" --

13   A.   They come to purchasing in chancery, and those bills are

14   paid.

15   Q.   They're paid like on the claims docket?

16   A.   Yes.

17   Q.   And they're presented directly to the Board of

18   Supervisors?

19   A.   To approve the claim -- to approve the claim docket,

20   yeah.

21   Q.   Right.  It's listed on the claims docket, apparently?

22   A.   That's our regular process.  So I would -- yes, I would

23   say it is.

24   Q.   Okay.  Because you said, and I think you testified, that

25   you never look at -- you never see the bills?

```
 1   A.   Right.  Exactly.  I see the claims docket, and then I see
 2   what's listed on there for that particular month or those two
 3   weeks.  So when it coming out of our general fund that we're
 4   paying, that's the process where it goes to be -- the claim is
 5   sent to the Board of Supervisors to be voted on, and then
 6   they're paid.
 7   Q.   And has the Board of Supervisors objected to you about
 8   how that process should be handled?
 9   A.   No.
10   Q.   Have you advised them that the process should be handled
11   differently?
12   A.   No, I haven't.
13   Q.   Is any of the work that the monitors have billed for been
14   determined by the County that they did not do?
15   A.   I'm sure it hasn't been that way.  You've got to
16   understand, Your Honor, this was all in place before I got
17   there, so it would just be a part of the regular system,
18   because it was already functioning and moving.  So there
19   hasn't been any conversations or any objections to what was
20   already in place.
21        THE COURT:  Okay.  I have no further questions.  I'll
22   ask the United States if it has any follow-up based on the
23   questions that I've asked.
24        MS. STEEGE:  Just briefly.  Your Honor, if we could
25   bring up what's been admitted as PX-24.
```

1        THE COURT:  And I'm going to ask you to remove your

2   mask so that I can hear you.  I'm sorry.

3                  **FURTHER CROSS-EXAMINATION**

4   **BY MS. STEEGE:**

5   Q.   Mr. Jones, this was previously admitted as a list of

6   detention needs and concerns identified by the detention staff

7   who conducted the walkout?

8   A.   Right.

9   Q.   You'd agree that some of these are issues that we've

10  talked about:  staff shortage, biweekly pay, direct deposit,

11  hazard pay --

12  A.   Yes.

13  Q.   -- pay increase?

14       So these were the concerns that were identified by the

15  officers who walked out seeking better conditions?

16  A.   Are you asking me a question?  Yes, these are some of

17  the -- these are some of the issues, but, now, this is the

18  first time I've seen this document.  So as far as the walkout,

19  I don't know.

20  Q.   As far -- I'm sorry?

21  A.   As far as the walkout that you're asking me about, I

22  don't know if any of these pertain to that.

23  Q.   I'll offer to you that it's already been admitted in

24  evidence and other individuals who testified are redacted from

25  the list identified.  This document has not made it to your

1    attention previously?

2    A.   No.

3         MS. STEEGE:  Nothing further.  Thank you.

4         THE COURT:  All right.  Any follow-up from the County?

5                    **REDIRECT EXAMINATION**

6    **BY MR. ANDERSON:**

7    Q.   Mr. Jones, just briefly, you said Mr. Crisler was the

8    director of the juvenile detention center.

9    A.   Yes, that's correct.

10   Q.   Is that his correct position?

11   A.   Yes.

12   Q.   Or is that an interim director?

13   A.   He's the interim director.  He's the interim director.

14   We're still going through the process of the application.  So

15   when I say he's the director, he's in the process of

16   directing, but he's definitely the interim director.

17   Q.   And is there a search for a permanent director?

18   A.   Yes.  We're looking for applications that's been coming

19   in the last month and a half, and we haven't even had anybody

20   that made application that qualified.

21        MR. ANDERSON:  Give me just a second, if you would,

22   Your Honor.

23        THE COURT:  All right.

24        MR. ANDERSON:  Your Honor, we've had testimony

25   regarding this document, and I'd like to have it introduced

1    for identification.

2         THE COURT:  Yes.  It is the chart that was a

3    demonstrative piece.  It will be received for ID only as

4    D-159.  D-159 is what it will be.  I did not ask if the United

5    States had any objection.

6         MS. STEEGE:  No objection.

7         THE COURT:  All right.

8       (Defendants' Exhibit 159 marked for identification.)

9         MR. ANDERSON:  Thank you, Your Honor.  We have no

10   further questions of Mr. Jones.

11        THE COURT:  Is this witness finally excused?

12        MR. ANDERSON:  For the defendants, yes, sir.

13        THE COURT:  All right.

14        MS. STEEGE:  We would reserve the right to recall

15   County witnesses on rebuttal if necessary.

16        THE COURT:  Have you listed him as one of your

17   witnesses?

18        MS. STEEGE:  We have not, Your Honor, but I believe our

19   witness disclosures included a request to reserve that right

20   to call County witnesses on rebuttal.

21        THE COURT:  All right.  Okay.  You may step down,

22   Mr. Jones.  I'll ask that you not discuss your testimony with

23   anyone or allow anyone to discuss any testimony with you.

24        THE WITNESS:  Thank you, Your Honor.

25        THE COURT:  You're still sequestered.

1      At this time it is an appropriate time -- I'm sorry.

2  I'll let Mr. Jones get to his area.

3      MS. STEEGE:  If I may, Your Honor, we do have a copy of

4  the incident report referenced earlier for Mr. Mosley.  I have

5  provided a copy to the County, and I'm happy to provide that

6  to the Court as well.

7      THE COURT:  Please speak into the microphone.

8      MS. STEEGE:  I had a copy of the incident report we

9  discussed earlier about Mr. Mosley.  I've provided a copy to

10  the County as well.  I can provide it to the Court now, and we

11  await direction as to how you wish to proceed.

12      THE COURT:  Please do.  Thank you.  You can provide it

13  to Ms. Summers now.

14      Mr. Shelson?

15      MR. SHELSON:  Should this be marked as a plaintiff

16  identification-only document so the record is clear?

17      THE COURT:  Yes.  Thank you.  I just want to see it for

18  myself.  That's all.  But it will be P -- let's see.  It will

19  be P-115, because 114 was the minutes.

20      MS. STEEGE:  I believe we have an exhibit marked for

21  use later as 115, so we might use 116 for now.

22      THE COURT:  Oh, I'm sorry.  Whatever the next one is.

23      MS. STEEGE:  Thank you.

24      THE COURT:  116, then; is that right?  Okay.  I'm

25  sorry.  I'm still looking at my own list.  You may present

 1    that to Ms. Summers.

 2        (Plaintiff's Exhibit 116 marked for identification.)

 3        THE COURT:  At this time, it's our time to take our

 4    lunch break.  It's about 12:40.  Let's be prepared to start

 5    back up at 2:00.  We're in recess.

 6            (A lunch recess was taken.)

 7        THE COURT:  You may be seated.

 8        All right.  Are we ready to proceed?

 9        MR. ANDERSON:  Yes, sir.

10        THE COURT:  All right.  Who is the County's next

11    witness?

12        MR. ANDERSON:  Credell Calhoun.

13        THE COURT:  All right.

14        (Whereupon, the witness was placed under oath.)

15        THE COURT:  Mr. Calhoun, I know you've been in and out,

16    but my general instructions are to speak into the microphone.

17    Please speak at a pace at which the court reporter can keep up

18    with you, because she's taking down everything that's being

19    said.  Please allow the lawyers to finish their questions

20    before you begin to speak so that the two of you will not be

21    speaking at the same time.  And make sure all of your

22    responses are verbal.  If you're going to nod or shake your

23    head, please tell me yes or no as well.  I'll be monitoring

24    that, though.

25            So for the record, could you state and spell your name.

 1          THE WITNESS:  Credell Calhoun.  That's C-r-e-d-e-l-l,

 2   C-a-l-h-o-u-n.

 3          THE COURT:  Thank you.

 4          You may proceed.

 5          MR. ANDERSON:  Thank you, Your Honor.

 6                         **CREDELL CALHOUN,**

 7          **having been first duly sworn, was examined and**

 8   **testified as follows...**

 9                      **DIRECT EXAMINATION**

10   **BY MR. ANDERSON:**

11   Q.   Mr. Calhoun, what is your educational background?

12   A.   I finished my bachelor's at Prairie View A&M University

13   and a master's in counseling and guidance at A&M University

14   and the specialist degree at Jackson State University.

15   Q.   What is your work background?

16   A.   I worked at -- after I finished at Prairie View getting a

17   master's, I did three years at Wiley College as director of

18   counseling and testing, and when I came to Jackson State to

19   get my specialty there, I got a job with Jackson State CEDA

20   program as a counselor, where I was over the counseling for

21   three different programs, including the clerical.  I'm most

22   proud of the clerical program because we put -- in one year it

23   was a 26-student program.  We put as many as 96 persons -- it

24   was a one-year program, but we put 96 people to work that

25   year.  And from there --

```
 1   Q.   I don't want to cut you off on that.  I don't know if
 2   Your Honor need to hear all that, but --
 3   A.   Anyway, I went to go on.  And then I went to the City of
 4   Jackson as the assistant to Mayor Dale Danks, and from there
 5   got a job in development and training, and after that I was
 6   elected to the state representative position, District 68 from
 7   Hinds County.  And almost --
 8        THE COURT:  I know you did some other things between
 9   then and now; right?
10        THE WITNESS:  Also I served on the city council here in
11   the City of Jackson.
12   BY MR. ANDERSON:
13   Q.   Tell us about your --
14   A.   And now I'm on the Board of Supervisors after serving a
15   second stint in the legislature.
16   Q.   Tell us about your public service.  Start at --
17   A.   I was in the Marines for three years.  I call that public
18   service, a lot of public service there.  And --
19   Q.   Were you honorably discharged?
20   A.   Yes.  Yes, I was.
21   Q.   Okay.
22   A.   And I did get the GI Bill to go to Prairie View,
23   including the master's.  I finished Prairie View in two and a
24   half years after I started and got a master's in three and a
25   half years.
```

1   Q.   You were on the city council, the legislature, and

2   likewise on the Board of Supervisors.

3   A.   Correct.

4   Q.   Why did you seek public service?

5   A.   When I was a young fellow, my mother moved us to

6   California, and just being a kid in a new city, I was always

7   helping people cross the street and things of that nature, and

8   it made me feel real good helping people.  So when I finished

9   my counseling degree, I started counseling, and I feel real

10   good doing counseling work, helping people one at a time.  And

11   that's why I went into being an elected official where you

12   could help more people at a time.

13   Q.   Thank you.  Thank you, Mr. Calhoun.

14       When were you elected to the Board of Supervisors?

15   A.   2020.  Well, 2019.  Started service in 2020.

16   Q.   So your service pretty much has been mostly under COVID,

17   has it not?

18   A.   We got elected in '79 -- I mean in 2019, started serving

19   January 2020.  We had a big flood, and we were under an

20   emergency.  When we came out of that, COVID hit.  So we have

21   been under emergency in the Hinds County for the last two

22   years.  Ever since we've been in, it's been a struggle, but

23   we've been trying to manage the best way we can.

24   Q.   Is Hinds County one of the flourishing counties?

25   A.   We're not flourishing.  We're losing population, and a

1 lot of business have been leaving, so the tax base has been

2 eroding to some degree, and -- but we're continuing to try to

3 attract businesses.  We did get the Continental Tire before I

4 came on.  While I was in the legislature, we were able to help

5 that, and hopefully we can start seeing some more of that in

6 the future.

7 Q.   What about the population of Hinds County?  Which

8 direction is it going?

9 A.   It's been going down for the last two censuses.  The last

10 20 years, it's been going down.

11 Q.   And the city of Jackson is a major part of your county,

12 is it not?

13 A.   It's going down even worse.  They are building more in

14 the county than they are in the city.

15 Q.   As a supervisor, I'm pretty sure your constituents call

16 on you often.  Do they not?

17 A.   Well, when I was -- when I was on the city council, I

18 hated it because they called every night, every day, but they

19 are just as bad as this.  That's the one thing, that's it's an

20 overload as far as people calling for everything from, as they

21 say, getting a cat out of the tree to potholes, flooding.

22 Especially water situations.  We have a terrible --

23 Q.   About the water situation -- excuse me --

24      THE COURT:  Hold on, hold on.  Let him finish his

25 question.  No, no, I mean, both of y'all can't talk at the

1    same time.

2          MR. ANDERSON:  I was going to say, Mr. Credell has

3    challenges hearing, and mine is probably worse than yours, but

4    we'll work through this.

5    BY MR. ANDERSON:

6    Q.   If you would, talk about some of the water challenges for

7    Hinds County.

8    A.   Well, last year we had a freeze, and for four weeks in

9    south Jackson, we had no water, and Mr. Jones, the

10   administrator now, we were in south Jackson with a water truck

11   trying to get toilet water to people.  Matter of fact, I

12   actually took water in buckets and went into houses and

13   actually flushed their toilet for them.  That's how difficult

14   it was, and hopefully we're going to do something about that

15   this year.  We're looking at it with American Rescue funds,

16   and the State is talking about helping us.

17         If we do a million, they'll do a million.  If we do 40

18   million, they'll do 40 million.  So it's looking a little up

19   right now to solve those water problems in south Jackson.

20   Q.   The challenges on the water front are mostly in the city

21   of Jackson, are they not?

22   A.   It's mostly in the city of Jackson.  We have some in

23   Byram area, but south Jackson is the major area, and hopefully

24   we can get that solved.

25   Q.   Are there water towers in Hinds County?

1    A.   We have one water tower, and that's the water tower at

2    the Raymond Detention Center, and hopefully we're going to be

3    building one at the new detention center that we plan to build

4    very shortly and break ground on that.  And hopefully we can

5    utilize that for the Henley-Young detention center, and that

6    is a -- that's a problem that we have there also right now,

7    low water pressure.  So that would be taken care of with that.

8    And also some of that will go into the south Jackson area.

9    Q.   We're here today because of the detention center down at

10   Raymond.  Is this an important issue to the Board of

11   Supervisors?

12   A.   Very important.  Very important issue to the supervisors.

13   Let me just digress just a bit.  When we came in -- I've been

14   knowing about the detention center since it was built.  I was

15   in the legislature at the time, and it was a boondoggle then.

16   It didn't match up -- it didn't meet any qualification.  At

17   the time doors weren't working and the -- and I, coming in,

18   talked to the other Board members, and they agreed that that

19   center would not come into compliance with all the things that

20   were on that list.

21        And we asked -- we started then before we were -- before

22   we were sworn in working on a new jail, we went to -- David

23   Archie and I went to --

24   Q.   Let me stop you just a minute.  Before we go into the new

25   jail, would you tell the Court about the improvements to the

1    detention center that have happened since you've been on the

2    Board of Supervisors?

3    A.   Repeat that question.

4    Q.   Since you've been on the Board of Supervisors, tell the

5    Court what improvements to the detention center have been

6    made.

7    A.   Okay.  We have -- when I came -- when this Board took

8    office, the first thing that was said, "We're not kicking the

9    can down the road any further.  We're going to do everything

10   possible to fix the detention center so that it will meet" --

11   even though we knew it was going to be very difficult because

12   of the direct-supervision provision in there, because all the

13   contractors were telling us that it was going to be very

14   difficult and very costly.  And so we said to the sheriff,

15   "What is it that you need to get this center into compliance?"

16       He said, "First we got to get some doors that lock," and

17   that --

18   Q.   Let me stop you again, Mr. Calhoun.  We've had a

19   contractor to come and testify, and he's testified under oath

20   about the improvements and how much they've cost.  What I want

21   to ask you about is:  The quality assurance director has

22   reported that there's a lack of cooperation with the Board of

23   Supervisors regarding the detention center.  Are you --

24       THE COURT:  Hold on.  Hold on for one second.  That's

25   part of the QA report that's Exhibit -- just hold on one

```
 1   second, okay?

 2   BY MR. ANDERSON:

 3   Q.   That document is in evidence, and I want to refer you to

 4   the highlighted part.  Do you see that?

 5   A.   Uh-huh.

 6   Q.   It says on there "a not so subtle lack of cooperation

 7   from the Board of Supervisors" --

 8        THE COURT:  You need to speak into the microphone when

 9   you're speaking.

10        MR. ANDERSON:  Oh, I'm sorry.  Yeah, I thought I'd get

11   it sooner.

12   BY MR. ANDERSON:

13   Q.   Let me stop you, first of all.

14   A.   Okay.

15   Q.   I just want to ask you:  Is that an accurate statement?

16   A.   No.

17   Q.   Okay.  I want to ask you again --

18   A.   I want to say this.

19   Q.   I didn't ask you a question.  We want to get out of here

20   today, so I don't want you --

21        THE WITNESS:  Judge, I'm used to being on the radio, so

22   it makes me talk a little bit too much.  Sorry about that.

23        THE COURT:  Okay.

24   BY MR. ANDERSON:

25   Q.   I asked you if you would review the minutes of the Board
```

1    of Supervisors since you've been on the Board as it relates to

2    requests from the sheriff, from people at the Hinds County

3    Detention Center, and what was the reaction to the Board of

4    Supervisors.  Have you been through those minutes?

5    A.   I've been through the minutes.  Since you say you want to

6    ask the question, I'll stop.

7    Q.   Okay.  Are these the minutes that you've been through?

8    A.   Those are the minutes.

9    Q.   And these minutes are D-53 all the way to D-74.

10   A.   Yes, sir.

11   Q.   Was there ever a time since you've been on the Board that

12   requests regarding the detention center has come to the Board

13   and it was rejected by the Board of Trustees -- by the Board

14   of Supervisors?

15   A.   Not one time, as I can recall, that's since I've been

16   president, before I was president, every Board member

17   supported the detention center.  They followed the -- matter

18   of fact, they got on the same kick.  We'll have to take care

19   of the detention center, and if -- and I always told the staff

20   that if a request comes from the detention center, let's take

21   care of it as fast as state law will require --

22        MR. ANDERSON:  Your Honor, I --

23   A.   -- or as state law will allow.

24        MR. ANDERSON:  -- misstated.  It's D-49 through D-74.

25   BY MR. ANDERSON:

1    Q.   And if I understand your testimony, you told the staff

2    and everybody in attendance that there was a standing order;

3    am I correct?  And what did that standing order from you say?

4    A.   If a request comes from the sheriff or anyone at the

5    detention center, to get it as fast -- as rapidly as state law

6    requires -- will allow.  Excuse me.

7    Q.   Have you been to the detention center since you've been a

8    member of the Board?

9    A.   Yes, sir.  I had to go look at some of those doors we

10   were paying such a large price for.  They were expensive.

11   Q.   And what were you going to the detention center to do?

12   A.   To check and see how the work was going and see how

13   things look.  I better stop there.

14   Q.   There were a number of deaths at the detention center in

15   2021.  What did you as president of the Board of Supervisors

16   do about that?

17   A.   We got with the sheriff and others and tried to come up

18   with a way to prevent the deaths in the future, and it's

19   horrifying to have deaths when you are over a situation, and

20   that's what happened.  And we as a Board supported the sheriff

21   to do whatever is necessary to prevent the death in the

22   future.

23   Q.   Did you get involved as president of the Board of

24   Supervisors regarding the staffing at the detention center?

25   A.   We supported the sheriff in any way that we could to

1  support -- we passed different resolutions, expanded the area

2  where they could recruit from.  Anything that we could to get

3  them -- get the number of detention officers up at the

4  detention center, we did that as a Board.

5  Q.   In trying to improve the conditions at the detention

6  center regarding staffing and all the other items that we know

7  about, what impact, if you know, did COVID-19 have?

8  A.   Tremendous.  First, you can't get the things that you

9  need as rapidly as you -- as you need them, and COVID -- COVID

10  has hampered the Board in many ways, and especially at the

11  detention center.

12  Q.   There's been testimony in this trial that you requested

13  the detention center to release a friend of yours -- or child

14  of a friend of yours from the detention center to the work

15  center.  Did that happen?

16  A.   That happened.  It happened, and I can explain it this

17  way:  When they requested, I called the -- when the request

18  came in from the mother, I did -- I've been knowing them for

19  years and knew the kid when he was growing up, and I felt that

20  he was a decent person and moving would be -- wouldn't be

21  disastrous and -- but the administrator told me that his

22  classification -- I didn't quite understand the meaning of

23  "classification" at the time, not fully, and -- but once --

24  when I asked her to move him, she gave me his classification.

25        And after he was moved, I found out that DOJ didn't think

```
 1   too kindly of moving the classification into the work center

 2   from the detention center.  So I requested to the -- the

 3   administrator to move him back --

 4   Q.   Let me stop you there.

 5   A.   Okay.

 6   Q.   Was he moved back?

 7   A.   He was moved back the next day.

 8   Q.   Did you learn a lesson from calling the detention center?

 9   A.   I haven't called it since.  Not one time.

10   Q.   Since you've been on the Board of Supervisors, you have

11   been involved in securing a new jail for the -- for Hinds

12   County.  Tell the Court what your involvement has been and --

13   the short form, and --

14   A.   I know I did go to -- we'll go back to Coahoma County,

15   and I want to be sure that we understand that David Archie --

16   I know the --

17   Q.   Let's -- we don't need to talk about that, Mr. --

18   A.   But I know the jails watch TV.  So I want to say, David

19   Archie and I went to Coahoma County to look at it.  Benchmark

20   Construction took us up there and showed us what they had.  We

21   liked it.  So we told him to try to put together a package for

22   us, and he's been working on it ever since.  And I can say

23   COVID-19 has slowed the process down.  Everybody understand

24   that, but we're going to break ground sometime this year and

25   hopefully have all the amenities there and at least in
```

 1    18 months or so have at least 200 beds for the bad guys.

 2    Q.   The County is working with Cooke Douglass & Farr --

 3    A.   Yes.

 4    Q.   -- to do a master plan for the jail and do it in phases;

 5    is that correct?

 6    A.   Right.  And at this point the phases is the first 200

 7    with all the amenities, including courtrooms, and the last

 8    phase at least 400 more beds.  It could be 500 more, depending

 9    on -- we were going to do it in three, but now it's down to

10    two.

11    Q.   Okay.  Thank you.  Let me just ask you:  Do you know who

12    Frank Shaw is?

13    A.   Yes, I know Frank.  I met him.  And he sound like --

14    looking at his qualifications, sound like a pretty good

15    fellow.

16    Q.   And what is his position today?

17    A.   He's the administrator of the detention center in

18    Raymond.

19    Q.   Is he the interim?

20    A.   Interim.  Interim.  Interim for six months.  The Board

21    voted to hire him for six months to help get the detention

22    center in Raymond together.

23    Q.   Has the Board decided to do a national search for --

24    A.   Yes.  At this time a national search is ongoing.

25         MR. ANDERSON:  If you give me a minute, Your Honor, I

1    might be through.

2         THE COURT:  Okay.

3         MR. ANDERSON:  Your Honor, I mentioned to you that the

4    documents that Mr. Calhoun referred to, D-48 through 74, the

5    minutes of the Board of Supervisors while he was on the Board,

6    those are public records of Hinds County, and I would move

7    that they be introduced into evidence.

8         THE COURT:  Any objection from the United States?

9         MR. CHENG:  No objection.

10        THE COURT:  Okay.  That would be D-48 through D-74 are

11   received into evidence.

12        (Defendants' Exhibits 48 through 74 entered.)

13   BY MR. ANDERSON:

14   Q.  Mr. Calhoun, you've testified about the new jail, its

15   timeline and what's involved in it.  Mr. Farr from Cooke

16   Douglass & Farr has testified.  Would you rely on him to make

17   those decisions about when it will open and those kinds of

18   items?

19   A.  Yes, sir, we would.

20        MR. ANDERSON:  With that, Your Honor, I have no further

21   questions.

22        THE COURT:  Okay.  Thank you.

23                       **CROSS-EXAMINATION**

24   **BY MR. CHENG:**

25   Q.  Good afternoon, Mr. Calhoun.  It's been a few years, it

```
 1   feels like.

 2   A.   Yes.

 3   Q.   How are you doing these days?

 4   A.   Doing good.

 5   Q.   You mentioned the COVID pandemic.  Was Ms. Bryan the jail

 6   administrator at the time the COVID pandemic hit the jail?

 7   A.   Was who?

 8   Q.   Was Ms. Bryan one of the jail administrators in charge

 9   when the COVID pandemic hit the jail?

10   A.   No.

11   Q.   So how long has the pandemic been running?

12   A.   Two years.

13   Q.   So when did Ms. Bryan start?

14   A.   Last year.

15   Q.   So has she been jail administrator at least during the

16   last part of the pandemic?

17   A.   Yes, she was.

18   Q.   Did you consider her performance to be adequate in

19   dealing with the pandemic at the jail?

20   A.   I considered it to be -- as far as I can -- we did pretty

21   good with the pandemic.

22   Q.   And did you ever raise any concerns about her performance

23   when she started running the jail?

24   A.   When she came?

25   Q.   Right.
```

1    A.   I had total confidence in her when she came.  I was one

2    of the people that was pushing the sheriff to hire her.

3    Q.   And I think earlier you talked about how, you know, you

4    get a lot of calls from constituents and you're very busy as a

5    supervisor; is that right?

6    A.   Yes, sir.

7    Q.   So one of the things that's really important to do is to

8    delegate responsibilities to the right officials inside your

9    County government; correct?

10   A.   Right.

11   Q.   And so, you know, you talked about how, you know, you

12   trust your architects to deal with the buildings.  Do you

13   remember that?

14   A.   Uh-huh (affirmative).

15   Q.   Do you think it might also be important to trust jail

16   administrators and jail professionals for running the jail?

17   A.   Correct.

18   Q.   And that's one of the lessons you learned.  When you try

19   to help a friend's kid, you know, sometimes you might stumble

20   into something you don't understand at the jail.  You got

21   that; right?

22        Okay.  And, you know, like every other profession, being

23   a jail administrator has its own types of qualifications and

24   credentials; right?

25   A.   Uh-huh (affirmative).

1   Q.   Is that -- I'm sorry.  Uh-huh, is that "yes"?

2   A.   Yes.  Yes, sir.

3   Q.   Thank you.

4        And so the consent decree, for example, has requirements

5   for what's supposed to be a jail administrator; right?

6   A.   Correct.

7   Q.   And it's supposed to be somebody who actually has run

8   jails before.  You understood that; right?

9   A.   Correct.

10  Q.   Do you understand, sir, the difference between who is

11  housed at a jail versus who is housed at a prison?

12  A.   I didn't -- I didn't hear that.

13  Q.   Do you understand the difference between people who are

14  housed at a jail versus people housed at a prison?

15  A.   Yes, I know the difference.  One is being detained for

16  court, and one is serving time.

17  Q.   All right.  So I think you said earlier they're bad guys,

18  and some of them may be bad guys; right?

19  A.   Right.

20  Q.   But some of them have just been accused.  They haven't

21  even been convicted yet; right?

22  A.   Correct.

23  Q.   And in this state, because of the way the mental health

24  system works, there are people in the jail who might just be

25  mentally ill and who are going to end up in a state hospital

1  or something.

2  A.   Correct.

3  Q.   And because there aren't really great mental health

4  resources in this state, the sheriff ends up having to deal

5  with a lot of these patients at his jail; is that right?

6  A.   Correct.

7  Q.   So you understand how important it is to provide good

8  mental health services at the jail?

9  A.   Correct.

10  Q.   Now, when you have a medical contract with QCHC -- that's

11  the medical contractor; is that right?

12  A.   Yes, sir.

13  Q.   Sorry.  Nodding and --

14  A.   Yes, sir.  I remember the judge's orders.  No nodding.

15  Q.   Thank you.

16      So with the medical contract, QCHC, once the Board

17  approved the contract, QCHC gets to spend its own money, and

18  as long as it's under the contract, it has a lot of freedom to

19  use its own resources; correct?

20  A.   Correct.

21  Q.   So if they want to buy supplies or hire employees, as

22  long as it's under the contract, they can do it; is that

23  right?

24  A.   Correct.

25  Q.   And you would never ask a medical provider to wait for a

1     Board meeting to approve some important medical expense, would

2     you?

3     A.   It probably depends.

4     Q.   Right.  Well if you did it, I mean, if there's an

5     emergency --

6     A.   If it's an emergency, we can -- we can move quite rapidly

7     at the Board.

8     Q.   Yeah, but cases happen --

9     A.   With -- we have emergency authority.

10    Q.   Yeah, but if you went to, like, a doctor's office and you

11    needed something, you would not want the doctor to get

12    emergency approval to pay for the medications; right?

13    A.   We have emergency authority.

14    Q.   Yeah, but you would -- I mean, would you go to a doctor

15    and expect them to have to get approval to pay for something

16    before they give you medication?

17    A.   I -- I guess not as an individual going to a doctor.

18    Q.   I mean, there's a difference between controlling spending

19    at a big, higher level -- you know, a big program level and

20    controlling spending for day-to-day operational reasons;

21    right?

22    A.   Right.

23    Q.   And for operational reasons, there are things that

24    sometimes have to be done very quickly in medicine or in an

25    emergency; right?

```
 1   A.   Correct.
 2   Q.   Now, your emergency approval power, does that require the
 3   whole Board to vote on it?
 4   A.   We don't have to have -- somebody have to sign for it.
 5   Q.   Okay.  So you have someone sign --
 6   A.   You only have three votes.
 7   Q.   You only need three votes --
 8   A.   Yeah.
 9   Q.   -- for an emergency?
10   A.   You have to have at least three votes with the Board of
11   Supervisors.
12   Q.   Right.  So you still need a vote even for emergency
13   spending?
14   A.   Right.
15   Q.   And that's a democratic safeguard to make sure nobody,
16   you know, misuses money; right?
17   A.   Right.
18   Q.   But even a mechanism like that, you know, if it really is
19   an emergency, this waiting for the Board to get three votes,
20   that does put a delay in the process; right?
21   A.   Right.
22   Q.   And, you know, you've already said that, you know, you're
23   familiar with the problems the jail has had for decades
24   because you were in the state legislature; is that right?
25   A.   I didn't hear that.
```

```
 1  Q.   Oh, sorry.  Because you were in the state legislature,
 2  you knew that the jail had problems almost from the day it
 3  opened; right?
 4  A.   Yes.  I was -- not because I was in there.  I was alive.
 5  I mean, they were talking about it on the news.
 6  Q.   Right.  And I'm almost -- I'm almost embarrassed to bring
 7  this up, but Ms. Peggy Calhoun, is she related to you?
 8  A.   Yes.
 9  Q.   She's your spouse?
10  A.   Yes.
11  Q.   All right.  And so Ms. Calhoun was actually one of the
12  parties who approved the consent decree; right?
13  A.   Yes.
14  Q.   I imagine -- I don't want to get into privilege, but I
15  imagine she may have said a few things about the jail in her
16  day; right?
17  A.   Yes.
18  Q.   Okay.  I'll just move on from there, then.
19       But the Board -- when it approved it at the time, the
20  Board agreed the consent decree complied with the Prison
21  Litigation Reform Act.  You understood that; right?
22  A.   Right.
23  Q.   And even today would you agree that having enough
24  officers in the housing units is something they should be
25  doing to provide security in the jail?
```

1   A.   Would I agree?

2   Q.   Uh-huh.  They need to have security officers in the

3   housing units in order to provide security in the jail?

4   A.   Absolutely.  They should, but the direct supervision at

5   that jail is just very dangerous.

6   Q.   Well --

7   A.   And I had Sheriff Vance complain about that ongoing when

8   he was alive.

9   Q.   Right.  You know, when you say "direct supervision at the

10  jail," you mean putting an officer in the housing units?

11  A.   Yes, sir.  He was continuously complaining to us about

12  needing that direct supervision.

13  Q.   And you understand under the decree there are a couple

14  different types of remedies; right?  One set of remedies is to

15  try to improve the locks and the doors and the physical plant

16  to make it physically secure.  You understand that?

17  A.   Yes.  He pushed for that.

18  Q.   But, you know, the other half of security is actually

19  having detention officers trained and guarding the inmates;

20  you understood that part?

21  A.   No, I didn't understand that they could go in those pods.

22  Q.   Now, actually, under the consent decree, they're required

23  to go in the pods.  Did you know that?

24  A.   And I think stand right there and take the abuse and not

25  get killed.  Is that what you're saying?

```
 1   Q.   Yes.  They have to go in the housing units.  You
 2   understood that?
 3   A.   Yeah, I understand that, and did -- and did look at the
 4   possibility of putting them enclosed within the pods and all
 5   of that, and the contractors and engineers told me that that
 6   could not be done unless you're going to spend $100 million,
 7   so we were building a jail -- a new facility anyway, so we
 8   went that route.
 9   Q.   But that's with the physical plant; right?  But there is
10   also the regular supervision side.  So -- well, let me go back
11   a little bit.
12        Earlier Mr. Kenny Jones said something about how they
13   weren't going to pay for staff to go in the housing units
14   because it's dangerous for the staff.  Were you here when he
15   said something like that?
16   A.   (Nodding affirmatively.)
17   Q.   So did you agree with him that you don't want to make the
18   staff go in the housing units or pay for staff to go in
19   housing units?
20   A.   Well, it's a dangerous situation.  I'll give you a
21   scenario.  Sheriff Lee Vance was continuously complaining
22   every time we would talk to him about that.
23   Q.   Right.
24   A.   So that's all I wanted to say on that.
25   Q.   But even under Sheriff Vance, the jail was not fully
```

1  staffed, was it?

2  A.  No.

3  Q.  You've never really been --

4  A.  No.

5  Q.  -- at the required staffing level?

6  A.  No.

7  Q.  So isn't this a little bit of a Catch-22?  I mean, you're

8  saying if it's dangerous, we don't want to put staff in the

9  housing units, but we're not going to put housing units until

10  it's less dangerous; right?

11  A.  Right.

12  Q.  Right.  And the big problem there is it's always going to

13  be dangerous if you don't have more staff; right?

14  A.  Right.

15  Q.  Do you recall in June 2021 when you were at a status

16  conference and you said the Board is working on financing in

17  order to help hire more staff?

18  A.  Repeat that.

19  Q.  Sure.  Do you remember in June 2021 --

20  A.  Can you speak in the mike?

21  Q.  Oh.  Can you hear me now?

22      THE COURT:  That's much better.  He has a hearing aid

23  on, so...

24  A.  I'm trying.

25  BY MR. CHENG:

```
 1   Q.   So in June 2021 you said you would try and look for
 2   financing to hire more staff?
 3   A.   We could -- we looked for financing, but finding staff is
 4   very difficult.  We did extend the radius where we could hire
 5   them from, and we still are having difficulty.
 6   Q.   So there's been a lot of talk about the fights --
 7   A.   Excuse me.  Let me say this.  Everybody's having trouble
 8   hiring people right now during COVID.
 9   Q.   Right.
10   A.   So to criticize the County for not hiring is -- is really
11   stretching a little bit because -- and the job down there is a
12   very difficult job, and hopefully we can get the funds up
13   where they would come, but it is a very -- it's very difficult
14   in these days.  I think everybody need to know that job --
15   filling a job that's easy is hard to do now.  So --
16   Q.   I mean, Mr. Calhoun, that just means that in some ways,
17   when other people can't find workers, they raise salaries;
18   right?
19   A.   Correct.
20   Q.   Or maybe they give them benefits or improve the working
21   conditions; right?
22   A.   Correct.
23   Q.   Maybe even telework, which will probably never happen in
24   a jail, but that happens?
25   A.   Correct.
```

***DAILY TRANSCRIPT***

```
 1   Q.   So early on I think your Board has known you need to be
 2   able to raise salaries; right?
 3   A.   Right.
 4   Q.   So in June 2021, if I could just remind you, page 45,
 5   lines 6 through 18 of -- I believe it's Defendants'
 6   Exhibit 51.  If you don't mind, let me just pull that up real
 7   quick.  Well, sorry.  It's a transcript.
 8        So remember back when you were first before the judge
 9   early?
10   A.   First done what?
11   Q.   When there was a staff conference in front of the judge
12   and it was an early time and you were able to tell the judge
13   what your plans were?
14   A.   Uh-huh (affirmative).
15   Q.   And at the time I think you said, "We're excited about
16   the new hire, the director of the detention center, and we
17   have been planning for some time with the administrator and
18   others in the finance department trying to come up with the
19   funding to raise the salaries of all detention officers."
20        Do you remember that?
21   A.   I thought -- I thought we did.  I thought they did raise.
22   I thought it went to 31,000.
23   Q.   Right.  So the 31,000, though, that --
24   A.   No.  I'm saying I did what we were talking about.
25   Q.   Right.  Right.  But this was in June 2021; correct?
```

```
 1    A.   Yeah.  But we still -- it takes time to do --

 2    Q.   I get that.

 3    A.   And the County doesn't have unlimited funds, you know?

 4    Everybody need to remember that.  We're working on a very

 5    restricted budget, and our budget is not going up.  It's going

 6    down to some degree, and --

 7    Q.   So how long did it take before you passed the 5 percent

 8    pay increase?  About six months?

 9    A.   Yes.

10    Q.   All right.  So it did take some time.  But between the

11    time you make a promise to the Court and you actually get

12    something done, it can take several months; right?

13    A.   Right.

14    Q.   Okay.

15    A.   Remember, it's still politics, and politics takes time to

16    get done, and you got to sell people on it.  And now the Board

17    has been supporting every -- we get 100 percent even though we

18    have people on the Board with different views and a lot of

19    things going on, but we support the detention center every

20    time 100 percent when it comes to trying to save lives down

21    there or protect the detention officer, raises for the

22    detention officer.  All of those things are actually done by

23    unanimous vote of the Board.

24    Q.   But you did say when it's brought before the Board.

25    A.   Right.
```

1   Q.   So it does depend on whether the sheriff brings a

2   proposal before the Board; right?

3   A.   Everything has to come from some department.

4   Q.   If no department brings it to you, you will never have

5   anything to vote on; right?

6   A.   It has to get on the agenda.  It's the way the State

7   require the Board to do.  It has to be approved by the Board

8   and put on the minutes in order to become law.

9   Q.   But the Board isn't just a rubber stamp; right?  It's

10  also the main executive body for the County; correct?

11  A.   It is the executive body for the County for all funds

12  going through the County.

13  Q.   So in some ways the Board can do some planning and it can

14  do some work of its own in order to try to make things better

15  at the jail; right?

16  A.   We're doing -- we're talking to the department heads.

17  We're talking to the administrator.  We're talking to the

18  sheriff.  We're talking to everybody in the County to keep

19  things rolling.

20  Q.   I just want to be clear, though.  It does have both the

21  authority and the responsibility to serve as the executive

22  agency for the County; right?

23  A.   Correct.

24  Q.   Okay.  Now, would you agree that opening up the mental

25  health unit at the jail is something that's necessary to

1   address the needs of the detainees in the jail?

2   A.   It would help.

3   Q.   And we talked earlier about all the mental health cases

4   in the County; right?

5   A.   It's -- it's probably a necessity at this time.

6   Q.   And in some ways even having community mental health

7   programs or strengthening the severe mental health --

8   A.   Let me say --

9   Q.   -- is important, too; right?

10  A.   -- a lot of people are not doing what they should do in

11  the state of Mississippi for mental health, and if we had more

12  help from the State, we would be much better off at the

13  County.  I know that because I served in the legislature for a

14  number of years, and they've been pulling back for some time

15  on mental health.

16  Q.   And you understand that the reason we created his CJCC,

17  Criminal Justice Coordinating Committee, is to sort of help

18  bridge those ties between county, state, city to address these

19  types of mental health issues; right?

20  A.   Yeah.  Thank you for doing that.

21  Q.   You know, I know you alluded to how people on the Board

22  don't always agree, but they support the jail.  Does the

23  infighting inside the Board sometimes get a little

24  distracting, though?  I mean, everybody's seen it; right?

25  We've seen the videos, people getting in fights on TV; right?

```
 1   A.   It's a distraction on the Board.
 2   Q.   And the sheriff had to warn people who disrupt the board
 3   and had to arrest a board member; remember that?
 4   A.   It's some distraction on the Board.
 5   Q.   That's a little bit of distraction; right?
 6   A.   Yeah.
 7   Q.   There was some discussion about the --
 8   A.   Let me just say this:  Not since this sheriff's been
 9   here.
10   Q.   All right.  But the sheriff's only been here a couple
11   months; right?
12   A.   That's right.  Not since he's been here.
13   Q.   I wanted to get a little bit of a clarification on
14   something that happened.  There was some discussion about
15   taking away the pins from the sheriff's department.  Do you
16   remember if that may have happened at one point?
17   A.   Yeah.  That -- that was a budget move, but it -- they had
18   orders from the Board.  Whenever they needed someone at the
19   detention center, they could get them.
20   Q.   Right.
21   A.   That was just for the budget when they organized it for
22   the next year.
23   Q.   So I think it was in October of 2021.  My understanding
24   is -- and, you know, we can bring it up, but it's Defense
25   Exhibit 51, page 581.  So was this the Board meeting when they
```

 1    allowed the pins to come back to the sheriff's department?

 2    A.   Uh-huh.  Yes.

 3    Q.   Okay.  So the pins were restored, but it's only if -- as

 4    needed; right?

 5    A.   Right.  That's exactly what I said.  It was budget only,

 6    and orders were that the sheriff's department for the

 7    detention center get pins whenever they needed it.

 8    Q.   All right.  There are some folks in Hinds County who want

 9    to open up a misdemeanor holding facility; is that right?

10    A.   The City.

11    Q.   Right.  And I take it people are worried about crime in

12    the community; right?

13    A.   Yes, sir.

14    Q.   But do you agree that having a good jail that has good

15    systems for identifying who's dangerous and not dangerous may

16    actually help public safety?

17    A.   I guess so.  I don't know for sure, but I guess so.

18    Q.   You talk to a lot of folks in town; right?

19    A.   I talk to a lot of people.

20    Q.   Over the years a lot of constituents tell you their

21    problems?

22    A.   All the time.

23    Q.   And sometimes fights that break out in the jail end up

24    affecting the community; right?

25    A.   I don't get a lot of complaints about what's happening in

1    the jail in the community.

2    Q.   Okay.  Did you review the recruitment and retention

3    report from Mr. Rivera?

4    A.   Do what?

5    Q.   Mr. Rivera's recruitment and retention report.  Y'all

6    hired a consultant to help with recruiting and retention.

7    A.   Right.  Okay.

8    Q.   Do you remember him?

9    A.   Right.

10   Q.   That was Mr. Rivera?

11   A.   Right.

12   Q.   Did you review his report?

13   A.   No.  I haven't reviewed it lately, anyway.

14   Q.   He was hired in 2020; right?

15   A.   Yes.

16   Q.   Okay.  And during most of those months, nothing happened

17   with that project; correct?

18   A.   Right.

19   Q.   But Ms. Bryan came in and she helped revitalize it?

20   A.   Right.

21   Q.   Do you think that was a helpful thing for her to do?

22   A.   It was helpful.

23   Q.   Yeah.  And you've been sitting in this hearing, so you've

24   heard some of his recommendations; right?

25   A.   Yes.

1  Q.  For things like, you know, biweekly paychecks and direct

2  deposit; you heard all that stuff?

3  A.  Yes.

4  Q.  Okay.  And would you agree these are all things you want

5  to do and maybe even have already done?

6  A.  We haven't -- we haven't -- we are doing everything --

7  most of the things in there, anyway.

8  Q.  Well, you haven't passed a career ladder; right?

9  A.  The months -- what do you say, twice-a-month pay, yes,

10  but it's in the works.

11  Q.  It's in the works, but it isn't done yet?

12  A.  It's a good chance it will be done shortly.

13  Q.  So at least that recommendation, that was one you agreed

14  with?

15  A.  5 percent, 31,000, all of these we agree with.

16  Q.  Okay.  And he also recommended some improvements to

17  technology.  Did you see all that or hear anything about that?

18  A.  Yes.

19  Q.  Is that going to be in the works, too?

20  A.  Technology is in the works, yes.

21  Q.  Now, during the pandemic, the County had to learn to

22  switch to remote telework for a lot of its employees; right?

23  A.  Correct.

24  Q.  Even Board meetings, you had to add technology so they

25  could be broadcast?

```
 1    A.   Correct.  Correct.
 2    Q.   All right.  But even to this day, the jail recruiting
 3    office, they don't have high-speed internet; right?
 4    A.   I'm not sure about that.
 5    Q.   Okay.  You mentioned you've met Mr. Shaw before.  Have
 6    you reviewed his curriculum vitae before he became jail
 7    administrator?
 8    A.   His resume?
 9    Q.   Yes.
10    A.   Yes, sir.
11    Q.   All right.  So you know his resume only shows prison
12    work; right?
13    A.   Correct.
14    Q.   You know, one shouldn't rely too much on allegations, but
15    are you aware that Mr. Shaw's prison, the East Mississippi
16    Correctional Facility, has been accused of having some
17    problems with inmates?
18    A.   With inmates?
19    Q.   With inmates.
20    A.   No.
21    Q.   Did you know, for example, there were allegations of
22    violence in his facilities?
23    A.   No.
24    Q.   If you knew, do you think that might have affected your
25    decision to hire him to run the jail?
```

1    A.   I'd have to look at it.

2    Q.   If you knew that, would you have asked more questions

3    about his hiring?

4    A.   If I had seen it, yes.

5    Q.   Well, I guess I should probably ask:  Was there, like, an

6    interview before he was hired?

7    A.   Was there what?

8    Q.   Did you actually have an interview for him before he was

9    hired?

10   A.   Yes, he was interviewed.

11   Q.   And was it the whole Board, or who did the interviewing?

12   A.   The sheriff department.

13   Q.   Everyone?

14   A.   Beg your pardon?

15   Q.   I'm sorry.  I couldn't quite hear you.  The sheriff's

16   department?

17   A.   The sheriff's department.

18   Q.   Okay.  So did you do any interviewing of Mr. Shaw?

19   A.   I spoke to him myself.  I talked to him about it and

20   asked him questions, yes.

21   Q.   Okay.

22   A.   That's me, now.  The whole Board did not.

23        MR. CHENG:  If I could have just a moment, Your Honor?

24        THE COURT:  You may.

25   BY MR. CHENG:

1    Q.   Let me move on a little bit to Henley-Young.  There was

2    some talk about the water supply issues in Jackson.

3    Henley-Young has water supply issues as well; right?

4    A.   Yes, it does.

5    Q.   Sometimes that facility has no running water for the

6    kids?

7    A.   Yes.  It's a water problem at the Henley-Young.

8    Q.   And there was some discussion about the new jail.  Have

9    you obtained all the financing you need for the new jail yet?

10   A.   Yes, we have.  To get started with the first phase, we're

11   ready to move on that.

12   Q.   Right.  But it isn't complete yet; right?  You still have

13   more to do to get the full financing for the jail?

14   A.   No, we don't need to do anything else to get it rolling

15   to break ground and start building at this time.

16   Q.   But you've only got one of four millages approved; right?

17   A.   Right.  But let me state it:  We're ready to build the

18   jail now.  We have the financing in place to do that, and the

19   well, as far as the well is concerned, well and tower, it will

20   be put up at the same time.

21   Q.   But if the jail were finished tomorrow, you don't

22   actually have enough officers to staff the new jail; right?

23   A.   We don't have enough officers to staff the old jail right

24   now.

25   Q.   Right.  And at the old jail, there are still doors that

1  don't lock; correct?

2  A.   It's still problems at the old jail.  Let me just say

3  this:  We've been in office for two years.  We've been working

4  overtime at that facility as a Board.  We've spent over

5  $4 million in the last two years trying -- that's as much as

6  they've spent over the last six years -- well, the four years

7  prior to that.  So we're not kicking the can down the road

8  with this Board.

9  Q.   I don't want to get you in trouble with your wife, but if

10  they didn't spend $6 million in the previous six years, that's

11  kind of the previous Board's fault; right?

12  A.   All right.  Go ahead.

13  Q.   When I say previous Board, maybe some people in the

14  past --

15  A.   I can't --

16       THE COURT:  All right.  Hold on.  Let's make sure one

17  person is talking at a time.

18       THE WITNESS:  Okay.

19       MR. CHENG:  I'll let it go, Your Honor.  We'll just

20  move on.

21  BY MR. CHENG:

22  Q.   One thing about Mr. Shaw, do you know if any of his

23  facilities were mental health facilities?

24  A.   I don't know.

25  Q.   Is it possible that, you know, a prison warden may not

1    have a lot of familiarity with running a mental health unit in

2    a jail?

3    A.   I don't know that either.

4    Q.   Okay.  The minutes that were just introduced, those

5    minutes were all from a period before the current sheriff took

6    office; is that right?

7    A.   Correct.

8    Q.   And I guess the last question is:  Would you just agree

9    that when the County takes someone into custody at the jail,

10   the County does become responsible for their safety and

11   upkeep?

12   A.   Correct.

13   Q.   So it's responsible also for their medical and mental

14   health care?

15   A.   Correct.

16   Q.   And providing them with food and sanitary living

17   conditions?

18   A.   Correct.

19   Q.   Thank you.

20   A.   Thank you.

21        THE COURT:  Any redirect of this witness?

22        MR. ANDERSON:  Yes, Judge.

23                    **REDIRECT EXAMINATION**

24   **BY MR. ANDERSON:**

25   Q.   Mr. Calhoun, --

1    A.   Yes, sir.

2    Q.   -- this document that's been offered during the testimony

3    of Mr. Jones, and it is marked as D-159.  I want to ask you a

4    couple of questions about it.

5    A.   Yes, sir.

6    Q.   If Mr. Jones said that the detention budget was

7    $18 million, would you disagree or agree with it?

8    A.   I agree.

9    Q.   And that amounts to 22 percent of the County's budget; is

10   that correct?

11   A.   If not more.

12   Q.   Does Hinds County have a public school system?

13   A.   Yes, it does.

14   Q.   And do you have any idea how many students attend?

15   A.   A few thousand.  About 6,000.

16   Q.   If I told you it was 9,000, would you agree or disagree?

17   A.   I wouldn't disagree.

18   Q.   Is there a community college?

19   A.   Yes, it is.

20   Q.   And it's called Hinds Community College?

21   A.   Hinds Community College.

22   Q.   And how many students, if you know, attend Hinds

23   Community College?

24   A.   I think it's the largest community college in the state

25   of Mississippi.  Probably in the neighborhood of 8- or 9,000

1733

1    students.

2    Q.    And those that are in Hinds County, do you know?

3    A.    Probably at least 6,000.

4    Q.    If I told you it was 8,000, would you agree or disagree?

5    A.    I can believe that.  It's a large community college.

6    It's the largest community college in the state of

7    Mississippi.

8    Q.    How many detainees are there out at the Hinds County

9    Detention Center?

10   A.    Approximately 600.

11   Q.    And when you entered your order to tell everybody in

12   Hinds County that the detention center comes first, do they

13   come before the public schoolkids in this -- of Hinds County?

14   A.    Repeat that again.

15   Q.    When you tell people --

16   A.    Oh, when I tell people that.  I don't tell them that.

17   Well --

18   Q.    When it came to paying bills, repairs, fixing locks and

19   doors --

20   A.    We had to do that because we were under the consent

21   decree.  We had to move on that.

22   Q.    Let me stop you and ask:  Did that order come before the

23   public schoolkids --

24   A.    Yes, sir.

25   Q.    -- of Hinds County?

1    A.   It did.

2    Q.   And did it come before the Hinds Community College

3    students --

4    A.   Yes, it did.

5    Q.   -- of Hinds County?

6         Your wife was on the Board of Supervisors for a long

7    period of time, and I think you replaced her.

8    A.   I did replace her.  She served 28.  I've served two.

9    That's 30 together.

10   Q.   And she voted to approve the consent decree in this

11   matter, did she not?

12   A.   Yes, she did.

13   Q.   And today do you think she made an error, or was that a

14   smart judgment on her part?

15   A.   I think that was an error.  I think it was an error to --

16   for the -- because of the center that she was trying to --

17   well, to bring into compliance, it wasn't possible.

18   Q.   My final question to you, Mr. Calhoun, is that in 1986,

19   when I was running for reelection on the Supreme Court, who

20   was my campaign manager?

21   A.   I was.

22        MR. ANDERSON:  Thank you.

23        THE COURT:  That makes you biased, then; right?

24        THE WITNESS:  Judge, I -- Judge, I just want you to

25   know at that time I loved campaigning, and I enjoyed

1  campaigning for him.

2                          **EXAMINATION**

3  **BY THE COURT:**

4  Q.   All right.  I do have a few questions for you,

5  Mr. Calhoun.

6  A.   Yes, sir.

7  Q.   And the lawyers for the United States will be able to

8  follow up based on the questions that I ask, and then the

9  attorneys for the County will be able to do the same.

10       You mentioned that your wife was part of the Board of

11  Supervisors that signed off on the consent decree.

12  A.   Yes, sir.

13  Q.   Okay.  What is your understanding as to why that consent

14  decree was necessary?

15  A.   It was a problem at that center, at the detention center,

16  and the reason it came -- the reason it was a problem is

17  because from the door, the building did not meet

18  specification.

19  Q.   All right.  And the Department of Justice has done an

20  investigation and found that the inmates' constitutional

21  rights are being systemically violated by Hinds County; right?

22  A.   Correct.

23  Q.   And they threatened to sue Hinds County; right?

24  A.   Correct.

25  Q.   And, in fact, they did sue Hinds County?

```
 1   A.   Yes.

 2   Q.   And as a part of that suit, they immediately entered into

 3   the consent decree; is that your understanding?

 4   A.   That's what I understand, anyway.

 5   Q.   Okay.  And as a part of that consent decree, Hinds County

 6   agreed to do what?

 7   A.   To bring -- come into compliance.  But, Judge, when they

 8   made their agreement, it was a bad agreement because the

 9   facility that was there was not -- it's not a facility that

10   could come into compliance with all of the stipulations that's

11   in that consent decree.  It's just not possible.  That's why,

12   Judge, that we as a Board decided to go with a new facility,

13   and I -- for the life of me, I can't figure out how -- in

14   talking to all the engineers, everybody that I've talked to,

15   it's not possible unless you spend over $100 million.  You can

16   do the same thing with a new facility and have something for

17   the 21st -- 22nd century instead of just in the 21st century.

18   Q.   But those Board of Supervisors decided that the consent

19   decree was what they -- they agreed, did they not?

20   A.   They agreed to it, but I thought -- I think, and, Judge,

21   I just feel that the facility was bad from the door.  If it's

22   bad from the door, it's going to be bad when the door is

23   closed.  It's no way to get that -- in my opinion, in talking

24   to engineers everywhere, you're not going to get that facility

25   in compliance with what the Board agreed to.
```

1   Q.   Okay.  And the Board was represented by lawyers; correct?

2   A.   Yes.

3   Q.   All right.  But moving forward, that consent decree had

4   been in place since 2016; right?

5   A.   Correct.

6   Q.   And you were elected in 2019, in November?

7   A.   Correct.  Yes.  Start serving in --

8   Q.   January.

9   A.   -- January 2020.

10   Q.   January 2020.  And in January of 2020, one of the first

11   votes you made, right, was about the stipulated order, was it

12   not?

13   A.   Correct.

14   Q.   So you approved -- you and the Board, the current

15   Board --

16   A.   Right.

17   Q.   -- approved that stipulated order; right?

18   A.   Yes.  But we were -- we were trying to do the best we

19   could to make sure that we made the -- we get that facility

20   safe as we could for the inmates -- the detainees, not

21   inmates, and the detention officers.  That was our objective

22   was to get them as safe as possible with a new sheriff.  We

23   were working with him trying to do all that we could to make

24   that possible.

25   Q.   Well, let me ask you this:  That was in January of 20- --

```
 1    A.   2020.

 2    Q.   2020.  Are you aware that the Department of Justice had

 3    filed a motion for contempt against Hinds County in June of

 4    2021, and are you aware that the United States had already

 5    filed a motion to hold Hinds County in contempt back in June

 6    of 2021?

 7    A.   Yes.

 8    Q.   Are you aware that there was a hearing --

 9    A.   Yes.

10    Q.   -- set on that -- on that motion for December of 2019?

11    A.   2019?

12    Q.   There was supposed to be a hearing on the motion for

13    contempt back in 2019; right?

14    A.   Before I took office.

15    Q.   Before you took office.

16    A.   Okay.

17    Q.   Are you aware of that?

18    A.   Correct.

19    Q.   But immediately -- but that hearing was put off; right?

20    A.   Correct.

21    Q.   And one of your first votes of this new Board was the

22    stipulated order; is that right?

23    A.   Correct.

24    Q.   And why do you believe the Board entered into the

25    stipulated order?
```

```
 1   A.   Trying to stave off the takeover of what you came to do
 2   now.
 3   Q.   Right.  You didn't want to -- you didn't want to be held
 4   in contempt; right?
 5   A.   Right.
 6   Q.   So the stipulated order has a lot of terms to it as well;
 7   right?
 8   A.   Right.
 9   Q.   Has Hinds County complied with all those terms in the
10   stipulated order?
11   A.   We're working to.  We've been trying.
12   Q.   You've been working.  Have you done them?
13   A.   No, they have not been done altogether.
14   Q.   So you've not met the terms of the stipulated order?
15   A.   We've been working to do it.  We've been putting funds
16   out there.  We have contractors out there.  We hired a special
17   contractor that deals with the prisons, and he's been working
18   for the last two years trying to get in compliance with that
19   stipulated order.
20   Q.   Now, this court entered a show cause order in what month
21   on this contempt motion?  Do you know?
22   A.   I don't remember that.
23   Q.   It was the night of the runoff election; right?
24   A.   November something.
25   Q.   It was in November.  Would you agree it was the night of
```

1    the runoff election?

2    A.   Yes, sir.  That's right.  Okay.

3    Q.   Okay.  And after that, the County has now -- is it your

4    understanding that the County has moved to terminate the

5    consent decree?

6    A.   Yes.

7    Q.   Okay.  And is it your view that the County has moved to

8    terminate the agreement because the County believes that it

9    has performed all the terms of the settlement agreement?

10   A.   I think -- I think we are trying to terminate it because

11   it's too strenuous to me at this time, and I think everybody's

12   forgetting that we are really doing overtime trying to get a

13   new jail that will meet all the specifications that the

14   consent decree is trying to get to.

15   Q.   But the new jail won't be done until when, Mr. Calhoun?

16   A.   It's about -- it's at least 18 months away.  I know we

17   have to do something right now, but it's about 18 months away.

18   Q.   Has any bulldozer turned over any tree?

19   A.   Not yet.

20   Q.   Has any bulldozer dug up any piece of ground?

21   A.   Not yet.

22   Q.   Has any foundation been laid?

23   A.   Not yet.

24   Q.   Has any pipes been laid?

25   A.   Not yet.

```
 1   Q.   Has any water or have any of the studies or plans been
 2   completed?
 3   A.   They are almost complete.
 4   Q.   Have they been completed?
 5   A.   Not yet.  But we're going to be breaking ground very
 6   soon.
 7   Q.   Very soon?
 8   A.   Yes, sir.
 9   Q.   What does the County believe will be done by July 1?
10   Will everything be done by July 1?
11   A.   "Everything" like?
12   Q.   Everything that needs to be done under the consent decree
13   and/or the stipulated order.
14   A.   I don't know about that, Judge, by July 1st, but we'll be
15   working to get it done by July 1st.
16   Q.   Are there any parts of the prison that is being done in a
17   direct-supervision style at all to your knowledge?
18   A.   No.
19   Q.   Not even a workers' center -- or work center?  I'm just
20   asking.
21   A.   The work center I don't know about.  I've been to the
22   detention center in Raymond, but not the work center.
23   Q.   All right.  I don't know if you were in here for part of
24   the testimony, but if you -- if I told you that some of the
25   testimony has -- one of the quality assurance reports
```

1    indicated that one or two or some number of inmates --

2    detainees were covered with feces, would that be something

3    that you as the president of the Board of Supervisors would be

4    disappointed in?

5    A.   Yes.

6    Q.   I think somebody asked you about the deaths that have

7    occurred.

8    A.   Yes.

9    Q.   You are aware that there was at least one inmate who was

10   a victim of assault back in October?

11   A.   Yes.

12   Q.   That he might have been injured as early as in the

13   morning but not discovered to have been dead for nine hours.

14   That's unacceptable for the County.

15   A.   It's unacceptable, but -- I can't understand, but that

16   was under the watch of Major Bryan.  I don't know.

17   Q.   And who did Major Bryan report to then?

18   A.   The sheriff.

19   Q.   And who was the sheriff then?

20   A.   Mr. Crisler.

21   Q.   And who appointed that sheriff?

22   A.   The Board appointed him.

23   Q.   That sheriff was not elected; right?

24   A.   No.

25   Q.   The Board appointed that sheriff based on what?

```
 1    A.   Based on his experience in law enforcement, not detention

 2    centers.

 3    Q.   Not detention centers.

 4    A.   Right.

 5    Q.   Okay.  You were responsible in part for appointing the

 6    jail administrator at that time; correct?  I mean the Board.

 7    A.   I did.  It was recommended by the Justice Department and

 8    to our attorney, and he recommended her to me, and I did have

 9    a big voice in talking to the sheriff at the time to bring her

10    on board.

11    Q.   Nobody stood in the way of the County of finding their

12    own jail administrator; is that correct?

13    A.   That's correct.

14    Q.   The County could have taken all kinds of steps to

15    announce, select, and advertise or do whatever it needed to

16    get the jail administrator of its choice; correct?

17    A.   Correct.

18    Q.   And you attended some of the status conferences that the

19    Court held?

20    A.   Correct.

21    Q.   And Chief Vance was high on Major Bryan; right?

22    A.   Not at first.

23    Q.   Not at first?

24    A.   Not at first.  It took -- it took the Board talking to

25    him and --
```

1  Q.   But he expressed to the Court that she was his version of

2  a Michael Jordan; right?

3  A.   Let me just say:  After he was convinced and he

4  interviewed her, he was high on her.

5  Q.   The sheriff's attorney was very high on Ms. Bryan too;

6  right?

7  A.   Correct.

8  Q.   Even you told the Court that you were excited about the

9  new hire; correct?

10 A.   That's what I told you.

11 Q.   Do you recall if Mr. Gaylor also --

12 A.   Yes.

13 Q.   -- said that he was excited?

14 A.   He was excited at the time.

15 Q.   At the time.  Nobody seems to be excited now.

16 A.   That's right.

17 Q.   Okay.  I mean -- okay.  So let's talk a little bit more.

18 Was the Board involved in hiring any of the other County

19 administrators?  Excuse me, not County administrators.  Jail

20 administrators?

21 A.   No, they weren't.

22 Q.   The Board -- I guess you were not a member of the Board

23 prior to 2020, so you wouldn't know.

24 A.   I never heard anybody talk about it.

25 Q.   Okay.  Let's talk about the County administrators.  Since

1    you've been on the Board of Supervisors, how many County

2    administrators have there been?

3    A.    Three.  The same.

4    Q.    County administrators?

5    A.    Yeah.  You had Jennifer Collins was the first one that we

6    hired.  We had a temporary one, but -- for one month, but

7    Jennifer Collins, Scherrie Prince, and now Mr. Jones.

8    Q.    Okay.  And you've been on the Board --

9    A.    Two years.

10   Q.    Two years.  In the next two years, do you anticipate the

11   Board having another three County administrators?

12   A.    No.  Mr. Jones has a two-year contract, so we'll have him

13   for two years.

14   Q.    Okay.  Ms. Riley-Collins did not have a contract?

15   A.    No.  And Ms. Prince was an interim.

16   Q.    She was an interim.

17   A.    Uh-huh (affirmative).

18   Q.    The current jail administrator is Mr. Frank Shaw?

19   A.    Frank Shaw.

20   Q.    I think you testified that you participated in

21   interviewing him?

22   A.    Yes.  You recall that I talked to him about where he had

23   been and what he had been doing and how many people were in

24   the facilities and things of that nature.

25   Q.    Did -- how did -- how do you understand Mr. Shaw came to

1    the attention of -- who brought Mr. Shaw to your attention?

2    A.   The sheriff.

3    Q.   The sheriff.  Do you know if there were applications

4    solicited?

5    A.   I'm not sure.  This one, he's just a temporary, so --

6    he's interim, so it's not the same process as a permanent

7    hire.

8    Q.   It's not the same process?

9    A.   Yeah.  It's not the same process as a permanent hire.

10   You can get someone temporary without a whole long list of

11   folk.  You can bring them in.  I'm not sure how the sheriff

12   came to his choosing of Mr. Frank Shaw.

13   Q.   Would you expect the sheriff to have consulted with the

14   monitors on selecting a new jail administrator while the

15   consent decree was in place?

16   A.   I would assume so.  I don't know, Judge -- Judge, on that

17   since it's temporary or interim.  If we get the permanent one,

18   I think it should go through the monitors.

19   Q.   Do you think there are certain job requirements of a jail

20   administrator?

21   A.   Yes, it is.

22   Q.   You just can't put anybody there; right?

23   A.   No, you can't.  You can't put anybody, but I think the

24   sheriff, if he's going to run it, should pick the person that

25   he's satisfied with.

```
 1   Q.   You saw Mr. Shaw's resume?

 2   A.   Who?

 3   Q.   Did you see Mr. Shaw's resume?

 4   A.   Yes, sir.

 5   Q.   You did?

 6   A.   Yes, sir.  I thought it was a good resume.

 7   Q.   Did you ask him where all he had been employed?

 8   A.   Yes, sir.

 9   Q.   Do you know if he was ever employed for Management and

10   Training Corporation, MTC?

11   A.   Is that in Mississippi?

12   Q.   He was employed in Mississippi at one time; right?  Is

13   that your understanding?

14   A.   We talked to him about that.

15   Q.   About?

16   A.   About his employment in Mississippi.

17   Q.   About his employment in Mississippi?

18   A.   Yes.

19   Q.   Was he --

20   A.   I did.  I talked to him about that, and he did say he was

21   at it for a good-sized facility, and that was important to me

22   to get a person that was in a facility that's comparable to

23   the one that we have here.

24   Q.   I think the testimony showed that he might have been in

25   care of East Mississippi, EMCF, East Mississippi Correctional
```

1  Facility.  That's in or near Meridian, I believe.  Would you

2  disagree with that?

3  A.   Correct.

4  Q.   All right.  Do you know if he was also employed at a

5  similar facility in Arizona?

6  A.   I don't think I -- I think he was employed in a facility

7  in Illinois, not -- I didn't see the Arizona one.

8  Q.   Okay.  So you only know about Illinois, possibly?

9  A.   I knew -- that's right.  Illinois.  That's what I talked

10  to him about.

11  Q.   And I'm just asking.  I'm just asking.  Do you know if he

12  was employed by a facility in Arizona?

13  A.   I didn't know about that one.

14  Q.   And if he were employed in a facility out in Arizona,

15  would you know anything about the circumstances --

16  A.   No.

17  Q.   -- of the facility that he ran out in Arizona?

18  A.   I didn't know about that.

19  Q.   When you came on to the Board after being elected in

20  2019, your first day on the job was January 1 or thereabouts

21  of 2020.  That's correct; right?

22  A.   (Nodding affirmatively.)

23  Q.   All right.  And who was the County administrator on the

24  day that you started?

25  A.   That -- I can't think of her name, but it was the one

 1   that had been there for 12 years.

 2   Q.   Would that be Carmen Davis?

 3   A.   Yes.

 4   Q.   Okay.  And the Board voted to replace Ms. Carmen Davis?

 5   A.   With the interim, James Ingram, for a month.

 6   Q.   Okay.  That would be Ms. Prince?

 7   A.   No.  James Ingram served.

 8   Q.   James Ingram.  And he was a person employed by the

 9   County?

10   A.   He was assistant.

11   Q.   Okay.  At one point he was over inventory or something;

12   correct?

13   A.   He's over inventory now.

14   Q.   Okay.

15   A.   But he was assistant to Ms. Carmen Davis at the time, and

16   they just moved him up.

17   Q.   All right.

18   A.   It was also -- he was assistant and over inventory.

19   Q.   So Carmen Davis was the County administrator.  The new

20   Board decided to go in a different direction?

21   A.   Correct.

22   Q.   And you hired --

23   A.   Jennifer --

24   Q.   I guess you let Ms. Davis go?

25   A.   The first day or the second day but -- yeah, the first

```
 1    day.
 2    Q.   Mr. Ingram was then allowed to be the interim?
 3    A.   Interim.
 4    Q.   You were satisfied with what he did for the period of
 5    time that he did it; is that a fair statement?
 6    A.   He didn't say a lot.  I don't know.  He was just there
 7    for a month.
 8    Q.   Okay.  And then the next person that the Board --
 9    A.   Ms. Collins came in.
10    Q.   Ms. Collins?
11    A.   Jennifer Collins, yes.
12    Q.   And for the time that -- how many months was she there?
13    A.   Approximately eight months.
14    Q.   And during the time that you -- that she was there as
15    County administrator, did the Board trust her judgment?
16    A.   Yes, pretty much.
17    Q.   Did the Board value her opinion?
18    A.   Pretty much.
19    Q.   Okay.  I'm not suggesting that you ratified everything
20    that she might have done, because apparently the Board thought
21    there was a need to go in a different direction at some point
22    in time; correct?
23    A.   Correct.
24    Q.   And after Ms. --
25    A.   The idea on the Board is to keep three votes, and she
```

1    lost the three votes.  So whenever you lose three votes on any

2    Board of Supervisors, they can go any direction they please.

3    Q.   Okay.  And so speaking of going the direction that they

4    needed, the next person who served as administrator after

5    Ms. Collins left was Ms. Prince?

6    A.   Yeah.  Scherrie Prince.

7    Q.   And how long did she serve?

8    A.   She served probably about four or five months.

9    Q.   Okay.  And was the Board -- did the Board value her

10   opinion?

11   A.   While she was there, yes, but she was interim.

12   Q.   She was interim.

13   A.   Yeah.

14   Q.   Valued her judgment; is that a fair statement?

15   A.   Pretty much.

16   Q.   Okay.  But then you decided to go in a different

17   direction, and that's when Mr. Jones was hired?

18   A.   Kenny.  Yes, sir.

19   Q.   The Board value his opinion?

20   A.   Yes, so far.

21   Q.   And his judgment?

22   A.   Yes, sir.

23   Q.   All right.  How many County attorneys have there been

24   since you came on board?

25   A.   One County attorney other than the one that was there

1    when we gaveled in, and there was --

2    Q.   And that was Mr. Teeuwissen?

3    A.   Teeuwissen.  And he was let go at the same time as

4    Ms. Carmen Davis.

5    Q.   Was he let go before he presented the stipulated order to

6    the Board?

7    A.   I think so.

8    Q.   Oh, he was?

9    A.   I think so.  I think he came in -- I can't remember

10   exactly, but I think this attorney came in right away,

11   Mr. Gaylor.

12   Q.   Well, my only question is:  Did the Board value

13   Mr. Teeuwissen's -- how long had Mr. Teeuwissen been the Board

14   attorney?

15   A.   He had been there for quite a while.  I don't remember

16   exactly, but at least four or five years.

17   Q.   And apparently he lost three votes, apparently?

18   A.   That's the law of order in the Board of Supervisors.  You

19   have to keep three votes.

20   Q.   But you realized on the first day that the Board gaveled

21   in, that was the day that you-all received -- were briefed, at

22   least, on the stipulated order; correct?

23   A.   Correct.

24   Q.   Did he discuss it with you?

25   A.   Yes.  We -- we've listened to the stipulated order quite

1    a bit.

2    Q.   You actually had come to court in 2019 before you were

3    elected; right?

4    A.   I came with Ms. Calhoun.

5    Q.   But you came.  You came and participated -- I mean, you

6    came and --

7    A.   Yeah, I did.

8    Q.   You were very interested in what was going on with the

9    Raymond Detention Center; correct?

10   A.   Correct.  I think that's where I got the idea --

11   listening to your talking and knowing the condition of that

12   center, I got the idea that we're going to have to get a new

13   facility in order to do what everybody's talking about doing.

14   So I did listen intently to what you were talking about and --

15   and been trying to ever since fulfill the order.

16   Q.   You indicated that the new jail that you're proposing is

17   one that at least -- one phase, at least, I think you

18   mentioned about 200 beds.

19   A.   At least.

20   Q.   At least 200 beds?

21   A.   Uh-huh (affirmative).

22   Q.   How many detainees are at the Raymond Detention Center

23   right now?

24   A.   About 600.

25   Q.   So is it the County's plan to leave 400 --

```
 1   A.   No.  We -- it just depends.  We're -- I'm talking to some

 2   folks.  Hopefully we can come up with enough funds to do it

 3   all in one phase.  It just depend on funding.  It's always

 4   depending on money, and if you get the money, you can build

 5   800 beds, but right now we're looking at 200.

 6   Q.   Do you have the money to build a bed for 200 right now?

 7   A.   We have the funding together to do that.

 8   Q.   Okay.  But you have no funding for anything more than

 9   that?

10   A.   Not right now.

11   Q.   And there's no guarantee that you will get the funding?

12   A.   We'll get the funding somehow.

13   Q.   Somehow?

14   A.   Somehow we're going to get it.  Judge, one thing.  If I

15   tell you I'm going to do something, I'm going to do everything

16   I know to to get it done, and we are working with some people

17   to try to make that happen.

18   Q.   Now, I think I heard Mr. Chamblee mention that the -- I

19   guess he wanted to make sure that I was under the right

20   understanding, but Mr. Rivera, the man who did the report on

21   the retention --

22   A.   Yeah.  Okay.

23   Q.   -- D-4 --

24   A.   Uh-huh.  Okay.

25   Q.   -- I think Mr. Chamblee indicated that he was hired in
```

1    2020?

2    A.   Uh-huh (affirmative).

3    Q.   But the date of his report, it was not completed until

4    January the 10th, 2022.  Do you know why?

5    A.   No.

6    Q.   You were testifying about things done relatively quickly

7    when it comes to the jail.

8    A.   Uh-huh (affirmative).

9    Q.   I'm just not clear on when -- when the County either

10   hired Mr. Rivera or when the County expected him to do his

11   job, and when he did his job, what did the County do based on

12   what his findings were?  Do you know?

13   A.   No, I don't know all of the details, but we've been

14   trying to come up with as much of the recommendation as

15   possible.

16   Q.   Has the County started the process for finding a

17   permanent jail administrator?

18   A.   Not yet.  We have been -- we just got this one, and we --

19   we haven't started the process yet.

20   Q.   Do you know how long Mr. Shaw's contract is for?

21   A.   Six months.

22   Q.   Six months?

23   A.   Yes, sir.

24   Q.   Okay.  So you expect to have a new jail administrator,

25   then, I presume, within six months?

```
 1    A.    Yes, sir.  We're doing a national search -- going to do a

 2    national search.

 3    Q.    Do you know what the County has agreed to pay Mr. Shaw

 4    for the six-month period?

 5    A.    Not exactly.  I can't remember exactly, but --

 6    Q.    It would be on the Board's minutes?

 7    A.    Yes.  If I think a minute, I could come up with it.  Let

 8    me see.  Probably around 15,000 a month.  I'm just guessing.

 9    Q.    Probably around 15,000 a month?

10    A.    Uh-huh.  Probably.  Or 12,000.  That's -- 12,000?  It's

11    something --

12          MR. SHELSON:  Your Honor, I'm sorry.  He did say he's

13    guessing, and either he knows or he doesn't, and I think the

14    record should reflect that.

15          THE COURT:  All right.

16    BY THE COURT:

17    Q.    You're speculating, and he's objecting to your

18    speculating on that issue.

19          Are you, Mr. Calhoun -- I know -- are you familiar with a

20    walkout that occurred at the facility back in the fall?

21    A.    Yes, I am.

22    Q.    I know you were not a member -- well, yes, you were a

23    member of the Board of Supervisors then, were you?

24    A.    A walkout?

25    Q.    A walkout that occurred last fall.
```

 1   A.   Yeah, I was a member.

 2   Q.   Right.  And so you -- you do recall that walkout?

 3   A.   Yes, I do.

 4   Q.   Did the Board undertake any sort of investigation as to

 5   why that walkout occurred?

 6   A.   No.

 7   Q.   Did the Board ask the sheriff to investigate why that --

 8   A.   No.

 9   Q.   -- walkout occurred?

10   A.   No, the Board didn't.

11   Q.   The Board didn't?

12   A.   Huh-huh (negative).

13   Q.   Was the Board concerned that there was a walkout that

14   occurred?

15   A.   Yes, it was concerning.  But we didn't ask for an

16   investigation.

17   Q.   What did you do to address it?

18   A.   We waited for a report from the administrator what was

19   going on or that she have.

20   Q.   And what did you learn -- did you learn anything about

21   that walkout?

22   A.   We got that same report that was reported to you by the

23   administrator.  That's the only report -- only thing that I

24   have, anyway.

25   Q.   The stipulated order was signed off and adopted by the

1  Board of Supervisors in January of 2020.  That's correct;

2  right?

3  A.   Correct.

4  Q.   Since that time has the Board ever requested the Court or

5  DOJ to modify the stipulated order?

6  A.   No.  I don't recall asking.

7  Q.   Never asked him to take -- asked the Court to relax any

8  of the terms that the parties agreed to?

9  A.   I don't recall.

10       THE COURT:  I have no further questions.  I'll turn it

11  over to the United States for follow-up and then to the

12  County.

13                **FURTHER CROSS-EXAMINATION**

14  **BY MR. CHENG:**

15  Q.   Hello, again, Mr. Calhoun.  You mentioned a report that

16  the County administrator gave the judge.  You mean the oral

17  report about what caused the work stoppage?

18  A.   I did what?

19  Q.   Well, you talked earlier about this report about what

20  caused the work stoppage.  Do you remember that, the Judge

21  asked about the work stoppage?  The walkout.  I'm sorry.  The

22  walkout.

23  A.   Yeah.  I didn't ask for a report.  I just heard from --

24  matter of fact, I heard in here more than I have heard

25  earlier.

```
1   Q.   So this investigation that was supposedly done about the
2   walkout, it's an oral report; is that right?
3   A.   That's what I heard.
4   Q.   So there's no written report; correct?
5   A.   No.
6   Q.   Okay.  I understand you think the jail can't really be
7   fixed, but right now is the jail basically unsafe from a
8   constitutional standpoint?
9   A.   Yes.  Yes, it is.
10  Q.   Thank you.  And then the other question I have, you also
11  talked about how many inmates are in the jail versus how many
12  people are in schools and how many people go to the community
13  college; right?
14  A.   Correct.
15  Q.   Now, the schools and the community college, they get
16  funding from taxes and federal scholarships and grant money;
17  right?
18  A.   Yes, a lot of different sources.
19  Q.   But the jail, that's basically a County responsibility;
20  is that right?
21  A.   Correct.
22  Q.   And to some degree the State has some responsibility for,
23  like, mental patients; correct?
24  A.   (Nodding affirmatively.)
25  Q.   Is that a "yes"?
```

1    A.   Correct.

2    Q.   And when you talked about the number of people in the

3    jail, that 600 number, that's the capacity of the jail; right?

4    A.   That's what's in there right now.

5    Q.   Do you have any idea how many people, though, actually

6    pass through the jail in any given year?

7    A.   No.

8    Q.   Is it possible -- people get booked in and then released.

9    It could be thousands and thousands of people?

10   A.   I don't have any idea how many come through in a year.

11   Q.   It would make it a little bit different if a lot of

12   people have achieved ending up in jail; right?

13   A.   I would assume so.

14        MR. CHENG:  No other questions.  Thank you, Your Honor.

15        THE COURT:  All right.  Any follow-up from the County?

16        MR. ANDERSON:  Yes, sir.

17                 **FURTHER REDIRECT EXAMINATION**

18   **BY MR. ANDERSON:**

19   Q.   Mr. Calhoun, are you a lawyer?

20   A.   No.  Except for in Algonquin County.  I was called a

21   lawyer all my life.

22   Q.   You expressed some opinions here about constitutional

23   violations.  Are you trained in that arena?

24   A.   No, I'm not.

25   Q.   Does the Board of Supervisors operate the Raymond

1  Detention Center?

2  A.   No.   That's the sheriff's responsibility.

3  Q.   There was testimony about Rivera.   Do you know whether or

4  not the County hired that entity or whether the monitor did?

5  A.   I don't know that.   Did you say -- I didn't hear you.

6  Q.   Yeah.   There was some testimony about Rivera.   Is that

7  the correct name?

8  A.   Oh, okay.   The mental person, company.

9  Q.   Do you know who retained him?

10  A.   No.

11  Q.   Was it the Board of Supervisors or the monitor, or do you

12  know?

13  A.   I'm not sure.

14  Q.   Okay.   Okay.   I didn't hear all of it, but counsel for

15  the Government shared that you do not support the public

16  schools or you -- I didn't hear it, but Hinds County supports

17  its public schools, does it not?

18  A.   Yes.   We put funds into public schools and junior

19  colleges, and any education system in the County gets some

20  funds from the County tax money, from the citizens of Hinds

21  County.

22        MR. ANDERSON:   I have nothing further, Your Honor.

23        THE COURT:   All right.   Since this is the party who's

24  representing -- the person who's representing the County, you

25  may step down, but I'm not going to release you.   They can

1    call you.  You can sit in the audience.  You can participate

2    in all these proceedings, Mr. Calhoun, because you're the

3    president.

4         THE WITNESS:  Thank you.  Thank you so much.

5         THE COURT:  At this time we're going to take a

6    15-minute recess.  When we come back, we're going to talk

7    about some housekeeping things with respect to where we are

8    for the rest of the day and as far as we go forward, because I

9    know there's at least one other witness who the parties

10   anticipate calling today.  But we'll talk about that in

11   15 minutes, which is -- let's just come back at 4:20.

12              (A brief recess was taken.)

13        THE COURT:  You may be seated.

14        Housekeeping, I realize we're rapidly approaching the

15   end of the day and the end of the week.  So it is at least

16   4:20, I guess.  I don't think we ought to put any witness on

17   unless there's a witness who can last for three minutes or

18   less, and that ain't happening.

19        So let's talk about next week.  The County still

20   anticipates calling the sheriff, I presume, or at least has

21   the right to.

22        MR. HALL:  Yes, Your Honor.

23        THE COURT:  Okay.  Does the County anticipate any other

24   witnesses?

25        MR. HALL:  No.  He'll be our last witness.

1        THE COURT:  Okay.  Does DOJ anticipate any rebuttal?

2        MS. COWALL:  We may have, I would say, a few short

3   rebuttal witnesses, and we may not quite know until after the

4   defendants call their last witness.

5        I don't anticipate it would be very long in terms of

6   rebuttal.  I think that we could possibly call two to three

7   people and it would take maybe a total of an hour.

8        THE COURT:  Again, I'm not going to rush anyone.  Then

9   we need to prepare for closings and arguments -- I say

10  closing, closings/arguments.  In that case I think we'll be

11  here until Tuesday.  I don't know how long Mr. Jones might be.

12  I know they have a lot of areas, but it's only a short period

13  of time that he's been in office, but there are a number of

14  areas where there may be some questions.

15       I say we take all the testimony we can take on Monday

16  and be prepared to do closings and arguments on Tuesday, and

17  we'll take whatever time the parties need.  We'll be able to

18  figure that out on Monday, but I don't want the parties to be

19  anticipating doing closings on Monday.  Go ahead and start

20  planning to do those for Tuesday regardless of whether

21  testimony ends and how long it might take; that is, unless the

22  County changes its mind over the weekend and doesn't call the

23  sheriff.  But let's plan for the testimony concluding on

24  Monday and prepare for closings on Tuesday.

25       Let me ask the Government now, and you're not bound to

```
 1   it at all, the parties.  I think I gave you an hour for
 2   openings, I think, but having heard the testimony and all
 3   that, what do you think?  How long do you anticipate right
 4   now?  And, again, I'm not holding you to anything because
 5   you'll have the weekend to think about it, but how long do you
 6   think?
 7        MS. COWALL:  Your Honor, we would suggest that each
 8   party could have 45 minutes.  I think that we could do our
 9   closing in 45 minutes, just to be safe.  It may not be
10   45 minutes total, but I don't want to overpromise and
11   underdeliver.
12        THE COURT:  Okay.  I gave you an hour for opening.  I
13   thought you'd like that for closing.
14        MS. COWALL:  Well, yeah.  Okay.  We can do that.
15        MR. HALL:  Your Honor, we'd like the full hour for
16   closing.
17        THE COURT:  Would that be for -- were you speaking for
18   the sheriff?
19        MR. HALL:  We have two main parties, so I want to
20   reserve an hour for the sheriff and the County have an hour.
21   I may not do that, but I just want to be on the record to
22   reserve an hour for arguments on behalf of the sheriff.
23        THE COURT:  Now, as a part of -- okay.  We'll reserve
24   additional time for any questions that the Court has.  Back at
25   the very beginning of this case, I think, even before we began
```

1   the trial, during the status conference, I asked the parties

2   to be able to offer to the Court on a continuum, I guess, what

3   sort of remedy might be available, if any, something less than

4   a receiver, something greater than a receiver, whatever, and I

5   might have some questions about that, and I might have some

6   questions about some specific evidence on some things, so --

7   you know, so we'll -- you should plan for a question or two at

8   some point in time.

9        I know we've been hard at it for two weeks.  I've had

10  the easy job, and I know you-all have been working real hard,

11  and, again, I appreciate you-all working together through

12  this.  And, again, I haven't said it often in this case as I

13  do in every other case, but the case is still in the hands of

14  the parties.  You know, it's the Court's view that the parties

15  took it out of the Court's hand in December of 2019, and you

16  can take it out of the hands of the Court now.  I took it out

17  of the hands of Judge Barbour in 2016, so that opportunity is

18  always yours, and you can take advantage of it.

19       Is there anything else we need to take care of?

20       MS. COWALL:  One more thing, Your Honor.  May

21  Ms. Mosley be released yet, or is the Court still --

22       THE COURT:  She may be released.

23       MS. COWALL:  Thank you, Your Honor.

24       THE COURT:  Thank you.  She may be released.  I'm

25  sorry.

1          Mr. Shelson?

2          MR. SHELSON:  Yes, Your Honor.  We object to

3     Mr. Calhoun and Mr. Jones not being released.  The United

4     States' sort of global reservation about who they may or may

5     not call in rebuttal I think is not effective as a matter of

6     law, and on the witness list -- may I display this, please?

7          That they actually submitted to the Court.  There is no

8     reservation.  We think that when they asked for the monitors

9     to go home, we didn't object aside from the little joke, and

10    we think its uncalled for, number one, to not let us release

11    our witnesses that are not on the United States' witness list;

12    and, number two, as I alluded to already, because a global

13    reservation is ineffective and there's no purported

14    reservation on the United States' witness list submitted to

15    the Court in the form that the Court asked for, the United

16    States should limit it -- the United States' potential

17    universe of rebuttal witnesses should be limited to this

18    document.

19          I think it's probably moot.  It sounds like we're going

20    to conclude on Monday with testimony.  We submit that should

21    be a requirement, that the parties should have to conclude

22    their case in chiefs and any rebuttal testimony on Monday and

23    that this matter conclude on Tuesday in the manner already

24    addressed by the Court.

25          Thank you, Your Honor.

 1          THE COURT:  Well, let me ask you this, Mr. Shelson:

 2    I'm looking at Docket 133.  I assume that's where that came

 3    from.  I don't know.

 4          MR. SHELSON:  I think this is on the docket.

 5          THE COURT:  And I see on page 2 of the docket -- this

 6    was filed February the 9th, 2022 -- in addition to the list of

 7    witnesses, they have "Additionally, the United States may

 8    call, A, any witness listed on the Defendants' witness list;

 9    B, any custodian of records or other witness to provide

10    foundation testimony, *et cetera*; and C, any witness necessary

11    to rebut the Defendants' case put forth at the hearing."

12          MR. SHELSON:  And we would submit, Your Honor, that

13    that's kind of analogous to their general objections to

14    discovery that they have no effect as a matter of law, of

15    course, going forward as a general objection under the case

16    law, and that's the whole problem, Judge.  In that reservation

17    you just read, they can call anybody in the universe.

18    Especially under C, if there was a C.  The third one.  And,

19    Your Honor, that's not appropriate.

20          THE COURT:  All right.  Thank you, Mr. Shelson.  I'll

21    give the United States an opportunity to respond and I'll

22    rule.

23          MR. SHELSON:  Yes, sir.  And --

24          THE COURT:  Oh, I'm sorry.  Go ahead.  You have more?

25          MR. SHELSON:  Just one more thing, Your Honor.  Thank

1   you.

2        Presuming that the 24-hour for end-of-day rule applies

3   to rebuttal witnesses, we expect with all reason to -- that

4   the testimony of the sheriff should conclude by noon on

5   Monday, so we would appreciate getting notification of the

6   United States' rebuttal witnesses by noon on Sunday.

7        THE COURT:  Okay.  The United States -- well, let's

8   take up the issue of whether the Court ought to allow

9   Mr. Jones, I presume is the only defendant -- the only witness

10  who is still sequestered for the most part.

11       MS. COWALL:  We don't object to releasing County

12  Administrator Jones, Your Honor.  As to the request that we

13  inform the defendants who we'll call as rebuttal witnesses

14  before their final witness testifies, I just don't think

15  that's logistically possible since we need to hear what the

16  defense witness testifies to before we can determine if we

17  need to call rebuttal witnesses.

18       And as you see from Docket Entry 133, the people who

19  we're looking at calling as rebuttal witnesses are people who

20  have already testified in this hearing, so it's not as if

21  we're going to be bringing in someone completely unknown.

22  We're only considering calling people who have already

23  testified before the Court this past week -- two weeks.

24       THE COURT:  There will be a sufficient time on Monday

25  between the breaks, I think, between the defendant closing its

 1  case and the -- to the extent the Government chooses to put on

 2  any rebuttal witnesses.  I take that that is akin to

 3  impeachment sort of evidence, I guess, and there's no

 4  requirement, at least, that parties produce evidence that

 5  they're going to impeach a witness with in advance.  So all

 6  right.  So I'm not going to order that specific relief.  We'll

 7  get to that point after the Government closes its -- after the

 8  County closes its case.  All right?

 9       MS. COWALL:  Yes, Your Honor.

10       THE COURT:  Is there anything else we need to take up

11  with -- I know the SPLC lawyer's still here.  I think I denied

12  your original request without prejudice.  Okay.  We're good.

13  All right.

14       Anything else?  Please have a great weekend.  Enjoy

15  yourselves.

16       The Court is now adjourned.

17  ****************************************************************

18

19

20

21

22

23

24

25

1                **COURT REPORTER'S CERTIFICATE**

2

3        I, Candice S. Crane, Official Court Reporter for the

4 United States District Court for the Southern District of

5 Mississippi, do hereby certify that the above and foregoing

6 pages contain a full, true, and correct transcript of the

7 proceedings had in the forenamed case at the time and place

8 indicated, which proceedings were stenographically recorded by

9 me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11 comply with those prescribed by the Court and Judicial

12 Conference of the United States.

13        THIS, the 26th day of February, 2022.

14

15                         /s/ Candice S. Crane, RPR, CCR

16                         Candice S. Crane, RPR, CCR #1781
                           Official Court Reporter

17                         United States District Court
                        Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25