1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                   NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA                        PLAINTIFF

5    VERSUS              CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

6    THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                    DEFENDANTS
7

8

9            EVIDENTIARY HEARING, VOLUME 10,
         BEFORE THE HONORABLE CARLTON W. REEVES,
10          UNITED STATES DISTRICT COURT JUDGE,
                  FEBRUARY 28, 2022,
11               JACKSON, MISSISSIPPI

12

13           (Appearances noted herein.)

14

15

16

17

18

19

20

21

     REPORTED BY:
22
         CANDICE S. CRANE, RPR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601) 608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov

                   ***DAILY TRANSCRIPT***

1   **APPEARANCES:**

2      FOR THE PLAINTIFF:

3          CHRISTOPHER N. CHENG, ESQ.
            SARAH G. STEEGE, ESQ.
4          LAURA L. COWALL, ESQ.
            HELEN VERA, ESQ.
5          MITZI DEASE-PAIGE, ESQ.

6      FOR THE DEFENDANTS:

7          NICHOLAS F. MORISANI, ESQ.
            JAMES W. SHELSON, ESQ.
8          TONY R. GAYLOR, ESQ.
            RAYFORD G. CHAMBERS, ESQ.
9          JOHN C. HALL, II, ESQ.
            REUBEN ANDERSON, ESQ.

10

11     ALSO PRESENT:

12         ANTHONY NJOKU
            MICHAEL DENAULT
13         ELIZABETH SIMPSON
            DAVID PARRISH
14         JIM MOESER
            RICHARD DUDLEY
15         SHERIFF TYREE JONES
            LESLIE FAITH JONES
16         CINDY MOHAN

17

18

19

20

21

22

23

24

25

1  **TABLE OF CONTENTS**

2  Style and appearances...............................1771-1772

3  WITNESS:  TYREE JONES

4      Direct by Mr. Hall..................................1776

5      Cross by Ms. Cowall................................1848

6      Redirect by Mr. Hall..............................1935

7      Examination by the Court..........................1962

8      Further Redirect by Mr. Hall......................1990

9  Court Reporter's Certificate..........................1994

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **IN OPEN COURT, FEBRUARY 28, 2022**

2

3        THE COURT:  You may be seated.

4        Good morning.  I apologize.  I wish this were my only

5   case, but it's not.  I had some issues come up in another

6   matter.  I hope everyone had a good weekend.

7        Is there anything we need to take up before we begin?

8        MS. COWALL:  Yes, Your Honor.  A couple things briefly.

9        THE COURT:  Okay.  Ms. Cowall?

10       MS. COWALL:  First, I just wanted to make the Court

11  aware that the United States went ahead and disclosed to

12  defendants the identity of the individuals who we believe we

13  will call as rebuttal witnesses after Defendants conclude

14  their case.

15       THE COURT:  Okay.

16       MS. COWALL:  And those individuals are Kathryn Bryan,

17  Dave Parrish, and Lisa Simpson.

18       And with regard to Ms. Bryan, I want to point out one

19  thing to the Court, just so the Court is fully aware.  It came

20  to our attention on Friday that Ms. Bryan had been contacted

21  by press, and they conveyed an allegation to her and she

22  denied it, and that showed up in a press article on Friday

23  afternoon, so we wanted to make sure the Court was fully aware

24  of that.  The press had reached out to her, and she's been

25  instructed not to discuss her testimony, and she did not.  She

1  hasn't been in court.  She has not reviewed any transcripts.

2  But for full transparency, we wanted to make sure the Court

3  knew the press did contact her and she told them that she

4  denied the allegations they conveyed to her when they

5  contacted her.

6        THE COURT:  Okay.  Mr. Hall?

7        MR. HALL:  Good morning, Judge.

8        THE COURT:  Good morning.

9        MR. HALL:  Could you clarify what the allegations were

10  that Ms. Bryan responded to?

11       THE COURT:  Okay.

12       MS. COWALL:  So this was a WLBT article published

13  February 25th entitled, "Witness says former jail

14  administrator organized November walkout at Raymond Detention

15  Center," and she denied that allegation.

16       MR. HALL:  Thank you, Your Honor.

17       THE COURT:  All right.  Anything else?

18       All right.  Is the defendant ready to call its next

19  witness?

20       MR. HALL:  We are.  We call Sheriff Tyree Jones to the

21  stand.

22       (Whereupon, the witness was placed under oath.)

23       THE COURT:  Mr. Jones, you've been here throughout the

24  course of this trial, so you know what I've been telling each

25  witness, do you not?

1       THE WITNESS:  Yes, sir, I do.

2       THE COURT:  Okay.  If you will, though, for the record,

3   please state and spell your name.

4       THE WITNESS:  Sheriff Tyree Jones.  That's T-y-r-e-e,

5   last name Jones, J-o-n-e-s.

6       THE COURT:  Okay.  You may proceed.

7       MR. HALL:  Thank you, Your Honor.

8                           **TYREE JONES,**

9           **having been first duly sworn, was examined and**

10   **testified as follows...**

11                       **DIRECT EXAMINATION**

12   **BY MR. HALL:**

13   Q.  Sheriff, let's talk about your background for a moment,

14   okay?

15   A.  All right.

16       THE COURT:  Slide your microphone down just a little

17   bit.

18       MR. HALL:  Are you saying I'm shorter than everybody

19   else, Judge?

20       THE COURT:  No.  You're just not speaking directly into

21   it, I didn't think.

22       MR. HALL:  Is that better?

23       THE COURT:  Yes.

24       Court Reporter?

25       THE REPORTER:  Yes, sir.

1          THE COURT:  Okay.

2    BY MR. HALL:

3    Q.   Tell us about your educational background starting from

4    high school, please.

5    A.   I graduated from Saint Joseph Catholic High School here

6    in Jackson.  I went to Tougaloo College from there, and after

7    that I went to the Jackson Police Department Training Academy

8    and graduated from the Jackson Police Department Training

9    Academy several years ago.

10   Q.   How long ago -- you said several years ago.  I need

11   you -- we're going to date you right now.

12   A.   I started with the Jackson Police Department in 2000, and

13   I stayed with the Jackson Police Department for about

14   20 years.

15   Q.   And when you left JPD, what rank did you leave at?

16   A.   I was a commander at the time.

17   Q.   And as far as your role as a commander, tell us, what did

18   that entail with JPD?

19   A.   At that particular time, I was the commander of the

20   violent crimes division in the investigations services for the

21   Jackson Police Department.  I was the commander of the

22   robbery/homicide division as well as other investigative

23   divisions within that bureau as well.

24   Q.   And at some point did your employment take you to the

25   Hinds County Sheriff's Department?

1   A.   Yes, sir, it did.  When the late sheriff, Lee Vance, was

2   elected sheriff in 2019, he took office in January 2020.  I

3   joined the Hinds County Sheriff's Office as the captain of the

4   criminal investigations division.

5   Q.   And do the criminal investigations division investigate

6   matters inside the detention center as well as on patrol?

7   A.   Yes.  The criminal investigations division was composed

8   of investigators that investigated felony crimes, some

9   misdemeanor crimes throughout all of Hinds County, and we also

10   had an investigator that was assigned to work investigations

11   within the detention facilities as well.

12   Q.   Let's talk about that.  Prior to becoming the sheriff,

13   what experience did you have at the detention center?

14   A.   Prior to becoming the sheriff -- of course, when I joined

15   the Hinds County Sheriff's Office, I had some dealings with

16   the detention center due to the fact that I had a jail

17   investigator that was within my division that worked cases in

18   the detention facility.  So I was abreast of some of the

19   incidents and some of the reportings that needed to be done

20   regarding crimes that had occurred in the detention

21   facilities.

22   Q.   Now, let's go back.  Had you had an opportunity when you

23   were with JPD to actually book suspects into the Raymond

24   Detention Center while you were a JPD officer?

25   A.   Yes, several times.  And not only that, I was on the SWAT

1  time for Jackson Police Department for about 15 years as well.

2  And I had responded to several incidents at the Raymond

3  Detention Center as a member of the SWAT team when we had to

4  go down and handle disturbances in the past, shakedowns and

5  other things like that.  So I was very familiar with how the

6  particular facilities operate.

7  Q.  I still want to stick with your time before you were the

8  sheriff.  While you were captain over investigations, did you

9  have any experience with the federal monitors in this matter?

10  A.  Yes, I did, as it relates to the part of the consent

11  decree, the stipulated order that pertained to criminal

12  investigations and the reporting of investigations to the

13  monitors and to the Department of Justice as well.

14  Q.  Now, let's talk about your transition to sheriff, okay?

15  Tell the Court about that.

16  A.  Well, it was always my dream to become the next sheriff

17  following the late sheriff, Lee Vance, but, of course, due to

18  his untimely death, I made a decision as it relates to my

19  future, and I stepped up and I decided to run for office.  As

20  a result of that, I was elected in November -- November 23rd,

21  2021, as the next sheriff of Hinds County following his

22  tenure.

23  Q.  Now, let's talk about your on-boarding as sheriff, okay?

24  A.  Okay.

25  Q.  What are your responsibilities as sheriff?

```
 1   A.   The sheriff is responsible for detention services.  We

 2   have responsibility with all of the courthouses in Hinds

 3   County.  We have an operations division which includes law

 4   enforcement personnel.  You have civil processing.  You have

 5   patrol.  You have investigations.  So it's kind of broken down

 6   into two different divisions.  We would say detention services

 7   and operations, and operations is mostly the law enforcement

 8   part of it.  We have bailiffs in the courtrooms.  We have

 9   security in the courthouses.

10        So these are just some of the services that the sheriff's

11   office handle, and we serve all of Hinds County, which is

12   composed of about 840 to 870 square miles of Hinds County, to

13   include rural and nonrural Hinds County as well.

14   Q.   All right.  Now, as far as patrol is concerned, how many

15   patrol officers do you have?

16   A.   Right now in patrol, we probably have about 30.  But

17   that's just not officers -- the deputies that are out

18   patrolling the streets.  You still have investigations; you

19   have some in street interdiction; K-9; some of those deputies

20   fall up under the patrol division as well.

21   Q.   What about civil process?

22   A.   Civil processing is a division within itself.

23   Q.   How many people in civil process?

24   A.   Right now we have civilian staff -- we have two civilian

25   staff.  I think we have four or five deputies that are
```

1    assigned to civil processing.

2    Q.   Now, once you became the sheriff, did you undertake any

3    efforts to familiarize yourself with the function of

4    government?

5    A.   Yes, I did.

6    Q.   Tell us about that.

7    A.   The day after I was elected -- well, I kind of knew how

8    the government functioned, of course, but the day after I was

9    elected, to familiarize myself more with working with the

10   Board of Supervisors, I met with the Board President, Credell

11   Calhoun, in his office the day I was elected, and we discussed

12   several things about how we were going to transition and move

13   forward as me being the next sheriff.

14        But the majority of our conversation that I was more

15   concerned about was detention services, the consent decree,

16   because I knew that on the day of the election, that there had

17   been some correspondence that had been passed down through the

18   federal courts, and I knew that that was a very dire issue

19   that needed to be addressed immediately, and with me coming in

20   office, I needed to familiarize myself more with it.

21   Q.   Your victory party was cut short that night when you

22   found out there was a show cause order?

23   A.   Yes, sir.  My victory party consisted of me going in a

24   private room and having a discussion regarding the show cause

25   order, absolutely.

1   Q.  And who were you speaking with?

2   A.  I was speaking with the County attorney at the time.  It

3   was -- well, he's still the County attorney, Tony Gaylor.

4   Q.  And with respect to familiarizing yourself with the

5   function of the jail, did you do that?

6   A.  Yes, sir, I did.

7   Q.  How did you do that?

8   A.  I contacted the jail administrator at the time, who was

9   Kathryn Bryan, and we had a meeting in, again, Supervisor

10   Credell Calhoun's office along with Tony Gaylor.  We met for a

11   few hours.  And we specifically discussed moving forward with

12   the consent decree, addressing the issues of the consent

13   decree, and me getting to know her a little bit better.

14       Because I remember when she came on board, it was around

15   the time that all of us got COVID together:  myself, Kathryn

16   Bryan, the late Sheriff Lee Vance, and several others.  And I

17   had been at home on quarantine due to being sick.  So by the

18   time I came back to work, I think that she had returned back

19   to work.

20       Shortly after that is when I began my campaign for

21   sheriff, and, of course, while I was campaigning, I was still

22   employed, but I was on what you would call a leave of absence

23   during that time.

24   Q.  There's been a lot of talk about the hopes for success

25   when Major Bryan was first hired.  Did you share those hopes

1  for success?

2  A.  Yes, sir.  Absolutely.  At the time that she was hired,

3  again, I was the captain.  I was very supportive of the

4  hiring.  It was my understanding that she was qualified and

5  that she was going to bring some hope -- a hopeful future for

6  detention services, I should say, and I was very supportive of

7  that at the time when she was hired, even until the meeting

8  that we had --

9          MR. HALL:  I'm sorry, Judge.  Sorry.

10          THE COURT:  You may proceed.

11  A.  Even -- and I expressed that with her during the meeting

12  I had with her and Supervisor Calhoun and Tony Gaylor.  I

13  mean, I made it perfectly clear to her that I knew -- because

14  my background was mostly law enforcement, but I depended on

15  her experience and her expertise in detention services to help

16  us move forward with addressing the consent decree.  As a

17  matter of fact, I called her my field training officer on

18  several occasions, and that's what I depended on her doing

19  during my administration, helping me move forward due to her

20  experience and expertise.

21  BY MR. HALL:

22  Q.  We'll get back to -- let me ask you this:  Did your

23  opinion of Ms. Bryan change during the course of your working

24  with her?

25  A.   Yes, sir.  Absolutely.

1    Q.   We'll get to that in a moment.  I want to talk about the

2    best efforts that the County has made.  So let me just ask

3    you:  Have you put forth best efforts to getting the jail to

4    be a better and safe place?

5    A.   Yes, sir, I have.

6    Q.   Let's talk about that.  First I want to talk about the

7    CJCC.  A lot has been made about the CJCC.  What's your

8    understanding about the function of the CJCC?

9    A.   Well, it's composed of several stakeholders regarding the

10   criminal justice system here in Hinds County, and since I've

11   been in office, we've had one meeting.  As a result of that

12   meeting, I was appointed as one of the chairpersons for that

13   committee as well.  So we haven't met again yet, but we do

14   have a future meeting coming up.

15        But to get me more acclimated with exactly what the CJCC

16   does and what everyone who is involved brings to the table,

17   the Hinds Behavioral Health Systems had a representative

18   there, you had chancery and circuit judges, you had attorneys

19   that were in the meeting, District Attorney's Office was

20   there, and I think the Jackson Police Department was the only

21   entity that did not provide a representative for this

22   particular meeting that we had.

23   Q.   As far as JPD is concerned, have you reached out to the

24   JPD chief to see if his presence will be at the next CJCC

25   meeting?

```
 1   A.   It's my understanding that someone will be.  It wasn't --
 2   I didn't do it per se, but I think there was some
 3   communication about having someone there from the police
 4   department.  If I remember correctly, there was a City
 5   Attorney that was at the meeting, just no one from the police
 6   department itself.
 7   Q.   And with respect to the CJCC, is it your understanding
 8   that its purpose is to optimize the criminal justice system in
 9   Hinds County?
10   A.   Yes, sir, it is.
11   Q.   Is part of that reducing the criminal backlog?
12   A.   Yes.  Reducing the criminal backlog in Hinds County,
13   which would eventually result in reducing the number of
14   detainees that are being housed in the Hinds County detention
15   facilities as well.
16   Q.   And it's my understanding everybody has a part in the
17   CJCC; is that right?
18   A.   Yes, sir, that's true.
19   Q.   As far as the Hinds County Sheriff's Office, do you have
20   indictment powers?
21   A.   No, sir, I do not.
22   Q.   Do you have the power to set court?
23   A.   No, sir, I don't.
24   Q.   Do you have powers to file habeas motions on behalf of
25   defendants to bring them to court?
```

1  A.  No, sir, I don't.

2  Q.  Now, as far as your best effort, let's talk about the

3  plant facility.  I'm not going to beat a dead horse.  Since

4  you've been the sheriff, were dedicated maintenance workers

5  assigned to the Raymond Detention Center?

6  A.  Yes, sir.  And I will say not only were they assigned,

7  they were always present every time I would visit the

8  detention center, even up till today.  To this particular

9  point, there is someone there.  That maintenance truck one or

10  two will always be parked in front of that detention facility

11  at the curb when I pull up down there.

12  Q.  Likewise, as far as the information technology person,

13  does the RDC have an information technology person?

14  A.  Detention services does not, but the sheriff's department

15  does have an IT person that also works for detention services

16  as well.

17  Q.  And does the sheriff's department IT person go down to

18  RDC to handle IT issues?

19  A.  Yes, sir, he does.

20  Q.  With respect to the amount of money -- you heard the --

21  Supervisor Calhoun and Mr. Jones testify.  Are you aware of

22  how much money has been spent by this Board alone to address

23  shortcomings with the plant facility at the Raymond Detention

24  Center?

25  A.  I don't have the exact amount.  I think that it was on

1   record that maybe several million dollar, 3- or $4 million,

2   had been spent regarding the plant facility.

3   Q.   Let me ask you this.  Are there ongoing efforts --

4   A.   Yes.

5   Q.   Like as we sit here today, are folks down there right now

6   still fixing locks and cameras, *et cetera*?

7   A.   Yes.  It's an ongoing process.

8   Q.   Are there ongoing efforts right now to improve the

9   control rooms?

10  A.   Yes, there is.

11  Q.   Now, with respect to the people at Benchmark, those are

12  your managers -- your construction managers; right?

13  A.   Correct.

14  Q.   Have you changed any of their plans or directives with

15  respect to what they plan to do to improve RDC since you've

16  been sheriff?

17  A.   No, sir, I have not.

18  Q.   Why not?

19  A.   Because it's my understanding that they were brought on

20  to help us.  They are services provided to detention services,

21  and I just don't -- I don't disagree or have an issue with

22  anything that they're doing, any work that they're currently

23  working on or have completed.  You know, I depend on them and

24  their expertise to help detention services and help us with

25  the physical plant as well.

1  Q.   Let's talk about the new facility.  Do you know if plans

2  have been drafted to build a new facility?

3  A.   Yes, sir.  After I was elected, even before I was sworn

4  in, I had a meeting with the stakeholders regarding building

5  of the new facility.  That meeting also consisted of Board

6  President Credell Calhoun, Kathryn Bryan, Benchmark, and the

7  architecture firm CDF.  We were at their facility, so I got

8  pretty much -- I was abreast of the building of the new

9  facility, some of the structural plans, and some of the dates

10 that had been set forth as well regarding the new facility.

11 Q.   And that was, you say, before you were sworn in in

12 December?

13 A.   This was before I was sworn in.  After I was elected on

14 November 23rd, I attended three meetings before I was sworn in

15 on December the 3rd.  All of those meetings were specifically

16 about detention services.  All of those meetings included the

17 former jail administrator, Kathryn Bryan, as well.

18 Q.   All right.  Now, have you spoken with or communicated

19 with any United States congressman from Mississippi with

20 respect to building the new jail?

21 A.   Yes, sir.

22 Q.   Tell us about that.

23 A.   I've had conversations with Representative Bennie

24 Thompson and I've had a conversation on several occasions with

25 Congressman Michael Guest.

1    Q.   Did anybody direct you to speak to these two gentlemen?

2    A.   No.  I also had a conversation with Lieutenant Governor

3    Hosemann as well regarding the building of the detention

4    facilities, our current conditions that we're in, and to see

5    what kind of services can they offer us or provide us that

6    falls within their scope.  So yes, I have.

7    Q.   Did Congressman Thompson and Congressman Guest offer you

8    their support with respect to building this facility?

9    A.   They have.  More so Congressman Guest.  With Congressman

10   Thompson it was more just a conversation, because we had

11   conversation regarding grants and some other things.  I was

12   trying to see if any of the grants that he offered would

13   pertain to something I could use in detention services.

14        Congressman Guest pledged whatever support that he can

15   give us regarding the building of the new facility as well.

16        Lieutenant Governor Hosemann stated to me that he could

17   provide services and that he would be able to match the water

18   and sewer component of the building of the new facility.  I

19   took that information back to the Board of Supervisors,

20   specifically Credell Calhoun, and I let him know that I had

21   had a conversation with him.

22        The next meeting we had with the stakeholders regarding

23   building of the new facility, this was also brought up as

24   well, and I think it's pretty much been confirmed that he will

25   help us with the water tower that we need and he will match

 1   the water and sewer component part of the building of the new

 2   facility as well.

 3   Q.   That's with state funds?

 4   A.   Yes, sir, with state funds.

 5   Q.   Or whatever funds he can get, I guess?

 6   A.   Whatever funds he can give us.

 7   Q.   With respect to the new jail, are you anticipating

 8   housing federal inmates awaiting trial in the federal courts?

 9   A.   That is something that I would like to propose once we

10   get a new detention facility built, that we can start housing

11   federal detainees in Hinds County versus Madison County due to

12   where the structure will be centralized, which is closer to

13   downtown Jackson, closer to the federal courthouse.  I would

14   like to see that in the foreseeable future as well.

15   Q.   Let's move on to staffing.  Once you became sheriff, tell

16   us what you did with respect to the command staff at the

17   detention facility.

18   A.   Well, let's talk about before I became the sheriff what I

19   did regarding the command staff.  After I was elected, I had a

20   meeting with Kathryn Bryan, and I asked her some of the

21   specific things that she needed right away, and one of the

22   things that she needed was a command staff promoted.  She

23   needed -- I think it was a couple of captains and maybe a

24   lieutenant, and I called the undersheriff at the time, who was

25   Alan White, and I told Alan White that we needed to go ahead

 1   and promote the individuals that she wanted to be promoted to

 2   be on her command staff in detention services.  So that

 3   happened.

 4       As a matter of fact, that happened the day of the meeting

 5   with Supervisor Calhoun, because she and I met for about two

 6   hours after I spoke with -- after the three or four of us met

 7   together, she and I spoke specifically alone, and this was one

 8   of the things that she said that she needed done immediately.

 9   Q.   And that happened?

10   A.   It happened that day.

11   Q.   Okay.  With respect to the command staff of the sheriff's

12   department, did that change?

13   A.   Yes, sir.  The command staff of the sheriff's department

14   changed.  We reorganized the organizational chart to better

15   and effectively communicate between myself and the jail

16   administrator at the time.  What I did was I removed all

17   operational staff from the detention services command

18   structure.  I had it set up where the jail administrator

19   reported directly to me instead of having to go through the

20   chief deputy and undersheriff.  So this was done -- this was

21   done before I took office as well.

22   Q.   It was done before you took office.  Was it done at your

23   directive, though?

24   A.   Yes, sir, it was done at my directive.  This was a part

25   of the -- my organizational chart that I wanted to bring in

1  under my administration, and I think that it was more than

2  fitting for the terms of the stipulated order and the consent

3  decree as well that the jail administrator would report

4  directly to the sheriff.

5  Q.   Even if we didn't have a consent decree or stipulated

6  order, does that make better sense, to have the jail

7  administrator report directly to the sheriff?

8  A.   Yes, sir it does.

9  Q.   Now, is there a nationwide -- are you aware of a

10  nationwide problem with staffing in law enforcement in

11  general?

12  A.   There's a nationwide shortage of people seeking the job

13  of public safety, whether it's law enforcement, detention

14  services.  It's just not a desired job nationwide right now.

15       Not only that, something else that has continued to

16  affect those numbers recently is the effects of COVID over the

17  last couple years.  If you look at the statistics nationwide,

18  COVID is the number one killer of law enforcement today.  You

19  have more law enforcement personnel that are dying from COVID

20  than you have law enforcement personnel dying from gun

21  violence.

22  Q.   Let's talk about this.  A lot has been made about

23  plugging in gaps at the detention center.  Why don't you just

24  take patrol officers off the street and send them down to the

25  detention center?

1    A.   My patrol operations division run about two or three

2    deputies short each day, each shift.  So they do respond to

3    the Hinds County Detention Services or facility where there's

4    a call for service.  They're still centralized in Raymond as

5    well.  They're close by.  They respond when a report needs to

6    be taken, when there's a major disturbance, but as it relates

7    to pulling them off patrol and putting them into the

8    facilities to work, that has not happened.

9         Another thing is, overtime is available for all deputies

10   that either work in detention services or in patrol.  That

11   overtime has been approved by the Board, and there's an

12   unlimited amount of overtime as long as it's, you know,

13   according to federal standards, I guess, as it relates to how

14   many hours you can work and all that.  But overtime is

15   available for patrol.

16        Now, the one thing that Kathryn Bryan proposed to me and

17   asked me to do that I refused to do -- and I think there's

18   been some confusion about this as well, and I think that the

19   record should be clear about that -- is she wanted me to

20   terminate a long-standing policy that has been with the Hinds

21   County Sheriff's Office to forbid officers or deputies being

22   able to work part-time jobs or work cash assignments outside

23   of their duties with the Hinds County Sheriff's Office.

24   Q.   Let me ask you this -- let me stop you right there.  Are

25   those the deputies that are working, like, at Kroger on 55 and

1   places like that?

2   A.   You have deputies that work several places.  They work at

3   restaurants.  They work at Kroger.  They work under the

4   direction of several private businesses within Hinds County.

5   This is another supplement to their income.  Our deputies

6   depend on this income to take care of their families.  Not

7   only do you have deputies that are in operations working

8   part-time jobs and cash assignments, you also have detention

9   officers that are qualified -- some are qualified and

10  certified to work cash assignments and part-time jobs as well.

11  Q.   Let me ask you this, though:  Outside of the

12  supplementation of their salaries, are these part-time

13  sheriff's officers, do they supplement the overall public

14  safety in Hinds County when they work these private jobs?

15  A.   Absolutely.  Not only is it good for -- it's good for

16  presence of public safety throughout Hinds County.  You

17  mentioned specifically Kroger.  When people go to Kroger and

18  shop, they know that there's going to be at least two deputies

19  at Kroger, and that's just Kroger.  There are several other

20  businesses within Hinds County that we provide services for

21  outside of our normal duty hours or normal shift within the

22  sheriff's office.

23  Q.   Now, you talked also -- I want to get a little bit more

24  involved with this.  Have there ever been discussions about

25  moving detainees from the Raymond Detention Center to other

1  sheriff's offices or sheriff's departments throughout the

2  state?

3  A.   Yes, sir, there has been some discussion about that.  As

4  a matter of fact, I plan to have that as a discussion item on

5  the next agenda for the next board meeting.  I have

6  communicated with other sheriffs.  As a matter of fact, we

7  have some detainees right now that are housed in other

8  jurisdictions as well, but I think that there needs to be a

9  master plan put in place right now, as we speak, to be able to

10  transfer detainees out of Pod A.

11  Q.   Why Pod A?

12  A.   Because Pod A is the most unsecure pod that we have at

13  the Raymond detention facility right now.

14  Q.   Let's talk about context, because context is important.

15  As far as unsecure, to be specific, is it that detainees can

16  leave and walk out on the street from Pod A?

17  A.   No.  The cell doors in Pod A don't lock.  There are

18  lighting issues in Pod A as well.  The detainees are secured,

19  you know, but their cell doors don't lock, and what this does

20  is this leaves room for them to congregate, and if you have

21  issues and they have issues with one another, it can cause

22  some type of disturbance or some type of assault between

23  detainees as well.

24  Q.   As far as the doors not locking on the cells in Pod A,

25  how does that occur?

1   A.   You said how does it occur?

2   Q.   How does it occur?

3   A.   I don't know.  It's been a long-standing issue, from my

4   understanding, that the cell doors in Pod A don't lock.  It's

5   due to several mechanical failures that have been in existence

6   for several years.  That -- that's all I know about it.

7   Q.   Let me ask you a better question.  Is it as a result of

8   lack of maintenance, or are the detainees jamming the locks?

9        MS. COWALL:  Objection, Your Honor.  Leading.

10        THE COURT:  Objection overruled.

11   A.   I think you can contribute it to a little bit of both,

12   but there have been several instances where the detainees have

13   been able to jam locks and override the mechanical system to

14   keep doors open or leave the doors open.  That didn't just

15   happen in Pod A.  That happened in Pod B and Pod C as well,

16   but as you know, those doors -- the locking mechanisms in

17   those doors have been changed and replaced.

18   BY MR. HALL:

19   Q.   With respect to moving the detainees from Pod A to other

20   facilities, has that solution been discussed before at the

21   Hinds County Sheriff's Department?

22   A.   It's my understanding that it had been discussed prior to

23   me taking office as well, yes.

24   Q.   Is that with the interim Sheriff Crisler?

25   A.   Yes.

1  Q.   Do you know if those conversations were had between

2  Mr. Crisler and former jail administrator Bryan?

3  A.   Yes, they were.

4  Q.   What is the purpose, then, of moving -- if you move the

5  detainees from Pod A, what would be the purpose of that?

6  A.   Well, first of all, it relieves some of the numbers that

7  we have within our detention facilities.  Another thing that

8  it does is for safety, the safety of the detainees and the

9  safety of the detention officers as well, due to the fact

10  that, again, the cell doors don't lock.  That is the pod where

11  we've had several assaults over the last few years, and at

12  some point there could be a decision made as it relates to:

13  Do we go ahead and -- I don't want to use the word "remodel,"

14  but go ahead and make the physical changes in that particular

15  pod or do we not, and we leave the detainees out while we're

16  building a new facility, and once a new facility is

17  constructed, we can then move those detainees into the new

18  facility, and that way we would have better security --

19  security within the new facility, and Pod B and Pod C and RDC

20  would still be secure as well.

21  Q.   Now, let's talk about the recruitment and retention

22  report that's been discussed.  Sheriff, have you seen what's

23  been admitted into evidence as D-4, the recruitment and

24  retention report for the Hinds County Sheriff's Office?

25  A.   Yes, sir, I have.

1   Q.   And do you see the date?

2   A.   Yes, sir.  January 10th, 2022.

3   Q.   So this report was issued, I guess, about a month and a

4   week after your being sworn in?

5   A.   Yes, sir, it was.

6   Q.   Did you have -- well, let me ask you this:  You heard

7   Ms. Simpson testify about this document; right?

8   A.   Yes, sir, I did.

9   Q.   Did you have any input with respect to drafting this

10  document?

11  A.   I didn't know anything about this document until it

12  arrived on my desk or through my e-mail.

13  Q.   Do you know if Mr. Hopkins, who handles the money for the

14  County, if he had any input with respect to this document?

15  A.   No, sir, he didn't.

16  Q.   Do you know if the HR department, human resources, had

17  any input with producing this document?

18  A.   No, sir.  It's my understanding that -- I don't even know

19  who Matt Rivera is.  Never seen him before.  It's my

20  understanding he was hired by the monitors.  He's not a County

21  hire or a County employee, and this recruitment and retention

22  report was done specifically in detention services with the

23  input of only the jail administrator at the time, Ms. Kathryn

24  Bryan, along with the monitors and maybe some other detention

25  personnel.

1      Outside of that, no other County employee or sheriff's

2  office employee had anything to do with this recruitment and

3  retention report.

4  Q.   Well, how did they produce this and pass it off as if it

5  was from the Hinds County Sheriff's Office?

6  A.   Again, that's just what it says:  Hinds County Sheriff's

7  Office.  Nobody outside of detention services had anything to

8  do with this report, and this is only a reflection of certain

9  individuals' perspective of the Hinds County Sheriff's Office

10 as it relates to recruitment and retention and detention

11 services.

12 Q.   Scroll down.  It says "Information gathering for this

13 report was primarily reliant on oral interviews with both the

14 current jail leadership and recruiter."  Do you see that?

15 A.   Yes, sir.

16 Q.   Isn't the sheriff jail leadership?

17 A.   Yes, sir.  The sheriff is the leader -- the administrator

18 for the whole department.

19 Q.   And that's by statute; right?

20 A.   Yes, sir.  That's by statute.

21 Q.   And then the second part that's highlighted:  "Worth

22 noting, on-site observation and staff interviews were also

23 conducted in early 2020."  Do you see that?

24 A.   Yes, sir, I do.

25 Q.   Does that make any sense to you for this report to rely

1  on interviews conducted two years prior to the issuance of

2  this document?

3  A.   No.  And I haven't seen anything in this document to

4  reflect who was interviewed in early 2020.  I don't see

5  anything -- everything in this particular document that I

6  viewed, again, was under the administration of the former jail

7  administrator, Kathryn Bryan.

8  Q.   Now I'm going to scroll down to page 3 under "Strengths."

9  The first strength is, "Detention has an experienced, skilled,

10  and courageous leader at the top."  Is that talking about you?

11  A.   No.

12  Q.   Who is it talking about?

13  A.   The former jail administrator, Kathryn Bryan.

14  Q.   And then this third thing that I highlighted, "Recruiting

15  has a dedicated and qualified professional to perform duties,"

16  who would that be?

17  A.   That would be the detention recruiter.  Bernard Moore is

18  his name.

19  Q.   Who does he work for?  What office does he work for?

20  A.   He works for the sheriff's office, but he is assigned to

21  detention services.

22  Q.   And why is he assigned to detention services?

23  A.   As a recruiter to recruit detention personnel.

24  Q.   Is patrol short-staffed?

25  A.   Yes, it is.

1   Q.   Does he undertake efforts to hire patrol officers as

2   well?

3   A.   No.  He's assigned specifically to detention only.

4   Q.   Now, let's talk about what efforts -- again, I'm going to

5   move fast with this.  What efforts have been undertaken by the

6   sheriff's department to attract new recruits?  From the

7   financial standpoint, what efforts have been undertaken to

8   attract recruits and to retain recruits?

9   A.   Well, let's go back to even before I was elected sheriff.

10  I knew the current situation that we were in regarding our

11  staffing in detention services.  I knew that detention

12  services was short-staffed.  I knew there had been a pay

13  increase that had been proposed and approved back sometime

14  late 2021.  I also knew of the -- not bonuses but the

15  incentives that had been provided through the County

16  Administrator's Office as well to all County employees,

17  because, again, I was still an employee and I still qualified

18  for that as well.

19       But part of my campaign, I had a five-point plan that was

20  in place that I shared with the people of Hinds County.  The

21  number one point on my five-point plan was recruitment and

22  retention.  So I knew that there was a dire need to have a

23  recruitment and retention plan put in place for detention

24  services that would also include several incentives, pay

25  raises, to be able to attract more personnel.  And this is

1  just based on some of the numbers that we have seen in this

2  particular area as it relates to other agencies that hire and

3  employ detention officers.

4  Q.   Let me ask you this:  Despite not having any input in the

5  recruitment and retention document that we previously referred

6  to, did you read it?

7  A.   Absolutely.

8  Q.   Why?

9  A.   Because it still had the Hinds County Sheriff's Office on

10 it and I found it to be a very interesting document to read.

11 Even though I disagreed with some of the content in it and I

12 disagreed with the whole process of how this document was

13 proposed, I still found some very interesting points in the

14 document that should be addressed.  And I took action and I

15 addressed some of the most important issues that I'd found in

16 that document as well.

17 Q.   And after you did that, what steps did you take?

18 A.   Well, first of all, I contacted -- I had met with the

19 former jail administrator, Kathryn Bryan, I met with Chief

20 Anthony Simon of detention services, and we came up with that

21 number, that $31,000 salary for starting pay for the detention

22 officers.  I called the County administrator, Kenny Wayne

23 Jones, immediately and the County attorney, Tony Gaylor.  He

24 came over to my office and we met, and I stressed to him how

25 important it was that we go ahead and get this salary increase

1  approved so that we can start the process of attracting more

2  personnel for the Hinds County Detention Services.  So we took

3  it to the Board.  It was my understanding that that $31,000

4  has been approved.

5  Q.  Let me ask you this:  Did you prepare an actual proposal

6  for pay and salary as a step plan?

7  A.  Yes, sir, I did.  I did that back in January after I got

8  this recruitment and retention report.  It took me a while.  I

9  had to go back and forth with some numbers, compare to some

10  other agencies, and I finalized the document in late January

11  as well.  And I sent it to the County administrator as well as

12  the County attorney, and it will be on the next board agenda

13  for discussion for possible consideration as well.

14      MR. HALL:  Your Honor, can I have a moment to confer

15  with counsel opposite?

16      THE COURT:  Yes, you may.

17      MR. HALL:  Your Honor, may I approach the courtroom

18  deputy to mark a document for identification purposes only?

19      THE COURT:  Okay.

20  BY MR. HALL:

21  Q.  This is the Hinds County -- excuse me, detention

22  services' proposed paid salary?

23  A.  Yes.

24  Q.  Okay.  And is this the document you're speaking of?

25  A.  Yes, this is the document that I'm speaking of.  I

1    created this document and these numbers after I reviewed the

2    recruitment and retention plan.  This document includes the

3    $31,000 salary along with -- the numbers are broken down into

4    monthly and also biweekly for the new pay plan that the County

5    has proposed and is getting ready to adopt.

6        Not only that, I have done something I would consider a

7    step plan where you have Detention Officer I, you have

8    Detention Officer II, Detention Officer III, and after that

9    you can be promoted, after so many years of service, to the

10   rank of sergeant, to the rank of lieutenant, and maybe the

11   appointed rank of captain in detention services.

12       But other things that are included in this document is a

13   uniform stipend for $250 to be considered for detention

14   officers.  The County provides uniforms for detention officers

15   as well as operational officers as well, but they don't

16   provide things like boots and other miscellaneous equipment.

17       And another thing that I included was if you have a

18   college degree, there's an incentive for that.  Shift

19   differential pay.  If you work the night shift, you'll have a

20   shift differential pay.  If you work on holidays -- you'll

21   have the deputies that will work on holidays.  You get paid

22   time-and-a-half for holidays.

23       But one of the main components for this is to be able to

24   immediately attract staff and detention officers right now.  I

25   got with the County attorney and the County administrator, and

1   whereas we cannot offer bonuses to new hires, we can offer an

2   incentive, and we've identified the funds that that incentive

3   can come from, and we -- in an effort to attract more

4   personnel, once you're hired as a new detention officer, after

5   six months you'll get a $1,000 incentive.  After 12 months,

6   you'll get another $1,000 incentive.  So within that first

7   year, you'll get a $2,000 incentive.  This is for new hires

8   only.

9   Q.   Do we have the money for that?  Does the County have the

10  money for that?

11  A.   Yes.  We have identified where the money will come from

12  for that, yes.

13       MR. HALL:  Your Honor, may I approach?

14       THE COURT:  You may.  This is for identification only?

15       MR. HALL:  I'm just giving it back to her so I don't

16  lose it.

17       THE COURT:  Is it for ID purposes?

18       MR. HALL:  D-160.

19       THE COURT:  Okay.  D-160.  It will marked for

20  identification.

21       Does the Government have any objection?

22       MS. COWALL:  We would just like to get a copy of the

23  document, please.

24       THE COURT:  Okay.  You're talking about before you get

25  to cross-examination or now?  Or Mr. Shelson has one, I

1    believe.

2         MS. COWALL:  Preferably now, but before

3    cross-examination would be good.

4         MR. HALL:  He's giving it to her right now, Your Honor.

5         THE COURT:  Okay.

6         MR. HALL:  Thanks, Jim.

7         May I proceed, Your Honor?

8         THE COURT:  You may.

9    BY MR. HALL:

10   Q.   Sheriff, with respect to the $31,000 pay raise, how many

11   line officers would that affect at the detention center?

12   A.   A large percentage.  I would probably say about 60 to

13   70 percent.  What I'm seeking to do is to get everyone up to

14   the same pay scale.  You have detention officers that have

15   been there for an amount of time that are performing the same

16   duties, but before my administration, in other previous

17   administrations, they weren't being compensated the same.  I

18   think that some of their salaries may have been based on maybe

19   how somebody knew somebody, you know, or something like that.

20   I want to be fair and equal with everybody, bring everybody up

21   to the same salary of $31,000, and after that have a step plan

22   in place across the board that will apply to everybody.

23   Q.   Now, seeing that you're short on patrol officers, have

24   you tried to get the operations and patrol side a raise?

25   A.   No, I have not.

1    Q.   Why not?

2    A.   Right now, where we're currently at with our staffing

3    levels at detention services, right now it's more priority to

4    attract more detention officers, even though there's a

5    shortage in patrol, the patrol officers -- or patrol deputies,

6    operational deputies, right now.

7    Q.   Now, there's been a lot made about the difference in pay

8    between a corrections officer and a patrol officer.  Tell us

9    why patrol officers are paid differently than detention

10   officers.

11   A.   Historically, patrol officers have always been paid more

12   than detention officers.  To become a patrol officer, patrol

13   deputy, of course, there's more training -- a whole lot more

14   training involved.  The duties of a patrol officer or patrol

15   deputy are completely different than that of a detention

16   officer as well.

17   Q.   Be specific, Sheriff.  With respect to the training that

18   a law enforcement officer has, do they have to go to the

19   training in Rankin County?

20   A.   They either go to training -- there's several state

21   agencies.  They go to the Jackson Police Department for

22   training; they go to the Mississippi Law Enforcement Officer

23   Training Academy in Rankin County; you have one in south

24   Mississippi; and there's another one -- I think maybe in the

25   delta or north Mississippi, there's another certified officer

1   training academy as well.

2   Q.   Do your detention officers have arrest powers?

3   A.   No, they do not.

4   Q.   Now, let's turn your attention to the former jail

5   administrator.  Okay?

6   A.   Yes, sir.

7   Q.   We spoke earlier about your optimism with respect to

8   Ms. Bryan.  Did she advise during your first meeting about

9   anything about your future political goals?

10   A.   Yes, sir, she did.  When she and I met that day we met

11   with Supervisor Calhoun and the County Attorney Gaylor, she

12   and I had a meeting for about two hours following that meeting

13   in the conference room, and we talked.  And the first thing

14   that she said to me was, and I quote, "Sheriff, if you want to

15   get re-elected, I'll get you re-elected.  All I need is six

16   months and I'll get us out of this thing," end quote.

17        The "thing" that she was referring to was the consent

18   decree.  I stressed to her at that time that that was more

19   important for me.  I was not concerned about a re-election or

20   another campaign, especially after I had just finished going

21   through that process.  My immediate attention was for

22   detention services and what I can do under my administration

23   to make a change with this consent decree and be able to

24   continue to address some of the issues that we were currently

25   facing.

1   Q.   Did you ask anybody for help getting re-elected?

2   A.   No, sir.  I haven't even talked about that.

3   Q.   Now, as far as the quality assurance reports that are

4   generated -- are you familiar with what I'm talking about?

5   A.   Somewhat, yes.

6   Q.   All right.  Do you have any input -- or since you've been

7   the sheriff, have you had any input in the preparation of the

8   quality assurance reports that were drafted on behalf of the

9   detention center?

10  A.   No, I have not.  And furthermore, there have been quality

11  assurance meetings that have been held regarding these

12  reports.  Prior to my administration, the sheriff was invited

13  to those meetings.  Under my administration, I have been

14  excluded -- or I was excluded from those meetings.  That

15  meeting composed of the quality assurance person, the former

16  jail administrator, and I'm not exactly sure who else, but I

17  was not invited.  There was no communication with me regarding

18  the preparation, the input, or anything regarding the quality

19  assurance reports.  I only saw them once it had been published

20  by the quality assurance person.

21  Q.   Did you have ever any problems with communications --

22  well, let's talk about insubordination first.

23       Did you ever have any problems with insubordination

24  concerning Ms. Bryan?

25  A.   Yes, sir, I did.

1   Q.   Now, as far as the timeline is concerned, you said you

2   were sworn into office December 3rd.

3   A.   Yes, sir.

4   Q.   Prior to that time, were you having any issues with her?

5   A.   No, I did not.  I depended on her, and I thought that she

6   and I were going to have to a very good working relationship,

7   and I stressed that to her.  I stressed that to the Board of

8   Supervisors that I thought that we were going to have a very

9   good working relationship, and I looked to build success with

10  her administration at that particular time.  But as time went

11  on, our working relationship pretty much began to fail and I

12  was put in several compromising situations while attempting to

13  be the administrator for the whole sheriff's office, to

14  include detention services.

15       There was a culture that had been created in detention

16  services.  There was a concerted effort of individuals in

17  detention services that was being led by the former jail

18  administrator.  Kathryn Bryan created a culture and an

19  atmosphere that would diminish my authority and would

20  compromise my administration as well.  Not only did I begin to

21  hear signs of this but I began to see the obvious signs of

22  this as well.

23  Q.   Give us an example.

24  A.   There were e-mails that had been shared between -- well,

25  I've already spoken about the -- I wasn't included in certain

1    meetings, you know, and in all transparency, I think that

2    there was something brought up earlier in testimony about a

3    meeting I think that Attorney Cheng asked did I attend an exit

4    meeting.  I didn't know anything about an exit meeting.  The

5    persons that are responsible for communicating this to me was

6    part of this concerted effort, and there was a lack of

7    communication.  So I was not brought abreast of certain

8    meetings.

9    Q.   Let me ask you that while we're on the subject.  With

10   respect to case in point, as far as communication -- we'll

11   pivot a little bit and talk about communication.

12        Do you remember the occasion where the Court and his

13   staff came to the facility?

14   A.   Yes, I did.

15   Q.   Did Major Bryan advise you that a federal judge was in

16   her facility?

17   A.   No, sir.  As a matter of fact, I didn't know anything

18   about it.  I contacted the compliance coordinator, Synarus

19   Green, that morning, and I asked him about the jail

20   walk-through, and I asked him was it something that he thinks

21   I should attend.  He told me no.  With me knowing that that

22   was probably not the case, I needed to get up and drive on

23   down there.  That's exactly what I did.

24   Q.   How did you find out about it?

25   A.   I can't remember exactly how I found out.  I think me and

1   you may have communicated about it and you told me about it.

2   Yeah, that's how I found out about it.  But prior to that, I

3   had no knowledge -- no knowledge of it.  Even after contacting

4   him, he told me that I shouldn't -- that there was no need for

5   me to be there, and I never had that communication with

6   Kathryn Bryan as well.

7   Q.   Likewise, as far as communication breakdowns are

8   concerned, was there another instance dealing with the master

9   planning meeting with the architects and the Board members

10  that you were not kept in the loop on?

11  A.   No, I was not.  There was a -- there was a meeting during

12  the monitors' visit that was being held at the architecture

13  firm.  I didn't know anything about that meeting.  The only

14  way I found out about it, the County administrator, Kenny

15  Wayne Jones, contacted me and asked me why wasn't I at the

16  meeting.  And I told him I didn't know anything about it, but

17  I stopped what I was doing and I drove over there and I

18  attended the meeting.

19       Now, prior to this I had attended two other meetings, one

20  even before I was elected -- I'm sorry, before I took office,

21  at this firm, so I was familiar with where it was, the process

22  of the meeting and everything, but for whatever reason during

23  the week of the monitors, I wasn't even brought abreast of a

24  meeting.  Nobody communicated that to me.

25  Q.   With respect to -- let's get back to insubordination now.

1813

1   Did you have an incident involving Ms. Bryan being

2   insubordinate on or about January 5th?

3   A.   Yes, sir, I did.   That was one instance where she was

4   insubordinate, but I can also elaborate on some others as

5   well, and I have the documentation to prove that as well.

6   Q.   Let's talk about the January 5th incident, though.   Do

7   you recall scheduling a meeting and she refused to attend?

8   A.   Yes, sir.   What happened is we have a young lady by the

9   name of Sheena Fields.   She was on FMLA.

10   Q.   Without getting into too much specific information about

11   Ms. Fields' employment, let's leave it at that if we can.   A

12   conversation about an employee.   Go ahead.

13   A.   Conversation.   And it was regarding something that I

14   considered to be very dire and important, and that was the

15   reporting of our COVID numbers.   Okay?   Well, this employee

16   was responsible for coordinating with the state Board of

17   Health regarding our COVID numbers, reporting COVID numbers

18   for vaccinations and everything else.   This not only included

19   detention services and detainees but it was for the whole

20   Sheriff's Department as a whole.   She had been appointed to

21   these duties several months ago.

22        It was my understanding that Kathryn Bryan relieved her

23   of those duties, putting us in what I would consider a

24   compromising situation regarding the reporting of our COVID

25   numbers.   I called her and told her that I wanted to have a

1    meeting with her and this employee so we can discuss this

2    issue.  She told me -- she called me back and she told me that

3    she was not going to attend my meeting, and I asked her why.

4    And her comment to me was because she don't like the way that

5    I handle meetings with subordinates.  Okay.  So --

6    Q.   Has a subordinate ever told you they weren't going to

7    meet with you?

8    A.   Never.

9         MS. COWALL:  Objection, Your Honor.  He's asking for

10    all kinds of hearsay.

11        THE COURT:  Objection sustained.

12   BY MR. HALL:

13   Q.   Have you ever had this experience before?

14   A.   No, sir, I have not.

15   Q.   You were elaborating.  Go ahead.

16   A.   It was due to a meeting that I had with she, Chief Simon,

17   and IAD regarding our IAD reports and how we would move

18   forward with having her a part of the disciplinary action

19   committee and review team for detention services.  And in that

20   meeting, she had knowledge of something due to her expertise

21   that I just really didn't know, and I asked her to show it to

22   me.  And she was very sarcastic, smirk, and I just told her in

23   the meeting, I said, "Major Bryan," I said, "your sarcasm and

24   smirk is not welcome in the meeting."  I said, "I'm trying to

25   get an understanding of something that you have more knowledge

1815

1    of so I will have a better understanding of it as well."

2        So that's what she was referring to, but, nevertheless, I

3    still ended up meeting with her on January the 5th regarding

4    the issue of the employee, how we were going to move forward

5    with reporting our COVID numbers to the state, and making sure

6    that we were doing everything in compliance as it relates to

7    communication of COVID with the Department of Health as well.

8    Q.   Let me ask you this:  Did you have any other barriers

9    with communicating with Ms. Bryan while she was the jail

10   administrator?  For instance -- let me lay some foundation.

11       Did she have a County-issued cellphone?

12   A.   Yes, sir, she had a County-issued cellphone.

13   Q.   And a County-issued e-mail address as well?

14   A.   Yes, sir, she did.

15   Q.   Would she use either of those regularly?

16   A.   No, sir.  And I stressed to her on several occasions how

17   very important it was for her to utilize her County-issued

18   cellphone and have her County e-mail connected to her County

19   phone instead of using her personal phone for County business

20   and County e-mails as well.  I gave her that directive several

21   times.  She still refused to do it.  The phone stayed unused

22   for several weeks.

23   Q.   Now, with respect to the January 5th issue, did you make

24   your complaints known to anyone with respect to Ms. Bryan's

25   insubordination?

```
 1   A.   Let me say this:  Kathryn Bryan put me in some very

 2   compromising situations, to the point where I did not trust

 3   her nor her leadership.  And I felt compelled, to protect the

 4   dignity of my administration and my office, that I needed to

 5   document everything with her.  Not only did I have to document

 6   it, but I had to record my meetings with her as well because I

 7   found her to be very untruthful about things that she said in

 8   meetings, her communication with me, even to include some of

 9   the testimony that she said in here on the stand.  I recorded

10   my meetings with her so that I can reflect if it ever needed

11   to be for the record exactly what happened and how it

12   happened.

13        During the January 5th meeting, I found something to be

14   very interesting that she said.  She said to me, she said,

15   "Sheriff, I'm not going to be able to work for -- I'm not

16   going to be able to work with you, for you."  She also

17   mentioned that she had rescinded a resignation that she gave

18   me the day that we met in Supervisor Calhoun's office.

19   Q.   Hold on.  So we've got that, there's been testimony about

20   a November 10, 2021, resignation letter.

21   A.   Yes.

22   Q.   Are you saying she gave you that letter also?

23   A.   The day that we met, she and I met alone, she gave me

24   that resignation.  She hand-delivered it to me.  And she told

25   me that that resignation was still in effect and she was going
```

1   to leave it in effect as well because she wanted to have some

2   leverage to get some of the things that she felt that she

3   should get or that she needed.  So she was still leaving it on

4   the table.  She made that perfectly clear to me.

5       Now, in the January 5th meeting, it's my understanding

6   according to her, that she rescinded the resignation.  Now, I

7   told her in the meeting that I never received anything from

8   her regarding her rescinding the resignation.  She told me,

9   "Well, I rescinded it to one of the attorneys."  And I told

10  her, I said, "Major Bryan, I'm the sheriff."  I said, "If

11  you're going to rescind your resignation, you should rescind

12  your resignation to me."  Well, she apologized for that, but I

13  still never received anything in writing regarding her

14  rescinding her resignation.

15      But what I did find priority at that particular time with

16  her telling me that she was not going to be able to work with

17  me, and I knew of her past threats of resignation on several

18  occasions, that I needed to start seeking leadership in

19  detention services, and that would include finding another

20  jail administrator as well.

21  Q.   Let me ask you this:  Prior to that January 5th incident,

22  did you have any incidents with Ms. Bryan and her failure to

23  offer PREA services to a detainee?

24  A.   Yes, sir, I did.

25  Q.   Tell us about that without identifying the detainee,

 1   obviously.

 2   A.   Yes, sir.  I received a letter from one of the sources

 3   that provide PREA services to detainees.  The letter was as a

 4   result of an encounter that this lady had with Kathryn Bryan

 5   where we had a detainee that had been a victim of a sexual

 6   assault in detention services, and according to the law and

 7   according to PREA standards, this detainee is eligible or

 8   should be provided services to this detainee.

 9       Well, in an e-mail conversation -- and I got the e-mail

10   documentation as well where Major Bryan denied the PREA

11   services for this detainee that had been a victim of a sexual

12   assault in detention services.  Kathryn Bryan told the source

13   that we are currently operating under a consent decree and we

14   do not have a PREA policy that has been adopted and we --

15   Q.   Is that true?

16   A.   No, sir, it's not true.  We have a PREA policy that was

17   written and adopted by DOJ.  The late Sheriff Lee Vance signed

18   off on this PREA policy last year, maybe early 2021.  I was

19   familiar with it because, of course, being the captain of

20   criminal investigations, the PREA incidents fell within the

21   scope of the jail investigator as well.

22       So I e-mailed the PREA policy to Kathryn Bryan just so I

23   would have a better understanding and to confirm that we do

24   have a PREA policy.  And she acknowledged that that was the

25   document or the policy that we're operating from.  So why she

1   told the lady that we don't have a PREA policy, I was confused

2   about that.

3        And even if we didn't have a PREA policy, if you have a

4   victim that's been a victim of a sexual assault in the jail,

5   or even without a consent decree, according to PREA law and

6   PREA standards, they're still eligible for services.  That has

7   nothing to do with it.  Forbidding or not having the proper

8   communication between this detainee and the services that he

9   should have been provided could have got us into a further

10   litigation situation like we're currently in right now,

11   because that is something that we have to do.  We have to

12   provide these services.

13   Q.  Let me ask you this:  Were you aware that -- have you

14   ever heard that Ms. Bryan advised the staff at the Raymond

15   Detention Center or even other members of the Hinds County

16   executive staff that she wanted to be the monitor if one was

17   appointed?

18   A.  Yes, sir, she did.  Even in our meeting that she and I

19   had, the same day she gave me the resignation, she mentioned

20   receivership to me that day.  She said to me, "I'm not sure if

21   we are going into receivership, but if we do, I could possibly

22   be a receiver.  I'm not sure."  So that was in a meeting that

23   she and I had even before I took office.

24        Now, after I got sworn in and I took office, again, the

25   culture and the concerted effort between Kathryn Bryan and

1  others in detention services would elaborate on the fact that

2  we are going into receivership, that she would be the

3  receiver, and that she would offer certain individuals jobs

4  within Hinds County Detention Services as well.  I've had

5  conversations with detention staff.  Not only that, I was

6  forwarded an e-mail conversation between Kathryn Bryan and the

7  quality assurance person.  I shared -- I sent the e-mail to

8  the Board on January 5th explaining my -- my encounter that I

9  had with Kathryn Bryan and my lack of trust I had with her

10 regarding her leadership under my administration.  That e-mail

11 was shared by Synarus Green with Kathryn Bryan.  Kathryn

12 Bryan, in turn, shared the e-mail with some of her

13 subordinates in detention services, to include Priscilla

14 Dawson.  She and Priscilla Dawson had an e-mail exchange where

15 Priscilla Dawson specifically talked about her being appointed

16 as the compliance director for detention services and that she

17 thought that she would be a good candidate for that position

18 as well.  So this all reflects on, again, what I consider the

19 concerted effort between individuals and the atmosphere in

20 detention services that seemed to be more a priority of a

21 receivership than addressing the needs at hand under my

22 administration.

23 Q.   Let's fast-forward, then.  At some point did you take

24 steps to identify someone to be the interim administrator for

25 the facility?

1    A.    Yes, sir.  After I had that meeting with her and she

2    shared that information with me on January the 5th, I knew

3    that it was time for me to start looking in another direction.

4    Q.    Let's go back though these -- because this needs to be

5    clear for the record as far as the number of times that a

6    resignation was given, all right?

7         Are you familiar with the first resignation letter that

8    was given?  When was that?

9    A.    The first resignation letter was given to interim Sheriff

10   Crisler on November the 10th.  On November the 26th, she sent

11   an e-mail saying that she was resigning effectively

12   November 29th.  She sent another e-mail November 26th saying

13   that she had acted rashly and that she was reconsidering that

14   and that she was not going to resign November 29th but she

15   would still resign February the 10th, 2022.

16        MS. COWALL:  Your Honor, we just object to the

17   continued hearsay.

18        THE COURT:  Objection sustained.

19   BY MR. HALL:

20   Q.    Let me ask it this way.  Let's fast-forward to the -- and

21   we'll get into how you came up with the interim director in a

22   moment, but at some point did you have a meeting with the --

23   let me ask it this way:  After the January 5th e-mail to the

24   Board and all the things that had gone on, what was the straw

25   that broke the camel's back with respect to Kathryn Bryan?

1   A.   Well, I spoke about the meeting that we had -- that they

2   had at the architectural firm.

3   Q.   Do you remember what date that was, on or about?

4   A.   Maybe somewhere last week of January, maybe the 27th,

5   28th.

6   Q.   Were the monitors -- was Mr. Parrish in that meeting?

7   A.   Yes, he was.

8   Q.   Okay.  Go ahead.

9   A.   There was -- the attorneys were in the meeting; Kathryn

10  Bryan was in the meeting; Synarus Green was in the meeting.

11  Q.   Was Mr. Morisani at that meeting?

12  A.   Yes, sir, he was.  The room was -- about 20 people in the

13  room.  I think they had the Zoom platform set up, so it was

14  being monitored.

15  Q.   This occurred at the architectural firm?

16  A.   Yes, sir, it did.

17  Q.   Okay.  Go ahead.

18  A.   So when I came into the meeting -- first of all, I had

19  not been even -- I wasn't even aware of the meeting.  Well, I

20  came in and took a seat.  So as I took a seat, Kathryn Bryan

21  intentionally, and it was very obvious what she did, played a

22  song on her phone by Eric Clapton, "I Shot the Sheriff," and I

23  found that to be very, very disturbing, and I documented that

24  information and I sent that information to the Board as well.

25  And I still to this day say that my perception of that should

1    never be slighted because, again, I'm the sheriff of Hinds

2    County.  She was the jail administrator.  That was very

3    unprofessional, and that was putting me in a very compromising

4    situation.

5        Again, our relationship had already pretty much

6    diminished, working relationship, and I found that to be very

7    intimidating moving forward.  I knew at that particular point

8    that I needed to separate myself from Kathryn Bryan.

9    Q.   What about separating the County from Kathryn Bryan?

10   A.   Kathryn Bryan needed to be separated from Hinds County as

11   a whole.  Yes, she did.

12   Q.   So at some point you heard her testify about a meeting

13   that she had in your office pertaining to her resignation?

14   A.   Yes, sir, we did.

15   Q.   Who was at that meeting?

16   A.   You were at that meeting; Doris Coleman, the human

17   resources person for the sheriff's office, was in that meeting

18   as well.

19   Q.   And what was discussed at that meeting?

20   A.   I recorded that meeting as well.  I told her that instead

21   of waiting till February the 10th for the resignation that she

22   had given me, that I was honoring her resignation effectively

23   January 31st instead of waiting until February 10th.

24   Q.   Let's talk about this.  You got to clear this up.  She

25   testified she rescinded her resignation.  Did you hear that?

1    A.   Yes, sir, she did.

2    Q.   Did you ever accept any rescission of her resignation?

3    A.   I never accepted it; I never got it; and in the meeting

4    that we had on January the 31st, I stressed to her that even

5    if she did rescind her resignation, that I was not obligated

6    to accept her rescinding a resignation.  And I also spoke with

7    her regarding the policies of working for the Hinds County

8    Sheriff's Office at will and the pleasure of the sheriff and

9    all that as well.

10   Q.   Now, let's talk about timing, because you recall the very

11   next day we had a status conference with the Court.  Do you

12   recall that?

13   A.   Yes.

14   Q.   Wouldn't it have been easier on your lawyers to not have

15   done that, to not have to deal with this the day before

16   dealing with the Court about this issue?

17   A.   Again, my perception is not to be slighted regarding the

18   intimidation and what I felt from Kathryn Bryan and the way

19   that she handled herself with me.  I wish that I didn't wait

20   until 4:00 that day to have this meeting with her, but due to

21   other obligations that day, I had to wait.  I wish I had done

22   it at 8:00 that morning, to be honest with you.

23   Q.   To be clear, though, did you accept Ms. Bryan's

24   resignation effective a week earlier because your feelings

25   were hurt?

1  A.   No, sir, I did not.

2  Q.   What was that based on?

3  A.   It was based on what she had done, and it was based on

4  the levels of insubordination that I had to deal with

5  regarding Kathryn Bryan, her ignoring several directives that

6  I gave her, my lack of trust with her, as well as another

7  incident involving another PREA situation where we had another

8  detainee that had been a victim of a sexual assault involving

9  a detainee and an employee that she failed to address.  And I

10  had to intervene and address this particular issue as well due

11  to her not addressing it.

12       We had -- the PREA coordinator contacted Major Bryan one

13  evening via e-mail and told her that she needed to speak with

14  her immediately regarding a --

15       MS. COWALL:  Your Honor, we'd just object again to

16  hearsay.

17       THE COURT:  Objection sustained.

18  BY MR. HALL:

19  Q.   Let me ask you this question here and move on from that:

20  Were you surprised that the Government designated her as an

21  expert shortly after you accepted her resignation?

22  A.   Yes.

23  Q.   You were surprised?

24  A.   Surprised that they designated her?

25  Q.   Yes.

1    A.   No.  No, I wasn't surprised.  I mean, I was expecting --

2    I was expecting her to probably testify in this court

3    proceeding.  You know, I'm just not sure what capacity, but I

4    was sure that she would probably testify, yes.

5    Q.   Did you have any certainty one way or the other if she

6    was going to testify for -- or to be critical of the Hinds

7    County Detention Services?

8    A.   Oh, yes.  Absolutely.

9         MR. HALL:  Your Honor, I have about maybe -- I say

10   30 minutes, but, you know, a lawyer telling you that, for what

11   that's worth.  If you want to take a break, I can be finished

12   by --

13        THE COURT:  We'll take our morning break since we've

14   had none.

15        Sheriff Jones, if you will, don't discuss your

16   testimony with anyone.  Well, you can talk to Mr. Hall and

17   your lawyers.

18        We're going to be in -- it's 11:25.  Let's come back at

19   11:40.  We'll be in recess.

20              (A brief recess was taken.)

21        THE COURT:  You may proceed, Mr. Hall, at your leisure.

22        MR. HALL:  Thank you, Your Honor.

23   BY MR. HALL:

24   Q.   Sheriff, let's turn your attention to the Hinds County

25   Board of Supervisors, okay?

1    A.    Okay.

2    Q.    Do you have a relationship with each of the individual

3    members of the Board?

4    A.    Yes, sir, I do.

5    Q.    With respect to the meetings, do you attend the meetings?

6    A.    Yes, sir, I do.

7    Q.    Now, as far as your relationship is concerned, did you

8    have a relationship with those individuals prior to them even

9    being elected to the Board, some of them, anyway?

10   A.    Yes.  I knew several of them, yes.

11   Q.    And let's talk about this, because it comes up with the

12   perceived acrimony and, shall I say, antics at times that come

13   from the Hinds County Board meetings.  Have you witnessed

14   that?

15   A.    Yes, sir, I do.

16   Q.    Have you had occasion to address those issues with the

17   Board members?

18   A.    Yes, sir, I have.

19   Q.    Tell us how.

20   A.    I have a duty and an obligation to the courthouses in

21   Hinds County.  The meeting where the Board of Supervisors take

22   place is in the Chancery Court building.  It's my duty and my

23   officers' duty to make sure that we have peace in the

24   buildings and that the Board meetings flow smoothly, I guess,

25   without being interrupted, with peace, and this includes the

1    Board members as well as the general public that are in

2    attendance as well.

3    Q.   And despite the acrimony, the perceived acrimony, at

4    times, have you had any problems with the Hinds County Board

5    of Supervisors approving things that were presented to them

6    that were for the betterment of the detention center?

7    A.   No.

8    Q.   This week -- let's talk about this week -- well, no, last

9    week.  Did you start the day out attending the Hinds County

10   Board meeting?

11   A.   No.  I started the day out here, but I had to leave and

12   go to the meeting briefly and return.

13   Q.   Why did you do that?

14   A.   Because there were some things on the agenda that needed

15   to be presented.  The undersheriff was there presenting these

16   things, but there was some confusion as it relates to

17   salaries, the hiring of my legal counsel as well.  So I had to

18   leave and go to the board meeting to clear those matters up,

19   and as soon as I finished, I returned back to court.

20   Q.   Now, let's talk about some other issues that have been

21   brought up in this matter, okay?  I'm just going to pivot, all

22   right?

23        In-and-out transfers.  Did you hear testimony about

24   in-and-out transfers?

25   A.   Yes, sir, I have.

1   Q.   What is an in-and-out transfer?

2   A.   That was kind of new to me.  I'm not familiar with --

3   you're speaking in detention services where someone is -- I

4   wasn't familiar with that process.  I'll just say that.

5   Q.   I think Ms. Simpson testified about that.

6   A.   Right.

7   Q.   Being unfamiliar with that, do you know if that happens

8   at the Raymond Detention Center?

9   A.   I haven't seen any documentation or I don't have any

10  knowledge of that happening at the Raymond Detention Center.

11  Q.   Likewise, let's talk about civil commitments.  Are civil

12  commitments -- people that are being taken away for civil

13  commitments, are they even taken to the Raymond Detention

14  Center?

15  A.   No.  They're not put in jail for a civil commitment, no.

16  Q.   Do you know where they are taken?

17  A.   For medical treatment, state hospital, or wherever the

18  court order designates them to go.

19  Q.   Likewise, there was testimony about pretrial diversion.

20  Are you familiar with that?

21  A.   Yes.

22  Q.   Who decides whether or not an offender gets pretrial

23  diversion?

24  A.   Not the sheriff's office.

25  Q.   Okay.  Wouldn't that be something that the Court would

1    decide?

2    A.   That's between the Court and the District Attorney's

3    Office.

4    Q.   Likewise, there was discussion about you transferring

5    jail staff from the Raymond Detention Center when it was

6    short-staffed.  Do you recall that?

7    A.   Yes, sir.

8    Q.   Let's talk about that now.  Tell me about those two

9    individuals who you transferred from the Raymond Detention

10   Center?

11   A.   I transferred two individuals.  One lady put in a request

12   to transfer out.  We had an opening for an evidence

13   technician.  We had another opening for an administrative

14   assistant position in civil processing, I think it is.  Yeah.

15   And I transferred those two people without -- one of them had

16   some serious medical issues, and I won't elaborate further on

17   that.  The other one is still a certified detention officer,

18   and she still goes and works several hours of overtime in

19   detention services for overtime.  It was only two people that

20   I transferred during my administration.

21   Q.   All right.  Let's talk about the Taser issue.  You heard

22   all this testimony about the Taser issue; right?

23   A.   A whole lot.

24   Q.   Now, when was the first time Tasers were actually

25   introduced into the Raymond Detention Center that you're aware

1    of?

2    A.   That I'm aware of?

3    Q.   Right.

4    A.   Under the Lee Vance administration.  In early 2021,

5    detention services received several Tasers, and they went to

6    the detention transportation deputies initially.

7    Q.   And when was the earliest, that you're aware of, that

8    Ms. Bryan had requested Tasers to be brought into the

9    detention center?

10   A.   Kathryn Bryan introduced Tasers to the detention services

11   and to the staff.  She sent an e-mail on August the 20th

12   requesting 20 Tasers for detention.

13        MS. COWALL:  Your Honor, we just object to the

14   additional hearsay and would like to have a standing objection

15   to hearsay that's been proffered by this witness.  We've been

16   trying to be restrained given that this is a bench proceeding,

17   but really we want to globally object to the hearsay before

18   the Court.

19        THE COURT:  Well, I'm not going to allow a global

20   objection.  You ought to object on any issues to hearsay as to

21   what Major Bryan said.

22        MS. COWALL:  Yes, Your Honor.  We would object to that

23   in this instance here.

24        MR. HALL:  The statement was not being used to prove

25   the truth of the matter asserted but just to identify the

```
 1    timeline for when -- not who said it but when the Tasers were
 2    actually introduced into the facility.
 3              THE COURT:  Okay.  Objection sustained.
 4              But you can go ahead.
 5    BY MR. HALL:
 6    Q.  So as far as the -- to your knowledge -- without saying
 7    who said what, but as far as your knowledge is concerned, do
 8    you know if Tasers were requested in October of 2021 by Major
 9    Bryan?
10    A.  Yes, sir, they were.
11    Q.  And then there's a document; I want to say it's P-77.
12              MR. HALL:  One second.  I'll tell you when to cut it
13    on.
14    BY MR. HALL:
15    Q.  There was testimony about the Tasers being requested and
16    you allowing the Tasers to be brought into the facility.  Do
17    you remember that, Sheriff?
18    A.  Yes, sir, I do.
19    Q.  I can't pull it up.
20         With respect to that, who did you task to actually hand
21    the Tasers out?
22    A.  Okay.  You want me to go back to how we got to the point
23    of me tasking that?
24    Q.  That's fine.
25    A.  Okay.  So there had been a request for 20 Tasers for
```

1    detention.  One of my first agenda items when I first took

2    office in my first board meeting initially was for some

3    additional equipment for Tasers for detention.  The request

4    had already been made.  We had a meeting in my office on

5    January the 12th, and the meeting was regarding inventory and

6    requisitions.  It was myself, Kathryn Bryan, Anthony Simon,

7    Captain Pete Luke, and Jerry Arrinder.  I wanted to have a

8    meeting so we could all sit down and fulfill some of the

9    requisitions that had been introduced by Kathryn Bryan to make

10   sure that we were all on the same page:  what we considered to

11   be priority; what we needed to, again, go over the process of

12   identifying vendors, what vendors we can use, what vendors we

13   can't use; and just to be able to get acclimated with the

14   process.

15        Well, during this meeting the Taser situation came up.  I

16   said that I knew the request had been made for 20 Tasers.  I

17   didn't have 20 Tasers at that particular time, but Kathryn

18   Bryan stressed that she needed or she wanted the Tasers.

19            MS. COWALL:  Your Honor, we just object to the hearsay

20   again.

21            THE COURT:  Objection sustained.

22            You can't tell me what Kathryn Bryan said.

23   BY MR. HALL:

24   Q.  Let me ask you this this way, Sheriff.  Let me ask you

25   this way:  A request was made for Tasers?

1  A.   Yes.

2  Q.   Was a request for training also made at that same time

3  for Tasers?

4  A.   There was never a request made for training for Tasers.

5  Q.   As far as Ms. Bryan is concerned, did you hear her

6  testimony that she is a certified trainer, use of force,

7  *et cetera*?

8  A.   Yes.

9  Q.   Did she ever offer to train anybody in the use of Tasers

10  inside the facility?

11  A.   Never.

12  Q.   Now, let's talk about why Mr. Simon -- because it seems

13  like she took exception to you tasking that to Captain Simon.

14  Why was Captain Simon tasked with that, with issuing the

15  Tasers?

16  A.   First of all, Captain Simon is a subordinate of the

17  sheriff.  I can task anyone within the sheriff's office with a

18  particular assignment that I feel the need to.

19      But after that meeting that we had regarding the Tasers,

20  I started identifying Tasers that we could use in detention

21  services.  As a matter of fact, I called some law enforcement

22  personnel that had Tasers that weren't using them, and I told

23  them to turn them in because it was my understanding that the

24  Tasers were needed in detention services.

25      So at the conclusion of this meeting on January the 12th,

1  on January the 14th, Captain Simon and Captain Conner both

2  went to supply and they checked out Tasers out of inventory.

3  Q.  Was that done to slight Ms. Bryan?

4      MS. COWALL:  Objection, Your Honor.  Leading.

5      THE COURT:  Objection overruled.

6  A.  No, it was not.  My reasoning for assigning him to do it

7  was because after the meeting, he and Simon had already gone

8  and gotten -- I'm sorry, Simon and Conner had already gone and

9  got their Tasers.  That following week, which I think may have

10  been somewhere around January 21st, is when I told him to go

11  ahead and get the remainder of the Tasers issued to the

12  supervisory staff of detention services, because they had

13  already gotten their Tasers.  That's when I learned about some

14  extra training or something for the Tasers.

15      Now, the training never came up until I tasked Simon with

16  going ahead and getting the Tasers issued to the rest of the

17  people there.

18  Q.  As far as those individuals that the Tasers were

19  ultimately assigned to, were they, in fact, trained to use

20  Tasers?

21  A.  Yes.  They were trained and they were certified to use

22  Tasers.

23  Q.  Let's talk about this, because a lot was brought out

24  about the termination of three individuals who were supposed

25  to get some training.  Do you recall that?

1    A.   Yes, I do.

2    Q.   All right.  Tell the Court the real story behind why

3    those three individuals were terminated.  Let me preface the

4    question.  Did it have anything to do with the death of MC?

5    A.   MR.

6    Q.   MR.  Thank you.

7    A.   Yes, it did.

8    Q.   In October of 2021?

9    A.   Yes, sir, it did.

10   Q.   Did this predate your inauguration, you being sworn in as

11   sheriff?

12   A.   Yes, it did.

13   Q.   After you became the sheriff, had any disciplinary action

14   been taken against individuals with the Raymond Detention

15   Center who may or may not have been responsible for

16   supervising the detainees at this point?

17   A.   No, sir.

18   Q.   Had any investigation been undertaken?

19   A.   An investigation by internal affairs had been initiated

20   somewhat, but there was never any accountability or anything

21   from the jail administrator regarding the policy violations

22   stemming from the death of MR at the Raymond Detention Center.

23   Q.   Let me ask you this now:  Can you take disciplinary

24   action against individuals prior to an internal affairs

25   investigation being concluded?

1837

1   A.   Yes, I can.

2   Q.   Let's talk about that.  When you were sworn in

3   December 3rd -- this occurred late October, right --

4   A.   Right.

5   Q.   -- the gentleman's death?

6        Tell us what happened with respect to your holding those

7   individuals accountable.

8   A.   I learned that these individuals -- let's go back.

9        I knew that when the death of MR occurred, I reviewed the

10  after-action report that was prepared, and I noticed that the

11  after-action report did not include several policy violations

12  that had been noted during the investigation of the death of

13  MR.  Furthermore, the monitors published a report shortly

14  after the death of MR, and it didn't specifically say what

15  policy violations there were, but just by reading that report,

16  you knew that there were some possible policy violations.

17  Q.   So I've looked at a lot of monitoring reports.  Have you

18  reviewed any monitoring reports?

19  A.   Yes, sir.

20  Q.   Are they usually pretty thorough with respect to when we

21  drop the ball, they tell us exactly how and when we dropped

22  the ball?

23  A.   Absolutely.

24  Q.   Was that the case with respect to this after-action

25  report concerning MR's death?

```
 1  A.   No, it was not.  There was never any accountability
 2  stemming from the death of MR.  It should have taken place
 3  previous or prior to my administration.
 4  Q.   All right.  So we heard testimony from Major Bryan that
 5  you just came and fired three people and didn't consult her;
 6  right?  Did you hear her say that?
 7  A.   Yes, sir, I did.
 8  Q.   Tell us about that.  Did you try to consult with Major
 9  Bryan in connection with the discipline of these three
10  individuals?
11  A.   I did.
12  Q.   And were you able to contact her?
13  A.   No, I was not.
14  Q.   Why is that?
15  A.   After the investigation was completed, there was an
16  e-mail that said the investigation was --
17  Q.   Well --
18          MS. COWALL:  Your Honor, I just object to hearsay
19  again.
20          THE WITNESS:  Okay.
21          MR. HALL:  I concede that one.
22          THE COURT:  Objection sustained.
23  BY MR. HALL:
24  Q.   Let me ask you this.  Just answer this question right
25  here:  Did you try to reach out to Major Bryan?
```

1   A.   I did.  Several times.

2   Q.   Did she answer -- how did you try to reach out to her?

3   A.   I called her.

4   Q.   And did she answer the phone?

5   A.   No, sir.  I left her a voicemail that morning, told her

6   to call me.  Maybe about three hours or so passed.  I called

7   her again, still no answer.  And maybe about another

8   30 minutes or so and finally she called me back.

9   Q.   All right.  And at that point did you -- what had you

10  decided to do with respect to disciplining these correction

11  officers?

12  A.   My initial call to her that morning was let her know that

13  I have received the final results of the investigation.

14       THE COURT:  Hold on for a second.

15       MS. COWALL:  We'd just object to hearsay again with

16  regard to the content of these calls.

17       THE COURT:  Objection overruled.

18  A.   I called her to let her know that I had gotten the

19  results of the investigation and that I was preparing to

20  terminate the detention officers.

21  BY MR. HALL:

22  Q.   Who has the ultimate call on terminations of Hinds County

23  employees.  At the sheriff's department, anyway.

24  A.   The sheriff.

25  Q.   Did you exercise that?

1  A.   Yes, sir, I did.

2  Q.   Did you have any question, though, as to why that had not

3  been done prior to this particular day?

4  A.   Yes, sir, I did.

5  Q.   And did you get any explanation for why these individuals

6  had not been disciplined up until this point?

7  A.   No, sir, I did not.

8  Q.   Let me ask you this:  Did you review the video of the

9  incident?

10  A.   The video?  Yes.  Yes.

11  Q.   Do you know if Ms. Bryan had reviewed the video of the

12  incident?

13  A.   According to her after-action report, she did.

14  Q.   Was it clear from just looking at that video that several

15  policy violations had occurred by -- on the part of

16  corrections officers?

17  A.   Yes.  That along with the statements of the detention

18  officers well reflected that there were several policy

19  violations and that those policy violations should have

20  been -- should be addressed immediately, because if we had any

21  type of these -- any type of policy violation of these sort

22  again, it could possibly lead to another major incident

23  happening at the Raymond Detention Center.  Yes.

24  Q.   Were those -- I'm sorry.  Were those individuals

25  suspended or anything?

 1  A.   They were terminated.

 2  Q.   No, I'm sorry.  Before you terminated them?

 3  A.   No.  They continued to work after the death of MR.

 4  Q.   Let's talk about Mr. Mosley, Justin Mosley.  There was

 5  testimony about Mr. Mosley.  Are you familiar with Justin

 6  Mosley?

 7  A.   Very familiar.

 8  Q.   How are you familiar with Mr. Mosley?

 9  A.   Mr. Mosley -- shortly after I came to the sheriff's

10  office, Mr. Mosley was arrested based on an investigation that

11  we conducted in criminal investigations where a man was

12  murdered and a young lady was murdered in front of her

13  children.

14       MS. COWALL:  Your Honor, we just object to the

15  relevance.

16       THE COURT:  Objection overruled.

17  BY MR. HALL:

18  Q.   And was Mr. Mosley the suspect in those murders?

19  A.   Yes, sir, he was identified as the suspect.

20  Q.   All right.  At some point was he apprehended and brought

21  down to the Raymond Detention Center?

22  A.   Yes, sir, he was.

23  Q.   With respect to your -- you said you were a captain over

24  investigations prior to becoming the sheriff; is that right?

25  A.   Correct.

1    Q.   Did you have any interaction or did you come across any

2    information with respect to any incident reports involving

3    Mr. Mosley?

4    A.   You mean before -- you mean after he was arrested?

5    Q.   Right.

6    A.   Oh, yes.  Yes, sir.

7    Q.   And were you aware of the -- any incidents involving

8    Mr. Mosley while he was a detainee at the Raymond Detention

9    Center?

10   A.   Yes, sir, I did.

11   Q.   Are you aware of the reason why Mr. Mosley was in a

12   segregated cell prior to his death?

13   A.   Yes, sir, I am.

14   Q.   Okay.  Tell the Court what happened.

15   A.   He had sexually assaulted a female detention officer that

16   day, and they put him -- as a result of that, they put him in

17   isolation/segregation.

18   Q.   Do you know specifically what the assault entailed?

19   A.   I think it was -- I want to say I think he grabbed her

20   buttocks area, fondled her or rubbed her or something like

21   that, her body.

22   Q.   Do you know if he exposed himself as well?

23   A.   I can't recall that.

24   Q.   Do you know why that same incident would have been

25   characterized by Ms. Simpson as inappropriate touching by a

1   detainee?

2           MS. COWALL:  Objection, Your Honor.  Foundation.

3           THE COURT:  Objection sustained.

4           MR. HALL:  I could ask her.  We'll move on.

5   BY MR. HALL:

6   Q.  Let's stay on Mr. Mosley.  While he was in -- just as far

7   as your understanding is concerned, was he on a suicide watch

8   in that segregated cell?

9   A.  No.

10  Q.  With respect to the monitors, have these monitors ever

11  contacted you directly to just get your opinion or impression

12  of how the jail was going?

13  A.  No.  Not since I've been the sheriff.  I did have contact

14  with the monitors prior to being elected as sheriff.  Back

15  when I was a captain, I had contact with them based on the

16  criminal investigation reports and things that we needed to do

17  in criminal investigations for reporting purposes, but not

18  since I became the sheriff, no.

19  Q.  Did you -- were you aware of the relationship between

20  Ms. Bryan and Ms. Simpson during -- I guess after you became

21  sheriff?

22  A.  I knew about their relationship prior to me becoming the

23  sheriff.

24  Q.  Did you know how friendly it was?

25  A.  Yes, I did.

1    Q.   Did that bother you, or did you have a concern about the

2    friendliness of the relationship initially?

3    A.   No, not initially, due to the fact that I honestly

4    thought that when Major Bryan came aboard, that I was --

5    again, like I stressed earlier, I was very supportive of her

6    in that hiring because I thought it was going to lead us in a

7    different direction and better direction.

8    Q.   With respect to the times -- and I think you testified

9    earlier that you had voiced some concerns to the Board of

10   Supervisors about Ms. Bryan, and that e-mail was at some point

11   forwarded to the monitors.  Are you aware of that?

12   A.   Yes, I am.

13   Q.   Did the monitors ever reach out to you at that point to

14   see what the issue was?

15   A.   No.

16   Q.   As far as the monitors are concerned, now, did you ever

17   make your concerns known to the monitors directly about the

18   deteriorating -- or deteriorated relationship between your

19   leadership and Ms. Bryan?

20   A.   Yes, I did.

21   Q.   When was that?

22   A.   When the monitors did a site visit, we had a meeting in

23   my office that included the monitors, a few other people.  I

24   think maybe an attorney or so was in there as well.

25   Q.   What was their response?

1    A.   "We don't get involved" --

2         MS. COWALL:  Your Honor, again, object to hearsay.

3         THE COURT:  Objection overruled.

4    BY MR. HALL:

5    Q.   Go ahead.

6    A.   Lisa Simpson's response was, "We don't normally get

7    involved in personnel issues or personnel matters."

8         MR. HALL:  Your Honor, may I have the Court's

9    indulgence?

10        THE COURT:  You may.

11        MR. HALL:  One moment, Your Honor.

12        Your Honor, is D-126 -- has that been admitted?  I

13   think it is.

14        THE COURT:  Yes, it has.  D-126?

15        MR. HALL:  Yes, Your Honor.

16        THE COURT:  You have a copy of it?

17        MR. HALL:  I'd ask it be pulled up, yes.

18        THE COURT:  You're going to have to put it on the Elmo.

19        MR. HALL:  Yes, Your Honor.  I got it right there.

20        THE COURT:  Oh, you're using Trial Director or

21   something?

22        MR. HALL:  Yes, Your Honor.

23        THE COURT:  Okay.  All right.

24   BY MR. HALL:

25   Q.   Sheriff, I want to direct your attention to what's been

1    admitted into evidence as D-126, and the bottom is an e-mail

2    from August 29, 2021.  Do you see that?

3    A.   Yes, sir.

4    Q.   And this is an e-mail from Kathryn Bryan to Elizabeth

5    Simpson, "General update," and at the very bottom:  "I feel

6    it's important to officially notify you of this situation."

7    She's complaining that she's having a hard time with the

8    County.  The last part that I have highlighted:  "I think it

9    is important to officially notify you of this situation as I

10   am currently assessing my options with regard to continued

11   employment with Hinds County."  Did I read that correctly?

12   A.   Yes, sir.

13   Q.   Do you know if Ms. Simpson, after getting this email from

14   Ms. Bryan, ever advised anybody with the County that our jail

15   administrator was currently assessing her options with regard

16   to continued employment with Hinds County?

17          MS. COWALL:  Objection.  Foundation.

18          MR. HALL:  I just asked him if he knew, Your Honor.

19          THE COURT:  Overruled.

20   A.   Not to my knowledge.

21   BY MR. HALL:

22   Q.   And I want to scroll up.  "Hi Kat."  This is from

23   Ms. Simpson to Ms. Bryan.

24          THE COURT:  Just make sure if you're going to read,

25   just slow it down.  Your pace is pretty --

1      MR. HALL:  She hasn't gotten on me yet, Judge.

2   BY MR. HALL:

3   Q.   It says, "Hi, Kat.  I'm really sorry to hear that the

4   administration is making your job so difficult.  I did let the

5   judge know of the problem and asked him to emphasize the

6   importance of getting the cooperation of the administration."

7      Did I read that correctly?

8   A.   Yes.

9   Q.   Again, as you read this, is there anything in here that

10   shows she gave the County a heads-up that its jail

11   administrator was about to leave?

12   A.   No.

13   Q.   Is there anything in this e-mail that shows that

14   Ms. Simpson is willing to discuss Ms. Bryan's allegations to

15   verify them?

16   A.   No.

17      MR. HALL:  Your Honor, I don't have any further

18   questions of this witness.

19      THE COURT:  Okay.  Thank you, Mr. Hall.

20      Obviously we're not going to start the

21   cross-examination of this witness now.  It's 12:16.  We'll

22   break for lunch, and we'll start back at 1:30.  That's about

23   an hour.  Let's start back about 1:30.

24      And you can meet with your lawyer.

25      THE WITNESS:  Thank you, Your Honor.

1        THE COURT:  And anything we need to take care of before

2   the break?

3        MS. COWALL:  Not at this time, Your Honor.

4        THE COURT:  All right.  We'll be in recess for lunch.

5             (A lunch recess was taken.)

6        THE COURT:  You may be seated.

7        MS. COWALL:  Your Honor, I apologize.  We're having a

8   little bit of a technical difficulty at the moment.

9        THE COURT:  Okay.

10       MS. COWALL:  Okay.  Your Honor, I apologize for that

11  delay, but it looks like the technical issue has been

12  resolved.

13       THE COURT:  It's been resolved?

14       MS. COWALL:  Yes, Your Honor.

15       THE COURT:  Sheriff Jones, you may return to the stand.

16       I'll remind you, Sheriff, that you are still under

17  oath.

18       THE WITNESS:  Yes, sir.

19       THE COURT:  Ms. Cowall, you may proceed.

20       MS. COWALL:  Thank you, Your Honor.

21                       **CROSS-EXAMINATION**

22  **BY MS. COWALL:**

23  Q.  Sheriff Jones, you were sworn in on December 3rd, 2021;

24  is that correct?

25  A.  Yes, ma'am.

1  Q.   And as sheriff, you're the County's top law enforcement
2  officer; right?
3  A.   That's correct.
4  Q.   You're at the top of the organizational chart for the
5  sheriff's office; correct?
6  A.   Yes, ma'am, I am.
7  Q.   You've actually been employed by the Hinds County
8  Sheriff's Office for about two years; is that right?
9  A.   Yes, ma'am.
10  Q.   And you've had some interaction with the monitor in your
11  former role at the sheriff's office; correct?
12  A.   Yes, ma'am.  As a captain.
13  Q.   So you've had some time to get familiar with the Hinds
14  County Jail; right?
15  A.   Somewhat, yes.
16  Q.   And you've had some time to get familiar with the consent
17  decree in this case?
18  A.   Yes, ma'am.
19  Q.   And the stipulated order from 2020?
20  A.   Yes, ma'am.
21  Q.   And you've been in the hearing here each day; correct?
22  A.   Yes, ma'am, I have.
23  Q.   And you'd agree the jail is facing challenges; correct?
24  A.   That's correct.
25  Q.   You've even given press interviews commenting on

```
 1   challenges facing the jail; right?
 2   A.   You're going to have to repeat that one.  A little too
 3   fast.
 4          THE COURT:  Slow down, if you will.
 5          MR. COWALL:  Sure.
 6   BY MR. COWALL:
 7   Q.   You've even given press interviews commenting on the
 8   challenges facing the jail; right?
 9   A.   Oh, yes, ma'am, I have.
10   Q.   And detention levels in particular have been a challenge
11   for Hinds County Jail; right?
12   A.   Yes, ma'am.
13   Q.   Since before COVID; right?
14   A.   For several years, yes, ma'am.
15   Q.   And you've -- so you've heard the monitor's corrections
16   expert testify that currently the number of officers in the
17   jail is the lowest it's ever been since monitoring started; do
18   you recall that testimony?
19   A.   Yes, I do.
20   Q.   So would you agree that detention officer staffing in the
21   jail is dangerously low?
22   A.   I wouldn't say dangerously low, but I would say that it's
23   low and it's something that should be addressed.
24   Q.   In fact, there's a serious shortage of staff at both
25   Raymond and the work center; right?
```

 1   A.   Hinds County Detention Services as a whole has staff

 2   shortages, yes.

 3   Q.   And that has affected the quality of work being

 4   performed; correct?

 5   A.   The quality of work, the level of supervision, yes.

 6   Q.   And you'd agree that having officers assigned to units

 7   that house detainees is necessary to jail safety and security?

 8   A.   Yes, ma'am, it is.

 9   Q.   Units shouldn't go unsupervised; right?

10   A.   That's correct.

11   Q.   And having officers working in units is necessary to

12   prevent destruction of repairs being done to the units; right?

13   A.   Yes.

14   Q.   And the jail needs enough officers to provide detainees

15   access to medical and mental health care; right?

16   A.   Yes, ma'am.

17   Q.   Medical and mental health staff should have an officer

18   with them when they go into the units; right?

19   A.   That's correct.

20   Q.   But that doesn't consistently happen, does it?

21   A.   I can't testify as to whether or not it consistently

22   happens because I'm not there for the daily or day-to-day

23   operations.  I do understand what you're asking.  Is there a

24   need for it, yes, but whether it happens consistently, I can't

25   testify whether it happens consistently because I'm not there

1  on a day-to-day basis.

2  Q.   So there are a number of items in the consent decree that

3  are affected by understaffing; correct?

4  A.   Yes.

5  Q.   And yet, as you testified, detention officers have been

6  transferred out of the jail and over to other parts of the

7  sheriff's office; right?

8  A.   Under my administration, I transferred two people.

9  Q.   I'd like to show you Plaintiff's Exhibit 17.  It should

10  come up on your screen, or else there's also a set of binders

11  behind you if you prefer the hard copy.

12      Do you recognize Plaintiff's Exhibit 17, Sheriff Jones?

13  A.   Yes, ma'am, I do.

14  Q.   And this is an assignment of personnel, effective date

15  January 5th, 2022; correct?

16  A.   Yes, ma'am.

17  Q.   And it states the action taken is that "staff person is

18  hereby transferred from a detention officer to administrative

19  assistant in civil process"; correct?

20  A.   Yes, ma'am.

21  Q.   And you signed this order; correct?

22  A.   Yes, ma'am, I did.

23      MS. COWALL:  Your Honor, we'd move to admit Exhibit 17.

24      THE COURT:  Any objection?

25      MR. HALL:  No objection.

```
 1              THE COURT:  P-17 will be received into evidence.
 2              (Plaintiff's Exhibit 17 entered.)
 3    BY MS. COWALL:
 4    Q.   And I believe you testified that there was one other
 5    staff person who has been transferred out of the jail.  Was
 6    that more recently than January?
 7    A.   I don't recall exactly when it was.  The --
 8    Q.   Let's -- oh, I'm sorry.
 9    A.   I'm sorry.  Go ahead, ma'am.
10    Q.   Oh, no.  Please finish.
11    A.   I don't recall how recently it was.  It was under my
12    administration, but I don't recall the exact date that it
13    happened.
14              MR. COWALL:  Let's pull up what's been marked as
15    Plaintiff's Exhibit 105.
16              May I approach the witness, Your Honor?
17              THE COURT:  You may.
18    A.   Thank you.
19    BY MR. COWALL:
20    Q.   Sheriff Jones, do you recognize what's been marked as
21    Plaintiff's Exhibit 105?
22    A.   Yes, ma'am.  It's a transfer order for a detention
23    officer.
24    Q.   And this detention officer was transferred out of the
25    work center on February 1st, 2022, correct?
```

```
 1   A.   That's correct.

 2   Q.   And you signed this order; correct?

 3   A.   Yes, ma'am, I did.

 4   Q.   And I believe that you testified about some shortages of

 5   patrol staffing as well; is that correct?

 6   A.   Yes, ma'am.

 7   Q.   But the defendants didn't produce any patrol staffing

 8   analysis in this litigation, did they?

 9   A.   Patrol staffing analysis?

10   Q.   Correct.

11   A.   No, ma'am.

12   Q.   Okay.  Now, it's been a challenge to recruit and retain

13   staff for the jail; right?

14   A.   Yes, it has been a challenge.

15   Q.   And for staffing, a challenge that you have is being able

16   to adequately pay personnel with a competitive salary;

17   correct?

18   A.   Yes, ma'am, that's correct.

19   Q.   And for detention officer staffing, the only thing you

20   can do is ask for more money from the Board; correct?

21   A.   That's correct.

22   Q.   Yet up to this point, you have not gone before the Board

23   to request a career ladder pay system so that people can make

24   more money if they stay on at the jail; correct?

25   A.   I went before the Board and I got the $31,000 approved.
```

1  I have completed my pay and recruitment documents that I am

2  going to go before the Board and present.  It took some time

3  to get that completed, to be able to identify whether or not

4  the monies would be available.  So it is going to be up for a

5  discussion in the next Board meeting, yes.

6  Q.   Okay.  So none of that has actually been implemented yet;

7  right?

8  A.   As I testified, no.

9  Q.   And that includes any uniform stipend for detention

10 officers; correct?

11 A.   Yes, ma'am, that is included.

12 Q.   But it has not been implemented; correct?

13 A.   Ma'am, nothing on my pay scale -- I'm sorry, my pay plan

14 that I have completed has been approved or presented yet.

15 Q.   Okay.  And are you aware of how long the County has been

16 promising to provide a career ladder pay system?

17 A.   I am not aware of that, no.

18 Q.   Now, how about requesting money from the Board for items

19 that could enhance officer safety, like flashlights.  You have

20 not done that, have you?

21 A.   Yes, ma'am, I have.

22 Q.   And would that have been in the Board meeting minutes?

23 A.   No, ma'am, it's not.

24 Q.   Where is --

25 A.   That did not go before the Board.  There was a request

1   that was put in for several equipment items.  We had a meeting

2   on January the 12th.  We discussed inventory and requisitions.

3   The flashlights was part of that, along with handcuffs, leg

4   irons -- matter of fact, we identified the monies that was --

5   we were going to use to make that order.  It's my

6   understanding following that meeting that order has been made.

7   That's why I had Captain Luke and Jerry Arrinder from my

8   supply division to be at that meeting, so they could know

9   exactly what we needed and what was priority for us at that

10  particular time.

11       The flashlights were priority due to the fact of the

12  power outage -- well, not power outage but lights not

13  operating in Pod A.  The handcuffs and the leg irons was also

14  priority for the safety of the detainees as well as the staff

15  there.  And as a matter of fact, I think that we decided that

16  we were going to even step outside of the County's budget and

17  use seized and forfeiture money to be able to accommodate some

18  of these purchases as well.

19  Q.  So you said that was discussed at a meeting in January?

20  A.  Yes, ma'am.  That was on January the 12th.  That meeting

21  was with Kathryn Bryan, Anthony Simon, myself, Pete Luke, and

22  Jerry Arrinder.

23  Q.  And with regard to flashlights, the lights have been out

24  in the jail for some months now; correct?

25  A.  I know during my administration, the lights have been out

1  in Pod A.  I'm not exactly sure before my administration when

2  the lights were not operating in Pod A.

3  Q.   So should the Board meeting minutes reflect what you just

4  stated about that January meeting?

5  A.   I'm not exactly -- that meeting is not in the Board

6  meeting -- Board minutes.  I do have a recording of the

7  meeting where I recorded the meeting for requisition and

8  inventory purposes, but in the Board minutes, it was never

9  proposed to the Board.  That was a meeting in my office with

10  my staff.

11  Q.   Okay.  So it hasn't been proposed to the Board yet?

12  A.   It doesn't have to be proposed to the Board for

13  purchases.  For that -- for those particular items, it didn't

14  have to go to the Board.  Again, we identified the monies that

15  was available to be able to purchase it.  And I think that my

16  understanding of it is, it was less than the amount that we

17  needed to go to the Board for.  That was my understanding.

18  But it wasn't -- the orders have been made.

19  Q.   Are the flashlights in officers' hands yet?

20  A.   No, they're not.

21  Q.   Speaking of Board meetings, there have been some issues

22  with conducting business at the Board meetings; hasn't there?

23  A.   Yes, ma'am, there has been.

24  Q.   Board members have disputed who is the president and the

25  vice president; correct?

1   A.   Yes, ma'am, they have.

2   Q.   And this even resulted in an altercation between Board

3   members?

4   A.   Yes, ma'am, it has.

5   Q.   And the dispute between Board members became so

6   contentious that it interfered with the Board's ability to

7   have a meeting without chaos; didn't it?

8   A.   The meetings were interrupted, I will say, but we were

9   able to get the situation under control and move forward with

10  the meeting and handling County business as well.

11  Q.   And that was after your deputies had to arrest a Board

12  member for disrupting business; correct?

13  A.   Ma'am, no deputy under my administration has had to

14  arrest any Board member, so I can't testify to that.

15  Q.   It got so bad that you had to issue a letter threatening

16  to arrest people who disrupted Board meetings; correct?

17  A.   I did issue a letter to all of the Board members.  I

18  never threatened to arrest anyone per se, but I did note in my

19  letter that an arrest will be made if things got out of

20  control or a law was broken.  But there was never a threat to

21  arrest a certain individual or anything on the Board.

22  Q.   But you felt the need to indicate that people could be

23  arrested if Board meetings continued to be disrupted; correct?

24  A.   Yes, ma'am.  That's my duty and that's my obligation

25  under the law, as I stated earlier, to restore order and peace

1  in all County courthouses.  So I am obliged to that particular

2  duty.

3  Q.  And there's a lawsuit pending as to who should be in

4  charge of the Board; correct?

5  A.  That's my understanding, ma'am.

6  Q.  Now, we've heard some testimony about a 5 percent raise

7  that's implemented and some proposals that you have, but

8  that's the first raise in some years; correct?

9  A.  I don't know, ma'am.

10  Q.  And with the 5 percent raise, that's not even enough to

11  address inflation in just the past year; correct?

12  A.  I don't know what the inflation numbers are.  That

13  5 percent raise was done prior to my administration.  My

14  administration has been responsible for asking for the $31,000

15  raise.  I'm not exactly sure what numbers you're referring to

16  regarding inflation compared to a 5 percent pay raise.

17  Q.  Let's look at Plaintiff's Exhibit 107, which has been

18  marked as 107.

19        MS. COWALL:  Your Honor, may I approach the witness?

20        THE COURT:  You may.

21  BY MS. COWALL:

22  Q.  Now, if you look at this document entitled "Bureau of

23  Labor Statistics" from the bls.gov website, that states

24  "Consumer prices up 7.5 percent over year ended January 2022."

25  Is that what it states?

1  A.   Does that what?

2  Q.   Is that what this states?

3  A.   Yes, ma'am, it does.

4  Q.   So does this indicate that the 5 percent raise was less

5  than the rate of inflation in the past year?

6         MR. HALL:  Objection, Your Honor.  This is outside the

7  scope of this witness's purview.  The document she's reading

8  also looks like a print-off.  I don't know where this -- it

9  says "Bureau of Labor Statistics," but she's asking him about

10 something that she hasn't laid the proper predicate about

11 where it came from, either.

12        THE COURT:  Any response from the Government?

13        MS. COWALL:  Yes, Your Honor.  Sheriff Jones has

14 testified about what the County is doing or trying to do with

15 regard to raising officer salaries, and 5 percent has come up,

16 and so this is a printout from the Bureau of Labor Statistics

17 indicating inflation of 5 percent over the past year.  So I'm

18 asking him about a 5 percent raise as it relates to the rate

19 inflation as indicated by the Bureau of Labor Statistics.

20        THE COURT:  Is this a self-authenticating document?

21        MS. COWALL:  I believe so, Your Honor.  It's from

22 bls.gov.

23        THE COURT:  I'm sorry?

24        MS. COWALL:  I believe so.  It's from bls.gov, the

25 Bureau of Labor Statistics.

1        THE COURT:  Objection overruled.

2   BY MS. COWALL:

3   Q.   So based on this document, Sheriff, this indicates that

4   the rate of inflation in the past year exceeded the one raise

5   the County has been able to pass; correct?

6   A.   Ma'am, I'm not understanding exactly what you're asking

7   me.  I think you're asking me to compare a pay raise to what's

8   in this document.  First of all, the 5 percent pay raise was

9   done before my administration for detention.  Second of all, I

10  think you're asking me to mathematically compare the two, and

11  I'm not prepared to do that.  I don't know what 5 percent and

12  inflation -- how it affects one way or the other.  I just know

13  that there was a 5 percent pay raise that was implemented

14  prior to my administration, so I don't have any knowledge of

15  what you're talking about.

16  Q.   I'm just asking you if 7.5 is greater than 5.

17  A.   Yes, 7.5 is greater than 5, yes, but 7.5 doesn't -- this

18  doesn't say anything about salary for Hinds County Detention

19  Services, or any type of comparison to detention services, and

20  I'm not sure if there's something in this document that does.

21  So only thing that I can say about this is 7.5 is greater than

22  5 percent.

23  Q.   Thanks, Sheriff Jones.  And if you look at page 107-3.

24  Would you agree that at the top of that page, the Bureau of

25  Labor Statistics indicates that gasoline prices rose

1  40 percent over the last year?

2  A.  Yes, ma'am.

3  Q.  And some staff have --

4      MR. HALL:  Objection, Your Honor.  What she's asking

5  the sheriff to read is a Consumer Price Index for all urban

6  consumers, and there's been no predicate that Mississippi

7  falls within that definition.  Now, if she wants to ask about

8  the Mississippi inflation rate, I think that's the better

9  analogy to make, but with respect to what she's offering, Your

10 Honor, it's apples and hand grenades.

11     THE COURT:  Objection sustained.

12 BY MS. COWALL:

13 Q.  Some staff have to drive quite a ways to get to work in

14 Raymond or Henley-Young, don't they?

15 A.  Say what now?

16 Q.  Some staff have to drive quite a ways to get to work in

17 Raymond or at Henley-Young; right?

18 A.  Ma'am, I'm sure people drive from all surrounding areas

19 to get to work, but I can't specify who drives the furthest or

20 where the furthest employee drives from their house to get to

21 work.

22 Q.  And staff currently have to drive to the jail to pick up

23 paper checks; correct?

24 A.  I don't know, ma'am.  I don't know -- well, let me say

25 this:  I'm not sure of the process of how the detention

1    officers are given their checks.  I'm not sure if they get

2    them when they come to work or if they make a special trip to

3    pick up their check.  I don't know.  But I think what you're

4    asking is about the issuing of paper checks, it's my

5    understanding, yes, they do -- or they are still issued a

6    paper check, yes.

7    Q.   Now, you spoke on your direct exam about retention and

8    recruitment report by Mr. Matt Rivera; correct?

9    A.   Yes, ma'am, I did.

10   Q.   And he was the retention consultant hired by the County

11   to comply with the stipulated order; correct?

12   A.   It's my understanding he was hired by the monitors to

13   address retention and recruitment or whatever it is.

14   Q.   But the County was required to complete that action on

15   its own; correct?

16   A.   It's my understanding, yes.

17   Q.   And the County failed to do that, correct, within the

18   time required by the stipulated order?

19   A.   I'm not sure, ma'am.

20        MR. COWALL:  Let's pull up Plaintiff's Exhibit 2,

21   please.

22   BY MR. COWALL:

23   Q.   Can you look at the second page, provision B-4.

24   Actually, the third page.  Fourth page.

25        If you look at number 3 at the top of page 5, does that

1  state "Within four months, with the assistance of the

2  recruitment and corrections consultant, the County shall

3  develop a recruitment and retention plan to implement the

4  substantive requirements of the settlement"?

5  A.   Yes, it does.

6  Q.   And this document was filed January 16, 2020, correct?

7  A.   That's correct.

8  Q.   So the County needed help from the monitor to get this

9  done then; right?

10  A.   The County what?

11  Q.   Needed help from the monitor to get this done?

12  A.   That's my understanding.

13  Q.   It wasn't done on time, was it?

14  A.   I received it in January of 2022.  What happened in

15  between that time, I can't testify to.  I'm not exactly sure.

16  Again, I was not familiar with this even being conducted until

17  I got it in my office in January of this year.

18  Q.   Would that report have been helpful to have gotten

19  sooner?

20  A.   You mean sooner in my administration?

21  Q.   Sooner, sure, in your administration, yes.

22  A.   I think that that was rather soon in my administration.

23  I think I had been in office a little bit -- maybe five weeks

24  or so when I received it.  But once I received it, I read it,

25  and I began taking immediate action regarding some of the

 1    issues in this report and addressing some of the issues in

 2    this report as well.

 3    Q.   So you agree the report was helpful?

 4    A.   I agree that there were some helpful topics in the

 5    report, but there are several things in the report that I

 6    disagreed with as well.

 7    Q.   Now, speaking of leadership at the jail, you went before

 8    the Board to appoint a new jail administrator; is that

 9    correct?

10    A.   Yes.  That has been discussed.  We have hired -- I guess

11    contracted a new jail administrator, yes.

12    Q.   And that person is Mr. Frank Shaw; correct?

13    A.   Yes, ma'am, it is.

14    Q.   Mr. Shaw's experience is with prisons, not jails;

15    correct?

16    A.   That's my understanding.

17    Q.   And did you -- how did you come up with Mr. Shaw's name?

18    A.   I had -- after my meeting on January 5th with Kathryn

19    Bryan, I felt that it was time for me to start having some

20    discussions about moving forward with my administration and

21    the jail administrator, and I felt that it was very important

22    to start having this discussion, so I consulted with our

23    attorneys that are representing us, and I was referred

24    Mr. Frank Shaw by some of the attorneys that are representing

25    us.

1    Q.   Is that because they've worked with him previously?

2    A.   It's my understanding that they have, yes.

3    Q.   Now, was Mr. Shaw initially going to be the permanent

4    jail administrator?

5    A.   No, ma'am.  There was never an intention to have him as a

6    permanent jail administrator, but he would be an interim jail

7    administrator moving forward while we conducted a search for a

8    new permanent jail administrator.

9    Q.   I'd like to show you what will be marked as Plaintiff's

10   Exhibit 102.

11          MS. COWALL:  May I approach, Your Honor?

12          THE COURT:  You may.

13   BY MS. COWALL:

14   Q.   I'd like to direct your attention to the second page of

15   this news article, under the heading "Interim Jail

16   Administrator Appointed."

17   A.   Yes, ma'am.

18   Q.   Does that state "Jones appointed current detention center

19   Assistant Warden Anthony Simon as interim jail administrator

20   Monday.  He said he plans to announce Bryan's permanent

21   replacement soon.  The person, who Jones declined to name, has

22   been offered the job, but the hiring process hasn't been

23   completed."  Is that what that states?

24   A.   Yes, it does.

25   Q.   Now, did you vet Mr. Shaw before recommending that the

1   Board hire him as your new jail administrator?

2   A.   Yes, I did.

3   Q.   Did you know that he was the warden of East Mississippi

4   Correctional Facility from 2012 to 2020?

5   A.   Yes, ma'am, I did.

6   Q.   And did you know that facility has been the subject of

7   federal civil rights litigation regarding conditions there?

8   A.   Yes, ma'am.  And I also read the opinion of the federal

9   judge issued in that case as well in regards to Mr. Frank

10  Shaw.  He put in his opinion that Mr. Frank Shaw was providing

11  good leadership, and he had several positive things to say

12  about the leadership of Mr. Frank Shaw during that particular

13  time as well.  And I took that into consideration, especially

14  with the dire situation that the Hinds County detention

15  facilities are currently under right now as well.

16  Q.   Now, in your vetting of Mr. Shaw, did you come across a

17  New York Times article about him?

18  A.   No, I did not.

19       MS. COWALL:  Your Honor, may I approach the witness,

20  please?

21       THE COURT:  You may.

22  BY MS. COWALL:

23  Q.   Now, Sheriff Jones, this is a New York Times article

24  entitled "Inside a Private Prison:  Blood, Suicide and Poorly

25  Paid Guards"; correct?

1    A.   Yes, ma'am, it is.

2    Q.   And it's dated March 4th, 2018; is that correct?  Excuse

3    me.  April 3rd, 2018.

4    A.   April 3rd, 2018, yes, ma'am.

5    Q.   And this states "On the witness stand and under pressure,

6    Frank Shaw, the warden of East Mississippi" --

7         MR. HALL:  Objection, Your Honor.  Excuse me.  Hearsay.

8         MS. COWALL:  I'm not asking him anything about the

9    truth of the matter asserted.

10        THE COURT:  You may ask your question.

11   BY MS. COWALL:

12   Q.   This states "On the witness stand and under pressure,

13   Frank Shaw, the warden of the East Mississippi Correctional

14   Facility, could not guarantee that the prison was capable of

15   performing its most basic function.

16        "Asked if the guards were supposed to keep inmates in

17   their cells, he said, wearily, 'They do their best.'"

18        My question is whether you had read that before

19   recommending Mr. Shaw.

20   A.   No, I had not.

21   Q.   And it's important for inmates to be able to be kept in

22   their cells; correct?

23   A.   Yes, ma'am.  I stressed that earlier when we specifically

24   discussed Pod A at the Raymond detention facility.

25   Q.   Doing one's best isn't enough to secure -- when it comes

1  to securing inmates in their cells; correct?

2  A.  I can't testify to that because I'm not exactly sure what

3  those conditions were.  To say guards do their best -- we can

4  say we do our best right now even though the cell doors in

5  Pod A don't lock.  So I can't testify to that because I'm not

6  exactly sure what the specific conditions was of this

7  facility, and, again, this is something that I've just seen.

8  Q.  Do you think it's enough in general for a jail to do its

9  best to keep inmates secure?

10  A.  I think that jails should keep their detainees or inmates

11  secure.

12  Q.  And if you turn to page 4 of this article --

13      THE COURT:  If you're going to read something from it,

14  slow down just a little bit.

15  A.  Is this page 4 here?

16  BY MS. COWALL:

17  Q.  Yes, Sheriff Jones.

18  A.  Okay.

19  Q.  Where it states "The warden said that he had been unaware

20  of cases in which inmates had been so badly beaten that they

21  required hospitalization, and that he had not disciplined

22  guards who failed to ensure that inmates were unable to jam

23  door locks and leave their cells."  And that's referring to

24  Mr. Shaw; correct?

25  A.  That's what it says, yes.

1    Q.   And it also says "When Mr. Shaw was asked about the

2    variety of homemade objects used to commit assaults at the

3    prison, he was dismissive.  'Inmates have weapons,' he said.

4    'It's a fact of life.'"

5         Are you concerned that was Mr. Shaw's response to a

6    question about weapons in a correction facility?

7    A.   I'm not concerned, necessarily, about it because, I mean,

8    I agree with it.  There are weapons in correctional

9    facilities.  There are homemade shanks in the Raymond

10   Detention Center.  That's why it's very important to conduct

11   random shakedowns, so that way you will be able to stop this

12   from happening as well as recover weapons in the facility as

13   well.  So I can't think of a prison or a jail where detainees

14   don't at some point introduce some type of homemade weapon

15   that they made while they were in there.

16   Q.   So your testimony is that you didn't have concerns about

17   this statement in the article?

18   A.   Ma'am, I testified that until you just gave me this

19   article, I had never seen it.  So I can't say what I was

20   concerned about when I've never read it before.

21   Q.   So were you also unaware that Mr. Shaw had previously

22   been a warden at an Arizona prison where a state report

23   determined a riot there was sparked by his company's culture

24   of disorganization, disengagement, and disregard of policies

25   and fundamental inmate management and security principles?

1    A.   Yes, ma'am, I am familiar with that.  And I spoke with

2    Mr. Shaw regarding that.  It's my understanding when we spoke

3    about that, he had just been at that facility for two weeks.

4    Q.   Do you know why it wasn't listed on his resume, that

5    facility?

6    A.   I'm not exactly sure.

7    Q.   So Mr. Shaw has a six-month contract; is that correct?

8    A.   Yes, ma'am, that's correct.

9    Q.   So he'll be here until mid to late August; is that

10   correct?

11   A.   Yes.

12   Q.   So there isn't an anticipation of a permanent jail

13   administrator until August; is that right?

14   A.   We're doing a search for a jail administrator, a

15   current -- I'm sorry, a permanent jail administrator.

16   Q.   And how long is that anticipated to take?

17   A.   I don't have a time frame right now, but I can tell you

18   an active search is ongoing.  I have gotten about two resumes

19   from people interested so far as well.

20   Q.   And who are those two people?

21   A.   I don't have the names with me right now, ma'am.

22   Q.   So the jail administrator is supposed to oversee the

23   jail; correct?

24   A.   Yes, ma'am.  The jail and all of detention services.

25   Q.   But in the past few months, the jail administrator was

1    left out of decisions regarding the jail; correct?

2    A.   No, ma'am, that's not true.

3    Q.   I'd like to draw your attention to what's been previously

4    admitted as Plaintiff's Exhibit 86.  You testified that you're

5    familiar with the jail's quality assurance monthly reports;

6    correct?

7    A.   Yes.

8    Q.   And if you look at page 10, second full paragraph.  Does

9    this state "Major Bryan is now receiving information from IAD

10   investigations; however, she is not involved in the

11   disciplinary actions concerning detention staff.  Sheriff

12   Jones and Major Bryan will have to discuss her role in this

13   particular area.  As the detention administrator who is

14   present on-site daily, there should be some level of

15   discretion granted to afford her input in suspensions,

16   terminations, *et cetera*.  This will be revisited in future

17   reports."

18        That's what that states; correct?

19   A.   Absolutely.  But are you asking me has this been done --

20   Q.   No.

21   A.   -- had this been implemented?

22   Q.   I'm just asking if that's what this states.

23   A.   Yes, it does.

24   Q.   Thank you.

25        Now, you're aware the parties jointly selected Lisa

1    Simpson to monitor compliance with the consent decree; right?

2    A.   Yes, ma'am, I am.

3    Q.   And you agree the monitor and her team are experts in the

4    decree areas they monitor?

5    A.   I tend to disagree with some of that due to an encounter

6    that I had with Dave Parrish when I first got employed with

7    the Hinds County Sheriff's Office due to his request for me to

8    do something that I would have considered unethical under my

9    leadership and me being a sworn law enforcement officer.

10        Mr. Parrish does not have any law enforcement experience

11   nor investigative experience.  And he asked me to do something

12   regarding a several-years-old case where an inmate died -- or

13   a detainee died in the detention facility and it was ruled a

14   homicide.  There were several suspects that had been

15   identified, charged, and indicted for this murder.  This

16   murder happened probably about two or three years before I

17   even came to the Hinds County Sheriff's Office.

18        He wanted me -- he said that he didn't agree with

19   something about the investigation and he wanted me to go back

20   and write an opinion about the investigation.  He asked me to

21   do this about two or three times, and each time he asked me

22   that, I told him no, because anything that I documented

23   regarding that investigation, especially my opinion, would be

24   open to disclosure for a case that was pending an upcoming

25   trial.

```
1   Q.   And your background is in law enforcement, correct, not
2   detention?
3   A.   Absolutely.
4   Q.   And your attorneys have not objected to the
5   qualifications of the monitoring team leading up to this
6   proceeding; correct?
7   A.   No.  You --
8        MR. HALL:  Objection, Your Honor.  She knows very well
9   we've made several objections to that.
10       THE COURT:  Objection sustained.
11  BY MS. COWALL:
12  Q.   You don't dispute that Mr. Parrish is an expert in
13  correctional administration, though; do you?
14  A.   No.
15  Q.   I'd like to pull up Exhibit 41.  I believe you testified
16  that you've reviewed the monitoring reports; is that right?
17  A.   Yes.
18  Q.   Do you disagree with any of monitors' compliance findings
19  in their most recent monitoring report?
20  A.   Yes.  And I also know that there were things that should
21  have been in the monitoring reports that were not reflected in
22  the monitoring reports as well.
23  Q.   And there's a process for parties to submit report
24  comments to the monitors; correct?
25  A.   There's a process for what now?
```

1   Q.   Providing comments to the monitors regarding their draft

2   reports.

3   A.   Comments between who?

4   Q.   Between the parties and the monitor.

5   A.   Yes, ma'am.  But as I stated earlier, I haven't had any

6   dialogue with the monitors since I've been in office with the

7   exception of the week that they did their on-site visit.

8   Q.   And nothing prevents you from reaching out to the

9   monitors; correct?

10  A.   No, it didn't.

11  Q.   You're entitled to have ex parte communication with the

12  monitors; correct?

13  A.   Yes.

14  Q.   Do you disagree with any of the monitors' recommendations

15  in their most recent monitoring report?

16  A.   No, I don't.

17  Q.   Have you asked the monitors how they would prioritize the

18  requirements of the consent decree?

19  A.   No.  We had a discussion when I met with the monitors.

20  We discussed issues at the detention facility.  I think that

21  it would be more my responsibility as well as the jail

22  administrator as well to identify some of the priority things

23  that should be addressed, which I'm well aware of as well.

24  Q.   So have you provided a written plan for those

25  prioritizations?

1876

1    A.   You say have I provided a written plan?

2    Q.   Yes.

3    A.   No.  But there has been a lot of communication about

4    those plans, things that we consider a priority.  I mean, I

5    read the reports, and the reports require communication.  I

6    have been in communication regarding the things I would

7    consider to be priority.

8    Q.   Communication with whom?

9    A.   I've been in communication with the new interim jail

10   administrator.  I've been in communication with the Board, the

11   County attorney.  We talked about these things because, of

12   course, without the cooperation of the Board, these things

13   wouldn't be possible.  So I have to have communication with

14   them regarding some of the issues.

15   Q.   But have you reached out to the monitors to ask how they

16   would prioritize their recommendations?

17   A.   No, I have not.

18   Q.   I want to go back for a second to what you had said about

19   overtime.  You testified that deputies can choose to do

20   overtime in details in the community; right?

21   A.   I never said deputies do overtime in the community.  We

22   have a policy that allows deputies to work part-time jobs and

23   cash assignments outside of the Hinds County Sheriff's Office.

24   Q.   And those assignments may be more appealing than working

25   in the jail; correct?

1    A.   Are you asking my opinion?

2    Q.   Sure.

3    A.   I don't know.

4    Q.   And you didn't provide any incentive to work in the jail

5    versus working at Kroger, did you, in terms of overtime or

6    off-duty assignments?

7    A.   No.  But what I did say was, and I still stand to this

8    today, that I was not going to terminate our off-duty policy

9    for Hinds County deputies, but at the same time we made sure

10   the deputies knew that there was overtime available in

11   detention if they desired to work overtime as well.

12   Q.   That actually wasn't my question.  My question was about

13   providing an incentive to do jail overtime as opposed to

14   off-duty assignments in the community.

15   A.   What is the incentive outside of offering overtime?  I

16   can't -- I think you're asking me something based on an

17   individual-by-individual basis.  It would be up to them to

18   determine whether or not working in the jail for overtime is

19   more beneficial than going to work a part-time job or an

20   off-duty detail.

21   Q.   So individual staff members would have to make that

22   choice?

23   A.   That's up to each individual to make the choice whether

24   or not they want to work a cash assignment or to work overtime

25   in the jail.  What did I say was they were still going to be

1878

1    afforded that opportunity to make that decision, because I was

2    not counseling or forfeiting our long-standing, off-duty

3    employment for Hinds County deputies.  And to be honest with

4    you, I believe that we would have had a mass exodus of not

5    only sworn officers but detention officers as well, because,

6    again, you have detention officers that work and depend on

7    off-duty assignments as well.

8    Q.   So there wasn't any financial incentive to work in the

9    jail versus off-duty assignments in the community?

10   A.   Ma'am, when you say "incentives," the only incentive that

11   you have for working overtime in the jail is overtime pay.

12   That's the only incentive there is.  I'm not exactly -- we

13   can't offer them anything outside of overtime pay is what I'm

14   trying to say.  Overtime was available.  There's no other

15   incentive to go along with that.

16   Q.   And that's because the Board hasn't approved any kind of

17   incentive; correct?

18   A.   I'm not aware of an incentive ever being proposed.  At

19   one time there was no overtime policy with the Hinds County

20   Sheriff's Office.  The Board approved for overtime to be

21   available for detention.  Sworn deputies in law enforcement

22   and other areas of the sheriff's office are not even eligible

23   to work overtime in their respective divisions.  There's only

24   overtime available in detention, whereas in the past that was

25   not even available as well.

1    Q.   Okay.  And you testified that staffing the off-duty

2    assignments at Kroger, for example, helps public safety;

3    correct?

4    A.   Yes, it does.

5    Q.   And would you agree that staffing the jail also improves

6    public safety?

7    A.   Yes, ma'am, it does.

8    Q.   Now, I believe that you testified that you were familiar

9    with an interim report filed by the monitors in October 2021;

10   correct?

11   A.   You talking about regarding the death of MR?

12        MR. COWALL:  Let's go ahead and pull up Plaintiff's

13   Exhibit 40.

14   BY MR. COWALL:

15   Q.   Is this the report that you reviewed?

16   A.   Yes, that's the report I'm referring to.

17   Q.   I'd like to show you page 4 of this report.  And if you

18   take a minute and look at the bullet points on this page.

19   A.   Yes, ma'am.

20   Q.   So these are concerns voiced by the monitors after the

21   homicide of MR in the jail; correct?

22   A.   That's my understanding, yes.

23   Q.   Do you share these concerns voiced by the monitors?

24   A.   Did I what?

25   Q.   Do you share the concerns voiced by the monitors in these

```
 1  bullet points?
 2  A.   What do you mean "share"?  Do I agree?
 3  Q.   Correct.
 4  A.   Well, I wasn't the sheriff when this happened, so I can't
 5  necessarily reflect back to this report directly related to
 6  the death of MR.  It's my understanding at this particular
 7  time this is what they published.
 8  Q.   But you've reviewed this report; correct?
 9  A.   Yes, ma'am, I have.
10  Q.   Have you created any corrective action plans based on the
11  concerns identified by the monitors?
12  A.   Yes, ma'am, I have.  And that's why I held the detention
13  officers that were in policy violations accountable for their
14  actions surrounding the death of MR as well.  Some of the
15  other issues that are included in here are still ongoing
16  efforts in detention that are being currently addressed today.
17  Q.   So your corrective action and response to this report was
18  to fire the officers involved in the MR homicide; is that
19  right?
20  A.   That's not what I said.  That was a component of some of
21  the issues that surrounded the death of MR.  I held those
22  detention officers accountable for the several policy
23  violations.
24  Q.   And have you created any written corrective action plans
25  based on these concerns here?
```

1    A.   No, I have not.

2    Q.   And you're aware that the monitors conducted a site visit

3    the week of January 24, 2022; correct?

4    A.   Yes.

5    Q.   And you actually received the site visit schedule via

6    e-mail; didn't you?

7    A.   Yes.  But there had been modifications to the one that I

8    received, yes.

9    Q.   So you're aware of both the schedule and modifications to

10   the schedule?

11   A.   I was not aware of all the modifications, no.

12   Q.   But you were aware of some modifications, you said?

13   A.   I said I understand that there were some modifications,

14   but I wasn't aware of all the modifications.

15   Q.   Did you ask someone what the modifications were?

16   A.   No, I never asked anyone.  Well, let me say this:  I

17   learned about the modifications later.  There was, I think,

18   maybe some time and days adjusted and some other things that

19   happened, but I was there for the site visit.  I was abreast

20   of what was going on while the monitors were here.  I was left

21   out of meetings, like I said earlier, as well.

22   Q.   So you were left out of the meetings despite that the

23   meetings were arranged by County employees; correct?

24   A.   When you say "County employees," who are you speaking of

25   specifically?

1  Q.   Well, for example, the compliance coordinator.  He's the

2  person who arranges the meetings; correct?

3  A.   And I didn't get that meeting from the compliance

4  coordinator regarding the jail.  I expressed that earlier.

5  Q.   And the compliance coordinator is an employee of the

6  County; correct?

7  A.   He's an employee of the County, not the sheriff's office.

8  Q.   So having missed that exit meeting, did you ask the

9  monitors for feedback from the last on-site visit?

10  A.   You said since I missed the meeting?

11  Q.   Because you missed the meeting, did you ask the monitors

12  for feedback from the site visit?

13  A.   No.  I knew that there would be a report to follow it.

14  Q.   So you were just going to wait for the report, then?

15  A.   Yes.

16  Q.   Now, I believe that you said that you were aware of the

17  monthly quality assurance reports put out by the jail's

18  quality assurance officer; correct?

19  A.   Yes, ma'am, that's correct.

20  Q.   Do you agree that they identify significant concerns?

21  A.   Yes, they do.

22  Q.   And were you aware that Sheriff Vance did meetings on

23  these quality assurance reports?

24  A.   Yes.  I understand that he may have attended some

25  meetings or something like that.  I don't know.  That's my

1   understanding.  That's what was told to me.  He and I never

2   had that conversation, so I can't confirm one way or the

3   other, and he's not here to confirm it himself.

4   Q.   And you haven't requested meetings on these monthly

5   quality assurance reports, have you?

6   A.   Ma'am, as I stated earlier, I didn't even know that

7   meetings existed under my administration regarding quality

8   assurance reports.

9   Q.   So you read the reports and didn't request meetings based

10  on them?

11  A.   It's my understanding that before the report is even

12  published, that there's a meeting held with several people

13  regarding the report.  I have not been included in any of

14  those meetings.

15  Q.   Did you ask to be included?

16  A.   Ma'am, I just found out about the meetings recently.  I

17  think they're being held maybe once a month, something like

18  that.  I haven't been the sheriff but a few months.  I don't

19  think there's been a large amount of meetings regarding

20  quality assurance reports.

21  Q.   And you haven't asked for any of those meetings to occur

22  that were not already occurring?

23  A.   The quality assurance coordinator is the one that

24  schedules the meeting and makes sure that the people are at

25  the meetings.  She had the jail administrator there.  Why

1   wasn't I advised or aware of the meeting myself?  So I can't

2   answer that question.

3   Q.   And both of those people report to you; correct?

4   A.   The quality assurance person reports directly to the jail

5   administrator, yes.

6   Q.   And the jail administrator reports to you; correct?

7   A.   Yes.  And again, she didn't make me aware or abreast of

8   any meetings that were being held regarding the quality

9   assurance reports.

10  Q.   And you didn't ask her to schedule a meeting for you?

11  A.   Ask who, ma'am?

12  Q.   The quality assurance coordinator.

13  A.   Regarding the reports?

14  Q.   Right.

15  A.   No.  I just read the reports once they were delivered to

16  me, given to me.

17  Q.   Let's go ahead and look at the January '22 quality

18  assurance report, which is Plaintiff's Exhibit 106.

19       Now, I want to talk first about policies.  If you'll look

20  at page 1, the fourth paragraph, this states "The policy

21  process has slowed considerably due to the absence of the

22  policy coordinator"; correct?

23  A.   That's correct.  Policy coordinator, my understanding,

24  when I took office was out sick or something like that.

25  Q.   And if you go to page 4, the third paragraph, this states

1    "There are a total of 56 outstanding policies"; correct?

2    A.   Outstanding policies?  Yes.

3    Q.   And if you look below that paragraph to the currently

4    approved policies, policies now in committee review, and

5    policies forwarded to the Department of Justice for approval,

6    what's the total for those three categories?

7    A.   Twenty-five.

8    Q.   And if you look at the next page, it looks like there are

9    33; correct?

10   A.   That's correct.

11   Q.   And then there's also seven now in committee review;

12   correct?

13   A.   That's correct.

14   Q.   And it looks like there were three forwarded to the

15   Department of Justice; correct?

16   A.   Yes, ma'am.

17   Q.   So the number of outstanding policies exceeds the number

18   of policies that have been completed at any level; correct?

19   A.   That's correct.

20   Q.   Now, lack of technology impedes the County's ability to

21   recruit jail staff; right?

22   A.   Yes, it does.

23   Q.   If I want to work at the jail, I can't apply online, can

24   I?

25   A.   Yes, you can apply online for employment with the Hinds

1    County Sheriff's Office.

2    Q.   But I still have to drop off a paper application?

3    A.   I don't know exactly how it works, but you can apply

4    online, yes.

5    Q.   So let's look at the same report, page 3, the second to

6    last paragraph from the bottom of the page.  If you look at

7    the second half of that paragraph, it states "The plan noted

8    the lack of technology being used to attract applicants, such

9    as on-line applications and virtual interviews.  There is an

10   application on the Hinds County website, but a prospective

11   employee still has to bring in the application and be

12   interviewed."  Is that what this states?

13   A.   Yes.

14   Q.   Let's talk about attrition.  Do you know how many cadet

15   classes there were last month?  Is it one cadet class last

16   month?

17   A.   We have a cadet class in session now that's scheduled to

18   graduate this week, I think it is.

19   Q.   And do you know how many candidates there are?

20   A.   I think there may be six or seven.

21   Q.   Were there initially nine?

22   A.   I don't know, ma'am.

23   Q.   Let's go ahead and look at page 4 of that same report,

24   the first paragraph.  So it looks like the new cadet training

25   class began January 31st with nine candidates, of which one

1    has left the agency.  Is that what that states?

2    A.   Yes, ma'am, it does.

3    Q.   So people have dropped out already from the cadet class

4    in this past month, correct?

5    A.   I noted there was one person that was in the class

6    erroneously.  They shouldn't have been in that class.  Now, as

7    it relates to the other ones that have dropped out, you asked

8    me how many were in the class.  I do know that there were some

9    that left.  I can't specify as it relates to the reasoning

10   behind it, but there are six or seven left in the class now.

11   Q.   Okay.  And if you look at that paragraph right

12   afterwards, it talks about field training officer program;

13   correct?

14   A.   Yes, ma'am, it does.

15   Q.   And the last sentence indicates that one of the graduates

16   from the first FTO training program has already left the

17   agency to work for another agency at a higher salary; correct?

18   A.   That's correct.

19   Q.   What's the jail's staff turnover rate?  Do you know?

20   A.   What's the what?

21   Q.   The jail's staff turnover rate?

22   A.   I'm not exactly sure of the percentage or number-wise,

23   but I won't dispute the fact that there is a concern regarding

24   the turnover rate in detention services.

25   Q.   Now, if I proffer to you that Sheriff Vance told the

1    Court in February of last year the jail had hired over 100

2    people but lost 60 people, would you disagree with that?

3    A.   No, I won't.

4    Q.   That kind of turnover affects staffing levels; right?

5    A.   Yes, ma'am, it does.

6    Q.   And it affects training too, doesn't it?

7    A.   Yes, ma'am, it does.

8    Q.   You waste resources training people who don't stay on;

9    right?

10   A.   What now?

11   Q.   You waste resources training people who don't stay on;

12   right?

13   A.   Yes, ma'am, that's true.

14   Q.   And it's harder to develop a pool of experienced

15   officers; correct?

16   A.   Yes, ma'am, it is.

17   Q.   And you need experienced officers to be field training

18   officers; right?

19   A.   Yes, ma'am, you do.

20   Q.   And to be supervisors; correct?

21   A.   Yes, ma'am.

22   Q.   Now, I'd like to talk to you about detainees with serious

23   mental illness in your custody and some information in this

24   January report.

25        Were you aware that during rounds last month, several

1    detainees were in various stages of uncleanliness:  Two were

2    covered in feces, two had suffered considerable weight loss,

3    and two were covered in sores, with one having to be

4    hospitalized for treatment?

5    A.   That's my understanding according to the quality

6    assurance report, yes.

7    Q.   And detainees were not receiving meals because another

8    detainee was actually taking everyone's food and eating it;

9    correct?

10   A.   Again, these are things that are documented in the

11   quality assurance reports.  Outside of the quality assurance

12   reports, I haven't seen or received any type of documentation,

13   nor do I even know if it exists.  These are things in the

14   quality assurance report with nothing available to necessarily

15   support some of that.  So the only thing that I can tell you

16   is what I've read, which is the same thing that you're reading

17   right now.

18   Q.   When did you read that?

19   A.   After the report came out.  I can't remember the exact

20   date.

21   Q.   Did you follow up on this information?

22   A.   Yes, I did.

23   Q.   And did you order any corrective action based on this?

24   A.   I asked that it be monitored, and I also asked was there

25   any other type of documentation to support this, and there was

```
 1   not any other type of documentation.

 2   Q.   Did you issue any written directives?

 3   A.   No, I did hot.

 4   Q.   Do you think it's a symptom of jail dysfunction to have

 5   detainees with serious mental illness covered in feces?

 6   A.   Yes, ma'am.  That is concerning.

 7   Q.   Do you think it's a symptom of jail dysfunction that

 8   detainees with serious mental illness are having their food

 9   stolen and losing significant weight?

10   A.   I think it is, but I can't confirm if that happened or

11   not because there's no report or no documentation to reflect

12   that other than what's in that report.  So what I'm saying is

13   I would like to see the source that that information was

14   provided to be able to be put into the quality assurance

15   report, because there's no documentation in existence to

16   support that.

17   Q.   And you're entitled to see that documentation at any

18   time; correct?

19   A.   Yes, ma'am, I am.  I should be, yes.

20   Q.   And do you think it's a symptom of jail dysfunction that

21   detainees with serious mental illness are covered in sores?

22   A.   I wouldn't say jail dysfunction, but I will say that

23   that's concerning.  You have sick people in jail.  You have

24   sick people that are suffering from both mental and physical

25   sicknesses as well.  So I would just say that it's concerning.
```

1    How it relates to jail dysfunction, I can't go on the record

2    and say that's related directly to jail dysfunction because

3    you have sick people, mentally and physically, in every jail

4    in America.

5    Q.   But with regard to these particular conditions, these

6    outcomes indicate a significant lack of staff supervision,

7    don't they?

8    A.   Ma'am, like I said, outside of what you're reading right

9    now, I have not seen or know of any documentation to support

10   any of that -- what's in that report.  And moving forward,

11   we're going to implement that -- everything that's included in

12   that quality assurance report, because there are some very

13   concerning issues regarding the quality assurance reports that

14   I have seen.  And we're going to make sure that we take the

15   actions we need to take as it relates to documentation to

16   support these things that are in the quality assurance reports

17   instead of just depending on the report itself.

18   Q.   Now, it took some time for those conditions to develop;

19   correct?  Someone doesn't suffer noticeable weight loss

20   overnight?

21   A.   Again, ma'am, I'm still going to go back to what I'm

22   saying.  The only thing that I can do or I have done is read

23   exactly what you're reading off of that paper.  I can't -- I

24   don't have anything to reflect that that actually happened or

25   if that even exists.  But, now, if you're asking me does it

1    concern me, yes, it does.  If you're asking me is it related

2    directly to jail dysfunction, I will again go back to my

3    original statement:  I can't relate that to jail dysfunction

4    because I'm not aware of it.  First of all, it's not

5    documented how it is related to jail dysfunction, and, again,

6    people in every jail in America suffers from some type of

7    physical ailment or mental ailment as well.

8    Q.  So is it your testimony that people in every jail suffer

9    serious weight loss because their food is being stolen?

10   A.  I think I just testified to that, ma'am.  And once again,

11   I can't confirm if that happened or not.  You're reading

12   something off of a piece of paper the same way that I did.  I

13   can't confirm if an inmate's food was stolen or not.  I

14   haven't seen any documentation, nor do I think that the

15   documentation even exists.

16        But are you asking me if I'm concerned about it if did

17   happen and if it is happening?  By all means, yes.  Will I

18   take corrective action or corrective measurements to see to it

19   that it doesn't happen?  Yes, ma'am, I will.  But there needs

20   to be documentation to go along with these type of incidents

21   that are reported in quality assurance reports so that we know

22   that we're properly addressing these situations instead of

23   just having a report without the documentation on file to

24   support the content of the quality assurance reports.

25   Q.  So did you ask to review medical records to see if they

1   substantiated what was in your quality assurance officer's

2   report?

3   A.   No, I did not.

4   Q.   Hinds County Jail doesn't have a mental health unit;

5   right?

6   A.   There is a mental health unit that is under way.  It's my

7   understanding that that mental health unit was addressed prior

8   to me taking office.  I learned of it before I took office.

9   After I was elected, I went down and toured the jail, and I

10  understood that there is an area that has been designated for

11  mental health, and I want to say that it's in B-Pod.

12  Q.   And there's been talk of getting this mental health unit

13  off the ground for years; right?

14  A.   I can't elaborate on how long it's been.  I do understand

15  in the past there has been an issue regarding it, but I can

16  say at this particular point that it has been addressed and

17  it's under way.

18  Q.   And County approvals are required to set up the mental

19  health unit; right?

20  A.   When you say "County," what division of the County are

21  you referring to?

22  Q.   Well, for example, to get desks, chairs, and other

23  furniture, those things haven't been approved yet, have they?

24  A.   I'm not sure, ma'am.  I'm not -- again, this is something

25  that happened before I -- before I took office.  There have

1894

1    been some things ordered, but I can't elaborate on

2    specifically if they were for the mental health unit as it

3    relates to chairs and desks and all of that.  I'm not sure,

4    ma'am.

5    Q.   Okay.  But you read the January '22 QA report; right?

6    A.   Yes.

7    Q.   Let's look at page 6, the fifth paragraph.

8    A.   Which paragraph, ma'am?

9    Q.   Beginning with, "The furnishings for the mental health

10   unit, desks, chairs, and other furniture needed for staff's

11   use, were selected from surplus, but the submitted purchase

12   order had not been approved as of January 31, 2022.  Upon

13   inquiry, I was advised the County does not have the funds in

14   the budget to purchase the items and that HCSO will have to

15   wait to order any items needed in detention services."  Is

16   that what this states?

17   A.   That's what it states, but I will have to disagree with

18   that.

19   Q.   And so you're saying that this -- the furnishings have

20   been --

21   A.   Now, let me --

22   Q.   -- given?

23   A.   No.  What I'm saying is I'm not exactly sure where we are

24   with this particular requisition, but "the County does not

25   have funds in the budget to purchase the items and that Hinds

1    County SO will have to wait to order any items needed in

2    detention services," I'll have to disagree with that, because

3    we have gotten 100 percent full cooperation from the Board as

4    it relates to ordering things and needed things for detention

5    services, but as in any other government, there's a process

6    that has to be honored.

7    Q.   And that process can be lengthy; correct?

8    A.   It can be lengthy at times, but that's County government,

9    and that's the process.

10   Q.   So if you saw something in this report that was

11   incorrect, why didn't you contact Ms. Dawson and let her know?

12   A.   We did speak with Ms. Dawson.  My attorney and I met with

13   Ms. Dawson, and we talked to her specifically about her

14   report.  So we did talk about it.

15   Q.   But she didn't issue any correction as to this statement

16   in the report; right?

17   A.   No, she didn't correct it, but we addressed her quality

18   assurance reports with her and some of the content that was

19   being put into the reports as well.

20   Q.   Now, you've been here throughout this hearing, so you've

21   heard concerns about training; correct?

22   A.   You say training?

23   Q.   Yes, training.

24   A.   Yes, ma'am, I have.

25   Q.   And detention staff needed to work in the mental health

1    unit still haven't been trained yet; correct?

2    A.   It's my understanding that there should be training

3    provided for them, yes.

4    Q.   But that hasn't happened yet; correct?

5    A.   I think the class got canceled or some classes got

6    canceled due to a staff shortage, but Kathryn Bryan canceled

7    that maybe back in December.

8    Q.   And that was also because the trainer hadn't been paid;

9    correct?

10   A.   I can't advise.  I don't know.

11   Q.   Well, let's look at the November quality assurance

12   report, paragraph 42 -- or, excuse me, Exhibit 42.  Let's turn

13   to page 6.  In the last paragraph, does that state "There is

14   still a wait for mental health staff to be hired because of a

15   significant delay by the County when they are slow to approve

16   the contract in a reasonable time frame"?

17   A.   Yes.  That's what it says, yes.

18   Q.   So you don't disagree with that statement?

19   A.   I don't have any knowledge of it.

20   Q.   But you reviewed this report; correct?

21   A.   You say this is the November report?

22   Q.   Yes.

23   A.   So is this the one that came out in December?

24   Q.   November.

25   A.   No.  I wasn't the sheriff in November.

1    Q.   So you didn't review any quality assurance reports from

2    before you became sheriff?

3    A.   I did.  I did go back and review some, but I just can't

4    remember if this is one of the ones that we went back and

5    reviewed and discussed.  I'm not sure, ma'am.

6    Q.   Okay.  Now, you've been here throughout this hearing, so

7    you've heard concerns about staff performing welfare checks of

8    detainees in the jail; correct?

9    A.   Yes, ma'am, I did.

10   Q.   And you also are aware of the homicide of MR that

11   occurred in October 2021; correct?

12   A.   Yes, ma'am.

13   Q.   And even after that, jail staff still aren't doing

14   adequate welfare checks on detainees; are they?

15   A.   There have been reports of it, if that's what you're

16   asking, yes.

17   Q.   For example, they're not opening cell doors and verifying

18   detainees' welfare; correct?

19   A.   If that's what's in the report.  What are you referring

20   to?

21   Q.   Let's look at the January 2022 QA report again,

22   plaintiff's Exhibit 106.  Page 7, the fifth paragraph, stating

23   "The observation log documentation continues to be inaccurate.

24   It was brought to my attention recently that in booking, staff

25   was using the same times for all observations.  I was also

1    advised that officers are not opening cell doors and verifying

2    detainees' welfare.  Supervisory staff agreed to look into the

3    matter and speak with staff to get the deficiencies corrected.

4    Staff advised that there's no need to open the cell doors if

5    the detainee is responsive when the observation is performed.

6    It was recommended that staff remove the paper covers that

7    detainees put over the lights and block visibility into the

8    cells."

9        It's dangerous if staff can't see into detainees' cells;

10   correct?

11   A.   Yes, that is concerning.

12   Q.   Dangerous to both detainees and staff; correct?

13   A.   Yes.

14   Q.   And it's reported that this is occurring in the jail this

15   past month, and by "this," I mean the deficiencies with

16   welfare checks.  Correct?

17   A.   Yes.  According to this report.  And it's also according

18   to this report that supervisory staff was addressed about this

19   issue as well and that they would take corrective measurements

20   needed in the jail to foresee -- for the foreseeable future

21   that this is being conducted the right way and the proper way.

22   Q.   And this problem was occurring months after a homicide in

23   which there was inadequate supervision; correct?

24   A.   There was inadequate supervision after the homicide, and

25   there were several policy violations surrounding that homicide

1    as well.

2    Q.   Let's talk about those policy violations.  You agree that

3    it's important to conduct an investigation of a staff member

4    before terminating their employment; correct?

5    A.   Yes, ma'am.  That's exactly what the internal affairs

6    division did.  They conducted a full investigation.  They

7    reviewed video footage.  They got statements from officers.

8    That's what led to the decision to terminate these officers'

9    employment.

10   Q.   And how long did that investigation take?

11   A.   I'm not exactly sure how long it took.  I can say that

12   when I took office in December, nothing had been done.  And

13   when I found out about it, it was very concerning to me

14   because of the type of policy violations that were committed

15   that, once again, if we were still faced with some of those

16   same type of policy violations, it could have possibly led to

17   another death or can get us into further litigation civilly

18   regarding the death of a detainee.

19        It's my opinion that when that incident initially

20   happened, we knew or they knew -- when I say "we," they, the

21   sheriff's office and staff, knew that there were possible

22   violations.  Those detention officers should have been placed

23   on administrative leave immediately pending the outcome of

24   that investigation to hinder another situation like that from

25   possibly happening again.

1    Q.   And so are you aware that for months Jail Administrator

2    Bryan had tried unsuccessfully to get access to those internal

3    affairs files?

4    A.   No, ma'am, that's not true.  The way that the Hinds

5    County Sheriff's Office is set up -- and it's always been the

6    policy that internal affairs reports directly to the office of

7    the sheriff.  The jail administrator or no other employee is

8    entitled to information included in internal affairs

9    investigations or reports.  However, we deemed it necessary at

10   this particular point to have Kathryn Bryan as a part of what

11   we consider the disciplinary review committee for detention so

12   that when an investigation is being conducted by internal

13   affairs, she will have input as it relates to what happens

14   during those disciplinary proceedings if there are policy

15   violations that have been noted and identified.

16   Q.   But she never -- she didn't get access to that internal

17   affairs information for months; correct?  That was what the

18   attorney for the County represented to this court in

19   September 2021?

20   A.   I don't know what happened prior to my administration,

21   ma'am.  I don't know.

22        MR. COWALL:  Let's go ahead and pull up ECF Number 95,

23   page 102.

24   BY MR. COWALL:

25   Q.   Do you see where this states "MS. BARKER:  I want to

1    first address the issue of Major Bryan having access to the

2    internal affairs files.  Your Honor, we became aware that was

3    a problem last week.  We are actually as we speak drafting a

4    directive that allows her complete access to those internal

5    affairs files so that she can participate and see if there is

6    any problems and what type of corrective measures need to be

7    taken from a policy standpoint, and I want to make that

8    abundantly clear.  If Major Bryan needs access and this will

9    help the process, absolutely.  We are fixing that."

10        But that didn't happen, did it?

11   A.   This was prior --

12        MR. HALL:  Well, he got it covered, Judge.  Never mind.

13        THE COURT:  All right.

14   A.   This was prior to my administration.  I think that I have

15   told you what my fix was to this particular problem once I

16   took office.  We had a meeting with internal affairs to

17   include Lieutenant Childs from IAD, Kathryn Bryan, and Anthony

18   Simon, and we discussed how we were going to move forward with

19   IAD investigations and including Ms. Bryan in the disciplinary

20   process as well.

21        Now, when I --

22   Q.   But she didn't actually get included in the process, did

23   she?

24        MR. HALL:  Your Honor, now I'd like to lodge my

25   objection.  She's asking him questions about internal affairs

1   reports that predated the death of MR.

2        THE COURT:  Objection overruled.  The sheriff's

3   office -- the sheriff is sued in his official capacity and

4   individual capacity; correct?

5        MR. HALL:  I get that, Judge.  I'm saying she's asking

6   about Major Bryan's access to records where this testimony

7   occurred October 12th, 2021, and the young man didn't die

8   until weeks after that.

9        THE COURT:  But internal affairs documents, whether

10  they were available after MR was killed or before, I think the

11  question is:  Did Major Bryan have access to internal affairs

12  documents?  It doesn't matter when.  I don't think she's

13  limited to the period of time of MR.

14       MR. HALL:  I was just objecting.  It seemed like she's

15  conflating the issues.

16       THE COURT:  You may separate the issues, then,

17  Ms. Cowall.

18  BY MS. COWALL:

19  Q.   I'm asking about access in general that Ms. Bryan had.

20  After it was represented to the Court that she would get

21  access and that she would have input into disciplinary

22  decisions, she was not actually given that, was she?

23  A.   She was given that under my administration.  According to

24  this, I guess not prior to me, but I did tell her that she

25  would be included in my administration.  And, for example, she

 1    gave me -- well, she wanted to discipline a detention officer.

 2    She wanted to fire a detention officer for talking back to

 3    her, and initially I agreed to it, but this was something that

 4    happened prior to my administration as well.

 5    Q.   Well, let's talk about something that happened during

 6    your administration.

 7    A.   Okay.

 8    Q.   Let's look at the December 2021 QA report, which is

 9    Plaintiff's Exhibit 86, page 10, second paragraph.  Does that

10    state "Major Bryan is now receiving information from IAD

11    investigations; however, she is not involved in the

12    disciplinary actions concerning detention staff"?

13         Is that what that states?

14    A.   That's what it states, but I have to disagree with that.

15    Q.   And again, you had reviewed this report previously;

16    correct?

17    A.   Yes, ma'am, I have.  And I think that I've also put on

18    the record about disciplinary actions concerning detention

19    staff, how when before I took action regarding the termination

20    of the detention officers, I reached out to Ms. Bryan several

21    times to have that discussion with her.

22         Now, I understand exactly what this is saying, but

23    according to the stipulated order, it still clearly says that

24    the ultimate authority lies within the office of the sheriff

25    and the sheriff him or herself to take disciplinary action,

1   terminations, and all of that.

2       Now, another thing that's very interesting about this is

3   she was going to be included in our next disciplinary review,

4   which was held in early February.  We've only held one during

5   my administration, and that was in February.  She was no

6   longer an employee, but she would have been included in those

7   proceedings.

8   Q.   Okay.  So you're saying in the future, she would be?

9   A.   Ma'am?

10  Q.   Your testimony is that in the future she would have been

11  if she hadn't departed the jail?

12  A.   Absolutely.

13  Q.   And would you agree that an after-action report is not

14  the vehicle to hold staff accountable?

15  A.   I agree that it's not to hold staff accountable, but at

16  the same time, an after-action report should reflect if there

17  were policy violations included.  And if you review the

18  after-action report after the death of MR, well, you'll see

19  that Kathryn Bryan put something in the report to allude to

20  the fact of the detention officer that was assigned to the

21  control room was little to no movement, but the detention

22  officer was actually asleep on duty.

23      So that should have been noted in that after-action

24  report.  Not only that, it should have been that particular

25  time that the jail administrator took immediate corrective

 1   actions regarding policy violations in the jail.  You had a

 2   detention officer that was asleep on duty.  You had two

 3   detention officers that failed to render medical aid and help

 4   a detainee that was possibly in a compromising situation, and

 5   to just address it as a possible drug overdose and walk away

 6   from the situation is very concerning.

 7       So if you had one -- or the three of these detention

 8   officers that went to sleep on duty again or that failed to

 9   render medical aid to a detainee that was in a compromising

10   situation between October and December, the time that they

11   were terminated, then we could have possibly had another death

12   in the jail.

13   Q.   So it would have been important for Major Bryan to see

14   what was happening in the IA investigations during those three

15   months; correct?

16   A.   No, that's not what I'm saying.  She knew.

17   Q.   Would it have been important for her to have seen what

18   was happening in those IA investigations so she could make a

19   recommendation for interim action?

20   A.   The IAD investigation wasn't wrapped up until I took

21   office.

22   Q.   So it would have been important for her to have seen

23   those while they're in progress; correct?

24   A.   No.  But what is important, that she recognize as the

25   jail administrator that there were policy violations that have

1   been committed and she should have held her staff accountable.

2   Now, we're talking about a jail administrator, them having, I

3   guess, oversight as it relates to the detention officers in

4   the jail.  It talks about discipline; it talks about hiring

5   promoting, and everything else.  The same action that she

6   wanted to take for a detention officer -- to terminate this

7   detention officer for talking back to her, that same energy

8   should have been reflected to the possible policy violations

9   regarding the death of MR.

10  Q.   And the way to hold the staff accountable is through IA

11  investigations; correct?

12  A.   That's not necessarily true.  She has the authority --

13  just like she did for the detention officer that she said

14  talked back to her, she had the authority to send them home.

15  So that's not necessarily true.

16  Q.   So you disagree that it's relevant for the jail

17  administrator to understand what IA is discovering as it

18  conducts its investigation?

19  A.   Say what now?

20  Q.   So you disagree that it's important for the jail

21  administrator to understand what IA is doing as it conducts

22  its investigations?

23  A.   Internal affairs does not answer -- and this is in

24  policy -- does not answer to the jail administrator.  It

25  answers directly to the office of the sheriff, ma'am.  Now,

1  the communication should be between the sheriff and the jail

2  administrator, not the jail administrator and internal

3  affairs.  But in this particular matter, nothing had been done

4  surrounding the policy violations stemming from the death of

5  MR and --

6  Q.  That's because the IA investigation was still pending and

7  Ms. Bryan didn't have access to the files; correct?

8  A.  No, ma'am, that is not true.  It is because as a jail

9  administrator, she should have held those detention officers

10  accountable immediately while the investigation was being

11  conducted for corrective measurements to see that these

12  incident does not occur again and to see if there were policy

13  violations that would lead to disciplinary action; as well as

14  the jail administrator, she's given that authority and given

15  those duties, and I think that I have specifically given you

16  another example whereas she wanted to fire a detention

17  officer.

18  Q.  Well, that isn't my question.

19      MR. HALL:  Objection, Your Honor.  She needs to let him

20  finish.

21      THE COURT:  Let him finish his answer.

22  A.  Can I finish my answer?

23  BY MR. COWALL:

24  Q.  Oh, yes, please.

25  A.  It's my understanding that, again, she wanted to fire a

1    detention officer for talking back.  She sent that same

2    detention officer home.  So she has the authority.  That was a

3    policy violation that she knew of and that she witnessed.  The

4    same thing should have been applied to the death of MR.  She

5    should not have gone with those detention officers still

6    working from October to December to avoid sleeping on duty and

7    failing to render medical aid to a detainee that's in a

8    compromised situation.  That happened under her leadership as

9    the jail administrator, and she knew about it at the time that

10   it happened.

11   Q.  But she didn't have access to the IA investigations in

12   progress, did she?

13   A.  Ma'am, my answer to you again, that has nothing to do

14   with --

15        THE COURT:  No, no.  Answer her question, and then you

16   can explain.

17   A.  She did not have access to the files at that particular

18   time.  My understanding, according to some of the

19   documentation -- again, this was before my administration.

20   Now, but what she does have is, once again, the authority to

21   take immediate corrective actions with her staff in detention

22   and --

23   BY MR. COWALL:

24   Q.  Should she -- excuse me.

25   A.  Go ahead, ma'am.

1    Q.   Oh, no.  Please finish your answer.

2    A.   No, I'm done.  Go ahead.

3    Q.   Should she take action without being able to see what IA

4    is finding in their investigation?

5    A.   Yes.  That falls within the scope of her duties.  She

6    took immediate action for the detention officer that was

7    talking back to her without an IAD investigation.  It's no

8    different, ma'am.

9    Q.   So talking back is the same to you as lack of supervision

10   for a staff who died?

11   A.   No, ma'am, but you're asking specifically about taking

12   action without an IAD investigation.  She sent a detention

13   officer home and wanted to fire a detention officer for

14   talking back without an IAD investigation.  I was just using

15   that to compare the two, because that goes to show the scope

16   of her responsibilities and her duties at that particular time

17   as well.

18   Q.   Let's talk about PREA.  What does PREA stand for?

19   A.   Prison Rape Elimination Act.

20   Q.   And that applies to staff sexual misconduct; correct?

21   A.   Yes, ma'am, it does.

22   Q.   And the jail reported having a PREA case just last month;

23   correct?

24   A.   In January, yes.

25   Q.   And that was after the jail didn't have a PREA

```
 1   coordinator for some months; correct?
 2   A.   No, that's not true.  The PREA coordinator was at work
 3   when that incident happened in January.  She was on duty.  But
 4   she was --
 5   Q.   But she had been out for some time; right?
 6   A.   Ma'am, she had been out for some time on sick leave for
 7   something.
 8   Q.   And she had the PREA cellphone while she was out on sick
 9   leave; correct?
10   A.   I can't -- I don't know.
11   Q.   And that staff person involved in the PREA case was
12   actually terminated; is that correct?
13   A.   Say what now?
14   Q.   That staff person involved in the PREA incident was
15   actually terminated?
16   A.   Yes.  I terminated that detention officer the next
17   morning following that incident, yes.
18   Q.   And staff training on PREA requirements is important to
19   try to prevent staff sexual misconduct; correct?
20   A.   Yes, it is.
21   Q.   The staffing shortages have prevented staff from getting
22   trained at the jail; correct?
23   A.   I haven't seen any training for PREA recently or training
24   staff on PREA that I needed to approve.  So I can't say if
25   that's correct or not, but I do know that there's an ongoing
```

1   training for PREA.  I went through the training myself when I

2   was a captain in investigations.  So I do know that it does

3   exist, but I haven't seen anything or any knowledge of it

4   under my leadership.

5   Q.   And shifting gears a bit to talk about another item in

6   the January QA report, fire safety.  Fires are still occurring

7   in the Raymond Detention Center; correct?

8   A.   Yes, ma'am.

9   Q.   And combining that with a lack of staff supervision on

10  the units, that's a significant life safety risk; isn't it?

11  A.   Yes, ma'am.  It's very concerning.

12  Q.   And detainees sometimes burn up their uniforms; right?

13  A.   It's my understanding that -- I'm not exactly sure what

14  method they're using.  I'm not sure sometime if it's a

15  uniform, if it's paper, or what.

16  Q.   And when Hinds County detainees burn up their uniforms,

17  they can end up wearing just their underwear; correct?

18  A.   If they burn their uniform, yes, until they're issued

19  another uniform, yes, ma'am.

20  Q.   And that's because detainees only get one uniform now?

21  A.   I'm not exactly sure about that.

22  Q.   Are you aware they used to get two uniforms?

23  A.   I'm not.

24  Q.   Do you think it's a symptom of jail dysfunction to have

25  detainees wearing only their underwear and not uniforms?

```
 1              MR. HALL:  Objection.  Argumentative.
 2              THE COURT:  Objection overruled.
 3   A.   Do I think it's related to jail dysfunction?
 4   BY MS. COWALL:
 5   Q.   A symptom of jail dysfunction.
 6   A.   I'm not exactly sure, because -- let me say this.  I know
 7   firsthand that you have detainees that have uniforms and they
 8   have perfectly working uniforms and they still choose to wear
 9   their underwear or they choose to wear the -- we call them
10   long handles -- that's what they look like to me, but, like,
11   the thermal underwear type of clothing -- around the housing
12   units.  So I'm not exactly sure if I can say that that relates
13   to jail dysfunction, because some of them choose to take the
14   uniforms off and just walk around in their underwear.
15   Q.   And staff aren't able to require them to wear their
16   uniforms, if they have them?
17   A.   Yes, they are.
18   Q.   But staff aren't enforcing that rule?
19   A.   Not necessarily.  I'm sure that they are, but I'm saying
20   I've seen this personally myself and I've witnessed this
21   personally as well.
22   Q.   So you've seen jail detainees going around in their
23   underwear in the jail?
24   A.   In the housing unit, yes, I have.  You stated that
25   earlier, and I will say that I have -- I have seen that.
```

1   Q.   How often are you in the jail, Sheriff Jones?

2   A.   I've been down to the jail several times during my

3   administration.  I can't tell you exactly how many times, but

4   I've been down there several times.

5   Q.   On a weekly basis, how many times are you in the jail?

6   A.   You say a weekly basis?

7   Q.   Uh-huh.

8   A.   I'm not exactly sure.  There may have been a week or so

9   that I didn't go down there, but I don't just go down to the

10  jail specifically for detention.  I go down there regarding

11  other issues as well.  We still hold meetings at the jail.  We

12  hold, like, the internal affairs disciplinary committee

13  proceedings.  We still have that in the conference room at the

14  jail as well.

15  Q.   And when is the last time you were in the housing units

16  in the jail?

17  A.   Last week.

18  Q.   And so you've seen the status of repairs in the jail;

19  correct?

20  A.   I've seen the what?

21  Q.   The status of repairs in the jail?

22  A.   Yes, ma'am, I have.

23  Q.   And funding issues with the County have delayed repairs

24  in the jail; correct?

25  A.   It's my understanding that that has been an issue, but

1  it's not to the point where they are not being addressed or

2  they're being denied.

3  Q.   My question was about delays.

4  A.   Ma'am?

5  Q.   My question was about delays.

6  A.   No.  Well, I am familiar with delays.  Yes, ma'am, I am.

7  Q.   Okay.  And we've been talking about the term "quality

8  assurance."  You're familiar with that term; correct?

9  A.   Yes, ma'am.

10  Q.   You agree it's important for a jail to identify problems?

11  A.   Yes, ma'am, I am.

12  Q.   Because otherwise how can they be fixed; right?

13  A.   Well, I do agree with that, but I also disagree with some

14  of the content that is in the quality assurance report.  You

15  have in one of the quality assurance reports things that

16  reflect an individual or the administrator when it should be

17  about the system as a whole.  Putting in the quality assurance

18  report that the quality assurance person is a cheerleader per

19  se for the jail administrator, I think that that is biased and

20  I think that that's irrelevant.  We need to stick to exactly

21  what needs to go in there and the content regarding our

22  situation, not an individual per se.

23  Q.   So it's important to identify problems in the quality

24  assurance reports?

25  A.   Yes, ma'am.  Absolutely.

1    Q.   But the jail does not have a culture that encourages

2    identification of problems, does it?

3    A.   The jail does not have a culture of identifying problems?

4    Q.   A culture that encourages identification of problems.

5    A.   Well, I think that that would fall back on the leadership

6    of the jail.  I can't say whether they do or not.  Me

7    personally, under my administration, I would like to see that

8    all problems are not only identified but they are also

9    documented so that we would have the proper documentation to

10   be able to support the problems and then have a corrective

11   action in place to fix whatever the problem is.

12   Q.   The jail is under your purview; correct?

13   A.   Yes, ma'am, it is.

14   Q.   So it would be important for the jail to have a culture

15   that self-identifies problems; correct?

16   A.   I support that, yes.

17   Q.   But they don't have that, do they?

18   A.   Well, the quality assurance report, to me, reflects the

19   problems that are in the jail.  So that's a way of reporting

20   the problems, so I can't say that there's a culture that it

21   doesn't exist, because if you read the quality assurance

22   reports, the problems that are in the jail are in the reports.

23   And not only that, the manifest is there when I go.  Some of

24   this is true to the naked eye, some of the problems that we

25   have in detention services.

1   Q.   And Ms. Dawson has encountered trouble reporting those

2   problems in the jail; correct?

3   A.   Reporting it to who, ma'am?

4   Q.   Reporting in her quality assurance reports.

5   A.   To who?

6   Q.   In the reports.  She has had trouble and has encountered

7   difficulty in conveying problems in the jail in her reports;

8   correct?

9   A.   I'm not aware of that.

10  Q.   Let's look at Defendants' Exhibit 83.  Let's look at page

11  940.  Oh, excuse me.  Page -- is this an e-mail from, at the

12  bottom of the page, Ms. Priscilla Dawson?

13  A.   Yes.

14  Q.   Who is Priscilla Dawson?

15  A.   She's the quality assurance person.

16  Q.   And she sent this e-mail on January 10, 2022?

17  A.   Yes.

18  Q.   To Kathryn Bryan; correct?

19  A.   Yes, ma'am.

20  Q.   And this e-mail states "Good evening.  Please review the

21  following statement and advise if I should include this in the

22  report.  I'm not trying to get fired."

23       Is that what this states?

24  A.   Yes.

25  Q.   So Ms. Dawson had some concern about getting fired based

1   on this e-mail; correct?

2   A.   I'm not exactly -- I'm not sure.  What is she referring

3   to?

4   Q.   The e-mail refers to a statement here about a discrepancy

5   between the accuracy of the numbers being provided from HR;

6   correct?

7   A.   And it also says last month's report.  I'm not familiar

8   with this, ma'am.  I can't elaborate on this.

9   Q.   Okay.  But you agree this e-mail states that she's not

10  trying to get fired; correct?

11  A.   Yes, it does say that, but I don't understand what the

12  basis of this e-mail would be to reflect her getting fired.  I

13  haven't threatened to terminate her or I haven't held her

14  accountable for anything that would lead to her termination,

15  so I'm not sure what this e-mail is about.

16  Q.   Okay.  Let's shift gears a bit and talk about the staff

17  walkout from November 2021.  You were here when there was

18  testimony about that; correct?

19  A.   Yes, ma'am, I was.

20  Q.   And the County administrator testified that former jail

21  administrator Bryan instigating the staff walkout; is that

22  correct?

23  A.   According to the testimony that I heard, yes.

24  Q.   That walkout occurred around the time the Board passed

25  the 5 percent raise; right?

```
 1    A.   The walkout happened on November the 13th of 2021.

 2    Q.   And do you recall if it was around the time the raise had

 3    been announced?

 4    A.   I cannot -- I was concentrating on my campaign at the

 5    time.  I was on a leave of absence, so I'm not exactly sure.

 6    I do know that the two may have corresponded around the same

 7    time, but I can't relate the two of them together into close

 8    proximity.  I'm not sure.

 9    Q.   So you're not sure what prompted the walkout?

10    A.   No, ma'am, I'm not.

11    Q.   About County Administrator Jones' testimony was contrary

12    to what was publicly reported about the walkout; right?

13    A.   What was publicly reported about the walkout?

14    Q.   Well, let's look at Plaintiff's Exhibit 117.

15         MR. HALL:  Your Honor, just a quick question.  I may be

16    missing it.  I don't have a PX-117, and I don't know if a

17    PX-117 was ever identified by the Government prior to this

18    hearing.

19         MS. COWALL:  It's solely for cross-examination

20    purposes.

21         THE COURT:  You need to give it to the other side if

22    they haven't seen a copy of it, though.

23         MS. COWALL:  Yes.  I'm looking for it right now.

24         MR. HALL:  I think it was for last three exhibits that

25    were up.  I hadn't seen those either, so...
```

1      MS. COWALL:  Right.  They were cross exhibits for

2  impeachment only.

3      It's actually 118.  I apologize.

4      May I approach the witness, Your Honor?

5      THE COURT:  You may.

6  BY MS. COWALL:

7  Q.  So if you look at this article from WJTV, the last

8  sentence of the article.

9  A.  Yes.

10  Q.  It was publicly reported that "Crisler claims Jones

11  organized the walkout, but Jones strongly denied this

12  allegation."  That's what was publicly reported regarding the

13  walkout; correct?

14  A.  I tell you, that was brought up during the debate.  I can

15  only tell you and I can only testify as to who was not

16  responsible for the walkout, and that's Tyree Jones.  I'm not

17  sure who was responsible for the walkout.  I don't have any

18  knowledge of the walkout other than what's been reported on

19  the news.  So I don't have any -- I don't know who's

20  responsible.  I know I'm not responsible for it.

21  Q.  Okay.  Now, you've been testifying about Major Bryan's

22  leadership as jail administrator; correct?

23  A.  Yes, ma'am.

24  Q.  You're not testifying that Major Bryan failed to take

25  steps towards safer conditions at the jail; are you?

1   A.   I'm not testifying that she was not.   There were some

2   corrective steps that were taken.   As a matter of fact, before

3   I took office after I was elected, I went down and I toured

4   the jail, and I saw a shift of changes that had occurred over

5   the last several months, since my last visit to the jail.   So

6   I do know that there were corrective things and corrective

7   actions that had taken place under Kat Bryan's administration,

8   yes.

9   Q.   Uh-huh.   And you're aware that the County filed a

10  declaration for Ms. Bryan in response to the order to show

11  cause in this case; correct?

12  A.   Is that the declaration that we put on the monitor the

13  other day where she stated that she had gotten some of the

14  things that she needed in place and she felt good moving

15  forward or something like that?

16  Q.   We can put it on the screen.   It's ECF-106.   This is the

17  declaration here.   Have you seen this before?

18  A.   Yes.   I've seen this, yes.

19  Q.   Okay.   So you chose to terminate Major Bryan despite the

20  progress set out in this declaration; correct?

21       MR. HALL:   Objection, Your Honor.   Mischaracterizing

22  facts in evidence.

23       THE COURT:   Objection overruled.

24  A.   Major Bryan was not terminated.

25  BY MR. COWALL:

1    Q.   Your testimony was that you accepted her resignation

2    before it was to be effective; correct?

3    A.   I put her resignation in effect ten days before she was

4    to resign.  Were --

5    Q.   And that was despite --

6         MR. HALL:  Objection, Your Honor.

7         THE COURT:  Let him answer the question.

8    BY MS. COWALL:

9    Q.   Please finish.

10   A.   The word "termination" was never used during that

11   meeting.

12   Q.   So you chose to accept a resignation that Ms. Bryan had

13   rescinded before the effective date, despite this declaration;

14   correct?

15   A.   I also think that I testified that I never got an

16   official rescinding of her resignation.  The only thing she

17   told me is she rescinded her resignation to the attorneys.

18   There was never any documentation to prove that she rescinded

19   her resignation.  I also --

20   Q.   That's actually not the question --

21        MR. HALL:  Objection, Your Honor.  He's still

22   answering.  She's been cutting him off all afternoon.

23        THE COURT:  Allow him to finish his answer.

24   A.   I also alluded to the fact that if she had rescinded her

25   resignation as the sheriff, that doesn't necessarily mean that

1    I had to accept her rescinding her resignation.

2    Q.   So however you characterize the action you took, you took

3    that despite the progress set forth in Major Bryan's

4    declaration; correct?

5    A.   I took the action with Major Bryan for the betterment of

6    Hinds County, for the betterment of the Hinds County Sheriff's

7    Office to include the detainees, the staff, and my

8    administration.  That's why the action was taken.  It had

9    nothing to do with the progress that had been made.  I've

10   agreed that progress had been made, but I've also elaborated

11   about my working relationship to several instances of

12   insubordination that I've had to deal with and address

13   regarding Major Bryan.

14        As the Sheriff of Hinds County, it's my duty, my

15   obligation, to address staffing issues.  It's my -- also my

16   duties to have a jail administrator or anybody else on my

17   staff that I can fully trust and that I believe is in the

18   betterment for my administration as well.  Kathryn Bryan no

19   longer fitted those qualities, and it was time for us to

20   separate her from Hinds County.

21   Q.   Did she ever refuse to meet with you?

22   A.   Yes, ma'am, she did.

23   Q.   Did she refuse to meet with you one-on-one?

24   A.   No, she did not.

25   Q.   And you talked about a song that she played in the

1    meeting.  That was her cellphone ringtone; wasn't it?

2    A.   I'm not exactly sure what it was, but as I stated

3    earlier, my perception is not to be slighted regarding that

4    particular incident.  Whether it was a ringtone or whether it

5    was the phone music itself, my perception of that is not to be

6    slighted.

7    Q.   So --

8    A.   Not only that, I think that I have pointed out several

9    other instances, and if I need to go back through them one by

10   one with you again, I will, regarding failures on behalf of

11   Kathryn Bryan to detention services that were not in context

12   with the consent decree, the stipulated order, and things that

13   could have set us back regarding some of those failures as

14   well.  That was my reasoning -- that was the basis of my

15   reasoning regarding her employment with the Hinds County

16   Sheriff's Office any further.

17   Q.   And you don't dispute that the County sought out

18   Ms. Bryan to be the jail administrator; correct?

19   A.   That's my understanding that they did.  And it's also my

20   understanding there have been some regrets expressed about

21   that as well due to some of the issues that I've had to face

22   personally and the administration of Hinds County has had to

23   face regarding her employment as well.

24        There have been several threats of resignation from

25   Kathryn Bryan even before I took office.  There were several

1    threats of resignation, what I would consider that to be

2    unstability and instability within detention services.  We

3    need someone that we can trust, someone that won't tell you

4    "I'm not going to be able to work with you."  What happens

5    when you're the elected sheriff and your jail administrator

6    tells you that "I'm not going to be able to work with you"?

7    It's that time that I need to start looking for a jail

8    administrator.  I'm going to be here.  I'm elected to serve in

9    this office, and I need the same dedication and

10   trustworthiness from a jail administrator as well.

11        So I had the several threats of resignation.  I had a

12   resignation on my desk effective February 10th, 2022, and I

13   also had her to tell me that on January the 5th.  So to keep

14   us from being set back to a degree where we didn't have a

15   qualified jail administrator in place or someone that can lead

16   detention services for a long period of time, I went ahead and

17   started taking corrective actions and corrective measurements

18   at that particular time to get somebody in place that I can

19   trust and that I believe can move Hinds County forward in

20   detention services.

21   Q.   Did you explore with her why she had submitted letters of

22   resignation?

23   A.   Yes, I did.

24   Q.   And did you -- nonetheless, you felt that it was more

25   appropriate to bring in an interim jail administrator with no

1  jail experience?

2  A.   That's not what I did.  I think that the word "jail" and

3  "prison" has been -- has been somewhat opposite in this

4  particular setting, but as I stated to you earlier, it was

5  very important for me to separate Kathryn Bryan from my

6  administration.  I do understand and I do know some of the

7  terms that she had threatened to quit under.  But how do you

8  move forward with a jail administrator threatening to quit

9  based on things that may not go their way at any particular

10 time?

11      And if you go back and look at some of the documentation

12 leading all the way back to August, just three weeks after she

13 took office, there's documentation to prove that she was

14 talking about quitting back in August.  She was talking about

15 quitting in November.  That's instability and unstability in

16 detention services, and that's not what we need moving

17 forward.  We need somebody here that we can trust to move

18 forward with the challenges that we have and what I would

19 consider a very dire situation regarding our detention

20 services.

21 Q.   And so now the next step is to have an interim jail

22 administrator for six months; correct?

23 A.   Well, again, he's interim.  He's not permanent.

24 Q.   And his experience is with prisons; correct?

25 A.   It's my understanding, yes.

1    Q.   Let's talk about an area where detention experience is

2    relevant.  Let's talk about Tasers.

3         Now, you talked a bit about Tasers being provided.

4    A.   Yes, ma'am.

5    Q.   You're not testifying that jail policy had been enacted

6    to guide how Tasers should be used in the jail, are you?

7    A.   Tasers is included in the use-of-force policy in the

8    jail.  They are identified as electronic control devices.

9    They're in the policy for the use of force for detention.

10   Q.   So you think the policy adequately addresses Tasers?

11   A.   Yes, it does.  It's a use-of-force -- it is weapon or an

12   avenue provided to detention staff for the use-of-force

13   continuum, is what it is.  This policy has been and was in

14   place long before I was elected sheriff.  Detention services

15   had already been introduced to Tasers before I became the

16   sheriff, before I was elected, before I took office.  There

17   was a request for 20 Tasers.  I fulfilled -- or tried to

18   fulfill the request.

19        There was never anything mentioned about training for

20   Tasers until I contacted Captain Simon and told him to issue

21   the other Tasers to the other supervisory staff in detention.

22   He and Captain Conner had already gotten their Tasers at the

23   direction of, I guess, Kathryn Bryan after the meeting that we

24   had in my office regarding requisitions and inventory.

25   Q.   And Kathryn Bryan had conveyed to you her concerns about

1   bringing Tasers in without adequate policies or training;

2   correct?

3   A.   You're absolutely right.  And again, she brought that to

4   my attention after I gave Captain Simon the directive to issue

5   the Tasers.  If there was a need for the issue for training

6   for Tasers, why did she allow Captain Simon and Captain Conner

7   to get their Tasers without that training?  So the Tasers had

8   already been introduced.

9       Let me give you the specific dates.  January the 12th, we

10  had a meeting regarding Tasers in my office.  January the

11  14th, Captain Simon and Captain Conner were given Tasers in

12  detention.  January the 21st, which was a week later, I

13  contacted Captain Simon and told him to go ahead and give the

14  rest of the Tasers to the supervisory staff in detention

15  services.

16      So training didn't come up from Kathryn Bryan before she

17  allowed Captain Simon and Captain Conner to get Tasers.

18  Training didn't come up when the detention officers that were

19  assigned to transportation had been issued Tasers months

20  before she took employment with the Hinds County Sheriff's

21  Office.  The only time Tasers came up was the conflict because

22  I contacted him and told him to go ahead and give them to the

23  rest of the staff, but she had allowed he and Captain Conner

24  to already get their Tasers without any type of training that

25  she alluded to afterwards.

1   Q.   So you contacted Chief Simon rather than her to provide

2   the Tasers?

3   A.   Yes, ma'am, I did give him that assignment to go ahead

4   and give the rest of the Tasers out, only because he had

5   already gotten his Taser from supply.  So I just told him to

6   let the rest of the people know to go to supply and get the

7   Tasers that had been designated for them.

8   Q.   So you weren't aware before Major Bryan told you that

9   there needed to be additional policy, training, and protocols

10  for Tasers before they're distributed in the jail; is that

11  right?

12  A.   I recorded a meeting, and I have this recording.  On

13  January the 12th, we met for about two hours and ten minutes

14  in my office about Tasers, training, less lethal equipment,

15  purchase requisitions, requisition process.  Training was

16  never mentioned regarding Tasers.  We mentioned deputies had

17  been -- I'm sorry, detention officers had been certified to

18  carry the Tasers and to use the Tasers.  The only training

19  that we mentioned in this meeting was, "Let's get the training

20  and certification for the shotgun with the bean bag rounds."

21  We discussed getting some detention officers trained and

22  certified to use those because we didn't have any at that

23  particular time.

24       Training, again, never came up in any meeting in any type

25  of setting regarding Tasers.  I am a certified Taser -- I'm

1    certified to carry a Taser as well.  You go through the

2    training and you get certified.  There's no difference or no

3    policy to differentiate the two between detention services or

4    anyone else.  We don't have a policy that says detention

5    services require additional training for Tasers, but Tasers

6    are included in the detention services' use-of-force

7    continuum.

8        But there's nothing in writing, there's no policy to

9    require detention officers to receive additional training to

10   carry the Tasers.  The only thing that's required is they are

11   certified to use them, and we had several detention officers

12   that had been certified to use and carry the Tasers, and

13   that's what I acted on.

14   Q.   Isn't that a problem that there isn't separate training

15   for using a Taser in a jail, a closed environment, as opposed

16   to using a Taser in a patrol environment?

17   A.   I wouldn't necessarily say that it's a problem, but

18   there's not a policy for it.  So if there's not a policy for

19   it, how can we require training when there's no policy to

20   differentiate the two?

21   Q.   Now, you testified about sending detainees from Hinds

22   County Jail to other county jails; correct?

23   A.   Yes, ma'am, I did.

24   Q.   You agree there would need to be an evaluation of

25   conditions in other jails before sending detainees to those

1    other jails; right?

2    A.   Yes, ma'am.  Absolutely.

3    Q.   Because the decree covers replacement facilities;

4    correct?

5    A.   Yes, ma'am, it does.

6    Q.   And has that evaluation been done yet?

7    A.   No, ma'am.  We have not even identified places to take

8    the detainees, but what I did say, there has to be some

9    discussion that needs to be initiated between my office and

10   the Board of Supervisors to identify what counties we can take

11   detainees to, what the compensation process would consist of,

12   and what are the conditions of those facilities as well.

13   Q.   Now, in general would you agree that the RDC is plagued

14   with issues?

15   A.   Yes, ma'am, it is.

16   Q.   In fact, the jail is not reasonably safe, is it?

17   A.   There are some areas that are unsafe, yes.

18   Q.   What areas are unsafe?

19   A.   I would consider A-Pod to be unsafe.  That's why we

20   specifically discussed about a plan to address the situation

21   in A-Pod.

22   Q.   How long have detainees been in A-Pod?

23   A.   Ma'am, I don't know.  It's 160 detainees in there.  I'm

24   not sure how long they've been in there.

25   Q.   And as sheriff, you are responsible for the detention of

1    juveniles charged as adults; correct?

2    A.    Yes, ma'am, I am.

3    Q.    And those juveniles charged as adults are currently

4    housed at the Henley-Young Center; correct?

5    A.    Yes, ma'am, they are.

6    Q.    And Henley-Young is currently suffering staffing

7    shortages; correct?

8    A.    That's my understanding.

9    Q.    And those staffing shortages affect safety, correct?

10   A.    In Henley-Young, yes, ma'am, they do.

11   Q.    And they affect provision of education too?

12   A.    You're asking my opinion about that?

13   Q.    I'm asking based on you hearing the testimony throughout

14   this hearing and your personal observations.

15   A.    I can't say that staffing issues are necessarily related

16   to the educational process.  I'm not there for the day-to-day

17   operations, and I have no knowledge of the lack of the

18   educational process as it relates to the JCAs that are at

19   Henley-Young.

20   Q.    How about provision of behavioral programming and mental

21   health treatment?  Do the staffing shortages affect those

22   things?

23   A.    Again, I would have to say I'm not aware of that

24   occurring or the two of them being related:  staffing

25   shortages to the lack of mental health treatment or whatever.

 1    I can't say -- I can't relate the two of them together because

 2    I'm not aware of it.

 3    Q.   But the JCAs are under your authority; correct?

 4    A.   Yes, ma'am, they are.

 5    Q.   And so would you agree that for detainees under your

 6    supervision, there's a magnitude of issues that you have to

 7    address?

 8    A.   Yes, ma'am, there are.

 9    Q.   And you agree that building a new jail won't solve all

10    those issues; correct?

11    A.   It won't solve the issues, but it will make a major

12    impact on the issues, and it will provide us some relief and

13    more of a sense of security for the detainees and our

14    detention officer staff as well.

15    Q.   Building a new jail won't get you out of the consent

16    decree; will it?

17    A.   No, ma'am, it will not.

18    Q.   And you also can't just wait for the new jail.  Detainees

19    in the current jail deserve to be reasonably safe now;

20    correct?

21    A.   Yes, ma'am.  That's why it's still a priority under my

22    administration that we continue to address the needs of the

23    Raymond Detention Center and our detention services while we

24    build a new jail.  The consent decree also does not require

25    that we build a new jail, but I think that that is a major

1   step forward to show that Hinds County is trying to do

2   everything it can regarding the safety of the detainees as

3   well as the safety of the detention officers that work for the

4   Hinds County Sheriff's Office as well.  But it's never to be

5   ignored that the main priority right now is the conditions of

6   the Raymond Detention Center.

7           THE COURT:  At this moment, we're going to take a break

8   for the court reporter.  I don't know how much longer you

9   have, but it sounds like --

10          MS. COWALL:  Not too much, hopefully, but I don't want

11  to hold up the break.

12          THE COURT:  And I want the court reporter to take a

13  break.

14          I'll tell you this:  We're going to see how this

15  testimony goes.  We'll see how this testimony goes.  We may be

16  here a little while.  We may.  I have to talk to my court

17  reporter first about it.

18          Since you're under cross-examination, do not talk to

19  anyone about your testimony.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  We'll be in recess until 4:15.

22              (A brief recess was taken.)

23          THE COURT:  You may proceed.

24  BY MS. COWALL:

25  Q.  Just a couple more questions.

1   A.   Yes, ma'am.

2   Q.   Sheriff Jones, before the break you testified that

3   building a new jail would be a major step forward; correct?

4   A.   Yes, ma'am, I did.

5   Q.   There are not currently sufficient staff to operate the

6   new jail; are there?

7   A.   No, there are not.

8   Q.   And that new jail won't be finished for some years;

9   correct?

10  A.   That's correct.  But I do look to have some better

11  staffing issues in place under my administration as it relates

12  to the time that it will take to build that jail as well.

13  That's why I have proposed a new pay plan, recruitment and

14  retention plan for detention officers so that way we can

15  attract more personnel.  I believe that with the numbers and

16  some of the criteria that we are proposing for new detention

17  officers, that we may have an increase in staff.  Not only

18  that, we will be able to retain staff as well to be able to

19  staff the new facility and still operate out of the services

20  in Raymond as well.

21  Q.   But the jail hasn't been able to staff up over the past

22  six years of this consent decree, has it?

23  A.   Under the old salary and some of the old employee

24  conditions, no, they have not.  That's why I'm very optimistic

25  about the future of detention services under the new proposed

 1  pay plan that I'm trying to get adopted.

 2  Q.   And you agree that the jail needs to have enough staff to

 3  operate that new jail before it opens; correct?

 4  A.   Yes, ma'am, it does.

 5       MS. COWALL:  Thank you.  No further questions.

 6       MR. HALL:  May it please the Court?

 7       THE COURT:  You may proceed.

 8                      **REDIRECT EXAMINATION**

 9  **BY MR. HALL:**

10  Q.   Sheriff, I've got a couple things to go over with you.

11  All right?

12  A.   Okay.

13  Q.   I'll start with this:  You were asked questions about

14  your onboarding of Frank Shaw and how you hired Mr. Shaw.  Do

15  you remember that?

16  A.   Yes, sir.

17  Q.   And you were asked some questions about whether or not

18  you were aware of a New York Times article and whether you

19  were aware that he was over EMCF; right?

20  A.   Yes, sir.

21       MR. HALL:  And I'll bring this back up.

22       THE COURT:  On the side.

23  BY MR. HALL:

24  Q.   And this is a -- counsel opposite asked you questions

25  about a New York Times article.  It looks like it was dated

1  April 3rd, 2018.  Do you see that?

2  A.   Yes, sir.

3  Q.   You testified that you were not aware of this article

4  that was written by Timothy Williams; right?

5  A.   That's correct.

6  Q.   Now, I assume, I'm just making an assumption, he's a

7  writer for the New York Times.

8  A.   I guess so.

9  Q.   All right.  Now I want to show you --

10       MR. HALL:  I guess we can ask the Court to take

11  judicial notice of Case Number 3:13-cv-326-WHB-JCG.  It's an

12  opinion and order in *Jermaine Dockery v. Pelicia Hall, et al.*,

13  opinion and order.  Your Honor, I'd first like to get this

14  marked for identification purposes as -- I think it would be

15  D-161.

16       May I approach Ms. Summers?

17       THE COURT:  Yes, you may.

18  BY MR. HALL:

19  Q.   Is this the order that you were talking about when you

20  were asked those questions on cross-examination?

21  A.   Yes.  From former Honorable William Barbour, I think it

22  was, his opinion.

23  Q.   Right.

24  A.   Yes.

25  Q.   I want to turn your attention, so for clarification, to

1   page 8 of the opinion, and I highlighted.  It states,

2   "Additionally, the facility came under the new leadership as

3   Frank Shaw was hired by MTC as warden of EMCF."

4        Do you see that?

5   A.   Yes.

6   Q.   Is that the same Frank Shaw that you -- that the County

7   has retained to be the interim jail administrator?

8   A.   Yes, it is.

9   Q.   It goes on to state, "With Shaw as warden, it appears

10  that major changes have been made with respect to the physical

11  conditions at the prison.  The decrepit cell and common area

12  conditions that were documented as having existed when the

13  lawsuit was filed in 2013 were not present when the facility

14  was toured by the undersigned during trial.  Shaw has

15  implemented staffing changes, including the hiring of

16  additional corrections officers and shift managers; has fired

17  guards and other personnel for disciplinary reasons; and has

18  worked to both improve security and decrease the amount of

19  contraband at the facility."

20       Had you read this paragraph prior to making a decision

21  about hiring Mr. Shaw?

22  A.   Yes.

23  Q.   Now, what do you give more weight to, Mr. Sheriff:  a

24  newspaper article written by Timothy Williams or an opinion

25  and order drafted by an Article III judge?

1938

```
 1    A.   I'm going with the judge's opinion.

 2    Q.   Now, we also have a couple follow-ups.  Let's talk about

 3    the PREA incidents that counsel opposite wanted to talk to you

 4    about.

 5    A.   Yes, sir.

 6    Q.   You were asked a question about the PREA coordinator.

 7    A.   Yes, sir.

 8    Q.   All right.  Does RDC have a PREA coordinator as well as

 9    PREA compliance officers?

10    A.   Detention services has a PREA coordinator that educates

11    detention staff, to include myself, about PREA logistics and

12    information that should be disseminated throughout the

13    facility to both the detainees as well as the detention

14    officers as well.

15    Q.   Now, when the PREA coordinator was out, Major Bryan was

16    still at the facility; right?

17    A.   Yes, she was.  And according to her -- she didn't testify

18    to this, but she told me --

19         MS. COWALL:  Objection, Your Honor.  This is hearsay.

20         MR. HALL:  I can ask him another way, Your Honor.

21         THE COURT:  Okay.  Objection sustained.

22    BY MR. HALL:

23    Q.   Do you understand Major Bryan to be a PREA auditor?

24    A.   She told me she was.

25    Q.   With respect to detainees making complaints about PREA,
```

1    does the facility down in Raymond have a PREA hotline that

2    they can use to make inquiries or complaints?

3    A.   It's my understanding that they do have that service

4    provided to them, and apparently it goes to a cellphone or

5    something like that.  But that's not the only measurement that

6    can be taken for reporting PREA incidents in detention

7    services as well.

8    Q.   That's what I'm getting at, because a lot has been made

9    of this cellphone that was not in the facility.  So let's talk

10   about the other ways that detainees can make complaints about

11   PREA.  Okay?

12       Don't detainees also make these complaints to third

13   parties, such as family and friends, to be relayed to the

14   staff at the RDC?

15   A.   Yes, they do.

16   Q.   Can't they file grievances directly with the staff

17   themselves to make these complaints?

18   A.   Yes.  They can file grievances and/or tell a staff member

19   of an incident that they would like to report, and it's that

20   staff member's duty to report it to a higher authority and to

21   get this information relayed to the PREA coordinator for an

22   investigation as well.

23   Q.   Now, just because the PREA coordinator was out on FMLA,

24   is it your understanding that -- or let me ask it this way:

25   Were there any PREA incidents not addressed because the PREA

1    coordinator was out of the facility?

2    A.   I'm not aware of any necessarily that weren't addressed

3    specifically because the coordinator was off, but I am aware

4    of two instances where PREA situations were not addressed in

5    detention services.  One when -- occurred when the PREA

6    coordinator was out, the other occurred when the PREA

7    coordinator was back at work, and both of the failed PREA

8    situations failed at the hands of the then jail administrator

9    at that particular time.

10   Q.   Let me ask you this:  If a PREA coordinator is out of the

11   building, whose responsibility is it to fill that gap?

12   A.   The jail administrator.

13   Q.   Likewise, is there a third-party agency named the

14   Mississippi Against Sexual Assaults that detainees can reach

15   out to if they have an issue?

16   A.   Yes, sir, it is.  It's a coalition that provides services

17   for detainees that have been a victim of a PREA incident or a

18   sexual assault that occurred in detention services.

19   Q.   Now, with respect to --

20        MR. HALL:  I want to pull up D-83 on my machine.

21   BY MR. HALL:

22   Q.   It's at the bottom.  And pointing to -- this is the

23   e-mail dated January 10th, 2022, counsel opposite referred to

24   between Priscilla Dawson and Kathryn Bryan:  "Please review

25   the following statements and advise if I should include in the

1    report.  I'm not trying to get fired."

2         And then there's, like, a colon and a slash.  Do you see

3    that?

4    A.   Yes.

5    Q.   And I don't know -- I'm not 13, so I don't know what

6    emoji that is, but is that, like, an emoji that that colon and

7    slash is supposed to stand for?

8    A.   I can't -- I don't know.

9    Q.   Okay.

10        MR. HALL:  And then if we scroll up now.

11   BY MR. HALL:

12   Q.   Because I was curious about this.  Kathryn Bryan then

13   responds, "I've read it a few times through the lens others

14   may use.  It's accurate and nonjudgmental, just like all of

15   your writings.  It comes across explanatory on a critical

16   issue.  The Feds will like what you wrote it, so there's your

17   backup.  I hate that you have to worry bit," but it should

18   probably be "but maybe that's coming to an end very soon."

19        Do you know what she's talking about, what may be coming

20   to an end very soon?

21   A.   Yes.

22        MS. COWALL:  Objection.  Speculation.

23        MR. HALL:  He said he knows, Judge.

24        THE COURT:  Okay.  He had originally testified he knew

25   nothing about this document, though, so --

1    MR. HALL:  Well, he was asked questions about it

2    nonetheless.

3        THE COURT:  Go ahead and answer the question.  How did

4    you know?

5        THE WITNESS:  Well, I think I testified we didn't go

6    over this particular e-mail right here.  We went over the one

7    about getting fired.  That's what I said that I wasn't

8    familiar with.

9        MR. HALL:  I was asking him, Your Honor, this part down

10   here, "The Feds will like that you wrote it, so there's your

11   backup.  I hate that you have to worry, but maybe that's

12   coming to an end very soon."

13       And I asked the witness if he knew what she meant by

14   "maybe that's coming to an end very soon."

15       THE COURT:  How would he know what Kathryn Bryan meant

16   by that?

17       MR. HALL:  He may have discussed it with Ms. Bryan or

18   Ms. Dawson.

19       THE COURT:  Okay.  All right.

20   BY MR. HALL:

21   Q.   Do you know what she meant by that?

22   A.   I won't necessarily say that I know without mentioning

23   other correspondence that I've been afforded to read between

24   the two of them.

25   Q.   And that's fine if you have -- the basis of your response

1   is other documents and things, then advise the Court of that.

2           THE COURT:  Has that been given up in discovery?

3           THE WITNESS:  No.

4           MR. HALL:  Well, some of it absolutely is in discovery.

5           THE COURT:  I understand the parties did not have

6   official discovery, but the parties gave over documents to

7   each other.

8           MR. HALL:  We did and there are several e-mails

9   between -- there are several e-mails between Ms. Bryan,

10  Ms. Dawson, as well as the witness advised that he's had

11  conversations with Ms. Dawson with respect to the -- what was

12  going on at the detention center while Ms. Bryan was there, so

13  that's what he's basing his responses on.

14          THE COURT:  Okay.

15          MR. HALL:  I can lay more foundation.

16          THE COURT:  Please do.

17  BY MR. HALL:

18  Q.   After Major Bryan's resignation was accepted and she was

19  relieved, did you have an opportunity to discuss Major Bryan

20  with Ms. Dawson, the quality assurance director?

21          MS. COWALL:  Objection.  Calls for hearsay.

22          THE COURT:  Let him answer the question.

23  BY MR. HALL:

24  Q.   Did you speak to her?

25  A.   Yes, I did.

1    Q.   Without saying what she told you, what were the topics

2    that you spoke about?

3    A.   Some of the correspondence that I had read between she

4    and Kathryn Bryan, her job and duties as the quality assurance

5    person and how we were going to move forward with some of the

6    reportings that we had as well.

7    Q.   And with respect to -- did you -- what did you leave --

8    what impression did you leave with?

9    A.   Of what?

10   Q.   As far as the relationship between Ms. Bryan and what

11   the --

12          MR. HALL:  Did you take that off or --

13          MS. SUMMERS:  Yes.

14   BY MR. HALL:

15   Q.   As far as the relationship between her and the sense

16   of -- let me ask you this:  Did you speak about morale with

17   Ms. Dawson?

18   A.   Yes, I did.

19   Q.   All right.  What was your impression with respect to

20   morale after Major Bryan left after speaking to Ms. Dawson?

21   A.   That morale would get better as it relates to the

22   departure of Ms. Bryan.  But we also spoke about morale and

23   some other issues regarding my administration prior to her

24   departure during that meeting as well.

25   Q.   And as far as the quality assurance reports were

```
 1    concerned, did you discuss why or why you were not included in
 2    the quality assurance meetings?
 3            MS. COWALL:  Objection.  Calls for hearsay.
 4            THE COURT:  No.  He may answer that question.
 5    A.   Yes, sir, I did.
 6    BY MR. HALL:
 7    Q.   Did you discuss why you were not included in the drafting
 8    of the quality assurance documents?
 9    A.   Yes, sir.
10    Q.   And what is your understanding as to the reason why you
11    were not included in the meetings or the draftings of those
12    documents?
13    A.   Ms. Dawson stated that she was given the --
14            THE COURT:  That would be hearsay.
15            MR. HALL:  Right, I know, Judge.
16    BY MR. HALL:
17    Q.   Let me ask it this way.  Without saying what you were
18    told --
19    A.   Okay.
20    Q.   -- just give me the reason that you -- give me the reason
21    that you know as to why you weren't included on the drafting
22    or the meetings themselves.
23    A.   The directive was given not to include me.
24            THE COURT:  Hold up.  Who did that directive come from?
25            MR. HALL:  I didn't ask him yet.  Can I ask him who it
```

```
 1  came from?
 2        THE COURT:  No, I mean, you're eliciting hearsay.
 3        MR. HALL:  I'm trying, Judge.  Let me move on.
 4  BY MR. HALL:
 5  Q.  As far as -- just scroll up now -- this January 10th,
 6  2022.  Again, this is from Ms. Dawson to Ms. Bryan, "Thanks
 7  for the feedback.  I may slightly adjust the wording so they
 8  won't look as crooked."
 9       Who is Ms. Dawson talking about looking crooked?
10        MS. COWALL:  Objection.  Calls for speculation.
11        THE COURT:  Objection sustained.
12  BY MR. HALL:
13  Q.  Scrolling up, Ms. Bryan responds, "You are a sly one."  I
14  don't know what's underneath that black dot.  And she says,
15  Priscilla Dawson tells her she's learned from the "b-o-s."  Is
16  that boss?  "L-o-l-o-l."
17        MS. COWALL:  Objection.  Calls for speculation.
18        THE COURT:  Objection sustained.
19  BY MR. HALL:
20  Q.  I'm just asking, do you know what she's means, what
21  Ms. Dawson is referring to, "she's learning from the boss?
22  A.  When I see B-O-S, I think Board of Supervisors.
23  Q.  She's learning from the Board of Supervisors.  Okay.  Got
24  it.  Now, you were asked a bunch of questions about monitoring
25  reports.
```

```
 1          Do you recall that?
 2    A.   Yes, sir.
 3    Q.   And as far as monitor's reports were concerned, prior to
 4    your -- you taking office in December, were you given an
 5    opportunity by the Department of Justice or anybody at the
 6    monitors to edit the monitoring reports?
 7    A.   No, sir.
 8    Q.   All right.  With respect to this one, this most recent
 9    one, I guess the fifteenth monitoring report, that came out
10    prior to your -- you taking office as well; is that right?
11    A.   The most recent one?
12    Q.   The fifteenth monitoring report.
13    A.   This is not from the January site visit?
14    Q.   No.
15    A.   No, that one was issued before I took office as well,
16    sir.
17    Q.   And you were asked a bunch of questions about, did you
18    write any type of corrective action plan in connection with
19    the monitor's report.
20          Do you remember that?
21    A.   Yes.
22    Q.   All right.  And what was your response?
23    A.   No, I didn't.
24    Q.   All right.  Did your jail administrator write any type of
25    corrective action report directed to that fifteenth monitoring
```

1    report?

2    A.    No, sir.

3    Q.    Do you know why not?

4    A.    I'm not exactly sure.

5    Q.    Whose job was it -- if there were to be some corrective

6    action plan drafted, whose job would that have been?

7    A.    The jail administrator and it would have to be

8    communicated through me, of course, for approval, but that

9    falls within the scope and duties of the jail administrator.

10   Q.    Now, this was before you took over, so that would have

11   been her and Crisler?

12   A.    Yes.

13   Q.    All right.  And you were also talk -- you also spoke

14   about the detainees that were referred to in the quality

15   assurance report as being soiled and having to be transferred

16   for medical assistance.

17        Do you remember that?

18   A.    Are we referring to the SMIs?

19   Q.    Yes.

20   A.    Yes.

21   Q.    And it's your testimony that you did not see any

22   documentation to verify that actually happened?

23   A.    There's no documentation to support that information

24   that's included in the report.

25   Q.    All right.  With respect to that lack of documentation,

1    what did your jail administrator do to obtain that

2    documentation?

3    A.    Nothing.

4    Q.    As far as the corrective action that you were asked

5    about -- I'll ask this extra question -- did your jail

6    administrator take any corrective action to address these

7    individuals who were found soiled allegedly and had sores?

8    A.    No.

9    Q.    Whose job would that have been?

10   A.    The jail administrator.

11   Q.    Now, you and I can agree you're ultimately responsible.

12   A.    I'm ultimately responsible for the sheriff's office as

13   the head of the sheriff's office, the department head, however

14   you would like to refer to it.  So, yes, I do accept

15   responsibility in everything.

16         But at the same time, you have people in places that you

17   depend on or that you designate to do specific jobs and the

18   qualifications that fall within the scope of their duties as

19   well, so that you can communicate effectively with your other

20   department heads within your agency as well.

21   Q.    Now, do you know if there were any corrective action

22   plans drafted by the monitors to assist the Hinds County

23   Sheriff's Office in addressing the issue with respect to the

24   two detainees that were soiled with sores?

25   A.    I haven't seen any.

1   Q.   Isn't that one of the things we pay them for?

2   A.   Yes, it is.

3   Q.   Let's talk about the disciplinary proceedings.   There was

4   a lot of back and forth about the three individuals that were

5   terminated.   And just for clarification now, can detention

6   employees be terminated absent a complete IAD investigation?

7   A.   Yes, absolutely, and I'll give you an instance.   The

8   detention officer that was lastly accused of the sexual

9   assault involving the detainee, there was no IAD investigation

10  conducted, that detention officer was fired the next morning.

11  So you don't have to have an IAD investigation to terminate an

12  employee of the Hinds County Sheriff's Office.

13  Q.   And when did that occur?

14  A.   In mid-January, mid-to-late January is when that

15  occurred.

16  Q.   So all this going back and forth about Ms. Bryan needing

17  an IAD report prior to making a determination, what do you

18  make of that?

19  A.   Well, just like I stated on the record earlier, she does

20  not have to have an IAD report to take action.   And I think I

21  gave an example between two incidents that happened under her

22  leadership, whereas she wanted the detention officer

23  terminated for talking back to her and smarting off at the

24  mouth without an IAD investigation.

25       Well, you had the detention officers regarding the death

1  of MR and there were several known policy violations

2  surrounding that event.  And as I state on the record, I will

3  continue to state corrective measurements should have been

4  taken immediately following the death of MR to keep us from

5  being in another situation that could have possibly resulted

6  in the death or the serious injury like the situation with MR.

7      Now, I'm not saying that policy violations led to the

8  death or it was because of policy violations.  It just should

9  be noted that there were several policy violations surrounding

10  that incident, and they should have been immediately held

11  accountable in some way until the outcome of an investigation

12  was completed.  Whether the investigation took one week, one

13  month, two weeks, two months, three weeks, or three months, it

14  doesn't matter.  Based on those type of policy violations,

15  there should have been corrective action taken immediately

16  following that death.

17  Q.  With respect to the disciplinary committee down at RDC,

18  you testified that after you became sheriff, you've only had

19  one disciplinary action committee meeting; is that right?

20  A.  That's correct.  And that was held in early February, and

21  we had been backed up.

22  Q.  Who was present at that meeting?

23  A.  We had two.  We had one from operations, and we had one

24  for detention.  The one for detention included me, you, the

25  IAD lieutenant, IAD investigator, and the jail command staff,

```
 1    the three captains from detention services.
 2    Q.   And were one of the -- was Captain Simon present at that?
 3    A.   Yes, he was present.
 4    Q.   Was he the acting administrator of the facility at that
 5    time?
 6    A.   Yes, he was.
 7    Q.   Likewise, you talked about fires being started at the
 8    facility.
 9         Do you remember that?
10    A.   Yes, sir.
11    Q.   Have we had any injuries in connection with fires being
12    started?
13    A.   No injuries that I'm aware of.
14    Q.   And we'll concede one fire without an injury is one fire
15    too many; right?
16    A.   Yes, it's very concerning regarding the fire situation.
17    Q.   Likewise, you were asked about a culture of identifying
18    problems.
19         Do you recall that?
20    A.   Yes.
21    Q.   Now, since you've become the sheriff I guess in December,
22    are you not copied on e-mails from our compliance coordinator,
23    Mr. Green, that go out to the monitors?
24    A.   Yes, I am.
25    Q.   Okay.  Are there days where several of those
```

1   correspondence goes out to the monitors?

2   A.   Yes, it is.

3   Q.   And what type of correspondence is included in those

4   e-mails?

5   A.   There's several situations -- I mean, several things.

6   You have -- sometimes you have rapid notifications, you have

7   e-mails that need to be shared, you have reports from

8   detention services, incident reports, narratives.  Sometimes

9   you may have grievances that may be shared, so there's a

10  collection of correspondence that has to be shared between

11  detention services and the monitors.

12  Q.   Now, as far as that culture of identifying problems, do

13  you ever have to tell Mr. Green, send this or send that?

14  A.   No, I don't.  He does it -- he does it on his own and

15  that's been routine, from what I understand, for several

16  months, maybe up to a couple of years.

17  Q.   Does Mr. Green have carte blanche to send what he feels

18  is appropriate to the federal monitors?

19  A.   Yes, I think that he does send things that he feels they

20  should be aware of as well.  Yes.

21  Q.   Have you tried to dampen any of his communications with

22  the federal monitors?

23  A.   Never.

24  Q.   Do you know if I've done that?

25  A.   No, sir.

1   Q.   Anybody from the County, including the lawyers, have they

2   done that?

3   A.   No, sir.

4   Q.   Likewise with the quality assurance documents, even

5   though you don't edit them, have you seen the editorials in

6   the quality assurance being critical of the Board of

7   Supervisors in some of those quality assurance documents?

8   A.   Yes.

9   Q.   Have you ever told Ms. Dawson don't put that stuff in

10  there even after reading it, even if it may not be relevant?

11  A.   No.

12  Q.   So there is a culture of identifying problems with Hinds

13  County, isn't there?

14  A.   Yes.

15  Q.   You also talked about Ms. Bryan; did she do some good

16  things down at RDC?

17  A.   Yes, sir, she did.

18  Q.   Okay.  Nevertheless, you also testified about

19  instability.

20  A.   Yes.

21  Q.   Have you ever had a subordinate threaten to quit or

22  resign, let's say, two, three, four, five times and leave in

23  that position before?

24  A.   No, sir, I have not.

25  Q.   Counsel opposite also asked if the County sought out Kat

1    Bryan, and I need to clarify.  Did the County seek out Kat

2    Bryan, or was Ms. Bryan referred or recommended to the County

3    by the monitors?

4    A.   Ms. Bryan was recommended by the monitors.  Ms. Elizabeth

5    Simpson is the one that recommended her to the County and she

6    was -- she was hired by the late Sheriff Lee Vance.

7    Q.   I know you're going to be asked about this later, so may

8    as well get it out of the way.  Did you consult with any of

9    the monitors prior to hiring Mr. Shaw?

10   A.   No, sir, I did not.

11   Q.   Why not?

12   A.   There was a lack of trust for the monitors at that

13   particular point.  I didn't trust the judgment of the monitors

14   moving forward with hiring another detention administrator

15   based on what I had to face regarding the former jail

16   administrator and based on that being a recommendation of at

17   least one of the monitors for that hiring.  So I didn't trust

18   the monitors.

19        There was a -- there was just a very distinct lack of

20   trust, and, again, this is based on things that I have been

21   afforded to and correspondence that I've been afforded to

22   during my administration that put me in a place where I didn't

23   trust the monitors or trust their judgment about certain

24   things as well.

25   Q.   With respect to the testimony by the monitors, has your

1  opinion changed with your respect to your lack of trust

2  listening to how they've been testifying against the County?

3  A.   Yes, it has.  You know, since I've been with the

4  sheriff's office, it was always my interpretation or my

5  perception that the monitors were independents that were put

6  in place to guide us and help us with the process.

7       Now, let me say this.  The monitors, based on my

8  observation, pick and choose certain things that should be

9  reported in their reportings to the Government and to the

10  federal judge as well, especially when it comes to the past

11  jail administrator.  There's no reflection of anything

12  negative in any of the reports coming from the monitors about

13  things that were shortcomings of the former jail administrator

14  or things that the jail administrator failed on.

15      But there were several other failures and distinct

16  notices made in those reports.  Again, that led me to a place

17  of distrust with the federal monitors, because I know for a

18  fact and I have seen myself and I have read myself that there

19  were failures that should have been reported and addressed.

20      Ms. Simpson testified the other day on the stand that she

21  was even aware of a situation where a detainee was denied PREA

22  services.  According to her testimony -- according to her

23  testimony, there was another explanation for that particular

24  incident; whereas there's not another explanation for it.  But

25  that was noted, and we knew that there was a failure there.

1   But if I hadn't gotten the letter that I received and if

2   I didn't investigate that incident myself, it would have never

3   been reported, and to me, just like I said the other day -- I

4   mean, I said earlier, that's a very serious situation where we

5   are denying services to detainees when we have a PREA policy

6   that's been adopted by DOJ that we're currently operating

7   under as well.

8   Q.   You also gave testimony about A-Pod being unsafe.

9   A.   Yes, sir.

10  Q.   All right.  I just want to keep everything in context.

11  Is it your testimony that all day, 24/7, A-Pod, every aspect

12  of A-Pod is unsafe?

13  A.   It's not all aspects are unsafe.  The unsafe comes from

14  the doors not being able to lock in Pod A allowing detainees

15  to congregate more or have contact with each other more in

16  that particular pod.  That's not to say that what I'm saying

17  is -- I guess what I'm saying is the overall picture of it

18  based on the doors not locking.

19       Now, the detainees are safe within the housing unit

20  itself, but the doors not locking is what causes the safety

21  concern as well as some of the lights not operating in A-Pod

22  as well.

23  Q.   Let me ask you this.  With respect to the other pods, you

24  have three pods down there; right?

25  A.   Yes.

```
 1   Q.   You were employed back in 2020 when this current board
 2   was elected, weren't you?
 3   A.   Yes, I was.  We came in together.
 4   Q.   Okay.  Sheriff Vance --
 5   A.   Right.
 6   Q.   -- and this current board?
 7   A.   Yes, sir.
 8   Q.   Did you have an occasion to visit the Raymond Detention
 9   Center in 2020?
10   A.   Yes, sir, several times.
11   Q.   With respect to the condition of the Raymond Detention
12   Center in 2020 versus how it looks today, is there a
13   difference?
14   A.   Yes, sir, there is a difference.
15   Q.   As far as Pod B and Pod C, isn't it safe to say that B
16   and C looked like A does now back in 2020?
17   A.   You're saying did B and C look like A did?
18   Q.   Right.
19   A.   Well, when we came, they were already working on C-Pod.
20   Q.   Okay.
21   A.   They finished the renovations and completed that work
22   shortly after we came onboard as well.  Then they started
23   working on B-Pod, and I think there's still being some work
24   conducted there now.
25        But to answer your question, B and C-Pod faced some of
```

1   the same issues then that A-Pod is facing now, except those

2   issues have been addressed and have been fulfilled for the

3   most part.

4        The next plan, as I stated, we need to do the same thing

5   with A-Pod that has been done with B and C-Pod.  We need to

6   make a determination for the foreseeable future how we're

7   going to utilize A-Pod and what we're going to do with the

8   detainees there.

9        MR. HALL:  All right.  May I have the Court's

10  indulgence?

11       THE COURT:  Yes.

12  BY MR. HALL:

13  Q.  Let me ask you this, Mr. Sheriff.  With respect to -- you

14  heard the testimony of, I guess, four monitors throughout the

15  last two weeks.  Did you hear them talk about or testify about

16  any successes made by Hinds County?

17  A.  No, I didn't.  And if there was anything specifically

18  related to that, there was still something to come behind it.

19  For example, I heard Ms. Simpson testify about the work

20  center, and she talked about how good the work center was

21  operating.  It was operating as a jail should.

22       Well, when asked again specifically about it, well, there

23  was still some issues, some major issues, according to her,

24  with the work center.  So I'm not -- I'm confused as it

25  relates to is it actually operating as a jail should according

1    to her, or because it is operating as a jail should, should

2    that be overshadowed with the negativity of the facility as

3    well?

4        And I don't think that it should be handled that way

5    because we're still -- this is still a very fluid situation,

6    day-to-day operation we're operating under regarding our

7    detention facilities.  And we can't ignore the fact that all

8    of our facilities do need some changes and do need -- there

9    are some things that need to be implemented and addressed.

10        But we can't say that nothing has been done, because I've

11   personally seen a lot of work done.  And I've seen the

12   dedication from all stakeholders involved to make sure the

13   work is addressed and done as well.

14   Q.   Let me ask you this last question, because a lot of other

15   people have asked me this question also.  As an outsider

16   looking in, this jail seems like a big hassle to me.  And you

17   got elected by a big margin, you're a young guy, you'll

18   probably be the sheriff as long as you want to be the sheriff.

19        Why in the world won't you just step aside and let the

20   federal government to get this -- appoint a monitor, fix it,

21   you step back in, and look like a hero?  Why won't you just

22   let that happen?

23   A.   Well, I want an opportunity for my administration to make

24   a difference addressing our jail situation.  You know, that

25   jail is owned by and paid for by the citizens of Hinds County,

1   the taxpayers' dollars.  It's the sheriff's duty and

2   obligation to oversee the jail and the jail operations as

3   well.  That's what I would like to continue to do under my

4   administration and under my leadership.

5       I want to be responsible for getting us out of this

6   current situation that we're in or playing a role in getting

7   us out of this current situation that we're in to be able to

8   move detention services forward.  And we continue to operate

9   with the budget that is provided to us through the Board of

10  Supervisors and the taxpayers of Hinds County, rather than

11  letting a third party coming in that's unfamiliar with Hinds

12  County and operate our jail facilities.

13  Q.   Didn't these monitors state that even with the

14  appointment of a monitor, their presence would still be -- or

15  with the appointment of a receiver, their presence would still

16  be necessary to ensure compliance with the settlement

17  agreement?

18  A.   Yes.  According to the monitors, their presence would

19  still be necessary if we went into any type of receivership,

20  yes.

21  Q.   And I know I said that was my last question but is

22  there -- with the federal receiver, does federal money come

23  with that?

24  A.   No, it does not.

25  Q.   Well, who would pay for anything that's needed by the

1    jail if a receiver was appointed?

2    A.   The taxpayers of Hinds County.

3    Q.   The same as right now?

4    A.   Yes, sir.

5         MR. HALL:   I don't have any further questions, Your

6    Honor.

7         THE COURT:   Okay.   Obviously, you know that the Court

8    has questions.

9                          **EXAMINATION**

10   **BY THE COURT:**

11   Q.   I'll start off with the highly charged accusation that

12   you've made about the monitors.

13   A.   Yes, sir.

14   Q.   Prior to just hearing that, I've not heard anything about

15   the improper conduct of the monitors.   Have you advised the

16   Court of the monitors engaging in improper conduct?

17   A.   What specific conduct are you referring to, Your Honor?

18   Q.   I think your testimony was that the monitor was not being

19   impartial anymore?

20   A.   Oh, yes, sir.

21   Q.   Okay.   So I have not -- I've not heard that before, the

22   monitor or either -- yeah, the monitor or either Mr. Parrish's

23   conduct of your saying that he asked you to do something you

24   thought was illegal.

25   A.   Yes, sir, I -- that happened.

1   Q.   Did you report that to the sheriff?

2   A.   Yes, I did.  I remember us having that conversation when

3   I reported it to --

4   Q.   And who was the sheriff?

5   A.   It was Sheriff Vance.  And I told the -- his counsel at

6   the time, which was Claire Barker, about my conversation and

7   my issue that I had with Dave Parrish asking me to do

8   something that I would consider unlawful and unethical

9   regarding an investigation that was currently pending a court

10  trial.

11  Q.   Okay.  And I think you questioned the integrity of the

12  monitor sitting right there in the stand, and this is the

13  first time I've heard that.  So have you conveyed whatever ill

14  feelings you had with respect to the monitor carrying out her

15  role?  Have you conveyed that to anyone -- have you conveyed

16  it to the Court?

17  A.   I have not conveyed it to the Court, but I've had recent

18  conversations with counsel --

19  Q.   I don't -- and that's all I need to -- I don't want to

20  know what the conversations were.

21  A.   Oh, yes, sir.

22  Q.   I'm not going to invade your attorney-client privilege in

23  that regard.

24  A.   Yes, sir.

25  Q.   So tell me, you came on with Mr. Vance, I think.  Who

1    composed Mr. Vance's command staff?  Who was the undersheriff?

2    A.   Alan White was the undersheriff.  Eric Wall was the chief

3    deputy.  And then you had Major Pete Luke, and then you had

4    captains that were assigned under that leadership to

5    respective divisions as well.

6         Now, for detention --

7    Q.   You were the captain of investigators; correct?

8    A.   Yes, sir, I was the captain of CID.

9    Q.   And there was a captain of patrol?

10   A.   Captain of patrol.

11   Q.   Was that Jarett Taylor?

12   A.   Yes, sir, he is.  He was, yes, sir.

13   Q.   And then you had the warden who was Major Rushing?

14   A.   Major Rushing.

15   Q.   Okay.  Anybody else on the command staff?

16   A.   Yes, sir.  Captain Jeffery Burnley was the captain of

17   administration, civil processing, court bailiffs, 9-1-1

18   dispatch.

19   Q.   Any other command staff?

20   A.   No.  But, of course, you had the command staff in

21   detention, but that was the overall structure of the

22   department at that time, sir.

23   Q.   Did that command staff change any when Mr. Crisler became

24   interim sheriff?

25   A.   Yes, it did.

1    Q.   And how did the command staff change?

2    A.   Eric Wall left the department.  Jarett Taylor was

3    promoted to chief deputy.  Crystal Houston was promoted from

4    lieutenant to captain of the patrol division.

5    Q.   And by that time, Major Rushing was no longer there.  It

6    was Ms. Bryan?

7    A.   Yes, Major Rushing had been gone a long time ago.  You

8    had Fielder between Rushing and Bryan.

9    Q.   Right.  Claire Barker remained counsel?

10   A.   Yes, sir, she did.

11   Q.   Okay.  Now, who is in your command staff?

12   A.   In my command staff, Alan White is the undersheriff.

13   Jarett Taylor is the chief deputy.  I have four captains:

14   Captain Pete Luke, Captain Jeffery Burnley, Captain Natasha

15   Holmes, and Captain Crystal Houston.

16   Q.   What is your understanding as to why the consent decree

17   was entered into in 2016?  What is your understanding?

18   A.   It was my understanding that it was an agreement made

19   between the counsel of the board at that particular time and

20   the Department of Justice; that was my overall purview of it.

21   Q.   And why was the -- what was the need for the consent

22   decree as far as your understanding?

23   A.   The rights of prisoners, inhumane treatment, along with

24   other specifications as well, but that's the way I understood

25   it.

1    Q.   And what was your understanding of the stipulated order

2    that was subsequently entered into?

3    A.   The stipulated order was just out of the -- what I would

4    consider a short -- a shorter version of the consent decree

5    outfitting different things that needed to be addressed in a

6    shorter form than the original consent decree.

7    Q.   Now, I think you testified and that you understand

8    that -- well, let me ask you this:  Do you believe that the

9    buck stops with the sheriff?

10   A.   No, sir, it does not.

11   Q.   Okay.  Where does the buck stop with the sheriff with

12   respect to the office of sheriff?

13   A.   Oh.  I mean, it's the sheriff, and you have to have the

14   Board of Supervisors, of course.  But it does stop with the

15   sheriff's office with me, yes, sir.

16   Q.   Well, with respect to detention issues?

17   A.   Yes, sir, it does.

18   Q.   With respect to patrol issues?

19   A.   Yes, sir, it does.

20   Q.   With respect to administrative issues within the

21   sheriff's department?

22   A.   Yes, sir, it does.

23   Q.   With respect to the law enforcement side?

24   A.   Yes, sir, it does.

25   Q.   Personnel side?

```
 1    A.   Yes, sir, it does.

 2    Q.   Bailiffs in the courtroom?

 3    A.   Yes, sir, it does.

 4    Q.   And prior to your coming onboard, Interim Sheriff Crisler

 5    was the sheriff; correct?

 6    A.   Yes, sir, he was.

 7    Q.   Do you agree that the buck stopped with him as sheriff

 8    for those same areas where --

 9    A.   Yes, sir, it should have.  I -- I -- yes, sir.  Yes, as

10    the sheriff, that's the way it should operate.  Yes.

11    Q.   And when Mr. Vance was in office when he held the

12    position as sheriff, the buck stopped with him; correct?

13    A.   Yes, sir, it did.

14    Q.   And prior to Mr. Vance being the sheriff, Vic Mason was

15    the sheriff; correct?

16    A.   Yes, sir, he was.

17    Q.   And the buck stopped with Mr. Mason; correct?

18    A.   Yes, sir, it did.

19    Q.   And before Mr. Mason, Tyrone Lewis was the sheriff;

20    right?

21    A.   Yes, sir.

22    Q.   And with respect to sheriff duties, who did the buck stop

23    with?

24    A.   Him.

25    Q.   And before Tyrone Lewis, there was Malcolm McMillan;
```

***DAILY TRANSCRIPT***

1    correct?

2    A.   Yes, sir.

3    Q.   And who did the buck stop with?

4    A.   It stopped with him.

5    Q.   So anything that any employee up under the sheriff failed

6    to do, it really doesn't matter, because the buck would stop

7    with the sheriff; wouldn't you agree?

8    A.   Yes, sir, I do agree.

9    Q.   Now, you were at the facility the week of January the

10   24th because I was there.

11        Do you remember that?

12   A.   Yes, sir.  I did get a call that you were down there,

13   yes, sir.

14   Q.   Okay.  The only someone who knew -- well, you wouldn't --

15   well, when I was at the facility, you were there; right?

16   A.   Yes, sir, I was.

17   Q.   How many of your lawyers were there?

18   A.   I don't know exactly.  I know --

19   Q.   Mr. Gaylor was there; right?

20   A.   Yes, sir.  Mr. Hall.

21   Q.   Mr. Hall.  Mr. Morisani was there; right?

22   A.   Yes, sir.

23   Q.   In addition, the compliance -- Mr. Green was there;

24   right?

25   A.   Yes, sir, he was.

```
 1    Q.   There were a number of deputies who were there; right?

 2    A.   Yes, sir, it was.

 3    Q.   Major Bryan was there; correct?

 4    A.   Yes, sir, she was.

 5    Q.   And during -- and the monitors were there, Ms. Simpson

 6    and Mr. Parrish?

 7    A.   Yes, sir, that's correct.

 8    Q.   And on that date, the locks in A-Pod were not working;

 9    right?

10    A.   Yes, sir, that's correct.

11    Q.   And as far as you know today, some of the locks are still

12    not working; correct?

13    A.   Yes, sir, that's true.

14    Q.   And at least in some of the pods like you've testified, I

15    believe you said that the lights were not working; correct?

16    A.   Yes, sir, in A-Pod.

17    Q.   On that day, did you smell smoke at the facility?

18    A.   Your Honor, if I just may be open and transparent with

19    you.  I've lost complete sense of taste and smell since I had

20    COVID.

21    Q.   Okay.

22    A.   I still haven't regained those senses since I had COVID

23    in July of last year.

24    Q.   Would you have any reason to disagree if the Court

25    smelled smoke --
```

```
 1   A.   No, sir, I won't.

 2   Q.   -- in the facility?

 3   A.   No.

 4   Q.   Now, during the time you were -- you mentioned you were

 5   captain of the investigations.  Did you consider yourself part

 6   of Sheriff Vance's command staff?

 7   A.   Yes, sir, I did.

 8   Q.   Okay.  And as a part of his staff, command staff, did the

 9   command team talk about the detention facility?

10   A.   Several times, yes, sir, we did.

11   Q.   And there were times when the monitors would issue the

12   reports during the time that Sheriff Vance was in office;

13   correct?

14   A.   Yes, sir.

15   Q.   And the Court would hold status conferences after the

16   release of those reports; correct?

17   A.   Yes, sir.

18   Q.   Did you attend any of those status conferences?

19   A.   I was present for a few via Zoom, I think it was.  We

20   would be in Claire Barker's office, and we would all

21   congregate in there and we would have the meeting via Zoom.

22   Q.   And during those status conferences, the Court would talk

23   about the report?

24   A.   Yes, sir.

25   Q.   And there would be some discussion about what was in the
```

1   report?

2   A.   Yes, sir.

3   Q.   Okay.  And how the County might remedy anything that the

4   monitors found that were not according to the stipulated order

5   at the time; correct?

6   A.   Correct.

7   Q.   I think you said as captain of investigations, you were

8   responsible for, I guess, overseeing investigations both

9   inside the detention facility and outside?

10   A.   Yes, sir, I was responsible for criminal investigations

11   throughout all of Hinds County as well as detention services.

12   I had a jail investigator that was assigned to detention to

13   conduct investigations in detention services.

14       Later during our administration, I recognized the need

15   for another jail administrator (sic) as well, and I

16   recommended that we get another jail administrator (sic).  I

17   remember speaking with the monitors about this, and they

18   thought this was a good idea as well.

19   Q.   You said another jail administrator, but --

20   A.   I'm sorry.

21   Q.   -- I think you meant investigator; correct?

22   A.   Yes, sir, so that gives us two jail investigators.  So

23   that gives us two jail investigators that we have currently in

24   detention services now.

25   Q.   Now, MR was killed during the Vance administration --

1    during the Crisler administration; correct?

2    A.   Yes, sir, he was.

3    Q.   Okay.  Prior to that, how many deaths had occurred in

4    2021 at the facility?

5    A.   I think maybe five or six.

6    Q.   Were there any investigations done of those deaths?

7    A.   Yes, sir, there were.

8    Q.   There were?

9    A.   Yes, sir.

10   Q.   Were there any after-action reports done in those deaths?

11   A.   I've only seen one after-action report.

12   Q.   Let me ask you, what exactly is an after-action report?

13   A.   The first time I became familiar with an after-action

14   report was when I read the one for the death of MR, and that

15   was being completed by the former jail administrator.

16        Before then, I didn't really have much knowledge of an

17   after-action report or the requirement of an after-action

18   report by -- so I can't say if one existed or it didn't.  That

19   was my first time reading that because, of course, it goes

20   directly to the sheriff, I guess, and his administration.

21   Q.   So do you know what one needs to do to prepare an

22   after-action report?

23   A.   Yes, I do.

24   Q.   What does one need to do to prepare an after-action

25   report?

***DAILY TRANSCRIPT***

```
 1   A.   I think one needs to get all of the circumstances

 2   surrounding whatever the event is that's being written about

 3   or reported.  I think that it should also specify any

 4   corrections that need to be made or should be made.  I think

 5   that it should also distinguish or address policy violations

 6   as well in an after-action report or possible policy

 7   violations in an after-action report as well.  I think that is

 8   crucial for that to be -- to be addressed, that way you will

 9   have proper documentation for it, and you will have

10   accountability established for all parties that could have

11   been involved in whatever the incident is that led to an

12   after-action report being written.

13   Q.   So did the former sheriff rely on you for advice with

14   respect to what ought to be occurring or not occurring at the

15   detention center?

16   A.   You mean Sheriff Vance?

17   Q.   Yes.

18   A.   In what aspect, Your Honor?

19   Q.   You were part of the command staff.  I'm just asking, I

20   mean --

21   A.   Yes, sir.  He depended on me regarding the criminal

22   investigation aspect of incidents that occurred in detention

23   services; whereas we had employees that were found to be

24   smuggling contraband into the facility.  It would be my

25   obligation and duty to make sure that these detention officers
```

1   were held accountable.  Even after termination, if criminal

2   charges were warranted, it would be up to my division to seek

3   criminal charges.

4       It would be up to my division to investigate assaults in

5   the jail, whether the assaults were inmate on inmate or

6   detention officer on inmate to determine whether charges

7   should be filed by the detainee or by the detention officer.

8   And if so, we would facilitate that through the courts through

9   my division as well.

10  Q.  And how many officers did you have working for you

11  inside -- doing investigations inside the detention center

12  when you were over that area?

13  A.   Initially it was one, and we later got a second one.

14  Q.   Okay.  Now, there's been a lot of testimony today about

15  these quality assurance summary reports.  Do you have any

16  reason to believe that the information in those reports is not

17  truthful?

18  A.   I don't.  But I don't have anything to support it

19  neither, Your Honor, and I think that some of the things that

20  are included in those reports should be considered very

21  crucial and should be considered very serious and concerning.

22  And I think there should be some type of documentation to

23  support it as well instead of just putting it in a quality

24  assurance report without having other documentation of these

25  particular incidents.

1   Q.   PX-86 is a quality assurance summary of December 2021.

2   That's when you were sheriff; correct?

3   A.   Yes, sir.

4   Q.   I'm not sure, but I think the testimony reflected that

5   you had not -- have you -- did you read this before it was

6   submitted to the monitors or whoever it was submitted to?

7   A.   No, sir.  I've also stated on record, Your Honor, that I

8   was not afforded the opportunity to read any of these reports

9   before they were submitted to the monitors.

10       A directive was given to communicate specifically with

11   the jail administrator and not the sheriff regarding the

12   quality assurance reports; therefore, I was only afforded the

13   opportunity to read them after they had already been

14   submitted, or when it was time for them to be submitted after

15   they had been completed.

16       And also, Your Honor, I think it's important that the

17   record reflect that the jail administrator had -- the former

18   jail administrator had a lot of input as it relates to editing

19   some of these reports herself and making corrections and

20   changes to these reports before they were published as well,

21   again, excluding the sheriff from this process.

22   Q.   Did your investigators do an investigation of the death

23   of MR?

24   A.   Only Internal Affairs.  That death was outsourced to

25   Mississippi Bureau of Investigations to conduct the matter of

1  death and the criminal proceedings regarding that death as

2  well.

3  Q.   Why MBI?

4  A.   Well, it's going to be state law coming up, from my

5  understanding, that they investigate all law enforcement

6  related deaths or all jail deaths or whatever.

7       But then it was so that you would have an independent

8  agency conducting the investigation rather than having your

9  own criminal investigations division conduct an investigation.

10  Q.   But do you not do an investigation for your own purposes

11  to figure out what might -- what disciplinary action might be

12  taken against an employee?

13  A.   Yes, sir, I stated that was internal affairs.  They did

14  that investigation, yes, sir.

15  Q.   Internal affairs?

16  A.   Yes, sir, they conducted an investigation.

17  Q.   But internal affairs did not complete that investigation

18  until December of 2021; correct?

19  A.   Well, yes, sir.  And that was because I asked that they

20  go ahead and wrap it up or where we were with that

21  investigation; that is correct.

22  Q.   Now, you agree that there was -- I know you said that you

23  were not the sheriff at the time that MR was killed; correct?

24  A.   That's correct, yes, sir.

25  Q.   The buck stopped with the sheriff, though, did it not, in

1   your view?

2   A.   Yes, it did.

3   Q.   And I think you've testified on a number of occasions

4   that there were some things that were immediate to you in

5   looking at the videotape.  You could easily see that the

6   person was sleeping and not just inattentive, or whatever the

7   word that was used in some earlier reports.

8   A.   Yes, sir.  It was clear that the detention officer was

9   asleep as well as other information in that investigation

10  regarding the policy violations.  They were also on video as

11  well.

12  Q.   And just like you saw that immediately, just like you saw

13  that, presumably the sheriff in office could have seen that if

14  they looked at whatever you looked at; right?

15  A.   I will say that, but I'm not sure if he looked at it or

16  not.  I can't say.  I don't know.

17  Q.   And if he didn't look at it, that would be a problem,

18  too; right?

19  A.   It would be concerning, yes.

20  Q.   Now, of course, you know that that sheriff is now over

21  Henley-Young; is that right?

22  A.   Yes, sir, he is.

23  Q.   You've mentioned that you were -- you know, you're

24  responsible for the hiring of the jail administrators at RDC

25  and involved in that.  Were you consulted at all about the

1    administrator for Henley-Young?

2    A.   Yes, sir, I was.

3    Q.   Okay.  And you agreed that -- that the person who was

4    ultimately chosen for that position was the best person for

5    that position at the time, I guess?

6    A.   Well, Your Honor, I won't necessarily say that I agree.

7    I had some concerns, but ultimately that decision was made

8    through the County Administrator's Office.  But I will say and

9    I'll make it perfectly clear that I said that I can work with

10   anybody in any particular capacity as well, and which he and I

11   have had several communications.  We have had meetings

12   together, and we have worked together on several occasions

13   since he's been in that position as well.

14   Q.   During this litigation, you've given a few interviews to

15   the press; is that right?

16   A.   Yes, sir, I have.

17   Q.   And is it fair for me to assume, then, that you watched

18   some of the reports of this trial?

19   A.   I'm going to be honest with you, I don't watch the news.

20   Q.   Okay.  Do you read any of the reports of the trial?

21   A.   I have read a few, yes.

22   Q.   I think there was testimony earlier about internal

23   affairs documents and the -- at one point, the monitor did not

24   have access to the internal affairs documents -- not the

25   monitor -- excuse me -- the jail administrator?

```
1   A.   Yes, sir.

2   Q.   Okay.  Now, are internal affairs documents available to

3   the public?

4   A.   No, sir, they're not.

5   Q.   If I were to tell you that I saw the internal affairs

6   report in this case with respect to MR posted on WLBT News'

7   website --

8   A.   They are available only through a public records request,

9   yes.

10  Q.   Internal affairs documents?

11  A.   Yes, sir, through a public records request, they are.

12  Q.   Okay.  And that would explain possibly, then, that the

13  County or the sheriff's department got a request for release

14  for those documents from a source?

15  A.   Yes, sir, there was a request for a public records

16  document release for that.

17  Q.   And, now, I know you ran for this position, and as a part

18  of your running for the position, you appeared in at least

19  three debates; is that right?

20  A.   Yes, sir.

21  Q.   Okay.  One debate was with all the candidates or most of

22  the candidates.  I'm not sure if all of them were there.

23  A.   Yes, sir.

24  Q.   But then there were two debates, one at Jackson State on

25  November the 11th, 2021, between you and Mr. Crisler.  That's
```

1    one -- one debate; right?

2    A.   Yes, sir.  Yes.

3    Q.   And then there was a second debate hosted by WJTV?

4    A.   Yes, sir, that's correct.

5    Q.   Okay.  Now, during that debate, do you recall saying that

6    "Hinds County, we are nowhere near ready to come from up under

7    the consent decree"?

8    A.   Yes, sir, I did.

9    Q.   And that's what you believed back on November 11, 2021?

10   A.   I knew there were several issues that needed to be

11   addressed regarding the consent decree, yes, sir.

12   Q.   And at the debate on November the 18th at WJTV, with

13   respect to this walkout, do you recall saying that Mr. Crisler

14   accused you -- "the walkout was at the instruction of my

15   opponent."  I think those are your words about that; right?

16   A.   Yes, sir, he did say that in the debate.

17   Q.   Okay.  Have you -- obviously, you disagree with that?

18   A.   Completely.

19   Q.   But have you seen any documentation from the County or

20   otherwise that says that -- other than what we heard the other

21   day from Mr. Jones, is there any documentation that -- have

22   you seen any documentation that Major Bryan was the source of

23   the walkout?

24   A.   I have not seen any documentation, no.

25   Q.   Do you recall at the debate on November 18th, the WJTV

1    debate, saying, "We are at a set back, nowhere near ready from

2    coming up under the consent decree.  We are moving backwards."

3        Do you recall saying that?

4    A.   Yes, I did.  And it was as it relates to some of the

5    issues that needed to be addressed and specifically regarding

6    some of the deaths that occurred in the jail, specifically the

7    death of MR.

8    Q.   And the death of MR occurred sometime in October?

9    A.   Yes, sir.

10   Q.   And this Court entered its show cause order the night

11   that the polls closed on the runoff election; correct?

12   A.   I remember well, yes.

13   Q.   And I think you testified that you immediately -- one of

14   the first things you did was start trying to familiarize

15   yourself with the consent decree -- I mean, excuse me, not the

16   consent decree.  Excuse me -- with the show cause order?

17   A.   We were at my victory party at Hal & Mal's.  The County

18   attorney was there.  And we immediately stepped in a private

19   room, and we had a conversation about the show cause order

20   that night.

21   Q.   Now, I know that the Board of Supervisors, there have

22   been discussions about a new jail.

23   A.   Yes, sir.

24   Q.   And you've been part of those discussions now?

25   A.   Yes, sir, part of the discussions, and I attended several

1    meetings regarding this effort as well.

2    Q.   Were you a part of any discussions about a new jail prior

3    to you becoming sheriff?

4    A.   No.  I only had somewhat knowledge of it.  I didn't

5    realize, to be honest with you, until I became sheriff that so

6    much had been completed regarding it, regarding a new

7    facility, and that they had seemed to be making a lot of

8    progress.  So not only was the chatter there, there was also

9    resources and correspondence to support the fact that there

10   were some real heavy talks about building a new jail and

11   planning phases of a new jail as well.

12   Q.   Were you part of any of those conversations when you were

13   on Sheriff Vance's command staff?

14   A.   No, I wasn't part of any of the conversations.  Again, it

15   was mentioned, but I'm not as -- to be honest with you, I'm

16   not exactly sure when the beginning phase of the new jail even

17   initiated.  I don't know, so I can't say on record when that

18   was.  Only thing that I can testify is to what I was afforded

19   once I was elected sheriff, which I considered to be official

20   at that particular point and not just talks about a new jail.

21   Q.   Turning back to your debate that you had with

22   Mr. Crisler.

23   A.   Uh-huh.

24   Q.   The new jail was one of the topics at the WJTV debate;

25   right?

1    A.   Yes, sir.

2    Q.   Do you recall saying this, and if you don't, you don't:

3    "Hinds County is in no shape, form, or fashion ready to build

4    a new jail right now.  How can we build a new jail when we

5    can't currently maintain the one we have right now to come

6    from up under the consent decree?  Notice the runoff is

7    Tuesday, and we're talking about a new jail.  That's

8    impossible.  We can't even deal with the particular jail we

9    have now."

10       Do you recall saying that?

11   A.   Yes, sir, I do.  And, again, at that particular time, I

12   didn't know that they had made so much progress with building

13   a new facility, because, again, that was done while I was out

14   on leave from the sheriff's office.  And I wasn't afforded

15   that information or given that information about a new jail.

16   I didn't know anything about they had made that much progress

17   with building the new jail until I met with Supervisor Calhoun

18   the day after I was elected, when I met with him in his

19   office.

20   Q.   Again, the buck stopped with the sheriff.  So you heard

21   Mr. Calhoun's testimony about him having somewhat of a say

22   with respect to where a detainee should be housed.

23       Do you recall that testimony?

24   A.   Yes, sir, I recall that testimony and that incident.

25   Q.   Okay.  Does that violate RDC policy?

1    A.   You mean moving a detainee?

2    Q.   At the request of a member of the Board of Supervisors.

3    A.   I wouldn't necessarily say it violates a policy.  There's

4    not a policy for or against it, but what it does do, it does

5    not involve classification, which should always be considered

6    when you're moving a detainee from one facility to another.

7    And due to the fact that classification was excluded from this

8    particular process, that's what was found to be alarming and

9    concerning regarding this incident.

10   Q.   Now, you indicated that -- did you interview Mr. Frank

11   Shaw?

12   A.   Yes, sir, I did.

13   Q.   How long did that interview last?

14   A.   I'm not exactly sure.  We sat in my office -- I know it

15   was over an hour -- and we talked.  That was just one of the

16   occasions that I spoke with him.

17   Q.   Did you consider anyone else for the slot that Mr. Shaw

18   has now been picked for?

19   A.   Not for the interim position, no, sir.

20   Q.   Now, I think the Government asked you about his stint in

21   Arizona.  He worked for MTC in Arizona, didn't he?

22   A.   That's my understanding, yes.

23   Q.   Did you get that understanding from him?

24   A.   Yes, sir, I did.

25   Q.   Did he tell you why that may not be listed on his resume?

1    A.   It was my understanding that he was there for only two

2    weeks.

3    Q.   Did he say if the Arizona Department of Corrections did

4    any investigation -- well, did he mention there was a riot at

5    the facility he was at?

6    A.   Yes, I'm familiar with that.

7    Q.   Did he mention the Arizona Department of Corrections did

8    an investigation?

9    A.   No, sir.

10   Q.   Did he mention anything about what that investigation

11   concluded?

12   A.   No, sir.

13   Q.   Did he mention if he was a primary focus of the

14   investigation by the Arizona Department of Corrections?

15   A.   No, sir.

16   Q.   Did he mention that MTC lost the contract that it held

17   with the Arizona Department of Corrections because of the

18   events that occurred there?

19   A.   He didn't.  But I think I read something of that nature

20   in some correspondence that I read regarding that riot or that

21   incident that occurred.

22   Q.   And none of that concerned you?

23   A.   Well, I wouldn't say that it didn't concern me, but it

24   was my understanding that he was there for two weeks and that

25   he had departed.  I never saw anything or a reflection of him

1   being responsible or held responsible for anything regarding

2   that particular situation.

3   Q.   You are aware the Court asked the parties to submit names

4   of potential receivers; right?

5   A.   Yes, sir, I am.

6   Q.   Okay.  And are you aware the Board of Supervisors and you

7   have submitted the name of Frank Shaw to be the receiver, if

8   the Court were to appoint one?

9   A.   I can't say that I am.

10   Q.   Assuming that Hinds County has recommended him as a

11   receiver, those would be proper questions for this Court to

12   inquire into if it considers him a receiver; right?

13   A.   Yes, sir.

14   Q.   Everything that might have happened out in Arizona;

15   right?

16   A.   Yes, those would be things to consider.

17   Q.   Including things that happened at EMCF when he was there;

18   right?

19   A.   Yes, sir, that's correct.

20   Q.   Now, I think your testimony was that you were somewhat

21   concerned about having not attended the exit interview that

22   occurred the week of January 24th when the monitors were last

23   onsite.  You did not attend that one; right?

24   A.   No, sir, I didn't.

25   Q.   But there were employees of the sheriff's department who

1   actually did; is that correct?

2   A.   I'm not -- I'm not aware of that.  Maybe the attorney.

3   Q.   Maybe the attorney?

4   A.   But I wasn't, and it may be my understanding as well, but

5   I can't -- the jail administrator may not have even been

6   present, but I know I wasn't.

7   Q.   Okay.  Was the compliance coordinator there to your

8   knowledge?

9   A.   I'm not sure, sir.

10  Q.   Okay.  Who does the compliance coordinator report to, the

11  Board, or the sheriff, or anybody?

12  A.   They are a sheriff's department employee assigned to

13  detention.  She reports directly to the jail administrator.

14  The PREA coordinator and the quality assurance coordinator

15  both report directly to the jail administrator.

16  Q.   And what is Mr. Green's role in all of this -- Synarus --

17  who is Synarus employed by?

18  A.   He's employed by Hinds County.

19  Q.   Okay.  And what is his role?

20  A.   He's the compliance coordinator from my understanding.

21  Q.   And he gathers information and provides it to the monitor

22  and they talk -- from my understanding of the status

23  conferences, they talk rather routinely?

24  A.   Yes, sir, that's my understanding as well.

25  Q.   Okay.  I think I'm almost through.  I think you were here

```
 1   when Major Bryan testified, I believe.  And I think we all

 2   agree that she was hired in June, and she and Sheriff Vance

 3   worked together for less than -- physically together for less

 4   than a week, because he was out with COVID, she was out with

 5   COVID, and even you were out with COVID?

 6   A.   We all went out with COVID around the same time and that

 7   was in -- that was in mid- -- that was in late July,

 8   mid-to-late July when that happened.

 9   Q.   And Sheriff Vance died August 3rd.

10   A.   He died August 3rd.  I had just returned to work the day

11   before he died.

12   Q.   Okay.  And so that was about the same time that Major

13   Bryan returned?

14   A.   I'm not exactly sure.

15   Q.   Okay.  But it's your understanding that she worked there

16   September 2021?

17   A.   Yes, sir, she was.

18   Q.   October 2021?

19   A.   Yes, sir.

20   Q.   November 2021?

21   A.   Yes, sir.

22   Q.   December 2021?

23   A.   Yes, sir.

24   Q.   And January 2022?

25   A.   Yes, sir.
```

1  Q.   How long had the consent decree been in place?

2  A.   Five, six years.

3  Q.   How long had we been -- how long had the County been

4  operating under the stipulated order?

5  A.   I think it came down in early 2020 -- January 2020,

6  shortly after we came into office.

7  Q.   By the way, when I was there the other week, was there

8  any direct supervision going on that day?

9  A.   Not -- I can't recall.  Not at RDC, but the work center

10 does work under direct supervision.

11 Q.   The work center does work under direct supervision?

12 A.   Yes, sir.

13 Q.   RDC does not?

14 A.   No, sir.

15 Q.   And on the day that I was there, were there tables and

16 chairs in the Pod-A or any of the pods for the inmates to eat

17 their food off of?

18 A.   No, sir.

19 Q.   Are they there today?

20 A.   Not that I'm aware of, no.

21      THE COURT:  I have no further questions.  I turn it

22 over to the United States for any follow-up based on what I

23 have asked.

24      MS. COWALL:  The United States has no questions, Your

25 Honor.

---***DAILY TRANSCRIPT***---

1          THE COURT:  Okay.  Mr. Hall for the County.

2          MR. HALL:  May it please the Court?

3          THE COURT:  You may.

4                **FURTHER REDIRECT EXAMINATION**

5  **BY MR. HALL:**

6  Q.   Mr. Sheriff, the Court just asked you questions about

7  comments you made while you were on the campaign trail.  And

8  did you have the same insight and knowledge of what was going

9  on at the Raymond Detention Center while you were on the

10  campaign trail as you did after you were elected?

11  A.   No, sir, I did not until I was elected.  And I went to

12  the Raymond Detention Center and I did a tour, and Director

13  Weill can reflect that I stated that I was very impressed with

14  some of the changes that had taken place within the Raymond

15  Detention Center since my last visit.  And although there was

16  a lot of work that still needed to be completed, I was

17  impressed with some of the things that I saw, and I was again

18  impressed with Kathryn Bryan at that particular point as well.

19  Q.   After you were elected, did you have better access to

20  information, regarding the detention services -- more access

21  than you had while you were a candidate?

22  A.   Yes, sir, I did, absolutely.

23  Q.   Did you have more access than you had when you were just

24  a captain -- not just a captain, but a captain with the Hinds

25  County Sheriff's Office?

1    A.   Yes, sir.  I had full access to everything as it relates

2    to not only the sheriff's office business but County business

3    that affects the sheriff's office as well.

4    Q.   Now, the Court just asked you also about direct

5    supervision.  Direct supervision is where you have the

6    detention officers in the pod actually watching the detainees;

7    is that right?

8    A.   Yes, sir.

9    Q.   When we were down there, I thought that there was a unit

10   on B-Pod with the two female corrections officers.  Do you

11   recall that?

12          MS. COWALL:  Objection, leading.

13          THE COURT:  Objection overruled.

14   A.   I vaguely remember something.  Like, there was so much

15   moving around, there was so much going on, we were in and out

16   of the pods.  Now, let me say this:  I do know that there have

17   been some stations set up in B-Pod and C-Pod set up for direct

18   supervision.  This was recently done, and I first saw it when

19   I went to tour the jail after I was elected and before I was

20   sworn in.

21        But on that particular day, I just can't -- I'm not going

22   to dispute it and say that it wasn't.  I just can't remember.

23   BY MR. HALL:

24   Q.   I want to jog your memory, okay, if I can?

25   A.   Okay.

1    Q.   I asked you about it, and the question I asked was:  If

2    something goes down, are those two little girls going to be

3    able to handle business?

4    A.   That's correct.  Yes, you did.

5    Q.   So was that a -- not to disparage the correction officers

6    by calling them little girls, but they were young and small.

7    I own that.  I was wrong.

8         Was that a direct supervision pod?

9    A.   Yes, at that time.  Yes, and I remember that

10   specifically.  Yes.

11        MR. HALL:  Court's indulgence, Your Honor.

12        I don't have any further questions, Your Honor.

13        THE COURT:  You may step down, Mr. Jones.

14        We actually ended a little bit earlier than I thought

15   we would today.  We are at the end of our day, though.

16        Okay.  We should start back up tomorrow morning at

17   9:00.  I'm going to allow the County to rest then as opposed

18   to now, and then any rebuttal the Government will begin after

19   the County rests.  We'll see where we are around the lunch

20   hour as to whether or not we get through tomorrow, but we made

21   things on this end flexible.  If we, for some reason, do not

22   conclude tomorrow -- but I think we still should do our best

23   to, including closing statements and closing arguments, but

24   that's all I have.

25        Anything we need to take up before we end the day?

1        MS. COWALL:  No, Your Honor.

2        MR. HALL:  Nothing from the defendant.

3        THE COURT:  Okay.  Thank you all so much for your

4    patience, and we'll start up at 9:00 tomorrow morning.

5        Court's in recess or adjourned.

6    ****************************************************************

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **COURT REPORTER'S CERTIFICATE**

2

3       I, Candice S. Crane, Official Court Reporter for the

4   United States District Court for the Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true, and correct transcript of the

7   proceedings had in the forenamed case at the time and place

8   indicated, which proceedings were stenographically recorded by

9   me to the best of my skill and ability.

10      I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13      THIS, the 28th day of February, 2022.

14

15                              /s/ Candice S. Crane, RPR, CCR

16                              Candice S. Crane, RPR, CCR #1781
                                Official Court Reporter
17                              United States District Court
                                Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25