1             IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                  NORTHERN DIVISION

3

4  UNITED STATES OF AMERICA                 PLAINTIFF

5  VERSUS            CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

6  THE HINDS COUNTY BOARD OF SUPERVISORS,
    HINDS COUNTY SHERIFF, ET AL.          DEFENDANTS
7

8

9              EVIDENTIARY HEARING, VOLUME 11,
        BEFORE THE HONORABLE CARLTON W. REEVES,
10        UNITED STATES DISTRICT COURT JUDGE,
              MARCH 1, 2022,
11           JACKSON, MISSISSIPPI

12

13         (Appearances noted herein.)

14

15

16

17

18

19

20

21

22  REPORTED BY:

23     CANDICE S. CRANE, RPR, CCR #1781
     OFFICIAL COURT REPORTER
     501 E. Court Street, Suite 2.500
24     Jackson, Mississippi  39201
     Telephone:  (601) 608-4187
25     E-mail:  Candice_Crane@mssd.uscourts.gov

***DAILY TRANSCRIPT***

1    **APPEARANCES:**

2       FOR THE PLAINTIFF:

3           CHRISTOPHER N. CHENG, ESQ.
            SARAH G. STEEGE, ESQ.
4           LAURA L. COWALL, ESQ.
            HELEN VERA, ESQ.
5           MITZI DEASE-PAIGE, ESQ.

6       FOR THE DEFENDANTS:

7           NICHOLAS F. MORISANI, ESQ.
            JAMES W. SHELSON, ESQ.
8           TONY R. GAYLOR, ESQ.
            RAYFORD G. CHAMBERS, ESQ.
9           JOHN C. HALL, II, ESQ.
            REUBEN ANDERSON, ESQ.
10
        ALSO PRESENT:
11
            ANTHONY NJOKU
12          MICHAEL DENAULT
            ELIZABETH SIMPSON
13          DAVID PARRISH
            JIM MOESER
14          RICHARD DUDLEY
            SHERIFF TYREE JONES
15          LESLIE FAITH JONES
            CINDY MOHAN
16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Style and appearances.................................1995-1996
The defendants rest....................................1998

WITNESS:  KATHRYN BRYAN (REBUTTAL)

    Direct by Ms. Cowall...................................1999
    Cross by Mr. Hall......................................2010
    Defendants' Exhibit 107 entered.......................2024
    Redirect by Ms. Cowall................................2031
    Examination by the Court..............................2034

WITNESS:  ELIZABETH SIMPSON (REBUTTAL)

    Direct by Mr. Cheng...................................2040
    Cross by Mr. Hall......................................2048
    Redirect by Mr. Cheng.................................2061
    Examination by the Court..............................2063
    Recross by Mr. Hall...................................2070
    Further Examination by the Court......................2077

WITNESS:  DAVID PARRISH (REBUTTAL)

    Direct by Mr. Cheng...................................2079
    Cross by Mr. Morisani.................................2093
    Redirect by Mr. Cheng.................................2103
    Examination by the Court..............................2104

CLOSING ARGUMENTS:

    By Mr. Cheng...........................................2108
    By Mr. Shelson.........................................2154
    By Mr. Cheng...........................................2194

Court Reporter's Certificate............................2207

|    |                                                          |
|----|----------------------------------------------------------|
| 1  | **IN OPEN COURT, MARCH 1, 2022**                         |
| 2  |                                                          |
| 3  | THE COURT:  You may be seated.                           |
| 4  | Good morning.  I apologize for the delay.  Is there      |
| 5  | anything we need to take up before we begin?             |
| 6  | MR. HALL:  Nothing from the defendant, Your Honor.       |
| 7  | MS. COWALL:  Nothing from the United States, Your        |
| 8  | Honor.                                                   |
| 9  | THE COURT:  All right.  What says the defendant?         |
| 10 | MR. HALL:  The defense rests.                            |
| 11 | THE COURT:  All right.  The defendant has now rested.    |
| 12 | Does the Government intend to call any rebuttal          |
| 13 | witnesses?                                               |
| 14 | MS. COWALL:  Yes, Your Honor.  We plan to call three     |
| 15 | rebuttal witnesses, beginning with Major Kathryn Bryan.  |
| 16 | THE COURT:  You may proceed.                             |
| 17 | MS. COWALL:  Thank you, Your Honor.                      |
| 18 | THE COURT:  Good morning, Major Bryan.  That document    |
| 19 | that you just had -- Ms. Cowall, could you get that document? |
| 20 | Maybe that was another witness from yesterday.  I'm not sure. |
| 21 | MS. COWALL:  Okay.                                       |
| 22 | THE COURT:  Major Bryan, I will remind you, you're       |
| 23 | still under oath.                                        |
| 24 | THE WITNESS:  Yes, sir.                                  |
| 25 | THE COURT:  All right.  And, Ms. Cowall, you may         |

1    proceed.

2          MS. COWALL:  Thank you, Your Honor.

3                        **KATHRYN BRYAN,**

4          **having been previously duly sworn, was examined**

5    **and further testified as follows...**

6                 **DIRECT EXAMINATION (REBUTTAL)**

7    **BY MS. COWALL:**

8    Q.   Good morning, Major Bryan.

9    A.   Good morning.

10   Q.   Welcome back.  I have a few questions for you.  Some may

11   be topics that you touched on, and some may be new topics.

12         The first thing I'd like to ask you about is a staff

13   walkout.  Are you aware of a staff walkout that occurred at

14   the Hinds County Jail in November 2021?

15   A.   I am.

16   Q.   And what is your recollection of what happened?

17   A.   I got a call from Chief Simon on a Friday, I believe.  I

18   was off.  I had friends and family in town and was not at work

19   and got a call that he had heard word from one of the officers

20   that there was a rumor that there was going to be a walkout,

21   that a couple officers just weren't going to come to work

22   because they were disgruntled about some pay issues and

23   overall conditions of their employment.

24         So I made a phone call, I believe directly to -- I called

25   the County to find out what was going on with the 5 percent

 1    pay raise and the -- I believe at the time the COVID stimulus

 2    money, spoke to Mr. Stephen Hopkins, and he graciously offered

 3    to go to the jail and explain to the officers what the

 4    sequence of events was before that was going to kick in, just

 5    to give them some more information than what they were hearing

 6    about in the media, which is where they got the information

 7    that they had.

 8    Q.   So had that pay been announced already?

 9    A.   When I was in the Board of Supervisors meeting and saw

10    them vote the 5 percent in, I did go back to the jail and tell

11    staff right away that the 5 percent had been voted in,

12    because, again, we were trying desperately to keep staff from

13    resigning.  So I wanted them to know that that had been

14    approved.  And then it didn't hit their paychecks for a while,

15    and then I heard that there was going to be a walkout.

16         And Mr. Stephen Hopkins went to the jail and took a long

17    time explaining everything to the staff that were there.  I

18    understand it was to their satisfaction.  They thanked him for

19    being there.  Chief Simon said everything seemed to have

20    settled down, and everybody went back to work and everything

21    was fine.

22         Saturday morning -- I believe I got my timeline right.

23    Saturday morning I get word that they've walked out, that

24    there are six or seven of them in the parking lot refusing to

25    go to work.  So I went.  Chief Simon was on his way, Captain

1    Conner was on his way, and I spoke to then Sheriff Crisler,

2    who was there, and he said, "I'm here.  I'm speaking with the

3    staff out in the parking lot."

4         When I got to the parking lot in the Raymond Detention

5    Center, there were probably 30 officers gathered, some in

6    civilian clothes that were clearly not on duty that had come,

7    and Sheriff Crisler was addressing them, and he had spoke for

8    a length of time and then identified one of the officers that

9    seemed to be kind of leading the charge or taking

10   responsibility for the group, so he asked her to come in.  The

11   three of us met in my office.  He directed her to write down a

12   list of what would appease the staff in general, and so she

13   left my office to go compile this list.

14        She later came back with the list, gave it to me, and

15   left again.  Sheriff Crisler went over that list and had me

16   write down the dates that those things that were on their last

17   of demands would be addressed or accomplished and then

18   directed me to give that list back to the officer.

19   Q.   And so did you know the walkout was going to happen

20   before it happened, before you got that call from Chief Simon?

21   A.   So the short answer is no.  The fuller answer is this:

22   In my 30-year career as a law enforcement officer and as a

23   detention administrator, I have never seen the need for nor

24   have I ever stooped to sedition, nor have I ever done anything

25   that would place my officers' lives or jobs in jeopardy just

1    to accomplish something.  So any allegation or suggestion that

2    I incited an insurrection, that I supported it, or that I was

3    otherwise privy to it would be a lie.

4    Q.   I'd like to move on and talk to you about something on a

5    different topic, which is PREA, the Prison Rape Elimination

6    Act.

7         Are you aware of any allegation that you denied PREA

8    services to a detainee?

9    A.   I am.

10   Q.   And what's your recollection of what actually happened?

11   A.   So Officer Fields was the -- is the PREA coordinator, and

12   she went out on leave for an undetermined period of time.  I

13   never knew while she was out for a total of the five months

14   when she would be coming back, so I didn't take efforts to

15   find other officers to fill that role because I didn't know

16   when she would be coming back.  And, again, this was right

17   after I got there.  There were a lot of things going on that I

18   needed to address.

19        So during that time while she was out, we had a complaint

20   of a PREA incident from a female detainee at the work center.

21   So I contacted Lieutenant McBride, who was the lieutenant at

22   the work center, and -- highly competent supervisor, just an

23   amazing officer, and asked him to go look into this allegation

24   from the female detainee at the work center, so he did.

25   Conducted what I thought was a very sufficient investigation

1   into that allegation and determined that it was unfounded,

2   there was no basis to find that to be a PREA incident.

3       So even though the incident was declared unfounded, we

4   still put that detainee in touch with someone from MSCASA,

5   Coalition Against Sexual Abuse, because clearly that female

6   detainee needed to talk to somebody, even though she, we

7   believe, made this up.  So Lieutenant McBride made that

8   coordination between the person at MSCASA and the female

9   detainee, and they had a phone conference.

10      He also arranged for some follow-up meetings between the

11  detainee and MSCASA, but right at that time he went out on

12  leave because he got married.  So he left with the

13  understanding that those were going to be continuing, he left

14  with my understanding that those would be continuing, and I

15  didn't think another thing of it because, again, it had been

16  unfounded.

17      Come to find out, the subsequent meetings never happened.

18  I don't know why.  But I had initially made contact with

19  MSCASA, explained to them my background with respect to PREA,

20  how I felt about PREA and how important it was to me.

21      At the time I had looked for a policy on PREA.  Again, I

22  had just gotten there, wasn't super savvy on where things were

23  or what they were called, so when I did a cursory look in the

24  approved policies that we had, I didn't see anything that

25  jumped out that said PREA.  So I told her, I said, "I don't

 1    think that we have a PREA policy, but I don't need a PREA

 2    policy to arrange for these meetings with you and the

 3    detainee."  It wasn't until -- so Lieutenant McBride came back

 4    and we went about our work.

 5         Four months later, coincidentally when Officer Fields

 6    returned to work, within a day or two there seemed to be a

 7    problem with how we conducted that investigation, and the

 8    woman from MSCASA sent a letter to the sheriff expressing some

 9    things that weren't true and her disappointment that we had

10    denied her client services, which was also untrue.

11    Q.   Now, I'd like to shift gears a bit and talk to you about

12    termination of staff related to the homicide of detainee MR.

13         Are you familiar with those terminations, Major Bryan?

14    A.   I am.

15    Q.   And who terminated staff --

16         MR. HALL:  Your Honor, we're going to object that this

17    is not proper rebuttal in that Major Bryan has already -- or

18    Ms. Bryan's already testified about this in her case in chief.

19         THE COURT:  Objection overruled.

20    BY MS. COWALL:

21    Q.   Who terminated staff with regard to the MR homicide?

22    A.   Sheriff Jones.

23    Q.   And had you sought to terminate staff before Sheriff

24    Jones did?

25    A.   Not those staff, but yes.

1  Q.   And why hadn't you sought to terminate those staff before

2  Sheriff Jones did?

3  A.   So the incident in question rose to the level of being an

4  internal affairs investigation, and internal affairs, from

5  what I had experienced in my short tenure with the Hinds

6  County Sheriff's Office, handled that investigation into any

7  staff misconduct, not me.  So my responsibility with relation

8  to that incident was to conduct an after-action review and

9  issue a report from that.

10 Q.   And had you been able to review internal affairs

11 investigation records regarding these staff?

12 A.   No.

13 Q.   Tell us about the access that you did or didn't have to

14 internal affairs investigative materials while you were jail

15 administrator.

16 A.   So my access was either none for a while or extremely

17 limited for a short period of time.  I repeatedly requested

18 access and didn't get access.

19 Q.   Did you raise a concern about this to folks from the

20 sheriff's office or the County?

21 A.   I did.

22 Q.   Did you raise concerns that were conveyed to the Court?

23 A.   I raised concerns with the monitor.  Sheriff Crisler

24 sought to address that.  He had issued an order to his

25 in-house counsel to draft a memorandum from his office giving

1    me that access, and he thought -- in my discussion with him,

2    he told me that he thought that that had been done.

3    Unbeknownst to him, it hadn't been done, so that caused a

4    delay.  But he did take efforts to give me access to those

5    files in those investigations.

6    Q.   And you talked about the type of access that you

7    eventually got.  Was that adequate?

8    A.   No.

9    Q.   And why not?

10   A.   Well, it is my understanding that the consent decree

11   indicates that I should have some input into personnel

12   decisions, and so if I'm not given access to investigative

13   files until after the fact and after decisions are made, then

14   that is not adequate access.

15        There was a period of time that the only access I got was

16   a spreadsheet of cases that were open with very limited

17   information on the spreadsheet, and in my opinion that access

18   is not adequate.

19   Q.   And you mentioned the consent decree requirement about

20   the jail administrator needing to be consulted regarding staff

21   discipline and termination issues.

22        Did the sheriff contact you and consult with you before

23   firing staff regarding the MR homicide?

24   A.   No.

25   Q.   Now, I have a series of questions that may jump around a

1   bit, so bear with me here.

2       I'd like to follow up a bit on your relationship with

3   Sheriff Jones.

4       Did you ever refuse to meet with Sheriff Jones during

5   your tenure as jail administrator?

6   A.   I did not.

7   Q.   Did you ever tell Sheriff Jones that you couldn't work

8   with him?

9   A.   So that was the beginning of the sentence.  The full

10  sentence was that I couldn't continue to work for him under

11  the conditions that we were facing, which was:  We weren't

12  communicating very well and we needed to find a way to work

13  together in a different way.  I communicated that in person

14  and I communicated that in an e-mail requesting a meeting to

15  that end.

16  Q.   And did you get a response to that?

17  A.   I did not.

18  Q.   Did you exclude Sheriff Jones from quality assurance

19  meetings?

20  A.   I did not.

21  Q.   Did the sheriff ever tell you that you intimidated him?

22  A.   He did not.

23  Q.   Did Sheriff Jones ever do anything to suggest he felt

24  intimidated by you?

25  A.   No.

1   Q.   Now, there's been an allegation that you played a song in

2   a meeting and it upset the sheriff.  Can you explain what

3   happened?

4   A.   So my phone went off in a -- the last day of the

5   monitors' site visit, we had a master planning meeting at the

6   architectural firm, and there were quite a number of people in

7   attendance, and like we all do, I always try to turn my ringer

8   off, but I didn't that day, and my phone rang, and I turned it

9   off pretty quickly because it was sitting right in front of

10   me.  If that made him uncomfortable, I don't understand that.

11      That's been my ringer for every incoming call regardless

12   of who's calling for about ten years, and during that time

13   there had to have been 40 or 50 sheriffs that have heard that

14   ringtone that think it's funny.

15   Q.   Speaking of phones, did you ever ignore calls from the

16   sheriff on your County phone or e-mails on your County e-mail?

17   A.   I've always returned a call from Sheriff Jones, and as I

18   explained to him -- so my office is outside the secure

19   perimeter of the jail.  It's in the administrative area, where

20   we carry cellphones and whatever else.  When I go into the

21   jail, I don't take my cellphone into the jail.  A, it's not

22   safe.  B, there's no cellphone reception in there.  So if I'm

23   in the bowels of the jail, I don't have my phone.  And that

24   could be for a period of time, so I'm not as timely answering

25   phone calls as people that just work in administrative offices

1    are.

2    Q.   Now, do you believe that you tried to work things out

3    with the sheriff, Sheriff Jones, before he fired you?

4    A.   I made several requests to have meetings to get things

5    sorted out.  I don't think that I was provided enough time to

6    really make significant effort to work things out because I

7    was terminated so soon after his election.

8    Q.   A couple more questions, Major Bryan.

9         In your role as Hinds County jail administrator, who did

10   you consider yourself to be serving?

11   A.   I served the community that I made my home.  I reported

12   to the sheriff of Hinds County.

13   Q.   And what did you believe your mission to be when you came

14   to Hinds County?

15   A.   As communicated to me by Sheriff Vance, I was to help

16   compliance efforts to get us out from underneath the consent

17   decree and do what I've done in several other jails, which is

18   improve conditions and run a constitutional jail.

19        MS. COWALL:  Thank you, Major Bryan.

20        I have no further questions at this time.

21        MR. CHENG:  I should mention Mr. Parrish e-mailed that

22   he's having a hard time hearing the witness, so I don't know

23   if it's the mike.

24        THE COURT:  Okay.

25        MR. CHENG:  Thank you.

1          THE COURT:  We'll turn up the mike a little bit.

2          MR. HALL:  Court's indulgence while I set up, Judge?

3          THE COURT:  You may.

4          MR. HALL:  May it please the Court?

5          THE COURT:  You may proceed.

6                    **CROSS-EXAMINATION (REBUTTAL)**

7     **BY MR. HALL:**

8     Q.   Ms. Bryan, I have some questions about what you were just

9     asked.  And let's talk about the walkout first.  Okay?

10         Now, it's your testimony that you heard rumblings about a

11    walkout the day before it happened; correct?

12    A.   Yes.

13    Q.   You didn't call the sheriff and let him know, did you?

14    A.   No.

15    Q.   And as we've heard in here, the buck stops with the

16    sheriff; right?  Do you agree with that sentiment?

17    A.   Yes.

18    Q.   And if somebody walks out of that sheriff's jail, whose

19    responsibility is it?

20    A.   It's ultimately the sheriff's.

21    Q.   Didn't you think it was a good idea to tell the sheriff

22    that you had heard about a potential walkout when you heard

23    about it?

24    A.   Not if I could get it under control, no.

25    Q.   So if you could handle it, you didn't think that was

1    something important to relay to Sheriff Crisler?

2    A.   Part of my responsibilities as jail administrator is to

3    keep burdens off of the sheriff and handle as much as I can.

4    Q.   You can't have it both ways.  It's either his

5    responsibility or it's not.  Now, you can't get praise for the

6    great things and when the bad stuff happens put it off on the

7    sheriff.  You agree with that; right?

8         MS. COWALL:  Objection, Your Honor.  It's

9    argumentative.

10        THE COURT:  Objection sustained.

11   BY MR. HALL:

12   Q.   As far as Mr. Hopkins is concerned -- let's talk about

13   that.

14        Mr. Hopkins is over finance and budgets for the County?

15   That was a question.  You can answer.

16   A.   Yes.

17   Q.   And you talked to him that Friday to quell the rumors; is

18   that right?

19   A.   Yes.

20   Q.   And did he go down there?

21   A.   He did.

22   Q.   Did you go down there with him?

23   A.   I did not.

24   Q.   So as a jail administrator trying to keep things off the

25   sheriff, you didn't feel it necessary to address the staff the

1    day before an actual walkout occurred when you heard there

2    were rumblings; is that right?

3    A.   Because I have full trust and confidence in Chief Simon,

4    who was there.

5    Q.   But you sent a money man down there to talk to him from

6    the County?

7    A.   I sent a what?

8    Q.   The money man.  That's what I call him.

9         You sent the budget guy to address this issue instead of

10   going down there yourself?

11   A.   I didn't send anyone.  He offered to go.

12   Q.   And you didn't offer to go with him, did you?

13   A.   No, I did not.

14   Q.   You didn't tell the sheriff to accompany him either, did

15   you?

16   A.   As I just said, no, I didn't.

17   Q.   The next day when the walkout actually occurred, now, who

18   gave you notice that the walkout had occurred?

19   A.   Chief Simon.

20   Q.   Now, let's be clear.  Was it a walkout, or did Alpha

21   shift not come on to relieve Charlie shift?

22   A.   I don't know if semantics matter.  Officers didn't go to

23   work.

24   Q.   Let's be clear, now.  So was it that one shift refused to

25   go into the building to relieve the shift that was already

1    there?

2    A.   That was part of it, yes, but there were other officers

3    assembled in the parking lot already.

4    Q.   But the notion that -- those other officers that were

5    assembled in the parking lot, you said they had regular street

6    clothes on; right?

7    A.   Yes.

8    Q.   And they weren't supposed to work that day, to your

9    knowledge, were they?

10   A.   Some of them were scheduled to work later that day.

11   Q.   But the notion of all the corrections officers leaving

12   the Raymond Detention Center, that didn't happen, did it?

13   A.   No.  There were one or two left still in the building.

14   Q.   Which two were left in the building?

15   A.   I don't know.

16   Q.   So it's your testimony -- how many people work on a

17   shift?  That would have been Charlie shift?

18   A.   It varies from day to day and shift to shift.

19   Q.   Did you discipline any of these people?

20   A.   No.  Sheriff Crisler said we weren't going to discipline

21   them because there were so many of them.

22   Q.   But your testimony is that the whole Charlie shift with

23   the exception of two walked out of that building?

24   A.   That is not my testimony.

25   Q.   Okay.  So you said there were only two left.  That's what

1    I'm trying to figure out.

2         How many people actually walked out?

3    A.   I don't have a number of how many people walked out.

4    Q.   How many people were left in the building?

5    A.   Just a handful.

6    Q.   So now it's a handful.  So I need you to be specific,

7    because this matters.  Okay?

8         Specifically, do you know how many people were left in

9    your facility that you were charged with?

10   A.   I do not.

11   Q.   Now, as far as this PREA investigation, it's your

12   testimony that you were new and didn't know that the detention

13   center had a PREA policy; is that right?

14   A.   Yes.

15   Q.   And you advised a third party that the County did not

16   have a PREA policy, didn't you?

17   A.   Yes.

18   Q.   Did you go back and tell them once you found it, "I was

19   mistaken.  We do actually have a PREA policy"?

20   A.   I don't remember if I did or not.

21   Q.   Now, you were also -- this cellphone business, now let's

22   talk about that.

23        You said you don't bring your cellphone in because it

24   doesn't work in the building?

25   A.   That wasn't all I said.  I said it's not safe to bring a

1   cellphone down into the jail and there's very poor reception

2   once you get into the jail.

3   Q.   The PREA coordinator has a cellphone; right?

4   A.   Yes.

5   Q.   And does the cellphone that the PREA coordinator has,

6   does she have some special satellite phone that works in the

7   jail cell -- in the jail?

8   A.   I don't know what type of phone she has.

9   Q.   She has a County-issued phone, to the best of your

10   knowledge; right?

11   A.   I believe so.

12   Q.   And the same type of County-issued phone that the County

13   gave you to use; right?

14   A.   I have no idea if it's the same.

15   Q.   You have no reason to believe that the cellphone that the

16   PREA coordinator uses to handle her job is any different than

17   the cellphone that was issued to you, do you?

18   A.   No.

19   Q.   As far as the decision to terminate staff, you just

20   previously testified that you were not sure about where things

21   were as far as policies were concerned; right?  Is that a fair

22   statement?

23   A.   Yes.

24   Q.   Is it also a fair statement that you may not have been

25   aware of how disciplinary policies worked, let's say in the

1   fall of 2021?

2   A.   That would be correct.

3   Q.   All right.  You and I can agree that you had the full

4   capability to discipline employees absent an IAD report;

5   right?

6   A.   That was never specifically communicated to me, no.

7   Q.   So if it wasn't communicated, that's different than

8   saying you didn't have that authority; right?

9   A.   Well, that was the gray area that I functioned in.

10  Absent directives, I didn't know what authority I had.

11  Q.   So let's go back to the MR incident.

12       Now, you reviewed the video; right?

13  A.   I did.

14  Q.   And you saw a corrections officer sleeping, didn't you?

15  A.   I saw what appeared -- if you read the AAR, it did not

16  say that he was sleeping.  It said he wasn't moving for a

17  significant period of time.

18  Q.   I agree that's exactly how you characterized it, but you

19  could have also written down he was sleeping, because that's

20  what he was doing; right?

21  A.   So the video that I reviewed, absent any other

22  information, indicated to me that he was immobile for a period

23  of time.  Could I make a determination that he was asleep?

24  Not from that video.

25  Q.   Did you undertake any type of investigation yourself?

```
 1   For instance, did you talk to him?

 2   A.   If there's an internal affairs investigation going on, I

 3   should not talk to the people involved.

 4   Q.   Who said that?  Where is that policy?

 5   A.   There is no policy.

 6   Q.   So there was nothing keeping you from investigating --

 7   A.   I don't know where they --

 8   Q.   Let me finish my question, ma'am.

 9        THE COURT:  Hold on.  Yeah, one at a time.  Finish your

10   question.

11   BY MR. HALL:

12   Q.   There is no policy preventing you from conducting your

13   own investigation to see if an individual was sleeping while

14   an inmate was being murdered, is there?

15   A.   It doesn't make any sense to me for there to be dual

16   investigations for the same purpose, and I don't know if

17   rights had been read previously to those officers or not, and

18   I don't want to otherwise mess up their internal

19   investigation.  So, no, that is not something that I would do.

20   Q.   Did you ask the sheriff if it was okay for you to

21   investigate this yourself?

22   A.   No.

23   Q.   Did you ask the IAD if you could talk to the individuals

24   yourself?

25   A.   No.
```

```
 1    Q.   So you don't know one way or the other testifying today

 2    whether or not it was inappropriate for you to have terminated

 3    these officers absent an IAD investigation, do you?

 4    A.   Well, I didn't have the authority to terminate anyone.

 5    Q.   Well, you had the authority to recommend terminations;

 6    right?

 7    A.   I did.

 8    Q.   Okay.  And it's your testimony, though, that you never

 9    discussed your authority with respect to terminating these

10    officers with Sheriff Crisler at the time, did you?

11    A.   Right.

12    Q.   What about your subordinates who had been in the jail

13    longer than you?  Did you discuss your authority to recommend

14    terminating these individuals prior to an IAD report being

15    complete?

16    A.   Not that I remember, no.

17    Q.   Now, there was an incident, though, where you got -- you

18    asked -- this was after Sheriff Jones took office.

19         There was an incident where you wanted him to terminate a

20    corrections officer because she smarted off at you?  Do you

21    recall that?

22    A.   I do.

23    Q.   And you weren't waiting for an IAD report to be finished

24    before you wanted him to fire her, did you?

25    A.   No, because that wasn't an incident that required an IAD
```

1   investigation.  That was an incident that happened in my

2   presence.

3   Q.   But the fact remains, an IAD report is not necessary,

4   it's not a precursor to disciplining or terminating employees.

5   You and I can agree to that; right?

6   A.   Yes.

7   Q.   And no one has ever told you that we have to have an IAD

8   investigation complete before employees are terminated or

9   disciplined, have they?

10  A.   No, they have not.

11  Q.   You've never seen a policy that says IAD reports or

12  investigations have to be complete before disciplinary action

13  is rendered, have you?

14  A.   No.

15  Q.   And as far as your access to IAD reports, you said both

16  Sheriff Crisler and -- well, you didn't say this.

17       Did Sheriff Jones -- isn't it true that Sheriff Jones

18  also increased your access to IAD reports?

19  A.   Yes.

20  Q.   So both sheriffs did.  There was, I guess, a break in the

21  chain, though, with respect to previous counsel that didn't

22  get it done; is that right?

23  A.   Correct.

24  Q.   And as far as -- let's go back to the termination of

25  these officers.

1      Now, before those officers were terminated, it's your

2  testimony that Sheriff Jones never talked to you about

3  terminating them at all?

4  A.   No, not prior to that day.

5  Q.   But that day he told you he's coming there to terminate

6  them, didn't he?

7  A.   Because I called him about that, yes, and he did say they

8  were on their way.

9  Q.   You called him back; right?  Meaning you returned his

10  phone call.

11  A.   I don't remember if he had called me.  But when I heard

12  from Chief Simon that he had gotten a call from the lieutenant

13  of investigations that she was on her way down to fire

14  officers, I called the sheriff.

15  Q.   You knew about that, though.  Before the terminations

16  occurred, you did confer with Sheriff Jones; right?

17  A.   I did not confer with him.

18  Q.   He just told you what was about to happen?

19  A.   He did.

20  Q.   And you just previously testified that you don't have

21  authority yourself to terminate anyone; right?

22  A.   Correct.

23  Q.   Because the buck stops with the sheriff.  That's his job,

24  isn't it?

25  A.   Yes.

1    Q.   And there's nothing wrong with the sheriff terminating

2    corrections officers that he feels need to be terminated, is

3    there?

4    A.   No.

5    Q.   And you don't have any -- your only criticism is that he

6    didn't give you a heads-up; right?

7    A.   No, that's not -- that's not correct.

8    Q.   Okay.

9    A.   My issue is that that doesn't flesh with what the consent

10   decree requires, that I have input on personnel decisions.

11   Q.   It says you have input on personnel decisions.  So is it

12   your understanding that the consent decree allows you to

13   override the sheriff's decisions in terminations?

14   A.   Of course not.

15   Q.   Let me ask you this:  As far as -- you were involved with

16   a -- preparing a recruitment and retention policy for the

17   County, weren't you?

18   A.   I spoke with the HR consultant on that, yes.

19   Q.   Okay.  And you started that in, let's say, December,

20   maybe late November of 2021?

21        MS. COWALL:  Objection, Your Honor.  This is outside

22   the scope of direct.

23        THE COURT:  It is.  There was no questions about the

24   retention thing on direct and during rebuttal.  Objection

25   sustained.

```
 1            MR. HALL:  All right.  Let me -- Court's indulgence.
 2   BY MR. HALL:
 3   Q.   Let me ask you this:  Counsel opposite asked you about
 4   when you were terminated by the County.  Do you recall those
 5   questions or that question?
 6   A.   Yes.
 7   Q.   All right.  And, in fact, you resigned from the County
 8   starting in November of 2021; right?
 9   A.   Yes.
10   Q.   And you had actually drafted that resignation letter back
11   in October, October 22nd, 2021, didn't you?
12   A.   I don't recall the time frame.
13   Q.   But it was prior to the November 10th date that you gave
14   the resignation letter to Sheriff Crisler; right?
15   A.   I know I had worked on it prior to submitting it, yes.
16   Q.   And you had a date of January as your last date --
17   something like late January as your last date on your first
18   resignation letter you drafted; right?
19            THE COURT:  Before you answer.
20            MS. COWALL:  Objection, Your honor.  Beyond the scope
21   of direct.
22            THE COURT:  Objection overruled.  She did testify about
23   being terminated and that goes to that, so...
24            THE WITNESS:  Can you ask your question again, please?
25   BY MR. HALL:
```

```
 1   Q.   Sure.  I'll just pull it up.
 2        MR. HALL:  One second, Your Honor.  I'm ready.
 3   BY MR. HALL:
 4   Q.   I want to show you D-106.  Do you see that?
 5   A.   I do.
 6   Q.   And this is Friday, October 22nd, 2021, resignation
 7   letter.  It looks like you e-mailed the resignation letter
 8   from yourself to yourself.  Do you see that?
 9   A.   I do.
10   Q.   And the actual --
11        MR. HALL:  I thought I had it pulled up already, Judge.
12   BY MR. HALL:
13   Q.   The actual letter -- I want you to look at D-107.  Do you
14   see that?
15   A.   I do.
16   Q.   And let me ask you, is this an accurate representation --
17   have you seen this letter before?
18   A.   I have.
19   Q.   And who drafted this letter?
20   A.   I did.
21   Q.   Is it a fair and accurate description of the
22   representation of what you drafted?
23   A.   It is.
24        MR. HALL:  Your Honor, I'd like to have what's been
25   marked as D-107 entered into evidence.
```

1            THE COURT:  Any objection?

2            MS. COWALL:  Your Honor, I'm just trying to determine

3    for what purpose -- I'm just trying to determine for what

4    purpose -- what's the impeachment purpose here?

5            THE COURT:  It's not being introduced to impeach her, I

6    don't think.  It's being introduced --

7            MR. HALL:  May I get some tissue?

8            THE COURT:  I'm sorry?

9            MR. HALL:  May I approach the witness box for some

10   tissue?

11           THE COURT:  Yeah.

12           It's not being introduced for impeachment.  She's

13   acknowledged that she's aware of it.  Is there any objection

14   other than relevancy?

15           MS. COWALL:  No, Your Honor.

16           THE COURT:  Objection overruled.  D-107 will be

17   received into evidence.

18                (Defendants' Exhibit 107 entered.)

19   BY MR. HALL:

20   Q.  Now, you had e-mailed yourself October 22nd about

21   resigning from the County; right?

22   A.  It was right around -- I don't know if it was

23   October 22nd, but it was prior to submitting the resignation

24   letter, yes.

25   Q.  And you actually drafted a letter dated October 25th with

1   an effective date of January 25th -- October 25, 2021, with an

2   effective date of January 25th, 2022; right?

3   A.   Correct.

4   Q.   And you also recall e-mailing Ms. Simpson back in August

5   about reevaluating whether or not you were going to continue

6   working at Hinds County.  Do you remember that?

7   A.   I do.

8   Q.   So -- well, you had started in August also; right?

9   A.   I was hired in June.

10   Q.   But you actually started working in August; isn't that

11   right?

12   A.   Yes.

13   Q.   In less than a month of working, you were already telling

14   the monitors that you were having second thoughts and you were

15   reevaluating whether or not you were going to stay on with the

16   County; right?

17   A.   Things had dramatically changed after the passing of

18   Sheriff Vance.  Yes.

19   Q.   So August 29th.  If we fast-forward to -- let's use this

20   date -- October 25th, you actually drafted a resignation

21   letter with an effective date of resignation for January 25th,

22   2022; right?

23   A.   Again, yes.  That's accurate.

24   Q.   And then we fast-forward to PX-13 that's already in

25   evidence.  The same letter; you just pushed the date out to

```
 1   November 10th, 2021; right?

 2   A.   I didn't want to resign.  I was trying very, very hard

 3   not to resign.

 4   Q.   Your previous testimony was that events happened on

 5   November 9th that precipitated your resignation on

 6   November 10th.  Do you recall testifying to that?

 7   A.   I do.

 8   Q.   All right.  That's not true, is it?  Because you had

 9   drafted a letter October 22nd, 2021, long before anything

10   happened on November 9th; isn't that right?

11   A.   There were circumstances in place that were causing me to

12   evaluate my employment in October.  That doesn't negate the

13   fact that something precipitated the final issuance of that

14   letter of resignation in November.

15   Q.   And then the walkout occurred, what, three days later

16   after you sent this -- about November 13th, three days

17   later -- three days after you resigned or sent your

18   resignation letter to Sheriff Crisler; isn't that right?

19   A.   I believe that's accurate.

20   Q.   And with respect to -- you also had an e-mail to the

21   County, I want to say Mr. Gaylor, on November 26th talking

22   about I'm pushing my deadline back or I'm pushing my date of

23   resignation earlier.  That was around November 26th; right?

24   A.   I don't recall when exactly it was.

25   Q.   But it happened, didn't it?
```

1    A.   It did.

2    Q.   And I just want to count now.  In August you were talking

3    about resigning.  You told the monitors that; right?

4    A.   I was not talking about resigning in August.

5    Q.   You were thinking about leaving.  You were reconsidering

6    your employment opportunities; correct?

7    A.   I was exploring -- I was extraordinarily disappointed

8    that things had so dramatically changed after the passing of

9    Sheriff Vance and was reaching out for some counsel, for some

10   input, because things were not good.

11   Q.   And when you sent that e-mail in August of 2021 saying

12   that you were reevaluating whether or not you were going to

13   stay with the County, do you know if the monitors had told

14   anybody at the County about that conversation that the two of

15   you had?

16   A.   I wouldn't know.

17   Q.   So we have the August e-mail.  You drafted a resignation

18   letter in October; right?

19   A.   Again, yes.

20   Q.   Gave it to one sheriff November 10th, 2021; right?

21   A.   Yes.

22   Q.   In November, later that month, sent an e-mail saying your

23   date of resignation is being moved closer instead of

24   February 10th; right?

25   A.   Yes.

```
 1   Q.   Then after Sheriff Jones was sworn in, you gave that
 2   letter to him as well, didn't you?
 3   A.   I don't recall giving him the letter.
 4   Q.   You don't recall giving Sheriff Jones the resignation
 5   letter?
 6   A.   I'm not saying I didn't.  I just don't recall giving it
 7   to him.
 8   Q.   Okay.  If he testified that you did, you don't have any
 9   reason to doubt that you gave it to him, do you?
10   A.   No.
11   Q.   And if his testimony is that he got it around the time of
12   his -- him being sworn in as sheriff -- he got sworn in in
13   December -- do you have any reason to doubt that?
14   A.   No.
15   Q.   So gave the resignation letter to a second sheriff, which
16   is this gentleman right here, in December; right?
17   A.   Again, I don't remember doing it.
18   Q.   Not doubting that you did it either, though, are you?
19   A.   As I said, if he's testified that I did, I have no reason
20   to doubt him.
21   Q.   Then in January, you tell this same sheriff that "I don't
22   know if I'm going to be able to work with you under these
23   circumstances" or whatever the rest of the sentence is.
24   That's what you told this sheriff; right?
25   A.   In an effort to work together, yes.
```

1   Q.   And you were called into his office January 31st, and he

2   advised that the resignation you had given to Sheriff Crisler

3   as well as him would be effective immediately; right?

4   A.   He did say that, yes.

5   Q.   Never said you were fired, did he?

6   A.   He did not say fired, no.

7   Q.   Never said you were terminated, did he?

8   A.   He said he was terminating my duties, my

9   responsibilities.

10  Q.   Did he use that word?  Because I was sitting there.

11  Don't you remember?

12          MS. COWALL:  Objection, Your Honor.

13          THE COURT:  Objection sustained.  Are you going to be a

14  witness, Mr. Hall?

15          MR. HALL:  No, Your Honor.  I apologize to the Court

16  and to the witness.

17  BY MR. HALL:

18  Q.   Is that what you recall?

19  A.   I don't recall verbatim what he said.

20  Q.   Let me ask you this:  Have you ever had an employee

21  resign three or four times and kept them on?

22  A.   No.

23          MR. HALL:  I don't have any further questions, Your

24  Honor.

25          THE COURT:  All right.  Hold on.  Mr. Shelson wants

```
 1   to...
 2   BY MR. HALL:
 3   Q.   As far as -- I want you to look at D-106, Ms. Bryan.  Do
 4   you see that?
 5   A.   I do.
 6   Q.   And that is an e-mail -- it's a printout of an e-mail
 7   from your e-mail address to your e-mail address.  Do you see
 8   that?
 9   A.   I do.
10   Q.   All right.  Do you recall -- just looking at this, do you
11   recall sending that e-mail to yourself?
12   A.   I don't.
13   Q.   That is, in fact, though, your e-mail address, isn't it?
14   A.   It is.
15   Q.   And do you recall sending -- whether that day or any
16   other day, do you recall sending a resignation letter to
17   yourself in October of 2021?
18   A.   I don't specifically recall that, no.
19   Q.   All right.  Do you have any reason to doubt that this
20   e-mail that was shown to you is authentic?
21   A.   No.
22        MR. HALL:  Your Honor, I'd like to have what's been
23   marked as D-106 entered into evidence.
24        THE COURT:  Any objection?
25        MS. COWALL:  No, Your Honor.
```

1          THE COURT:  D-106 will be received in evidence.

2          (Defendants' Exhibit 106 entered.)

3          MR. HALL:  I tender the witness, Your Honor.

4          THE COURT:  All right.  You may.

5                  **REDIRECT EXAMINATION (REBUTTAL)**

6    **BY MS. COWALL:**

7    Q.   I have just a few follow-up questions, Major Bryan.

8          Mr. Hall was asking you about whether you sent this

9    October 2021 letter to yourself.  Did you send that letter to

10   anyone other than yourself?

11   A.   No.

12   Q.   Do you know how the County got that letter, then?

13   A.   I know they have access to people's e-mail accounts, so I

14   don't know if they got it while I was employed or after.

15   Q.   Okay.  Now, Mr. Hall was talking about an incident where

16   he claims that a staff smarted off at you.  Do you know what

17   incident he's talking about?

18   A.   I do.  And there's a little more to it than that.

19   Q.   Can you explain to the Court what more there was to it?

20   A.   Sure.  I believe it was a Saturday.  I wasn't at work,

21   and I had a call from Chief Simon that there had been an

22   assault in one of the units and that the inmates weren't

23   letting staff come in to tend to the injured inmate.  I know

24   that similar things had happened like that before I got there,

25   but we hadn't had inmates lock out staff from a unit in a

1   while.

2       So in any event, I went.  And I got there before Chief

3   Simon or Captain Conner got there, so I went down the hall to

4   the unit to see what was going on.  There were no officers in

5   the unit.  I had the person in the control room open the door

6   for me, and I went in the unit and was in with my inmates for

7   a while trying to suss out what happened.  I had them all

8   present themselves for inspection.  I didn't see anything at

9   that time by myself to indicate that there had been an

10  assault.  And according to them, they were not keeping staff

11  from coming in and tending to anybody.  They didn't know what

12  was going on.  But it was a very volatile situation.

13      When you go into a unit, sometimes you can feel things

14  just aren't quite right and that things feel a little volatile

15  and dangerous.  I wasn't sure what was going on, but we at

16  least had access to the unit at that time.

17      A short time after, while I was still there, Chief Simon

18  and Captain Conner came, entered the unit with some other

19  staff, and proceeded to, again, have the inmates line up for

20  inspection, look into the cells to see what was going on.

21      After we were in there for a while regaining control to

22  our satisfaction, we left the unit.  And as we were walking

23  down the great hall, there were a bunch of officers in the

24  hallway and an inmate worker or an inmate being escorted

25  somewhere at the other end of the hall.  And as we were

  1    leaving, there was a female officer that was raising Cain at

  2    us, yelling at us that she didn't understand why we were

  3    leaving, that we didn't lock any of the inmates down or take

  4    any disciplinary action against the inmates, words to the

  5    effect of we got to go home while they had to continue to deal

  6    with the problem, and she was yelling and appeared to be not

  7    under control of herself at all.

  8        And I was asking her -- I told her that we had things

  9    under control with what information that we had.  Asked her if

 10    she had other information about anything else that we should

 11    be concerned about, she needed to let us know so we could go

 12    back into the unit and address that before we did leave, and

 13    she just kept yelling in front of staff, in front of inmates

 14    down the hall, to her command staff.  And I asked her three --

 15    and she kept walking off, yelling profanity.  She said, "I'm

 16    not here for that," and kept walking off.

 17        And I asked her three or four times to come back and talk

 18    to me and tell me what was going on so we could address it,

 19    and she kept refusing and finally just walked off.  This was

 20    towards the end of her shift.  And because she was so out of

 21    control of herself and not fit to be in that facility, I sent

 22    her home for the duration of her shift and then wrote all that

 23    up and recommended her termination.  I absolutely did.

 24        MS. COWALL:  Thank you, Ms. Bryan.

 25        Nothing further.

 1          THE COURT:  The Court has a couple of questions related

 2     to the testimony you've just given, Ms. Bryan.

 3                        **EXAMINATION (REBUTTAL)**

 4     **BY THE COURT:**

 5     Q.   What month, if you recall, was this incident with this

 6     employee?

 7     A.   I believe it was December, Your Honor.

 8     Q.   All right.  And you said you wrote up something --

 9     A.   Yes, sir.

10     Q.   -- on it and recommended her termination?

11     A.   I did, yes, sir.

12     Q.   And at that time Sheriff Jones would have been the

13     sheriff?

14     A.   Yes, sir.

15     Q.   All right.  With respect to internal affairs

16     investigations, what is your understanding of what rises to

17     the level or what might rise to the level of an internal

18     affairs investigation?

19     A.   There are incidences that are -- it's almost the

20     distinction between a misdemeanor and a felony.  Misdemeanors

21     that can be handled without a larger investigation, incidences

22     with staff behavior or staff conduct that are very apparent

23     from an initial look versus something that needs to be looked

24     into and delved further into.  For example, officers bringing

25     in contraband, that kind of misconduct would rise to the level

 1    of an internal affairs investigation.

 2    Q.   That type of misconduct, that example that you just gave,

 3    it's actually a criminal offense to bring in contraband into

 4    the facility.  Isn't it a crime?

 5    A.   Yes, sir.

 6    Q.   And would the assault of an inmate -- of a detainee by a

 7    correctional officer lead to an internal affairs investigation

 8    or could it lead into an internal affairs investigation?

 9    A.   I believe so, yes, sir.

10    Q.   And there are some regular employee matters that might

11    lead to an internal affairs investigation?

12    A.   So sometimes there are allegations that officers are

13    being inappropriate with inmates, not passing contraband but

14    just some naughty behavior.  Something like that would need an

15    internal affairs investigation.  It could.

16    Q.   The incident that you had with the employee there in

17    December, do you believe that would lead to an internal

18    affairs investigation?

19    A.   I don't believe so, Your Honor, because there was nothing

20    else about that incident that needed to be investigated.  It

21    all happened in full view of us.

22    Q.   Do you know if there was an internal affairs

23    investigation done about the incident?

24    A.   I believe there might have been.  I believe there might

25    have been, yes, sir.

```
 1   Q.   Okay.  Now, about the walkout, at any time prior to this
 2   trial, has anyone accused you of orchestrating the walkout?
 3   A.   Never.
 4   Q.   Has anyone told you that you had been under suspicion
 5   that you orchestrated the walkout?
 6   A.   No, sir.
 7   Q.   Did -- and did Sheriff Crisler ever accuse you of
 8   orchestrating it?
 9   A.   No, sir.
10   Q.   Did Mr. Hopkins ever tell you that you orchestrated the
11   walkout?
12   A.   No, sir.
13   Q.   Did Sheriff Jones tell you that you orchestrated the
14   walkout?
15   A.   No, Your Honor.
16   Q.   Did the president of the Board of Supervisors ever convey
17   to you that you orchestrated the walkout?
18   A.   No, sir.
19   Q.   In any of your conversations where you were rescinding
20   your resignation, tendering your resignation, in any of your
21   conversations with anybody, have they ever told you that you
22   were behind the walkout?
23   A.   No, sir.
24   Q.   With respect to MR, did Sheriff -- MR was the person who
25   was assaulted and killed in the detention facility.  Did
```

1   Sheriff Crisler ever tell you to investigate the incident?

2   A.   No, sir.

3   Q.   Were you aware that there was an internal affairs

4   investigation going on with respect to that incident?

5   A.   Yes, sir.

6   Q.   Did Sheriff Crisler ever tell you to fire those

7   individuals who, I guess, were observed on the -- who were

8   found to have been culpable, responsible -- I mean the

9   correctional officer -- for not doing their jobs?

10   A.   No, sir, he didn't.

11   Q.   When you were hired by Sheriff -- when you were hired by

12   Sheriff Vance -- you were hired by Sheriff Vance?

13   A.   Yes.

14   Q.   What was your understanding, if any, about your role as a

15   jail administrator when it comes to personnel decisions?

16   A.   I don't know that we had ever had -- we didn't have time

17   to have a conversation about that.

18   Q.   All right.  Oh, returning to the walkout.  I believe your

19   testimony was that you had received information from Mr. Simon

20   that there was some unrest -- something going -- something

21   might be in the works?

22   A.   Yes, sir.

23   Q.   All right.  There was some conversation about whether

24   employees were -- who was on the -- who was on the shift, who

25   was off the shift, and you indicated that Mr. Hopkins talked

1   to some of the individuals; is that correct?

2   A.   Yes, sir.

3   Q.   Did the sheriff also go down there and talk to the

4   individuals?

5   A.   Not that day, no, sir.

6   Q.   Not that Friday?

7   A.   I believe -- I don't think he did on that Friday, no.

8   Q.   But did he go down there that Saturday during the time of

9   what has been reported to be a walkout?

10  A.   He did.

11  Q.   Did the sheriff convey to you whether or not he thought

12  everything -- he took care of everything?

13  A.   He did.

14  Q.   Okay.  That every- -- did he indicate -- well, what did

15  he indicate to you?

16  A.   When it was all finished, Your Honor, when the officer

17  had come back in with the list of issues for the entirety of

18  the group and the sheriff and I went over each item and he

19  gave me the dates that he felt those things could be addressed

20  or accomplished and he said he felt everything was fine, he

21  said to me that they were all going back to work and that he

22  was going to go because everything was under control.  And

23  then he directed me to meet with the officer to give her this

24  list and talk with her for a little while.  But he left with

25  the understanding that everything was resolved.

```
1   Q.   Was that on Saturday?

2   A.   I believe so, yes, sir.

3   Q.   I mean was it that day?

4   A.   It was that day.

5   Q.   And did you and the sheriff discuss that list that day?

6   A.   We did.

7   Q.   And do you believe you took care of whatever directives

8   that you had from the sheriff with respect to that issue?

9   A.   We didn't.

10  Q.   I'm sorry?

11  A.   If I understand your question, Your Honor, were we able

12  to address all the items on their list?  We weren't.

13  Q.   Okay.  But did you attempt to address them?

14  A.   Yes.  Some of those issues that they raised were the same

15  issues that we had been working on, so, yes, we were working

16  on addressing all of their issues.

17  Q.   Were the -- all the issues addressed prior to your

18  departure?

19  A.   No, sir.

20  Q.   Were all the issues fixed prior to your departure?

21  A.   No, sir.

22       THE COURT:  I have no further questions.

23       In terms of the Government, any follow-up from the

24  United States to the questions that I've asked?

25       MS. COWALL:  None, Your Honor.
```

1          THE COURT:  Any follow-up from Hinds County?

2          MR. HALL:  No from County, Your Honor.

3          THE COURT:  Major Bryan, you're finally excused.  You

4  can return to your normal duties.  You can sit in the -- you

5  can do whatever you wish to do.

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  Does the United States wish to call its

8  next witness?

9          MR. CHENG:  The United States calls Elizabeth Simpson.

10          THE COURT:  Ms. Simpson, can you hear and see us in the

11  courtroom?  I guess you can see me now at this point; right?

12          THE WITNESS:  Yes, Your Honor, I can see you.  I cannot

13  see Mr. Cheng.

14          THE COURT:  Right.  When he starts -- during

15  questioning, we'll make sure you see him rather than me.

16          THE WITNESS:  Okay.

17          THE COURT:  You are still under oath.  And if you do

18  not understand any of the questions, please let us know.  If

19  you can't hear something, please let us know.

20          So, Mr. Cheng, you may proceed.

21                    **ELIZABETH SIMPSON,**

22           **having been previously duly sworn, was examined**

23  **and further testified as follows...**

24                **DIRECT EXAMINATION (REBUTTAL)**

25  **BY MR. CHENG:**

1   Q.   Good morning, Ms. Simpson.  Can you hear me?

2   A.   Yes.  Good morning.

3   Q.   Good morning.

4        Ms. Simpson, did you hear County Administrator Jones's

5   description about what triggered the staff walkout?

6   A.   Yes.

7        THE COURT:  You need to make sure you're speaking into

8   the microphone, Mr. Cheng.

9        MR. CHENG:  Yes, Your Honor.

10       THE COURT:  You probably should bring it down just a

11  little bit.

12       MR. CHENG:  Is that better?

13       THE COURT:  Yeah.

14  BY MR. CHENG:

15  Q.   Do you have any reason to question Mr. Jones's claim that

16  Ms. Bryan instigated the walkout?

17       I'm sorry, Ms. Simpson.

18  A.   Yes.

19  Q.   We just lost your volume.

20  A.   Can you hear me?

21  Q.   Now we can hear you.

22  A.   Okay.  Yes.

23  Q.   And why would you question his claim?

24  A.   Well, when I heard about the walkout, it actually was

25  pretty much as it was occurring.  One of the officers called

1   Mr. Parrish, and Mr. Parrish called me, and I called Major

2   Bryan -- it would have been shortly -- I believe shortly after

3   the walkout -- and talked with her about it.  And she seemed

4   upset that it had occurred, perhaps a little bit angry but

5   mostly upset that it had occurred.  It did not seem at all

6   like she had instigated it or wanted it to happen.  She was

7   concerned.

8   Q.   Now, was the officer who called Mr. Parrish, was that

9   Ms. Bryan?

10   A.   No.  I believe it was Sergeant Winter called Mr. Parrish.

11   Q.   Have the defendants ever told you that they believed

12   Ms. Bryan instigated the walkout before this week?

13   A.   No.

14   Q.   And has their story about this been consistent over time?

15   A.   Well, the -- I mean, they were consistent that they never

16   indicated that Major Bryan had instigated it.

17   Q.   Mr. Jones, the County administrator, also testified about

18   your fees.  Were there any inaccuracies with his testimony?

19   A.   Yes.

20   Q.   And what were those inaccuracies?

21   A.   Well, the document that was produced purports to list the

22   amount of fees paid to each member of my team, including

23   myself, and there are multiple entries where the fees charged

24   by the entire team were listed as being charged by myself, so

25   the entries on February 15, 2018; March 28, 2018 --

 1          THE COURT:  Hold on one second.  Tell me what -- if

 2     you're looking at an exhibit, please tell the Court -- if

 3     you're looking at an exhibit, please tell the Court what

 4     exhibit that is.

 5          THE WITNESS:  It is an exhibit.  On mine it's -- it

 6     looks like it's page numbers, but it's D-001356.

 7          THE COURT:  Mr. Cheng, do you know what exhibit that

 8     is?  It sounds like that's a Bates number.

 9          MR. HALL:  D-142, Your Honor.

10          MR. CHENG:  Thank you.

11          THE COURT:  Thank you.

12          I'm sorry.  Go ahead, Ms. Simpson.

13     A.   So the entries that are attributed to me, even though

14     they're the entire team, is February 15, 2018; March 28, 2018;

15     the second entry on November 29, 2018; the entry on

16     January 3rd, 2019; all three entries on February 14, 2019; the

17     second entry on November 18, 2019; all three entries on

18     January 21st, 2020.  Those are all team invoices that are

19     attributed to me alone.

20     BY MR. CHENG:

21     Q.   And the County administrator also questioned the size of

22     some of those fees in, I believe, late 2019.  Can you explain

23     why there were fees in late 2019, early 2020?

24     A.   Well, the dates that are listed there are actually the

25     dates that the invoices were paid and not the dates of when

 1    the invoice was submitted.

 2        So the first entry on November 18, 2019, was actually an

 3    underpayment from February 2018.  There had been -- in

 4    February 2018 the invoice was underpaid.

 5        And then the next entry on November 18, 2019, was

 6    actually our site visit from September 2018 and then

 7    subsequent months.  But the -- the administrator also

 8    testified that we did not do a site visit in the time frame

 9    reflected by these dates, and actually we did do a site visit.

10    In January 2020 we were on-site.  That would have been billed

11    later.

12    Q.   Was this before the pandemic shut everything down?

13    A.   Yes.

14    Q.   All right.  Let's talk next about Mr. Rivera.  The

15    defendants mentioned that Mr. Rivera was billed through your

16    contract, but was he selected only at your request?

17    A.   No.

18    Q.   And, actually, how was he selected?

19    A.   I knew of his work, and I did recommend him.  This was in

20    late 2019.  Mr. Teeuwissen and Ms. Barker talked with him,

21    interviewed him, and decided that they would like to utilize

22    his services.  And so I put him on my contract at their

23    request.

24    Q.   And if Mr. Rivera is not the retention and pay consultant

25    hired to comply with the court order, is there some other

1  retention or pay consultant that has been selected by the

2  County?

3  A.   Not that I know of.

4  Q.   Let's talk a little bit about the mental health unit.

5  You may have heard Mr. Chamblee talk about the mental health

6  unit getting ready or working in the B-1 iso in order to get

7  it ready.

8       Did you hear that?

9  A.   Yes.  Yes.

10 Q.   What is the difference between B-1 iso and B-1?

11 A.   Well, two of the housing units in each of the pods have a

12 very small area that is sort of attached to them, although

13 separated by a door, and those small areas have -- depending

14 on which one, have four cells in them, and they're called the

15 iso units.

16 Q.   So did Mr. Chamblee's testimony indicate to you that the

17 mental health unit is ready?

18 A.   No.  I believe he said that it would be soon, but he was

19 referring to B-1 iso, which is not actually intended to be the

20 mental health unit.

21 Q.   And what still needs to be done for the mental health

22 unit to be opened?

23 A.   I believe that the rooms that will be used for the

24 offices and therapies still need to be finished and furnished

25 and the -- the electronics, the communication needs to be set

1    up.  I think the officers' station was not completed when we

2    toured the facility, and I think there are still issues with

3    the -- or at the time of the site visit, the fire alarm had

4    not been completed, and I'm not sure the fire hoses were in.

5    So there were -- and, of course, there was no furniture, no

6    tables and chairs.

7    Q.   And this is just the physical plant stuff.  Are there

8    other steps that still need to be done for training and

9    staffing the mental health unit?

10   A.   Yes.  The officers that would be positioned there still

11   need to complete the training.  They had one session; they

12   were intended to have two additional sessions.  And I believe

13   that QCHC staffing is pretty far down right now, so I believe

14   they have some hiring to do before the mental health unit

15   could operate.

16   Q.   You sat through all the testimony over the last couple

17   weeks?

18   A.   Yes.

19   Q.   Having heard the testimony of defendants' witnesses, have

20   you changed your mind about whether the conditions in the jail

21   violate the rights of detainees?

22   A.   No, I have not changed --

23        MR. SHELSON:  Your Honor, this kind of global question

24   is not proper rebuttal evidence.  Rebuttal evidence, Your

25   Honor, is generally allowed to counter new facts presented in

 1    the defendants' presentation to prove -- or to rebut evidence

 2    not available earlier through no fault of the plaintiff.  This

 3    global assessment is not proper rebuttal evidence, and that

 4    case is *McAfee versus Murray Ohio Manufacturing*, 66

 5    Fed.Appx. 523, at 7.

 6              THE COURT:  What circuit?

 7              MR. SHELSON:  Fifth.

 8              THE COURT:  All right.  I'm not going to ask that he

 9    go -- I guess you're asking me to ask him to go down line by

10    line and be here the rest of the -- however long it takes to

11    go down each one of these, then.  I guess that's what you're

12    asking.  Since it can't be done globally, you're asking

13    that -- you're suggesting the remedy to that is to allow him

14    to go down each one.

15              MR. SHELSON:  No, sir.  I don't think that -- rebuttal

16    is supposed to be specific.  This is asking her to sum up if

17    anything she heard changes her mind.  She should only be

18    addressing whether a new fact changed her mind.

19              THE COURT:  Okay.  The Government's response, please?

20              MR. CHENG:  Well, Your Honor, they did bring up the

21    PLRA.  So I don't have the case in front of me, but this does

22    make it a little bit unusual.  I mean, when they invoke the

23    PLRA, they're going to force us go through all the provisions.

24    Their own witnesses actually made some very conclusory

25    statements about how they're not really so terrible and

1    they're in compliance, so this is a sufficient way of

2    addressing it.

3          THE COURT:  Okay.  I'm going to overrule the objection.

4    BY MR. CHENG:

5    Q.   So, again, Ms. Simpson, having heard the testimony of

6    defendants' witnesses, have you changed your mind about

7    whether conditions in the jail violate the rights of

8    detainees?

9    A.   No, I have not.

10   Q.   Have you changed your mind about whether they have

11   violated the Court's orders?

12   A.   No, it has not changed my mind.

13   Q.   Has it changed your mind about whether the court orders

14   remain necessary to address constitutional violations?

15   A.   No, it has not changed my mind.

16   Q.   And have you changed your mind about whether a

17   receivership is still necessary?

18   A.   No, I have not.

19        MR. CHENG:  No other questions, Your Honor.

20        THE COURT:  All right.

21        MR. HALL:  May it please the Court?

22        THE COURT:  You may proceed.

23                    **CROSS-EXAMINATION (REBUTTAL)**

24   **BY MR. HALL:**

25   Q.   Ms. Simpson, just a couple areas I want to go over with

1   you.

2      With respect to the staff walkout, did you dedicate any

3   time in your monitor report about the staff walkout?

4   A.   I think it happened after we submitted our report.  I

5   could be wrong.

6   Q.   Okay.  So are you writing something about it now?

7   A.   I have not started the report.

8   Q.   Do you plan on including that information in your report?

9   A.   I actually hadn't thought about it yet.

10   Q.   Let me ask you this:  You just heard the testimony of

11   Ms. Bryan that she did not tell the sheriff about the walkout

12   when she first learned of it the day before it happened.  Did

13   you hear her testify to that?

14   A.   Yes.  I recall it a little bit differently in that she

15   didn't hear it was going to happen.  There were concerns that

16   it might happen.

17   Q.   Let's go with that, then.  She heard concerns that it

18   might happen and she failed to tell the sheriff; right?

19   A.   That's correct.

20   Q.   Do you have a criticism of that?

21   A.   I guess depending on how certain it seemed, it would be

22   something to tell the sheriff, yes.

23   Q.   Well, what level of certainty was required?

24   A.   I don't know that I can quantify it.

25   Q.   Isn't it true it's never a good idea if you hear of

1    something like a -- well, let me ask it this way:  Rumblings

2    of a staff walkout at an understaffed facility is very

3    critical, isn't it?

4    A.   That would be, yes.

5    Q.   And rumblings do rise to the level of something that a

6    sheriff needs to know, don't you think?

7    A.   Again, I guess it depends on how certain the rumblings

8    appear to be.

9    Q.   The rumblings were certain enough to send a budgetary

10   officer from the County down there to talk to the people on

11   Friday.  Did you hear that?

12   A.   I did.

13   Q.   So that's pretty certain, isn't it?

14        MR. CHENG:  Object.

15   A.   Well, I think their concerns were primarily monetary, --

16        MR. CHENG:  Objection.

17   A.   -- so the money person was addressing those concerns.

18        THE COURT:  What's your objection?

19        MR. CHENG:  Leading.

20        THE COURT:  Objection overruled.

21        MR. HALL:  Did he say leading?

22        THE COURT:  Yes.  I said it's overruled.

23   BY MR. HALL:

24   Q.   Do I need to repeat my question?

25   A.   I think I answered your question.

1    Q.   Okay.  I missed it.

2    A.   I believe I responded that the staff concerns were about

3    monetary issues, and so it made sense for the budget person to

4    be the one to go talk with them.

5    Q.   Okay.  It was more appropriate, then, for the budgetary

6    person rather than the sheriff who is in charge of the jail to

7    talk to them; is that your testimony?

8    A.   I didn't say it was more appropriate.  I said it was

9    appropriate.

10   Q.   The sheriff should have been told; can you and I agree

11   about that?

12   A.   Again, it depends on the level of certainty of the

13   rumblings, but yes.

14   Q.   Now, you also were asked questions about whether or not

15   anyone from the County ever told you that Ms. Bryan was behind

16   that -- that staff walkout; right?

17   A.   That's right.

18   Q.   Did you ever ask anyone at the County what was behind it

19   or had they had any investigation regarding the staff walkout?

20   A.   No.

21   Q.   You also testified about hiring Mr. Rivera to do a

22   recruitment and retention recommendation; right?

23   A.   I brought him on the team to provide the County

24   consultation in that area.

25   Q.   Okay.  And who was he supposed to be consulting for?

A.   Well, of course, there was the changeover right at that
time, and with the new administration and the new sheriff and
the new jail administrator, they had him working with the
recruitment officer, which was at a much lower level than I
recommended that he be involved at.

Q.   Now, isn't it true, though, that you had several e-mail
correspondence with Ms. Bryan and Mr. Rivera in connection
with preparing this recruitment plan; right?

A.   Yes.

Q.   And never once included a sheriff, either Sheriff Crisler
or Sheriff Jones, did you?

A.   I did not.

Q.   Why is that?

A.   I believe that Major Bryan's intention was to have a
draft plan that would then be presented to the sheriff for
approval.

Q.   Is that what the January 10th -- the January 10th
document was?

A.   I'm sorry.  What's your question?

Q.   Is that what the January 10th document was, the actual
report?  Was that to be -- is that still something that needs
to be approved by the sheriff's office?

A.   I don't know if it requires approval, but that was, I
believe, her intention was to submit it to the sheriff.

Q.   Do you have any other reason for not including the

 1    sheriff in the preparation of this document?

 2    A.   No.

 3    Q.   Did you include the County administrator in the

 4    preparation of that document?

 5    A.   No.

 6    Q.   Why not?

 7    A.   Well, for one thing, I didn't prepare the document.  I

 8    made comments on it after it was prepared.  But, again, I

 9    think the plan was that it would go to the County -- go to the

10    sheriff and then to the County.

11    Q.   You said you made comments after it was prepared?

12    A.   Yes.  Well, on the draft.

13    Q.   And you had a lot of comments on this draft.  For

14    instance, you reviewed this draft as far back as December of

15    2021, didn't you?

16    A.   I don't recall when I first reviewed it, but that

17    would -- that would sound right.

18    Q.   I want to show you an e-mail from Kathryn Bryan to Lisa

19    Simpson dated December 3rd, 2021.  Do you see that?

20    A.   Actually, I can't read it, but I believe you if that's

21    what it says.

22    Q.   What can't you read?  Like, is it not coming up or --

23    A.   It's too small.

24         THE COURT:  If it's small, you need to --

25         MS. SUMMERS:  Zoom.  There you go.

1          MR. HALL:  Like that?

2          MS. SUMMERS:  Yes.

3   BY MR. HALL:

4   Q.  All right.  Ms. Simpson, do you see it now?  Is that

5   better?

6   A.  Can you make it just a little bigger?  Okay.

7   Q.  All right.  And let's go back.  December 3rd, 2021, you

8   responded to Ms. Bryan that you reviewed the plan and can talk

9   about it.  "This is my area of expertise, so I have a few

10  thoughts."

11         Do you know if this was Ms. Bryan's area of expertise?

12  A.  I don't know what her experience in this area is.

13  Q.  Did you consult with the County's human resources

14  director?

15  A.  Mr. Rivera did.  I did not.

16  Q.  Are you sure about that?

17  A.  Yes.

18  Q.  How are you sure about that?

19  A.  It was back when he did his visit in, I believe,

20  February 2020 and I talked with him after and he had spoken

21  with Doris Coleman.

22  Q.  Okay.  But I'm talking about now February 2020.  This is

23  almost two calendar years later, in December of 2021; right?

24  A.  Yes.

25  Q.  Okay.  Do you know if Mr. Rivera spoke with human

1   resources at this time when you-all were making these changes?

2   A.   I don't believe he did.

3   Q.   All right.  And there's a line in here that I thought was

4   interesting.

5        You were here for the testimony yesterday; right?

6   A.   Yes.

7   Q.   And there's a line in -- from your e-mail, "and at the

8   burden of driving out to Raymond, might have to go into the

9   pay analysis."  Do you see that?

10  A.   Yes.

11  Q.   You heard the Government ask that same exact question of

12  Mr. Jones yesterday, didn't you?

13  A.   I didn't specifically remember that, but I believe you.

14  Q.   Okay.  Did you have input in the Government's preparation

15  of their case by using the recruitment and retention letter --

16  or recruitment and retention policy?

17  A.   I'm sorry.  I don't understand your question.

18  Q.   How is it that a line from an e-mail that you drafted

19  ended up in the DOJ lawyer's cross-examination of the sheriff

20  of Hinds County?

21            MR. CHENG:  Objection.

22            THE COURT:  Objection sustained.

23            MR. HALL:  I'll move on.

24  BY MR. HALL:

25  Q.   Another e-mail --

```
 1          THE COURT:  When you put it on the screen, slow down --
 2  slow it down putting it on the screen.  You moved it too fast.
 3          MR. HALL:  Oh, like that?
 4          THE COURT:  You might be able to adjust it.  I mean,
 5  just take it away and just -- take it away for a second and
 6  hit the focus button.
 7          MR. HALL:  How about that?  Is that autofocus?  There
 8  we go.
 9  BY MR. HALL:
10  Q.   I'll show you a December 22nd e-mail from Ms. Bryan to
11  you.  Do you see that?
12  A.   Yes.
13  Q.   And then scrolling up a little bit, Mr. Parrish also had
14  comments in the recruitment and retention plan; right?
15  A.   Yes.
16  Q.   Do you know if this is his area of expertise?
17  A.   I believe he had quite a bit of experience in dealing
18  with staff issues as the sheriff of his jail, but specific to
19  human resources, I don't know what his expertise is.
20  Q.   As far as -- and this recruitment and retention letter
21  took into account things such as pay analysis, right, and pay
22  structure?
23  A.   Yes.
24  Q.   A lot has been asked of the County if they've done a pay
25  analysis.  You've not done a pay analysis for the County, have
```

1    you?

2    A.   No.

3    Q.   And I'm scrolling down now.  This is from Mr. Parrish,

4    his input:  "The HCSO needs to recognize that detention is the

5    most important component of the agency."  Do you see that?

6    A.   Yes.

7    Q.   And then it says "with the same respect, compensation,

8    and support that the law enforcement officers receive."  Do

9    you see that?

10   A.   Yes.

11   Q.   As far as your monitoring over the last six years, have

12   you seen a lack of respect that's different from the law

13   enforcement side to the detention side?

14   A.   Yes.

15   Q.   And that's based on what?

16   A.   It's based on the lack of parity in pay and benefits.

17   Q.   And as far as pay and benefits are concerned, you

18   understand that law enforcement officers undergo more rigorous

19   training than detention officers; isn't that right?

20   A.   Yes.

21   Q.   And they have more responsibilities than detention

22   officers, don't they?

23   A.   I don't know that I'd agree with that.

24   Q.   Well, do you have any -- let me set the predicate.

25        You're a monitor for detention centers; right?

1    A.   That's right.

2    Q.   You've never monitored a law enforcement agency, have

3    you?

4    A.   No.

5    Q.   So you don't know, then, what the difference is with

6    respect to compensation -- or excuse me, for training law

7    enforcement officers are -- is versus the training for

8    detention officers, do you?

9    A.   I think it was mentioned earlier in this proceeding, but,

10   no, I have no personal knowledge.

11   Q.   That there's a difference in training; right?

12   A.   Yes.

13        MR. HALL:  Can I have a moment, Your Honor?

14   BY MR. HALL:

15   Q.   Now, you just made some of your last comments or your

16   last testimony with Mr. Cheng.  I just want to follow up with

17   that.

18        Isn't it true that you characterize the work center as

19   being a model but now you're saying we're out of compliance

20   with that?

21   A.   No.  If I said it's a model, direct supervision works

22   well there.  There are some system issues that apply to both

23   the work center and Raymond.

24   Q.   All right.  But with respect to -- I guess the question

25   Mr. Cheng proposed to you, basically Hinds County hasn't done

1  anything right, is your testimony.

2        MR. CHENG:  Objection, Your Honor.  Argumentative and

3  mischaracterizes.

4        THE COURT:  Objection overruled.

5  A.  No, that's not correct.

6  BY MR. HALL:

7  Q.  They have done some things right?

8  A.  Yes.

9  Q.  And you can concede that Hinds County has made

10  significant efforts to comply with both the consent decree as

11  well as the stipulated order; isn't that right?

12  A.  I don't know that I would say "significant," but they

13  have made some steps, yes.

14  Q.  All right.  Let me ask you this, then:  As far -- if the

15  DA's Office is not indicting people and the courts are not

16  holding court in compliance with the CJCC portion of the

17  consent decree, isn't it true by your assessment we'll never

18  be able to come into compliance?

19  A.  No.

20  Q.  No, that's not true?

21  A.  No, that's not true.

22  Q.  So we will be able to come into compliance even though

23  the District Attorney's Office is not indicting people, court

24  is not being held?  That's your testimony?

25  A.  Yes.

1  Q.   And even if that's in violation of the CJCC; is that

2  right?

3  A.   I'm sorry.  I don't know what you mean by "in violation

4  of the CJCC."

5  Q.   The CJCC portion of the consent decree placed the burden

6  on Hinds County to optimize the criminal justice system;

7  right?

8  A.   No.  It places the burden on Hinds County to create and

9  support an effective CJCC.

10  Q.   And an effective CJCC is where a District Attorney's

11  Office is indicting people; right?

12  A.   That would hopefully be one of the goals of the CJCC

13  would be to implement system reform such that people move

14  through the system more efficiently.

15  Q.   All right.  Likewise, as far as the courts are concerned,

16  if the courts are not holding court and moving cases, would

17  that be a violation or would that be contrary to the goals of

18  the CJCC?

19  A.   One would hope.  I mean, the CJCC would have to set its

20  own goals, but hopefully that would be one of the goals.

21       MR. HALL:  All right.  One moment, Your Honor.

22       I don't have any further questions for this witness.

23       THE COURT:  All right.  Thank you, Mr. Hall.

24       Any redirect of this witness?

25       MR. CHENG:  Just a couple questions.

1      **REDIRECT EXAMINATION (REBUTTAL)**

2  **BY MR. CHENG:**

3  Q.   Ms. Simpson, did the sheriff notify you that there had

4  been a staff walkout?

5  A.   No.

6  Q.   You also talked a little bit about the recruitment

7  coordinator and how Ms. Bryan and I believe a recruitment

8  officer was assigned to work with your team on the issue or

9  assigned to work with Mr. Rivera.  Do you recall that?

10  A.   Yes.

11  Q.   Did you ever ask the defendants to appoint someone higher

12  up than the recruitment officer to work on recruitment and

13  retention with Mr. Rivera?

14  A.   Yes.

15  Q.   And what was their response?

16  A.   I spoke with Ms. Barker about it, and she said she

17  thought it was a good idea, but it didn't happen.

18  Q.   Mr. Hall asked you whether you agree that law enforcement

19  officers have more responsibilities than detention officers.

20  What is your view on that issue?

21  A.   My view is that that's not the case.  They have very

22  different duties, but I think the duties of the detention

23  officer are as varied and as important as those of law

24  enforcement officers and as dangerous.

25  Q.   Now, what types of duties do detention officers have that

1   law enforcement officers don't have to deal with?

2   A.   Well, they are --

3        MR. HALL:  Objection, Your Honor.  It's outside the

4   course -- or the scope of this witness's knowledge.  She

5   testified she's never monitored law enforcement agencies

6   before.

7        THE COURT:  She'll be allowed to tell what the duties

8   of the detention officer are.

9   A.   Well, there's quite a few, as one can tell from the

10  policies and procedures, but they are enclosed in a confined

11  space with people that have been accused of committing crimes,

12  and they are generally required to ensure the safety and the

13  welfare of those individuals, yes --

14  BY MR. CHENG:

15  Q.   Do they have responsibility --

16  A.   -- in general.

17  Q.   Do they have responsibility for using force on other

18  people?

19  A.   Yes.  They have to follow the use-of-force policy in

20  terms of not using force when it's not required and using it

21  when it is required.

22  Q.   And in this jail, do they also have to provide or help

23  with providing medical or mental health care?

24  A.   Yes.  They may be called upon to transport people to the

25  medical area or to provide supervision when medical is on the

1    unit seeing individuals or doing med pass.

2           MR. CHENG:  No other questions.  Thank you.

3           THE COURT:  I have a couple of follow-ups.

4                   **EXAMINATION (REBUTTAL)**

5    **BY THE COURT:**

6    Q.   With respect to the duties of a detention officer,

7    Ms. Simpson, some of the detainees have been determined to

8    have been extremely violent; is that correct?

9    A.   That's correct.

10   Q.   Because they've been arrested by the people on the law

11   enforcement side of the sheriff's department; correct?

12   A.   That's correct.

13   Q.   They've also been arrested by any law enforcement agency,

14   the police departments in the jurisdiction.  Is that your

15   understanding?

16   A.   Yes, Your Honor.  That's correct.

17   Q.   And with respect to that, how many people are assigned to

18   a pod?

19   A.   Officers?  There's supposed to be a housing unit officer

20   in each housing unit; somebody in the control -- in the

21   control room; a rec officer; a transport officer.  I believe

22   that's it, but --

23   Q.   Oh, I'm sorry.  My question -- I'm sorry.  I was not

24   clear about my question.

25           How many detainees are assigned to a pod?

1    A.   Oh, I'm sorry.  There would be around 200, 220, in that

2    range.

3    Q.   And --

4    A.   If it's full.

5    Q.   And typically how many correctional officers does Hinds

6    County have assigned to a particular pod?

7    A.   Well, they've been understaffed, and so there are times

8    when there's one person in the control room and maybe one or

9    two officers for the pod.

10   Q.   And the level of dangerousness at the facility is

11   determined in part by the fact that some of the pods, as we've

12   heard over the testimony -- some of the cell doors do not lock

13   there; is that correct?

14   A.   That's correct.

15   Q.   Now, again, you've sat through all of this trial, and

16   there was testimony, I think, from the sheriff yesterday that

17   one of your -- one of the monitors who you hired engaged in, I

18   think the sheriff's testimony was, illegal conduct.

19   A.   I heard that.

20   Q.   Now, had you heard that allegation before?

21   A.   No.

22   Q.   Did Chief Vance ever discuss it with you before?

23   A.   No.

24   Q.   Did anyone ever accuse -- tell you that one of the

25   persons that you have hired had been engaged in what they

1   believe to be illegal conduct?

2   A.   No.

3   Q.   And if someone had reported that to you, what steps do

4   you think you would have taken?

5   A.   I think I would have attempted to determine whether the

6   conduct was illegal; and if it was, I would ask the team

7   member to resign.

8   Q.   Okay.  Would you also -- in telling the team member to

9   resign, would you report that to the Court?

10  A.   Yes.

11  Q.   Did anyone from the County convey to you that they

12  thought that your relationship with Major Bryan compromised

13  your ability to do the work that the Court had appointed you

14  to do?

15  A.   No.

16  Q.   Do you believe that any prior relationship that you've

17  had with Major Bryan has compromised you or your work as a

18  monitor in this case?

19  A.   No.  And I had no -- I had no familiarity with Major

20  Bryan prior to her becoming the jail administrator.

21  Q.   Oh, you did not?

22  A.   I did not.

23  Q.   You had never worked with her?

24  A.   No.  Just to clarify, one of my team members, Karen

25  Albert, who works with the County on jail policies, had worked

1   with Major Bryan I think through the NIC, the National

2   Institute of Corrections.  They had been on some projects

3   together, and Karen Albert recommended Major Bryan, and I

4   passed that recommendation on to the defendants.

5   Q.   During the course of your -- well, Major Bryan came on --

6   was hired, I think, in June of 2021; is that correct?

7   A.   That's correct, yes.

8   Q.   Right.  And she started working sometime after that

9   point, but her relationship with Hinds County ended in January

10  of 2022; is that your understanding?

11  A.   Yes.  Yes, Your Honor.

12  Q.   Is there anything about her service with Hinds County

13  that has in any way caused you to provide information to the

14  Court that the Court in any way should leave with a view that

15  your monitoring reports are somehow compromised?

16  A.   No, I don't believe so.

17  Q.   All right.  And since Major Bryan has come on, how many

18  monitoring reports have you done?

19  A.   The fourteenth and the fifteenth.  Two.

20  Q.   So nothing about Monitoring Reports one through thirteen

21  would be influenced at all by anything that Major Bryan has

22  done; correct?

23  A.   That's correct.

24  Q.   And with respect to the exit interview that you had, did

25  you do an exit interview back in January of 2022?

1    A.    Yes.

2    Q.    At that exit interview, did anyone ever indicate to you

3    that you're somehow compromised?

4    A.    No.

5    Q.    Did anyone indicate to you that somehow your relationship

6    with Major Bryan calls into question the work that you had

7    done that week?

8    A.    No.

9    Q.    Do you recall -- well, let me ask you this:  During those

10   months that you were doing remote visits, what I call remote,

11   you and its -- the evidence shows there was a period of time

12   where the monitors did not come to the facility in-person, and

13   I'll call those remote visits.

14         With the remote visits, after concluding whatever

15   investigation and how -- the record would show how you did it.

16   In those instances, did you also have an exit interview --

17   A.    Yes.

18   Q.    -- at the end of those visits?

19   A.    Yes, that's correct.

20   Q.    And the -- well, prior to -- prior to -- when you were

21   first doing your on-site visit, you did have exit interviews

22   then; right?

23   A.    That's correct.

24   Q.    Okay.  And on the remote visits, you had exit interviews?

25   A.    That's correct.

1 Q. What was the process of determining who would attend any

2 of the exit interviews that you had?

3 A. Well, we -- prior to the site visit, we would prepare a

4 schedule and provide that schedule to the compliance

5 coordinator, and he would disseminate it to all the people

6 that were going to be interviewed in the course of the site

7 visit.

8 Q. When you say the "compliance coordinator," who is that

9 individual?

10 A. Synarus Green.

11 Q. Did you have any reason to believe that Mr. Green was not

12 doing his job?

13 A. No.

14 Q. Did you have confidence in what Mr. Green was doing with

15 respect to assisting you in your monitoring duties?

16 A. Yes.  During the site visits, people were available and

17 ready when they were supposed to be, so it appeared that

18 Mr. Green let people know what the schedule was.

19 Q. Okay.  And continue describing the process, if you will.

20 A. And I don't believe there was an official listing of who

21 all would be expected at the exit interview, but certainly by

22 practice it was widely attended both when we were on-site and

23 when we've done these remote.

24 Q. Okay.  Did the sheriff -- did any of the sheriffs attend

25 any of these?

1    A.    Yes.

2    Q.    And what sheriffs attended them?

3    A.    Sheriff Mason attended them and Sheriff Vance attended

4    them.  And --

5    Q.    Did Sheriff -- I'm sorry.  Go ahead.

6    A.    I -- yes, Sheriff Crisler attended the fall one.

7    Q.    Okay.  Did Sheriff Jones attend the last one that you

8    had?

9    A.    No.

10   Q.    I am correct in assuming that there were individuals from

11   the sheriff's department who did attend; is that correct?

12   A.    There was one of the attorneys and Ms. Tanecka Moore.  I

13   believe she's employed by the County, though, not the

14   sheriff's office.

15   Q.    Well, prior to this last visit, do you recall if any

16   employees of the sheriff's department would attend the exit

17   interviews?

18   A.    Yes.  Quite a few.

19   Q.    Did you ask during the exit interview why no one was

20   there from the sheriff's department?

21   A.    I did not ask.

22   Q.    Were you told anything about the reason why no one was

23   there from the sheriff's department?

24   A.    No, I was not.

25   Q.    Did you find it unusual that no individuals were there

1    from the sheriff's department?

2    A.    Yes, it was unusual.

3    Q.    Now, you indicated that Major -- you had heard about

4    Major Bryan through Ms. Albert.  Did the County have the

5    authority to conduct its own search to find a jail

6    administrator who met the qualifications in the stipulated

7    order?

8    A.    Yes.

9    Q.    Did you ever tell the County that they could only pick

10   the person of your choice?

11   A.    No.

12   Q.    Have you ever told the County that they must hire a

13   specific individual to carry forth the duties and

14   responsibilities or the obligations of the consent decree?

15   A.    No, I have not.

16   Q.    Or of the stipulated order?

17   A.    No, I have not.

18        THE COURT:  The United States may follow up with any

19   questions that I've asked.

20        MR. CHENG:  No questions, Your Honor.

21        THE COURT:  Hold on, Mr. Hall.  The -- Hinds County may

22   follow up now.

23        MR. HALL:  Thank you, Your Honor.

24              **RECROSS-EXAMINATION (REBUTTAL)**

25   **BY MR. HALL:**

1   Q.   The Court just asked you questions about whether or not

2   the County had any issues with your impartiality.  Do you

3   recall that?

4   A.   Yes.

5   Q.   Does it -- is it your experience that if someone has

6   problems or doesn't trust you, that they would tell you they

7   don't trust you in the broader scheme of things?

8   A.   I think that's really variable.

9   Q.   If the County had told you that they had lost confidence

10  in your impartiality, what would have happened?

11  A.   I think it would be upon the County to raise it with the

12  Court.

13  Q.   And you really think you would be removed as the monitor

14  if that was raised?

15  A.   I'm sorry.  Could you repeat that?

16  Q.   Well, it's been raised in this proceeding.  Do you expect

17  that your role with Hinds County will change?

18  A.   I think that will be up to the Court, but I don't

19  anticipate it.

20  Q.   As far as your relationship with Ms. Bryan, one of the

21  issues that's come up is the fact that -- let me just pull it

22  up here.  I'm ready.

23       Looking at what's been entered into evidence as D-126 as

24  an example.  This is an August 29th e-mail.

25       Can you see it?

    1    A.   No, I cannot.

    2            THE COURT:  Enlarge it.

    3    BY MR. HALL:

    4    Q.   Is that better?

    5    A.   No, it doesn't show up on my screen at all.

    6            THE COURT:  I think that's an exhibit already and I

    7    think she may have left here with copies of the exhibits.

    8    Could you tell her what exhibit that is and maybe she has it.

    9            MR. HALL:  It's Defendants' 126.

   10            THE COURT:  It's D-126.  Do you have that exhibit,

   11    Ms. Simpson?

   12            THE WITNESS:  No, I do not.  I think it's in one of my

   13    e-mails.  I could try to find it.

   14            Okay.  Yes.

   15    BY MR. HALL:

   16    Q.   All right.  This is an August 29, 2021, e-mail.

   17            Do you see that?

   18    A.   Yes.

   19    Q.   And this is an e-mail from Ms. Bryan to you maybe about a

   20    month after she started working telling you that it's

   21    impossible for her to do her job, *et cetera*; right?

   22    A.   Yes.

   23    Q.   And at the bottom, "However, I feel it is important to

   24    officially notify you of this situation as I am currently

   25    assessing my options with regards to continued employment with

1    Hinds County."

2         Do you see that?

3    A.    Yes.

4    Q.    With respect to trust issues, once you were advised on

5    August 29, 2021, that Ms. Bryan was currently assessing her

6    options with regard to continued employment with Hinds County,

7    did you tell anybody at the County about this?

8    A.    I talked with Mr. Gaylor about the issues that were of

9    concern to Major Bryan.

10   Q.    All right.  Did you tell her though -- tell him

11   specifically this bottom part -- or did you forward that

12   e-mail to him?

13   A.    No.

14   Q.    Now, you would routinely get e-mails forwarded to you

15   from the County; right?

16   A.    No, not routinely.

17   Q.    Mr. Green wouldn't send --

18   A.    Unless I'm misunderstanding you.

19   Q.    I missed it.  Can you repeat that, please?

20   A.    I just said no, not routinely.  Unless I'm

21   misunderstanding your question.

22   Q.    Well, County employees would forward e-mails to you that

23   you were originally not on.  Is that a fair statement?

24   A.    It has happened.

25   Q.    And there was nothing keeping you from forwarding this

 1   particular e-mail to Mr. Gaylor to apprise him of the problem;

 2   right?

 3   A.   Right.

 4   Q.   You just didn't do it?

 5   A.   I -- right.  Like I said, I talked to Mr. Gaylor about

 6   the issues that were concerning to Major Bryan and I talked to

 7   Major Bryan, and as a result of that conversation, her -- she

 8   did not seem to have any present intention to leave Hinds

 9   County.

10   Q.   Even though she --

11   A.   In fact, she frequent -- I'm sorry.

12        In fact, she frequently talked about how much she cared

13   about her work in Hinds County and how much she really wanted

14   to see the jail be successful.

15   Q.   And if we scroll up here, "Hi, Kat, I'm really sorry to

16   hear the administration is making your job so difficult."

17        Do you see that?

18   A.   I do.

19   Q.   Okay.  Why did you take her word on face value?

20   A.   I did not.

21   Q.   Is there anything in this e-mail that says you'll talk to

22   the County to get to the bottom of this?

23   A.   Not in that e-mail.

24   Q.   Did you ever give the County the benefit of the doubt

25   when Ms. Bryan was giving you -- was complaining?

1   A.   As I mentioned, I spoke with Mr. Gaylor about the issues

2   that were of concern to her.

3   Q.   Likewise, this e-mail that you sent to Ms. Bryan, you

4   didn't forward that to the County either, did you?

5   A.   No, I did not.

6   Q.   With respect to selecting a jail monitor, the Court just

7   asked you questions about if the -- if Hinds County was

8   obligated to take your recommendation.

9        Do you recall that?

10  A.   Yes.

11  Q.   And you're saying the County was not obligated to take

12  your recommendation; right?

13  A.   That's correct.

14  Q.   And the County today with Mr. Shaw is not obligated to

15  take any recommendations from you hiring him either, are they?

16  A.   No, they're not.

17       MR. HALL:  One moment, Your Honor, I'm trying to

18  show -- because she's not here I can't show -- I wanted to --

19  BY MR. HALL:

20  Q.   Let me ask you this:  Ms. Simpson, you're aware that that

21  last exit interview was scheduled at the same time as a Hinds

22  County board meeting; right?

23  A.   It was scheduled in the afternoon and I know there was a

24  Hinds County board meeting in the morning and that they

25  sometimes go long.

```
 1   Q.   And Mr. Gaylor told you that we have a board meeting, I
 2   don't think we'll be finished by 1:00; right?
 3   A.   He sent me an e-mail and I don't -- it was to that
 4   effect.
 5   Q.   And this whole DOG -- DOJ team was on it, on that e-mail;
 6   right?  Well, most of them.
 7        Mr. Cheng was on that e-mail; right?
 8   A.   That could be.  I don't recall.
 9   Q.   Yet there were members from Hinds County that were
10   present; correct?
11   A.   As I mentioned, one attorney and Mr. Tanecka Moore.
12   Q.   Ms. Moore is an attorney also?
13   A.   Yes.
14   Q.   Okay.
15   A.   I don't think she -- that's not her job description but
16   she is, I understand.
17   Q.   I think that's absolutely her job description.  You're
18   not aware of that?
19        So you had one County attorney; right?  And then one of
20   the attorneys at the County who was engaged to try this case
21   was there also; right?
22   A.   Yes.
23        MR. HALL:  I don't have any further questions.
24        THE COURT:  Those persons, were they -- you said they
25   were County employees or County attorneys?
```

 1          MR. HALL:  Yeah, Ms. Moore was a attorney --

 2          THE COURT:  Was she there representing the sheriff is

 3     the question?

 4          MR. HALL:  One of our lawyers were -- I want to say

 5     Nick was -- one of those guys was there.

 6          THE COURT:  My question was, was any employee of the

 7     sheriff's department there?  That was my question.

 8          MR. HALL:  No.  Even if the sheriff was at the --

 9          THE COURT:  Any employee of the sheriff was there.

10          MR. HALL:  And he testified yesterday he didn't know

11     about the meeting, so that's what it was.

12          THE COURT:  Nobody in the sheriff's department knew

13     about the meeting, in other words?

14          MR. HALL:  From my information, that's correct.  That's

15     the sheriff's testimony.

16          Does the Court have any further questions of me?

17          THE COURT:  No, Mr. Hall.  And I'm going to let you

18     follow up as well as the Government but I want to just make

19     sure that my questions were not misinterpreted in any way.

20          MR. HALL:  Okay.

21                    **FURTHER EXAMINATION (REBUTTAL)**

22     **BY THE COURT:**

23     Q.  Ms. Simpson, I asked you about whether or not the County

24     had any obligation to hire or to consult with -- to hire

25     anybody to be the jail administrator, but I think I couched it

1    in terms of so long as that individual met the terms of the

2    stipulated order or the consent decree.

3        You would expect that any jail administrator does meet

4    the definition and the qualifications set forth in the

5    stipulated order, would you not?

6    A.   Yes.  In the consent decree, yes.

7    Q.   Right.  And was it your view that Major Bryan met those

8    qualifications?

9    A.   Yes.

10   Q.   Was it your view that major -- that Mr. Felder -- or

11   Fielder, whatever his name was, who was serving there in

12   between Ms. Rushing and Ms. Bryan met the qualifications?

13   A.   That's correct.

14   Q.   All right.  Did you consider Ms. Bryan an employee of the

15   sheriff's department?

16   A.   Yes.

17   Q.   And under the stipulated order, Ms. Simpson, were you

18   allowed to talk to employees of the department?

19   A.   Yes.

20   Q.   All right.  And did you frequently talk to employees of

21   the department?

22   A.   Relatively frequently, yes.

23       THE COURT:  Okay.  Anything -- would you -- I have no

24   questions.

25       Does the United States wish to follow up based on

```
 1    anything that I just asked?
 2            MR. CHENG:  No, Your Honor.
 3            THE COURT:  Mr. Hall?
 4            MR. HALL:  No, Your Honor.
 5            THE COURT:  All right.  Ms. Simpson, you're excused.
 6            We're going to take about a 20-minute break.  It's
 7    approximately 11:30.  We'll come back at 11:50.  We're in
 8    recess.
 9                    (A brief recess was taken.)
10            THE COURT:  You may be seated.
11            Anything to take up before we call the next witness?
12    The United States may call its next witness.
13            MR. CHENG:  Thank you.
14            The United States calls David Parrish.
15                        DAVID PARRISH,
16          having been previously duly sworn, was examined
17    and further testified as follows...
18                  DIRECT EXAMINATION (REBUTTAL)
19    BY MR. CHENG:
20    Q.  Good morning, Mr. Parrish.  Can you hear?
21    A.  Yes, I can.  Thank you.
22            THE COURT:  I'm going to remind you, Mr. Parrish,
23    you're still under oath.  Did you hear me?
24            THE WITNESS:  Yes.
25            THE COURT:  You may proceed.
```

 1   BY MR. CHENG:

 2   Q.   Mr. Parrish, did you hear Mr. Chamblee's testimony about

 3   the repairs that have been made at the jail?

 4   A.   Yes, I did.

 5   Q.   Did Mr. Chamblee's testimony indicate to you that they

 6   have fixed everything they promised to fix to comply with the

 7   Court's orders?

 8   A.   Well, not quite, but it made it sound like most

 9   everything was done except some work still being handled on

10   what he referred to as Bravo 1 iso.

11   Q.   So what still needs to be done?

12   A.   Bravo Pod has been substantially repaired, but the mental

13   health unit is going to be Bravo 1 which is a -- about a

14   32-bed -- or a 32-cell, 64-bed housing unit, and next to it is

15   Bravo 1 iso which would be special confinement for people

16   assigned there which has only four single cells.  That's -- so

17   Bravo 1 needs to be completely finished.  It's not done yet.

18        In addition, the back of the control room is going to be

19   modified into some office space for mental health staff and

20   none of that work had taken place when I was there, well, last

21   week in January.  It's conceivable some of that could have

22   occurred since then.

23        But they also had to do work on the old video -- excuse

24   me, the old noncontact visiting space where inmates used to

25   visit with people.  That's been shut down for years and that's

1    been reconfigured into special program space or special space

2    for one-on-one consulting between mental health patients and

3    the staff.  And then on the other side of that corridor,

4    there's a larger room that's got to be renovated and turned

5    into like a classroom setting, so there's still considerable

6    work to be done there yet.

7    Q.  So Mr. Chamblee also talked about repairs to doors and

8    locks.  After hearing what he said has been done, is there any

9    more work that still needs to be done with doors and locks?

10   A.  Well, unfortunately it's a never-ending process there in

11   that things get repaired, and then there's more damage and

12   they have to be repaired again.  So when I was there in the

13   end of January, the main door going off the great hall back to

14   Bravo Pod did not function --

15            THE COURT:  Hold on.

16   A.  It has been repaired --

17            THE COURT:  Hold on, Mr. Parrish.  Is there an

18   objection?

19            MR. MORISANI:  Yes, sir.  This is not proper rebuttal.

20   This is all stuff he's already testified to on his direct exam

21   and on his redirect exam the first week of the hearing.

22            THE COURT:  Okay.  Objection overruled.

23   BY MR. CHENG:

24   Q.  You can still answer, Mr. Parrish.

25   A.  Okay.  I guess I was just trying to give an update from

1    what I had said earlier.  I've gone back and double-checked

2    with the chief safety and security officer to get the current

3    status, and there are still two housing unit doors in Charlie

4    Pod, to Charlie 2 and to Charlie 3, which do not function as

5    late as this past Saturday.  Other doors have been repaired

6    but it's -- as I indicated, something that has been done one

7    time but it's a never-ending process really to stay on top of

8    that.

9    Q.   So Mr. Chamblee also talked about things they've done to

10   deal with fire pumps and fire systems.  Did that resolve the

11   fire safety issues at the jail?

12   A.   Well, it's certainly better than it used to be.  But the

13   example that I've given was I think in Charlie Pod, Charlie 2

14   no longer has a fire hose in it because the cabinet had been

15   broke into by the inmates.  So they have been -- the fire

16   hoses have been put in place, but it's imperative that staff

17   still be assigned to the housing unit constantly without any

18   interruption to make ensure that the equipment has not been

19   torn up by the inmates when the housing units are left

20   unattended.

21   Q.   How about the alarm systems?  Are those addressed now

22   that Mr. Chamblee and Mr. Farr have talked about their fixes?

23   A.   I think he gave an accurate assessment.  It's a work in

24   progress, and there's been wiring put in place and equipment

25   for but Bravo pod, but now has to be retrofitted to Charlie

1   Pod as well and then Alpha if it's ever used for housing

2   later.

3           THE COURT:  Hold on.

4           MR. MORISANI:  Your Honor, I would just object again.

5   It sounds like he's summarizing testimony that was presented

6   in our case in chief and none of this is new information that

7   wasn't available to him before now.

8           THE COURT:  Objection overruled.

9   BY MR. CHENG:

10  Q.   After you heard Mr. Chamblee and Mr. Farr, was there any

11  information that they provided that suggest they've gotten a

12  handle over the maintenance system at the jail?

13  A.   Well, I think in our reports we have indicated and we

14  certainly have in our exit briefings and in our discussions

15  with those staff that probably one of the best things the

16  County did was to bring on board Benchmark Construction to

17  provide some structure and control of the maintenance process.

18  That's been a huge step in the right direction.

19           And from the sheriff's side of things, bringing in the

20  chief safety security officer to coordinate all work orders so

21  there was one central accounting for them, something that had

22  never been done before, was a good step in the right direction

23  so it's better than it used to be.

24  Q.   Has it actually resolved the maintenance issues?

25  A.   Well, the maintenance issues have not been totally

1    resolved at the Raymond Detention Center in particular, but

2    that's one of the things that needs to be addressed in the

3    priority list of items required under the stipulated order for

4    the master planning committee.

5    Q.   Can we talk next about something the sheriff testified to

6    regarding some type of unethical or illegal conduct.

7         Did you make a request to the sheriff when he was an

8    investigator to look into a death at the early part of this

9    monitoring process?

10   A.   Okay.  Your question is did I ask Sheriff Jones when he

11   was Captain Jones?

12   Q.   Yes.

13   A.   Okay.  I met then Captain Jones when he took over CID

14   about the time that Sheriff Vance took office, and there had

15   been a change of -- he was a new captain in charge of CID and

16   something that I had dealt with his predecessor on I brought

17   up with him and that dealt with a beating death of an inmate

18   that occurred in -- I think December the 3rd of 2018 in

19   Bravo 3 and it was somewhat similar to the MR case now.  And

20   it was investigated at that time by CID.

21        The investigation dragged on for many months but they

22   finally got it finished, and to my recollection they did

23   charge some inmates in that beating death.  But there were

24   issues of whether or not the officers on duty performed their

25   duties as they were supposed to, whether they were doing

1  well-being checks that were documented or had taken

2  appropriate action, and I had already felt that that should

3  have been then referred over to IAD to look at that aspect of

4  it.

5      And then when Captain Jones took over, when I first met

6  him, I saw an opportunity maybe now they would go back and

7  look at that sort of thing.  I requested that.  He didn't

8  think that that was appropriate because it occurred under the

9  previous administration of Sheriff Mason and so I dropped the

10  matter at that point and took no further action.

11  Q.  So as far as you know, did the sheriff or Captain Jones

12  ever do an IAD investigation of whether staff might have been

13  accountable for that death?

14  A.  I don't think he would have been responsible for that,

15  but he was in charge of CID and I was asking to have it

16  referred over to IAD, a separate entity that looks at the

17  action of officers.  That wasn't really addressed in the CID

18  investigation of the beating death of inmate on inmate.

19  Q.  Let's talk a little bit about staffing and supervision.

20  Did you hear County Administrator Jones and Board President

21  Calhoun use the term direct supervision during their

22  testimony?

23  A.  Yes, I did.

24  Q.  Did you have any concerns about the way they used the

25  term?

2086

A.   Based on some of the things that they said, I don't think
that they had a good grasp of what direct supervision really
is, and certainly that -- I guess there's lack of conception
of the fact that the Raymond Detention Center was built as a
direct supervision jail and it actually functioned that way
from 1994 up until 2012 when the officers were pulled out of
the housing units and they were left unattended.  At that
point things fell apart.  The inmates took over and there was
a major riot.

     And so I think what they were looking at was it would be
dangerous to put people back face-to-face with the inmates.
Actually though, what they've got to understand is that's
exactly what direct supervision is.  In a direct supervision
housing unit, there's one officer ideally with no more than
64 inmates face-to-face, just like a teacher in a classroom,
no bars or glass between them, there 24 hours a day, 7 days a
week to make sure that their housing unit of 64 inmates is
well maintained; that the officer is there to resolve
questions for the inmates and prevent problems from
developing.

     And I don't think there's a real, true understanding of
the way direct supervision should work, perhaps on the part of
some of those who testified earlier this week.

Q.   If defendants like Mr. Calhoun or their designates like
Mr. Jones don't want to put officers in the housing units, can

1  they comply with the consent decree?

2  A.   Well, the settlement agreement and the consent decree

3  specifies that all housing -- all facilities are supposed to

4  be operated under direct supervision.  We have managed to put

5  that in place -- or they have managed to put that in place

6  with our help and technical assistance at the work center.  We

7  now have just one officer taking care of up to 64 inmates in

8  each of those four housing units.  That's never occurred at

9  the Raymond Detention Center.

10      The Charlie Pod opened up in October of 2020, supposedly

11  under direct supervision, and it has never functioned that way

12  since.  There have been officers assigned inside the housing

13  units but not consistently around the clock seven days a week.

14  That leaves big gaps and that's why there's damage and why

15  there's still problems.

16  Q.   The sheriff also proposed what he called a step plan.

17  Have you had a chance to review that plan?

18  A.   Yes, I just got a chance to look at it today and I'm

19  pleased.  It's a big step in the right direction.  If the

20  County can implement something like that, it will really be

21  beneficial.  There's -- I mean, it takes into account an

22  increase for entry level, and then it goes beyond and has

23  incentives for staying in the employ of the sheriff's office

24  for a number of years and then there are steps that go with

25  that and it looks at the various ranks.

1          Of all the documents that I have looked at so far, since

2     the beginning of the monitoring process, that's the best

3     approach that I have ever seen generated to deal with the

4     problem.

5          Now I hope that the Board of Supervisors will take it

6     under consideration and pass it in very much that form.  It

7     will be very beneficial for recruitment and retention efforts.

8     Q.   Did you also hear the sheriff's testimony about Tasers?

9     A.   About Tasers, yes, I did.

10    Q.   Did you agree with the sheriff's testimony about the

11    adequacy of their training and policies for Tasers?

12    A.   I'm not real clear on what training is required.  My best

13    understanding was that he said you have to go through some

14    form of training for a Taser to be certified to carry it.  If

15    that is done -- the standards are different in each state and

16    so forth, but if that is done, apparently it meets the

17    requirements of here in -- or in Mississippi and that would be

18    satisfactory, I would think.  But that step needs to be -- the

19    officers need to be certified however that training process is

20    required in Mississippi.

21    Q.   Are most of the detention officers in the jail certified

22    for Taser use?

23    A.   I'm not aware of it at this point, but that is not

24    something that we went back and examined previously because

25    Tasers were not carried up until just recently.

```
 1    Q.   Did you also hear the sheriff talk about the differences

 2    between -- or rather the lack of differences between

 3    patrolling on the streets and prisons and jails?

 4    A.   Yes.

 5    Q.   Are there actually differences between how things are run

 6    in a jail versus prisons or being on the streets?

 7         MR. MORISANI:  Objection, Your Honor.  I don't know

 8    that there's been a foundation laid for his ability to testify

 9    about what happens on the streets.  I think we covered that on

10    his cross-examination on the second day of trial.

11         THE COURT:  Objection overruled.

12    BY MR. CHENG:

13    Q.   You can answer the question, Mr. Parrish.

14    A.   I'm sorry.  It sounded like a three-part question to me.

15    Can you restate it for me, please?

16    Q.   Well, let me ask you, are there differences between

17    running things in a jail versus prisons?

18    A.   Differences between jails and prisons?

19    Q.   Yes.

20    A.   Yes.  I mean, jails are place of pretrial detention.

21    Everybody that comes in the jail has been charged criminally

22    by the law enforcement officer in the street, it doesn't mean

23    they're guilty.  Their held and detained until such time as

24    there's a court hearing and decision.

25         Some people serve relatively short periods of time.  In
```

most states it's like up to a year would be served in the
county jail, over a year, then you go off to state prison.
But prisons are different in that they hold only sentenced
people for long terms, generally for a year or more, but there
are states that have different standards.

       The big difference between a jail and a prison
operationally is that jails take in far more people in a
year's time then they hold at any one time.  So as I think I
commented before, an excess of 10 million people are arrested
in the United States every year and go to jail.  We don't have
10 million people locked up.  But the jails churn through lots
and lots of people.

       The prisons have a much more stable population.  People
come in, they're scheduled to come in, and they stay for a
longer period of time.  Prisons are generally in more rural
areas where there's a lot of space and the site plan is spread
out and inmates move from one function to another.  They're
not locked into their housing units all the time.  They eat in
the central dining room and go back and forth.  They go to
services as opposed to services coming to them.

       Jails are different.  They're generally in an urban area.
They need to be because all those pretrial detainees have to
be shipped to court.  It doesn't make sense to build a jail
out in a rural area.  So that's why so many jails were
originally built in the County courthouse, but they're

1  generally in an urban area and those people have to go to and

2  from court and that's a lot of transportation.

3      And then within the facility, a jail holds men, women,

4  juveniles tried as adults, everybody arrested goes to one

5  place.  A prison is generally dedicated to one type of inmate,

6  either youthful offender or low risk or medium or maximum

7  security, whatever the category may be.  So jails have a lot

8  of everything put together in one place.  Prisons have the

9  option to be able to separate things.

10 Q.  And at the booking stage, are there differences in the

11 stability of inmates coming through booking versus the inmates

12 who are admitted into prisons?

13 A.  Well, a jail has to take whatever it receives from the

14 arresting agency, and that means people that come into jail

15 high on alcohol or drugs or upset because they've been

16 arrested or what have you.  They may have medical issues, the

17 jail doesn't know anything about them and has to start from

18 scratch, doing the medical screening, all the classification

19 work, and all that to determine what they're dealing with.

20     By the time an inmate goes to a state prison, they've

21 been through all that, there's a complete package on them.

22 They've got their medical program laid out, and then all of

23 that is provided when the prison intake center receives them

24 from a county jail.

25 Q.  One of the former sheriffs also provided a step plan;

1   correct?

2   A.   Yes, sir.

3   Q.   Was that ever passed?

4   A.   No.  It was first brought up about three years ago.

5        THE COURT:  Hold on.  There's an objection.

6        MR. MORISANI:  I just object.  Again, this is improper

7   rebuttal.  He's now talking about a sheriff before this

8   sheriff.

9        THE COURT:  We don't need to rehash everything.

10  Objection sustained.

11  BY MR. CHENG:

12  Q.   Do you know what the inflation rate is in Mississippi?

13  A.   No.

14       THE COURT:  Hold up.  There's an objection.

15       MR. MORISANI:  I just object again.  This was brought

16  up in our case in chief.  These are not new facts.

17       THE COURT:  Objection sustained.

18  BY MR. CHENG:

19  Q.   Defendant had question of the building for the monitoring

20  team.  Did you actually tour the facility in early 2020?

21  A.   Yes.

22       MR. CHENG:  All right.  If I can have a moment, Your

23  Honor?

24       THE COURT:  You may.

25       MR. CHENG:  That's it, Your Honor.

1      Thank you, Mr. Parrish.

2      THE COURT:  All right.

3      MR. MORISANI:  May I proceed, Your Honor?

4      THE COURT:  Yes, you may.

5                **CROSS-EXAMINATION (REBUTTAL)**

6  **BY MR. MORISANI:**

7  Q.   Good afternoon, Mr. Parrish.  How are you?

8  A.   Very good.  A lot warmer here than when I was in

9  Mississippi.

10 Q.   I've got a couple of questions to follow up after my

11 friend from the Department of Justice questioned you, and I

12 guess I'll start just generally.

13      Mr. Parrish, you testified -- or you were asked some

14 questions about prisons and jails.  You'd agree with me that

15 you've never operated and managed a prison, have you?

16 A.   No, I have not.

17 Q.   And you also talked a little bit about priority issues

18 under the stipulated order.  I'm going to try to --

19 A.   Just --

20 Q.   I'm going to try to put a copy of it on the Elmo, and

21 just tell me if you have trouble seeing it and I can, you

22 know, play with it a little bit.  Let me back it up for you.

23      It's -- for the record, it's PX-2.

24      Do you see that clearly, Mr. Parrish?

25 A.   I got my reading glasses on.  I'm working on it.

 1   Q.   All right.  I can zoom in a little bit.  Tell me if this

 2   helps.

 3        Did that help at all?

 4   A.   I think I can make that out right there.

 5   Q.   All right.  I'm going to flip to the page 3 of this

 6   document, and it -- really where I'm focused is on this is

 7   Roman numeral I, section B --

 8   A.   Yes.

 9   Q.   -- where the green tab is.  If you'll just take a moment

10   to look -- read that paragraph B and then let me know and I'll

11   flip the page.  And I think too, I think y'all agreed to have

12   a copy of this with you.  Do you have a copy in front of you,

13   the stipulated order?

14   A.   Yes, I think I do.  The stipulated order?

15   Q.   Yes, sir.  That may be easier to do it that way.

16   A.   Yes, sir.  I've got it right here.

17   Q.   Go ahead and read Roman numeral I, section B.  That

18   paragraph B, and then turn the page to page 4, and if you'll

19   read numbers 1 through 4.  I can take this off.

20   A.   Yes, sir.

21   Q.   And I'm just going to let you use your copy and I'll use

22   mine.  Just let me know when your finished, when you've read

23   these.

24   A.   Yes, sir.

25   Q.   You'd agree with me, you don't see anywhere in section

1    Roman numeral I, section B, numbers 1 through 4, you don't see

2    anywhere where there's the word priority or anything that

3    requires a priority list, do you?

4    A.   Yes, it's paragraph number 2.

5    Q.   Okay.  I thought you'd say that.  Where in paragraph 2 is

6    there the word priority?

7    A.   Okay.  That's terminology that we have used, but it is a

8    list of all the things, not just a list of the things that

9    have to be done but then saying what's going to be done and in

10   what order.

11   Q.   You'd agree with me though, when you say that's

12   terminology that we've used, that's kind of -- that's not

13   what's written here in the document though, is it?

14   A.   It doesn't use the word priority.

15   Q.   So you'd agree there's nothing in this section that

16   requires a priority list for repairs as part of the master

17   plan, wouldn't you?

18   A.   No, I disagree with that.  I think that paragraph 2

19   requires the County, the master planning committee, to decide

20   what items are going to be corrected in the existing

21   facilities and when it's going to be done.

22   Q.   But it doesn't say anything about priority, does it?

23   A.   It does not use the word priority, no.

24   Q.   Okay.  Thank you, sir.

25        And you'd agree with me, too, that the Raymond Detention

 1  Center is built in a rural area, isn't it?

 2  A.   Well, it's about 18 to 20 miles out of downtown, yes.

 3  Q.   Now, I want to clarify something that just wasn't clear

 4  and I didn't -- I may not have heard or what I heard may not

 5  have been correct, but did you testify when my friend from the

 6  Department of Justice was asking you questions that you went

 7  back and checked with the safety officer?

 8  A.   Yes.

 9  Q.   Okay.  When did you have this conversation with the

10  safety officer?

11  A.   I sent him a text over the weekend while I was flying

12  home --

13  Q.   So --

14  A.   -- and asked to see if he could check on an update on the

15  status of the doors that I had indicated were not functioning.

16  The reason being that things could have changed since I was

17  there in the end of January, and I wanted to have the most

18  current information for when I work on the report.

19  Q.   And I think you're testifying over -- I think it was over

20  our objection.  You're testifying as an expert for the

21  Department of Justice, aren't you?

22        MR. CHENG:  Objection, Your Honor.

23        THE COURT:  Objection sustained.

24  BY MR. MORISANI:

25  Q.   All right.  So you talked to my client while this hearing

1    was ongoing, wasn't it?

2    A.   Yes.  I didn't talk to him.  I sent a text message and

3    asked if he could check on the status the doors.

4    Q.   And what's your understanding of why you're testifying

5    here today and in this hearing?

6    A.   I'm being asked questions on what I can respond to.

7    Q.   Who proffered you as an expert in this hearing?

8    A.   I think it was Mr. Cheng.

9    Q.   Okay.  So you're proffered as an expert by the Department

10   of Justice and you're talking to our client in the middle of

11   the hearing; am I correct?

12   A.   I sent him a text message and asked for information on

13   the status of the doors, that's correct.

14   Q.   What's this person's name?

15   A.   Sergeant Winter.

16   Q.   When's the last time Sergeant Winter has been at the

17   jail?

18   A.   I don't know.  He's been -- he was there.

19   Q.   When was he there?

20   A.   When I contacted him.

21   Q.   So on Saturday, February the 26th, you say he was at the

22   facility?

23   A.   I don't know if he was physically there or whether he had

24   just checked on it.  I don't know.  But he's -- he was off

25   duty for a while, but he informed me that he had come back to

 1  work and I don't know the exact dates.

 2  Q.  Well, this is important to me, Mr. Parrish, so I want you

 3  to think.  Did he -- did he give you any indication he was at

 4  the facility the day you contacted him in the midst of this

 5  hearing?

 6  A.  No, he didn't say where he was at all.

 7  Q.  Did he say who he talked to?

 8  A.  I'm sorry?

 9  Q.  Did he say who he talked to?

10  A.  No, he didn't indicate that he talked to anybody.

11  Q.  You do know that the County has a right to have counsel

12  present, don't you?

13      MR. CHENG:  Objection, Your Honor.  Calls for a legal

14  conclusion --

15      THE COURT:  Objection sustained.

16  BY MR. MORISANI:

17  Q.  Do you have a copy of the consent decree with you, sir?

18  A.  Yes, sir.

19  Q.  Can you read paragraph 143 of the consent decree for me?

20  A.  Paragraph 43?

21  Q.  143.

22  A.  Excuse me.  Yes.

23      It says "The parties shall have the opportunity to

24  participate in all monitoring site visits."

25  Q.  Thank you.

```
 1        Have you contacted anyone else from the facility during

 2   this litigation, this hearing, other than Mr. Winter?

 3   A.   No, I've not contacted anybody else.

 4   Q.   Now, when we -- I spent a lot of time with you at the

 5   facility site visit the week of January 24th.

 6        Do you recall that?

 7   A.   Yes, I do.

 8   Q.   When we were there, do you recall being on Pod C, Unit

 9   No. 2 with me?

10   A.   Yes.

11   Q.   And do you recall us having a lengthy conversation with

12   the officer that was on the floor working that pod that day?

13   A.   Yes.

14   Q.   And she was in a direct supervision posture, was she not?

15   A.   Yes.

16   Q.   She had a desk right there that she was working at,

17   wasn't she?

18   A.   Yes.

19   Q.   Her name for the record was Officer McKinney, wasn't it?

20   A.   I'll take your word.  I don't recall.

21   Q.   Now, you'd agree with me too that placing an officer on a

22   unit floor like that among the detainees does not guarantee

23   that there will be no assaults involving detainees on that

24   floor, will it?

25   A.   No, it does not.
```

1  Q.   And it does not mean that there will be no fights among

2  the detainees on that floor, will it?

3  A.   No.

4  Q.   Now, you had direct supervision facilities constructed in

5  Hillsborough County, didn't you?

6  A.   Yes, a total of 5,000 beds over a period of about

7  25 years.

8  Q.   Do you recall showing me the pictures of those

9  facilities?

10 A.   I think so.

11 Q.   Were those facilities built with two floors in the living

12 areas?

13 A.   One was and that was the older one that opened in 1990, a

14 1700-bed facility.  And then the newer one that started in the

15 1990s, later, is about 3,300 beds, primarily all single-level

16 with no mezzanine and they're direct supervision dormitories.

17 Q.   The second one is that, Orient or Falkenburg?

18 A.   Falkenburg is the larger of the two and the newest of the

19 two.

20 Q.   So Falkenburg was built as a direct supervision facility;

21 would you agree?

22 A.   Yes.

23 Q.   And when you have cells on the outside of those units, in

24 the living areas, you have cells you could lock people behind

25 with the bars and glass you talked about earlier?

```
 1   A.   There are no bars anywhere in the Hillsborough County
 2   jail system.  We managed to build high security without having
 3   to resort to bars.  But one-tenth of a direct supervision jail
 4   generally needs to be, what I call, confinement space or
 5   lockdown.  That would be single-cell confinement for people
 6   who can't get along in general population and direct
 7   supervision or have to be separated for a number of reasons,
 8   including disciplinary or administrative confinement.
 9       So an integral part of a direct supervision jail is that
10   roughly 10 percent of it needs to be lockdown space.
11   Q.   So is that a yes to my question that Falkenburg was not
12   built with bars and glass between the officers and the
13   detainees?
14   A.   Falkenburg -- 90 percent of Falkenburg is direct
15   supervision dormitories, and then about 10 percent is
16   single-cell confinement space.
17   Q.   I'm still trying to get an answer to my question.
18           MR. CHENG:  Objection.  Asked and answered.
19           THE COURT:  Objection overruled.
20           Re-ask your question, Mr. Morisani.
21           MR. MORISANI:  Yes, sir.
22   BY MR. MORISANI:
23   Q.   That 90 percent you referred to at Falkenburg, that's not
24   built with glass and/or bars separating the detainees from
25   those guards that are tasked under that management style with
```

1    operating on the floor of those living units, is it?

2    A.  No, that's direct supervision dormitories where there's

3    one officer in what you would refer to as a housing unit with

4    64 inmates in it.

5    Q.  Now, when you walk on the living units at RDC, Raymond

6    Detention Center, here in Hinds County, you'd agree with me

7    when you walk onto those living units, you see cells on each

8    wall of those living units, don't you?

9    A.  Yes.

10   Q.  So you'd agree with me that if RDC is going to be

11   operated under a direct supervision management style, it's

12   poorly designed for that, is it not?

13   A.  Yes, you're correct.  It's designed as a direct

14   supervision jail but that's the way that direct supervision

15   jails were designed at that particular time in the United

16   States with individual cells.

17       The Orient Road Jail that you made reference to was

18   designed with individual cells, a mezzanine level, and so

19   forth.  We just came up with a better way of doing it later

20   on.  But many direct supervision jails have individual cells

21   and a common dayroom, much as you would find at the Raymond

22   Detention Center.

23       The other aspects of the Raymond Detention Center which I

24   have problems with regarding design or it was not the most

25   efficiently laid out, it had from what from my perspective is

 1   unnecessary control rooms that require additional staffing

 2   that would not be in place if it were designed today.

 3        MR. MORISANI:  Your Honor, if I may briefly confer.  I

 4   may be finished.

 5        THE COURT:  All right.

 6        MR. MORISANI:  No further questions, Your Honor.

 7        THE COURT:  All right.  Any redirect of this witness?

 8                 **REDIRECT EXAMINATION (REBUTTAL)**

 9   **BY MR. CHENG:**

10   Q.   Could you pull up -- I believe it's Plaintiff's

11   Exhibit 1, the consent decree?  Can you pull up Plaintiff's

12   Exhibit 1, paragraph 141?

13        Mr. Parrish, have you engaged in ex parte communications

14   with County employees in the past where you talked to them

15   without an attorney present?

16   A.   Yes, I do fairly routinely try and put together my

17   portion of the monitoring report and to get status updates

18   since we have to do a lot remotely by telephone or e-mail.

19   Q.   And when you gathered information from Sergeant Winter,

20   were you doing a site inspection of the jail at the time?

21   A.   No, sir.  I was just trying to get the most current

22   information because when I initially testified, that was based

23   on my observations approximately one month ago when I was

24   there at the end of January, and I just wanted to know where

25   things were today, had anything changed.

1          MR. CHENG:  No other questions.  Thank you,

2     Mr. Parrish.

3          THE COURT:  All right.  I just have a couple of

4     questions, Mr. Parrish.

5                    **EXAMINATION (REBUTTAL)**

6     **BY THE COURT:**

7     Q.   You've been in this trial the entire time.  Did

8     Ms. Simpson -- you would agree that Ms. Simpson was the head

9     of the monitoring team?

10    A.   Yes, sir.

11    Q.   Okay.  Has she ever -- has she -- at any point during the

12    time that you-all have been doing the monitoring, has she ever

13    expressed a concern to you that you might have been accused of

14    doing something that was unethical?

15    A.   No, sir.

16    Q.   Has she ever approached you and questioned you about any

17    type of possible illegal conduct that you might have done?

18    A.   No, sir.

19    Q.   Did she ever question you about having any concern that

20    had been conveyed to her about whether you had done anything

21    inappropriate, unethical, or illegal?

22    A.   Yes, sir, with regard to the first.  I had a telephone

23    conversation with the newly selected jail administrator, Major

24    Bryan, shortly after she came on board, and I was catching her

25    up on the history of what we've been through in the monitoring

1    process.  Apparently I said some things that she took, I

2    guess, offense to or didn't like to hear, and she ended up

3    complaining to the legal advisor for the sheriff's office.

4    Ms. Simpson got that information, passed it along to me.

5         After that, I sat down and worked things out with Major

6    Bryan and we had a very good working relationship from then

7    on.  I was very pleased to have her come on board with her

8    background and expertise when she finally did, and I must have

9    done things the wrong way in explaining some of the history of

10   what we had been through.

11        THE COURT:  Okay.  Thank you.

12        Does United States have any follow-up based on what

13   I've asked?

14        MR. CHENG:  No, Your Honor.  Thank you.

15        THE COURT:  Does Hinds County?

16        MR. MORISANI:  No, sir.

17        THE COURT:  Thank you, Mr. Parrish.

18        United States, you may call your next witness.

19        MR. CHENG:  Your Honor, we have no more witnesses.

20        THE COURT:  Does the United States rest?

21        MR. CHENG:  Yes, Your Honor.

22        THE COURT:  All right.  All the testimony is now before

23   the Court.  You want to make sure all the evidence that you --

24   I'll leave that open until we come back.  You can check your

25   files, records to make sure all the evidence is in that you

1    wish to be before -- you know, for the record.

2         It's 12:35.  Are we prepared to do closings -- closing

3    statements/arguments today?

4         MR. CHENG:  Yes, Your Honor.  Just one clarification.

5    Is Mr. Parrish released?

6         THE COURT:  Yes.  Mr. Parrish and Ms. Simpson are both

7    released as well as any of the other monitors who may be on

8    the line.

9         MR. CHENG:  And we will be ready for openings, Your

10   Honor -- closings.

11        THE COURT:  Closings.  Please not opening again.  We've

12   been here long enough together.

13        How much time does the United States -- we sort of

14   briefly talked about this the other day, but how much time

15   does the United States wish to have?

16        MR. CHENG:  We've requested one hour, Your Honor.

17        THE COURT:  All right.  Okay.  Hinds County?  Hinds

18   County, I guess, yes.

19        MR. SHELSON:  Your Honor, the County is ready for

20   closing.  We probably need about 45 minutes, and I think

21   Mr. Hall wanted to reserve some time for the sheriff.

22        THE COURT:  Mr. Hall, you want a full hour?

23        MR. HALL:  I'll reserve.  I don't know if I'll use any

24   time at all, Judge, but I'd like to reserve it.

25        THE COURT:  All right.  Okay.  We'll report back at

 1   2:00 and the parties should be ready to start.  I will tell

 2   you there may be a time or two where I may ask a question or

 3   two during your closing, so just anticipate that.  I may or

 4   may not but anticipate it.

 5           All right.  We're in recess until 2:00.

 6                   (A lunch recess was taken.)

 7           THE COURT:  Please be seated.

 8           Y'all keep your seats.  Anything we need to take up?

 9           MR. CHENG:  No, Your Honor.  We did check the exhibits.

10   Our exhibits are fine.

11           THE COURT:  Okay.  From the defense, are your exhibits?

12           MR. SHELSON:  Your Honor, we're good.  Thanks.

13           THE COURT:  The parties have now rested.  I'm ready to

14   hear closing statements of the United States.

15           Mr. Cheng, do you wish to reserve any time for

16   rebuttal?

17           MR. CHENG:  We'll reserve 10 minutes for rebuttal, Your

18   Honor.

19           THE REPORTER:  Is your mike on?

20           MR. CHENG:  No.  Thank you.

21           THE COURT:  Do you need a warning when you're at the

22   50-minute mark?

23           MR. CHENG:  Yes, it would be helpful, Your Honor.

24           THE COURT:  Okay.  A five-minute warning or --

25           MR. CHENG:  Yes, a five-minute warning would be great.

 1          THE COURT:  You may proceed when you wish.

 2          MR. CHENG:  Your Honor, I'd like to take a step back in

 3     time and remember how we arrived at this point.  The Hinds

 4     County Jail has been dangerous, and detainees have not

 5     received adequate supervision, medical care, mental health

 6     care for many years.  There have been problems with unlawful

 7     detention and problems with the use of force.

 8          After staff were pulled out of units, riots destroyed

 9     several units inside the jail in 2012.  The United States

10     opened an investigation of the facility and actually issued a

11     findings letter, which notified the County Board at the time

12     of serious deficiencies with the jail.

13          The next year, in 2016, defendants entered into the

14     consent decree to address the violations that the United

15     States had found.  Our findings letter was actually included

16     as one of the exhibits to the complaint to justify the entry

17     of relief.  At the time the letter wrote, "County officials

18     have tried to take remedial action to address reported jail

19     deficiencies.  The sheriff and County Board have expended

20     funds to make physical plant repairs, contracted with

21     experienced managers to oversee jail reforms, and started

22     planning other improvements.  However, these actions have not

23     remedied the jail's fundamental problems.

24          Until the County implements systemic remedies,

25     piecemeal reforms are insufficient.  Plus despite the County's

recent efforts to address systemic deficiencies, we find that
longstanding problems with jail safety and security persists
and continue to pose an unacceptable risk to prisoners in
violation of the constitution."

We did not have any power to foresee the future, Your
Honor, but it is quite jarring in many ways how we are in a
situation today that is so similar to what it was like in
2016.  Here we are more than six years later, four years after
most of the consent decree deadlines have expired, and the
same issues persist today.

On February 4th, this Court held the defendants in
contempt for violating the Court's orders and putting
detainees in ongoing danger.  The Court -- I shouldn't have to
explain your own order, Your Honor, but the Court noted the
turbulent history of the jail, the reasons why court orders
are necessary to resolve constitutional deficiencies, and the
lack of adequate supervision, emergency response, violence in
the jail, and a failure to provide necessary medical and
mental health care.

THE COURT:  I'm going to ask you just to slow down just
a little bit.

MR. CHENG:  Yes, Your Honor.

Until recently, defendants agreed that the consent
decree remedies were necessary.  They learned from the
mistakes of the past, and weren't going to repeat them; that

 1    was what they were trying to project to the Court.  Like a

 2    ship headed toward a field of icebergs, the jail just needed a

 3    clear, new course to save it.  The consent decree laid out

 4    that course.  But today, defendants argue that the Court

 5    should just throw out the consent decree, and let them chart

 6    their own course.  If allowed to do so, this is all but a

 7    guarantee for greater disaster.

 8          As the Court heard from several witnesses, the limited

 9    measures the County has taken, many of them in just the past

10    couple months, if not the past couple weeks, on the eve of

11    this proceeding can be summed up in one cliche:  It's too

12    little too late.

13          For the rest of this statement, I'm going to try to

14    break it up in four parts.  First, I'd like to talk a bit

15    about how the witnesses demonstrated serious continuing

16    violations of law.  Secondly, I'd like to address some of the

17    defendants' arguments that have been brought up in the

18    response, and which we anticipate they will bring up in

19    argument.  Third, we will try to address some of the specific

20    problems posed by the PLRA.  And, finally, we will talk about

21    the need for remedies including a receivership.

22          Let's first talk about the types of violations that

23    were demonstrated at trial last week.  Over the past two

24    weeks, the United States has presented evidence showing the

25    defendants have not learned from the past, and that conditions

1    in the jail remain dangerous with no obvious end in sight.

2         As the Court has heard, defendants have failed to adopt

3    even the most basic remedies required by the consent decree

4    and stipulated order, even though they have had since 2016,

5    almost five and a half years, to work on those remedies.

6    They've also had the assistance of the monitoring team and

7    other highly qualified professionals.

8         The defendants' compliance failures are not just minor

9    imperfections on an otherwise steady path toward progress.

10   Rather they are a result of entrenched systemic dysfunction,

11   similar to the dysfunction that predictably led to rioting and

12   other problems earlier in the history of this case.

13        Additionally, these County compliance failures are not

14   without consequence.  As the Court has heard, they have

15   resulted in serious harm, including six deaths in the last

16   year, and an ongoing substantial risk of serious harm at the

17   jail.  The bottom line is the jail remains very dangerous and

18   serious harm continues at the jail.

19        The Court does not need to wait for harm to occur

20   before taking action, because under the constitutional

21   standard, the risk of foreseeable future serious harm is just

22   as actionable.

23        As the former jail administrator, Major Bryan testified

24   entire pods are often unsupervised at the Raymond Detention

25   Center with critical posts left vacant on virtually every

shift, every day.  In the absence of supervision, violence and
chaos ensued.  A detainee was murdered in the jail just four
months ago, and the staff had not discovered him for nine
hours.

Stabbings and other violent assaults occur.  In the
second half of 2021, at least 77 reported fights and assaults
occurred at Raymond, including a homicide.  Given problems
with the defendants' incident reporting and investigation
systems, there's good reason to believe many other assaults go
unreported.

Contraband purchase, when they occur as required by the
decree, routinely produce large volumes of weapons,
cellphones, and other items that pose a security threat.
Detainees are still able to break out of the jail, go up on
the roof, and retrieve contraband.

If we were just looking at their failure to remedy
unconstitutional conditions in the jail, the defendants'
culpability would be obvious.  But as the Court heard, the
defendants have resisted implementing remedies that they
agreed to implement.  The defendants have been reluctant to
add or fund staffing, because they would rather wait until a
new jail is built before putting staff in the dangerous
housing units.  They have fired a qualified jail administrator
and replaced her with someone who has no jail experience.
They have lost a number of other senior staff, because they

1    have been unwilling to support the requested reforms.

2         The defendants' attorneys have argued that the Court

3    should defer to corrections professionals, but this is a case

4    where the defendants themselves ignored their own

5    professionals and have repeatedly intervened at the jail in

6    ways that undermined or damaged their ability to comply with

7    constitutional standards.  And in doing so, their practices

8    have not just exacerbated conditions in the jail, but this

9    illustrates a degree of deliberate indifference to the harm

10   that is being caused to detainees.  The County's response has

11   been unreasonable, and more importantly, unconstitutional.

12        I'd like to talk a little bit more in detail about the

13   record before the Court about the types of violations.  We've

14   probably beaten this dead horse quite a bit in the last two

15   weeks, but the most obvious problem is the lack of staffing

16   and supervision.  All four members of the monitoring team

17   described the damage done by lack of adequate detention staff.

18        How many times have the managers, jail managers, and

19   even the former sheriff said that the jail needs a career

20   ladder, a salary step plan, and other potential remedies in

21   order to improve staff recruitment and retention?

22        How many times in the past did the defendants promise

23   to do something, and then implement only half measures, if

24   they implemented any at all?

25        In the status conferences and in the language of the

 1    stipulated order, the defendants promised to establish a

 2    career ladder, and they promised to hire a qualified jail

 3    administrator.  They assured the staff they would train staff

 4    on appropriate policies.  They talked about direct

 5    supervision.  They talked about implementing classification.

 6         And yet the fact is that the jail is now at the lowest

 7    staffing level it has ever been, as the Court heard in witness

 8    testimony from multiple witnesses, not just the monitors, but

 9    jail administrators and even defendants' witnesses themselves.

10         So defendants obviously failed to implement their own

11    remedies, but they exacerbated the situation by firing the

12    latest jail administrator, one who defendants themselves

13    lauded just a few months ago and whose declaration they relied

14    on in responding to the Court's show cause order.  They pulled

15    staff from the jail and shifted them to other duties.

16         As the County administrator and the Board president

17    both conceded, staffing is so low that staff cannot provide

18    direct supervision of detainees.  Contraband is an ongoing

19    problem.  And as the Board president has also acknowledged,

20    the jail has never been fully staffed, and this puts detainees

21    and staff at ongoing risk of harm.

22         As Major Bryan testified, the County did recently

23    initiate a 5 percent pay raise for detention officers.  This

24    belated attempt was, at best, just a first step to stop the

25    hemorrhaging of staff.  No one is going to complain about them

1   giving a 5 percent pay raise.  A 5 percent pay raise in how

2   many years of very little action on staff and supervision,

3   adopted only on the eve of trial.

4        As the Board president and County administrator

5   acknowledge, staff still do not receive cost-of-living raises,

6   there is no career ladder, no biweekly pay, no electronic

7   payment.  All of these things are relatively minor but could

8   improve retention, but they never did even the minor things.

9        When Major Bryan advocated for such minor

10  administrative proposals to make the detention officer

11  positions more attractive, like implementing direct deposit

12  and biweekly pay for detention officers, the defendants

13  rejected those improvements.  When she tried to obtain tools

14  as stopgap measures to counteract the harsh job conditions,

15  like giving officers flashlights because of the poor lighting

16  in the jail, she ran head first into the dysfunctional County

17  requisition system.  This system caused the jail to run out of

18  cleaning supplies during a pandemic.

19        So the things that would have made the work site a

20  little bit more humane, a little bit better, not just for

21  inmates but for staff, just weren't there, and so they have

22  continually hemorrhaged staff.  There's so many other places

23  these workers can go to to take a job.  Why do they need to

24  work at the jail?

25        The staffing problems that long have plagued Hinds

1    County also hinder other areas of compliance outside of

2    security and direct supervision of inmates.  It has a ripple

3    effect that reaches multiple aspects of jail conditions and

4    effects every piece of the consent decree.

5         As Mr. Parrish testified, the defendants have made

6    little progress on major physical plant issues.  Defendants'

7    own witness, Mr. Chamblee, their contractor who has handled

8    large repairs to the jail over the past two years --

9         THE REPORTER:  Slow down for me, please.

10        MR. CHENG:  Sure.

11        Mr. Chamblee, the contractor who has handled larger

12   repairs in the jail over the past two years, testified that

13   many important repairs have yet to be made.  A-Pod is

14   particularly dangerous as the sheriff and others testified.

15        Mr. Chamblee testified that although detainees are

16   still housed in A-Pod, "The cell doors are not operational."

17   They do not lock.  The electronic control panels are not

18   working.  He testified that the entry door to A-Pod was broken

19   until December 2021, that additional doors in booking and in

20   the medical area still need to be fixed.

21        Mr. Chamblee confirmed that there's no functioning

22   alarm system in C-Pod or A-Pod.  Fire hoses have not been

23   installed in A-Pod, and the sprinkler system at the work

24   center is not working.  There are no security vestibules

25   outside of the control rooms or housing units or master

1    control.  Major security issues, such as the roof at Raymond,

2    continue to be breached easily by detainees.  The lights are

3    broken in A-Pod.  The electrical systems are damaged, and it

4    goes on and on.

5         But what is most telling about his testimony is that he

6    also acknowledges that without improvements to what the

7    inmates are doing, they will not be able to maintain the

8    physical plant condition of the jail.  So even here where

9    you're talking about physical plant and things the defendants

10   might have done, it all ultimately boils down to are the staff

11   really in charge of the jail?

12        Inadequate staffing and delayed repairs go hand in hand

13   at the jail.  The defendants' failure to come into compliance

14   in a timely fashion has led to wasted resources, such as, for

15   example, as Mr. Chamblee noted when things get fixed, then

16   they get broken again.

17        There's so little supervision that dozens of cells were

18   turned into "trash dumpster cells" and had to be taken

19   offline, as Mr. Parrish and Mr. Chamblee had observed.  These

20   are cells that some of the experts have never seen before,

21   this odd practice of just eliminating housing in order to

22   handle trash.

23        Eventually some of these cells were cleaned out, but

24   the jail leadership just had their contractor weld the doors

25   back shut again rather than fixing what's broken inside.  So

1    the cells are still uninhabitable.

2         The defendants have squattered other past improvements

3    by opening up the renovated C-Pod without providing the

4    necessary staff to help maintain conditions.

5         Another longstanding problem that has hindered progress

6    at the jail is the County's officials interference with and

7    lack of support for corrections professionals who are trying

8    to facilitate progress.  There is a leadership issue at the

9    jail.

10        As Major Bryan testified, the sheriff has acted

11   unilaterally ordering Tasers to be given to select officers

12   without consulting the jail administrator and without

13   implementing appropriate staff training.  As Mr. Parrish also

14   testified, Tasers may have already been used at the jail

15   contrary to policy and in ways that harm detainees.

16        Interference by the sheriff and the County Board have

17   also impeded reforms to intake processing and the facility

18   assignment of detainees.  And in just the last two months, the

19   sheriff has transferred people in and out of detention while

20   staffing levels were already at an all-time low.  County

21   leadership has not been consistent, but it has consistently

22   interfered with decisions that should be made by correctional

23   professionals.  Detainees, as well as detention officers, have

24   suffered as a result.

25        Another area of continuing concern is the housing of

 1    children in Hinds County who are charged as adults.  These

 2    youth charged as adults also suffer harm and are exposed to

 3    the risk of harm due to these same issues.  Everyone

 4    recognizes that some of these youth are charged with very

 5    serious crimes and have very serious needs.  They often have

 6    very complicated behavioral and mental health histories.  That

 7    is not an excuse to ignore their needs; it is an obligation to

 8    provide for them.

 9         As the Court heard from the monitor's juvenile justice

10    expert, Jim Moeser, the Henley-Young facility was selected to

11    provide these services.  The consent decree doesn't say you

12    have to use Henley-Young.  It says if you're going to house

13    juveniles charged as adults, you must provide for them in a

14    facility that meets the requirements of the consent decree.

15         The defendants chose to use Henley-Young, but

16    Henley-Young is currently unable to provide basic supervision

17    of children to prevent and respond to incidents; it doesn't

18    have sufficient staffing; it is unable to provide the

19    necessary school, behavioral, and mental health programming

20    required by the consent decree; partly because so many

21    necessary staff positions are vacant, and the turnover is so

22    high.

23         Again, this is something very parallel to what happened

24    at Raymond Detention Center.  It's almost uncanny how much the

25    pattern persists.  The thing that unites these two facilities

1  is they are both County facilities controlled by the County

2  defendant.

3       As at RDC, instability in leadership at Henley-Young is

4  a major issue.  The previous executive director recently left

5  due to --

6       THE COURT:  I'm going to ask you to just -- I mean,

7  you're reading, so please slow down for the court reporter

8  because she's going to have to go through this.

9       MR. CHENG:  Yes, Your Honor.

10      THE COURT:  I don't know if Mr. Morisani is going to

11  have to talk later on, but she's going to have to go through

12  this with everybody else.  And, you know, it's okay if you

13  don't finish in time.  I'm here.

14      MR. CHENG:  You know you shouldn't tempt me that way,

15  Your Honor, but thank you.

16      THE COURT:  Just slow down.  I don't want to -- you

17  know, I just want to make sure that you're not -- I don't want

18  to see smoke coming out of any fingers down here.

19      MR. CHENG:  Well, Your Honor, I don't want to injure

20  Ms. Crane either.  We've known her a long time.

21      THE COURT:  All right.

22      MR. CHENG:  So as at RDC, instability in leadership at

23  Henley-Young is a major issue.

24      Defendants spent a lot of time this week complaining

25  about Ms. Bryan, but they ignored the fact that Fernandez

1    Frazier left a resignation letter that similarly condemned

2    them for lack of support, raising many of the similar issues

3    that Ms. Bryan raised about the jail.

4         Another area that is of continuing concern and that was

5    brought out in the testimony is the fact that inadequate

6    correctional staffing also means the health staff cannot do

7    their jobs, and detainees cannot receive the medical and

8    mental health care they need.  There are not enough

9    correctional staff to go with nurses to distribute medication

10   on the pods, to go with the mental staff to provide therapy,

11   to bring detainees to the medical unit for care, or just to

12   remain in the medical unit to supervise inmates.

13        Even when officers can go with mental health staff to

14   the housing units, Dr. Dudley testified that the staff must

15   provide therapy at the cell doors, a less-than-therapeutic

16   arrangement, and detainees speaking through bars is simply not

17   an effective form of treatment.

18        Here, defendants acknowledge that they needed to make

19   improvements.  They agreed to adopt a mental health unit, but

20   again, the testimony shows they failed to follow through.

21        Detainees with serious mental illness continue to

22   suffer harm as a result of inadequate numbers of health staff

23   as well and a poor working relationship or certainly lack of

24   coordination between mental health and security.  There simply

25   are not enough hours in the week for the current mental health

 1    staff to meet detainees' basic needs.

 2         Dr. Dudley testified about the very large mental health

 3    caseload and how many of the detainees in the facility have

 4    serious mental health conditions.  The defendants themselves

 5    acknowledge that because of weaknesses in the state and

 6    community mental health system, the jail becomes a primary

 7    source of mental health care in the community, but it is not

 8    staffed or operated as though it's going to provide such care.

 9         Despite ample warning from the monitoring team, no one

10    has taken action to improve the mental health staffing levels.

11    Not enough staff means that detainees with serious mental

12    illness are not getting adequate education, support, and

13    medication monitoring.  This leads to significant behavior

14    problems in the jail, putting those detainees and others at

15    risk of harm.  It stresses what is already limited security

16    staffing and limited housing options in a jail that was simply

17    not designed for this type of case.  It sets detainees up for

18    failure when they're released to the community, and meanwhile,

19    the mental health caseload just climbs.

20         Detainees are also harmed when security staff fail to

21    recognize clear signs of distress.  You heard just last month

22    detainees with serious mental illness were covered in feces

23    and found onsite.  Two have lost a considerable amount of

24    weight and have sores on their bodies.  One of these

25    individuals had to be hospitalized.  These types of conditions

1  don't just happen by accident.  As the testimony has shown,

2  mental health staff, not security staff, had to raise these

3  problems.

4       In addition, both Dr. Dudley and Ms. Mosley described

5  the correctional response to Ms. Mosley's notification of

6  behavioral issues.  It's an anecdote, Your Honor, but it's a

7  telling one.  Ms. Mosley testified that Mr. Mosley was found

8  in jail -- found in jail exactly the environment that had not

9  worked for him in the community, confrontation and violence

10 from correctional officers and all too easy access to street

11 drugs inside the jail.  Mr. Mosley deteriorated in spring

12 2021, but it did not result in more monitoring and care.  But

13 instead he was signed to booking in April, in violation of

14 both the consent decree and the stipulated order.  Even though

15 Ms. Mosley directly warned the jail that being housed in

16 booking with manic symptoms could kill him, they took no

17 action.  He killed himself within a week.

18       Even now, almost a year after Mr. Mosley's death, there

19 remains no formal mechanisms for security or mental health

20 staff to ramp up monitoring when needed, and there is

21 insufficient training for security staff in addressing mental

22 health issues.  Nor is there therapeutic housing available in

23 the jail, at least not until the mental health unit is opened.

24       The mental health unit is chronically two to three

25 months away from opening with new obstacles identified as we

1   go.  It will come too late for Mr. Mosley and others at the

2   jail, but if the Court grants our requested relief, it is our

3   hope it will help other detainees in the jail.

4       The second area I want to discuss are some of the

5   defendants' arguments, which they've included in both their

6   briefs and we can anticipate from the way they've challenged

7   witnesses.

8       Defendants' witnesses have spoken of the things they

9   have done, list of repairs, funding, specific items that have

10   supposedly been achieved.  The real issue, though, is whether

11   those actions are enough to meet constitutional standards.

12   The testimony shows that the defendants' fixes occurred in

13   fits and starts, and in many cases on the eve of this hearing,

14   and indeed, none of the steps that their witnesses talked

15   about were enough to remedy the actual unconstitutional

16   conditions.

17       The parties already agreed that the consent decree is

18   what constitutes a reasonable response to constitutional

19   harms.  By that measure, defendants have fallen far short as

20   they have complied with only 3 of 92 substantive provisions

21   all these years later.

22       Defendants' witnesses, including Sheriff Jones, pointed

23   to hiring of Benchmark, CDFL, and other appointments as

24   evidence of their good faith efforts.  But both Mr. Chamblee

25   and Mr. Farr acknowledge that most of the problems identified

1    by the monitors persist, including doors, cameras, cell

2    lights, and fire alarms that don't work across housing units

3    and facilities.  Both said the defendants have some ways to go

4    before they have maintenance systems in place.

5         Mr. Farr conceded that his firm's effort to help the

6    County develop a maintenance program is "definitely a work in

7    progress."  The same systemic problems that the Court has

8    heard out for years continues to hinder any significant

9    progress, given the length of time the consent decree has been

10   in place, and the extensive efforts of the monitor to try to

11   help the defendants achieve compliance.  This is also why the

12   defendants are in contempt of the consent decree.

13        The defendants' witnesses have also testified about

14   plans, including some big plans like building a new jail.

15   Your Honor, the County has been talking about building a new

16   jail for years, but as Mr. Farr testified and the Board

17   president acknowledged, the defendants have not even finished

18   obtaining financing for a new jail.  Defendants own witnesses

19   conceded that if everything goes according to plan, not a

20   single bed will be available at the planned new jail for

21   years.  If anything, the defendants seem to be overconfident

22   that just building a new facility will solve their problems.

23        According to Mr. Farr, even in the best-case scenario,

24   only 200 beds would be available after the first phase of the

25   new jail is complete with a projected date of summer 2025.

1    The majority of planned beds would not be ready for at least

2    another year after that.  And, again, that's only if necessary

3    funds are allocated, a big if.

4         As Mr. Farr and the president of the Board of

5    Supervisors, Mr. Calhoun, both testified, they have not broken

6    ground or actually started building the new jail.

7         In the meantime, the problems at the current jail, the

8    one they've got, are serious and urgent and cannot wait for

9    the construction of a new jail.  As the sheriff himself has

10   acknowledged, just planning to build a new jail is nowhere

11   near enough to address the ongoing harm.

12        Even if the defendants someday complete the planning

13   phase and get the new jail fully funded and then build it and

14   move the detainees there, they'll still need to staff it, and

15   ensure staff are adequately trained and supervised.  They have

16   never demonstrated the ability to staff even the current

17   facility at required levels, let alone prepare staffing for a

18   new jail.

19        Now, if they build a new jail, it will face the same

20   staffing challenges if the broken senior leadership issues and

21   broken systems are not fixed first.  They'll also still need

22   to provide constitutionally adequate medical and mental health

23   care.  They'll still need to provide a maintenance system to

24   keep the new facility in good shape.  As Mr. Farr conceded,

25   the defendants have not provided for staffing or maintenance

1    funding necessary to operate a new jail.

2         The defendants have also spent a good deal of time

3    blaming others for their problems.  They have blamed their

4    past leadership and pointed to new people at the helm as if

5    this time things are going to be different.  Sheriff Jones is

6    new to the position.  He was sworn in only a few months ago.

7    We acknowledge that.

8         Some of the defendants' witnesses say he is the man who

9    will right the ship.  The sheriff himself repeatedly insisted

10   that past failures, even recent ones, occurred before his

11   administration.  Mr. Parrish acknowledged that the step plan

12   that the sheriff proposed, if implemented, could be a good

13   thing.

14        Similarly, the defendants' witnesses had great optimism

15   about the new interim jail administrator, Frank Shaw, even

16   though he has no experience running a jail and apparently is

17   not even going to be the permanent position.  As Your Honor

18   knows, this is the same story from Hinds County with the

19   latest replacements to the cast of people who have been hired

20   to run the jail.

21        As Ms. Simpson testified, since the defendants entered

22   into this consent decree five and a half years ago, there have

23   been four different sheriffs, and at least as many different

24   county administrators, jail administrators or acting jail

25   administrators, and different directors of Henley-Young.

 1    Every time defendants promise new leadership and a new day on

 2    the horizon, yet every time the problems have just festered.

 3    Even if these new leaders really did possess all the qualities

 4    necessary to lead, that is far from a guarantee that they will

 5    be able to overcome the dysfunction in County leadership.  It

 6    is unlikely they will be able to overcome the bureaucratic

 7    processes and political systems that have hindered progress in

 8    the past.

 9         THE COURT:  Hold on for one second.

10         Will the persons who are listening in on Zoom please

11    put your speaker on mute?

12         All right.  You may --

13         MR. CHENG:  Thank you, Your Honor.

14         THE COURT:  Well, this may be a good time for me to ask

15    that question about the change in leadership and all.

16         Since Sheriff Jones is new, Mr. Cheng, how should that

17    play into the Court's analysis on whether the office or him

18    could have been determined to be -- you know, to meet the

19    definition of deliberate indifference for purposes of the

20    PLRA?  You may be getting into that because he's only been

21    there for two months --

22         MR. CHENG:  Yes.

23         THE COURT:  -- or since December the 3rd, I believe.

24         How should the Court look at that?  The County and the

25    parties -- the County and the sheriff filed their motion to

```
 1   terminate sometime in January, I think, immediately after the
 2   leadership had changed with respect to the sheriff's office.
 3   I guess if the County had filed that motion in 2020, because
 4   the consent decree had been in place and in 2020 you had new
 5   Hinds County leadership.  If the changing of the leadership --
 6   can the changing of leadership every few months or whatever
 7   avoid -- could it be used as a -- could it be used to sort of
 8   stymie the Court in trying to find that there has been
 9   deliberate indifference or the constitutional standards have
10   not been yet?
11        MR. CHENG:  I think the short answer is no, Your Honor.
12   This is ultimately an injunction against an official capacity
13   party.  So it is against the office of the sheriff, it is
14   against Hinds County, it is against the Board, not necessarily
15   the particular individual who is in office.  So as long as
16   that entity has been unable to address constitutional
17   violations, you can still hold them responsible for what
18   happens in the jail.
19        Additionally, I think it actually is shown on the
20   record that although Sheriff Jones and some of the board
21   members are relatively new, they have themselves contributed
22   to the violations.  So even if you were looking at them as
23   actual individuals and people, there is still reason to find
24   that they have been culpable, that they have been indifference
25   to the conditions.
```

```
 1          I should also clarify that although we used the term
 2   "deliberate indifference," that is actually a term better used
 3   for prison conditions cases.  In a jail, the defendants
 4   actually have an obligation to run the facility in a way that
 5   does not lead to unnecessary punishment of people who often
 6   have never been convicted of a crime.  There is some evidence,
 7   for example, that some of the mental health individuals are
 8   actually civil detainees.  Their charges either have been
 9   dropped or are no longer pending, but they have to be housed
10   at the jail until a placement can be found for them.
11          There is an obligation on the County Government
12   officials to provide a higher standard of care in that
13   situation.  So, yes, Your Honor, it should not effect that
14   analysis.
15          THE COURT:  Thank you.
16          MR. CHENG:  Going back to the leadership issue, Your
17   Honor.  As the County heard from Major Bryan, even the most
18   highly anticipated and highly qualified new jail administrator
19   that the County has ever hired can come on board with promises
20   of support, expend great efforts to do the best job she can,
21   and still fail to implement basic improvements because of
22   defendants' leadership.
23          Defendants will likely offer other excuses for lack of
24   progress.  Again, this is a pattern that has repeated itself
25   over the years.  This year I think the term was "the great
```

1   resignation," perhaps it's COVID.  When asked to update the

2   Court as to progress towards compliance, they have repeatedly

3   offered such excuses instead of making commitments to real

4   progress.

5        The past two weeks have been no exception.  They blamed

6   Major Bryan, the monitor, their own staff, the detainees, many

7   other people for their failure to remedy jail deficiencies.

8        While some of these issues clearly pose challenges for

9   the County, they do a poor job of explaining the longstanding

10  failure to comply with the consent decree.  The issues with

11  hiring, retention, and unstable leadership existed for years

12  before COVID, before Major Bryan, or the great resignation.

13       Similarly, inadequate maintenance, dubious detention

14  policies, poor mental health care preceded economic

15  disruptions and labor shortages.  The defendants ignored the

16  importance of their own agency.  Their lack of planning and

17  refusal to do what needs to be done to cope with the new

18  challenges are why they're unable to make much progress in the

19  first place.

20       It should not have been a surprise that problems might

21  arise in trying to get the facility into compliance.  A good

22  defendant would have come up with plans to deal with some of

23  the anticipated problems before they occurred.  The defendants

24  have repeatedly missed opportunities and wasted resources by

25  waiting, delaying, and refusing to implement recommendations.

```
 1          The defendants will likely also claim the consent
 2   decree demands too much, that it's too complex, and that
 3   explains their lack of progress.  It will probably be entwined
 4   with some of their other legal arguments.  While couched in
 5   legal terms, this is really a variation of the pass the buck
 6   defense, Your Honor.
 7          What does the consent decree really do?  It requires a
 8   minimal level of staffing, implementation of commonsense
 9   policies, essential medical and mental health care, humane
10   living condition, and a number of administrative safeguards
11   against dangerous jail hazards.  Still, the defendants will
12   maintain that Hinds County has too much going on, that the
13   consent decree covers more ground than necessary.
14          If you really think about their argument, Your Honor,
15   this argument basically concedes that the conditions at
16   Raymond Detention Center at least are unconstitutional.  It's
17   just that defendants don't think they should have to do
18   anything about it.
19          As the Court is well aware, the consent decree defines
20   the jail to include Raymond, the work center, and any facility
21   that houses County detainees or juveniles charged as adults,
22   so it covers the entire Hinds County Jail system, not just
23   Raymond.  The facilities share policies, staff, and detainees.
24          To alleviate severe staff shortages at Raymond, staff
25   have been reassigned from the work center, which causes
```

 1   supervision challengers there.  The rights of the people

 2   detained in all of these facilities are protected by the

 3   consent decree, not to mention federal law, but practically

 4   speaking, this is one system that requires a systemwide

 5   remedy.  That is not because the remedy is overbroad or too

 6   complicated; it's because it's necessary to address

 7   constitutional violations.

 8         The defendants similarly complain about the monitor and

 9   her team, even though they've never raised such complaints

10   before, and despite the fact that the little progress they

11   have made has been largely due to technical assistance and

12   implementing recommendations and concrete actions taken by the

13   monitors.  The irony is they criticize the monitors and say

14   the process is too complicated, but if you take a look at some

15   very specific remedies like the hiring of a retention

16   consultant, getting policies adopted.  These things would not

17   have made any progress at all without the monitors.

18         Indeed, defendants spent a considerable amount of time

19   attacking Matt Rivera and others who were hired so the

20   defendants would not be in contempt of the Court's orders.

21   This concept of blaming people who are trying to help you

22   through your own faults, it runs throughout the defense, and

23   it remains a problem here.

24         The defendants contend some of the actions the County

25   has taken are basically -- I forget the exact phrase, but I

1    think it's better than nothing or something is better than

2    nothing.  Better than nothing is not the Eighth Amendment

3    standard for safety, medical care, or living conditions.  It

4    is not enough to remedy the defendants' longstanding contempt

5    of agreed-upon remedies.  It is not consistent with the

6    Fourteenth Amendment's stand on unnecessarily punishing

7    detainees.

8         Instead of doing what they're legally required to do,

9    the defendants are simply arguing they have done -- arguing

10   that what they have done should be enough.  Something is

11   better than nothing.  Some lifeboats are better than none.

12        The defendants argue that they have a school for

13   children who are charged as adults, but the number of school

14   hours is half the time required by law.  The defendants argue

15   that they are staffing Raymond as best they can, even though

16   their housing units are unsupervised, and even though they've

17   allowed staffing to drop below any level it's been in the

18   past.  These are not convincing arguments, Your Honor.  They

19   are rather evidence of a detention system that is so broken

20   that the defendants no longer even try to comply with the law.

21        THE COURT:  Put a pin right there, because I'm going to

22   ask you what about all the testimony I heard about what they

23   intend to do, what they're planning to do?

24        The testimony with respect to Supervisor Calhoun, any

25   request that comes from the County, RDC, is funded -- is

1     priority -- takes priority over everything else; that, you

2     know, we've spent $3 million.  It's taken 18 percent of our

3     budget, or whatever those numbers are, and that we are

4     spending money and that's what you-all want.  We got Benchmark

5     in here today.  Benchmark is probably working over there

6     today.  What does that say about them meeting or failing to

7     meet their obligations?

8          MR. CHENG:  Well, first you have to consider the actual

9     remedies in question, Your Honor.  In many cases the remedies

10    they finally adopted were very late, and when they adopted

11    them, they often did not adopt the full range of

12    recommendations.  So, for example, you know, they should have

13    been fixing some of these doors six years ago, but the Court's

14    well aware that a lot of these things weren't done until the

15    stipulated order was entered.

16         And then when Benchmark came online, there was still a

17    plan.  We talked about how there's basically a consent decree

18    course for getting into compliance.  It was never going to be

19    enough to just fix the doors.  They also had to improve

20    staffing at the same time, and this is where defendants have

21    repeatedly sort of gotten in their own way.

22         You know, we acknowledge when you spend a lot of money

23    on repairs, it can be very frustrating that they get taken

24    apart.  But everyone knew that was going to happen if they

25    didn't implement direct supervision and have a phase-in

1    process for bringing inmates back into renovated units.  They

2    didn't do that.

3        I wish that was the only example, but there was plenty

4    of evidence this week, Your Honor, of ways that they have

5    wasted resources, things they have done that just didn't make

6    a lot of sense.

7        The other thing is the constitutional standard

8    ultimately is separate from good intent.  Like, you can mean

9    well, but if you have a serious problem and you don't address

10   it, you can still be constitutionally culpable.  You know, if

11   good intentions were enough to save us from violating the law,

12   there would never be violations of law.  So I think that's the

13   basic answer, Your Honor.

14        THE COURT:  All right.  Thank you.

15        MR. CHENG:  Let me move on to talk a little bit about

16   the PLRA.  Instead of doing the hard and necessary work to

17   bring the jail up to constitutional standards, the defendants

18   asked the Court to terminate the consent decree.  Not a few

19   provisions because they were working on physical plant, not

20   because they did some good things, they wanted the entire

21   decree terminated as though they are fully in compliance with

22   the constitution.  The PLRA does not require that.

23        The consent decree itself is narrowly tailored and

24   satisfies the PLRA, because it is necessary to fix ongoing

25   constitutional harms.  As I just said, Your Honor, good

1    intentions aren't enough, but that's also true with PLRA

2    compliance.  Because you partially complied with something is

3    not enough if the constitution requires them to do more.  To

4    protect inmates, to meet some minimal-level of safety, medical

5    and mental health care, and due process, the defendants can be

6    legally obligated to do more.  And in that area, the monitor

7    and her team pointed out all the various ways that there are

8    ongoing, serious constitutional violations at the jail.

9        The same conditions establishing defendants' contempt

10    of the Court-ordered consent decree and the need for receiver

11    also provide ample basis for the Court to deny the defendants'

12    PLRA motion, except arguably two of the three that are in

13    sustained substantial compliance.  Those two provisions are

14    paragraph 40, which requires staff to pass background checks;

15    and paragraph 80, which requires that youth are properly

16    separated by sight and sound from adult prisoners.

17        Although the defendants have sustained substantial

18    compliance with the requirement for a full-time compliance

19    coordinator, Mr. Green, that is an ongoing obligation that

20    must be maintained in order to ensure that the monitor and her

21    team are able to fulfil their duties.

22        Now, defendants are likely to argue that they can also

23    meet the PLRA because they are partially compliant with some

24    other provisions of the consent decree; this is wrong.  In

25    this situation, the defendants should be held in contempt.

1    Partial compliance does not mean they were addressing basic

2    constitutional needs.  It means they have failed to implement

3    remedies needed to protect constitutional rights.

4         As the monitor explained in her testimony, a provision

5    is rated as partially compliant if "some of the components" of

6    the provision have been satisfied.  That is a very low

7    standard.  This can mean that one subpart has been achieved,

8    but as Ms. Simpson testified, "significant work" may remain.

9         The record from the past two weeks demonstrates that

10   for many of the provisions rated partial compliance, the work

11   that remains will not be achieved without significant external

12   pressure and oversight.  In sum, the consent decree's

13   provisions comply with the PLRA, because they remain necessary

14   to remedy the unconstitutional risk of substantial serious

15   harm.

16        Let me also talk briefly, Your Honor, about

17   receivership as a remedy.  Your Honor asked the parties to be

18   prepared to discuss appropriate remedies.  The United States

19   urges the Court to appoint a receiver.  We do not take this

20   request lightly.  It is a significant intervention by the

21   Court, but it is appropriate when other lesser remedies have

22   failed and would not work to address ongoing harm or risk of

23   harm and when current leadership is not equipped to fix the

24   conditions.  That is the case here.

25        Appointing a receiver is now the minimally necessary

1    remedy to address the longstanding and ongoing constitutional

2    harms at the jail.  The case of *Plata versus Schwarzenegger* is

3    instructive, 2005 Westlaw 2932253 from the Northern District

4    of California in October 2005.

5        The Court established the receivership in that case to

6    take control over medical service delivery in California state

7    prisons three years after the Court entered a consent decree.

8    The path traveled by the state of California is similar to

9    that traveled by Hinds County, but here we've already had

10   twice the time that was allowed California to fix

11   constitutional harms in a statewide system.  There are several

12   factors the Court had to express --

13       THE COURT:  Hold on for one second.  This is your

14   five -- this would be your five-minute mark.  I'm adding five

15   minutes, though, because I've asked you a few questions.

16       MR. CHENG:  Thank you, Your Honor.

17       First, there is a grave and immediate threat of harm.

18   Much of the harm that has occurred in this case has occurred

19   relatively recently.  The most obvious harm, putting aside the

20   many riots and assaults and ongoing violence, six of the most

21   concerning deaths occurred in 2021.  They were not isolated

22   incidents.  The same system that failed to prevent this harm

23   remains today.  Many of the same violations remain today.

24       Moreover, the system has not demonstrated a capacity to

25   self-evaluate and correct these harms.  Indeed, the very fact

1    the defendants have continually come to this court and denied

2    the need to take action is indicative that they are not going

3    to fix these problems on their own.

4        Recent improvements do not defeat receivership.  In

5    *Plata*, the court identified several steps the state had taken

6    to address the staffing crisis, but found them piecemeal steps

7    that failed to make the necessary transformations in the

8    system and were insufficient to resolve the crisis.

9        Here, too, you know, we have 5 five percent pay raise,

10   which was long promised but only implemented months after it

11   was promised.  But it doesn't do anything about the retention

12   plan, a salary ladder, retention bonuses, providing basic

13   equipment to the inmate -- to the staff, uniform stipends,

14   improving working conditions, giving them better leadership,

15   all the many other things that Mr. Rivera, for example,

16   identified in his retention plan.  As a matter of fact,

17   Mr. Rivera, who was hired to help the defendants, they now are

18   attacking him, too, so they clearly have no intention to

19   implement his remedies.

20       Describing failures to discipline doctors responsible

21   for patient death and morbidity, the *Plata* court found, "The

22   leadership vacuum and the lack of discipline also fosters a

23   culture of nonaccountability and nonprofessionalism whereby

24   the acceptance of degrading and humiliating conditions becomes

25   routine and permissible."

1          Again, this is similar to Hinds County, which does not

2     train, supervise, or discipline correctional officers.  When

3     you have defendants saying things like, oh, they're bad

4     people; you're going to have violence in any facility.  But

5     the standard being set at the highest level seems to be very

6     low here in Hinds County as well.

7          A second factor for receivership is whether less

8     extreme measures have been exhausted or proved futile.  As the

9     *Plata* court wrote, "Even the Court must use the least possible

10    power adequate to fix the constitutional violations.  It is

11    'not required to restrict its powers to those that have proven

12    inadequate or that show no promise of being fruitful.'"

13         Again, it's not as if nobody has tried to work with the

14    County.  It isn't just this Court with the consent decree and

15    then the stipulated order, it is all the effort expended by

16    the monitors, by a series of consultants to help the

17    defendants, it's a series of jail administrators who have

18    tried to work with the defendants to implement reforms, it's

19    the Henley-Young administrator, it's technical assistance

20    agencies, it's -- the list just goes on and on.  In many ways,

21    one of the cruelest things about what the County has done is

22    what it has done to its own employees and staff creating a

23    demoralizing situation where nobody wants to work for the

24    jail.

25         A contempt remedy is insufficient here because the

1    defendants' compliance with the consent decree has actually

2    regressed since the show cause order and on the eve of this

3    hearing.  Monetary sanctions are not a solution where the

4    County has not shown they know how to fix the constitutional

5    harms.  Indeed if they are correct that the monetary issues

6    are so serious, stripping them of funds would not help benefit

7    the jail; it would actually deplete resources that could be

8    better used.

9         Similarly, appointing a special master would be futile,

10   because they've already benefited from years of guidance and

11   support from experts and the monitoring team.  Cutting off

12   their access to funding or disciplining them in other ways,

13   it's all negative, punitive penalty, but it wouldn't actually

14   make the jail better.

15        Based on what the monitors said, Your Honor, the most

16   direct way, the most efficient way to get ahead is to clear

17   some of the -- debride the detritus that is getting in the way

18   of jail reform, and that can be done with a receiver in a more

19   efficient way than any other remedy.

20        The *Plata* court also looked at other alternatives, such

21   as closing the prison and ordering the release of those

22   prisoners.  But while a receiver is a strict remedy, it is

23   actually less onerous than the other options available to the

24   Court, and in that sense, the United States supports trying to

25   find a less onerous way of getting the defendants into

```
 1   compliance.
 2        THE COURT:  What other options might be stronger than a
 3   receiver?
 4        MR. CHENG:  For example, a prisoner release order, Your
 5   Honor.
 6        THE COURT:  I'm sorry?
 7        MR. CHENG:  A prisoner release order.
 8        THE COURT:  A release order?
 9        MR. CHENG:  Yes, Your Honor.
10        THE COURT:  That is saying that every detainee has to
11   be let go?
12        MR. CHENG:  Yes.
13        THE COURT:  Any other things greater than a
14   receivership?
15        MR. CHENG:  Well, the receivership, once its set up, is
16   actually not that intrusive, because it basically lets the
17   jail continue to operate as a jail.  And in some ways, it just
18   steps in for the sheriff or the County Board running things.
19        If, for example, the Court imposed very, very strict
20   types of penalties for violating the court order, those could
21   be in many ways much more onerous to the defendants both in
22   their individual and official capacity.  Likewise, there are
23   some remedies where if the Court imposed them, it would
24   require much more control over what the defendants themselves
25   do.  You know, we don't want to necessarily, you know,
```

```
1   micromanage every aspect of the sheriff's department.  We only
2   need to deal with the jail, and if you can carve that out and
3   still keep it within the otherwise normally operated County
4   system, that is a lesser intrusive remedy.
5           THE COURT:  Okay.  Have a receiver who focuses in on
6   the detention --
7           MR. CHENG:  Yes.
8           THE COURT:  -- side of things only.  All right.
9           MR. CHENG:  So, for example, going back to, like, the
10  release issue, there are a number of remedies, for example,
11  that the defendants have claimed that they need to do:
12  Releasing all the misdemeanants or doing all types of strange
13  things in how they control who gets into the jail, whether
14  it's the County administrator calling up trying to get people
15  moved to the work center, or the sheriff sort of stepping in
16  and trying to micromanage operations.  That level of
17  micromanagement by the Court itself might actually be fairly
18  intrusive.  But if on the other hand, you have a receiver and
19  a professional jail administrator, a lot of those types of
20  decisions are going to be handled in a manner that is
21  consistent with both public safety and with the needs of the
22  jail --
23          THE COURT:  What --
24          MR. CHENG:  -- so those would be --
25          THE COURT:  I'm sorry.  What about -- since all the
```

1    testimony from the County now is that they're full-steam ahead

2    in building a new jail.  What, if anything, could the receiver

3    do to make that happen?

4         There is no guaranteed financing, for example, no

5    guaranteed financing.  But could the receiver pick up from

6    where the County is right now and make sure that gets done?

7         I mean, can the receiver do anything that the president

8    of the Board of Supervisors or the sheriff or anybody else

9    can't get done now?

10       MR. CHENG:  I think the basic answer is yes, Your

11   Honor.  Certainly it's going to depend a bit on what is in the

12   order for receivership, and I think the parties would have to

13   provide something like that to the Court to identify what

14   those powers are.  One of the advantages of having a master

15   planning process that's ongoing is a receiver could sort of

16   slide into that, and it's already moving along.  And so you

17   don't necessarily, again, have to shift course radically.  You

18   can have the receiver step into the shoes of the County Board

19   of Supervisors, work with them in sort of a collaborative way,

20   and move forward with the master plan.

21       But at the same time, you are protecting that process

22   from sort of the defendant's tendency to make things harder

23   for themselves than they really need to.

24       THE COURT:  All right.  You may proceed.

25       MR. CHENG:  The third factor is that simply continuing

insistence on compliance with court orders would likely just
lead to more confrontation and delay.  The County has proven
unable to comply with the consent decree and the stipulated
order despite the guidance of the monitoring team.  We have
repeatedly made the same recommendations over and over.  They
come from the monitor; they come from their consultants.  Yet
every single time, we had to go move for contempt or fight out
everything, and that would just be an insufficient use of
resources on the part of all sides, Your Honor, on everyone's
side.

An example would be, for instance, the County heard --
the County administrator claimed that some of the issues
identified by the monitoring team were completely new to them.
You know, that seems unlikely, but to the extent that the
County administrator and others are constantly turning over,
every party coming in feels like they're being attacked every
single time a monitor says there's a problem.  And if you want
to make that process a little more collaborative, having a
greater sense of stability at the jail by having a receiver
and providing institutional memory might help stabilize this
dispute.

The bottom line is the defendants again claim they are
new and are not to blame for the jail's longstanding problems.
If this pattern keeps repeating itself, Your Honor, we're
going to be dealing with this six years from now, we're going

1     to hear the same arguments, probably new defendants, maybe

2     even new attorneys, and it's just not going to be an efficient

3     use of judicial resources or public resources.

4          The fourth factor for a receivership is that the County

5     doesn't have the leadership that would turn the tide within a

6     reasonable period of time.  Some of that I've already alluded

7     to, their failure to implement the reforms they promised to

8     make.

9          But there's a broader issue of we may have designed a

10    system where board members and sheriffs have oversight over a

11    jail, but that doesn't necessarily mean they are in the best

12    position to run the jail or to make every decision for the

13    jail.  And in a lot of jurisdictions, they let their jail

14    administrators do their jobs, and the jails get better.  For

15    whatever reason, the leadership in Hinds County has felt

16    obliged to either drag their feet or interfere in ways that

17    have prevented them from making reform.  So if the leadership

18    of the County cannot act, then it's up to the Court to make

19    sure that we deal with the leadership problem by providing a

20    court-ordered receiver.

21         I should mention -- you know, to be fair to defendants

22    and because I don't want to necessarily bash them -- the Court

23    does not need to find bad faith in order to remand to

24    receivership.  There are some indications there was some bad

25    faith, but you don't have to find it in order to require a

1  receiver.

2       A sixth factor is whether resources are being wasted.

3  I've alluded to that before, Your Honor.  There's just a lot

4  of indications in this case that some of the reforms that have

5  been attempted in the past just were not going to work out and

6  so resources have been wasted, because ultimately the

7  important decisions were not made and important actions were

8  not taken.

9       THE COURT:  I take it from resources being wasted,

10  though, and I suspect we'll hear from them, the County put

11  some effort into talking about the fees of the monitors and

12  how much they have paid the monitors over this six-year

13  period.  Obviously if a receiver is in place, they'll have to

14  pay the cost of the receiver and whatever tools, whatever

15  resources the receiver uses to perfect his or her mission.

16       MR. CHENG:  I know the defendants have argued that.

17  You know, the United States would argue that the monitors have

18  been worth every penny that they've been paid by the County,

19  and there are a number of reasons why that's the case.  If you

20  look at the areas of compliance, again, most of those were

21  only going to make progress with the help of the monitors.

22       It is true a receiver is a separate expense from the

23  monitors.  One of the realities about operating public systems

24  is you do need some checks and balances, some safeguards to

25  keep that system online.  The monitor is to report to the

1    Court.  They're the eyes and ears of the Court to let you know

2    objectively what's going on.

3         Ultimately, the receiver is stepping in for a

4    defendant, they're running the facility.  So it's very hard

5    for somebody who's running a program to also evaluate their

6    own performance, so it's not really a waste, Your Honor.  In

7    many ways, it's a protection against the kinds of things that

8    can go wrong when we put too much power into a judicial

9    receiver.  It is a substantially significant remedy, and when

10   a court does it at the federal level, it's a pretty serious

11   step, Your Honor.  We do use them in other situations.  But we

12   always have to have some safeguards, and so one of those is

13   keeping the monitor.

14        The other thing I should mention is that although the

15   defendants have complained about the fees, if you look at the

16   fees stretched out over six years, they're fairly reasonable

17   for what they've done.  You know, we don't have comparative

18   data or anything like that as part of the record, but nobody

19   had complained about it until this hearing.

20        The other reality is if you look at what they were

21   trying to deal with and the amount of work they've had to do,

22   again, it's quite reasonable.  They're trying to assess every

23   aspect of an entire system.  They're interacting not just with

24   the County Board but with other stakeholders, and dealing with

25   some very significant problems that have not been fully

```
1    addressed in this state.  So by that standard, it's a very
2    reasonable expense.
3         THE COURT:  I'm going to give you five more minutes to
4    close this portion up, because we have gone over.  But I'll
5    give the other side -- I'll try to give them an equal amount
6    of time.
7         MR. CHENG:  Thank you, Your Honor.
8         The other factor is that a receiver is likely to
9    provide a relatively quick and efficient remedy if it's
10   properly enacted and you get the right person as receiver.
11   They would be aided by the monitoring reports, which are
12   already in this case and created a very clear record of what
13   needs to be done.
14        The receivership is not indefinite, but it is a means
15   to an end, and eventually it will bring the County into
16   substantial compliance with the consent decree with a
17   transition period afterwards that will eventually lead to the
18   end of federal oversight.  So a receiver in this sense is
19   meant to promote a faster end to the case, and it hopefully
20   likely will do so.
21        The receivership can also solve some of the
22   difficulties Hinds County has had with compliance.  In *Plata*,
23   the court found that certain obstacles external to the prison
24   system did not excuse the defendants from taking action.
25   Here, too, there are some external obstacles, such as alleged
```

1    some state procurement requirements, various fiscal

2    obligations.  Those obligations do not necessarily excuse the

3    defendants for noncompliance with the consent decree, and it

4    certainly does not excuse constitutional violations, but a

5    receiver could help address some of those obstacles.  The

6    receiver will work within existing state laws and contracts,

7    but if necessary, could request that the Court issue an order

8    bypassing true obstacles to achieving constitutional jail

9    conditions if those obstacles frustrate federal supremacy in

10   this area.

11         A well-qualified receiver, like the candidates the

12   United States has suggested, will bring expertise and

13   knowledge of jail resources that may not be known to

14   defendants themselves.  They may be more familiar with what is

15   necessary to fix a jail system.

16         Ultimately, Your Honor, the people living and working

17   in the jail cannot wait any longer for conditions to be

18   brought up to minimum constitutional standards.  When the

19   County takes people into its custody, those people rely

20   completely on the County for their safety, health, and

21   wellbeing.  The County has not been able to meet its

22   responsibility.

23         Too many people have suffered and even died.  We ask

24   the Court to find the defendants in contempt with all decree

25   provisions that are not yet in substantial compliance.  We ask

1    that the Court order that a receiver be appointed with

2    authority for the custody, care, and treatment for all adult

3    detainees and youth charged as adults in Hinds County.

4         THE COURT:  Before you do -- you ended at a point I do

5    want to ask about.  You mentioned the United States has a

6    recommended, in the United States' view, pretty well-qualified

7    receivers.

8         What if the Court were to decide to appoint a receiver,

9    but appoint the receiver of the County's choice?  That is,

10   they've recommended Frank Shaw.  What is it about his

11   experience -- based on what has been submitted and based on

12   what's in the evidence, what does the United States say with

13   respect to his qualifications to serve as receiver in this

14   case?

15        MR. CHENG:  Well, Your Honor, we do think that before

16   the Court appoints a receiver, there should be some briefing

17   and discussion about it.  But certainly on its face, the CV of

18   Mr. Shaw suggests he's not appropriately suited for running

19   the jail.  His background is primarily in corrections at the

20   prison level.

21        As was brought out in the testimony, there are

22   significant differences in running a jail, both in terms of

23   the number of people coming through the front door as well as

24   the acuity of their status.  It is very concerning that the

25   defendants seem to think that a prison is the standard,

1    because that is actually punishment.  People get sent to

2    prison as punishment for their crimes.  These are pretrial

3    detainees in a jail, so it's even a completely different legal

4    standard.

5           To the extent he has some corrections experience, that

6    is certainly useful, but, again, it's a completely different

7    thing to have a prison with a relatively stable population

8    versus a jail where there's constant turnover with people

9    coming in, often from the street, high on drugs, and with

10   serious mental health issues that have not been stabilized.

11   You have juveniles charged as adults.  This is not something

12   you can sort of jump into if you only have a prison

13   background.

14          THE COURT:  Thank you, Mr. Cheng.

15          We're going to take a five-minute break for the court

16   reporter.  We're going to start back up at 3:15, and I'm going

17   to try to keep track of adding on the number of minutes and

18   times that the parties need to keep everything equalized.

19          We're in recess.

20          Do you have anything, Mr. Shelson?

21          MR. SHELSON:  Oh, no, Your Honor.  I'm just standing.

22          THE COURT:  Okay.  All right.  We'll be in recess.

23               (A brief recess was taken.)

24          THE COURT:  I'll remind those persons who are

25   participating by Zoom to have your speaker -- your audio on

```
 1    mute.

 2            I'll give your people an opportunity to come in.

 3            I think we went about 20 minutes over, a total of

 4    20 minutes over.  The Government has 10 minutes left.  If the

 5    County wishes to use an hour and 20 minutes, you may do so.

 6            MR. SHELSON:  Thank you, Your Honor.  May I have the

 7    Elmo?

 8            THE COURT:  And by the same token, the sheriff will

 9    have that amount of time as well.

10            MR. SHELSON:  May I proceed, Your Honor?

11            THE COURT:  You may.

12            MR. SHELSON:  Your Honor, four conclusions following

13    the hearing are obvious:

14            One, the consent decree is not helping.  It should be

15    terminated or substantially reformed.

16            Two, the RDC facility itself is working against

17    compliance.  It should be replaced.

18            Three, the near exclusive focus going forward should be

19    on realistic steps to increase staffing.

20            And, four, a receiver is not needed for one through

21    three above.

22            Your Honor, I agree with Mr. Cheng that it's easier to

23    run a jail if money is no object, and the County is not

24    required to abide by state law.  With that said, Your Honor, I

25    want to turn to plaintiff's proposed conclusions of law.  It
```

1   reads in part, Your Honor "PLRA provides that in any civil

2   action with respect to prison conditions in which prospective

3   relief is ordered, such relief shall be terminable upon the

4   motion of any party two years after the date the Court granted

5   or approved the prospective relief."

6        It is undisputed that more than two years have passed

7   since the consent decree and stipulated order were entered.

8   Therefore, the Court should terminate those orders unless the

9   necessary, narrow, and intrusive test is satisfied.  Plaintiff

10  has the burden of proof on that test.  The plaintiff has not

11  satisfied its burden.

12       Also heard several times, Your Honor, that Mr. Cheng

13  referred to the constitutional standards.  I do not recall him

14  identifying the constitutional standard to which he is

15  referring to.  But presumably, at least based on plaintiff's

16  proposed conclusions of law, he's talking about the Eighth

17  Amendment.  And, Your Honor, as the plaintiff notes in its

18  proposed finding of fact, the Fifth Circuit's test for the

19  Eighth Amendment requires extreme deprivation of the minimal

20  civilized measures of life's necessities.

21       The consent decree should be terminated for these

22  reasons, and I'll take each one in turn.

23       The first as we alluded to in opening is that the

24  consent decree tries to do too much.  The starting point --

25  and I'll talk about this more later, but the starting point is

1    that the work center, Henley-Young, JDC, the criminal justice

2    system through the device of the CJCC, and the administrative

3    provisions of the consent decree which make up the bulk of

4    that document should not be part of a consent decree going

5    forward.

6         The consent decree, Your Honor, is impossibly

7    overbroad.  As long as it is, it still has many gaps and the

8    monitors have been allowed to fill those gaps.  A few

9    examples, these are from the Fifteenth Monitoring Report.

10   Inmate-on-inmate assaults continue at a high rate, assaults

11   and conflicts between inmates are all too common.  We visited

12   with this with Ms. Simpson.  What constitutes a high risk?

13   What is all too common?  She could not point to any provision

14   of the decree that sets any standard for those kind of things.

15   So the truth is a high rate and what's all too common is

16   whatever the monitors says it is.

17        Contraband is still at an unacceptable level.

18   Likewise, there's no standard for that in the consent decree.

19   So again, what is unacceptable is what the monitors say is

20   unacceptable.

21        The monitors talked about length of stay at the RDC and

22   recidivism.  I believe Ms. Simpson conceded there's no

23   standards for those items in the consent decree.  So again,

24   they're what the monitors say they are.

25        Another good example, Your Honor, is what is in

paragraph 42(g)(7) of the consent decree, Mr. Cheng alluded to these provisions, I believe refers to appropriate treatment and therapeutic housing.  Dr. Dudley conceded neither of those terms are defined in the consent decree.  So the truth is that appropriate treatment and therapeutic housing under this decree are whatever Dr. Dudley says they are.

Final example, Your Honor, this is the Fifteenth Monitoring Report, page 85, it's referencing paragraph 77(a) of the decree.  And it says here, Your Honor, that the assessment in paragraph 77(a) should be focused on the following, and it lists five bullet points.

Your Honor, as Ms. Simpson conceded, none of those five bullet points are enumerated in paragraph 77(a).  So this is yet another example of the monitors adding things in the decree that are not in the decree and in this instance finding the County noncompliant based on their add-ons at least in part to the decree.

The 64-page, single-spaced consent decree is overbroad on its face.  But even so, it has major gaps.  No spaces between the words allow the monitors to improperly expand the overbreadth of the decree, even further by filling the gaps themselves.

Next, Your Honor, is full compliance.  What is full compliance?  We don't know.  The decree doesn't say.  There is no overall compliance standard in this decree, and I'll come

1    back to that.

2         In addition to being overly broad, the consent decree

3    is too stringently applied by the monitors.  First example

4    about that, Your Honor, is the testimony of Jim Moeser.

5    Mr. Moeser testified that the provisions -- that even the

6    provisions where the monitors have found sustained compliance

7    should continue to be under a consent decree.  Sustained

8    compliance, I think as we all know by now, is not even a thing

9    under the consent decree but it's telling because even where

10   the monitors have find -- have found that the County is in

11   sustained compliance, which by their definition is compliance

12   for more than two years, that's still not good enough and even

13   those provisions should remain subject to a consent decree.

14   So it's tough to tell under standards like that how the County

15   ever gets out of this decree.

16        Mr. Moeser also testified about movable furniture at

17   Henley-Young.  He conceded that movable furniture is not

18   required by the consent decree but he claimed that the lack of

19   movable furniture is still relevant to compliance.  We submit

20   that that simply cannot be.  If it's not a requirement of the

21   consent decree, it's not required and it cannot be relevant to

22   compliance.

23        Other examples, Your Honor, include Ms. Simpson's

24   testimony about the JDC and work center which she testified

25   should remain under a decree.  Starting with JDC, these are

1    all references from the Fifteenth Monitoring Report, which is

2    Exhibit P-41.  This is page 31.  The monitors found that the

3    JDC has been closed because of plumbing and HVAC problems.

4         Page 48, it states since JDC has been closed for over a

5    year, there is no need to address compliance at the facility.

6         Page 38, the housing units at the JDC are currently

7    closed.  So this facility is closed.  It's not being used as a

8    jail.  It's no longer being evaluated for compliance, but

9    Ms. Simpson still thinks it should be subject to the decree.

10   It should not and subjecting this facility to a continued --

11   to continually be under a decree exceeds constitutional

12   minimums.  Same is true --

13        THE COURT:  But is it -- I'm just asking, is it --

14   would it fall under the decree because it is part of the jail

15   system?  I mean, even though it's closed, it is still part of

16   the Hinds County Jail system; right?

17        MR. SHELSON:  Well --

18        THE COURT:  The jail system itself is composed of RDC,

19   the workers' center, JDC, and Henley-Young; right?  Are there

20   any other -- I mean, although it's closed, isn't it part of

21   the system?

22        MR. SHELSON:  That's how the jail is defined under the

23   consent decree, yes, sir.  But, Your Honor, I don't think that

24   in any way precludes things that should no longer be under the

25   consent decree from being cut loose.

```
 1        THE COURT:  Right.  And if we agree -- and if the Court
 2   agrees that it's cut loose -- it's cut loose, which means that
 3   cannot be used in the future unless some court approval,
 4   right, or what?
 5        MR. SHELSON:  I'm sorry, Your Honor?
 6        THE COURT:  If they wanted to bring it back online,
 7   would it fall under the consent decree even after it's cut
 8   loose?
 9        MR. SHELSON:  I think if that were being reopened as a
10   jail, I think there would be -- I think the process would be
11   for a motion to bring it back in if the plaintiff thought that
12   were necessary.
13        THE COURT:  Okay.  Let me ask you this though about the
14   consent decree itself.  You talk about what specific words
15   were used and we've heard the testimony and stuff about the
16   lawyers being involved, about the Board adopting the consent
17   decree.  It was presented to the -- the consent decree was
18   presented to the Board of Supervisors by its lawyers.  The
19   lawyers signed off on it.  Judge Barbour entered the consent
20   decree.  The same method went and Judge Barbour was fairly
21   specific I think during his hearing.  He said this is going to
22   bind boards.  It doesn't matter what composition of the Board
23   may exist in the future.  And then when we got to the
24   stipulated order, the same thing.
25        And so but for the fact that we do have different
```

 1    lawyers here, I mean does -- is the lawyer -- because we have
 2    different lawyers here, is the County's hand strengthened at
 3    saying those are not words as Mr. Credell Calhoun testified?
 4    He said he would not have recommended that the Board sign it
 5    the last time -- if he were on the Board at the time that his
 6    wife was on the Board, I believe was his testimony, that's
 7    something I wouldn't have done.
 8         I mean, so what value, if any, should the Court put
 9    into parties entering consent decrees or contracts or
10    settlement agreements that lawyers do all the time that are
11    blessed by the Court?
12         MR. SHELSON:  None, Your Honor, because we're under the
13    context of the PLRA, none of the relevant provision -- the
14    relevant criterion is the passage of time and that criterion
15    is satisfied.
16         THE COURT:  And if the parties agree on the front end
17    though that what the parties have recommended to the Court at
18    that time, if the parties agree that there is a bear minimum
19    constitutional level, I think that's one of the provisions in
20    the consent decree or a sub-decree, is it not?
21         MR. SHELSON:  It is, Your Honor.
22         THE COURT:  So you're telling me that was not the case?
23         MR. SHELSON:  No, Your Honor.  Obviously the County
24    signed it -- they did everything Your Honor said.  They signed
25    it, they agreed to it, they had lawyers and so on.  But what

1   we're saying is that the PLRA trumps all that, and I have a

2   Fifth Circuit citation if the Court would like it but --

3            THE COURT:  Okay.  All right.

4            MR. SHELSON:  On the overly stringent application of

5   compliance as it relates to the work center, all these on this

6   slide are from the Fifteenth Monitoring Report, Exhibit P-41.

7   The monitors found that direct supervision has been

8   implemented successfully and is effective at the work center.

9            Next, that medical and mental health services are being

10  delivered effectively at the work center.

11           Next, outdoor recreation is properly provided at the

12  work center.

13           And finally, suicide watch is properly conducted at the

14  work center.

15           Your Honor alluded to the -- that the work center

16  functions as a jail properly should.  Still Ms. Simpson wants

17  it kept under the decree.  There is no reason to do that, and

18  doing so -- keeping it under a decree would exceed

19  constitutional minimums.

20           And to that point, Your Honor, the RDC is a troubled

21  facility -- and I'm going to talk more about that, but the

22  County's operation of the RDC is not constitutionally

23  deficient and it is guided by legitimate governmental interest

24  such as budgetary and other concerns.

25           I'm not going to belabor this, Your Honor, because we

1    talked about it in our opening and we visited extensively with

2    this -- about this with Ms. Simpson.  There are 92 substantive

3    provisions in the decree.  That's more than necessary to meet

4    constitutional minimums.

5        We talked about paragraph 42 in opening and with

6    Ms. Simpson.  It's pages 11 through 15 of the decree.  It has

7    9 subparts, 21 subparts to the subparts.  It's broken up in to

8    three separate subparts for compliance evaluation.  Whatever

9    the constitutional minimum is for the matters addressed in

10    paragraph 42, paragraph 42 exceeds constitutional minimum.

11        We talked about gap fillers, Your Honor.  It's the

12    County's position that allowing the monitors to fill the gaps

13    in the decree and for those to effectively become terms of the

14    decree exceeds constitutional minimums.

15        Next, Your Honor, compliance is a mess under the

16    decree.  And here's what I mean by that.  The left-hand column

17    is a compliance standard.  The right is a definition, if there

18    is one in the consent decree, so noncompliance.  Under the

19    consent decree, that's when the County has met most or all of

20    the relevant provisions of the agreement -- well, has not met.

21    Most or all is zero to some number greater than 50 percent.

22    Where it falls in that range, we don't know because the

23    consent decree does not say, and Ms. Simpson didn't really

24    explain it.

25        Partial compliance.  County has achieved compliance

 1    with some of the components of the relevant provision of the

 2    agreement but significant work remains to be done.  According

 3    to the dictionary, Your Honor, some means a nonspecified

 4    amount or number of.  Mr. Cheng seems to think that the use of

 5    the word some is a good thing.  A nonspecified amount or

 6    number of is not a good thing in a consent decree where the

 7    party is subject to contempt.

 8         Plaintiff also was proud about Ms. Simpson's testimony

 9    regarding some.  We don't share that.  Is this is an

10    illustration of how this document?  Yes, the County did sign

11    it, but this document is poorly drafted, this is a good

12    example of that.

13         THE COURT:  What if the Court decides that some

14    mechanism ought to be in place, something, and the Court says

15    JDC, no longer; work center, no longer; RDC.  Would the County

16    be willing to draft what a consent decree ought to look like

17    for the Court?  Would these set of attorneys agree?  Because

18    what we're having to do now is, because these set of attorneys

19    said terminate the agreement, we have to go through line by

20    line.  What if we were to give these set of attorneys an

21    opportunity to do a consent decree that they believe complied

22    with the PLRA, would that be acceptable?

23         MR. SHELSON:  Yes, sir.  The trick would be though

24    whether -- I assume at some point it would be shared with DOJ

25    and then that would become the tricky part.

1          THE COURT:  What if DOJ agrees if the language closes

2     in those gaps?  I mean, because what we have here is I told

3     the parties all the way through this litigation that the case

4     is always in your hands, and I don't think there's been any

5     attempt to compromise or deal with this thing at all.  We've

6     heard discussions about the weakness of the current stipulated

7     order, the current consent decree, but there has been no

8     measurable effort, I don't think, to give the Court different

9     language, new language, or language that the County believes

10    would even be appropriate.

11         MR. SHELSON:  Yes, sir.  And if the County drafted a

12    consent decree and DOJ agreed to it, that would obviously be

13    an extraordinarily good development.  Yes, sir.

14         THE COURT:  Okay.

15         MR. SHELSON:  So turning to substantial compliance.

16    The County has achieved compliance with the material

17    components and has met the goals of the relevant provision of

18    the agreement.  I visited some about this with Ms. Simpson is

19    that 100 percent, 90, 80, 75 percent of the time, don't know,

20    the decree doesn't say.  But what we do know is that material

21    components and goals are not identified in the substantive

22    provisions of the decree.  Sustained compliance, it's not in

23    the decree.  Full compliance is not in the decree.

24         So turning back to this point I made earlier, Your

25    Honor, the truth is there is no overall compliance standard in

1   the decree nor is there a deadline to achieve overall

2   compliance.  So when Mr. Cheng said most of the consent decree

3   deadlines have expired in terms of reaching some sort of

4   overall compliance, we respectfully disagree with that because

5   we don't think that's in there.

6         Your Honor, the monitors claim they're not demanding

7   perfection from the County, but the monitors' perception of

8   compliance makes obtaining compliance about as likely as the

9   clock striking 13.  If the goal here is to keep the County

10  under a consent decree forever, this decree satisfies that

11  goal.  The consent decree as written and as applied consigns

12  the County to a kind of purgatory on steroids because there's

13  no realistic way out and the monitors' positions regarding JDC

14  and the work center are good illustrations of that.

15        Turning to deliberate indifference, Your Honor.  The

16  County has not been deliberately indifferent.  The County has

17  responded reasonably.  Why do we say that?  Let's start with

18  Major Bryan's testimony.

19        Major Bryan testified that she was not deliberately

20  indifferent when she was the jail administrator.  She did not

21  turn a blind eye to life safety or other issues.  If she saw a

22  life safety issue, she attempted to address it.

23        There's also the matter of Major Bryan's declaration

24  which is in the record as ECF-105-1.  Ms. Bryan conceded that

25  positive developments and the progress reflected in her

1     declaration are not indicative of the distinct lack of support

2     she referenced in her letter of resignation.

3          Next, Your Honor --

4          THE COURT:  Let's talk about her declaration that the

5     County gave to the Court on December the 17th, I believe, the

6     date of her declaration is December the 14th.

7          Now, apparently the County was fully satisfied with

8     what she had done at least through December the 14th and that

9     would have postdated the time that Sheriff Jones came onto the

10    thing.  I don't know if there was consultation with Jones as

11    to whether they should use the declaration of Major Bryan but

12    that's what the case is.  It was used.  It was relied upon.  I

13    presume that -- I guess I failed to ask the question of

14    whether the -- the declaration was drafted in part or if they

15    made sure that -- if the lawyers made sure the declaration

16    said exactly the things they wanted it to say.

17         But how should the Court look at what the parties

18    submitted on December the 17th vis-a-vis what has happened

19    since December the 17th?  And, you know, I believe that the

20    sheriff has a right to hire and fire anybody he wishes, except

21    for discriminatory reasons.  So obviously I -- will the County

22    concede that they -- that they thought Major Bryan was doing a

23    good job up until December the 14th at least?

24         MR. SHELSON:  Your Honor, first of all, Major Bryan

25    testified she stands by her declaration.  Next answer to Your

1    Honor's question directly, I went through this the first time

2    I cross-examined Major Bryan, and it all started out with a

3    pretty extensive list of positive developments, everything

4    from 55-inch TVs to so forth.  So I don't understand the

5    County's position to be that Major Bryan didn't have any

6    accomplishments that one would be objectively proud of.  What

7    I understand happened --

8            THE COURT:  Okay.  There was a lot of testimony --

9            MR. SHELSON:  Yes, sir.

10            THE COURT:  -- about all her failings, whether it was

11    the County or the sheriff, I mean, because a portion of this

12    trial was spent talking about the performance of Major Bryan.

13    A lot of the trial was spent on things that had occurred in

14    the past up under the leadership of all the various sheriffs.

15    So I'm just trying to figure out how should the Court weave in

16    or handle the testimony and the testimony -- or the evidence

17    before it, and part of the evidence is the declaration of

18    Major Bryan?

19            MR. SHELSON:  I think there's two buckets, Your Honor,

20    and they're not mutually exclusive.  Major Bryan in one bucket

21    has accomplishments.  There's no question about that.  And she

22    should get credit for those and so should the County.

23            Now, the other bucket, Your Honor, there's no question

24    there were difficulties between the sheriff and Major Bryan,

25    and sheriff -- the sheriff felt, and he talked about it, that

1    she was -- that she engaged in what the sheriff believed was

2    insubordination.

3         Now, Your Honor, I don't think they're mutually

4    exclusive because what the sheriff perceived as

5    insubordination doesn't wipe out positive developments.

6         THE COURT:  Okay.  Thank you.  Go ahead, sir.

7         MR. SHELSON:  So the testimony of Robert Farr, Your

8    Honor, on the condition of RDC -- and none of this is an

9    excuse, Your Honor.  The County did not -- is not -- does not

10   have a bad jail.  It did not build a bad jail in 1994 to be in

11   contempt of court.  The RDC was built in '94.  Briefly as I

12   can, perimeter walls not grouted; cell walls not grouted; roof

13   was not joined with adjacent wall structures, meaning it's

14   susceptible to escapes; grout was placed in some of the

15   drainage systems during original construction.  Those systems

16   do not properly function to this day.  You have to enter the

17   housing unit to repair mechanical systems.  That's a big

18   problem, it makes it especially difficult to manage and

19   maintain air handling units that provide environmental

20   controls in the pods.

21        And the last major point that Mr. Farr talked about was

22   that the existing facility does not have the ability to manage

23   medical and mental health concerns or to allow the

24   classification to be properly utilized.  This is for context

25   Your Honor.  This is the facility we have, it's the facility

1  we're trying to stabilize, and it's the facility that we're

2  going to replace, and all that is responding reasonably.

3       I want to turn next, Your Honor, to the Board minutes

4  which I believe are in evidence as D-48 through D-74.  And I

5  invite the Court to carefully review those minutes because we

6  believe that they will be replete with examples of where this

7  Board -- this current Board that came into office in

8  January 2020 had, as one of its core missions, the improvement

9  of detention services, and the minutes back that up.  These

10  are just some of the examples, Your Honor.  I'm not even going

11  to cover all these.

12       But Exhibit D-59, the March 3rd, 2020, board minutes.

13  Board approved an emergency declaration for RDC.  They

14  suspended residency requirement for all consent decree-related

15  staff.

16       D-73 dated September 21, 2020, the Board approved

17  installation of a new water booster pump station at

18  Henley-Young for $40,886.  So we heard about water problems at

19  Henley-Young, but the Board over time and continuing on to

20  this day is addressing those problems.

21       Exhibit D-65, May 3rd, 2021, the Board approved repairs

22  at RDC for $595,491, approved a contract for QCHC for

23  2.8 million for medical and mental health detention services.

24       D-68 dated July 19, 2021, Your Honor there can see all

25  the invoices.  I'm not going to belabor them.  They encompass

1    both the RDC and the roof repairs at Henley-Young.

2         And D-74, Your Honor, dated September 7, 2021, the

3    Board approved two invoices from B&E Communication totaling

4    $208,860 for work at RDC and Henley-Young.  All told since

5    this Board came to office, this Board has approved over

6    $4 million for repairs to the jail primarily focused on RDC.

7    We view those as considerably more significant than apparently

8    the plaintiff does, but that amount is undisputed.

9         Next, Your Honor, is the testimony of Gary Chamblee.

10   We -- Mr. Chamblee testified to what we view as the rather

11   extraordinary efforts to -- on the work that's been done on

12   B-Pod and C-Pod and the RDC generally, everything from the

13   roof to the kitchen.  And that work is ongoing, Your Honor,

14   and that work's been extensive, it's been conducted during a

15   pandemic, and yes, it's ongoing, but that's something the

16   County should be commended for, not criticized for.

17   There's -- it seems, Your Honor, that it's never good enough.

18        And so Mr. Chamblee testified to the extensive array of

19   things that have been done since this Board came into office

20   at RDC, the work center, and Henley-Young, and Mr. Cheng chose

21   to list what we think are the few items that are not being

22   ignored but that Mr. Chamblee said are in the process of

23   getting done.

24        Your Honor, the truth is that when this Board took

25   over, everybody knows that A-Pod is not where it needs to be.

1    It's probably an understatement.  But when this Board took

2    over, that's kind of where B-Pod and C-Pod were too.  They're

3    not like A-Pod anymore.  The County deserves credit for that.

4    They're addressing the issues.  It's not perfect, but perfect

5    is not the standard.  And, Your Honor, again this was all done

6    during COVID-19 --

7         THE COURT:  Would you agree, though, that the County

8    agreed to do it because for whatever reason -- for whatever

9    reason back in 2019 when the Court was about to have the

10   hearing on the contempt motion, the first contempt motion back

11   in June -- that was filed in June 2021, that they at least

12   agreed to move forward and act precipitously with the

13   stipulated -- with one of the first items of the new Board

14   that had three -- I guess at least three new board members

15   because McGowan was on the previous Board as was Vern Gavin.

16   So we have -- did we have three new members or did we have

17   four new members?

18        MR. SHELSON:  I don't know, Your Honor.

19        THE COURT:  You don't know.  Okay.  I don't want to

20   misstate the facts.

21        But a new Board came in place on the heels of the

22   United States having filed a contempt motion back in

23   June 2021.  And for whatever reason, business -- busyness of

24   the Court or whatever reason it was, that contempt motion was

25   not heard or was not about to be heard until December of

 1  2019 -- I'm sorry, I said 2021 -- June of 2019 is when the

 2  contempt motion was filed.  It was not brought -- it was not

 3  scheduled to be heard until December of 2019, and at that

 4  point in time the parties agreed to put off the contempt

 5  hearing and the new Board signed off on the stipulated order,

 6  and it is that stipulated order that allowed the new Board or

 7  gave them room, I guess, to do all of these things.  But that

 8  was the impetus behind the Board doing something, wouldn't the

 9  County agree?  Because that -- they had not committed those

10  funds and stuff before then, had they?

11       MR. SHELSON:  I don't believe so, Your Honor, but the

12  County did agree to the stipulated order, and Mr. Morisani

13  went through the physical plant provisions of that order in

14  some significant detail with Mr. Chamblee and I think

15  objectively serious progress has been made.

16       THE COURT:  Okay.

17       MR. SHELSON:  I mean, the County -- I'm sorry, Your

18  Honor.

19       THE COURT:  No, no.  I said okay.

20       MR. SHELSON:  Yes, sir.

21       So the County -- I mentioned the need for a new jail.

22  Your Honor heard Mr. Farr.  Three options were presented to

23  the County.  The County selected option two after an extensive

24  master planning, and I think -- process that I think even the

25  monitors did not criticize.  But in brief, option two, build a

1   new jail at the Henley-Young site, close RDC, put ongoing

2   investments to keep it functioning through June 2026.

3          Your Honor, no one is saying build a new jail and

4   ignore the existing physical plant improvements that still

5   need to be made, and that's just not what we're doing, Your

6   Honor.  And both Chamblee and Farr testified to that.

7          There will -- there needs to be ongoing investments in

8   the physical plant of RDC until the new jail is opened in

9   phases, and there are and there will be.  And the last point

10  of option two is to continue to use the work center and,

11  likewise, improvements will be -- continue to be made to the

12  work center.

13         So what's the timing of the new jail that's being built

14  in phases?  Start construction by November 2022 and a 200-bed

15  facility and all operational components by June 2025.

16         Phase 1B, 600 beds by June 2026.  Phase 2, 792 beds by

17  January 2028.

18         So no one from the County is standing up here, Your

19  Honor, and saying this is going to happen overnight.  It's

20  obviously a process through at least January 2028 and, Your

21  Honor, there's no indication that a receiver could speed this

22  process up.

23         What's more, Your Honor, on that point, I believe I

24  asked Ms. Simpson what facts she had that -- I don't remember

25  the exact question, but the essence of it was that the

1    receiver could do better, and I don't recall her being able to

2    identify such facts.  And I don't mean to pick on Ms. Simpson

3    when I say that, Your Honor.  That's not my intention.

4         The new jail cost.  123 million for the new jail,

5    10 million for the water tower and water system at

6    Henley-Young, total cost $133 million.  This isn't play money,

7    Your Honor.  This is a significant investment and the County

8    has bound itself to do it.

9         The financing criticisms I frankly don't understand.

10   The evidence is that the County's total general fund revenue

11   on an annual basis is approximately $80 million, so

12   133 million is -- represents more than a year and a half of

13   the County's entire general fund revenue.

14        Now, Your Honor, I just don't think its hyperbole to

15   suggest that the County does have $133 million to park in a

16   bank account to spend incrementally through 2028 as this jail

17   is built in phases, and that's just not how these capital

18   improvement projects are funded.  They're funded in phases.

19   The undisputed testimony is there will be four millage

20   increases.  One has already been passed.  The others will be

21   passed in connection with the phases to fund them as the jail

22   is built.  That's responsible financing.

23        And, again, Your Honor, to suggest the County is

24   somehow deficient because they cannot park $133 million in a

25   bank account for approximately six years, we just don't think

1    that's a fair criticism.

2         Next, Your Honor --

3         THE COURT:  Is there a guarantee that the County will

4    do a millage increase those ongoing years?  Is there a

5    guarantee?  Political pressure might zone in on the County

6    Board supervisors about raising taxes and then where might we

7    be with only phase one completed, for example, because there

8    may not be any agreement among the Board to raise taxes once

9    again?  I think Mr. Calhoun was talking about population

10   dwindling, tax base dwindling.

11        MR. SHELSON:  You know, Your Honor, do I have a

12   guarantee?  I don't.  But the best answer I can give is that's

13   the democratic process.  So the Board -- the Board cannot vote

14   to -- this Board cannot vote to raise another millage, say,

15   two years from now.  It just can't do that under state law,

16   Your Honor.  So I'm not playing games, but it -- the existing

17   Board has to be the Board that raises millage at the relevant

18   time.

19        So if your question is can the existing Board maybe do

20   four millage increases at once?  Maybe so, but there's no

21   fiscal reason to do that and to impose that burden, an

22   unnecessary tax burden on the County taxpayers that's

23   premature.

24        THE COURT:  I understand.  But should the Court give

25   any points, if you will, to the County because it promises to

1    do that down the road when they have no control over what a

2    future Board might do with respect to that point?

3         MR. SHELSON:  I think the Court should because, you

4    know, if they say that and then they don't actually start

5    building the thing, then okay.  But if they are --

6         THE COURT:  You heard the testimony about -- I

7    understand they voted unanimous.  That's what part of the

8    testimony is.  But there's much acrimony on this Board with

9    who is even the president, at least there was.  There was.

10        MR. SHELSON:  Yes, sir.

11        THE COURT:  So, you know, again, the three votes on the

12   Board could always change, and because apparently they're

13   governed by three votes.  And so, you know, with the acrimony

14   on one side with respect who the leadership is of the Board

15   versus what they might do later on, that leadership could

16   collapse on any given day.  You would agree; right?

17        MR. SHELSON:  I would agree in a general sense, Your

18   Honor, but I would also point out that the testimony is that,

19   one, there is acrimony, but two, the acrimony has never in one

20   instance led to anything other than a unanimous vote on

21   anything related to detention.

22        THE COURT:  Okay.  All right.

23        MR. SHELSON:  The next thing I want to talk about is

24   staffing.  One of the things in one of the quality assurance

25   reports was a remark, an unverified remark, that one can earn

1    more working at Starbucks or McDonald's than a detention

2    officer in Hinds County.

3            And, Your Honor, it's hard to find definitive

4    information on what the starting salary is for Starbucks in

5    Mississippi, but this Glassdoor document dated January 27,

6    2022, suggests that the starting salary in Starbucks in

7    Mississippi is $10 per hour with a range of 9 to $16 per hour.

8            MR. CHENG:  Objection, Your Honor, not part of the

9    record.

10           THE COURT:  This is argument so that's fine.  Thank

11   you.

12           Mr. Shelson.

13           MR. SHELSON:  So, Your Honor, a $31,000 annual salary

14   equates to --

15           THE COURT:  For the record, I overruled that objection.

16   I just want to be clear.

17           MR. SHELSON:  Thank you, Your Honor.

18           $31,000 starting salary equates to an hourly wage of

19   $14.90 an hour.  So I concede to Mr. Cheng that I don't know

20   exactly what the starting salary of Starbucks is in

21   Mississippi, but it's in the range of 9 to $16, then either

22   the detention center is higher or it's within the range.

23           In the fiscal quarter, Your Honor, ended January 22nd,

24   2022, Starbucks net revenues, net revenues, was $8.1 billion.

25           Hinds County came into existence in 1821, 201 years

 1    ago.  Again, Your Honor, I don't have general fund revenue

 2    fund information back 201 years, but I think it's likely that

 3    in 201 years the County has not generated general fund

 4    revenues of $8.1 billion which is the amount Starbucks

 5    generated in one quarter.  So the fact that the County is in

 6    the range of what Starbucks pays is again to be commended, not

 7    condemned.

 8         With all that said, Your Honor, I'd like to turn to

 9    plaintiff's proposed remedy which is a receiver and it's a

10    remedy endorsed by the lead monitor.  And I think it's

11    important in this discussion to make note of D-158 which is in

12    evidence -- well, it's not -- it's D-158 for introduction

13    which is DOJ's proposed order for what they call the

14    compliance director, but it's a euphemism for receiver.

15    Receiver is an extraordinary remedy.  The way that it's

16    depicted in the proposed order, it would be extremely applied,

17    and a receiver violates the necessary, narrow, and intrusive

18    analysis.

19         Your Honor, this morning's edition from the Clarion

20    Ledger, front page lead story, quoted Hernandez Stroud, who is

21    with the Brennen Center for Justice and a law professor.

22    Dr. Stroud was quoted as follows:  "Receivership is the

23    federal government's most invasive and powerful remedial

24    tactic."  The County agreed with that.  The County does not

25    agree there is a more intrusive remedy than a receiver,

1    especially if the receivership is being contemplated by DOJ

2    and the lead monitor.

3         Your Honor, Professor Stroud also said that a

4    receivership is a nuclear option.  We agree with that too.

5         There are some things -- I alluded to at the beginning

6    that there were many provisions of the consent decree that are

7    in the nature of administrative compliance.  This table, Your

8    Honor, the left column is the page in Exhibit P-41, the

9    Fifteenth Monitoring Report, and the right column is what's

10    addressed on those pages.  So some examples, Your Honor, that

11    just simply do not call for a receiver, and there's many more

12    than these in the Fifteenth Monitoring Report.

13         Anyway, pages 61 through 62, UOF, use of force,

14    incident reports are generated.  That's a good thing.  But

15    partial compliance was the evaluation because some reports

16    continue to be titled as something other than UOF and the UOF

17    check box is not checked.

18         Your Honor, these are not the kind of things that

19    should implicate even consideration of a receiver.  Pages 62

20    through 63, while some reports are clear and comprehensive,

21    all too often the lack of clarity and failure to provide

22    details make it hard to determine whether or not appropriate

23    procedure was followed.

24         Your Honor, accurate reporting is important, no one

25    going to deny that, but it does not rise to a constitutional

 1   dimension.

 2        Your Honor, there are easier ways to get better reports

 3   or less intrusive ways, certainly, to get better reporting

 4   than through a receiver.

 5        Page 64, it reads "On a day-to-day basis, supervisors

 6   are actively involved in dealing with incidents, sometimes

 7   more so than would be expected."  That's a good thing, I

 8   presume.  "Supervisors follow through on UOF cases by

 9   notifying the appropriate chain of command and investigative

10   authorities."  Another good thing.  But then there's a

11   however, and throughout these monitoring reports, there always

12   seems to be, with respect to the County, a however, a but, or

13   an although.  But anyway, this goes on to say "However,

14   supervisors do not evaluate incidents, reach conclusions, and

15   make recommendations."  A receiver is not the least intrusive

16   way to address these types of issues.

17        Page 65, photographs are not routinely taken and

18   supervisors do not indicate that an inmate had refused to sign

19   a waiver when photographs are refused.  Not taking

20   photographs, waiver when one is refused does not implicate a

21   receiver.

22        And finally, Your Honor, page 89.  When it has been

23   found that a detainee's mental health status has deteriorated

24   while being in segregation, mental health staff assess

25   additional mental health treatment needs.  That's a good

 1    thing.  But if the detainee is already on the mental health

 2    caseload, any indicated changes to his or her treatment plan

 3    are made.  That's a second good thing.  And if the detainee is

 4    not already on the mental health caseload, he/she is added to

 5    the caseload and an appropriate treatment plan is developed.

 6    That's a third good thing.

 7         Although this is documented in a detainee's medical

 8    records, a fourth good thing that's not consistently

 9    documented in the records, a segregation review ratings.  So

10    we have four good things there, and one thing that was not up

11    to the standards of the monitor.  And, you know, how many

12    times do we have to document the same thing?  It was in the

13    medical records but it wasn't in this segregation review

14    meetings, so it's always something.

15         Your Honor, paragraph 77 is another long paragraph in

16    the consent decree.  It has many subparts.  This part I read

17    is from just one of the subparts.  But the whole paragraph 77

18    got one compliance evaluation rating, and it was noncompliant.

19    So even with all this four good things and one thing not

20    satisfactory, this was part of what was found to be

21    noncompliance.

22         And, Your Honor, the difficulty with things like that

23    is it does reduce this process to something of a paper chase.

24    We've had 15 monitoring reports and one interim report and

25    we've had 1,556 pages of monitoring reports to date with more

1    on the way.

2         Your Honor, Dave Parrish testified by deposition in a

3    proceeding in the United States District Court, Eastern

4    District of Michigan in June 2013 and that case involved a

5    consent decree.  Mr. Parrish was asked the following:  In your

6    opinion as a person who was working corrections for

7    30-plus years -- or 27 years, does that, a consent decree, add

8    an extra layer of protection to the process to make sure the

9    jail is in compliance with national and state standards?

10        Answer:  I would characterize it by saying it creates

11   an extra layer of administration, not necessarily compliance.

12   Having worked on it, I have seen how it can become a paper

13   chase as opposed to meaningful.

14        Question:  Are you saying that the one that you worked

15   on was a paper chase?

16        Answer:  I've seen example of that in parts of it, that

17   it becomes almost an end to itself to try to comply with the

18   consent judgment.

19        Your Honor, this is what we have here.  There are many

20   extra layers of administration in the consent decree, not

21   necessarily compliance.  It has become a paper chase on the

22   kind of things I just outlined and the last table we went

23   through as opposed to being meaningful, and these are examples

24   of the consent decree here becoming an end to itself.

25        So we don't say this to demonize the monitors, but we

1    have an honest difference of opinion with plaintiff when

2    plaintiffs suggest that the monitoring has helped better the

3    Raymond Detention Center.  So, Your Honor --

4         THE COURT:  Without the monitoring, do you think the

5    County would have done anything?

6         MR. SHELSON:  I think that --

7         THE COURT:  Without the monitoring, without the Court

8    having these status conferences, without the Court coming in

9    here every time there's a monitoring report, do you think as a

10   lawyer who's looking back on their case that the County would

11   have done any of these things?

12        MR. SHELSON:  Yes, sir.

13        THE COURT:  Okay.  All right.

14        MR. SHELSON:  And I think they would have done better

15   with less.

16        THE COURT:  That's what the stipulated order was for in

17   part; right?

18        MR. SHELSON:  In part, Your Honor, and I think that,

19   especially given the timing of when that hit, which is not an

20   excuse, but given the timing when that hit, the County has

21   done an excellent job and certainly a good faith job of

22   attempting to comply with that, and I think they've complied

23   with the bulk of the substantive provisions.  They're

24   deficient on the CJCC things, but the physical plant and those

25   type of things, again, I think they're to be commended.

1          Now, have they complied with every single provision of

2     it?  No.  No, Your Honor, they haven't.

3          THE COURT:  All right.

4          MR. SHELSON:  So under the proposed order that DOJ

5     circulated and the lead monitor endorsed, in short, Your

6     Honor, it's a hostile takeover of the jail.  The County's

7     powers regarding the jail are suspended outright.  The

8     receiver shall exercise all powers of administration, control,

9     management, operation, and financing of the jail.

10         Further, the receiver shall determine the jail's

11    budget, including staff, salary and benefits, medical and

12    mental health services, physical plant improvements, fire

13    safety, and other remedies.  It is also not entirely clear

14    under DOJ's proposed order whether the receiver is subject to

15    state procurement or other state laws.

16         Your Honor, the truth is that the County's budget is

17    finite, that's not an excuse.  It's reality.  A budget is a

18    zero sum game.  22 percent, undisputed testimony, of the

19    County's budget presently goes to detention services.  So if a

20    receiver is put into place and every dollar that the receiver

21    says to increase detention services by is a dollar less for

22    something else, and we should not lose sight of that.  If the

23    receiver wants a million dollar more for detention services,

24    that's a million dollars less for roads and bridges or

25    whatever else the County is also responsible for funding.

 1    That's not an excuse.  It's reality.

 2        The proposed order also creates a bureaucracy of

 3    overwatch.  I think Your Honor alluded to this in questioning

 4    Mr. Cheng.  It creates a receiver, it creates the office of

 5    the receiver, it creates staff and legal counsel for the

 6    receiver, and it leaves the four-person monitoring team

 7    intact.

 8        As I understood Ms. Simpson's testimony today, she is

 9    not disputing the totals attributed to the monitoring team on

10    exhibit D-41.  She's disputing the column that allocates

11    certain expenses entirely to her.  Regardless, it's undisputed

12    that the cost of the monitoring team on an annual basis is

13    approximately $275,000.

14        So adding the receiver, the office of the receiver,

15    staff and legal counsel to that, it's not unreasonable to

16    assume that the annual cost of receiver and monitoring will be

17    in the range of a million dollars.  Assuming a starting salary

18    of $31,000, that's -- $1 million at $31,000 per employee is 32

19    new detention officers.

20        THE COURT:  Let me ask you this:  I mean, I know

21    Benchmark Construction is there now, but part of what I had

22    been hearing at the status conferences was that at one time

23    the work that was to be done, the County had relied on persons

24    employed by the County, the maintenance became so deficient

25    because they were not getting the work done.  It was deficient

1    work.  It had to go back -- and Benchmark now has to come in.

2    And I'm not sure what Benchmark is charging the County.  But,

3    again, if the County had been doing what it was supposed to do

4    long ago, then you might not even need Benchmark today.

5         MR. SHELSON:  No, sir.  I'm so sorry, Your Honor.  With

6    respect to that --

7         THE COURT:  The other example then, the outfit that

8    came from Texas to redo the doors, if they had gotten with

9    that outfit years ago to do the doors, they could have done

10   the doors at a lesser cost possibly.  They went and got the

11   group from Texas to do -- to refit, retrofit, or to do the

12   doors, to fix the doors.  This is something that they know --

13   that they knew that needed to be fixed for quite some time.

14   And, again, I mean, you know, the mere fact that, you know,

15   we're saying that the monitors cost are somehow -- I

16   understand they're added cost to what the County has done, but

17   this whole thing got started before 2015 when DOJ initiated

18   its investigation.  And that investigation went on for a year

19   or more before DOJ filed suit, and then they filed suit and

20   that suit was assigned to Judge Barbour who's no longer here.

21        MR. SHELSON:  There's no question, Your Honor, that

22   mistakes have been made along the way, but they're not --

23   those 1994, 2012, and so on mistakes are -- I don't -- they're

24   not what the Court has found the County in contempt for.  And

25   so, Your Honor, could there have been a better facility built

1    in 1994?  Sure there could have been.  There wasn't.  I don't

2    have an explanation for that.  It's an albatross.  It was a

3    bad facility from the start and it still is.

4         The 2012 decision to pull officers and not do direct

5    supervision, I mean arguably they've never recovered from

6    that, but that was a bad decision in hindsight, but it's not

7    contempt of court.

8         THE COURT:  I'm only talking about 2012.  I wasn't

9    talking about 1994.  I realize the structure and the building

10   that it exists today is one that everybody has been pointing

11   to throughout this litigation saying but the jail is just an

12   albatross, it is something that has never operated properly,

13   but from 2015 -- at 2015 before the lawsuit was filed, DOJ

14   submitted to the County a findings letter.  That means their

15   investigation began before 2015 which resulted into the filing

16   of the lawsuit in 2016 which resulted in the first consent

17   decree.  And that's -- and then that's what I'm concerned

18   about, the consent decree, and then finally the stipulated

19   order.  And now the County seems to say that part of the

20   problem now is that we've had to pay monitors for the last --

21   since 2016 at whatever rate you pay them.

22        MR. SHELSON:  No, sir.  And if I misstated that point

23   on the monitors, that wasn't -- I misstated.  That's not my

24   intention.  What I'm trying to say about the monitors is that

25   the consent decree is written and as applied is not helping.

1          THE COURT:  Okay.

2          MR. SHELSON:  And, Your Honor, a more streamlined

3    process is what is needed here.  And, Your Honor --

4          THE COURT:  And what streamline process is it the

5    County recommends that the Court get out?  That the Court -- I

6    guess what the County says is that there should be no

7    oversight whatsoever, that the Court should terminate the

8    current agreement, period, and move on.

9          MR. SHELSON:  There's not a period, Your Honor.  I'm

10   going to get to that.  I have an hour to get to it.

11         But I would like, Your Honor, if I may address the

12   Court's point about physical plant and maintenance.  To begin

13   with, we think they are two different things.  So if Your

14   Honor is asking if the Court would have done this or that,

15   better maintenance, and so forth at the plant back in 2015 or

16   that time period, would we still be having the physical plant

17   issues that we have today, I think the answer is definitively

18   yes.

19         And I think that was exactly what Mr. Farr testified

20   to.  Your Honor asked him several questions about that, and as

21   I understood Mr. Farr's testimony is that regardless of

22   maintenance, that mechanical systems at some point reach the

23   end of their useful life.

24         Now, if you have better maintenance along the way,

25   Mr. Farr did agree with the Court that that can at the margins

1    expand the life span of mechanical systems, but regardless of

2    maintenance, at some point mechanical systems are at the end

3    of their life cycle and that's where we are now with the

4    Raymond Detention Center.  So to the extent better maintenance

5    earlier would have impacted those systems, possibly, but

6    marginally, and they would still be at the end of their life

7    cycle today regardless.

8          So under the proposed order, there's no time limit for

9    the relinquishment of the receiver's power.  There's a lot in

10   that proposed order about vesting power in the receiver but

11   very little about relinquishing it.

12         Most concerning to the County is that a receiver is not

13   accountable to the people.  As already noted, Hinds County's

14   authority has suspended complete control, is vested in

15   receiver, the receiver is not accountable to the voters.  All

16   of that in the context of that, no one knows at this point how

17   much all of that would cost and no one knows the duration.

18         We submit, Your Honor, that this approach raises

19   serious separation of power issues and issues as well as

20   federalism problems that are so grave that no such order

21   appointing a receiver can be sustained.

22         We also note, Your Honor, that just last November,

23   Sheriff Jones received 60 percent of the vote.  A receiver

24   would never be held to such a process.

25         Turning back, Your Honor, to this morning's article in

the Clarion Ledger, further noted, according to Professor
Stroud, that a successful receivership will have a robust,
detailed, specific, measurable, time-bound blueprint for
bettering the institution.  The proposed order D-158 has none
of those things.  So Your Honor is correct that the County has
asked for termination and it is, in fact, the County's lead
request for relief that the consent decree and the stipulated
order be terminated.

But, Your Honor, sometimes less is more, and this is
one of those times.  So even if the Court does not outright
terminate the consent decree and stipulated order, the focus
going forward, as I alluded to, should be on staffing and
stabilizing the RDC facility until a new jail is built.

I don't think the monitors actually disagree with that
emphasis.  This is from the Fifteenth Monitoring Report,
page 38, "The inability of the Hinds County Sheriff's Office
to hire and retain enough detention staff to operate its jail
facilities in compliance with the settlement agreement has
been the primary shortcoming during the past five years of
monitoring."  Discussed that with Ms. Simpson, I alluded to it
as lack of staffing having a ripple effect through the other
provisions of the consent decree.  And the monitors in the
Fifteenth Monitoring Report referenced the inability to hire
sufficient staff.

Your Honor, it's not that efforts haven't been made.

1    Efforts have been made and they've not been successful.  Those

2    are two very different things.  I'm not going to belabor them

3    because we've talked about them extensively in this trial.

4         Your Honor -- and when I talk about reformation, and I

5    said I would get to this, this is an approach.  One, the work

6    center, JDC, Henley-Young, and CJCC should not be subject to a

7    consent decree going forward.  The emphasis should be on

8    staffing, the benchmark should be the $31,000 starting salary,

9    direct deposit in accordance with state law, bimonthly pay,

10   the sheriff's step plan which is D-160 and which Mr. Parrish

11   talked about favorably this morning.  All of this can be

12   reviewed after six months or some like time frame.

13        The point, Your Honor, is the way the staffing

14   provisions in the consent decree are structured is absolutely

15   the wrong way to approach the issue.  Creating an absolute

16   number -- I forget exactly what it is -- 359 or whatever the

17   number is, is the wrong approach because it's a strict

18   liability kind of thing.  Either you hit that number or you

19   don't.  A better approach is to enumerate what the County must

20   do to try to achieve that.  And if those things are

21   implemented and you're not hitting that number, that then it

22   can be one of two things.  Well, let me correct that.  What we

23   do know it's not because the County is not trying to comply.

24   And if -- if despite reasonable efforts the County is not

25   hitting the staffing numbers, it could be that there are labor

1    market conditions that are simply outside of its control.

2          And, Your Honor, you can always talk about increasing

3    starting salaries, but just as an example a starting salary of

4    $40,000 times 350 employees is $14 million.  And I mention

5    that just for context because the general fund revenue is

6    80 million.  So at some point you just exhaust the money

7    supply available to the County.

8          The third thing is physical plant improvements at RDC

9    through June 2026.

10          The fourth thing, to purchase GoPro cameras and

11    stainless steel, detention-grade tables and chairs for RDC

12    housing units.

13          The fifth thing is to reduce the use of A-Pod.  That's

14    a process, too, Your Honor.  There's about 160 people --

15    160 detainees there.  That cannot happen overnight.  You can

16    start implementing no new detainees to A-Pod and you can close

17    the unit in phases.  As you do so, you would free up detention

18    staff for B and C-Pods.

19          The last thing, Your Honor, is to the extent that there

20    was a view that other provisions of the consent decree are

21    necessary, that could be monitored only and not subject to

22    contempt but subject to a motion for specific, that is

23    non-global relief by the United States for eminent life safety

24    issues.  But subject to any question Your Honor may have, that

25    concludes my closing argument.

```
 1          THE COURT:  Does -- I know the County in good faith
 2   submitted Frank Shaw as a potential receiver.  Does the County
 3   believe that Frank Shaw could be a great receiver if the Court
 4   were to go that route?
 5          MR. SHELSON:  If the Court goes that route, Your Honor,
 6   then yes, the County has every confidence that Mr. Shaw would
 7   do a good job.
 8          THE COURT:  Thank you, Mr. Shelson.
 9          MR. SHELSON:  Thank you, Your Honor.
10          THE COURT:  We're going to take a ten-minute break.
11          Mr. Hall, do you think you'll be an hour and
12   20 minutes?  I know I said that.
13          MR. HALL:  I'll waive, Your Honor, and join in
14   Mr. Shelson's closing arguments.
15          THE COURT:  Well, we'll take a ten-minute break and
16   come back with the Government's ten minutes.
17          Thank you.  We'll be in recess.
18               (A brief recess was taken.)
19          THE COURT:  You can keep your seats.  All right.
20          Mr. Cheng, you may proceed.
21          MR. CHENG:  Thank you.  Your Honor, before I sort of go
22   down point by point some of the biggest issues raised by the
23   defendants, I'm going to skip to the back and take a brief
24   look at the counterproposal, I guess we can call it.
25          The consent decree is a plan.  It's a very good plan
```

1    that outlined a way for the defendants to fix the jail the

2    right way.  What the defendants are offering is ultimately

3    sort of the second-best, third-best version.  It is on its

4    face not going to get them into compliance.  And I think the

5    fact they even propose it shows, first, their concern about

6    what the facts actually show, which is the consent decree

7    remains necessary.  And, second, it demonstrates something

8    about the defendants' own attitude.  Their desire to do

9    everything as minimally and inadequately as possible, which is

10   why they ended up in this mess in the first place.

11        This will illustrate two flaws with the plan.  The

12   first is they want to limit the Court's ability to issue

13   contempt, except when subject to a specific motion for

14   specific relief for imminent life safety issues.  That is not

15   actually the law, Your Honor.  We do not have to wait for an

16   imminent life safety problem in order to take action under the

17   federal constitution.  If there is a serious deficiency, it

18   poses a serious risk to the safety of the inmates, you can act

19   before the threat becomes imminent.  That is very important,

20   Your Honor.

21        Most disasters do not occur because of something

22   immediately obvious.  It's because there are a series of

23   deficiencies in the system that when disaster strikes,

24   multiple systems failed.

25        The Titanic does not sink just because it hit an

1    iceberg.  It became tragic because of other failures:  Not

2    enough lifeboats, it was going too fast through the ocean,

3    there were not enough people on watch, the steel was the wrong

4    type.  That is what this consent decree is about.  It's about

5    making sure we have all the right pieces to get the jail

6    fixed.

7         The other problem with this proposal, Your Honor, if

8    you just look at is that they make promises that they've

9    already failed to meet.  They want to talk about reducing the

10   use of A-Pod.  Focus on that.  If you have enough staffing and

11   supervision, we can reduce the use of A-Pod.  The stipulated

12   order already said you cannot use A-Pod at all until you've

13   made certain renovations, and it's very clear in the consent

14   decree A-Pod is completely inappropriate for housing inmates.

15   Again, these are half-measures being offered against a

16   perfectly good consent decree.

17        Let me turn next to the PLRA arguments and clump them a

18   bit together.  The thing that's important to remember is that

19   the testimony from most of the witnesses was that the

20   provisions of the decree are necessary and required to address

21   constitutional violations.  None of the witnesses said that

22   any of the provisions are necessary or superfluous.  That's a

23   legal argument; that's what lawyers say.  But whether you're

24   talking about Mr. Chamblee, Mr. Farr, Mr. Parrish, they all

25   pointed to why the basic provisions are necessary.

1          The other thing to keep in mind under the PLRA is when

2     you really look at the consent decree, consider just how many

3     things were left to the defendants.  In many ways, they're the

4     ones allowed to create the plans, they're the ones to hire the

5     jail administrator, they're the ones consulted on the policies

6     and procedures.  And even the CJCC, they're the ones allowed

7     to establish it, but once they get it running, they have

8     tremendous discretion in what they need to do to address the

9     problems.  The key is they need to actually act in good faith

10    and address these type of problems.

11          THE COURT:  But you would agree that they have no --

12    they can't force a DA to do anything who is a state officer,

13    they can't force a circuit judge to do anything who is a state

14    judge?  They're all the stakeholders; they can't force the

15    city of Jackson to even participate in it or any of the other

16    cities who may be part of it.  There are other municipalities

17    throughout the -- the only stakeholders from the County's

18    perspective is the detention facility and the sheriff, and

19    that's probably all on the County's side of things; right?

20          MR. CHENG:  Yes, Your Honor.  But note that the

21    contempt isn't being sought for not forcing the DA to do

22    anything or not forcing the state to do anything.  It's being

23    brought because they never staffed the CJCC.  They weren't

24    really holding meetings at the CJCC.  The key defendants

25    weren't really participating in the CJCC, and under the

1    stipulated order, certain requirements for the pretrial

2    program, they didn't even get that started.  So in many ways,

3    Your Honor, again, this is stuff within the jurisdiction of

4    the defendants.  They have the power to change their future,

5    and they chose not to.  So it's perfectly fair to hold them

6    accountable.

7         The other thing I would mention is, you know, we can

8    keep going back and forth about what's specifically required.

9    I think the United States has made a pretty good case for

10   basically most of the provisions being required and being

11   compliant with the PLRA.

12        But there's a broader philosophical issue here.  Are we

13   a nation of laws or not?  Just because they have the right to

14   file the PLRA does not necessarily mean that they have a basis

15   for throwing things out, and it doesn't necessarily mean they

16   shouldn't be held accountable when they do it in a frivolous

17   way.

18        Mr. Shelson argued that it doesn't matter what they

19   signed.  So what about their counterproposal; they signed

20   that.  Is that meaningless, too?

21        I think that may overstate what the PLRA actually says.

22   The PLRA let's them get out of consent decrees that are

23   onerous that are not necessary, but you can still consider the

24   fact that they entered into an agreement when trying to

25   determine what is appropriate relief.  You can consider the

 1   history of the case when trying to give context to the

 2   remedies that are being addressed.

 3          You know, Mr. Shelson brought up the fact that

 4   Mr. Parrish referred to this process as a paper case in a

 5   different case.  But Mr. Parrish in this case said you need

 6   the consent decree, and it's time to seek a receiver.

 7          We, in a court system, have to consider both the facts

 8   of the case in front of us as well as the broader legal

 9   principals, and neither of those work in defendants' favor.

10   The facts clearly show that this is still a dangerous facility

11   in all the key categories, and legally they haven't really

12   made their arguments for why they should be excused from the

13   relief.

14          Now, there are a bunch of arguments about why the

15   consent decree, it's too onerous.  I addressed some of that in

16   my closing statement.  You know, if we're going to bring up

17   outside documents like Starbucks' salaries, why is it that a

18   corporate firm like Phelps Dunbar, on any given day, they work

19   on labor agreements, employment agreements, stock agreements.

20   Corporate agreements like that are filled with language that

21   is in many ways far less clear and predictable than you find

22   in the consent decree.

23          Our entire criminal justice system is built on the idea

24   that you can only convict someone if they were guilty beyond a

25   reasonable doubt.  This consent decree has multiple provisions

1    that gives clear guidance on how to determine whether to

2    terminate:  Paragraph 119, paragraph 120, paragraph 164,

3    paragraph 165.

4         Mr. Shelson made all types of claims about how the

5    agreement is vague, and it doesn't give them any guidance.

6    There are clear deadlines.  There are standards.  There are

7    standards that have been applied for the 15 monitoring

8    reports, which nobody really questioned.  There is nothing

9    vague about this process, nothing unfair about the consent

10   decree.

11        THE COURT:  What, if any, weight should I give to the

12   fact that the Court, starting with Judge Gargiulo, has been

13   having these status conferences on the heel of the release of

14   every monitoring report?

15        And I can only speak for this Court, but the way the

16   process has worked is -- and the consent decree speaks to it,

17   is that prior to the consent decree -- excuse me, the

18   monitoring report becoming final, the parties are given an

19   opportunity to weigh in.  And then at the status conferences,

20   at least for the ones that I've presided over which has been

21   the ones since 2019, I believe, the parties are given an

22   opportunity to discuss the progress that they've made or even

23   the things that continue to need fixing.  And there appear to

24   be no complaints at all with respect -- maybe complaints, but

25   nothing about the decree that the terms just absolutely cannot

1    be met, because we don't understand what they mean.  I mean,

2    how should the Court weigh what has happened in the status

3    conferences?

4         MR. CHENG:  It should weigh it against the defendants,

5    Your Honor.  Clearly, you know, they have had an opportunity

6    to opine.

7         Now, I hesitated a little bit because sometimes when

8    people are trying to be cooperative, they will not necessarily

9    make a big fuss in court, and we don't want to create a

10   situation where you have to object solely for the sake of

11   objecting.  But in this case, again, the facts indicate the

12   reason the defendants didn't object isn't just because they

13   were trying to play nice with the Justice Department, it's

14   everybody agreed that this situation was really bad, and this

15   was the right path forward.  And that hasn't changed, Your

16   Honor, that just hasn't changed, not really.  And that's why

17   we need to proceed with the consent decree.

18        As for the receiver, Your Honor, you know, Mr. Shelson

19   pointed to the reasons why a receiver may be drastic.  But,

20   again, pointing to what Mr. Parrish had said, it's necessary.

21   And as long as we meet the legal requirements for a receiver,

22   it can be justified under PLRA.  It's needed because the

23   problems and fixes have been known for years, they keep

24   wasting resources, they don't have the leadership they need in

25   order to get things fixed.  It's something that needs to be

1    addressed.

2         Now, Mr. Shelson made a number of claims about how

3    unfair receivers are and how vague and open-ended.  I would

4    just say the idea that the United States has not tried to work

5    with defendants, I would contest that.  You know, the consent

6    decree is the United States trying to work with the

7    defendants.  The stipulated order is the United States trying

8    to work with the defendants.

9         Although we didn't bring it up, even the compliance

10   director agreement is an indication of the ways the United

11   States has tried to work with defendants.  And I do think

12   there's a certain degree of misrepresentation about what's

13   been offered here, just like they said that the consent decree

14   doesn't have termination dates and no standards for

15   termination.  You know, we have said in our closing that there

16   are ways to set up a receivership to have the proper

17   safeguards.  It isn't an indefinite, all-powerful receiver.

18   It's a process that's governed by federal law.  It's overseen

19   by this Court and is subject -- my apologies, Your Honor.  I

20   seem to have a loose strap on my mask.

21        THE COURT:  It's fine.  We've issued a new order today.

22   You can actually remove your mask, actually, but go ahead.

23        MR. CHENG:  We don't have to wear masks anymore maybe.

24        So these are all things that can be built into these

25   types of orders.

1          The idea that they have unlimited budget, again, Your

2     Honor, as we represented, nobody is asking for, you know,

3     super powers for this receiver.  We are asking for the powers

4     necessary to remedy a constitutional violation.

5          There was a little bit of a discussion about whether or

6     not the defendants have been held to fair standards when

7     judging them on their ability to comply with the decree.  At

8     some point, Your Honor, the facts just sort of speak for

9     themselves.  When your staff are so afraid of working in the

10    facility, they walk out.  When your jail administrators

11    confirm everything the monitor says, how many more benchmarks

12    or how many more standards do you need?

13         And at some pint, the best standard is exactly what

14    they've agreed to.  If they said we will staff every housing

15    unit, why don't they staff every housing unit?  If they said

16    we are going to adopt various remedies, even if you're not

17    successful with implementing it, why can't do so?  If you

18    promise to stop using the booking unit as a housing unit, why

19    are you still using it?

20         Now, we could go on and on about how many ways we could

21    measure it.  We could probably create an agreement that's

22    500 pages long with multiple ways of assessing things.  This

23    is a basic agreement to protect people's rights.  The fact

24    that it's written as it is, is actually fairly streamlined and

25    efficient and appropriate in this case.

1          THE COURT:  I'll give you two minutes.

2          MR. CHENG:  Okay.  Your Honor, finally, I would just

3     mention, and they talked about the history of Hinds County,

4     201 years, and how compared to Starbucks, they don't have as

5     much revenue as Starbucks.  The irony is when it comes to

6     people's constitutional rights, especially in institutions,

7     there is a long history in this country.  And the reason we

8     have a statute like CRIPA is we recognize that how we treat

9     people in these institutions is a reflection on our greater

10    society.  The rights we are willing to vigorously enforce

11    effect not only the people in the institutions, but the entire

12    base level of rights in this country.

13          While everyone wants to look for ways we can minimize

14    this or do less or more, the reality is if you keep aiming for

15    the bottom rung of standards for this facility, you're also

16    saying something about what you believe about the rights of

17    everyone in Hinds County, in Mississippi, and in the United

18    States.

19          Most of these people have never been convicted of a

20    crime.  Many of them will be released into society.  How they

21    are treated will have an impact on their community's safety.

22    The legal standard for enforcing constitutional rights if it

23    becomes too low, if it becomes minimized, if it becomes so

24    technical that it becomes meaningless, that, too, will have an

25    impact on society.  But none of that stuff is going to be

1    explicitly addressed in our findings, in our legal briefs, but

2    that's what's really going on here, Your Honor.

3         So The United States asks that the Court uphold the

4    consent decree and enforce it in the spirit it's intended.  It

5    is more than a piece of paper, Your Honor.  Thank you.

6         THE COURT:  All right.  Thank you.

7         I commend counsel for the trial in this matter.  The

8    Court is going to take all that it has heard, seen, and all

9    that is part of the record under consideration and will rule

10   in due course.  But until I rule, the case is in the hands of

11   the parties until I rule.  I realize I have -- I realize I do

12   have to rule quickly because the law requires me that I rule

13   quickly, but I expect to.

14        Mr. Shelson, you had something?

15        MR. SHELSON:  Just briefly, Your Honor.  During the

16   break I had a chance to confer with co-counsel and the County.

17   Your Honor asked me whether the County would be willing to

18   draft what it thought was a suitable consent decree.  After

19   conferring with my colleagues, the answer to that question is

20   yes.  I don't know how that affects anything.  Your Honor just

21   addressed, and I wanted to answer your question directly.

22        THE COURT:  Okay.  Thank you.

23        As I said, the case is in the parties' hands so I

24   suggest draft away.  But in the meantime, I am going to be

25   working because I have evident deadlines based on what the law

 1   requires me to, so -- and I don't -- and I expect to meet my

 2   legal obligations.

 3         Mr. Cheng?

 4         MR. CHENG:  Your Honor, do you expect any posttrial

 5   briefings from the parties, and do you want to address sort of

 6   the provisions line by line?

 7         THE COURT:  If I do, I'll ask for them through some

 8   sort of text order or something.

 9         But, again, thank you for your work on this.  The case

10   is now closed for purposes of the evidence.  The Court is

11   adjourned.  Spend the rest of your money here in Jackson.

12   ****************************************************************

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded by

9    me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13         THIS, the 2nd day of March, 2022.

14

15                         /s/ Candice S. Crane, RPR, CCR

16                         Candice S. Crane, RPR, CCR #1781
                           Official Court Reporter
17                         United States District Court
                           Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25

                        ***DAILY TRANSCRIPT***